**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | MDL No. 2323 No. 12-md-2323-AB |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION Case No. 11-CV-05209-AB |
| CHARLES RAY EASTERLING and his wife, MARY ANN EASTERLING, et al., | |
| Plaintiffs, | |
| v. | |
| NATIONAL FOOTBALL LEAGUE, INC., | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE NATIONAL FOOTBALL LEAGUE'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES RAY EASTERLING and his wife, MARY ANN EASTERLING, et al., | CIVIL ACTION<br>Case No. 11-CV-05209-AB |
| Plaintiffs, | |
| v. | |
| NATIONAL FOOTBALL LEAGUE, INC., | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE NATIONAL FOOTBALL LEAGUE'S
## MOTION TO DISMISS THE AMENDED COMPLAINT

**Table of Contents**

                                                                        **Page**

Table of Authorities ......................................................................................... ii

Preliminary Statement ...................................................................................... 1

Statement of Facts ............................................................................................. 5

Argument ......................................................................................................... 15

I.      PLAINTIFFS' CLAIMS ARE PREEMPTED BY SECTION 301 OF THE
        LMRA .................................................................................................... 15

        A.      Plaintiffs' Claims Are Substantially Dependent on an
                Interpretation of the Terms of the CBAs ..................................... 17

                1.      Plaintiffs' Claims Require Interpretation of the CBAs ................. 18

                2.      The Case Law Compels Preemption of Plaintiffs' Claims ........... 24

        B.      Plaintiffs' Claims Arise Under the CBA ...................................... 27

II.     PLAINTIFFS FAIL TO STATE CLAIMS UPON WHICH RELIEF CAN
        BE GRANTED ....................................................................................... 31

        A.      Plaintiffs Fail to State a Claim for Concealment ....................... 31

        B.      Plaintiffs Fail to State a Claim for Civil Conspiracy ................. 35

        C.      Plaintiffs Fail to State a Claim for Medical Monitoring ............ 37

Conclusion ...................................................................................................... 41

## Table of Authorities

**Page(s)**

CASES

*Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co., Inc.*,
   404 F.3d 566 (2d Cir. 2005) ...................................................................32

*Allegheny General Hosp.* v. *Philip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000) ...................................................................33

*Allis-Chalmers Corp.* v. *Lueck*,
   471 U.S. 202 (1985)....................................................15, 16, 18, 23, 27, 29, 30

*Althaus ex rel. Althaus* v. *Cohen*,
   756 A.2d 1166 (Pa. 2000) .......................................................................17

*Altman* v. *Fortune Brands, Inc.*,
   268 A.D.2d 231 (N.Y. App. Div. 2000) .....................................................37

*Angst* v. *Mack Trucks, Inc.*,
   969 F.2d 1530 (3d Cir. 1992) ..............................................................16, 30

*Antol* v. *Esposto*,
   100 F.3d 1111 (3d Cir. 1997) ...................................................................15

*Ashcroft* v. *Iqbal*,
   129 S.Ct. 1937 (2009)..............................................................................33

*Askey* v. *Occidental Chemical Corp.*,
   102 A.D.2d 130 (N.Y. App. Div. 1984) .....................................................38

*Atwater* v. *National Football League*,
   626 F.3d 1170 (11th Cir. 2010) ...........................................................23, 26

*Aubrey* v. *Sanders*,
   No. 07-CV-0137, 2008 WL 4443826 (W.D. Pa. Sept. 26, 2008)..........................18

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
   No. 10-CV-2401, 2011 WL 4006639 (E.D. Pa. Sept. 7, 2011).......................39, 40

*Barnes* v. *Am. Tobacco Co.*,
   161 F.3d 127 (3d Cir. 1998) ................................................................17, 39

*Beidleman* v. *Stroh Brewery Co.*,
   182 F.3d 225 (3d Cir. 1999) ................................................................15, 18

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007)..................................................................................40

*Boone* v. *City of Philadelphia*,
668 F. Supp. 2d 693 (E.D. Pa. 2009) ......................................................40

*Bower* v. *Westinghouse Elec. Corp.*,
522 S.E.2d 424 (W. Va. 1999)..................................................................38

*Brown* v. *National Football League*,
219 F. Supp. 2d 372 (S.D.N.Y. 2002) ..................................5, 7, 17, 29

*Buck* v. *Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006) ......................................................................5

*Burns* v. *Jaquays Min. Corp.*,
752 P.2d 28 (Ariz. Ct. App. 1987)............................................................39

*Capital Funding, VI, LP* v. *Chase Manhattan Bank USA, N.A.*,
No. 01-CV-6093, 2003 WL 21672202 (E.D. Pa. Mar. 21, 2003) ...........34

*Caronia* v. *Philip Morris USA, Inc.*,
No. 06-CV-224, 2011 WL 338425 (E.D.N.Y. Jan. 13, 2011)...........17, 38, 39, 40

*Christidis* v. *First Pa. Mortg. Trust*,
717 F.2d 96 (3d Cir. 1983) ........................................................................32

*Clarett* v. *National Football League*,
369 F.3d 124 (2d Cir. 2004) ......................................................................7

*Clarke* v. *City of New York*,
82 A.D.3d 1143 (N.Y. App. Div 2011) ....................................................30

*Destefano & Assoc., Inc.* v. *Cohen*,
No. 2775 June Term 2000, 2002 WL 1472340 (Pa. Com. Pl. Ct. May 23,
2002) .........................................................................................................35

*Donini Int'l, S.p.A.* v. *Satec (U.S.A.) LLC*,
No. 03-CV-9471, 2004 WL 1574645 (S.D.N.Y. July 13, 2004)...........36

*Fagan* v. *AmerisourceBergen Corp.*,
356 F. Supp. 2d 198 (E.D.N.Y. 2004) ......................................................33

*Fanty* v. *Com. of Pa., Dept of Public Welfare*,
551 F.2d 2 (3d Cir. 1977) ..........................................................................41

*Fisher* v. *APP Pharms., LLC*,
783 F. Supp. 2d 424 (S.D.N.Y. 2011) ................................................................. 33

*Fox* v. *Marshall*,
88 A.D.3d 131 (N.Y. App. Div. 2011) ................................................................ 17

*Franchise Tax Bd.* v. *Constr. Laborers Vacation Trust*,
463 U.S. 1 (1983) ................................................................................................ 16

*Gaines* v. *Krawczyk*,
354 F. Supp. 2d 573 (W.D. Pa. 2004) ................................................................ 32

*Gerardi* v. *Nuclear Util. Servs., Inc.*,
566 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991) .......................................................... 38

*Givens* v. *Tennessee Football, Inc.*,
684 F. Supp. 2d 985 (M.D. Tenn. 2010) ........................... 3, 17, 22, 24, 25, 26, 30

*Grose* v. *Procter & Gamble Paper Prods.*,
866 A.2d 437 (Pa. Super. Ct. 2005) ............................................................. 35, 36

*Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*,
No. 04-CV-3318, 2005 WL 736217 (S.D.N.Y. Mar. 30, 2005) ........................... 34

*Hayes* v. *National Football League*,
469 F. Supp. 252 (C.D. Cal. 1979) .................................................................... 30

*Henderson* v. *Merck & Co., Inc.*,
998 F. Supp. 532 (E.D. Pa. 1998) ..................................................................... 16

*Holmes* v. *National Football League*,
939 F. Supp. 517 (N.D. Tex. 1996) ..................................................................... 5

*Houraney* v. *Burton & Assoc., P.C.*,
701 F. Supp. 2d 258 (E.D.N.Y. 2010) ............................................................... 32

*Hughes* v. *BCI Int'l Holdings, Inc.*,
452 F. Supp. 2d 290 (S.D.N.Y. 2006) ............................................................... 17

*Hurst* v. *Consol. Freightways Corp.*,
No. 88-CV-0744, 1990 WL 43934 (M.D. Pa. Apr. 5, 1990) ............................... 30

*Int'l Bhd. of Elec. Workers, AFL-CIO* v. *Hechler*,
481 U.S. 851 (1987) ............................................................................................ 18

*Jeffers* v. *D'Allessandro*,
681 S.E.2d 405 (N.C. Ct. App. 2009) ................................................... 3, 17, 24, 26

iv

*Jones* v. *Utils. Painting Corp.*,
   198 A.D.2d 268 (N.Y. App. Div. 1993) ...................................................................39

*Kline* v. *EDS Relocation & Assignment Servs.*,
   No. 08-CV-0980, 2008 WL 4822026 (M.D. Pa. Nov. 4, 2008) ..............................33

*Kottler* v. *Deutsche Bank AG*,
   607 F. Supp. 2d 447 (S.D.N.Y. 2009) ...................................................................35

*Lefkowitz* v. *Bank of New York*,
   676 F. Supp. 2d 229 (S.D.N.Y. 2009) ...................................................................33

*Luden's Inc.* v. *Local Union No. 6*,
   28 F.3d 347 (3d Cir. 1994) ...................................................................................31

*Majer* v. *Sonex Research, Inc.*,
   541 F. Supp. 2d 693 (E.D. Pa. 2008) ....................................................................17

*Manti's Transp., Inc.* v. *C.T. Lines, Inc.*,
   68 A.D.3d 937 (N.Y. App. Div. 2009) ...................................................................18

*McCracken* v. *Ford Motor Co.*,
   588 F. Supp. 2d 635 (E.D. Pa. 2008) ...............................................................33, 34

*McDonough* v. *Toys 'R' Us, Inc.*,
   638 F. Supp. 2d 461 (E.D. Pa. 2009) ....................................................................41

*McKeeman* v. *Corestates Bank, N.A.*,
   751 A.2d 655 (Pa. Super. Ct. 2000) ......................................................................37

*Medtech Prods. Inc.* v. *Ranir, LLC*,
   596 F. Supp. 2d 778 (S.D.N.Y. 2008) ...................................................................35

*Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*,
   261 F.R.D. 13 (S.D.N.Y. 2009) ............................................................................23

*Nolde Bros.* v. *Local No. 358*,
   430 U.S. 243 (1977) .............................................................................................30

*Operative Plasterers' & Cement Masons' Int'l Ass'n* v. *Metro. N.Y. Dry Wall*
*Contractors Ass'n, Inc.*,
   543 F. Supp. 301 (D.C.N.Y. 1982) ..................................................................36, 37

*Remson* v. *Verizon Commc'ns, Inc.*,
   No. 07-CV-5296, 2009 WL 723872 (E.D.N.Y. Mar. 13, 2009)..............................38

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002) ...................................................................32

*Rosenberg* v. *Avis Rent A Car Sys., Inc.*,
    No. 07-CV-1110, 2007 WL 2213642 (E.D. Pa. July 31, 2007) .............33

*Santiago* v. *Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010) ............................................................34, 36

*Sedona Corp.* v. *Ladenburg Thalmann & Co.*,
    No. 03-CV-3120, 2011 WL 4348138 (S.D.N.Y. Sept. 15, 2011) ..........32

*Sherwin* v. *Indianapolis Colts, Inc.*,
    752 F. Supp. 1172 (N.D.N.Y. 1990).................3, 17, 22, 24, 26, 29, 30

*Sosna* v. *Iowa*,
    419 U.S. 393 (1975)...............................................................................40

*St. John* v. *Int'l Ass'n of Machinists and Aerospace Workers*,
    139 F.3d 1214 (8th Cir. 1998) ..............................................................30

*Stringer* v. *National Football League*,
    474 F. Supp. 2d 894 (S.D. Ohio 2007) ..........................................*passim*

*Summers* v. *Earth Island Inst.*,
    555 U.S. 488 (2009)...............................................................................40

*Taylor* v. *Mooney Aircraft Corp.*,
    265 Fed. Appx. 87 (3d Cir. 2008)..........................................................31

*Thompson* v. *Ross*,
    No. 10-CV-479, 2010 WL 3896533 (W.D. Pa. Sept. 30, 2010).....35, 36

*Tran* v. *Metro. Life Ins. Co.*,
    408 F.3d 130 (3d Cir. 2005) ..................................................................23

*Tuosto* v. *Philip Morris USA, Inc.*,
    672 F. Supp. 2d 350 (S.D.N.Y. 2009) ...................................................34

*United Steelworkers of Am.* v. *Rawson*,
    495 U.S. 362 (1990).........................................................................15, 28

*Walter* v. *Magee-Women's Hospital of UPMC Health System*,
    876 A.2d 400 (Pa. Super. Ct. 2005), *aff'd*, 906 A.2d 1194 (2006)........39

*Wegman* v. *Dairylea Co-op., Inc.*,
    50 A.D.2d 108 (N.Y. App. Div. 1975) ..................................................36

*Williams* v. *National Football League,*
    582 F.3d 863 (8th Cir. 2009) ........................................................................22, 26

*Woods* v. *Maytag Co.,*
    No. 10-CV-0559, 2010 WL 4314313 (E.D.N.Y. Nov. 2, 2010) ...........................34

*Zafarana* v. *Pfizer Inc.,*
    724 F. Supp. 2d 545 (E.D. Pa. 2010) ............................................................36, 37

## STATUTES AND RULES

29 U.S.C. § 185(a) ...........................................................................................15

Fed. R. Civ. P. 9(b)......................................................................................31, 32

Fed. R. Civ. P. 12(b)(1) ...............................................................................1, 40

Fed. R. Civ. P. 12(b)(6) .................................................................................1, 5

Fed. R. Civ. P. 23(a) ........................................................................................40

Fed. R. Civ. P. 23(c)(5).....................................................................................40

## OTHER AUTHORITIES

D. Scott Aberson, *Note, A Fifty-State Survey of Medical Monitoring and the
    Approach the Minnesota Supreme Court Should Take When Confronted With
    The Issue,* 32 WM. MITCHELL. L. REV. 1096 (2006) ...........................................37

16 AM. JUR. 2D *Conspiracy* § 64 (2011)..............................................................37

37 AM. JUR. 2D *Fraud and Deceit* § 202 (2011) ..................................................34

15A C.J.S. *Conspiracy* § 9 (2011)......................................................................35

15A C.J.S. *Conspiracy* § 15 (2011)....................................................................36

37 C.J.S. *Fraud* § 29 (2011) .............................................................................32

Defendant National Football League (the "NFL"), by its attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP and Duane Morris LLP, respectfully submits this memorandum of law in support of its motion to dismiss the amended complaint ("Amended Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### Preliminary Statement

This action—contending that the NFL breached its duty to regulate the sport of professional football to minimize the risk of concussions to NFL players—is fundamentally a labor dispute that depends upon an interpretation of the terms of collective bargaining agreements and thus is completely preempted under section 301 of the Labor Management Relations Act (the "LMRA").

Plaintiffs are seven former players who played in the NFL during various periods from 1970-2010.  Each plaintiff played NFL football pursuant to the terms of a collective bargaining agreement and the accompanying NFL Constitution and Bylaws (together, the "CBAs").   Although the CBAs evolved over time, each is a labor agreement that painstakingly details and comprehensively governs the relationship between the NFL, its Member Clubs, and its players.  Among numerous other provisions, the CBAs (i) address the promulgation and review of rules and regulations, including those relating to player safety; (ii) delegate to the NFL's Member Clubs and their medical staff the responsibility for treating player injuries, including making "return-to-play" decisions; (iii) establish a joint committee whose sole function is to address issues, and make recommendations, concerning player safety and welfare; (iv) provide for a player's right to compensation and other benefits in the event of injury; and (v) set forth the

dispute resolution procedures to be followed in the event of a dispute involving any provision of the CBAs.

The CBAs—like all collective bargaining agreements affecting interstate commerce—are governed by section 301 of the LMRA. Section 301 is intended to ensure that labor disputes are resolved under a uniform body of federal labor law and adjudicated in accordance with the grievance procedures set forth in collective bargaining agreements. Thus, section 301 completely preempts state law claims—including tort claims—that are substantially dependent upon or inextricably intertwined with the terms of, or arise under, a collective bargaining agreement.

That is the case here. Plaintiffs' grievance—dressed up as tort claims for negligence, "concealment," civil conspiracy, medical monitoring, and loss of consortium—hinges on allegations that the NFL had a duty to "regulate" and "monitor" the sport of professional football and to provide "reasonable and appropriate rules" to reduce the risk of concussions to players, yet purportedly failed to warn players of the risks of repeated concussions, did not "promulgate rules and regulations" to address adequately the risks of concussions and return to play, and concealed certain facts relating to concussions. At bottom, plaintiffs accuse the NFL of failing to act "reasonably."

Adjudication of plaintiffs' claims substantially depends on an interpretation of the many CBA provisions addressing player health and safety. For example, the Court will be required to ascertain what duties, if any, the NFL owed to plaintiffs and the scope of those duties, in order to evaluate whether the NFL acted "reasonably." Because the CBAs allocate responsibility for treating player injuries

generally—and making "return-to-play" decisions specifically—to Member Clubs and their physicians, a court cannot make such an assessment in a vacuum; it must first consider the scope of pre-existing duties delegated to the Clubs and their physicians under the CBAs.  Indeed, numerous courts have so held in determining that near-identical claims against the NFL and its Clubs by former NFL players seeking to impute to others duties expressly prescribed in the CBAs are preempted under section 301.  *See, e.g.*, *Givens* v. *Tennessee Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010); *Stringer* v. *National Football League*, 474 F. Supp. 2d 894, 909-11 (S.D. Ohio 2007); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1177-79 (N.D.N.Y. 1990); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412 (N.C. Ct. App. 2009).  The result here should be no different.

Plaintiffs' claims are also preempted because they rest on purported obligations that arise under the CBAs.  The crux of the Amended Complaint is that the NFL failed to implement adequate rules and regulations regarding player health and safety, and failed adequately to enforce those safety-related rules that it did promulgate.  The CBAs, however, expressly delineate the obligations of the NFL with respect to both the promulgation and enforcement of health and safety-related rules for NFL players.

But even if all of plaintiffs' claims were not preempted, plaintiffs' claims for "concealment," civil conspiracy, and medical monitoring cannot survive because they are deficiently pleaded.

First, plaintiffs fail to allege, let alone with the requisite specificity, the essential elements of concealment, whether fraudulent or negligent.  (Indeed, plaintiffs fail even to allege adequately which claim they purport to plead.)  Plaintiffs' sole

allegation concerning the supposed concealment is the assertion that the NFL concealed the "connection" between "concussions" and "brain injury" and contains no detail as to what specifically was concealed, by whom it was concealed, when it was concealed, or how the concealment caused plaintiffs' purported injuries. And as for the many other required elements of the claim—materiality, intent, and justifiable reliance—plaintiffs simply do not even try to allege them.

Second, plaintiffs' claim for civil conspiracy lacks the central element of the claim: that two or more people agreed to commit an unlawful act. In support of their conclusory claim—of a purported conspiracy occurring at some unspecified time during four decades and involving an infinite number of unnamed conspirators—plaintiffs offer no factual allegations demonstrating an agreement in furtherance of an unlawful act between the NFL and any other individual or entity.

Finally, plaintiffs' medical monitoring claim—alleged on behalf of a putative class of former and current NFL players (notwithstanding that courts routinely reject attempts to certify medical monitoring claims given, as here, the individual issues that pervade such a claim)—also rests solely on boilerplate and does not contain a single supporting allegation. Nor could it. Medical monitoring claims must be premised on exposure to "proven hazardous substances" that invade the body; "a greater risk of concussions"—the supposed "substance" alleged by plaintiffs here—is no such thing. Moreover, plaintiffs—all former NFL players—have no standing to assert medical monitoring claims on behalf of the alleged subclass of current NFL players.

In sum, the Amended Complaint—a workplace grievance improperly (and insufficiently) pleaded in tort—should be dismissed with prejudice.

### Statement of Facts[1]

The NFL is an unincorporated association of 32 Member Clubs and has its principal place of business in New York.  (*See* Am. Compl. ¶ 30.)  The NFL promotes, organizes, and regulates the sport of professional football in the United States.  *Stringer*, 474 F. Supp. 2d at 898.

Plaintiffs are seven former professional football players—Charles Ray Easterling, Wayne Radloff, James McMahon, Gerald Feehery, Joseph E. Thomas, Michael Thomas Furrey, and Steve Kiner—who played in the NFL during various periods from 1970 through 2010, and the spouses of four of them.  (Am. Compl. ¶¶ 23-29.)

---

[1]  This summary is based on the allegations of the Amended Complaint—the factual averments of which the NFL denies but assumes to be true for purposes of this motion only—and, where applicable, public records and documents integral to plaintiffs' claims, including the CBAs.  This Court may consider the CBAs in adjudicating this motion under Rule 12(b)(6) because the CBAs are integral to plaintiffs' claims and certain CBAs are publicly available.  *See Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider . . . any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case."); *Brown* v. *National Football League*, 219 F. Supp. 2d 372, 376, 386-87 (S.D.N.Y. 2002) (considering CBA provisions in order to adjudicate NFL's motion to dismiss); *Holmes* v. *National Football League*, 939 F. Supp. 517, 520 n.2 (N.D. Tex. 1996) (same); *cf. Stringer*, 474 F. Supp. 2d at 902 (considering CBA provisions and converting the NFL's motion to dismiss into a summary judgment motion).  The NFL has publicly posted certain CBAs on its website at the following address: http://static.nfl.com/static/content/public/image/cba/nfl-cba-2006-2012.pdf.

**The NFL Collective Bargaining Agreements**

The relationship between the NFL and plaintiffs is defined by the various CBAs that were operative during each of plaintiffs' careers.[2]  The CBAs are the product of exhaustive arm's-length negotiations between the NFLMC, the exclusive bargaining representative of the NFL, and the NFLPA, the exclusive bargaining representative of NFL players.  As "the union for professional football players," the NFLPA "[r]epresents all players in matters concerning . . . working conditions and protects their rights as professional football players."  (www.nflplayers.com/about-us.)  The CBAs negotiated by the NFLPA and the NFLMC, along with the NFL Constitution and Bylaws to which the NFLPA agreed to be bound, thus "represent[] the complete understanding of the parties on all subjects covered [t]herein" and are binding on the NFL and on all players

---

[2]  Mr. Easterling played in the NFL "during the mid-1970s and into the early 1980s," pursuant to the terms of the 1970 Collective Bargaining Agreement between the NFL Management Council ("NFLMC") and the NFL Players Association ("NFLPA"), effective from February 1, 1970 to January 31, 1974 ("1970 CBA"), the 1977 Collective Bargaining Agreement between the NFLMC and the NFLPA, effective from February 1, 1974 to July 15, 1982 ("1977 CBA"), and possibly the 1982 Collective Bargaining Agreement between the NFLMC and the NFLPA, effective from July 16, 1982 to August 31, 1987 ("1982 CBA").  (Am. Compl. ¶ 23.)  Mr. Radloff played in the NFL from "approximately 1985 through part of 1991," pursuant to the terms of the 1982 CBA.  (*Id.* ¶ 24.)  Mr. McMahon played in the NFL from 1982 through 1996, pursuant to the terms of the 1982 CBA and the 1993 Collective Bargaining Agreement between the NFLMC and the NFLPA (as amended June 6, 1996, February 25, 1998, December 4, 2000, and January 8, 2002), effective from March 29, 1993 to March 7, 2006 ("1993 CBA").  (*Id.* ¶ 25.)  Mr. Feehery played in the NFL from 1983 through 1990, pursuant to the terms of the 1982 CBA.  (*Id.* ¶ 26.)  Mr. Thomas played in the NFL from 2007 through 2010, pursuant to the terms of the 2006 Collective Bargaining Agreement between the NFLMC and the NFLPA, effective March 8, 2006 to March 1, 2011 ("2006 CBA").  (*Id.* ¶ 27.)  Mr. Furrey played in the NFL from "approximately 2003 through 2010," pursuant to the terms of the 1993 and 2006 CBAs.  (*Id.* ¶ 28.)  Mr. Kiner played in the NFL from 1970 through 1978, pursuant to the terms of the 1970 and 1977 CBAs.  (*Id.* ¶ 29.)

and their heirs, executors, administrators, and representatives.[3]  (*See* Ex. 4,[4] 1977 CBA

Preamble and Art. II § 1; Ex. 5, 1982 CBA Preamble and Art. II § 1; Ex. 6, 1993 CBA

Preamble, Art. III § 1, and Art. LV § 14; Ex. 10, 2006 CBA Preamble, Art. III § 1, and

Art. LV § 14; *see also* Ex. 3, 1970 CBA Preamble and Art. II § 4.)[5]

  The CBAs cover a broad range of subjects affecting the terms and

conditions of employment for NFL players, including NFL player contracts and salary

provisions, NFL draft rules, and player discipline.  (Ex. 3, 1970 CBA Art. II § 2; Ex. 4,

1977 CBA Art. II § 2; Ex. 5, 1982 CBA Art. I § 1; Ex. 6, 1993 CBA Art. II § 1; Ex. 10,

2006 CBA Art. II § 1.)  Although the CBAs have changed over time pursuant to the

collective bargaining process, every CBA expressly addresses player health and safety

and provides grievance procedures for the resolution of disputes under the CBAs.

### Player Medical Care Provisions

  The CBAs delegate to the NFL's Member Clubs and their medical staff

the responsibility for treating player injuries generally.  For example, certain CBAs

---

[3] *See Clarett* v. *National Football League*, 369 F.3d 124 (2d Cir. 2004) ("In the collective bargaining agreement, the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein."); *see also Brown*, 219 F. Supp. 2d at 386 ("[The NFL Constitution and Bylaws were] bargained over and included within the scope of the CBA.").

[4] All exhibits cited in this memorandum are attached to the accompanying Declaration of Dennis L. Curran, dated November 8, 2011.

[5] The NFL has operated continuously under a CBA since 1968, except between 1987-1993, when no CBA was in place.  (*See* Ex. 5, 1982 CBA Art. XXXVIII § 2 (1982 CBA may be terminated by either party on August 31, 1987); Ex. 6, 1993 CBA Art. LVIII § 1 (1993 CBA becomes effective March 29, 1993).)  As discussed in note 2, *supra*, all plaintiffs played professional football pursuant to various CBAs, and this gap is therefore irrelevant.

delegate to Club physicians the responsibility for making "return to play" decisions and advising players of the risk of continued performance, and set forth the qualifications for Club medical staff.  Thus, the CBAs provide:

- "Each Club will have a board-certified orthopedic surgeon as one of its Club physicians.  The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs." (Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1.)

- "All full-time head trainers and assistant trainers . . . will be certified by the National Athletic Trainers Association.  All part-time trainers must work under the direct supervision of a certified trainer."  (Ex. 5, 1982 CBA Art. XXXI § 2; Ex. 6, 1993 CBA Art. XLIV § 2; Ex. 10, 2006 CBA Art. XLIV § 2.)

- "The home team shall provide a physician and an ambulance at each game available to both teams.  Said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams."  (*See, e.g.*, Ex. 11, 1969 NFL and American Football League Constitution and Bylaws Art. XIX § 19.5.)

- "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player.  If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity." (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 5, 1982 CBA Art. XXXI § 1.)

- "All determinations of recovery time for major and minor injuries must be by the Club's medical staff and in accordance with the Club's medical standards . . . .  The prognosis of the player's recovery time should be as precise as possible."  (*See, e.g.*, Ex. 20, 1980 Supp. to NFL Constitution and Bylaws Art. XVII.)

- "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ."  (Ex. 6, 1993 CBA Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9.)

Certain CBAs also set forth player rights and obligations related to medical care.  For example, the CBAs provide that players have the right to investigate the adequacy of medical care provided by a Club physician and to obtain a second medical opinion.  Thus, the CBAs provide:

- "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety."  (Ex. 9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d).)

- "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the cost of [these] medical services."  (Ex. 5, 1982 CBA Art. XXXI § 3; Ex. 6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3.)

- "A player will have the right to choose the surgeon who will perform surgery . . . .  Any such surgery will be at Club expense."  (Ex. 5, 1982 CBA Art. XXXI § 4; Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 4.)

- "Each player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and will further undergo a "post-season physical examination" at the player or Club's request.  (Ex. 5, 1982 CBA Art. XXXI § 5; *see also* Ex. 6, 1993 CBA Art. XLIV § 5; Ex. 10, 2006 CBA Art. XLIV § 5.)

### *Player Safety Provisions*

The CBAs also delineate the manner in which rules, including rules concerning player safety, are promulgated and enforced.  For example, all rule changes must be presented to the NFL or approved by a standing committee of the NFL vested with the authority to recommend playing rule changes, and the Clubs, the NFLPA, and the NFL all are charged with the responsibility for reviewing player safety aspects of playing rules.  Thus, the CBAs provide:

- "Playing rules may be amended or changed at any Annual Meeting by the affirmative vote of not less than three-fourths or 21, whichever is greater,

of the members of the League, provided the proposed amendment or change has been presented to the League in writing fifteen (15) days prior to the Annual Meeting or a recessed session thereof, or provided the proposed amendment or change carries the unanimous approval of a duly appointed standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes, in which case notice of at least 12 hours prior to the vote is required; and further provided that all playing rules proposals from clubs must be submitted in writing to the League office a minimum of thirty (30) days in advance of any Annual Meeting of the League.  Otherwise unanimous consent is required for any amendment to the Playing Rules."  (*See, e.g.*, Ex. 24, 1984 NFL Constitution and Bylaws Art. XI § 11.2.)

- "A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee') will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects."  (Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI.)

- "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c).)

- "If . . . the Commissioner determines that the adoption of the playing rule change could adversely affect player safety, the Commissioner will refer the proposed playing rule change to [the Joint] Committee for consideration and recommendation."  (Ex. 4, 1977 CBA Art. XI § 8.)

### Player Benefits

The CBAs include numerous provisions regarding players' rights to compensation and benefits in the event of injuries, including the right to workers' compensation, supplemental disability benefits, and termination pay.  *See, e.g.*, Ex. 3, 1970 CBA Art. XI; Ex. 4, 1977 CBA Art. IX; Ex. 5, 1982 CBA Art. IX; Ex. 6, 1993 CBA Art. X; Ex. 10, 2006 CBA Art. X (Injury Grievance); Ex. 3, 1970 CBA Art. IV § 12; Ex. 4, 1977 CBA Art. XXXII; Ex. 5, 1982 CBA Art. XXXV; Ex. 6, 1993 CBA Art.

XXIII; Ex. 10, 2006 CBA Art. XXIII (Termination Pay); Ex. 3, 1970 CBA Art. XV § 7;

Ex. 4, 1977 CBA Art. XXXIII; Ex. 5, 1982 CBA Art. XXXVI; Ex. 6, 1993 CBA Art.

LIV; Ex. 10, 2006 CBA Art. LIV (Workers' Compensation); Ex. 5, 1982 CBA Art.

XXIV; Ex. 6, 1993 CBA Art. L; Ex. 10, 2006 CBA Art. L (Severance Pay); Ex. 6, 1993

CBA Art. LI; Ex. 10, 2006 CBA Art. LI (Supplemental Disability Benefits); Ex. 6, 1993

CBA Art. LII; Ex. 10, 2006 CBA Art. LII (Benefits Arbitrator); Ex. 10, 2006 CBA Art.

XLVIII-D (88 Benefit); Ex. 4, 1977 CBA Art. X; Ex. 5, 1982 CBA Art. X; Ex. 6, 1993

CBA Art. XII § 1; Ex. 10, 2006 CBA Art. XII § 1 (Injury Protection Benefit).   For

example:

- "The parties agree to . . . establish a . . . plan . . . to provide medical benefits to former Players who are . . . determined . . . to have dementia." (Ex. 10, 2006 CBA Art. XLVIII-D.)

- "[A] player . . . will receive an injury protection benefit [when t]he player [has] been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician . . . or the player [has] undergone Club-authorized surgery in the off-season following the season of injury; and . . . [t]he player [has] undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and . . . [t]he player [has] failed the pre-season physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury.  A player who qualifies . . . cannot be waived prior to such pre-season physician examination."  (Ex. 4, 1977 CBA Art. X; Ex. 5, 1982 CBA Art. X; *see also* Ex. 6, 1993 CBA Art. XII § 1; Ex. 10, 2006 CBA Art. XII § 1.)

### Grievance Procedures

Finally, all CBAs provide for an exclusive dispute resolution procedure to

address disputes arising under the CBAs.  Since 1977, all CBAs have contained a broad

arbitration provision that encompasses disputes arising not only from the CBAs

themselves, but also from an NFL Player Contract or any provision of the NFL Constitution and Bylaws that relates to the terms and conditions of NFL players' employment:

> • "Any dispute (hereinafter referred to as a 'grievance') arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the [arbitration] procedure set forth in this Article except wherever another method of dispute resolution is set forth elsewhere in this Agreement, and except wherever the Settlement Agreement provides that the Special Master, Impartial Arbitrator, the Federal District Court or the Accountants shall resolve a dispute." (Ex. 6, 1993 CBA Art. IX § 1; Ex. 10, 2006 CBA Art. IX § 1; *see also* Ex. 4, 1977 CBA Art. VII § 1; Ex. 5, 1982 CBA Art. VII § 1.)

From 1970 to 1977, the CBA contained a similar dispute resolution procedure that required the NFL Commissioner to resolve all grievances arising under the CBA. (Ex. 3, 1970 CBA Art. X.)

In addition to this broad arbitration provision, the CBAs expressly forbid players from bringing "any suit[] against the NFL or any Club with respect to any claim relating to any aspect of the NFL rules" or "the NFL Constitution and Bylaws." (Ex. 4, 1977 CBA Art. III § 2; Ex. 5, 1982 CBA Art. III § 2; Ex. 6, 1993 CBA Art. IV § 2; Ex. 10, 2006 CBA Art. IV § 2.)

**The Amended Complaint**

Notwithstanding that the NFLPA, on behalf of all NFL players, agreed to CBAs that expressly address issues relating to player health and safety and require that all disputes arising under the CBAs be resolved through grievance procedures, plaintiffs filed this action asserting claims for negligence, concealment, civil conspiracy, medical

monitoring, and loss of consortium, and seeking, among other relief, compensatory damages for purported concussion-related injuries sustained during their NFL football careers. (Am. Compl. ¶¶ 36-63.)

The Amended Complaint alleges that the NFL "assumed a duty . . . to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players." (*Id.* ¶ 45.) Plaintiffs allege that the NFL breached this duty by:

- "Failing to warn of the risk of unreasonable harm resulting from repeated concussions" (*id.* ¶ 47(a));

- "Failing to disclose the special risks of long term complications from repeated concussions and return to play" (*id.* ¶ 47(b));

- "Failing to disclose the role that repeated concussions has [sic] in causing chronic life-long cognitive decline" (*id.* ¶ 47(c));

- "Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return to play policy to minimize long-term chronic cognitive problems" (*id.* ¶ 47(d); *see also id.* ¶¶ 10, 35(b));

- "Misrepresenting pertinent facts that players needed to be aware of to make determinations of the safety of return to play" (*id.* ¶ 47(e));

- "Concealing pertinent facts" (*id.* ¶ 47(f));

- "Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions" (*id.* ¶ 47(g)); and

- "[F]ail[ing] to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered a concussion or sub-concussion" (*id.* ¶ 61).

Based on those alleged acts, the Amended Complaint asserts that the NFL "failed to act reasonably," thereby "caus[ing] or increas[ing] the risk that the plaintiffs . . . would suffer repeated concussions and long-term injury." (*Id.* ¶¶ 10, 17; *see also id.* ¶¶ 16, 18, 50-57.)

Specifically, the Amended Complaint challenges the NFL's rulemaking with regard to injury prevention.  According to the Amended Complaint, in 1979, the NFL "promulgated a rule [penalizing] players who are found to have used their helmets to butt, spear or ram an opponent with the crown or top of the helmet"; in 1989, the NFL "provide[d] referees with the authority to eject a player who is observed using his helmet in this fashion"; in 1996, the NFL "ma[de] it a personal foul with potential associated fines to hit with the helmet"; and the NFL adopted the "NOCSAE" standard for football helmets "to improve upon the safety of helmets and minimize the risk of head injury." (*Id*. ¶¶ 3, 5-7.)  Plaintiffs assert that the NFL did not "insist on the strict enforcement" of these rules in order to "keep[] its fan base excited over the visual excitement generated by" helmet tackles.  (*Id*. ¶¶ 6-7.)

Plaintiffs also contend that "[f]or more than 35 years," the NFL "denied that it knew [of]" and "actively concealed" any connection "between . . . concussions, the NFL policies regarding tackling methodology or . . . return to play and long-term . . . problems."  (*Id*. ¶¶ 2, 15; *see also id*. ¶¶ 8-9, 14, 16-18.)  Plaintiffs further claim that although the NFL "commissioned" "scientific" "studies" "to assess the health and well-being of retired players," the NFL—as part of its alleged concealment—"disputed the results" of one of these studies.  (*Id*. ¶¶ 8, 11.)

Finally, plaintiffs conclusorily maintain—absent any supporting factual allegations—that the NFL "conspired with its team members and/or independent contractors" to dispute the connection between concussions and long-term injuries, that the plaintiff spouses "seek to recover for the . . . loss of consortium" suffered as a result of their husbands' injuries, and that—because of their purported increased "exposure" to

concussions—plaintiffs, and a putative class that purports to include "current players" even though all of the named plaintiffs are former players, "require specialized testing . . . for the detection of the long-term effects" of such injuries. (*Id.* ¶¶ 41, 53, 60-63.)

*      *      *

For the reasons set forth below, plaintiffs' claims are preempted by section 301 of the LMRA. Plaintiffs further fail adequately to plead claims for concealment, civil conspiracy, and medical monitoring. Accordingly, the Amended Complaint should be dismissed.

<b><u>Argument</u></b>

<b>I.</b>

<b><u>PLAINTIFFS' CLAIMS ARE PREEMPTED BY SECTION 301 OF THE LMRA</u></b>

It is well settled that section 301 of the LMRA completely preempts all state law claims—including tort claims—that are substantially dependent on an interpretation of the terms of, or arise under, a collective bargaining agreement. 29 U.S.C. § 185(a) (codifying section 301); *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 213, 220 (1985) (claims that are "substantially dependent upon analysis of the terms of [a collective bargaining] agreement," and "state-law rights and obligations that do not exist independently of [collective bargaining] agreements," are preempted); *see also United Steelworkers of Am.* v. *Rawson*, 495 U.S. 362, 368 (1990) ("only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective-bargaining agreements"); *Beidleman* v. *Stroh Brewery Co.*, 182 F.3d 225, 231-32 (3d Cir. 1999) (same); *Antol* v. *Esposto*, 100 F.3d 1111, 1115, 1117 (3d Cir. 1997) (same).

The "preemptive force of § 301 is so powerful" because Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules. *Franchise Tax Bd.* v. *Constr. Laborers Vacation Trust*, 463 U.S. 1, 23 (1983); *Beidleman*, 182 F.3d at 234 ("[T]he underlying reason for section 301 preemption [is] 'the need for uniform interpretation of contract terms to aid both the negotiation and the administration of collective bargaining agreements'" (quoting *Antol*, 100 F.3d at 1115)); *Henderson* v. *Merck & Co., Inc.*, 998 F. Supp. 532, 536 (E.D. Pa. 1998) ("[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from branches of that agreement, must be resolved by reference to uniform federal law"). Moreover, "a central tenet of federal labor-contract law under § 301 [is] that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Allis-Chalmers*, 471 U.S. at 220. Section 301 preemption thus "preserves the central role of arbitration in our system of industrial self-government" and assures that, in the context (as here) of collective bargaining agreements with arbitration or other grievance provisions, an arbitrator—not a court— will resolve the dispute. *Id*. at 219 (unless courts apply section 301 preemption broadly, "the arbitrator's role . . . could be bypassed easily") (internal quotations and citations omitted); *Angst* v. *Mack Trucks, Inc.*, 969 F.2d 1530, 1537-58 (3d Cir. 1992) (same).

Plaintiffs' claims here are completely preempted by section 301 because, among other reasons, those claims are substantially dependent upon an interpretation of numerous provisions in the applicable CBAs. Indeed, a federal court, in *Stringer* v. *National Football League*, considered a claim against the NFL nearly identical to this— premised on the NFL's alleged failure "to minimize the risk of heat-related illness," and

"establish regulations" to ensure "adequate care and monitoring of players suffering from heat-related illness"—and, like numerous other courts considering state law tort claims against the NFL or its Member Clubs by NFL players relating to health and safety provisions, held that plaintiff's claim was completely preempted by section 301. 474 F. Supp. 2d at 903, 909-11; *see also Givens*, 684 F. Supp. 2d at 990-91 (negligent infliction of injury, outrageous conduct, and bad faith performance of contract claims against Member Club preempted); *Sherwin*, 752 F. Supp. at 1177-79 (negligence, fraud, negligent misrepresentation, negligent and intentional infliction of emotional distress, and medical malpractice claims against Member Club preempted); *Jeffers*, 681 S.E.2d at 412 (negligent retention and intentional misconduct claims against Member Club preempted); Section I.A.2., *infra*.[6]

## A.     Plaintiffs' Claims Are Substantially Dependent on an Interpretation of the Terms of the CBAs

Plaintiffs' claims for negligence, concealment, medical monitoring, and civil conspiracy—each of which is founded on a purported duty owed to plaintiffs[7]—are

---

[6]    *But see Brown*, 219 F. Supp. 2d at 379-80, 382 (negligence claim against NFL not preempted because referee hired by NFL owed a duty to the "general public" to "use due care in throwing small weighted objects" because the "careless throwing of objects" could have harmed "any bystander"; the alleged duty therefore existed "independent of any CBA").

[7]    "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." *Althaus ex rel. Althaus* v. *Cohen*, 756 A.2d 1166, 1168 (Pa. 2000); *Fox* v. *Marshall*, 88 A.D.3d 131, 135 (N.Y. App. Div. 2011). "Negligence," in turn, is an element of both the medical monitoring and negligent concealment claims (as discussed at p.34 n.12, the Amended Complaint does not specify whether plaintiffs' "concealment" claim sounds in fraud or negligence; both are preempted by section 301 for the reasons discussed herein). *See Barnes* v. *Am. Tobacco Co.*, 161 F.3d 127, 138 (3d Cir. 1998); *Majer* v. *Sonex Research, Inc.*, 541 F. Supp. 2d 693, 713 (E.D. Pa. 2008); *Caronia* v. *Philip Morris USA, Inc.*, No. 06-CV-224, 2011 WL 338425, at *6 (E.D.N.Y. Jan. 13, 2011); *Hughes* v. *BCI Int'l*

preempted by section 301 of the LMRA because determining whether the NFL, in fact, owed a duty to plaintiffs to "minimize the risk of injury," assessing the scope of any such duty, and deciding whether the NFL breached this purported duty by failing to act "reasonably" substantially depends on an analysis of the numerous CBA provisions addressing the health and safety of NFL players. *See Int'l Bhd. of Elec. Workers, AFL-CIO* v. *Hechler*, 481 U.S. 851, 852 (1987); *Allis-Chalmers*, 471 U.S. at 213, 220; *Beidleman*, 182 F.3d at 231-32; *Stringer*, 474 F. Supp. 2d at 909-11; Am. Compl. ¶¶ 10, 45, 47.

### 1. Plaintiffs' Claims Require Interpretation of the CBAs

Plaintiffs' claims, at their core, are premised on the NFL's alleged "duty . . . to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players." (Am. Compl. ¶ 45; *see also id.* ¶¶ 10, 16, 17, 19, 47.) As discussed above, plaintiffs contend that the NFL breached that purported duty by, among other alleged acts, "[f]ailing to promulgate rules and regulations to adequately address the dangers of repeated concussions," "[f]ailing to . . . reasonably enforce" safety rules that have been implemented, failing to adopt "a return to play policy to minimize long-term chronic cognitive problems," "fail[ing] to establish a proper and adequate methodology to monitor and detect when players suffer" concussions, and

---

*Holdings, Inc.*, 452 F. Supp. 2d 290, 303 (S.D.N.Y. 2006). Similarly, an essential element of fraudulent concealment is a duty to disclose. *See Aubrey* v. *Sanders*, No. 07-CV-0137, 2008 WL 4443826, at *5-6 (W.D. Pa. Sept. 26, 2008); *Manti's Transp., Inc.* v. *C.T. Lines, Inc.*, 68 A.D.3d 937, 940 (N.Y. App. Div. 2009). Plaintiffs' civil conspiracy claim is similarly premised on the allegation that the NFL—in conjunction with others—breached its duty by "reject[ing] the causal connection between multiple concussions . . . and . . . the chronic long term effects of these injuries." (Am. Compl. ¶ 41; *compare* ¶ 47(a)-(c), (e).)

"[f]ailing to warn of the risk of unreasonable harm resulting from repeated concussions."
(*Id*. ¶¶ 19, 47, 61.)  Those allegations strike at the heart of the myriad health and safety
provisions in the CBAs and plainly require interpretation of them.

   As detailed above, the CBAs contain numerous provisions that delegate
certain responsibilities for player health and safety to NFL committees, the NFL's
Member Clubs and their medical staff, and the NFLPA (or the players themselves).
Regarding the "methodology to monitor and detect" when players are injured,
"warn[ings] of the risk" of injuries, and "return to play" decisions, the CBAs charge Club
medical staff with such obligations.  (*Id*. ¶¶ 19, 47(a), (d).)  For example, the CBAs
require that "[i]f a Club physician advises a . . . Club representative of a player's physical
condition which adversely affects the player's . . . health, the physician will also advise
the player.  If such condition could be significantly aggravated by continued
performance, the physician will advise the player . . . before the player is again allowed to
perform on-field activity."  (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art.
XLIV § 1; *see also* Ex. 5, 1982 CBA Art. XXXI § 1.)  In addition, the CBAs state that
"[a]ll determinations of recovery time for . . . injuries must be by the Club's medical staff
and in accordance with the Club's medical standards."  (*See, e.g.*, Ex. 20, 1980 Supp. to
NFL Constitution and Bylaws Art. XVII.)  Moreover, "if Player is injured . . . and
promptly reports such injury to the Club physician . . . then Player will receive such
medical . . . care . . . as the Club physician may deem necessary."  (Ex. 6, 1993 CBA
Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9.)  Likewise, "[t]he home team shall provide
a physician and an ambulance at each game available to both teams."  (*See, e.g.*, Ex. 11,
1969 NFL and American Football League Constitution and Bylaws Art. XIX § 19.5.)

The CBAs further mandate that "[a]ll full-time head trainers [be] certified by the National Athletic Trainers Association," and that "[a]ll part-time trainers must work under the direct supervision of a certified trainer."  (Ex. 5, 1982 CBA Art. XXXI § 2; Ex. 6, 1993 CBA Art. XLIV § 2; Ex. 10, 2006 CBA Art. XLIV § 2.)

Regarding the "promulgat[ion of] rules and regulations" on player health and safety issues, the CBAs task the NFL and Member Clubs with "amend[ing] or chang[ing]" the NFL "[p]laying rules"; all proposed rule changes voted on by the Clubs must first be presented to the NFL.  (*See, e.g.*, Ex. 23, 1984 NFL Constitution and Bylaws, Art. XI § 11.2.)  In addition, the CBAs establish the "Joint Committee on Player Safety and Welfare . . . for the purpose of discussing the player safety and welfare aspects of . . . playing rules," and require that "[i]f . . . the Commissioner determines that the adoption of the playing rule change could adversely affect player safety, the Commissioner will refer the proposed playing rule change to this Committee for consideration and recommendation."  (Ex. 4, 1977 CBA Art. XI § 8; Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Am. Compl. ¶ 47(d); *see also* Ex. 3, 1970 CBA Art. V.)  The CBAs further mandate that "[i]f the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate, and "request an advisory decision" by an arbitrator regarding the proposed change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XII § 1(c); Ex. 10, 2006 CBA Art. XII § 1(c).)

Finally, the CBAs grant NFL players certain rights and obligations relating to health and safety issues.  *See, e.g.*, Ex. 9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d) (empowering the "NFLPA . . . to commence an

investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety"); Ex. 5, 1982 CBA Art. XXXI § 3; Ex. 6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3 ("A player will have the opportunity to obtain a second medical opinion" at Club's expense); Ex. 5, 1982 CBA Art. XXXI § 4; Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 4 (guaranteeing a player's "right to choose the surgeon who will perform surgery" on the player); Ex. 5, 1982 CBA Art. XXXI § 5; *see also* Ex. 6, 1993 CBA Art. XLIV § 5; Ex. 10, 2006 CBA Art. XLIV § 5 ("[e]ach player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and a "post-season physical examination" shall be conducted at the player's or Club's request).

As these (and other) CBA provisions make clear, an assessment of plaintiffs' claims necessarily and substantially depends on an interpretation of the CBAs. Plaintiffs allege that the NFL "failed to act reasonably" in several respects: by failing to "identify at risk players," "alert players" regarding injury risks, "develop appropriate and necessary guidelines for return to play," implement "rules to minimize the risk of injury," and "enforce" safety rules it had adopted. (Am. Compl. ¶¶ 10, 16, 17, 45, 47(g), 61.) But as discussed above, the CBAs already delegate responsibility for each of these tasks: Club physicians are tasked with monitoring player injuries, warning players about injury risks, and making return to play decisions; the NFL and its Member Clubs are responsible for implementing safety-related rules and regulations; the Clubs, the NFLPA, and the NFL share responsibility for commenting on such rules; and the NFLPA is further empowered to investigate player safety issues.

Thus, a court cannot evaluate the scope of the NFL's purported duties to plaintiffs or whether the NFL acted "reasonably" without first considering these preexisting obligations regarding player health and safety imposed by the CBAs. For example, determining whether, as plaintiffs allege, the NFL failed to act "reasonably" by not "develop[ing] guidelines for return to play"—and what conduct would be "reasonable" under the circumstances—would first require interpretation of the provision that "[a]ll determinations of recovery time for . . . injuries must be by the Club's medical staff and in accordance with the Club's medical standards." (*Id*. ¶ 10; Ex. 20, 1980 Supp. to NFL Constitution and Bylaws Art. XVII.) *See Stringer*, 474 F. Supp. 2d at 910-11 (wrongful death claim preempted where player's spouse sought to impute to NFL health-related duties assigned to others under CBA); *see also Givens*, 684 F. Supp. 2d at 990-91 (tort claims preempted where former player sought to impute to Member Club health-related duties assigned to Club physician under CBA).

Simply put, the NFL's alleged duty—even if "assumed" as plaintiffs allege—cannot be considered in a "vacuum," but must be calibrated according to the scope of the duties contractually delegated to others by the CBAs. *Stringer*, 474 F. Supp. 2d at 910-11; *Sherwin*, 752 F. Supp. at 1177-79 (fraud claim against Member Club preempted because CBA establishes "duty of a club physician, and arguably the club," to inform player of adverse physical conditions); Am. Compl. ¶¶ 45, 47.

In addition, the Court cannot determine whether plaintiffs justifiably relied on the NFL's alleged concealment without interpreting the CBAs' health and safety provisions. *See Williams* v. *National Football League*, 582 F.3d 863, 881 (8th Cir. 2009) (finding players' fraud claim—that the NFL knew that a supplement contained a banned

substance but failed to warn the players—was "preempted because the Players cannot demonstrate the requisite reasonable reliance . . . without resorting to the CBA," which tasked specific individuals with responsibility for knowing the contents of supplements); *see also Atwater* v. *National Football League*, 626 F.3d 1170, 1183 (11th Cir. 2010) (finding former players' negligent misrepresentation claim—that the NFL provided inaccurate background information regarding investment advisors for the players—was preempted because "whether Plaintiffs reasonably relied on Defendants' misrepresentations is substantially dependent on the CBA's language," which delegated responsibility for player finances to specific individuals). Courts must consider the "relationship of the parties . . . and the nature of the transaction when determining whether one party's reliance . . . is justifiable." *Tran* v. *Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005) (internal quotations and citations omitted); *Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 28 (S.D.N.Y. 2009). Thus, any analysis of plaintiffs' purported reliance necessarily depends on an interpretation of the numerous CBA provisions that define the obligations of the NFL, Member Clubs, Club physicians, and players regarding player health and safety and, as the parties bargained, expressly delegate those duties to the Member Clubs and their medical staff.

In sum, all of plaintiffs' claims are "substantially dependent on analysis of" the numerous health and safety-related CBA provisions and are thus preempted by section 301. *Allis-Chalmers*, 471 U.S. at 213.

### 2.     The Case Law Compels Preemption of Plaintiffs' Claims

A long line of NFL preemption precedent supports the conclusion that plaintiffs' tort claims are "substantially dependent" on an analysis of the CBAs.  *See, e.g.*, *Givens*, 684 F. Supp. 2d at 990-91; *Stringer*, 474 F. Supp. 2d at 909-11; *Sherwin*, 752 F. Supp. at 1177-79; *Jeffers*, 681 S.E.2d at 412.

*Stringer* v. *National Football League*—holding that a claim against the NFL founded on allegations substantially similar to those advanced here was preempted under section 301—is on point.  474 F. Supp. 2d at 909-11.  In *Stringer*, the widow of an NFL player, Korey Stringer, brought a wrongful death claim against the NFL (and others) after Stringer died from heatstroke suffered at the Minnesota Vikings' training camp. Like plaintiffs here, the *Stringer* plaintiff alleged that the NFL assumed a duty to its players "to use ordinary care in overseeing, controlling, and regulating practices, policies, procedures, equipment, working conditions and culture of the NFL teams . . . to minimize the risk of heat-related illness," and that the NFL breached this duty by "fail[ing] to provide . . . competent information . . . to . . . trainers, physicians and coaches regarding heat-related illness."  *Id*. at 899; *cf*. Am. Compl. ¶¶ 45, 47.  Specifically—and, again, like plaintiffs here—the *Stringer* plaintiff asserted that the NFL "fail[ed] to establish regulations" to ensure "adequate care and monitoring of players suffering from heat-related illness" and "regulation of . . . return to practice."  *Stringer*, 474 F. Supp. 2d at 903-04; *cf*. Am. Compl. ¶ 47(d)-(e).   Indeed, except for substituting the word "concussion" for "heat-related illness" in their Amended Complaint, plaintiffs' allegations mimic nearly verbatim the facts alleged in *Stringer* and thus are preempted for

the same reasons.  *Compare* Am. Compl. ¶¶ 5-7, 45-47 *with Stringer*, 474 F. Supp. 2d at 899, 903-05.

The *Stringer* court determined that plaintiff's claim was preempted because it was "substantially dependent upon an analysis of certain CBA provisions imposing duties on the Clubs with respect to medical care and treatment of NFL players." *Id*. at 909 (internal quotations omitted).  Specifically, and among other reasons, the court found because the CBA "places primary responsibility" for treating the players' physical conditions on the team physicians, the CBA provisions doing so "must, therefore, be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances." *Id*. at 910-11.  The court thus held that, even if the NFL had voluntarily assumed a duty, "the degree of care owed cannot be considered in a vacuum" but instead "must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players." *Id*. at 910.

Indeed, *Stringer* is consistent with numerous other decisions holding that player injury claims that seek to impute to NFL Clubs duties owed by others under the CBA are preempted because they require interpretation of CBA terms.  For example, in *Givens* v. *Tennessee Football, Inc.*, a former player alleged that an NFL Club failed to inform him of a knee defect that was detected by the Club physician, and that plaintiff continued to play football until a subsequent injury caused the defect to "crumble" thereby ending his career.  684 F. Supp. 2d at 988.  The court, relying on the same CBA provisions considered by the *Stringer* court, concluded that plaintiff's claims were preempted by section 301:  "The questions raised by the Complaint, such as whether a

physician's failure to advise a player of his medical condition should be imputed to the club or whether the club has a duty independent of the physician to advise a player of his medical condition, are 'inextricably intertwined' with the provisions of the CBA." *Id.* at 990-91; *Sherwin*, 752 F. Supp. at 1177-78 (finding former NFL player's claims that Club provided negligent medical treatment and fraudulently concealed the extent of the player's injury were preempted because Club "did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the" CBAs, and because the CBAs established "the duty of a club physician, and arguably the club, to inform a player of physical conditions," and whether the physician and the club both owed this duty presented "precisely the type of question which must be reserved for the arbitrator"); *Jeffers*, 681 S.E.2d at 412 (finding former NFL player's claims against Club—that team physician performed unauthorized procedures during knee surgery—preempted because the claims were substantially dependent on an analysis of CBA provisions setting forth the Clubs' and players' rights and duties in connection with medical care); *see also Williams*, 582 F.3d at 881 (finding negligence claim against the NFL preempted because "whether the NFL . . . owed the Players a duty to provide . . . a warning [that a supplement contained a banned substance under the NFL Drug Policy] cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy"); *Atwater*, 626 F.3d at 1182 (finding former players' negligence, negligent misrepresentation, and breach of fiduciary duty claims against the NFL—premised on allegations that they were victims of Ponzi scheme conducted by financial advisors who had been improperly vetted by NFL—were preempted, in part, because the court "would . . . have to consult the CBA to determine

the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship").

So, too, here.

## B. Plaintiffs' Claims Arise Under the CBA

Plaintiffs' claims are preempted by section 301 for an additional reason: They are premised on rights and obligations that arise under the CBAs.  *See Allis-Chalmers*, 471 U.S. at 213.

The CBAs define the relationship between—and are binding as to—the NFL, its Member Clubs, and the players.  (*See* Ex. 4, 1977 CBA Art. II § 1; Ex. 5, 1982 CBA Art. III § 1; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1; *see also* Ex. 3, 1970 CBA Art. II § 1 (CBAs "represent[] the complete understanding of the parties on all subjects covered [t]herein"); Ex. 3, 1970 CBA Art. II § 1; Ex. 4, 1977 CBA Art. I § 1; Ex. 5, 1982 CBA Art. II § 2; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1 (incorporating by reference the NFL Constitution and Bylaws).)

As the Amended Complaint makes clear, plaintiffs' claims hinge fundamentally on the NFL's purported failure to promulgate adequate rules regarding player health and safety.  (*See, e.g.*, Am. Compl. ¶ 10 (the NFL "failed to . . . develop[] . . . rules regarding return-to-play criteria"); *id.* ¶ 35(b) (plaintiffs "played in the NFL under the same inadequate rules"); *id.* ¶ 45 (the NFL "assumed a duty . . . to . . . provide . . . appropriate rules to minimize the risk of injury"); *id.* ¶ 47(d) (the NFL failed "to promulgate rules . . . to adequately address the dangers of repeated concussions and a return to play policy"); *id.* ¶ 47(g) (the NFL failed to "reasonably enforce those rules [already implemented] to minimize the risk of" injury).)

The CBAs, however, establish the duty of the NFL and its Clubs to implement and enforce rules regarding professional football generally, and health and safety-related rules in particular. Indeed, the CBAs delegate to the NFL and its Clubs the obligation to "amend[] or change[]" all NFL "[p]laying rules," and further require that all proposed rule changes be presented to the NFL prior to a vote. (*See, e.g.*, Ex. 23, 1984 NFL Constitution and Bylaws, Art. XI § 11.2; *see also* Ex. 4, 1977 CBA Art. XI; Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a) (forming the "Joint Committee on Player Safety and Welfare" which is tasked with addressing "the player safety and welfare aspects of . . . playing rules"); Ex. 4, 1977 CBA Art. XI § 8 (requiring the NFL to refer rules that may adversely affect player safety to the Joint Committee for consideration and recommendation); Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c) (empowering the NFLPA to investigate potentially hazardous rules).) Thus, the NFL's alleged duty—to implement "appropriate rules to minimize the risk of injury"—arises under the CBAs.[8] (Am. Compl. ¶ 45.)

That this purported obligation arises under the CBAs is confirmed by the fact that the duty does not exist independent of the CBAs: The NFL does not owe duties to promulgate rules regarding player health and safety to the "general public" or "any human being." *See Rawson*, 495 U.S. at 371 (holding a state law right only arises outside

---

[8] The *Stringer* court concluded that the NFL's alleged duties did not arise under the CBA. Unlike the *Stringer* plaintiff—who alleged "that in issuing the [Hot Weather] guidelines," the NFL assumed a duty and breached it because the Guidelines were allegedly "incomplete and contrary to the best practices"—plaintiffs here allege that the NFL "[f]ail[ed] to promulgate" and enforce "rules" relating to player health and

of a CBA where defendant is "accused of acting in a way that might violate the duty of reasonable care owed to every person in society"); *Brown*, 219 F. Supp. 2d at 378 ("To be independent of the CBA, a tort claim must allege a violation of a duty 'owed to every person in society' as opposed to a duty owed only to employees covered by the collective bargaining agreement" (quoting *Rawson*, 495 U.S. 362 (1990)); *Sherwin*, 752 F. Supp. at 1178 (finding fraud claim arose under CBA because "[t]he Colts owed a duty to . . . provide truthful information regarding medical treatment and diagnoses . . . only to their players covered by the standard player agreement and the CBA," not "to every person in society" (quoting *Rawson*, 495 U.S. at 371)); *but see Stringer*, 474 F. Supp. 2d at 908 (suggesting *Brown*'s reading of *Rawson* is "too broad," and stating "the relevant inquiry . . . is not to whom the duty is owed, but how it came into being").  Plaintiffs do not allege and cannot credibly maintain, for example, that the NFL was obligated to "develop[] . . . rules regarding return-to-play criteria" for every football player at any level.  (Am. Compl. ¶ 10.)  On the contrary, the duties alleged by plaintiffs all concern the implementation and enforcement of rules pertaining to the health and safety of solely NFL players.

Accordingly, plaintiffs' claims—all of which are premised on CBA provisions regarding rulemaking and all of which thus involve duties allegedly owed to NFL players only—arise under the CBAs and are preempted by section 301.  *See Allis-Chalmers*, 471 U.S. at 213.

\*          \*          \*

---

safety—obligations that are, as discussed, created by the CBAs.  *Stringer*, 474 F. Supp. 2d at 905; Am. Compl. ¶ 47(d); *see also id.* ¶¶ 10, 35(b), 45, 47(g).

In sum, all of plaintiffs' claims are preempted under section 301 and should be dismissed.[9]  *Givens*, 684 F. Supp. 2d at 991-92 ("[B]ecause preempted claims must first be presented through the arbitration procedure established in a collective bargaining agreement, those claims should be dismissed" (citing *Allis-Chalmers*, 471 U.S. at 219-20)); *see also Angst*, 969 F.2d at 1537 ("Under federal labor law, aggrieved employees must exhaust their CBA's grievance and arbitration procedures before filing a complaint in federal court").  To the extent that plaintiffs have a claim for a violation of the CBAs, that claim may only proceed pursuant to the grievance procedures set forth in the CBAs.  (Ex. 4, 1977 CBA Art. VII § 1; Ex. 5, 1982 CBA Art. VII § 1; Ex. 6, 1993 CBA Art. IX § 1; Ex. 10, 2006 CBA Art. IX § 1; *see also* Ex. 3, 1970 CBA Art. X.)  *See Allis-Chalmers*, 471 U.S. at 220-21 (noting tort claim should have been "dismissed for failure to make use of the grievance procedure established in the collective-bargaining agreement . . . or dismissed as pre-empted by § 301") (citation omitted)).[10]

---

[9]   The plaintiff spouses' loss of consortium claims are derivative of the former players' claims and should therefore be dismissed.  *Hurst* v. *Consol. Freightways Corp.*, No. 88-CV-0744, 1990 WL 43934, at *5 (M.D. Pa. Apr. 5, 1990) (finding spouse's loss of consortium claim failed where husband's state-law claims were preempted by § 301); *see also St. John* v. *Int'l Ass'n of Machinists and Aerospace Workers*, 139 F.3d 1214, 1217 n.1 (8th Cir. 1998) (same); *Clarke* v. *City of New York*, 82 A.D.3d 1143, 1144, (N.Y. App. Div 2011) (loss of consortium claim is derivative of underlying claims); *cf. Sherwin*, 752 F. Supp. at 1179 (staying loss of consortium claim pending arbitration of underlying preempted claims).

[10]   Although it is unclear whether plaintiffs' claims allegedly accrued during periods in which no CBA was in place (*i.e.*, 1987-1993), "expiration of the [CBA] between the [NFL and NFLPA] does not excuse an otherwise existing requirement to exhaust the [CBA's] grievance procedures."  *Hayes* v. *National Football League*, 469 F. Supp. 252, 254 (C.D. Cal. 1979); *Sherwin*, 752 F. Supp. at 1174-75 & n.2 ("[T]he [expired] 1982 CBA continues to govern the relationship of the parties at least with respect to arbitration since the parties have continued to honor and utilize the arbitration provisions of the 1982 CBA."); *see also Nolde Bros.* v. *Local No. 358*, 430 U.S. 243,

## II.

## PLAINTIFFS FAIL TO STATE CLAIMS
## UPON WHICH RELIEF CAN BE GRANTED

To the extent that this Court finds that plaintiffs' claims for concealment, civil conspiracy, and medical monitoring are not preempted, these claims should be dismissed because they lack the requisite elements of each claim and are not, where applicable, pleaded with the particularity prescribed by Federal Rule of Civil Procedure 9(b).[11]

### A.    Plaintiffs Fail to State a Claim for Concealment

Plaintiffs do not adequately allege a claim for "concealment." To state a claim for fraudulent concealment, plaintiffs must allege that (1) defendant concealed a material fact (2) that defendant knew would be material to plaintiffs; (3) defendant had a

---

255 (1977) ("[T]he parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship."); *Luden's Inc.* v. *Local Union No. 6*, 28 F.3d 347, 357-58 (3d Cir. 1994) (same).

[11]   Plaintiffs purport to allege claims for concealment and civil conspiracy under the laws of all fifty states, and to assert a claim for medical monitoring under New York law. (*See* Am. Compl. ¶ 21.) While Pennsylvania courts focus on four factors when conducting a substantive choice of law analysis—(i) the alleged place of misconduct, (ii) the parties' domiciles, (iii) the alleged place of injury, and (iv) the place where the relationship between the parties is centered—plaintiffs have only alleged facts regarding the place of alleged misconduct (New York) and the parties' domiciles (Arizona, Georgia, New York, Pennsylvania, South Carolina, Virginia, Washington, West Virginia). *See Taylor* v. *Mooney Aircraft Corp.*, 265 Fed. Appx. 87, at *2 n.4 (3d Cir. 2008); Am. Compl. ¶¶ 2-20, 23-30. As discussed below, plaintiffs fail to state claims for concealment, conspiracy, and medical monitoring under the laws of these eight potentially applicable jurisdictions or any other jurisdiction. For ease of discussion, the NFL primarily cites New York and Pennsylvania case law in this brief because plaintiffs identify New York law as the primary state law governing their claims, and Pennsylvania is the forum state. (Am. Compl. ¶¶ 21-22.)

duty to disclose that fact; (4) defendant intended to mislead plaintiffs; (5) plaintiffs justifiably relied on the information provided by defendants; and (6) plaintiffs were injured as a result.  *See Gaines* v. *Krawczyk*, 354 F. Supp. 2d 573, 585 (W.D. Pa. 2004); *Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005); 37 C.J.S. *Fraud* § 29 (2011).

As with all claims for fraud, a fraudulent concealment claim must comply with Rule 9(b), which requires plaintiffs to allege "the circumstances constituting fraud . . . with particularity."  Fed. R. Civ. P. 9(b); *Christidis* v. *First Pa. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983); *Houraney* v. *Burton & Assoc., P.C.*, 701 F. Supp. 2d 258, 261 (E.D.N.Y. 2010).  Rule 9(b) thus requires plaintiffs to plead "all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216-17 (3d Cir. 2002) (citations omitted); *Sedona Corp.* v. *Ladenburg Thalmann & Co.*, No. 03-CV-3120, 2011 WL 4348138, at *3 (S.D.N.Y. Sept. 15, 2011).

Plaintiffs' conclusory pleading falls far short.  First, plaintiffs' only allegations that the NFL concealed a material fact are the conclusory claims that "[s]ince the early 1970s . . . . the defendant has taken an active role in concealing . . . any causative connection between concussions . . . and brain injury/illness."  (Am. Compl. ¶ 9; *see also id*. ¶¶ 15, 17, 37 (same).)  Plaintiffs do not, as they must, assert any factual allegations as to who purportedly concealed any information from plaintiffs, what exactly they concealed, when the alleged fraud occurred, or how the NFL perpetrated this supposed fraud—beyond the bare assertion that the NFL "disputed the results of a

scientific study it funded." (*Id.* ¶ 11.)  Nor do plaintiffs allege—in even conclusory terms, let alone with the requisite specificity—that the purportedly concealed information would have been material to any decisions they made.  Such an "unadorned, the defendant-unlawfully-harmed-me accusation" is insufficient to survive a motion to dismiss.  *Ashcroft* v. *Iqbal*, 129 S.Ct. 1937, 1949 (2009); *McCracken* v. *Ford Motor Co.*, 588 F. Supp. 2d 635, 644 (E.D. Pa. 2008) (dismissing claim because plaintiff "does not allege the date, place or time of these misrepresentations"); *Fisher* v. *APP Pharms., LLC*, 783 F. Supp. 2d 424, 432-33 (S.D.N.Y. 2011) (same); *Kline* v. *EDS Relocation & Assignment Servs.*, No. 08-CV-0980, 2008 WL 4822026, at *5 (M.D. Pa. Nov. 4, 2008) ("Plaintiffs fail to sufficiently plead that the alleged . . . omission . . . was material"); *Lefkowitz* v. *Bank of New York*, 676 F. Supp. 2d 229, 266 (S.D.N.Y. 2009) (same).

Plaintiffs also do not allege, as they must, that the NFL knew this purported link was important to plaintiffs and deliberately concealed the connection.  Nor do plaintiffs allege with specificity how the NFL's purported concealment caused plaintiffs' injuries.  Instead, the Amended Complaint asserts only that the NFL "has known . . . from its supervisory and management role" about the link between concussions and long-term injury since "the early 1970s," and speculates conclusorily that the NFL's concealment of this link was the "proximate cause" of plaintiffs' injuries. (Am. Compl. ¶¶ 9, 38.)  Plaintiffs' boilerplate is insufficient.  *See, e.g.*, *Rosenberg* v. *Avis Rent A Car Sys., Inc.*, No. 07-CV-1110, 2007 WL 2213642, at *5 (E.D. Pa. July 31, 2007) ("[Plaintiff] fails to allege with particularity that defendant . . . had *knowledge* of the falsity of the alleged representation"); *Fagan* v. *AmerisourceBergen Corp.*, 356 F. Supp. 2d 198, 218 (E.D.N.Y. 2004) (same); *Allegheny General Hosp.* v. *Philip Morris,*

*Inc.*, 228 F.3d 429, 445-46 (3d Cir. 2000) ("[P]roximate cause is lacking due to the remoteness of the . . . injury in relation to the [alleged misconduct] and the speculativeness of damages"); *Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*, No. 04-CV-3318, 2005 WL 736217, at *4 (S.D.N.Y. Mar. 30, 2005) (same).

As for the other required elements of fraud—intent to defraud and justifiable reliance—plaintiffs simply do not even try to allege them. *See Santiago* v. *Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) ("To determine the sufficiency of a complaint . . . a court must . . . [f]irst . . . take note of the elements a plaintiff must plead to state a claim." (quoting *Iqbal*, 129 S. Ct. at 1947, 1950)); *Capital Funding, VI, LP* v. *Chase Manhattan Bank USA, N.A.*, No. 01-CV-6093, 2003 WL 21672202, at *6 (E.D. Pa. Mar. 21, 2003) (dismissing claim where plaintiff did not allege "that [defendants] . . . intended to defraud [plaintiff]"); *Woods* v. *Maytag Co.*, No. 10-CV-0559, 2010 WL 4314313, at *9 (E.D.N.Y. Nov. 2, 2010) (same); *McCracken*, 588 F. Supp. 2d at 644 (dismissing claim, in part, because plaintiff "does not allege . . . whether he relied on [alleged omissions] when purchasing" automobile "or how any such reliance was justified"); *Tuosto* v. *Philip Morris USA, Inc.*, 672 F. Supp. 2d 350, 363 (S.D.N.Y. 2009) (same). Accordingly, plaintiffs' deficiently pleaded fraudulent concealment claim should be dismissed.[12]

---

[12]   Plaintiffs do not specify whether their "concealment" claim sounds in fraud or negligence. To the extent that plaintiffs purport to plead "negligent concealment," their claim fares no better. "[M]any states do not recognize a cause of action for negligent nondisclosure." 37 AM. JUR. 2D *Fraud and Deceit* § 202 (2011). Those that do require elements that generally track the elements of a negligent misrepresentation claim and include, for example, (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; (4) which

**B.**     <u>Plaintiffs Fail to State a Claim for Civil Conspiracy</u>

Plaintiffs' civil conspiracy claim is equally deficient.  Although state laws differ regarding the elements of conspiracy, all require that plaintiffs plead the foundation of the claim:  that two or more people agreed to do an unlawful act.  *See Grose* v. *Procter & Gamble Paper Prods.*, 866 A.2d 437, 440 (Pa. Super. Ct. 2005); *Kottler* v. *Deutsche Bank AG*, 607 F. Supp. 2d 447, 463 (S.D.N.Y. 2009); *see also* 15A C.J.S. *Conspiracy* § 9 (2011).  Plaintiffs "who allege civil conspiracy must plead some fact, such as meetings, conferences, telephone calls or joint signatures on relevant forms, or allege facts inferring conspiratorial conduct."  *Thompson* v. *Ross*, No. 10-CV-479, 2010 WL 3896533, at *7 (W.D. Pa. Sept. 30, 2010) (internal quotation marks and citations omitted); *Medtech Prods. Inc.* v. *Ranir, LLC*, 596 F. Supp. 2d 778, 794-95 (S.D.N.Y. 2008) (plaintiff's conspiracy allegation—that defendants "conspired, agreed, and planned to use [plaintiff's] confidential and proprietary information"—were "too conclusory and lacking in factual detail to survive . . . Motions to Dismiss").

Plaintiffs' sole allegation regarding the NFL's purported conspiratorial conduct—that the NFL "conspired with its team members and/or independent contractors" by "direct[ing them] to . . . reject the . . . connection between multiple

---

results in injury to a party acting in justifiable reliance on the misrepresentation; and (5) a duty owed by one party to another.  *See, e.g.*, *Destefano & Assoc., Inc.* v. *Cohen*, No. 2775 June Term 2000, 2002 WL 1472340, at *2 (Pa. Com. Pl. Ct. May 23, 2002) (applying the elements of a negligent misrepresentation claim to a negligent concealment claim).  As discussed above, plaintiffs have failed to plead either the NFL's alleged concealment or the causative link between such concealment and plaintiffs' injuries with the requisite particularity.  Plaintiffs have further failed to allege that the purportedly concealed facts were material or that plaintiffs justifiably relied on allegedly incomplete information provided by the NFL.  *See* Section II.A., *supra*.

concussions . . . and . . . long term effects"—is devoid of any concrete information regarding the alleged conspiracy. (Am. Compl. ¶ 41.) Indeed, plaintiffs have alleged a nearly infinite number of possible co-conspirators (while identifying none specifically), have suggested that the purported conspiracy occurred sometime during "the decades of the 1970s, 1980s, 1990s, and 2000s," and have offered not a shred of factual support—no "meetings, conferences, telephone calls or joint signatures"—demonstrating who at the NFL orchestrated this purported conspiracy or how they achieved it. *Thompson*, 2010 WL 3896533, at *7; Am. Compl. ¶ 10; *see also id*. ¶ 7. This "threadbare conspiracy cause of action with no factual corroboration" should be dismissed. *Thompson*, 2010 WL 3896533, at *7; *see also Santiago*, 629 F.3d at 130 ("allegations that . . . are no more than conclusions, are not entitled to the assumption of truth"); *Donini Int'l, S.p.A.* v. *Satec (U.S.A.) LLC,* No. 03-CV-9471, 2004 WL 1574645, at *3, 4 (S.D.N.Y. July 13, 2004) (same).

Moreover, many states—including New York and Pennsylvania—also require plaintiffs to plead malice, "*i.e.*, an intent to injure," an essential element of conspiracy. *Grose*, 866 A.2d at 440, 441; *see also Wegman* v. *Dairylea Co-op., Inc.*, 50 A.D.2d 108, 114 (N.Y. App. Div. 1975) (same); 15A C.J.S. *Conspiracy* § 15 (2011). In those jurisdictions, "[i]t must be alleged that the *sole* purpose of the conspiracy was to injure the [p]laintiffs." *Zafarana* v. *Pfizer Inc.*, 724 F. Supp. 2d 545, 559 (E.D. Pa. 2010) (dismissing claim against pharmaceutical companies where plaintiffs did not aver that defendants' sole purpose was to injure, but to maximize profits); *Operative Plasterers' & Cement Masons' Int'l Ass'n* v. *Metro. N.Y. Dry Wall Contractors Ass'n, Inc.*, 543 F. Supp. 301, 313 (D.C.N.Y. 1982) (same). Here, plaintiffs allege that the NFL concealed

the connection between concussions and long-term injuries to further its "interest in keeping its fan base excited and interested," thus conceding that the conspiracy's "sole purpose" was not to injure plaintiffs. *Zafarana*, 724 F. Supp. 2d at 559; *Operative Plasterers' & Cement Masons' Int'l Ass'n*, 543 F. Supp. at 313; Am. Compl. ¶¶ 6-7.

        In addition, under the state laws of most jurisdictions, conspiracy is not independently actionable; liability depends on the performance of a separate, intentional tort. *See* 16 AM. JUR. 2D *Conspiracy* § 64 (2011). As discussed, plaintiffs fail to state a claim for fraudulent concealment and assert no other intentional tort. Accordingly, their conspiracy claim should be dismissed. *See McKeeman* v. *Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000) (dismissing claim for lack of underlying tort); *Altman* v. *Fortune Brands, Inc.*, 268 A.D.2d 231, 232 (N.Y. App. Div. 2000) (same).

## C.    **Plaintiffs Fail to State a Claim for Medical Monitoring**

        Finally, plaintiffs fail adequately to allege a claim for medical monitoring. As a threshold matter, this claim is not viable in most states. *See generally* D. Scott Aberson, *Note, A Fifty-State Survey of Medical Monitoring and the Approach the Minnesota Supreme Court Should Take When Confronted With The Issue*, 32 WM. MITCHELL. L. REV. 1096 (2006). Those jurisdictions that recognize the claim require plaintiffs to plead substantially similar elements:

> (1) exposure at greater than background levels; (2) to a proven hazardous substance; (3) caused by defendant's tortious conduct; (4) as a proximate result of the exposure, plaintiff faces an elevated risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes early detection possible; (6) the monitoring program is different than the program normally prescribed in the absence of exposure; and (7) the monitoring program is reasonably necessary according to contemporary scientific principles.

*See, e.g.*, *Caronia*, 2011 WL 338425, at *7 (E.D.N.Y. Jan. 13, 2011).

Plaintiffs' medical monitoring claim is infirm for numerous reasons. First, plaintiffs fail to plead the claim's essential element—namely, that plaintiffs were exposed to a "proven hazardous substance" that invaded the body. *Id.* Instead, plaintiffs allege that they have "been exposed to a greater risk of concussions . . . which then have an increased risk of . . . long-term injury." (Am. Compl. ¶ 55.) An "increased risk of concussions" is not a "proven hazardous substance" under settled law, which permits medical monitoring claims only on the basis of exposure to a tangible, harmful substance that physically enters the body. *See, e.g.*, *Remson* v. *Verizon Commc'ns, Inc.*, No. 07-CV-5296, 2009 WL 723872, at *4 (E.D.N.Y. Mar. 13, 2009) (noting "plaintiff must allege exposure to the allegedly toxic material" and that "alleged exposure to industrial chemicals" sufficed); *Askey* v. *Occidental Chemical Corp.*, 102 A.D.2d 130, 136 (N.Y. App. Div. 1984) (noting that "liability grows out of invasion of the body by the foreign substance" and finding "exposure to . . . toxic chemicals emanating from the landfill" satisfies this element); *Gerardi* v. *Nuclear Util. Servs., Inc.*, 566 N.Y.S.2d 1002, 1003-04 (N.Y. Sup. Ct. 1991) (stating plaintiff must plead "invasion of the body by toxic substances" and finding "exposure . . . to toxic asbestos" sufficient); *see also Bower* v. *Westinghouse Elec. Corp.*, 522 S.E.2d 424, 427, 433 (W. Va. 1999) (holding "plaintiff must present scientific evidence demonstrating a probable link between exposure to a particular compound and human disease" and suggesting "expos[ure] to . . . deleterious

substances" including "arsenic," "beryllium," "MTBE," and "PCB compounds" is sufficient).[13]

"Hazardous conditions" do not suffice.  *See, e.g., Walter* v. *Magee-Women's Hospital of UPMC Health System*, 876 A.2d 400, 405 (Pa. Super. Ct. 2005), *aff'd*, 906 A.2d 1194 (2006) (dismissing claim where plaintiffs "claim they were exposed to dangerous and unsafe medical care . . . and attempt to equate this with exposure to a proven hazardous substance").[14]

Second, where, as here, the "claim for medical monitoring essentially tracks the elements of the claim, but without any specific facts alleged (e.g., as to what medical monitoring procedure exists . . . )," such "generalized allegations are legally insufficient to state a claim."  *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, No. 10-CV-2401, 2011 WL 4006639, at *3 (E.D. Pa. Sept. 7, 2011); *see also Jones* v. *Utils. Painting Corp.*, 198 A.D.2d 268, 268 (N.Y. App. Div. 1993) (dismissing claim because "complaint fails to specifically allege actual exposure to asbestos, at toxic levels, sufficient to state a cause of action").  Here, plaintiffs fail to plead any facts to support

---

[13]   Indeed, so limiting "proven hazardous substances" accords with the public policy that justifies "medical monitoring" as a means to "promote[] early diagnosis and treatment of disease resulting from exposure to toxic substances."  *Barnes*, 161 F.3d at 139-40; *see also Burns* v. *Jaquays Min. Corp.*, 752 P.2d 28, 33 (Ariz. Ct. App. 1987) (medical monitoring "subjects polluters to significant liability when proof of the causal connection between the tortious conduct and the plaintiffs' exposure to chemicals is likely to be most readily available").

[14]   To the extent plaintiffs have alleged that they have been exposed to concussions, and not merely a "greater risk" of concussions, their claim is similarly unavailing.  (*See* Am. Compl. ¶ 57.)   As discussed, plaintiffs must allege exposure to a proven hazardous substance that invades the body.  *Caronia*, 2011 WL 338425, at *5 (only "one who has suffered an invasion of the body by [a] foreign substance" can recover under claim).  A concussion is neither a tangible substance nor can it invade the body.

their allegations, which merely repeat the elements of the claim nearly verbatim without providing any factual allegation regarding, for example, a "normal" background level for concussions or the alleged concussion-exposure monitoring procedure. *See Caronia*, 2011 WL 338425, at *7; Am. Compl. ¶¶ 55-58. Such pleading is the exact type of "formulaic recitation" of elements that courts have found "legally insufficient to state a claim." *See Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007); *In re Avandia*, 2011 WL 4006639, at *3.

Finally, to the extent that plaintiffs have asserted medical monitoring claims on behalf of current NFL players, those claims should be dismissed because plaintiffs lack standing under Federal Rule of Civil Procedure 12(b)(1) to bring them. "The doctrine of standing . . . requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers* v. *Earth Island Inst*., 555 U.S. 488, 493 (2009) (citations omitted). Thus, in putative class actions a class representative "must be a member of the class which he or she seeks to represent." *Sosna* v. *Iowa,* 419 U.S. 393, 403 (1975); *see also* Fed. R. Civ. P. 23(a) (same). Each subclass, in turn, must also be "treated as a class," and must therefore be represented by a named class representative. Fed. R. Civ. P. 23(c)(5); *Boone* v. *City of Philadelphia*, 668 F. Supp. 2d 693, 706 (E.D. Pa. 2009).

Here, although the named plaintiffs consist only of former NFL players, plaintiffs nonetheless seek to certify a subclass defined as, "All current NFL players" who have or will experience a concussion and who have not been properly monitored ("Subclass E"). (Am. Compl. ¶ 32; *see also id*. ¶ 59.) Because none of the named

plaintiffs is a current NFL player, and therefore no class representative exists for Subclass E, the claims that plaintiffs seek to bring on behalf of this class must be dismissed due to plaintiffs' lack of standing. *See Fanty* v. *Com. of Pa.*, *Dept of Public Welfare*, 551 F.2d 2, 7 n.4 (3d Cir. 1977) (dismissing claims where no class representatives were members of subclasses); *McDonough* v. *Toys 'R' Us, Inc.*, 638 F. Supp. 2d 461, 473 (E.D. Pa. 2009) (same).

### Conclusion

For the foregoing reasons, the NFL respectfully submits that the Amended Complaint should be dismissed with prejudice.

Dated: New York, New York
November 9, 2011

Respectfully submitted,

By: __/s/ Brad S. Karp_____

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Bruce Birenboim
Beth A. Wilkinson
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

DUANE MORRIS LLP
John J. Soroko (Pa. Atty. ID 25987)
Dana B. Klinges (Pa. Atty. ID 57943)
30 South 17th Street
Philadelphia, PA 19103-4196
(215) 979-1000

*Attorneys for Defendant*