Exhibit 6
Part 4 of 5

# ARTICLE XXXIX
## MEAL ALLOWANCE

***Section 1*. Reimbursement**: A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and post-season as follows: 1993-94 League Years—Breakfast $12.00, Lunch $15.00, Dinner $33.00; 1995-96 League Years—Breakfast $13.00, Lunch $17.00, Dinner $35.00; 1997-99 League Years—Breakfast $14.00, Lunch $19.00, Dinner $37.00. For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

***Section 2*. Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

**119**

# ARTICLE XL
# DAYS OFF

*Section 1*. **Rate**: All players will be permitted days off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2*. **Requirements:** During the 24-hour period constituting a day off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

120

# ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification**: A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)      Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)      Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses**: As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

121

**Section 3. Travel Expenses**: Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent

that the player is legally obligated to such rent and each such payment shall not exceed $4,000 during the 1993-95 League Years, and $4,750 during the 1996-98 League Years; and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*Section 4.* **Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

122

# ARTICLE XLII
# POST-SEASON PAY

**Section 1. System:** Beginning with the post-season following the 1993 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each post-season game played:

|  |  | 93 | 94 | 95 | 96 | 97 | 98 | 99 |
|---|---|---|---|---|---|---|---|---|
| Wild Card Game | (Div. Winner) | $ 12 | 12 | 13 | 14 | 15 | 15 | 16 |
|  | (Other) | 7.5 | 7.5 | 7.5 | 10 | 10 | 10 | 10 |
| Division Playoff Game |  | 12 | 12 | 13 | 14 | 15 | 15 | 16 |
| Conference Championship Game |  | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 |
| Super Bowl Game (Winning Team) |  | 38 | 42 | 42 | 48 | 48 | 53 | 58 |
| (Losing Team) |  | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 |
|  |  |  |  |  |  |  | (in thousands) | |

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**123**

**Section 4. Conference Championship; Super Bowl Game:**

(a)      A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game.

(b)      A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or post-season) will receive one-half the amount designated in Section 2 for such game.

(c)      A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)      A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was

on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)     A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)     A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

124   (g)     A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/ Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5**. **Payment**: Players will be paid under this Article within fifteen (15) days after the game in question has been played.

# ARTICLE XLIII
# PRO BOWL GAME

**Section 1. Compensation:** Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $20,000 and each player on the losing Team will receive $10,000. These amounts shall be increased to $25,000 and $12,500 respectively for the Pro Bowls following the 1997 through 1999 seasons.

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

125

# ARTICLE XLIV
# PLAYERS' RIGHTS TO MEDICAL CARE
# AND TREATMENT

*Section 1.* **Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

*Section 2.* **Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

*Section 3.* **Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

126

*Section 4.* **Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 5.* **Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

### Section 6. Substance Abuse:

(a)    **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)    **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)    **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

127

# ARTICLE XLV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

**128**

## ARTICLE XLVI
## PLAYER BENEFIT COSTS

*Section 1.* **Right of Reduction**: The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) post-season pay (although the NFLPA will have the unilateral right to direct that post-season pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

*Section 2.* **Right of Restoration**: Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

129

*Section 3.* **Definition**: For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)      pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

(b)      group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)      injury protection (as described in Article XII);

(d)      workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)      pre-season per diem amounts (as described in Sections 3 and 4

of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)     moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)     post-season pay (as described in Article XLII and Article XLIII);

(h)     player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year); and

(i)     severance pay (as described in Article L).

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article **130** XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, and the Supplemental Disability Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

***Section 4.*** **Resolution of Disputes**: In the event the NFLPA and the Management Council are unable to agree by March 7 as to projected Player Benefit Costs for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)     The parties will submit in writing to the Benefit Arbitrator their

respective calculations of projected Player Benefit Costs for the forthcoming year. Such submissions to the Benefits Arbitrator will be made by each party by March 15.

(b)      Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)      As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**131**

# ARTICLE XLVII
## RETIREMENT PLAN

*Section 1.* **Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan"), formed pursuant to Section 5 of this Article, will be continued and maintained in full force and effect during the term of this Agreement. Prior to such merger, the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan") and the Pete Rozelle NFL Player Retirement Plan (the "Pete Rozelle Plan") will each be continued and maintained in full force and effect. When used in other Articles in this Agreement, the terms "Bert Bell/Pete Rozelle Plan" and "Merged Plan" will also refer to each of the Bert Bell Plan and the Pete Rozelle Plan for the periods prior to such merger, as appropriate depending on the context in which such term is used.

*Section 2.* **Amendment by Bargaining Parties:** Promptly following the ratification of this Agreement, the parties will instruct the Members of the Retirement Board of the Bert Bell Plan and of the Retirement Committee of the Pete Rozelle Plan to amend the Bert Bell Plan and the Pete Rozelle Plan to allow the parties, when acting jointly, to directly amend the Bert Bell Plan and the Pete Rozelle Plan to (1) change the vesting schedule, (2) increase and revise benefits, (3) impose and remove limits on maximum benefits, (4) expand coverage (including but not limited to merger with other qualified plans), and (5) provide that, during the term of this Agreement, the Members of the Retirement Board of the Bert Bell Plan and the Members of the Retirement Committee of the Pete Rozelle Plan cannot increase benefits. These provisions will be continued in the Merged Plan.

*Section 3.* **Contributions:** For each of the seven Plan Years beginning April 1, 1993 and ending March 31, 2000, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year, except that a $1 million contribution for the 1993 Plan Year will be made to the Bert Bell Plan on or before twenty (20) business days following ratification of this Agreement. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after April 1, 2000 will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the

132

Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Amendment of Bert Bell and Pete Rozelle Plans**: Promptly following the amendment to the Bert Bell Plan and the Pete Rozelle Plan described in Section 2 above, the parties will jointly make the amendments in subsections (A) through (D) below.

(A)    Faster Vesting: Both the Bert Bell Plan and the Pete Rozelle Plan will be amended such that each participant who has three or more Credited Seasons and who has at least one Credited Season in the 1993 Plan Year or in a later Plan Year will be fully vested in his accrued benefit.

(B)    Benefits for Future Seasons: The Bert Bell Plan will be amended to provide the following Benefit Credits for Credited Seasons after 1992:

| Credited Season | Benefit Credit |
|---|---|
| 1993 | $220 |
| 1994 | $220 |
| 1995 | $260 |
| 1996 | $260 |
| 1997 | $300 |
| 1998 | $300 |
| 1999 | $300 |

133

(C)    New and Revised Disability Benefits: The Bert Bell Plan will be further amended as follows:

(1)    Plan Section 5.1 will be deleted and replaced with language substantially equivalent to the following:

"Any Player or Vested Inactive Player, other than a Retired Player or a Player who has reached his Normal Retirement Date, who is determined by the Retirement Board upon written application to be totally and permanently disabled, as defined below, will be entitled to receive a monthly pension commencing after the expiration of a six (6) month waiting period measured from the date of such disability in an amount equal to 100% of the Benefit Credits of the Player at the date such disability occurs, including, if applicable, the scheduled Benefit Credit as provided in Section 4.1 for the Plan Year in which the disability occurs. This benefit may be increased as provided below. All benefits provided by this Article will be retroactive to the date of disability and will be payable for life or until cessation of the total and permanent disability."

"(A) (Active Football). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) results from League foot-

ball activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled shortly after the disability(ies) first arises."

"(B) (Active Nonfootball). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) does not result from League football activities, but does arise while the Player is an Active Player and does cause the Player to be totally and permanently disabled shortly after the disability(ies) first arises."

"(C) (Football Degenerative). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (a) age 45, or (b) 12 years after the end of the Player's last Credited Season."

"(D) (Inactive Nonfootball). Effective April 1, 1993, the monthly pension shall be no less than $1,500 if the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player. The minimum benefits provided under this subsection (D) will be offset by any disability benefits provided by an employer other than the NFL or NFL Clubs, but will not be offset by worker's compensation."

"(E) (Dependent Child). Effective April 1, 1993, $100 per month for each dependent child will be payable during the period of total and permanent disability; provided, however, that notwithstanding anything in this Article 5 to the contrary, the additional benefit of $100 per month shall terminate as soon as the dependent child (in respect of whom it is paid) ceases to be the Player's dependent child."

134

"For purposes of this Section 5.1, the term "Active Player" means a Player who (1) is obligated to perform football playing services under contract with an Employer, or (2) is no longer obligated to perform football playing services under contract with an Employer, but is between the period beginning when the player's last contract under which the player was obligated to perform football playing services expired or was terminated for any reason, and ending on the later of (a) the July 15 following the beginning of the period or (b) the first day of preseason training camp."

"A Player who becomes totally and permanently disabled no later than six months after a disability(ies) arises will be conclusively deemed to have become totally and permanently disabled 'shortly after' as that phrase is used in subsections (A) and (B) above, and a Player who becomes totally and permanently disabled more than twelve months after a disability(ies) arises will be conclusively deemed not to have become totally and permanently disabled 'shortly after' as that phrase is used in subsections (A) and (B) above. In cases falling within this six to twelve month period, the Retirement Board will have the right and duty to determine whether the 'shortly after' standard is satisfied."

(2)    The first paragraph of Plan Section 5.2 will be amended to re-

place "prevented from or unable to engage in" with "substantially prevented from or substantially unable to engage in," and to add the following sentence at the end thereof:

"A Player or Vested Inactive Player shall not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2 merely because such person is employed by the NFL or an NFL Club, manages personal or family investments, is employed by or associated with a charitable organization, or is employed out of benevolence."

(3)     Plan Articles 5 and 6 will be amended to replace "football activities" each time it appears with "League football activities."

(4)     Plan Section 6.1 will be amended to change "sixty (60) months" to "ninety (90) months".

(5)     The second paragraph of Plan Section 6.1 will be amended to change "36 months" to "48 months".

(6)     Plan Section 6.3 will be amended to insert a period after "a month" the first time it occurs, and to delete the remaining language in that Section.

(7)     Plan Section 6.4(B) will be amended to change "60%" to "55%," and Plan Section 6.4(C) will be amended to change "80%" to "70%".

(8)     The final paragraph of Plan Section 6.4 will be amended to replace "and has resulted in" with "and was the most significant factor in".

(9)     The second sentence of Plan Section 6.5 will be amended to read as follows: "'Arising out of League football activities' shall not include any disablement resulting from other employment, or athletic activity for recreational purposes."

All of the changes in this Section 4(C) will be effective as of the first of the month following ratification of this Agreement, and will apply to applications for benefits by or on behalf of players first making application for such benefits on or after April 1, 1993 and who earn a Credited Season in 1993 or later, and will apply on the basis of all prior injuries, including injuries prior to April 1, 1993.

(D)     Removal of Early Retirement Option: The Bert Bell Plan and the Pete Rozelle Plan will each be amended such that players who have no Credited Seasons for Plan Years prior to the 1993 Plan Year will not be eligible to elect an early retirement pension prior to age 55, or to elect a 25% early payment benefit.

(E)     Joint Administration of Rozelle Plan: Within 30 days after ratification of this Agreement, the Pete Rozelle Plan will be maintained and jointly administered in the same manner as the Bert Bell Plan. The NFLPA and the Management Council will each appoint three members to the Retirement Committee of the Pete Rozelle Plan.

135

***Section 5.* Plan Merger and Further Amendments:**

(A)      Plan Merger: Promptly following the amendment described in Section 2 above and immediately after the amendments described in Section 4 above, the parties will merge the Bert Bell Plan with the Pete Rozelle Plan. The effect of such merger will be to bring Pete Rozelle Plan participants under the terms of the Bert Bell Plan, as modified pursuant to this Agreement, and the combined Plan will be called the "Bert Bell/Pete Rozelle NFL Player Retirement Plan" (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan").

(B)      Retroactive Increase in Benefit Credits for Prior Years: Upon or immediately following its creation, the parties will amend the Merged Plan to increase benefits for Credited Seasons prior to 1993 (including seasons prior to 1959 that are considered Credited Seasons pursuant to section 1.15(C) of the Bert Bell Plan) by forty percent (40%). These benefit increases will be retroactively effective for payments made on or after April 1, 1987 for participants in pay status as of March 1, 1993, but will be offset by retroactive payments made pursuant to the benefit increase resolution of the Retirement Board of the Bert Bell Plan adopted in September 1992. The retroactive portion of these increases will be paid in a lump sum as soon as administratively practicable.

**136**

(C)      Retroactive Increase in Minimums: Upon or immediately following its creation, the parties will amend the Merged Plan such that:

(1)      Effective April 1, 1987, the $750 per month minimum benefit for nonfootball total and permanent disability in Plan Section 5.1 will be increased to $1,500 per month; and the $50 per month per dependent child benefit in Plan Sections 5.1 and 5.4 will be increased to $100 per month;

(2)      Effective April 1, 1987, the $500 per month minimum "line-of-duty disability benefit" described in Plan Section 6.3 will be increased to $1,000 per month;

(3)      Effective April 1, 1987, the $600 per month minimum Widow's and Surviving Children's benefit described in the first paragraph of present Plan Section 7.3 will be increased to $1,200 per month, the $1,000 per month minimum Widow's and Surviving Children's benefit for players active in 1977 through 1981 described in the second paragraph of present Plan Section 7.3 will be increased to $2,000 per month, and the $1,500 per month minimum Widow's and Surviving Children's benefit for players active in the 1982 and later seasons described in the third paragraph of present Plan Section 7.3 will be increased to $3,000 per month.

All benefit increases in this subsection 5(C) will take effect retroactively for persons in pay status as of March 1, 1993, but will be offset by retroactive payments made pursuant to the benefit increase resolution of the Retirement Board of the Bert Bell Plan adopted in September 1992. The

retroactive portion of these increases will be paid in a lump sum as soon as administratively practicable.

(D)    Retroactive Extension of Total and Permanent Disability Benefits: Notwithstanding Section 4 above, the amendments described in paragraphs (1), (2), and (3) of Section 4(C) will also apply to (1) persons currently receiving total and permanent disability benefits under the Bert Bell Plan; and (2) any player who may subsequently apply for disability benefits under either the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, regardless of whether the player had a Credited Season after 1992 or when the disability(ies) arose, unless a previous application for benefits by such player that is related to the present disability(ies) was denied prior to the date of this Agreement. The parties will agree on those persons who, effective as of the first of the month following ratification of this Agreement, will be entitled to total and permanent disability benefits under Sections 5.1(A) (Active Football), 5.1(B) (Active Nonfootball), and 5.1(C) (Football Degenerative) of the Bert Bell Plan, as amended by this Agreement, on the basis of previous injuries. The provisions of the Bert Bell Plan and later the Merged Plan will determine whether persons should be entitled to such disability benefits beginning as of a later date on the basis of previous or subsequent injuries.

137

(E)    Timing and Contingency: The plan merger and all of the benefit increases in this section are contingent on such notice to and approval of the Internal Revenue Service and the Pension Benefit Guaranty Corporation as counsel deem appropriate. However, payment of all benefit increases under this Section 5, including the retroactive portion of these increases, will commence as soon as administratively practicable. To the extent that the plan merger and/or benefit increases are frustrated because of the lack of government approval or the action of a court, the parties will agree on the best method to accomplish the benefit increases in this Section 5 pro rata based solely on the available assets of the Bert Bell Plan and the Pete Rozelle Plan.

**Section 6. Benefits for Pre-1959 Seasons:** Promptly following the amendment described in Section 2 above, the parties will jointly amend the Bert Bell Plan, contingent on approval by the Internal Revenue Service, to include players who played football prior to the 1959 season as participants and to provide that each such player who has five or more Credited Seasons before 1959 will be credited with a monthly benefit at normal retirement age of $80 for each Credited Season prior to 1959, excluding any Credited Season prior to 1959 for which the participant was previously receiving benefits in accordance with Section 1.15(C) of the Bert Bell Plan. If a player, who would otherwise have been eligible for this benefit, died on or after July 1, 1987, and was married at the time of his death, the player's surviv-

ing spouse will receive a benefit equal to the amount she would have received had the player elected a joint and survivor annuity when the player would have been eligible to begin receiving benefits. This expansion of the Bert Bell Plan will take effect as of the first of the month following IRS approval. Also, as soon as administratively practicable following such IRS approval, players and surviving spouses receiving benefits under this Section will receive a lump sum payment equal to one-quarter of the benefit amount they would have received had IRS approval been obtained upon ratification. To the extent that this expansion of the Bert Bell Plan is prevented or frustrated because of the lack of government approval or the action of a court, this Section 6 will be nullified.

**138**

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

**Section 1. Establishment:** The parties will jointly establish a new plan, to be called the NFL Player Second Career Savings Plan (hereinafter referred to as "Savings Plan"). The Savings Plan will be jointly administered pursuant to the requirements of the Taft Hartley Act in a manner similar to the Bert Bell/Pete Rozelle Plan. The Savings Plan will be established as a tax-qualified multiemployer defined contribution profit-sharing plan, and will be submitted to the Internal Revenue Service for advance approval. The Plan Year will be the period April 1 to March 31.

**Section 2. Contributions:** For each of the Plan Years 1993 to 1999, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club, unless this figure is changed pursuant to this Agreement. Contributions to the Savings Plan for the Plan Years 1993 through 1999 will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year. Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

**139**

**Section 3. Allocation:** Contributions described in Section 2 above for a Plan Year will, after payment of the administrative expenses of the Savings Plan, be allocated to achieve, as nearly as possible, the effect of an equal allocation for each participant with full vesting after two (2) Credited Seasons.

**Section 4. Salary Reduction Contributions:** The Savings Plan will generally allow players to make salary reduction contributions pursuant to section 401(k) of the Internal Revenue Code. The parties may jointly restrict the ability to make salary reduction contributions if necessary or desired to avoid or minimize possible problems and administrative complications relating to the tests and limits of section 401(k)(3) and section 415 of the Internal Revenue Code or similar rules. The NFL Clubs will cooperate in the administration of salary reduction contributions.

**Section 5. Benefit Options:** A participant in the Savings Plan will be permitted to select from among the following options for the payout of his account balance: (1) a lump sum; (2) installment payments over a ten (10) year period, with one-tenth of the account balance paid as of the first of the month following election of this option, one-ninth of the remaining account balance payable one year later, etc.; (3) an annuity for the life of the player only; (4) an annuity for the life of the player with a 50% continuation benefit for his surviving spouse; and (5) any other annuity option

deemed appropriate by the fiduciaries of the Savings Plan. Where a player selects an annuity pursuant to options 3, 4, or 5 above, the Savings Plan will use his account balance to purchase such an annuity from a commercial insurer selected by the fiduciaries of the Savings Plan. No payments in any form will be made to a player before he attains age 45 and ceases to be employed by an NFL Club, except that a player employed by an NFL Club may elect to receive Savings Plan benefits after he attains age 59-1/2.

*Section* 6. **Death Benefits:** If a player dies prior to the time for receiving a benefit, his surviving spouse (or his designated beneficiary if no surviving spouse exists) will be entitled to 100% of his vested account balance, payable as a lump sum.

*Section* 7. **Investment:** Participants will be permitted to direct the investment of funds held on their behalf among at least three investment choices as determined by the fiduciaries of the Savings Plan, and to move funds among such choices quarterly. The Savings Plan will be valued quarterly and players will receive quarterly statements of their account balances.

**140**

# ARTICLE XLIX
# GROUP INSURANCE

**Section 1. Group Insurance Benefits:** Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)    Life Insurance: A rookie player will be entitled to $100,000 in coverage. A veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage.

(b)    Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual, $400 per family per plan year, with a maximum out-of-pocket expense of $800 per year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $1 million.

(c)    Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)    Preventive care paid at 100% of UCR,
(2)    General services paid at 85% of UCR, and
(3)    Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum annual benefit payable is $2,000 per covered individual.

Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 will continue to receive insurance coverage under this Article until the first game of the next regular season. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

**Section 2. Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any docu-

141

ment or other information relating to group insurance, including materials relating to experience and costs.

**142**

# ARTICLE L
## SEVERANCE PAY

**Section 1. Eligibility:** Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through 1999, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

**Section 2. Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; and (b) $10,000 per Credited Season for each of the seasons 1993 through 1999.

**Section 3. Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

143

**Section 4. Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
| --- | --- | --- |
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through February 19, or earlier | June 1 | June 30 |
| February 20 through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

*Section 5.* **Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

*Section 6.* **Only One Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

*Section 7.* **Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

*Section 8.* **Prior Severance Pay:** Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

144

*Section 9.* **Nonassignability:** The right to receive payment hereunder shall not be assignable, transferrable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

# ARTICLE LI
# SUPPLEMENTAL DISABILITY BENEFITS

*Section 1.* **Establishment:** The parties will jointly establish a new plan, to be called the NFL Player Supplemental Disability Plan (hereafter "Supplemental Disability Plan"), to provide disability benefits in addition to those provided under the Bert Bell/Pete Rozelle Plan. The Supplemental Disability Plan will be jointly administered pursuant to the requirements of the Taft Hartley Act. The Supplemental Disability Plan will be established as a voluntary employees' beneficiary association ("VEBA") within the meaning of section 501(c)(9) of the Internal Revenue Code, and will be designed to comply with the requirements of that section. The Supplemental Disability Plan will be submitted to the Internal Revenue Service for approval as a VEBA. The Plan Year will be the twelve-month period beginning April 1.

*Section 2.* **Contributions:** For each of the Plan Years 1993 to 1999, and unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

**145**

*Section 3.* **Disability Benefits:** A former player who is receiving total and permanent disability benefits under Sections 5.1(A) (Active Football), 5.1(B) (Active Nonfootball), or 5.1(C) (Football Degenerative) of the Bert Bell/Pete Rozelle Plan will also receive under this Supplemental Disability Plan the following benefits for each month in which he receives total and permanent disability benefits under those Sections of the Bert Bell/Pete Rozelle Plan. The following benefits will take effect as of the first of the month following ratification of this Agreement, with no retroactive payments:

(a)     If the player is receiving total and permanent disability benefits under Section 5.1(A) (Active Football) of the Bert Bell/Pete Rozelle Plan, $4,335 per month, increasing to $8,500 per month effective March 1, 1995, and increasing further to $12,670 per month effective March 1, 1997.

(b)     If the player is receiving total and permanent disability benefits under Section 5.1(B) (Active Nonfootball) of the Bert Bell/Pete Rozelle Plan, $3,500 per month, increasing to $4,335 per month effective March 1, 1994, increasing further to $5,170 per month effective March 1, 1995, and increasing further to $6,000 per month effective March 1, 1997.

(c)      If the player is receiving total and permanent disability benefits under Section 5.1(C) (Football Degenerative) of the Bert Bell/Pete Rozelle Plan, $2,250 per month, increasing to $3,085 per month effective March 1, 1995, and increasing further to $4,335 per month effective March 1, 1997.

The definition of "Active Player" in Section 5.1 of the Bert Bell/Pete Rozelle Plan (as amended under this Agreement) will also apply for purposes of this Supplemental Disability Plan.

**Section 4. Retirement Ignored:** Benefits under this Supplemental Disability Plan payable through March 31, 2000, will continue, regardless of the player's age, as long as the player is receiving disability benefits under Article 5 of the Bert Bell/Pete Rozelle Plan.

146

# ARTICLE LII
# BENEFIT ARBITRATOR

*Section 1.* **Selection**: The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

147

*Section 2.* **Compensation**: To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

*Section 3.* **Role**: The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either

party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

148

# ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

**149**

# ARTICLE LIV
# WORKERS' COMPENSATION

*Section 1.* **Benefits**: In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

*Section 2.* **Rejection of Coverage**: Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

*Section 3.* **Arbitration**: In any state where a Club (e.g., Miami Dolphins/ Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**150**

*Section 4.* **Joint Study**: The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

*Section 5.* **Moratorium**: The NFLMC, the NFL, all of the Clubs and the NFLPA agree to a moratorium on any and all efforts to change state laws concerning workers' compensation coverage of professional athletes, beginning as of the execution of this Agreement and ending December 31, 1994. During such period, the NFLMC, the NFL, any Club, the NFLPA, and/or their respective agents are prohibited from making or supporting any attempt, directly or indirectly, to change state laws affecting players' workers' compensation coverage.

*Section 6.* **Preservation of Rights:** The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

*Section 7.* **Reopener:** If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days' written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

151

# ARTICLE LV
# MISCELLANEOUS

**Section 1. Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product.

**Section 2. On-Field Attire:** Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

**Section 3. Appearances:** No Club may unreasonably require a player to appear on radio or television.

**Section 4. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

152

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any Club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Clubs as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cut-down date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three days prior to the date of the game.

NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

153

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefor by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its 28 members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

**Section 16. Headings**: The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods**: The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits**: All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence**: The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

154

# ARTICLE LVI
# 1999 LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the final League Year of this Agreement (1999), except that the following rules shall apply only in that League Year:

***Section 1***. **No Salary Cap**: No Salary Cap shall be in effect during the 1999 League Year.

***Section 2***. **Free Agency If Salary Cap in 1998**: In the event that a Salary Cap is in effect in the 1998 League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the 1999 League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the 1999 League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii)(1), (2), (3) and (4) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

**155**

***Section 3***. **Free Agency If No Salary Cap in 1998**: In the event that a Salary Cap is not in effect in the 1998 League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the 1999 League Year shall be five Accrued Seasons.

***Section 4***. **Franchise and Transition Players:** As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, 1999, notwithstanding that Transition Players may not be designated in the 1995, 1996, 1997 and 1998 League Years (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS: LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

**156**

*Section 2.* **Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

*Section 3.* **CBA Expiration:**

(a)    Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)    The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1. Effective Date:** Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993.

**Section 2. Termination:** Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on March 1, 2000, or thereafter by giving sixty (60) days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

**Section 3. Termination Date:** This Agreement shall be effective from the date hereof and shall continue in full force and effect until March 1, 2000, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire at the end of the League Year following the Draft held in the year 2000.

157

**Section 4. Termination Prior to Expiration Date:**

(a)    **Due To Invalidation of Settlement Agreement.** In the event that the Settlement Agreement does not receive Court Approval or is otherwise invalidated by any appellate court prior to September 1, 1993:

(i)    this Agreement shall terminate immediately;

(ii)    the <u>White</u> action and the Related Litigation (as defined in Article I of the Settlement Agreement) shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)    all pending motions in <u>White</u> and <u>McNeil</u> shall be decided by the Court; and

(iv)    with respect to all Player Contracts entered into by Unrestricted Free Agents during the period from March 1 to the date of such disapproval, and by Restricted Free Agents during the period from March 1 to the date of such disapproval:

(1)    any Club that had rights to the services of any such player on January 31, 1993 shall have the right to assume any such Player Contract by notice to the player, the New Club, the NFLPA and Class Counsel within ten days of the date of such disapproval, and in such event such Prior Club shall have the same rights to the services of such player that the New Club would have had under such Player Contract;

(2)    within twenty days of the date of such disapproval, any such

player shall have the right to void any such Player Contract, whether such contract was assumed by the Prior Club or not, by notice to the Prior Club or New Club, which clubs shall notify the NFLPA and Class Counsel of such election as soon as possible but in no event later than one day after receiving such notice (in the event the player voids such Player Contract, the player shall return to the Team any compensation received thereunder); and any such player shall have such further relief as determined by the Court pursuant to the pending motions in White and McNeil;

(3)     in the event that a player voids a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract after the date of such election; and

(4)     in the event that a player elects not to void a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract.

(b)     **Approval of Settlement Agreement Invalidated.** In the event that the Settlement Agreement receives Court Approval but such approval is invalidated by any appellate court on or after September 1, 1993:

**158**

(i)     this Agreement shall terminate immediately;

(ii)     the White action and the Related Litigations shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)     all Player Contracts entered into prior to such date of such disapproval shall remain in full force and effect and shall be binding on all Parties;

(iv)     a player with a Player Contract referred to in Section 4(b)(iii) above shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases And Covenants Not to Sue) of the Settlement Agreement, that arises out of such Player Contract, for conduct prior to such disapproval consistent with the express terms of this Agreement.

(c)     **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement except as referred to in subsections (a) and (b) above, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is ren-

dered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (1999 League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d)    **Termination Due To Collusion.** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

159

(e)    **Termination After Closing Date.** If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f)    **No Waiver.** Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

*Section 5.* **Ratification:** This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

# ARTICLE LIX
# GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

160

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a)   **To the National Football League Management Council:**
The National Football League
Management Council
410 Park Avenue
New York, New York 10022
Attention: Executive Vice President - Labor Relations

(b)   **To an NFL Club:**
At the principal address of such Club as then listed on the records of the NFL or at that Club's principal office.
Attention: President

(c)   **To the NFLPA:**
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
Attention: General Counsel

**161**

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

BY: _____

BY: _____

# APPENDIX A

## CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

162

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football

League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

                                    Signature


                                    Player's Name—Type or Print


**163**

## APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

164

# APPENDIX C

# NFL PLAYER CONTRACT

THIS CONTRACT is between _____ _____, hereinafter "Player," and_____ _____, a _____ corporation (limited partnership) (partnership), hereinafter "Club," operating under the name of the _____ _____ _____ as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

1.    TERM.  This contract covers _____ football season(s), and will begin on the date of execution or March 1, _____, whichever is later, and end on February 28 or 29, _____, unless extended, terminated, or renewed as specified elsewhere in this contract.

2.    EMPLOYMENT AND SERVICES. Club employs Player as a skilled football player. Player accepts such employment. He agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those associated with the game. Player will report promptly for and participate fully in Club's official mandatory mini-camp(s), official pre-season training camp, all Club meetings and practice sessions, and all pre-season, regular season and post-season football games scheduled for or by Club. If invited, Player will practice for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the League unless the game is first approved by the League.

**165**

3.    OTHER ACTIVITIES.  Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a significant risk of personal injury.

4.   PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
(a) Player grants to Club and the League, separately and together, the au-
thority to use his name and picture for publicity and the promotion of NFL
Football, the League or any of its member clubs in newspapers, magazines,
motion pictures, game programs and roster manuals, broadcasts and tele-
casts, and all other publicity and advertising media, provided such public-
ity and promotion does not constitute an endorsement by Player of a com-
mercial product. Player will cooperate with the news media, and will par-
ticipate upon request in reasonable activities to promote the Club and the
League. Player and National Football League Players Association, here-
inafter "NFLPA," will not contest the rights of the League and its member
clubs to telecast, broadcast, or otherwise transmit NFL Football or the right
of NFL Films to produce, sell, market, or distribute football game film
footage, except insofar as such broadcast, telecast, or transmission of
footage is used in any commercially marketable game or interactive use.
The League and its member clubs, and Player and the NFLPA, reserve their
respective rights as to the use of such broadcasts, telecasts or transmissions
of footage in such games or interactive uses, which shall be unaffected by
this subparagraph.

**166**         (b)   Player hereby assigns to the NFLPA and its licensing affiliates, if
any, the **exclusive** right to use and to grant to persons, firms, or corpora-
tions (collectively "licensees") the right to use his name, signature facsimi-
le, voice, picture, photograph, likeness, and/or biographical information
(collectively "image") in group licensing programs. Group licensing pro-
grams are defined as those licensing programs in which a licensee utilizes a
total of six (6) or more NFL player images on products that are sold at re-
tail or used as promotional or premium items. Player retains the right to
grant permission to a licensee to utilize his image if that licensee is not con-
currently utilizing the images of five (5) or more other NFL players on prod-
ucts that are sold at retail or are used as promotional or premium items. If
Player's inclusion in a particular NFLPA program is precluded by an indi-
vidual exclusive endorsement agreement, and Player provides the NFLPA
with timely written notice of that preclusion, the NFLPA will exclude Play-
er from that particular program. In consideration for this assignment of
rights, the NFLPA will use the revenues it receives from group licensing
programs to support the objectives as set forth in the By-laws of the NFLPA.
The NFLPA will use its best efforts to promote the use of NFL player im-
ages in group licensing programs, to provide group licensing opportunities
to all NFL players, and to ensure that no entity utilizes the group licensing
rights granted to the NFLPA without first obtaining a license from the
NFLPA. This paragraph shall be construed under New York law without ref-
erence to conflicts of law principles. The assignment in this paragraph shall
expire on December 31 of the later of (a) the third year following the exe-
cution of this contract, or (b) the year in which this contract expires. Nei-

ther Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this sub-paragraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

   5.   COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

   $_____ for the 19_____ season;

   $_____ for the 19_____ season;

   $_____ for the 19_____ season;

   $_____ for the 19_____ season;

   $_____ for the 19_____ season.

**167**

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

   6.   PAYMENT.  Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or bi-weekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly por-

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary having become due and payable up to the time of termination.

7.    DEDUCTIONS.   Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.    PHYSICAL CONDITION.   Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.    INJURY.   Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.   WORKERS' COMPENSATION.   Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

**168**