# Exhibit 7
# Part 5 of 6

**Section 6. Pre-Training Camp Period:** *During the ten consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.*

*\*Extension Agreement 6/6/96*

**Section 7. Enforcement:** *The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L*

*\*Extension Agreement 6/6/96*

.

**158**

# ARTICLE XXXVI
# MINICAMPS

*Section 1*. **Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

*Section 2*. **Length:** No minicamp may exceed three days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

*Section 3*. **Expenses:** Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

*Section 4*. **Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

*Section 5*. **Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

# ARTICLE XXXVII
## PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell or Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** During the term of this Agreement, a rookie player will receive "per diem" payments at the rate of $500 per week in the 1993-94 League Years, $550 per week in the 1995 League Year, $600 per week in the 1996 League Year, $650 per week in the 1997 League Year, $675 per week in the 1998-99 League Years, *$700 per week in the 2000-01 League Years, and $725 per week in the 2002 League Year,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 6/6/96*

**Section 4. Veteran Per Diem:** During the term of this Agreement, a veteran player will receive "per diem" payments at the rate of $600 per week in the 1993-94 League Years, $700 per week in the 1995-96 League Years, $800 per week in the 1997-99 League Years, *and $900 per week in the 2000-02 League Years,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 6/6/96*

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**160**

*Section 6*. **Number of Pre-Season Games**: The NFL will use its best efforts to hold no more than four pre-season games beginning in the 1995 League Year.

*Section 7*. **Telephones**: Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

*Section 8*. **Expenses**: Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

# ARTICLE XXXVIII
## SALARIES

**Section 1. 1993 Minimum Salaries:** For the 1993 League Year, the Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| Length of Service | Minimum Salary For Players Not on Club's Active/Inactive (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $60,000 | $100,000 |
| One Credited Season | $70,000 | $125,000 |
| Two or More Credited Seasons | $80,000 | $150,000 |

**Section 2. Minimum Salaries For League Years After 1993:** For the League Years after the 1993 League Year, the Minimum Salaries set forth in Section 1 above shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

> *\* For the 1996 League Year, the Minimum Active/Inactive List Salary for players with five or more Credited Seasons (as defined in Article XXXVIII of the CBA), who have an allocated portion of signing bonus, reporting bonus, and roster bonus for that League Year of less than $25,000, shall be at least $250,000 plus a sum equal to $250,000 multiplied by the same percentage as the increase in Projected DGR for the 1996 League Year over DGR for the 1995 League Year (up to a maximum of ten percent (10%)). Thereafter, such Minimum Active/Inactive List Salary for such players shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR, up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. For all other players with five or*

> *more Credited Seasons, the Minimum Active/Inactive List Salary shall be the same as for players with two or more Credited Seasons, except that any player who has received with respect to that League Year (i) Salary (not including performance incentives but including roster bonuses, reporting bonuses and the allocated portion of any signing bonus) less than (ii) the amount of the Minimum Active/Inactive List Salary set forth in the first two sentences of this paragraph (as appropriate) adjusted to reflect the number of weeks that the player was on the Club's Active or Inactive List, shall receive at the end of the League Year an additional payment from his Club(s) equal to the difference between (ii) and (i) (on a pro rata basis between or among the Clubs, if applicable).*
>
> *Side Letter 11/1/95: Sec. 3*

**Section 3. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

**Section 4. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 5. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 6. Payment:** Unless agreed upon otherwise between the Club and

the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 7. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 8. Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 9. Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement covering the 1993 and future League Years will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

**Section 10. Split Contracts:**

    (a)      After the point in the regular season at which a player who signed

**164**

his Player Contract prior to the 1993 League Year has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

(b)     After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent and during the 1993 League Year or thereafter has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

*Section 11*. **Funding of Deferred and Guaranteed Contracts**: The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury Bill rate as published in The Wall Street Journal on March 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

# ARTICLE XXXIX
# MEAL ALLOWANCE

*Section 1.* **Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and post-season as follows: 1993-94 League Years-Breakfast $12.00, Lunch $15.00, Dinner $33.00; 1995-96 League Years-Breakfast $13.00, Lunch $17.00, Dinner $35.00; 1997-1999 League Years-Breakfast $14.00, Lunch $19.00, Dinner $37.00; *2000-02 League Years-Breakfast $15.00, Lunch $21.00, Dinner $39.00.* For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*\*Extension Agreement 6/6/96*

*Section 2.* **Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 P.M. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 A.M., players will receive breakfast money.

# ARTICLE XL
# DAYS OFF

*Section 1*. **Rate:** All players will be permitted days-off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2*. **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

167

# ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification**: A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses**: As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses**: Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

**168**

not exceed $4,000 during the 1993-95 League Years, $4,750 during the 1996-98 League Years, *and $5,000 during the 1999-2002 League Years;* and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*Extension Agreement 6/6/96*

**Section 4. Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

Article XLII, Section 1

# ARTICLE XLII
# POST-SEASON PAY

**Section 1. System:** Beginning with the post-season following the 1993 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 |
|---|---|---|---|---|---|---|---|---|---|---|
| Wild Card Game (Div. Winner) | $12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 |
| (Other) | | 7.5 | 7.5 | 7.5 | 10 | 10 | 10 | 10 | 12.5 | 12.5 | 12.5 |
| Division Playoff Game | 12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 |
| Conference Championship Game | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 |
| Super Bowl Game | | | | | | | | | | |
| (Winning Team) | 38 | 42 | 42 | 48 | 48 | 53 | 58 | 58 | 63 | 63 |
| (Losing Team) | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 |

*Extension Agreement 6/6/96

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**

(a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game.

(b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or post-season) will receive one-half the amount designated in Section 2 for such game.

(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

**170**

(d)      A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)      A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)      A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)      A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/ Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5.** **Payment**: Players will be paid under this Article within fifteen (15) days after the game in question has been played.

# ARTICLE XLIII
# PRO BOWL GAME

**Section 1. Compensation**: Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $20,000 and each player on the losing Team will receive $10,000. These amounts shall be increased to $25,000 and $12,500 respectively for the Pro Bowls following the 1997 through 1999 seasons *and to $30,000 and $15,000 respectively for the Pro Bowls following the 2000 through 2002 seasons.*

*\*Extension Agreement 6/6/96*

**Section 2. Selection**: Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives**: Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury**: In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment**: Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

172

# ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

*Section 1.* **Club Physician**: Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

*Section 2.* **Club Trainers**: All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

*Section 3.* **Players' Right to a Second Medical Opinion**: A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

*Section 4.* **Players' Right to a Surgeon of His Choice**: A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 5.* **Standard Minimum Pre-Season Physical**: Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

**173**

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

**Section 6.** **Substance Abuse:**

(a)      **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)      **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)      **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

174

# ARTICLE XLV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records**: Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records**: Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

175

# ARTICLE XLVI
# PLAYER BENEFIT COSTS

**Section 1. Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) post-season pay (although the NFLPA will have the unilateral right to direct that post-season pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action can not reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

**Section 2. Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition:** For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)     Pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

(b)     Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)     Injury protection (as described in Article XII);

(d)     Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)     Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)     Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

**176**

(g)    Post-season pay (as described in Article XLII and Article XLIII);

(h)    Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year); and

(i)    Severance pay (as described in Article L).

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, and the Supplemental Disability Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to projected Player Benefit Costs for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)    The parties will submit in writing to the Benefit Arbitrator their respective calculations of projected Player Benefit Costs for the forthcoming year. Such submissions to the Benefits Arbitrator will be made by each party by March 15.

(b)    Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

Article XLVI, Section 4 (c)

(c)      As soon as possible following the closing of such expedited hear-
ing, the Benefit Arbitrator will render his or her decision, which will be fi-
nal and binding on the parties. Post-hearing briefs following the close of
such hearing will be permitted only if requested by the Benefit Arbitrator,
and any post-hearing brief so requested must be submitted within one (1)
week, with no extension. The parties intend that post-hearing briefs will be
requested only in unusual circumstances. In no event will the Benefit Ar-
bitrator's decision be rendered and delivered to the parties any later than
March 31.

178

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. Prior to such merger, the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan") and the Pete Rozelle NFL Player Retirement Plan (the "Pete Rozelle Plan") will each be continued and maintained in full force and effect. When used in other Articles in this Agreement, the terms "Bert Bell/Pete Rozelle Plan" and "Merged Plan" will also refer to each of the Bert Bell Plan and the Pete Rozelle Plan for the periods prior to such merger, as appropriate depending on the context in which such term is used. *The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.*

*\*Extension Agreement 6/6/96*

**Section 2. Additional Credited Seasons:** *For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan at the beginning of such Plan Year to provide a Benefit Credit of $320 for players who earn a Credited Season in that Plan Year.*

*\*Extension Agreement 6/6/96*

**Section 3. Contributions:** *For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.*

*\*Extension Agreement 6/6/96*

179

# ARTICLE XLVIII
## SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance:** *The NFL Player Second Career Savings Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.*

*\*Extension Agreement 6/6/96*

**Section 2. Contributions**: For each of the Plan Years 1993 to 1999, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club, unless this figure is changed pursuant to this Agreement. *For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend the Savings Plan at the beginning of such Plan Year to require each NFL Club to contribute $250,000 to the Savings Plan for such Plan Year, unless this figure is changed pursuant to this Agreement. For each Plan Year that contributions to the Savings Plan are required to be made pursuant to this Agreement, contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.* Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*\*Extension Agreement 6/6/96*

180

# ARTICLE XLIX
# GROUP INSURANCE

***Section 1.*** **Group Insurance Benefits**: Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)     Life Insurance: *For the 1993-99 League Years,* a rookie player will be entitled to $100,000 in coverage, and a veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage. *For the 2000-02 League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.*

*\*Extension Agreement 6/6/96*

(b)     Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual, $400 per family per plan year, with a maximum out-of-pocket expense of $800 per year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $1 million.

(c)     Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)     Preventive care paid at 100% of UCR,

(2)     General services paid at 85% of UCR, and

(3)     Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum annual benefit payable is $2,000 per covered individual.

(d)     *Insurance Benefits for Vested Players: Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance coverage under this until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.*

181

**Section 2. Extended Post-Career Medical And Dental Insurance:** *The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:*

*(a)      Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during the period from January 1, 1996 through May 1, 1996 will continue to receive the benefits described in Subsections 1(b) and 1(c) above until the first regular season game of the 1997 season.*

*(b)      Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1996 season, or at any time thereafter prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for twenty-four (24) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.*

*(c)      All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described in Subsections 2(a) and 2(b) above are provided, as if such additional benefits had not been provided.*

**Section 3.  Limitations And Rules For Extended Insurance:** *Certain limitations and rules for the benefits described in Section 2 above will apply as follows:*

*(a)      The benefits described in Subsections 2(a) and 2(b) above will terminate immediately upon the expiration or termination of this Agreement for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.*

*(b)      The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.*

*(c)      The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.*

*(d)      The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to: (i) in the 1998 League Year, the costs for such benefits up to $250,000 multiplied by the number of Clubs in the League that League Year; and (ii) in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.*

**Section 4. Financing For Extended Insurance:**

*(a)      The cost for the benefits described in Subsection 2(a) above will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.*

**182**

(b)     The cost for the benefits described in Subsection 2(b) above for those players who are released or otherwise sever employment after the first game of the 1996 regular season through the 1997 League Year will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(c)     The NFL will reimburse the NFLPA for costs paid pursuant to Subsections 4(a) and 4(b) above, when and to the extent that such costs are charged against the Salary Cap in accordance with Subsections 4(d) and 4(e) below, and as follows:

(i)     In the 1998 League Year, only to the extent that, in the aggregate, the Clubs' costs that League Year for Section 2 benefits is less than $250,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount; and

(ii)     In the 1999 and subsequent League Years, only to the extent that, in the aggregate, the Clubs' costs that League Year for Section 2 benefits is less than $500,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount.

Reimbursement by the NFL will end when the costs paid by the NFLPA pursuant to Subsections 4(a) and 4(b) above have been fully reimbursed or such earlier date when this Agreement shall expire. Notwithstanding the foregoing, if the NFL cancels any extensions of this Agreement pursuant to Article LXI (Extension of Agreement), any costs paid by the NFLPA pursuant to Subsections 4(a) or 4(b) above, and which have not been charged against the Salary Cap, shall be reimbursed by the NFL in the first month of the Final League Year of this Agreement.

(d)     The costs for the benefits described in Section 2 above during the 1998 and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(e)     The amounts reimbursed to the NFLPA in the 1998 and subsequent League Years for the costs described in Subsections 4(a) and 4(b) above will be charged against the Salary Cap in the League Year in which the reimbursements are to be made, prior to the issuance of the Initial Special Purpose Letter, based upon a projection pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 10(c), of the amount of such reimbursements to be made for that League Year, subject to the following rules:

(i)     In the 1998 League Year, the amount shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,000,000 more than the amount of the 1997 Salary Cap. Any amount that is not charged in the 1998 League Year, pursuant to the preceding sentence, may be carried over to be charged in the 1999 and future League Years, pursuant to and subject to subsections (ii) and (iii) below.

(ii)     In the 1999 and future League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank

*created by the Settlement Agreement between the parties dated June 6, 1996, is $1,500,000 more than the amount of the Salary Cap in the prior League Year. Any remaining amount that is not charged in such a League Year may be carried over to be charged in subsequent League Year(s), subject to subsection (iii) below.*

*(iii)     Beginning in the first League Year in which at any time the Salary Cap Bank has a balance of zero, and in all subsequent League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).*

*(iv)     To the extent that the projection of the amount of reimbursements for a League Year made pursuant to this Subsection 4(e) are later determined to be incorrect, a reconciliation shall be made the following League Year.*

*\*Extension Agreement 6/6/96*

**Section 5. Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

# ARTICLE L
## SEVERANCE PAY

**Section 1.** **Eligibility:** Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through *2002,* will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

*\*Extension Agreement 6/6/96*

**Section 2.** **Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992;(b) $10,000 per Credited Season for each of the seasons 1993 through 1999; *and (c) $12,500 per Credited Season for each of the seasons 2000 through 2002.*

*\*Extension Agreement 6/6/96*

**Section 3.** **Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

**Section 4.** **Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
|---|---|---|
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through February 19, or earlier | June 1 | June 30 |
| February 20 through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

**Section 5.** **Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in

**185**

NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay:** Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability:** The right to receive payment hereunder shall not be assignable, transferrable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

186

# ARTICLE LI
# SUPPLEMENTAL DISABILITY BENEFITS

**Section 1. Maintenance:** *The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.*

*\*Extension Agreement 6/6/96*

**Section 2. Contributions:** *For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year,* unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*\*Extension Agreement 6/6/96*

**Section 3. Extension:** *For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.*

*\*Extension Agreement 6/6/96*

# ARTICLE LII
# BENEFIT ARBITRATOR

*Section 1.* **Selection:** The Management Council and the NFLPA will sub-
mit five candidates for Benefit Arbitrator to each other within two weeks of
the ratification of this Agreement. If the parties are unable to agree on a Ben-
efit Arbitrator from among the ten candidates submitted, a flip of the coin,
no later than three weeks after ratification of the Agreement, will determine
which party first strikes a name from the other party's list of candidates, and
the parties will alternately strike names beginning within 24 hours of the
coin flip and continuing for no more than a total of 24 hours until the par-
ties are able to agree on the selection of the Benefit Arbitrator, or until on-
ly one candidate's name remains, which candidate will become the Benefit
Arbitrator. If for any reason this procedure does not result in the selection
of the Benefit Arbitrator within one month of the ratification of this Agree-
ment, the Notice Arbitrator provided for in Article IX (Non-Injury Griev-
ance), will appoint the Benefit Arbitrator of his or her choice within one
week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitra-
tor, the procedure in this Section will be followed to fill the vacancy, sub-
stituting only the date of such vacancy for the date of ratification of this
Agreement, and permitting the party who lost the prior coin flip to strike
the first name from the other party's list of candidates. Either party may dis-
miss the Benefit Arbitrator between May 1 and June 1 of each calendar year
of this Agreement by written notice to the Benefit Arbitrator and the other
party.

*Section 2.* **Compensation:** To the extent that the fees and expenses of the
Benefit Arbitrator are not properly charged to and paid by one of the em-
ployee benefit plans described or created by this Agreement, such fees and
expenses will be divided equally between the parties.

*Section 3.* **Role:** The Benefit Arbitrator will resolve any and all disagree-
ments relating to Articles XLVI through LI of this Agreement. However, dis-
agreements relating to eligibility for pension, disability, or other benefits un-
der the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility
for disability benefits under the Supplemental Disability Plan will be re-
solved in accordance with the procedures that have previously been adopt-
ed by the Members of the Retirement Board of the Bert Bell/Pete Rozelle
Plan for the resolution of such issues under that Plan, or such other proce-
dures as may be jointly agreed upon by the parties. Also, prior to the merg-
er of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to
eligibility for benefits under the Pete Rozelle Plan will be resolved in accor-
dance with the procedures established under that Plan. The parties may
jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either

**188**

party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

# ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
# WORKERS' COMPENSATION

**Section 1. Benefits**: In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage**: Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

**Section 3. Arbitration**: In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study**: The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (Plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5. Moratorium**: The NFLMC, the NFL, all of the Clubs and the NFLPA agree to a moratorium on any and all efforts to change state laws concerning workers' compensation coverage of professional athletes, beginning as of the execution of this Agreement and ending December 31, 1994. During such period, the NFLMC, the NFL, any Club, the NFLPA, and/or their respective agents are prohibited from making or supporting any attempt, directly or indirectly, to change state laws affecting players' workers' compensation coverage.

**191**

Article LIV, Section 6

**Section 6. Preservation of Rights**: The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

**Section 7. Reopener:** If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

**192**

# ARTICLE LV
# MISCELLANEOUS

***Section 1*. Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product.

***Section 2*. On-Field Attire:** Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

***Section 3*. Appearances:** No Club may unreasonably require a player to appear on radio or television.

***Section 4*. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

***Section 5*. Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

***Section 6*. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

***Section 7*. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

***Section 8*. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three days prior to the date of the game.

**193**

NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its 28 members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

**194**

**Section 16**. **Headings**: The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17**. **Time Periods**: The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18**. **Exhibits**: All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19**. **Parol Evidence**: The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

# ARTICLE LVI
## FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

*Section 1*. **No Salary Cap**: No Salary Cap shall be in effect during the *Final* League Year.

*Extension Agreement 6/6/96*

*Section 2*. **Free Agency If Salary Cap *In League Year Prior To Final League Year*:**  In the event that a Salary Cap is in effect in the *League Year prior to the Final League Year:* (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the *Final* League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the *Final* League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

*Extension Agreement 6/6/96*

*Section 3*. **Free Agency If No Salary Cap *In League Year Prior To Final League Year*:** In the event that a Salary Cap is not in effect in the League Year prior to the *Final* League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the *Final* League Year shall be five Accrued Seasons.

*Extension Agreement 6/6/96*

*Section 4*. **Franchise and Transition Players**: As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, *in the Final League Year*, notwithstanding that Transition Players may not be designated in *the League Years after the 1994 League Year* (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

*Extension Agreement 6/6/96*

**196**

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS:
# LABOR EXEMPTION

**Section 1. Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

**Section 2. Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

**Section 3. CBA Expiration:**

(a)    Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)    The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

197

# ARTICLE LVIII
## DURATION OF AGREEMENT

**Section 1. Effective Date:** Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993.

**Section 2. Termination:** Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on March 1, 2000, or thereafter by giving sixty (60) days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

**Section 3. Termination Date:** *Except as provided in Section 4 below, and in Article LXI (Extension of Agreement) below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the 2000 League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire as prescribed in Article XVI, Section 1.*

*\*Extension Agreement 6/6/96*

**Section 4. Termination Prior to Expiration Date:**

(a)     **Due to Invalidation of Settlement Agreement.** In the event that the Settlement Agreement does not receive Court Approval or is otherwise invalidated by any appellate court prior to September 1, 1993:

(i)     This Agreement shall terminate immediately;

(ii)     The <u>White</u> action and the Related Litigation (as defined in Article I of the Settlement Agreement) shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)     All pending motions in <u>White</u> and <u>McNeil</u> shall be decided by the Court; and

(iv)     With respect to all Player Contracts entered into by Unrestricted Free Agents during the period from March 1 to the date of such disapproval, and by Restricted Free Agents during the period from March 1 to the date of such disapproval:

(1)     Any Club that had rights to the services of any such player on January 31, 1993 shall have the right to assume any such Player Contract by notice to the player, the New Club, the NFLPA and Class Counsel within ten days of the date of such disapproval, and in such event such Prior Club shall have the same rights to the services of such player that the New Club would have had under such Player Contract;

198

(2)      Within twenty days of the date of such disapproval, any such player shall have the right to void any such Player Contract, whether such contract was assumed by the Prior Club or not, by notice to the Prior Club or New Club, which clubs shall notify the NFLPA and Class Counsel of such election as soon as possible but in no event later than one day after receiving such notice (in the event the player voids such Player Contract, the player shall return to the Team any compensation received thereunder); and any such player shall have such further relief as determined by the Court pursuant to the pending motions in <u>White</u> and <u>McNeil</u>;

(3)      In the event that a player voids a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract after the date of such election; and

(4)      In the event that a player elects not to void a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract.

(b)      **Approval of Settlement Agreement Invalidated**. In the event that the Settlement Agreement receives Court Approval but such approval is invalidated by any appellate court on or after September 1, 1993:

(i)      This Agreement shall terminate immediately;

(ii)      The <u>White</u> action and the Related Litigations shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)      All Player Contracts entered into prior to such date of such disapproval shall remain in full force and effect and shall be binding on all Parties;

(iv)      A player with a Player Contract referred to in Section 4(b)(iii) above shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases And Covenants Not to Sue) of the Settlement Agreement, that arises out of such Player Contract, for conduct prior to such disapproval consistent with the express terms of this Agreement.

(c)      **Provision Invalidated**. If at any time after Court Approval during the term of this Agreement except as referred to in subsections (a) and (b) above, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwith-standing anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft),

XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (1999 League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d)      **Termination Due To Collusion**. If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)      **Termination After Closing Date**. If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f)      **No Waiver**. Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

***Section 5***. **Ratification**: This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

# ARTICLE LIX
# GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a) <u>To the National Football League Management Council</u>:
The National Football League
Management Council
280 Park Avenue
New York, New York  10017
Attention: Executive Vice President—Labor Relations

(b) <u>To an NFL Club</u>:
At the principal address of such Club as then
listed on the records of the NFL or at that Club's
principal office.
Attention: President

(c) <u>To the NFLPA</u>:
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

# ARTICLE LXI
## EXTENSION OF AGREEMENT

1.      Unless the NFL or the NFLPA has by December 1, 1997 provided written notice to the other party cancelling any further extension of this Agreement, then, as of the first date of the 1998 League Year, the term of this Agreement shall be extended by an additional League Year, until the end of the 2001 League Year. The December 1, 1997 deadline will be extended until five business days after the revenue terms of the new or extended NFL network television contracts (broadcast and cable) are provided in writing to the NFLPA, if such revenue terms have not been so provided at least five business days prior to December 1, 1997.

2.      Unless the NFL or the NFLPA has by December 1, 1998 provided written notice to the other party cancelling any further extension of this Agreement, then, as of the first date of the 1999 League Year, the term of this Agreement shall be extended by an additional League Year, until the end of the 2002 League Year.

*Extension Agreement 6/6/96*

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

BY: _____

BY: _____

203