# Exhibit 7
# Part 6 of 6

# APPENDIX A

## CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football

League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

Signature

Player's Name——Type or Print

Appendix B

# APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

206

# APPENDIX C

# NFL PLAYER CONTRACT

THIS CONTRACT is between _____
_____, hereinafter "Player," and_____
_____,
a _____
corporation (limited  partnership) (partnership), hereinafter "Club," oper-
ating under the name of the _____
_____ as a member of the National Football
League, hereinafter "League." In consideration of the promises made by
each to the other, Player and Club agree as follows:

  1.    TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

  2.    EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory mini-camp(s), official pre-season training
camp, all Club meetings and practice sessions, and all pre-season, regular
season and post-season football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

  3.    OTHER ACTIVITIES. Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experi-
ence as a football player, the loss of which cannot be estimated with any cer-
tainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

207

Appendix C

### 4.   PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

(a)   Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)   Player hereby assigns to the NFLPA and its licensing affiliates, if any, the **exclusive** right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on products that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract

**208**

expires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

    5.    COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____ for the 19_____ season;

$_____ for the 19_____ season;

$_____ for the 19_____ season;

$_____ for the 19_____ season;

$_____ for the 19_____ season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

    6.    PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or bi-weekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning

Appendix C

of the regular season, the yearly salary payable to Player will be reduced pro-portionately and Player will be paid the weekly or bi-weekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-week-ly portions of his yearly salary having become due and payable up to the time of termination.

7.    DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Play-er will be paid, in cash on demand or by means of deductions from pay-ments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifi-cally provides otherwise.

8.    PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will un-dergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical con-dition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.    INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subse-quent period covered by this contract, as Player is physically unable to per-form the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated benefi-ciary, to his estate.

10.  WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is

210

entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.  SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.  TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.  INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

211

14.   RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.   INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.   EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.   ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this

contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22. LAW. This contract is made under and shall be governed by the laws of the State of _____.

213

Appendix C

23. WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled <u>White</u> v. <u>National Football League</u>, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in <u>Brown</u> v. <u>Pro Football, Inc</u>. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in <u>White</u> ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the <u>White</u> class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24. OTHER PROVISIONS.

(a) Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b) Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c) The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

214

25. SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

PLAYER _____    CLUB _____

Home Address _____    By _____

_____    Club Address _____

Telephone Number _____    _____

Date _____    Date _____

PLAYER'S CERTIFIED AGENT _____

Address _____

_____

Telephone number _____

Date _____

Copy Distribution:   White–League Office    Yellow–Player
                     Green–Member Club      Blue–Management Council
                     Gold–NFLPA             Pink–Player Agent

215

# APPENDIX D

# FIRST REFUSAL OFFER SHEET

Name of Player:                           Date:

Address of Player:                        Name of New Team:

Name and Address of                       Name of Prior Team:
Player's Representative
Authorized to Act for Player:             Address of Prior Team:


Principal Terms of NFL Player Contract With New Team:

      [Supply Information on this Sheet or on Attachment]

     1.   Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized league-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

     2.   Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

     3.   Other terms (that need not be matched):

Player:                                   New Club:

By _____                By _____
                                              Chief Operating Officer


216

# APPENDIX E

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                               Date:

Address of Player:                            Name of New Team:

Name and Address of                           Name of Prior Team:
Player's Representative
Authorized to Act for Player:                 Address of Prior Team:

    The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

Prior Team

By _____
     Chief Operating Officer

**217**

Appendix F

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By _____

WITNESSED BY:

_____

218

# APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or already on the roster of the Club, and for whom the Club needs Room.

# APPENDIX H

## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR of the member clubs of the NFL (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions and definitions contained in the Settlement Agreement. The information on the Schedule is to be the responsibility of the NFL Member Clubs' and the NFL's managements. The Accountants' responsibility will be to express an opinion on the Schedule based on their audit.

The NFL and Class Counsel or any Players Union are to retain a national accounting firm (the "Accountants"). The Accountants are to conduct an audit of the Schedule (the "Audit") in accordance with generally accepted auditing standards. Those standards require that the Accountants plan and perform the Audit to obtain reasonable assurance about whether the Schedule is free of material misstatement. The Audit shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Audit shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of 6 members with 3 representatives designated by each of the NFL and Class Counsel or any Players Union. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Audit described in the preceding paragraph and again before February 15th to review the results of the Audit before issuance of the final report for that playing season.

The procedures detailed below are designed for the Accountants to determine whether, in their opinion, the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the member clubs of the NFL for such season in accordance with the terms of the Settlement Agreement. The Accountants will audit the Schedule for each playing season.

The Accountants may rely on the auditing procedures performed by each member club's local accounting firm ("Local Accountants") or may test the procedures on a scope basis so as to permit the Accountants to ob-

220

tain a reasonable basis to express an overall opinion on the Schedule as referred above.

The Accountants will have access to the Local Accountants' audit workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the NFL and Class Counsel to be performed by the Accountants**

**General**

- The Settlement Agreement should be reviewed and understood.

- See Exhibit I for the form of the Accountants' Audit Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All audit workpapers of the Accountants relative to its report on the Schedule should be made available for review by representatives of the NFL and Class Counsel or any Players Union prior to issuance of the report.

- A summary of all Audit findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised during the Audit should be resolved by the Committee.

221

Appendix H

- Estimates should be reviewed in accordance with the Settlement Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be re-confirmed with third parties when possible.

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

**Procedures provided by the NFL and Class Counsel to be performed by the Local Accountants**

**General**
- Each NFL member club shall be audited in accordance with the Settlement Agreement. The Settlement Agreement should be reviewed and understood by all Local Accountants.

- See Exhibit II for the form of the Local Accoutants' Audit Report.

- Special rules for Cap Counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

**Team Salaries - Schedule 1**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the Settlement Agreement.

- Compare player names with all player lists for the season in question.

222

- Determine method used to value non-cash compensation is in compliance with methods outlined in the Settlement Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the Settlement Agreement.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA - Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

Appendix H

## Player Costs - Schedule 3

- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the Agreement.

## Defined Gross Revenues - Schedule 4

- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the DGR Settlement Agreement. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

## Excluded DGR - Schedule 5

- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

## Questions - Schedule 6

- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

224

- Prepare a summary of all changes.

## DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

- Review supporting details of any changes.

Appendix H-Exhibit I

# EXHIBIT I

## ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, White v. NFL, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of the Member Clubs and the NFL's management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the NFL or any Member Club taken as a whole.

226

## EXHIBIT II

## LOCAL ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ a Member Club of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of _____ management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the _____ taken as a whole.

227

# APPENDIX I

# STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1.   History
     - player
     - family
     - thorough review of all team physicians and trainer reports for preceding seasons

2.   Examination
     - head
     - face
     - scalp
     - ears
       - external & drums
     - sinus
     - throat
     - eyes
       - pupils
       - reaction to movement & light
     - lungs
       - palpation
     - chest
     - heart
     - visceral
     - hernia
     - rectal
       - hemorrhoid
       - fistula
       - prostate
     - gastric
     - any unusual body marks, i.e. scars, birthmarks
     - height
     - weight
     - temperature
     - blood pressure
     - pulse
     - heart rate

228

## Orthopedic Examination

Examination visually, including stress testing and range of motion for all of the following:

- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees—also knee jerk
- ankle—check Achilles tendon for abnormalities and by jerk test
- toes

## Flexibility

Testing of hamstrings and neck

## EKG

Heart Abnormalities

## Stress Testing (at physician's discretion) (Treadmill or bicycle) for cardio-vascular

## Blood Testing

Standard grid. Testing for (including but not limited to):

- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen
- Tay Sachs
- Sickle Cell
- VD

} Where applicable. If found, individual counseling necessary.

**229**

Appendix I

## Urinalysis
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

## Vision Testing
- peripheral vision
- standard eye test

## Hearing Test

## Dental Examination

## Chest X-Ray (at appropriate intervals)
(Only as recommended by AMA standard)
Check for:  Tumor
               T.B.
               Lesions

## X-Ray all previously injured areas (at physician's discretion)

# APPENDIX J

# ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

Non-football related disability rates before retirement:

| Age | Rate |
|---|---|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. |

Withdrawal rates:

| For Players With Service of | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993. |
| Retirement age: | 47, except 55 for players with no credited seasons before 1993 |
| Percent married: | Social Security awards in 1972 |
| Age of Player's wife: | Three years younger than player |

231

Appendix J

| | |
|---|---|
| Remarriage rates: | 1971 Railroad Retirement Board rates |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of plan year |
| Actuarial value of assets: | One-time write-up to market value as of March 31, 1993 followed by restart of the present procedure thereafter. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for Line-of-Duty disability benefits. |
| Amortization period: | 20 years beginning April 1, 1993; 19 years as of April 1, 1994, etc. In years when there is a zero or negative unfunded actuarial accrued liability, the amount which is expected to produce a zero unfunded actuarial accrued liability at the end of the plan year. |

232

# APPENDIX K

# EXTENSION CHART

*Salary Cap as Percentage of DGR*

|                     | 96 | 97 | 98 | 99 | 00 | 01 | 02 |
|---------------------|----|----|----|----|----|----|----|
| Immediately         | 63 | 62 | 62 | 62 | U  |    |    |
| No Notice to Cancel | 63 | 62 | 63 | 63 | 63 | 63 | U  |
| 12/1/97 PA Notice   | 63 | 62 | 62 | 62 | U  |    |    |
| 12/1/97 MC Notice   | 63 | 62 | 62 | 63 | U  |    |    |
| 12/1/98 PA Notice   | 63 | 62 | 63 | 63 | ·62| U  |    |
| 12/1/98 MC Notice   | 63 | 62 | 63 | 62 | 63 | U  |    |

U  =  Uncapped
PA = Players
MC = NFL Management Council

*Extension Agreement 6/6/96*

233

# APPENDIX L

# OFF-SEASON WORKOUT RULES

*The 1993 Collective Bargaining Agreement with the NFLPA provides that, except for certain specified minicamps, any off-season workout programs or classroom instruction shall be voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for sixteen weeks between the end of the previous season and ten days prior to the start of veteran training camp. The CBA limits such workouts to four days per week, except weekends. Included in the sixteen weeks may be no more than fourteen days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.*

*Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.*

*Teams are to provide their players and the Management Council, at least fifteen days prior to the start of its off-season workout program, the time frame for the program including designation of any days on which organized team practice activity will take place. Prompt notification of any schedule changes must be provided to the Management Council, which will provide the NFLPA with prompt notification of both the original schedule and any changes.*

*The following rules shall also apply to the fourteen days of organized team practice activity:*

- *No pads except protective knee or elbow pads. Helmets are permitted.*
- *No live contact; no live contact drills between offensive and defensive linemen.*
- *7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.*
- *The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.*
- *Maximum six hours per day, with a maximum two hours on field, for any player.*

*\*Extension Agreement 6/6/96*

234

# APPENDIX M

## PSL EXAMPLES

*Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs):*

**1. Subsection (x)(1)— Maximum Annual Allocation Amount**

**Year 1 (1996)-**   *PSL revenues received* = $ 45 million
*Remaining life of PSL* = 16 years
*WSJ Treasury Bill rate at 2/1/96 - 8%*
*Factor-Future Value of 8% annuity 15 years (maximum)*
= 27.152 (annual compounding)
*Future Value of $3 million/year for 15 years*
= $3 million x 27.152 = $81.456 million
*Interest Amount* = $81.456 million - $45 million
= $36.456 million

*Year 1 Annual Interest Allocation*
= $36.456 million/15 years = $2.43 million/year

*Year 1 PSL Allocation Amount*
= *PSL Amount* = $45 million/15 years = $3.00 million
+ *Allocated Interest*                = <u>$2.43 million</u>
*Total Year 1 Allocation*            = $5.43 million

*1996 PSL Maximum Annual Allocation Amount*      = $5.43 million

235

Appendix M

**Year 2 (1997)-**  *PSL revenues received = $ 30 million*
*Remaining life of PSL  = 15 years*
*WSJ Treasury Bill rate at 2/1/97 - 7%*
*Factor-Future Value of 7% annuity 15 years = 25.129*
*(annual compounding)*
*Future Value of $2 million/year for 15 years*
*= $2m x 25.129    = $50.258 million*
*Interest Amount       = $50.258 million – $30 million*
*                               = $20.258 million*

*Year 2 Annual Interest Allocation*
*= $20.258 million/15 years = $1.35 million/year*

*Year 2 PSL Allocation Amount*
*= PSL Amount = $30 million/15 years = $2.00 million*
*+ Allocation Interest                = $1.35 million*
*Total Year 2 Allocation           = $3.35 million*

*PSL Maximum Annual Allocation Amount*
*Year 1 PSL Allocation Amount      = $5.43 million*
*Year 2 PSL Allocation Amount      = $3.35 million*

*1997 PSL Maximum Annual Allocation Amount      = $8.78 million*

236

**Year 3 (1998)-**  *PSL revenues received* = $ 7 million
*Remaining life of PSL* = 14 years
*WSJ Treasury Bill rate at 2/1/98 - 7.5%*
*Factor-Future Value of 7.5% annuity 14 years* = 23.366
*Future Value of $.5 million/year for 14 years*
= $.5m x 23.366    = $11.683 million
*Interest Amount*    = $11.683 million - $7 million
= $  4.683 million

*Year 3 Annual Interest Allocation*
= $4.683 million/14 years = $.335 million/year

*Year 3 PSL Allocation Amount*
= *PSL Amount* = $7 million/14 years = $  .500 million
+ *Allocated Interest*         = $  .335 million
*Total Year 3 Allocation*         = $  .835 million

*PSL Maximum Annual Allocation Amount*
*Year 1 PSL Allocation Amount*    = $5.430 million
*Year 2 PSL Allocation Amount*    = $3.350 million
*Year 3 PSL Allocation Amount*    = $  .835 million

*1998 PSL Maximum Annual Allocation Amount*    = $9.615 million

2. *Subsection (x)(2)— PSL Revenues Used For Stadium Construction Or Renovation*

*Assume the Team sells PSLs on the following terms:*
- *Gross PSL revenues received in 1996* = $45 million
- *Income taxes paid on PSL revenues in 1996* = $12 million
- *Legal and marketing costs incurred relating to PSL*
  *revenues* = $6 million
- *Stadium renovation costs* = $56 million

*The PSL revenues included in DGR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.*

*Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m - ($12m + 6m)) and the total stadium renovation costs were $30 million.*

*The PSL revenues excluded from DGR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.*

237

Appendix M

3. *Subsection (x)(2)— Maximum Exclusion Of PSL Revenues Each League Year*

For purposes of this subsection, Excluded DGR spillover shall be calculated as follows for each Team:
      -Assume that the new stadium's first full year of operation is 1998.
      -Assume that the Team's Excluded DGR data is as follows:

|  | <u>1997</u> | <u>1998</u> |
|---|---|---|
| Excluded DGR | $5 million | $15 million |

If the League, as a whole, is in a spillover situation in 1998, then the increase in DGR due to spillover would be $10 million ($15 million - $5 million).

If the League is not in a spillover situation in 1998, the increase in DGR due to spillover would be zero.

4. *Subsection (x)(3)— PSL Difference Credited To DGR*

a. Assume that the new stadium is placed in service in June 1998.

1998 increase in DGR directly related to new stadium:
| | |
|---|---|
| - Increase in gate receipts | $6 million |
| - Increase in DGR spill-over | <u>$2 million</u> |
| Total DGR increase | $8 million |

Cumulative PSL Difference:

| <u>Year</u> | PSL Maximum Annual <u>Allocation Amount</u> | First Year <u>DGR Increase</u> | PSL <u>Difference</u> |
|---|---|---|---|
| 1996 | $5.430 million | $8 million (assumed) | $   0 |
| 1997 | $8.780 million | $8 million (assumed) | $ .780 million |
| 1998 | $9.615 million | $8 million | <u>$1.615 million</u> |

Cumulative PSL Difference                  $2.395 million

For purposes of computing the PSL Difference, we assume that the increase in DGR was the same for 1996 and 1997 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million).

$2.395 million would be credited into DGR in the 1999 League Year.

238

*b. Assume that the new stadium is placed in service in June 1998.*

*1998 increase in DGR directly related to new stadium:*

| | |
|---|---|
| - Increase in gate receipts | $ 9 million |
| - Increase in DGR spill-over | $16 million |
| Total DGR increase | $25 million |

*Cumulative PSL Difference:*

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|---|---|---|---|
| 1996 | $5.430 million | $25 million (assumed) | 0 |
| 1997 | $8.780 million | $25 million (assumed) | 0 |
| 1998 | $9.615 million | $25 million | 0 |

*Cumulative PSL Difference*        0

**Since the increase in DGR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year.**

*No amount would be credited into DGR in the 1999 League Year.*

5. *Subsection (x)(5) - Carryover PSL Credit*

*Assume the following:*
- *New Stadium is placed in service in June 1998.*
- *1999 - 2002 Maximum Annual Allocation Amount is $9.615 million.*
- *Increases in DGR directly related to New Stadium are as follows:*

| | |
|---|---|
| 1999 | $ 8 million |
| 2000 | $ 9 million |
| 2001 | $14 million |

*The Carryover PSL credits are calculated as follows:*

| | |
|---|---|
| 1999 | $9.615m - $8m = $1.615m |
| 2000 | $9.615m - $9m = $ .615m |
| 2001 | (No carryover PSL credits) |

*Under this scenario, year 2001 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 1999 and 2000 ($1.615m + $.615m) can be deducted in full from DGR in League Year 2001. There would be no remaining Carryover PSL credits to deduct from DGR in*

239

Appendix M

*future League years.*

6. *Subsection (x)(6) - Reduction In Premium Seat And Luxury Box Expenses*

*Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.*

7. *PSL Revenues Not Benefitting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium*

*In any case where:*

(i)     *PSLs are sold by a Team or by a third party (such as a stadium corporation, a non-profit private sector entity, or a governmental entity) pursuant to Team authorization; and*

(ii)    *all net proceeds of such PSL sale are used to build a new stadium or construct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and*

(iii)   *such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or non-profit entity; and*

(iv)    *the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and*

(v)     *neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease;*

240

_then_, because the Team and its affiliates do not receive any net benefit arising out of the sale of PSLs other than through the stadium construction or improvements paid by the PSL revenues (all PSL revenues being spent on third-party costs and charges directly incurred as a result of the PSL sale, or on stadium construction or improvements), none of the proceeds received from the sale of the PSLs would be included in DGR or Excluded DGR. Each of Example Nos. 1 through 6 above assumes that, for one or more reasons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts other than the PSL proceeds, including but not limited to any expense payments, may be treated as DGR, Excluded DGR, or non-DGR under this Agreement. Moreover, the Special Master or the Court would have the authority to examine any transaction involving the Club or any of its affiliates and the Stadium landlord or any of its affiliates, to determine if such transaction transfers, in whole or in part, some or all of the economic benefit of any PSL revenues to the Club or any of its affiliates, and any such transferred economic benefits shall be treated as DGR or Excluded DGR, as appropriate.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsections (xi)(1) through (xi)(6) call for calculations quite similar to those discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

*Extension Agreement 6/6/96

**241**

# INDEX

## ACCOUNTING PROCEDURES
Accountants' Review Procedures - 220-227 (Appendix H)
Disputed Adjustments - 132
Final Special Purpose Letter - 130-132
Initial Special Purpose Letter - 130, 183
Projected Benefits - 133-134
Projected DGR - 132

## ACCRUED SEASON
Calculation and Reporting Requirement - 53
Free Agency Requirement in Final League Year - 196
Practice Squad Eligibility - 155
Roster Exemptions (5-day preseason letter) - 152
Unrestricted Free Agents, Restricted Free Agents - 55-56
Veterans With Less Than 3 Accrued Seasons - 53-54

## AGENT CERTIFICATION
16 (Article VI)

## AMERICAN BOWL
Reporting Date - 160

## ANTI-COLLUSION
141-146 (Article XXVIII)

## ARBITRATION
Accrued Seasons Reporting Hardship - 53
Benefit Arbitrator - 177-178, 188-189
Club or Player Signing Hardship - 43, 55, 59, 75
Expedited Arbitration: 13 (Group Licensing), 62-63 (UFA, RFA), 87-89
    Benefits
Franchise, Transition Player Tender Disputes - 70, 73
Good Faith Negotiations Dispute - 163
Impartial Arbitrator - 139-140
Injury Grievance Panel - 27
Likely To Be Earned Dispute - 99
NFL Player Contract Issue Dispute - 213
Non-Cash Provisions or Player Gift Dispute - 125, 126
Non-Injury Grievance Panel - 21-22
Player Safety Rules Dispute - 34
Preseason 10-day pre-camp violation - 158
Union Security Dispute - 14
Workers' Compensation (equivalent benefits) - 191

## BENEFITS
Description - 87- 88
Group Insurance - 181-184 (Medical, Dental)
Injury Protection - 33
Player Benefit Costs - 176-178
Post-Career Medical - 182
Post-Season Pay - 170-171
Projected Benefits - 133
Retirement Plan - 179 (Article XLVII) (Bert Bell/Pete Rozelle Plan)
Second Career Savings Plan - 180 (Article XLVIII)
Severance Pay - 185-186 (Article L)
Supplemental Disability Benefits - 187 (Article LI)

## BERT BELL/PETE ROZELLE PLAN
See: Benefits: Retirement Plan

## CAREER PLANNING PROGRAM
15, 194

## CERTIFICATIONS
147-148 (Article XXIX)

## CLUB DISCIPLINE
Conduct Detrimental to Club - 18
Deduction - 19
Fine Schedule - 18
Published Lists - 19
Uniformity - 19

## COLLEGE DRAFT
Compensatory Draft Selections - 45, 48, 74
Number of Choices - 42
Other Professional Teams - 43
Required Tender - 42
Return to College - 44
Signing of Drafted Rookies - 42-43
Subsequent Draft - 45
Time of Draft - 42
Trading Deadline - 43
Workouts of Draft-Eligible Players - 46

## COMMISSIONER DISCIPLINE
Fine Money - 32
League Discipline - 31
One Penalty - 32

**COMMITTEES**
34-35 (Article XIII)

**CREDITED SEASON**
Benefits - 179, 181, 185
Definition: Minimum Salary - 53-54, 163

**DAYS OFF**
167 (Article XL)

**DEFERRED AMOUNTS**
Deferred Paragraph 5 Limitation - 164
Deferred Salary and Present Value Rate - 93-94
Deferred Signing Bonus With Extension - 129-130
Funding of Deferred and Guaranteed Contracts - 165

**DEFINITIONS**
4-8 (Article I)

**DEFINED GROSS REVENUES (DGR)**
Broadcast - 82
Disputed Adjustments - 131-132
Excluded DGR - 82-83
Gate Receipts - 82
Inclusion in DGR (1992 Base Year Ratio) - 83
Not DGR - 82
Payments to NFLPA - 84
Personal Seat Licenses - 84, 235-241 (Appendix M)
Projected DGR - 132-133
Reporting DGR - 130-133

**DRAFT CHOICE COMPENSATION**
Franchise Player - 66
Restricted Free Agents - 56-61

**DRUGS OF ABUSE**
See: Medical (Substance Abuse)

**DURATION OF AGREEMENT**
198-200 (Article LVIII)

**ENFORCEMENT OF SALARY CAP AND ENTERING
       PLAYER POOL**
134-135 (Article XXV)
Fraudulent Loan - 124-125

**244**

## ENTERING PLAYER POOL
47-52 (Article XVII)
25% rule - 49
Assignment - 49
Buyout of Termination Right - 50
Calculation - 47-48
Incentives - 115-123
LTBE Incentive Levels - 104-114
Renegotiation Limitation - 51
Rookie Allocation - 47-48
Rookie Orientation Camp Costs - 51-52
Waivers - 49
Workout Payments in Future Years - 49

## EXCLUDED DGR
See: Defined Gross Revenues (DGR)

## EXCLUSIVE RIGHTS PLAYERS
See: Veterans With Less Than 3 Accrued Seasons

## EXHIBIT A, EXHIBIT B INCENTIVES
101-103 (Team and Individual Incentives)

## EXPANSION
151 (Article XXXI)

## EXTENSION OF AGREEMENT (LANGUAGE INSERTS)
7, 33, 42, 46, 60, 87, 89-91, 94, 123-124,
157-159, 160, 166, 172, 179-184, 185, 187, 233, 234, 241, 263

## FALSE CERTIFICATION
148

## FINAL CAPPED YEAR
30% Rule - 127-128
Signing Bonus Acceleration Post-June 1 - 96
Signing Bonus Proration Limitation - 94
Team Incentives Valuation and Playtime Requirements - 120
Treatment of Guaranteed Contracts - 123-124

## FINAL EIGHT PLAN
77-78 (Article XXI)

Index

**FINAL LEAGUE YEAR**
Benefits Contributions - 179-180, 183, 187
Free Agency Eligibility - 196
No Salary Cap - 196
Qualifying Offers - 196
Transition Player Designation - 68

**FINAL SPECIAL PURPOSE LETTER**
See: Accounting Procedures

**FINE SCHEDULE**
See: Club Discipline

**FIRST REFUSAL PROCEDURES**
60-62
First Refusal Offer Sheet (Appendix D) - 216
First Refusal Exercise Notice (Appendix E) - 217

**FRANCHISE PLAYER**
Designations - 66
Draft Choice Compensation - 66
Duration of Designation and Period - 71-73
Required Tender - 66-68
Right To Decline (Named Plaintiffs) - 74
Signing Period - 75-76
Withdrawal of Designation - 71-72

**GOVERNING AGREEMENT**
9 (Article II)

**GOVERNING LAW**
201 (Article LIX)

**GROUP INSURANCE**
See: Benefits

**HALL OF FAME GAME**
Reporting Date - 160

**HONORS, RECOGNIZED MEDIA**
Rookie LTBE Honors - 104
Media (Veterans, Rookies) - 116-117

246

**IMPARTIAL ARBITRATOR**
139-140 (Article XXVII)
Club or Player Signing Hardship - 43, 55, 59, 75
Franchise or Transition Player Tender Amount Disputes - 70-71
LTBE Performance Bonus Disputes - 99
Non-Football Services and Non-Cash Provision Dipsutes - 89, 125-126
Player Reporting Hardship - 53
Player Sole Control Disputes - 94
RFA, First Refusal Disputes - 62-63

**INCENTIVES**
See: Entering Player Pool 115-123 (Incentives), LTBE 104-114 (Incentives
      Levels)
See: Salary Cap (Incentives)

**INDIVIDUAL RIGHT OF FIRST REFUSAL**
63
Required Form (Waiver of Free Agent Rights (Appendix F)) - 218

**INITIAL SPECIAL PURPOSE LETTER**
See: Accounting Procedures

**INJURED RESERVE**
Credited Season - 163
Minimum Salaries - 54

**INJURY GRIEVANCES**
25-30 (Article X)
Appeal - 26
Discovery - 30
Filing - 25
Hearing - 27
Neutral Physician List - 26
Payment - 29

**INJURY PROTECTION**
33 (Article XII)

**KEY DATES - JUNE 1**
RFA Qualifying Offer Extension Deadline - 59
Severance Pay Applications - 185
Sigining Bonus Acceleration - 96
Treatment of Completion Bonuses - 98
UFA Tender Deadline - 55

Index

**KEY DATES - JUNE 15**
Reduction of RFA Qualifying Offer - 59

**KEY DATES - JULY 15**
Prior Club Exclusive Rights (if tender made) - 55
Transition Player Offer Sheet Deadline - 68
UFA Contract Reporting Deadline - 37

**LICENSING**
NFLPA Group Player Licensing - 13-14, 39, 208-209

**MANAGEMENT RIGHTS**
9

**MAXIMUM DISCIPLINE SCHEDULE**
See: Club Discipline

**MEAL ALLOWANCE**
166 (Article XXXIX)

**MEDICAL**
Club Physician - 173, 175
Club Trainer - 173
Medical Records - 175 (Article XLV) (Access to Personnel and Medical
    Records)
Player Medical Costs - 88, 177
Players' Rights to Medical Care and Treatment - 173-174 (Article XLIV)
Second Medical Opinion - 173
Standard Minimum Pre-Season Physical - 173-174, 228-230 (Appendix I)
Substance Abuse - 174

**MINICAMPS**
159 (Article XXXVI)

**MINIMUM ACTIVE/INACTIVE LIST SALARY**
53-54, 162-163

**MOVING AND TRAVEL EXPENSES**
168-169 (Article XLI)

**MUTUAL RESERVATION OF RIGHTS**
197 (Article LVII), 200

**NEUTRAL PHYSICIAN**
26, 28-29

**NEUTRAL VERIFIER**
147, 149-150

**NFL PLAYER CONTRACT**
36-40 (Article XIV)
Certifications - 147-148
Commissioner Disapproval - 38-39, 134, 141, 213
Filing Requirements - 37-38, 54, 58
Split Contract (Minimum Salary) - 53-54, 164-165
Text of Contract (Appendix C) - 207-215

**NO STRIKE/LOCKOUT/SUIT**
11-12 (Article IV)

**NON-FOOTBALL INJURY OR ILLNESS (NFI)**
Accrued Seasons - 53
Compensation, Tolling - 152
Credited Season - 163
Pre-Training Camp Period - 169

**NON-INJURY GRIEVANCES**
20-24 (Article IX)
Appeal - 20
Discovery - 21
Filing - 20
Hearing - 22
Initiation - 20
Payment - 24

**NOTICE OF SIGNING**
37-38, 46, 54, 56

**NOTICE OF TERMINATION**
79-80, 219 (Form - Appendix G)

**OFFER SHEET AND FIRST REFUSAL PROCEDURES**
60-63 (Principal Terms, Incentives, No Consideration Between Clubs)
First Refusal Exercise Notice - 217 (Appendix E)
First Refusal Offer Sheet - 216 (Appendix D)
Individual Right of First Refusal - 63
Right of First Refusal for Transition Players - 69-70
Waiver of Free Agent Rights (Appendix F) - 218

**OFF-SEASON WORKOUTS**
157-158 (Article XXXV)
Final Capped Year (32 days) - 98
Pre-Training Camp Period - 158
Treatment of Reasonable and Customary Expenses - 125-126
Workout at Minimum Not Treated as Renegotiation - 130

**OPTION**
Buyout - 97
Clause - 41 (Article XV)
Exercise Amount - 50

**PENSION PLAN**
See: Benefits (Retirement Plan)

**PER DIEM**
See: Pre-Season Training Camp (Per Diem)

**PERSONAL SEAT LICENSE (PSL)**
84-87, 235-241

**PHYSICALLY UNABLE TO PERFORM (PUP)**
152, 158

**PLAYER CONTRACT**
See: NFL Player Contract

**PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT**
173-174 (Article XLIV)

**PLAYER SAFETY AND WELFARE**
See: Committees (Player Safety and Welfare)

**PLAYER SECURITY**
17 (Article VII)

**PLAYER TICKETS**
194

**POST-CAREER MEDICAL**
See: Benefits, Post-Career Medical

**POST-SEASON PAY**
170-171 (Article XLII)

**PRACTICE SQUAD**
155-156 (Article XXXIV)

**PRE-59ER**
87, 176

**PRE-SEASON PHYSICAL**
173-174, 228-230 (Appendix I)

**PRE-SEASON TRAINING CAMP**
160-161 (Article XXXVII)
Per Diem (Veteran and Rookie) - 160

**PRE-TRAINING CAMP PERIOD**
158

**PREAMBLE**
3

**PRESENT VALUE CALCULATIONS**
Acceleration of Guaranteed Salary - 124
Completion Bonus Calculation - 98
Deferred Salary - 93-94
Franchise and Transition Player Tenders - 68
Funding of Deferred and Guaranteed Contracts - 165
Signing Bonus With Extension - 95-96

**PRINCIPAL TERMS**
See: Offer Sheet and First Refusal Procedures

**PRIOR SIGNING BONUSES**
97

**PRO BOWL GAME**
172 (Article XLIII)

**PROJECTED BENEFITS, DGR**
See: Accounting Procedures

**QUALIFYING OFFERS**
Computation of Team Salary - 92-93
Final League Year - 196
Guarantee for Individual First Refusal Right - 63-64
Restricted Free Agents, 56-60

Index

**RECOGNIZED MEDIA**
116-117

**RELOCATION BONUS**
99, 115, 151

**RENEGOTIATIONS AND EXTENSIONS**
129-130

**REPORTING BONUSES**
Contract Signed After Start of Training Camp  - 97
Expansion Team Training Camp Report - 151
Minimum Salary for Veteran With 5 or More Credited Seasons - 162-163
Treatment of Guaranteed Report - 97

**RESTRICTED FREE AGENTS (RFA)**
56-65

**RIGHT TO DECLINE (NAMED PLAINTIFFS)**
74

**ROOKIE ORIENTATION**
15, 51-52, 126

**ROOM AND BOARD**
Pre-Season Training Camp - 160
Rookie Orientation Camp - 52

**ROSTER BONUSES**
Minimum Salary for Veteran With 5 or More Credited Seasons - 162-163
NLTBE Roster Included in Team Salary When Earned - 121
Rookie LTBE Roster Bonuses - 104
Treatment of Off-Season Roster Bonus - 97-98
Treatment of Roster Bonus After Last Pre-Season game - 97

**ROSTER EXEMPTION**
Pre-Season 5-Day Letter - 152-153

**SALARY ADVANCES**
97, 98, 125

**SALARY CAP**
82-133 (Article XXIV)
Computation of Team Salary - 92-93
Guaranteed League-wide Salary - 89
Minimum Team Salary - 91-92
Trigger for Guaranteed League-wide Salary, Salary Cap and Minimum
    Team Salary - 89
Valuation of Player Contracts
    Deferred Salary - 93-94
    Paragraph 5 - 93-94, (Top 51-93)
    Signing Bonuses
        Acceleration in League Year Preceeding Uncapped Year - 96
        Acceleration if NLTBE Termination Right and Roster
        Requirement - 96
        Amounts Treated as - 97-99
        Credit for Refunded - 99
        Proration Allocation From Uncapped Years - 94-95
        Rookie Playtime Requirement (Sole Control Proration) - 94
        With Extension - 95-96

30% Rules - 127-128
Buyout of Termination Right - 50, 127-128
Guaranteed Contracts - 123-124
Incentives
    Additional Incentives for Veterans, Rookies, and Teams - 117-123
    Conjunctive/Disjunctive - 122-123
    Exhibits A and B - 101-103
    Final 8 Salary - 78
    Franchise or Transition Player Tenders - 74
    Offer Sheets - 61-62
    Per Event, Per Play - 120
    Rookie LTBE Incentive Levels - 104-114
Increase of Current Year Salary After 10th Week - 99
Mid-Season Contracts - 127
Other Amounts (Loans, Salary Advances, Non-Cash Provision) - 124-127
Renegotiations and Extensions
    Consideration Treated as Signing Bonus - 97
    Final Capped Year - 98
    Treatment of Option Exercise Amounts - 128

**SCOPE OF AGREEMENT**
10 (Article III)

**SCOUTING COMBINE**
15, 46

Index

**SECOND CAREER SAVINGS PLAN**
See: Benefits (Second Career Savings Plan)

**SEVERANCE PAY**
See: Benefits (Severance Pay)

**SPECIAL MASTER**
136-138 (Article XXVI)
Anti-Collusion - 141-146
Appeal of Commissioner Disapproval of Entering Player Pool Contract -
      38-39
DGR and Accounting Disputes - 131-132
Enforcement of Salary Cap and Entering Player Pool - 134-135
False Certifications - 148
Minimum Team Salary Dispute - 91-92
PSL Disputes - 241
Termination of CBA Due to Collusion -198-200

**SQUAD SIZE**
154 (Article XXXIII)

**STIPULATION AND SETTLEMENT AGREEMENT**
4, 9, 40, 78, 84, 94, 96, 120, 124-125, 130, 214, 226-227

**SUPER BOWL GAME**
170, 194

**SUPPLEMENTAL DISABILITY PLAN**
See: Benefits (Supplemental Disability Plan)

**SUPPLEMENTAL DRAFT**
48

**TELEVISON**
Accountant Review Procedures (Appendix H) - 220, 224
Accounting Procedures - 130-133
DGR Calculation - 82-83
Extension of Agreement - 203
Player Appearances - 193

**TENDERS**
Computation of Team Salary - 92
Drafted Rookies - 44
Franchise Player - 66-67
Players with Less Than Three Accrued Seasons - 53
Transition Player - 68-69

**TERMINATION PAY**
81 (Article XXIII)

**TICKETS**
NFLPA, Player Tickets - 193-194

**TIME OF DRAFT**
42

**TRAINING CAMP**
See: Pre-Season Training Camp

**TRANSITION PLAYER**
Designation Period - 73
Prospective Designation - 74
Required Tender - 68-69
Right of First Refusal - 69-70
Right to Decline (Named Plaintiffs) - 74
Signing Period - 75-76

**TRAVEL DAY**
166

**UNDISCLOSED TERMS**
See: Enforcement of Salary Cap and Entering Player Pool

**UNION DUES AND MEMBERSHIP**
13-15 (Article V) (Union Security)
Dues Checkoff - 13
Dues Checkoff Authorization Form (Appendix A) - 204-205
NFLPA Meetings - 13

Index

## UNRESTRICTED FREE AGENTS (UFA)
Definition - 55
Free Agency Eligibility in Final League Year - 196
Individual Right of First Refusal - 63
June 1 Tender - 55
Salary Cap Valuation of June 1 Tender on July 15 - 92
Signing Period - 55-56

## VETERANS WITH LESS THAN THREE ACCRUED SEASONS
53-54 (Article XVIII)

## WAIVER SYSTEM
79-80 (Article XXII)

## WORKERS' COMPENSATION
191-192 (Article LIV)