# Exhibit 8
# Part 3 of 5

lation and Settlement Agreement and in Article XXIV, Section 7(b)(i)(2) of the Collective Bargaining Agreement, unless the exercise of the right to terminate is also conditioned upon the following playtime requirements: (1) for players drafted in the first round, at least 35% of the plays if the triggering condition occurs in the first year of the Player Contract, and at least 45% of the plays if in any subsequent year; (2) for all other Rookie players, at least 15% of the plays if the condition occurs in the first year of the Player Contract, and at least 30% of the plays if in any subsequent year. The playtime requirements set forth above do not affect the signing bonus allocation for any contract entered into by players other than Rookies.

*Side Letter 9/21/93: Sec. 15

* [A]ny multi-year Player Contract not unconditionally approved by the Commissioner as of the date hereof, other than any multi-year Player Contract executed in the last Capped Year of this Agreement, that extends from a Capped Year into any Uncapped Year (hereinafter "Subject Contract"). For purposes of determining Team Salary, if (i) the sum of the player's Paragraph 5 Salary, roster bonuses that are based upon the player making any of the Club's roster categories without limitation, and reporting bonuses during all Capped Years of the Subject Contract (but, if there are fewer than three remaining Capped Years, during the first three years of the Subject Contract) in the aggregate less than (ii) the portion of the Subject Contract's signing bonus that would be allocated to those League Years if the signing bonus were prorated equally over the term of the Subject Contract, then: the difference between the amounts calculated pursuant to (ii) and (i) of this sentence, up to 50% of the portion of the signing bonus that would otherwise be allocated to the Uncapped Years (the "Difference"), shall be deducted in equal portions from those Uncapped Years and reallocated[1] in equal portions over the Capped Years of the Subject Contract (or, if there are fewer than three Capped Years within the term of the Subject Contract, over the first three years of the Subject Contract). For purposes of this Paragraph, a renegotiation shall be treated as if it is an entirely new Player Contract. Notwithstanding the above, any Subject Contract executed prior to November 15, 1995 for which there is a Difference as a result of the calculation set forth above

shall have the 1995 portion of such Difference allocated to 1995 Team Salary to the extent of the Club's current and any future Room during the 1995 regular season (except such Room that results from the termination or renegotiation of a 1995 Player Contract after October 30, 1995), with the balance to be allocated to the 1996 League Year. Further, any Subject Contract executed between November 15, 1995 and the end of the 1995 League Year shall have the 1995 portion of any Difference allocated to the 1996 League Year.

*Side Letter 11/1/95: Sec. 1

(3)   If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

* For the purposes of the Salary Cap, any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The parties agree that, pursuant to the Collective Bargaining Agreement, the player shall always have the right to receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X, Paragraph G.1. (b) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

*Side Letter 9/21/93: Sec. 17

(4)   *If either party hereto has cancelled the extension of this Agreement as set forth in Article LXI (Extension of Agreement), then signing bonuses agreed to after the date of such cancellation shall be prorated using the 2002 League Year as the Final Capped Year.*

*Extension Agreement 2/25/98

(ii) **Acceleration.**

(1)    For any player removed from the Team's roster on or before June 1, any unamortized signing bonus amounts will be included in Team Salary for such League Year. If such acceleration puts a Team over the Salary Cap, the Team will have seven days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)    For any player removed from the Team's roster after June 1, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

> * During any League Year immediately preceding an Uncapped Year, the provisions relating to acceleration of unamortized signing bonuses applicable on or before June 1 of that League Year shall apply during that League Year after June 1.
>
> *Side Letter 11/1/95: Sec. 2

(3)    In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, then such signing bonus shall be accelerated as in subsection (ii)(1) above and the assignee Team's Team Salary will not include any portion of the signing bonus.

(4)    Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary. To the extent that such acceleration puts the Team over its Salary Cap, the difference shall be deducted from its Salary Cap for the following year.

> * With respect to a Player Contract in which the player has one or more rights to terminate based upon one or more not "likely to be earned" incentives <u>and</u> the player also being on the roster at a subsequent time, no acceleration shall occur pursuant to Article XXIV, Section 7(b)(ii)(4) of the CBA until both the incentive(s) and the roster precondition(s) have been satisfied.
>
> *Side Letter 10/21/96: Sec. 5

(5)    The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii) **Prior Signing Bonuses.** All signing bonuses from League Years prior to 1993 will be prorated over the term of the original Player Contracts

**102**

and included in Team Salary in the 1993 League Year and thereafter.

(iv)   **Amounts Treated as Signing Bonuses.** For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)   Any amount specifically described in a Player Contract as a signing bonus;

(2)   Any guaranteed reporting bonus;

(3)   Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)   Any option buyout amount, when paid or guaranteed; and

(5)   In the event that a Player Contract calls for a Salary in the second year of such Contract that is less than half the Salary called for in the first year of such Contract, the difference between the Salary in the second contract year and the first contract year shall be treated as a signing bonus.

* In a contract signed after the start of training camp, a reporting bonus for that season will be counted as a signing bonus. In a contract signed after the last pre-season game, a roster bonus for that season will be counted as a signing bonus.
                              *Side Letter 9/21/93: Sec. 18

* Any salary advance paid on a guaranteed basis will be counted as a signing bonus.
                              *Side Letter 9/21/93: Sec. 19

* For purposes of the Salary Cap and Entering Player Pool, any guaranteed bonus tied to workouts shall be treated as a Signing Bonus.
                              *Side Letter 6/23/93: Sec. 3

* For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to re-pay shall be treated as a Signing Bonus.
                              *Side Letter 6/23/93: Sec. 4

* For purposes of the Salary Cap and Entering Player Pool, any roster or reporting bonus which is earned or paid before the start of the Club's pre-season training camp shall be treated as a signing bonus.
                              *Side Letter 6/23/93: Sec. 6

* Except as set forth in [the] Paragraph [to follow], the full non-guaranteed amount of any Salary advance, off-

103

season work-out bonus, off-season roster bonus, or off-season reporting bonus shall be included in Team Salary only in the League Year in which it is earned by the player, without any pro-ration. For purposes of this paragraph only, "guaranteed" means Salary that is fully guaranteed, prior to being earned, for skill, for injury, and regardless of any termination of the contract by the Club. The definition of "guaranteed" set forth above shall not affect Salary Cap accounting for any other purpose.

*Side Letter 10/21/96: Sec. 1

* With respect to any Player Contract, or any renegotiation or extension of a Player Contract, that is executed in the Final Capped Year, each of the following shall be treated as a signing bonus, at the time of execution, if it is to be earned or paid to the player in the Final League Year (which is an Uncapped Year): (a) any Salary advance which the player is not and cannot be obligated to repay; (b) any off-season workout bonus that is contingent upon the player's participation in less than 32 days of the Club's off-season work-out program; (c) any off-season roster bonus; and (d) any off-season reporting bonus.

*Side Letter 10/21/96: Sec. 2

* [A]ny bonus to be paid to a player solely for fulfilling his obligations to play under his Player Contract without seeking to renegotiate and/or "holding out" (i.e., a "completion bonus"), and which bonus is otherwise guaranteed for skill and injury, shall be considered to be a "signing bonus" under Article X of the Settlement Agreement and Article XXIV of the CBA, except that the amount of any such completion bonus shall be calculated at its present value, computed at the Treasury Bill rate published in The Wall Street Journal on March 1 of the League Year in which the Player Contract is executed. Further, if any event occurs which extinguishes the player's right to receive such completion bonus, any amount of the bonus that has previously been included in Team Salary shall be immediately added to the Team's Salary Cap for the current League Year, if such event occurs prior to June 1, or for the next League Year, if such event occurs after such date, with the remainder of the bonus that has been allocated to Team Salary for future League Years immediately extinguished.

*Side Letter 1/18/94: Sec. 3

**104**

\* Any relocation bonus which is individually negotiated between a player and a Club shall be treated as a signing bonus.

*\*Side Letter 5/24/95: Sec. 9*

\* *For each League Year prior to the Final Capped Year*, if a Club and a player renegotiate or extend a contract and increase the player's Salary for the current League Year, the increase will be counted as Salary for that League Year if the NFL Management Council receives, prior to 4:00 p.m. (*New York Time*) on the Monday of the tenth week of the regular season, notice of the salary terms of such an executed extended or renegotiated contract. In any other circumstance *prior to the Final Capped Year*, the increase in Salary will be treated as a signing bonus that is allocated over the remaining years of the Player Contract (including the "current" year of that contract) to the extent that such allocation is permitted by the Settlement Agreement and the CBA. *The then-existing provisions of the CBA will govern the Salary Cap valuation of such a renegotiation or extension in the Final Capped Year. The parties have reserved their respective positions regarding the CBA's requirements for any such renegotiation or extension in the Final Capped Year.*

*\*Side Letter 5/24/95: Sec. 14*
*as amended Side Letter 5/13/99*

(v)    **Credit for Signing Bonuses Refunded.** In the event that a Team receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a signing bonus, such amount as has previously been included in Team Salary shall be added to the Team's Salary Cap for the next League Year.

(c)    **Incentives.**

(i)    Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

(ii)    At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

(iii)    At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equalling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

> * Any team performance will be automatically deemed to be "Likely to be earned" if the Team met or exceeded the specified performance during the prior League Year, and will be automatically deemed to be "not likely to be earned" if the Team did not meet the specified performance during the prior League Year.
>
> *Side Letter 2/22/96: Sec. 1

> * Any incentive bonus that depends on team performance in any category not identified in Exhibit A hereto automatically will be deemed "likely to be earned."
>
> *Side Letter 9/21/93: Sec. 8

> * Any incentive bonus that depends on a player's individual performance in any category not identified in Exhibit B hereto automatically will be deemed "likely to be earned." Any incentive bonus that depends on a player's individual performance in categories other than those used to assess performance at the player's primary position automatically will be deemed "likely to be earned."
>
> *Side Letter 9/21/93: Sec. 11

106

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## (EXHIBIT A)
## TEAM INCENTIVES

| OFFENSE | DEFENSE | SPECIAL TEAMS |
|---|---|---|
| Points scored by offense | Points allowed by defense | Own punt return average |
| Touchdowns scored by offense | Touchdowns allowed by defense | Own kickoff return average |
| Total offense (net yards) | Total defense (net yards) | Opposition punt return average |
| | | Opposition kickoff return average |
| Average net yards gained per rushing play | Average net yards given up per rushing play | |
| Average net yards gained per passing play | Average net yards given up per passing play | |
| Sacks allowed | Sacks | |
| Passing % completed | Interceptions | |

| ALL |
|---|
| Wins |
| Playoffs |
| Conference Championship |
| Super Bowl |
| Touchdowns on returns and recoveries |
| Net difference takeaways/giveaways |

*Side Letter 9/21/93: Exhibit A

107

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ( EXHIBIT B)
## INDIVIDUAL INCENTIVES

**RUSHING**

Total yards

Average yards
(100 attempts)

Touchdowns

**PASSING**

Passer rating
(224 attempts)

Completion percentage
(224 attempts)

Interception percent
(224 attempts)

Total yards

Yards per pass
(224 attempts)

Touchdown passes

**RECEIVING**

Total receptions

Total yards

Average yards
(32 receptions)

Touchdowns

**DEFENSE**

Interceptions

Interception return yards

Touchdowns on interception
returns

Opponent fumble recoveries

Opponent fumble return yards

Touchdowns on opponent
fumble returns

Sacks

**PUNT RETURNS**

Total yards

Average (20 returns)

Touchdowns

108

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## (EXHIBIT B)
## INDIVIDUAL INCENTIVES

### KICKOFF RETURNS
Total yards
Average (20 returns)
Touchdowns

### PUNTING
Gross average (40 punts)
Net average (40 punts)
Inside 20-yard line

### PLACE KICKING
Total points
Field goals
Field goal percentage
(16 attempts)
Field goal percentage
0-19 yards (4 attempts)
Field goal percentage
20-29 yards (4 attempts)
Field goal percentage
30-39 yards (4 attempts)
Field goal percentage
40-49 yards (4 attempts)
Field goal percentage
50 yards or longer (3 attempts)

### OTHERS
Roster bonuses
Reporting bonuses
Playtime bonuses
(excluding special teams)
Special teams playtime

*Side Letter 9/21/93: Exhibit B

109

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| CATEGORY | | PERCENT COUNTED |
|---|---|---|
| ROSTER BONUSES (regular season) | | |
| All Drafted | | 100% |
| Undrafted | | 30% |
| ROSTER BONUSES (pre-season) | | |
| All Players | | 100% |
| PLAYING TIME | ROUNDS 1-3 | |
| | Up to 33% | 100% |
| | 34% - 75% | 75% |
| | 76% - 90% | 50% |
| | 91% - 100% | 25% |
| | ROUNDS 4-8 | |
| | Up to 25% | 100% |
| | 26% - 33% | 75% |
| | 34% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | UNDRAFTED | |
| | Up to 15% | 100% |
| | 16% - 25% | 75% |
| | 26% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | All percentages will round to the nearest whole percentage (e.g., .05 is rounded to 1.0) | |
| SPECIAL TEAMS PARTICIPATION | ROUNDS 1 - 3 | 100% |
| | ROUNDS 4 - 8 | 66% |
| | UNDRAFTED | 50% |
| HONORS (First or Second Team)* | ROUNDS 1 - 2 | |
| | All-Rookie | 100% |
| | All NFL, Pro Bowl | 5% |
| | All Conference | 10% |
| | ALL OTHERS | |
| *See Media List on pages 122-123 | All-Rookie | 15% |
| | All Conference | 5% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

**RUSHING**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Rushing | Up to 150 yards | 100% |
| | 151 - 350 yards | 75% |
| | 351 - 500 yards | 66% |
| | 501 - 700 yards | 33% |
| | 701 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 100 yards | 100% |
| | 101 - 350 yards | 66% |
| | 351 - 650 yards | 25% |
| | 651 yards or more | 0% |
| Average Yards | ROUNDS 1 - 3 | |
| (100 attempts) | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 66% |
| | 4.01 - 4.49 | 33% |
| | 4.5 or more | 0% |
| | ALL OTHERS | |
| | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 50% |
| | 4.01 - 4.49 | 25% |
| | 4.5 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

111

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

# ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

**PASSING**

| | | |
|---|---|---|
| Passer Rating | ROUNDS 1 - 3 | |
| (224 attempts) | 50 rating or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 50% |
| | 90.00 - 100.00 | 33% |
| | 100.01 or more | 0% |
| | ALL OTHERS | |
| | 50.00 or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 25% |
| | 90.01 or more | 0% |
| Completion Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | Up to 52% | 100% |
| | 52.1 - 56% | 66% |
| | 56.1 - 59% | 33% |
| | 59.01% or more | 0% |
| | ALL OTHERS | |
| | Up to 52% | 100% |
| | 52.1 - 56% | 50% |
| | 56.1 - 59% | 25% |
| | 59.01% or more | 0% |
| Interception Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | 3.0% or more | 100% |
| | 2.7 - 2.9% | 66% |
| | 2.1 - 2.6% | 33% |
| | 2.0% or less | 0% |
| | ALL OTHERS | |
| | 3.0% or more | 100% |
| | 2.7 - 2.9% | 50% |
| | 2.1 - 2.6% | 25% |
| | 2.0% or less | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| Total Yards | ROUNDS 1 - 3 | |
|---|---|---|
| Passing | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 25% |
| | 1,201 yards or more | 0% |
| Yards Per Pass | ROUNDS 1 - 3 | |
| (224 attempts) | Under 6 | 100% |
| | 6.0 - 7 | 66% |
| | 7.1 - 8 | 33% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| | ALL OTHERS | |
| | Under 6 | 100% |
| | 6.0 - 7 | 50% |
| | 7.1 - 8 | 25% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| Touchdown Passes | ROUNDS 1 - 3 | |
| | Under 11 | 100% |
| | 12 - 16 | 66% |
| | 17 - 23 | 33% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |
| | ALL OTHERS | |
| | Under 11 | 100% |
| | 12 - 16 | 50% |
| | 17 - 23 | 25% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |

113

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### RECEIVING

| Total Receptions | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 20 catches | 100% |
| | 21 - 30 catches | 75% |
| | 31 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| | ALL OTHERS | |
| | Up to 10 catches | 100% |
| | 11 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| Total Yards Receiving | ROUNDS 1 - 3 | |
| | Up to 200 yards | 100% |
| | 201 - 300 yards | 75% |
| | 301 - 400 yards | 50% |
| | 401 - 800 yards | 25% |
| | 801 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 150 yards | 100% |
| | 151 - 250 yards | 75% |
| | 251 - 350 yards | 50% |
| | 351 - 700 yards | 25% |
| | 701 yards or more | 0% |
| Average Yards (32 receptions) | ROUNDS 1 - 3 | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 75% |
| | 14.6 - 16.5 | 50% |
| | 16.6 - 18.5 | 25% |
| | 18.6 or more | 0% |
| | ALL OTHERS | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 66% |
| | 14.6 - 16.5 | 33% |
| | 16.6 - 18.5 | 10% |
| | 18.6 or more | 0% |

114

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| Receiving Touchdowns | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

**TOTAL OFFENSE**

| Total Yards | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 10% |
| | 1,201 yards or more | 0% |

| Scoring | ROUNDS 1 - 3 | |
|---|---|---|
| | 2 - 28 points | 100% |
| | 29 - 65 points | 50% |
| | 66 - 75 points | 25% |
| | 76 points or more | 0% |
| | ALL OTHERS | |
| | 2 - 28 points | 100% |
| | 29 - 55 points | 50% |
| | 56 - 75 points | 10% |
| | 76 points or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

**DEFENSE**

| | | |
|---|---|---|
| Interceptions | ROUNDS 1 - 3 | |
| | 1 - 5 | 100% |
| | 6 - 10 | 50% |
| | 11 or more | 0% |
| | ALL OTHERS | |
| | 1 - 3 | 100% |
| | 4 - 6 | 33% |
| | 7 or more | 0% |
| Interception Return Yards | ROUNDS 1 - 3 | |
| | 0 - 85 | 100% |
| | 86 - 150 | 66% |
| | 151 - 190 | 33% |
| | 191 or more | 0% |
| | ALL OTHERS | |
| | 0 - 65 | 100% |
| | 66 - 85 | 50% |
| | 86 - 110 | 25% |
| | 111 or more | 0% |
| Touchdowns on Interception Returns | ALL | |
| | 1 | 100% |
| | 2 | 50% |
| | 3 or more | 0% |
| Opponent Fumble Recoveries | ALL | |
| | 1 - 2 | 100% |
| | 3 - 4 | 50% |
| | 5 or more | 0% |
| Opponent Fumble Return Yards | ROUNDS 1 - 3 | |
| | 0 - 40 | 100% |
| | 41 - 65 | 66% |
| | 66 - 80 | 33% |
| | 81 or more | 0% |
| | ALL OTHERS | |
| | 0 - 30 | 100% |
| | 31 - 55 | 50% |
| | 56 - 75 | 25% |
| | 76 or more | 0% |

116

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| | | |
|---|---|---|
| Touchdowns on | ALL | |
| Opponent Fumble | 1 | 100% |
| Returns | 2 | 50% |
| | 3 or more | 0% |
| Sacks | ROUNDS 1 - 3 | |
| | .5 - 4 sacks | 100% |
| | 4.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| | ALL OTHERS | |
| | .5 - 3 sacks | 100% |
| | 3.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |

**PUNT RETURNS**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 224 | 100% |
| | 225 - 349 | 33% |
| | 350 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 7.9 | 100% |
| | 8.0 - 10.9 | 33% |
| | 11.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
### (REVISED SCHEDULE B)

**KICKOFF RETURNS**

| Total Yards | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 599 | 100% |
| | 600 - 649 | 33% |
| | 650 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19.9 | 100% |
| | 20.0 - 21.9 | 33% |
| | 22.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

**PUNTING**

| Gross Average (40 punts) | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 42.4 | 100% |
| | 42.5 - 43.9 | 33% |
| | 44.0 or more | 0% |
| Net Average (40 punts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 35.9 | 100% |
| | 36.0 - 37.9 | 33% |
| | 38.0 or more | 0% |
| Inside 20-yard line | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 23 | 33% |
| | 24 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### PLACE KICKING

| | | |
|---|---|---|
| Total Points | ROUNDS 1 - 3 | |
| | Up to 86 points | 100% |
| | 87 - 95 points | 75% |
| | 96 - 104 points | 50% |
| | 105 - 113 points | 10% |
| | 114 points or more | 0% |
| | ALL OTHERS | |
| | Up to 75 points | 100% |
| | 76 - 90 points | 66% |
| | 91 - 99 points | 33% |
| | 100 - 109 points | 10% |
| | 110 points or more | 0% |
| Field Goals | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 26 | 33% |
| | 27 or more | 0% |
| Field Goal Percentage (16 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 75% | 100% |
| | 75.1 - 80% | 33% |
| | 80.1 - 100% | 0% |
| Field Goal Percentage 0-19 yards (4 attempts) | ALL | 100% |
| Field Goal Percentage 20 - 29 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 85% | 100% |
| | 85.1 - 95% | 33% |
| | 95.1 - 100% | 0% |
| Field Goal Percentage 30 - 39 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 70% | 100% |
| | 70.1 - 90% | 33% |
| | 90.1 - 100% | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| | | |
|---|---|---|
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 40 - 49 yards | ALL OTHER | |
| (4 attempts) | 0 - 55% | 100% |
| | 55.1 - 70% | 33% |
| | 70.1 - 100% | 0% |
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 50 yards or longer | ALL OTHERS | |
| (3 attempts) | 0 - 45% | 100% |
| | 45.1 - 60% | 33% |
| | 60.1 - 100% | 0% |

*Side Letters 4/27/93 & 4/27/94

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ENTERING PLAYER POOL INCENTIVES

\* Team Leaders

   a) If the incentive is written for leading the Club in any official League statistical category [assuming it is on Exhibit A or B], 0% will be counted.

   b) If the incentive is written for any ranking other than first on the Club in any official League statistical category, 100% will be counted.

*Side Letter 4/27/93: Sec. 7

   c) If the incentive is written for leading the team in kick returns or punt returns, and the player qualifies under the minimum standard established by the League for those statistical categories, the following percentages shall be counted:

| | |
|---|---|
| ROUNDS 1 - 3 | 100% |
| ROUNDS 4 - 5 | 33% |
| ROUNDS 6 - 8 | 10% |
| ALL OTHERS | 0% |

*Side Letter 6/30/93: Sec. 16

\* Each component of non-cumulative incentives is calculated individually, and only the highest component amount is counted. For example, an incentive clause for a 1st-round running back that provides for $10,000 for up to 150 yards or $20,000 for 151-350 yards is counted as $15,000. (This amount is arrived at by taking the greater of 100% of $10,000 or 75% of $20,000, which equals $15,000. Only the higher component amount of $15,000 is counted).

*Side Letter 4/27/93: Sec. 8

The following shall count at 100%:
\* Any team statistic or team unit statistic, if the statistic was achieved in the prior season (based on prior season's performance).

*Side Letter 4/27/93: Sec. 9

\* Incentives within the sole control of the player (e.g., non-guaranteed reporting bonuses, workouts, weight clauses, etc.).

*Side Letter 4/27/93: Sec. 10

121

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

*Any relocation or completion bonus.

> *Side Letter 4/27/93: Sec. 11

*Any incentive not measured by official NFL statistics (i.e., hurries, tackles and assists) or incentives based on subjective standards.

> *Side Letter 4/27/93: Sec. 12

* Any guaranteed salary or bonus.

> *Side Letter 4/27/93: Sec. 13

* Any pre-season or off-season statistics.

> *Side Letter 4/27/93: Sec. 14

* Any incentive based upon another player's performance.

> *Side Letter 4/27/93: Sec. 15

* Incentives based on leading the team in punting/kicking will be counted at 100%.

> *Side Letter 6/30/93: Sec. 18

* If a rookie player has an incentive bonus for touchdowns, we will apply the rushing and receiving touchdowns likely to be earned rule and if a rookie non-kicker has a Total Points incentive, we will apply the total points likely to be earned levels for a rookie kicker to value the incentives.

> *Side Letter 7/26/94

## *<u>HONORS AND RECOGNIZED MEDIA</u>

**VETERAN HONORS**
PRO BOWL
1ST & 2ND ALL NFL
1ST & 2ND ALL CONFERENCE
SUPER BOWL MVP (ROZELLE TROPHY)
MVP-NFL
OFFENSIVE PLAYER OF YEAR — NFL OR CONF
DEFENSIVE PLAYER OF YEAR — NFL OR CONF
PLAYER OF YEAR — NFL OR CONF

**VETERAN MEDIA**
ASSOCIATED PRESS
UNITED PRESS INTERNATIONAL

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
FOOTBALL NEWS
NEWSPAPER ENTERPRISE ASSOCIATION
FOOTBALL DIGEST
USA TODAY
COLLEGE & PRO FOOTBALL WEEKLY

**ROOKIE HONORS (FIRST OR SECOND TEAM)**
**ROUNDS 1-2**
| | |
|---|---|
| ALL ROOKIE | 100% |
| ALL NFL, PRO BOWL | 5% |
| ALL CONFERENCE | 10% |
| **ALL OTHERS** | |
| ALL-ROOKIE | 15% |
| ALL CONFERENCE | 5% |
| **ALL** | |
| ROOKIE OF YEAR — NFL OR CONF | 0% |
| ROOKIE OF YEAR — OFFENSE — NFL | 0% |
| ROOKIE OF YEAR — DEFENSE — NFL | 0% |

**ROOKIE MEDIA**
ASSOCIATED PRESS
UNITED PRESS INTERNATIONAL
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
NEWSPAPER ENTERPRISE ASSOCIATION
SPORTING NEWS

*Side Letter 9/25/95 & 4/27/93

## ADDITIONAL INCENTIVE RULES FOR VETERANS, ROOKIES, INDIVIDUALS AND TEAMS

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be re-valued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.

*Side Letter 9/21/93: Sec. 1

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be re-valued at the time of the renegotiation. Thus, if at

123

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a pre-existing contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

*Side Letter 9/21/93: Sec. 2

* Other than as set forth in [the paragraph immediately following,] for purposes of the Salary Cap and Entering Player Pool, any incentive bonus to an offensive player that is based upon the defensive team's or special team's performance automatically will be deemed "likely to be earned." Conversely, any incentive bonus to a defensive player that is based upon the offensive team's or special team's performance automatically will be deemed "likely to be earned." Any incentive bonus based upon another player's performance automatically will be deemed "likely to be earned."

*Side Letter 9/21/93: Sec. 3

* For purposes of the Salary Cap and Entering Player Pool, any incentive bonus in a contract signed by a Rookie that is based upon special team performance automatically will be deemed "likely to be earned," except for an incentive bonus to a Rookie kicker or Rookie punter that is based upon improvement in the performance of the kicking or punting team. Any incentive bonus to a player who is not a Rookie that is based upon special team performance automatically will be deemed "likely to be earned" unless the player played in at least 50% of his team's special team plays in the previous season.

*Side Letter 9/21/93: Sec. 4

* For purposes of the Salary Cap and Entering Player Pool, any incentive bonus based on the team's performance automatically will be deemed "likely to be earned" if it sets a minimum level of statistical performance that is equal to or lower than that achieved by the team finishing fifth from the bottom in the League in the applicable category during the previous season. For example, an incentive bonus based on a team winning at least a specified number of games will be evaluated by deter-

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

mining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.

*Side Letter 9/21/93: Sec. 5

* Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 24th in the League in total offense will be deemed "likely to be earned" in a League consisting of 28 teams; similarly, an incentive bonus based on a team finishing 12th in its Conference will be deemed "likely to be earned" in a Conference consisting of 14 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

*Side Letter 9/21/93: Sec. 6

* Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

*Side Letter 9/21/93: Sec. 7

* In any Player Contract signed by a Rookie, if more than three different team performance categories are included as incentives, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." For Player Contracts signed by Rookies selected in rounds one and two of the NFL draft, any team

125

performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 35% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 45% of the plays for any team incentives that apply in any subsequent year of such a contract. For Player Contracts signed by all other Rookies, a team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 15% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 30% of the plays for any team incentives that apply in any subsequent year of such a contract. The provisions of this paragraph supplement and do not override [Paragraph 9] of the parties' letter of agreement of April 27, 1993. The calculation of these playtime requirements shall exclude special teams plays.

*Side Letter 9/21/93: Sec. 9

* In any Player Contract signed by a player other than a Rookie, if more than three different team performance categories are included as incentives, covering the Final Capped Year or thereafter, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." In addition, any team performance bonus for a player other than a Rookie covering the Final Capped Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determination of whether the incentive is "likely to be earned" will be made pursuant to Article X, Paragraph G.3.(a) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(c)(i) of the Collective Bargaining Agreement. The calculation of these playtime requirements shall exclude special teams plays.

*Side Letter 9/21/93: Sec. 10

* Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year. For Rookies, it will be based on 75% of the

team leader on the Rookie's team in the specified performance category in the previous year. If not initially counted as "likely to be earned," such incentives shall be counted immediately towards the Salary Cap and Entering Player Pool when they are earned.

*Side Letter 9/21/93: Sec. 12

* Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie quarterback who was drafted in the first round, any incentive bonus for leading his team in any quarterback category in his third NFL season or thereafter automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie running back who was drafted in the first round, any incentive bonus for leading his team in any running back category automatically will be deemed "likely to be earned." The provisions of this paragraph shall apply notwithstanding [Paragraph 7] of the parties' letter agreement of April 27, 1993.

*Side Letter 9/21/93: Sec. 13

* For purposes of the Salary Cap, any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned at 100 percent of its value, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except (1) as provided [two paragraphs] above [in regards to per play or per game occurrences,] (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid, (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately, or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

*Side Letter 9/21/93: Sec. 14

* Any incentive bonus which a player and a Club agreed to prior to the 1993 League Year that depends upon performance in any category not identified in Exhibit A or Exhibit B will be determined to be likely or unlikely to be earned based upon the player's and/or team's per-

127

formance in such category during the League Year prior to the League Year in which the incentive may be earned. Any incentive bonus which a player and a Club agreed to in the 1993 League Year or thereafter that depends upon performance in any category not identified in Exhibit A or Exhibit B automatically will be deemed "Likely to be earned."

*Side Letter 5/24/95: Sec. 6

* Any incentive bonus which a player and a Club agree to in the 1994 League Year, or in any future League Year during the term of the CBA, that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

*Side Letter 5/24/95: Sec. 7

* Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Pre-season roster bonuses are automatically deemed "likely to be earned."

*Side Letter 5/24/95: Sec. 8

* For purposes of the Salary Cap, any incentive bonus (or portion thereof) that is earned during the [Final Capped] Year, but which had not been deemed likely to be earned at 100 percent of its value during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the [Final Capped] Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the [Final Capped] Year, become impossible for the player to attain.

*Side Letter 11/11/93: Sec. 1

* To determine the value of an incentive clause for Salary Cap purposes, either under the specific circumstances set forth in the paragraph above, or under the specific circumstances set forth in paragraph 14 of the letter from Jeffrey L. Kessler to Harold R. Henderson dated

September 21, 1993, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had 1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

*Side Letter 11/11/93: Sec. 2

* If more than eight different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight incentives with the lowest dollar value automatically will be deemed "likely to be earned." For purposes of this paragraph, each conjunctive combination of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X," shall be counted as one performance category), and each disjunctive combination of performance categories shall be counted by the number of disjunctive performance categories in the combination (e.g., an incentive clause reading, "if A or B or C, then player will receive $X", shall be counted as three performance categories). In addition, any of the disjunctive performance categories may itself be a conjunctive combination of performance categories (e.g., the "A" in the immediately preceding example may be a conjunctive combination of numerous performance categories, and would be counted as being one category because of its conjunctive nature).

*Side Letter 2/22/96: Sec. 2

* [The above paragraph] does not supersede the terms of any other letter agreement between the parties that

129

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

automatically deem certain performance incentives to be "likely to be earned" or "not likely to be earned" depending upon whether the incentive fulfills other specified criteria (e.g., Paragraphs 3-10 of the September 21, 1993 letter agreement).

*Side Letter 2/22/96: Sec. 3

* [The two preceding paragraphs do] not apply and the parties reserve their rights with respect to multi-year contracts containing team performance incentives.

*Side Letter 2/22/96: Sec. 4

(d)     **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)     In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the Final Capped Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, if payment of the player's entire Salary for the Final Capped Year is not fully guaranteed. For example, without limitation on any other applicable example, if neither party exercises any right to cancel *the* extension of this Agreement, and if the Salary Cap is in effect during the *2002* and *2003* League *Years,* and the player enters *into* a *four-year contract* which *is* not fully guaranteed for the *2002* and *2003* League Years, but *is* fully guaranteed for the *2004 and 2005* League Years, the full amount of the guaranteed Salary for the *2004* and *2005* League Years will be included in Team Salary for the *2002* and *2003* League Years in a proportion determined by the Team.

\* *Extension Agreement 2/25/98*

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond three years after the Final Capped Year will be included in Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

(iii)     Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the Treasury Bill rate published in The Wall Street Journal of March 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Section 7(b)(ii)(1) above, shall apply.

(iv)     If any Player Contract entered into in a Capped Year provides for

**130**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

yearly Salary in a sequence that, in the Final Capped Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

> \* For the purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Article XXIV, Section 7(d)(i)-(iv).
>
> *Side Letter 6/23/93: Sec. 2

(e)     **Other Amounts.**

(i)     **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

> \* For purposes of the Salary Cap and Entering Player Pool, in the event that a player and Club enter into a fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), the parties agree that such a fraudulent agreement would constitute an improper circumvention of the Salary Cap and/or Entering Player Pool, in violation of the Stipulation and Settlement Agreement, Article X, Part G, Paragraph 5 (a), and the Collective Bargaining Agreement, Article XXIV, Section 7(e)(i).
>
> *Side Letter 11/11/93: Sec. 3

(ii)     **Salary Advances.** The full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

> *For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to re-pay shall be treated as a Signing Bonus.
>
> *Side Letter 6/23/94: Sec. 4

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(iii)    **Non-Cash Provisions.** The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

> * Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits.
>
> *Side Letter 5/24/95: Sec. 5

> * Expenses for travel, board and lodging for a player participating in an off-season workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.
>
> *Side Letter 5/24/95: Sec. 1

> * Except as set forth in the two preceding paragraphs, in Issue No. 30, and in the letter agreement between us dated August 4, 1993 regarding Rookie Orientation Camps, if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to the CBA or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This paragraph does not apply to consideration paid to a player (or his affiliate) for non-football playing services, which continues to be subject to Article XXIV, Section 1(c)(ii) of the CBA.
>
> *Side Letter 5/24/95: Sec. 4

> * Compensation to players for participation in the off-season workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article XXXV of the CBA shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article XXXV, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii)

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. For example, without limitation upon any other example, a Club having a nine-week workout program in the 1994 League Year for sixty players to be paid at the minimum amount will include $108,000 in its Team Salary on the first day of such program ($50 per day x four workout days per week x nine weeks x sixty players). At the conclusion of a club's off-season workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

*Side Letter 5/24/95: Sec. 3

* If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three or more seasons, the fair market value of such gifts up to $10,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. If such gifts have a value between $10,000 and $15,000, the parties reserve their rights with respect to the treatment of the excess fair market value above $10,000; in the absence of agreement between the parties on such treatment, the Impartial Arbitrator shall decide. If the player has been under contract with the Club in less than three seasons, the entire fair market value of any such gifts shall be counted as Salary.

*Side Letter 4/16/96

(iv) **Annuities.** The cost to the Team of any annuity provided to any player *(but not including any annuity provided pursuant to the player annuity program described in Article XLVIII-A)*, computed at the Treasury Bill rate on March 1 of the applicable League Year, shall be included immediately in Team Salary.

*Extension Agreement 2/25/98

(f) **Traded Contracts.** In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be re-valued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.

*Side Letter 9/21/93: Sec. 1*

* A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.

*Side Letter 5/24/95: Sec. 11*

(g)   **Mid-Season Contracts**. In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

**Section 8.** **30% Rules:**

(a)   No NFL Player Contract entered into in an Uncapped Year prior to the Final League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the Contract per year. For example, a four-year Player Contract commencing in the 1993 League Year may not provide for an annual decrease of more than 30% of the Salary, excluding amounts treated as a signing bonus, in the 1993 League Year for each of the four years covered by the contract.

(b)   No NFL Player Contract entered into in a Capped Year and extending into the Final League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the Final Capped Year, per year, either in the Final League Year or in any subsequent League Year covered by the Player Contract. For example, without limitation on any other applicable example, if neither party exercises any right to cancel *the* extension of this Agreement, a four-year Player Contract signed in the *2003* League Year (assuming it is a Capped Year) may not provide for an annual increase of more than 30% of the *2003* League Year Salary, excluding amounts treated as a signing bonus, in each of the three additional League Years covered by the Contract.

*Extension Agreement 2/25/98*

* Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one

or more contract years shall be treated as signing bonus at the time the buy-out is exercised by the Club, and pro-rated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buy-out is based upon one or more incentives that are not "likely to be earned." Such a buy-out amount shall not be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA.

*Side Letter 10/21/96: Sec. 3(a)

* The parties acknowledge that Class Counsel together with the NFLPA, and the NFL Management Council, disagree as to the treatment of allocated signing bonus and buy-out payments when a player's right to terminate one or more contract years and/or the Club's right to buy-out is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this paragraph [and the one preceding], the terms of [both these paragraphs] may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this paragraph.

*Side Letter 10/21/96: Sec. 3(b)

* Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, pro-rated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA, pro-rated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii)

135

if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Side Letter 10/21/96: Sec. 4

**Section 9. Renegotiations and Extensions:** Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

(a)      The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

(b)      No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(c)      No contract renegotiations may be done for a current season after the last regular season game of that season.

(d)      A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(f).

(e)      As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

* No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.

*Side Letter 10/21/96: Sec. 6

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be re-valued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a pre-existing contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

*Side Letter 9/21/93: Sec. 2

* For purposes of the Salary Cap, any signing bonus given in connection with a contract extension entered into

before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The parties agree that, pursuant to the Collective Bargaining Agreement, the player shall always have the right to receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X, Paragraph G.1.(b) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

*Side Letter 9/21/93: Sec. 17

* Any agreement to compensate a player at the minimum amount set forth in Article XXXV of the CBA for participation in an off-season workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.

*Side Letter 5/24/95: Sec. 2

* *[A]ny salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Entering Player Pool shall not be treated as a renegotiation.*

**Side Letter 11/7/97*

* *We have discussed whether an amendment to a Player Contract that changes the terms under which Signing Bonus is paid is or is not a "renegotiation" of the contract under the terms of Article I, Section 2(ab) and Article XXIV, Section 9 of the CBA (and corresponding provisions of the <u>White</u> Settlement Agreement)....We have agreed that any such agreement is a "renegotiation" under the terms of these provisions...*

**Side Letter 5/13/99*

**137**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

**Section 10. Accounting Procedures:**

    (a)    **Special Purpose Letters and DGR Reporting.**

    (i)(A)   *At least three days prior to the beginning* of each *League Year,* the parties will be provided with an "Initial Special Purpose Letter" by an independent auditor *(hereinafter "the Accountants") which compiles the preliminary reporting of* the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each *Club* and the NFL for the League Year *about to be* concluded, *utilizing information reported by* independent *Club and League auditors. The* Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the *Clubs and the League* in providing information to the Accountants ("DGR Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The engagement of the *Accountants* shall be deemed to be renewed annually unless the *Accountants are* discharged by either party during the period from *May 1* to July 1 of that year.

    (B)   *The amount of any Salary Cap and Minimum Team Salary that may apply in a League Year, and the extent to which Required Tenders and Qualifying Offers must be increased in a League Year, shall be determined utilizing: (i) the information contained in the Initial Special Purpose Letter for the immediately preceding League Year, and (ii) any adjustments resulting from prior League Years.*

    (ii)   *On or before the May 1 following the conclusion of each of the Capped Years hereunder, the parties will be provided with a "Final Special Purpose Letter" by the Accountants reporting the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each NFL Team and the NFL for the League Year just concluded. The review procedures to be performed by the Accountants are set forth in Appendix H attached hereto, or as otherwise agreed between the parties. To the extent that the amounts set forth in the Final Special Purpose Letter are different from those in the Initial Special Purpose Letter, such that the amount of any Salary Cap and/or Minimum Team Salary that League Year would have been different than that utilized as a result of the issuance of the Initial Special Purpose Letter, any such difference in the Salary Cap and/or Minimum Team Salary shall be credited or deducted, as the case may be, to any next Salary Cap and/or Minimum Team Salary (but subject in any case to Section 4(b)(i) above), with interest (using the one year Treasury Bill rate as published in* <u>The Wall Street Journal</u> *on March 1 of each applicable League Year), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), if specified by the NFLPA. Notwithstanding the foregoing, in the Final Capped Year, the Final Special Purpose Letter shall be issued no later than March 1, and any such difference shall immediately be credited or deducted, as the case may be, to the Salary Cap and/or Minimum Team Salary for the Final Capped Year (but subject in any case to Section 4(b)(i) above), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program) if specified by the NFLPA.*

                                                   *\*Extension Agreement 2/25/98*

**138**

(iii)    The Accountants shall review the reasonableness of any esti-
mates of revenues or expenses included in any *Club's* DGR Reports in the
League Years covered by this Agreement and may make such adjustments
in such estimates as they deem appropriate. To the extent that the actual
amounts of revenues received or expenses incurred differ from such esti-
mates, adjustments shall be made: *(a) pursuant to Section 10(a)(ii) above for
estimates corrected prior to the issuance of the Final Special Purpose Letter, and
(b)* in DGR for the following League Year, *without interest, for estimates cor-
rected thereafter.*

*Extension Agreement 2/25/98*

(iv)    With respect to expenses deducted by the NFL or the *Clubs* from
television, cable and radio broadcast revenues or any other revenues, the
NFL and the *Clubs* shall report in the DGR Reports only those expenses
that are reasonable and customary in accordance with the provisions of
Section 1(a)(i). All categories of expenses deducted from such revenues by
the NFL or a *Club* in a DGR Report completed by the NFL or that *Club* shall
be reviewed by the Accountants, who shall determine whether they are rea-
sonable and customary.

*Extension Agreement 2/25/98*

(v)    *Reasonably prior to the issuance of the Final Special Purpose Letter,
the Accountants shall, as* set forth in Appendix H attached hereto, notify des-
ignated representatives of the NFL and the NFLPA: (1) if the Accountants
have any questions concerning the amounts of revenues or expenses re-
ported by the *Clubs* or any other information contained in the DGR Reports
submitted by the *Clubs;* and (2) if the Accountants propose that any ad-
justments be made to any revenue or expense item or any other informa-
tion contained in the DGR Reports submitted by the *Clubs.*

*Extension Agreement 2/25/98*

(vi)    In the event of any dispute concerning the amounts (as opposed
to includability or the interpretation, validity or application of this Agree-
ment) of any revenues, expenses, or Player Costs to be included in the DGR
Reports, including any dispute concerning any findings or determinations
concerning expenses made by the Accountants pursuant to the provisions
of subsection (iv), that cannot be resolved among the parties (hereinafter
referred to as "Disputed Adjustments"), such dispute shall be resolved by
the Accountants after consulting and meeting with representatives of both
parties.

(vii)    Notwithstanding the foregoing, either party shall have the right
to contest, by commencing a Special Master Proceeding pursuant to this
Agreement, any Disputed Adjustments made by the Accountants, whenev-
er such Disputed Adjustments for all *Clubs* are adverse to the party com-
mencing the proceeding in an aggregate amount of $5 million or more in

**139**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

any League Year covered by this Agreement. If the Disputed Adjustments for all *Clubs* are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all *Clubs* adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a DGR Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

*Extension Agreement 2/25/98*

(viii)    After receiving the Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its *Clubs* to further verify the accuracy of the information in the Final Special Purpose Letter.

*Extension Agreement 2/25/98*

(b)    **Projected Defined Gross Revenues.**
(i)    For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4-5 and 10(a) above, and for any other purpose specifically stated in this Agreement, Defined Gross Revenues shall be projected ("Projected Defined Gross Revenues") *utilizing* one or more *agreed-upon methods for the projection process so that the anticipated growth of Projected DGR (based upon factors such as anticipated new stadiums, expansion Clubs, and revenue provisions in the NFL's television and other contracts) over the course of League Years which are anticipated to be Capped Years shall be as accurate as practicable, subject to any agreement between the parties to allocate DGR over particular League Years pursuant to Section 1(a)(xiv) above. Notwithstanding the foregoing, any difference between Projected DGR and DGR for the prior League Year shall be credited or deducted, as the case may be, in the calculation of the Salary Cap and/or Minimum Team Salary* for the next League Year using the *method set forth in Sections 10(b)(ii) and (iii) below, subject in any case to Section 4(b)(i) above. Moreover, if on March 1 of the year, one or more League-wide television or local television and radio contracts are in effect for the next League Year, the actual revenues expected from such source under such contract shall be used in the*

140

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

determination of Projected Defined Gross Revenues, *unless another alloca-tion has been or is agreed to by the parties*. If, after the initial calculation of Pro-jected DGR for a League Year, a new League-wide television contract is en-tered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Pro-jected DGR, and the Salary Cap and Minimum Team Salary shall immedi-ately be adjusted accordingly. In addition, if one or more new *Clubs are* scheduled to be added to the NFL during the next League Year as *one or more* expansion *Clubs,* Projected DGR will include an additional projection of DGR *determined in a manner agreed to by the parties*. In addition, if, after the initial calculation of Projected DGR for a League Year, the number of scheduled regular season games per *Club* is increased above the standard of sixteen (16), Projected DGR will include an additional projection of DGR to account for such additional games as agreed upon by the NFLPA and the Management Council.

*Extension Agreement 2/25/98*

(ii)    In the event that actual Defined Gross Revenues for any League Year are less than Projected Defined Gross Revenues (as calculated in ac-cordance with Section 10(b)(i) above) for that League Year, then the differ-ence shall be deducted from Projected Defined Gross Revenues for the next League Year.

(iii)    In the event that actual Defined Gross Revenues for any League Year exceeded Projected Defined Gross Revenues (as calculated in accor-dance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Defined Gross Revenues for the next League Year.

(iv)    Any adjustments pursuant to Section *10(a)(iii)* above will be subtracted from or added to Projected DGR as appropriate.

*Extension Agreement 2/25/98*

(c)    **Projected Benefits**.

(i)    For purposes of computing the Salary Cap and Minimum Team Salary to be applied in any upcoming League Year in accordance with Sec-tions 4-5 and *10(a)* above, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the upcoming League Year pur-suant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

*Extension Agreement 2/25/98*

**141**

(ii)     In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year.

(iii)     In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year.

(iv)     In the event the NFLPA exercises *any* right to reduce or freeze *or increase* certain Benefits pursuant to Article XLVI (Player Benefit Costs), Projected Benefits shall be adjusted immediately to reflect such changes.

*\*Extension Agreement 2/25/98*

(v)     In the event the amount of Projected Benefits is adjusted pursuant to (1) subsection (c)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

# ARTICLE XXV
## ENFORCEMENT OF THE SALARY
## CAP AND ENTERING PLAYER POOL

*Section 1.* **Undisclosed Terms:** At the time a Club and a player enter into any Player Contract, or any renegotiation, extension or amendment of a Player Contract, there shall be no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, between such player and any Club involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

*Section 2.* **Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Defined Gross Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

*Section 3.* **Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap Minimum Team Salary).

*Section 4.* **Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Contracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

143

Article XXV, Enforcement of the Salary Cap and Entering Player Pool

**Section 5. Special Master Review**: In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

**Section 6. Sanctions**: In the event that the Special Master finds a violation of this Section 1 of this Article, the Commissioner shall be authorized to impose a fine of up to $2,000,000 payable to the NFL, upon any Club found to have committed such violation, and shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

**Section 7. Prior Conference**: Prior to the initiation of a proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

**Section 8. DGR Circumvention**: *In the event that a Club or anyone acting on its behalf materially fails to report, or materially misreports, Defined Gross Revenues, Excluded DGR, or non-DGR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to Defined Gross Revenues, the NFLPA and/or the Management Council shall have the right to initiate a proceeding before the Special Master to determine whether such conduct is in violation of this Section 8 of this Article. In the event that the Special Master finds a violation of this Section 8, the Special Master may impose a fine upon the Club of up to $2 million, which shall be donated as additional contributions to the youth football programs fund described in Article XXIV (Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary), Section 1(a)(xiii) above.*

*\*Extension Agreement 2/25/98*

**144**

# ARTICLE XXVI
# SPECIAL MASTER

**Section 1.** **Appointment:** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in <u>White v. NFL</u> shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

**Section 2.** **Scope of Authority:** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

    (a)    The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

    (b)    The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be <u>de novo</u>;

    (c)    Subject to subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

    (d)    Except for any matters for which the Court has <u>de novo</u> review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the recommendation of the Special Master. The parties may seek appropriate relief

to effectuate and enforce this provision.

(e) The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement for Special Master review.

**Section 3. Discovery**: In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary) of this Agreement regarding any DGR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation**: The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures**: All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the

NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 6. Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

**Section 7. Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

# ARTICLE XXVII
# IMPARTIAL ARBITRATOR

**Section 1. Selection**: The parties shall agree upon an Impartial Arbitrator who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority**: The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings**: Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4. Discovery**: In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator**: The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

**Section 6. Procedures**: All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

148

***Section 7.*** **Selection of Impartial Arbitrator**: In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree to submit the issue to the President of the ABA who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs, or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Impartial Arbitrator from among the names on such list, they shall alternatively strike names from said list, until only one name remains, and that person shall be the Impartial Arbitrator. The first strike shall be determined by a coin flip. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

# ARTICLE XXVIII
# ANTI-COLLUSION

**Section 1. Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

(a)    whether to negotiate or not to negotiate with any player;

(b)    whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(c)    whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

(d)    whether to exercise or not to exercise a Right of First Refusal; or

(e)    concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

> \* [U]nder Article XIV (NFL Player Contract), paragraph 3 of Article XXX (Consultation and Information Sharing), paragraph 4 of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), and Article XXVIII (Anti-Collusion Provisions) of the Collective Bargaining Agreement, any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA and Class Counsel, cannot be the basis of any claim of collusion. Class Counsel, the NFLPA, or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.
>
> \*Side Letter 5/6/93

**Section 2. Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)    that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

(b)    that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

150

(c)      that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

(d)      that the player is or has been subject to any Right of First Refusal.

*Section 3.* **Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

*Section 4.* **League Disclosures:** Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

*Section 5.* **Enforcement of Anti-Collusion Provisions:** Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

*Section 6.* **Burden of Proof:** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by

**151**

itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

**Section 7. Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

**Section 8. Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)    To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes

place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)      To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

*Section 9.* **Computation of Damages**: Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)      Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)      Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)      Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $1,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $1,000,000.

*Section 10.* **Player Election**: A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during

153

Article XXVIII, Anti-Collusion

the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

**Section 11. Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

**Section 12. Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

**Section 13. Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

**Section 14. No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

**Section 15. Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

**Section 16. Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)      Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one

**154**

NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

(b)    Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)    Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)    In order to terminate this Agreement:

(i)    The proceeding must be brought by the NFLPA;

(ii)    The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)    The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

# ARTICLE XXIX
# CERTIFICATIONS

***Section 1.* Contract Certification**:

(a)      Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of a player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, and that there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving Salary or other consideration of any kind to be paid, furnished or made available to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

(b)      In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)      In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)      No contract will be approved by the Commissioner unless accompanied by the certifications required by subsections (a), (b) and (c) above.

***Section 2.* End of League Year Certification**:

(a)      At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the NFL a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or the NFL Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that player. Upon receipt of each such certification, the NFL shall forward a copy of the

156

certification to the NFLPA.

(b)      Any failure to execute a certification as required under Section 2(a) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

***Section 3***. **False Certification**: Any person who knowingly files a false certification required by Section 1(a) or 1(b) of this Article shall be subject to a fine of up to $250,000, upon a finding of such violation by the Special Master. The amount of such fine as to a Club or non-player Club employee shall be determined by the Commissioner.

# ARTICLE XXX
# CONSULTATION AND INFORMATION SHARING

***Section 1*. Consultation and Communications:**

(a)       In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b)       Subject to any claim of attorney-client and/or work product privilege, any communications under this section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

***Section 2*. Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected DGR, and a revised estimate on the first day of each month thereafter in any such year.

***Section 3*. Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

***Section 4*. Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

158

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within five (5) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings:** During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

# ARTICLE XXXI
# EXPANSION

*Section 1*. **Veteran Allocation**: The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three per Club, excluding any player who has a no trade clause in his Player Contract.

*Section 2*. **Additional Compensatory Picks**: The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

*Section 3*. **Entering Player Pool Adjustment**: The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

*Section 4*. **Relocation Bonus**: Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of *$20,000* upon reporting to the expansion Club for pre-season training camp, and an additional bonus of *$30,000* upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

*\*Extension Agreement 2/25/98*

# ARTICLE XXXII
# OTHER PROVISIONS

**Section 1. CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or post-season, whichever is applicable).

**Section 2. Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

**Section 3. Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

**Section 4. Roster Exemption:**

(a)     Certain Players Not Under Contract. After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)     Players Under Contract. If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)     Restricted Players. Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 2, or Article XIX

**161**