# Exhibit 8
# Part 4 of 5

Article XXXII, Other Provisions

(Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i)     If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii)    If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)   If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

> * [A]ny player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) of the CBA, shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with subsections (i) through (iii) of Article XXXII, Section 4(c) of the CBA. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.
>
> *Side Letter 1/18/94

No player may be placed on roster exempt under this subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with (i) through (iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this subsection, the player shall not be entitled to compensation.

(d)     Except as provided in subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

**162**

# ARTICLE XXXIII
# SQUAD SIZE

*Section 1.* **Active List:** For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

*Section 2.* **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

*Section 3.* **Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

163

# ARTICLE XXXIV
# PRACTICE SQUADS

***Section 1.*** **Practice Squads**: For each regular season commencing with the 1993 League Year, the League may elect in accordance with this Article to establish practice squads not to exceed five (5) players per Club.

***Section 2.*** **Signing With Other Clubs**: Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

***Section 3.*** **Salary**: Minimum salary for a practice squad player shall be $3,300 per week for the 1993-97 League Years, *$3,650 per week for the 1998-99 League Years,* $4,000 per week for the 2000-02 League Years, *and $4,350 for the 2003-04 League Years,* including post-season weeks in which his Club is in the playoffs, provided however, that no player who was on a practice squad in the 1992 season shall be paid less than the minimum practice squad salary for that season.

*Extension Agreement 2/25/98*

***Section 4.*** **Eligibility**:

   (a)   The practice squad shall consist of *the following players, provided that they have not served more than one previous season on a Practice Squad: (i)* players who do not have an Accrued Season of NFL experience; *and (ii) free agent players who were on the Active List for fewer than nine regular season games during their only Accrued Season(s).* No player may be a practice squad player for more than two seasons.

*Extension Agreement 2/25/98*

   (b)   *A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and has been a member of a club's Practice Squad for at least three regular season or post-season games (a bye week counts as a game provided that the player is not terminated until after the regular season or post-season weekend in question).*

*Extension Agreement 2/25/98*

      * If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club

B), (1) the player shall receive three weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the five-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three weeks salary that he is entitled to receive from Club B.

*Side Letter 8/18/97

# ARTICLE XXXV
# OFF-SEASON WORKOUTS

**Section 1. Voluntary Workouts:** No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be voluntary and take place in the manner and time period set forth in this Article.

**Section 2. Time Periods:** From the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than sixteen total weeks, and no more than four workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

**Section 3. Payment:** Beginning with the off season following the 1993 NFL season, each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout requirements: $50 during the 1994-95 League Years; $60 during the 1996-97 League Years; $70 during the 1998-99 League Years; $80 during the 2000-01 League Years; $90 during the 2002 League Year; *and $100 during the 2003-04 League Years.*

*Extension Agreement 2/25/98*

**Section 4. Injuries:** Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

**Section 5. Miscellaneous:** No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.

Article XXXV, Off-Season Workouts

**Section 6. Pre-Training Camp Period**: During the ten consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.

**Section 7. Enforcement**: The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L.

167

# ARTICLE XXXVI
# MINICAMPS

**Section 1. Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

**Section 2. Length:** No minicamp may exceed three days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

**Section 3. Expenses:** Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

**Section 4. Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

**Section 5. Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

# ARTICLE XXXVII
# PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell or Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** During the term of this Agreement, a rookie player will receive "per diem" payments at the rate of $500 per week in the 1993-94 League Years, $550 per week in the 1995 League Year, $600 per week in the 1996 League Year, $650 per week in the 1997 League Year, $675 per week in the 1998-99 League Years, $700 per week in the 2000-01 League Years, $725 per week in the 2002-03 *League Years, and $750 per week in the 2004 League Year,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 2/25/98*

**Section 4. Veteran Per Diem:** During the term of this Agreement, a veteran player will receive "per diem" payments at the rate of $600 per week in the 1993-94 League Years, $700 per week in the 1995-96 League Years, $800 per week in the 1997-99 League Years, $900 per week in the 2000-*03 League Years, and $1,000 per week in the 2004 League Year,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 2/25/98*

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

169

Article XXXVII, Pre-Season Training Camps

***Section 6.* Number of Pre-Season Games:** The NFL will use its best efforts to hold no more than four pre-season games beginning in the 1995 League Year.

***Section 7.* Telephones:** Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

***Section 8.* Expenses:** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

**170**

# ARTICLE XXXVIII
# SALARIES

*Section 1*. **1993 Minimum Salaries:** For the 1993 League Year, the Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| Length of Service | Minimum Salary For Players Not on Club's Active/Inactive (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $60,000 | $100,000 |
| One Credited Season | $70,000 | $125,000 |
| Two or More Credited Seasons | $80,000 | $150,000 |

*Section 2*. **Minimum Salaries For *1994-97* League Years:** For the *1994-97* League Years, the Minimum Salaries set forth in Section 1 above shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

*\*Extension Agreement 2/25/98*

> \* For the 1996 League Year, the Minimum Active/Inactive List Salary for players with five or more Credited Seasons (as defined in Article XXXVIII of the CBA), who have an allocated portion of signing bonus, reporting bonus, and roster bonus for that League Year of less than $25,000, shall be at least $250,000 plus a sum equal to $250,000 multiplied by the same percentage as the increase in Projected DGR for the 1996 League Year over DGR for the 1995 League Year (up to a maximum of ten percent (10%)). Thereafter, such Minimum Active/Inactive List Salary for such players shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR, up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actu-

al amount from League Year to League Year. For all other players with five or more Credited Seasons, the Minimum Active/Inactive List Salary shall be the same as for players with two or more Credited Seasons, except that any player who has received with respect to that League Year (i) Salary (not including performance incentives but including roster bonuses, reporting bonuses and the allocated portion of any signing bonus) less than (ii) the amount of the Minimum Active/Inactive List Salary set forth in the first two sentences of this paragraph (as appropriate) adjusted to reflect the number of weeks that the player was on the Club's Active or Inactive List, shall receive at the end of the League Year an additional payment from his Club(s) equal to the difference between (ii) and (i) (on a pro rata basis between or among the Clubs, if applicable).

*Side Letter 11/1/95: Sec. 3

**Section 3. Minimum Salaries For 1998 League Year:** *For the 1998 League Year, the Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season, as calculated under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), including Paragraph 5 Salary and any additional amounts for pro-rated signing bonus (but excluding any amounts from signing bonuses paid prior to 1998 with a 1998 proration amount of $100,000 or less), roster and reporting bonuses, and likely to be earned incentives, will be not less than the following:*

Article XXXVIII, Salaries

| Length of Service | Minimum Salary For Players Not On Club's Active/Inactive List (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $ 92,000 | $158,000 |
| One Credited Season | 111,000 | 198,000 |
| Two Credited Seasons | 129,000 | 238,000 |
| Three Credited Seasons | 144,000 | 275,000 |
| Four Credited Seasons | 159,000 | 300,000 |
| Five or more Credited Seasons | 174,000 | 325,000 |

For the 1998 League Year, the Paragraph 5 Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season, will be not less than the following:

| Length of Service | Minimum Salary For Players Not On Club's Active/Inactive List (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $ 87,000 | $144,000 |
| One Credited Season | 101,000 | 180,000 |
| Two Credited Seasons | 117,000 | 216,000 |
| Three Credited Seasons | 117,000 | 216,000 |
| Four Credited Seasons | 117,000 | 216,000 |
| Five or more Credited Seasons | 117,000 | 216,000 |

**Section 4. Minimum Salaries For 1999 League Year**: For the 1999 League Year, the Paragraph 5 Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| Length of Service | Minimum Salary For Players Not On Club's Active/Inactive List (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $101,000 | $175,000 |
| One Credited Season | 122,000 | 250,000 |
| Two Credited Seasons | 142,000 | 325,000 |
| Three Credited Seasons | 157,000 | 350,000 |
| Four Credited Seasons | 172,000 | 375,000 |
| Five or more Credited Seasons | 187,000 | 400,000 |

Article XXXVIII, Salaries

*Section 5. Minimum Salaries After The 1999 League Year:* After the 1999 League Year, the Minimum Paragraph 5 Salaries set forth in Section 4 above shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

*Extension Agreement 2/25/98

**Section 6. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

**Section 7. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 8. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 9. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invali-

**174**

dates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 10. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 11. Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 12. Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement covering the 1993 and future League Years will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

**Section 13. Split Contracts:**

     (a)     After the point in the regular season at which a player who signed his Player Contract prior to the 1993 League Year has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the In-

175

Article XXXVIII, Salaries

active List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

(b)        After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent and during the 1993 League Year or thereafter has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

**Section 14.** **Funding of Deferred and Guaranteed Contracts**: The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury Bill rate as published in The Wall Street Journal on March 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

# ARTICLE XXXIX
# MEAL ALLOWANCE

*Section 1.* **Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and post-season as follows: 1993-94 League Years-Breakfast $12.00, Lunch $15.00, Dinner $33.00; 1995-96 League Years-Breakfast $13.00, Lunch $17.00, Dinner $35.00; 1997-1999 League Years-Breakfast $14.00, Lunch $19.00, Dinner $37.00; 2000-02 League Years-Breakfast $15.00, Lunch $21.00, Dinner $39.00; *2003-04 League Years-Breakfast $16.00, Lunch $23.00, Dinner $41.00.* For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*\*Extension Agreement 2/25/98*

*Section 2.* **Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 P.M. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 A.M., players will receive breakfast money.

# ARTICLE XL
# DAYS OFF

*Section 1.* **Rate**: All players will be permitted days-off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2.* **Requirements**: During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

178

# ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

*Section 1*. **Qualification**: A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

    (a)    Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

    (b)    Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

*Section 2*. **Moving Expenses**: As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

*Section 3*. **Travel Expenses**: Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

**179**

not exceed $4,000 during the 1993-95 League Years, $4,750 during the 1996-98 League Years, $5,000 during the 1999-2002 League Years, *and $5,250 during the 2003-2004 League Years;* and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*Extension Agreement 2/25/98*

**Section 4. Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

180

# ARTICLE XLII
## POST-SEASON PAY

**Section 1. System**: Beginning with the post-season following the 1993 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation**: A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wild Card Game (Div. Winner) | $12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 | *18* | 18 |
| (Other) | | 7.5 | 7.5 | 7.5 | 10 | 10 | 10 | 10 | 12.5 | 12.5 | 12.5 | *15* | 15 |
| Division Playoff Game | 12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 | *18* | 18 |
| Conference Champion-ship Game | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 | *36.5* | 36.5 |
| Super Bowl Game (Winning Team) | 38 | 42 | 42 | 48 | 48 | 53 | 58 | 58 | 63 | 63 | *68* | 68 |
| (Losing Team) | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 | *36.5* | 36.5 |

*\*Extension Agreement 2/25/98*

**Section 3. Wild Card Game; Division Play-off Game**: A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**
       (a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game.
       (b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or post-season) will receive one-half the amount designated in Section 2 for such game.

**181**

Article XLII, Post-Season Pay

(c)       A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)       A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)       A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)       A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)       A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5.** **Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

# ARTICLE XLIII
# PRO BOWL GAME

**Section 1. Compensation:** Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $20,000 and each player on the losing Team will receive $10,000. These amounts shall be increased to $25,000 and $12,500 respectively for the Pro Bowls following the 1997 through 1999 seasons, *to $30,000 and $15,000 respectively for the Pro Bowls following the 2000 through 2002 seasons, and to $35,000 and $17,500 respectively for the Pro Bowls following the 2003 through 2004 seasons.*

*\*Extension Agreement 2/25/98*

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

183

# ARTICLE XLIV
# PLAYERS' RIGHTS TO MEDICAL CARE
# AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

**184**

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

***Section 6.*** **Substance Abuse:**

    (a)     **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

    (b)     **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

    (c)     **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

# ARTICLE XLV
## ACCESS TO PERSONNEL AND
## MEDICAL RECORDS

*Section 1*. **Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2*. **Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

186

# ARTICLE XLVI
# PLAYER BENEFIT COSTS

**Section 1.** (a) **General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) post-season pay (although the NFLPA will have the unilateral right to direct that post-season pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b) *1998 Amendment Benefits: During each League Year for which a Salary Cap applies, the NFLPA will have the unilateral right to increase, reduce or freeze each separate and individual Player Benefit Cost relating to 1998 Amendment Benefits that are set forth in Sections 5(c), 5(d) and 5(e) of this Article to the extent permitted by law, to ensure that the total cost of the 1998 Amendment Benefits does not exceed and is not less than the amount set forth below for each such League Year. Any increase shall be for one League Year only and shall not create a continuing obligation for the Clubs.*

*For the 1998 League Year, the total cost of the 1998 Amendment Benefits shall be the lesser of (i) 63% of Projected Defined Gross Revenues, less $1,607.65 million, less Player Benefit Costs for Player Benefits other than for the 1998 Amendment Benefits, or (ii) $50 million. For subsequent Capped Years, the total cost of the 1998 Amendment Benefits shall be as follows:*

| Capped Year | Total Cost |
|---|---|
| 1999: | $ 50 million |
| 2000: | $ 75 million |
| 2001 and thereafter: | $100 million |

*Notwithstanding the foregoing language regarding the total cost of 1998 Amendment Benefits for the 1998 and subsequent League Years, Class Counsel and the NFLPA may specify additional amounts to be used for additional increases in the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), pursuant to subsection (iii) of the last sentence of Article XXIV, Section 4(a) for additional amounts generated from the 1998 League Year, and pursuant to Article XXIV, Section 10(a)(ii) for additional amounts generated from later League Years. Forty-five percent (45%) of any additional amounts generated from the 1998 League Year pursuant to subsection (iii) of the last sentence of Article XXIV, Section 4(a) will be contributed to the Player Annuity Program for the 1998 An-*

187

nuity Year (as defined in Article XLVIII-A), and fifty-five percent (55%) will be contributed to the Player Annuity Program for the 1999 Annuity Year. During each League Year for which a Salary Cap does not apply, the NFL shall be required to contribute with respect to the 1998 Amendment Benefits only the cost of those such benefits that are set forth in Sections 5(a), 5(b), 5(c) and 5(e).

       If the NFLPA is notified in writing that the cost of the 1998 Amendment Benefits for a Capped Year is projected to exceed or to be less than the above total for a League Year, and the NFLPA does not specify which benefits are to be increased, reduced or frozen by the later of (1) the beginning of that League Year, and (2) 30 days after the date the NFLPA receives such notice, the Management Council shall have the unilateral right to reduce or increase 1998 Amendment Benefits to the extent permitted by law, to achieve the above total cost for that League Year. Any reductions or increases in 1998 Amendment Benefits shall be implemented as of the beginning of a League Year by determining projected 1998 Amendment Benefits based on Projected Benefits, as defined in Article XXIV, Section 10(c).

       (c) **Adjustment:** If the actual Player Benefit Costs of the 1998 Amendment Benefits exceed the applicable amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be reduced by such excess.

       If the actual Player Benefit Costs of the 1998 Amendment Benefits are less than the amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be increased by such shortfall.

       *Extension Agreement 2/25/98

**Section 2. Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition:** For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

       (a)     Pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

**188**

(b)        Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)        Injury protection (as described in Article XII);

(d)        Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)        Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)        Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)        Post-season pay (as described in Article XLII and Article XLIII);

(h)        Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year);

(i)        Severance pay (as described in Article L); and

(j)        *The Player Annuity Program (as described in Article XLVIII-A).*
*\*Extension Agreement 2/25/98*

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, the Supplemental Disability Plan, *and the Player Annuity Program* will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

*\*Extension Agreement 2/25/98*

**Section 4. Resolution of Disputes**: In the event the NFLPA and the Management Council are unable to agree by March 7 as to *Projected Benefits* for

the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

*Extension Agreement 2/25/98*

(a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of *Projected Benefits* for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

*Extension Agreement 2/25/98*

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5. 1998 Amendment Benefits:** *For purposes of this Agreement, the term "1998 Amendment Benefits" means the following:*

*(a)     The increase in 1998 and future Benefit Credits to $425 described in Article XLVII, Section 2 and the increase in Benefit Credits for prior years described in Article XLVII, Section 4;*

*(b)     The decrease in the vesting requirement described in Article XLVII, Section 5;*

*(c)     The increases in the Second Career Savings Plan contributions described in Article XLVIII, Section 2;*

*(d)     The Player Annuity Program (as described in Article XLVIII - A); and*

*(e)     The increases in the Extended Post-Career Medical and Dental Insurance benefits described in Article XLIX, Section 2(c).*

*Extension Agreement 2/25/98*

**190**

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1. Maintenance and Definitions**: The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. Prior to such merger, the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan") and the Pete Rozelle NFL Player Retirement Plan (the "Pete Rozelle Plan") will each be continued and maintained in full force and effect. When used in other Articles in this Agreement, the terms "Bert Bell/Pete Rozelle Plan" and "Merged Plan" will also refer to each of the Bert Bell Plan and the Pete Rozelle Plan for the periods prior to such merger, as appropriate depending on the context in which such term is used. The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.

**Section 2. Additional Credited Seasons:** The parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to provide a Benefit Credit of *$425* for players who earn a Credited Season in *each Plan Year that begins both (1) on or after April 1, 1998, and (2) prior to the expiration of the Final League Year.*
*\*Extension Agreement 2/25/98*

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

191

Article XLVII, Retirement Plan

**Section 4. Increase in Past Service Credit:** *Effective for payments on and after June 1, 1998, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to increase the Benefit Credit in effect for each Credited Season prior to 1998 as follows:*

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| Before 1968 | $100 |
| 1968 and 1969 | 130 |
| 1970 | 170 |
| 1971 | 175 |
| 1972 through 1976 | 185 |
| 1977 through 1981 | 200 |
| 1982 through 1992 | 230 |
| 1993 and 1994 | 240 |
| 1995 and 1996 | 285 |
| 1997 | 330 |

**Section 5. Decrease in Vesting Requirement:** *Effective for payments on and after June 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan to provide that any player who (i) earned his last Credited Season prior to the 1975 Plan Year; (ii) is credited with at least four (4) Credited Seasons; and (iii) is alive on June 1, 1998, shall be fully vested in the right to receive a retirement benefit under the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment shall be entitled to receive any benefit under the Bert Bell/Pete Rozelle Plan other than his Normal, Deferred or Early Retirement Benefit. No player who is vested as a result of this amendment shall be entitled to elect to receive a retirement benefit in the optional form provided by Section 4.4(c)(3) of the Bert Bell/Pete Rozelle Plan. No beneficiary of a player who is vested as a result of this amendment and who dies prior to his Annuity Starting Date (as defined in the Bert Bell/Pete Rozelle Plan) shall be entitled to receive any benefit, except that the surviving spouse of such a player shall be entitled to receive a pre-retirement survivor annuity under rules similar to those in Section 4.9(b) of the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment who attained his Normal Retirement Age prior to June 1, 1998 shall be entitled to a benefit with respect to any period prior to June 1, 1998. Any Normal Retirement Benefit paid pursuant to this amendment will not be actuarially adjusted to reflect an Annuity Starting Date after the player's Normal Retirement Date, except to the extent the Annuity Starting Date is after June 1, 1998.*

**Section 6. Line-of-Duty Disability Benefit:** *Effective as of July 1, 1993, the parties will amend Article 6 of the Bert Bell/Pete Rozelle Plan as follows:*
      (a)      *Subsections 6.4(b) and 6.4(c) will be revised to read as follows:*

      "(b)      *A disability will be deemed to be 'permanent' if it has persist-*

**192**

ed or is expected to persist for at least 12 months from the date of its occurrence and if the Player is not an Active Player."

"(c)  'Arising out of League football activities' means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. 'Arising out of League football activities' does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities."

(b)  Subsection 6.5(f) will be revised to read as follows:

"(f)  The phrase 'and has resulted in the Player's retirement from League football' is added to replace everything after the word 'occurrence' in Section 6.4(b)."

**Section 7. Classification Rules for Total and Permanent Disability:** *Effective as of July 1, 1993, the parties will amend the Bert Bell/Pete Rozelle Plan as follows:*

"5.6  Classification Rules.

(a)  A Player who becomes totally and permanently disabled and who satisfies the conditions of eligibility for benefits under Section 5.1(a), 5.1(b), 5.1(c), or 5.1(d), or Section 5.5, shall be deemed to continue to be eligible only for the category of benefits for which he first qualifies, unless the Player shows by evidence found by the Retirement Board to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of total and permanent disability benefits.

(b)  A Player who becomes totally and permanently disabled and satisfies the conditions of eligibility for benefits under Section 5.1(a), 5.1(b), 5.1(c), or 5.1(d), or Section 5.5, and who subsequently is found by the Retirement Board no longer to be totally and permanently disabled, shall cease to be eligible for benefits. Any such Player shall thereafter remain eligible to receive total and permanent disability benefits in accordance with Section 5.1 or Section 5.5 should the Player experience a subsequent period of total and permanent disability. Any such subsequent total and permanent disability shall be classified in accordance with the provisions of Section 5.1 or Section 5.5, without regard to the classification of any previous period of total and permanent disability.

(c)  For purposes of Article 5, the term 'League football activities' will have the meaning given in Article 6."

193

Article XLVII, Retirement Plan

**Section 8. Limit on Retroactive Benefits and Claims:** *Effective for claims for benefits received on and after November 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan, or will cause the Bert Bell/Pete Rozelle Plan to be amended, as follows:*

> (a)  *The text of the second paragraph of Section 5.1 of the Bert Bell/Pete Rozelle Plan will be amended to replace the words "Notwithstanding the above" with the words "Except as provided in Section 5.7";*
>
> (b)  *Article 5 of the Bert Bell/Pete Rozelle Plan will be amended by adding a new Section 5.7 to read substantially as follows:*

"5.7    *Limit on Retroactive Benefits and Claims. Effective for claims for benefits received on and after November 1, 1998, no total and permanent disability benefit under this Article 5 will be payable with respect to any month or other period of time that precedes by more than forty-two (42) months the date the Plan Director first receives a written application or similar letter requesting such benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit. A Player's total and permanent disability benefits will not be reclassified or otherwise increased with respect to any month or other period of time that precedes by more than forty-two (42) months the date the Plan Director receives a written application or similar letter requesting such reclassification or increase that begins the administrative process that results in the award of the benefit. In determining the appropriate classification of benefits for a Player who is totally and permanently disabled, it will be conclusively presumed that the Player was not totally and permanently disabled for all months or other periods of time more than forty-two (42) months prior to the date the Plan Director receives a written application or similar request for total and permanent disability benefits that begins the administrative process that results in the award of the benefit. The forty-two month limitations period in each of the above sentences will be tolled for any period of time during which such Player is found by the Retirement Board to be physically or mentally incapacitated in a manner that substantially interferes with the filing of such claim."*

**Section 9. Alcohol and Substance Abuse:** *The parties will amend Section 5.1 of the Bert Bell/Pete Rozelle Plan, or will cause the Bert Bell/Pete Rozelle Plan to be amended, to insert substantially the following language as a separate paragraph at the end of Section 5.1:*

> "*Effective for payments on and after November 1, 1998, Sections 5.1(a), 5.1(b), 5.1(c), and the provisions of Section 5.5 that pertain to disabilities resulting from a football injury incurred while an Active Player will not apply to a total and permanent disability caused by the use of, addiction to, or dependence upon (1) any controlled substance (as defined in 21 U.S.C. sec. 802(6)), unless (i) such use of, addiction*

**194**

to, or dependence upon results from the substantially continuous use of a controlled substance that was prescribed for League football activities or for an injury (or injuries) or illness arising out of League football activities of the applicant while he was an Active Player, and (ii) an application for total and permanent disability benefits is received based on such use of, addiction to, or dependence upon a controlled substance no later than eight (8) years after the end of the Player's last Credited Season; (2) alcohol; or (3) illegal drugs. Effective for payments on and after November 1, 1998, if a Player's benefit has been increased pursuant to Section 5.4 with respect to a total and permanent disability to which Section 5.1(a), 5.1(b), or 5.1(c), or the provisions of Section 5.5 that pertain to disabilities resulting from a football injury incurred while an Active Player does not apply after November 1, 1998, such benefit shall be reduced to the greater of the sum of the Player's Benefit Credits or the minimum amount specified in Section 5.1(d). All other provisions of Section 5.4 shall continue to apply to such benefit. For purposes of this section, the term 'illegal drugs' includes all drugs and substances (other than alcohol and controlled substances, as defined above) used or taken in violation of law or League policy."

**Section 10. Psychological/Psychiatric Disorders:** Effective on October 29, 1998, the parties will amend Section 5.1 of the Bert Bell/Pete Rozelle Plan, or will cause the Bert Bell/Pete Rozelle Plan to be amended, to insert substantially the following language as separate paragraphs at the end of Section 5.1:

"Effective for payments on and after November 1, 1998, a payment for total and permanent disability as a result of a psychological/psychiatric disorder may only be made, and will only be awarded, for benefits under the provisions of Section 5.1(b), Section 5.1(d), or the provisions of Section 5.5 that pertain to disabilities resulting from other than a football injury.

Notwithstanding the foregoing, a total and permanent disability as a result of a psychological/psychiatric disorder may be awarded under the provisions of Section 5.1(a), Section 5.1(c), or the provisions of Section 5.5 that pertain to disabilities resulting from a football injury incurred while an Active Player if the requirements for a total and permanent disability are otherwise met and the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (_e.g._, repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for total and permanent disability benefits under Section 5.1(a)."

*Extension Agreement 2/25/98

**195**

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

***Section 1*. Maintenance**: The NFL Player Second Career Savings Plan (**"Savings Plan"**), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

***Section 2*. Contributions:**

(a)　　　***Prior to 1998***: For each of the Plan Years 1993 to *1997*, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club. *Such contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.*

*\*Extension Agreement 2/25/98*

(b)　　　***1998 and Later Years***: *For each Plan Year that begins (1) on or after April 1, 1998 and (2) before the end of the Final League Year, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:*

(i)　　　*Matching Contributions. The parties will amend the Savings Plan to require the NFL Clubs in the aggregate to contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be as set forth below:*

| Plan Years | Amount |
|---|---|
| *1998, 1999, 2000* | *One Dollar (up to a maximum of $10,000) for each dollar contributed by the player* |
| *2001 through the Final League Year* | *Two Dollars (up to a maximum of $20,000) for each dollar contributed by the player.* |

*Any salary reduction contribution made by a player to the Savings Plan during a calendar year, including such contributions in 1998 prior to the Extension Date, will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:*

**196**

Article XLVIII, Second Career Savings Plan

(a)        by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)        by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)        Minimum Contribution. The NFL Clubs in the aggregate will contribute to the Savings Plan, for each of the Plan Years 1998 to the Final League Year, a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)        Expenses. The NFL Clubs will make contributions to the Savings Plan at least quarterly in an amount sufficient to pay administrative expenses.

(c)        **Protection of Deductions:** The parties will adopt a Money Purchase Plan to supplement the Savings Plan to the extent necessary to avoid disallowance of deductions because of the limit of section 404(a)(3)(A)(i) of the Internal Revenue Code. The NFL Clubs will not be required to make any contributions to the Savings Plan or to such Money Purchase Plan that are not deductible when made under the limits of section 404(a) of the Internal Revenue Code, provided that the NFL Clubs have timely taken such reasonable actions to avoid or minimize the application of those limits.

(d)        **Future Contributions and Collection:** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Extension Agreement 2/25/98

# ARTICLE XLVIII - A
## PLAYER ANNUITY PROGRAM

**Section 1. Establishment**: *The parties will jointly establish a new benefit, to be called the NFL Player Annuity Program (hereinafter referred to as "Player Annuity Program"). The Player Annuity Program will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Annuity Year will be the period April 1 to March 31. The Player Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Program will be continued and maintained in full force and effect during the term of this Agreement.*

**Section 2. Contributions:** *For each of the Annuity Years 1998 and thereafter only for each year in which a Salary Cap applies, a contribution will be made to the Player Annuity Program on behalf of the NFL Clubs as indicated below, unless this figure is changed pursuant to this Agreement, including the rights of the parties under Section 1(b) of Article XLVI of this Agreement:*

| Capped Annuity Year | Total Contribution |
|---|---|
| *1998* | *$33 million* |
| *1999* | *$35.4 million* |
| *2000* | *$54 million* |
| *2001 and later Capped years* | *$73 million* |

*Contributions to the Player Annuity Program for an Annuity Year will be made as follows:*

    *1.      Expenses: The NFL Clubs will prepay contributions to the Annuity Program at least quarterly in an amount sufficient to pay administrative expenses. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.*

    *2.      Allocations: Allocations for the benefit of individual players will be made on and as of December 31 and March 31 of each Annuity Year, as described in Section 3(c) below.*

**198**

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

**Section 3. Eligibility and Allocation:**

　　(a)　　**Points:** Players who earn a Credited Season, as that term is defined in the Bert Bell/Pete Rozelle Plan, in an Annuity Year and who have a total of four or more Credited Seasons as of the end of such Annuity Year will receive points for each such Credited Season depending on their total Credited Seasons as follows:

| Total Credited Seasons | Points for 1998 and 1999 Years | Points for 2000 and later Years |
|---|---|---|
| 4, 5, and 6 | 1 | 1 |
| 7 through 10 | 2 | 1 |
| 11 or more | 3 | 1 |

　　(b)　　**Individual Allocations:** The amount allocated to an individual player who receives one or more points in an Annuity Year will be calculated as follows: In December of each such year a good faith estimate will be made by the Annuity Board of the total contribution expected to be made during such Annuity Year under Section 2 above by all NFL Clubs, minus the estimated administrative expenses for the Annuity Year, and minus any retroactive allocations made to players under rules similar to those in Section 3.4 of the Savings Plan. A good faith estimate will also be made at that time by the Annuity Board of the total points expected to be earned during such Annuity Year by all players. Each player's actual allocation will be determined by (1) taking the total estimated available contributions as described above, (2) dividing by the estimate of the total points expected to be earned by all players, and (3) multiplying the result by the number of points actually earned by that player according to the above schedule. In the Annuity Year beginning on April 1, 2000 only, the above formula will be adjusted so that players with 7 to 10 Credited Seasons will receive $12,000 more than players with 4 to 6 Credited Seasons, and players with 11 or more Credited Seasons will receive $24,000 more than players with 4 to 6 Credited Seasons.

　　(c)　　**Timing:** Eligible players who earn a Credited Season by December 1 of an Annuity Year will receive their allocation on December 31 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive their allocation on March 31 of such Annuity Year.

**Section 4. Distributions:** A player may elect to begin receiving distributions under the Player Annuity Program in the form of annuity or installment payments at

any time after the later of (a) the player's attainment of age 35, or (b) five years after the end of the Annuity Year containing the player's last Credited Season. Payments must begin no later than age 65. A player who elects to begin receiving annuity or installment payments under the preceding sentences may elect to receive such payments in substantially equal amounts for a period beginning on the date of commencement of such payments and ending upon the player's attainment of age 45, or such later age as he shall specify, or for life. Alternatively, a player may elect to defer his receipt of distributions under the Player Annuity Program. Upon a player's attainment of age 45, such player may elect to receive his benefit under the Player Annuity Program in the form of an annuity or a lump sum payment. If a player dies before making an election to receive benefits, the player's named beneficiary may make an election that otherwise would have been available to the player. A player's rights under the Player Annuity Program may not be transferred, assigned, or alienated.

**Section 5. Structure:** The Player Annuity Program will hold assets for the sole benefit of players and their beneficiaries. To expedite the creation of the Program and to reduce costs, the parties agree that the Program will be administered by an Annuity Board, and that prior to the first meeting of the Annuity Board the advisors to the Player Annuity Program will be the same as the advisors to the Savings Plan. The Player Annuity Program is intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity as described in Section 6 below.

**Section 6. Insurance Company:** The parties intend to establish as soon as possible an insurance company to hold and invest the assets of the Player Annuity Program. It is intended that such insurance company would be owned by the Player Annuity Program, and would issue either a group annuity contract to the Player Annuity Program or individual annuity contracts to player participants. The parties will review as soon as possible the steps involved and the feasibility of establishing such an insurance company, and retain the right to jointly decide to contract with outside entities for the provision of services in this area. To the extent that the approval or acquiescence of the Department of Labor or any other federal or state agency is deemed necessary or desirable with respect to any feature of the Player Annuity Program, counsel for the Program will seek such approval or acquiescence with the involvement and cooperation of the parties and their designated representatives.

*Extension Agreement 2/25/98

200

# ARTICLE XLIX
# GROUP INSURANCE

*Section 1.* **Group Insurance Benefits:** Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)     Life Insurance: For the 1993-99 League Years, a rookie player will be entitled to $100,000 in coverage, and a veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage. For the 2000-02 League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.

(b)     Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual *per plan year and* $400 per family per plan year, with a maximum out-of-pocket expense of $800 per *plan* year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $2 million.

(c)     Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

1)     Preventive care paid at 100% of UCR,

2)     General services paid at 85% of UCR, and

3)     Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual *per plan year.*

*\*Extension Agreement 2/25/98*

(d)     **Insurance Benefits for Vested Players:** Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

Article XLIX, Group Insurance

*Section 2.* **Extended Post-Career Medical And Dental Insurance**: The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)     Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during the period from January 1, 1996 through May 1, 1996 will continue to receive the benefits described in Subsections 1(b) and 1(c) above until the first regular season game of the 1997 season.

(b)     Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1996 season, *and before the first regular season game of the 1998 season, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for twenty-four (24) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.*

*(c)     Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1998 season or at any time thereafter prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for thirty-six (36) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.*

*(d)     All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described in Subsections 2(a), 2(b), and 2(c) above are provided, as if such additional benefits had not been provided.*

*\*Extension Agreement 2/25/98*

*Section 3.* **Limitations And Rules For Extended Insurance**: Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a)     The benefits described in Subsections 2(a), 2(b), and 2(c) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)     The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.

(c)     The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.

**202**

(d)        The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to: (i) in the 1998 League Year, the costs for such benefits up to $250,000 multiplied by the number of Clubs in the League that League Year; and (ii) in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4. Financing For Extended Insurance:**

(a)        The cost for the benefits described in Subsection 2(a) above will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(b)        The cost for the benefits described in Subsection 2(b) above for those players who are released or otherwise sever employment after the first game of the 1996 regular season through the 1997 League Year will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(c)        The NFL will reimburse the NFLPA for costs paid pursuant to Subsections 4(a) and 4(b) above, when and to the extent that such costs are charged against the Salary Cap in accordance with Subsections 4(d) and 4(e) below, and as follows:

(i)        in the 1998 League Year, only to the extent that, in the aggregate, the Clubs' costs for that League Year for Section 2 benefits is less than $250,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount; and

(ii)        in the 1999 and subsequent League Years, only to the extent that, in the aggregate, the Clubs' costs for that League Year for Section 2 benefits is less than $500,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount.

Reimbursement by the NFL will end when the costs paid by the NFLPA pursuant to Subsections 4(a) and 4(b) above have been fully reimbursed or such earlier date when this Agreement shall expire. Notwithstanding the foregoing, if the NFL cancels any extensions of this Agreement pursuant to Article LXI (Extension of Agreement), any costs paid by the NFLPA pursuant to Subsections 4(a) or 4(b) above, and which have not been charged against the Salary Cap, shall be reimbursed by the NFL in the first month of the Final League Year of this Agreement.

(d)        The costs for the benefits described in Section 2 above during the 1998 and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(e)        The amounts reimbursed to the NFLPA in the 1998 and subsequent League Years for the costs described in Subsections 4(a) and 4(b) above will be charged against the Salary Cap in the League Year in which the reimbursements are to be made, prior to the issuance of the Ini-

tial Special Purpose Letter, based upon a projection pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 10(c), of the amount of such reimbursements to be made for that League Year, subject to the following rules:

      (i)      In the 1998 League Year, the amount shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,000,000 more than the amount of the 1997 Salary Cap. Any amount that is not charged in the 1998 League Year, pursuant to the preceding sentence, may be carried over to be charged in the 1999 and future League Years, pursuant to and subject to subsections (ii) and (iii) below.

      (ii)      In the 1999 and future League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,500,000 more than the amount of the Salary Cap in the prior League Year. Any remaining amount that is not charged in such a League Year may be carried over to be charged in subsequent League Year(s), subject to subsection (iii) below.

      (iii)      Beginning in the first League Year in which at any time the Salary Cap Bank has a balance of zero, and in all subsequent League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

      (iv)      To the extent that the projection of the amount of reimbursements for a League Year made pursuant to this Subsection 4(e) are later determined to be incorrect, a reconciliation shall be made the following League Year.

**Section 5. Administration**: The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

# ARTICLE L
## SEVERANCE PAY

*Section 1*. **Eligibility**: Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through 2004, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

*Section 2*. **Amount**: Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; and (c) $12,500 per Credited Season for each of the seasons 2000 through 2002.

*Section 3*. **Application**: To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

*Section 4*. **Payment**: Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
| --- | --- | --- |
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 Through February 19, or earlier | June 1 | June 30 |
| February 20 through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

205

Article L, Severance Pay

**Section 5. Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay:** Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

206

# ARTICLE LI
# SUPPLEMENTAL DISABILITY BENEFITS

*Section 1*. **Maintenance**: The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2*. **Contributions**: For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*Section 3*. **Extension**: For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend Section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

# ARTICLE LII
# BENEFIT ARBITRATOR

**Section 1. Selection:** The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

**Section 2. Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

**Section 3. Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either

208

Article LII, Benefit Arbitrator

party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

# ARTICLE LIII
# RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
## WORKERS' COMPENSATION

**Section 1. Benefits**: In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage**: Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

**Section 3. Arbitration**: In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study**: The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5. Moratorium**: The NFLMC, the NFL, all of the Clubs and the NFLPA agree to a moratorium on any and all efforts to change state laws concerning workers' compensation coverage of professional athletes: *(a)* beginning as of the execution of this Agreement and ending December 31, 1994; *and (b) beginning as agreed to by the parties in the transition rules for the 1998 League Year and ending June 1, 1999*. During such *periods*, the NFLMC,

211

Article LIV, Workers' Compensation

the NFL, any Club, the NFLPA, and/or their respective agents are prohib-
ited from making or supporting any attempt, directly or indirectly, to
change state laws affecting players' workers' compensation coverage.

*Extension Agreement 2/25/98*

**Section 6. Preservation of Rights**: The NFLPA and the Clubs preserve
their prior positions with regard to the legality of workers' compensation
offset provisions under state law, and nothing in this Article shall prevent
any player from claiming that an offset provision is not legally binding up-
on him or prevent any Club from asserting that an offset provision is legal-
ly binding upon a player. In addition, neither party nor members of the
NFLPA's bargaining unit will claim that the other party's agreement to this
Article or the revised NFL Player Contract appended hereto affects the
rights set forth above.

**Section 7. Reopener**: If the parties do not reach agreement concerning fu-
ture workers' compensation coverage of NFL players within sixty (60) days
of the issuance of the committee recommendations pursuant to Section 4
above, then either party may reopen this Article upon the giving of ten (10)
days written notice, and both parties will have an obligation to resume ne-
gotiations limited to the issue of workers' compensation, and both parties
will be free to engage in whatever concerted or other action may be per-
mitted by law in support of their positions.

212

# ARTICLE LV
# MISCELLANEOUS

*Section 1*. **Endorsements**: No Club may unreasonably refuse to permit a player to endorse a product.

*Section 2*. **On-Field Attire**: Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

*Section 3*. **Appearances**: No Club may unreasonably require a player to appear on radio or television.

*Section 4*. **Promotion**: The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

*Section 5*. **Deduction**: The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

*Section 6*. **Public Statements**: The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

*Section 7*. **Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cut-down date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

*Section 8*. **NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three days prior to the date of the game.

213

Article LV, Miscellaneous

NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

214

Article LV, Miscellaneous

**Section 16. Headings**: The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods**: The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits**: All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence**: The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

215

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

*Section 1.* **No Salary Cap**: No Salary Cap shall be in effect during the Final League Year.

*Section 2.* **Free Agency If Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is in effect in the League Year prior to the Final League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the Final League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

*Section 3.* **Free Agency If No Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five Accrued Seasons.

*Section 4.* **Franchise and Transition Players**: As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

216

# ARTICLE LVII
## MUTUAL RESERVATION OF RIGHTS:
## LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Subject to the provisions of this Article, up-on the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargain-ing unit shall be deemed to have waived, by reason of the Settlement Agree-ment or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice autho-rized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

*Section 2.* **Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its ex-press term.

*Section 3.* **CBA Expiration:**
(a)      Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any play-er represented by the NFLPA shall be able to commence an action, or as-sert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties re-serve any arguments they may make regarding the application of the labor exemption.

(b)      The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a ma-jority of players indicate that they wish to end the collective bargaining stat-us of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termina-tion by the NFLPA of its status as a collective bargaining representative is

217

Article LVII, Mutual Reservation of Rights: Labor Exemption

or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

# ARTICLE LVIII
# DURATION OF AGREEMENT

***Section 1*. Effective Date**: Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993. *With respect to the 1998 amendments to this Agreement, those amendments shall be effective upon the execution of those amendments, except that: (i) the 1998 amendments with respect to the Entering Player Pool and the amount of the Salary Cap shall be effective as of the first day of the 1998 League Year; and (ii) the parties may agree upon transition rules implementing the terms of the 1998 amendments, which transition rules shall be effective as of such dates as are agreed to by the parties.*

*\*Extension Agreement 2/25/98*

***Section 2*. Termination**: Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on March 1, *2005 (or March 1, 2004, in the event the extension of this Agreement is cancelled as set forth in Article LXI (Extension of Agreement)),* or thereafter, by giving sixty (60) days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

*\*Extension Agreement 2/25/98*

***Section 3*. Expiration Date**: Except as provided in Section 4 below, and in Article LXI (Extension of Agreement) below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the *2004* League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire as prescribed in Article XVI, Section 1.

*\*Extension Agreement 2/25/98*

***Section 4*. Termination Prior to Expiration Date:**

(a)      **Due to Invalidation of Settlement Agreement.** In the event that the Settlement Agreement does not receive Court Approval or is otherwise invalidated by any appellate court prior to September 1, 1993:

(i)      This Agreement shall terminate immediately;

(ii)      The <u>White</u> action and the Related Litigation (as defined in Article I of the Settlement Agreement) shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)      All pending motions in <u>White</u> and <u>McNeil</u> shall be decided by the Court; and

219

Article LVIII, Duration of Agreement

(iv)     With respect to all Player Contracts entered into by Unrestricted Free Agents during the period from March 1 to the date of such disapproval, and by Restricted Free Agents during the period from March 1 to the date of such disapproval:

(1)     Any Club that had rights to the services of any such player on January 31, 1993 shall have the right to assume any such Player Contract by notice to the player, the New Club, the NFLPA and Class Counsel within ten days of the date of such disapproval, and in such event such Prior Club shall have the same rights to the services of such player that the New Club would have had under such Player Contract;

(2)     Within twenty days of the date of such disapproval, any such player shall have the right to void any such Player Contract, whether such contract was assumed by the Prior Club or not, by notice to the Prior Club or New Club, which clubs shall notify the NFLPA and Class Counsel of such election as soon as possible but in no event later than one day after receiving such notice (in the event the player voids such Player Contract, the player shall return to the Team any compensation received thereunder); and any such player shall have such further relief as determined by the Court pursuant to the pending motions in <u>White</u> and <u>McNeil</u>;

(3)     In the event that a player voids a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract after the date of such election; and

(4)     In the event that a player elects not to void a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract.

(b)     **Approval of Settlement Agreement Invalidated.** In the event that the Settlement Agreement receives Court Approval but such approval is invalidated by any appellate court on or after September 1, 1993:

(i)     This Agreement shall terminate immediately;

(ii)     The <u>White</u> action and the Related Litigations shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)     All Player Contracts entered into prior to such date of such disapproval shall remain in full force and effect and shall be binding on all Parties;

(iv)     A player with a Player Contract referred to in Section 4(b)(iii) above shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases And Covenants Not to Sue) of the Settlement Agreement, that arises out of such Player Contract, for conduct prior to such disapproval consistent with the express terms of this Agreement.

220