Exhibit 9
Part 4 of 5

# ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

*Section 1.* **Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

*Section 2.* **Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

*Section 3.* **Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

*Section 4.* **Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 5.* **Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

Article XLIV, Players' Rights to Medical Care and Treatment

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

*Section 6*. **Substance Abuse:**

(a)  **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)  **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)  **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

192

# ARTICLE XLV
## ACCESS TO PERSONNEL AND
## MEDICAL RECORDS

*Section 1.* **Personnel Records**: Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records**: Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

# ARTICLE XLVI
# PLAYER BENEFIT COSTS

**Section 1.** (a) **General Right of Reduction:** The NFLPA will have the uni-lateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b) **1998 Amendment Benefits:** During each League Year for which a Salary Cap applies, the NFLPA will have the unilateral right to increase, re-duce or freeze each separate and individual Player Benefit Cost relating to 1998 Amendment Benefits that are set forth in Sections 5(c), 5(d) and 5(e) of this Article to the extent permitted by law, to ensure that the total cost of the 1998 Amendment Benefits does not exceed and is not less than the amount set forth below for each such League Year. Any increase shall be for one League Year only and shall not create a continuing obligation for the Clubs. The total cost of the 1998 Amendment Benefits for Capped Years in the 2002 League Year and thereafter *shall be* $100 million, *plus an addition-al amount, if necessary, sufficient to raise the Allocation under the Player Annuity Program to $65,000 for each player eligible for an Allocation, unless the parties agree otherwise.*

Notwithstanding the foregoing language regarding the total cost of 1998 Amendment Benefits for the 2002 League Year *and thereafter*, Class Coun-sel and the NFLPA may specify additional amounts to be used for addi-tional increases in the Player Annuity Program described in Article *XLVIII-A* (Player Annuity Program), pursuant to Article XXIV, Section 10(a)(ii) for additional amounts generated from the 2002 League Year *and thereafter.* During each League Year for which a Salary Cap does not apply, the NFL shall be required to contribute with respect to the 1998 Amendment Ben-efits only the cost of those benefits that are set forth in Sections 5(a) *and* 5(b). If the NFLPA is notified in writing that the cost of the 1998 Amendment Benefits for a Capped Year is projected to exceed or to be less than the above total for a League Year, and the NFLPA does not specify which benefits are to be increased, reduced or frozen by the later of (1) the beginning of that League Year, and (2) 30 days after the date the NFLPA re-ceives such notice, the Management Council shall have the unilateral right to reduce or increase 1998 Amendment Benefits to the extent permitted by

**194**

law, to achieve the above total cost for that League Year. Any reductions or increases in 1998 Amendment Benefits shall be implemented as of the beginning of a League Year by determining projected 1998 Amendment Benefits based on Projected Benefits, as defined in Article XXIV, Section 10(c).

(c) **Adjustment**: If the actual Player Benefit Costs of the 1998 Amendment Benefits exceed the applicable amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be reduced by such excess. If the actual Player Benefit Costs of the 1998 Amendment Benefits are less than the amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be increased by such shortfall.

**Section 2. Right of Restoration**: Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition**: For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)     Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII); *provided that all costs associated with the benefit increase, to which the parties agreed in 2002, under Article XLVII, Section 8, shall be allocated for Player Benefit Costs purposes in equal amounts to the 2002-2006 League Years;*

(b)     Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)     Injury protection (as described in Article XII);

(d)     Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)     Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)     Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)     Postseason pay (as described in Article XLII and Article XLIII);

Article XLVI, Player Benefit Costs

*and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary;*

(h)    Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year, beginning with the 1993 League Year);

(i)    Severance pay (as described in Article L);

(j)    The Player Annuity Program (as described in Article *XLVIII-A);*

(k)    *The Minimum Salary Benefit (as described in Article XXXVIII-A);*

(l)    *The Performance Based Pool (as described in Article XXXVIII-B); and*

(m)    *The Tuition Assistance Plan (as described in Article XLVIII-B).*

*\* Extension Agreement 1/8/02*

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, *and the Tuition Assistance Plan* will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

*Section 4.* **Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

196

(a)      The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b)      Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)      As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5. 1998 Amendment Benefits**: For purposes of this Agreement, the term "1998 Amendment Benefits" means the following:

(a)      The increase in 1998 and future Benefit Credits to $425 described in Article XLVII, Section 2 and the increase in Benefit Credits for prior years described in Article XLVII, Section 4;

(b)      The decrease in the vesting requirement described in Article XLVII, Section 5;

(c)      The increases in the Second Career Savings Plan contributions described in Article XLVIII, Section 2;

(d)      The Player Annuity Program (as described in Article XLVIII-A); and

(e)      The increases in the Extended Post-Career Medical and Dental Insurance benefits described in Article XLIX, Section 2(c).

**Section 6. Limitations on Contributions:** *Effective March 1, 2002,*
*(a) No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, the Severance Pay Plan, or the Tuition Assistance Plan (individually, a "Player Benefit Plan") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Plan shall be amended to prevent any employer provided benefit from accruing or being otherwise credited, paid, or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Plan in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club. During an Uncapped Year, a payment of benefits under a Player Benefit Plan shall be made only if and to the extent the payment either is funded, or is required by ERISA.*

Article XLVI, Player Benefit Costs

(b)      The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be required to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

*Extension Agreement 1/8/02

# ARTICLE XLVII
# RETIREMENT PLAN

***Section 1.*** **Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.

***Section 2.*** **Additional Credited Seasons:** *[no longer applicable]*

***Section 3.*** **Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

***Section 4.*** ***Benefit Credits:*** Effective for payments on and after *September* 1, *2001*, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to *provide* the *following* Benefit *Credits* for *the indicated* Credited *Seasons:*

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| *Before 1982* | $200 |
| 1982 through 1992 | 230 |
| 1993 and 1994 | 240 |
| 1995 and 1996 | 285 |
| 1997 | 330 |
| *1998 through the Plan Year that begins prior to the expiration of the Final League Year* | *425* |

199

Article XLVII, Retirement Plan

**Section 5. Decrease in Vesting Requirement:** Effective for payments on and after June 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan to provide that any player who (i) earned his last Credited Season prior to the 1975 Plan Year; (ii) is credited with at least four (4) Credited Seasons; and (iii) is alive on June 1, 1998, shall be fully vested in the right to receive a retirement benefit under the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment shall be entitled to receive any benefit under the Bert Bell/Pete Rozelle Plan other than his Normal, Deferred or Early Retirement Benefit. No player who is vested as a result of this amendment shall be entitled to elect to receive a retirement benefit in the optional form provided by Section 4.4(c)(3) of the Bert Bell/Pete Rozelle Plan. No beneficiary of a player who is vested as a result of this amendment and who dies prior to his Annuity Starting Date (as defined in the Bert Bell/Pete Rozelle Plan) shall be entitled to receive any benefit, except that the surviving spouse of such a player shall be entitled to receive a pre-retirement survivor annuity under rules similar to those in Section 4.9(b) of the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment who attained his Normal Retirement Age prior to June 1, 1998 shall be entitled to a benefit with respect to any period prior to June 1, 1998. Any Normal Retirement Benefit paid pursuant to this amendment will not be actuarially adjusted to reflect an Annuity Starting Date after the player's Normal Retirement Date, except to the extent the Annuity Starting Date is after June 1, 1998.

**Section 6. *Medical Standards for Line-of-Duty Disability Benefits:** The parties agree to amend the Bert Bell/Pete Rozelle Plan to adopt revised medical standards for Line-of-Duty disability benefits based upon the American Medical Association's <u>Guides to the Evaluation of Permanent Impairment (Fourth Edition, Chicago, IL)</u> ("AMA Guides"). Effective for applications received on and after April 1, 2002, the parties will amend Section 6.4 of the Bert Bell/Pete Rozelle Plan to read substantially as follows:*

*"6.4 Definitions*
*(a) A "substantial disablement" is a "permanent" disability that*
*(1) Results in a 50% or greater loss of speech or sight; or*
*(2) Results in a 55% or greater loss of hearing; or*
*(3) Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or*

*(4) For orthopedic impairments, using the <u>Guides to the Evaluation of Permanent Impairment (Fourth Edition, Chicago, IL)</u>,is (a) a 55% or greater loss of use of the entire lower extremity; or (b) a 30% or greater loss of use of the entire upper extremity; or (c) an impairment to the spine that results in a 29% or greater whole body impairment. In each case for orthopedic impairments, a maximum of 10 percentage points will be allowed for symptoms of pain."*

*\* Extension Agreement 1/8/02*

**200**

Article XLVII, Retirement Plan

**Section 7. Practice Squad Credited Season:** *Effective April 1, 2001, the parties will amend Section 1.10 of the Bert Bell/Pete Rozelle Plan to add a new subsection (f) to read substantially as follows:*

*"(f) effective April 1, 2001, has a season with at least eight games on the practice squad in a Plan Year (either before or after April 1, 2001) in which he did not otherwise earn a Credited Season, provided that he is otherwise vested and earns a Credited Season in 2001 or later. A player may earn a maximum of one Credited Season under this Section 1.10 (f) regardless of the number of seasons in which he has at least eight games on the practice squad."*

*\*Extension Agreement 1/8/02*

**Section 8. Increase in Past Service Credit:** *Effective for payments on and after September 1, 2001, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to increase the Benefit Credit in effect for each Credited Season prior to 1977 to $200. Payments reflecting this increase will begin with the March 1, 2002 payment. Benefits for affected players in pay status shall be proportionately increased based on the new and prior benefit credits.*

*\*Extension Agreement 1/8/02*

201

Article XLVIII, Second Career Savings Plan

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance**: The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:**

**(a)     Prior to 2001:** For each of the Plan Years 1993 through *1999, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club. For the 2000 Plan Year, a contribution of $250,000 will be made to the Savings Plan on behalf of each Club.* Such contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.

     *\*Extension Agreement 2/25/98, as amended by Extension Agreement 1/8/02*

**(b)     2001 and Later Years**: For each *of the Plan Years 2001 and thereafter in which the Salary Cap applies,* a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

     (i)     Matching Contributions. The parties will amend the Savings Plan to require the NFL Clubs in the aggregate to contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two Dollars (up to a maximum of $20,000) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

     (a)     by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

     (b)     by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

     (ii)     Minimum Contribution. The NFL Clubs in the aggregate will

202

Article XLVIII, Second Career Savings Plan

contribute to the Savings Plan, for each Plan Year *in which a Salary Cap applies,* a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)      Expenses. The NFL Clubs will make contributions to the Savings Plan at least quarterly in an amount sufficient to pay administrative expenses.

(c)      **Future Contributions and Collection:** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*\*Extension Agreement 1/8/02*

**Section 3. Expansion of Eligible Employees:** *Effective as of April 1, 2002, the parties will amend the Savings Plan so that first year players (not including practice squad players) may participate and contribute to the Savings Plan, but will not receive employer contributions under Sections 3.2, 3.3, 3.4, or 3.6 of the Savings Plan for that Plan Year.*

*\*Extension Agreement 1/8/02*

Article XLVIII-A, Player Annuity Program

# ARTICLE XLVIII-A
# PLAYER ANNUITY PROGRAM

*Section 1.* **Establishment**: The parties will jointly establish a new benefit, to be called the NFL Player Annuity Program (hereinafter referred to as "Player Annuity Program"). The Player Annuity Program will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Annuity Year will be the period April 1 to March 31. The Player Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Program will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions**: For each of the Annuity Years 2001 and thereafter in which a Salary Cap applies, a contribution will be made to the Player Annuity Program on behalf of the NFL Clubs unless this figure is changed pursuant to this Agreement, including the rights of the parties under Section 1(b) of Article XLVI of this Agreement, *in the amount of $73 million, but not less than an amount sufficient to fund an Allocation of $65,000 to each player eligible for an Allocation, unless the parties agree otherwise.*
                                        *\* Extension Agreement 1/8/02*

Contributions to the Player Annuity Program for an Annuity Year will be made as follows:
1. Expenses: The NFL Clubs will prepay contributions to the Annuity Program at least quarterly in an amount sufficient to pay administrative expenses. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

2. Allocations: Allocations for the benefit of individual players will be made on and as of December 31 and March 31 of each Annuity Year, as described in Section 3(c) below.

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Section 3.* **Eligibility and Allocation**:
    (a)        **Points**: *For Annuity Year 2001 and each year thereafter for which a*

204

*Salary Cap applies, players* who earn a Credited Season, as that term is defined in the Bert Bell/Pete Rozelle Plan, in an Annuity Year and who have a total of four or more Credited Seasons as of the end of such Annuity Year will receive *one point* for each such Credited Season.

(b) **Individual Allocations:** The amount allocated to an individual player who receives *a point* in the 2001 and later Annuity Years will be calculated as follows: In December of each such year a good faith estimate will be made by the Annuity Board of the total contribution expected to be made during such Annuity Year under Section 2 above by all NFL Clubs, minus the estimated administrative expenses for the Annuity Year, and minus any retroactive allocations made to players under rules similar to those in Section 3.4 of the Savings Plan. A good faith estimate will also be made at that time by the Annuity Board of the total points expected to be earned during such Annuity Year by all players. The value of a point will be determined by (1) taking the total estimated available contributions as described above and (2) dividing by the estimate of the total points expected to be earned by all players. *The Allocation to each player eligible for an Allocation will, for each of the 2002 through 2006 Annuity Years, not be less than $65,000, unless the parties agree otherwise.*

*\*Extension Agreement 1/8/02*

(c) **Timing:** Eligible players who earn a Credited Season by December 1 of an Annuity Year will receive their allocation on December 31 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive their allocation on March 31 of such Annuity Year.

*Section 4.* **Distributions:** A player may elect to begin receiving distributions under the Player Annuity Program in the form of annuity or installment payments at any time after the later of (a) the player's attainment of age 35, or (b) five years after the end of the Annuity Year containing the player's last Credited Season. Payments must begin no later than age 65. A player who elects to begin receiving annuity or installment payments under the preceding sentences may elect to receive such payments in substantially equal amounts for a period beginning on the date of commencement of such payments and ending upon the player's attainment of age 45, or such later age as he shall specify, or for life. Alternatively, a player may elect to defer his receipt of distributions under the Player Annuity Program. Upon a player's attainment of age 45, such player may elect to receive his benefit under the Player Annuity Program in the form of an annuity or a lump sum payment. If a player dies before making an election to receive benefits, the player's named beneficiary may make an election that otherwise would have been available to the player. A player's rights under the Player Annuity Program may not be transferred, assigned, or alienated.

Article XLVIII-A, Player Annuity Program

**Section 5. Structure:** The Player Annuity Program will hold assets for the sole benefit of players and their beneficiaries. The parties agree that the Program will be administered by an Annuity Board, and that prior to the first meeting of the Annuity Board the advisors to the Player Annuity Program will be the same as the advisors to the Savings Plan. The Player Annuity Program is intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity as described in Section 6 below.

# ARTICLE XLVIII-B
# TUITION ASSISTANCE PLAN

**Section 1. Establishment:** *Effective April 1, 2002, the parties shall establish a new benefit program to be called the NFL Player Tuition Assistance Plan. The Plan will provide up to $15,000 per League year as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. A written plan that qualifies as an educational assistance program under Section 127 of the Internal Revenue Code will be established, and benefits to a player in any calendar year will be paid through such educational assistance program up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan will begin on April 1.*

**Section 2. Eligibility:** *To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.*

**Section 3. Reimbursement:** *An eligible player will be reimbursed by no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books.*

*\*Extension Agreement 1/8/02*

Article XLIX, Group Insurance

# ARTICLE XLIX
# GROUP INSURANCE

**Section 1. Group Insurance Benefits**: Players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

    (a)    **Life Insurance:** For the *2002-06* League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.

    (b)    **Medical**: *Until and including August 31, 2002, each player is required to pay an annual deductible of $200 per individual per plan year and $400 per family per plan year, with a maximum out-of-pocket expense of $800 per plan year (including the deductible) for each covered individual. Effective September 1, 2002, each player is required to pay an annual deductible of $400 per individual per plan year and $800 per family per plan year, with an maximum out-of-pocket expense of $1600 (including the deductible) for each covered individual. Effective March 1, 2002,*

    *1)*    *the co-insurance paid by a covered individual for services rendered by out-of-network providers will change from 20% of covered charges to 30% of covered charges; and*

    *2)*    *the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and*

    *3)*    *a prescription drug card will be provided to covered individuals requiring a $5 co-pay for generic drugs and a $10 co-pay for brand name drugs if the generic or brand name drugs are obtained from participating pharmacies. The availability of participating pharmacies will not be significantly reduced below the level initially provided by CIGNA.*

    *4)*    *Notwithstanding the effective date stated above, the* maximum lifetime benefits paid on behalf of a covered individual will be $2.5 million *effective September 9, 2001.*

    (c)    **Dental**: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

    1)    Preventive care paid at 100% of UCR,

    2)    General services paid at 85% of UCR, and

    3)    Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

    (d)    **Insurance Benefits for Vested Players**: Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance cov-

208

Article XLIX, Group Insurance

erage under this Article until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

(e)     ***Family Medical and Dental Coverage for Deceased Players:*** *A player's enrolled dependents (including a child born to the player's wife within ten months after the player's death) shall be entitled to continuing family medical and dental insurance coverage effective August 1, 2001, as follows:*

*1)     for the dependents of a player on the Active, Inactive, Reserve/ Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;*

*2)     for dependents of a player who was receiving coverage under Section 1(d) , 2(c), or 2(d) of this Article at the time of his death, coverage will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.*

*\*Extension Agreement 1/8/02*

***Section 2. Extended Post-Career Medical And Dental Insurance:*** The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)-(b) *[no longer applicable]*

(c)     Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1998 season and before the first regular season game of the 2002 season will continue to receive the benefits described in Subsections 1(b) and 1(c) above for thirty-six (36) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.

(d)     *Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during or after the first regular season game in the 2002 season or at any time thereafter prior to the expiration or termination of this Agreement will continue to receive the benefits described in Subsections 1(b) and 1(c) above for forty-eight (48) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Subsection 1(d) of this Article.*

(e)     All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described

**209**

Article XLIX, Group Insurance

in Subsections 2(a), 2(b), and 2(c) above are provided, as if such additional benefits had not been provided.

(f)     The costs for the benefits described in this Section during the *2001* and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

*\* Extension Agreement 1/8/02*

**Section 3.** **Limitations And Rules For Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a)     The benefits described in Subsections 2(c) and 2(d) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)     The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.

(c)     The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.

(d)     The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to, in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4.** *[no longer applicable]*

**Section 5.** **Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

**210**

# ARTICLE L
## SEVERANCE PAY

**Section 1. Eligibility**: Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through *2006*, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

**Section 2. Amount**: Each eligible player will receive severance pay in the amounts determined as follows:  (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; (c) $12,500 per Credited Season for each of the seasons 2000 through *2006*.

*\* Extension Agreement 1/8/02*

**Section 3. Application**: To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

**Section 4. Payment**: Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
|---|---|---|
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through *the end of the League Year, or earlier* | June 1 | June 30 |
| *The beginning of the League Year* through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

**211**

Article L, Severance Pay

*Section 5*. **Failure to Apply**: A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

*Section 6*. **Only One Payment**: Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

*Section 7*. **Payable to Survivor**: In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

*Section 8*. **Prior Severance Pay**: Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

*Section 9*. **Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

212

# ARTICLE LI
# SUPPLEMENTAL DISABILITY BENEFITS

*Section 1.* **Maintenance**: The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions**: For each Plan *Year in which the Salary Cap applies*, unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*\*Extension Agreement 1/8/02*

*Section 3.* **Extension**: For each Plan Year in *which the Salary Cap applies*, the parties will amend Section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

*\*Extension Agreement 1/8/02*

*Section 4. Automatic Payment and Waiver: The parties will amend the Supplemental Disability Plan effective February 1, 2002 to provide that payments under the Supplemental Disability Plan will automatically be paid to all players who qualify for such benefits unless the qualifying player waives the right to receive such benefits. A player's waiver may be revoked, but not with respect to benefits that would have been paid prior to the revocation of his waiver.*

*\*Extension Agreement 1/8/02.*

Article LII, Benefit Arbitrator

# ARTICLE LII
# BENEFIT ARBITRATOR

**Section 1. Selection:** The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

**Section 2. Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

**Section 3. Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Ei-

214

Article LII, Benefit Arbitrator

ther party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

Article LIII, Retention of Benefits

# ARTICLE LIII
# RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
# WORKERS' COMPENSATION

**Section 1. Benefits:** In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

**Section 3. Arbitration:** In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study:** The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5.** *[no longer applicable]*

**Section 6. Preservation of Rights:** The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the

217

Article LIV, Workers' Compensation

NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

***Section 7*. Reopener**: If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

# ARTICLE LV
# MISCELLANEOUS

***Section 1*. Endorsements**: No Club may unreasonably refuse to permit a player to endorse a product.

***Section 2*. On-Field Attire**: Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

***Section 3*. Appearances**: No Club may unreasonably require a player to appear on radio or television.

***Section 4*. Promotion**: The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

***Section 5*. Deduction**: The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

***Section 6*. Public Statements**: The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

***Section 7*. Address**: The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first preseason cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

***Section 8*. NFLPA Tickets**: Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire

219

Article LV, Miscellaneous

to attend such a game at least three days prior to the date of the game. NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets**: Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests**: No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security**: A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program**: The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents**: The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect**: This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization**: The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has

Article LV, Miscellaneous

been duly authorized to execute this Agreement on behalf of its members.

**Section 16. Headings**: The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods**: The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits**: All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence**: The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

*Extension Agreement 1/8/02*

221

Article LVI, Final League Year

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap**: No Salary Cap shall be in effect during the Final League Year.

*Section 2*. **Free Agency If Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is in effect in the League Year prior to the Final League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the Final League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

*Section 3*. **Free Agency If No Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five Accrued Seasons.

*Section 4*. **Franchise and Transition Players**: As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

222

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS:
# LABOR EXEMPTION

***Section 1.*** **Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

***Section 2.*** **Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

***Section 3.*** **CBA Expiration:**

(a)      Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)      The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

223

Article LVIII, Duration of Agreement

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1. Effective Date**: Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993. With respect to the 1998 amendments to this Agreement, those amendments shall be effective upon the execution of those amendments, except that: (i) the 1998 amendments with respect to the Entering Player Pool and the amount of the Salary Cap shall be effective as of the first day of the 1998 League Year; and (ii) the parties may agree upon transition rules implementing the terms of the 1998 amendments, which transition rules shall be effective as of such dates as are agreed to by the parties. *With respect to the 2002 amendments to this Agreement, those amendments shall be deemed effective as of the last game of the 2001 regular season, except for the benefits which are specified to go into effect beginning in the 2002 League Year.*

*\* Extension Agreement 1/8/02*

**Section 2. Expiration Date**: Except as provided in Section 3 below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the 2007 League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire *in the League Year immediately following the expiration or termination of this Agreement.*

*\* Extension Agreement 1/8/02*

**Section 3. Termination Prior to Expiration Date:**
(a)-(b) *[no longer applicable]*
(c)      **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (Final League Year), XXVI-II (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of ter-

224

mination within 30 days of the date of such determination and any appeals relating thereto.

(d)    **Termination Due To Collusion.** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)    **Termination After Closing Date.** If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f)    **No Waiver.** Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

***Section 4.* Ratification:** This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

Article LIX, Governing Law

# ARTICLE LIX
# GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a)     To the National Football League Management Council:
The National Football League
Management Council
280 Park Avenue
New York, New York  10017
Attention: Executive Vice President—Labor Relations

(b)     To an NFL Club:
At the principal address of such Club as then
listed on the records of the NFL or at that Club's
principal office.
Attention: President

(c)     To the NFLPA:
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE          NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION               MANAGEMENT COUNCIL

BY: _____     BY: _____

227

Appendix A

# APPENDIX A

## CHECK-OFF AUTHORIZATION FOR
## NATIONAL FOOTBALL LEAGUE PLAYERS
## ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management

Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

Signature

Player's Name—Type or Print

Appendix B

# APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a preseason physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

230

# APPENDIX C

# NFL PLAYER CONTRACT

THIS CONTRACT is
between_____,
hereinafter "Player," and_____,a
_____
corporation (limited partnership) (partnership), hereinafter "Club," oper-
ating under the name of the _____
as a member of the National Football League, hereinafter "League." In con-
sideration of the promises made by each to the other, Player and Club agree
as follows:

1.      TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

2.      EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory minicamp(s), official preseason training
camp, all Club meetings and practice sessions, and all preseason, regular
season and postseason football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

3.      OTHER ACTIVITIES. Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experi-
ence as a football player, the loss of which cannot be estimated with any cer-
tainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

231

Appendix C

4.    PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

(a)    Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)    Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on *or in conjunction with* products (*including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.*) that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire

232

on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract expires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

*Extension Agreement 1/8/02*

5.     COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during preseason training and in connection with playing preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.     PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides

233

Appendix C

otherwise, if this contract is executed or Player is activated after the begin-
ning of the regular season, the yearly salary payable to Player will be re-
duced proportionately and Player will be paid the weekly or biweekly por-
tions of his yearly salary becoming due and payable after he is activated.
Unless this contract specifically provides otherwise, if this contract is ter-
minated after the beginning of the regular season, the yearly salary payable
to Player will be reduced proportionately and Player will be paid the week-
ly or bi weekly portions of his yearly salary having become due and payable
up to the time of termination.

7.    DEDUCTIONS. Any advance made to Player will be repaid to
Club, and any properly levied Club fine or Commissioner fine against Play-
er will be paid, in cash on demand or by means of deductions from pay-
ments coming due to the Player under this contract, the amount of such
deductions to be determined by Club unless this contract or any collective
bargaining agreement in existence during the term of this contract specifi-
cally provides otherwise.

8.    PHYSICAL CONDITION. Player represents to Club that he is
and will maintain himself in excellent physical condition. Player will un-
dergo a complete physical examination by the Club physician upon Club
request, during which physical examination Player agrees to make full and
complete disclosure of any physical or mental condition known to him
which might impair his performance under this contract and to respond
fully and in good faith when questioned by the Club physician about such
condition. If Player fails to establish or maintain his excellent physical con-
dition to the satisfaction of the Club physician, or make the required full
and complete disclosure and good faith responses to the Club physician,
then Club may terminate this contract.

9.    INJURY. Unless this contract specifically provides otherwise, if
Player is injured in the performance of his services under this contract and
promptly reports such injury to the Club physician or trainer, then Player
will receive such medical and hospital care during the term of this contract
as the Club physician may deem necessary, and will continue to receive his
yearly salary for so long, during the season of injury only and for no subse-
quent period covered by this contract, as Player is physically unable to per-
form the services required of him by this contract because of such injury. If
Player's injury in the performance of his services under this contract results
in his death, the unpaid balance of his yearly salary for the season of injury
will be paid to his stated beneficiary, or in the absence of a stated benefi-
ciary, to his estate.

10.    WORKERS' COMPENSATION. Any compensation paid to Play-
er under this contract or under any collective bargaining agreement in ex-

234

istence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.   SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.   TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.   INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

235

Appendix C

14.   RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.   INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.   EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.   ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his ser-

236

vices under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18.   FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.   DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.   NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.   OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

Appendix C

22.   LAW. This contract is made under and shall be governed by the laws of the State of _____.

23.   WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, preseason compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.   OTHER PROVISIONS. (a)   Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)   Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)   The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the

time the information was provided, true and correct in all material respects.

25.   SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

PLAYER _____     CLUB _____

Home Address _____     By _____

Telephone Number _____     Club Address _____

Date _____     Date _____

PLAYER'S CERTIFIED AGENT _____

Address _____

Telephone Number _____

Date _____

Copy Distribution:     White-League Office     Yellow-Player
                       Green-Member Club       Blue-Management Council
                       Gold-NFLPA              Pink-Player Agent

Appendix D

# APPENDIX D

## FIRST REFUSAL OFFER SHEET

Name of Player:                              Date:

Address of Player:                           Name of New Team:

Name and Address of                          Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                             Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

[Supply Information on this Sheet or on Attachment]

1.      Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

2.      Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

3.      Other terms (that need not be matched):

Player:                                      New Club:

By: _____                   By: _____
                                             Chief Operating Officer

240

# APPENDIX E

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                         Address of Prior Team:

    The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

                                      Prior Team:

                                       By: _____
                                         Chief Operating Officer

Appendix F

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By:_____

WITNESSED BY:

_____

242

# APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

243

Appendix H

# APPENDIX H

# ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR *of the NFL and its* member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions *of* the CBA. The information on the Schedule is to be the responsibility of the *management of the* Clubs and the NFL.

The *Management Council and the NFLPA* are to retain a national accounting firm (the "Accountants") *which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures* shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The *Procedures* shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six members with three representatives designated by each of the Management Council and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the *Procedures* described in the preceding paragraph and again before *May 1st* to review the results of the *Procedures* before issuance of the final report for that playing season.

The procedures detailed below *and/or as otherwise agreed by the parties are and shall be* designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the NFL *and its Clubs* for such *League Year* in accordance with the *provisions* of the CBA. The Accountants will *perform the Procedures with respect* to the Schedule for each *League Year.*

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), *as agreed upon by the parties,* or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report *upon the Procedures* as referred above.

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Ac-

244

countants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the *Management Council* and *the NFLPA* to be performed by the Accountants**

**General**
- *The CBA and all relevant side letters* should be reviewed and understood.

- See Exhibit *H.1* for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule *shall* be made available for review by representatives of the *Management Council* and *the NFLPA* prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the *Management Council* and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with the CBA. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

Appendix H

- Revenue and expense amounts that have been estimated should be re-confirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

## Procedures provided by the *Management Council* and *the NFLPA* to be performed by the Local Accountants

### General
- *The local accountants shall conduct procedures as agreed upon by the parties.*

- *The CBA and all side letters* should be reviewed and understood by all Local Accountants.

- See Exhibit *H.2* for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

### Team Salaries - Schedule 1
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the CBA.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the CBA.

246

Appendix H

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the CBA.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this CBA.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**
- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the CBA.

247

Appendix H

**Defined Gross Revenues - Schedule 4**

- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the CBA. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

**Excluded DGR - Schedule 5**
- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

**Questions - Schedule 6**
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

248

Appendix H

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

*Extension Agreement 1/8/02*

Appendix *H.1*

# EXHIBIT *H.1*

## ACCOUNTANTS' *AGREED-UPON PROCEDURES* REPORT

*We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (collectively, the "Parties") with respect to the National Football League Office Reporting Package and the Reporting Packages* of the Member Clubs of the National Football League, *for the [insert] League Year, solely to assist the Parties in evaluating whether the Reporting Packages were prepared* in accordance with the provisions and definitions contained in the *Instructions to the Reporting Package. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which this report has been requested or for any other purpose.*

*Our findings are set forth in the accompanying Schedule B.*

*We were not engaged to, and will not perform an audit or examination, the objective of which would be the expression of an opinion on the Reporting Packages. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an* audit *or examination of the Reporting Packages, other matters might have come to our attention that would have been reported to the Parties.*

*This report is intended solely for the use of the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.*

*\*Extension Agreement 1/8/02*

250

Exhibit H.2

# EXHIBIT H.2

## LOCAL ACCOUNTANTS' *AGREED-UPON PROCEDURES* REPORT

*We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was prepared in accordance* with the provisions and definitions contained in the *Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of management of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule A either* for the *purpose for which this* report *has been requested* or for any other purpose.

*Our findings are set forth in the accompanying Schedule B.*

*We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.*

*This report is intended solely for the use of the [Member Club Name], the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.*

*\*Extension Agreement 1/8/02*

Appendix 1

# APPENDIX I

## STANDARD MINIMUM PRESEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1. History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpation
   - chest
   - heart
   - visceral
   - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e. scars, birthmarks
   - height
   - weight
   - temperature
   - blood pressure
   - pulse
   - heart rate

252

Appendix I

**Orthopedic Examination**
Examination visually, including stress testing and range of motion for all of the following:
- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck

**EKG**
Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardio-vascular

**Blood Testing**
Standard grid. Testing for (including but not limited to):
- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*
- Sickle Cell*
- VD*

*Where applicable. If found, individual counseling necessary.

253

Appendix I

**Urinalysis**
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**
- peripheral vision
- standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for:  Tumor
            T.B.
            Lesions

**X-Ray all previously injured areas** (at physician's discretion)

254

Appendix J

# APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

Nonfootball related disability rates before retirement:

| Age | Rate |
|---|---|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

Football related disability rates: .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later.

Withdrawal rates:

For Players
| With Service of | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

Election of early payment benefit: 35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993.

Retirement age: 47, except 55 for players with no credited seasons before 1993

Percent married: Social Security awards in 1972

Age of Player's wife: Three years younger than player

255