# Exhibit 10
# Part 2 of 4

Year Salaries for players at the position (within the categories set forth in Section 7(a) below) at which the player played the most games during the prior League Year; or (3) 144% of his Prior Year Salary. By way of example, a kicker designated as a Franchise Player for the third time in the 2007 League Year would have a Required Tender equal to the greater of: (i) the average of the five (5) largest 2006 Salaries for quarterbacks; (ii) 120% of the average of the five (5) largest 2006 Salaries for kickers; or (iii) 144% of the player's own 2006 Salary. If the Club designates the player as a Franchise Player for the third time, the designating Club shall be the only Club with which the player may negotiate or sign a Player Contract. In lieu of designating such a player as a Franchise Player for the third time, any Club may designate such player as a Transition Player pursuant to Section 3 below.

(c)      If a player subject to a Franchise Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this Subsection only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties under Article X (Injury Grievance), whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, providing such exam takes place within twenty (20) days of the contract termination.

(d)      Any of the required tenders set forth in this Section 2 may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(e)      For the purpose of this Article, "Salary" means the total of the Paragraph 5 Salary (reduced proportionately if the contract is entered into after the first regular season game), roster and reporting bonuses, pro-rata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the applicable year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Salary shall also include any unrepaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate.

(f)      The calculation of any five (5) largest Prior Year Salaries shall include any Player Contract resulting from acceptance of a tender for the Prior Year pursuant to Section 2(a)(i) or (a)(ii) above, provided that the player

69

played during the Prior League Year pursuant to the tender, but shall not include the amount of any term of a Player Contract renegotiated after the Monday of the tenth week of the regular season of the Prior League Year that provides for an unearned incentive to be treated as a signing bonus.

(g)    The calculation of any five (5) largest Salaries for the current League Year as of the end of the Restricted Free Agent signing period pursuant to Section 2(a)(ii) above shall include any Player Contract resulting from acceptance of any tender for the Prior League Year pursuant to Section 2(a)(i) or (a)(ii) above, provided that the player played during the Prior League Year pursuant to the tender, but shall not include (i) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date or (ii) the amount of any term of a Player Contract renegotiated after the Monday of the tenth week of the regular season of the Prior League Year that provides for an unearned incentive to be treated as a signing bonus.

(h)    If a Franchise Player receives a required tender pursuant to Section 2(a)(i) above, any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet). This Subsection (h) shall not apply to a player who was designated as a Transition Player in lieu of being designated as a Franchise Player, pursuant to Section 3(a) below, or to any other Transition Player.

(i)    The definition of a "Signing Bonus" for purposes of the top five and top 10 minimum tenders is the same as that under the Salary Cap. The pro-rata portion of such Signing Bonuses includes prorated amounts from prior Player Contracts, and the Salary Cap acceleration rules for unamortized Signing Bonus amounts do not apply to the calculation of the top five and top 10 minimum tenders.

(j)    For purposes of calculating the minimum tenders to Franchise and Transition players under this Article, if the present value of any deferred Paragraph 5 amount (as defined in Article XXIV, Section 7(a)(ii)) is at least $100,000 less than the initial Paragraph 5 amount (before being present valued), then the present value amount shall be used.

(k)    Any Club designating a Franchise Player shall have until 4:00 p.m., New York time, on July 15 of the League Year (or, if July 15 falls on a Saturday or Sunday, the first Monday thereafter) for which the designation takes effect to sign the player to a multi-year contract or extension. After that date, the player may sign only a one-year Player Contract with his Prior Club for that season, and such Player Contract may not be extended until after the Club's last regular season game.

**Section 3.** **Transition Player Designations:**

(a)      Each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player in the Final League Year. In addition, in each League Year during the term of this Agreement, each Club shall be permitted to designate one Unrestricted Free Agent or Restricted Free Agent as a Transition Player in lieu of designating a Franchise Player, if such Franchise Player designation is available to such Club, in addition to the Transition Player designation permitted by the immediately preceding sentence, during the same designation period as the Franchise Player designation period. The period for Clubs to designate Transition Players will begin on the twenty-second day preceding the first day of the new League Year and will end at 4:00 p.m. New York time on the eighth day preceding the first day of the new League Year.

(b)      Any Club that designates a Transition Player shall receive the Rights of First Refusal specified in this Article notwithstanding the number of his Accrued Seasons. Any Transition Player shall be completely free to negotiate and sign a Player Contract with any Club during the period from the first day of the League Year following the expiration of his last player contract to July 22, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs of any kind, subject only to the Prior Club's Right of First Refusal described in this Article.

**Section 4.** **Required Tender for Transition Players:**

(a)      Any Club that designates a Transition Player shall be deemed on the first day of the League Year following the expiration of the player's last contract to have automatically tendered the player a one year NFL Player Contract for the average of the ten (10) largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(b)      [*Omitted*]

(c)      The calculation of any ten (10) largest Prior Year Salaries pursuant to Section 4(a) above shall include any Player Contract amount resulting from acceptance of a tender for the Prior Year pursuant to Section 2(a)(i), 2(a)(ii) or 4(a) above, provided that the player played the Prior League Year pursuant to such tender, but shall not include the amount of any Player Contract renegotiated after the Monday of the tenth week of the

71

regular season of the Prior Year that provides for an unearned incentive treated as a signing bonus.

(d)     If a player subject to a Transition Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this Subsection only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties under Article X (Injury Grievance), whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, providing such exam takes place within twenty (20) days of the contract termination.

**Section 5. Right of First Refusal for Transition Players:** Any player designated as a Transition Player shall, at the expiration of his prior year Player Contract, be permitted to negotiate a Player Contract with any Club. When the Transition Player negotiates such an offer with a New Club, which the player desires to accept, he shall give to the Prior Club a completed Offer Sheet, signed by the player and the New Club, which shall contain the Principal Terms (as defined in Article XIX (Veteran Free Agency)) of the New Club's offer. The Prior Club, within seven (7) days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth in Sections 3(b)-(h), 4 and 6 of Article XIX (Veteran Free Agency) above, except that no Draft Choice Compensation shall be made with respect to such player, and, for the purposes of those provisions, the player and each Club shall otherwise have the same rights and obligations as for a Restricted Free Agent set forth in those provisions, notwithstanding the number of his Accrued Seasons.

**Section 6. Lists:** On each date following the dates set forth in Sections 1 and 3 above, the NFL shall provide to the NFLPA a list of each Unrestricted Free Agent designated as a Franchise Player or a Transition Player.

**Section 7. Salary Information:**

(a)     No later than February 1 of each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten (10) largest Prior Year Salaries for players at the following positions which shall be utilized for calculating the average Prior Year Salaries of players at the positions of Franchise Players and Transition Players: Quarterback, Running Back, Wide Receiver, Tight End, Offensive Line, Defensive End, Interior Defensive Line, Linebacker, Cornerback, Safety, and Kicker/Punter

(b)     No later than ten (10) days after the last day of the Restricted

Free Agent Signing Period in each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten (10) and five (5) largest Salaries for players at the positions set forth in subparagraph (a) above which shall be utilized for calculating the applicable average Salaries of players at such positions as of the last day of the Restricted Free Agent Signing Period (including the amount of Salary in any executed Offer Sheets).

(c)     Any dispute concerning the identity and Salaries of players included within each player position category, or any other matter regarding these figures, shall be submitted to and resolved by the Impartial Arbitrator during the period from February 1 to February 15, or within twenty five (25) days after the last day of the Restricted Free Agent Signing Period, respectively. The Impartial Arbitrator shall make an independent determination in writing. In arriving at his determination, the Impartial Arbitrator shall consider any relevant information furnished to him, and shall be provided access to all relevant Player Contracts. The Impartial Arbitrator's determination shall be final and binding upon all parties.

**Section 8.** **No Assignment:** No Club may assign or otherwise transfer to any other Club the exclusive negotiating rights or any Right of First Refusal it may have for any Franchise Player, nor any Right of First Refusal it may have for any Transition Player, nor any designation rights it may have.

**Section 9.** [*Omitted*]

**Section 10.** **Franchise Player Designation Period:** A Club may designate a Franchise Player only during the periods and in the numbers specified in Section 1 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Franchise Player with respect to any first future League Year during the term of this Agreement for which such player is anticipated to be an Unrestricted Free Agent. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the five (5) largest Prior Year Salaries for players at the position category at which he played the most games during the prior League Year, or 120% of the player's Prior-Year Salary, whichever is greater, except as provided in Section 2(b) above. If a Club designates a player pursuant to this Section 10, the Club shall be deemed to have used the Franchise Player designation in Section 1 above for the year in which the designation takes effect; provided, however, that if a player designated to become the Franchise Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (oth-

73

er than through the waiver system) before such designation is exercised, the Club shall be entitled to designate a new Franchise Player for that League Year. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

*Section 11.* **Transition Player Designation Period:** A Club may designate a Transition Player (or players) only during the periods and in the numbers specified in Section 3 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Transition Player with respect to any first future League Year during the term of this Agreement for which such player becomes an Unrestricted Free Agent; any such future designation exhausts the Club's designation right (and does not move to any other Club) even if the player moves to another Club, as a Restricted Free Agent or via waivers, before he would have become an Unrestricted Free Agent with the designated Club. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the ten (10) largest Prior Year Salaries for players at the position that he played the most games during the prior League Year, or 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become a Transition Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Prior Club shall be entitled to designate a new Transition Player for that League Year. If a Prior Club becomes entitled to designate a new Transition Player pursuant to this Section 11, the prior Club may designate the new Transition Player for that League Year during the period prescribed by Section 3(a) above, in the League Year prior to the League Year in which the player initially designated would have become a Transition Player. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

*Sections 12-13.* [*Omitted*]

**Section 14. Other Terms:** For the purposes of this Article, the Required Tenders of a one year Player Contract for at least 120% (or 144%, if the player is eligible to receive such a tender) of the Franchise Player's or 120% of the Transition Player's Prior Year Salaries shall in addition to the 120% or 144% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or

74

performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% (or 144%, if the player is eligible to receive such a tender) of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (5) (or ten (10), as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

**Section 15. Compensatory Draft Selection:** The procedures for awarding Compensatory Draft Selections shall be determined as agreed by the NFL and the NFLPA.

**Section 16. Signing Period for Transition Players:**

(a)      In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 22 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time.

(b)      If a Transition Player described in Subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five (5) days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c)      If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten (10) largest Salaries for the prior League Year for players at the player's specified position, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 17. Signing Period for Franchise Players:**

(a)      If a Franchise Player has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York

time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(b)      If a Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable tender must be made and any 120% tender shall be measured from the Player's prior year salary. If such a player is redesignated as a Franchise Player for the League Year following the League Year in which he does not play, the player may be designated only under Section 2(a)(i) above, except that Draft Choice Compensation of only one first round draft selection and one third round draft selection shall be made with respect to such player in the event he signs with the New Club. If such a player is designated as a Franchise Player for a third time, the terms of Section 2(b) above, shall apply. If a Franchise Player who has sufficient Accrued Seasons to become an Unrestricted Free Agent is not designated as a Franchise Player or Transition Player for any League Year immediately following a League Year in which he does not play, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

76

# ARTICLE XXI
# FINAL EIGHT PLAN

**Section 1. Application:** The provisions of this Article shall apply only in any League Year during the term of this Agreement in which no Salary Cap is in effect.

**Section 2. Top Four Teams:** Each of the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; and (c) any Unrestricted Free Agent signed pursuant to Section 4 below.

**Section 3. Next Four Teams:** Each of the four playoff Clubs that lost in the immediately preceding playoff games to the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player contract; (c) any Unrestricted Free Agent signed pursuant to Section 4 below; and (d) any Unrestricted Free Agent as follows:

    (i)      One such player for a Player Contract that has a first year Salary of $4,925,000 or more; and

    (ii)     Any number of such players for a Player Contract that has a first year Salary of no more than $3,275,000 and an annual increase in any future contract years of no more than 30% of the first contract year Salary, not including any amount attributed to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this Subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 4. Replacement of Free Agents Signed by Other Club:** Each of the eight Clubs subject to the provisions of this Article shall be permitted to negotiate and sign one Unrestricted Free Agent to a Player Contract ("New Player") for each Unrestricted Free Agent who was under contract to such Club on the last date of the prior League Year, who has signed with another Club ("Previous Player"), so long as the Player Contract for the New Player shall have a first year Salary of no more than the first year Salary of the Player Contract signed by the Previous Player with the New Club,

and an annual increase in any future contract years of no more than 30% of the first contract year Salary, excluding any amounts attributable to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this Subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

*Section 5.* **Increases:** The amounts specified in this Article ($4,925,000 and $3,275,000) shall increase each League Year following the 2006 League Year by the same percentage as the increase in Projected TR over the prior League Year's TR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)). Notwithstanding the foregoing, in no event shall the amounts specified in this Article increase if the Projected TR for the League Year in question is not greater than the highest TR of any previous League Year.

*Section 6.* **Salary Definition:** For purposes of this Article, "Salary" means Paragraph 5 Salary, roster and reporting bonuses, pro-rata portions of signing bonuses, likely to be earned incentive bonuses, and other payments in compensation for the playing of professional football, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) below.

*Section 7.* **Trade Limitation:** No Club subject to the provisions of this Article may, for one League Year, trade for a player it otherwise would not be permitted to sign as an Unrestricted Free Agent as a result of the provisions in this Article.

*Section 8.* **Transition and Franchise Players:** Clubs subject to the Final Eight Plan are permitted to negotiate with and sign Transition Players and Franchise Players who otherwise are permitted to negotiate and sign with other Clubs.

*Section 9.* **Player Tenders:** Each of the eight teams subject to the Final Eight Plan may, after the later of July 15 or the first scheduled day of the first NFL training camp, in any League Year in which the Final Eight Plan is in effect, sign any Unrestricted Free Agent whose team did not make the June 1 Tender or whose team subsequently withdrew that Tender.

# ARTICLE XXII
# WAIVER SYSTEM

***Section 1.*** **Release:**

(a)     Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.

(b)     Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

***Section 2.*** **Contact:** Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

***Section 3.*** **Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or postseason game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and Bylaws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

***Section 4.*** **Notice of Termination:** The Notice of Termination form attached hereto as Appendix G will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice

of Termination will be sent to him by certified mail at his last address on file with the Club.

*Section 5.* **NFLPA's Right to Personnel Information:** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice between the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

*Section 6.* **Rosters:** The NFLMC shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

*Section 7.* **Procedural Recall Waivers:** A player with four (4) or more Credited Seasons who is subject to procedural recall waivers from the Reserved/Retired or Reserve/Military status, and who opts for Free Agency in lieu of assignment, cannot, during the same season, re-sign or return to the Club that originally requested such waivers.

## ARTICLE XXIII
## TERMINATION PAY

**Section 1. Eligibility:** Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for termination pay under this Article if:

    (1)    He is released after his Club's first regular season game; and

    (2)    He has made the Inactive or Active List of his Club on or after the date of his Club's first regular season game.

Subject to Section 3 below, the amount of termination pay payable to such player shall be the unpaid balance of his Paragraph 5 Salary for that League Year. Termination pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to termination pay more than once during his playing career in the NFL.

**Section 2. Regular Season Signings:** The termination pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the greater of: (i) the unpaid balance of the initial 25% of such player's Paragraph 5 Salary, or (ii) one week's salary up to a maximum of the Active/Inactive List Paragraph 5 Salary of a player with ten (10) or more Credited Seasons as specified in Article XXXVIII, Section 6, notwithstanding the actual number of Credited Seasons the player has earned. For purposes of this 25% calculation only, the term "Paragraph 5 Salary" shall be defined as the proportionate remaining balance to be paid at the time such player is signed by the Club. (For example and without limitation, if a player is signed after the second week of the 2006 regular season to a Contract with a Paragraph 5 Salary of $850,000, his Paragraph 5 Salary for purposes of the 25% calculation shall be $750,000 or 15/17ths of $850,000.)

**Section 3. Ineligibility For Termination Pay:**

    (a)    An otherwise qualified player will not be entitled to termination pay under this Article if the Club can demonstrate that, after receipt of a written warning from his Club in the form attached hereto as Appendix N, the player failed to exhibit the level of good faith effort which can be reasonably expected from NFL players on that Club.

    (b)    A player shall not be eligible for Termination Pay if, without missing a game check at the Paragraph 5 rate stated in his terminated contract, he signs a Player Contract with the same Club that terminated his contract, which new contract provides for Paragraph 5 salary at a rate equal to or greater than that of his terminated contract. If the player's new contract is subsequently terminated, however, he shall be eligible for Termination Pay for such subsequent termination.

81

# ARTICLE XXIV
## GUARANTEED LEAGUE-WIDE SALARY,
## SALARY CAP, & MINIMUM TEAM SALARY

*Section 1.* **Definitions:** For purposes of this Article, and anywhere else specifically stated in this Agreement, the following terms shall have the meanings set forth below:

(a)     **Total Revenues.**

(i)     "Total Revenues" ("TR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Total Revenues for each playing season during the term of this Agreement. Total Revenues shall include, without limitation:

(1)     Regular season, pre-season, and postseason gate receipts (net of (A) admission taxes, (B) taxes on tickets regularly paid to governmental authorities by Clubs or Club Affiliates, provided such taxes are deducted for purposes of calculating gate receipts subject to revenue sharing and (C) surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing), including ticket revenue from "luxury boxes," suites, and premium seating subject to gate receipt sharing among NFL Teams (except as otherwise expressly agreed to by the parties, the aggregate amount of ticket revenue allocated to luxury boxes, suites and premium seating to be included in TR is the face value of the ticket, or any additional amounts which are subject to gate receipt sharing among NFL Clubs);

(2)     Proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL pre-season, regular season and playoff games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts (which shall not include any broadcast of an NFL pre-season, regular season or playoff game occurring more than 72 hours after the live exhibition of the game, unless the broadcast is the first broadcast in the market), and all other means of distribution, net of any reasonable and customary NFL (or Club, as the case may be) expenses related to the project;

(3)     Revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that described in Section 1(a)(i)(1) above (with "Super suites" (i.e., suites substantially larger in size than the largest suite regularly available for sale in the stadium) to have

82

no additional value imputed in respect of them by virtue of such status), Internet operations (including merchandise sales) other than those conducted by NFL Ventures, L.P. or its subsidiaries (which are separately addressed below), and sales of programs and novelties (in each of the foregoing cases, all revenues for these subcategories will be calculated using gross figures without any expenses deducted other than only those set forth in or expressly referenced in Section 1(a)(xiv)(1) below);

(4)     The net consolidated revenue generated by NFL Ventures L.P. (including but not limited to those categories of revenue currently or formerly generated by NFL Ventures' subsidiaries, NFL Properties LLC, NFL Enterprises LLC, and NFL Productions LLC d/b/a NFL Films, but excluding from NFL Ventures' revenue any revenues otherwise included in TR pursuant to Subsections (a)(i)(1)-(3) above or Subsection (a)(i)(5) below), with only those expenses set forth in or expressly referenced in Section 1(a)(xiv)(1) below deducted in calculating such net consolidated revenue for purposes of calculating TR. Notwithstanding the foregoing or anything else in this Agreement, any revenues of NFL Ventures or any of its subsidiaries that are distributed directly or indirectly to any Club or Club Affiliate, or are held by NFL Ventures or any of its subsidiaries other than for their own legitimate investment purposes (including reasonable working capital, etc.) and available for distribution to any such Club or Club Affiliate, shall be included in TR (but shall be so included in TR only once, as revenue of either NFL Ventures or of such Clubs/Club Affiliates, in such League Years as are consistent with the Parties' practices for the 1993-2005 League Years). To the extent that revenues of the NFL, NFL Properties, NFL Films, NFL Enterprises, any other NFL affiliate (other than NFL Attractions, as defined below), any Club, or any Club Affiliate result from any licenses to or other provision of intellectual property or other products or services to NFL Attractions, such revenues will be included in TR at no less than fair market value (e.g., to the extent that film, video, NFL logos or other intellectual properties or other products or services of such NFL and/or Club entities are utilized by NFL Attractions without the payment of any licensing fees, the fair market value amount shall be imputed). Any dispute over the fair market value shall be resolved in the first instance by the Accountants after consulting and meeting with representatives of both parties. In the event such dispute involves a disputed amount of $10 million or more, each party shall have a right to appeal such resolution to the Special Master, who shall review the dispute de novo, and whose decision shall be subject to appeal pursuant to Article XXVI (Special Master), Section 2;

(5)     Barter income, which shall be valued at 90% of the fair market value of the goods or services received;

(6)     The value of equity instruments unconditionally received from third parties by the NFL or member Clubs (i.e., not equity instruments in business entities formed and owned exclusively by the NFL, NFL Ventures L.P. or any of its subsidiaries, or the member Clubs) derived from, relating

83

to or arising out of the performance of players in NFL football games, net of the exercise price, if any, paid (whether in cash or by a reduction in the quantity of equity instruments to be received by the NFL or member Clubs) for acquiring such equity instruments. Reasonable determinations as to valuation, TR inclusion dates, and expense deductions (other than any exercise price) in respect of specific equity instruments shall be agreed upon in good faith between the NFL and NFLPA in connection with each specific equity instrument so included, or, if such an agreement cannot be reached, shall be determined by the Accountants, whose decision shall be subject to appeal to the Special Master pursuant to Article XXVI;

(7)      Revenues received by a Club or Club Affiliate pursuant to a stadium lease or directly related stadium-use agreement with an unaffiliated third party, where the amount of such revenues is determined based upon activities that are unrelated to NFL football, in circumstances where the involved Club or Club Affiliate is not required to make a non-de minimis investment of capital or cash to receive such revenue (provided that the provisions of this Subsection (1)(a)(i)(7) shall not be retroactively applied to include in TR revenues generated from non-football business opportunities arising out of leases or other stadium use agreements entered into prior to January 1, 1993, the financial terms of which have not been amended since such date; and further provided that the foregoing does not affect, and the parties have not reached agreement and reserve their respective positions on, the treatment of revenue arising from the acquisition by a Club or Club Affiliate of a right to develop real estate in proximity to a stadium, pursuant to a stadium lease or directly related stadium use agreement with an unaffiliated third party);

(8)      Recoveries under business interruption insurance policies that are received by any League- or Club-related entity, to the extent that such recoveries compensate such entity for lost revenues that would have been included in TR. The amount of such recoveries shall be included in TR net of (1) premiums paid for the policy/policies recovered under in the League Year(s) that include the events and the recoveries; and (2) deductible and unreimbursed expenses arising out of or related to the events giving rise to the insurance claim/recovery. Any lump sum payments will be allocated under the method separately agreed to by the parties;

(9)      Any expense reimbursements received by a Club or Club Affiliate from a governmental entity in connection with a stadium lease or a directly related stadium-use agreement, except as provided in Section 1(a)(ii)(F) below; and

(10)     Proceeds from the sale or conveyance of any right to receive any of the revenues described above.

(ii)      The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Teams which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "TR"):

84

(A)     Proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, dues or capital contributions received by the NFL (provided, however, that to the extent that there is put into place an incremental system for the NFL to recapture or to be repaid upon sale of a Club or Club Affiliate NFL contributions to stadium construction, as contemplated by Section 4(e)(v)(2) below, the incremental NFL recapture and/or receipts under such system shall not constitute TR, but shall give rise to incremental NFLPA recapture or repayment of Project Credits as contemplated by Section 4(e)(v)(2)), fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries (other than those net business interruption insurance recoveries that are described in Section 1(a)(i)(8) above), sales of interests in real estate and other property, and Club cheerleader revenues (provided that, if such cheerleader revenue is provided by an entity with which the Club has another commercial relationship, the Accountants will review the transactions and determine the appropriateness of any revenue allocations);

(B)     Revenues generated from stadium events unrelated to NFL football (e.g., concerts, soccer games) in which the Club or a Club Affiliate makes a non de minimis investment of capital or cash, and the value of, and revenues generated from, stadium-related businesses and/or opportunities unrelated to NFL football in which the Club or an affiliate must invest a non-de minimis amount of capital, cash, or effort to generate revenue (other than real estate development opportunities, which are subject to the reservation in Subsection 1(a)(i)(7) above);

(C)     The value of promotional spots (e.g., television or radio spots) that are received from time to time by the NFL under national media contracts solely for its own use (either to promote the NFL's own football related businesses (and not the businesses of any other party), or for charitable purposes) and not for resale;

(D)     Revenues derived from NFL Attractions (a joint venture that formerly included the NFL and St. Joe Corporation) from the operation of indoor NFL entertainment facilities, with entry rights separate from the stadium, which facilities do not permit the users thereof to view the live performance of players in NFL football games except by media available outside the stadium (except to the extent that revenues derived from NFL Attractions are addressed in the second sentence of Section 1(a)(i)(4) above). This exclusion shall apply so long as the business of NFL Attractions is conducted with a non-NFL third party that holds a non-de minimus interest and participates in the business of NFL Attractions. Each of the parties hereto reserves any positions it may have regarding whether any similar revenues derived from other sources are TR or non-TR;

(E)     The value of complimentary or other no-charge tickets distributed by a Club, up to (but not in excess of) the following levels: (1) 1,700 tickets for each home regular season and pre-season game, or (2)

85

1,250 tickets for each home regular season game and 3,500 tickets for each home pre-season game;

(F)     Specifically designated day-of-game expense reimbursements received by a Club or Club Affiliate from a governmental entity, where such reimbursements are for legitimate expenses that the Club or Club Affiliate has incurred that the governmental entity previously incurred (including in connection with the Club's occupancy of a prior stadium, if the reimbursements arise out of the construction of a new stadium). This exclusion shall not apply to expense reimbursements received in connection with concession sales, operation of parking facilities, signage or advertising sales, or any other revenue generating activity at the stadium other than the conduct of the game itself (e.g., expense reimbursements for game-day security previously provided by the police, and post-game stadium clean-up previously provided by a municipality, are not treated as TR, if such reimbursement otherwise qualifies). All claims for this exclusion shall be supported by appropriate documentation evidencing the extent to which the Club or Club Affiliate incurred the designated day-of-game expense and the extent to which the governmental entity previously incurred the expense. The Parties have agreed that the day-of-game reimbursements received by the Buffalo Bills, Indianapolis Colts, Green Bay Packers, and Philadelphia Eagles shall be excluded as those arrangements existed as of March 8, 2006;

(G)     Investments in or contributions toward the purchase of concession equipment by concessionaires on behalf of a Club or a Club's Stadium, and the value of provided elements related to the operation and maintenance of the soft drink equipment in the Club's Stadium (i.e., dispensing/vending equipment, service), subject to disclosure and NFLPA review and approval of such arrangements; and

(H)     The value of luxury boxes that are (1) used by a Club owner for personal purposes or to promote the Club or the owner's other business interests; or (2) provided to stadium authorities, municipalities, and/or governmental officials, or (3) used or made available for use by the owner(s) of the visiting Club, or (4) provided for the use of a Club head coach; in each case where no revenue is actually received by the Club or a Club Affiliate, except that the value of such luxury boxes will be imputed as TR unless at least one luxury box in the stadium is available and unsold; provided that, in no event shall revenue be imputed for one luxury box that is used by the owner(s) of the Club, and one luxury box that is used or made available for use by the owner(s) of the Visiting Club. Without limiting the foregoing, the value of any luxury box that is provided to a former Club owner in connection with the sale of a Club shall be imputed into TR unless the prior owner is obliged to pay the club periodic consideration (i.e., annual rent) in connection with such use, in which case such consideration will be included as revenue in TR.

(iii)     Notwithstanding any other provision of this Agreement, the

86

NFLPA and NFLMC may agree, on a case-by-case basis, with no limitation on their exercise of discretion, not to include in TR network television revenue to the extent that such revenue is used to fund the construction or renovation of a stadium that results in an increase in TR.

(iv)    [Omitted]

(v)     [Omitted]

(vi)    It is acknowledged by the parties hereto that for purposes of determining Total Revenues:

(1)    NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in Total Revenues) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in Total Revenues), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a); and

(2)    NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities"); and

(3)    The reasonableness and includability in TR of such allocations and transactions between Related Entities shall be determined by the nationally recognized accounting firm jointly retained by the parties, in accordance with the procedures described in Section 10 below.

(vii)   [Omitted]

(viii)  For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to TR, Benefits, Player Costs, Projected TR, Projected Benefits, Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, or Salary, such amounts shall be rounded to the nearest $1,000.

(ix)    [Omitted]

(x)(1)  Without limiting the foregoing, except as specified in Subsections (x)(2) through (x)(7) below, TR shall include all revenues from Personal Seat Licenses ("PSLs") received by, or received by a third party and used, directly or indirectly, for the benefit of the NFL or any Team or Team Affiliate, without any deduction for taxes or other expenses (but subject to the provisions of Appendix H-3, Section C, with respect to PSL refunds). Such revenues shall be allocated in equal portions, commencing in the League Year in which they are received, over the remaining life of the PSL, subject to a maximum allocation period of fifteen (15) years; provided, however, that interest from the League Year the revenues are received until the League Years the revenues are allocated into TR shall be imputed and included in TR, in equal portions over such periods, calculated on an annual compounded basis using the one-year Treasury Note rate published in *The Wall Street Journal* of February 1 during the League Year in which the

87

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

revenues are received. Each equal portion of PSL revenues allocated into TR, plus an equal portion of the imputed interest specified above, shall be referred to as the "Maximum Annual Allocation Amount."

(x)(2)  To the extent that PSL revenues are used to pay for the construction of a new stadium or for stadium renovation(s) that increase TR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), and if such PSL revenues have received a waiver of any applicable League requirement of sharing of "gross receipts," then such PSL revenues will not be included in a particular League Year in TR. Notwithstanding the foregoing, except where, subsequent to the 2005 League Year, the NFLPA has approved the exclusion of PSL revenues from TR in circumstances where the stadium is also supported by a Stadium Credit described in Section 4(e) below, the maximum exclusion of PSL revenues each League Year from TR shall be equal to any increase in TR that directly results from such stadium construction or renovation as calculated in Subsections (x)(3) through (x)(7) below.

(x)(3)  Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of PSL revenues excluded each League Year shall be equal to the Maximum Annual Allocation Amount. If the actual increase in TR directly resulting from such stadium construction or renovations during the first full League Year in which such stadium and/or renovations are put into service (the "First Year PSL Increases") is less than any Maximum Annual Allocation Amount for that League Year or any prior League Year (the "PSL Difference"), then the aggregate PSL Difference for every such League Year (assuming for purposes of calculating such PSL Difference, that the First Year PSL Increase had been received in each such League Year) shall be credited to TR in the immediately following League Year.

(x)(4)  Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a) below) shall determine the increase in TR that directly results each League Year from a stadium construction or renovation funded, in whole or in part, by PSL revenues. In the case of a new stadium, such calculation shall be made by comparing the TR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the TR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the TR directly generated by those specific stadium facilities which are renovated, with the TR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the TR directly generated by the facilities prior to their renovation would equal either zero, or the amount of TR directly generated by any facilities that were replaced by the renovation). If the NFL and the NFLPA

88

agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in TR throughout the stadium (e.g., increased concession, parking or novelty revenues) as being directly generated by the renovation.

(x)(5)  If the calculations set forth in (x)(4) above result in an exclusion of PSL revenues from TR that is less than the Maximum Annual Allocation Amount, the Accountants shall report the amount not excluded from TR as a "Carryover PSL Credit." Such Carryover PSL Credits, if any, shall be deducted from a Team's TR in the first future League Year in which the amount of TR directly generated by the new stadium or the renovated facilities exceeds the Maximum Annual Allocation Amount (the "PSL Excess"), but only up to the amount of the PSL Excess. Each dollar of Carryover PSL Credit may be deducted from a Team's TR only once, and only to the extent of any PSL Excess existing at the time of such deduction.

(x)(6)  Any applicable deduction from TR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by PSL revenues excluded from TR pursuant to Subsection (x)(2) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total PSL revenues described in the first sentence of Subsection (x)(2), and the denominator of which is (2) the total costs for construction of the new stadium or renovations.

(x)(7)  For purposes of this paragraph, the term "PSL" shall include any and all instruments of any nature, whether of temporary or permanent duration, that give the purchaser the right to acquire or retain tickets to NFL games and shall include, without limitation, seat options; seat bonds; and suite bonds or long-term conveyances of suite occupancy rights where proceeds are segregated and unequivocally dedicated to stadium construction (e.g., Founders' Suite Programs) that directly or indirectly give purchasers the right to acquire NFL tickets, provided that the NFLPA shall have the unconditional right to review and determine whether any specific instruments relating to suites qualify as PSLs. PSL revenues shall also include revenues from any other device (e.g., periodic payments such as surcharges, loge maintenance fees, etc.) that the NFL and the NFLPA agree constitutes a PSL.

(x) (8)  Notwithstanding the above or anything else in this Agreement, any exclusions of PSL revenue from TR in respect of PSLs first sold after the 2005 League Year shall be subject to approval by the NFLPA on a case-by-case basis.

(xi)(1)  Notwithstanding Section 1(a)(i)-(iv) above, premium seat rev-

89

enues that otherwise would be included in TR shall not be so included in a particular League Year to the extent that such revenues are used to pay for, or to pay financing costs for, the construction of a new stadium or for stadium renovation(s) that increase TR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), and if such revenues have received a waiver of any League requirement of sharing of "gross receipts." The maximum exclusion of premium seat revenue from TR each League Year shall be equal to any increase in TR that directly results from such stadium construction or renovation as calculated in Subsections (xi)(2) through (xi)(6) below.

(xi)(2) Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of premium seat revenues excluded each League Year shall be equal to the amount that receives a waiver of any League requirement of sharing of gross receipts (the "Non-Shared Amount"). If the actual increase in TR during the first full League Year in which the new stadium or the renovated facilities are put into service (the "First Year Premium Seat Increase") is less than any Non-Shared Amount for that League Year or any prior League Year (the "Premium Seat Difference"), then the aggregate Premium Seat Difference for every such League Year (assuming for purposes of calculating such Premium Seat Difference that the First Year Premium Seat Increase had been received in each such League Year) shall be credited to TR in the immediately following League Year.

(xi)(3) Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a) below) shall determine the increase in TR that directly results each League Year from the stadium construction or renovation funded, in whole or in part, with premium seat revenues. In the case of a new stadium, such calculation shall be made by comparing the TR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the TR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the TR directly generated by those specific stadium facilities which are renovated, with the TR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the TR directly generated by the facilities prior to their renovation would equal either zero, or the amount of TR directly generated by any facilities that were replaced by the renovation). If the NFL and the NFLPA agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in TR throughout the stadium (e.g., increased concession, parking or novelty revenues) as be-

ing directly generated by the renovation.

(xi)(4) If the calculations set forth in (x)(3) above result in an exclusion of premium seat revenues from TR that is less than the Non-Shared Amount, the Accountants shall report the amount not excluded from TR as a "Carryover Premium Seat Credit." Such Carryover Premium Seat Credits, if any, shall be deducted from a Team's TR in the first future League Year in which the amount of TR directly generated by the new stadium or the renovated facilities exceeds the Non-Shared Amount (the "Premium Seat Excess"), but only up to the amount of the Premium Seat Excess. Each Carryover Premium Seat Credit may be deducted from a Team's TR only once, and only to the extent of any Premium Seat Excess existing at the time of such deduction.

(xi)(5) Any applicable deduction from TR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by premium seat revenues excluded from TR pursuant to Subsection (x)(1) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total premium seat Non-Shared Amount dedicated to funding the project during the allocation period, and (2) the denominator of which is the total costs for construction of the new stadium or renovations.

(xi)(6) For purposes of this paragraph, the term "Premium Seat Revenue" shall include revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.

(xi)(7) Notwithstanding the above or anything else in this Agreement, any exclusions of Premium Seat Revenue from TR in respect of premium seat products first sold after the 2005 League Year shall be subject to approval by the NFLPA on a case-by-case basis.

(xi-a) Exclusions from TR of Premium Seat Revenue, and of PSL revenue as described in Subsection (x) above, in respect of funding for stadium projects approved after the 2005 League Year will terminate upon sale of the recipient franchise.

(xii)   The parties may agree to allocate TR received or to be received on an accrual basis in a particular League Year over one or more other League Years.

(xiii)   If, one or more weeks of any NFL season are cancelled or TR for any League Year substantially decreases, in either case due to a terrorist or military action, natural disaster, or similar event, the parties shall engage in good faith negotiations to adjust the provisions of this Agreement with re-

91

spect to the projection of TR and the Salary Cap for the following League Year so that TR for the following League Year is projected in a fair manner consistent with the changed revenue projection caused by such action. In such circumstances, the parties agree to discuss in good faith the possibility of suspending the application of Article XXIV, Section 4(c).

(xiv) Expense Deductions

(1)   The only expense deductions permitted to be taken in calculating Total Revenue are:

(A) a set deduction of five percent (5%) of TR (which set deduction is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below) which includes Youth Football, NFL Europe, Players Inc. payments, NFL Charities, all team operating and day-of-game expenses, and any other category of expenses not previously netted against specific revenues). Set 5% percentage for TR Cost Deduction (i.e., both ceiling and floor);

(B) the set deduction of one and eight-tenths percent (1.8%) of TR described in Section 4(e) below (which set deduction is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below, and is intended to account for private contributions to stadium construction qualifying for support under the G-3 program or any similar successor program, as well as for stadium security expenses), the amount of which set deduction may be increased with the express approval of the NFLPA to up to two and three-tenths percent (2.3%) of TR if private contributions to stadium construction that are approved by the NFLPA shall so justify (i.e., up to an additional one-half of one percent (.5%) of TR may be deducted from the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below, if approved by the NFLPA, as provided in Section 4(e) below);

(C) expense deductions allowed to be netted against related revenues before inclusion of such revenues in TR, as follows:

(i) with respect to Club revenue items set forth in Section 1(a)(i)(3) above, the deduction of only those direct expenses allowed by the NFLPA to be netted against specific revenues of the foregoing types prior to the 2006 League Year (see Appendix H-3 for a non-exclusive list of such deductions, and Section F of Appendix H-3 for the list of deductions applicable to Club Internet operations (including merchandise sales)) and any other deductions specifically approved by the NFLPA after the date hereof; and

(ii) with respect to NFL Ventures and/or its subsidiaries, only those expenses of NFL Ventures and/or its subsidiaries previously allowed by the NFLPA to be netted against specific revenue items of such entities prior to the 2006 League Year (see Appendix H-3 for a non-exclusive list of such deductions and Section F of Appendix H-3 for the list of deductions applicable to NFL Ventures Internet operations (including merchandise sales)), and any other deductions specifically approved by the NFLPA after

92

the date hereof;

(D) expense deductions not referenced in Section 1(a)(xiv)(1)(C) above that were allowed by the NFLPA to be netted against related revenues before inclusion of such revenues in DGR or EDGR prior to the 2006 League Year, including but not limited to such deductions and exclusions relating to PSLs and premium seats as described in Subsections 1(a)(x)-(xi) above, for qualifying projects prior to the 2006 League Year (see Appendix M for examples as to the treatment of such PSLs), and such deductions as are set forth in Appendix H-3 (which provides a non-exclusive list and descriptions of other deductions allowed by the NFLPA prior to the 2006 League Year);

(E) deductions for expenses on additional "new nets" subject to NFLPA approval; and

(F) any other deductions specifically approved by the NFLPA after the 2005 League Year

(2) Otherwise allowable expenses may only be deducted against the revenues to which they directly relate, and only up to the amount of such directly related revenues. If the result of expense netting with respect to a particular revenue item is a negative number, the TR count for such revenue item shall be zero and such negative number may not be used for any purpose.

(b) **Benefits.** "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for:

(i) Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII);

(ii) Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(iii) Injury protection (as described in Article XII);

(iv) Workers' compensation, payroll, unemployment compensation, social security taxes, and contributions to the fund described in Article LIV, Section 4 below;

(v) Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(vi) Expenses for travel, board and lodging for a player participating in an off-season workout program in accordance with Section 7(e)(iv)(3) below;

(vii) Payments or reimbursements made to players participating in a Club's Rookie Orientation Program (as described in Section 4(n) of Article XVII);

(viii) Moving and travel expenses (as described in Sections 2, 3, and 4

93

of Article XLI, and Section 8 of Article XXXVII);

(ix)    Postseason pay (as described in Article XLII and Article XLIII); and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary.

(x)    Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year). Subject to the foregoing, Player medical costs shall include one-third of each Club's expenses for tape used on players and one-third of each Club's player physical examination costs for signed players (player physical examination costs relating to the Combine or for Free Agents whom the Club does not sign are not included in Player Benefit Costs);

(xi)    Severance pay (as described in Article L);

(xii)    The Player Annuity Program (as described in Article XLVIII-A);

(xiii)    The Minimum Salary Benefit (as described in Article XXXVIII-A);

(xiv)    The Performance Based Pool (as described in Article XXXVIII-B);

(xv)    The Tuition Assistance Plan (as described in Article XLVIII-B);

(xvi)    The NFL Players Health Reimbursement Account (as described in Article XLVIII-C);

(xvii)    The "88 Benefit" for former players suffering from dementia (as described in Article XLVIII-D); and

(xviii)    The NFL Player Benefits Committee (as described in Article XLVIII-E).

Without limitation on any other provision of this Agreement, Benefits will not include (1) salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII; (2) any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (3) attorneys' fees, costs, or other legal expenses incurred by Clubs in connection with workers' compensation claims of players. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

(c)    **Salary.**

(i)    "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including

94

Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

(ii)    A player's Salary shall also include any and all consideration received by the player or his Player Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the Impartial Arbitrator that the consideration paid to the player or Player Affiliate for such nonfootball services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar nonfootball playing services from an independent third party; and (2) the percentage of total compensation for nonfootball services received from third parties versus the Team or Team Affiliate.

(iii)    For purposes of this Article, Salary shall be computed pursuant to the additional rules below.

**Section 2. Trigger for Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary:**

(a)    If in any League Year the total Player Costs for all NFL Teams equals or exceeds 56.074% of actual Total Revenues, there shall be a Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary in the amounts set forth below for the next League Year and all subsequent League Years, unless the Salary Cap is removed pursuant to Section 2(b) below. Notwithstanding the immediately preceding sentence, there will be no Guaranteed League-wide Salary, Salary Cap, or Minimum Team Salary in the Final League Year.

(b)    If the total Player Costs of the NFL Teams during any League Year in which the Salary Cap is in effect falls below 46.868% of actual Total Revenues (before taking into account, and exclusive of, any Guaranteed League-wide Salary makeup payments pursuant to Section 3 below), then there shall be no Salary Cap for the next League Year or any succeeding League Year unless and until the Salary Cap again becomes effective in accordance with Section 2(a) above.

**Section 3. Guaranteed League-wide Salary:** In any League Year in which a Salary Cap is in effect, there shall be a Guaranteed League-wide Salary of 50% of Total Revenues. In the event that the Player Costs for all NFL Teams during any League Year in which a Salary Cap is in effect are less than 50% of actual TR for such season, then, on or before April 15 of the next League Year, the NFL shall pay an amount equal to such deficiency directly to play-

ers who played on NFL Teams during such season pursuant to the reasonable allocation instructions of the NFLPA.

*Section 4.* **Salary Cap Amounts:**

(a)    Subject to the adjustments and credits set forth below, the amount of the Salary Cap for each NFL Team in years that it is in effect shall be (1) in the 2006 League Year, $102 million; (2) in the 2007 League Year, $109 million; (3) in the 2008 League Year, 57.5% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (4) in the 2009 League Year, 57.5% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (5) in the 2010 League Year, 58% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; and (6) in the 2011 League Year, 58% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year. Notwithstanding the preceding sentence or anything else in this Agreement, there shall be no Salary Cap in the Final League Year.

(b)(i)   In the event that the Salary Cap amount for the 2006 League Year or the 2007 League Year differs from 57% of Total Revenues, less League-wide Benefits, divided by the number of Teams playing in the NFL during such year, the difference for the 2006 League Year shall be credited or adjusted, as the case may be, in the calculation of the Salary Cap for the 2008 League Year, and the difference for the 2007 League Year shall be credited or adjusted, as the case may be, in the calculation of the Salary Cap for the 2009 League Year.

(ii)     Upon receipt of the information set forth in Section 10(a)(i)(B) below, at the end of the League Year, the parties shall agree upon the amount of the Salary Cap, subject to the adjustments and credits set forth below, for each NFL Team for the Capped League Year, if any, following the next League Year. For example, the parties shall agree at the end of the 2006 League Year on the Salary Cap for the 2008 League Year.

(iii)    Wherever the parties have agreed that a difference in the Salary Cap is to be carried over into a future League Year (e.g., Article XXIV, Section 10(a)(ii)), if the number of Clubs in the NFL changes from the League Year in which the Salary Cap difference originated to the League Year in which it will be applied, the amount of the difference will be adjusted to reflect the different number of Clubs in the NFL.

(c)     The actual dollar amount of the Salary Cap shall not be less than the actual dollar amount of any Salary Cap in effect during the preceding League Year, provided, however, that at no time shall the Projected Benefits, plus the amount of the Salary Cap multiplied by the number of Teams in the NFL, exceed 61.68% of Projected TR. See Appendix O.

(d)   **Adjustment Mechanism**

(i)      An Adjustment ("Adjustment") will be triggered if, during any Capped League Year, League-wide Cash Player Costs exceed or fall below the TR Trigger Percentage for that League Year multiplied by Total Revenues for that League Year (the "Trigger"). The differences shall be defined as the "League Excess" and "League Shortfall," respectively.

(ii)     At the end of each League Year, a determination shall be made as to whether an Adjustment with respect to that League Year has been triggered, and if so, its amount and allocation into future League Years.

(iii)    The "TR Trigger Percentage" shall be 59% in the 2006 and 2007 League Years, 59.5% in the 2008 and 2009 League Years, and 60% in the 2010 and 2011 League Years.

(iv)     "Cash Player Costs" for purposes of this Subsection is the sum of Cash Salary (as defined by Section 4(d)(ix) below), Performance Based Pay, Minimum Salary Benefit, and all costs committed to be spent in that League Year for other Player Benefits.

(v)      "Club Excess" is the amount by which a Club's Cash Player Costs exceed the TR Trigger Percentage multiplied by TR divided by the number of Clubs in the League during the year in which such excess occurs.

(vi)     "Accrued League Excess" is the total of all League Excesses from prior League Years that have not been offset by a League Shortfall.

(vii)    If an Adjustment is triggered by a League Shortfall in any League Year, such amount shall first be reduced by any remaining Accrued League Excess and any remaining balance shall result in a pro rata deduction from each Club's Team Salary, allocated equally among the remaining League Years that may be Capped Years under this Agreement.

(viii)   If an Adjustment is triggered by a League Excess in any League Year, a pro rata share of the League Excess for that League Year shall first be applied to each Club to offset any remaining Team Salary "deductions" that previously arose from any League Shortfall (with such deductions applied first to earlier Capped Years if the amount of Excess to be applied is less than the remaining "deductions" from prior League Years); if after all such Club offsets have been deducted from the League Excess, there remains a positive number in the League Excess on a League-wide basis, such number shall become the Accrued League Excess for that League Year. The League Excess (not the Accrued League Excess) shall also be a "charge" to the Team Salary of the Clubs with a Club Excess for that League Year. Each such Club will bear its proportionate share of the League Excess, the proportion to be determined by reference to each Club's share of the sum of the Club Excesses of the affected Clubs, with such proportionate share allocated equally among the remaining League Years that may be Capped Years under this Agreement; such charge to Clubs with such a Club Excess for that League Year shall be in addition to, and not in lieu of, the League-wide Shortfall adjustment.

97

(ix)     "Cash Salary" for purposes of this subparagraph is the sum of to-tal Paragraph 5 amounts earned by players (applying the valuation rules which apply to deferred salary specified in Section 7(a)(ii)), signing bonus amounts paid or committed (including amounts treated as signing bonus pursuant to this Agreement) (applying to signing bonuses the valuation rules that apply to deferred salary specified in Section 7(a)(ii) below), in-centives that have been earned and paid, or earned and committed to be paid to players (applying the valuation rules which apply to deferred salary specified in Section 7(a)(ii)), grievances settled, termination pay for which a player is eligible, injury settlements, Salary advances that were not in-cluded in Paragraph 5, and anything else paid or provided to players dur-ing that League Year that would be valued under the Salary Cap (e.g., the fair market value of automobiles gifted to players).

(x)     An illustration of the operation of the Adjustment Mechanism described in this Section 4(d) is set forth in Appendix P.

(xi)     If this Agreement is terminated early, there shall be no accelera-tion of outstanding credits or charges.

(e)     **Stadium Credit**

(i)     A Stadium Credit of 1.8% of TR is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) above (i.e., $102 million in the 2006 League Year, $109 million in the 2007 League Year, 57.5% of TR in the 2008 and 2009 League Years, and 58% of TR in the 2010 and 2011 League Years). If a Stadium Credit greater than 1.8% of TR in a League Year results from the sum of (a) Project Cred-its in respect of new G-3 stadium projects and amounts approved by the NFLPA after the 2005 League Year, (b) combined Project Credits in respect of previously approved G-3 stadium projects, (c) any banked credits that may be applied in that League Year as provided below, and (d) the Security Credit, then the excess over 1.8% of TR, up to a maximum of an addition-al one-half of one percent (0.5%) of TR (i.e., up to a maximum of 2.3% of TR), will be deducted from the calculation of the Salary Cap.

(ii)     For purposes of calculating the Stadium Credit:

(a)     the Annual League-wide security cost credit (the "Security Cred-it") shall be the greater of (1) $8 million increased at the rate of five percent (5%) each League Year subsequent to the 2006 League Year provided that, if as a result of the increase, the Stadium Credit exceeds 1.8% of TR, the Se-curity Credit for that League Year shall be reduced to equal the difference between the sum of 1.8% of TR plus the "bank" then-existing, if any, mi-nus the Project Credits for that League Year, or (2) any larger amount specif-ically approved by the NFLPA;

(b)     the term "G-3" shall mean any League stadium construction support program involving League loans or cash contributions to, or in-vestments in, stadium construction projects (including but not limited to the program established by 1999 NFL Resolution G-3 and extended by 2003 NFL Resolution JC-1), but shall not include any League stadium con-

98

struction support program involving temporary exemptions from NFL sharing rules of particular revenue streams;

(c)      the Salary Cap credit counted towards the Stadium Credit in respect of G-3 projects approved and first funded after the 2005 League Year shall be 50% of the Annual Amortization Amount in respect of such stadium, with no cap on the amount of such Salary Cap credit as long as the amounts have been expressly approved by the NFLPA;

(d)      the Salary Cap credit counted towards the Stadium Credit in respect of G-3 projects approved and first funded in or before the 2005 League Year shall be 50% of the Annual Amortization Amount in respect of up to $300 million (present value) in qualifying private contribution to the construction of such stadium (the credits defined in Subsections (c) and (d) are hereinafter referred to as the "Project Credits");

(e)      the "Annual Amortization Amount" for each G-3 stadium shall be the amortization charge for that year in respect of all qualifying private contributions to construction of such G-3 stadium project, calculated (1) over a 15-year period (or less if a shorter amortization period is used) (the "G-3 Amortization Period"), and (2) with interest at an agreed-upon rate based on the NFL's long-term borrowing cost to fund stadium construction support provided in the first year in which such support was provided to such project.

(iii)      If in any Capped Year prior to the Final Capped Year, the sum of that year's Project Credits and Security Credit (the "Actual Annual Credit") is less than the full base amount of the Stadium Credit (i.e., 1.8%), the difference between such base Stadium Credit and such Actual Annual Credit ("banked credits") will be "banked" and available for use (and shall be the first credits used, before any incremental Stadium Credits in excess of 1.8% that may be granted by the NFLPA are used) to offset future years' Actual Annual Credits to the extent such Actual Annual Credits exceed the 1.8% set deduction in any League Year; provided that such banked credits will not be available without the NFLPA's express approval to offset Actual Annual Credits in excess of 2.3% of TR in any such League Year. To the extent that the "bank" is not fully eliminated by application to subsequent Actual Annual Credits, each Club shall receive a deduction from its Team Salary in the Last Capped Year equal to its pro rata share of the unused portion of the "bank" (which deduction from Team Salary shall create additional Room for each Club).

(iv)      If a franchise that received G-3 funding approval is sold during its G-3 Amortization Period, the Project Credit in respect of that franchise will cease (provided that Project Credits in respect of the year the franchise sale is closed will be pro-rated and will cease only as of the closing date of the sale) and the Actual Annual Credit will accordingly be reduced.

(v)(1)  The termination of future Project Credits will be the only mechanism by which the NFLPA's support for G-3 projects is adjusted in the event of Club sales for so long as the NFL's only repayment requirement/re-

capture mechanism in respect of sales of G-3 recipient Clubs is payment to the NFL of the "unamortized balance" of such franchise's G-3 support (calculating such unamortized balance over 15 years on a straight-line basis) plus (a) interest adjustments (if any), (b) any deficiencies in respect of Club guarantees of revenues that are dedicated to and applied to repay League-level borrowings to fund the G-3 support given to the Club, and (c) compensation to other Clubs for stadium credits against the Salary Cap and/or PSL exclusions from TR lost to the League as a result of the sale.

(2)     If the NFL imposes any incremental repayment requirement or recapture mechanism in respect of G-3, PSL, or premium seat support that is applicable when recipient franchises are sold, the NFLMC and the NFLPA will negotiate in good faith an equitable adjustment mechanism in respect of payments made to the NFL in connection with the sale of such recipient franchises, with the objective of providing to the NFLPA recapture or repayment of Project Credits on a basis comparable in nature, as well as proportionate in amount, to the NFL's incremental recapture or receipt of repayment in respect of G-3, PSL, and/or premium seat support. If the parties are unable to agree, the Special Master shall determine the amount or mechanism to be used for an equitable adjustment for the NFLPA.

(vi)     Project Credits in respect of G-3 funding first advanced after the 2005 League Year will begin to count towards the Stadium Credit in the League Year prior to the scheduled opening of the new stadium.

(vii)     There will be no limit on the Project Credit for any individual project approved and first funded after the 2005 League Year, but the qualifying private contributions to the Project Credit, and the resulting Annual Amortization Amount, in respect of each project will be subject to NFLPA approval prior to the initial NFL support funding for such project. Also, in furtherance (and not in limitation) of Section 1(a)(x)(8) above, any proposal for exclusion of PSL or premium seat revenue from TR in respect of PSLs or premium seats to be sold in connection with any stadium receiving G-3 support (and seeking Project Credits in respect of such support) shall be subject to approval by the NFLPA on a case-by-case basis, and all such PSL or premium seat revenue shall be included in TR in the absence of express NFLPA approval.

(viii)     The definition of stadium construction costs used by the NFL as of the end of the 2005 League Year (which has been provided to the NFLPA) to determine the amount of G-3 funds to be advanced to Clubs will be used to calculate the Stadium Credit, except that the capitalized value of rent paid to a third-party (i.e., unaffiliated) landlord in excess of a $2 million annual deductible that is deemed under such NFL definition to be a capital investment will be considered a capital investment for Stadium Credit purposes and will give rise to a Stadium Credit only if (1) a Club commits to pay such excess rent pursuant to documents entered into in connection with, but in advance of commencement of construction on, a stadium construction project; (2) the landlord will be providing bond fund-

100

ing for stadium construction pursuant to such documents; (3) the land-lord's bond funding is used for costs that are "qualifying project costs" under the G-3 program; and (4) the bond funding is greater than the amount of the rent deducted. The NFLPA has the right to review stadium project spending independently to verify that the G-3 stadium construction cost definition has been properly applied, with any disputes subject to review by the Special Master pursuant to Article XXVI.

(ix)     Total TR must increase as a result of each G-3 project, after all TR deductions resulting from the project are counted.

(x)      Notwithstanding anything else in this Agreement, if a Club and/or Club owner owns a stadium constructed with G-3 funding, then revenues derived from non-football events/operations at the stadium are first deemed to be applied to cover non-football operating costs, then to cover general stadium overhead and operating costs (excluding NFL event game day costs). The amount of any excess non-football event revenues remaining after such subtractions will be applied to reduce the outstanding "private contribution" towards the stadium project, thus producing a corresponding 50% reduction in the Salary Cap deduction in respect of the G-3 Project. (Example: Team-owned stadium has $10 million in gross concert income, direct concert costs of $2 million, and stadium overhead of $4 million. $4 million in net concert income is applied to reduce the outstanding "private contribution" in respect of the stadium project, which will result in a lower Salary Cap deduction amount.) If the amount of the "private contribution" has been fully amortized, revenues from non-football events/operations for such stadium will not constitute Total Revenues.

(xi)     PSL/premium seat deductions from TR are not available for any G-3 stadium project approved and first funded before the 2006 League Year. As to any G-3 stadium project (including projects approved and first funded before the 2006 League Year), (a) no deductions from TR are available for naming rights revenues (to the extent received by or on behalf of a Club or Club Affiliate) that are used for the construction or renovation of such stadiums, but such revenues (if so used) shall constitute private contributions to the project for purposes of calculating the private contribution thereto (which will give rise to Project Credits to the extent such credits are approved by the NFLPA); and (b) there shall be no deduction in any League Year through the 2008 League Year for depreciation as to luxury boxes in any stadium for which a Stadium Credit is given (the parties reserve their respective rights and positions with respect to depreciation for luxury boxes thereafter). As to any G-3 stadium project approved and first funded after the 2006 League Year, all deductions from Total Revenues or otherwise in the calculation of the Salary Cap with respect to such stadium will be subject to approval by the NFLPA, in order for the project to qualify under this Subsection (e).

101

*Section 5.* **Minimum Team Salary:**

(a)      For the 2006 League Year, there shall be a guaranteed Minimum Team Salary of 84% of the Salary Cap. For each subsequent Capped Year, the percentage set forth in the prior sentence shall increase 1.2%, but in no event shall the percentage be greater than 90%. For example, in the 2008 League Year, there shall be a guaranteed Minimum Team Salary of 86.4% of the Salary Cap. Each Team shall be required to have a Team Salary of at least the Minimum Team Salary at the end of each Capped Year. There shall be no Minimum Team Salary in the Final League Year.

(b)      Nothing contained herein shall preclude a Team from having a Team Salary in excess of the Minimum Team Salary, provided it does not exceed the Salary Cap.

(c)      Any shortfall in the Minimum Team Salary at the end of a League Year shall be paid, on or before April 15 of the next League Year, by the Teams having such shortfall, directly to the players who were on such Teams' roster at any time during the season, pursuant to reasonable allocation instructions of the NFLPA.

(d)      If the NFL agrees, or a judgment or award is entered by the Special Master, that a Team has failed by the end of the then current League Year to make the payments required to satisfy a Team's obligations to pay the Minimum Team Salary required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocation instructions of the NFLPA).

*Section 6.* **Computation of Team Salary:** During any League Year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary:

(a)      **Player Contracts.** Subject to the rules below in Section 7 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised, options, shall be included in Team Salary.

(b)      **Tenders.**

(i)      Drafted Rookies' Salaries shall be tendered automatically at the Rookie Minimum Active List Salary as of the day of the Draft and shall be included in Team Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Tuesday following the tenth week of the regular season (if the player is unsigned).

(ii)      For players with less than three (3) Accrued Seasons whose contracts have expired, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished.

(iii)      For players who are Restricted Free Agents, the Qualifying Offer will be included in Team Salary when tendered until the player is signed,

**102**

the Qualifying Offer is withdrawn, or a "June 1 tender" (which may be made on or before June 1) is made. If the player is unsigned and the Team makes a June 1 tender or June 15 tender, such tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(iv)     For players who are Unrestricted Free Agents, the June 1 tender, if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(v)     For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi)     All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c)     **Practice Squad Contracts.** Any Practice Squad contract Salaries shall be included in Team Salary except to the extent otherwise provided in Article XXXIV, Section 5.

(d)     **Termination Pay.** Any type of Termination Pay liability will be included in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e)     **Grievances.** When a player salary grievance is filed against a Team, 50% of the amount claimed (or, for a player whose contract qualifies under Article XXXVIII-A, 50% of the player's Salary Cap count, prorated to reflect the number of weeks remaining in the regular season) will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first; at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Team are more than the original 50% attributions and put the Team over the Salary Cap, the excess will be deducted from the Team's Salary Cap in the following League Year; if the net total grievance amounts paid are less than the original 50% attributions and the Team finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Team's Salary Cap for the following League Year. If an award or settlement is made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 50% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 50% attribution, the difference shall be deducted from Team Salary when the award is made.

(f)     **Expansion Bonuses.** Except as set forth in Article XXXI (Expansion), any expansion bonuses paid to players shall be included in Team Salary.

103

(g)     **Other Amounts.** Any other Salary not listed above paid to players shall be included in Team Salary.

*Section 7.* **Valuation of Player Contracts:** Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap:

(a)     **Paragraph 5.**

(i)     The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between March 1 and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 7):

(1)     Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2)     Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii)     **Deferred Salary.** Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be considered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the one-year Treasury Note rate published in *The Wall Street Journal* on February 1 in the year earned. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

(b)     **Signing Bonuses.**

(i)     **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract (on a straight-line basis, unless subject to acceleration or some other treatment as provided in this Agreement), with a maximum proration of six years, in determining Team and Player Salary, except that:

(1)     Maximum proration shall be five (5) years (a) for contracts entered into during the period after the last regular season game of the 2005 League Year through the last regular season game of the 2006 League Year and (b) for contracts entered into during the period after the last regular season game of the League Year preceding the Final Capped Year through the end of the Final Capped Year. For purposes of this Subsection 7(b)(i)(1) only, a renegotiation or extension of a Player Contract shall be treated as a new Player Contract.

(2)     Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control,

such issue shall be resolved by the Impartial Arbitrator.

(3)　　With respect to the proration of signing bonuses for Player Contracts entered into by Rookie players in which the player has the right to terminate based solely upon reporting, making the roster and/or playtime, such conduct shall automatically be deemed "within his sole control" unless the exercise of the right to terminate is also conditioned upon the following playtime requirements: (1) for players drafted in the first round, at least 35% of the plays if the triggering condition occurs in the first year of the Player Contract, and at least 45% of the plays if in any subsequent year; (2) for all other Rookie players, at least 15% of the plays if the condition occurs in the first year of the Player Contract, and at least 30% of the plays if in any subsequent year. The playtime requirements set forth above do not affect the signing bonus allocation for any contract entered into by players other than Rookies.

(4)　　For any multiyear Player Contract entered into in a Capped Year prior to the last Capped Year that extends into any Uncapped Year, if (i) the sum of the player's Paragraph 5 Salary, roster bonuses that are based upon the player making any of the Club's roster categories without limitation, and reporting bonuses during all Capped Years of the Contract (but, if there are fewer than three (3) remaining Capped Years, during the first three (3) years of the Contract) is in the aggregate less than (ii) the portion of the Contract's signing bonus that would be allocated to those League Years if the signing bonus were prorated equally over the term of the Contract, then: the difference between the amounts calculated pursuant to (ii) and (i) of this sentence, up to 50% of the portion of the signing bonus that would otherwise be allocated to the Uncapped Years (the "Difference"), shall be deducted in equal portions from those Uncapped Years and reallocated in equal portions over the Capped Years of the Contract (or, if there are fewer than three (3) Capped Years within the term of the Contract, over the first three (3) years of the Contract). For purposes of this Subsection only, a renegotiation shall be treated as if it is an entirely new Player Contract.

(5)　　[Omitted]

(6)　　[Omitted]

(7)　　If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

(8)　　Any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The player shall receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X of the Stipulation and Settlement Agreement and Arti-

105

cle XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

(ii)   **Acceleration.**

(1)    For any player removed from the Team's roster, or whose Contract is assigned to another Club via waivers or trade, on or before June 1 in any League Year prior to the Final Capped Year, or at any time during the Final Capped Year, any unamortized signing bonus amounts will be included in Team Salary for such League Year, except that for each League Year preceding the Final Capped Year, each Club may designate up to two (2) Player Contracts that, if terminated on or prior to June 1 and if not renegotiated after the last regular season game of the prior League Year, shall be treated (except to the extent prescribed by Section 7(d)(iii) below) as if terminated on June 2, i.e., the Salary Cap charge for each such contract will remain in the Club's Team Salary until June 2, at which time its Paragraph 5 Salary and any unearned LTBE incentives will no longer be counted and any unamortized signing bonus will be treated as set forth in Subsection (2) below. If acceleration puts a Team over the Salary Cap, the Team will have seven (7) days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)    For any player removed from the Team's roster or whose Contract is assigned via waivers or trade after June 1, except in the Final Capped Year, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

(3)    In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, the Team Salary of the player's new team will not include any portion of the signing bonus.

(4)    Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary (notwithstanding the foregoing, if the player has one or more rights to terminate based upon one or more not "likely to be earned" incentives and the player also being on the roster at a subsequent time, no acceleration shall occur until both the incentive(s) and the roster precondition(s) have been satisfied). To the extent that such acceleration puts the Team over its Salary Cap in a League Year prior to the Final Capped Year, the difference shall be deducted from its Salary Cap for the following year; to the extent that such acceleration puts the Team over the Salary Cap in the Final Capped Year, the Team will have seven (7) days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

106

(5)     The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)     [*Omitted*]

(iv)     **Amounts Treated as Signing Bonuses.** For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)     Any amount specifically described in a Player Contract as a signing bonus;

(2)     Any guaranteed reporting bonus;

(3)     Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)     Any option buyout amount, when paid or guaranteed;

(5)     The difference between the Salary in the second contract year and the first contract year when Salary in the second contract year is less than half the Salary called for in the first year of such Contract;

(6)     Any reporting bonus in the season of signing when a contract is signed after the start of training camp;

(7)     Any roster bonus in the season of signing when a contract is signed after the last pre-season game;

(8)     Any salary advance paid on a guaranteed basis;

(9)     Any guaranteed bonus tied to workouts;

(10)     Any salary advance which a player is not obligated to repay;

(11)     In a Player Contract executed after September 28, 2005, any amount of a Salary advance, off-season workout bonus, off-season roster bonus, or off-season reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, on a non-contingent basis for all of the guarantees. (Notwithstanding Subsections (8)-(9) above, a Salary advance, off-season workout bonus, off-season roster bonus, or off-season reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, but on a contingent basis for any of the potential guarantees, shall be included in Team Salary only in the League Year in which the bonus is earned by the player; e.g., in the case of an off-season roster bonus, in the League Year in which the player is required to be on the roster to earn the bonus. The rules set forth in this Subsection (11) shall not affect Salary Cap accounting for any other purpose.);

(12)     In a Player Contract, or any renegotiation or extension of a Player Contract, that is executed in the Final Capped Year, each of the following, if it is to be earned or paid to the player in the Final League Year (which is an Uncapped Year): (a) any Salary advance which the player is not and cannot be obligated to repay; (b) any off-season workout bonus that is contingent upon the player's participation in less than 32 days of the Club's off-season workout program; (c) any off-season roster bonus; and (d) any

107

off-season reporting bonus;

(13)    In a Player Contract executed on or before September 28, 2005, any Paragraph 5 Salary which was guaranteed for 2006 or earlier and treated as a signing bonus on or before September 28, 2005;

(14)    In a Player Contract executed on or before September 28, 2005, any Paragraph 5 Salary which was guaranteed for 2007 or later and treated as a signing bonus on or before September 28, 2005, in which case any allocation to 2005 or earlier shall remain as is, and any allocation to 2006 or later shall be reallocated to occur entirely in the year(s) of the guarantee(s);

(15)    In a Player Contract executed on or before September 28, 2005, any roster bonus or Paragraph 5 Salary that the Club had the right to guarantee for skill, when the Club subsequently exercises the right to guarantee such bonus or Paragraph 5 Salary for skill;

(16)    Any bonus to be paid to a player solely for fulfilling his obligations to play under his Player Contract without seeking to renegotiate and/or "holding out" (i.e., a "completion bonus"), and which bonus is otherwise guaranteed for skill and injury, <u>except</u> that the amount of any such completion bonus shall be calculated at its present value, computed at the one-year Treasury Note rate published in *The Wall Street Journal* on February 1 of the League Year in which the Player Contract is executed. Further, if any event occurs which extinguishes the player's right to receive such completion bonus, any amount of the bonus that has previously been included in Team Salary shall be immediately added to the Team's Salary Cap for the current League Year, if such event occurs prior to June 1, or for the next League Year, if such event occurs after such date, with the remainder of the bonus that has been allocated to Team Salary for future League Years immediately extinguished.

(17)    Any relocation bonus which is individually negotiated between a player and a Club; and

(18)    Any increase in a player's Salary for the current League Year that occurs as a result of the renegotiation or extension of the player's Contract in that League Year, if the NFL Management Council does not receive notice of the salary terms of such an executed extended or renegotiated contract prior to 4:00 p.m. (New York Time) on the Monday of the tenth week of the regular season. The then-existing provisions of the CBA will govern the Salary Cap valuation of such a renegotiation or extension in the Final Capped Year. The parties have reserved their respective positions regarding the CBA's requirements for any such renegotiation or extension in the Final Capped Year.

Notwithstanding the above provisions or anything else in this Agreement, but subject to Section 7(d) below, any guaranteed Paragraph 5 Salary in a Player Contract executed after September 28, 2005, including but not limited to renegotiations or extensions of pre-existing Player Contracts, will not be treated as a signing bonus solely on the basis of the guarantee.

(v)    **Credit for Signing Bonuses Refunded.** In the event that a Team

receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a signing bonus, such amount as has previously been included in Team Salary shall be added to the Team's Salary Cap for the next League Year. For purposes of this Subsection, to the extent that they constitute reimbursement for previously paid signing bonus, insurance proceeds received by a Team as beneficiary to cover the player's inability to perform services required by his Player Contract shall be deemed a "refund from the player" if (a) the Club or the player purchased the policy (b) the amounts covered by the policy are so specified in the Player Contract; and (c) the policy is made available for inspection upon request by the Management Council or the NFLPA.

(c)     **Incentives.**

(i)     Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

(ii)     At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

(iii)     At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equaling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

(iv)     Any team performance will be automatically deemed to be "likely to be earned" if the Team met or exceeded the specified performance during the prior League Year, and will be automatically deemed to be "not likely to be earned" if the Team did not meet the specified performance during the prior League Year.

(v)     Any incentive bonus that depends on team performance in any category not identified in Exhibit A hereto automatically will be deemed "likely to be earned."

(vi)     Any incentive bonus that depends on a player's individual performance in any category not identified in Exhibit B hereto automatically will be deemed "likely to be earned." Any incentive bonus that depends on

109

a player's individual performance in categories other than those used to assess performance at the player's primary position automatically will be deemed "likely to be earned."

(vii)   Any incentives "likely to be earned" by Rookies shall be valued at the percentages set forth in Exhibit C hereto.

(viii)   Any incentives based on a player receiving Honors or Media Recognition not listed on Exhibit D hereto shall automatically be deemed "likely to be earned."

110

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT A)
TEAM INCENTIVES

| OFFENSE | DEFENSE | SPECIAL TEAMS |
|---|---|---|
| Points scored by offense | Points allowed by defense | Own punt return average |
| Touchdowns scored by offense | Touchdowns allowed by defense | Own kickoff return average |
| Total offense (net yards) | Total defense (net yards) | Opposition punt return average |
| | | Opposition kickoff return average |
| Average net yards gained per rushing play | Average net yards given up per rushing play | |
| Average net yards gained per passing play | Average net yards given up per passing play | |
| Sacks allowed | Sacks | |
| Passing % completed | Interceptions | |

| ALL |
|---|
| Wins |
| Playoffs |
| Conference Championship |
| Super Bowl |
| Touchdowns on returns and recoveries |
| Net difference takeaways/giveaways |

(EXHIBIT B)
## INDIVIDUAL INCENTIVES

**RUSHING**
Total yards

Average yards
(100 attempts)

Touchdowns

**PASSING**
Passer rating
(224 attempts)

Completion percentage
(224 attempts)

Interception percent
(224 attempts)

Total yards

Yards per pass
(224 attempts)

Touchdown passes

**RECEIVING**
Total receptions

Total yards

Average yards
(32 receptions)

Touchdowns

**DEFENSE**
Interceptions

Interception return yards

Touchdowns on interception
returns

Opponent fumble recoveries

Opponent fumble return yards

Touchdowns on opponent
fumble returns

Sacks

**PUNT RETURNS**
Total yards

Average (20 returns)

Touchdowns

112

(EXHIBIT B)
**INDIVIDUAL INCENTIVES**

**KICKOFF RETURNS**
Total yards
Average (20 returns)
Touchdowns

**PUNTING**
Gross average (40 punts)
Net average (40 punts)
Inside 20-yard line

**PLACEKICKING**
Total points
Field goals
Field goal percentage
(16 attempts)
Field goal percentage
0-19 yards (4 attempts)
Field goal percentage
20-29 yards (4 attempts)
Field goal percentage
30-39 yards (4 attempts)
Field goal percentage
40-49 yards (4 attempts)
Field goal percentage
50 yards or longer (3 attempts)

**OTHERS**
Roster bonuses
Reporting bonuses
Playtime bonuses
(excluding special teams)
Special teams playtime

113

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| CATEGORY | | PERCENT COUNTED |
|---|---|---|
| ROSTER BONUSES | | |
| (regular season) | | |
| All Drafted | | 100% |
| Undrafted | | 30% |
| ROSTER BONUSES | | |
| (pre-season) | | |
| All Players | | 100% |
| PLAYING TIME | ROUNDS 1-3 | |
| | Up to 33% | 100% |
| | 34% - 75% | 75% |
| | 76% - 90% | 50% |
| | 91% - 100% | 25% |
| | ROUNDS 4-8 | |
| | Up to 25% | 100% |
| | 26% - 33% | 75% |
| | 34% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | UNDRAFTED | |
| | Up to 15% | 100% |
| | 16% - 25% | 75% |
| | 26% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | All percentages will round to the nearest whole percentage (e.g., .05 is rounded to 1.0) | |
| SPECIAL TEAMS | ROUNDS 1 - 3 | 100% |
| PARTICIPATION | ROUNDS 4 - 8 | 66% |
| | UNDRAFTED | 50% |
| HONORS | ROUNDS 1 - 2 | |
| (First or Second Team) | All-Rookie | 100% |
| | All NFL, Pro Bowl | 5% |
| | All Conference | 10% |
| | ALL OTHERS | |
| | All-Rookie | 15% |
| | All Conference | 5% |
| | ALL | |
| | Rookie of Year ("ROY") | 0% |
| | NFL or Conf. ROY | 0% |
| | ROY - Offense - NFL | 0% |
| | ROY - Defense - NFL | 0% |

114

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

**RUSHING**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Rushing | Up to 150 yards | 100% |
| | 151 - 350 yards | 75% |
| | 351 - 500 yards | 66% |
| | 501 - 700 yards | 33% |
| | 701 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 100 yards | 100% |
| | 101 - 350 yards | 66% |
| | 351 - 650 yards | 25% |
| | 651 yards or more | 0% |
| Average Yards | ROUNDS 1 - 3 | |
| (100 attempts) | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 66% |
| | 4.01 - 4.49 | 33% |
| | 4.5 or more | 0% |
| | ALL OTHERS | |
| | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 50% |
| | 4.01 - 4.49 | 25% |
| | 4.5 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

115

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

**PASSING**

| | | |
|---|---|---|
| Passer Rating | ROUNDS 1 - 3 | |
| (224 attempts) | 50 rating or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 50% |
| | 90.00 - 100.00 | 33% |
| | 100.01 or more | 0% |
| | ALL OTHERS | |
| | 50.00 or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 25% |
| | 90.01 or more | 0% |
| Completion Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | Up to 52% | 100% |
| | 52.1 - 56% | 66% |
| | 56.1 - 59% | 33% |
| | 59.01% or more | 0% |
| | ALL OTHERS | |
| | Up to 52% | 100% |
| | 52.1 - 56% | 50% |
| | 56.1 - 59% | 25% |
| | 59.01% or more | 0% |
| Interception Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | 3.0% or more | 100% |
| | 2.7 - 2.9% | 66% |
| | 2.1 - 2.6% | 33% |
| | 2.0% or less | 0% |
| | ALL OTHERS | |
| | 3.0% or more | 100% |
| | 2.7 - 2.9% | 50% |
| | 2.1 - 2.6% | 25% |
| | 2.0% or less | 0% |

116

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Passing | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 25% |
| | 1,201 yards or more | 0% |
| Yards Per Pass | ROUNDS 1 - 3 | |
| (224 attempts) | Under 6 | 100% |
| | 6.0 - 7 | 66% |
| | 7.1 - 8 | 33% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| | ALL OTHERS | |
| | Under 6 | 100% |
| | 6.0 - 7 | 50% |
| | 7.1 - 8 | 25% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| Touchdown Passes | ROUNDS 1 - 3 | |
| | Under 11 | 100% |
| | 12 - 16 | 66% |
| | 17 - 23 | 33% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |
| | ALL OTHERS | |
| | Under 11 | 100% |
| | 12 - 16 | 50% |
| | 17 - 23 | 25% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

RECEIVING

| Total Receptions | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 20 catches | 100% |
| | 21 - 30 catches | 75% |
| | 31 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| | ALL OTHERS | |
| | Up to 10 catches | 100% |
| | 11 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |

| Total Yards Receiving | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 200 yards | 100% |
| | 201 - 300 yards | 75% |
| | 301 - 400 yards | 50% |
| | 401 - 800 yards | 25% |
| | 801 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 150 yards | 100% |
| | 151 - 250 yards | 75% |
| | 251 - 350 yards | 50% |
| | 351 - 700 yards | 25% |
| | 701 yards or more | 0% |

| Average Yards (32 receptions) | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 75% |
| | 14.6 - 16.5 | 50% |
| | 16.6 - 18.5 | 25% |
| | 18.6 or more | 0% |
| | ALL OTHERS | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 66% |
| | 14.6 - 16.5 | 33% |
| | 16.6 - 18.5 | 10% |
| | 18.6 or more | 0% |

118

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| Receiving Touchdowns | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

**TOTAL OFFENSE**

| Total Yards | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 10% |
| | 1,201 yards or more | 0% |
| Scoring | ROUNDS 1 - 3 | |
| | 2 - 28 points | 100% |
| | 29 - 65 points | 50% |
| | 66 - 75 points | 25% |
| | 76 points or more | 0% |
| | ALL OTHERS | |
| | 2 - 28 points | 100% |
| | 29 - 55 points | 50% |
| | 56 - 75 points | 10% |
| | 76 points or more | 0% |

119

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

**DEFENSE**

| | | |
|---|---|---|
| Interceptions | ROUNDS 1 - 3 | |
| | 1 - 5 | 100% |
| | 6 - 10 | 50% |
| | 11 or more | 0% |
| | ALL OTHERS | |
| | 1 - 3 | 100% |
| | 4 - 6 | 33% |
| | 7 or more | 0% |
| Interception Return Yards | ROUNDS 1 - 3 | |
| | 0 - 85 | 100% |
| | 86 - 150 | 66% |
| | 151 - 190 | 33% |
| | 191 or more | 0% |
| | ALL OTHERS | |
| | 0 - 65 | 100% |
| | 66 - 85 | 50% |
| | 86 - 110 | 25% |
| | 111 or more | 0% |
| Touchdowns on Interception Returns | ALL | |
| | 1 | 100% |
| | 2 | 50% |
| | 3 or more | 0% |
| Opponent Fumble Recoveries | ALL | |
| | 1 - 2 | 100% |
| | 3 - 4 | 50% |
| | 5 or more | 0% |
| Opponent Fumble Return Yards | ROUNDS 1 - 3 | |
| | 0 - 40 | 100% |
| | 41 - 65 | 66% |
| | 66 - 80 | 33% |
| | 81 or more | 0% |
| | ALL OTHERS | |
| | 0 - 30 | 100% |
| | 31 - 55 | 50% |
| | 56 - 75 | 25% |
| | 76 or more | 0% |

120

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Touchdowns On | ALL | |
| Opponent Fumble | 1 | 100% |
| Returns | 2 | 50% |
| | 3 or more | 0% |
| Sacks | ROUNDS 1 - 3 | |
| | .5 - 4 sacks | 100% |
| | 4.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| | ALL OTHERS | |
| | .5 - 3 sacks | 100% |
| | 3.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |

PUNT RETURNS

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 224 | 100% |
| | 225 - 349 | 33% |
| | 350 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 7.9 | 100% |
| | 8.0 - 10.9 | 33% |
| | 11.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

121

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

### KICKOFF RETURNS

| Total Yards | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 599 | 100% |
| | 600 - 649 | 33% |
| | 650 or more | 0% |
| Average<br>(20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19.9 | 100% |
| | 20.0 - 21.9 | 33% |
| | 22.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

### PUNTING

| Gross Average<br>(40 punts) | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 42.4 | 100% |
| | 42.5 - 43.9 | 33% |
| | 44.0 or more | 0% |
| Net Average<br>(40 punts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 35.9 | 100% |
| | 36.0 - 37.9 | 33% |
| | 38.0 or more | 0% |
| Inside 20-yard line | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 23 | 33% |
| | 24 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
**ROOKIE "LIKELY TO BE EARNED" INCENTIVES**

**PLACEKICKING**

| | | |
|---|---|---|
| Total Points | ROUNDS 1 - 3 | 100% |
| | Up to 86 points | 100% |
| | 87 - 95 points | 75% |
| | 96 - 104 points | 50% |
| | 105 - 113 points | 10% |
| | 114 points or more | 0% |
| | ALL OTHERS | |
| | Up to 75 points | 100% |
| | 76 - 90 points | 66% |
| | 91 - 99 points | 33% |
| | 100 - 109 points | 10% |
| | 110 points or more | 0% |
| Field Goals | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 26 | 33% |
| | 27 or more | 0% |
| Field Goal Percentage (16 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 75% | 100% |
| | 75.1 - 80% | 33% |
| | 80.1 - 100% | 0% |
| Field Goal Percentage 0-19 yards (4 attempts) | ALL | 100% |
| Field Goal Percentage 20 - 29 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 85% | 100% |
| | 85.1 - 95% | 33% |
| | 95.1 - 100% | 0% |
| Field Goal Percentage 30 - 39 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 70% | 100% |
| | 70.1 - 90% | 33% |
| | 90.1 - 100% | 0% |

123

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 40 - 49 yards | ALL OTHER | |
| (4 attempts) | 0 - 55% | 100% |
| | 55.1 - 70% | 33% |
| | 70.1 - 100% | 0% |
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 50 yards or longer | ALL OTHERS | |
| (3 attempts) | 0 - 45% | 100% |
| | 45.1 - 60% | 33% |
| | 60.1 - 100% | 0% |

124

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT D)
### HONORS AND RECOGNIZED MEDIA

**VETERAN HONORS**
PRO BOWL
1ST & 2ND ALL NFL
1ST & 2ND ALL CONFERENCE
SUPER BOWL MVP (ROZELLE TROPHY)
MVP — NFL
OFFENSIVE PLAYER OF YEAR — NFL OR CONF
DEFENSIVE PLAYER OF YEAR — NFL OR CONF
PLAYER OF YEAR — NFL OR CONF

**VETERAN MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
FOOTBALL NEWS
FOOTBALL DIGEST
USA TODAY
COLLEGE & PRO FOOTBALL WEEKLY

**ROOKIE HONORS (FIRST OR SECOND TEAM)***
**ROUNDS 1-2**
ALL ROOKIE
ALL NFL, PRO BOWL
ALL CONFERENCE
**ALL OTHERS**
ALL-ROOKIE
ALL CONFERENCE
**ALL**
ROOKIE OF YEAR — NFL OR CONF
ROOKIE OF YEAR — OFFENSE — NFL
ROOKIE OF YEAR — DEFENSE — NFL

**ROOKIE MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS

* *See* Exhibit C for Rookie Honors percentages

125

(ix)    The following is a non-exclusive list of rules that apply to incentives for Rookies:

(1) If the incentive is written for leading the Club in any official League statistical category (assuming it is on Exhibit A or B), it shall be valued at 0%;

(2) Rookie incentives shall be valued at 100%, for:

(A)    Any incentive written for any ranking other than first on the Club in any official League statistical category;

(B)    Any team statistic or team unit statistic, if the statistic was achieved in the prior season (based on prior season's performance);

(C)    Any incentives within the sole control of the player (e.g., non-guaranteed reporting bonuses, workouts, weight clauses, etc.);

(D)    Any relocation or completion bonus;

(E)    Any incentive not measured by official NFL statistics (i.e., hurries, tackles and assists) or incentives based on subjective standards;

(F)    Any guaranteed salary or bonus;

(G)    Any pre-season or off-season statistics;

(H)    Any incentive based upon another player's performance; and

(I)    Any incentives based on leading the team in punting/kicking.

(3) If the incentive is written for leading the team in kick returns or punt returns, and the player qualifies under the minimum standard established by the League for those statistical categories, then the following percentages shall be counted:

| | |
|---|---|
| ROUNDS 1 - 3 | 100% |
| ROUNDS 4 - 5 | 33% |
| ROUNDS 6 - 8 | 10% |
| ALL OTHERS | 0% |

(4) If a Rookie has an incentive bonus for touchdowns, the rushing and receiving touchdowns likely to be earned levels will apply to value the incentive;

(5) If a Rookie non-kicker has a Total Points incentive, the total points likely to be earned levels for a rookie kicker will apply to value the incentive.

(6) For Rookies, each component of non-cumulative incentives is calculated individually, and only the highest component amount is counted. For example, an incentive clause for a first-round running back that provides for $10,000 for up to 150 yards or $20,000 for 151-350 yards is counted as $15,000. (This amount is arrived at by taking the greater of 100% of $10,000 or 75% of $20,000, which equals $15,000. Only the higher component amount of $15,000 is counted).

(x)    [Omitted]

(xi)    Any team performance-related incentive will be revalued under

126

the "likely to be earned" rules if the contract is assigned to a new Team through trade or waiver.

(xii)    Any renegotiated contract will be revalued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a preexisting contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

(xiii)    Other than as set forth in Subsection (xiv) below, any incentive bonus to an offensive player that is based upon the defensive team's or special team's performance automatically will be deemed "likely to be earned." Conversely, any incentive bonus to a defensive player that is based upon the offensive team's or special team's performance automatically will be deemed "likely to be earned." Any incentive bonus based upon another player's performance automatically will be deemed "likely to be earned."

(xiv)    Any incentive bonus in a contract signed by a Rookie that is based upon special team performance automatically will be deemed "likely to be earned," except for an incentive bonus to a Rookie kicker or Rookie punter that is based upon improvement in the performance of the kicking or punting team. Any incentive bonus to a player who is not a Rookie that is based upon special team performance automatically will be deemed "likely to be earned" unless the player played in at least 50% of his team's special team plays in the previous season.

(xv)    Any incentive bonus based on the team's performance automatically will be deemed "likely to be earned" if it sets a minimum level of statistical performance that is equal to or lower than that achieved by the team finishing fifth from the bottom in the League in the applicable category during the previous season. For example, an incentive bonus based on a team winning at least a specified number of games will be evaluated by determining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.

(xvi)    Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 28th in the League in total offense will be deemed "likely to be earned" in a League consisting of 32 teams; similarly, an incentive bonus based on

127

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

a team finishing 14th in its Conference will be deemed "likely to be earned" in a Conference consisting of 16 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

(xvii)   Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

(xviii)  In any Player Contract signed by a Rookie, if more than three (3) different team performance categories are included as incentives, all but the three (3) incentives with the lowest dollar value automatically will be deemed "likely to be earned." For Player Contracts signed by Rookies selected in rounds one and two of the NFL draft, any team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 35% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 45% of the plays for any team incentives that apply in any subsequent year of such a contract. For Player Contracts signed by all other Rookies, a team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 15% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 30% of the plays for any team incentives that apply in any subsequent year of such a contract. The provisions of this paragraph supplement and do not override Subsection (ix)(2)(B) above. The calculation of these playtime requirements shall exclude special teams plays.

(xix)    In any Player Contract signed by a player other than a Rookie, if more than three (3) different team performance categories are included as incentives, covering the Final Capped Year or thereafter, all but the three (3) incentives with the lowest dollar value automatically will be deemed "likely to be earned." In addition, any team performance bonus for a player other than a Rookie covering the Final Capped Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determination of whether the incentive is "likely to be earned" will be made pursuant to Article XXIV, Section 7(c)(i). The calculation of these playtime requirements shall exclude special teams plays.

(xx)     Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year. For Rookies, it will be based on 75% of the team leader on the Rookie's team in the specified performance category in the previous year. If not initially counted as "likely to be earned," such incentives shall be counted imme-

128

diately towards the Salary Cap and Entering Player Pool when they are earned.

(xxi)   Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie quarterback who was drafted in the first round, any incentive bonus for leading his team in any quarterback category in his third NFL season or thereafter automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie running back who was drafted in the first round, any incentive bonus for leading his team in any running back category automatically will be deemed "likely to be earned." The provisions of this paragraph shall apply notwithstanding Subsections (ix)(1) and (ix)(2)(A) above.

(xxii)   Any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned at 100 percent of its value, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except: (1) as provided in Subsection (xx) above in regards to per play or per game occurrences; (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid; (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately; or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

(xxiii)   Any incentive bonus which a player and a Club agree to that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

(xxiv)   Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Pre-season roster bonuses are automatically deemed "likely to be earned."

(xxv)   Any incentive bonus (or portion thereof) that is earned during the Final Capped Year, but which had not been deemed likely to be earned at 100 percent of its value during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the Final Capped Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the Final Capped Year, become impossible for the player to attain.

(xxvi)   To determine the value of an incentive clause for Salary Cap purposes, under either Subsection (xxii) or (xxv) above, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had

129

1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

(xxvii)  If more than eight (8) different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight (8) incentives with the lowest dollar value automatically will be deemed "likely to be earned." For purposes of this paragraph, each conjunctive combination of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X," shall be counted as one performance category), and each disjunctive combination of performance categories shall be counted by the number of disjunctive performance categories in the combination (e.g., an incentive clause reading, "if A or B or C, then player will receive $X," shall be counted as three (3) performance categories). In addition, any of the disjunctive performance categories may itself be a conjunctive combination of performance categories (e.g., the "A" in the immediately preceding example may be a conjunctive combination of numerous performance categories, and would be counted as being one category because of its conjunctive nature).

(xxviii) Subsection (xxvii) above, does not supersede the terms of any other provisions or other agreements between the parties that automatically deem certain performance incentives to be "likely to be earned" or "not likely to be earned" depending upon whether the incentive fulfills other specified criteria.

(xxix) Subsections (xxvii) and (xxviii) above, do not apply and the parties reserve their rights with respect to multiyear contracts containing team performance incentives in more than one year.

(d)     **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)     In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the Final Capped Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, if payment of the player's entire Salary for the Final Capped Year is not fully guaranteed. For example, without limitation on any other applicable example, and if the Salary Cap is in effect during the 2010 and 2011 League Years, and the player enters into a

130

four-year contract which is not fully guaranteed for the 2011 League Year, which is the Final Capped Year, but is fully guaranteed for the 2012 and 2013 League Years, which are Uncapped Years, then the full amount of the guaranteed Salary for the 2012 and 2013 League Years will be included in Salary and Team Salary for the 2010 and 2011 League Years in a proportion determined by the Team.

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond three (3) years after the Final Capped Year will be included in Salary and Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

(iii)    Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the one-year Treasury Note rate published in *The Wall Street Journal* of February 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Subsection 7(b)(ii)(1) above, shall apply.

(iv)    If any Player Contract entered into in a Capped Year provides for yearly Salary in a sequence that, in the Final Capped Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

(v)     For purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Subsections 7(d)(i)-(iv) above.

(e)     **Other Amounts.**

(i)     **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

(ii)    A fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), constitutes an improper circumvention of the Salary Cap and/or Entering Player Pool, in violation of Subsection 7(e)(i) above.

(iii)   **Salary Advances.** Except as provided in Subsection 7(b)(iv) above, the full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

131

(iv)    **Non-Cash Provisions.**

(1)    The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

(2)    Any tangible item of value provided to unsigned players (or their affiliates) recruited by Clubs will be included in Salary. Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits. Miscellaneous costs associated with recruiting unsigned players but not paid to players (or their affiliates) are not included as part of Salary or Benefits, except as set forth above.

(3)    Expenses for travel, board and lodging for a player participating in an off-season workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. *See* Section 1(b)(vi) above (including such expenses in Player Costs as Benefits). Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.

(4)    The voluntary provision to all players on a Club of meals, team apparel, or one team trip for celebrations in each League Year (plus any trips to the White House for the Super Bowl Champions) will not be included in Team Salary or Player Costs. This Subsection does not affect the treatment of consideration paid to a player for services other than football playing services, as provided in Section 1(c)(ii) above.

(5)    Except as provided in Subsections 7(e)(iv)(2)-(4) above, and Article XVII, Section 4(n) (concerning Rookie Orientation Programs), if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to the CBA or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This paragraph does not apply to consideration paid to a player (or his affiliate) for nonfootball playing services, which are subject to Section 1(c)(ii) above.

(6)    Compensation to players for participation in the off-season workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article XXXV shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article XXXV, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii) the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. For example, without limitation upon any other example, a Club having a fourteen-week workout

132

program in the 2006 League Year for 60 players to be paid at the minimum amount will include $369,600 in its Team Salary on the first day of such program ($110 per day x four workout days per week x fourteen weeks x sixty players). At the conclusion of a club's off-season workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

(7)     If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three (3) or more seasons, the fair market value of such gifts up to $15,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. Notwithstanding the previous sentence, if the player has been under contract with the Club in less than three (3) seasons, the entire fair market value of any such gifts shall be counted as Salary.

(v)     **Annuities.** The cost to the Team of any annuity provided to any player (but not including any annuity provided pursuant to the player annuity program described in Article XLVIII-A), computed at the one-year Treasury Note rate on February 1 of the applicable League Year, shall be included immediately in Team Salary.

(f)     **Traded Contracts.**

(i)     In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

(ii)     A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.

(g)     **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

**Section 8. 30% Rules:**

(a)     No NFL Player Contract entered into in an Uncapped Year prior to the Final League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the contract per year. This rule shall not apply in any Capped Year to any Player Contract that was signed in the 1993 League Year or earlier.

(b)     No NFL Player Contract entered into in a Capped Year and ex-

133

tending into the Final League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the Final Capped Year, per year, either in the Final League Year or in any subsequent League Year covered by the Player Contract. For example, without limitation on any other applicable example, a four-year Player Contract signed in the 2011 League Year, assuming that it is Capped, may not provide for an annual increase of more than 30% of the 2011 League Year Salary, excluding amounts treated as a signing bonus, in any of the three (3) additional League Years covered by the Contract.

(c)     Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buyout is exercised by the Club, and prorated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buyout is based upon one or more incentives that are not "likely to be earned." Such a buyout amount shall not be included in any calculation for purposes of the 30% Rule, set forth above. (The parties acknowledge a disagreement as to the treatment of allocated signing bonus and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this Subsection (c), the terms of this Subsection may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this parenthetical.).

(d)     Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 30% Rule, set forth above, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

**Section 9.** Renegotiations and Extensions:

(a)     Provided that all Salary Cap requirements are met, Player Con-

134

tracts for current and future years may be renegotiated and/or extended except as follows:

(i)       The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve (12) months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

(ii)      No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(iii)     No contract renegotiations may be done for a current season after the last regular season game of that season.

(iv)     A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(i).

(v)      As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

(b)      No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.

(c)      Any agreement to compensate a player at the minimum amount set forth in Article XXXV for participation in an off-season workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.

(d)      Any salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Entering Player Pool shall not be treated as a renegotiation.

(e)      An amendment to a Player Contract that changes the terms under which Signing Bonus is paid is a renegotiation.

**Section 10.** Accounting Procedures:

(a)      **Special Purpose Letters and TR Reporting.**

(i)(A)   As provided below, each League Year the parties will be provided with one or more "Special Purpose Letters" by an independent accounting firm (hereinafter "the Accountants") which report the Total Revenues, Team Salary, Cash Player Costs, Player Costs and Benefits of each Club and the NFL for that League Year, utilizing information reported by independent Club and League accounting firms, and information obtained by the Accountants through its review procedures. The Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the Clubs and the League in providing information to the Accountants ("Revenue Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The

135

basic review procedures to be performed by the Accountants are set forth in Appendix H hereto, and may be modified and/or supplemented by mutual agreement of the parties. The engagement of the Accountants shall be deemed to be renewed annually unless the Accountants are discharged by either party during the period from May 1 to July 1 of that year. Each Special Purpose Letter shall be based upon the best available information at the time of its issuance, and shall include a report of adjustments and new information obtained with respect to amounts previously reported for prior League Years.

(B)     The amount of any Salary Cap and Minimum Team Salary that may apply in a League Year shall be determined at the times and utilizing the Special Purpose Letters and other information described in Section 10(e) below, subject to adjustments at the times and in the manners described in Subsections (ii) and (iii) of this Section 10(a).

(ii)     Subject to Subsection 10(a)(iii) below, in the event than any error is found in (1) DGR, EDGR, or Player Costs in respect of the 2005 League Year or any earlier League Year; or (2) in Total Revenues or Player Costs in respect of any League Year subsequent to the 2005 League Year, which, if it had not occurred, would have resulted in any increase or decrease in any Salary Cap in one or more prior League Years, the total amount of any such Salary Cap shortfall or overage, as the case may be, shall be added or subtracted, as the case may be, the next time the Salary Cap is calculated. An inaccuracy in an estimate that was made in a prior League Year shall not be considered an error for purposes of this Subsection, and such estimates shall be reconciled by the Accountants each League Year. In the event that an inaccuracy in an estimate is not reconciled, the failure to do so shall be considered an error for purposes of this Subsection. Any individual errors proposed for correction pursuant to this Subsection that are greater than $25,000 must be substantiated by evidence and be reviewed with the Management Council, the NFLPA, and the Accountants prior to the correction being made. Any dispute regarding such corrections shall be subject to the procedures that apply under Subsections 10(a)(ix)-(x) below.

(iii)     To the extent that the amounts and information set forth in a Special Purpose Letter indicate that the amount of any Salary Cap and/or Minimum Team Salary in any prior League Year should have been different from the amount actually utilized, any such difference in the Salary Cap and/or Minimum Team Salary shall be credited or deducted, as the case may be, to the next Salary Cap and/or Minimum Team Salary to be set, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of each applicable League Year) (but subject in any case to Section 4(b)(i) above), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), if specified by the NFLPA. In the case of any updated Special Purpose Letter issued in the Final Capped Year, such adjustment shall be immediate.

(iv)     The Accountants shall review the reasonableness of any esti-

136

mates of revenues or expenses included in any Club's Revenue Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made as provided in Section 10(a)(ii) above.

(v)     With respect to expenses deducted by the NFL or the Clubs from television, cable and radio broadcast revenues or any other revenues, the NFL and the Clubs shall report in the Revenue Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i) above. All categories of expenses deducted from such revenues by the NFL or a Club in a Revenue Report completed by the NFL or that Club shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

(vi)     The Accountants shall receive, in connection with their duties: (1) access to and copies of the local accountant workpapers with respect to the Schedule described in Appendix H; and (2) access to the financial audit workpapers of the local accountants or League Office (to the extent necessary), provided that any information derived from the access described in this clause (2) will be held in confidence and will not be part of any file subject to NFLPA review.

(vii)     The NFL will use its best efforts to ensure that any contract between the League, any Club, or any Club Affiliate, and any third party in connection with the sale or marketing of any source of TR shall include terms that provide to the Accountants and the NFLPA access to any and all financial and contractual information and documents in the possession, custody, or control of such third party to which the Club, Club Affiliate, or any other entity controlled by the owner of the Club has any right to any access, relating to such revenue source or any other financial or contractual relationship or transaction between such third party and the League, the Club involved in the sale or marketing of such revenue source, any Affiliate of that Club, or any of that Club's owners. In each case such access shall be subject to and limited by the rules set forth in this Agreement or otherwise agreed to by the parties regarding the dissemination of information provided to the Accountants and the NFLPA pursuant to the audit process. If the NFL, despite its best efforts, cannot ensure such access, the NFLPA shall have the right to obtain an order against the Club or Club Affiliate from a court or the Special Master requiring that such access be allowed.

(viii)     Reasonably prior to the issuance of a Special Purpose Letter, the Accountants shall, as set forth in Appendix H attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Clubs or any other information contained in the Revenue Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other infor-

137

mation contained in the Revenue Reports submitted by the Clubs.

(ix)     In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the Revenue Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of Subsection (iv) or Subsection (v), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(x)     Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a Revenue Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(xi)     After receiving a Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in such Special Purpose Letter. Bennett Hutt & Co. or another auditing firm replacing Bennett Hutt & Co. (subject to notification to and approval by the NFLMC, not to be unreasonably withheld, of such replacement for Bennett Hutt & Co.) (Bennett Hutt & Co. or such replacement firm hereinafter being referred to as the "NFLPA Auditor") may copy documents it reviews in the course of its audits and maintain copies of documents reviewed in its office. Other than as set forth in this Subsection, the NFLPA Auditor may not show any such copies to anyone other than its partners, employees, and agents. The documentation made available and

138

the information contained therein shall be held in strict confidence and may be discussed only with individuals authorized in this Subsection, or as jointly authorized by the NFL Management Council and the NFLPA. The NFLPA Auditor may prepare one or more written or oral reports for the use of the NFLPA in connection with this Agreement, which may refer to and discuss the contents of documents reviewed, but which may not include copies of any such documents. Any such report shall not be referred to or distributed to anyone outside of the NFLPA or the NFLPA Auditor for any other purpose. If the NFLPA determines in the exercise of its judgment that matters discussed in the NFLPA Auditor's report may indicate a violation of this Agreement, then the NFLPA Auditor may show a copy of such documents that it considers in the exercise of its judgment to be relevant to such potential violation to counsel for the NFLPA (who as of the date hereof are also serving as Class Counsel), the Executive Director and General Counsel of the NFLPA, up to three (3) NFLPA staff personnel (whose authority to receive such information shall be disclosed in advance to the NFLMC) and up to three (3) members of the NFLPA Executive Committee (whose authority to receive such information shall be disclosed in advance to the NFL Management Council). In addition, a copy of such documents may be presented to the Special Master and/or a court in any proceeding to enforce this Agreement. At least four (4) business days prior to commencing any such proceeding based upon such documents, the NFLPA will advise the NFL Management Council of the alleged violation upon which the proceeding would be based; the parties shall stipulate to reasonable protective order terms and conditions to protect the confidentiality of such information. Except in connection with a proceeding as described in the preceding sentence, the NFLPA, its representatives and agents shall not refer to or distribute such copies to anyone outside of their organizations for any other purpose.

    (b)    **Projected Total Revenues**

    (i)    For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4-5, and 10(a) above and Section 10(e) below, and for any other purpose specifically stated in this Agreement, Total Revenues for the applicable League Year(s) shall be projected ("Projected Total Revenues") utilizing one or more agreed-upon methods for the projection process so that the anticipated growth of Projected TR (based upon factors such as anticipated new stadiums, expansion Clubs, and revenue provisions in the NFL's television and other contracts) over the course of League Years which are anticipated to be Capped Years shall be as accurate as practicable, subject to any agreement between the parties to allocate TR over particular League Years pursuant to Section 1(a)(xii) above. Notwithstanding the foregoing, any difference between Projected TR and TR for a prior League Year shall be credited or deducted, as the case may be, in the calculation of the next Salary Cap and/or Minimum Team Salary to be set using the method set forth in Sec-

139

tions 10(b)(ii) and (iii) below, subject in any case to Section 4(b)(i) above. In the Final Capped Year, all such differences and other adjustments from prior League Years shall be made first in the initial calculation of the Salary Cap and Minimum Team Salary, and then shall be updated, with any other differences and adjustments discovered or agreed to subsequent to the initial calculation of the Salary Cap and Minimum Team Salary (a) on or before the third day prior to the beginning of the Final Capped Year, if and only if the Final Capped Year is determined on the basis of an election by either the NFL Management Council or the NFLPA to terminate one or more Capped Years hereunder, and (b) in all cases, on or before May 1 in such Final Capped Year. Moreover, if one or more League-wide television or local television and radio contracts are in effect for the League Year in respect of which the Salary Cap and Minimum Team Salary are being calculated, the actual revenues expected from such source under such contract shall be used in the determination of Projected TR, unless another allocation has been or is agreed to by the parties. Notwithstanding the foregoing or anything else in this Agreement, if, after the initial calculation of the Salary Cap, Minimum Team Salary, and Projected TR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Projected TR, and the Salary Cap and Minimum Team Salary calculated for that League Year shall immediately be adjusted accordingly. In addition, if one or more new Clubs are scheduled to be added to the NFL during the next League Year as one or more expansion Clubs, Projected TR will include an additional projection of TR determined in a manner agreed to by the parties. In addition, if, after the initial calculation of Projected TR for a League Year, the number of scheduled regular season games per Club is increased above the standard of sixteen (16), Projected TR will include an additional projection of TR to account for such additional games as agreed upon by the NFLPA and the Management Council.

(ii)     In the event that actual Total Revenues for any League Year are less than Projected TR (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the difference shall be deducted from Projected Total Revenues for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iii)     In the event that actual Total Revenues for any League Year exceeded Projected TR (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Total Revenues for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made), ex-

140

cept that if, in respect of the 2008 League Year or any subsequent Capped Year, on the basis of the final Reporting Packages for the most recently completed League Year it is determined by the May 1 subsequent to the setting of the Salary Cap and Minimum Team Salary for the subsequent League Year (e.g., by May 1, 2007, in respect of the 2008 League Year, the Salary Cap and Minimum Team Salary for which were set three (3) days prior to the beginning of the 2007 League Year) that actual Total Revenues for the most recently completed League Year exceeded Projected TR for such League Year, the amount of such deficiency shall be set forth in an updated Special Purpose Letter to be issued on such May 1 and shall be taken into account in calculating the Projected Total Revenues for such subsequent League Year, and the Salary Cap and Minimum Team Salary for such subsequent League Year shall be appropriately increased to reflect such addition.

(iv)     Any adjustments pursuant to Section 10(a)(iv) above will be subtracted from or added to Projected TR as appropriate.

(c)     **Timetable and Procedures**

(i)     On or before the date of the Super Bowl in each League Year prior to the Final Capped Year, the parties will meet for the purposes of agreeing upon projections to be used in the calculation for the next Salary Cap and Minimum Team Salary to be set, including:

(A) incremental stadium-related revenues from the opening of any new stadium, any major renovation of an existing stadium, or any known major modification of an existing stadium lease;

(B) percentage increases to be used in the projections of the following categories of revenue (except to the extent addressed by Subsection (c)(i)(A) above): (1) gate receipts; (2) all other Club TR; and (3) all other League TR.

(ii)     In the absence of agreement within ten (10) business days after such meeting, such increases shall be projected on the basis of:

(A) for stadium-related revenues pursuant to Subsection (c)(i)(A) above, (1) the most recent projections used to secure financing of the stadium construction or renovation costs or to secure the lease modifications or, (2) in the absence of such projections, a determination by the Accountants, after consultation with both parties, subject to review by the Special Master pursuant to Article XXVI.

(B) for other projections described in Subsection (c)(i)(B) above, assuming a percentage increase at the annual percentage increase for that category of revenues over the prior four (4) League Years (on a per-Club basis for Club revenues and on a League-wide basis for revenues of the League, NFL Ventures, and other League affiliates). In the event of any dispute over such average annual percentage increases, the percentages shall be determined by the Accountants, after consultation with both parties, subject to review by the Special Master pursuant to Article XXVI.

(iii)     Notwithstanding Subsections 10(c)(i)-(ii) above, in the event that the NFL expands in the future by the addition of one or more Teams,

141

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

the parties will meet on or before October 15 of the League Year prior to the first League Year in which the expansion Club will play NFL games to agree upon a methodology for revenue projections for the following League Year attributable to the expansion Team. In the absence of agreement prior to December 15, such revenues shall be projected on the basis prescribed by Section 10(b)(i) above and Paragraph 10 of the settlement agreement of the parties on this subject dated June 6, 1996.

(d) **Projected Benefits.**

(i) For purposes of computing the Salary Cap and Minimum Team Salary to be applied in a League Year in accordance with Sections 4-5 above and Section 10(e) below, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the applicable League Year pursuant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii) In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(d)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iii) In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(d)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iv) In the event the NFLPA exercises any right to reduce or freeze or increase certain Benefits pursuant to Article XLVI (Player Benefit Costs), Projected Benefits shall be adjusted immediately to reflect such changes.

(v) In the event the amount of Projected Benefits is adjusted pursuant to (1) Subsection (d)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, then the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

(e) **Setting the Salary Cap.**

(i) **2008 and Subsequent Capped Years.** The Salary Cap and Minimum Team Salary for the 2008 League Year and each subsequent Capped

142

Year shall be set at least three (3) days before the beginning of the League Year immediately preceding the relevant Capped Year, based upon Projected Total Revenues and Projected Benefits for the relevant Capped Year, as provided in Subsections 10(b)-(c) above, utilizing the information contained in a Special Purpose Letter which the Accountants shall issue on or before the date on which such Salary Cap and Minimum Team Salary are to be set, and shall be subject to adjustment upwards, but not downwards, on the May 1 immediately following the setting of such Salary Cap and Minimum Team Salary in accordance with Section 10(b)(iii) above, based on an updated Special Purpose Letter to be issued on or before such date (if issuance of such an updated Special Purpose Letter is appropriate in light of the Total Revenues reflected in the final Reporting Packages for the then-most recently completed League Year).

(ii)      **2011 League Year.** If neither of the parties terminates either of the final two Capped Years of this Agreement pursuant to Article LVIII, Section 3(a), the Salary Cap and Minimum Team Salary for the 2011 League Year (the Final Capped Year) shall be initially set at the time specified in Subsection 10(e)(i) above, and shall be finally determined within five (5) business days after May 1, 2011, utilizing information contained in a final Special Purpose Letter issued by the Accountants on or before May 1, 2011.

(iii)      **Early Termination Provisions.** If either of the parties terminates one or both of the final two Capped Years of this Agreement pursuant to Article LVIII, Section 3(a), with the result that a League Year earlier than the 2011 League Year becomes the Final Capped Year, then the Salary Cap and Minimum Team Salary for the League Year that has become the Final Capped Year as the result of such termination (a) shall be updated on or before the third day prior to the beginning of such Final Capped Year, utilizing information contained in a Special Purpose Letter which the Accountants shall issue on or before such date, and (b) shall be finally determined within five (5) business days after May 1 in such Final Capped Year, utilizing information contained in a final Special Purpose Letter issued by the Accountants on or before May 1 in such Final Capped Year.

(iv)      **Adjustments in Final Capped Year.** In setting the Salary Cap and Minimum Team Salary for the Final Capped Year, all differences and other adjustments shall be implemented in an updated Salary Cap and Minimum Team Salary, within five (5) business days of the issuance of the May 1 final Special Purpose Letter.

*Section 11.* **Revenue Sharing:** For each season during the term of this Agreement, there shall be a program of revenue or cost sharing among the NFL Clubs which shall (a) be based on the Resolution adopted by the NFLMC on March 9, 2006 (2006 Resolution MC-1), approving this Agreement (including "qualifiers" established under Paragraph 5 of that Resolution), (b) provide for incremental revenue sharing as compared to the

143

arrangements created by 1995 Resolution G-6, and (c) be reasonably satis-
factory to the NFLPA. The revenue sharing program described to the
NFLPA by memorandum dated March 10, 2006, has been determined by
the NFLPA to be satisfactory. Any material modification to that program
must also be reasonably satisfactory to the NFLPA.

144

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY CAP
# AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time, enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; and/or (b) concerning the terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Total Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Con-

145

tracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

*Section 5.* **Special Master Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

*Section 6.* **Sanctions:**

(a) **Players and Agents.** In the event that the Special Master finds a violation of Subsection 1(a) or 1(b) of this Article, for each such violation: (i) (1) the Special Master may impose a fine of up to $375,000 on any player or player agent found to have committed such violation, and (2) shall, unless the parties to this Agreement otherwise agree, order the player to disgorge any undisclosed compensation found to have been paid in violation of Section 1 of this Article unless the player establishes by a preponderance of the evidence that he was unaware of the violation; and (ii) the Commissioner shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

(b) **Clubs.** In the event that the Special Master finds a violation of Section 1(a) of this Article, for each such violation, the Commissioner shall be authorized to: (i) impose a fine of up to $5,250,000, payable to the NFL, upon any Club found to have committed such violation; (ii) order the forfeiture of up to a maximum of two (2) draft choices (without limitation as to round) by the Club found to have committed such violation; (iii) impose a fine of up to $375,000 on any Club executive or other Club personnel found to have committed such violation; and/or (iv) suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In the event that the Special Master finds a violation of Subsection 1(b) of this Article, for each such violation, the Special Master may: (i) impose a fine of up to $5,250,000, payable to the NFL, upon any Club found to have committed such violation; and (ii) impose a fine of up to $375,000 on any Club executive or other Club personnel found to have committed such violation. In addition, in the event that the Special

146

Master finds a violation of Subsection 1(b) of this Article, for each such violation, the Commissioner (i) shall be authorized to order the forfeiture of up to a maximum of two (2) draft choices (without limitation as to round) by the Club found to have committed such violation; and (ii) shall, unless the parties agree otherwise, suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In imposing sanctions pursuant to the immediately preceding sentence, the Commissioner shall apply the same standards that he would apply in the event of a violation of Subsection 1(a), taking into account the sanctions, if any, imposed by the Special Master. In amending the prior version of this Section in December 2000 and incorporating those amendments into this Section, the parties have not waived or affected their respective positions as to whether the Commissioner does or does not have authority to impose discipline for such violations against any Club, Club executive, or other Club personnel greater than the sanctions set forth in this Article, and those amendments shall not be considered in any resolution of that issue. For purposes of this Subsection 6(b), the term "Club personnel" shall not include players.

(c)     Subject to the parties' mutual reservation of their respective positions in the next to last sentence of Subsection 6(b) above, the sanctions set forth in Subsections 6(a) and 6(b) above shall be the sole penalties under this Agreement for conduct in violation of Section 1 of this Article or Sections 1-3 of Article XXIX (Certifications), and each of the sanctions set forth in Subsections 6(a) or 6(b) above may not be imposed more than once on the same person or Club for the same conduct, even if such conduct constitutes a violation of both Paragraph 1 of this Article and Paragraphs 1-3 of Article XXIX (Certifications). All fines collected from players and agents, and all disgorged compensation collected from players pursuant to this Section 6, shall be contributed and allocated as prescribed in Article XI (Commissioner Discipline), Section 6. For each League Year after the 2006 League Year, each of the maximum fines set forth in this Paragraph 6 shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year). The sanctions set forth in Sections 6(a) and 6(b) above shall not be implemented until the conclusion of any appeals thereof.

*Section 7*. **Revenue Circumvention**: In the event that a Club or anyone acting on its behalf fails to materially report or materially misreports Total Revenue ("TR") or non-TR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to such revenues, the NFLPA and/or the Management Council shall have the right to initiate a proceeding before the Special Master to determine whether such conduct is in violation of this Section 7 of this Article. In the event that the Special Master finds a viola-

147

tion of this Section 7, the Special Master may impose a fine upon the Club of up to $3 million, which shall be donated as additional contributions to the youth football programs fund referenced in Article XXIV (Guaranteed League-wide Salary, Salary Cap, & Minimum Team Salary), Section 1(a)(xiv)(1)(A) above. For each League Year after the 2006 League Year, the maximum fine set forth in this Paragraph 7 shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year).

*Section 8.* **Management Council Audit Rights.** The Management Council shall have the right to audit records of Clubs and Club Affiliates to investigate allegations of violations of Section 1 of this Article. In agreeing to this Section, the parties have not waived or affected their respective positions as to whether the Management Council may conduct any Club-related audits beyond those set forth in the preceding sentence, and such amendment shall not be considered in any resolution of that issue.

*Section 9.* **Prior Consultation.** Reasonably prior to the initiation of a proceeding alleging a violation of Section 1(a) or 1(b) above, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute, and the charging party shall disclose to the other party (either the NFLPA or the Management Council, as the case may be) all evidence (whether exculpatory or inculpatory) concerning such alleged violation (and provide a copy of all such evidence in documentary form), including but not limited to any such evidence that is the product of any investigation by or on behalf of the charging party. All such evidence subsequently acquired by the charging party shall be subject to disclosure to the other party in any resulting proceeding. This section shall not require the disclosure of any attorney-client communication, or any work product created by or at the request of an attorney. In addition, any attempt by the League, the Management Council, or any Club to have discipline imposed on any person (including but not limited to a Club) for conduct in violation of Section 1(a) or 1(b) above shall be immediately disclosed to the NFLPA.

# ARTICLE XXVI
# SPECIAL MASTER

***Section 1.* Appointment:** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in <u>White</u> v. <u>NFL</u> shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, and XXXVIII-B, and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

***Section 2.* Scope of Authority:** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

(a)      The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

(b)      The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;

(c)      Subject to Subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

(d)      Except for any matters for which the Court has de novo review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the recommendation of the Special Master. The parties may seek appropriate relief

149

Article XXVI, Special Master

to effectuate and enforce this provision.

(e)    The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement for Special Master review.

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement regarding any TR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the

150

NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 6. Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven (11) attorneys (none of whom shall have nor whose firm shall have represented within the past five (5) years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty (30) days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety (90) days preceding the end of any term, but no later than thirty (30) days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

**Section 7. Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

# ARTICLE XXVII
## IMPARTIAL ARBITRATOR

*Section 1.* **Selection:** The parties shall select one of the Non-Injury Griev-
ance Arbitrators who shall concurrently serve as the Impartial Arbitrator,
who shall have exclusive jurisdiction to determine disputes that are specif-
ically referred to the Impartial Arbitrator pursuant to the express terms of
this Agreement.

*Section 2.* **Scope of Authority:** The powers of the Impartial Arbitrator and
the rights of the parties in any proceeding before him or her shall be solely
to determine disputes that are specifically referred to the Impartial Arbitra-
tor pursuant to the express terms of this Agreement. In no event shall the
Impartial Arbitrator have any authority to add to, subtract from, or alter in
any way the provisions of this Agreement.

*Section 3.* **Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon
their issuance be final and binding upon all parties, except as expressly
specified under this Agreement or as expressly agreed to among all parties.

*Section 4.* **Discovery:** In any of the disputes described in this Agreement
over which the Impartial Arbitrator has authority, the Impartial Arbitrator
shall, for good cause shown, grant reasonable and expedited discovery up-
on the application of any party where, and to the extent, he determines it
is reasonable to do so and it is possible to do so within the time period pro-
vided for his determination. Such discovery may include the production of
documents and the taking of depositions.

*Section 5.* **Compensation of Impartial Arbitrator:** The compensation to
and costs of the Impartial Arbitrator in any proceeding brought pursuant to
this Agreement shall be equally borne by the NFL and the NFLPA. In no
event shall any party be liable for the attorneys' fees incurred in any such
proceeding by any other party.

*Section 6.* **Procedures:** All matters in proceedings before the Impartial Ar-
bitrator shall be heard and determined in an expedited manner. A pro-
ceeding may be commenced upon 48 hours written notice served upon the
party against whom the proceeding is brought and the Impartial Arbitrator,
and the arbitration, shall be deemed to have been commenced on the sec-
ond business day after such notice was given. All such notices and all or-
ders and notices issued and directed by the Impartial Arbitrator shall be
served upon the NFL and the NFLPA, in addition to any counsel appear-
ing for individual NFL players or individual Clubs. The NFL and the
NFLPA shall have the right to participate in all such proceedings, and the
NFLPA may appear in any proceedings on behalf of any NFL player who

152