Exhibit 10
Part 3 of 4

has given authority for such appearance.

***Section 7.*** **Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree that the Impartial Arbitrator shall be randomly selected from the then-currently serving Non-Injury Grievance Arbitrators. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety (90) days preceding the end of any term, but no later than thirty (30) days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

# ARTICLE XXVIII
## ANTI-COLLUSION

*Section 1.* **Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

(a)    whether to negotiate or not to negotiate with any player;

(b)    whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(c)    whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

(d)    whether to exercise or not to exercise a Right of First Refusal; or

(e)    concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

*Section 1a.* **Commissioner Approvals:** Any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA cannot be the basis of any claim of collusion. The NFLPA or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.

*Section 2.* **Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)    that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three (3) Accrued Seasons, or a Franchise Player designation; or

(b)    that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

(c)    that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

(d)    that the player is or has been subject to any Right of First Refusal.

*Section 3.* **Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in

154

Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

*Section 4.* **League Disclosures:** Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

*Section 5.* **Enforcement of Anti-Collusion Provisions:** Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

*Section 6.* **Burden of Proof:** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any

155

evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

***Section 7. Summary Judgment:*** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

***Section 8. Remedies:*** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)        To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three (3) sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this Subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)        To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

***Section 9. Computation of Damages:*** Upon any finding of a violation of

156

Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)    Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)    Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)    Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $3,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $3,000,000. For each League Year after the 2006 League Year, each of the enumerated fines set forth in this Subsection 9(c) shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year).

**Section 10. Player Election:** A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future dam-

157

ages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

*Section 11.* **Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

*Section 12.* **Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

*Section 13.* **Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

*Section 14.* **No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

*Section 15.* **Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

*Section 16.* **Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five (5) or more Clubs and caused injury to 20 or more players; or

(b)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two (2)

consecutive NFL seasons which, either individually or in total, involved seven (7) or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two (2) consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)   Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)   In order to terminate this Agreement:

(i)   The proceeding must be brought by the NFLPA;

(ii)   The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)   The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

## ARTICLE XXIX
## CERTIFICATIONS

*Section 1.* **Contract Certification:**

(a)    Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of the player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; or (b) concerning terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

(b)    In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)    In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)    No contract will be approved by the Commissioner unless accompanied by the certifications required by Subsections (a), (b), and (c) above.

(e)    Any failure to execute and submit a certification as required under Section 1(a) above may be deemed evidence of a violation of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1 of this Agreement. Any failure to execute and submit a certification as required under Section 1(b) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion) of this Agreement. Any failure to execute and submit a certification as required under Section 1(c) above may be deemed evidence of a violation of that provision.

*Section 2.* **End of League Year Certification:**

(a)    At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the

160

Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1. Upon receipt of such certification, the Management Council shall forward a copy of the certification to the NFLPA.

(b)     At the conclusion of each League Year, each player agent representing a player who was under contract to an NFL Club during that League Year shall submit to the NFLPA a certification confirming, after reasonable inquiry of all personnel in his or her agency with authority to negotiate Player Contracts, that neither he or she nor they has entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1. Upon receipt of such certification, the NFLPA shall forward a copy of the certification to the Management Council.

(c)     Any failure to execute and submit a certification as required under Section 2(a) or 2(b) above, may be deemed evidence of a violation of Article XXV, Section 1 of this Agreement.

(d)     At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or the NFL Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, where such communication or disclosure is inconsistent with Article XXVIII (Anti-Collusion), Section 1. Upon receipt of each such certification, the NFL shall forward a copy of the certification to the NFLPA.

(e)     Any failure to execute a certification as required under Section 2(d) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

***Section 3. False Certification:*** Any person or Club who knowingly executes or files a false certification required by Sections 1(a), 1(b), 2(a), or 2(b) of this Article shall be subject to a fine of up to $375,000, upon a finding of such violation by the Special Master. Authority to impose such a fine

161

shall rest with the Special Master or the Commissioner, consistent with the allocation of authority in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 6(b). Notwithstanding the foregoing, in no circumstances shall a fine under this section be imposed upon any person or Club if such person or Club is also being sanctioned for the same conduct under Article XXV, Section 6 above.

162

# ARTICLE XXX
# CONSULTATION AND INFORMATION SHARING

**Section 1. Consultation and Communications:**

(a)    In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b)    Subject to any claim of attorney-client and/or work product privilege, any communications under this Section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this Section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

**Section 2. Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected TR, and a revised estimate on the first day of each month thereafter in any such year.

**Section 3. Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

**Section 4. Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

163

Article XXX, Consultation and Information Sharing

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within two (2) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings:** During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

164

# ARTICLE XXXI
## EXPANSION

*Section 1.* **Veteran Allocation:** The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three (3) per Club, excluding any player who has a no trade clause in his Player Contract.

*Section 2.* **Additional Compensatory Picks:** The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three (3) seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

*Section 3.* **Entering Player Pool Adjustment:** The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

*Section 4.* **Relocation Bonus:** Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $30,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $40,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

165

# ARTICLE XXXII
# OTHER PROVISIONS

*Section 1.* **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or postseason, whichever is applicable).

*Section 2.* **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

*Section 3.* **Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

*Section 4.* **Roster Exemption:**

(a)     Certain Players Not Under Contract. After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)     Players Under Contract. If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)     Restricted Players. Any player whose contract has expired and who either (i) has two (2) but less than three (3) Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three (3) Accrued Seasons), Section 2, or

166

Article XIX (Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i)     If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii)    If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)   If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

(iv)    Any player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three (3) weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with Subsections (i)-(iii) above. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

(v)     No player may be placed on roster exempt under this Subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five (5) days prior to the Club's second pre-season game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with Subsections (i)-(iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this Subsection, the player shall not be entitled to compensation.

(d)     Except as provided in Subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two (2) weeks of the regular season.

**Section 5.** Arena Football Players:

(a)     Players under an NFL Player Contract may not be allocated to a club in the Arena League, whether or not that Arena League club is commonly owned with an NFL Club.

(b)     Otherwise eligible Arena League players who would be Rookies in the NFL may be drafted by any NFL Club pursuant to current draft procedures, even if under contract to an Arena League Club.

Article XXXII, Other Provisions

(c)       Before a player under contract in the Arena League may be signed to an NFL Player Contract, he must be released by the Arena League club from any pre-existing contract obligations in the Arena League, including any residual contract rights relating to negotiation, first refusal, etc., and except for players to whom an NFL Club has draft rights, will be considered an Unrestricted Free Agent. This provision refers solely to contractual rights between a player and a team in the Arena Football League and does not refer to the terms of any collective bargaining agreement in the Arena League.

(d)       A player whose most recent contract to play professional football was with an AFL team ("Related AFL Team") that shares common ownership with an NFL Club ("Related NFL Club") may not sign a Player Contract with that Related NFL Club until after a period of 72 hours following the termination or expiration of the player's contract with the Related AFL Team. During that 72-hour period, the player shall be completely free to negotiate and sign a Player Contract with any other Club. The terms of this Subsection (d) are subject to any rights that any Club may have under Article XVI (College Draft), and any Club that has drafted such a player consistent with the terms of this Agreement may sign such a player at any time permitted by this Agreement.

(e)       NFL clubs and Arena League clubs may have common practice facilities, but may not participate in common classroom work, film study, drills, scrimmages, or other on- or off-field work.

(f)       Any NFL player suspended for one year or less in the NFL by the Commissioner or his Club may not play for an Arena League team that is commonly-owned with his NFL Club during any term of his suspension that overlaps with the period of time the player is under contract to his NFL Club.

(g)       If an Arena League club that is commonly-owned with an NFL Club engages in conduct that would violate NFL Rules, including but not limited to the NFL's anti-tampering policy, the violation shall be attributed to the NFL Club, so long as any sanctions are imposed consistent with the terms of this Agreement and the NFL Constitution and Bylaws.

168

# ARTICLE XXXIII
## SQUAD SIZE

*Section 1.* **Active List:** For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

*Section 2.* **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

*Section 3.* **Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

169

# ARTICLE XXXIV
## PRACTICE SQUADS

*Section 1.* **Practice Squads:**

(a)      The League may elect in any League Year in accordance with this Article to establish practice squads not to exceed eight (8) players per Club. The League's election in any one season shall not determine or affect its election in any subsequent season.

(b)      The League may elect to allow some or all Clubs to add to their practice squads one additional player, who shall not count against the limit above, whose citizenship and principal place of residence are outside the United States and its Territories ("International Player"). The League's election in any one season shall not determine or affect its election in any subsequent season. Such International Players shall be subject to the same terms and conditions of employment that apply to other practice players except that they (1) may not, during the term of their practice player contract, negotiate or sign an NFL Player Contract with any Club; and (2) may not practice with any Club following the last Conference Championship Game unless both Conference Championship teams have such a player. In addition, notwithstanding the provisions of Section 4 below, such International Player shall be eligible to serve on a Practice Squad for three (3) additional seasons after the completion of the player's year(s) as an International Player. As set forth in Article XXXIV, Section 3, the weekly salary for such international players shall not be included in the employing Club's Team Salary and shall be deducted from the calculation of the Salary Cap in the same manner as any Player Benefit.

*Section 2.* **Signing With Other Clubs:**

(a)      Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

(b)      Notwithstanding Subsection (a) above, a practice squad player may not sign an NFL Player Contract with his Club's next opponent later than 4:00 p.m., New York time, on the sixth day preceding the game (except in bye weeks, when the prohibition commences on the tenth day preceding the game).

*Section 3.* **Salary:** Minimum salary for a practice squad player shall be

170

$4,700 per week for the 2006-07 League Years, $5,200 per week for the 2008-10 League Years and the 2011 League Year if it is an Uncapped Year, and $5,700 per week for the 2011 League Year if it is a Capped Year and the 2012 League Year, including postseason weeks in which his Club is in the playoffs.

**Section 4. Eligibility:**

(a)       The practice squad shall consist of the following players, provided that they have not served more than two (2) previous seasons on a Practice Squad: (i) players who do not have an Accrued Season of NFL experience; and (ii) free agent players who were on the Active List for fewer than nine (9) regular season games during their only Accrued Season(s). An otherwise eligible player may be a practice squad player for a third season only if the Club by which he is employed that season has at least 53 players on its Active/Inactive List during the entire period of his employment.

(b)       A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and been a member of the club's Practice Squad for at least three (3) regular season or postseason games during his first two (2) Practice Squad seasons, and for at least one regular season or postseason game during his third Practice Squad season. (A bye week counts as a game provided that the player is not terminated until after the regular season or postseason weekend in question.)

**Section 5. Active List:** If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three (3) weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three (3) games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the eight-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three (3) weeks salary that he is entitled to receive from Club B.

171

# ARTICLE XXXV
# OFF-SEASON WORKOUTS

**Section 1. Voluntary Workouts:** No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be strictly voluntary and take place in the manner and time period set forth in this Article.

**Section 2. Time Periods:**

(a)      Subject to the limitations in Subsection (b) below, from the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than fourteen (14) total weeks, and no more than four (4) workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

(b)      Each year off-season workout programs may not begin, and players may not be asked to voluntarily attend any such program, earlier than a date to be agreed upon by the Management Council and the NFLPA, and announced before the conclusion of the prior regular season. Each year on a date to be agreed upon by the parties, each Club shall provide the Management Council and the NFLPA with the Club's schedule for its off-season workout program that year, and shall advise the Management Council and the NFLPA in writing in advance of any changes to that schedule; if the Management Council provides such information to the NFLPA, the Club's obligation under this sentence shall be deemed satisfied. Notwithstanding the foregoing, any player who (1) is under contract or tender to an NFL Club; and (2) has been officially allocated by that Club to the NFL Europe League may commence voluntary off-season workouts with his NFL Club on the day following the NFL Europe League's prescribed yearly deadline for allocation of NFL players.

**Section 3. Payment:** Each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout requirements: $110 for the 2006 League Year; $120 for the 2007-08 League Years; $130 for the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year; and $145 for the 2011 League Year if it is a Capped Year and the 2012 League Year. Players who (1) are under contract or tender to

172

an NFL Club; and (2) have been officially allocated by that Club to the NFL Europe League who participate in a Club's off-season workout program may also receive expenses for travel, board, and lodging subject to the terms and conditions set forth in Article XXIV, Section 7(e)(iv)(3).

**Section 4. Injuries:** Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

**Section 5. Miscellaneous:**

(a)    No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.

(b)    During the off-season program period, except for the fourteen (14) days of organized team practice activity and mini-camps, players may be (1) at the Club facility no more than four (4) hours per day, no more than four (4) days per week, and not during weekends; and (2) on the field no more than ninety (90) minutes per day. In addition, the Club may not specify to any player more than two (2) specific hours a day during which it suggests that the player be at club facilities. Any player participating in an off-season workout program may select the other two (2) hours in which he wishes to conduct his weight training, etc., as long as he does so during the hours of operations of the Club's weight room.

**Section 6. Pre-Training Camp Period:** During the ten (10) consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or

173

any provision in any Player Contract. Notwithstanding the above, nothing in this Section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.

**Section 7. Rookie Premiere:** Invited Rookies will be permitted by their respective Clubs to attend the NFL Players Rookie Premiere provided that: (i) such event is scheduled during the month of May; (ii) such event encompasses a maximum of four (4) consecutive days, including both a Saturday and a Sunday; and (iii) the NFLPA provides the Management Council with the dates for the next Rookie Premiere not later than February 1 of each year.

**Section 8. Enforcement:**

(a)    The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L.

(b)(i)   The Management Council and the NFLPA shall each designate one or more representatives to investigate claims of violations of the rules set forth above or any other rules relating to off-season workouts set forth in this Agreement. At the request of either party, these representatives will inspect appropriate areas of Club facilities without notice to the Club and, upon request from any representative, shall be provided, as quickly as reasonably possible, with copies of film or other documentation any repre-

174

sentative deems relevant to any possible violation.

(ii)     Within forty-eight (48) hours of the commencement of a complaint by the NFLPA to the Management Council, or sooner if practical, the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL shall be advised of the status of the complaint and these persons shall attempt to determine if a violation occurred. If they are unable to agree upon the outcome, the matter will be immediately referred to a non-injury grievance arbitrator who will render a decision within forty-eight (48) hours of the submission of the dispute. If the arbitrator determines that a violation has occurred, or if the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL agree that a violation has occurred, the next scheduled week of the Club's off-season program shall be cancelled, excluding mini-camps, and no player may work out at any team facility during the cancelled week. However, in such event, players participating in the Club's off-season program shall be deemed to have participated in the required number of days for the cancelled week in order to qualify for off-season workout pay. If the arbitrator finds two (2) separate violations of these rules in the same League Year, the Commissioner shall cause the Club to forfeit a fourth-round draft selection in the next draft in which the Club has such a selection. No conduct occurring prior to the date upon which any non-injury grievance is filed under these rules may serve as the basis for a finding of a second violation by a Club; a second violation by a Club in the same League Year must be predicated upon facts arising after the grievance alleging the first violation has been filed.

(iii)     Except as provided in the fourth preceding sentence, these limitations on off-season workouts shall not preclude any player from working out on his own at any time, including weekends. By agreeing to the sanctions in this Subsection (b), the parties have not waived or affected their respective positions as to the issue of the Commissioner's authority to impose discipline, including the forfeiture of draft choices, for conduct within the scope of his authority under the Constitution and Bylaws.

175

# ARTICLE XXXVI
# MINICAMPS

**Section 1. Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two (2) additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

**Section 2. Length:** No minicamp may exceed three (3) days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

**Section 3. Expenses:**

(a)      Any veteran player who attends a minicamp will receive meal allowances in accordance with Article  XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

(b)      If a rookie player (defined as in Article XXXVIII, Section 1) signed a Player Contract with any Club for the prior League Year, he shall receive, for each day that he attends minicamp, the following compensation, but no other compensation: (i) the prorated portion of the weekly per diem specified for the current League Year (as set forth in Article XXXVII, Section 3); (ii) the meal allowance specified for the current League Year (as set forth in Article XXXIX, Section 1); and (iii) all travel expenses to and from the camp, plus housing (for players coming from out-of-town).

**Section 4. Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

**Section 5. Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

# ARTICLE XXXVII
# PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell/Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** A rookie player will receive "per diem" payments at the rate of $775 per week in the 2006 League Year, $800 per week in the 2007-08 League Years, $825 per week in the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year, and $850 per week in the 2011 League Year if it is a Capped Year and the 2012 League Year, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game.

**Section 4. Veteran Per Diem:** A veteran player will receive "per diem" payments at the rate of $1,100 per week in the 2006-07 League Years, $1,225 per week in the 2008-10 League Years and the 2011 League Year if it is an Uncapped Year, and $1,375 per week in the 2011 League Year if it is a Capped Year and the 2012 League Year, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**Section 6. Number of Pre-Season Games:** The NFL will use its best efforts to hold no more than four pre-season games.

177

***Section 7*. Telephones:** Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

***Section 8*. Expenses:** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

178

# ARTICLE XXXVIII
# SALARIES

**Sections 1-5.** [*Omitted*]

**Section 6. Minimum Salaries:**

(a)    Beginning in the 2006 League Year, the Paragraph 5 Salary of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| League Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Zero Credited Seasons | 275 | 285 | 295 | 310 | 325 | 340 | 355 |
| One Credited Season | 350 | 360 | 370 | 385 | 400 | 415 | 430 |
| Two Credited Seasons | 425 | 435 | 445 | 460 | 475 | 490 | 505 |
| Three Credited Seasons | 500 | 510 | 520 | 535 | 550 | 565 | 580 |
| Four-Six Credited Seasons | 585 | 595 | 605 | 620 | 635 | 650 | 665 |
| Seven-Nine Credited Seasons | 710 | 720 | 730 | 745 | 760 | 775 | 790 |
| Ten or more Credited Seasons | 810 | 820 | 830 | 845 | 860 | 875 | 890 |

(all amounts in thousands of dollars)

provided, however, that if any League Year other than the 2012 League Year is an Uncapped Year, then the minimum Paragraph 5 Salary for each such Uncapped Year shall only increase $10,000 from the prior League Year (e.g., if the 2010 League Year is Uncapped, then the minimum Paragraph 5 Salary for a player with zero Credited Seasons for 2010 shall be $320,000 instead of $325,000).

(b)    Beginning in the 2006 League Year, the Minimum Salary of any player not on a Club's Active/Inactive List (excluding practice squad) shall be as follows:

| League Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Zero Credited Seasons | 180 | 190 | 200 | 215 | 230 | 245 | 260 |
| One Credited Season | 195 | 205 | 215 | 230 | 245 | 260 | 275 |
| Two Credited Seasons | 210 | 220 | 230 | 245 | 260 | 275 | 290 |
| Three Credited Seasons | 250 | 260 | 270 | 285 | 300 | 315 | 330 |
| Four-Six Credited Seasons | 275 | 285 | 295 | 310 | 325 | 340 | 355 |
| Seven-Nine Credited Seasons | 300 | 310 | 320 | 335 | 350 | 365 | 380 |
| Ten or more Credited Seasons | 325 | 335 | 345 | 360 | 375 | 390 | 405 |

(all amounts in thousands of dollars)

provided, however, that if any League Year other than the 2012 League Year is an Uncapped Year, then the minimum Paragraph 5 Salary for each such Uncapped Year shall only increase $10,000 from the prior League Year (e.g., if the 2010 League Year is Uncapped, then the minimum Paragraph 5 Salary

179

for a player with zero Credited Seasons for 2010 shall be $225,000 instead of $230,000).

**Section 7. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three (3) or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

**Section 8. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two (2) or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 9. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 10. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 11. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

180

*Section 12.* **Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

*Section 13.* **Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement will be provided to the NFLPA within two (2) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

*Section 14.* **Split Contracts:**
  (a)    [*Omitted*]
  (b)    After the point in the regular season at which a player with four (4) or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

*Section 15.* **Funding of Deferred and Guaranteed Contracts:** The NFL may require that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club

181

funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

182

## ARTICLE XXXVIII-A
## MINIMUM SALARY BENEFIT

*Section 1.* **Qualifying Players**: For purposes of this Article, a "Qualifying Player" shall be defined as a player with four (4) or more Credited Seasons, whose contract has expired or been terminated, who signs a Qualifying Contract.

*Section 2.* **Qualifying Contracts:** For purposes of this section, a "Qualifying Contract" shall be defined as a Player Contract signed by a Qualifying Player that (a) covers only a single League Year and (b) contains no terms that affect compensation in any way other than (1) the applicable minimum Paragraph 5 Salary, (2) up to $40,000 in additional compensation for the 2006-08 League Years, or up to $50,000 in additional compensation for the 2009-11 League Years (e.g., signing bonus allocation, roster, report, or any incentive (LTBE or not)), and/or (3) a guarantee for salary and/or Salary advance of up to the Minimum Salary for a player with two (2) Credited Seasons (e.g., $425,000 in the 2006 League Year). Thus, for example, a contract that includes an option year is not a Qualifying Contract. Similarly, a Qualifying Contract may not be extended or renegotiated in any manner. Split contracts, if they otherwise qualify, may be Qualifying Contracts. If the player's prior contract was terminated, he is eligible to sign a Qualifying Contract if he does not earn more than $40,000 (2006-08 League Years) or $50,000 (for the 2009-2011 League Years) in additional compensation less the amount of any additional compensation and/or guaranteed Salary earned during that League Year under the terminated years of his prior contract(s), but his combined compensation from the terminated contract(s) earned for that League Year and the Qualifying Contract cannot exceed the applicable minimum for that League Year plus $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in additional compensation.

*Section 3.* **Additional Compensation Rules:**

(a)      Per-day off-season workout payments shall not be considered in determining "additional compensation" under Section 2 above, if such payments do not exceed the minimum level prescribed by Article XXXV (e.g., $110 per day for fourteen (14) four-day weeks ($6,160) during the 2006 League Year).

(b)      If, however, the Player Contract provides for off-season workout payments above the minimum level, (e.g., $111 per day for fourteen (14) four-day weeks during the 2006 League Year), then the total of those payments (e.g., $6,216 in the prior example) shall be included in determining "additional compensation."

(c)      If the Player Contract provides for off-season workout bonus payments on a basis other than a per-day payment, such amounts shall count as "additional compensation" but will not affect the treatment of any off-

183

season workout payments that do not exceed the minimum prescribed level. For example, without limitation on any other example, a player with a 2006 Player Contract that provides for a $40,000 bonus payable to the player for participating in at least ten (10) days of off-season workouts, in addition to the per-day minimum of $110 and no other "additional compensation," has "additional compensation" of $40,000.

(d)      If a player receives from a single Club, under a series of contracts, off-season workout payments specified on a per-day basis that average more than the minimum level prescribed by Article XXXV (e.g., more than $110 per day during the 2006 League Year), then all of the off-season workout payments paid on a per-day basis shall count as "additional compensation."

(e)      If a player is eligible to sign a Qualifying Contract with a New Club in accordance with Section 9 below, the full amount of any signing bonus payable to the player under any Player Contract that was executed in the same League Year as the proposed Qualifying Contract shall count against the "additional compensation" that can be earned by such player in accordance with Section 2 above. No other signing bonus amounts from contracts other than the Qualifying Contract shall count as "additional compensation" for such player.

(f)      If a player is eligible to sign a Qualifying Contract with his Old Club in accordance with Section 11 below, the circumstances in which signing bonus from a contract other than the Qualifying Contract may count against the $40,000 (or $50,000 during the 2009-2011 League Years) in additional compensation that can be earned by the player in accordance with Section 2 above, shall be determined exclusively under Section 11 below, the terms of which are not affected by Subsection 3(e) above.

**Section 4. Payments:** Players with Qualifying Contracts shall be paid 1/17th of the specified minimum salary on a weekly basis (e.g., 1/17 of $810,000 per week in the 2006 League Year for a player with ten (10) or more Credited Seasons).

**Section 5. Reduced Salary Cap Count:** Notwithstanding any other provision of this Agreement, the Salary Cap count for a Qualifying Contract shall be the same as the minimum salary for a player with two (2) Credited Seasons. For split "Qualifying Contracts," the Salary Cap count will equal either the difference between the player's minimum salary and the full minimum salary for players with two (2) Credited Seasons (if the player is on an Active/Inactive List) or the difference between the player's split minimum salary and the split minimum for players with two (2) Credited Seasons (if the player is not on an Active/Inactive List).

**Section 6. Minimum Salary Benefit Calculation:** The difference between

184

the Salary Cap count for a Qualifying Contract and the stated minimum for the Qualifying Player's years of service shall be counted as a Player Benefit ("the Minimum Salary Benefit"). For example, in the 2006 League Year, a Qualifying Player with five (5) Credited Seasons shall receive a Minimum Salary of $585,000; however, only $425,000 shall count against his Club's Team Salary. The difference of $160,000 shall be counted as a Player Benefit. Similarly, for example, in the 2006 League Year, a Qualifying Player with 12 Credited Seasons shall receive a Minimum Salary of $810,000; however, only $425,000 shall count against his Club's Team Salary. The difference of $385,000 shall be counted as a Player Benefit.

**Section 7. Extensions of Qualified Contracts:** After the Club's last game of a season and prior to the expiration of the Qualifying Contract, the current Club and Player may agree to extend for one year a Qualifying Contract, provided that the terms of the extension comply with Section 2 above.

**Section 8.** [*Omitted*]

**Section 9. Terminated Qualifying Players:** If his contract is terminated, a Qualifying Player may sign a Qualifying Contract with any "New Club" (defined as any Club that did not hold contractual rights to the player's services on the final day of the prior regular season or last postseason game).

**Section 10. Players Moving to New Club:** In the event that a player signs a Qualifying Contract with a "New Club," the player cannot be traded back to the "Old Club" during that League Year unless the player's prior contract(s) with the Old Club meets the requirements of Section 11 below. In the event that the player signs a Qualifying Contract with a New Club and the Qualifying Contract is terminated by the New Club, the player may sign a Qualifying Contract with his Old Club. Nothing in the foregoing shall prevent a player from signing a contract with his Old Club if the Old Club does not seek to have the contract treated as a Qualifying Contract.

**Section 11. Player Returning to Old Club:** A player whose prior contract was terminated may sign a Qualifying Contract with his "Old Club" (defined as the Club that held contractual rights to the player's services on the final day of the prior regular season or last postseason game), provided that the Old Club did not, on or after January 1 in the calendar year that preceded the calendar year in which his contract was terminated, (a) renegotiate and/or extend his prior contract to increase and guarantee compensation or to convert non-guaranteed compensation to a signing bonus allocation, for more than $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in any League Year of the contract for which the player has received or will receive compensation, or (b) sign the player to a new multi-

185

year contract for more than the applicable Minimum Salary in any League Year of the contract plus $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in additional compensation in any League Year of the contract for which the player has received or will receive compensation, and further provided that (c) the sum of any acceleration from signing bonus that was agreed to in a contract executed on or after January 1 in the calendar year in which the contract was terminated and any other additional compensation that the player has received or will receive from that terminated contract does not exceed $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years). For purposes of the immediately preceding clause (c) only, any acceleration of signing bonus will be counted in the League Year of the contract's termination regardless of whether the contract was terminated before or after June 1, and signing bonus proration for the final League Year of a contract terminated after June 1 in the contract's next to last League Year will be considered to be accelerated. For example, if on January 1, 2006 a player signs a two-year contract for the minimum Paragraph 5 salary in both years and a $80,000 signing bonus, and his contract is terminated on June 2, 2006, the player is not eligible to sign a 2006 Qualifying Contract with his Old Club because the sum of the acceleration of the 2006 prorated portion of the signing bonus ($40,000) that was agreed to in the year of his contract termination and the 2006 prorated portion of signing bonus from that terminated contract ($40,000) resulted in "additional compensation" of more than $40,000 in 2006. However, if the contract was signed on December 1, 2005, and the contract is terminated on June 2, 2006, the player is eligible to sign a Qualifying Contract with his Old Club if that contract includes no other additional compensation.

**Section 12. Players with Expired Contract:** Upon the expiration of a Player Contract, the player may sign a Qualifying Contract with any Club.

**Section 13. Guarantees:** If a Qualifying Contract with guarantees is terminated, the player shall continue to receive the guaranteed portion of the contract and that money shall continue to count against the Team's Salary Cap, but the benefit portion of the player's compensation (including the subsidy) shall cease. For example, if a player with a $710,000 Qualifying Contract, which includes a $425,000 Paragraph 5 guarantee, is terminated after the eighth week of the regular season, he receives $425,000 of the $710,000 Minimum Salary. If the player signs multiple guaranteed Qualifying Contracts covering the same League Year at the applicable Minimum Salary, the maximum guaranteed salary he can earn under all such Qualifying Contracts is $425,000.

**Section 14. Termination Pay:** If a Qualifying Player is eligible for termination pay when he is released and subsequently files a claim, he shall receive the charged amount (e.g., $425,000) plus the full benefit amount (e.g.,

186

$285,000 for a player with a Paragraph 5 Minimum Salary of $710,000). The player does not receive the benefit amount twice (i.e., $995,000).

***Section 15.*** **No Benefit for Non-Qualifying Contracts:** Contracts for players with four (4) or more Credited Seasons who sign at the applicable minimum for that year plus more than $40,000 in additional compensation (e.g., prorated signing bonus, etc.) in any of the 2006-08 League Years, or more than $50,000 in additional compensation in any of the 2009-11 League Years, or who otherwise do not qualify for the benefit, are not Qualifying Contracts. The Salary Cap count for such contracts will be in accordance with existing Salary Cap rules. There will be no Minimum Salary Benefit or reduced Salary Cap count for such contracts.

187

## ARTICLE XXXVIII-B
## PERFORMANCE-BASED POOL

**Section 1. Creation of Fund:** In each Capped Year, the NFL shall create a fund known as the Performance Based Pool that will be deducted from the calculation of the Salary Cap in the same manner as any other player benefit.

**Section 2. Amount of Fund:** For the 2006 League Year, the fund shall be $3 million per Club ($96 million League-wide). The fund will increase in each subsequent Capped Year by 5% unless otherwise agreed by the parties; provided, however, that the NFLPA has the unilateral right to reduce or freeze the amount of the fund pursuant to Article XLVI, Section 1.

**Section 3. Mandatory Distribution Each Year:** There shall be mandatory distribution to players of the entire fund each year.

**Section 4. Qualifying Players:** A player shall be eligible for participation in the Performance Based Pool for a League Year if he plays for at least one down in any regular season game. A player may receive multiple distributions if he qualifies for more than one Club in a single League Year.

**Section 5. Methodology:**

(a)      Each player's "Playtime Percentage" shall be calculated by (i) adding the player's total plays on offense or defense, as appropriate, plus special teams and (ii) dividing that number by the team's total plays on offense or defense, as appropriate, plus special teams;

(b)      Each player's "PBP Compensation" shall be calculated by adding his full regular season Paragraph 5 Salary, prorated signing bonus for the current League Year (plus any signing bonus acceleration (without regard to the June 1 rule) due to his having been released during the applicable League Year, unless the player is re-signed by his old Club without having missed a week of the regular season), earned incentives, and other compensation for the current League Year, subject to the following provisions:

(i)      For all players other than those who receive the Minimum Salary Benefit, the full regular season Paragraph 5 Salary shall be used;

(ii)      For players who were released and later resigned by the same Club during the regular season, the Paragraph 5 Salary from the player's initial contract shall be used for the period ending with the player's release, and the Paragraph 5 Salary from the player's subsequent contract shall be used for the period from release through the term of the subsequent contract;

(iii)      For players who receive the Minimum Salary Benefit, the Paragraph 5 Minimum Salary amount for a player with two (2) Credited Seasons, rather than the stated Paragraph 5 Salary, shall be used to calculate

188

Article XXXVIII-B, Performance-Based Pool

the player's PBP Compensation;

    (iv)    If a Player Contract is renegotiated after the Monday of the tenth week of the regular season to include an unearned incentive for the current League Year that is treated as signing bonus, such incentive shall not be counted in the calculation of PBP Compensation; and

    (v)    If a portion of the Player's Paragraph 5 Salary is treated as a signing bonus, the full Paragraph 5 Salary (rather than the current year's proration) will be counted; all other amounts treated as signing bonus will be included on a prorated basis except for unearned incentives, as described in Subsection (iv) above.

    (c)    Each player's "PBP Index" shall be calculated by dividing the player's Playtime Percentage by his PBP Compensation;

    (d)    Each player shall receive an allocation from the fund determined by (i) dividing his PBP Index by the sum of the PBP Indices for each player on the Club and then (ii) multiplying that percentage by the Club's total PBP allocation.

***Section 6. Corrections:*** If, after the fund has been distributed to players for any given League Year, a player demonstrates that his payment was miscalculated and should have been greater, he shall promptly be paid the additional Performance-Based Pay to which he is entitled, and said amount shall be deducted from the Club's actual PBP allocation for the following League Year.

189

## ARTICLE XXXIX
## MEAL ALLOWANCE

*Section 1.* **Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and postseason as follows: 2006-07 League Years—Breakfast $17.00, Lunch $25.00, Dinner $43.00; 2008-10 League Years and the 2011 League Year if it is an Uncapped Year—Breakfast $18.00, Lunch $27.00, Dinner $45.00; and 2011 League Year if it is a Capped Year and 2012 League Year—Breakfast $19.00, Lunch $29.00, Dinner $47.00. For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*Section 2.* **Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

190

## ARTICLE XL
## DAYS OFF

***Section 1.*** **Rate**: All players will be permitted days off at least at the rate of four (4) days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

***Section 2.*** **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

191

## ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)        Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)        Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

192

not exceed $5,500 during the 2006 League Year, $5,750 during the 2007-08 League Years; $6,100 during the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year; and $6,350 during the 2011 League Year if it is a Capped Year and the 2012 League Year; and (c) the room cost of seven (7) days' stay at a hotel of the Club's choice in the new team city for the player.

**Section 4. Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

# ARTICLE XLII
## POST-SEASON PAY

***Section 1. System:*** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

***Section 2. Compensation:*** A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 06 | 07 | 08 | 09 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|
| **Wild Card Game** | | | | | | | |
| (Division Winner) | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| (Other) | 17 | 18 | 18 | 19 | 19 | 20 | 20 |
| **Division Playoff Game** | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| **Conf. Championship Game** | 37 | 37.5 | 37.5 | 38 | 38 | 40 | 40 |
| **Super Bowl Game** | | | | | | | |
| (Winning Team) | 73 | 78 | 78 | 83 | 83 | 88 | 88 |
| (Losing Team) | 38 | 40 | 40 | 42 | 42 | 44 | 44 |

***Section 3. Wild Card Game; Division Play-off Game:*** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

***Section 4. Conference Championship; Super Bowl Game:***

    (a)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three (3) previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

    (b)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three (3) previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

    (c)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight (8) or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

    (d)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three (3) and not more than seven (7) games (i.e., regular and postseason) will receive one-half the

194

amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)    A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)    A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)    A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5. Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

195

## ARTICLE XLIII
## PRO BOWL GAME

**Section 1. Compensation:** For the 2006 and 2007 seasons, each player on the winning Team in the AFC- NFC Pro Bowl game will receive $40,000 and each player on the losing Team will receive $20,000. These amounts shall be increased to $45,000 and $22,500 respectively for the Pro Bowls following the 2008 through 2010 seasons, and to $50,000 and $25,000 respectively for the Pro Bowls following the 2011 and 2012 seasons.

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

196

# ARTICLE XLIV
## PLAYERS' RIGHT TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician, provided that no Club may conduct its own individual testing for anabolic steroids and related substances or drugs of abuse or alcohol. In addition, the League may conduct mandatory urinalysis testing of all players

197

at the beginning of the pre-season in the same manner as past seasons. The League may also conduct random testing for steroids and related substances as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

*Section 6.* **Substance Abuse**:

(a) **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b) **Anabolic Steroids and Related Substances.** The Policy on Anabolic Steroids and Related Substances in effect as of March 8, 2006, shall remain in effect, except as modified by the parties due to scientific advances with respect to testing techniques or other matters, or as otherwise agreed by the parties. There shall be a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c) **Drugs of Abuse and Alcohol.** The NFL Policy and Program for Substances of Abuse in effect as of March 8, 2006, shall apply with respect to drugs of abuse and alcohol, including annual pre-season testing of all players, except as otherwise amended by the parties.

198

## ARTICLE XLV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

**Section 1. Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

**Section 2. Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two (2) times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

199

## ARTICLE XLVI
## PLAYER BENEFIT COSTS

**Section 1. (a) General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan"), (2) benefits under the NFL Player Supplemental Disability Plan (the "Disability Plan"), and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below 6% of Projected Total Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b)      **1998 Amendment Benefits:** [*No longer applicable*]

(c)      **NFLPA Right To Increase Certain Benefits:** In 2006 and each League Year thereafter for which a Salary Cap applies, the NFLPA will have the unilateral right to increase benefits under the NFL Player Second Career Savings Plan (as described in Article XLVIII) ("Second Career Savings Plan"), the NFL Player Annuity Program (as described in Article XLVIII-A) ("Player Annuity Program"), and the NFL Players Health Reimbursement Account (as described in Article XLVIII-C) ("Health Reimbursement Plan"), but only if such right is exercised on or before April 15 of such League Year, and only to the extent that the cost of such benefit increases is offset by reductions in other benefits pursuant to Section 1(a) of this Article. For 2010 and each League Year thereafter, the parties will jointly negotiate increases, if any, under the Second Career Savings Plan, the Player Annuity Program, the Health Reimbursement Plan, and/or the Severance Plan, but only if such League Year is a Capped Year. Any increase pursuant to this section shall be for one year only and shall not create a continuing obligation of the Clubs.

**Section 2. Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition:** For purposes of this Agreement, the term "Player Benefit Costs" shall be the same as defined in Article XXIV, Section 1(b).

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits

200

for the League Year beginning at approximately the previous March 1, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Total Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three (3) days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5.** 1998 Amendment Benefits: [*No longer applicable*]

**Section 6.** Limitations on Contributions:

(a)     No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Player Annuity Program, the Severance Pay Plan, the NFL Player Supplemental Disability Plan, the Health Reimbursement Account, the NFL Player Benefits Committee, the Workers' Compensation Time Offset Fund, the Performance Based Pool, or the Tuition Assistance Plan (individually, a "Player Benefit Arrangement") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Arrangement shall be amended to prevent any employer provided benefit from accruing or being otherwise credited or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

(b)     The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be re-

201

quired to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

(c)     The parties will amend all Player Benefit Arrangements and the Retirement Plan to the extent necessary to permit any expenses related thereto to be paid by NFL Player Benefits Administration, if established, pursuant to Article XLVIII-E, except for expenses that cannot by law be paid by NFL Player Benefits Administration, or that are not currently deductible under Section 162 of the Internal Revenue Code, notwithstanding any other provision of the plan or this Agreement.

**Section 7. Application of Salary Cap to Plan Years:** For purposes of Articles XLVI through LI, a Salary Cap applies to a Plan Year if a Salary Cap is in effect on the first day of that Plan Year.

**Section 8. Timing:** Player Benefit Costs for pension funding, the Second Career Savings Plan, the NFL Player Supplemental Disability Plan, the Player Annuity Program, the Tuition Assistance Plan, the Health Reimbursement Account, and the 88 Benefit will be deemed to be made in a League Year for purposes of this Agreement if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

202

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1.** **Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Retirement Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

**Section 2.** **Additional Credited Seasons:** [*No longer applicable*]

**Section 3.** **Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Retirement Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4.** **Benefit Credits:** Effective for payments on and after June 1, 2006, the parties will amend Section 4.1 of the Retirement Plan to provide the following Benefit Credits for the indicated Credited Seasons:

| Credited Season in Plan Year | Benefit Credit |
| --- | --- |
| Before 1982 | $250 |
| 1982 through 1992 | $255 |
| 1993 and 1994 | $265 |
| 1995 and 1996 | $315 |
| 1997 | $365 |
| 1998 through the Plan Year that begins prior to the expiration of the Final League Year | $470 |

203

Benefits for affected players in pay status shall be proportionately increased based on the new and prior Benefit Credits, except that the minimum increase for any affected Player will be $50 per month.

**Section 5. Disability Benefits:** The following changes shall be made to the Plan's disability benefits:

(a)     Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will delete the Dependent Children's benefit described in Retirement Plan Section 5.1(e).

(b)     Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will increase the minimum Inactive total and permanent disability benefit from $1,500 to $1,750.

(c)     Effective April 1, 2007, the parties will amend the rules contained in Section 5.3 of the Retirement Plan to read substantially as follows:

> Any person receiving total and permanent disability benefits may be required to submit to periodic physical examinations for the purpose of re-examining his condition. The examinations will occur not more often than once every three (3) years, except that upon request of three (3) or more voting members of the Retirement Board, examinations may occur as frequently as once every six (6) months. For each calendar year in which a person receives total and permanent disability benefits, he must submit a complete copy, with all schedules and attachments, of his annual federal income tax return by July 1 of the following calendar year. A person who has not filed his annual federal income tax return by July 1 must submit either (1) submit a signed statement that he does not intend to file such tax return, and state the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year, and provide such federal income tax return promptly after it is filed. If the Retirement Board or the Disability Initial Claims Committee determines that such person is no longer totally and permanently disabled, the total and permanent disability benefits will terminate. The total and permanent disability benefits of any person refusing to submit to a required physical examination or to submit an annual federal income tax return (or equivalent) will be suspended until such refusal is resolved to the satisfaction of the Retirement Board. If such refusal is not resolved to the satisfaction of the Retirement Board within one year after such person is no-

204

Article XLVII, Retirement Plan

tified of the consequences of his refusal, his total and permanent disability benefits will be terminated. In that event, such person must submit a new application to be eligible to receive any further total and permanent disability benefits, but the classification rules of Plan Section 5.6(a) and 5.6(b) will not apply.

**Section 6.** **Joint and Survivor Reset:** Effective for payments on and after April 1, 2006, the parties will amend the Retirement Plan to provide that the monthly benefit of a player who has elected either (1) a qualified joint and survivor annuity pursuant to Plan Section 4.4(c)(2) or (2) a life and contingent annuitant pension pursuant to Plan Section 4.4(c)(4) with his wife as the beneficiary, and who survives or has survived his wife, will increase to the amount that would have been paid if the player had elected a Life Only Pension as of his Annuity Starting Date (including subsequent benefit increases). The increase in benefit under the previous sentence will be paid beginning as of the later of (i) the first day of the month following the date of the wife's death, and (ii) April 1, 2006, and will continue for the life of the Player. However, no increase will be paid for any month that begins more than 42 months before the date upon which the player first notifies the Retirement Plan of his wife's death. The parties will also amend the Retirement Plan to provide a new table in Appendix B of the Retirement Plan to be used for a player with an Annuity Starting Date after March 31, 2007, which will provide the factors used to determine the actuarial equivalent of the benefit when the player's wife is his beneficiary.

**Section 7.** **Death Benefits:** Effective for payments on and after April 1, 2006, the parties will amend Section 7.2 of the Retirement Plan to insert "$3,600" in place of "$1,200"; "$6,000" in place of "2,000"; and "$9,000" in place of "$3,000."

205

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

*Section 1.* **Maintenance:** The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:**

(a)     **Prior to 2006:** [*No longer applicable*]

(b)     **2006 and Later Years:** For each of the Plan Years 2006 and thereafter in which the Salary Cap applies, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)     **Matching Contributions.** The NFL Clubs in the aggregate will contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two dollars (up to a maximum of $20,000 for each of the Plan Years 2006 through 2008, $22,000 for the 2009 Plan Year, $24,000 for the 2010 Plan Year, and $26,000 for the 2011 Plan Year) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(a)     by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)     by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)     **Minimum Contribution.** The NFL Clubs in the aggregate will contribute to the Savings Plan, for each Plan Year in which a Salary Cap applies, a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three (3) or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two (2) Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce

206

his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)    **Expenses.** The NFL Clubs will make advance contributions to the Savings Plan in an amount sufficient to pay all administrative expenses approved by the Savings Board which are not paid by NFL Player Benefits Administration under Article XLVIII-E.

(c)    **Future Contributions and Collection:** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

(d)    **Automatic Enrollment:** Effective beginning with the 2007 Plan Year, the Plan will be amended to automatically enroll each eligible player who does not otherwise elect to make, or not to make, salary reduction contributions such that his contribution will be 10% of his eligible compensation each pay period up to the maximum permitted under Section 402(g) of the Internal Revenue Code for the calendar year. Effective beginning with the 2008 Plan Year, the Plan will be further amended to allow permissible withdrawals to the full extent permitted under Section 414(w) of the Internal Revenue Code.

207

## ARTICLE XLVIII-A
## PLAYER ANNUITY PROGRAM

**Section 1. Establishment:** The NFL Player Annuity Program ("Annuity Program") will be continued and maintained in full force and effect during the term of this Agreement, except that the structure of the Program will be amended to include both a taxable portion ("Taxable Portion") and a tax-qualified portion ("Qualified Portion"). The Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

**Section 2. Contributions:** For each of the Annuity Years 2006 and thereafter in which a Salary Cap applies, a contribution will be made to the Annuity Program on behalf of the NFL Clubs as follows (unless changed by the NFLPA pursuant to Article XLVI of this Agreement):

(1) **Expenses:** The NFL Clubs will make advance contributions to the Annuity Program in an amount sufficient to pay all administrative expenses approved by the Annuity Board which are not paid by NFL Player Benefits Administration under Article XLVIII-E. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

(2) **Current Allocations:** An Allocation of $65,000 will be made for each eligible Player who earns a Credited Season (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan) in an Annuity Year and who has a total of four (4) or more Credited Seasons as of the end of such Annuity Year.

(3) **Retroactive Allocations:** Retroactive Allocations will be made as provided in Section 3.4 of the Annuity Program.

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

**Section 3. Timing:** Effective April 1, 2006, an eligible player who earns a Credited Season through the sixth week of the regular season of an Annuity Year will receive an allocation on December 1 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive an allocation on March 31 of such Annuity Year.

**Section 4. Structure:** The Annuity Program will hold assets for the sole

208

benefit of players and their beneficiaries and to pay all expenses of the Annuity Program approved by the Annuity Board. The Annuity Program is currently intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity.

**Section 5.** **New Tax-Qualified Portion:** The parties agree to amend the Annuity Program so that a portion of the Allocations will be contributed to the Qualified Portion. The remaining portion of the Allocations will continue to be credited to the Taxable Portion. The portion of the Allocations to be contributed to the Qualified Portion will be the largest multiple of $1,000 that does not exceed (1) the amount that is currently deductible by the NFL Clubs under Section 404 of the Internal Revenue Code, or (2) the maximum amount permitted by Section 415 of the Internal Revenue Code.

The parties agree that, beginning with the 2006 Plan Year, a player who earns his second or third Credited Season will receive an allocation of $5,000 for that year in the new Qualified Portion, subject to a vesting schedule. Forfeitures will be used to reduce employer contributions. Allocations in later years for a player will be reduced to the extent such player receives an allocation for his second or third Credited Season.

**Section 6.** **NFL Player Annuity & Insurance Company Net Worth:** Unless unusual circumstances exist that warrant a greater Net Worth, the estimated Net Worth of the NFL Player Annuity & Insurance Company ("Company") at the end of each calendar year beginning with 2006 shall not exceed the greater of (1) one percent (1%) of the total Segregated Accounts, or (2) $3.5 million. For purposes of this calculation, Net Worth is defined as the net worth of the Company as shown in the pro forma financial statements. At its last meeting in each calendar year, the Company's Board of Directors shall determine:

(a)     Whether or not unusual circumstances exist that warrant a greater estimated Net Worth;

(b)     The amount of any payment to the player Segregated Accounts from the Company General Account for the current year, such that the estimated Net Worth for the current year does not exceed the above limits; and

(c)     The amount, if any, by which the Company charge to the player Segregated Accounts for the upcoming calendar year should be reduced, such that the estimated Net Worth at the end of the following calendar year is not expected to exceed the above limits.

209

# ARTICLE XLVIII-B
# TUITION ASSISTANCE PLAN

*Section 1.* **Establishment:** The NFL Player Tuition Assistance Plan will provide up to $15,000 per League Year for which a Salary Cap applies as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. The NFL Player Tuition Assistance Plan is a written plan that is intended to qualify as an educational assistance program under Section 127 of the Internal Revenue Code that provides benefits to a player in any calendar year up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan begins on April 1.

*Section 2.* **Eligibility:**

(a)     To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.

(b)     Effective April 1, 2006, a player, who (i)  is not eligible for benefits under 2(a) above, (ii)  has at least one Credited Season after the 2005 Season, and (iii)  has at least five (5) Credited Seasons under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, shall be eligible to be reimbursed for up to $45,000 of his expenses incurred for qualifying tuition, fees and books, provided such expenses are incurred within 36 months of the first day of the League Year immediately following the player's last regular or post season game and otherwise satisfy the conditions of the plan.

(c)     A player who has just completed his first Credited Season will be eligible to be reimbursed for a course that begins after his Club's final game of that season and prior to the next following season provided that:

(i)     if, on the day the course begins, the player is under contract with a Club; and

(ii)     if any portion of the course is taught after the start of his Club's off-season workout program, that the player does not have to travel more than 100 miles from that Club's main practice facility to take the course, provided that

(iii)     the Parties may waive the 100 mile limitation in any individual

210

case, based upon a showing of unreasonable hardship.

***Section 3.*** **Reimbursement:** An eligible player will be reimbursed no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books.

# ARTICLE XLVIII-C
## NFL PLAYERS HEALTH REIMBURSEMENT ACCOUNT

*Section 1.* **Establishment:** The parties will jointly establish a new benefit, to be called the NFL Players Health Reimbursement Account Plan (hereinafter referred to as "Health Reimbursement Plan" or "Plan"). The Health Reimbursement Plan will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Plan Year begins on April 1. The Health Reimbursement Plan, and any and all future amendments thereto as adopted in accordance with the terms of that Plan, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:** For each of the Plan Years 2006 and thereafter in which a Salary Cap applies, a contribution will be made to the Health Reimbursement Plan on behalf of the NFL Clubs based on the actuarial assumptions and methods contained in Appendix J-1. If either party terminates the CBA such that the last League Year subject to a Salary Cap is before 2011, the unfunded present value of accrued nominal accounts shall be funded at a time or times selected by the NFL Management Council in an amount sufficient to pay reimbursements when they become due. All such contributions will be held for the exclusive benefit of Participants and their beneficiaries, and under no circumstances will any assets of the Plan ever revert to, or be used by, an Employer, the League, or the NFLPA. Notwithstanding the above, any contribution made by or on behalf of an Employer to the Plan due to a mistake of fact or law will be returned to such Employer within six (6) months of the determination that such contribution was in error. The return of contributions is limited to that portion of the contribution as to which there was a mistake of fact or law. A returned contribution will not include any earnings attributable to the contribution, but will be reduced by any losses attributable to the contribution. It will be the duty of the fiduciaries of the Health Reimbursement Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. No participant or beneficiary is required to or permitted to contribute, except as may be required by law. The present value of accrued nominal accounts will be determined based on the actuarial assumptions and methods contained in Appendix J-1.

*Section 3.* **Eligibility:** A Player participates in this Plan if (a) he earns a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement

212

Plan ("Retirement Plan") for 2006 or for any later Plan Year for which a Salary Cap applies and has a total of three (3) or more Credited Seasons as of the end of such Plan Year, or (b) his last Credited Season under the Retirement Plan is either 2004 or 2005 and he had a total of eight (8) or more Credited Seasons as of the end of the such Plan Year.

**Section 4. Health Reimbursement Accounts:** A nominal account will be established to account for the interest of each eligible player. No interest, other investment earnings, or losses will be credited to any nominal account, except as described under Section 7(b) below. Reimbursement payments from the Plan to eligible players, their spouses, and dependents will reduce the health reimbursement accounts dollar-for-dollar. Credits to the nominal accounts of eligible Players are determined as of March 31 of each Plan Year during which a Salary Cap applies as follows:

(a)     On March 31, 2007, the nominal account of each eligible player will be credited with $25,000 for each of his Credited Seasons.

(b)     On March 31, 2008 and at the end of each Plan Year thereafter for which a Salary Cap applies:

(i)     The nominal account of an eligible Player who earned a Credited Season in that Plan Year will be credited with $25,000; and

(ii)    The nominal account of a Player who first becomes eligible in that Plan Year because it is his third Credited Season will be credited with an additional $50,000 for that year only.

(c)     The determination by the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan of a Player's Credited Seasons will be binding on the Plan. A player who is awarded Credited Seasons by the Retirement Board and who thereby (1) becomes eligible to participate in the Plan or (2) becomes eligible for additional credits, will receive retroactive credits to his nominal account as of the end of the Plan Year in which the Retirement Board's Credited Season determination is made. The amount of the retroactive allocation will be $25,000 times the number of Credited Seasons not already counted under the Plan.

Total credits to an eligible player's nominal account shall not exceed $300,000.

**Section 5. Payments from Health Reimbursement Accounts:** The Plan will reimburse medical care expenses (within the meaning of Internal Revenue Code section 213(d), and including, without limitation, direct medical expenses, medical insurance premiums, and medical insurance copays and deductibles to the extent provided in such Internal Revenue Code section) incurred by eligible players and their spouses and dependents without regard to Section 152(b)(1), (b)(2) and (d)(1)(B)). The Plan will be established and administered to use the broadest allowable definition of "dependent" permitted by law. Payments will be made only to the extent that the player or the player's spouse or dependents have not been reimbursed

213

for the expense from any other plan. No player will have the right to receive cash or any taxable or nontaxable benefit other than the reimbursement of medical care expenses incurred by the player and his spouse and dependents. No reimbursement will be made to the extent that it would reduce the Player's Health Reimbursement Account below zero. A player's rights under this Health Reimbursement Plan may not be transferred, assigned, or alienated, except pursuant to a qualified medical child support order as defined in Section 609(a)(2) of ERISA.

Upon the death of a player, any remaining account balance may be used only to reimburse the medical care expenses of his surviving spouse and dependents. Upon the death of such surviving spouse and last dependent, or upon the death of the player if there is no surviving spouse or dependents, any unused remaining balance is cancelled.

A player may receive a reimbursement from this Plan only for expenses incurred during a period of time during which he is not covered by (a) the Group Insurance provided in Section 1 of Article XLIX and (b) the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article XLIX; except that a player who is covered by the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article XLIX by reason of COBRA may receive a reimbursement from this Plan.

**Section 6. Structure:** The Health Reimbursement Plan will hold assets for the exclusive benefit of players and their beneficiaries. The parties agree that the Plan will be administered by a Health Board, and that prior to the first meeting of the Health Board the advisors to the Health Reimbursement Plan will be the same as the advisors to the Savings Plan. The Health Reimbursement Plan is intended to be a health care reimbursement arrangement as described in IRS Notice 2002-45, 2002-28 IRB 93; Rev. Rul. 2002-41, 2002-28 IRB 75; and Situation 1 of IRS Revenue Ruling 2005-24.

**Section 7. Plan Operation in Uncapped Years:** The Plan will operate as follows in years for which no Salary Cap applies:

(a)    The Plan will continue in existence until all nominal accounts have been paid out or forfeited; and

(b)    The nominal accounts will not be credited with any earnings or interest except to the extent that, in the sole discretion of the Health Board, accumulated Plan earnings exceed current expenses and an appropriate reserve.

214

# ARTICLE XLVIII-D
## 88 BENEFIT

***Section 1:* Establishment:** The parties agree to design and establish a new plan, effective February 1, 2007, to be called the "88 Plan," to provide medical benefits to former Players who are (1) vested due to their Credited Seasons or their total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (2) determined by the governing Board of the 88 Plan (the "88 Board") to have "dementia," as defined by the parties. The 88 Plan will be jointly administered, pursuant to the requirements of the Taft-Hartley Act, in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The 88 Plan, and any and all future amendments thereto, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Prior to the first meeting of the 88 Board, the advisors to the 88 Plan will be the same as the advisors to the Savings Plan. The Plan Year begins on April 1.

***Section 2:* Benefits:** The Plan will reimburse, or pay for, certain costs related to dementia. In no event will the total payments to or on behalf of an eligible player exceed $88,000 in any year, and in no event will benefits be paid for any month or other period of time that precedes the later of (1) February 1, 2007, or (2) the date the 88 Board first receives a written application or similar letter requesting the benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit, except that an application received on or before May 15, 2007, will be deemed to have been received on February 1, 2007. The costs to be paid for an eligible player include:

(a)      For any month in which an eligible player was admitted as an in-patient at an eligible institution for all or part of the month, institutional custodial care, institutional charges, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $88,000; and

(b)      For any month in which an eligible player was not admitted as an in-patient at an eligible institution for all or part of the month, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $50,000.

The maximum benefit payable for any month shall be reduced, but not below zero, by the amount of any total and permanent disability benefits paid by the Bert Bell/Pete Rozelle NFL Player Retirement Plan and the NFL Player Supplemental Disability Plan. However, the maximum benefit payable for any month shall not be reduced by those total and permanent disability benefits paid to players who are receiving the Inactive total

215

and permanent disability benefit described in Section 5.1(d) of the Bert Bell/Pete Rozelle NFL Player Retirement Plan. In the case of a player who has reached his normal retirement date under the Bert Bell/Pete Rozelle Plan and who is receiving total and disability benefits under Section 5.1(a), 5.1(b), or 5.1(c) of the Bert Bell/Pete Rozelle Plan (including a player who has converted to retirement benefits under Section 5.4 of that Plan), the maximum benefit payable for any month shall be reduced, but not below zero, by the excess of (1) the monthly benefit the player would receive from both the Bert Bell/Pete Rozelle Plan and the Supplemental Disability Plan if he elected a Life Only form beginning on his normal retirement date, over (2) the monthly benefit the player would have received from the Bert Bell/Pete Rozelle Plan in a Life Only form beginning on his normal retirement date based solely on his Credited Seasons, as if he were not disabled. The parties will structure the benefits payable for or to eligible Players to reduce or eliminate taxes on such benefits, to the extent deemed possible. At the discretion of the 88 Board, payments for durable medical equipment and prescription medication may be made directly to the player.

**Section 3: Funding:** Effective February 1, 2007, and continuing for the term of this Agreement, the NFL Clubs will make advance contributions to the 88 Plan in an amount sufficient to pay benefits and all administrative expenses approved by the 88 Board which are not paid by the NFL Player Benefits Committee under Article XLVIII-E.

**Section 4: Term:** This Plan will continue to provide benefits as above after the Final League Year and after the expiration of this Agreement, but only to a former player who qualified during a Plan Year for which a Salary Cap was in effect and who remains qualified.

## ARTICLE XLVIII-E
## NFL PLAYER BENEFITS COMMITTEE

*Section 1.* **Establishment:** The parties agree to consider and, if feasible, jointly establish, as soon as administratively feasible, a labor-management committee as described in the Labor-Management Cooperation Act of 1978 that is exempt from Section 302 of the LMRA pursuant to Section 302(c)(9) of the LMRA. If established, the labor-management committee will be known as "NFL Player Benefits." The NFLPA and the Management Council will have the right to appoint an equal number of voting members of NFL Player Benefits. Prior to the first meeting of NFL Player Benefits, the advisors to NFL Player Benefits will be the same as the advisors to the NFL Player Second Career Savings Plan.

*Section 2.* **Function:** NFL Player Benefits, through an entity to be called NFL Player Benefits Administration, if established, will provide the services now provided by the Plan Office in Baltimore and such other services as the parties may direct it to perform. NFL Player Benefits Administration, if established, will also pay directly the expenses of the Bert Bell/Pete Rozelle NFL Player Retirement Plan, the NFL Player Second Career Savings Plan, the NFL Player Supplemental Disability Plan, the NFL Player Annuity Program, the 88 Plan, and the Health Reimbursement Plan, including investment, legal, actuarial, consulting, audit, and other expenses, except expenses that cannot be so paid by law, to the extent deemed appropriate by NFL Player Benefits.

*Section 3.* **Expenses:** The NFL Clubs will pay in advance amounts sufficient to fund each budget or expense of NFL Player Benefits Administration, if established, to the extent such budget or expense is approved by NFL Player Benefits. Such amounts will be a Player Benefit Cost for purposes of this Agreement.

*Section 4.* **Uncapped Years:** During League Years in which no Salary Cap applies, NFL Player Benefits Administration, if established, will be funded by the Bert Bell/Pete Rozelle NFL Player Retirement Plan, the NFL Player Supplemental Disability Plan, the NFL Player Second Career Savings Plan, the NFL Player Annuity Program, the 88 Plan, and the Health Reimbursement Plan proportionately in accordance with the services provided to each such plan, or otherwise to the extent the parties agree.

217

## ARTICLE XLIX
## GROUP INSURANCE

*Section 1.* **Group Benefits:** Players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)     **Life Insurance:** Effective September 6, 2006, a rookie player will be entitled to $300,000 in coverage, and a veteran player's coverage will be increased by $100,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan NFL Player Retirement Plan ("Retirement Plan")) up to a maximum of $800,000 in coverage.

(b)     **Medical:** Each player is required to pay an annual deductible of $400 per individual per plan year and $800 per family per plan year, with maximum out-of-pocket expenses of $1600 (including the deductible) for each covered individual. In addition:

(1)     the co-insurance paid by a covered individual for services rendered by out-of-network providers will be 30% of covered charges; and

(2)     the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and

(3)     a prescription drug card will be provided to covered individuals requiring a $5 co-pay for generic drugs and a $10 co-pay for brand name drugs if the generic or brand name drugs are obtained from participating pharmacies. The availability of participating pharmacies will not be significantly reduced below the level initially provided by CIGNA.

(4)     The maximum lifetime benefits paid on behalf of a covered individual will be $2.5 million.

(c)     **Dental:** Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)     Preventive care paid at 100% of UCR;

(2)     General services paid at 85% of UCR; and

(3)     Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

(d)     **Period of Benefits:** Subject to the extension provided in Section 2, players will continue to receive the benefits provided in this article through the end of the Plan Year in which they are released or otherwise sever employment. Effective September 7, 2005, players vested under the Retirement Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive the benefits provided under this section until the first regular season game of the season that begins in the following calendar year. Group benefits are guaranteed during the term of

**218**

this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

(e) **Family Medical and Dental Coverage for Deceased Players:** A player's enrolled dependents (including a child born to the player's wife within ten (10) months after the player's death) shall be entitled to continuing family medical and dental coverage effective August 1, 2001, as follows:

(1) for the dependents of a player on the Active, Inactive, Reserve/Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;

(2) for dependents of a player who was receiving coverage under this Article at the time of his death, coverage will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.

**Section 2. Extended Post-Career Medical and Dental Benefits:** The medical and dental benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)-(c) [*no longer applicable*]

(d) Players vested under the Retirement Plan who are released or otherwise sever employment at any time after the first regular season game in the 2002 season, and before the first regular season game in the 2005 season will continue to receive the benefits described in Subsections 1(b) and 1(c) above for forty-eight (48) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Subsection 1(d) of this Article.

(e) Players vested under the Retirement Plan who are released or otherwise sever employment at any time on or after the first regular season game in the 2005 season, and prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above through the end of the Plan Year in which such release or severance occurs and for the following sixty (60) month period.

(f) All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described above are provided, as if such additional benefits had not been provided.

**Section 3. Limitations and Rules for Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a) The benefits described in Subsections 2(d) and 2(e) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including,

without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)    Players eligible for coverage under Section 2 above are not obligated to enroll in any other health plan or program for health services offered by an employer

(c)    The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to, in the 2006 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4.** [*No longer applicable*]

**Section 5. Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will be entitled to appoint one of the Trustees of the NFL Players Insurance Plan. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

220

## ARTICLE L
## SEVERANCE PAY

***Section 1.* Eligibility:** Only players with two (2) or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan), at least one of which is for a season occurring in 1993 through 2011, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay. Determinations of the Retirement Board with respect to Credited Seasons will be final and binding for purposes of determining severance pay.

***Section 2.* Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; (c) $12,500 per Credited Season for each of the seasons 2000 through 2008; and (d) $15,000 per Credited Season for each of the seasons 2009 through 2011; for which a Salary Cap is in effect at the beginning of that Credited Season.

***Section 3.* Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

***Section 4.* Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
| --- | --- | --- |
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through the end of the League Year, or earlier | June 1 | June 30 |
| The beginning of the League Year through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

221

Article L, Severance Pay

**Section 5. Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay:** Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

222

# ARTICLE LI
# DISABILITY PLAN

**Section 1. Maintenance:** The NFL Player Supplemental Disability Plan ("Supplemental Disability Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Supplemental Disability Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:** For each Plan Year in which the Salary Cap applies, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and all administrative expenses approved by the Disability Board which are not paid by the NFL Player Benefits Administration under Article XLVIII-E. It will be the duty of the fiduciaries of the Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

**Section 3. Extension:** For each Plan Year in which the Salary Cap applies, a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

223

## ARTICLE LII
## BENEFIT ARBITRATOR

*Section 1.* **Selection:** The Management Council and the NFLPA will submit five (5) candidates for Benefit Arbitrator to each other within two (2) weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten (10) candidates submitted, a flip of the coin, no later than three (3) weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

*Section 2.* **Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

*Section 3.* **Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either party may refer a matter to the Benefit Arbitrator by so notifying the Bene-

224

fit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two (2) weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three (3) days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

225

## ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
# WORKERS' COMPENSATION

**Section 1. Benefits:** In any state where workers' compensation coverage is not compulsory or where a Club is excluded from a state's workers' compensation coverage, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its Players. In the event that a Player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its Players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its Players in the same manner provided in Section 1 above.

**Section 3. Arbitration:** In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a Player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Workers' Compensation Offset Provisions:** The parties agree that the following provisions shall exclusively govern any and all rights Clubs have with respect to workers' compensation credits or offsets during the remaining Capped Years of this Agreement.

(i) **"Dollar-for-Dollar" Credits or Offsets.** No Club shall be entitled to claim or receive any dollar-for-dollar credit or offset for salary, benefits, or other compensation paid or payable to a Player against any award or settlement of workers' compensation benefits, either pursuant to Paragraph 10 of the NFL Player Contract or any provision of state law.

(ii) **"Time" Credits or Offsets.** All Clubs are instead entitled only to a "time" credit or offset under Paragraph 10 of the NFL Player Contract or state law, as set forth more specifically in Subsections (A)-(F) below. This "time" credit or offset shall in all cases be expressed or granted as a reduction in the number of weeks of a Player's workers' compensation award or settlement that is attributable to the same period of weeks in which the Player is deemed entitled to salary payments or CBA benefits as described in this Section. The credit or offset shall be at the weekly rate specified under the state workers' compensation law in question. Because the period from the beginning of the regular season to the end of the League Year (25

227

weeks) is approximately 1.5 times longer than the seventeen (17) week period over which Players receive salary and/or Injury Protection payments, the parties agree that, in calculating the "time" credit or offset as set forth more particularly herein, the Club is entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week during the regular season for which a Player is awarded or executes a settlement agreement for workers' compensation benefits and for the same period of weeks is paid his full Paragraph 5 salary or Injury Protection payments.

(A)    In the case of salary payments pursuant to Paragraph 5 or 9 of the NFL Player Contract, the Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week during the regular season in which the Player is physically unable to perform his services under his contract due to an injury he suffers while performing services during that contract year, to a maximum of 25 weeks, provided that the Player receives his full salary as set forth in Paragraph 5 of his contract for the period in question. For example, if a Player receives three (3) weeks of Paragraph 5 salary subsequent to an injury that rendered him unable to perform for three (3) games (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 4.5 (= 3 x 1.5) weeks of the Player's workers' compensation award or settlement. As another example, if a Player receives seventeen (17) weeks of Paragraph 5 salary subsequent to an injury that rendered him unable to perform all 16 games of the regular season (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 (= 17 x 1.5) weeks of the Player's workers' compensation award or settlement.

(B)    In the case of Injury Protection payments, a Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week from the beginning of regular season to the end of the League Year that the Player receives full Injury Protection payments, to a maximum of 25 weeks. For example, if a Player receives the Injury Protection payments for 17 weeks (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 weeks of the Player's workers' compensation award or settlement. As another example, if a Player receives Injury Protection payments for three (3) weeks but then signs a contract for that season with another Club such that benefits payments cease, the Club will be entitled to a reduction of 4.5 weeks of the workers' compensation award or settlement. In the event that a Club pays a Player full Injury Protection payments prior to the first regular season game of the League Year, the Club will be entitled to a reduction of 1.5 weeks of the Player's workers' compensation award or settlement for each week during the regular season to the end of the League Year for which the Player's Injury Protection payments are made.

(C)    Nothing in this Section 4 shall be interpreted to preclude a Club from receiving the "time" credit or offset set forth in this Section for both

228

salary payments and Injury Protection payments when both payments are made.

(D)    In the event that an Injury Grievance, Injury Protection, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, is settled between the Player and the Club, or in the event that a Club and Player execute an injury-related settlement agreement, the Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week that the Player is deemed entitled to receive his full Paragraph 5 salary or Injury Protection payments pursuant to the settlement, to a maximum of 25 weeks. The Club and Player shall be required to specify in the written settlement agreement the number of weeks for which the Player is receiving his full Paragraph 5 salary or Injury Protection payments under the settlement so that the appropriate number of weeks of the Player's workers' compensation award or settlement can be reduced. For example, if a Player and a Club settle an Injury Grievance, Injury Protection or injury guarantee claim for a specified period of three (3) weeks, the Club will be entitled to a reduction of 4.5 (= 3 x 1.5) weeks of the Player's workers' compensation award or settlement.

(E)    In the event that an Arbitrator awards Paragraph 5 salary or Injury Protection payments in an Injury Grievance, Injury Protection, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, for the same period of weeks for which a Player has already been awarded workers' compensation benefits or received a workers compensation settlement, the Club shall be entitled to a reduction of 1.5 weeks of the Player's workers' compensation award or settlement for each week the Player is deemed entitled to receive his full Paragraph 5 salary or Injury Protection payments pursuant to the Arbitrator's award. For example, if an Arbitrator awards a Player three (3) weeks of Paragraph 5 salary pursuant to an Injury Grievance award and the Player has already been awarded workers' compensation benefits or received a workers' compensation settlement for that same period, the Arbitrator shall reduce the award by an amount equal to 4.5 (= 3 x 1.5) weeks of workers' compensation benefits.

(F)    Clubs are not entitled to any credit or offset under this Article against any workers' compensation benefits attributable to the period of time after the last League Year for which the Player is entitled to receive salary payments (or, in cases where the Player receives Injury Protection payments, after such period) from the Club, even if the Player's entitlement to such payments is not determined until after the League Year in question. No payment of any of the following may be used by a Club as a basis for claiming any workers' compensation credit or offset under this Article:

(1) Signing bonus;

229

(2) Option bonus;

(3) Roster bonus;

(4) Incentive bonus;

(5) Performance-based pay earned prior to the date of injury (unless, for any period of time in which a Club would otherwise be entitled to a credit or offset pursuant to this Section, the Player's weekly salary would be less than the amount of weekly workers' compensation benefits payable under state law, in which case the performance-based pay could be added by the Club to the Player's Paragraph 5 salary for those weeks in which the Club would be entitled to a credit or offset under this Section);

(6) Deferred compensation (except where the deferred compensation is salary attributable to the weeks for which the Player has been awarded or has executed a settlement agreement for workers' compensation benefits as described in this Section in which case the Club is permitted a credit or offset in the same manner as if the salary was not deferred and instead was paid during the League Year in which the Player was physically unable to perform his services under his NFL Player Contract due to an injury he suffered while performing services during that contract year);

(7) Severance pay; or

(8) Any other form of compensation other than Paragraph 5 salary under the NFL Player Contract or Injury Protection payments under the CBA.

(G) Total and Permanent, Line of Duty and Degenerative Disability Benefits paid pursuant to the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents are not subject to any credit or offset for workers' compensation benefits, whether or not those benefits are payable during the same period in which the disability payments are payable. Clubs are not entitled to any credit or offset under this Article for any workers' compensation benefits payable to any Player against any payments made to any Player under the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents; provided, however, that the receipt of such disability payments by the Player shall not affect the Club's right to claim or

230

receive any offsets or credits set forth elsewhere in this Article.

(iii)    **Pending cases.** The parties agree to settle those Players' workers' compensation claims and related cases that were pending or in any stage of appeal as of March 8, 2006, and thereafter in which a Player or former Player has claimed entitlement to workers' compensation benefits on account of an injury or injuries suffered while performing services under a NFL Player Contract and in which a Club is claiming any entitlement to a credit or offset greater than the credit or offset provided herein; all such settlements shall limit credits or offsets as set forth in this Article, regardless of any awards or decisions already entered in any particular case. Clubs specifically reserve the right to maintain any defenses they may have in such pending cases that are unrelated to the offset issue.

(iv)    **Remedies.** If, after March 8, 2006, despite the terms of this Article and the Clubs' obligation to comply with Subsection (iii) and all other provisions of this Article, a state court or other competent authority nevertheless renders a decision or other determination with an outcome inconsistent with the terms of this Section 4, then the Player shall have a right to immediate payment from the Club for the amount of any difference between such outcome and the outcome specified in Subsections (i)-(ii) above. A Player may initiate a claim under this Section by filing a written notice by certified mail or fax with the Management Council and furnishing a copy to the Club involved. The claim shall set forth the name of the matter and jurisdiction in which the improper award was made, the amount of payment requested and the basis for the calculation. The claim must be initiated within 45 days of either the date of execution of this Agreement or the date of any adverse order (whichever is later); provided, however, that in the event the Player files an appeal of any adverse order, the time for the Player to notify the Club will begin to run from the date the appeal is decided.

(v)    **Time-Offset Fund.** The NFL shall establish a fund which shall bear the cost of additional benefits or associated insurance and related costs (exclusive of professional fees, administrative overhead, penalties or similar costs) incurred by any Club as a direct result of the adoption of this Section 4. The parties shall use their best efforts to ensure that all parties involved including the Clubs and their insurance carriers will implement this Subsection (v) in such a manner as to minimize the costs and expenses associated with this fund.

(vi)    **Disputes.** Any dispute concerning the operation of Section 4 and/or any payments to a Player under Subsection (iv) will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 5. Preservation of Rights:** Beginning as of the Final League Year, the NFLPA and the Clubs preserve their prior positions (i.e., prior to March 8, 2006) with regard to the applicability and legality of workers' compensation offset provisions under state law, and nothing in this Article shall be-

231

ginning in the Final League Year prevent any Player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision (including, but not limited to, a state statute providing a Club with a dollar-for-dollar credit) is legally binding upon a Player.

232

# ARTICLE LV
# MISCELLANEOUS

*Section 1.* **Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product. Notwithstanding the foregoing, and without affecting interpretation of the preceding sentence, no player will be permitted to be a party to any endorsement arrangement of any kind with a company whose brand name is prominently associated with the production, manufacture, or distribution of a substance that has been banned by the Policy and Procedure with respect to Anabolic Steroids and Related Substances. The Management Council and the NFLPA will agree each year on a list of such companies.

*Section 2.* **Game Day Attire:**

(a)     Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

(b)     On game days, prior to the game and continuing until 90 minutes after the whistle ending each game (pre-season or regular season), players will be prohibited from wearing, displaying, or orally promoting equipment, apparel, or other items that carry commercial names or logos of companies in any televised interview on Club premises, unless such commercial identification has been approved in advance by the League office.

(c)     Notwithstanding Subsection (b) above, players will be permitted to wear apparel bearing the logo "Players Inc" and/or the logo "NFLPA" during televised interviews in the locker room following pre-season and regular season games, provided that such apparel does not display the names, logos, or other identifying marks of any other entity or product that is licensed by or associated with Players Inc or the NFLPA, including, but not limited to, the manufacturer of the apparel or any sponsor or licensee of Players Inc, the NFLPA, or any individual player.

(d)     The provisions in Subsection (b)-(c) above, shall not be used or referred to in any dispute between the parties over prohibition by the League and/or any Club of the wearing of unapproved commercial items in circumstances other than as expressly addressed in Subsections (b)-(c).

*Section 3.* **Appearances:** No Club may unreasonably require a player to appear on radio or television.

*Section 4.* **Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

*Section 5.* **Deduction:** The involuntary deduction of amounts from any

233

compensation due to a player for the purpose of compensating any Club personnel is prohibited.

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three (3) days prior to the date of the game. NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing

234

that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

**Section 16. Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

**Section 20. Prior Side Letters:** Except to the extent inconsistent with this

235

Article LV, Miscellaneous

Agreement or superseded by a new side letter executed by the Parties after the date of this Agreement, all interpretative side letters executed prior to the date of this Agreement shall remain in full force and effect.

236

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap:** No Salary Cap shall be in effect during the Final League Year.

**Section 2. Free Agency If Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is in effect in the League Year prior to the Final League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six (6) or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five (5) Accrued Seasons in the Final League Year, as if such player had four (4) Accrued Seasons, except that the Qualifying Offer amounts specified in Article XIX (Veteran Free Agency), Section 2(b)(ii)(1)-(3) shall be $50,000 greater, and the Qualifying Offer amounts specified in Article XIX Section 2(b)(ii)(4)-(5) shall be $100,000 greater.

**Section 3. Free Agency If No Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five (5) Accrued Seasons.

**Section 4. Franchise and Transition Players:** As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS:
# LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Subject to the provisions of this Article, up-on the expiration (or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

*Section 2.* **Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

*Section 3.* **CBA Expiration:**

(a)      Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six (6) months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)      The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is

238

or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

239

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1.** [*Omitted*]

**Section 2. Effective Date/Expiration Date:** Except as provided in Section 3 below, this Agreement shall be effective from March 8, 2006 until the last day of the 2012 League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire in the League Year immediately following the expiration or termination of this Agreement.

**Section 3. Termination Prior to Expiration Date:**

(a)   Either the NFLPA or the Management Council may terminate both of the final two Capped Years (2010 and 2011) by giving written notice to the other on or before November 8, 2008. In that event, the 2010 League Year would be the Final League Year, and the Agreement would continue in full force and effect until the last day of that League Year, except for the provisions related to the Draft, which would expire as prescribed in Article XVI, Section 1.

(b)   Either the NFLPA or the Management Council may terminate the final Capped Year of this Agreement (2011) by giving written notice to the other on or before November 8, 2009. In that event, the 2011 League Year would be the Final League Year, and the Agreement would continue in full force and effect until the last day of that League Year, except for the provisions related to the Draft, which would expire as prescribed in Article XVI, Section 1.

(c)   **Provision Invalidated:** If at any time after Court Approval during the term of this Agreement, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (Final League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d)   **Termination Due To Collusion:** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the

240

NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty (30) days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty (30) days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten (10) days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)     **No Waiver:** Any failure of the NFL or the NFLPA to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

### Section 4. Effect of Early Termination on Player Contracts:

(a)     If otherwise in compliance with this Agreement upon execution prior to notice of early termination, a Player Contract may not be found to violate this Agreement solely by reason of a subsequent early termination of this Agreement. For example, a Player Contract that, upon execution, complies with the 30% Rule set forth in Article XXIV, Section 8(b), may not be found to violate the 30% Rule solely by reason of a subsequent early termination, although neither the Player nor the Club may, after notice of early termination of this Agreement, exercise any options, or otherwise exercise rights or take actions that would, upon exercise or implementation, cause the Player Contract to violate the 30% Rule.

(b)     Except as otherwise provided in Article XXIV, the Salary Cap accounting treatment accorded to Player Contracts executed, or any options or other rights exercised, prior to any notice of early termination of this Agreement will not change, and such contracts will not be re-valued, solely by reason of such early termination.

(c)     Contracts executed or renegotiated after any notice of early termination of this Agreement, as well as the exercise after such notice of any pre-existing option or contract rights shall be governed by the then-existing Salary Cap rules, taking into account the consequences of any such early termination (e.g., the conversion of 2009 to the Final Capped Year and the conversion of 2010 to an Uncapped Year).

### Section 5. Ratification: This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal pro-

241

*Article LVIII, Duration of Agreement*

cedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

242

## ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

243

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a)    To the National Football League Management Council:
The National Football League
Management Council
280 Park Avenue
New York, New York 10017
Attention: Executive Vice President—Labor Relations

(b)    To an NFL Club:
At the principal address of such Club as then
listed on the records of the NFL or at that Club's
principal office.
Attention: President

(c)    To the NFLPA:
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE    NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION    MANAGEMENT COUNCIL


BY: _____    BY: _____

244

## APPENDIX A
## CHECK-OFF AUTHORIZATION FOR
## NATIONAL FOOTBALL LEAGUE PLAYERS
## ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven (7) days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management

245

Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:


_____
Signature


_____
Player's Name—Type or Print

246

## APPENDIX B
## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under Subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

247

# APPENDIX C
## NFL PLAYER CONTRACT

THIS CONTRACT is between _____,
hereinafter "Player," and_____,
a _____ corporation
(limited partnership) (partnership), hereinafter "Club," operating under
the name of the
as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree
as follows:

1.    TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, terminated, or renewed as specified elsewhere in this contract.

2.    EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory minicamp(s), official pre-season training
camp, all Club meetings and practice sessions, and all pre-season, regular
season and postseason football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

3.    OTHER ACTIVITIES. Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a significant risk of personal injury.

4.    PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
(a)    Player grants to Club and the League, separately and together,

**248**