Exhibit 10
Part 4 of 4

Appendix C

the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)      Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.) that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract ex-

249

pires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

5.    COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____for the 20_____season;

$_____for the 20_____season;

$_____for the 20_____season;

$_____for the 20_____season;

$_____for the 20_____season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.    PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly por-

Appendix C

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7.   DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.   PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.   INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.   WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

251

deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.   SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.   TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.   INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14.   RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which

252

are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.   INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.   EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.   ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

253

18.    FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.    DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.    NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.    OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22.    LAW. This contract is made under and shall be governed by the laws of the State of _____.

Appendix C

23.    WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.    OTHER PROVISIONS.
(a)    Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)    Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)    The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

255

25.   SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

_____        _____
PLAYER                             CLUB
_____        _____
Home Address                       By
_____        _____
Telephone Number                   Club Address
_____        _____
Date                               Date
_____
PLAYER'S CERTIFIED AGENT
_____
Address
_____
Telephone Number
_____
Date

Copy Distribution:   White-League Office     Yellow-Player
                     Green-Member Club       Blue-Management Council
                     Gold-NFLPA              Pink-Player Agent

256

## APPENDIX D
## FIRST REFUSAL OFFER SHEET

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                         Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

    [Supply Information on this Sheet or on Attachment]

    1.    Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

    2.    Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

    3.    Other terms (that need not be matched):

Player:                                  New Club:

By: _____              By: _____
                                         Chief Operating Officer

**APPENDIX E**
**FIRST REFUSAL EXERCISE NOTICE**

Name of Player:                    Date:

Address of Player:                 Name of New Team:

Name and Address of               Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                   Address of Prior Team:

    The undersigned member of the NFL hereby exercises its Right of First
Refusal so as to create a binding Agreement with the player named above
containing the Principal Terms set forth in the First Refusal Offer Sheet (a
copy of which is attached hereto), and those terms of the NFL Player Con-
tract not modified by such Principal Terms.


                                   Prior Team

                                   By: _____
                                   Chief Operating Officer

258

Appendix F

## APPENDIX F
## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By: _____

WITNESSED BY:

_____

259

**APPENDIX G**
**NOTICE OF TERMINATION**

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

260

# APPENDIX H
## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Cash Player Costs, and Total Revenues ("TR") of the NFL and its member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions of the CBA. The information on the Schedule is to be the responsibility of the management of the Clubs and the NFL.

The Management Council and the NFLPA are to retain a national accounting firm (the "Accountants") which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Procedures shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six (6) members with three (3) representatives designated by each of the Management Council and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Procedures described in the preceding paragraph and again to review the results of the Procedures reasonably before issuance of any Special Purpose Letter for that playing season.

The procedures detailed below and/or as otherwise agreed by the parties are and shall be designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Cash Player Costs and Total Revenues of the NFL and its Clubs for such League Year in accordance with the provisions of the CBA. The Accountants will perform the Procedures with respect to the Schedule for each League Year.

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), as agreed upon by the parties, or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report upon the Procedures as referred above.

261

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

## Procedures provided by the Management Council and the NFLPA to be performed by the Accountants

### General

- The CBA and all relevant side letters should be reviewed and understood.

- See Exhibit H.1 for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in TR where appropriate.

- The Player Compensation and Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule shall be made available for review by representatives of the Management Council and the NFLPA prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the Management Council and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with the CBA. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

- Revenue and expense amounts that have been estimated should be re-confirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from TR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, TR.

## Procedures provided by the Management Council and the NFLPA to be performed by the Local Accountants

### General
- The local accountants shall conduct procedures as agreed upon by the parties.

- The CBA and all side letters should be reviewed and understood by all Local Accountants.

- See Exhibit H.2 for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

### Team Salaries - Schedule 1
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the CBA.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the CBA.

263

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the CBA.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this CBA.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

## Benefits - Schedule 2

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

## Player Costs - Schedule 3

- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the CBA.

264

**Cash Player Costs - Schedule 3A**
- Perform procedures provided in Schedules 1 and 2 above and calculate Club's "Cash Salary" and amounts committed to be spent by Club in the year under review for Player Benefits, to determine the Club's contribution to Cash Player Costs (as defined in Article XXIV, Section 4(d)(iv) for such year.

**Revenues - Schedule 4**
- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included in TR in a manner consistent with the CBA. Amounts included in TR, and deductions against such revenues should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in TR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in TR. Test appropriateness of balances where appropriate.

**Questions**
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

265

**Revenue Reporting Procedures and List of Related Entities**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

266

Exhibit H.1

# EXHIBIT H.1
## ACCOUNTANTS' AGREED-UPON PROCEDURES REPORT

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (collectively, the "Parties") with respect to the National Football League Office Reporting Package and the Reporting Packages of the Member Clubs of the National Football League, for the [insert] League Year, solely to assist the Parties in evaluating whether the Reporting Packages were prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and will not perform an audit or examination, the objective of which would be the expression of an opinion on the Reporting Packages. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an audit or examination of the Reporting Packages, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

267

## EXHIBIT H.2
## LOCAL ACCOUNTANTS' AGREED-UPON
## PROCEDURES REPORT

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of management of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule A either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the [Member Club Name], the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

# APPENDIX H-3
## REVENUE ACCOUNTING RULES

The following is a non-exclusive list of revenue accounting rules that were agreed to by the Parties prior to the 2006 League Year that continue in effect under this Agreement, as stated in Article XXIV, Section 1(a). These rules apply to TR as of the 2006 League Year, and to DGR or Excluded DGR, as appropriate, prior to then. These rules apply only to the extent expressly stated below and shall not be used to support or impose an interpretation of any provision of the Settlement Agreement or any other provision of this Agreement. The Parties hereby confirm that, absent an express provision of the Agreement or this Appendix to the contrary, all revenue accounting rules applied prior to the 2006 League Year continue in effect, regardless of whether or not they are set forth or referenced in this Appendix or the text of the Agreement.

## A. Cost of Goods Sold

In the event that a Club or Club Affiliate is regularly engaged in selling goods (e.g., concessions or merchandise) directly to the public, and incurs an actual out-of-pocket, direct cost for purchasing such goods (i.e., the purchase price paid to an unrelated third party including shipping costs and sales taxes paid, net of all discounts), and such goods are not sold to any individual or entity related in any manner to any Club owner or previous owner, then such "cost of goods sold" may be deducted from the calculation of the TR revenues for that Club. Allowable costs of goods deductions shall not include, without limitation: costs that are imputed or allocated in any manner; insurance; depreciation; amortization; costs incurred by any person other than the Club or Club Affiliate, including but not limited to such costs that are reimbursed by the Club or Club Affiliate; maintenance expenses; expenses that have in any manner been shifted from another revenue source that was previously included in TR on a gross basis; marketing; advertising or promotional expenses; and interest or financing costs.

In the event that a Club or Club Affiliate is regularly engaged in selling directly to the public printed materials promoting the Club, NFL players, or NFL football, and the Club or Club Affiliate incurs an actual, out-of-pocket, direct cost in the production of such printed materials, and such goods are not sold to any individual or entity related in any manner to any Club or previous owner, then thirty-three percent (33%) of such costs may be deducted from the printed material revenue included in the calculation of the TR revenues for that Club. This paragraph is intended to supplement without modifying the immediately preceding paragraph pertaining to costs of goods sold.

269

## B. Sponsorship Revenues

In the event that a Club provides tickets to any individual or entity having a sponsorship relationship with the Club (including tickets provided pursuant to any sponsorship contract), the face value of such tickets may be excluded from TR only if the tickets are excluded from TR under Article XXIV, Section 1(a)(ii)(E). In any case, all sponsorship revenue from sponsors (whether cash or barter) less only the face value of any tickets provided by the Club which are otherwise included in TR shall be included in TR (i.e., a revenue amount that a Club receives from a sponsor in connection with the sponsor receiving tickets shall not be counted more than once).

In the event that a Club provides tickets to any individual or entity not having a sponsorship relationship with the Club, and the Club receives anything of value from such individual or entity, then the fair market value of the consideration received by the Club (whether cash or barter), less only the face value of any tickets provided by the Club which would otherwise be included in TR, shall be included in TR.

## C. PSL Refunds

PSL revenues shall be reported net of actual refunds made in the year for which such revenues are reported. If an amount has been refunded, then the refunded amount shall be deducted from PSL revenues used in the calculation of TR. If there is a non-contingent contractual commitment to refund, but the refund is to be made at a later date, then the only amount included is the interest (i.e., deferred compensation interest rate) on the refund. Otherwise, all amounts are included regardless of any refund contingencies. If a refund contingency occurs and money previously included as PSL revenue is refunded, the NFL shall receive a credit against TR (i.e., League-wide TR shall be reduced) in the amount of the refund the next Salary Cap year.

## D. Luxury Boxes, Suites and Premium Seating

Non-shared revenues relating to luxury boxes, suites and premium seating that are included in TR that are not included in Article XXIV, Section 1(a)(i)(1) above will be included in the calculation only after the deduction of direct expenses for depreciation (subject to Article XXIV, Section 4(e)(xi)), rent, interest and taxes. Where a deduction for direct expenses for depreciation for such revenues is available, such direct expenses will be calculated using a reasonable period of depreciation, and will not include acquisition expenses not directly related to the construction or improvement of the luxury box, suite or premium seating.

270

There is no change in the depreciation methods for all stadiums existing as of the 1997 League Year. In addition, if a new stadium replaces the stadiums in place as of January 26, 1999 for any of the following Clubs: Arizona Cardinals, Chicago Bears, Cincinnati Bengals, Denver Broncos, Detroit Lions, Minnesota Vikings, Philadelphia Eagles, Pittsburgh Steelers, San Diego Chargers, San Francisco 49ers, Seattle Seahawks, or Tennessee Titans, then the un-depreciated costs of the luxury boxes at the old stadium will be accelerated into the final League Year of the old stadium and deducted in full as depreciation expense against luxury box revenues. For Jack Kent Cooke Stadium (which went into service in the 1997 League Year), and any other new stadium put into service in the 1998 League Year or thereafter, the depreciable lives for luxury boxes shall be as follows: (i) depreciation on the physical structure of the box (e.g., the concrete, steel, etc. used in the construction of the box) shall be 30 years (however, if the stadium lease term is less than 30 years, the parties agree to revisit the depreciation period for the specific stadium); (ii) depreciation on fixtures for the box (e.g., wiring costs, internal fixtures, etc.) shall be 12 years; and (iii) depreciation on newly purchased furniture and movable fixtures shall be five (5) years.

Any revenues derived from or to be derived from any sale or conveyance of any right to revenue from luxury boxes, suites or premium seating that the NFL and NFLPA do not agree to treat as a PSL pursuant to Article XXIV, Section 1(a)(x)(7) will be included in TR on a straight line amortized basis over the period of time covered by the sale or conveyance of such rights, up to the maximum useful life of the luxury boxes, suites or premium seating, consistent with the first paragraph of this Section D. Any revenues derived from or to be derived from the multi-year lease or sale of luxury boxes, suites or premium seating, as a prepayment or otherwise, will be included in TR on a straight line amortized basis over the period of time covered by the multi-year lease or sale of such seating. If the Club or Club owner is required as part of the transaction to provide to the other party to the transaction with tickets to non-football events, the face value or fair market value of such tickets, whichever is lower, will not be included in the allocation.

### E.  Advertising

Advertising expenses in connection with broadcasts or cablecasts of games or other NFL-related programs are not allowable expenses, except that allowable reasonable and customary expenses for Clubs that produce the broadcast or cablecast themselves shall include payments to unrelated third parties for print, broadcast or cablecast advertising (including "spots") that promote the broadcast or cablecast itself (e.g., ads promoting the team alone are not an allowable expense, but ads promoting the broadcast or cablecast are an allowable expense).

## F.  Special Internet-Related Provisions

Revenues from the NFL Internet Network received by entities that are owned by substantially all of the NFL member Clubs and that are involved in Internet businesses related to the NFL (the "Network Entities"), or by any member Club of the NFL (including, without limitation, revenues from auctions to the extent the net revenues therefrom are no longer used for charitable purposes) will constitute revenue of the recipient entity to be included as part of such entity's contribution to TR, in accordance with Article XXIV, Section 1(a)(i)(3) or 1(a)(i)(4), as the case may be, subject to netting by each entity of the reasonable and customary expenses incurred to generate, and directly related to the generation of, such revenues by the recipient entity, as agreed upon by the parties, or in the absence of such agreement, as determined consistently with the principles applicable to NFL.com as of January 26, 2001, by the jointly-retained Accountant; provided, that no negative number may result from such netting for any member Club (and/or its respective Club Affiliate(s)); and further provided that the aggregate result of netting for the Network Entities collectively may not be a negative number. Payments made to Players Inc pursuant to the Internet Agreement, dated January 26, 2001, and as subsequently extended and modified by the parties ("Internet Agreement") shall then be netted against the Internet revenues of the entities identified above (and allocated among such entities in accordance with their respective net revenues from Internet activities as determined in accordance with this Section) in the League Year in which such sums are paid to Players Inc; provided that the aggregate result of such netting may not be a negative number. The payments made to Players Inc pursuant to the Internet Agreement shall not themselves be separately deducted from aggregate League-wide revenue in the calculation of TR. This paragraph does not apply to any non-Internet related revenues or expenses of any member Club, Club Affiliate, or Network Entity, which are governed by other provisions. The treatment of any negative numbers in connection with this paragraph shall be in accordance with the practice used as of the 2005 League Year.

If at any time, the Network Entities no longer dedicate auction proceeds to charity, then all proceeds from the auction site received by the Network Entities or any other NFL-related entity or the Clubs or any Club Affiliate will be included in calculating the NFL Ventures revenue included in TR in accordance with Article XXIV, Section 1(a)(i)(4), net of the recipient entity's reasonable and customary (1) cost of goods sold, (2) fulfillment costs, (3) payments to players (through Players Inc, in the case of players represented on a group basis by Players Inc as exclusive agent under the Group Licensing Program) for services or items, (4) commissions and listing fees paid to the auction provider, (5) authentication costs, and (6) third-party site development and maintenance costs, in each case provided that such

costs are incurred to generate, and are directly related to the generation of, such proceeds.

## G. NFL Ventures/Non-Internet Expense Deductions

In calculating the net consolidated revenue of NFL Ventures to be included in TR pursuant to Article XXIV, Section 1(a)(i)(4).

Expenses for NFL.com and Satellite TV that are both directly related to the project, and reasonable and customary, may be deducted from such revenues, with the amounts to be determined by the Accountants. Allocations of expenses are permitted if sufficient evidence is provided to support their qualification for deductibility, and are subject to review and adjustment by the Accountants. However, no allocations may be made for salaries and benefits of employees of the NFL or any NFL-related entity, unless the person is documented to and in fact works at least 75% of the time on NFL.com and/or Satellite TV.

Deductible advertising expenses for NFL.com and Satellite TV shall include payments to unrelated third parties for print and broadcast advertising (including "spots") that promote NFL.com and/or Satellite TV, but only if no other NFL product or service (or other product or service) is advertised.

## H. [*Omitted*]

## I. Naming Rights/Pouring Rights

1. If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to pouring rights, such revenues shall be included in TR except to the extent set forth below.

2. If a Club or Club Affiliate receives revenues in cash or barter for or in respect to pouring rights at a stadium that serves as a venue for both the Club and Major League Baseball, the proportion of such revenues to be included in TR shall be limited to: (i) for a Club or Club Affiliate that does not own or operate the stadium, any such revenues received by the Club or Club Affiliate from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such pouring rights revenues (for example, if, in connection with a pouring rights transaction, the Club receives $500,000 from an unrelated third party which owns and operates the stadium, transfers $300,000 in revenue to the MLB tenant, and receives real estate to be used as a parking lot with a value of $150,000 from the MLB tenant, $350,000 shall be included in TR); and (ii) for a Club or Club Affiliate that owns or operates the stadium, any such revenues received by the Club or Club Affiliate multiplied by a fraction, the numerator of which shall be the total at-

273

tendance for all NFL games in the facility during the League Year in question (the "NFL Attendance") and the denominator of which shall be the sum of the NFL Attendance in the League Year in question plus the total attendance at all MLB games, if any, in the facility during the League Year in question. In no case shall there be any double-counting of revenue.

3.      If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to naming rights, such revenues shall be included in TR except to the extent set forth below.

4.      Subject to Article XXIV, Section 4(e)(xi) above, such revenues shall not be included in TR to the extent that they are used to pay for construction of a new stadium or for stadium renovations that increase TR; such exclusions from TR shall be governed by the same rules used to determine the extent to which PSL revenues are excluded from TR, except that any allocation of naming rights lump sum payments among League Years shall be in accordance with Appendix H-3, Section J below.

5.      If a Club or Club Affiliate receives revenues in cash or barter for or in respect to naming rights at a stadium that serves as a venue for both the Club and Major League Baseball, the proportion of such revenues otherwise eligible for inclusion in TR (see Paragraph 4 of this Section I above) (the "eligible revenues") shall be limited to: (i) for a Club or Club Affiliate that does not own or operate the stadium, any eligible revenues received from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such naming rights revenues (see the example in Paragraph 2 of this Section I above); and (ii) for a Club or Club Affiliate that owns or operates the stadium, sixty percent of eligible revenues received by the Club or Club Affiliate. In no case shall there be any double-counting of revenue.

6.      The parties agree that to "operate" a stadium for purposes of this Section I means that the Club or Club Affiliate has the right to receive all naming and pouring rights revenues.

J.   **Lump Sum Payments, etc.**

In the event that a Club or Club Affiliate receives or has received a lump sum payment for sponsorship or other rights for or with respect to multiple years, which revenues would otherwise constitute TR, such revenues shall be allocated among such years according to one of the following methods which the NFL Management Council may elect prior to the initial allocation of each respective lump sum payment:

(i)      in equal annual portions over a period of five (5) years or the duration of the rights, whichever is shorter; or

(ii)      in equal annual portions over a period of ten (10) years or the duration of rights, whichever is shorter; provided that interest from the League Year the revenues are received until the League Years the revenues

274

are allocated into TR shall be imputed and included in TR in equal portions over such periods, calculated on an annual compounded basis using the one-year Treasury Bill rate published in *The Wall Street Journal* of February 1 during the League Year in which the revenues are received.

If a Club enters into a multi-year contract pursuant to which revenues are to be received in different League Years, the contract's attribution of revenues to specific years shall not control the allocation of revenues among League Years for TR purposes if the allocation is inconsistent with the schedule for receipt of such revenues. In that case, and subject to the last two sentences in this paragraph, such revenues shall be allocated to the League Years they are received. If the amount received in any League Year is grossly disproportionate to the pro rata portion of the total amount to be paid, the Accountants shall bring such amount to the attention of the parties, which shall review the relevant facts and consider whether some other attribution is appropriate. For example, without limitation on any other example, if a three-year, $15 million sponsorship contract states that $4 million of the total amount to be paid to the Club is attributable to the first year, $5 million is attributable to the second year, and $6 million is attributable to the third year, but the Club in fact is paid $5 million in the 2006 League Year, and is scheduled to be paid $6 million in the 2007 League Year and $4 million in the 2008 League Year, then $5 million shall be allocated to TR in the 2006 League Year, and, if the other amounts are paid as scheduled, $6 million will be allocated to TR in the 2007 League Year, and $4 million will be allocated to TR in the 2008 League Year. This rule does not apply to the treatment of an initial or other payment received by a Club or Club Affiliate that the Club or Club Affiliate asserts is attributable to the entire term or more than one year of a multiyear broadcast, sponsorship, concession, signage, or other contract (for example, without limitation on any other example, a lump-sum, up-front payment for a multi-year sponsorship contract). This issue is expressly left open.

## K.  Revenue Sharing

The gross receipts described in clause (1) of NFL 1995 Resolution G-6 that are paid into the revenue sharing pool established by such resolution and/or to any successor revenue sharing pool established pursuant to or in connection with the revenue sharing plan referenced in Article XXIV, Section 11, shall, for TR accounting purposes, be considered revenue subject to gate receipt sharing among NFL Clubs, and thus be included in TR, subject to any applicable allocation or exclusion pursuant to Article XXIV, Section 1(a)(x)-(xi). Such revenue shall be included only once (i.e., for the Club whose home games generate such gross receipts but not for any Club receiving revenue sharing distributions from such pool).

275

## L.  Multi-Use Stadiums

When a Club plays its home games in a multi-use stadium (e.g., the stadium is used for both NFL games and Major League Baseball or Major League Soccer games) that is owned, operated, or leased by the Club or Club Affiliate, signage revenues which are received by the Club or a Club Affiliate in consideration for the right to display such signage during both NFL games and Major League Baseball games shall be allocated based on the total attendance in the stadium during the baseball and NFL seasons beginning in the same year (e.g., the 2005 baseball season and the 2005-06 NFL season). If a multi-use stadium is not used for Major League Baseball games or the revenues are received from an unrelated third party which owns, operates or leases the stadium, no allocation shall be made between the various sports and the entire amount of signage revenues received by the Club and/or Club Affiliate shall be included in the appropriate year(s).

Clubs may receive luxury box revenues in excess of ticket revenues subject to gate receipt sharing among NFL Clubs, when such revenue might also be attributable in part to the purchaser's right to use the luxury box to attend non-football events, such as baseball, if such right is included in the purchase of the box from the Club. When a Club receives revenues in excess of ticket revenue subject to gate receipt sharing among NFL Clubs from the sale of luxury box rights which also permit the purchaser to attend Major League Baseball games, a weighted allocation shall be made of such revenue between TR and baseball-related revenue, pursuant to the allocation method the parties agreed upon on October 20, 1994, based upon the respective ticket prices of the football and baseball tickets. No allocation shall be made, and the full amount of the revenues will be included in TR, to the extent that the purchaser also has the right to use the box to attend non-football events other than Major League Baseball. The allocation method agreed to by the parties will not affect the inclusion in TR of the ticket revenue subject to gate receipt sharing among NFL Clubs.

## M. Advertising/Barter Transactions

The value assigned to revenue from barter transactions associated with advertising is to be based on the rate cards, and all other non-ticket barter transactions are to be valued at the fair market value of the goods or services received. However:

(i)      For local radio and television promotions that are non-guaranteed (i.e., the station has the unilateral discretion to extinguish the Club's right to the promotion), the value assigned to revenues associated with such promotions will be zero, unless (a) such promotions have a stated value in the contract, in which case the assigned value will be twenty-five per-

276

cent (25%) of the stated value, or (b) the lack of a stated value is grossly disproportionate to the actual value. Any promotion that a Club may sell or otherwise transfer to a third party is agreed to be guaranteed, notwithstanding any other terms of the contract.

(ii)     For local radio and television promotions that are guaranteed, the value assigned to revenue associated with such promotions will be one hundred percent (100%) of rate card, or the stated amount in the contract where the contract specifies a stated dollar amount of advertising which the Club may draw against.

(iii)     Where the total revenue value provided by a Club in a barter transaction associated with advertising is greater, using rate card valuation, than the revenue value received by the Club, and where the Club is transferring to an unrelated party its rights to advertising, and where the goods and services received by the Club in the barter transaction have been valued at fair market value, the assigned value for the advertising provided by the Club may be reduced by the Accountants from the rate card valuation on a pro rata basis, where such reduction is needed to make the value of the goods and services provided by the Club equal to the value of the goods and services it received.

## N. Off-Site Pre-season Games

Clubs at times receive a flat amount for playing in off-site pre-season games (non-American Bowl), and also may be reimbursed for expenses. In such circumstances, only the flat amount received from the off-site game will be included in TR. Reimbursed expenses and unreimbursed expenses will not be included in TR.

## O. Club Related Entities

Any entity which has the same ownership as a Club, or is controlled by the same persons or entities which own or control a Club, and is engaged in transactions with the Club will be treated as the same entity for the purposes of the TR Reporting Package and any audit with respect thereto. Any entity which does not fit the rule set forth in the first sentence of this paragraph, but which has partial common ownership with a Club, which is engaged in transactions with the Club, will have its transactions reviewed by the local accountants and the Accountants to confirm that any revenues and expenses in such transaction are reasonable.

## P.  Miscellaneous Revenues and Expenses

Revenue from premium charges on ticket sales in excess of the face value of the ticket (e.g., rebates from ticketing sources); revenue from scrimmages and training camps; and broadcast revenue from a Coach's show or pre-

277

game and post-game show received by a Club will be included in TR. However, revenue from scrimmages or training camps that are donated to charities will not be included in TR. Credit card charges related to ticket sales are not considered a deductible "surcharge" and will not be offset against gate receipts. If a Club charges a service fee on the tickets it sells in excess of the face value of the ticket, on a ticket account basis and not on a per-ticket basis (which fee is limited by the League to a $4 per ticket account), such service fee will not be TR.

Charitable contributions made by sponsors or other entities that have a commercial relationship with a Club, to charitable entities affiliated with or designated by a Club (e.g., charitable foundations), pursuant to a contract with the Club, are Club revenues, and shall be classified as TR or non-TR, as appropriate, except if the commercial relationship is a relationship between a Club and a player.

If a player fine is a deduction from a player's salary which is never paid (and thus not included in a W-2), it is not included in Salary or TR. If a fine is paid by the player, either as a deduction from gross salary or in a separate payment, it is counted as Salary. If the Club gives a fine to charity, it is not included in TR. If the Club spends a fine on behalf of all players for specific purposes that it (or any other Club) had previously earmarked as being paid by fine money for the benefit of all players (such as player parties), and the players were (and are) expressly notified of such specific earmarking, the fine is not included in TR. If the Club keeps a fine, it is included in TR. Any fine assessed by and paid to the League is not included in TR.

The value of in kind provisions to the League office under contracts made by NFL Ventures or its subsidiaries (e.g., airline tickets) will not be included in TR. The value of in kind provisions distributed or provided to Clubs under such contracts will be included in TR; the value of such provisions will be based upon actual usage or consumption by each Club (the Clubs will be responsible for tracking such usage or consumption).

Salary or other compensation paid to a Club owner relating to a pre-game or other broadcast program may not be deducted from TR as an expense item pursuant to Article XXIV, Section 1(a)(i)(2). Such salary or other compensation paid to coaches may be deducted as such an expense item, up to a maximum of $125,000 each League Year per Club per coach, if such expense is actually incurred.

## APPENDIX I
## STANDARD MINIMUM PRE-SEASON
## PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1. History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpation
   - chest
   - heart
   - visceral
   - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e. scars, birthmarks
   - height
   - weight
   - temperature
   - blood pressure
   - pulse
   - heart rate

279

**Orthopedic Examination**

Examination visually, including stress testing and range of motion for all of the following:

- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**

Testing of hamstrings and neck

**EKG**

Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardiovascular

**Blood Testing**

Standard grid. Testing for (including but not limited to):

- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*
- Sickle Cell*
- VD*

*Where applicable. If found, individual counseling necessary.

280

Appendix 1

**Urinalysis**
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**
- peripheral vision
- standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for:          Tumor
              T.B.
              Lesions

**X-Ray all previously injured areas** (at physician's discretion)

281

# APPENDIX J
## ACTUARIAL ASSUMPTIONS AND
## ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins<br>(Effective April 1, 2007: RP-2000 Table projected to 2006) |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table<br>(Effective April 1, 2007: RP-2000 Table, disabled mortality) |

Nonfootball related disability rates before retirement:

| Age | Rate |
|-----|------|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

(Effective April 1, 2007, the above rates are increased by 33⅓%.)

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. (Effective April 1, 2007, the .08% and .06% above are changed to .10% and .08%, respectively.) |

Withdrawal rates:

For Players

| With Service of | Rate |
|-----------------|-------|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two (2) years will elect the benefit two (2) years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no Credited Seasons before 1993. |

282

| | |
|---|---|
| Retirement age: | 47, except 55 for players with no Credited Seasons before 1993 |
| Percent married: | Social Security awards in 1972 |
| Age of Player's wife: | Three (3) years younger than player |
| Remarriage and mortality rates for widow's benefit: | 1971 Railroad Retirement Board rates (Effective April 1, 2007: 1980 Railroad Retirement Board rates) |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of Plan Year |
| Actuarial value of assets: | Write up of assets to market value and restart a new asset smoothing method as of April 1, 2007. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for line-of-duty disability benefits. |
| Amortization period: | The Plan's unfunded actuarial accrued liability as of April 1, 2006 will be amortized in level amounts over seven (7) years, beginning with the contribution for the 2006 Plan Year. In each Plan Year after the 2006 Plan Year, a new level seven-year amortization period will be established for the net change in the Plan's unfunded liability during the preceding Plan Year, other than for the unfunded liability attributable to the benefit increases to which the parties agreed in the 2006 Amendment to the CBA ("2006 Benefit Increase"). The unfunded liability of the 2006 Benefit Increase will be amortized over six (6) years, beginning with the contribution for the 2006 Plan Year, except that if the CBA is terminated by either party such that the last League Year subject to a Salary Cap is before 2011, the unamortized amount for the 2006 Benefit Increase may, at the Management |

283

Council's discretion, be amortized on a pro ra-
ta basis over the remaining League Year or
League Years subject to a Salary Cap, unless
otherwise agreed to by the parties. In no event
shall the contribution for a year exceed an
amount which is expected to produce a nega-
tive unfunded actuarial liability at the end of
the plan year; nor shall the contribution be less
than the minimum required under section 412
of the Internal Revenue Code.

## APPENDIX J-1
## HEALTH REIMBURSEMENT PLAN ACTUARIAL
## ASSUMPTIONS AND FUNDING

| | |
|---|---|
| **Valuation Date:** | April 1 |
| **Value of Assets:** | Market value |
| **Mortality Assumptions:** | None |
| **Players Included in Valuation:** | Players for whom a nominal balance has been established |
| **Player's Last Season:** | Each active player is assumed to have three (3) future Credited Seasons |
| **Date When Benefits Will Begin to be Paid:** | Each player with a nominal balance is assumed to begin distributions five (5) years after his expected last Credited Season |
| **Annual Distributions:** | Annual distributions will equal the estimated cost of a year's coverage for an active player under the Player Group Insurance Plan for the years in which a reimbursement is expected to be made |
| **Discount Rate:** | 60 basis points greater than the average yield of money market funds as published in *The Wall Street Journal* on each April 1 nearest the Valuation Date |
| **Expenses:** | $500,000 for the year beginning April 1, 2007, and, for each subsequent year, the actual expenses for the prior year |
| **Contributions and Amortization Period:** | As of April 1, 2006, a valuation is prepared based on the expected nominal balances for seasons prior to 2006 ("past service liability"), and the sum of the expected value of the balances to be earned during the |

285

2006 Season and the estimated expenses for the year ("normal cost"). A contribution will be made by March 31, 2007, of at least the sum of (1) the normal cost, (2) an amortization of the past service liability over five (5) years, and (3) the assumed expenses.

A valuation will be performed each subsequent year. Each year a new base will be established equal to the Plan's unfunded liability less the unamortized amount of the bases for the past service liability and each of the bases established for 2006. Each year, a contribution will be made equal to the sum of (1) the normal cost for the year, (2) the amount for each amortization base amortized over five (5) years (until each base is fully amortized), and (3) interest to the end of the year. The contribution, however, will be reduced, but will not be less than zero, to the extent the assets exceed the Plan's liability.

**APPENDIX K**
**EXTENSION CHART**

Salary Cap as Percentage of TR

|     | <u>06</u> | <u>07</u> | <u>08</u> | <u>09</u> | <u>10</u> | <u>11</u> | <u>12</u> | <u>13</u> |
|-----|-----|-----|------|------|-----|-----|-----|-----|
|     | 57  | 57  | 57.5 | 57.5 | 58  | 58  | U   | D   |
| (1) | 57  | 57  | 57.5 | 57.5 | U   | D   | -   |     |
| (2) | 57  | 57  | 57.5 | 57.5 | 58  | U   | D   |     |

U = Uncapped
D = College Draft

(1)  If either party terminates final two Capped Years (2010 and 2011) by
     11/8/08.
(2)  If either party terminates final Capped Year (2011) by 11/8/09.

287

# APPENDIX L
## OFF-SEASON WORKOUT RULES

The Collective Bargaining Agreement with the NFLPA provides that, except for certain specified mini-camps, any off-season workout programs or classroom instruction shall be strictly voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for fourteen (14) weeks between the end of the previous season and ten (10) days prior to the start of veteran training camp. The CBA limits such workouts to four (4) days per week; such workout programs are not permitted on weekends. Included in the fourteen (14) weeks may be no more than fourteen (14) days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.

Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the Management Council the schedule for the program, including designation of any days on which organized team practice activity will take place, pursuant to the rules set forth in Article XXXV of the CBA, and any changes to the schedule for the program.

The following rules shall also apply to the fourteen (14) days of organized team practice activity:
- No pads except protective knee or elbow pads. Helmets are permitted.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.
- Maximum six (6) hours per day, with a maximum two (2) hours on field, for any player.

## APPENDIX M
## PSL EXAMPLES

Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs), based on the assumption that the NFLPA has approved the PSL deduction:

### 1. Subsection (x)(1) — Maximum Annual Allocation Amount

**Year 1 (2006)**   PSL revenues received = $ 45 million
Remaining life of PSL = 16 years
WSJ Treasury Note rate at 2/1/06 - 8%
Factor-Future Value of 8% annuity 15 years (maximum)
= 27.152 (annual compounding)
Future Value of $3 million/year for 15 years
= $3 million x 27.152 = $81.456 million
Interest Amount        = $81.456 million $45 million
                             = $36.456 million

Year 1 Annual Interest Allocation
= $36.456 million/15 years = $2.43 million/year

Year 1 PSL Allocation Amount
= PSL Amount = $45 million/15 years = $3.00 million
+ Allocated Interest            = $2.43 million
Total Year 1 Allocation         = $5.43 million

2006 PSL Maximum Annual Allocation Amount     = $5.43 million

289

**Year 2 (2007)** PSL revenues received = $ 30 million
Remaining life of PSL = 15 years
WSJ Treasury Note rate at 2/1/07 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129      = $50.258 million
Interest Amount       = $50.258 million $30 million
= $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
= PSL Amount = $30 million/15 years      = $2.00 million
+ Allocation Interest                    = $1.35 million
Total Year 2 Allocation                  = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount             = $5.43 million
Year 2 PSL Allocation Amount             = $3.35 million

2007 PSL Maximum Annual Allocation Amount = $8.78 million

**Year 3 (2008)**   PSL revenues received = $ 7 million
Remaining life of PSL = 14 years
WSJ Treasury Note rate at 2/1/08 7.5%
Factor-Future Value of 7.5% annuity 14 years = 23.366
Future Value of $ 5 million/year for 14 years
= $.5m x 23.366   = $11.683 million
Interest Amount   = $11.683 million $7 million
                  = $ 4.683 million

Year 3 Annual Interest Allocation
= $4.683 million/14 years = $.335 million/year

Year 3 PSL Allocation Amount
= PSL Amount = $7 million/14 years   = $ .500 million
+ Allocated Interest                 = $ .335 million
Total Year 3 Allocation              = $ .835 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount   = $5.430 million
Year 2 PSL Allocation Amount   = $3.350 million
Year 3 PSL Allocation Amount   = $ .835 million

2008 PSL Maximum Annual Allocation Amount   = $9.615 million

## 2. Subsection (x)(2) — PSL Revenues Used For Stadium Construction Or Renovation

Assume the Team sells PSLs on the following terms:
• Gross PSL revenues received in 2006 = $45 million
• Income taxes paid on PSL revenues in 2006 = $12 million
• Legal and marketing costs incurred relating to PSL revenues=$6 million
• Stadium renovation costs = $56 million

The PSL revenues included in TR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.

Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m ($12m + 6m)) and the total stadium renovation costs were $30 million.

The PSL revenues excluded from TR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.

291

**3.** [*Omitted*]

**4. Subsection (x)(3) — PSL Difference Credited To TR**

a. Assume that the new stadium is placed in service in June 2008.

2008 increase in TR directly related to new stadium:

| | |
|---|---|
| Increase in gate receipts | $6 million |
| Increase in Other TR | $2 million |
| Total TR increase | $8 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year TR Increase | PSL Difference |
|---|---|---|---|
| 2006 | $5.430 million | $8 million (assumed) | $ 0 |
| 2007 | $8.780 million | $8 million (assumed) | $.780 million |
| 2008 | $9.615 million | $8 million | $1.615 million |
| Cumulative PSL Difference | | | $2.395 million |

For purposes of computing the PSL Difference, we assume that the increase in TR was the same for 2006 and 2007 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million). $2.395 million would be credited into TR in the 2009 League Year.

b. Assume that the new stadium is placed in service in June 2008.

2008 increase in TR directly related to new stadium:

| | |
|---|---|
| Increase in gate receipts | $ 9 million |
| Increase in other TR | $16 million |
| Total TR increase | $25 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year TR Increase | PSL Difference |
|---|---|---|---|
| 2006 | $5.430 million | $25 million (assumed) | 0 |
| 2007 | $8.780 million | $25 million (assumed) | 0 |
| 2008 | $9.615 million | $25 million | 0 |
| Cumulative PSL Difference | | | 0 |

**292**

Since the increase in TR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year. No amount would be credited into TR in the 2009 League Year.

### 5. Subsection (x)(5) Carryover PSL Credit

Assume the following:
    New Stadium is placed in service in June 2008.
    2009 2002 Maximum Annual Allocation Amount is $9.615 million.
    Increases in TR directly related to New Stadium are as follows:
    2009    $ 8 million
    2010    $ 9 million
    2011    $14 million

The Carryover PSL credits are calculated as follows:
    2009    $9.615m $8m = $1.615m
    2010    $9.615m $9m = $ .615m
    2011    (No carryover PSL credits)

Under this scenario, year 2011 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 2009 and 2010 ($1.615m + $.615m) can be deducted in full from TR in League Year 2011. There would be no remaining Carryover PSL credits to deduct from TR in future League years.

### 6. Subsection (x)(6) Reduction In Premium Seat And Luxury Box Expenses

Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.

### 7. PSL Revenues Not Benefiting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium

In any case where:

(i) PSLs are sold by a Team or by a third party (such as a stadium corporation, a nonprofit private sector entity, or a governmental entity) pursuant to Team authorization; and

(ii) all net proceeds of such PSL sale are used to build a new stadium or con-

293

struct improvements to an existing stadium in which the Team will play up-
on completion, or is then playing and will continue to play (net proceeds
are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs,
marketing expenses, or securities registration fees) if such taxes and ex-
penses are directly incurred as the result of the PSL sale, and do not bene-
fit the Team or any of its affiliates, either directly or indirectly, other than
through the stadium construction or improvements paid by the PSL rev-
enues); and

(iii) such new or improved stadium is owned by a party not affiliated with
the Team, such as a governmental entity or a private sector for-profit or non-
profit entity; and

(iv) the Team (and all Team affiliates) have only a leasehold interest, and no
reversionary interest in the stadium (that is, if the Team or any Team affili-
ate wishes to acquire any title to the stadium, it must do so in a separately
negotiated arms'-length transaction); and

(v) neither the Team nor any of its affiliates receives any payments, long-
term loans, forgiveness of indebtedness, or other consideration from the
Stadium landlord or any of its affiliates, other than payments that are due
to the Team pursuant to its lease as consideration for its performance of its
obligations under the lease, or are reimbursements for expenses incurred by
the Team solely in performing its obligations under the lease; then, because
the Team and its affiliates do not receive any net benefit arising out of the
sale of PSLs other than through the stadium construction or improvements
paid by the PSL revenues (all PSL revenues being spent on third-party costs
and charges directly incurred as a result of the PSL sale, or on stadium con-
struction or improvements), none of the proceeds received from the sale of
the PSLs would be included in TR. Each of Example Nos. 1 through 6
above assumes that, for one or more reasons, the example does not qualify
for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts
other than the PSL proceeds, including but not limited to any expense pay-
ments, may be treated as TR or non-TR under this Agreement. Moreover,
the Special Master or the Court would have the authority to examine any
transaction involving the Club or any of its affiliates and the Stadium land-
lord or any of its affiliates, to determine if such transaction transfers, in
whole or in part, some or all of the economic benefit of any PSL revenues
to the Club or any of its affiliates, and any such transferred economic ben-
efits shall be treated as TR.

NOTE: Premium seat revenues (non-shared amounts) discussed in Sub-
sections (xi)(1) through (xi)(6) call for calculations quite similar to those

294

discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

**APPENDIX N**
**WRITTEN WARNING GOOD FAITH EFFORT**

[date]

Dear [player]:

The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article XXIII of the Collective Bargaining Agreement if you are terminated before the end of this season.


[Club Official]
[Club name]

# APPENDIX O
## SALARY CAP CALCULATION EXAMPLE

If 2007 Salary Cap:          $109 million

If 2008 Projected TR equals $205 million per Club:

> 57.5% = $117.875 million
> 61.68% = $126.44 million

less assumed Projected Benefits/salary cap deductions of $20 million per Club:

> 57.5% cap = $97.875 million
> 61.68% max = $106.44 million

then, pursuant to Article XXIV, Section 4(c), the Salary Cap for 2008 is $106.44 million

297

# APPENDIX P
## ADJUSTMENT MECHANISM EXAMPLES

**Example #1: League Excess at the end of Year 1**

**Assumptions:**
5-Team League
At Year End League-wide Cash Player Costs exceed Trigger by $5M
Dollar amounts in millions

|        |                |                 |                     | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|--------|----------------|-----------------|---------------------|------|------|------|------|------|
| Club   | '06 Trigger    | '06 Cash PC     | Pro Rata Share      | '07  | '08  | '09  | '10  | '11  |
| A      | 102.0          | 101.5           |                     |      |      |      |      |      |
| B      | 102.0          | 99.0            |                     |      |      |      |      |      |
| C      | 102.0          | 100.5           |                     |      |      |      |      |      |
| D      | 102.0          | 109.5           | 75%                 | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| E      | 102.0          | 104.5           | 25%                 | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| League-wide | 510.0     | 515.0           | 100%                | 1.0  | 1.0  | 1.0  | 1.0  | 1.0  |
| Excess/(Shortfall) |     | 5.0             |                     |      |      |      |      |      |

298

Appendix P

**Example #2: League Shortfall at the end of Year 1**

**Assumptions:**
5-Team League
At Year End League-wide Cash Player Costs fall below Trigger by $9M
Dollar amounts in millions

|  |  |  |  | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|---|---|---|---|---|---|---|---|---|
| Club | '06 Trigger | '06 Cash PC | Pro Rata Share | '07 | '08 | '09 | '10 | '11 |
| A | 102.0 | 100.0 | 20% | (.36) | (.36) | (.36) | (.36) | (.36) |
| B | 102.0 | 102.0 | 20% | (.36) | (.36) | (.36) | (.36) | (.36) |
| C | 102.0 | 99.0 | 20% | (.36) | (.36) | (.36) | (.36) | (.36) |
| D | 102.0 | 106.0 | 20% | (.36) | (.36) | (.36) | (.36) | (.36) |
| E | 102.0 | 94.0 | 20% | (.36) | (.36) | (.36) | (.36) | (.36) |
| League-wide | 510.0 | 501.0 | 100% | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) |
| Excess/(Shortfall) |  | (9.0) |  |  |  |  |  |  |

299

**Example #3: League Excess in Year 1 and League Shortfall in Year 2**

**Assumptions:**
5-Team League
League Excess of $5M at the end of Year 1 (Clubs D & E exceeded Trigger)
League Shortfall of $9M at the end of Year 2
Dollar amounts in millions

| Club | | '06 Excess | '07 Shortfall | '07 | '08 | '09 | '10 | '11 |
|---|---|---|---|---|---|---|---|---|
| League-wide | | 5.0 | (9.0) | | | | | |
| A | Year 1 | | | | | | | |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| B | Year 1 | | | | | | | |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| C | Year 1 | | | | | | | |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| D | **Year 1** | | | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| E | **Year 1** | | | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| League-wide | | | | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 |

Adjustment to Team Salary Over Remaining Capped Years

| League Year | Excess/ (Shortfall) | |
|---|---|---|
| 2006 | 5.0 | Allocate charge proportionately among Clubs that exceeded Trigger (D&E) |
| 2007 | (9.0) | Shortfall (to be offset by Prior Years' League Excess, then allocated equally among all Clubs) |
| | (4.0) | Pro rata deduction to be allocated to each Club's Team Salary |

300

Appendix P

**Example #4**: League Excess in Year 1, League Shortfall in Year 2 and
League Excess in Year 3

**Assumptions:**
5-Team League
League Excess of $5M at the end of Year 1 (Clubs D & E exceeded Trigger)
League Shortfall of $9M at the end of Year 2
League Excess of $6M at the end of Year 3 (Clubs A & E exceeded Trigger
    equally)
Dollar amounts in millions

| Club | | '06 Excess | '07 Shortfall | '08 Excess | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|------|------|------|------|------|------|------|------|------|------|
| | | | | | '07 | '08 | '09 | '10 | '11 |
| League-wide | | 5.0 | (9.0) | 6.0 | | | | | |
| A | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | **Year 3** | | | | | | 1.0 | 1.0 | 1.0 |
| B | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| C | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| D | **Year 1** | | | | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| E | **Year 1** | | | | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | **Year 3** | | | | | | 1.0 | 1.0 | 1.0 |
| League-wide | | | | | 1.0 | 0.0 | 3.0 | 3.0 | 3.0 |

| League Year | Excess/ (Shortfall) | |
|------|------|------|
| 2006 | 5.0 | Allocate charge proportionately among Clubs that exceeded Trigger (D&E) |
| 2007 | (9.0) | Shortfall (to be offset by Prior Years' League Excess, then allocated equally among all Clubs) |
| | (4.0) | Pro rata deduction to be allocated to each Clubs Team Salary |
| 2008 | 6.0 | Excess will offset "deductions" from any remaining League Shortfall in Prior Years ($6M-$3M), then allocate total League Excess charge ($6M) proportionately among Clubs that exceeded Trigger (A&E) |

301