# EXHIBIT 8
# (CONTINUED)

## ARTICLE XXV
## ENFORCEMENT OF THE SALARY
## CAP AND ENTERING PLAYER POOL

*Section 1.* **Undisclosed Terms:** At the time a Club and a player enter into any Player Contract, or any renegotiation, extension or amendment of a Player Contract, there shall be no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, between such player and any Club involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

*Section 2.* **Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Defined Gross Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

*Section 3.* **Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap Minimum Team Salary).

*Section 4.* **Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Contracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

143

**EX 8, PAGE 869**

Article XXV, Enforcement of the Salary Cap and Entering Player Pool

**Section 5. Special Master Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

**Section 6. Sanctions:** In the event that the Special Master finds a violation of this Section 1 of this Article, the Commissioner shall be authorized to impose a fine of up to $2,000,000 payable to the NFL, upon any Club found to have committed such violation, and shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

**Section 7. Prior Conference:** Prior to the initiation of a proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

**Section 8. DGR Circumvention:** *In the event that a Club or anyone acting on its behalf materially fails to report, or materially misreports, Defined Gross Revenues, Excluded DGR, or non-DGR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to Defined Gross Revenues, the NFLPA and/or the Management Council shall have the right to initiate a proceeding before the Special Master to determine whether such conduct is in violation of this Section 8 of this Article. In the event that the Special Master finds a violation of this Section 8, the Special Master may impose a fine upon the Club of up to $2 million, which shall be donated as additional contributions to the youth football programs fund described in Article XXIV (Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary), Section 1(a)(xiii) above.*

*\*Extension Agreement 2/25/98*

144

Case 2: Case 2:33-md-02323-AB Document 10-12 Filed 02/29/12 Page 4 of 151 Page ID #:8265

## ARTICLE XXVI
## SPECIAL MASTER

**Section 1. Appointment:** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in White v. NFL shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

**Section 2. Scope of Authority:** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

(a) The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

(b) The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;

(c) Subject to subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

(d) Except for any matters for which the Court has de novo review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the recommendation of the Special Master. The parties may seek appropriate relief

145

Article XXVI, Special Master

to effectuate and enforce this provision.

(e)    The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement for Special Master review.

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary) of this Agreement regarding any DGR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the

146

NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

*Section 6.* **Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

*Section 7.* **Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

EX 8, PAGE 873

## ARTICLE XXVII
## IMPARTIAL ARBITRATOR

**Section 1. Selection:** The parties shall agree upon an Impartial Arbitrator who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4. Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

**Section 6. Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

148

**Section 7. Selection of Impartial Arbitrator**: In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree to submit the issue to the President of the ABA who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs, or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Impartial Arbitrator from among the names on such list, they shall alternatively strike names from said list, until only one name remains, and that person shall be the Impartial Arbitrator. The first strike shall be determined by a coin flip. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

**EX 8, PAGE 875**

## ARTICLE XXVIII
## ANTI-COLLUSION

**Section 1. Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

    (a)    whether to negotiate or not to negotiate with any player;

    (b)    whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

    (c)    whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

    (d)    whether to exercise or not to exercise a Right of First Refusal; or

    (e)    concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

> \* [U]nder Article XIV (NFL Player Contract), paragraph 3 of Article XXX (Consultation and Information Sharing), paragraph 4 of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), and Article XXVIII (Anti-Collusion Provisions) of the Collective Bargaining Agreement, any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA and Class Counsel, cannot be the basis of any claim of collusion. Class Counsel, the NFLPA, or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.
>
>                    \*Side Letter 5/6/93

**Section 2. Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

    (a)    that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

    (b)    that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

150

Case 2: PASE-08339DR-02RPAVAB-DoBument09-18r12FiFe+d-923/29/12-PageP0-8rof-5451Page ID
#:8271

(c)     that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

(d)     that the player is or has been subject to any Right of First Refusal.

**Section 3. Club Discretion**: Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 4. League Disclosures**: Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 5. Enforcement of Anti-Collusion Provisions**: Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

**Section 6. Burden of Proof**: The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by

EX 8, PAGE 877

itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

**Section 7. Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

**Section 8. Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a) To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes

**EX 8, PAGE 878**

place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)     To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

**Section 9. Computation of Damages**: Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)     Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section I of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)     Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)     Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $1,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $1,000,000.

**Section 10. Player Election**: A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during

EX 8, PAGE 879

Article XXVIII, Anti-Collusion

the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

**Section 11. Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

**Section 12. Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

**Section 13. Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

**Section 14. No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

**Section 15. Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

**Section 16. Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)     Where there has been a finding or findings of one or more in stances of a violation of Section 1 of this Article with respect to any one

154

NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

(b)　Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)　Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)　In order to terminate this Agreement:

(i)　The proceeding must be brought by the NFLPA;

(ii)　The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)　The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

155

# ARTICLE XXIX
# CERTIFICATIONS

### Section 1. Contract Certification:

(a)     Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of a player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, and that there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving Salary or other consideration of any kind to be paid, furnished or made available to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

(b)     In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)     In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)     No contract will be approved by the Commissioner unless accompanied by the certifications required by subsections (a), (b) and (c) above.

### Section 2. End of League Year Certification:

(a)     At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the NFL a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or the NFL Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that player. Upon receipt of each such certification, the NFL shall forward a copy of the

156

EX 8, PAGE 882

certification to the **NFLPA**.

    (b)    Any failure to execute a certification as required under Section 2(a) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

*Section 3*. **False Certification:** Any person who knowingly files a false certification required by Section 1(a) or 1(b) of this Article shall be subject to a fine of up to $250,000, upon a finding of such violation by the Special Master. The amount of such fine as to a Club or non-player Club employee shall be determined by the Commissioner.

157

Article XXX, Consultation and Information Sharing

## ARTICLE XXX
## CONSULTATION AND INFORMATION SHARING

### Section 1. Consultation and Communications:

(a)　In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b)　Subject to any claim of attorney-client and/or work product privilege, any communications under this section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

**Section 2. Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected DGR, and a revised estimate on the first day of each month thereafter in any such year.

**Section 3. Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

**Section 4. Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

158

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within five (5) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings:** During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

EX 8, PAGE 885

# ARTICLE XXXI
# EXPANSION

*Section 1.* **Veteran Allocation:** The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three per Club, excluding any player who has a no trade clause in his Player Contract.

*Section 2.* **Additional Compensatory Picks:** The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

*Section 3.* **Entering Player Pool Adjustment:** The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

*Section 4.* **Relocation Bonus:** Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $20,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $30,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

*\*Extension Agreement 2/25/98*

## ARTICLE XXXII
## OTHER PROVISIONS

**Section 1. CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or post-season, whichever is applicable).

**Section 2. Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

**Section 3. Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

### Section 4. Roster Exemption:

(a)   Certain Players Not Under Contract. After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)   Players Under Contract. If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)   Restricted Players. Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 2, or Article XIX

161

EX 8, PAGE 887

Article XXXII, Other Provisions

(Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

    (i)     If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

    (ii)    If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

    (iii)   If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

> \* [A]ny player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) of the CBA, shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with subsections (i) through (iii) of Article XXXII, Section 4(c) of the CBA. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

                     \*Side Letter 1/18/94

No player may be placed on roster exempt under this subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with (i) through (iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this subsection, the player shall not be entitled to compensation.

    (d)    Except as provided in subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

162

## ARTICLE XXXIII
## SQUAD SIZE

**Section 1. Active List**: For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

**Section 2. Pre-Season**: The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

**Section 3. Inactive List**: Inactive List players will receive the same benefits and protections as Active List players.

**Section 4. Active and Inactive List Limit**: In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

163

**EX 8, PAGE 889**

# ARTICLE XXXIV
## PRACTICE SQUADS

**Section 1. Practice Squads:** For each regular season commencing with the 1993 League Year, the League may elect in accordance with this Article to establish practice squads not to exceed five (5) players per Club.

**Section 2. Signing With Other Clubs:** Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

**Section 3. Salary:** Minimum salary for a practice squad player shall be $3,300 per week for the 1993-97 League Years, *$3,650 per week for the 1998-99 League Years,* $4,000 per week for the 2000-02 League Years, *and $4,350 for the 2003-04 League Years,* including post-season weeks in which his Club is in the playoffs, provided however, that no player who was on a practice squad in the 1992 season shall be paid less than the minimum practice squad salary for that season.

*\*Extension Agreement 2/25/98*

### Section 4. Eligibility:

(a) The practice squad shall consist of *the following players, provided that they have not served more than one previous season on a Practice Squad:* (i) players who do not have an Accrued Season of NFL experience; *and (ii) free agent players who were on the Active List for fewer than nine regular season games during their only Accrued Season(s).* No player may be a practice squad player for more than two seasons.

*\*Extension Agreement 2/25/98*

(b) *A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and has been a member of a club's Practice Squad for at least three regular season or post-season games (a bye week counts as a game provided that the player is not terminated until after the regular season or post season weekend in question).*

*\*Extension Agreement 2/25/98*

> \* If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club

EX 8, PAGE 890

B), (1) the player shall receive three weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the five-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three weeks salary that he is entitled to receive from Club B.

*Side Letter 8/18/97

165

## ARTICLE XXXV
## OFF-SEASON WORKOUTS

*Section 1.* **Voluntary Workouts**: No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be voluntary and take place in the manner and time period set forth in this Article.

*Section 2.* **Time Periods**: From the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than sixteen total weeks, and no more than four workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

*Section 3.* **Payment**: Beginning with the off-season following the 1993 NFL season, each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout requirements: $50 during the 1994-95 League Years; $60 during the 1996-97 League Years; $70 during the 1998-99 League Years; $80 during the 2000-01 League Years; $90 during the 2002 League Year; *and $100 during the 2003-04 League Years.*

*\*Extension Agreement 2/25/98*

*Section 4.* **Injuries**: Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

*Section 5.* **Miscellaneous**: No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.

EX 8, PAGE 892

**Section 6. Pre-Training Camp Period**: During the ten consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.

**Section 7. Enforcement**: The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L.

**EX 8, PAGE 893**

## ARTICLE XXXVI
## MINICAMPS

**Section 1. Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

**Section 2. Length:** No minicamp may exceed three days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

**Section 3. Expenses:** Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

**Section 4. Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

**Section 5. Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

**168**

# ARTICLE XXXVII
## PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell or Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** During the term of this Agreement, a rookie player will receive "per diem" payments at the rate of $500 per week in the 1993-94 League Years, $550 per week in the 1995 League Year, $600 per week in the 1996 League Year, $650 per week in the 1997 League Year, $675 per week in the 1998-99 League Years, $700 per week in the 2000-01 League Years, $725 per week in the 2002-03 *League Years, and $750 per week in the 2004 League Year*, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 2/25/98*

**Section 4. Veteran Per Diem:** During the term of this Agreement, a veteran player will receive "per diem" payments at the rate of $600 per week in the 1993-94 League Years, $700 per week in the 1995-96 League Years, $800 per week in the 1997-99 League Years, $900 per week in the 2000-03 *League Years, and $1,000 per week in the 2004 League Year*, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 2/25/98*

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

169

**EX 8, PAGE 895**

Article XXXVII, Pre-Season Training Camps

***Section 6*. Number of Pre-Season Games**: The NFL will use its best efforts to hold no more than four pre-season games beginning in the 1995 League Year.

***Section 7*. Telephones**: Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

***Section 8*. Expenses**: Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

**EX 8, PAGE 896**

## ARTICLE XXXVIII
## SALARIES

*Section 1.* **1993 Minimum Salaries**: For the 1993 League Year, the Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| Length of Service | Minimum Salary For Players Not on Club's Active/Inactive (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $60,000 | $100,000 |
| One Credited Season | $70,000 | $125,000 |
| Two or More Credited Seasons | $80,000 | $150,000 |

*Section 2.* **Minimum Salaries For 1994-97 League Years**: For the 1994-97 League Years, the Minimum Salaries set forth in Section 1 above shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

*\*Extension Agreement 2/25/98*

> \* For the 1996 League Year, the Minimum Active/Inactive List Salary for players with five or more Credited Seasons (as defined in Article XXXVIII of the CBA), who have an allocated portion of signing bonus, reporting bonus, and roster bonus for that League Year of less than $25,000, shall be at least $250,000 plus a sum equal to $250,000 multiplied by the same percentage as the increase in Projected DGR for the 1996 League Year over DGR for the 1995 League Year (up to a maximum of ten percent (10%)). Thereafter, such Minimum Active/Inactive List Salary for such players shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR, up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actu-

171

Article XXXVIII, Salaries

al amount from League Year to League Year. For all other players with five or more Credited Seasons, the Minimum Active/Inactive List Salary shall be the same as for players with two or more Credited Seasons, except that any player who has received with respect to that League Year (i) Salary (not including performance incentives but including roster bonuses, reporting bonuses and the allocated portion of any signing bonus) less than (ii) the amount of the Minimum Active/Inactive List Salary set forth in the first two sentences of this paragraph (as appropriate) adjusted to reflect the number of weeks that the player was on the Club's Active or Inactive List, shall receive at the end of the League Year an additional payment from his Club(s) equal to the difference between (ii) and (i) (on a pro rata basis between or among the Clubs, if applicable).

*Side Letter 11/1/95: Sec. 3

**Section 3. Minimum Salaries For 1998 League Year:** *For the 1998 League Year, the Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season, as calculated under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), including Paragraph 5 Salary and any additional amounts for pro-rated signing bonus (but excluding any amounts from signing bonuses paid prior to 1998 with a 1998 proration amount of $100,000 or less), roster and reporting bonuses, and likely to be earned incentives, will be not less than the following:*

EX 8, PAGE 898

| Length of Service | Minimum Salary For Players Not On Club's Active/Inactive List (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $ 92,000 | $158,000 |
| One Credited Season | 111,000 | 198,000 |
| Two Credited Seasons | 129,000 | 238,000 |
| Three Credited Seasons | 144,000 | 275,000 |
| Four Credited Seasons | 159,000 | 300,000 |
| Five or more Credited Seasons | 174,000 | 325,000 |

For the 1998 League Year, the Paragraph 5 Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season, will be not less than the following:

| Length of Service | Minimum Salary For Players Not On Club's Active/Inactive List (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $ 87,000 | $144,000 |
| One Credited Season | 101,000 | 180,000 |
| Two Credited Seasons | 117,000 | 216,000 |
| Three Credited Seasons | 117,000 | 216,000 |
| Four Credited Seasons | 117,000 | 216,000 |
| Five or more Credited Seasons | 117,000 | 216,000 |

**Section 4. Minimum Salaries For 1999 League Year:** For the 1999 League Year, the Paragraph 5 Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| Length of Service | Minimum Salary For Players Not On Club's Active/Inactive List (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $101,000 | $175,000 |
| One Credited Season | 122,000 | 250,000 |
| Two Credited Seasons | 142,000 | 325,000 |
| Three Credited Seasons | 157,000 | 350,000 |
| Four Credited Seasons | 172,000 | 375,000 |
| Five or more Credited Seasons | 187,000 | 400,000 |

EX 8, PAGE 899

Article XXXVIII, Salaries

**Section 5. Minimum Salaries After The 1999 League Year:** *After the 1999 League Year, the Minimum Paragraph 5 Salaries set forth in Section 4 above shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.*

*\*Extension Agreement 2/25/98*

**Section 6. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

**Section 7. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 8. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 9. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invali-

174

EX 8, PAGE 900

dates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 10. Deferred Paragraph 5**: A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 11. Number of Regular Season Games**: The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 12. Copies of Contracts**: In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement covering the 1993 and future League Years will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

**Section 13. Split Contracts**:

    (a)    After the point in the regular season at which a player who signed his Player Contract prior to the 1993 League Year has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the In-

175

EX 8, PAGE 901

Article XXXVIII, Salaries

active List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

      (b)      After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent and during the 1993 League Year or thereafter has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

**Section 14. Funding of Deferred and Guaranteed Contracts**: The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury Bill rate as published in The Wall Street Journal on March 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

176

**EX 8, PAGE 902**

## ARTICLE XXXIX
## MEAL ALLOWANCE

**Section 1. Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and post-season as follows: 1993-94 League Years-Breakfast $12.00, Lunch $15.00, Dinner $33.00; 1995-96 League Years-Breakfast $13.00, Lunch $17.00, Dinner $35.00; 1997-1999 League Years-Breakfast $14.00, Lunch $19.00, Dinner $37.00; 2000-02 League Years-Breakfast $15.00, Lunch $21.00, Dinner $39.00; *2003-04 League Years-Breakfast $16.00, Lunch $23.00, Dinner $41.00.* For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.
*\*Extension Agreement 2/25/98*

**Section 2. Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 P.M. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 A.M., players will receive breakfast money.

177

## ARTICLE XL
## DAYS OFF

**Section 1. Rate**: All players will be permitted days-off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

**Section 2. Requirements**: During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

178

## ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)  Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)  Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

179

EX 8, PAGE 905

Article XLI, Moving and Travel Expenses

not exceed $4,000 during the 1993-95 League Years, $4,750 during the 1996-98 League Years, $5,000 during the 1999-2002 League Years, and $5,250 during the 2003-2004 League Years; and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.
*Extension Agreement 2/25/98*

**Section 4. Transportation**: Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

180

# ARTICLE XLII
# POST-SEASON PAY

**Section 1. System**: Beginning with the post-season following the 1993 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation**: A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wild Card Game (Div. Winner) | $12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 | 18 | 18 |
| (Other) | 7.5 | 7.5 | 7.5 | 10 | 10 | 10 | 10 | 12.5 | 12.5 | 12.5 | 15 | 15 |
| Division Playoff Game | 12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 | 18 | 18 |
| Conference Championship Game | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 | 36.5 | 36.5 |
| Super Bowl Game (Winning Team) | 38 | 42 | 42 | 48 | 48 | 53 | 58 | 58 | 63 | 63 | 68 | 68 |
| (Losing Team) | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 | 36.5 | 36.5 |

*Extension Agreement 2/25/98*

**Section 3. Wild Card Game; Division Play-off Game**: A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**

 (a) A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game.

 (b) A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or post-season) will receive one-half the amount designated in Section 2 for such game.

181

Case 2:08-cv-83395-R-MAN AB Document 18-12 Filed 03/29/12 Page 41 of 151 Page ID #:8302

(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)     A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)     A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)     A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5. Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

182

## ARTICLE XLIII
## PRO BOWL GAME

**Section 1. Compensation:** Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $20,000 and each player on the losing Team will receive $10,000. These amounts shall be increased to $25,000 and $12,500 respectively for the Pro Bowls following the 1997 through 1999 seasons, *to $30,000* and $15,000 respectively for the Pro Bowls following the 2000 through 2002 seasons, *and to $35,000 and $17,500 respectively for the Pro Bowls following the 2003 through 2004 seasons.*

*\*Extension Agreement 2/25/98*

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

EX 8, PAGE 909

## ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

184

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

### Section 6. Substance Abuse:

(a)    **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)    **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)    **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

EX 8, PAGE 911

## ARTICLE XLV
## ACCESS TO PERSONNEL AND
## MEDICAL RECORDS

**Section 1. Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

**Section 2. Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

186

Case 2: Case 2:13-md-02420-RP Document 18-12 Filed 03/09/12 Page 46 of 51 Page ID #:8307

## ARTICLE XLVI
## PLAYER BENEFIT COSTS

**Section 1.** (a) **General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) post-season pay (although the NFLPA will have the unilateral right to direct that post-season pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b) *1998 Amendment Benefits: During each League Year for which a Salary Cap applies, the NFLPA will have the unilateral right to increase, reduce or freeze each separate and individual Player Benefit Cost relating to 1998 Amendment Benefits that are set forth in Sections 5(c), 5(d) and 5(e) of this Article to the extent permitted by law, to ensure that the total cost of the 1998 Amendment Benefits does not exceed and is not less than the amount set forth below for each such League Year. Any increase shall be for one League Year only and shall not create a continuing obligation for the Clubs.*

*For the 1998 League Year, the total cost of the 1998 Amendment Benefits shall be the lesser of (i) 63% of Projected Defined Gross Revenues, less $1,607.65 million, less Player Benefit Costs for Player Benefits other than for the 1998 Amendment Benefits, or (ii) $50 million. For subsequent Capped Years, the total cost of the 1998 Amendment Benefits shall be as follows:*

| Capped Year | Total Cost |
|---|---|
| 1999: | $ 50 million |
| 2000: | $ 75 million |
| 2001 and thereafter: | $100 million |

*Notwithstanding the foregoing language regarding the total cost of 1998 Amendment Benefits for the 1998 and subsequent League Years, Class Counsel and the NFLPA may specify additional amounts to be used for additional increases in the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), pursuant to subsection (iii) of the last sentence of Article XXIV, Section 4(a) for additional amounts generated from the 1998 League Year, and pursuant to Article XXIV, Section 10(a)(ii) for additional amounts generated from later League Years. Forty-five percent (45%) of any additional amounts generated from the 1998 League Year pursuant to subsection (iii) of the last sentence of Article XXIV, Section 4(o) will be contributed to the Player Annuity Program for the 1998 An-*

187

**EX 8, PAGE 913**

Article XLVI, Player Benefit Costs

*nuity Year (as defined in Article XLVIII-A), and fifty-five percent (55%) will be contributed to the Player Annuity Program for the 1999 Annuity Year. During each League Year for which a Salary Cap does not apply, the NFL shall be required to contribute with respect to the 1998 Amendment Benefits only the cost of those such benefits that are set forth in Sections 5(a), 5(b), 5(c) and 5(e).*

*If the NFLPA is notified in writing that the cost of the 1998 Amendment Benefits for a Capped Year is projected to exceed or to be less than the above total for a League Year, and the NFLPA does not specify which benefits are to be increased, reduced or frozen by the later of (1) the beginning of that League Year, and (2) 30 days after the date the NFLPA receives such notice, the Management Council shall have the unilateral right to reduce or increase 1998 Amendment Benefits to the extent permitted by law, to achieve the above total cost for that League Year. Any reductions or increases in 1998 Amendment Benefits shall be implemented as of the beginning of a League Year by determining projected 1998 Amendment Benefits based on Projected Benefits, as defined in Article XXIV, Section 10(c).*

*(c) **Adjustment:** If the actual Player Benefit Costs of the 1998 Amendment Benefits exceed the applicable amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be reduced by such excess.*

*If the actual Player Benefit Costs of the 1998 Amendment Benefits are less than the amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be increased by such shortfall.*

*\*Extension Agreement 2/25/98*

**Section 2. Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition:** For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a) Pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

188

(b)     Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)     Injury protection (as described in Article XII);

(d)     Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)     Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)     Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)     Post-season pay (as described in Article XLII and Article XLIII);

(h)     Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year);

(i)     Severance pay (as described in Article L); and

(j)     *The Player Annuity Program (as described in Article XLVIII-A).*
                                        *Extension Agreement 2/25/98

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, the Supplemental Disability Plan, *and the Player Annuity Program* will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

                                        *Extension Agreement 2/25/98

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to *Projected Benefits* for

EX 8, PAGE 915

Article XLVI, Player Benefit Costs

the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

*Extension Agreement 2/25/98*

    (a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of *Projected Benefits* for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

*Extension Agreement 2/25/98*

    (b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

    (c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5. 1998 Amendment Benefits:** *For purposes of this Agreement, the term "1998 Amendment Benefits" means the following:*

    *(a)     The increase in 1998 and future Benefit Credits to $425 described in Article XLVII, Section 2 and the increase in Benefit Credits for prior years described in Article XLVII, Section 4;*

    *(b)     The decrease in the vesting requirement described in Article XLVII, Section 5;*

    *(c)     The increases in the Second Career Savings Plan contributions described in Article XLVIII, Section 2;*

    *(d)     The Player Annuity Program (as described in Article XLVIII - A); and*

    *(e)     The increases in the Extended Post-Career Medical and Dental Insurance benefits described in Article XLIX, Section 2(c).*

*Extension Agreement 2/25/98*

190

## ARTICLE XLVII
## RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. Prior to such merger, the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan") and the Pete Rozelle NFL Player Retirement Plan (the "Pete Rozelle Plan") will each be continued and maintained in full force and effect. When used in other Articles in this Agreement, the terms "Bert Bell/Pete Rozelle Plan" and "Merged Plan" will also refer to each of the Bert Bell Plan and the Pete Rozelle Plan for the periods prior to such merger, as appropriate depending on the context in which such term is used. The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.

**Section 2. Additional Credited Seasons:** The parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to provide a Benefit Credit of $425 for players who earn a Credited Season in *each Plan Year that begins both (1) on or after April 1, 1998, and (2) prior to the expiration of the Final League Year.*
*Extension Agreement 2/25/98

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

191

**EX 8, PAGE 917**

Article XLVII, Retirement Plan

**Section 4. Increase in Past Service Credit:** *Effective for payments on and after June 1, 1998, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to increase the Benefit Credit in effect for each Credited Season prior to 1998 as follows:*

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| Before 1968 | $100 |
| 1968 and 1969 | 130 |
| 1970 | 170 |
| 1971 | 175 |
| 1972 through 1976 | 185 |
| 1977 through 1981 | 200 |
| 1982 through 1992 | 230 |
| 1993 and 1994 | 240 |
| 1995 and 1996 | 285 |
| 1997 | 330 |

**Section 5. Decrease in Vesting Requirement:** *Effective for payments on and after June 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan to provide that any player who (i) earned his last Credited Season prior to the 1975 Plan Year; (ii) is credited with at least four (4) Credited Seasons; and (iii) is alive on June 1, 1998, shall be fully vested in the right to receive a retirement benefit under the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment shall be entitled to receive any benefit under the Bert Bell/Pete Rozelle Plan other than his Normal, Deferred or Early Retirement Benefit. No player who is vested as a result of this amendment shall be entitled to elect to receive a retirement benefit in the optional form provided by Section 4.4(c)(3) of the Bert Bell/Pete Rozelle Plan. No beneficiary of a player who is vested as a result of this amendment and who dies prior to his Annuity Starting Date (as defined in the Bert Bell/Pete Rozelle Plan) shall be entitled to receive any benefit, except that the surviving spouse of such a player shall be entitled to receive a pre-retirement survivor annuity under rules similar to those in Section 4.9(b) of the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment who attained his Normal Retirement Age prior to June 1, 1998 shall be entitled to a benefit with respect to any period prior to June 1, 1998. Any Normal Retirement Benefit paid pursuant to this amendment will not be actuarially adjusted to reflect an Annuity Starting Date after the player's Normal Retirement Date, except to the extent the Annuity Starting Date is after June 1, 1998.*

**Section 6. Line-of-Duty Disability Benefit:** *Effective as of July 1, 1993, the parties will amend Article 6 of the Bert Bell/Pete Rozelle Plan as follows:*

　　　　　*(a)　　　Subsections 6.4(b) and 6.4(c) will be revised to read as follows:*

　　　　　*"(b)　　A disability will be deemed to be 'permanent' if it has persist*

192

ed or is expected to persist for at least 12 months from the date of its occurrence and if the Player is not an Active Player."

"(c) 'Arising out of League football activities' means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. 'Arising out of League football activities' does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities."

(b) Subsection 6.5(f) will be revised to read as follows:

"(f) The phrase 'and has resulted in the Player's retirement from League football' is added to replace everything after the word 'occurrence' in Section 6.4(b)."

**Section 7. Classification Rules for Total and Permanent Disability:** Effective as of July 1, 1993, the parties will amend the Bert Bell/Pete Rozelle Plan as follows:

"5.6 Classification Rules.

(a) A Player who becomes totally and permanently disabled and who satisfies the conditions of eligibility for benefits under Section 5.1(a), 5.1(b), 5.1(c), or 5.1(d), or Section 5.5, shall be deemed to continue to be eligible only for the category of benefits for which he first qualifies, unless the Player shows by evidence found by the Retirement Board to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of total and permanent disability benefits.

(b) A Player who becomes totally and permanently disabled and satisfies the conditions of eligibility for benefits under Section 5.1(a), 5.1(b), 5.1(c), or 5.1(d), or Section 5.5, and who subsequently is found by the Retirement Board no longer to be totally and permanently disabled, shall cease to be eligible for benefits. Any such Player shall thereafter remain eligible to receive total and permanent disability benefits in accordance with Section 5.1 or Section 5.5 should the Player experience a subsequent period of total and permanent disability. Any such subsequent total and permanent disability shall be classified in accordance with the provisions of Section 5.1 or Section 5.5, without regard to the classification of any previous period of total and permanent disability.

(c) For purposes of Article 5, the term 'League football activities' will have the meaning given in Article 6."

EX 8, PAGE 919

Article XLVII, Retirement Plan

**Section 8. Limit on Retroactive Benefits and Claims:** *Effective for claims for benefits received on and after November 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan, or will cause the Bert Bell/Pete Rozelle Plan to be amended, as follows:*

      (a)    *The text of the second paragraph of Section 5.1 of the Bert Bell/Pete Rozelle Plan will be amended to replace the words "Notwithstanding the above" with the words "Except as provided in Section 5.7";*

      (b)    *Article 5 of the Bert Bell/Pete Rozelle Plan will be amended by adding a new Section 5.7 to read substantially as follows:*

"5.7    *Limit on Retroactive Benefits and Claims. Effective for claims for benefits received on and after November 1, 1998, no total and permanent disability benefit under this Article 5 will be payable with respect to any month or other period of time that precedes by more than forty-two (42) months the date the Plan Director first receives a written application or similar letter requesting such benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit. A Player's total and permanent disability benefits will not be reclassified or otherwise increased with respect to any month or other period of time that precedes by more than forty-two (42) months the date the Plan Director receives a written application or similar letter requesting such reclassification or increase that begins the administrative process that results in the award of the benefit. In determining the appropriate classification of benefits for a Player who is totally and permanently disabled, it will be conclusively presumed that the Player was not totally and permanently disabled for all months or other periods of time more than forty-two (42) months prior to the date the Plan Director receives a written application or similar request for total and permanent disability benefits that begins the administrative process that results in the award of the benefit. The forty-two month limitations period in each of the above sentences will be tolled for any period of time during which such Player is found by the Retirement Board to be physically or mentally incapacitated in a manner that substantially interferes with the filing of such claim."*

**Section 9. Alcohol and Substance Abuse:** *The parties will amend Section 5.1 of the Bert Bell/Pete Rozelle Plan, or will cause the Bert Bell/Pete Rozelle Plan to be amended, to insert substantially the following language as a separate paragraph at the end of Section 5.1:*

      *"Effective for payments on and after November 1, 1998, Sections 5.1(a), 5.1(b), 5.1(c), and the provisions of Section 5.5 that pertain to disabilities resulting from a football injury incurred while an Active Player will not apply to a total and permanent disability caused by the use of, addiction to, or dependence upon (1) any controlled substance (as defined in 21 U.S.C. sec. 802(6)), unless (i) such use of, addiction*

194

**EX 8, PAGE 920**

*to, or dependence upon results from the substantially continuous use of a controlled substance that was prescribed for League football activities or for an injury (or injuries) or illness arising out of League football activities of the applicant while he was an Active Player, and (ii) an application for total and permanent disability benefits is received based on such use of, addiction to, or dependence upon a controlled substance no later than eight (8) years after the end of the Player's last Credited Season; (2) alcohol; or (3) illegal drugs. Effective for payments on and after November 1, 1998, if a Player's benefit has been increased pursuant to Section 5.4 with respect to a total and permanent disability to which Section 5.1(a), 5.1(b), or 5.1(c), or the provisions of Section 5.5 that pertain to disabilities resulting from a football injury incurred while an Active Player does not apply after November 1, 1998, such benefit shall be reduced to the greater of the sum of the Player's Benefit Credits or the minimum amount specified in Section 5.1(d). All other provisions of Section 5.4 shall continue to apply to such benefit. For purposes of this section, the term 'illegal drugs' includes all drugs and substances (other than alcohol and controlled substances, as defined above) used or taken in violation of law or League policy."*

**Section 10. Psychological/Psychiatric Disorders:** *Effective on October 29, 1998, the parties will amend Section 5.1 of the Bert Bell/Pete Rozelle Plan, or will cause the Bert Bell/Pete Rozelle Plan to be amended, to insert substantially the following language as separate paragraphs at the end of Section 5.1:*

> *"Effective for payments on and after November 1, 1998, a payment for total and permanent disability as a result of a psychological/psychiatric disorder may only be made, and will only be awarded, for benefits under the provisions of Section 5.1(b), Section 5.1(d), or the provisions of Section 5.5 that pertain to disabilities resulting from other than a football injury.*
>
> *Notwithstanding the foregoing, a total and permanent disability as a result of a psychological/psychiatric disorder may be awarded under the provisions of Section 5.1(a), Section 5.1(c), or the provisions of Section 5.5 that pertain to disabilities resulting from a football injury incurred while an Active Player if the requirements for a total and permanent disability are otherwise met and the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for total and permanent disability benefits under Section 5.1(a)."*

*Extension Agreement 2/25/98

195

EX 8, PAGE 921

# ARTICLE XLVIII
## SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance:** The NFL Player Second Career Savings Plan (**"Savings Plan"**), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:**

(a) **Prior to 1998:** For each of the Plan Years 1993 to 1997, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club. *Such contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.*
\*Extension Agreement 2/25/98

(b) **1998 and Later Years:** *For each Plan Year that begins (1) on or after April 1, 1998 and (2) before the end of the Final League Year, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:*
(i) *Matching Contributions. The parties will amend the Savings Plan to require the NFL Clubs in the aggregate to contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be as set forth below:*

| Plan Years | Amount |
|---|---|
| *1998, 1999, 2000* | *One Dollar (up to a maximum of $10,000) for each dollar contributed by the player* |
| *2001 through the Final League Year* | *Two Dollars (up to a maximum of $20,000) for each dollar contributed by the player.* |

*Any salary reduction contribution made by a player to the Savings Plan during a calendar year, including such contributions in 1998 prior to the Extension Date, will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:*

EX 8, PAGE 922

(a)      *by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and*

(b)      *by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.*

(ii)      Minimum Contribution. The NFL Clubs in the aggregate will contribute to the Savings Plan, for each of the Plan Years 1998 to the Final League Year, a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)      Expenses. The NFL Clubs will make contributions to the Savings Plan at least quarterly in an amount sufficient to pay administrative expenses.

(c)      **Protection of Deductions:** The parties will adopt a Money Purchase Plan to supplement the Savings Plan to the extent necessary to avoid disallowance of deductions because of the limit of section $404(a)(3)(A)(i)$ of the Internal Revenue Code. The NFL Clubs will not be required to make any contributions to the Savings Plan or to such Money Purchase Plan that are not deductible when made under the limits of section $404(a)$ of the Internal Revenue Code, provided that the NFL Clubs have timely taken such reasonable actions to avoid or minimize the application of those limits.

(d)      **Future Contributions and Collection:** *Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.*

*Extension Agreement 2/25/98

EX 8, PAGE 923

## ARTICLE XLVIII - A
## PLAYER ANNUITY PROGRAM

**Section 1. Establishment**: *The parties will jointly establish a new benefit, to be called the NFL Player Annuity Program (hereinafter referred to as "Player Annuity Program"). The Player Annuity Program will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Annuity Year will be the period April 1 to March 31. The Player Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Program will be continued and maintained in full force and effect during the term of this Agreement.*

**Section 2. Contributions:** *For each of the Annuity Years 1998 and thereafter only for each year in which a Salary Cap applies, a contribution will be made to the Player Annuity Program on behalf of the NFL Clubs as indicated below; unless this figure is changed pursuant to this Agreement, including the rights of the parties under Section 1(b) of Article XLVI of this Agreement:*

| Capped Annuity Year | Total Contribution |
|---|---|
| 1998 | $33 million |
| 1999 | $35.4 million |
| 2000 | $54 million |
| 2001 and later Capped years | $73 million |

*Contributions to the Player Annuity Program for an Annuity Year will be made as follows:*

1.       *Expenses: The NFL Clubs will prepay contributions to the Annuity Program at least quarterly in an amount sufficient to pay administrative expenses. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.*

2.       *Allocations: Allocations for the benefit of individual players will be made on and as of December 31 and March 31 of each Annuity Year, as described in Section 3(c) below.*

*Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.*

### Section 3. Eligibility and Allocation:

(a)     **Points:** *Players who earn a Credited Season, as that term is defined in the Bert Bell/Pete Rozelle Plan, in an Annuity Year and who have a total of four or more Credited Seasons as of the end of such Annuity Year will receive points for each such Credited Season depending on their total Credited Seasons as follows:*

| Total Credited Seasons | Points for 1998 and 1999 Years | Points for 2000 and later Years |
|---|---|---|
| 4, 5, and 6 | 1 | 1 |
| 7 through 10 | 2 | 1 |
| 11 or more | 3 | 1 |

(b)     **Individual Allocations:** *The amount allocated to an individual player who receives one or more points in an Annuity Year will be calculated as follows: In December of each such year a good faith estimate will be made by the Annuity Board of the total contribution expected to be made during such Annuity Year under Section 2 above by all NFL Clubs, minus the estimated administrative expenses for the Annuity Year, and minus any retroactive allocations made to players under rules similar to those in Section 3.4 of the Savings Plan. A good faith estimate will also be made at that time by the Annuity Board of the total points expected to be earned during such Annuity Year by all players. Each player's actual allocation will be determined by (1) taking the total estimated available contributions as described above, (2) dividing by the estimate of the total points expected to be earned by all players, and (3) multiplying the result by the number of points actually earned by that player according to the above schedule. In the Annuity Year beginning on April 1, 2000 only, the above formula will be adjusted so that players with 7 to 10 Credited Seasons will receive $12,000 more than players with 4 to 6 Credited Seasons, and players with 11 or more Credited Seasons will receive $24,000 more than players with 4 to 6 Credited Seasons.*

(c)     **Timing:** *Eligible players who earn a Credited Season by December 1 of an Annuity Year will receive their allocation on December 31 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive their allocation on March 31 of such Annuity Year.*

**Section 4. Distributions:** *A player may elect to begin receiving distributions under the Player Annuity Program in the form of annuity or installment payments at*

199

EX 8, PAGE 925

Article XLVIII-A, Player Annuity Program

*any time after the later of (a) the player's attainment of age 35, or (b) five years after the end of the Annuity Year containing the player's last Credited Season. Payments must begin no later than age 65. A player who elects to begin receiving annuity or installment payments under the preceding sentences may elect to receive such payments in substantially equal amounts for a period beginning on the date of commencement of such payments and ending upon the player's attainment of age 45, or such later age as he shall specify, or for life. Alternatively, a player may elect to defer his receipt of distributions under the Player Annuity Program. Upon a player's attainment of age 45, such player may elect to receive his benefit under the Player Annuity Program in the form of an annuity or a lump sum payment. If a player dies before making an election to receive benefits, the player's named beneficiary may make an election that otherwise would have been available to the player. A player's rights under the Player Annuity Program may not be transferred, assigned, or alienated.*

**Section 5. Structure:** *The Player Annuity Program will hold assets for the sole benefit of players and their beneficiaries. To expedite the creation of the Program and to reduce costs, the parties agree that the Program will be administered by an Annuity Board, and that prior to the first meeting of the Annuity Board the advisors to the Player Annuity Program will be the same as the advisors to the Savings Plan. The Player Annuity Program is intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity as described in Section 6 below.*

**Section 6. Insurance Company:** *The parties intend to establish as soon as possible an insurance company to hold and invest the assets of the Player Annuity Program. It is intended that such insurance company would be owned by the Player Annuity Program, and would issue either a group annuity contract to the Player Annuity Program or individual annuity contracts to player participants. The parties will review as soon as possible the steps involved and the feasibility of establishing such an insurance company, and retain the right to jointly decide to contract with outside entities for the provision of services in this area. To the extent that the approval or acquiescence of the Department of Labor or any other federal or state agency is deemed necessary or desirable with respect to any feature of the Player Annuity Program, counsel for the Program will seek such approval or acquiescence with the involvement and cooperation of the parties and their designated representatives.*

*\*Extension Agreement 2/25/98*

200

**EX 8, PAGE 926**

# ARTICLE XLIX
# GROUP INSURANCE

**Section 1. Group Insurance Benefits**: Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a) Life Insurance: For the 1993-99 League Years, a rookie player will be entitled to $100,000 in coverage, and a veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage. For the 2000-02 League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.

(b) Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual *per plan year and* $400 per family per plan year, with a maximum out-of-pocket expense of $800 per *plan* year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $2 million.

(c) Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

    1) Preventive care paid at 100% of UCR,

    2) General services paid at 85% of UCR, and

    3) Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual *per plan year.*

*\*Extension Agreement 2/25/98*

(d) **Insurance Benefits for Vested Players**: Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

201

EX 8, PAGE 927

Article XLIX, Group Insurance

**Section 2. Extended Post-Career Medical And Dental Insurance**: The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

    (a)    Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during the period from January 1, 1996 through May 1, 1996 will continue to receive the benefits described in Subsections 1(b) and 1(c) above until the first regular season game of the 1997 season.

    (b)    Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1996 season, *and before the first regular season game of the 1998 season, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for twenty-four (24) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.*

    *(c)    Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1998 season or at any time thereafter prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for thirty-six (36) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.*

    *(d)    All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described in Subsections 2(a), 2(b), and 2(c) above are provided, as if such additional benefits had not been provided.*

*\*Extension Agreement 2/25/98*

**Section 3. Limitations And Rules For Extended Insurance**: Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

    (a)    The benefits described in Subsections 2(a), 2(b), and 2(c) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

    (b)    The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.

    (c)    The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.

202

**EX 8, PAGE 928**

(d)     The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to: (i) in the 1998 League Year, the costs for such benefits up to $250,000 multiplied by the number of Clubs in the League that League Year; and (ii) in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

### Section 4. Financing For Extended Insurance:

(a)     The cost for the benefits described in Subsection 2(a) above will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(b)     The cost for the benefits described in Subsection 2(b) above for those players who are released or otherwise sever employment after the first game of the 1996 regular season through the 1997 League Year will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(c)     The NFL will reimburse the NFLPA for costs paid pursuant to Subsections 4(a) and 4(b) above, when and to the extent that such costs are charged against the Salary Cap in accordance with Subsections 4(d) and 4(e) below, and as follows:

(i)     in the 1998 League Year, only to the extent that, in the aggregate, the Clubs' costs for that League Year for Section 2 benefits is less than $250,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount; and

(ii)     in the 1999 and subsequent League Years, only to the extent that, in the aggregate, the Clubs' costs for that League Year for Section 2 benefits is less than $500,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount.

Reimbursement by the NFL will end when the costs paid by the NFLPA pursuant to Subsections 4(a) and 4(b) above have been fully reimbursed or such earlier date when this Agreement shall expire. Notwithstanding the foregoing, if the NFL cancels any extensions of this Agreement pursuant to Article LXI (Extension of Agreement), any costs paid by the NFLPA pursuant to Subsections 4(a) or 4(b) above, and which have not been charged against the Salary Cap, shall be reimbursed by the NFL in the first month of the Final League Year of this Agreement.

(d)     The costs for the benefits described in Section 2 above during the 1998 and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(e)     The amounts reimbursed to the NFLPA in the 1998 and subsequent League Years for the costs described in Subsections 4(a) and 4(b) above will be charged against the Salary Cap in the League Year in which the reimbursements are to be made, prior to the issuance of the ini-

203

Article XLIX, Group Insurance

tial Special Purpose Letter, based upon a projection pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 10(c), of the amount of such reimbursements to be made for that League Year, subject to the following rules:

(i)     In the 1998 League Year, the amount shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,000,000 more than the amount of the 1997 Salary Cap. Any amount that is not charged in the 1998 League Year, pursuant to the preceding sentence, may be carried over to be charged in the 1999 and future League Years, pursuant to and subject to subsections (ii) and (iii) below.

(ii)    In the 1999 and future League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,500,000 more than the amount of the Salary Cap in the prior League Year. Any remaining amount that is not charged in such a League Year may be carried over to be charged in subsequent League Year(s), subject to subsection (iii) below.

(iii)   Beginning in the first League Year in which at any time the Salary Cap Bank has a balance of zero, and in all subsequent League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(iv)    To the extent that the projection of the amount of reimbursements for a League Year made pursuant to this Subsection 4(e) are later determined to be incorrect, a reconciliation shall be made the following League Year.

**Section 5. Administration**: The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

204

**EX 8, PAGE 930**

Case 2: Case 2:12-md-02323-AB Document 10-12 Filed 03/09/12 Page 64 of 151 Page ID #:8325

## ARTICLE L
## SEVERANCE PAY

**Section 1. Eligibility**: Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through 2004, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

**Section 2. Amount**: Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; and (c) $12,500 per Credited Season for each of the seasons 2000 through 2002.

**Section 3. Application**: To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

**Section 4. Payment**: Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
|---|---|---|
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 Through February 19, or earlier | June 1 | June 30 |
| February 20 through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

205

EX 8, PAGE 931

Article L, Severance Pay

**Section 5. Failure to Apply**: A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment**: Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor**: In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay**: Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability**: The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

206

## ARTICLE LI
## SUPPLEMENTAL DISABILITY BENEFITS

*Section 1.* **Maintenance:** The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*Section 3.* **Extension:** For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend Section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

207

**EX 8, PAGE 933**

## ARTICLE LII
## BENEFIT ARBITRATOR

**Section 1. Selection**: The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

**Section 2. Compensation**: To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

**Section 3. Role**: The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either

EX 8, PAGE 934

party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will he requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

209

## ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

210

## ARTICLE LIV
## WORKERS' COMPENSATION

**Section 1. Benefits**: In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage**: Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

**Section 3. Arbitration**: In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study**: The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5. Moratorium**: The NFLMC, the NFL, all of the Clubs and the NFLPA agree to a moratorium on any and all efforts to change state laws concerning workers' compensation coverage of professional athletes: (a) beginning as of the execution of this Agreement and ending December 31, 1994; and (b) *beginning as agreed to by the parties in the transition rules for the 1998 League Year and ending June 1, 1999.* During such periods, the NFLMC,

**211**

EX 8, PAGE 937

Article LIV, Workers' Compensation

the NFL, any Club, the NFLPA, and/or their respective agents are prohibited from making or supporting any attempt, directly or indirectly, to change state laws affecting players' workers' compensation coverage.

*Extension Agreement 2/25/98*

**Section 6. Preservation of Rights:** The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

**Section 7. Reopener:** If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

212

**EX 8, PAGE 938**

Case 2: Case 2:12-md-02323-AB Document 18-12 Filed 03/09/12 Page 72 of 151 Page ID #:8333

# ARTICLE LV
## MISCELLANEOUS

**Section 1. Endorsements**: No Club may unreasonably refuse to permit a player to endorse a product.

**Section 2. On-Field Attire**: Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

**Section 3. Appearances**: No Club may unreasonably require a player to appear on radio or television.

**Section 4. Promotion**: The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction**: The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

**Section 6. Public Statements**: The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address**: The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets**: Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three days prior to the date of the game.

213

**EX 8, PAGE 939**

Article LV, Miscellaneous

NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery** of Documents: The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

214

**EX 8, PAGE 940**

*Section 16.* **Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

*Section 17.* **Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

*Section 18.* **Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

*Section 19.* **Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

215

**EX 8, PAGE 941**

## ARTICLE LVI
## FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League
Year of this Agreement, except that the following rules shall apply only in
that League Year:

**Section 1. No Salary Cap:** No Salary Cap shall be in effect during the Final
League Year.

**Section 2. Free Agency If Salary Cap In League Year Prior To Final
League Year:** In the event that a Salary Cap is in effect in the League Year
prior to the Final League Year: (a) the number of Accrued Seasons required
to be an Unrestricted Free Agent during the Final League Year shall be six
or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran
Free Agency), Sections 2-4, shall apply to any player with five Accrued Sea-
sons in the Final League Year, as if such player had four Accrued Seasons,
except that the Qualifying Offers specified in Article XIX (Veteran Free
Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers
originally stated to be $325,000, and $100,000 greater for the Qualifying
Offers originally stated to be $700,000 or $900,000, subject to any addi-
tional increases in the base amounts in accordance with the rules set forth
in Article XIX (Veteran Free Agency), Section 2(e).

**Section 3. Free Agency If No Salary Cap In League Year Prior To Final
League Year:** In the event that a Salary Cap is not in effect in the League
Year prior to the Final League Year, the number of Accrued Seasons required
to be an Unrestricted Free Agent during the Final League Year shall be five
Accrued Seasons.

**Section 4. Franchise and Transition Players:** As set forth in Article XX
(Franchise and Transition Players), Section 3, each Club shall be permitted
to designate one Unrestricted Free Agent as a Transition Player between
February 1 and February 15, in the Final League Year, notwithstanding that
Transition Players may not be designated in the League Years after the 1994
League Year (except as provided in Article XX (Franchise and Transition
Players), Sections 3(a) and 11).

216

**EX 8, PAGE 942**

## ARTICLE LVII
## MUTUAL RESERVATION OF RIGHTS:
## LABOR EXEMPTION

**Section 1. Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

**Section 2. Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

### Section 3. CBA Expiration:

(a)  Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)  The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is

217

EX 8, PAGE 943

Article LVII. Mutual Reservation of Rights: Labor Exemption

or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

218

## ARTICLE LVIII
## DURATION OF AGREEMENT

**Section 1. Effective Date:** Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993. *With respect to the 1998 amendments to this Agreement, those amendments shall be effective upon the execution of those amendments, except that: (i) the 1998 amendments with respect to the Entering Player Pool and the amount of the Salary Cap shall be effective as of the first day of the 1998 League Year; and (ii) the parties may agree upon transition rules implementing the terms of the 1998 amendments, which transition rules shall be effective as of such dates as are agreed to by the parties.*

*\*Extension Agreement 2/25/98*

**Section 2. Termination:** Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on March 1, *2005 (or March 1, 2004, in the event the extension of this Agreement is cancelled as set forth in Article LXI (Extension of Agreement)),* or thereafter, by giving sixty (60) days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

*\*Extension Agreement 2/25/98*

**Section 3. Expiration Date:** Except as provided in Section 4 below, and in Article LXI (Extension of Agreement) below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the *2004* League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire as prescribed in Article XVI, Section 1.

*\*Extension Agreement 2/25/98*

**Section 4. Termination Prior to Expiration Date:**

(a)    **Due to Invalidation of Settlement Agreement.** In the event that the Settlement Agreement does not receive Court Approval or is otherwise invalidated by any appellate court prior to September 1, 1993:

(i)    This Agreement shall terminate immediately;

(ii)    The <u>White</u> action and the Related Litigation (as defined in Article I of the Settlement Agreement) shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)    All pending motions in White and McNeil shall be decided by the Court; and

219

EX 8, PAGE 945

(iv)    With respect to all Player Contracts entered into by Unrestricted Free Agents during the period from March 1 to the date of such disapproval, and by Restricted Free Agents during the period from March 1 to the date of such disapproval:

(1)    Any Club that had rights to the services of any such player on January 31, 1993 shall have the right to assume any such Player Contract by notice to the player, the New Club, the NFLPA and Class Counsel within ten days of the date of such disapproval, and in such event such Prior Club shall have the same rights to the services of such player that the New Club would have had under such Player Contract;

(2)    Within twenty days of the date of such disapproval, any such player shall have the right to void any such Player Contract, whether such contract was assumed by the Prior Club or not, by notice to the Prior Club or New Club, which clubs shall notify the NFLPA and Class Counsel of such election as soon as possible but in no event later than one day after receiving such notice (in the event the player voids such Player Contract, the player shall return to the Team any compensation received thereunder); and any such player shall have such further relief as determined by the Court pursuant to the pending motions in White and McNeil;

(3)    In the event that a player voids a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract after the date of such election; and

(4)    In the event that a player elects not to void a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract.

(b)    **Approval of Settlement Agreement Invalidated.** In the event that the Settlement Agreement receives Court Approval but such approval is invalidated by any appellate court on or after September 1, 1993:

(i)    This Agreement shall terminate immediately;

(ii)    The White action and the Related Litigations shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)    All Player Contracts entered into prior to such date of such disapproval shall remain in full force and effect and shall be binding on all Parties;

(iv)    A player with a Player Contract referred to in Section 4(b)(iii) above shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases And Covenants Not to Sue) of the Settlement Agreement, that arises out of such Player Contract, for conduct prior to such disapproval consistent with the express terms of this Agreement.

EX 8, PAGE 946

(c)     **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement except as referred to in subsections (a) and (b) above, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (1999 League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d)     **Termination Due To Collusion.** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)     **Termination After Closing Date.** If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f)     **No Waiver.** Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

221

**EX 8, PAGE 947**

Article LVIII, Duration of Agreement

**Section 5. Ratification:** This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

222

## ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

223

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a)  <u>To the National Football League Management Council</u>:
The National Football League
Management Council
280 Park Avenue
New York, New York 10017
Attention: Executive Vice President    Labor Relations

(b)  <u>To an NFL Club</u>:
At the principal address of such Club as then
listed on the records of the NFL or at that Club's
principal office.
Attention: President

(c)  <u>To the NFLPA</u>:
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

224

# ARTICLE LXI
## EXTENSION OF AGREEMENT

If the NFL or the NFLPA has by December 1, 2000 provided written notice to the other party cancelling the further extension of this Agreement, then this Agreement shall *continue in full force and effect until the last day of the 2003* League Year, *except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire as prescribed in Article XVI, Section 1.* The December 1, 2000 deadline *may* be extended by *mutual agreement of the parties.*

*\*Extension Agreement 2/25/98*

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

BY: _____

BY: _____

225

Appendix A

## APPENDIX A

### CHECK-OFF AUTHORIZATION FOR
### NATIONAL FOOTBALL LEAGUE PLAYERS
### ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football

226

Appendix A

League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

Signature

Player's Name—Type or Print

227

Appendix B

## **APPENDIX B**

### **INJURY PROTECTION/EARLY WAIVER**

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

**EX 8, PAGE 954**

# APPENDIX C

## NFL PLAYER CONTRACT

THIS CONTRACT is between_____
_____, hereinafter "Player," and_____
_____,
a _____
corporation (limited partnership) (partnership), hereinafter "Club," oper-
ating under the name of the_____
_____ as a member of the National Football
League, hereinafter "League." In consideration of the promises made by
each to the other, Player and Club agree as follows:

    1.    TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi
nated, or renewed as specified elsewhere in this contract.

    2.    EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate ful-
ly in Club's official mandatory mini-camp(s), official pre-season training
camp, all Club meetings and practice sessions, and all pre-season, regular
season and post-season football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

    3.    OTHER ACTIVITIES. Without prior written consent of the Club,
Player will not play football or engage in activities related to football other-
wise than for Club or engage in any activity other than football which may
involve a significant risk of personal injury. Player represents that he has
special, exceptional and unique knowledge, skill, ability, and experience as
a football player, the loss of which cannot be estimated with any certainty
and cannot be fairly or adequately compensated by damages. Player there-
fore agrees that Club will have the right, in addition to any other right which
Club may possess, to enjoin Player by appropriate proceedings from play-
ing football or engaging in football-related activities other than for Club or
from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

229

Appendix C

### 4.    PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

(a)    Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)    Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on products that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract expires. Nei-

230

EX 8, PAGE 956

ther Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

5.    COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

| | |
|---|---|
| $_____ | for the 19_____ season; |
| $_____ | for the 19_____ season; |
| $_____ | for the 19_____ season; |
| $_____ | for the 19_____ season; |
| $_____ | for the 19_____ season. |

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.    PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or bi-weekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly por-

231

Appendix C

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary having become due and payable up to the time of termination.

7.    DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.    PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.    INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.    WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

232

deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14 RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which

233

EX 8, PAGE 959

Appendix C

are not inconsistent with the provisions of this contract or of any collective
bargaining agreement in existence during the term of this contract. Player's
attention is also called to the fact that the League functions with certain
rules and procedures expressive of its operation as a joint venture among
its member clubs and that these rules and practices may affect Player's re-
lationship to the League and its member clubs independently of the provi-
sions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the
League and professional football that would result from impairment of pub-
lic confidence in the honest and orderly conduct of NFL games or the in-
tegrity and good character of NFL players. Player therefore acknowledges
his awareness that if he accepts a bribe or agrees to throw or fix an NFL
game; fails to promptly report a bribe offer or an attempt to throw or fix an
NFL game; bets on an NFL game; knowingly associates with gamblers or
gambling activity; uses or provides other players with stimulants or other
drugs for the purpose of attempting to enhance on-field performance; or is
guilty of any other form of conduct reasonably judged by the League Com-
missioner to be detrimental to the League or professional football, the
Commissioner will have the right, but only after giving Player the opportu-
nity for a hearing at which he may be represented by counsel of his choice,
to fine Player in a reasonable amount; to suspend Player for a period certain
or indefinitely; and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides other-
wise, if Player becomes a member of the Armed Forces of the United States
or any other country, or retires from professional football as an active play-
er, or otherwise fails or refuses to perform his services under this contract,
then this contract will be tolled between the date of Player's induction in-
to the Armed Forces, or his retirement, or his failure or refusal to perform,
and the later date of his return to professional football. During the period
this contract is tolled, Player will not be entitled to any compensation or
benefits. On Player's return to professional football, the term of this con-
tract will be extended for a period of time equal to the number of seasons
(to the nearest multiple of one) remaining at the time the contract was
tolled. The right of renewal, if any, contained in this contract will remain in
effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides other-
wise, Club may assign this contract and Player's services under this con-
tract to any successor to Club's franchise or to any other Club in the
League. Player will report to the assignee Club promptly upon being in-
formed of the assignment of his contract and will faithfully perform his ser-
vices under this contract. The assignee club will pay Player's necessary trav-
eling expenses in reporting to it and will faithfully perform this contract

234

with Player.

18.    FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.    DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.    NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.    OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22.    LAW. This contract is made under and shall be governed by the laws of the State of _____.

235

Appendix C

    23.    WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled <u>White</u> v. <u>National Football League</u>, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in <u>Brown</u> v. <u>Pro Football, Inc</u>. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in <u>White</u> ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the <u>White</u> class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

    24.    OTHER PROVISIONS.
    (a)    Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

    (b)    Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

    (c)    The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

236

Appendix C

5.   SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| PLAYER | CLUB |
| Home Address | By |
| Telephone Number | Club Address |
| Date | Date |
| PLAYER'S CERTIFIED AGENT | |
| Address | |
| Telephone Number | |
| Date | |

Copy Distribution:   White League Office          Yellow-Player
                     Green-Member Club          Blue-Management Council
                     Gold-NFLPA                 Pink-Player Agent

237

Appendix D

## APPENDIX D

### FIRST REFUSAL OFFER SHEET

Name of Player:                              Date:

Address of Player:                          Name of New Team:

Name and Address of                     Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                                     Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

 [Supply Information on this Sheet or on Attachment]

 1. Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized league-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

 2. Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

 3. Other terms (that need not be matched):

Player:                                             New Club:

By: _____  _____     By: _____  ___ ___
                                                              Chief Operating Officer

238

# APPENDIX E

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                              Date:

Address of Player:                           Name of New Team:

Name and Address of                          Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                             Address of Prior Team:

The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

                         Prior Team

                         By: _____
                             Chief Operating Officer

239

Appendix F

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By: _____

WITNESSED BY:

——— ————————————— —————

240

## APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

241

Appendix H

## APPENDIX H

## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR of the member clubs of the NFL (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions and definitions contained in the Settlement Agreement. The information on the Schedule is to be the responsibility of the NFL Member Clubs' and the NFL's managements. The Accountants' responsibility will be to express an opinion on the Schedule based on their audit.

The NFL and Class Counsel or any Players Union are to retain a national accounting firm (the "Accountants"). The Accountants are to conduct an audit of the Schedule (the "Audit") in accordance with generally accepted auditing standards. Those standards require that the Accountants plan and perform the Audit to obtain reasonable assurance about whether the Schedule is free of material misstatement. The Audit shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Audit shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of 6 members with 3 representatives designated by each of the NFL and Class Counsel or any Players Union. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Audit described in the preceding paragraph and again before February 15th to review the results of the Audit before issuance of the final report for that playing season.

The procedures detailed below are designed for the Accountants to determine whether, in their opinion, the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the member clubs of the NFL for such season in accordance with the terms of the Settlement Agreement. The Accountants will audit the Schedule for each playing season.

The Accountants may rely on the auditing procedures performed by each member club's local accounting firm ("Local Accountants") or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to express an overall opinion on the Schedule as referred above.

242

Appendix H

The Accountants will have access to the Local Accountants' audit workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

## Procedures provided by the NFL and Class Counsel to be performed by the Accountants

### General

- The Settlement Agreement should be reviewed and understood.

- See Exhibit I for the form of the Accountants' Audit Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All audit workpapers of the Accountants relative to its report on the Schedule should be made available for review by representatives of the NFL and Class Counsel or any Players Union prior to issuance of the report.

- A summary of all Audit findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised during the Audit should be resolved by the Committee.

- Estimates should be reviewed in accordance with the Settlement Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

243

Appendix II

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

**Procedures provided by the NFL and Class Counsel to be performed by the Local Accountants**

**General**
- Each NFL member club shall be audited in accordance with the Settlement Agreement. The Settlement Agreement should be reviewed and understood by all Local Accountants.

- See Exhibit II for the form of the Local Accoutants' Audit Report.

- Special rules for Cap Counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

**Team Salaries - Schedule 1**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the Settlement Agreement.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the Settlement Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

244

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the Settlement Agreement.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| Players Pension | Workers Compensation |
| Severance Costs | FICA - Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**
- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the Agreement.

245

**EX 8, PAGE 971**

Appendix H

**Defined Gross Revenues - Schedule 4**
- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the DGR Settlement Agreement. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

**Excluded DGR - Schedule 5**
- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

**Questions - Schedule 6**
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

246

**EX 8, PAGE 972**

Appendix H

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

- Review supporting details of any changes.

247

Exhibit I

## EXHIBIT I

## ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, White v. NFL, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of the Member Clubs and the NFL's management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the NFL or any Member Club taken as a whole.

248

Exhibit II

# EXHIBIT II

## LOCAL ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ a Member Club of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, White v. NFL, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of _____ management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the _____ taken as a whole.

249

Appendix I

# APPENDIX I

## STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

### General Medical Examination

1. History
    - player
    - family
    - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
    - head
    - face
    - scalp
    - ears
        - external & drums
    - sinus
    - throat
    - eyes
        - pupils
        - reaction to movement & light
    - lungs
        - palpation
    - chest
    - heart
    - visceral
    - hernia
    - rectal
        - hemorrhoid
        - fistula
        - prostate
    - gastric
    - any unusual body marks, i.e. scars, birthmarks
    - height
    - weight
    - temperature
    - blood pressure
    - pulse
    - heart rate

250

Appendix 1

## Orthopedic Examination
Examination visually, including stress testing and range of motion for all
of the following:
- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

## Flexibility
Testing of hamstrings and neck

## EKG
Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardio-
vascular

## Blood Testing
Standard grid. Testing for (including but not limited to):
- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*          *Where applicable. If found,
- Sickle Cell*        individual counseling necessary.
- VD*

251

Appendix I

**Urinalysis**
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**
- peripheral vision
- standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for: Tumor
T.B.
Lesions

**X-Ray all previously injured areas** (at physician's discretion)

252

## APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

| Non-football related disability rates before retirement: | Age | Rate |
|---|---|---|
| | 22 | .04 |
| | 27 | .04 |
| | 32 | .04 |
| | 37 | .05 |
| | 42 | .09 |
| | 47 | .18 |
| | 52 | .41 |

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. |

| Withdrawal rates: | For Players With Service of | Rate |
|---|---|---|
| | 1 year | 29.1% |
| | 2 years | 19.7% |
| | 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993. |
| Retirement age: | 47, except 55 for players with no credited seasons before 1993 |
| Percent married: | Social Security awards in 1972 |

253

Appendix J

| | |
|---|---|
| Age of Player's wife: | Three years younger than player |
| Remarriage rates: | 1971 Railroad Retirement Board rates |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of plan year |
| Actuarial value of assets: | One-time write-up to market value as of March 31, 1993 followed by restart of the present procedure thereafter. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for Line-of-Duty disability benefits. |
| Amortization period: | 20 years beginning April 1, 1993; 19 years as of April 1, 1994, etc. In years when there is a zero or negative unfunded actuarial accrued liability, the amount which is expected to produce a zero unfunded actuarial accrued liability at the end of the plan year. |

254

# APPENDIX K

## EXTENSION CHART

*Salary Cap as Percentage of DGR*

|                     | 98 | 99 | 00 | 01 | 02   | 03 | 04 |
|---------------------|----|----|----|----|------|----|----|
| Notice to Cancel    | 63 | 63 | 63 | 63 | 64   | U  |    |
| No Notice to Cancel | 63 | 63 | 63 | 63 | 63.5 | 64 | U  |

$U$ = Uncapped

255

Appendix I.

## APPENDIX L

## OFF-SEASON WORKOUT RULES

The 1993 Collective Bargaining Agreement with the NFLPA provides that, except for certain specified minicamps, any off-season workout programs or classroom instruction shall be voluntary. No Club official shall indicate to a player that the Club's off season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for sixteen weeks between the end of the previous season and ten days prior to the start of veteran training camp. The CBA limits such workouts to four days per week, except weekends. Included in the sixteen weeks may be no more than fourteen days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.

Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the Management Council, at least fifteen days prior to the start of its off-season workout program, the time frame for the program including designation of any days on which organized team practice activity will take place. Prompt notification of any schedule changes must be provided to the Management Council, which will provide the NFLPA with prompt notification of both the original schedule and any changes.

The following rules shall also apply to the fourteen days of organized team practice activity:

- No pads except protective knee or elbow pads. Helmets are permitted.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11 on 11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the off season to ensure player safety and adherence to live contact guidelines.
- Maximum six hours per day, with a maximum two hours on field, for any player.

256

## APPENDIX M

## PSL EXAMPLES

Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs):

### 1. Subsection (x)(1) — Maximum Annual Allocation Amount

**Year 1 (1996)** -   PSL revenues received = $ 45 million
Remaining life of PSL = 16 years
WSJ Treasury Bill rate at 2/1/96 - 8%
Factor-Future Value of 8% annuity 15 years (maximum)
= 27.152 (annual compounding)
Future Value of $3 million/year for 15 years
= $3 million x 27.152 = $81.456 million
Interest Amount  = $81.456 million - $45 million
                   = $36.456 million

Year 1 Annual Interest Allocation
= $36.456 million/15 years = $2.43 million/year

Year 1 PSL Allocation Amount
= PSL Amount = $45 million/15 years = $3.00 million
+ Allocated Interest                              = $2.43 million
Total Year 1 Allocation                           = $5.43 million

1996 PSL Maximum Annual Allocation Amount         = $5.43 million

257

Appendix M

**Year 2 (1997)-** PSL revenues received = $ 30 million
Remaining life of PSL = 15 years
WSJ Treasury Bill rate at 2/1/97 - 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129       = $50.258 million
Interest Amount       = $50.258 million - $30 million
                      = $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
=PSL Amount=$30 million/15 years    = $2.00 million
+ Allocation Interest               = $1.35 million
Total Year 2 Allocation             = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount        = $5.43 million
Year 2 PSL Allocation Amount        = $3.35 million

1997 PSL Maximum Annual Allocation Amount      = $8.78 million

258

Appendix M

**Year 3 (1998)-** PSL revenues received = $ 7 million
Remaining life of PSL = 14 years
WSJ Treasury Bill rate at 2/1/98 - 7.5%
Factor-Future Value of 7.5% annuity 14 years = 23.366
Future Value of $.5 million/year for 14 years
= $.5m x 23.366      = $11.683 million
Interest Amount      = $11.683 million - $7 million
                     = $ 4.683 million

Year 3 Annual Interest Allocation
= $4.683 million/14 years = $.335 million/year

Year 3 PSL Allocation Amount
= PSL Amount ÷ $7 million/14 years  = $ .500 million
+ Allocated Interest                = $ .335 million
Total Year 3 Allocation             = $ .835 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount        = $5.430 million
Year 2 PSL Allocation Amount        = $3.350 million
Year 3 PSL Allocation Amount        = $ .835 million

1998 PSL Maximum Annual Allocation Amount      = $9.615 million

## 2. Subsection (x)(2) — PSL Revenues Used For Stadium Construction Or Renovation

Assume the Team sells PSLs on the following terms:
- Gross PSL revenues received in 1996 = $45 million
- Income taxes paid on PSL revenues in 1996 = $12 million
- Legal and marketing costs incurred relating to PSL
  revenues  $6 million
- Stadium renovation costs = $56 million

The PSL revenues included in DGR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.

Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m - ($12m + 6m)) and the total stadium renovation costs were $30 million.

The PSL revenues excluded from DGR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.

259

Appendix M

### 3. Subsection (x)(2) — **Maximum Exclusion Of PSL Revenues Each League Year**

For purposes of this subsection, Excluded DGR spillover shall be calculated as follows for each Team:

    -Assume that the new stadium's first full year of operation is 1998.
    -Assume that the Team's Excluded DGR data is as follows:

|              | 1997        | 1998         |
|--------------|-------------|--------------|
| Excluded DGR | $5 million  | $15 million  |

If the League, as a whole, is in a spillover situation in 1998, then the increase in DGR due to spillover would be $10 million ($15 million - $5 million).

If the League is not in a spillover situation in 1998, the increase in DGR due to spillover would be zero.

### 4. Subsection (x)(3) — **PSL Difference Credited To DGR**

    a. Assume that the new stadium is placed in service in June 1998.

    1998 increase in DGR directly related to new stadium:

| - Increase in gate receipts   | $6 million |
| - Increase in DGR spill-over  | $2 million |
| Total DGR increase            | $8 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|------|--------------------------------------|-------------------------|----------------|
| 1996 | $5.430 million                       | $8 million (assumed)    | $ 0            |
| 1997 | $8.780 million                       | $8 million (assumed)    | $.780 million  |
| 1998 | $9.615 million                       | $8 million              | $1.615 million |

Cumulative PSL Difference        $2.395 million

    For purposes of computing the PSL Difference, we assume that the increase in DGR was the same for 1996 and 1997 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million).

    $2.395 million would be credited into DGR in the 1999 League Year.

260

**EX 8, PAGE 986**

b. Assume that the new stadium is placed in service in June 1998.

1998 increase in DGR directly related to new stadium:

| | |
|---|---|
| - Increase in gate receipts | $ 9 million |
| - Increase in DGR spill over | $16 million |
| Total DGR increase | $25 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|---|---|---|---|
| 1996 | $5.430 million | $25 million (assumed) | 0 |
| 1997 | $8.780 million | $25 million (assumed) | 0 |
| 1998 | $9.615 million | $25 million | 0 |

Cumulative PSL Difference                                                              0

**Since the increase in DGR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year.**

No amount would be credited into DGR in the 1999 League Year.

### 5. Subsection (x)(5) - Carryover PSL Credit

Assume the following:

-New Stadium is placed in service in June 1998.
-1999 - 2002 Maximum Annual Allocation Amount is $9.615 million.
-Increases in DGR directly related to New Stadium are as follows:

| 1999 | $ 8 million |
|---|---|
| 2000 | $ 9 million |
| 2001 | $14 million |

The Carryover PSL credits are calculated as follows:

| 1999 | $9.615m - $8m = $1.615m |
|---|---|
| 2000 | $9.615m - $9m = $ .615m |
| 2001 | (No carryover PSL credits) |

Under this scenario, year 2001 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 1999 and 2000 ($1.615m + $.615m) can be deducted in full from DGR in League Year 2001. There would be no remaining Carryover PSL credits to deduct from DGR in future League years.

261

Appendix M

## 6. Subsection (x)(6) - Reduction In Premium Seat And Luxury Box Expenses

Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.

## 7. PSL Revenues Not Benefitting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium

In any case where:

(i) PSLs are sold by a Team or by a third party (such as a stadium corporation, a non-profit private sector entity, or a governmental entity) pursuant to Team authorization; and

(ii) all net proceeds of such PSL sale are used to build a new stadium or construct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and

(iii) such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or non-profit entity; and

(iv) the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and

(v) neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant

262

to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease;

then, because the Team and its affiliates do not receive any net benefit arising out of the sale of PSLs other than through the stadium construction or improvements paid by the PSL revenues (all PSL revenues being spent on third-party costs and charges directly incurred as a result of the PSL sale, or on stadium construction or improvements), none of the proceeds received from the sale of the PSLs would be included in DGR or Excluded DGR. Each of Example Nos. 1 through 6 above assumes that, for one or more reasons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts other than the PSL proceeds, including but not limited to any expense payments, may be treated as DGR, Excluded DGR, or non-DGR under this Agreement. Moreover, the Special Master or the Court would have the authority to examine any transaction involving the Club or any of its affiliates and the Stadium landlord or any of its affiliates, to determine if such transaction transfers, in whole or in part, some or all of the economic benefit of any PSL revenues to the Club or any of its affiliates, and any such transferred economic benefits shall be treated as DGR or Excluded DGR, as appropriate.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsections (xi)(1) through (xi)(6) call for calculations quite similar to those discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

EX 8, PAGE 989

Appendix N

# APPENDIX N

## WRITTEN WARNING
## GOOD FAITH EFFORT

*[date]*

*Dear [player]:*

*The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article XXIII of the Collective Bargaining Agreement if you are terminated before the end of this season.*

*[Club Official]*
*[Club name]*

*\*Extension Agreement 2/25/98*

264

# INDEX

**A**

Acceleration, 102
**Access**
    to medical records, 186
    to personnel records, 186
Accrued Season, 55, 57, 68, 150, 164
    definition, 5
    for franchise player, 79
    for restricted free agent, 58–59
**Active**
    List, 75, 85, 164, 176
    Player, 193, 205
Active/Inactive List, 164, 171–172
Advisory Committee, 185
Agent regulation system, 16
Agents regulated by NFLPA, 16. *See also* NFLPA
**Agreement**
    definition, 4
    effective date, 219
    expiration date, 219
    extension, 7–8, 43, 95, 203, 219, 225
    negotiation of, 10
    ratification, 221–222
    scope and arbitration, 10
    termination, 154–155, 219
Alcohol and substance abuse, 194–195. *See also* Chemical Dependency;
    Drugs; Substance abuse
Annual. *See* Draft, annual
    Selection meeting, 1993, 43
Annuity, *See* Player Annuity
**Answer**
    injury grievance, 25. *See also* Injury grievance, non-injury grievance
Anti-Collusion, 67, 145–146, 156, 221
    burden of proof, 151–152
    computation of damages, 153
    costs, 154
    disclosures, 151
    discretion, 151
    effect on computations, 154
    enforcement of provisions, 151
    on remedies, 152 153
    on summary judgment, 152
    other Club conduct, 150 151

**EX 8, PAGE 991**

Anti-Collusion (*continued*)
    payment of damages, 154
    player election, 153–154
    prior conference, 155
    prohibited conduct, 150
    reimbursement, 154
    termination, 154–155
    time limits, 155
Appeal, 20–21,
    Commissioner discipline, 31
Appearances, 213
Application, 78, 205
    for disputes, 175
    for Final Eight Plan, 80
    for signing period, 78–79
    for total disability benefits, 195
Appointment
    of Special Master, 145
Arbitration, 10, 11, 174, 211
    expedited, 65
Arbitration Panel
    and injury grievance, 27
    involved in non-injury grievance, 21–22
Arbitrator, 29
    decision in committees, 36
    injury grievance procedure, 26
    notice, 20–22
    senior, 21, 27
Arbitrators decision
    of non-injury grievance, 22–23
Attire
    on field, 213
Authorization, 214

**B**

Benefit Arbitrator, 190
    compensation, 208
    role, 208–209
    selection, 208
Benefit Credits, 190–192
Benefits, 9, 88, 142, 160, 211
    definition, 6, 93
    injury protection, 33
    maximum lifetime, 201

266

Benefits *(continued)*
    projected, 96, 141–142
    retention of, 210
Bert Bell Plan, 93, 94, 169, 189, 191. *See also* Bert Bell/Pete Rozelle NFL
    Player Retirement Plan; Pete Rozelle NFL Player Retirement Plan;
    Retirement Plans
Bert Bell/Pete Rozelle NFL Player Plan (Merged Plan), 23, 29, 83, 85, 93,
    94, 187, 189, 191, 192, 193, 194, 199, 201–202, 205, 207
Bonus
    amounts treated as signing, 103
    completion, 104, 122
    credit for signing bonuses refunded, 105
    expansion, 98
    extension, 101, 137
    incentive, 106, 124, 125, 126–128, 127
    non-guaranteed reporting, 105, 121
    off-season reporting, 104
    off-season roster, 104
    off-season workout, 105
    paid performance, 106
    performance, 70, 105
    pre-season roster, 128
    prior signing, 102–103
    pro-rated signing, 172
    relocation, 105, 122, 160
    reporting, 64
    roster, 64, 70, 172
    salary, 70
    signing, 51, 64, 70, 99, 101, 102, 105, 134–135, 137
    weight, 105
Buyouts and signing bonus, 51

## C

Canton Hall of Fame game, 162
Capped Year, 57
    definition, 6. *See also* League Year
Career Planning Program, 15, 214
Career-ending injury, 76
Carryover Premium Seat Credit, 90, 92. *See also* PSL
Certification
    contract, 156
    end of League Years, 156–157
    exclusive representation and NFLPA agent certification, 16
    false, 157
    NFLPA agent certification penalty, 16

267

Check-Off
    authorization, 13
    union security, 13
Chemical Dependency Program, 15. *See also* Alcohol and substance
    abuse; Drugs; Substance abuse
Circumvention, 143
Claim filing, 155
Class Counsel, 51, 87, 135, 150, 187
    definition, 4
Club affiliate, 39, 143, 146, 156, 167
    definition, 4. *See also* Team affiliate
Club discipline
    deduction, 19
    disputes, 19
    maximum discipline, 18–19
    published list, 19
    uniformity, 19
Club physician, 18, 184, 186
    injury grievance, 25, 29
    injury protection, 33, 34
College draft, 5, 11, 29, 64-65, 150, 153, 221
    assignment of draft rights, 46
    compensatory draft selections, 46–47
    definition, 5
    no subsequent draft, 46
    notice of signing, 47
    number of choices, 43
    other professional themes, 44-45
    required tender, 43
    return to college, 45–46
    signing of drafted rookies, 43–44
    subsequent draft, 46
    time of draft, 43
    undrafted rookies, 47
    workouts draft eligible players, 47. *See also* Compensatory Draft; Draft
Commissioner, 16, 99, 167, 185
    and committees, 35
    approval of contract, 156
    definition, 4
    determination by, 157
    disapproval, 39, 143–144. *See also* Exempt Commissioner Permission
    List
Commissioner discipline
    costs, 32
    fine money, 32

**EX 8, PAGE 994**

Commissioner discipline *(continued)*
  league discipline, 31
  one penalty, 32
  representation, 31–32
  time limits, 31
Committee Player/Club Operations, 166
Committees, 23
  Advisory, 185
  and Commissioner, 35
  Competition Committee, 36
  Grievance Settlement Committee, 24
  Joint Committee, 35–36
  Player/Club Operations Committee, 36
Compensation, 169, 208
  Benefit Arbitration, 208
  draft choice, 164
  of Special Master, 146
  pre-season training camp, 169
  other, 174
  to players, 162. *See also* Bonus; Incentive; Meal allowance; Salary
Compensatory
  damages, 153
  picks, additional, 160
Compensatory Draft, 11
  definition, 5
  selection, 43, 48, 49, 77, 78. *See also* College Draft; Draft
Competition Committee, 36
Completion
  bonus, 104, 122. *See also* Bonus
Conduct
  other club, 150–151
  prohibited, 150
Conformity
  NFL Player Contract, 38
Consideration between clubs, 64
Consultation and Information Sharing, 150, 156
  consultation and communication, 158
  copies, 159
  meetings, 159
  neutral verifier, 158–159
  notice of invalid contract, 158
  salary summaries, 158
Contact
  waiver system, 83
  work, 166

269

Contract
    certification, 156
    deferred, 176
    guaranteed, 176
    mid-season, 134
    multi-year, 130
    player's contract, during suspension, 14
    renegotiation and extensions, 136-140
    renegotiation, definition, 6
    split, 175-176
    traded, 133–134. *See also* NFL Player's Contract
Contributions to Savings Plan, 196–197. *See also* specific retirement
    plans; savings plans
Copies, 159
    of contracts, 175
    of medical records, 186
    of personnel records, 186
    requirements for processing, 65
Costs, 154
    and non-injury grievance, 23-24
    Commissioner discipline, 32
    for insurance coverage, 203–204
    injury grievance[Expenses], 29
    of arbitration, 23–24
    of arbitrator, 23–24
    player benefit, 142
    player costs in Rookie Orientation Programs, 53
    postponement, 27
    transcription, 23–24. *See also* Expenses
Credited
    season, 172, 174, 199–200, 201, 205
    service, 169

## D

Deduction 213
Deferred
    contracts, 176
    salary, 99
Deferred Paragraph 5 Salary, 175. *See also* Salaries
Defined Gross Revenues, 86-94, 141
    definition, 6. *See also* DGR; Excluded DGR; Projected DGR
Definition
    accrued season, 5
    agreement, 4
    annuity starting date, 192

**EX 8, PAGE 996**

Definition (*continued*)
    benefits, 6
    Class Council, 4
    Club Affiliate, 39
    Commissioner, 4
    compensatory draft, 5
    disability, 192  193
    draft, 5
    draft choice compensation, 5
    drafted rookie, 5
    entering player pool, 48
    final eight plan, 5
    free agent, 5
    guaranteed, 104
    guaranteed league-wide salary, salary cap & minimum team salary,
        6–7
    Impartial Arbitrator, 4
    injury grievance, 25
    league football activity, defined, 193
    league year, 4
    minimum salary, 5
    minimum team salary, 7
    negotiation, 5
    new club, 5
    NFL player contract, 4
    NFL Rules, 4
    NFLPA Player, Group Licensing Program, 13–14
    non-injury grievance, 20
    paragraph 5 salary, 7
    player benefit costs, 93
    player contract, 5
    player costs, 7
    prior club, 5
    Retirement Plan, 191
    Rookie player, definition, 169
    room, 7
    undrafted rookie, 6
"Deion Rule"[Signing Bonus], 100-101
Dental insurance
    group insurance benefit, 201
    insurance benefits, 202
    insurance extended post-career, 202. *See also* specific insurance
        programs
Designated franchise player, 73
Developmental squad, 173. *See also* Practice squad

271

**EX 8, PAGE 997**

DGR, 60, 86–94. *See also* Defined Gross Revenue, Excluded DGR; Projected DGR
Disability
    classification rules for total and permanent, 193
    definition, 192–193. *See also* Injuries
Disability benefits
    supplemental contributions, 207
    supplemental extension, 207
    supplemental maintenance, 207
Disagreements
    resolved by Benefit Arbitrator, 208–209
Discipline list
    published, 19
Discovery, 21
    of Impartial Arbitrator, 148
    of Special Master, 146
Dispute, 18, 87, 1148
    and injury protection, 34
    attempt to negotiate, 155
    club discipline, 19
    resolution, 189–190, 209
    with career-ending injury, 76–77
Disputed Adjustments, 139–149
Distributions, 199–200
Documents
    delivery of, 214
Draft, 126
    annual, 49
    between clubs, 55
    definition, 5
    eligible players, 47
    first round, 68
    initial, 44
    next annual, 44
    no subsequent, 46
    picks, 5
    requirements, 48
    rights, 154
    selection, 160
    selections, 69
    subsequent, 46
    supplemental, 49. *See also* College Draft; Compensatory Draft; Draft Choice Compensation
Draft Choice Compensation, 6, 45, 46, 47, 49, 55, 57, 59–63, 68–69, 71, 78–79, 83, 164

**EX 8, PAGE 998**

Draft Choice Compensation (*continued*)
   between clubs, 58
   definition, 5
Draft rights
   assignment, 46
   of clubs, 152
Draft Selection
   and player's original draft round, 59
Drafted
   player, 43
   player on waivers, 50
Drafted Rookie, 44, 46, 65, 152–153
   definition, 5
   Player Contract, 49, 52
   signing, 43–44, 48
Drugs
   illegal, 195. *See also* Alcohol and Substance Abuse; Chemical
   Dependency; Substance abuse
Duration of Agreement, 14, 37
   effective date, 219
   expiration date, 219
   ratification, 221–222
   termination, 219
   termination prior to expiration date, 219–221. *See also* Agreement

E
Early Retirement Benefit, 192
Effect
   of rulings of Impartial Arbitrator 148, 148
   of Salary Cap, 154
   on computations, 154
Eligibility, 205
   waiver system, 83. *See also* Waiver system
End of League Years
   certification, 156–157. *See also* League Years
Enforcement of Salary Cap and Entering Player Pool, 74, 150
   circumvention, 143
   Commissioner disapproval, 143
   DGR circumvention, 144
   sanctions, 144
   Special Master action, 143
   Special Master review, 144
   undisclosed terms, 143
Entering Player Pool, 11, 38, 44, 45, 103, 124, 131, 136–137, 143, 219
   adjustment, 160

273

**EX 8, PAGE 999**

Entering Player Pool (*continued*)
    calculation, 48–50
    covered league years, 48
    definition, 48
    formula allotment, 48–50, 52
    incentives, 121–122
    operation, 50–54
Excluded DGR, 9, 87–88, 91–92. *See also* DGR; Defined Gross Revenue;
        Projected DGR
Exclusive Representation and NFLPA Agent Certification, 16. *See also*
        NFLPA
Exempt Commissioner Permission List, 55, 174. *See also* List
Expansion
    additional compensatory picks, 160
    bonuses, 98
    clubs, 160
    entering player pool adjustment, 160
    relocation bonus, 160
    teams, 160
    veteran allocation, 160
Expedited Arbitration, 65
Expense, 86, 132
    administrative, 198
    awarded by arbitrator, 24
    deducted from revenues, 139
    for players attending minicamps, 168
    injury grievance, 29
    medical, 9, 93, 189
    moving and travel, 93, 189
    non-injury grievance[Costs], 23–24
    of copies, 159
    of neutral physician, 29
    Rookie Orientation Program, 53
    traveling, 170
Extended insurance
    financing for, 203–204
    limitations and rules for, 202–203. *See also* specific insurance pro-
        grams
Extended Post-Career Medical and Dental Insurance benefits, 190. *See al-
        so* specific Benefits; Insurance programs
Extension of Agreement, 7–8, 43, 95, 203. *See also* Agreement

**F**
False certification, 157

EX 8, PAGE 1000

Fees
    initiation, 13
    maintenance, 90
    postponement, 27
    postponement on hearing, 22
Filing, 20
    claim, 155
    in injury grievance, 25
    of non-injury grievance, 22
Final Capped Year, 104, 105, 126, 128, 130–131
    definition, 8
Final Eight Plan, 11, 136
    application, 80
    definition, 5
    increases, 81
    next four teams, 80
    replacement of free agents signed by other club, 80–81
    salary definition, 81
    top four teams, 80
    trade limitation, 81–82
Final League Years, 8, 71, 134
    definition, 7–8. *See also* League Years
Final Special Purpose Letter, 96, 139
Fines
    club discipline, 19
    Commissioner discipline, 32
First Game, 169
First Refusal
    Exercise Notice, 65–66
    Exercise Notice For Restricted Free Agents, 62–63
    Exercise Notice, No and Veteran Free Agency, 63
    Procedures For Restricted Free Agents, 62–63
    Rights, 45, 57, 61, 79, 83, 164
Franchise and transition player, 5, 6, 43, 49
    compensatory draft selection, 77–78
    designations, 68
    duration of designation, 73–75
    franchise player designation, 73–74
    franchise player designation period, 74–75
    lists, 72
    other terms, 77
    prospective designation, 77
    required tender for franchise players, 68–72
    right to decline, 77
    rights of first refusal for transition players, 72

EX 8, PAGE 1001

Franchise and transition player (continued)
    salary information, 72–73
    signing period for franchise players, 78 –79
    signing period for transition players, 78
    transition player designation period, 74–75
Free Agent, 45, 153
    definition, 5
Free Agent List, 67. See also List
Funding
    of deferred and guaranteed contracts, 176

G
Good faith
    negotiation, 40–41
    of required tender, 58
Governing Agreement
    conflicts, 9
    implementation, 9
    management rights, 9
    rounding, 9
Governing law, 223
Grievance
    initiated, 20
    procedure, 11
    received, 20
    resolving, 20–21
Grievance. See also Injury grievance; Non-injury grievance
Grievance Settlement Committee, 24
Group Insurance
    administration, 204
    financing for extended insurance, 203–204
    group insurance benefits, 201–202
    programs, 93, 189. See also specific insurance programs
Guaranteed
    contracts, 176
    definition, 104
Guaranteed League-Wide Salary & Minimum Team Salary, 4, 95
Guaranteed League-Wide Salary, Salary & Minimum Team Salary, 8, 11
    definition, 6–7
Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary,
    144
    30% Rules, 134–135
    accounting procedures, 138–142
    compensation of team salary, 97
    definitions, 86–93

EX 8, PAGE 1002

Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary
   (continued)
   guaranteed league-wide salary, 95
   minimum team salary, 96
   renegotiations and extensions, 136–137
   salary cap amounts, 95
   trigger, 94–95
   valuation of player contracts, 98–133

**H**
Hearings, 140, 209
   injury grievance, 27, 29
   of non-injury grievance, 22–23
   prehearing briefs, 21
   transcribing of, 27
Honors
   and recognized media, 122–123

**I**
Impartial Arbitrator, 3, 44, 55, 57, 61, 65, 73, 74, 76, 78, 94, 99, 105,
      132–133, 175
   compensation of, 148
   definition, 4
   effect of rulings, 148
   procedures, 148
   scope of authority, 148
   selection, 148 -149
Inactive List, 85, 163, 176. *See also* List
Incentive
   additional incentive rules for veterans, rookies, individuals and teams,
         123 130
   and Veteran Free Agency, 64
   based on another player's performance, 122
   based on Club performance, 64
   bonus, 106, 124, 125, 126–127, 127 -128
   bonus for rookie, 122
   clause, 128–129
   entering player pool incentives, 121–122
   for rookie, 54
   individual incentives, 108–109
   likely to be earned, 54, 64
   performance, 130
   rookie "likely to be earned" incentives, 110–120
   team incentives, 107
   team performance-related, 134. *See also* Bonus

277

Individually negotiated limitations on player movement and veteran free
     agency, 65–66
Initial Special Purpose Letter, 204
Injured Reserve List, 30. *See also* Active/Inactive List
Injury, 166
     as an Active Player, 194–195
     career-ending, 76
     during minicamps, 168
     non-football, 174
     non-injury circumstances, 76
     protection, 93, 189
Injury grievance, 69
     answer, 25
     appeal, 26–27
     arbitration channel, 27
     definition, 25
     discovery, 30
     expenses, 29
     filing, 25
     hearing, 27· 28
     information exchange, 30
     miscellaneous issuers, 28
     neutral physician, 26
     payment, 29
     pension credit, 29
     playoff money, 29–30
     presumption of fitness, 29. *See also* Non–injury grievance
Injury protection
     benefit, 33
     disputes, 34
     qualification, 33
Insurance coverage. *See* COBRA coverage; Dental insurance; Extended in-
          surance coverage; Medical insurance
Insurance programs. *See* specific insurance programs

**J**
Joint Committee, 35–36. *See also* Committee

**L**
Labor
     exemption, 217
Labor Relations, 158  159
League
     discipline, 31
     disclosures, 151

278

League Security, 214
League Year,
    definition, 4
    Final, 216
Life insurance
    group insurance benefit, 201. *See also* specific insurance programs
"Likely to be Earned." *See* Incentives
Limits
    of active players, 163
List
    Active, 75, 85
    Active/Inactive List, 164
    Active/Inactive List Limit, 163, 165
    Discipline List, Published, 19
    Exempt Commissioner Permission List, 55, 174
    Free Agent List, 67
    Inactive List, 85, 163, 176
    Injured Reserve List, 30
    Minimum Active/Inactive List Salaries, 5, 9
    Non- Football Injury or Illness List, 167
    Size Active and Inactive List Limit, 163
    Size Inactive List, 163
Loans, 131
LTBE, *See* Incentives

**M**
Maintenance of Retirement Plans, 191. *See also* specific retirement plans
Management Council, 1, 9, 14–17, 20–22, 25, 27, 28, 30  32, 35, 36,
        38, 39, 51, 84, 105, 135, 174, 204, 208, 211, 213, 214, 219,
        221
Matching Contributions to Savings Plan, 197–198
Maximum Annual Allocation Amount, 89–90
Meal allowance reimbursement, 177
Medical insurance
    benefits, 202
    extended post-career, 202
    group insurance benefit, 201. *See also* specific insurance programs
Merged Plan. *See* Bert Bell/Pete Rozelle Plan
Mid-season contracts, 134. *See also* Contracts
Minicamps, 166
    contact, 168
    expenses, 168
    injuries, 168
    length, 168
    number, 168

**EX 8, PAGE 1005**

Minimum
    Active/Inactive List Salaries, 5, 9, 43, 45, 55
    Contributions to Savings Plan, 197  198
    Paragraph 5 Salaries, 174
    salaries, 9, 164
    after 1999, 174
    increase, 174
    salaries, definition, 5. *See also* Salaries
Minimum Team Salary, 96–97, 142, 143
    definition, 7
Mutual reservation of rights: labor exemption
    CBA expiration, 217- 218
    labor exemption, 217
    rights under law, 217


**N**
National Football League Players Association. *See* NFLPA
National Football League Management Council. *See* Management Council
Negotiation, 150
    Club's rights, 151
    definition, 5
    for Unrestricted Free Agent, 57
    of Agreement, 10
    rights, exclusive, 134. *See also* Good faith negotiation
Neutral Physician
    injury grievance, 25, 28–29
Neutral verifier, 158–159
New Club, 62, 64, 70, 72
    definition, 5. *See also* Old Club; Prior Club
NFL Competition Committee. *See* Competition Committee
NFL Constitution and By-Laws, 11, 20
    definition, 4
NFL Draft. *See* Draft.
NFL Player Contract, 6, 7, 9, 11, 16, 20, 25, 37, 41, 42, 43, 44, 46, 52,
    58, 61, 63, 69, 72, 74, 75, 76, 77, 78, 80, 94, 97–99, 102, 104, 123,
    125, 126, 132, 133, 134, 135, 136, 150, 152, 156, 164–165, 170
    and non-injury grievance, 20
    changes, 37
    Commissioners disapproval, 39–40, 143–144
    conformity, 38
    definition, 4, 5
    determining the salary, 136
    expiration of, 61
    for franchise Players, 68
    form, 37

NFL Player Contract (*continued*)
    general, 37
    good faith negotiation, 40–41
    injury grievance, 23
    included in team salary, 97
    multi-year, 100
    NFLPA Group Licensing Program, 40
    not modified by Principal Terms, 63
    requirements for rookie, 50–51
    term, 37
    variation, 98
    See also Contracts
NFLMC. *See* Management Council
NFLPA, 3, 9, 10, 11, 13, 14, 15, 20, 22, 23, 26, 27, 28, 29, 31, 32, 34,
    35, 38, 46, 55, 58, 72, 84, 90, 91, 96, 97, 140, 143, 144, 146,
    147, 148, 151, 154, 155, 157, 158, 167, 168, 183, 185, 201,
    205, 221, 224
    address, 67
    agent certification enforcement, 16
    agent certification exclusive representation, 16
    certified agents, 174–175
    enforcement, 16
    exclusive representation, 16
    Group Licensing Program, 40
    meetings and union security, 13
    penalty, 16
    responsibility in union security, 15
    sponsoring orientation, 15
    tickets, 213
    union security and NFLPA requirements, 13
    union security and NFLPA responsibility, 15
No-trade clause, 83
Non
    cash provisions, 131–133
    football injury, 55, 161, 174
    football injury or illness list, 167
    guaranteed reporting bonus, 105, 121
Non-injury grievance, 10, 11, 14, 35, 167, 174, 211
    appeal, 20–21
    arbitration panel, 21–22
    arbitrator's decision and award, 23
    costs, 23–24
    definition, 20
    discovery, 21
    filing, 20

EX 8, PAGE 1007

Non-injury grievance *(continued)*
   Grievance Settlement Committee, 24
   hearing, 22  23
   initiation, 20
   payment, 24
   representation, 23
   time limits, 23. *See also* Injury grievance
Notice
   and Veteran Free Agency, 66–67
   Arbitrator, 20–22
   hand delivered, 224
   notice of invalid contract, 158
   of invalid contract, 158
   of signing, 58
   of signing by veteran with less than three accrued seasons, 55
   of signing drafted rookie, 47
   of signing undrafted rookie, 47
   of termination in waiver system, 83
   Personnel, 84
Number
   of regular season games, 175

**O**
Off-Season Workouts
   bonus, 105
   enforcement, 167
   injuries, 166
   miscellaneous, 166
   payment, 166
   pre-training camp, 166–167
   time period, 166
   voluntary workouts, 166
Offer Sheet, 62, 63, 64, 66, 67, 70, 98, 150, 156
   and Principal Terms, 63–64
   for Restricted Free Agents, 62–63
Old Club
   and incentives, 64. *See also* New Club; Prior Club
Option Clause, 11
   existing option clauses, 42
   prohibition, 42
Orientation
   during timing and testing sessions, 15
   Rookie Orientation Program, player reimbursement, 53
   Rookie Orientation Program, evaluation, 53–54

**EX 8, PAGE 1008**

**P**

Paragraph 5 Salary, 57, 59, 61, 64, 65, 70, 81, 85, 99, 100
 definition, 7
Parol Evidence, 214
Payment, 70, 166, 174–175
 and non-injury grievance, 24
 calculation, 51
 minimum workout payments, 51
 Rookie Orientation Program, 53
 of damages, 154
 of injury grievance, 29
 of salaries, 174–175. *See also* Bonus; Benefits; Compensation
Penalty
 and NFLPA Agent Certification, 16
 assessed by Special Master, 147
 Commissioner discipline, 32
 negotiating rights of players, 55
Performance
 bonus, 70, 105
 categories, 125–126, 129
 incentives, 130
 issuers, 129
 physically unable, 161
Personal Seat Licenses. *See* PSL
Personnel information
 NFLPA's right to, 84
Pete Rozelle NFL Player Retirement Plan (Peter Rozelle Plan), 93, 94, 169,
 189. *See also* Bert Bell NFL Player Retirement Plan; Bert Bell/Pete NFL
 Player Retirement Plan; Retirement Plan
Physical examination, 29, 167
 in injury protection, 33
Physically unable to perform. *See* PUP
Physician
 club, 26, 29
 neutral, 26, 28-29, 29
 orthopedic, 26
 treating, 26
Player Affiliate, 1, 39, 57, 70, 94, 143, 146, 156
 definition, 4
Player Annuity Program, 94, 133, 187, 189–190
 contributions, 198–199
 definitions, 198
 eligibility, 199–200
 establishment, 198

**EX 8, PAGE 1009**

Player Benefit Costs, 142
    1998 Amendment benefits, 187–188, 190
    definition, 93, 188–189
    general right of reduction, 187
    resolution of disputes, 189–190
    right of restoration, 188. *See also* Benefit; Incentive; Salary
Player Costs, 9, 88, 139, 160
    definition, 7. *See also* Costs
Player Second Career Savings Plan. *See* Savings Plan
Player security
    no discrimination, 17
    personal appearance, 17
Players Association. *See* NFLPA
Player's Contract
    during suspension, 14. *See also* Contract
Player/Club Operations Committee, 36, 166
Post-season pay, 30, 187
Practice squad, 174
    eligibility, 164–165
    or development squad, 55
    player, 164
    restriction in size, 164
    salary, 164
    signing with other clubs, 164. *See also* Developmental Squad
Pre-season, 163
    game, 40, 169–170
    per diem, 189
    per diem amounts, 93
    physical, 184–185
    roster bonus, 128
Principal Term, 62, 65, 70
    and Veteran Free Agency, 63–64
    of Offer Sheet, 63–64
Prior
    Club, 6, 55, 58, 60, 62, 64, 65, 70, 72, 76, 78, 151, 220, 256
    Club and Restricted Free Agents, 58
    conference, 143, 155
    signing bonuses, 102–103
    team, 61, 78
Prior Year Salaries, 57, 68 69, 71, 73, 75, 76, 77
    definition 5-6
Pro-rated
    signing bonus, 172

**EX 8, PAGE 1010**

Procedures
    of Impartial Arbitrator, 148
    of Special Master, 146–147
Projected benefits, 9, 96, 141–142
    adjusted, 142
    definition, 7. *See also* Benefits
Projected Defined Gross Revenues, 95, 187, 190
Projected DGR, 48, 81, 140–141, 171, 174
    definition, 7. *See also* DGR; Excluded DGR
Proration
    of signing bonuses, 99
PSL
    difference, 89
    excess, 90
    first-year increases, 89
    revenues, 89 90, 92
PUP, 161, 167, 174

## Q

Qualifying Offer, 9, 60, 61–62, 67, 88, 97, 216
    and Restricted Free Agent, 65
    for Restricted Free Agents, 58

## R

Recruitment
    of an unsigned player, 132
Refusal Exercise Notice. *See* First Refusal Exercise Notice
Related Entities, 88
Release
    waiver system, 83. *See also* Waiver system
Releases and Covenants Not to Sue, 11, 37, 220
Relocation
    bonus, 105, 122, 160
Remedies, 152–153
Renegotiation
    and extensions, 136–140
    and Rookie, 57
    contract, 123–124
    definition, 6
    during the term of Player Contract, 6
    of a Player Contract, 74
    of an existing Player Contract, 70
Reporting bonus
    off-season, 104
    under the Player Contract, 64. *See also* Bonus; Incentive

**EX 8, PAGE 1011**

Representation, 31–32
    and non-injury grievance, 23
Required tender, 9, 43, 44, 69, 77, 88
    and Rookie Allocation, 50
    definition, 6
    for Franchise Players, 68–70
    for Transition Players, 71–72
    good faith negotiation, 41. See also Tender
Reserve PUP List, 55. See also PUP
Restricted Free Agency
    definition, 6
    player qualifications, 6
Restricted Free Agent, 65, 71, 72, 151–152, 156, 176
    and Qualifying Offer, 65
    definition, 6
    signing period, 73
Retirement
    Board, 193
    of players, 133
Retirement Plan
    additional credited seasons, 191
    alcohol and substance abuse, 194–195
    classification rules for total and permanent disability, 193
    contributions, 191
    decrease investing requirement, 192
    definition, 191
    increase in past service credit, 192
    limits on retroactive benefits and claims, 194
    line-of-duty disability benefit, 192–193
    maintenance, 191
    psychological/psychiatric disorders, 195. See also Bert Bell NFL Player
        Retirement Plan; Bert Bell/Pete Rozelle Retirement Plan; Pete
        Rozelle NFL Player Retirement Plan; specific savings plans
Right of First Refusal, 44, 46, 60, 62, 63, 65, 73, 150–151
    definition, 6
    for Restricted Free Agents, 58–59
    for transition players, 72. See also No Right of First Refusal
Rights
    preservation of, 212
    under law, 217
Rookie, 99, 100
    25% rule for rookies, 51
    allocation, 48, 49–50, 160
    and Contract requirements, 50–51
    and minimum workouts payments, 51

286

Rookie *(continued)*
 and Player Contract requirements, 50–51
 contract, 126
 definition, 6
 Free Agent, 45
 insurance coverage, 201
 likely to be earned incentives, 110  120
 Orientation Camps, 132
 per diem, 169
 player, 3
 player definition, 169
 undrafted, 3
 without renegotiation, 57. *See also* Drafted Rookie; Undrafted Rookie
Rookie Orientation Program
 evaluation of, 53–54
 per player reimbursement, 53
Room
 definition, 7
 in rookie allocation, 50
Roster
 bonus, 70, 172
 bonus under the Player Contract, 64
 bonus, off-season, 104
 categories, 100
 exemption, 161–162
 exemption time limits, 162
 final, 84
 reduction, 161
Rules
 25% Rule for Rookies, 51, 52, 125, 135
 30% Rules, 134–135
 CFL rule, 161
 for classification of total and permanent disability, 193

S

Salaries, 171-175
 calculation of ten largest, 72
 of various team positions, 73. *See also* specific salary categories
Salary
 advance, 103–104
 advances, 131
 bonus, 70
 camp, 142
 deferral, 137

287

Salary (continued)
    deferred, 99
    definition, 4, 69–70, 81, 94
    drafted rookie salary, 97
    for Restricted Free Agent, 63–64
    fully guaranteed, 104
    increase requirements for Rookie, 50–51
    Information, 72–73
    information in NFL Player Contract, 38
    minimum, 164
    minimum team salary, 97
    reduction contributions, 189
    requirements minimum salary, 51
    summaries, 158
    team, 99, 100, 101, 102
    team salary, 97. See also Bonus; Incentive; Paragraph 5 Salary; Prior
    Year Salary; Team Salary
Salary Cap, 6–7, 39, 69, 103, 130 131, 154, 158, 203
    definition, 7
    for Rookie, 53
Savings Plan
    contributions, 196–197
    establishment, 199
    maintenance, 196. See also Second Career Savings Plan
Scope of authority
    of Impartial Arbitrator, 148
    of Special Master, 145–146
Scouting Combine, 15, 47
Season, 127
Second Career Savings Plan, 93, 94, 188, 189, 190. See also Savings Plan
Selection, 208
    of Impartial Arbitrator, 148
    of Special Master, 147
Senior Arbitrator, 21
    arbitration panel, 27
Settlement Agreement, 11, 158
    definition, 4
Severance pay, 94
    amount, 205
    application, 205
    eligibility, 205
    failure to apply, 206
    nonassignability, 206
    only one payment, 206
    payable to survivor, 206

EX 8, PAGE 1014

Severance pay *(continued)*
    payment, 205
    prior severance pay, 206
Signing bonus, 5–6, 70, 99, 101, 102 - 103, 105, 134  135, 137
    amounts treated as, 103
    and time of buy-out, 51
    for Unrestricted Free Agents, 57
    prorata portion, 70
    under the Player Contract, 64. *See also* Bonus
Signing period, 67, 69
    definition, 60–61
    for Restricted Free Agents, 60–62
    for transition players, 78
    for Unrestricted Free Agents, 57–58
    in waiver system, 83
    of Restricted Free Agent, 73
Special Master, 40, 87, 150, 152, 153–155, 157
    action, 143
    appointment, 145
    compensation, 146
    definition, 4
    discovery, 146
    penalties, 147
    procedures, 146–147
    proceeding, 139–140
    review, 143
    scope of authority, 145–146
    selection of, 147
Split contracts, 175 -176
"Spillover" (Excess EDGR), 88
Squad
    developmental, 174
    practice, 163–164, 174
    size active and inactive list limit, 163
    size Inactive list, 163
    size pre-season, 163. *See also* Developmental squad; Practice squad
Standard Minimum Pre-Season Physical, 184–185
Stipulation and Settlement Agreement, 81, 99 -100, 131, 137
    definition, 4
Subsequent draft. *See* Draft, subsequent
Substance Abuse, 194–195
    alcoholic steroids and related substances, 185
    drugs of abuse and alcohol, 185
    general policy, 185
Summary judgment, 152

**EX 8, PAGE 1015**

Supplemental Disability Plan, 93, 187, 189
Supplemental draft. *See* Draft, supplemental
Suspension, 19

**T**
Team, 91, 98, 131, 141
   incentives, 107
   performance issues, 130
   performance-related incentive, 134
   rights, 98
Team Affiliate, 1, 57, 70, 88, 89, 90, 91, 92, 94, 97, 131
Team Salary, 9, 51, 97, 99, 100, 102, 105–106, 131, 136
   definition, 7
   right to exercise option, 52
   summaries, 158. *See also* Salaries
Tenders, 97–98
Termination, 154–155
   of Agreement, 154–155
   of drafted rookie, 152–155
   pay, 98
   pay eligibility, 85
   pay ineligibility for termination pay, 85
   pay liability, 98
   pay regular season signings, 85
   prior to expiration date, 37
   through waivers, 84
Time limits, 31, 155
   injury grievance [financing], 25
   non-injury grievance [initiation], 20
Time off
   days off, 178
   requirements, 178
Time periods, 166, 214
Traded contracts, 133–134
Training camp, 103, 166–167
   pre-season, 162
   definition, 169
   expenses, 170
   number of games, 170
   reporting, 169
   room and board, 169
   telephones, 170
   veteran per diem, 169

**EX 8, PAGE 1016**

Transition player, 5, 65, 70, 71, 73, 151, 216
    designation, 71
    signing period, 78
Treating Physician
    injury grievance, 25. *See also* Physician
Trigger for Guaranteed League-wide Salary, Salary Cap, and Minimum
    Team Salary, 94  95

U
Uncapped Year, 48, 62, 95
    definition, 7
Undisclosed terms, 143
Undrafted Rookie, 46, 47, 150
    definition, 6
    Free Agent, 44
    Player Contract, 52
    salary of, 50
Undrafted rookie player. *See also* Drafted Rookie; Drafted Player
Union security, 10, 11, 13–15
    and NFLPA meetings, 13
    and NFLPA requirements, 13
    check-off, 13
    disputes, 14
    NFLPA Player Group Licensing Program, 13–14
    NFLPA responsibility, 15
    orientation, 15
    procedure for enforcement, 14–15. *See also* NFLPA
Unrestricted Free Agency, 5
    player qualifications, 5
Unrestricted Free Agent, 38, 68, 71, 72, 77, 79, 150, 151–152, 156, 216
    definition, 6
Unrestricted Free Agents, 57-58, 71
Upgraded Tender, 60. *See also* Required Tender; Tender

V
Veteran
    allocation, 160
    definition, 6
    Player Contract, 135, 136
Veteran Free Agency, 6, 11, 66–67, 69, 77, 152, 161–162, 216, 221
    expedited arbitration, 63
    individually negotiated limitations on player movement, 65–66
    Offer Sheet and First Refusal Procedures, 62–63
    restricted free agents, 58–62

**EX 8, PAGE 1017**

Veteran Free Agency (*continued*)
    signing period for Unrestricted Free Agents, 57–58
    Unrestricted Free Agents, 57–58
Veteran Free Agency Notices, 66–67
Veteran player, 136
    and Player Contract, 129
    contract, 136
    definition, 169
    insurance coverage, 201
Veterans with less than three accrued seasons, 11, 45, 161
    accrued seasons calculation, 53
    negotiating rights, 53
    notice of signing, 53–54
Voluntary workouts, 166

**W**
Waiver
    procedures, 83
Waiver system, 11, 44, 76, 80, 152–153
    contact, 83
    ineligibility, 83
    NFLPA right to personnel information, 84
    notice of termination, 83
    release, 83
    rosters, 84
Weight bonus, 105. *See also* Bonus
Workers' Compensation, 10, 11, 93, 189
    arbitration, 211
    benefits, 211
    joint study, 211
    moratorium, 211–212
    preservation of rights, 212
    rejection of coverage, 211
    reopener, 212

**EX 8, PAGE 1018**