Case 2:13-md-02403-AB Document 18-34 Filed 03/29/12 Page 1 of 293

# EXHIBIT 28

# CONSTITUTION
# AND BYLAWS
## OF THE
# NATIONAL
# FOOTBALL LEAGUE



**Effective February 1, 1970**
**(2006 Rev.)**

\*Provisions of the Constitution relating to players (in particular, Articles XII, XIV, XV, XVI, XVII, and XVIII) remain subject to the provisions of the Collective Bargaining Agreement.

**EX 28, PAGE 2834**

# **Table of Contents**

| **Article** | | **Page Number** |
|---|---|---|
| Article I | Name and Principal Office | 1 |
| Article II | Purposes and Objects | 2 |
| Article III | Membership | 3 |
| Article IV | Territorial Rights | 12 |
| Article V | Meetings of the League | 20 |
| Article VI | Executive and Other Committees | 23 |
| Article VII | Officers | 26 |
| Article VIII | Commissioner | 28 |
| Article IX | Prohibited Conduct | 37 |
| Article X | Broadcasting and Television | 45 |
| Article XI | Playing Rules | 48 |
| Article XII | Eligibility of Players | 49 |
| Article XIII | Schedule | 58 |
| Article XIV | Selection Meeting | 60 |
| Article XV | Player Contracts | 67 |
| Article XVI | Assignment of Player Contracts | 69 |
| Article XVII | Player Limits and Eligibility | 72 |
| Article XVIII | Waivers | 89 |
| Article XIX | Conduct of Regular Season Games | 96 |
| Article XX | Divisional Playoff Games | 105 |
| Article XXI | Conference Championship Games | 110 |
| Article XXII | Super Bowl Game | 113 |
| Article XXIII | Preseason and Postseason Games | 114 |
| Article XXIV | Notices | 116 |
| Article XXV | Amendment of Constitution and Bylaws | 117 |
| Appendix of Resolutions | | A-i |

**EX 28, PAGE 2835**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 4 of 293
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 4 of 293
#:10252

# Article I

## Name and Principal Office

1.1 The name of this association shall be National Football League, hereinafter called "League." The word "League" herein shall refer to the National Football League, unless otherwise specified.

1.2 The Commissioner shall select the location of the office of the League, which shall be located in or adjacent to a city in which a League franchise is operated.

**EX 28, PAGE 2836**

# Article II

## Purposes and Objects

2.1    The purpose and objects for which the League is organized are:

    (A)    To promote and foster the primary business of League members, each member being an owner of a professional football club located in the United States.

    (B)    To do and perform such other functions as may be necessary to carry out the purpose and objects of the League.

2.2    The League is not organized nor to be operated for profit.

**EX 28, PAGE 2837**

Case 2:12-md-02323-AB Document 69-33 Filed 12/20/11 Page 6 of 293
Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 6 of 293
#:10254

# Article III

## Membership

### Members

3.1 (A) Membership in the League shall be limited to the thirty-two (32) member clubs specified in Section 4.5 hereof and such new members as may be thereafter duly elected.

(B) The admission of a new member club, either within or outside the home territory of an existing member club, shall require the affirmative vote of three-fourths of the existing member clubs of the League.

*See* 1995 Resolution G-4 (Los Angeles franchise opportunity), App., p. 1995-1

1999 Resolution EC-1 (Houston expansion), App., p. 1999-1

### Eligibility of New Members

3.2 Any person, association, partnership, corporation, or other entity of good repute organized for the purpose of operating a professional football club shall be eligible for membership, except:

(A) No corporation, association, partnership, or other entity not operated for profit nor any charitable organization or entity not presently a member of the League shall be eligible for membership.

(B) If any privately held corporation, partnership, trust, or other entity owns or operates, directly or indirectly, any substantial non-football business or assets and owns, directly or indirectly, an interest in or otherwise operates a member club, then:

(1) The member club shall be held in a separate corporation, partnership, or trust (the "Football Company"), the primary purpose of which shall at all times be and remain the operation of a professional football team as a member club of the League, which such primary purpose shall not be changed, and the only material asset of which shall be the member club;

(2) The ownership interest in the Football Company shall be held directly by a holding company that shall have no operating business or material assets but only ownership interests in other entities, and the ownership interests in the holding company shall be owned directly by individuals (or certain

3                    Article III

**EX 28, PAGE 2838**

Case 2:12-md-02323-AB Document 69-33 Filed 12/20/11 Page 7 of 293
Case 2:11-cv-08396-R-MAN Document 18-34 Filed 03/29/12 Page 7 of 293
#:10255

trusts or partnerships approved by the Commissioner's office); and

(3) The Football Company and all individuals or entities holding a direct or indirect interest in the Football Company shall be subject to all of the League policies and requirements on ownership that the members may from time to time adopt or apply, including, without limitation, all reporting, audit, ownership, and debt limitation requirements.

*See* 1985 Resolution FC-7 (rules governing limited partnerships), App., p. 1985-2
1988 Resolution FC-3 (club debt limitation requirements), App., p. 1988-2
1990 Resolution FC-2 (financial reporting), App., p. 1990-1
1996 Resolution FC-5 (rules governing limited partnerships; attribution), App., p. 1996-2
1996 Resolution FC-6 (rules governing corporations; attribution), App., p. 1996-3
1997 Resolution FC-3 (cross-ownership), App., p. 1997-1
1998 Resolution FC-10 (rules governing limited liability companies; attribution), App., p. 1998-12
2001 Resolution FC-4 (debt ceiling), App., p. 2001-1
2004 Resolution FC-1A (rules governing aggregation of a Principal Owner's ownership interest with those of immediate family members for the purposes of determining whether such Principal Owner holds at least a 30% beneficial interest), App., p. 2004-11
2004 Resolution FC-2 (cross-ownership), App., p. 2004-13
2004 Resolution FC-7 (financial reporting), App., p. 2004-14
2005 Resolution FC-2 (debt ceiling), App., p. 2005-6

**Admission for Members**

3.3 (A) Each applicant for membership shall make a written application to the Commissioner. Such application shall describe the type of organization and shall designate the city in which the franchise of the applicant shall be located. Such application shall further describe and contain the following information:

(1) The names and addresses of all persons who do or shall own any interest or stock in the applicant, together with a statement that such persons will not own or hold such interest or stock for the benefit of any undisclosed person or organization;

(2) A detailed balance sheet of such company as of the date of organization and a pro forma statement as of the time it shall

**EX 28, PAGE 2839**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 8 of 293
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 8 of 293
#:10256

commence actual operation. A written financial statement shall be required from the applicant and from anyone owning an interest in any applicant, including stockholders and partners;

(3) If applicant is a corporation, a certified copy of the Articles of Incorporation, Bylaws and share certificate shall accompany such application, provided, however, that if the organization of such corporation has not been commenced or completed, a detailed statement summarizing the proposed plan of operation and the capital structure thereof shall be furnished;

(4) If applicant is a partnership, unincorporated association, or other entity, a certified copy of the Articles of Co-Partnership or organization agreement shall accompany such application;

(5) The names and addresses of all officers and directors; and

(6) All applications shall contain a representation that upon acceptance, the applicant will subscribe to and agree to be bound by the Constitution and Bylaws, Rules and Regulations of the League and any amendments or modifications thereto.

(B) Each application for membership shall be accompanied by a certified check for twenty-five thousand dollars ($25,000). Upon approval of any application for membership, an additional twenty-five thousand dollars ($25,000) shall be paid to the League. If any application for admission is rejected, the League shall repay to the applicant the sum of twenty-five thousand dollars ($25,000) paid by the applicant at the time of such application, less all expenses reasonably incurred in connection with the consideration and investigation of such application.

(C) Upon receipt of any application for membership in the League, the Commissioner shall conduct such investigation thereof as he deems appropriate. Following the completion of such investigation, the Commissioner shall submit the application to the members for approval, together with his recommendation thereon, and such information thereon that the Commissioner deems pertinent. Each proposed owner or holder of any interest in a membership, including stockholders in any corporation, members of a partnership, and all other persons holding any interest in the applicant, must be individually approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

Article III

**EX 28, PAGE 2840**

Case 2:12-md-02323-AB Document 69-33 Filed 12/20/11 Page 9 of 293
Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 9 of 293
#:10257

**Franchise Certificate of Membership**

3.4     Each member shall receive a Franchise Certificate of Membership signed
        by the Commissioner and Secretary of the League certifying that such
        member is a member of the League and holds a franchise from the
        League to operate a professional football club in a designated city. Such
        Franchise Certificate shall not be assignable nor transferable, except as
        provided in Section 3.5 hereof.

**Transfer of Membership**

3.5     No membership, or any interest therein, may be sold, assigned, or
        otherwise transferred in whole or in part except in accordance with and
        subject to the following provisions:

        (A)    Application for the sale, transfer, or assignment of a membership,
               or of any interest therein, must be made in writing to the
               Commissioner. Upon receipt of such application, the
               Commissioner is empowered to require from applicant and
               applicant shall furnish such information as the Commissioner
               deems appropriate, including:

               (1)    The names and addresses of each of the buyers, transferees, or
                      assignees thereof;

               (2)    The price to be paid for such sale, transfer, or assignment, and
                      the terms of payment, including a description of the security
                      for the unpaid balance, if any;

               (3)    A banking reference for each buyer, transferee, or assignee;
                      and

               (4)    If the buyer, transferee, or assignee is a corporation, a copy of the
                      Articles of Incorporation and Bylaws thereof, together with a copy
                      of the share certificates of each class of stock to be outstanding, the
                      names and addresses of the directors and officers thereof, the
                      names and the addresses of the stockholders therein, and the
                      price paid or to be paid and the time of payment for said stock, a copy of
                      any proposed voting trust agreement and of any voting trust
                      certificates.

        (B)    Upon receipt thereof, the Commissioner shall conduct such
               investigation as he deems appropriate. Upon completion thereof,
               the Commissioner shall submit the proposed transfer to the
               members for approval, together with his recommendation thereon,
               and all information in respect thereto that the Commissioner deems
               pertinent. All sales, transfers, or assignments, except a transfer
               referred to in Section 3.5(C) hereof, shall only become effective if

6                                    Article III

**EX 28, PAGE 2841**

approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

(C) If any person owning or holding a membership, or an interest therein, by stock ownership or otherwise, dies, such membership or interest therein may be transferred to a member of the "immediate family" of the deceased without requiring the consent or approval of the members of the League or the Commissioner. Similarly, if any person owning or holding a membership or an interest therein, by stock ownership or otherwise, seeks to transfer such membership or any interest therein by gift, such membership or the interest therein may be transferred to the donee if the donee is a member of the "immediate family" of the donor. In such event, no consent or approval of the members of the League or the Commissioner shall be required to complete such transfer. The "immediate family" for the purpose of this paragraph shall mean the wife, child, mother, father, brothers and sisters, or any other lineal descendant of the deceased or donor. In all other cases involving death or transfers by gift, any person succeeding to a membership or an interest therein, whether by gift, will, intestacy, or otherwise, must be first investigated by the Commissioner in such manner as the Commissioner deems appropriate. Upon the completion thereof, the Commissioner shall submit such succession or transfer to the membership for approval and shall accompany the same with his recommendation thereon. No such succession or transfer shall be effective unless first approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

**Voluntary Withdrawal**

3.6    Any member of the League may withdraw from membership either:

(A) By selling, assigning, or transferring its membership upon the terms and conditions set out in Section 3.5 hereof; or

(B) A club may voluntarily withdraw from the League by tendering its written resignation to the Commissioner and simultaneously surrendering its Franchise Certificate of Membership, making full payment of any and all dues, assessments, or other debts owing to the League, and assigning to the League or its nominee all player contracts and the lease of its playing field, if and to the extent the lease is assignable; provided, however, that no voluntary withdrawal may be made in any year between March 1st and the date of the Super Bowl game of that year, except with the unanimous consent of all members.

**EX 28, PAGE 2842**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 11 of 29
1:8-cv-08390-R-MAN Document 69-33 Filed 12/20/11 Page 11 of 293
#:10259

**Involuntary Termination**

3.7 Membership in the League shall be automatically terminated whenever:

(A) An individual or corporate member or a partnership member or any general partner therein makes an assignment for the benefit of his or its creditors or files a voluntary petition in bankruptcy or whenever a receiver or trustee in bankruptcy is appointed for the property and assets of the member or of any general partner of a partnership member or whenever reorganization proceedings in bankruptcy are instituted by or against the member or by or against any general partner possessing an interest in a partnership membership. In the event the partnership agreement of a partnership member provides for automatic termination of the interest of any general partner who makes an assignment for the benefit of his creditors or who becomes the subject of any such bankruptcy proceedings and also provides for the continuation of such partnership in any such event and the remaining partners satisfy the requirements of Sections 3.5(A) and (B) hereof, then this Section 3.7(A) shall be inoperative with respect to such partnership member; or

(B) A member disbands its team during the regular season; or

(C) A member permanently disbands its business organization or ceases its business.

**Effect of Termination**

3.8 (A) Upon the expulsion of a member or upon any other involuntary termination of membership, the following shall occur:

(1) The lease of its playing field or interest of the member therein, if and to the extent the lease or interest is assignable, shall, upon demand of the League, be assigned to the League or its nominee, provided, however, that the assignment of said lease to the League shall first be approved by the affirmative vote or written consent of no less than three-fourths or 20, whichever is greater, of the members of the League. Said lease shall therefore be handled or disposed of in such manner as the remaining League members, by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members shall decide.

(2) Title to all player contracts of the terminated member and title to all players on the Reserve or Selection List of such terminated member and any interest or right to such players and contracts shall, if demanded by the League, be assigned to

8                                                          Article III

**EX 28, PAGE 2843**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 12 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 12 of 293
#:10260

the League or its nominee, provided that such assignments are first approved by the affirmative vote or written consent of not less than three-fourths or 20, whichever is greater, of the remaining League members. Said players and contracts so acquired shall thereafter be handled and disposed of within the League in such manner as the remaining member clubs by the affirmative vote of not less than three-fourths or 20, whichever is greater, members of the League shall decide.

(3) All interests of the terminated member in and to any funds or property of the League, or any right or interest therein, shall cease.

(B) Whenever any stockholder, partner, or holder of any interest in a member club is requested to sell or dispose of his stock or an interest in a membership in the League by reason of an expulsion or other involuntary termination, such sale or disposition must be completed within one hundred twenty (120) days after such action has been ordered. If such stock or interest is not sold or disposed of within one hundred twenty (120) days, then the price and other terms of the sale or disposition shall be fixed by mutual agreement between the person affected and the Commissioner; if such cannot be accomplished by mutual agreement, then the price and other terms shall be fixed by arbitration with one arbitrator to be selected by the Commissioner and the other by the affected holder of the stock or interest. If within five (5) days the two arbitrators cannot agree on the price and terms, then the two arbitrators shall select a third arbitrator and the decision of the majority of the arbitrators shall be binding on all parties. If any person required to name an arbitrator fails to do so, or if the two arbitrators cannot agree on a third arbitrator, then such arbitrator in either case shall be named by the Commissioner.

**Capital Contribution of Transferee**

3.9     A new member acquiring its membership by transfer from another member shall succeed to the interest of the transferor in and to the funds, property, rights, and interests of the League and shall not be obligated to make the capital contribution required under Section 3.3(B) hereof.

**EX 28, PAGE 2844**

**Membership Fees and Assessments**

3.10   Whenever monies are required to meet the expenses of the League and League funds are not available for that purpose, then, upon demand by the Commissioner, each member shall be obligated to contribute equally its share of the required monies.

> *See* 1984 Resolution (Finance; interest charged on delinquent club payments), App., p. 1984-2

**Membership Covenants and Obligations**

3.11   Each member club, and each and all of the owners, officers, stockholders, directors, or partners therein, as well as any other person owning any interest in such member club, assumes and agrees to be bound by the following obligations of membership in the League:

   (A)   They, and each of them, shall be bound by and will observe all decisions of the Commissioner of the League in all matters within his jurisdiction.

   (B)   They, and each of them, shall be bound by and will observe all decisions, rulings, and action of the Executive Committee or the member clubs of the League in every matter within the jurisdiction of such Committee or such member clubs, as the case may be.

> *See*  2004 Resolution BV-4 (All agreements existing as of the date of, and relating to the matters covered by, 2004 Resolution BV-4 remain in effect, with clubs to continue to participate and support implementation of such agreements), App., p. 2004-3

   (C)   They, and each of them, to the fullest extent permitted by law, release and indemnify the Commissioner, the League and every employee thereof, every member club and every officer, director, or employee thereof, and every holder of an interest therein, from and against any and all claims, demands, suits or other proceedings, whether for damages or otherwise, which they, or any of them, or any other party, may at any time have or assert in connection with or by reason of any action taken or not taken by the released/indemnified parties in their official capacities on behalf of the League or any committee thereof.

> *See* 1997 Resolution FC-6 (reimbursement of legal fees and expenses), App., p. 1997-3

**EX 28, PAGE 2845**

(D) They, and each of them, shall include in every contract between any member club and its employees, including coaches and players, a clause wherein the parties to such contract agree to be bound by the Constitution and Bylaws of the League.

(E) That after becoming a member of the League, the primary purpose of the corporation, partnership, or other entity operating the club shall at all times be and remain the operation of a professional football team as a member club of the League, and such primary purpose shall not be changed.

> *See* 1993 Resolution FC-5 (primary purpose requirement), App., p. 1993-6
>
> *See also* 2005 Resolution BC-1 (prohibition on member club ownership of a Club-dedicated Network), App., p. 2005-1

(F) They, and each of them, consent to be bound by the provisions of the Final Judgment of the United States District Court for the Eastern District of Pennsylvania entered against the National Football League and certain of its member clubs on December 28, 1953, and as thereafter modified and for the purpose of said Judgment submit to the jurisdiction of said Court.

(G) They, and each of them, agree to be bound by all of the terms and provisions of the Constitution and Bylaws of the League as now or hereafter in effect.

(H) They, and each of them, agree to be represented at each and every meeting of the League and of the Executive Committee of the League by a representative duly authorized and empowered to cast a binding vote of the member club on all questions coming before such meeting.

> *See* 1984 Resolution (Long Range Planning Committee, League meetings), App., p. 1984-4

**EX 28, PAGE 2846**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 15 of 29
8:09-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 15 of 293
#:10263

# Article IV

## Territorial Rights

**Home Territory Defined**

4.1  "Home Territory" with respect to any club means the city in which such club is located and for which it holds a franchise and plays its home games and includes the surrounding territory to the extent of 75 miles in every direction from the exterior corporate limits of such city, except as follows:

(A) Whenever any two member clubs, other than the San Francisco 49ers and the Oakland Raiders, are located and hold franchises for different cities within 100 miles of each other measured from the exterior corporate limits of such city, then the territorial rights of each of such clubs shall only extend to and include an area of one-half the distance between such cities.

(B) The "home territory" of the Green Bay Packers shall extend to and include all of Milwaukee County, Wisconsin, despite the fact that portions of such County are outside the 75 mile limits from the exterior corporate limits of the City of Green Bay.

**Rights Within Home Territory**

4.2  Each member shall have the exclusive right within its home territory to exhibit professional football games played by teams of the League except that:

(A) Whenever two club franchises in the League are located in the same city, then the owners of each of such franchises shall have equal rights within the home territory of such city.

(B) In respect to the San Francisco and Oakland franchises the following provisions shall apply:

(1) The home club in each city shall have the exclusive right to exhibit professional football games played by teams in the League in its city, and neither the San Francisco nor the Oakland club shall have any right to play professional football in the city of the other without the consent of the other club.

(2) In respect to the area included in the home territory of both clubs, but located outside the city limits of both cities, both clubs shall have joint rights of exclusivity, and both of said clubs may play games with other clubs in the League within

**EX 28, PAGE 2847**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 16 of 29
Case 8:08-cv-08390-R-MAN Document 69-33 Filed 12/20/11 Page 16 of 293
#:10264

such area without the consent of the other club also operating in the same home territory or any part thereof.

(C) Subject to the provisions of Sections 4.2(A) and (B) above, no club in the League shall be permitted to play games within the home territory of any other club unless a home club is a participant.

(D) In the event the Baltimore franchise is forfeited or surrendered, or is transferred to a city other than Baltimore, all rights to the Baltimore territory shall revest in the Washington Redskins, and the area included in the Baltimore territory shall be reconstituted and become part of the Home Territory of the Washington Redskins pursuant to the Constitution and Bylaws of the League.

(E) The Home Territory of the Washington Redskins and the Home Territory of the Baltimore Ravens, respectively, shall remain as defined in Article 4.1(A) above except that the Home Territory of the Redskins shall include all of Montgomery and Prince Georges Counties and no other part of the State of Maryland and the Home Territory of the Baltimore Ravens shall include all of Anne Arundel and Howard Counties in the State of Maryland.

**League Control of Games**

4.3    The League shall have exclusive control of the exhibition of football games by member clubs within the home territory of each member. No member club shall have the right to transfer its franchise or playing site to a different city, either within or outside its home territory, without prior approval by the affirmative vote of three-fourths of the existing member clubs of the League.

*See* 2002 Resolution G-7 (confirming League control of sidelines for marketing and broadcasting purposes), App., p. 2002-8

**Home Marketing Area**

4.4    Home Marketing Area Defined.

(A) Each club shall have a Home Marketing Area in which it may engage in the commercial activities set forth in Section 4.4(B) below. The Home Marketing Area shall be defined as (i) the Home Territory (including the portion of any foreign country within a club's Home Territory, provided however, that activities within a foreign country are coordinated with and approved in advance by the League on behalf of NFL International) and (ii) the State within which the City for which the club holds a franchise is located.

13                            Article IV

**EX 28, PAGE 2848**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 17 of 29
Case 2:07-cv-08396-R-MAN Document 09-33 Filed 12/20/11 Page 17 of 293
#:10265

Where two or more clubs share a Home Territory, each club shall have equal rights under Section 4.4(B) below with respect to the Home Territory and Home Marketing Area. Where two or more clubs hold franchises within the same state but do not share a Home Territory, each club shall have equal rights within the Home Marketing Area, except for the Home Territory of another club.

The Home Marketing Area of any club shall also include the county in which the club's preseason training camp is located (if located within the United States) for the duration of such training camp only, unless the training camp is located within the Home Territory of another member club.

(B) Club Rights Within Home Marketing Area; Exclusivity and Other Terms

(1) Subject to the terms of Section 4.4(A), each club shall have exclusive rights vis-à-vis other clubs to use its trademarks, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future (the "Club Marks") within its Home Marketing Area with respect to NFL football activities involving (i) local advertising, sponsorship, naming rights, and related promotional arrangements; (ii) retail stores and other club-identified physical structures and ventures; (iii) promotional and public awareness campaigns, including "image" advertising; and (iv) club-sponsored events.

(2) A club's rights to use its Club Marks within its Home Marketing Area shall at all times be subject to: (i) League agreements, including with manufacturers of licensed products; (ii) the rights of League sponsors and business partners, including television partners and the NFL Network; (iii) the right of the League to promote League initiatives and events; and (iv) the rights of the League and individual clubs to reach fans outside of their Home Marketing Area through e-commerce and other Internet related activities, catalog sales and database marketing. Except as otherwise set forth in this Section, no club shall have any rights to use or license its Club Marks in the Home Marketing Area of another club.

(C) A club may request a limited expansion of its Home Marketing Area into a border state. Such requests will be evaluated based on the effect of the proposed expansion on the interests of the League or another member club.

**EX 28, PAGE 2849**

(D) Consistent with prior resolutions, the Los Angeles home territory shall remain owned and controlled by the League, and pending a decision by the League to place one or more franchises in the Los Angeles area, no club shall have rights to use Club Marks in the Los Angeles Home Territory for the purposes set forth in Section 4.4(B) above.

(E) The League directly and/or through one or more entities collectively owned by the clubs (e.g., NFL Ventures, NFL Enterprises, NFL Properties, NFL International, and NFL Productions) (the "League affiliates") shall retain exclusive control of all trademarks owned by the League entities (including, without limitation, NFL, the NFL Shield design, Super Bowl game, Pro Bowl game, NFL Kickoff, NFL Playoffs, in their present form or as may be adopted in the future; collectively the "League Marks") and the collective use of Club Marks (the use of all clubs' Club Marks with equal emphasis) in any context. No club may license or use League Marks or any other Club Marks, nor permit a third party to use any of its Club Marks together with the Club Marks of another club absent prior League approval.

(F) The League shall retain exclusive worldwide control to license and otherwise use League Marks and individual Club Marks during the term of 2004 Resolution BV-4, in respect of the following business operations: (i) the promotion of the League; (ii) game presentation including presentation and promotion of NFL football through game telecasts and related programming in all forms of media; (iii) international operations; (iv) apparel, accessories, footwear and fitness products; (v) computer and video games; (vi) trading cards; (vii) footballs, helmets, and other equipment used on the playing field; (viii) player-identified product; (ix) home videos and related NFL Films products; (x) products including the marks of all clubs; and (xi) licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games. With respect to any such operations, no club may "opt out" of any League arrangement in such business operations or "go dark" by refusing to cooperate with any such arrangement.

(G) The League may enter into sponsorship and promotional agreements licensing the use of League Marks and collective use of Club Marks. Except as set forth in Section 4.4(F) above, each club shall retain the right to have a separate sponsorship and promotional arrangement for individual use of its Club Marks within its Home Marketing Area, subject to rules and policies established by the League and/or a League affiliate, including without limitation, regulations based on taste, image, health or

15                    Article IV

**EX 28, PAGE 2850**

safety, or integrity of the game considerations, and relating to premium products and branding. The clubs, by a three-fourths vote, may authorize a League affiliate to enter into a particular sponsorship agreement for a specific category licensing the use of League Marks and the individual use of all of the Club Marks.

(H) Any club that licenses or authorizes use of its Club Marks in violation of this section 4.4 or related rules or policies, shall, in addition to any other penalty that may be assessed, pay to the League or a League affiliate all proceeds and other consideration received for such license and not be entitled to share in any revenues generated by the use of League Marks and Club Marks under Resolution BV-4.

(I) Any disputes arising out of or relating to 2004 Resolution BV-4, any policies or rules developed to implement 2004 Resolution BV-4, the NFL trademark trust and any related agreements, or the rights and obligations of NFL Ventures and its affiliates, shall be resolved exclusively under the mechanism set forth in Article VIII hereof.

*See* 2004 Resolution BV-4 (Rights of clubs in Home Marketing Area; NFL right to enter into license agreements to use League and club marks for non-apparel products to be distributed nationally; League responsibilities for trademark and related intellectual property activities of the NFL and the clubs; dispute resolution), App., p. 2004-3

**Conference Alignment**

4.5 The League shall be divided into two conferences called the National Football Conference and the American Football Conference. The National Football Conference shall consist of sixteen (16) teams, and the American Football Conference shall consist of sixteen (16) teams as follows:

**National Football Conference**

| | |
|---|---|
| Arizona Cardinals | New Orleans Saints |
| Atlanta Falcons | New York Giants |
| Carolina Panthers | Philadelphia Eagles |
| Chicago Bears | St. Louis Rams |
| Dallas Cowboys | San Francisco 49ers |
| Detroit Lions | Seattle Seahawks |
| Green Bay Packers | Tampa Bay Buccaneers |
| Minnesota Vikings | Washington Redskins |

Article IV

**EX 28, PAGE 2851**

**American Football Conference**

| | |
|---|---|
| Baltimore Ravens | Kansas City Chiefs |
| Buffalo Bills | Miami Dolphins |
| Cincinnati Bengals | New England Patriots |
| Cleveland Browns | New York Jets |
| Denver Broncos | Oakland Raiders |
| Houston Texans | Pittsburgh Steelers |
| Indianapolis Colts | San Diego Chargers |
| Jacksonville Jaguars | Tennessee Titans |

Such Conferences shall be operated under the following terms and conditions:

(A)   Each conference shall be divided into four (4) divisions;

(B)   The divisions of the clubs in the American Football Conference are as follows:

**South:**

| | |
|---|---|
| Houston Texans | Jacksonville Jaguars |
| Indianapolis Colts | Tennessee Titans |

**North:**

| | |
|---|---|
| Baltimore Ravens | Cleveland Browns |
| Cincinnati Bengals | Pittsburgh Steelers |

**West:**

| | |
|---|---|
| Denver Broncos | Oakland Raiders |
| Kansas City Chiefs | San Diego Chargers |

**East:**

| | |
|---|---|
| Buffalo Bills | New England Patriots |
| Miami Dolphins | New York Jets |

(C)   The divisions of the clubs in the National Football Conference are as follows:

**South:**

| | |
|---|---|
| Atlanta Falcons | New Orleans Saints |
| Carolina Panthers | Tampa Bay Buccaneers |

17                     Article IV

**EX 28, PAGE 2852**

**North:**

| Chicago Bears | Green Bay Packers |
| Detroit Lions | Minnesota Vikings |

**West:**

| Arizona Cardinals | San Francisco 49ers |
| St. Louis Rams | Seattle Seahawks |

**East:**

| Dallas Cowboys | Philadelphia Eagles |
| New York Giants | Washington Redskins |

(D) The scheduling of games within each conference and between the two conferences shall be governed by the provisions of Article XIII hereof.

(E) The New York Giants and the New York Jets shall not be assigned to the same conference without the consent of both clubs.

(F) The San Francisco 49ers and the Oakland Raiders shall not be assigned to the same conference without the prior consent of both clubs unless the conferences are divided into smaller numerical groupings, i.e., divisions; in such case, the 49ers and the Raiders may be assigned to the same conference, but may not be placed in the same division or other smallest numerical grouping of clubs within the same conference.

(G) Any realignment of the League must be approved by the affirmative vote of three-fourths of the existing member clubs of the League, except that in the case of two-franchise areas (e.g., New York Giants/New York Jets), no realignment placing both franchises in the same conference can be approved without the consent of the two franchises.

(H) Subject to the other provisions of this Section 4.5, whenever the League proposes or seeks to realign the clubs into conferences or other groups for scheduling or standing purposes, the following factors shall be considered in order not to unfairly prejudice the rights of any club in the League: geographical location, natural rivalries, stadium capacity, gate attendance, weather conditions, relative team strength, and baseball conflicts involving clubs playing home games in baseball stadiums.

**EX 28, PAGE 2853**

*See* 1995 Resolution G-4 (giving Rams' realignment vote to Commissioner), App., 1995-1

1996 Resolution G-1 (giving Ravens' realignment vote to Commissioner via referenced settlement agreement), App., p. 1996-5

1996 Resolution G-4 (giving Oilers' realignment vote to Commissioner), App., p. 1996-6

1999 Resolution EC-1 (approving expansion to Houston and League realignment), App., p. 1999-1

2001 Resolution G-5 (realignment into two conferences, each with four divisions of four teams), App., p. 2001-7

**EX 28, PAGE 2854**

# Article V

## Meetings of the League

**Annual Meetings**

5.1    The Annual Meeting of the League shall be held not earlier than the second Monday in February of each year and not later than April 1 in such year; such meeting shall be held on such date and at such places and times as the Commissioner shall designate in the notices of the meeting.

**Special Meetings**

5.2    Special meetings of the League may be held at any place upon call by the Commissioner.

**Notice of Annual and Special Meetings**

5.3    (A)    Written notice of the time and place of holding any meeting shall be given to each member at least thirty (30) days in advance of the day fixed for the Annual Meeting or at least seven (7) days in advance of the day fixed for any special meetings.

(B)    Notice of a special meeting shall state the time, place, and purpose of the meeting. The notice of the Annual Meeting must state the time and place of the meeting, but not the purpose. If any amendments to the Constitution and Bylaws are to be considered at the Annual Meeting, the submission of such proposals must be in accordance with Article XXV hereof, except that, any other provisions of this Constitution notwithstanding, the Commissioner may propose in his sole discretion amendments which he considers to be of an emergency nature, and such amendments at a special meeting will require an affirmative vote of three-quarters or 20, whichever is greater, of the member clubs for passage.

(C)    Notices of any meeting may be waived by the unanimous consent of all member clubs.

**Quorum**

5.4    At all meetings of the League, whether Annual or Special, three-fourths or 20, whichever is greater, of the members of the League in good standing, present in person or by authorized representatives, shall constitute a quorum for the transaction of business and shall have the power to adjourn the meeting from time to time without notice other than announcement at the meeting until the requisite numbers of members shall be present.

EX 28, PAGE 2855

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 24 of 29
1:8-v-08390-R-MAN Document 69-33-34 Filed 12/20/11 Page 24 of 293
#:10272

**Voting and Representation**

5.5 (A) At each meeting of the League, each member shall be limited to two (2) representatives. Each member shall be limited to only one (1) vote upon any matter presented to the meeting. Each member shall file with the League within the time designated by the Commissioner a written designation of the representative and alternate to vote and act for it. The Commissioner or presiding officer may require proof satisfactory to the Commissioner or presiding officer of the authority of any representative to represent a member. In all meetings, both Executive Session and general, proxy voting is prohibited. If a member is not represented at the time of a vote, the three-fourths requirement for a vote to carry will be based on the number of members present. This special voting procedure when a quorum but not all clubs are represented shall not apply whenever a unanimous vote is required by the Constitution and Bylaws.

(B) Any proposal introduced to the membership at a meeting of the League at which a quorum is present or otherwise properly before the membership, may be voted upon either during or following such meeting by NFLNet, e-mail or facsimile or by similar means of communication.

**Number of Votes**

5.6 Except as herein otherwise specifically provided, the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League at any Annual Meeting of the League shall be required for action.

**Order of Business at Annual Meeting**

5.7 The order of business for the Annual Meeting shall be as follows:

Roll call
Reading of minutes of the previous meeting
Report of the Commissioner
Report of the Treasurer
Report of other League officers
Report of the Public Relations Department
Report of other committees
Unfinished business
Nomination and election of officers
Installation of officers
New business
Adjournment

21                    Article V

**EX 28, PAGE 2856**

**Executive Session**

5.8    Upon call of the Commissioner or by majority vote of the members of the
       League, the League may go into Executive Session. Each member shall
       designate its duly authorized representative to act for it in such Executive
       Session. In any Executive Session, unless otherwise designated by the
       Commissioner, two representatives of each member and the
       Commissioner shall be present together with such other persons as either
       the Commissioner or the members by majority vote shall invite; provided
       that when two representatives of a member club are present in Executive
       Session, one of them must own an equity interest in such club. The
       Commissioner shall be Chairman of the Executive Session and may
       appoint the Secretary of the Session. Action at any Executive Session
       shall constitute action of the League.

       *See also* 1984 Resolution (Long Range Planning Committee; League
                  meetings), App., p. 1984-4

**Conduct of Meeting**

5.9    Except in respect to matters covered specifically in the Constitution and
       Bylaws of the League, Roberts Rules of Order shall prevail in all
       meetings of the League; provided, however, that any action taken in any
       meeting of the League involving a matter not covered specifically in the
       Constitution and Bylaws of the League shall require the affirmative vote
       of not less than three-fourths or 20, whichever is greater, of the members
       of the League for approval.

**Action Without a Meeting**

5.10   Any action or resolution which may be taken or adopted at a League
       meeting may be taken or adopted by an instrument in writing signed by
       all members of the League.

**EX 28, PAGE 2857**

Case 8:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 26 of 29
1:88-cv-08390-R-MAN Document 69-33 Filed 12/20/11 Page 26 of 293
#:10274

# Article VI

## Executive and Other Committees

### Number

6.1 The League shall have an Executive Committee composed of one (1) representative from each member club. Each representative shall be appointed by the member club by written notice to the Commissioner. Each club may name an alternate representative in the same manner. Said alternate shall have the same authority as the regular appointee in the absence of such appointee. Each appointee and alternate on the Executive Committee shall serve until his appointment is revoked in writing by the appointing member club.

> *See* 1997 Resolution FC-3 (permitting Commissioner to disapprove Executive Committee appointments), App., p. 1997-1
> 2004 Resolution FC-2 (permitting Commissioner to disapprove Executive Committee appointments), App., p. 2004-13

### Voting Qualifications

6.2 At all meetings of the Executive Committee, each member of the Committee shall have one (1) vote.

6.3 All Executive Committee members must be either owners or holders of an interest or officers of member clubs in the League.

### Vacancies

6.4 In case any vacancy occurs in the Executive Committee, a successor shall be appointed by the member affected by the vacancy.

### Powers and Duties

6.5 The Executive Committee shall have the following powers and duties:

(A) It shall have the power, after notice and hearing, to impose fines upon any member or any owner, director, partner, officer, stockholder, player, or employee of a member of the League.

(B) It shall have the power, after notice and hearing, to increase or impose other or additional penalties after action of the Commissioner upon any matter submitted to it by the Commissioner for that purpose, pursuant to Section 8.13(B)

**EX 28, PAGE 2858**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 27 of 29
1:89-cv-08395-R-MAN Document 69-33 Filed 12/20/11 Page 27 of 293
#:10275

hereof; provided, however, that the Executive Committee shall have no power to modify, reduce, remit, or suspend any fine, penalty, or suspension imposed by the Commissioner under Section 8.13(A) hereof.

(C)   It shall have the power and duty to investigate and report its findings and recommendations to the League on any matter referred to it by the Commissioner or the members.

(D)   It shall have power to cause an audit of the books and records of the League and the Treasurer thereof and shall report its findings to the members and the Commissioner promptly.

(E)   If the Commissioner dies, is unwilling, or is by reason of physical or mental disability unable to discharge his duties as Commissioner, the Executive Committee shall have the power to decide that an emergency exists in the League. It shall thereupon call a special meeting of the members at a time and place selected by the Committee. Such meeting shall be held within thirty (30) days after the declaration of such emergency, and notice of such meeting shall be given as in the case of any other special meeting. The purpose of such meeting shall be either to remove such Commissioner or to elect a new Commissioner or to appoint an acting Commissioner to serve until the next succeeding Annual Meeting.

(F)   It is empowered to borrow in the name of the League such sum or sums of money as it may from time to time deem necessary or appropriate and to authorize the Commissioner and Treasurer, individually or jointly, to make and deliver in the name of the League a promissory note or notes evidencing any such loan and to pledge as security therefor any stocks, bonds, or other securities owned by the League.

(G)   In the event that the Commissioner or any other officer of the League shall be convicted of a crime involving moral turpitude or be physically or mentally incapacitated to perform his duties or shall fail or refuse to abide by the Constitution and Bylaws of the League, and the Executive Committee finds that such action by such officer is detrimental to the best interests of the League, or in the event the Commissioner or any other officer of the League fails or is unwilling to perform his duties, then such Committee shall have the power after notice and hearing to suspend or remove said officer and to terminate any contract between such Commissioner or officer and the League.

**EX 28, PAGE 2859**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 28 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 28 of 293
#:10276

**Approval**

6.6    All actions and decisions of the Executive Committee must be approved
       by the affirmative vote of not less than three-fourths or 20, whichever is
       greater, of the members of the Executive Committee provided, however,
       that:

       (A)    Any decisions to proceed under Section 6.5(C), (D), or (E) hereof
              may be taken by majority vote of the Executive Committee; and

       (B)    In any hearing involving charges against any club or whenever one
              club is making charges against another, the member club or clubs
              so involved shall not vote.

**Other Committees**

6.7    The Commissioner of the League may appoint such other committees as
       the League deems necessary and appropriate. All committees shall act
       under the direction and chairmanship of the Commissioner, who shall be
       a member "ex-officio" of each committee. The League shall pay each
       member of the committee the expenses of his attendance at committee
       meetings.

       *See* 2004 Resolution BV-4 (Formation of a special committee to evaluate
       key financial aspects of the operations of all member clubs in relation to
       all revenue sources and opportunities and to make recommendations on
       these matters, including revenue and cost sharing alternatives), App.,
       p. 2004-3

**Vacancies**

6.8    Subject to the provisions of Section 8.1 hereof, the Executive Committee
       shall have the power to fill by appointment any and all vacancies in any
       elective offices of the League for the balance of the term of such office or
       until a successor is duly elected for such office in the prescribed manner.

**Meetings**

6.9    At each meeting of the Executive Committee, the Commissioner of the
       League shall preside.

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 29 of 29
Case 3:11-cv-08396-R-MAN Document 69-38 Filed 12/20/11 Page 29 of 293
#:10277

# Article VII

## Officers

**Officers**

7.1 (A) The officers of the League shall be the Commissioner, a Secretary, and a Treasurer. The Secretary and Treasurer shall be appointed by the Commissioner. The Commissioner shall have the right to appoint any other officers or assistants thereto as he, in his sole discretion, deems necessary. The duties and compensation thereof shall be fixed by the Commissioner.

(B) The sole officer in each Conference of the League shall be the President thereof. The President of each Conference shall be selected by the affirmative vote of not less than three-fourths or 10, whichever is greater, of the members of the Conference for which such person is to serve as President.

**Voting**

7.2 The Commissioner shall be elected pursuant to and in accordance with the provisions of Section 8.1 hereof. Any other officer of the League shall be appointed by the Commissioner in accordance with the provisions of Section 7.1(A) hereof, provided, however, that if the Commissioner is unable so to do by reason of death or disability, then such officer shall be elected by the affirmative vote of not less than three-quarters or 20, whichever is greater, of the member clubs of the League.

**Commissioner**

7.3 The powers and duties of the Commissioner shall be such as are described in Article VIII hereof.

**Treasurer**

7.4 The Treasurer shall have charge and custody of, and be responsible for, all funds and securities of the League, receive and give receipts for monies due and payable to the League from any source whatsoever, and deposit all such monies in the name of the League in such depositories as the Commissioner may determine, keep full and accurate accounts of the receipts and disbursements of the League, and in general perform all of the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to him by the Commissioner or the Executive Committee. In addition, the Treasurer shall:

(A) Pay all current bills and salaries after approval by the Commissioner;

**EX 28, PAGE 2861**

(B)   Annually submit to the member clubs detailed financial statements;

(C)   He shall give a surety bond in the principal sum of not less than
two hundred fifty thousand dollars ($250,000) for the faithful
discharge of his duties, with the League named as obligee thereon.
The premium shall be paid by the League; and

(D)   During the playing season, he shall report weekly to each member
on attendance and receipts for all games played by member clubs
during the preceding week. Such report shall also include any
delinquency in any amounts owing to the League and such other
information as the Treasurer deems expedient.

> *See also* 1983 Resolution (Finance; clubs' share of coaches' pension
> plans), App., p. 1983-1
> 1990 Resolution FC-2 (club financial reporting), App.,
> p. 1990-1
> 1993 Resolution FC-1 (Deferred Compensation Reserve
> Mechanism) App., p. 1993-3
> 2004 Resolution FC-7 (club financial reporting), App., p.
> 2004-14

## Secretary

7.5   The Secretary shall keep records of all proceedings of the League and the
minutes of the meetings of the members and of the Executive Committee
in one or more books provided for that purpose, cause all notices to be
duly given in accordance with the provisions of this Constitution, or as
required by law, be custodian of the League records, keep a register of the
Post Office addresses of each member, and in general perform all of the
duties incident to the office of Secretary and such other duties as may
from time to time be assigned to him by the Commissioner.

The Secretary will supply the member clubs with a record of the action
taken at any meeting within twenty (20) days following the adjournment
thereof and shall also furnish the member clubs formal minutes of each
meeting within ninety (90) days following the adjournment of each
meeting.

## Disability of Commissioner

7.6   If, by reason of physical or mental disability, the Commissioner is unable
to discharge or perform the duties of his office, or is unwilling so to do,
then, during any such period, the Executive Committee may require any
other member of the Commissioner's staff to perform such duties of the
Commissioner.

**EX 28, PAGE 2862**

# Article VIII

## Commissioner

**Employment**

8.1  The League shall select and employ a person of unquestioned integrity to serve as Commissioner of the League and shall determine the period and fix the compensation of his employment. All voting requirements and procedures for the selection of or successor to the office of Commissioner shall be determined by the affirmative vote of not less than two-thirds or 18, whichever is greater, of the members of the League.

**Independence**

8.2  The Commissioner shall have no financial interest, direct or indirect, in any professional sport.

**Jurisdiction to Resolve Disputes**

8.3  The Commissioner shall have full, complete, and final jurisdiction and authority to arbitrate:

(A)  Any dispute involving two or more members of the League or involving two or more holders of an ownership interest in a member club of the League, certified to him by any of the disputants;

(B)  Any dispute between any player, coach, and/or other employee of any member of the League (or any combination thereof) and any member club or clubs;

(C)  Any dispute between or among players, coaches, and/or other employees of any member club or clubs of the League, other than disputes unrelated to and outside the course and scope of the employment of such disputants within the League;

(D)  Any dispute between a player and any official of the League;

(E)  Any dispute involving a member or members in the League or any players or employees of the members of the League or any combination thereof that in the opinion of the Commissioner constitutes conduct detrimental to the best interests of the League or professional football.

**EX 28, PAGE 2863**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 32 of 29
1:8-v-08390-R-MAN Document 09-33 Filed 12/20/11 Page 32 of 293
#:10280

**Financial and Other Authority**

8.4    (A)    The Commissioner, on behalf of the League, may incur any
              expense which, in his sole discretion, is necessary to conduct and
              transact the ordinary business of the League, including but not
              limited to, the leasing of office space and the hiring of employees
              and other assistance or services; provided, however, that the
              Commissioner shall not have authority to incur any expense for
              any extraordinary obligations or make any capital investment on
              behalf of the League without prior approval by the Executive
              Committee.

       (B)    The Commissioner shall: (1) preside at all meetings of the League
              and the Executive Committee; (2) be the principal executive officer
              of the League and shall have general supervision of its business
              and affairs; and (3) approve for payment all proper charges.

**Policy and Procedure**

8.5    The Commissioner shall interpret and from time to time establish policy
       and procedure in respect to the provisions of the Constitution and Bylaws
       and any enforcement thereof.

**Detrimental Conduct**

8.6    The Commissioner is authorized, at the expense of the League, to hire
       legal counsel and take or adopt appropriate legal action or such other
       steps or procedures as he deems necessary and proper in the best interests
       of either the League or professional football, whenever any party or
       organization not a member of, employed by, or connected with the
       League or any member thereof is guilty of any conduct detrimental either
       to the League, its member clubs or employees, or to professional football.

**Game Officials**

8.7    The Commissioner shall select and employ a Supervisor of League Game
       Officials and shall further select and approve all game officials for all
       preseason, regular season, and postseason games. All fees and traveling
       expenses of game officials shall be paid by the League after approval by
       the Commissioner. It shall be the duty of each member to accept as game
       officials for any game such game officials as the Commissioner shall
       assign to such game.

**EX 28, PAGE 2864**

### Public Relations Department

8.8    The Commissioner shall have authority to establish a Public Relations Department for the League, and such department shall be under his exclusive control and direction. He may employ persons to staff said department and shall fix and determine the compensation thereof.

### Broadcasts and Television

8.9    Subject to the provisions of Article X hereof, the Commissioner shall have the exclusive authority to arrange for and sell all broadcasting and television rights to the Conference Championship games and the Super Bowl game.

### League Contracts

8.10    The Commissioner shall have authority to arrange for and negotiate contracts on behalf of the League with other persons, firms, leagues, or associations; provided, however, that except in instances where the Commissioner is otherwise specifically authorized herein, any contract involving a substantial commitment by the League or its members shall not be binding unless first approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

### Reports

8.11    The Commissioner shall render an annual report to the League members at each Annual Meeting.

### Bond

8.12    The Commissioner shall file and maintain in effect a surety bond with the League in the sum of fifty thousand dollars ($50,000). Said bond shall be conditioned upon faithful performance by the Commissioner of his duties and shall name the League as obligee. The expenses for such bond shall be paid by the League.

### Disciplinary Powers of Commissioner

8.13    (A)    Whenever the Commissioner, after notice and hearing, decides that an owner, shareholder, partner or holder of an interest in a member club, or any player, coach, officer, director, or employee thereof, or an officer, employee or official of the League has either violated the Constitution and Bylaws of the League or has been or is guilty of conduct detrimental to the welfare of the League or professional football, then the Commissioner shall have complete authority to:

**EX 28, PAGE 2865**

Case 2:12-md-02323-AB  Document 18-34  Filed 03/29/12  Page 34 of 29
Case 2:08-cv-08396-R-MAN  Document 69-33  Filed 12/20/11  Page 34 of 293
#:10282

(1) Suspend and/or fine such person in an amount not in excess of five hundred thousand dollars ($500,000), or in the case of an unrescinded unauthorized sale, transfer, or assignment of a membership or an interest therein to any person other than a member of the transferor's immediate family in violation of Section 3.5 hereof, the greater of (i) five hundred thousand dollars ($500,000), and (ii) an amount equal to 15% of the transaction value; and/or

(2) Cancel any contract or agreement of such person with the League or with any member thereof;

(3) In cases involving a violation of the prohibitions against tampering as set forth in Sections 9.1(C)(10) and (11), 9.2 and 12.1(B) hereof, award or transfer selection choices and/or deprive the offending club of a selection choice or choices; and

(4) In cases involving a violation affecting the competitive aspects of the game, award selection choices and/or deprive the offending club of a selection choice or choices and/or cancel any contract or agreement of such person with the League or with any member thereof and/or fine the offending club in an amount not in excess of five hundred thousand dollars ($500,000), or in the case of an unrescinded unauthorized sale, transfer, or assignment of a membership or an interest therein to any person other than a member of the transferor's immediate family in violation of Section 3.5 hereof, the greater of (i) five hundred thousand dollars ($500,000), and (ii) an amount equal to 15% of the transaction value.

(B) Whenever the Commissioner determines that any punishment that the Commissioner has the power to impose pursuant to Section 8.13(A), is not adequate or sufficient, considering the nature and gravity of the offense involved, he may refer the matter to the Executive Committee, with a recommendation that all or any part of the following additional or increased punishments or discipline be imposed:

(1) Cancellation or forfeiture of the franchise in the League of any member club involved or implicated. If such occurs, the affected franchise shall be sold and disposed of under the provisions of Section 3.8(B) hereof;

**EX 28, PAGE 2866**

(2) Cancellation or forfeiture of the interest in a member club or in the franchise thereof owned by a person involved or implicated therein. If such occurs, the interest held by any person so implicated shall be sold and disposed of under the provisions of Section 3.8(B) hereof;

(3) Declare one or more players of the offending club to be a free agent or that one or more players, and the contracts thereon held by the offending club, be assigned to another club or clubs;

(4) Assignment to another club or a nominee of the League of the lease on any stadium or playing field held for or owned by the defending club or any person owning any interest therein;

(5) Assignment to one or more clubs of players on the Selection or Reserve Lists of the offending club;

(6) Require the sale of any stock or interest in a member club of such offending person by the method and under the procedure specified in Section 3.8(B) hereof; and

(7) Make any other recommendation he deems appropriate.

The Executive Committee may impose such other or additional discipline or punishment as it may decide.

Any such ruling or decision by the Commissioner under the circumstances referred to in this Section 8.13(B), after approval or ratification by the affirmative vote of no less than three-fourths or 20, whichever is greater, of the members of the League, as aforesaid, shall be final, conclusive, and unappealable. Any party involved in or affected by any such decision agrees to release and waive any and all claims that such party may now or hereafter have or possess arising out of or connected with such decision against the Commissioner, individually and in his official capacity, as well as against the League and any officer or employee thereof and every member club therein and against any director, officer, shareholder, or partner thereof or the holder of any interest therein, whether for damages or for any other remedy or relief.

The word "person," for the purposes of this subparagraph (B) of Article VIII, Section 8.13, shall mean and include a member club and any owner, officer, stockholder, or partner thereof, or anyone holding any interest therein.

The membership of a member or the interest of any person owning a share or interest therein shall be suspended or terminated under this Section 8.13(B) only by resort to the following procedure:

**EX 28, PAGE 2867**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 36 of 29
1:8-cv-08396-R-MAN Document 09-33-34 Filed 12/20/11 Page 36 of 293
#:10284

(a) Any member of the Executive Committee or the Commissioner may prefer charges against a member or the holder of any interest therein on the ground that such a member or holder has violated the provisions of the Constitution and Bylaws or is or has been guilty of conduct detrimental to the League or to professional football. Said charges shall be in writing and filed with the Secretary of the League. The Commissioner shall first conduct such investigation as he deems appropriate. Upon the completion thereof, the Commissioner shall submit a copy of the charges by mail to each member club and to the member or person against whom such charges have been made and shall make his recommendation thereon to the member clubs.

(b) The member or person so charged may, within fifteen (15) days after receipt of the charges, file with the Commissioner its or his written answer thereto. The Commissioner shall thereupon deliver a copy of such answer to all members of the League.

(c) A special meeting of the League shall be called to hear charges; the time and place of such meeting shall be fixed by the Commissioner.

(d) At such hearing the Commissioner shall preside, unless he is the complainant. In such event, the presiding officer shall be elected by majority vote of the members attending the meeting.

(e) At the hearing the member or person so charged shall have the right to appear in person and by counsel. Strict rules of evidence shall not apply, and any testimony and documentary evidence submitted to the hearing shall be received and considered. Either the complainant or the member or person charged shall be entitled to an adjournment for a reasonable time to enable it or him to present rebuttal evidence.

(f) After considering all the evidence, the members shall vote upon the charges and fix the punishment. An affirmative vote of not less than three-fourths or 20, whichever is greater, of the members shall be required to sustain the charges and fix the punishment, excluding the vote of any member in which the person charged has an interest.

**EX 28, PAGE 2868**

      (g) If the members vote to terminate the membership or the interest of any member in a club of the League, then the member club or person charged shall be required to dispose of such membership or interest in the affected club in accordance with the provisions of Section 3.8(B) hereof.

(C) Whenever the Commissioner, after notice and hearing, determines that a person employed by or connected with the League or any member club thereof has bet money or any other thing of value on the outcome or score of any game or games played in the League or has had knowledge of or has received an offer, directly or indirectly, to control, fix, or bet money or other consideration on the outcome or score of a professional football game and has failed to report the same in the manner hereinafter prescribed, then the Commissioner shall have complete and unrestricted authority to enforce any or all of the following penalties:

    (1) Suspend such person indefinitely or for a prescribed period of time;

    (2) Bar such person from the League for life;

    (3) Cancel or terminate the contract of such person in the League or any member club thereof;

    (4) Require the sale of any stock, or other interest of such offending person in any member club by the method and under the procedure specified in Section 3.8(B) hereof;

    (5) Fine such person in an amount not in excess of five hundred thousand dollars ($500,000);

    (6) Cancel or declare to be forfeited any interest in a member club, or in the franchise thereof, owned by any person so involved. In such event, any interest of the offending person so implicated in the club or any stock owned by such person in any member club shall be sold under the procedure provided in Section 3.8(B) hereof;

    (7) Assign to another club or a member of the League the lease on any stadium or playing field held for or owned by the offending club or by any person owning any interest therein;

    (8) Assign to one or more other clubs players on the Selection or Reserve Lists of the offending club;

EX 28, PAGE 2869

Case 2:12-md-02323-AB   Document 18-34   Filed 03/29/12   Page 38 of 29
3:09-cv-08395-R-02MAN-AB   Document 69-33   Filed 12/20/11   Page 38 of 293
#:10286

(9)  Impose such other or additional punishment or discipline as the Commissioner may decide.

If the person involved is a player in the League, such player is obligated to report immediately such incident to the head coach, owner, or managing officer of the club with which he is affiliated. If the person involved is either an owner, officer, director, stockholder, or a partner of a member club or owns or holds an interest therein, or is a coach or employee (other than a player) thereof, such report shall be made promptly to the Commissioner. Any decision by the Commissioner under the circumstances referred to in this Section 8.13(C) shall be final, conclusive, and unappealable. All persons involved in or affected by any such decision agree to release and waive any and all claims arising out of or connected with such decision that such person may now have or hereafter possess against the Commissioner, individually and in his official capacity, as well as against the League or any officer or employee thereof and against every member club therein and any director, officer, shareholder, or partner thereof or against the holder of any interest therein, either for damages or for any other remedy or relief. The word "person" wherever used in this subparagraph (C) of Article VIII, Section 8.13, shall mean and include a member club, or any club owner, official, officer, stockholder, partner thereof, or anyone holding any interest therein, as well as a coach, player, or other employee thereof; it shall also include an officer or employee of the League or any official employed by the League.

(D)  Whenever the Commissioner finds, in his sole and exclusive discretion, that any person, whether or not connected or affiliated with the League or a member club therein, is guilty of conduct detrimental to the best interests of the League or professional football, then in addition to his other powers prescribed in the Constitution and Bylaws of the League, the Commissioner shall have the right to bar and prohibit such person from entry to any stadium or park used by the League or its member clubs or affiliates for the practice or exhibition of professional football.

(E)  The Commissioner shall have authority to change, reduce, modify, remit, or suspend any fine, suspension, or other discipline imposed by the Commissioner and not requiring approval of the member clubs.

35                          Article VIII

**EX 28, PAGE 2870**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 39 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 39 of 293
#:10287

**Miscellaneous Powers of the Commissioner**

8.14   (A)   The Commissioner shall have the power, without a hearing, to disapprove contracts between a player and a club, if such contracts have been executed in violation of or contrary to the Constitution and Bylaws of the League, or, if either or both of the parties to such contracts have been or are guilty of an act or conduct which is or may be detrimental to the League or to the sport of professional football. Any such disapproval of a contract between a player and a club shall be exercised by the Commissioner upon written notice to the contracting parties within ten (10) days after such contracts are filed with the Commissioner. The Commissioner shall also have the power to disapprove any contract between any club and a player or any other person, at any time pursuant to and in accordance with the provisions of Section 8.13(A) of the Constitution and Bylaws.

       (B)   The Commissioner shall have the power to hear and determine disputes between clubs in respect to any matter certified to him by either or both of the clubs. He shall also have the power to settle and determine any controversy between two clubs which, in the opinion of the Commissioner, involves or affects League policy.

       (C)   The Commissioner shall have the right to propose amendments or modifications to the Constitution and Bylaws of the League by submitting such amendments or modifications in writing to the League no less than fifteen (15) days prior to the holding of any Annual Meeting of the League or recessed session thereof.

            *See* 1990 Resolution SM-1 (confirming Commissioner's supervisory authority over the operations of Management Council, NFL Properties, and NFL Films), App., p. 1990-3 2004 Resolution BV-4 (Appointment by the Commissioner of members of a special committee to evaluate key financial aspects of the operations of all member clubs in relation to all revenue sources and opportunities and to make recommendations on these matters, including revenue and cost sharing alternatives), App., p. 2004-3

        *See also* NFL Collective Bargaining Agreement ("CBA"), including Article XI (Commissioner Discipline)

**EX 28, PAGE 2871**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 40 of 29
Case 3:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 40 of 293
#:10288

# Article IX

## Prohibited Conduct

**Conflicting Interests and Prohibited Conduct**

9.1 (A) The violation of any of the provisions of this Article IX shall constitute conduct detrimental to the League and professional football.

   (B) No member, or stockholder, officer, director, partner, or employee thereof, and no officer or employee of the League, including a game official, shall:

   (1) Own or have any financial interest, directly or indirectly, in any other member club of the League;

   (2) Directly or indirectly loan money to or become surety or guarantor for any other member club or any player, coach, or employee thereof, or holder of an interest therein;

   (3) Directly or indirectly loan money or offer any gift or reward or become surety or guarantor for any game official or other official or employee of the League; or

   (4) Act as the contracting agent or representative for any player or share or be financially interested in the compensation of any player in the League. Nothing herein shall prevent any player from negotiating on his own behalf or for his own account.

   (C) No member, nor any stockholder, director, officer, partner, or employee thereof, or person holding an interest therein, nor any officer or employee of the League shall:

   (1) Publicize or participate in the selection of any mythical All-League or All-Opponent team;

   (2) Issue a free ticket of admission to a game to any visiting club or player thereof except pursuant to the Constitution and Bylaws of the League;

   (3) Offer any gift or reward to a player, coach, or person connected with or employed by another member club for services promised, rendered, or to be rendered in defeating or attempting to defeat a competing club;

37                                    Article IX

**EX 28, PAGE 2872**

Case 2:12-md-02323-AB Document 18334 Filed 12/20/11 Page 41 of 29
Case 2:08-cv-08390-R-MAN Document 69-33 Filed 12/20/11 Page 41 of 293
#:10289

(4) Publicly criticize any member club or its management, personnel, employees, or coaches and/or any football official employed by the League. All complaints or criticism in respect to the foregoing shall be made to the Commissioner only and shall not be publicized directly or indirectly;

(5) Directly or indirectly pay a fine for a person who has been penalized;

(6) Permit or state in any game program, or by means of its public address system or otherwise, that it, he, or they, offer or agree, either directly or indirectly, to pay or give money or any other thing of value to any member of the public; neither shall any club or other person referred to in this Section 9.1 be permitted to participate at any time, directly or indirectly, in any lottery of any kind, except that no provision of the Constitution and Bylaws shall prohibit a member club or any broadcasting or other entity with which a club has a contractual relationship from accepting advertising on club radio broadcasts, preseason telecasts, highlight shows or in game programs or stadiums from any state or municipal lottery or off-track betting organization that does not offer any lottery or other betting scheme based on the outcome of or any performance in any NFL game or in any other actual sporting event; provided that such advertising shall not (a) in any way involve club, coach, player, or other club employee affiliation with or endorsement of such lottery or off-track betting, nor (b) include promotion of any lottery game or betting scheme having a sports theme;

*See* 1985 Resolution G-2 (In-Stadium Giveaways), App., p. 1985-3
1993 Resolution BC-2 (Lottery and Off-Track Betting Organization Advertising), App., p. 1993-1

(7) Own, directly or indirectly, any interest whatsoever in a professional football organization, league, club, or team not a member of the League, except that these prohibitions shall not apply to the direct or indirect ownership by NFL owners of interests in clubs of the Arena Football League playing in the home territory of the owner's NFL club, provided that any players who have not executed an NFL Player Contract and who participate for such Arena League club shall be available to be signed by any National Football League club, subject to customary eligibility rules. Nor shall these prohibitions bar participation of NFL member clubs in an international Spring Football League to commence play no later than the Spring of 1991;

**EX 28, PAGE 2873**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 42 of 29
1:87-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 42 of 293
#:10290

*See* 2002 Bylaw Proposal No. 6 (Arena Football League players),
App., p. 2002-1

(8) Offer or pay a player or coach, and no player or coach may
receive any bonus, money, or thing of value, for winning any
game played in the League.

No club or any representative thereof, shall offer to pay,
directly or indirectly, to a player, and no player shall receive,
any bonus of any kind unless such bonus provision is attached
to and/or incorporated in the contract of such player;

(9) Fail to present its team at the time and place where it is
scheduled to play in a preseason or regular season game,
unless such failure is caused by any unavoidable accident in
travel or by conditions beyond the control of the member;

(10) Tamper with players of college teams who are not eligible for
play in the League under the eligibility rules thereof.

(11) Tamper with a player or coaches or other employee under
contract to or the property of another member club;

(12) Offer, agree, conspire, or attempt to illegally influence the
outcome of the member or fail to suspend immediately any
officer or player or other employee of the member who shall
be proven guilty of offering, agreeing, conspiring, or
attempting to influence the outcome of any game or be
interested in any pool or wager of any game in which a
member club participates;

(13) Dispense beer or other beverage in NFL stadia except by
pouring into cups;

(14) Use at any time, from the start to the finish of any game in
which a club is a participant, any communications or
information gathering equipment, other than Polaroid-type
cameras or field telephones, including without limitation
videotape machines, telephone tapping or bugging devices, or
any other form of electronic device that might aid a team
during the playing of a game;

(15) In respect to minor league clubs and the Canadian Football
League, the following prohibitions shall apply to all clubs in
the League:

**EX 28, PAGE 2874**

Case 2:12-md-02323-AB Document 18-34 Filed 12/20/11 Page 43 of 29
Case 2:12-md-02323-AB Document 09-33 Filed 03/29/12 Page 43 of 293
#:10291

(a) No club in the League shall own or have any financial interest, directly or indirectly, in any minor league club, except that these prohibitions shall not apply to the direct or indirect ownership by NFL owners of interests in clubs of the Arena Football League playing in the home territory of the owner's NFL club, provided that any players who have not executed an NFL Player Contract and who participate for such Arena League club shall be available to be signed by any National Football League club, subject to customary eligibility rules.

(b) No club in the League shall, directly or indirectly, loan money to, nor make a gift or contribution to, nor become a surety or guarantor for any minor league club or for any player, coach, employee, owner, stockholder, officer, director, or partner therein, or to any holder of any interest in any minor league club.

(c) The restrictions on the clubs in this League as set out in subparagraphs and (a) and (b) above, shall likewise apply to all owners, stockholders, officers, directors, partners, agents, representatives, or employees of clubs in the League, as well as to any other person owning any interest in any club in this League.

A "minor league club" shall include any professional football club not a member of this League, which has been designated by the Commissioner of this League as a minor league club.

Should any club in the League violate the provisions of this 9.1(C)(15), then, in addition to all other remedies available to the Commissioner under this Constitution and Bylaws, such club guilty of such violation shall not have the right to employ as a football player any player who was under contract to or played for such minor league club at the time of any such violation.

(D) No player, coach, or manager shall, directly or indirectly, own stock or have any financial interest in the ownership or earnings of any member club of the League, other than in the member club with whom he is employed, and then only under an agreement approved by the Executive Committee stipulating for the immediate sale (and the terms thereof) of such stock or financial interest therein in the event of his transfer to, employment by, or association with, another member club. A player, coach, or manager financially interested in another member club shall be ineligible to play for, coach, or manage the club of any other member while, in the opinion of the Executive Committee, such interest is retained by or for him, directly or indirectly.

**EX 28, PAGE 2875**

Case 3:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 44 of 29
Case 2:89-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 44 of 293
#:10292

    (E)    No player, coach, manager, or owner may remove his team, nor order his team removed, from the field during the playing of a game, regular or preseason, except at the direction of the referee. Should any club in this League violate the provisions of this subsection 9.1(E), then in addition to all other remedies available to the Commissioner under this Constitution and Bylaws, such club guilty of such violation shall face possible forfeiture of any victory or tie achieved in such game and in addition incur sole liability for financial losses suffered by the opposing team and any other member clubs so affected. All such determinations shall be made by the Commissioner.

    (F)    No member shall permit access to the NFLNet, e-mail, facsimile or other similar means of communication by non-club personnel.

**Tampering**

9.2    If a member club or any officer, shareholder, director, partner, employee, agent, or representative thereof or any person holding an interest in said club shall tamper, negotiate with, or make an offer, directly or indirectly, to a player, or his representative, on the Active, Reserve, or Selection List of another member club, then unless the offending club shall clearly prove to the Commissioner that such action was unintentional, the offending club, in addition to being subject to all other penalties provided in the Constitution and Bylaws, shall lose its selection choice in the next succeeding Selection Meeting in the same round in which the affected player was originally selected in the Selection Meeting in which he was originally chosen. If such affected player was never selected in any Selection Meeting, the Commissioner shall determine the round in which the offending club shall lose its selection choice. Additionally, if the Commissioner decided such offense was intentional, the Commissioner shall have the power to fine the offending club and may award the offended club 50% of the amount of the fine imposed by the Commissioner. In all such cases the offended club must first certify to the Commissioner that such an offense has been committed.

    *See* 1998 Resolution G-2 (tampering/non-player personnel), App., p. 1998-13
       2000 Resolution G-1B (tampering/non-player personnel), App., p. 2000-1
       2001 Resolution G-4 (tampering/non-player personnel), App., p. 2001-3
       2004 Resolution G-1 (tampering/non-player personnel), App., p. 2004-15
       2004 Resolution JC-1A (tampering/non-player personnel), App., p. 2004-16

**EX 28, PAGE 2876**

Case 3:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 45 of 29
Case 2:07-cv-08390-R-MAN Document 69-38 Filed 12/20/11 Page 45 of 293
#:10293

9.3 (A) (1) No coach or administrative or supervisory employee, as hereinafter defined, may be employed by any member club of the League without the prior approval of the Commissioner. All coaches must have a written contract. Such contract shall be filed in the League office promptly following execution, and the terms thereof must be approved by the Commissioner. An administrator or supervisory employee, for the purpose of this Section, shall mean a general manager or any assistant to the president or executive officer of the club.

(2) Every contract with any employee of the League or of a club therein shall contain a clause wherein the employee agrees to abide and be legally bound by the Constitution and Bylaws and the Rules and Regulations of the League, as well as by the decisions of the Commissioner, which decisions shall be final, conclusive, and unappealable. Such contract shall provide further that the contracting parties, if involved or affected in any manner by a decision of the Commissioner, agree to release the Commissioner and to waive every claim he, they, or it have against the Commissioner, individually and in his official capacity, as well as against the League, each and every member club thereof, and any and all directors, officers, stockholders, partners, or holders of an interest therein, for damages and for any other claims or demands arising out of or connected with any decision of the Commissioner. Every written employment contract with any non-player employee of a club shall be filed in the League office promptly following its execution and shall provide: that such contract sets forth the entire agreement between the parties; that no oral agreements, and no other written agreements, except as are attached to the contract or specifically incorporated by reference therein, exist between them; that such written contract (including agreements attached thereto or incorporated therein) sets forth the entire agreement with respect to the employee's services for the club; and that neither party will rely on any agreement or understanding not reduced to writing and specifically incorporated into such employment contract prior to its execution or when subsequently amended.

(B) No owner or person holding any interest in a member club, nor any officer, stockholder, director, or partner thereof, nor any officer or employee of the League or a member club thereof, shall enter the dressing room of a game official.

(C) Subject to the provisions of Section 17.10 hereof for purposes of this subsection, a player shall be deemed to be an "active member of the Armed Forces" until he is discharged therefrom or listed as a

42                                                                    Article IX

EX 28, PAGE 2877

reserve member of the Armed Forces. No active member of the Armed Forces may play or practice with a club in the League, subject to the following limitations:

(1) In the event of a declaration of war, the Commissioner has the right to suspend this requirement for the duration thereof.

(2) This provision shall not apply to participation in preseason games.

(3) This provision shall not apply to any player who has been given a conditional release from the Armed Forces or is on terminal leave.

(4) Active members of the Armed Forces may play or practice with a club provided:

(a) The club, at the time the player is inducted into the Armed Forces of the United States, continues to carry such player as one of its active players and notifies the Commissioner to that effect at the time of said induction; and

(b) Such player receives permission from his commanding officer in the military service to play or practice with such club.

(D) No club, nor any coach, representative, or employee thereof, shall use or employ any mechanical or other equipment or device in connection with the staging or playing of any game, except such as has been normally and commonly used in games in former seasons in the League; no electronic magnifiers or loud speaker systems may be used or employed either from the stands, bench or sidelines to impart any information or instructions to players engaged in play on the field, but such instruction or information shall only be given orally or through substitution or through coach-to-quarterback radio systems approved by the membership.

(E) No films of prior games shall be shown or displayed on or by means of television other than complete game films. Such film shall not be stopped during any showing; provided, however, that in the staging of a regular quarterback show of a club, clips or portions of game films may be shown. In connection with the showing of films, no employee, officer, owner, or representative of a club shall make any comment or express any opinion, publicly or for publication, on the quality of the officiating or that any play shown was or was not illegal.

**EX 28, PAGE 2878**

(F) No bonus may be paid to a player or players for winning a particular game; neither may remuneration or gifts of any kind other than those listed in the contract of a player be announced, promised, or paid directly or indirectly by a member club or by any person connected with or employed by a club.

(G) No blanket remuneration or bonuses shall be paid or given to players at any time.

(H) There shall be no contact work prior to a club's official preseason camp. In any offseason camp, clubs may use helmets and protective pads for elbows and knees, but all other pads are prohibited. Blocking dummies, sleds, and similar apparatus may be used in offseason camps at club's option.

(I) All clubs must pay the travel expenses of the players to training camp, and if a player thereafter is included on the Active List of the club for the first regular season game, travel expenses to training camp for that player, if previously paid, may be deducted from the salary of the player. If a player is waived out, then the waiving club shall pay the travel expenses of the player for the return trip to his house, provided, however, that if the player is claimed by another club under waivers, or is sold or traded, then the club acquiring the player shall pay the travel expenses of such player incurred in connection with reporting to the new club.

*See* CBA, Article XXXVII (Travel Expenses to Training Camp)

**EX 28, PAGE 2879**

# Article X

## Broadcasting and Television

**Contract Conditions**

10.1 Any contract entered into by any club for telecasting or broadcasting its games, and the sponsor or sponsors of each game telecast or broadcast pursuant to such a contract, must be approved in writing by the Commissioner in advance of such telecast or broadcast.

**Television Restrictions**

10.2 Subject to the limitations and exceptions set forth in this Article, member clubs participating in any game are authorized to telecast and broadcast such game anywhere except as follows:

   (A) No club shall cause or permit a game in which it is engaged to be telecast into any area included within the home territory of any other club on the day that such other club is engaged in playing a game at home;

   (B) No telecast of a home game within the home territory of a club shall be caused or permitted, except by agreement between the participating clubs;

   (C) Each home club grants to the visiting club the exclusive right to permit or license the telecast of the game being played between them back to the home territory of the visiting club.

   The Commissioner will not approve any contracts that do not contain a provision stating that the contract is subject to Article X as now or hereafter in effect.

   *See* 1984 Resolution BC-5 (preseason game telecast consent by visiting club), App., p. 1984-1
      1984 Resolution (Broadcasting; preseason television rights contract requirements), App., p. 1984-3

**EX 28, PAGE 2880**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 49 of 293
Case 2:11-cv-08390-R-MAN Document 09-33 Filed 12/20/11 Page 49 of 293
#:10297

**Television Income**

10.3   All regular season (and preseason network) television income will be divided equally among all member clubs of the League regardless of the source of such income, except that the member clubs may, by unanimous agreement, provide otherwise in a specific television contract or contracts.

    *See* 1998 Resolution BC-7 (payments to participants in nationally televised preseason games), App., p. 1998-8

**Network Provisions**

10.4   In any network television contract in effect in the League after 1970, the following provisions shall apply:

    (A)   Each regular season road game of the New York Giants, New York Jets, Oakland Raiders, and San Francisco 49ers will be televised live back to the home territory of the club participating in the road game.

    (B)   Without the prior consent of the home team, no road game of either the Oakland Raiders or the San Francisco 49ers respectively may be televised back to the home territory of the other club on any day when the other club is playing a game at home.

**Championship Games**

10.5   The sale of radio and television and film rights for the Super Bowl game and Conference Championship games shall be under the sole jurisdiction of the Commissioner and be subject to the provisions of Article X.

    In the Super Bowl game and Conference Championship games:

    (A)   The participating clubs may broadcast by radio on a non-exclusive basis from a station located in its home territory; provided, (a) said club contributes to the gross receipts of the game (to be divided in the same manner as game receipts are distributed) a fair and equitable sum fixed by the Commissioner in his sole and absolute discretion; and (b) the Commissioner approves all sponsors and broadcasters involved in the game.

    (B)   No television station may carry or broadcast the game if its signal is visible in the home territory (75 miles) of the home club in the city where the game is being played. The Commissioner's decision in this matter shall be final.

**EX 28, PAGE 2881**

**Broadcast Facilities**

10.6    Each club when playing at home shall provide adequate space for use of the visiting club in telecasting and/or broadcasting each game.

**Player Depiction and Club Promotion**

10.7    The player grants to the club controlling his contract and to the League severally and jointly the privilege and authority to use his name and/or picture for publicity and/or advertising purposes in newspapers, magazines, motion pictures, game programs and annual roster manuals, radio material, television telecasts, and all other publicity and/or advertising media, provided such publicity and/or advertising does not in itself constitute an endorsement by that individual player of a commercial product.

**Judgment**

10.8    All provisions of Article X are intended to conform to and are subject to the Final Judgment of the United States District Court for the Eastern District of Pennsylvania, entered December 28, 1953, and as thereafter modified, against the National Football League and certain of its member clubs. In the event of any conflict between the Constitution and Bylaws and said judgment, the provisions of said Final Judgment, as modified, shall prevail.

**Replays in Stadiums**

10.9    In all NFL stadiums with the capability of displaying television replays on the scoreboard of action occurring on the field, such displays may be shown at any time during the game, provided, however, that the selection of material for the replays shall be at the home club's discretion.

*See also* CBA, including Article LV (Miscellaneous/Appearances)

**EX 28, PAGE 2882**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 51 of 293
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 51 of 293
#:10299

# Article XI

## Playing Rules

**Official Rules**

11.1 The playing rules of the League shall be those set out in the Official Playing Rules of the National Football League.

**Amendment of Rules**

11.2 Playing rules may be amended or changed at any Annual Meeting by the affirmative vote of not less than three-fourths or 21, whichever is greater, of the members of the League, provided the proposed amendment or change has been presented to the League in writing fifteen (15) days prior to the Annual Meeting or a recessed session thereof, or provided the proposed amendment or change carries the unanimous approval of a duly appointed standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes, in which case notice of at least 12 hours prior to the vote is required; and further provided that all playing rules proposals from clubs must be submitted in writing to the League office a minimum of thirty (30) days in advance of any Annual Meeting of the League. Otherwise unanimous consent is required for any amendment to the Playing Rules.

**Rules Committee**

11.3 Each member club of the League shall have one representative only on the Rules Committee.

**EX 28, PAGE 2883**

Case 2:12-md-02323-AB Document 13-34 Filed 03/29/12 Page 52 of 129
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 52 of 293
#:10300

# Article XII

## Eligibility of Players

**General Rules of Eligibility**

12.1 (A) No person shall be eligible to play or be selected as a player unless (1) all college football eligibility of such player has expired; or (2) at least five (5) years shall have elapsed since the player first entered or attended a recognized junior college, college, or university; or (3) such player receives a diploma from a recognized college or university prior to September 1st of the next football season of the League. The expression "recognized junior college, college, or university" shall be interpreted to mean any college listed in the Blue Book of College Athletics, published by the Athletic Publishing Company, P.O. Box 931, Montgomery, Alabama 36101-0931 and/or the Directory of Postsecondary Institutions, U.S. Dept. of Education, Washington, D.C.

The fact that a player has college eligibility remaining in another sport other than football shall not affect his eligibility under this Section, provided the player meets all other qualifications hereunder.

Despite the foregoing, if four college football seasons shall have elapsed since the player first entered or attended college and if such player did not at any time during such period participate in college football, such player shall be eligible for selection.

Special consideration shall be granted to those players whose colleges and/or conferences allow five years of football eligibility, during all of which the player may participate full-time, as distinguished from those who "red-shirt," i.e. do not participate during one particular year. If a player under the circumstances described above has completed four years of participating football eligibility and elects not to avail himself of his fifth year, such player shall be eligible for selection in this League.

Any player who does not attend college is automatically eligible for selection in the next principal draft that is conducted after four football seasons have elapsed since the player discontinued high school, and if not selected at that time, the player is eligible thereafter to be signed as a free agent, unless he subsequently attends college and participates in college football, in which case he shall be subject to Section 12.1(D) below. If four seasons have not elapsed since the player discontinued high school, he is ineligible for selection, but may apply to the Commissioner for special eligibility.

**EX 28, PAGE 2884**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 53 of 29
Case 2:09-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 53 of 293
#:10301

*See* NFLNet Memorandum, February 16, 1990 (establishing policy and procedure pursuant to Article VIII, Section 8.5, permitting college players to apply for special draft eligibility if at least three football seasons have elapsed since graduation from high school), App., p. 1990-4

(B) No player may be signed to a contract or any other document (including a letter of intent), directly or indirectly, until completion of all football games, including postseason bowl games in which the team of the school or college of such player is to participate and in which the player is to participate; such provision shall also apply to college football players competing in football in any season ending after that date when the original class of such player shall have been graduated. If a club violates this Section, it shall be subject to punishment by the Commissioner. Such punishment shall provide for the loss of selection choices of the offending club in the next or in succeeding Selection Meetings up to and including the entire Selection List. All negotiating rights to the player or players so involved shall be awarded to the club lowest in the League standings, excluding the offending club, at the time of the last Selection Meeting.

(C) A diploma of graduation issued by a recognized college or university to a student under an accelerated course or program shall be acceptable for eligibility purposes despite the fact that the student actually attended such institution for a period of less than four (4) years.

(D) No person who has never been selected in a Selection Meeting and who has college athletic eligibility remaining and who registers at a college for the fall term or semester may be signed to a contract by a club in the League until the close of the next succeeding Selection Meeting of the League, at which meeting he would be eligible for selection regardless of how many seasons in excess of five have elapsed since he first registered at a college and regardless of how many Selection Meetings for which he was eligible have transpired.

(E) No person who plays college football after the opening date of the training season in any year may play football in the League during the balance of the same calendar year.

(F) No person eligible for the Selection Meeting in any calendar year may be signed to a contract with a club in the League until the Selection Meeting in that year.

**EX 28, PAGE 2885**

(G)    A player, either under contract to or on the Reserve or Selection List of a League club, shall be a member of the team of the club until the Commissioner receives notice from such club that other League clubs are free to negotiate or contract with said player. Upon receipt of any such notice, the Commissioner shall promptly notify each other League club thereof. Until the notice is given by the Commissioner, no other club may sign a contract nor negotiate with such player unless prior written permission thereof has been given by the club owning rights to such player.

(H)    Any player who expects to graduate before his college football eligibility expires may become conditionally eligible for the League's principal Selection Meeting (i.e., the 12-round annual draft that includes approximately 373 choices) by declaring to the Commissioner in writing his intention to graduate before the League's next succeeding regular season, which declaration must be in the Commissioner's office no later than 15 days before the date of the opening of the principal Selection Meeting. The Commissioner has the authority to change the receipt date of the written declaration if he deems such change appropriate. If a player's written declaration is received in timely fashion and the League office determines that he has a reasonable opportunity to graduate before the next succeeding regular season of the League, all member clubs will be advised of his conditional eligibility for the principal Selection Meeting. Any player so designated cannot be signed to an NFL Player Contract, regardless of whether he is selected in the Selection Meeting, until the League office is advised by an appropriate authority at the player's college that he has graduated. Any player who makes such a declaration to graduate and who does not graduate before the next succeeding regular season of the League will be ineligible in the League for that season and postseason; and, if such player has been selected in the principal Selection Meeting, the selecting club will forfeit its selection choice. Any player who fails to make a timely written declaration of his intent to graduate but does graduate before his college football eligibility expires and before the beginning of the next succeeding regular season of the League will be eligible for a supplemental draft.

    *But see* CBA, Article XVI (overriding this provision and limiting draft to seven rounds)

(I)    If a player who was not eligible for the principal Selection Meeting becomes eligible between the time of such principal Selection Meeting and the next succeeding regular season of the League, he will be eligible for a supplemental draft, subject to all provisions of subsection (J) below.

Case 2:12-md-02323-AB   Document 18-34   Filed 03/29/12   Page 55 of 29
Case 2:11-cv-08396-R   MAIN   Document 09-33   Filed 12/20/11   Page 55 of 293
#:10303

(J) Whenever a player or players become eligible for the League subsequent to the principal Selection Meeting, a supplemental draft will be conducted to admit such players. Supplemental draft procedures are as follows:

   (1) The League office will schedule a maximum of one supplemental draft in any year—to be conducted no later than the seventh calendar day prior to the opening of the first training camp. To be eligible for a supplemental draft, a player's petition for special eligibility must be approved by the League office and his name promulgated to clubs no later than 10 calendar days prior to the last day on which a supplemental draft can be conducted.

   (2) The League office will conduct each supplemental draft by electronic hookup with member clubs.

   (3) Immediately before each supplemental draft is to begin, the League office will conduct a lottery to determine the selection order of member clubs. Procedures of the lottery are:

      (a) A first step will be taken in which the order of the first round of the immediately prior principal draft, exclusive of any trades affecting that prior draft, will be weighted by assigning the weakest club the greatest number of lottery chances and the strongest club the fewest number (i.e., the weakest club will have its name in the drawing 32 times, the next weakest 31 times, etc., until the Super Bowl game winner will have its name in once.)

      (b) Lottery chances for the weakest teams, i.e., those which won no more than six games in the prior regular season, will be placed together in a container and drawn to determine a number of places in the selection order equal to the total number of those teams.

      (c) Lottery chances for the remaining teams, with the exception of the playoff teams, next will be placed together in a container and drawn to determine the places following those determined under (b) above.

      (d) Lottery chances for the playoff teams next will be placed together in a container and drawn to determine the remaining places in the selection order.

   (4) The Commissioner will determine an appropriate per-selection time limit for each supplemental draft.

**EX 28, PAGE 2887**

(5) Trades involving draft choices may not be made after clubs have been informed of the priority of a supplemental draft until the conclusion of such draft.

(6) Each supplemental draft will proceed by rounds through 12 rounds.

(7) Any club that selects a player in a supplemental draft must forfeit a choice in the same round in the next succeeding principal draft.

(8) Any club that does not own a choice in a given round of the next succeeding principal draft may not select a player in that same round in a prior year's supplemental draft.

## Rules and Regulations

12.2 (A) A club, at its option, may adopt individual club rules and regulations not inconsistent with or contrary to the Constitution and Bylaws of the League and/or the Rules and Regulations of the League. The club shall give players reasonable notice of all rules and regulations adopted by the club. Any club adopting rules and regulations may suspend and/or fine a player for violation thereof.

(B) The League may adopt League Rules and Regulations, and any Rules and Regulations so adopted must be printed on the reverse side of the standard form of player contract used by the League.

12.3 (A) No person employed by a club as a coach, trainer, or in any capacity other than as a player, may play for that club or any other club in that same year unless said employee is:

(1) Signed to a current year NFL Player Contract; and

(2) Counted within the first applicable player limit of the preseason and all subsequent player cut downs. If such person is released through waivers or placed on the Reserve List after the first applicable player limit is in effect, he cannot return to any club in the League in the same season as an active player.

(B) Whenever a player under contract or option to a member club in the League fails to report to that club prior to its first regular season game, then such player, without the prior consent of the Commissioner, may not play with any club in the League during that same season if said player played in any other league, or with any other team other than in or for the League during that same calendar year, unless such other league or other club in which or for whom such player played is designated by the Commissioner of

53                                Article XII

**EX 28, PAGE 2888**

the League as a minor league; the decision of the Commissioner shall be final.

(C) No club may sign any player who, in the same year, has been under contract to a Canadian Football League club at the end of the CFL club's season (regular season or postseason, whichever is applicable).

(D) No player under contract to a club in the League shall be permitted to participate in any football game for or against any team, group, or organization outside the League, except in games officially approved and sanctioned by the League.

(E) (1) If a player reports to the club at its preseason training camp and is, in the opinion of the club physician, physically unable to perform his services as a player, the club will have the following options:

(a) Place the player on waivers with the designation "Failed Physical;" or

(b) Place him in the category of Active/Physically Unable to Perform. Players in this status count on the Active List and are allowed to attend meetings and undergo non-contact rehabilitative workouts up to the time of the second roster reduction in the preseason, at which time the club must either request waivers on the player as "Failed Physical," place him on Reserve/Physically Unable to Perform (see (c) below), trade the player, or continue to count him on the Active List. If the player continues to count on the Active List, he will be considered to have passed the club's physical examination. Any player in the status of Active/Physically Unable to Perform who appears in contact work during practice or any preseason game will be subject to all rules applicable to players who have passed the club's physical examination; or

(c) Place him in the category of Reserve/Physically Unable to Perform. The following rules apply:

(i) Upon receiving notification that the player has been placed on Reserve/Physically Unable to Perform, the League office will arrange to send the player to a neutral physician appointed by the Commissioner;

**EX 28, PAGE 2889**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 58 of 29
Case 2:08-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 58 of 293
#:10306

(ii) Players on Reserve/Physically Unable to Perform are ineligible for all games of the club and for all practice sessions, subject to the conditional practice described below. All players on Reserve/Physically Unable to Perform may attend meetings;

(iii) Commencing the day after the club's sixth regular season game (including any bye week), and continuing through the day after the club's ninth regular season game (including any bye week), clubs are permitted to begin practicing players on Reserve/Physically Unable to Perform for a period not to exceed 21 days. At any time during the 21-day practice period or not later than 4:00 p.m., New York time, on the day after the conclusion of the 21-day period, clubs are permitted to restore such players to their Active/Inactive list;

(iv) A club may at any time of the season request waivers on a player who is on Reserve/Physically Unable to Perform, provided, however, that if the player has not yet passed the club's physical examination, the waiver request will be marked "Failed Physical." Further, such player on waivers cannot return in the same season to the club which requested waivers;

(v) If the player is not restored to the Active/Inactive List by 4:00 p.m., New York time, on the day after the conclusion of the 21-day period and the club elects to continue to carry the player on Reserve/ Physically Unable to Perform, the player shall not be permitted to practice during the remainder of the season, including the postseason;

(vi) Players on Reserve/Physically Unable to Perform shall not be traded; and

(vii) Clubs are required to notify the League office on the first day of the 21-day practice period, which information shall be promulgated to clubs on that day's personnel notice.

(2) No club will be permitted to use any of the procedures of Physically Unable to Perform unless it reports to the League office at the time physical examinations are given that the involved player has failed his physical.

**EX 28, PAGE 2890**

(3)    If a player reports to a club at its preseason training camp and passes the club's physical, then later suffers an injury unrelated to football, the club may place him on Reserve as Non-Football Injury or Illness (N-F/I). Such a player may not play or practice with that club for the remainder of the season, including postseason, under any circumstances. Players on Reserve N-F/I shall not be traded. If suspended or placed on Reserve N-F/I, players shall not be entitled to compensation.

(4)    The club may also use the designation N-F/I for a player who fails the training camp physical, but said player will be governed by the provisions of 12.3(E)(1). Player shall not be entitled to compensation.

12.4    (A)    After the first mandatory roster reduction in the preseason and for the remainder of the season, a member club is permitted to transport a free agent player to its home city or any other site for two visits, one for the purpose of a tryout and/or physical examination, the other for a physical examination only. A visit for the purpose of a physical examination is limited to one day only, while a visit for a tryout and physical examination is limited to two days, but the tryout portion of the two-day visit must be completed in one day. The player's presence with the club must be reported to the League office prior to the completion of the visit. The League, in turn, shall promulgate all such visits to member clubs. Helmets and protective pads for elbows and knees are permitted for tryouts; all other pads are prohibited. The involved player or players shall not be on the club's practice field at the same time as regular practice is being conducted. The club shall be allowed a maximum of two players from its Active List to participate with the tryout player during his tryout. Multiple tryouts of the same player in the same session by a club are prohibited unless, following the most recent tryout, the player is placed under contract and released by another club in the League. Nothing in this subsection is to be interpreted in any way as a modification of Section 17.4(B) of this Constitution and Bylaws, and therefore such player may not participate in practice with the playing squad. No remuneration of any kind, except normal travel and lodging expenses, may be paid to such player while not under contract. Players tried out under this rule are not subject to the provisions of Section 17.4(C), which restrict the return to a former club.

The above restrictions also apply to any tryouts and/or physical examinations conducted for or administered to free agent players at any location, even if the club does not transport the player to the site.

EX 28, PAGE 2891

(B) A player on the Reserve List of a member club may, with the permission of that member club, try out with another member club on one day only and only if the club granting permission notifies the Commissioner's office of such permission by NFLNet, e-mail, facsimile or other similar means of communication, and the Commissioner's office, in turn, notifies each member club in advance of such tryout through the daily notice that such permission has been granted. Subsequently, the club conducting the tryout must notify the Commissioner's office by NFLNet, e-mail, facsimile or other similar means of communication, of the date of the player's presence with that club prior to the completion of such tryout.

*See also*   CBA, including Article XVI (College Draft), Article XVII (Entering Player Pool), and Article XXXII (Other Provisions)

**EX 28, PAGE 2892**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 61 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 61 of 293
#:10309

# Article XIII

## Schedule

### Preparation

13.1  The Commissioner shall draft a schedule and forward the same to the member clubs as soon as possible after the Super Bowl game. Such schedule shall constitute the official schedule for the regular season games of each member club of the League and shall not require any consent nor approval by the member clubs.

> *See* 1990 Resolution G-8 (League office control and coordination of international games), App., p. 1990-2
> 2006 Resolution BC-1 (Flexible Scheduling), App., p. 2006-1

### Conditions

13.2  The following conditions shall govern and apply in drafting of the schedule each year, namely,

(A)  Whenever reference is made to a Green Bay home game, it is understood that such home game may be scheduled at either Green Bay or Milwaukee, subject to the approval of the Commissioner.

(B)  Without the consent of the affected clubs, neither the New York Giants, the New York Jets, nor the San Francisco 49ers shall be required to play more regular season home games on the road than at home.

(C)  The San Francisco 49ers and Oakland Raiders will not be required to play any regular season game at home on the same day without the consent of both clubs.

(D)  The Commissioner will apply the following policies in preparing the official League regular season schedule beginning in 2002:

(1)  Each team will play home and home with all division opponents (6 games).

(2)  Each team in a division will play one other division within the conference based on annual rotation of divisions (4 games).

(3)  Each team will play one game against the team with the same standing from each of the two remaining divisions within its own conference, based upon previous season's results (i.e., 1 vs. 1&1; 2 vs. 2&2; 3 vs. 3&3; 4 vs. 4&4) (2 games).

**EX 28, PAGE 2893**

(4) Each team in a division will play the same entire division from the other conference on an annual rotating basis (4 games).

> *See* 2006 Resolution BV-1 (scheduling of international regular season games), App., p. 2006-6

**Schedule Adjustments**

13.3 (A) In the event a member club ceases operating and a new franchise is then issued by the League to a new member club to replace such former member, the new member shall be obligated to perform under the same schedule in effect at the time the former club ceases operations, whether or not the franchise issued to the new member is to be operated in the same city as the former franchise holder.

(B) In the event a member club shall cease operations and the League does not replace such franchise by issuing a new franchise or by the transfer of the former franchise, the Commissioner is empowered to make whatever adjustments in the schedule as he in his sole discretion decides are necessary, and all member clubs shall be bound thereby.

**Change in Site**

13.4 When a game is scheduled in a stadium used for baseball, the Commissioner shall have the right to change the site of the game whenever he concludes such action is necessary by reason of the probable participation of the baseball club in the postseason playoffs and/or World Series. In such event, the visiting club will be reimbursed by the League for any extra travel expense incurred because of such change, and the home club will be compensated by the League for any loss of revenue suffered by it as a result of such change in the site of the game. The Commissioner's decision shall be final and binding upon both of the affected clubs in respect to the need for and amount of any such compensation or reimbursement.

**EX 28, PAGE 2894**

# Article XIV

## Selection Meeting

14.1 A Selection Meeting of the League shall be held on the second Tuesday following the playing of the last postseason game; there shall be only one Selection Meeting each year. The Commissioner shall preside at the Selection Meeting and is empowered to settle any dispute or controversy involving or occurring in the Selection Meeting not otherwise covered by provisions of the Constitution and Bylaws of the League.

14.2 The only players eligible to be selected in any Selection Meeting shall be those players who fulfill the eligibility standards prescribed in Article XII, Section 12.1 of the Constitution and Bylaws of the League.

14.3 (A) At each Selection Meeting each club participating therein shall select players of its own choice. Selection shall be made by the clubs in each round in the reverse order of their standing.

(B) Reference in this Article to "standing" shall mean the standing of the clubs in the League in regular season games at the time of the Selection Meeting. In calculating the percentage, tie games shall be calculated as one-half game won and one-half game lost. To determine the percentage, the total number of winning games, including any fractions thereof to account for ties, shall be divided by the total number of games played in the regular season.

(1) The winner of the Super Bowl game shall select last and the loser of such game shall select next-to-last in all rounds, regardless of the record of such participating clubs in the regular season.

(2) In the event of a tie in the selection order involving a non-Super Bowl game playoff club or clubs, such playoff club shall be assigned selection priority within its tied segment below that of non-playoff clubs and in inverse proportion to the number of cumulative plus-factors it achieves during the playoffs, as set forth in subsections (a) through (c), but in no case shall such a club move out of its tied segment.

(a) For a loss in the Wild Card Playoffs, a plus-factor of one-half;

(b) For participation, win or lose, in the Divisional Playoffs, a plus-factor of one; and

**EX 28, PAGE 2895**

(c) For a loss in the Conference Championship game, a plus-factor of one.

(3) Clubs with the best won-lost-tied records after the procedures of (1) and (2) above have been applied shall drop to their appropriate spots in the tied segment.

(4) If, after all the foregoing procedures of this Section 14.3(B) have been applied, ties still exist, such ties shall be broken by figuring the aggregate won-lost-tied percentage of each involved club's regular season opponents and awarding preferential selection order to the club which faced the schedule of teams with the lowest aggregate won-lost-tied percentage.

(5) If, after the procedures of (4) above have been applied, ties still exist, the divisional or conference tie-breaking method, whichever is applicable, shall be applied.

(6) If, after the procedures of (5) have been applied, ties still exist, they shall be broken by a coin flip conducted by the Commissioner.

(7) After the selection order for the first round of the college draft has been determined under this Section 14.3(B), the round-to-round rotation will be as follows:

   (a) Clubs originally involved in two-club ties will alternate positions from round to round;

   (b) In the cases of ties that originally involved three or more clubs, the club at the top of a tied segment in a given round will move to the bottom of the segment for the next round, while all other clubs in the segment move up one place. This rotation will continue throughout the draft.

(C) One player shall be selected in each round by each club participating in that round.

(D) There shall be twelve (12) selection rounds at each meeting.

*But see* CBA, Article XVI (overriding this provision and limiting draft to seven rounds)

**EX 28, PAGE 2896**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 65 of 29
Case 2:12-cv-08390-R MAN Document 69-33 Filed 12/20/11 Page 65 of 293
#:10313

**Selecting Ineligible Player**

14.4 If any club selects an ineligible player, such club shall lose the right to that player and to the selection choice for that year.

**Reserve List—Selectees**

14.5 The selecting club shall have the exclusive right to negotiate for the services of each player selected by it in the Selection Meeting. Selected players shall be placed on the Reserve List of that club.

**Selectee Returning To College**

14.6 Any player eligible for selection at the Selection Meeting who is not selected, shall be eligible to sign with any club in the League, provided, however, that if any eligible selectee not chosen possesses additional college eligibility and thereafter attends college in the fall semester following the Selection Meeting, such player may not be signed by any club until after the close of the next succeeding Selection Meeting, at which time he is eligible for selection.

**League Policy On Playing With Another Club**

14.7 The League reaffirms the resolution passed unanimously in May 1935, and which has been in effect in the operations of the League since that time by adding the following action:

If for any valid reason it would be impossible for a player to play in the city by which he has been selected, or the player can show reasonable cause why he should be permitted to play in a city other than that designated for him, then through such arrangements as can be made by sale or trade with another club, he shall be permitted to play in the city he prefers if the Commissioner of the League approves his reasons as valid.

**Contact With Draft-Eligibles**

14.8 The following rules govern club contact with draft-eligible players:

(A) Clubs may time, conduct on-field tests, interview, and administer written tests to draft-eligible players only at the following sites and subject to the following conditions (see (B)(3)(e) below for exceptions for interviews and written tests):

(1) League-approved workouts administered by scouting organizations of which NFL clubs are members. A maximum of one such workout per year (preferably in late January or early February) will be held at a central location over several consecutive days, provided, however, that the scheduling for such workouts will, where possible, make full use of weekend

Case 2:12-md-02323-AB Document 18-34 Filed 02/20/11 Page 66 of 29
Case 2:12-md-02323-AB Document 09-33 Filed 12/20/11 Page 66 of 293
#:10314

days to minimize the participants' mid-week absence from their campuses, and further provided that best efforts will be made to limit each individual player's participation in the workouts to a three-day period that will allow him to attend classes the first day, travel to the workout site that afternoon or evening, participate in a full day of timing and testing (and/or medical examination) on the second day, and travel home on the third day after a half-day of participation at the workouts.

Players who have been invited to the League-approved session shall not be timed or tested at their residence or college campus until after the completion of the League-approved session.

(2) The metropolitan area of the city in which the player's college is located. (NFL clubs located in such areas may use their own facilities for the timing and testing if they wish.)

   (a) Where possible, all in-season visits to campuses by NFL club representatives (including employees of scouting organizations of which NFL clubs are members) will be by appointment with advance notice to each college's designated professional football liaison. NFL representatives will adhere to the colleges' individual policies concerning open or closed practice sessions.

   (b) Each NFL club and each NFL scouting organization will designate one person authorized to discuss injury or rehabilitation information with a college trainer during the season. College trainers will be asked to fill out a physical-status form on each of his team's draft-eligible players in late summer and an updated form, if warranted, after the college season is completed. These forms, developed by the Professional Football Athletic Trainers Society and approved by the member clubs and scouting organizations, constitute the only demands that representatives of the NFL clubs or scouting organizations will make on college trainers each year.

   (c) For off-season visits to campuses, NFL representatives must make every effort to work out draft-eligible players only on days of the week designated by the college involved. NFL representatives would continue to be allowed to attend professional football timing days scheduled in the spring by colleges for all players, including non-draft-eligibles.

**EX 28, PAGE 2898**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 67 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 67 of 293
#:10315

    (d) If an NFL club is conducting on-field tests for five or more draft-eligible players at a single site outside of its home city on any day, notification of such tests must be provided to the Player Personnel Department of the League office and posted on the NFL website no later than three business days prior to the date of the tests, and all NFL clubs will be permitted to attend such on-field testing. This prohibition does not apply to interviews, electronic testing, or psychological testing.

(3) The campus of any college located in the same state as the player's college, provided that the player is attending a school in NCAA Division I-AA, II, or III, an NAIA school, or a junior college. In such cases, the player is permitted to be timed, tested, and interviewed only on a school's Pro Day, and only if he has received permission from a school's Pro Liaison.

(4) The metropolitan area of the city in which the player lives. (NFL clubs located in such areas may use their own facilities for the timing and testing if they wish.) If a draft-eligible player establishes a residence in another city (e.g., lease on an apartment), NFL clubs will be permitted to send their scouts to such cities for purposes of timing and testing. If a draft-eligible player establishes a residence in another city and becomes part of a "camp," involving other players, NFL clubs are prohibited from timing and testing such players at a "camp," observing the sessions of the "camp," or otherwise participating in it.

    (a) If an NFL club is conducting on-field tests for five or more draft-eligible players at a single site outside of its home city on any day, notification of such tests must be provided to the Player Personnel Department of the League office and posted on the NFL website no later than three business days prior to the date of the tests, and all NFL clubs will be permitted to attend such on-field testing. This prohibition does not apply to interviews, electronic testing, or psychological testing.

(5) College postseason all-star game practice sessions, provided that the players are participants in the all-star game. Players who are not participants are prohibited from such activities.

(B) Clubs may administer medical examinations to draft-eligible players under the following rules:

(1) At League-approved workouts administered by scouting

64          Article XIV

**EX 28, PAGE 2899**

Case 3:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 68 of 29
Case 3:12-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 68 of 293
#:10316

organizations of which NFL clubs are members (see (A)(1) above);

(2) At a maximum of one League-wide follow-up session per year scheduled at a central location approximately two to three weeks before the annual college draft. This session would be for physical examinations only and would include no physical activity, such as on-field drills, weightlifting, and performance tests. Players invited to this follow-up session would be from the following categories:

   (a) Those designated by team physicians at the earlier timing and testing session as requiring further physical examination closer to the draft;

   (b) Those invited to the earlier workouts but who did not attend;

   (c) Those subject to an occurrence that changes their physical or eligibility status;

   (d) Others agreed upon by the scouting organizations;

(3) At the club's facilities or any other location, including the player's campus, provided that no draft-eligible player may be brought into a club's facilities or home-city area before the time of the initial League-wide session (see (A)(1) above); further provided that clubs will be limited to examining at the club's facilities or elsewhere in the club's home-city area, or at any other location, a maximum of thirty (30) players; and further provided that clubs located in the same franchise area are prohibited from combining their allotments of players under the permissible 30 per club to create a larger number for each. Despite the foregoing, a club may, after the initial League-wide session, administer physical examinations at its facilities or elsewhere in its home-city area to an unlimited number of draft-eligible players who reside or attend college in the metropolitan area of the club's facility. All medical examinations of draft-eligible players administered by individual clubs in their home-city areas must be administered under the following rules:

   (a) Duration of each examination is limited to one day;

   (b) Examination must not include physical activity of any kind. (A Cybex test is considered part of an orthopedic examination and is permitted);

**EX 28, PAGE 2900**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 69 of 29
Case 2:08-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 69 of 293
#:10317

    (c) Examination must be after the completion of all football games, including postseason bowl games, in which the player is to participate as a player for his school;

    (d) The League office must be notified of all such examinations before they are administered; and

    (e) Interviews and written tests may be conducted during the visit for the physical examination.

(C) A physical examination is the only permissible reason for a member club to bring a draft-eligible player into its city and/or training facilities before the draft of that year.

(D) During the period from one week before the annual draft up to and including the final day of the draft, no club is permitted to transport or sponsor the transport of a draft-eligible player to its offices, workout facilities, home city, or other site without prior permission of the Commissioner, even if the player's campus or residence is located in the same metropolitan area as the club's facility; and no club is permitted during the same period to house a draft-eligible player at any site, including sites within his home city. Medical examinations may be administered by clubs during this one-week period at the player's home city or the city in which his college is located, whichever is applicable.

(E) In no circumstances under (A) and (B) above is a club permitted to give or offer to give, directly or indirectly, a draft-eligible player anything of significant value beyond necessary transportation and lodging expenses. Club souvenirs and similar items are permissible. With respect to transportation paid for or arranged for free agents who are not selected in the draft, such payments or arrangements may not be made until the final round of the draft is completed.

(F) If a player is draft-eligible for a given draft by not having signed with the club that selected him in the immediate prior draft, no club in the League except the original drafting club may time, test, examine, or otherwise contact such player without permission of the original drafting club up until the time he is selected by another club. Any such contact may subject the contacting club to League tampering prohibitions (see Section 9.2).

*See also* CBA, including Article XVI (College Draft)

EX 28, PAGE 2901

# Article XV

## Player Contracts

**Player Contract**

15.1  All contracts between clubs and players shall be executed in triplicate and be in the form adopted by the member clubs of the League; such contract shall be known as the "NFL Player Contract." Subject to the provisions of Section 9.1(C)(8) hereof, a club may delete portions of or otherwise amend the NFL Player Contract subject to the right of the Commissioner to disapprove the same, as provided by Section 15.4 hereof.

**Amendment Of Player Contract**

15.2  The form of NFL Player Contract adopted by the League may be amended at any time by the affirmative vote or written consent of not less than three-fourths or 20, whichever is greater, of the member clubs of the League, provided, however, that in the event of an amendment to the NFL Player Contract, or should a new NFL Player Contract be adopted by the League, such action shall in no manner affect, change, modify, or terminate any of the terms or provisions of any unexpired NFL Player Contract then in effect between a player and a club in the League.

**Filing**

15.3  An executed copy of each player contract must be filed with the Commissioner within ten (10) days after the execution thereof. The Commissioner's office shall stamp the time of receipt upon all contracts immediately upon the filing with the Commissioner. All other documents required to be filed with the Commissioner shall likewise be stamped immediately upon receipt thereof. Contracts in effect at the date of the adoption of the Constitution and Bylaws shall not be affected by the foregoing provision if such contracts had been previously executed and filed in accordance with the Constitution and Bylaws of the League at the time of execution and filing.

**Disapproval**

15.4  The Commissioner shall have the power to disapprove any contract between a player and a club executed in violation of or contrary to the Constitution and Bylaws of the League or if either contracting party is or has been guilty of conduct detrimental to the League or to professional football. Any such disapproval of a player contract must be exercised by the Commissioner within ten (10) days after such contract is filed with the Commissioner.

**EX 28, PAGE 2902**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 171 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 17 of 293
#:10319

**Promulgation**

15.5    The Commissioner shall notify all clubs of the execution of free agent
        player contracts on a weekly basis as part of the League personnel notice.

**Prerequisite To Play and Practice**

15.6    No club shall permit a player in any practice session or game, subject to
        the tryout provision of Sections 12.4(A) and (B), with its team unless:

        (A)    An NFL Player Contract has been executed between the player and
               a club or the player contract has been properly assigned to the club;
               and

        (B)    Such contract or assignment is on file in the League office or the
               League office has been notified by NFLNet, e-mail, facsimile or
               other similar means of communication, of the execution of a
               contract or assignment.

15.7    Any direct or indirect compensation or anything of value paid to a player
        who is not on the club's Active, Inactive, or Reserve Lists, regardless of
        whether the player participates in the club's practice sessions, shall
        constitute a competitive violation and the club and/or involved club
        employee shall be subject to disciplinary action under Section 8.13(A)(4)
        of this Constitution and Bylaws. Similarly, the tryout provisions of
        Section 12.4(A) shall be strictly enforced, and any violations of this rule
        shall fall within the provisions of Section 8.13(A)(4).

15.8    The minimum first-year income for a selected player shall be $12,000.

        *But see*   CBA, Article XXXVIII, Section 6 (setting minimum salary for
                    players with less than one credited season)

15.9    In addition to the salary stipulated in Paragraph 5 of his contract, each
        player shall, during the training season, be paid an allowance for expenses
        to be determined by the club.

        *See also*   CBA including Article XIV (NFL Player Contract)

**EX 28, PAGE 2903**

# Article XVI

## Assignment Of Player Contracts

**Assignment Notice**

16.1   All assignments of player contracts (through trade, waiver, or otherwise) shall be documented by the assignor club with execution of a notice to the player in a form prescribed by the Commissioner. Such form will be in quadruplicate, with appropriate copies delivered to the player, the Commissioner, and the assignee club, and a copy retained by the assignor club.

**Player Responsibility**

16.2   Immediately following any assignment, the player shall report to the assignee club as promptly as possible and shall perform services with the assignee club as prescribed in said contract.

**Salary Liability**

16.3   The assignor club shall be liable for such proportion of the player's salary for the season as the number of the applicable League games of the assignor club's regular season elapsed up to and including the date of assignment bears to the total number of games in the assignor club's regular season, provided, however that whenever such assignment involves a player claimed as a result of a waiver, then the allocation of salary shall be subject to the provisions of Section 18.8 hereof. The assignee club shall be liable for the balance of the player's salary subject also to the provisions of Section 18.8 in respect to players acquired through waiver. For the purposes of this Section, the date of assignment shall be deemed to be the date on which notice of assignment is delivered to the Commissioner as prescribed in Section 16.1 hereof, or the date when the player was notified orally of such assignment by an authorized member of the assignor club, whichever occurs first. In the event of a dispute as to whether or not oral notice of the assignment has been given by the assignor club, the burden of proving shall rest with the assignor club.

**Waivers**

16.4   (A)   If waivers are required for assignment of a player's contract, no assignment shall be effected and no notice of assignment shall be delivered to the player unless and until the club has been advised by the Commissioner that waivers have been granted by all clubs entitled to claim the player under the waiver rules.

**EX 28, PAGE 2904**

Case 2:12-md-02323-AB Document 18-34 Filed 02/29/12 Page 73 of 293
Case 2:12-cv-08390-R-MAN Document 69-33 Filed 12/20/11 Page 73 of 293
#:10321

(B)     Whenever a club has been awarded a player through waivers, such club acquires all rights to the player owned or possessed by the waiving club, including any rights to the player's services for a succeeding season or seasons and, subject to the provisions of Section 18.8 hereof, the claiming club likewise assumes all obligations under such contract or contracts.

**Promulgation**

16.5    All assignments shall be promulgated by the Commissioner through bulletins sent to each club.

**Trading Deadline**

16.6    By definition, a trade in the League is a transaction involving two or more clubs resulting in an outright or conditional assignment or exchange of player contracts, rights to players, selection choices, and/or cash, which transaction is not effected through the waiver system, the first-refusal/compensation system of an operative collective bargaining agreement, or other special assignment procedures of this Constitution and Bylaws. There shall be no trades for past, future or nominal consideration. Trades are permissible within the following period:

Trades involving selection choices, cash, player contracts and/or rights to players from club Reserve lists may be made only on days during which the League office is open to accept player-personnel transactions from the period beginning on the first such day after the expiration of NFL Player Contracts and continuing until 4:00 p.m., New York time, on the day after the date that the final game of the sixth regular season weekend begins (i.e., Tuesday if the final game of such weekend's schedule of games begins on Monday).

**Trade Conditions**

16.7    (A)     No trade may be made between member clubs in any season wherein the player traded may revert to or be traded back to the original club, unless through the normal procedure of trading, waiving, etc., as otherwise specified in this Section and this Constitution and Bylaws.

        (B)     All conditions affecting trades must be specified in the original notification to the Commissioner of the trade and in the trade agreement papers. If the written conditions do not cover subsequent events which result in the assignee club having use of the player on its Active List at some later time or in obtaining value for him through a subsequent trade, the original assignor club shall have no recourse.

**EX 28, PAGE 2905**

**Approval by the Commissioner**

16.8   (A)   No sale or trade by a club shall be binding unless approved by the Commissioner. Immediately following such approval, the Commissioner shall notify all clubs of such trade or sale.

       (B)   All sale or trade agreements between clubs must be in writing and filed with the Commissioner within fifteen (15) days following completion of such sale or trade. The League office shall stamp the time of receipt on any sale or trade agreement immediately upon the filing thereof.

16.9   When a player on the Active or Inactive List of a club is traded or acquired on waivers on or after 4:00 p.m., New York time, on the Thursday prior to the opening of the regular season, or at any time thereafter, such player must immediately be listed within the applicable player limit of the club to which he is traded or acquired, which includes both the team's Active and Inactive Lists.

**EX 28, PAGE 2906**

# Article XVII

## Player Limits and Eligibility

**Cutdowns and Player Limits**

17.1 (A) Subject to paragraphs (B) through (D) of this Section 17.1, clubs
will be limited to a year-round roster limit of 80 players on the
following combined lists: Active, Inactive, Reserve/Injured,
Reserve/Physically Unable to Perform, Reserve/Non-Football
Illness/Injury, Reserve/Suspended, Practice Squad, Exempt, and
Future. The 80-player limit will not include any players on the
following lists: Reserve/Retired, Reserve/Did Not Report, Reserve/
Left Squad, Reserve/Military, un-signed draft choices, unsigned
Veteran Free Agents, Unprotected Players, and players who have
been declared ineligible to participate (suspended) by the
Commissioner.

(B) Any players placed on Reserve/Injured prior to the roster reduction
to 65 players on the Active List will not count on the club's overall
roster limit of 80 players, provided that the club requested waivers
on the player with the designation "injured" and placed the player
on Reserve/Injured immediately after the expiration of the
claiming period and provided that all such players will count on the
club's overall 80-man roster limit after 4:00 p.m., New York time,
on the day of the cutdown to 65 players.

(C) Any players placed on Reserve/Physically Unable to Perform or
Reserve/Non-Football Injury/Illness prior to the roster reduction to
65 players on the Active List will not count on the club's overall
roster limit of 80 players, provided that the club requests waivers
on the player with the designation "Failed Physical" immediately
upon reporting to training camp and failing the club's physical
examination and that the club places the player on Reserve/PUP or
Reserve/NF/I immediately after the expiration of the claiming
period. All such players will count on the club's overall roster limit
after 4:00 p.m., New York time, on the day of the cutdown to 65
players. All players so placed on Reserve/PUP or Reserve/NF/I
shall not be eligible to play or practice for that club for the
remainder of the regular season and postseason, notwithstanding
other provisions in this Constitution and Bylaws. The same
provisions shall apply to a Vested Veteran who is placed on
Reserve/PUP or Reserve/NF/I immediately upon failing the
training camp physical examination, provided that the club
declares to the League office at such time that the player shall be
ineligible to practice or play for the remainder of the regular season
and postseason.

**EX 28, PAGE 2907**

Case 2:13-md-02323-AB Document 18-34 Filed 03/29/12 Page 76 of 29
Case 1:08-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 76 of 293
#:10324

(D) If a player has passed his club's training camp physical examination and is placed on Reserve/Non-Football Injury/Illness prior to the roster reduction to 65 players on the Active List, he will not count on the club's overall roster limit of 80 players, provided that the club requests waivers on the player with the designation "Non-Football Injury/Illness" and provided that the club places the player on Reserve/NFI immediately after the expiration of the claiming period. All such players will count on the club's overall roster limit of 80 players after 4:00 p.m., New York time, on the day of the cutdown to 65 players. All players so placed on Reserve/NFI shall not be eligible to play or practice for that club for the remainder of the regular season and postseason. The same provisions shall apply to a Vested Veteran who is placed on Reserve/NFI after passing his club's training camp physical examination.

(E) If a player, after reporting to training camp, leaves his club without permission, and the club is granted an exemption, such player will not count on the club's overall roster limit of 80 players until 4:00 p.m., New York time, on the day of the cutdown to 65 players on the Active List, or until the player returns to the club, whichever occurs first.

(F) Subject to the provisions of Section 17.3 of this Article, clubs will be required to reduce their Active Lists to 75 players by 4:00 p.m., New York time, on the Tuesday after the third preseason weekend and to 53 players by 6:00 p.m., New York time, on the Saturday of the fourth preseason weekend. The claiming period for players on waivers at the final cutdown shall be 12 noon, New York time, on the following day (Sunday).

(G) No player may play with any team unless an executed contract with that team is on file in the office of the Commissioner, pursuant to the provisions of Section 15.6. This number shall include all veteran players upon whom options have been exercised for the applicable year, except a veteran player discharged for military service subsequent to June 1st in the applicable year.

(H) Notwithstanding other provisions of this Constitution and Bylaws allowing recall of waiver requests under certain circumstance, the following rules are in effect with respect to waivers involving players who do not meet the physical standards of the club: Any waiver request on an injured player and any waiver request on a player who fails the club physical may not be recalled and no claim on any such player may be withdrawn.

**EX 28, PAGE 2908**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 77 of 293
Case 2:12-md-02323-AB Document 09-3834 Filed 12/20/11 Page 77 of 293
#:10325

**Active/Inactive Lists**

17.2 The Active List, for the purposes of this Article, shall consist of all players eligible to play in any preseason, regular season, playoff, championship, or postseason game then under contract to the club within the applicable player limit as set out in the preceding section. This Section 17.2, and succeeding Section 17.3 are in force only within the provisions of the applicable player limit in a given year.

17.3 One hour and 30 minutes prior to kickoff, each club is required to establish its 45-player Active List for the game by notifying the Referee of the players on its Inactive List for that game. Each club may also identify one player on its Inactive List who may dress for the game, provided that (1) such player is a quarterback; (2) the club has two quarterbacks on its 45-player Active List; (3) if the third quarterback enters the game during the first three periods, he must replace one of the club's other two quarterbacks, neither of whom may thereafter return to the game under any circumstances; and (4) if the third quarterback enters the game during the fourth period or any overtime period, he must replace one of the club's other two quarterbacks, either of whom is permitted to return to the game.

Players on the Inactive List, except for the Third Quarterback, are prohibited from participating in game day warm-ups with their teams for all preseason, regular season, and post-season games, except the Super Bowl game. Except for the Third Quarterback, they are also prohibited from dressing in game uniforms on game days, or representing their teams in pregame ceremonies. They may be in the bench area during the game provided they dress in clothing issued by the club to its game staff and display appropriate bench area credentials.

For the Super Bowl game only, Inactive List players may participate in game day warm-ups in their uniforms. During the game, they are permitted in the bench area, provided they dress in clothing issued by the club (which may include game jersey) to its game staff and display appropriate bench area credentials.

Any club that makes a roster change on game-day, subject to the provisions outlined above, also has the responsibility of confirming such change by NFLNet to the League office the following day.

**Future List**

17.4 (A) The Future List, for the purpose of this Article, shall consist of all players under contract to a club for a succeeding year or years but not for the current year. Clubs may not sign free agent players to their Future List until the day after the last day of the final regular season weekend (Tuesday if the final regular season game begins

**EX 28, PAGE 2909**

Case 3:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 78 of 29
Case 2:11-cv-08395-R-MAN Document 69-33 Filed 12/20/11 Page 78 of 293
#:10326

on Monday). If the club of a Practice Squad player has completed its season (i.e., is not participating in the playoffs or has lost in the playoffs), such Practice Squad player may thereafter be signed as a free agent to any club's Future List. A free agent signed to a club's Future List is not eligible to be signed by any club for the current season. Contracts for players signed to a club's Future List will begin on February 1 of the subsequent year.

(B)  No player may practice with a club unless such player is signed to a contract with that club for the current or succeeding season or seasons. All contracts including contracts of players on the Future List must be filed with the Commissioner in accordance with the provisions of Section 15.3 hereof.

**Reacquisition of Players**

(C)  A player who has been traded or assigned via waivers cannot return to the club that took such action until two seasons, including the season of the year in which he left the club, have elapsed, unless one of the following exceptions applies:

**Reacquiring Traded Player**

(1)  Traded player must have been on the Active List of the assignee club, any club beyond the assignee club, or a combination thereof, for a minimum of four (4) regular season games, after which the original assignor club may reacquire the player by waiver assignment or free-agent signing. The four-game requirement specified herein may span two regular season if applicable; or

(2)  Traded player must have been on the Active List of the assignee club, any club beyond the assignee club, or a combination thereof, for less than four (4) regular season games and must have been placed on waivers and terminated by the assignee club or any subsequent club, in which case the original assignor club may reacquire the player only by free-agent signing. The original assignor club under these circumstances must not reacquire such player by trade or assignment via waivers; or

(3)  Traded player, before participating in any practice or game for the assignee club, must have reverted to the assignor club through conditions of a trade requiring his reporting to or passing the physical examination of the assignee club.

**EX 28, PAGE 2910**

Case 2:12-md-02323-AB   Document 18-34   Filed 03/29/12   Page 79 of 293
Case 2:12-md-02323-AB   Document 69-33   Filed 12/20/11   Page 79 of 293
#:10327

**Reacquiring Player Assigned Via Waivers**

(4) Player assigned via waivers must have been on the Active List
of the assignee club, any club beyond the assignee club, or a
combination thereof, for a minimum of four (4) games while a
player limit is in effect (preseason or regular season games, or
a combination thereof), after which the original assignor club
may reacquire the player by trade, waiver assignment, or free-
agent signing. The four-game requirement specified herein
may span two seasons if applicable; or

(5) Player assigned via waivers must have been on the Active List
of the assignee club, any club beyond the assignee club, or a
combination thereof, for less than four (4) games while a
player limit is in effect (preseason or regular season games, or
a combination thereof) and must have been placed on waivers
and terminated by such assignee club or any subsequent club,
in which case the original assignor club may reacquire the
player only by free-agent signing. The original assignor club
under these circumstances must not reacquire such player by
trade or assignment via waivers.

**Reacquiring Terminated Player**

(6) There are no restrictions on reacquiring, in the same or a
subsequent season, players who have been terminated via the
waiver system, subject to restrictions that may appear in other
parts of this Constitution and Bylaws.

**Evasion of Reacquisition Rules**

(7) Any evasion of the rules covering reacquisition of players,
including but not limited to procedures by a club to place a
player on another club's roster in order to evade the former
club's player limit, will result in appropriate discipline by the
Commissioner against all involved clubs that are proven to
have taken part in such maneuvers with prior knowledge of
the evasion.

(D) No player who opts for free agency under the waiver system section of
the Collective Bargaining Agreement can re-sign with the same club in
the same season or in the following season.

**EX 28, PAGE 2911**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 80 of 29
1:89-cv-08395-R-MAN Document 69-33 Filed 12/20/11 Page 80 of 293
#:10328

**Reserve List**

17.5   The Reserve List of each club may consist of players in the following categories:

    (A)   Retired

    (B)   Did not report

    (C)   Left squad (quit team)

    (D)   Injured

    (E)   Physically unable to perform (at the time of the training camp physical)

    (F)   N-F/I (Non-football injury or illness)

    (G)   In military

    (H)   Selected in Selection Meeting by the club, but never under contract

    (I)   Suspended or declared ineligible, or expelled from the League for violation of the contract between the player and the club or for other reasons permitted by this Constitution and Bylaws.

Players placed on Reserve in the manner prescribed in (A), (B), (G), and (I) may apply to the Commissioner for reinstatement. Players placed on Reserve under (C) shall be governed by the provisions of Article 17.15(C).

Players placed on Reserve under (D) shall not be eligible to play or practice with the club for the remainder of the regular season and postseason under any circumstances. Players placed on Reserve under (E) are subject to the provisions of Article 12.3(E). Players on Reserve under (H) may be activated upon signing.

A player on a club's Reserve List shall not be eligible to contract with any other club unless and until the player is released or his contract assigned as provided in this Constitution and Bylaws.

**Reserve List Limitations**

17.6   (A)   Unless this Constitution and Bylaws provides otherwise, any player on the Active List of the club who reports to the club and is thereafter placed on the Reserve List by reasons other than military service may not play with his club for the balance of that preseason or regular season unless waivers have been asked on such player, which waivers may not be recalled; provided, however, that if such player becomes an active player with another club and such other club thereafter asks waivers on him, and he is either claimed, released on waivers, or plays with another club in its league in that season, then the original club is entitled to restore such player to its Active List if it acquires him in a manner permitted by this Constitution and Bylaws or the rules of the League. If another club acquires such player from the Reserve List of another club by

means of a trade following the establishment of 65 active players, such player cannot play for the acquiring club for the balance of that season unless the acquiring club waives such player without recall.

(B)     Whenever a player is placed on the Reserve List of a club for any reason, the club must promptly submit a written report to the Commissioner stating the reason for such action. Upon receipt of such information, the Commissioner shall investigate the circumstances thereof in such manner as he deems appropriate. The Commissioner shall have the right to request further explanation or substantiation of the matter, and the club shall supply the same. In the event the Commissioner determines that placing such player on the Reserve List violated the provisions of Section 17.7 of the Constitution and Bylaws of the League, the Commissioner shall have the power to remove such player from the Reserve List and to take such other action against the club that he believes appropriate. Additionally, when such determination is made by the Commissioner, all expenses incurred by the Commissioner in any investigation thereof shall be charged against the involved club and such club shall be obligated to pay such expenses upon demand by the Commissioner.

**Evasion**

17.7    No club shall place any player on its Reserve List in order to evade the player limit.

**College All-Star Players**

17.8    Any player injured while a member of a preseason All-Star squad in connection with a game approved by the League may thereafter be carried without being counted as an Active Player for the determination of the applicable player limit and without requiring the club to place such player on its Reserve List. Such privilege shall continue until such player is able to play football. If such player, after being listed and counted as one of the Active Players within the applicable player limit, has a reoccurrence of the same injury, then such player may again be carried as a player of the club without being counted as an Active Player or being placed on the Reserve List until he again recovers from such reinjury. A medical report of the All-Star participant's injury must be filed with the League office as soon as possible after the All-Star game.

**EX 28, PAGE 2913**

**Retired Players**

17.9    A Retired Player is defined as a player who discontinues professional
        football play in the League while under contract or option to a club. A
        Retired Player shall not be eligible to play football in the League until he
        shall have been reinstated by the Commissioner as provided in Section
        17.13. Upon his reinstatement such player shall be eligible to play
        football only for the club entitled to his services at the time of his
        retirement or its assignee.

        Notwithstanding the above, if such retirement occurs prior to the date that
        such player is required to report to the club's training camp, the player
        must provide written notification to the Commissioner of his retirement
        before his club shall be permitted to place him on its Reserve List,
        provided that no club shall be permitted to place a player on
        Reserve/Retired until 4:00 p.m., New York time, on the 15th day
        following the receipt of such letter by the Commissioner.

        Such letter must be in a form acceptable to the Commissioner and must
        acknowledge that if the club places the player on Reserve/Retired prior to
        the date that such player is required to report to its training camp, such
        player shall not be eligible to be reinstated in the same season.

        At any time prior to the expiration of the 15-day period that follows the
        receipt by the Commissioner of a player's retirement letter, a player may
        revoke such letter by written notification to the Commissioner, in which
        case the club shall not be permitted to place the player on its
        Reserve/Retired list prior to the date that such player is required to report
        to its training camp.

        If any player is placed on Reserve/Retired on or after the date that he is
        required to report to his club's training camp, he shall be eligible for
        reinstatement pursuant to the provisions of Section 17.13.

**Military Service List**

17.10   Any player on the Active List for the first regular season game who is
        thereafter inducted into the Armed Forces of the United States shall
        automatically be placed on the Reserve List of his club and shall not
        count in the Active Player limit of said club nor be permitted to play or
        practice with the club until his reinstatement to the Active List, subject to
        the provisions of Section 17.13 and Section 9.3(C)(4).

        The following additional rules shall apply in respect to the military
        service of a player:

        (A)    No player who reports to his club after the commencement of
               training camp because of any reserve military obligations affecting

79                          Article XVII

**EX 28, PAGE 2914**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 83 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 83 of 293
#:10331

such player need be counted on the Active Player roster of the club until he receives one (1) day's practice for every day missed because of his military obligation, but not to exceed four (4) weeks, provided, however, if such player plays in one or more preseason games, he must be counted on the Active List.

(B) No player reporting to his club after October 15 in any year need be counted on the Active or Inactive List unless the club wishes to activate such player for a regular season game.

(C) Whenever a player reports to his team and thereafter is placed on military reserve to permit such player to fulfill the required two weeks of active military duty, such player shall be allowed one week following his return to the club before such player must be counted as an active player. However, if the club elects to play such player in any preseason or regular-season game, such player must be included on the Active List of such club.

(D) None of the privileges accorded under the provisions of this Section 17.10 shall apply to players having military service obligations of less than a period embracing fourteen (14) days.

(E) All clubs are obligated to notify the League office within forty-eight (48) hours of the time when any of its players are released from active military service and shall specify the date such player reported to the club. Failure of a club to comply with this provision will require the League office to treat the date such player was released from the service as the date when such player reported to the club.

(F) Any player released from military service after October 15 and under contract to the club for such season may be placed on the Inactive List of that club and may be named to the Active List of the club and participate in any Divisional Playoff game, Conference Championship game, or Super Bowl game in accordance with the provisions of Section 20.6.

**Suspended Players**

17.11 A club or the Commissioner may suspend a player for violation of this Constitution and Bylaws, his NFL Player Contract, or the rules and regulations of the League or the club. During the period of suspension, a player shall not be entitled to compensation and shall be ineligible to play with any club. Any player suspended by a club shall have the right to appeal to the Commissioner, who shall have authority to order his reinstatement upon such terms as he deems proper. Players suspended by either the Commissioner or a club will be placed in the category of Reserve/Suspended. If the immediate former category of a player

**EX 28, PAGE 2915**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 84 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 84 of 293
#:10332

suspended by a club was the Active List and the club wishes to lift his suspension and return him to the Active List, it may do so without requesting procedural-recall waivers, despite the provisions of Section 17.6(A) of this Constitution and Bylaws. Any club that places a player on Reserve/Suspended to evade the Active List limit will be subject to appropriate disciplinary action by the Commissioner.

**Ineligible Players**

17.12 The Commissioner may, on application of a club or on his own motion, declare ineligible a player who violates his contract, is guilty of conduct detrimental to the best interests of professional football, or who violates this Constitution and Bylaws or the rules and regulations of his club. Any ineligible player shall not be entitled to play for any club in the League until he shall have been reinstated by the Commissioner.

17.13 All players in the categories of Reserve/Retired, Reserve/Did Not Report, and Reserve/Veteran Free Agent Asked to Re-Sign will continue to be prohibited from being reinstated in the last 30 days of the regular season. Additionally, no player in such category will be reinstated between the trading deadline of the applicable season and the normal 30-day deadline unless the club initiates the reinstatement request and the Commissioner approves it.

**Listing of Players**

17.14 All players must be listed by the club on one of the following lists:

Active List
Reserve List
Exemption List

**Exemption List**

(A) The Exemption List is a special player status available to clubs only in unusual circumstances. The List includes those players who have been declared by the Commissioner to be temporarily exempt from counting within the Active List limit. Any request for an Exemption must be sent to the Commissioner by NFLNet, e-mail, facsimile or other similar means of communication, and must include complete facts and reasons to support such request. Only the Commissioner has the authority to place a player on the Exemption List; clubs have no such authority. Except as provided in paragraph (1) of this subsection (A), no exemption, regardless of circumstances, is automatic. The Commissioner also has the authority to determine in advance whether a player's time on the Exemption List will be finite or will continue until the Commissioner deems the exemption should be lifted and the player

81                                                                Article XVII

Case 2:12-md-02323-AB  Document 18-34  Filed 03/29/12  Page 85 of 29
Case 2:12-md-02323-AB  Document 69-33  Filed 12/20/11  Page 85 of 293
#:10333

returned to the Active List. The following additional provisions
govern the Exemption List:

(1) Clubs participating in the American Bowl games shall be
granted roster exemptions for any international players signed
for such game, provided that the exemption extends for no
more than 10 days and expires at 4:00 p.m., New York time,
on the first business day after the game.

(2) In no event will the Commissioner grant an exemption of
more than two games in cases where a player fails to report to
his club at the prescribed time. Whenever an exemption is
granted in a case of late-reporting, it will be rescinded and the
player added to the Active List as of 4:00 p.m., New York
time, on the last League business day before he appears in
playing uniform at a game of his club. A late-reporting player
is defined as a player already under contract on his club's
Active List or Reserve List or a player on his club's Reserve
List as an unsigned draft choice or unsigned Veteran Free
Agent who fails to report to his club at the prescribed time.

(3) If a player who is eligible for a two-game roster exemption
reports to camp prior to the time that a roster limit is in effect,
the two-game maximum will be reduced by the number of
games that the club has played since the player reported,
provided that the club notifies the League office as soon as the
player reports that it desires a roster exemption and provided
that the player does not dress for or participate in a game.

(4) If a player, after reporting, leaves his club without permission
and the club is granted an exemption, such exemption will
expire immediately upon the player's return to the club,
unless the Commissioner deems it reasonable that the player
is not in sufficient physical condition to return to regular
participation.

(5) It is permissible for a club to trade or request waivers on a
player who is on the Exemption List. If such player is
assigned to another club and the involved exemption is for a
finite period of time, the assignee club will have available to it
only the portion of the exemption which has not expired. If
such player is assigned to another club and the involved
exemption is not for a finite period of time, the player will
immediately count on the assignee club's Active List unless
the Commissioner deems it reasonable that the player is not in
sufficient physical condition to begin or return to regular
participation.

**EX 28, PAGE 2917**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 86 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 86 of 293
#:10334

**Player Leaving Camp**

17.15 If a player leaves the camp of his club during either the training season or the regular season without permission, the following provisions shall apply in respect to such player:

(A) If such player returns to his club within five (5) days from date of his departure, then the club shall be limited to the exercise of one of the following alternatives:

(1) The club may restore such player to its Active List, provided it either has maintained or immediately provides a place on its Active List within the applicable player limit; or

(2) The club may waive or trade such player.

(B) If such player does not return to his club until five (5) or more days shall have elapsed from the date of his departure and the club did not retain a place on its active roster for such player, then the club shall have the right to exercise any one of the following options:

(1) The club may place such player on its Reserve List as a Retired Player; or

(2) The club may reduce its active roster to provide a place thereon for such player; or

(3) The club may waive such player or another player from its Active List.

(C) Any player placed on the Reserve List as a Retired Player under the circumstances described in Section 17.15(B)(1) above shall remain on the Reserve List of the club for the balance of that season. In such event the obligation of the player to perform services as a professional football player for the club in that season shall be tolled. The term of such player's contract to his club for the balance of that season shall be extended and shall not commence until the player returns to professional football for such club. Additionally, any renewal option for such player's services shall be tolled and shall remain in effect until the end of such extended term of the contract. During any such retirement period, such player shall not be allowed to play football for any other club engaged in professional football; neither shall such player be entitled to any compensation, expenses, or other payments from his club under his contract.

**EX 28, PAGE 2918**

(D) Any player placed on the Reserve List as a Retired Player under the provisions described in Section 17.15(B)(1) shall not be entitled to reinstatement as an Active Player for the balance of the season in which such retirement occurs.

(E) He cannot practice for the season.

(F) Any violation or attempt to evade the player limit is conduct detrimental to football.

#### Reserve/Injured

17.16 The following rules govern Reserve/Injured:

(A) **Purpose.** Reserve/Injured is a category of the Reserve List. A club may use this category for a player who is injured in a practice session or game of his club in any year after having passed the club's physical examination in that year. If a player fails the club's initial physical examination in any year, he is not eligible for Reserve/Injured; the club may instead use the procedures of Physically Unable to Perform or Non-Football Injury/Illness, whichever is applicable. A Non-Football Injury or Illness case may, in some circumstances, fall under the procedures of Reserve/Injured, but only if such injury or illness occurs after the player has passed the club's physical for that year.

(B) **Participation While on Reserve/Injured**. Players on Reserve/Injured at any time may not play or practice or engage in any drill or any physical activity other than that required as part of their rehabilitation with that club for the remainder of the season, including postseason, under any circumstances. Players on Reserve/Injured are prohibited from appearing in games, participating in game-day warm-ups with their teams, dressing in game uniforms on game days, or representing their teams in pregame ceremonies. Reserve/Injured players may, however, attend team meetings, engage in rehabilitative work under the direction of the club's physician or trainer, observe practice, and serve their clubs on the sidelines, provided they perform a necessary function connected with the game, dress in clothing issued by the club to its game staff, and display appropriate credentials under the prevailing rules covering the bench areas.

(C) **Compensation While on Reserve/Injured.** Players on Reserve/Injured are compensated at the full rate of their NFL Player Contracts (Paragraph 5).

**EX 28, PAGE 2919**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 88 of 29
Case 2:09-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 88 of 293
#:10336

(D) **Injury Definition.** For purposes only of administering the procedures of Reserve/Injured, a minor injury is one which renders a player physically unable to play football for any period less than six weeks (42 calendar days) from the date of injury. Conversely, a major injury is one which renders a player physically unable to play football for a minimum of six weeks (42 calendar days) from the date of injury.

(E) **Documentation.** All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards. Such prognosis must be documented on the form "Verification of Injury/Illness Report," which must be completed in full by the club physician and countersigned by a working club executive or the head coach. This form must be filed in the League office within 15 days after the date the player is officially added to Reserve/Injured; if not, the club forfeits a spot on its Active List until it complies. The prognosis of the player's recovery time should be as precise as possible. When the verification form is received by the League office, the case receives a major or minor injury classification, which remains fixed unless the Commissioner grants special permission to reclassify after considering a revised prognosis by the club.

The League's medical examination procedures shall include a network of qualified neutral physicians in each club's territory (including the training camp area). Such physicians shall be available to examine players within a short time (usually less than a week) after a player is injured.

(F) **Evasion.** The Commissioner is authorized to take whatever steps he deems necessary to investigate any Reserve/Injured case that he has reason to believe may not have been handled properly by the involved club. If he determines that a club has abused the procedures of Reserve/Injured in order to evade the player limit or for any other reason, he may take appropriate disciplinary action.

(G) **Minor Injuries.** If a club places a player with a minor injury onto Reserve/Injured, such player must be placed on no-recall waivers as soon as, in the judgment of the club, he is physically able to play football. Such players may not be reacquired by the club for the remainder of the season, including the postseason. This definition of a minor injury shall be applicable throughout the remainder of the season, including postseason, even if less than six weeks remain in a club's season. If, despite the original classification of minor injury, the player's recovery time continues into the following year, the waiver request must be before April 15.

**EX 28, PAGE 2920**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 89 of 293
Case 2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 89 of 293
#:10337

(H) **Contract Restrictions.** Whenever a player becomes subject to waivers under the rules governing Reserve/Injured, there must be no subsequent renegotiations or modification of his contract that constitutes a deterrent to claims by other clubs.

(I) **N-F/I After Passing Physical.** Players who go onto the Reserve List under Non-Football Injury or Illness after passing the club's physical examination may not play or practice with the club for the remainder of the season, including postseason, under any circumstances, except for players placed on Reserve/NF/I pursuant to the terms of the NFL Drug Policy. Players on Reserve/Non-Football Illness/Injury shall not be traded.

(J) **Trading From Reserve/Injured.** Players on Reserve/Injured may not be traded.

(K) **Settlements.** Any financial settlement agreed to between a club and player concerning an injury shall cover a fixed period of time and shall be reported in detail to the League office. Such player then shall be carried on the club's Reserve/Injured list for the specified period covered by the settlement. Such listing must be for procedural purposes only, and the player must not practice with or be affiliated with the club in any way other than normal rehabilitation treatment. At the end of such specified period, the player must be placed on waivers.

Clubs also have the option of immediately requesting waivers on a player with whom they have negotiated a financial settlement. Any such waiver request shall carry the notation "Injury Settlement," and any such financial settlement must be reported in detail to the League office and must specify that the agreement does not obviate the League's waiver system. Players with whom a club has reached an injury settlement and for whom it has requested waivers (or terminated without waivers if the player had four or more pension-credited seasons) may not be reacquired by that club during the same season until a period of time has elapsed since the date of termination that is six regular or postseason games longer than the number of regular season games represented by the settlement (a bye week counts as a game). The above procedure shall also be applicable to a player who has been placed on Reserve/Injured or for whom a club has requested waivers with the designation "injured," provided that no later than 4:00 p.m., New York time, on the fifth business day after the date that the player was placed on Reserve/Injured or that waivers were requested, whichever occurs first, the club (1) executes and files an Injury Settlement with the league office, and (2) requests waivers for the player with the designation "Injury Settlement" (or terminates him without waivers if the player has four or more pension-credited seasons). A

Case 3:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 90 of 29
Case 2:13-cv-08390-R-MAN Document 69-33 Filed 12/20/11 Page 90 of 293
#:10338

player for whom waivers have been requested pursuant to an injury settlement is permitted to be claimed, and any player terminated pursuant to an injury settlement is permitted to sign with any other club, subject to customary rules. Clubs are permitted to pay the settlement amount in weekly installments or in other arrangements acceptable to player and club, provided that any amounts paid to the player are received no later than the last game represented by the settlement. Upon termination, such players are free agents and shall have no further contact with the club, including a tryout, until the date that they have become eligible to be re-signed by the club.

**Practice Squad**

17.17  After 12 noon, New York time, on the Monday prior to the first regular season game, clubs may establish a Practice Squad of five players, which is limited to players who are free agents and who do not have an accrued season of free agency credit, unless that season was achieved by spending an entire regular season on Reserve/Injured or Reserve/Physically Unable to Perform. A player who achieved his accrued season on Reserve/Injured or Reserve/Physically Unable to Perform may be signed to the Practice Squad of any club except the club that placed him in that category. Practice Squad players are eligible to be signed to the Active/Inactive List of other NFL clubs.

   *See* 2004 Resolution MC-1 (providing that, subject to negotiation and agreement with the NFL Players Association, clubs may employ up to eight practice squad players for the 2004 season, and the League has the option to extend this arrangement for subsequent seasons), App., p. 2004-18

   *See also* 2005 Resolution G-3 (extending 2004 Resolution MC-1, permitting clubs to employ practice squads not to exceed eight players for the 2005 season), App., p. 2005-7

   *See also* 2006 Resolution G-3 (extending 2005 Resolution G-3), App., p. 2006-15

**Players Waived Injured**

17.18  (A)  Players waived injured will continue to be no-recall and count against the applicable player limit if they clear waivers.

      (B)  If a player is placed on injured waivers and the club remains below the applicable player limit at all times until such player clears waivers, the club may at that time return the player to its roster and use him in a game as soon as he is physically able.

**EX 28, PAGE 2922**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 91 of 29
1:8-cv-08390-R-MAN Document 69-33 Filed 12/20/11 Page 91 of 293
#:10339

(C) If a player is placed on injured waivers and the club reaches the applicable player limit before such player clears waivers, the club cannot return the player to its roster but must immediately place him on Reserve/Injured.

**EX 28, PAGE 2923**

# Article XVIII

## Waivers

**When Required**

18.1 (A) Clubs desiring to release players must first give written notice to the Commissioner of such intention. At 4:00 p.m., New York time, during each day, exclusive of Sundays, the Commissioner shall notify each club of such waiver request and any club desiring the services of said player may claim him. Regardless of the time when the League receives a request for waivers, the Commissioner shall not give the notice thereof to the clubs until 4:00 p.m., New York time, on the same or succeeding day.

Clubs shall not have a right to withdraw any claims, and, except for waiver requests designated as Procedural Recall, clubs shall not have a right of recall for any waiver requests.

**Claiming Period**

(B) Clubs may claim a player placed on waivers by notifying the Commissioner within the claiming period. Clubs may file claims on players for whom waivers have been requested beginning at 4:01 p.m., New York time, on the day such waivers are requested and ending at 4:00 p.m., New York time, on a subsequent date, pursuant to the following:

(1) For any waivers requested during the period commencing on the first business day after the Pro Bowl and concluding on the last business day prior to June 1, a 24-hour claiming period shall be in effect, except for waiver requests on Friday and Saturday of each week, which shall expire at 4:00 p.m., New York time, on the following Monday. If waivers are requested on the last business day prior to June 1, they shall expire on the first business day after June 1. If such waiver request has been designated as Procedural Recall, the club requesting such waivers shall thereafter have an additional 24 hours to recall such waiver request.

(2) For any waivers requested during the period commencing on June 1 through the last business day prior to July 4, a claiming period of three business days shall be in effect. If the third day falls on a weekend, holiday, or such other day when the League office is not open for business, the claiming deadline shall be extended until 4:00 p.m., New York time, on the next League business day. If waivers are requested within three

**EX 28, PAGE 2924**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 93 of 29
Case 2:08-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 93 of 293
#:10341

business days of the last business day prior to July 4, such waivers shall expire at 4:00 p.m., New York time, on the last business day prior to July 4. If waivers are requested on the last business day prior to July 4, they shall expire on the first business day after July 4. If such waiver request has been designated as Procedural Recall, the club requesting such waivers shall thereafter have an additional 24 hours to recall such waiver request.

(3) If waivers are requested within three business days of the last business day prior to July 4, such waivers shall expire at 4:00 p.m., New York time, on the last business day prior to July 4.

If waivers are requested on the last business day prior to July 4, they shall expire on the first business day after July 4. If such waiver request has been designated as Procedural Recall, the club requesting such waivers shall thereafter have an additional 24 hours to recall such waiver request.

(4) For any waivers requested during the period commencing the first business day after July 4 through 4:00 p.m., New York time, on the Friday prior to the final regular season weekend, a 24-hour claiming period shall be in effect, except for waiver requests on Friday and Saturday of each week, which shall expire at 4:00 p.m., New York time, on the following Monday.

Waivers requested on the Friday preceding the final regular season weekend shall expire at 4:00 p.m., New York time, on Saturday.

(5) A claiming period of 10 calendar days shall be in effect for any waivers requested during the period from the Saturday of the final regular season weekend through the conclusion of the final postseason game, but the assignment or termination of any players will be deferred until the first business day after the Super Bowl game. If the waiver request is within 10 calendar days of the first business day after the Super Bowl game, such claiming period will expire on the first business day after the Super Bowl game. A club that is not participating in the playoffs shall not request waivers on players after 4:00 p.m., New York time, on the Saturday of the final regular-season weekend, unless it is awarded a player via waivers on the Monday after its final regular season game and needs to create an opening on its roster for such player.

**EX 28, PAGE 2925**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 94 of 29
1:89-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 94 of 293
#:10342

Subject to rules prohibiting assignment via waivers, trades, free-agent signings, and other such personnel transactions by clubs involved in games at any time on a Sunday or on non-Sunday afternoons, clubs are permitted to transact player-personnel business on Thanksgiving Day and to notify the League office by NFLNet, e-mail, facsimile or other similar means of communication, of such action on that day. The League office will promulgate such action to all clubs as early as possible on the following morning (Friday), and the deadline for claims on players placed on waivers on Thursday will end on Friday at 4:00 p.m., New York time.

Waivers requested on Christmas Day (unless Christmas Day falls on a Saturday or Sunday) shall be promulgated to clubs the next morning and shall expire at 4:00 p.m., New York time, that afternoon.

All waiver notices released by the Commissioner during the training or regular season shall be sent by NFLNet or facsimile.

The Commissioner shall notify each club in both conferences simultaneously of any waiver request in the manner prescribed above. Any club within the League may, upon request, secure from the Commissioner all available salary information on any player for whom waivers have been requested, which information shall be supplied prior to the time for the filing of any claim on such player.

### Awarding of Players

(C) Whenever a club claims and is thereafter awarded a player, the following rules shall govern:

(1) The club to which the player is awarded is required to count the player on its Active List for at least two business days. The assignee club is prohibited from trading such player unless he has been a member of the club's Active/Inactive List for one preseason or regular season game or for seven days, whichever occurs first.

If a player limit is applicable at the time of the award, and the club has a full complement of Active Players within such limit, then following the award of such player the club must either:

(a) Waive another player from its Active List with no right of recall;

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 95 of 293
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 95 of 293
#:10343

(b) Place another player from its Active List on its Reserve List, subject to all of the restrictions applicable to the Reserve List; or

(c) Trade another player on its Active List.

(2) If a club is awarded a player, is assigned a player in trade, or signs a free-agent player to a current-year contract at any time after Monday, 4:00 p.m., New York time, prior to the first regular season game and for the balance of the regular season, if the club at the time of such acquisition has a full complement of players under the applicable player limit, the club must either:

(a) Waive another player from its Active List with no right of recall (or designate a recallable player currently on waivers as nonrecallable);

(b) Place another player from its Active List on its Reserve List subject to all restrictions applicable to the Reserve List; or

(c) Trade another player from its Active List.

The exercise by the club of any of the foregoing alternatives must be taken by 4:00 p.m., New York time, on the day of the acquisition, with the exception that if the acquisition is an award via waivers, the club is allowed up to one hour after notification of the award to take appropriate action.

(3) "Time" referred to in subsection (2) above shall always be 4:00 p.m., New York time, unless superseded by other provisions of this Constitution and Bylaws.

(D) Whenever a claiming club is to be awarded a player on the day of a preseason or regular season game for which it is scheduled, the award shall not be made until 4:00 p.m., New York time, on the next day of business following the game.

**Recall of Waiver**

18.2 (A) Subject to other provisions of this Constitution and Bylaws restricting the right of recall under various circumstances, a club which has requested waivers may recall the request by notifying the Commissioner of such recall by NFLNet, e-mail, facsimile or other similar means of communication, within twenty-four (24) hours after the expiration of the claiming period.

**EX 28, PAGE 2927**

Case 2:12-md-02323-AB Document 18-34 Filed 12/20/11 Page 96 of 293
Case 2:12-cv-08396-R-MAN Document 09-33 Filed 03/29/12 Page 96 of 29
#:10344

(B) Whenever the Commissioner notifies a club that a player placed on waiver has been claimed, the Commissioner shall do so by NFLNet, e-mail, facsimile or other similar means of communication.

### Free Agents

18.3 Whenever a player has been placed on waivers and not designated injured and is not claimed by another club, such player shall then become a free agent upon expiration of the waiver recall period, if any, on such player.

### Players Waived While Injured

18.4 Whenever a player has been placed on waivers and the waiving club designates such player to be injured and there is no award of the player made to another club, such injured player remains under contract to the waiving club until the expiration of such contract or until its termination by the club in accordance with the provisions thereof.

### Multiple Claims

18.5 If three or more regular season games have been played by all clubs in the League, and two or more clubs claim a player's contract after a waiver, the contract shall be awarded to the club whose standing in the League race at that time is the lowest. If three regular season games have not been played and two or more clubs claim a player's contract after a waiver, the contract shall be awarded to the club which finished lowest in the League standings in the preceding season. In case of a tie in the standings, if three or more regular season games have not been played by all clubs, the contract will be awarded to the club which had priority in the most recent Selection Meeting as provided for in Section 14.3(B). If three or more regular season games have been played, ties shall be broken by figuring the aggregate won-lost-tied percentage of the opponents that an involved club has played at that point of the regular season and awarding the contract to the club which has faced the schedule of teams with the lowest aggregate won-lost-tied percentage. If a tie still exists, the Commissioner will award the contract by lot.

### Waiver Price

18.6 The price of a player claimed on waiver shall be $100.00. The claiming club shall, within 24 hours of notification by the Commissioner that the player's contract has been awarded to it, forward to the waiving club its check for the waiver price, and an assignment of the player's contract shall be executed promptly by the two clubs.

**EX 28, PAGE 2928**

**Waiver Requests**

18.7  If the request for waivers occurs either during the training season or the regular
season, the waiver request must be by NFLNet, e-mail, facsimile or other
similar means of communication. During the non-playing season, a waiver
request may be by mail and the time stamped upon receipt of any such mailing
by the Commissioner shall determine the date of the request. Despite the fact
that such communication be delayed, misdirected or lost, the time of delivery
to the Commissioner thereof shall fix the date of request. Clubs shall have the
right to telephone the Commissioner's office and give oral notice that a written
or NFLNet, e-mail, facsimile or similar request for waiver has been given. In
such event, the time of the telephone call shall fix the date for the giving of
notice of a waiver.

**Salary of Claimed Player**

18.8  (A)  Each player under contract to a club must be paid a full game
salary by such club unless a request for waivers on such player is
sent by such club and received by the League office prior to 4:00
p.m., New York time, on Tuesday prior to the first regular season
game and/or before 4:00 p.m., New York time, on the Tuesday
following the playing of a regular season game. If any other club
claims such player and such player is thereafter awarded to such
claiming club, such claiming club shall assume the player contract
and be responsible for the balance of the salary of such player as
prescribed therein.

(B)  Despite anything in this Constitution and Bylaws to the contrary,
whenever a player's contract or contracts are assigned through the
waiver system, the assignee club's financial responsibility under
such contract or contracts and any attachment thereto shall be
limited to: (1) any unearned salary, as set forth in Paragraph 5 of
the NFL Player Contract and (2) any unearned football-related
performance bonuses. The original signing club shall retain
responsibility for all other financial obligations to the player of any
character arising as a result of the signing of such contract or
contracts, including but not limited to any signing bonus.

**Notification**

18.9  If a player has an active contract and reports and then leaves the club,
such fact must be reported to the League office within 48 hours after such
player has left the club. If not reported, the Commissioner, after verifying
such fact, shall request waivers on said player; such request for waivers
may not be recalled. This provision shall not be applicable to any player
inducted into military service.

**EX 28, PAGE 2929**

18.10 Where any player contract awarded on waivers to another club contains a provision purporting to impose, or having the effect of imposing, financial obligations on the claiming club that were not imposed on the waiving club, the waiving club shall bear the ultimate financial responsibility for meeting such obligations.

18.11 Clubs are prohibited from renegotiating, revising, altering, or superseding any contract in a manner that would constitute a deterrent to claims of that contract by another club, e.g., "guaranteed" and "no trade" provisions. If such a contract is executed, the club may not subsequently waive the player in that season.

**Waiver System**

18.12 (A) All claims filed by clubs shall be in priority order within groupings of one or more and the claiming club shall indicate the number of players within each grouping it wishes to be assigned. No player may be listed more than once.

(B) All players placed on waivers will be waived for all years of their contract.

*See also*  CBA, including Article XXII (Waiver System)

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 99 of 29
Case 2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 99 of 293
#:10347

# Article XIX

## Conduct of Regular Season Games

**Game Receipts and Guarantee**

19.1 (A) The home club shall deliver to the League office the greater of $30,000 for each regular season and preseason game, or 40% of the gross receipts after the following deductions:

(1) All federal, state, and municipal taxes assessed on the sale of tickets, plus any other special charges approved in writing on an individual club basis by the Executive Committee.

(2) A stadium rental allowance equal to fifteen (15%) percent of the gross receipts after deducting the taxes and any other approved special charges set out in (1) above.

(3) "Gross Receipts," as used in this section, shall mean all receipts derived from the sale of tickets, including taxes and special charges but excluding ticket handling charges. Receipts of the home club from the sale of season tickets shall be included in the gross receipts from each game equally in proportion to the number of regular season games scheduled by the club after the adjustment of any preseason game monies included in the cost of the season ticket.

*See* 1987 Resolution FC-1 (authorizing Executive Committee to approve exclusion of seat premiums for stadium projects), App., p. 1987-1
1987 Resolution FC-7 (ticket handling and service charges), App., p. 1987-3
1994 Criteria for Approval of Premium Waivers, App., p. 1994-3
1995 Resolution G-6 (revenue sharing pool), App., p. 1995-4
1999 Resolution G-3 (restating and expanding League policy governing waivers of sharing obligations for stadium construction projects), App., p. 1999-2
2001 Resolution G-1 (revisions to definition and calculation of visiting team share for preseason games), App., p. 2001-2
2003 Resolution JC-1 (extending G-3 stadium program), App., p. 2003-7
2006 Resolution BV-1 (scheduling of international regular season games), App., p. 2006-6
2006 Resolution G-1 (approval of CBA; revenue sharing pool), App., p. 2006-9

**EX 28, PAGE 2931**

2006 Resolution MC-1 (approval of CBA; revenue sharing pool), App., p. 2006-9

(4) Each club shall provide the League office by July 15 of each year with ticket manifests for all games to be played in the club's home stadium. Ticket manifests shall list the number and price of all tickets printed to include standing room tickets, and shall include a breakout of the amount of each tax and any special charge included in the price of each category of ticket. In the event ticket manifests are subsequently changed (e.g., bleachers are added subsequent to baseball season at a date different from originally planned and submitted) it shall be the responsibility of each club to update the ticket manifests on file in the League office.

(5) All clubs, on or before May 1, shall forward to the League office a certified report by an independent CPA of attendance and income for all home games (preseason, regular season, and postseason) of the previous season to include a certified count of unsold tickets of all categories.

(B) Except as the Finance Committee may otherwise specify in policies and procedures adopted and amended from time to time, (i) final settlement of funds payable to the League office pursuant to Section 19.1(A) shall be made on the day of the game or no later than two business days subsequent to each regular season or preseason game, and (ii) the home club shall make settlement by wiring Federal funds to the League office.

(C) There shall be no charge imposed or percentage claimed against gate receipts of regular season games for or by the League office.

(D) The home team may deduct from the final settlement of visiting team shares amounts owed by the visiting team for the purchase of game tickets.

   *See* 2001 Resolution G-1 (pooling of visiting team shares), App., p. 2001-2

**Conduct of Game**

19.2   Each club shall play all of its regular season games at the times and places provided for in the official schedule of the League. There shall be no postponement of regular season games unless said game cannot be played because of an Act of God or because of a state, federal or local prohibition. Neither the starting time of a regular season game nor the locale of the game shall be changed in any manner after the adoption of the schedule and the publication thereof, except with the written consent

of both clubs and the prior approval of the Commissioner.

*But see* 2006 Resolution BC-1 (Flexible Scheduling), App., p. 2006-1

**Bench Personnel**

19.3    With the exception of uniformed players eligible to participate in the game, all persons in a team's bench area must wear a visible credential clearly marked "BENCH." For all NFL home games—preseason, regular season, and postseason—the home club will be issued a maximum of 27 credentials and the visiting club will be issued a maximum of 25 credentials for use in its bench area. Such credentials must be worn by coaches, players under contract to the applicable club but ineligible to participate in the game, and team support personnel (trainers, doctors, equipment men). From time to time, persons with game-services credentials (e.g., oxygen technicians, ball boys) and authorized club personnel not regularly assigned to the bench area may be in a team's bench area for a brief period without bench credentials.

Clubs are prohibited from allowing into their bench area any persons who are not officially affiliated with the club or otherwise serving a necessary game-day function. Clubs also are prohibited from allowing into the nonbench areas of field level any persons who have not been accredited to those locations by the home club's public relations office for purposes related to news-media coverage, stadium operations, or pre-game and halftime entertainment.

**Field Credentials**

19.4    Persons permitted on the field level during a game, other than those described in Section 19.3, shall be limited to photographers, stadium employees, utility maintenance personnel, and police. Such persons must remain behind the playing field's standard six-foot border and are not permitted within bench areas. Clubs which seat pre-game and halftime personnel on the field level must keep them well behind the six-foot border. All such persons not in uniform covered in this subsection must be issued and display appropriate credentials issued by the home club only.

**Medical Facilities**

19.5    The home team shall provide a physician and an ambulance at each game available to both teams. Said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams.

**EX 28, PAGE 2933**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 102 of 29
ase 2:12-cv-03396-R-MAN Document 69-34 Filed 12/20/11 Page 102 of 29
ID #:10350

**Player Attire**

19.6    All players of a team shall be uniformly and neatly attired for all games. All players on the same team must wear the same color jersey, head guards, and stockings, except that a club, at its option, may permit all eligible pass receivers to wear a different color head gear than the rest of the team. If a different color is worn by any eligible pass receiver of a club, all of the eligible receivers must wear the same color. Players must wear stockings in all games. The Commissioner must approve in advance any changes in the colors of the club. Every player appearing on the field during the game or in any pregame workout must wear his complete game outfit exclusive of pads and helmet.

**Player Identification**

19.7    Players must wear on the back and front of their jerseys identification numbers that shall be at least eight (8) inches long and four (4) inches wide. Names of players shall be placed on uniforms directly above the numbers on the back in a size lettering no less than two and one-half ($2^1/_2$) inches. The name and number of each player of the visiting team must be furnished to the home team by the visiting club at least six (6) days prior to the scheduled game with the visiting team. Any change in the numbering of a player shall be forthwith communicated to the opposing club.

**Choice of Game Uniforms**

19.8    (A)    Subject to the provisions of subsection (B) hereof and at the option of the home club, the visiting team in all preseason and regular season games shall wear the colors awarded to such team under Section 19.9, and the home team shall wear white. In the event that the colors of the visiting team conflict with the white worn by the home team, the visiting team shall wear other colors approved by the Commissioner. The provisions of this Section shall also apply to the Divisional Playoff games, Conference Championship games, and to the Super Bowl game.

        (B)    Provided written approval is obtained from the applicable television network of the home club prior to September 1st in any year, neither club in any preseason or regular season game shall be required to wear white jerseys, but shall be permitted to wear the colors awarded to their respective clubs. The same provisions shall likewise apply to the Divisional Playoff games, Conference Championship games, and to the Super Bowl game, provided such permission is received from the applicable television network before 5:00 p.m., New York time on the Tuesday preceding the playing of such game.

**EX 28, PAGE 2934**

**Club Colors**

19.9 (A) The colors of the respective clubs are as follows:

| | |
|---|---|
| Arizona Cardinals | Cardinal red, black and white |
| Atlanta Falcons | Red, black, silver and white |
| Baltimore Ravens | Purple, black and old gold |
| Buffalo Bills | Royal, red, navy, and grey |
| Carolina Panthers | Process blue, black and silver |
| Chicago Bears | Navy, orange and white |
| Cincinnati Bengals | Black, orange and white |
| Cleveland Browns | Dark brown, orange and white |
| Dallas Cowboys | Royal, silver, white and navy |
| Denver Broncos | Navy and orange |
| Detroit Lions | Light blue, silver and black |
| Green Bay Packers | Dark green, yellow-gold and white |
| Houston Texans | Navy, white and red |
| Indianapolis Colts | Royal and white |
| Jacksonville Jaguars | Teal, black and old gold |
| Kansas City Chiefs | Red, yellow-gold and white |
| Miami Dolphins | Aqua, coral, white and navy |
| Minnesota Vikings | Purple, yellow-gold and white |
| New England Patriots | Red, white, navy and silver |
| New Orleans Saints | Metallic gold, black and white |
| New York Giants | Red, white, dark royal and silver |
| New York Jets | Dark green and white |
| Oakland Raiders | Silver and black |
| Philadelphia Eagles | Midnight green, silver, black and white |
| Pittsburgh Steelers | Yellow-gold and black |
| St. Louis Rams | Navy, metallic gold and white |
| San Diego Chargers | Navy, yellow-gold and white |
| San Francisco 49ers | Brick red, metallic gold and black |
| Seattle Seahawks | Storm blue, bright green and navy |
| Tampa Bay Buccaneers | Red, pewter and black |
| Tennessee Titans | Light blue, navy and red |
| Washington Redskins | Burgundy and yellow-gold |

The Commissioner must approve, in advance, any changes in the foregoing colors of the clubs.

*See* 2004 Resolution BV-4 (Prohibiting club marks and logos from being used in connection with the presentation of other sports without prior League approval by three-fourths of the member clubs; prohibiting assignment, sublicenses, mortgages, pledges, hypothecations and other transfers or encumbrances of League and club marks without prior League approval), App., p. 2004-3

**EX 28, PAGE 2935**

**Conflicting Club Colors**

(B) The home club shall have the option of deciding whether the visiting club shall wear white jerseys or shall wear the colors awarded to the visiting team in any League game, regular season or preseason. The home club is obligated to give written notice to the visiting club and to the Commissioner of its decision on the colors of the jerseys to be worn by the visiting club, which notification must be given by July 1st of the year in which the game is scheduled to be played. If either participating club fails to conform to the jersey colors designated for such game, then there shall be an automatic fine against the offending club of $5,000, which sum shall be payable to the League office. Despite the foregoing, in the event that the colors of the participating teams as so designated are in conflict for a League game, regular season or preseason, the Commissioner shall have the right to designate the colors to be used by the competing teams in such game.

(C) Anything in Section 19.9(B) to the contrary notwithstanding, if any game, including the Super Bowl game, is played in a city other than in a city of the competing clubs, then the colors awarded to such teams by the League may be worn by the competing teams unless such colors are, in the opinion of the Commissioner, conflicting. In such event, if competing teams are unable to agree upon the colors to be worn by each team in such game, the Commissioner shall have the right to designate the colors to be used by the competing teams in such game.

(D) No club shall have the right to make changes in its club colors and/or in the designs of its team helmets or uniforms except in accordance with the following provisions:

(1) Absent specific extenuating circumstances as determined by the Commissioner, if a club desires to make any changes in club colors, uniform appearance, designs of team helmets, designs of team uniforms, trademarks, or trade names, it must give written notice and details thereof to the League on or before March 1 of the year prior to the year in which it wishes to change; must comply with the uniform change notification and approval timeline as established by the League office and amended from time to time; and further must obtain approval from the League pursuant to Section 19.9(D)(2) by December 1 of the year prior to the year in which it wishes to change; otherwise it shall have no right to make any change for the succeeding season.

**EX 28, PAGE 2936**

> > *See* 2002 Resolution G-3 (uniform design changes and
> > notification timeline), App., p. 2002-3
> > 2003 Resolution G-1 (third uniform design), App., p. 2003-5

> > (2) Despite the provisions of the foregoing sub-paragraph (1) of
> > this Section 19.9(D) and despite the fact that notice was given
> > of the proposed change in the colors and/or designs of team
> > helmet and uniforms as above set out, should such change, in
> > the opinion of the Commissioner, result in any conflict with
> > the club colors and/or helmet and uniform designs of any
> > other club, and the clubs involved are unable to agree upon a
> > method of solving such conflict, the Commissioner shall have
> > the right to designate the club colors and/or the designs of the
> > team helmet or uniforms to be used by the affected clubs in
> > such season.

> *See* 2004 Resolution BV-4 (Resolution of disputes relating to 2004
> Resolution BV-4, any policies or rules developed to implement
> 2004 Resolution BV-4, the NFL trademark trust and any related
> agreements, or the rights and obligations of NFL Ventures and its
> affiliates), App., p. 2004-3

**Seats for Visiting Club**

19.10    The home club must reserve a total of twenty-five (25) seats for the
visiting club located within the 40 yard lines.

**Game Postponed or Rescheduled**

19.11    (A)    After the first two weekends of the regular season, all games shall
be played on Sunday unless both competing clubs agree to a
change in the day of the game or unless such date is affected by
World Series play. In such event the day of the game may be
changed from Sunday.

(B)    If a scheduled game cannot be played on the designated day, it will
be rescheduled by the Commissioner.

(C)    Whenever a postponement is attributable to negligence by a club,
the negligent club shall be responsible for all home club costs and
expenses, including gate receipts and television contract income,
subject to approval by the Commissioner.

(D)    All teams traveling by air to play a regular season game must be
scheduled to arrive in the game city or vicinity before eighteen (18)
hours prior to the scheduled kickoff, unless adequate protection is
provided for the squad to make the trip by other means of
transportation.

**EX 28, PAGE 2937**

**Starting Times**

19.12  The starting time for all regular season games shall be 1:00 p.m., at the site at which they are played, unless prohibited by local or state statute or authorized otherwise by the Commissioner.

*But see* 2006 Resolution BC-1 (Flexible Scheduling), App., p. 2006-1

**Introduction of Players**

19.13  Prior to the game, each club is required to introduce (i) its Head Coach, and (ii) its full squad as a unit, or 11 members of its offensive team, defensive team, or special teams, either as individuals or as a unit, unless inclement weather prevents or interferes with such introduction. A representative sampling of the photos of the visiting players and the photo of the visiting head coach must appear in all game programs.

**Complimentary Tickets**

19.14  The following rules govern the complimentary ticket policy for preseason, regular season, wildcard and division playoff games:

(A)  A "complimentary ticket" is any ticket which is issued free as a courtesy by the home club for a seat or location reflected on the club's ticket manifest and which otherwise would be salable.

(B)  The home club may deduct up to 1,000 tickets of any price category listed on its ticket manifest, provided, however, that the club itemizes the number of complimentary tickets issued by category of recipient. Categories of recipients may include, but are not limited to, players, coaches, other club personnel, officials, other League employees, media, media guests, local dignitaries, lease requirements, bus drivers, etc. If a home club issues more than 1,000 complimentary tickets of the type contemplated above without the prior permission of the visiting club, the home club must pay the full price for all such tickets exceeding 1,000, and such income must be reflected in the game's gross receipts. Separate and apart from the above complimentary tickets and the limits placed thereon, the home club may issue without limitation such additional complimentary tickets as may be required to seat pregame and halftime entertainment personnel. The number and price of complimentary tickets issued to such pregame and halftime entertainment personnel shall be listed separately in the space provided on the League game statement.

**EX 28, PAGE 2938**

**Tickets for Players**

19.15   Each player of the home club is entitled to receive one complimentary ticket for each home game. The home club shall not issue any tickets to the visiting club, directly or indirectly, except when full payment is made for such tickets.

   *But see*   CBA Article LV, Section 9 (stating that two complimentary tickets will be made available to each player of the home club for each home game)

**Playing Surface**

19.16   All clubs must provide and have available a tarpaulin adequate to cover the entire playing area of the field and must exercise reasonable care and diligence in arranging for the use thereof whenever the weather is apt to render unfit or endanger the playing condition of the home field.

19.17   Teams playing in parks with baseball facilities should sod or seed the infield after the baseball season.

**Restrictions**

19.18   Bull horns, klaxons, megaphones and other noisemaking devices are banned from parks in the NFL.

19.19   No person except authorized club and League personnel and accredited members of the media shall be permitted to enter a dressing room of any participating club on the day of a game.

**Game Films**

19.20   The home club shall provide the visiting club facilities and vantage points equal to its own for the filming of the game for coaching purposes.

19.21   A club that films its home games from more than one sideline vantage point shall inform future opponents, with whom films are to be exchanged, of that fact and must provide each opponent true copies of films taken from the vantage point preferred by the opponent.

**EX 28, PAGE 2939**

# **Article XX**

## **Divisional Playoff Games**

**Pairings and Priority**

20.1   The four division champions and two Wild Card clubs (the two clubs with the best records other than the division champions) from each conference will participate in the postseason. Tie games are calculated as one-half game won and one-half game lost. Both Wild Cards may come from the same division. Clubs eliminated in Divisional Championship tie-breakers are eligible to be Wild Cards if their records qualify them.

20.2   Pairings for the playoffs will be as follows:

The six postseason participants from each conference will be seeded as follows:

1.   The division champion with the best record.
2.   The division champion with the second-best record.
3.   The division champion with the third-best record.
4.   The division champion with the fourth-best record.
5.   The Wild Card club with the best record.
6.   The Wild Card club with the second-best record.

If two or more division champions finish with the same won-lost-tied percentage at the end of the regular season, ties will be broken pursuant to Section 20.4(B).

In the first round, the division champion with the third-best record (the #3 seed) will play the Wild Card club with the second-best record (the #6 seed), and the division champion with the fourth-best record (the #4 seed) will play the Wild Card team with the best record (the #5 seed). The division champions will host the games.

In the second round, the division champion with the best record (the #1 seed) will play the winner of the game between the division champion with the fourth-best record and the Wild Card with the best record, unless the Wild Card club with the second-best record wins its First Round game, in which case the division champion with the best record will play the Wild Card club with the second-best record. In either case, the division champion with the second-best record will play the winner of the other first round game. The two division champions with the best won-lost-tied percentage in the regular season will host games.

None of the above will be affected by the fact that a Wild Card club and division champion are from the same division.

**EX 28, PAGE 2940**

Case 2:12-md-02323-AB Document 69-33 Filed 12/20/11 Page 109 of 29
Case 2:12-cv-03396-R MAN Document 18-34 Filed 03/29/12 Page 109 of 29
ID #:10357

**Division Ties**

20.3  If, at the end of the regular season, two or more clubs in the same division finish with the best won-lost-tied percentage, the following steps will be taken until a champion is determined:

TWO CLUBS

1. Head-to-head (best won-lost-tied percentage in games between the clubs.)

2. Best won-lost-tied percentage in games played within the division.

3. Best won-lost-tied percentage in common games.

4. Best won-lost-tied percentage in games played within the conference.

5. Strength of victory.

6. Strength of schedule.

7. Best combined ranking among conference teams in points scored and points allowed.

8. Best combined ranking among all teams in points scored and points allowed.

9. Best net points in common games.

10. Best net points in all games.

11. Best net touchdowns in all games.

12. Coin toss.

THREE OR MORE CLUBS*

1. Head-to-head (best won-lost-tied percentage in games among the clubs.)

2. Best won-lost-tied percentage in games played within the division.

3. Best won-lost-tied percentage in common games.

4. Best won-lost-tied percentage in games played within the conference.

5. Strength of victory.

6. Strength of schedule.

7. Best combined ranking among conference teams in points scored and points allowed.

8. Best combined ranking among all teams in points scored and points allowed.

9. Best net points in common games.

10. Best net points in all games.

11. Best net touchdowns in all games.

12. Coin toss.

*Note: If two clubs remain tied after a third club is eliminated during any step, tie-breaker reverts to Step One of two-club format.

**EX 28, PAGE 2941**

**Wild Card Ties**

20.4    If necessary to break ties to determine the two Wild Card clubs from each
        conference, the following steps will be taken:

   (A)    If all the tied clubs are from the same division, apply division tie-
          breaker.

   (B)    If the tied clubs are from different divisions, apply the following
          steps:

TWO CLUBS

        1.   Head-to-head, if applicable.

        2.   Best won-lost-tied percentage in the games played within the
             conference.

        3.   Best won-lost-tied percentage in common games, minimum of
             four.

        4.   Strength of victory.

        5.   Strength of schedule.

        6.   Best combined ranking among conference teams in points
             scored and points allowed.

        7.   Best combined ranking among all teams in points scored and
             points allowed.

        8.   Best net points in conference games.

        9.   Best net points in all games.

        10.  Best net touchdowns in all games.

        11.  Coin toss.

THREE OR MORE CLUBS

        1.   Apply division tie-breaker to eliminate all but highest ranked
             club in each division prior to proceeding to step two. The
             original seeding within a division upon application of the
             division tie-breaker remains the same for all subsequent
             applications of the procedure that are necessary to identify the
             three Wild Card participants.

**EX 28, PAGE 2942**

2. Head-to-Head Sweep (apply only if one has defeated each of the others or one club has lost to each of the others.)

3. Best won-lost-tied percentage in games played within the conference.

4. Best won-lost-tied percentage in common games, minimum of four.

5. Strength of victory.

6. Strength of schedule.

7. Best combined ranking among conference teams in points scored and points allowed.

8. Best combined ranking among all teams in points scored and points allowed.

9. Best net points in conference games.

10 Best net points in all games.

11. Best net touchdowns in all games.

12. Coin toss

(C) When the first Wild Card Team has been identified, the procedure is repeated to name the second Wild Card (i.e., eliminate all but the highest ranked club in each division prior to proceeding to step two). In situations where three teams from the same division are involved in the procedure, the original seeding of the teams remains the same for subsequent applications of the tie-breaker if the top-ranked team in that division qualifies for a Wild Card berth.

**Sudden Death**

20.5 The sudden-death system to determine the winner shall prevail when the score is tied at the end of the regulation playing time of a Division Playoff game.

Under this system the team scoring first during over-time play herein provided for, shall be the winner of the game, and the game is automatically ended on any score (including a safety) or when a score is awarded by the referee for a palpably unfair act. Other provisions in respect to the sudden death system shall be as provided in the Rule Book of the League.

**EX 28, PAGE 2943**

**Playoff Rosters**

20.6    Rosters for clubs participating in the playoffs will be frozen after the final
        regular season game, with the following exceptions:

> 1. Clubs will be permitted to claim and be awarded players for
>    whom waivers have been requested prior to 4:00 p.m., New
>    York time, on the Friday preceding the final regular season
>    weekend.
>
> 2. Clubs will be permitted to sign free agents throughout the
>    postseason, but are limited to a total of four free agent
>    signings, including players on other clubs' Practice Squads,
>    during the period that begins at 4:00 p.m., New York time, on
>    the Wednesday after the final regular season weekend. Clubs
>    cannot sign more than two such players during any week of
>    the postseason. Players who were on a club's Practice Squad
>    at the conclusion of the regular season and who are signed to
>    that club's Active/Inactive List during the postseason shall not
>    count against the limit of two free agent signings in a week or
>    the overall limit of four signings.
>
> 3. Clubs will be permitted to restore to their Active Lists players
>    who have been placed on Reserve/Non-Football Illness for the
>    purpose of drug rehabilitation.
>
> 4. Clubs may remove players from their Active Lists by
>    requesting waivers or by any other method possible in this
>    Constitution and Bylaws. If waivers are requested on a player,
>    such requests will be No Recall/No Withdrawal, a 10-day
>    claiming period will be in effect, and any assignment or
>    termination will be deferred until the first business day after
>    the Super Bowl game.

**EX 28, PAGE 2944**

# Article XXI

## Conference Championship Games

**Supervision**

21.1 The American Football Conference and National Football Conference Championship games shall be under the supervision, control, and direction of the Commissioner, and the Commissioner shall establish the date, starting time, and the ticket price of the games.

Nevertheless, all provisions relating to the site of the games and to the division or distribution of the proceeds of said games shall require approval of the affirmative vote of not less than three-fourths or 20, whichever is greater, of the member clubs of the League.

All questions arising in connection with said games not specifically provided for herein or covered in the playing rules of the League shall be decided by the Commissioner.

**Tickets**

21.2 Tickets shall be printed under the Commissioner's direction, and the cost thereof shall be charged as an expense of the game. Tickets shall be made available as promptly as possible following the determination of the teams to participate therein. There shall be no complimentary tickets for the game.

21.3 The Commissioner shall have the authority to order the home club to honor reserved seat requests in the following priority:

(A) One hundred (100) tickets for the Conference office.

(B) Up to one hundred (100) tickets for the televising network and twenty (20) for the national radio network.

(C) Tickets for the visiting clubs in such quantity as the Commissioner deems necessary, providing that such quantity does not exceed 20% of the available tickets after provision for season-ticket holders or other obligations under this Section 21.3.

The home club is entitled to permit the season-ticket holders to purchase for the Conference Championship games the same number of seats at the same locations as such season-ticket holders held throughout the regular season.

**EX 28, PAGE 2945**

All unsold tickets in possession of the visiting club, together with funds covering any tickets sold by the visiting club, must be returned postage prepaid, by the fastest means possible, to the home club not later than 72 hours prior to the scheduled starting time of said game.

**Schedule and Site**

21.4   Each season the pairings and sites of the Conference Championship games will be determined as follows: winners of the Divisional Playoff games (second round) under the formula provided for in Section 20.2 will be the four participants; the home team in a Conference Championship game will be the division champion that was seeded highest in the playoffs, unless two Wild Card teams are in a Conference Championship game, in which case the Wild Card team that was seeded highest in the First Round of the playoffs will be the home team.

**Officials**

21.5   The Commissioner shall select all persons to officiate at the Conference Championship games, and in making such selection shall not invite nor be required to observe any recommendations or objections from member clubs, coaches, or employees in respect to the officials therein.

**Game Receipts and Expenses**

21.6   The game receipts shall include all receipts from the sale of tickets, whether presented for admission or not, and any additional amounts received for radio, television, and motion pictures. Such receipts shall be deposited in the League Treasury.

The program receipts, including sums for advertising or sale thereof, shall belong to the home club, and any profit or loss thereon shall be for the account of the home club. Neither the League nor the visiting club shall share in the program or be responsible therefor.

21.7   After all income from the game from whatever sources has been computed, the Treasurer of the League, after approval by the Commissioner, shall first pay the following amounts therefrom:

(A)   All federal admission and other taxes, state, federal, or local;

(B)   Stadium rental and all other expenses involved in the staging of the game, including the authorized halftime entertainment, visiting team travel expenses, and game officials' expenses.

Balance of the income, if any, shall be distributed by the formula as fixed by resolution of the member clubs of the League.

**EX 28, PAGE 2946**

### Halftime Entertainment

21.8   Halftime entertainment shall be provided by the home club under the supervision of the Commissioner, and the cost of the same shall be charged to and paid as an expense of the game.

### Visiting Club Travel

21.9   The visiting club shall be allowed transportation and hotel expenses for fifty-five (55) persons.

### Sudden Death

21.10  If a Conference Championship game results in a tie score at the end of regulation play, the sudden-death system of determining the winner shall prevail as described in Section 20.5 hereof, and the game will thereafter proceed by quarters with no halftime intermission. Rules for time-outs will be the same as in a regulation game, including rules governing the last two minutes of the second and fourth quarters in any sudden-death period.

**EX 28, PAGE 2947**

# Article XXII

## Super Bowl Game

**Supervision**

22.1    The Super Bowl game shall be played under the supervision, control, and direction of the Commissioner, except that the site of the game and all provisions relating to the division or distribution of the proceeds of said game shall require approval of the affirmative vote of not less than three-fourths or 20, whichever is greater, of the member clubs of the League.

**Tickets**

22.2    The Commissioner shall establish the date, starting time, and the ticket price of the game. Tickets shall be printed under the Commissioner's direction, and the cost thereof shall be charged as an expense of the game. There shall be no complimentary tickets for the game.

**Sudden Death**

22.3    If the game results in a tie score at the end of regulation play, the sudden-death system of determining the winner shall prevail as described in Section 20.5, and the game will thereafter proceed by quarters with no halftime intermission. Rules for time outs will be the same as in a regulation game, including rules governing the last two minutes of the second and fourth quarters in any sudden-death period.

**Decisions of Commissioner**

22.4    All questions arising in connection with said game not expressly provided for by the provisions hereof or by agreement of the League shall be decided by the Commissioner.

> *See*    1989 Resolution G-3 (Reporting of Super Bowl game ticket distribution to League office; allocation for season ticket holders), App., p. 1989-1
> 1991 Resolution SB-2 (Super Bowl game site selection voting procedures), App., p. 1991-3
> 1998  Resolution SB-5 (Super Bowl game ticket allocation formula for Super Bowl game XXXVI and beyond), App., p. 1998-14

**EX 28, PAGE 2948**

# Article XXIII

## Preseason and Postseason Games

**Preseason Games**

23.1   No member club shall schedule a preseason game without the approval of the Commissioner. The preseason schedule shall be completed and the dates and participants named at the Annual Meeting of the League. Should a conflict exist at the time of the October League Meeting, the Commissioner will be empowered to make any changes necessary to complete the preseason schedule so it can be presented to the membership for approval.

(A)   Any preseason game which is required to be played between the Oakland Raiders and San Francisco 49ers shall be counted as a preseason game between teams of opposite conferences for the purpose of conforming to any provision hereof requiring any of such participating teams to play a prescribed number of preseason games with teams in the opposite conference before it can play a preseason game within its own conference. Such provision shall apply despite the fact that such clubs may be members of the same conference.

(B)   All restrictions upon the right of clubs to participate in preseason games may be imposed by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the member clubs of the League.

(C)   Each preseason game contract shall be approved by the Commissioner and the rules and procedures for sharing gross gate receipts shall be the same as those applicable to regular season games, as set forth in Section 19.1 and League resolutions referred to therein.

(D)   All clubs shall schedule four (4) preseason games each season, to be scheduled on the four consecutive weekends prior to the first regular season weekend, excluding the Professional Football Hall of Fame game participants and participants in American Bowl games, who will each play five games. Each NFL club will be required to play two (2) preseason games at its home stadium. Any exception to this rule must be approved by the Commissioner.

> *See*  2001 Resolution G-1 (pooling of visiting team shares), App., p. 2001-2
> 2001 Resolution G-5 (realignment; scheduling of preseason games), App., p. 2001-7

**EX 28, PAGE 2949**

2006 Resolution BC-4 (extending 2001 Resolution G-5),
App., p. 2006-5

**Postseason Games**

23.2    No club shall participate in any non-League game after the Super Bowl
        game shall have been played, except that the club winning the Super
        Bowl game must play any non-League game contracted for by the
        League.

**Prohibited Games**

23.3    No club may play a non-League game of any kind after such club has
        played its first regular season game.

**Player Participation**

23.4    Except for games sanctioned and approved by the League, no player may
        participate in any game between the time of the completion of the last
        regular season game of his club and July 1st of the following year.

> *See* 1990 Resolution G-8 (League office control and coordination
>       of international games), App., p. 1990-2
>       1991 Resolution G-10 (authorizing Commissioner to select
>       American Bowl participants), App., p. 1991-2
>       1998 Resolution BC-5 (preseason games/network package),
>       App., p. 1998-6
>       1998 Resolution BC-6 (authorizing Commissioner to select
>       Hall of Fame game participants), App., p. 1998-7
>
> *See also* CBA, including Article XXXVII (Number of Preseason
>       Games)

**EX 28, PAGE 2950**

# **Article XXIV**

## **Notices**

**Type of Notice**

Unless the Constitution and Bylaws specify a different form or method of notice, all notices required to be given under any provision of the Constitution and Bylaws shall be in writing or by NFLNet, e-mail, facsimile or other similar means of communication, addressed to the last known address of the addressee; all notices by mail shall be deposited in the U.S. Mail, postage thereon prepaid.

**EX 28, PAGE 2951**

# Article XXV

## Amendment of Constitution and Bylaws

**Amendment After Notice**

25.1 (A) Subject to the provisions of Section 25.3 herein, the Constitution and Bylaws of the League may be altered or amended by the affirmative vote of not less than three-fourths or 21, whichever is greater, of the member clubs of the League at any Annual Meeting of the League, provided fifteen (15) days written notice of the proposed amendment is given to the member clubs in advance of such meeting or any recessed session thereof; further provided that if any club introduces an amendment proposal which involves the competitive aspects of the game, such proposal must be submitted in writing to the League office a minimum of thirty (30) days in advance of any Annual Meeting of the League. If notice of at least 12 hours prior to the vote is given and such alteration or amendment carries the unanimous approval (in the case of an alteration or amendment which involves the competitive aspects of the game; majority approval in all other cases) of a duly appointed standing committee of the League vested with the authority to make a recommendation on the subject matter of such amendment, such alteration or amendment may be approved by three-fourths or 21, whichever is greater, of the member clubs of the League convened at any Annual Meeting or recessed session thereof. In all other cases involving an alteration or amendment to the Constitution and Bylaws, the provisions of Section 25.2 shall apply.

(B) If any amendment or alteration of the Constitution and Bylaws is adopted or fails of adoption at an Annual Meeting of the League under circumstances wherein such proposal required a vote of three-fourths or 20, whichever is greater, of the member clubs of the League, the action on the proposed alteration or amendment cannot be changed at any recessed session of such Annual Meeting except by the unanimous vote of all of the member clubs of the League.

**Amendment Without Notice**

25.2 This Constitution and Bylaws may also be altered or amended by a unanimous vote of all the member clubs at any meeting, special, annual, or otherwise.

EX 28, PAGE 2952

**Special Provisions for Amendment of Constitution and Bylaws**

25.3 (A) No change or amendment to any section of the Constitution and Bylaws involving or relating to the arrangement under which the Baltimore and Washington franchises are to be operated and handled shall be effective unless approved by the unanimous vote of all member clubs of the League. Such arrangement is contained in the provisions of Section 4.2(D) of the Constitution and Bylaws.

(B) No change or amendment to any section of the Constitution and Bylaws involving or relating to the arrangements and conditions under which the New York Giants and the New York Jets franchises are to be operated and handled shall be effective unless approved by the unanimous vote of all member clubs of the League. Such arrangements and conditions are contained in the following sections of the Constitution and Bylaws: 4.2(A), 4.5(B), 4.5(D), 10.4, and 13.2.

(C) No change or amendment to any section of the Constitution and Bylaws involving or relating to the arrangements and conditions under which the Oakland Raiders and the San Francisco 49ers franchises are to be operated and handled shall be effective unless approved by the unanimous vote of all member clubs of the League. Such arrangements and conditions are contained in the following sections of the Constitution and Bylaws: 4.2(B), 4.2(C), 4.5(C), 4.5(F), 4.5(G), 4.5(H), 10.4, 13.2, and 23.1.

(D) Anything in this Constitution and Bylaws to the contrary not withstanding, the provisions of Section 3.1(B), 4.2(C), 6.1, 6.2, 10.3, and of this Section 25.3 may not be altered or amended without the unanimous consent of all members of the League.

**Name of Proposer**

25.4 Whenever an amendment or alteration to the Constitution and Bylaws is submitted for approval, such must indicate the author of the proposal.

**EX 28, PAGE 2953**

# TABLE OF CONTENTS

**Page Number**

**TAB 1977**
1977 RESOLUTION (Finance) (October 13, 1977)     1977-1

**TAB 1978**
1978 RESOLUTION (Finance) (January 23, 1978)     1978-1

**TAB 1982**
1982 RESOLUTION (Finance) (December 15, 1982)     1982-1

**TAB 1983**
1983 RESOLUTION (Finance) (May 25, 1983)     1983-1
1983 RESOLUTION (Finance) (May 25, 1983)     1983-2

**TAB 1984**
1984 RESOLUTION BC-5     1984-1
1984 RESOLUTION (Finance) (March 19, 1984)     1984-2
1984 RESOLUTION (Broadcasting) (March 23, 1984)     1984-3
1984 RESOLUTION (Long Range Planning Committee) (May 23, 1984)     1984-4

**TAB 1985**
1985 RESOLUTION FC-7     1985-1
1985 RESOLUTION FC-7 (Duplicate number)     1985-2
1985 RESOLUTION G-2     1985-3

**TAB 1987**
1987 RESOLUTION FC-1 (As Amended)     1987-1
1987 RESOLUTION FC-3     1987-2
1987 RESOLUTION FC-7     1987-3

**TAB 1988**
1988 RESOLUTION FC-2     1988-1
1988 RESOLUTION FC-3 (As Amended)     1988-2
1988 RESOLUTION FC-5 (As Amended)     1988-3

**TAB 1989**
1989 RESOLUTION G-3     1989-1

**TAB 1990**
1990 RESOLUTION FC-2     1990-1
1990 RESOLUTION G-8     1990-2
1990 RESOLUTION SM-1     1990-3
1990 NFLNET MEMORANDUM, FEBRUARY 16, 1990
   (Special Draft Eligibility)     1990-4

**TAB 1991**
1991 RESOLUTION G-1     1991-1
1991 RESOLUTION G-10     1991-2
1991 RESOLUTION SB-2     1991-3

**EX 28, PAGE 2954**

ase 2:12-md-02328-AB Document 18-34 Filed 03/29/12 Page 123 of 29
2:12-cv-08396-R  MAN Document 69-33 Filed 12/20/12 Page 123 of 29
ID #:10371

**TAB 1993**

| | |
|---|---|
| 1993 RESOLUTION BC-2 | 1993-1 |
| 1993 RESOLUTION CEC-1 | 1993-2 |
| 1993 RESOLUTION FC-1 | 1993-3 |
| 1993 RESOLUTION FC-5 | 1993-6 |
| 1993 RESOLUTION IC-1 (As Amended) | 1993-7 |

**TAB 1994**

| | |
|---|---|
| 1994 RESOLUTION BC-4 | 1994-1 |
| 1994 RESOLUTION BC-6 (As Amended) | 1994-2 |
| 1994 CRITERIA FOR APPROVAL OF PREMIUM WAIVER | 1994-3 |

**TAB 1995**

| | |
|---|---|
| 1995 RESOLUTION G-4 | 1995-1 |
| 1995 RESOLUTION G-6 | 1995-4 |

**TAB 1996**

| | |
|---|---|
| 1996 RESOLUTION FC-1 | 1996-1 |
| 1996 RESOLUTION FC-5 | 1996-2 |
| 1996 RESOLUTION FC-6 | 1996-3 |
| 1996 RESOLUTION G-1 | 1996-5 |
| 1996 RESOLUTION G-4 | 1996-6 |

**TAB 1997**

| | |
|---|---|
| 1997 RESOLUTION FC-3 | 1997-1 |
| 1997 RESOLUTION FC-6 (As Amended) | 1997-3 |
| 1997 RESOLUTION JC-1 | 1997-4 |
| 1997 RESOLUTION NFLP-3 (As Amended) | 1997-5 |

**TAB 1998**

| | |
|---|---|
| 1998 RESOLUTION BC-1 | 1998-1 |
| 1998 RESOLUTION BC-2 | 1998-2 |
| 1998 RESOLUTION BC-4 | 1998-5 |
| 1998 RESOLUTION BC-5 | 1998-6 |
| 1998 RESOLUTION BC-6 (As Amended) | 1998-7 |
| 1998 RESOLUTION BC-7 | 1998-8 |
| 1998 RESOLUTION FC-2 | 1998-9 |
| 1998 RESOLUTION FC-3 | 1998-10 |
| 1998 RESOLUTION FC-9 | 1998-11 |
| 1998 RESOLUTION FC-10 | 1998-12 |
| 1998 RESOLUTION G-2 | 1998-13 |
| 1998 RESOLUTION SB-5 (As Amended) | 1998-14 |

**TAB 1999**

| | |
|---|---|
| 1999 RESOLUTION EC-1 (As Amended) | 1999-1 |
| 1999 RESOLUTION G-3 (As Amended) | 1999-2 |

**EX 28, PAGE 2955**

Case 2:12-md-02328-AB Document 69-34 Filed 03/29/12 Page 124 of 29
2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 124 of 29
ID #:10372

**TAB 2000**

| | |
|---|---|
| 2000 RESOLUTION G1-B* | 2000-1 |
| 2000 RESOLUTION G-3A | 2000-3 |
| 2000 RESOLUTION G-8 | 2000-4 |
| 2000 RESOLUTION G-10 | 2000-5 |

**TAB 2001**

| | |
|---|---|
| 2001 RESOLUTION FC-4 (As Amended) | 2001-1 |
| 2001 RESOLUTION G-1 (As Amended) | 2001-2 |
| 2001 RESOLUTION G-4 (As Amended) | 2001-3 |
| 2001 RESOLUTION G-5 (As Amended) | 2001-7 |
| 2001 RESOLUTION JC-1 (As Amended) | 2001-8 |
| 2001 RESOLUTION JC-3 (As Amended) | 2001-14 |

**TAB 2002**

| | |
|---|---|
| 2002 BYLAW PROPOSAL NO. 6 | 2002-1 |
| 2002 RESOLUTION FC-12 | 2002-2 |
| 2002 RESOLUTION G-3 (As Amended) | 2002-3 |
| 2002 RESOLUTION G-6 | 2002-6 |
| 2002 RESOLUTION G-7 | 2002-8 |
| 2002 RESOLUTION MC-1 | 2002-10 |

**TAB 2003**

| | |
|---|---|
| 2003 RESOLUTION BC-1 (As Amended) | 2003-1 |
| 2003 RESOLUTION BC-2 | 2003-4 |
| 2003 RESOLUTION G-1 | 2003-5 |
| 2003 RESOLUTION IC-1 (As Amended) | 2003-6 |
| 2003 RESOLUTION JC-1 (As Amended) | 2003-7 |

**TAB 2004**

| | |
|---|---|
| 2004 RESOLUTION BC-3 | 2004-1 |
| 2004 RESOLUTION BC-4 | 2004-2 |
| 2004 RESOLUTION BV-4 (As Amended) | 2004-3 |
| 2004 RESOLUTION FC-1A (As Amended) | 2004-11 |
| 2004 RESOLUTION FC-2 (As Amended) | 2004-13 |
| 2004 RESOLUTION FC-7 (As Amended) | 2004-14 |
| 2004 RESOLUTION G-1 (As Amended) | 2004-15 |
| 2004 RESOLUTION JC-1A | 2004-16 |
| 2004 RESOLUTION MC-1 | 2004-18 |

* Presented in the Competition Committee report as Resolution G-IA; renamed
G-IB to reflect amendments by the Competition Committee before the start of the
Annual Meetings.

**EX 28, PAGE 2956**

**TAB 2005**

| | |
|---|---|
| 2005 RESOLUTION BC-1 | 2005-1 |
| 2005 RESOLUTION BC-2 | 2005-2 |
| 2005 RESOLUTION BC-3 | 2005-3 |
| 2005 RESOLUTION BV-1 | 2005-4 |
| 2005 RESOLUTION FC-2 (As Amended) | 2005-6 |
| 2005 RESOLUTION G-3 | 2005-7 |
| 2005 RESOLUTION G-4 (As Amended) | 2005-8 |
| 2005 RESOLUTION MC-1 | 2005-10 |
| 2005 RESOLUTION MC-2 | 2005-11 |

**TAB 2006**

| | |
|---|---|
| 2006 RESOLUTION BC-1 | 2006-1 |
| 2006 RESOLUTION BC-3 | 2006-3 |
| 2006 RESOLUTION BC-4 | 2006-5 |
| 2006 RESOLUTION BV-1 | 2006-6 |
| 2006 RESOLUTION BV-2 | 2006-8 |
| 2006 RESOLUTION G-1 | 2006-9 |
| 2006 RESOLUTION MC-1 | 2006-9 |
| 2006 RESOLUTION G-3 | 2006-15 |

**INDEX**        I-1

**EX 28, PAGE 2957**

**1977 RESOLUTION (FINANCE)**
**(OCTOBER 13, 1977)**

*Resolved*, that the National Football League be hereby authorized to continue to receive network television revenues and postseason game proceeds as agent for and on behalf of the member clubs of the League and to disburse such funds on their behalf, without further action on their part, for the following purposes:

1. To pay on behalf of each of the member clubs to the Management Council from time to time those amounts necessary to satisfy the obligations of the clubs under the Stipulation and Settlement Agreement;

2. To make payments on behalf of each of the member clubs to the Player Insurance Trust and the Player Retirement Plan at such times and in such amounts as are necessary to satisfy the obligations of each member club as established in the 1977 Collective Bargaining Agreement and any future collective bargaining agreements. The clubs intend that, consistent with past practice, there shall be allocated to each club postseason game income in an amount equal to such club's share of the contribution to the Player Benefit Plan, so that the cost of the plans will be borne equally by each club (except that proper credit shall be given to Tampa Bay and Seattle for the pension contribution allocable to the 1974 and 1975 seasons); and

3. To meet expenses of postseason games.

All network television revenues and postseason game proceeds received hereunder by (the League treasurer) as agent for the member clubs which are not required for the foregoing purposes shall be promptly disbursed to the member clubs. This resolution shall remain in effect until amended or revoked by the member clubs of the National Football League.

**EX 28, PAGE 2958**

**1978 RESOLUTION (FINANCE)**
**(JANUARY 23, 1978)**

*Resolved,* that commencing with the 1976 season:

(1) All postseason game revenues, from whatever source derived (including interest), shall be divided equally among the member clubs, and

(2) Each club shall be charged with its allocable share of contributions to the Player Retirement Plan and Player Insurance Trust, such allocable share to be determined in a manner consistent with past practice.

Further *Resolved,* that the October 13, 1977 resolutions regarding postseason game income are hereby superseded to the extent inconsistent with the foregoing resolution, and are otherwise reaffirmed.

**1982 RESOLUTION (FINANCE)**
**(DECEMBER 15, 1982)**

*Resolved,* that whenever a member club is delinquent with respect to one or
more League or Management Council assessments and the League office, as agent
for the clubs, is in receipt of funds attributable to the delinquent club's account,
the Commissioner may authorize the Treasurer to apply such funds to eliminate or
reduce the delinquent club's assessment liability.

**EX 28, PAGE 2960**

Case 2:12-md-02323-AB Document 18-34 Filed 02/29/12 Page 129 of 29
Case 2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 129 of 29
ID #:10377

**1983 RESOLUTION (FINANCE)**
**(MAY 25, 1983)**

*Resolved*, that the Treasurer of the National Football League be, and hereby is, authorized to deduct from postseason game revenues and the regular season network television advance rights payments each club's allocable share of payments to the Coaches' Pension Plan.

**EX 28, PAGE 2961**

Case 2:12-md-02323-AB Document 6934 Filed 02/29/12 Page 130 of 29
Case 2:12-cv-08395-R-MAN Document 69-33 Filed 12/20/11 Page 130 of 29
ID #:10378

**1983 RESOLUTION (FINANCE)**
**(MAY 25, 1983)**

*Resolved,* that each club submit to the League office by June 15 of each year commencing with the year 1983 a current list of that club's ownership to include percent of ownership, and that such information be available to the League office for inspection by any person having an ownership interest in a National Football League club, <u>provided however that any application to inspect such information must be submitted by the club's representative on the Executive Committee to the Commissioner and must be approved by the Commissioner. Approval by the Commissioner shall not be unreasonably withheld.</u>

Green Bay, as a publicly-held corporation having in excess of 10 stockholders, is exempt from compliance with this resolution.

**EX 28, PAGE 2962**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 131 of 29
Case 2:12-cv-03395-R-MAN Document 18-34 Filed 12/20/11 Page 131 of 29
ID #:10379

**1984 RESOLUTION BC-5**

    *Resolved,* that it shall be League policy that, when preseason games are sold out 72 hours before kickoff and the home team wishes to offer a home telecast of the game, the consent of the visiting team for such home telecasts shall be considered automatically effective.

**EX 28, PAGE 2963**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 132 of 29
2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 132 of 29
ID #:10380

**1984 RESOLUTION (FINANCE)**
**(MARCH 19, 1984)**

*Resolved,* that the Treasurer of the National Football League shall be and hereby is authorized and directed to charge interest at the then prevailing prime rate plus four percent to any club which is delinquent in any amount due and payable by such club to the League office and that such interest shall be charged to the delinquent club from the date the payment was due until the payment is made.

**EX 28, PAGE 2964**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 133 of 29
Case 2:12-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 133 of 29
ID #:10381

**1984 RESOLUTION (BROADCASTING)**
**(MARCH 23, 1984)**

*Resolved,* that every club contract for the sale or transfer of its preseason game television rights shall include among its provisions the following:

Telecasting rights transferred pursuant to this contract are subject to the following limitations:

1. No game shall be telecast into any area within the home territory of any other NFL club on a day when such other club is playing a game at home;

2. No home game may be telecast or carried on tape delay on the day of the game within the home territory of the home club except with express written consent of the visiting club; and

3. Each visiting club shall have the exclusive right to permit or license a telecast of the game being played back to the home territory of the visiting club.

No contract for the sale or transfer of preseason game telecasting rights shall be approved by the Commissioner unless the above provision is specifically included.

**EX 28, PAGE 2965**

## 1984 RESOLUTION (LONG RANGE PLANNING COMMITTEE)
## (MAY 23, 1984)

*Resolved,* that from time to time the League shall have confidential Executive Session meetings. Club representatives in attendance at such sessions shall be a maximum of two per club, who shall be limited to (a) the principal owner of the club and (b) a key day-to-day business operating executive of the club; provided that the principal owner may designate, in place of either (a) or (b), a member of (a)'s immediate family.

Up to three such representatives shall be designated on an annual basis, in writing ten days in advance of the annual meeting, and these representatives shall not be altered for 12 months except in case of death or disability of any representative, change of club ownership or, in the case of a club employee, disassociation from the club involved.

In order to encourage involvement of principal owners, every effort will be made to schedule such meetings at predetermined times within the allocated meeting schedules.

**EX 28, PAGE 2966**

Case 2:12-md-02323-AB Document 69-34 Filed 03/29/12 Page 135 of 293
2:12-cv-08396-R-MAN Document 18-34 Filed 12/20/11 Page 135 of 29
ID #:10383

## 1985 RESOLUTION FC-7

*Resolved,* that each club shall submit a certified audit report, together with such additional information necessary to complete the League-wide financial report, to the Treasurer of the NFL within one hundred twenty (120) days of that club's fiscal year end, and that failure to do so shall result in a League office imposed club fine of $5,000 for the first 10 days, and $1,000 per day for each day thereafter, and

Further *Resolved,* that the Treasurer will not disclose individual club data to other League or club personnel, or to the Management Council.

**EX 28, PAGE 2967**

## 1985 RESOLUTION FC-7*

*Resolved,* that in considering proposed admission for or transfer of membership under Article III of the Constitution and Bylaws, the members shall not approve any admission of or transfer to any corporation or partnership unless a majority of the beneficial interest and voting rights in such corporation or partnership is vested in one individual, except as set forth below; and

Further *Resolved,* that a limited partnership may be approved for admission as a member or for transfer of membership provided that the controlling partnership agreements meet all of the following conditions.

   a) there is one general partner who has at least 30% of the beneficial interest in the capital of the limited partnership;

   b) there are no more than 15 limited partners or individuals with interests in limited partners;

   c) complete management control is vested in the general partner, and no management rights may be exercised by any limited partner except matters required by law, such as limitations on the general partner's right to change the ownership interests of the limited partners, the right of the limited partners to have access to the books and records of the partnership, etc.;

   d) the financial resources of the partners, to the extent available for partnership purposes, are adequate in the business judgment of the Executive Committee to meet all foreseeable debts and liabilities of the partnership;

   e) any change in the general partner, admission or withdrawal of a limited partner, or transfer or redemption of a limited partnership interest is subject to the approval of the members of the League; and

Further *Resolved,* that nothing in this resolution in any way negates or supersedes any other policies on ownership that the membership may from time to time adopt or apply.

*Duplicate number

1985-2

**EX 28, PAGE 2968**

**1985 RESOLUTION G-2**

*Resolved,* that the Resolution and Guidelines for In-Stadium Giveaways that was adopted for 1984 only at the Recessed Session of the 1984 annual meeting be extended indefinitely.

───────────────────────────────────────

**REVISED GUIDELINES PROPOSED BY NFL PROPERTIES STAFF AND APPROVED BY THE NFL PROPERTIES EXECUTIVE COMMITTEE, MAY 25, 1984:**

A. Giveaway items must be fan-related, with souvenir take-home value; e.g., pom-pom, team photo, team poster, calendars, etc. Artificial noise-makers are prohibited.

B. Clubs may use any item on the Approved List issued by NFL Properties Executive Committee. The Club must clear in advance with NFL Properties any item not on the Approved List before it can be used as an in-stadium giveaway.

C. Clubs may not use any item on Prohibited List issued by NFL Properties Executive Committee.

D. Clubs must exercise quality control over giveaway items.

E. Corporate sponsorship of giveaways is encouraged, but any involvement must be controlled by the Club and licensed with Local Trademark Rights Agreement by NFL Properties (fee waived).

F. Advertising and promotional artwork and copy must be approved in advance by the Club and NFL Properties.

G. Six samples of each giveaway item used must be sent to NFL Properties within one week of the giveaway program.

Giveaways should be planned on a select basis, not every home game.

**EX 28, PAGE 2969**

**1987 RESOLUTION FC-1**

#### (AS AMENDED)

*Resolved,* that any income in excess of the stated ticket price from the sale, leasing or licensing of seats or admission to any game, including club seats or other premium pricing but excluding box suites, is to be included in gross receipts of the game as defined in Article XIX, Section 19.1 of the Constitution and Bylaws; and

Further *Resolved,* that the Executive Committee, on recommendation by the Finance Committee, may approve the exclusion of any excess income described above by any individual club, to the extent and during the time that the excess income is dedicated to and used for financing construction, expansion or major refurbishing of a stadium; and

Further *Resolved,* that for purposes of the League's television blackout policy, unsold club seats or other premium seats will not be included in the manifest.

**EX 28, PAGE 2970**

Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 139 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 139 of 293
ID #:10387
**1987 RESOLUTION FC-3**

*Resolved,* that for purposes of calculating gross gate receipts from postseason games, participating clubs must include 50% of all revenues above the stated ticket price from the licensing or rental of suites or other premium pricing (such as club seats) charged specifically for that game.

1987-2

**EX 28, PAGE 2971**

**1987 RESOLUTION FC-7**

*Resolved,* that any ticket handling or ticket service charge in excess of $4.00 per regular season ticket account or order constitutes gross receipts and is to be shared with the visiting team in accordance with established procedures.

**EX 28, PAGE 2972**

**1988 RESOLUTION FC-2**

*Resolved,* that no club be permitted to withdraw amounts required to be on deposit in the deferred compensation fund except with the permission of the Executive Committee.

**EX 28, PAGE 2973**

ase 2:12-md-02323-AB Document 69-33 Filed 03/29/12 Page 142 of 29
FF-cv-08396-R23MAN Document 69-34 Filed 12/20/11 Page 142 of 29
ID #:10390

**1988 RESOLUTION FC-3**

#### (AS AMENDED)

*Resolved,* that effective March 31, 1988, each member club is prohibited from incurring more than $35 million of debt related to such club;

Further *Resolved,* that for purposes of this Resolution, debt includes any short term or long term liabilities of the club other than (a) accounts payable, accruals, and taxes which are incurred in the ordinary course of business and are not overdue or in default, and (b) liabilities for current or deferred compensation;

Further *Resolved,* that for purposes of this Resolution, debt includes any amounts similar to the above, and not already included above, incurred by the principal and/or controlling owner of the club, for which the assets, stock or ownership interest of the club is pledged or hypothecated;

Further *Resolved,* that any club in violation of this provision on March 31, 1988 shall be given five years to reach compliance, provided that the amount by which the club is in default declines in each year;

Further *Resolved,* that each club and each principal and/or controlling owner of the club shall report to the Treasurer of the NFL no later than July 31, 1988, the amount of its debt covered by this Resolution, and report annually thereafter within 120 days of the club's fiscal year end;

Further *Resolved,* that the Executive Committee, after consideration by the Finance Committee, be authorized to waive these restrictions to the extent necessary in appropriate circumstances; and

Further *Resolved,* that the Finance Committee will annually consider whether, in light of inflation and franchise values, this debt limitation should be increased, and will report to the Executive Committee.

**EX 28, PAGE 2974**

## 1988 RESOLUTION FC-5

### (AS AMENDED)

*Resolved,* that all financial terms of stadium leases or amendments thereto executed after this date must be reviewed by the Finance Committee and recommended to the Executive Committee for approval prior to execution by the club; and

Further *Resolved,* that for this purpose each club must submit copies of such leases or amendments to the League office at least thirty days prior to anticipated execution.

+ + + + +

### ADDENDUM TO FC-5:

### FINANCE COMMITTEE
### REPORT TO THE MEMBERSHIP
### STADIUM LEASE ISSUES

At last year's meeting, the membership approved a resolution which provides that clubs must share proceeds of club seats or other premium pricing with the visiting team, unless an exemption from sharing is approved by the Executive Committee upon recommendation of the Finance Committee. Exemptions may only be requested to the extent that the funds generated are used to service the financing for a new stadium or substantial rebuilding or remodeling.

In order to reach a recommendation on any requested exemption, the Finance Committee will consider a number of factors having to do with the overall balance of shared versus unshared revenue generated by football activities. In order to avoid situations in which commitments have been made which are later found unacceptable, the Committee recommends most strongly that clubs involved in leases for new or renovated stadiums contact the Committee well before the negotiations are completed.

Examples of lease or financing provisions which the Committee would expect to question closely are the following:

- An imbalance among the proportion of various categories of revenues (percentage rent, premium seating, suites, etc.) which are dedicated to repayment of the stadium financing.

- Surcharges. The Committee does not believe that any further surcharges are likely to be justifiable as deductions in computing visitors' share.

- Any provisions which have the effect of diverting funds from sales of tickets to booster groups, civic groups, etc.

1988-3

**EX 28, PAGE 2975**

- Attendance guarantees, except to the extent that any proceeds from such guarantees are committed to be shared with visiting teams.

- Provisions which provide for the club or a related entity to obtain equity in the stadium for little or no capital cost.

- Lease provisions applicable to postseason games which are more onerous than the provisions applicable to preseason or regular season games.

**EX 28, PAGE 2976**

Case 2:12-md-02323-AB Document 69-33 Filed 02/29/12 Page 145 of 29
Case 2:12-cv-08396-R-MAN Document 18-34 Filed 12/20/11 Page 145 of 29
ID #:10393
**1989 RESOLUTION G-3**

*Resolved,* that beginning with Super Bowl XXIV and forward, all NFL teams
will report to the League office immediately before or immediately after the
playing of the Super Bowl game their distribution of tickets to the game. The
report is to take a form prescribed by the League office, but will include
individuals, corporate affiliation and number of tickets issued; and

Further *Resolved,* that beginning with Super Bowl XXIV and forward the
League office will prescribe a formula for the ticket distribution of the Super
Bowl game host team(s) and participating teams. Under the current distribution
formula, it will generally call for (based on 70,000 capacity):

— A minimum of 4,500 of the 7,000 tickets for the host team will go to season
    ticket holders. All other local needs will be the responsibility of the host
    team(s).

— A minimum of 10,500 of the 14,000 tickets for the participating teams will
    go to season ticket holders. All other local needs will be the responsibility
    of the participating teams.

— It is recommended that all other teams set aside a portion of no less than
    10% of their Super Bowl game tickets to season ticket holders.

**EX 28, PAGE 2977**

**1990 RESOLUTION FC-2**

*Resolved,* that each member club shall submit no later than May 31st of each year the results for its fiscal year covering the previous season and operating budgets for its next three fiscal years in a format to be prescribed by the Treasurer, and that the Treasurer aggregate these budgets and distribute them to the clubs in a format reflecting averages and groups of clubs;

Further *Resolved,* that the Treasurer shall not disclose individual club data to other NFL or club personnel; and

Further *Resolved,* that failure of a club to submit this data on a timely basis subjects the club to the same fines as failure to submit timely annual reports.

**EX 28, PAGE 2978**

**1990 RESOLUTION G-8**

Amend existing three International Resolutions to read:

*Resolved,* that any international games—preseason, regular season or postseason—will be scheduled by and administered through the League office;

*Resolved,* that no member club will enter into negotiations for an international game without advance approval by the Commissioner. To insure proper promotion and staging of the games(s), no other NFL games will be played in the country or market of the American Bowl site(s); and

*Resolved,* that club selection and game arrangements, including game telecasting, will be under the control of the Commissioner. Club selection will be based on those clubs willing to participate.

**EX 28, PAGE 2979**

**1990 RESOLUTION SM-1**

*Resolved,* that the following principles of operation are hereby approved and
are to be implemented by the Commissioner:

1. That the labor-management relations function of the Management Council
   be brought under the direction of the Commissioner on the terms set forth
   in the accompanying Resolution unanimously recommended by the CEC.

2. That the Commissioner chair the boards of directors of NFL Films and
   NFL Properties in order to ensure consistency on policy matters and
   coordination among League organizations with respect to the
   implementation of such policies.

3. That the NFL's business operations and business development activities,
   including NFL Films and NFL Properties, be conducted on a coordinated
   and properly unified basis under the direction of the Commissioner.

**EX 28, PAGE 2980**

**SPECIAL DRAFT ELIGIBILITY**
**POLICY AND PROCEDURE ANNOUNCED FEBRUARY 16, 1990**

1. Applications for special eligibility for the 1990 draft will be accepted only
   from college players as to whom three full college seasons have elapsed
   since their high school graduations.

2. Such applications must be filed with the League office prior to
   <u>March 22, 1990</u>, one month before the 1990 draft.

3. To be declared eligible for the 1990 draft, a player filing for special eligibility
   must include in his application an irrevocable renunciation of any further
   college football eligibility.

4. Players will not be permitted to elect to bypass the March 22 application
   date in order to seek eligibility for a later supplemental draft and no
   supplemental draft will be held to accommodate such an election.

1990-4

## 1991 RESOLUTION G-1

*Resolved,* that beginning with the 1992 preseason schedule and thereafter, each NFL club will be required to play two (2) preseason games at its home stadium. Any exception to this rule must be approved by the Commissioner; and

Further *Resolved,* that while responsibility for scheduling preseason games will remain a club function, should a conflict still exist at the time of the October League Meeting, the Commissioner will be empowered to make any changes necessary to complete the preseason schedule so it can be presented to the membership for approval.

**EX 28, PAGE 2982**

# 1991 RESOLUTION G-10

*Resolved,* that the teams participating in the annual preseason American Bowl series will be selected by the Commissioner by February 15 of the year in which the games will be played; and

Further *Resolved,* that each member club is obligated to participate in the series unless it can demonstrate a valid reason to the Commissioner why it should not participate.

**EX 28, PAGE 2983**

Case 2:12-md-02328-AB Document 18-34 Filed 02/29/12 Page 152 of 29
2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 152 of 29
ID #:10400

**1991 RESOLUTION SB-2**

*Resolved,* that the voting procedures for selecting Super Bowl game sites be as follows:

1. All voting will be by secret ballot, the votes to be counted by Lamar Hunt and Wellington Mara, Conference Presidents.

2. All cities bidding will be eligible for the first vote.

3. If one city does not receive the necessary 21 or more affirmative votes on the first vote, the list of eligible cities will be reduced to the top three plus ties for third, or if there are not ties for third, all cities within one vote of third.

4. If after the second vote no city has received the necessary 21 or more votes, the list of eligible cities will be reduced to the top two and any ties.

5. There will be a maximum of one vote to achieve the necessary 21 or more votes for an award when the list is reduced to the top two and ties. If after one vote no award has been made, the requirement to be selected will be reduced to simple majority vote. Voting continues until an award is made.

6. At no time will actual numerical vote be revealed by the Conference Presidents unless directed to do so by the Commissioner.

7. Each award will be decided individually, except that the Commissioner may propose a multiple award if circumstances so dictate.

**EX 28, PAGE 2984**

**1993 RESOLUTION BC-2**

   *Resolved,* that neither Section 9.1(C)(6) nor any other provision of the
Constitution and Bylaws prohibits a member club, or any broadcasting or other
entity with which a club has a contractual relationship, from accepting advertising
on club radio broadcasts, preseason telecasts, highlight shows or in game
programs or stadiums, from any state or municipal lottery or off-track betting
organization that does not offer any lottery or other betting scheme based on the
outcome of or any performance in any NFL game or in any other actual sporting
event; <u>provided</u> that such advertising shall not (a) in any way involve club, coach,
player or other club employee affiliation with or endorsement of such lottery or
off-track betting, nor (b) include promotion of any lottery game or betting scheme
having a sports theme.

**EX 28, PAGE 2985**

**1993 RESOLUTION CEC-1**

*Whereas,* by resolution dated September 10, 1987 (as modified by resolutions dated May 23, 1990, May 22, 1991, and November 5, 1992), the NFL Management Council established a contingency fund (the "Strike Fund") to provide loans to its member clubs in the event of a player strike; and

*Whereas,* the Management Council wishes, in light of the Stipulation and Settlement Agreement dated February 26, 1993, which significantly reduces the prospect of a player strike, to apply amounts in the Strike Fund to satisfy in part the clubs' payment obligations under Article XII of the Stipulation and Settlement Agreement, it is hereby

*Resolved,* that if the District Court approves the Stipulation and Settlement Agreement, and if such approval has not at that time been invalidated by the Court of Appeals, the Executive Director be, and he hereby is, authorized to take all necessary and appropriate actions, including the execution of documents and certification of instruments, to transfer from the Strike Fund to the "qualified settlement fund" to be created pursuant to Article XII of the Stipulation and Settlement Agreement the following amounts on the following dates:

a) $70,000,000 on April 26, 1993 or ten days after District Court approval of the Stipulation and Settlement Agreement, whichever is later, and

b) the balance remaining in the Strike Fund on October 15, 1993.

**EX 28, PAGE 2986**

ase 2:12·md·02323·AB Document 19·34 Filed 02/29/12 Page 155 of 29
rcv·03396·R·23MAN Document 69·33·4 Filed 12/20/11 Page 155 of 29
ID #:10403
**1993 RESOLUTION FC-1**

*Resolved,* that the Finance Committee resolution dated March 22, 1982, amended October 23, 1984, and amended October 21, 1992, be further amended in the manner set forth below (new language underlined; deleted language struck over).

Subject:               Finance (Deferred compensation reserve mechanism)

Date of Adoption:   March 22, 1982; amended October 23, 1984; amended
                     October 21, 1992

*Resolved,* that the clubs establish a Deferred Compensation Reserve Mechanism in the form set forth in Exhibit A attached hereto (below);

Further *Resolved,* that each club prepare annually and submit to the League office the report and calculation described in Exhibit A;

Further *Resolved,* that the Treasurer of the League report at least annually to the Finance Committee the status of compliance by the member clubs with the provisions of Exhibit A;

Further *Resolved,* that the League, acting on behalf of the member clubs, establish a trust for the purpose of holding the funds deposited under the terms described in Exhibit A (with any officer of the League authorized to establish such trust);

Further *Resolved,* that the trustee described in Exhibit A be designated as Mercantile-Safe Deposit and Trust Company or such other trustee as the Finance Committee shall from time to time designate by instruction to the Treasurer;

Further *Resolved,* that the trustee, acting in consultation with or subject to an investment agent initially designated as Merrill Lynch Private Capital, Inc. or such other or additional investment agents as the Finance Committee shall from time to time designate by instruction to the Treasurer, be directed to invest the funds (or portions of the funds) in a manner consistent with the interest of the member clubs and subject to such limitations or restrictions as the Finance Committee shall from time to time determine as appropriate; and

Further *Resolved,* that the Finance Committee shall require the trustee to provide reports quarterly to the concerned clubs and the Finance Committee containing such information as the Finance Committee believes appropriate.

+ + + + +

**EX 28, PAGE 2987**

Case 2:12-md-02323-AB Document 6933 Filed 02/29/12 Page 156 of 29
Case 2:08-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 156 of 29
ID #:10404

**EXHIBIT A**

**DEFERRED COMPENSATION RESERVE MECHANISM**

1. Within 60 days of the measurement date (January 31 of each year), each club is to deposit with the trustee sufficient funds to bring its account with the trust to the balance calculated under paragraph (4) below.

2. In the transition years, the club will deposit no later than March 31, 1983, one-third of the amount calculated as of January 31, 1983, and at March 31, 1984. In subsequent years, the club will deposit 100% of the amount required.

3. Annual calculations required herein will be accompanied by a letter from the clubs' independent public accountants attesting to the accuracy of the calculation.

4. Calculation of the amount to be deposited shall be made as follows, and shall be set forth in reasonable detail in the report submitted:

   a) The club shall set forth the gross amount of deferred compensation payable at the measurement date, together with the amounts payable in each subsequent fiscal year ended January 31.

   b) The club shall deduct $1,000,000 from such gross amount of deferred compensation. The deduction shall be made from the earliest maturity first, and from successive years until the full deduction is claimed.

   c) The club shall calculate the present values, at the measurement date, of the remaining amounts payable, using ~~as~~ a discount rate ~~of 12%~~ the one year Treasury Bill rate as published in the Wall Street Journal on March 1st of each Year.

   d) The resultant sum of the present values is the amount that must be deposited with the trustee.

5. Each year, as soon as possible, the trustee shall advise each club of the total funds (at market value) standing to the club's credit, including accumulated fund earnings.

6. If a club reasonably anticipates that its funds on deposit are in excess of the amounts which will be required at the next measurement date, the club may upon certification to the League by a responsible officer of the club obtain refund of such excess.

7. In the event any club fails to make required deposits, the League may make the deposit on behalf of the club from any club funds to which the League has access.

Case 2:12-md-02323-AB Document 69-33 Filed 02/29/12 Page 157 of 29
Case 2:12-cv-08396-R-MAN Document 18-34 Filed 12/20/11 Page 157 of 29
ID #:10405

8. Funds held on deposit will remain part of each club's general assets and will be subject to the claims of creditors.

9. Deferred compensation includes (a) any compensation unpaid as of March 31 following the measurement date, earned and vested for services already performed by any club employee, and (b) any unpaid compensation to players for past or future services under signed contracts, the liability for which cannot be terminated by action of the contracting club or its assignee (such as termination via waivers). Any deferred compensation payable at an indefinite date (e.g., commencing one year after retirement) is to be included in the calculation as though the employee retired at the end of the existing contract with options.

10. Deferred compensation to any employee may be reduced by the amounts of any loans to that same employee, to the extent that such loans are reasonably available to be offset against payment of the deferred compensation.

**EX 28, PAGE 2989**

**1993 RESOLUTION FC-5**

**Primary Purpose Requirement**

*Resolved,* that if any privately-held corporation, partnership, trust or other entity owns or operates, directly or indirectly, any substantial non-football business or assets and owns, directly or indirectly, an interest in or otherwise operates a member club, then:

   (i) the member club shall be held in a separate corporation, partnership or trust (the "Football Company") the primary purpose of which shall at all times be and remain the operation of a professional football team as a member club of the League, which such primary purpose shall not be changed, and the only material asset of which shall be the member club;

   (ii) the ownership interest in the Football Company shall be held directly by a holding company that shall have no operating business or material assets but only ownership interests in other entities, and the ownership interests in the holding company shall be owned directly by individuals (or certain trusts or partnerships approved by the Commissioner's Office); and

   (iii) the Football Company and all individuals or entities holding a direct or indirect interest in the Football Company shall be subject to all of the League policies and requirements on ownership that the members may from time to time adopt or apply, including, without limitation, all reporting, audit, ownership and debt limitation requirements.

**EX 28, PAGE 2990**

**1993 RESOLUTION IC-1**

**(AS AMENDED)**

*Resolved,*

1. International Business Objectives

   A. That the League will continue to expand interest in the game, as appropriate, and coordinate programs to develop support for NFL football in international markets, including Canada, Mexico, Asia, and Europe;

   B. To accomplish the above, an NFL International Division will be established under a senior executive and with a business plan that integrates all existing and future elements that produce revenue and promote NFL football;

   C. This integrated business plan will include, but not be limited to, television, American Bowl series, licensing, a European-based league, sponsorships and grass roots development; and

   D. The International Division will form a joint venture with outside investors and committed sponsorship support to operate the European-based league, which is currently expected to commence its first season of play in 1995, subject to postponement by decision of the NFL or its representatives if economic conditions so dictate.

2. Termination of Existing WLAF

   A. The existing concept of a World League with a majority of teams in the United States and dependent on substantial North American television revenues will be discontinued in favor of a European-based league.

3. Business Plan and League Operations

   A. The International Division will develop a comprehensive business plan with full implementing documentation, including signed sponsorship, joint venture, investment and other agreements, all of which shall be reviewed and approved by both the Finance Committee and the International Committee;

   B. The business plan and implementing documentation will contain performance benchmarks and funding levels and timetables consistent with those presented to the membership at the 1993 Fall Recessed Meeting; and

1993-7

**EX 28, PAGE 2991**

C. Such plan, and a schedule for implementation of the plan, shall be delivered to the membership no later than the Spring Recessed Meeting in 1994.

**1994 RESOLUTION BC-4**

*Resolved,* that preseason contracts will be forwarded to the League office for Commissioner approval as follows:

Preseason game contracts by April 15. Any agreement between clubs for the home telecast (live or delayed) of a game must be in writing and forwarded to the League with the preseason game contract in question by the April 15 date.

Preseason television contracts by June 1. A copy of proposed preseason television contracts must be directed to the League office for initial review prior to the signing by the member club involved. Final, signed preseason television contracts will be forwarded to the League office for approval by the June 1 date.

Further *Resolved,* that club radio contracts will be forwarded to the League office for Commissioner approval as follows:

Radio contracts by June 1. A copy of proposed club radio contracts must be directed to the League office for initial review prior to the signing by the member club involved. Final, signed club radio contracts will be forwarded to the League office for approval by the June 1 date.

Further *Resolved,* that clubs will use standard preseason game, preseason television and club radio contracts provided by the League office when negotiating new or renewed contracts.

**EX 28, PAGE 2993**

**1994 RESOLUTION BC-6**

**(AS AMENDED)**

*Resolved,*

1. that the Commissioner cause NFL Enterprises L.P. ("Enterprises") to be formed as a Delaware limited partnership, to be owned by each of the member clubs equally;

2. that the Commissioner will cause the formation of a Delaware corporation, to be owned by each of the member clubs equally, to act as general partner of Enterprises;

3. that the Commissioner be, and hereby is, authorized to cause direct or indirect equity interests in Enterprises to be issued to each of the member clubs for such consideration as he shall deem appropriate; and

4. that the Executive Committee of the NFL Enterprises partnership shall at all times consist of the same club representatives who comprise the League's Broadcasting Committee.

**EX 28, PAGE 2994**

## 1994 CRITERIA FOR APPROVAL OF PREMIUM WAIVER

If a waiver of the requirement that the club seating premium be shared with the visiting team is requested under a stadium renovation plan, the following points must be met:

1. Each request for an exemption will be submitted to and must be approved by the membership, after review and consideration by the Finance Committee.

2. The maximum length of time for the exemption cannot exceed 12 years.

3. The total premium on the club seating, not just the visiting team share, must be used to finance renovation and/or amortize debt.

4. The percentage of club seats "waived" cannot exceed 20% of the total seating manifest.

5. The ticket price for a club seat must be as high as any other seat in the stadium. Further, VTS shall be calculated as if the average percentage price differential between the highest priced seats and the balance of the seats in the stadium that existed for the three years prior to the application's approval continues to exist.

6. For purposes of calculating VTS, any "premiums" that, in the period beginning five years after the project is commenced, are less than $250 per seat per season will be treated as ticket price increases subject to sharing.

7. VTS must increase in the first year of the project. In addition, once the waiver is granted, and so long as it is in effect, VTS attributable to the remaining seats in the stadium cannot be decreased.

8. Only projects that are directly related to stadium renovation and upgrading and that the requesting club can demonstrate will result in shamble revenue or other benefits to the visiting team will qualify for funding under the waiver. If non-qualifying projects such as practice facilities, team offices, luxury boxes, stadium clubs whose revenue is not shared with the visiting team, etc., are undertaken as part of a larger project that includes qualifying stadium renovation projects, the incremental cost of the non-qualifying projects must be borne by the team, whether or not any public funding is available for the project, with no VTS contribution.

9. The Finance Committee and the membership will consider plans that reflect departures from the above terms, but only if, during the waiver period, VTS is calculated as if those terms are in effect.

**EX 28, PAGE 2995**

**1995 RESOLUTION G-4**

*Whereas,* the Los Angeles Rams have requested that they be allowed to relocate their home territory from Los Angeles to St. Louis and have submitted a Statement of Reasons in support of their request pursuant to the League's Procedures for Proposed Franchise Relocation (the "Procedures");

*Whereas,* the Executive Committee rejected the Rams' request on March 15, 1995, in light of the Commissioner's report that, on the terms presented, the Rams' proposed relocation was not justified by the specifically identified factors set forth in the League's Procedures;

*Whereas,* notwithstanding its earlier rejection of the proposed Rams relocation, the Executive Committee has determined that in light of all circumstances and factors relevant to the proposed relocation, it is in the best interests of the League, as a collective whole, for the Rams' proposed relocation to St. Louis to proceed immediately;

*Whereas,* the Executive Committee further believes that St. Louis is a strong venue for NFL football and will suitably serve as a League home city;

*Whereas,* the Executive Committee further believes that it must be an important objective of the League to reconstitute a strong NFC presence in the greater Los Angeles area as soon as possible; and

*Whereas,* the Executive Committee also wishes to establish the terms applicable to the Rams' relocation, including, without limitation, the amount and disposition of the franchise relocation fee payable by the Rams.

Therefore, Be It *Resolved,* that the proposed relocation of the Rams' home territory from Los Angeles to St. Louis be approved on the terms set forth in this Resolution, which terms require:

• The Rams to share, as "gross receipts" sharable under Article XIX of the League Constitution and Bylaws, revenues, as provided below, from the sale of certain Personal Seat Licenses that are required for the purchase of season tickets to Rams' home games in St. Louis. Of such PSL proceeds, $50.0 million have been determined to be sharable as "gross receipts," and the 34% portion of such funds to be shared is equal to $17.0 million. Such $17.0 million shall be paid to the League and distributed pro rata to the other 29 member clubs of the League or pooled, as the Executive Committee shall later determine. Such funds shall be paid in equal annual installments over the next fifteen years, with the first such installment to be paid within thirty days from the closing (the "Closing") of the transaction contemplated by that certain NFL Franchise Relocation Agreement dated as of January 17, 1995 (the "Relocation Agreement") and any subsequent installments to be paid annually on or before the anniversary date of the initial installment payment;

**EX 28, PAGE 2996**

Case 2:12-cv-03396-R-MAN Document 69-34 Filed 12/20/12 Page 165 of 293
Case 2:12-md-02323-AB Document 18-34 Filed 03/29/12 Page 165 of 29
ID #:10413

- The Rams to indemnify the other member clubs of the League for any rebate in the rights fees paid, or diminution in the rights fees to be paid, to the League in respect of any of the League's current television arrangements (for the years 1995-1997) caused by substitution of St. Louis for Los Angeles, subject to a "cap" on the aggregate amount payable by the Rams pursuant to this paragraph of $12.5 million, and further provided that such payment, in all events, shall not exceed 50% of the total rebate made or diminution suffered by the League. The Rams shall have the right to arbitrate, under procedures to be determined by agreement between the Rams and the League, whether any such rebate should have been made or diminution should have been agreed to and, if so, the appropriate amount of such rebate or diminution;

- Subject to and conditioned on the Closing, the Rams to pay to the League, for stadium trust fund purposes, for payment of NFL Charities, Inc., or for such other purposes as the Finance Committee may determine, a franchise relocation fee in an aggregate amount of $29 million to reflect the enhancement of the value of the Rams franchise resulting from the club's relocation to St. Louis, with an initial installment of $20 million to be paid in respect of such fee on or before November 15, 1995, and the balance of $9 million to be paid in equal installments over a 15-year period, with each installment to be paid on or before November 16 of the year due;

- The Rams to forgo their right to receive any portion of the fees or other consideration ("Fee") received by the League from the award of the next two clubs added to the League by expansion if such teams are added at any time within the next ten years; provided, however, the Rams shall fully participate in a Fee attributable to the award of an expansion club in the greater Los Angeles area if one of the next two expansion clubs is located within said area; and

- The Rams to recognize the League's right (a) to determine the start time of all St. Louis home games and (b) to determine the club's conference and divisional alignment, and in furtherance of such right to grant to the Commissioner an irrevocable proxy to vote on behalf of the Rams in connection with any realignment proposal;

Further *Resolved,* that the Executive Committee hereby reaffirms that, in light of the importance of a second greater Los Angeles area team to the League's television packages and to other interests of the League, after the Rams' relocation to St. Louis the League, as a collective whole, will own and control the second franchise opportunity in the greater Los Angeles area; that no club may appropriate such opportunity for itself without the consent of the Executive Committee, as required by Section 4.3 of the League Constitution and Bylaws; and that any further relocation of a member club to the greater Los Angeles area shall be conditioned upon the payment of an appropriate franchise enhancement fee and satisfaction of other terms (including terms consistent with those set forth

**EX 28, PAGE 2997**

above) to be determined pursuant to procedures and/or criteria to be promulgated by the Commissioner; and

Further *Resolved,* that the visiting team share of all premiums charged by the Rams with respect to club seats in the new St. Louis domed stadium (which are sharable with visiting teams playing in the stadium pursuant to 1987 Resolution FC-1) shall be pooled in a League account for distribution in such manner as the Executive Committee may direct.

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 167 of 29
Case 2:12-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 167 of 29
ID #:10415
**1995 RESOLUTION G-6**

*Whereas,* the Executive Committee wishes to create a pool consisting of (1) the amount visiting teams would have received, absent this resolution, in respect of monies received, directly or indirectly, by any party, including any member club (a) in excess of the stated ticket price for any "club" or "premium" seat (other than seats in luxury suites) attributable to the sale, lease, or licensing for use of such seat, or (b) from any party's sale or issuance of any "permanent seat licenses" or other similar instruments that give purchasers the right to acquire tickets to NFL games (other than the Super Bowl game), and (2) any franchise enhancement, transfer, relocation, or similar fees or payments made by or in respect of any member club in connection with any geographic relocation of any NFL franchise (all such revenues, the "Pooled Revenues");

Be it *Resolved,* that all Pooled Revenues shall, from and after the adoption of this resolution, be required to be paid to an administered fund, which fund shall be distributed currently according to distribution standards to be adopted by the NFL Management Council Executive Committee, to member clubs with adjusted revenues (defined as gross revenues less aggregate amounts paid for stadium rent [not to exceed 15% of net gate receipts] and for locally-required player benefits) that are less than the League average (any such clubs, "Receiving Clubs");

Further *Resolved,* that the CEC shall consult with the Finance Committee of the League and shall annually circulate to the member clubs for comment its proposed distribution standards for each season before making any distribution from Pooled Revenues to any Receiving Clubs; and

Further *Resolved,* that the arrangements set forth herein for distribution of Pooled Revenues to Receiving Clubs are conclusively deemed by the membership to satisfy in full the requirement, set forth in Resolution MC-92-2 and CEC Resolution 93-1, that a revenue sharing plan be adopted as an interdependent component of the Management Council's adoption of the 1993 Collective Bargaining Agreement.

**EX 28, PAGE 2999**

# 1996 RESOLUTION FC-1

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous current economic factors and conditions, including recent changes in franchise values and current and foreseeable club revenue levels;

*Resolved,* that effective March 31, 1996, the amount of debt which each member club may incur, as described in 1988 Resolution FC-3 (which set the debt ceiling at $35 million and took effect on March 31, 1988), be raised from the current $40 million (at which the debt ceiling has been set since March 23, 1994) to $55 million; and

Further *Resolved,* that without limitation of the foregoing, the authorization for an incremental $10 million of debt in excess of club debt to be secured by the principal and/or controlling owner's interest in the franchise (as described in 1992 Resolution FC-1 and extended by 1994 Resolution FC-3) be repealed effective March 31, 1996;

Further *Resolved,* that effective March 31, 1996, no debt beyond the foregoing $55 million may be secured by any principal and/or controlling owner's interest in a franchise, but that both the assets of the member club and the principal and/or controlling owner's interest therein may be used as security for the foregoing $55 million in debt, in such proportions as the club and its principal and/or controlling owner may determine;

Further *Resolved,* that any debt of any principal and/or controlling owner of a club secured by such owner's interest in the club shall count towards such club's $55 million debt ceiling on a dollar-for-dollar basis;

Further *Resolved,* that each club shall be required annually to submit to the Treasurer an auditor's letter certifying that it is, and at all times during the previous year has been, in compliance with the debt ceiling at all levels; and

Further *Resolved,* that the Finance Committee will annually consider whether, in light of inflation, projected revenues, and franchise values, the overall club and/or controlling owner debt limitation should be further increased, and will report to the Executive Committee.

1996-1

**EX 28, PAGE 3000**

**1996 RESOLUTION FC-5**

*Whereas,* the Finance Committee has determined, in light of estate planning and similar issues, to relax to a limited extent the provisions of 1985 Resolution FC-7 that (1) restrict member clubs organized as limited partnerships to 15 limited partners and (2) require each person who holds a direct or indirect beneficial interest in the club to be counted as a limited partner for purpose of the restriction;

Be It *Resolved,* that member clubs organized as limited partnerships will continue to be required to have a single general partner controlled by an individual who has at least a 30% equity interest and total voting control of the general partner's and limited partnership's affairs (except for voting rights of limited partners required by law);

Further *Resolved,* that from the date of this resolution, up to a total of 25 persons may own direct or indirect interests in such clubs (including interests in the general partner of such a club); and

Further *Resolved,* that with respect to *family companies* and *family trusts* owning limited partnership interests in a member club, the following ownership attribution rules will apply for purposes of these ownership limitations:

> Family companies and family trusts shall count as a single "person" if:
>
> (1) members of a single family (a) own substantially all equity interests in the company, or (b) constitute substantially all of the trust beneficiaries, and
>
> (2) the only assets owned by the particular company or trust in addition to the NFL club interest are passive investment assets that are not used in an active trade or business (although a family company owning an interest in an NFL club may be a member of a group of companies structured in accordance with 1993 Resolution FC-5), and
>
> (3) in the case of a company, a single individual has voting control of such company (whether as general partner, equity holder, voting trustee under a trust containing provisions with respect to control, continuation, primacy of League policies, and trustee succession that are acceptable to the League, or proxy holder under irrevocable proxies in form and substance acceptable to the League), and in the case of a trust, a single individual acts as trustee under a trust agreement containing provisions with respect to control, trustee succession, primacy of League policies, and investment restrictions that are acceptable to the League.

1996-2
**EX 28, PAGE 3001**

**1996 RESOLUTION FC-6**

*Whereas,* the Finance Committee has determined that restrictions on the number of owners of NFL clubs that are organized as corporations should be adopted; and

*Whereas,* the Committee further believes that those restrictions should be comparable to those set forth in 1985 Resolution FC-7, as amended by 1996 Resolution FC-5, and that certain benefits afforded to the principal and/or controlling owner of a club organized as a limited partnership under 1985 Resolution FC-7 should also be extended to principal and/or controlling owners of clubs organized as corporations;

Be It *Resolved,* that from the date of this resolution, no more than a total of 25 persons may own direct or indirect interests in member clubs organized as corporations;

Further *Resolved,* that with respect to *family companies* and *family trusts* owning interests in a member club organized as a corporation, the following ownership attribution rules will apply for purposes of these ownership limitations:

> Family companies and family trusts shall count as a single "person" if:
>
> (1) members, of a single family (a) own substantially all equity interests in the company, or (b) constitute substantially all of the trust beneficiaries,
>
> (2) the only assets owned by the particular company or trust in addition to the NFL club interest are passive investment assets that are not used in an active trade or business (although a family company owning an interest in an NFL club may be a member of a group of companies structured in accordance with 1993 Resolution FC-5), and
>
> (3) in the case of a company, a single individual has voting control of such company (whether as general partner, equity holder, voting trustee under a trust containing provisions with respect to control, continuation, primacy of League policies, and trustee succession that are acceptable to the League, or proxy holder under irrevocable proxies in form and substance acceptable to the League), and in the case of a trust, a single individual acts as trustee under a trust agreement containing provisions with respect to control, trustee succession, primacy of League policies, and investment restrictions that are acceptable to the League;

Further *Resolved,* that if an NFL club is owned by a privately held corporation that has multiple classes of stock, one of which possesses full voting power and the others of which possess voting power only to the extent required by applicable

**EX 28, PAGE 3002**

corporate law, the principal and/or controlling owner shall only be required to have a 30% equity interest in the corporation if such principal and/or controlling owner owns all of the voting stock of the corporation and is not subject to contractual or other restrictions on his ability to vote such stock;

Further *Resolved,* that if an NFL club is owned by a privately held corporation other than one described above, there shall be a single individual (or League-approved voting trust or family holding company) who owns at least 51% of the stock and controls at least 51% of the voting power of such corporation; and

Further *Resolved,* that any NFL club owned by any corporation that is not in compliance with this resolution as of the date of its passage shall come into compliance with this resolution no later than December 31, 1997.

**EX 28, PAGE 3003**

**1996 RESOLUTION G-1**

*Resolved,* that the recommended settlement among the Cleveland Browns franchise, the City of Cleveland, the Maryland Stadium Authority, Art Modell, and the League described to the membership and reflected in binding letter agreements dated February 8, 1996 between the League, Cleveland, Art Modell, and the MSA, is hereby approved;

Further *Resolved,* that pursuant to the settlement Art Modell (or a franchise entity controlled by Art Modell) will become the operator of an NFL franchise in Baltimore effective in the 1996 NFL season (to operate with current Browns personnel under a new name approved by the League); will make a $29 million payment to the League (with an initial payment of $20 million and the balance in 10 equal annual installments); will pay 34% of all Baltimore PSL revenues into the League revenue sharing pool in equal payments over a 15-year period; and will transfer the Cleveland Browns name, logo, trademarks, heritage, history and memorabilia to the Commissioner in trust, for assignment to an NFL franchise designated by decision of the League's membership to begin play in Cleveland in the 1999 League season;

Further *Resolved,* that pursuant to the settlement the League will commit that a franchise (either an existing or expansion franchise, to be determined in 1998 or 1999) will resume play in Cleveland as the Browns upon completion to the League's satisfaction of a new stadium in 1999; and the League will advance up to $48 million in construction funds to Cleveland for the new stadium (promised upon satisfactory premium seat sales, execution by the City of a lease on the terms of its November 8, 1995 proposal to the Browns, and public and business community commitment of at least $192 million in construction funds for the stadium), to be repaid to the League by the club beginning play in Cleveland in 1999; and

Further *Resolved,* that the settlement shall be embodied in documents satisfactory to the Commissioner and the Stadium and Finance Committees, and shall be conditioned upon mutual general releases and waivers of all litigation claims by all involved parties.

**EX 28, PAGE 3004**

**1996 RESOLUTION G-4**

*Whereas,* on February 7, 1996, the Houston Oilers formally advised the Commissioner of their desire to relocate their home territory from Houston, Texas, to Nashville, Tennessee, and made a submission in support of the proposed relocation, as contemplated by the League's Procedures for Proposed Franchise Relocations (the "Procedures"); and

*Whereas,* the Executive Committee has determined that in light of all circumstances and factors relevant to the permanent relocation of the Oilers' home territory to Nashville, it is in the best interests of the League, as a collective whole, for such relocation to be approved, notwithstanding that it may be necessary for the Oilers to play in Houston and/or Memphis during the 1996 and 1997 seasons (and possibly the 1998 season) in light of the terms of the Oilers' lease for the Houston Astrodome and the construction schedule for the proposed new stadium to be built for the Oilers in Nashville; and

*Whereas,* the Executive Committee now wishes to establish the terms applicable to the permanent relocation of the Oilers' home territory to Nashville;

Be It *Resolved,* that the permanent relocation of the Oilers' home territory from Houston to Nashville (the "Relocation") be approved on the terms and subject to the conditions set forth in this Resolution;

Further *Resolved,* that in connection with the Relocation, the Oilers shall pay a franchise relocation fee in an aggregate amount of $20 million to reflect the enhancement in value of the Oilers franchise resulting from the club's relocation to Nashville, to be paid on or before October 1, 1998. In addition, the Oilers shall pay, at such times and in such manner as directed by the Commissioner, up to $5 million to visiting teams which played in Houston in 1995 and which play in Houston or Memphis at any time before the club's new stadium in Nashville is completed, in such amount(s) as may be necessary in order to ensure that the visiting clubs receive visiting team shares in respect of their games at Houston or Memphis that, on average, are at least equal to $542,000 (the average visiting team share paid by the Oilers over the 1992 through 1994 seasons);

Further *Resolved,* that consistent with established League practice, any revenues received from the sale of Permanent Seat Licenses or club seats that are invested in construction of the new Nashville stadium shall not be subject to sharing in accordance with established criteria and upon final approval by the Finance Committee;

Further *Resolved,* that in connection with the Relocation, the Oilers shall grant to the Commissioner an irrevocable proxy to vote on behalf of the Oilers in connection with any realignment proposal;

Further *Resolved,* that the approval granted hereby shall be automatically voided, and of no force and effect, if either:

**EX 28, PAGE 3005**

Case 2:12-md-02323-AB Document 69-34 Filed 02/20/12 Page 174 of 29
Case 2:12-cv-03396-R-MAN Document 18-34 Filed 02/29/12 Page 174 of 29
ID #:10422

• Davidson County voters fail to approve the proposed Oilers relocation in the referendum to be held on May 7, 1996; or

• Federal legislation applicable to the Relocation shall be enacted during the 104th Congress, which legislation would require the League to grant an expansion franchise to any investor on any basis that is "forced" or that involves any term, including a requirement to expand the League, that is not willingly agreed to by the League and its member clubs. The Commissioner shall have the authority to deem this condition satisfied upon the adjournment of the 104th Congress; and

Further *Resolved,* that the approval granted hereby shall be embodied in documents satisfactory to the Commissioner and to the Finance Committee, which shall include general litigation releases from the Oilers and all of their affiliates and from the Nashville parties.

**1997 RESOLUTION FC-3**

*Whereas,* the membership desires to strengthen and improve the League's existing ownership policies;

*Whereas,* the membership desires to retain and reaffirm the traditional role of individual locally-based ownership; and

*Whereas,* the membership also desires to reaffirm and strengthen the right and duty of the membership carefully to review and approve proposed changes in club ownership;

Be it *Resolved,* as follows:

1. That the controlling owner of an NFL club may acquire an interest in a major league baseball, basketball or hockey ("other major sports league") franchise (subject to prior notice to the Commissioner and to such covenants and safeguards as the Commissioner and Finance Committee may determine are appropriate to address actual or perceived conflicts of interest that may arise in the particular situation), but only if such other franchise is located (1) within the home territory of the owner's NFL club, or (2) within a neutral area, i.e., any area that is not within the home territory of any NFL club;

2. That the controlling owner of an NFL club may propose to sell his NFL ownership interest to an individual owner of a franchise in another major sports league, but only if (a) the other major sports league franchise is located within the home territory of the owner's NFL club or within a neutral territory, (b) the NFL owner has given advance notice to the Commissioner of his consideration of such a sale and has advised the Commissioner of his reasons for believing the proposed cross-ownership to be appropriate, and (c) the Commissioner and the Finance Committee have investigated the situation in accordance with criteria and procedures to be established by them to address actual or perceived conflicts of interest or other circumstances relevant to the particular situation, and have determined that the relative balance of the asserted benefits and disadvantages of cross-ownership in the particular situation (including the existence or absence of other possible purchasers of the controlling NFL interest) make it appropriate for the NFL owner to proceed to negotiate the proposed sale and to submit it for Executive Committee approval;

3. That any sale of a controlling interest in an NFL club to an owner of another major league sports franchise shall, after negotiation of a sale agreement, be submitted for consideration to the Executive Committee as required by the League's standard procedures, and shall require the approval of three-quarters of the membership;

**EX 28, PAGE 3007**

4. That any cross-owner of an NFL club shall own and operate such NFL club in compliance with the terms of all NFL ownership, debt ceiling, and other policies applicable to the ownership or operation of an NFL club, and such safeguards or covenants as the Commissioner and Finance Committee may determine are appropriate to the particular situation;

5. That in order to ensure compliance with the NFL Constitution and Bylaws, the Collective Bargaining Agreement, and other NFL policies and agreements and to avoid potential conflicts of interest and the appearance thereof, the Commissioner will annually conduct audits, as appropriate, of any cross-owned NFL club and/or affiliated entities of such NFL club, and will have the authority to review, as appropriate, any contracts of any cross-owned NFL club or affiliated entity based upon the Commissioner's determination that reasonable cause exists to review such contracts for the reasons set forth above, and may impose sanctions pursuant to his authority under the Constitution and Bylaws; and

6. That for purposes of this resolution the "home territories" described above shall include each home territory in which a club is currently playing (which, as of the date of this resolution, includes Houston) as well as the areas that would constitute the home territories of clubs playing in Cleveland, greater Los Angeles (including Orange County), Nashville, and Memphis.

Further *Resolved,* that any person designated as an appointee or alternate under Article VI of the Constitution and Bylaws may not serve in that capacity if disapproved by the Commissioner and Finance Committee for any reason. This paragraph shall not apply to any current owner of an interest of an NFL club unless that club is or becomes commonly owned with another major sports league franchise.

**EX 28, PAGE 3008**

## 1997 RESOLUTION FC-6

### (AS AMENDED)

*Resolved,* that if any member club or any entity controlled by any direct or indirect owner of an interest in a member club (a "Claiming Party"), initiates, joins, has a direct, football-related financial interest in, or offers substantial assistance to any lawsuit or other legal, regulatory, or administrative proceeding ("Claim") against the League, any affiliated League entity (including, without limitation, NFL Enterprises, NFL Films, or NFL Properties), a majority of the other member clubs, or any other member club(s) on a basis that the Commissioner determines is generally applicable to a majority of clubs, or any director, officer, or employee of any such entity (a "League Affiliate") (including any suit purportedly filed on behalf of the League or any League Affiliate), each Claiming Party shall be obligated jointly and severally to reimburse the League and/or each such League Affiliate for all of such party's legal fees, litigation expenses, and costs incurred in such Claim if the Claiming Party (or the third party that received substantial assistance from the Claiming Party, or in whose Claim the Claiming Party has a direct, football-related financial Interest) does not obtain a judgment on the merits which substantially achieves, in substance and amount, the remedy sought;

Further *Resolved,* that the Commissioner or his designee, following notice and an opportunity for the Claiming Party to be heard, shall determine the amount of said legal fees, litigation expenses, and costs, and such determination shall be final and binding;

Further *Resolved,* that the Commissioner shall have authority to make a special League assessment equal to said amount against the Claiming Party and to make payments from said assessments to each League Affiliate entitled to receive them;

Further *Resolved,* that this resolution shall apply to all future claims, but shall not require payment to the League or any League Affiliate of its legal fees, litigation expenses, or costs in the event of (i) a negotiated settlement of any such Claim; or (ii) in any case brought under Section 8.3 of the Constitution and Bylaws or any similar method of internal dispute resolution; or (iii) in any claim brought by a non-football entity controlled by a direct or indirect owner where the Claim does not address business practices of the League or of a League Affiliate in a way generally applicable to all clubs; and

Further *Resolved,* that the other powers of the Commissioner and/or Executive Committee that may be applicable to such a Claim under the NFL Constitution and Bylaws (e.g., the power to make a determination as to conduct detrimental and to impose penalties for such conduct) are not affected by this Resolution.

**EX 28, PAGE 3009**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 178 of 293
Case 2:12-cv-03396-R MAN Document 69-34 Filed 12/20/11 Page 178 of 293
ID #:10426

**1997 RESOLUTION JC-1**

*Whereas,* the NFL Employee Benefit Committee and the NFL Finance Committee have considered certain issues concerning club policy to provide employee group medical benefits;

*Resolved,* that effective April 1, 1997, the NFL clubs' group medical plans will provide coverage for new employees transferring from other NFL clubs and League entities, as of the date of hire, and will further provide that no limitations for pre-existing conditions for the new employee and his dependents may be applied; and

Further *Resolved,* that medical insurance be extended until age 65 for employees (and for their dependents) who have 15 years of pension credited service and who are eligible for early retirement (age 55) when they leave NFL football, subject to the following conditions:

- The employee must have a Credited Season for the 1996 or later NFL season.

- The employee will participate in the plan of the club from which he retires, under the same terms, including any required employee contribution, as active employees.

- The employee must make a contribution at least equal to 20 percent of the cost of coverage.

- The net cost after employee contributions will be paid by the club from which the employee retires.

- The club's obligation ends when the employee becomes eligible for Medicare or another employer group medical plan, or attains age 65.

**EX 28, PAGE 3010**

# 1997 RESOLUTION NFLP-3

#### (AS AMENDED)

*Whereas,* the member clubs of the NFL have determined that, in order to promote the primary business of the member clubs (professional football), it is necessary and appropriate to form, on a League-wide coordinated basis, a venture to create and operate location-based entertainment ("LBE") venues with an NFL theme (the "Venture");

*Whereas,* the LBE venues will include interactive entertainment, other entertainment, retail, NFL memorabilia, and food service, and will both foster fan interest in the NFL and create a new and separate source of revenues not derived from NFL games; and

*Whereas,* the member clubs now wish to authorize and direct the formation of one or more entities to engage in this new Venture;

Be it *Resolved,* that the Commissioner, with the concurrence of the NFLP Executive Committee and the Finance Committee, is hereby authorized and directed to cause the formation of a limited partnership, to be named NFL Attractions, L.P. or such other name as he may determine (the "Partnership"), to be owned in equal shares by all NFL member clubs, with a sole general partner owned in equal shares by each of the member clubs (the "General Partner");

Further *Resolved,* that the initial board of directors shall be Roger Headrick, Wayne Weaver, Robert Tisch, Jerry Richardson and Pat Bowlen, as representatives of the NFL Properties Executive Committee, the Finance Committee, the Stadium Committee, and the Broadcasting Committee respectively;

Further *Resolved,* that the General Partner shall, under the control of its Board of Directors, negotiate and enter into a joint venture agreement with St. Joe Corporation on the terms generally presented to the member clubs on December 9, 1997 with such changes therein as the Board of Directors and the officers of the General Partner negotiating the same shall deem reasonable or appropriate (with the General Partner's execution of the same to be conclusive proof of the acceptability of the same);

Further *Resolved,* that the Board of Directors of the General Partner shall have full authority to approve any and all joint venture agreements and to designate the Partnership's representatives on the joint venture board;

Further *Resolved,* that if the Board of Directors of the General Partner elects not to proceed with a joint venture with St. Joe Corporation, it may cause the Partnership to pursue the Venture with another joint venture partner on such terms and conditions as the Board may deem reasonable or appropriate;

**EX 28, PAGE 3011**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 180 of 29
Case 2:13-cv-03396-R-MAN Document 18-34 Filed 12/20/11 Page 180 of 29
ID #:10428

Further *Resolved,* that the member clubs hereby acknowledge that proper implementation of the Venture will require long-term licenses for NFL and club marks, logos, film, and other rights, in order to assure that this new business venture can operate successfully for a long period of time, and accordingly the member clubs recognize the importance to the Venture, and approve the grant, of appropriate long-term licenses for such marks, logos, film and other rights by NFL Properties, Inc., NFL Films, Inc., and NFL Enterprises L.P. to be used solely in connection with this Venture; and

Further *Resolved,* that each member club will cooperate as reasonably requested with the Partnership and the joint venture in implementing and carrying out the business plan related to the Venture.

**1998 RESOLUTION BC-1**

*Resolved,* that the membership hereby approves the eight-year television contracts with ABC, ESPN, CBS, and FOX, covering all NFL regular season and postseason games, the Hall of Fame game, and no less than 10 other preseason games each year, for the 1998 through 2005 seasons;

Further *Resolved,* that the League will implement the television agreements with these organizations through scheduling, game length, overall cooperation, and preseason policies described to the membership and comparable to those in effect from 1994-97, with 16 games played over 17 weeks each season, with one bye week for each team each season; and

Further *Resolved,* that each team participating in a nationally-televised preseason game (other than the Hall of Fame game) will receive $400,000 for its participation in such game, and that all other television income will be divided equally pursuant to the Constitution and Bylaws.

**EX 28, PAGE 3013**

**1998 RESOLUTION BC-2**

*Resolved,* that member clubs will cooperate fully with the television networks (ABC, CBS, ESPN and FOX) in order to present NFL football on television in the most professional manner. Such cooperation will include, but not be limited to, the following areas:

1. GAME PREPARATION

   • Making previous game tapes available to TV announcers for viewing.

   • Allowing network personnel (defined as the producer, director and game announcers) reasonable access at practice one or two days before a game, at the network's option.

   • Making players/coaches available, either the day before a game, or on game day, for interviews or other pre-taping when it does not interfere with standard club operations or practices.

   • Supplying a fresh set of head shots including all players, the head coach, general manager and principal owner(s) by July 15 of each season to NFL Films for distribution to the networks.

2. GAME COVERAGE

   • Making available, if asked, a key player from the winning team for a brief interview with the telecasting network immediately following the game.

   • Strictly adhering to League policy regarding the six-foot white border and the yellow restraining line, and agreeing to an expanded secondary border area that will allow special access for network television.

   • Making available accurate injury information as quickly as possible to the network during a game.

   • Strictly adhering to game time schedules.

   • Properly maintaining and operating referee wireless equipment (which includes a complete back-up set).

   • Allowing the use of a sideline camera cart or carts on both sides at the field.

   • Providing acceptable low end zone camera locations.

**EX 28, PAGE 3014**

- Allowing hand-held crews to shoot from approved locations outside of the yellow restraining line, including behind team bench areas.

- Providing two individuals on the sidelines whose primary assignment will be TV liaison. One person, which both the home team (every home game) and visiting team (optional) should supply, will assure that the network's field camera crews and field reporter(s) have access to primary allowable areas from which to shoot and/or report. The second individual (the NFL Sideline Coordinator), approved by the League office, will wear a Green Hat and will serve as direct liaison with the network's sideline coordinator (Orange Sleeves). These two individuals will serve as representatives of each club's P.R. Director and the League on applicable matters. They must be present at the pre-game officials meeting 1:30 before kickoff.

3. SCHEDULING

- Making every effort to maximize stadium availability for scheduling purposes.

- Agreeing, with proper notice, to switch regular season games from 1:00 to 4:00 p.m. (Eastern Time) to accommodate television broadcasting patterns.

- Agreeing to cooperate fully with League office on finalization of the network preseason game packages.

4. NEW/RENOVATED STADIUMS

- Providing minimum broadcasting requirements in new or remodeled stadiums, including

  - Locating the TV booth at 50-yard line between 40 and 80 feet above field with minimum width of 20 feet.

  - Positioning primary elevated coverage cameras on TV booth side between 19 and 27 degrees (to near sideline) with standing positions and unobstructed views.

  - Locating high end zone camera positions between 24 degrees and 36 degrees to back of each end zone.

  - Having available at least five radio/preseason TV booths.

  - Guaranteeing NFL Films two elevated camera locations at approximately the 50-yard line.

**EX 28, PAGE 3015**

Case 2:12-md-02328-AB Document 1834 Filed 03/29/12 Page 184 of 29
ase 2:08-cv-03395-R-MAN Document 69-33 Filed 12/20/11 Page 184 of 29
ID #:10432

5. NETWORK ADVERTISER/SPONSOR SUPPORT

- Making a reasonable number of game tickets available to the networks. If requested, the minimum number for FOX and CBS will be 10 season tickets, or 24 tickets to any specific game telecast by either network. If requested, each club should also make 50 tickets available to FOX and CBS for at least one game per season (game or games selected by the network). If requested, the minimum for ABC will be 175 tickets per each game telecast. If requested, the minimum for ESPN will be 100 tickets per each game telecast. Regarding individual game ticket allocations other than season tickets, at least 20 tickets, in groups of two or more, will be located between the 30-yard lines and with elevation. If requested, up to 24 tickets per game will be provided to our national radio partner—currently CBS Radio—for games it broadcasts.

- Allowing the applicable television network to place appropriate signs/banners on end zone walls or on field level walls across the field from camera locations so that they may be shown on the telecast that has been purchased by the network. Conversely, clubs will not allow local radio/television stations or any other commercial identifications via signs/banners on end zone walls or on field level walls across from network camera locations or on the field surface, including sideline areas, so that television networks will be forced to show such commercial signage as part of their telecasts and therefore provide free television time. Stadium names with commercial tie-ins also are prohibited from being placed in these restricted areas.

- Agreeing not to cooperate in any way with local television shows that would air at the same time as FOX and CBS pregame shows, or against any network game telecast.

Case 2:12-md-02323-AB Document 6933-4 Filed 03/29/12 Page 185 of 293
2:11-cv-08395-R MAN Document 69-33 Filed 12/20/11 Page 185 of 29
ID #:10433
**1998 RESOLUTION BC-4**

*Resolved,* that the Commissioner will apply the following policies in preparing the official League regular season schedule:

1. The scheduling of all Sunday games and late season Saturday games remains at the discretion of the League office.

2. The following scheduling provisions will apply to the Monday Night Football Package:

   a) Maximum of three appearances per club.

   b) If a club is scheduled three times, two of the three games will be scheduled home or away, unless prior permission is received from the club.

   c) If a club is scheduled twice, both games may be scheduled at home, both games may be scheduled away, or one game may be scheduled at home and one away.

   d) If a club is scheduled once, the game may be scheduled home or away.

3. No club will be asked to make more than one appearance per season in games scheduled on dates other than Saturday, Sunday or Monday, i.e. Thanksgiving Day games or other Thursday games that would result in a team having less than a full week of preparation time both before and after the game.

**EX 28, PAGE 3017**

**1998 RESOLUTION BC-5**

*Resolved,* that teams will cooperate fully with the League office on the finalization of the network preseason game package (11 game minimum, HOF game included);

Further *Resolved,* that teams are obligated to play a minimum of two network preseason games, if asked (HOF game and other international "extra" games not included) and understand that there may be specific instances when additional games are required;

Further *Resolved,* that teams will agree to play preseason games on nights other than Saturday (two Monday night games, and one or more Thursday, Friday and Sunday night games will be required at minimum);

Further *Resolved,* that teams will agree to play daytime preseason games as required by our network agreements;

Further *Resolved,* that teams understand that their local stations give up all rights, including tape delay to games selected for the network preseason game package. (Television patterns will be the same as in the regular season); and

Further *Resolved,* that League office decisions on the preseason schedule will be final and binding on the member clubs with such decisions to be made in the collective best interest of the teams and the League.

**EX 28, PAGE 3018**

**1998 RESOLUTION BC-6**

**(AS AMENDED)**

    *Resolved,* insofar as the annual AFC/NFC Hall of Fame game will be moved
to Prime Time in order to secure better television exposure of the game, the
Commissioner shall have the authority to designate the participants on an annual
basis, beginning in 1999. One participating team shall be selected from the
American Football Conference, and the other participating team shall be selected
from the National Football Conference, provided that no team shall be required to
play more than once in any seven year period.

**EX 28, PAGE 3019**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 188 of 29
Case 2:11-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 188 of 29
ID #:10436

**1998 RESOLUTION BC-7**

*Resolved,* that beginning with the 1998 season, the League shall pay $500,000
per game to each team participating in a nationally televised preseason game
(other than the Hall of Fame game).

**EX 28, PAGE 3020**

**1998 RESOLUTION FC-2**

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions, including franchise values and current and foreseeable club revenue levels;

Be it *Resolved,* that effective April 1, 1998:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $55 million to $75 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1; and

3. If more than $20 million of such $75 million in debt is secured by any direct or indirect interest of the principal or controlling owner of a club or a liability of such principal or controlling owner (whether directly or by way of guaranty or other surety), then all amounts of such debt in excess of such $20 million shall be secured by a pledge of substantially all of the member club's assets in addition to any pledges or other security given by the principal or controlling owner in respect of such amounts; and

Further *Resolved,* that the Finance Committee will annually consider whether, in light of inflation, projected revenues, and franchise values, the overall debt limitation should be further increased beyond the aggregate $75 million allowed under this resolution, and will report to the Executive Committee.

**EX 28, PAGE 3021**

**1998 RESOLUTION FC-3**

*Whereas,* the League has undertaken a coordinated international development effort through NFL International, which is operated as a part of NFL Enterprises L.P.; and

*Whereas,* the Finance Committee, in consultation with the International Committee, has determined that it is appropriate and in the League's long-term interest to dedicate on an ongoing basis an amount equal to the League's international television revenues to the funding of NFL International's business operations;

Be it *Resolved,* that in the current League fiscal year and in all League fiscal years until this resolution is repealed, the Treasurer is authorized and directed to pay from the Agency Account to NFL Enterprises L.P. an amount equal to the League's international television revenues for such League fiscal year;

Further *Resolved,* that such payment shall be deemed an additional capital contribution made equally by all member clubs to NFL Enterprises L.P.; and

Further *Resolved,* that such additional capital contribution shall be used exclusively to fund the international development effort to be conducted by NFL International.

**EX 28, PAGE 3022**

**1998 RESOLUTION FC-9**

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions, including franchise values and current and foreseeable club revenue levels;

Be it *Resolved,* that effective August 1, 1998:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $75 million to $100 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1;

3. The level at which 1998 Resolution FC-2 requires club-related liabilities of the principal or controlling owner (including obligations secured by his interest in his club) also to be secured by a pledge of club assets shall be increased from $20 million to $25 million; and

4. In connection with any acquisition of a member club or any controlling interest therein, the principal and/or controlling owner shall be required to invest equity (cash on hand or funds borrowed against other current or determinable future assets of such owner) in a minimum amount to be determined by the Finance Committee, and no acquisition transaction that the Finance Committee finds to be excessively leveraged shall be recommended by the Finance Committee for membership approval; and

Further *Resolved,* that the Finance Committee will consider at the March 1999 League meeting, and annually thereafter, whether, in light of inflation, projected revenues, and franchise values, the overall debt limitation should be further increased beyond the aggregate $100 million allowed under this resolution, and will report to the Executive Committee.

**EX 28, PAGE 3023**

**1998 RESOLUTION FC-10**

*Whereas,* several owners have sought to utilize limited liability companies ("LLCs") in their club ownership structures in order to take advantage of LLCs' favorable tax characteristics and flexible structure; and

*Whereas,* the membership has determined that, in certain circumstances, the League's ownership policies may be adequately served and protected through the use of LLCs;

Be it *Resolved,* that a member club may be organized as an LLC, provided that it has a single controlling member (which may be an individual, or an entity that is wholly owned by a single individual with complete voting control thereof) with at least a 30% equity interest in, and total voting control of the affairs of, the LLC (except for voting rights of non-controlling members of the LLC that are mandatory under applicable law);

Further *Resolved,* that up to a total of 25 persons may own direct or indirect interests in such a club (or in members of the LLC that owns such a club); and

Further *Resolved,* that with respect to family companies and family trusts owning non-voting, non-controlling membership interests in a club organized as an LLC (or in non-voting, non-controlling members of such an LLC), the following ownership attribution rules shall apply for purposes of these ownership limitations:

Family companies and family trusts shall count as a single "person" if:

(1) members of a single family (a) own substantially all equity interests in the company or (b) constitute substantially all of the trust beneficiaries, and

(2) the only assets owned by the company or trust in addition to the NFL club are passive investment assets that are not used in an active trade or business (although a family company owning an interest in an NFL club may be a member of a group of companies structured in accordance with 1993 Resolution FC-5), and

(3) in the case of a company, a single individual has voting control of such company (whether as proxy holder under irrevocable proxies in form and substance acceptable to the League, or as managing member, general partner, equity holder, or voting trustee under a trust containing provisions with respect to control, continuation, primacy of League policies, and control succession that are acceptable to the League), and in the case of a trust, a single individual acts as trustee under a trust agreement containing provisions with respect to control, trustee succession, primacy of League policies, and investment restrictions that are acceptable to the League.

1998-12

**EX 28, PAGE 3024**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 193 of 29
2:12-cv-08396-R MAN Document 69-34 Filed 12/20/11 Page 193 of 29
ID #:10441
**1998 RESOLUTION G-2**

*Resolved,* that the NFL Anti-Tampering Policy will be amended to reflect the following:

1. If a club (the inquiring club) is interested in interviewing for a head coaching position an assistant coach who is a member of the staff of a club participating in the playoffs, the chief operating officer of the inquiring club will be permitted to contact the chief operating officer of the assistant coach's club to advise him of its interest. The chief operating officer of the club participating in the playoffs will then advise the assistant coach of the expression of interest, and the assistant coach will advise his chief operating officer if he is interested in interviewing with the inquiring club after the conclusion of the season. This information will then be conveyed to the chief operating officer of the inquiring club.

2. There shall be no other direct or indirect contact between any member of the inquiring club and the assistant coach that it desires to interview for its head coaching position.

**EX 28, PAGE 3025**

**1998 RESOLUTION SB-5**

**(AS AMENDED)**

*Resolved,* that for Super Bowl XXXVI and beyond, tickets will be distributed according to the following formula:

Accommodations for box suites will be taken off the top of the allocable seating, as will 2,500 tickets, which will be set aside for the League-run fan drawing, international travel programs and other international needs. From the remaining, these percentages will be allocated:

| | |
|---|---|
| League office | 25.28% |
| AFC Team | 17.50% |
| NFC Team | 17.50% |
| Host Team | 5.00% * |
| Other 28 Member Clubs | 34.72% (1.24% each) |

\* If the Host Team is one of the participants, each participating team will share tickets equally, receiving 19.46%. If two teams share the host market, they will each receive 3.12%; and

Further *Resolved,* that the Super Bowl Advisory Committee, in consultation with Atlanta and Tampa Bay, is authorized to decide upon ticket allocations of between 5% and 10% for Atlanta and Tampa Bay for Super Bowls XXXIV and XXXV, respectively. The balance will be equally divided among the 28 non-involved teams.

**EX 28, PAGE 3026**

**1999 RESOLUTION EC-1**

**(AS AMENDED)**

*Resolved,* that a National Football League expansion franchise is hereby granted to Houston, to begin play in the 2002 season as a member club of the American Football Conference in a new state-of-the-art, retractable roof stadium in that community;

Further *Resolved,* that such expansion franchise is awarded to Houston NFL Holdings, L.P. (the "Franchisee") on the terms and conditions reflected in the Expansion Franchise Agreement executed by the Franchisee and Robert C. McNair, as its controlling owner (the "Controlling Owner"), with such award conditioned on completion of appropriate documentation and legal matters in form and substance acceptable to the Commissioner;

Further *Resolved,* that the procedure pursuant to which the Franchisee has been admitted is hereby deemed to satisfy all applicable procedural requirements under the NFL Constitution and Bylaws;

Further *Resolved,* that a waiver of the Franchisee's obligation, under Article XIX, Section 19.1, of the Constitution and Bylaws, to pay a Visiting Team Share of gross receipts derived from the sale of Permanent Seat Licenses is hereby granted, as and to the extent that the revenues from such Permanent Seat License are dedicated to funding construction and related costs of the new Houston Stadium;

Further *Resolved,* that the Franchisee is hereby granted a temporary and decreasing waiver of the League's debt ceiling, for the term of and to accommodate the installment purchase price payment schedule specified in the Expansion Franchise Agreement, with the Franchisee and the Controlling Owner to be in full compliance with all then-applicable debt ceiling limitations from and after the payment of the final purchase price installment on January 15, 2004;

Further *Resolved,* that the Franchisee will obtain players through the same player stocking plan used for the Cleveland Browns;

Further *Resolved,* that a Super Bowl game will be played in the new Houston stadium at the first opportunity, subject to team and community agreements comparable to those obtained with respect to the last five Super Bowl games; and

Further *Resolved,* that no later than June 1, 2001, the member clubs will adopt a realignment plan that will ensure that each conference has an equal number of member clubs, aligned in four divisions of four teams each.

**EX 28, PAGE 3027**

**1999 RESOLUTION G-3**

### (AS AMENDED)

*Whereas,* it is appropriate to improve the League's current policies to support new stadium construction through club seat sharing exemptions, as reflected in the club seat sharing exemption guidelines adopted by the League in 1994 (the "Guidelines"), and through PSL sharing exemptions;

*Whereas,* a revised policy can facilitate new stadium construction projects by (1) making upfront League loans in support of Clubs' private contributions to such projects (rather than annually exempting from sharing the visiting team share ("VTS") of club seat premiums over a period up to 15 years), and (2) assuring that League loans will amount to at least 34% of an affected Club's private contribution to a project;

*Whereas,* such League loans should be subject to member club approval on a case-by-case basis;

Be it *Resolved:*

(1) That for any stadium construction project involving a private investment for which an affected Club makes a binding commitment from now through the 2002 NFL season (through March 31, 2003), the League shall make a loan to the affected Club to support such project based on the amount that the affected Club has committed to such project as a private contribution (the "Private Contribution");

(2) That the amount of such League loan shall range from 34% to 50% of the Private Contribution, determined on a case-by-case basis based on the size of the Private Contribution, with incremental League loans in excess of 34% generally to be made available to facilitate stadium construction projects in the largest markets that are home to an NFL Club, and with the League loans in smaller markets generally limited to 34% of the Private Contribution;

(3) That the Commissioner is authorized to make arrangements for the League to borrow from commercial or institutional lenders funds to make such League loans, with the funds to be repaid to such lenders over an appropriate time period (10 years or such other period as may be determined by the Finance Committee); and

(4) That the specific borrowings from commercial or institutional lenders related to any stadium construction project must be approved as part of the League's approval of a League loan to such project, with the borrowings to be repaid principally from the VTS of club seat premiums generated by such project, and, to the extent that the VTS of club seat premiums is

**EX 28, PAGE 3028**

insufficient to repay such loans, with any incremental funds needed for
repayment to be assessed against the League's network television revenues;

Further *Resolved:*

(1) That if PSLs are sold with respect to a particular stadium construction
project, such PSLs shall be eligible for an exemption from sharing in
accordance with current policies;

(2) That the amount of VTS exempted in respect of PSLs sold shall be offset
against the principal amount of League loans available for the project; and

(3) That for purposes of determining whether a project is eligible for
incremental League loans, only the first $75 million of PSL proceeds shall
be treated as a portion of the Private Contribution;

Further *Resolved:*

(1) That any League loan under the League policy adopted by this resolution,
as between an affected Club and the League, shall be forgiven over the
term of the aforementioned League borrowing on an equal annual basis;
and

(2) That, if an affected Club that receives a League loan under the League
policy adopted by this resolution (or a controlling interest therein) is
subsequently sold other than to a member or members of an owner's
immediate family (as defined in the NFL Constitution and Bylaws) before
the final maturity date of the League loan, then the selling party shall repay
to the League from the sale proceeds at closing an amount equal to the
outstanding principal balance on the League loan; and

Further *Resolved,* that in order for a stadium construction project involving a
Private Contribution to qualify for a League loan, the conditions set forth in
Attachment A to this resolution must be satisfied.

+ + + + +

## ATTACHMENT A

(a) The League must approve a resolution specifically directing the making of
a loan in respect of a particular stadium construction project, following an
evaluation of (1) the necessity of a new or renovated stadium in a market in
terms of the suitability, economic competitiveness, and physical condition
of the existing facility, the stadium's importance to League franchise
stability, the League's concerns regarding its national image and presence,
the importance of an affected market to the League's national television
ratings, and other League business priorities, and (2) the specific attributes

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 198 of 29
Case 2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 198 of 29
ID #:10446

of the project, including the scope and cost of the project relative to the economics in a market and the League as a whole, the balance of projected shareable and non-sharable revenue streams and the construction costs associated with each, whether a renovation project is a "qualifying" project (as defined in the Guidelines), and similar factors;

(b) Such resolution must be adopted and the stadium construction project must be committed to by both public and private parties, from now through the 2002 NFL season (through March 31, 2003);

(c) The stadium construction project must be a "public-private partnership" to which public authorities and an affected Club each have committed funds;

(d) The project must not involve any relocation of or change in an affected Club's "home territory" (as defined in the Constitution and Bylaws);

(e) Increases in the visiting team share generated by the new or renovated stadium must meet the standards set forth in the Guidelines; and

(f) The NFL Players Association must agree to exclude from DGR, over a reasonable period of time on a straight-line amortization basis, the entire amount of the Private Contribution, together with an amount equal to the imputed interest on the Private Contribution at a commercially reasonable interest rate.

**EX 28, PAGE 3030**

Case 2:12-md-02328-AB Document 18-34 Filed 03/29/12 Page 199 of 29
Case 2:08-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 199 of 29
ID #:10447

## 2000 RESOLUTION G1-B[*]

Amend the Anti-Tampering Policy of the League to reflect the following:

1. (a) Prior to March 2, if a club is interested in discussing its head coaching position with an assistant coach whose playing season (excluding the Pro Bowl game) is over, and who is contractually obligated to another club, the assistant coach's employer club may not deny the coach the opportunity to discuss, and possibly accept, such employment. Except for the post-season procedure applicable to coaches whose clubs are participating in the playoffs, no club, directly or through an intermediary, may seek permission to discuss its head coaching position with an assistant coach of another club until the playing season of that coach's employer club is completed. Similarly, no employer club may grant permission of the kind described in the immediate prior sentence until that club's playing season is completed, including post-season if applicable.

   (b) After March 1 of any year, if a club seeks permission to discuss employment with an assistant coach who is under contract to another club at any time prior to the opening of the employer club's training camp, it will be considered a lateral move, and the employer club is under no obligation to grant the coach the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted.

2. (a) All moves of assistant coaches to any position other than head coach are lateral moves.

   (b) If a club is interested in discussing an assistant coaching position with an assistant coach who is under contract to another club at any time prior to the opening of the employer club's training camp, it will be considered a lateral move, and the employer club is under no obligation to grant the coach the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted.

---

[*] Presented in the Competition Committee report as Resolution G-IA; renamed G-IB to reflect amendments by the Competition Committee before the start of the Annual Meetings.

**EX 28, PAGE 3031**

3. Any contacts by a club seeking to employ an assistant coach -- either
with the employer club of the person sought, or directly with the club
employee sought (or his representative) -- are subject to the provisions
of the section on "Protocol." Similarly, contacts by club employees
seeking assistant coaching jobs with other clubs are subject to the
provisions of the section on "Protocol." Despite provisions of the
"Protocol" section, all in-season discussions, requests for permission, or
contacts of any kind concerning the future employment of an assistant
coach with a club other than his employer club are prohibited.

**2000 RESOLUTION G-3A**

*Whereas,* the Competition Committee is concerned about overall onfield player conduct including (1) celebratory acts taking place on the playing field that go beyond the natural, spontaneous expressions of exuberance that add to the excitement and enjoyment of NFL games, (2) actions that are sexually suggestive or can otherwise be construed as being in poor taste, and (3) actions that are unsportsmanlike toward officials;

Be it *Resolved,* therefore, that it is Unsportsmanlike Conduct if two or more players engage in prolonged, excessive or premeditated celebrations, particularly after scoring plays; if a player engages in actions that are sexually suggestive or that can otherwise be construed as being in poor taste; and if a player engages in actions that are unsportsmanlike and/or offensive toward officials. Such unsportsmanlike conduct will subject the player(s) to significant fines.

**EX 28, PAGE 3033**

**2000 RESOLUTION G-8**

*Resolved,* that the Commissioner will apply the following policies in preparing the official League regular season schedule beginning in 2002:

A. Each team will play home and home with all division opponents (6 games).

B. Each team in a division will play one other division within the conference based on annual rotation of divisions (4 games).

C. Each team will play one game against the team with the same standing from each of the two remaining divisions within its own conference, based upon previous season's results (i.e., 1 vs. 1&1; 2 vs. 2&2; 3 vs. 3&3; 4 vs. 4&4) (2 games).

D. Each team in a division will play the same entire division from the other conference on an annual rotating basis (4 games).

**EX 28, PAGE 3034**

**2000 RESOLUTION G-10**

*Whereas,* the membership has received several presentations by the Executive Committee of NFL Properties and the Board of Directors of NFL Enterprises ("the Committees") regarding their review of the business conditions and the need for a restructuring of the League's consumer products and apparel business;

*Whereas,* the Committees have unanimously recommended that the member clubs enter into the two-stage arrangement with Reebok described in the accompanying Resolution; and

*Whereas,* the membership concurs in the judgment and recommendation of the Committees that the agreement described in the accompanied Resolution will enhance the quality, attractiveness, and image of the League and its member clubs, and will improve the League's consumer products business.

Be it *Resolved* that:

1. The member clubs hereby approve, adopt and concur in the attached Resolution of the Committees;

2. That the member clubs approve the acquisition of an option to acquire an equity position of 49% in a joint venture with Reebok (referred to as "Newco") on the terms described in the Resolution;

3. That the member clubs hereby approve the necessary grant of rights and marks, logos, other intellectual property and marketing assets pursuant to the license agreement between NFL Properties and Reebok on the terms described in the Resolution; and

4. That the member clubs agree to give their full cooperation as necessary to implement and further the agreement between NFL Properties and Reebok.

#### ATTACHMENT TO 2000 RESOLUTION G-10

#### RESOLUTION

*Whereas,* over the past six (6) months, the NFL Properties and Broadcasting Committees (the "Committees") have met in joint session and received several extensive presentations, and engaged in lengthy analysis and discussion concerning the state of the consumer products and apparel business and the need to develop new models to improve the business;

*Whereas,* the Committees have received a proposal from Reebok International, Ltd. ("Reebok") to enhance the product design, quality, attractiveness to consumers and marketing of NFL apparel products and extensively discussed an

**EX 28, PAGE 3035**

Case 2:12-md-02323-AB Document 19-34 Filed 02/29/12 Page 204 of 29
Case 2:08-cv-03396-R-MAN Document 59-33 Filed 12/20/11 Page 204 of 29
ID #:10452

appropriate deal structure to accomplish these business goals, pursuant to which Reebok would receive long term exclusive rights for uniforms and sideline apparel, certain other apparel product categories and fitness products; and

*Whereas,* the Committees believe that the proposed business arrangement ("Venture") with Reebok (the key terms of which are described below) is essential to improving the quality, image, attractiveness to consumers and profitability of the NFL consumer products and apparel business:

1. Ten year exclusive license agreement, including the NFL and all club marks and logos, for uniforms, sideline apparel, headwear and fitness equipment commencing in the 2002 season and ending March 31, 2012.

2. An interim license for the 2001 season to outfit 21 Clubs for uniforms and sideline apparel along with non-exclusive rights for those and other apparel products.

3. The option to convert the rights under the exclusive license into a joint venture ("Newco") after Year 3, 4, or 5 (2003, 2004 or 2005) by foregoing royalty payments. If the option is exercised, the NFL will hold 49% ownership, split profits equally and have equal representation on the Newco Board of Directors.

4. The ability for either the NFL or Reebok to terminate the Venture for any reason after Year 6 (2006).

5. Consideration in the form of minimum annual royalty guarantees commencing in Year 2 at $15 million and increasing to $22.5 million during the term of the Agreement along with the potential to receive 1.6 million stock warrants from Reebok priced at 20% above the average closing market price of the stock for the fifteen (15) days prior to the execution of the documentation implementing the Venture (projected to be December 12, 2000).

It is hereby *Resolved,* that the Commissioner, or such other officer(s) as he may designate (on behalf of the National Football League, its Member Clubs and NFL Properties), with the concurrence of the Committees, shall be authorized to enter into agreements implementing the Venture with Reebok on the above terms, with such changes therein as the two Committees shall deem reasonable or appropriate (with the two Committees' approval of the same to be conclusive proof of the acceptability of the same);

Further *Resolved,* that the Commissioner, with the concurrence of the two Committees, be and hereby is authorized to cause the League or its affiliates to enter into one or more agreements with Reebok, as he and such Committees may deem necessary or appropriate, to implement the Venture and to create or pursue the Venture, all on the terms referenced to in the recitals above and previously described to the member clubs or such other terms as he with the concurrence of

**EX 28, PAGE 3036**

such two Committees may deem necessary or proper (with the acceptability and propriety of any such terms to be conclusively indicated by the League's entry into such agreements); and

Further *Resolved,* that each member club will cooperate as reasonably requested in implementing and carrying out the business plan related to the Venture.

**EX 28, PAGE 3037**

**2001 RESOLUTION FC-4**

### (AS AMENDED)

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions, including franchise values and current and foreseeable club revenue levels;

Be it *Resolved,* that effective immediately:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $100 million to $125 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1;

3. The level at which 1998 Resolution FC-9 requires club-related liabilities of the principal or controlling owner (including obligations secured by his interest in his club) also to be secured by a pledge of club assets shall remain at $25 million; and

4. In connection with any acquisition of a member club or any controlling interest therein, the principal and/or controlling owner shall be required to invest equity (cash on hand or funds borrowed against other current or determinable future assets of such owner) in a minimum amount to be determined by the Finance Committee, and no acquisition transaction that the Finance Committee finds to be excessively leveraged shall be recommended by the Finance Committee for membership approval; and

Further *Resolved,* that the Finance Committee will consider at the March, 2002, League Meeting, and annually thereafter, whether, in light of inflation, projected revenues, and franchise values, the overall debt limitation should be further increased beyond the aggregate $125 million allowed under this resolution, and will report to the Executive Committee.

**EX 28, PAGE 3038**

**2001 RESOLUTION G-1**

**(AS AMENDED)**

*Whereas,* pursuant to 1999 Resolution EC-1, the Member Clubs resolved to expand by adding a 32nd member club, to be located in Houston, Texas;

*Whereas,* pursuant to that same Resolution, the Member Clubs resolved to realign the League into two 16-team Conferences, with each Conference to consist of four divisions of four teams each; and

*Whereas,* as part of accomplishing this desired realignment, the Member Clubs have determined to address certain related financial consideration;

Be it *Resolved:*

1. that beginning with the 2002 NFL season, all regular season and preseason game visiting team shares shall be pooled and shared equally among the 32 Member Clubs;

2. that the term "visiting team share" shall mean the portion of gross receipts currently required (in the absence of a waiver) to be paid to visiting clubs under Article 19.1(A) of the NFL Constitution and Bylaws in respect of regular season games;

3. that the separate rules for sharing "gross gate receipts" in respect of preseason games under Article 23.1(C) shall be eliminated;

4. that for purposes of calculating such visiting team shares, the term "gross receipts" shall have the meaning given to it in Article 19.1(A)(3) as supplemented by 1987 Resolution FC-1, and the exclusions permitted in calculating visiting team shares shall be those exclusions currently allowed under Article 19.1(A), as supplemented by 1995 Resolution G-6 and 1999 Resolution G-3;

5. that the current preseason scheduling system and contract approval process set forth in Article 23.1 shall not be affected by this resolution; and

Further *Resolved,* that the Finance Committee is authorized to establish policies relating to complimentary seats, "unsaleable" seats, preparation of ticket manifests, audit procedures, and related administrative matters for the purpose of implementing this Resolution, which it shall periodically present to the membership for discussion; and

Further *Resolved,* that Articles 19.1 and 23.1 of the NFL Constitution and Bylaws shall be deemed amended as necessary to accomplish this Resolution.

**EX 28, PAGE 3039**

## **2001 RESOLUTION G-4**

### **(AS AMENDED)**

Amend the Anti-Tampering Policy to reflect the following:

1. If a club is interested in discussing a position with a non-player, non-coach employee who is under contract to another club, the employer club is under no obligation to grant the employee the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted.

2. If a club is interested in discussing a position as club president or general manager, or a position with equivalent responsibilities and authority, with an individual who is contractually obligated to another club after the conclusion of that club's playing season, the employer club may not deny the employee the opportunity to discuss and accept such employment, unless the individual is already employed as a club president or general manager, or is employed in a position with equivalent responsibilities and authority. A club president is defined as an individual who shall have authority and responsibility for the organization, direction, and management of day-to-day operations of the club and who reports directly to the controlling owner. A general manager is defined as an individual who has (1) the authority over all personnel decisions related to the signing of free agents, the selection of players in the College Draft, trades, terminations, and related decisions, and (2) the responsibility for coordinating other football activities with the Head Coach.

### **ATTACHMENT TO 2001 RESOLUTION G-4 (AS AMENDED)**

Amend the Anti-Tampering Policy as follows (old language struck over, new language underlined):

• **High-Level Club Employees (Non-Player, Non-Coach)**. The following provisions govern in cases of high-level club employees (non-player, non-coach), defined for purposes of this Policy as club president, general manager, and persons with equivalent responsibilities and authority. A club president is defined as an individual who shall have authority and responsibility for the organization, direction, and management of day-to-day operations of the club and who reports directly to the controlling owner. A general manager is defined as an individual who has (1) the authority over all personnel decisions related to the signing of free agents, the selection of players in the College Draft, trades, terminations, and related decisions, and (2) the responsibility for coordinating other football activities with the Head Coach (see "Test of Reasonableness," "Administrative Review," page 10, for disputes concerning this definition):

2001-3

**EX 28, PAGE 3040**

- *Under Contract.* Except as may be otherwise provided in such contract, a club is not obligated to grant another club permission to discuss employment with a high-level employee if he or she is under contract, even if the second club is prepared to offer him or her a position of greater responsibility within the category of High-Level Club Employees. Clubs may negotiate a right of first refusal.

- *Expired Contract.* If the contract of a high-level employee has expired or he or she is a non-contract employee, any attempt by the employer club to deny the employee an opportunity to discuss or accept employment with another club will be considered improper ~~unreasonable~~ under "Administrative Review," ~~the "Test of Reasonableness,"~~ page 10.

*Other Club Employees (Non-Player, Non-Coach).* The following provisions govern in cases of club employees who do not fall into the categories of player, coach, or high-level employee (see definition above):

- *Under Contract.* If a club employee (other than player, coach, or high-level-employee) is under contract for the succeeding season or seasons at the time an off-season expression of interest in him or her is made to the employer club by another club, ~~the employer club may not unreasonably deny permission for the employee to discuss and accept employment with the inquiring club, except that where the employee's primary responsibilities extend to recurring events beyond the playing season (principally the college draft or the free agency period), the employer club may suspend permission until after occurrence of such event. This applies but is not limited to contract employees of a club's player personnel department who are responsible for gathering information on and evaluating draft eligible players or veteran free agent players (scouts, directors of player personnel, directors of pro and college personnel, etc.). The above restriction regarding recurring events beyond the playing season will not apply if another club is prepared to offer a general manager's position or its equivalent, to a non-player, non-coach employee who is under contract for the succeeding season or seasons. If an employer club has an employee under contract for a future season, it has no obligation to grant permission to another club to contact its employee to offer him a position that is a lateral move (See "Test of Reasonableness," page 10.)~~ the employer club is under no obligation to grant the employee the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted. If, however, the inquiring club is prepared to offer a position as a high-level employee, as defined above, the employer club may not deny the employee the opportunity to discuss and accept such employment.

- *Contract Due to Expire.* If a club employee (other than player, coach, or high-level employee) has completed the regular season covered by the final year of his or her contract, any attempt to deny permission for the employee to discuss and accept employment with another club will be

2001-4
**EX 28, PAGE 3041**

considered improper unreasonable under "Administrative Review" the
"Test of Reasonableness" (page 10), except that where the employee's
primary responsibilities extend to recurring events beyond the playing
season (principally the college draft or the free-agency period), the
employer club may suspend permission until after occurrence of such
event. This applies but is not limited to contract employees of club's
player-personnel department who are responsible for gathering information
on and evaluating draft-eligible players or veteran free agent players
(scouts, directors of player personnel, directors of pro and college
personnel, etc.). The above restriction regarding recurring events beyond
the playing season will not apply if another club is prepared to offer a
position as a high level employee, as defined above, to a non-player, non-
coach employee whose contract is expiring, nor will it apply to employees
who do not have contracts or whose contracts are expiring prior to the
recurring off-season event such as the draft or the free-agency period.

• *Permission to Discuss/Sign.* Permission granted by a club to an employee
to discuss employment is also permission to accept employment with
another club, provided, however, that an employer club may limit the
duration of its permission. Any permission granted by an employer club to
discuss employment with another club must be documented in writing and
provided to the employee in advance of any such discussions.

**Test of Reasonableness Administrative Review**

Subject to the specific provisions of this Policy that allow a club to withhold
permission for an employee to discuss or accept employment with another club,
an employee must not be unjustifiably prevented from significantly bettering
himself or herself within the League.

If a disagreement arises over whether an employer club has improperly
unreasonably withheld permission or whether a club has incorrectly designated
the category of an employee (see section on high-level employees), the involved
club or clubs may certify a dispute with the Commissioner. The Commissioner
will then promptly gather all pertinent facts, including but not limited to the
relative compensation levels, length of term of current and proposed contracts,
authority, and responsibilities, opportunities for advancement, and inter-club
competitive ramifications of a the proposed job change. In rendering his final,
expedited decision, the Commissioner will not be disposed to approve a job
change that in name is a promotion but is in fact a lateral move involving little or
no greater responsibility than the prior job.

As provided for above under "Non-Players," no club, nor any person
employed by or otherwise affiliated with a club, is permitted to discuss
employment with an employee of another club during the employer club's playing
season, regardless of the contractual status of the employee. Conversely, it will be
considered unreasonable under this test for any employer, during the off-season,
to deny permission to another club to discuss or offer employment to a non-

**EX 28, PAGE 3042**

contract employee or to deny permission to a non-contract employee to seek other employment on his own.

### Protocol

As a common courtesy and to avoid inter-club disputes, whenever a club wishes to contact a non-player employee of another club about possible employment, such inquiring club must first notify the owner or operating head of the employer club to express its interest. This requirement prevails even if the employee in question does not have an active contract and even if other provisions of this Policy prohibit the employer club from denying permission to discuss employment with the employee. (See the sections under "NFL Players" above for rules governing contacts of or by players.)

Whenever a non-player employee of a club initiates contact with another club about possible employment, the contacted club must immediately notify the owner or operating head of the employer club about the contact, after which all other applicable provisions of this Policy will apply.

Despite the other requirements of this section on protocol, if a public announcement has been made by an employer club that it has dismissed or will not be retaining an employee, such employee and any clubs interested in him or her are under no obligation to observe the club-to-club courtesies of this section.

### Discipline

Any violation of this Anti-Tampering Policy will subject the involved club and/or person to severe disciplinary action by the Commissioner. The League office will promulgate to all clubs the details of any penalties imposed for tampering.

**EX 28, PAGE 3043**

## 2001 RESOLUTION G-5

### (AS AMENDED)

*Whereas,* the League is required under 1999 Resolution EC-1 to adopt by no later than June 1, 2001, a realignment plan that will result in two conferences each containing four divisions of four teams; and

*Whereas,* such realignment will take effect commencing with the 2002 NFL season;

Be it *Resolved,* that the National Football League is hereby realigned in accordance with the attached realignment plan;

Further *Resolved,* that the NFL Constitution and Bylaws shall be deemed amended as necessary to accomplish this Resolution; and

Further *Resolved,* that beginning with the 2002 NFL season, the League office will undertake to schedule preseason games for five years (i.e., through the 2006 season), provided that (a) such scheduling authority will be exercised pursuant to a plan developed by the Commissioner and submitted to the membership for review; (b) clubs realigned from otherwise intact divisions will receive preference in scheduling home games with former division rivals and other attractive opponents; (c) such scheduling authority will not extend to the final weekend of the preseason; and (d) unless otherwise agreed to by the membership, such scheduling authority will expire following the 2006 preseason.

**AFC**

| EAST | NORTH | SOUTH | WEST |
|------|-------|-------|------|
| Buffalo | Baltimore | Houston | Denver |
| Miami | Cincinnati | Indianapolis | Kansas City |
| New England | Cleveland | Jacksonville | Oakland |
| N.Y. Jets | Pittsburgh | Tennessee | San Diego |

**NFC**

| EAST | NORTH | SOUTH | WEST |
|------|-------|-------|------|
| Dallas | Chicago | Atlanta | Arizona |
| N.Y. Giants | Detroit | Carolina | St. Louis |
| Philadelphia | Green Bay | New Orleans | San Francisco |
| Washington | Minnesota | Tampa Bay | Seattle |

2001-7

**EX 28, PAGE 3044**

**2001 RESOLUTION JC-1**

**(AS AMENDED)**

*Whereas,* pursuant to 2000 Resolution JC-1 (as amended), the Member Clubs established the NFL Internet Network to promote their joint entertainment product and to enhance their ability to compete with other entertainment providers;

*Whereas,* the NFL Internet Network has increased the overall quality of the Internet presence of the NFL and the Member Clubs, and has also increased the popularity and usage of the Network's member sites; and

*Whereas,* in order to facilitate and accommodate new third-party arrangements with respect to NFL.com (the anchor site of the NFL Internet Network) and other Network member sites, the Member Clubs wish to extend the term of the NFL Internet Network;

Be it *Resolved,* that the term of the NFL Internet Network shall be extended through the 2005 NFL season, with operations of such Network to be conducted in accordance with the Fundamental Principles and Operating Guidelines attached to this Resolution, as such Fundamental Principles and Operating Guidelines may be modified from time to time by the Member Clubs.

**ATTACHMENT TO 2001 RESOLUTION JC-1**

**(AS AMENDED)**

**NFL INTERNET NETWORK**

**FUNDAMENTAL PRINCIPLES AND OPERATING GUIDELINES**

The following principles and operating guidelines have been carefully developed to foster the growth of NFL.com and Club sites in an exclusive network framework.

A. Fundamental Principles

1. Network Concept

   • All Clubs participate in the NFL network; all Club site traffic count will be aggregated only with NFL.com traffic count for Media Matrix (or other Internet measurement service) reporting.

   • NFL.com will link directly to Official Club Sites (No NFL.com club pages); Clubs must include key content formerly on NFL.com (rosters, etc.) and standardized promotion/links to NFL.com and

**EX 28, PAGE 3045**

approved League Internet partners. For 2001 and future years, such promotion shall include promotional (i.e., logo) links from each Official Club Site's home page to the NFL Internet Network's development and portal partners, who shall also provide links from their respective sites to each Club's Official Club Site.

- League and Clubs will work together to implement technology, design, and content integration plan.

2. NFL Game Action Video

- All NFL game video is a collective League asset and will be managed and distributed by the NFL Network. Video will be available on Club sites as described below.

- Full-length NFL football games (live or archived) will be distributed only on NFL.com (or successor League new media outlet).

3. Intellectual Property Matters

- To ensure compliance with non-Internet agreements negotiated and approved by the League, new media applications affecting or governed by such contracts (which include the CBA, network TV contracts) will be administered at the NFL Network level.

- To ensure protection of NFL intellectual property, all NFL media content (such as video and photos) will be licensed to third parties only at the NFL Network level.

4. Privacy Policies and Compliance with Laws

- The League will compile for the Clubs a list of "best practices" in respect of privacy policies, changes in the legal environment with respect to online issues (such as the Children's Online Privacy Protection Act), data usage, and similar matters.

- Each Club will be responsible for ensuring that its Official Club Site complies with all applicable laws and follows "best practices" online.

In order to further the development of a strong and viable Internet network, the NFL and the Clubs will proceed on the following basis for the 2001-2005 seasons.

**EX 28, PAGE 3046**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 215 of 29
Case 2:12-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 215 of 29
ID #:10463

B. 2001 Operating Guidelines

1. Web Agreements

   • Clubs must file all web hosting, commerce, and related agreements
     with the League office.

   • Club web site agreements will have a term of 2 years or less; Club
     (but not developer) renewal options allowed.

   • Club site agreements are subject to League approval in only those
     respects that affect NFL.com or other Club sites; League will provide
     approval or responses within 10 days.

   • League will provide Clubs with a list of suggested web site
     developers. Clubs may select their own developer, subject to these
     Principles and Guidelines.

2. Game-Action Video on Club Sites

   • NFL Films will provide video highlights programming for use on
     Club sites.

   • Clubs may offer their coaches' shows and other local TV shows on
     Club sites.

   • NFL Films will provide footage for Club site archival features (i.e.,
     top 10 Club plays of all time.)

   • NFL Films will also produce other custom programming for Club
     sites. (Similar quantities of footage as licensed for local broadcast
     programming.)

   • Clubs may not sell sponsorships or advertising in conjunction with
     game video programming. (i.e., Club secured advertisers may not
     receive exposure in the video or on the web page(s) associated with
     the video programming.)

   • Video may not appear on Club sites during network broadcast
     windows or otherwise violate network broadcast agreements.

3. Links/Third Party Networks/Content Licensing

   • Clubs may link to local media, local sponsors, etc., without NFL
     Network approval, but may not link to sports site and/or sports
     content aggregators or major portals without NFL Network approval.
     Clubs shall (1) use the NFL Internet Network navigation bar (which

will contain links to each other NFL Internet Network site and to the NFL Internet Network's production and portal partners) on the home pages of their Official Club Sites, and (2) provide promotional (i.e., logo) links on the home page of their official sites to the NFL's production and portal partners, who shall also provide links from their respective sites to each Club's Official Club Site.

- Clubs may not participate in third party networks involving the aggregation of audience, ad sales, or commerce.

- Networking and sale or licensing of content to third parties are solely the prerogative of the NFL Network.

- Clubs may not sell or license promotional rights to any Internet Service Provider, or substantive ISP rights (e.g., the right to provide vanity e-mail services), for any season after the 2001 season, as sale or licensing of such rights would conflict with rights licensed and/or granted to NFL Internet Network portal partners.

- The NFL Internet Network's portal partner shall be entitled to allow its subscribers to customize their personal home pages with the marks and logos of a subscriber's favorite Club along with a package of links and content focused on such Club (including a link to the Club's Official Web Site).

4. Game Day Applications

- Real-time statistics and "game-day live" applications will reside only on NFL.com. or "co-branded" NFL.com sites produced in conjunction with the NFL Internet Network's production partner.

- Clubs will link to such central game day applications.

5. Games

- All action-simulation and other types of games produced by League level game developer(s) will reside on NFL.com or an NFL "game channel."

- Clubs may produce and develop their own trivia games consistent with the terms of the League level agreement.

- Availability of action-simulation, trivia, and mini-games on Club sites will be subject to the proposed NFL relationship with EA/AOL.

2001-11

**EX 28, PAGE 3048**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 217 of 29
Case 2:12-cv-08395-R-MAN Document 69-34 Filed 12/20/11 Page 217 of 29
ID #:10465

  • All fantasy games will reside on NFL.com only; Clubs will link to
    NFL.com fantasy games. Customized Club prizes and incentives can
    be created in coordination with NFL.com.

6. Radio

  • Any radio broadcasts of NFL games on the Internet will be available
    via NFL.com (all games) and Club sites (Club's broadcast).

  • The League and Clubs will collaborate to create additional radio
    programming (i.e., greatest moments, archived games), available via
    Club sites and NFL.com.

  • The party arranging to make such broadcasts available on a particular
    site will bear responsibility for talent and guild clearances and
    residuals for broadcasts on the site.

7. Club Site Advertising

  • Club sites to include Club-sold and League-sold advertising.

  • Clubs to sell all site ad inventory except advertising associated with
    NFL Films video programming, which will be sold by the League to
    a national sponsor(s). Revenues from League-sold advertising will be
    divided equally. Clubs to retain 100% of revenues from Club-sold
    advertising.

  • NFL production and portal partners will sell Club-controlled
    inventory if and only if requested to do so by a Club.

  • Official Club sponsors will receive category protection on Club sites.

8. Commerce

  • Clubs may link directly from their Club site to a team-specific e-
    commerce "Shop" administered by Venator or a successor NFL
    Internet Network e-commerce partner. Clubs will receive the full
    retail royalty (15%) based on the traffic they deliver to their "Shop".

  • Clubs may choose other e-commerce providers/partners, but such
    deals will have a term of 2 years or less with Club (not developer)
    renewal options allowed.

9. Auctions

  • A single central auction engine has been created and will continue to
    be hosted on eBay, pursuant to an agreement with NFL.com.

- The central auction engine will continue to include customized auction "store fronts" for Clubs.

- Should a Club provide "inventory" for an auction, that Club will receive all revenues generated, less an industry-standard listing/transaction fee (7%).

- All net proceeds received from merchandise or experiences sold through Internet auctions will be paid to charity, with the party receiving such proceeds to designate the recipient charity.

10. Photos

- Clubs and League will work to develop a common credentialing policy to protect against "bootlegged" photos.

- NFL Properties will continue to license stock photo houses to sell NFL photos, and will arrange for Club and League access to such photos for web site use.

- Clubs should include photos on their sites.

11. Compliance

Non-compliance will subject violators to fines, etc., for conduct detrimental.

**2001 RESOLUTION JC-3**

#### (AS AMENDED)

*Whereas,* 2000 Resolution G-10 concerning the agreement between NFL Properties and Reebok (copy attached) was approved on December 12, 2000 subject to a further ratification vote after the completion of the terms of definitive documents and club distribution arrangements with Reebok; and

*Whereas,* (1) the terms of the definitive documents negotiated with Reebok are consistent with those set forth in 2000 Resolution G-10 and (2) arrangements providing Clubs greater flexibility in the distribution of the products covered by the Reebok agreement have been established;

It is hereby *Resolved,* that notwithstanding anything set forth in 2000 Resolution G-10, the affirmative vote of not less than three quarters of the members of the League present and voting shall be required for the following matters related to the Reebok agreements:

1. termination of the Reebok agreements;

2. exercise of the first option (to acquire 49% of Newco and form a joint venture) or the second option (buyout of Reebok's equity interest in Newco after exercise of the first option);

3. permitting the name or logo of a third party sponsor to appear on game uniforms or sideline apparel products (and promotional/sponsorship agreement related thereto);

4. exercise of the Reebok warrants;

5. "roll in" of substantial volume of new products into the Omnibus License Agreement that are designated to achieve the Roll-in Objective; and

6. take any action under the Reebok agreements that would have the effect, directly or indirectly, of extending the term of the Reebok agreements; and

Further *Resolved,* that 2000 Resolution G-10 is ratified and approved, including the terms set forth in paragraphs 1-6 above.

**EX 28, PAGE 3051**

**2002 BYLAW PROPOSAL NO. 6**

*Whereas,* a number of NFL owners have purchased interests in teams in the Arena Football League; and

*Whereas,* the membership wishes to define certain principles involving players who are employed by Arena League and NFL teams with common ownership;

Be it *Resolved,* that if an NFL club drafts a player under contract to an Arena League club with which it shares common ownership, the NFL club must, upon signing the player to an NFL Player Contact, offer that contract to all other NFL clubs via procedural recall waivers. This requirement will also apply to undrafted rookie free agents and veterans subject to waivers who formerly played for an Arena League team that shares common ownership with the NFL club that has signed him to a contract; and

Further *Resolved*, that a player not subject to waivers in the NFL may not play back-to-back seasons for commonly owned NFL and Arena League teams.

**EX 28, PAGE 3052**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 221 of 29
Case 2:11-cv-08395-R-MAN Document 69-33 Filed 12/20/11 Page 221 of 29
ID #:10469

**2002 RESOLUTION FC-12**

*Whereas,* the NFL credit facility arranged by the League office serves important League interests by establishing a benchmark borrowing and collateral framework for NFL lending, and a benchmark credit rating for lending to NFL clubs;

*Whereas,* such facility has substantially grown in size and club participation since its inception in 1991, necessitating that the syndicate of banks providing liquidity for the facility be expanded;

*Whereas,* the continued ready availability of the facility to all non-participating clubs will also serve important League interests;

*Whereas,* further expansion of the syndicate, to keep the facility readily available to all NFL clubs, will require the establishment of an interest reserve in the form of a $15 million standby letter of credit to mitigate any possible risk of an interruption in interest payments in the event of a club default on its credit facility loan; and

*Whereas,* the posting by the League (or an affiliated NFL entity) of the necessary standby letter of credit (with the costs thereof to be reimbursed to the League by clubs participating in the credit facility) will facilitate the current and potential future expansion of the credit facility;

Be it *Resolved,* that the League's (or an affiliate's) posting of the proposed standby letter of credit as an interest reserve mechanism for the League-wide credit facility be, and hereby is, approved on the terms described to the membership; and

Further *Resolved,* that the terms and conditions of the League's posting of the letter of credit shall be reflected in reimbursement and other appropriate agreements with participating clubs, credit facility syndicate banks, and other parties to the credit facility transactions, which shall be in form and substance acceptable to the Commissioner, with the Commissioner or his designee to execute and deliver such agreements on behalf of the League parties thereto.

## 2002 RESOLUTION G-3

### (AS AMENDED)

*Whereas,* pursuant to Article 19 of the NFL Constitution and Bylaws, the League has the authority to approve changes in uniform appearance, including logos, colors and design;

*Whereas,* changes in uniform appearance that are proposed by Member Clubs are subject to, among other things, the notification requirements set forth in Article 19.9(D)(1) and in 1997 Resolution NFLP-1;

*Whereas,* consistent with the NFL Uniform Code, and unless expressly provided otherwise, the term "uniform" as used herein applies to every piece of equipment worn by a player, including but not limited to helmet, pants, jerseys, wristbands, gloves, stockings, shoes, visible undergarments, and accessories such as headwear, coverings worn under helmets, and hand towels;

*Whereas,* pursuant to Article 19 and interpretations thereunder, each Member Club is permitted to have one home uniform design and one away uniform design for use during NFL games;

*Whereas,* the marketing benefits to the NFL and its Member Clubs, and developments in the NFL's consumer products business make it beneficial to revise the notice requirements for uniform changes and permit the Member Clubs to create a third uniform design for use at regular season NFL games subject to certain conditions.

First, be it *Resolved,* to supersede 1997 Resolution NFLP-1 and to amend Article 19.9(D)(1) to read as follows (deleted language struck over, new language underlined):

(D) No club shall have the right to make changes in its club colors and/or in the designs of its team helmets or uniforms except in accordance with the following provisions:

(1) Absent specific extenuating circumstances as determined by the Commissioner, if a club desires to make any changes in club colors, uniform appearance, designs of team helmets, designs of team uniforms, trademarks, or trade names, it must give written notice and details thereof to the League on or before September March 1 of the year prior to the year in which it wishes to change; must comply with the uniform change notification and approval timeline as established by the League office and amended from time to time, the current timeline being attached hereto; and further must obtain approval from the League pursuant to the Section 19.9(D)(2) herein by October December 1 of the year prior to the year in which it wishes to change; otherwise it shall have no right to make any change for the succeeding season.

## EX 28, PAGE 3054

Second, be it Further *Resolved,* that beginning with the second half of the 2002 season, the Member Clubs may use a third uniform design subject to the conditions set forth below:

    (1) The third uniform design may be one of two options: (a) an alternate color scheme, using the colors that are part of the club's existing color palette (as set forth in Article 19.9 and any Appendix to the NFL Constitution and Bylaws), and using the same design and logo as either the existing home or away uniform, or (b) a previously approved "classic" uniform from the Club's history.

    (2) The helmet to be used with the third uniform design is limited to the following: If the third uniform design incorporates an alternate color scheme, a second helmet may not be used and the Club must use an existing helmet. If the third uniform design is a "classic" uniform, the helmet may be the existing helmet or a previously approved "classic" helmet.

    (3) The creation of a third uniform design is subject to the notice and approval procedures set forth in Section 19.9(D) of the NFL Constitution and Bylaws, as amended; provided, however, that for the 2002 season only, the deadline for obtaining League approval for a third uniform design is May 1, 2002.

    (4) A Club may wear an approved third uniform design at one home game each season in connection with a special event, occasion or anniversary, provided that the Club gives notice to the League office by July 1 of the year in which the selected game is scheduled to be played, the selected game does not conflict with a League event or initiative, and the event being commemorated is approved by the Commissioner.

Third, be it Further *Resolved,* that a Club may not change its regular home and away uniforms more than once every five NFL seasons, and may not change its third uniform design more than once every five NFL seasons, absent specific extenuating circumstances (e.g., Club ownership change or relocation) as determined by the Commissioner.

Fourth, be it Further *Resolved,* that the Commissioner, in consultation with the NFL Business Ventures Committee, is authorized to establish policies and procedures relating to the subject matter of this resolution, including but not limited to uniform changes, third uniform design, the use of special event uniforms in connection with League initiatives, and related administrative matters, which they shall periodically present to the membership for discussion.

Fifth, be it Further *Resolved,* that the NFL Constitution and Bylaws shall be deemed further amended as necessary to accomplish this Resolution.

**EX 28, PAGE 3055**

**ATTACHMENT TO 2002 RESOLUTION G-3**

**UNIFORM CHANGE NOTIFICATION AND APPROVAL TIMELINE**

| DEADLINE | REQUIREMENT |
|----------|-------------|
| March 1 of year prior to the year in which uniform change will take place | Written notice and details of any changes in uniform provided to the League office |
| July 1 of the year prior | Uniform color selection and logo design completed, with club owner and chief executive approval |
| August 1 of the year prior | First uniform samples created -- Club owner, equipment manager and chief executive should have approved designs for first samples |
| November 1 of the year prior | Final uniform samples provided to League office for approval-final TV test and approvals from Club owner, equipment manager and chief executive should also be forwarded by this date |
| December 1 of the year prior | League office final approval |

If final samples do not arrive in the League offices by November 1 of the year preceding the season in which the change is occurring the uniform will not be approved.

2002-5
**EX 28, PAGE 3056**

**2002 RESOLUTION G-6**

Amend the NFL's Crowd Noise Policy to read as follows (deleted language struck over, new language underlined):

N. Crowd Noise

While the League does not wish to place restrictions on spontaneous crowd noise or to diminish fan enjoyment in our sport, it is each club's responsibility to exert proper control over cheerleaders and mascots (including noise-making specialists hired exclusively for that purpose), use of scoreboards, message boards, etc. Artificial or manufactured crowd noise in NFL stadiums has increased to the extent that teams have notified the League office that they have experienced difficulty communicating within their bench area as well as on the field.

1. Club-Controlled Sound—The home club does not have the prerogative to decide if sound hampers signal calling. While spontaneous crowd noises may be beyond immediate control, noise of any kind (music, horns, gongs, drums, etc.) that is under club control must cease when the play clock (40-25) is running and the visiting team is in possession of the ball. This includes kickoffs. Conversely, this restriction does not apply when the home team is in possession of the ball. Flagrant attempts by cheerleaders, mascots or the public address system to encourage crowd noise for the purpose of disrupting the visiting team's offense while the play clock is running is prohibited. The use of noise meters or such messages as "Noise!," "Let's hear it," "Raise the Roof," "Let's go Crazy," "Pump it Up," "12th Man" or any video to incite crowd noise are prohibited at any time during the game. These examples are not limited to the foregoing, but also would include similar messages that encourage crowds to make random noise in order to disrupt the opposition. The prohibitions specified in this section also apply during kicking plays.

Exception: Any conventional cheerleader or mascot actions or the use of the scoreboard or message board for acceptable cheers such as "Defense!" and "Push 'em back!" must be stopped when the huddle breaks and/or the offensive team moves to the line of scrimmage.

2. "Wave"—Club-controlled efforts to start the "Wave" cheer through the use of cheerleaders or message boards—even if the actions are stopped when the visiting team breaks the huddle—are a violation of the crowd noise policy.

3. Noise-Making Devices—Bullhorns, megaphones, Klaxons, whistles and other noisemakers of any kind are not permitted in the stadium.

**EX 28, PAGE 3057**

4. Field-Level Speakers—The number of field-level speakers must be limited to a maximum of four. They must be placed between the goal lines and the 20-yard lines, and be pointed away from the bench area and the playing field.

5. Mascots—Team mascots must stay behind the six-foot white border at all times during the game (they may be on the field at appropriate times during the pregame and at halftime when players are not on the field), and they are prohibited from engaging in any acts of taunting opposing players, coaches, and game officials. In the event of violations, teams employing the mascots will be subject to significant fines.

Clubs should be aware of the playing rule adopted at the 1989 Annual Meeting which establishes a set of procedures, including loss of time-outs or five-yard penalty on the defense, to handle the problem of crowd noise which prevents the offense from hearing its signals.

**EX 28, PAGE 3058**

**2002 RESOLUTION G-7**

*Whereas,* Article 4.3 of the Constitution and Bylaws provides, and has long provided, that "[t]he League shall have exclusive control of the exhibition of football games by member clubs";

*Whereas,* pursuant to that exclusive control, and consistent with the provisions of Article 10 of the Constitution and Bylaws, the League has for decades entered into contracts for the exhibition of NFL games by national broadcast networks and, more recently, by cable and by satellite;

*Whereas,* the stadium interior regularly within the frame of the television broadcast, including but not limited to the field, as well as the benches and surrounding areas ("the sidelines"), has long been considered to be the equivalent of the "stage" for purposes of the exhibition of NFL games and therefore within the League's exclusive control;

*Whereas,* the League's control has been exercised, for example, through restrictions on signs and banners "on end zone walls or on field level walls across from network camera locations or on the field, including sideline areas" (1994 Resolution BC-3) and through control of game-day marketing opportunities, such as branded apparel, on the sidelines (see 2001 Resolution JC-3);

*Whereas,* the League and its affiliates have, and expect to have in the future, strategic relationships with sponsors (e.g., Motorola, Gatorade) and others (e.g., Reebok) that represent collective assets and opportunities of all of the member clubs;

*Whereas,* the maintenance and enhancement of both those strategic relationships and the League's broadcast relationship could be jeopardized in the absence of collective League control over marketing and sponsorship opportunities presented by sideline exposure during NFL games;

*Whereas,* the membership generally, and the Business Ventures and Broadcasting Committees, will continue to explore alternatives for promoting the value of the broadcasting, marketing and sponsorship relationships of the League and its member clubs; and

*Whereas,* the Executive Committee wishes to reaffirm and confirm that Article 4.3's provision for exclusive League control over the exhibition of football games by member clubs includes all marketing and sponsorship opportunities on the sidelines of all NFL games;

**EX 28, PAGE 3059**

Case 2:12-md-02328-AB  Document 18-34  Filed 03/29/12  Page 228 of 29
cv-08396-R  MAN  Document 69-33  Filed 12/20/11  Page 228 of 29
ID #:10476

It is Hereby *Resolved,* that Article 4.3's provision for exclusive control over
the exhibition of football games includes all marketing and sponsorship
opportunities on the sidelines of all NFL games; and that prior exercise by the
League and its affiliated entities of such control be, and is, hereby ratified and
affirmed.

**EX 28, PAGE 3060**

## 2002 RESOLUTION MC-1

*Whereas,* certain NFL players have experienced both on-field and off-field injuries resulting in total and permanent disability;

*Whereas,* worker's compensation coverage may be unavailable or inadequate to offset the costs associated with such total and permanent disabilities;

*Whereas,* many NFL clubs have purchased insurance to cover costs associated with such injuries;

*Whereas*, NFL clubs may wish to supplement such insurance coverage at favorable rates;

*Whereas,* a League-wide catastrophic loss program would result in coverage for all NFL players at all times for both on-field and off-field injuries and result in lower premium costs for Member Clubs; and

*Whereas,* the NFL Management Council Executive Committee recommends that all Member Clubs should be provided with more cost-effective and comprehensive catastrophic loss protection; it is therefore

*Resolved,* that the Management Council Executive Committee unanimously moves approval of the NFL Catastrophic Loss Program, on such terms and conditions as are attached hereto.

#### ATTACHMENT TO 2002 RESOLUTION MC-1

#### PRO FINANCIAL SERVICES, INC., LLOYD'S, LONDON INDICATION

#### FOR THE NATIONAL FOOTBALL LEAGUE (NFL) FOR AND ON

#### BEHALF OF ALL MEMBER TEAMS

#### 2002 CATASTROPHIC LOSS PROGRAM

Type:............................................Catastrophic Injury Insurance-Accidental Bodily Injury Only-24 hour.

Form: ..........................................Lloyd's, London wording to be advised.

Holder:........................................The National Football League (NFL) for and on behalf of all thirty-two (32) Member Teams.

Insureds:......................................The National Football League contracted football players.

2002-10

**EX 28, PAGE 3061**

Territorial Limit: ........................Worldwide.

Interest: ......................................Accidental Bodily Injury causing catastrophic injury defined as: paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight

Term: .........................................Thirty-Six (36) months from the Time of Binding.

Sum Insured: ..............................On and Off Field Coverage - $1,000,000 Maximum Sum Insured Any One Player.

Limit Any One Occurrence: ........$10,000,000

Premium:

   Year 1) $640,000.00 ..............Due at Inception

   Year 1) $160,000.00 ..............Due in the event of a claim within the first 12 months

   Year 2) $640,000.00 ..............Due at First Anniversary

   Year 2) $160,000.00 ..............Due in the event of a claim within the first 24 months

   Year 3) $640,000.00 ..............Due at Second Anniversary

   Year 3) $160,000.00 ..............Due in the event of a claim at any time within the policy term

**Conditions:**

1. Mandatory that all Players contracted to National Football League Clubs be covered, not to exceed ninety (90) players per NFL team.

2. All players to be covered under this policy must pass their team's official entrance examination and be warranted fit and healthy at the date the player is added to the coverage.

3. Receipt of premium.

4. Catastrophic Injury defined as paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight.

5. All Catastrophic coverages purchased by individual NFL teams will cancel if the above League Plan is purchased.

2002-11

**EX 28, PAGE 3062**

ase 2:12-md-02328-AB Document 18-34 Filed 02/29/12 Page 231 of 29
ase 2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 231 of 29
ID #:10479

**2003 RESOLUTION BC-1**

**(AS AMENDED)**

*Whereas,* the League's Broadcasting Committee has reviewed and approved the terms of the proposed NFL Sunday Ticket rights agreement between NFL Enterprises and DirecTV for the 2003-08 NFL seasons (the "DirecTV Agreement");

*Whereas,* the Board of Directors of NFL Enterprises has approved the terms of the DirecTV Agreement;

*Whereas,* the DirecTV Agreement creates a distribution opportunity for an NFL television channel (the "NFL Network");

*Whereas,* it is anticipated that the NFL Network will, under the DirecTV Agreement, produce as much as $100 million in subscriber fees from DirecTV to be invested in the development and distribution of the NFL Network;

*Whereas,* the NFL Network creates long-term strategic value and opportunity for the League as a whole, and could reach many more NFL fans and generate substantially more in revenue if it is broadly distributed via cable television systems and potentially via satellite television carriers in addition to DirecTV; and

*Whereas,* the Executive Committee of the League now also wishes to confirm its interest in facilitating the broad distribution of the NFL Network via cable television and satellite television systems in order to reach more NFL fans and to maximize the NFL Network's long-term monetary and strategic value, and associated collective benefits for the League and the member Clubs;

It is hereby *Resolved* that the League concurs in the Broadcasting Committee's approval of the DirecTV Agreement, with the Broadcasting Committee to ensure that, during the term of the DirecTV Agreement, no network television agreement containing provisions that would interfere with or preclude NFL Enterprises' performance of the DirecTV Agreement will be executed;

Further *Resolved,* that the Executive Committee confirms its intent to secure the monetary and strategic value of the NFL Network for the benefit of the League as a whole by obtaining broad distribution for the NFL Network on cable television systems and potentially satellite television carriers in addition to DirecTV;

Further *Resolved,* that in order to secure such broad distribution of the NFL Network on cable television systems and additional satellite television carriers, each member club shall cooperate with NFL Enterprises in the conduct of the NFL Network business and in such club's exploitation of its local media

**EX 28, PAGE 3063**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 232 of 293
Case 2:08-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 232 of 293
ID #:10480

opportunities, in order to permit the financial and strategic value of the collective NFL Network opportunity to be secured and enhanced;

Further *Resolved,* that, to ensure that the NFL Network has attractive programming to help it secure broad distribution and without limiting the manner in which Clubs cooperate in the NFL Network's business, clubs shall make the following programming available to the NFL Network:

1. Beginning with the later of the 2004 NFL preseason and the first NFL preseason following the expiration of such club's current preseason television contract, each club shall

   a. make available to NFL Enterprises the right to reair its preseason game telecasts (i) live outside of such club's home market and (ii) on a non-exclusive, time-delayed basis within and outside such club's home market as part of the programming mix for the NFL Network (the airing of which shall not give rise to any preseason networking charges under then-current League policies on networking of preseason games); and

   b. make available to NFL Enterprises the right to reair such preseason game telecasts on a "video on demand" basis (the airing of which shall not give rise to any preseason networking charges under then-current League policies on networking of preseason games);

2. Beginning with the 2004 NFL season, each club shall make available to NFL Enterprises its season preview shows (if any), to air on the NFL Network and/or on a "video on demand" basis; and

3. Beginning with the 2003 NFL season, each club shall cooperate with NFL Enterprises by producing, at Enterprises' cost and expense, customized shoulder programming related to such club to be aired by the NFL Network on a "video on demand" basis.

Further *Resolved,* that the programming described in the previous section of this resolution, and other "video on demand" programming made available by the NFL Network to subscribers to the various cable television and satellite television services carrying the NFL Channel, shall be the only NFL programming made available on a "video on demand" basis by the League or the member clubs;

Further *Resolved,* that club promotional advertising in any such telecasts will be included in any reairs and current club exclusive advertising relationships will be respected in any reairs within the club's home marketing area, and that a full report on proposed NFL Network advertising patterns and relationships will be presented to the Board of NFL Business Ventures prior to the Fall 2003 Annual Meeting and to the full membership at that Meeting;

**EX 28, PAGE 3064**

Case 2:12-md-02323-AB Document 69-34 Filed 03/29/12 Page 233 of 293
Case 2:07-cv-08396-R-MAN Document 18-34 Filed 12/20/11 Page 233 of 29
ID #:10481

Further *Resolved,* that each club shall require that any regional sports network carrying its preseason games limit its distribution of such games to those areas within the club's home territory (i.e., primary and secondary television markets) in which such regional sports network is distributed via cable television systems, and "black out" such games outside the club's home territory if the regional sports network is distributed to wider areas by cable systems or satellite television distribution; and

Further *Resolved,* that member clubs are encouraged, in their distribution of local preseason game and shoulder programming, to promote the NFL Network through advertisements and promotional mentions for the NFL Network.

**EX 28, PAGE 3065**

**2003 RESOLUTION BC-2**

*Whereas*, satellite radio is a new nationwide distribution platform that offers the NFL an opportunity -- previously unavailable to it -- to provide out-of-market audiocasts to fans of NFL clubs;

*Whereas*, satellite radio also offers the League the opportunity for substantial promotional exposure and (potentially) to create simulcast programming that can also air on the NFL Network;

*Whereas*, the NFL and its member clubs can realize the full potential of the nationwide satellite radio platform and minimize adverse impact on the League's and the member clubs' respective terrestrial radio and Internet audio streaming businesses only through a coordinated approach to satellite radio development pursued at a national level by the League;

*Whereas*, in order to begin such coordinated development of the satellite radio platform, NFL Enterprises has negotiated a seven-year nationwide satellite radio agreement with Sirius Satellite Radio, which includes game broadcasts, other programming, and equity grants to NFL Enterprises for the benefit of its partners (the member clubs), all as described to the membership; and

*Whereas*, the Broadcasting Committee has recommended that the member clubs approve the Sirius agreement, and that the directors of NFL Ventures, Inc. approve such agreement as well;

Be it *Resolved*, that the nationwide satellite radio agreement between NFL Enterprises and Sirius Satellite Radio be, and hereby is, approved on the terms presented to the membership; and

Further *Resolved*, that the Commissioner (as Chairman of NFL Ventures) and each officer of NFL Enterprises be, and hereby is, authorized and directed to negotiate and execute definitive agreements with Sirius implementing the transaction described to the membership, with such officer's execution of those agreements being conclusively deemed to evidence the acceptability thereof.

**EX 28, PAGE 3066**

**2003 RESOLUTION G-1**

*Whereas,* pursuant to 2002 Resolution G-3, the Member Clubs may wear an approved third uniform design at one home game each season in connection with a special event, occasion or anniversary, provided that the Club gives notice to the League office by July 1 of the year in which the selected game is scheduled to be played, the selected game does not conflict with a League event or initiative, and the event being commemorated is approved by the Commissioner ("the Third Uniform Design Program");

*Whereas,* pursuant to Article 19.9 of the NFL Constitution and Bylaws, the home team has the option of deciding whether the visiting club shall wear white jerseys or the colors awarded to the visiting team under Section 19.9, and the Commissioner has authority to resolve any conflict or asserted conflict between the colors of the two clubs;

*Whereas,* the Member Clubs believe that it would be beneficial to authorize the Business Ventures Committee to oversee implementation of the Third Uniform Design Program; and

*Whereas,* developments in the NFL's consumer products business make it desirable to expand the Third Uniform Design Program to allow a third uniform design at two regular season games, home or away.

Be it *Resolved,* that, subject to the conditions prescribed by 2002 Resolution G-3, a Club may wear an approved third uniform design at two regular season games, home or away; and

Further *Resolved,* that the Business Ventures Committee shall be authorized to oversee implementation of the Third Uniform Design Program.

**EX 28, PAGE 3067**

**2003 RESOLUTION IC-1**

**(AS AMENDED)**

*Whereas*, the member clubs committed to operate the NFL Europe League through the 2003 NFL Europe League season pursuant to 1999 Resolution IC-1 and 2000 Resolution JC-5;

*Whereas*, the NFL Europe League serves important League objectives by, among other things, providing development opportunities for potential NFL players (U.S. and foreign players), coaches (including former players and minorities), officials, and staff, increasing international awareness of American football, and providing programming for the NFL Network;

*Whereas*, the NFL Players Association has expressed a continuing commitment to share the cost of the NFL Europe League (including, but not limited to, annual DGR deductions and Salary Cap credits); and

*Whereas*, the member clubs believe that continued investment in NFL Europe is in the best interests of the League and wish to extend their commitment to the NFL Europe League;

Be it *Resolved*:

1. That the NFL Europe League shall be operated through the 2005 NFL Europe League season on the basis presented to the Executive Committee.

2. In operating for the term set forth in the preceding paragraph, NFL Europe shall emphasize the following goals:

   a. Identify and develop foreign national players to expand the talent pool on an international basis and elevate the presence of NFL Europe.

   b. Emphasize operations in priority markets where individual Europe League teams have the greatest prospect for successful operation.

   c. Explore joint ventures and Europe-based partnerships that will enhance the prospect for improved financial performance and public awareness and acceptance in Europe.

   d. That the budget for NFL Europe League operations shall be approved annually by the Business Ventures Committee, which shall report to the League membership on such approved budgets.

**EX 28, PAGE 3068**

## 2003 RESOLUTION JC-1

### (AS AMENDED)

*Whereas,* the stadium construction support program established by 1999 Resolution G-3 (the "G-3 Program") has been successful in improving the League's ability to secure the construction of new stadiums through public-private partnerships;

*Whereas,* extension of the G-3 Program can facilitate public-private efforts in support of new stadium construction projects in the remaining markets where such projects are needed by (1) continuing to make upfront League loans available to support Clubs' private contributions to such projects (rather than annually exempting from sharing the visiting team share ("VTS") of club seat premiums over a period up to 15 years), and (2) continuing to ensure that League loans will amount to at least 34% of an affected Club's private contribution to a project;

*Whereas,* the Finance and Stadium Committees have determined that any extension of the G-3 Program should reaffirm the principal parameters of the current G-3 Program, including but not limited to (1) the target maximum annual assessment level presented to the membership in connection with the G-3 Program ($1 million per club), (2) the requirement that, upon the sale (other than an intra-family sale) of any Club that receives League stadium construction support under the G-3 Program during the first fifteen seasons after a G-3 stadium is opened, the selling party shall repay the unamortized portion of such League support from the sale proceeds, (3) the maximum amortization period for League borrowings to fund G-3 Program stadium support (determined by the Finance Committee to be 25 years after the inception of the G-3 Program unless the Finance Committee shall subsequently determine to the contrary), and (4) the amortization period for League G-3 Program support to a Club (15 years from the opening of the Club's stadium); and

*Whereas,* the membership desires to clarify and strengthen certain aspects of the G-3 Program while retaining substantially all of the principal parameters described above;

Be it *Resolved:*

1. That for any stadium construction project (new stadium or substantial renovation) involving a private investment for which an affected Club makes a binding commitment, the League shall make a loan to the affected Club to support such project based on the amount that the affected Club has committed to such project as a private contribution (the "Private Contribution"), provided, that no such loan shall be made if the result would be that the projected television assessments arising out of the G-3 Program (defined as the portion of the League's total G-3 borrowings that are projected not to be amortized through application of club seat premium VTS and PSL VTS generated from G-3-funded stadiums during their first

2003-7

**EX 28, PAGE 3069**

15 years of operations, based on projections provided to the membership in connection with a request for G-3 approval and (where applicable) club guarantees of such projected club seat premium and PSL VTS levels) exceed the target maximum annual assessment level of $1 million per Club per year for a 25 year period ending on March 31, 2024;

2. That the amount of such League loan shall be either 34% or 50% of the Private Contribution, determined by the size of the television market in which the stadium involved is being constructed, with League loans at the 50% level to be made available to facilitate stadium construction projects for NFL clubs currently operating in the six largest national television markets, and with the League loans in all other television markets limited to 34% of the Private Contribution;

3. That each League loan in support of a stadium construction project shall be subject to membership approval on a case-by-case basis, and that, in addition to the restriction on the availability of such loans based on the target maximum annual assessment level set forth in paragraph (1) above, no League committee shall recommend any such loan for membership approval unless:

   a. the club seeking such support shall have provided, at least six weeks in advance of the League meeting at which such support is to be considered:

      i. detailed information on the sources and uses of construction funds (for review by NFL staff and consultants as to the adequacy and appropriateness of the proposed construction budget);

      ii. detailed projections of the revenues to be generated from the new stadium during its first fifteen seasons of operations (for review by NFL staff and consultants to permit them to calculate the amount of revenue available to defray League support for the project and the funds needed to amortize over a reasonable period the club's stadium construction debt (if any)); and

      iii. detailed information on the scope of the project (to permit review by NFL consultants as to the matters addressed in paragraph 1 of Attachment A);

   b. the club seeking such support shall have guaranteed the amount of revenues from Club Seat Premium and PSL VTS that it projects will be generated by its stadium to defray G-3 Program support for such stadium, at levels consistent with recent precedents (90% of the club-generated funds to be used for such purposes that are reflected in the club projections presented to the membership, with funds from both Club Seat Premium and PSL VTS counted towards satisfaction of such guarantee), and shall have projected that Club-generated funds equal to

2003-8
**EX 28, PAGE 3070**

no less than 80% of G-3 Program support in the case of a 34% loan, and no less than 50% of G-3 Program support in the case of a 50% loan, will be generated by the project to defray G-3 Program support; and

c. the club shall have accepted all overrun risk, as between itself and the League, by accepting a "hard cap" on the amount of G-3 Program support it will receive, which may be varied or increased only through a subsequent membership vote;

4. That the Commissioner is authorized to make arrangements for the League to borrow from commercial or institutional lenders funds to make such League loans, with the funds to be repaid to such lenders over an appropriate time period (25 years after the inception of the G-3 Program, or such other period as may be determined by the Finance Committee);

5. That a specific authorization to borrow the necessary funds to provide support for each project from commercial or institutional lenders will be included as part of the League's approval of a League loan to such project, with the borrowings to be repaid principally from the VTS of club seat premiums generated by such project and other G-3 projects, and, to the extent that the VTS of club seat premiums generated during the first 15 seasons of G-3 stadium operation (all of which shall be applied to amortize League debt incurred to fund the G-3 Program, even if the support provided under the G-3 Program to a particular project is nominally amortized in fewer than 15 seasons) is insufficient to repay such loans, with any incremental funds needed for repayment to be assessed against the League's network television revenues;

Further *Resolved:*

1. That if PSLs are sold with respect to, and entirely dedicated to, a particular stadium construction project, such PSLs shall be eligible for an exemption from sharing in accordance with current policies;

2. That the amount of VTS exempted in respect of PSLs sold shall constitute a League contribution and thus shall reduce the principal amount of League loans available for the project by such exempted amount; and

3. That for purposes of determining whether a project is eligible for incremental League loans, only the first $75 million of PSL proceeds shall be treated as a portion of the Private Contribution;

Further *Resolved:*

1. That, as between an affected Club and the League, any League loan under the League policy extended by this resolution shall be forgiven over the term of such League loan, on an equal annual basis; and

2003-9
**EX 28, PAGE 3071**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 240 of 29
2:12-cv-08396-R-MAN Document 69-34 Filed 12/20/11 Page 240 of 29
ID #:10488

2. That, if a Club that receives a League loan under the League policy extended by this resolution and such Club (or a controlling interest therein) is thereafter sold other than to a member or members of an owner's immediate family (as defined in the NFL Constitution and Bylaws) before the final maturity date of the League loan, then the selling party shall repay to the League from the sale proceeds at closing an amount equal to the outstanding principal balance of the League loan, and shall further pay to the League the shortfall (if any) of its guarantee of Club Seat Premium and PSL VTS to be generated by the stadium, with such shortfall to be determined by pro-rating such guarantee over the first fifteen seasons of stadium operations, and calculating the shortfall (if any) against the guarantee for that portion of such fifteen seasons that has then elapsed; and

Further *Resolved,* that in order for a stadium construction project involving a Private Contribution to qualify for a League loan, the conditions set forth in Attachment A to this resolution must be satisfied.

**ATTACHMENT A TO 2003 RESOLUTION JC-1 (As Amended)**

a. The League must approve a resolution specifically directing the making of a loan in respect of a particular stadium construction project, following an evaluation of (1) the necessity of a new or renovated stadium in a market in terms of the suitability, economic competitiveness, and physical condition of the existing facility, the stadium's importance to League franchise stability, the League's concerns regarding its national image and presence, the importance of an affected market to the League's national television ratings, and other League business priorities, and (2) the specific attributes of the project, including the scope and cost of the project relative to the economics in a market and the League as a whole, the balance of projected shareable and non-sharable revenue streams and the construction costs associated with each, whether a renovation project is a "qualifying" project (as defined in the 1994 Club Seat Sharing Exemption Guidelines), and similar factors;

b. Such resolution must be adopted and the stadium construction project must be committed to by both public and private parties before the maximum annual assessment target of $1 million per club is reached;

c. The stadium construction project must be a "public-private partnership" to which public authorities and an affected Club each have committed funds;

d. The project must not involve any relocation of or change in an affected Club's "home territory" (as defined in the Constitution and Bylaws);

e. No project proposal may be accepted from any club that, within the year prior to its submission of such proposal, has had pending or has supported a lawsuit against the League or any of its member Clubs;

f. Increases in the visiting team share generated by the new or renovated stadium must meet the standards set forth in the 1994 Club Seat Sharing Exemption Guidelines; and

g. The NFL Players Association must agree to exclude from DGR, over a reasonable period of time on a straight-line amortization basis, the entire amount of the Private Contribution (except for any deemed contribution made by a club in the form of rent in excess of a $2 million per year deductible, which may be reconsidered and modified by the Finance Committee from time to time), together with an amount equal to the imputed interest on the Private Contribution at a commercially reasonable interest rate.

**EX 28, PAGE 3073**

**2004 RESOLUTION BC-3**

*Whereas,* the League's Broadcasting Committee has reviewed and unanimously approved the terms of the proposed NFL Sunday Ticket rights agreement between NFL Enterprises LLC and DirecTV for the 2006-2010 NFL seasons (the "DirecTV Agreement");

*Whereas,* this extended agreement continues the League's satellite television service in the same format as has been successfully presented during the seasons 1994-2004; and

*Whereas,* the DirecTV Agreement will continue to provide a distribution opportunity for the NFL Network consistent with the DirecTV arrangements currently in effect;

Be it *Resolved* that the League concurs in the Broadcasting Committee's approval of the DirecTV Agreement and directs the Broadcasting Committee to ensure that, during the term of the DirecTV Agreement, no network television agreement containing provisions that would interfere with or preclude NFL Enterprises' performance of its obligations under the DirecTV Agreement.

**EX 28, PAGE 3074**

**2004 RESOLUTION BC-4**

*Whereas*, the League has negotiated new television contracts for its Sunday afternoon television packages with CBS and FOX, covering all NFL preseason, regular season and postseason Sunday afternoon games, and no less than 2 Super Bowl games each, for the 2006 through 2011 seasons;

*Whereas*, ratification of those contracts by the membership has been unanimously recommended by the Broadcasting Committee; and

*Whereas*, the membership now desires to ratify and approve such contracts, with specific administrative and cooperation policies with respect to such television contracts to be adopted by membership resolution at a later date following the League's negotiation of television contracts for its prime time television packages;

Be it *Resolved*, that the League's 2006-2011 television contracts with CBS and FOX each are hereby ratified and approved; and

Further *Resolved*, that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2004 and 2005 seasons, which continue to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2.

**EX 28, PAGE 3075**

**2004 RESOLUTION BV-4**

#### (AS AMENDED)

*Whereas*, the NFL has for decades operated a successful and highly respected business involving the collective licensing and protection of League Marks[1] and Club Marks[2], and has entered into successful business relationships with producers of a wide range of consumer products and with major corporate sponsors in a variety of fields;

*Whereas*, the licensing of League Marks and Club Marks has become an integral and important part of the collective efforts of the League and the Member Clubs to promote and foster the primary business of League Members, the creation of a football entertainment product, NFL football;

*Whereas*, since 1982 such activities have been implemented by NFL Properties on a collective basis through the mechanism of an NFL Trust and related exclusive license agreements;

*Whereas*, the League's business models for licensing, sponsorships and promotion have evolved and been modified by League Committees and membership decisions to allow the League and Member Clubs to compete more effectively with other trademark holders in view of changes in business conditions within the NFL as well as in the broader competitive marketplace;

*Whereas*, the NFL Trust and related exclusive license agreements are scheduled to expire on March 31, 2004;

*Whereas*, a trust structure is no longer necessary to achieve the purposes for which it was intended based on changes in the NFL's business structure and operations including the formation of NFL Ventures, L.P.;

*Whereas*, the development and use of League Marks and Club Marks, for both commercial and promotional purposes, should continue to be managed through a membership-owned common enterprise and on a coordinated basis under the terms set forth below and consistent with settled League governance principles;

---

[1] League Marks shall mean all trademarks owned by the League entities, including without limitation, NFL, the NFL Shield design, Super Bowl game, Pro Bowl game, NFL Kickoff, NFL Playoffs in their present form or as may be adopted in the future.

[2] Club Marks shall mean all trademarks owned by a Member Club, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future.

**EX 28, PAGE 3076**

*Whereas*, League and Member Club trademark licensing and related activities constitute a shared opportunity created by the joint presentation of NFL football games among all Member Clubs and a collective means of promoting NFL football, and are most appropriately pursued on terms established by the vote of three-fourths of Member Clubs as provided in the Constitution and Bylaws; and

*Whereas*, the Member Clubs deem it necessary and advisable to amend certain provisions of the Constitution and Bylaws to implement the successor arrangements to the NFL Trust and to ensure that League Marks and Club Marks can continue to be effectively used to promote and foster NFL football;

Be it *Resolved* that the Constitution and Bylaws are amended as follows:

1. Expiration of Trust and New Agreement: The NFL Trust and related exclusive license agreements will expire by their terms on March 31, 2004. Subject to existing agreements, the terms of this Resolution, and other applicable provisions of the NFL Constitution and Bylaws and League rules and policies, each Club will have the right to use its Club Marks within its Home Territory and Home Marketing Area, as defined below.

2. Continuation of Existing Agreements: All existing agreements entered into by the League or a League affiliate[3] with third parties on matters covered by this Resolution shall remain in effect according to their terms, including any extension or renewal rights. All Clubs shall continue to participate in and support implementation of all such agreements. This Resolution shall not affect any existing agreements between the League (and/or a League affiliate) and the NFL Players Association (and/or an affiliate).

3. Definition of Home Territory: The definition of "Home Territory" as set forth in Article 4.1 of the Constitution and Bylaws remains unchanged, and the definition of club "rights within home territory" as set forth in Article 4.2 of the Constitution and Bylaws remains unchanged except that this Article is amended to add the following subsection (E).

> The Home Territory of the Washington Redskins and the Home Territory of the Baltimore Ravens, respectively, shall remain as defined in Article 4.1 (A) above except that the Home Territory of the Redskins shall include all of Montgomery and Prince Georges Counties and no other part of the State of Maryland and the Home Territory of the Baltimore Ravens shall include all of Anne Arundel and Howard Counties in the State of Maryland.

---

[3] League affiliate shall mean entities collectively owned by the Member Clubs of the NFL (e.g., NFL Ventures, NFL Enterprises, NFL Properties, NFL International, and NFL Productions).

2004-4
**EX 28, PAGE 3077**

4. <u>Definition of Home Marketing Area</u>: Article 4 of the Constitution and Bylaws is hereby amended to add the following Article 4.4, and existing Article 4.4 ("Conference Alignment") shall be renumbered as Article 4.5:

(4.4) Home Marketing Area Defined

(A) Each Club shall have a Home Marketing Area in which it may engage in the commercial activities set forth in Section 4.4(B) below. The Home Marketing Area shall be defined as (i) the Home Territory (including the portion of any foreign country within a Club's Home Territory, provided however, that activities within a foreign country are coordinated with and approved in advance by the League on behalf of NFL International) and (ii) the State within which the City for which the Club holds a franchise is located.

Where two or more Clubs share a Home Territory, each Club shall have equal rights under Section 4.4(B) below with respect to the Home Territory and Home Marketing Area. Where two or more Clubs hold franchises within the same state but do not share a Home Territory, each Club shall have equal rights within the Home Marketing Area, except for the Home Territory of another Club.

The Home Marketing Area of any Club shall also include the County in which the Club's preseason training camp is located (if located within the United States) for the duration of such training camp only, unless the training camp is located within the Home Territory of another Member Club.

(B) Club Rights Within Home Marketing Area; Exclusivity and Other Terms

1. Subject to the terms of Section 4.4(A), each Club shall have exclusive rights vis-à-vis other Clubs to use its Club Marks within its Home Marketing Area with respect to NFL football activities involving (i) local advertising, sponsorship, naming rights, and related promotional arrangements; (ii) retail stores and other Club-identified physical structures and ventures; (iii) promotional and public awareness campaigns, including "image" advertising; and (iv) Club-sponsored events.

2. A Club's rights to use its Club Marks within its Home Marketing Area shall at all times be subject to: (i) League agreements, including with manufacturers of licensed products; (ii) the rights of League sponsors and business partners, including television partners and the NFL Network;

2004-5
**EX 28, PAGE 3078**

(iii) the right of the League to promote League initiatives
and events; and (iv) the rights of the League and
individual Clubs to reach fans outside of their Home Marketing Area
through e-commerce and other Internet related activities,
catalog sales and database marketing. Except as otherwise
set forth in this Section, no Club shall have any rights to use
or license its Club Marks in the Home Marketing Area of
another Club.

(C) A Club may request a limited expansion of its Home Marketing
Area into a border state. Such requests will be evaluated based
on the effect of the proposed expansion on the interests of the
League or another Member Club.

(D) Consistent with prior resolutions, the Los Angeles home
territory shall remain owned and controlled by the League, and
pending a decision by the League to place one or more
franchises in the Los Angeles area, no Club shall have rights to
use Club Marks in the Los Angeles Home Territory for the
purposes set forth in Section 4.4(B) above.

5. <u>Revenue and Cost Sharing Study</u>: The Commissioner will appoint a
Special Committee of at least nine owners to evaluate in depth the key
financial aspects of the operations of all member clubs in relation to all
revenue sources and revenue opportunities, all club operating costs
(including team and owner stadium construction costs), and the impact of
these matters on the competitive football opportunities of all clubs as well
as the terms of any current or proposed Collective Bargaining Agreement
with the NFL Players Association. The Committee will make
recommendations on these matters, including on revenue and cost sharing
alternatives, to the thirty-two (32) owners for their consideration in further
League decision-making. The members of this Committee will include
three of the current members of the Management Council Executive
Committee; three of the current members of the Finance Committee; and
three owners not currently a member of either of these committees.

6. <u>League Policies</u>: This Resolution shall not affect any existing policies
regarding the League's image, health and safety issues, or the integrity of
the game. To further the commitment of all Clubs to promote NFL football,
Club Marks can be used in connection with the presentation and promotion
only of (a) NFL football as conducted by the League and its Member Clubs
or (b) football presented by NFL-owned entities approved by the League's
membership, such as the NFL Europe League (see Section 9.1(C)(7)). Club
marks and logos may not be used in connection with the presentation or
promotion of other sports, amateur or professional, except with the prior
approval of the League's membership based upon a three-fourths vote.

**EX 28, PAGE 3079**

Case 2:12-md-02323-AB Document 6933 Filed 03/29/12 Page 248 of 29
Case 2:12-cv-08396-R Document 69-34 Filed 12/20/11 Page 248 of 29
ID #:10496

7. <u>League Control of League Marks and Collective Use of Club Marks</u>: The League directly and/or through one or more League affiliates shall retain exclusive control of all League Marks and the collective use of Club Marks (the use of all Clubs' marks with equal emphasis) in any context. No Club may license or use League Marks or any other Club Marks, nor permit a third party to use any of its Club Marks together with the Club Marks of another Club absent prior League approval.

8. <u>League Control of League Marks and Individual Club Marks in Certain Contexts</u>: The League shall retain exclusive worldwide control to license and otherwise use League Marks and individual Club Marks during the Term of this Resolution, in respect of the following business operations: (i) the promotion of the League; (ii) game presentation including presentation and promotion of NFL football through game telecasts and related programming in all forms of media; (iii) international operations; (iv) apparel, accessories, footwear and fitness products; (v) computer and video games; (vi) trading cards; (vii) footballs, helmets, and other equipment used on the playing field; (viii) player-identified product; (ix) home videos and related NFL Films products; (x) products including the marks of all Clubs; and (xi) licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games. With respect to any such operations, no Club may "opt out" of any League arrangement in such business operations or "go dark" by refusing to cooperate with any such arrangement.

9. <u>League and Club Publishing</u>: The League shall continue to be responsible for publishing products (books, magazines, etc.) that feature the marks, logos and intellectual property of the League and Member Clubs, with each Club retaining the right to produce and license Club-related publications using its Club Marks within its Home Marketing Area.

10. <u>League Sponsorship and Promotional Arrangements</u>:

   (a) The League may enter into sponsorship and promotional agreements licensing the use of League Marks and collective use of Club Marks. Except as set forth in paragraph 8 above, each Club shall retain the right to have a separate sponsorship and promotional arrangement for individual use of its Club Marks within its Home Marketing Area, subject to rules and policies established by the League and/or a League affiliate, including without limitation, regulations based on taste, image, health or safety, or integrity of the game considerations, and relating to premium products and branding.

   (b) The Member Clubs, by a three-fourths vote, may authorize a League affiliate to enter into a particular sponsorship agreement for a specific

2004-7
**EX 28, PAGE 3080**

category licensing the use of League Marks and the individual use of all of the Club Marks.

11. <u>Hardline Products</u>: The League has the exclusive right to enter into license agreements to use League Marks and Club Marks for non-apparel ("hardline") products to be distributed nationally. Except for those hardline products identified in paragraph 8 above, Clubs shall have the rights set forth below:

   (a) Clubs may opt independently to obtain certain hardline products bearing their respective Club Marks from League licensees for distribution in the Club's Home Marketing Area in non-traditional retail outlets operated by Club sponsors (e.g., automobile dealerships). League licensees will be required to offer a favorable price to such Clubs. Clubs may purchase the product from a non-licensee if the price is at least 10% below the NFL licensee's price provided the quality of the product is comparable to that offered by the NFL licensee. Clubs electing this option will be required to ensure that a customary royalty is paid to a League affiliate.

   (b) Clubs may "opt out" of League licensing arrangements for certain products bearing their Club Marks for taste, image or other legitimate reasons but may not license their Club Marks for use on the identical or substantially similar hardline products independently. Clubs opting out of a product will not share in any revenue derived from the sale of that product.

   (c) Clubs may enter into license agreements for use of their Club Marks on up to five products which are not part of the NFL's national licensing program for distribution within the Club's Home Marketing Area, subject to appropriate quality control provisions and receipt of customary royalty payments by a League affiliate.

12. <u>Extension of NFL Internet Network</u>: The NFL Internet Network as currently structured and operated by the League and the member clubs, under 2000 Resolution JC-1 and 2001 Resolution JC-1, shall be extended to operate beyond the end of the 2005 NFL season through and including March 31, 2019. During this Term, the membership may periodically review the operations and elements of the Network to take account of changing technology, business models and other considerations and to determine whether modifications (by three-fourths membership vote) should be made to aspects of the Network's operations.

13. <u>Violations; Sanctions and Penalties</u>: Any Club that licenses or authorizes use of its Club Marks in violation of this Resolution, or related rules or policies, shall, in addition to any other penalty that may be assessed, pay to the League or a League affiliate all proceeds and other consideration

**EX 28, PAGE 3081**

received for such license and not be entitled to share in any revenues generated by the use of League Marks and Clubs Marks hereunder.

14. Finance/Tax Matters: NFL Properties' net income and expenses shall be taken into account for purposes of determining the License Fee to be paid by NFL Ventures to the Clubs.

15. Effective Term of Resolution: This Resolution shall be effective as of April 1, 2004, and shall remain in effect through and including March 31, 2019 or expiration of any then-existing agreements beyond the Term as approved by three-fourths of the Member Clubs.

16. Three-Fourths Voting Standard; Constitution and Bylaws Governs: This Resolution may be amended and further membership decisions on these matters will be made by a three-fourths vote of the Member Clubs.

17. League Responsibilities for Trademark Protection: All trademark and related intellectual property protection activities for the League and the Member Clubs, including without limitation, registration activities and the prosecution or defense of litigation, will be handled on a worldwide basis exclusively by a League affiliate, as will all agreements with the NFL Players Association or its affiliates relating to the subject matter of this Resolution.

18. Disputes Resolution; Constitution and Bylaws Governs: Any disputes arising out of or relating to this Resolution, any policies or rules developed to implement this Resolution, the Trust and any related agreements, or the rights and obligations of NFL Ventures and its affiliates, shall be resolved exclusively under the mechanism set forth in Article VIII of the Constitution and Bylaws.

19. Policies and Compliance Matters:

    (a) Any policies or rules developed to implement this Resolution shall be established by the Commissioner in consultation with the Business Ventures Committee.

    (b) All licenses granted by the League and any Member Club or any affiliate of such entity shall include appropriate provisions relating to audit, insurance and indemnification, quality control, prohibitions on assignment, sublicensing, or otherwise encumbering League Marks or Club Marks, prohibitions on third party licensing of League Marks or Club Marks, and other contractual provisions that may be from time to time required to protect the League and the Member Clubs.

    (c) Clubs shall not mortgage, pledge, hypothecate or otherwise encumber rights in Club Marks without prior approval of the League.

**EX 28, PAGE 3082**

20. <u>Club Cooperation and Support of Joint Activities</u>: The Clubs shall
cooperate with the League and League affiliates as may be reasonably
necessary to carry out the terms of this Resolution including the licensing
and protection of League Marks and Club Marks rights and in that respect
shall execute documents as may be reasonably requested by the League or
a League affiliate to carry out the purposes of this Resolution.

## 2004 RESOLUTION FC-1A

### (AS AMENDED)

Whereas, 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6, requires that a single individual (the "Principal Owner", also referred to as the "Controlling Owner") must hold at least a 30% beneficial interest in a Member Club, and that such individual also have total voting control of the Member Club through a voting trust, general partner or managing member interest, shareholders agreement, or similar arrangement;

*Whereas*, the Finance Committee recognizes the importance of permitting Principal Owners to engage in responsible succession planning and to provide for the orderly transfer of ownership to the next generation without the disruption of forced sales to pay estate taxes; and

*Whereas*, to facilitate such intergenerational transfers the Finance Committee has determined that it is in the best interest of the League to allow Principal Owners, in certain circumstances and subject to certain conditions, to reduce potential estate tax liability by holding individually less than a 30% beneficial interest, and aggregating the Principal Owner's individual interest with those of immediate family members to reach the required 30% stake;

Be it *Resolved*, that a Principal Owner will be deemed to own a 30% beneficial interest in his club if all of the following conditions are met:

1. The Principal Owner has owned the club for at least ten years, except that this provision shall not apply to any person who is a Principal Owner as of April 15, 2004, or his designated beneficiary;

2. The Principal Owner individually owns a beneficial interest in the Member Club of at least twenty percent (20%);

3. The Principal Owner and members of the Principal Owner's immediate family hold, through a family-owned entity in which the Principal Owner is the sole general partner, manager, voting stockholder, or trustee (as the case may be) an aggregate beneficial interest in the Member Club of at least thirty percent (30%) (such entity, the "GP Entity");

4. The Principal Owner has total voting control of the Member Club through the GP Entity as managing member of a limited liability company, or general partner of a limited partnership, that owns the Member Club, or as the owner of all voting stock of a Member Club, in each case as documented to and approved by the Commissioner;

5. The Principal Owner provides verification in form and substance satisfactory to the Commissioner that he has made arrangements to pass

2004-11

**EX 28, PAGE 3084**

total voting control of the Member Club upon his death to a designated beneficiary who is a member of his immediate family, that upon the Principal Owner's death such designated beneficiary will succeed to the Principal Owner's position and will own at least a 20% beneficial interest in the Member Club, that following the Principal Owner's death members of the Principal Owner's immediate family will continue to hold at least a 30% beneficial interest in the Member Club, and that these arrangements will stay in effect until the Principal Owner's death or disposition of the Member Club, whichever occurs first;

6. No change may be made in the individual exercising total voting control of the Member Club except (a) with prior consent of the League's Executive Committee by a three-fourths vote, and (b) where the successor to the control position holds at least a 20% beneficial interest in the Club;

7. A member of the Principal Owner's immediate family may sell or transfer his interest in the Member Club, subject to the terms of any partnership, shareholder, or other contractual agreement and League policies regarding the transfer of ownership in Member Clubs;

8. In any case where a member of the Principal Owner's immediate family wishes to sell an interest that has been aggregated with the Principal Owner's interest to satisfy the 30% beneficial ownership requirement, such person must be required by the governing internal agreement of the GP Entity to sell such interest to the GP Entity (or to individuals owning interests therein), and the organizational documents of the GP Entity must provide that if the price cannot be agreed upon, the arbitration mechanism as set forth in Article III, Section 3.8(B) of the Constitution and Bylaws will be used to determine the price of the interest being sold; and

9. In any case not involving a transfer from a Principal Owner to a successor group of his immediate family, the requirement that the Principal Owner hold at least a 30% beneficial interest in the Member Club shall remain in full force and effect;

Be it Further *Resolved*, that except as specifically amended hereby, all policies relating to ownership or transfers of ownership in Member Clubs, including applicable debt ceiling rules, shall remain in full force and effect and shall be fully applicable to the GP Entity and to all members of the Principal Owner's immediate family owning interests therein; and

Be it Further *Resolved*, that nothing in this Resolution shall affect the validity of any existing and approved ownership arrangement at a Member Club.

2004-12
**EX 28, PAGE 3085**

## 2004 RESOLUTION FC-2

### (AS AMENDED)

*Whereas*, pursuant to 1997 Resolution FC-3, the membership provided for cross-ownership by controlling NFL owners in certain limited circumstances;

*Whereas*, the membership desires to clarify and strengthen ownership policy as it related to cross-ownership; and

*Whereas*, the membership wishes to avoid conflicts of interest, protect confidential information, and encourage owners to promote and develop NFL and club business;

Be it *Resolved* that:

1. The terms of 1997 Resolution FC-3 shall be deemed fully applicable to any member of a controlling owner's immediate family who either (a) holds an interest in the franchise, (b) is an officer, director or executive of the club or a club affiliate, or (c) is designated by the club as a representative to the Executive Committee pursuant to Article VI of the Constitution and Bylaws.

2. The provision of 1997 Resolution FC-3 shall be deemed fully applicable to any non-controlling owner who acquires his interest in an NFL franchise after May 25, 2004, and either (a) has an option, right of first refusal, or other contractual provision pursuant to which he may become the controlling owner of the club or (b) is designated by the club as a representative to the Executive Committee pursuant to Article VI of the Constitution and Bylaws.

3. Any person found by the Commissioner and the Finance Committee not to be in compliance with 1997 Resolution FC-3 or this Resolution shall be ineligible to attend meetings of the Executive Committee, and may not be appointed a member of the Broadcasting, Business Ventures, Finance, Stadium or Management Council Executive Committees.

4. For purposes of the Resolution, the term "club affiliate" shall have the meaning set forth in the Collective Bargaining Agreement. The term "immediate family" shall have the meaning set forth in Article 3.5 of the Constitution and Bylaws.

**EX 28, PAGE 3086**

**2004 RESOLUTION FC-7**

**(AS AMENDED)**

*Whereas*, all NFL member clubs are required annually to furnish audited financial statements to the League office,

*Whereas*, all NFL member clubs are required annually to furnish financial information sufficient to allow the preparation of the annual conforming statements;

*Whereas*, these financial reports are relied upon by the membership to formulate and implement important League policies; and

*Whereas*, the Committees wish to enhance the reliability, thoroughness and accuracy of these reports;

Be it *Resolved*, that

1. All club audited financial statements and all club conforming statements must include a specific certification that the financial results of all football-related affiliated entities have been included in the club's report;

2. All club audited financial statements and all club conforming statements must include a representation, signed by the principal owner and Chief Financial Officer, that the reports are complete and accurate, and contain all necessary disclosures, to the best of the signing party or parties' knowledge;

3. All club conforming statements must be audited by the club's independent auditors and include an audit opinion covering all schedules thereto in accordance with the conforming statement instructions prepared in accordance with a standardized chart of accounts as promulgated by the Finance Committee;

4. Each club shall submit the certified audit report and conforming statement to the Treasurer of the NFL by the earlier of June 30 or within 150 days after that club's fiscal year end; and

5. Each club will grant full cooperation to League auditors for the purpose of reviewing and confirming compliance with this Resolution and related instructions for preparing the conforming statements.

**EX 28, PAGE 3087**

Case 2:12-md-02323-AB Document 18-34 Filed 02/29/12 Page 256 of 29
2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 256 of 29
ID #:10504

**2004 RESOLUTION G-1**

**(AS AMENDED)**

Amend the Anti-Tampering Policy to reflect the following:

> After February 15 of any year and through the conclusion of the annual
> Selection Meeting, if a club seeks permission to discuss employment with an
> individual who is under contract for the succeeding season or seasons to
> another club to offer him a position as a high-level club employee, the
> employer club is under no obligation to grant the individual the opportunity
> to discuss the position with the interested club, provided that his current
> responsibilities do not include gathering information on and evaluating draft-
> eligible players or veteran free agent players. At the discretion of the
> employer club, however, such permission may be voluntarily granted.

**EX 28, PAGE 3088**

**2004 RESOLUTION JC-1A**

<u>Renew and amend for the 2004, 2005 and 2006 seasons</u>, the amendments made to the Anti-Tampering Policy by 2002 Resolution JC-1 which was for the 2003 season only, as follows (new language underlined):

The following post-season procedure applies if a club (the inquiring club) is interested in discussing its vacant head coaching position with an assistant coach whose employer club is participating in the playoffs:

1. The owner or operating head of the inquiring club may contact the owner or operating head of the employer club to request written permission to discuss its head coaching position with an assistant coach.

2. If the employer club elects to grant permission to the inquiring club, the one (1) interview between the inquiring club and the assistant coach must be conducted in the home city of the employer's club at a time that is convenient for the employer club. For clubs that have byes in the Wild Card weekend, interviews of its coaches must be conducted prior to the <u>conclusion of</u> Wild Card games. For assistant coaches of clubs that participate in a Wild Card game and advance to the Divisional Playoffs, interviews must be conducted after the Wild Card games and prior to the Divisional Playoff games. An inquiring club is permitted only one interview with an assistant coach while his team is competing in the post-season, and there shall be no other direct or indirect contact between any employee or agent of the inquiring club and the assistant coach or any representative or agent of the assistant coach. No interviews may be requested nor granted after the Divisional Playoff weekend for any assistant coach whose team is still participating in the post-season.

3. No contract shall be executed, and no agreement to execute a contract, or an announcement of a contract or of an agreement for employment, shall be permitted until after the conclusion of the employer club's playing season.

4. If a club elects to grant permission for one of its assistant coaches to interview for a head coaching position, it must grant permission to all inquiring clubs that seek to interview him. Permission cannot be granted selectively.

5. If a club elects to grant permission for one of its assistant coaches to interview with an inquiring club or clubs, it may deny permission for another member of its staff, provided that the denial is applicable to all inquiring clubs.

**EX 28, PAGE 3089**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 258 of 29
Case 2:12-cv-03396-R-MAN Document 18-34 Filed 12/20/11 Page 258 of 29
ID #:10506

6. <u>The procedures described above will also apply if a club wishes to discuss a vacant high-level non-player, non-coach position (defined as club president, general manager, or a position with equivalent responsibilities and authority) with an individual who is not a high-level club employee and whose employer club is participating in the playoffs.</u>

ase 2:12-md-02323-AB Document 6534 Filed 03/29/12 Page 259 of 29
FF-cv-08396-R23MAN Document 69-33 Filed 12/20/11 Page 259 of 29
ID #:10507

**2004 RESOLUTION MC-1**

*Whereas*, the existence of Practice Squads has been authorized and regulated since 1993 by Article XXXIV of the Collective Bargaining Agreement ("CBA");

*Whereas*, NFL Clubs have benefited from the ability to employ practice squad players;

*Whereas*, numerous NFL Clubs have expressed the desire to employ additional practice squad players beyond the five (5) authorized by Article XXXIV, Section 1 of the CBA;

*Whereas*, the Competition Committee has unanimously recommended that Practice Squad rosters be increased by up to (3) players per Club;

*Whereas*, such additional practice squad players would be subject to all the restrictions and provisions of Article XXXIV; and

*Whereas*, the Management Council Executive Committee recommends that for the 2004 League Year only, and perhaps for subsequent League Years depending upon further review at the conclusion of the 2004 season, Clubs should have the opportunity to employ additional practice squad players; it is therefore

*Resolved,* that the Management Council, subject to negotiation and agreement with the NFL Players Association, modify Article XXXIV to provide for Practice Squads not to exceed eight (8) players per Club for the 2004 League Year only and to provide for an NFL option for subsequent League Years to set Practice Squad levels not to exceed (8) players per Club.

**EX 28, PAGE 3091**

**2005 RESOLUTION BC-1**

It is hereby *Resolved* that, to protect and enhance the ability of the League to compete effectively with other entertainment providers and to protect the interests of the League as a whole (and specific initiatives thereof, including but not limited to the NFL Network), no member club may launch, operate, or participate in the launch or operation of, a Club-dedicated Network (as defined in the attached Report of the Broadcasting Committee);

*Further Resolved,* that, to avoid any conflicts of interests (including the appearance thereof) and to ensure compliance with the "primary purpose" rule set forth in the NFL Constitution, no member club may acquire or hold an equity or quasi-equity interest in a Club-equity Network (as defined in the attached Report of the Broadcasting Committee) unless prior approval of the terms of such equity interest shall have been obtained from the Commissioner after consultation with the Broadcasting Committee;

*Further Resolved*, that to preserve and enhance the ability of the League and the NFL Network to compete with other entertainment providers on a national basis, clubs may license programming to third-party-owned Regional Sports Networks only if carriage of such programming is expressly limited to the Club's home television market; and

*Further Resolved,* that with respect to an existing Club-equity Network in Dallas and existing and planned Club-dedicated Networks in Atlanta and Tampa Bay, the NFL Network and the involved Clubs will cooperate in good faith in promptly transitioning such existing operations into virtual Club networks as contemplated by, and within the framework of, the NFL Network.

**EX 28, PAGE 3092**

**2005 RESOLUTION BC-2**

*Whereas,* the League has negotiated new television contracts for its prime time television packages with NBC and ESPN, covering all NFL prime time regular season games, certain preseason games, and in the case of NBC, certain postseason games including the Super Bowl games to be played in February 2009 and February 2012; and

*Whereas,* ratification of the NBC contract (covering the 2006-2011 seasons) at this time by the membership has been unanimously recommended by the Broadcasting Committee; and

*Whereas,* ratification of the ESPN contract (covering the 2006-2013 NFL seasons) by the membership has been unanimously recommended at such time as a definitive long-form agreement has been completed, reflecting in a manner satisfactory to the NFL all of the terms and conditions of the Memorandum of Agreement with ESPN dated April 15, 2005; and

*Whereas,* the membership now desires to ratify and approve such NBC contract, with specific administrative and cooperation policies with respect to such television contracts to be adopted by membership resolution at a later date following the League's ratification of the ESPN contract;

*Be it Resolved,* that the League's 2006-2011 television contract with NBC is hereby ratified and approved; and

*Further*, *Resolved,* that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2005 season, which continues to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2.

**EX 28, PAGE 3093**

ase 2:12-md-02323-AB Document 6933  Filed 12/20/11  Page 262 of 29
rev-08396-R 23MAN Document 18-34  Filed 03/29/12  Page 262 of 29
ID #:10510
**2005 RESOLUTION BC-3**

*Whereas*, the League has negotiated new television contracts for its prime time television packages with NBC and ESPN, covering all NFL prime time regular season windows that have existed under previous NFL television contracts, certain preseason games, and in the case of NBC, certain postseason games including the Super Bowl games to be played in February 2009 and February 2012; and

*Whereas*, the membership has previously ratified the NBC contract (covering the 2006-2011 seasons); and

*Whereas*, the Broadcast Committee has unanimously recommended ratification of the ESPN contract (covering 2006-2013 NFL seasons) at this time, given that definitive long-form documentation with ESPN has been completed, reflecting in a manner satisfactory to the NFL all of the terms and conditions of the Memorandum of Agreement with ESPN dated April 15, 2005; and

*Whereas*, the membership now desires to ratify and approve such ESPN contract, with specific administrative and cooperation policies with respect to all of the League's television contracts to be adopted by membership resolution at a later date following the League's decision on creation and/or license of a possible Thursday/Saturday prime time television package;

Be it *Resolved*, that the League's 2006-2013 television contract with ESPN is hereby ratified and approved and subject to completion on terms satisfactory to the Commissioner of certain ancillary agreements with ESPN's sister network ABC, the league office is director to take steps to implement such agreement; and

Further, *Resolved*, that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2005 season, which continues to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2.

**EX 28, PAGE 3094**

**2005 RESOLUTION BV-1**

*Whereas***,** the wireless distribution of NFL and Member Club related content (e.g.,  game video highlights, live game statistics, score updates, screen savers, ring tones, wallpaper, text based news services/updates, polls, contests/ sweepstakes) for use on handheld devices such as cellular telephones represents a significant emerging business opportunity for the NFL, to serve its fans, offering long-term strategic value to the NFL and Member Clubs by providing an opportunity to reach fans who are unable otherwise to access NFL and Member Club content;

*Whereas***,** the NFL Business Ventures Committee has concluded that certain wireless content distribution of NFL and Member Club related content on a national level could most effectively serve NFL fans and enable the Member Clubs to compete effectively with other content providers if it were administered solely by the League Office on a collective basis; and

*Whereas***,** the Committee has concluded that, in order to provide all Member Clubs with incremental assets to sell to third parties and service their fans, certain Member Club related content should be available for wireless distribution by the Member Clubs as set forth herein;

It is hereby *Resolved***,** that NFL Ventures, L.P. or an appropriate affiliate shall attempt to enter into a wireless distribution agreement with a third party wireless network operator or other third party wireless content distributor in order to facilitate the broad distribution of NFL and Member Club related content, to best serve NFL fans, and to maximize the associated revenue to the entire NFL, provided that the entry into such agreement, shall be subject to the prior approval of the NFL Business Ventures Committee in its capacity as the NFL Ventures Board of Directors. Such agreement may include game video highlights, NFL Films video, NFL Network video, fantasy football, promotional content (e.g., screen savers, ringtones and wallpaper), video games, game radio highlights, segments and alerts, but may not include Member Club live full game radio rights;

*Further Resolved***,** that subject to the terms of any national wireless content distribution agreement between NFL Ventures, L.P. or an appropriate affiliate and a third party wireless network operator or other third party wireless content distributor, and also pending the approval of such agreement by the NFL Business Ventures Committee, each Member Club shall then have the right to authorize third party wireless network operators and/or other third party wireless content distributors to distribute on a wireless basis, only the following content:

a) Non-game "shoulder" audio/visual programming not including any game video footage, such as coaches' shows and press conferences produced by or on behalf of such Member Club (excluding VOD and NFL Films produced programming), the availability of which shall be subject to all applicable NFL rules.

2005-4
**EX 28, PAGE 3095**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 264 of 29
Case 2:12-cv-03395-R-MAN Document 69-33 Filed 12/20/11 Page 264 of 29
ID #:10512

    b) Screen savers, ring tones, wallpaper, text based news services/updates, polls, contest/sweepstakes and, subject to the approval of the NFL, other non-game promotional content related to such Member Club and to no other Member Club.

*Further Resolved*, that all content distributed wirelessly pursuant to a Member Club agreement with third party wireless network operators and/or other third party wireless content distributors may be distributed only to consumers who reside, have billing addresses, and wireless devices registered, in the Member Club's Home Television Territory, and may be made available to such consumers for reception, viewing and use only on wireless devices registered in the Member Club's Home Television Territory.

*Further Resolved,* that any wireless content distribution agreement entered into by any Member Club as permitted hereunder shall expressly provide that it is subject to all applicable NFL rules and the prior approval of the League Office.

*Further Resolved,* that any marketing rights associated with NFL and Member Club wireless content shall be governed by the applicable provisions of the NFL Master Agreement as set forth in 2004 Resolution BV-4 (As Amended) regarding the execution of such rights in the Member Club's Home Marketing Area.

## 2005 RESOLUTION FC-2
### (As Amended)

*Whereas*, the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions;

Be it *Resolved*, that effective immediately:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $125 million to $150 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1;

3. The level at which 1998 Resolution FC-9 requires club-related liabilities of the principal or controlling owner (including obligations secured by his interest in his club) also to be secured by a pledge of club assets shall remain at $25 million; and

4. Consistent with 2001 Resolution FC-4, in connection with any acquisition of a member club or any controlling interest therein, the principal and/or controlling owner shall be required to invest equity (cash on hand or funds borrowed against other current or determinable future assets of such owner) in a minimum amount to be determined by the Finance Committee, and no acquisition transaction that the Finance Committee finds to be excessively leveraged shall be recommended by the Finance Committee for membership approval.

*Further Resolved*, that the Finance Committee may consider annually, whether, in light of economic factors and projected revenues, the overall debt limitation should be further increased beyond the aggregate $150 million allowed under this resolution, and will report to the Executive Committee.

**EX 28, PAGE 3097**

**2005 RESOLUTION G-3**

*Whereas*, numerous NFL clubs have expressed the desire to extend 2004 Resolution MC-1 for another year; and

*Whereas*, NFL Clubs benefited from the ability to employ three additional practice squad players during the 2004 season, and a total of eight (8) such players; and

*Whereas*, the Competition Committee unanimously recommends that for the 2005 League Year only, Practice Squad rosters be maintained at eight (8) players per club; it is therefore

*Resolved*, that clubs be permitted Practice Squads not to exceed eight (8) players per Club for the 2005 League Year.

**EX 28, PAGE 3098**

ase 2:12-md-02323-AB Document 6534 Filed 02/20/12 Page 267 of 29
FF v 08396-R23MAN Document 69-33 Filed 12/20/11 Page 267 of 29
ID #:10515

**2005 RESOLUTION G-4**
**(As Amended)**

*Whereas,* the NFL is competing in an increasingly global professional sports marketplace fueled by worldwide media and communications, an emerging global consumer culture, and the exceptional performance of individual athletes who become national "heroes" in their countries;

*Whereas*, in this global marketplace, a strong presence beyond the United States, or any other single country, may be necessary to position a sports property as a business partner of choice for broadcasters, sponsors, and licensees;

*Whereas*, current NFL business partners are already making significant sports-related investments in foreign markets, and are seeking NFL leadership in growing football abroad;

*Whereas*, the NFL has engaged in almost twenty years of international activity with exhibition games, grass roots programs, and customized television programming, and NFL Europe League ("NFLEL");

*Whereas*, since 2003, when the member clubs committed to operate NFLEL through the 2005 NFLEL season (pursuant to 2003 Resolution IC-1), NFLEL has continued to serve important NFL objectives by, among other things, continuing to develop and evaluate U.S. and foreign players and coaches, and has also positioned itself well for the future by strategically concentrating in Germany, and by establishing the NFL Europe Advisory Board;

*Whereas,* the NFL Players Association continues to regard NFLEL as an important element of our relationship and has committed to increase its share of the cost of NFLEL through the 2006 NFLEL season;

*Whereas*, the NFL has launched NFL Network and has also created the contractual predicates for a new Thursday-Saturday cable television package, both of which increase demand for live football game programming and related television content, and NFLEL is an important source of such content;

*Whereas,* the member clubs believe that continued investment in NFLEL is in the best interests of the League, provided that such investment can be effectively controlled and that the volatility of such investment can be minimized, and wish to extend their commitment to NFLEL on such a basis;

Be it *Resolved*:

1. That NFLEL shall be operated for five additional seasons, through the 2010 NFLEL season, pursuant to annual business plans and budgets that shall be reviewed and endorsed by the Commissioner, and approved by the

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 268 of 293
Case 2:08-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 268 of 293
ID #:10516

Business Ventures Committee as part of the League's annual international business plan.

2. That the NFLEL operating authorization under this Resolution is conditioned a) on the continued financial support of NFLEL by the NFL Players Association at the minimum net level of $21 million for the 2006 NFLEL season, as provided for under the September 30, 2005 amendment to the Collective Bargaining Agreement executed by the NFLPA and NFL Management Council; and b) on an extension of the Collective Bargaining Agreement before the beginning of any Uncapped Year that includes a continuing commitment of financial support by the NFL Players Association at minimum annual net levels of $25 million for each of the 2007-2010 NFLEL seasons, or such lesser amount as may be agreed by the League's membership in any extension of the Collective Bargaining Agreement.

3. That NFLEL shall place highest priority on securing third-party investment (at the team and/or league levels), and shall structure and operate in such a manner as to make the league optimally attractive to such potential investors, provided that such structure and operations shall not materially degrade the quality of the league's development of U.S. players.

4. That the NFLEL operating authorization under this Resolution may, at the discretion of the Business Ventures Committee, be revoked or modified if: a) the NFL Europe Advisory Board ceases to exist or changes in character from its current CEO-driven structure; b) third-party investment in at least two NFLEL teams has not been secured and activated by the beginning of the 2008 NFLEL season; or c) the league's actual Operating Income (in constant exchange rate terms) for both the 2006 and 2007 seasons is lower by 20% or more than the approved budgeted levels.

**EX 28, PAGE 3100**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 269 of 29
se 2:12-cv-08395-R-MAN Document 69-33 Filed 12/20/11 Page 269 of 29
ID #:10517

**2005 RESOLUTION MC-1**

*Whereas*, certain NFL players have experienced both on-field and off-field injuries resulting in total and permanent disability; and

*Whereas*, workers' compensation coverage may be unavailable or inadequate to offset the costs associated with such total and permanent disabilities; and

*Whereas*, the NFL has purchased a League-wide catastrophic loss program to cover all NFL players at all times for both on-field and off-field injuries thereby resulting in lower premium costs for Member Clubs; and

*Whereas*, the insurance policy purchased in 2001 will expire in August, 2005; and

*Whereas*, the Management Council Executive Committee recommends the continuation of the insurance coverage for a three year term; it is therefore

*Resolved*, that the Management Council authorizes that the NFL Catastrophic Loss Program be retained for another three-year period on such terms and conditions as are attached hereto.

Case 2:12-md-02323-AB Document 6983-4 Filed 02/29/12 Page 270 of 29
Case 2:08-cv-03396-R-MAN Document 69-33 Filed 12/20/11 Page 270 of 29
ID #:10518

**2005 RESOLUTION MC-2**

*Whereas*, certain drafted players have suffered career ending injuries or accidental death prior to reporting to their initial training camp; and

*Whereas*, the loss of the drafted player and draft choice is an insurable interest of the club; and

*Whereas*, certain first and second round drafted players have suffered temporary total disabilities which has caused them to miss all or part of their first regular season; and

*Whereas*, the Management Council Executive Committee recommends that insurance coverage be acquired to cover the loss of services of such players due to permanent or total disability or accidental death; it is therefore

*Resolved*, that the membership authorize the acquisition of a draft choice asset value policy for a three year term on such terms and conditions as are attached hereto.

**EX 28, PAGE 3102**

## 2006 RESOLUTION BC-1

*Resolved*, that in preparation of the official NFL regular season schedule and administration of the new "flexible scheduling system" that will be implemented beginning with the 2006 NFL season for Sunday games to be telecast on CBS, Fox and NBC, the Commissioner and League Office will apply the following policies:

1. Each club will, with proper notice, switch Sunday regular season games between 1:00 and 4:15 P.M. (Eastern Time), and in flexible scheduling weeks (generally weeks 11-17 of each season) to approximately 8:15 P.M. (Eastern Time), to accommodate television broadcasting patterns;

2. The following scheduling provisions will apply to the scheduling of the League's Sunday Night prime time broadcast television package:

   a. Maximum of three <u>scheduled</u> (i.e., Week 1-10) appearances per club, inclusive of the Thursday night opener;

   b. With respect to such <u>scheduled</u> appearances;

      i. If a club is scheduled three times, such club may not be scheduled with all of those games at home, or all such games away, without its prior permission;

      ii. If a club is scheduled twice, both games may be scheduled away, or one may be schedule at home and one away; and

      iii. If a club is schedule once, such game may be home or away.

3. In addition to such <u>scheduled</u> Sunday night broadcast appearances, all clubs may have games "flexed" into the Sunday night broadcast package and scheduled in other prime time television packages subject to the following:

   i. No club may, as a result of such "flexing" and scheduling in other prime time packages, appear more than six times in prime time television packages;

   ii. No more than three clubs may appear six times in prime time television packages;

   iii. No club may appear in the Sunday night broadcast more than four times, and only three clubs may appear in such package four times.

2006-1

**EX 28, PAGE 3103**

Case 2:12-md-02323-AB Document 18-34 Filed 02/29/12 Page 272 of 29
Case 2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 272 of 29
ID #:10520

4. No club will be required to make more than one appearance per season in games scheduled on dates other than Saturday, Sunday or Monday if, as a result of such scheduled appearance, such club will have fewer than five days available for preparation time prior to such games.

**2006 RESOLUTION BC-3**

*Whereas,* it is in the best interests of the member clubs to cooperate fully with their broadcast partners to ensure the presentation of NFL football in the most professional and high quality manner, be it

*Resolved,* that the provisions of 1998 Resolution BC-2 shall remain in full force and effect throughout the term of the current contracts with CBS, ESPN, Fox and NBC, and shall extend to NFL Films, the NFL Network and Westwood One; and further

*Resolved,* that the clubs shall also cooperate with the television networks as follows:

1. By making available key players, the head coach and, if requested, the offensive/defensive coordinators to the telecasting network at the weekly production meeting (to be scheduled for a minimum of 60 minutes).

2. By allowing the telecasting network unobstructed access to players on the field pregame (provided there is no interruption of pregame drills) and, at the club's option, to the team locker room for a taped piece to be used only until the game has concluded.

3. At the club's option, by making available to the telecasting network the head coach and/or a "star" player for an on-camera interview at halftime, as well as any inactive (but not suspended) player at any time during the game.

4. By giving priority for post-game on-field interviews to the telecasting network first, followed by Westwood One (if applicable), the NFL Network and other national television partners.

5. By ensuring unobstructed views and access to team bench areas and bench activity, with TV crews using hand-held equipment from approved locations behind the yellow restraining line; by limiting sideline boom microphones to one each for NFL Films and the two participating teams; and by exercising necessary crowd control to ensure clear shots of out of bounds lines.

6. By allowing NFL Films (or a club film crew in lieu of NFL Films) into the winning locker room; and by allowing network camera and reporter access outside team locker rooms (excluding training and X-ray areas).

7. For games broadcast by Westwood One, providing it with priority in selecting a radio booth behind only the home and visiting team primary booths, and 2 close-in parking spaces.

2006-3
**EX 28, PAGE 3105**

Case 2:12-md-02323-AB Document 69-33 Filed 02/29/12 Page 274 of 29
Case 2:12-cv-08395-R Document 18-34 Filed 12/20/11 Page 274 of 29
ID #:10522

8. Providing all network partners access to a live feed of any club preseason telecast within the broadcast window of a live network preseason game for purposes of limited in-progress taped highlights.

9. Providing necessary stadium services (as defined by the network agreements and the Broadcasting Committee) at club expense; and further

*Resolved,* that beginning two hours before the scheduled start of a game until the game's conclusion, clubs shall not permit any media entity other than the telecasting entity to televise live from a set located at any place with a field view in the stadium, except that the NFL and home club may permit (a) reporters from other NFL network partners and the participating clubs' local station partners to do live or taped stand-ups (without a set) until one hour before the scheduled start of the game; (b) reporters from local stations broadcasting in the local markets of the participating teams to do live or taped reports for regularly-scheduled local news programs (without a set) until 20 minutes before the scheduled start of the game; and (c) the NFL Network to have reporters providing live or taped reports (without a set) until kick off; and shall remove all other television and other video media personnel from the field during the game; and further

*Resolved,* that clubs shall (and shall require their local broadcasters to) honor provisions in national television contracts on scheduling local post-game shows and to comply with League policies implemented to enhance the value of telecasts to the League and NFL broadcast partners; and further

*Resolved*, that the Commissioner and Broadcasting Committee may develop other guidelines to implement the broadcasting agreements, which shall be binding on the member clubs.

**EX 28, PAGE 3106**

**2006 RESOLUTION BC-4**

*Whereas*, the League adopted under 2001 Resolution G-5 a realignment plan and provided the League Office with scheduling authority for the preseason games (not including the final weekend of the preseason);

*Whereas*, such scheduling authority expired with the conclusion of the 2006 preseason;

Be it *Resolved,* that beginning with the 2007 NFL season, the League Office will schedule preseason games (not including the final week of the preseason), provided that (a) such scheduling authority will be exercised in accordance with the plan developed by the Commissioner in 2002 and submitted to the membership for review, (b) clubs realigned from otherwise intact divisions will receive preference in scheduling home games with former division rivals and other attractive opponents; (c) such scheduling authority will continue to honor traditional rivalries (e.g. Jets-Giants) as requested by the clubs; and (d) unless otherwise agreed to by the membership.

Be it *Further Resolved,* that as stated in the 1998 Resolution BC-5:

Teams will cooperate fully with the League Office on the finalization of the network preseason game package (15 games, HOF game included).

Teams are obligated to play a minimum of two network preseason games, if asked (HOF game and other international "extra" games not included) and understand that there may be specific instances when additional games are required.

Teams will agree to play preseason games on nights other than Saturday if requested to do so to satisfy network partner commitments.

Teams will agree to play daytime preseason games when required to satisfy network partner commitments.

Teams understand that their local stations give up all rights, including tape delay to games selected for the network preseason game package.

League Office decisions on the preseason schedule will be final and binding on the member clubs with such decisions to be made in the collective best interest of the teams and the League.

**EX 28, PAGE 3107**

**2006 RESOLUTION BV-1**

*Whereas,* the NFL has demonstrated its commitment to competing in a global professional sports marketplace and to developing a greater presence beyond the United States;

*Whereas*, current NFL business partners have made significant sports-related investments in foreign markets and are seeking NFL leadership in growing football abroad;

*Whereas*, the NFL has engaged in almost twenty years of international activity including exhibition games, grass roots programs, customized television programming, and investment in the NFL Europe League;

*Whereas*, the NFL live game experience is one of the most compelling assets available to the League in building its fan base and business opportunities globally;

*Whereas,* during the 2005 season, the NFL held its first-ever regular season game outside the United States in Mexico City, successfully demonstrating the potential for global demand at both the fan and sponsor level;

*Whereas*, the member clubs believe that hosting additional NFL regular season games outside the United States is in the best interests of the League, and will contribute to the strength and development of the NFL's brand and presence outside the United States.

Be it *Resolved,* that the League is authorized to schedule up to two (2) regular-season games per season outside the United States beginning with the 2007 season and continuing through at least the 2011 season (the "International Games");

Be it *Further Resolved*, that the operating budget for the International Games will be reviewed and endorsed by the Commissioner and approved by the Business Ventures Committee as part of the League's international business plan;

Be it *Further Resolved*, that all competitive aspects of the International games will be considered and, if necessary, approved by the Competition Committee;

Be it *Further Resolved*, that the "home" team will have the option of designating one regularly scheduled home game that will not be eligible as an International Game;

Be it *Further Resolved*, that divisional match-ups will not be eligible as International Games, without the consent of both clubs;

**EX 28, PAGE 3108**

Be it *Further Resolved*, that the visiting team will be required to participate in accordance with the NFL schedule;

Be it *Further Resolved,* that clubs who participate in International Games outside North America will have a bye week scheduled the week following the International Game. In addition, each participating team will have a "home" market game scheduled for the week prior to the International Game.

Be it *Further Resolved*, that for International Games, the "home" team will be paid a game fee equal to the average net revenue of the team's seven other regular season home games, less actual VTS. "Home" team travel and local costs, including transportation, practice facilities and security will be the responsibility of the League office. For games played outside North America, the differential between the "visiting" team travel costs and the average travel costs for the season's other away games and all local costs will also be the responsibility of the League office.

**2006 RESOLUTION BV-2**

*Whereas,* NFL Enterprises' agreement with CBS Sportsline and AOL with respect to production and operation of the NFL.com Internet site and the NFL Internet Network has recently expired;

*Whereas,* NFL Enterprises' management has concluded, after extensive exploratory discussions with a number of potential Internet partners, that a new arrangement for third-party production and operation of NFL.com and the NFL Internet Network would not produce the strategic, financial and other benefits that it believes should be attained from the operation of NFL.com and the NFL Internet Network over the next five years and beyond;

*Whereas,* NFL Enterprises LLC believes that in-house operation of NFL.com and the NFL Internet Network would be a better strategic and financial alternative than a new third-party arrangement; and

*Whereas,* the Broadcasting Committee, as part of its strategic oversight of NFL media operations and plans, has unanimously concurred in the judgment of NFL Enterprises' management;

*Be It Resolved,* that NFL Enterprises will operate NFL.com and the NFL Internet Network on an in-house basis going forward, subject to oversight and budgetary approval by the NFL Ventures L.P. Executive Committee.

*Further Resolved,* that no change in the allocation of the Clubs' and NFL Enterprises' respective rights, opportunities and obligations in the Internet and related digital media spaces will occur as a result of (or is requested or contemplated in connection with), the in-house operation of NFL.com and the NFL Internet Network, which will continue to be operated through the 2019 season in accordance with the allocation of rights, opportunities, and obligations set forth in 2001 Resolution JC-1, as contemplated by and mandated pursuant to 2004 Resolution BV-4.

**EX 28, PAGE 3110**

**2006 RESOLUTION G-1**
**2006 RESOLUTION MC-1**

**March 15, 2006**

**Resolution Adopted at Special Management Council/**
**League Meeting, March 8, 2006, Dallas, Texas**

**(Moved by Baltimore, Carolina, Dallas, Denver, New England, New York**
**Giants, New York Jets, Pittsburgh; seconded by Atlanta)**

1. Accept the Union's offer.

2. SRS funded at the following levels:

    a. 2006 -- $100 million

    b. 2007-11 – 65% of **a club's own revenue at the** "midpoint" **between
       the Salary Cap and the "trigger"** (58.5% level), **projected at
       approximately**
        i. 2007 -- $105 million
        ii. 2008 -- $120 million
        iii. 2009 -- $140 million
        iv. 2010 -- $210 million
        v. 2011 -- $220 million

    **[Note: The current projections of committed finding levels,
    distributed at the meeting during the discussion of the proposed
    resolution, is at Attachment A.]**

3. Funding Mix:

    a. Current **SRS Funding Sources** (now pooled; approximately $27
       million annually)

    b. **Annual** commitments from High Revenue Clubs, at
        i. $3 million from each of the top five Clubs
        ii. $2 million from each of the next five Clubs
        iii. $1 million from each of the next five Clubs

    c. Balance from High Revenue Clubs' **(as identified on an annual
       basis)** share of incremental League revenue streams in excess of
       current projections (other than television); e.g., new business
       categories, new technologies, new revenue streams from existing
       business categories.

2006-9

**EX 28, PAGE 3111**

Case 2:12-md-02323-AB Document 69-34 Filed 02/29/12 Page 280 of 293
Case 2:12-cv-03396-R MAN Document 69-34 Filed 12/20/11 Page 280 of 293
ID #:10528

   **d. [Deleted due to overlap with paragraph 4.]**

4. **The League will have the** authority to borrow against High Revenue
   Clubs' **(as identified on an annual basis)** share of digital and internet
   revenue **streams** pooled at League level to fund shortfalls. **Such funding
   may** be called to the actual extent earned by qualifying Clubs in the given
   year. To the extent earned, the League will borrow these monies against a
   pledge of the High Revenue Clubs' distribution of **future New Media
   revenues. For the first four years of the extended CBA (2006-09), the
   annual financial responsibility of the top 15 clubs for funding
   shortfalls of up to $105 million (average of $26 million/year)** will be as
   follows:
   **a. Clubs** 1-5 = $2.6 million
   **b. Clubs** 6-10 = $2.08 million
   **c. Clubs** 11-15 = $520 thousand

   To the extent less **than the $26 million annual average is needed,** it
   will be taken pro rata on the above formula. **Money will not be borrowed
   unless necessary.**

   **For the duration of this CBA, including the uncapped year,** all
   revenues generated by the NFL or any member club from the distribution
   of audio, video, animated, live statistical, or textual content via any
   subscription, non-broadcast digital, or other technology for distributing
   media now in existence or hereafter developed, including without limitation
   subscription television or radio (other than existing DirecTV and Sirius
   agreements), video-on-demand, internet (including advertising or pay-per-
   view or related services), broadband, IPTV, or digital download or
   streaming devices (e.g., iPods, cell phones, PDAs or similar devices) shall
   be committed as equally-shared revenues (hereafter referred to as "New
   Media Revenues"). Beginning with the 2006 League Year, the amount of
   equally-shared New Media Revenues that would otherwise be distributed to
   the High Revenue Clubs (as that term is defined by the membership) shall
   instead be used **to the extent necessary to** fund the supplemental revenue
   sharing pool created under the extended CBA. **Any** New Media Revenues
   not devoted to the supplemental revenue sharing pool **shall be** distributed
   equally to clubs that are not "High Revenue Clubs" **and to High Revenue
   Clubs insofar as the New Media Revenues of those clubs are not
   required to fund the supplemental revenue sharing pool.**

5. **To the extent excess funding arising from Paragraph 3 exists in any
   year, such excess will be retained ("Banked") for future obligations
   through four years or six years, as the case may be. At the end of the
   term provided for under this document any remaining banked funds
   will be returned to the contributing clubs. [This section may drop out;
   committed to discuss further with the clubs.** *(See Note 3 at Attachment
   C.)***]**

Case 2:12-md-02328-AB Document 18-34 Filed 03/29/12 Page 281 of 29
Case 2:12-cv-08396-R-MAN Document 69-33 Filed 12/20/11 Page 281 of 29
ID #:10529

6. Qualifiers per current system/Commissioner recommendations (See Attachment B; "Funds Distribution Standards"). **The final system will include qualifiers. The Commissioner will appoint and chair a Special Committee, to be composed of eight owners (2 from each "quartile" in the League), which will review the issue of qualifiers and make a report and recommendations to the membership. Any qualifiers will be approved by a vote of three-fourths of the membership. If, in the judgment of the Commissioner, the membership is unable to resolve the issue of qualifiers on a three-fourths vote, the Commissioner shall have the authority to determine those qualifiers that will apply to distributions from the supplemental revenue sharing pool. [*See Notes 1 and 2 (at Attachment C) for Commissioner's comments on the subject of qualifiers.*]**

7. If at end of term, there is a debt balance, debt will be repaid in same proportion as High Revenue Clubs' contributions to pool. **[This section needs further consideration in light of paragraph 4.** *(See Note 3 at Attachment C) for Commissioner's comments on this subject.*]**

8. Any decision **to be made as per the Players Association's term sheet in November 2008 or 2009** to extend the CBA to include a 2010 and/or 2011 capped year shall require the affirmative vote of three-fourths of the Member Clubs.

**Player Cost as % of Revenue Test - 65%**

|  |  | **Seasons Projected** | | | | | |
|  |  | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| 6-Year Deal Average | | | | | | | |
| 58.5% | # Clubs Above 65% | 18 | 16 | 16 | 17 | 17 | 17 |
|  | $ Required | $100 | $111 | $115 | $132 | $207 | $219 |

**EX 28, PAGE 3114**

## FUNDS DISTRIBUTION STANDARDS

New Stadium - no distribution for specified period of years

Purchase of team - no distributions for specified period of years, on standards provided in advance of purchase

Distributions tied to improved team performance on objective standards (home sellouts, gross ticket receipts to VTS pool, etc.)

**EX 28, PAGE 3115**

Case 2:12-md-02328-AB Document 69-34 Filed 02/29/12 Page 284 of 29
Case 2:12-cv-08396-R-MAN Document 69-34 Filed 12/20/11 Page 284 of 29
ID #:10532

# NOTES

1. In response to questions from Mike Bidwell, John Shaw and others, the Commissioner explained that the Resolution would state that he would appoint a Special Committee to study the issue of qualifiers and to report to the membership. He further explained that the qualifiers to be evaluated by the Committee would include those in the current SRS system (such as the imputation of ticket receipts for each club as a percentage of average receipts) and that the three items identified in the attachments to the 8 Club Proposal reflected for Commissioner's recommendations as to the key elements of a framework for establishing qualifiers.

2. In response to suggestions from Mike Bidwill and others, the Commissioner stated that the Resolution would state that any qualifiers would be subject to approval by a vote of the League's membership under the three-fourths voting standard. At the suggestion of Dan Snyder and others (and with the concurrence of Mike Bidwill), the Commissioner stated that the Resolution would provide that, in the event of a membership deadlock on qualifiers, the Commissioner would have the delegated authority to determine qualifiers that will apply as a condition of receiving a distribution from the Revenue Sharing Pool. The Commissioner also noted Jeff Lurie's suggestion that the qualifiers should be determined within the next six months.

3. In response to a question from Jeff Lurie, the Commissioner stated that this paragraph was a direct carryover from the Jets-Patriots concept summary and that the paragraph might prove to be unnecessary in light of the new and broader funding arrangements reflected in the 8 Club Proposal; that in developing the 8 Club Proposal, we had not had time to address this issue; and that the issue would be addressed in a definitive way after the 8 Club Proposal was adopted (assuming it would be adopted).

## 2006 RESOLUTION G-3

*Whereas*, numerous NFL clubs have expressed the desire to extend 2005 Resolution G-3 for four additional years; and

*Whereas*, NFL Clubs benefited from the ability to employ three additional practice squad players during the 2004 and 2005 seasons, and a total of eight (8) such players; it is therefore

*Resolved*, that clubs be permitted Practice Squads not to exceed eight (8) players per Club for the 2006, 2007, 2008 and 2009 League Years.

**EX 28, PAGE 3117**

— A —

ADVERTISING
  Lottery and off-track betting, 1993-1

AMERICAN BOWL, 1990-2, 1991-2

ANTI-TAMPERING POLICY, 1998-13, 2000-1, 2001-3, 2004-15, 2004-16

ARENA FOOTBALL LEAGUE, 2002-1

ASSESSMENTS, 1982-1

AUDIT REPORT, 1985-1

— B —

BROADCASTING
  Advertising/sponsorships, 1993-1, 1998-2, 2003-1
  Club cooperation, 1998-2, 2006-3, 2006-8
  DIRECTV Contract, see DIRECTV CONTRACT
  Game day operations, 1998-2, 2002-8
  Network contracts, 1998-1, 2004-2, 2005-2, 2005-3
  NFL Network, 2003-1
  Preseason games, 1984-1, 1994-1, 1998-6, 1998-8
  Radio, 1994-1
  Schedule, see GAME SCHEDULE
  Sirius Radio Contract, see SIRIUS SATELLITE RADIO CONTRACT
  Stadium signage, 2002-8

— C —

CATASTROPHIC LOSS PROGRAM, 2002-10, 2005-10

CLAIMS AGAINST LEAGUE, 1997-3

CLUB CONTRACTS
  Preseason games, 1994-1
  Preseason television, 1984-3, 1994-1
  Radio, 1994-1

CLUB DEBT
  Debt limit, see DEBT LIMIT
  Definition, 1988-2

**EX 28, PAGE 3118**

Case 2:12-md-02323-AB Document 6934 Filed 03/29/12 Page 287 of 293
Case 2:12-cv-03395-R-MAN Document 69-33 Filed 12/20/11 Page 287 of 29
ID #:10535

CLUB DELINQUENT ACCOUNTS, 1982-1, 1984-2

CLUB MARKS, see TRADEMARKS

CLUB REPORTING
    Audit report, 1985-1, 2004-14
    Debt limit, 1996-1
    Financial statements/budget, 1990-1, 2004-14
    Ownership, 1983-2
    Super Bowl game ticket distribution, 1989-1

CLUB SEAT PREMIUMS
    Inclusion in gross receipts, 1987-1, 1995-1
    Pooling, 1995-1, 1995-4
    Stadium financing, 1999-2, 2003-7
    Waiver criteria, 1994-3

COACHES' PENSION PLAN, 1983-1

COMMISSIONER
    Approval of uniform changes, 2002-3
    Authority over affiliate operations, 1990-3
    Authority to assess club for legal fees and expenses, 1997-3
    Preseason Scheduling Authority, 1991-1, 2001-7

CONTROLLING OWNER REQUIREMENTS, see OWNERSHIP POLICIES

CORPORATE OWNERSHIP, 1996-3

CREDIT FACILITY, 2002-2

CROSS-OWNERSHIP, 1997-1, 2004-13

CROWD NOISE, 2002-6


— D —

DEBT LIMIT, 1988-2, 1996-1, 1998-9, 1998-11, 2001-1
    Waiver, 1999-1, 2005-6

DEFERRED COMPENSATION, 1988-1, 1993-3

DIRECTV CONTRACT, 2003-1, 2004-1

DRAFT
    Draft choice asset value policy, 2005-11

**EX 28, PAGE 3119**

DRAFT ELIGIBILITY, 1990-4

— E —

ELIGIBILITY, 1990-4

EMPLOYEE BENEFITS
    Medical insurance, 1997-4

EXECUTIVE SESSION MEETINGS, 1984-4

EXPANSION, 1995-1, 1996-5, 1996-6, 1999-1

— F —

FINANCIAL REPORTING, 1990-1, 2004-14

FINANCING
    Stadium, 1999-2, 2003-7

— G —

G-3 STADIUM FINANCING PROGRAM, 1999-2, 2003-7

GAMBLING
    Lottery advertising, 1993-1

GAME SCHEDULE
    General, 1998-5, 2000-4, 2006-1
    International games, 1990-2, 2006-6
    Preseason games, 1991-1, 1998-6, 2001-2, 2001-7, 2006-5

GROSS GATE RECEIPTS
    Calculation, 1987-1, 1987-3, 1995-1, 2001-2
    Postseason, 1987-2

— H —

HALL OF FAME GAME, 1998-7

**EX 28, PAGE 3120**

Case 2:12-md-02323-AB Document 6934 Filed 02/29/12 Page 289 of 29
Case 2:03-cv-09353-R-MAN Document 69-33 Filed 12/20/11 Page 289 of 29
ID #:10537

— I —

IN-STADIUM GIVEAWAYS, 1985-3

INSURANCE
    Draft choice asset value policy, 2005-11

INTEREST ON CLUB DELINQUENT ACCOUNTS, 1984-2

INTERNATIONAL
    American Bowl, 1991-2
    Business objectives, 1993-7
    Funding, 1998-10
    Game scheduling and administration, 1990-2, 2006-6
    NFL Europe, 2003-6
    Television revenue, 1998-10

INTERNET NETWORK, 2001-8, 2004-3, 2006-8
    Wireless distribution, 2005-4

— L —

LEAGUE MARKS, see TRADEMARKS

LEAGUE-WIDE CREDIT FACILITY, 2002-2

LEASES, see STADIUM LEASES

LEGAL FEES, 1997-3

LICENSING OF TRADEMARKS, see TRADEMARKS

LIMITED LIABILITY COMPANIES
    Ownership requirements, 1998-12

LIMITED PARTNERSHIPS
    Ownership requirements, 1985-2, 1996-2

LITIGATION EXPENSES, 1997-3

LOCATION-BASED ENTERTAINMENT VENTURE, 1997-5

LOS ANGELES FRANCHISE, 1995-1

**EX 28, PAGE 3121**

— M —

MANAGEMENT COUNCIL, 1990-3

MEETINGS
Executive Session, 1984-4

MONDAY NIGHT FOOTBALL, 1998-5

— N —

NETWORK TELEVISION CONTRACTS, 1998-1, 2004-2, 2005-2, 2005-3

NFL ATTRACTIONS, 1997-5

NFL ENTERPRISES, see NFL VENTURES

NFL EUROPE, 2003-6

NFL FILMS, 1990-3

NFL INTERNET NETWORK, see INTERNET NETWORK

NFL PROPERTIES, 1990-3
   Reebok Joint Venture, 2000-5, 2001-14

NFL VENTURES (FORMERLY KNOWN AS NFL ENTERPRISES), 1994-2,
1998-10

— O —

OFF-TRACK BETTING ORGANIZATIONS
   Advertising, 1993-1

OWNERSHIP POLICIES, 1985-2
   Acquisition debt, 1998-11, 2001-1
   Aggregation of Principal Owner's interests with those of immediate family
     members, 2004-11
   Corporations, 1996-3
   Cross ownership, 1997-1, 2004-13
   Family companies/trusts, 1996-2, 1996-3, 1998-12, 2004-11
   Limited liability companies, 1998-12
   Limited partnerships, 1996-2
   Primary purpose requirement, 1993-6, 2005-1
   Reporting requirements, 1983-2

OWNERSHIP REPORT, 1983-2

**EX 28, PAGE 3122**

— P —

PERMANENT SEAT LICENSES (PSLs), 1995-1, 1996-5, 1996-6, 1999-1, 1999-2, 2003-7

PLAYER BENEFITS, 1977-1, 1978-1, 2002-10

PLAYER CONDUCT
    Unsportsmanlike conduct, 2000-3

PLAYER STOCKING PLAN, 1999-1

POOLED REVENUE, see REVENUE SHARING

POSTSEASON
    Calculation of gross gate receipts, 1987-2
    Game revenue distribution, 1977-1, 1978-1, 1983-1
    Super Bowl game, see SUPER BOWL GAME

PRACTICE SQUAD, 2004-18, 2005-7, 2006-15

PRESEASON
    American Bowl, 1990-2, 1991-2
    Game contracts, 1994-1, 2001-2
    Nationally televised games, 1998-1
    Payments for nationally televised games, 1998-8
    Scheduling, 1991-1, 1998-6, 2001-2, 2001-7, 2006-5
    Telecast consent, 1984-1
    Television rights contracts, 1984-3, 1994-1, 2003-1

PRIMARY PURPOSE REQUIREMENT, 1993-6
    Club-dedicated networks, 2005-1

PROMOTIONS
    In-stadium giveaways, 1985-3

— R —

RADIO
    Club contracts, 1994-1

REALIGNMENT, 1995-1, 1996-6, 1999-1, 2001-7

REEBOK JOINT VENTURE, 2000-5, 2001-14

**EX 28, PAGE 3123**

RELOCATION,
    Browns/Ravens, 1996-5
    Oilers/Titans, 1996-6
    Rams, 1995-1

RELOCATION FEES, 1995-1, 1996-5, 1996-6

REVENUE SHARING, 1995-4, 2001-2, 2006-9


— S —

SATELLITE
    Radio, see SIRIUS SATELLITE RADIO CONTRACT
    Television, see DIRECTV CONTRACT

SCHEDULING, see GAME SCHEDULE

SIDELINES, LEAGUE CONTROL, 2002-8

SIRIUS SATELLITE RADIO CONTRACT, 2003-4

STADIUM FINANCING, see G-3 STADIUM FINANCING PROGRAM

STADIUM LEASES, 1988-3

STRIKE FUND, 1993-2

SUPER BOWL GAME
    Site selection, 1991-3, 1999-1
    Team ticket report, 1989-1
    Ticket distribution, 1989-1, 1998-14


— T —

TELEVISION CONTRACTS, see BROADCASTING

TELEVISION REVENUE
    Distribution, 1977-1, 1983-1
    International, 1998-10
    Preseason, 1998-1, 1998-8
    Relocated franchise, 1995-1

**EX 28, PAGE 3124**

THANKSGIVING GAMES, 1998-5

TICKETS
   Super Bowl game, 1989-1, 1998-14

TRADEMARKS, 2004-3


— U —

UNIFORM DESIGN, 2002-3, 2003-5

UNSPORTSMANLIKE CONDUCT, 2000-3


— V —

VISITING TEAM SHARE
   Calculation of gross gate receipts, 1987-1, 1987-3, 1995-4, 2001-2
   Pooling, 1995-4, 2001-2
   Postseason, 1987-2
   Relocated franchise, 1996-6
   Waiver, 1987-1, 1994-3, 1999-1, 1999-2, 2003-4

**EX 28, PAGE 3125**