Case 2:13-md-02493-AB Document 20-5 Filed 03/29/12 Page 1 of 39 Page ID
Case 2:11-cv-08395-R-MAN Document 69-4 Filed 12/20/11 Page 1 of 39 Page ID
#:7342

# EXHIBIT 3

# 1970

# COLLECTIVE BARGAINING

# AGREEMENT

between the

**NFL MANAGEMENT COUNCIL**

and the

**NFL PLAYERS ASSOCIATION**

**NFL MANAGEMENT COUNCIL**
540 MADISON AVENUE
NEW YORK, N. Y. 10022

# TABLE OF CONTENTS

Preamble ....................................................................... 3

Article I. Recognition ......................................................... 4
    Section 1. Recognition of the NFLPA ................................. 4
    Section 2. Recognition of the NFLPRA ............................... 4
    Section 3. Check-off ...................................................... 4

Article II. Agreement .......................................................... 5
    Section 1. Implementation .............................................. 5
    Section 2. Governing Agreement ....................................... 5
    Section 3. Joint Committee ............................................. 5
    Section 4. Scope of Agreement ........................................ 5
    Section 5. Management Rights ......................................... 6

Article III. Standard Player Contract ........................................ 6
    Section 1. Definition ..................................................... 6
    Section 2. Revision of Standard Player Contract ................... 6

Article IV. Compensation for Players ....................................... 6
    Section 1. Individual Negotiations ..................................... 6
    Section 2. Eligibility for Pre-season Compensation ................ 7
    Section 3. Pre-season Compensation ................................. 7
    Section 4. Per Diem Expense Payments ............................. 8
    Section 5. Minimum Regular Season Salary ........................ 9
    Section 6. Commencement of Salary Negotiations ................ 9
    Section 7. Payment of Salary .......................................... 9
    Section 8. Post-season Games ......................................... 9
        (a) Divisional Play-off Games ................................. 9
        (b) Conference Championship Games ........................ 10
        (c) World Championship Games ............................... 11
        (d) Pro-Bowl ..................................................... 12
    Section 9. Compensation for Post-season Games ................. 12
    Section 10. Meal Allowance ........................................... 13
    Section 11. Moving and Travel Expenses ........................... 13
        (a) Qualifications ............................................... 13
        (b) Formula for Reimbursement .............................. 13
        (c) Manual ....................................................... 14
        (d) Immediate Transportation ................................ 14
    Section 12. Termination Pay ........................................... 14

Article V. Joint Committee ................................................... 15
    Section 1. Size of Committee .......................................... 15
    Section 2. Meetings of Committee .................................... 15
    Section 3. Powers of Committee ...................................... 15
    Section 4. Scope of Discussion ........................................ 15
    Section 5. Outside Consultants ........................................ 16
    Section 6. Impartial Members .......................................... 16
    Section 7. Creation of Committee ..................................... 16

Article VI. Retirement Plan — Insurance ................................... 16
    Section 1. Retirement Plan and Trust Fund ........................ 16
    Section 2. Contribution to Trust Fund ............................... 17
    Section 3. Retirement Board ........................................... 19
    Section 4. Insurance ..................................................... 21

**Article VII. Joint Player Picture Program** ...............................21
    Section 1. Property Rights ...........................22
    Section 2. Commencement ...........................22
    Section 3. Income .....................................22
    Section 4. Negotiation of Program ...............23
    Section 5. Conditions .................................23
    Section 6. Visual Plan ...............................23
    Section 7. Topps ......................................23
    Section 8. Individual Rights .......................24

**Article VIII. Option Clause** ............................24

**Article IX. Waiver Procedure and Regulations**............24

**Article X. Non-Injury Grievance Procedure** .................25

**Article XI. Injury Grievance Procedure**.......................26
    Section 1. Selection of Neutral Physician...............26
    Section 2. Notification of Club .......................26
    Section 3. Procedure .................................27
    Section 4. Miscellaneous ............................28
    Section 5. Finality of Medical Opinion ...........28
    Section 6. Appeal Procedure .......................29
    Section 7. Expenses of Procedure ...............30
    Section 8. Pension Credit .........................31

**Article XII. Fines** .........................................31

**Article XIII. Endorsements — TV Appearances** .............32
    Section 1. Endorsements ............................32
    Section 2. TV Appearances ........................32

**Article XIV. Retention of Benefits** ..........................32

**Article XV. Miscellaneous** ................................32
    Section 1. Off-Season Training Camp ...........32
    Section 2. Deduction of Club House Expenses...............32
    Section 3. Adverse Public Statements .............32
    Section 4. Exchange of Information ...............32
    Section 5. No Discrimination .......................33
    Section 6. Tickets for Away Games ...............33
    Section 7. Workmen's Compensation ...........33
    Section 8. Players Injured Prior to Signing New Contract...............34
    Section 9. Rights to Legal Counsel ...............34
    Section 10. Travel Expenses to Training Camps...............34

**Article XVI. Duration of Agreement**.......................34
    Section 1. Effective Date .............................34
    Section 2. Expiration Date .........................34
**Appendix**
    A. Letter of League Council ........................35
    B. Modification Letter ...............................36

# COLLECTIVE BARGAINING AGREEMENT

THIS AGREEMENT is made and entered into by and among the NATIONAL FOOTBALL LEAGUE PLAYERS' ASSOCIA-TION (hereinafter referred to as the "NFLPA"), an unincorporated association, the NATIONAL FOOTBALL LEAGUE PLAYER RELATIONS ASSOCIATION (hereinafter referred to as the "NFLPRA"), and each of the MEMBER CLUBS of the National Football League (hereinafter referred to as "Member Clubs").

WHEREAS, the NFLPA is the sole and exclusive bargaining representative of professional football players as more fully set forth in the Petition for Certification on file with the National Labor Relations Board (hereinafter referred to as the "NLRB"), Region 18, Minneapolis, Minnesota; and

WHEREAS, the NFLPRA has been recognized by the NFLPA as the collective bargaining representative of the Member Clubs of the National Football League (hereinafter referred to as the "NFL") and any additional organizations which may become members of the NFL during the term of this Agreement; and

WHEREAS, previous collective bargaining agreements entered into by and between the NFL and the NFLPA and the Member Clubs of the American Football League and the American Football League Players' Association have expired in their entirety; and

WHEREAS, the NFLPA has negotiated with the NFLPRA on behalf of all of the players in the NFL with respect to terms and conditions of employment, and it is specifically understood that each individual player has a right to negotiate with his club for regular season compensation in excess of the minimums established in this Agreement, including bonuses and any form of deferred or other compensation; and

WHEREAS, the NFLPRA has been authorized by the Member Clubs of the NFL to negotiate for and on behalf of the Member Clubs individually and collectively, and proof of said authorization was presented to the NLRB, Region 18.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, it is hereby agreed as follows:

3

# ARTICLE I

## RECOGNITION

### Section 1. Recognition of the NFLPA:

The NFLPA filed a Petition for Certification of an already recognized union before the NLRB, Region 18, Minneapolis, Minnesota, on May 8, 1970, and a consent Election Agreement was entered into by and between the parties to this Agreement on July 10, 1970. The NFLPA has been recognized by the Member Clubs acting through the NFLPRA as the sole and exclusive bargaining agent for professional football players in the NFL as set forth in the unit description in said Consent Election Agreement incorporated herein by reference.

The NFLPRA and the NFLPA agree that the NFLPA has the right to negotiate minimum regular season compensation and all other terms and conditions of employment. However, the NFLPA shall not bargain on regular season compensation of individual NFL players other than minimum regular season salaries.

### Section 2. Recognition of the NFLPRA:

The NFLPA has recognized the NFLPRA as the sole and exclusive bargaining agent for the Member Clubs, and it is understood and agreed to by the parties to this Agreement that the Member Clubs, acting individually or in concert or through their agents, are bound by the terms of this Agreement.

### Section 3. Check-off:

In the event a player signs a voluntary check-off authorization, the NFLPRA and the Member Clubs hereby covenant and agree that the Member Clubs shall check-off the annual dues stipulated by the NFLPA not later than ten (10) days after the check-off authorization has been submitted to the Clubs during the life of this Agreement, and that the foregoing deduction shall be forwarded to the NFLPA at its national offices or any other address designated by the NFLPA within seven days of said check-off.

4

## ARTICLE II

## AGREEMENT

**Section 1. Implementation:**

The parties agree that they will use their best efforts to assure that all terms of this Agreement are carried out.

**Section 2. Governing Agreement:**

The provisions of this Agreement and the provisions of the Agreement entered into by the parties on July 10, 1970, incorporated by reference herein, supersede any conflicting provisions now existing or which shall exist during the life of the Agreement in the NFL Constitution and Bylaws, the Standard Player Contract, the Bert Bell NFL Player Retirement Plan and Trust Agreement, and any other document affecting the wages, hours or working conditions of NFL players.

**Section 3. Joint Committee on Contract Interpretation:**

In order to minimize or avoid disputes over the meaning, interpretation or proper application of the terms of this Agreement, a joint committee of the NFLPRA and the NFLPA is hereby established to consider any questions of interpretation or application of the terms of this Agreement that may be referred to it by the NFLPA or the NFLPRA. One (1) member of the committee shall be appointed by the NFLPRA, and one (1) member shall be appointed by the NFLPA.

Any dispute submitted to the committee shall be determined by unanimous decision; any such decision shall be final and binding on all parties to this Agreement, and shall be made available in writing to the NFLPRA and the NFLPA.

**Section 4. Scope of Agreement:**

The NFLPRA, the Member Clubs and the NFLPA hereby agree that this Agreement represents a complete and final understanding on all bargainable subjects of negotiation among the parties during the term of this Agreement, except as specifically excluded hereunder and subject to the exceptions set forth in a letter of Marshall E. Leahy, Esq., dated March 1, 1971, which is incorporated by reference herein.

5

## Section 5. Management Rights:

Nothing in this Agreement shall be construed to restrict the rights of the Member Clubs to manage and direct their operations in any manner whatsoever except as specifically limited by the terms of this Agreement.

# ARTICLE III

## STANDARD PLAYER CONTRACT

### Section 1. Definition:

All players in the NFL shall sign the Standard Player Contract which shall be known as the "NFL Standard Player Contract." The Standard Player Contract shall govern the relationship between the clubs and the players, except that this Agreement shall govern if any terms of the Standard Player Contract conflict with the terms of this Agreement. No amendments to the Standard Player Contract affecting the terms and conditions of employment of NFL players shall be effected without the approval of the NFLPA, subject, however, to the right of the player and his club to agree upon changes in his contract consistent with this Agreement.

### Section 2. Revision of the NFL Standard Player Contract:

The Standard Player Contract shall be revised to conform to the terms of this Agreement and to eliminate the ambiguities present in the Standard Player Contract now in use. Attorneys for the NFLPA and the Member Clubs shall exert their best efforts to submit a revised Standard Player Contract to the NFLPA and the Member Clubs for approval not later than November 30, 1971. The revised Standard Player Contract may be used beginning with the 1972 season. The rights and obligations of players and the Member Clubs as set forth in the existing Standard Player Contracts which extend beyond the 1972 season shall not be modified or affected by the revised Standard Player Contract.

# ARTICLE IV

## COMPENSATION FOR PLAYERS

### Section 1. Individual Negotiations:

It is understood and agreed that individual NFL players have the right to negotiate regular season compensation above the mini-

6

EX 3, PAGE 42

mums established in this Agreement. Each player must receive at least the applicable minimum regular season salary established in this Agreement. The NFLPA specifically waives its rights to negotiate maximum regular season compensation for individual players represented by the NFLPA.

### Section 2. Eligibility for Pre-Season Compensation:

All NFL players credited with at least one year of service for pension vesting purposes under the Bert Bell NFL Retirement Plan and Trust Agreement on the Active List of a Member Club, including players on the Injured Reserve List, or waived injured, forty-eight hours prior to a pre-season game, shall receive pre-season pay for that game on the date thereof in accordance with the schedule set forth below. If any player has been waived and has either not been claimed or waivers have not expired prior to the forty-eight hours, the waiving club shall be obligated to pay the waived player his pre-season pay in accordance with the schedule set forth below. The College All-Star Game shall be exempt from this schedule, and individual players of the Member Club participating in said game shall be paid in accordance with past practice.

The length of service of an NFL player shall be determined by crediting one year to a player for each year of credit he has received for pension vesting purposes pursuant to the Bert Bell NFL Player Retirement Plan then in effect. Credit received by a player for pension vesting purposes in the American Football League shall also be applied in determining his length of service.

### Section 3. Pre-season Compensation:

The following pre-season pay schedule shall be in effect for all eligible NFL players in the 1970 season:

| | |
|---|---|
| 5th and subsequent year players | — $280 per pre-season game |
| 4th year players | — $210 per pre-season game |
| 3rd year players | — $140 per pre-season game |
| 2nd year players | — $ 70 per pre-season game |

The following pre-season pay schedule shall be in effect for all eligible NFL players during the 1971 season:

| | |
|---|---|
| 5th and subsequent year players | — $330 per pre-season game |
| 4th year players | — $250 per pre-season game |

7

| 3rd year players | — $170 per pre-season game |
| 2nd year players | — $ 90 per pre-season game |

The above pre-season payment schedule shall be in effect during the 1972 season for all players but shall be increased in accordance with the percentage of increase in the cost of living for the twelve (12) months ending May 31, 1972, and shall be adjusted to reflect any change in the player's length of service. The amount of increase in the cost of living shall be determined by the rise in the National Consumer Price Index, published by the United States Department of Labor.

Pre-season payments during 1973 shall equal the sum paid in 1972 adjusted to reflect any change in the player's length of service and any increase in the cost of living for the twelve (12) months ending May 31, 1973. The pre-season payment schedules set forth above and the per diem expense payments set forth in Section 4 below shall not be decreased should there be a decline in the cost of living. Pre-season game checks shall be paid in weekly installments commencing with the first pre-season game.

## Section 4. Per Diem Expense Payments:

In addition to the pre-season compensation set forth in Section 3 of this Article IV, all players, including rookies, shall receive the following per diem for expenses during the pre-season period (up to one (1) week prior to the first regular season game) and whenever required by their Club to be available in camp:

1970 — $12.00 per day

1971 — $13.00 per day

1972 — $13.00 per day plus any increase in the cost of living as measured by the National Consumer Price Index, published by the United States Department of Labor for the twelve (12) month period ending May 31, 1972.

1973 — The sum paid in 1972, plus any increase in the cost of living as reflected by the Consumer Price Index for the twelve (12) month period ending May 31, 1973.

Per-diem expense payments shall be in addition to room and board provided for all NFL players during training camp or during

8

pre-season. Per diem expense payments shall be paid in weekly installments commencing with the first week of camp.

### Section 5. Minimum Regular Season Salary:

The minimum regular season salary hereby agreed to shall not include any amounts paid to NFL players during the pre-season. Minimum regular season compensation for all players, excluding rookies, shall be Thirteen Thousand Dollars ($13,000). The minimum regular season compensation for rookies shall be Twelve Thousand Dollars ($12,000), provided the rookie has been selected in the common player draft or is on the Active List of his Member Club at any time during the regular season. The term "rookie," for purposes of this Section 5, means any person who shall execute a Standard Player Contract with a Member Club and thereafter report for the first time to a training camp or practice sessions of a Member Club.

### Section 6. Commencement of Salary Negotiations:

Member Clubs shall commence salary negotiations with individual players prior to May 15 of each calendar year.

### Section 7. Payment of Salary:

Players shall be paid 100% of their regular season compensation in equal weekly or biweekly installments over the course of the regular season, commencing with the first regular season game. However, this provision shall in no way invalidate or otherwise affect any deferred compensation arrangement or any other method of payments an individual player may enter into with his particular club.

### Section 8. Post-season Games:

#### (a) Divisional Play-off Games:

Each player participating in a divisional play-off game or players on the Move List, Injured Reserve List or waived injured at the time of the game shall receive an amount equal to the amount obtained by dividing the amount of his regular season compensation set forth in his Standard Player Contract, including the present day value of his deferred compensation, by the number "14".

"Deferred compensation" for the purposes of this Section 8 (a) means the present value based on the then-current prime rate of interest (unless there is a prior written understanding between

9

the player and his club which provides for a different rate of interest or no rate of interest), the payment of which is postponed to a subsequent year by written agreement between a player and his member club:

### (b) American and National Conference Championship Games:

The past formula for establishing player compensation shall no longer be followed. Each player on the winning team in a Conference Championship game shall receive Eight Thousand Five Hundred Dollars ($8,500), and each player on the losing team shall receive Five Thousand Five Hundred Dollars ($5,500). The criteria for allocation of shares shall be as follows:

### 1. Conference Championship Games — Participants:

(i) Each of the forty players on the Active List of a member club participating in a Conference Championship game shall receive a full share if he has been on the Active List or Move List of the member club for three regular season games (including any Divisional Playoff game) prior to participating in the Conference Championship game.

(ii) Any player on the winning team who participates in the game but does not meet the three-game qualification outlined in paragraph 1(a) above shall receive $2,400. Any player on the losing team who does not meet the three-game qualification shall receive $1,600.

### 2. Conference Championship Games — Non-participants:

In order for any other player to receive a share, or a portion thereof, pursuant to subsections (i) — (iv) below, he must be at the time of the game, under contract to the participating Member Club for the season concluded or for the succeeding season, except for the following:

(i) All players who were on the Active List of the participating member club for at least three and not more than seven regular season games (including any Divisional Playoff game) shall receive one-half share.

(ii) All veteran players injured during the regular season and removed from the Active List of the participating Mem-

10

ber Club for reason of injury (and not subsequently activated or released) shall receive one-half share.

(iii) All veteran players injured during the pre-season and removed from the Active List of the participating Member Club for reason of injury (and not subsequently activated or released) shall receive one-half share.

(iv) All players who were on the Active List of a participating club for eight or more regular season games (including any Divisional Playoff game) shall receive a full share.

(v) Notwithstanding the above, a player otherwise eligible will not be entitled to any of the payments stipulated hereunder if he has signed a contract with any other club for the same season or for the succeeding season.

**(c) World Championship Game:**

Players on the winning team shall receive Fifteen Thousand Dollars ($15,000) and players on the losing team shall receive Seven Thousand Five Hundred Dollars ($7,500). The criteria for allocation of shares shall be as follows:

**1. World Championship Game Participants:**

(i) Each of the forty players on the Active List of each Member Club participating in the World Championship Game shall receive a full share if he has been on the Active List or Move List of the Member Club for three regular season games (including any Divisional Playoff game or Conference Championship game) prior to participating in the World Championship game.

(ii) Any player on the winning team who participates in the World Championship Game but does not meet the three-game qualification outlined in paragraph 1 (i) above shall receive $4,000. Any player on the losing team who does not meet the three-game qualification shall receive $2,000.

**2. World Championship Game — Non-participants:**

In order for any other player to receive a share or a portion thereof, pursuant to subsections (i) — (iv) below, he must, at the time of the game, be under contract to the participating

11

Member Club for the season concluded or for the succeeding season except for the following:

(i) All players who were on the Active List of the participating Member Club for eight or more regular season games (including Divisional Playoff game and Conference Championship) shall receive a full share.

(ii) All players who were on the Active List of the participating Member Club for at least three, but not more than seven, regular season games (including any Divisional Playoff game and Conference Championship) games shall receive one-half share.

(iii) All veteran players injured during the regular season and removed from the Active List for reason of injury (and not subsequently activated or released) shall receive a full share.

(iv) All veteran players injured during the pre-season and removed from the Active List for reason of injury (and not subsequently activated or released) shall receive one-half share.

(v) Notwithstanding the above, a player otherwise eligible hereunder will not be entitled to any of the payments stipulated hereunder if he has signed a contract with any other club for the same season or for the succeeding season.

(vi) For purposes of this Section 8, a veteran player shall be defined as a player who has one or more years of service for pension vesting purposes.

**(d) Pro-Bowl:**

Players on the winning team in the annual Pro-Bowl game shall receive Two Thousand Dollars ($2,000), and players on the losing team shall receive One Thousand Five Hundred Dollars ($1,500).

**Section 9. Compensation for Post-season Games:**

Member Clubs shall pay players for any post-season game within thirty (30) days after said game is played. The Pro-Bowl is excepted from this Section 9.

12

## Section 10. Meal Allowance:

Players will be reimbursed for meals not furnished by Member Clubs on travel days during the regular season in accordance with the following schedule:

Breakfast — $3.00        Lunch — $4.00        Dinner — $9.00

A travel day shall commence at the time a team leaves its home city and shall terminate when the team arrives back in its home city.

## Section 11. Moving and Travel Expenses:

### (a) Qualifications:

Players qualifying under any of the following categories shall receive reimbursement for his and his immediate family's moving and travel expenses, upon presentation of vouchers, in accordance with subparagraph (b) of this Section 11:

1. Any vested player who is traded or claimed at any time during the calendar year; (A "vested player" means a player with five years or more of credit for pension vesting purposes.)

2. Any other player with at least one year credit for pension vesting purposes who is traded or claimed after the start of training camp, who subsequently makes the Active List of the Member Club to which he is traded or by whom he is claimed.

3. Any other player, not described above, who is traded or claimed after the start of the regular season, who subsequently makes the Active List of the Club to which he is traded or by whom he is claimed.

### (b) Formula for Reimbursement:

Players who qualify for reimbursement pursuant to Subsection (a) above shall receive, upon presentation of vouchers, up to the greater of the applicable amounts computed pursuant to Schedules A and B below.

### SCHEDULE A

Member Clubs of the NFL shall be assigned the following Zones:

Zone 1: Philadelphia, New York, Washington, Baltimore, Pittsburgh, Cleveland, Atlanta, Boston, Miami and Buffalo;

13

Zone 2: Detroit, Chicago, New Orleans, Minnesota, Kansas City, Green Bay, Dallas, Houston, Cincinnati, St. Louis;

Zone 3: Denver;

Zone 4: San Francisco, Los Angeles, San Diego, Oakland.

Eligible players shall receive up to Three Hundred Dollars ($300) if traded to a Member Club in the same zone; up to Six Hundred Dollars ($600) if traded to a Member Club in an adjacent zone; up to Nine Hundred Dollars ($900) if traded to a Member Club two (2) zones away; and up to One Thousand Two Hundred Dollar ($1200) if traded to a Member Club three (3) zones away.

## SCHEDULE B

An amount equal to forty cents ($.40) per mile multiplied by the number of miles between the player's residence and team city to which he is traded.

(c) A relocation expense policy manual setting forth expenditures for reimbursement of relocation expenses will be jointly prepared by the NFLPA and the NFLPRA not later than June 30, 1971.

(d) **Immediate Transportation for Traded or Waived Players:**

All players who are traded shall report to the Member Club to whom they have been traded by the fastest available means of transportation. The Member Club to which he is traded shall, at its expense in addition to any amounts set forth in (b) above, furnish the player with appropriate air fare so as to facilitate the player's prompt reporting.

**Section 12. Termination Pay:**

Any vested player released from the Active List of his Member Club after the commencement of the regular season schedule shall receive termination pay in an amount equal to twenty-five per cent (25%) of his regular season compensation, exclusive of deferred compensation; in no event, however, shall such player be entitled to more than one hundred per cent (100%) of his regular season compensation for such season, exclusive of deferred compensation, or such payment more than once during his playing career in the NFL.

14

# ARTICLE V

## JOINT COMMITTEE

The NFLPA and the NFLPRA agree to establish a Joint Committee for the purpose of discussing problems relating to professional football.

**Section 1. Size of Committee:**

The Committee shall consist of six (6) persons. Two (2) persons representing the NFLPA and two (2) persons representing the NFLPRA shall be selected at the outset, with one (1) person each from the American and the National Conferences of the National Football League.

The four persons so chosen as members of the Committee shall have the power to select two (2) additional members, with one (1) such additional member being a member of the NFLPA, and one (1) additional member being an officer, employee or owner of the Member Clubs of the National Football League.

**Section 2. Meetings of the Committee:**

The Committee shall hold two (2) regular meetings each year; the first regular meeting shall be held on the first Monday immediately following the date of the Super Bowl Game. The second regular meeting of the Committee shall be held no earlier than February 15 and no later than July 15 each year, on a date and at a site selected by the Committee.

Special meetings may be held at any time and place mutually agreeable to the Committee.

**Section 3. Powers of Committee:**

The Committee shall not have the power to commit or bind either the NFLPA or the NFLPRA to any issue it may have considered or on which it may make a recommendation.

**Section 4. Scope of Discussion:**

The Committee may discuss and examine any issue or subject it desires, and any member of the Committee shall be permitted to present any subject or issue he desires for discussion, provided it is a subject related to professional football. All Committee recommendations shall be made directly only to the NFLPA, the Presi-

15

dents of both Conferences of the National Football League, and to the Commissioner of the National Football League.

**Section 5. Employment of Outside Consultants:**

The Committee may, if it desires, employ outside parties to assist it in the performance of its functions. The compensation and expenses of any such outside party shall be paid in such manner as the Committee shall decide.

**Section 6. Impartial Members of the Committee:**

The Committee may, at its discretion, name one or more outside persons as additional members of the Committee. The compensation and expenses of such outside members of the Committee shall be paid in such manner as the Committee shall decide.

**Section 7. Creation of Committee:**

The NFLPA and the NFLPRA agree that their respective nominee members of the Committee shall be selected and the length of their terms on the Committee fixed under such rules as the NFLPA or NFLPRA shall separately establish; the original appointees on the Committee shall be selected within thirty (30) days following the execution of this bargaining agreement.

## ARTICLE VI

## RETIREMENT PLAN — INSURANCE

**Section 1. Retirement Plan and Trust Fund:**

(a) The "Bert Bell NFL Player Retirement Plan and Trust Agreement" established in 1962 as amended, and qualified under Sections 401 and 501 of the Internal Revenue Code, and the American Football League Player Retirement Plan established in 1964, as amended and qualified under Sections 401 and 501 of the Internal Revenue Code, shall be merged effective as of April 1, 1970. It is hereby agreed that the new merged plan shall be known as the Bert Bell NFL Player Retirement Plan (hereinafter referred to as the "Plan"), and that the Plan shall be continued and maintained in full force and effect during the life of this Agreement.

(b) It is also agreed that all assets of both predecessor plans shall be commingled in a single trust fund effective as of April 1, 1970. Such assets, all future investment increments and all future

16

contributions shall be used to provide the benefits and expenses of the merged Plan, without regard to the date on which such assets became the property of the merged Plan or any predecessor plan.

**Section 2. Contributions to the Trust Fund:**

(a) For the four years beginning April 1, 1970, and ending March 31, 1974, the Member Clubs will contribute to the Trust Fund in accordance with the following schedule:

| Plan Year Beginning April 1 | Annual Contribution |
|---|---|
| 1970 | $3,950,000 |
| 1971 | 4,125,000 |
| 1972 | 4,275,000 |
| 1973 | 4,425,000 |

Contributions shall be used exclusively to provide the benefits of the Retirement Plan, its investment management and administration costs, and the costs of any studies undertaken by the Retirement Board. The NFLPRA guarantees that the contributions for each Plan Year will be paid into the Trust Fund on or before March 31, of each year. Any change in the number of NFL franchises will affect the annual aggregate contributions due hereunder in accordance with the terms of the letter of Marshall E. Leahy dated March 1, 1971, which is incorporated by reference herein. Any contributions not received by the trustee on or before the date they become due shall bear interest from the due date to the date of receipt by the trustee at an annual rate of six per cent (6%) simple interest. It shall be the duty of the Retirement Board to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

(b) The obligations of the Member Clubs created hereunder shall apply only to the amount of contributions to be made by the Member Clubs to the Retirement Plan. The Member Clubs do not guarantee any benefits under the Retirement Plan. Furthermore, it is agreed that the determination of the sources of revenue that shall be used to satisfy the contribution obligation of the NFLPRA shall be exclusively within the control of the Member Clubs.

(c) **Study of Plan:**

A study of all aspects of the Retirement Plan shall be commenced under the auspices of the Retirement Board as soon as

17

practicable, for the purpose of assisting the Retirement Board in deciding upon changes in the benefits and other provisions of the Plan for Plan Years beginning April 1, 1970, and thereafter.

The amendments to the Plan shall be effective retroactive to April 1, 1970, and shall include, but not be limited to:

1. Widow's benefits payable monthly in an amount not less than $200 per month, from the first of the month following the death of (a) any NFL Player on the Active List, Move List, Injured Reserve List or who is waived injured, or (b) any inactive vested player who has not yet begun to receive his retirement benefits and continuing until the death of the widow, or her remarriage, if earlier;

2. Disability benefits payable monthly in an amount not less than $200 per month to players who (as a result of football activities) suffer substantial partial or total disability as determined by the Retirement Board, which is deemed to be permanent; monthly disability benefits shall continue for the shorter of five years or the duration of the disability. The NFLPA and the NFLPRA are both concerned about the potential liability of the Pension Fund in connection with the proposed monthly permanent partial disability benefit. They both recognize that it is extremely difficult to satisfy this concern absent experience. For the purpose of obtaining such experience, the parties agree that the Pension Retirement Board shall decide on the basis of rules of uniform application on a case by case basis whether a player did in fact sustain an injury that has resulted in a substantial permanent partial disability. Such an award shall be for a term of five years only and any workmen's compensation payments (or the monthly equivalent of any lump sum payment awards) shall be deducted therefrom. The Retirement Board shall also undertake to develop medical standards for the administration of this benefit.

3. Increases in the value of retirement benefit credits established under the predecessor plans with respect to football seasons prior to 1970, provided that such benefit increases are funded over a period not to exceed twenty (20) years from April 1, 1970.

18

## Section 3. The Retirement Board:

(a) The Retirement Plan shall provide that the Retirement Board shall be composed of four persons designated by the NFLPA and four persons designated by the Member Clubs. The NFLPA representatives shall be designated by the NFLPA in accordance with procedures approved by its membership and shall consist of two active players and two inactive vested players, with equal representation from the American Conference and the National Conference.

(b) The Commissioner of the NFL shall be Chairman of the Retirement Board and shall preside at all meetings of the Board. The Commissioner shall have no vote. Two Vice-chairmen shall be selected, one designated from among their number by the Retirement Board members representing the NFLPA and the other designated from among their number by the Board members representing the Member Clubs. The duties of the Vice-Chairmen shall be as stated in the Retirement Plan and the Bylaws of the Board and shall include, but not be limited to, submission of agendas for Retirement Board meetings and review of minutes prior to submission for approval by the Board.

(c) The Board shall act by the affirmative vote of five (5) members on matters related to interpretation of benefit, eligibility and other administrative provisions of the Plan. On all other matters, including amendments to the Plan, the Trust Agreement and the Bylaws of the Retirement Board (and other matters defined in Sub-section (d) as "substantial issues"), the Board shall act by the affirmative vote of six (6) members.

If any Board member is unable to attend a meeting of the Board, the side which designated such member may appoint an alternate to represent the absent member.

The quorum for a meeting of the Board shall be six (6) members.

(d) If the Board shall determine that any matter which the Board has been unable to resolve by action of the Board is a substantial issue, the Commissioner of the NFL shall be requested to offer his recommendations. If after consideration of the Commissioner's recommendation the Board is still unable to achieve resolution, the matter shall be submitted to the Commissioner for

19

arbitration, whose decision shall be final and binding unless rejected by six (6) votes.

A "substantial issue" shall be defined for purposes of this Subsection (d) as "any matter which six members of the Board designate as such," but in any event the following matters shall be conclusively considered to be substantial issues and shall require six votes for passage:

(1) Amendments to any documents;

(2) The Plan design;

(3) Selection of the actuary or actuaries;

(4) Selection of the Investment Manager;

(5) Investment policy determination;

(6) Selection of outside experts and the agency to handle the Plan;

(7) Definition of terms of the Plan, Trust and Bylaws.

(e) Except as limited by (f) below, the powers granted to the Retirement Board under the Retirement Plan shall include all powers incident to the operation of the Plan and the Trust, including but not limited to the power to amend the Plan, the Trust Agreement and any insurance contracts associated with the predecessor plans or this Plan, to construe the Plan and to reconcile inconsistencies in the Plan.

(f) No action of the Retirement Board shall:

1. Alter the amount of the contributions otherwise payable to the Plan;

2. Cause the Plan and the Trust to fail to qualify under Section 401 (a) and 501 (a), or cause any portion of contributions to the Plan to fail to be deductible to the Member Clubs under Section 404 (a) of the Internal Revenue Code;

3. Reduce, as a direct result of an amendment, any benefit credits already earned and otherwise payable under the Plan;

4. Amend the Plan in a manner that will render the Plan actuarially unsound.

(g) The Retirement Board shall:

1. Pay all reasonable and necessary expenses of the Plan

20

and the Trust and cause the same to be paid currently out of the assets of the Trust; and

2. Allocate an annual amount out of contribution income to the amortization of unfunded actuarial liabilities so as to fund such liabilities on an actuarially sound basis, but not in excess of twenty (20) years from April 1, 1970.

## Section 4. Insurance:

This Section 4 shall apply only to players and their families.

The Member Clubs agree that they will take out and maintain throughout the four years beginning April 1, 1970, a group life insurance policy acceptable to the NFLPA and similar to policies in effect during the 1969 season. The amounts of life insurance coverage for active and inactive vested players shall be maintained in accordance with the schedule in effect during the 1969 season.

In addition to the life insurance program, the Member Clubs agree that all players and their families shall be covered during the four years beginning April 1, 1970, by a group major medical policy with benefits equal to those in effect during the 1969 season. With respect to maternity benefits, said policy shall guarantee, effective as to dependent children conceived after March 31, 1970, that each player shall be reimbursed for all expenses up to and including the amount of $150, and eighty per cent (80%) of expenses in excess of $150.

The Member Clubs shall also provide dental benefits to players and their families under an insurance policy or policies to be effective not later than October 1, 1970, and continuing until March 31, 1974. A design of benefits with an annual cost not to exceed $125,000 shall be jointly approved by the NFLPA and the Member Clubs after receiving recommendations from the consultants representing the NFLPA and the Member Clubs.

## ARTICLE VII

## JOINT PLAYER PICTURE PROGRAM

The NFLPA and the NFLPRA shall establish a joint program (hereinafter referred to as the "Joint Program") relating to trading

21

cards and picture premiums pursuant to the following terms and conditions:

**Section 1. Property Rights:**

The NFLPRA shall make available to the Joint Program the logos, insignias and other property rights of the NFLPRA and its constituent Member Clubs. The NFLPA shall make available to the Joint Program the names, pictures, signatures and biographical data of members of the NFLPA and other property rights of the NFLPA.

**Section 2. Commencement:**

The Joint Program shall be in effect from the date hereof until January 31, 1974.

**Section 3. Income:**

Gross income realized from agreements entered into pursuant to the Joint Program (except for the provisions set forth in Section 6, of this Article VII) shall be allocated as follows:

1971—With the exception of revenues from the Topps, Coca-Cola and Visual Panographics Agreements, the first $75,000 of revenues earned from Joint Programs in the twelve month period commencing February 1, 1971, shall belong to and be forwarded to the NFLPRA. The NFLPRA obligation in 1971 granting the first $75,000 of monies earned in the year 1971 shall terminate as of January 31, 1972. Revenues in excess of $75,000 earned during this period shall be shared equally. Revenues earned during each of the twelve month periods beginning February 1, 1972, and February 1, 1973, respectively, with the exception of the Coca-Cola and Topps Agreements, shall be allocated as set forth below;

1972, 73—The first $50,000 shall belong to the NFLPRA; the next $50,000 shall belong to the NFLPA; the next $25,000 shall belong to the NFLPRA; the next $25,000 to the NFLPA and the revenues earned in excess of $150,000 during each of the 12 month periods, shall be shared on a 50-50 basis.

Gross income received from agreements entered into during the term of the Joint Program but extending beyond said term shall be

22

shared equally by the NFLPA and the NFLPRA notwithstanding any conditions in this Section 3.

**Section 4. Negotiation of Programs:**

All Joint Program agreements will be jointly negotiated by the NFLPA and the NFLPRA and shall be approved and executed by both the NFLPA and the NFLPRA.

**Section 5. Conditions:**

(i) The NFLPRA on behalf of the Member Clubs hereby covenants and agrees that no legal action will be instituted by the NFLPRA or any member clubs in connection with the NFLPA Agreements with Visual Panographics terminating on February 1, 1972.

(ii) In connection with any Joint Program, the NFLPRA hereby covenants that neither the Member Clubs nor the League office will interfere in any way with picture taking of NFL players in team uniforms by the NFLPA or its agents or licenses.

(iii) Payments owed to the NFLPA pursuant to the Article VII shall be paid to the NFLPA upon receipt. Should income be paid to the NFLPA office, the NFLPA agrees to forward the NFLPRA share immediately upon receipt.

(iv) Other than is provided in Section 6 herein, it is understood that the NFLPA shall be solely responsible for commissions due to any licensing agent employed by the NFLPA.

**Section 6. Visual Panographics:**

It is understood and agreed that until January 31, 1972, the NFLPA shall retain all income received by it pursuant to its Agreement with Visual Panographics. Thereafter, and for the balance of the term of the Collective Bargaining Agreement, the net proceeds of any new agreement with Visual Panographics (less the commissions due to LCA) shall be payable pursuant to the allocation set forth under Section 3 herein.

**Section 7. Topps:**

The NFLPRA shall have the right to negotiate with Topps Chewing Gum ("Topps") regarding improvements in the agreement currently in effect between the NFLPA and Topps, and the NFLPRA shall be entitled to retain any amounts negotiated in

23

excess of the amounts payable to the NFLPA, pursuant to its agreement with Topps.

**Section 8. Individual Rights:**

It is understood and agreed that individual NFL players may use club uniforms, insignias and game films for personal endorsements and personal commercial ventures in accordance with the provisions of the Standard Player Contract.

**Section 9.**

Nothing herein shall limit or inhibit in any way the right of the NFLPA or the NFLPRA to conduct their own licensing programs.

## ARTICLE VIII

### OPTION CLAUSE

Any NFL player who is playing out his option (performing the services required of him under his Standard Player Contract pursuant to the Option contained therein) shall be paid no less than ninety per cent (90%) of the total amount of his Standard Player Contract for the previous season, including amounts of deferred compensation and bonus payments attributable to that Contract. The phrase "rate of compensation" as set forth in paragraph 10 of the Standard Player Contract shall include deferred compensation and bonus payments excluding any signing bonus, of any nature whatsoever, and shall not be limited to the amount set forth in paragraph 3 of the Standard Player Contract. In order for a player to receive ninety per cent of his performance bonuses under this Article VIII, he must meet the previously established conditions of said bonus during the year in which he is playing out his option.

## ARTICLE IX

### WAIVER PROCEDURES AND REGULATIONS

The NFL and NFLPA shall, prior to the beginning of each football season during the term of this Agreement, jointly prepare and distribute to all NFL players a booklet explaining the Waiver Procedures and Regulations to be in effect for each such season. This booklet shall include, but not be limited to, an explanation of Waiver Procedures, the Move List, the Reserve List, the Active

24

List, Future List, the assignment of player contracts and player limits and eligibility. Every effort shall be made to prepare this booklet in a manner so as to be easily understood by all NFL players.

Coaches or any other persons connected with one NFL club shall be prohibited from notifying or contacting any NFL player employed by another NFL club regarding any action taken pursuant to the waiver procedures and regulations then in effect. Whenever possible the Member Clubs shall give a player written notice that he has cleared waivers within twenty-four (24) hours after he has cleared. This information shall not be made available to the media until twenty-four (24) hours after written notice has been received by the player.

Any NFL player who is declared ineligible to compete in official pre-season, regular season or post-season games because of a breach of waiver procedures and regulations or any other provision of the Constitution and Bylaws of the NFL by any NFL club by whom he is employed shall be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, shall be a minimum of one week's salary and, when applicable, per diem expense payments.

## ARTICLE X

## NON-INJURY GRIEVANCE PROCEDURE

A "grievance" shall be defined as "a claim or a complaint submitted by any NFL player and/or the NFLPA regarding the interpretation or the application of any provision of the Standard Player Contract, the NFL Constitution and Bylaws or any rules and regulations promulgated pursuant thereto insofar as the interpretation pertains to wages, hours and working conditions of a player's employment or the application of any provision of this agreement as it applies to an individual player. A player need not be under contract at the time his grievance is presented. The NFLPRA also has the right to institute a grievance against an individual player pursuant to the procedures set forth in this Article.

**Step 1.** Any NFL player or the NFLPA may present a written grievance to any Member Club or to the League itself within sixty (60) days from the date of the occurrence of the action that gives

25

rise to the grievance or the date on which the facts of the matter became known or should have become known, whichever is later. If agreement regarding the grievance is reached between the player and the Club, written notice of the facts and terms of settlement shall be forwarded to the NFLPA by the Club within ten (10) days from the date of such settlement.

**Step 2.** If the grievance remains unsettled for a period of ten (10) days from the time it is submitted to the club, either the NFLPA or the NFL player may appeal directly to the Commissioner of the NFL for his decision, which decision shall be final and binding on all parties to this agreement.

# ARTICLE XI

## INJURY GRIEVANCE PROCEDURE*

In the event a player believes that he is physically incapable of playing professional football at the time his Standard Player Contract is terminated as the result of a football injury, he may institute a claim against his Member Club under the injury grievance procedure set forth below:

**Section 1. Selection of Neutral Physician:**

During the term of this Agreement the NFLPRA and NFLPA shall maintain a jointly approved list of neutral physicians, including at least two (2) orthopedic physicians in each city in which an NFL club is located. The entire list of neutral physicians shall be subject to review and modification every twelve (12) months. Each physician should be willing and able to examine NFL players promptly without delay.

**Section 2. Notification of Club:**

A player who believes he has a claim must notify his Member Club in writing of his claim not more than twenty (20) days from the date he clears waivers or the date his standard player contract is terminated, whichever is later. Such notification shall set forth the approximate date of the alleged injury and its general nature. The Club has the burden of proving that the player did not suffer a new injury. If a player passes the physical examination of the team

*See letter of clarification and modification of the Injury Grievance Procedure at page 36.

26

physician, it will be presumed that such player was physically fit to play football on the date he reported.

### Section 3. Procedure:

Within seventy-two (72) hours following receipt of the notification provided for in Section 2 above, the club may:

(a) Deny liability by sending the grievant notice in writing that the club has rejected his claim. If the club shall select this alternative (a), the player shall present himself for examination by the neutral physician within ten (10) days after receipt of notification; or,

(b) Notify the player in writing that the club wishes him to be examined by the club's physician or another physician chosen by the club. This examination should be scheduled as soon as possible and in no event later than forty-eight (48) hours from the date the player receives notice of the scheduled examination. The report of the physician selected by the club shall be sent to the grievant within forty-eight (48) hours following such examination. The club shall bear all reasonable expenses incurred by the grievant pursuant to this sub-paragraph (b). If the report of the club doctor or a physician chosen by the club shall be adverse to the player, he shall present himself for examination by a neutral physician within ten (10) days following the player's receipt of any such report; or

(c) Notify the player that he should proceed to be examined by a neutral physician, in which case the player shall present himself for examination by the neutral physician within ten (10) days after receipt of such notification; or,

(d) Raise any special defenses, including but not limited to the following:

(i) That the player did not pass the physical examination administered by the club physician at the beginning of each training period as provided for in paragraph 6 of the Standard Player Contract. It is understood and agreed that this particular defense shall not be available to the club if the player shall have participated in any contact drills during such period or shall have been active and in uniform for any exhibition game or any regular season game; or

27

    (ii)  That the player's injury arose solely from a non-football related cause subsequent to the physical examination administered by the team physician as provided in paragraph 6 of the Standard Player Contract; or

  (iii)  That the player's injury was not football related and that he had executed a waiver or release prior to his physical examination or his commencement of practice.

  (iv)  That the player did not suffer a new injury nor aggravate an old injury during the contract year.

If the Club shall raise a special defense pursuant to this subsection (d) above, the player shall present himself for examination by a neutral physician within ten (10) days following receipt of notification that the club has elected to raise a special defense. If the report of the neutral physician supports the player, the special defense shall be processed pursuant to the provisions of Section 6 below as soon as possible.

**Section 4. Miscellaneous:**

(a) If the club fails to respond within the applicable time periods set forth above, the player may present himself for examination by the neutral physician within ten (10) days subsequent to the date in which notification should have been given to the player.

(b) The ten (10) day limitation set forth herein may be extended if no neutral physician within a reasonable proximity to the grievant is able to examine the grievant within said time period.

(c) The club may present to the neutral physician the medical history of the player; provided, however, that such medical history contain no opinions with regard to the player's physical condition at the time of his release or whether or not he is able to perform the services required of him pursuant to his Standard Player Contract. Each copy of any such medical history which is submitted must also be furnished to the legal counsel for the NFLPA.

(d) The player shall notify the club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to his selection by the player.

**Section 5. Finality of Medical Opinion, Payment and Appeal:**

The report of the neutral physician shall be final and binding

28

on both parties. The club shall make payment to the player, if required, within ten (10) days following the receipt of the report of the neutral physician. However, in the event that the medical conclusions of the neutral physician contain ambiguities and a legitimate dispute remains as to the physician's findings, any party may request clarification from the neutral physician. Such clarification must be requested within three (3) days following receipt of the neutral physician's report. If, subsequent to such clarification, a legitimate dispute remains regarding the medical conclusions of the neutral physician, the matter may be appealed pursuant to Section 6 of this Article XI; provided, however, that such appeal must be made within ten (10) days subsequent to the receipt of the neutral physician's report or of the clarification if requested.

**Section 6. Appeal Procedure:**

Any dispute which may exist between an NFL player and/or the NFLPA and a Member Club of the National Football League relating to an injury incurred by an NFL player while performing the services required of him pursuant to the Standard Player Contract, including injuries incurred in connection with either a pre-season, regular season or post-season game, and/or which arise out of or relate to an injury grievance filed by an NFL player or by the NFLPA on behalf of the NFL player in accordance with the injury grievance procedure then in effect under any existing collective bargaining agreement between such parties, or any injury grievance procedure contained in the Standard Player Contract, if applicable, shall be finally decided by an impartial arbitrator selected as follows:

1. The NFLPA, the NFL player or the affected club shall notify the Commissioner of the National Football League in writing that a dispute concerning an injury exists and that arbitration is desired in order to resolve the dispute.

2. Within five (5) days subsequent to the receipt of written notice requesting arbitration, the Commissioner shall disclose in writing (including TWX or telegram) to the parties the name of the person selected by him to act as the impartial arbitrator.

3. Either of the parties involved in the dispute shall have the right, in its or his sole discretion, to reject the person se-

29

lected by the Commissioner as the impartial arbitrator and shall notify the Commissioner and the other party or parties to the dispute in writing (including TWX or telegram) regarding its or his acceptance or rejection of such nominee within five (5) days of receipt of notice of any such appointment. In the event either party shall reject the nominee selected by the commissioner, the Commissioner shall, within five (5) days following receipt of such written notice of rejection, select another person to act as the impartial arbitrator. This procedure shall be repeated until a mutually acceptable impartial arbitrator is selected.

4.  (a) The decision of the impartial arbitrator regarding the merits of the claim or grievance and the total amount to be awarded, if any, shall be final, binding and unappealable, notwithstanding the provisions of subparagraph (b) below. (b) The Commissioner shall have the right to review any decision or award rendered by the impartial arbitrator for the purpose of determining whether or not it requires adjustment by reason of the applicable provisions of the Constitution and Bylaws of the National Football League.

Anything in this paragraph to the contrary notwithstanding, it is hereby agreed that no claim or grievance hereunder shall exceed the total amount of compensation specified in the affected Standard Player Contract or contracts, including bonus or deferred compensation arrangements between the parties not set forth in the Standard Player Contract, involved in the decision and submitted to the impartial arbitrator, and no award by such impartial arbitrator may exceed the total amount of compensation specified in such Standard Player Contract or contracts including bonus or deferred compensation arrangement between the parties not set forth in the Standard Player Contract, involved in such dispute or grievance.

It is understood that the impartial arbitrator may award to the NFL player payments for medical expenses incurred or which will be incurred in connection with the injury, to the extent such expenses have not been provided for under any Workman's Compensation policy or by the Club, should it be self-insured.

## Section 7. Expenses of Procedure:

The first one hundred dollars ($100) of expense charged by a neutral physician shall be shared equally by the Club and the

30

player. Any charge in excess of one hundred dollars shall be paid by the Club if the player is given an award, and paid by the player if he is not given an award. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice shall be borne by the player. The parties will share equally in the expense of any impartial arbitration engaged in pursuant to Section 5 herein.

**Section 8. Pension Credit:**

Any player who shall receive payment for three (3) or more regular season games during any year by reason of the procedure set forth above shall be credited with a year of service for pension vesting purposes pursuant to the Bert Bell NFL Player Retirement Plan.

## ARTICLE XII

## FINES

It is agreed between the NFLPA and the NFLPRA that the following policies shall govern with respect to Club fines:

(a) All Clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of fines which it intends to impose; such list shall specify clearly the type of violation and the amount of the fine.

(b) All fines shall be imposed uniformly on all players for the same offense; however, the Club may specify the events which create an escalation of the fine, providing the formula for escalation is uniform in its application.

(c) The schedule and formula on fines shall apply to each club individually. Each club shall have the right to establish its own fine policy independent of the policy of any other club.

(d) A club shall have the right to impose fines against players for any incident which it, in its sole discretion, believes should be the subject of a fine, despite the fact that such fine is not published; any such fine and amount thereof, however, may be made the subject of a grievance in accordance with the provisons of Article X hereof.

(e) The amount of any fine assessed against an NFL player shall be deducted from his total compensation reflected on his W-2 withholding statement.**

**See letter of modification at page 36.

31

# ARTICLE XIII

## ENDORSEMENTS — TELEVISION APPEARANCES

**Section 1. Endorsements:**

No Member Club may arbitrarily refuse to permit a player to endorse a product.

**Section 2. Television Appearances:**

No Club may unreasonably require a player to appear on radio or television.

# ARTICLE XIV

## RETENTION OF BENEFITS

Any player currently employed or employed after February 1, 1970, shall receive at least the minimum benefits set forth in this Agreement. No direct financial benefit granted by any club to its team during the life of the 1968 NFL and 1968 AFL Collective Bargaining Agreement and Memorandum of Agreement, respectively, shall be reduced during the term of this Agreement.

# ARTICLE XV

## MISCELLANEOUS

**Section 1. Off-season Training Camp:**

The NFLPA and the NFLPRA agree that no veteran player shall be required to perform any activities relating to professional football during the off-season except on a voluntary basis.

**Section 2. Deductions of Club House Expenses:**

The deduction of amounts from any compensation due to a player for the purpose of compensating any Club House personnel or any other Club attache is prohibited.

**Section 3. Adverse Public Statements:**

The NFLPA and NFLPRA agree that each will use its best efforts to avoid public comments by Clubs, owners, non-playing personnel, as well as by players or coaches, which express adverse criticism of the Club, the coach or the operation and policy thereof, or which tend to cast discredit upon a Club, a player or any other person involved in the operation of the Club or the League.

**Section 4. Exchange of Information and Accommodations for NFLPA Authorized Representatives at League Games:**

The Clubs shall furnish upon request to the NFLPA address

32

lists and telephone lists to the extent available, covering all players under contract to the Club.

Two press or other suitable complimentary tickets shall be furnished to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. The NFLPA will provide a list of authorized persons who qualify under this Section to the League Office. The NFLPA must notify the home Club of its desire to attend such game at least three (3) days prior to the date of the game. NFLPA representatives shall possess appropriate identification evidencing the authority of such persons to act as NFLPA representatives.

## Section 5. No Discrimination:

There shall be no discrimination in any form against any player or any party to this Agreement by any party to this Agreement because of race, religion, national origin or activity on behalf of the National Football League Players' Association.

## Section 6. Tickets for Away Games:

Each player will be afforded the opportunity to purchase two (2) tickets from the best tickets available for public sale immediately prior to the public sale for each away game.

## Section 7. Workman's Compensation Benefits:

(a) In any state where Workman's Compensation coverage is not compulsory, a Club shall either voluntarily obtain coverage under the compensation laws of that state, or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this Section, such benefits shall be equivalent to those benefits paid under the Workman's Compensation Law of the state in which his Club is located.

(b) Nothing herein stated shall be interpreted as preventing a Club, which has the legal right to do so, from rejecting coverage under the Workman's Compensation Law of its state. However, if a Club elects to reject coverage under the Workman's Compensation Law of its state, it must nevertheless guarantee benefits to its players in the manner previously prescribed in this Section 7. Moreover, any Club that is excluded, for any reason, from coverage under the Workman's Compensation Laws of its state shall remain excluded from those laws if it elects to do so. However, such a Club shall be obligated to guarantee benefits to its players in the manner previously prescribed in this Section.

33

**Section 8. Players Injured Prior to Signing New Contracts:**

A player removed from the Active Roster by reason of injury between the beginning of the training camp period and the first regular season game and who has not signed a new contract shall be guaranteed one hundred per cent (100%) of the compensation provided in his contract for the contract year immediately preceding the year in which he is injured.

**Section 9. Right to Legal Counsel:**

An individual player shall have the right to have legal counsel represent him in his individual salary negotiations.

**Section 10. Travel Expenses to Training Camp:**

Member Clubs must reimburse players for reasonable traveling expenses incurred in reaching training camps from the player's residence. There shall be no deduction by the Member Club for this payment. A player who is cut shall be reimbursed for his return trip.

## ARTICLE XVI

## DURATION OF AGREEMENT

**Section 1. Effective Date:**

This Agreement shall be deemed effective as of February 1, 1970, following ratification of the NFLPA and the NFLPRA.

**Section 2. Expiration Date:**

This Agreement shall remain in full force and effect until January 31, 1974, and then shall automatically terminate. Negotiations between the NFLPA and NFLPRA shall commence not later than March 15, 1974.

NFLPA     March 29, 1971

By John Mackey /s/
President

Attest Edward R. Garvey /s/

By Marshall E. Leahy on
behalf of Texas E. Schramm
and the NFLPRA and
the Member Clubs
of the NFL June 17, 1971

Edward R. Garvey, Esq.[1]

34

March 1, 1971

Lindquist & Vennum

Dear Mr. Garvey:

Please be advised that the NFLPRA's construction of the Collective Bargaining Agreement between the NFLPRA and the NFLPA is that, subject to the provisions of the agreement, any change in current practices affecting employment conditions of the players shall be negotiated in good faith.

Sincerely,
Marshall E. Leahy, Esq.
General Counsel to the NFLPRA

[1] Incorporated by reference in Article II, Sec. 4.

Edward R. Garvey, Esq.[2]                                    March 1, 1971

Lindquist & Vennum

Dear Mr. Garvey:

On behalf of the twenty-six Member Clubs of the National Football League, please be advised that there will not be any increase or decrease in the number of franchises during the term of the Collective Bargaining Agreement.

If such an increase or decrease nevertheless takes place despite my assurances to the contrary, the Member Clubs will increase or decrease the annual contributions to the Pension Fund in the ratio that the number of franchises at such time bears to twenty-six.

Sincerely, Marshall E. Leahy, Esq.
General Counsel to the Twenty-Six
Member Clubs of the National Football League

[2] Incorporated by reference in Article VI, Sec. 2.

35

# *APPENDIX B*

## MODIFICATION AND CLARIFICATION OF THE COLLECTIVE BARGAINING AGREEMENT

**ARTICLE XI, Section 5**

The neutral physician shall be requested to report solely on the physical condition of the grievant, and the extent of his injury, if any, at the time he is examined by the neutral physician. His report shall be confined to that question.

In the absence of a settlement following the report of the neutral physician, the case may be appealed by either party hereto pursuant to Section 6 of Article XI within five (5) days of the receipt by the NFLPA and the NFLPRA of the neutral physician's report. The appeal shall be heard by a neutral arbitrator selected in accordance with the procedure set forth below.

The neutral arbitrator shall consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of his injury at the time of his examination by the neutral physician. The neutral arbitrator shall decide the dispute in light of this finding and such other issues or defenses which may have properly been submitted to him.

The parties hereto agree to select a panel of neutral arbitrators to arbitrate injury grievances, pursuant to Article XI, and further that no less than 20 and no more than 50 shall constitute said panel. The NFLPA, the NFLPRA and the Commissioner of the NFL will nominate individuals for the panel no later than July 10, 1971, and agree that no individual may be selected unless the NFLPA and the NFLPRA accept his appointment to the panel. Representatives of the NFLPA and the NFLPRA will complete selection of the panel no later than August 10, 1971.

Whenever a neutral arbitrator is selected pursuant to Section 6 of Article XI of the Collective Bargaining Agreement, the Commissioner of the National Football League shall nominate three (3) members of the panel for consideration by the parties hereto within five (5) days of receipt of a written request to appoint an arbitrator. The NFLPA and the NFLPRA shall then have the right to veto one (1) such nominee within five (5) days of receipt of the

36

nominations from the Commissioner. The Commissioner shall then appoint one individual, not vetoed by either party, to serve as the arbitrator.

## OTHER CLARIFICATIONS

It is understood that the NFLPA and the NFLPRA shall jointly prepare and submit a revenue ruling request to Internal Revenue with regard to Section (e) of Article XII (Fines). Said Section (e) shall be inoperable until January 1, 1972, or until the ruling is received whichever first occurs.

It is understood that the term "deferred compensation" as used in Section 8 (a) of Article IV of the Collective Bargaining Agreement refers to that portion of deferred compensation allocable to the current contract year in which the game is played.

It is understood that the Member Clubs and the League will use best faith efforts, to the extent possible, to avoid release to the media of information concerning the placing of players on waivers until 24 hours after the player has received written notice of same.

Article IV, Section 8, (b) (1), (ii) is modified by deleting the words "at least" in both places where they appear and further that (iii) of the same Section 8 is deleted in its entirety. The same words and subsection (iii) of Article IV, Section 8, (c) (ii) and (iii) shall be consistent with the above.

Agreed upon by the NFLPRA and the NFLPA on June 17, 1971.