Case 2:13-md-02883-AB   Document 20-6   Filed 03/29/12   Page 1 of 65   Page ID
Case 2:11-cv-08395-R   -MAN   Document 69-6   Filed 12/20/11   Page 1 of 65   Page ID
#:7381

# EXHIBIT 4

Case 2:12-md-02323-AB Document 20-6 Filed 03/29/12 Page 2 of 65 Page ID
Case 2:11-cv-08396-R-MAN Document 69-5 Filed 12/20/11 Page 2 of 65 Page ID
#:7382



# Collective Bargaining Agreement



## MANAGEMENT COUNCIL

# Table of Contents

|  |  | Page |
|---|---|---|
| PREAMBLE | ................................................... | 6 |
| Article I. | GOVERNING AGREEMENT ...................... | 6 |
| Section 1. | Conflicts ................................ | 6 |
| Section 2. | Full Force and Effect ................. | 6 |
| Section 3. | Implementation ........................ | 7 |
| Section 4. | Management Rights ..................... | 7 |
| Article II. | SCOPE OF AGREEMENT ........................ | 7 |
| Section 1. | Scope ................................... | 7 |
| Section 2. | Arbitration ............................. | 7 |
| Article III. | NO STRIKE/LOCKOUT/SUIT .................. | 8 |
| Section 1. | No Strike/Lockout .................... | 8 |
| Section 2. | No Suit ................................. | 8 |
| Article IV. | UNION SECURITY ............................. | 9 |
| Section 1. | Union Security ......................... | 9 |
| Section 2. | Check-off ............................... | 9 |
| Section 3. | NFLPA Meetings ....................... | 9 |
| Section 4. | Disputes ................................ | 9 |
| Article V. | PLAYER SECURITY .......................... | 10 |
| Section 1. | No Discrimination ..................... | 10 |
| Section 2. | Personal Appearance .................. | 10 |
| Article VI. | CLUB DISCIPLINE .......................... | 10 |
| Section 1. | Maximum Discipline .................. | 10 |
| Section 2. | Published Lists ........................ | 10 |
| Section 3. | Uniformity ............................. | 10 |
| Section 4. | Disputes ................................ | 10 |
| Article VII. | NON-INJURY GRIEVANCE ................... | 11 |
| Section 1. | Definition .............................. | 11 |
| Section 2. | Initiation ............................... | 11 |
| Section 3. | Filing ................................... | 11 |
| Section 4. | Player-Club Relations Committee .... | 12 |
| Section 5. | Appeal ................................. | 12 |
| Section 6. | Arbitrators ............................. | 13 |
| Section 7. | Hearing ................................ | 13 |
| Section 8. | Integrity and Public Confidence ...... | 14 |
| Section 9. | Miscellaneous .......................... | 14 |
| Section 10. | Representation ......................... | 14 |
| Section 11. | Costs ................................... | 14 |
| Article VIII. | COMMISSIONER DISCIPLINE .............. | 14 |
| Section 1. | Commissioner Discipline .............. | 14 |
| Section 2. | Miscellaneous .......................... | 15 |
| Section 3. | Representation ......................... | 15 |
| Section 4. | Costs ................................... | 15 |
| Article IX. | INJURY GRIEVANCE ........................ | 15 |
| Section 1. | Definition .............................. | 15 |
| Section 2. | Filing ................................... | 16 |
| Section 3. | Answer ................................. | 16 |
| Section 4. | Neutral Physician ...................... | 17 |
| Section 5. | List ..................................... | 17 |
| Section 6. | Appeal ................................. | 17 |
| Section 7. | Hearing ................................ | 18 |
| Section 8. | Miscellaneous .......................... | 18 |
| Section 9. | Expenses ............................... | 18 |
| Section 10. | Pension Credit ......................... | 18 |
| Section 11. | Payment ............................... | 18 |
| Article X. | INJURY PROTECTION ....................... | 19 |
| Section 1. | Qualification ........................... | 19 |
| Section 2. | Benefit ................................. | 19 |
| Section 3. | Disputes ................................ | 19 |

*Page*

Article XI.   COMMITTEE ON SAFETY AND WELFARE..   20
  Section   1.   Composition   ........................................   20
  Section   2.   Meetings   ............................................   20
  Section   3.   Powers   ...............................................   20
  Section   4.   Scope   .................................................   20
  Section   5.   Consultants   ........................................   20
  Section   6.   Appointments   .....................................   20
  Section   7.   Initial Tasks   .......................................   21
  Section   8.   Playing Rules   .....................................   21
  Section   9.   Competition Committee   ...................   21
Article XII.   NFL PLAYER CONTRACT   .....................   21
  Section   1.   Form   ..................................................   21
  Section   2.   Changes   .............................................   22
Article XIII.   COLLEGE DRAFT   .................................   22
  Section   1.   Time of Draft   .....................................   22
  Section   2.   Number of Choices   ............................   22
  Section   3.   Required Tenders   ...............................   22
  Section   4.   Exclusive Right   .................................   24
  Section   5.   Subsequent Draft   ..............................   24
  Section   6.   No Subsequent Draft   .........................   24
  Section   7.   No Required Tender   ...........................   25
  Section   8.   Other Professional Team   ...................   25
  Section   9.   Return to NFL   ...................................   25
  Section   10.   Unlimited Terms   ...............................   26
  Section   11.   Assignment   ........................................   26
  Section   12.   Notice   ...............................................   26
Article XIV.   OPTION CLAUSE   .................................   26
  Section   1.   Vested Players   ...................................   26
  Section   2.   Rookies and Non-Vested Players   ....   26
  Section   3.   Compensation   ....................................   27
Article XV.   RIGHT OF FIRST REFUSAL/
                     COMPENSATION   .............................   27
  Section   1.   Applicability   ......................................   27
  Section   2.   Contract Expiration Date   .................   27
  Section   3.   Offer Sheet   ........................................   27
  Section   4.   First Refusal Exercise Notice   .........   28
  Section   5.   No First Refusal Exercise Notice   ....   28
  Section   6.   One Offer Sheet   ................................   28
  Section   7.   Principal Terms   .................................   28
  Section   8.   Non-Principal Terms   .........................   29
  Section   9.   Qualifying Offer   ................................   29
  Section   10.   Qualification for First Refusal   .......   29
  Section   11.   Qualification for Compensation   ......   30
  Section   12.   Amount of Compensation   ................   31
  Section   13.   Absence of Choice   ...........................   31
  Section   14.   Copies   ...............................................   32
  Section   15.   Circulation of Veteran Free
                        Agent List   .....................................   32
  Section   16.   Notice   ...............................................   32
  Section   17.   Re-Signing   ........................................   32
  Section   18.   Extreme Personal Hardship   ............   33
First Refusal Offer Sheet   ...........................................   34
First Refusal Exercise Notice   ....................................   35
First Refusal/Compensation Charts   ...................   36, 37
Article XVI.   WAIVER SYSTEM   .................................   38
  Section   1.   Release   ...............................................   38
  Section   2.   Contact   ..............................................   38
  Section   3.   Ineligibility   .......................................   38
Article XVII.   EXPANSION   .........................................   39

|  |  |  | Page |
|---|---|---|---|
| Section | 1. | Seattle and Tampa Bay | 39 |
| Section | 2. | Veteran Allocation | 39 |
| Section | 3. | Future Expansion | 39 |
| Article XVIII. |  | OTHER PROVISIONS | 39 |
| Section | 1. | CFL Rule | 39 |
| Section | 2. | Physically Unable to Perform | 39 |
| Section | 3. | Non-Football Injury | 39 |
| Article XIX. |  | SQUAD SIZE | 40 |
| Section | 1. | Active List | 40 |
| Section | 2. | Pre-Season | 40 |
| Section | 3. | Inactive List | 40 |
| Section | 4. | Moves | 40 |
| Section | 5. | Definitions | 40 |
| Article XX. |  | OFF-SEASON TRAINING CAMPS | 41 |
| Section | 1. | Number | 41 |
| Section | 2. | Length | 41 |
| Section | 3. | Expenses | 41 |
| Section | 4. | Contact | 41 |
| Section | 5. | Injuries | 41 |
| Article XXI. |  | PRE-SEASON TRAINING CAMPS | 41 |
| Section | 1. | Definition | 41 |
| Section | 2. | Room and Board | 42 |
| Section | 3. | Rookie Per Diem | 42 |
| Section | 4. | Veteran Per Diem | 42 |
| Section | 5. | 16 and 4 | 42 |
| Section | 6. | Reporting | 42 |
| Section | 7. | Telephones | 42 |
| Section | 8. | Expenses | 42 |
| Article XXII. |  | SALARY MINIMA AND PAYMENT | 43 |
| Section | 1. | Definition | 43 |
| Section | 2. | Rookie Minimum | 43 |
| Section | 3. | Rookie Payment | 43 |
| Section | 4. | Veteran Minima | 43 |
| Section | 5. | Pre-July 19, 1974 | 43 |
| Section | 6. | Post-July 19, 1974 | 44 |
| Section | 7. | 16 and 4 | 44 |
| Section | 8. | Individual Negotiations | 44 |
| Section | 9. | Right to Representation | 44 |
| Section | 10. | Method of Payment | 44 |
| Section | 11. | 10% Grievance | 44 |
| Article XXIII. |  | MEAL ALLOWANCES | 45 |
| Section | 1. | Reimbursement | 45 |
| Section | 2. | Travel Day | 45 |
| Article XXIV. |  | DAYS-OFF | 45 |
| Section | 1. | Rate | 45 |
| Section | 2. | Requirements | 45 |
| Article XXV. |  | MOVING AND TRAVEL EXPENSES | 45 |
| Section | 1. | Qualification | 45 |
| Section | 2. | Reimbursement | 46 |
| Section | 3. | Trip for Wife | 47 |
| Section | 4. | Transportation | 47 |
| Article XXVI. |  | PLAY-OFF GAMES | 47 |
| Section | 1. | Divisional | 47 |
| Section | 2. | Wild-Card | 47 |
| Section | 3. | Payment | 47 |
| Article XXVII. |  | CONFERENCE CHAMPIONSHIP GAMES | 48 |
| Section | 1. | Compensation | 48 |
| Section | 2. | Payment | 49 |

|  |  |  | **Page** |
| --- | --- | --- | --- |
| Article XXVIII. | Super Bowl Game | | 49 |
| Section | 1. | Compensation | 49 |
| Section | 2. | Payment | 50 |
| Article XXIX. | Pro Bowl Game | | 50 |
| Section | 1. | Compensation | 50 |
| Section | 2. | Selection | 50 |
| Section | 3. | Wives | 50 |
| Section | 4. | Injury | 50 |
| Section | 5. | Payment | 50 |
| Article XXX. | Group Insurance | | 51 |
| Section | 1. | Life | 51 |
| Section | 2. | Major Medical | 51 |
| Section | 3. | Dental | 51 |
| Section | 4. | Other Benefits | 51 |
| Section | 5. | Joint Board | 51 |
| Article XXXI. | Retirement Plan | | 51 |
| Section | 1. | Maintenance | 51 |
| Section | 2. | Contributions | 51 |
| Section | 3. | 1974 and 1975 | 52 |
| Section | 4. | Number of Clubs | 53 |
| Section | 5. | Obligations | 53 |
| Section | 6. | Retirement Board | 53 |
| Section | 7. | Investment | 53 |
| Section | 8. | Amendments | 54 |
| Section | 9. | Conformance | 55 |
| Section | 10. | Reopener | 55 |
| Article XXXII. | Termination Pay | | 56 |
| Section | 1. | 14 and 6 | 56 |
| Section | 2. | 16 and 4 | 56 |
| Section | 3. | One Week | 57 |
| Article XXXIII. | Workmen's Compensation | | 57 |
| Section | 1. | Benefits | 57 |
| Section | 2. | Rejection of Coverage | 57 |
| Article XXXIV. | Miscellaneous | | 57 |
| Section | 1. | Endorsements | 57 |
| Section | 2. | Appearances | 57 |
| Section | 3. | Promotion | 58 |
| Section | 4. | Deductions | 58 |
| Section | 5. | Public Statements | 58 |
| Section | 6. | Addresses | 58 |
| Section | 7. | NFLPA Tickets | 58 |
| Section | 8. | Player Tickets | 58 |
| Section | 9. | Tests | 58 |
| Section | 10. | Club Fines | 59 |
| Section | 11. | League Security | 59 |
| Article XXXV. | Retention of Benefits | | 59 |
| Section | 1. | Individual Benefits | 59 |
| Section | 2. | Group Benefits | 59 |
| Article XXVI. | Duration of Agreement | | 59 |
| Section | 1. | Effective Date | 59 |
| Section | 2. | Termination Date | 59 |
| Section | 3. | Stipulation and Settlement Agreement | 59 |
| Appendix A | Applicable NFL Constitutional Provisions will Be Available on a Future Date | | |
| Appendix B | Check-Off Authorization | | 61 |
| Appendix C | Enforcement of Union Security | | 63 |
| Appendix D | Class Action Settlement | | 64 |

# PREAMBLE

THIS AGREEMENT is made and entered into on the 1st day of March, 1977, by and between the National Football League Players Association (hereinafter referred to as the "NFLPA") on behalf of present and future employee players in the National Football League (hereinafter referred to as the "NFL") and the National Football League Management Council (hereinafter referred to as the "Management Council") on behalf of the present and future employer member clubs of the NFL (hereinafter referred to as the "clubs"):

WHEREAS, the NFLPA is recognized by the Management Council as the sole and exclusive bargaining representative of present and future professional football players employed by the clubs and as set forth in the NLRB Certification dated January 22, 1971; and

WHEREAS, the Management Council is recognized by the NFLPA as the collective bargaining representative of the clubs, and any additional clubs which may become members of the NFL during the term of this Agreement, acting individually, collectively or through their agents; and

WHEREAS, the NFLPA and the Management Council mutually acknowledge that this Agreement is the product of bona fide, arms-length collective bargaining;

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, it is hereby agreed as follows:

## ARTICLE I

## GOVERNING AGREEMENT

Section 1. **Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the Standard Player Contract, the NFL Player Contract, the NFL Constitution and Bylaws, the Bert Bell NFL Player Retirement Plan and Trust Agreement, or any other document affecting terms and conditions of employment of NFL players, and all players, clubs, the NFLPA, the NFL, and the Management Council will be bound hereby.

Section 2. **Full Force and Effect:** Any provisions of the Standard Player Contract, the NFL Player Contract, the NFL Constitution and Bylaws (those provisions per-

6

taining to terms and conditions of employment of NFL players attached hereto as Appendix A [1]), the Bert Bell NFL Player Retirement Plan and Trust Agreement, or any other document affecting terms and conditions of employment of NFL players, which are not superseded by this Agreement, will remain in full force and effect for the continued duration of this Agreement, and, where applicable, all players, clubs, the NFLPA, the NFL, and the Management Council will be bound thereby.

Section 3. **Implementation:** The NFLPA and Management Council will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and clubs.

Section 4. **Management Rights:** The NFL clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement.

## ARTICLE II
## SCOPE OF AGREEMENT

Section 1. **Scope:** This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article XXXI, Section 10 on Retirement Plan, the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement; provided, however, that except as provided otherwise in this Agreement, if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the Council will give the NFLPA notice of and negotiate the proposed change in good faith.

Section 2. **Arbitration:** The question of whether or not the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a non-injury grievance under Article VII of this Agreement. If the

7

outside arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the outside arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations.[1]

## ARTICLE III

### NO STRIKE/LOCKOUT/SUIT

Section 1. **No Strike/Lockout:** Except as otherwise provided in Article XXXI, Section 10 on Retirement Plan, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any club for the duration of this Agreement, and no club, either individually or in concert with other clubs, will engage in any lockout for the duration of this Agreement.

Section 2. **No Suit:** Upon court approval of the Stipulation and Settlement Agreement referred to in Article XXXVI, Section 3 of this Agreement, the NFLPA agrees that it will not sue, nor support financially or administratively, any suit against the NFL or any club with respect to any claim relating to any aspect of the NFL rules, including, without limitation, the Standard Player Contract, the NFL Player Contract, the NFL Constitution and Bylaws, the college draft, the option clause, the right of first refusal or compensation, the waiver system, the trading of players, tampering, and the maintenance of certain reserve lists; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any club, acting individually or in concert with other clubs, or the Management Council has breached the terms of this Agreement, the Standard Player Contract, the NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article VII of this Agreement.

---

[1] Appendix A has not been prepared as yet.

8

# ARTICLE IV

## UNION SECURITY

**Section 1. Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the beginning of the 1977 pre-season training camp and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA and whose initial employment with an NFL club began or begins subsequent to February 1, 1974 must, on the 30th day following the beginning of his employment or the commencement of the 1977 pre-season training camp, whichever is later, pay, pursuant to Section 2 below or otherwise, to the NFLPA an annual service fee in the same amount as any initiation fee required of members of the NFLPA and the annual dues.

**Section 2. Check-Off:** Commencing with the 1977 season, each club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown, of each player for whom a current check-off authorization (copy attached hereto as Appendix B and made a part of this Agreement) has been provided to the club. The club will forward the check-off monies to the NFLPA within seven days of the check-off.

**Section 3. NFLPA Meetings:** The NFLPA will have the right to conduct two meetings on club property each year, one during the pre-season and another during the regular season, provided that the player rep or NFLPA office has given the club at least seven days notice of its desire to hold such a meeting. No meeting will be held at a time which would disrupt a coach's normal team schedule.

**Section 4. Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article IV will be processed pursuant to Article VII,

9

Non-Injury Grievance. Any decision of an outside arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and club(s) involved and the parties to this Agreement.

## ARTICLE V

## PLAYER SECURITY

Section 1. **No Discrimination:** There will be no discrimination in any form against any player by the Management Council, any club, or by the NFLPA because of race, religion, national origin, or activity on behalf of the NFLPA.

Section 2. **Personal Appearance:** No player will be disciplined because of his personal appearance, including hair length, facial hair or dress; provided, however, that clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the clubs.

## ARTICLE VI

## CLUB DISCIPLINE

Section 1. **Maximum Discipline:** The NFLPA and the Management Council will agree upon and publish a maximum discipline schedule to be utilized beginning with the 1977 season; such schedule will include maximum discipline for offenses or categories of offenses.

Section 2. **Published Lists:** All clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of the discipline which can be imposed for designated offenses within the limits set by the maximum schedule referred to in Section 1 above.

Section 3. **Uniformity:** Discipline will be imposed uniformly within a club on all players for the same offense; however, the club may specify the events which create an escalation of the discipline, provided the formula for escalation is uniform in its application.

Section 4. **Disputes:** Any dispute involved in club discipline may be made the subject of a non-injury grievance under Article VII of this Agreement, Non-Injury Grievance.

10

# ARTICLE VII
## NON-INJURY GRIEVANCE

**Section 1. Definition:** Any dispute (hereinafter referred to as a "grievance") involving the interpretation or application of, or compliance with, provisions of this Agreement (except as provided otherwise in Section 8 of this Article VII, in Article VIII, and in Article IX, the Standard Player Contract (except as provided in Paragraph 8 of the Standard Player Contract), the NFL Player Contract (except as provided in Paragraph 3 of the NFL Player Contract), the Bert Bell NFL Player Retirement Plan and Trust Agreement (only when submitted by a majority of the Retirement Board pursuant to Article XXXI, Section 6 of this Agreement), and the NFL Constitution and Bylaws (those provisions pertaining to terms and conditions of employment of NFL players, will be available at a future date in App. A),[1] will be resolved exclusively in accordance with the procedure set forth in this Article.

**Section 2. Initiation:** A grievance may be initiated, as set forth in Section 3 below, by a player, a club, the Management Council, or the NFLPA except that the NFLPA may not, without the approval of the player involved, initiate a grievance involving player discipline which has been imposed by a club. No party should initiate a grievance until and unless it has first discussed the matter with the party or parties against whom the grievance is to be initiated in an attempt to settle it. Except as provided otherwise in Article XV, Section 18 and Article XXII, Section 11, a grievance must be initiated within 60 days from the date of the occurrence or non-occurrence upon which the grievance is based, or within 60 days from the date on which the facts of the matter became known or reasonably should have become known to the party initiating the grievance, whichever is later. A player need not be under contract to an NFL club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

**Section 3. Filing:** Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing written notice thereof with a club and furnishing a copy of such notice to the Management Council; and a club or the Management Council may initiate a grievance by filing written notice thereof with the

11

NFLPA and furnishing copies of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. The party to whom a non-injury grievance has been presented will answer in writing within 10 days. If the answer contains a denial, the specific grounds will be set forth.

Section 4. **Player-Club Relations Committee:** If a grievance is not disposed of to the satisfaction of the parties involved within 20 days following the filing of the notice provided for in Section 3 above, such grievance will (unless the parties agree to submit the matter directly to the outside arbitrator) be referred to the Player-Club Relations Committee (hereinafter referred to as the "PCRC"), consisting of two representatives (at least one of whom will be an active player) appointed by the NFLPA and two club representatives appointed by the Management Council. Within 14 days following such reference, the PCRC will meet, on a date and at a time and place agreed upon by the NFLPA and the Management Council, to consider the grievance. Attendance at such meeting by only one of the persons appointed by the NFLPA and only one of the persons appointed by the Management Council will constitute a quorum. Notwithstanding the number of their appointees in attendance, both the NFLPA and the Management Council will each be entitled to cast two votes at any meeting of the PCRC.

Section 5. **Appeal:** If the PCRC resolves any grievance by majority vote or by mutual agreement, such resolution and the specific reasons therefore will be put in writing and will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and club(s) involved and the parties to this Agreement. If the PCRC fails to resolve a grievance within five days following its meeting thereon, either the player(s) or club(s) involved, or the NFLPA or the Management Council, may, within 20 days following the meeting of the PCRC, appeal such grievance by filing written notice thereof with the outside arbitrator designated by the parties as the notice arbitrator, the party or parties against whom such appeal is taken, and either the NFLPA or the Management Council, as the case may be. If the grievance involves a suspension of a player by a club, a complaint under Article II on Scope

12

of Agreement, a dispute under Article XXXI on the Retirement Plan, or is one which the parties agree requires expeditious treatment, it will be appealed immediately upon filing to the outside arbitrator, unless the parties agree to refer it to the PCRC.

Section 6. **Arbitrators:** The parties to this Agreement have agreed upon the appointment of Paul Martha and James Scearce as the outside arbitrators, who will serve for the duration of this Agreement; provided, however, that as of March 1, 1978, and as of each successive March 1, either of the parties to this Agreement may discharge either outside arbitrator by serving 30 days' prior written notice upon him and upon the other party to this Agreement. The parties will thereupon agree upon a successor arbitrator. The arbitrator so discharged will continue to serve until his successor is agreed upon. One of the outside arbitrators will be designated by the parties as the notice arbitrator, with whom any notice of appeal must be filed.

Section 7. **Hearing:** Upon his receipt of notice of appeal of a grievance filed pursuant to Section 5 above, the notice arbitrator will, so as to equalize the caseload of non-injury grievances between himself and the other arbitrator, and without prior consultation with the NFLPA or the Management Council, designate himself or the other arbitrator to hear the case. The designated arbitrator will, after consultation with the NFLPA and the Management Council, set an early time and convenient place for hearing such grievance. The parties to the grievance, and the NFLPA and the Management Council, will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. As soon as possible following the conclusion of such hearing, the outside arbitrator will render a written decision which will constitute full, final, and complete disposition of the grievance, and will be binding upon the player(s) and club(s) involved and the parties to this Agreement; provided, however, that the outside arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy whatsoever other than a money award, an order of reinstatement, suspension without pay, a cease and desist order, a credit or benefit award under

13

the Bert Bell NFL Player Retirement Plan, or an order of compliance with a specific term of this Agreement or any other applicable document.

Section 8. **Integrity and Public Confidence:** In the event a matter filed as a grievance in accordance with the provisions of Section 3 above gives rise to issues involving the integrity of, or public confidence in, the game of professional football, the Commissioner may, at any stage of its processing, after consultation with the PCRC, order that the matter be withdrawn from such processing and thereafter be processed in accordance with the procedure provided in Article VIII of this Agreement, Commissioner Discipline.

Section 9. **Miscellaneous:** Each of the time limits set forth in this Article may be extended by mutual agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon, either the player, the NFLPA, the club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

Section 10. **Representation:** In any meeting or hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of the NFLPA may also participate in such meeting or hearing and represent the player. In any such meeting or hearing, a club representative may be accompanied by counsel of his choice. A representative of the Management Council may also participate in such meeting or hearing and represent the club.

Section 11. **Costs:** All costs of arbitration, including the fees and expenses of the outside arbitrator, will be borne equally between the parties thereto. Unless the arbitrator determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

# ARTICLE VIII

## COMMISSIONER DISCIPLINE

Section 1. **Commissioner Discipline:** Notwithstanding anything stated in Article VII of this Agreement, Non-Injury Grievance, all disputes involving a fine or suspension imposed upon a player by the Commissioner for

conduct on the playing field, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: The Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within 20 days following written notification of the Commissioner's action, the player affected thereby or the NFLPA, with the approval of the player involved, may appeal in writing to the Commissioner. The Commissioner will designate a time and place for hearing, which will be commenced within 10 days following his receipt of the notice of appeal. As soon as practicable following the conclusion of such hearing, the Commissioner will render a written decision, which decision will constitute full, final, and complete disposition of the dispute, and will be binding upon the player(s) and club(s) involved and the parties to this Agreement with respect to that dispute.

Section 2. **Miscellaneous:** Each of the time limits set forth in this Article may be extended by mutual agreement of the Commissioner and the player(s) and the club(s) involved.

Secton 3. **Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of the NFLPA may also participate in such hearing and represent the player. In any such hearing, a club representative may be accompanied by counsel of his choice. A representative of the Management Council may also participate in such hearing and represent the club.

Section 4. **Costs:** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

## ARTICLE IX

### INJURY GRIEVANCE

Section 1. **Definition:** An "injury grievance" is a claim or complaint that, at the time an NFL player's Standard Player Contract or NFL Player Contract was terminated by a club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services

15

under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

Section 2. **Filing:** Any NFL player and/or the NFLPA must present an injury grievance in writing to a club, with a copy to the Management Council, within 20 days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If the player passes the physical examination of the club at the beginning of the pre-season training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date he reported.

Section 3. **Answer:** The club to which an injury grievance has been presented will answer in writing within five days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

(a) That the player did not pass the physical examination administered by the club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any pre-season or regular season game; provided, however, that the club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

(b) That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during the physical examination;

(c) That player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

(d) That the player's injury arose solely from a non-football related cause subsequent to the physical examination;

(e) That subsequent to the physical examination the player suffered no new football-related injury; or

16

(f) That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical capacity below the level existing at the time of his physical examination as contemporaneously recorded by the club physician.

Section 4. **Neutral Physician:** If the answer to an injury grievance is not satisfactory to the grievant, the player may present himself for examination by a neutral physician within 20 days from the date of receipt of the answer. If the club fails to answer an injury grievance within the five-day period, the player may present himself for examination by a neutral physician within 20 days after the time for answering has elapsed. These time periods may be extended by mutual consent if a neutral physician is not available. The player will notify the club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player.

Section 5. **List:** The NFLPA and the Management Council will maintain a jointly-approved list of neutral physicians, including at least two orthopedic physicians in each city in which an NFL club is located. The list will be subject to review and modification every 12 months. Each physician should be willing and able to examine NFL players promptly. The club may present to the neutral physician, with a copy to the NFLPA and the Management Council, the medical history of the player; provided, however, that such medical history contain no opinions as to whether the player was physically able to perform the services required of him by his contract at the time it was terminated.

Section 6. **Appeal:** Any injury grievance may be appealed to an arbitrator by the filing of written notice of appeal with the chairman of the arbitration panel within 30 days from the date of receipt of the neutral physician's written report. There will be a panel of five arbitrators, whose appointments must be accepted in writing by the NFLPA and the Management Council. The parties hereto will agree on such panel by September 1, 1977. When the panel is determined, the parties hereto will choose one from among their number as the chairman of the panel. Whenever the chairman of the panel of arbitrators receives written notice of appeal of an injury grievance, he will promptly select one member of the agreed-upon panel to decide the grievance. The

**17**

chairman will rotate the selection of an arbitrator in such manner so as to equalize the caseload of injury grievances among the full panel.

Section 7. **Hearing:** The arbitrator will hold a hearing on an injury grievance at the earliest practicable time following referral to him. He will render a decision within 30 days from the date of the hearing or of final submission of the matter to him, whichever is later. His decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document.

Section 8. **Miscellaneous:** The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The club or the Management Council must advise the grievant and the NFLPA in writing no later than seven days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with an injury.

Section 9. **Expenses:** Expenses charged by a neutral physician will be shared equally by the club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties will share equally in the expense of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses.

Section 10. **Pension Credit:** Any player who receives payment for three or more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell NFL Player Retirement Plan as determined by the Retirement Board.

Section 11. **Payment:** If an award is made by the arbitrator, payment will be promptly made to the player or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment.

18

# ARTICLE X

## INJURY PROTECTION

**Section 1. Qualification:** Beginning with the 1977 season, a player qualifying under the following criteria will receive an injury protection benefit in accordance with Section 2 below:

(a) The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his club's last game in the season of injury, as certified by the club physician following a physical examination after the last game; or the player must have undergone club-authorized surgery in the off-season following the season of injury; **and**

(b) The player must have undergone whatever reasonable and customary rehabilitation treatment his club required of him during the off-season following the season of injury; **and**

(c) The player must have failed the physical examination given by the club physician at the start of the preseason training camp following the season of injury because of such injury and his club must have terminated his contract for the season following the season of injury. A player who qualifies under subsections (a) and (b) above cannot be waived prior to such pre-season physical examination.

**Section 2. Benefit:** A player qualifying under Section 1 above will receive an amount equal to 50% of his contract salary for the season following the season of injury, up to a maximum payment of $37,500, unless he has individually negotiated more injury protection into that contract. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated injury protection into that contract. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another NFL club. A player will not be entitled to such benefit more than once during his playing career in the NFL.

**Section 3. Disputes:** Any dispute under this Article will

19

be processed under Article VII of this Agreement, Non-Injury Grievance.

# ARTICLE XI

## COMMITTEE ON SAFETY AND WELFARE

A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, drug abuse prevention programs, and any other relevant subjects.

Section 1. **Composition:** The Joint Committee will consist of six members: three club representatives (plus advisors) and three NFLPA representatives (plus advisors).

Section 2. **Meetings:** The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee.

Section 3. **Powers:** The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue.

Section 4. **Scope:** The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner of the NFL, or any appropriate committee of the NFL: such recommendation will be given serious and thorough consideration.

Section 5. **Consultants:** The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides.

Section 6. **Appointments:** The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within 30 days following the execution of this Agreement.

20

Section 7. **Initial Tasks:** The NFLPA and the Management Council agree that three tasks for the Joint Committee to undertake promptly upon the execution of this Agreement are: (a) a review of all current materials on the player safety aspects of player equipment, playing surfaces and other safety matters, and a determination of whether a moratorium on further installation of artificial turf in NFL stadia is desirable; (b) a determination of whether the convening of a conference on illegal drugs is desirable; and (c) an education program among clubs and players on workmen's compensation and preparation of guidelines on filing of workmen's compensation claims.

Section 8. **Playing Rules:** If, after the formation of the Joint Committee, any playing rule is proposed to be changed, and the Commissioner determines that the adoption of the playing rule change could adversely affect player safety, the Commissioner will refer the proposed playing rule change to this Committee for consideration and recommendation. After deliberation, this Committee may make whatever recommendation it deems appropriate to the Competition Committee of the NFL. No such playing rule change will be made by the clubs until it has been referred to this Committee for consideration and recommendation. Except as so limited, nothing in this section will impair or limit in any way the right of the clubs to make any playing rule change whatsoever.

Section 9. **Competition Committee:** One player-member of the Joint Committee will be invited to attend the annual meeting of the NFL Competition Committee as an observer, to represent the players' viewpoint on NFL playing rules.

## ARTICLE XII

## NFL PLAYER CONTRACT

Section 1. **Form:** The NFL Player Contract form will be revised to conform to the terms of this Agreement. The NFLPA and the Management Council will exert their best efforts to agree upon a revised NFL Player Contract form by April 15, 1977. Following adoption of a revised NFL Player Contract form, that form will be used by all players and clubs for subsequent signings.

21

Section 2. **Changes:** No amendment to the NFL Player Contract form will be effected without NFLPA approval; provided, however, that the player and his club will have the right to agree upon changes in his contract or contracts consistent with the provisions of this Agreement and with the provisions of the NFL Constitution and Bylaws not in conflict with this Agreement.

## ARTICLE XIII

## COLLEGE DRAFT

Section 1. **Time of Draft:** Commencing with the college draft to be held on or about May 1, 1977, and with respect to the college draft to be held on or about May 1 each year thereafter, through at least 1986, the following principles will apply; provided, nevertheless, that the dollar amounts specified in this Article XIII are subject to modification through negotiation between the parties whenever this Agreement or any successor agreement terminates:

Section 2. **Number of Choices:** There will be no more than 336 selection choices in any college draft (in the event of NFL expansion, there will be an additional 12 selection choices per expansion club, except in the first year of expansion, when the expansion clubs may be given additional choices). Subject to such maximum, the clubs may determine the number of choices alloted to a club in any given round, so long as such allotment does not diminish the number of choices available for compensation under Article XV of this Agreement or any successor agreement.

Section 3. **Required Tenders:** In order to qualify within the definition of the term "required tender" as used hereinafter in this Article, the contract or contracts tendered to a rookie player must be, at the club's option, either:

(a) An NFL Player Contract with a stated term of one year, which contract must call for a salary of at least $20,000 ($22,000 in 1980 through 1982), with no signing or reporting bonus and no advances; and the contract must contain an option clause of one year, exerciseable once for at least 110% of the salary in year one; **or**

(b) Two NFL Player Contracts with stated terms of

22

one year each, which contracts must call for salaries in years one and two, respectively, of at least $25,000 and $35,000 ($27,500 and $37,500 in 1980 through 1982), with no signing or reporting bonus and no advances; the contract for year two may contain an option clause of one year, exerciseable once for at least 110% of the salary as in year two; and the contract for year one must provide that in the event the contract is terminated by the club in accordance with its terms, the club will nevertheless be obligated to pay the player the guaranteed amount of $25,000 ($27,500 in 1980 through 1982), less all amounts paid or owing to the player as a result of service rendered under such contract, but not including performance bonus compensation, prior to the termination of the contract; **or**

(c) Three NFL Player Contracts with stated terms of one year each, which contracts must call for salaries in years one through three, respectively, of at least $30,000, $40,000 and $50,000 ($33,500, $43,500 and $53,500 in 1980 through 1982), with no signing or reporting bonus and no advances; the contract for year three may contain an option clause of one year, exerciseable once for at least 110% of the salary as in year three; and the contracts for years one and two, respectively, must provide that in the event that either contract is terminated by the club in accordance with its terms, the club will nevertheless be obligated to pay the player the guaranteed amount of $30,000 and $20,000, respectively ($33,500 and $21,750 in 1980 through 1982), less all amounts paid or owing to the player as a result of service rendered under such contract, but not including performance bonus compensation, prior to the termination of the contract; **or**

(d) Four NFL Player Contracts with stated terms of one year each, which contracts must call for salaries in years one through four, respectively, of at least $35,000, $45,000, $55,000 and $65,000 ($40,000, $50,-000, $60,000 and $70,000 in 1980 through 1982), with no signing or reporting bonus and no advances; the contract for year four may contain an option clause of one year exerciseable once for at least 110% of the salary as in year four; and the contracts for years one and two, respectively, must provide that in the event either contract is terminated by the club in accordance with its terms, the club will nevertheless he obligated

23

to pay the player the guaranteed amount of $35,000 and $45,000, respectively ($40,000 and $50,000 in 1980 through 1982), less all amounts paid or owing to the player as a result of service rendered under such contract, but not including performance bonus compensation, prior to the termination of the contract.

Section 4. **Exclusive Right:** A club which drafts a player will, during the period from the date of such college draft (hereinafter "initial draft") to the date of the next college draft (hereinafter "subsequent draft"), be the only NFL club with which such player may negotiate or sign a contract; provided that, on or before the June 7 immediately following the initial draft, such club has tendered to such player a contract or contracts in the form prescribed in Article XII above, giving the player 15 days to accept (a "required tender"). If, within the period between the initial and subsequent draft, such player has not signed a contract with the club which drafted him in the initial draft, such club loses the exclusive right, which it obtained in the initial draft, to negotiate with the player and the player is then eligible to be drafted by another NFL club in the subsequent draft.

Section 5. **Subsequent Draft:** A club which, in the subsequent draft, drafts a player who (a) was drafted in the initial draft; (b) received a "required tender" from the NFL club which drafted him in the initial draft; and (c) did not sign a contract with such first NFL club prior to the subsequent draft, will, during the period from the date of the college draft held in the following year, be the only NFL club with which such player may negotiate or sign a contract, provided such club has made a "required tender". If such player has not signed a contract within the period between the subsequent draft and the next college draft with the club which drafted him in the subsequent draft, that club loses its exclusive right, which it obtained in the subsequent draft, to negotiate with the player, and the player is free to negotiate and sign a contract at any time thereafter with any NFL club, and any NFL club is then free to negotiate and sign a contract with such player, without any compensation between clubs or first refusal rights of any kind.

Section 6. **No Subsequent Draft:** If a player is drafted by an NFL club in an initial draft and (a) receives a

24

"required tender"; (b) does not sign a contract with an NFL club prior to the subsequent draft; and (c) is not drafted by any NFL club in such subsequent draft, the player is free to negotiate and sign a contract at any time thereafter with any NFL club, and any NFL club is then free to negotiate and sign a contract with such player, without any compensation between clubs or first refusal rights of any kind.

Section 7. **No Required Tender:** If a player is drafted by an NFL club in either an initial or subsequent draft and does not receive a "required tender", the player is free to negotiate and sign a contract with any NFL club on June 8 following such draft and at any time thereafter, and any NFL club is then free to negotiate and sign a contract with such player, without any compensation between clubs or first refusal rights of any kind.

Section 8. **Other Professional Team:** If a player is drafted by an NFL club in an initial draft and, during the period in which he may negotiate and sign a contract with only the club which drafted him, signs a contract with a professional football team not in the NFL that covers at least the season immediately following said initial draft, then such NFL club will retain the exclusive NFL rights to negotiate with and sign the player for the period ending two years from the date of the initial draft, following which two-year period the player is free to negotiate with any NFL club, and any NFL club is free to negotiate with such player, subject to Section 9 below.

Section 9. **Return to NFL:** If a player who has signed a contract with a professional football team not in the NFL desires to return to the NFL two or more years following the date of his initial draft, the NFL club which had drafted the player will have no right of compensation under Article XV, but will have a right of first refusal under the applicable terms and conditions of that Article. The returning player will notify the NFLPA and the NFL of his desire to negotiate a contract with an NFL club, which notice will advise of the date on which he will be free of any contractual obligations, if any. Within 30 days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL club which had drafted the player must tender a written contract

25

offer to the player in order to retain the right of first refusal under Section 9.

Section 10. **Unlimited Terms:** Nothing contained herein will prohibit a club from making an offer to a rookie player of a contract containing any terms (such as, without limitation, duration, salary or other compensation, etc.) that are not prohibited by this Agreement, or a rookie player from accepting any such offer and making any proposal or counter-proposal relating to the terms of a contract not prohibited by this Agreement.

Section 11. **Assignment:** In the event that the exclusive right to negotiate with a player is assigned by an NFL club to another NFL club in accordance with NFL procedures, the NFL club to which such right has been assigned will have the same, but no greater, right to negotiate with such player as enjoyed by the club assigning such right, and such player will have the same, but no greater, obligation to the NFL club to which such right has been assigned as he had to the club assigning such right.

Section 12. **Notice:** A "required tender" will be deemed tendered by an NFL club when hand delivered or sent by prepaid certified or registered mail to the player or, if he has designated one in writing, his designated representative.

## ARTICLE XIV

### OPTION CLAUSE

Section 1. **Vested Players:** Upon the execution of this Agreement, any contract or series of contracts thereafter signed by a veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned will not include an option year, unless an option clause has been individually negotiated by the player and his club for a specific consideration other than compensation for the player's services.

Section 2. **Rookies and Non-Vested Players:** Upon the execution of this Agreement, any one-year contract thereafter signed by a rookie player must include an option year; any other contract or series of contracts thereafter signed by a rookie player may include an option year; and any contract or series of contracts

26

thereafter signed by a veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned may include an option year.

Section 3. **Compensation:** Following the execution of this Agreement, for contracts currently in existence and those signed in the future with option years, the option will be exercised by the club at no less than 110% of the player's salary provided in his contract for the previous year, excluding any signing or reporting bonus. Player will receive 100% of performance bonus provisions where the bonus is earned in the option year.

# ARTICLE XV

## RIGHT OF FIRST REFUSAL/COMPENSATION

Section 1. **Applicability:** Commencing with players who play out the options in their contracts or whose contracts otherwise expire (hereinafter referred to as "veteran free agents") in 1977, and with respect to veteran free agents through at least 1982, the following principles will apply:

Section 2. **Contract Expiration Date:** Commencing in 1978, the expiration date of all then current and future player contracts will automatically be moved up to February 1 of the same year. After February 1, a veteran free agent will be free to negotiate with any club, and any NFL club will be free to negotiate with such player. During 1977 only, a player who has played out the option in his contract or whose contract otherwise would expire in 1977 will be free to negotiate with any NFL club, and any NFL club will be free to negotiate with such player, immediately upon execution of this Agreement.

Section 3. **Offer Sheet:** When a veteran free agent receives an offer to sign a contract or contracts from a new club, which he desires to accept, he will on or before April 15 give to his old club a completed Offer Sheet substantially in the form of Exhibit A attached hereto, signed by the player and by the chief operating officer of the new club, which will contain the "principal terms" (as defined in Section 7 below) of the new club's offer. Subject to Section 10 below, the player's old club, upon receipt of the Offer Sheet, may exer-

27

cise its "right of first refusal", which will have the legal consequences set forth in Section 4 below.

Section 4. **First Refusal Exercise Notice:** Subject to Section 18 below, if, within seven days from the date it receives an Offer Sheet, the veteran free agent's old club gives to him a First Refusal Exercise Notice substantially in the form of Exhibit B attached hereto, such player and his old club will be deemed to have entered into a binding agreement, which they will promptly formalize in an NFL Player Contract(s), containing all the "principal terms" of the Offer Sheet and those terms of the NFL Player Contract(s) not modified by the "principal terms".

Section 5. **No First Refusal Exercise Notice:** Subject to Sections 6 and 10 below, if, within seven days from the date it receives an Offer Sheet, the veteran free agent's old club does not give him a First Refusal Exercise Notice, the player and the new club will be deemed to have entered into a binding agreement, which they will promptly formalize in an NFL Player Contract(s), containing all the "principal terms" of the Offer Sheet, those terms of the NFL Player Contract(s) not modified by the "principal terms", and the non-principal terms offered to the player by the new club.

Section 6. **One Offer Sheet:** There may be only one Offer Sheet signed by both a club and a veteran free agent outstanding at any one time. An Offer Sheet, before it is given to the veteran free agent's old club, may be revoked or withdrawn only upon the written consent of the new club and the player. An Offer Sheet, after it is given to a veteran free agent's old club, may be revoked or withdrawn only upon the written consent of the old club, the new club and the player. In either of such events, a veteran free agent will be free to negotiate with any NFL club, and any NFL club will be free to negotiate with such player, subject only to his old club's renewed right of first refusal.

Section 7. **Principal Terms:** For purposes of this Article, the "principal terms" will include the following: (a) the salary the new club will pay to the veteran free agent and/or his designees, currently and/or as deferred compensation in specified installments on specified dates, in consideration for his services as a football player under the contract or contracts; (b) any signing or reporting bonus the new club will pay to the veteran free

28

agent and/or his designees, currently and/or deferred, and the terms thereof; and (c) any modification of and/or addition to the terms contained in the NFL Player Contract form requested by the veteran free agent and acceptable to the new club, which relate to terms of the player's employment as a football player (which will be evidenced by a copy of the NFL Player Contract form, marked to show changes).

Section 8. **Non-Principal Terms:** For purposes of this Article, the "principal terms" will not include any of the following: (a) any loan the new club will make to the veteran free agent and/or his designees under the contract or contracts, and the terms thereof and security therefor, if any; (b) any performance bonus the new team will pay to the veteran free agent under the contract or contracts; (c) a description of any property other than money which the new club will provide or make available to the veteran free agent and/or his designees under the contract or contracts; (d) any investment opportunity which the new club will provide or make available to the veteran free agent and/or his designees; (e) any money and/or property the new club will pay, provide or make available to the veteran free agent and/or his designees in consideration for services by him or others; (f) any intangible benefits or advantages that might accrue to the veteran free agent as a consequence of living and playing in the geographic area of the new club; (g) any promise by the new club of a try-out, audition or introduction for the possibility of performing services or earning income other than that as a football player; and (h) any other terms not included within the "principal terms" set forth in Section 7 above.

Section 9: **Qualifying Offer:** For purposes of Section 10, 11, and 12 of this Article, a "qualifying offer" will include the sum of: (a) the total amount of salary to be paid under the contract or contracts, averaged over the full number of years of the contract or contracts, but no more than five years; and (b) any signing or reporting bonus to be paid under the contract or contracts, prorated over the full number of years of the contract or contracts, but no more than five years.

Section 10. **Qualification for First Refusal:** Anything above in this Article to the contrary notwithstanding, in order for a veteran free agent's old club to be entitled

29

to a right of first refusal, the player must have been given a "qualifying offer" in writing either by his old club on or before February 1 (on or before 15 days from the date of execution of this Agreement in 1977), or by a new club on or before April 15 (but not before March 16 in 1977) to be represented by an Offer Sheet, in the following amounts: $30,000 or more ($35,000 in 1980 through 1982) if the player has not yet completed the season in which his 4th year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned; (b) $40,000 or more if he has not yet completed the season in which his 5th year of Credited Service has been earned; (c) $45,000 or more if he has not yet completed the season in which his 6th year of Credited Service has been earned; and (d) an increase of $5,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibit C and D attached hereto. If the veteran free agent has not been given a "qualifying offer" either by his old club or a new club by the dates specified above, then Section 17 below will come into play.

Section 11. **Qualification for Compensation:** In order for a veteran free agent's old club to be entitled to a right of compensation, the player must have been given a "qualifying offer" by a new club on or before April 15, to be represented by an Offer Sheet, in the following amounts: (a) $50,000 ($55,000 in 1980 through 1982) or more if the player has not yet completed the season in which his 7th year (8th year in 1980 through 1982) of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned; (b) $55,000 or more if the player has not yet completed the season in which his 8th year of Credited Service has been earned; (c) $60,000 or more if the player has not yet completed the season in which his 9th year of Credited Service has been earned; (d) $65,000 or more ($70,000 in 1980 through 1982) if the player has not yet completed the season in which his 10th year of Credited Service has been earned; (e) $75,000 or more ($80,000 in 1980 through 1982) if the player has not yet completed the season in which his 11th year of Credited Service has been earned; (f) $90,000 or more ($95,000 in 1980 through 1982) if the player has not yet completed the season in which his 12th year of Credited Service has been earned; and (g) the same ratio of "qualifying

30

offer" to years of service thereafter, in accordance with the graphs portrayed in Exhibits C and D. Anything in Subsections (d) through (g) to the contrary notwithstanding, the "qualifying offer" with respect to veteran free agent quarterbacks will increase by $5,000 for each year of Credited Service after $60,000 if the player has not yet completed the season in which his 9th year of Credited Service has been earned, in accordance with Exhibits C and D.

Section 12. **Amount of Compensation:** Subject to Section 10 above, if, within seven days from the date it receives an Offer Sheet, a veteran free agent's old club, which is entitled to a right of first refusal or a right of compensation, chooses not to exercise its right of first refusal, then the player and the new club will be deemed to have entered into a binding agreement as provided in Section 5 above, and the player's old club will receive the following compensation: (a) if the "qualifying offer" is $50,000 or more, but less than $65,000 ($55,000 and $70,000 in 1980 through 1982), the new club's 3rd round selection choice, or a better 3rd round choice obtained by assignment from another NFL club, in the next immediate college draft; (b) if the "qualifying offer" is $65,000 or more, but less than $75,000 ($70,000 and $80,000 in 1980 through 1982), the new club's 2nd round selection choice, or a better 2nd round choice obtained by assignment from another NFL club, in the next immediate college draft; (c) if the "qualifying offer" is $75,000 or more, but less than $125,000 ($80,000 and $130,000 in 1980 through 1982), the new club's 1st round selection choice, or a better 1st round choice obtained by assignment from another NFL club, in the next immediate college draft; (d) if the "qualifying offer" is $125,000 or more, but less than $200,000 ($130,000 and $200,000 in 1980 through 1982), the new club's 1st and 2nd round selection choices, or better 1st and 2nd round choices obtained by assignment from other NFL clubs, in the next immediate college draft; and (e) if the "qualifying offer" is $200,000 or more, the new club's 1st round selection choices, or better 1st round choices obtained by assignment from other NFL clubs, in the next immediate two college drafts, all in accordance with Exhibit C and D.

Section 13. **Absences of Choice:** A club not having the future selection choice or choices necessary to provide

31

compensation in the event the veteran free agent's old club chooses to exercise its right of compensation, if any, may not sign an Offer Sheet as provided in Section 3 above.

Section 14. **Copies:** Within seven days after an Offer Sheet is signed by a player and a new club, that club will cause a copy thereof to be given to the NFL; and within seven days after the giving of a First Refusal Exercise Notice to the veteran free agent, the old club will cause a copy thereof to be given to the NFL.

Section 15: **Circulation of Veteran Free Agent List:** The NFL will prepare and circulate to all NFL clubs and the NFLPA a list containing the names of all players who will become veteran free agents as of February 1. The list will be circulated between January 1 and February 1 of each year following the date of this Agreement.

Section 16. **Notice:** Any Offer Sheet, First Refusal Exercise Notice, or other writing required or permitted to be given under this Article will be hand delivered or sent by prepaid certified or registered mail addressed as follows: (a) To any club: addressed to that club at the principal address of such club as then listed on the records of the NFL or at that club's principal office, to the attention of the club president; (b) To the NFL: addressed to the NFL at 410 Park Avenue, New York, New York, 10022, to the attention of the Commissioner; (c) To the NFLPA: addressed to the NFLPA at 1300 Connecticut Avenue, N.W., Washington, D.C., 20036, to the attention of the Executive Director; and (d) To a veteran free agent: to his address listed on the Offer Sheet and, if the player designates a representative on the Offer Sheet and lists such representative's address thereon, a copy will be sent to such representative at such address. An Offer Sheet will be deemed given only when actually received by the player's old club. A First Refusal Exercise Notice will be deemed given when sent by the player's old club. Other writings required or permitted to be given under this Article (including a "qualifying offer") will be deemed given when hand delivered or sent by prepaid certified or registered mail addressed as above required.

Section 17. **Re-Signing:** If a veteran free agent receives no offer to sign a contract or contracts with a new NFL club pursuant to this Article, and his old club advises

32

him in writing by June 1 that it desires to re-sign him, the player may, at his option within 15 days, sign either (a) a contract or contracts with his old club at its last best written offer given on or before February 1 of that year, or (b) a one-year contract (with no option year) with his old club at 110% of the salary provided in his contract for the last preceding year (if the player has just played out the option year, the rate will be 120%). If the player's old club does not advise him in writing by June 1 that it desires to re-sign him, the player will be free on June 2 to negotiate and sign a contract or contracts with any NFL club, and any NFL club will be free to negotiate and sign a contract or contracts with such player, without any compensation between clubs or first refusal rights of any kind.

Section 18. **Extreme Personal Hardship:** In the event of alleged extreme personal hardship or an alleged violation of Article V, Section 1, of this Agreement, a veteran free agent may, within seven days after the February 1 expiration date of his contract, unless the condition arises after that date, file a non-injury grievance pursuant to Article VII of this Agreement. If the PCRC is unable to resolve the grievance, and should the outside arbitrator conclude that such extreme personal hardship objectively exists or that there has been a substantive violation of Article V, Section 1, then he may deny to the player's old club its right of first refusal. In the event a club's first refusal rights are denied under this Section because of extreme personal hardship, the club's last written contract offer to the player will constitute a "qualifying offer" for compensation pursuant to Section 11 of Article XV.

33

**EXHIBIT A**

## First Refusal Offer Sheet

Name of Player:          Date:

Address of Player:          Name of New Club:

Name and Address of Player's          Name of Old Club:
Representative Authorized to
Act for Player:

### Principal Terms of NFL Player Contract or Contracts with New Club:

[Supply Information on this Sheet or on Attachment]

(a) Salary, including deferred compensation:

(b) Signing or reporting bonus, if any:

(c) Modifications and additions to NFL Player Con-
tract(s): [attached marked-up copy of NFL Play-
er Contract(s)]

Player:          New Club:

By ........................................          By  ..................................
          Chief Operating Officer

34

**EXHIBIT B**

## First Refusal Exercise Notice

Name of Player:                        Date:

Address of Player:                     Name of Old Club:

Name and Address of Player's          Name of New Club:
Representative Authorized to
Act for Player:

 

 

 

The undersigned member club of the NFL hereby exercises its Right of First Refusal under the Collective Bargaining Agreement dated March 1, 1977, so as to create a binding agreement with the player named above containing the "principal terms" set forth in the First Refusal Offer Sheet, a copy of which is attached hereto, and those terms of the NFL Player Contract(s) not modified by such "principal terms".

 

Old Club

 

By ..........................................
    Chief Operating Officer

35



EXHIBIT C

**FIRST REFUSAL \ COMPENSATION**
1977, 1978 AND 1979

Under red line—NO FIRST REFUSAL
Under black line—NO COMPENSATION

36



EXHIBIT D

# FIRST REFUSAL \ COMPENSATION
## 1980 AND 1981

**Under red line—NO FIRST REFUSAL**

**Under black line—NO COMPENSATION**

37

# ARTICLE XVI

## WAIVER SYSTEM

**Section 1. Release:** Whenever a player who has completed the season in which his fourth year or more of Credited Service under the provisions of the Bert Bell NFL Player Retirement Plan as of January 1, 1976, has been earned is placed on waivers, claimed and would be awarded, the club having requested waivers will immediately advise the player of such fact, provided the waiver request has taken place within the time period of February 1 to the end of the NFL intra-conference trading period. Within 24 hours after receipt of such information, the player may, at his option, give written notice to the club having requested waivers that he desires to terminate his contract or contracts and obtain his unconditional release. However, should the player fail to give such notice within the 24-hour period, his contract will be awarded to the claiming club in accordance with the rules prescribed in the 1976 NFL Constitution and Bylaws. In the event the player requests his unconditional release, the player and the NFLPA will be advised promptly by the NFL which clubs claimed the player.

**Section 2. Contact:** Coaches or any other persons connected with another NFL club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving club. Whenever possible, the club will give the player written notice that he has cleared waivers within 24 hours after he has cleared.

**Section 3. Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or post-season game because of a breach of waiver procedures and regulations or any other provision of the 1976 NFL Constitution and Bylaws by any NFL club by whom he is employed will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

38

# ARTICLE XVII

## EXPANSION

Section 1. **Seattle and Tampa Bay:** Within 30 days after execution of this Agreement, any veteran player selected in the 1976 expansion allocation by Seattle or Tampa Bay who was on that club's Active List or Injured Reserve List at the end of the 1976 regular season will receive a bonus of $2,500.

Section 2. **Veteran Allocation:** In the event the clubs make a determination after the execution of this Agreement to expand the number of clubs, it is agreed upon that an expansion allocation of veteran players may be held on the terms decided by the clubs.

Section 3. **Future Expansion:** Any veteran player selected in any expansion allocation subsequent to the execution of this Agreement will receive a bonus of $2,500 after reporting upon invitation to the expansion club's first pre-season training camp and passing the club's physical examination; and an additional bonus of $2,500 upon making the expansion club's Active List at any time during the club's first regular season.

# ARTICLE XVIII

## OTHER PROVISIONS

Section 1. **CFL Rule:** Commencing with the 1977 season, a player who has practiced and/or played in the CFL may be employed by an NFL club in the same season so long as he is signed by the NFL club on or before July 15 of the year in question.

Section 2. **Physically Unable to Perform:** Any player placed on Reserve as Physically Unable to Perform under the terms and conditions of the 1976 Constitution and Bylaws will be paid at the rate of his full contract salary while on such Reserve.

Section 3. **Non-Football Injury:** The contract of a player placed on Reserve as Non-Football Injury or Illness (N-F/I) under the terms and conditions of the 1976 NFL Constitution and Bylaws will not be tolled for the period of his failure to perform his services under the contract and will continue to run as if the player were

39

performing, but he will not be entitled to any compensation under his contract during that period. This modification will not apply to the option year of a player's contract or, in the absence of an option year, to the last year of a player's contract.

## ARTICLE XIX

### SQUAD SIZE

Section 1. **Active List:** For each regular season beginning in 1977, the Active List limit will be 43 players per club. This limit may not be reduced by the clubs for the duration of this Agreement; provided, however, that individual clubs may from time to time carry less than 43 players on their Active Lists during the regular season.

Section 2. **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the clubs. In the event the clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 43 by the start of the regular season.

Section 3. **Inactive List:** For each regular season beginning in 1977, the Inactive List limit will be two players per club. This limit may not be reduced by the clubs for the duration of this Agreement; provided, however, that individual clubs may carry less than two players on their Inactive Lists during the regular season.

Section 4. **Moves:** There will be no limit on the number of moves between the Active List and the Inactive List during the regular season. A player who is moved to a club's Inactive List from its Active List will continue to be paid at his full salary rate. A free agent who is signed onto a club's Inactive List during the regular season will be paid at the minimum salary rate of $15,000 per year for whatever period of time during the regular season he is on the Inactive List. A player placed on the Inactive List will sign an NFL Player Contract for the year in question, but will not be required to sign a future contract.

Section 5. **Definitions:** The terms Active List, Inactive

40

List and other player categories will be defined as in Appendix A attached to this Agreement.

# ARTICLE XX

## OFF-SEASON TRAINING CAMPS

Section 1. **Number:** Each club may hold a maximum of one mandatory off-season training camp for veteran players. If a club hires a new head coach after the end of the regular season, that club may hold two additional voluntary off-season training camps for veteran players. There is no limitation on the number of off-season training camps a club may hold for rookie players.

Section 2. **Length:** No off-season training camp may exceed three days in length, plus one day for physical examinations. If possible, off-season training camps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

Section 3. **Expenses:** Any veteran player who attends an off-season training camp will receive meal allowances in accordance with Article XXIII, Section 1 of this Agreement, plus all travel expenses to and from the camp. In addition, the club will provide housing at off-season training camps for players coming from out-of-town.

Section 4. **Contact:** There will be no contact work or use of pads (helmets permitted) at off-season training camps.

Section 5. **Injuries:** Any player injured in a club's off-season training camp will be protected in the same manner as if injured during the club's pre-season training camp.

# ARTICLE XXI

## PRE-SEASON TRAINING CAMPS

Section 1. **Definition:** For purposes of this Agreement, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons

EX 4, PAGE 114

in which a year of Credited Service has been earned under such Plan.

Section 2. **Room and Board:** All players will receive room and board during the pre-season training camp.

Section 3. **Rookie Per Diem:** A rookie player will receive "per diem" payments at the rate of $200 per week ($225 per week in 1978; $250 per week in 1979; $275 per week in 1980; and $300 per week in 1981) commencing with the first day of pre-season training camp and ending one week prior to the club's first regular season game.

Section 4. **Veteran Per Diem:** Beginning in 1977, a veteran player will receive "per diem" payments at the rate of $250 per week ($275 per week in 1978; $300 per week in 1979; $325 per week in 1980; and $350 per week in 1981) commencing with the first day of pre-season training camp and ending with the day before the club's first pre-season game.

Section 5. **16 and 4:** In the event the clubs make a determination during the term of this Agreement that the number of regular season games will be increased to 16 for subsequent seasons, then during those seasons falling within the term of this Agreement, veteran players will receive "per diem" payments at the rate provided in Section 4 above, plus $150 per week, commencing with the club's first pre-season game (exclusive of the Canton Hall-of-Fame Game) and ending one week prior to the club's first regular season game (four weeks).

Section 6. **Reporting:** Beginning in 1977, no veteran player, other than quarterbacks and injured players, will be required to report to a club's official pre-season training camp earlier than 15 days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to clubs participating in the Canton Hall-of-Fame Game.

Section 7. **Telephones:** Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

Section 8. **Expenses:** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences upon submission of vouchers. There will be no deduction by the clubs for these payments. Players who

42

are released by club will be reimbursed for their return trips to their residence, upon submission of vouchers.

# ARTICLE XXII

## SALARY MINIMA AND PAYMENT

**Section 1. Definition:** For purposes of this Agreement, a player's "salary" is defined as the rate of payment set forth in paragraph 3 of the Standard Player Contract or paragraph 5 of the NFL Player Contract, as the case may be.

**Section 2. Rookie Minimum:** Upon execution of this Agreement, the minimum salary for a rookie player will be $15,000 ($17,000 in 1980 and 1981); the minimum salary for a rookie player who makes his club's Active List at any time during the regular season will be $20,000 ($22,000 in 1980 and 1981), including the amount of any signing or reporting bonus and the amount of any performance bonus earned for making the club's Active List at any time during the regular season.

**Section 3. Rookie Payment:** A rookie player will receive his salary in equal weekly or biweekly installments over the course of the regular season commencing with the first regular season game.

**Section 4. Veteran Minima:** Except as provided otherwise in Article XIX, Section 4, on Squad Size, upon execution of this Agreement the minimum salary for veteran players will be $24,000 ($26,000 in 1980 and 1981) for a 2nd year player; $26,000 ($28,000 in 1980 and 1981) for a 3rd year player; $28,000 ($30,000 in 1980 and 1981) for a 4th year player; and $30,000 ($32,000 in 1980 and 1981) for a 5th year or more player. The length of service of a veteran player will be determined by crediting one year service for each year the player has been on the Active List of a club for at least three regular season games.

**Section 5. Pre-July 19, 1974:** Subject to Section 7 below, a veteran player who signed a contract for the 1977 or a later season prior to July 19, 1974, will receive 110% of his salary under such contract, 10% to be paid in equal weekly installments commencing with the first pre-season game and ending with the last pre-season game and 100% to be paid in equal weekly or

43

biweekly installments over the course of the regular season commencing with the first regular season game.

Section 6. **Post-July 19, 1974:** Subject to Section 7 below, a veteran player who signed or signs a contract for the 1977 or a later season on or after July 19, 1974, will receive 10% of his salary in equal weekly installments commencing with the first pre-season game and ending with the last pre-season game, and 90% of his salary in equal weekly or biweekly installments over the course of the regular season commencing with the first regular season game.

Section 7. **16 and 4:** Sections 5 and 6 above to the contrary notwithstanding, in the event the clubs make a determination during the term of this Agreement that the number of regular season games will be increased to 16 for subsequent seasons, then during those seasons falling within the term of this Agreement, a veteran player will receive 100% of his salary (110% in a contract signed prior to July 19, 1974) in equal weekly or biweekly installments over the course of the regular season commencing with the first regular season game.

Section 8. **Individual Negotiations:** For the term of this Agreement, all NFL players will have the right to individually negotiate salaries above the minima established in this Agreement.

Section 9. **Right to Representation:** An individual player will have the right to have a representative of his choice, other than another active NFL player or someone employed by the NFLPA or an NFL club, to assist him in his individual contract negotiations. A club will negotiate with the player or his representative in good faith; provided, however, that no club will be required to deal on a collective basis with a representative who represents more than one player on that club.

Section 10. **Method of Payment:** This Article in no way invalidates or otherwise affects any deferred compensation arrangement or any other method of payment an individual player may contract for with his club.

Section 11. **10% Grievance:** A veteran player having signed a Standard Player Contract in 1974 on or after July 19 of that year, who claims that his club abused the intended application of the "10% pre-season, 90% regular season" formula in individual contract negotiations, will have the right to process a non-injury grievance under Article VII of this Agreement, and the

44

Management Council and the club involved will waive any time limitation which might otherwise bar such a grievance (but no more than 90 days after the execution of this Agreement).

## ARTICLE XXIII

### MEAL ALLOWANCES

Section 1. **Reimbursement:** Begiuuing in 1977, a player will be reimbursed for meals not furnished by his club on travel days during the pre-season, regular season and post-season as follows: 1977 and 1978—Breakfast $4.00, Lunch $6.00, and Dinner $16.00; 1979 and 1980—Breakfast $5.00, Lunch $6.00, and Dinner $16.00; and 1981—Breakfast $5.00, Lunch $6.00, and Dinner $17.00.

Section 2. **Travel Day:** Each travel day will commence at the time a team leaves its home city and will terminate at the time the team arrives back at its home city. If a team is travelling for a day game and leaves its home city after 2:00 P.M. on the day prior to the game, players will receive dinner money if the team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 A.M., players will receive breakfast money.

## ARTICLE XXIV

### DAYS-OFF

Section 1. **Rate:** Beginning in 1977, all players will be permitted days-off at least at the rate of four per month as determined by the clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective clubs.

Section 2. **Requirements:** During the 24-hour period constituting a day-off, any player may be required to undergo medical treatment and quarterbacks may be required to attend coaches' meetings.

## ARTICLE XXV

### MOVING AND TRAVEL EXPENSES

Section 1. **Qualification:** Upon the execution of this Agreement, a player qualifying under either of the fol-

45

lowing categories will receive reimbursement for his and his immediate family's moving and travel expenses, upon presentation of vouchers, in accordance with Section 2 below:

(a) Any veteran player who is traded or claimed at any time during the calendar year, and takes up permanent residence in the city of the club to which he is traded or by which he is claimed before the first regular season game of the subsequent season; or

(b) Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

Section 2. **Reimbursement:** A player who qualifies for reimbursement pursuant to Section 1 above will receive, upon presentation of vouchers, up to the greater of the applicable amounts computed pursuant to Schedule A or B below:

## SCHEDULE A

Member clubs of the NFL are assigned the following zones:

Zone 1: Philadelphia, New York, Washington, Baltimore, Pittsburgh, Cleveland, Atlanta, New England, Miami, Buffalo and Tampa Bay;

Zone 2: Detroit, Chicago, New Orleans, Minnesota, Kansas City, Green Bay, Dallas, Houston, Cincinnati, and St. Louis;

Zone 3: Denver;

Zone 4: San Francisco, Los Angeles, San Diego, Oakland and Seattle.

An eligible player will receive up to $400 if traded to or claimed by a club in the same zone; up to $800 if traded to or claimed by a club in an adjacent zone; up to $1,200 if traded to or claimed by a club two zones away; and up to $1,600 if traded to or claimed by a club three zones away.

## SCHEDULE B

An eligible player will receive an amount equal to $1.00 per mile multiplied by the number of miles be-

46

tween the player's residence and the city of the club to which he is traded or by which he is claimed.

Section 3. **Trip for Wife:** Upon the execution of this Agreement, any veteran player who is traded or claimed at any time during the calendar year or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the club to which he is traded or by which he is claimed will receive a first class round-trip air fare for his wife or the equivalent in cash if she does not use the air fare.

Section 4. **Transportation:** Each player who is traded or claimed during the pre-season or regular season will report to the club to which he is traded or by which he is claimed by the fastest available means of transportation. Upon the execution of this Agreement, any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

## ARTICLE XXVI

### PLAY-OFF GAMES

Section 1. **Divisional:** Beginning in the 1977 post-season, each player who at the time of a divisional play-off game is on the Active List, Inactive List, or Injured Reserve List of a club participating in the game will receive $5,000.

Section 2. **Wild-Card:** In the event the clubs make a determination during the term of this Agreement that in subsequent post-seasons a "wild-card" play-off game will be instituted for each conference, then during those post-seasons falling within the term of this Agreement each player who at the time of a "wild-card" play-off game is on the Active List, Inactive List, or Injured Reserve List of a club participating in the game will receive $3,000.

Section 3. **Payment:** Players will be paid for a "wild-card" or divisional play-off game within 15 days after the game is played.

47

# ARTICLE XXVII

## CONFERENCE CHAMPIONSHIP GAMES

**Section 1. Compensation:** Beginning with the 1977 post-season, players will receive the following payments with regard to a conference championship game:

(a) A player who at the time of a conference championship game is and has been on the Active List or Inactive List of a club participating in the game for at least three regular season games (including any divisional play-off game) will receive $9,000.

(b) A player who at the time of a conference championship game is and has been on the Active List or Inactive List of a club participating in the game for less than three regular season games (including any divisional play-off game) will receive $2,250.

(c) A player who at the time of a conference championship game is not on the Active List or Inactive List of a club participating in the game, but was on the club's Active List or Inactive List for eight or more regular season games (including any divisional play-off game), will receive $9,000 provided he is not under contract to another club at the time of the game.

(d) A player who at the time of a conference championship game is not on the Active List or Inactive List of a club participating in the game, but was ou the club's Active List or Inactive List for at least three and not more than seven regular season games (including any divisional play-off game), will receive $4,500 provided he is not under contract to another club at the time of the game.

(e) A veteran player who was injured during the regular season and removed from the Active List or Inactive List of a club participating in a conference championship game for reason of injury (and not subsequently activated or released) will receive $9,000 provided he is not under contract to another club at the time of the game.

(f) A veteran player who was injured during the pre-season and removed from the Active or Inactive List of a club participating in a conference championship game for reason of injury (and not subsequently activated or released) will receive $4,500 provided he is not under contract to another club at the time of the game.

48

Section 2. **Payment:** Players will be paid for a conference championship game within 15 days after the game is played.

## ARTICLE XXVIII

## SUPER BOWL GAME

Section 1. **Compensation:** Beginning with the 1977 post-season, players will receive the following payments with regard to the Super Bowl game:

(a) A player who at the time of the Super Bowl game is and has been on the Active List or Inactive List of a club participating in the game for at least three regular season games (including any divisional play-off and conference championship game) will receive $18,000 if the club wins the game or $9,000 if the club loses the game.

(b) A player who at the time of the Super Bowl game is and has been on the Active List or Inactive List of a club participating in the game for less than three regular season games (including any divisional play-off and conference championship game) will receive $4,500 if the club wins the game and $2,250 if the club loses the game.

(c) A player who at the time of the Super Bowl game is not on the Active List or Inactive List of a club participating in the game, but was on the club's Active List or Inactive List for eight or more regular season games (including any divisional play-off and conference championship game), will receive $18,000 if the club wins the game or $9,000 if the club loses the game, provided he is not under contract to another club at the time of the game.

(d) A player who at the time of the Super Bowl game is not on the Active List or Inactive List of a club participating in the game, but was on the club's Active List or Inactive List for at least three and not more than seven regular season games (including any divisional play-off and conference championship game), will receive $9,000 if the club wins the game or $4,500 if the club loses the game, provided he is not under contract to another club at the time of the game.

(e) A veteran player who was injured during the regular season and removed from the Active List or

49

Inactive List of a club participating in the Super Bowl game for reason of injury (and not subsequently activated or released) will receive $18,000 if the club wins the game or $9,000 if the club loses the game, provided he is not under contract to another club at the time of the game.

(f) A veteran player who was injured during the pre-season and removed from the Active List or Inactive List of a club participating in the Super Bowl game for reason of injury (and not subsequently activated or released) will receive $9,000 if the club wins the game or $4,500 if the club loses the game, provided he is not under contract to another club at the time of the game.

Section 2. **Payment:** Players will be paid for the Super Bowl game within 15 days after the game is played.

# ARTICLE XXIX

## PRO BOWL GAME

Section 1. **Compensation:** Beginning with the 1977 post-season, each player on the winning team in the AFC-NFC Pro Bowl game will receive $5,000 and each player on the losing team will receive $2,500.

Section 2. **Selection:** Beginning with the 1977 post-season, Pro Bowl game players will be chosen on the basis of two votes per club, one by the coaches and one by the players. The player rep will conduct the balloting of the players in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to insure participation in the game and prompt reporting by players selected.

Section 3. **Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl game.

Section 4. **Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediate following season, the player will be paid by his club the weekly installments of his salary covering the games missed.

Section 5. **Payment:** Players will be paid for the Pro Bowl game within 15 days after the game is played.

50

# ARTICLE XXX

## GROUP INSURANCE

Section 1. **Life:** Effective with the first regular season game of the 1977 season, group insurance coverage will be increased to $30,000 for a rookie player, and a veteran player's coverage will be increased by $5,000 for each Credited Season under the Bert Bell NFL Player Retirement Plan to a maximum of $50,000.

Section 2. **Major Medical:** Effective with the execution of this Agreement, the group major medical maximum for a player and his family will be increased to $250,000; and, subject to the $25 deductible, 80% of the first $3,000 and 100% of the excess eligible medical expenses for a player will be reimbursed.

Section 3. **Dental:** Effective with the execution of this Agreement, there will be an increase in scheduled dental benefits averaging 35%; the dental maximum will be increased to $1,000, subject to the $25 deductible; and orthodontics coverage will be added to the group dental policy.

Section 4. **Other Benefits:** All other group insurance benefits effective during the 1975 season will be continued in effect during the term of this Agreement.

Section 5. **Joint Board:** A Joint Insurance Board will have general administration authority over the group insurance program in accordance with guidelines to be established by that Board.

# ARTICLE XXXI

## RETIREMENT PLAN

Section 1. **Maintenance:** The Bert Bell NFL Player Retirement Plan and Trust Agreement (hereinafter referred to as the "Plan" and "Trust") will be continued and maintained in full force and effect during the term of this Agreement.

Section 2. **Contributions:** Contributions under the Plan

51

will be made in the six Plan Years beginning April 1, 1976, and ending March 31, 1982 (except as provided below with respect to the Plan Year beginning April 1, 1976), in accordance with the following schedule:

| Plan Year Beginning April 1 | Annual Contribution |
|---|---|
| 1976 | $7,145,000 |
| 1977 | 7,395,000 |
| 1978 | 7,495,000 |
| 1979 | 7,643,500 |
| 1980 | 8,045,000 |
| 1981 | 8,195,000 |

Contributions will be used exclusively to provide the benefits of the Plan and to pay for its investment management and administration costs. Subject to Section 4 below, the clubs guarantee that the contribution for the Plan Year beginning April 1, 1976, will be paid into escrow on or before March 31, 1977, the escrow agent being instructed to pay such sum into the Trust on or about May 1, 1977 upon implementation of Article XIII of this Agreement, and that subsequent contributions will be paid into the Trust on or before the last day of each Plan Year thereafter, provided that such contributions are allowable as deductions under the applicable provisions of the Internal Revenue Code. Any contribution not received by the Trustee on or before the date it is due will bear interest from the due date to the date of receipt by the Trustee at an annual rate of 6% interest. It will be the duty of the Retirement Board to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. Contributions in future years will be as provided in the Collective Bargaining Agreement effective during such years, subject to Section 3 below.

Section 3. **1974 and 1975:** The then-26 clubs guarantee that contributions for the two Plan Years beginning April 1, 1974 and April 1, 1975, respectively, of $5,200,-000 and $6,250,000, will be paid as a part of the contribution schedule in Section 2 above at the rate of $515,000 and $645,000, respectively, or a total of $1,-160,000 annually, to March 31, 1990, provided that such contributions are allowable as deductions under the applicable provisions of the Internal Revenue Code. Any decrease in the number of NFL clubs after the conclusion of the Plan Year ending March 31, 1977,

52

will decrease the above-stated contributions to the Trust in the ratio that the number of clubs at such time bears to 26.

Section 4. **Number of Clubs:** Any increase or decrease in the number of NFL clubs after the conclusion of the Plan Year ending March 31, 1977, will increase or decrease the contributions to the Trust stated in Section 2 above, less the portions stated in Section 3 above, in the ratio that the number of clubs at such time bears to 28.

Section 5. **Obligations:** The obligations of the clubs hereunder will apply only to the amount of contributions to be made by the clubs to the Plan. The clubs do not guarantee any benefits under the Plan, except as provided under the applicable law. Furthermore, it is agreed that the determination of the sources of revenue that will be used to satisfy the contribution obligation of the clubs will be exclusively within the control of the clubs.

Section 6. **Retirement Board:** The Retirement Board (hereinafter the "Board") will be composed of seven members: three voting members representing the Management Council; three voting members representing the NFLPA; and the Commissioner of the NFL, who will be chairman of the Board but with no vote. The parties agree that it is in the best interests of the Plan and the Plan Beneficiaries that the members of the Board be divorced from the collective bargaining process to the extent possible. The Board will act on all matters by a vote of a majority (four) of voting members, including whether or not to submit any dispute related to the interpretation or application of benefit, eligibility and other administrative provisions of the Plan or Trust Agreement as a non-injury grievance under Article VII of this Agreement. All "substantial issues" as presently defined in Article 8.6 of the Plan will, if not resolved by a vote of a majority (four) of voting members, not be resolved either in accordance with the procedures presently provided in that Article of the Plan or the procedures of Article VII of this Agreement.

Section 7. **Investment:** Fifty percent (50%) of each contribution under the Plan for the six Plan Years beginning April 1, 1976, and ending March 31, 1982, will be invested in fixed income securities, unless the Retirement Board, by a vote of a majority (four) of

53

voting members, determines otherwise. With respect to assets in the Trust as of March 31, 1977 before the contribution for the Plan Year beginning April 1, 1976, the Board will review the performance of the present investment managers and adopt reasonable investment guidelines at the first meeting following the execution of this Agreement. Present investment guidelines will no longer be in effect as of such meeting. No later than July 15, 1977, the Board will select a single actuary to advise the Board and a single administrator to administer the Plan and Trust. The interest assumption used under the Plan will be 6% per annum unless otherwise determined by a vote of a majority (four) of voting members of the Board.

Section 8. **Amendments:** Subject to the limitations of ERISA, the Retirement Board will, by a vote of a majority (four) of the voting members, promptly amend the Plan (subject to the restrictions contained in Article 8.5 (A) (B) (C) and (E) of the Plan) to provide the following:

(a) **Vesting:** Vesting will be reduced from five to four Credited Seasons for a player who achieves his fourth Credited Season in the 1974 and later seasons.

(b) **Benefits:** An improvement in Benefits for Active and Inactive (Retired) Players for the Plan Years 1968 through 1976.

(c) **Early Payment:** Effective with the amendment of the Plan will be established an early payment benefit whereby a Vested Player may, upon leaving football, request to receive in a lump sum 25% of the present value as of the date of receipt of his Benefit Credits at such date, provided that distribution of such sum will be made to such player no earlier than the third game of the regular season next following his leaving football. Said request will be acted upon by a Committee of the Retirement Board consisting exclusively of the voting members representing the NFLPA. After appropriate communication with the Vested Player, if such Committee determines in its sole and absolute discretion that such distribution would be in the Vested Player's best interest, then such distribution will be made. The remaining 75% of the present value of the earned Benefit Credits will be payable in monthly installments beginning at age 55, unless the player elects to receive the remaining 75% in the form of a reduced Early

54

Retirement benefit beginning at age 45 or an increased Deferred Retirement Benefit no later than age 65.

(d) **Total and Permanent Disability:** Effective with the amendment of the Plan, in the event of Total and Permanent Disability, the benefit will be the benefit earned to the date of disability, subject to a minimum of $1,000 per month if the disability results from a football injury incurred while an active player or $500 per month if the disability results from other than a football injury. In addition, $50 per month for each dependent child will be payable during the period of both types of disability.

(e) **Widow's and Survivor Benefits:** Effective with the amendment of the Plan, in the event of death or remarriage of a widow, present Widow's Benefit payments subject to a minimum of $300 per month will continue to any surviving children until one of the children last reaches age 19 (or, age 23 if in college), or continuously if any child is mentally or physically incapacitated. Players active in the 1977 season and thereafter will be entitled to a minimum Widow's Benefit of $1,000 per month payable for 48 months following the date of death; thereafter, survivor benefits will be payable as stated above.

(f) **Line-Of-Duty:** Effective with the amendment of the Plan, the Line-Of-Duty Disability Benefit will be subject to a minimum of $250 per month.

(g) **Early Retirement Reduction Factor:** The early retirement reduction factor currently in use under the Plan may not be increased.

Section 9. **Conformance:** The Plan and Trust will be amended to conform to the provisions of this Agreement and any requirements of ERISA. All other provisions of the Plan and Trust will remain unchanged, unless duly amended by the Retirement Board.

Section 10. **Reopener:** In the event any contribution under this Article is not made on or before the date it is due because it is not allowable as a deduction under the applicable provisions of the Internal Revenue Code, the NFLPA may reopen this Agreement, upon the giving of 10 days written notice, with reference solely to the issue of the Retirement Plan, and the parties will have an obligation to resume negotiations limited to the issue of the Retirement Plan, and both parties will be free

55

to engage in whatever concerted action may be permitted by law in support of their positions.

# ARTICLE XXXII

## TERMINATION PAY

Section 1. **14 and 6:** Beginning in 1977, any player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, and is released from the Active List or Injured Reserve List (or Inactive List if player was moved from the Active List) of his club after the commencement of the regular season schedule, but prior to the Thursday before the seventh regular season game, is entitled to claim and receive, after the end of the regular season schedule, termination pay in an amount equal to the unpaid balance of the initial 50% of his salary, exclusive of deferred compensation, but not less than an amount equal to one week's salary, up to a maximum of $5,000; provided, however, that (a) a player will not be entitled to such termination pay if he has signed a contract with another club for that same season; and (b) a player will not be entitled to such termination pay more than once during his playing career in the NFL.

Section 2. **16 and 4:** In the event the clubs make a determination during the term of this Agreement that the number of regular season games will be increased to 16 for subsequent seasons, then during those seasons falling within the term of this Agreement, any player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, and is released from the Active List or Injured Reserve List (or Inactive List if player was moved from the Active List) of his club after the commencement of the regular season schedule, but prior to the Thursday before the eighth regular season game, is entitled to claim and receive, after the end of the regular season schedule, termination pay in an amount equal to the unpaid balance of the initial 50% of his salary, but not less than an amount equal to one week's salary, up to a maximum of $5,000; provided, however, that (a) a player will not be entitled to such termination pay if he has signed a con-

56

tract with another club for that same season; and (b) a player will not be entitled to such termination pay more than once during his playing career in the NFL.

Section 3. **One Week:** Beginning in 1977, any player who otherwise qualifies for termination pay under Section 1 or 2 above, but is released during the regular season after the time he would be entitled to the unpaid balance of the initial 50% of his salary, will receive termination pay in an amount equal to one week's salary, up to a maximum of $5,000.

## ARTICLE XXXIII

### WORKMEN'S COMPENSATION

Section 1. **Benefits:** In any states where Workmen's Compensation coverage is not compulsory, a club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the workmen's compensation law of the state in which his club is located.

Section 2. **Rejection of Coverage:** Nothing herein stated is to be interpreted as preventing a club, which has the legal right to do so, from rejecting coverage under the workmen's compensation law of its state. However, if a club elects to reject coverage under the workmen's compensation law of its state, it must nevertheless guarantee benefits to its players in the manner previously prescribed in Section 1 above. Moreover, any club may be excluded from those laws if it elects to do so. However, such a club will be obligated to guarantee benefits to its players in the manner previously prescribed in Section 1 above.

## ARTICLE XXXIV

### MISCELLANEOUS

Section 1. **Endorsements:** No club may arbitrarily refuse to permit a player to endorse a product.

Section 2. **Appearances:** No club may unreasonably require a player to appear on radio or television.

57

Section 3. **Promotion:** The NFLPA will use its best efforts to see that the players cooperate with the clubs and the news media in reasonable promotional activities on behalf of the clubs and the NFL. The Management Council and the clubs will not unreasonably interfere with NFLPA-sponsored promotional events and such events will be submitted to the Joint Committee for recommendation.

Section 4. **Deductions:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any club house personnel or any other club attache is prohibited.

Section 5. **Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by club personnel or players which express criticism of any club, its coach or its operation and policy, or which tend to cast discredit upon a club, a player or any other person involved in the operation of a club, the NFL, the Management Council, or the NFLPA.

Section 6. **Addresses:** The Management Council will furnish upon request to the NFLPA address and telephone lists to the extent available covering all players who are under contract to the clubs. These lists will be furnished as of October 1 for in-season and January 1 for off-season. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the clubs.

Section 7. **NFLPA Tickets:** Two complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home club of its desire to attend such a game at least three days prior to the date of the game. NFLPA representatives must possess appropriate identification.

Section 8. **Player Tickets:** Two complimentary tickets will be made available to each player for each home game of his club. Each player will be afforded the opportunity to purchase two tickets for each away game from the best tickets available for public sale immediately prior to the public sale for each game.

Section 9. **Tests:** No psychological or personality tests

58

will be given to any player after he signs his first contract with an NFL club. A player is entitled to review the results of his psychological or personality tests upon request.

Section 10. **Club Files:** All club personnel files relating to a player, except scouting, coaching, and attorney-client privileged material, will be open during reasonable times to inspection by the player or his designated representative.

Section 11. **League Security:** The NFLPA and the Management Council will meet with the Commissioner's Counsel and discuss the guidelines utilized in League security investigations.

## ARTICLE XXXV

### RETENTION OF BENEFITS

Section 1. **Individual Benefits:** Except as may be provided otherwise in this Agreement, any player currently employed or employed after February 1, 1974, will receive the benefits set forth herein for the term of this Agreement.

Section 2: **Group Benefits:** No direct financial benefit granted by any club to its players as a group during the life of, but apart from, the 1968 Collective Bargaining Agreement, the 1968 AFL Memorandum of Agreement, or the 1970 Collective Bargaining Agreement may be reduced during the term of this Agreement.

## ARTICLE XXXVI

### DURATION OF AGREEMENT

Section 1. **Effective Date:** This Agreement will be effective as of February 1, 1974, except as specifically provided otherwise in this Agreement.

Section 2. **Termination Date:** Except as specifically provided otherwise in this Agreement, this Agreement will terminate on July 15, 1982, unless extended by written agreement of the NFLPA and the Management Council.

Section 3. **Stipulation and Settlement Agreement:** If the Stipulation and Settlement Agreement in the Alex-

59

**ander** case does not receive court approval by the Federal District Court of Minnesota, or if, following such court approval, the Stipulation and Settlement Agreement becomes null and void for any reason provided for therein or otherwise agreed upon by the signatories thereto, or if the continued operation of Article XIII or XV of this Collective Bargaining Agreement is effectively enjoined by a court of competent jurisdiction, then this Agreement, at the option of either party hereto, may be terminated upon the giving of written notice of termination. It is understood between the parties that, upon such termination, all rights, duties, obligations, and privileges of the parties provided for hereunder will cease to be effective; provided, however, that employment practices and procedures already followed pursuant to this Agreement and benefits already paid pursuant to this Agreement will be accepted as fully effective and agreed to between the parties for the period preceding such termination.

| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION | NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL |
|---|---|
| BY EDWARD R. GARVEY, | BY SARGENT KARCH, |
| Executive Director | Executive Director |
| BY LEN HAUSS, | BY WELLINGTON T. MARA, |
| 1st Vice-President. | Chairman |

60

# APPENDIX B

## CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fee, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

☐ I direct that any initiation fee and the annual dues be deducted beginning on either the 30th day following the beginning of my employment as a player in the National Football League, or the commencement of the 1977 pre-season training camp, whichever is later.

☐ I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on either the 30th day following the beginning of my employment as a player in the National Football League, or the commencement of the 1977 pre-season training camp, whichever is later.

The foregoing authorized deductions are to be checked-off annually in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 1300 Connecticut Avenue, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this

61

authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each, or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.


Date


Signature


Player's Name—Type or Print


**62**

# APPENDIX C

## PROCEDURE FOR THE ENFORCEMENT OF THE UNION SECURITY AGREEMENT BETWEEN THE NFL MANAGEMENT COUNCIL AND THE NFLPA

On this day, March 1, 1977, the Management Council and the NFLPA have entered into a collective bargaining agreement ("Agreement") which includes Article IV containing a union security clause. To the extent permitted by federal and applicable state laws, the parties hereby agree to enforce the union security clause contained in Article IV, Section 1 of the Agreement according to the following procedure:

Upon written notification to the PCRC by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Article IV, Section 1, the PCRC will within seven days consider the matter. If there is no resolution of the matter within seven days, then the club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the club in writing that the suspended player has satisfied his obligation as contained in Article IV, Section 1 of the Agreement. The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

It is further agreed that the term "member in good standing" as used in Article IV of the Agreement applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

It is further agreed that Agreement on Article II relating to Scope of Agreement, Article III relating to No Strike/Lockout/Suit, and Article XXXVI relating to Duration of Agreement notwithstanding, that if at

63

any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of Article IV of the Agreement relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and the parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted action may be permitted by law in support of their positions.

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION BY EDWARD R. GARVEY,

NATIONAL FOOTBALL LEAGUE MANAGE-MENT COUNCIL BY SARGENT KARCH

## APPENDIX D

### CLASS ACTION SETTLEMENT

The Stipulation and Settlement Agreement in the *Alexander v. NFL* class action referred to in Article XXXVI, Section 3 of the Agreement provides for payments to class members totalling $13,675,000 over a ten-year period. The Stipulation and Settlement Agreement, Notice to Class Members, and other relevant documents may be obtained through the NFLPA office in Washington, D.C

64