Case 2:12-md-02323-AB Document 20-8 Filed 03/29/12 Page 1 of 224

# EXHIBIT 6



# NFL
# COLLECTIVE
# BARGAINING
# AGREEMENT
# 1993-2000



# TABLE OF CONTENTS

PAGE

PREAMBLE ........................................................................................... 1

ARTICLE I DEFINITIONS ..................................................................... 2
    Section 1. General Definitions ............................................................ 2
    Section 2. Free Agency Definitions .................................................... 3
    Section 3. Salary Cap Definitions ...................................................... 5

ARTICLE II GOVERNING AGREEMENT ........................................... 7
    Section 1. Conflicts ............................................................................ 7
    Section 2. Implementation ................................................................. 7
    Section 3. Management Rights ........................................................... 7
    Section 4. Rounding .......................................................................... 7

ARTICLE III SCOPE OF AGREEMENT ............................................... 8
    Section 1. Scope ............................................................................... 8
    Section 2. Arbitration ........................................................................ 8

ARTICLE IV NO STRIKE/LOCKOUT/SUIT ....................................... 9
    Section 1. No Strike/Lockout ............................................................. 9
    Section 2. No Suit ............................................................................. 9
    Section 3. Releases ......................................................................... 10

ARTICLE V UNION SECURITY ........................................................ 11
    Section 1. Union Security ................................................................ 11
    Section 2. Check-off ....................................................................... 11
    Section 3. NFLPA Meetings ............................................................ 11
    Section 4. NFLPA Player Group Licensing Program ....................... 11
    Section 5. Disputes ........................................................................ 12
    Section 6. Procedure for Enforcement ............................................ 12
    Section 7. NFLPA Responsibility .................................................... 13
    Section 8. Orientations ................................................................... 13

ARTICLE VI NFLPA AGENT CERTIFICATION ................................ 14
    Section 1. Exclusive Representation ............................................... 14
    Section 2. Enforcement .................................................................. 14
    Section 3. Penalty .......................................................................... 14

ARTICLE VII PLAYER SECURITY ................................................... 15
    Section 1. No Discrimination .......................................................... 15
    Section 2. Personal Appearance .................................................... 15

ARTICLE VIII CLUB DISCIPLINE .................................................... 16
    Section 1. Maximum Discipline ...................................................... 16

i

Section 2. Published Lists ...................................................17
Section 3. Uniformity........................................................17
Section 4. Disputes............................................................17
Section 5. Deduction .........................................................17

ARTICLE IX NON-INJURY GRIEVANCE ...................18
Section 1. Definition .........................................................18
Section 2. Initiation..........................................................18
Section 3. Filing................................................................18
Section 4. Appeal.............................................................18
Section 5. Discovery ........................................................19
Section 6. Arbitration Panel..............................................19
Section 7. Hearing ...........................................................20
Section 8. Arbitrator's Decision and Award. ....................21
Section 9. Time Limits .....................................................21
Section 10. Representation. ...............................................21
Section 11. Costs..............................................................21
Section 12. Payment ........................................................22
Section 13. Grievance Settlement Committee . . . ..............22

ARTICLE X INJURY GRIEVANCE..............................23
Section 1. Definition .........................................................23
Section 2. Filing................................................................23
Section 3. Answer.............................................................23
Section 4. Neutral Physician.............................................24
Section 5. Neutral Physician List ......................................24
Section 6. Appeal.............................................................25
Section 7. Arbitration Panel..............................................25
Section 8. Hearing ...........................................................25
Section 9. Miscellaneous .................................................26
Section 10. Expenses ........................................................27
Section 11. Pension Credit.................................................27
Section 12. Payment .........................................................27
Section 13. Presumption of Fitness ...................................27
Section 14. Playoff Money.................................................28
Section 15. Information Exchange ......................................28
Section 16. Discovery .......................................................28

ARTICLE XI COMMISSIONER DISCIPLINE................29
Section 1. League Discipline.............................................29
Section 2. Time Limits .....................................................29
Section 3. Representation..................................................29
Section 4. Costs ...............................................................30
Section 5. One Penalty .....................................................30
Section 6. Fine Money .....................................................30

ii

ARTICLE XII INJURY PROTECTION............................................................31
    Section 1. Qualification ............................................................31
    Section 2. Benefit ...................................................................31
    Section 3. Disputes..................................................................32

ARTICLE XIII COMMITTEES ..................................................................33
    Section 1. Joint Committee.........................................................33
    Section 2. Competition Committee..................................................34
    Section 3. Player/Club Operations Committee.......................................34

ARTICLE XIV NFL PLAYER CONTRACT ......................................................35
    Section 1. Form ....................................................................35
    Section 2. Term ....................................................................35
    Section 3. Changes .................................................................35
    Section 4. Conformity ..............................................................35
    Section 5. General..................................................................35
    Section 6. Commissioner Disapproval ..............................................36
    Section 7. NFLPA Group Licensing Program.........................................36
    Section 8. Good Faith Negotiation ..................................................37

ARTICLE XV OPTION CLAUSE..................................................................38
    Section 1. Prohibition ..............................................................38
    Section 2. Existing Option Clauses..................................................38

ARTICLE XVI COLLEGE DRAFT................................................................39
    Section 1. Time of Draft ...........................................................39
    Section 2. Number of Choices.......................................................39
    Section 3. Required Tender..........................................................39
    Section 4. Signing of Drafted Rookies ..............................................39
    Section 5. Other Professional Teams.................................................40
    Section 6. Return to College........................................................41
    Section 7. Assignment of Draft Rights...............................................42
    Section 8. Subsequent Draft ........................................................42
    Section 9. No Subsequent Draft .....................................................42
    Section 10. Compensatory Draft Selections ..........................................42
    Section 11. Undrafted Rookies.......................................................43
    Section 12. Notice of Signing.......................................................43

ARTICLE XVII ENTERING PLAYER POOL......................................................44
    Section 1. Definition ...............................................................44
    Section 2. Covered League Years.....................................................44
    Section 3. Calculation ..............................................................44
    Section 4. Operation ...............................................................45

iii

**ARTICLE XVIII VETERANS WITH LESS THAN**
**THREE ACCRUED SEASONS** .......................................... 47
Section 1. Accrued Seasons Calculation .... .. ... .. .... .............. 47
Section 2. Negotiating Rights of Players With Less
Than Three Accrued Seasons ............................... 47
Section 3. Minimum Salaries ..... ........... .. .... ....47
Section 4. Notice of Signing ................................. ...... ...48

**ARTICLE XIX VETERAN FREE AGENCY** ............................. 49
Section 1. Unrestricted Free Agents. ...... . ........................... 49
Section 2. Restricted Free Agents. .. . ...... ........ .. ................50
Section 3. Offer Sheet and First Refusal Procedures.... . . .......... 54
Section 4. Expedited Arbitration.. .. ........ ........ .. ...... .. .... . .57
Section 5. Individually Negotiated Limitations or
Player Movement ....... ..... . . ... . ... .. 57
Section 6. Notices, Etc ............. ....... ..... ....... ...........58

**ARTICLE XX FRANCHISE AND TRANSITION PLAYERS** ............. 60
Section 1. Franchise Player Designations .. ... ......... ..............60
Section 2. Required Tender for Franchise Players.... .. .. ..............60
Section 3. Transition Player Designations . . .. .. ............ ...... .. ..62
Section 4. Required Tender for Transition Players ..... ... .. ..... . 62
Section 5. Right of First Refusal for Transition Players.. ................63
Section 6. Lists .... .. .. ...... ........ . ....... . ..... . .......... .. .......... ...63
Section 7. Salary Information ........................ ....... ............ . .63
Section 8. No Assignment .......... ......................... ............ ...64
Section 9. Duration of Designation .................................. 64
Section 10. Franchise Player Designation Period . ... ..... . ...... . .65
Section 11. Transition Player Designation Period. .. ................. . 65
Section 12. Prospective Designation .............. .. . ..... . ........ ...66
Section 13. Right to Decline ...... .. ..... . .......... ....... .. ... . 66
Section 14. Other Terms..... ....... ....... .......... ....... ................ ...67
Section 15. Compensatory Draft Selection ............ ............ ..... . 67
Section 16. Signing Period for Transition Players ....... .................67
Section 17. Signing Period for Franchise Players ..... ....................68

**ARTICLE XXI FINAL EIGHT PLAN** .................................69
Section 1. Application ..... ..... ... .... ... .. .. .................. ... ...69
Section 2. Top Four Teams...... ........................ . ......... . .. . 69
Section 3. Next Four Teams .. . ...... .. .. . .. . ..... . ....................59
Section 4. Replacement of Free Agents Signed by Other Club .. ...69
Section 5. Increases... . . .... .. .. ............................ .. . ... . 70
Section 6. Salary Definition .... .. ......... ... , ........ . .. ........... 70
Section 7. Trade Limitation ......... .. ..... . . .. . .. ... .....70

iv

ARTICLE XXII WAIVER SYSTEM .................................................71
  Section 1. Release ..........................................................................71
  Section 2. Contact ........................................................... 71
  Section 3. Ineligibility .................................................................71
  Section 4. Notice of Termination .................................................. 71
  Section 5. NFLPA's Right to Personnel Information ........................72
  Section 6. Rosters ...........................................................................72

ARTICLE XXIII TERMINATION PAY.............................................73
  Section 1. Eligibility. ............................................................... 73
  Section 2. Regular Season Signings ...............................................73

ARTICLE XXIV GUARANTEED LEAGUE-WIDE SALARY,
  SALARY CAP & MINIMUM TEAM SALARY................................74
  Section 1. Definitions............................................................ 74
  Section 2. Trigger For Guaranteed League-wide Salary,
          Salary Cap, and Minimum Team Salary....................77
  Section 3. Guaranteed League-wide Salary ....................................77
  Section 4. Salary Cap Amounts ................................................78
  Section 5. Minimum Team Salary .................................................79
  Section 6. Computation of Team Salary .......................................79
  Section 7. Valuation of Player Contracts........................................81
  Section 8. 30% Rules ...................................................................85
  Section 9. Renegotiations and Extensions......................................85
  Section 10. Accounting Procedures ..................................... . 85

ARTICLE XXV ENFORCEMENT OF THE SALARY
  CAP AND ENTERING PLAYER POOL....................................90
  Section 1. Undisclosed Terms.................................................. 90
  Section 2. Circumvention..............................................................90
  Section 3. Special Master Action...................................................90
  Section 4. Commissioner Disapproval .............................................90
  Section 5. Special Master Review .................................................91
  Section 6. Sanctions ..................................................................91
  Section 7. Prior Conference...........................................................91

ARTICLE XXVI SPECIAL MASTER............................................92
  Section 1. Appointment ............................................................92
  Section 2. Scope of Authority ......................................................92
  Section 3. Discovery ....................................................... 93
  Section 4. Compensation .................................... . 93
  Section 5. Procedures... ................................................................ 93
  Section 6. Selection of Special Master.... .................................94
  Section 7. Penalties .....................................................................94

v

**ARTICLE XXVII IMPARTIAL ARBITRATOR** ............................................95
    Section 1. Selection...................................................................................95
    Section 2. Scope of Authority ......................................................95
    Section 3. Effect of Rulings..........................................................95
    Section 4. Discovery ...................................................................95
    Section 5. Compensation of Impartial Arbitrator ..... ... . ..........95
    Section 6. Procedures..................................................................95
    Section 7. Selection of Impartial Arbitrator........ .... ....... ..........96

**ARTICLE XXVIII ANTI-COLLUSION** .................................................97
    Section 1. Prohibited Conduct .......................................97
    Section 2. Other Club Conduct. ... .. ..... . ................................ 97
    Section 3. Club Discretion ............................................97
    Section 4. League Disclosures.....................................98
    Section 5. Enforcement of Anti-Collusion Provisions . .     .. 98
    Section 6. Burden of Proof.............................................98
    Section 7. Summary Judgment......................................99
    Section 8. Remedies.....................................................99
    Section 9. Computation of Damages ............................99
    Section 10. Player Election     .. .. ...... ................. .....100
    Section 11. Payment of Damages.................................101
    Section 12. Effect on Cap Computations ......................101
    Section 13. Effect of Salary Cap.....................................101
    Section 14. No Reimbursement....................................101
    Section 15. Costs.........     ..     .. .          ... . . .     101
    Section 16. Termination .................................................101
    Section 17. Time Limits . ...............................................102
    Section 18. Prior Conference ........................................102

**ARTICLE XXIX CERTIFICATIONS** ...................................................103
    Section 1. Contract Certification..................................103
    Section 2. End of League Year Certification ... .. ..............103
    Section 3. False Certification ...... .... . .... ..  . .... . .104

**ARTICLE XXX CONSULTATION AND INFORMATION SHARING**..105
    Section 1. Consultation and Communications............................105
    Section 2. Salary Summaries........... .    .. ....... ........... ... 105
    Section 3. Notice of Invalid Contract.............. ........................ 105
    Section 4. Neutral Verifier. . . .......................................... 105
    Section 5. Copies.... ....... .         . .. ...... 106
    Section 6. Meetings....... ..... .. ....... ............... ....... ..........106

**ARTICLE XXXI EXPANSION** .........................................................107
    Section 1. Veteran Allocation     . ................. . . ...... 107
    Section 2. Additional Compensatory Picks .. ..................... .......107

vi

Section 3. Entering Player Pool Adjustment ... . ..........................107
Section 4. Relocation Bonus............ .............. ........     ....... 107

ARTICLE XXXII OTHER PROVISIONS .........................................108
Section 1. CFI Rule  .. . ................... .... ............. .. .............108
Section 2. Physically Unable to Perform  . .. .. .. ......................108
Section 3. Non-Football Injury  ..   .. .... . .... .........................108
Section 4. Roster Exemption .......... .. ....................................108

ARTICLE XXXIII SQUAD SIZE.........................................110
Section 1. Active List.........................   ... . ..........................110
Section 2. Pre Season ......  ....................................................110
Section 3. Inactive List . ................... ... .. ...... ..............110
Section 4. Active and Inactive List Limit ........................ ... ...... .110

ARTICLE XXXIV PRACTICE SQUADS............................................111
Section 1. Practice Squads... ..................................... ... ................111
Section 2. Signing With Other Clubs............. .......................111
Section 3. Salary ... . .....  ....... .............................................111
Section 4  Eligibility . ............ ........          ..........................  ....111

ARTICLE XXXV OFF-SEASON WORKOUTS .................................112
Section 1. Voluntary Workouts . .... ..... ................................112
Section 2. Time Periods .....  ........... ...................................112
Section 3. Payment   .. ........... ..... ....... ...........................112
Section 4. Injuries  .... ...... .. ........ .. ...... ....... ........ .. ...112
Section 5. Miscellaneous ....................... ........ ..... .. ..........112

ARTICLE XXXVI MINICAMPS .....................................................113
Section 1  Number.... .............. ........... ......... .. ..... . ..........113
Section 2. Length ... .. .. ......................................................113
Section 3. Expenses .......... .... . ...... ......... ........  . ..........113
Section 4  Contract .................... . .. .......................................113
Section 5  Injuries....... ... ....... ........ ....    . ....... . ......113

ARTICLE XXXVII PRE-SEASON TRAINING CAMPS ....................114
Section 1. Definition .............................. ............... .....114
Section 2  Room and Board   ... . .... ...... . .........................114
Section 3. Rookie Per Diem .   ... .. ...... . .. . .........................114
Section 4  Veteran Per Diem ...................................................114
Section 5. Reporting   .... ......... .. ...... ......... ....... .......114
Section 6. Number of Pre-Season Games ... .   .... .................114
Section 7. Telephones.... ........... ..........................  . .......     115
Section 8. Expenses ............... . ......................... ...      ..... 115

vii

ARTICLE XXXVIII SALARIES ...................................................116
    Section 1. 1993 Minimum Salaries., ..... ...... ...    . .. ..... . ...116
    Section 2. Minimum Salaries For 1994-1998 League Years. ........116
    Section 3. Credited Season.    ...........................................116
    Section 4. Other Compensation ........, ........... .. .. ... .........116
    Section 5. Arbitration. ......, . ..... ........ ............... ..............117
    Section 6. Payment ........................................ ..........  .117
    Section 7. Deferred Paragraph 5............. . ...........................117
    Section 8. Number of Regular Season Games............ . . ........ ..117
    Section 9. Copies of Contracts ...... .. ........ . ...... . . .............. . .117
    Section 10. Split Contracts.... ..... ... . ..........................  .. ...118
    Section 11. Funding of Deferred and Guaranteed Contracts ......118

ARTICLE XXXIX MEAL ALLOWANCE ..........................................119
    Section 1. Reimbursement .. ... ...........................................119
    Section 2. Travel Day.. ...... ........... .. ..... . . ............... ...    . 119

ARTICLE XL DAYS OFF.......................................................120
    Section 1. Rate.... ................. .......... .    . .......... ... .......120
    Section 2. Requirements ............. , ...................................120

ARTICLE XLI MOVING AND TRAVEL EXPENSES ......................121
    Section 1. Qualification...................... ... ..................  .. ......121
    Section 2. Moving Expenses.....    .    ..  ..    . . ..................121
    Section 3. Travel Expenses.......................................... ......121
    Section 4. Transportation ..................................., ............ .    122

ARTICLE XLII POSTSEASON PAY.........................................123
    Section 1. System. ... .............. ...... .................................123
    Section 2. Compensation.... . ..... . ........................ .... ...........123
    Section 3. Wild Card Game; Division Play-off Game............  ..123
    Section 4. Conference Championship, Super Bowl Game ...........123
    Section 5. Payment ..................... ...... ..................,............124

ARTICLE XLIII PRO BOWL GAME.......................................125
    Section 1. Compensation .. .... ......... .................  . ...........125
    Section 2. Selection.............................................. . ...125
    Section 3. Wives ...................................... .... ......................125
    Section 4. Injury .............. .................................. ...... .. ... ...125
    Section 5. Payment ...................................... ...... , .    125

ARTICLE XLIV PLAYERS' RIGHTS TO MEDICAL
CARE AND TREATMENT ...................................................126
    Section 1. Club Physician ...,.. ...... .    . ... .... ...... .. .. .... ...126
    Section 2. Club Trainers    ...... .. ...................... . ...............  126

viii

Section 3. Players' Right to a Second Medical Opinion ...... 126
Section 4. Players' Right to a Surgeon of His Choice ..................126
Section 5. Standard Minimum Pre-Season Physical .....................126
Section 6. Substance Abuse. . . . . . . . . . . . . . . . . . . . . . . . . . . 127

**ARTICLE XLV ACCESS TO PERSONNEL AND**
**MEDICAL RECORDS**......................................................**128**
Section 1. Personnel Records............ . ....................... ...... ...128
Section 2. Medical Records .. ... ..... ... .   . . . . . . . . . ... .. ...128

**ARTICLE XLVI PLAYER BENEFIT COSTS**......................................**129**
Section 1. Right of Reduction ... ... ... .............. . . .     . .129
Section 2. Right of Restoration .. ... ...... . .... ................. ...129
Section 3. Definition .............................. .. ... ... ... .. ...... 129
Section 4. Resolution of Disputes ........ .. .. .. ... ..       .. . . ..130

**ARTICLE XLVII RETIREMENT PLAN** ............................................**132**
Section 1. Maintenance and Definitions. .  . . . . . . ... ... ......... ..132
Section 2. Amendment by Bargaining Parties . ... ... . . ................132
Section 3. Contributions .         . . .. ..  .. .... . ... ... ..... .............132
Section 4. Amendment of Bert Bell and Pete Rozelle Plans ..... ....133
Section 5. Plan Merger and Further Amendments   .... ...... ......136
Section 6. Benefits for Pre-1959 Seasons        .... ...... .. ...     137

**ARTICLE XLVIII SECOND CAREER SAVINGS PLAN**.......................**139**
Section 1. Establishment ... ... ... ... ... ..... .. ...... ........ ............139
Section 2. Contributions ......... ... ... .... ..... .. ........ .. ...........139
Section 3. Allocation .................. ... .... .. ..... .. ...... ............. 139
Section 4. Salary Reduction Contributions    ... ... .... ...... ... 139
Section 5. Benefit Options ...... ... . .. ... .. ....... .. ..... ... ..... ....139
Section 6. Death Benefits        .... ... . ... . ... ...... .      .... , 140
Section 7. Investment . ........... ... ........... .......... . ...... . .... 140

**ARTICLE XLIX GROUP INSURANCE**..............................................**141**
Section 1. Group Insurance Benefits ........ ... ............ ..............141
Section 2. Administration ....................... .. ... . ... .  ...... .....141

**ARTICLE L SEVERANCE PAY** ..........................................................**143**
Section 1. Eligibility ... ... .. .. .................. .. .... . ........................143
Section 2. Amount. .......... .. .     . .. ...... ... .........143
Section 3. Application   ......... .. .......... .. .  ..  . ... .. ....   ... 143
Section 4. Payment         ........... ... . . . .....    ..... ..........143
Section 5. Failure to Apply ... . ... ... ... .... ... ......... ...... ... . . 144
Section 6. Only One Payment .. ...... , ........... ..... ..... .... ... 144
Section 7. Payable to Survivor... ... ... . .          . .    . ...144

ix

Section 8. Prior Severance Pay ................. ............................. ..144
Section 9. Nonassignability ... ............................ ........................ ...144

ARTICLE LI SUPPLEMENTAL DISABILITY BENEFITS.................145
   Section 1. Establishment.......... ... ..... ........ · ...... ... · ·       145
   Section 2. Contributions ... . . ... . . .... ......... ...............145
   Section 3. Disability Benefits ................. ....... · .... .. .... . ...... 145
   Section 4. Retirement Ignored .......... ............... ... ..... ..... ....146

ARTICLE LII BENEFIT ARBITRATOR.............................................147
   Section 1. Selection... . . . .... . ........... ..... ........... ........... ......147
   Section 2. Compensation ... ... .............. ... .... ...... .......... .......147
   Section 3. Role............ . . . ..... . . .. .. ................... ... . . . . . .. . 147

ARTICLE LIII RETENTION OF BENEFITS ...................................149

ARTICLE LIV WORKERS' COMPENSATION ...............................150
   Section 1. Benefits . . . ..... .......... ......... ...... ... ........... ..... ....150
   Section 2. Rejection of Coverage....... ................. ....................150
   Section 3. Arbitration................. ..... . . ......................       150
   Section 4. Joint Study................................................ .. . . . .       150
   Section 5. Moratorium ........ ... ... ... .. ... .... ........ . . ..........150
   Section 6. Preservation of Rights.., . . ... .....................................151
   Section 7. Reopener ......... ......... . . .             . . ..................151

ARTICLE LV MISCELLANEOUS .......................................................152
   Section 1. Endorsements. ............ .......... ... .............. .............152
   Section 2. On-Field Attire...... ... .............. ...................... .... .152
   Section 3. Appearances ................................................... ...... ...152
   Section 4. Promotion ...................... ...... ... .. ... ... . . . . .  ..... 152
   Section 5. Deduction ......       . .                . .  ....... .............. ...152
   Section 6. Public Statements ........ ... ...... ..... ... . . .. . ..... . .      152
   Section 7. Address. . . ............ ..,. ... ... .. . .... ..................      ...152
   Section 8. NFLPA Tickets............. . ... . . ......... ...................152
   Section 9. Player Tickets................................ ..........................153
   Section 10. Tests ....................................... . .... . .... . . ....................153
   Section 11. League Security............. ........... ..........................153
   Section 12. Career Planning Program............. ... .. ... ....... . 153
   Section 13. Delivery of Documents . .. ........... ......   .. . . .   ... .153
   Section 14. Binding Effect.... . ... ... .. .  .. . ............... .... ..153
   Section 15. Authorization        .... .. . ..... ......... ...... .. ......153
   Section 16. Headings .............................................. ............. ....154
   Section 17. Time Periods.......... ... .... ....... ..... .......... . .....154
   Section 18. Exhibits ... ...... ........ ......... .............................. 154
   Section 19. Parol Evidence ........ ... ................ ............ ...............154

x

ARTICLE LVI 1999 LEAGUE YEAR.................................................155
Section 1. No Salary Cap.........................................................155
Section 2. Free Agency If Salary Cap in 1998.............................155
Section 3. Free Agency If No Salary Cap in 1998.........................155
Section 4. Franchise and Transition Players..............................155

ARTICLE LVII MUTUAL RESERVATION OF RIGHTS:
LABOR EXEMPTION............................................................156
Section 1. Rights Under Law...................................................156
Section 2. Labor Exemption....................................................156
Section 3. CBA Expiration.......................................................156

ARTICLE LVIII DURATION OF AGREEMENT.............................157
Section 1. Effective Date........................................................157
Section 2. Termination...........................................................157
Section 3. Termination Date....................................................157
Section 4. Termination Prior to Expiration Date...........................157
Section 5. Ratification............................................................159

ARTICLE LIX GOVERNING LAW..............................................160

ARTICLE LX NOTICES............................................................161          xi

APPENDIX A  CHECK-OFF AUTHORIZATION............................162

APPENDIX B  INJURY PROTECTION/EARLY WAIVER.................164

APPENDIX C  NFL PLAYER CONTRACT....................................165

APPENDIX D  FIRST REFUSAL OFFER SHEET............................174

APPENDIX E  FIRST REFUSAL EXERCISE NOTICE......................175

APPENDIX F  WAIVER OF FREE AGENT RIGHTS........................176

APPENDIX G  NOTICE OF TERMINATION.................................177

APPENDIX H  ACCOUNTANTS REVIEW PROCEDURES.............178

APPENDIX I  MINIMUM PRE-SEASON PHYSICAL.......................186

APPENDIX J  ACTUARIAL ASSUMPTIONS..............................  189

LETTER AGREEMENT DATED MAY 6, 1993
(SALARY SUMMARIES)..........................................................191

LETTER AGREEMENT DATED MAY 6, 1993
  (COMMISSIONER CONTRACT REVIEW) ...................................192

LETTER AGREEMENT DATED JUNE 23, 1993
  (MISCELLANEOUS SUBJECTS)............... ............................193

LETTER AGREEMENT DATED AUGUST 4, 1993
  (ROOKIE ORIENTATION)...................................................195

LETTER AGREEMENT DATED AUGUST 4, 1993
  (FINAL EIGHT PLAN) ........................................................197

LETTER AGREEMENT DATED AUGUST 4, 1993
  (PLAYER MEDICAL) .........................................................198

INDEX.................................................................................199

xii

## PREAMBLE

This Agreement, which is the product of bona fide, arm's-length collective bargaining, is made and entered into on the 6th day of May, 1993, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL in a bargaining unit described as follows:

1. All professional football players employed by a member club of the National Football League;

2. All professional football players who have been previously employed by a member club of the National Football League who are seeking employment with an NFL Club;

3. All rookie players once they are selected in the current year's NFL College Draft; and

4. All undrafted rookie players once they commence negotiation with an NFL Club concerning employment as a player.

I

# ARTICLE I
# DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

**Section 1. General Definitions:**

(a) "Agreement" means this Collective Bargaining Agreement, dated **May** 6, 1993.

(b) "Class Counsel" means the law firm of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, and the law firm of Lindquist & Vennum, 4200 IDS Center, Minneapolis, Minnesota 55402.

(c) "Club" or "Team" or "Member," used interchangeably herein, means any entity that is a member of the NFL or operates a franchise in the NFL at any time during the term of this Agreement.

(d) "Club Affiliate" or "Team Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a Club or any owner of a Club.

(e) "Commissioner" means the Commissioner of the NFL.

(f) "Impartial Arbitrator" means the person authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

(g) "League Year" means the period from February 20 of one year through and including February 19 of the following year, or such other one year period to which the NFL and the NFLPA may agree. For 1993, the League Year shall begin on March 1 and end on the date on which all 1993 League Year contracts terminate, as agreed between the NFL and the NFLPA.

(h) "NFL Player Contract" means the form of Player Contract utilized in the NFL.

(i) "NFL Rules" means the Constitution and Bylaws, rules, and regulations of the NFL and/or the Management Council.

(j) "Player Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a player.

(k) "Salary" means any compensation of money, property, invest-

2

ments, loans, or anything else of value that a Club pays to, or is obligated to pay to, a player or Player Affiliate, or is paid to a third party at the request of and for the benefit of a player or Player Affiliate, during a League Year, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(l) "Settlement Agreement" means the Stipulation and Settlement Agreement, dated February 26, 1993.

(m) "Special Master" means the special master appointed and authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

**Section 2. Free Agency Definitions:**

(n) "Accrued Season" means any playing season for which a player received credit with respect to his qualifications for Unrestricted Free Agency or Restricted Free Agency, as described in Article XIX (Veteran Free Agency).

(o) "Compensatory Draft Selection" means an additional Draft choice awarded to a Club as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players).

3

(p) "Draft" or "College Draft" means the NFL's annual draft of Rookie football players as described in Article XVI (College Draft)

(q) "Draft Choice Compensation" means the right of any Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players), to receive draft pick(s) from any other Club

(r) "Drafted Rookie" means a person who is selected in the current League Year's Draft or whose Draft rights are held, or continue to be held, consistent with this Agreement, by an NFL Club that selected the Rookie in a prior Draft.

(s) "Final Eight Plan" means the rules whereby signings of Unrestricted Free Agents are limited in Uncapped Years for the final eight playoff Clubs, under the limited circumstances described in Article XXI (Final Eight Plan).

(t) "Free Agent" means a player who is not under contract and is free to negotiate and sign a Player Contract with any NFL Club, without Draft Choice Compensation or any Right of First Refusal

(v) "Minimum Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player not on any Active list, and not on the Inactive list, pursuant to this Agreement.

(v) "Minimum Active/Inactive List Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player on any Active list, or on the Inactive list, pursuant to this Agreement.

(w) "Negotiate" means, with respect to a player or his representatives on the one hand, and an NFL Club or its representatives on the other hand, to engage in any written or oral communication relating to efforts to reach agreement on employment and/or terms of employment between such player and such Club.

(x) "New Club" means any Club except the Prior Club (as defined below)

(y) "Player Contract" means a written agreement or series of such agreements executed at or about the same time between a person and an NFL Club pursuant to which such person is employed by such Club as a professional football player.

4

(z) "Prior Club" means the Club that contracted with or otherwise held the NFL playing rights for the player for the previous NFL League Year.

(aa) "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing bonus, and other payments to a player in compensation for the playing of professional football for the last League Year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Beginning with the 1994 League Year, Prior Year Salary shall also include any un-repaid loans made, guaranteed or collateralized by a team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(ab) "Renegotiate" means any change in Salary or the terms under which such Salary is earned or paid, or any change regarding the Club's right to trade the player, during the term of a Player Contract.

(ac) "Required Tender" means a Player Contract tender that a Club is required to make to a player pursuant to this Agreement, either as a matter of right with respect to the player, or to receive Rights of First Refusal, Draft Choice Compensation and/or other rights with respect to the player, as specified in this Agreement.

(ad) "Restricted Free Agent" means a Veteran who has three or more Accrued Seasons and who completes performance of his Player Contract, but who is still subject to a Right of First Refusal and/or Draft Choice Compensation in favor of his Prior Club.

(ae) "Right of First Refusal" means the right of an NFL Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players) to retain the services of certain Veteran players by matching offers made to those players.

(af) "Rookie" means a person who has never signed a Player Contract with an NFL Club.

(ag) "Undrafted Rookie" means a Rookie who was eligible for but not selected in a College Draft.

(ah) "Unrestricted Free Agent" means a Veteran who completes performance of his Player Contract, and who is no longer subject to any exclusive negotiating rights, Right of First Refusal, or Draft Choice Compensation in favor of his Prior Club.

(ai) "Veteran" means a player who has signed at least one Player Contract with an NFL Club.

5

### Section 3. Salary Cap Definitions:

(aj) "Benefits" or "Player Benefit Costs" means the specific benefits paid to players set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ak) "Capped Year" means any League Year for which a Salary Cap is in effect.

(al) "Defined Gross Revenues" or "DGR" means all of the League and Team revenues that are included within the definition of Defined Gross Revenues, as set forth in Article XXV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(am) "Guaranteed League-wide Salary" means the minimum amount that the Teams in the NFL must pay in Player Costs during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(an) "Minimum Team Salary" means the minimum amount that each Team must pay in Salaries during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum

Team Salary), Section 5.

(ao)   "Paragraph 5 Salary" means the compensation set forth in paragraph 5 of the NFL Player Contract. or in any amendments thereto.

(ap)   "Player Costs" means the total Salaries and Benefits attributable to a League Year for all NFL Teams under all of the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), but not including loans, loan guarantees, unpaid grievances attributions, and unearned incentives.

(aq)   "Projected Benefits" means the amount of Benefits projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ar)   "Projected Defined Gross Revenues" means the amount of Defined Gross Revenues projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(as)   "Room" means the extent to which a Team's then-current Team Salary is less than either the Salary Cap or Entering Player Pool, as applicable.

(at)   "Salary Cap" means the absolute maximum amount of Salary that each Club may pay or be obligated to pay or provide to players or Player Affiliates, or may pay or be obligated to pay to third parties at the request of and for the benefit of Players or Player Affiliates, at any time during a particular League Year, in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), if applicable.

(au)   "Team Salary" means the Team's aggregate Salary for Salary Cap purposes, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(av)   "Uncapped Year" means any League Year for which a Salary Cap is not in effect.

## ARTICLE II
## GOVERNING AGREEMENT

*Section 1.* **Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the NFL Player Contract, the NFL Constitution and Bylaws, the Bert Bell/Pete Rozelle NFL Player Retirement Plan and Trust Agreement, the Pete Rozelle Plan or any other document affecting terms and conditions of employment of NFL players, and all players, Clubs, the NFLPA, the NFL, and the Management Council will be bound hereby. The provisions of the Stipulation and Settlement Agreement in <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) ("Settlement Agreement"), shall supersede any conflicting provisions of this Agreement.

*Section 2.* **Implementation:** The NFLPA and the Management Council will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs. The NFLPA will use its best efforts to see that the terms and conditions of all NFL Player Contracts are carried out in full by players.

*Section 3.* **Management Rights:** The NFL Clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement and the Settlement Agreement.

7

*Section 4.* **Rounding:** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, or Salary, such amounts shall be rounded to the nearest $1,000.

## ARTICLE III
## SCOPE OF AGREEMENT

*Section 1. Scope:* This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article V (Union Security), Section 6, on Union Security, and on Article LIV (Workers' Compensation), Section 7, on Workers' Compensation, the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws; provided, however, that if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the Management Council will give the NFLPA notice of and negotiate the proposed change in good faith.

*Section 2. Arbitration:* The question of whether the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance), which shall be the exclusive method for resolving disputes arising out of this Section 2. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations

8

## ARTICLE IV
## NO STRIKE/LOCKOUT/SUIT

**Section 1. No Strike/Lockout**: Except as otherwise provided in Article V (Union Security), Section 6, or Article LIV (Workers' Compensation), Section 7, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim by the Management Council that the NFLPA has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the Management Council will have the right to submit such claim directly to the courts.

**Section 2. No Suit**: The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against, the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, the Settlement Agreement, or any term of this Agreement or the Settlement Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Entering Player Pool, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, the Final Eight Plan, Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the Management Council, has, (1) breached the terms of this Agreement, the NFL Player Contract, the revised NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article IX (Non Injury Grievance) or asserting any claim before the Special Master or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the Settlement Agreement and from asserting such a claim before the Special Master, Impartial Arbitrator, or the Federal District Court, as provided for in the Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the presently existing provisions of the Constitution and Bylaws of the NFL as they are currently operative and administered (except any provisions relating to the 1982 CBA, which have been superseded by this Agreement); provided, however, that nothing herein shall prevent the NFLPA, its members, agents or bargaining unit members from asserting any

9

**EX 6, PAGE 245**

rights they may have under the federal labor laws or under this Agreement
or the Settlement Agreement.

**Section 3. Releases**: The releases and covenants not to sue contained in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement are hereby incorporated by reference.

10

## ARTICLE V
## UNION SECURITY

**Section 1.** Union Security: Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and whenever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

**Section 2.** Check-off: Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix A and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check off.

11

**Section 3.** NFLPA Meetings: The NFLPA will have the right to conduct three meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule.

**Section 4.** NFLPA Player Group Licensing Program: The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA and the NFL. Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to

Article IX (Non-Injury Grievance). For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on: (a) products in any one product category, as defined by industry standards; or (b) products in different categories if a total of six or more players are used and (i) the products all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items.

**Section 5. Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article, except any dispute concerning Section 4 of this Article, will be processed pursuant to Article IX (Non-Injury Grievance). Any decision of an outside arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

**Section 6. Procedure for Enforcement:**

    (a)    Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article V (Union Security), the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article V (Union Security). The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

    (b)    It is further agreed that the term "member in good standing" as used in this Article V (Union Security) applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

    (c)    It is further agreed that notwithstanding Article III (Scope of Agreement), Article IV (No Strike/Lockout/ Suit), and Article LVIII (Duration of Agreement), that if at any time in the term of the Agreement, any

12

court or agency shall wholly or partially invalidate the provisions of Article V (Union Security) relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

**Section 7. NFLPA Responsibility:** It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

**Section 8. Orientations:** During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine. The NFLPA and the NFL will also sponsor an orientation with an agreed-upon agenda for all rookies on a Club-by-Club basis during the first half of the NFL regular season, which meetings may take place on the players' day off if no other mutually acceptable day is agreed upon

13

## ARTICLE VI
## NFLPA AGENT CERTIFICATION

*Section 1*. **Exclusive Representation**: The NFLMC and the Clubs recog-
nize that the NFLPA regulates the conduct of agents who represent players
in individual contract negotiations with Clubs. The NFLMC and the Clubs
agree that the Clubs are prohibited from engaging in individual contract ne-
gotiations with any agent who is not listed by the NFLPA as being duly cer-
tified by the NFLPA in accordance with its role as exclusive bargaining
agent for NFL players. The NFLPA shall provide and publish a list of agents
who are currently certified in accordance with its agent regulation system,
and shall notify the NFLMC and the Clubs of any deletions or additions to
the list pursuant to its procedures. The NFLPA agrees that it shall not delete
any agent from its list until that agent has exhausted the opportunity to ap-
peal the deletion to a neutral arbitrator pursuant to its agent regulation sys-
tem. The NFLPA shall have sole and exclusive authority to determine the
number of agents to be certified, and the grounds for withdrawing or deny-
ing certification of an agent. The NFLPA agrees that it will not discipline,
dismiss or decertify agents based upon the results they achieve or do not
achieve in negotiating terms or conditions of employment with NFL Clubs.

14      *Section 2*. **Enforcement**: Under procedures to be established by agreement
between the NFL and the NFLPA, the Commissioner shall disapprove any
NFL Player Contract(s) between a player and a Club unless such player: (a)
is represented in the negotiations with respect to such NFL Player Con-
tract(s) by an agent or representative duly certified by the NFLPA in accor-
dance with the NFLPA agent regulation system and authorized to represent
him; or (b) acts on his own behalf in negotiating such NFL Player Con-
tract(s)

*Section 3*. **Penalty**: Under procedures to be established by agreement be-
tween the NFL and the NFLPA, the NFL shall impose a fine of $10,000 up-
on any Club that negotiates any NFL Player Contract(s) with an agent or
representative not certified by the NFLPA in accordance with the NFLPA
agent regulation system if, at the time of such negotiations, such Club ei-
ther (a) knows that such agent or representative has not been so certified
or (b) fails to make reasonable inquiry of the NFLPA as to whether such
agent or representative has been so certified. Such fine shall not apply, how
ever, if the negotiation in question is the first violation of this Article by the
Club during the term of this Agreement. It shall not be a violation of this
Article for a Club to negotiate with any person named on (or not deleted
from) the most recently published list of agents certified by the NFLPA to
represent players.

## ARTICLE VII
## PLAYER SECURITY

*Section 1.* No Discrimination: There will be no discrimination in any form against any player by the Management Council, any Club or by the NFLPA because of race, religion, national origin or activity or lack of activity on behalf of the NFLPA.

*Section 2.* Personal Appearance: Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

15

## ARTICLE VIII
## CLUB DISCIPLINE

**Section 1. Maximum Discipline:**

(a)     For the 1993 League Year, the following maximum discipline schedule will be applicable:

Overweight -- maximum fine of $50 per lb./per day

Unexcused late reporting for mandatory off-season training camp, team meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, or scheduled promotional activity — maximum fine of $200.

Failure to promptly report injury to Club physician or trainer — maximum fine of $200.

Losing, damaging or altering Club-provided equipment — maximum fine of $200 and replacement cost, if any.

Throwing football into stands — maximum fine of $200

16

Unexcused late reporting for or absence from pre-season training camp by a player under contract except those signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency) — maximum fine of $4,000 per day for the 1993-95 League Years and $5,000 per day for the 1996-99 League Years.

Unexcused late reporting for or absence from pre-season training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency)     maximum fine of $4,000 per day for the 1993-95 League Years and $5,000 per day for the 1996-99 League Years, plus one week's regular season salary for each pre-season game missed

Unexcused missed mandatory off-season training camp, team meeting, practice, curfew, bed check, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, or scheduled promotional activity — maximum fine of $1,000.

Material failure to follow rehabilitation program prescribed by Club physician or trainer — maximum fine of $1,000

Unexcused missed team transportation — maximum fine of $1,000 and transportation expense, if any

Loss of all or part of playbook, scouting report or game plan — maximum fine of $1,000.

Ejection from game — maximum fine of $2,000.

Conduct detrimental to Club — maximum fine of an amount equal to one week's salary and/or suspension without pay for a period not to exceed four (4) weeks.

The Club will promptly notify the player of any discipline; notice of any Club fine in the $4,000/$5,000 maximum category and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

(b) The amounts set forth in Section 1(a) above shall be in effect for the 1993, 1994 and 1995 League Years. Such fines shall be increased by 25% each for the 1996 League Year and each year thereafter during the term of this Agreement, except for those fines for which the specific increase is set forth in Section 1(a) above.

**Section 2. Published Lists:** All Clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of the discipline which can be imposed for designated offenses within the limits set by the maximum schedule *referred* to in Section 1 above.

17

**Section 3. Uniformity:** Discipline will be imposed uniformly within a Club on all players for the same offense; however, the Club may specify the events which create an escalation of the discipline, provided the formula for escalation is uniform in its application. Any disciplinary action imposed upon a player by the Commissioner pursuant to Article XI (Commissioner Discipline) will preclude or supersede disciplinary action by the Club for the same act or conduct.

**Section 4. Disputes:** Any dispute involved in Club discipline may be made the subject of a non-injury grievance under Article IX (Non-Injury Grievance).

**Section 5. Deduction:** Any Club fine will be deducted at the rate of no more than $1,000 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. This will not apply to a suspension.

## ARTICLE IX
## NON-INJURY GRIEVANCE

**Section 1. Definition:** Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere in this Agreement, and except wherever the Settlement Agreement provides that the Special Master, Impartial Arbitrator, the Federal District Court or the Accountants shall resolve a dispute.

**Section 2. Initiation:** A grievance may be initiated by a player, a Club, the Management Council, or the NFLPA. A grievance must be initiated within forty-five (45) days from the date of the occurrence or non-occurrence upon which the grievance is based, or within forty-five (45) days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

18

**Section 3. Filing:** Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail or fax with the Management Council and furnishing a copy of such notice to the Club(s) involved; a Club or the Management Council may initiate a grievance by filing written notice by certified mail or fax with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA. The party to whom a non-injury grievance has been presented will answer in writing by certified mail or fax within seven (7) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or Club(s) involved and the NFLPA or the Management Council as may be applicable.

**Section 4. Appeal:** If a grievance is not resolved after it has been filed and answered, either the player(s) or Club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken, and either the NFLPA or

the Management Council as may be appropriate. If the grievance involves a
suspension of a player by a Club, the player or NFLPA will have the option
to appeal it immediately upon filing to the Notice Arbitrator and a hearing
will be held by an arbitrator designated by the Notice Arbitrator within sev-
en (7) days of the filing of the grievance. In addition, the NFLPA and the
Management Council will each have the right of immediate appeal and
hearing within seven days with respect to four (4) grievances of their re-
spective choice each calendar year. The arbitrator(s) designated to hear
such grievances will issue their decision(s) within five (5) days of the com-
pletion of the hearing. Pre-hearing briefs may be filed by either party and,
if filed, will be exchanged prior to hearing.

**Section 5. Discovery:** No later than ten (10) days prior to the hearing, each
party will submit to the other copies of all documents, reports and records
relevant to the dispute. Failure to submit such documents, reports and
records no later than ten (10) days prior to the hearing will preclude the
non-complying party from submitting such documents, reports and
records into evidence at the hearing, but the other party will have the op-
portunity to examine such documents, reports and records at the hearing,
and to introduce those it desires into evidence, except that relevant docu-
ments submitted to the opposing party less than ten (10) days before the
hearing will be admissible provided that the proffering party and the cus-
todian(s) of the documents made a good faith effort to obtain (or discover
the existence of) said documents or that the document's relevance was not
discovered until the hearing date. In the case of an expedited grievance pur-
suant to Section 4, such documentary evidence shall be exchanged on or
before two (2) days prior to the hearing unless the arbitrator indicates oth-
erwise.

19

**Section 6. Arbitration Panel:** There will be a panel of four (4) arbitrators,
whose appointment must be accepted in writing by the NFLPA and the
Management Council. The parties will designate the Notice Arbitrator with-
in ten (10) days of the execution of this Agreement. In the event of a va-
cancy in the position of Notice Arbitrator, the senior arbitrator in terms of
affiliation with this Agreement will succeed to the position of Notice Arbi-
trator, and the resultant vacancy on the panel will be filled according to the
procedures of this Section. Either party to this Agreement may discharge a
member of the arbitration panel by serving written notice upon the arbi-
trator and the other party to this Agreement between December 1 and 10
of each year but at no time shall such discharges result in no arbitrators re-
maining on the panel. If either party discharges an arbitrator, the other par-
ty shall have two (2) business days to discharge any other arbitrator. If the
parties are unable to agree on a new arbitrator within thirty (30) days of any
vacancy, the Notice Arbitrator shall submit a list of ten (10) qualified and
experienced arbitrators to the NFLPA and the Management Council. With-

in fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

**Section 7. Hearing:** Each arbitrator will designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 15 through September 10 for non-expedited cases, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for such ensuing period, which process will be repeated on an annual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date in the Club city unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, and subject to Section 5, any evidence relevant to the grievance. All hearings will be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended, notwithstanding any party's failure to present post hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call. If either party requests post-

20

hearing briefs, the parties shall prepare and simultaneously submit briefs except in grievances involving non-suspension Club discipline where less than $25,000 is at issue, in which cases briefs will not be submitted. Briefs must be submitted to the arbitrator postmarked no later than sixty (60) days after receipt of the last transcript.

**Section 8. Arbitrator's Decision and Award:** The arbitrator will issue a written decision within thirty (30) days of the submission of briefs, but in no event shall he consider briefs filed by either party more than sixty (60) days after receipt of the last transcript, unless the parties agree otherwise. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement; provided, however, that the arbitrator will not have the jurisdiction or authority. (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or an order of compliance, with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article XIII (Committees). Section 1(c). In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of the grievance. The interest shall be calculated at the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

27

**Section 9. Time Limits:** Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon in writing, either the player, the NFLPA, the Club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

**Section 10. Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a Club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

**Section 11. Costs:** All costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the

parties. Notwithstanding the above, if the hearing occurs in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city and one night's lodging.

**Section 12. Payment.** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each subsequent twelve (12) month period in lieu of continuation of any pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

**Section 13. Grievance Settlement Committee:** A grievance settlement committee consisting of the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL shall have the authority to resolve any grievance filed under this Article. This committee shall meet periodically to discuss and consider pending grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of the two members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement. Consideration of any grievance by this committee shall not in any way delay its processing through the non-injury grievance procedure described in this Article, and no grievance may be resolved pursuant to this Section once an arbitration hearing has been convened pursuant to Section 7 hereof.

22

# ARTICLE X
# INJURY GRIEVANCE

**Section 1. Definition:** An "injury grievance" is a claim or complaint that, at the time a player's NFL Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

**Section 2. Filing:** Any player and/or the NFLPA must present an injury grievance in writing to a Club, with a copy to the Management Council, within twenty-five (25) days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

**Section 3. Answer:** The Club to which an injury grievance has been presented will answer in writing within seven (7) days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

    (a)    That the player did not pass the physical examination administered by the Club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any pre-season or regular season game, provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

    (b)    That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during the physical examination;

    (c)    That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

    (d)    That the player's injury arose solely from a non-football related cause subsequent to the physical examination.

23

(e)     That subsequent to the physical examination the player suffered no new football-related injury;

(f)     That subsequent to the physical examination the player suffered no football related aggravation of a prior injury reducing his physical capacity below the level existing at the time of his physical examination as contemporaneously recorded by the Club physician

**Section 4. Neutral Physician**: The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty (20) days from the date of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The player will notify the Club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may review any objective medical tests which all parties mutually agree to provide. The neutral physician is further authorized to perform any necessary diagnostic tests after consultation with the parties. The neutral physician is required to submit to the parties a detailed typewritten medical report of his examination. In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file injury grievances

**Section 5. Neutral Physician List**: The NFLPA and the Management Council will maintain a jointly approved list of neutral physicians, including at least two orthopedic physicians in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three (3) orthopedic physicians to the other party within thirty (30) days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement, within ten (10) days they will select a neutral physician for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the

24

nominees on its list, and the other party will be bound by such selection.
The next vacancy occurring will be filled in similar fashion with the party
who initially struck first then striking second. The parties will alternate
striking first for future vacancies occurring thereafter during the term of this
Agreement.

**Section 6. Appeal**: A grievance may be appealed to an arbitrator by filing of
written notice of appeal with the chairman of the arbitration panel within
thirty (30) days from the date of receipt of the neutral physician's written
report.

**Section 7. Arbitration Panel**: There will be a panel of five (5) arbitrators,
whose appointment must be accepted in writing by the NFLPA and the
Management Council. The parties have designated Arthur Stark as the
Chairman of the panel. In the event of a vacancy in the position of the
Chairman of the panel, the senior arbitrator in terms of affiliation with this
Agreement will succeed to the position of Chairman of the panel, and the
resultant vacancy on the panel will be filled according to the procedures of
this Section. Either party to this Agreement may discharge a member of the
arbitration panel by serving written notice upon the arbitrator and the oth-
er party to this Agreement between December 1 and 10 of each year, but at      25
no time shall such discharges result in no arbitrators remaining on the pan-
el. If either party discharges an arbitrator, the other party shall have two (2)
business days to discharge any other arbitrator. Any vacancies occurring on
the arbitration panel will be filled as follows: If the parties are unable to
agree to a new arbitrator within thirty (30) days of the occurrence of the va-
cancy, the Chairman of the panel shall submit a list of ten (10) qualified and
experienced arbitrators to the NFLPA and the Management Council. With-
in fourteen (14) days of the receipt of the list, the NFLPA and the Manage-
ment Council shall select one arbitrator from the list by alternately striking
names until only one remains, with a coin flip determining the first strike.
The next vacancy occurring will be filled in similar fashion, with the party
who initially struck first then striking second. The parties will alternate
striking first for future vacancies occurring thereafter during the term of this
Agreement. If either party fails to cooperate in the striking process, the oth-
er party may select one of the nominees on the list and the other party will
be bound by such selection.

**Section 8. Hearing**: Each arbitrator shall designate a minimum of twelve
hearing dates per year, exclusive of the period July 15 through September
10, for use by the parties to this Agreement. Upon being appointed, each
arbitrator will, after consultation with the Chairman, provide to the NFLPA
and the Management Council specified hearing dates for each of the ensu-
ing six months, which process will be repeated on a semiannual basis there
after. The parties will notify each arbitrator thirty (30) days in advance of

which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Chairman to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

Post-hearing briefs must be submitted to the arbitrator postmarked no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of injury. The interest shall be calculated at the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

*Section* 9. **Miscellaneous:** The arbitrator will consider the neutral physi-

26

cian's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The Club or the Management Council must advise the grievant and the NFLPA in writing no later than seven (7) days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with an injury.

**Section 10. Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in travelling to and from his residence to the Club city and one night's lodging.

**Section 11. Pension Credit:** Any player who receives payment for three or    27
more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell/Pete Rozelle NFL Player Retirement Plan as determined by the Retirement Board.

**Section 12. Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each such subsequent twelve (12) month period in lieu of continuation of pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

**Section 13. Presumption of Fitness:** If the player passes the physical examination of the Club prior to the pre-season training camp for the year in

question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

*Section 14.* Playoff Money: If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL post-season playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though he had been on the Injured Reserve list at the time of the playoff games in question, should he otherwise qualify for such pay pursuant to Article XLII (Post-Season Pay).

*Section 15.* Information Exchange: The NFLPA and the Management Council must confer on a regular basis concerning the status of pending injury grievances and the attribution of any injury grievance exposure to Team Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). Any communications pursuant to this Section are inadmissible in any grievance hearing.

28      *Section 16.* Discovery: No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the injury grievance hearing. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

## ARTICLE XI
## COMMISSIONER DISCIPLINE

**Section 1. League Discipline.** Notwithstanding anything stated in Article IX (Non-Injury Grievance):

(a)    All disputes involving a fine or suspension imposed upon a player for conduct on the playing field other than as described in subsection (b) below, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within twenty (20) days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b)    Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within ten (10) days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c)    On receipt of a notice of appeal under subsection (a) or (b) above, the Commissioner will designate a time and place for a hearing to be commenced within ten (10) days thereafter, at which he or his designee (other than the person appointed in (b) above) will preside. The hearing may be by telephone conference call, if the player so requests. As soon as practicable following the conclusion of such hearing, the Commissioner will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to subsection (b) above may only be affirmed, reduced, or vacated by the Commissioner in such decision, and may not be increased.

**Section 2. Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the Commissioner and the player(s) and the Club(s) involved.

**Section 3. Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of the NFLPA may also participate in such hearing and represent the player

29

In any such hearing, a Club representative may be accompanied by counsel of his choice. A representative of the Management Council may also participate in such hearing and represent the Club. The NFLPA and Management Council have the right to attend all hearings provided for in this Article. At the hearing, the player, the NFLPA and the Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the hearing. All hearings shall be transcribed.

**Section 4. Costs.** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

**Section 5. One Penalty:** The Commissioner and a Club will not discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

**Section 6. Fine Money:** Any fine money collected pursuant to this Article will be contributed to the Brian Piccolo Cancer Fund, the Vincent T. Lombardi Cancer Research Center, ALS Neuromuscular Research Foundation, and the NFLPA Players Assistance Trust ("PAT"). Any such fine money shall be allocated equally among the four (4) organizations mentioned in the preceding sentence.

30

## ARTICLE XII
## INJURY PROTECTION

**Section 1. Qualification**: A player qualifying under the following criteria
will receive an injury protection benefit in accordance with Section 2 below.

(a)  The player must have been physically unable, because of a severe
football injury in an NFL game or practice, to participate in all or part of his
Club's last game of the season of injury, as certified by the Club physician
following a physical examination after the last game; or the player must
have undergone Club-authorized surgery in the off-season following the
season of injury; and

(b)  The player must have undergone whatever reasonable and cus-
tomary rehabilitation treatment his Club required of him during the off-sea-
son following the season of injury; and

(c)  The player must have failed the pre-season physical examination
given by the Club physician for the season following the season of injury
because of such injury and as a result his Club must have terminated his
contract for the season following the season of injury. This pre-season phys-
ical may be given by the Club physician prior to the beginning of pre-sea-
son camp, so long as such fact is clearly communicated to the player at the
time of the physical exam. The past understanding of the parties concern-
ing a Club releasing a player who otherwise qualifies under (a) and (b)
above prior to the pre-season physical examination will apply during the
term of this Agreement (see Appendix B)

**Section 2. Benefit**: Effective after the execution of this Agreement, a player
qualifying under Section 1 above will receive an amount equal to 50% of
his contract salary for the season following the season of injury, up to a
maximum payment of $150,000 for players released pursuant to Section
1(c) above in League Year 1993, unless he has individually negotiated more
injury protection or a larger guaranteed salary into that contract. This
amount shall be increased to $175,000 in the 1994-96 League Years, and
to $200,000 for the 1997-99 League Years. A player will receive no amount
of any contract covering any season subsequent to the season following the
season of injury, except if he has individually negotiated injury protection
into that contract. The benefit will be paid to the player in equal weekly in-
stallments commencing no later than the date of the first regular season
game, which benefit payments will cease if the player signs a contract for
that season with another Club. A player will not be entitled to such bene-
fit more than once during his playing career in the NFL, and such benefit
shall be reduced by any salary guaranteed to the player for the season fol-
lowing the season of injury

31

**Section 3. Disputes**: Any dispute under this Article will be processed under Article IX (Non Injury Grievance).

32

## ARTICLE XIII
## COMMITTEES

**Section 1. Joint Committee:**

(a)    A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee. The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

3.3

(b)    The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement. The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly upon the execution of this Agreement is a review of all current materials on the player safety aspects of player equipment, playing surfaces, including artificial turf and other safety matters.

(c)    Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators desig-

nated in Article IX (Non-Injury Grievance). A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and the arbitrator must render his decision within one (1) week of the hearing. No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

**Section 2.** Competition Committee: The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

### Section 3. Player/Club Operations Committee:

(a)    A Player/Club Operations Committee (hereinafter the "Operations Committee") shall be established for the purpose of examining issues arising with respect to the implementation of this Agreement. The Operations Committee may discuss and examine, and jointly decide, any such issues; provided, however, that any consideration by the Operations Committee shall not delay any grievance or other procedure under this Agreement, unless the Committee jointly decides otherwise.

(b)    The Operations Committee will consist of up to six (6) members: the Executive Vice President for Labor Relations of the NFL and a maximum of two (2) Club representatives (plus advisors), and the Executive Director of the NFLPA and a maximum of two (2) NFLPA representatives (plus advisors). The respective additional members of the Operations Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original additional members on the Operations Committee will be selected within thirty (30) days following the execution of this Agreement. An equal number on each side shall sit on all matters, and the Committee shall jointly decide whether the Committee shall sit with two (2), four (4) or six (6) members on any given matter. The Operations Committee will hold meetings on dates and at sites mutually agreeable to the Committee members.

34

## ARTICLE XIV
## NFL PLAYER CONTRACT

**Section 1. Form:** The NFL Player Contract form attached hereto as Appendix C, will be used for all player signings. This form cannot be amended without the approval of the Management Council and the NFLPA.

**Section 2. Term:** The NFL Player Contract shall be modified to expire on the last day of the last League Year subject to such Contract.

**Section 3. Changes:**

(a) Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract or contracts consistent with the provisions of this Agreement and the Settlement Agreement.

(b) The NFL Player Contract shall be modified to provide that, other than any rights the player may have as a member of the class in White v. NFL, No. 4 92 906 (D. Minn.) to object to the Settlement Agreement during its review by the District Court, the player waives and releases any claims (i) arising out of, related to, or asserted in that action; and (ii) for conduct engaged in pursuant to the Settlement Agreement during the express term of the Settlement Agreement.

35

(c) Any waiver and release included in the NFL Player Contract pursuant to this Article does not supersede and is subject to the provisions set forth in Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, and Article LVIII (Duration of Agreement) of this Agreement. Specifically, in the event that the Settlement Agreement is terminated, not approved or invalidated on appeal, pursuant to Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, any such waiver and release shall remain or not remain in effect to the extent that the releases and covenants not to sue set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement remain or do not remain in effect. Except in the circumstances described in the preceding sentence, this subsection shall not affect the validity or enforceability of any release and waiver contained in a Player Contract executed on or after March 1, 1993.

**Section 4. Conformity:** All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement and the Settlement Agreement.

**Section 5. General:**

(a) Any agreement between any player and any Club concerning

terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. The League shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. The League shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), within two business days following the NFL's receipt of such information.

(b)     Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for non-football-related services shall be set forth in writing and disclosed and provided to the League within five business days of the execution or making of the agreement. The NFL shall provide such information to the NFLPA within two business days of the receipt of such information.

(c)     No Club shall pay or be obligated to pay any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract or a contract for non-football related services as described in Section 5(b) above. Nothing contained in the immediately preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d)     During the period any Salary Cap is in effect, in addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This subsection shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

**Section 6. Commissioner Disapproval:** If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefor by noon on the date following such disapproval.

**Section 7. NFLPA Group Licensing Program:** The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in paragraph 4a of Appendix C, regarding the NFLPA Group Licensing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision.

36

*Section 8. Good Faith Negotiation:* In addition to complying with specif ic provisions in this Agreement, any Club or player engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

37

## ARTICLE XV
## OPTION CLAUSE

*Section 1.* **Prohibition:** Commencing with the execution of this Agreement, the option clause contained in the NFL Player Contract shall be discontinued. Any option clause must be negotiated as a separate addendum to the revised NFL Player Contract form. Any negotiated option clause must state the dollar amount(s) to be paid to the player during the option year.

*Section 2.* **Existing Option Clauses:** If any option clause contained in an NFL Player Contract in existence at the time of the execution of this Agreement is exercised by the Club, it shall be at the rate of salary specified. The player will also receive 100% of performance bonus provisions where the bonus is earned in the option year.

38

**EX 6, PAGE 274**

## ARTICLE XVI
## COLLEGE DRAFT

**Section 1. Time of Draft:** Commencing with the 1993 Annual Selection Meeting (the "College Draft" or "Draft"), and with respect to the Draft to be held each League Year thereafter during the term of this Agreement, as well as the Draft to be held in the League Year commencing on or about February 20, 2000, and the subsequent implementation of each such Draft during the applicable League Year, the following rules shall apply:

**Section 2. Number of Choices:** With the exception of the 1993 Draft, the Draft shall consist of seven rounds, with each round consisting of the same number of selection choices as there will be Clubs in the NFL the following League Year, plus a maximum number of additional Compensatory Draft Selections equal to the number of Clubs then in the League, with such Compensatory Draft Selections reserved for Clubs losing certain Unrestricted Free Agents. For the 1993 League Year only, the Draft shall consist of eight rounds without any additional Compensatory Draft Selections, except any additional selections as provided in Article XX (Franchise and Transition Players), Section 13. To the extent that the Compensatory Draft Selections referred to in Article XX (Franchise and Transition Players), Section 13 are not all awarded for use in the 1993 League Year Draft, such remaining selections are reserved for the Drafts in subsequent League Years under this Agreement in addition to the maximum number of selections set forth in the first sentence of this Section 2. Each Draft to be held after the 1993 League Year shall be held on or about February 15 or May 1, on a date which shall be determined by the Commissioner.

39

**Section 3. Required Tender:** A Club that drafts a player shall be deemed to have automatically tendered the player a one year NFL Player Contract for the Minimum Active/Inactive List Salary then applicable to the player pursuant to the terms of this Agreement. The NFL or the Club shall provide the player with notice of such Required Tender before or immediately following the Draft.

### Section 4. Signing of Drafted Rookies:

(a)     A drafted player may accept the Required Tender at any time up to and including the Tuesday following the tenth week of the regular season immediately following the Draft, at 4:00 p.m. New York time. In the event the exclusive negotiating rights to the drafted player are assigned to another Club through the NFL waiver system, the acquiring Club must immediately extend the Required Tender following assignment. If released through waivers, the player shall be treated as an Undrafted Rookie Free Agent, with the right to sign an NFL Player Contract with any Club. If the Club that drafted the player signs the player after he is waived and becomes

a Rookie Free Agent, the player's entire salary shall be counted against the Entering Player Pool, in the manner described in Article XVII (Entering Player Pool).

(b)    If a Drafted Rookie has not signed a Player Contract during the period from the date of such Draft to the thirtieth day prior to the beginning of the regular season: (i) the Club that drafted the player may not thereafter trade to another Club either its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year; and (ii) the Club that drafted the player is the only Club with which the player may sign a Player Contract until the day of the Draft in the subsequent League Year, at which time such player is eligible to be drafted in the subsequent League Year's Draft by any Club except the Club that drafted him in the initial Draft. (After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s)).

(c)    If a Drafted Rookie has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

### Section 5. Other Professional Teams:

(a)    Notwithstanding Section 4(b) above, if a player is drafted by a Club and, during the period between the Draft and the next annual Draft, signs a contract with, plays for or is employed by a professional football team not in the NFL during all or any part of the 12-month period following the initial Draft, then the drafting Club (or any assignee Club) shall retain the exclusive NFL rights to negotiate for and sign a contract with the player until the day of the Draft three League Years after the initial Draft, and shall, thereafter have a Right of First Refusal as described herein, and the player may receive offers from any Club at any time thereafter. The player shall notify the NFLPA and the NFL of his desire to sign a contract with an NFL Club, and of the date on which the player will be free of his other contractual obligations of employment, if any. Within thirty days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL Club that drafted the player must tender a one year written Player Contract to the player in order to retain its rights to that player, as detailed below:

40

(b)     For a player to whom the drafting Club retains the exclusive NFL rights to negotiate pursuant to Section 4(a) above, the Club must tender a one year Player Contract with salary of at least the Minimum Active/Inactive List Salary for players with less than one credited season, as defined in Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 3, within the thirty day period specified in subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall be subject to the Entering Player Pool, as set forth in Article XVI (Entering Player Pool). If the player is released through waivers, the player immediately becomes a Free Agent, with the right to sign an NFL Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     For players with respect to whom the drafting Club retains a Right of First Refusal pursuant to this Section 5, during each League Year the player shall be treated as if he were a Restricted Free Agent not subject to Draft Choice Compensation, as described in Article XIX (Veteran Free Agency), Section 2, except as otherwise set forth in this Section 5. For such players subject to a Right of First Refusal, the Club must tender a one year Player Contract with at least the Minimum Active/Inactive List Salary for players with two or more Credited Seasons, as defined in Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 3, within the thirty day period specified in subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall not be subject to the Entering Player Pool. If the Club does not make or withdraws the Required Tender, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(d)     This Section 5 shall apply to any player drafted in the 1990 League Year or thereafter, except that tenders to and Player Contracts entered into with players drafted in the 1990, 1991 and 1992 League Years shall not be subject to the Entering Player Pool. Any player drafted prior to the 1990 League Year shall be governed by rules identical to the provisions set forth in Article XIII of the 1982 Collective Bargaining Agreement.

**Section 6. Return to College:** If any college football player who becomes eligible for the Draft prior to exhausting his college football eligibility through participation is drafted by an NFL Club, and returns to college, the drafting Club's exclusive right to negotiate and sign a Player Contract with such player shall continue through the date of the Draft that follows the last season in which the player was eligible to participate in college football, and

41

thereafter the player shall be treated and the Club shall have such exclusive rights as if he were drafted in such Draft by such Club (or assignee Club).

**Section 7. Assignment of Draft Rights**: In the event that the exclusive right to negotiate for a Drafted Rookie under Sections 4, 5 or 6 above is assigned from one Club to another Club, the Club to which such right has been assigned shall have the same, but no greater, right to such player, including the Right of First Refusal described in Section 5, as would the Club assigning such right, and such player shall have the same, but no greater, obligation to the NFL Club to which such right has been assigned as he had to the Club assigning such right.

**Section 8. Subsequent Draft**: A Club that, in a subsequent Draft, drafts a player who (a) was selected in an initial Draft, and (b) did not sign a contract with the NFL Club that drafted him or with any assignee Club during the signing period set forth in Sections 4 through 6 above, shall, during the period from the date of the subsequent Draft to the date of the Draft held the subsequent League Year, be the only NFL Club that may negotiate with or sign a Player Contract with such player. If such player has not signed a Player Contract within the period beginning on the date of the subsequent Draft and ending on the thirtieth day prior to the beginning of the regular season, the Club loses all rights to trade its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year. After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s), except as provided in Section 4(c) above. If the player has not signed a Player Contract by the day of the next annual College Draft following the subsequent Draft, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 9. No Subsequent Draft**: If a player is drafted by a Club in an initial Draft and (a) does not sign a contract with a Club during the signing period set forth in Sections 4 through 6 above, and (b) is not drafted by any Club in the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 10. Compensatory Draft Selections**: The rules and procedures regarding Compensatory Draft Selections set forth in Section 2 above shall be as agreed upon by the NFL and the NFLPA.

12

**Section 11. Undrafted Rookies:** Any person who has not been selected by a Club in a College Draft shall be free, after the completion of a College Draft for which he is eligible, to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such person after such date, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind.

**Section 12. Notice of Signing:** Promptly following but no later than two business days after receipt of notice of the signing of any Drafted or Undrafted Rookie, the NFL shall notify the NFLPA of such signing.

43

## ARTICLE XVII
## ENTERING PLAYER POOL

**Section 1. Definition:** For purposes of this Article XVII of this Agreement, the following terms shall have the meanings set forth below:

(a) "Entering Player Pool" means the League-wide limit on the total amount of Salary to which all of the NFL Clubs may contract for in signing Drafted Rookies (and certain amounts contracted to be paid to Undrafted Rookies as described below) during each League Year of this Agreement, as set forth below.

(b) Salary shall be defined and calculated in the same manner as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). In the event a Rookie who is subject to the Entering Player Pool signs a Player Contract after the commencement of the regular season, the Club must have Room under its Rookie Allocation for the entire Paragraph 5 amount of the contract.

**Section 2. Covered League Years:** The Entering Player Pool will be in effect in the 1993 League Year and in all subsequent League Years, except as set forth below. Beginning with the 1994 League Year, the NFL may remove the Entering Player Pool at its option in any Uncapped Year, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year. Further, in any Capped Year, the NFL may remove the Pool, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year, but to the extent that any Club spends more than its Rookie Allocation in that League Year, the Club will pay an equivalent number of dollars to its Veteran players pursuant to reasonable allocation instructions by the NFLPA.

**Section 3. Calculation:**

(a) For the 1993 League Year, the Entering Player Pool shall be $56 million, i.e., an average of $2 million per Club. For each applicable succeeding League Year of this Agreement, the Entering Player Pool shall consist on a League-wide basis of the greater of: (i) $2 million multiplied by the number of Clubs in the NFL at the time of the Draft; (ii) 3.5% of Projected DGR; or (iii) the aggregate amount, in actual dollars, of the Entering Player Pool in the previous League Year, provided, however, that to the extent there are greater than 28 compensatory picks as a result of Article XX (Franchise and Transition Players), Section 13, the Entering Player Pool shall be increased in accordance with subsection (c) below, and to the extent there are lower than 28 compensatory picks in any League Year, the amount of the Entering Player Pool shall be reduced in a manner agreed upon by the NFL and the NFLPA.

44

**EX 6, PAGE 280**

(b)     For each League Year of this Agreement, each Club shall have a Rookie Allocation, which shall be its proportional share of the Entering Player Pool, calculated based on the number, round, and position of the Club's selection choices in the Draft. The Rookie Allocation formula shall be agreed upon by the NFL and the NFLPA and shall remain in effect for the duration of the Agreement, unless the NFL and the NFLPA otherwise agree.

(c)     If, pursuant to Article XX (Franchise and Transition Players), Section 13, a Club has one or more Compensatory Draft Selections resulting from the loss of any players specified in such section, an amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding subsection (b) above), based upon the amount allotted to selection choices of that round and position in calculating the Rookie Allocation (the "Formula Allotment"). In the event that a Club signs a Player Contract with a Drafted Rookie who was drafted in a prior League Year, an additional amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding subsection (b) above), equal to the lower of the Club's original Formula Allotment for such draft choice or the amount of unused Room under the Club's Rookie Allocation during the League Year in which the player was originally drafted.

(d)     Notwithstanding the above, nothing shall prevent the Club from signing a player for an amount in excess of the player's Formula Allotment, if the Club has Room available under its Rookie Allocation.

(e)     In the event that the NFL holds a supplemental draft in addition to its annual Draft in advance of the next League Year's Draft, adjustments shall be made to the Entering Player Pool and Rookie Allocation in a manner to be agreed upon by the NFL and the NFLPA.

**Section 4. Operation**:

(a)     No Club may enter into Player Contracts with Drafted Rookies that, standing alone or in the aggregate, provide for Salaries in the first League Year of such Player Contracts that would exceed the Club's Rookie Allocation for that year.

(b)     For the purposes of this Article XVII, the Salary of any Undrafted Rookie shall count toward the Club's Rookie Allocation only to the extent that it exceeds the then-applicable Minimum Active/Inactive List Salary for that player.

(c)     In the event that a Draft selection is assigned to another Club prior to completion of the Draft, the amount of the Formula Allotment for such selection shall be assigned to the Club receiving the selection under

45

the assignment. A Club may not assign the exclusive negotiating rights to a Drafted Player to another Club if such New Club does not have Room under its Rookie Allocation equal to at least the original Formula Allotment for the player, unless the player consents to such assignment.

(d)   (i)     If a Drafted Player is placed on waivers, the player's Formula Allotment remains with the Club that requested waivers on him, and the assignee Club must have Room or make Room under its Rookie Allocation to make the Required Tender to the player

(ii)     If a Club requests waivers on a Drafted Rookie and that player is released via waivers, the requesting Club can sign that player to a Player Contract during that League Year only if the Club has Room under its Rookie Allocation equal to the full Salary contracted for in that League Year.

(e)     No Player Contract signed by a Rookie may provide for an annual increase in Salary of more than 25% of the contract's first League Year Salary. For the purposes of the calculation in this section only, any amount of a signing bonus attributed to the player's Salary shall not be counted.

(f)     The Player Contract of a Drafted Rookie or Undrafted Rookie may not be renegotiated for a one (1) year period following the date of the initial signing of such Player Contract, or until August 1 of the following League Year, whichever is later.

(g)     Nothing in this Agreement is intended to or shall be construed to mean that any Rookie's Salary is predetermined by any Allocation or Formula Allotment.

(h)     The list of each Formula Allotment attributed to each draft selection shall be agreed to by the NFL and the NFLPA, and shall not be disclosed to Clubs, Players, Player Agents or the public.

46

## ARTICLE XVIII
## VETERANS WITH LESS THAN THREE ACCRUED
## SEASONS

### Section 1. Accrued Seasons Calculation:

(a)    For the purposes of calculating Accrued Seasons under this Agreement, a player shall receive one Accrued Season for each season during which he was on, or should have been on, full pay status for a total of six or more regular season games, but which, irrespective of the player's pay status, shall not include games for which the player was on: (i) the Exempt Commissioner Permission List, (ii) the Reserve PUP List as a result of a non-football injury, or (iii) a Club's Practice or Development Squad.

(b)    For the purposes of calculating Accrued Seasons under this Agreement, for any League Year during the term of this Agreement beginning with the 1993 League Year, a player shall not receive an Accrued Season for any League Year in which the player is under contract to a Club and in which he failed to report to such Club at least thirty days prior to the first regular season game of that season, or in which the player thereafter failed to perform his contract services for the Club for a material period of time, unless he demonstrates to the Impartial Arbitrator extreme personal hardship causing such failure to report or perform, such as severe illness or    47
death in the family. The determination of the Impartial Arbitrator shall be made within thirty days of the application by the player and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

### Section 2. Negotiating Rights of Players With Less Than Three Accrued Seasons: Any Veteran with less than three Accrued Seasons whose contract has expired may negotiate or sign a Player Contract only with his Prior Club, if on or before March 1 his Prior Club tenders the player a one year Player Contract with a Paragraph 5 Salary of at least the Minimum Active/Inactive List Salary applicable to that player. If the Prior Club has not by that date made the Required Tender or later withdraws such tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

### Section 3. Minimum Salaries: For the 1993 League Year, the Minimum Active/Inactive List Salary shall be at least $100,000 for players with less than one Credited Season; $125,000 for players with one Credited Season; and $150,000 for players with two or more Credited Seasons. For the 1993

League Year, the Minimum Salary (excluding practice squad players) shall be at least $60,000 for players with less than one Credited Season, $70,000 for players with one Credited Season, and $80,000 for players with two or more Credited Seasons. Thereafter, such Minimum Salaries and Minimum Active/Inactive List Salaries shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per season, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries and Minimum Active/Inactive List Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year. For the purposes of this section only, the definition of "Credited Season" shall be the same as set forth in Section 1(a) above for Accrued Seasons, except that games on the Injured Reserve list shall not be included, and the number of regular season games required shall be three instead of six.

**Section 4. Notice of Signing:** Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

48

## ARTICLE XIX
## VETERAN FREE AGENCY

**Section 1. Unrestricted Free Agents:**

(a)     Subject to the provisions of Article XX (Franchise and Transition Players), any player with five or more Accrued Seasons, or with four or more Accrued Seasons in any Capped Year, shall at the expiration of his Player Contract, become an Unrestricted Free Agent. Such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, subject to the signing period set forth below.

(b)     **Signing Period.**

(i)     In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by July 15 or the first scheduled day of the first NFL training camp, whichever is later, in the League Year following the expiration of his last Player Contract, he may negotiate or sign a Player Contract from July 15 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, only with his Prior Club, provided that the Prior Club by June 1 has tendered to the player a one-year Player Contract of at least 110% of either (a) his Prior Year Salary (if his expiring Player Contract is not a Player Contract he entered into as a Rookie), or (b) his Paragraph 5 Salary (if his expiring Player Contract is a Player Contract he entered into as a Rookie, without renegotiation), in each case with all other terms of his contract identical to his prior year's contract. For the purposes of this subsection, "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the last year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Beginning with the 1994 League Year, Prior Year Salary shall also include any un-repaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(ii)     If an Unrestricted Free Agent described in subsection (b)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all

49

parties

(iii)    If an Unrestricted Free Agent does not play in the NFL for the remainder of a League Year pursuant to subsection (b)(iii) above, commencing the first day of the following League Year, the player shall be free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period

(c)    In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by June 1 of the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date tendered to the player a one year Player Contract in accordance with the requirements of subsection (b)(i) above, or has withdrawn the tender, the player shall continue to be an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period

50

(d)    An Unrestricted Free Agent shall not be subject to any limitations on the period of time before which he may qualify as an Unrestricted Free Agent again, or to any limitations on the number of times he may be an Unrestricted Free Agent.

(e)    Promptly upon but no later than two business days after the signing of any Unrestricted Free Agent to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing

**Section 2. Restricted Free Agents:**

(a)    Any Veteran player with three or more Accrued Seasons, but less than five Accrued Seasons (or less than four Accrued Seasons in any Capped Year), shall, at the expiration of his last Player Contract during such period, become a Restricted Free Agent. Any such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, subject to the restrictions set forth in this Article

(b)    In order to receive the following specified Rights of First Refusal and/or Draft Choice Compensation with respect to a Restricted Free Agent, the Prior Club of a Restricted Free Agent must tender the player a Qualifying Offer on or before the first date of the Restricted Free Agent Signing Period, as follows:

(i)    For Restricted Free Agents with three Accrued Seasons:

(1)    Right of First Refusal: one year Player Contract with Paragraph 5 Salary of at least $275,000;

(2)    Right of First Refusal and Draft Selection at Player's Original Draft Round: one year Player Contract with a Paragraph 5 Salary of at least (a) $275,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

(3)    Right of First Refusal and One First Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $600,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

(4)    Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $800,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

(ii)    For Restricted Free Agents with four Accrued Seasons (in Uncapped Years):

(1)    Right of First Refusal: one year Player Contract with Paragraph 5 Salary of at least $325,000;

(2)    Right of First Refusal and Draft Selection at Player's Original Draft Round: one year Player Contract with a Paragraph 5 Salary of at least (a) $325,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

(3)    Right of First Refusal and One First Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $700,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged; and

(4)    Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection: one year Player Contract with Paragraph 5 Salary of at least (a) $900,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged.

(c)    Notwithstanding subsections 2(b)(i) and 2(b)(ii) above, in the event that a Prior Club tenders any of its Restricted Free Agents originally selected in a draft round lower than the first round a Qualifying Offer that

requires Draft Choice Compensation of one first round selection (the "Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one second round selection for any of its Restricted Free Agents originally selected in the first round of the Draft, unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the Upgraded Tender.

(d)   Notwithstanding subsections 2(h)(i) and 2(h)(ii) above, in the event that the player was originally selected in a draft round after the seventh round (or, for the 1993 League Year only, after the eighth round), a Qualifying Offer in the amount required to obtain a Right of First Refusal and Draft Choice Compensation at the Player's Original Draft Round shall entitle a Club only to a Right of First Refusal for such player.

(e)   The amounts of the Qualifying Offers specified in this section ($275,000, $325,000, $600,000, $700,000, $800,000 and $900,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall Qualifying Offer amounts increase if the projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

52

(f)   A Restricted Free Agent shall have the option of accepting a one year NFL Player Contract for 110% of his Prior Year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) in lieu of a Player Contract for the applicable alternative amount specified in this section, if he so wishes, regardless of which Player Contract is for a greater amount.

(g)   In the event a Prior Club withdraws its Qualifying Offer, the Restricted Free Agent shall immediately become an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without being subject to First Refusal, Draft Choice Compensation, Signing Period, or any other limitation of any kind.

(h)   **Signing Period.** Notwithstanding anything else in this Agreement, in the 1993 League Year, Restricted Free Agents shall be free to negotiate and sign a Player Contract with any Club during the period commencing on March 1, 1993, and ending at 11:59 p.m. New York time on April 23, 1993 (the "Signing Period"). In future League Years, the dates of

such Signing Period shall be agreed upon by the NFL and the NFLPA by the previous September 1, but in no event may such Signing Period end subsequent to the annual College Draft (if the Draft is held on or about May 1) or no less than a period of sixty days.

(i)   (i)   In the event that a Restricted Free Agent has not signed a Player Contract with a Club within the Signing Period in the League Year following the expiration of his last Player Contract, and if the Prior Club by June 1 tenders to the Restricted Free Agent a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) or extends the player's Qualifying Offer, whichever is greater (the "June 1 Tender"), the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from June 1 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time. If the player's Qualifying Offer is greater than 110% of the player's Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged), the Club may withdraw the Qualifying Offer on June 15 and retain its rights under the preceding sentence, so long as the Club immediately tenders the player a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) (the "June 15 Tender").

(ii)   If a Restricted Free Agent described in subsection (i)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall not play football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(iii)   If a Restricted Free Agent does not play in the NFL in a League Year, his Prior Team shall have the right to tender such player any Qualifying Offer consistent with Section 2(b) prior to the next League Year's Restricted Free Agent Signing Period. In the event such a Qualifying Offer is rendered, the Prior Team shall have the applicable rights regarding such player according to such tender, and such player shall have the same rights regarding negotiations with other Clubs as he had the previous League Year.

(j)   In the event that a Restricted Free Agent has not signed a Player Contract with a Club by June 1 in the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date made the applicable June 1 Tender to such player, or withdraws the tender, or in the event the Club has withdrawn the applicable June 15 Tender, the player shall be completely free to negotiate and sign a Player Contract with any

53

Club, and any Club may negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(k) Promptly upon but no later than two business days after the signing of any Restricted Free Agent to a Player Contract, or the extending to any Restricted Free Agent of a Qualifying Offer, the signing or extending Club shall notify the NFL, which shall notify the NFLPA of such signing or offer.

## Section 3. Offer Sheet and First Refusal Procedures:

(a) Offer Sheets. When a Restricted Free Agent receives an offer to sign a Player Contract from any Club (the "New Club") other than the Prior Club, which offer the player desires to accept, he shall give to the Prior Club a completed certificate substantially in the form of Appendix D, attached hereto (the "Offer Sheet"), signed by the Restricted Free Agent and the New Club, which shall contain the "Principal Terms" (as defined below) of the New Club's offer. The Prior Club, within seven days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth below

54

(b) First Refusal Exercise Notice. If the Prior Club gives the Restricted Free Agent a "First Refusal Exercise Notice" substantially in the form of Appendix E, attached hereto, within seven days from the date the Prior Club receives an Offer Sheet, but not later than four days before the Draft (or until 11:59 p.m., New York time on April 24, 1993 in the 1993 League Year), such Restricted Free Agent and the Prior Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms (subject to subsection (e) below); (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the player than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the Prior Club. The player and the New Club may not renegotiate such Player Contract to reduce the Salary in such contract until the date after the trading deadline in that League Year.

(c) No First Refusal Exercise Notice. If the Prior Club does not give the Restricted Free Agent the First Refusal Exercise Notice within the applicable period, the player and the New Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms; (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the Restricted Free Agent than those

contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the New Club (subject to Section 5 below), **and** the Restricted Free Agent's Prior Club shall receive from the New Club the Draft Choice Compensation, if any, specified in Section 2 above of this Article. Any Club that does not have available, in the upcoming Draft, the selection choice or choices (its own or better choices in the applicable rounds) needed to provide Draft Choice Compensation in the event of a timely First Refusal Exercise Notice may not sign an Offer Sheet in such circumstances.

(d)    **One Offer Sheet.** There may be only one Offer Sheet signed by a Restricted Free Agent outstanding at any one time, provided that the Offer Sheet has also been signed by a Club. An Offer Sheet, before or after it is given to the Prior Club, may be revoked or withdrawn only by the Clubs upon the written consent of the Restricted Free Agent. In either of such events, the Restricted Free Agent shall again be free to negotiate and sign a Player Contract with any Club, and any Club shall again be free to negotiate and sign a Player Contract with such Restricted Free Agent, subject to the Prior Club's continued Right of First Refusal and/or Draft Choice Compensation as described in this section.

(e)    **Principal Terms.** For the purposes of this section, the Principal Terms of an Offer Sheet are only:

(i)    Salary, which shall consist only of: (a) the fixed and specified dollar amounts the New Club will pay, guarantee or lend to the Restricted Free Agent and/or his designees (currently and/or as deferred compensation in specified installments on specified dates) in consideration for his services as a football player under the Player Contract (i.e., signing bonus, Paragraph 5 Salary, and reporting and roster bonuses); and (b) Salary that is variable and/or is subject to calculation only upon the following bases: (i) based upon performance of the Club extending the Offer Sheet (only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to subsection (e) above, must be matched by the Prior Club for the purpose of exercising a Right of First Refusal, and such incentives may not exceed fifteen percent (15%) of the Salary in the Offer Sheet); and (ii) generally recognized League honors to be agreed upon by the parties; and

(ii)    any modifications of and additions to the terms contained in the NFL Player Contract requested by the Restricted Free Agent and acceptable to the New Club, that relate to non-compensation terms (including guarantees, no-cut, and no-trade provisions) of the Restricted Free Agent's employment as a football player (which shall be evidenced either by a copy of the NFL Player Contract, marked to show changes, or by a brief written summary contained in or attached to the Offer Sheet).

(f)    **No Property or Investments.** A Club may not offer any item of

55

property or investments other than Salary as part of the Principal Terms contained in an Offer Sheet.

(g)     **Incentives.** For those incentives which are based on Club performance, only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to sub-section (e) above, must be matched by the Old Club for the purpose of exercising a Right of First Refusal.

(h)     **No Consideration Between Clubs.** There may be no consideration of any kind given by one Club to another Club in exchange for a Club's decision to exercise or not to exercise its Right of First Refusal, or in exchange for a Club's decision to submit or not to submit an Offer Sheet to a Restricted Free Agent or to make or not to make an offer to enter into a Player Contract with a Restricted Free Agent. If a Club exercises its Right of First Refusal and matches an Offer Sheet, that Club may not trade that player to the Club that submitted the Offer Sheet for at least one calendar year, unless the player consents to such trade.

56          (i)     **NFL Only.** No Right of First Refusal rule, practice, policy, regulation, or agreement, including any Right of First Refusal applicable to any Restricted Free Agent or Transition Player pursuant to Article XX (Franchise and Transition Players) below, may apply to the signing of a Player Contract with, or the playing with, any club in any professional football league other than the NFL by any Restricted Free Agent (except as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below).

(j)     **No Assignment.** No Right of First Refusal may be assigned to any other Club (except as provided in Article XVI (College Draft), Section 7 or as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below), including any Right of First Refusal with respect to Restricted Free Agents, Transition Players, or Drafted Rookies described in Article XVI (College Draft), Section 5.

(k)     **Copies.** Promptly upon but no later than two business days after the giving of an Offer Sheet to the Prior Club, the Restricted Free Agent shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. Promptly upon but no later than two business days after the giving of a First Refusal Exercise Notice to the Restricted Free Agent, the Prior Club shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. At any time after the giving of an Offer Sheet to a Prior Club, the NFL may require the New Club to cause a copy thereof to be given to

the NFL and the NFLPA by telecopy.

**Section 4. Expedited Arbitration**: An expedited arbitration before the Impartial Arbitrator, whose decision shall be final and binding upon all parties, shall be the exclusive method for resolving the disputes set forth in this Section. If a dispute arises between the player and either the Prior Club or the New Club, as the case may be, relating to their respective obligations to formalize their binding agreements created under Sections 3(b) or (c) above, or as to whether the binding agreement is between the Restricted Free Agent and the New Club or the Restricted Free Agent and the Prior Club, such dispute shall immediately be submitted to the Impartial Arbitrator, who shall resolve such dispute within ten days but in no event later than two (2) days before the Draft. The Impartial Arbitrator shall not have the power to terminate any such binding agreement, he shall have the power only to direct the parties to formalize such binding agreement into a Player Contract in accordance with the Principal terms of the applicable Offer Sheet, as interpreted by the Impartial Arbitrator

**Section 5. Individually Negotiated Limitations on Player Movement**:

(a)    All individually negotiated limitations on player movement are prohibited, except as specifically provided as follows:

(i)    If a Restricted Free Agent has been tendered a Qualifying Offer of (a) Paragraph 5 Salary of at least $275,000 for a player with three Accrued Seasons, or (b) at least $325,000 for a player with four Accrued Seasons, or (c) at least 110% of his prior year's Paragraph 5 Salary, whichever is greater (in each case with all other terms of his prior year contract carried forward), **and** the Qualifying Offer is fully guaranteed for skill and injury, the Restricted Free Agent and its Prior Club may negotiate and contract for an individual Right of First Refusal with respect to the services of such player.

57

(ii)    Any Unrestricted Free Agent shall be permitted to negotiate and contract for an individual Right of First Refusal with any Club with respect to the services of such player so long as the player is not a Franchise Player or Transition Player at the time of such negotiation and contract.

(b)    Any player (other than a Free Agent) with less than three Accrued Seasons is prohibited from negotiating any individual limitations on his movement in his Player Contract or otherwise, and all Clubs are prohibited from negotiating any such limitations with such players.

(c)    Any individual Right of First Refusal that is negotiated and contracted for pursuant to subsection (a) or (b) above shall be void and unenforceable unless it is specified in a separate document signed by such player in the form annexed hereto as Appendix F, acknowledging such player's waiver of the express right that Unrestricted Free Agents have under this Agreement to be free of any Right of First Refusal restriction on their free

dom of movement.

(d)     Any individually negotiated Rights of First Refusal in any Player Contract existing at the time of the execution of this Agreement shall remain in effect only if written to supersede any litigation settlement agreement, or any collective bargaining agreement ("CBA"). Existing individually negotiated Rights of First Refusal that provide that a CBA will govern shall be deemed to be superseded by this Agreement to the extent of any conflict.

(e)     The amounts specified in this section ($275,000 and $325,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such tender amounts increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

58      (f)     Rights of First Refusal negotiated pursuant to this Section 5 may be traded or assigned as part of a player's contract.

**Section 6. Notices, Etc.:**

(a)     Any Offer Sheet, First Refusal Exercise Notice, or other writing required or permitted to be given under this Article XIX (Veteran Free Agency) shall be sent either by personal delivery or by overnight mail, or by telecopy (in each case a confirmation copy shall also be sent by certified or registered mail), addressed as follows:

(i)     To any NFL Club: addressed to that Club at the principal address of such Club as then listed on the records of the NFL, or at the Club's principal office, to the attention of the Club's president or general manager;

(ii)     To the NFL, 410 Park Avenue, New York, New York 10022, to the attention of Executive Vice President-Labor Relations;

(iii)     To a Restricted Free Agent: to his address listed on the Offer Sheet and, if the Restricted Free Agent designates a representative on the Offer Sheet and lists such representative's address thereon, a copy shall be sent to such representative at such address, and

(iv)     To the NFLPA, 2021 L Street, N.W., Suite 600, Washington, D.C. 20036.

(b)     An Offer Sheet shall be deemed given only when received by the Prior Club. A First Refusal Exercise Notice, a Qualifying Offer and any other writing required or permitted under Article XIX (Veteran Free Agency)

shall be deemed given when sent by the Prior Club.

(c)     Subject to Article XXVIII (Anti-Collusion), Section 1, below, the NFL shall have the right to prepare and circulate to all Clubs two lists containing, respectively, no more than the name, address, Social Security number, telephone number, college, position, Team, Right of First Refusal and/or any Draft Choice Compensation of each and every player who shall or has become (i) an Unrestricted Free Agent; or (ii) a Restricted Free Agent, as of March 1, or as of the first date of the Signing Period, respectively ("Free Agent Lists"), and no other list relating to free agents. Information shall not be selectively withheld for some players but not others. If one or more Free Agent Lists are so circulated, copies thereof shall be sent to the NFLPA.

59

## ARTICLE XX
## FRANCHISE AND TRANSITION PLAYERS

**Section 1. Franchise Player Designations**: Except as set forth in Sections 3 and 9 below, each Club shall be permitted to designate one of its players who would otherwise be an Unrestricted Free Agent as a Franchise Player each season during the term of this Agreement. Any Club that designates a Franchise Player shall be the only Club with which such Franchise Player may negotiate or sign a Player Contract, during the period the player is so designated, notwithstanding the number of his Accrued Seasons (except as provided in Sections 2(b) and 2(c) below). In the 1993 League Year, any such designation must be made no later than February 25. Thereafter, any such designation must be made between February 1 and February 15 of each League Year or during such other period as may be agreed on by the NFL and the NFLPA.

**Section 2. Required Tender for Franchise Players:**

(a)     For the 1993 League Year, any Club that designates a Franchise Player shall be deemed on the first day following the expiration of his contract to have automatically tendered the player a one year NFL Player Contract for the average of the five largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater.

(b)     For the 1993 League Year, any Club that designated a Franchise Player who has not signed a Player Contract by 4:00 p.m. New York time on June 14, and which has not withdrawn its required tender, shall exercise on that date one of the following options with respect to the player:

(i)     the Club shall (1) tender the player a one year NFL Player Contract for the average of the five largest Salaries in Player Contracts signed for the 1993 League Year as of May 6, 1993 for players at the position at which he played the most games during the prior League Year, or (2) continue the amount of the required tender pursuant to subsection (a) above, whichever is greater; or

(ii)     the Club shall continue its tender to the player pursuant to subsection (a) above at no less than its original level, but then, until 4:00 p.m. New York time on July 15, 1993, the player shall be permitted to negotiate a Player Contract with any Club as if he were a player subject to Section 9 below, except that Draft Choice Compensation of two (2) first round draft selections shall be made with respect to such player in the event he signs with the New Club, and the Signing Period for such player shall be determined under Section 17 below.

(c)     After the 1993 League Year, any Club that designates a Franchise Player shall on the date the designation is made notify the player and the

60

NFLPA which one of the following two potential required tenders the Club
has selected:

(i)    a one year NFL Player Contract for the average of the five largest
Prior Year Salaries for players at the position at which the Franchise Player
played the most games during the prior League Year; or 120% of his Prior
Year Salary, whichever is greater: if the Club extends the tender pursuant to
this Subsection (c)(i), the player shall be permitted to negotiate a Player
Contract with any Club as if he were a player subject to Section 5 below,
except that Draft Choice Compensation of two first round draft selections
shall be made with respect to such player in the event he signs with the
New Club, and the Signing Period for such player shall be determined un-
der Section 17 below; or

(ii)    a one year NFL Player Contract for (1) the average of the five
largest Salaries in Player Contracts for that League Year as of the end of the
Restricted Free Agent Signing Period that League Year, as set forth in Article
XIX (Veteran Free Agency), Section 2(h), for players at the position at which
he played the most games during the prior League Year, or (2) the amount
of the required tender under subsection (c)(i) above, whichever is greater

(d)    Any of the required tenders set forth in this Section 7 may be
withdrawn at any time, but if such tender is withdrawn, the player imme-
diately becomes an Unrestricted Free Agent and thereafter is completely      61
free to negotiate and sign a Player Contract with any Club, and any Club
shall be completely free to negotiate and sign a Player Contract with any
such player, without any penalty or restriction, including, but not limited
to, Draft Choice Compensation between Clubs or First Refusal Rights of
any kind, or any signing period.

(e)    For the purpose of this Article, "Salary" means the total of the
Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing
bonus, and other payments to players in compensation for the playing of
professional football for the applicable year of the player's most recently ne-
gotiated Player Contract, except for performance bonuses other than roster
and reporting bonuses. Beginning with the 1994 League Year, Salary shall
also include any un-repaid loans made, guaranteed or collateralized by a
Team or its Team Affiliate to a player or Player Affiliate during or after the
1993 League Year.

(f)    The calculation of any five largest Salaries pursuant to this Arti-
cle shall not include: (i) any Player Contract resulting from an acceptance
of a tender extended pursuant to subsection (b)(i)(1) or (c)(i) above, with-
out any increase in Salary above the tender, or (ii) any Player Contract
amount resulting from a renegotiation of an existing Player Contract be-
tween the time of the designation and any applicable later date; provided,
however, that Player Contract amounts in existence prior to such renegoti-

auons shall be used if otherwise appropriate

### Section 3. Transition Player Designations:

(a) Each Club shall be permitted to designate two Unrestricted Free Agents as Transition Players by February 25, 1993; one Unrestricted Free Agent as a Transition Player between February 1 and February 15, 1994, and one Unrestricted Free Agent as a Transition Player between February 1 and February 15, 1999. In addition, in each League Year during the term of this Agreement, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player in lieu of designating a Franchise Player, if such Franchise Player designation is available to such Club, in addition to the Transition Player designations permitted by the immediately preceding sentence.

(b) Any Club that designates a Transition Player shall receive the Rights of First Refusal specified in this Article notwithstanding the number of his Accrued Seasons. Any Transition Player shall be completely free to negotiate and sign a Player Contract with any Club during the period from the first day of the League Year following the expiration of his last Player Contract to July 15, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs of any kind, subject only to the Prior Club's Right of First Refusal described in this Article.

### Section 4. Required Tender for Transition Players:

(a) Any Club that designates a Transition Player shall be deemed on the last day of the League Year following the expiration of the player's last contract to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(b) For the 1993 League Year, any Club that designated a Transition Player who has not signed a Player Contract by 1.00 p.m. New York time on June 14, and which has not withdrawn its required tender, shall tender such player a one year NFL Player Contract for (i) the average of the ten largest Salaries in Player Contracts signed for the 1993 League Year as of

62

May 6, 1993 for players at the position at which he played the most games
during the prior League Year, or (ii) the amount of the required tender pur-
suant to subsection (a) above, whichever is greater. This tender may be
withdrawn at any time, but if such tender is withdrawn, the player immed-
iately becomes an Unrestricted Free Agent and thereafter is completely
free to negotiate and sign a Player Contract with any Club, and any Club
shall be completely free to negotiate and sign a Player Contract with any
such player, without any penalty or restriction, including, but not limited
to, Draft Choice Compensation between Clubs or First Refusal Rights of
any kind, or any signing period.

(c)  The calculation of any ten largest Salaries pursuant to this Arti-
cle shall not include: (i) any Player Contract amount resulting from an ac-
ceptance of a tender pursuant to subsection (b)(i) above, without any in-
crease in Salary above the tender; or (ii) any Player Contract amount re-
sulting from a renegotiation of an existing Player Contract between the time
of the designation and any applicable later date; provided, however, that
Player Contract amounts in existence prior to such renegotiations shall be
used if otherwise appropriate.

**Section 5. Right of First Refusal for Transition Players:** Any player desig-
nated as a Transition Player shall, at the expiration of his prior year Player          63
Contract, be permitted to negotiate a Player Contract with any Club. When
the Transition Player negotiates such an offer with a New Club, which the
player desires to accept, he shall give to the Prior Club a completed Offer
Sheet, signed by the player and the New Club, which shall contain the Prin-
cipal Terms (as defined in Article XIX (Veteran Free Agency)) of the New
Club's offer. The Prior Club, within seven days from the date it receives the
Offer Sheet, may exercise or not exercise its Right of First Refusal, which
shall have the legal consequences set forth in Sections 3(b) (b), 4 and 6 of
Article XIX (Veteran Free Agency) above, except that no Draft Choice Com-
pensation shall be made with respect to such player, and, for the purposes
of those provisions, the player and each Club shall otherwise have the same
rights and obligations as for a Restricted Free Agent set forth in those pro-
visions, notwithstanding the number of his Accrued Seasons.

**Section 6. Lists:** On each date following the dates set forth in Sections 1
and 3 above, the NFL shall provide to the NFLPA a list of each Unrestrict-
ed Free Agent designated as a Franchise Player or a Transition Player.

**Section 7. Salary Information:**
(a)  No later than February 1 of each League Year during the term of
this Agreement, the NFL shall compile and disclose to the NFLPA a list of
each of the ten largest Prior Year Salaries for players at the following posi-
tions which shall be utilized for calculating the average Prior Year Salaries of

players at the positions of Franchise Players and Transition Players: Quarterback, Running Back, Wide Receiver, Tight End, Offensive Line, Defensive End, Interior Defensive Line, Linebacker, Cornerback, Safety, and Kicker/Punter. For the 1993 League Year, such list shall be provided to the NFLPA by February 15.

(b)     No later than ten days after the last day of the Restricted Free Agent Signing Period in each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten and five largest Salaries for players at the positions set forth in subparagraph (a) above which shall be utilized for calculating the applicable average Salaries of players at such positions as of the last day of the Restricted Free Agent Signing Period (including the amount of Salary in any executed Offer Sheets). For the 1993 League Year, such supplemental list shall be provided to the NFLPA no later than May 18, 1993 with respect to such Salaries as of May 6, 1993.

(c)     Any dispute concerning the identity and Salaries of players included within each player position category, or any other matter regarding these figures, shall be submitted to and resolved by the Impartial Arbitrator during the period from February 1 to February 15, or within twenty-five days after the last day of the Restricted Free Agent Signing Period respectively; for the 1993 League Year, any such dispute shall be submitted to and resolved by the Impartial Arbitrator prior to March 1 or May 31, respectively. The Impartial Arbitrator shall make an independent determination in writing, in arriving at his determination, the Impartial Arbitrator shall consider any relevant information furnished to him and shall be provided access to all relevant Player Contracts. The Impartial Arbitrator's determination shall be final and binding upon all parties.

**Section 8. No Assignment:** No Club may assign or otherwise transfer to any other Club the exclusive negotiating rights or any Right of First Refusal it may have for any Franchise Player, nor any Right of First Refusal it may have for any Transition Player, nor any designation rights it may have.

**Section 9. Duration of Designation:** Each Club that signs a player it designated as a Franchise Player to a Player Contract shall be deemed each League Year thereafter to have utilized its Franchise Player designation for each League Year for which such player entered into a Player Contract with such Club at the time when such player was subject to such designation (unless the Club exercised a Right of First Refusal with respect to a Franchise Player rendered a Player Contract pursuant to Sections 20(b)(i) or 2(c)(i) above, in which case the Club shall be deemed to have utilized its Franchise Player designation only in the League Year of the designation). For example, without limitation on any other applicable example, a Fran-

64

chise Player who signs a Player Contract for two League Years at a time when the player was subject to the designation shall be deemed to be the Club's Franchise Player for both such League Years. However, in the event that the designated player retires or suffers a career-ending injury (or an injury that prevents or will prevent the player from playing in 32 consecutive regular season games) which prevents him from playing a contract year entered into while under such designation (or is unavailable for the season due to non-injury circumstances beyond the control of the Club), such Club shall be permitted to designate another player in lieu of such injured, retired or unavailable player for each remaining League Year covered by the Club's prior designation for such player, provided that the Club designates a new Franchise Player during the designation period prior to the first League Year to be covered by the re-designation. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 10. Franchise Player Designation Period**: A Club may designate a Franchise Player only during the periods and in the numbers specified in Section 1 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Franchise Player with respect to any first future League Year during the term of this Agreement for which such player is anticipated to be an Unrestricted Free Agent. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the five largest Prior Year Salaries for players at the position category at which he played the most games during the prior League Year, or 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become the Franchise Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Club shall be entitled to designate a new Franchise Player for that League Year. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 11. Transition Player Designation Period**: A Club may designate a Transition Player (or players) only during the periods and in the numbers specified in Section 3 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Transition Player with respect to any first future League Year during the term of this Agreement for which such player becomes an Unrestricted Free Agent; any such future designation exhausts the Club's desig-

65

**EX 6, PAGE 301**

nation right (and does not move to any other Club) even if the player moves to another Club as a Restricted Free Agent or via waivers, before he would have become an Unrestricted Free Agent with the designated Club. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the ten largest Prior Year Salaries for players at the position that he played the most games during the prior League Year, or 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become a Transition Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Prior Club shall be entitled to designate a new Transition Player for that League Year. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 12. Prospective Designation**: Notwithstanding Sections 10 and 11 above, if in the 1993 League Year (or in the 1994 League Year, if no Salary Cap is in effect during the 1994 League Year), a Club designates a Franchise Player or Transition Player to apply to the first League Year a designated player is expected to be eligible to be an Unrestricted Free Agent under Article XIX (Veteran Free Agency), but that player turns out not to be an Unrestricted Free Agent because of the failure of the Salary Cap to be in effect that League Year, such designation shall apply to such player the next League Year in which the player becomes an Unrestricted Free Agent.

**Section 13. Right to Decline**: Each plaintiff who was a named plaintiff prior to February 26, 1993, in the following actions shall be permitted to decline any designation as a Franchise Player or Transition Player during the term of this Agreement, for any reason whatsoever, by notice to his prior Club within ten days of such designation for current year designations and within ten days of February 15 (or such other date as may be agreed upon by the NFL and the NFLPA) in the future League Year such designation becomes effective for future year designations: White v. NFL, Civ. No. 4-92-906 (D. Minn.); Lewis v. NFL, Civ. No. 3-93-87 (D. Minn.); McNeil v. NFL, Civ. No. 4-90-476 (D. Minn.); Allen v. Chargers Football Co., Civ. No. 91-4322 (C.D. Cal.); Joyner v. NFL, Civ. No. 92-2876 (E.D. Pa.); and Heibert v. NFL, Civ. No. 50735-6 (Sup. Ct. Cal.). In the event that a Club designates any such player as a Franchise Player or Transition Player, and such player declines such designation and signs with another Club, such designating Club shall be awarded Compensatory Draft Selection(s) in lieu of such designation. In the case of a Franchise Player, only one year's desig-

66

nation shall be exhausted in the latter situation. Such additional Compensatory Draft Selections shall not exceed a total of twenty during the term of this Agreement.

**Section 14. Other Terms:** For the purposes of this Article, the Required Tenders of a one year Player Contract for at least 120% of the Franchise Player's or Transition Player's Prior Year Salaries shall in addition to the 120% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (or ten, as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

**Section 15. Compensatory Draft Selection:** The procedures for awarding Compensatory Draft Selections shall be determined as agreed by the NFL and the NFLPA.

**Section 16. Signing Period for Transition Players:**

(a)    In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 15 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time.

(b)    If a Transition Player described in subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c)    If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Salaries for the prior League Year for players at the player's specified position, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such

67

tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 17. Signing Period for Franchise Players:**

(a)  If a Franchise Player has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(b)  If a Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable tender must be made and any 120% tender shall be measured from the Player's prior year salary. If a Franchise Player is not designated as a Franchise Player or Transition Player the second League Year, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

68

## ARTICLE XXI
## FINAL EIGHT PLAN

**Section 1. Application:** The provisions of this Article shall apply only in any League Year during the term of this Agreement in which no Salary Cap is in effect.

**Section 2. Top Four Teams:** Each of the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; and (c) any Unrestricted Free Agent signed pursuant to Section 4 below.

**Section 3. Next Four Teams:** Each of the four playoff Clubs that lost in the immediately preceding playoff games to the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; (c) any Unrestricted Free Agent signed pursuant to Section 4 below; and (d) any Unrestricted Free Agent as follows:

    (i)    one such player for a Player Contract that has a first year Salary of $1,500,000 or more; and

    (ii)    any number of such players for a Player Contract that has a first year Salary of no more than $1,000,000 and an annual increase in any future contract years of no more than 30% of the first contract year Salary, not including any amount attributed to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 4. Replacement of Free Agents Signed by Other Club:** Each of the eight Clubs subject to the provisions of this Article shall be permitted to negotiate and sign one Unrestricted Free Agent to a Player Contract ("New Player") for each Unrestricted Free Agent who was under contract to such Club on the last date of the prior League Year, who has signed with another Club ("Previous Player"), so long as the Player Contract for the New Player shall have a first year Salary of no more than the first year Salary of the Player Contract signed by the Previous Player with the New Club,

69

and an annual increase in any future contract years of no more than 30% of the first contract year Salary, excluding any amounts attributable to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this section may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 5. Increases:** The amounts specified in this Article ($1,500,000 and $1,000,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)). Notwithstanding the foregoing, in no event shall the amounts specified in this Article increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

**Section 6. Salary Definition:** For purposes of this Article, "Salary" means Paragraph 5 Salary, roster and reporting bonuses, prorata portions of signing bonuses, likely to be earned incentive bonuses, and other payments in compensation for the playing of professional football, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) below.

70

**Section 7. Trade Limitation:** No Club subject to the provisions of this Article may, for one League Year, trade for a player it otherwise would not be permitted to sign as an Unrestricted Free Agent as a result of the provisions in this Article.

## ARTICLE XXII
## WAIVER SYSTEM

**Section 1. Release:**

(a) Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading dead line, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no trade clause in his Player Contract. If such player does not have a no trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.    71

(b) Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

**Section 2. Contact:** Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

**Section 3. Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or post-season game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and By-laws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

**Section 4. Notice of Termination:** The Notice of Termination form attached hereto as Appendix G will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice of Termination will

**EX 6, PAGE 307**

be sent to him by certified mail at his last address on file with the Club.

*Section 5.* **NFLPA's Right to Personnel Information:** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice between the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

*Section 6.* **Rosters:** The NFLMC shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non-Football Illness/Injury; Practice Squad.

72

## ARTICLE XXIII
## TERMINATION PAY

**Section 1. Eligibility**: Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for termination pay under this Article if:

    (1)    he is released after his Club's first regular season game, and

    (2)    he has made the Inactive or Active List of his Club on or after the date of his Club's first regular season game.

The amount of termination pay payable to such player if he is released prior to the eighth regular season game shall be the unpaid balance of the initial 50% of his Paragraph 5 Salary, but not less than an amount equal to one week's salary, up to a maximum of $20,000. If he is released after such point but before 4:00 p.m. New York time on the Tuesday prior to the final regular season game, the amount shall be one week's salary, up to a maximum of $20,000. Termination pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to termination pay more than once during his playing career in the NFL.

**Section 2. Regular Season Signings**: The termination pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the unpaid balance of the initial 25% of such player's Paragraph 5 Salary. If such player is released after the eighth regular season game, his termination pay shall be one week's salary, up to a maximum of $20,000.

73

**EX 6, PAGE 309**

## ARTICLE XXIV
## GUARANTEED LEAGUE-WIDE SALARY,
## SALARY CAP & MINIMUM TEAM SALARY

**Section 1. Definitions:** For purposes of this Article, and anywhere else specifically stated in this Agreement, the following terms shall have the meanings set forth below:

(a) **Defined Gross Revenues.**

(i) "Defined Gross Revenues" (also referred to as "DGR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall, in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Defined Gross Revenues for each playing season during the term of this Agreement. Defined Gross Revenues shall include, without limitation:

(1) regular season, pre-season, and post season gate receipts (net of admission taxes, and surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing), including ticket revenue from "luxury boxes," suites and premium seating subject to gate receipt sharing among NFL Teams; and

(2) proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL pre-season, regular season and play-off games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts (which shall not include any broadcast of an NFL pre-season, regular season or play off game occurring more than 72 hours after the live exhibition of the game, unless the broadcast is the first broadcast in the market), and all other means of distribution, net of any reasonable and customary NFL expenses related to the project; and

(3) proceeds from the sale or conveyance of any right to receive any of the revenues described above

(ii) The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Teams which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "DGR"): proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, dues or capital contributions received by the NFL, fines, "revenue sharing" among NFL teams, interest income, insurance recoveries, and sales of interests in real estate and other property.

(iii) Notwithstanding subsection 1(a)(i) above, the following shall be

74

considered "Excluded DGR" and not included in Defined Gross Revenues: revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that included in subsection 1(a)(i)(1) above, sales of programs and novelties, and any categories of revenue (other than those listed in subsections 1(a)(i)(1)-(3) above) currently included under NFL Films and NFL Properties, Inc. and its subsidiaries.

(iv)    In calculating Defined Gross Revenues, the amount of Excluded DGR divided by the sum of Excluded DGR plus DGR from all sources except network television revenues shall not exceed the percentage resulting from dividing 1992 Excluded DGR by the sum of 1992 Excluded DGR plus 1992 DGR from all sources except network television revenues. In the event Excluded DGR for any season exceeds the percentage resulting from the above calculation, any excess Excluded DGR shall be included in DGR. For purposes of the calculations described in this subsection (iv), Excluded DGR shall not include any revenues referred to in subsection 1(a)(ii).

(v)    Notwithstanding the provisions of subsection 1(a)(i)(2) above, for the purposes of calculating Defined Gross Revenues for the 1993 League Year only, revenues derived from national network television shall be deemed to be $35 million per NFL Team. Any actual amounts received in excess of that amount shall be included pro rata in DGR for the 1994 and 1995 seasons                                                                                       75

(vi)    It is acknowledged by the parties hereto that for purposes of determining Defined Gross Revenues.

(1)    NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in Defined Gross Revenues) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in Defined Gross Revenues), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a); and

(2)    NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL teams (hereinafter "Related Entities").

(vii)    The reasonableness and includability in DGR of such allocations and transactions between Related Entities shall be determined by the nationally recognized accounting firm jointly retained by the parties, in accordance with the procedures described in Section 10 below.

(viii)    For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries,

Team Salary, or Salary, such amounts shall be rounded to the nearest $1,000.

(ix) In calculating Defined Gross Revenues, each League Year up to $5 million per year shall be deducted from DGR to the extent that such sums are received that League Year by the NFLPA pursuant to Paragraphs 5, 12, 29 and 30 of the Stipulation and Settlement Agreement in _NFLPA v. NFL Properties, Inc._, No. 90-CV-4244 (MJL) (S.D.N.Y.).

### (b) Benefits.

"Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to or on behalf of present or former NFL players, but only for:

(i) pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

(ii) Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(iii) injury protection (as described in Article XII);

(iv) workers' compensation, payroll, unemployment compensation, and social security taxes;

(v) pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(vi) moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(vii) post-season pay (as described in Article XI II and Article XLIII);

(viii) player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year); and

(ix) severance pay (as described in Article L).

Benefits will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII. Benefits also will not include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan,

76

and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

(c) **Salary.**

(i) "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

(ii) A player's Salary shall also include any and all consideration received by the player or his Player Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the impartial Arbitrator that the consideration paid to the player or Player Affiliate for such non-football services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar non-football playing services from an independent third party, and (2) the percentage of total compensation for non-football services received from third parties versus the Team or Team Affiliate.

77

(iii) For purposes of this Article, Salary shall be computed pursuant to the additional rules below.

**Section 2. Trigger For Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary:** There shall be no Guaranteed League-wide Salary, Salary Cap, or Minimum Team Salary for NFL Teams during the 1993 League Year. If in the 1993 League Year or any subsequent League Year the total Player Costs for all NFL Teams equals or exceeds 67% of actual Defined Gross Revenues, there shall be a Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary in the amounts set forth below for the next League Year and all subsequent League Years, unless the Salary Cap is removed pursuant to Section 4(b)(iii)(4) below. Notwithstanding the immediately preceding sentence, there will be no Guaranteed League-wide Salary, Salary Cap or Minimum Team Salary for the 1999 League Year.

**Section 3. Guaranteed League-wide Salary:** In any League Year in which

a Salary Cap is in effect there shall be a Guaranteed League-wide Salary of 58% of actual Defined Gross Revenues. In the event that the Player Costs for all NFL teams during any League Year in which a Salary Cap is in effect are less than 58% of actual Defined Gross Revenues for such season, then, on or before April 15 of the next League Year, the NFL shall pay an amount equal to such deficiency directly to players who played on NFL Teams during such season pursuant to the reasonable allocation instructions of the NFLPA.

### Section 4. Salary Cap Amounts:

(a) Subject to the adjustments set forth below, the amount of the Salary Cap for each NFL Team in years that it is in effect shall be (1) in the first League Year, 64% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year, (2) in the second League Year, 63% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; and (3) in the remaining League Years until 1999, or until the Cap is removed pursuant to subsection (b)(ii)(4) below, 62% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year.

78

(b) The foregoing Salary Cap amounts shall be adjusted as follows:

(i) The actual dollar amount of the Salary Cap shall not be less than the actual dollar amount of any Salary Cap in effect during the preceding League Year; provided, however, that at no time shall the Projected Benefits, plus the amount of the Salary Cap multiplied by the number of Teams in the NFL, exceed 70% of the Projected Defined Gross Revenues.

(ii) If the total Player Costs of the NFL Teams during any League Year in which the Salary Cap is in effect falls below:

(1) 59% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 1% of Projected Defined Gross Revenues;

(2) 58% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 2% of Projected Defined Gross Revenues;

(3) 57% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 3% of Projected Defined Gross Revenues;

(4) 56% of actual Defined Gross Revenues, then there shall be no Salary Cap for the next League Year or any succeeding League Year unless and until the Salary Cap again becomes effective in accordance with Section 2 of this Article.

**Section 5. Minimum Team Salary:**

(a) With respect to each League Year for which a Salary Cap is in effect, there shall be a guaranteed Minimum Team Salary for each Team of 50% of Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the then current number of teams in the NFL. Each Team shall be required to have a Team Salary of at least the Minimum Team Salary at the end of each League Year.

(b) Nothing contained herein shall preclude a Team from having a Team Salary in excess of the Minimum Team Salary, provided it does not exceed the Salary Cap.

(c) Any shortfall in the Minimum Team Salary at the end of a League Year shall be paid, on or before April 15 of the next League Year, by the Teams having such shortfall, directly to the players who were on such Teams' roster at any time during the season, pursuant to reasonable allocation instructions of the NFLPA.

(d) If the NFL agrees, or a judgment or award is entered by the Special Master, that a Team has failed by the end of the then current League Year to make the payments required to satisfy a Team's obligations to pay the Minimum Team Salary required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid, as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocation instructions of the NFLPA).

79

**Section 6. Computation of Team Salary:** During any League Year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary.

(a) **Player Contracts.** Subject to the rules below in Section 7 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised options, shall be included in Team Salary.

(b) **Tenders.** (i) Drafted Rookies' Salaries shall be tendered automatically at the Rookie Minimum Active List Salary as of the day of the Draft and shall be included in Team Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Thursday following the tenth week of the regular season (if the player is unsigned).

(ii) For players with less than three Accrued Seasons whose contracts have expired, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished

(iii) For players who are Restricted Free Agents, the Qualifying Offer

will be included in Team Salary when tendered until the player is signed, the Qualifying Offer is withdrawn, or a "June 1 tender" (which may be made on or before June 1) is made. If the player is unsigned and the Team makes a June 1 tender or June 15 tender, such tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(iv) For players who are Unrestricted Free Agents, the June 1 tender if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned)

(v) For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi) All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c) **Practice Squad Contracts.** Any Practice Squad contract Salaries shall be included in Team Salary

(d) **Termination Pay.** Any type of Termination Pay liability will be included in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e) **Grievances.** When a player salary grievance is filed against a team, 50% of the amount claimed will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first, at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Team are more than the original 50% attributions and put the Team over the Salary Cap, the excess will be deducted from the Team's Salary Cap in the following League Year; if the net total grievance amounts paid are less than the original 50% attributions and the Team finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Team's Salary Cap for the following League Year. If an award or settlement is made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 50% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 50% attribution, the difference shall be deducted from Team Salary when the award is made

(f) **Expansion Bonuses.** Except as set forth in Article XXXI (Expan-

sion), any expansion bonuses paid to players shall be included in Team Salary.

(g)   Other Amounts. Any other Salary not listed above paid to players shall be included in Team Salary.

**Section 7. Valuation of Player Contracts:** Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap.

(a)   **Paragraph 5.**

(i)   The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between March 1 and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 7):

(1)   Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2)   Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii)   Deferred Salary. Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be considered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the Treasury Bill rate published in The Wall Street Journal on March 1 in the year earned. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

81

(b)   **Signing Bonuses.**

(i)   **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract in determining Team and Player Salary, except that.

(1)   Signing bonuses in contracts negotiated in a Capped Year may not be prorated more than three years beyond 1998;

(2)   Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control, such issue shall be resolved by the Impartial Arbitrator.

(3)   If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

(ii)  **Acceleration.**

(1)  For any player removed from the Team's roster on or before June 1, any unamortized signing bonus amounts will be included in Team Salary for such League Year. If such acceleration puts a Team over the Salary Cap, the Team will have seven days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)  For any player removed from the Team's roster after June 1, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

(3)  In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, then such signing bonus shall be accelerated as in subsection (ii)(1) above and the assignee Team's Team Salary will not include any portion of the signing bonus.

(4)  Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary. To the extent that such acceleration puts the Team over its Salary Cap, the difference shall be deducted from its Salary Cap for the following year.

82

(5)  The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)  **Prior Signing Bonuses.** All signing bonuses from League Years prior to 1993 will be prorated over the term of the original Player Contracts and included in Team Salary in the 1993 League Year and thereafter.

(iv)  **Amounts Treated as Signing Bonuses.** For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)  Any amount specifically described in a Player Contract as a signing bonus;

(2)  Any guaranteed reporting bonus;

(3)  Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)  Any option buyout amount, when paid or guaranteed; and

(5)  In the event that a Player Contract calls for a Salary in the second year of such Contract that is less than half the Salary called for in the first year of such Contract, the difference between the Salary in the second contract year and the first contract year shall be treated as a signing bonus.

(v)  **Credit for Signing Bonuses Refunded.** In the event that a team receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a

signing bonus, such amount as has previously been included in Team Salary shall be added to the Team's Salary Cap for the next League Year

    (c)   **Incentives.**

    (i)   Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

    (ii)   At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

    (iii)   At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equalling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

83

    (d)   **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that.

    (i)   In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the 1998 League Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, if payment of the player's entire Salary for the 1998 League Year is not fully guaranteed. For example, if the Salary Cap is in effect during the 1997 and 1998 League Years, and the player enters a series of four one-year contracts which are not fully guaranteed for the 1997 and 1998 League Years, but are fully guaranteed for the 1999 and 2000 League Years, the full amount of the guaranteed Salary for the 1999 and 2000 League Years will be included in Team Salary for the 1997 and 1998 League Years in a proportion determined by the team.

    (ii)   In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond the 2001 League Year will be included in Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team

(iii) Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the Treasury Bill rate published in The Wall Street Journal of March 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Section 7(b)(iii)(1) above, shall apply.

(iv) If any Player Contract entered into in a Capped Year provides for yearly Salary in a sequence that, in the 1993 League Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

(e) **Other Amounts.**

(i) **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

(ii) **Salary Advances.** The full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

(iii) **Non-Cash Provisions.** The fair market value of all non cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

(iv) **Annuities.** The cost to the Team of any annuity provided to any player, computed at the Treasury Bill rate on March 1 of the applicable League Year, shall be included immediately in Team Salary.

(f) **Traded Contracts.** In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

(g) **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

84

**Section 8. 30% Rules:**

   (a)   No NFL Player Contract entered into in an Uncapped Year prior to the 1999 League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the Contract per year. For example, a four-year Player Contract commencing in the 1993 League Year may not provide for an annual decrease of more than 30% of the Salary, excluding amounts treated as a signing bonus, in the 1993 League Year for each of the four years covered by the Contract.

   (b)   No NFL Player Contract entered into in a Capped Year and extending into the 1999 League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the 1998 League Year, per year, either in the 1999 League Year or in any subsequent League Year covered by the Player Contract. For example, a four-year Player Contract signed in the 1998 League Year (assuming it is a Capped Year) may not provide for an annual increase of more than 30% of the 1998 League Year Salary, excluding amounts treated as a signing bonus, in each of the three additional League Years covered by the Contract.

85

**Section 9. Renegotiations and Extensions:** Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows.

   (a)   The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

   (b)   No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

   (c)   No contract renegotiations may be done for a current season after the last regular season game of that season.

   (d)   A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(f).

   (e)   As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

**Section 10. Accounting Procedures:**

   (a)   **Special Purpose Letter and DGR Reporting.**
   (i)   On or before the February 7 following the conclusion of each of

the years hereunder, the parties will be provided with an "Initial Special Purpose Letter" by the NFL, gathered from independent Team auditors, preliminarily setting forth the Defined Gross Revenues and Excluded DGR of each NFL Team and the NFL for the League Year just concluded, for the purpose of determining the extent to which Required Tenders and Qualifying Offers must be increased the next League Year.

    (ii)    On or before the March 1 following the conclusion of each of the years hereunder, the parties will be provided with a "Final Special Purpose Letter," by an independent auditor certifying the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each NFL Team and the NFL for the League Year just concluded. The independent auditor (hereinafter the "Accountants") shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The review procedures to be performed by the Accountants are set forth in Appendix II attached hereto. The Reporting Package to be used by the Teams in providing information to the Accountants ("DGR Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The engagement of the Auditor shall be deemed to be renewed annually unless the Auditor is discharged by either party during the period from the submission of the Final Special Purpose Letter up to July 1 of that year.

    (iii)    The Accountants shall review the reasonableness of any estimates of revenues or expenses included in any Member Team's DGR Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made in DGR for the following League Year.

    (iv)    With respect to expenses deducted by the NFL or the Member Teams from television, cable and radio broadcast revenues or any other revenues, the NFL and the Member Teams shall report in the DGR Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i). All categories of expenses deducted from such revenues by the NFL or a Member Team in a DGR Report completed by the NFL or that Team shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

    (v)    As set forth in Appendix II attached hereto, the Accountants shall notify designated representatives of the NFL and the NFLPA (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Member Teams or any other information contained in the DGR Reports submitted by the Member Teams, and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other information contained in the DGR Reports submitted by the Member Teams.

    (vi)    In the event of any dispute concerning the amounts (as opposed

86

to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the DGR Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of subsection (iv), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(vii)   Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Member Teams are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Member Teams are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that, (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded, and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party       87 shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Member Teams adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a DGR Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(viii)   After receiving the Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Teams to further verify the accuracy of the information in the Final Special Purpose Letter.

(b)   **Projected Defined Gross Revenues.**

(i)   For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4 and 5 above, and for any other purpose specifically stated in this Agreement, Defined Gross Revenues shall be projected ("Projected Defined Gross Revenues") to be the Defined Gross Revenues for the immediately preceding League Year increased by 4% (or the previous year's increase, whichever is greater) for gate receipt revenues, and 6% (or the previous

year's increase, whichever is greater) for other DGR except for League-wide television revenues; provided, however, that if on March 1 of the year, one or more League-wide television and radio contracts are in effect for the next League Year in lieu of using the prior year's DGR for such source, the actual revenues expected from such source under such contract (plus in the 1994 and 1995 League Years, the additional amounts allocated from the 1993 League Year DGR pursuant to Section 1(a)(v) above) shall he used in the determination of Projected Defined Gross Revenues. If, after the initial calculation of Projected DGR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts (plus any adjustment pursuant to Section 1(a)(v) above) shall be substitut- -ed for the amount for League-wide television revenues previously included in Projected DGR, and the Salary Cap and Minimum Team Salary shall immediately be adjusted accordingly. In addition, if one or more new NFL teams is (or are) scheduled to be added to the NFL during the next League Year as an expansion Team(s), Projected DGR will include an additional projection of DGR (excluding DGR from national, network or cable television contracts) equal to the average of the top twenty-one Teams from the prior League Year with the highest DGR. In addition, if, after the initial calculation of Projected DGR for a League Year, the number of scheduled regular season games per team is increased above the standard of sixteen (16), Projected DGR will include an additional projection of DGR to account for such additional games as agreed upon by the NFLPA and the Management Council.

(ii) In the event that actual Defined Gross Revenues for any League Year are less than Projected Defined Gross Revenues (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the difference shall be deducted from Projected Defined Gross Revenues for the next League Year.

(iii) In the event that actual Defined Gross Revenues for any League Year exceeded Projected Defined Gross Revenues (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Defined Gross Revenues for the next League Year.

(iv) Any adjustments pursuant to Section 10(a)(ii) above will be subtracted from or added to Projected DGR as appropriate.

(c) **Projected Benefits.**

(i) For purposes of computing the Salary Cap and Minimum Team Salary to be applied in any upcoming League Year in accordance with Sections 4 and 5 above, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the upcoming League Year pursuant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calcu-

88

lating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii)   In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year.

(iii)   In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year.

(iv)   In the event the NFLPA exercises its right to reduce or freeze certain Benefits pursuant to Article XLVI (Player Benefit Costs), Section 1, Projected Benefits shall be adjusted immediately to reflect such changes.

(v)   In the event the amount of Projected Benefits is adjusted pursuant to (1) subsection (c)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

89

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY CAP AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** At the time a Club and a player enter into any Player Contract, or any renegotiation, extension or amendment of a Player Contract, there shall be no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, between such player and any Club involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Defined Gross Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

90

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Contracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

**Section 5. Special Master Review**: In the event that the Commissioner dis approves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

**Section 6. Sanctions**: In the event that the Special Master finds a violation of this Section 1 of this Article, the Commissioner shall be authorized to impose a fine of up to $2,000,000 payable to the NFL, upon any Club found to have committed such violation, and shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

91

**Section 7. Prior Conference**: Prior to the initiation of a proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

**EX 6, PAGE 327**

## ARTICLE XXVI
## SPECIAL MASTER

**Section 1. Appointment:** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in White v. NFL shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, and LV-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator) and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

**Section 2. Scope of Authority:** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that.

(a)     The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

92      (b)     The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion, except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;

(c)     Subject to subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

(d)     Except for any matters for which the Court has de novo review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer

subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the recommendation of the Special Master. The parties may seek appropriate relief to effectuate and enforce this provision.

(e) The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV-XVI-XXI, XXIV-XXX, and I-VI-LVIII of this Agreement for Special Master review.

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary) of this Agreement regarding any DGR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, in direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice

93

(or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 6. Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

**Section 7. Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee

94

## ARTICLE XXVII
## IMPARTIAL ARBITRATOR

**Section 1. Selection:** The parties shall agree upon an Impartial Arbitrator who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4. Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

**Section 6. Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

95

*Section* 7. **Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree to submit the issue to the President of the ABA who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs, or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Impartial Arbitrator from among the names on such list, they shall alternatively strike names from said list, until only one name remains, and that person shall be the Impartial Arbitrator. The first strike shall be determined by a coin flip. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

96

## ARTICLE XXVIII
## ANTI-COLLUSION

**Section 1. Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

 (a)   whether to negotiate or not to negotiate with any player;

 (b)   whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

 (c)   whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

 (d)   whether to exercise or not to exercise a Right of First Refusal, or

 (e)   concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract

**Section 2. Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above;

 (a)   that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

 (b)   that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

 (c)   that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

 (d)   that the player is or has been subject to any Right of First Refusal

**Section 3. Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking

97

any penalty or other relief against any Club or the NFL.

**Section 4. League Disclosures:** Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this section may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

98

**Section 5. Enforcement of Anti-Collusion Provisions:** Except as provided in Section 16(C) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

**Section 6. Burden of Proof:** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player

from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

**Section 7. Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

**Section 8. Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right

(a) To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this subsection (a) such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; **and**

(b) To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

**Section 9. Computation of Damages:** Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which

99

any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a) Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b) Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c) Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $1,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $1,000,000.

*Section 10.* **Player Election:** A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right,

100

he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

*Section 11.* **Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

*Section 12.* **Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXV above. The amount of compensatory damages awarded will be included in such computations.

*Section 13.* **Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall, take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

101

*Section 14.* **No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

*Section 15.* **Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs

*Section 16.* **Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances

   (a)   Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

   (b)   Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this

Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season, or

(c)     Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)     In order to terminate this Agreement:

(i)     the proceeding must be brought by the NFLPA,

(ii)     the NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)     the Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

102

# ARTICLE XXIX
# CERTIFICATIONS

### Section 1. Contract Certification:

(a)  Every Player Contract, or any renegotiation, extension or amend-
ment of a Player Contract, entered into during the term of this Agreement
shall contain a certification, executed separately by: (i) the person who ex-
ecuted the Player Contract on behalf of the Club, (ii) the player, and (iii)
any player representative who negotiated the contract on behalf of the play-
er confirming that the Player Contract, renegotiation, extension or amend-
ment sets forth all components of a player's remuneration, for his playing
of professional football, from the Club or Club Affiliate and that there are
no undisclosed agreements of any kind, express or implied, oral or written,
and that there are no promises, undertakings, representations, commit-
ments, inducements, assurances of intent, or understandings of any kind
that have not been disclosed to the NFL involving Salary or other consid-
eration of any kind to be paid, furnished or made available to the player, or
Player Affiliate, by the Club or Club Affiliate either during the term of the
Player Contract or thereafter.

(b)  In the same certification, the Club, player, and player represen-
tative will either confirm that, to the best of their knowledge, no conduct     103
violative of Article XXVIII (Anti-Collusion) took place with respect to the
contract, renegotiation, extension or amendment in question, or describe
such conduct of which they are aware.

(c)  In the same certification, the Club will confirm that any infor-
mation regarding the negotiation of such contract provided to the Neutral
Verifier pursuant to Article XXX (Consultation and Information Sharing),
Section 4 was, at the time the information was provided, true and correct
in all material respects.

(d)  No contract will be approved by the Commissioner unless ac-
companied by the certifications required by subsections (a), (b) and (c)
above.

### Section 2. End of League Year Certification.

(a)  At the conclusion of each League Year, the executive primarily re-
sponsible for football operations on behalf of each Club shall submit to the
NFL a certification confirming that the Club has not, to the extent of his
knowledge after reasonable inquiry of all owners and all employees with au-
thority to negotiate Player Contracts, violated the terms of Article XXVIII
(Anti-Collusion), Section 1, nor received from the NFL or the NFL Man-
agement Council any communication disclosing that an NFL Club had ne-
gotiated with or is negotiating with any Restricted Free Agent, unless and

**EX 6, PAGE 339**

until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that player. Upon receipt of each such certification, the NFL shall forward a copy of the certification to the NFLPA.

(b) Any failure to execute a certification as required under Section 2(a) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

**Section 3.** False Certification: Any person who knowingly files a false certification required by Section 1(a) or 1(b) of this Article shall be subject to a fine of up to $250,000, upon a finding of such violation by the Special Master. The amount of such fine as to a Club or non-player Club employee shall be determined by the Commissioner.

104

## ARTICLE XXX
## CONSULTATION AND INFORMATION SHARING

**Section 1. Consultation and Communications:**

(a)    In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b)    Subject to any claim of attorney-client and/or work product privilege, any communications under this section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

**Section 2. Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected DGR, and a revised estimate on the first day of each month thereafter in any such year.

**Section 3. Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

**Section 4. Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to veri-

105

EX 6, PAGE 341

fy the terms and conditions of the offer. The Neutral Verifier shall promptly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this section shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within five (5) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings:** During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

106

# ARTICLE XXXI
## EXPANSION

*Section 1. Veteran Allocation*: The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three per Club, excluding any player who has a no-trade clause in his Player Contract.

*Section 2. Additional Compensatory Picks*: The Clubs may decide the selection position for expansion teams in the College Draft, and may allocate to each expansion Club additional special Draft selections in the Drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special Draft selection for each expansion Club in each round of the Draft in each such year.

*Section 3. Entering Player Pool Adjustment*: The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for Draft selections awarded to expansion teams pursuant to Section 2.

*Section 4. Relocation Bonus*: Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $10,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $15,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

107

# ARTICLE XXXII
## OTHER PROVISIONS

*Section 1.* **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or post-season, whichever is applicable).

*Section 2.* **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

*Section 3.* **Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

108   A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the Club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

### *Section 4.* Roster Exemption:

(a)   **Certain Players Not Under Contract.** After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)   **Players Under Contract.** If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)   **Restricted Players.** Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section

2. and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 2, or Article XIX (Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions

(i)    If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii)    If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)    If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

No player may be placed on roster exempt under this subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second pre-season game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with (i) through (iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this subsection, the player shall not be entitled to compensation.

(d)    Except as provided in subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

109

## ARTICLE XXXIII
### SQUAD SIZE

**Section 1. Active List:** For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

**Section 2. Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

**Section 3. Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

**Section 4. Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

110

# ARTICLE XXXIV
# PRACTICE SQUADS

**Section 1. Practice Squads:** For each regular season commencing with the 1993 League Year, the League may elect in accordance with this Article to establish practice squads not to exceed five (5) players per Club.

**Section 2. Signing With Other Clubs:** Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

**Section 3. Salary:** Minimum salary for a practice squad player shall be $3,300 per week, including post-season weeks in which his Club is in the playoffs, provided, however, that no player who was on a practice squad in the 1992 season shall be paid less than the minimum practice squad salary for that season.

111

**Section 4. Eligibility:** The practice squad shall consist of players who do not have an accrued season of NFL experience. No player may be a practice squad player for more than two seasons.

## ARTICLE XXXV
## OFF-SEASON WORKOUTS

*Section 1. Voluntary Workouts*: No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be voluntary and take place in the manner and time period set forth in this Article.

*Section 2. Time Periods*: From the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than sixteen total weeks, and no more than four workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work out on his own on weekends using Club facilities if he wishes to do so.

*Section 3. Payment*. Beginning with the off season following the 1993 NFL season, each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout requirements: $50 during the 1994-95 League Years; $60 during the 1996-97 League Years; and $70 during the 1998 League Year.

*Section 4. Injuries*: Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre season training camp, provided he is working out at the Club's facility under the direction of a Club official.

*Section 5. Miscellaneous*: No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts.

112

## ARTICLE XXXVI
## MINICAMPS

**Section 1. Number**: Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

**Section 2. Length**: No minicamp may exceed three days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

**Section 3. Expenses**: Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

**Section 4. Contact**: There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps   113

**Section 5. Injuries**: Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

## ARTICLE XXXVII
## PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell or Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** During the term of this Agreement, a rookie player will receive "per diem" payments at the rate of $500 per week in the 1993-94 League Years, $550 per week in the 1995 League Year, $600 per week in the 1996 League Year $650 per week in the 1997 League Year, and $675 per week in the 1998-99 League Years, commencing with the first day of pre-season training camp and ending one week prior to the Club's first
114  regular season game

**Section 4. Veteran Per Diem:** During the term of this Agreement, a veteran player will receive "per diem" payments at the rate of $600 per week in the 1993-94 League Years, $700 per week in the 1995-96 League Years, and $800 per week in the 1997-99 League Years, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**Section 6. Number of Pre-Season Games:** The NFL will use its best efforts to hold no more than four pre-season games beginning in the 1995 League Year

*Section 7. Telephones:* Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

*Section 8. Expenses:* Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

115

## ARTICLE XXXVIII
## SALARIES

**Section 1. 1993 Minimum Salaries**: For the 1993 League Year, the Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| Length of Service | Minimum Salary For Players Not On Club's Active/Inactive List (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $ 60,000 | $ 100,000 |
| One Credited Season | 70,000 | 125,000 |
| Two or More Credited Seasons | 80,000 | 150,000 |

**Section 2. Minimum Salaries For 1994-1998 League Years**: For the 1994-98 League Years, the Minimum Salaries set forth in Section 1 above shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

**Section 3. Credited Season**: For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

**Section 4. Other Compensation**: A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified

116

agent on a collective or tandem basis for two or more players on that Club.
Nothing in this Section will be affected by Article III (Scope of Agreement),
Section 2.

**Section 5. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 6. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 7. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 8. Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 9. Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by

117

Rookie and Veteran players after the date of execution of this Agreement covering the 1993 and future League Years will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

**Section 10. Split Contracts:**

(a) After the point in the regular season at which a player who signed his Player Contract prior to the 1993 League Year has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

118

(b) After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent and during the 1993 League Year or thereafter has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

**Section 11. Funding of Deferred and Guaranteed Contracts:** The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury Bill rate as published in The Wall Street Journal on March 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

**EX 6, PAGE 354**

## ARTICLE XXXIX
## MEAL ALLOWANCE

*Section 1. Reimbursement:* A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and post-season as follows: 1993-94 League Years—Breakfast $12.00, Lunch $15.00, Dinner $33.00; 1995-96 League Years—Breakfast $13.00, Lunch $17.00, Dinner $35.00; 1997-99 League Years—Breakfast $14.00, Lunch $19.00, Dinner $37.00. For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*Section 2. Travel Day:* Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

119

# ARTICLE XL
## DAYS OFF

*Section 1. Rate:* All players will be permitted days off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2. Requirements:* During the 24-hour period constituting a day off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

120

## ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a) Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city, or

(b) Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation, (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent

121

that the player is legally obligated to such rent and each such payment shall not exceed $4,000 during the 1993-95 League Years, and $4,750 during the 1996-98 League Years; and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

**Section 4. Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

122

## ARTICLE XLII
## POST-SEASON PAY

*Section 1.* System: Beginning with the post-season following the 1993 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

*Section 2.* Compensation: A player who qualifies will receive the following amount for each post-season game played:

|  |  | (years) | 93 | 94 | 95 | 96 | 97 | 98 | 99 |
|---|---|---|---|---|---|---|---|---|---|
| Wild Card Game | (Div Winner) | $ 12 | 12 | 13 | 14 | 15 | 15 | 16 |
|  | (Other) |  | 7.5 | 7.5 | 7.5 | 10 | 10 | 10 | 10 |
| Division Playoff Game |  |  | 12 | 12 | 13 | 14 | 15 | 15 | 16 |
| Conference Championship Game |  |  | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 |
| Super Bowl Game (Winning Team) |  |  | 38 | 42 | 42 | 48 | 48 | 53 | 58 |
|  | (Losing Team) |  | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 |
|  |  |  |  |  |  |  |  | (in thousands) | |

*Section 3.* Wild Card Game; Division Play-off Game: A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.    123

### Section 4. Conference Championship; Super Bowl Game:

(a)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game.

(b)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or post-season) will receive one-half the amount designated in Section 2 for such game.

(c)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was

on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)   A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game, provided he is still under contract to the Club at the time of the game.

(f)   A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

124   (g)   A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5. Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

## ARTICLE XLIII
## PRO BOWL GAME

**Section 1. Compensation:** Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $20,000 and each player on the losing Team will receive $10,000. These amounts shall be increased to $25,000 and $12,500 respectively for the Pro Bowls following the 1997 through 1999 seasons.

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.                    125

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

## ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE
## AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

126

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery, and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense, provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

**EX 6, PAGE 362**

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

### *Section 6.* Substance Abuse:

(a) **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b) **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c) **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.    127

## ARTICLE XIV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

128

## ARTICLE XLVI
## PLAYER BENEFIT COSTS

**Section 1. Right of Reduction**: The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/ Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) post-season pay (although the NFLPA will have the unilateral right to direct that post-season pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

**Section 2. Right of Restoration**: Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition**: For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)    pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII),

(b)    group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)    injury protection (as described in Article XII);

(d)    workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)    pre-season per diem amounts (as described in Sections 3 and 4

129

of Article XXXVII) and regular season meal allowances (as described in Article XXX),

(f)   moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)   post-season pay (as described in Article XLII and Article XLIII);

(h)   player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year), and

(i)   severance pay (as described in Article L).

130      Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, and the Supplemental Disability Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to projected Player Benefit Costs for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)   The parties will submit in writing to the Benefit Arbitrator their

respective calculations of projected Player Benefit Costs for the forthcoming year. Such submissions to the Benefits Arbitrator will be made by each party by March 15.

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

131

## ARTICLE XLVII
## RETIREMENT PLAN

*Section 1. Maintenance and Definitions:* The Bert Bell/Pete Rozelle NFL
Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan"),
formed pursuant to Section 5 of this Article, will be continued and main-
tained in full force and effect during the term of this Agreement. Prior to
such merger, the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan")
and the Pete Rozelle NFL Player Retirement Plan (the "Pete Rozelle Plan")
will each be continued and maintained in full force and effect. When used
in other Articles in this Agreement, the terms "Bert Bell/Pete Rozelle Plan"
and "Merged Plan" will also refer to each of the Bert Bell Plan and the Pete
Rozelle Plan for the periods prior to such merger, as appropriate depending
on the context in which such term is used.

*Section 2. Amendment by Bargaining Parties:* Promptly following the rat-
ification of this Agreement, the parties will instruct the Members of the Re-
tirement Board of the Bert Bell Plan and of the Retirement Committee of
the Pete Rozelle Plan to amend the Bert Bell Plan and the Pete Rozelle Plan
to allow the parties, when acting jointly, to directly amend the Bert Bell
Plan and the Pete Rozelle Plan to (1) change the vesting schedule, (2) in-
crease and revise benefits, (3) impose and remove limits on maximum ben-
efits, (4) expand coverage (including but not limited to merger with other
qualified plans), and (5) provide that, during the term of this Agreement,
the Members of the Retirement Board of the Bert Bell Plan and the Mem-
bers of the Retirement Committee of the Pete Rozelle Plan cannot increase
benefits. These provisions will be continued in the Merged Plan.

*Section 3. Contributions:* For each of the seven Plan Years beginning April
1, 1993 and ending March 31, 2000, a contribution will be made to the
Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on
behalf of each NFL Club as actuarially determined to be necessary to fund
the benefits provided in this Article, based on the actuarial assumptions
and methods contained in Appendix J. No provision of this Agreement will
eliminate or reduce the obligation to provide the benefits described in this
Article, or eliminate or reduce the obligations of the NFL Clubs to fund re-
tirement benefits. Contributions will be used exclusively to provide retire-
ment benefits and to pay expenses. Contributions for a Plan Year will be
made on or before the end of each Plan Year, except that a $1 million con-
tribution for the 1993 Plan Year will be made to the Bert Bell Plan on or be-
fore twenty (20) business days following ratification of this Agreement.
Benefit Credits for future seasons and benefits subject to Retirement Board
approval, if any, and contributions, if any, for Plan Years beginning on and
after April 1, 2000 will be determined pursuant to future collective bar-
gaining agreements, if any. It will be the duty of the Retirement Board of the

132

Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Amendment of Bert Bell and Pete Rozelle Plans:** Promptly following the amendment to the Bert Bell Plan and the Pete Rozelle Plan described in Section 2 above, the parties will jointly make the amendments in subsections (A) through (D) below.

(A)    Faster Vesting: Both the Bert Bell Plan and the Pete Rozelle Plan will be amended such that each participant who has three or more Credited Seasons and who has at least one Credited Season in the 1993 Plan Year or in a later Plan Year will be fully vested in his accrued benefit.

(B)    Benefits for Future Seasons: The Bert Bell Plan will be amended to provide the following Benefit Credits for Credited Seasons after 1992.

| Credited Season | Benefit Credit |
|---|---|
| 1993 | $220 |
| 1994 | $220 |
| 1995 | $260 |
| 1996 | $260 |
| 1997 | $300 |
| 1998 | $300 |
| 1999 | $300 |

133

(C)    New and Revised Disability Benefits. The Bert Bell Plan will be further amended as follows:
(1)    Plan Section 5.1 will be deleted and replaced with language substantially equivalent to the following:

"Any Player or Vested Inactive Player, other than a Retired Player or a Player who has reached his Normal Retirement Date, who is determined by the Retirement Board upon written application to be totally and permanently disabled, as defined below, will be entitled to receive a monthly pension commencing after the expiration of a six (6) month waiting period measured from the date of such disability to an amount equal to 100% of the Benefit Credits of the Player at the date such disability occurs, including, if applicable, the scheduled Benefit Credit as provided in Section 4.1 for the Plan Year in which the disability occurs. This benefit may be increased as provided below. All benefits provided by this Article will be retroactive to the date of disability and will be payable for life or until cessation of the total and permanent disability."

"(A) (Active Football). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) results from League foot-

ball activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled shortly after the disability(ies) first arises."

"(B) (Active Nonfootball). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) does not result from League football activities, but does arise while the Player is an Active Player and does cause the Player to be totally and permanently disabled shortly after the disability(ies) first arises."

"(C) (Football Degenerative). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (a) age 45, or (b) 12 years after the end of the Player's last Credited Season."

"(D) (Inactive Nonfootball). Effective April 1, 1993, the monthly pension shall be no less than $1,500 if the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player. The minimum benefits provided under this subsection (D) will be offset by any disability benefits provided by an employer other than the NFL or NFL Clubs, but will not be offset by worker's compensation."

"(E) (Dependent Child). Effective April 1, 1993, $100 per month for each dependent child will be payable during the period of total and permanent disability; provided, however, that notwithstanding anything in this Article 5 to the contrary, the additional benefit of $100 per month shall terminate as soon as the dependent child (in respect of whom it is paid) ceases to be the Player's dependent child "

"For purposes of this Section 5.1, the term "Active Player" means a Player who (1) is obligated to perform football playing services under contract with an Employer, or (2) is no longer obligated to perform football playing services under contract with an Employer, but is between the period beginning when the player's last contract under which the player was obligated to perform football playing services expired or was terminated for any reason, and ending on the later of (a) the July 15 following the beginning of the period or (b) the first day of preseason training camp "

"A Player who becomes totally and permanently disabled no later than six months after a disability(ies) arises will be conclusively deemed to have become totally and permanently disabled 'shortly after' as that phrase is used in subsections (A) and (B) above, and a Player who becomes totally and permanently disabled more than twelve months after a disability(ies) arises will be conclusively deemed not to have become totally and permanently disabled 'shortly after' as that phrase is used in subsections (A) and (B) above. In cases falling within this six to twelve month period, the Retirement Board will have the right and duty to determine whether the 'shortly after' standard is satisfied."

(2)     The first paragraph of Plan Section 5.2 will be amended to re-

134

place "prevented from or unable to engage in" with 'substantially prevented from or substantially unable to engage in," and to add the following sentence at the end thereof:

"A Player or Vested Inactive Player shall not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2 merely because such person is employed by the NFL or an NFL Club, manages personal or family investments, is employed by or associated with a charitable organization, or is employed out of benevolence."

(3) Plan Articles 5 and 6 will be amended to replace "football activities" each time it appears with "League football activities."

(4) Plan Section 6.1 will be amended to change "sixty (60) months" to "ninety (90) months".

(5) The second paragraph of Plan Section 6.1 will be amended to change "36 months" to "48 months".

(6) Plan Section 6.3 will be amended to insert a period after "a month" the first time it occurs, and to delete the remaining language in that Section.

(7) Plan Section 6.4(B) will be amended to change "60%" to "55%," and Plan Section 6.4(C) will be amended to change "80%" to "70%".

(8) The final paragraph of Plan Section 6.4 will be amended to replace "and has resulted in" with "and was the most significant factor in"  135

(9) The second sentence of Plan Section 6.5 will be amended to read as follows: "'Arising out of League football activities' shall not include any disablement resulting from other employment, or athletic activity for recreational purposes."

All of the changes in this Section 4(C) will be effective as of the first of the month following ratification of this Agreement, and will apply to applications for benefits by or on behalf of players first making application for such benefits on or after April 1, 1993 and who earn a Credited Season in 1993 or later, and will apply on the basis of all prior injuries, including injuries prior to April 1, 1993.

(D) Removal of Early Retirement Option: The Bert Bell Plan and the Pete Rozelle Plan will each be amended such that players who have no Credited Seasons for Plan Years prior to the 1993 Plan Year will not be eligible to elect an early retirement pension prior to age 55, or to elect a 25% early payment benefit.

(E) Joint Administration of Rozelle Plan. Within 30 days after ratification of this Agreement, the Pete Rozelle Plan will be maintained and jointly administered in the same manner as the Bert Bell Plan. The NFLPA and the Management Council will each appoint three members to the Retirement Committee of the Pete Rozelle Plan.

### Section 5. Plan Merger and Further Amendments:

(A) Plan Merger: Promptly following the amendment described in Section 2 above and immediately after the amendments described in Section 4 above, the parties will merge the Bert Bell Plan with the Pete Rozelle Plan. The effect of such merger will be to bring Pete Rozelle Plan participants under the terms of the Bert Bell Plan, as modified pursuant to this Agreement, and the combined Plan will be called the "Bert Bell/Pete Rozelle NFL Player Retirement Plan" (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan").

(B) Retroactive Increase in Benefit Credits for Prior Years: Upon or immediately following its creation, the parties will amend the Merged Plan to increase benefits for Credited Seasons prior to 1993 (including seasons prior to 1959 that are considered Credited Seasons pursuant to section 1.15(C) of the Bert Bell Plan) by forty percent (40%). These benefit increases will be retroactively effective for payments made on or after April 1, 1987 for participants in pay status as of March 1, 1993, but will be offset by retroactive payments made pursuant to the benefit increase resolution of the Retirement Board of the Bert Bell Plan adopted in September 1992. The retroactive portion of these increases will be paid in a lump sum as soon as administratively practicable.

136

(C) Retroactive Increase in Minimums. Upon or immediately following its creation, the parties will amend the Merged Plan such that:

(1) Effective April 1, 1987, the $750 per month minimum benefit for nonfootball total and permanent disability in Plan Section 5.1 will be increased to $1,300 per month; and the $30 per month per dependent child benefit in Plan Sections 5.1 and 5.4 will be increased to $100 per month;

(2) Effective April 1, 1987, the $500 per month minimum "line-of-duty disability benefit" described in Plan Section 6.3 will be increased to $1,000 per month;

(3) Effective April 1, 1987, the $600 per month minimum Widow's and Surviving Children's benefit described in the first paragraph of present Plan Section 7.3 will be increased to $1,200 per month; the $1,000 per month minimum Widow's and Surviving Children's benefit for players active in 1977 through 1981 described in the second paragraph of present Plan Section 7.3 will be increased to $2,000 per month; and the $1,500 per month minimum Widow's and Surviving Children's benefit for players active in the 1982 and later seasons described in the third paragraph of present Plan Section 7.3 will be increased to $3,000 per month.

All benefit increases in this subsection 5(C) will take effect retroactively for persons in pay status as of March 1, 1993, but will be offset by retroactive payments made pursuant to the benefit increase resolution of the Retirement Board of the Bert Bell Plan adopted in September 1992. The

**EX 6, PAGE 372**

retroactive portion of these increases will be paid in a lump sum as soon as administratively practicable.

(D)     Retroactive Extension of Total and Permanent Disability Benefits: Notwithstanding Section 4 above, the amendments described in paragraphs (1), (2), and (3) of Section 4(C) will also apply to (1) persons currently receiving total and permanent disability benefits under the Bert Bell Plan, and (2) any player who may subsequently apply for disability benefits under either the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, regardless of whether the player had a Credited Season after 1992 or when the disability(ies) arose, unless a previous application for benefits by such player that is related to the present disability(ies) was denied prior to the date of this Agreement. The parties will agree on those persons who, effective as of the first of the month following ratification of this Agreement, will be entitled to total and permanent disability benefits under Sections 5.1(A) (Active Football), 5.1(B) (Active Nonfootball), and 5.1(C) (Football Degenerative) of the Bert Bell Plan, as amended by this Agreement, on the basis of previous injuries. The provisions of the Bert Bell Plan and later the Merged Plan will determine whether persons should be entitled to such disability benefits beginning as of a later date on the basis of previous or subsequent injuries.

137

(E)     Timing and Contingency. The plan merger and all of the benefit increases in this section are contingent on such notice to and approval of the Internal Revenue Service and the Pension Benefit Guaranty Corporation as counsel deem appropriate. However, payment of all benefit increases under this Section 5, including the retroactive portion of these increases, will commence as soon as administratively practicable. To the extent that the plan merger and/or benefit increases are frustrated because of the lack of government approval or the action of a court, the parties will agree on the best method to accomplish the benefit increases in this Section 5 pro rata based solely on the available assets of the Bert Bell Plan and the Pete Rozelle Plan.

**Section 6. Benefits for Pre-1959 Seasons:** Promptly following the amendment described in Section 2 above, the parties will jointly amend the Bert Bell Plan, contingent on approval by the Internal Revenue Service, to include players who played football prior to the 1959 season as participants and to provide that each such player who has five or more Credited Seasons before 1959 will be credited with a monthly benefit at normal retirement age of $80 for each Credited Season prior to 1959, excluding any Credited Season prior to 1959 for which the participant was previously receiving benefits in accordance with Section 1.15(C) of the Bert Bell Plan. If a player, who would otherwise have been eligible for this benefit, died on or after July 1, 1987, and was married at the time of his death, the player's surviv-

ing spouse will receive a benefit equal to the amount she would have received had the player elected a joint and survivor annuity when the player would have been eligible to begin receiving benefits. This expansion of the Bert Bell Plan will take effect as of the first of the month following IRS approval. Also, as soon as administratively practicable following such IRS approval, players and surviving spouses receiving benefits under this Section will receive a lump sum payment equal to one-quarter of the benefit amount they would have received had IRS approval been obtained upon ratification. To the extent that this expansion of the Bert Bell Plan is prevented or frustrated because of the lack of government approval or the action of a court, this Section 6 will be nullified.

138

## ARTICLE XLVIII
## SECOND CAREER SAVINGS PLAN

**Section 1. Establishment:** The parties will jointly establish a new plan, to be called the NFL Player Second Career Savings Plan (hereinafter referred to as "Savings Plan"). The Savings Plan will be jointly administered pursuant to the requirements of the Taft Hartley Act in a manner similar to the Bert Bell/Pete Rozelle Plan. The Savings Plan will be established as a tax-qualified multiemployer defined contribution profit-sharing plan, and will be submitted to the Internal Revenue Service for advance approval. The Plan Year will be the period April 1 to March 31.

**Section 2. Contributions:** For each of the Plan Years 1993 to 1999, a contribution of $115,000 will be made to the Savings Plan on behalf of each NFL Club, unless this figure is changed pursuant to this Agreement. Contributions to the Savings Plan for the Plan Years 1993 through 1999 will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year. Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

139

**Section 3. Allocation:** Contributions described in Section 2 above for a Plan Year will, after payment of the administrative expenses of the Savings Plan, be allocated to achieve, as nearly as possible, the effect of an equal allocation for each participant with full vesting after two (2) Credited Seasons.

**Section 4. Salary Reduction Contributions:** The Savings Plan will generally allow players to make salary reduction contributions pursuant to section 401(k) of the Internal Revenue Code. The parties may jointly restrict the ability to make salary reduction contributions if necessary or desired to avoid or minimize possible problems and administrative complications relating to the tests and limits of section 401(k)(3) and section 415 of the Internal Revenue Code or similar rules. The NFL Clubs will cooperate in the administration of salary reduction contributions.

**Section 5. Benefit Options:** A participant in the Savings Plan will be permitted to select from among the following options for the payout of his account balance: (1) a lump sum; (2) installment payments over a ten (10) year period, with one tenth of the account balance paid as of the first of the month following election of this option, one-ninth of the remaining account balance payable one year later, etc.; (3) an annuity for the life of the player only; (4) an annuity for the life of the player with a 50% continuation benefit for his surviving spouse; and (5) any other annuity option

**EX 6, PAGE 375**

deemed appropriate by the fiduciaries of the Savings Plan. Where a player selects an annuity pursuant to options 3, 4, or 5 above, the Savings Plan will use his account balance to purchase such an annuity from a commercial insurer selected by the fiduciaries of the Savings Plan. No payments in any form will be made to a player before he attains age 45 and ceases to be employed by an NFL Club, except that a player employed by an NFL Club may elect to receive Savings Plan benefits after he attains age 59-1/2.

**Section 6. Death Benefits:** If a player dies prior to the time for receiving a benefit, his surviving spouse (or his designated beneficiary if no surviving spouse exists) will be entitled to 100% of his vested account balance, payable as a lump sum.

**Section 7. Investment:** Participants will be permitted to direct the investment of funds held on their behalf among at least three investment choices as determined by the fiduciaries of the Savings Plan, and to move funds among such choices quarterly. The Savings Plan will be valued quarterly and players will receive quarterly statements of their account balances.

140

## ARTICLE XLIX
## GROUP INSURANCE

**Section 1 Group Insurance Benefits**: Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a) Life Insurance: A rookie player will be entitled to $100,000 in coverage. A veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage.

(b) Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual, $400 per family per plan year, with a maximum out-of-pocket expense of $800 per year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $1 million.

(c) Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to     141
players pursuant to the following schedule:

(1) Preventive care paid at 100% of UCR,
(2) General services paid at 85% of UCR, and
(3) Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum annual benefit payable is $2,000 per covered individual.

Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 will continue to receive insurance coverage under this Article until the first game of the next regular season. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

**Section 2. Administration**: The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any docu-

**EX 6, PAGE 377**

ment or other information relating to group insurance, including materials relating to experience and costs.

142

## ARTICLE I.
## SEVERANCE PAY

**Section 1. Eligibility:** Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through 1999, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

**Section 2. Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; and (b) $10,000 per Credited Season for each of the seasons 1993 through 1999.

**Section 3. Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

143

**Section 4. Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
|---|---|---|
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through February 19, or earlier | June 1 | June 30 |
| February 20 through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

**Section 5. Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay:** Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

144

**Section 9. Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

## ARTICLE LI
## SUPPLEMENTAL DISABILITY BENEFITS

*Section 1.* **Establishment:** The parties will jointly establish a new plan, to be called the NFL Player Supplemental Disability Plan (hereafter "Supplemental Disability Plan"), to provide disability benefits in addition to those provided under the Bert Bell/Pete Rozelle Plan. The Supplemental Disability Plan will be jointly administered pursuant to the requirements of the Taft Hartley Act. The Supplemental Disability Plan will be established as a voluntary employees' beneficiary association ("VEBA") within the meaning of section 501(c)(9) of the Internal Revenue Code, and will be designed to comply with the requirements of that section. The Supplemental Disability Plan will be submitted to the Internal Revenue Service for approval as a VEBA. The Plan Year will be the twelve-month period beginning April 1.

*Section 2.* **Contributions:** For each of the Plan Years 1993 to 1999, and unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

145

*Section 3.* **Disability Benefits:** A former player who is receiving total and permanent disability benefits under Sections 5.1(A) (Active Football), 5.1(B) (Active Nonfootball), or 5.1(C) (Football Degenerative) of the Bert Bell/Pete Rozelle Plan will also receive under this Supplemental Disability Plan the following benefits for each month in which he receives total and permanent disability benefits under those Sections of the Bert Bell/Pete Rozelle Plan. The following benefits will take effect as of the first of the month following ratification of this Agreement, with no retroactive payments:

(a)     If the player is receiving total and permanent disability benefits under Section 5.1(A) (Active Football) of the Bert Bell/Pete Rozelle Plan, $4,335 per month, increasing to $8,500 per month effective March 1, 1995, and increasing further to $12,670 per month effective March 1, 1997.

(b)     If the player is receiving total and permanent disability benefits under Section 5.1(B) (Active Nonfootball) of the Bert Bell/Pete Rozelle Plan, $3,500 per month, increasing to $4,335 per month effective March 1, 1994, increasing further to $5,170 per month effective March 1, 1995, and increasing further to $6,000 per month effective March 1, 1997.

(c)    If the player is receiving total and permanent disability benefits under Section 5.1(C) (Football Degenerative) of the Bert Bell/Pete Rozelle Plan, $2,250 per month, increasing to $3,085 per month effective March 1, 1995, and increasing further to $4,335 per month effective March 1, 1997.

The definition of "Active Player" in Section 5.1 of the Bert Bell/Pete Rozelle Plan (as amended under this Agreement) will also apply for purposes of this Supplemental Disability Plan.

**Section 4. Retirement Ignored:** Benefits under the Supplemental Disability Plan payable through March 31, 2000, will continue, regardless of the player's age, as long as the player is receiving disability benefits under Article 5 of the Bert Bell/Pete Rozelle Plan.

146

## ARTICLE LII
## BENEFIT ARBITRATOR

**Section 1. Selection:** The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

147

**Section 2. Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

**Section 3. Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either

party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

148

## ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of the Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

149

## ARTICLE LIV
## WORKERS' COMPENSATION

**Section 1. Benefits**: In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage**: Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

150

**Section 3. Arbitration**. In any state where a Club (e.g., Miami Dolphins' Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study**: The parties agree to establish a joint committee composed of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5. Moratorium**: The NFLMC, the NFL, all of the Clubs and the NFLPA agree to a moratorium on any and all efforts to change state laws concerning workers' compensation coverage of professional athletes, beginning as of the execution of this Agreement and ending December 31, 1994. During such period, the NFLMC, the NFL, any Club, the NFLPA, and/or their respective agents are prohibited from making or supporting any attempt, directly or indirectly, to change state laws affecting players' workers' compensation coverage.

**Section 6. Preservation of Rights:** The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

**Section 7. Reopener:** If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days' written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

151

# ARTICLE LV
# MISCELLANEOUS

**Section 1. Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product

**Section 2. On Field Attire:** Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

**Section 3. Appearances:** No Club may unreasonably require a player to appear on radio or television.

**Section 4. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

152

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any Club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Clubs as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cut-down date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three days prior to the date of the game

NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances. **153**

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefor by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its 28 members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

*Section 16.* **Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

*Section 17.* **Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

*Section 18.* **Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto

*Section 19.* **Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV-XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

154

## ARTICLE LVI
## 1999 LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the final League Year of this Agreement (1999), except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap:** No Salary Cap shall be in effect during the 1999 League Year.

**Section 2. Free Agency If Salary Cap in 1998:** In the event that a Salary Cap is in effect in the 1998 League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the 1999 League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the 1999 League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(a)(i)(1), (2), (3) and (4) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

**Section 3. Free Agency If No Salary Cap in 1998:** In the event that a Salary Cap is not in effect in the 1998 League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the 1999 League Year shall be five Accrued Seasons.

**Section 4. Franchise and Transition Players:** As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, 1999, notwithstanding that Transition Players may not be designated in the 1995, 1996, 1997 and 1998 League Years (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

155

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS: LABOR EXEMPTION

**Section 1. Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights: Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

**Section 2. Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

## Section 3. CBA Expiration:

(a)   Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later: at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)   The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred

156

## ARTICLE LVIII
## DURATION OF AGREEMENT

**Section 1. Effective Date:** Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV XVI-XXI, XXIV-XXX and LVI-LVII shall be deemed effective as of March 29, 1993.

**Section 2. Termination:** Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on March 1, 2000, or thereafter by giving sixty (60) days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

**Section 3. Termination Date:** This Agreement shall be effective from the date hereof and shall continue in full force and effect until March 1, 2000, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire at the end of the League Year following the Draft held in the year 2000.

157

### Section 4. Termination Prior to Expiration Date:

(a)     Due To Invalidation of Settlement Agreement. In the event that the Settlement Agreement does not receive Court Approval or is otherwise invalidated by any appellate court prior to September 1, 1993:

(i)     this Agreement shall terminate immediately;

(ii)     the White action and the Related Litigation (as defined in Article I of the Settlement Agreement) shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)     all pending motions in White and McNeil shall be decided by the Court, and

(iv)     with respect to all Player Contracts entered into by Unrestricted Free Agents during the period from March 1 to the date of such disapproval, and by Restricted Free Agents during the period from March 1 to the date of such disapproval:

(1)     any Club that had rights to the services of any such player on January 31, 1993 shall have the right to assume any such Player Contract by notice to the player, the New Club, the NFLPA and Class Counsel within ten days of the date of such disapproval, and in such event such Prior Club shall have the same rights to the services of such player that the New Club would have had under such Player Contract.

(2)     within twenty days of the date of such disapproval, any such

player shall have the right to void any such Player Contract, whether such contract was assumed by the Prior Club or not, by notice to the Prior Club -or New Club, which clubs shall notify the NFLPA and Class Counsel of such election as soon as possible but in no event later than one day after receiving such notice (in the event the player voids such Player Contract, the player shall return to the Team any compensation received thereunder); and any such player shall have such further relief as determined by the Court pursuant to the pending motions in White and McNeil;

(3) in the event that a player voids a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract after the date of such election; and

(4) in the event that a player elects not to void a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract.

(b) **Approval of Settlement Agreement Invalidated.** In the event that the Settlement Agreement receives Court Approval but such approval is invalidated by any appellate court on or after September 1, 1993:

(i) this Agreement shall terminate immediately;

(ii) the White action and the Related Litigations shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii) all Player Contracts entered into prior to such date of such disapproval shall remain in full force and effect and shall be binding on all Parties;

(iv) a player with a Player Contract referred to in Section 4(b)(iii) above shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases And Covenants Not to Sue) of the Settlement Agreement, that arises out of such Player Contract, for conduct prior to such disapproval consistent with the express terms of this Agreement.

(c) **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement except as referred to in subsections (a) and (b) above, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is ren-

158

dered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (1999 League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d) **Termination Due To Collusion**. If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties 159 shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e) **Termination After Closing Date**. If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f) **No Waiver**. Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

*Section 3*. Ratification: This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

## ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

160

**EX 6, PAGE 396**

## ARTICLE LX
## NOTICES

Any notice to be given, under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

    (a)    **To the National Football League Management Council:**
        The National Football League
        Management Council
        410 Park Avenue
        New York, New York 10022
        Attention: Executive Vice President - Labor Relations

    (b)    **To an NFL Club:**
        At the principal address of such Club as then listed on the records of the NFL or at that Club's principal office.
        Attention: President

    (c)    **To the NFLPA:**
        National Football League Players Association
        2021 L Street, N.W.        161
        Washington, D.C. 20036
        Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing

NATIONAL FOOTBALL LEAGUE    NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION    MANAGEMENT COUNCIL.

BY:                  BY:

## APPENDIX A

### CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

162

The foregoing authorized deductions are to be checked off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football

League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

Signature

Player's Name—Type or Print

163

## APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

164

# APPENDIX C

## NFL PLAYER CONTRACT

THIS CONTRACT is between

_____, hereinafter "Player," and _____

_____.

a _____

corporation (limited partnership) (partnership), hereinafter "Club," oper-
ating under the name of the _____

_____ as a member of the National Football
League, hereinafter "League." In consideration of the promises made by
each to the other, Player and Club agree as follows:

1.    TERM.  This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

2.    EMPLOYMENT AND SERVICES.  Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off    **165**
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory mini-camp(s), official pre-season training
camp, all Club meetings and practice sessions, and all pre-season, regular
season and post-season football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

3.    OTHER ACTIVITIES.  Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experi-
ence as a football player, the loss of which cannot be estimated with any cer-
tainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

4. PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
(a) Player grants to Club and the League, separately and together, the au-
thority to use his name and picture for publicity and the promotion of NFL
Football, the League or any of its member clubs in newspapers, magazines,
motion pictures, game programs and roster manuals, broadcasts and tele-
casts, and all other publicity and advertising media, provided such public-
ity and promotion does not constitute an endorsement by Player of a com-
mercial product. Player will cooperate with the news media, and will par-
ticipate upon request in reasonable activities to promote the Club and the
League. Player and National Football League Players Association, here-
inafter "NFLPA," will not contest the rights of the League and its member
clubs to telecast, broadcast or otherwise transmit NFL Football or the right
of NFL Films to produce, sell, market, or distribute football game film
footage, except insofar as such broadcast, telecast, or transmission of
footage is used in any commercially marketable game or interactive use.
The League and its member clubs, and Player and the NFLPA, reserve their
respective rights as to the use of such broadcasts, telecasts or transmissions
of footage in such games or interactive uses, which shall be unaffected by
this subparagraph.

166

(b) Player hereby assigns to the NFLPA and its licensing affiliates, if
any, the exclusive right to use and to grant to persons, firms, or corpora-
tions (collectively "licensees") the right to use his name, signature facsimi-
le, voice, picture, photograph, likeness, and/or biographical information
(collectively "image") in group licensing programs. Group licensing pro-
grams are defined as those licensing programs in which a licensee utilizes a
total of six (6) or more NFL player images on products that are sold at re-
tail or used as promotional or premium items. Player retains the right to
grant permission to a licensee to utilize his image if that licensee is not con-
currently utilizing the images of five (5) or more other NFL players on prod-
ucts that are sold at retail or are used as promotional or premium items. If
Player's inclusion in a particular NFLPA program is precluded by an indi-
vidual exclusive endorsement agreement, and Player provides the NFLPA
with timely written notice of that preclusion, the NFLPA will exclude Play-
er from that particular program. In consideration for this assignment of
rights, the NFLPA will use the revenues it receives from group licensing
programs to support the objectives as set forth in the By-laws of the NFLPA.
The NFLPA will use its best efforts to promote the use of NFL player im-
ages in group licensing programs, to provide group licensing opportunities
to all NFL players, and to ensure that no entity utilizes the group licensing
rights granted to the NFLPA without first obtaining a license from the
NFLPA. This paragraph shall be construed under New York law without ref-
erence to conflicts of law principles. The assignment in this paragraph shall
expire on December 31 of the later of (a) the third year following the exe-
cution of this contract, or (b) the year in which this contract expires. Nei-

ther Club nor the League is a party to the terms of this paragraph, which is
included herein solely for the administrative convenience and benefit of
Player and the NFLPA. The terms of this subparagraph apply unless, at the
time of execution of this contract, Player indicates by striking out this sub-
paragraph (b) and marking his initials adjacent to the stricken language his
intention to not participate in the NFLPA Group Licensing Program. Noth-
ing in this subparagraph shall be construed to supersede or any way broad-
en, expand, detract from, or otherwise alter in any way whatsoever, the
rights of NFL Properties, Inc. as permitted under Article V (Union Securi-
ty). Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

   5.   COMPENSATION. For performance of Player's services and all
other promises of Player, Club will pay Player a yearly salary as follows:

   $_____    for the 19____ season;

   $_____    for the 19____ season;

   $_____    for the 19____ season;

   $_____  .   for the 19   season;

   $_____    for the 19____ season

In addition, Club will pay Player such earned performance bonuses as may
be called for in this contract; Player's necessary traveling expenses from his
residence to training camp; Player's reasonable board and lodging expens-
es during pre-season training and in connection with playing pre-season,
regular season, and post-season football games outside Club's home city;
Player's necessary traveling expenses to and from pre-season, regular sea-
son, and post season football games outside Club's home city; Player's
necessary traveling expenses to his residence if this contract is terminated
by Club; and such additional compensation, benefits and reimbursement
of expenses as may be called for in any collective bargaining agreement in
existence during the term of this contract. (For purposes of this contract, a
collective bargaining agreement will be deemed to be "in existence" during
its stated term or during any period for which the parties to that agreement
agree to extend it.)

   6.   PAYMENT   Unless this contract or any collective bargaining
agreement in existence during the term of this contract specifically provides
otherwise, Player will be paid 100% of his yearly salary under this contract
in equal weekly or bi-weekly installments over the course of the applicable
regular season period, commencing with the first regular season game
played by Club in each season. Unless this contract specifically provides
otherwise, if this contract is executed or Player is activated after the begin-
ning of the regular season, the yearly salary payable to Player will be re-
duced proportionately and Player will be paid the weekly or bi-weekly por-

167

EX 6, PAGE 403

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary having become due and payable up to the time of termination.

7. DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8. PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9. INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10. WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

168

deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgement of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

169

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply. If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which

are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice,

170     to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely, and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18. FILING This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

171

20 NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21 OTHER AGREEMENTS This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party

22. LAW. This contract is made under and shall be governed by the laws of the State of _____.

23 WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled

White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre season compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24 OTHER PROVISIONS. (a) Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b) Each of the undersigned further confirms that, except insofar as any of the undersigned may describe to in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c) The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects

172

25. SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

---

**PLAYER** _____     **CLUB** _____

**Home Address** _____     **By** _____

_____     **Club Address** _____

**Telephone Number** _____

**Date** _____     **Date** _____    173

**PLAYER'S CERTIFIED AGENT** _____

**Address** _____

**Telephone number** _____

**Date** _____

Copy Distribution:    White–League Office      Yellow–Player
                      Green–Member Club        Blue  Management Council
                      Gold–NFLPA               Pink–Player Agent

**EX 6, PAGE 409**

## APPENDIX D

### FIRST REFUSAL OFFER SHEET

Name of Player:                                Date:

Address of Player:                             Name of New Team:

Name and Address of                            Name of Prior Team
Player's Representative
Authorized to Act for Player:                  Address of Prior Team:


Principal Terms of NFL Player Contract With New Team:

   [Supply Information on this Sheet or on Attachment]

   1    Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary: signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates) amount and terms of loans, if any; and description of variation and method of calculation, if any. for Salary in Principal Terms that may be variable and/or calculable (i.e., on ly likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized league-wide bonus): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives).

   2.    Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)].

   3.    Other terms (that need not be matched):

Player:                                       New Club:

By ___.         _____        By _____
                                     Chief Operating Officer

174

## APPENDIX E

### FIRST REFUSAL EXERCISE NOTICE

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:            Address of Prior Team:

The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

Prior Team

By _____     175

Chief Operating Officer

## APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By _____ _____

WITNESSED BY:

176 —. ——— —————————

# APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____. _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

   In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.          **177**

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or already on the roster of the Club, and for whom the Club needs Room.

**EX 6, PAGE 413**

# APPENDIX H

## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR of the member clubs of the NFL (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions and definitions contained in the Settlement Agreement. The information on the Schedule is to be the responsibility of the NFL Member Clubs' and the NFL's managements. The Accountants' responsibility will be to express an opinion on the Schedule based on their audit.

The NFL and Class Counsel or any Players Union are to retain a national accounting firm (the "Accountants"). The Accountants are to conduct an audit of the Schedule (the "Audit") in accordance with generally accepted auditing standards. Those standards require that the Accountants plan and perform the Audit to obtain reasonable assurance about whether the Schedule is free of material misstatement. The Audit shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Audit shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of 6 members with 3 representatives designated by each of the NFL and Class Counsel or any Players Union. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Audit described in the preceding paragraph and again before February 15th to review the results of the Audit before issuance of the final report for that playing season.

The procedures detailed below are designed for the Accountants to determine whether, in their opinion, the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the member clubs of the NFL for such season in accordance with the terms of the Settlement Agreement. The Accountants will audit the Schedule for each playing season.

The Accountants may rely on the auditing procedures performed by each member club's local accounting firm ("Local Accountants") or may test the procedures on a scope basis so as to permit the Accountants to ob

178

rain a reasonable basis to express an overall opinion on the Schedule as referred above

The Accountants will have access to the Local Accountants' audit workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

## Procedures provided by the NFL and Class Counsel to be performed by the Accountants

### General

- The Settlement Agreement should be reviewed and understood

- See Exhibit I for the form of the Accountants' Audit Report

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable. 179

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood

- All audit workpapers of the Accountants relative to its report on the Schedule should be made available for review by representatives of the NFL and Class Counsel or any Players Union prior to issuance of the report

- A summary of all Audit findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised during the Audit should be resolved by the Committee

- Estimates should be reviewed in accordance with the Settlement Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be re-confirmed with third parties when possible.

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

**Procedures provided by the NFL and Class Counsel to be performed by the Local Accountants**

**180**

**General**
- Each NFL member club shall be audited in accordance with the Settlement Agreement. The Settlement Agreement should be reviewed and understood by all Local Accountants.

- See Exhibit II for the form of the Local Accountants' Audit Report.

- Special rules for Cap Counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood

**Team Salaries - Schedule 1**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the Settlement Agreement.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the Settlement Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the Settlement Agreement

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

181

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period

**Benefits – Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA – Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**
- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the Agreement.

**Defined Gross Revenues - Schedule 4**
- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the DGR Settlement Agreement. Amounts included in DGR should be verified to supporting documentation.

182
- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

**Excluded DGR - Schedule 5**
- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

**Questions - Schedule 6**
- Review with Controller or other representatives of the team the answers to all questions on this schedule

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

- Review supporting details of any changes.

183

# EXHIBIT I

## ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the ___ _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, White v. NFL, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of the Member Clubs and the NFL's management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

184

In our opinion the Schedule referred to above presents fairly, in all material respects, the team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the NFL or any Member Club taken as a whole.

## EXHIBIT II

## LOCAL ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ a Member Club of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, White v NFL, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of _____ management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

185

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the _____ taken as a whole.

# APPENDIX 1

## STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

### General Medical Examination

1.  History
    - player
    - family
      thorough review of all team physicians and trainer reports for preceding seasons

2.  Examination
    - head
    - face
      scalp
    - ears
      - external & drums
      sinus
    - throat
    - eyes
      - pupils
      - reaction to movement & light
    - lungs
      - palpation
    - chest
    - heart
    - visceral
      hernia
    - rectal
      hemorrhoid
      - fistula
      - prostate
    - gastric
    - any unusual body marks, i.e. scars, birthmarks
    - height
      weight
    - temperature
    - blood pressure
    - pulse
    - heart rate

**186**

### Orthopedic Examination

Examination visually, including stress testing and range of motion for all of the following

- neck and spine.
- shoulder
  elbow
- wrist
- fingers
  hips
- knees—also knee jerk
- ankle—check Achilles tendon for abnormalities and by jerk test
- toes

### Flexibility

Testing of hamstrings and neck

### EKG

Heart Abnormalities

187

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardio-vascular

### Blood Testing

Standard grid. Testing for (including but not limited to):

- Chemistry
  Calcium
  Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
  Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen
- Jay Sachs         Where applicable. If found,
  Sickle Cell        individual counseling necessary
  VD

## Urinalysis

Check for (including but not limited to).

- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

## Vision Testing

- peripheral vision
- standard eye test

## Hearing Test

## Dental Examination

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for: Tumor

188          T.B.
         Lesions

**X-Ray all previously injured areas** (at physician's discretion)

# APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

Mortality rates:    Group Annuity Mortality Table for 1983 without margins

Disability mortality
before age 65:      1965 Railroad Retirement Board select and ultimate table

| Non-football related disability rates before retirement. | Age | Rate |
|---|---|---|
| | 22 | .04 |
| | 27 | .04 |
| | 32 | .04 |
| | 37 | .05 |
| | 42 | .09 |
| | 47 | .18 |
| | 52 | .41 |

Football related        .08% per year for active players and .06% per year        189
disability rates:       for inactive players until age 45, after which it be-
                        comes zero. Active players are assumed to become
                        inactive after one year or age 30, whichever comes
                        later.

| Withdrawal rates | For Players With Service of | Rate |
|---|---|---|
| | 1 year | 29.1% |
| | 2 years | 19.7% |
| | 3 years | 17.0% |

Election of early        35% of all players out of football less than two years
payment benefit:        will elect the benefit two years after leaving football.
                        Active players are assumed to leave football after
                        one season or age 30, whichever is later. No as-
                        sumption for players with no credited seasons be-
                        fore 1993.

Retirement age:         47, except 55 for players with no credited seasons
                        before 1993

Percent married         Social Security awards in 1972

Age of Player's wife:   Three years younger than player

Remarriage rates:   1971 Railroad Retirement Board rates

Net investment return:  7.25%

Administration
expenses:   Actual for prior year

Valuation date:   First day of plan year

Actuarial value
of assets:   One time write up to market value as of March 31,
1993 followed by restart of the present procedure
thereafter

Funding method:   Unit credit cost method, except retrospective term
cost based on actual experience during the prior
year for Line-of-Duty disability benefits.

Amortization period   20 years beginning April 1, 1993; 19 years as of
April 1, 1994, etc. In years when there is a zero or
negative unfunded actuarial accrued liability, the
amount which is expected to produce a zero un-
funded actuarial accrued liability at the end of the
plan year.

190

## LETTER AGREEMENT

May 6, 1993

Harold Henderson
National Football League
Management Council.
410 Park Avenue
New York, New York 10022

Dear Harold:

This letter confirms certain agreements between the National Football League Players Association ("NFLPA") and the National Football League Management Council ("NFLMC") regarding several matters not set forth in the Collective Bargaining Agreement ("CBA"). First, the NFLMC will exercise its best efforts to provide to the NFLPA as soon as possible, but no later than December 31, 1993, a complete copy of all existing salary summaries and Player Contracts and Offer Sheets in the NFLMC's possession that were signed by players with respect to the 1989 through 1992 League Years. The copy may be in microfiche or similar readable form.

Second, it is the intention of the NFLPA that it will appoint Eugene Upshaw and Michael Kenn, or two persons of similar stature, to attend meetings of the NFL Competition Committee pursuant to Article XIII (Player Relations Committee), Section 2, of the CBA.

Third, if a Club competes in the Super Bowl, each of its practice squad players will be given a ring similar in appearance to the one provided to Active/Inactive List players, but the ring may be of lesser value.

Sincerely,

/S/

Richard Berthelsen

SEEN & AGREED

_[signature]_

191

## LETTER AGREEMENT

May 6, 1993

Harold Henderson
National Football League
Management Council
410 Park Avenue
New York, NY 10022

Re: White v. NFL
Dear Harold:

This letter will confirm our agreement that under Article XIV (NFL Player Contract), paragraph 3 of Article XXX (Consultation and Information Sharing), paragraph 4 of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), and Article XXVIII (Anti-Collusion Provisions) of the Collective Bargaining Agreement, any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA and Class Counsel, cannot be the basis of any claim of collusion. Class Counsel, the NFLPA, or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.

192

Sincerely,

/S/

Richard Berthelsen

Harold Henderson

Seen & Agreed

## LETTER AGREEMENT

June 23, 1993

Mr. Harold R. Henderson
Executive Vice President for
 Labor Relations/Chairman NFLMC
National Football League
410 Park Avenue
New York, New York 10022

Dear Harold

This letter confirms our agreed-upon interpretations of the following provisions of the Collective Bargaining Agreement ("CBA").

1. If a Rookie contracts with a Club for the minimum workout payments set forth in Article XXXV, for his second or subsequent season, such payments shall not be included for the purposes of the 25% calculation under Article XVII, Section 4(e). If a Rookie contracts with a Club for a workout payment in excess of the minimum, such excess amount shall be included for the purposes of the 25% calculation under Article XVII, Section 4(e). In all cases, a workout payment shall count toward Team Salary and a Team's Rookie Allocation. **193**

2. For the purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Article XXIV, Section 7(d) (i)-(iv).

3. For purposes of the Salary Cap and Entering Player Pool, any guaranteed bonus tied to workouts shall be treated as a Signing Bonus.

4. For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to re-pay shall be treated as a Signing Bonus

5. For purposes of calculating the minimum tenders to Franchise and Transition players under Article XX, if the present value of any deferred Paragraph 5 amount (as defined in Article XXIV, Section 7, Paragraph (a) (ii)) is at least $100,000 less than the initial Paragraph 5 amount (before being present valued), then the present value amount shall be used.

6. For purposes of the Salary Cap and Entering Player Pool, any roster or reporting bonus which is earned or paid before the start of the Club's pre-season training camp shall be treated as a Signing Bonus.

7. For purposes of the Entering Player Pool and a Team's Rookie Allocation, amounts contracted to be paid to Drafted Rookies, and amounts in excess of the applicable Minimum Active/Inactive List Salary contracted to be paid to Undrafted Rookies pursuant to Article XVII, Section 4, shall be counted against the Entering Player Pool and a Team's Rookie Alloca

**EX 6, PAGE 429**

tion, whether the amounts are actually paid, in the manner otherwise specified in the CBA.

8. The final sentence of Article XIX, Section 3 (b) applies to Article XIX, Section 3 (c).

9. Pursuant to Article XXXIV, Section 4, the practice squad shall consist of players who do not have an Accrued Season.

In addition, it is agreed that in League Years for which no Salary Cap is in effect, 85% of any amount contracted by a Team to be paid from the Team's Rookie Allocation to a Rookie, but not actually paid by the Team to that player, either as a rookie, or as a re-signed first-year player or practice squad player, which amount was not paid because that player was released, will be distributed to all rookies on such Team promptly after the end of the season on a pro rata basis based upon the number of downs played.

Finally, it is agreed that any non-injury dispute between a player and a Club arising before the effective date of the CBA that was or is arbitrable under a 1992 or 1993 NFL Player Contract, involving a player who is under contract or who has received a tender for the 1993 NFL season, which dispute to date has not been filed as a civil action, must be processed through Article IX of the CBA and must be initiated prior to the date of the first regular season game of the 1993 League Year.

194

Sincerely,

Gene Upshaw

Agreed to and accepted:

Harold R. Henderson

## LETTER AGREEMENT

August 4, 1993

Gene Upshaw
Executive Director
NFL Players Association
2021 L. Street, N.W.
Washington, D.C. 20036

Re: Collective Bargaining Agreement
Dear Gene:

This letter confirms our agreement regarding reimbursements and
payments to players for Rookie Orientation Camps, as follows:

1. The parties agree that if a club has a Rookie Orientation Program
apart from its allowable mini camp(s) and prior to its training camp, the fol-
lowing categories of per player reimbursements or payments will not be
counted against the Entering Player Pool:

(1) One Round Trip Airline Ticket or its cash equivalent from the
player's place of residence to the club city and back, not to exceed $750.                195

(2) Room and Board of up to $100 per day or its equivalent, up to a
maximum of 45 days.

(3) Ground transportation to and from the player's place of residence
in the club's city to the club's facility.

Any amounts in excess of the above reimbursements or payments
will count against the Entering Player Pool.

2. The parties further agree that the above reimbursements or pay-
ments for Rookie Orientation Programs will not be considered Player Costs
during the term of this Agreement. The parties reserve their respective
rights and arguments with respect to whether any amounts in excess of the
above reimbursements or payments do or do not qualify as Player Costs un-
der the Agreement.

3. Costs associated with the Rookie Orientation Programs will be
evaluated by the NFLPA, Class Counsel, and the NFLMC each year to de-

**EX 6, PAGE 431**

4

termine if adjustment, with respect to the Entering Player Pool, is appropriate.

Sincerely,

Harold Henderson

SEEN & AGREED

196

## LETTER AGREEMENT

August 4, 1993

Gene Upshaw
Executive Director
NFL Players Association
2021 L. Street, N.W.
Washington, D.C. 20036

Re: Collective Bargaining Agreement
Dear Gene.

This letter confirms our agreed-upon interpretation of the Collective Bargaining Agreement ("CBA") regarding whether Clubs subject to the Final Eight Plan are permitted to negotiate with and sign Transition Players, and Franchise Players who otherwise are permitted to negotiate and sign with other Clubs.

We have agreed that Final Eight Plan Clubs are permitted under the CBA to negotiate with and sign such players, since these players are not Unrestricted Free Agents. We further confirm that this agreement does not affect in any way any contracts such players may have already entered into this year.

197

Sincerely,

*Harold Henderson*

Harold Henderson

SEEN & AGREED

# LETTER AGREEMENT

August 4, 1993

Harold R. Henderson
Executive Vice President for Labor Relations/
Chairman NFLMC
National Football League
410 Park Avenue
New York, New York 10022

Re: Collective Bargaining Agreement
Dear Harold:

This letter confirms our understanding that our agreement to use one contract form for a multi year deal between a player and a club (as opposed to using a series of one year contract forms as in the past) does not expand the period of time for which a club is obligated to provide an injured player with medical and hospital care. Put another way, we agree that Paragraph 9 of the new NFL Player Contract gives the same coverage in this respect as Paragraph 9 of the old form.

198

Of course, nothing in this letter shall be construed as modifying any workers compensation rights that a player or club may have.

Sincerely,

Gene Upshaw

SEEN & AGREED

# INDEX

## A

ACCESS TO PERSONNEL AND MEDICAL RECORDS,
ARTICLE XLV ................................................................**12B**
Section 1. Personnel Records.. ...... ...... .. ... .. ................ 128
Section 2. Medical Records . ........ .... ..... . ....... . 128

ADDRESSES, ARTICLE LV, SECTION 7 ................................... ......152

ANTI-COLLUSION, ARTICLE XXVIII................................................97
Section 1. Prohibited Conduct . ...... .. ...... .. ..... . . .. .... .. 97
Section 2. Other Club Conduct ...... ..... ......................... ..............97
Section 3. Club Discretion .. ......... ............ .. ... ............ .......97
Section 4. League Disclosures . ..... ................ ... .... ... .......98
Section 5. Enforcement of Anti-Collusion Provisions ......... .. ...98
Section 6. Burden of Proof . ... . .. .. .... . ....... .. ... ....... ... 98
Section 7. Summary Judgment........... .... .. ... .... .......... .. . 99
Section 8. Remedies.......... .... ..... ..... ...... ...... ...........99
Section 9. Computation of Damages              99
Section 10. Player Election  ....... ........... .. .. ......... ... 100
Section 11. Payment of Damages ..... ........... ... ......... ....... 101
Section 12. Effect on Cap Computations... ........ ...... .. ...... .101
Section 13. Effect on Salary Cap.. . .. .... .. ..... . ...... ... .. 101
Section 14. No Reimbursement ... . ...... . .... .. ... . . . 101
Section 15. Costs . ...... . .... ... .. ...... .............. .. . .. ......101
Section 16. Termination  ...... .... .......... ..... ..... ..... ... 101
Section 17. Time Limits ... .. . ......... .... ... .. .. , ... ... .....102
Section 18. Prior Conference . . ...... .. ...... ... .. ... .. .. ... .. 102

APPEARANCES, ARTICLE LV, SECTION 3 ...................................152

ATTIRE, ON-FIELD, ARTICLE LV, SECTION 2 ...............................152

AUTHORIZATION, ARTICLE LV, SECTION 15...............................153

## B

BENEFIT ARBITRATOR, ARTICLE LII..........................................147
Section 1. Selection.... .. ......... ...... ... .. ... ... ...... ........147
Section 2. Compensation ..............................................147
Section 3. Role... ... .. .... .. ...... ... . ... ............. ........ 147

BINDING EFFECT, ARTICLE LV, SECTION 14...............................153

199

# C

CAREER PLANNING PROGRAM, ARTICLE LV, SECTION 12 ......133

CERTIFICATIONS, ARTICLE XXIX ..............................................103
   Section 1. Contract Certification. .      ...... ... . ..... ........103
   Section 2. End of League Year Certification ................. ..............103
   Section 3. False Certification ... ... ... ... .... .. ... .............. ... . ..104

CLUB DISCIPLINE, ARTICLE VIII ...............................................16
   Section 1. Maximum Discipline............ ... ............... ..... ........16
   Section 2. Published Lists ......... ............... ....... ................ ..17
   Section 3. Uniformity . .... ...... . ................. . ... . ...... . ....17
   Section 4. Disputes... . . .....      ..... .... ...... ... ..........17
   Section 5. Deduction .. . . ...      . . . ...      . ...........17

COLLEGE DRAFT, ARTICLE XVI...............................................39
   Section 1. Time of Draft ... ......... .... . ..... .....      ......39
   Section 2. Number of Choices... ..... ...... ..... ..... .. .............39
   Section 3. Required Tender. .......... .. .... .. ... .. ... ...... ...... ....39
   Section 4. Signing of Drafted Rookies . . .. .... ................ .... . . .39
   Section 5. Other Professional Teams .. .......................... ... ...40
   Section 6. Return to College      .. ........... .. ........... ............ ..41
   Section 7. Assignment of Draft Rights ... .. ..... ......... ..... ..42
   Section 8. Subsequent Draft . . . . .. . ... ... ... .. ... ... ....... . 42
   Section 9. No Subsequent Draft .. .. ... . .      .. ... ... ........42
   Section 10. Compensatory Draft Selections .. ...... .... ............42
   Section 11. Undrafted Rookies .............. ... .......... ....      ... . . 43
   Section 12. Notice of Signing ... .. ... .. ...... .................. .. . ..43

COMMISSIONER DISCIPLINE, ARTICLE XI....................................29
   Section 1. League Discipline....... ......      ... ...... .. ...... .. ..29
   Section 2. Time Limits .. ....... .................................... ...... .......29
   Section 3. Representation . .. ...... ... . ... . ... ........ ...........29
   Section 4. Costs.. . . . . .. ... ... ... .... . .. ..... ... ... ... ... .      30
   Section 5. One Penalty.... ..... . .... .... ... .... .......... ......... .. ... ..30
   Section 6. Fine Money      ... .... .... ... ...... ...... . ..... ..... .. . ...30

COMMITTEES, ARTICLE XIII ..............................................................33
   Section 1. Joint Committee .......... . . ..... ... . . . ... ... ........33
   Section 2. Competition Committee .. ...... ...... ......................34
   Section 3. Player/Club Operations Committee. .... ................ .. .34

200

CONSULTATION AND INFORMATION SHARING,
    ARTICLE XXX .............................................................105
    Section 1. Consultation and Communications... ................ ... 105
    Section 2. Salary Summaries... ......... ..........................105
    Section 3. Notice of Invalid Contract ................. ........ ............. 105
    Section 4. Neutral Verifier...................................... ............ .....105
    Section 5. Copies................... ....... ........................ ......... ...106
    Section 6. Meetings.................... ........... ...... ........ ........ ......106

# D

DAYS OFF, ARTICLE XL ..............................................120
    Section 1. Rate.................. ........................ ......................120
    Section 2. Requirements ........ .................... ........ .... .... .... 120

DEDUCTIONS (CLUB HOUSE DUES),
    ARTICLE LV, SECTION 5 ...............................................152

DEFINITIONS, ARTICLE I.................................................2
    Section 1. General Definitions ...........................................2
    Section 2. Free Agency Definitions ........................... ...........3
    Section 3. Salary Cap Definitions... ................................. 5      201

DELIVERY OF DOCUMENTS, ARTICLE LV, SECTION 13 ...........153

DURATION OF AGREEMENT, ARTICLE LVIII............................157
    Section 1. Effective Date     .. .. ....... ...... ................ ..........157
    Section 2. Termination . ............. ..... .... ................. ......... .. ..157
    Section 3. Termination Date         . .... .............. . .............157
    Section 4. Termination Prior to Expiration Date ...........................157
    Section 5. Ratification ...................................... ...........159

# E

ENDORSEMENTS, ARTICLE LV, SECTION 1 ...............................152

ENFORCEMENT OF THE SALARY CAP AND ENTERING PLAYER
    POOL, ARTICLE XXV ...........................................................90
    Section 1. Undisclosed Terms ...... ...... ......................... ...... .. 90
    Section 2. Circumvention... ........ . .... ....        90
    Section 3. Special Master Action         . ..... ..... . . ...... .. .. 90
    Section 4. Commissioner Disapproval..........................................90
    Section 5. Special Master Review.. ..... ... .... .. .. .. .. .. ..91
    Section 6. Sanctions.................. ........ .. .. ........ .. ...... ... . .. ...91
    Section 7. Prior Conference         . .. .. ...... .. . .... .......... ..... . .91

**EXHIBITS, ARTICLE LV, SECTION 18** ..........................................154

**EXPANSION, ARTICLE XXXI** ..........................................................107
    Section 1. Veteran Allocation.............................................107
    Section 2. Additional Compensatory Picks ............................107
    Section 3. Entering Player Pool Adjustment .............. ...107
    Section 4. Relocation Bonus........ ......... .....................107

## F

**FINAL EIGHT PLAN, ARTICLE XXI**........................................69
    Section 1. Application.................................................69
    Section 2. Top Four Teams.....................................69
    Section 3. Next Four Teams............................................69
    Section 4. Replacement of Free Agents Signed
              By Other Club ...........................................69
    Section 5. Increases.................................................70
    Section 6. Salary Definition ...........................................70
    Section 7. Trade Limitation .....................................70

**FRANCHISE AND TRANSITION PLAYERS, ARTICLE XX** ...............60
    Section 1. Franchise Player Designations ..................60
    Section 2. Required Tender for Franchise Players....................60
    Section 3. Transition Player Designations............................62
    Section 4. Required Tender for Transition Players .........................62
    Section 5. Right of First Refusal for Transition Players.....63
    Section 6. Lists .......................................................63
    Section 7. Salary Information ......................................63
    Section 8. No Assignment............................................64
    Section 9. Duration of Designation ..................................64
    Section 10. Franchise Player Designation Period ...................65
    Section 11. Transition Player Designation Period ........... .....65
    Section 12. Prospective Designation .............................66
    Section 13. Right to Decline.......................................66
    Section 14. Other Terms.............................................67
    Section 15. Compensatory Draft Selection ......................67
    Section 16. Signing Period for Transition Players ...............67
    Section 17. Signing Period for Franchise Players.................68

## G

**GOVERNING AGREEMENT, ARTICLE II** ...........................7
    Section 1. Conflicts .................................................7
    Section 2. Implementation ..........................................7
    Section 3. Management Rights .....................................7

202

**EX 6, PAGE 438**

Section 4 Rounding ... . ... . ...... .... . ........................ ..7

GOVERNING LAW, ARTICLE LIX.......................................160

GROUP INSURANCE, ARTICLE XLIX.......................................141
  Section 1. Group Insurance Benefits. . . . . . . . .  ...... . ... ....... ..141
  Section 2. Administration.... .. . .... ......... . ......... .... .. .. 141

GUARANTEED LEAGUE-WIDE SALARY, SALARY CAP
  AND MINIMUM TEAM SALARY, ARTICLE XXIV.....................74
  Section 1. Definitions ... ..  · · ·· ...... .... .. ....... .. ... 74
  Section 2. Trigger for Guaranteed League-wide Salary,
            Salary Cap, and Minimum Team Salary. .... .......... 77
  Section 3. Guaranteed League-wide Salary..... ............., ......... . 77
  Section 4. Salary Cap Amounts ..... . . ...... ... . . ......................78
  Section 5. Minimum Team Salary ... .. ...........................79
  Section 6. Computation of Team Salary        . ...... . .... .79
  Section 7. Valuation of Player Contracts      . . .. ....... ...81
  Section 8. 30% Rules . .................. ........ ...... .... . .....85
  Section 9. Renegotiations and Extensions. ... .. ......... . .. .........85
  Section 10. Accounting Procedures ... ....... ....... ....... . ...... .....85

203

### H

HEADINGS, ARTICLE LV, SECTION 16 ......................................154

### I

IMPARTIAL ARBITRATOR, ARTICLE XXVII ...............................95
  Section 1. Selection. . . .. .. . ............. ..... ...... ..................95
  Section 2. Scope of Authority ..... . .......... . .. . . .   ..95
  Section 3. Effect of Rulings... ........ ...... .... . ...... .....  ..........95
  Section 4. Discovery ...........  ...... ............ ... ... ..... . ...........95
  Section 5. Compensation of Impartial Arbitrator ... ... .. . . . ........95
  Section 6. Procedures  .. . ......... . .... ... ....... . .. . .... ...95
  Section 7 Selection of Impartial Arbitrator ..................,.... ........ . .96

INJURY GRIEVANCE, ARTICLE X.......................................23
  Section 1. Definition     . . ......... ...   ...... . ... .. .. ...............23
  Section 2. Filing ...... . .... ......... . ..... ....... . . .... ....... .. ....23
  Section 3. Answer ..... . ........ ... .......... ... .... ... ............ .. . ...23
  Section 4. Neutral Physician.....................................24
  Section 5. Neutral Physician List ...... .... .., ... ... . .... .. .. 24
  Section 6. Appeal......... ... . .. .. ... .. ...... .  ..25
  Section 7. Arbitration Panel .. ..... .. ........ ... ... . ... ..... ... .....25

Section 8. Hearing ................................... 25
Section 9. Miscellaneous ............................ 26
Section 10. Expenses ............................... 27
Section 11. Pension Credit ......................... 27
Section 12. Payment ................................ 27
Section 13. Presumption of Fitness ................. 27
Section 14. Playoff Money .......................... 28
Section 15. Information Exchange ................... 28
Section 16. Discovery .............................. 28

**INJURY PROTECTION, ARTICLE XII.................................31**
Section 1. Qualification ........................... 31
Section 2. Benefit................................. 31
Section 3. Disputes................................ 32

## L

**1999 LEAGUE YEAR, ARTICLE LVI.............................155**
Section 1. No Salary Cap.. ........................ 155
Section 2. Free Agency If Salary Cap in 1998....... 155
Section 3. Free Agency If No Salary Cap in 1998.... 155
204    Section 4. Franchise and Transition Players ....... 155

**LEAGUE SECURITY, ARTICLE IV, SECTION 11..............153**

## M

**MEAL ALLOWANCE, ARTICLE XXXIX...............................119**
Section 1. Reimbursement .......................... 119
Section 2. Travel Day.............................. 119

**MINICAMPS, ARTICLE XXXVI ..................................113**
Section 1. Number.................................. 113
Section 2. Length.................................. 113
Section 3. Expenses................................ 113
Section 4. Contact................................. 113
Section 5. Injuries................................ 113

**MOVING AND TRAVEL EXPENSES, ARTICLE XLI.............121**
Section 1. Qualification........................... 121
Section 2. Moving Expenses......................... 121
Section 3. Travel Expenses......................... 121
Section 4. Transportation ......................... 122

MUTUAL RESERVATION OF RIGHTS: LABOR EXEMPTION,
ARTICLE LVII ........................................................................156
   Section 1. Rights Under Law ..................................................156
   Section 2. Labor Exemption ... ... .. ........................................156
   Section 3. CBA Expiration ......................................................156

## N

NFLPA AGENT CERTIFICATION, ARTICLE VI ...........................14
   Section 1. Exclusive Representation .......................................14
   Section 2. Enforcement .... ... ..................................................14
   Section 3. Penalty.. ................................................................14

NFLPA TICKETS, ARTICLE IX, SECTION 8 ................................152

NFL PLAYER CONTRACT, ARTICLE XIV...................................35
   Section 1. Form ..................................................................35
   Section 2. Term ..................................................................35
   Section 3. Changes. ...........................................................35
   Section 4. Conformity..........................................................35
   Section 5. General..............................................................35
   Section 6. Commissioner Disapproval ..................................36
   Section 7. NFLPA Group Licensing Program...........................36
   Section 8. Good Faith Negotiation .......................................37

NON-INJURY GRIEVANCE, ARTICLE IX ...................................18
   Section 1. Definition. . . ......................................................18
   Section 2. Initiation. .. .........................................................18
   Section 3. Filing..................................................................18
   Section 4. Appeal.... ...........................................................18
   Section 5. Discovery ...... ....................................................19
   Section 6. Arbitration Panel.. . .............................................19
   Section 7. Hearing .. ... ........................................................20
   Section 8. Arbitrator's Decision and Award..............................21
   Section 9. Time Limits ............. ..........................................21
   Section 10. Representation. .. . ..............................................21
   Section 11. Costs ................................................................21
   Section 12. Payment ..........................................................22
   Section 13. Grievance Settlement Committee .... ... ................22

NO STRIKE/LOCKOUT/SUIT, ARTICLE IV ..................................9
   Section 1. No Strike/Lockout ..................................................9
   Section 2. No Suit. ...... ........................................................9
   Section 3. Releases.. .. ... .....................................................10

205

NOTICES, ARTICLE LX.................................................................161

## O

OFF-SEASON WORKOUTS, ARTICLE XXXV ................................112
    Section 1. Voluntary Workouts.....................................................112
    Section 2. Time Periods.............................................................112
    Section 3. Payment..................................................................112
    Section 4. Injuries...................................................................112
    Section 5. Miscellaneous..........................................................112

OPTION CLAUSE, ARTICLE XV...................................................38
    Section 1. Prohibition..............................................................38
    Section 2. Existing Option Clauses.............................................38

OTHER PROVISIONS, ARTICLE XXXII ........................................108
    Section 1. CFL Rule................................................................108
    Section 2. Physically Unable to Perform......................................108
    Section 3. Non Football Injury..................................................108
    Section 4. Roster Exemption.....................................................108

## 206

## P

PAROL EVIDENCE, ARTICLE IX, SECTION 19...............................154

PLAYER BENEFIT COSTS, ARTICLE XLVI...................................129
    Section 1. Right of Reduction....................................................129
    Section 2. Right of Restoration..................................................129
    Section 3. Definition...............................................................129
    Section 4. Resolution of Disputes...............................................130

PLAYER POOL (ENTERING), ARTICLE XVII..................................44
    Section 1. Definition...............................................................44
    Section 2. Covered League Years................................................44
    Section 3. Calculation..............................................................44
    Section 4. Operation...............................................................45

PLAYER SECURITY, ARTICLE VII...............................................15
    Section 1. No Discrimination.....................................................15
    Section 2. Personal Appearance.................................................15

PLAYER TICKETS, ARTICLE LX, SECTION 9.................................153

PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT,
ARTICLE XLIV ........................................................... 126
Section 1. Club Physician ............................................ 126
Section 2. Club Trainers ............................................. 126
Section 3. Players' Right to a Second Medical Opinion ............... 126
Section 4. Players' Right to a Surgeon of His Choice ........        126
Section 5. Standard Minimum Pre Season Physical .................... 126
Section 6. Substance Abuse .......................................... 127

POST-SEASON PAY, ARTICLE XLII ....................................... 123
Section 1. System ................................................... 123
Section 2. Compensation ............................................. 123
Section 3. Wild Card Game, Division Play off Game ................... 123
Section 4. Conference Championship, Super Bowl Game ................. 123
Section 5. Payment .................................................. 124

PRACTICE SQUADS, ARTICLE XXXIV ...................................... 111
Section 1. Practice Squads .......................................... 111
Section 2. Signing With Other Clubs ................................. 111
Section 3. Salary ................................................... 111
Section 4. Eligibility .............................................. 111

PRE-SEASON TRAINING CAMPS, ARTICLE XXXVII, .......................... 114
Section 1. Definition ............................................... 114
Section 2. Room and Board ........................................... 114
Section 3. Rookie Per Diem .......................................... 114
Section 4. Veteran Per Diem ......................................... 114
Section 5. Reporting ................................................ 114
Section 6. Number of Pre Season Games ............................... 114
Section 7. Telephones ............................................... 115
Section 8. Expenses ................................................. 115

PRO BOWL GAME, ARTICLE XLIII ........................................ 125
Section 1. Compensation ............................................. 125
Section 2. Selection ................................................ 125
Section 3. Wives .................................................... 125
Section 4. Injury ................................................... 125
Section 5. Payment .................................................. 125

PROMOTIONS, ARTICLE LV, SECTION 4 ................................... 152

PUBLIC STATEMENTS, ARTICLE LV, SECTION 6 ............................ 152

207

# R

**RETENTION OF BENEFITS, ARTICLE LIII** ............................149

**RETIREMENT PLAN, ARTICLE XLVII** ............................... ... ...132
Section 1. Maintenance and Definitions..... ... ...... ........ ......132
Section 2. Amendment by Bargaining Parties ..... .............. .. ..132
Section 3. Contributions .......................... ........... . .............132
Section 4. Amendment of Bert Bell and Pete Rozelle Plans .... . ...133
Section 5. Plan Merger and Further Amendments.. . .. . . ...... ...136
Section 6. Benefits for Pre-1959 Seasons .. ...... . . . .  .. .. . . . .137

# S

**SALARIES, ARTICLE XXXVIII** .........................................116
Section 1. 1993 Minimum Salaries.................. ..........................116
Section 2. Minimum Salaries For 1994-98 League Years ............116
Section 3. Credited Season..., . ... . .  .... .. .. .............. ....116
Section 4. Other Compensation .............. ....... ........... ....116
Section 5. Arbitration........... ..... .... ..... .  . ............... ........117
Section 6. Payment ...... .. ... ..... ........ ............... ........117
Section 7. Deferred Paragraph 5............. . ... ....... ... ... ......117
Section 8. Number of Regular Season Games ............ .. ........  117
Section 9. Copies of Contracts .. .  ...... ... ........... .. .  ........117
Section 10. Split Contracts... .  . ...........  ..  .  . ........... . ...118
Section 11. Funding of Deferred and Guaranteed Contracts .. ...118

**SCOPE OF AGREEMENT, ARTICLE III** .............................................8
Section 1. Scope ....... .... .  .. ... .... ...... .. ..............................8
Section 2. Arbitration: .. ....... .. .. ......., . ........ .... ...................8

**SECOND CAREER SAVINGS PLAN, ARTICLE XLVIII**...................139
Section 1. Establishment ... .......... .. .... . ...........................139
Section 2. Contributions  .. ........... ............ ..   . ....139
Section 3. Allocation ...... . .... . ... . ............................ ............ 139
Section 4. Salary Reduction Contributions........ ...................139
Section 5. Benefit Options  ... . . .... . ... ... .. . ......... .. 139
Section 6. Death Benefits . ....... ......................... ...........140
Section 7. Investment  ................ .. . ........... . ........ 140

**SEVERANCE PAY, ARTICLE L**................................................143
Section 1. Eligibility . .... . . . .. . . .. ... ...  . .. ...... 143
Section 2. Amount. ............ .. .............. ... . .............. ......143
Section 3. Application... . . . .  .................. .  ........ ...... ...143
Section 4. Payment ... .. .... ..... .. ... ..... ...... ................ ....143

208

Section 5. Failure to Apply ........... 144
Section 6. Only One Payment ....... 144
Section 7. Payable to Survivor ....... 144
Section 8. Prior Severance Pay ...... 144
Section 9. Nonassignability ...... 144

SPECIAL MASTER, ARTICLE XXVI .......92
Section 1. Appointment ....... 92
Section 2. Scope of Authority ....... 92
Section 3. Discovery ....... 93
Section 4. Compensation ....... 93
Section 5. Procedures ....... 93
Section 6. Selection of Special Master ...... 94
Section 7. Penalties ....... 94

SQUAD SIZE, ARTICLE XXXIII .......110
Section 1. Active List ....... 110
Section 2. Pre-Season ....... 110
Section 3. Inactive List ....... 110
Section 4. Active and Inactive List Limit ....... 110

SUPPLEMENTAL DISABILITY BENEFITS, ARTICLE LI .......145     209
Section 1. Establishment ....... 145
Section 2. Contributions ....... 145
Section 3. Disability Benefits ....... 145
Section 4. Retirement Ignored ....... 146

T

TERMINATION PAY, ARTICLE XXII .......73
Section 1. Eligibility ....... 73
Section 2. Regular Season Signings ....... 73

TESTS, PSYCHOLOGICAL OR PERSONALITY,
ARTICLE LV, SECTION 10 .......153

TIME PERIODS, ARTICLE LV, SECTION 17 .......154

U

UNION SECURITY, ARTICLE V .......11
Section 1. Union Security ....... 11
Section 2. Check Off ....... 11
Section 3. NFLPA Meetings ....... 11
Section 4. NFLPA Player Group Licensing Program ....... 11

Section 5. Disputes .............................................. 12
Section 6. Procedure for Enforcement.......................... 12
Section 7. NFLPA Responsibility ............................. 13
Section 8. Orientations ..................................... 13

## V

**VETERAN FREE AGENCY, ARTICLE XIX**.......................... 49
Section 1. Unrestricted Free Agents........................... 49
Section 2. Restricted Free Agents............................ 50
Section 3. Offer Sheet and First Refusal Procedures. ......... 54
Section 4. Expedited Arbitration............................. 57
Section 5. Individually Negotiated Limitations
    on Player Movement ..................................... 57
Section 6. Notices, Etc..................................... 58

**VETERANS WITH LESS THAN THREE ACCRUED SEASONS.**
**ARTICLE XVII** ............................................. 47
Section 1. Accrued Seasons Calculation. ..................... 47
Section 2. Negotiating Rights of Players With Less
    Than Three Accrued Seasons ............................ 47

210    Section 3. Minimum Salaries ................................ 47
Section 4. Notice of Signing ............................... 48

## W

**WAIVER SYSTEM, ARTICLE XXII** ............................. 71
Section 1. Release ......................................... 71
Section 2. Contact ......................................... 71
Section 3. Ineligibility ................................... 71
Section 4. Notice of Termination ........................... 71
Section 5. NFLPA's Right to Personnel Information ........... 72
Section 6. Rosters ......................................... 72

**WORKERS' COMPENSATION, ARTICLE LIV** ..................... 150
Section 1. Benefits ....................................... 150
Section 2. Rejection of Coverage.......................... 150
Section 3. Arbitration.................................... 150
Section 4. Joint Study.................................... 150
Section 5. Moratorium..................................... 150
Section 6. Preservation of Rights......................... 151
Section 7. Reopener ...................................... 151