# EXHIBIT 9
# (CONTINUED)

ommendation of the Special Master. The parties may seek appropriate relief to effectuate and enforce this provision.

(e)   The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, *XXXVIII-A*, *XXXVIII-B*, and LVI-LVIII of this Agreement for Special Master review.

  * *Extension Agreement 1/8/02*

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement regarding any DGR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed

**147**

EX 9, PAGE 1178

Article XXVI, Special Master

with the Special Master. All such notices and all orders and notices issued
and directed by the Special Master shall be served upon the NFL and the
NFLPA, in addition to any counsel appearing for individual NFL players or
individual NFL Clubs. The NFL and the NFLPA shall have the right to par-
ticipate in all such enforcement proceedings, and the NFLPA may appear
in any enforcement proceedings on behalf of any NFL player who has giv-
en authority for such appearance.

*Section 6. Selection of Special Master*: In the event that the NFL and
NFLPA cannot agree on the identity of a Special Master to be appointed by
the Court, the parties agree to submit the issue to the President of the
American Bar Association ("ABA") who shall submit to the parties a list of
eleven attorneys (none of whom shall have nor whose firm shall have rep-
resented within the past five years players, player representatives, clubs or
owners in any professional sport). If the parties cannot within thirty days
of receipt of such list agree to the identity of the Special Master from among
the names on such list, they shall alternately strike names from said list, un-
til only one name remains, and that person shall be the Special Master. The
first strike shall be determined by a coin flip. Upon approval by the Court,
the Special Master shall serve for an initial two-year term commencing on
the date of entry of the order of appointment. Thereafter, the Special Mas-
ter shall continue to serve for successive three-year terms unless notice to
the contrary is given either by the NFL or the NFLPA. Such notice shall be
given to the other party, the Court and the Special Master within the nine-
ty days preceding the end of any term, but no later than thirty days prior
to the end of such term. Following the giving of such notice, a new Special
Master shall be selected in accordance with the procedures set forth in this
Section 6. The NFL and the NFLPA may dismiss the Special Master at any
time and for any reason upon their mutual consent.

*Section 7. Penalties*: Any monetary penalty assessed by the Special Master
may be assessed only against a Club or Clubs or the League, as applicable,
found to have violated this Agreement. In no event may the Special Master
order relief, or assess any monetary penalty, against an individual Club
owner, officer, or non player employee.

**148**

# ARTICLE XXVII
## IMPARTIAL ARBITRATOR

**Section 1. Selection:** The parties shall agree upon an Impartial Arbitrator who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4. Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

**Section 6. Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

149

Article XXVII, Impartial Arbitrator

*Section 7.* **Selection of Impartial Arbitrator**: In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree to submit the issue to the President of the ABA who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs, or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Impartial Arbitrator from among the names on such list, they shall alternatively strike names from said list, until only one name remains, and that person shall be the Impartial Arbitrator. The first strike shall be determined by a coin flip. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

150

# ARTICLE XXVIII
## ANTI-COLLUSION

**Section 1. Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

(a)    whether to negotiate or not to negotiate with any player;

(b)    whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(c)    whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

(d)    whether to exercise or not to exercise a Right of First Refusal; or

(e)    concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

> \* [U]nder Article XIV (NFL Player Contract), paragraph 3 of Article XXX (Consultation and Information Sharing), paragraph 4 of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), and Article XXVIII (Anti-Collusion Provisions) of the Collective Bargaining Agreement, any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA and Class Counsel, cannot be the basis of any claim of collusion. Class Counsel, the NFLPA, or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.
>
> \*Side Letter 5/6/93

**Section 2. Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)    that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

(b)    that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

151

**EX 9, PAGE 1182**

Article XXVIII, Anti-Collusion

    (c)     that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

    (d)     that the player is or has been subject to any Right of First Refusal.

**Section 3. Club Discretion**: Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 4. League Disclosures**: Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 5. Enforcement of Anti-Collusion Provisions**: Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

**Section 6. Burden of Proof**: The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by

152

itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

**Section 7. Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

**Section 8. Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a) To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes

EX 9, PAGE 1184

place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)     To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

*Section 9*. **Computation of Damages**: Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)     Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)     Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)     Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $2,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $2,000,000. *For each League Year after the 2000 League Year, each of the enumerated fines set forth in this subsection 9(c) shall increase by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (up to a maximum of ten percent (10%) per League Year).*

*Amendment Agreement 12/4/00*

*Section 10*. **Player Election**: A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability

EX 9, PAGE 1185

and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

**Section 11. Payment of Damages**: In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

**Section 12. Effect on Cap Computations**: In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

**Section 13. Effect of Salary Cap**: In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

**Section 14. No Reimbursement**: Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

**Section 15. Costs**: In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable

EX 9, PAGE 1186

Article XXVIII, Anti-Collusion

basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

**Section 16. Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a) Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

(b) Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c) Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d) In order to terminate this Agreement:

(i) The proceeding must be brought by the NFLPA;

(ii) The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii) The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

156

# ARTICLE XXIX
## CERTIFICATIONS

**Section 1. Contract Certification:**

(a)  Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of *the* player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, *or* promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: *(a)* involving consideration of any kind to be paid, furnished or made available *or guaranteed* to the player, or Player Affiliate, by the Club or Club Affiliate either *prior to*, during, *or after* the term of the Player Contract; *or (b) concerning terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.*

(b)  In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)  In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)  No contract will be approved by the Commissioner unless accompanied by the certifications required by subsections (a), (b), and (c) above.

(e)  *Any failure to execute and submit a certification as required under Section 1(a) above may be deemed evidence of a violation of Article XXV (Enforcement Of The Salary Cap And Entering Player Pool), Section 1 of this Agreement. Any failure to execute and submit a certification as required under Section 1(b) above may be deemed evidence of a violation of Article XXVIII (Anti-collusion) of this Agreement. Any failure to execute and submit a certification as required under Section 1(c) above may be deemed evidence of a violation of that provision.*

\* *Amendment Agreement 12/4/00*

**Section 2. End of League Year Certification:**

(a)  At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the *Management Council* a certification confirming that the Club has not, to the

157

Article XXIX. Certifications

extent of his knowledge after reasonable inquiry of all owners and all employees with *authority to negotiate Player Contracts, entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement Of The Salary Cap And Entering Player Pool), Section 1. Upon receipt of such certification, the Management Council shall forward a copy of the certification to the NFLPA.*

(b) *At the conclusion of each League Year, each player agent representing a player who was under contract to an NFL Club during that League Year shall submit to the NFLPA a certification confirming, after reasonable inquiry of all personnel in his or her agency with authority to negotiate Player Contracts, that neither he or she nor they has entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement Of The Salary Cap And Entering Player Pool), Section 1. Upon receipt of such certification, the NFLPA shall forward a copy of the certification to the Management Council.*

(c) *Any failure to execute and submit a certification as required under Section 2(a) or 2(b) above, may be deemed evidence of a violation of Article XXV, Section 1 of this agreement.*

*\*Amended Agreement 12/4/00*

(d) At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or the NFL Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that *Unrestricted Free Agent, where such communication or disclosure is inconsistent with Article XXVIII (Anti-Collusion), Section 1.* Upon receipt of each such certification, the NFL shall forward a copy of the certification to the NFLPA.

(e) Any failure to execute a certification as required under Section 2(d) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

**Section 3. False Certification**: Any person *or Club who knowingly executes or* files a false certification required by *Sections* 1(a), 1(b), *2(a), or 2(b)* of this Article shall be subject to a fine of up to $250,000, upon a finding of such violation by the Special Master. *Authority to impose such a fine shall rest with*

**158**

*the Special Master or* the Commissioner, *consistent with the allocation of authority in Article XXV (Enforcement Of The Salary Cap And Entering Player Pool), Section 6(b). Notwithstanding the foregoing, in no circumstances shall a fine under this section be imposed upon any person or Club if such person or Club is also being sanctioned for the same conduct under Article XXV, Section 6 above.*
\* *Amendment Agreement 12/4/00*

159

## ARTICLE XXX
## CONSULTATION AND INFORMATION SHARING

### Section 1. Consultation and Communications:

(a) In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b) Subject to any claim of attorney-client and/or work product privilege, any communications under this section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

**Section 2. Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected DGR, and a revised estimate on the first day of each month thereafter in any such year.

**Section 3. Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

**Section 4. Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

**160**

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within five (5) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings**: During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

EX 9, PAGE 1192

## ARTICLE XXXI
## EXPANSION

**Section 1. Veteran Allocation**: The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three per Club, excluding any player who has a no trade clause in his Player Contract.

**Section 2. Additional Compensatory Picks**: The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

**Section 3. Entering Player Pool Adjustment**: The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

**Section 4. Relocation Bonus**: Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $20,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $30,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

162

## ARTICLE XXXII
## OTHER PROVISIONS

**Section 1. CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or postseason, whichever is applicable).

**Section 2. Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

**Section 3. Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off NF/I during the period when such action is allowed by League rules, his contract will not be tolled.

### Section 4. Roster Exemption:

(a)     Certain Players Not Under Contract. After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)     Players Under Contract. If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)     Restricted Players. Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 2, or Article XIX

**163**

Article XXXII, Other Provisions

(Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i) If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii) If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii) If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

> * [A]ny player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) of the CBA, shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with subsections (i) through (iii) of Article XXXII, Section 4(c) of the CBA. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

*Side Letter 1/18/94

No player may be placed on roster exempt under this subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with (i) through (iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this subsection, the player shall not be entitled to compensation.

(d) Except as provided in subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

164

## ARTICLE XXXIII
## SQUAD SIZE

**Section 1. Active List:** For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

**Section 2. Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

**Section 3. Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

**Section 4. Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

**EX 9, PAGE 1196**

# ARTICLE XXXIV
## PRACTICE SQUADS

**Section 1. Practice Squads**: For each regular season, the League may elect in accordance with this Article to establish practice squads not to exceed five (5) players per Club.

**Section 2. Signing With Other Clubs**: Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

**Section 3. Salary**: Minimum salary for a practice squad player shall be $4,000 per week for the 2002 League Year, *$4,350 for the 2003-04* League Years, and *$4,700* for the 2005-07 League Years including postseason weeks in which his Club is in the playoffs.

*\* Extension Agreement 1/8/02*

**Section 4. Eligibility:**

    (a)    The practice squad shall consist of the following players, provided that they have not served more than one previous season on a Practice Squad: (i) players who do not have an Accrued Season of NFL experience; and (ii) free agent players who were on the Active List for fewer than nine regular season games during their only Accrued Season(s). No player may be a practice squad player for more than two seasons.

    (b)    A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and has been a member of a club's Practice Squad for at least three regular season or postseason games (a bye week counts as a game provided that the player is not terminated until after the regular season or postseason weekend in question).

> \* If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three

166

games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the five-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three weeks salary that he is entitled to receive from Club B.

*Side Letter 8/18/97

167

## ARTICLE XXXV
## OFF-SEASON WORKOUTS

**Section 1. Voluntary Workouts**: No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be *strictly* voluntary and take place in the manner and time period set forth in this Article.

**Section 2. Time Periods**:

(a)    *Subject to the limitations in subsection (b) below, from* the end of the previous NFL season until the opening of training camp, Cluhs may schedule or conduct off-season workout programs for no more than *fourteen* total weeks, and no more than four workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

(b)    *Each year off-season workout programs may not begin, and players may not be asked to voluntarily attend any such program, earlier than a date to be agreed upon by the Management Council and the NFLPA, and announced before the conclusion of the prior regular season; for 2002 only, that date is agreed to be March 25, 2002. Each year on a date to be agreed upon by the parties, each Club shall provide the Management Council and the NFLPA with the Club's schedule for its off-season workout program that year, and shall advise the Management Council and the NFLPA in writing in advance of any changes to that schedule.* .

(c)    *During the off-season program period, except for the fourteen days of organized team practice activity and mini-camps, players may be (1) at the Club facility no more than four hours per day, no more than four days per week, and not during weekends; and (2) on the field no more than ninety minutes per day. In addition, the Club may not specify to any player more than two specific hours a day during which it suggests that the player be at club facilities. Any player participating in an off-season workout program may select the other two hours in which he wishes to attend to conduct his weight training, etc., as long as he does so during the hours of operations of the Club's weight room.*

\* *Extension Agreement 1/8/02*

**Section 3. Payment**: Each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout re-

**168**

quirements: $90 during the 2002 League Year; $100 during the 2003-04 League Years; *$110 for the 2005-06 League Years; and $120 for the 2007 League Year.*

*\* Extension Agreement 1/8/02*

**Section 4. Injuries**: Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

**Section 5. Miscellaneous**: No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.

**Section 6. Pre-Training Camp Period**: During the ten consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this Section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.

> *\* Invited Rookies will be permitted by their respective Clubs to attend the NFL Players Rookie Premiere provided that: (i) such event is scheduled during the month of May; (ii) such*

169

*event encompasses a maximum of four consecutive days, including both a Saturday and a Sunday; and (iii) the NFLPA provides the Management Council with the dates for the next Rookie Premiere not later than February 1 of each year.*
*\* Side Letter 1/22/01*

### Section 7. Enforcement:

(a)   The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L.

(b)(i)   *The Management Council and the NFLPA shall each designate one or more representatives to investigate claims of violations of the rules set forth above or any other rules relating to off-season workouts set forth in this Agreement. At the request of either party, these representatives will inspect appropriate areas of Club facilities without notice to the Club and, upon request from any representative, shall be provided, as quickly as reasonably possible, with copies of film or other documentation any representative deems relevant to any possible violation.*

(ii)   *Within forty-eight (48) hours of the commencement of a complaint by the NFLPA to the Management Council, or sooner if practical, the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL shall be advised of the status of the complaint and these persons shall attempt to determine if a violation occurred. If they are unable to agree upon the outcome, the matter will be immediately referred to a non-injury grievance arbitrator who will render a decision within forty-eight hours of the submission of the dispute. If the arbitrator determines that a violation has occurred, or if the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL agree*

170

*that a violation has occurred, the next scheduled week of the Club's off-season program shall be cancelled, excluding mini-camps, and no player may work out at any team facility during the cancelled week. However, in such event, players participating in the Club's off-season program shall be deemed to have participated in the required number of days for the cancelled week in order to qualify for off-season workout pay. If the arbitrator finds two separate violations of these rules in the same League Year, the Commissioner shall cause the Club to forfeit a fourth-round draft selection in the next draft in which the Club has such a selection. No conduct occurring prior to the date upon which any non-injury grievance is filed under these rules may serve as the basis for a finding of a second violation by a Club; a second violation by a Club in the same League Year must be predicated upon facts arising after the grievance alleging the first violation has been filed.*

*(iii)    Except as provided in the fourth preceding sentence, these limitations on off-season workouts shall not preclude any player from working out on his own at any time, including weekends. Except as expressly provided in the 2002 amendments to this Article or in the 2002 amendments to Appendix L hereto, all prior rules in this Agreement concerning off-season workouts will continue to apply. By agreeing to the sanctions in this subsection (k), the parties have not waived or affected their respective positions as to the issue of the Commissioner's authority to impose discipline, including the forfeiture of draft choices, for conduct within the scope of his authority under the Constitution and Bylaws.*

*\* Extension Agreement 1/8/02*

EX 9, PAGE 1202

Article XXXVI Minicamps

## ARTICLE XXXVI
## MINICAMPS

*Section 1.* **Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

*Section 2.* **Length:** No minicamp may exceed three days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

*Section 3.* **Expenses:** Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

*Section 4.* **Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

*Section 5.* **Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

172

## ARTICLE XXXVII
## PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell or Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** During the term of this Agreement, a rookie player will receive "per diem" payments at the rate of $725 per week in the 2002-03 League Years, $750 per week in the 2004 League Year, *$775 per week in the 2005-06 League Years, and $800 per week in the 2007 League Year,* commencing with the first day of preseason training camp and ending one week prior to the Club's first regular season game.

*\* Extension Agreement 1/8/02*

**Section 4. Veteran Per Diem:** During the term of this Agreement, a veteran player will receive "per diem" payments at the rate of $900 per week in the 2000-03 League Years, $1,000 per week in the 2004 League Year, *and $1,100 per week in the 2005-07 League Years,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

*\* Extension Agreement 1/8/02*

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**Section 6. Number of Pre-Season Games:** The NFL will use its best efforts to hold no more than four pre-season games.

173

**EX 9, PAGE 1204**

Article XXXVII Pre-Season Training Camps

**Section 7. Telephones**: Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

**Section 8. Expenses**: Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

174

**EX 9, PAGE 1205**

Case 2: Case 2:13-cv-02890-AB Document 28-14 Filed 02/09/12 Page 30 of 158 Page ID #:8522

# ARTICLE XXXVIII
## SALARIES

**Sections 1-5.** *[no longer applicable]*

**Section 6. Minimum Salaries After The 2001 League Year:**
    *(a)    After the 2001 League Year, the Paragraph 5 Salary of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:*

| League Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| *Less than One Credited Season* | 225 | 225 | 230 | 230 | 235 | 235 |
| *One Credited Season* | 300 | 300 | 305 | 305 | 310 | 310 |
| *Two Credited Seasons* | 375 | 375 | 380 | 380 | 385 | 385 |
| *Three Credited Seasons* | 450 | 450 | 455 | 455 | 460 | 460 |
| *Four-Six Credited Seasons* | 525 | 530 | 535 | 540 | 545 | 545 |
| *Seven-Nine Credited Seasons* | 650 | 655 | 660 | 665 | 670 | 670 |
| *Ten or more Credited Seasons* | 750 | 755 | 760 | 765 | 770 | 770 |

*(all amounts in thousands of dollars)*

    *(b)    After the 2001 League Year, the Minimum Salary of any player not on a Club's Active/Inactive List (excluding practice squad) shall be as follows:*

| League Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| *Less than One Credited Season* | 130 | 130 | 135 | 135 | 140 | 140 |
| *One Credited Season* | 145 | 145 | 150 | 150 | 155 | 155 |
| *Two Credited Seasons* | 160 | 160 | 165 | 165 | 170 | 170 |
| *Three Credited Seasons* | 200 | 200 | 205 | 205 | 210 | 210 |
| *Four-Six Credited Seasons* | 225 | 225 | 230 | 230 | 235 | 235 |
| *Seven-Nine Credited Seasons* | 250 | 250 | 255 | 255 | 260 | 260 |
| *Ten or more Credited Seasons* | 275 | 275 | 280 | 280 | 285 | 285 |

*(all amounts in thousands of dollars)*

    *\* Extension Agreement 1/8/02*

**Section 7. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

175

**EX 9, PAGE 1206**

Article XXXVIII, Salaries

**Section 8. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 9. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 10. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 11. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 12. Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will

176

the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 13. Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

**Section 14. Split Contracts:**
    (a)    *[no longer applicable]*
    (b)    After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

**Section 15. Funding of Deferred and Guaranteed Contracts:** The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury *Note* rate as published in The Wall Street Journal on *February* 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

*Extension Agreement 1/8/02*

177

## ARTICLE XXXVIII-A
## MINIMUM SALARY BENEFIT

**Section 1. Qualifying Players:** *For purposes of this Article, a "Qualifying Player" shall be defined as a player with four or more Credited Seasons, whose contract has expired or been terminated, who signs a Qualifying Contract.*

**Section 2. Qualifying Contracts:** *For purposes of this section, a "Qualifying Contract" shall be defined as a Player Contract signed by a Qualifying Player that (a) covers only a single League Year and (b) contains no terms that affect compensation in any way other than (1) the applicable minimum Paragraph 5 Salary, (2) up to $25,000 in additional compensation (e.g., signing bonus allocation, roster, report, or any incentive (LTBE or not)), and/or (3) a guarantee for salary and/or Salary advance of up to the Minimum Salary for a player with three Credited Seasons (e.g., $450,000 in 2002). Thus, for example, a contract that includes an option year is not a Qualifying Contract. Similarly, a Qualifying Contract may not be extended or renegotiated in any manner. Split contracts, if they otherwise qualify, may be Qualifying Contracts. If the player's prior contract was terminated, he is eligible to sign a Qualifying Contract if he does not earn more than $25,000 in additional compensation less the amount of any additional compensation and/or guaranteed Salary earned during that League Year under the terminated years of his prior contract(s), but his combined compensation from the terminated contract(s) earned for that League Year and the Qualifying Contract cannot exceed the applicable minimum for that League Year plus $25,000 in additional compensation.*

**Section 3. Transition Rules:** *A multi-year contract signed prior to December 1, 2001, shall be a Qualifying Contract if all other requirements (other than the requirement that the player's contract has expired or been terminated) are met, including, but not limited to, the applicable minimum, no more than $25,000 in additional compensation in any League Year of the contract (e.g., signing bonus allocation, roster, report, or any incentive (LTBE or not)) and/or a guarantee for salary and/or Salary advance of up to the minimum salary for a player with three Credited Seasons (e.g., $450,000 in the 2002 League Year). The total amount specified for each League Year under the contract cannot exceed the applicable minimum for such League Year plus $25,000 in additional compensation for such League Year. For example, a player with 11 Credited Seasons who signed a two-year contract prior to December 1, 2001 containing Paragraph 5 salaries of $477,000 in 2001 and $750,000 in 2002, and no more than $25,000 in additional compensation in either year, would qualify for the benefit. If the same Player Contract had additional compensation in excess of $25,000 in each or either year, the contract would not qualify.*

**Section 4. Payments:** *Players with Qualifying Contracts shall be paid 1/17th of the specified minimum salary on a weekly basis (e.g., 1/17 of $750,000 per week in the 2002 League Year for a player with ten or more Credited Seasons).*

178

**Section 5. Reduced Salary Cap Count:** *Notwithstanding any other provision of this Agreement, the Salary Cap count for a Qualifying Contract shall be the same as the minimum salary for a player with three Credited Seasons. For split "Qualifying Contracts," the Salary Cap count will equal either the difference between the player's minimum salary and the full minimum salary for players with three Credited Seasons (if the player is on an Active/Inactive List) or the difference between the player's split minimum salary and the split minimum for players with three Credited Seasons (if the player is not on an Active/Inactive List).*

**Section 6. Minimum Salary Benefit Calculation:** *The difference between the Salary Cap count for a Qualifying Contract and the stated minimum for the Qualifying Player's years of service shall be counted as a Player Benefit ("the Minimum Salary Benefit"). For example, in the 2002 League Year, a Qualifying Player with five Credited Seasons shall receive a Minimum Salary of $525,000; however, only $450,000 shall count against his Club's Team Salary. The difference of $75,000 shall be counted as a Player Benefit and paid out of a League-wide benefit pool. Similarly, for example, in the 2002 League Year, a Qualifying Player with 12 Credited Seasons shall receive a Minimum Salary of $750,000; however, only $450,000 shall count against his Club's Team Salary. The difference of $300,000 shall be counted as a Player Benefit and paid out of a League-wide benefit pool.*

**Section 7. League-wide Salary Cap Treatment:** *At the start of each League Year, the Minimum Salary Benefit will be projected on a League-wide basis (i.e., the projected total number of Qualifying Contracts in each category multiplied by their respective benefits) and deducted from the calculation of the Salary Cap in the same manner as any other Player Benefit. At the end of each League Year, the projected benefit will be reconciled to the actual benefit and the difference will be added to or subtracted from the following year's Player Benefit projection.*

**Section 8. League-wide Cash Treatment:** *At the end of each League Year, the actual Minimum Salary Benefit spent on a League-wide basis (i.e., the actual total number of Qualifying Contracts in each category multiplied by their respective benefits) and divided by the number of Clubs in the League will be calculated to derive the Average Minimum Salary Benefit. If the total actual Minimum Salary Benefit allocated to a Club exceeds the Average Minimum Salary Benefit, the Club will be responsible to pay the difference. If a Club's total actual Minimum Salary Benefit is below the Average Minimum Salary Benefit, the Club will receive a credit.*

**Section 9. Terminated Qualifying Players:** *If his contract is terminated, a Qualifying Player may sign a Qualifying Contract with any "New Club" (defined as any Club that did not hold contractual rights to the player's services on the final day of the prior regular season or last postseason game).*

**Section 10. Players Moving to New Club:** *In the event that a player signs a Qualifying Contract with a "New Club," the player cannot be traded back to the*

179

EX 9, PAGE 1210

Article XXXVIII-A, Minimum Salary Benefit

"Old Club" during that League Year unless the player's prior contract(s) with the Old Club meets the requirements of Section 11 below. In the event that the player signs a Qualifying Contract with a New Club and the Qualifying Contract is terminated by the New Club, the player may sign a Qualifying Contract with his Old Club. Nothing in the foregoing shall prevent a player from signing a contract with his Old Club if the Old Club does not seek to have the contract treated as a Qualifying Contract.

**Section 11. Player Returning to Old Club:** A player whose prior contract was terminated may sign a Qualifying Contract with his "Old Club" (defined as the Club that held contractual rights to the player's services on the final day of the prior regular season or last postseason game), provided that the Old Club did not, on or after January 1 in the calendar year that preceded the calendar year in which his contract was terminated, (a) renegotiate and/or extend his prior contract to increase or guarantee compensation or to convert non-guaranteed compensation to a signing bonus allocation, for more than $25,000 in any League Year of the contract for which the player has received or will receive compensation, or (b) sign the player to a new multi-year contract for more than the applicable Minimum Salary in any League Year of the contract plus $25,000 in additional compensation in any League Year of the contract for which the player has received or will receive compensation, and further provided that (c) the sum of any acceleration from signing bonus that was agreed to in a contract executed on or after January 1 in the calendar year in which the contract was terminated and any other additional compensation that the player has received or will receive from that terminated contract does not exceed $25,000. For purposes of the immediately preceding clause (c) only, any acceleration of signing bonus will be counted in the League Year of the contract's termination regardless of whether the contract was terminated before or after June 1, and signing bonus proration for the final League Year of a contract terminated after June 1 in the contract's next to last League Year will be considered to be accelerated. For example, if on January 1, 2002 a player signs a two-year contract for the minimum Paragraph 5 salary in both years and a $50,000 signing bonus, and his contract is terminated on June 2, 2002, the player is not eligible to sign a 2002 Qualifying Contract with his Old Club because the sum of the acceleration of the 2003 prorated portion of the signing bonus ($25,000) that was agreed to in the year of his contract termination and the 2002 prorated portion of signing bonus from that terminated contract ($25,000) resulted in "additional compensation" of more than $25,000 in 2002. However, if the contract was signed on December 1, 2001, and the contract is terminated on June 2, 2002, the player is eligible to sign a Qualifying Contract with his Old Club if that contract includes no other additional compensation.

**Section 12. Players with Expired Contract:** Upon the expiration of a Player Contract, the player may sign a Qualifying Contract with any Club.

**Section 13. Guarantees:** If a Qualifying Contract with guarantees is terminat-

**180**

ed, the player shall continue to receive the guaranteed portion of the contract and that money shall continue to count against the Team's Salary Cap, but the benefit portion of the player's compensation (including the subsidy) shall cease. For example, if a player with a $750,000 Qualifying Contract, which includes a $450,000 Paragraph 5 guarantee, is terminated after the eighth week of the regular season, he receives $450,000 of the $750,000 Minimum Salary. If the player signs multiple guaranteed Qualifying Contracts covering the same League Year at the applicable Minimum Salary, the maximum guaranteed salary he can earn under all such Qualifying Contracts is $450,000.

**Section 14. Termination Pay:** If a Qualifying Player is eligible for termination pay when he is released and subsequently files a claim, he shall receive the charged amount (e.g., $450,000) plus the full benefit amount (e.g., $200,000 for a player with a Paragraph 5 Minimum Salary of $650,000). The player does not receive the benefit amount twice (i.e., $850,000).

**Section 15. No Benefit for Non-Qualifying Contracts:** Contracts for players with four or more Credited Seasons who sign at the applicable minimum for that year plus more than $25,000 in additional compensation (e.g., prorated signing bonus, etc.), or who otherwise do not qualify for the benefit, are not Qualifying Contracts. The Salary Cap count for such contracts will be in accordance with existing Salary Cap rules. There will be no Minimum Salary Benefit or reduced Salary Cap count for such contracts.

* Extension Agreement 1/8/02

> * Per day off-season workout payments shall not be considered in determining "additional compensation" for purposes of this Article if such payments are at the minimum level prescribed by Article XXXV. For example, without limitation on any other example, if a 2002 Player Contract provides for off-season workout payments of $90 per day for 14 four-day weeks, none of those payments ($5,040) shall be considered "additional compensation." If, however, that Player Contract provides for off-season workout payments of $91 per day, all of the workout payments ($5,096) shall be included in determining "additional compensation." If a Player Contract provides for off-season workout bonus payments on a basis other than a per-day payment, such payments shall count as "additional compensation" but will not affect the treatment of any off-season workout payments at the minimum prescribed level. For example, without limitation on any other example, a player with a 2002 Player Contract that provides for a $25,000 bonus payable to the player for participating in at least ten days of off-season workouts, in addition to the per-day minimum of $90 and no other "additional compensation," has "addition-

Article XXXVIII-A, Minimum Salary Benefit

> al compensation" of $25,000. Similarly, if a player receives from a single club, under a series of contracts, off-season workout payments specified on a per-day basis that average more than $90 per day, all of the off-season workout payments paid on a per-day basis shall count as "additional compensation."
>
> \* Side Letter 6/17/02
>
> \* For purposes of determining "additional compensation" under this Article, any incentives with respect to any League Year prior to the 2002 League Year (LTBE or not) shall be counted only to the extent such incentives were earned. For example, without limitation on any other example, if a player's 2001 Player Contract contained an incentive of $30,000 for rushing more than 1,000 yards and an incentive of $15,000 for rushing between 500 and 999 yards, and the player rushed for 900 yards and thus earned $15,000, only $15,000 shall count as "additional compensation" under this Article.
>
> \* Side Letter 6/17/02

182

# ARTICLE XXXVIII-B
## PERFORMANCE-BASED POOL

**Section 1. Creation Of Fund:** *Beginning in the 2002 League Year and continuing through the 2007 League Year, the NFL shall create a fund with (a) the difference in the minimum salaries negotiated in the January 8, 2002 amendments to this Agreement, and the minimum salaries that would have been calculated in the absence of such amendments, and (b) the difference in the Entering Player Pool negotiated in the January 8, 2002 amendments to this Agreement, and the Entering Player Pool that would have been calculated in the absence of such amendments.*

**Section 2. Annual Projection:** *Prior to each League Year, the fund will be projected on a League-wide basis and deducted from the calculation of the Salary Cap in the same manner as any other player benefit.*

**Section 3. Mandatory Distribution Each Year:** *There shall be mandatory distribution to players of the entire fund each year.*

**Section 4. Qualifying Players:** *The players who qualify for distributions shall be agreed upon by the NFLPA and the Management Council. If no agreement is reached, the fund from the Entering Player Pool difference shall be distributed to all qualifying Rookies, and the fund from the minimum salary difference shall be distributed to all qualifying Veterans.*

**Section 5. Methodology:** *The method of determining payments shall be: calculate total downs played, and award the players money based upon each individual's downs played in relation to the team's total downs (%), or such other rules as agreed upon by the NFLPA and the Management Council. Consideration will be given to awarding additional "points" for continuity with the same Club.*

*\* Extension Agreement 1/8/02*

EX 9, PAGE 1214

Article XXXIX, Meal Allowance

## ARTICLE XXXIX
## MEAL ALLOWANCE

*Section 1*. **Reimbursement**: A player will be reimbursed for meals not furnished by his Club on travel days during the preseason, regular season and postseason as follows: 2002 League Year-Breakfast $15.00, Lunch $21.00, Dinner $39.00; 2003-04 League Years-Breakfast $16.00, Lunch $23.00, Dinner $41.00; *and 2005-07 League Years-Breakfast $17.00, Lunch $25.00, Dinner $43.00*. For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*\* Extension Agreement 1/8/02*

*Section 2*. **Travel Day**: Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

184

# ARTICLE XL
## DAYS OFF

*Section 1.* **Rate**: All players will be permitted days-off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2.* **Requirements**: During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

185

## ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification**: A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses**: As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses**: Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such

**186**

payment shall not exceed $5,000 during the 2002 League Year, $5,250 during the 2003-2004 League Years, *$5,500 during the 2005-06 League Years, and $5,750 during the 2007 League Year;* and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*\* Extension Agreement 1/8/02*

**Section 4. Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

187

**EX 9, PAGE 1218**

## ARTICLE XLII
## POST-SEASON PAY

**Section 1. System:** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each postseason game played:

| (in $000's) | 02 | 03 | 04 | 05 | 06 | 07 |
|---|---|---|---|---|---|---|
| Wild Card Game | | | | | | |
| (Division Winner) | 17 | 18 | 18 | 19 | 19 | 20 |
| (Other) | 12.5 | 15 | 15 | 17 | 17 | 18 |
| Division Playoff Game | 17 | 18 | 18 | 19 | 19 | 20 |
| Conference Championship Game | 35 | 36.5 | 36.5 | 37 | 37 | 37.5 |
| Super Bowl Game | | | | | | |
| (Winning Team) | 63 | 68 | 68 | 73 | 73 | 78 |
| (Losing Team) | 35 | 36.5 | 36.5 | 38 | 38 | 40 |

\* *Extension Agreement 1/8/02*

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**

(a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

(b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was

**188**

on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and postseason) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)     A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)     A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)     A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5. Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

## ARTICLE XLIII
## PRO BOWL GAME

**Section 1. Compensation**: Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $30,000 and each player on the losing Team will receive $15,000. These amounts shall be increased to $35,000 and $17,500 respectively for the Pro Bowls following the 2003 and 2004 seasons, *and to $40,000 and $20,000 respectively for the Pro Bowls following the 2005 through 2007 seasons.*

*\* Extension Agreement 1/8/02*

**Section 2. Selection**: Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives**: Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury**: In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment**: Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

190

# ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician**: Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers**: All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion**: A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice**: A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical**: Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

EX 9, PAGE 1222

Article XLIV, Players' Rights to Medical Care and Treatment

seasons. The League may also conduct random testing for steroids as in the
past seasons, but with limits on the number of times any given player can
be tested to be negotiated between the Commissioner and the NFLPA.

## Section 6. Substance Abuse:

(a)     **General Policy.** The parties agree that substance abuse and the
use of anabolic steroids are unacceptable within the NFL, and that it is the
responsibility of the parties to deter and detect substance abuse and steroid
use and to offer programs of intervention, rehabilitation, and support to
players who have substance abuse problems.

(b)     **Anabolic Steroids and Related Substances.** The League's ex-
isting Policy and Procedure with respect to Anabolic Steroids and Related
Substances will remain in effect, except as it may be modified in the future
due to scientific advances with respect to testing techniques or other mat-
ters. The parties will establish a joint Advisory Committee, consisting of the
League's Advisor for Anabolic Steroids and Related Substances and an
equal number of members appointed by the NFLPA and by the Manage-
ment Council, to study pertinent scientific and medical issues and to ad-
vise the parties on such matters.

(c)     **Drugs of Abuse and Alcohol.** The League's existing Policy and
Procedure with respect to Drugs of Abuse and Alcohol will remain in effect,
including annual pre-season testing of all players; provided that the parties
will promptly make their best efforts jointly to formulate and implement a
modified program with respect to Drugs of Abuse and Alcohol to become
effective for the 1993 NFL season.

192

# ARTICLE XLV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

**Section 1. Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

**Section 2. Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

**EX 9, PAGE 1224**

## ARTICLE XLVI
## PLAYER BENEFIT COSTS

*Section 1*. (a) **General Right of Reduction**: The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b) **1998 Amendment Benefits**: During each League Year for which a Salary Cap applies, the NFLPA will have the unilateral right to increase, reduce or freeze each separate and individual Player Benefit Cost relating to 1998 Amendment Benefits that are set forth in Sections 5(c), 5(d) and 5(e) of this Article to the extent permitted by law, to ensure that the total cost of the 1998 Amendment Benefits does not exceed and is not less than the amount set forth below for each such League Year. Any increase shall be for one League Year only and shall not create a continuing obligation for the Clubs. The total cost of the 1998 Amendment Benefits for Capped Years in the 2002 League Year and thereafter *shall be* $100 million, *plus an additional amount, if necessary, sufficient to raise the Allocation under the Player Annuity Program to $65,000 for each player eligible for an Allocation, unless the parties agree otherwise.*

Notwithstanding the foregoing language regarding the total cost of 1998 Amendment Benefits for the 2002 League Year *and thereafter*, Class Counsel and the NFLPA may specify additional amounts to be used for additional increases in the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), pursuant to Article XXIV, Section 10(a)(ii) for additional amounts generated from the 2002 League Year *and thereafter*. During each League Year for which a Salary Cap does not apply, the NFL shall be required to contribute with respect to the 1998 Amendment Benefits only the cost of those such benefits that are set forth in Sections 5(a) *and* 5(b). If the NFLPA is notified in writing that the cost of the 1998 Amendment Benefits for a Capped Year is projected to exceed or to be less than the above total for a League Year, and the NFLPA does not specify which benefits are to be increased, reduced or frozen by the later of (1) the beginning of that League Year, and (2) 30 days after the date the NFLPA receives such notice, the Management Council shall have the unilateral right to reduce or increase 1998 Amendment Benefits to the extent permitted by

194

law, to achieve the above total cost for that League Year. Any reductions or increases in 1998 Amendment Benefits shall be implemented as of the beginning of a League Year by determining projected 1998 Amendment Benefits based on Projected Benefits, as defined in Article XXIV, Section 10(c).

(c) **Adjustment**: If the actual Player Benefit Costs of the 1998 Amendment Benefits exceed the applicable amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be reduced by such excess. If the actual Player Benefit Costs of the 1998 Amendment Benefits are less than the amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be increased by such shortfall.

**Section 2. Right of Restoration**: Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition**: For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a) Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII); *provided that all costs associated with the benefit increase, to which the parties agreed in 2002, under Article XLVII, Section 8, shall be allocated for Player Benefit Costs purposes in equal amounts to the 2002-2006 League Years;*

(b) Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c) Injury protection (as described in Article XII);

(d) Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e) Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f) Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g) Postseason pay (as described in Article XLII and Article XLIII);

**195**

*and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary;*

    (h)    Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year, beginning with the 1993 League Year);

    (i)    Severance pay (as described in Article L);

    (j)    The Player Annuity Program (as described in Article XLVIII-A);

    (k)    *The Minimum Salary Benefit (as described in Article XXXVIII-A);*

    (l)    *The Performance Based Pool (as described in Article XXXVIII-B); and*

    (m)    *The Tuition Assistance Plan (as described in Article XLVIII-B).*

                                 *\* Extension Agreement 1/8/02*

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, *and the Tuition Assistance Plan* will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5. 1998 Amendment Benefits**: For purposes of this Agreement, the term "1998 Amendment Benefits" means the following:

(a)     The increase in 1998 and future Benefit Credits to $425 described in Article XLVII, Section 2 and the increase in Benefit Credits for prior years described in Article XLVII, Section 4;

(b)     The decrease in the vesting requirement described in Article XLVII, Section 5;

(c)     The increases in the Second Career Savings Plan contributions described in Article XLVIII, Section 2;

(d)     The Player Annuity Program (as described in Article XLVIII-A); and

(e)     The increases in the Extended Post-Career Medical and Dental Insurance benefits described in Article XLIX, Section 2(c).

**Section 6. Limitations on Contributions**: *Effective March 1, 2002,*

*(a) No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, the Severance Pay Plan, or the Tuition Assistance Plan (individually, a "Player Benefit Plan") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Plan shall be amended to prevent any employer provided benefit from accruing or being otherwise credited, paid, or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Plan in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club. During an Uncapped Year, a payment of benefits under a Player Benefit Plan shall be made only if and to the extent the payment either is funded, or is required by ERISA.*

197

Article XLVI, Player Benefit Costs

    (b)    *The parties will amend all benefit plans qualified under Section 401(a)*
*of the Internal Revenue Code to ensure that an NFL Club will be required to make*
*contributions to any qualified benefit plan only to the extent that such contribu-*
*tions are deductible when made under the limits of Section 404(a) of the Internal*
*Revenue Code.*

*\*Extension Agreement 1/8/02*

198

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.

**Section 2. Additional Credited Seasons:** *[no longer applicable]*

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Benefit Credits:** Effective for payments on and after *September 1, 2001*, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to *provide the following* Benefit *Credits* for *the indicated* Credited *Seasons*:

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| *Before 1982* | $200 |
| 1982 through 1992 | 230 |
| 1993 and 1994 | 240 |
| 1995 and 1996 | 285 |
| 1997 | 330 |
| *1998 through the Plan Year that begins prior to the expiration of the Final League Year* | 425 |

EX 9, PAGE 1230

Article XLVII, Retirement Plan

**Section 5. Decrease in Vesting Requirement:** Effective for payments on and after June 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan to provide that any player who (i) earned his last Credited Season prior to the 1975 Plan Year; (ii) is credited with at least four (4) Credited Seasons; and (iii) is alive on June 1, 1998, shall be fully vested in the right to receive a retirement benefit under the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment shall be entitled to receive any benefit under the Bert Bell/Pete Rozelle Plan other than his Normal, Deferred or Early Retirement Benefit. No player who is vested as a result of this amendment shall be entitled to elect to receive a retirement benefit in the optional form provided by Section 4.4(c)(3) of the Bert Bell/Pete Rozelle Plan. No beneficiary of a player who is vested as a result of this amendment and who dies prior to his Annuity Starting Date (as defined in the Bert Bell/Pete Rozelle Plan) shall be entitled to receive any benefit, except that the surviving spouse of such a player shall be entitled to receive a pre-retirement survivor annuity under rules similar to those in Section 4.9(b) of the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment who attained his Normal Retirement Age prior to June 1, 1998 shall be entitled to a benefit with respect to any period prior to June 1, 1998. Any Normal Retirement Benefit paid pursuant to this amendment will not be actuarially adjusted to reflect an Annuity Starting Date after the player's Normal Retirement Date, except to the extent the Annuity Starting Date is after June 1, 1998.

**Section 6. Medical Standards for Line-of-Duty Disability Benefits:** *The parties agree to amend the Bert Bell/Pete Rozelle Plan to adopt revised medical standards for Line-of-Duty disability benefits based upon the American Medical Association's Guides to the Evaluation of Permanent Impairment (Fourth Edition, Chicago, IL) ("AMA Guides"). Effective for applications received on and after April 1, 2002, the parties will amend Section 6.4 of the Bert Bell/Pete Rozelle Plan to read substantially as follows:*

*"6.4 Definitions*

*(a) A "substantial disablement" is a "permanent" disability that*

*(1) Results in a 50% or greater loss of speech or sight; or*

*(2) Results in a 55% or greater loss of hearing; or*

*(3) Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or*

*(4) For orthopedic impairments, using the Guides to the Evaluation of Permanent Impairment (Fourth Edition, IL),is (a) a 55% or greater loss of use of the entire lower extremity; or (b) a 30% or greater loss of use of the entire upper extremity; or (c) an impairment to the spine that results in a 29% or greater whole body impairment. In each case for orthopedic impairments, a maximum of 10 percentage points will be allowed for symptoms of pain."*

* Extension Agreement 1/8/02

**200**

**Section 7. Practice Squad Credited Season**: *Effective April 1, 2001, the parties will amend Section 1.10 of the Bert Bell/Pete Rozelle Plan to add a new subsection (f) to read substantially as follows:*

*"(f) effective April 1, 2001, has a season with at least eight games on the practice squad in a Plan Year (either before or after April 1, 2001) in which he did not otherwise earn a Credited Season, provided that he is otherwise vested and earns a Credited Season in 2001 or later. A player may earn a maximum of one Credited Season under this Section 1.10 (f) regardless of the number of seasons in which he has at least eight games on the practice squad."*

*Extension Agreement 1/8/02*

**Section 8. Increase in Past Service Credit:** *Effective for payments on and after September 1, 2001, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to increase the Benefit Credit in effect for each Credited Season prior to 1977 to $200. Payments reflecting this increase will begin with the March 1, 2002 payment. Benefits for affected players in pay status shall be proportionately increased based on the new and prior benefit credits.*

*Extension Agreement 1/8/02*

**EX 9, PAGE 1232**

# ARTICLE XLVIII
## SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance**: The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

### Section 2. Contributions:

(a)    **Prior to 2001**: For each of the Plan Years 1993 through 1999, *a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club. For the 2000 Plan Year, a contribution of $250,000 will be made to the Savings Plan on behalf of each Club.* Such contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.

*\*Extension Agreement 2/25/98, as amended by Extension Agreement 1/8/02*

(b)    **2001 and Later Years**: For each *of the Plan Years 2001 and thereafter in which the Salary Cap applies*, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)    Matching Contributions. The parties will amend the Savings Plan to require the NFL Clubs in the aggregate to contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two Dollars (up to a maximum of $20,000) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(a)    by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)    by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)    Minimum Contribution. The NFL Clubs in the aggregate will

202

Article XLVIII, Second Career Savings Plan

contribute to the Savings Plan, for each Plan Year in which a Salary Cap applies, a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)   Expenses. The NFL Clubs will make contributions to the Savings Plan at least quarterly in an amount sufficient to pay administrative expenses.

(c)   **Future Contributions and Collection**: Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Extension Agreement 1/8/02*

**Section 3. Expansion of Eligible Employees**: *Effective as of April 1, 2002, the parties will amend the Savings Plan so that first year players (not including practice squad players) may participate and contribute to the Savings Plan, but will not receive employer contributions under Sections 3.2, 3.3, 3.4, or 3.6 of the Savings Plan for that Plan Year.*

*Extension Agreement 1/8/02*

203

**EX 9, PAGE 1234**

Article XLVIII-A, Player Annuity Program

## ARTICLE XLVIII-A
## PLAYER ANNUITY PROGRAM

**Section 1. Establishment:** The parties will jointly establish a new benefit, to be called the NFL Player Annuity Program (hereinafter referred to as "Player Annuity Program"). The Player Annuity Program will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Annuity Year will be the period April 1 to March 31. The Player Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Program will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:** For each of the Annuity Years 2001 and thereafter in which a Salary Cap applies, a contribution will be made to the Player Annuity Program on behalf of the NFL Clubs unless this figure is changed pursuant to this Agreement, including the rights of the parties under Section 1(b) of Article XLVI of this Agreement, *in the amount of $73 million, but not less than an amount sufficient to fund an Allocation of $65,000 to each player eligible for an Allocation, unless the parties agree otherwise.*

*\* Extension Agreement 1/8/02*

Contributions to the Player Annuity Program for an Annuity Year will be made as follows:

1. Expenses: The NFL Clubs will prepay contributions to the Annuity Program at least quarterly in an amount sufficient to pay administrative expenses. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

2. Allocations: Allocations for the benefit of individual players will be made on and as of December 31 and March 31 of each Annuity Year, as described in Section 3(c) below.

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

### Section 3. Eligibility and Allocation:
    (a)    **Points:** *For Annuity Year 2001 and each year thereafter for which a*

204

Article XLVIII-A, Player Annuity Program

*Salary Cap applies, players* who earn a Credited Season, as that term is defined in the Bert Bell/Pete Rozelle Plan, in an Annuity Year and who have a total of four or more Credited Seasons as of the end of such Annuity Year will receive *one point* for each such Credited Season.

(b)     **Individual Allocations:** The amount allocated to an individual player who receives *a point* in the 2001 and later Annuity Years will be calculated as follows: In December of each such year a good faith estimate will be made by the Annuity Board of the total contribution expected to be made during such Annuity Year under Section 2 above by all NFL Clubs, minus the estimated administrative expenses for the Annuity Year, and minus any retroactive allocations made to players under rules similar to those in Section 3.4 of the Savings Plan. A good faith estimate will also be made at that time by the Annuity Board of the total points expected to be earned during such Annuity Year by all players. The value of a point will be determined by (1) taking the total estimated available contributions as described above and (2) dividing by the estimate of the total points expected to be earned by all players. *The Allocation to each player eligible for an Allocation will, for each of the 2002 through 2006 Annuity Years, not be less than $65,000, unless the parties agree otherwise.*

*\*Extension Agreement 1/8/02*

(c)     **Timing:** Eligible players who earn a Credited Season by December 1 of an Annuity Year will receive their allocation on December 31 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive their allocation on March 31 of such Annuity Year.

**Section 4. Distributions:** A player may elect to begin receiving distributions under the Player Annuity Program in the form of annuity or installment payments at any time after the later of (a) the player's attainment of age 35, or (b) five years after the end of the Annuity Year containing the player's last Credited Season. Payments must begin no later than age 65. A player who elects to begin receiving annuity or installment payments under the preceding sentences may elect to receive such payments in substantially equal amounts for a period beginning on the date of commencement of such payments and ending upon the player's attainment of age 45, or such later age as he shall specify, or for life. Alternatively, a player may elect to defer his receipt of distributions under the Player Annuity Program. Upon a player's attainment of age 45, such player may elect to receive his benefit under the Player Annuity Program in the form of an annuity or a lump sum payment. If a player dies before making an election to receive benefits, the player's named beneficiary may make an election that otherwise would have been available to the player. A player's rights under the Player Annuity Program may not be transferred, assigned, or alienated.

205

Article XLVIII-A, Player Annuity Program

**Section 5. Structure:** The Player Annuity Program will hold assets for the sole benefit of players and their beneficiaries. The parties agree that the Program will be administered by an Annuity Board, and that prior to the first meeting of the Annuity Board the advisors to the Player Annuity Program will be the same as the advisors to the Savings Plan. The Player Annuity Program is intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity as described in Section 6 below.

206

## ARTICLE XLVIII-B
## TUITION ASSISTANCE PLAN

**Section 1. Establishment:** *Effective April 1, 2002, the parties shall establish a new benefit program to be called the NFL Player Tuition Assistance Plan. The Plan will provide up to $15,000 per League year as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. A written plan that qualifies as an educational assistance program under Section 127 of the Internal Revenue Code will be established, and benefits to a player in any calendar year will be paid through such educational assistance program up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan will begin on April 1.*

**Section 2. Eligibility:** *To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.*

**Section 3. Reimbursement:** *An eligible player will be reimbursed by no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books.*

*\*Extension Agreement 1/8/02*

207

**EX 9, PAGE 1238**

Article XLIX, Group Insurance

## ARTICLE XLIX
## GROUP INSURANCE

*Section 1.* **Group Insurance Benefits**: Players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a) **Life Insurance**: For the *2002-06* League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.

(b) **Medical**: *Until and including August 31, 2002, each player is required to pay an annual deductible of $200 per individual per plan year and $400 per family per plan year, with a maximum out-of-pocket expense of $800 per plan year (including the deductible) for each covered individual. Effective September 1, 2002, each player is required to pay an annual deductible of $400 per individual per plan year and $800 per family per plan year, with an maximum out-of-pocket expense of $1600 (including the deductible) for each covered individual. Effective March 1, 2002,*

*1) the co-insurance paid by a covered individual for services rendered by out-of-network providers will change from 20% of covered charges to 30% of covered charges; and*

*2) the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and*

*3) a prescription drug card will be provided to covered individuals requiring a $5 co-pay for generic drugs and a $10 co-pay for brand name drugs if the generic or brand name drugs are obtained from participating pharmacies. The availability of participating pharmacies will not be significantly reduced below the level initially provided by CIGNA.*

*4) Notwithstanding the effective date stated above, the* maximum lifetime benefits paid on behalf of a covered individual will be $2.5 million *effective September 9, 2001.*

(c) **Dental**: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

1) Preventive care paid at 100% of UCR,

2) General services paid at 85% of UCR, and

3) Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

(d) **Insurance Benefits for Vested Players**: Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance cov-

208

erage under this Article until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

(e)     *Family Medical and Dental Coverage for Deceased Players: A player's enrolled dependents (including a child born to the player's wife within ten months after the player's death) shall be entitled to continuing family medical and dental insurance coverage effective August 1, 2001, as follows:*

*1)     for the dependents of a player on  the Active, Inactive, Reserve/ Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;*

*2)     for dependents of a player  who was receiving coverage under Section 1(d) , 2(c), or 2(d) of  this Article at the time of his death, coverage  will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.*

                                                    *Extension Agreement 1/8/02

**Section 2. Extended Post-Career Medical And Dental Insurance:** The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)-(b) *[no longer applicable]*

(c)     Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1998 season and before the first regular season game of the 2002 season will continue to receive the benefits described in Subsections 1(b) and 1(c) above for thirty-six (36) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.

(d)     *Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during or after the first regular season game in the 2002 season or at any time thereafter prior to the expiration or termination of this Agreement will continue to receive the benefits described in Subsections 1(b) and 1(c)  above for forty-eight (48) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Subsection 1(d) of this Article.*

(e)     All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described

                                                    **209**

Article XLIX, Group Insurance

in Subsections 2(a), 2(b), and 2(c) above are provided, as if such additional benefits had not been provided.

(f)    The costs for the benefits described in this Section during the *2001* and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

*\* Extension Agreement 1/8/02*

**Section 3. Limitations And Rules For Extended Insurance**: Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a)    The benefits described in Subsections 2(c) and 2(d) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)    The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.

(c)    The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.

(d)    The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to, in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4.** *[no longer applicable]*

**Section 5. Administration**: The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

**210**

# ARTICLE L
## SEVERANCE PAY

**Section 1. Eligibility:** Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through 2006, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

**Section 2. Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; (c) $12,500 per Credited Season for each of the seasons 2000 through 2006.

*Extension Agreement 1/8/02*

**Section 3. Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

**Section 4. Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
|---|---|---|
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through *the end of the League Year, or earlier* | June 1 | June 30 |
| *The beginning of the League Year* through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

211

EX 9, PAGE 1242

Article L, Severance Pay

**Section 5. Failure to Apply**: A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment**: Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor**: In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay**: Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability**: The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

212

# ARTICLE LI
## SUPPLEMENTAL DISABILITY BENEFITS

**Section 1. Maintenance**: The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions**: For each Plan *Year in which the Salary Cap applies*, unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*\*Extension Agreement 1/8/02*

**Section 3. Extension**: For each Plan Year in *which the Salary Cap applies*, the parties will amend Section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

*\*Extension Agreement 1/8/02*

**Section 4. Automatic Payment and Waiver**: *The parties will amend the Supplemental Disability Plan effective February 1, 2002 to provide that payments under the Supplemental Disability Plan will automatically be paid to all players who qualify for such benefits unless the qualifying player waives the right to receive such benefits. A player's waiver may be revoked, but not with respect to benefits that would have been paid prior to the revocation of his waiver.*

*\*Extension Agreement 1/8/02*

213

## ARTICLE LII
## BENEFIT ARBITRATOR

**Section 1. Selection:** The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

**Section 2. Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

**Section 3. Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Ei-

214

ther party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

215

Article LIII, Retention of Benefits

## ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

216

## ARTICLE LIV
## WORKERS' COMPENSATION

**Section 1. Benefits:** In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

**Section 3. Arbitration:** In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study:** The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5.** *[no longer applicable]*

**Section 6. Preservation of Rights:** The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the

217

EX 9, PAGE 1248

Article LIV, Workers' Compensation

NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

*Section 7*. **Reopener:** If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

**218**

# ARTICLE LV
# MISCELLANEOUS

**Section 1. Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product.

**Section 2. On-Field Attire:** Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

**Section 3. Appearances:** No Club may unreasonably require a player to appear on radio or television.

**Section 4. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first preseason cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire

EX 9, PAGE 1250

Article IV, Miscellaneous

to attend such a game at least three days prior to the date of the game. NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets**: Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests**: No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security**: A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program**: The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents**: The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect**: This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization**: The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has

220

been duly authorized to execute this Agreement on behalf of its members.

**Section 16. Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

*Extension Agreement 1/8/02*

221

Article LVI, Final League Year

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap**: No Salary Cap shall be in effect during the Final League Year.

*Section 2.* **Free Agency If Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is in effect in the League Year prior to the Final League Year; (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the Final League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

*Section 3.* **Free Agency If No Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five Accrued Seasons.

*Section 4.* **Franchise and Transition Players**: As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

222

# ARTICLE LVII
## MUTUAL RESERVATION OF RIGHTS: LABOR EXEMPTION

**Section 1. Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

**Section 2. Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

**Section 3. CBA Expiration:**

(a) Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b) The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

223

## ARTICLE LVIII
## DURATION OF AGREEMENT

*Section 1.* **Effective Date:** Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993. With respect to the 1998 amendments to this Agreement, those amendments shall be effective upon the execution of those amendments, except that: (i) the 1998 amendments with respect to the Entering Player Pool and the amount of the Salary Cap shall be effective as of the first day of the 1998 League Year; and (ii) the parties may agree upon transition rules implementing the terms of the 1998 amendments, which transition rules shall be effective as of such dates as are agreed to by the parties. *With respect to the 2002 amendments to this Agreement, those amendments shall be deemed effective as of the last game of the 2001 regular season, except for the benefits which are specified to go into effect beginning in the 2002 League Year.*

\* *Extension Agreement 1/8/02*

*Section 2.* **Expiration Date:** Except as provided in Section 3 below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the *2007* League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall *expire in the League Year immediately following the expiration or termination of this Agreement.*

\* *Extension Agreement 1/8/02*

### *Section 3.* **Termination Prior to Expiration Date:**
  (a)-(b) *[no longer applicable]*

  (c) **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (Final League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of ter-

**224**

mination within 30 days of the date of such determination and any appeals relating thereto.

(d)   **Termination Due To Collusion.** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)   **Termination After Closing Date.** If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f)   **No Waiver.** Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

*Section 4.* **Ratification:** This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

**EX 9, PAGE 1256**

Article LIX, Governing Law

## ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

226

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

    (a)    To the National Football League Management Council:
            The National Football League
            Management Council
            280 Park Avenue
            New York, New York 10017
            Attention: Executive Vice President—Labor Relations

    (b)    To an NFL Club:
            At the principal address of such Club as then
            listed on the records of the NFL or at that Club's
            principal office.
            Attention: President

    (c)    To the NFLPA:
            National Football League Players Association
            2021 L Street, N.W.
            Washington, D.C. 20036
            Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE      NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION             MANAGEMENT COUNCIL

BY: _____             BY: _____

EX 9, PAGE 1258

Appendix A

## APPENDIX A

### CHECK-OFF AUTHORIZATION FOR
### NATIONAL FOOTBALL LEAGUE PLAYERS
### ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management

228

Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

Signature

Player's Name—Type or Print

229

Appendix B

# APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a preseason physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

230

# APPENDIX C

## NFL PLAYER CONTRACT

**THIS CONTRACT is**
between_____,
hereinafter "Player," and_____,a
_____
corporation (limited partnership) (partnership), hereinafter "Club," oper-
ating under the name of the _____
as a member of the National Football League, hereinafter "League." In con-
sideration of the promises made by each to the other, Player and Club agree
as follows:

1.      **TERM.** This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

2.      **EMPLOYMENT AND SERVICES.** Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory minicamp(s), official preseason training
camp, all Club meetings and practice sessions, and all preseason, regular
season and postseason football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

3.      **OTHER ACTIVITIES.** Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experi-
ence as a football player, the loss of which cannot be estimated with any cer-
tainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

231

Appendix C

4.    PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

(a)    Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)    Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on *or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.)* that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire

232

on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract expires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

*Extension Agreement 1/8/02*

5. COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during preseason training and in connection with playing preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6. PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides

Appendix C

otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will he paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7.　　DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.　　PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.　　INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.　　WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in ex-

234

istence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

235

Appendix C

14. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his ser-

**236**

vices under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18.    FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.    DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.    NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.    OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

237

Appendix C

22.    LAW. This contract is made under and shall be governed by the laws of the State of _____ .

23.    WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, preseason compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.    OTHER PROVISIONS. (a)    Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances, of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)    Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)    The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the

238

time the information was provided, true and correct in all material respects.

    25.    SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| PLAYER | CLUB |
| Home Address | By |
| Telephone Number | Club Address |
| Date | Date |

PLAYER'S CERTIFIED AGENT

Address

Telephone Number

Date

| Copy Distribution: | White-League Office | Yellow-Player |
|---|---|---|
| | Green-Member Club | Blue-Management Council |
| | Gold-NFLPA | Pink-Player Agent |

239

**EX 9, PAGE 1270**

Appendix D

# APPENDIX D

## FIRST REFUSAL OFFER SHEET

Name of Player:                         Date:

Address of Player:                      Name of New Team:

Name and Address of                     Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                        Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

  [Supply Information on this Sheet or on Attachment]

  1.    Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

  2.    Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

  3.    Other terms (that need not be matched):

Player:                                 New Club:

By: _____             By: _____
                                        Chief Operating Officer

240

# APPENDIX E

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                    Date:

Address of Player:                 Name of New Team:

Name and Address of               Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                   Address of Prior Team:

  The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

        Prior Team:

        By: _____
        Chief Operating Officer

241

**EX 9, PAGE 1272**

Appendix F

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By: _____

WITNESSED BY:

_____

242

# APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

243

Appendix H

## APPENDIX H

## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR *of the NFL and its* member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions *of* the CBA. The information on the Schedule is to be the responsibility of the *management of the* Clubs and the NFL.

The *Management Council and the NFLPA* are to retain a national accounting firm (the "Accountants") *which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures* shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The *Procedures* shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six members with three representatives designated by each of the Management Council and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the *Procedures* described in the preceding paragraph and again before *May 1st* to review the results of the *Procedures* before issuance of the final report for that playing season.

The procedures detailed below *and/or as otherwise agreed by the parties are and shall be* designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the NFL *and its Clubs* for such *League Year* in accordance with the *provisions* of the CBA. The Accountants will *perform the Procedures with respect* to the Schedule for each *League Year.*

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), *as agreed upon by the parties,* or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report *upon the Procedures* as referred above.

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Ac-

244

countants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

### Procedures provided by the *Management Council* and *the NFLPA* to be performed by the Accountants

### General

- *The CBA and all relevant side letters* should be reviewed and understood.

- See Exhibit *H.1* for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule *shall* be made available for review by representatives of the *Management Council* and *the NFLPA* prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the *Management Council* and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with the CBA. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

245

Appendix H

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

### Procedures provided by the *Management Council* and *the NFLPA* to be performed by the Local Accountants

#### General
- *The local accountants shall conduct procedures as agreed upon by the parties.*

- *The CBA and all side letters* should be reviewed and understood by all Local Accountants.

- See Exhibit H.2 for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

#### Team Salaries - Schedule 1
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the CBA.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the CBA.

**246**

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the CBA.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this CBA.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**
- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the CBA.

247

Appendix H

## Defined Gross Revenues - Schedule 4

- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the CBA. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

## Excluded DGR - Schedule 5
- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

## Questions - Schedule 6
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

248

Appendix H

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

*Extension Agreement 1/8/02*

249

**EX 9, PAGE 1280**

Appendix H.1

## EXHIBIT H.1

## ACCOUNTANTS' *AGREED-UPON PROCEDURES* REPORT

*We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (collectively, the "Parties") with respect to the National Football League Office Reporting Package and the Reporting Packages* of the Member Clubs of the National Football League, *for the [insert] League Year, solely to assist the Parties in evaluating whether the Reporting Packages were prepared* in accordance with the provisions and definitions contained in the *Instructions to the Reporting Package. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which this report has been requested or for any other purpose.*

*Our findings are set forth in the accompanying Schedule B.*

*We were not engaged to, and will not perform an audit or examination, the objective of which would be the expression of an* opinion *on the Reporting Packages. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an* audit *or examination of the Reporting Packages, other matters might have come to our attention* that *would have been reported to the Parties.*

*This report is intended solely for the use of the National Football League Management Council, the National Football League Players Association and Class Counsel* and *should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.*
*\*Extension Agreement 1/8/02*

250

# EXHIBIT H.2

## LOCAL ACCOUNTANTS' *AGREED-UPON PROCEDURES* REPORT

*We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was* prepared in accordance with the provisions and definitions contained in the *Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the re-*sponsibility of management *of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in* Schedule A *either for the purpose for which this* report *has been requested* or for any other purpose.

*Our findings are set forth in the accompanying Schedule B.*

*We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.*

*This report is intended solely for the use of the [Member Club Name], the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.*

*\*Extension Agreement 1/8/02*

Appendix 1

# APPENDIX I

## STANDARD MINIMUM PRESEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

### General Medical Examination

1. History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpation
   - chest
   - heart
   - visceral
   - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e. scars, birthmarks
   - height
   - weight
   - temperature
   - blood pressure
   - pulse
   - heart rate

252

EX 9, PAGE 1283

Appendix I

**Orthopedic Examination**
Examination visually, including stress testing and range of motion for all of the following:

- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck

**EKG**
Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardiovascular

**Blood Testing**
Standard grid. Testing for (including but not limited to):

- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*      *Where applicable. If found,
- Sickle Cell*    individual counseling necessary.
- VD*

253

Appendix I

## Urinalysis
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

## Vision Testing
- peripheral vision
- standard eye test

## Hearing Test

## Dental Examination

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for: Tumor
        T.B.
        Lesions

**X-Ray all previously injured areas** (at physician's discretion)

254

**EX 9, PAGE 1285**

# APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

| Nonfootball related disability rates before retirement: | Age | Rate |
|---|---|---|
| | 22 | .04 |
| | 27 | .04 |
| | 32 | .04 |
| | 37 | .05 |
| | 42 | .09 |
| | 47 | .18 |
| | 52 | .41 |

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. |

| Withdrawal rates: | For Players With Service of | Rate |
|---|---|---|
| | 1 year | 29.1% |
| | 2 years | 19.7% |
| | 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993. |
| Retirement age: | 47, except 55 for players with no credited seasons before 1993 |
| Percent married: | Social Security awards in 1972 |
| Age of Player's wife: | Three years younger than player |

255

Appendix J

| | |
|---|---|
| Remarriage rates: | 1971 Railroad Retirement Board rates |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of plan year |
| Actuarial value of assets: | Onetime write-up to market value as of March 31, 1993 followed by restart of the present procedure thereafter. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for Line-of-Duty disability benefits. |
| Amortization period: | 20 years beginning April 1, 1993; 19 years as of April 1, 1994, etc. In years when there is a zero or negative unfunded actuarial accrued liability, the amount which is expected to produce a zero unfunded actuarial accrued liability at the end of the plan year. |

256

# APPENDIX K

## EXTENSION CHART

Salary Cap as Percentage of DGR

|                    | 02 | 03    | 04    | 05   | 06   | 07 |
|--------------------|----|-------|-------|------|------|----|
| If notice given (1)| 64 | 64.25 | 64.75 | 65   | 65   | U  |
| If no notice given | 64 | 64.25 | 64.75 | 65.5 | 64.5 | U  |

U  =  Uncapped

*Extension Agreement 1/8/02

(1) Notice may be given by either party.

257

# APPENDIX L

## OFF-SEASON WORKOUT RULES

The Collective Bargaining Agreement with the NFLPA provides that, except for certain specified mini-camps, any off-season workout programs or classroom instruction shall be *strictly* voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for *fourteen* weeks between the end of the previous season and ten days prior to the start of veteran training camp. The CBA limits such workouts to four days per week; *such workout programs are not permitted on* weekends. Included in the *fourteen* weeks may be no more than fourteen days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.

Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the Management Council the *schedule* for the program, including designation of any days on which organized team practice activity will take place, *pursuant to the rules set forth in Article XXXV of the CBA*, and any changes *to the schedule for the program*.

The following rules shall also apply to the fourteen days of organized team practice activity:

- No pads except protective knee or elbow pads. Helmets are permitted.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.
- Maximum six hours per day, with a maximum two hours on field, for any player.

\* *Extension Agreement 1/8/02*

# APPENDIX M

## PSL EXAMPLES

Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs):

### 1. Subsection (x)(1) — Maximum Annual Allocation Amount

Year 1 (1996)   PSL revenues received = $ 45 million
Remaining life of PSL = 16 years
WSJ Treasury *Note* rate at 2/1/96 - 8%
Factor-Future Value of 8% annuity 15 years (maximum)
= 27.152 (annual compounding)
Future Value of $3 million/year for 15 years
= $3 million x 27.152 = $81.456 million
Interest Amount        = $81.456 million - $45 million
                       = $36.456 million

Year 1 Annual Interest Allocation
= $36.456 million/15 years = $2.43 million/year

Year 1 PSL Allocation Amount
= PSL Amount = $45 million/15 years = $3.00 million
+ Allocated Interest                = $2.43 million
Total Year 1 Allocation             = $5.43 million

1996 PSL Maximum Annual Allocation Amount        = $5.43 million

259

Appendix M

**Year 2 (1997)**    PSL revenues received = $ 30 million
Remaining life of PSL = 15 years
WSJ Treasury *Note* rate at 2/1/97 - 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129      = $50.258 million
Interest Amount      = $50.258 million - $30 million
     = $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
= PSL Amount = $30 million/15 years    = $2.00 million
+ Allocation Interest      = $1.35 million
Total Year 2 Allocation      = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount      = $5.43 million
Year 2 PSL Allocation Amount      = $3.35 million
1997 PSL Maximum Annual Allocation Amount      = $8.78 million

260

Appendix M

**Year 3 (1998)** PSL revenues received $= \$ 7$ million
Remaining life of PSL $= 14$ years
WSJ Treasury *Note* rate at 2/1/98 - 7.5%
Factor-Future Value of 7.5% annuity 14 years $= 23.366$
Future Value of \$.5 million/year for 14 years
$= \$.5m \times 23.366$      $= \$11.683$ million
Interest Amount      $= \$11.683$ million - \$7 million
     $= \$ 4.683$ million

Year 3 Annual Interest Allocation
$= \$4.683$ million/14 years $= \$.335$ million/year

Year 3 PSL Allocation Amount
$=$ PSL Amount $= \$7$ million/14 years $= \$ .500$ million
$+$ Allocated Interest      $= \$ .335$ million
Total Year 3 Allocation      $= \$ .835$ million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount      $= \$5.430$ million
Year 2 PSL Allocation Amount      $= \$3.350$ million
Year 3 PSL Allocation Amount      $= \$ .835$ million
1998 PSL Maximum Annual Allocation Amount      $= \$9.615$ million

## 2. Subsection (x)(2) — PSL Revenues Used For Stadium Construction Or Renovation

Assume the Team sells PSLs on the following terms:
- Gross PSL revenues received in 1996 $= \$45$ million
- Income taxes paid on PSL revenues in 1996 $= \$12$ million
- Legal and marketing costs incurred relating to PSL revenues $=$ \$6 million
- Stadium renovation costs $= \$56$ million

The PSL revenues included in DGR, subject to the rules in Subsections (x)(3) through (x)(7), would be \$45 million.

Assume that only the net PSL revenues of \$27 million were used in the renovation project (\$45m - (\$12m + 6m)) and the total stadium renovation costs were \$30 million.

The PSL revenues excluded from DGR in this example would be limited to \$27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of \$45 million.

261

Appendix M

## 3. Subsection (x)(2) — Maximum Exclusion Of PSL Revenues Each League Year

For purposes of this subsection, Excluded DGR spillover shall be calculated as follows for each Team:
- Assume that the new stadium's first full year of operation is 1998.
- Assume that the Team's Excluded DGR data is as follows:

|              | 1997        | 1998         |
|--------------|-------------|--------------|
| Excluded DGR | $5 million  | $15 million  |

If the League, as a whole, is in a spillover situation in 1998, then the increase in DGR due to spillover would be $10 million ($15 million - $5 million).

If the League is not in a spillover situation in 1998, the increase in DGR due to spillover would be zero.

## 4. Subsection (x)(3) — PSL Difference Credited To DGR

a. Assume that the new stadium is placed in service in June 1998.

1998 increase in DGR directly related to new stadium:
- Increase in gate receipts        $6 million
- Increase in DGR spill-over       $2 million
- Total DGR increase               $8 million

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|------|-----------------|-----------------|-----------------|
| 1996 | $5.430 million | $8 million (assumed) | 0 |
| 1997 | $8.780 million | $8 million (assumed) | $.780 million |
| 1998 | $9.615 million | $8 million | $1.615 million |
| Cumulative PSL Difference | | | $2.395 million |

For purposes of computing the PSL Difference, we assume that the increase in DGR was the same for 1996 and 1997 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million).

$2.395 million would be credited into DGR in the 1999 League Year.

262

Appendix M

b. Assume that the new stadium is placed in service in June 1998.

1998 increase in DGR directly related to new stadium:
- Increase in gate receipts $ 9 million
- Increase in DGR spill over $16 million
  Total DGR increase $25 million

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|------|------|------|------|
| 1996 | $5.430 million | $25 million (assumed) | 0 |
| 1997 | $8.780 million | $25 million (assumed) | 0 |
| 1998 | $9.615 million | $25 million | 0 |
| Cumulative PSL Difference | | | 0 |

**Since the increase in DGR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year.**

No amount would be credited into DGR in the 1999 League Year.

### 5. Subsection (x)(5)  Carryover PSL Credit

Assume the following:
- New Stadium is placed in service in June 1998.
- 1999 - 2002 Maximum Annual Allocation Amount is $9.615 million.
- Increases in DGR directly related to New Stadium are as follows:
  | 1999 | $ 8 million |
  | 2000 | $ 9 million |
  | 2001 | $14 million |

The Carryover PSL credits are calculated as follows:
| 1999 | $9.615m - $8m = $1.615m |
| 2000 | $9.615m - $9m = $ .615m |
| 2001 | (No carryover PSL credits) |

Under this scenario, year 2001 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 1999 and 2000 ($1.615m + $.615m) can be deducted in full from DGR in League Year 2001. There would be no remaining Carryover PSL credits to deduct from DGR in future League years.

263

Appendix M

## 6. Subsection (x)(6) Reduction In Premium Seat And Luxury Box Expenses

Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.

## 7. PSL Revenues Not Benefitting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium

In any case where:

(i)  PSLs are sold by a Team or by a third party (such as a stadium corporation, a nonprofit private sector entity, or a governmental entity) pursuant to Team authorization; and

(ii)  all net proceeds of such PSL sale are used to build a new stadium or construct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and

(iii) such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or nonprofit entity; and

(iv) the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and

(v)  neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease;

264

then, because the Team and its affiliates do not receive any net benefit aris-
ing out of the sale of PSLs other than through the stadium construction or
improvements paid by the PSL revenues (all PSL revenues being spent on
third-party costs and charges directly incurred as a result of the PSL sale, or
on stadium construction or improvements), none of the proceeds received
from the sale of the PSLs would be included in DGR or Excluded DGR.
Each of Example Nos. 1 through 6 above assumes that, for one or more rea-
sons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts
other than the PSL proceeds, including but not limited to any expense pay-
ments, may be treated as DGR, Excluded DGR, or non-DGR under this
Agreement. Moreover, the Special Master or the Court would have the au-
thority to examine any transaction involving the Club or any of its affiliates
and the Stadium landlord or any of its affiliates, to determine if such transac-
tion transfers, in whole or in part, some or all of the economic benefit of any
PSL revenues to the Club or any of its affiliates, and any such transferred eco-
nomic benefits shall be treated as DGR or Excluded DGR, as appropriate.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsec-
tions (xi)(1) through (xi)(6) call for calculations quite similar to those dis-
cussed in Example Nos. 1 through 6 above in calculating "Premium Seat
Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses,"
and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."
*Extension Agreement 1/8/02*

265

Appendix N

## APPENDIX N

### WRITTEN WARNING
### GOOD FAITH EFFORT

[date]

Dear [player]:

The Club hereby provides you with written notice that you are failing to ex-
hibit the level of good faith effort which can be reasonably expected from
players on this Club. If you do not demonstrate the good faith effort which
can be reasonably expected from players on this Club, you will not be en-
titled to Termination Pay under Article XXIII of the Collective Bargaining
Agreement if you are terminated before the end of this season.

[Club Official]

[Club name]

266

**EX 9, PAGE 1297**

## APPENDIX O

## CALCULATION EXAMPLE

*If 2005 Salary Cap:*      *$81.7 million*

*If 2006 Projected DGR, after DGR adjustments (including the shift of $342 million in television rights fees, plus interest, to 2006), equals $140 million per club:*

$$65\% = \$91 \text{ million}$$
$$70\% = \$98 \text{ million}$$

*less assumed Projected Benefits/salary cap deductions of $19 million per club:*

$$65\% \, cap = \$72 \text{ million}$$
$$70\% \, max = \$79 \text{ million}$$

*then, pursuant to Article XXIV, § 4(b)(i), the Salary Cap for 2006 is $79 million*

*\*Extension Agreement 1/8/02*

267

**EX 9, PAGE 1298**

# INDEX

**0 – 9**
25% Rule, 53, 134-135
30% Rule, 54, 134-135
70% Rule, 96

**A**
Acceleration, 72, 102-103, 180; *see also Signing Bonus.*
Access to Personnel and Medical Records, 193
Accrued Season, 6, 11, 47-48, 57-58, 59, 67, 73-74, 98, 151, 163, 166,
    177, 222
    definition, 5
    franchise player, 70-72
    restricted free agent, 60-62
Active
    List, 5, 46, 48, 53, 55, 57, 76, 85, 88, 98-99, 162, 165-167, 175,
        177, 179, 186, 188-189
    Player, 13, 165, 211, 236, 255
Active/Inactive List, 46, 48, 53, 55, 88, 99, 166-167, 175, 179
Actual DGR, *see DGR.*
Additional Compensation, 176-177, 178, 180-182, 233, 242;
    *see also Bonus; Incentives.*
Advisory Committee, *see Committee.*
Agent Certification, *see NFLPA.*
Agent Regulation, *see NFLPA.*
Agreement
    definition, 4
    effective date, 224
    expiration date, 224
    governing, 9
    ratification, 225
    scope of, 10
    settlement, 4, 9, 11, 12, 39-40, 43, 68, 76, 82, 88, 100, 102, 105,
        136, 137, 152, 160, 212, 223, 225, 238
    termination of, 46, 146, 156, 209-210, 223, 224-225
    termination prior to expiration date, 224
    undisclosed, between player and club,
Alcohol Abuse, *see Players' Right to Medical Care and Treatment.*
Answer
    injury grievance, 27; *see also Injury Grievance.*
    non-injury grievance, 22; *see also Non-Injury Grievance.*

**EX 9, PAGE 1299**

Anti-Collusion, 69, 146-147, 151-156, 157-158, 224-225, 238
    burden of proof, 152-153
    computation of damages, 154
    costs, 155
    disclosures, League, 152
    discretion, 152
    effect on computations, 155
    enforcement of provisions, 152
    other Club conduct, 151-152
    payment of damages, 155
    player election, violation proven, 154-155
    prior conference, before filing claim, 156
    prohibited conduct, 151
    reimbursement, 155
    remedies, 153-154
    summary judgment, 153
    termination of Agreement, 156
    time limits, 156
Appeal, 17, 22-23, 29, 151, 153, 224-225
    value of NFL Films and Properties revenues, for DGR purposes, 87, 92
    Commissioner discipline, 33-34
    injury grievance, 29
    NFL player contract, disapproval of, 43-44
    non-injury grievance, 22-23
Appendix
    A, check off authorization for National Football League Players Association deductions, 228-229
    B, injury protection, early waiver, 35-36, 230
    C, NFL player contract, 40, 45, 231-239
    D, first refusal offer sheet, 64, 240
    E, first refusal exercise notice, 64, 241
    F, waiver of free agent rights, 68, 242
    G, notice of termination, 83-84, 243
    H, accountants' review procedures, 138, 244-249
    I, standard minimum preseason physical examination, 252-253
    J, actuarial assumptions and actuarial cost method, 199, 255-256
    K, extension chart, 257
    L, off-season workout rules, 168-171, 258
    M, PSL examples, 259-264
    N, written warning good faith effort, 85, 266
    O, calculation example, 267
Appointment of Special Master, *see Special Master.*

EX 9, PAGE 1300

Index

Arbitration, 10, 11, 13, 23, 26, 29, 31, 67, 149, 170, 176, 196, 217, 235, 237
    expedited hearing, 176, 197, 215
Arbitration Panel
    injury grievance, 29
    non-injury grievance, 23
Arbitrator,
    Benefit, 196-197, 214-215
    Chairman, 29-30
    decision, 14, 23, 25-26, 30-31, 37-38, 67
    decision in committees, 37
    extreme personal hardship, 47, 57, 59, 63, 79
    Impartial, 4, 11, 22, 47, 57, 59, 63, 67, 74-75, 77, 78, 79, 94, 100, 106, 131, 133, 149-150, 176, 177
    Injury, 27-32
    injury grievance procedure, 235
    Non-Injury, 22-26
    non-injury grievance procedure, 26
    notice, 22-24, 214
    Senior, 23, 29
Assigned Via Waivers, *see Waiver System.*
Assignee Club, *see Awarding Club.*
Assignor Club, *see Waiving Club.*
Awarding Club, *see Waiver System.*

**B**

Benefits, 6-7, 9, 88, 93-97, 137-139, 141, 162, 165, 194-197, 199-201, 205, 207-210, 213-217, 224, 233, 235-236, 244, 247, 256, 265
    definition, 6-7, 93
    guaranteed benefits, workers compensation, 217-218, 234-235
    injury protection, 35-36, 93, 195, 230
    minimum salary, 94, 178-182, 196
    player benefit, 6, 93, 141, 155, 179, 194-198, 209
    projected, 7, 141
    retention of, 216
Benefit Arbitrator, 214-215
    authority, 214
    compensation, 214
    role, 214-215
    selection, 214
Benefit Credits, 199
Bert Bell Plan, 186, 201; *see also Bert Bell/Pete Rozelle NFL Player Retirement Plan; Merged Plan; Pete Rozelle NFL Player Retirement Plan; Retirement Plans.*
Bert Bell/Pete Rozelle NFL Player Retirement Plan, *see Merged Plan.*

**EX 9, PAGE 1301**

Binding Effect, Agreement on Parties, 220
Bonus
    completion, 104-105, 122
    contract modification, 103
    credit, for signing bonuses refunded, 105
    expansion, 99
    extension, 102, 136
    incentive, 82, 106, 122-128, 136, 176
    option years, 103
    performance, 6, 45, 59, 71, 78, 106, 125-126, 233
    relocation, 105, 162
    reporting, 5-6, 59, 71, 82, 101, 103-104, 106, 121, 176
    roster, 40, 65, 101, 103-104, 109, 128, 240
    salary, 15
    signing, 54, 59, 65, 72, 81-82, 97, 100-105, 131, 134-136, 180, 240,
       247
    team performance, 106, 123-126, 129, 133
    weight, 106
    workout, 104, 181
Buyout Clauses, *see Signing Bonus.*

## C

Calculations , 51-53, 86-141, 175, 177, 179, 183, 205, 240, 261-265,
    267
    anti-collusion damages, 154-155
    credited season, for minimum salary, 175
    DGR, 86-94
    entering player pool, 51-53
    EDGR, 86-94
    minimum salary benefit, 179
    performance-based pool payment, 183
    team salary, 98
Canadian Football League (CFL), *see CFL Rule.*
Canton Hall of Fame Game, 164, 173
Capped Year, 6-7, 51, 59, 60, 64, 96-97, 100-101, 104, 105, 126, 128,
    130, 134, 138
    definition, 6-7; see also Final Capped Year; Salary Cap.
Career-ending Injury, *see Injury.*
Career Planning Program, 15, 220; *see also Tuition Assistance Program.*
Carryover PSL Credit, *see PSL.*
CBA, 1, 11, 15, 42, 43, 44, 53, 55, 68, 76, 77, 82, 103, 104, 105, 132,
    223, 245
    expiration, 223
Certification 144, 146, 208
    agent, 15, 17-18

271

Index

    contract, by club, player and agent, 157-159
    end of League Year, 157-158
    failure to execute and submit, 157
    false, 146, 158-159
CFL Rule, 163
Check-Off Authorization, NFLPA Dues, *see Union Security.*
Chemical Dependency Program, *see Union Security; see also Players' Right to Medical Care and Treatment.*
Circumvention, Salary Cap and DGR, 131, 142, 144
Claiming Club, *see Waiver System.*
Class Counsel, 54, 56, 87, 134, 151, 194, 225, 250, 251
    definition, 4
Club 5
    definition, 4
    discretion, 152
    expansion, 140, 162
    *See Team; Member.*
Club Affiliate, 4
    definition, 4
Club Discipline, 20-21, 25
    deduction, 21
    disputes, 21
    maximum discipline, fines, 20
    published fines list, 21
    uniformity, 21
Club Physician, *see Physician.*
Collective Bargaining Agreement, *see CBA.*
College Draft, 3, 11, 40, 46-50, 51-53, 67, 151, 154, 162, 224
    annual, 46
    assignment of draft rights, 48
    compensatory draft selections, 46, 49, 51, 78
    definition, 5
    drafted rookie, 5, 46, 47, 48, 52, 53, 55, 153, 154
    initial, 47
    next annual, 47
    no subsequent, 49
    notice of player signing, 49
    number of choices, 46
    other professional teams, 47
    required tender, drafted rookie, 46
    returning to college, drafted rookie, 48
    signing, drafted rookie, 46-47
    subsequent, 48-49
    supplemental, 53
    time of draft, 46

**EX 9, PAGE 1303**

        undrafted rookies, 6, 49, 51, 55, 99, 151
        workouts, draft eligible players, 49-50
        *see also Compensatory Draft; Draft Choice Compensation; Draft Rights;*
            *Rookie.*
    College Players Returning to College, *see College Draft.*
    Collusion, *see Anti-Collusion.*
    Commissioner, 100, 101, 151, 159, 192, 220, 236
        approval of contracts, 142-143, 157
        committees' recommendations to, 37
        definition, 4
        disapproval, 43, 142
        fines, 33
        *see also Commissioner Discipline.*
        Commissioner Discipline, 21, 33-34
        fines, 144, 170-171, 234, 236
        hearing costs, 34
        league discipline, 33
        one penalty, 34
        representation, during hearing, 33-34
        supercedes team discipline, 21
        time limits, 33
        *see also Commissioner.*
    Committees, 25, 37-38
        advisory, 192
        and the Commissioner, 37
        competition, 38
        grievance settlement, 26
        joint , player safety and welfare, 37-38, 217
        player/club operations (operations), 38, 168
    Compensation, 4, 5, 7, 37, 43, 44, 48, 49, 57, 82, 83, 94, 132, 143,
        144, 147, 149, 163-164, 176, 177, 178, 180-182, 188, 190, 206,
        214, 217-218, 219, 233, 236, 240, 242
        additional, 176, 178, 180-182, 233, 242
        deduction, 219
        deferred, 43, 65, 176, 206, 240
        draft choice, 5, 6, 48-49, 57, 59-60, 62-65, 69, 70-71, 73, 74, 79,
            83, 166
        guaranteed, 177, 180
        non guaranteed, 180
        other, 83, 176
        players, 245
        post season, 188-189
        Pro-Bowl, 190
        Special Master, 147
        *see also Bonus; Incentive; Salary.*

**EX 9, PAGE 1304**

Index

Compensatory
    damages, 154-155
    picks, additional, 162
Compensatory Draft, 11
    selection, 5, 46, 49, 51-52, 78
    *see also College Draft.*
Competition Committee, *see Committees.*
Completion Bonus, *see Bonus.*
Computation of Anti-Collusion Damages, *see Anti-Collusion; see also Calculations.*
Computation of a Team's Salary, *see Team Salary; see also Calculations.*
Conduct, 11, 13, 17, 20, 33, 34, 39
    other club, 151
    prohibited, 49, 151
Conformity in NFL Player Contract, 40
Consideration Between Clubs, 66
Consultation and Information Sharing, 151, 157, 160-161
consultation and communication, 161
copies, 161
    meetings, 161
    neutral verifier, player contracts offers, 160-161, 238
    notice of invalid contract, 160
    salary summaries, 160
Contact
    during off season workouts, 169, 258
    during mini camp, 172
Contacting Players on Waivers, 83 *see Waiver System.*
Contingency Clause, 102
Contract
    certification, 157
    deferred, 177
    guaranteed, 130, 177
    mid-season, 134
    multi-year, 75, 178, 180
    player, 4-7, 9, 11, 17, 22, 27, 39-45, 51-55, 57, 59-83, 85-86, 93-94,
        98-105, 123, 125-127, 129-130, 132-137, 142-143, 151-153,
        155, 157-158, 160-163, 166, 169, 176-178, 181-182, 190, 196,
        218, 223, 231-239
    qualifying, 178-181
    renegotiation and extensions, 55, 59, 71, 73, 75, 101, 104, 105, 135-
        137
    rookie, and playtime requirements, 54, 125
    split, 177
    tolled, 14, 163, 236
    traded, 133

274

Contributions to Retirement Plan, *see Retirement Plan.*
Copies, 22-23, 27, 32, 38, 67, 69, 161, 170, **177**, 211
    contracts, 239
    medical records, 193
    personnel records, 193
Costs, 7, 90, 91, 95, 147, 149, 155, 161, 186, 191, 247
    insurance coverage, 93
    Commissioner discipline, 34
    injury grievance, 30
    non-injury grievance 24
    player benefit, 6, 93, 141, 194-198, 209-210
    postponement, 24, 30
    rookie orientation programs, 56
    transcription, 26
    (non-injury grievance); *see also Expenses.*
Covered League Years, Entering Player Pool, 51; *see also Entering Player Pool; League Years.*
Credited, 253
    season, 47 48, 175, 178-179, 181, 199-205, 207-208, 211
    service, 31, 83, 85, 173, 189

**D**
Days Off, 185
Deceased Players, 209
Deferred, 43, 65, 176, 200, 206, 240
    bonuses, 101, 137
    contracts, 177
    salary, 72, 97, 99, 176
Defined Gross Revenues (DGR), *see DGR; see also EDGR; Non- DGR.*
Definitions
    accrued season, 5
    agreement, 4
    benefits, 6
    Class Counsel, 4
    club affiliate (team affiliate), 4
    club/team/member, 4
    Commissioner, 4
    compensatory draft selection, 5
    draft (college draft), 5
    draft choice compensation, 5
    drafted rookie, 5
    final eight plan, 5
    free agent, 5
    Impartial Arbitrator, 4
    league year, 4

Index

    minimum active/inactive list salary, 5
    minimum salary, 5
    minimum team salary, 7
    negotiation, 5
    new club, 5
    NFL player contract, 4
    NFL rules, 4
    paragraph 5 salary, 7
    player affiliate, 4
    player benefit costs/ benefits, 6
    player contract, 5, 7
    player costs, 7
    prior club, 5
    prior year salary, 5-6
    renegotiate, 6
    rookie, 6
    room, 7
    salary, 4
    settlement agreement (stipulation and settlement agreement), 4
    undrafted rookie, 6
Delivery of Documents, by Management Council and NFLPA, 220
Dental Insurance, *see Group Insurance.*
"Deion Rule", *see Signing Bonus.*
Developmental Squad, *see Practice Squad.*
DGR, 9, 51, 62, 68, 82, 86-93, 96-97, 137-141, 144-145, 147, 154,
    160, 244-247, 248-249, 257, 261-263, 265, 267
    definition, 86
    elements, DGR, 86-93
    elements, EDGR, 87-92
    elements, non-DGR, 87
    formulas, 87-88
    report(ing), 137-139, 245
    *see also EDGR; Non-DGR; Projected DGR.*
Disability
    classification rules for total and permanent, 200
    definition, 200; *see also Injury; Supplemental Disability Benefits.*
Disagreements Resolved by Benefit Arbitrator, 196-197, 214 (XLVI-LI)
Discipline,
    club, 20-21, 25
    Commissioner, 21, 33-34, 170-171, 234, 236
    imposed uniformly, 21
    list, 21
    reasons for, 20
Disclosure of Pre-Existing Condition, 27, 29, 234

276

Discovery,
   Impartial Arbitrator proceedings, 149
   non-injury grievance, 23
   Special Master proceedings, 147, 153
Discrimination, *see Player Security.*
Dispute, 10, 13, 14, 21, 22, 23, 26, 30, 33, 35, 67, 75, 77, 78, 87, 106,
   139, 141, 143, 145, 146, 147, 149, 156, 170, 177, 196, 215, 225,
   235, 237
   career-ending injury, 75-78
   club discipline, 21
   injury protection, 35-36
   resolution, 141, 196, 215
   union security, 13
Disputed Adjustments, 139
Distributions of Performance Based Pool Funds, 183, *see Performance-*
   *Based Pool.*
Draft, *see College Draft.*
Draft Choice Compensation, 6, 48-49, 57, 59, 60, 62-65, 69-71, 73-74,
   79, 83, 166
definition, 5
   Franchise and Transition Players, 71-74
   Veteran Free Agency, 6, 57, 59-65
Drafted Player, *see College Draft.*
Draft Rights, 5
   assignment, 48
   of clubs, 153
Draft Selection, *see College Draft.*
Drug Use and Abuse, *see Players' Right to Medical Care and Treatment.*
Duration of Agreement, *see Agreement.*

**E**
EDGR, 9, 87-92, 137-138, 144, 244, 248, 262, 265; *see also Defined*
   *Gross Revenues; Non-DGR; Projected DGR..*
Effect
   Impartial Arbitrator ruling, 149
   salary cap, 155
End of League Year Certification, 157-158
Endorsements, Player, 219
Enforcement, Anti Collusion Provisions, 152, *see Anti Collusion.*
Enforcement of Salary Cap and Entering Player Pool, 75, 136, 137, 157-
   159
   circumvention, 142
   Commissioner disapproval, 142
   DGR circumvention, 144-145
   management council audit rights, 145

Index

    prior consultation, resolution of dispute, 145
    sanctions, players, agents and club personnel, 143-144
    Special Master, action and review, 142-143
    undisclosed terms, in player contracts, 142
Entering Player Pool, 7, 43, 46-48, 51-56
    adjustment, 162
    calculation, 51-53
    covered league years, 51
    definition, 51
    formula allotment, 51-54
    incentives, 121
    operation, 53-55
    removal of entering player pool, 51
    rookie allocation, 52
Excluded DGR, 9, 87-92, 137-138, 144, 244, 248, 262, 265; see also De-
    fined Gross Revenues; Non-DGR; Projected DGR..
Exclusive Representation and NFLPA Agent Certification, see NFLPA.
Exempt Commissioner Permission List, 84, 175; see also Commissioner.
Expansion
    additional compensatory picks, 162
    bonuses, 99
    entering player pool adjustment, 162
    relocation bonus, 105, 162
    veteran allocation, 162
Expedited Arbitration, see Arbitration.
Expenses, 37, 86, 90, 138, 139, 199, 203, 205, 208, 213
    benefit arbitration, 214-215
    club's prepaid contributions to the Annuity Program, 204-205
    copies, 161
    player, during minicamp, 172
    injury grievance, 31
    joint committee, 37
    medical, 31, 208
    moving and travel, 93, 186-187, 195
    neutral physician, 31
    neutral verifier, 161
    non-injury grievance(costs), 26
    rookie orientation program, 56
    security, 96
    witnesses, 31
Extended Post Career Insurance, 197, 209
    financing, 210
    limitations and rules, 209-210, see Group Insurance.
Extended Post-Career Medical and Dental Insurance Benefits, see Group
    Insurance.

EX 9, PAGE 1309

Extension Date in Savings Plan, *see Second Career Savings Plan.*
Extension of Agreement, *see Agreement.*

**F**
Failure to Disclose Pre-Existing Conditions, *see Special Defense.*
False Certification, 146, 158
Fees, 15, 26, 87, 90, 93, 139, 147, 149, 155, 196, 207, 228, 264
    benefit arbitration (arbitrator), 214
    postponement, injury grievance hearing, 30
    postponement, non-injury grievance hearing, 24
Filing, 43, 237
    injury grievance, 27, 29, 31
    non-injury grievance, 22-23
Final Capped Year, 96, 100, 104-105, 126, 128, 130, 134, 138
    definition, 7
Final Eight Plan, 11, 81-82, 136
    definition, 5
    increases, 82
    next four teams, 81
    replacement of free agents signed by other club, 81-82
    salary definition, 82
    top four teams, 81
    trade limitation, 82
Final League Years, 95, 134, 180, 199, 222, 224
    definition, 7; *see also League Years.*
Final Special Purpose Letter, *see Special Purpose Letter.*
Fines, 86, 144, 146, 154-155
    club, 21
    Commissioner, 33
    rookie symposium, 15-16
    Special Masters, 143-144
    uncertified agents, 17
First Refusal Exercise Notice, 65, 67-69, 241
First Refusal Procedure, 64
First Refusal Rights, 48-49, 57, 73, 80, 166
    veteran free agency, 59-60, 63
First Year Premium Seat Increase, 85; *see also PSL.*
Formula Allotment, *see Rookie Allocation; see also Entering Player Pool.*
Franchise Player, 64, 67, 70, 82, 98, 151, 157, 163
    designation, 71
    designation period, 77
    duration of designation, 75-77
    lists, 74
    other terms, 78
    required tender, 71-72

Index

   salary information, 74-75
   signing period, 79-80
Free Agency, 5-6, 20, 59-69, 153, 163-164, 222, 224
Free Agent, 5, 47,
   restricted free agent, 6, 48, 60, 62-70, 72, 74, 77, 152-153, 158, 163
   rookie, 46, 48-49
   unrestricted free agent, 6, 20, 42, 46, 59, 60, 62, 67-73, 77, 80-83,
      98, 152-153, 158, 163, 220, 222; *see also Free Agency.*
Free Agent List, 69; *see also Free Agency; Free Agent.*
Funding Of Deferred And Guaranteed Contracts, 177, *see also Salaries.*

G
Good Faith, 58, 60, 62, 71, 85, 86, 170, 205, 234
   effort, 23, 32, 266
   negotiation, 10, 44, 93, 176
Governing Agreement, 9
   conflicts, 9
   implementation, 9
   management rights, 9
   rounding, 9
   *see also Agreement.*
Governing Law, 226
Grievance, 7; *see also Injury Grievance; Non-Injury Grievance; Salary.*
Grievance Settlement Committee, 26; *see also Injury Grievance; Non-Injury
   Grievance; Salary.*
Group Insurance, 93, 195
   administration, 210
   dental insurance, 208
      annual deductible, 208
      coverage, 208
   extended post-career medical and dental insurance, 209-210
   family medical and dental coverage for deceased player, 209
   group insurance benefits, 208
   life insurance, 208
   limitations and rules for extended insurance, 210
   medical, 208
      annual deductible, 208
      insurance co-payment, 208
      prescription drug co-payment, 208
      maximum lifetime benefits paid on covered individuals, 208
   *see also Players' Right to Medical Care and Treatment; Retention of Benefits;
      Supplemental Disability Benefits.*
Guaranteed Contracts, *see Contracts.*

**EX 9, PAGE 1311**

Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary, 7, 51, 82, 224
    30% Rules, 134-135
    accounting procedures, 137-138
    computation of team salary, 98
    definitions, 86-93
        benefits, player benefit costs, 93-94
        defined gross revenues, 86-93
        salary, 94
Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary
    guaranteed league-wide salary, 94-95
    renegotiations and extensions, 135-136
    salary cap amounts, 95
        adjustments, 95-96
        calculation, 97-100
    team salary, 97-100
    trigger, 94
    valuation of player contracts, 99-135
    see also Contracts; DGR; EDGR; Non-DGR; Salary Cap; Team Salary.

**H**
Hearings, 23, 31, 37-38, 139, 146, 176, 200, 215, 236
    benefits, 196-197
    injury grievance, 29-32
    league discipline, 33-34
    non-injury grievance, 23-26
    prehearing briefs, 23
    transcribing of, 24, 30, 34

**I**
Impartial Arbitrator, 11, 22, 47, 63, 67, 74, 75, 77, 78, 79, 100, 106, 131, 133, 146
    compensation, 149
    definition, 4
    discovery, 149
    effect of rulings, 149
    personal hardship determination, 47, 57
    procedures, 149
    scope of authority, 149
    selection, 150
    term, 150
Inactive List, 5, 9, 46-48, 53, 55, 57, 88, 99, 162, 165-167, 175, 177, 179, 188-189; see also Active List; Active/Inactive List.

**EX 9, PAGE 1312**

Index

Incentive, 40
    additional incentive rules for veterans, rookies, individuals and teams,
        128, 176, 178, 190
    based on another player's performance, 126, 128
    based on club performance, 110, 126
    bonus, 82
    bonus, for rookies, 110, 126
    clause, 126, 130-131, 190
    entering player pool, 126
    honors and recognized media, 122
    individual, 110, 126
    likely to be earned, 106, 110-120
    performance, 129
    per play/game, 126-128
    rookie "likely to be earned", 110-120
    team, 125-126
    team performance-related, 125, 133
    veteran, 129
    see also Bonus; Signing Bonus.
Increases in Salary, Final Eight Plan, 82
Index, 268
Individual Incentives, see Incentive.
Individually Negotiated Limitations on Player Movement, Veteran Free
    Agency, 69
Ineligible to Compete, Club Breach of Waiver Procedures, 83; see also
    Waiver System.
Initial Draft, see College Draft.
Initial Special Purpose Letter, see Special Purpose Letter.
Initiation; see also Fees.
Injured Reserve, see Injury.
Injured Reserve List; see also Active/Inactive List; Injury.
Injury
    career-ending, 75, 77, 78
    during minicamps, 172
    during pro bowl game, 190
    guarantee provision, 177
    non-football (N-F/I), 163, 169, 175
    non-injury circumstances, 75, 77-78
    payment of salary, PUP, 57, 163, 175, 209
    player, 31, 39, 155, 173, 185
    protection, 35-36, 93, 195, 230
    reserve, 74, 207, 209
    settlement, 31, 97

**282**

Injury Grievance, 27-32, 71, 235
    answer, 27-28
    appeal, 29
    definition, 27
    discovery, 32
    expenses, 31
    filing, 27
    hearing, 29-30
    information exchange, 32
    neutral physician, 28
    payment, 31
    pension credit, 31
    playoff money, 32
    post-hearing briefs, 30
    presumption of fitness, 31
    special defense, 27-28
Injury Protection, 35, 93, 195, 230
    benefit, 35
    disputes, 35-36
    qualification, 35
Insurance Benefits for Retired/Terminated Players, 208-210, *see Group Insurance.*
Insurance Coverage, 208-210, *see Group Insurance,*
Insurance Programs, 208-210, *see Group Insurance.*

**J**
Joint Committee, 37-38, 217, *see Joint Committee on Player Safety and Welfare*
Joint Committee on Player Safety and Welfare, 37-38
    arbitrator's advisory decision, 37-38
    changing playing rules, 37-38
    inadequate medical care, 38
June 1st Rule, *102, 105, see Acceleration.*
June 1st Tender, 59, 60, 63, 82, 98, *see Tender.,*
June 15th Tender, 63, 98, *see Tender.*

**L**
Labor Exemption, 223-224
League
    discipline, 33
    disclosures, 152
    -wide benefit pool, 179; *see also Minimum Salary Benefit*
League Security, 220

EX 9, PAGE 1314

Index

League Years, 4-7, 15, 20-21, 35, 39-41, 44, 46-49, 51-60, 62-65, 68,
    70-84, 86, 89-102, 104-106, 120, 132-141, 144-145, 154-155, 157-
    158, 160-161, 166, 169, 171-173, 175, 178-184, 186-187, 194-196,
    199, 207-208, 210-211, 216, 224-225, 244, 250-251, 262-263
    definition, 4
    final, 7, 222
Life Insurance, 208, see Group Insurance
Likely to be Earned, 54, 56, 66, 82, 103, 106, 110-120, 122-129, 133-
    136, 240; see also Bonus; Incentives.
List
    active, 5, 85, 98, 162, 165-166, 177, 186, 188-189
    active/inactive, 5, 9, 46, 48, 53, 55, 57, 88, 99, 162, 166, 167, 175,
        179
    active/inactive limit, 76, 165
    discipline, published, 21
    exempt Commissioner permission, 84, 175
    franchise and transition player, 74
    free agent, 69
    inactive, 5, 162, 165-166, 177, 188-189
    injured reserve, 32, 84, 162, 169, 175, 188, 209
    non-active/inactive, 5, 162, 165-166, 177, 188-189
    reserved/non-football injury or illness, 162, 163, 169, 175
    size active and inactive limit, 76, 164, 165
    size inactive, 164
Loans, to players, 4, 6-7, 59, 71, 94, 131, 240, 245-248, 264
LTBE, see Likely To Be Earned , 178, 182

M
Maintenance of Retirement Plans, 199; see also Merged Plan.
Management Council, 1, 3-4, 9-11, 14, 19, 22-24, 27-30, 34, 37-42, 54,
    96, 105, 134, 140, 144-145, 152, 157-158, 168, 170, 176-177, 183,
    194, 210, 214, 219-220, 225, 227-228, 239, 244-246, 250, 251,
    258
Matching Contributions to Savings Plan, 202-203, see Second Career Sav-
    ings Plan
Maximum Annual Allocation Amount, 89-90, 259-261, 263, see PSL.,
Maximum Discipline, 20, see Club Discipline.
Meal Allowance, 93, 172, 184, 190, 195
Measuring Date, 40
Medical Care, 191-192, see Player's Right to Medical Care and Treatment.,
Member, 3, 4, 11, 13-14, 23-24, 26, 29-30, 37-39, 44, 84, 166, 186,
    192, 214, 217, 220-221, 223, 225, 228-229, 231-232, 236, 238-
    239, 241, 244, 250-251, see Club; Team.
Merged Plan, 199
Mid-Season Contracts, see Contracts., 134

Minicamps, 168, 172
    contact, 172
    expenses, 172
    injuries, 172
    length, 172
    number, 172
Minimum
    active/inactive list salaries, 9, 88, 175
    contributions to savings plan, 202-203
    paragraph 5 salaries, 178, 180
    pre-season physical, 191
    salary, 5, 54, 94, 166, 175, 178, 180-181
    split qualifying salary, 178-179
    team salary, 4, 7, 8, 11, 32, 41, 51, 68, 82, 86-140
    tender, 72-73
Minimum Salary Benefit, 94, 178-182
    calculation, 179
    guarantees, 180
    league-wide cash treatment, 179
    league-wide salary cap treatment, 179
    payments, salary, 178-179
    player moving to new club, 179
    player returning to old club, 180
    player with expired contract, 180
    qualifying contracts, 178
    qualifying players, 178
    reduced salary cap count, 179
    terminated qualifying players, 179
    transition rules, 178
Moving and Travel Expenses, 93, 186-187, 195
    moving, 186
    qualifications for, 186
    transportation, 187
    travel and housing, 186-187
Mutual Reservation of Rights: Labor Exemption, 223
    CBA expiration, 223
    labor exemption, 223

N
N-F/I, *see Injury.*
National Football League Players' Association, *see NFLPA.*
National Football League Management Council, *see Management Council.*
National Football League, *see NFL.*

EX 9, PAGE 1316

Index

Negotiation, 3, 10, 11, 17, 44, 63, 67, 93, 177, 218, 238
    definition, 5
    unrestricted free agent, 6, 59
    of agreement,
Neutral Physician, *see Physician*.
Neutral Verifier, for Player Contracts Offers,
New Club, 157, 160-161, 238
    definition, 5
Next Annual Draft, *see Draft*.
NFL
    address, 69, 227
    annual meeting, 37-38
    attractions, 87
    constitution and by-laws, 9-11, 15, 171
    Enterprises, 87
    Films, 87
    Properties, 87
NFL Club, 3, 9, 17, 47, 48, 68, 76, 83, 94, 152, 158, 167, 197-198,
    199, 202-203, 210-212, 227, *see Club*.
NFL Competition Committee, *see Committee*.
NFL Draft, *see Draft*.
NFL Player Contract, 7, 9, 11, 17, 22, 27, 39-44, 45, 47, 65, 77-78,
    134, 151, 166, 177, 218, 231-239, 240, 241, 242, 243
    changes, 39
    Commissioner's disapproval, 43-44
    conformity, 40-41
    definition, 4
    determining salary,
    disputes, 107, 139
    general, 41-43
    good faith negotiation, 44
    included in team salary,
    multi-year, 75, 178, 180
NFLPA group licensing program, 44
    not modified by principal terms, 64-65, 241
NFL Player Supplemental Disability Plan, *see Supplemental Disability Bene-
    fits*.
NFL Rules, *see Rules*.
NFL Teams, 7, 86, 88, 93-96, 141; *see also Club*.
NFLMC, *see Management Council*.

EX 9, PAGE 1317

Index

NFLPA, 1, 3, 4, 9-11, 13-15, 17-19, 22-44, 47, 49, 51-52, 54-58, 62,
  64, 67, 69-70, 74, 78, 84, 87-88, 90-92, 95-98, 100, 106, 134, 137-
  156, 158, 160-161, 164, 168, 170, 172, 176-177, 183, 190, 192,
  194-196, 209-212, 214, 217-220, 223-225, 227, 232-233, 239, 242,
  244-246, 258
    address, 69, 227
    agent certification, 15, 17-18
    certified agents, 176
    enforcement, 17
    exclusive representation, 17
    penalty, 17
    Player Group Licensing Program, 13
    rookie orientation, 56
    tickets, 219
    union security, 13
No Assignment of Club Right's to Franchise/Transition Players, 67
No Consideration Between Clubs, 66
No Property or Investments, in Offer Sheets, 66
No Reimbursement Among Clubs, Anti-Collusion Violation, 155
No Strike/Lockout/Suit, 11-12
No Subsequent Draft, *see Draft.*
No Trade Clause, 83, 162
Non-Cash Provisions, 131
Non-Compensation Terms, 66
Non-Defined Gross Revenues, *see Non-DGR.*
Non-DGR, 87, 144, 265
Non-Football Injury (N-F/I), *see Injury.*
Non-Football Injury or Illness List, 163, 169
Non-Football Services, 94
Non-Guaranteed Reporting Bonus, *see Reporting Bonus.*
Non-Injury Grievance, 22
    appeal, 22-23
    arbitration panel, 23-24
    arbitrator's decision and award, 25
    costs, 26
    definition, 22
    discovery, 23
    expedited grievance, 23
    filing, 22
    grievance settlement committee, 26
    grounds for grievance, 22-23
    hearing, 24-25
    initiation, 22
    payment, 26

**EX 9, PAGE 1318**

Index

representation, 25
time limits, 25
Non-Shared Amount, *see PSI.*
Notice, 14, 15, 20, 29, 40, 46, 64-65, 67, 68-69, 147-149, 150, 163, 170, 214, 218, 235, 237, 241, 243, 257, 266
veteran free agency, 68-69
Arbitrator, 23
invalid contract, 160
notice of signing, 49, 57
signing, by veteran with less than three accrued seasons, 57
signing, drafted rookie, 49
signing, undrafted rookie, 49
termination, in waiver system, 83, 225, 243
personnel, 84
to NFL, NFLMC and NFLPA, 28, 33, 37, 42, 47, 49, 51, 57, 83-84, 93, 103, 140, 143, 149, 151, 160, 164, 176, 194, 224-225, 227-228, 232
Number of Regular Season Games, 164, 176

**O**
Off-Season Reporting Bonus, *see Bonus.*
Off Season Roster Bonus, *see Bonus.*
Off-Season Workouts, 96, 258, 131, 132, 137, 168-171
bonus, 104, 181
enforcement, 170-171
injuries, 169
miscellaneous, 169
payment, 168-169
prohibited Club activity, 169
time period, 168
voluntary, 168
Offer Sheet, 64-69, 71-72, 74, 142, 151-152, 158, 244
first refusal procedure, 64-67
franchise player, 71
one offer sheet, outstanding, 65
principal terms, 65, 66
restricted free agents,
transition player, 71
Old Club, matching incentives, 66, 180
One Offer Sheet, Outstanding, 65, *see Offer Sheet.*
On Field Attire, 219
Operation Committee, *see Committee.*
Operation in Entering Player Pool, *see Entering Player Pool.*
Option Bonus, 45
Option Clause, 11, 45, 151

**EX 9, PAGE 1319**

existing option clauses, 45
    prohibition, 45
Orthopedic Physician, *see Physician.*
Other Provisions, 163
    CFL Rule, 163
    non-football injury, 163
    physically unable to perform (PUP), 163
    roster exemption, 163-164

**P**

Paid Performance Bonus, *see Bonus.*
Paragraph 5 Salary, 5, 7, 57, 61-63, 67, 71, 82, 85, 99, 101, 175, 178,
    180, 240
    definition, 7
    June 1st tender, 59, 60, 63, 82, 98
    June 15th tender, 63, 98
    minimum, 178, 180
    minimum qualifying offer, restricted free agent, 9, 62-64, 67
    minimum qualifying offer, right of first refusal and/or draft choice com-
        pensation, 62, 64-69, 72-74, 151-152
    *see also Deferred Paragraph 5 Salary; Minimum Paragraph 5 Salary;
        Salary.*
Parol Evidence, Modifying Agreement, 221
Payment, 6, 14, 26, 31, 35, 54, 56, 59, 71, 82-83, 86-87, 90, 94, 97-99,
    102, 130, 135-136, 155, 198, 172-174, 176-178, 181-183, 186-187,
    189-190, 196-197, 199-201, 203-207211-213, 233-235, 240, 247,
    255, 264-265
    non-injury grievance award, 26
    injury protection benefit, 33
    rookie orientation program, 56
    minimum workout, 54, 171, 181-182
    damages, 155
    performance based pool, 152, 183
    post season, 188-189
    salary, non-football injury or illness,
    salary, PUP,
    salary, waiver system.
    salaries, bonuses, 66, 76, 93, 95, 163, 166, 220
    severance, 94, 196, 211-212
Penalty, 14, 17, 34, 49, 57, 59, 60, 63, 71, 73, 79, 80, 83, 148, 152,
    166,
    and NFLPA Agent Certification, 17
    assessed by Special Master, 148
    in Commissioner discipline, 34
Pension, 31, 93-94, 155, 195-196, 214, 247

Index

Per Diem, *see Pre-Season Training Camp*.
Performance Based Pool, 52, 183
    annual projection, 183
    creation of fund, 183
    mandatory distribution each year, 183
    methodology, 183
    qualifying player, 183
Performance Bonus, *see Bonus*.
Performance Categories, 125, 129
Performance Incentives, *see Incentives*.
Personal, 68, 83, 88, 193, 220, 231, 235, 243, 259
    appearance, 19, 169
    hardship, 47, 57, 59, 63, 79
Personnel Information, NFLPA's Right to, 84
Personal Seat License, *see PSL*.
Pete Rozelle NFL Player Retirement Plan, *see Pete Rozelle Plan*.
Pete Rozelle Plan, 83, 173, 192, 201-204, 208, 209, 211, 213, 214; *see
    also Bert Bell NFL Player Retirement Plan; Merged Plan; Retirement Plan*
Physical Examination, 27-28, 31, 35, 172-173, 191, 230, 234-235, 243
Physically Unable to Perform (PUP), 27, 32, 163, 169, 234
Physician
    club, 20, 27, 28, 31, 35-36, 191, 193, 234-235, 243
    neutral, 28, 191
    orthopedic, 28, 191
    treating, 28
Plan Benefit Costs, 194-198
Play Rule Change, 37-38
Player
    appearances, 169, 219
    categories of, deals with rosters, 84, 97
    election, 154
    promotions, 223
    public statements, 219
    tickets, 220
    *see also Rookie; Veterans*.
Player Affiliate, 4, 7, 42, 59, 71, 94, 142, 157
Player Annuity Program, 94, 138, 194, 196-197, 204
    allocation, 204-205
    annuity board, 206
    contributions, 204
    definitions,
    distribution, 205

290

    eligibility, 204-205
        individual allocations, 204-206
        points, 204-206
        timing, 205
    establishment, 204
    insurance company,
        structure, 206
Player's Association, *see NFLPA.*
Player Benefit, 155, 179, 183, 197; *see Player Benefit Costs.*
Player Benefit Costs, 93, 141, 194-198
    1998 amendment benefits, 194, 197
    adjustments, 195
    definition, 6, 195-196
    general right of reduction, 194
    limitation on contributions, 197-198
    resolution of disputes, 196-197
    right of restoration, 195
    *see also Benefit.*
Player Benefit Credits, 197, 199, 201
Player Benefit Plan, *see Player Benefit Costs.*
Player/Club Operations Committee, *see Committee.*
Player Contract, *see Contract; see also Bonuses, Incentives; Salary.*
Player Costs, 6-7, 9, 88, 94-96, 137.139, 162, 244, 247
Player Second Career Savings Plan, *see Second Career Savings Plan.*
Player Security, 19
Players' Right to Medical Care and Treatment, 191-192
    club physician, 191
    club trainer, 191
    drugs of abuse and alcohol, 192
    insurance benefits, 198, 208
    records, 193
    second medical opinion, 191
    standard, 38
    standard minimum pre-season physical, 191-192
    substance abuse, 192
    surgeon of his choice, 191
Playoff Clubs, 5, 81
Playtime Requirement, 100-101, 125-126; *see also Incentives; Player Annu-ity Program.*
Post-Season Pay, 188-189
    compensation, 188
    payment, 189
    playoff system, 189
Practice Squad, 84, 98, 166, 209
    credited season, 201

**EX 9, PAGE 1322**

Index

eligibility, 166-167
player, 56
salary, 93, 166, 175
signing with other clubs, 166
size of, 165
Pre-Season, 164, 219, 228, 230, 231-233, 238
cut down dates and player limits, 165
game, 43, 76, 103, 164
per diem, 173, 195
physical, 36, 230, 252
roster bonus, 128
testing, drugs and alcohol, 253, 192
training camp, 104, 173-174, 231, 233, 258
veteran reporting (relocation) bonus, during expansion allocation,
105, 162
Premium
seat excess, 92, 265
seat revenue, 90-93, 265
Previous Player, 81
Principal Term, 64-67, 71, 240, 241
offer sheet, 64-67
restricted free agents, 67
Prior Club, 5, 57, 59, 60-67, 69, 72-74, 158
franchise players, 64
restricted free agents, 6, 60, 65, 67, 152
transition players, 71-72, 78
unrestricted free agents, 42
signing bonuses, 72, 105
Prior Year Salary, 5, 6, 59, 72, 77-78
Pro-Bowl Game, 190
compensation, 190
injury, 190
payment, 190
selection, 190
wives, 190
Pro-Rated Signing Bonus, *see Signing Bonus.*
Procedures, 17, 23, 29, 49, 64, 78, 83, 88, 137, 138, 141, 147, 148-
150, 190, 208, 214-215, 225, 235, 244-247, 248-251
changing playing rules, 37-38
Impartial Arbitrator, 149
Special Master, 147-148
Professional, 6, 33, 59, 66, 82, 148, 150, 157, 231, 236, 238
player, 3, 5
teams, 47
Prohibition of Option Clause, 45

292

Projected Benefits, 7, 9, 88, 95-97, 141, 195-197, 267
    adjusted, 141
    definition, salary cap and team salary purposes, 96-97
    *see also Benefits*
Projected Defined Gross Revenues, *see Projected DGR.*.
Projected DGR, 7, 9, 88; *see also DGR; EDGR; Non-DGR.*
Property or Investments, as Principal Terms of Offer Sheets, 66
PSL,
    carryover PSL credit, 90, 263
    difference, 89, 262-263
    excess, 90, 263
    first-year increases, 89
    funding the construction and renovation of stadiums, 89-91, 261-265
    maximum annual allocation amount, 89-90, 259-263
    non-share amount, 91-92, 265
    revenues, 89-90, 92, 259-262, 265
Physically Unable To Perform, 27, 32, 163, 164, 234
    injury protection, 35-36, 93, 195, 230
    salary,
PUP, *see Physically Unable to Perform.*

## Q
Qualifying Contract, 179-181; *see also   Bonuses, Contract, Incentives.*
Qualifying Offer, 9, 61-63, 67, 69, 138, 222
    and restricted free agent, 98
Qualifying Player, 178, 179, 181, 183, 213

## R
Records, 23, 28, 32, 68, 145, 227
    personnel, 192
    medical, 193
Recruitment of an Unsigned Player, 131
Reimbursement, 56, 186, 207, 208, 233, 264
    meal allowance, 184
    no, 155
    travel, 184
Related Entities, definition, 88, 249
Released, in Waiver System, *see Waiver System.*
Releases and Covenants Not to Sue, 12, 39
Relocation Bonus, *see Bonus.*
Remedies, 153, 199, 203, 204, 213
Renegotiation and Extensions, *see Contract.*
Renegotiation of an Existing Player Contract, 71, 73, *see Contract.*
Renovation of Stadiums, 87, 89-92, 261; *see also Stadium.*
Reopener, Workers' Compensation, 218

Index

Reporting Bonus, *see Bonus.*
Representation During Grievance Procedures, *see Grievance, Injury Grievance; Non-Injury Grievance.*
Required Tender, 6, 9, 57, 88, 138, 151, 163,
    franchise players, 70-71
    good faith negotiation, 44
    rookie, 46, 53
    transition players, 73
    *see Tender.*
Reserve Physical Unable to Perform,
    *see also Physically Unable To Perform.*
Reserve PUP, *see Reserved Physically Unable to Perform.*
Restricted Free Agent, 6, 48, 60, 62-67, 69, 70, 72, 74, 77, 152-153,
    158, 163
    offer sheet, 64
    qualifying offer, 61-64, 98
    required tenders, 62
    right of first refusal, 61
    signing period, 62
    *see also Free Agency; Free Agent.*
Restricted Players, 163
Retention of Benefits, 216
Retirement
    Board, 199, 214, 255, 256
    of players, 83, 93, 94, 133, 189, 194-196, 236
Retirement Plan, 189, 194, 199-201
    benefit credits, 197, 199, 201
    contributions, 198
    decrease in vesting requirement, 199
    definition, 198
    maintenance, 198
    medical standard for line-of-duty disability benefit, 199
    psychological/psychiatric disorders,
    *see also Merged Plan.*
Revenues, for DGR Purposes,
    *see also DGR.*
Right of First Refusal, 47-48, 61-69, 73-74, 151-152, 241-242
    definition, 5, 8
    restricted free agents, 60-64
    transition players, 73-74
Right of Restoration, Individual Player Benefits, 195
Rights
    preservation of, 217
    under law, 223

**EX 9, PAGE 1325**

Rookie, 3, 5-6, 15, 46-49, 51-56, 59, 67, 94, 98-101, 106, 110-120,
    122-127, 132, 134-136, 151, 153-154, 162, 169-170, 172-173, 177,
    183, 186-187, 208, 238
    25% rule, 53-55, 110-117, 134-135
    allocation, 51-56, 163
    contract, 46-49, 51, 53, 54, 59, 177
    contract renegotiation, 59, 136
    contract requirements, 46-56
    definition, 5-6, 173
    drafted, 5, 47-49, 52-53, 55, 153
    free agent, 5, 46-49
    incentives, 56, 106, 110-125
    insurance coverage, 208
    minimum workouts payments, 54
    orientation program, 56, 132
    per diem, 173
    premiere, 169, 170
    salary, 55, 94, 98-99, 238
    signing bonus, 9, 59, 100-101
    symposium, 15
    undrafted, 5, 6, 53, 55, 99, 151, 154
    *see also Drafted Rookie; Undrafted Rookie*
Rookie Allocation, 51-56, 163, *see Rookie.*
Rookie Orientation, 56, 132
    during timing and testing sessions, 15
    player reimbursement, 56
        evaluation,
Rookie Salary, 46, 51, 55, 94, 98-99, 238, *see Rookie; see also Contract.*
Room, 174, 187
    and board, 56, 173
    definition, 7
    for salary cap purposes, 43, 52-53, 71, 102, 106, 133, 235, 243
    in rookie allocation, 51-53
Roster Bonus, 40, 103-104, 128, *see Bonus.*
Roster Exemption Status, 163
    contracted player, 163
    players not under contract, 163
    restricted free agent, 163
Rounding, 9
Rules
    25% rule, for Rookies, 54-55, 134-135
    30% rule, 53-54, 134-135
    70% rule, 96
    CFL rule, 163

EX 9, PAGE 1326

Index

    NFL rules, definition, 4
    play rule change, 37-38

S

Salaries, 53, 70, 71, 73-74, 77-79, 93, 98, 172, 177, 196, 244, 246
    arbitration, other/additional compensation, 176-178, 180-182, 233
    credited season, calculation, 47-48, 175-176, 178-179, 181, 199,
    copies of contracts, 177
    definition, 7
    funding of deferred and guaranteed contracts, 177
    minimum salaries, 7, 9, 88, 97, 175, 183
        active/inactive list, 5, 9, 46, 48, 53, 55, 88, 99, 166-167, 175, 179
        non-active/inactive list, 5, 9, 46, 48, 53, 55, 57, 88, 99
    other compensation, 83, 176
    payment, 6, 35, 54, 59, 71, 82, 94, 97-99, 102, 129-130, 134, 136,
        155, 168, 172-173, 176-178, 181, 183, 189-190, 233-234
    split contracts, 177, 178
Salary
    active/inactive list, 5, 9, 46, 48, 53, 55, 88, 99, 166-167, 175, 179
    advance, 97, 103-104, 131, 178
    cash, 96, 97
    deferred, 97, 99-100
    deferred paragraph 72, 176
    definition, 82
    determining player salary, 9, 51, 175
    drafted rookie, 46, 51, 98
    first year, 81
    guaranteed, 122, 130, 178, 181
    grievance, 99
    increase requirements, for rookie, 53, 62, 71, 73, 101, 105, 134-135
    information, 41, 74
    minimum, 5, 54, 94, 166, 175, 178-183, 196,
    minimum active/inactive list, 5, 9, 46, 48, 53, 88, 99
    minimum salary requirements, 54, 166, 175, 178-181, 183
    minimum split 179
    minimum team salary, 4, 6-8, 32, 41, 51, 68, 94, 97-98, 138, 140-
        145, 162, 194-195, 224, 259
    paragraph 5, 7, 43, 51, 57, 59, 61, 63, 66-67, 71-73, 85, 97, 99,
        101, 131, 175, -176, 178, 180-181, 240
    practice squad, 56, 93, 98, 166-167, 175, 196-197
    prior year, 5, 6, 59, 61, 67, 70, 73-74, 77-79
    reduction contributions, 94, 196
    summaries, 160
        restricted free agent, 61-64, 67, 98, 163
        team, 7, 9, 55, 88, 97-99, 102-106, 128-135, 138, 160, 179

EX 9, PAGE 1327

see also Bonus; Incentive; Paragraph 5 Salary; Prior Year Salary; Team Salary.
Salary Cap, 4, 6, 7-8, 11, 32, 43, 51, 55-56, 68, 71-72, 75, 81-82, 93-99, 101-106, 123-124, 126-128, 130-131, 133, 135-137, 138, 140-144, 147, 151, 155, 157-159, 162, 179, 181, 183, 194-195, 202-205, 210, 213, 222, 224, 235, 238, 243-244, 246, 257-259, 267
    adjustment, 95, 138
    amount, 95-96
    credit, 97
    deduction, 267
    definition, 6
    for rookie, 51-53, 98-101
Sanctions, 143-144, 171
Savings Plan, 93-94, 195-197, 202-206, see Second Savings Career Plan.
Scope of Authority, 146-147
    Impartial Arbitrator, 4, 11, 22, 47, 57, 59, 63, 67, 74-75, 77-79, 106, 111, 133, 149-150, 176, 177
Special Master, 146-147
Scouting Combine, 15, 49
Season, 1, 5-6, 11, 13, 15, 20-21, 25, 27, 30-33, 35-36, 43-44, 46-49, 51, 54-61, 63, 67-68, 70, 73-80, 83-85, 86, 88, 93, 95, 97-100, 103-106, 110-122, 124-125, 127-128, 132-134, 136-137, 140, 151, 153, 155-156, 160, 162-166, 168-182, 184-196, 199-203, 205, 207-209, 243-247, 252, 255, 258, 266
Second Career Savings Plan, 94, 196-197, 202, 204
    contributions, 197
    establishment, 104
    expansion of eligible employees, 203
    maintenance, 202
Selection, (expand), 214
    Impartial Arbitrator, 150
Special Master, 148
Senior Arbitrator, 23, 29, see Arbitrator.
Settlement Agreement, 4, 9, 11, 12, 39-40, 43, 68, 76, 82, 88, 100, 102, 105, 117, 136, 152, 160, 212, 223, 225, 238, 244
Severance Pay, 94, 196-197, 211-212
    amount, 211
    application, 211
    eligibility, 211
    failure to apply for, 212
    nonassignability, 212
    only one payment, 212
    payable to survivor, 212
    payment, 211

EX 9, PAGE 1328

Index

    plan, 197
    prior, 212
Signing Bonus, 5, 54, -55, 59, 65, 72, 81, 92, 97, 100-105, 240, 246-
    247
    amounts treated as, 97, 103, 121, 124-125, 134, 136, 178, 180
    at time of buy-out, 54, 134
    "Deion Rule", 101
    individually negotiated right of first refusal, 68, 103
    option buyout, 103
    proration, 100, 102, 104, 180
    rookie, 100
    unrestricted free agents,
    see also Bonus.
Signing Period, 42, 48-49, 57, 59-60, 62-63, 69-71, 73-74, 76, 78-80,
    83, 153
    definition, 62
    franchise player, 76, 79, 80
    in waiver system, 81, 83
    restricted free agents, 62-63, 69, 70, 74, 153
    transition players, 72-73
    unrestricted free agents, 42, 59-60, 69, 71, 73, 76, 79-80
Special Defenses, 27, 31; see also Injury Grievance.
Special Master, 4, 11, 22, 41, 43, 87, 139-140, 142-144, 146-148, 151,
    153, 155-156, 158-159, 225, 265
    action, 142
    appointment, 146
    compensation, 147
    definition, 4
    discovery, 147
    jurisdiction, 147
    penalties, 148
    procedures, 147-148
    proceeding, 139
    review, 143
    scope of authority, 146-147
    selection of, 148
    term, 148
Spillover, Excess EDGR, 89, 91, 262
Split Contracts, 177, 178 see Salaries.
Split Qualifying Contract, 179, see Minimum Salary Benefits.
Squad, 13, 57, 228
    active and inactive list limit, 165
    practice, 56, 84, 93, 98, 166-167, 175, 196, 201, 203, 209
    size inactive list, 165
    size pre-season, 12, 165

Standard Minimum Pre-Season Physical, 191, 192
Stadium
    construction, 89, 91, 261, 264-265
    increase in DGR, 89-91, 262-263
    new, 89-92, 140, 262-263
    old, 89, 91
    renovation, 87, 89-92, 261
Steroids, 192, *see Players' Right to Medical Care and Treatment.*
Stipulation and Settlement Agreement, 9, 44, 82, 88, 100, 102, 136, 238
Subsequent Draft, 48-49, *see Draft.*
Substance Abuse, 192
    alcohol, steroids and related substances, 192
    drugs of abuse and alcohol, 192
    general policy, 192
    *see also Players' Right to Medical Care and Treatment.*
Summary Judgment, 153
Supplemental Disability Benefits, 213
    automatic payment and waiver, 213
    contributions, 213
    extension, 213
    maintenance, 213
Supplemental Disability Plan, 194, 196, 197, 213, 214
Supplemental Draft, 52-53, *see Draft.*
Suspension, 14, 20-21, 23, 25, 33

**T**
Team, *see also Club.*
    incentives, 107, 125-126, 240
    performance issues,
    performance-related incentive, 9, 43-44, 46-49, 54-55, 63, 74-75, 77,
        88, 98, 129, 133, 135, 153, 237
Team Affiliate, 4, 6, 59, 71, 91, 94, 131, 264
Team Leaders, Defined, 121
Team Salary, 4, 6-9, 11, 32, 41, 51, 55, 68, 82, 88, 94-95, 97-107, 128,
    130-135, 138, 140-144, 147, 160, 162, 179, 194-195, 210, 224,
    259
    cap, 4, 6-8, 11, 32, 43, 51, 55-56, 68, 71-72, 75, 81-82, 93-106,
        123-124, 126-128, 130-133, 135-138, 140-144, 147, 151, 155,
        157-160, 179, 181, 183, 194-195, 202-204
    computation, 98
    definition, 82
    elements,
    right to exercise option, 40-41, 45, 54-55, 64-69, 74-75, 98, 100,
        134-136, 151, 153, 241
    summaries, 160

**EX 9, PAGE 1330**

Index

Tenders, 63, 71-72, 75, 78, 88, 98-99, 138
    June 1st , 63, 82, 98
    June 15th, 59, 63, 98
    one year, 47-48, 57, 60, 63, 73, 77-79
    minimum, 72
    required, 6, 9, 44, 46, 48, 53, 57-58, 60, 62, 70-71, 73, 78, 88, 138,
        151, 163
    upgraded, 61-62
Terminated Via Waivers, Notice, 83-84, 243
Termination of Agreement, 46, 146, 156, 209-210, 223-224
Termination of Drafted Rookie, 53, 153
Termination Pay, 85
    contract signed after the beginning of the season, 85
    eligibility, 85
    ineligibility, 85
Tests, 28, 220, 246-248
    psychological or personality, 220
    steroid, 192
    urinalysis, 191, 254
Tickets, 219-220, see Player.
Time Limits
    Commissioner discipline, 33-34
    designating franchise player, 70
    injury grievances, 27-32
    non-injury grievances, 22-26
    reporting salary information to the NFLPA, 41
Time Off
    days off, 15, 181, 185
    requirements, 185
Time Periods, 168, 221
Top Four Teams, 81, see Final Year Plan.
Traded Contracts, 123; see also Contracts.
Traded Players, 6, 44, 66, 82, 123, 133
Trade Limitations, 82
Training Camp, 20-21, 31, 59, 76, 82, 103, 160, 164, 168-169, 173-
    174, 231, 233, 258,
    definition, 173
    expenses, 174
    number of games, 173-174
    pre-season, 20-21, 31, 164, 169, 172-174
    reporting, 173
    rookie per diem, 173
    room and board, 173
    telephones, 174
    veteran per diem, 173

Transition Player, 41, 64, 66-67, 71-74, 77-80, 142, 157, 163, 222
    designation, 77, 142, 157
    designation period, 72-73
    duration of designation, 75
    list, 74
    right of first refusal, 73-74
    salary information, 74
    signing period, 78-79
    *see also Franchise Player; Restricted Free Agent.*
Trigger for Guaranteed League-Wide Salary, Salary Cap, and Minimum
    Team Salary, 94-98, *see Guaranteed League-wide Salary, Salary Cap, and*
    *Minimum Team Salary.*
Tuition Assistance Program, 207
    establishment, 207
    eligibility, 207
    reimbursement, 207

**U**
Uncapped Year, 7, 51, 64, 101-104, 134, 160, 197
Undisclosed Terms, Player Contracts, 55, 142, 157-158, 238
Undrafted Rookie, 3, 49
    definition, 6
    free agent, 46, 99
    player contract, 55, 151
    salary, 99
    *see also Rookie; Drafted Rookie.*
Union Security, 10-11, 13
    check-off, 13
    disputes, 14
    NFLPA player group licensing program, 13-14
    NFLPA responsibility, 15
    orientation, 15
    procedure for enforcement, 14-15
    *see also NFLPA*
Unrestricted Free Agency, 5; *see also Free Agency; Restricted Free Agent; Un-*
    *restricted Free Agents.*
Unrestricted Free Agent, 5-6, 20, 42, 59-60, 62, 69, 71-73, 77, 80-83,
    152-153, 158, 220
    definition, 6
    franchise players, 70
    right of first refusal, 67, 71, 73
    transition player, 72, 77, 80, 163, 222
    *see also Free Agency; Free Agent.*
Upgraded Tender, 61-62, *see Tender.*

**EX 9, PAGE 1332**

Index

**V**
Valuation of Player Contracts, 99, *see Contracts; see also Calculations*.
Vested Player, 208
    allocation, 204-205
    contract, 200-201
    definition, 200-201
    insurance benefits, 208-209
    veteran, 200-201
Veteran Free Agency, 5-6, 20, 59, 69, 209
    expedited arbitration, 67
    individually negotiated limitations on player movement, 67-69
    offer sheet and first refusal procedures, 64-67
    one offer sheet, 65
    restricted free agents, 60-64
    signing period for unrestricted free agents, 59-60
    unrestricted free agents, 59-60
    *see Unrestricted Free Agents*.
Veteran Free Agency Notices, 68-69
Veteran Player, 6, 51, 60, 94, 162, 172-173, 186-187, 189, 208
    and expansion draft, 162, 186
    contract, 135-136, 177
    definition, 6, 173
    expenses, 186-187
    insurance coverage, 208
    per diem, 173
    with less than three accrued seasons, 57-58
        accrued seasons calculation, 57
        negotiating rights, 57-58
        notice of signing, 57-58, 60, 64
    with four or more accrued season, 59

**W**
Waiver Procedures, 46-47, 83-84, 98, 102, 133, 167
Waiver System, 83
    awarding club, 83
    claiming club, 83
    contacting players on waivers, 83
    drafted rookie, 46-47
    ineligibility, 83
    NFLPA right to personnel information, 84
    notice of termination, 83-84
    release, 83-84
    rosters, 84
waiving club, 83, 230-231
Weight Bonus, 106; *see also Bonus*.

302

**EX 9, PAGE 1333**

Wives, Transportation Provided for, 190
Workers' Compensation, 10-11, 93, 195, 217, 234-235, 247
    arbitration, 217
    benefits, 217
    joint study, 217
    preservation of rights, 217-218
    rejection of coverage, 217
    reopener, workers' compensation article, 218

Y

Youth Football Program, Deduction, 144

**EX 9, PAGE 1334**