# EXHIBIT 2

# AGREEMENT

733

THIS AGREEMENT is made and entered into by and between THE NATIONAL FOOTBALL LEAGUE PLAYERS' ASSOCIATION, hereinafter referred to as the "Association", and THE NATIONAL FOOTBALL LEAGUE, hereinafter referred to as the "League" or the "NFL".

## PREAMBLE

WHEREAS, the Association is an unincorporated organization and the duly authorized collective bargaining representative of the professional football players employed by each of the Clubs constituting the members of the League, hereinafter referred to as the "Member Clubs"; and

WHEREAS, the League is an organization composed of Member Clubs owned by employers who employ members of the Association; and

WHEREAS, the Association has undertaken to negotiate on behalf of all of the players employed by the Member Clubs of the League with respect to the terms and conditions of their employment, except that it is specifically understood that regular season pay, including any form of deferred compensation, shall be negotiated by the individual players with their respective Clubs, and not by the Association; and

WHEREAS, it is further specifically understood that upon the expiration of this Agreement pre-season pay shall not be negotiated by the Association, but thereafter shall be the amount for pre-season set forth herein.

NOW, THEREFORE, for the mutual covenants and premises herein contained, it is hereby agreed as follows:

ARTICLE I 781

RECOGNITION--CHECK-OFF

Section 1. Recognition: The League recognizes the Association as the sole and exclusive collective bargaining representative of all the professional football players employed by the Member Clubs with respect to all terms and conditions of their employment, except as otherwise specified in this Agreement. It is hereby expressly agreed that the Association shall at no time negotiate regular season pay for its members, and that upon the expiration of this Agreement, the Association shall no longer negotiate for its members pre-season pay as fixed by this Agreement. However, the Association shall have the right to bargain with the League to establish a single minimum salary applicable to all players or more than one minimum salary based solely upon the length of time players have played in the League.

Section 2. Scope of Agreement: The League, the Member Clubs and the Association hereby agree that this Agreement represents a complete full and final understanding on all bargainable subjects of negotiation among the parties during the term of this Agreement, except as specifically excluded hereunder.

The parties agree that they will use their respective best efforts to assure that all terms and conditions of Standard Player Contracts signed by individual players will be given full force and effect for the term of this Agreement.

Section 3. Check-Off: In the event a player signs a voluntary Check-Off Authorization Card, the Member Club shall check off the annual dues to the Association. The Check-Off Authorization Cards shall be in a form as set forth in Appendix "A" of this Agreement. The foregoing deduction shall

-2-

EX 2, PAGE 17

735

be made on the first payroll period after the player has signed said Authorization Dues Check-Off Card. The amount so collected shall be forwarded to the Association office at 1100 North Woodward Avenue, Birmingham, Michigan 48011, or to any other office designated by the Association.

## ARTICLE II

### MANAGEMENT RIGHTS

Nothing in this Agreement shall be construed to restrict the rights of the Member Clubs to manage and direct their operations in any manner whatsoever except as specifically limited by the terms of this Agreement.

## ARTICLE III

### STANDARD PLAYER CONTRACT

Section 1. Governing Agreement: The provisions of the Constitution and By-Laws for professional football operations as conducted by the National Football League and the American Football League (the "Joint Constitution" herein), the NFL Constitution and By-Laws, Standard Player Contracts, and the Bert Bell NFL Player Retirement Plan and Trust Agreement, shall remain in full force and effect and may from time to time be amended pursuant to the terms thereof. However, to the extent that any of these agreements are inconsistent with, or by amendment become inconsistent with this Agreement, the provisions of this Agreement shall govern.

## ARTICLE IV

### COMPENSATION FOR PLAYERS

Section 1. Regular Season Pay: The individual player's regular season pay shall be that salary, excluding any plan of deferred compensation, set forth in the individual player's contract and shall be the total amount of compensation paid to a player for an entire regular season.

-3-

736

Section 2. Pre-Season Pay:

(a) An individual player's pre-season pay shall be the amount of compensation to be paid to a player on the active roster in each pre-season game (or to a player removed from the active roster by reason of injury), plus the amount of per diem to be paid to that player for expenses incurred by him while in training camp or if required by the Club to be available in camp.

(b) All veteran players on the active roster of a club 48 hours prior to a pre-season game shall receive pre-season pay for that game in accordance with the schedule set forth below; if any player has been waived and has either not been claimed and waivers have not expired prior to the 48 hours, the waiving club shall be obligated to pay the waived player his pre-season pay in accordance with the following schedule:

(1) Fifth year contract players - $280.00;

(2) Fourth year contract players - $210.00;

(3) Third year contract players - $140.00; and

(4) Second year contract players - $70.00.

The College All-Star Game shall be exempt from this schedule. Individual players of the professional team playing in said game shall be paid in accordance with past practice.

In addition, all veteran players shall receive $10.00 per diem while in training camp or if required by the Club to be available in camp, for expenses until one week prior to the first Sunday of the regular season schedule, at which time such per diem payment shall be terminated.

(c) The term "veteran player" as used in this Agreement shall apply to any player who has received at least one year

-4-

of credit for pension vesting purposes. The length of service 737 of a veteran player shall be determined by crediting one year of veteran status to a player for each year of credit he receives for pension vesting purposes. For purposes of determining eligibility for pay for pre-season games only, credit received by a player for pension vesting purposes in the American Football League shall be applied toward determining his veteran status in the League.

(d) Upon the expiration of this Agreement pre-season pay shall no longer be negotiated by the Association, but shall thereafter be the amount for pre-season set forth in this Agreement.

Section 3. <u>Yearly Salary</u>: The individual yearly salary of any player shall be the total amount of his "regular season pay" and "pre-season pay" as those terms are defined in Sections 1 and 2 of this Article.

Section 4. <u>Salary Negotiations</u>: Member Clubs agree to commence salary negotiations with individual players prior to May 15 of each year.

Section 5. <u>Minimum Yearly Salary</u>: The minimum yearly salary for veteran contracted service players shall be twelve thousand dollars ($12,000.00) for such players in their second contract year, and thirteen thousand dollars ($13,000.00) for such players in their third and subsequent contract years.

Section 6. <u>Salary Payment</u>: Players shall be paid 100% of their regular season pay in equal weekly or semi-monthly installments over the course of the regular season; however, this provision shall in no way invalidate or otherwise affect any deferred compensation arrangement or any other method of payment an individual player may make with his particular Club.

-5-

735

**Section 7. Compensation for Post-Season Games:**
Member Clubs shall make every effort to pay players for any post-season game within 30 days after said game is played.

**Section 8. Meal Allowance:** Players will be reimbursed for meals not furnished by Member Clubs on travel days during the regular season in accordance with the following schedule: breakfast - $2.00; lunch - $2.00; dinner - $6.00. A travel day shall commence at the time a Club leaves its home city and shall terminate when the Club arrives back in its home city.

## ARTICLE V
### MOVING AND TRAVELING EXPENSES

**Section 1. Who Qualifies and for What Amount:** Any player under contract who is traded or claimed during the regular season, or any veteran player under contract, who after the start of training camp but before the beginning of the regular season, is traded or claimed and who subsequently makes the active roster of the Club to which he is traded or claimed or any vested player (one with four years and three games of service) who is traded or claimed after the commencement of training camp shall receive reasonable reimbursement for moving and traveling expenses in an amount not to exceed the amounts set forth in the following schedule:

Member Clubs shall be assigned the following zones:

Zone 1 - Philadelphia, New York, Washington, Baltimore, Pittsburgh, Cleveland and Atlanta

Zone 2 - Detroit, Chicago, New Orleans, Minnesota, Green Bay, Dallas and St. Louis

Zone 3 - None

Zone 4 - San Francisco and Los Angeles

-6-

73J

Players who qualify for reasonable reimbursement for moving and travelling expenses shall receive up to a maximum of three hundred dollars ($300.00) if traded to a Member Club in the same zone; up to a maximum of six hundred dollars ($600.00) if traded to a Member Club in an adjacent zone; up to a maximum of nine hundred dollars ($900.00) if traded to a Member Club two zones away; and up to a maximum of twelve hundred dollars ($1,200.00) if traded to a Member Club three zones away.

Section 2.  Transportation to be Used:  All players who are traded shall report to their new Club by the fastest available means of transportation.

## ARTICLE VI

## TERMINATION PAY

Termination pay shall be granted to any vested active contracted service player released from the active roster of his club after commencement of the regular season schedule in an amount equal to 25% of his regular season pay, exclusive of deferred compensation, but in no event shall such player be entitled to more than 100% of his regular season pay exclusive of deferred compensation, for that year or more than one such payment during his playing career.

## ARTICLE VII

## PENSION PLAN - INSURANCE POLICY

Section 1.  Pension Plan:  The parties to this Agreement have established a pension plan known as the "Bert Bell NFL Player Retirement Plan and Trust Agreement" (hereinafter referred to as the "Pension Plan" or "Plan").  The Pension Plan has been approved and is on file with the Internal Revenue Service.

Except as otherwise expressly provided in this Agreement, it is understood and agreed that the Pension Plan, and all

-7-

740

amendments thereto, shall be continued and maintained in full force and effect during the life of this Agreement.

Section 2. Contributions to the Pension Plan:

(a) It is understood that the NFL and AFL Pension Plans shall be merged by 1970 and bargaining on pensions will be conducted in 1970 on the basis of the merged plan.

(b) It is clearly understood that the Member Clubs have no express or implied commitment regarding any contribution to the Pension Plan beyond 1969.

(c) For the next two Plan years ending March 31, 1969 and March 31, 1970 respectively the Member Clubs will contribute a total of three million dollars ($3,000,000.00) to the Pension Plan for pension benefits, administrative costs and the costs of the study described in sub-paragraph (g) of this Section.

(d) It is clearly understood that the guarantee of the Member Clubs applies only to the amount of the contribution to the Pension Plan. Clubs do not guarantee any benefits under the Pension Plan.

(e) It is also understood and agreed that it shall be exclusively within the control of the Member Clubs to determine the sources of revenue that shall be used to satisfy their guarantee.

(f) The Member Clubs guarantee to take out and maintain an insurance policy that will provide the existing benefits under a Group Insurance policy presently in effect plus an increase in major medical benefits to fifty thousand dollars (50,000.00) for each active player and the members of his immediate family (wife and children).

(g) A study of all aspects of the Pension Plan shall be commenced under the auspices of the Retirement Board

-8-

741

as soon as is feasible for the purpose of assisting the Board
in the determination of benefits in this plan for years ending
March 31, 1969 and March 31, 1970 respectively, and for the
further purpose of assisting the parties in the 1970 negotiations
involving the merged plan.

Section 3. The Retirement Board:

(a) The Pension Plan shall provide that the Retirement
Board under the Plan shall be composed as follows:

(1) One active player and one inactive vested
player selected by the Association;

(2) Two (2) members selected by the Member
Clubs;

The Board shall act by majority vote. Alternates
for each member may be designated.

(b) The powers granted to the Retirement Board
under the Pension Plan shall be expanded to include all powers
concerning:

(1) Administration of the Plan;

(2) Determination and design of the projected
benefits of the Plan;

(3) Determination of amounts to be allocated,
out of contributions and other income, to the funding
of prior and current service benefits;

(4) Hiring of all professional and staff per-
sonnel including the administrator and advisors;

(5) Consideration of Player grievances relating
to the rights of players under the NFL Retirement Plan; and

(6) All other necessary powers incident to
the above powers or to the normal operation of the Plan,
including but not limited to the power to amend the Plan,
to construe the Plan and to reconcile inconsistencies
in the Plan.

-9-

(c) However, no action of the Retirement Board shall:

(1) Alter the amount of the contributions otherwise payable to the Plan;

(2) Cause the Plan to fail to qualify under Sections 401(a) and 501(a), or cause any portion of contributions to the Plan to fail to be deductible to the Member Clubs under Section 404(a), of the Internal Revenue Code;

(3) Reduce, as a direct result of an amendment, the value of any benefit already earned and otherwise payable under the Plan;

(4) Amend the Plan in a manner that will render the Plan unsound on an actuarial basis.

(d) The Retirement Board shall also:

(1) See to the payment of all reasonable and necessary expenses of the Plan and cause the same to be paid currently out of the income of the Plan before allocations are made out of income for the funding of benefits; and

(2) Allocate an annual amount (out of available contribution income) to the funding of unfunded accrued liabilities so as to fully fund such liabilities on an actuarially sound basis.

Section 4. In the event the parties agree that an expert is necessary in any action taken pursuant to this Article, the parties shall seek to reach agreement on such expert. In the event the parties fail to reach agreement on the expert, the provisions of Article VII, Section 5 herein shall apply.

Section 5. Any issue arising under any of the provisions of this Article or any provisions of the Pension Plan on which the Board is deadlocked, shall be referred for determination pursuant to Step 3 of the grievance procedure set forth in Article IX herein.

-10-

Section 6. Miscellaneous: It is expressly under- 743 stood that the Plan as previously constituted together with this Agreement and all amendments to said Plan, will not render said Plan ineligible or prevent the deductibility of contributions to same under Sections 401(a) and 501(a) and other applicable provisions of the Internal Revenue Code. To this extent, the parties shall file all amendments to said Plan, with said Internal Revenue Service so as to maintain the Plan's eligibility and preserve the deductibility of said contributions.

### ARTICLE VIII

### OPTION CLAUSE

The provisions of the Standard Player Contract, Joint Constitution, NFL Constitution and By-Laws pertaining to options and free agent rules shall not be amended during the life of this Agreement. A joint committee consisting of two representatives of the Association and two representatives of the League shall be established to study these provisions and to make such recommendations to the parties as the committee may decide upon.

### ARTICLE IX

### GRIEVANCE PROCEDURE

For the purpose of providing an orderly and expeditious procedure for the handling and resolving of grievances the following shall apply:

Section 1. Definitions:

(a) "Grievance" shall mean a request or complaint by a player, the Association or a Member Club against any of the contracting parties to this Agreement relating to any matter involving the interpretation or application of any

"11"

741

provision of this governing Agreement or the Standard Player Contract.

(b)  "Player", for purposes of this Article, shall mean a player under contract for the current calendar year. The term "player" shall also include former players who have grievances arising during the time they were players as defined in the preceding sentence.

Section 2.  Procedure:

STEP 1.  Any player who believes that he has a justifiable grievance shall discuss the matter with a representative of his Club designated to handle such matters in an attempt to solve same.  Should the player so desire, his Player Representative may be present during such discussions and may participate in such discussions.

In the event the matter is not resolved as a result of such discussion, the grievance in written form shall be presented to the Club's designated representative; provided, however, that for a grievance to be considered beyond STEP 1, such grievance must be presented within sixty (60) days from the date of the occurrence of the grievance or within sixty (60) days of the date on which the facts of the matter became known or reasonably should have become known to the player, whichever is later.  Within ten (10) days following the receipt of such grievance, the Club's designated representative shall advise the player in writing of the Club's decision and shall furnish a copy of same to the Association's designated representative.

STEP 2.  In the event the player or the Association is dissatisfied with the decision of the Club, the grievance may be appealed by the filing of a written notice of appeal to the League President or his representative or a represent-

-12-

743

ative designated by the League within twenty (20) days following the grievant's receipt of the Club's written decision.

In the event a grievance concerns more than one (1) Club, or is instituted by a Member Club, the parties may initiate the grievance procedure at STEP 2 herein. In such cases, the time limitations regarding submission within sixty (60) days from the date of the occurrence or sixty (60) days from the date upon which the facts of the matter became known, or reasonably should have become known, shall apply.

The representative designated by the League shall, within ten (10) days after receipt of the appeal or written grievance, meet with the representatives of the Association or other parties involved in an attempt to resolve the dispute. Within ten (10) days following such discussion, the League representative shall render his decision in writing to the parties to the dispute.

STEP 3. In the event the Association or any Member Club is dissatisfied with the written decision of the representative of the League, the Association or Member Club may appeal said decision in writing, within twenty (20) days from receipt of such decision, directly to the Commissioner's office. The Commissioner may direct the parties to attend a conference over which he or his representative shall preside in order to settle the grievance. In any event, the Commissioner must, within thirty (30) days from the written appeal from STEP 2 of the Grievance Procedure, render a written decision on said matter. Any decision so rendered by the Commissioner shall be final and binding upon all parties herein.

Section 3. In the case of injury grievances only, the grievance procedure set forth below shall be followed:

- 33 -

## 746

(a)  A player must give notice to his Club of his alleged injury within thirty-six (36) hours of its occurrence.

(b)  A player must, within seventy-two (72) hours after his examination by his Club Physician, submit at his own expense to a physical examination by a physician of his own choice.

(c)  The purpose of the time limits for physical examinations set forth in (a) and (b) above is to obtain evidence of an injury as quickly as possible.  It is recognized that there may be exceptional cases where the precise time limits must be waived.

(d)  In the event of a dispute between the two physicians with respect to the player's physical ability to render the services required of him by his Standard Player Contract, the grievance shall be submitted to a disinterested third party physician selected by the Club Physician and the player's physician.  If the two physicians are unable to agree on the selection of a third party physician, he shall be selected from a list prepared by an agreement of the parties from a panel which is mutually acceptable.

(e)  The opinion of such disinterested physician shall be conclusive and binding upon the player and his club on the medical question.  In the event there is any disagreement as to the scope or meaning of the third party physician's report relating to aspects other than the precise medical question, the player may refer the matter to the Association; the Association shall have the right at its request, to have the matter considered by the League or its nominee; if such matter cannot be resolved by

-14-

747

mutual agreement, the matter shall be submitted to the
Commissioner for final determination.

(f)  In no event may any grievance concerning
an injury be considered which is not presented as a
grievance within one year from the date on which such
injury occurred except that whenever a player is terminated
as a player, he shall have one year from the date of said
termination within which to claim a grievance arising
under the contract in existence at the time of the termi-
nation.

Section 4.  Each party shall bear his own costs
incident to the settlement of disputes under this Article.

Section 5.  All time limitations contained herein
may be waived by mutual agreement of the parties.

Section 6.  In the event the Commissioner acts di-
rectly pursuant to the powers granted him under the Joint
Constitution, NFL Constitution, or By-Laws or Paragraph 4 of
the Standard Player Contract, such action shall not be con-
sidered a grievance, but the following procedure shall apply:
The Commissioner shall give notice and conduct
a hearing before taking any action against a player
under Section 8.13(A) of the NFL Constitution.  In con-
nection with any action or decision by the Commissioner
pursuant to any other provision of the Joint Constitution,
NFL Constitution or Paragraph 4 of the Standard Player
Contract, any player or the Association or a club affected
by such action or decision shall have the right upon re-
quest to a hearing before the Commissioner or his nominee
for reconsideration of such action or decision.  The Com-
missioner's decision upon any such rehearing shall be

-15-

745

final and binding. In any event, no action or decision by the Commissioner shall contravene this Agreement.

Section 7. In making his decision, if any, pursuant to STEP 3 of the Grievance Procedure set forth herein, the Commissioner shall be limited to an interpretation and application of the applicable agreement and shall have no power to add to, subtract from, or in any way modify the terms of the applicable agreement.

## ARTICLE X

### ENDORSEMENTS - LICENSING - TV APPEARANCES

Section 1. Endorsements: No Member Club shall arbitrarily refuse to permit a player to endorse a product.

Section 2. Licensing:

(a) A joint committee consisting of two (2) representatives of the League and two (2) representatives of the Association shall be established to study licensing and to make recommendations to the parties.

(b) The Association agrees to give full force and effect to all licensing agreements entered into by the Commissioner in 1967 or in 1968 with third parties on behalf of the Players, including existing options, with the understanding that in no event shall any of these agreements be extended into the 1970 football season. All such revenues derived therefrom shall be committed to the Pension Plan as set forth herein for the years ending March 31, 1969 and March 31, 1970, respectively and credited as part of the League's contribution for those years.

Section 3. TV Appearances: No Club shall unreasonably require a player to appear on radio or TV.

-16-

740

## ARTICLE XI

### MISCELLANEOUS PROVISIONS

Section 1. No Discrimination: There shall be no discrimination in any form against any athlete or a Member Club by any party to this Agreement because of race, religion, national origin, or activity on behalf of the National Football League Players' Association.

Section 2. No Reduction of Financial Benefits: No direct financial benefit currently being granted by any Club to its team shall be reduced during the term of this Agreement. Nothing herein contained shall be deemed to affect the power of the Commissioner or a club to fine or suspend a player pursuant to the Constitution, By-Laws, Rules and Regulations of the League.

Section 3. Tickets for Away Games: Each player will be afforded the opportunity to purchase two tickets from the best tickets available for public sale immediately prior to the public sale for each away game.

Section 4. Workmen's Compensation Benefits:

(a) In any state where workmen's compensation coverage is not compulsory, a Club shall either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this Section, such benefits shall be equivalent to those benefits paid under the workmen's compensation law of the state in which his Club is located.

(b) Nothing herein stated shall be interpreted as preventing a Club, which has the legal right to do so, from rejecting coverage under the workmen's compensation law of

-17-

EX 2, PAGE 32

its state. However, if it selects to reject coverage under 750
the workmen's compensation law of its state, it must neverthe-
less guarantee benefits to its players in the manner previously
prescribed in this Section. Moreover, any Club that is excluded,
for any reason, from coverage under the workmen's compensation
laws of its state shall remain excluded from those laws if it
selects to do so. However, such a Club shall be obligated to
guarantee benefits to its players in the manner previously pre-
scribed in this Section.

Section 5. Players Injured Prior to Signing New
Contracts: Players who are removed from the active roster by
reason of injury between the beginning of the training camp
period and the first regular season game and who have not signed
new contracts, shall be guaranteed 100% of their salaries as
stated on the front side of their contracts for the contract
year immediately preceding the year in which they are injured.

Section 6. Right to Legal Counsel: An individual
player shall have the right to have legal counsel represent
him in his individual salary negotiations. However, it is
understood that collective bargaining on salary negotiations
on behalf of more than one player shall not be permitted unless
expressly agreed to by the Member Club.

ARTICLE XII

DURATION OF AGREEMENT

Section 1. Effective Date: This Agreement shall
be deemed effective as of July 15, 1968.

Section 2. Expiration Date: This Agreement shall
remain in full force and effect until February 1, 1970, and
then shall automatically renew itself from year to year there-
after, unless the League or the Association gives written

751

notice to the other party to amend, modify or terminate with-
in not less than sixty (60) days prior to any expiration date.
The parties may, by written agreement, modify or amend this
Agreement at any time hereafter.

This Agreement may be executed in counterpart.

WHEREOF, the parties have witnessed this Agreement
this 20 day of November, 1968.

NATIONAL FOOTBALL LEAGUE                NATIONAL FOOTBALL LEAGUE
                                       PLAYERS' ASSOCIATION

752

VOLUNTARY CHECK-OFF

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION

_____   _____
(CLUB)                              (DATE)

Pursuant to this Authorization and Assignment, please deduct from my annual salary on the first payroll period following the Last League Game date receipt of this voluntary authorization and assignment and such dues as are outlined below.

The foregoing membership dues shall be remitted promptly by you, to the National Football League Players Association.

This authorization and assignment shall be effective and cannot be cancelled for a period of one (1) year from the date appearing above or until the termination date of the current Collective Bargaining Agreement between the League and the Association, whichever occurs sooner.

I hereby voluntarily authorize you to continue the above Authorization and Assignment in effect after the expiration of the above referenced period.

The undersigned has affixed his signature voluntarily and after having read the foregoing.

National Football League Players Association

WITNESS: _____        _____
                                                     (Player Signature)

_____
(Address)