# EXHIBIT 8



# NFL
# COLLECTIVE
# BARGAINING
# AGREEMENT
## 1993-2005

COLLECTIVE BARGAINING AGREEMENT
BETWEEN
THE NFL MANAGEMENT COUNCIL
AND
THE NFL PLAYERS ASSOCIATION
**As Amended February 25, 1998**



# TABLE OF CONTENTS

INTRODUCTION ...................................................1

PREAMBLE ......................................................3

ARTICLE I DEFINITIONS ..........................................4
Section  1.  General Definitions .................................4
Section  2.  Free Agency Definitions .............................5
Section  3.  Salary Cap Definitions ..............................6
Section  4.  Further Definitions .................................7

ARTICLE II GOVERNING AGREEMENT ...............................9
Section  1.  Conflicts ..........................................9
Section  2.  Implementation .....................................9
Section  3.  Management Rights ..................................9
Section  4.  Rounding ..........................................9

ARTICLE III SCOPE OF AGREEMENT ...............................10
Section  1.  Scope ............................................10
Section  2.  Arbitration .......................................10

ARTICLE IV NO STRIKE/LOCKOUT/SUIT ...........................11
Section  1.  No Strike/Lockout .................................11
Section  2.  No Suit ..........................................11
Section  3.  Releases .........................................12

ARTICLE V UNION SECURITY ....................................13
Section  1.  Union Security ....................................13
Section  2.  Check-off ........................................13
Section  3.  NFLPA Meetings ...................................13
Section  4.  NFLPA Player Group Licensing Program ..............13
Section  5.  Disputes .........................................14
Section  6.  Procedure for Enforcement .........................14
Section  7.  NFLPA Responsibility ..............................15
Section  8.  Orientations ......................................15

ARTICLE VI NFLPA AGENT CERTIFICATION .......................16
Section  1.  Exclusive Representation ...........................16
Section  2.  Enforcement ......................................16
Section  3.  Penalty ..........................................16

ARTICLE VII PLAYER SECURITY .................................17
Section  1.  No Discrimination .................................17
Section  2.  Personal Appearance ...............................17

i

**ARTICLE VIII CLUB DISCIPLINE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
   Section   1.  Maximum Discipline . . . . . . . . . . . . . . . . . . . . . . . . . .18
   Section   2.  Published Lists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
   Section   3.  Uniformity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
   Section   4.  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
   Section   5.  Deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

**ARTICLE IX NON-INJURY GRIEVANCE** . . . . . . . . . . . . . . . . . . . . . . .20
   Section   1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
   Section   2.  Initiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
   Section   3.  Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
   Section   4.  Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
   Section   5.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
   Section   6.  Arbitration Panel . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
   Section   7.  Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
   Section   8.  Arbitrator's Decision and Award . . . . . . . . . . . . . . . .23
   Section   9.  Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
   Section 10.  Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
   Section 11.  Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
   Section 12.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
   Section 13.  Grievance Settlement Committee . . . . . . . . . . . . . . .24

**ARTICLE X INJURY GRIEVANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
   Section   1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
   Section   2.  Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
   Section   3.  Answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
   Section   4.  Neutral Physician . . . . . . . . . . . . . . . . . . . . . . . . . . .26
   Section   5.  Neutral Physician List . . . . . . . . . . . . . . . . . . . . . . . .26
   Section   6.  Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26
   Section   7.  Arbitration Panel . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
   Section   8.  Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
   Section   9.  Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
   Section 10.  Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
   Section 11.  Pension Credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
   Section 12.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
   Section 13.  Presumption of Fitness . . . . . . . . . . . . . . . . . . . . . . .29
   Section 14.  Playoff Money . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
   Section 15.  Information Exchange . . . . . . . . . . . . . . . . . . . . . . . .30
   Section 16.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

**ARTICLE XI COMMISSIONER DISCIPLINE** . . . . . . . . . . . . . . . . . .31
   Section   1.  League Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . .31
   Section   2.  Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
   Section   3.  Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
   Section   4.  Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

ii

Section 5. One Penalty ................................... 32
Section 6. Fine Money ................................... 32

**ARTICLE XII INJURY PROTECTION** ........................ 33
Section 1. Qualification ............................... 33
Section 2. Benefit ..................................... 33
Section 3. Disputes ................................... 34

**ARTICLE XIII COMMITTEES** ............................. 35
Section 1. Joint Committee ............................. 35
Section 2. Competition Committee ....................... 36
Section 3. Player/Club Operations Committee ............ 36

**ARTICLE XIV NFL PLAYER CONTRACT** ..................... 37
Section 1. Form ....................................... 37
Section 2. Term ....................................... 37
Section 3. Changes .................................... 37
Section 4. Conformity ................................. 38
Section 5. General .................................... 38
Section 6. Commissioner Disapproval .................... 39
Section 7. NFLPA Group Licensing Program ............... 40
Section 8. Good Faith Negotiation ...................... 40

**ARTICLE XV OPTION CLAUSE** ............................ 42
Section 1. Prohibition ................................ 42
Section 2. Existing Option Clauses .................... 42

**ARTICLE XVI COLLEGE DRAFT** ........................... 43
Section 1. Time of Draft .............................. 43
Section 2. Number of Choices .......................... 43
Section 3. Required Tender ............................ 43
Section 4. Signing of Drafted Rookies ................. 43
Section 5. Other Professional Teams ................... 44
Section 6. Return to College .......................... 45
Section 7. Assignment of Draft Rights ................. 46
Section 8. Subsequent Draft ........................... 46
Section 9. No Subsequent Draft ........................ 46
Section 10. Compensatory Draft Selections ............. 46
Section 11. Undrafted Rookies ......................... 47
Section 12. Notice of Signing ......................... 47
Section 13. Workouts of Draft-Eligible Players ........ 47

**ARTICLE XVII ENTERING PLAYER POOL** ................... 48
Section 1. Definition ................................. 48
Section 2. Covered League Years ....................... 48

iii

Section    3.  Calculation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
Section    4.  Operation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

**ARTICLE XVIII VETERANS WITH LESS THAN**
**THREE ACCRUED SEASONS**  . . . . . . . . . . . . . . . . . . . . . . . . . .55
Section    1.  Accrued Seasons Calculation  . . . . . . . . . . . . . . . . . .55
Section    2.  Negotiating Rights of Players with Less
               Than Three Accrued Seasons  . . . . . . . . . . . . . . . . . . .55
Section    3.  Notice of Signing  . . . . . . . . . . . . . . . . . . . . . . . . . . . .55

**ARTICLE XIX VETERAN FREE AGENCY**  . . . . . . . . . . . . . . . . . . . .57
Section    1.  Unrestricted Free Agents  . . . . . . . . . . . . . . . . . . . . . .57
Section    2.  Restricted Free Agents  . . . . . . . . . . . . . . . . . . . . . . . .58
Section    3.  Offer Sheet and First Refusal Procedures  . . . . . . . . .62
Section    4.  Expedited Arbitration  . . . . . . . . . . . . . . . . . . . . . . . . .65
Section    5.  Individually Negotiated Limitations
               on Player Movement  . . . . . . . . . . . . . . . . . . . . . . . . . .65
Section    6.  Notices, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .66

**ARTICLE XX FRANCHISE AND TRANSITION PLAYERS**  . . . . . . . . .68
Section    1.  Franchise Player Designations  . . . . . . . . . . . . . . . . .68
Section    2.  Required Tender for Franchise Players  . . . . . . . . . . .68
Section    3.  Transition Player Designations  . . . . . . . . . . . . . . . . .71
Section    4.  Required Tender for Transition Players  . . . . . . . . . . .71
Section    5.  Right of First Refusal for Transition Players  . . . . . . .72
Section    6.  Lists  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72
Section    7.  Salary Information  . . . . . . . . . . . . . . . . . . . . . . . . . . .73
Section    8.  No Assignment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .73
Section    9.  Duration of Designation . . . . . . . . . . . . . . . . . . . . . . .73
Section  10.  Franchise Player Designation Period  . . . . . . . . . . . .75
Section  11.  Transition Player Designation Period . . . . . . . . . . . . .76
Section  12.  Prospective Designation . . . . . . . . . . . . . . . . . . . . . . .77
Section  13.  Right to Decline . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77
Section  14.  Other Terms  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77
Section  15.  Compensatory Draft Selection  . . . . . . . . . . . . . . . . .78
Section  16.  Signing Period for Transition Players  . . . . . . . . . . . .78
Section  17.  Signing Period for Franchise Players  . . . . . . . . . . . .78

**ARTICLE XXI FINAL EIGHT PLAN** . . . . . . . . . . . . . . . . . . . . . . . . .80
Section    1.  Application  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80
Section    2.  Top Four Teams . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80
Section    3.  Next Four Teams  . . . . . . . . . . . . . . . . . . . . . . . . . . . .80
Section    4.  Replacement of Free Agents Signed by Other Club . .80
Section    5.  Increases . . . . . . . . . . . . . . . . ———— . . . . . . . . . . . . .81
Section    6.  Salary Definition  . . . . . . . . . . . . . . . . . . . . . . . . . . . .81

iv

Section    7.   Trade Limitation  . . . . . . . . . . . . . . . . . . . . . . . . . . . .81

**ARTICLE XXII WAIVER SYSTEM** . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Section    1.   Release  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Section    2.   Contact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Section    3.   Ineligibility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Section    4.   Notice of Termination  . . . . . . . . . . . . . . . . . . . . . . .83
Section    5.   NFLPA's Right to Personnel Information . . . . . . . . . .84
Section    6.   Rosters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

**ARTICLE XXIII TERMINATION PAY** . . . . . . . . . . . . . . . . . . . . . . . .85
Section    1.   Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85
Section    2.   Regular Season Signings . . . . . . . . . . . . . . . . . . . . . . .85
Section    3.   *Ineligibility For Termination Pay*  . . . . . . . . . . . . . . . .85

**ARTICLE XXIV GUARANTEED LEAGUE-WIDE SALARY,**
**SALARY CAP, & MINIMUM TEAM SALARY** . . . . . . . . . . . . . .86
Section    1.   Definitions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86
Section    2.   Trigger For Guaranteed League-wide Salary,
                Salary Cap, and Minimum Team Salary  . . . . . . . . . .94
Section    3.   Guaranteed League-wide Salary . . . . . . . . . . . . . . . . .95
Section    4.   Salary Cap Amounts  . . . . . . . . . . . . . . . . . . . . . . . .95
Section    5.   Minimum Team Salary . . . . . . . . . . . . . . . . . . . . . . .96
Section    6.   Computation of Team Salary  . . . . . . . . . . . . . . . . . .97
Section    7.   Valuation of Player Contracts . . . . . . . . . . . . . . . . . .98
Section    8.   30% Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .134
Section    9.   Renegotiations and Extensions . . . . . . . . . . . . . . . . .136
Section 10.   Accounting Procedures  . . . . . . . . . . . . . . . . . . . . . .138

**ARTICLE XXV ENFORCEMENT OF THE SALARY**
**CAP AND ENTERING PLAYER POOL** . . . . . . . . . . . . . . . . . . .143
Section    1.   Undisclosed Terms  . . . . . . . . . . . . . . . . . . . . . . . . .143
Section    2.   Circumvention  . . . . . . . . . . . . . . . . . . . . . . . . . . . .143
Section    3.   Special Master Action . . . . . . . . . . . . . . . . . . . . . . . .143
Section    4.   Commissioner Disapproval  . . . . . . . . . . . . . . . . . . .143
Section    5.   Special Master Review  . . . . . . . . . . . . . . . . . . . . . . .144
Section    6.   Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .144
Section    7.   Prior Conference  . . . . . . . . . . . . . . . . . . . . . . . . . . .144
Section    8.   *DGR Circumvention*  . . . . . . . . . . . . . . . . . . . . . . . .144

**ARTICLE XXVI SPECIAL MASTER** . . . . . . . . . . . . . . . . . . . . . . . .145
Section    1.   Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .145
Section    2.   Scope of Authority . . . . . . . . . . . . . . . . . . . . . . . . . .145
Section    3.   Discovery  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .146
Section    4.   Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .146

EX 8, PAGE 720

Section 5. Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
Section 6. Selection of Special Masters . . . . . . . . . . . . . . . . . 147
Section 7. Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

**ARTICLE XXVII IMPARTIAL ARBITRATOR** . . . . . . . . . . . . . . . . . . . . 148
Section 1. Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 2. Scope of Authority . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 3. Effect of Rulings . . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 4. Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 5. Compensation of Impartial Arbitrator . . . . . . . . . . 148
Section 6. Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 7. Selection of Impartial Arbitrator . . . . . . . . . . . . . . 149

**ARTICLE XXVIII ANTI-COLLUSION** . . . . . . . . . . . . . . . . . . . . . . . 150
Section 1. Prohibited Conduct . . . . . . . . . . . . . . . . . . . . . . . 150
Section 2. Other Club Conduct . . . . . . . . . . . . . . . . . . . . . . . 150
Section 3. Club Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . 151
Section 4. League Disclosures . . . . . . . . . . . . . . . . . . . . . . . 151
Section 5. Enforcement of Anti-Collusion Provisions . . . . . . . 151
Section 6. Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . 151
Section 7. Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . 152
Section 8. Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
Section 9. Computation of Damages . . . . . . . . . . . . . . . . . . . 153
Section 10. Player Election . . . . . . . . . . . . . . . . . . . . . . . . . . 153
Section 11. Payment of Damages . . . . . . . . . . . . . . . . . . . . . . 154
Section 12. Effect on Cap Computations . . . . . . . . . . . . . . . . 154
Section 13. Effect of Salary Cap . . . . . . . . . . . . . . . . . . . . . . 154
Section 14. No Reimbursement . . . . . . . . . . . . . . . . . . . . . . . 154
Section 15. Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
Section 16. Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
Section 17. Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
Section 18. Prior Conference . . . . . . . . . . . . . . . . . . . . . . . . 155

**ARTICLE XXIX CERTIFICATIONS** . . . . . . . . . . . . . . . . . . . . . . . . 156
Section 1. Contract Certification . . . . . . . . . . . . . . . . . . . . . 156
Section 2. End of League Year Certification . . . . . . . . . . . . . . 156
Section 3. False Certification . . . . . . . . . . . . . . . . . . . . . . . . 157

**ARTICLE XXX CONSULTATION AND INFORMATION SHARING** . 158
Section 1. Consultation and Communications . . . . . . . . . . . . 158
Section 2. Salary Summaries . . . . . . . . . . . . . . . . . . . . . . . . 158
Section 3. Notice of Invalid Contract . . . . . . . . . . . . . . . . . . 158
Section 4. Neutral Verifier . . . . . . . . . . . . . . . . . . . . . . . . . . 158
Section 5. Copies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
Section 6. Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

vi

**ARTICLE XXXI EXPANSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
  Section  1.  Veteran Allocation . . . . . . . . . . . . . . . . . . . . . . . 160
  Section  2.  Additional Compensatory Picks . . . . . . . . . . . . . . . 160
  Section  3.  Entering Player Pool Adjustment . . . . . . . . . . . . . . 160
  Section  4.  Relocation Bonus . . . . . . . . . . . . . . . . . . . . . . . . 160

**ARTICLE XXXII OTHER PROVISIONS** . . . . . . . . . . . . . . . . . . . . . 161
  Section  1.  CFL Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
  Section  2.  Physically Unable to Perform . . . . . . . . . . . . . . . . 161
  Section  3.  Non-Football Injury . . . . . . . . . . . . . . . . . . . . . . . 161
  Section  4.  Roster Exemption . . . . . . . . . . . . . . . . . . . . . . . . 161

**ARTICLE XXXIII SQUAD SIZE** . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
  Section  1.  Active List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
  Section  2.  Pre-Season . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
  Section  3.  Inactive List . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
  Section  4.  Active and Inactive List Limit . . . . . . . . . . . . . . . . 163

**ARTICLE XXXIV PRACTICE SQUADS** . . . . . . . . . . . . . . . . . . . . . 164
  Section  1.  Practice Squads . . . . . . . . . . . . . . . . . . . . . . . . . 164
  Section  2.  Signing With Other Clubs . . . . . . . . . . . . . . . . . . 164
  Section  3.  Salary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
  Section  4.  Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

**ARTICLE XXXV OFF-SEASON WORKOUTS** . . . . . . . . . . . . . . . . . 166
  Section  1.  Voluntary Workouts . . . . . . . . . . . . . . . . . . . . . . . 166
  Section  2.  Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
  Section  3.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
  Section  4.  Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
  Section  5.  Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
  Section  6.  Pre-Training Camp Period . . . . . . . . . . . . . . . . . . . 167
  Section  7.  Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

**ARTICLE XXXVI MINICAMPS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
  Section  1.  Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
  Section  2.  Length . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
  Section  3.  Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
  Section  4.  Contact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
  Section  5.  Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

**ARTICLE XXXVII PRE-SEASON TRAINING CAMPS** . . . . . . . . . . . 169
  Section  1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169
  Section  2.  Room and Board . . . . . . . . . . . . . . . . . . . . . . . . . 169
  Section  3.  Rookie Per Diem . . . . . . . . . . . . . . . . . . . . . . . . . 169
  Section  4.  Veteran Per Diem . . . . . . . . . . . . . . . . . . . . . . . . . 169

vii

| | | | |
|---|---|---|---|
| Section | 5. | Reporting | 169 |
| Section | 6. | Number of Pre-Season Games | 170 |
| Section | 7. | Telephones | 170 |
| Section | 8. | Expenses | 170 |

**ARTICLE XXXVIII SALARIES** .............................................. 171
| | | | |
|---|---|---|---|
| Section | 1. | 1993 Minimum Salaries | 171 |
| Section | 2. | Minimum Salaries For 1994-1997 League Years | 171 |
| Section | 3. | *Minimum Salaries For 1998 League Year* | 172 |
| Section | 4. | *Minimum Salaries For 1999 League Year* | 173 |
| Section | 5. | *Minimum Salaries After The 1999 League Year* | 174 |
| Section | 6. | Credited Season | 174 |
| Section | 7. | Other Compensation | 174 |
| Section | 8. | Arbitration | 174 |
| Section | 9. | Payment | 174 |
| Section | 10. | Deferred Paragraph 5 | 175 |
| Section | 11. | Number of Regular Season Games | 175 |
| Section | 12. | Copies of Contracts | 175 |
| Section | 13. | Split Contracts | 175 |
| Section | 14. | Funding of Deferred and Guaranteed Contracts | 176 |

**ARTICLE XXXIX MEAL ALLOWANCE** ...................................... 177
| | | | |
|---|---|---|---|
| Section | 1. | Reimbursement | 177 |
| Section | 2. | Travel Day | 177 |

**ARTICLE XL DAYS OFF** ..................................................... 178
| | | | |
|---|---|---|---|
| Section | 1. | Rate | 178 |
| Section | 2. | Requirements | 178 |

**ARTICLE XLI MOVING AND TRAVEL EXPENSES** ............... 179
| | | | |
|---|---|---|---|
| Section | 1. | Qualification | 179 |
| Section | 2. | Moving Expenses | 179 |
| Section | 3. | Travel Expenses | 179 |
| Section | 4. | Transportation | 180 |

**ARTICLE XLII POST-SEASON PAY** ...................................... 181
| | | | |
|---|---|---|---|
| Section | 1. | System | 181 |
| Section | 2. | Compensation | 181 |
| Section | 3. | Wild Card Game; Division Play-off Game | 181 |
| Section | 4. | Conference Championship; Super Bowl Game | 181 |
| Section | 5. | Payment | 182 |

**ARTICLE XLIII PRO BOWL GAME** ....................................... 183
| | | | |
|---|---|---|---|
| Section | 1. | Compensation | 183 |
| Section | 2. | Selection | 183 |

EX 8, PAGE 723

| Section | 3. | Wives | 183 |
| Section | 4. | Injury | 183 |
| Section | 5. | Payment | 183 |

**ARTICLE XLIV PLAYERS' RIGHTS TO MEDICAL**
**CARE AND TREATMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . **184**

| Section | 1. | Club Physician | 184 |
| Section | 2. | Club Trainers | 184 |
| Section | 3. | Players' Right to a Second Medical Opinion | 184 |
| Section | 4. | Players' Right to a Surgeon of His Choice | 184 |
| Section | 5. | Standard Minimum Pre-Season Physical | 184 |
| Section | 6. | Substance Abuse | 185 |

**ARTICLE XLV ACCESS TO PERSONNEL AND**
**MEDICAL RECORDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **186**

| Section | 1. | Personnel Records | 186 |
| Section | 2. | Medical Records | 186 |

**ARTICLE XLVI PLAYER BENEFIT COSTS** . . . . . . . . . . . . . . . . . . **187**

| Section | 1. | General Right of Reduction | 187 |
| Section | 2. | Right of Restoration | 188 |
| Section | 3. | Definition | 188 |
| Section | 4. | Resolution of Disputes | 189 |
| Section | 5. | *1998 Amendment Benefits* | 190 |

**ARTICLE XLVII RETIREMENT PLAN** . . . . . . . . . . . . . . . . . . . . **191**

| Section | 1. | Maintenance and Definitions | 191 |
| Section | 2. | Additional Credited Seasons | 191 |
| Section | 3. | Contributions | 191 |
| Section | 4. | *Increase in Past Service Credit* | 192 |
| Section | 5. | *Decrease in Vesting Requirement* | 192 |
| Section | 6. | *Line-of-Duty Disability Benefit* | 192 |
| Section | 7. | *Classification Rules for Total and Permanent Disability* | 193 |
| Section | 8. | *Limit on Retroactive Benefits and Claims* | 194 |
| Section | 9. | *Alcohol and Substance Abuse* | 194 |
| Section | 10. | *Psychological/Psychiatric Disorders* | 195 |

**ARTICLE XLVIII SECOND CAREER SAVINGS PLAN** . . . . . . . . . . **196**

| Section | 1. | Maintenance | 196 |
| Section | 2. | Contributions | 196 |

***ARTICLE XLVII-A PLAYER ANNUITY PROGRAM*** . . . . . . . . . . . . **198**

| Section | 1. | *Establishment* | 198 |
| Section | 2. | *Contributions* | 198 |
| Section | 3. | *Eligibility and Allocation* | 199 |

EX 8, PAGE 724

| | | | |
|---|---|---|---|
| Section | 4. | Distributions | 199 |
| Section | 5. | Structure | 200 |
| Section | 6. | Insurance Company | 200 |

**ARTICLE XLIX GROUP INSURANCE** .................................. **201**
| | | | |
|---|---|---|---|
| Section | 1. | Group Insurance Benefits | 201 |
| Section | 2. | Extended Post-Career Medical And Dental Insurance | 202 |
| Section | 3. | Limitations And Rules For Extended Insurance | 202 |
| Section | 4. | Financing For Extended Insurance | 203 |
| Section | 5. | Administration | 204 |

**ARTICLE L SEVERANCE PAY** ...................................... **205**
| | | | |
|---|---|---|---|
| Section | 1. | Eligibility | 205 |
| Section | 2. | Amount | 205 |
| Section | 3. | Application | 205 |
| Section | 4. | Payment | 205 |
| Section | 5. | Failure to Apply | 206 |
| Section | 6. | Only One Payment | 206 |
| Section | 7. | Payable to Survivor | 206 |
| Section | 8. | Prior Severance Pay | 206 |
| Section | 9. | Nonassignability | 206 |

**ARTICLE LI SUPPLEMENTAL DISABILITY BENEFITS** ........... **207**
| | | | |
|---|---|---|---|
| Section | 1. | Maintenance | 207 |
| Section | 2. | Contributions | 207 |
| Section | 3. | Extension | 207 |

**ARTICLE LII BENEFIT ARBITRATOR** .............................. **208**
| | | | |
|---|---|---|---|
| Section | 1. | Selection | 208 |
| Section | 2. | Compensation | 208 |
| Section | 3. | Role | 208 |

**ARTICLE LIII RETENTION OF BENEFITS** ...................... **210**

**ARTICLE LIV WORKERS' COMPENSATION** ................... **211**
| | | | |
|---|---|---|---|
| Section | 1. | Benefits | 211 |
| Section | 2. | Rejection of Coverage | 211 |
| Section | 3. | Arbitration | 211 |
| Section | 4. | Joint Study | 211 |
| Section | 5. | Moratorium | 211 |
| Section | 6. | Preservation of Rights | 212 |
| Section | 7. | Reopener | 212 |

**ARTICLE LV MISCELLANEOUS** ................................. **213**
| | | | |
|---|---|---|---|
| Section | 1. | Endorsements | 213 |

x

| Section | 2. | On-Field Attire | 213 |
| Section | 3. | Appearances | 213 |
| Section | 4. | Promotion | 213 |
| Section | 5. | Deduction | 213 |
| Section | 6. | Public Statements | 213 |
| Section | 7. | Address | 213 |
| Section | 8. | NFLPA Tickets | 213 |
| Section | 9. | Player Tickets | 214 |
| Section 10. | | Tests | 214 |
| Section 11. | | League Security | 214 |
| Section 12. | | Career Planning Program | 214 |
| Section 13. | | Delivery of Documents | 214 |
| Section 14. | | Binding Effect | 214 |
| Section 15. | | Authorization | 214 |
| Section 16. | | Headings | 215 |
| Section 17. | | Time Periods | 215 |
| Section 18. | | Exhibits | 215 |
| Section 19. | | Parol Evidence | 215 |

**ARTICLE LVI FINAL LEAGUE YEAR** ........................... **216**

| Section | 1. | No Salary Cap | 216 |
| Section | 2. | Free Agency If Salary Cap In League Year Prior to Final League Year | 216 |
| Section | 3. | Free Agency If No Salary Cap In League Year Prior To Final League Year | 216 |
| Section | 4. | Franchise and Transition Players | 216 |

**ARTICLE LVII MUTUAL RESERVATION OF RIGHTS: LABOR EXEMPTION** ........................... **217**

| Section | 1. | Rights Under Law | 217 |
| Section | 2. | Labor Exemption | 217 |
| Section | 3. | CBA Expiration | 217 |

**ARTICLE LVIII DURATION OF AGREEMENT** ............... **219**

| Section | 1. | Effective Date | 219 |
| Section | 2. | Termination | 219 |
| Section | 3. | Expiration Date | 219 |
| Section | 4. | Termination Prior to Expiration Date | 219 |
| Section | 5. | Ratification | 222 |

**ARTICLE LIX GOVERNING LAW** ........................... **223**

**ARTICLE LX NOTICES** ........................... **224**

**ARTICLE LXI EXTENSION OF AGREEMENT** ............... **225**

xi

APPENDIX A—CHECK-OFF AUTHORIZATION FOR NATIONAL
  FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS .226

APPENDIX B—INJURY PROTECTION/EARLY WAIVER . . . . . . . .228

APPENDIX C—NFL PLAYER CONTRACT . . . . . . . . . . . . . . . . . .229

APPENDIX D—FIRST REFUSAL OFFER SHEET . . . . . . . . . . . . .238

APPENDIX E—FIRST REFUSAL EXERCISE NOTICE . . . . . . . . . .239

APPENDIX F—WAIVER OF FREE AGENT RIGHTS . . . . . . . . . . .240

APPENDIX G—NOTICE OF TERMINATION . . . . . . . . . . . . . . . .241

APPENDIX H—ACCOUNTANTS' REVIEW PROCEDURES . . . . . .242

APPENDIX I—STANDARD MINIMUM PRE-SEASON
  PHYSICAL EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . .250

APPENDIX J—ACTUARIAL ASSUMPTIONS AND
  ACTUARIAL COST METHOD . . . . . . . . . . . . . . . . . . . . . . . .253

APPENDIX K—EXTENSION CHART . . . . . . . . . . . . . . . . . . . . . .255

APPENDIX L—OFF-SEASON WORKOUT RULES . . . . . . . . . . . .256

APPENDIX M—PSL EXAMPLES . . . . . . . . . . . . . . . . . . . . . . . . .257

APPENDIX N—WRITTEN WARNING GOOD FAITH EFFORT . . .264

INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .265

EX 8, PAGE 727

# INTRODUCTION

On February 25, 1998, the National Football League Management Council ("NFLMC") and the National Football League Players Association ("NFLPA") agreed to extend, with certain modifications, the 1993 NFL Collective Bargaining Agreement ("CBA"), which was previously amended June 6, 1996.

This booklet incorporates the 1998 extension agreement into the text of the CBA. The 1998 extension language to the amended 1993 CBA is set forth in italic copy with applicable notations to the extension agreement.

In addition, side letter agreements between the NFLMC and the NFLPA setting forth the parties' interpretation of various provisions of the CBA are reprinted and indented within the appropriate articles. Side letters that were agreed to after the 1996 extension are added to this booklet, and are set forth in italics.

For easy reference, the article names can be found at the top of each two-page set of this booklet.

1

## PREAMBLE

This Agreement, which is the product of bona fide, arm's length collective bargaining, is made and entered into on the 6th day of May, 1993, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL in a bargaining unit described as follows:

1.     All professional football players employed by a member club of the National Football League;

2.     All professional football players who have been previously employed by a member club of the National Football League who are seeking employment with an NFL Club;

3.     All rookie players once they are selected in the current year's NFL College Draft; and

4.     All undrafted rookie players once they commence negotiation with an NFL Club concerning employment as a player.

3

## ARTICLE I
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

**Section 1. General Definitions:**

(a) "Agreement" means this Collective Bargaining Agreement, dated May 6, 1993.

(b) "Class Counsel" means the law firm of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, and the law firm of Lindquist & Vennum, 4200 IDS Center, Minneapolis, Minnesota 55402.

(c) "Club" or "Team" or "Member," used interchangeably herein, means any entity that is a member of the NFL or operates a franchise in the NFL at any time during the term of this Agreement.

(d) "Club Affiliate" or "Team Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a Club or any owner of a Club.

(e) "Commissioner" means the Commissioner of the NFL.

(f) "Impartial Arbitrator" means the person authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

(g) "League Year" means the period from February 20 of one year through and including February 19 of the following year, or such other one year period to which the NFL and the NFLPA may agree. For 1993, the League Year shall begin on March 1 and end on the date on which all 1993 League Year contracts terminate, as agreed between the NFL and the NFLPA.

(h) "NFL Player Contract" means the form of Player Contract utilized in the NFL.

(i) "NFL Rules" means the Constitution and By-Laws, rules, and regulations of the NFL and/or the Management Council.

(j) "Player Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a player.

(k) "Salary" means any compensation of money, property, investments, loans, or anything else of value that a Club pays to, or is obligated to pay to, a player or Player Affiliate, or is paid to a third party at the request of and for the benefit of a player or Player Affiliate, during a League Year, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(l) "Settlement Agreement" means the Stipulation and Settlement Agreement, dated February 26, 1993.

(m) "Special Master" means the special master appointed and authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

4

**Section 2. Free Agency Definitions:**

(n) "Accrued Season" means any playing season for which a player received credit with respect to his qualifications for Unrestricted Free Agency or Restricted Free Agency, as described in Article XIX (Veteran Free Agency).

(o) "Compensatory Draft Selection" means an additional Draft choice awarded to a Club as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players).

(p) "Draft" or "College Draft" means the NFL's annual draft of Rookie football players as described in Article XVI (College Draft).

(q) "Draft Choice Compensation" means the right of any Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players), to receive draft pick(s) from any other Club.

(r) "Drafted Rookie" means a person who is selected in the current League Year's Draft or whose Draft rights are held, or continue to be held, consistent with this Agreement, by an NFL Club that selected the Rookie in a prior Draft.

(s) "Final Eight Plan" means the rules whereby signings of Unrestricted Free Agents are limited in Uncapped Years for the final eight playoff Clubs, under the limited circumstances described in Article XXI (Final Eight Plan).

(t) "Free Agent" means a player who is not under contract and is free to negotiate and sign a Player Contract with any NFL Club, without Draft Choice Compensation or any Right of First Refusal.

(u) "Minimum Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player not on any Active list, and not on the Inactive list, pursuant to this Agreement.

(v) "Minimum Active/Inactive List Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player on any Active list, or on the Inactive list, pursuant to this Agreement.

(w) "Negotiate" means, with respect to a player or his representatives on the one hand, and an NFL Club or its representatives on the other hand, to engage in any written or oral communication relating to efforts to reach agreement on employment and/or terms of employment between such player and such Club.

(x) "New Club" means any Club except the Prior Club (as defined below).

(y) "Player Contract" means a written agreement or series of such agreements executed at or about the same time between a person and an NFL Club pursuant to which such person is employed by such Club as a professional football player.

(z) "Prior Club" means the Club that contracted with or otherwise held the NFL playing rights for the player for the previous NFL League Year.

(aa) "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing bonus, and other

5

EX 8, PAGE 731

payments to a player in compensation for the playing of professional football for the last League Year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Beginning with the 1994 League Year, Prior Year Salary shall also include any un-repaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(ab) "Renegotiate" means any change in Salary or the terms under which such Salary is earned or paid, or any change regarding the Club's right to trade the player, during the term of a Player Contract.

(ac) "Required Tender" means a Player Contract tender that a Club is required to make to a player pursuant to this Agreement, either as a matter of right with respect to the player, or to receive Rights of First Refusal, Draft Choice Compensation and/or other rights with respect to the player, as specified in this Agreement.

(ad) "Restricted Free Agent" means a Veteran who has three or more Accrued Seasons and who completes performance of his Player Contract, but who is still subject to a Right of First Refusal and/or Draft Choice Compensation in favor of his Prior Club.

(ae) "Right of First Refusal" means the right of an NFL Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players) to retain the services of certain Veteran players by matching offers made to those players.

(af) "Rookie" means a person who has never signed a Player Contract with an NFL Club.

(ag) "Undrafted Rookie" means a Rookie who was eligible for but not selected in a College Draft.

(ah) "Unrestricted Free Agent" means a Veteran who completes performance of his Player Contract, and who is no longer subject to any exclusive negotiating rights, Right of First Refusal, or Draft Choice Compensation in favor of his Prior Club.

(ai) "Veteran" means a player who has signed at least one Player Contract with an NFL Club.

### Section 3. Salary Cap Definitions:

(aj) "Benefits" or "Player Benefit Costs" means the specific benefits paid to players set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ak) "Capped Year" means any League Year for which a Salary Cap is in effect.

(al) "Defined Gross Revenues" or "DGR" means all of the League and Team revenues that are included within the definition of Defined Gross Revenues, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(am) "Guaranteed League-wide Salary" means the minimum amount

6

that the Teams in the NFL must pay in Player Costs during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(an) "Minimum Team Salary" means the minimum amount that each Team must pay in Salaries during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 5.

(ao) "Paragraph 5 Salary" means the compensation set forth in paragraph 5 of the NFL Player Contract, or in any amendments thereto.

(ap) "Player Costs" means the total Salaries and Benefits attributable to a League Year for all NFL Teams under all of the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), but not including loans, loan guarantees, unpaid grievances attributions, and unearned incentives.

(aq) "Projected Benefits" means the amount of Benefits projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ar) "Projected Defined Gross Revenues" means the amount of Defined Gross Revenues projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(as) "Room" means the extent to which a Team's then-current Team Salary is less than either the Salary Cap or Entering Player Pool, as applicable.

(at) "Salary Cap" means the absolute maximum amount of Salary that each Club may pay or be obligated to pay to players or Player Affiliates, or may pay or be obligated to pay to third parties at the request of and for the benefit of Players or Player Affiliates, at any time during a particular League Year, in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), if applicable.

(au) "Team Salary" means the Team's aggregate Salary for Salary Cap purposes, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(av) "Uncapped Year" means any League Year for which a Salary Cap is not in effect.

### Section 4. Further Definitions:

(aw) "Final League Year" means the League Year which is scheduled prior to its commencement to be the final League Year of this Agreement. As of the date hereof, the Final League Year is the 2004 League Year. If *either* party hereto has by December 1, 2000 cancelled the extension of this Agreement as set forth in Article LXI (Extension of Agreement), then, be-

7

EX 8, PAGE 733

Article I, Definitions

ginning on the date of *such cancellation*, the Final League Year will be the 2003 League Year. The Final League Year shall always be an Uncapped Year.
*Extension Agreement 2/25/98*

(ax)   "Final Capped Year" means the League Year immediately prior to the Final League Year. The Final Capped Year shall be Capped unless the Salary Cap is removed pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 4(b)(ii)(4).

8

# ARTICLE II
# GOVERNING AGREEMENT

*Section 1.* **Conflicts**: The provisions of this Agreement supersede any conflicting provisions in the NFL Player Contract, the NFL Constitution and Bylaws, or any other document affecting terms and conditions of employment of NFL players, and all players, Clubs, the NFLPA, the NFL, and the Management Council will be bound hereby. The provisions of the Stipulation and Settlement Agreement, *as amended*, in White v. NFL, No. 4-92-906 (D. Minn.) ("Settlement Agreement"), shall supersede any conflicting provisions of this Agreement.

*Section 2.* **Implementation**: The NFLPA and the Management Council will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs. The NFLPA will use its best efforts to see that the terms and conditions of all NFL Player Contracts are carried out in full by players.

*Section 3.* **Management Rights**: The NFL Clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement and the Settlement Agreement.

*Section 4.* **Rounding**: For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, or Salary, such amounts shall be rounded to the nearest $1,000.

9

Article III, Scope of Agreement

# ARTICLE III
# SCOPE OF AGREEMENT

**Section 1. Scope**: This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article V (Union Security), Section 6, on Union Security, and on Article LIV (Workers' Compensation), Section 7, on Workers' Compensation, the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws; provided, however, that if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the Management Council will give the NFLPA notice of and negotiate the proposed change in good faith.

**Section 2. Arbitration**: The question of whether the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance), which shall be the exclusive method for resolving disputes arising out of this Section 2. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations.

10

**EX 8, PAGE 736**

## ARTICLE IV
## NO STRIKE/LOCKOUT/SUIT

**Section 1. No Strike/Lockout:** Except as otherwise provided in Article V (Union Security), Section 6, or Article LIV (Workers' Compensation), Section 7, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim by the Management Council that the NFLPA has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the Management Council will have the right to submit such claim directly to the courts.

**Section 2. No Suit:** The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against, the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, the Settlement Agreement, or any term of this Agreement or the Settlement Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Entering Player Pool, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, the Final Eight Plan, Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the Management Council, has: (1) breached the terms of this Agreement, the NFL Player Contract, the revised NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article IX (Non-Injury Grievance) or asserting any claim before the Special Master or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the Settlement Agreement and from asserting such a claim before the Special Master, Impartial Arbitrator, or the Federal District Court, as provided for in the Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the presently existing provisions of the Constitution and Bylaws of the NFL as they are currently operative and administered (except any provisions relating to the 1982 CBA, which have been superseded by this Agreement); provided, however, that nothing herein shall prevent the NFLPA, its members, agents or bargaining unit members from asserting any

11

EX 8, PAGE 737

Article IV. No Strike/Lockout/Suit

rights they may have under the federal labor laws or under this Agreement or the Settlement Agreement.

**Section 3. Releases:** The releases and covenants not to sue contained in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement are hereby incorporated by reference.

12

## ARTICLE V
## UNION SECURITY

**Section 1. Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

**Section 2. Check-off:** Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix A and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check-off.

**Section 3. NFLPA Meetings:** The NFLPA will have the right to conduct three meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule.

**Section 4. NFLPA Player Group Licensing Program:** The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA and the NFL. Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to

**13**

Article IX (Non-Injury Grievance). For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on: (a) products in any one product category, as defined by industry standards; or (b) products in different categories if a total of six or more players are used and (i) the products all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items.

**Section 5. Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article, except any dispute concerning Section 4 of this Article, will be processed pursuant to Article IX (Non-Injury Grievance). Any decision of an outside arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

**Section 6. Procedure for Enforcement:**

(a)     Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article V (Union Security), the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article V (Union Security). The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

(b)     It is further agreed that the term "member in good standing" as used in this Article V (Union Security) applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

(c)     It is further agreed that notwithstanding Article III (Scope of Agreement), Article IV (No Strike/Lockout/Suit), and Article LVIII (Duration of Agreement), that if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of Article V (Union Security) relating to Union Security, then the NFLPA may reopen

14

this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

**Section 7. NFLPA Responsibility:** It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

**Section 8. Orientations:** During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine. The NFLPA and the NFL will also sponsor an orientation with an agreed-upon agenda for all rookies on a Club-by-Club basis during the first half of the NFL regular season, which meetings may take place on the players' day off if no other mutually acceptable day is agreed upon.

> \* *This confirms our agreement that attendance at the annual Rookie Symposium shall be mandatory for all Rookies invited to the Symposium. A material failure to attend the entire Symposium (e.g., missing more than one presentation) that is unexcused by the NFLMC will result in a fine of $10,000. The NFLPA and the NFLMC shall each use its best efforts to encourage players to participate fully in all symposium activities and to abide by all symposium rules (e.g., dress code, curfew, etc.). Being late for or missing curfew will result in a fine at the then applicable amount under Article VIII of the CBA. Other lateness for meetings or similar Article VIII violations will be disciplined at the applicable fine amounts. Discipline shall be imposed, if appropriate, by the NFLMC, not by any Club.*
> *\*Side Letter 1/25/99*

15

**EX 8, PAGE 741**

## ARTICLE VI
## NFLPA AGENT CERTIFICATION

**Section 1. Exclusive Representation:** The NFLMC and the Clubs recognize that the NFLPA regulates the conduct of agents who represent players in individual contract negotiations with Clubs. The NFLMC and the Clubs agree that the Clubs are prohibited from engaging in individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players. The NFLPA shall provide and publish a list of agents who are currently certified in accordance with its agent regulation system, and shall notify the NFLMC and the Clubs of any deletions or additions to the list pursuant to its procedures. The NFLPA agrees that it shall not delete any agent from its list until that agent has exhausted the opportunity to appeal the deletion to a neutral arbitrator pursuant to its agent regulation system. The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent. The NFLPA agrees that it will not discipline, dismiss or decertify agents based upon the results they achieve or do not achieve in negotiating terms or conditions of employment with NFL Clubs.

**Section 2. Enforcement:** Under procedures to be established by agreement between the NFL and the NFLPA, the Commissioner shall disapprove any NFL Player Contract(s) between a player and a Club unless such player: (a) is represented in the negotiations with respect to such NFL Player Contract(s) by an agent or representative duly certified by the NFLPA in accordance with the NFLPA agent regulation system and authorized to represent him; or (b) acts on his own behalf in negotiating such NFL Player Contract(s).

**Section 3. Penalty:** Under procedures to be established by agreement between the NFL and the NFLPA, the NFL shall impose a fine of $10,000 upon any Club that negotiates any NFL Player Contract(s) with an agent or representative not certified by the NFLPA in accordance with the NFLPA agent regulation system if, at the time of such negotiations, such Club either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NFLPA as to whether such agent or representative has been so certified. Such fine shall not apply, however, if the negotiation in question is the first violation of this Article by the Club during the term of this Agreement. It shall not be a violation of this Article for a Club to negotiate with any person named on (or not deleted from) the most recently published list of agents certified by the NFLPA to represent players.

16

## ARTICLE VII
## PLAYER SECURITY

**Section 1. No Discrimination:** There will be no discrimination in any form against any player by the Management Council, any Club or by the NFLPA because of race, religion, national origin or activity or lack of activity on behalf of the NFLPA.

**Section 2. Personal Appearance:** Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

17

**EX 8, PAGE 743**

# ARTICLE VIII
# CLUB DISCIPLINE

### Section 1. Maximum Discipline:

(a)    For the 1993 League Year, the following maximum discipline schedule will be applicable:

Overweight—maximum fine of $50 per lb./per day.

Unexcused late reporting for mandatory off-season training camp, team meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, or scheduled promotional activity —maximum fine of $200.

Failure to promptly report injury to Club physician or trainer · maximum fine of $200.

Losing, damaging or altering Club-provided equipment—maximum fine of $200 and replacement cost, if any.

Throwing football into stands—maximum fine of $200.

Unexcused late reporting for or absence from pre-season training camp by a player under contract except those signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency)    maximum fine of $4,000 per day for the 1993-95 League Years and $5,000 per day for the 1996-2004 League Years.

Unexcused late reporting for or absence from pre-season training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency)—maximum fine of $4,000 per day for the 1993-95 League Years and $5,000 per day for the 1996-2004 League Years, plus one week's regular season salary for each pre-season game missed.

Unexcused missed mandatory off-season training camp, team meeting, practice, curfew, bed check, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, or scheduled promotional activity—maximum fine of $1,000.

Material failure to follow rehabilitation program prescribed by Club physician or trainer—maximum fine of $1,000.

Unexcused missed team transportation—maximum fine of $1,000 and transportation expense, if any.

Loss of all or part of playbook, scouting report or game plan    maximum fine of $1,000.

Ejection from game··    maximum fine of $2,000.

Conduct detrimental to Club—maximum fine of an amount equal to one week's salary and/or suspension without pay for a period not to exceed four (4) weeks.

The Club will promptly notify the player of any discipline; notice of any Club fine in the $4,000/$5,000 maximum category and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

(b)    The amounts set forth in Section 1(a) above shall be in effect for

18

the 1993, 1994 and 1995 League Years. Such fines shall be increased by 25% each for the 1996 League Year and each year thereafter during the term of this Agreement, except for those fines for which the specific increase is set forth in Section 1(a) above.

**Section 2. Published Lists:** All Clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of the discipline which can be imposed for designated offenses within the limits set by the maximum schedule referred to in Section 1 above.

**Section 3. Uniformity:** Discipline will be imposed uniformly within a Club on all players for the same offense; however, the Club may specify the events which create an escalation of the discipline, provided the formula for escalation is uniform in its application. Any disciplinary action imposed upon a player by the Commissioner pursuant to Article XI (Commissioner Discipline) will preclude or supersede disciplinary action by the Club for the same act or conduct.

**Section 4. Disputes:** Any dispute involved in Club discipline may be made the subject of a non-injury grievance under Article IX (Non-Injury Grievance).

**Section 5. Deduction:** Any Club fine will be deducted at the rate of no more than $1,000 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. This will not apply to a suspension.

19

# ARTICLE IX
# NON-INJURY GRIEVANCE

**Section 1. Definition**: Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere in this Agreement, and except wherever the Settlement Agreement provides that the Special Master, Impartial Arbitrator, the Federal District Court or the Accountants shall resolve a dispute.

**Section 2. Initiation**: A grievance may be initiated by a player, a Club, the Management Council, or the NFLPA. A grievance must be initiated within forty-five (45) days from the date of the occurrence or non-occurrence upon which the grievance is based, or within forty-five (45) days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

**Section 3. Filing**: Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail or fax with the Management Council and furnishing a copy of such notice to the Club(s) involved; a Club or the Management Council may initiate a grievance by filing written notice by certified mail or fax with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA. The party to whom a non-injury grievance has been presented will answer in writing by certified mail or fax within seven (7) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or Club(s) involved and the NFLPA or the Management Council as may be applicable.

**Section 4. Appeal**: If a grievance is not resolved after it has been filed and answered, either the player(s) or Club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken, and either the NFLPA or

20

the Management Council as may be appropriate. If the grievance involves a suspension of a player by a Club, the player or NFLPA will have the option to appeal it immediately upon filing to the Notice Arbitrator and a hearing will be held by an arbitrator designated by the Notice Arbitrator within seven (7) days of the filing of the grievance. In addition, the NFLPA and the Management Council will each have the right of immediate appeal and hearing within seven (7) days with respect to four (4) grievances of their respective choice each calendar year. The arbitrator(s) designated to hear such grievances will issue their decision(s) within five (5) days of the completion of the hearing. Prehearing briefs may be filed by either party and, if filed, will be exchanged prior to hearing.

**Section 5. Discovery:** No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the dispute. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing will be admissible provided that the proffering party and the custodian(s) of the documents made a good faith effort to obtain (or discover the existence of) said documents or that the document's relevance was not discovered until the hearing date. In the case of an expedited grievance pursuant to Section 4, such documentary evidence shall be exchanged on or before two (2) days prior to the hearing unless the arbitrator indicates otherwise.

**Section 6. Arbitration Panel:** There will be a panel of four (4) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties will designate the Notice Arbitrator within ten (10) days of the execution of this Agreement. In the event of a vacancy in the position of Notice Arbitrator, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Notice Arbitrator, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If the parties are unable to agree on a new arbitrator within thirty (30) days of any vacancy, the Notice Arbitrator shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. With-

21

in fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

**Section 7. Hearing:** Each arbitrator will designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 15 through September 10 for non-expedited cases, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for such ensuing period, which process will be repeated on an annual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date in the Club city unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, and subject to Section 5, any evidence relevant to the grievance. All hearings will be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call. If either party requests

22

post-hearing briefs, the parties shall prepare and simultaneously submit briefs except in grievances involving non-suspension Club discipline where less than $25,000 is at issue, in which cases briefs will not be submitted. Briefs must be submitted to the arbitrator postmarked no later than sixty (60) days after receipt of the last transcript.

**Section 8. Arbitrator's Decision and Award**: The arbitrator will issue a written decision within thirty (30) days of the submission of briefs, but in no event shall he consider briefs filed by either party more than sixty (60) days after receipt of the last transcript, unless the parties agree otherwise. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement; provided, however, that the arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or an order of compliance, with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article XIII (Committees), Section 1(c). In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of the grievance. The interest shall be calculated at the one-year Treasury Bill rate published in the Wall Street Journal as of March 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

**Section 9. Time Limits:** Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon in writing, either the player, the NFLPA, the Club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

**Section 10. Representation**: In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a Club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

**Section 11. Costs:** All costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the

**EX 8, PAGE 749**

Article IX, Non-Injury Grievance

parties. Notwithstanding the above, if the hearing occurs in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city and one night's lodging.

**Section 12. Payment**: If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Bill rate published in the Wall Street Journal as of March 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each subsequent twelve (12) month period in lieu of continuation of any pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

**Section 13. Grievance Settlement Committee**: A grievance settlement committee consisting of the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL shall have the authority to resolve any grievance filed under this Article. This committee shall meet periodically to discuss and consider pending grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of the two members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement. Consideration of any grievance by this committee shall not in any way delay its processing through the non-injury grievance procedure described in this Article, and no grievance may be resolved pursuant to this Section once an arbitration hearing has been convened pursuant to Section 7 hereof.

24

## ARTICLE X
## INJURY GRIEVANCE

**Section 1. Definition:** An "injury grievance" is a claim or complaint that, at the time a player's NFL Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

**Section 2. Filing:** Any player and/or the NFLPA must present an injury grievance in writing to a Club, with a copy to the Management Council, within twenty-five (25) days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

**Section 3. Answer:** The Club to which an injury grievance has been presented will answer in writing within seven (7) days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

(a) That the player did not pass the physical examination administered by the Club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any pre-season or regular season game; provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

(b) That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during the physical examination;

(c) That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

(d) That the player's injury arose solely from a non-football-related cause subsequent to the physical examination;

(e) That subsequent to the physical examination the player suffered no new football-related injury;

(f) That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical capacity below the level existing at the time of his physical examination as contemporaneously recorded by the Club physician.

25

**Section 4. Neutral Physician:** The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty (20) days from the date of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The player will notify the Club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may review any objective medical tests which all parties mutually agree to provide. The neutral physician is further authorized to perform any necessary diagnostic tests after consultation with the parties. The neutral physician is required to submit to the parties a detailed typewritten medical report of his examination. In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file injury grievances.

**Section 5. Neutral Physician List:** The NFLPA and the Management Council will maintain a jointly approved list of neutral physicians, including at least two orthopedic physicians in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three (3) orthopedic physicians to the other party within thirty (30) days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement, within ten (10) days they will select a neutral physician for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the nominees on its list, and the other party will be bound by such selection. The next vacancy occuring will be filled in similar fashion with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement.

**Section 6. Appeal:** A grievance may be appealed to an arbitrator by filing of written notice of appeal with the chairman of the arbitration panel within

26

**EX 8, PAGE 752**

thirty (30) days from the date of receipt of the neutral physician's written report.

**Section 7. Arbitration Panel:** There will be a panel of five (5) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties have designated Arthur Stark as the Chairman of the panel. In the event of a vacancy in the position of the Chairman of the panel, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Chairman of the panel, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. Any vacancies occurring on the arbitration panel will be filled as follows: If the parties are unable to agree to a new arbitrator within thirty (30) days of the occurrence of the vacancy, the Chairman of the panel shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

**Section 8. Hearing:** Each arbitrator shall designate a minimum of twelve hearing dates per year, exclusive of the period July 15 through September 10, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairman, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing six months, which process will be repeated on a semiannual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question

27

**EX 8, PAGE 753**

cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Chairman to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

Post-hearing briefs must be submitted to the arbitrator postmarked no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of injury. The interest shall be calculated at the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

**Section 9. Miscellaneous:** The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The Club or the Management Council must advise the grievant and the NFLPA in writing no later than seven (7) days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with an injury.

28

**Section 10. Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in travelling to and from his residence to the Club city and one night's lodging.

**Section 11. Pension Credit:** Any player who receives payment for three or more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell/Pete Rozelle NFL Player Retirement Plan as determined by the Retirement Board.

**Section 12. Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each such subsequent twelve (12) month period in lieu of continuation of pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

**Section 13. Presumption of Fitness:** If the player passes the physical examination of the Club prior to the pre-season training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

**Section 14. Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL post-season playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though he had been on

29

Article X, Injury Grievance

the Injured Reserve list at the time of the playoff games in question, should he otherwise qualify for such pay pursuant to Article XLII (Post-Season Pay).

**Section 15. Information Exchange**: The NFLPA and the Management Council must confer on a regular basis concerning the status of pending injury grievances and the attribution of any injury grievance exposure to Team Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). Any communications pursuant to this Section are inadmissible in any grievance hearing.

**Section 16. Discovery**: No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the injury grievance hearing. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

30

## ARTICLE XI
## COMMISSIONER DISCIPLINE

**Section 1. League Discipline**: Notwithstanding anything stated in Article IX (Non-Injury Grievance):

(a) All disputes involving a fine or suspension imposed upon a player for conduct on the playing field other than as described in subsection (b) below, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within twenty (20) days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b) Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within ten (10) days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c) On receipt of a notice of appeal under subsection (a) or (b) above, the Commissioner will designate a time and place for a hearing to be commenced within ten (10) days thereafter, at which he or his designee (other than the person appointed in (b) above) will preside. The hearing may be by telephone conference call, if the player so requests. As soon as practicable following the conclusion of such hearing, the Commissioner will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to subparagraph (b) above may only be affirmed, reduced, or vacated by the Commissioner in such decision, and may not be increased.

**Section 2. Time Limits**: Each of the time limits set forth in this Article may be extended by mutual agreement of the Commissioner and the player(s) and the Club(s) involved.

**Section 3. Representation**: In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of the NFLPA may also participate in such hearing and represent the player. In any such hearing, a Club representative may be accompanied by counsel of his choice. A representative of the Management Council may also

31

EX 8, PAGE 757

Article XI, Commissioner Discipline

participate in such hearing and represent the Club. The NFLPA and Management Council have the right to attend all hearings provided for in this Article. At the hearing, the player, the NFLPA and the Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the hearing. All hearings shall be transcribed.

**Section 4. Costs:** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

**Section 5. One Penalty:** The Commissioner and a Club will not discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

**Section 6. Fine Money:** Any fine money collected pursuant to this Article will be contributed to the Brian Piccolo Cancer Fund, the Vincent T. Lombardi Cancer Research Center, ALS Neuromuscular Research Foundation, and the NFLPA Players Assistance Trust ("P.A.T."). Any such fine money shall be allocated equally among the four (4) organizations mentioned in the preceding sentence.

32

# ARTICLE XII
# INJURY PROTECTION

**Section 1. Qualification**: A player qualifying under the following criteria will receive an injury protection benefit in accordance with Section 2 below:

(a)     The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician following a physical examination after the last game; or the player must have undergone Club-authorized surgery in the off-season following the season of injury; and

(b)     The player must have undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and

(c)     The player must have failed the pre-season physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury. This pre-season physical may be given by the Club physician prior to the beginning of pre-season camp, so long as such fact is clearly communicated to the player at the time of the physical exam. The past understanding of the parties concerning a Club releasing a player who otherwise qualifies under (a) and (b) above prior to the pre-season physical examination will apply during the term of this Agreement (see Appendix B).

**Section 2. Benefit**: Effective after the execution of this Agreement, a player qualifying under Section 1 above will receive an amount equal to 50% of his contract salary for the season following the season of injury, up to a maximum payment of $150,000 for players released pursuant to Section 1(c) above in League Year 1993, unless he has individually negotiated more injury protection or a larger guaranteed salary into that contract. This amount shall be increased to $175,000 in the 1994-96 League Years, to $200,000 for the 1997-99 League Years, to $225,000 for the 2000-02 League Years, *and to $250,000 for the 2003-04 League Years*. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated injury protection into that contract. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the season following the season of injury.

*\*Extension Agreement 2/25/98*

EX 8, PAGE 759

Article XII, Injury Protection

**Section 3. Disputes:** Any dispute under this Article will be processed under Article IX (Non-Injury Grievance). In any grievance in which the NFLPA or a player is claiming an injury protection benefit, the NFLPA or the player may contend that the player should not have passed the pre-season physical examination given by a Club following the season of a player's injury. In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the Club's pre-season physical exam, provided that such physician conducted his examination of the player within fourteen days of the player's contract termination, but no later than the date of the first pre-season cutdown. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 1(c) above shall be deemed to have been satisfied.

\* Extension Agreement 2/25/98

34

**EX 8, PAGE 760**

## ARTICLE XIII
## COMMITTEES

### Section 1. Joint Committee:

(a)    A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee. The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

(b)    The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement. The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly upon the execution of this Agreement is a review of all current materials on the player safety aspects of player equipment, playing surfaces, including artificial turf and other safety matters.

(c)    Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article IX (Non-Injury Grievance). A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and

35

EX 8, PAGE 761

the arbitrator must render his decision within one (1) week of the hearing. No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

**Section 2. Competition Committee:** The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

**Section 3. Player/Club Operations Committee:**

(a)     A Player/Club Operations Committee (hereinafter the "Operations Committee") shall be established for the purpose of examining issues arising with respect to the implementation of this Agreement. The Operations Committee may discuss and examine, and jointly decide, any such issues; provided, however, that any consideration by the Operations Committee shall not delay any grievance or other procedure under this Agreement, unless the Committee jointly decides otherwise.

(b)     The Operations Committee will consist of up to six (6) members: the Executive Vice President for Labor Relations of the NFL and a maximum of two (2) Club representatives (plus advisors), and the Executive Director of the NFLPA and a maximum of two (2) NFLPA representatives (plus advisors). The respective additional members of the Operations Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original additional members on the Operations Committee will be selected within thirty (30) days following the execution of this Agreement. An equal number on each side shall sit on all matters, and the Committee shall jointly decide whether the Committee shall sit with two (2), four (4) or six (6) members on any given matter. The Operations Committee will hold meetings on dates and at sites mutually agreeable to the Committee members.

36

**EX 8, PAGE 762**

## ARTICLE XIV
## NFL PLAYER CONTRACT

**Section 1. Form**: The NFL Player Contract form attached hereto as Appendix C will be used for all player signings. This form cannot be amended without the approval of the Management Council and the NFLPA.

> * [U]se [of] one contract form for a multi-year deal between a player and a club (as opposed to using a series of one-year contract forms as in the past) does not expand the period of time for which a club is obligated to provide an injured player with medical and hospital care...[W]e agree that Paragraph 9 of the new NFL Player Contract gives the same coverage in this respect as Paragraph 9 of the old form.
>
> *Side Letter 8/4/93

**Section 2. Term**: The NFL Player Contract shall be modified to expire on the last day of the last League Year subject to such Contract.

**Section 3. Changes:**

(a) Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract or contracts consistent with the provisions of this Agreement and the Settlement Agreement.

(b) The NFL Player Contract shall be modified to provide that, other than any rights the player may have as a member of the class in White v. NFL., No. 4-92-906 (D. Minn.) to object to the Settlement Agreement during its review by the District Court, the player waives and releases any claims: (i) arising out of, related to, or asserted in that action; and (ii) for conduct engaged in pursuant to the Settlement Agreement during the express term of the Settlement Agreement.

(c) Any waiver and release included in the NFL Player Contract pursuant to this Article does not supersede and is subject to the provisions set forth in Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, and Article LVIII (Duration of Agreement) of this Agreement. Specifically, in the event that the Settlement Agreement is terminated, not approved or invalidated on appeal, pursuant to Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, any such waiver and release shall remain or not remain in effect to the extent that the releases and covenants not to sue set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement remain or do not remain in effect. Except in the circumstances described in the preceding sentence, this subparagraph shall not affect the validity or enforceability of any release and waiver contained in a Player Contract executed on or after March 1, 1993.

37

Article XIV, NFL Player Contract

**Section 4. Conformity:** All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement and the Settlement Agreement.

**Section 5. General:**

(a) Any agreement between any player and any Club concerning terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. The League shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. The League shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), within two business days following the NFL's receipt of such information.

> \* In order to assist the efficient operation of the Salary Cap, with respect to each Player Contract executed after the date of this letter: (i) each Club shall provide to the NFL Management Council ("NFLMC") a copy of each such Player Contract within two days of the execution of such contract by the player and the Club; (ii) notwithstanding Article XIV, Section 5(a) of the CBA, the NFLMC shall provide a copy of each such Player Contract to the NFLPA within two days of its receipt by the NFLMC; and (iii) the NFLMC shall provide to the NFLPA as soon as reasonably practicable a copy of any page of each such Player Contract that has on it the signature of the player's representative if such copy has not already been provided to the NFLPA by the NFLMC. It is anticipated that each Club will send a copy of each such Player Contract to the NFLMC by overnight mail the day it is so executed, and the NFLMC will send a copy of such copy to the NFLPA by overnight mail the day it [is] so received.
>
> \*Side Letter 5/24/95: Sec. 13
>
> \* In the event that an Unrestricted Free Agent signs a Player Contract with a Club other than his prior Club between July 5 and July 15, the Player or his Agent shall promptly notify the Players Association, which will promptly notify the NFL Management Council in writing, and the New Club shall promptly notify the NFL Management Council, in writing, of such signing. If nei-

38

ther the NFL Management Council nor the Players Association has received any such written notice prior to midnight on July 15, such Player Contract shall be deemed not to have been signed within the signing period prescribed by Article XIX, Section 1(b)(i) of the CBA.

*Side Letter 3/3/97: Sec. 2

(b)    Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for non-football-related services shall be set forth in writing and disclosed and provided to the League within five business days of the execution or making of the agreement. The NFL shall provide such information to the NFLPA within two business days of the receipt of such information.

(c)    No Club shall pay or be obligated to pay any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract or a contract for non-football related services as described in Section 5(b) above. Nothing contained in the immediately preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d)    During the period any Salary Cap is in effect, in addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This paragraph shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

**Section 6. Commissioner Disapproval:** If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefore by noon on the date following such disapproval.

> *[I]n the event the Commissioner disapproves any Player Contract as being in violation of the Salary Cap or Entering Player Pool, or any other provision of the Settlement Agreement or corresponding provision of the CBA, the filing of an appeal of such disapproval pursuant to Article XV, Paragraph 5 or Article XXII, Paragraph 1 of the Settlement Agreement, or Article XXV, Section 5 or Article XXVI, Section 1 of the CBA, shall automatically stay the Commissioner's disapproval, and the player shall continue to be free to practice and play for the Club, un-

EX 8, PAGE 765

til the Special Master (or the District Court acting in lieu of the Special Master) issues its ruling. Provided, however, that in the event such Special Master appeal is filed within one week of or after the first scheduled regular season game of the Club: (i) the appeal shall be conducted in an expedited manner and shall be concluded within five days of the filing date of such appeal; and (ii) the Special Master shall issue his ruling by the end of such five day period. Provided, further, that, in the event the appeal is filed after the Club's first pre-season game, but before the date one week before the Club's first scheduled regular season game: (i) the appeal shall be conducted in an expedited manner and shall be concluded within ten days of the filing date of such appeal; and (ii) the Special Master shall issue his ruling by the end of such ten day period. If there is no ruling by the end of the periods prescribed in the preceding two sentences, or, for earlier filed appeals, by the day following the Club's third pre-season game, the automatic stay shall be dissolved. If the Commissioner disapproves a Player Contract for any of the reasons stated above on a second occasion for the same player during a given League Year, and determines that such player should not be able to play, there shall be no stay of such disapproval pursuant to this agreement, unless it is determined that the Commissioner's second disapproval is arbitrary or capricious. This agreement shall not prejudice or affect in any way, or constitute a waiver with respect to, any rights of class members to seek a stay or injunctive relief before the District Court, pursuant to the Federal Rules of Civil Procedure; nor shall it prejudice or affect in any way the rights of the NFL to oppose, or the arguments of the NFL in opposition, to such a stay.

*Side Letter 1/18/94: Sec. 2

**Section 7. NFLPA Group Licensing Program:** The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in paragraph 4a of Appendix C, regarding the NFLPA Group Licensing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision.

**Section 8. Good Faith Negotiation:** In addition to complying with specific provisions in this Agreement, any Club or player engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

EX 8, PAGE 766

* The parties hereby agree that pursuant to Article 14, Section 8 of the Collective Bargaining Agreement, a Club extending a Required Tender must, for so long as that Tender is extended, have a good faith intention to employ the player receiving the Tender at the Tender compensation level during the upcoming season. It shall be deemed to be a violation of this provision if, while the tender is outstanding, a Club insists that such a player agree to a Player Contract at a compensation level during the upcoming season below that of the Required Tender amount. The foregoing shall not affect any rights that a Club may have under the Player Contract, under the CBA, or under the Stipulation and Settlement Agreement, including but not limited to the right to terminate the contract, renegotiate the contract, or to trade the player if such termination, renegotiation, or trade is otherwise permitted by the Player Contract, CBA, or Stipulation and Settlement Agreement.

*Side Letter 3/3/97: Sec. 1

41

# ARTICLE XV
# OPTION CLAUSE

*Section 1.* **Prohibition:** Commencing with the execution of this Agreement, the option clause contained in the NFL Player Contract shall be discontinued. Any option clause must be negotiated as a separate addendum to the revised NFL Player Contract form. Any negotiated option clause must state the dollar amount(s) to be paid to the player during the option year.

*Section 2.* **Existing Option Clauses:** If any option clause contained in an NFL Player Contract in existence at the time of the execution of this Agreement is exercised by the Club, it shall be at the rate of salary specified. The player will also receive 100% of performance bonus provisions where the bonus is earned in the option year.

42

## ARTICLE XVI
## COLLEGE DRAFT

**Section 1. Time of Draft:** Commencing with the 1993 Annual Selection Meeting (the "College Draft" or "Draft"), and with respect to the Draft to be held each League Year thereafter during the term of this Agreement, as well as the Draft to be held in the League Year immediately following the expiration or termination of this Agreement (which Draft shall *be held between February 14 and May 2, 2005, unless the extension of* this Agreement is cancelled by *either of the* parties hereto *as set forth in Article LXI (Extension of Agreement), in which case such draft shall be held between February 14 and May 2, 2004)*, and the subsequent implementation of each such Draft during the applicable League Year, the following rules shall apply:

*\*Extension Agreement 2/25/98*

**Section 2. Number of Choices:** With the exception of the 1993 Draft, the Draft shall consist of seven rounds, with each round consisting of the same number of selection choices as there will be Clubs in the NFL the following League Year, plus a maximum number of additional Compensatory Draft Selections equal to the number of Clubs then in the League, with such Compensatory Draft Selections reserved for Clubs losing certain Unrestricted Free Agents. For the 1993 League Year only, the Draft shall consist of eight rounds without any additional Compensatory Draft Selections, except any additional selections as provided in Article XX (Franchise and Transition Players), Section 13. To the extent that the Compensatory Draft Selections referred to in Article XX (Franchise and Transition Players), Section 13 are not all awarded for use in the 1993 League Year Draft, such remaining selections are reserved for the Drafts in subsequent League Years under this Agreement in addition to the maximum number of selections set forth in the first sentence of this Section 2. Each Draft to be held after the 1996 League Year shall be held between February 14 and May 2, on a date which shall be determined by the Commissioner.

**Section 3. Required Tender:** A Club that drafts a player shall be deemed to have automatically tendered the player a one year NFL Player Contract for the Minimum Active/Inactive List Salary then applicable to the player pursuant to the terms of this Agreement. The NFL or the Club shall provide the player with notice of such Required Tender before or immediately following the Draft.

### Section 4. Signing of Drafted Rookies:

(a) A drafted player may accept the Required Tender at any time up to and including the Tuesday following the tenth week of the regular season immediately following the Draft, at 4:00 p.m. New York time. In the event the exclusive negotiating rights to the drafted player are assigned to

43

another Club through the NFL waiver system, the acquiring Club must immediately extend the Required Tender following assignment. If released through waivers, the player shall be treated as an Undrafted Rookie Free Agent, with the right to sign an NFL Player Contract with any Club. If the Club that drafted the player signs the player after he is waived and becomes a Rookie Free Agent, the player's entire salary shall be counted against the Entering Player Pool, in the manner described in Article XVII (Entering Player Pool).

(b)     If a Drafted Rookie has not signed a Player Contract during the period from the date of such Draft to the thirtieth day prior to the beginning of the regular season: (i) the Club that drafted the player may not thereafter trade to another Club either its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year; and (ii) the Club that drafted the player is the only Club with which the player may sign a Player Contract until the day of the Draft in the subsequent League Year, at which time such player is eligible to be drafted in the subsequent League Year's Draft by any Club except the Club that drafted him in the initial Draft. (After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s)).

(c)     If a Drafted Rookie has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

### Section 5. Other Professional Teams:

(a)     Notwithstanding Section 4(b) above, if a player is drafted by a Club and, during the period between the Draft and the next annual Draft, signs a contract with, plays for or is employed by a professional football team not in the NFL during all or any part of the 12 month period following the initial Draft, then the drafting Club (or any assignee Club) shall retain the exclusive NFL rights to negotiate for and sign a contract with the player until the day of the Draft three League Years after the initial Draft, and shall thereafter have a Right of First Refusal as described herein, and the player may receive offers from any Club at any time thereafter. The player shall notify the NFLPA and the NFL of his desire to sign a contract with an NFL Club, and of the date on which the player will be free of his other contractual obligations of employment, if any. Within thirty days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL Club that drafted the player must tender a one

44

EX 8, PAGE 770

year written Player Contract to the player in order to retain its rights to that player, as detailed below.

(b)     For a player to whom the drafting Club retains the exclusive NFL rights to negotiate pursuant to Section 4(a) above, the Club must tender a one year Player Contract with salary of at least the Minimum Active/Inactive List Salary for players with less than one credited season, as defined in Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 3, within the thirty day period specified in subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall be subject to the Entering Player Pool, as set forth in Article XVII (Entering Player Pool). If the player is released through waivers, the player immediately becomes a Free Agent, with the right to sign an NFL Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     For players with respect to whom the drafting Club retains a Right of First Refusal pursuant to this Section 5, during each League Year the player shall be treated as if he were a Restricted Free Agent not subject to Draft Choice Compensation, as described in Article XIX (Veteran Free Agency), Section 2, except as otherwise set forth in this Section 5. For such players subject to a Right of First Refusal, the Club must tender a one year Player Contract with at least the Minimum Active/Inactive List Salary for players with two or more Credited Seasons, as defined in Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 3, within the thirty day period specified in subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall not be subject to the Entering Player Pool. If the Club does not make or withdraws the Required Tender, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(d)     This Section 5 shall apply to any player drafted in the 1990 League Year or thereafter, except that tenders to and Player Contracts entered into with players drafted in the 1990, 1991 and 1992 League Years shall not be subject to the Entering Player Pool. Any player drafted prior to the 1990 League Year shall be governed by rules identical to the provisions set forth in Article XIII of the 1982 Collective Bargaining Agreement.

**Section 6. Return to College:** If any college football player who becomes eligible for the Draft prior to exhausting his college football eligibility through participation is drafted by an NFL Club, and returns to college, the drafting Club's exclusive right to negotiate and sign a Player Contract with such player shall continue through the date of the Draft that follows the last season in which the player was eligible to participate in college football, and

45

EX 8, PAGE 771

thereafter the player shall be treated and the Club shall have such exclusive rights as if he were drafted in such Draft by such Club (or assignee Club).

**Section 7. Assignment of Draft Rights**: In the event that the exclusive right to negotiate for a Drafted Rookie under Sections 4, 5 or 6 above is assigned from one Club to another Club, the Club to which such right has been assigned shall have the same, but no greater, right to such player, including the Right of First Refusal described in Section 5, as would the Club assigning such right, and such player shall have the same, but no greater, obligation to the NFL Club to which such right has been assigned as he had to the Club assigning such right.

**Section 8. Subsequent Draft**: A Club that, in a subsequent Draft, drafts a player who (a) was selected in an initial Draft, and (b) did not sign a contract with the NFL Club that drafted him or with any assignee Club during the signing period set forth in Sections 4 through 6 above, shall, during the period from the date of the subsequent Draft to the date of the Draft held the subsequent League Year, be the only NFL Club that may negotiate with or sign a Player Contract with such player. If such player has not signed a Player Contract within the period beginning on the date of the subsequent Draft and ending on the thirtieth day prior to the beginning of the regular season, the Club loses all rights to trade its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year. After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s), except as provided in Section 4(c) above. If the player has not signed a Player Contract by the day of the next annual College Draft following the subsequent Draft, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 9. No Subsequent Draft**: If a player is drafted by a Club in an initial Draft and (a) does not sign a contract with a Club during the signing period set forth in Sections 4 through 6 above, and (b) is not drafted by any Club in the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 10. Compensatory Draft Selections**: The rules and procedures regarding Compensatory Draft Selections set forth in Section 2 above shall be as agreed upon by the NFL and the NFLPA.

46

**Section 11. Undrafted Rookies:** Any person who has not been selected by a Club in a College Draft shall be free, after the completion of a College Draft for which he is eligible, to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such person after such date, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind.

**Section 12. Notice of Signing:** Promptly following but no later than two business days after receipt of notice of the signing of any Drafted or Undrafted Rookie, the NFL shall notify the NFLPA of such signing.

**Section 13. Workouts of Draft-Eligible Players:** In order to encourage fair competition among all Draft-eligible players who were invited to the NFL Scouting Combine, and to discourage any unfair advantages from individual workouts of such players, Clubs are prohibited from attending or conducting, directly or indirectly, any workouts of any Draft-eligible player(s) who were invited to, and were not excused from (because of medical or other reasons) attending or participating fully in workouts at, the NFL Scouting Combine.

**EX 8, PAGE 773**

Case 2: Case 2:12-cv-03394-AB Document 20 11 Filed 03/29/12 Page 61 of 555 Page ID #:8135

## ARTICLE XVII
## ENTERING PLAYER POOL

**Section 1. Definition:** For purposes of this Article XVII of this Agreement, the following terms shall have the meanings set forth below:

(a) "Entering Player Pool" means the League-wide limit on the total amount of Salary to which all of the NFL Clubs may contract for in signing Drafted Rookies (and certain amounts contracted to be paid to Undrafted Rookies as described below) during each League Year of this Agreement, as set forth below.

(b) Salary shall be defined and calculated in the same manner as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). In the event a Rookie who is subject to the Entering Player Pool signs a Player Contract after the commencement of the regular season, the Club must have Room under its Rookie Allocation for the entire Paragraph 5 amount of the contract.

**Section 2. Covered League Years:** The Entering Player Pool will be in effect in the 1993 League Year and in all subsequent League Years, except as set forth below. Beginning with the 1994 League Year, the NFL may remove the Entering Player Pool at its option in any Uncapped Year, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year. Further, in any Capped Year, the NFL may remove the Pool, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year, but to the extent that any Club spends more than its Rookie Allocation in that League Year, the Club will pay an equivalent number of dollars to its Veteran players pursuant to reasonable allocation instructions by the NFLPA.

**Section 3. Calculation:**

(a) For the 1993 League Year, the Entering Player Pool shall be $56 million, i.e., an average of $2 million per Club. For *the 1994-97 League Years*, the Entering Player Pool shall consist on a League wide basis of the greater of: (i) $2 million multiplied by the number of Clubs in the NFL at the time of the Draft; (ii) 3.5% of Projected DGR; or (iii) the aggregate amount, in actual dollars, of the Entering Player Pool in the previous League Year. *For the 1998 League Year, the Entering Player Pool shall consist, on a League-wide basis, of 107.8% of the dollar amount of the Entering Player Pool for the 1997 League Year (excluding any formula allotments attributable to any Compensatory Draft Selections). For the 1999 League Year and each applicable succeeding League Year of this Agreement, the Entering Player Pool shall consist on a League-wide basis of the amount of the Entering Player Pool for the immediately preceding League Year (excluding any formula allotments attributable to any Compensatory Draft Selections), increased by the same percentage as the increase in Projected DGR for that League Year over the prior year's DGR (as defined in Article*

EX 8, PAGE 774

*XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)),*
*up to a maximum of ten percent (10%) per season, but shall not in any event de-*
*crease in actual amount from League Year to League Year. Notwithstanding the*
*foregoing, to the extent there are Compensatory Draft Selections as a result of Ar-*
*ticle XVI (College Draft), Section 2 and/or Article XX (Franchise and Transition*
*Players), Section 13, the Entering Player Pool shall be increased in accordance*
*with subsection (c) below and as otherwise* agreed upon by the NFL and the
NFLPA.

*\*Extension Agreement 2/25/98*

(b)     For each League Year of this Agreement, each Club shall have a
Rookie Allocation, which shall be its proportional share of the Entering
Player Pool, calculated based on the number, round, and position of the
Club's selection choices in the Draft. The Rookie Allocation formula shall
be agreed upon by the NFL and the NFLPA and shall remain in effect for
the duration of the Agreement, unless the NFL and the NFLPA otherwise
agree.

(c)     If, pursuant to Article *XVI (College Draft), Section 2 and/or Article*
XX (Franchise and Transition Players), Section 13, a Club has one or more
Compensatory Draft Selections, an amount shall be added to that Club's
Rookie Allocation, and to the Entering Player Pool (notwithstanding sub-
section (b) above), based upon the amount allotted to selection choices of
that round and position in calculating the Rookie Allocation (the "Formu-
la Allotment"). In the event that a Club signs a Player Contract with a Draft-
ed Rookie who was drafted in a prior League Year, an additional amount
shall be added to that Club's Rookie Allocation, and to the Entering Player
Pool (notwithstanding subsection (b) above), equal to the lower of the
Club's original Formula Allotment for such draft choice or the amount of
unused Room under the Club's Rookie Allocation during the League Year
in which the player was originally drafted.

*\*Extension Agreement 2/25/98*

(d)     Notwithstanding the above, nothing shall prevent the Club from
signing a player for an amount in excess of the player's Formula Allotment,
if the Club has Room available under its Rookie Allocation.

(e)     In the event that the NFL holds a supplemental draft in addition
to its annual Draft in advance of the next League Year's Draft, adjustments
shall be made to the Entering Player Pool and Rookie Allocation in a man-
ner to be agreed upon by the NFL and the NFLPA.

> \*In the event the NFL holds a supplemental draft in ad-
> dition to its annual College Draft in advance of the fol-
> lowing League Year's College Draft, there shall be added
> to each selecting Club's Rookie Allocation, and (cumo-
> latively, if more than one selecting Club) to the Entering
> Player Pool for that League Year, an amount equal to the
> Formula Allotment for the corresponding choice(s) in

49

EX 8, PAGE 775

that League Year's College Draft. In the subsequent League Year, after Formula Allotments have been established for each selection position in the College Draft, the amount of the Formula Allotment(s) for the selections used in the prior year's supplemental draft shall be deducted from the Club's Rookie Allocation. See Article XVII, Sec. 3 (e) of the CBA.

Example: If Team A selects a player in a supplemental draft with the first choice in the third round, Team A's Rookie Allocation for that League Year shall be increased by an amount equal to the Formula Allotment for the first choice in the third round of that year's College Draft. An amount equal to the Formula Allotment for the first choice in the third round of the prior League Year's Draft shall be eliminated from the subsequent League Year's Entering Player Pool, in that Club's Rookie Allocation, but all other Rookie Allocations remain the same.
*Side Letter 5/24/95

### Section 4. Operation:

(a)     No Club may enter into Player Contracts with Drafted Rookies that, standing alone or in the aggregate, provide for Salaries in the first League Year of such Player contracts that would exceed the Club's Rookie Allocation for that year.

(b)     For the purposes of this Article XVII, the Salary of any Undrafted Rookie shall count toward the Club's Rookie Allocation only to the extent that it exceeds the then-applicable Minimum Active/Inactive List Salary for that player.

(c)     In the event that a Draft selection is assigned to another Club prior to completion of the Draft, the amount of the Formula Allotment for such selection shall be assigned to the Club receiving the selection under the assignment. A Club may not assign the exclusive negotiating rights to a Drafted Player to another Club if such New Club does not have Room under its Rookie Allocation equal to at least the original Formula Allotment for the player, unless the player consents to such assignment.

(d) (i)  If a Drafted Player is placed on waivers, the player's Formula Allotment remains with the Club that requested waivers on him, and the assignee Club must have Room or make Room under its Rookie Allocation to make the Required Tender to the player.

(ii)     If a Club requests waivers on a Drafted Rookie and that player is released via waivers, the requesting Club can sign that player to a Player Contract during that League Year only if the Club has Room under its Rookie Allocation equal to the full Salary contracted for in that League Year.

(e)     No Player Contract signed by a Rookie may provide for an annual increase in Salary of more than 25% of the contract's first League Year

EX 8, PAGE 776

Salary, *unless such Player Contract provides for Salary which is equal to the then-applicable Minimum Salary for each League Year of the contract.* For the purposes of the calculation in this section only, any amount of a signing bonus attributed to the player's Salary shall not be counted.

*\*Extension Agreement 2/25/98*

> \* If a Rookie contracts with a Club for the minimum workout payments set forth in Article XXXV, for his second or subsequent season, such payments shall not be included for the purposes of the 25% calculation under Article XVII, Section 4(e). If a Rookie contracts with a Club for a workout payment in excess of the minimum, such excess amount shall be included for the purposes of the 25% calculation under Article XVII, Section 4(e). In all cases, a workout payment shall count toward Team Salary and a Team's Rookie Allocation.
>
> \*Side Letter 6/23/93: Sec. 1

> \* Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buy-out is exercised by the Club, and pro-rated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buy-out is based upon one or more incentives that are not "likely to be earned." Such a buy-out amount shall not be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA.
>
> \*Side Letter 10/21/96: Sec. 3(a)

> \* The parties acknowledge that Class Counsel together with the NFLPA, and the NFL Management Council, disagree as to the treatment of allocated signing bonus and buy-out payments when a player's right to terminate one or more contract years and/or the Club's right to buy-out is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this paragraph [and the one preceding], the terms of [both these] paragraph[s]…may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all of their rights with respect to the

**51**

EX 8, PAGE 777

subject of this paragraph.

*Side Letter 10/21/96: Sec. 3(b)

* Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, pro-rated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA, pro-rated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Side Letter 10/21/96: Sec. 4

(f)     The Player Contract of a Drafted Rookie or Undrafted Rookie may not be renegotiated for a one (1) year period following the date of the initial signing of such Player Contract, or until August 1 of the following League Year, whichever is later.

(g)     Nothing in this Agreement is intended to or shall be construed to mean that any Rookie's Salary is predetermined by any Allocation or Formula Allotment.

(h)     The list of each Formula Allotment attributed to each draft selection shall be agreed to by the NFL and the NFLPA, and shall not be disclosed to Clubs, Players, Player Agents or the public.

> * For purposes of the Entering Player Pool and a Team's Rookie Allocation, amounts contracted to be paid to Drafted Rookies, and amounts in excess of the applicable Minimum Active/Inactive List Salary contracted to be paid to Undrafted Rookies pursuant to Article XVII, Section 4, shall be counted against the Entering Player Pool and a Team's Rookie Allocation, whether or not the

52

amounts are actually paid, in the manner otherwise specified in the CBA.

*Side Letter 6/23/93: Sec. 7

* [I]n League Years for which no Salary Cap is in effect, 85% of any amount contracted by a Team to be paid from the Team's Rookie Allocation to a Rookie, but not actually paid by the Team to that player, either as a rookie, or as a re-signed first year player or practice squad player, which amount was not paid because that player was released, will be distributed to all rookies on such Team promptly after the end of the season on a pro rata basis based upon the number of downs played.

*Side Letter 6/23/93

* [I]f a Club has a Rookie Orientation Program apart from its allowable mini camp(s) and prior to its training camp, the following categories of per player reimbursements or payments will not be counted against the Entering Player Pool:

(1) One Round Trip Airline Ticket or its cash equivalent from the player's place of residence to the Club city and back, not to exceed $750.

(2) Room and Board of up to $100 per day or its equivalent, up to a maximum of 60 days.

(3) Ground transportation to and from the player's place of residence in the club's city to the club's facility.

Any amounts in excess of the above reimbursements or payments will count against the Entering Player Pool.

*Side Letter 8/4/93: Sec. 1
*as amended, Side Letter 5/13/99*

* The above reimbursements or payments for Rookie Orientation Programs will not be considered Player Costs during the term of this Agreement. The parties reserve their respective rights and arguments with respect to whether any amounts in excess of the above reimbursements or payments do or do not qualify as Player Costs under the Agreement.

*Side Letter 8/4/93: Sec. 2

53

Article XVII, Entering Player Pool                                    .

> \* Costs associated with the Rookie Orientation Pro-
> grams will be evaluated by the NFLPA, Class Counsel,
> and the NFLMC each year to determine if adjustment,
> with respect to the Entering Player Pool, is appropriate.
> \*Side Letter 8/4/93: Sec. 3

*\*\*See Pages 110-130 for Rookie "Likely To Be Earned" Incentives. Article XXIV, Section 7(c).*

54

## ARTICLE XVIII
## VETERANS WITH LESS THAN THREE
## ACCRUED SEASONS

### Section 1. Accrued Seasons Calculation:

(a)    For the purposes of calculating Accrued Seasons under this Agreement, a player shall receive one Accrued Season for each season during which he was on, or should have been on, full pay status for a total of six or more regular season games, but which, irrespective of the player's pay status, shall not include games for which the player was on: (i) the Exempt Commissioner Permission List, (ii) the Reserve PUP List as a result of a non-football injury, or (iii) a Club's Practice or Development Squad.

(b)    For the purposes of calculating Accrued Seasons under this Agreement, for any League Year during the term of this Agreement beginning with the 1993 League Year, a player shall not receive an Accrued Season for any League Year in which the player is under contract to a Club and in which he failed to report to such Club at least thirty days prior to the first regular season game of that season, or in which the player thereafter failed to perform his contract services for the Club for a material period of time, unless he demonstrates to the Impartial Arbitrator extreme personal hardship causing such failure to report or perform, such as severe illness or death in the family. The determination of the Impartial Arbitrator shall be made within thirty days of the application by the player, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

### Section 2. Negotiating Rights of Players with Less Than Three Accrued Seasons:
Any Veteran with less than three Accrued Seasons whose contract has expired may negotiate or sign a Player Contract only with his Prior Club, if on or before March 1 his Prior Club tenders the player a one year Player Contract with a Paragraph 5 Salary of at least the Minimum Active/Inactive List Salary applicable to that player. If the Prior Club has not by that date made the Required Tender or later withdraws such tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

### Section 3. Notice of Signing:
Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

55

EX 8, PAGE 781

Article XVIII, Veterans with Less Than Three Accrued Seasons

** See Pages 38-39 - Article XIV, Section 5(a) for Side Letter of 5/24/95, Section 13 and Side Letter of 3/3/97, Section 2 re: Notice of Signing.

** See Pages 40-41 - Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

** Prior Section 3 (Minimum Salaries) omitted under 2/25/98 Extension Agreement; See Pages 171-174-Article XXXVIII, Sections 1-5 re: Minimum Salaries.

56

**EX 8, PAGE 782**

# ARTICLE XIX
# VETERAN FREE AGENCY

## *Section 1.* Unrestricted Free Agents:

(a)     Subject to the provisions of Article XX (Franchise and Transition Players), any player with five or more Accrued Seasons, or with four or more Accrued Seasons in any Capped Year, shall, at the expiration of his Player Contract, become an Unrestricted Free Agent. Such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, subject to the signing period set forth below.

(b)     **Signing Period.**

(i)     In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by July 15 or the first scheduled day of the first NFL training camp, whichever is later, in the League Year following the expiration of his last Player Contract, he may negotiate or sign a Player Contract from July 15 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, only with his Prior Club, provided that the Prior Club by June 1 has tendered to the player a one year Player Contract of at least 110% of either (a) his Prior Year Salary (if his expiring Player Contract is not a Player Contract he entered into as a Rookie), or (b) his Paragraph 5 Salary (if his expiring Player Contract is a Player Contract he entered into as a Rookie, without renegotiation), in each case with all other terms of his contract identical to his prior year's contract. For the purposes of this subsection, "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the last year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Beginning with the 1994 League Year, Prior Year Salary shall also include any un-repaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(ii)     If an Unrestricted Free Agent described in subparagraph (b)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

**EX 8, PAGE 783**

Article XIX, Veteran Free Agency

(iii)    If an Unrestricted Free Agent does not play in the NFL for the remainder of a League Year pursuant to subparagraph (b)(ii) above, commencing the first day of the following League Year, the player shall be free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)    In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by June 1 of the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date tendered to the player a one year Player Contract in accordance with the requirements of subparagraph (b)(i) above, or has withdrawn the tender, the player shall continue to be an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(d)    An Unrestricted Free Agent shall not be subject to any limitations on the period of time before which he may qualify as an Unrestricted Free Agent again, or to any limitations on the number of times he may be an Unrestricted Free Agent.

(e)    Promptly upon but no later than two business days after the signing of any Unrestricted Free Agent to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

\*\*See Pages 38-39 - Article XIV, Section 5(a) for Side Letter of 5/24/95, Section 13 and Side Letter of 3/3/97, Section 2 re: Notice of Signing.

\*\*See Pages 40-41 - Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

### Section 2. Restricted Free Agents:

(a)    Any Veteran player with three or more Accrued Seasons, but less than five Accrued Seasons (or less than four Accrued Seasons in any Capped Year), shall, at the expiration of his last Player Contract during such period, become a Restricted Free Agent. Any such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, subject to the restrictions set forth in this Article.

(b)    In order to receive the following specified Rights of First Refusal and/or Draft Choice Compensation with respect to a Restricted Free Agent, the Prior Club of a Restricted Free Agent must tender the player a Qualify-

58

ing Offer on or before the first date of the Restricted Free Agent Signing Period, as follows:

    (i)    For Restricted Free Agents with three Accrued Seasons:

    (1)    Right of First Refusal: one year Player Contract with Paragraph 5 Salary of at least $275,000;

    (2)    Right of First Refusal and Draft Selection at Player's Original Draft Round: one year Player Contract with a Paragraph 5 Salary of at least (a) $275,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

    (3)    Right of First Refusal and One First Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $600,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

    (4)    Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $800,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

    (ii)    For Restricted Free Agents with four Accrued Seasons (in Uncapped Years):

    (1)    Right of First Refusal: one year Player Contract with Paragraph 5 Salary of at least $325,000;

    (2)    Right of First Refusal and Draft Selection at Player's Original Draft Round: one year Player Contract with a Paragraph 5 Salary of at least (a) $325,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

    (3)    Right of First Refusal and One First Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $700,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged; and

    (4)    Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection: one year Player Contract with Paragraph 5 Salary of at least (a) $900,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged.

    (c)    Notwithstanding subparagraphs 2(b)(i) and 2(b)(ii) above, in the event that a Prior Club tenders any of its Restricted Free Agents origi-

EX 8, PAGE 785

Article XIX, Veteran Free Agency

nally selected in a draft round lower than the first round a Qualifying Offer that requires Draft Choice Compensation of one first round selection (the "Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one second round selection for any of its Restricted Free Agents originally selected in the first round of the Draft, unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the Upgraded Tender.

(d)     Notwithstanding subsections 2(b)(i) and 2(b)(ii) above, in the event that the player was originally selected in a draft round after the seventh round (or, for the 1993 League Year only, after the eighth round), a Qualifying Offer in the amount required to obtain a Right of First Refusal and Draft Choice Compensation at the Player's original Draft Round shall entitle a Club only to a Right of First Refusal for such player.

(e)     The amounts of the Qualifying Offers specified in this paragraph ($275,000, $325,000, $600,000, $700,000, $800,000 and $900,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall Qualifying Offer amounts increase if the projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

(f)     A Restricted Free Agent shall have the option of accepting a one year NFL Player Contract for 110% of his Prior Year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) in lieu of a Player Contract for the applicable alternative amount specified in this paragraph, if he so wishes, regardless of which Player Contract is for a greater amount.

(g)     In the event a Prior Club withdraws its Qualifying Offer, the Restricted Free Agent shall immediately become an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without being subject to First Refusal, Draft Choice Compensation, Signing Period, or any other limitation of any kind.

** See Pages 40-41 - Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

(h)     **Signing Period**. Notwithstanding anything else in this Agreement, in the 1993 League Year, Restricted Free Agents shall be free to negotiate and sign a Player Contract with any Club during the period commencing on March 1, 1993, and ending at 11:59 p.m. New York time on April 23, 1993 (the "Signing Period"). In future League Years, the dates of

60

such Signing Period shall be agreed upon by the NFL and the NFLPA by the previous September 1, but in no event may such Signing Period be less than a period of sixty days.

(i) (i) In the event that a Restricted Free Agent has not signed a Player Contract with a Club within the Signing Period in the League Year following the expiration of his last Player Contract, and if the Prior Club by June 1 tenders to the Restricted Free Agent a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) or extends the player's Qualifying Offer, whichever is greater (the "June 1 Tender"), the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from June 1 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time. If the player's Qualifying Offer is greater than 110% of the player's Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged), the Club may withdraw the Qualifying Offer on June 15 and retain its rights under the preceding sentence, so long as the Club immediately tenders the player a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) (the "June 15 Tender").

(ii) If a Restricted Free Agent described in subsection (i)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall not play football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(iii) If a Restricted Free Agent does not play in the NFL in a League Year, his Prior Team shall have the right to tender such player any Qualifying Offer consistent with Section 2(b) prior to the next League Year's Restricted Free Agent Signing Period. In the event such a Qualifying Offer is tendered, the Prior Team shall have the applicable rights regarding such player according to such tender, and such player shall have the same rights regarding negotiations with other Clubs as he had the previous League Year.

(j) In the event that a Restricted Free Agent has not signed a Player Contract with a Club by June 1 in the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date made the applicable June 1 Tender to such player, or withdraws the tender, or in the event the Club has withdrawn the applicable June 15 Tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club may negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to,

61

EX 8, PAGE 787

Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(k)     Promptly upon but no later than two business days after the signing of any Restricted Free Agent to a Player Contract, or the extending to any Restricted Free Agent of a Qualifying Offer, the signing or extending Club shall notify the NFL, which shall notify the NFLPA of such signing or offer.

\*\* See Pages 38-39 - Article XIV, Section 5(a) for Side Letter of 5/24/95, Section 13 and Side Letter 3/3/97, Section 2 re: Notice of Signing.

(l)     Draft Choice Compensation under this Article shall be due in that League Year's Draft unless the Offer Sheet is received by the Prior Club later than two days before that League Year's Draft, in which case Draft Choice Compensation shall be due in the following League Year's Draft.

(m)     *Notwithstanding the foregoing, in the event that the Prior Club of a Restricted Free Agent has tendered the player a Qualifying Offer pursuant to this Article XIX, Section 2(m) in an amount at least $500,000 greater than that specified by Sections 2(b)(i)(4) or 2(b)(ii)(4) above, as applicable depending upon whether the League Year is a Capped Year or an Uncapped Year, or by Article LVI, Section 2(b), if applicable, then the Club shall have a Right of First Refusal and Draft Choice Compensation of only One First Round Selection, but any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet).*

*\*Extension Agreement 2/25/98*

## Section 3. Offer Sheet and First Refusal Procedures:

(a)     **Offer Sheets.** When a Restricted Free Agent receives an offer to sign a Player Contract from any Club (the "New Club") other than the Prior Club, which offer the player desires to accept, he shall give to the Prior Club a completed certificate substantially in the form of Appendix D, attached hereto (the "Offer Sheet"), signed by the Restricted Free Agent and the New Club, which shall contain the "Principal Terms" (as defined below) of the New Club's offer. The Prior Club, within seven days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth below.

(b)     **First Refusal Exercise Notice.** If the Prior Club gives the Restricted Free Agent a "First Refusal Exercise Notice" substantially in the form of Appendix E, attached hereto, within seven days from the date the Prior Club receives an Offer Sheet, but not later than four days before the Draft (or until 11:59 p.m. New York time on April 24, 1993 in the 1993

EX 8, PAGE 788

League Year), such Restricted Free Agent and the Prior Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms (subject to subsection (e) below); (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the player than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the Prior Club.

(c)     No First Refusal Exercise Notice. If the Prior Club does not give the Restricted Free Agent the First Refusal Exercise Notice within the applicable period, the player and the New Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms; (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the Restricted Free Agent than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the New Club (subject to Section 5 below), and the Restricted Free Agent's Prior Club shall receive from the New Club the Draft Choice Compensation, if any, specified in Section 2 above of this Article. Any Club that does not have available, in the upcoming Draft, the selection choice or choices (its own or better choices in the applicable rounds) needed to provide Draft Choice Compensation in the event of a timely First Refusal Exercise Notice may not sign an Offer Sheet in such circumstances. The player and the New Club may not renegotiate such Player Contract to reduce the Salary in such contract until the date after the trading deadline in that League Year.

> *Neither the Player nor the New Club may exercise an option in such Player Contract that reduces Salary in the first League Year of such contract until the date after the trading deadline in that League Year.*

> *Side Letter 4/16/98

(d)     One Offer Sheet. There may be only one Offer Sheet signed by a Restricted Free Agent outstanding at any one time, provided that the Offer Sheet has also been signed by a Club. An Offer Sheet, before or after it is given to the Prior Club, may be revoked or withdrawn only by the Clubs upon the written consent of the Restricted Free Agent. In either of such events, the Restricted Free Agent shall again be free to negotiate and sign a Player Contract with any Club, and any Club shall again be free to negotiate and sign a Player Contract with such Restricted Free Agent, subject to the Prior Club's continued Right of First Refusal and/or Draft Choice Compensation as described in this section.

(e)     Principal Terms. For the purposes of this section, the Principal Terms of an Offer Sheet are only:

EX 8, PAGE 789

Article XIX, Veteran Free Agency

(i)      Salary, which shall consist only of: (a) the fixed and specified dollar amounts the New Club will pay, guarantee or lend to the Restricted Free Agent and/or his designees (currently and/or as deferred compensation in specified installments on specified dates) in consideration for his services as a football player under the Player Contract (i.e., signing bonus, Paragraph 5 Salary, and reporting and roster bonuses); and (b) Salary that is variable and/or is subject to calculation only upon the following bases: (i) based upon performance of the Club extending the Offer Sheet (only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to subsection (c) above, must be matched by the Prior Club for the purpose of exercising a Right of First Refusal, and such incentives may not exceed fifteen percent (15%) of the Salary in the Offer Sheet); and (ii) generally recognized league honors to be agreed upon by the parties; and

(ii)     Any modifications of and additions to the terms contained in the NFL Player Contract requested by the Restricted Free Agent and acceptable to the New Club, that relate to non-compensation terms (including guarantees, no-cut, and no-trade provisions) of the Restricted Free Agent's employment as a football player (which shall be evidenced either by a copy of the NFL Player Contract, marked to show changes, or by a brief written summary contained in or attached to the Offer Sheet).

(f)      **No Property or Investments.** A Club may not offer any item of property or investments other than Salary as part of the Principal Terms contained in an Offer Sheet.

(g)      **Incentives.** For those incentives which are based on Club performance, only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to subsection (c) above, must be matched by the Old Club for the purpose of exercising a Right of First Refusal.

(h)      **No Consideration Between Clubs.** There may be no consideration of any kind given by one Club to another Club in exchange for a Club's decision to exercise or not to exercise its Right of First Refusal, or in exchange for a Club's decision to submit or not to submit an Offer Sheet to a Restricted Free Agent or to make or not to make an offer to enter into a Player Contract with a Restricted Free Agent. If a Club exercises its Right of First Refusal and matches an Offer Sheet, that Club may not trade that player to the Club that submitted the Offer Sheet for at least one calendar year, unless the player consents to such trade.

(i)      **NFL Only.** No Right of First Refusal rule, practice, policy, regulation, or agreement, including any Right of First Refusal applicable to any Restricted Free Agent or Transition Player pursuant to Article XX (Franchise and Transition Players) below, may apply to the signing of a Player Contract with, or the playing with, any club in any professional football league other than the NFL by any Restricted Free Agent (except as agreed by the player in the circumstances set forth in Section 5 below). This prohibition ap-

64

plies to any Right of First Refusal described in this Agreement (except as described in Section 5 below).

(j)     **No Assignment.** No Right of First Refusal may be assigned to any other Club (except as provided in Article XVI (College Draft), Section 7 or as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below), including any Right of First Refusal with respect to Restricted Free Agents, Transition Players, or Drafted Rookies described in Article XVI (College Draft), Section 5.

(k)     **Copies.** Promptly upon but no later than two business days after the giving of an Offer Sheet to the Prior Club, the Restricted Free Agent shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. Promptly upon but no later than two business days after the giving of a First Refusal Exercise Notice to the Restricted Free Agent, the Prior Club shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. At any time after the giving of an Offer Sheet to a Prior Club, the NFL may require the New Club to cause a copy thereof to be given to the NFL and the NFLPA by telecopy.

*Section 4.* **Expedited Arbitration:** An expedited arbitration before the Impartial Arbitrator, whose decision shall be final and binding upon all parties, shall be the exclusive method for resolving the disputes set forth in this Section. If a dispute arises between the player and either the Prior Club or the New Club, as the case may be, relating to their respective obligations to formalize their binding agreements created under sections 3(b) or (c) above, or as to whether the binding agreement is between the Restricted Free Agent and the New Club or the Restricted Free Agent and the Prior Club, such dispute shall immediately be submitted to the Impartial Arbitrator, who shall resolve such dispute within ten days but in no event later than two (2) days before the Draft. The Impartial Arbitrator shall not have the power to terminate any such binding agreement; he shall have the power only to direct the parties to formalize such binding agreement into a Player Contract in accordance with the Principal Terms of the applicable Offer Sheet, as interpreted by the Impartial Arbitrator.

*Section 5.* **Individually Negotiated Limitations on Player Movement:**

(a)     All individually negotiated limitations on player movement are prohibited, except as specifically provided as follows:

(i)     If a Restricted Free Agent has been tendered a Qualifying Offer of (a) Paragraph 5 Salary of at least $275,000 for a player with three Accrued Seasons, or (b) at least $325,000 for a player with four Accrued Seasons, or (c) at least 110% of his prior year's Paragraph 5 Salary, whichever is greater (in each case with all other terms of his prior year contract carried forward), **and** the Qualifying Offer is fully guaranteed for skill and injury, the Restricted Free Agent and his Prior Club may negotiate and contract for

65

EX 8, PAGE 791

Article XIX, Veteran Free Agency

an individual Right of First Refusal with respect to the services of such player.

(ii)     Any Unrestricted Free Agent shall be permitted to negotiate and contract for an individual Right of First Refusal with any Club with respect to the services of such player so long as the player is not a Franchise Player or Transition Player at the time of such negotiation and contract.

(b)     Any player (other than a Free Agent) with less than three Accrued Seasons is prohibited from negotiating any individual limitations on his movement in his Player Contract or otherwise, and all Clubs are prohibited from negotiating any such limitations with such players.

(c)     Any individual Right of First Refusal that is negotiated and contracted for pursuant to subsection (a) or (b) above shall be void and unenforceable unless it is specified in a separate document signed by such player in the form annexed hereto as Appendix F, acknowledging such player's waiver of the express right that Unrestricted Free Agents have under this Agreement to be free of any Right of First Refusal restriction on their freedom of movement.

(d)     Any individually negotiated Rights of First Refusal in any Player Contract existing at the time of the execution of this Agreement shall remain in effect only if written to supersede any litigation settlement agreement or any collective bargaining agreement ("CBA"). Existing individually negotiated Rights of First Refusal that provide that a CBA will govern shall be deemed to be superseded by this Agreement to the extent of any conflict.

(e)     The amounts specified in this section ($275,000 and $325,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such tender amounts increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

(f)     Rights of First Refusal negotiated pursuant to this Section 5 may be traded or assigned as part of a player's contract.

### Section 6. Notices, Etc.:

(a)     Any Offer Sheet, First Refusal Exercise Notice, or other writing required or permitted to be given under this Article XIX (Veteran Free Agency), shall be sent either by personal delivery or by overnight mail, or by telecopy (in each case a confirmation copy shall also be sent by certified or registered mail), addressed as follows:

66

\* The confirmation copy described in Article XIX, Section 6 (a) of the CBA may sent by first class mail, postage prepaid, instead of certified or registered mail.
\*Side Letter 5/24/95: Sec. 12

(i) To any NFL Club: addressed to that Club at the principal address of such Club as then listed on the records of the NFL or at the Club's principal office, to the attention of the Club's president or general manager;

(ii) To the NFL, 280 Park Avenue, New York, New York 10017, to the attention of Executive Vice President-Labor Relations;

(iii) To a Restricted Free Agent: to his address listed on the Offer Sheet and, if the Restricted Free Agent designates a representative on the Offer Sheet and lists such representative's address thereon, a copy shall be sent to such representative at such address; and

(iv) To the NFLPA, 2021 L Street, N.W., Suite 600, Washington, D.C. 20036.

(b) An Offer Sheet shall be deemed given only when received by the Prior Club. A First Refusal Exercise Notice, a Qualifying Offer and any other writing required or permitted under Article XIX (Veteran Free Agency) shall be deemed given when sent by the Prior Club.

(c) Subject to Article XXVIII (Anti-Collusion), Section 1, below, the NFL shall have the right to prepare and circulate to all Clubs two lists containing, respectively, no more than the name, address, Social Security number, telephone number, college, position, Team, Right of First Refusal and/or any Draft Choice Compensation of each and every player who shall or has become (i) an Unrestricted Free Agent; or (ii) a Restricted Free Agent, as of March 1, or as of the first date of the Signing Period, respectively ("Free Agent Lists"), and no other list relating to free agents. Information shall not be selectively withheld for some players but not others. If one or more Free Agent Lists are so circulated, copies thereof shall be sent to the NFLPA.

EX 8, PAGE 793

## ARTICLE XX
## FRANCHISE AND TRANSITION PLAYERS

**Section 1. Franchise Player Designations:** Except as set forth in Sections 3 and 9 below, each Club shall be permitted to designate one of its players who would otherwise be an Unrestricted Free Agent as a Franchise Player each season during the term of this Agreement. *Beginning in the 1999 League Year, the player so designated may be one who would otherwise be a Restricted Free Agent.* Any Club that designates a Franchise Player shall be the only Club with which such Franchise Player may negotiate or sign a Player Contract, during the period the player is so designated, notwithstanding the number of his Accrued Seasons (except as provided in Sections 2(b) and 2(c) below). In the 1993 League Year, any such designation must be made no later than February 25. Thereafter, any such designation must be made between February 1 and February 15 of each League Year or during such other period as may be agreed on by the NFL and the NFLPA, *with the period ending at 4:00 p.m. New York time.*

*Extension Agreement 2/25/98*

### Section 2. Required Tender for Franchise Players:

(a) For the 1993 League Year, any Club that designates a Franchise Player shall be deemed on the first day following the expiration of his contract to have automatically tendered the player a one year NFL Player Contract for the average of the five largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater.

(b) For the 1993 League Year, any Club that designated a Franchise Player who has not signed a Player Contract by 4:00 p.m. New York time on June 14, and which has not withdrawn its required tender, shall exercise on that date one of the following options with respect to the player:

(i) The Club shall (1) tender the player a one year NFL Player Contract for the average of the five largest Salaries in Player Contracts signed for the 1993 League Year as of May 6, 1993 for players at the position at which he played the most games during the prior League Year, or (2) continue the amount of the required tender pursuant to subsection (a) above, whichever is greater; or

(ii) The Club shall continue its tender to the player pursuant to subsection (a) above at no less than its original level, but then, until 4:00 p.m. New York time on July 15, 1993, the player shall be permitted to negotiate a Player Contract with any Club as if he were a player subject to Section 5 below, except that Draft Choice Compensation of two (2) first round draft selections shall be made with respect to such player in the event he signs with the New Club, and the Signing Period for such player shall be determined under Section 17 below.

(c) After the 1993 League Year, any Club that designates a Franchise

68

Player shall on the date the designation is made notify the player and the NFLPA which one of the following two potential required tenders the Club has selected:

(i)   A one year NFL Player Contract for the average of the five largest Prior Year Salaries for players at the position at which the Franchise Player played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater; if the Club extends the tender pursuant to this Subsection (c)(i), the player shall be permitted to negotiate a Player Contract with any Club as if he were a player subject to Section 5 below, except that Draft Choice Compensation of two first round draft selections shall be made with respect to such player in the event he signs with the New Club, and the Signing Period for such player shall be determined under Section 17 below; or

(ii)   A one year NFL Player Contract for (1) the average of the five largest Salaries in Player Contracts for that League Year as of the end of the Restricted Free Agent Signing Period that League Year, as set forth in Article XIX (Veteran Free Agency), Section 2(h), for players at the position at which he played the most games during the prior League Year, or (2) the amount of the required tender under subsection (c)(i) above, whichever is greater.

(iii)   *Beginning in the 1999 League Year, if a player subject to a Franchise Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this paragraph only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties under Article X (Injury Grievance), whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, providing such exam takes place within twenty (20) days of the contract termination.*

*Extension Agreement 2/25/98*

(d)   Any of the required tenders set forth in this Section 2 may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

** See Pages 40-41 - Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

69

EX 8, PAGE 795

Article XX, Franchise and Transition Players

(e) For the purpose of this Article, "Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the applicable year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Beginning with the 1994 League Year, Salary shall also include any un-repaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(f) The calculation of any five largest Salaries pursuant to this Article shall not include: (i) any Player Contract resulting from an acceptance of a tender extended pursuant to subsection (b)(i)(1) or (c)(ii) above, without any increase in Salary above the tender; or (ii) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date; provided, however, that Player Contract amounts in existence prior to such renegotiations shall be used if otherwise appropriate.

(g) *If a Franchise Player receives a required tender pursuant to Section 2(c)(i) above, any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet). This subsection (g) shall not apply to a player who was designated as a Transition Player in lieu of being designated as a Franchise Player, pursuant to Section 3(a) below, or to any other Transition Player.*
\*Extension Agreement 2/25/98

> \* [T]he definition of a "Signing Bonus" for purposes of the top 5 and top 10 minimum tenders is the same under the Salary Cap, that the prorata portion of such Signing Bonuses includes pro-rated amounts from prior Player Contracts, and that the Salary Cap acceleration rules for unamortized Signing Bonus amounts do not apply to the calculation of the top 5 and top 10 minimum tenders.
> \*Side Letter 2/14/96

> \* For purposes of calculating the minimum tenders to Franchise and Transition players under Article XX, if the present value of any deferred Paragraph 5 amount (as defined in Article XXIV, Section 7, Paragraph (a)(ii)) is at least $100,000 less than the initial Paragraph 5 amount (before being present valued), then the present value amount shall be used.
> \*Side Letter 6/23/93: Sec. 5

70

### Section 3. Transition Player Designations:

(a)    Each Club shall be permitted to designate two Unrestricted Free Agents as Transition Players by February 25, 1993; one Unrestricted Free Agent as a Transition Player between February 1 and February 15, 1994; and one Unrestricted Free Agent as a Transition Player between February 1 and February 15 in the Final League Year, *with the period ending at 4:00 p.m. New York time.* In addition, in each League Year during the term of this Agreement, each Club shall be permitted to designate one Unrestricted Free Agent *or Restricted Free Agent* as a Transition Player in lieu of designating a Franchise Player, if such Franchise Player designation is available to such Club, in addition to the Transition Player designations permitted by the immediately preceding sentence, *during the same designation period as the Franchise Player designation period.*

*\*Extension Agreement 2/25/98*

(b)    Any Club that designates a Transition Player shall receive the Rights of First Refusal specified in this Article notwithstanding the number of his Accrued Seasons. Any Transition Player shall be completely free to negotiate and sign a Player Contract with any Club during the period from the first day of the League Year following the expiration of his last player contract to July 15, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs of any kind, subject only to the Prior Club's Right of First Refusal described in this Article.

### Section 4. Required Tender for Transition Players:

(a)    Any Club that designates a Transition Player shall be deemed on the first day of the League Year following the expiration of the player's last contract to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

\*\* See Page 70 - Article XX, Section 2(g) for Side Letter 6/23/93, Sec. 5 re: Calculation of Minimum Tender to Franchise and Transition Players.

71

**EX 8, PAGE 797**

Article XX, Franchise and Transition Players

(b)     For the 1993 League Year, any Club that designated a Transition Player who has not signed a Player Contract by 4:00 p.m. New York time on June 14, and which has not withdrawn its required tender, shall tender such player a one year NFL Player Contract for (i) the average of the ten largest Salaries in Player Contracts signed for the 1993 League Year as of May 6, 1993 for players at the position at which he played the most games during the prior League Year, or (ii) the amount of the required tender pursuant to subsection (a) above, whichever is greater. This tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     The calculation of any ten largest Salaries pursuant to this Article shall not include: (i) any Player Contract amount resulting from an acceptance of a tender pursuant to subsection (b)(i) above, without any increase in Salary above the tender; or (ii) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date; provided, however, that Player Contract amounts in existence prior to such renegotiations shall be used if otherwise appropriate.

**Section 5. Right of First Refusal for Transition Players:** Any player designated as a Transition Player shall, at the expiration of his prior year Player Contract, be permitted to negotiate a Player Contract with any Club. When the Transition Player negotiates such an offer with a New Club, which the player desires to accept, he shall give to the Prior Club a completed Offer Sheet, signed by the player and the New Club, which shall contain the Principal Terms (as defined in Article XIX (Veteran Free Agency)) of the New Club's offer. The Prior Club, within seven days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth in Sections 3(b)-(h), 4 and 6 of Article XIX (Veteran Free Agency) above, except that no Draft Choice Compensation shall be made with respect to such player, and, for the purposes of those provisions, the player and each Club shall otherwise have the same rights and obligations as for a Restricted Free Agent set forth in those provisions, notwithstanding the number of his Accrued Seasons.

**Section 6. Lists:** On each date following the dates set forth in Sections 1 and 3 above, the NFL shall provide to the NFLPA a list of each Unrestricted Free Agent designated as a Franchise Player or a Transition Player.

72

**Section 7. Salary Information:**

(a)   No later than February 1 of each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten largest Prior Year Salaries for players at the following positions which shall be utilized for calculating the average Prior Year Salaries of players at the positions of Franchise Players and Transition Players: Quarterback, Running Back, Wide Receiver, Tight End, Offensive Line, Defensive End, Interior Defensive Line, Linebacker, Cornerback, Safety, and Kicker/Punter. For the 1993 League Year, such list shall be provided to the NFLPA by February 15.

(b)   No later than ten days after the last day of the Restricted Free Agent Signing Period in each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten and five largest Salaries for players at the positions set forth in subparagraph (a) above which shall be utilized for calculating the applicable average Salaries of players at such positions as of the last day of the Restricted Free Agent Signing Period (including the amount of Salary in any executed Offer Sheets). For the 1993 League Year, such supplemental list shall be provided to the NFLPA no later than May 18, 1993 with respect to such Salaries as of May 6, 1993.

(c)   Any dispute concerning the identity and Salaries of players included within each player position category, or any other matter regarding these figures, shall be submitted to and resolved by the Impartial Arbitrator during the period from February 1 to February 15, or within twenty-five days after the last day of the Restricted Free Agent Signing Period, respectively; for the 1993 League Year, any such dispute shall be submitted to and resolved by the Impartial Arbitrator prior to March 1 or May 31, respectively. The Impartial Arbitrator shall make an independent determination in writing. In arriving at his determination, the Impartial Arbitrator shall consider any relevant information furnished to him, and shall be provided access to all relevant Player Contracts. The Impartial Arbitrator's determination shall be final and binding upon all parties.

**Section 8. No Assignment:** No Club may assign or otherwise transfer to any other Club the exclusive negotiating rights or any Right of First Refusal it may have for any Franchise Player, nor any Right of First Refusal it may have for any Transition Player, nor any designation rights it may have.

**Section 9. Duration of Designation:** Each Club that signs a player it designated as a Franchise Player to a Player Contract shall be deemed each League Year thereafter to have utilized its Franchise Player designation for each League Year for which such player entered into a Player Contract with such Club at the time when such player was subject to such designation (unless the Club exercised a Right of First Refusal with respect to a Franchise Player tendered a Player Contract pursuant to Sections 2(b)(ii) or

73

EX 8, PAGE 799

Article XX, Franchise and Transition Players

2(c)(i) above, in which case the Club shall be deemed to have utilized its Franchise Player designation only in the League Year of the designation). For example, without limitation on any other applicable example, a Franchise Player who signs a Player Contract for two League Years at a time when the player was subject to the designation shall be deemed to be the Club's Franchise Player for both such League Years. However, in the event that the designated player retires or suffers a career-ending injury (or an injury that prevents or will prevent the player from playing in 32 consecutive regular season games) which prevents him from playing a contract year entered into while under such designation (or is unavailable for the season due to non-injury circumstances beyond the control of the Club), such Club shall be permitted to designate another player in lieu of such injured, retired or unavailable player for each remaining League Year covered by the Club's prior designation for such player, provided that the Club designates a new Franchise Player during the designation period prior to the first League Year to be covered by the re-designation. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator. *If a Club and a player agree to extend (either separately or as part of a renegotiation) a Player Contract prior to July 15 in the League Year for which the Club designated the player as a Franchise Player, such Club shall also be deemed to have utilized its Franchise Player designation pursuant to this Section 9 for the full period of that extension. If a Club and a player agree to extend (either separately or as part of a renegotiation) a Player Contract on or after July 15 in the League Year for which the Club designated the player as a Franchise Player, such Club shall not be deemed to have utilized its Franchise Player designation pursuant to this Section 9 for the period of the extension, unless there has been a violation of the provisions of Article XXV (Enforcement of The Salary Cap And Entering Player Pool), Sections 1 or 2, with respect to such contract extension.*

*\*Extension Agreement 2/25/98*

   \* Beginning with the 1994 League Year, if a Club with draws a Franchise Player designation after the last date of the signing period for Unrestricted Free Agents (i.e., July 15 or the first scheduled day of the first NFL training camp, whichever is later), and the Club subsequently signs a Player Contract for that season with the player who was subject to the designation, and does so before the later of (i)15 days after the withdrawal of the designation, or (ii) the day after the next scheduled NFL preseason game for the Club (not including any game played outside the U.S.), the Club shall be deemed to have signed the player while he was subject to the designation, and, pursuant to Article VIII, Paragraph 9 of the Settlement Agreement, and Article XX, Section 9 of

74

EX 8, PAGE 800

the CBA, the Club shall have utilized its Franchise Player designation for each League Year for which such Player Contract was signed.

Also, beginning with the 1994 League Year, if a Club withdraws a Franchise Player designation after the date of its final cutdown to the Active List limit for that season, and the Club subsequently signs a Player Contract for that season with the player who was subject to the designation, and does so before the day after the Club's second regular season game after the withdrawal of the designation, the Club shall be deemed to have signed the player while he was subject to the designation, and, pursuant to Article VIII, Paragraph 9 of the Settlement Agreement, and Article XX, Section 9 of the CBA, the Club shall have utilized its Franchise Player designation for each League Year for which such Player Contract was signed.

\*Side Letter 1/18/94: Sec. 1

\* If a club executes a multi-year agreement with a player designated as a Franchise Player and trades the player the same day to another NFL club, the assignor club will be deemed to have used its franchise designation for only the League Year in which the contract was executed.
\*Side Letter 4/21/95

\* If a Club and a player whom the Club had designated as a Franchise Player in a prior League Year agree to extend a Player Contract that was agreed to when the player was subject to the Franchise Player designation, such Club shall not thereby be deemed to have utilized its Franchise Player designation pursuant to Article XX, Section 9 of the CBA for the period of the extension.
\* Side Letter 5/24/95: Sec. 10

**Section 10. Franchise Player Designation Period**: A Club may designate a Franchise Player only during the periods and in the numbers specified in Section 1 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Franchise Player with respect to any first future League Year during the term of this Agreement for which such player is anticipated to be an Unrestricted Free Agent. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the five largest Prior Year Salaries for players at the

75

Article XX, Franchise and Transition Players

position category at which he played the most games during the prior
League Year, or 120% of the player's Prior-Year Salary, whichever is greater.
If a player designated to become the Franchise Player in the future retires,
suffers a career-ending injury (or an injury that prevents the player from
participating in 32 consecutive regular season games), is unavailable for the
season due to non-injury circumstances beyond the control of the Club, or
is assigned to another Club (other than through the waiver system) before
such designation is exercised, the Club shall be entitled to designate a new
Franchise Player for that League Year. Any dispute as to whether an injury
is career-ending or prevents or will prevent a player from playing in 32 con-
secutive games shall be decided by the Impartial Arbitrator.

**Section 11. Transition Player Designation Period**: A Club may designate
a Transition Player (or players) only during the periods and in the numbers
specified in Section 3 above; otherwise, the Club's right to such designa-
tion expires. However, a Club may designate a player to whom the Club has
rights as a Transition Player with respect to any first future League Year dur-
ing the term of this Agreement for which such player becomes an Unre-
stricted Free Agent; any such future designation exhausts the Club's desig-
nation right (and does not move to any other Club) even if the player moves
to another Club, as a Restricted Free Agent or via waivers, before he would
have become an Unrestricted Free Agent with the designated Club. For any
such players, the Club shall be deemed on the first day of the first future
League Year in which the designation takes effect to have automatically ten-
dered the player a one year NFL Player Contract for the applicable average
of the ten largest Prior Year Salaries for players at the position that he played
the most games during the prior League Year, or 120% of the player's Prior
Year Salary, whichever is greater. If a player designated to become a Transi-
tion Player in the future retires, suffers a career-ending injury (or an injury
that prevents the player from participating in 32 consecutive regular season
games), is unavailable for the season due to non-injury circumstances be-
yond the control of the Club, or is assigned to another Club (other than
through the waiver system) before such designation is exercised, the Prior
Club shall be entitled to designate a new Transition Player for that League
Year.

> \* If a Prior Club becomes entitled to designate a new
> Transition Player pursuant to Article XX, Section 11
> (penultimate sentence) of the Collective Bargaining
> Agreement, the prior Club may designate the new Tran-
> sition Player for that League Year between February 1
> and February 15 of any League Year prior to the League
> Year in which the player initially designated would have
> become a Transition Player.
>
> \*Side Letter 5/24/95: Sec. 15

76

Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 12. Prospective Designation:** Notwithstanding Sections 10 and 11 above, if in the 1993 League Year (or in the 1994 League Year, if no Salary Cap is in effect during the 1994 League Year), a Club designates a Franchise Player or Transition Player to apply to the first League Year a designated player is expected to be eligible to be an Unrestricted Free Agent under Article XIX (Veteran Free Agency), but that player turns out not to be an Unrestricted Free Agent because of the failure of the Salary Cap to be in effect that League Year, such designation shall apply to such player the next League Year in which the player becomes an Unrestricted Free Agent.

**Section 13. Right to Decline:** Each plaintiff who was a named plaintiff prior to February 26, 1993, in the following actions shall be permitted to decline any designation as a Franchise Player or Transition Player during the term of this Agreement, for any reason whatsoever, by notice to his prior Club within ten days of such designation for current year designations and within ten days of February 15 (or such other date as may be agreed upon by the NFL and the NFLPA) in the future League Year such designation becomes effective for future year designations: White v. NFL, Civ. No. 4-92-906 (D. Minn.); Lewis v. NFL, Civ. No. 3-93-87 (D. Minn.); McNeil v. NFL, Civ. No. 4-90-476 (D. Minn.); Allen v. Chargers Football Co., Civ. No. 91-4322 (C.D. Cal.); Joyner v. NFL, Civ. No. 92-2876 (E.D. Pa.); and Hebert v. NFL, Civ. No. S023546 (Sup. Ct. Cal.). In the event that a Club designates any such player as a Franchise Player or Transition Player, and such player declines such designation and signs with another Club, such designating Club shall be awarded Compensatory Draft Selection(s) in lieu of such designation. In the case of a Franchise Player, only one year's designation shall be exhausted in the latter situation. Such additional Compensatory Draft Selections shall not exceed a total of twenty during the term of this Agreement.

**Section 14. Other Terms:** For the purposes of this Article, the Required Tenders of a one year Player Contract for at least 120% of the Franchise Player's or Transition Player's Prior Year Salaries shall in addition to the 120% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (or ten, as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

77

Article XX, Franchise and Transition Players

**Section 15. Compensatory Draft Selection:** The procedures for awarding Compensatory Draft Selections shall be determined as agreed by the NFL and the NFLPA.

**Section 16. Signing Period for Transition Players:**

(a) In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 15 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time.

(b) If a Transition Player described in subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c) If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Salaries for the prior League Year for players at the player's specified position, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 17. Signing Period for Franchise Players:**

(a) If a Franchise Player has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

78

(b)      If a Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable tender must be made and any 120% tender shall be measured from the Player's prior year salary. If such a player is re-designated as a Franchise Player *for the League Year following the League Year in which he does not play, the player may be designated only under Section 2(c)(i) above, except that Draft Choice Compensation of only one first round draft selection and one third round draft selection shall be made with respect to such player in the event he signs with the New Club. If a Franchise Player who has sufficient Accrued Seasons to become an Unrestricted Free Agent is not designated as a Franchise Player* or Transition Player *for any* League Year *immediately following a League Year in which he does not play*, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Extension Agreement 2/25/98*

79

**EX 8, PAGE 805**

## ARTICLE XXI
## FINAL EIGHT PLAN

**Section 1. Application:** The provisions of this Article shall apply only in any League Year during the term of this Agreement in which no Salary Cap is in effect.

**Section 2. Top Four Teams:** Each of the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; and (c) any Unrestricted Free Agent signed pursuant to Section 4 below.

**Section 3. Next Four Teams:** Each of the four playoff Clubs that lost in the immediately preceding playoff games to the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player contract; (c) any Unrestricted Free Agent signed pursuant to Section 4 below; and (d) any Unrestricted Free Agent as follows:

    (i)    One such player for a Player Contract that has a first year Salary of $1,500,000 or more; and

    (ii)    Any number of such players for a Player Contract that has a first year Salary of no more than $1,000,000 and an annual increase in any future contract years of no more than 30% of the first contract year Salary, not including any amount attributed to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 4. Replacement of Free Agents Signed by Other Club:** Each of the eight Clubs subject to the provisions of this Article shall be permitted to negotiate and sign one Unrestricted Free Agent to a Player Contract ("New Player") for each Unrestricted Free Agent who was under contract to such Club on the last date of the prior League Year, who has signed with another Club ("Previous Player"), so long as the Player Contract for the New Player shall have a first year Salary of no more than the first year Salary of the Player Contract signed by the Previous Player with the New

80

Club, and an annual increase in any future contract years of no more than 30% of the first contract year Salary, excluding any amounts attributable to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 5. Increases:** The amounts specified in this Article ($1,500,000 and $1,000,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)). Notwithstanding the foregoing, in no event shall the amounts specified in this Article increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

**Section 6. Salary Definition:** For purposes of this Article, "Salary" means Paragraph 5 Salary, roster and reporting bonuses, prorata portions of signing bonuses, likely to be earned incentive bonuses, and other payments in compensation for the playing of professional football, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) below.

**Section 7. Trade Limitation:** No Club subject to the provisions of this Article may, for one League Year, trade for a player it otherwise would not be permitted to sign as an Unrestricted Free Agent as a result of the provisions in this Article.

> \* [R]egarding whether Clubs subject to the Final Eight Plan are permitted to negotiate with and sign Transition Players, and Franchise Players who otherwise are permitted to negotiate and sign with other Clubs…Final Eight Plan Clubs are permitted under the CBA to negotiate with and sign such players, since these players are not Unrestricted Free Agents.
>
> *Side Letter 8/4/93

> \* For purposes of the Final Eight Plan provisions, each of the eight teams subject to the provisions of Article IX of the Stipulation and Settlement Agreement and Article XXI of the Collective Bargaining Agreement may, after the later of July 15 or the first scheduled day of the first NFL training camp, in any League Year in which the Final Eight Plan is in effect, sign any Unrestricted Free

81

Article XXI, Final Eight Plan

> Agent whose team did not make the June 1 Tender or
> whose team subsequently withdrew that Tender.
> \*Side Letter 9/21/93: Sec. 20

82

# ARTICLE XXII
## WAIVER SYSTEM

### Section 1. Release:

(a)    Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.

(b)    Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

**Section 2. Contact:** Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

**Section 3. Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or post-season game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and Bylaws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

**Section 4. Notice of Termination:** The Notice of Termination form attached hereto as Appendix G will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice of Termination will be sent to him by certified mail at his last address on file with the Club.

83

Article XXII, Waiver System

*Section 5.* **NFLPA's Right to Personnel Information**: The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice between the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

*Section 6.* **Rosters**: The NFLMC shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

84

# ARTICLE XXIII
# TERMINATION PAY

**Section 1. Eligibility:** Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for termination pay under this Article if:

    (1)    He is released after his Club's first regular season game; and

    (2)    He has made the Inactive or Active List of his Club on or after the date of his Club's first regular season game.

*Subject to Section 3 below, the* amount of termination pay payable to such player shall be the unpaid balance of his Paragraph 5 Salary *for that League Year.* Termination pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to termination pay more than once during his playing career in the NFL.

*\*Extension Agreement 2/25/98*

**Section 2. Regular Season Signings:** The termination pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the unpaid balance of the initial 25% of such player's Paragraph 5 Salary. If such player is released after the eighth regular season game, his termination pay shall be one week's salary, up to a maximum of $20,000.

**Section 3. Ineligibility For Termination Pay:** *An otherwise qualified player will not be entitled to termination pay under this Article if the Club can demonstrate that, after receipt of a written warning from his Club in the form attached hereto as Appendix N, the player failed to exhibit the level of good faith effort which can be reasonably expected from NFL players on that Club.*

*\*Extension Agreement 2/25/98*

    \*- A player shall not be eligible for Termination Pay if, without missing a game check at the Paragraph 5 rate stated in his terminated contract, he signs a Player Contract with the same Club that terminated his contract, which new contract provides for Paragraph 5 salary at a rate equal to or greater than that of his terminated contract. If the player's new contract is subsequently terminated, however, he shall be eligible for Termination Pay for such subsequent termination. This paragraph may not be used or referred to in any pending case that was filed prior to the date of this letter, except to enforce the terms of this sentence.

*\*Side Letter 3/3/97: Sec. 3*

85

## ARTICLE XXIV
## GUARANTEED LEAGUE-WIDE SALARY,
## SALARY CAP, & MINIMUM TEAM SALARY

**Section 1. Definitions:** For purposes of this Article, and anywhere else specifically stated in this Agreement, the following terms shall have the meanings set forth below:

(a) **Defined Gross Revenues.**

(i) "Defined Gross Revenues" (also referred to as "DGR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall in good faith act and use their best efforts, consistent with sound business judgement, so as to maximize Defined Gross Revenues for each playing season during the term of this Agreement. Defined Gross Revenues shall include, without limitation:

(1) Regular season, pre-season, and post-season gate receipts (net of admission taxes, and surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing), including ticket revenue from "luxury boxes," suites and premium seating subject to gate receipt sharing among NFL Teams; and

(2) Proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL pre-season, regular season and play-off games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts (which shall not include any broadcast of an NFL pre-season, regular season or play-off game occurring more than 72 hours after the live exhibition of the game, unless the broadcast is the first broadcast in the market), and all other means of distribution, net of any reasonable and customary NFL expenses related to the project; and

(3) Proceeds from the sale or conveyance of any right to receive any of the revenues described above.

(ii) The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Teams which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "DGR"): proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, dues or capital contributions received by the NFL, fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries, and sales of interests in real estate and other property.

86

Article XXIV. Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

Notwithstanding any other provision of this Agreement, revenues derived from NFL Attractions (a joint venture that formerly included the NFL and St. Joe Corporation) from the operation of indoor NFL entertainment facilities, with entry rights separate from the stadium, which facilities do not permit the users thereof to view the live performance of players in NFL football games except by media available outside the stadium, shall not be included in DGR or Excluded DGR (except to the extent that revenues derived from NFL Attractions are addressed in the second sentence of Section 1(a)(iii) below). This exclusion shall apply so long as the business of NFL Attractions is conducted with a non-NFL third party that holds a non-de minimus interest and participates in the business of NFL Attractions. Each of the parties hereto reserves any positions it may have regarding whether any similar revenues derived from other sources are DGR, non-DGR or Excluded DGR.

Notwithstanding any other provision of this Agreement, the NFLPA and Class Counsel may agree, on a case-by-case basis, with no limitation on their exercise of discretion, not to include in DGR network television revenue to the extent that such revenue is used to fund the construction or renovation of a stadium that results in an increase of DGR and/or Excluded DGR.

*Extension Agreement 2/25/98

(iii)   Notwithstanding subsection 1(a)(i) above, the following shall be considered "Excluded DGR" and not included in Defined Gross Revenues: revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that included in subsection 1(a)(i)(1) above, sales of programs and novelties, and any categories of revenue (other than those listed in subsections 1(a)(i)(l)-(3) above) currently included under NFL Films and NFL Properties, Inc. and its subsidiaries. To the extent that revenues of the NFL, NFL Properties, NFL Films, NFL Enterprises, any other NFL affiliate (other than NFL Attractions), any Club, or any Club affiliate result from any licenses to or other provision of intellectual property or other products or services to NFL Attractions, such revenues will be included in DGR or Excluded DGR, as appropriate, at no less than fair market value (e.g., to the extent that film, video, NFL logos or other intellectual properties or other products or services of such NFL and/or Club entities are utilized by NFL Attractions without the payment of any licensing fees, the fair market value amount shall be imputed). Any dispute over the fair market value shall be resolved in the first instance by the Accountants after consulting and meeting with representatives of both parties. In the event such dispute involves a disputed amount of $10 million or more, each party shall have a right to appeal such resolution to the Special Master, who shall review the dispute de novo, and whose decision shall be subject to appeal pursuant to Article XXVI, Section 2.

*Extension Agreement 2/25/98

87

(iv)    In calculating Defined Gross Revenues, the amount of Excluded DGR divided by the sum of Excluded DGR plus DGR from all sources except network television revenues shall not exceed the percentage resulting from dividing 1992 Excluded DGR by the sum of 1992 Excluded DGR plus 1992 DGR from all sources except network television revenues. In the event Excluded DGR for any season exceeds the percentage resulting from the above calculation, any excess Excluded DGR shall be included in DGR. For purposes of the calculations described in this subsection (iv), Excluded DGR shall not include any revenues referred to in subsection l(a)(ii).

(v)    Notwithstanding the provisions of subsection 1(a)(i)(2) above, for the purposes of calculating Defined Gross Revenues for the 1993 League Year only, revenues derived from national network television shall be deemed to be $35 million per NFL Team. Any actual amounts received in excess of that amount shall be included pro rata in DGR for the 1994 and 1995 seasons.

(vi)    It is acknowledged by the parties hereto that for purposes of determining Defined Gross Revenues:

(1)    NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in Defined Gross Revenues) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in Defined Gross Revenues), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a); and

(2)    NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities").

(vii)    The reasonableness and includability in DGR of such allocations and transactions between Related Entities shall be determined by the nationally recognized accounting firm jointly retained by the parties, in accordance with the procedures described in Section 10 below.

(viii)    For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, or Salary, such amounts shall be rounded to the nearest $1,000.

(ix)    In calculating Defined Gross Revenues, each League Year up to $5 million per year shall be deducted from DGR to the extent that such sums are received that League Year by the NFLPA pursuant to Paragraphs 5, 12, 29 and 30 of the Stipulation and Settlement Agreement in NFLPA v. NFL Properties, Inc., No. 90-CV-4244 (MJL) (S.D.N.Y.).

88

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(x)(1) Without limiting the foregoing, except as specified in subsections (x)(2) through (x)(7) below, DGR shall include all revenues from Personal Seat Licenses ("PSLs") received by, or received by a third party and used, directly or indirectly, for the benefit of, the NFL or any Team or Team Affiliate, without any deduction for taxes or other expenses. Such revenues shall be allocated in equal portions, commencing in the League Year in which they are received, over the remaining life of the PSL, subject to a maximum allocation period of fifteen years; provided, however, that interest from the League Year the revenues are received until the League Years the revenues are allocated into DGR shall be imputed and included in DGR, in equal portions over such periods, calculated on an annual compounded basis using the Treasury Bill rate published in The Wall Street Journal of February 1 during the League Year in which the revenues are received. Each equal portion of PSL revenues allocated into DGR, plus an equal portion of the imputed interest specified above, shall be referred to as the "Maximum Annual Allocation Amount."

(x)(2) To the extent that PSL revenues are used to pay for the construction of a new stadium or for stadium renovation(s) that increase DGR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), and if such PSL revenues have received a waiver of any League requirement of sharing of "gross receipts," then such PSL revenues will not be included in a particular League Year in DGR or in Excluded DGR. Notwithstanding the foregoing, the maximum exclusion of PSL revenues each League Year from DGR shall be equal to any increase in DGR that directly results from such stadium construction or renovation (including through any spillover from Excluded DGR) as calculated in subsections (x)(3) through (x)(7) below.

(x)(3) Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of PSL revenues excluded each League Year shall be equal to the Maximum Annual Allocation Amount. If the actual increase in DGR directly resulting from such stadium construction or renovations during the first full League Year in which such stadium or renovations are put into service (the "First Year PSL Increases") is less than any Maximum Annual Allocation Amount for that League Year or any prior League Year (the "PSL Difference"), then the aggregate PSL Difference for every such League Year (assuming for purposes of calculating such PSL Difference, that the First Year PSL Increase had been received in each such League Year) shall be credited to DGR in the immediately following League Year.

(x)(4) Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a)(ii) below) shall determine the increase in DGR that directly results each League Year from a stadium construction or renovation funded, in whole or in part, by PSL revenues. In the

89

case of a new stadium, such calculation shall be made by comparing the DGR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the DGR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the DGR directly generated by those specific stadium facilities which are renovated, with the DGR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the DGR directly generated by the facilities prior to their renovation would equal either zero, or the amount of DGR directly generated by any facilities that were replaced by the renovation). If the NFL or the NFLPA agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in DGR throughout the stadium (e.g., increased concession, parking or novelty revenues spilling into DGR) as being directly generated by the renovation.

(x)(5) If the calculations set forth in (x)(4) above result in an exclusion of PSL revenues from DGR that is less than the Maximum Annual Allocation Amount, the Accountants shall report the amount not excluded from DGR as a "Carryover PSL Credit." Such Carryover PSL Credits, if any, shall be deducted from a Team's DGR in the first future League Year in which the amount of DGR directly generated by the new stadium or the renovated facilities exceeds the Maximum Annual Allocation Amount (the "PSL Excess"), but only up to the amount of the PSL Excess. Each dollar of Carryover PSL Credit may be deducted from a Team's DGR only once, and only to the extent of any PSL Excess existing at the time of such deduction.

(x)(6) Any applicable deduction from DGR or Excluded DGR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by PSL revenues excluded from DGR and Excluded DGR pursuant to subsection (x)(2) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total PSL revenues described in the first sentence of subsection (x)(2), and the denominator of which is (2) the total costs for construction of the new stadium or renovations.

(x)(7) For purposes of this paragraph, the term "PSL" shall include any and all instruments of any nature, whether of temporary or permanent duration, that give the purchaser the right to acquire or retain tickets to NFL games and shall include, without limitation, seat options and bonds giving purchasers the right to acquire NFL tickets. PSL revenues shall also include revenues from any other device (e.g., periodic payments such as sur-

charges, loge maintenance fees, etc.) that the NFL and the NFLPA agree constitutes a PSL.

(xi)(1) Notwithstanding Section 1(a)(i)-(iv), above, premium seat revenues that otherwise would be included in Excluded DGR shall not be so included in a particular League Year to the extent that such revenues are used to pay for, or to pay financing costs for, the construction of a new stadium or for stadium renovation(s) that increase DGR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), and if such revenues have received a waiver of any League requirement of sharing of "gross receipts." The maximum exclusion of premium seat revenue from Excluded DGR each League Year shall be equal to any increase in DGR that directly results from such stadium construction or renovation (including through any spillover from Excluded DGR) as calculated in subsections (xi)(2) through (xi)(6) below.

(xi)(2) Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of premium seat revenues excluded each League Year shall be equal to the amount that receives a waiver of any League requirement of sharing of gross receipts (the "Non-Shared Amount"). If the actual increase in DGR during the first full League Year in which the new stadium or the renovated facilities are put into service (the "First Year Premium Seat Increase") is less than any Non-Shared Amount for that League Year or any prior League Year (the "Premium Seat Difference"), then the aggregate Premium Seat Difference for every such League Year (assuming for purposes of calculating such Premium Seat Difference that the First Year Premium Seat Increase had been received in each such League Year) shall be credited to Excluded DGR in the immediately following League Year.

(xi)(3) Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a)(ii) below) shall determine the increase in DGR that directly results each League Year from the stadium construction or renovation funded, in whole or in part, with premium seat revenues. In the case of a new stadium, such calculation shall be made by comparing the DGR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the DGR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the DGR directly generated by those specific stadium facilities which are renovated, with the DGR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the DGR directly generated by the facilities prior to their renovation would equal either zero, or the amount of DGR directly generated by any facilities that were replaced by the renovation). If the NFL and the NFLPA agree that a renovation is substantial enough to in-

EX 8, PAGE 817

crease revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in DGR throughout the stadium (e.g., increased concession, parking or novelty revenues spilling into DGR) as being directly generated by the renovation.

(xi)(4)If the calculations set forth in (xi)(3) above result in an exclusion of premium seat revenues from Excluded DGR that is less than the Non-Shared Amount, the Accountants shall report the amount not excluded from Excluded DGR as a "Carryover Premium Seat Credit." Such Carryover Premium Seat Credits, if any, shall be deducted from a Team's Excluded DGR in the first future League Year in which the amount of DGR directly generated by the new stadium or the renovated facilities exceeds the Non-Shared Amount (the "Premium Seat Excess"), but only up to the amount of the Premium Seat Excess. Each Carryover Premium Seat Credit may be deducted from a Team's DGR only once, and only to the extent of any Premium Seat Excess existing at the time of such deduction.

(xi)(5)Any applicable deduction from DGR or Excluded DGR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by premium seat revenues excluded from Excluded DGR pursuant to subsection (xi)(1) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total premium seat Non-Shared Amount dedicated to funding the project during the allocation period, and (2) the denominator of which is the total costs for construction of the new stadium or renovations.

(xi)(6)For purposes of this paragraph, the term "Premium Seat Revenue" shall include revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.

(xii)    *An amount equal to the lesser of the following amounts shall be de ducted from the calculation of Excluded DGR each League Year: (a) $6 million, or (b) the amount contributed to or deposited with NFL Charities that League Year by or on behalf of NFL Properties or NFL Films, or any of their subsidiaries.*

(xiii)    *Up to the following additional amounts, if committed to youth football programs and contributed by the NFL, its Teams, or their affiliates, in a qualified not-for-profit fund administered by a board jointly appointed by the NFL and the NFLPA, shall also be deducted from the calculation of DGR:*

92

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

> *1998 League Year: $10.0 million*
> *1999 League Year: $12.5 million*
> *2000 League Year: $15.0 million*
> *2001 League Year: $20.0 million*
> *2002 League Year: $20.0 million*
> *2003 League Year: $22.5 million*

    (xiv)   *The parties may agree to allocate DGR received or to be received on an accrual basis in a particular League Year over one or more other League Years.*

                          \*Extension Agreement 2/25/98

    (b)    **Benefits.** "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for:

    (i)    Pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

    (ii)    Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

    (iii)    Injury protection (as described in Article XII);

    (iv)    Workers' compensation, payroll, unemployment compensation, and social security taxes;

    (v)    Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

    (vi)    Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

    (vii)    Post-season pay (as described in Article XLII and Article XLIII); *and salary paid to practice squad players pursuant to a practice squad contract during the post season, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the post-season will be counted as Salary.*

    (viii)    Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year); and

93

    (ix)   Severance pay (as described in Article L); *and*

    (x)   *The Player Annuity Program (as described in Article XLVIII-A).*
                                                   *\*Extension Agreement 2/25/98*

Benefits will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII. Benefits also will not include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or Bert Bell/Pete Rozelle NFL Player Retirement Plan. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

    (c)   **Salary.**

    (i)   "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

    (ii)   A player's Salary shall also include any and all consideration received by the player or his Player Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the Impartial Arbitrator that the consideration paid to the player or Player Affiliate for such non-football services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar non-football playing services from an independent third party; and (2) the percentage of total compensation for non-football services received from third parties versus the Team or Team Affiliate.

    (iii)   For purposes of this Article, Salary shall be computed pursuant to the additional rules below.

**Section 2. Trigger for Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary:** There shall be no Guaranteed League-wide Salary, Salary Cap, or Minimum Team Salary for NFL Teams during the 1993 League Year. If in the 1993 League Year or any subsequent League Year the

94

total Player Costs for all NFL Teams equals or exceeds 67% of actual Defined Gross Revenues, there shall be a Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary in the amounts set forth below for the next League Year and all subsequent League Years, unless the Salary Cap is removed pursuant to Section 4(b)(ii)(4) below. Notwithstanding the immediately preceding sentence, there will be no Guaranteed League-wide Salary, Salary Cap or Minimum Team Salary in the Final League Year.

**Section 3. Guaranteed League-wide Salary:** In any League Year in which a Salary Cap is in effect there shall be a Guaranteed League-wide Salary of 58% of actual Defined Gross Revenues. In the event that the Player Costs for all NFL Teams during any League Year in which a Salary Cap is in effect are less than 58% of actual Defined Gross Revenues for such season, then, on or before April 15 of the next League Year, the NFL shall pay an amount equal to such deficiency directly to players who played on NFL Teams during such season pursuant to the reasonable allocation instructions of the NFLPA.

**Section 4. Salary Cap Amounts:**
   (a)    Subject to the adjustments set forth below, the amount of the Salary Cap for each NFL Team in years that it is in effect shall be: (1) in the first League Year, 64% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (2) in the 1995 and 1996 League Years, 63% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (3) in the 1997 League Year, 62% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (4) *in the 1998-2001 League Years, 63% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (5) in the 2002 League Year, 63.5% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year (unless any of the parties hereto has provided notice canceling the extension as set forth in Article LXI (Extension of Agreement), in which case the Salary Cap for the 2002 League Year shall be 64% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year); (6) in the 2003 League Year, 64% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year (unless any of the parties hereto has provided notice canceling the extension as set forth in Article LXI (Extension of Agreement), in which case the 2003 League Year shall be an Uncapped Year). Notwithstanding the above, in the 1998 League Year: (i) the amount of the Salary Cap for each NFL Team shall be $52.388 million per Team; (ii) to the extent that the Salary Cap for the 1998 League Year would have been greater than this*

95

*amount as a result of the issuance of the Final Special Purpose Letter (including the Salary Cap Bank calculation), any DGR that would have caused such excess shall be used for increased Benefits in the 1998 League Year, up to a maximum of $50 million in such increased League-wide Benefits; and (iii) to the extent that the Salary Cap for the 1998 League Year would have been greater than $52.388 million per Team as a result of the issuance of the Final Special Purpose Letter (including the Salary Cap Bank calculation), without the DGR utilized for the $50 million in maximum increased League-wide Benefits for that League Year, the difference between that Salary Cap amount and $52.388 million shall be credited to the Salary Cap in the 1999 League Year or, if specified by the NFLPA and Class Counsel, be used for additional increases in the Player Annuity Program described in Article XLVIII-A (Player Annuity Program).*

**\*Extension Agreement 2/25/98**

(b)  The foregoing Salary Cap amounts shall be adjusted as follows:

(i)  The actual dollar amount of the Salary Cap shall not be less than the actual dollar amount of any Salary Cap in effect during the preceding League Year; provided, however, that at no time shall the Projected Benefits, plus the amount of the Salary Cap multiplied by the number of Teams in the NFL, exceed 70% of the Projected Defined Gross Revenues.

(ii)  If the total Player Costs of the NFL Teams during any League Year in which the Salary Cap is in effect falls below:

(1)  59% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 1% of Projected Defined Gross Revenues;

(2)  58% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 2% of Projected Defined Gross Revenues;

(3)  57% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 3% of Projected Defined Gross Revenues;

(4)  56% of actual Defined Gross Revenues, then there shall be no Salary Cap for the next League Year or any succeeding League Year unless and until the Salary Cap again becomes effective in accordance with Section 2 of this Article.

### Section 5. Minimum Team Salary:

(a)  *For the 1993-97 League Years, with* respect to each League Year for which a Salary Cap is in effect, there shall be a guaranteed Minimum Team Salary for each Team of 50% of Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the then current number of Teams in the NFL. *Beginning in the 1998 League Year, with respect to each League Year for which a Salary Cap is in effect, there shall be a guaranteed Minimum Team Salary for each Team of 54% of Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the then current number of Teams* in

the NFL. Each Team shall be required to have a Team Salary of at least the Minimum Team Salary at the end of each League Year.

*Extension Agreement 2/25/98*

(b)   Nothing contained herein shall preclude a Team from having a Team Salary in excess of the Minimum Team Salary, provided it does not exceed the Salary Cap.

(c)   Any shortfall in the Minimum Team Salary at the end of a League Year shall be paid, on or before April 15 of the next League Year, by the Teams having such shortfall, directly to the players who were on such Teams' roster at any time during the season, pursuant to reasonable allocation instructions of the NFLPA.

(d)   If the NFL agrees, or a judgment or award is entered by the Special Master, that a Team has failed by the end of the then current League Year to make the payments required to satisfy a Team's obligations to pay the Minimum Team Salary required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocation instructions of the NFLPA).

**Section 6. Computation of Team Salary**: During any League year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary:

(a)   **Player Contracts.** Subject to the rules below in Section 7 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised, options, shall be included in Team Salary.

(b)   **Tenders.**

(i)   Drafted Rookies' Salaries shall be tendered automatically at the Rookie Minimum Active List Salary as of the day of the Draft and shall be included in Team Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Tuesday following the tenth week of the regular season (if the player is unsigned).

(ii)   For players with less than three Accrued Seasons whose contracts have expired, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished.

(iii)   For players who are Restricted Free Agents, the Qualifying Offer will be included in Team Salary when tendered until the player is signed, the Qualifying Offer is withdrawn, or a "June 1 tender" (which may be made on or before June 1) is made. If the player is unsigned and the Team makes a June 1 tender or June 15 tender, such tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

97

**EX 8, PAGE 823**

(iv)    For players who are Unrestricted Free Agents, the June 1 tender, if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(v)    For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi)    All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c)    **Practice Squad Contracts.** Any Practice Squad contract Salaries shall be included in Team Salary.

(d)    **Termination Pay.** Any type of Termination Pay liability will be included in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e)    **Grievances.** When a player salary grievance is filed against a Team, 50% of the amount claimed will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first; at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Team are more than the original 50% attributions and put the Team over the Salary Cap, the excess will be deducted from the Team's Salary Cap in the following League Year; if the net total grievance amounts paid are less than the original 50% attributions and the Team finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Team's Salary Cap for the following League Year. If an award or settlement is made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 50% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 50% attribution, the difference shall be deducted from Team Salary when the award is made.

(f)    **Expansion Bonuses.** Except as set forth in Article XXXI (Expansion), any expansion bonuses paid to players shall be included in Team Salary.

(g)    **Other Amounts.** Any other Salary not listed above paid to players shall be included in Team Salary.

**Section 7. Valuation of Player Contracts:** Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap:

EX 8, PAGE 824

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(a)  **Paragraph 5.**

(i)  The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between March 1 and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 7):

(1)  Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2)  Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii)  **Deferred Salary.** Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be considered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the Treasury Bill rate published in The Wall Street Journal on March 1 in the year earned. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

(b)  **Signing Bonuses.**

(i)  **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract in determining Team and Player Salary, except that:

(1)  Signing bonuses *agreed to* in a Capped Year may not be prorated more than three years beyond the Final Capped Year *(notwithstanding the foregoing, signing bonuses agreed to in Player Contracts approved by the Commissioner on or after agreement by the parties with respect to transition rules for proration in the 1998 League Year, but prior to court approval, and in no event earlier than June 30, 1998, may not be prorated more than six years, and signing bonuses agreed to in the 1999 or 2000 League Years may not be prorated more than seven years).*

*\*Extension Agreement 2/25/98*

(2)  Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control, such issue shall be resolved by the Impartial Arbitrator.

> \* With respect to the proration of signing bonuses for Player Contracts entered into by Rookie players in which the player has the right to terminate based solely upon reporting, making the roster and/or playtime, such conduct shall automatically be deemed "within his sole control," as set forth in Article X, Paragraph G.2.(a)(ii) of the Stipu-

99

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

lation and Settlement Agreement and in Article XXIV, Section 7(b)(i)(2) of the Collective Bargaining Agreement, unless the exercise of the right to terminate is also conditioned upon the following playtime requirements: (1) for players drafted in the first round, at least 35% of the plays if the triggering condition occurs in the first year of the Player Contract, and at least 45% of the plays if in any subsequent year; (2) for all other Rookie players, at least 15% of the plays if the condition occurs in the first year of the Player Contract, and at least 30% of the plays if in any subsequent year. The playtime requirements set forth above do not affect the signing bonus allocation for any contract entered into by players other than Rookies.

*Side Letter 9/21/93: Sec. 15

* [A]ny multi-year Player Contract not unconditionally approved by the Commissioner as of the date hereof, other than any multi-year Player Contract executed in the last Capped Year of this Agreement, that extends from a Capped Year into any Uncapped Year (hereinafter "Subject Contract"). For purposes of determining Team Salary, if (i) the sum of the player's Paragraph 5 Salary, roster bonuses that are based upon the player making any of the Club's roster categories without limitation, and reporting bonuses during all Capped Years of the Subject Contract (but, if there are fewer than three remaining Capped Years, during the first three years of the Subject Contract) in the aggregate less than (ii) the portion of the Subject Contract's signing bonus that would be allocated to those League Years if the signing bonus were prorated equally over the term of the Subject Contract, then: the difference between the amounts calculated pursuant to (ii) and (i) of this sentence, up to 50% of the portion of the signing bonus that would otherwise be allocated to the Uncapped Years (the "Difference"), shall be deducted in equal portions from those Uncapped Years and reallocated' in equal portions over the Capped Years of the Subject Contract (or, if there are fewer than three Capped Years within the term of the Subject Contract, over the first three years of the Subject Contract). For purposes of this Paragraph, a renegotiation shall be treated as if it is an entirely new Player Contract. Notwithstanding the above, any Subject Contract executed prior to November 15, 1995 for which there is a Difference as a result of the calculation set forth above

shall have the 1995 portion of such Difference allocated
to 1995 Team Salary to the extent of the Club's current
and any future Room during the 1995 regular season
(except such Room that results from the termination or
renegotiation of a 1995 Player Contract after October
30, 1995), with the balance to be allocated to the 1996
League Year. Further, any Subject Contract executed be-
tween November 15, 1995 and the end of the 1995
League Year shall have the 1995 portion of any Differ
ence allocated to the 1996 League Year.

\*Side Letter 11/1/95: Sec. 1

(3)  If a Player Contract provides for an increase in Salary upon the
assignment of such contract to another NFL Team, such increase shall be
included in the player's Salary upon such assignment and be attributable
to the Team paying the bonus.

\* For the purposes of the Salary Cap, any signing bonus
given in connection with a contract extension entered
into before the expiration of the player's existing con-
tract will be prorated over the remaining years of the un-
expired contract together with its extension. The parties
agree that, pursuant to the Collective Bargaining Agree-
ment, the player shall always have the right to receive
such a signing bonus at the time that the extension is
executed, unless the player expressly agrees in the con-
tract to defer payment of the extension bonus, in which
case only the present value of the deferred payment, cal-
culated in accordance with the method set forth in Ar-
ticle X, Paragraph G.1. (b) of the Stipulation and Settle-
ment Agreement and Article XXIV, Section 7(a)(ii) of the
Collective Bargaining Agreement, shall be prorated (un-
less the extension is executed within one year of the ex-
ecution of the contract being extended, in which case
the gross amount of the extension bonus shall be pro-
rated).

\*Side Letter 9/21/93: Sec. 17

(4)  *If either party hereto has cancelled the extension of this Agreement as
set forth in Article LXI (Extension of Agreement), then signing bonuses agreed to
after the date of such cancellation shall be prorated using the 2002 League Year as
the Final Capped Year.*

*\*Extension Agreement 2/25/98*

101

(ii)   **Acceleration.**

(1)   For any player removed from the Team's roster on or before June 1, any unamortized signing bonus amounts will be included in Team Salary for such League Year. If such acceleration puts a Team over the Salary Cap, the Team will have seven days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)   For any player removed from the Team's roster after June 1, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

> * During any League Year immediately preceding an Uncapped Year, the provisions relating to acceleration of unamortized signing bonuses applicable on or before June 1 of that League Year shall apply during that League Year after June 1.
>
> *Side Letter 11/1/95: Sec. 2

(3)   In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, then such signing bonus shall be accelerated as in subsection (ii)(1) above and the assignee Team's Team Salary will not include any portion of the signing bonus.

(4)   Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary. To the extent that such acceleration puts the Team over its Salary Cap, the difference shall be deducted from its Salary Cap for the following year.

> * With respect to a Player Contract in which the player has one or more rights to terminate based upon one or more not "likely to be earned" incentives and the player also being on the roster at a subsequent time, no acceleration shall occur pursuant to Article XXIV, Section 7(b)(ii)(4) of the CBA until both the incentive(s) and the roster precondition(s) have been satisfied.
>
> *Side Letter 10/21/96: Sec. 5

(5)   The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)   **Prior Signing Bonuses.** All signing bonuses from League Years prior to 1993 will be prorated over the term of the original Player Contracts

102

and included in Team Salary in the 1993 League Year and thereafter.

(iv)     **Amounts Treated as Signing Bonuses.** For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)     Any amount specifically described in a Player Contract as a signing bonus;

(2)     Any guaranteed reporting bonus;

(3)     Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)     Any option buyout amount, when paid or guaranteed; and

(5)     In the event that a Player Contract calls for a Salary in the second year of such Contract that is less than half the Salary called for in the first year of such Contract, the difference between the Salary in the second contract year and the first contract year shall be treated as a signing bonus.

> * In a contract signed after the start of training camp, a reporting bonus for that season will be counted as a signing bonus. In a contract signed after the last pre-season game, a roster bonus for that season will be counted as a signing bonus.
>
> *Side Letter 9/21/93: Sec. 18

> * Any salary advance paid on a guaranteed basis will be counted as a signing bonus.
>
> *Side Letter 9/21/93: Sec. 19

> * For purposes of the Salary Cap and Entering Player Pool, any guaranteed bonus tied to workouts shall be treated as a Signing Bonus.
>
> *Side Letter 6/23/93: Sec. 3

> * For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to re-pay shall be treated as a Signing Bonus.
>
> *Side Letter 6/23/93: Sec. 4

> * For purposes of the Salary Cap and Entering Player Pool, any roster or reporting bonus which is earned or paid before the start of the Club's pre-season training camp shall be treated as a signing bonus.
>
> *Side Letter 6/23/93: Sec. 6

> * Except as set forth in [the] Paragraph [to follow], the full non-guaranteed amount of any Salary advance, off-

103

season work-out bonus, off-season roster bonus, or off-season reporting bonus shall be included in Team Salary only in the League Year in which it is earned by the player, without any pro-ration. For purposes of this paragraph only, "guaranteed" means Salary that is fully guaranteed, prior to being earned, for skill, for injury, and regardless of any termination of the contract by the Club. The definition of "guaranteed" set forth above shall not affect Salary Cap accounting for any other purpose.

*Side Letter 10/21/96: Sec. 1

* With respect to any Player Contract, or any renegotiation or extension of a Player Contract, that is executed in the Final Capped Year, each of the following shall be treated as a signing bonus, at the time of execution, if it is to be earned or paid to the player in the Final League Year (which is an Uncapped Year): (a) any Salary advance which the player is not and cannot be obligated to repay; (b) any off-season workout bonus that is contingent upon the player's participation in less than 32 days of the Club's off-season work-out program; (c) any off-season roster bonus; and (d) any off-season reporting bonus.

*Side Letter 10/21/96: Sec. 2

* [A]ny bonus to be paid to a player solely for fulfilling his obligations to play under his Player Contract without seeking to renegotiate and/or "holding out" (i.e., a "completion bonus"), and which bonus is otherwise guaranteed for skill and injury, shall be considered to be a "signing bonus" under Article X of the Settlement Agreement and Article XXIV of the CBA, except that the amount of any such completion bonus shall be calculated at its present value, computed at the Treasury Bill rate published in The Wall Street Journal on March 1 of the League Year in which the Player Contract is executed. Further, if any event occurs which extinguishes the player's right to receive such completion bonus, any amount of the bonus that has previously been included in Team Salary shall be immediately added to the Team's Salary Cap for the current League Year, if such event occurs prior to June 1, or for the next League Year, if such event occurs after such date, with the remainder of the bonus that has been allocated to Team Salary for future League Years immediately extinguished.

*Side Letter 1/18/94: Sec. 3

104

\* Any relocation bonus which is individually negotiated between a player and a Club shall be treated as a signing bonus.

*Side Letter 5/24/95: Sec. 9*

\* *For each League Year prior to the Final Capped Year,* if a Club and a player renegotiate or extend a contract and increase the player's Salary for the current League Year, the increase will be counted as Salary for that League Year if the NFL Management Council receives, prior to 4:00 p.m. (New York Time) on the Monday of the tenth week of the regular season, notice of the salary terms of such an executed extended or renegotiated contract. In any other circumstance *prior to the Final Capped Year*, the increase in Salary will be treated as a signing bonus that is allocated over the remaining years of the Player Contract (including the "current" year of that contract) to the extent that such allocation is permitted by the Settlement Agreement and the CBA. *The then-existing provisions of the CBA will govern the Salary Cap valuation of such a renegotiation or extension in the Final Capped Year. The parties have reserved their respective positions regarding the CBA's requirements for any such renegotiation or extension in the Final Capped Year.*

*Side Letter 5/24/95: Sec. 14
as amended Side Letter 5/13/99*

(v)     **Credit for Signing Bonuses Refunded.** In the event that a Team receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a signing bonus, such amount as has previously been included in Team Salary shall be added to the Team's Salary Cap for the next League Year.

(c)     **Incentives.**

(i)     Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

(ii)     At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the

105

amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

(iii) At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equalling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

> \* Any team performance will be automatically deemed to be "Likely to be earned" if the Team met or exceeded the specified performance during the prior League Year, and will he automatically deemed to be "not likely to be earned" if the Team did not meet the specified performance during the prior League Year.
> *Side Letter 2/22/96: Sec. 1

> \* Any incentive bonus that depends on team performance in any category not identified in Exhibit A hereto automatically will be deemed "likely to be earned."
> *Side Letter 9/21/93: Sec. 8

> \* Any incentive bonus that depends on a player's individual performance in any category not identified in Exhibit B hereto automatically will be deemed "likely to be earned." Any incentive bonus that depends on a player's individual performance in categories other than those used to assess performance at the player's primary position automatically will be deemed "likely to be earned."
> *Side Letter 9/21/93: Sec. 11

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## (EXHIBIT A)
## TEAM INCENTIVES

| OFFENSE | DEFENSE | SPECIAL TEAMS |
|---|---|---|
| Points scored by offense | Points allowed by defense | Own punt return average |
| Touchdowns scored by offense | Touchdowns allowed by defense | Own kickoff return average |
| Total offense (net yards) | Total defense (net yards) | Opposition punt return average |
| | | Opposition kickoff return average |
| Average net yards gained per rushing play | Average net yards given up per rushing play | |
| Average net yards gained per passing play | Average net yards given up per passing play | |
| Sacks allowed | Sacks | |
| Passing % completed | Interceptions | |

**ALL**
Wins
Playoffs
Conference Championship
Super Bowl
Touchdowns on returns
and recoveries
Net difference takeaways/giveaways

*Side Letter 9/21/93: Exhibit A

107

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ( EXHIBIT B)
## INDIVIDUAL INCENTIVES

### RUSHING

Total yards

Average yards
(100 attempts)

Touchdowns

### PASSING

Passer rating
(224 attempts)

Completion percentage
(224 attempts)

Interception percent
(224 attempts)

Total yards

Yards per pass
(224 attempts)

Touchdown passes

### RECEIVING

Total receptions

Total yards

Average yards
(32 receptions)

Touchdowns

### DEFENSE

Interceptions

Interception return yards

Touchdowns on interception
returns

Opponent fumble recoveries

Opponent fumble return yards

Touchdowns on opponent
fumble returns

Sacks

### PUNT RETURNS

Total yards

Average (20 returns)

Touchdowns

108

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## (EXHIBIT B)
## INDIVIDUAL INCENTIVES

### KICKOFF RETURNS

Total yards

Average (20 returns)

Touchdowns

### PUNTING

Gross average (40 punts)

Net average (40 punts)

Inside 20-yard line

### PLACE KICKING

Total points

Field goals

Field goal percentage
(16 attempts)

Field goal percentage
0-19 yards (4 attempts)

Field goal percentage
20-29 yards (4 attempts)

Field goal percentage
30-39 yards (4 attempts)

Field goal percentage
40-49 yards (4 attempts)

Field goal percentage
50 yards or longer (3 attempts)

### OTHERS

Roster bonuses

Reporting bonuses

Playtime bonuses
(excluding special teams)

Special teams playtime

*Side Letter 9/21/93: Exhibit B

109

**EX 8, PAGE 835**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| CATEGORY | | PERCENT COUNTED |
|---|---|---|
| ROSTER BONUSES | | |
| (regular season) | | |
| All Drafted | | 100% |
| Undrafted | | 30% |
| ROSTER BONUSES | | |
| (pre-season) | | |
| All Players | | 100% |
| PLAYING TIME | ROUNDS 1-3 | |
| | Up to 33% | 100% |
| | 34% - 75% | 75% |
| | 76% - 90% | 50% |
| | 91% - 100% | 25% |
| | ROUNDS 4-8 | |
| | Up to 25% | 100% |
| | 26% - 33% | 75% |
| | 34% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | UNDRAFTED | |
| | Up to 15% | 100% |
| | 16% - 25% | 75% |
| | 26% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | All percentages will round to the nearest whole percentage (e.g., .05 is rounded to 1.0) | |
| SPECIAL TEAMS | ROUNDS 1 - 3 | 100% |
| PARTICIPATION | ROUNDS 4 - 8 | 66% |
| | UNDRAFTED | 50% |
| HONORS | ROUNDS 1 - 2 | |
| (First or Second Team)* | All-Rookie | 100% |
| | All NFL, Pro Bowl | 5% |
| | All Conference | 10% |
| | ALL OTHERS | |
| *See Media List on | All-Rookie | 15% |
| pages 122-123 | | |
| | All Conference | 5% |

EX 8, PAGE 836

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
### (REVISED SCHEDULE B)

**RUSHING**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Rushing | Up to 150 yards | 100% |
| | 151 - 350 yards | 75% |
| | 351 - 500 yards | 66% |
| | 501 - 700 yards | 33% |
| | 701 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 100 yards | 100% |
| | 101 - 350 yards | 66% |
| | 351 - 650 yards | 25% |
| | 651 yards or more | 0% |
| Average Yards | ROUNDS 1 - 3 | |
| (100 attempts) | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 66% |
| | 4.01 - 4.49 | 33% |
| | 4.5 or more | 0% |
| | ALL OTHERS | |
| | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 50% |
| | 4.01 - 4.49 | 25% |
| | 4.5 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

111

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### PASSING

| | | |
|---|---|---|
| Passer Rating | ROUNDS 1 - 3 | |
| (224 attempts) | 50 rating or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 50% |
| | 90.00 - 100.00 | 33% |
| | 100.01 or more | 0% |
| | ALL OTHERS | |
| | 50.00 or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 25% |
| | 90.01 or more | 0% |
| Completion Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | Up to 52% | 100% |
| | 52.1 - 56% | 66% |
| | 56.1 - 59% | 33% |
| | 59.01% or more | 0% |
| | ALL OTHERS | |
| | Up to 52% | 100% |
| | 52.1 - 56% | 50% |
| | 56.1 - 59% | 25% |
| | 59.01% or more | 0% |
| Interception Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | 3.0% or more | 100% |
| | 2.7 - 2.9% | 66% |
| | 2.1 - 2.6% | 33% |
| | 2.0% or less | 0% |
| | ALL OTHERS | |
| | 3.0% or more | 100% |
| | 2.7 - 2.9% | 50% |
| | 2.1 - 2.6% | 25% |
| | 2.0% or less | 0% |

112

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| Total Yards | ROUNDS 1 - 3 | |
| --- | --- | --- |
| Passing | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 25% |
| | 1,201 yards or more | 0% |
| Yards Per Pass | ROUNDS 1 - 3 | |
| (224 attempts) | Under 6 | 100% |
| | 6.0 - 7 | 66% |
| | 7.1 - 8 | 33% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| | ALL OTHERS | |
| | Under 6 | 100% |
| | 6.0 - 7 | 50% |
| | 7.1 - 8 | 25% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| Touchdown Passes | ROUNDS 1 - 3 | |
| | Under 11 | 100% |
| | 12 - 16 | 66% |
| | 17 - 23 | 33% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |
| | ALL OTHERS | |
| | Under 11 | 100% |
| | 12 - 16 | 50% |
| | 17 - 23 | 25% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |

113

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

**RECEIVING**

| Total Receptions | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 20 catches | 100% |
| | 21 - 30 catches | 75% |
| | 31 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| | ALL OTHERS | |
| | Up to 10 catches | 100% |
| | 11 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| Total Yards Receiving | ROUNDS 1 - 3 | |
| | Up to 200 yards | 100% |
| | 201 - 300 yards | 75% |
| | 301 - 400 yards | 50% |
| | 401 - 800 yards | 25% |
| | 801 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 150 yards | 100% |
| | 151 - 250 yards | 75% |
| | 251 - 350 yards | 50% |
| | 351 - 700 yards | 25% |
| | 701 yards or more | 0% |
| Average Yards | ROUNDS 1 - 3 | |
| (32 receptions) | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 75% |
| | 14.6 - 16.5 | 50% |
| | 16.6 - 18.5 | 25% |
| | 18.6 or more | 0% |
| | ALL OTHERS | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 66% |
| | 14.6 - 16.5 | 33% |
| | 16.6 - 18.5 | 10% |
| | 18.6 or more | 0% |

114

**EX 8, PAGE 840**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| Receiving Touchdowns | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

**TOTAL OFFENSE**

| Total Yards | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 10% |
| | 1,201 yards or more | 0% |
| Scoring | ROUNDS 1 - 3 | |
| | 2 - 28 points | 100% |
| | 29 - 65 points | 50% |
| | 66 - 75 points | 25% |
| | 76 points or more | 0% |
| | ALL OTHERS | |
| | 2 - 28 points | 100% |
| | 29 - 55 points | 50% |
| | 56 - 75 points | 10% |
| | 76 points or more | 0% |

115

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
### (REVISED SCHEDULE B)

**DEFENSE**

| | | |
|---|---|---|
| Interceptions | ROUNDS 1 - 3 | |
| | 1 - 5 | 100% |
| | 6 - 10 | 50% |
| | 11 or more | 0% |
| | ALL OTHERS | |
| | 1 - 3 | 100% |
| | 4 - 6 | 33% |
| | 7 or more | 0% |
| Interception | ROUNDS 1 - 3 | |
| Return Yards | 0 - 85 | 100% |
| | 86 - 150 | 66% |
| | 151 - 190 | 33% |
| | 191 or more | 0% |
| | ALL OTHERS | |
| | 0 - 65 | 100% |
| | 66 - 85 | 50% |
| | 86 - 110 | 25% |
| | 111 or more | 0% |
| Touchdowns on | ALL | |
| Interception Returns | 1 | 100% |
| | 2 | 50% |
| | 3 or more | 0% |
| Opponent Fumble | ALL | |
| Recoveries | 1 - 2 | 100% |
| | 3 - 4 | 50% |
| | 5 or more | 0% |
| Opponent Fumble | ROUNDS 1 - 3 | |
| Return Yards | 0 - 40 | 100% |
| | 41 - 65 | 66% |
| | 66 - 80 | 33% |
| | 81 or more | 0% |
| | ALL OTHERS | |
| | 0 - 30 | 100% |
| | 31 - 55 | 50% |
| | 56 - 75 | 25% |
| | 76 or more | 0% |

116

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| | | |
|---|---|---|
| Touchdowns on | ALL | |
| Opponent Fumble | 1 | 100% |
| Returns | 2 | 50% |
| | 3 or more | 0% |
| Sacks | ROUNDS 1 - 3 | |
| | .5 - 4 sacks | 100% |
| | 4.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| | ALL OTHERS | |
| | .5 - 3 sacks | 100% |
| | 3.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| **PUNT RETURNS** | | |
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 224 | 100% |
| | 225 - 349 | 33% |
| | 350 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 7.9 | 100% |
| | 8.0 - 10.9 | 33% |
| | 11.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

117

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### KICKOFF RETURNS

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 599 | 100% |
| | 600 - 649 | 33% |
| | 650 or more | 0% |
| Average | ROUNDS 1 - 3 | 100% |
| (20 returns) | ALL OTHERS | |
| | 0 - 19.9 | 100% |
| | 20.0 - 21.9 | 33% |
| | 22.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

### PUNTING

| | | |
|---|---|---|
| Gross Average | ROUNDS 1 - 3 | 100% |
| (40 punts) | ALL OTHERS | |
| | 0 - 42.4 | 100% |
| | 42.5 - 43.9 | 33% |
| | 44.0 or more | 0% |
| Net Average | ROUNDS 1 - 3 | 100% |
| (40 punts) | ALL OTHERS | |
| | 0 - 35.9 | 100% |
| | 36.0 - 37.9 | 33% |
| | 38.0 or more | 0% |
| Inside 20-yard line | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 23 | 33% |
| | 24 or more | 0% |

118

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

**PLACE KICKING**

| | | |
|---|---|---|
| Total Points | ROUNDS 1 - 3 | |
| | Up to 86 points | 100% |
| | 87 - 95 points | 75% |
| | 96 - 104 points | 50% |
| | 105 - 113 points | 10% |
| | 114 points or more | 0% |
| | ALL OTHERS | |
| | Up to 75 points | 100% |
| | 76 - 90 points | 66% |
| | 91 - 99 points | 33% |
| | 100 - 109 points | 10% |
| | 110 points or more | 0% |
| Field Goals | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 26 | 33% |
| | 27 or more | 0% |
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| (16 attempts) | ALL OTHERS | |
| | 0 - 75% | 100% |
| | 75.1 - 80% | 33% |
| | 80.1 - 100% | 0% |
| Field Goal Percentage 0-19 yards (4 attempts) | ALL | 100% |
| Field Goal Percentage 20 - 29 yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| (4 attempts) | 0 - 85% | 100% |
| | 85.1 - 95% | 33% |
| | 95.1 - 100% | 0% |
| Field Goal Percentage 30 - 39 yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| (4 attempts) | 0 - 70% | 100% |
| | 70.1 - 90% | 33% |
| | 90.1 - 100% | 0% |

119

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| Field Goal Percentage | ROUNDS 1 - 3 | 100% | |
|---|---|---|---|
| 40 - 49 yards | ALL OTHER | | |
| (4 attempts) | 0 - 55% | 100% | |
| | 55.1 - 70% | 33% | |
| | 70.1 - 100% | 0% | |
| Field Goal Percentage | ROUNDS 1 - 3 | 100% | |
| 50 yards or longer | ALL OTHERS | | |
| (3 attempts) | 0 - 45% | 100% | |
| | 45.1 - 60% | 33% | |
| | 60.1 - 100% | 0% | |

*Side Letters 4/27/93 & 4/27/94

120

EX 8, PAGE 846

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ENTERING PLAYER POOL INCENTIVES

\* Team Leaders

a) If the incentive is written for leading the Club in any official League statistical category [assuming it is on Exhibit A or B], 0% will be counted.

b) If the incentive is written for any ranking other than first on the Club in any official League statistical category, 100% will be counted.

*Side Letter 4/27/93: Sec. 7

c) If the incentive is written for leading the team in kick returns or punt returns, and the player qualifies under the minimum standard established by the League for those statistical categories, the following percentages shall be counted:

| ROUNDS 1 - 3 | 100% |
| ROUNDS 4 - 5 | 33% |
| ROUNDS 6 - 8 | 10% |
| ALL OTHERS | 0% |

*Side Letter 6/30/93: Sec. 16

\* Each component of non-cumulative incentives is calculated individually, and only the highest component amount is counted. For example, an incentive clause for a 1st-round running back that provides for $10,000 for up to 150 yards or $20,000 for 151-350 yards is counted as $15,000. (This amount is arrived at by taking the greater of 100% of $10,000 or 75% of $20,000, which equals $15,000. Only the higher component amount of $15,000 is counted).

*Side Letter 4/27/93: Sec. 8

The following shall count at 100%:

\* Any team statistic or team unit statistic, if the statistic was achieved in the prior season (based on prior season's performance).

*Side Letter 4/27/93: Sec. 9

\* Incentives within the sole control of the player (e.g., non-guaranteed reporting bonuses, workouts, weight clauses, etc.).

*Side Letter 4/27/93: Sec. 10

121

**EX 8, PAGE 847**

Article XXIV. Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

\*Any relocation or completion bonus.

\*Side Letter 4/27/93: Sec. 11

\*Any incentive not measured by official NFL statistics (i.e., hurries, tackles and assists) or incentives based on subjective standards.

\*Side Letter 4/27/93: Sec. 12

\* Any guaranteed salary or bonus.

\*Side Letter 4/27/93: Sec. 13

\* Any pre-season or off-season statistics.

\*Side Letter 4/27/93: Sec. 14

\* Any incentive based upon another player's performance.

\*Side Letter 4/27/93: Sec. 15

\* Incentives based on leading the team in punting/kicking will be counted at 100%.

\*Side Letter 6/30/93: Sec. 18

\* If a rookie player has an incentive bonus for touchdowns, we will apply the rushing and receiving touchdowns likely to be earned rule and if a rookie non-kicker has a Total Points incentive, we will apply the total points likely to be earned levels for a rookie kicker to value the incentives.

\*Side Letter 7/26/94

## \*HONORS AND RECOGNIZED MEDIA

### VETERAN HONORS
PRO BOWL
1ST & 2ND ALL NFL
1ST & 2ND ALL CONFERENCE
SUPER BOWL MVP (ROZELLE TROPHY)
MVP-NFL
OFFENSIVE PLAYER OF YEAR — NFL OR CONF
DEFENSIVE PLAYER OF YEAR — NFL OR CONF
PLAYER OF YEAR — NFL OR CONF

### VETERAN MEDIA
ASSOCIATED PRESS
UNITED PRESS INTERNATIONAL

122

PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
FOOTBALL NEWS
NEWSPAPER ENTERPRISE ASSOCIATION
FOOTBALL DIGEST
USA TODAY
COLLEGE & PRO FOOTBALL WEEKLY

### ROOKIE HONORS (FIRST OR SECOND TEAM)
**ROUNDS 1-2**

| | |
|---|---|
| ALL ROOKIE | 100% |
| ALL NFL, PRO BOWL | 5% |
| ALL CONFERENCE | 10% |
| **ALL OTHERS** | |
| ALL-ROOKIE | 15% |
| ALL CONFERENCE | 5% |
| **ALL** | |
| ROOKIE OF YEAR — NFL OR CONF | 0% |
| ROOKIE OF YEAR — OFFENSE — NFL | 0% |
| ROOKIE OF YEAR — DEFENSE — NFL | 0% |

**ROOKIE MEDIA**
ASSOCIATED PRESS
UNITED PRESS INTERNATIONAL
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
NEWSPAPER ENTERPRISE ASSOCIATION
SPORTING NEWS

*Side Letter 9/25/95 & 4/27/93

### ADDITIONAL INCENTIVE RULES FOR VETERANS, ROOKIES, INDIVIDUALS AND TEAMS

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be re-valued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.

*Side Letter 9/21/93: Sec. 1

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be re-valued at the time of the renegotiation. Thus, if at

123

EX 8, PAGE 849

the time of the renegotiation, the conditions for an in-
centive bonus have already been satisfied, that bonus
will be deemed "likely to be earned." Any new or altered
incentive bonuses renegotiated in a pre-existing contract
after the start of the regular season in which they may be
earned automatically will be deemed "likely to be
earned" during that season.

*Side Letter 9/21/93: Sec. 2

* Other than as set forth in [the paragraph immediately
following,] for purposes of the Salary Cap and Entering
Player Pool, any incentive bonus to an offensive player
that is based upon the defensive team's or special team's
performance automatically will be deemed "likely to be
earned." Conversely, any incentive bonus to a defensive
player that is based upon the offensive team's or special
team's performance automatically will be deemed "like-
ly to be earned." Any incentive bonus based upon an-
other player's performance automatically will be
deemed "likely to be earned."

*Side Letter 9/21/93: Sec. 3

* For purposes of the Salary Cap and Entering Player
Pool, any incentive bonus in a contract signed by a
Rookie that is based upon special team performance au-
tomatically will be deemed "likely to be earned," except
for an incentive bonus to a Rookie kicker or Rookie
punter that is based upon improvement in the perform-
ance of the kicking or punting team. Any incentive
bonus to a player who is not a Rookie that is based up-
on special team performance automatically will be
deemed "likely to be earned" unless the player played in
at least 50% of his team's special team plays in the pre-
vious season.

*Side Letter 9/21/93: Sec. 4

* For purposes of the Salary Cap and Entering Player
Pool, any incentive bonus based on the team's perform-
ance automatically will be deemed "likely to be earned"
if it sets a minimum level of statistical performance that
is equal to or lower than that achieved by the team fin-
ishing fifth from the bottom in the League in the applic-
able category during the previous season. For example,
an incentive bonus based on a team winning at least a
specified number of games will be evaluated by deter-

124

EX 8, PAGE 850

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

mining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.

\*Side Letter 9/21/93: Sec. 5

\* Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 24th in the League in total offense will be deemed "likely to be earned" in a League consisting of 28 teams; similarly, an incentive bonus based on a team finishing 12th in its Conference will be deemed "likely to be earned" in a Conference consisting of 14 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

\*Side Letter 9/21/93: Sec. 6

\* Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

\*Side Letter 9/21/93: Sec. 7

\* In any Player Contract signed by a Rookie, if more than three different team performance categories are included as incentives, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." For Player Contracts signed by Rookies selected in rounds one and two of the NFL draft, any team

125

**EX 8, PAGE 851**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 35% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 45% of the plays for any team incentives that apply in any subsequent year of such a contract. For Player Contracts signed by all other Rookies, a team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 15% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 30% of the plays for any team incentives that apply in any subsequent year of such a contract. The provisions of this paragraph supplement and do not override [Paragraph 9] of the parties' letter of agreement of April 27, 1993. The calculation of these playtime requirements shall exclude special teams plays.

*Side Letter 9/21/93: Sec. 9

* In any Player Contract signed by a player other than a Rookie, if more than three different team performance categories are included as incentives, covering the Final Capped Year or thereafter, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." In addition, any team performance bonus for a player other than a Rookie covering the Final Capped Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determination of whether the incentive is "likely to be earned" will be made pursuant to Article X, Paragraph G.3.(a) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(c)(i) of the Collective Bargaining Agreement. The calculation of these playtime requirements shall exclude special teams plays.

*Side Letter 9/21/93: Sec. 10

* Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year. For Rookies, it will be based on 75% of the

126

team leader on the Rookie's team in the specified performance category in the previous year. If not initially counted as "likely to be earned," such incentives shall be counted immediately towards the Salary Cap and Entering Player Pool when they are earned.

*Side Letter 9/21/93: Sec. 12

* Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie quarterback who was drafted in the first round, any incentive bonus for leading his team in any quarterback category in his third NFL season or thereafter automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie running back who was drafted in the first round, any incentive bonus for leading his team in any running back category automatically will be deemed "likely to be earned." The provisions of this paragraph shall apply notwithstanding [Paragraph 7] of the parties' letter agreement of April 27, 1993.

*Side Letter 9/21/93: Sec. 13

* For purposes of the Salary Cap, any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned at 100 percent of its value, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except (1) as provided [two paragraphs] above [in regards to per play or per game occurrences,] (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid, (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately, or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

*Side Letter 9/21/93: Sec. 14

* Any incentive bonus which a player and a Club agreed to prior to the 1993 League Year that depends upon performance in any category not identified in Exhibit A or Exhibit B will be determined to be likely or unlikely to be earned based upon the player's and/or team's per-

127

formance in such category during the League Year prior
to the League Year in which the incentive may be earned.
Any incentive bonus which a player and a Club agreed
to in the 1993 League Year or thereafter that depends
upon performance in any category not identified in Ex-
hibit A or Exhibit B automatically will be deemed "Like-
ly to be earned."

*Side Letter 5/24/95: Sec. 6

* Any incentive bonus which a player and a Club agree
to in the 1994 League Year, or in any future League Year
during the term of the CBA, that: (i) depends upon per-
formance in any category not identified in Exhibit A or
Exhibit B; and (ii) is stated in terms of per play, per event
or per game, or for leading or any ranking on the Club in
any such category; shall be prohibited.

*Side Letter 5/24/95: Sec. 7

* Any roster bonus which is deemed not "likely to be
earned" based upon the player's performance during the
prior year shall immediately be included in Team Salary
when earned. Pre-season roster bonuses are automati-
cally deemed "likely to be earned."

*Side Letter 5/24/95: Sec. 8

* For purposes of the Salary Cap, any incentive bonus
(or portion thereof) that is earned during the [Final
Capped] Year, but which had not been deemed likely to
be earned at 100 percent of its value during that League
Year, will be deemed earned and counted against the
Salary Cap immediately upon attainment of the required
performance level. Conversely, any incentive bonus (or
portion thereof) that had been deemed likely to be
earned during the [Final Capped] Year will be immedi-
ately credited toward the Salary Cap if the required per-
formance level should, during the course of the [Final
Capped] Year, become impossible for the player to at-
tain.

*Side Letter 11/11/93: Sec. 1

* To determine the value of an incentive clause for Salary
Cap purposes, either under the specific circumstances
set forth in the paragraph above, or under the specific
circumstances set forth in paragraph 14 of the letter
from Jeffrey L. Kessler to Harold R. Henderson dated

EX 8, PAGE 854

September 21, 1993, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had 1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

*Side Letter 11/11/93: Sec. 2

* If more than eight different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight incentives with the lowest dollar value automatically will be deemed "likely to be earned." For purposes of this paragraph, each conjunctive combination of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X," shall be counted as one performance category), and each disjunctive combination of performance categories shall be counted by the number of disjunctive performance categories in the combination (e.g., an incentive clause reading, "if A or B or C, then player will receive $X", shall be counted as three performance categories). In addition, any of the disjunctive performance categories may itself be a conjunctive combination of performance categories (e.g., the "A" in the immediately preceding example may be a conjunctive combination of numerous performance categories, and would be counted as being one category because of its conjunctive nature).

*Side Letter 2/22/96: Sec. 2

* [The above paragraph] does not supersede the terms of any other letter agreement between the parties that

129

automatically deem certain performance incentives to be "likely to be earned" or "not likely to be earned" depending upon whether the incentive fulfills other specified criteria (e.g., Paragraphs 3-10 of the September 21, 1993 letter agreement).

\*Side Letter 2/22/96: Sec. 3

\* [The two preceding paragraphs do] not apply and the parties reserve their rights with respect to multi-year contracts containing team performance incentives.

\*Side Letter 2/22/96: Sec. 4

(d)     **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)     In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the Final Capped Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, if payment of the player's entire Salary for the Final Capped Year is not fully guaranteed. For example, without limitation on any other applicable example, if neither party exercises any right to cancel the extension of this Agreement, and if the Salary Cap is in effect during the 2002 and 2003 League Years, and the player enters into a four-year contract which is not fully guaranteed for the 2002 and 2003 League Years, but is fully guaranteed for the 2004 and 2005 League Years, the full amount of the guaranteed Salary for the 2004 and 2005 League Years will be included in Team Salary for the 2002 and 2003 League Years in a proportion determined by the Team.

\* Extension Agreement 2/25/98

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond three years after the Final Capped Year will be included in Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

(iii)     Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the Treasury Bill rate published in The Wall Street Journal of March 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Section 7(b)(ii)(1) above, shall apply.

(iv)     If any Player Contract entered into in a Capped Year provides for

130

yearly Salary in a sequence that, in the Final Capped Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

> \* For the purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Article XXIV, Section 7(d)(i)-(iv).

*Side Letter 6/23/93: Sec. 2

### (e)    Other Amounts.

(i)    **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

> \* For purposes of the Salary Cap and Entering Player Pool, in the event that a player and Club enter into a fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), the parties agree that such a fraudulent agreement would constitute an improper circumvention of the Salary Cap and/or Entering Player Pool, in violation of the Stipulation and Settlement Agreement, Article X, Part G, Paragraph 5 (a), and the Collective Bargaining Agreement, Article XXIV, Section 7(e)(i).

*Side Letter 11/11/93: Sec. 3

(ii)    **Salary Advances.** The full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

> \*For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to re-pay shall be treated as a Signing Bonus.

*Side Letter 6/23/94: Sec. 4

131

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(iii) **Non-Cash Provisions.** The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

> \* Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits.
>
> \*Side Letter 5/24/95: Sec. 3

> \* Expenses for travel, board and lodging for a player participating in an off-season workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.
>
> \*Side Letter 5/24/95: Sec. 1

> \* Except as set forth in the two preceding paragraphs, in Issue No. 30, and in the letter agreement between us dated August 4, 1993 regarding Rookie Orientation Camps, if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to the CBA or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This paragraph does not apply to consideration paid to a player (or his affiliate) for non-football playing services, which continues to be subject to Article XXIV, Section I(c)(ii) of the CBA.
>
> \*Side Letter 5/24/95: Sec. 4

> \* Compensation to players for participation in the off-season workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article XXXV of the CBA shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article XXXV, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii)

132

the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. For example, without limitation upon any other example, a Club having a nine-week workout program in the 1994 League Year for sixty players to be paid at the minimum amount will include $108,000 in its Team Salary on the first day of such program ($50 per day x four workout days per week x nine weeks x sixty players). At the conclusion of a club's off-season workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

*Side Letter 5/24/95: Sec. 3

\* If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three or more seasons, the fair market value of such gifts up to $10,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. If such gifts have a value between $10,000 and $15,000, the parties reserve their rights with respect to the treatment of the excess fair market value above $10,000; in the absence of agreement between the parties on such treatment, the Impartial Arbitrator shall decide. If the player has been under contract with the Club in less than three seasons, the entire fair market value of any such gifts shall be counted as Salary.

*Side Letter 4/16/96

(iv) **Annuities.** The cost to the Team of any annuity provided to any *player (but not including any annuity provided pursuant to the player annuity program described in Article XLVIII-A)*, computed at the Treasury Bill rate on March 1 of the applicable League Year, shall be included immediately in Team Salary.

*Extension Agreement 2/25/98

(f) **Traded Contracts.** In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

133

**EX 8, PAGE 859**

> \* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be re-valued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.
>
> \*Side Letter 9/21/93: Sec. 1

> \* A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.
>
> \*Side Letter 5/24/95: Sec. 11

(g) **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

### Section 8. 30% Rules:

(a) No NFL Player Contract entered into in an Uncapped Year prior to the Final League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the Contract per year. For example, a four-year Player Contract commencing in the 1993 League Year may not provide for an annual decrease of more than 30% of the Salary, excluding amounts treated as a signing bonus, in the 1993 League Year for each of the four years covered by the contract.

(b) No NFL Player Contract entered into in a Capped Year and extending into the Final League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the Final Capped Year, per year, either in the Final League Year or in any subsequent League Year covered by the Player Contract. For example, without limitation on any other applicable example, if neither party exercises any right to cancel *the* extension of this Agreement, a four-year Player Contract signed in the 2003 League Year (assuming it is a Capped Year) may not provide for an annual increase of more than 30% of the 2003 League Year Salary, excluding amounts treated as a signing bonus, in each of the three additional League Years covered by the Contract.

*\*Extension Agreement 2/25/98*

> \* Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one

134

or more contract years shall be treated as signing bonus at the time the buy-out is exercised by the Club, and pro-rated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buy-out is based upon one or more incentives that are not "likely to be earned." Such a buy-out amount shall not be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA.
*Side Letter 10/21/96: Sec. 3(a)

\* The parties acknowledge that Class Counsel together with the NFLPA, and the NFL Management Council, disagree as to the treatment of allocated signing bonus and buy-out payments when a player's right to terminate one or more contract years and/or the Club's right to buy-out is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this paragraph [and the one preceding], the terms of [both these paragraphs] may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this paragraph.

*Side Letter 10/21/96: Sec. 3(b)

\* Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, pro-rated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA, pro-rated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii)

135

if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Side Letter 10/21/96: Sec. 4

**Section 9. Renegotiations and Extensions:** Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

(a) The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

(b) No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(c) No contract renegotiations may be done for a current season after the last regular season game of that season.

(d) A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(f).

(e) As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

* No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.

*Side Letter 10/21/96: Sec. 6

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be re-valued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a pre-existing contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

*Side Letter 9/21/93: Sec. 2

* For purposes of the Salary Cap, any signing bonus given in connection with a contract extension entered into

**136**

before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The parties agree that, pursuant to the Collective Bargaining Agreement, the player shall always have the right to receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X, Paragraph G.1.(b) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

*Side Letter 9/21/93: Sec. 17

* Any agreement to compensate a player at the minimum amount set forth in Article XXXV of the CBA for participation in an off-season workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.

*Side Letter 5/24/95: Sec. 2

* *[A]ny salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Entering Player Pool shall not be treated as a renegotiation.*

*Side Letter 11/7/97

* *We have discussed whether an amendment to a Player Contract that changes the terms under which Signing Bonus is paid is or is not a "renegotiation" of the contract under the terms of Article I, Section 2(ab) and Article XXIV, Section 9 of the CBA (and corresponding provisions of the White Settlement Agreement).... We have agreed that any such agreement is a "renegotiation" under the terms of these provisions...*

*Side Letter 5/13/99

137

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

### Section 10. Accounting Procedures:

(a)    **Special Purpose Letters and DGR Reporting.**

(i)(A)  *At least three days prior to the beginning* of each *League Year,* the parties will be provided with an "Initial Special Purpose Letter" by an independent auditor *(hereinafter "the Accountants") which compiles the preliminary reporting of* the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each *Club* and the NFL for the League Year *about to be* concluded, *utilizing information reported by* independent *Club and League auditors. The* Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the *Clubs and the League* in providing information to the Accountants ("DGR Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The engagement of the *Accountants* shall be deemed to be renewed annually unless the *Accountants are* discharged by either party during the period from May 1 to July 1 of that year.

(B)  *The amount of any Salary Cap and Minimum Team Salary that may apply in a League Year, and the extent to which Required Tenders and Qualifying Offers must be increased in a League Year, shall be determined utilizing: (i) the information contained in the Initial Special Purpose Letter for the immediately preceding League Year, and (ii) any adjustments resulting from prior League Years.*

(ii)  *On or before the May 1 following the conclusion of each of the Capped Years hereunder, the parties will be provided with a "Final Special Purpose Letter" by the Accountants reporting the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each NFL Team and the NFL for the League Year just concluded. The review procedures to be performed by the Accountants are set forth in Appendix H attached hereto, or as otherwise agreed between the parties. To the extent that the amounts set forth in the Final Special Purpose Letter are different from those in the Initial Special Purpose Letter, such that the amount of any Salary Cap and/or Minimum Team Salary that League Year would have been different than that utilized as a result of the issuance of the Initial Special Purpose Letter, any such difference in the Salary Cap and/or Minimum Team Salary shall be credited or deducted, as the case may be, to any next Salary Cap and/or Minimum Team Salary (but subject in any case to Section 4(b)(i) above), with interest (using the one year Treasury Bill rate as published in The Wall Street Journal on March 1 of each applicable League Year), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), if specified by the NFLPA. Notwithstanding the foregoing, in the Final Capped Year, the Final Special Purpose Letter shall be issued no later than March 1, and any such difference shall immediately be credited or deducted, as the case may be, to the Salary Cap and/or Minimum Team Salary for the Final Capped Year (but subject in any case to Section 4(b)(i) above), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program) if specified by the NFLPA.*

\*Extension Agreement 2/25/98

138

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(iii)    The Accountants shall review the reasonableness of any estimates of revenues or expenses included in any Club's DGR Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made: (a) pursuant to Section 10(a)(ii) above for estimates corrected prior to the issuance of the Final Special Purpose Letter, and (b) in DGR for the following League Year, without interest, for estimates corrected thereafter.

*Extension Agreement 2/25/98

(iv)    With respect to expenses deducted by the NFL or the Clubs from television, cable and radio broadcast revenues or any other revenues, the NFL and the Clubs shall report in the DGR Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i). All categories of expenses deducted from such revenues by the NFL or a Club in a DGR Report completed by the NFL or that Club shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

*Extension Agreement 2/25/98

(v)    Reasonably prior to the issuance of the Final Special Purpose Letter, the Accountants shall, as set forth in Appendix H attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Clubs or any other information contained in the DGR Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other information contained in the DGR Reports submitted by the Clubs.

*Extension Agreement 2/25/98

(vi)    In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the DGR Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of subsection (iv), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(vii)    Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in

139

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a DGR Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

*Extension Agreement 2/25/98

(viii)   After receiving the Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in the Final Special Purpose Letter.

*Extension Agreement 2/25/98

(b)   **Projected Defined Gross Revenues.**
(i)   For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4-5 and 10(a) above, and for any other purpose specifically stated in this Agreement, Defined Gross Revenues shall be projected ("Projected Defined Gross Revenues") *utilizing one or more agreed-upon methods for the projection process so that the anticipated growth of Projected DGR (based upon factors such as anticipated new stadiums, expansion Clubs, and revenue provisions in the NFL's television and other contracts) over the course of League Years which are anticipated to be Capped Years shall be as accurate as practicable, subject to any agreement between the parties to allocate DGR over particular League Years pursuant to Section 1(a)(xiv) above. Notwithstanding the foregoing, any difference between Projected DGR and DGR for the prior League Year shall be credited or deducted, as the case may be, in the calculation of the Salary Cap and/or Minimum Team Salary for the next League Year using the method set forth in Sections 10(b)(ii) and (iii) below, subject in any case to Section 4(b)(i) above. Moreover, if on March 1 of the year, one or more League-wide television or local television and radio contracts are in effect for the next League Year*, the actual revenues expected from such source under such contract shall be used in the

140

**EX 8, PAGE 866**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

determination of Projected Defined Gross Revenues, *unless another alloca-*
*tion has been or is agreed to by the parties.* If, after the initial calculation of Pro-
jected DGR for a League Year, a new League-wide television contract is en-
tered into for that League Year, such amounts shall be substituted for the
amount for League-wide television revenues previously included in Pro-
jected DGR, and the Salary Cap and Minimum Team Salary shall immedi-
ately be adjusted accordingly. In addition, if one or more new *Clubs are*
scheduled to be added to the NFL during the next League Year as *one or*
*more* expansion *Clubs,* Projected DGR will include an additional projection
of DGR *determined in a manner agreed to by the parties.* In addition, if, after
the initial calculation of Projected DGR for a League Year, the number of
scheduled regular season games per *Club* is increased above the standard of
sixteen (16), Projected DGR will include an additional projection of DGR
to account for such additional games as agreed upon by the NFLPA and the
Management Council.

*\*Extension Agreement 2/25/98*

(ii)    In the event that actual Defined Gross Revenues for any League
Year are less than Projected Defined Gross Revenues (as calculated in ac-
cordance with Section 10(b)(i) above) for that League Year, then the differ-
ence shall be deducted from Projected Defined Gross Revenues for the next
League Year.

(iii)    In the event that actual Defined Gross Revenues for any League
Year exceeded Projected Defined Gross Revenues (as calculated in accor-
dance with Section 10(b)(i) above) for that League Year, then the amount
of such deficiency shall be added to Projected Defined Gross Revenues for
the next League Year.

(iv)    Any adjustments pursuant to Section *10(a)(iii)* above will be
subtracted from or added to Projected DGR as appropriate.

*\*Extension Agreement 2/25/98*

(c)    **Projected Benefits.**
(i)    For purposes of computing the Salary Cap and Minimum Team
Salary to be applied in any upcoming League Year in accordance with Sec-
tions 4-5 and *10(a)* above, and for any other purpose specifically stated in
this Agreement, Benefits shall be projected ("Projected Benefits") to be any
Benefits to be paid (or properly accrued) in the upcoming League Year pur-
suant to this Agreement. If the amounts to be paid for any Benefit during
the next League Year are not reasonably calculable, then, for the purposes
of calculating Projected Benefits, the projected amount to be paid for the
Benefit shall be the amounts expended by NFL Teams for the same Benefit
in the prior League Year.

*\*Extension Agreement 2/25/98*

**EX 8, PAGE 867**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(ii)     In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year.

(iii)    In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year.

(iv)     In the event the NFLPA exercises *any* right to reduce or freeze *or increase* certain Benefits pursuant to Article XLVI (Player Benefit Costs), Projected Benefits shall be adjusted immediately to reflect such changes.

*\*Extension Agreement 2/25/98*

(v)      In the event the amount of Projected Benefits is adjusted pursuant to (1) subsection (c)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

142