Case 2:12-md-02003-AB Document 98-6 Filed 01/28/12 Page 1 of 48

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Miami Division

MARVIN JONES; LEON SEARCY;                          Case No. _____
PATRICK SURTAIN; ORONDE GADSDEN;
DARYL PORTER; LAMAR THOMAS;
TROY DRAYTON; SEAN HILL; ROBERT HARRIS;
KEVIN LEWIS; LIONAL DALTON; JED WEAVER;
HENRI CROCKETT; ROY BARKER;
HURVIN MCCORMACK; DONNELL BENNETT;
KYLE TURLEY; MITCH WHITE; CAM CLEELAND;
JEFFREY BREGEL; and JAY FOREMAN

       Plaintiffs

vs.

NATIONAL FOOTBALL LEAGUE,

       Defendant.

_____/

## COMPLAINT

    The Plaintiffs sue the Defendant National Football League, and, in support thereof, state as follows:

### NATURE OF THE ACTION

    1.    This action arises from the concussion crisis afflicting former professional football players in the National Football League (the "NFL" or the "League"). For close to a century, evidence has linked concussions and long-term neurological problems, and specialists in brain trauma have been warning about the risks of permanent brain damage from repetitive concussions for decades. The NFL – as the organizer and purveyor of a professional sport in which head trauma is a regular and repeated occurrence – was aware of these risks but deliberately ignored and concealed them. Rather than warn its players that they risked

Case 2:12-md-02323-AB Document 26-1 Filed 03/30/12 Page 3 of 48 Page ID
#:11065
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 2 of 47

permanent brain injury if they returned to play too soon after sustaining a concussion, the NFL

actively deceived players, resulting in the players' belief that concussions did not present serious,

life-altering risks.

2.       The NFL, through its own initiative and voluntary undertaking, created the Mild

Traumatic Brain Injury Committee (the "MTBI Committee" or the "Committee") in 1994.  The

Committee was ostensibly created to research and ameliorate the impact of concussions on NFL

players.

3.       Despite clear medical evidence that on-field concussions led directly to brain

injuries and frequently had tragic repercussions for its retired players, the NFL failed to protect

other players from suffering a similar fate, and failed to inform players of the true risks

associated with such head trauma.   Instead, the NFL purposefully misrepresented and/or

concealed medical evidence on the issue.  While athletes who had suffered concussions in other

professional sports were being restricted from returning to play for full games or even seasons,

NFL players who had suffered concussions were regularly being returned to play after having

suffered a concussion in that same game.

4.       The NFL's active and purposeful concealment and misrepresentation of the severe

neurological risks of multiple concussions exposed players to dangers they could have avoided

had the League provided them with accurate information.  Many of these players, since retired,

have suffered severe and permanent brain damage as a result of the NFL's acts and/or omissions.

In fact, the MTBI Committee's concealment and misrepresentation of relevant medical evidence

over the years has caused an increased risk of life-threatening injury to players who were being

kept in the dark.

5.      The Plaintiffs in this case are former NFL players.  Each asserts some or all of the following claims against the NFL: (i) negligent undertaking; (ii) fraudulent concealment; (iii) fraudulent misrepresentation; and (iv) negligent misrepresentation.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy in this action exceeds $75,000.00 dollars, exclusive of costs, interest, and attorneys' fees.

7.      This Court has personal jurisdiction over the Defendant because it has substantial and continuous business contacts with the State of Florida, including but not limited to its having three franchises which play in Florida, and derives substantial revenue from its contacts with Florida.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(c), as Defendant is a corporation subject to personal jurisdiction in this District.

## THE PARTIES

9.      Plaintiff Marvin Jones is a resident and citizen of the State of Florida.  He played in the NFL from 1993 to 2003.

10.     Plaintiff Robert Harris is a resident and citizen of the State of Florida.  He played in the NFL from 1992 to 2000.

11.     Plaintiff Kevin Lewis is a resident and citizen of the State of Florida.  He played in the NFL from 2000 to 2005.

12.     Plaintiff Daryl Porter is a resident and citizen of the State of Florida.  He played in the NFL from 1997 to 2002.

Exhibit "A"
Page 28

13.     Plaintiff Lional Dalton is a resident and citizen of the State of Florida.  He played in the NFL from 1998 to 2006.

14.     Plaintiff Jed Weaver is a resident and citizen of the State of Florida.  He played in the NFL from 1999 to 2004.

15.     Plaintiff Leon Searcy is a resident and citizen of the State of Florida.  He played in the NFL from 1992 to 2002.

16.     Plaintiff Henri Crockett is a resident and citizen of the State of Florida.  He played in the NFL from 1997 to 2003.

17.     Plaintiff Roy Barker is a resident and citizen of the State of Florida.  He played in the NFL from 1993 to 1999.

18.     Plaintiff Hurvin McCormack is a resident and citizen of the State of Florida.  He played in the NFL from 1995 to 1999.

19.     Plaintiff Troy Drayton is a resident and citizen of the State of Florida.  He played in the NFL from 1993 to 2001.

20.     Plaintiff Donnell Bennett is a resident and citizen of the State of Florida.  He played in the NFL from 1994 to 2001.

21.     Plaintiff Oronde Gadsden is a resident and citizen of the State of Florida.  He played in the NFL from 1995 to 1996 and from 1998 to 2003.

22.     Plaintiff Sean Hill is a resident and citizen of the State of Florida.  He played in the NFL from 1994 to 1996.

23.     Plaintiff Lamar Thomas is a resident and citizen of the State of Florida.  He played in the NFL from 1993 to 1998.

24.     Plaintiff Patrick Surtain is a resident and citizen of the State of Florida.  He played in the NFL from 1998 to 2008.

25.     Plaintiff Mitch White is a resident and citizen of the State of Texas.  He played in the NFL from 2001 to 2005.

26.     Plaintiff Cam Cleeland is a resident and citizen of the State of Washington.  He played in the NFL from 1998 to 2006.

27.     Plaintiff Kyle Turley is a resident and citizen of the State of Tennessee.  He played in the NFL from 1998 to 2007.

28.     Plaintiff Jeffrey Bregel is a resident and citizen of the State of California.  He played in the NFL from 1987 to 1989.

29.     Plaintiff Jay Foreman is a resident and citizen of the State of Nebraska.  He played in the NFL from 1999 to 2006.

30.     Defendant NFL, which maintains its principal place of business at 280 Park Avenue, 15th Floor, New York, New York 10017, is an unincorporated association consisting of 32 member football teams.

31.     The NFL regularly conducts business in Florida, including, but not limited to the organizing and overseeing of games for the Miami Dolphins, Tampa Bay Buccaneers, and Jacksonville Jaguars teams, and selecting Florida cities to host the Super Bowl in Florida in 1968, 1969, 1971, 1976, 1979, 1984, 1989, 1991, 1995, 1999, 2001, 2005, 2007, 2009, and 2010.

32.     The League is in the business of, among other things, operating the sole major professional football league in the United States.  As such, the NFL promotes, organizes, and regulates the sport of professional football in the United States.

Case 2:12-md-02323-AB   Document 26-1   Filed 03/30/12   Page 7 of 48   Page ID
#:11069
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 6 of 47

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### *The NFL*

33.     The NFL is a $9,000,000,000.00 dollar-per-year business.

34.     The organization oversees America's most popular spectator sport, acting as a
trade association for 32 franchise owners.

35.     The NFL governs and promotes the game of football, sets and enforces rules and
league policies, and regulates team ownership.

36.     It generates revenue mostly through marketing sponsorships, licensing
merchandise, and by selling national broadcasting rights to the games.   The teams share a
percentage of the League's overall revenue.

37.     Owing in part to its immense financial power and monopoly status in American
football, the NFL has enormous influence over the education of team physicians, trainers,
coaches, and football players at all levels of the game concerning the assessment and impact of
football related injuries.

### *Concussions and CTE Generally*

38.     It has been well known for nearly a century that concussions and repetitive head
injuries cause a myriad of long-term sequelae.

39.     The American Association of Neurological Surgeons defines a concussion as "a
clinical syndrome characterized by an immediate and transient alteration in brain function,
including an alteration of mental status and level of consciousness, resulting from mechanical
force or trauma."

Exhibit "A"
Page 31

40.     The injury generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly.  The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

41.     Medical evidence has shown that symptoms of a concussion can reappear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

42.     According to neurologists, once a person suffers a concussion, he is up to four (4) times more likely to sustain a second one.  Additionally, after suffering even a single concussion, a lesser blow may cause the injury, and the injured person requires more time to recover.

43.     Clinical and neuropathological studies by some of the nation's foremost experts have demonstrated that multiple concussions sustained during an NFL player's career can cause severe cognitive problems such as depression and early-onset dementia.

44.     Repeated head trauma can also result in so-called "Second Impact Syndrome," in which re-injury to a person who has already suffered a concussion triggers swelling that the skull cannot accommodate.

45.     Repeated instances of head trauma also frequently lead to Chronic Traumatic Encephalopathy ("CTE"), a progressive degenerative disease of the brain.

46.     CTE involves the build-up of toxic proteins in the brain's neurons.  This build-up results in a condition whereby signals sent from one cell to thousands of connecting cells in various parts of the brain are not received, leading to abnormal and diminished brain function.

47.     CTE is found in athletes (and others) with a history of repetitive concussions. Conclusive studies have shown this condition to be prevalent in retired professional football players who have a history of head injury.

48.     This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue.  These changes in the brain can begin months, years, or even decades after the last concussion or the end of active athletic involvement.  The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse-control problems, aggression, depression, and eventually progressive dementia.

49.     The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

50.     To date, neuroanatomists have performed autopsies on thirteen (13) former NFL players who died after exhibiting signs of degenerative brain disease.  Twelve (12) of these players were found to have suffered from CTE.

### The NFL's Knowledge of the Dangers and Risks Associated with Concussions

51.     For almost a century, the NFL has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

52.     CTE was first addressed in a 1928 article written by pathologist Harrison Martland, discussing "Punch Drunk" syndrome in a group of athletes exposed to repetitive brain trauma (the "Martland study").  The article was published in the Journal of the American Medical Association.

53.     The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

8

54.     In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in those suffering repeated blows to the head, focusing on professional boxers.

55.     That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.,* recommending that players cease to play football after receiving their third concussion.)

56.     In 1973, a potentially fatal condition known as "Second Impact Syndrome"—in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate—was discovered.  It did not receive this name until 1984.

57.     Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least forty (40) football players.

58.     Between 1952 and 1994, numerous studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, and the *New England Journal of Medicine*, warning of the dangers of single concussions, multiple concussions, and football-related head trauma from multiple concussions.  These studies collectively established that:

     a.    repetitive head trauma in contact sports has dangerous long-term effects on the brain;

     b.    post-mortem evidence of CTE was present in numerous cases of boxers and contact-sport athletes;

     c.    there is a relation between neurologic pathology and length of career in athletes who play contact sports;

     d.    immediate retrograde memory issues occur following concussions;

     e.    mild head injury requires recovery time without risk of subjection to further injury;

9

     f.       head trauma is linked to dementia; and

     g.      a football player who suffers a concussion requires significant rest before being subjected to further contact.

59.     By 1991, three distinct medical professionals/entities, all independent from the NFL—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

60.     Upon information and belief, by 1991, the National Collegiate Athletic Association ("NCAA") football conferences and individual college teams' medical staffs, along with many lower-level football groups (*e.g.,* high school, junior high school, and pee-wee league) had adopted return-to-play criteria to protect football players even remotely suspected of having sustained concussions.

61.     In 1995, a group of neurological doctors, NFL team doctors, and some NFL players participated in the NFL Players' Head Concussion Brain Injury Seminar.  At this convention, many of the independent neurological doctors confirmed that concussions can have long-term negative health consequences and warned of the dangers associated with concussions and with returning to play too soon after having received a concussion.  One NFL team doctor acknowledged at this conference that any education and/or training on concussions should come from the NFL, but alleged that there was no hard data on the long-term effects of head injuries.  By implication, this doctor represented that the NFL had yet to issue any educational guidance on the adverse effects of concussions.

62.     In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving 18,000 collegiate and high school

Exhibit "A"
Page 35

Case 2:Case-2:13-md-02323-AB Document 26-1 Filed 03/30/12 Page 12 of 48 Page ID
#:11074
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 11 of 47

football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

63.     A 2000 study, which surveyed 1,090 former NFL players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers.  Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

64.     In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.   These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

65.     This echoed similar medical protocol established at a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

66.     Upon information and belief, in literally hundreds upon thousands of games and practices, concussed players—including those knocked entirely unconscious—were returned to play in the *same game or practice*.

67.     Indeed, while the NFL knew as early as the 1920's of the harmful effects of concussions on a player's brain, it actively concealed these facts from coaches, trainers, players, and the public.

*The NFL Voluntarily Undertakes the Responsibility of Studying Concussions Yet Fraudulently Conceals the Long-Term Effects of Concussions*

68.     As described above, the NFL has known for decades that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms.

69.     Rather than take immediate measures to protect its players from these known dangers, the NFL instead formed a committee to study the issue in 1994.  This Committee, the Mild Traumatic Brain Injury Committee (the "MTBI Committee" or the "Committee"), voluntarily undertook the responsibility of studying the effects of concussions on NFL players.

70.     Through its creation of the MTBI Committee, the NFL affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players, and to use reasonable care in the publication of data from the MTBI Committee's work.

71.     Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of fraudulent and negligent conduct.

72.     The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the League, and to outline solutions.  The MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

73.     By 1994, when the NFL formed the MTBI Committee, independent scientists, doctors, and neurologists alike were already convinced that all concussions—even seemingly mild ones—were serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

12

74.     The MTBI Committee was intended to be independent from the NFL, consisting of a combination of doctors and researchers.

75.     In actuality however, the MTBI Committee was not independent.  It consisted of five (5) members who were already affiliated with the NFL.

76.     The Committee was headed by Dr. Elliot Pellman, a rheumatologist who lacked any specialized training or education relating to concussions, and who reportedly had previously been fired by Major League Baseball for lying regarding his resume.  Dr. Pellman would go on to chair the MTBI Committee from 1994-2007, and his leadership of the Committee came under frequent harsh outside criticism related to his deficient medical training, background, and experience.

77.     The NFL failed to appoint any neuropathologist, neurologist, or any other doctor specializing in brain research to the MTBI Committee.

78.     From its inception in 1994, the MTBI Committee allegedly began conducting studies to determine the effect of concussions on the long-term health of NFL players. NFL Commissioner Roger Goodell ("Goodell") confirmed this in June 2007 when he stated publicly that the NFL had been studying the effects of traumatic brain injury for "close to 14 years . . . ."

79.     The MTBI Committee did not publish its first findings on active players until 2003.  In that publication, the MTBI Committee stated, contrary to years of (independent) findings, that there were no long term negative health consequences associated with concussions.

80.     The MTBI Committee published its findings in a series of thirteen (13) papers between 2003 and 2006.  According to the MTBI Committee, all of their findings supported a conclusion that there were no long term negative health consequences associated with

concussions.  These findings regularly contradicted the research and experiences of neurologists who treat sports concussions and the players who endured them.

81.    Completely contrary to public findings and conclusions, the NFL's team of hand-picked experts on the MTBI Committee did not find concussions to be of significant concern and felt it appropriate for players suffering a concussion to continue playing football during the same game or practice in which one was suffered.  This recommendation and practice by the NFL, promoted by the MTBI Committee, was irresponsible and dangerous.

82.    The MTBI Committee's methodology and the conclusions reached in their research were criticized by independent experts due to the numerous conclusions at odds with common medical knowledge and basic scientific protocol.

83.    For example, in 2004 the MTBI Committee published a conclusion in which it claimed that the Committee's research found no risk of repeated concussions in players with previous concussions and that there was no "7- to 10- day window of increased susceptibility to sustaining another concussion."

84.    In a comment to this publication, one independent doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which **contradicts literature published over the past twenty years** suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."  (emphasis added).

85.    As further example, an MTBI Committee conclusion in 2005 stated that "[t]here was no evidence of any adverse effect" of returning a formerly unconscious N.F.L. player to the same game. "These data suggest," the Committee reported, "that these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

86. Yet, a 2003 NCAA study of 2,905 college football players found just the opposite: "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

87. Other contrary conclusions that the MTBI Committee published over several years include but are not limited to the following:

    a.    in an October 2006 article by Drs. Pellman and Viano stated that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [concussions] in professional football are not serious injuries;"

    b.    that NFL players did not show a decline in brain function after a concussion;

    c.    that there were no ill effects among those who had three or more concussions or who took hits to the head that sidelined them for a week or more; and

    d.    that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions."

    e.    that NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

88. The Committee's papers (the "Pellman Papers") received significant criticism in the media from independent doctors and researchers, and were met with skepticism in peer review segments following each article's publication.

89. Renowned experts Dr. Robert Cantu and Dr. Julian Bailes wrote harshly critical reviews of the studies' conclusions.

90. The Pellman Papers were also criticized in the popular press by ESPN and the *New York Times* when repeated inconsistencies and irregularities in the MTBI Committee's data were revealed.

91.     An ESPN article described how the MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions.   The article further revealed that Dr. Pellman had fired a neuropsychologist for the New York Jets, Dr. William Barr, after Dr. Barr voiced concern that Dr. Pellman might be picking and choosing what data to include in the Committee's research to get results that would downplay the negative effects of concussions.

92.     As described in the following paragraphs, when faced with studies which implicated a causal link between concussions and cognitive degeneration, the NFL, through the MTBI Committee, continued to produce contrary findings which were false, distorted and deceiving, all in an effort to conceal and deceive players and the public at large.

93.     Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.   Dr. Omalu concluded in a *Neurosurgery* article that the players suffered from CTE.

94.     In response to Dr. Omalu's article, the MTBI Committee wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

95.     In 2005, a clinical study performed by Dr. Kevin Guskiewicz found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees without a history of concussions.   In doing this research, Dr. Guskiewicz conducted a survey of over 2,550 former NFL athletes.   The MBTI Committee attacked and undermined the study, stating: "We want to apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening. . . . You cannot tell that from a survey."

96.     In August 2007, the NFL, in keeping with its scheme of fraud and deceit, issued a concussion pamphlet to players which stated: "there is no magic number for how many concussions is too many."

97.     The concussion pamphlet was clearly designed to obtain player reliance: "We want to make sure all NFL players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions." The NFL decided that the "most up to date information" did not include the various independent studies indicating a causal link between multiple concussions and cognitive decline in later life.

### The NFL's Belated Acknowledgement of the Concussion Crisis

98.     Facing increasing media scrutiny over the MTBI Committee's questionable studies, Dr. Pellman eventually resigned as the head of the Committee in 2007.  He was replaced as head by Dr. Ira Casson and Dr. David Viano, but remained a member of the Committee.

99.     Dr. Casson continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries.  When asked in 2007 whether concussions could lead to brain damage, dementia, or depression, Dr. Casson denied the linkage six separate times.

100.    In June 2007, the NFL convened a concussion summit for team doctors and trainers.  At the summit, Dr. Casson told team doctors and trainers that CTE has never been scientifically documented in football players.

101.    When Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players in 2008, a MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn.

17

102.    In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players.  Over 1,000 former NFL players took part in the study.  The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population--- including a rate of 19 times the normal rate for men ages 30 through 49."

103.    The NFL, **who commissioned the study,** responded to these results by claiming that the study was incomplete, and that further findings would be needed.  Other experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

104.    After the results of this study were released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

105.    At the first hearing in October 2009, NFL Commissioner Roger Goodell acknowledged that the NFL owes a duty to the public at large to educate them as to the risks of concussions due to the league's unique position of influence: "In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well.  We must act in their best interests even if these young men never play professional football."

106.    Also at the October hearing, NFL Players' Association Executive Director DeMaurice Smith stated,   "[T]here have been studies over the last decade highlighting [connection between on-field injury and post career mental illness].  Unfortunately, the N.F.L.

18

Exhibit "A"
Page 43

Case 2:12-md-02323-AB Document 26-1 Filed 03/30/12 Page 20 of 48 Page ID
#:11082
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 19 of 47

has diminished those studies, urged the suppression of the findings and for years, moved slowly in an area where speed should have been the impetus."

107.    Dr. Casson gave testimony at these hearings, and continued to deny the validity of other non-NFL studies, stating that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

108.    In 2009, in a televised interview on HBO's Real Sports, Dr. Casson definitively and unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever."

109.    Shortly after the 2009 congressional hearings, however, the NFL announced that it would impose its most stringent rules to date on managing concussions, requiring players who exhibit any significant sign of concussion to be removed from a game or practice and be barred from returning the same day.

110.    In January 2010, the House Judiciary Committee held further hearings on football player head injuries.  Representative Conyers noted that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

111.    The NFL's belated change of policy contradicted past recommendations by its MTBI Committee which had recommended as safe the League's practice of returning players to the game after a concussion.  In fact, the Committee had published a paper in 2005 that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

Exhibit "A"
Page 44

112. In 2010, the NFL re-named the MTBI Committee to the "Head, Neck, and Spine Medical Committee" and announced that Dr. Pellman would no longer be a member of the panel. Drs. H. Hunt Batjer and Richard Ellenbogen were selected to replace Drs. Casson and Viano.

113. Under its new leadership, the Committee admitted that data collected by the NFL's formerly appointed brain-injury leadership was "infected," and said that their Committee should be assembled anew.

114. Dr. Batjer was quoted as saying, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

115. In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

116. Shortly thereafter, the NFL finally admitted the link between concussions and the above-described medical conditions.

117. In October 2011, Dr. Mitchel Berger of the Head, Neck, and Spine Medical Committee announced that a new study was in the planning process. He admitted that the MTBI Committee's previous long-range study was useless because "[t]here was no science in that." Dr. Berger further stated that data from the previous study would not be used. "We're really moving on from that data. There's really nothing we can do with that data in terms of how it was collected and assessed."

20

118.    Now, the NFL requires its member teams to have neurologists on the sidelines during games to clear players suspected of concussions prior to their return to play.

119.    Notwithstanding this new policy, on October 23, 2011, San Diego Charger Kris Dielman plainly suffered a concussion early in a game and could be seen staggering back to the huddle.  Despite the obvious brain injury, Mr. Dielman was neither evaluated by a doctor nor held out for even one play.  He suffered gran mal seizures on the team's plane ride home.

120.    Ten (10) days later, in November of 2011, the League's injury and safety panel issued a directive telling its game officials to watch closely for concussion symptoms in players.

121.    On or about December 21, 2011 the NFL alerted all thirty two (32) teams that, effective immediately, an independently certified athletic trainer would be assigned to monitor all suspected concussion-related injuries. The independent trainers are paid by the NFL and approved by the NFL Players' Association. The trainers' sole purpose is to oversee the treatment of possible concussions and ensure that medical staff on each team's sideline are following proper league protocol in testing players for concussions and related head injuries.

122.    Why League policy changes, accurate information sharing, strict fines and warnings were not recommended by the NFL's so called "expert" committee soon after its creation in 1994 is difficult to comprehend.  That it took sixteen (16) years to admit that there was a problem and to take real action to address that problem is willful and wanton and exhibits a reckless disregard for the safety of its players and the public at large.

### *Plaintiff Marvin Jones' Concussion History in the NFL and Injuries*

123.    Plaintiff Marvin Jones played in the NFL from 1993 to 2003.

124.    Plaintiff Jones suffered four (4) diagnosed concussions in games played.

Case 2:12-md-02323-AB Document 26-1 Filed 03/30/12 Page 23 of 48 Page ID
#:11085
Case 1:11-cv-24594-JEM Document 1 Entered on FLSD Docket 12/22/2011 Page 22 of 47

125. With respect to each of the diagnosed concussions, Plaintiff Jones was taken to the sidelines and asked two or three simple questions by his team's doctor, Elliot Pellman. (The questions included, for example, "Who is the president?" and "What day is it?" etc.). Following a successful answer to these questions, Plaintiff Jones would be returned to play.

126. Plaintiff Jones suffered other head injuries or blows to the head after being returned to play from his diagnosed concussions.

127. Plaintiff Jones also suffered approximately twenty (20) undiagnosed concussions while playing in the NFL. In one of these cases, he was knocked unconscious.

128. Plaintiff Jones was returned to play after every concussion he sustained, never missing more than one play. In every instance, he was given medical "clearance" to return to play.

129. Plaintiff Jones was never held out from practice or missed a practice due to a concussion.

130. At no time after suffering a concussion was Plaintiff Jones warned about the dangers of returning to play too quickly. Nor was Plaintiff Jones warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

131. As a result of the numerous concussions suffered during his playing career, Plaintiff Jones, though only 39 years old, suffers from, *inter alia,* the symptomology associated with CTE, severe migraine headaches, memory lapses and deficiency, suicidal thoughts, cervical spine arthritis, bi-polar mood symptoms, depression, extreme fatigue and apathy, bouts of intermittent extreme irritability, extreme anxiety and panic disorder, and intermittent extreme

22

Case 2:12-md-02323-AB Document 26-1 Filed 03/30/12 Page 24 of 48 Page ID
#:11086
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 23 of 47

sensitivity to light.  Plaintiff Jones is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Robert Harris' Concussion History in the NFL and Injuries*

132.    Plaintiff Robert Harris played in the NFL from 1992 to 2000.

133.    Plaintiff Harris sustained between one (1) and two (2) concussions per season, every season that he played in the NFL.

134.    Plaintiff Harris was returned to play after having suffered concussions before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

135.    At no time after suffering a concussion was Plaintiff Harris warned about the dangers of returning to play too quickly.  Nor was Plaintiff Harris warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

136.    As a result of the numerous concussions suffered during his playing career, Plaintiff Harris suffers from, *inter alia,* headaches, loss of memory, sleeping problems, cervical arthritis, dizziness, impulse control problems, blurred vision, slurred speech, and irritability. Since retiring, Plaintiff Harris has been diagnosed as having a neurological disorder and chronic brain injury.  He has also received head surgery.  Plaintiff Harris is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Kevin Lewis' Concussion History in the NFL and Injuries*

137.    Plaintiff Kevin Lewis played in the NFL from 2000 to 2005.

138.    Plaintiff Lewis sustained numerous undiagnosed concussions while playing in the NFL.

Exhibit "A"
Page 48

139.    Plaintiff Lewis was returned to play after having suffered concussions before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

140.    At no time after suffering a concussion was Plaintiff Lewis warned about the dangers of returning to play too quickly.  Nor was Plaintiff Lewis warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

141.    As a result of the numerous concussions suffered during his playing career, Plaintiff Lewis suffers from, *inter alia,* headaches and loss of memory, and has attention deficit problems.  Plaintiff Lewis is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Daryl Porter's Concussion History in the NFL and Injuries*

142.    Plaintiff Daryl Porter played in the NFL from 1997 to 2002.

143.    Plaintiff Porter sustained numerous diagnosed and undiagnosed concussions while playing in the NFL.

144.    Plaintiff Porter was returned to play after having suffered concussions before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

145.    At no time after suffering a concussion was Plaintiff Porter warned about the dangers of returning to play too quickly.  Nor was Plaintiff Porter warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

146.    As a result of the numerous concussions suffered during his playing career, Plaintiff Porter suffers from, *inter alia,* migraine headaches, loss of memory, difficulty

concentrating, sleeping problems, and cervical arthritis. Plaintiff Porter is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Lional Dalton's Concussion History in the NFL and Injuries*

147.    Plaintiff Lional Dalton played in the NFL from 1998 to 2006.

148.    Plaintiff Dalton received multiple diagnosed and undiagnosed concussions throughout his NFL career.

149.    Plaintiff Dalton received his first diagnosed concussion during a training camp practice.   He was knocked unconscious and revived by training staff with smelling salts. Plaintiff Dalton was returned to play during that practice.

150.    At the conclusion of that practice, Plaintiff Dalton approached his team doctor to discuss his continuing concussion symptoms.

151.    The team doctor discouraged him from seeking a second opinion, and informed Plaintiff Dalton that there were no dangers associated with a return to play.   At that time, Plaintiff Dalton was shown literature from the NFL corroborating the doctor's opinion.

152.    Plaintiff Dalton sustained his second diagnosed concussion during a regular season practice in 2006.  Plaintiff Dalton was knocked unconscious as a result of the concussion, yet was returned to play during that same practice.

153.    At no time after suffering a concussion was Plaintiff Dalton warned about the dangers of returning to play too quickly.  Nor was Plaintiff Dalton warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

154.    As a result of the numerous concussions suffered during his playing career, Plaintiff Dalton suffers from, *inter alia,* frequent nosebleeds, vision problems, depression, and

Exhibit "A"
Page 50

loss of memory. He also is required to take seizure medications. Plaintiff Dalton is also at heightened risk of developing further adverse neurological symptoms in the future.

### Plaintiff Jed Weaver's Concussion History in the NFL and Injuries

155. Plaintiff Jed Weaver played in the NFL from 1999 to 2004.

156. Plaintiff Weaver sustained numerous undiagnosed concussions while playing in the NFL.

157. Plaintiff Weaver was returned to play after having suffered those concussions before it was medically appropriate to do so and subsequently sustained other head injuries or blows to the head.

158. At no time after suffering a concussion was Plaintiff Weaver warned about the dangers of returning to play too quickly. Nor was Plaintiff Weaver warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

159. As a result of the numerous concussions suffered during his playing career, Plaintiff Weaver suffers from, *inter alia,* depression, anxiety, daily headaches, extreme irritability, dizziness, and difficulty concentrating. Plaintiff Weaver is also at heightened risk of developing further adverse neurological symptoms in the future.

### Plaintiff Leon Searcy's Concussion History in the NFL and Injuries

160. Plaintiff Leon Searcy played in the NFL from 1992 to 2002.

161. Plaintiff Searcy sustained numerous concussions while playing in the NFL.

162. Plaintiff Searcy was returned to play after having suffered concussions before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

Exhibit "A"
Page 51

Case 2:1:11-cv-02803-AB Document 26-1 Filed 03/30/12 Page 28 of 48 Page ID
#:11090
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 27 of 47

163.   At no time after suffering a concussion was Plaintiff Searcy warned about the dangers of returning to play too quickly.  Nor was Plaintiff Searcy warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

164.   As a result of the numerous concussions suffered during his playing career, Plaintiff Searcy suffers from, *inter alia,* headaches, memory loss, difficulty concentrating, irritability, and mood swings.  Plaintiff Searcy is also at heightened risk of developing further adverse neurological symptoms in the future.

### Plaintiff Henri Crockett's Concussion History in the NFL and Injuries

165.   Plaintiff Henri Crockett played in the NFL from 1997 to 2003.

166.   Plaintiff Crockett sustained one diagnosed concussion during a game in 2003.  He was returned to play in the same game.

167.   Plaintiff Crockett also sustained numerous undiagnosed concussions while playing in the NFL.

168.   Plaintiff Crockett was returned to play after having suffered concussions before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

169.   At no time after suffering a concussion was Plaintiff Crockett warned about the dangers of returning to play too quickly.  Nor was Plaintiff Crockett warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

170.   As a result of the numerous concussions suffered during his playing career, Plaintiff Crockett suffers from, *inter alia,* headaches, memory problems, difficulty concentrating,

27

and fatigue. Plaintiff Crockett is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Roy Barker's Concussion History in the NFL and Injuries*

171.    Plaintiff Roy Barker played in the NFL from 1993 to 2001.

172.    Plaintiff Barker sustained multiple concussions while playing in the NFL.

173.    After having sustained these concussions, Plaintiff Barker was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

174.    At no time after suffering a concussion was Plaintiff Barker warned about the dangers of returning to play too quickly. Nor was Plaintiff Barker warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries..

175.    As a result of the numerous concussions suffered during his playing career, Plaintiff Barker suffers from, *inter alia*, headaches, memory loss, and loss of concentration. Plaintiff Barker is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Hurvin McCormack's Concussion History in the NFL and Injuries*

176.    Plaintiff Hurvin McCormack played in the NFL from 1993 to 2001

177.    Plaintiff McCormack sustained multiple concussions while playing in the NFL.

178.    After having sustained these concussions, Plaintiff McCormack was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

Exhibit "A"
Page 53

Case 2:12-md-02323-AB Document 26-1 Filed 03/30/12 Page 30 of 48 Page ID
#:11092
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 29 of 47

179.   At no time after suffering a concussion was Plaintiff McCormack warned about the dangers of returning to play too quickly.  Nor was Plaintiff McCormack warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

180.   As a result of the numerous concussions suffered during his playing career, Plaintiff McCormack suffers from, *inter alia*, headaches, memory loss, and difficulty concentrating.  Plaintiff McCormack is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Troy Drayton's Concussion History in the NFL and Injuries*

181.   Plaintiff Troy Drayton played in the NFL from 1993 to 2001.

182.   Plaintiff Drayton sustained multiple concussions while playing in the NFL.

183.   After having sustained these concussions, Plaintiff Drayton was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

184.   At no time after suffering a concussion was Plaintiff Drayton warned about the dangers of returning to play too quickly.  Nor was Plaintiff Drayton warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

185.   As a result of the numerous concussions suffered during his playing career, Plaintiff Drayton suffers from, *inter alia*, headaches, memory loss, and difficulty concentrating.  Plaintiff Drayton is also at heightened risk of developing further adverse neurological symptoms in the future.

29

#### *Plaintiff Donnell Bennett's Concussion History in the NFL and Injuries*

186.    Plaintiff Donnell Bennett played in the NFL from 1994 to 2001.

187.    Plaintiff Bennett sustained multiple concussions while playing in the NFL.

188.    After having sustained these concussions, Plaintiff Bennett was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

189.    At no time after suffering a concussion was Plaintiff Bennett warned about the dangers of returning to play too quickly.  Nor was Plaintiff Bennett warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

190.    As a result of the numerous concussions suffered during his playing career, Plaintiff Bennett suffers from, *inter alia*, headaches, memory loss, and difficulty concentrating. Plaintiff Bennett is also at heightened risk of developing further adverse neurological symptoms in the future.

#### *Plaintiff Oronde Gadsden's Concussion History in the NFL and Injuries*

191.    Plaintiff Oronde Gadsden played in the NFL from 1995 to 1996 and from 1998 to 2003.

192.    Plaintiff Gadsden sustained multiple concussions while playing in the NFL.

193.    After having sustained these concussions, Plaintiff Gadsden was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

194.    At no time after suffering a concussion was Plaintiff Gadsden warned about the dangers of returning to play too quickly.  Nor was Plaintiff Gadsden warned about the risk of

Exhibit "A"
Page 55

long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

195.   As a result of the numerous concussions suffered during his playing career, Plaintiff Gadsden suffers from, *inter alia*, headaches, memory loss, and difficulty concentrating. Plaintiff Gadsden is also at heightened risk of developing further adverse neurological symptoms in the future.

### Plaintiff Sean Hill's Concussion History in the NFL and Injuries

196.   Plaintiff Sean Hill played in the NFL from 1994 to 1996.

197.   Plaintiff Hill sustained multiple concussions while playing in the NFL.

198.   After having sustained these concussions, Plaintiff Hill was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

199.   At no time after suffering a concussion was Plaintiff Hill warned about the dangers of returning to play too quickly.  Nor was Plaintiff Hill warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

200.   As a result of the numerous concussions suffered during his playing career, Plaintiff Hill suffers from, *inter alia*, headaches, memory loss, and difficulty concentrating. Plaintiff Hill is also at heightened risk of developing further adverse neurological symptoms in the future.

### Plaintiff Lamar Thomas's Concussion History in the NFL and Injuries

201.   Plaintiff Lamar Thomas played in the NFL from 1993 to 1998.

202.   Plaintiff Thomas sustained multiple concussions while playing in the NFL.

Exhibit "A"
Page 56

203.   After having sustained these concussions, Plaintiff Thomas was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

204.   At no time after suffering a concussion was Plaintiff Thomas warned about the dangers of returning to play too quickly.  Nor was Plaintiff Thomas warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

205.   As a result of the numerous concussions suffered during his playing career, Plaintiff Thomas suffers from, *inter alia*, headaches, memory loss, and difficulty concentrating. Plaintiff Thomas is also at heightened risk of developing further adverse neurological symptoms in the future.

### Plaintiff Patrick Surtain's Concussion History in the NFL and Injuries

206.   Plaintiff Patrick Surtain played in the NFL from 1998 to 2008.

207.   Plaintiff Surtain sustained multiple concussions while playing in the NFL.

208.   After having sustained these concussions, Plaintiff Surtain was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

209.   At no time after suffering a concussion was Plaintiff Surtain warned about the dangers of returning to play too quickly.  Nor was Plaintiff Surtain warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

Exhibit "A"
Page 57

210.    As a result of the numerous concussions suffered during his playing career, Plaintiff Surtain suffers from, *inter alia*, memory loss.  Plaintiff Surtain is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Mitch White's Concussion History in the NFL and Injuries*

211.    Plaintiff Mitch White played in the NFL from 2001 to 2005.

212.    Plaintiff White sustained multiple concussions while playing in the NFL.

213.    For example, received a concussion during a training camp practice, resulting in severe dizziness.

214.    Plaintiff White suffered a second concussion during another training camp.

215.    With respect to each of these concussions, Plaintiff White was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

216.    Plaintiff White was also shown literature from the NFL representing that engaging in normal football conduct directly subsequent to or shortly after suffering a concussion would not place players at any greater risk.

217.    At no time after suffering a concussion was Plaintiff White warned about the dangers of returning to play too quickly.  Nor was Plaintiff White warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

218.    As a result of the numerous concussions suffered during his playing career, Plaintiff White has been diagnosed with a traumatic brain injury, and suffers from, *inter alia,* headaches, loss of memory, suicidal thoughts, sleeping problems, cervical arthritis, anxiety, dizziness, chronic brain injury, impulse control problems, fatigue, irritability, numbness and

Exhibit "A"
Page 58

tingling, post-traumatic stress disorder, and depression and is required to take multiple medications. Plaintiff White is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Cam Cleeland's Concussion History in the NFL and Injuries*

219.    Plaintiff Cam Cleeland played in the NFL from 1998 to 2006.

220.    Plaintiff Cleeland sustained eight (8) diagnosed concussions and numerous undiagnosed concussions while playing in the NFL.

221.    After having sustained these concussions, Plaintiff Cleeland was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

222.    At no time after suffering a concussion was Plaintiff Cleeland warned about the dangers of returning to play too quickly. Nor was Plaintiff Cleeland warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

223.    Plaintiff Cleeland was also shown literature from the NFL representing that engaging in normal football conduct directly subsequent to or shortly after suffering a concussion would not place players at any greater risk.

224.    As a result of the numerous concussions suffered during his playing career, Plaintiff Cleeland has been diagnosed with post-traumatic stress disorder and cervical arthritis, and suffers from, *inter alia,* suicidal thoughts, sleeping problems, anxiety, dizziness, impulse control problems, fatigue, weight gain, numbness and tingling, apathy, depression, and mood swings. Plaintiff Cleeland is also at heightened risk of developing further adverse neurological symptoms in the future.

Exhibit "A"
Page 59

### *Plaintiff Kyle Turley's Concussion History in the NFL and Injuries*

225.    Plaintiff Kyle Turley played in the NFL from 1998 to 2007.

226.    Plaintiff Turley sustained multiple concussions while playing in the NFL.

227.    After having sustained these concussions, Plaintiff Turley was returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

228.    At no time after suffering a concussion was Plaintiff Turley warned about the dangers of returning to play too quickly.  Nor was Plaintiff Turley warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

229.    Further, Plaintiff Turley relied on specific misrepresentations of the NFL regarding or relating to the medical evidence on the adverse health consequences associated with concussions, as well as how to treat and evaluate concussions.  These representations include, but are not limited to, the 2007 pamphlet, described above in paragraphs 96 and 97, distributed by the NFL.

230.    As a result of the numerous concussions suffered during his playing career, Plaintiff Turley suffers from, *inter alia,* migraine headaches, dizziness, ringing in his ears, seizures, and memory problems.  He is also required to take medication for his headaches.  Plaintiff Turley is also at heightened risk of developing further adverse neurological symptoms in the future.

### *Plaintiff Jeffrey Bregel's Concussion History in the NFL and Injuries*

231.    Plaintiff Jeffrey Bregel played in the NFL from 1987 to 1989.

Exhibit "A"
Page 60

232.    Plaintiff Bregel sustained multiple concussions, including four (4) diagnosed concussions, while playing in the NFL.

233.    After sustaining his concussions, Plaintiff Bregel was, on multiple occasions, returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

234.    By way of example, Plaintiff Bregel suffered two (2) of his diagnosed concussions after knocking heads with an opposing player during practice. Plaintiff Bregel immediately suffered a severe headache, loss of concentration, and stinging sensation running down his arms. Despite his symptomology, Plaintiff Bregel was not pulled from practice, and was commanded by his coach to immediately run the same play again.

235.    At no time after suffering a concussion was Plaintiff Bregel warned about the dangers of returning to play too quickly. Nor was Plaintiff Bregel warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

236.    As a result of the numerous concussions suffered during his playing career, Plaintiff Bregel suffers from, *inter alia,* migraine headaches, dizziness, loss of memory, impulse control problems, depression, suicidal thoughts, fatigue, bipolar disorder, sleep problems, irritability, cervical spine arthritis, numbness/tingling sensations, anxiety, adjustment disorder, personality disorder, schizophrenia, and neurolepsy. Plaintiff Bregel is currently taking the following medications for his symptoms: Cymbalta, Abilify, Temazepam, Lorazepam, and Provigil. Plaintiff Bregel is also at heightened risk of developing further adverse neurological symptoms in the future.

36

Case 2:1:11-cv-02803-AB Document 26-1 Filed 03/30/12 Page 38 of 48 Page ID
#:11100
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 37 of 47

*Plaintiff Jay Foreman's Concussion History in the NFL and Injuries*

237.    Plaintiff Jay Foreman played in the NFL from 1999 to 2006.

238.    Plaintiff Foreman sustained multiple concussions, including four diagnosed concussions, while playing in the NFL.

239.    After sustaining his concussions, Plaintiff Foreman was, on multiple occasions, returned to play before it was medically appropriate and subsequently suffered other head injuries or blows to the head.

240.    At no time after suffering a concussion was Plaintiff Foreman warned about the dangers of returning to play too quickly.  Nor was Plaintiff Foreman warned about the risk of long-term injury due to football-related concussions.  This lack of warnings was a substantial factor in causing his current injuries.

241.    Further, Plaintiff Foreman relied on specific misrepresentations of the NFL regarding or relating to the medical evidence on the adverse health consequences associated with concussions, as well as how to treat and evaluate concussions. These misrepresentations were, among other things, included in NFL literature provided to Plaintiff Foreman while he was still playing in the NFL.

242.    As a result of the numerous concussions suffered during his playing career, Plaintiff Foreman suffers from, *inter alia*, severe headaches, depression, memory loss, loss of concentration, and mood swings.  Plaintiff Foreman is also at heightened risk of developing further adverse neurological symptoms in the future.

## COUNT I
### (Negligent Undertaking on Behalf of All Plaintiffs)

243.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

37

244.   Defendant NFL, through its own voluntary initiative and undertaking, created the MTBI Committee in 1994 which undertook to research the long-term effects of concussions and to ameliorate the occurrence/severity of concussions during game and practice play in an effort to educate and protect NFL players.

245.   In so doing, the NFL undertook to render services to the 32 franchised teams and/or to individual NFL players.

246.   The NFL, as purveyors of safety rules and regulations for the League and because of its enormous influence and control over research and education concerning football injuries, recognized that its formation of the MTBI Committee and the Committee's subsequent activities were necessary for the safety of individual NFL players, including Plaintiffs.

247.   Because of its undertaking to render the above-described services and its recognition that such services were necessary to NFL players' safety, the NFL had a duty to exercise reasonable care in its and the MTBI Committee's undertaking.

248.   The NFL failed to exercise reasonable care by numerous actions and omissions including but not limited to the following:

    a.   Appointing unqualified physicians to key positions within the MTBI Committee;

    b.   Appointing a physician to lead the MTBI Committee whose main goal was to satisfy the NFL in representing that there were no risks associated with sustaining concussions rather than accurately report or investigate such risks;

    c.   Allowing, requesting, or mandating the MTBI Committee to conduct research and/or studies that were deficient in a number of respects, including but not limited to the following:

        i.   The MTBI Committee's studies were based on an insufficient pool of players and omitted key groups of affected players, including players who were forced to retire due to post-concussion syndrome;

Exhibit "A"
Page 63

     ii. The MTBI Committee's methodology contained numerous design, data-collection, and data-analytical flaws;

     iii. The MTBI Committee refused to recognize, warn of, or adopt available independent research and/or evidence that established a link between concussions and long-term physical and mental health issues to which the players would be susceptible;

     iv. The MTBI Committee refused to recognize or warn players that practice and game-play concussions were likely and/or common in a contact sport such as professional football;

     v. The MTBI Committee failed to track medical status of players who left the NFL to determine whether they suffered from long-term health effects due to concussions;

    d. Downplaying or denying the severity of concussions and/or head injuries and the link between such injuries and long-term adverse health effects;

    e. Failing to educate, inform, or warn the players about the potential for, or proof of, long-term adverse health effects from sustaining concussions/head injuries during practice and/or game-play;

    f. Failing to take immediate action to ameliorate the occurrences and severity of concussions/head injuries sustained during practice and/or game-play after its studies revealed a clear link between concussions and long-term cognitive health problems; and

    g. Creating a "culture" within the NFL that promoted return-to-play policies that focused on increasing revenue rather than player safety.

    249.    The NFL's failure to exercise reasonable care increased the risk that Plaintiffs would suffer brain injuries.

    250.    Plaintiffs reasonably relied to their detriment on the NFL's actions and omissions on the subject. Plaintiffs sustained injuries due to their reliance.

    251.    The NFL's failure to exercise reasonable care directly and proximately caused the Plaintiffs to suffer brain injuries that have resulted in severe and permanent adverse health effects.

252.    Due to Plaintiffs' injuries, Plaintiffs have suffered from the symptoms and/or afflictions described herein and will continue to suffer from them in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant NFL for all recoverable damages, costs, pre-judgment interest, and all such other relief this Court deems appropriate. Plaintiffs further demand trial by jury of all issues triable as of right by jury.

## COUNT II
### (Fraudulent Concealment on Behalf of All Plaintiffs)

253.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

254.    Defendant NFL, because of its enormous influence over football-injury-related research and education and in light of its voluntary undertaking described above, owed NFL players, including Plaintiffs, a duty to disclose the known risks of long-term adverse medical effects associated with concussions and related head injuries.

255.    The NFL and its MTBI Committee actively concealed and/or failed to disclose, to both its players and the general public, information related to the long term health risks of sustaining concussions/head-injuries during football play.

256.    The NFL—as a result of both findings of other independent studies published on the same topic and its own Committee's data—knew that a clear causal link exists between concussions suffered during football play and adverse long-term health effects.

257.    The NFL engaged in a pattern of fraudulently concealing that causal link.  It failed to publish warnings of—or even acknowledge—the adverse health effects of football-related concussions until as late as June 2010, over fourteen (14) years after the NFL's MTBI Committee first began researching the health effects of such injuries and approximately eighty-

Exhibit "A"
Page 65

two (82) years after the first published article discussing the correlation between contact sports and brain trauma.

258.    Between 1994–2010, the NFL's MTBI Committee played a pivotal role in actively concealing and downplaying the known link between adverse health effects and football-related concussions, as described in ¶¶ 68-122.

259.    The NFL knew that NFL Players, including Plaintiffs, did not recognize the severity of the dangers posed by concussions and related head injuries and that they relied on the NFL for such risk-related information. The NFL also knew that there were no rules, guidelines, or criteria in place to protect Plaintiffs from concussions and related head injuries. Consequently, the NFL knew that its concealment of information related to the health risks of concussions and/or brain injuries would induce NFL players, including Plaintiffs, to continue to play after sustaining a concussion or related head injury, to return to play sooner than medically recommended after suffering such injury, and to play an aggressive style of football.

260.    Plaintiffs were justified in relying on the NFL's representations of information relating to the negative long-term effects of concussions/head-injuries because of the NFL's unique position as the regulatory body of professional football, its enormous influence over research and education relating to football injuries, and its establishment of the MTBI Committee. Plaintiffs relied on the NFL's representations to their detriment by, *inter alia*, returning to play too soon after sustaining concussions and related head injuries and failing to seek appropriate medical treatment for those injuries, thereby suffering long-term neurological damage.

261.    Due to Plaintiffs' injuries, Plaintiffs have suffered from the symptoms and/or afflictions described herein and will continue to suffer from them in the future.

Case 2:12-md-02323-AB Document 26-1 Filed 03/30/12 Page 43 of 48 Page ID
#:11105
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 42 of 47

WHEREFORE, Plaintiffs demand judgment against Defendant NFL for all recoverable damages, costs, pre-judgment interest, and all such other relief this Court deems appropriate. Plaintiffs further demand trial by jury of all issues triable as of right by jury.

### COUNT III
### (Fraudulent Misrepresentation on Behalf of Plaintiffs Kyle Turley, Lional Dalton, Mitch White, and Jay Foreman)

262.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein and further allege on information and belief as follows:

263.    The NFL's Mild Traumatic Brain Injury Committee ("the Committee") was established in 1994 for the purpose of researching, producing, and publishing a series of studies on the adverse health effects of football related concussions. The Committee began conducting research to support its studies from its inception in 1994.

264.    The Committee's research efforts culminated in the publication of thirteen (13) research papers in medical journals of general circulation between 2003 and 2006.

265.    The myriad representations contained in the Committee's research papers are discussed in detail at ¶¶ 68-122. By way of example, the salient misrepresentations include:

    a. The studies' findings that, after suffering an initial concussion, a player was not exposed to a "7- to 10- day window of increased susceptibility to sustaining another concussion;"

    b. The studies' conclusion that, because there was "no evidence of any adverse effect" of returning a formerly unconscious NFL player to play in the same game, these players were "at no increased risk" of suffering subsequent concussions after returning to play;

    c. The studies' conclusion that because a "significant percentage of players returned to play in the same game [after suffering a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [concussions] in professional football are not serious injuries;"

42

    d.   The studies' conclusion that there was no increased risk of adverse health effects among players who had suffered three or more concussions or among players who had been sidelined for more than one week as a result of a concussion;

    e.   The studies' claim that, after suffering a concussive injury, NFL players' brains healed faster than those of high school or collegiate football players; and

    f.   The studies' claim that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions."

266.    The NFL bolstered the misrepresentations contained in its published studies with public statements made by NFL doctors and members of the Committee—including but not limited to statements made by Drs. Elliot Pellman, David Viano, and Ira Casson in both generally circulated medical journals and media outlets—that defended the Committee's studies from the near-unanimous criticisms levied by the independent medical community.

267.    In accord with the Committee's conclusions, the NFL produced a concussion pamphlet in August 2007 which it distributed to all NFL players, including Plaintiffs. That pamphlet made the following false or misleading representations of material fact:

    a.   That "current research with professional athletes has shown that you should not be at further risk of greater injury once you receive proper medical treatment for a concussion;

    b.   That "current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly;" and

    c.   That "there is no magic number for how many concussions is too many" and that "research is currently underway to determine if there are any long-term effects of concussion in NFL athletes."

    d.   That the pamphlet was being provided to ensure that "NFL players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."

43

Case 2:1 Case 0:11-cv-02323-AB Document 26-1 Filed 03/30/12 Page 45 of 48 Page ID
#:11107
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 44 of 47

268.    Throughout the 2003 to 2009 period that the NFL published the Committee's research papers, endorsed statements made by Committee doctors, and produced the concussion pamphlet, the NFL knew that all of the misrepresentations contained therein were false or misleading because: (1) prior studies, published as early as 1952, in medical journals of general circulation, linked football related concussions with myriad adverse health effects; (2) contemporaneous findings from independent research studies—some of which were commissioned by the NFL itself—concluded that concussions suffered by NFL players place those players at a heightened risk of future cognitive impairment; and (3) both the medical community and general media sources such as ESPN and the *New York Times* levied near-unanimous criticisms of the Committee's studies.

269.    Despite such knowledge, the NFL made the misrepresentations outlined above with the intent of inducing NFL players, including Plaintiffs, to return to play as soon as physically possible after having suffered a football-related concussion and to promote an aggressive style of football that would attract viewers and promote the spectacle of violence that the NFL uses to market its product and merchandise to consumers.

270.    Plaintiffs relied on the misrepresentations made by the NFL's studies, doctors, concussion pamphlet, and other literature by, *inter alia*, playing an aggressive style of football (*e.g.* hitting players by leading with the crown of their head), failing to seek proper medical treatment for their concussive brain injuries, returning to play immediately after having suffered in-game concussive brain injuries, participating in subsequent games and practices without allowing sufficient time for their concussive brain injuries to heal, and failing to seek proper medical treatment for concussion-related health problems Plaintiffs continued to suffer after retiring from the NFL.

44

271.    As a result of Plaintiffs' reliance on the NFL's misrepresentations, the damage resulting from Plaintiff's football-related concussions was unnecessarily exacerbated. The numerous concussions that Plaintiffs sustained during their NFL careers now cause them to suffer from a number of severe and permanent adverse health effects.

272.    The NFL's misrepresentations entitle Plaintiffs to damages for, *inter alia*, bodily injury, pain and suffering, disability, medical expenses, loss of earnings, and loss of potential employment. These losses are either permanent or continuing and Plaintiffs will suffer these losses into the future.

WHEREFORE, Plaintiffs demand judgment against Defendant NFL for all recoverable damages, costs, pre-judgment interest, and all such other relief this Court deems appropriate. Plaintiffs further demand trial by jury of all issues triable as of right by jury.

### COUNT IV
### (Negligent Misrepresentation on Behalf of Plaintiffs Kyle Turley, Lional Dalton, Mitch White, and Jay Foreman)

273.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein and further allege on information and belief as follows:

274.    As outlined in detail above, the Committee's research papers, statements made by NFL doctors and Committee members in support of those statements, the 2007 concussion pamphlet, and other NFL literature all contain numerous misrepresentations of material facts.

275.    At the time the NFL made the representations at issue, the NFL knew or should have known of the falsity and/or misleading nature of those representations and was negligent in making them without first verifying their truthfulness or veracity. The NFL ignored (1) established findings of prior research studies, (2) contemporaneous findings from independent research studies, and (3) near-unanimous criticisms of its studies' validity by the medical

Case 2:12-md-02323-AB Document 26-1 Filed 03/30/12 Page 47 of 48 Page ID
#:11109
Case 1:11-cv-24594-JEM   Document 1   Entered on FLSD Docket 12/22/2011   Page 46 of 47

community and mass media, all of which placed the NFL on notice of the falsity and/or misleading nature of the representations made by the MTBI Committee's studies, the Committee's members and doctors, and the NFL's concussion pamphlet and other literature.

276.   The NFL made the misrepresentations outlined above with the intent of inducing NFL players, including Plaintiffs, to return to play as soon as physically possible after having suffered a football-related concussion and to promote an aggressive style of football that would attract viewers and promote the spectacle of violence that the company uses to market its product and merchandise to consumers.

277.   Plaintiffs justifiably relied on the misrepresentations made by the NFL's studies, doctors, concussion pamphlet, and other literature by, *inter alia*, playing an aggressive style of football (*e.g.* hitting players by leading with the crown of his head), failing to seek proper medical treatment for their concussive brain injuries, returning to play immediately after having suffered in-game concussive brain injuries, participating in subsequent games and practices without allowing sufficient time for their concussive brain injuries to heal, and failing to seek proper medical treatment for concussion-related health problems Plaintiffs continued to suffer after retiring from the NFL.

278.   The NFL occupies the unique position of regulating the game of professional football. Because of its influential position, amateur and professional football players, as well as the public at large, reasonably rely on the NFL to truthfully and accurately educate them as to the risks of football-related concussions. Consequently, Plaintiffs were justified in relying on the NFL's representations that football-related concussions pose no significant long term health risks.

46

Case 2:1:11-cv-24594-JEM Document 26-1 Filed 03/30/12 Page 48 of 48 Page ID
#:11110
Case 1:11-cv-24594-JEM Document 1 Entered on FLSD Docket 12/22/2011 Page 47 of 47

279.    As a result of Plaintiffs' reliance on the NFL's misrepresentations, the damage resulting from Plaintiffs' football-related concussions was unnecessarily exacerbated. The numerous concussions that Plaintiffs sustained during their NFL careers now cause them to suffer from a number of severe and permanent adverse neurological problems.

280.    The NFL's misrepresentations entitle Plaintiffs to damages for, *inter alia*, bodily injury, pain and suffering, disability, medical expenses, loss of earnings, and loss of potential employment. These losses are either permanent or continuing and Plaintiffs will suffer these losses into the future.

WHEREFORE, Plaintiffs demand judgment against Defendant NFL for all recoverable damages, costs, pre-judgment interest, and all such other relief this Court deems appropriate. Plaintiffs further demand trial by jury of all issues triable as of right by jury.

DATED this 22nd day of December, 2011.

Respectfully submitted,

**PODHURST ORSECK, P.A.**
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone: (305) 358-2800
Fax: (305) 358-2382

By:     /s/ Ricardo M. Martínez-Cid
STEVEN C. MARKS
Fla. Bar. No. 516414
Email: smarks@podhurst.com
RICARDO M. MARTÍNEZ-CID
Fla. Bar No. 383988
Email: rmcid@podhurst.com
STEPHEN F. ROSENTHAL
Fla. Bar No. 0131458
Email: srosenthal@podhurst.com
RAMON A. RASCO
Fla. Bar No. 0617334
Email: rrasco@podhurst.com
Attorneys for Plaintiffs

47