# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | MDL No. 2323<br>No. 12-md-2323-AB |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION<br>Case No. 2:12-cv-1023 |
| VERNON MAXWELL, et al. | |
| Plaintiffs, | |
| v. | |
| NATIONAL FOOTBALL LEAGUE, et al., | |
| Defendants. | |

**RIDDELL DEFENDANTS' NOTICE OF MOTION AND MOTION TO SEVER PURSUANT TO FRCP 20 AND 21; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF PAUL G. CEREGHINI; EXHIBITS "A" – "B"**

1   BOWMAN AND BROOKE LLP
    Paul G. Cereghini (SBN: 148016)
2   *Paul.Cereghini@bowmanandbrooke.com*
    Vincent Galvin, Jr. (SBN: 104448)
3   *Vincent.Galvin@bowmanandbrooke.com*
4   Marion V. Mauch (SBN: 253672)
5   *Marion.Mauch@bowmanandbrooke.com*
    879 West 190th Street, Suite 700
6   Gardena, CA 90248-4227
7   Tel:   (310) 768-3068
    Fax:   (310) 719-1019
8

9   Attorneys for Defendants RIDDELL, INC.; ALL AMERICAN
10  SPORTS CORPORATION; RIDDELL SPORTS GROUP, INC.;
    EASTON-BELL SPORTS, INC.; EASTON-BELL SPORTS, LLC;
11  EB SPORTS CORP.; and RBG HOLDINGS CORP.

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14

| 15  VERNON MAXWELL, et al., | CASE NO.: CV 11-8394 R (MANx) |
|---|---|
| 16          Plaintiffs, | **RIDDELL DEFENDANTS' NOTICE OF MOTION AND MOTION TO SEVER PURSUANT TO FRCP 20 AND 21; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF PAUL G. CEREGHINI; EXHIBITS "A" - "B"** |
| 17 | |
| 18  vs. | |
| 19  NATIONAL FOOTBALL LEAGUE, et al., | |
| 20 | |
| 21          Defendants. | |
| 22 | Date:      January 17, 2011 |
| 23 | Time:      10:00 a.m. |
| | Dept:      Courtroom 8 |
| 24 | |
| 25 | Judge: Hon. Manuel L. Real |
| 26 | Notice of related cases: |
| 27 | No. CV 11-08395 R (MANx) |
| | No. CV 11-08396 R (MANx) |
| 28 | |

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AND ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN:

**PLEASE TAKE NOTICE THAT** on January 17, 2012, at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 8 of the United States District Court, Central District of California, Western Division, located at 312 N. Spring Street, Los Angeles, California 90012, Defendants Riddell, Inc. (erroneously styled as "d/b/a Riddell Sports Group, Inc."); All American Sports Corporation; Riddell Sports Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp. (collectively, the "Riddell Defendants")[1] will move the Court for an order pursuant to Rules 20 and 21 of the Federal Rules of Civil Procedure ("FRCP") to sever from each other the claims of the named Plaintiffs who have been misjoined in this action and to require each of the named Plaintiffs to file separate complaints in separate actions against the Riddell Defendants, or for such other relief as the Court deems appropriate to address the misjoinder of these claims. The Riddell Defendants base this motion on the grounds that: (1) the named Plaintiffs' rights to relief do not each arise out of the same transaction, occurrence, or series of transactions or occurrences; (2) their claims lack common questions of law and fact; and (3) even if the claims were properly joined - which they are not - this Court should nonetheless sever them to prevent prejudice, delay, jury confusion, and judicial inefficiency.

The Riddell Defendants recognize that Plaintiffs all recently amended their Complaints (for a second time, in *Barnes*). The Riddell Defendants previously moved for severance based on the prior Complaints. The Amended Complaints do

---

[1] Referring to these Defendants collectively does not imply or concede that they are properly joined or named as Defendants, and the "Riddell Defendants" reserve the right to move to dismiss some or all of them. The collective reference is merely for convenience.

CV 11-8394 R (MANx)

1  not address any of the issues in those motions to sever. Moreover, Plaintiffs

2  appear to concede that point and the fact that considering those original motions to

3  sever is appropriate despite their amendments, presumably because the Amended

4  Complaints do not attempt or purport to address the issues raised in the motions to

5  sever. Thus, the Riddell Defendants have contemporaneously replied in support of

6  those motions to sever, which are currently set for hearing on January 3, 2012.

7  The Riddell Defendants file these current motions anew in the event the

8  Court deems that these misjoinder arguments should not be based on the prior

9  Complaints, but instead, prefers that the Riddell Defendants to move as to the

10  operative versions of the Complaints. These current motions may also facilitate a

11  hearing on the same date when the Court will hear the NFL and Riddell

12  Defendants' motions to dismiss.

13  The Riddell Defendants base this Motion on the Memorandum of Points and

14  Authorities set forth below and pleadings, records, and files in this action, and such

15  other and further evidence and argument as may be presented at the time of the

16  hearing.

17  This Motion is made following the conference of counsel pursuant to L.R. 7-

18  3 which took place on November 7, 2011.

19  DATED: December 20, 2011                BOWMAN AND BROOKE LLP

20

21                                         By:  /s/ Paul G. Cereghini
                                                Paul G. Cereghini
22                                              Vincent Galvin
                                                Marion V. Mauch
23                                              Attorneys for Defendants RIDDELL,
                                                INC.; ALL AMERICAN SPORTS
24                                              CORPORATION; RIDDELL
                                                SPORTS GROUP, INC.; EASTON-
25                                              BELL SPORTS, INC.; EASTON-
                                                BELL SPORTS, LLC; EB SPORTS
26
27                                              CORP.; and RBG HOLDINGS
                                                CORP.
28

CV 11-8394 R (MANx)

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   ARGUMENT ...................................................................................... 3

      A.    Plaintiffs' claims arise from separate occurrences that should not be joined in a single action. ........................................... 5

      B.    Plaintiffs' claims do not involve common questions of law or fact. ................................................................................ 9

      C.    Joinder of Plaintiffs' claims would not promote the purposes of FRCP 20, but rather would only cause delay, jury confusion, judicial inefficiency, and prejudice. ................................. 23

III.  CONCLUSION ................................................................................. 25

CV 11-8394 R (MANx)

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adams v. I-Flow Corp.,*
    C.D. Cal., Western Div., No. 2:09-cv-09550-R-SS .................... 5, 7, 8, 17, 18

*Am. Safety Equip. Corp. v. Winkler,*
    640 P.2d 216 (Colo. 1982) .................................................................... 13

*Anrig v. Ringsby United,*
    603 F.2d 1319 (9th Cir. 1979) .................................................................. 8

*Avila v. Citrus Cmty. Coll. Dist.,*
    38 Cal. 4th 148, 41 Cal. Rptr 3d 299 , 131 P.3d 383 (2006) ...................... 16

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 n.15 (5th Cir. 1996) ............................................................ 20

*Coleman v. Quaker Oats Co.,*
    232 F.3d 1271 (9th Cir. 2000) ......................................................... 23, 24

*Cooper v. R.J. Reynolds Tobacco Co.,*
    586 F. Supp. 2d 1312 (M.D. Fla. 2008) .................................................... 8

*Coughlin v. Rogers,*
    130 F.3d 1348 (9th Cir. 1997) .................................................................. 4

*Desert Empire Bank v. Ins. Co. of N. Am.,*
    623 F.2d 1371 (9th Cir. 1980) .................................................................. 4

*Fritz v. White Consol. Indus., Inc.,*
    306 A.D.2d 896, 762 N.Y.S.2d 711 (N.Y. App. Div. 2003) ...................... 21

*Frobes v. Stryker Corp.,*
    Nos. 08 CV, 1897(NG)(MDG), 2009 WL 3387037
    (E.D.N.Y. Aug. 5, 2009) .......................................................................... 8

*Gallegos v. Citizens Ins. Agency,*
    779 P.2d 99 (N.M. 1989) ........................................................................ 22

*Gawenda v. Werner Co.,*
    932 F. Supp. 183 (E.D. Mich. 1996) ...................................................... 21

CV 11-8394 R (MANx)

*Georgine v. Amchem Prods., Inc.,*
    83 F.3d 610 (3d Cir. 1996).................................................................. 20

*Graven v. Vail Assocs., Inc.,*
    909 P.2d 514 (Colo. 1996).................................................................. 21

*Heritage Pac. Fin., LLC v. Cole,*
    No. CV, 10-0394 PSG, 2010 WL 1838106
    (C.D. Cal. May 3, 2010)...................................................................... 4

*Holcim (US), Inc. v. Ohio Cas. Ins. Co.,*
    38 So. 3d 722 (Ala. 2009).................................................................. 22

*In re Amgen Inc. Secs. Litig.,*
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ........................................... 15

*In re Rhone-Poulenc Rorer, Inc.,*
    51 F.3d 1293 (7th Cir. 1995).............................................................. 20

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
    *Sales Practices, & Prods. Liab. Litig.,*
    785 F. Supp. 2d 925 (C.D. Cal. 2011) ............................................. 18

*Kasel v. Remington Arms Co.,*
    24 Cal. App. 3d 711, 101 Cal. Rptr. 314 (1972)............................... 19

*Lister v. Bill Kelley Athletic, Inc.,*
    485 N.E.2d 483 (Ill. App. Ct. 1982) .................................................. 13

*Mosley v. Gen. Motors Corp.,*
    497 F.2d 1330 (8th Cir. 1974)............................................................ 6

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985)........................................................................... 18

*S.A. Empresa de Viacao Aerea Rio Grandese v. Boeing Co.,*
    641 F.2d 746 (1981)........................................................................... 18

*Sams v. Beech Aircraft Corp.,*
    625 F.2d 273 (9th Cir. 1980).............................................................. 4

*Saval v. BL Ltd.,*
    710 F.2d 1027 (4th Cir. 1983)..................................................... 5, 6, 8

*Smith v. Fiber Controls Corp.*,
    300 N.C. 669 (1980)................................................................................... 22

*Testerman v. Riddell, Inc.*,
    161 Fed. Appx. 286 , 2006 WL 41193 (4th Cir. 2006) ................................ 14

*Warner v. Stryker Corp.*,
    No. 08–6368–AA, 2009 WL 1773170 (D. Or. June 22, 2009) ..................... 8

*Wash. Mut. Bank v. Superior Court*,
    24 Cal. 4th 906, 103 Cal. Rptr. 2d 320, 15 P.3d 1071 (2001) ..................... 20

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ....................................................... 9

*Wolfe v. Stork RMS-Protecon, Inc.*,
    683 N.E.2d 264 (Ind. App. 1997) .............................................................. 21

*Wynn v. Nat'l Broad. Co.*,
    234 F. Supp. 2d 1067 (C.D. Cal. 2002) ........................................................ 4

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001)............................................................ 20, 21

**Statutes**

28 U.S.C. §1332(d)........................................................................................... 8

Fla. Stat. § 768.81(3) ..................................................................................... 21

O.C.G.A. § 51-12-5.1 ...................................................................................... 22

Ohio Rev. Code § 2305.10(C)(1) .................................................................... 20

Or. Rev. Stat. § 31.730 (same) ....................................................................... 22

Tenn. Code Ann. § 29-28-103(a) (West 2011) ............................................... 20

Tex. Civ. Prac. & Rem. Code Ann. § 16.012 (West 2011).............................. 20

Va. Code Ann. § 8.01-38.1.............................................................................. 22

Wash. Rev. Code § 4.22.005 .......................................................................... 22

**Rules**

Fed. R. Civ. P. 20 .....................................................................................passim

Fed. R. Civ. P. 21 .....................................................................................passim

Fed. R. Civ. P. 20(a) ........................................................................... passim

Fed. R. Civ. P. 20(a)(1) ................................................................................. 4, 5

Fed. R. Civ. P. 20(a)(1)(A) .................................................................................. 5

Fed. R. Civ. P. 20(b) ........................................................................... 4, 5, 23

Fed. R. Evid. 201 ............................................................................................ 9, 15

**Other Authorities**

4 *Moore's Federal Practice*,
    § 21.02[4] (Matthew Bender 3d ed. 2009) ....................................... 4

*Cf.* Michael J. Stuart, et al., *Injuries in Youth Football: A Prospective
    Observational Cohort Analysis Among Players Aged 9 to 13 Years*,
    77 Mayo Clin. Proc. 317, 318 (2002) ........................................... 16

*Football Helmets and Products Liability*,
    8 J. Sports Law 153 (2001) ........................................................... 12

*Traumatic Brain Injury: Hope through Research, What Are the Different
    Types of TBI?*, Nat'l Inst. of Neurological Disorders & Stroke, Nat'l
    Inst. of Health ................................................................................... 1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The joinder across these three actions of 136 individual former NFL players (and 84 spouses),[2] who played football at various times over the course of more than 50 years for many different teams in dozens of different cities, allegedly sustaining distinct injuries in different ways, at different times, with different results, and while wearing different helmets, into three Amended Complaints is improper and violates FRCP 20 and 21. This Court should sever these disparate and misjoined claims because: (1) Plaintiffs' alleged rights to relief do not arise out of the same transaction, occurrence, or series of transactions or occurrences; (2) their claims lack common questions of law or fact; and (3) even if the claims were properly joined – which they are not – severance is appropriate to prevent prejudice, delay, confusion, and judicial inefficiency.

In these three actions, 220 total Plaintiffs[3] sue multiple entities, alleging the former player-Plaintiffs sustained various "traumatic brain injuries"[4] during their careers in the NFL, which spanned an overall period of 56 years, from 1953 to 2009. (*Barnes* Second Am. Compl. ("*Barnes* SAC") ¶ 153; *Maxwell* First Am.

---

[2] *Maxwell* Plaintiffs Brett and Emily Romberg, Ottis and Wanda Anderson, and Tina Jones (spouse of Gary Jones) dismissed their claims.

[3] The *Maxwell* action currently includes 73 former NFL players and 48 spouses. The *Pear* action includes 47 former players and 32 spouses. And the *Barnes* matter includes 16 former NFL players (one deceased) and 4 spouses.

[4] Plaintiffs lump all traumatic brain injuries ("TBI") together, but many different injuries fall within the umbrella of TBI, including concussion, skull fracture, hypoxia, anoxia, contusion, contrecoup, diffuse axonal injury, subdural hematoma, epidural hemtoma, and intracerebral hematoma. Nat'l Inst. of Neurological Disorders & Stroke, Nat'l Inst. of Health, *Traumatic Brain Injury: Hope through Research, What Are the Different Types of TBI?*, available at http://www.ninds.nih.gov/disorders/tbi/detail_tbi.htm# 169973218 (last visited Dec. 20, 2011).

1

Compl. ("*Maxwell* FAC") ¶ 453.)[5]   In addition to the NFL, the three Amended
Complaints name seven Defendants to whom Plaintiffs collectively refer to as the
"Riddell Defendants," which includes Defendants Riddell, Inc. (erroneously styled
as "d/b/a Riddell Sports Group, Inc."), All American Sports Corporation, Riddell
Sports Group, Inc., Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports
Corp., and RBG Holdings Corp. (*See, e.g.*, *Maxwell* FAC ¶¶ 76-83.)

According to Plaintiffs, two of these entities – Riddell, Inc. and All
American Sports Corporation – were "engaged in the business of designing,
manufacturing, selling and distributing football equipment, including helmets, to
the NFL and since 1989 has been the official helmet of the NFL." (*Id.* ¶¶ 76-77.)
As to the other five Riddell Defendants, the Complaints contain no allegations
whatsoever of any involvement in the design, manufacture, sales, or distribution of
football helmets, or any affiliation with Riddell, Inc. or All American Sports
Corporation. (*See id.* ¶¶ 78-82.)

Using identical, boilerplate language, all of the former NFL player-Plaintiffs
allege they "suffered multiple concussions that were improperly diagnosed and
improperly treated throughout [their] career[s]" as professional football players.
(*See, e.g.*, *id.* ¶ 178.)   None of the player-Plaintiffs allege what brand of helmet
they were wearing when they experienced a concussion.  Moreover, despite having
amended their Complaints, the *Maxwell* and *Pear* Plaintiffs still fail to allege they
were even wearing "Riddell" helmets when they suffered their alleged
concussions.  All Plaintiffs, likewise, fail to state any facts regarding when their
alleged concussions occurred, how they occurred, where they occurred, or how any

---

[5]  *Maxwell* Plaintiffs Brett Romberg and his wife moved for dismissal without
prejudice after Mr. Romberg re-signed with the Atlanta Falcons for the 2011-12
NFL season, making *Maxwell* Plaintiff Todd Johnson the player with the most
recent playing dates. (*Maxwell* FAC ¶¶ 452-56.)

2

conduct on the part of any of the Riddell Defendants proximately caused their alleged injuries.

Moreover, and more importantly for purposes of this motion, Plaintiffs' claims are not only legally deficient,[6] they are also entirely distinct and disparate. Plaintiffs' claims differ from each other in many fundamental respects, including, for example, in the make and model of the helmets they wore, the existence of modifications to those helmets, the condition of their helmets at the time of their alleged injuries, the availability of alternative designs and technology in the time period applicable to each player, the warnings and information available to the player-Plaintiffs, player experience before and during play in the NFL, and the mechanics, nature, extent and cause of each alleged injury.

In addition, Plaintiffs are residents of twenty-eight (28) different states and played for thirty (30)[7] different NFL teams in different cities and states. In total, across these three actions, at least thirty-three (33) different jurisdictions' laws might arguably apply to Plaintiffs' claims. However, Plaintiffs do not identify by which jurisdictions' laws their claims should be resolved.

## II. __ARGUMENT__

FRCP 20(a) permits the joinder of multiple plaintiffs in one action if:

(A)  they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B)  if any question of law or fact common to all these persons will arise in the action.

---

[6] The insufficiency of Plaintiffs' allegations to sustain their claims against the Riddell Defendants is addressed separately in the Riddell Defendants' contemporaneously filed Motion to Dismiss.

[7] Several of these franchises moved cities during the course of the 50-plus-year period covered by the Complaints. Thus, for instance, counting the St. Louis Cardinals as a different team from the Arizona Cardinals brings the total number of different teams to 36.

FRCP 20(a); *see also Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997). If the two-part test for permissive joinder is not satisfied, a court, in its discretion, may properly sever the misjoined parties, so long as no substantial right will be prejudiced by the severance. *See* Fed. R. Civ. P. 21 ("on motion or on its own, the court may . . . sever any claim against any party"); *see also Coughlin*, 130 F.3d at 1350. A court has broad discretion when ruling on a motion to sever claims under FRCP 21. *Heritage Pac. Fin., LLC v. Cole*, No. CV 10-0394 PSG, 2010 WL 1838106, at *3 (C.D. Cal. May 3, 2010) (citing *Sams v. Beech Aircraft Corp.*, 625 F.2d 273, 277 (9th Cir. 1980); 4 *Moore's Federal Practice*, § 21.02[4] (Matthew Bender 3d ed. 2009)).

Multiple plaintiffs cannot pass FRCP 20(a)(1)'s two-part test for proper permissive joinder where, as here, each plaintiff's claim arises from a different factual background. *Coughlin,* 130 F.3d at 1350. In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the dropped plaintiffs filing new, separate lawsuits against some or all of the defendants based on the claim or claims attempted to be set forth in the improperly commingled complaint. *Id.* at 1350-51.

Even where the FRCP 20(a)(1) requirements are met, the court may, in its discretion and pursuant to FRCP 20(b), "sever for at least two reasons: (1) to prevent jury confusion and judicial inefficiency, and (2) to prevent unfair prejudice to the [defendants]." *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1088 (C.D. Cal. 2002) (citing *Coleman v. Quaker Oats Co.*, 232 F.2d 1271, 1296 (9th Cir. 2000)); *see also Coleman*, 232 F.2d at 1296 ("Even once these requirements [of FRCP 20(a)(1)] are met, a district court must examine whether permissive joinder would comport with the principles of fundamental fairness or would result in prejudice to either side. Under FRCP 20(b), the district court may sever the trial in order to avoid prejudice." (citing *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980)) (internal citations omitted)).

1   Plaintiffs fail to meet the standard for proper joinder of their disparate
2   claims. There is nothing common in law or fact among them supporting proper
3   joinder. Therefore, pursuant to FRCP 21, this Court should, as it has done in the
4   past, sever the individual Plaintiffs' claims, pursuant to FRCP 21, with the
5   remaining claims pursued, if at all, as separate, individual actions with new case
6   numbers. *See Adams v. I-Flow Corp.*, C.D. Cal., Western Div., No. 2:09-cv-
7   09550-R-SS, Dkt No. 81 (Order dated 03/30/2010) (unpublished) (attached as Ex.
8   "A") (hereinafter "*Adams*").

9   Moreover, even if Plaintiffs were able to show proper joinder under FRCP
10  20(a)(1) - which they cannot - this Court should nonetheless sever these claims to
11  prevent delay, jury confusion, judicial inefficiency, and prejudice to the Riddell
12  Defendants. *See* Fed. R. Civ. P. 20(b).

13  **A.      Plaintiffs' claims arise from separate occurrences that should not**
14  **be joined in a single action.**

15  Permissive joinder under FRCP 20 first requires a similarity of transactions
16  or occurrences. Fed. R. Civ. P. 20(a)(1)(A). Merely alleging that various plaintiffs
17  experienced generally similar problems with various defendants' products is not
18  enough to support proper joinder. *See Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th
19  Cir. 1983) (resolving that, in an action alleging breach of warranty claims
20  concerning automobiles, the fact that the plaintiffs alleged similar problems did not
21  mean that the claims were transactionally related).[8]

---

22  [8] In opposing the original motions to sever, Plaintiffs attempted to distance
23  themselves from relevant joinder precedent by arguing that the *Saval* case is "not
24  binding authority" and "distinguishable." (*Maxwell* Pls.' Opp. to Riddell Defs.'
    Mot. to Sever at 7; *Barnes* Pls.' Opp. to Riddell Defs.' Mot. to Sever at 3.) *Saval*
25  is not distinguishable in any meaningful way. Moreover, both the Ninth Circuit
26  and this Court have recognized the precedential value of *Saval* and have both cited
    and followed it. *See, e.g., Coughlin*, 130 F.3d at 1351 (citing *Saval*); *Huezo v.*
27  *Westfield Topanga Owner L.P.*, No. CV 11-00800 MMM (PJWx) (C.D. Cal. May
28  9, 2011) (Morrow, J.) (citing *Saval* as supporting conclusion that plaintiffs' claims

CV 11-8394 R (MANx)

In *Saval*, four plaintiffs argued that their claims against several automobile-seller defendants were properly joined under Rule 20 because "they purchased their automobiles and experienced similar problems, none of which could be fixed satisfactorily." *Id.* The district court rejected the attempted joinder, finding that the plaintiffs' argument "conveniently glosse[d] over the differences between the unique histories of each of the four automobiles," and that they had "not demonstrated that any of the alleged similar problems resulted from a common defect." *Id.* After noting that FRCP 20 does not require "[a]bsolute identity of all events," and that "the rule should be construed in light of its purpose, which 'is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits,'" the Fourth Circuit affirmed. *Id.* at 1031 (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1332-33 (8th Cir. 1974)).

Turning to the specific facts before it, the *Saval* court noted that the "cars were purchased at different times, were driven differently, and had different service histories. Quite probably, severance would have been required in order to keep straight the facts pertaining to the separate automobiles." *Id.* The court concluded that "the purposes behind FRCP 20 would not be furthered" by allowing the attempted joinder, and that "considering the claims asserted by [the plaintiffs] in a single action would not enhance judicial economy." *Id.* at 1032.

Thus, the *Saval* court upheld severance of only four plaintiffs' claims due to concerns over the lack of commonality, factual differences between their claims, and failure of joinder to promote the purposes of FRCP 20. Here, those same concerns predominate, given that the player-Plaintiffs necessarily wore different helmets designed and produced over the course of more than fifty (50) years, with different usage histories, reconditionings, modifications, labels, manuals and so forth. However, the concerns mentioned in *Saval* over differences between four

---

of violations of Americans with Disabilities Act involved separate and distinct injuries and, therefore, were distinct transactions).

CV 11-8394 R (MANx)

plaintiff's products and their claims are multiplied exponentially here, given the attempted joinder of 136 separate player-Plaintiffs (including deceased *Barnes* player Lens) and 84 spouse-Plaintiffs.

This Court recently considered a strikingly similar improper attempt to join dozens of plaintiffs' unrelated claims into one mass-tort filing. Specifically, in *Adams*, the plaintiffs, who were represented by the same counsel as the *Maxwell* and *Pear* plaintiffs here (Girardi|Keese), attempted to join 141 plaintiffs who had undergone "separate shoulder surgeries that were performed at different times over the span of a ten (10) year period." *Adams* at 13. The Court found that the "surgeries were performed in different hospitals located in thirty-seven (37) states and Canada" by "numerous different surgeons, anesthesiologists, and other physicians . . . who [were] unlikely to have any common link to any two (2) of these plaintiffs, let alone one-hundred, forty-one (141) of them." *Id.*

Based on these facts, the Court determined that the *Adams* plaintiffs' claims did "not arise out of the same transaction, occurrence, or series of transactions or occurrences," and, therefore, the attempted joinder was improper and in violation of FRCP 20, requiring severance. *Id.* at 13-14.[9] During oral argument on the motion to sever, the Court explained that the joined claims were actually "140 litigations, all different. All different because they are different people who have been affected differently by different people and by different drugs." Tr. of Oral Arg. at 5, *Adams v. I-Flow, Corp.*, C.D. Cal., Western Div., No. 2:09-cv-09550-R-SS (attached as Ex. "B").

Citing case law from other jurisdictions, the Court explained that "other district courts have severed the claims of multiple plaintiffs, finding that the sole common allegation of pain pump or anesthetic use did not constitute a same transaction, occurrence, or series of transactions or occurrences." *Id.* (citing

---

[9] A copy of the transcript of the hearing on the *I-Flow* defendants' motion to sever is attached as Ex. "B."

*Warner v. Stryker Corp.*, No. 08–6368–AA, 2009 WL 1773170 (D. Or. June 22, 2009); *Frobes v. Stryker Corp.*, No. 08 CV 1897(NG)(MDG), 2009 WL 3387037 (E.D.N.Y. Aug. 5, 2009)). Finding misjoinder, the Court severed the *Adams* plaintiffs' claims, retained jurisdiction under 28 U.S.C. §1332(d), and ordered that "the claims for which the Court has dismissed with leave to amend may only be maintained going forward, if at all, in individual actions." *Id.* (citing *Cooper v. R.J. Reynolds Tobacco Co.*, 586 F. Supp. 2d 1312 (M.D. Fla. 2008)); *see also Anrig v. Ringsby United*, 603 F.2d 1319, 1325 (9th Cir. 1979) (discussing the flexibility the district court has in dealing with misjoined claims).

For the same reasons as in *Saval* and *Adams*, this Court should sever Plaintiffs' improperly-joined claims. As in *Saval*, the products used over the course of more than fifty (50) years by 136 different players are too distinct to support proper joinder. Also, like in *Adams*, Plaintiffs have attempted to join dozens and dozens of individuals' claims, arising from different facts occurring in dozens of different states while wearing different football equipment. Also, while Plaintiffs generally claim their injuries all occurred while playing professional football, as in *Adams*, Plaintiffs are, in fact, all "different people who have been affected differently by different people and by different [products]." Ex. B at 5.

If anything, the misjoinder here is even more egregious than in *Adams*, where the alleged conduct and injuries occurred over a period of ten (10) years. Ex. A at 13. Here, the alleged injuries took place over not ten, but over fifty (50) years – from 1953 to 2009. Thus, if anything, there is even less of an argument here that the claims arise out of the same transaction or occurrence, or even the same series of transactions, and there is even more compelling reason to sever these improperly-joined claims than there was in *Adams*.

In short, Plaintiffs fail to satisfy the first prong for permissive joinder under FRCP 20(a). Therefore, following *Adams*, and pursuant to FRCP 21, this Court can and should sever these distinct claims.

CV 11-8394 R (MANx)

**B.      Plaintiffs' claims do not involve common questions of law or fact.**

Plaintiffs also fail the second prong of FRCP 20(a) for permissive joinder because their claims do not involve common questions of law or fact.  To the contrary, their claims are each separate, distinct, and unique.

It is common knowledge that football helmet technology has changed drastically over the course of the more than fifty-year period covered by the Amended Complaints, as the pictures below document.[10]

 



While Plaintiffs' Amended Complaints now allege generally that the players wore Riddell helmets (at least, at times, for the *Maxwell* and *Pear* Plaintiffs), they

---

[10] This graphic timeline is taken from http://www.riddell.com/innovation/history/. The Court can and should take judicial notice of the undisputed fact that football helmets have changed considerably between 1953 and 2009. *See* Fed. R. Evid. 201 (providing that a court can take judicial notice of a fact not subject to reasonable dispute that is either: (1) generally known in the community where the court is located; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned); *see also, e.g., Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102 (N.D. Cal. 2003) (finding that it was appropriate for the court to take judicial notice that refrigerated goods are generally perishable because that fact is a matter of common knowledge).

are still devoid of any allegations of what model helmet(s) any of the players wore. For any player-Plaintiff who claims to have been wearing a Riddell helmet at the time of an alleged injury (and the *Maxwell* and *Pear* Plaintiffs still do not allege this), individualized fact issues will include determining the specific helmet model worn. Over the half-century time span covered by Plaintiffs' Complaints, Riddell manufactured dozens of different helmet models with different features and designs within model lines, as the *Maxwell* and *Pear* Plaintiffs acknowledge in cataloging the various different designs and safety innovations in Riddell helmets over the years. Riddell, http://www.riddell.com/innovation/history/ (last visited Dec. 20, 2011); *see also, e.g., Maxwell* FAC ¶¶ 95-99.[11] These differences included varied shell designs including early two-piece shells, and shells with different sizes, shapes, weights, centers of gravity, materials and other differences. Over these decades, helmets incorporated significantly different energy-absorbing liner designs, including suspension webbing, multi-crown suspension webbing, rubber padding, air cells, liquid cells, expanded polystyrene pads and others. Some helmet lines offered optional supplemental padding. Riddell, http://www.riddell.com/innovation/ history/ (last visited Dec. 20, 2011).

In spanning more than five decades beginning in the mid 1950's, Plaintiffs' design claims against the Riddell Defendants cover helmets designed prior to the existence of industry standards and under different versions of standards promulgated after formation of the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") in 1969.[12] Material and manufacturing techniques used in today's helmets did not exist in the 1950's, 1960's, 1970's and

---

[11] In fact, the *Maxwell* and *Pear* Plaintiffs largely cut and paste from Riddell's website for their allegations concerning "Riddell" in their amended complaints.

[12] NOCSAE is a non-profit charitable corporation created in 1969 to create standards for football helmets. NOCSAE, http://nocsae.org/helmet-standards.html?gclid=CNCWn5_mvawCFYqA5QodUUcyqA (last visited Dec. 20, 2011).

1    1980's.   The technical and scientific knowledge used in developing today's

2    helmets did not exist in the 1990's.  Over this wide time period, there were also

3    vast differences in Riddell's competitors and competitive helmet products available

4    to the different generations of player-Plaintiffs.[13]

5          As addressed in the Riddell Defendants' motion to dismiss, the claims of the

6    vast majority, if not all of Plaintiffs' claims are facially barred by the applicable

7    statutes of limitation.  Any remaining Plaintiffs, who claim to have experienced

8    football-related injuries in the several years before Plaintiffs filed their Complaints,

9    face individualized issues concerning the applicable statutes of limitations that may

10   well bar all of their claims as well.

11         Plaintiffs' claims against the Riddell Defendants will require further player-

12   by-player, helmet-by-helmet individualized determinations about whether each

13   individual player-Plaintiff appropriately used or misused any helmet he claims to

14   be deficient.   For starters, NOCSAE guidelines for football helmet inspections

15   highlight many of the individualized issues implicated by Plaintiffs' claims against

16   the Riddell Defendants.  NOCSAE recommends that players conduct the following

17   inspection prior to each helmet use:

18

19

20

21

22

23

24

25

26

27   _____

     [13] Many of the competitor helmet manufacturers in the 1960's, 1970's and 1980's
28   are now either out of business or no longer manufacturing football helmets.

CV 11-8394 R (MANx)

**HELMET INSPECTION**

**Football/Lacrosse/Ice Hockey**

A number of guidelines are in place to assist persons responsible for the inspection of and reconditioning of helmets. The following list is not intended to cover every observation. It is recommended that a periodic inspection be made of all helmets, and that they be periodically retested and reconditioned by a licensed reconditioner.

**Suggested Inspection Check List**

**EXTERIOR:**

1. Check helmet to for agreement with manufacturer's instructions and procedures.

2. Examine shell for cracks, particularly noting any cracks around holes (where most cracks start). Replace any shells that have cracked. *DO NOT USE A HELMET WITH A CRACKED SHELL.*

3. Examine all mounting rivets, screws, velcro and snaps for breakage, distortion and/or looseness. Repair as necessary.

4. Replace face mask if bare metal is showing, if there is a broken weld, or if the mask is grossly misshapen. Tighten or replace loose or damaged faceguard attachments.

5. Examine for helmet completeness and replace any parts which have become damaged, such as sweatbands, interior pads, nose bumpers and chinstraps.

6. Examine chinstrap for proper adjustment and inspect to see that it is buckled or stretched out of shape. Also inspect the snaps or attaching hardware to see if replacement is needed.

7. Read and follow instructions provided by manufacturer regarding care and maintenance procedures.

8. Never allow anyone to sit on helmets. This practice could crush or deform the helmet.

**CAUTION:**

Only paints, waxes, decals or cleaning agents approved by the manufacturer are to be used on any helmet. It is possible to get in touch with unapproved materials by using unauthorized materials which could permanently damage the helmet shell and affect its performance and durability.

**PLAYERS:**

Inspect your particular helmet prior to each usage as follows.

**INTERIOR: Padded Style**

**Foam/Air/Liquid**

1. Check foam padding for proper placement and any deterioration.

2. Check for cracks in the vinyl and, if cushions of air, to see and to get planned helmets.

3. Check that the protective system or foam padding has not been altered or removed.

4. Check for proper amount of inflation on air padded helmets. For those helmets with an external pump check for proper operation of pump, and check valve. Follow manufacturer's recommended practice for adjusting air and pressure of the system.

5. Replace any parts when damaged. Check for proper installation and fit.

6. Examine all rivets, screws, velcro, and snaps to insure that they are properly fastened and holding protective parts.

If any of the above inspections need to be repaired and/or replacement, notify your coach or equipment manager immediately. This is your responsibility.

*NEVER WEAR A DAMAGED HELMET!*

16  17

---

Plaintiffs' improperly joined actions also overlook individualized issues concerning reconditioned helmets. Often, football helmets are used for multiple seasons with periodic reconditioning. Individualized determinations will include whether any allegedly deficient helmet had been reconditioned, whether such reconditioning was done by a third-party, and whether it was done properly and within the overall useful lifespan of the helmet. *See, e.g.,* Brian James Mills, *Football Helmets and Products Liability*, 8 J. Sports Law 153, 156 (2001)

(discussing helmet reconditioning and recertification programs and how "the expected life of a helmet depends on numerous factors such as temperature, humidity, altitude, pollution, sunlight, storage, maintenance, the player's position, the player's field and practice time, and the length of the season").

The inappropriateness of joining even two player-Plaintiffs' claims, let alone claims by 136 players, is further underscored by the high probability that each individual Plaintiff wore multiple helmets while playing in the NFL, and many other helmets during years of play prior to entering the NFL. Plaintiffs allege that they sustained injuries from repetitive concussive events while playing football in the NFL, however, each player-Plaintiff will have a unique and distinct playing history, including different head-impact experiences, and possibly concussions, before playing in the NFL.

With respect to Plaintiffs' warning claims against the Riddell Defendants, individualized player-by-player issues will include identification of the multitude of warning labels, instruction manuals and other literature accompanying over 50 years of helmet models. Player-by-player, helmet-by-helmet determinations will need to be made on whether individual player-Plaintiffs received, read and heeded the different materials provided with their particular helmets. Such individualized and plaintiff-specific inquiries and analyses often factor into product litigation concerning helmets. *See, e.g.*, *Am. Safety Equip. Corp. v. Winkler*, 640 P.2d 216 (Colo. 1982) (examining whether the plaintiff justifiably relied on alleged misrepresentations by the manufacturer defendants in choosing to use one police helmet over the other for personal use when he knew or should have known that one of the model helmets had a quick release and the other did not); *Lister v. Bill Kelley Athletic, Inc.*, 485 N.E.2d 483 (Ill. App. Ct. 1982) (discussing how the specific warnings given to plaintiff by his football coaches regarding how to keep his head down when tackling was material to defeating plaintiff's duty-to-warn argument). Obviously, the materials available to a player in the 1950's differ from

CV 11-8394 R (MANx)

those available to a player in the 1980's, and differed even more in comparison to the materials available to a player who played in the past ten years. Then, there are further individualized issues concerning the removal, addition or alteration of on-helmet labels by the player-Plaintiffs themselves, third-party helmet reconditioners, team equipment managers, and others.

Each player-Plaintiff's claim also requires an individualized determination of the information known to that player about the risks of playing football, including the risk of brain injury. The *Maxwell* and *Pear* Plaintiffs' Amended Complaints cite thirty-six publicly-available examples of what they claim contain information on concussive brain-injury risk, with alleged publication dates spanning a time period from the 1890's to 1993. (*See, e.g., Maxwell* FAC ¶ 127.) For Plaintiffs who played before the 1960's, ten of these examples were in the public domain, according to Plaintiffs' own allegations. For Plaintiffs who played after 1993, all thirty-six were publicly available. Moreover, each player's personal experience with concussions, interactions with physicians and trainers, acknowledgement of risks in the contracts and releases they signed, and other career experiences, will impact the liability and causation analyses implicated by Plaintiffs' warning claims.

Plaintiffs' claims require individualized player-by-player, incident-by-incident consideration of the circumstances of individual concussion events to determine basic facts such as whether a concussion even occurred, what led to the concussion, whether the concussion involved helmet contact, and whether any feasible alternative design existed at that point in time and whether it would have prevented the concussion. *See, e.g., Testerman v. Riddell, Inc.*, 161 Fed. Appx. 286, 289 (4th Cir. 2006) (unpublished) (granting summary judgment in football equipment case because plaintiff failed to prove which blow caused the alleged injury, whether the area of impact was covered by the equipment, or whether any alternative equipment would have made a difference). Further incident-by-incident

considerations would include whether helmet modifications or maintenance issues played a part, or whether the concussion resulted from the player's violation of rules of the game or non-compliance with warnings and instructions.

Plaintiffs' claims are also improperly joined with respect to the seven individually named Riddell Defendants. Plaintiffs take a scattershot approach of stating all claims by all Plaintiffs against all of the Riddell Defendants, even though none of these defendants even existed during the years when many of the player-Plaintiffs played in the NFL.[14] Under Plaintiffs' improperly consolidated Complaints, the player-Plaintiffs who retired earliest are making claims against defendants that did not even exist while they played in the NFL, rendering it impossible that those Defendants could have been involved in these Plaintiffs' alleged injuries. (*See, e.g.*, *Maxwell* FAC ¶ 293.) For this reason alone, severance is essential so that each individual Plaintiff who might choose to refile an individual action can do so against only appropriate defendants allegedly involved in the design, manufacture, distribution or sale of the specific helmet or helmets that they might contend caused their alleged injury.[15]

---

[14] All American Sports Corporation was incorporated in Delaware on September 13, 1991. Riddell, Inc., formerly EN&T Association, Inc., was incorporated in the State of Illinois on April 4, 1988. Riddell Sports Group, Inc., is a Delaware corporation incorporated on March 29, 2001. Easton-Bell Sports, Inc. was incorporated in Delaware on June 13, 2003. Easton-Bell Sports, LLC was formed under Delaware law on June 13, 2003. RBG Holdings Corp. was incorporated in Delaware on September 17, 2004. EB Sports Corp. was incorporated in Delaware on November 15, 2006. The Secretaries of States' corporate status webpages for each of the above entities reflecting this information are attached as Exhibits "A" through "G" to the Riddell Defendants' Request for Judicial Notice. Pursuant to Rule 201 of the Federal Rules of Evidence this Court can and should take judicial notice of these facts as they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See also In re Amgen Inc. Secs. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008).

[15] As addressed in the Riddell Defendants' motions to dismiss, Plaintiffs' Complaints are defective for lack of any plausible and non-conclusory allegation

Additionally, many of the player-Plaintiffs had vastly different NFL playing experiences. Each player alleges he worked for a different team (sometimes as many as four different teams) over the course of his career, during different time periods, and throughout this fifty-plus-year period. (*See generally Maxwell* FAC ¶¶ 176-541.) The player-Plaintiffs also played a variety of different positions with different levels of exposure to possible head injury. For example, a running back may be at greater risk for more forceful head impacts than a center, who may be more protected from such impacts by virtue of his position, his relative size, and the rules of the game. *Cf.* Michael J. Stuart, et al., *Injuries in Youth Football: A Prospective Observational Cohort Analysis Among Players Aged 9 to 13 Years,* 77 Mayo Clin. Proc. 317, 318 (2002), *available at* http://www.mayoclinic proceedings.com/content /77/4/317.full.pdf ("Injuries to offensive players occurred most often to running backs."). Moreover, as Plaintiffs themselves allege, the rules of play in the NFL changed over time. (*See, e.g., Maxwell* FAC ¶ 128 (alleging changes in NFL rules from 1956 to 2005).)

Furthermore, each player-Plaintiff's medical history will vary significantly, providing a unique factual background for each alleged injury. Practices of various team physicians, trainers and other clinicians, and their specific diagnosis and course of treatment for each individual player-Plaintiff after each alleged head injury will also vary. The unique circumstances of each individual player's medical history and treatment will also provide differences in causation analysis, further necessitating individualized – not joined – consideration and litigation. *See, e.g., Avila v. Citrus Cmty. Coll. Dist.,* 38 Cal. 4th 148, 167-68, 41 Cal. Rptr 3d 299, 314-15, 131 P.3d 383 (2006) (holding that the host school for a sporting event breached no duty owed to an injured sports competitor because the competitor was

---

that Riddell Sports Group, Inc., Easton-Bell Sports, LLC, Easton-Bell Sports, Inc., EB Sports Corp., or RBG Holdings Corp. was involved in the design, manufacture, distribution, or sale of Riddell helmets.

under the care and supervision of his own team's coaches and trainers who had "exclusive authority" to determine whether the competitor could play or required medical attention).

By alleging that they "suffered multiple concussions that were improperly diagnosed and improperly treated throughout their careers" (*see, e.g., Maxwell* FAC ¶ 178), Plaintiffs raise individualized issues concerning the care each player-Plaintiff received for each alleged concussion event. Each such event will involve identification of the diagnosis and treatment provided, who provided it, why Plaintiffs feel they were improperly treated and diagnosed, and what, if anything, this has to do with Plaintiffs' claims against the Riddell Defendants.

It also bears mention that Plaintiffs do not all allege the same injuries or symptoms, which this Court has previously held further militates against proper joinder. *Adams* at 13-14. For instance, Plaintiff George Visger complains of frontal and temporal lobe damage, intermittent explosive disorder, cognitive impairment, poor judgment in regard to finance and relationships, and early on-set dementia. (*Maxwell* FAC ¶ 210.) Plaintiff Vernon Maxwell alleges only headaches and memory loss. (*Id.* ¶ 180.) Plaintiff Mike Richardson alleges different symptoms still, including depression, poor judgment, and substance abuse (*id.* ¶ 195); while Plaintiff David Kocourek, who played some 20 years before Mssrs. Vernon or Richardson and is now eighty-four (84) years old, complains of dementia, but does not complain of headaches, memory loss, depression, poor judgment, and substance abuse (*id.* ¶¶ 342-46). *See also Boschert v. Pfizer, Inc.*, No. 4:08-CV-1714 CAS, 2009 WL 1383183 (E.D. Mo. May 14, 2009) (granting severance for misjoinder based, in part, on the fact that, while the six plaintiffs all claimed to have suffered the same side-effects from the allegedly defective drug, "their alleged symptoms are not the same").

In *Adams*, this court ruled that such divergence in injuries, medical histories, and products used evinced a fundamental lack of commonality and, thus, a lack of

proper basis for joinder. *Adams* at 13-14 (finding that the "medical histories of the plaintiffs that necessitated the procedures are certainly diverse and likely share no commonality"). The same holds true here.

Finally, with respect to questions of law, given the nature of the claims and the unique circumstances of each player's career, each claim is likely to involve different legal standards based on complex choice-of-law analyses and even possibly, given that laws change over time, the time period in which the alleged cause of action arose or during which the Riddell Defendants' conduct must be evaluated. *See, e.g.*, *Boschert*, 2009 WL 1383183, at *4 (finding as an additional ground supporting severance the fact that the various plaintiffs' claims would necessarily "be based on each plaintiff's respective state's law," which would require "separate legal analyses"). Applying, for the sake of argument only, California's choice-of-law analysis, *see S.A. Empresa de Viacao Aerea Rio Grandese v. Boeing Co.*, 641 F.2d 746, 749 (1981) (explaining that federal court should normally apply the forum state's conflict-of-law analysis),[16] it is clear that California substantive law should not apply across the board to all Plaintiffs' claims if "either the plaintiff or the defendant has been forced into a forum devoid

---

[16] The Riddell Defendants do not concede that Plaintiffs' place of residence should control in terms of choice of law, or even that California choice-of-law should control, given that Plaintiffs improperly joined these claims in the first place, thereby improperly attempting to subject the Riddell Defendants to a California choice-of-law analysis. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 785 F. Supp. 2d 925, 928-29 (C.D. Cal. 2011) (expressing concern over improper attempts to dictate California substantive law over claims by plaintiffs with no connection to California by filing in California and seeking to apply California's choice-of-law analysis) (discussing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 820 (1985)). The Riddell Defendants further do not concede that Plaintiffs' claims should all proceed in California. Rather, at this time, the Riddell Defendants maintain merely that applying California's choice-of-law analysis, for example only, further demonstrates that these claims are misjoined.

of any such contact as would justify application of its own law." *Kasel v. Remington Arms Co.*, 24 Cal. App. 3d 711, 731, 101 Cal. Rptr. 314, 327-28 (1972) (quoting Ehrenzweig, *Conflict of Laws* (1962), §213, p. 555).

Here, dozens and dozens of Plaintiffs have no cognizable connection to California and, thus, no basis for application of California law to their claims. For example, *Maxwell* Plaintiff Vernon Maxwell attended college in Arizona, played for the Baltimore/Indianapolis Colts, Detroit Lions, and Seattle Seahawks, and now resides in Arizona. (*Maxwell* FAC ¶¶ 1, 176-80.) He alleges no connection whatsoever between his claims and California.[17] The same applies for the second *Maxwell* Plaintiff, Broderick Jones, who lives in Alabama and played for the Cleveland Browns and Baltimore Colts, and who fails to allege any connection between his claims and California. (*Id.* ¶¶ 2, 181-85.) The three Complaints are replete with dozens and dozens of other examples of Plaintiffs with no connection whatsoever between their claims and California or its law.

Plaintiffs' claims are all for alleged personal injuries. While there is no bright-line rule under California's "governmental interest" approach to choice-of-law analysis,[18] "[w]here the real issue involved in a case is compensation of the injured person, California courts have tended to apply the law of the place of the injured's domicile, finding that that state has the greatest interest in compensating its domiciliaries." *Kasel*, 24 Cal. App. 3d at 734, 101 Cal. Rptr. at 330. On this basis alone, and assuming *arguendo* that California choice-of-law analysis should apply and that Plaintiffs' place of residence alone were dispositive of the choice-of-law analysis (which the Riddell Defendants do not concede), Plaintiffs' claims

---

[17] As demonstrated in the contemporaneously filed motion to dismiss, Plaintiffs allege that several "Riddell Defendants" are California entities – Easton-Bell Sports, Inc.; EB Sports Corp.; and RBG Holdings Corp. (*see, e.g., Maxwell* FAC ¶¶ 79, 81-83) – but fail to allege any factual basis for any claims against them.
[18] *See supra* n.14.

would implicate thirty-three (33) different jurisdictions' product-liability/personal-injury laws.  Also, as the Ninth Circuit has recognized, the laws of negligence and products liability "all differ in some respects from state to state."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1188 (9th Cir. 2001) (quoting *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300-01 (7th Cir. 1995)).

Further compounding the confusion is the fact that a proper conflict-of-law analysis requires comparison of the forum state's laws with <u>each</u> non-forum jurisdiction's laws as to <u>each</u> individual claim.  *Id.* (citing *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 103 Cal. Rptr. 2d 320, 15 P.3d 1071, 1081 (2001) ("These [choice-of-law] rules apply whether the dispute arises out of contract or tort . . . and a separate conflict of laws inquiry must be made with respect to each issue in the case.")); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 743 n.15 (5th Cir. 1996) ("'[B]ecause we must apply an individualized choice of law analysis to each of plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially . . . .'" (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996))).  Thus, a proper choice-of-law analysis would have to be performed as to each of the 136 player-Plaintiffs' four separate claims against the Riddell Defendants, in addition to *Barnes* Plaintiff Lens's wrongful-death claim, as well as the eighty-four spouses' consortium claims.

Should the Court not dismiss these claims outright based on the Riddell Defendants' motion to dismiss, then performing a proper choice-of-law analysis would  be imperative, as determining the controlling law would impact many potentially dispositive legal issues on which various jurisdictions' laws vary significantly.  For example, numerous jurisdictions apply statutes of repose to products-liability claims like Plaintiffs, presenting additional grounds for possible dismissal.  *See, e.g.*, Tenn. Code Ann. § 29-28-103(a) (West 2011); Ohio Rev. Code § 2305.10(C)(1); Tex. Civ. Prac. & Rem. Code Ann. § 16.012 (West 2011).

Moreover, substantive product-liability law also varies significantly from jurisdiction to jurisdiction, including on issues such as standards for imposing liability (e.g., strict liability versus negligence-based), the necessary elements for proving product defect (e.g., certain jurisdictions, like Michigan, requiring pleading and proof of an alternative feasible design), standards for proving product defect (e.g., risk/utility versus consumer expectations), and the availability of certain defenses (e.g., assumption of the risk, misuse/alteration/modification, compliance with industry or government standards, etc.). *See Gawenda v. Werner Co.*, 932 F. Supp. 183, 187 (E.D. Mich. 1996) (explaining that, under Michigan law, "a plaintiff must prove, under a risk-utility analysis, that an available, safer, alternative design should have been adopted"); *see also Zinser*, 253 F.3d at 1188 (recognizing that the laws of negligence and products liability "all differ in some respects from state to state").

Likewise, the tests for causation can vary significantly, with some jurisdictions focusing on applying varying tests couched as "proximate cause," "substantial factor," or "substantial contributing cause." *See, e.g., Wolfe v. Stork RMS-Protecon, Inc.*, 683 N.E.2d 264, 268 (Ind. Ct. App. 1997) ("Proximate cause is an essential element of, and is determined in the same manner in, both negligence and product liability actions."); *Fritz v. White Consol. Indus., Inc.*, 306 A.D.2d 896, 897, 762 N.Y.S.2d 711, 714 (N.Y. App. Div. 2003) (explaining that a product liability plaintiff has the burden of showing that a defect was a "substantial factor" in causing injury); *Graven v. Vail Assocs., Inc.*, 909 P.2d 514, 520 (Colo. 1996) ("To establish causation, the plaintiff must prove that the defendant's conduct was a substantial contributing cause of the injury."). In addition, different jurisdictions have different laws governing joint-and-several liability versus apportionment of fault, not to mention potential defenses such as contributory negligence. *Compare* Fla. Stat. § 768.81(3) ("In a negligence action, the court shall enter judgment against each party liable on the basis of such party's

21

percentage of fault and not on the basis of the doctrine of joint and several liability."), *with Holcim (US), Inc. v. Ohio Cas. Ins. Co.*, 38 So. 3d 722, 728-29 (Ala. 2009) (explaining that joint and several liability applies in Alabama, and, therefore, a tort-feasor whose negligent act or acts proximately contribute in causing an injury may be held liable for the entire resulting loss.); *compare also Smith v. Fiber Controls Corp.*, 300 N.C. 669, 672 (1980) (contributory negligence will completely bar a plaintiff's recovery in a products liability action founded on negligence), *with* Wash. Rev. Code § 4.22.005 (providing that any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable to the claimant's contributory fault, but does not bar his recovery).

Adding another layer of individualized issues, depending on the applicable jurisdictions' laws, Plaintiffs' damages claims may involve vastly different limitations, set-offs, and possibly workers' compensation bars. For example, recoverability of damages varies significantly from state to state, with some jurisdictions imposing caps on certain types of compensatory damages, punitive damages, or both. *See, e.g.*, Md. Code Ann., Cts. & Judicial Proceedings § 11-108 (2008) (establishing a cap on all non-economic damages covering "personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury"); Va. Code Ann. § 8.01-38.1 (imposing a cap of $350,000 on punitive damages per action). Moreover, many states' laws differ significantly in terms of the standards for proving entitlement to punitive damages in the first place. *Compare* O.C.G.A. § 51-12-5.1 (requiring plaintiffs to prove entitlement to punitive damages "by clear and convincing evidence"), and Or. Rev. Stat. § 31.730 (same), *with*, *Gallegos v. Citizens Ins. Agency*, 779 P.2d 99 (N.M. 1989) (requiring entitlement to punitive damages to be proven only by a preponderance of the evidence).

CV 11-8394 R (MANx)

1    Plaintiffs' claims implicate a dizzying array of differing laws. The
2    necessarily disparate legal treatment implicated by this attempt to join together
3    through these three cases 136 separate player-Plaintiffs (and 84 spouses) from
4    dozens of different jurisdictions, with at least five separate claims against the
5    Riddell Defendants further compels severance of each of these actions.

6    **C.    Joinder of Plaintiffs' claims would not promote the purposes of
7          FRCP 20, but rather would only cause delay, jury confusion,
8          judicial inefficiency, and prejudice.**

9    Plaintiffs cannot show proper permissive joinder under Rule 20. Moreover,
10   even if joinder were not improper – which it is – the Court should nonetheless
11   exercise its broad discretion to sever these wildly dissimilar claims pursuant to
12   FRCP 20(b). *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000).

13   In *Coleman*, ten plaintiffs originally all jointly sued Quaker alleging age
14   discrimination in connection with "reductions-in-force" that occurred between
15   1994 and 1995. *Id.* at 1277. The District Court for the District of Arizona found
16   that the plaintiffs satisfied the two prongs of FRCP 20(a) for proper permissive
17   joinder, but the court nonetheless also considered whether the claims should be
18   severed pursuant to FRCP 20(b) "and concluded that severance was appropriate."
19   232 F.3d at 1296. Therefore, the district court "ordered the cases sent to the
20   districts in which the plaintiffs had worked for Quaker," and allowed the three
21   plaintiffs who worked in Arizona to proceed with that case there. *Id.* at 1280.

22   The remaining three plaintiffs appealed, arguing that the district court had
23   erred in severing their claims from the other original plaintiffs. *Id.* at 1296. The
24   Ninth Circuit disagreed and affirmed. *Id.* at 1297.

25   Specifically, the Ninth Circuit noted the district court's finding of prejudice
26   to the defendants "by having all ten plaintiffs testify in one trial." *Id.* at 1296, 1297
27   ("The district court properly considered the potential prejudice to Quaker created
28   by the parade of terminated employees and the possibility of factual and legal

CV 11-8394 R (MANx)

confusion on the part of the jury."). The Ninth Circuit also noted the findings of likely jury confusion by requiring the jury "to examine individually [each plaintiff's] employment history as well as the explanations given by Quaker for not retaining him or her, explanations that would require testimony of each employee's supervisors and raters." *Id.* at 1296. The Ninth Circuit further noted the district court's finding that "[l]egal confusion was also likely because the plaintiffs had worked for Quaker in six different states, and the jury would have had to evaluate their state law claims in light of the different laws of each state." *Id.*

On these findings, the Ninth Circuit noted, the district court properly concluded that "the likelihood of prejudice and confusion outweighed the gains from judicial economy and any potential prejudice to the plaintiffs who would try their cases in the states in which they lived and worked." *Id.* Also, "[g]iven the broad discretion with which the district court is vested to make a decision granting severance and the fact that the district court carefully weighed the arguments in favor of and against joinder," the Ninth Circuit affirmed. *Id.* at 1297.

This Court should reach the same result here and, even assuming it were to find proper joinder in the first place, should nonetheless sever these claims. As in *Coleman*, the Riddell Defendants would be prejudiced by allowing these claims to proceed together, but that prejudice would be multiplied many-fold by having to deal with many more – sometimes dozens more – than ten Plaintiffs. And even more so than in *Coleman*, which involved actions occurring over only a two-year period, *Id.* at 1277-79, here, Plaintiffs' claims span a period of well over 50 years. Likewise, while the *Coleman* district court found likely jury confusion and prejudice based on the involvement of only six different states' laws, here, that concern is again magnified many times over, given the potential applicability of dozens of different jurisdictions' laws to these wildly disparate claims.

1    There is no proper joinder here. Even if there were, this Court should

2    exercise its broad discretion to sever these disparate claims to avoid prejudice,

3    confusion, delay, and judicial inefficiency.

4  **III.**    **CONCLUSION**

5    For the reasons set forth above, the Riddell Defendants respectfully request

6    that, pursuant to FRCP 20 and 21, the Court sever the individual player-Plaintiffs'

7    (and their respective spouses') claims in each of these three actions – *Maxwell*,

8    *Pear*, and *Barnes* – against the Riddell Defendants, dismiss all but the named

9    Plaintiffs in each three action (and player-Plaintiff Pear's spouse), and order that

10   each of those severed/dismissed claims, if re-filed, be re-filed separately, in an

11   appropriate venue, and captioned with new and separate case numbers, or for such

12   other relief as the Court deems appropriate in its broad discretion to remedy the

13   misjoinder of these disparate claims.

15   DATED:     December 20, 2011       BOWMAN AND BROOKE LLP

17                      By:    /s/ Paul G. Cereghini

18                           Paul G. Cereghini

19                           Vincent Galvin

                        Marion V. Mauch

20                           Attorneys for Defendants RIDDELL,

21                           INC.; ALL AMERICAN SPORTS

                        CORPORATION; RIDDELL

22                           SPORTS GROUP, INC.; EASTON-

23                           BELL SPORTS, INC.; EASTON-

                        BELL SPORTS, LLC; EB SPORTS

24                           CORP.; and RBG HOLDINGS

25                           CORP.

CV 11-8394 R (MANx)