Ms. SANCHEZ. **And some of the people who are participating in this study have other conflicts of interest. You know, one of the committee members on the concussion committee owns the company that makes and markets, mainly through its use by most of the NFL teams, the neuropsychological test that is used in the study. Isn't that true?**

Mr. GOODELL. I don't know the answer to that question, but I will find out for you.

Ms. SANCHEZ. **My suggestion would be, and my time has expired, but my suggestion would be that instead of having NFL-connected consultants and doctors, that perhaps the true findings of a truly unbiased study would be better conducted by people who have not been on the payroll or not been retained by the NFL in any capacity.** (Emphasis added).

77. The NFL thereafter reacted to this barrage of criticism by having Casson and Viano, who had replaced Pel!man as co-chairs of the MTBI Committee, resign by suspending that Committee's research. The League also pledged to donate a paltry **$1** million to subsidize the CSTE's research on CTE.

78. On December 2, 2009, Goodell announced an update on concussion guidelines for the League's players. The statement outlined several changes. First, players who sustained a concussion should not return to practice or game play the same day if the following signs or symptoms are present: loss of consciousness, confusion, amnesia or other memory problems, abnormal neurological exam, new and persistent headache, or any other persistent concussion signs. Second, if a player is held from a game, clearance for return to play should be determined by both the team physician and an independent neurological consultant. Return to play should not be considered until the athlete is asymptomatic, both at rest and with exertion, has a normal neurological exam, and has normal neuropsychological testing. The NFL subsequently clarified that primary sports care physicians could be treated as independent neurological consultants.

79.     Aiello, the League spokesperson who had made staunch denials of the link between concussions and brain injury as late as September of 2009, made the following admission in a December 20, 2009 interview with a reporter for the *New York Times:*

> **After weeks of transforming its approach to concussions and its research into their long-term effects among players, the N.F.L. not only announced Sunday that it would support research by its most vocal critics but also conceded publicly for the first time that concussions can have lasting consequences.**
>
> "It's quite obvious from the medical research that's been done that concussions can lead to long-term problems," the league spokesman Greg Aiello said in a telephone interview. He was discussing how the league could donate $1 million or more to the Center for the Study of Traumatic Encephalopathy at Boston University, whose discoveries of brain damage commonly associated with boxers in the brains of deceased football players were regularly discredited by the N.F.L.
>
> **Told that his statement was the first time any league official had publicly acknowledged any long-term effects of concussions, and that it contradicted past statements made by the league, its doctors and literature currently given to players, Aiello said: "We all share the same interest. That's as much as I'm going to say."**
>
> Since an Oct. 28 hearing before the House Judiciary Committee, when the league's approach to science was compared to that of the tobacco industry, the N.F.L. has accepted the resignations of the co-chairmen of its concussion committee and overhauled its policies toward concussion management. Players now must be cleared by brain-injury experts unaffiliated with the team, and cannot return to a game or practice in which they have shown any significant sign of concussion.
>
> The second rule has since been recommended by an N.C.A.A. committee as standard policy for athletes in all sports, and will be considered by several state legislatures that have bills governing high school athletics before them.
>
> The recent changes by the N.F.L. had amounted to tacit acknowledgments that it was no longer able to defend a position that conflicted with nearly all scientific understanding of head trauma.
>
> **Until recently, the league and its committee on concussions had consistently minimized evidence testifying to the risks of repeated brain trauma in N.F.L. players — from researchers like**

> those at Boston University, to phone surveys the league itself
> commissioned, to demographic analysis of players known to have
> early-onset dementia. While discrediting such evidence, a
> pamphlet on concussions currently given to players states,
> "Research is currently underway to determine if there are any
> long-term effects of concussion in N.F.L. athletes."
>
> That research study, conducted by the N.F.L.'s committee on
> concussions, was recently suspended amid strong criticism of its
> design and execution by outside experts, players and members of
> Congress.
>
> "Mr. Aiello's statement is long overdue — it's a clear sign of how
> the culture of football has changed in recent months," Dr. Robert
> Stern, a co-director of the Boston University center and its
> Alzheimer's Disease Clinical and Research Program, said in a
> telephone interview.
>
> "There is no doubt that repetitive blows to the head result in long-
> term problems in the brain, including progressive dementia. With
> the N.F.L. taking these recent actions, we are finally at a point to
> move forward in our research and ultimately solve this important
> problem — for professional athletes and collegiate and youth
> players." (Emphasis added).

80. Despite these concessions, the problem continued unabated. 30 of **i60** NFL
players surveyed by the Associated Press in November of 2009 stated that they either failed to
report or underreported concussion symptoms. Players admitted that they returned to play after a
concussion feeling dazed or woozy or suffering from blurred vision.

81. In March of 2010, the MTBI Committee got a new name and new co-chairs.
It was rechristened as the Head, Neck and Spine Medical Committee, and became jointly chaired
by Dr. H. Hunt Batjer ("Batjer") of Northwestern Memorial Hospital and Dr. Richard Ellenbogen
("Ellemborgen") of Harborview Medical Center in Seattle. Batjer and Ellenbogen replaced Casson
and Viano, who in turn had replaced Pellman.

82. In a May 2010 Congressional hearing, Representative Anthony Weiner
addressed Batjer and Ellenborgen as follows: **"Mou have years of an infected system here,
land] your job is ...to mop lit] up."** (Emphasis added).

83.    Batjer and Ellenborgen conceded in June of 2010 that the League's efforts with respect to concussion and brain injury were riddled with duplicity, conflicts of interest and shocking ineptitude. As was reported in a June 1, 2010 *New York Times* article:

> **They accused a fellow doctor of minimizing solid evidence of the dangers of football concussions. They concurred that data collected by the N.F.L.'s former brain-injury leadership was "infected," said that their committee should be assembled anew, and formally requested that the group's former chairman, Dr. Elliot Pet!man, not speak at a conference Wednesday.**
>
> For the first time these remarks came not from outside critics of N.F.L. research but from those now in charge of it — Dr. H. Hunt Batjer and Dr. Richard G. Ellenbogen, prominent neurosurgeons who became co-chairmen of a new league committee in March. One week after two members of Congress accused the doctors of sounding too much like their predecessors, and on the eve of a league-sponsored symposium in Washington held by Johns Hopkins Medicine, Batjer and Ellenbogen made clear they planned to chart a new course.
>
> The two doctors criticized Johns Hopkins's promotional brochure for Wednesday's conference — which was open only to N.F.L. medical personnel, other doctors and members of the United States Department of Defense — for playing down existing evidence of brain damage in retired football players.
>
> The opening paragraph described the disease chronic traumatic encephalopathy as "now being reported in football players, although with unknown frequency." It added that these and related matters had been reported by the news media "with considerable hype around assertions of long-term harm to players from head injuries."
>
> **Batjer and Ellenbogen said that the frequency of reports of C.T.E. in players is not unknown — a Boston University research group has diagnosed it in all 12 former college and N.F.L. players of various ages it had tested for the condition.**
>
> **"They aren't assertions or hype — they are facts," said Ellenbogen, the chief of neurological surgery at Harborview Medical Center in Seattle, who has been instrumental in drafting legislation to protect young athletes from head injuries.**
>
> He added: "Doctors were relatively ineffectual for 25 years on this issue. Then it's on the front page and everything focuses like a laser beam and things begin to change from baby steps to giant steps

forward protecting kids. From a doctor-patient perspective, it's been the single best thing that has happened to this subject."

Dr. Constantine G. Lyketsos, a professor of psychiatry and behavioral sciences at Johns Hopkins who is directing Wednesday's conference, said in a telephone interview that he wrote the brochure and that the N.F.L. had no role with the event, other than providing financing. He defended his choice of words.

"We know of 12 cases" of C.T.E., Lyketsos said. "We don't know how many don't have it."

Regarding news media coverage of the harm caused by repeated concussions in football players, Lyketsos said: "There is a concern that I have that the possibility of serious long-term consequences are being overemphasized without clear evidence. It could turn out correct. It could turn out incorrect. We don't know."

He added: "I worry that it might be a disservice. That's a possibility."

The league spokesman Greg Aiello declined to comment on Lyketsos's statements, other than saying that the league has given $1 million to the Boston University group to support its research.

The former leaders of the N.F.L. concussion committee generally agreed with Lyketsos, an attitude that ultimately came to the attention of Congress and led to several hearings on the subject of sports concussions in athletes of all ages. Batjer and Ellenbogen had a shaky debut before some frustrated members of the House Judiciary Committee during a forum in New York on May 24, but in the following days they made sure they would no longer resemble their predecessors.

**The doctors said the old committee's ongoing studies on helmets and retired players' cognitive decline — whose structure and data were strongly criticized by outside experts — would not be used in any way moving forward. They said they were influenced by a comment made to them last Monday by Representative Anthony D. Weiner, Democrat of New York: "You have years of an infected system here that your job is to some degree to mop up."**

**"The word 'infected' hit me right between the eyes," said Ellenbogen. He and Batjer became co-chairmen of the N.F.L. committee in March.**

**Batjer added: "We all had issues with some of the methodologies described, the inherent conflict of interest that was there in many**

areas, that was not acceptable by any modern standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

Batjer said that he and Ellenbogen had begun reconstituting their committee from scratch. He said that six members had been selected so far, none of them holdovers from the prior regime.

The doctors so wanted to distance themselves from the past that on Monday they requested that Penman, who was scheduled to deliver some opening remarks at the Johns Hopkins symposium, be removed from the program. Pellman was the chairman of the N.F.L. concussion committee from 1994 to 2007 and stayed on it until he resigned in March. He remains the league's medical director and helped with the conference's logistics.

On Tuesday, an e-mail message was distributed to conference organizers saying that Pel!man would not attend the conference for family-related reasons.

"Neither Rich nor I thought he should appear to represent the N.F.L. in what would look like a leadership role," Batjer said. "It's not about Elliot.    It's about a complete severance from all prior relationships from that committee." (Emphasis added.)

84.    As reported in a July 26, 2010 article in the *New York Times,* on June 10, 2010, the NFL issued a warning poster that was placed in the locker rooms of member clubs and was also turned into a pamphlet. A copy of the poster is reproduced below. It stands in stark contrast to the pamphlet issued by the League in April of 2007. This advice was never given previously by the NFL and was certainly not given to players who retired prior to June of 2010. As the same article went on to note:

The league's reversal is not necessarily complete. On April 30, an outside lawyer for the league, Lawrence L. Lamade, wrote a memo to the lead lawyer for the league's and union's joint disability plan, Douglas Ell, discrediting connections between football head trauma and cognitive decline. The letter, obtained by The *New York Times,* explained, "We can point to the current state of uncertainty in scientific and medical understanding" on the subject to deny players' claims that their neurological impairments are related to football.  (Emphasis added.)

Case 2:12-md-02323-AB Document 7433-3 Filed 03/09/12 Page 7 of 33 Page ID
#:10661
Case 2:11-cv-08396-R-MAN Document 1 Filed 12/20/11 Page 45 of 65



**RIPS**

# CONCUSSION
## A Must Read for NFL Players
### Let's Take Brain Injuries Out of Play



## Concussion Facts

Concussion is a *brain hyory* that afters the way your brain functions

Concussion can occur from a blow to the headibody:
- following hairnet to helmet contact, and for
- contact with the ground, object or another player

Most concussions occur without Wring knocked unconscious

&wily of *flury,depends on* many fact* and Is not known until symptoms rosoliro and brain 'function is back to normal

*Alf* concutalOntato *not* CrilatOd*Otitis* ★ - Each player iS different, each injury is different and all iniurios should be evaluated by your team medical staff

## Concussion Symptoms

Differentsymptoms can occur and may not show up for several hours   Common symptoms include:

- Confusion
- Headache
- Amnesia I Difficulty remembortng
- Balance problems
- Irritability

- Difficulty concentrating

- Feeling•siuggiati,eta7,;.; or groggy
  Sonsitivity to noise
     Sensitivity to light
- Double1 fuzzy vision
- Slowed reaction
-Feeling more emotional
-Sleep disturbances
- Loss of consciousness

*Symptoms may worsen with physical or mortal oxortion            computer use,. reading)*

## Why Should I Report My Symptoms?

- Practicing or playing while still experiencing symptoms can prolong the time to recover and return to play.
- Unlike other Injuries, there may be significant consequences of "playing through" a concussion. Repetitive brain injury, when not boated promptly and properly may cause permanent damage to your brain.

## What Should I Do If I Think I've Had a Concussion?

**Report a** Never ignore symptoms even Il they appear mild. Look out for your teammates. Tell your Athletic Trainer or Team Physician If you think you or a teammate may have had a concussion.

**Get Checked Out.**   Your team medical staff has your health and well being as its first priority. They will manage your concussions according to NFL / NFLPA Guidelines which include being fully asymptomatic, both at rest and after exertion, having a normal neurologic examination, normal neuropsychotogical testing, and clearance to play by both the team medical staff and the Independent neurologic consultant.

**Take Care of Your Brain.**   According to the CDC', "traumatic brain injury can cause a wido tango of short— or long term changes affecting thinking, sensation, language , or emotions". These changes may lead to problems with memory and communication , personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life end your family's life forever.

  

### Work smart. Use your head, don't lead with it. Help make our game safer. Other athletes are watching...

 

for more information about traumatic brain Injury and concussion, go to httpd1www.cdc.goviconcussion

Exhibit "A"
Page 43

85.     Yet even after this new warning, NFL players are still going out on the field after receiving a significant concussion. In a September 19, 2010 posting by Sam Donellon, a sports columnist on philly.com, it was noted:

> A THOUSAND pardons. For the game plan, for the execution, for the ever-present "Not putting the guys in the right places" to succeed during Sunday's 27-20 loss to the Green Bay Packers.
>
> [Philadelphia Eagles Head Coach] Andy Reid issued his familiar post-loss mea culpas yesterday, vowing to "tighten up" special teams play, execution particularly on offense, and even his play-calling.
>
> The only thing he didn't apologize for was how, or why, two of his stars were allowed to re-enter the game after getting concussed Sunday afternoon at Lincoln Financial Field.
>
> That's because in his mind, and apparently in the minds of too many still involved in the NFL, he and his medical staff did what it was supposed to do in the cases of Stewart Bradley and Kevin Kolb. Asked all the right questions, got all the right answers, sent both back into a game even after both had displayed, for a national audience to see, evidence of head trauma.
>
> To wit:
>
> Kolb lying face down for several seconds before rising slowly, grass hanging from his facemask, walking slowly from the field; Bradley bouncing up after an inadvertent knee-to-helmet hit, only to stumble back down to the ground, clearly disoriented.
>
> That's a key word, disoriented. It's used in those famous updated guidelines the NFL issued last December to teams regarding concussions in the wake of congressional hearings and some high-profile injuries, including the repeated concussions to former Eagle Brian Westbrook.
>
> "A player who suffers a concussion should not return to play or practice on the same day," said an NFL release on those guidelines, which lists among symptoms "Loss of consciousness" and "Confusion as evidenced by disorientation to person, time or place; inability to respond appropriately to questions; or inability to remember assignments or plays."
>
> So what are we missing here? Reid said repeatedly Sunday, and again yesterday, that appropriate answers were given to questions. He said Kolb's inability to remember plays was only evident after he returned to play, and he was yanked after a three-and-out series.

38

COMPLAINT

But both men were clearly disoriented when they first reached their feet, and this is where we tread into the NFL's continued ambiguity over what it views as serious head trauma. Was Bradley's stumble due to poor balance or dizziness? The guidelines say poor balance necessitates removal, dizziness not necessarily so. But what's the difference and how the hell can anyone tell? Aren't they the same thing?

86.     As another example, the Concussion Blog reported on Austin Collie ("Collie"), a wide receiver who played for the Indianapolis Colts in 2010. Collie suffered a concussion in Week 9 of the regular season and was benched in Week 10. He returned in Week 11, and was withdrawn after playing part of that game because of "worsening symptoms." He was benched in Weeks 12-14, but returned in Week 15, only to receive yet another concussion. As the Concussion Blog noted:

> NFL "Policy" indicates that a player will not return from a concussion unless they pass all tests. Therefore if Indianapolis followed the "policy" then Collie was cleared and passed all tests by Week 11, and his first concussion resolved. The reports of more/worsening symptoms after 1st half of Pats game indicates that he MUST have sustained a second concussion. Then upon returning this week that would have meant that he cleared all tests and AGAIN sustained a concussion, his THIRD. Let me be clear here, you can only "aggravate" a concussion if you have not recovered from the first. And a player SHOULD NOT be playing with an unresolved concussion, by "policy". ...The Colts already are spinning this one, but no matter how you look at it they either failed the "policy" or knowingly put him back into action with a concussion. At the very least they misreported the second. If he were returned in Week 11 and "aggravated" it then he was not properly handled the first time.

87.     The plight of former NFL players suffering from brain injuries caused by their service in the game has continued in 2011. One example is provided by the case of Dave Duerson ("Duerson"), a former safety for the Chicago Bears and the New York Giants. After suffering months of headaches, blurred vision and deteriorating memory, Duerson committed suicide at the age of 50 on February 17, 2011. His final note asked that his brain be given to the NFL brain bank for evaluation.

39

88.     On May 2, 2011, researchers at CTSE at Boston University reported that
Duerson was suffering from CTE and released photographs of the autopsy of his brain. Examples
of those photographs obtained from the website of CBS Chicago are reproduced below:



Damn= Placmori

89.     The top row of photographs depicts three half sections of Duerson's brain
that exhibit multiple areas of damage (brown coloring) in the frontal and temporal cortex,
hippocampus and amygdala. The bottom row of photographs depicts microscopic images from
these damaged areas, showing severe neurodegeneration. As CBS Chicago reported:

> Dr. Robert Cantu, co-director of the CTSE, said at a news
> conference that such results normally are published first, but the
> Duerson family wanted them released earlier.
>
> **"It is our hope that through this research questions that go
> beyond our interests may be answered," The Duerson family
> said in a statement. "Questions that lead to a safer game of
> football, from professional to Pop Warner; Questions that lead
> to better diagnostic tests for those alive; and Questions that lead
> to a cure; will all hopefully be answered."** (Emphasis added).

90.     When this information was reported, DeMaurice Smith, Executive Director
of the NFLPA, stated that the fact that Duerson was suffering from CTE "makes it abundantly
clear what the cost of football is for the men who played and the families. It seems to me that any
decision or course of action that doesn't recognize that as the truth is not only perpetuating a lie,

but doing a disservice to what Dave feared and what he wanted to result from the donation of his brain to science."

91.    Another example is provided by the case of John Mackey ("Mackey"), the former tight end of the Chicago bears, who died in July of 2011 and for whom the 88 Plan described below was named. Mackey was diagnosed with frontotemporal dementia in 2007, forcing him to live full-time in an assisted living facility. The NFLPA refused to pay a disability income to him because it claimed that there was no proven direct link between brain injury and NFL game participation. When the 88 Plan came into being, he received payments pursuant to it, but they were far less than his family's costs. Mackey made less than a total of $500,000 during his decade-long NFL career. His wife, Sylvia, had to work as a flight attendant to supplement his NFL pension of $2,500 per month after they sold their California home to provide for his extensive medical care.

92.    The legendary Chicago Bears player, Gale Sayers, was asked about Mackey's demise by a reporter for the Chicago *Tribune* and his response was reported as follows: "Sayers feels the NFL could have done more to help Mackey during his final years. You know, John Mackey died at 60-something (69),' said Sayers. `(The NFL) could have helped him more, I felt. But they didn't, and the players (NFLPA) could have helped more, and it didn't happen.'

93.    On information and belief, proposals have been submitted to the NFL MTBI Committee about concussion concerns and the need to do regularized testing of players. To the best of Plaintiffs' knowledge, the League has never acted on them.

94.    The NFL's conduct stands in sharp contrast to what has been done or promulgated by other sports or medical bodies.

95.    For example, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: **"[bloxers that suffered concussion by KO, should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including but**

not limited to KO's, and should not compete in a boxing match in less than 75 days." (Emphasis added).

96.     The Second International Conference on Concussion in Sport met in Prague in 2004 and released the following statement: **"[WI hen a player shows ANY symptoms or signs of a concussion ... the player should not be allowed to return to play in the current game or practice ... When in doubt, sit them out!"** (Emphasis added). This directive echoed the position taken by the First International Conference on Concussion in Sport, held in Vienna in 2001.

97.     As ESPN has noted, **"Nil standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."** (Emphasis added).

98.     Another example is provided by the National Collegiate Athletic Association ("NCAA"), which also recognized inexcusably late the link between head impacts and brain injuries, and which did not taking affirmative action on this until 2010. The NCAA is the subject of at least two class actions suit for this tardiness. Nevertheless, once it did act, it did so in a manner that was more decisive than the NFL. The NCAA's webpage on concussion-related resources *(see* <http://www.neaa.or&wps/portalincaahome?WCM GLOBAL   CONTEXT=/ ncaa/NCAA/Academ ics+and+Athletes/Personal+WeifareMealth+and+Saletv/Concussion>) indicates that in an educational partnership with the Centers for Disease Control and Prevention, the NCAA has supplied each member college campus with two posters and two sets of fact sheets addressing concussion awareness, prevention, and management. It has issued the "NCAA Sports Medicine Handbook — Guideline on Concussions in the Athlete," which recommends best practices. The NCAA also requires each member college to develop a "Concussion Management Plan." One exemplar plan offered on the NCAA's website is the University of Georgia Athletic Association's ("UGAA") "Concussion Management Guidelines," which read as follows:

**1. UGAA will require student-athletes to sign a statement in which student-athletes accept the responsibility for reporting their injuries and illnesses to the sports medicine staff, including signs and symptoms of concussions (attachment A).** During the review and signing process student-athletes will watch a NCAA video on concussions and be provided with educational material 1 on concussions (attachment 13).

**2. UGAA will have on file and annually update an emergency action plan (attachment C) for each athletics venue to respond to student-athlete catastrophic injuries and illnesses,** including but not limited to concussions, heat illness, spine injury, cardiac arrest, respiratory distress *(e.g.* asthma), and sickle cell trait collapses. All athletics healthcare providers and coaches shall review and practice the plan annually. These sessions will be conducted prior to the start of the sport season. . . The UGAA compliance office will maintain a list of staff that have completed the requirement on file.

**3. UGAA sports medicine staff members shall be empowered to determine management and return-to-play of any ill or injured student-athlete, as he or she deems appropriate.** Conflicts or concerns will be forwarded to Ron Courson (director of sports medicine) and Fred Reifsteck, MD (head team physician) for remediation.

**4. UGAA shall have on file a written team physician—directed concussion management plan (attachment D) that specifically outlines the roles of athletics healthcare staff** (e.g., **physician, certified athletic trainer, nurse practitioner, physician assistant, neuropsychologist). In addition, the following components have been specifically identified for the collegiate environment:**

**a. UGAA coaches will receive a copy of the concussion management plan,** a fact sheet on concussions in sport, and view a video on concussions annually. The UGAA compliance office will maintain a list of staff that have completed the requirement on file.

**b. UGAA sports medicine staff members and other athletics healthcare providers will practice within the standards as established for their professional practice** *(e.g.,* team physician, certified athletic trainer, physical therapist, nurse practitioner, physician assistant, neurologist, neuropsychologist).

**c. UGAA shall record a baseline assessment for each student-athlete in the sports of baseball, basketball, cheerleading, diving, equestrian, football, gymnastics, pole vaulting, soccer, and softball, at a minimum. In addition, a baseline assessment will be recorded for student-athletes with a known history of concussion. The same baseline assessment tools should be used**

post-injury at appropriate time intervals. **The baseline assessment should consist of the use of: 1) symptoms checklist, 2) standardized balance assessment (Neurocom) and 3) neuropsychological testing (computerized IMPACT test). Neuropsychological testing has been shown to be effective in the evaluation and management of concussion. The neuropsychological testing program should be performed in consultation with a neuropsychologist. Post injury neuropsychological test data will be interpreted by a neuropsychologist prior to return to play.** Neuropsychological testing has proven to be an effective tool in assessing neurocognitive changes following concussion and can serve as an important component of an institution's concussion management plan. However, neuropsychological tests should not be used as a standalone measure to diagnose the presence or absence of a concussion as UGAA uses a comprehensive assessment by its sports medicine staff.

**d.   When a student-athlete shows any signs, symptoms or behaviors consistent with a concussion, the athlete will be removed from practice or competition, by either a member of the coaching staff or sports medicine staff. If removed by a coaching staff member, the coach will refer the student-athlete for evaluation by a member of the sports medicine staff.** During competitions, on the field of play injuries will be under the purview of the official and playing rules of the sport. UGAA staff will follow such rules and attend to medical situations as they arise. Visiting sport team members evaluated by UGAA sports medicine staff will be managed in the same manner as UGAA student-athletes.

**e. A student-athlete diagnosed with a concussion will be withheld from the competition or practice and not return to activity for the remainder of that day.**   Student-athletes that sustain a concussion outside of their sport will be managed in the same manner as those sustained during sport activity.

**f.   The student-athlete will receive serial monitoring for deterioration.**   Athletes will be provided with written home instructions (attachment E) upon discharge; preferably with a roommate, guardian, or someone that can follow the instructions.

**g.   The student-athlete will be monitored for recurrence of symptoms both from physical exertion and also mental exertion,** such as reading, phone texting, computer games, watching film, athletic meetings, working on a computer, classroom work, or taking a test. Academic advisors and professors will be notified of student-athlete's concussion, with permission for release of information from the student-athlete.

44
COMPLAINT

Exhibit "A"
Page 50

**h. The student-athlete will be evaluated by a team physician as outlined within the concussion management plan.** Once asymptomatic and post-exertion assessments are within normal baseline limits, return to play shall follow a medically supervised stepwise process.

i. Final authority for Return-to-Play shall reside with the team physician or the physician's designee as noted in the concussion management flowchart.

**5. UGAA will document the incident, evaluation, continued management, and clearance of the student-athlete with a concussion.** Aggregate concussion numbers per sport will be reported to the Director of Athletics annually.

**6. Athletics staff, student-athletes and officials will continue to emphasize that purposeful or flagrant head or neck contact in any sport should not be permitted.** (Emphasis added).

## The Riddell Defendants Are Complicit In The NFL's Misconduct

99. Riddell is complicit in the NFL's misconduct.

100. Riddell manufactures helmets for use by NFL players. Since 1989, **Riddell has been the official helmet for the League and is the only helmet manufacturer allowed to display its logo on helmets used in League games.** Prior to the commencement of the 2010 season, Riddell renewed its contract with the League allowing it to continue as the NFL's primary helmet provider through 2014. **The NFL has estimated that 75% of the helmets used in the League are manufactured by Riddell; Riddell estimated that the figure was** 77%.

101. The official guidelines from the National Operating Committee on Standards for Athletic Equipment do not address concussions. The guidelines involve a drop test designed only to simulate the forces that would cause a skull fracture.

102. Riddell has long been aware of medical issues concerning concussions. Yet despite being the maker of the official helmet for the NFL, **it did nothing to prevent the disinformation campaign engaged in by the League that is described in the preceding paragraphs.**

103. **Indeed, Riddell actively abetted the work of the NFL's MTBI Committee.** In 1997, it became part of that Committee's project of assessing concussions and health consequences to NFL players by analyzing and reconstructing head impacts.

104. In 2006, Riddell sponsored a study that appeared in *Neurosurgery* that was **co-authored by Lovell and Dr. Joe Maroon of the MTBI Committee** and Dr. Mickey Collins of the University of Pittsburgh Medical Center who works closely with various NFL member clubs that touted Riddell's "Revolution" helmet (introduced in 2002) as reducing the incidence of concussions in over 2000 high school athletes in Western Pennsylvania. **Cantu publicly criticized the study as being worthless.** This junk science is nonetheless still featured in a prominent place on Riddell's website (http://www.riddell.com/category/research-studies/), It is also used to promote the "Revolution Speed" helmet, which Riddell introduced in November of 2008 (http://www.riddell.com/press-releases/2918/pressreleases speedhelmet/).

105. In December of 2009, it was indicated that the NFL's MTBI Committee was going to develop a new football helmet safety standard by using a "linear impactor" test. Scientists were quick to react, as the *New York Times* reported:

> The critics said that **an improperly developed standard could compromise safety not just in the N.F.L.,** but at the college and youth levels greatly influenced by the professional game.
>
> **"This is not going to give you data you want with regard to concussion,"** said Dr. Robert Cantu, a medical expert on concussions and vice president for the National Operating Committee on Standards for Athletic Equipment, known as Nocsae. **"The way in which this study is set up, it won't answer the question in any meaningful way.**
>
> **"Terrible stuff. Should never be done."** (Emphasis added).

106. As an article by Pellman in *Neurosurgery* explained, out of 787 reported concussions suffered by NFL players between 1996 and 2001, the analysis focused on 25 that had

832883i

46
COMPLAINT

been captured on video. Cantu and Vin Ferrara ("Ferrara"), CEO of Xenith, another helmet

manufacturer for the NFL, explained the shortcomings of this approach:

> But it has long been recognized that the reason that player positions
> and yard markers were visible for those 25 collisions was that they
> were generally hits in the open field — where the players were
> moving at close to full speed and the ball carrier often didn't see the
> hit coming. **Because of this, Cantu said, the linear-impactor tests
> are replicating the most spectacular of collisions, rather than the
> lower forces known to cause the majority of concussions, such as
> hits along the line of scrimmage.**
>
> **"It's kind of like testing a car for front-end impacts by driving it
> off the edge of the Grand Canyon," said Ferrara, who said his
> letter to the IMTBII committee addressing these issues in early
> September was essentially ignored.    "If this becomes the
> standard people look to, which it will because we're talking
> about the N.F.L., it incentivizes manufacturers to make helmets
> stiffer, denser and more massive. If you only design for that and
> ignore the other 99 percent of hits, you're making the problem
> worse.** (Emphasis added).

107.    The Riddell Revolution design was derived from these 25 incidents on video

and Riddell or those closely affiliated with it, was heavily involved in the League's helmet-testing

procedures. A senior engineer at Biokinetics, Christopher Withnall, is listed as co-inventor on the

United States patent covering the Riddell Revolution's primary new technology. He is listed on

the company's website as participating in "ongoing N.F.L. concussion research and litigation

technical support" and is currently overseeing the NFL's helmet testing at Biokinetics.

108.    Ferrara and Robert Erb ("Erb") of Schutt Sports, a competitor of Riddell that

also supplies helmets to the NFL, have explained how the NFL's helmet testing program is

designed to favor Riddell:

> Erb said that too many of the doctors and technicians now involved
> with the N.F.L.'s testing protocol **"have a vested interest in Riddell
> looking good." Ferrara said that because the linear impactor
> and the Riddell helmets were derived from the same data, "they
> essentially favor each other."**
>
> **"Having those people, with all their respective interests, sitting
> around deciding on a helmet-testing process is like asking a**

47

COMPLAINT

> **father to judge his own children in a beauty contest," Erb said.
> "The only thing you can be sure of is that he's not going to vote
> for someone else's kid."** (Emphasis added).

109.    At the same time Riddell was actively involved in testing helmets for safety,
it was selling to the NFL helmets that provided very little protection against concussions caused by
head impacts. In May of 2011, Virginia Tech and Wake Forest University conducted tests on **10**
commercially available football helmets made by various manufacturers using the STAR
evaluation system. Recognizing that no helmet will eliminate concussions, the universities
attempted to evaluate which helmets do a better job reducing concussion risk. Helmets with lower
STAR values provide a reduction in concussion risk compared to helmets with higher STAR
values. The Riddell Revolution Speed had the best STAR score of 0.297. **On the other hand, the
Riddell VSR-4 helmet had one of the worst scores of 0.791.**

**110.    Manufacture of the VSR-4 helmet was only recently discontinued by
Riddell. According to Riddell, 38% of NFL players wore the VSR-4 helmet in 2010.**

**111.    The Concussion Blog reported 159 known concussions (an incidence
rate of over 15%) during the 2010 NFL regular season. According to this source, 64% of the
players who suffered a concussion during the 2010 season were wearing a helmet with a
Riddell ID. Of that subgroup, 51% were wearing a Riddell VSR-4 helmet. The
corresponding figure for the Revolution Speed helmet was 29%.**

**112.**    The Virginia Tech-Wake Forest University study has been criticized as
being incomplete, because the researchers simulated helmet-to-ground impacts, rather than helmet-
to-helmet collisions that are the cause of most concussions, so the high score afforded the Riddell
Revolution Speed might well be undermined if this additional factor were taken into account.

**III**

**III**

**The NFL's Retirement Plan And Other Benefit Plans For Retired NFL Players**

**And How They Are Inadequate**

113.     The NFL's retirement and disability benefits are simply insufficient as they fail to provide sufficient medical monitoring to retired NFL players who are at risk for neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions due to head impacts received during the period in which they played in the NFL. These benefits are also inadequate to defray the medical costs associated with the treatment of such cognitive-impairing conditions once they are diagnosed.

114.     Retirement and disability benefits for former NFL players are provided pursuant to the "Bert Bell/Pete Rozelle Retirement Plan" (the "Plan"). The Plan is a merger of two prior plans in 1993. The Plan provides for retirement benefits, total and permanent ("T&P") disability benefits, line of duty disability benefits and death benefits.

115.     As of December of 2010, only 3,154 former NFL players received pension benefits under the Plan, for an annual outlay of $63.7 million.

116.     In August of 2010, the United States Department of Labor ("DoL") put the Plan on "endangered" status because the Plan's funded percentage was only 75%.[1] The DoL's letter to the Plan (available from its website at <http://www.dol.gov/ebsa/pdf/e-notice092210001.pdf>) noted that the Plan needed to devise a "funding improvement plan."

117.     The Plan is run by a Retirement Board consisting of three persons selected by the NFLPA, three persons selected by the NFL Management Council and, in an *ex officio*

---

As the DoL explains on its website, <http://www.doL.gov/ebsa/criticalstatusnotices.html>: "[u]nder Federal pension law, if a multiemployer pension plan is determined to be in critical or endangered status, the plan must provide notice of this status to participants, beneficiaries, the bargaining parties, the Pension Benefit Guaranty Corporation and the Department of Labor. This requirement applies when a plan has funding or liquidity problems, or both, as described in the Federal law. If a plan is in critical status, adjustable benefits may be reduced and no lump sum distributions can be made. Pension plans in critical and endangered status are required to adopt a plan aimed at restoring the financial health of the pension plan."

49

COMPLAINT

capacity, the NFL Commissioner. The actuary for the Plan is Aon Corporation, executives of

which, on information and belief, have ownership interests in the Chicago Bears, one of the NFL's

member clubs.

118. Obtaining disability benefits under the Plan has been notoriously difficult.

In 2010, only 289 of 464 eligible players who applied for disability payments were awarded any.

119. As noted above, on June 23, 2007, hearings on the NFL's compensation of

retired players were held before the C&A Subcommittee. Numerous retired players suffering

severe disabilities as a result of their careers playing for the NFL told their stories of being denied

T&P and other benefits. Representative Sanchez summarized the evidence as follows:

> After announcing this hearing and subsequent research, it has
> become clear that the NFL disability and pension benefits plans have
> sparked a significant amount of passionate critics. The various
> stories relayed by the retirees demonstrate concern not only with
> how the plan is structured but also about how it is administered.

> The fundamental question then becomes whether this disability
> process is fair for the retired employees of the NFL. **The evidence
> suggests that the vast majority of former players needing
> benefits do not receive them. What is even more troubling is that
> through projects such as the NFL films, the NFL continues to
> profit off those very same players who are denied benefits.
> Essentially, is the NFL, a multibillion dollar organization, fairly
> treating the employees who helped build it?** (Emphasis added).

120. Representative Conyers also summarized some of the evidence that had been

presented to the subcommittee:

> [T]he NFL's treatment of its retired players with respect to disability
> and pension benefits is problematic. As many of us know, the
> average football athlete is not a marquee player but plays in the
> league for: less than 4 years and often retires because of injury. Upon
> retirement, he receives only $14,500 in pension benefits, less than
> half the amount received by an average retired Major League
> baseball player.

> **Of 10,000 retired NFL players, it is estimated that less than 300
> receive long-term disability payments. Several recent well-
> publicized cases highlight the resulting problems. For example,
> Pittsburgh Steelers center Mike Webster [("Webster")]. The**

**court recently awarded his estate more than $1.1 million in disability payments that the NFL's Retirement Plan administrators claimed he was not entitled to receive.**

Or take Brian DeMarco, former offensive lineman for the Jacksonville Jaguars. According to the Denver Post, Mr. DeMarco's back was broken in 17 places and he retired due to severe health problems after the 1999 season. But he has never been able to get NFL disability benefits. His disabilities were so extensive that he can't hold a telephone to his ear. In the last 4 years, Mr. DeMarco and his family have been homeless on three occasions.

I am concerned about the extent to which these issues are attributable to the administration of the NFL Retirement Plan, and I am troubled by the fact that arbitration is not readily available in cases of disability claims. The process for resolving disputes concerning player benefits and submission of disputes to a benefit arbitrator does not usually apply to retirement or disability benefits. Rather, the plan's Retirement Board hears appeals of its own decisions instead of submitting appeals to an arbitrator, and this practice has drawn significant criticism. (Emphasis added.)

121.    On September 18, 2007, a hearing on oversight of the NFL retirement system was held before the United States Senate Committee on Commerce, Science and Transportation. Similar testimony about denials of benefits was presented by NFL retired players.

122.    On April 8, 2008, the Congressional Research Service ("CRS") issued a report on "Former NFL Players: Disabilities, Benefits And Related Issues." It concluded:

The subject of players' injuries, disabilities, and benefits is a complex one, and, accordingly, there are a host of issues surrounding this subject. Although the number and type of benefits have grown over the years, older retirees, particularly those who played prior to 1982, have fewer benefits available to them than their successors have. Yet, this subset of former players might have the greatest financial and medical needs.

123.    As the CRS report also explained, there were substantial obstacles in obtaining T&P disability benefits under the Plan:

Overall, from July I, 1993, through June 26, 2007, 1,052 individuals applied for LOD or T&P disability benefits: 428 applications were approved; 576 were denied; and 48 are pending. The approval rate, which does not include the cases that are pending, is 42%. The

Case 2:12-md-02323-AB Document 43-8 Filed 12/26/13 Page 86 of 69 Page ID
Case 2:11-cv-08390-R-AB Document 743-8 Filed 02/30/13 Page 22 of 33 Page ID
#:10676

following series of statements shows the status of applications at
each step of the process.

—1,052 applications submitted for disability benefits.
   --358 (34%) applications approved.
   --675 (64%) applications denied.
   --19 (2%) applications are pending.

--223 (33% of 675) applications denied at the initial stage were
appealed.
   --69 (31%) approved on appeal.
   --132 (60%) denied on appeal.
   --22 (10%) appeals are pending.

--32 (24% of 132) applicants whose appeals were denied filed a
lawsuit.

--1 (3%) lawsuit resulted in a reversal of the Retirement
Board's decision.

124.    As the CRS report also noted, as of October 27, 2007, only 154 NFL retired

players were receiving T&P disability benefits.

125.    There also exists a separate health benefit plan for retired or former NFL

players known as the "88 Plan." The 88 Plan was created in August of 2007, apparently partly in

response to the congressional hearings cited above. It is designed to assist players who are vested

under the Plan and who have been determined to have dementia (including Alzheimer's Disease),

as this condition is defined in the 88 Plan. The 88 Plan will pay the cost of medical and custodial

care for eligible players, including institutional custodial care, institutional charges, home custodial

care provided by an unrelated third party, physician services, durable medical equipment, and

prescription medicine. For eligible players who are institutionalized as an in-patient, the maximum

annual benefit is currently $100,000 pursuant to the 2011 CBA ($130,000 beginning in 2016). For

eligible players who are not institutionalized as an in-patient, the maximum annual benefit is

$88,000 ($116,000 beginning in 2016). 88 Plan benefits may be paid on behalf of an eligible

player even if that player is also receiving T&P disability benefits from the Plan, but only if he is in

the "Inactive" category. As of December 2010, only 151 NFL players were receiving benefits under the 88 Plan.

126. There also exists an "NFL Player Care Plan" subsidized by the NFL. The NFL Player Care Plan provides a uniform administrative framework for a range of programs that benefit eligible former NFL players. Currently, these benefits are: (a) joint replacement benefits; (b) assisted living benefits; (c) discount prescription drug benefits; (d) Medicare supplement insurance benefits; (e) spine treatment benefits; (1) neurological care benefits; and (g) life insurance benefits. These benefits can be terminated summarily. For example, it has been reported that Bruce Schwager, who played at various NFL training camps and now suffers from dementia, was told on March 14, 2011 that his bills for treatment at a dementia-care facility in Sugarland, Texas will no longer be paid.

127. In sum, the NFL, likely the richest professional sports league ever, has demonstrated a repeated unwillingness to take adequate care of retired players who are suffering from the consequences of on-field head injuries incurred during their respective League careers and have made the game of professional football in this country what it is today. These players, members of the Class, are consequently at risk to neurodegenerative disorders and diseases for which medical monitoring is medically prudent and appropriate. Yet Defendants have failed to provide them with relief.

## COUNT I

### Action For Declaratory Relief (Against All Defendants)

128. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

129. There is a case and controversy among Plaintiffs and members of the Class on the one hand and Defendants on the other.

130.    Pursuant to Cal. Code of Civ. Pro. § **1060,** Plaintiffs and members of the Class seek a declaration as to the following.

131.    They seek a declaration that Defendants knew or reasonably should have known that the repeated traumatic brain and head impacts, as well as concussions, suffered by Class members while playing NFL football were likely to put them at excess risk to neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

132.    Plaintiffs and members of the Class seek a declaration that Defendants had a duty to advise them of these medical risks.

133.    Plaintiffs and members of the Class seek a declaration that Defendants willfully and intentionally concealed from and misled Class members concerning these medical risks.

134.    Plaintiffs and members of the Class seek a declaration that Defendants thereby recklessly endangered Plaintiffs and members of the Class.

<u>**COUNT H**</u>

<u>**Action For Medical Monitoring (Against All Defendants)**</u>

135.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

136.    As explained above, Plaintiffs and members of the Class experienced repeated traumatic brain and head impacts, including concussions during the duration of their respective NFL professional careers that increased their risk to neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

137.    Defendants were fully aware of the danger of exposing their players to further injury by allowing them to play with these injuries or to play prior to the time that such

Exhibit "A"
Page 60

injuries could heal, but until June of 2010 failed to warn players of these medical risks, and instead

attempted to conceal the harmful effects of football-related concussions from players prior to that

time. Furthermore, Defendants breached their duties of reasonable and ordinary care to the

Plaintiffs and members of the Class by failing to protect their physical and mental health and

failing to provide necessary and adequate safety information.

138.    As a proximate result of Defendants' tortious conduct, Plaintiffs and the

members of the Class have experienced an increased risk of developing serious latent

neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's

disease or similar cognitive-impairing conditions.

139.    A monitoring procedure exists that comports with contemporary scientific

principles and makes early detection of cognitive impairment possible. Such monitoring includes

baseline exams, diagnostic exams, and behavioral pharmaceutical interventions, which will prevent

or mitigate the adverse consequences of the latent neurodegenerative disorders and diseases

associated with the repeated traumatic brain and head impacts described herein. Furthermore, such

monitoring is different than the normal medical treatment proscribed for adult males.

140.    Plaintiffs and members of the Class therefore seek an injunction creating a

Court-supervised, Defendant funded medical monitoring regime for Plaintiffs and Class members,

which will facilitate the early diagnosis and adequate treatment in the event a neurodegenerative

disorder or disease is diagnosed.

141.    Plaintiffs and members of the Class also seek all other necessary relief in

connection with this claim.

## **COUNT III**

### **Action For Negligence (Against The NFL)**

142.    Plaintiffs repeat and reallege each of the allegations contained in the

foregoing paragraphs.

Exhibit "A"
Page 61

143.    The NFL has historically assumed an independent tort duty to invoke rules that protect the health and safety of its players, but it has violated Section 323 of the Restatement (Second) of Torts, and the common law.

144.    Throughout the history of the NFL, the League has purported to exercise its duty to protect the health and safety of its players by implementing rules, policies and regulations in a purported attempt to best protect its players.

145.    By enacting rules to protect the health and safety of its players, the NFL has repeatedly confirmed its duty to take reasonable and prudent actions to protect the health and safety of its players when known and foreseeable risks exist.

146.    The NFL breached its duty to its players, including Plaintiffs and members of the Class, to use ordinary care to protect the physical and mental health of players by implementing standardized post-concussion guidelines and by failing to implement mandatory rules that would prevent a player who suffered a mild traumatic brain injury from re-entering a football game or practice.

147.    Throughout the many years that the NFL has repeatedly established its duty to protect the health and safety of its players when known and foreseeable risks exist, until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer a concussive brain injury during a game.

148.    The NFL failed to establish any guidelines or policies to protect the mental health and safety of its players. As explained above, the guidelines that the League offered in 2007 were false and misleading and failed to apprise Class members of the risks associated with on-field concussions

149.    The NFL's failure to fulfill its assumed duty to protect its players includes, but is not limited to, the following failures:

(a)     Failure to institute acclimation requirements or

56
COMPLAINT

procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

(b)     Failure to regulate and monitor practices, games, rules, equipment, and medical care so as to minimize the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiffs and members of the Class;

(c)     Failure to require that an adequate concussive brain injury history be taken of NFL players;

(d)     Failure to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner;

(e)     Failure to invoke League-wide guidelines, policies, and procedures regarding the identification and treatment of concussive brain injury, and the return to play insofar as such matters pertain to concussive brain injury; and,

(f)     Failure to license and approve the best equipment available that will reduce the risk of concussive brain injury.

150.     The NFL breached its assumed duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

151.     The NFL failed to provide complete, current and competent information and directions to NFL athletic trainers, physicians and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

152.     If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs and members of the Class, by developing and implementing necessary guidelines, policies and procedures; providing reasonably safe helmets; and educating

and training all persons involved with the NFL clubs in the recognition, prevention and treatment of concussive brain injuries, the NFL players, such as Plaintiffs and members of the Class, would not have suffered from the subject conditions or the effects of those conditions, would have recovered more rapidly, or would not have suffered long-term brain damage, including CTE, MCI, Alzheimer's disease or similar cognitive-impairing condition.

153.     Under all of the above circumstances, it was foreseeable that the NFL's violations of its duties would cause or substantially contribute to the need for medical monitoring and personal injuries suffered by the Plaintiffs and members of the Class.

154.     The NFL committed acts of omission and commission, which collectively and severally, constituted negligence. The League's negligence was a proximate and producing cause of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class.

155.     As a result of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class, they are entitled to the medical monitoring relief, as alleged herein or allowed by law.

## COUNT IV

### Action For Negligence {Against Riddell}

156.     Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

157.     Riddell should have been well aware of scientific evidence that repeated blows to the head can lead to neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

158.     Riddell breached its duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to

Exhibit "A"
Page 64

Case 2:12-md-02323-AB Document 83-1 Filed 03/30/12 Page 29 of 33
Case 2:12-cv-03390-R-MAN Document 43-3 Filed 12/28/11 Page 66 of 69 Page ID
#:10683

reduce and/or minimize the risk of concussive brain injuries while playing football using their

helmets.

159.    Riddell committed acts of omission and commission, which collectively and

severally, constituted negligence. Riddell's negligence was a proximate and producing cause of

the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class.

160.    As a result of the injuries and/or increased risk of injuries suffered by

Plaintiff and members of the Class, they are entitled to the medical monitoring relief, as alleged

herein or allowed by law.

## COUNT V

### Action For Fraud (Against All Defendants)

161.    Plaintiffs repeat and reallege each of the allegations contained in the

foregoing paragraphs.

162.    Until June of 2010, the NFL made through its MTBI Committee, the

statements and actions of its Commissioner and its other agents and employees material

misrepresentations to its players, former players, Congress and the public at large that there was no

link between concussions and brain injury, including CTE, MCI, Alzheimer's disease or similar

cognitive-impairing conditions.

163.    The persons who made the misrepresentations as agents of the NFL and the

NFL knew they were false.

164.    The persons who made the misrepresentations as agents of the NFL and the

NFL intended to defraud Plaintiffs and members of the Class.

165.    Plaintiffs and members of the Class justifiably relied on these

misrepresentations to their detriment in getting care for their injuries.

166.    Plaintiffs and members of the Class were damaged by these

misrepresentations.

59

167.    Riddell was complicit in and contributed to the NFL's misconduct, *inter alia,* by failing to make any effort to counteract the disinformation being disseminated by the League, by aiding and abetting the activities of the NFL's MTBI COmmittee and by causing to be published misleading scientific studies concerning the capacity of its helmets to reduce the number of concussions.

168.    As a result of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class, they are entitled to the medical monitoring relief, as alleged herein or allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class pray for judgment with respect to their Complaint as follows:

1.    With respect to Counts, certifying the Class proposed in this Complaint pursuant to Cal. Code of Civ. Pro. § 382;

2.    With respect to Count 1, granting the declaratory relief requested pursuant to Cal. Code of Civ. Pro. § 1060;

3.    With respect to Count II through Count V, granting an injunction for the requested medical monitoring relief;

4.    With respect to all counts, awarding Plaintiffs and Class members their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law;

5.    With respect to all counts, granting Plaintiffs and Class members such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all matters so triable.


Dated: October 13, 2011

Res    tfull Submitted,

_Daniel L. Warshaw_ Cal. Bar No. 185365)

Michael D. Hausfeld
Richard S. Lewis
James J. Pizzirusso
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausleld@hausiledllo.com
riewis@hausfeldllo.com
ipizzirusso(ethausfeldllp.com

Daniel L. Warshaw Cal. Bar No. 185365)
 ifford H. Pearson (Cal. Bar No. 108523)
PEARSON, SIMON, WARSHAW &
PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pswplaw.com
cpearson@pswplaw.com


Sylvia Sokol
MOSCONE EMBLIDGE & SATER LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 362-3599
Facsimile: (415) 362-2006
sokolamesllp.com

Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mIchmannOhausreldllp.com
jkingfahausieldl lo.com
abailev@hausfeldllo.com
bweeker@hausfeldllo.com
mionesliphausfeldllp.com


Thomas V. Girardi (Cal. Bar No. 36603)
GIRARDI KEESE
1126 Wilshire Boulevard
Los Angeles CA 90017
Telephone: (213) 977-0211
Facsimile: (213) 481-1554
wirardiO.girardikeese.com

Bruce L. Simon (Cal. Bar No. 96241)
Thomas K. Boardman (Cal. Bar No. 276313)
PEARSON, SIMON, WARSHAW &
PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon(14pswolaw.com
tboardman(Mpswplaw.com

*Attorneys for Plaintiffs*

## PROOF OF SERVICE

### F.R.C.P. Rule 5(b)(2)

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 879 West 190th Street, Suite 700, Gardena, CA 90248-4227.

I hereby certify that on **December 20, 2011**, I served the document: **RIDDELL DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT; EXHIBIT "A"** on all interested parties in this action by placing **a true copy** thereof enclosed in sealed envelopes addressed as follows:

### SEE ATTACHED SERVICE LIST

( )    **BY MAIL (F.R.C.P. Rule 5(b)(2))**

( )    **BY OVERNIGHT DELIVERY (F.R.C.P. Rule 5(b)(2))**

( )    As follows: I am "readily familiar" with the firm's practice of collection and processing documents for mailing. Under the practice, the envelope would be put in a sealed envelope and deposited with the U.S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage date is more than **1** day after date of deposit for mailing in affidavit.

(X)    **BY CM/ECF:** I hereby certify that I electronically transmitted the attached document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the parties as shown on the attached Service List.

( )    **BY PERSONAL SERVICE (F.R.C.P. 5(2)):** I delivered such envelope by hand to the addressee.

Executed on **December 20, 2011,** at Gardena, California.

(X)    **(Federal)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
Regina Foley

CV 11-8396 R (MANx)

Case 2:11-cv-08396-ODW-MAN Document 74-3 Filed 12/20/11 Page 69 of 69 Page ID #:10687

# SERVICE/MAILING LIST

## Larry Barnes et al. v. National Football League, et al.

United States District Court–Central District of California - Western Division Case No: CV 11-8396 ODW (JCGx)

| | |
|---|---|
| David A. Rosen<br>ROSE, KLEIN & MARIAS LLP<br>801 S. Grand Avenue, 11th Floor<br>Los Angeles, CA 90017-4645 | **Attorneys for Plaintiffs**<br><br>Tel:    (213) 626.0571<br>Fax:   (213) 623.7755 |
| Ronald L. Olson, Esq.<br>Glenn d. Pomerantz, Esq.<br>MUNGER, TOLLES & OLSON LLP<br>355 South Grand Avenue, 35th<br>Los Angeles, CA 90071-1560 | **Attorneys for Defendants**<br>**NATIONAL FOOTBALL**<br>**LEAGUE and NFL PROPERTIES**<br>**LLC**<br><br>Tel:    (213) 683.9100<br>Fax:   (213) 683.5100 |
| Brad S. Karp, Esq.<br>Theodore V. Wells, Jr., Esq.<br>Lynn B. Bayard, Esq.<br>PAUL, WEISS, RIFKIND, WHARTON<br>& GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064 | **Attorneys for Defendants**<br>**NATIONAL FOOTBALL**<br>**LEAGUE and NFL PROPERTIES**<br>**LLC**<br><br>Tel:    (212) 373.3000<br>Fax:   (212) 757.3990 |