Case 2:14-cv-03396-R-MAN Document 34-5 Filed 03/30/12 Page 1 of 19 Page ID #:11203
Case 2:12-md-02323-AB Document 90-3 Filed 01/28/12 Page 51 of 99
Case 2:12-cv-00092-AB Document 1-15 Filed 01/09/12 Page 4 of 5

for his extensive medical care. The legendary Chicago Bears player, Gale Sayers, was asked about Mackey's demise by a reporter for the Chicago *Tribune* and his response was reported as follows: "Sayers feels the NFL could have done more to help Mackey during his final years. 'You know, John Mackey died at 60-something (69),' said Sayers. '(The NFL) could have helped him more, I felt. But they didn't, and the players (NFLPA) could have helped more, and it didn't happen.'"

183.   On information and belief, proposals have been submitted to the NFL MTBI Committee about concussion concerns and the need to do regularized testing of players. To the best of Plaintiffs' knowledge, the League has never acted on them.

184.   The NFL's conduct stands in sharp contrast to what has been done or promulgated by other sports or medical bodies.

185.   For example, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: "**[b]oxers that suffered concussion by KO, should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including but not limited to KO's, and should not compete in a boxing match in less than 75 days.**" (Emphases added).

186.   The Second International Conference on Concussion in Sport met in Prague in 2004 and released the following statement: "**[w]hen a player shows ANY symptoms or signs of a concussion ... the player should not be allowed to return to play in the current game or practice ... When in doubt, sit them out!**" (Emphases added). This directive echoed the position taken by the First International Conference on Concussion in Sport, held in Vienna in 2001.

Exhibit "A" - Page 164

Case 2:14-cv-03396-R-MAN Document 34-5 Filed 03/30/12 Page 2 of 19 Page ID #:11204
Case 2:12-md-02323-AB Document 90-3 Filed 01/23/12 Page 32 of 99
Case 2:12-cv-00092-AB Document 1-15 Filed 01/09/12 Page 5 of 5

187. As ESPN has noted, "**[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game.**" (Emphases added).

188. Another example is provided by the National Collegiate Athletic Association ("NCAA"), which also recognized inexcusably late the link between head impacts and brain injuries, not taking affirmative action until 2010. The NCAA is the subject of class action suits for this tardiness. Nevertheless, once it did act, it did so in a manner that was more decisive than the NFL. The NCAA's webpage on concussion-related resources (see <http://www.ncaa.org/wps/portal/ncaahome?WCM_GLOBAL_CONTEXT=/ncaa/NCAA/Academics+and+Athletes/Personal+Welfare/Health+and+Safety/Concussion>) indicates that in an educational partnership with the Centers for Disease Control and Prevention. The NCAA has supplied each member college campus with two posters and two sets of fact sheets addressing concussion awareness, prevention, and management. It has issued the "NCAA Sports Medicine Handbook - Guideline on Concussions in the Athlete" that recommends best practices. And the NCAA requires each member college to develop a "Concussion Management Plan". One exemplar plan offered on the NCAA's website is the University of Georgia Athletic Association's ("UGAA") "Concussion Management Guidelines," which reads as follows:

> 1. **UGAA will require student-athletes to sign a statement in which student-athletes accept the responsibility for reporting their injuries and illnesses to the sports medicine staff, including signs and symptoms of concussions (attachment A).** During the review and signing process student-athletes will watch a NCAA video on concussions and be provided with educational material1 on concussions (attachment B).

79

Case 2:14-cv-03396-R-MAN Document 34-5 Filed 03/30/12 Page 3 of 19 Page ID #:11205
Case 2:12-md-02323-AB Document 90-34-5 Filed 01/28/12 Page 53 of 99
Case 2:12-cv-00092-AB Document 1-16 Filed 01/09/12 Page 1 of 5

2. **UGAA will have on file and annually update an emergency action plan (attachment C) for each athletics venue to respond to student-athlete catastrophic injuries and illnesses,** including but not limited to concussions, heat illness, spine injury, cardiac arrest, respiratory distress (*e.g.* asthma), and sickle cell trait collapses. All athletics healthcare providers and coaches shall review and practice the plan annually. These sessions will be conducted prior to the start of the sport season. ...The UGAA compliance office will maintain a list of staff that have completed the requirement on file.

3. **UGAA sports medicine staff members shall be empowered to determine management and return-to-play of any ill or injured student-athlete, as he or she deems appropriate.** Conflicts or concerns will be forwarded to Ron Courson (director of sports medicine) and Fred Reifsteck, MD (head team physician) for remediation.

4. **UGAA shall have on file a written team physician–directed concussion management plan (attachment D) that specifically outlines the roles of athletics healthcare staff (e.g., physician, certified athletic trainer, nurse practitioner, physician assistant, neuropsychologist). In addition, the following components have been specifically identified for the collegiate environment:**

a. **UGAA coaches will receive a copy of the concussion management plan,** a fact sheet on concussions in sport, and view a video on concussions annually. The UGAA compliance office will maintain a list of staff that have completed the requirement on file.

b. **UGAA sports medicine staff members and other athletics healthcare providers will practice within the standards as established for their professional practice** (*e.g.*, team physician, certified athletic trainer, physical therapist, nurse practitioner, physician assistant, neurologist, neuropsychologist).

c. **UGAA shall record a baseline assessment for each student-athlete in the sports of baseball, basketball, cheerleading, diving, equestrian, football, gymnastics,**

80

Case 2:14-cv-03396-R-MAN Document 34-5 Filed 03/30/12 Page 4 of 19 Page ID #:11206
Case 2:12-md-02323-AB Document 90-3 Filed 01/28/12 Page 54 of 99
Case 2:12-cv-00092-AB Document 1-16 Filed 01/09/12 Page 2 of 5

pole vaulting, soccer, and softball, at a minimum. In addition, a baseline assessment will be recorded for student-athletes with a known history of concussion. The same baseline assessment tools should be used post-injury at appropriate time intervals. The baseline assessment should consist of the use of: 1) symptoms checklist, 2) standardized balance assessment (Neurocom) and 3) neuropsychological testing (computerized IMPACT test). Neuropsychological testing has been shown to be effective in the evaluation and management of concussion. The neuropsychological testing program should be performed in consultation with a neuropsychologist. Post injury neuropsychological test data will be interpreted by a neuropsychologist prior to return to play. Neuropsychological testing has proven to be an effective tool in assessing neurocognitive changes following concussion and can serve as an important component of an institution's concussion management plan. However, neuropsychological tests should not be used as a standalone measure to diagnose the presence or absence of a concussion as UGAA uses a comprehensive assessment by its sports medicine staff.

d. When a student-athlete shows any signs, symptoms or behaviors consistent with a concussion, the athlete will be removed from practice or competition, by either a member of the coaching staff or sports medicine staff. If removed by a coaching staff member, the coach will refer the student-athlete for evaluation by a member of the sports medicine staff. During competitions, on the field of play injuries will be under the purview of the official and playing rules of the sport. UGAA staff will follow such rules and attend to medical situations as they arise. Visiting sport team members evaluated by UGAA sports medicine staff will be managed in the same manner as UGAA student-athletes.

e. A student-athlete diagnosed with a concussion will be withheld from the competition or practice and not return to activity for the remainder of that day. Student-athletes that sustain a concussion outside of their

sport will be managed in the same manner as those sustained during sport activity.

f. **The student-athlete will receive serial monitoring for deterioration.** Athletes will be provided with written home instructions (attachment E) upon discharge; preferably with a roommate, guardian, or someone that can follow the instructions.

g. **The student-athlete will be monitored for recurrence of symptoms both from physical exertion and also mental exertion,** such as reading, phone texting, computer games, watching film, athletic meetings, working on a computer, classroom work, or taking a test. Academic advisors and professors will be notified of student-athlete's concussion, with permission for release of information from the student-athlete.

h. **The student-athlete will be evaluated by a team physician as outlined within the concussion management plan.** Once asymptomatic and post-exertion assessments are within normal baseline limits, return to play shall follow a medically supervised stepwise process.

i. Final authority for Return-to-Play shall reside with the team physician or the physician's designee as noted in the concussion management flowchart.

5. **UGAA will document the incident, evaluation, continued management, and clearance of the student-athlete with a concussion.** Aggregate concussion numbers per sport will be reported to the Director of Athletics annually.

6. **Athletics staff, student-athletes and officials will continue to emphasize that purposeful or flagrant head or neck contact in any sport should not be permitted.**

### B. <u>Riddell's Participation With The NFL In Misrepresenting The Risk Of Repeated Head Impacts.</u>

189. Riddell manufactures helmets for use by NFL players. Since 1989,

Riddell has been the official helmet for the League and is the only helmet manufacturer allowed to display its logo on helmets used in League games. Prior to the commencement of the 2010 season, Riddell renewed its contract with the League allowing it to continue as the NFL's primary helmet provider through 2014. The NFL has estimated that 75% of the helmets used in the League are manufactured by Riddell; Riddell estimated that the figure was 77%.

190. Riddell has long been aware of medical issues concerning concussions. Yet despite being the maker of the official helmet for the NFL, it did nothing to prevent the disinformation campaign engaged in by the League that is described in the preceding paragraphs.

191. Indeed, Riddell actively abetted the work of the NFL's MTBI Committee. In 1997, it became part of that Committee's project of assessing concussions and health consequences to NFL players by analyzing and reconstructing head impacts.

192. In 2006, Riddell sponsored a study that appeared in *Neurosurgery* that was co-authored by Lovell and Dr. Joe Maroon of the MTBI Committee and Dr. Mickey Collins of the University of Pittsburgh Medical Center who works closely with various NFL member clubs, that touted Riddell's "Revolution" helmet (introduced in 2002) as reducing the incidence of concussions in over 2000 high school athletes in Western Pennsylvania. Cantu publicly criticized the study as being worthless.

### C. The NFL's Retirement Plan And Other Benefit Plans For Retired NFL Players And How They Are Inadequate.

193. The NFL's retirement and disability benefits are simply insufficient to provide sufficient medical services to retired NFL players who are at risk for CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions due to head impacts received during the period in which they played League football. These benefits are also inadequate to

Case 2:12-cv-03390-R-MAN Document 34-5 Filed 03/30/12 Page 7 of 19 Page ID
#:11209
Case 2:12-cv-00092-AB Document 1-16 Filed 01/09/12 Page 5 of 5

defray the medical costs associated with the treatment of such cognitive-impairing conditions once they are diagnosed.

      194. Retirement and disability benefits for former NFL players are provided pursuant to the "Bert Bell/Pete Rozelle Retirement Plan" (the "Plan"). The Plan is a merger of two prior plans in 1993. The Plan provides for retirement benefits, total and permanent ("T&P") disability benefits, line of duty disability benefits and death benefits.

      195. As of December of 2010, only 3,154 former NFL players receive pension benefits under the Plan, for an annual outlay of $63.7 million.

      196. In August of 2010, the United States Department of Labor ("DoL") put the Plan on "endangered" status because the Plan's funded percentage was only 75%.[1] The DoL's letter to the Plan (available from its website at <http://www.dol.gov/ebsa/pdf/e-notice092210001.pdf>) noted that the Plan needed to devise a "funding improvement plan."

      197. The Plan is run by a Retirement Board consisting of three persons selected by the NFLPA, three persons selected by the NFL Management Council and, in an ex officio capacity, the NFL Commissioner. The actuary for the Plan is Aon Corporation, executives of which, on information and belief, have ownership interests in the Chicago Bears, one of the NFL's member clubs.

---

[1] As the DoL explains at its website, http://www.dol.gov/ebsa/criticalstatusnotices.html : "[u]nder Federal pension law, if a multiemployer pension plan is determined to be in critical or endangered status, the plan must provide notice of this status to participants, beneficiaries, the bargaining parties, the Pension Benefit Guaranty Corporation and the Department of Labor. This requirement applies when a plan has funding or liquidity problems, or both, as described in the Federal law. If a plan is in critical status, adjustable benefits may be reduced and no lump sum distributions can be made. Pension plans in critical and endangered status are required to adopt a plan aimed at restoring the financial health of the pension plan."

Case 2:14-cv-03396-R-MAN Document 34-5 Filed 03/30/12 Page 8 of 19 Page ID
Case 2:11-md-02323-AB Document 90-3 Filed 01/28/12 Page 58 of 99
#:11210
Case 2:12-cv-00092-AB Document 1-17 Filed 01/09/12 Page 1 of 6

198. Obtaining disability benefits under the Plan has been notoriously difficult. In 2010, only 289 of 464 eligible players who applied for disability payments were awarded any.

199. As noted above, on June 23, 2007, hearings on the NFL's compensation of retired players were held before C&A Subcommittee. Numerous retired players suffering severe disabilities as a result of their careers playing for the NFL, including Plaintiff Boyd, told their stories of being denied T&P and other benefits. Representative Sanchez summarized the evidence as follows:

> After announcing this hearing and subsequent research, it has become clear that the NFL disability and pension benefits plans have sparked a significant amount of passionate critics. The various stories relayed by the retirees demonstrate concern not only with how the plan is structured but also about how it is administered.
>
> The fundamental question then becomes whether this disability process is fair for the retired employees of the NFL. **The evidence suggests that the vast majority of former players needing benefits do not receive them. What is even more troubling is that through projects such as the NFL films, the NFL continues to profit off those very same players who are denied benefits. Essentially, is the NFL, a multibillion dollar organization, fairly treating the employees who helped build it?** (Emphases added).

200. Representative Conyers also summarized some of the evidence that had been presented to the subcommittee:

> [T]he NFL's treatment of its retired players with respect to disability and pension benefits is problematic. As many of us know, the average football athlete is not a marquee player but plays in the league for less than 4 years and often retires because of injury. Upon retirement, he receives only $14,500 in pension benefits, less than half the amount received by an average retired Major League baseball player.

85

Case 2:12-cv-03390-R-MAN Document 34-5 Filed 03/30/12 Page 9 of 19 Page ID #:11211
Case 2:12-md-03323-AB Document 90-3 Filed 01/28/12 Page 59 of 99
Case 2:12-cv-00092-AB Document 1-17 Filed 01/09/12 Page 2 of 6

> **Of 10,000 retired NFL players, it is estimated that less than 300 receive long-term disability payments. Several recent well-publicized cases highlight the resulting problems. For example, Pittsburgh Steelers center Mike Webster [("Webster")]. The court recently awarded his estate more than $1.1 million in disability payments that the NFL's Retirement Plan administrators claimed he was not entitled to receive.**
>
> Or take Brian DeMarco, former offensive lineman for the Jacksonville Jaguars. According to the Denver Post, Mr. DeMarco's back was broken in 17 places and he retired due to severe health problems after the 1999 season. But he has never been able to get NFL disability benefits. His disabilities were so extensive that he can't hold a telephone to his ear. In the last 4 years, Mr. DeMarco and his family have been homeless on three occasions.
>
> \*\*\*\*
>
> I am concerned about the extent to which these issues are attributable to the administration of the NFL Retirement Plan, and I am troubled by the fact that arbitration is not readily available in cases of disability claims. The process for resolving disputes concerning player benefits and submission of disputes to a benefit arbitrator does not usually apply to retirement or disability benefits. Rather, the plan's Retirement Board hears appeals of its own decisions instead of submitting appeals to an arbitrator, and this practice has drawn significant criticism. (Emphases added).

201. On September 18, 2007, a hearing on oversight of the NFL retirement system was held before the United States Senate Committee on Commerce, Science and Transportation. Similar testimony about denials of benefits was presented by NFL retired players.

202. On April 8, 2008, the Congressional Research Service ("CRS") issued a report on "Former NFL Players: Disabilities, Benefits And Related Issues." It concluded:

> The subject of players' injuries, disabilities, and benefits is a complex one, and, accordingly, there are a host of

86

issues surrounding this subject. Although the number and type of benefits have grown over the years, older retirees, particularly those who played prior to 1982, have fewer benefits available to them than their successors have. Yet, this subset of former players might have the greatest financial and medical needs.

203. As the CRS report also explained, there were substantial obstacles in obtaining T&P disability benefits under the Plan:

> Overall, from July 1, 1993, through June 26, 2007, 1,052 individuals applied for LOD or T&P disability benefits: 428 applications were approved; 576 were denied; and 48 are pending. The approval rate, which does not include the cases that are pending, is 42%. The following series of statements shows the status of applications at each step of the process.
>
> --1,052 applications submitted for disability benefits.
>   --358 (34%) applications approved.
>   --675 (64%) applications denied.
>   --19 (2%) applications are pending.
>
> --223 (33% of 675) applications denied at the initial stage were appealed.
>   --69 (31%) approved on appeal.
>   --132 (60%) denied on appeal.
>   --22 (10%) appeals are pending.
>
> --32 (24% of 132) applicants whose appeals were denied filed a lawsuit.
>
> --1 (3%) lawsuit resulted in a reversal of the Retirement Board's decision.

204. As the CRS report also noted, as of October 27, 2007, only 154 NFL retired players were receiving T&P disability benefits.

205. There also exists a separate health benefit plan for retired or former NFL players known as the "88 Plan." The 88 Plan was created in August of 2007, apparently partly in response to the congressional hearings cited above. It is designed to assist players who are

87

vested under the Plan and who are determined to have dementia (including Alzheimer's Disease), as this condition is defined in the 88 Plan. The 88 Plan will pay the cost of medical and custodial care for eligible players, including institutional custodial care, institutional charges, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medicine. For eligible players who are institutionalized as an in-patient, the maximum annual benefit is currently $100,000 pursuant to the 2011 CBA ($130,000 beginning in 2016). For eligible players who are not institutionalized as an in-patient, the maximum annual benefit is $88,000 ($116,000 beginning in 2016). 88 Plan benefits may be paid on behalf of an eligible player even if that player is also receiving T&P disability benefits from the Plan, but only if he is in the "Inactive" category. As of December 2010, only 151 NFL players were receiving benefits under the 88 Plan.

206. There also exists an "NFL Player Care Plan" subsidized by the NFL. The NFL Player Care Plan provides a uniform administrative framework for a range of programs that benefit eligible former NFL players. Currently, these benefits are: (a) joint replacement benefits; (b) assisted living benefits; (c) discount prescription drug benefits; (d) Medicare supplement insurance benefits; (e) spine treatment benefits; (f) neurological care benefits; and (g) life insurance benefits. These benefits can be terminated summarily. For example, it has been reported that Bruce Schwager, who played at various NFL training camps and now suffers from dementia, was told on March 14, 2011 that his bills for treatment at a dementia-care facility in Sugarland, Texas will no longer be paid.

207. In sum, the NFL, perhaps the richest professional sports league ever, has demonstrated a repeated unwillingness to take adequate care of retired players who are suffering

from the consequences of on-field head injuries incurred during their respective League careers and have made the game of professional football in this country what it is today.

### COUNT I
### Action For Declaratory Relief

208. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

209. There is a case and controversy among Plaintiffs on the one hand and the Defendants on the other.

210. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaration as to the following.

211. They seek a declaration that Defendants knew or reasonably should have known that the repeated traumatic brain and head impacts, as well as concussions, suffered by Plaintiffs while playing NFL football were likely to put them at excess risk to neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

212. Plaintiffs seek a declaration that the Defendants, through their voluntary undertakings, had a duty to advise players and protect players from these risks.

213. Plaintiffs seek a declaration that the Defendants willfully and intentionally misled Plaintiffs concerning these medical risks.

214. Plaintiffs seek a declaration that the Defendants thereby recklessly endangered Plaintiffs.

### COUNT II
### Action For Negligence

215. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

216. The NFL has historically assumed a gratuitous independent tort duty to create and enforce rules that protect the health and safety of its players, and it has violated Section 323 of the Restatement (Second) of Torts, and the common law.

217. Throughout the history of the NFL, the League has purported to exercise its duty to protect the health and safety of its players by implementing rules, policies and regulations in a purported attempt to best protect its players.

218. By enacting rules to protect the health and safety of its players, the NFL has repeatedly confirmed its duty to take reasonable and prudent actions to protect the health and safety of its players when known and foreseeable risks exist.

219. The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the physical and mental health of players by implementing standardized post-concussion guidelines and by failing to implement mandatory rules that would prevent a player who suffered a mild traumatic brain injury from re-entering a football game or practice.

220. Throughout the many years that the NFL has repeatedly established its duty to protect the health and safety of its players when known and foreseeable risks exist, until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer a concussive brain injury during a game.

221. The NFL failed to establish any adequate guidelines or policies to protect the mental health and safety of its players. As explained above, the guidelines that the League offered in 2007 were false and misleading and failed to apprise Plaintiffs of the risks associated with on-field concussions

222. The NFL's failure to fulfill its assumed duty to protect its players includes, but is not limited to, the following failures:

Case 2:12-cv-08396-R-MAN Document 90-3 Filed 01/28/12 Page 94 of 99 Page ID
#:11216
Case 2:12-cv-00092-AB Document 1-18 Filed 01/09/12 Page 1 of 6

    (a)  Failure to use reasonable care in the research of the concussions issue;

    (b)  Failure to use reasonable care in responding to independent scientific studies on the risk of concussions and brain disease in sport, and in football in particular;

    (c)  Failure to use reasonable care in denying the scientific evidence connecting NFL play to the risk of an occurrence of brain disease;

    (d)  Failure to use reasonable care in appointing competent and independent doctors and scientists to the MTBI Committee; and

    (e)  Failure to use reasonable care in protecting Plaintiffs from the risk of brain disease and the sequelae of the concussions experienced by Plaintiffs.

  223.  Plaintiffs relied on the Defendants' misrepresentations (including affirmative misrepresentation and omissions) detailed herein to their detriment.

  224.  The NFL breached its assumed duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

  225.  The NFL failed to provide complete, current, and competent information and directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

  226.  If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs, by developing and implementing necessary guidelines, policies, and procedures; providing reasonably safe helmets; and educating and training all persons involved with the NFL clubs in the recognition, prevention, and treatment of concussive brain injuries, the NFL players, such as Plaintiffs, would not have suffered from the subject condition or the effects of that condition, would have recovered more rapidly, or would not have

suffered long-term brain damage, including CTE, MCI, Alzheimer's disease or similar cognitive-impairing condition.

227. Under all of the above circumstances, it was foreseeable that the NFL's violations of its duties would cause or substantially contribute to personal injuries suffered by the Plaintiffs.

228. The NFL committed acts of omission and commission, which collectively and severally, constituted negligence. The League's negligence was a proximate and producing cause of injuries suffered by Plaintiffs.

229. In addition to the injuries suffered by Plaintiffs described herein, defendants' negligent conduct caused or contributed to the personal injuries of the individual named plaintiffs including neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions, past and future medical expenses, past and future loss of earnings, past and future emotional distress, and punitive damages.

230. As a result of the injuries of Plaintiffs, they are entitled to damages, as alleged herein or allowed by law.

## COUNT III
### Action For Fraud

231. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

232. Until June of 2010, the NFL, through its MTBI Committee, the statements and actions of its Commissioner and its other agents and employees, made material misrepresentations (and omissions) to its players, former players, the Congress and the public at

92

Exhibit "A" - Page 178

large that there was no link between concussions and brain injury, including CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

233. The persons who made the misrepresentations as agents of the NFL and the NFL knew the statements were false.

234. The persons who made the misrepresentations as agents of the NFL and the NFL intended to defraud the Plaintiffs.

235. The Plaintiffs justifiably relied on these misrepresentations to their detriment in getting care for their injuries.

236. The Plaintiffs were damaged by these misrepresentations.

237. In addition to the injuries suffered by Plaintiffs described herein, defendants' fraudulent conduct caused or contributed to the personal injuries of the individual named plaintiffs including neurodegenerative disorders and diseases including by not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions, past and future medical expenses, past and future loss of earnings, past and future emotional distress, and punitive damages.

238. As a result of the injuries of Plaintiffs, they are entitled to the damages, as alleged herein or allowed by law.

## COUNT IV
### Fraudulent Concealment

239. Plaintiffs repeat and allege each of the allegations contained in the foregoing paragraphs.

240. Defendants and their MTBI Committee concealed and misrepresented information to the Plaintiffs and the public regarding the brain disease risks of repeated head impacts and concussions in NFL play, over the time period relevant to this Complaint.

Case 2:12-cv-03390-R-MAN Document 1-18 Filed 01/09/12 Page 4 of 6
Case 2:12-md-02323-AB Document 34-5 Filed 03/30/12 Page 17 of 19 Page ID #:11219
Case 2:12-cv-00092-AB Document 1-18 Filed 01/09/12 Page 4 of 6

241. At no time prior to June 2010 did Defendants correct their misrepresentations. Even after June 2010, Defendants have failed to adequately advise Plaintiffs and the public of these risks.

242. Defendants knew their statements in regard to concussions and medical risks were false, and they knew the Plaintiffs would specifically rely on these statements.

243. In addition to the injuries suffered by Plaintiffs described herein, Defendants' negligent conduct caused or contributed to the personal injuries of the Plaintiffs including neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions, past and future medical expenses, past and future loss of earnings, past and future emotional distress, and punitive damages

244. As a result of the injuries of Plaintiffs, they are entitled to the damages, as alleged herein or allowed by law.

## COUNT V
### Action for Loss of Consortium

245. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

246. Spouses of Plaintiffs have suffered damages in the past and will suffer damages in the future as a direct result of the injuries described above.

247. Spouses of Plaintiffs seek to recover for past and future loss of consortium and other harm to their relationship and marriage.

248. As a result of the injuries of Plaintiffs, spouses of Plaintiffs are entitled to the damages, as alleged herein or allowed by law.

Exhibit "A" - Page 180

Case 2:11-cv-08396-R-MAN Document 90-5 Filed 01/26/12 Page 98 of 99 Page ID #:11220
Case 2:12-md-02323-AB Document 34-5 Filed 03/30/12 Page 18 of 19
Case 2:12-cv-00092-AB Document 1-18 Filed 01/09/12 Page 5 of 6

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

1. With respect to Count I, granting the declaratory relief requested pursuant to 28 U.S.C. § 2201;

2. With respect to Counts II through V, granting compensatory and punitive damages where applicable;

3. With respect to all counts, awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law;

4. With respect to all counts, granting Plaintiffs such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all matters so triable.

Dated: January 9, 2012

Respectfully Submitted,

*Brent W. Landau*
Brent W. Landau (PA # 202189)
Jeannine Kenney (PA # 307635)
HAUSFELD LLP
1604 Locust Street
Second Floor
Philadelphia, PA 19103
Telephone: (215) 985-3270
Facsimile: (215) 985-3271
blandau@hausfeldllp.com
jkenney@hausfeldllp.com

Michael D. Hausfeld
Richard Lewis
James Pizzirusso
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

95

mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com
jpizzirusso@hausfeldllp.com

Michael P. Lehmann
Jon T. King
Arthur N. Bailey, Jr.
HAUSFELD LLP
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeldllp.com
jking@hausfeldllp.com
abailey@hausfeldllp.com

Thomas V. Girardi
GIRARDI KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 977-0211
Facsimile: (213) 481-1554
tgirardi@girardikeese.com

Martin H. Weisfuse
WEISFUSE & WEISFUSE, LLP
420 Lexington Avenue
Room 2328
New York, NY 10170
mhw@weisfuse.com

*Attorneys for Plaintiffs*