**The NFL's Retirement Plan And Other Benefit Plans For Retired NFL Players**

**And How They Are Inadequate**

113. The NFL's retirement and disability benefits are simply insufficient as they fail to provide sufficient medical monitoring to retired NFL players who are at risk for neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions due to head impacts received during the period in which they played in the NFL. These benefits are also inadequate to defray the medical costs associated with the treatment of such cognitive-impairing conditions once they are diagnosed.

114. Retirement and disability benefits for former NFL players are provided pursuant to the "Bert Bell/Pete Rozelle Retirement Plan" (the "Plan"). The Plan is a merger of two prior plans in 1993. The Plan provides for retirement benefits, total and permanent ("T&P") disability benefits, line of duty disability benefits and death benefits.

115. As of December of 2010, only 3,154 former NFL players received pension benefits under the Plan, for an annual outlay of $63.7 million.

116. In August of 2010, the United States Department of Labor ("DoL") put the Plan on "endangered" status because the Plan's funded percentage was only 75%.[1] The DoL's letter to the Plan (available from its website at <http://www.dol.gov/ebsa/pdf/e-notice092210001.pdf>) noted that the Plan needed to devise a "funding improvement plan."

117. The Plan is run by a Retirement Board consisting of three persons selected by the NFLPA, three persons selected by the NFL Management Council and, in an *ex officio*

---

[1] As the DoL explains on its website, <http://www.doL.gov/ebsa/criticalstatusnotices.html>: "[u]nder Federal pension law, if a multiemployer pension plan is determined to be in critical or endangered status, the plan must provide notice of this status to participants, beneficiaries, the bargaining parties, the Pension Benefit Guaranty Corporation and the Department of Labor. This requirement applies when a plan has funding or liquidity problems, or both, as described in the Federal law. If a plan is in critical status, adjustable benefits may be reduced and no lump sum distributions can be made. Pension plans in critical and endangered status are required to adopt a plan aimed at restoring the financial health of the pension plan."

832883.1

49

COMPLAINT

Case 2:12-cv-02828-AB Document 43-3 Filed 03/30/12 Page 2 of 15
Case 2:11-cv-08395-R-MAN Document 75-3 Filed 12/20/11 Page 56 of 69 Page ID
#:10638

capacity, the NFL Commissioner. The actuary for the Plan is Aon Corporation, executives of which, on information and belief, have ownership interests in the Chicago Bears, one of the NFL's member clubs.

118. Obtaining disability benefits under the Plan has been notoriously difficult. In 2010, only 289 of 464 eligible players who applied for disability payments were awarded any.

119. As noted above, on June 23, 2007, hearings on the NFL's compensation of retired players were held before the C&A Subcommittee. Numerous retired players suffering severe disabilities as a result of their careers playing for the NFL told their stories of being denied T&P and other benefits. Representative Sanchez summarized the evidence as follows:

> After announcing this hearing and subsequent research, it has become clear that the NFL disability and pension benefits plans have sparked a significant amount of passionate critics. The various stories relayed by the retirees demonstrate concern not only with how the plan is structured but also about how it is administered.
>
> The fundamental question then becomes whether this disability process is fair for the retired employees of the NFL. **The evidence suggests that the vast majority of former players needing benefits do not receive them. What is even more troubling is that through projects such as the NFL films, the NFL continues to profit off those very same players who are denied benefits. Essentially, is the NFL, a multibillion dollar organization, fairly treating the employees who helped build it?** (Emphasis added).

120. Representative Conyers also summarized some of the evidence that had been presented to the subcommittee:

> [T]he NFL's treatment of its retired players with respect to disability and pension benefits is problematic. As many of us know, the average football athlete is not a marquee player but plays in the league for: less than 4 years and often retires because of injury. Upon retirement, he receives only $14,500 in pension benefits, less than half the amount received by an average retired Major League baseball player.
>
> **Of 10,000 retired NFL players, it is estimated that less than 300 receive long-term disability payments. Several recent well-publicized cases highlight the resulting problems. For example, Pittsburgh Steelers center Mike Webster [("Webster")]. The**

> court recently awarded his estate more than $1.1 million in disability payments that the NFL's Retirement Plan administrators claimed he was not entitled to receive.
>
> Or take Brian DeMarco, former offensive lineman for the Jacksonville Jaguars. According to the Denver Post, Mr. DeMarco's back was broken in 17 places and he retired due to severe health problems after the 1999 season. But he has never been able to get NFL disability benefits. His disabilities were so extensive that he can't hold a telephone to his ear. In the last 4 years, Mr. DeMarco and his family have been homeless on three occasions.
>
> I am concerned about the extent to which these issues are attributable to the administration of the NFL Retirement Plan, and I am troubled by the fact that arbitration is not readily available in cases of disability claims. The process for resolving disputes concerning player benefits and submission of disputes to a benefit arbitrator does not usually apply to retirement or disability benefits. Rather, the plan's Retirement Board hears appeals of its own decisions instead of submitting appeals to an arbitrator, and this practice has drawn significant criticism. (Emphasis added).

121. On September 18, 2007, a hearing on oversight of the NFL retirement system was held before the United States Senate Committee on Commerce, Science and Transportation. Similar testimony about denials of benefits was presented by NFL retired players.

122. On April 8, 2008, the Congressional Research Service ("CRS") issued a report on "Former NFL Players: Disabilities, Benefits And Related Issues." It concluded:

> The subject of players' injuries, disabilities, and benefits is a complex one, and, accordingly, there are a host of issues surrounding this subject. Although the number and type of benefits have grown over the years, older retirees, particularly those who played prior to 1982, have fewer benefits available to them than their successors have. Yet, this subset of former players might have the greatest financial and medical needs.

123. As the CRS report also explained, there were substantial obstacles in obtaining T&P disability benefits under the Plan:

> Overall, from July 1, 1993, through June 26, 2007, 1,052 individuals applied for LOD or T&P disability benefits: 428 applications were approved; 576 were denied; and 48 are pending. The approval rate, which does not include the cases that are pending, is 42%. The

following series of statements shows the status of applications at each step of the process.

—1,052 applications submitted for disability benefits.
  --358 (34%) applications approved.
  --675 (64%) applications denied.
  --19 (2%) applications are pending.

--223 (33% of 675) applications denied at the initial stage were appealed.
  --69 (31%) approved on appeal.
  --132 (60%) denied on appeal.
  --22 (10%) appeals are pending.

--32 (24% of 132) applicants whose appeals were denied filed a lawsuit.

--1 (3%) lawsuit resulted in a reversal of the Retirement Board's decision.

124. As the CRS report also noted, as of October 27, 2007, only 154 NFL retired players were receiving T&P disability benefits.

125. There also exists a separate health benefit plan for retired or former NFL players known as the "88 Plan." The 88 Plan was created in August of 2007, apparently partly in response to the congressional hearings cited above. It is designed to assist players who are vested under the Plan and who have been determined to have dementia (including Alzheimer's Disease), as this condition is defined in the 88 Plan. The 88 Plan will pay the cost of medical and custodial care for eligible players, including institutional custodial care, institutional charges, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medicine. For eligible players who are institutionalized as an in-patient, the maximum annual benefit is currently $100,000 pursuant to the 2011 CBA ($130,000 beginning in 2016). For eligible players who are not institutionalized as an in-patient, the maximum annual benefit is $88,000 ($116,000 beginning in 2016). 88 Plan benefits may be paid on behalf of an eligible player even if that player is also receiving T&P disability benefits from the Plan, but only if he is in

the "Inactive" category. As of December 2010, only 151 NFL players were receiving benefits under the 88 Plan.

126.    There also exists an "NFL Player Care Plan" subsidized by the NFL. The NFL Player Care Plan provides a uniform administrative framework for a range of programs that benefit eligible former NFL players. Currently, these benefits are: (a) joint replacement benefits; (b) assisted living benefits; (c) discount prescription drug benefits; (d) Medicare supplement insurance benefits; (e) spine treatment benefits; (1) neurological care benefits; and (g) life insurance benefits. These benefits can be terminated summarily. For example, it has been reported that Bruce Schwager, who played at various NFL training camps and now suffers from dementia, was told on March 14, 2011 that his bills for treatment at a dementia-care facility in Sugarland, Texas will no longer be paid.

127.    In sum, the NFL, likely the richest professional sports league ever, has demonstrated a repeated unwillingness to take adequate care of retired players who are suffering from the consequences of on-field head injuries incurred during their respective League careers and have made the game of professional football in this country what it is today. These players, members of the Class, are consequently at risk to neurodegenerative disorders and diseases for which medical monitoring is medically prudent and appropriate. Yet Defendants have failed to provide them with relief.

## COUNT I

### Action For Declaratory Relief (Against All Defendants)

128.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

129.    There is a case and controversy among Plaintiffs and members of the Class on the one hand and Defendants on the other.

130. Pursuant to Cal. Code of Civ. Pro. § **1060,** Plaintiffs and members of the Class seek a declaration as to the following.

131. They seek a declaration that Defendants knew or reasonably should have known that the repeated traumatic brain and head impacts, as well as concussions, suffered by Class members while playing NFL football were likely to put them at excess risk to neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

132. Plaintiffs and members of the Class seek a declaration that Defendants had a duty to advise them of these medical risks.

133. Plaintiffs and members of the Class seek a declaration that Defendants willfully and intentionally concealed from and misled Class members concerning these medical risks.

134. Plaintiffs and members of the Class seek a declaration that Defendants thereby recklessly endangered Plaintiffs and members of the Class.

## COUNT H

### Action For Medical Monitoring (Against All Defendants)

135. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

136. As explained above, Plaintiffs and members of the Class experienced repeated traumatic brain and head impacts, including concussions during the duration of their respective NFL professional careers that increased their risk to neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

137. Defendants were fully aware of the danger of exposing their players to further injury by allowing them to play with these injuries or to play prior to the time that such

injuries could heal, but until June of 2010 failed to warn players of these medical risks, and instead attempted to conceal the harmful effects of football-related concussions from players prior to that time. Furthermore, Defendants breached their duties of reasonable and ordinary care to the Plaintiffs and members of the Class by failing to protect their physical and mental health and failing to provide necessary and adequate safety information.

138. As a proximate result of Defendants' tortious conduct, Plaintiffs and the members of the Class have experienced an increased risk of developing serious latent neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

139. A monitoring procedure exists that comports with contemporary scientific principles and makes early detection of cognitive impairment possible. Such monitoring includes baseline exams, diagnostic exams, and behavioral pharmaceutical interventions, which will prevent or mitigate the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic brain and head impacts described herein. Furthermore, such monitoring is different than the normal medical treatment proscribed for adult males.

140. Plaintiffs and members of the Class therefore seek an injunction creating a Court-supervised, Defendant funded medical monitoring regime for Plaintiffs and Class members, which will facilitate the early diagnosis and adequate treatment in the event a neurodegenerative disorder or disease is diagnosed.

141. Plaintiffs and members of the Class also seek all other necessary relief in connection with this claim.

## COUNT III

### Action For Negligence (Against The NFL)

142. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

143. The NFL has historically assumed an independent tort duty to invoke rules that protect the health and safety of its players, but it has violated Section 323 of the Restatement (Second) of Torts, and the common law.

144. Throughout the history of the NFL, the League has purported to exercise its duty to protect the health and safety of its players by implementing rules, policies and regulations in a purported attempt to best protect its players.

145. By enacting rules to protect the health and safety of its players, the NFL has repeatedly confirmed its duty to take reasonable and prudent actions to protect the health and safety of its players when known and foreseeable risks exist.

146. The NFL breached its duty to its players, including Plaintiffs and members of the Class, to use ordinary care to protect the physical and mental health of players by implementing standardized post-concussion guidelines and by failing to implement mandatory rules that would prevent a player who suffered a mild traumatic brain injury from re-entering a football game or practice.

147. Throughout the many years that the NFL has repeatedly established its duty to protect the health and safety of its players when known and foreseeable risks exist, until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer a concussive brain injury during a game.

148. The NFL failed to establish any guidelines or policies to protect the mental health and safety of its players. As explained above, the guidelines that the League offered in 2007 were false and misleading and failed to apprise Class members of the risks associated with on-field concussions

149. The NFL's failure to fulfill its assumed duty to protect its players includes, but is not limited to, the following failures:

    (a) Failure to institute acclimation requirements or

      procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

    (b)    Failure to regulate and monitor practices, games, rules, equipment, and medical care so as to minimize the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiffs and members of the Class;

    (c)    Failure to require that an adequate concussive brain injury history be taken of NFL players;

    (d)    Failure to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner;

    (e)    Failure to invoke League-wide guidelines, policies, and procedures regarding the identification and treatment of concussive brain injury, and the return to play insofar as such matters pertain to concussive brain injury; and,

    (f)    Failure to license and approve the best equipment available that will reduce the risk of concussive brain injury.

150. The NFL breached its assumed duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

151. The NFL failed to provide complete, current and competent information and directions to NFL athletic trainers, physicians and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

152. If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs and members of the Class, by developing and implementing necessary guidelines, policies and procedures; providing reasonably safe helmets; and educating

and training all persons involved with the NFL clubs in the recognition, prevention and treatment of concussive brain injuries, the NFL players, such as Plaintiffs and members of the Class, would not have suffered from the subject conditions or the effects of those conditions, would have recovered more rapidly, or would not have suffered long-term brain damage, including CTE, MCI, Alzheimer's disease or similar cognitive-impairing condition.

153. Under all of the above circumstances, it was foreseeable that the NFL's violations of its duties would cause or substantially contribute to the need for medical monitoring and personal injuries suffered by the Plaintiffs and members of the Class.

154. The NFL committed acts of omission and commission, which collectively and severally, constituted negligence. The League's negligence was a proximate and producing cause of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class.

155. As a result of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class, they are entitled to the medical monitoring relief, as alleged herein or allowed by law.

## COUNT IV

### Action For Negligence {Against Riddell)

156. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

157. Riddell should have been well aware of scientific evidence that repeated blows to the head can lead to neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

158. Riddell breached its duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to

reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

159. Riddell committed acts of omission and commission, which collectively and severally, constituted negligence. Riddell's negligence was a proximate and producing cause of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class.

160. As a result of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class, they are entitled to the medical monitoring relief, as alleged herein or allowed by law.

## COUNT V

### Action For Fraud (Against All Defendants)

161. Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

162. Until June of 2010, the NFL made through its MTBI Committee, the statements and actions of its Commissioner and its other agents and employees material misrepresentations to its players, former players, Congress and the public at large that there was no link between concussions and brain injury, including CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

163. The persons who made the misrepresentations as agents of the NFL and the NFL knew they were false.

164. The persons who made the misrepresentations as agents of the NFL and the NFL intended to defraud Plaintiffs and members of the Class.

165. Plaintiffs and members of the Class justifiably relied on these misrepresentations to their detriment in getting care for their injuries.

166. Plaintiffs and members of the Class were damaged by these misrepresentations.

167. Riddell was complicit in and contributed to the NFL's misconduct, *inter alia,* by failing to make any effort to counteract the disinformation being disseminated by the League, by aiding and abetting the activities of the NFL's MTBI COmmittee and by causing to be published misleading scientific studies concerning the capacity of its helmets to reduce the number of concussions.

168. As a result of the injuries and/or increased risk of injuries suffered by Plaintiff and members of the Class, they are entitled to the medical monitoring relief, as alleged herein or allowed by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class pray for judgment with respect to their Complaint as follows:

1. With respect to Counts, certifying the Class proposed in this Complaint pursuant to Cal. Code of Civ. Pro. § 382;

2. With respect to Count 1, granting the declaratory relief requested pursuant to Cal. Code of Civ. Pro. § 1060;

3. With respect to Count II through Count V, granting an injunction for the requested medical monitoring relief;

4. With respect to all counts, awarding Plaintiffs and Class members their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law;

5. With respect to all counts, granting Plaintiffs and Class members such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all matters so triable.

Dated: October 13, 2011

Res tfull Submitted,

*[signature]*

Michael D. Hausfeld
Richard S. Lewis
James J. Pizzirusso
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com
jpizzirusso@hausfeldllp.com

Sylvia Sokol
MOSCONE EMBLIDGE & SATER LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 362-3599
Facsimile: (415) 362-2006
sokol@mesllp.com

Thomas V. Girardi (Cal. Bar No. 36603)
GIRARDI KEESE
1126 Wilshire Boulevard
Los Angeles CA 90017
Telephone: (213) 977-0211
Facsimile: (213) 481-1554
tgirardi@girardikeese.com

Daniel L. Warshaw (Cal. Bar No. 185365)
Clifford H. Pearson (Cal. Bar No. 108523)
PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pswplaw.com
cpearson@pswplaw.com

Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeldllp.com
jking@hausfeldllp.com
abailey@hausfeldllp.com
bweeker@hausfeldllp.com
mionesi@hausfeldllp.com

Bruce L. Simon (Cal. Bar No. 96241)
Thomas K. Boardman (Cal. Bar No. 276313)
PEARSON, SIMON, WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswplaw.com
tboardman@pswplaw.com

*Attorneys for Plaintiffs*

832883.1

61

COMPLAINT

## PROOF OF SERVICE
## F.R.C.P. Rule 5(b)(2)

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 879 West 190th Street, Suite 700, Gardena, CA 90248-4227.

I hereby certify that on **December 20, 2011**, I served the document: **RIDDELL DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; EXHIBIT "A"** on all interested parties in this action by placing **a true copy** thereof enclosed in sealed envelopes addressed as follows:

### SEE ATTACHED SERVICE LIST

( ) **BY MAIL (F.R.C.P. Rule 5(b)(2))**

( ) **BY OVERNIGHT DELIVERY (F.R.C.P. Rule 5(b)(2))**

( ) As follows: I am "readily familiar" with the firm's practice of collection and processing documents for mailing. Under the practice, the envelope would be put in a sealed envelope and deposited with the U.S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage date is more than **1** day after date of deposit for mailing in affidavit.

(X) **BY CM/ECF:** I hereby certify that I electronically transmitted the attached document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the parties as shown on the attached Service List.

( ) **BY PERSONAL SERVICE (F.R.C.P. 5(2)):** I delivered such envelope by hand to the addressee.

Executed on **December 20, 2011**, at Gardena, California.

(X) **(Federal)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

*Regina Foley*

Page 68

CV 11-8395 R (MANx)

# SERVICE/MAILING LIST

## David Pear, et al. v. National Football League, et al.

United States District Court – Central District of California - Western Division Case No: CV 11-8395 GAF (PJWx)

| | |
|---|---|
| Thomas V. Girardi, Esq.<br>GIRARDI \| KEESE<br>1126 Wilshire Boulevard<br>Los Angeles, CA 90017 | **Attorneys for Plaintiffs**<br><br>Tel:   (213) 977.0211<br>Fax:  (213) 481.1554 |
| Herman Russomanno, Esq.<br>Robert Borrello, Esq.<br>RUSSOMANNO & BORRELLO, P.A.<br>150 West Flagler Street – PH 2800<br>Miami, FL 33130 | **Attorneys for Plaintiffs**<br><br>Tel:   (305) 373.2101<br>Fax:  (305) 373.2103 |
| Jason E. Luckasevic, Esq.<br>John T. Tierney, III, Esq.<br>GOLDBERG, PERSKY & WHITE, P.C.<br>1030 Fifth Avenue<br>Pittsburgh, PA 15219 | **Attorneys for Plaintiffs**<br><br>Tel:   (412) 471.3980<br>Fax:  (412) 471.8308 |
| Ronald L. Olson, Esq.<br>Glenn d. Pomerantz, Esq.<br>MUNGER, TOLLES & OLSON LLP<br>355 South Grand Avenue, 35th<br>Los Angeles, CA 90071-1560 | **Attorneys for Defendants NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC**<br><br>Tel:   (213) 683.9100<br>Fax:  (213) 683.5100 |
| Brad S. Karp, Esq.<br>Theodore V. Wells, Jr., Esq.<br>Lynn B. Bayard, Esq.<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064 | **Attorneys for Defendants NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC**<br><br>Tel:   (212) 373.3000<br>Fax:  (212) 757.3990 |