# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** | **No. 2:12-md-02323-AB** <br> **MDL No. 2323** |
| THIS DOCUMENT RELATES TO: <br> *Easterling v. NFL*, No. 11-cv-5209 <br> *Jacobs v. NFL*, No. 12-cv-1035 <br> *Rucker v. NFL*, No. 12-cv-1036 <br> *Solt v. NFL*, No. 12-cv-0262 <br> *Glover v. NFL*, No. 12-cv-0287 <br> *Wooden v. NFL*, No. 12-cv-1037 <br> *Hughes v. NFL*, No. 12-cv-1423 <br> *LeMaster v. NFL*, No. 12-cv-2464 <br> *Brooks v. NFL*, No. 12-cv-2505 <br> *Jackson v. NFL*, No. 12-cv-2799 <br> *Granger v. NFL*, No. __-cv-____ <br>     (*transferred; no case # yet assigned*) | **MASTER ADMINISTRATIVE CLASS ACTION COMPLAINT FOR MEDICAL MONITORING** |
| Gerald Allen, Joseph Kowalewski, David Little, Shawn Wooden, *and* Ron Fellows, <br> *on behalf of themselves and others similarly situated,* <br>     Plaintiffs, <br><br>     v. <br><br> National Football League and NFL Properties, LLC, <br>     Defendants. | **ORIGINAL CLASS ACTION COMPLAINT** <br><br> CIVIL ACTION NO: _____ |

## PLAINTIFFS' MASTER ADMINISTRATIVE CLASS ACTION COMPLAINT FOR MEDICAL MONITORING

### AND

## ORIGINAL CLASS ACTION COMPLAINT FOR PLAINTIFFS ALLEN, KOWALEWSKI, LITTLE, WOODEN & FELLOWS

INTRODUCTION ............................................................................................................... 1

JURISDICTION AND VENUE ........................................................................................ 1

THE PARTIES ................................................................................................................... 1

CLASS ACTION ALLEGATIONS ................................................................................. 4

FACTUAL ALLEGATIONS ............................................................................................ 6

    The NFL's Fraudulent Concealment and Negligent Misrepresentations
    Related to The Risk of Repeated Traumatic Head Impacts and Brain Injury .............. 6

    The NFL's Influence ................................................................................................. 7

    The NFL Has Mythologized Violence Through the Media. ....................................... 7

    The NFL Markets and Glorifies Football's Violence Through NFL Films. ............... 8

    Head Injuries, Concussions, and Neurological Damage ......................................... 11

    The NFL Was in a Superior Position of Knowledge and
    Authority, and Owed a Duty to the Class ............................................................... 13

    The NFL Knew the Dangers and Risks Associated with Reptitive Head Impacts and
    Concussions ............................................................................................................ 20

    The NFL Voluntarily Undertook the Responsibility of Studying
    Head Impacts in Football, Yet Fraudulently Concealed Their Long-Term Effects ... 29

    The Congressional Inquiry and the NFL's Acknowledgment of the Concussion Crisis ............. 42

    The NFL's New Committee ..................................................................................... 46

    Scientific and Medical Evidence Regarding the Need for Medical Monitoring and the
    Availability of Specific Medical Tests and Protocols for the Early Detection of Latent
    Brain Injury ............................................................................................................ 47

COUNT I ........................................................................................................................... 52
    Medical Monitoring (On Behalf of The National Class) .......................................... 52

COUNT II .......................................................................................................................... 54
    Fraudulent Concealment/Negligent Omission (On Behalf of The National Class) ..... 54

COUNT III ......................................................................................................................... 56
    Action for Medical Monitoring (On Behalf of the Florida Class) ............................ 56

COUNT IV ......................................................................................................................... 58
    Action for Fraudulent Concealment/Negligent Omission (On Behalf of the Florida Class) ........ 58

COUNT V ........................................................................................................................... 60
    Action for Negligence seeking Medical Monitoring (On Behalf of a California Class) ............. 60

COUNT VI....................................................................................................................62

    Action for Fraudulent Concealment/Negligent Omission (On Behalf of a California Class) ......62

PRAYER FOR RELIEF ...............................................................................................64

DEMAND FOR JURY TRIAL .....................................................................................65

## INTRODUCTION

1.      This action is brought by former National Football League ("NFL" or "League") players who seek the establishment of a Court supervised fund to provide medical monitoring to the former players due to their increased risk of latent brain injuries caused by repeated traumatic head impacts received during the period when they played professional football.  These claims are brought for a National Class of all former NFL players, and alternatively for Classes of former NFL players who reside in particular states.  The allegations herein, except as to the Plaintiffs, are based on information and belief.

## JURISDICTION AND VENUE

2.      Jurisdiction is based on 28 USC §1332.

3.      Venue in this action is proper in this Court pursuant to 28 USC §1391.

4.      The amount in controversy exceeds $5,000,000 for each of the Class claims.

## THE PARTIES

5.      Plaintiff Gerald Allen is a class representative for the National Medical Monitoring Class.  He resides in New York City.  Mr. Allen played professional football in the NFL from 1966-1969.  He played as a running back for the Baltimore Colts in 1966, and for the Washington Redskins from 1967-1969.  During his career in the NFL he experienced repeated traumatic head impacts.  Mr. Allen is at increased risk of latent brain injuries caused by these repeated head impacts and therefore is in need of medical monitoring.

6.      Plaintiff Joseph Kowalewski is a class representative for the National Medical Monitoring Class.  He resides in Warners, New York.  Mr. Kowalewski played professional football in the NFL from 2006-2009.  He played on special teams and as a tight end and fullback for the New York Jets from 2006-2008, and for the Miami Dolphins in 2009.  During his career

in the NFL he experienced repeated traumatic head impacts.  After his retirement from football he has experienced neurological symptoms.  Mr. Kowalewski is at increased risk of latent brain injuries caused by these repeated traumatic head impacts and therefore is in need of medical monitoring.

7.     Plaintiff Shawn Wooden is a class representative for the Florida Medical Monitoring Class.  He resides in Pembroke Pines, Florida.  Mr. Wooden played professional football in the NFL from 1996-2004.  He played as a safety for the Miami Dolphins and the Chicago Bears.  During his career in the NFL he experienced repeated traumatic head impacts. After his retirement from football he has experienced neurological symptoms.  Mr. Wooden is at increased risk of latent brain injuries caused by these repeated traumatic head impacts and therefore is in need of medical monitoring.

8.     Plaintiff David Little is a class representative for the California Medical Monitoring Class.  He resides in Visalia, California.  Mr. Little played professional football in the NFL from 1984-1992.  He played as a tight end and special teams player for the Kansas City Chiefs in 1984, the Philadelphia Eagles from 1985-1989, the Phoenix Cardinals in 1990, and the Detroit Lions in 1991.  During his career in the NFL he experienced repeated traumatic head impacts.  After his retirement from football he has experienced neurological symptoms.  Mr. Little is at increased risk of latent brain injuries caused by these repeated traumatic head impacts and therefore is in need of medical monitoring.

9.     Plaintiff Ron Fellows is a class representative for the California Medical Monitoring Class.  He resides in Elk Grove, California.  Mr. Fellows played professional football in the NFL from 1981-1988.  He played as a defensive back and kick returner for the Dallas Cowboys from 1981-1986, and for the Los Angeles Raiders from 1987-1988.  During his career

2

in the NFL he experienced repeated traumatic head impacts.  After his retirement from football

he has experienced neurological symptoms.  Mr. Fellows is at increased risk of latent brain

injuries caused by these repeated traumatic head impacts and therefore is in need of medical

monitoring.

10.     Defendant NFL, which maintains its offices at 345 Park Avenue, New York, New

York, is an unincorporated association consisting of separately owned and independently-

operated professional football teams which operate out of many different cities and states within

this country.  The NFL is engaged in interstate commerce in the business of, among other things,

promoting, operating, organizing, and regulating the major professional football league in the

United States.  The NFL is not, and has not been, the employer of the Plaintiffs, who were

employed during their respective careers in professional football by the independent clubs

(hereinafter "Teams" or "Clubs") set forth below.  The United States Supreme Court held in

*American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212-13 (2010), that each team that is a member

of the NFL is a legally distinct and separate entity from both the other teams and the NFL itself.

11.     Defendant NFL Properties, LLC, as the successor-in-interest to National Football

League Properties Inc. ("NFL Properties"), is a limited liability company organized and existing

under the laws of the State of Delaware with its headquarters in the State of New York. NFL

Properties is engaged in, among other activities, approving, licensing and promoting equipment

used by all the National Football League teams. NFL Properties regularly conducts business in

California.

12.     Defendants National Football League and NFL Properties shall be referred to

collectively herein as the "NFL Defendants" or "Defendants."

13.     The NFL caused and contributed to the increased risks of latent brain injury alleged herein through its acts and omissions in failing to disclose the true risks of repeated traumatic head impacts in NFL football, and failing to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and the latent brain injury.

14.     On information and belief, Defendant NFL policies and decision making relevant to its conduct and the risks of latent brain injury alleged herein, occurred primarily at its corporate offices in New York City.

## CLASS ACTION ALLEGATIONS

15.     Plaintiffs are representatives of Classes, as defined by Fed R. Civ. P. 23(b)(2), and bring this action for medical monitoring relief on behalf of themselves and Classes identified herein with respect to which the NFL has acted or refused to act on grounds that apply generally to the Classes.

16.     The "National Class" is defined as:

> All retired or former NFL professional football players who reside in the United States, who are not now salaried employees of the NFL or any member club, and who have not filed a personal injury action for latent brain injury.

17.     Plaintiffs plead "state only" classes in the alternative to the pleading of a National Class.  The state only classes are defined as follows.

18.     The "Florida Class" is defined as:

> All retired or former NFL professional football players who reside in Florida, who are not now salaried employees of the NFL or any member club, and who have not filed a personal injury action for latent brain injury.

19.     The "California Class" is defined as:

4

> All retired or former NFL professional football players who
> reside in California, who are not now salaried employees of the
> NFL or any member club, and who have not filed a personal injury
> action for latent brain injury.

20.     If the National Class is not certified in this proceeding, Plaintiffs reserve the right

to bring state-only class medical monitoring claims for Plaintiffs and members of the Classes

residing in any of the 50 states.

21.     The members of the Classes are so numerous and geographically widely dispersed

that joinder of all members is impracticable.  There are questions of law and fact common to the

members of the Classes.  Plaintiffs' claims are typical of the claims of the members of the

Classes that they represent, and Plaintiffs will fairly and adequately protect the interests of the

Proposed Classes.

22.     Questions of law and fact common to the members of the Classes predominate

over any questions affecting only individual members of the Classes. These include the

following:

> (a)     Whether Plaintiffs and the Classes are entitled to
> injunctive relief in the form of a Court-supervised medical
> monitoring fund;

> (b)     Whether the Defendants have any affirmative
> defenses that can be litigated on a classwide basis;

> (c)     Whether the Defendants' conduct was tortious and
> caused members of the Classes to be at increased risk of latent brain
> injury;

> (d)     Whether medical monitoring is reasonably necessary
> for members of the Classes to obtain early diagnosis of latent brain

injury;

       (e)     Whether such medical monitoring is beyond the

routine medical care provided to men of a similar age as members of

the Classes; and

       (f)     Whether early diagnosis of latent brain injury will lead to

improved treatment for the medical, cognitive, psychological and

behavioral sequelae of the latent brain injury.

23.     The members of the Classes are ascertainable.

24.     A class action is superior to other available methods for fairly and efficiently

adjudicating the controversy.

## FACTUAL ALLEGATIONS

### The NFL's Fraudulent Concealment and Negligent Misrepresentations Related to the Risk of Repeated Traumatic Head Impacts and Brain Injury

25.     The NFL generates approximately $9,300,000,000.00 in gross income per year.

26.     The organization oversees America's most popular spectator sport, acting as a

trade association for the benefit of the thirty-two independently operated Teams. The NFL's

average attendance per game in 2009 was 67,509.

27.     The NFL has, since its inception in the first half of the twentieth century,

governed and promoted the game of football, and as referenced in detail herein, it was created

and established to act as the governing body, establishing rules related to player health and

safety, League policies, and team ownership.

28.     The NFL generates revenue mostly through marketing sponsorships, licensing

merchandise, and by selling national broadcasting rights to the games.  The Teams share a

percentage of the League's overall revenue.

6

29.     The NFL earns billions of dollars from its telecasting deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS ($622.5 million).

30.     Annually, the NFL redistributes approximately $4 billion in radio, television, and digital earnings to the Teams or approximately $125 million per Team.  Those revenue numbers show no sign of declining and have increased since 2009.

31.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 teams as a single unit.

### The NFL's Influence

32.     In part because of their financial power, monopoly status, and high visibility, the NFL Defendants have had enormous influence over the game of football at all levels of the game.

33.     Over many decades, the NFL Defendants' influence has been expanded through their use of the media. Through NFL films, the NFL Network, and www.NFL.com, the NFL Defendants have promoted NFL football via every mass communication medium available.

### The NFL Has Mythologized Violence Through the Media.

34.     Part of the NFL Defendants' strategy to promote NFL football is: (a) to mythologize players and Teams; (b) to glorify the accomplishments of individuals and Teams; and (c) to glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal and ferocious players and collisions, and simultaneously propagating the fraudulent representation that "getting your bell rung," "being dinged" and putting big hits on others is a badge of courage and does not seriously threaten one's health.

35.     As a result of the strategy glorifying the brutality and ferocity of NFL football, the NFL Defendants have propagated the false myth that collisions of all kinds, including brutal and ferocious collisions, many of which lead to short-term and long-term neurological damage to current and former NFL players, are an acceptable, desired, and natural consequence of the game, and a measure of the courage and heroism of those involved in football at every level of the game.

36.     As a result of this strategy, and the overwhelming influence of the NFL Defendants at every level of the game, the NFL Defendants have generated for themselves and others billions of dollars every year by promoting a product of brutality and ferocity and inculcating in players at every level of the game the false and life-threatening ideas that (a) brutal, ferocious, and debilitating collisions are a required and desired outcome in the game of football; and (b) playing despite repetitive head impacts is a laudable and desirable goal.

### The NFL Markets and Glorifies Football's Violence Through NFL Films.

37.     NFL Films is an agent and instrumentality of the NFL Defendants devoted to producing promotional films for the NFL.  One television critic described NFL Films as "the greatest in-house P.R. machine in pro sports history . . . an outfit that could make even a tedious stalemate seem as momentous as the battle for the Alamo."

38.     NFL Films is known for the style it features in all of its productions, capturing the NFL games, plays, players, and overall NFL environment in an artistic, promotional fashion. NFL Films cinematography is intended to create compelling storylines and highlight certain aspects of the game. NFL Films takes viewers right into the football action with close-ups and slow motion depiction of all the hard-hitting action taking place on the football field.

39.     The NFL focuses on violence as one of the NFL's greatest selling points:  the football player as gladiator.  To advance the NFL Defendants' purpose, NFL Films has created

numerous highlight features that focus solely on the hardest-hits that take place on the football field. These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

40.    The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles:  *NFL*: *Moment of Impact* (2007); *NFL's 100 Greatest Tackles* (1995); *Big Blocks and King Size Hits* (1990); *The Best of Thunder and Destruction – NFL's Hardest Hits*; *NFL Films Video: Strike Force* (1989); *The NFL's Greatest Hits* (1989); *Crunch Course*; *Crunch Course II* (1988); *Crunch Masters; In the Crunch* (1987); *NFL Rocks; NFL Rocks: Extreme Football*.

41.    NFL Films created the *"Top Ten Most Feared Tacklers"* series that was shown on the NFL Network, and it now has its own section on the NFL's website.  These features comprise videos highlighting the most vicious tacklers the NFL has ever seen.

42.    An explicit example of how the NFL Defendants market and glorify the violent nature of the NFL can be found on the back cover of the 2007 film *"Moment of Impact."*  The back cover of *"Moment of Impact"* advertises the film as follows: "First you hear the breathing, then you feel the wind coming through your helmet's ear hole. Suddenly you're down, and you're looking through your helmet's ear hole. Pain?  That's for tomorrow morning.  Right now you've gotta focus – focus on the play and try not to focus on the next moment of impact."  The entire message deemphasizes the acute and chronic risks associated with these head impacts.

43.    NFL Films, therefore, advances the NFL Defendants' agenda to promote the most violent aspects of NFL football and to urge players at every level of the game to disregard the results of violent head impacts.

9

44.     The NFL Defendants' strategically utilize NFL Films' cinematography and sound to exaggerate and emphasize vicious hits. The magnitude of the hit is emphasized by the slow-motion footage and the on-field microphones.  Vicious hits captured by NFL Films take on the appearance of the slow-motion crash safety test videos that appear in many car commercials—with players taking on the role of the crash-test dummy.

45.     The NFL Defendants, through NFL Films, promotes a culture in which playing hurt or with an injury is both expected and acclaimed in its mythical gladiator world.  Through NFL Films, the NFL has produced videos that praise players who embody the ethos of playing hurt (for example, "*Top Ten Gutsiest Performances*"). This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players must and often do play through any injury, including mild traumatic brain injury ("MTBI").

46.     This is part of the overall culture in which NFL players are encouraged to play despite an injury, in part, because failure to play through an injury creates the risk of losing playing time, a starting position, and possibly a career.

47.     Within this culture, the NFL Defendants purposefully profit from the violence they promote.

48.     This culture of violence, sponsored and encouraged by the NFL Defendants, has too many examples to provide in this Complaint.

49.     A few examples demonstrate its indelible place in the modus operandi of the NFL Defendants.  After joining the NFL, the Cleveland Browns were led by Hall of Famer Otto Graham to many consecutive championships.  The media and the NFL management at the time

were well aware of the targeted blows to the head suffered by Graham, with resulting loss of consciousness. Nevertheless, Graham was encouraged to come back and play in each game.

50.     This attitude and league sponsored mayhem continued in the decades of the 1980s, 1990s and 2000s, with players lauded for their "head hunting" skills.  As recently as October 2010, the NFL fined some players for what it characterized as "illegal and dangerous hits" and yet notwithstanding those fines, in an effort to profit, the NFL Defendants sold photos of the illegal hits on its website for between $54.95 and $249.95.

### Head Injuries, Concussions, and Neurological Damage

51.     Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause MTBI with a heightened risk of long term, chronic neuro-cognitive sequelae.

52.     The NFL Defendants have known or should have known for many years that the American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.  Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.  Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

53.     The NFL Defendants have known or should have known for many years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly.  The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

11

54.     The NFL Defendants have known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

55.     The NFL Defendants have known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover.  This goes to the heart of the problem:  players being unaware of the serious risk posed to their long-term cognitive health.

56.     The NFL Defendants have known or should have known for many years that clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during an NFL player's career can cause severe cognitive problems such as depression and early-onset dementia.

57.     The NFL Defendants have known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury.  These injuries have been documented and associated with sports-related head impacts in both football and boxing.

58.     The NFL Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed,

attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").  The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also is associated with an increased risk of suicide.

59.     The NFL Defendants have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma.  Published papers have shown that this condition is prevalent in retired professional football players who have a history of head injury.  The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

60.     The NFL Defendants have known for many years the reported papers and studies documenting autopsies on over twenty-five former NFL players.  Reports show that over ninety percent of the players suffered from CTE.

61.     As a result, published peer reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing professional football are linked to significant risk of permanent brain injury.

### The NFL Was In a Superior Position of Knowledge and Authority, and Owed a Duty to the Class

62.     At all times, the NFL's unique historical vantage point at the apex of the sport of football, paired with its unmatched resources as the most well-funded organization devoted to the business of the game, has afforded it unparalleled access to data relating the effect of head

impacts on football players and made it an institutional repository of decades of accumulated knowledge about head injuries to players.

63.     The NFL's accumulated knowledge about head injuries to players, and the associated health risks therefrom, was at all times vastly superior to that readily available to the Plaintiffs.

64.     From its inception, the NFL unilaterally created for itself the role of protecting players, informing players of safety concerns, and imposing unilaterally a wide variety of rules to protect players from injuries that were costly to the player, the game, and profits.   From the beginning, the NFL held itself out and acted as the guardian of the players' best interests on health and safety issues.

65.     For these reasons, players and their families have relied on the NFL to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

66.     In a recent public admission, the NFL stated that "[s]ince its earliest days, the league has continuously taken steps to ensure that the game is played as fairly as possible without unnecessary risk to its participants, including making changes and enhancements to game safety rules." (www.nflhealthsasfety.com/commitment/regulations) (2011-2012).

67.     On information and belief, since its inception, the NFL received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and sub-concussive injuries. Such ongoing medical advice and knowledge placed the NFL in position of ongoing superior knowledge compared to the players.   Combined with the NFL's unilateral and monopolistic power to set rules and determine policies throughout its game, the NFL at all relevant times was in a position

to influence and dictate how the game would be played and to define the risks to which players would be exposed.

68.     As a result, the NFL unilaterally assumed a duty to act in the best interests of the health and safety of NFL players, to provide truthful information to NFL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

69.      The NFL's voluntary actions and authority throughout its history show that as early as the 1920s the NFL shouldered for itself the common law duty to make the game of professional football safer for the players and to keep the players informed of safety information they needed to know.

70.     The NFL's historical actions in connection with these legal duties have included, but are not limited to, the following: adding a field judge (1929); establishing hash-marks at 10 yards from the sidelines (1933); establishing the penalty of unnecessary roughness for a deliberate rough contact on the passer after the pass is made (1938); making helmets mandatory (1943); adding a back field judge (1947); establishing a rule that the ball is dead when a runner touches the ground with any part of his body except his hands while in the grasp of an opponent (1955); establishing a rule that the ball is dead immediately if the runner touches the ground with any part of his body except his hands after being contacted by a defensive player (1956); establishing a penalty for grabbing the face mask of any opponent except a runner (1956); establishing a penalty of grabbing the face mask of any opponent (1962); requiring that goal posts be offset from the goal line (1966); establishing a rule that a player who signals for a fair catch cannot block or initiate contact with one of the kicking team's players until the ball touches a player (1967); establishing a rule that a defensive player who jumps or stands on a teammate or who is picked up by a teammate cannot attempt to block an opponent's kick (1973); establishing a rule that no receiver can be blocked below the waist after moving beyond the line of

scrimmage (1974); establishing a rule that eligible receivers who take a position more than two yards from the tackle cannot be blocked below the waist (1974); establishing a rule that a defender is not permitted to run or dive into a ball carrier who has fallen to the ground untouched (1976); establishing a rule that it is illegal for a defensive lineman to strike an opponent above the shoulders during his initial charge (1977) (previously the NFL made this illegal only during the first step); establishing that it is illegal for a wide receiver to clip an opponent anywhere (1977); establishing rules as to mandatory equipment (1979); establishing that it is illegal for a player in the backfield to chop an outside rusher on a pass play (1979); establishing that it is illegal to throw a punch or forearm or to kick an opponent (1979); and establishing that it is illegal to strike, swing, or club an opponent in the head, neck or face (1980).

71.     As the sport's governing entity (with monopolistic power), the NFL has made it known to players and teams alike that the NFL actively and pervasively governs player conduct and health and safety both on and off the field.  In public statements since its inception, the NFL has stated that its goals include taking necessary steps for the safety, health and well-being of players and their families.

72.     The NFL's approach has been paternalistic and has included comprehensive rookie training programs to teach new players how to manage their personal lives, inquiries from the media, and newly acquired income.

73.     For decades, the NFL voluntarily instituted programs to support player health and safety on and off the field, and the players and their families looked to the NFL for guidance on these issues.

74.     By way of example only, in 1959, the NFL unilaterally established medical, life insurance, and retirement plans, funded the plans, and controlled the nature and extent of each of these plans without any player involvement.  The NFL made all changes to the plans unilaterally.

75.      Despite its unilateral duty and power to govern player conduct on and off the field, the NFL has for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

76.     As one example, Cleveland Browns Quarterback Otto Graham was knocked unconscious during a game against the San Francisco 49ers in 1953 and he was carried off the field. After regaining consciousness, however, Graham returned to the field and played the balance of the game, even though his jaw required fifteen stitches after the game.

77.     Thus, since its inception, and continuing into the present, the NFL has been in a position that affords it a special relationship to NFL players as the guardian of their health and safety.  For that reason, from its inception and continuing into the present, the NFL owed a duty of reasonable care to keep NFL players informed of neurological risks, to inform NFL players truthfully, and not to mislead NFL players about the risks of permanent neurological damage that can occur from MTBI incurred while playing football.

78.     By way of example only, during the decades of the 1930s through the 1960s, the NFL—in its supervisory role as guardian of player safety—identified  tackling techniques that exposed players to increased risks of injury, including head, neck, and leg injuries.   Once identified, the NFL issued regulations which served as daily warnings to players of the hazardous nature of continuing to follow hazardous tackling techniques.  Examples of how the NFL carried out its duty to warn included, but were not limited to, rules penalizing players for: unnecessary

roughness for a deliberate rough contact on the passer after the pass is made (1938), making helmets mandatory (1943), adding a back field judge (1947), establishing a rule that the ball is dead when a runner touches the ground with any part of his body except his hands while in the grasp of an opponent (1955), establishing a rule that the ball is dead immediately if the runner touches the ground with any part of his body except his hands after being contacted by a defensive player (1956), establishing a penalty for grabbing the face mask of any opponent except a runner (1956), establishing a penalty for grabbing the face mask of any opponent (1962), establishing a rule that a player who signals for a fair catch cannot block or initiate contact with one of the kickers until the ball touches a player (1967), establishing a rule that no receiver can be blocked below the waist after moving beyond the line of scrimmage (1974), establishing a rule that eligible receivers who take a position more than two yards from the tackle cannot be blocked below the waist (1974), establishing a rule that a defender is not permitted to run or dive into a ball carrier who has fallen to the ground untouched (1976), and establishing a rule that it is illegal for a defensive lineman to strike an opponent above the shoulders during his initial charge (1977).

79.     As a result of its position of authority and repository of a composite of information throughout the League, the NFL was aware of how to protect NFL players from dangerous circumstances on the field of play and took unilateral, but insufficient, measures to do so.

80.     For decades, the NFL ignored the risks and/or was willfully blind to the risks and/or actively concealed the risks from NFL players, despite its historic and proactive role as the guardian of player safety.

81.     Moreover, from 1994 until 2010, the NFL publicly inserted itself into the business of head injury research and openly disputed that any short-term or long-term harmful

effects arose from football-related sub-concussive and concussive injuries. The NFL propagated its own industry funded and falsified research to support its position, despite its historic role as the guardian of player safety, and despite the fact that independent medical scientists had already come to the opposite conclusion.

82. On information and belief, over the past two decades, the NFL continued to exercise this common law duty and its unilateral authority to investigate and advise NFL players on many diverse and important topics, and that should have included the recognition of circumstances that can precipitate MTBI, the long-term potential consequences of MTBI to NFL players, and solutions for players who have sustained MTBI.

83. During this time period, beginning in the early 1990s, the NFL voluntarily and gratuitously inserted itself into the business of sponsoring medical research regarding the link between repetitive head impacts sustained while playing football and MTBI that can and does result in short-term and long-term neuro-cognitive injury and decline.

84. As such, the NFL continued its existing common law duty to provide truthful scientific research and information about the risks of concussive and sub-concussive injuries to NFL players, including the Plaintiffs, who relied on the NFL's research and pronouncements on that subject.

85. The NFL knew, reasonably expected, and intended NFL players, including the Plaintiffs, to rely on its research and pronouncements on that subject, in part, because of the historic special relationship between the NFL and the players and, in part, because the NFL knew that the vast majority of NFL players played under non-guaranteed contracts and would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to maintain those non-guaranteed contracts.

19

## The NFL Knew the Dangers and Risks Associated with
## Repetitive Head Impacts and Concussions

86.     For decades, the NFL has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

87.     In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study").   The article was published in the *Journal of the American Medical Association*.   The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

88.     In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

89.     In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c)   post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that boxer suffers significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

90.     The recommendations were codified as rules of the New York State Athletic Commission.

91.     In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

92.     That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.,* recommending that players cease to play football after receiving their third concussion.)

93.     In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

94.     A 1963 study by Drs. Mawdsley & Ferguson found that some boxers sustain chronic neurological damages as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.  *See* "Neurological Disease in Boxers," *Lancet* 2:795-81.

95.     A 1967 study examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.  Drs. Hughes & Hendrix, "Telemetered EEG from a Football Player in Action," *Electroencephalography & Clinical Neurophysiology* 24:183-86.

96.     In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

97.     In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing. This study outlined the neuropathological characteristics of "Dementia Pugilistica" ("DP"), including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

98.     A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion. The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

99.     In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram. By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

100.    In 1973, a potentially fatal condition known as "Second Impact Syndrome"—in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate—was identified. It did not receive this name until 1984. Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least forty football players.

101.    Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, and the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

> [R]epetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

22

encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

immediate retrograde memory issues occur following concussions;

mild head injury requires recovery time without risk of subjection to further injury;

head trauma is linked to dementia;

a football player who suffers a concussion requires significant rest before being subjected to further contact; and

minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

102.    In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

103.    In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

23

104.    The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

105.    In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which he later updated in 2001.

106.    By 1991, three distinct medical professionals/entities, all independent from the NFL—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

107.    On information and belief, by 1991, the NCAA football conferences and individual college teams' medical staffs, along with many lower-level football groups (*e.g.,* high school, junior high school, and pee-wee league) had disseminated information and adopted criteria to protect football players even remotely suspected of having sustained concussions.

108.    Further, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: "[b]oxers that suffered concussion by KO [loss of consciousness], should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including but not limited to KO's, and should not compete in a boxing match in less than 75 days."

109.    In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

110.    In 1999, former Pittsburgh Steeler and Hall of Fame inductee Mike Webster filed with the NFL a request that he receive complete disability benefits based on the fact that he had

24

sustained repeated and disabling head impacts while a player for the Steelers.  In 1999, Webster submitted extensive medical reports and testimony that stated, among other things, that Webster suffered from "traumatic or punch drunk encephalopathy [brain disease]" sustained from playing football that left Webster totally and permanently disabled as of 1991.

111.    The NFL's own physician independently examined Webster and concluded that Webster was mentally "completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

112.    Webster died in 2002 at the age of fifty. In December 2006, the Estate of Webster received an unpublished opinion from the United States Court of Appeals for the Fourth Circuit that affirmed the decision of the District Court that the administrator had wrongly denied him benefits.  In its opinion, the Fourth Circuit stated that the NFL Plan had acknowledged that the multiple head injuries Webster sustained during his playing career (1974-1990) ". . . had caused Webster eventually to suffer total and permanent mental disability . . . ."

113.    Thus, the NFL, through its own expert medical testimony and the expert testimony submitted by Webster knew and accepted that repetitive traumatic brain injuries sustained by a Hall of Fame player led to long-term encephalopathy and permanent mental disability.

114.    A 2000 study, which surveyed 1,090 former NFL players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers.  Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

115.    Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (3) eight suffered from Alzheimer's disease.

116.    A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

117.    In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.   These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

118.    This echoed similar medical protocol established at a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

119.    The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

120.    The chart on the following page, which was excerpted from an article in the 2010 *New England Journal of Medicine* entitled Traumatic Brain Injury—Football, Warfare, and Long-Term Effects, shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.



**Spectrum of Pathologic Features and Outcomes of Traumatic Brain Injury (TBI).**

In the left inset, Bielschowsky silver stain shows intraneuronal and extracellular neurofibrillary tangles in temporal cortex from a retired boxer with dementia pugilistica.[1] The right inset shows diffuse Aβ plaque deposits in temporal cortex from a subject who sustained severe TBI.[2]

121.     A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

122.    Indeed, while the NFL knew for decades of the harmful effects of concussions on a player's brain, it actively concealed these facts from coaches, players, and the public.

123.    On information and belief during every decade referenced above, the NFL was advised by physicians of all kinds regarding the risks associated with playing the game of football, including the risks associated with head impacts and MTBI.

124.    As described above, the NFL has known for decades that MTBI can and does lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

**The NFL Voluntarily Undertook the Responsibility of Studying Head Impacts in Football, Yet Fraudulently Concealed Their Long-Term Effects.**

125.    In 1994, then NFL commissioner Paul Tagliabue agreed to fund a committee to study the issue of head injury in the NFL. The NFL voluntarily and unilaterally proceeded to form the committee to study the issue.   This Committee, the Mild Traumatic Brain Injury Committee ("MTBI Committee") voluntarily undertook the responsibility of studying the effects of concussions and sub-concussive injury on NFL players.

126.    At that time, the current NFL Commissioner, Roger Goodell ("Goodell"), was the NFL's Vice President and Chief Operating Officer.

127.    With the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.   Through its voluntary creation of the MTBI Committee, the NFL affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players; the study of any kind of brain trauma relevant to the sport of football; the use of information developed; and the publication of data and/or pronouncements from the MTBI Committee.

29

128.    Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of fraudulent and negligent conduct, which included a campaign of disinformation designed to (a) dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and (b) to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

129.    The NFL's unparalleled status in the world of football imbued its MTBI Committee's pronouncements on concussions with a unique authoritativeness as a source of information to players.  The Plaintiffs therefore reasonably relied on the NFL's pronouncements and/or silence on this vital health issue.

130.    The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players caused by concussions and repetitive brain trauma received during their years as professional football players has been, until very recently, a concerted effort of deception and denial.  The NFL actively tried to and did conceal the extent of the concussion and brain trauma problem, the risk to the Plaintiffs, and the risks to anyone else who played football.

131.    The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the League, and to outline solutions.  Ironically, the MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

132.    By 1994, when the NFL formed the MTBI Committee, independent scientists and neurologists alike were already convinced that all concussions—even seemingly mild ones— were serious injuries that can permanently damage the brain, impair thinking ability and

memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

133.    The MTBI Committee was publicized by the NFL as independent from the NFL, consisting of a combination of doctors and researchers.

134.    The MTBI Committee, however, was not independent.  It consisted of at least five (5) persons who were already affiliated with the NFL.

135.    Instead of naming a noted neurologist to chair the newly formed MTBI Committee, or at least a physician with extensive training and experience treating head injuries, Tagliabue appointed Dr. Elliot Pellman, a rheumatologist who lacked any specialized training or education relating to concussions, and who was a paid physician and trainer for the New York Jets.

136.    Dr. Pellman had reportedly been fired by Major League Baseball for lying to Congress regarding his resume.

137.    Dr. Pellman would go on to chair the MTBI Committee from 1994-2007, and his leadership of the Committee came under frequent and harsh criticism related to his deficient medical training, background, and experience.

138.    The fact that Dr. Pellman was a paid physician for an NFL Team was an obvious conflict of interest.  At no time was Dr. Pellman independent of the NFL, because he was paid on an ongoing basis by an NFL Team.

139.    The NFL failed to appoint any neuropathologist to the MTBI Committee.

140.    From its inception in 1994, the MTBI Committee allegedly began conducting studies to determine the effect of concussions on the long-term health of NFL players.

31

141.   NFL Commissioner Roger Goodell confirmed this in June 2007 when he stated publicly that the NFL had been studying the effects of traumatic brain injury for "close to 14 years …."

142.   Under Dr. Pellman, the MTBI Committee spearheaded a disinformation campaign.

143.   Dr. Pellman and two other MTBI Committee members, Dr. Ira Casson, a neurologist, and Dr. David Viano, a biomedical engineer, worked to discredit scientific studies that linked head impacts and concussions received by NFL players to neuro-cognitive disorders and disabilities.

144.   The MTBI Committee did not publish its first findings on active players until 2003.   In that publication, the MTBI Committee stated, contrary to years of (independent) findings, that there was no long term negative health consequence associated with concussions.

145.   The MTBI Committee published its findings in a series of sixteen (16) papers between 2003 and 2009.  According to the MTBI Committee, all of their findings supported a conclusion that there was no long term negative health consequence associated with concussions or sub-concussive injuries sustained by NFL players.  These findings regularly contradicted the research and experiences of neurologists who treat sports concussions and the players who endured them.

146.   Completely contrary to peer reviewed scientific publications, the NFL's team of hand-picked so-called experts on the MTBI Committee did not find concussions to be of significant concern and felt it appropriate for players suffering a concussion to continue playing football during the same game or practice in which one was suffered. This recommendation and practice by the NFL, promoted by the MTBI Committee, was irresponsible and dangerous.

32

147.    The MTBI Committee's methodology and the conclusions reached in its research were criticized by independent experts due to the numerous flaws in the study design, methodology, and interpretation of the data, which led to conclusions at odds with common medical knowledge and basic scientific protocol.

148.    For example, in 2004 the MTBI Committee published a conclusion in which it claimed that its research found no risk of repeated concussions in players with previous concussions and that there was no "7-to-10 day window of increased susceptibility to sustaining another concussion."

149.    In a comment to this publication, one independent doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."

150.    As a further example, an MTBI Committee conclusion in 2005 stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."   "These data suggest," the MTBI Committee reported, "that these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

151.    Yet, a 2003 NCAA study of 2,905 college football players found just the opposite:  "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

152.    Support for this same conclusion was developed as early as 1982 in studies conducted at the University of Virginia.

153. Dr. Pellman and his group stated repeatedly that the NFL study showed "no evidence of worsening injury or chronic cumulative effects of multiple [MTBI] in NFL players."

154. The 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina, however, found a link between multiple concussions and depression among former professional players with histories of concussions.  A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

155. Other contrary conclusions that the MTBI Committee published at the behest, urging, and sponsorship of NFL over several years include, but are not limited to, the following:

> Drs. Pellman and Viano stated that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [TBIs] in professional football are not serious injuries";

> that NFL players did not show a decline in brain function after a concussion;

> that there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;

> that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions"; and

> that NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

156. The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data collection techniques.  They received significant criticism in the scientific and medical media from independent doctors and researchers and were met with skepticism in peer review segments following each article's publication.

157.    Moreover, the conclusions of the MTBI Committee completely contradicted the medical testimony Hall of Fame player Mike Webster submitted to the NFL in his application for disability, including the testimony the NFL's own paid expert submitted in connection with Mr. Webster's application.

158.    Renowned experts Dr. Robert Cantu and Dr. Julian Bailes wrote harshly critical reviews of the studies' conclusions.

159.    Dr. Cantu observed that the extremely small sample size and voluntary participation in the NFL's study suggested there was bias in choosing the sample. According to Dr. Cantu, no conclusions should be drawn from the NFL study.

160.    A different scientist who reviewed the MTBI Committee's work further stated that the NFL appeared to be primarily preparing a defense for when injured players eventually sued, and that it seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

161.    Dr. Kevin Guskiewicz has stated that the "data that hasn't shown up makes their work questionable industry-funded research."

162.    The MTBI Committee's work was criticized when repeated inconsistencies and irregularities in the MTBI Committee's data were revealed.

163.    The MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports.

164.    The results reported by Dr. Pellman and the MTBI Committee selectively excluded at least 850 baseline tests.  In a paper published in *Neurosurgery* in December 2004, Dr. Pellman and the other MTBI Committee members reported on the baseline data for 655

players and the results for 95 players who had undergone both baseline testing and post-concussion testing. They concluded that NFL players did not show a decline in brain function after suffering concussions. Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.  The paper did not explain where the players in the study groups came from specifically or why certain player data was included and that data from hundreds of other players was not.

165.    Pellman subsequently fired William Barr, a neuropsychologist for the New York Jets, after Dr. Barr presented at a conference some NCAA study findings that contradicted NFL practices.

166.    As described in the following paragraphs, when faced with studies which tended to show a causal link between MTBI and cognitive degeneration, the NFL, through the MTBI Committee, produced contrary findings that were false, distorted, and deceptive to NFL players, participants in football nationwide, and the public at large.

167.    Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.  Dr. Omalu concluded that the players suffered from CTE.

168.    All of these individuals suffered multiple concussions during their NFL careers. Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression.

169.    Some of Dr. Omalu's findings were published in *Neurosurgery*.  Those findings included that Webster's and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their activity in the NFL.

170.    In response to Dr. Omalu's articles, the MTBI Committee wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

171.    In an article published in *Neurosurgery* in 2007, Dr. Cantu reached a similar conclusion regarding Waters as Dr. Omalu had reached as to Webster and Long.

172.    A 2003 study partially authored by Dr. Kevin Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression.  The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

173.    The NFL's MTBI Committee attacked these studies.

174.    In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research.  Dr. Pellman called Dr. Guskiewicz in advance and questioned whether it was in the best interest of Dr. Guskiewicz to appear on the program.  On the program, Dr. Pellman stated unequivocally that he did not believe the results of the study led by Dr. Guskiewicz.

175.    In 2005, Dr. Guskiewicz performed a clinical follow-up study, and found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees without a history of concussions.  In doing this research, Dr. Guskiewicz conducted a survey of over 2,550 former NFL athletes.

176.    The MBTI Committee attacked and sought to undermine the study, issuing the following excuse and delay tactic:  "We want to apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening. . . . You cannot tell that from a survey."

177.    In August 2007, the NFL, in keeping with its scheme of fraud and deceit, issued a concussion pamphlet to players which stated:

> Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly.  It is important to understand that there is no magic number for how many concussions is too many.  Research is currently underway to determine if there are any long-term effects of concussion[s] in NFL athletes.

178.    In a statement made around the time that the concussion pamphlet was released, NFL Commissioner Roger Goodell said, "We want to make sure all NFL players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."   The NFL decided that the "most up to date information" did not include the various independent studies indicating a causal link between multiple concussions and cognitive decline in later life.

179.    Goodell also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

180.    The Plaintiffs relied to their detriment on the NFL's disinformation, all of which was contrary to the findings of the independent scientists who had studied the issue, including Drs. Guskiewicz, Cantu, Omalu, and Bailes, regarding the causal link between multiple head injuries and concussions and cognitive decline.

181.    The NFL's conflict of interest and motive to suppress information regarding the risks of repetitive traumatic brain injuries and concussions was vividly demonstrated by Dr. Pellman's treatment of a concussion sustained by former star New York Jets player Wayne Chrebet.  This occurred in 2003, the same time period when Dr. Pellman chaired the MTBI Committee.

182.    In November 2003, Chrebet sustained a concussion from another player's knee to the back of his head. The impact left him face down on the field in an unconscious state for several minutes.  Once Chrebet was on the sideline and conscious, Dr. Pellman administered tests.  Dr. Pellman knew that Chrebet had sustained a concussion, but reportedly Chrebet performed adequately on standard memory tests. According to reports, Dr. Pellman asked Chrebet some questions, including whether he was "okay."  Chrebet responded that he was. Reportedly, Dr. Pellman told Chrebet that, "This is very important for your career," and sent Chrebet back into the game.  Shortly thereafter, Chrebet was diagnosed with post-concussion syndrome and kept out of games for the remainder of the 2003 season.

183.    Today, Chrebet is 38 years old and reportedly suffers from depression and memory problems.

184.    In 2005, the MTBI Committee published a paper that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

185.    Facing increasing media scrutiny over the MTBI Committee's questionable studies, Dr. Pellman eventually resigned as the head of the Committee in February 2007.  He was replaced as head by Dr. Ira Casson and Dr. David Viano, but remained a member of the Committee.

186.    Dr. Guskiewicz, research director of the University of North Carolina's Center for the Study of Retired Athletes, said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

187.    Regarding Dr. Pellman's work, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions," but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

188.    Drs. Casson and Viano continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries.  In 2007, in a televised interview on HBO's Real Sports, Dr. Casson definitively and unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever."

189.    In June 2007, the NFL convened a concussion summit for team doctors and trainers.  Independent scientists, including Drs. Cantu, and Guskiewicz, presented their research to the NFL.

190.    Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline.  Dr. Bailes recalled that the MTBI's Committee's reaction to his presentation was adversarial:  "The Committee got mad . . . we got into it.  And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding?  Alienate the scientist who found it?  Refuse to accept the science coming from him?'"

191.    At the summit, Dr. Casson told team doctors and trainers that CTE has never been scientifically documented in football players.

192.    After reviewing five years of data of on-field concussions, the NFL falsely concluded that there was no evidence for an increase in secondary brain injuries after a concussion.

193.    In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale.  Dr. McKee stated: "[T]he easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions."  Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

194.    A MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn, and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal.  When Dr. McKee's research was published in 2009, Dr. Casson asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long[-]term brain damage."

195.    In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players.  Over 1,000 former NFL players took part in the study.  The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population---including a rate of 19 times the normal rate for men ages 30 through 49."

196.    The NFL, who commissioned the study, responded to these results by claiming that the study was incomplete, and that further findings would be needed.  NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose

dementia.  Dr. Casson implied that the Michigan study was inconclusive and stated that further work was required.  Other experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

**The Congressional Inquiry and
The NFL's Acknowledgement of the Concussion Crisis**

197.     Shortly after the results of the Michigan study were released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

198.     Drs. Cantu and McKee testified before the House of Representatives, Committee on the Judiciary, to discuss the long-term impact of football-related head injuries.

199.     At the first hearing in October 2009, NFL Commissioner Roger Goodell acknowledged that the NFL owes a duty to the public at large to educate them as to the risks of concussions due to the League's unique position of influence: "In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well.  We must act in their best interests even if these young men never play professional football."

200.     When Representative Sanchez questioned Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias, Goodell evaded answering the questions.

201.     On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, 26, who played in the NFL from 2004 to 2009, died after falling from the back of a truck.  Drs. Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed him with CTE.

42

202.     In January 2010, the House Judiciary Committee held further hearings on football player head injuries.   Representative Conyers observed that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

203.     Representative Linda Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years.  Why did it take 15 years?"

204.     In the 2010 Congressional hearings, Dr. Casson gave testimony that denied the validity of other non-NFL studies and stated that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

205.     The members of the MTBI Committee, however, knew of the decades old studies linking MTBI to long-term neurological problems.  Casson, a MTBI Committee member since its inception, stated before Congress on January 4, 2010, that he was "the lead author of a landmark paper on brain damage in modern boxers that was published in the [Journal of the American Medical Association] in 1984."   That paper, which referenced the many studies documenting CTE in boxers, studied eighteen former and active boxers and found that eighty-seven percent of the professional boxers had definite evidence of brain damage.  Specifically, the study determined that the subjects performed particularly poorly on neuropsychological tests measuring short-term memory.

206.     In his written statement to Congress, Casson stated that he has "been concerned about the possibility of long term effects on the brain related to football for close to thirty years." Dr. Casson offered that one of the reasons he "was asked to be on the NFL MTBI committee

was because of [his] knowledge of and experience treating boxers with chronic traumatic encephalopathy (CTE)."

207.    This testimony contradicted Casson's testimony that "there is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

208.    On February 1, 2010, Dr. Omalu spoke before members of the House Judiciary Committee at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football." In his prepared testimony, he explained:

> Glenn Pop Warner [1871 – 1954] founded the Pop Warner youth football league in 1929. He still remains one of the greatest football coaches in the history of American football. The single event, which necessitated the use of pads and helmets by football players took place in 1888 when the annual rules convention for the emerging sport of college football passed a rule permitting tackling below the waist.

> Football changed dramatically. Teams no longer arrayed themselves across the entire breath of the field. Teams bunched themselves around the runner to block for him. The wedge and mass play arrived. Football became, for a time, a savage sport full of fights, brawling, even fatalities."

> In 1912, Pop Warner said: "Playing without helmets gives players more confidence, saves their heads from many hard jolts, and keeps their ears from becoming torn or sore. I do not encourage their use. I have never seen an accident to the head which was serious, but I have many times seen cases when hard bumps on the head so dazed the player receiving them that he lost his memory for a time and had to be removed from the game."

> We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub-concussions both have the capacity to cause permanent brain damage. During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion. Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

209.    After the Congressional hearings, the NFLPA called for the removal of Dr. Casson as MTBI Committee co-chair, and stated, "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

210.    In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (the "Medical Committee") and announced that Dr. Pellman would no longer be a member of the panel.  Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Casson and Viano.  The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the new Medical Committee.

211.    Under its new leadership, the Committee admitted that data collected by the NFL's formerly appointed brain-injury leadership was "infected," and said that their Committee should be assembled anew.  The Medical Committee formally requested that Dr. Pellman not speak at one of its initial conferences.

212.    During a May 2010 Congressional hearing, a Congressman made it plain to Drs. Batjer and Ellenbogen that the NFL: "[had] years of an infected system here, and your job is . . . to mop [it] up."

213.    Shortly after the May 2010 hearing, Dr. Batjer was quoted as admitting, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us.  I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

214.    In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

215.    On February 17, 2011, former Chicago Bears and New York Giants player Dave Duerson committed suicide.  Fifty years old at the time, Duerson had suffered months of headaches, blurred vision, and faltering memory.

216.    Before his death, Duerson wrote a final note that asked that his brain be given to the NFL brain bank for evaluation.  After his death, Dr. Cantu determined that Duerson was suffering from CTE.

217.    When this information was reported, NFLPA Executive Director DeMaurice Smith stated that the fact that Duerson was suffering from CTE

>   makes it abundantly clear what the cost of football is for the men who played and the families.  It seems to me that any decision or course of action that doesn't recognize that as the truth is not only perpetuating a lie, but doing a disservice to what [Duerson] feared and what he wanted to result from the donation of his brain to science.

218.    In July 2011, John Mackey, former tight end of the Baltimore Colts died.  Mackey was diagnosed with front temporal lobe dementia in 2007, forcing him to live full-time in an assisted living facility.

**The NFL's New Committee**

219.    In October 2011, Dr. Mitchel Berger of the NFL's Head, Neck, and Spine Medical Committee announced that a new study was in the planning process.  He admitted that the MTBI Committee's previous long-range study was useless because "[t]here was no science in that."  Dr. Berger further stated that data from the previous study would not be used.  "We're really moving on from that data.  There's really nothing we can do with that data in terms of how it was collected and assessed."

220.    Why in 1994 (and far earlier) the NFL (and its MTBI Committee) failed to share accurate information and take appropriate actions is difficult to comprehend in light of the fact that the NFL has known for decades that multiple blows to the head can lead to long-term brain

injury, including memory loss, dementia, depression, and CTE and its related symptoms. Instead, the NFL misled players, coaches, trainers, and the public, and actively spread disinformation.

221.    It took decades for the NFL to admit that there was a problem and sixteen years to admit that its information was false and inaccurate.  The NFL's conduct in this regard is willful and wanton and exhibits a reckless disregard for the safety of its players and the public at large. At a minimum, the NFL acted with callous indifference to the duty it voluntarily assumed to the Plaintiffs and players at every level of the game.

222.    As a direct result of the fraudulent concealment and misrepresentations by the NFL, former players have for many decades been led to believe that the symptoms of early-onset dementia, ALS, loss of memory, headaches, confusion, and the inability to function were not caused by events occurring while they played in the NFL.  And, as a result of this willful and malicious conduct, these former players have been deprived of medical treatment, incurred expenses, lost employment, suffered humiliation and other damages to be specified.

### Scientific and Medical Evidence Regarding the Need for Medical Monitoring and the Availability of Specific Medical Tests And Protocols for the Early Detection of Latent Brain Injury

223.    For decades, published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury.  Such brain injury has been documented as a result of various causes, including sports-related head impacts in both football and boxing.

224.    Neuropathology studies, brain imaging tests, and  neuropsychological tests on many former football players, including former NFL players,  have established that football players who sustain repetitive head impacts while playing  the game  have suffered and continue to suffer brain injuries  that result in any one or more of the following conditions: early onset of

Alzheimer's Disease, dementia,  depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning,  loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and  latent disease known as Chronic Traumatic Encephalopathy ("CTE").   The latter condition involves the slow build-up of Tau protein within the brain tissue and causes many of the symptoms listed above.   CTE is also associated with an increased risk of suicide, dementia, and a progressive cognitive decline and dysfunction.

225.    Repeated traumatic head impacts suffered by former NFL players have a microscopic and latent effect on the brain.   These impacts twist, shear, and stretch neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein.   Among other things, the gradual build up of Tau protein – sometimes over decades -- causes CTE, which is the same phenomenon as boxer's encephalopathy (or punch drunk syndrome) studied and reported by Harrison Martland in 1928.

226.     But for the repetitive head impacts to which the Plaintiffs and members of the Class were exposed, the risk to Plaintiffs and members of the Class that such substances would be released into their brains would have been materially lower or zero.

227.    Accordingly, the repeated traumatic head impacts suffered by former NFL players exposed them to a subtle and repetitive change within the brain on the cellular level including increased levels of the Tau protein which is known to increase the risk of brain injury.   As a result, published peer reviewed scientific studies have shown that playing professional football is associated with significant risk for permanent brain injury.

228.    Published peer reviewed scientific studies have shown that 28% of the NFL retirees studied, suffered from depression, whereas the prevalence of depression in the general population is 9.5%.

48

229.    Published peer reviewed scientific studies have shown that 36% of NFL retirees, age 65-75, who were studied, suffered from dementia, whereas the prevalence of dementia in the general population for the same age group  is 2.2-6.5%.

230.    Published peer reviewed scientific studies have shown that retired players with three or more reported concussions had a fivefold prevalence of mild cognitive impairment (MCI) and a threefold prevalence of significant memory problems, compared to other retirees.

231.    In a study of NFL retirees, 11.1% of all respondents reported having a prior or current diagnosis of clinical depression.

232.    NFL retirees experienced earlier onset of Alzheimer's disease more frequently than the general American male population in the same age range.

233.    Once there is a finding of impairment of mental functioning, the prognosis is poor; the vast majority of such patients go on to develop Alzheimer's disease within a decade.

234.    Published peer review scientific studies have shown that 6.1% of retired NFL players over the age of 50 receive a Dementia-related diagnosis compared to the 1.2% national average for men of the same age.

235.    Published peer reviewed scientific studies have shown that the incidence of brain trauma in retired NFL players has been associated with mild cognitive impairment and depression.

236.    The Boston University Center for the Study of Traumatic Encephalopathy has performed autopsy examinations of the brains of deceased NFL players indicating an estimated lifetime prevalence of Chronic Traumatic Encephalopathy ("CTE") of 3.7% percent of all retired players.

237.    The evidence that CTE is caused by repeated sublethal brain trauma is overwhelming.

238.    Published peer reviewed scientific studies have shown that more than 61% of former NFL players have experienced concussions and a greater number have experienced repeated sub-concussive blows.

239.    Brain injury and brain disease in NFL retirees is a latent disease that can appear years or decades after the player experiences head trauma in his NFL career.

240.    Experts consider concussions the "tip of the iceberg," and believe repetitive sub-concussive blows to the head are the cause of significant brain disease in NFL retirees.

241.    Members of the Classes are exposed to a significant number of sub-concussive blows and concussions as a result of their professional football careers.  The general public does not experience this type of brain trauma.

242.    Historically the NFL has treated repeated sub-concussive blows and concussions as "dings" and having one's "bell rung," and fraudulently concealed and negligently misrepresented  facts that would assist the members of the Class in being able to obtain  adequate brain injury   diagnosis, management , and treatment of  the condition to facilitate recovery and rehabilitation.

243.    The Defendants' fraudulent concealment and negligent misrepresentations as to the risks of chronic sub-concussive blows and concussions has increased the risks for members of the Class to brain injury and its sequelae including cognitive, mental health, and neurological disorders during the years after retirement.

244.    Management of concussion requires a gradual multistep process involving baseline testing, and neurocognitive examination.

50

245.    For sports, such as football, in which repeated blows to the head are unavoidable, proper concussion assessment and management is paramount for preventing and mitigating long term consequences.

246.    Medical monitoring for latent brain injury identifies deficits that are amenable to treatment through medical, cognitive, psychological and behavioral counseling, (for the patient and his spouse and family), as well as through pharmaceutical treatment, lifestyle modifications, and other therapeutic interventions.

247.    Serial testing of cognitive functioning for early signs or symptoms of neurologic dysfunction, and serial brain imaging for signs of injury or disease, is medically necessary to assure early diagnosis and effective treatment of brain injury.

248.    Medical monitoring for latent brain injury is highly specialized and different from the medical care that is normally recommended to other men of a similar age, in the absence of a history of chronic repeated sub-concussive impacts and concussions.

249.    Well established and specialized medical monitoring procedures exist to provide early diagnosis of brain injury which greatly enhances successful treatment, rehabilitation, and prevention or mitigation of cognitive, psychological, and behavioral deficits.

250.    Such procedures include serial brain imaging studies and neuropsychological evaluations targeted on identifying the deficits associated with chronic and repeated sub-concussive blows and concussions experienced by members of the Classes.

251.    Medical monitoring for latent brain injury is reasonably necessary to provide for early diagnosis, leading to benefits in treatment, management, rehabilitation, and prevention or mitigation of damage.

51

## COUNT I

## Medical Monitoring (On Behalf of the National Class)

233.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing

paragraphs.

234.    Plaintiffs seek to certify a National Medical Monitoring Class under the

substantive law of the State of New York.

235.    During their respective NFL careers, Plaintiffs and the members of the Class

experienced repeated traumatic head impacts, including sub-concussive blows and concussions,

with greater frequency and severity than the general population of men of a similar age.

236.    The repeated traumatic head impact injuries, including  sub-concussive blows and

concussions, experienced by Plaintiffs and members of the Class during their respective NFL

careers are known and proven to be hazardous because they increase the risks of developing

neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's

disease or similar cognitive-impairing conditions.

237.    Defendants were fully aware of, yet concealed and misrepresented the dangers of

exposing players, including Plaintiffs and members of the Class, to increased risks of repeated

traumatic head impacts and developing neurodegenerative disorders and diseases.   By such

tortious conduct, Defendants breached their duties of reasonable and ordinary care to the

Plaintiffs and members of the Class, and caused the increased risks to the former players giving

rise to the need for medical monitoring.

238.    As a proximate result of Defendants' tortious conduct, Plaintiffs and the members

of the Class have experienced increased risks of repeated traumatic head impacts and developing

serious latent neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

239. Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the cognitive impairments and conditions that Plaintiffs and members of the Class are at increased risks of developing. Such monitoring, which includes but is not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, will prevent or mitigate the injuries, and enable treatment of the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic head impacts described herein.

240. The monitoring procedures set forth above are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for adult males.

241. As set forth above, the monitoring procedures are reasonably necessary according to contemporary scientific principles, to enable Plaintiffs and members of the Class to obtain early detection and diagnosis of the cognitive impairments and conditions that they are at increased risks of developing as a result of Defendants' tortious conduct described herein.

242. Plaintiffs and the members of the Class therefore seek an injunction creating a Court-supervised NFL-funded comprehensive medical monitoring program for Plaintiffs and the members of the Class, which would facilitate the early diagnosis and adequate treatment in the event a neurodegenerative disorder or disease is diagnosed in Plaintiffs or members of the Class.

243. Plaintiffs and the members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury. Without a Court-supervised NFL-funded

comprehensive medical monitoring program as described herein, the Plaintiffs and the members of the Class will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

244.    Plaintiffs and members of the Class seek the establishment of a Court-supervised fund to provide medical monitoring based on the independent cause of action for medical monitoring, or in alternative as a form of relief associated with a claim for negligence or other tortious conduct.

### COUNT II
### Fraudulent Concealment/Negligent Omission (On Behalf of the National Class)

245.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

246.    This count is based upon Defendants' fraudulent concealment and negligent omission.

247.    The NFL has historically assumed an independent and voluntary duty to protect the health and safety of its players.

248.     The NFL has repeatedly confirmed its duty to take reasonable and prudent action to protect the health and safety of its players in the face of such known and foreseeable risks.

249.    By taking such steps to protect the health and safety of its players, a relation of trust and confidence between the NFL and its players existed, which gave rise to a duty upon the NFL not to conceal or misrepresent material information to its players.

250.    The NFL had superior knowledge of such material information concerning the increased risks of repeated traumatic head impacts to its players, such material information was not readily available to the Plaintiffs or members of the Class, and the NFL knew or should have

known that the Plaintiffs and members of the Class were acting and playing based upon mistaken beliefs created by the NFL's concealment and misrepresentations.

251.    As alleged herein, the NFL intentionally or negligently concealed and misrepresented material information concerning the increased risks of repeated traumatic head impacts and developing neurodegenerative disorders and diseases alleged herein.

252.    The NFL knew or should have known that the information it did provide was false, misleading, and incomplete. The NFL players, including Plaintiffs and members of the Class, did reasonably and justifiably rely upon the NFL and its duty not to conceal or misrepresent material information.

253.    The NFL's concealment, omissions, and misrepresentations were done for the purpose of suppressing and misrepresenting material information about the latent brain injury risks of repeated traumatic head impacts in football, inducing former players, to act without taking adequate steps to prevent or mitigate the damage.

254.    The NFL's concealment, omissions and misrepresentations   were likely to mislead a reasonable NFL player, including Plaintiffs and members of the Class, who were acting reasonably under the circumstances.

255.    As a result of the NFL's fraudulent and negligent conduct as alleged herein, Plaintiffs and members of the Class were exposed to the increased risks as set forth above.

256.    As a result of the Defendants' fraudulent and negligent conduct as alleged herein, Defendants are liable to Plaintiffs and the Class members.

257.    As a result of the NFL's fraudulent and negligent conduct as alleged herein, Plaintiffs and the members of the Class are entitled to injunctive relief, as allowed by law, from the NFL in the form of a Court-supervised NFL-funded comprehensive medical monitoring

program for Plaintiffs and the members of the Class, which would facilitate the early diagnosis

and adequate treatment of brain injury for Plaintiffs and members of the Class.

## COUNT III
## Action for Medical Monitoring (On Behalf of the Florida Class)

258.     As an alternative to a National Class, Plaintiffs plead Classes of former NFL

players who reside in particular states.  Plaintiffs plead herein such alternative Classes for former

NFL players who reside in Florida; and further reserve their right to bring other state only

medical monitoring claims if the National Class is not certified.

259.     Plaintiffs repeat and reallege each of the allegations contained in the foregoing

paragraphs.

260.     During their respective NFL careers, Plaintiffs and the members of the Class

experienced repeated traumatic head impacts, including sub-concussive blows and concussions,

with greater frequency and severity than the general population of men of a similar age.

261.     The repeated traumatic head impact injuries, including  sub-concussive blows and

concussions, experienced by Plaintiffs and members of the Class during their respective NFL

careers are known and proven to be hazardous because they increase  the risks of developing

neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's

disease or similar cognitive-impairing conditions.

262.     Defendants were fully aware of, yet concealed and misrepresented the dangers of

exposing players, including Plaintiffs and members of the Class, to repeated traumatic head

impacts and increased risks of developing neurodegenerative disorders and diseases.  By such

tortious conduct, Defendants breached their duties of reasonable and ordinary care to the

Plaintiffs and members of the Class, and caused the risks to the former players giving rise to the

need for medical monitoring.

263.    As a proximate result of Defendants' tortious conduct, Plaintiffs and the members of the Class have experienced increased risks of developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

264.    Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the cognitive impairments and conditions that Plaintiffs and members of the Class are at increased risks of developing.  Such monitoring, which includes but is not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, will prevent or mitigate the injuries , and enable treatment of the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic head impacts  described herein.

265.    The monitoring procedures set forth above are fundamentally different and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for adult males.

266.    As set forth above, the monitoring procedures are reasonably necessary according to contemporary scientific principles, to enable Plaintiffs and members of the Class to obtain early detection and diagnosis of the cognitive impairments and conditions that they are at increased risks of developing as a result of Defendants' tortious conduct described herein.

267.    Plaintiffs and the members of the Class therefore seek an injunction creating a Court-supervised NFL-funded comprehensive medical monitoring program for Plaintiffs and the members of the Class, which would facilitate the early diagnosis and adequate treatment in the event a neurodegenerative disorder or disease is diagnosed in Plaintiffs or members of the Class.

268.     Plaintiffs and the members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury. Without a Court-supervised NFL-funded comprehensive medical monitoring program as described herein, the Plaintiffs and the members of the Class will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

269.     Plaintiffs and members of the Class seek the establishment of a Court-supervised fund to provide medical monitoring based on the independent cause of action for medical monitoring.

## COUNT IV
## Action for Fraudulent Concealment/Negligent Omission (On Behalf of the Florida Class)

270.     As an alternative to the allegations seeking a National Class, Plaintiffs plead a cause of action for the Florida Class for fraudulent concealment/negligent omission.

271.     Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

272.     This count is based upon Defendants' fraudulent concealment and negligent omission.

273.     The NFL has historically assumed an independent and voluntary duty to protect the health and safety of its players.

274.     The NFL has repeatedly confirmed its duty to take reasonable and prudent action to protect the health and safety of its players in the face of such known and foreseeable risks.

275.     By taking such steps to protect the health and safety of its players, a relation of trust and confidence between the NFL and its players existed, which gave rise to a duty upon the NFL not to conceal and misrepresent material information to its players.

58

276.     The NFL had superior knowledge of such material information concerning repeated traumatic head impacts and the increased risks to its players, such material information was not readily available to the Plaintiffs or members of the Class, and the NFL knew or should have known that the Plaintiffs and members of the Class were acting and playing based upon mistaken beliefs created by the NFL's concealment and misrepresentations.

277.     As alleged herein, the NFL intentionally or negligently concealed and misrepresented material information concerning repeated traumatic head impacts and the increased risks of developing neurodegenerative disorders and diseases alleged herein.

278.     The NFL knew or should have known that the information it did provide was false, misleading and incomplete. The NFL players, including Plaintiffs and members of the Class, did reasonably and justifiably rely upon the NFL and its duty not to conceal and misrepresent material information.

279.     The NFL's concealment, omissions, and misrepresentations were done for the purpose of suppressing and misrepresenting material information about the latent brain injury risks of repeated traumatic head impacts in football, inducing former players, to act without taking adequate steps to prevent or mitigate the damage.

280.     The NFL's concealment, omissions, and misrepresentations were likely to mislead a reasonable NFL player, including Plaintiffs and members of the Class, who were acting reasonably under the circumstances.

281.     As a result of the NFL's fraudulent and negligent conduct as alleged herein, Plaintiffs and members of the Class were exposed to the increased risks as set forth above.

282.     As a result of the Defendants' fraudulent and negligent conduct as alleged herein, Defendants are liable to Plaintiffs and the Class members.

283.     Plaintiffs and the members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury. Without a Court-supervised NFL-funded comprehensive medical monitoring program as described herein, the Plaintiffs and the members of the Class will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

284.     As a result of the NFL's fraudulent and negligent conduct as alleged herein, Plaintiffs and the members of the Class are entitled to injunctive relief, as allowed by law, from the NFL in the form of a Court-supervised NFL-funded comprehensive medical monitoring program for Plaintiffs and the members of the Class, which would facilitate the early diagnosis and adequate treatment of brain injury for Plaintiffs and members of the Class.

<u>COUNT V</u>
<u>Action for Negligence seeking Medical Monitoring (On Behalf of a California Class)</u>

285.     As an alternative to the allegation seeking a National Class, Plaintiffs plead a Class of former NFL players who reside in California.

286.     Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

287.     During their respective NFL careers, Plaintiffs and the members of the Class experienced repeated traumatic head impacts, including sub-concussive blows and concussions, with greater frequency and severity than the general population of men of a similar age.

288.     The repeated traumatic head impact injuries, including  sub-concussive blows and concussions, experienced by Plaintiffs and members of the Class during their respective NFL careers are known and proven to be hazardous because they increase the risks of developing

neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

289.    Defendants were fully aware of, yet concealed and misrepreseneted the dangers of exposing players, including Plaintiffs and members of the Class, to increased risks of repeated traumatic head impacts and developing neurodegenerative disorders and diseases.  By such tortious conduct, Defendants breached their duties of reasonable and ordinary care to the Plaintiffs and members of the Class, and caused the risks to the former players giving rise to the need for medical monitoring.

290.    As a proximate result of Defendants' tortious conduct, Plaintiffs and the members of the Class have experienced increased risks of developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

291.    Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the cognitive impairments and conditions that Plaintiffs and members of the Class are at increased risks of developing.  Such monitoring, which includes but is not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, will prevent or mitigate the injuries, and enable treatment of the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic head impacts  described herein.

292.    The monitoring procedures set forth above are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for adult males.

293.     As set forth above, the monitoring procedures are reasonably necessary according to contemporary scientific principles, to enable Plaintiffs and members of the Class to obtain early detection and diagnosis of the cognitive impairments and conditions that they are at increased risks of developing as a result of Defendants' tortious conduct described herein.

294.     Plaintiffs and the members of the Class therefore seek an injunction creating a Court-supervised NFL-funded comprehensive medical monitoring program for Plaintiffs and the members of the Class, which would facilitate the early diagnosis and adequate treatment in the event a neurodegenerative disorder or disease is diagnosed in Plaintiffs or members of the Class.

295.     Plaintiffs and the members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury. Without a Court-supervised NFL-funded comprehensive medical monitoring program as described herein, the Plaintiffs and the members of the Class will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

296.     Plaintiffs and members of the Class seek the establishment of a Court-supervised fund to provide medical monitoring as a form of relief associated with a claim for negligence or other tortious conduct.

## COUNT VI
## Action for Fraudulent Concealment/Negligent Omission (On Behalf of a California Class)

297.     As an alternative to the allegation seeking a National Class, Plaintiffs plead a cause of action for the California Class for fraudulent concealment/negligent omission.

298.     Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

299.     This count is based upon Defendants' fraudulent concealment and negligent omission.

300.     The NFL has historically assumed an independent and voluntary duty to protect the health and safety of its players.

301.      The NFL has repeatedly confirmed its duty to take reasonable and prudent action to protect the health and safety of its players in the face of such known and foreseeable risks.

302.     By taking such steps to protect the health and safety of its players, a relation of trust and confidence between the NFL and its players existed, which gave rise to a duty upon the NFL not to conceal or misrepresent material information to its players.

303.     The NFL had superior knowledge of such material information concerning repeated traumatic head impacts and the increased risks to its players, such material information was not readily available to the Plaintiffs or members of the Class, and the NFL knew or should have known that the Plaintiffs and members of the Class were acting and playing based upon mistaken beliefs created by the NFL's concealment and misrepresentations.

304.     As alleged herein, the NFL intentionally concealed and misrepresented   material information concerning the increased risks of repeated traumatic head impacts and developing neurodegenerative disorders and diseases alleged herein.

305.     The NFL knew or should have known that the information it did provide was false, misleading and incomplete.  The NFL players, including Plaintiffs and members of the Class, did reasonably and justifiably rely upon the NFL and its duty not to conceal and misrepresent   material information.

306.     The NFL's concealment , omissions , and misrepresentations  was done for the purpose of suppressing and misrepresenting material information about the latent brain injury

risks of repeated head traumatic impacts in football, inducing former players, to act without taking adequate steps to prevent or mitigate the damage.

307.    The NFL's concealment, omissions, and misrepresentations were likely to mislead a reasonable NFL player, including Plaintiffs and members of the Class, who were acting reasonably under the circumstances.

308.    As a result of the NFL's fraudulent and negligent conduct as alleged herein, Plaintiffs and members of the Class were exposed to the increased risks as set forth above.

309.    As a result of the Defendants' fraudulent and negligent conduct as alleged herein, Defendants are liable to Plaintiffs and the Class members.

310.    Plaintiffs and the members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury. Without a Court-supervised NFL-funded comprehensive medical monitoring program as described herein, the Plaintiffs and the members of the Class will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

311.    As a result of the NFL's fraudulent and negligent conduct as alleged herein, Plaintiffs and the members of the Class are entitled to injunctive relief, as allowed by law, from the NFL in the form of a Court-supervised NFL-funded comprehensive medical monitoring program for Plaintiffs and the members of the Class, which would facilitate the early diagnosis and adequate treatment of brain injury for Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class pray for judgment with respect to their Complaint as follows:

1.   With respect to Counts I and II, certifying the National Class proposed in this Complaint pursuant to Fed. R. Civ. P. 23(b)(2);

2.   With respect to Counts I and II, granting an injunction for the requested medical monitoring relief;

3.   In the alternative, with respect to Counts III -VI, certifying the Florida and California Classes proposed in this Complaint pursuant to Fed. R. Civ. P. 23(b)(2);

4.   In the alternative, with respect to Counts III-VI granting an injunction for the requested medical monitoring relief for the Florida and California Classes;

5.   With respect to all counts, awarding Plaintiffs and Class members their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law;

6.   With respect to all counts, granting Plaintiffs and Class members such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all matters so triable.

Dated:  June 7, 2012

Respectfully Submitted:

Jeannine M. Kenney (PA # 307635)
HAUSFELD LLP
1604 Locust Street
Second Floor
Philadelphia, PA 19103
Phone: (215) 985-3270
Fax: (215) 985-3271
jkenney@hausfeldllp.com

*Plaintiffs' Liaison Counsel*
*on Behalf of All Undersigned*
*Counsel of Record*

Christopher Seeger
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Phone:  (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Sol Weiss
**ANAPOL SCHWARTZ**
1710 Spruce Street
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

*Plaintiffs' Co-Lead Counsel*

David Buchanan
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Phone:  (212) 584-0700
Fax: (212) 584-0799
dbuchanan@seegerweiss.com

Larry E. Coben
**ANAPOL SCHWARTZ**
1710 Spruce Street
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
lcoben@anapolschwartz.com

Thomas V. Girardi
Graham B. LippSmith
**GIRARDI KEESE**
1126 Wilshire Blvd
Los Angeles, CA 90017
Phone: (213) 977-0211
Fax: (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

Gene Locks
David Langfitt
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-3434
Fax: (215) 893-3444
glocks@lockslaw.com
dlangfitt@lockslaw.com

Steven C. Marks
Ricardo Martinez-Cid
**PODHURST ORSECK P.A.**
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com
rmartinez-cid@podhurst.com

*Plaintiffs' Executive Committee*

James R. Dugan, II
**THE DUGAN LAW FIRM**
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Phone: (504) 648-0180
Fax: (504) 648-0181
jdugan@dugan-lawfirm.com

Arnold Levin
**LEVIN FISHBEIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
**RODANAST, PC**
801 Estelle Drive
Lancaster, PA 17601
Phone: (717) 892-3000
Fax: (717) 892-1200
dnast@rodanast.com

Charles S. Zimmerman
**ZIMMERMAN REED PLLP**
1100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: (612) 341-0400
Fax: (612) 341-0844
charles.zimmerman@zimmreed.com

David S. Casey, Jr.
Fred Schenk
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD**
**LLP**
110 Laurel Street
San Diego, CA  92101-1486
Phone: (619) 238-1811
Fax: (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

Anthony Tarricone
**KREINDLER &**
**KREINDLER LLP**
277 Dartmouth Street
Boston, MA 02116
Phone: (617) 424-9100
Fax: (617) 424-9120
atarricone@kreindler.com

Michael L. McGlamry
**POPE, MCGLAMRY,**
**KILPATRICK**
**MORRISON & NORWOOD,**
**P.C.**
3455 Peachtree Road, NE
The Pinnacle, Suite 925
Atlanta, GA 30326-3243
Phone: (404) 523-7706
Fax: (404) 524-1648
efile@pmkm.com

David A. Rosen
**ROSE, KLEIN & MARIAS**
**LLP**
801 South Grand Avenue, 11th
Floor
Los Angeles, CA 90017-4645
Phone: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

Derriel McCorvey
**THE LAW FIRM OF**
**DERRIEL C. MCCORVEY**
1115 W. Main Street, Suite 14
P.O. Box 2473
Lafayette, LA 70501
Phone: (337) 291-2431
derriel@mccorveylaw.com

*Plaintiffs' Steering Committee*