## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | MDL No.  2323 No. 12-md-2323-AB |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION No. 1:12-CV-03140-RMB-JS |
| MICHAEL HADDIX, GREGORY BROWN, and LAWRENCE WATKINS, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC, | |
| Defendants. | |

### MEMORANDUM OF PLAINTIFFS IN SUPPORT OF MOTION TO REMAND AND FOR DISCOVERY IN AID OF REMAND

Plaintiffs, MICHAEL HADDIX, GREGORY BROWN and LAWRENCE WATKINS, by counsel, on behalf of themselves and all others similarly situated ("Plaintiffs"), respectfully submit this Memorandum in support of their motion to remand.

### I.  SUMMARY OF ARGUMENT

A.  The Defendants have failed to satisfy their burden of proof that this Court has subject matter jurisdiction.  Defendants' Notice of Removal is incomplete and deficient on its face, because it fails to prove as a "legal certainty" that CAFA jurisdiction is satisfied.  The Defendants' purported evidence in the form of affidavits has failed to prove that the class numbers more than 100 and that the total damages exceed $5,000,000.  Defendants have the burden of proof on both issues and have failed to provide sufficient information on either to

establish federal subject matter jurisdiction under CAFA.   To the contrary, the affidavits of Dennis L. Curran and Oscar L. Lopez, M.D. fail to establish to a "legal certainty" that there are or would be more than one hundred plaintiffs in the class and that the costs of the remedy would exceed $5,000,000.   For those reasons alone, the Court should remand the case to the Superior Court of New Jersey, Law Division, Camden County.

B.  The case should also be remanded because the claims do not arise from, are not dependent upon, and are not "inextricably intertwined" with any provision of any collective bargaining agreement.   As a result, there is no need for this Court to refer to any collective bargaining agreement at all, because the claims involve medical monitoring for latent neuro-cognitive injury that develops later in life, far past the class-members' retirement from professional football.   Neuro-cognitive injury of any kind, including latent and progressive injury, was never mentioned, acknowledged, or ever referenced in any collective bargaining agreement until 2011, and even then, the first lawsuits on the issue had already been filed.

C.  To the extent the Court determines that the arguments for remand are insufficient, Plaintiffs respectfully request that this Court allow discovery in aid of remand since factual issues are contested.   *See USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 197-98 (3d Cir. 2003)* (on appeal from an order denying remand and denying jurisdictional discovery, Court reversed and remanded for jurisdictional discovery), *cert. den., 541 U.S. 903, 124 S. Ct. 1602, 158 L. Ed. 2d 244 (2004).*   The specific discovery requested is set forth within this Memorandum.

## II.  **RELEVANT FACTS**

On March 21, 2012, Plaintiffs filed the Class Action Complaint ("Complaint") in the Superior Court of New Jersey, Law Division, Camden County.   [Docket, Document 1-2, p. 2] The Complaint alleges in summary that Plaintiffs and the class suffered head injuries and/or

concussions while playing in the National Football League ("NFL"). *Id.*, ¶ 2, p. 7. The Complaint alleges that the NFL was aware of the relevant risks but deliberately ignored and/or actively concealed this information. *Id.* The Complaint requests a New Jersey state medical monitoring class. *See, e.g., id.* [Docket, Document 1-2, Prayer for Relief C., p. 113]

The Plaintiffs brought this case as a <u>New Jersey class action</u> for a class consisting of "All retired or former professional football players domiciled in the State of New Jersey who were employed by any member club that was part of the association called the NFL, but who are not now salaried employees of the NFL or any member club, or who have already filed an individual action against Defendants." *Id.,* ¶ 22, p. 13. The Complaint sets forth three subclasses: the Non-Concussion Subclass, the Concussion Subclass and the Symptomatic Subclass. *Id.* at ¶¶ 23-25, pp. 13-14. The Complaint alleges that "[u]pon information and belief, Plaintiffs believe that there are less than 100 persons who would satisfy the definition of the Class as set forth herein." *Id.* at ¶ 28, p. 14.

The Complaint alleges six counts for relief all based upon state law: (Count I) Action Declaratory Relief – Liability; (Count II) Medical Monitoring; (Count III) Fraudulent Concealment; (Count IV) Fraud; (Count V) Negligent Misrepresentation; and (Count VI) Negligence. The Complaint nowhere incorporates, relies on or refers to any Collective Bargaining Agreements ("CBAs").

On May 25, 2012, Defendants NFL and NFL Properties LLC filed their Notice of Removal in the United States District Court for the District of New Jersey. [Document 1, p. 1] The Notice of Removal is based on two grounds: (1) the alleged application of the Class Action Fairness Act ("CAFA"), *28 U.S.C. § 1332(d)(2)* and (2) alleged federal question jurisdiction

based on complete preemption under Section 301 of the Labor Management Relations Act ("LMRA"). *See* Notice of Removal [Document 1, ¶¶ 5, 13, pp. 4, 10].

The Defendants' Notice of Removal relies on its standard argument for preemption under Section 301 of the LMRA; that is, the Defendants claim that the Court must interpret collective bargaining agreements ("CBA") that were allegedly operative during the careers of the three named Plaintiffs to adjudicate the rights and duties of the parties in connection with the Plaintiffs' claims. *See* Notice of Removal [Document 1, ¶¶ 3, 9, pp. 3, 6-7]. The Defendants also claim that the Court must look to and interpret the NFL Constitution and Bylaws for the very same purpose. *See id.*, ¶¶ 10, 12, pp. 7, 9-10. The CBAs were negotiated by the NFL Management Council and the NFL Players' Association ("NFLPA"); however, there is no evidence whatsoever – and the Defendants have not presented any -- that the NFL Constitution and Bylaws were ever negotiated or bargained for among the NFLPA or the players generally. To the contrary, the NFL Constitution and Bylaws are organizational documents for the NFL and its member Teams. They were not bargained for or negotiated with the players and, therefore, have no bearing on any issue related to alleged preemption under Section 301 of the LMRA.

The specific grounds alleged by Defendants for CAFA jurisdiction are the following:

- A class allegedly of approximately 240 members;

- Minimum diversity of citizenship;

- An aggregate amount in controversy of allegedly more than $5,000,000.

The specific grounds alleged by Defendants for preemption are the following:

- The rights Plaintiffs seek to vindicate were allegedly created by CBAs;

- The rights Plaintiffs seek to vindicate allegedly are **not** based on a duty owed to every person in society;

- The rights Plaintiffs seek to vindicate are allegedly inextricably intertwined with or substantially dependent on interpretation of CBAs.

The Defendants' allegations regarding CAFA are supported by two Certifications attached to the Notice of Removal.  The Certification of Dennis L. Curran alleges that NFL records show there are approximately 240 class members.  *See* Notice of Removal [Document 1-3, p. 2].  The Certification of Oscar L. Lopez, M.D. alleges that a standard baseline diagnostic examination costs between $6,200.00 and $8,600.00.  *See* Notice of Removal [Document 1-4, ¶ 6, p. 3]

### III.   **ARGUMENT**

#### A.  **The Defendants Have the Burden to Show Federal Court Jurisdiction.**

The NFL must prove jurisdiction in this Court.  *Meddles v. Warminister Volunteer Ambulance Corps, 2006 U.S. Dist. LEXIS 81759, *2-*3 (E.D. Pa., Oct. 27, 2006)* (citing *Samuel-Bassett v. KIA Motors America, Inc., 357 F.3d 392, 397 (3d Cir. 2004)*).  Removal statutes are to be "strictly construed against removal and all doubts should be resolved in favor of remand."  *Gaul v. Neurocare Diagnostic, Inc., 2003 U.S. Dist. LEXIS 546, *4 (E.D. Pa. Jan. 6, 2003)* (quoting *Steel Valley Auth. v. Union Switch & Signal Div., American Standard, Inc., 809 F.2d 1006, 1010 (3d Cir. 1987), cert. dismissed sub nom. American Standard, Inc. v. Steel Valley Auth., 484 U.S. 1021, 108 S. Ct. 739, 98 L. Ed. 2d 756 (1988)*).  The district court must "assume as true all factual allegations of the complaint."  *Gaul, supra, 2003 U.S. Dist. LEXIS 546 at *4* (quoting *Steel Valley Auth., supra*).

#### B.  **This Court Does Not Have CAFA Jurisdiction.**

A federal district court "must rigorously examine a matter removed under CAFA to ensure that it does not prematurely preclude a class action (in all but name) from the court's

jurisdiction." *State of West Virginia ex rel. McGraw v. Comcast Corp., 705 F. Supp. 2d 441, 449 (E.D. Pa. 2010)*. The same rigorous examination should be undertaken to prevent a class action that does not satisfy the requirements of CAFA from being wrongly removed to this Court. Applying that rigorous examination, this Court does not have jurisdiction under CAFA for two reasons: (1) the Defendants have failed to prove that the number of class members exceeds 100, and (2) the Defendants have failed to prove that the total amount in controversy exceeds $5,000,000. Defendants have the burden of proof on both issues under CAFA and have failed as to both. *Morgan v. Gay, 471 F.3d 469, 470 (3d Cir. 2006), cert. den., 552 U.S. 940, 128 S. Ct. 66, 169 L.Ed. 2d 243 (2007).*

*28 U.S.C. § 1332(d)* provides that a district court has original subject matter jurisdiction only over any civil action where minimal diversity is established, the number of members of all proposed plaintiffs in the aggregate is 100 or more, and the aggregated amount in controversy exceeds $5,000,000, exclusive of interests and costs. See *Kaufman v. Allstate N.J. Ins. Co., 561 F.3d 144, 149 (3d Cir. 2009)*. Plaintiffs take issue with the second two factors. Defendants allege that the plaintiff class in the aggregate is 100 or more and that the aggregated amount in controversy exceeds $5,000,000. The Defendants have the burden to prove both factual issues and have failed to carry that burden.

### 1. The Defendants Have Failed to Prove That the Class Is 100 Members or More.

Under CAFA, the district courts do not have original jurisdiction over any class action in which "the number of members of all proposed plaintiff classes in the aggregate is less than 100." *28 U.S.C.A. § 1332 (d)(5)(B)*. The Complaint alleges specifically that "[u]pon information and belief, Plaintiffs believe that there are less than 100 persons who would satisfy the definition of the Class as set forth herein." Complaint [Document 1-2, ¶ 28, p. 14]. With "the well-

established backdrop that the plaintiff is the master of her own claim and thus 'may limit [her] claims to avoid federal subject matter jurisdiction,'" and when an allegation in a state court complaint alleges that CAFA jurisdiction is not met, the party seeking removal must prove to a "legal certainty" that CAFA jurisdiction is satisfied. *Frederico v. Home Depot, 507 F.3d 188, 195 (3d Cir. 2007)* (footnote omitted); *see also Morgan v. Gay, 471 F.3d 469, 474 (3d Cir. 2006); Lowdermilk v. United State Bank Nat'l Assoc., 479 F.3d 994, 998-99 (9th Cir. 2007)* (citing with approval, *Morgan*).

In an effort to establish jurisdiction, Defendants have appended the Certification of Dennis L. Curran in Support of the Notice of Removal ("Curran Certification"). [Document 1-3] Mr. Curran states in a conclusory fashion that according to "the NFL's records", there are "approximately 240 former players" (without providing the actual number) who meet the definition of the proposed class. Curran Certification [Document 1-3, ¶ 2, p. 2]. Mr. Curran's Certification fails to satisfy Defendants' burden, because he (a) fails to identify the players who would be members of the class or the teams for which they played, (b) fails to identify the records he reviewed, if any, to make his determinations,(c) does not state how he determined the players' "domiciles" for purposes of justifying his count of "approximately 240 former players", (d) fails to state how (or if) he has personal knowledge of whether the players he assumes are within the class are salaried employees of "any member club", and (e) fails to state what records, if any, he reviewed to determine whether any of the players whom Mr. Curran assumes are in the class have filed personal injury lawsuits against the Defendants (and, therefore, cannot be class members). ,

For these reasons, the Curran Certification is insufficient to establish that the class exceeds 100 members. *See, e.g., Hedrick v. CitiMortgage Inc., Civ. Action No. 2:12-cv-00537,*

*2012 U.S. Dist. LEXIS 58348, \*6-7 (S.D.W.V. Apr. 26, 2012)*(granting remand finding that affidavit by defendant was ambiguous and over-inclusive); *Freebird, Inc. v. Cimarex Energy Co., 499 F. Supp. 2d 283, 1286 (D. Kan. 2008)* (granting remand finding that the defendants' "affidavit was not sufficient because it did not set forth underlying facts to support its assertions"). All the uncertainties and ambiguities in the Curran Certification fail to establish to a "legal certainty" that removal was proper. To the contrary, the failure of Curran to provide even the most basic support for his assertions compels remand. *See Gaul, supra.* Accordingly, Defendants have failed to meet their burden to prove that the removal was proper, and Plaintiffs' motion for remand should be granted.

At the very least, this Court is left with two conflicting sworn estimates of the size of the New Jersey class. Thus, should this Court find that remand may not be ripe, Plaintiffs request that they be allowed <u>discovery</u> to try to resolve this conflict. The discovery would begin with production of documents providing the above missing information about each of the alleged approximately 240 former players. Discovery would also include the deposition of Mr. Curran to explore the records on which he purportedly relied and, for example, to determine why Mr. Curran thinks that all approximately 240 are still living, are domiciled in New Jersey, have not filed a pending personal injury suit against the Defendants, and are not now employed by the Defendants.

### 2. The Defendants Have Failed to Prove that the Amount in Controversy Exceeds $5,000,000.

Under CAFA, district courts have original jurisdiction in a case "in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs ...." *28*

*U.S.C.A. § 1332 (d)(2)[1]*.   The claims of individual class members shall be aggregated to determine the matter in controversy. *28 U.S.C.A. § 1332 (d)(6)*.   The Complaint does not allege a specific amount for the matter in controversy.

In an effort to establish jurisdiction, Defendants have appended the Certification of Oscar L. Lopez, M.D. in Support of the Notice of Removal ("Lopez Certification").   [Document 1-4]. Dr. Lopez estimates the cost of the standard baseline diagnostic examination for an individual at risk for, or who has symptoms of, cognitive impairment.   *See* Lopez Certification [Document 1-4, ¶ 6, p. 3].   Dr. Lopez's conclusion is that the total cost can be between $6,200 and $8,600.   *Id.* Defendants take the minimum estimate and multiply it by 240 class members to reach a total of over $1,400,000.   Notice of Removal [Document 1 at ¶ 29, p. 15].

Dr. Lopez's Certification requires <u>discovery</u>.   The Lopez Certification is dated May 16, 2012.   Twelve days earlier, Dr. Lopez signed a similar Declaration in *LeMaster v. National Football League*, E.D. Pa. No. 2:12-CV-02464-AB ("Lopez LeMaster Declaration"), copy attached hereto as Exhibit A.   In between those two dates, Dr. Lopez has increased by $200 the highest cost of the standard baseline diagnostic examination.   *Compare* Lopez LeMaster Declaration at ¶ 6, p. 9 (Exhibit A), and Lopez Certification [Document 1-4, ¶ 6, p. 3].   All costs of individual tests, however, are the same in both documents.   At a minimum, the discrepancy shows that Dr. Lopez is estimating costs.   Those estimates should be subject to discovery and scrutiny.

Even if accepted by the Court, the evidence Dr. Lopez provides does not prove with any certainty that the amount in controversy exceeds $5,000,000.   First, the class size itself is hotly

---

[1] Should this Court find that Defendants have failed to meet their burden of establishing to a "legal certainty" that the classes exceed 100 persons, the Court does not have to reach the issue of whether the amount in controversy exceeds $5,000,000.

contested.  If the Court determines that Defendants have failed to meet their burden and that the class, as pled in the Complaint, is less than 100 members, then a baseline examination of 99 people times $6,200 (the minimal amount provided by Dr. Lopez) totals $613,800, which is only 12% of $5,000,000.  Thus, on this issue alone, Defendants have failed to demonstrate that this Court has jurisdiction.

Even if the Court were to accept that the class size is "approximately 240 former players," the baseline examinations total only $1,488,000, which is over $3,512,000 short of the minimum jurisdictional amount.  Defendants do not offer any evidence of how the class is seek (and will possibly obtain) the difference.  Absent such evidence, the Defendants have failed to bear their burden of proof on jurisdiction, and the Court should remand the case to New Jersey State Court in Camden County.

Dr. Lopez's alleged "general costs" (Lopez Certification [Document 1-4, ¶ 6, p. 3]) are undefined and set in ranges.  As a result, the Court and parties are forced to speculate whether the costs are typically elevated charges that medical facilities seek to obtain from patients, health insurers and/or Medicare and/or Medicaid, or whether they are actual reimbursements or costs obtained from patients and third-party payors. *See Anthony C. Mengine Law, Inc. v. Healthport, 695 F. Supp. 2d 225,  (W.D. Pa., Feb. 13, 2010)*(granting remand and rejecting defendant's affidavit that failed to indicate costs "actually and reasonably incurred", rather than the "invoiced cost").  The differences are often substantial.

In addition, Dr. Lopez states that two expensive tests, namely a cerebrospinal fluid examination and a positron emission tomography scan ("PET") (together "costing" a minimum of $3,000 or almost half of Dr. Lopez's minimum total of $6,200) may or may not have to be conducted.  This lack of certainty by Dr. Lopez shows that his cost numbers are uncertain and

possibly far lower than the Defendants speculate they might be.  As a result, the Defendants'
own evidence (a) fails to prove that the amount in controversy exceeds $5,000,000 and (b)
supports the Plaintiffs' position that it more likely far less.[2]

Although the Defendants mention additional follow-up examinations will be required for
individuals who have symptoms of cognitive impairment (Lopez Certification [Document 1-4, ¶
7, p. 3], Dr. Lopez fails to provide any estimate of those costs.  For that reason, Defendants have
failed to bear their burden of proof.  *See id.*  Defendants also claim that there will be
administrative costs, but provide no estimate of those costs.  *See* Notice of Removal [Document
1, ¶ 29, p. 15].  In any event, the CAFA amount in controversy requirement explicitly excludes
interest and costs.  *28 U.S.C.A. ¶ 1332 (d)(2).*

For all of the reasons set forth above, Dr. Lopez's Declaration fails to prove anything
other than the amount in controversy is probably far lower than the $5,000,000 threshold, and
that Defendants have failed to satisfy their burden to establish jurisdiction.  *See Lohr v. United
Fin. Cas. Co., CA No. 09-752, 2009 U.S. Dist. LEXIS 75388, *14-17 (W.D. Pa., Aug. 25,
2009)*(granting remand and rejecting "unsupported assumptions" in defendants' declaration,
which "mathematically extrapolates" the number of putative class members and failed to provide
any factual information on the putative class members themselves); *see also Mengine Law, Inc.,
supra* (defendant's ambiguous affidavit "failed to adequately prove that plaintiffs' claim can
meet the $5,000,000 amount in controversy threshold"); *White v. Impac Funding Corp., Case
No. 10-cv-1780, 2011 U.S. Dist. LEXIS 24089, *14-15 (M.D. Fla. Feb. 15, 2011)* (granting
remand where "Defendant's affidavit contains no indication of the cost defendant actually and

---

[2] Eliminating these tests that "possibly" may be done lowers the minimum amount of medical monitoring, according to Dr. Lopez, to $3,200.  Multiplied by the largest potential class size as alleged in the Complaint of 99 persons, totals $316,800 – only 6% of the jurisdictional limit of $5,000,000.

reasonably incurred, granting remand and rejecting defendants' resort to "averages", assumptions and customs, and their attempt at "[c]obbling these assumption and averages together").

Defendants point to compensatory and punitive damages, without giving any estimate of the amount of either category and for whom those damages would apply. *See* Notice of Removal [Document 1, ¶ 29, p. 15].   However, the Complaint requests compensatory and punitive damages only for the Symptomatic Subclass. *See* Complaint [Document 1-2, Prayer for Relief E., p. 113].   Absent evidence of the size of that subclass and the exact nature of the subclass members' conditions, Defendants cannot estimate the amount of compensatory and punitive damages in controversy.   Their assertions are speculative and insufficient. *See Morgan, supra, 471 F.3d at 475* ("the defendants simply failed to prove what possible exposure existed with respect to punitive damages so as to satisfy any portion of the $5 million amount in controversy requirement"); *see also Rhoades v. Progressive Cas. Ins. Co., Case No. 10-cv-1788, 2010 U.S. Dist. LEXIS 111026, 15 (E.D. Cal. Oct. 8, 2010)*(granting remand finding that "[s]ince it is unclear how many class members would be entitled to the referenced damages, Defendant's damages assumptions are unsubstantiated").

For the foregoing reasons, the Defendants have failed to prove as a "legal certainty" that the amount in controversy exceeds $5,000,000.   That finding alone requires remand.   If the Court find that more information is warranted, Plaintiffs request <u>discovery</u> of the allegations set forth in the Lopez Certification, including, for example, the basis of the estimates provided and the necessity and cost of any additional follow-up examinations.

### C.  This Case is Not Preempted by Section 301.

#### a.  General Standards for Section 301 Preemption.

The "well-pleaded complaint rule" provides that federal jurisdiction is present only when a federal question is presented on the face of the complaint. *Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 2429, 96 L. Ed. 2d 318, 327 (1987)* (citation omitted).  The plaintiff is the master of his or her claim: federal jurisdiction may be avoided by exclusive reliance on state law. *Id.* (footnote omitted).  Complete preemption is an independent corollary to the well-pleaded complaint rule, and converts a state law complaint into a federal claim in cases that raise Section 301 preemption. *Id., 482 U.S. at 393, 107 S. Ct. at 2430, 96 L. Ed. 2d at 327-328.* "In order for there to be § 301 preemption, the plaintiff must plead an action that requires interpretation of the collective bargaining agreement." *Henderson v. Merck & Co., Inc., 998 F. Supp. 532, 537 (E.D. Pa. 1998)* (citation omitted).  The Supreme Court stated that preemption exists if the court determines that the claim is "inextricably intertwined" with the CBA, *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213, 105 S. Ct. 1904, 1912, 85 L. Ed. 2d 206, 216 (1985)*, or that the claim is "substantially dependent on analysis" of a CBA. *Caterpillar, supra, 482 U.S. at 394, 107 S. Ct. at 2431, 96 L. Ed. 2d at 328* (citation omitted).  In either case, the court must analyze the CBA and compare it to the plaintiffs' claims (that is, the facts and circumstances of the plaintiffs' allegations).

A state law claim is not preempted, even if it addresses the same set of facts as the CBA, as long as resolution of the state law claim does not require interpretation of the CBA. *See Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 410, 108 S. Ct. 1877, 1883, 100 L. Ed. 2d 410, 421 (1988).* A dispute that only tangentially involves a CBA may not be preempted. *See id., 486 U.S. at 413 n. 12, 108 S. Ct. at 1884 n. 12, 100 L. Ed. 2d at 423 n. 12.* Section 301

"cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law...." *Kline v. Security Guards, Inc., 386 F.3d 246, 254 (3d Cir. 2004)* (quoting *Livadas v. Bradshaw, 512 U.S. 107, 122-24, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994)*).

Section 301 preemption is narrow.  The Third Circuit has interpreted *Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Automobile, Aerospace, Agricultural Implement Workers of America, Int'l Union, 523 U.S. 653, 118 S. Ct. 1626, 140 L. Ed. 2d 863 (1998)* as taking "a very narrow view of federal jurisdiction under section 301," and as signaling "a narrow approach to section 301 jurisdiction."  *Voilas v. Local # 731, Int'l Union, United Automobile Aerospace and Agricultural Implement Workers of America, 170 F. 3d 367, 375 n. 1 (3d Cir. 1999)*.  The Court further said that *Textron* "suggests a correspondingly narrow scope for [Section 301] preemption." *Id.*

### b. **Section 301 Does Not Apply To This Case.**

Defendants make three arguments in their Notice of Removal to justify complete preemption under Section 301.  None has merit.

One argument is that the rights Plaintiffs seek to vindicate "were created by the CBAs...."  Notice of Removal [Document 1, ¶ 12, p. 9].  Defendants are absolutely wrong.  First, CBAs are not mentioned in the Complaint. All six Counts in the Complaint are traditional state law torts: declaratory relief – liability, medical monitoring, fraudulent concealment, fraud, negligent misrepresentation and negligence.  Second, the CBAs do not mention in any provision or any negotiated duty by the NFL relating to latent neuro-cognitive injury that arises later in life as a result of repetitive head impacts in NFL games and practices.  Further, since the NFL relies on the CBAs as the source for its duties to the Plaintiffs (and presumably the Plaintiffs' rights to sue the NFL for latent neuro-cognitive injuries), <u>discovery</u> is needed to learn the provisions of

the CBAs on which Defendants rely and how those provisions allegedly created Plaintiffs' rights and the NFL's duties in connection with the latent neuro-cognitive injuries from which Plaintiffs now suffer. Discovery is needed regarding the negotiation process of any specific CBA at issue and whether anyone within that process ever thought that latent neuro-cognitive injuries were a subject of collective bargaining. The NFL alludes to and selectively quotes from excerpts of CBAs, but failed to attach copies of the CBAs to the Notice of Removal.

If Defendants attempt to rely on CBAs from 1968 to 2011 as the source for these state law torts, <u>discovery</u> is needed to learn the exact language of the different CBAs on which Defendants rely, and how the CBAs allegedly created the Plaintiffs' rights. For example, one Plaintiff, Lawrence Watkins, played in the NFL from 1969 to 1977. Complaint [Document 1-2, ¶ 9, p. 9]. Mr. Watkins, therefore, played for part of his career under the 1968 CBA, as Defendants admit. Notice of Removal [Document 1, ¶3 n.1, pp. 3-4]. The 1968 CBA is a thin document that has more to do with player travel stipends than duties the NFL may or may not have undertaken to its players, and it is devoid of any language to support the Defendants' argument. *See* 1968 CBA, attached as Exhibit B. Most likely, that is why the Defendants failed to attach the 1968 CBA to the Notice of Removal.

At paragraph 10, page 7 of their Notice of Removal, the Defendants contend: "[f]or example, adjudicating Plaintiffs' claims will hinge on an interpretation of provisions of the CBAs relating to player medical care", yet there is no reference to player medical care in the 1968 CBA. In the listing of examples, the Defendants fail to provide one citation to the 1968 CBA. Many of the alleged citations to CBAs in the paragraph of the Notice of Removal are actually to the NFL Constitution or Bylaws. *See* Notice of Removal [Document 1, ¶ 10, pp. 7-8]. None of the provisions cited refer to neuro-cognitive injuries of any kind, including but not

limited to latent disease caused by repetitive head impacts.  The Defendant's reference to the NFL Constitution and Bylaws has no basis, because the Defendants fail to attach those documents and provide no evidence that the Constitution and Bylaws were part of the collective bargaining process between the NFL and the players or were ever bargained for by the players in negotiations.

The Defendants also make the unsupported assertion that the rights Plaintiffs seek to vindicate are not based on an independent duty "owed to every person in society," citing *United Steelworkers of America, AFL-CIO-CLC v. Rawson, 495 U.S. 362, 371, 110 S. Ct. 1904, 1910, 109 L. Ed. 2d 362, 374 (1990)*.  Notice of Removal [Document 1, ¶ 12, p. 9].  Defendants do not state or explain why the duties set forth in the Complaint are not owed to every person in society.  For example, the Defendants fail to explain why they do not to owe to persons generally (a) the duty to disclose long-term neuro-cognitive risks associated with repetitive head impacts in the game of football or (b) the duty not to falsify and misrepresent the truth of those risks.  The Defendants fail to explain how they do not owe those duties to all persons (including children and their families) who play football at every level of the game.  <u>Discovery</u> is required on this issue, so Plaintiffs can determine why Defendants claim that the duties set forth in the Complaint are not owed to every person in society.

Moreover, the Defendants' assertion that the duty must be owed to every person in society is incorrect.  The court in *Stringer v. National Football League, 474 F. Supp. 2d 894, 908 (S.D. Ohio 2007)* rejected that argument based on *Rawson* and concluded that the relevant inquiry was "not to whom the duty is owed, but how it came into being."  The court in *Jurevicius v. Cleveland Browns Football Co. LLC, 2010 U.S. Dist. LEXIS 144096, *14-*15 (N.D. Ohio, March 31, 2010)* agreed with *Stringer*.

There are additional related issues that the Defendants have ignored.  Defendants do not admit that some claims arise out of periods not governed by CBAs, even though for fifty percent (50%) of the years at issue no CBA existed.  Before 1968, there was no CBA.  From 1974 to 1977, there was a strike.  From 1987 to 1993 there was no CBA and no union.  Preemption cannot apply when there is no CBA.  For these reasons, the Defendants have used a broad-brush preemption argument that is contrary to fact in the hope that the Court will ignore factual arguments and focus solely on an abstract legal issue.  No legal issue, however, can be decided in a vacuum.  When there was no CBA for over 50% of the time period at issue, <u>discovery</u> is required to determine whether as a factual matter there are class members whose claims could not be subject, under any circumstances, to a preemption analysis and/or determination, because they never played under a CBA.

The Defendants' lone reference to the NFL Constitution and Bylaws (*see* Notice of Removal [Document 1, ¶¶ 10, 12, pp. 7-8, 9-10]), is spurious.  These documents were not the result of collective bargaining with Plaintiffs, their representatives, or any players, so they cannot be within any CBA.  Contrary to the Defendants' contention, there is no CBA that states that it "adopts" or "incorporates" those documents by reference.  To the contrary, as an example, the 1970 CBA carefully separates the NFL Constitution and Bylaws from the CBA:

> <u>The provisions of this Agreement</u> and the provisions of the Agreement entered into by the parties on July 10, 1970, incorporated by reference herein, <u>supersede any conflicting provisions now existing or which shall exist during the life of the Agreement in the NFL Constitution and Bylaws,</u> the Standard Player Contract, the Bert Bell NFL Player Retirement Plan and Trust Agreement, and any other document affecting the wages, hours or working conditions of NFL players.

1970 Collective Bargaining Agreement, Article II, Section 2, Governing Agreement.  *See* Exhibit C, attached.  For this reason, the Defendants' argument is wholly mistaken.

-17-

As to many other references to CBA provisions, Discovery is needed to determine the basis for the NFL's position that they support preemption.  In the Notice of Removal, Defendants list certain provisions as examples.  *See* Notice of Removal [Document 1, ¶ 10, pp. 7-8].  None of these sections refers to concussions, repetitive head impacts, latent neuro-cognitive injury, or early onset of dementia and encephalopathy.  In fact, not until August, 2011 does any CBA refer to "neuro-cognitive" injuries, and that CBA was negotiated and signed after the first brain injury lawsuits were filed.

The NFL, therefore, seeks to contort all of the pre-2011 CBAs as allegedly creating "rights" for players and "duties" of the NFL that would purportedly cover latent neuro-cognitive damage arising from repetitive head impacts in NFL games and practices.  The Defendants advance this argument notwithstanding the fact that the NFL aggressively refused to recognize until August 2011 that any such injuries were connected to or caused by the game of football.  In fact, the NFL propagated falsified industry-funded studies that claimed that there was **no link** between repetitive head impacts in NFL games and practices and early onset of neuro-cognitive injury and decline.  For this reason, the Defendants' position makes no sense: they cannot claim that the CBAs cover rights and duties regarding an injury caused by NFL football when throughout the years of every CBA the NFL took a position that no such injury ever occurred during its games and practices.

If the Court disagrees, Plaintiffs respectfully request leave to take discovery regarding the Defendants purported basis that the pre-2011 CBAs address Plaintiffs' rights (and the NFL's duties) regarding the head impacts and latent neuro-cognitive injuries sustained by Plaintiffs.  Discovery is needed to determine why the pre-2011 CBAs that do not mention these issues, yet allegedly create rights and duties that directly address them.  The discovery should include

identification of the drafters and negotiators and production of the relevant drafting documents. This review of CBAs to determine whether or not interpretation is needed of the CBAs is "inherently strained," *Henderson, supra, 998 F. Supp. at 537,* but permissible. *See Kline, supra, 386 F.3d at 256* ("the mere fact that we must look at the CBA in order to determine that it is silent on any issue relevant to Appellants' state claims does not mean that we have 'interpreted' the CBA").

### c. Plaintiffs' Claims are Not Inextricably Intertwined With or Substantially Dependent on an Interpretation of the pre-2011 CBAs.

The NFL's main argument for Section 301 preemption is that Plaintiffs' claims are "inextricably intertwined" with or "substantially dependent" on interpretation of CBAs. *See* Notice of Removal [Document 1, ¶ 9, pp. 6-7]. This requires a claim by claim analysis. *See Henderson, supra, 998 F. Supp. at 537* ("I must turn to the particular claims raised in Henderson's complaint and determine whether resolution of these claims requires interpretation of the collective bargaining agreements"). Unless the state law cause of action arose from a CBA, is dependent on an analysis of a CBA, or is "inextricably intertwined" with the terms of a CBA, Section 301 does not preempt the cause of action. *See e.g. Bartholomew v. AGL Res., Inc., 361 F.3d 1333, 1338 (11th Cir. 2004)* (referring to *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 213 (1985). *See also DeCoe v. General Motors Corp., 32 F.3d 212, 216-17 (6th Cir. 1994* ("A tort claim will be preempted if: (1) it arose from the CBA or (2) resolution of the claim is substantially dependent on an analysis of the terms of the CBA, or is inextricably intertwined with it").

A review of Plaintiffs' claims shows that they do not arise from, are not "inextricably intertwined" with, and are not "substantially dependent" on an interpretation of any CBA.

### 1. **Count I: Action for Declaratory Relief – Liability**

Count I requests four declarations of liability: (1) in summary, that the NFL knew or should have known of the risks of repeated traumatic brain and head impacts; (2) that the NFL had a duty to advise Plaintiffs and the Class of these risks; (3) that the NFL willfully and intentionally concealed these risks and misled Plaintiffs and the Class, and (4) that the NFL recklessly endangered Plaintiffs and the Class. Complaint [Document 1-2, ¶ 204, pp. 104-105]. There is no basis for linking these requested declarations to the CBAs. There is no language in the CBAs addressing repeated traumatic brain and head impacts.

Even though there is no language linking the requested declarations with CBAs, Defendants may nevertheless try to link them. To the extent that Defendants attempt to find a basis for this or any of the other counts of the Complaint in CBAs, Plaintiffs respectfully request discovery to determine the alleged linkage. More specifically, discovery is required to determine the true purpose of the provisions on which the NFL relies, and why there is an absence of any reference to head impacts and latent neuro-cognitive injury until the 2011 CBA.

### 2. **Count II: Medical Monitoring.**

Count II requests medical monitoring because Plaintiffs have a heightened risk of latent and progressive neuro-cognitive injury and related conditions. Complaint [Document 1-2, ¶ 216, p. 106-07]. Medical monitoring facilitates diagnosis and treatment. *Id.* The NFL has no basis to allege that medical monitoring is provided for in the CBAs. There is no provision of any CBA that even approaches that concept, right, or duty.

The seminal New Jersey case setting forth medical monitoring is *Ayers v. Township of Jackson, 106 N.J. 557, 606, 525 A.2d 287, 312-13 (1987).* The right to medical monitoring as set forth in *Ayers* and subsequent cases is totally independent of any CBAs.

### 3. **Count III: Fraudulent Concealment.**

Count III alleges fraudulent concealment of facts and information which caused the Plaintiffs and the Class to become exposed to the harm previously described. Complaint [Document 1-2, ¶219, p. 107]. By its very nature, fraudulent concealment alleges that significant information was withheld. By definition, significant information withheld could not have been negotiated as part of any CBA.

### 4. **Count IV: Fraud.**

Count IV alleges fraud based on the NFL's material misrepresentations that "there was no link between concussions and later life cognitive/brain injury, including CTE and its related symptoms." Complaint [Document 1-2, ¶ 223, p. 108]. This is an allegation of affirmative statements by the NFL. These affirmative statements are alleged specifically in the Complaint. *See, e.g.,* Complaint [Document 1-2, ¶ 123, p. 90] (statement about lack of increased risk by the NFL's Mild Traumatic Brain Injury Committee). None of the affirmative statements are connected in any way to a CBA, and there is no basis for the NFL's attempt to link the fraud claim to any provision in the CBAs

The Third Circuit's cases deny preemption of fraud counts, unless the claim is based on the specific subject matter of a CBA. That circumstance does not apply here: the pre-2011 CBAs contain no language that references head injuries, repetitive concussive and sub-concussive impacts, and latent neuro-cognitive injury. *See Trans Penn Wax Corp. v. McCandless, 50 F.3d 217, 232) (3d Cir. 1995)* (fraud not preempted; "[a]n examination of the employer's behavior, motivation, and statements does not substantially depend upon the terms of the collective bargaining agreement"); *Voilas, supra, 50 F.3d at 378* (fraud not preempted; "[i]n sum, the fraud claim in this case is not directly based upon the collective bargaining agreements

in force between the parties; nor will the resolution of the elements of common-law fraud require the interpretation of those bargaining agreements." *Id., 170 F.3d at 378. See also Berda v. CBS, Inc., 881 F.2d 20, 26-28 (3d Cir. 1989)* (holding fraud claims not preempted), *cert. den., 493 U.S. 1062, 110 S. Ct. 879, 107 L. Ed 2d 962 (1990). Cf. Beidleman v. The Stroh Brewery Co., 182 F.3d 225, 234 (3d Cir. 1999)* (Court holds fraudulent misrepresentation preempted where the essence of the claim is that employees were denied their rights under a specific agreement).

Cases involving claims against the NFL for football-related injuries also hold that fraud claims are not preempted. *See Jurevicius, supra, 2010 U.S. Dist. LEXIS 144096 at *38-*39; Bentley v. Cleveland Browns Football Co., LLC 194 Ohio App. 3d 826, 832, 958 N.E.2d 585, 589 (Ct. Appeals), discretionary appeal not allowed, 130 Ohio St. 3d 1476, 957 N.E. 2d 1168 (2011), cert. den., __ U.S. __, __ S. Ct. __, 182 L.Ed. 2d 808 (2012).*

### 5. Count V: Negligent Misrepresentation.

Count V alleges negligent misrepresentation from statements made by the NFL's Mild Traumatic Brain Injury Committee about the dangers players face from repetitive traumatic head impacts. *See* Complaint [Document 1-2, ¶ 230, p. 109]. As with the fraud claim, statements upon which Plaintiffs (as retired NFL players) relied occurred decades after the early CBAs, which never addressed any issue relating to repetitive traumatic head impacts and neuro-cognitive injury. None of these negligent misrepresentations is set forth in any CBA or in any way could be related to a CBA, which never addressed these issues.

Cases involving claims against the NFL for football-related injuries hold that negligent misrepresentation claims are not preempted. *See Jurevicius, supra, 2010 U.S. Dist. LEXIS 144096 at *37-*38* ("The duty underlying negligent misrepresentation is a duty owed by any professional to any person acting in justifiable reliance on that professional. The CBA does not

create this requirement."); *Bentley, supra,* 194 Ohio App. 3d at 832, 958 N.E.2d at 589 (follows *Jurevicius*).   The facts of *Atwater,* a case on which the Defendants rely, were completely different from the facts here.   In *Atwater,* the complaint was based on claims arising from a Financial Advisors Program that was directly connected with an NFL CBA.   *See Atwater, supra, 626 F.3d at 1174-75.*   When the court found preemption of plaintiff's claim for negligent misrepresentation in *Atwater, supra, 626 F.3d at 1182-83,* it based its decision on a reference in the relevant CBA to a Career Planning Program.   Here, there is no reference at all to repetitive traumatic head impacts and latent neuro-cognitive injury that manifests long after the NFL player's career is over.   For that reason alone, *Atwater* does not apply to this case at all.

### 6.  Count VI: Negligence.

Count VI alleges that the NFL breached an independently and voluntarily-assumed duty to its players to make rules that would protect their health and safety by failing to implement mandatory rules to minimize adverse consequences from repetitive traumatic head impacts and/or concussions, and to prevent such players from returning to play football too soon or at all. *See* Complaint [Document 1-2, ¶¶ 240-244, pp. 110-111].   The Complaint alleges additional eight additional specific failures that violated the NFL's voluntarily assumed duty.    *Id.* [Document 1-2, ¶ 245, pp. 111-12].   These include (1) the failure to require that an adequate concussive brain injury history be taken; (2) the failure to accurately diagnose and record sub-concussive and concussive brain injuries; (3) the failure to establish guidelines, policies and procedures regarding identification and treatment of sub-concussive and concussive brain injury; (4) the failure to establish proper return-to-play criteria for players who suffered sub-concussive and concussive brain injury; (5) the failure to approve and use the equipment most likely to reduce the risk of sub-concussive and concussive brain injury; and (6) the failure to provide

appropriate information to NFL personnel regarding sub-concussive and concussive brain injuries. *Id.* Neither the duty voluntarily assumed by the NFL nor the rights of Plaintiffs that arise from the breach of that duty can be found anywhere in any CBA.

The NFL's duty, in fact, arises from the common law, because the NFL voluntarily and historically assumed a duty as the guardian of player safety both before and after Plaintiffs retired. The conclusion that the duty arises from the common law and not from an interpretation of a CBA is supported by the doctrine that a state law claim is not preempted even if it addresses the same facts as a CBA, so long as resolution of the state law claim does not require interpretation of the CBA. *See Lingle, supra, 486 U.S. at 409-10, 108 S. Ct. at 1883, 100 L. Ed. 2d at 421.* At most, this dispute tangentially involves a CBA, see *id., 486 U.S. at 413 n. 12, 108 S. Ct. at 1884 n. 12, 100 L. Ed. 2d at 423 n. 12,* but only to the extent the Court must consult it to determine that it does not apply.

The conclusion of no preemption is supported by the admonition not to read Section 301 broadly to preempt non-negotiable rights conferred on employees as a matter of state law. *See Kline, supra, 386 F.3d at 254* (quoting *Livadas*). The conclusion of no preemption is also supported by the Third Circuit's interpretation of *Textron* as signaling a narrow approach to Section 301 jurisdiction, and suggesting a correspondingly narrow scope for Section 301 preemption. *See Voilas, supra, 170 F.3d at 375 n. 1.*

The conclusion of no preemption is also supported by football injury cases holding that negligence was not preempted. *See Hendy v. Losse, 1991 U.S. App. LEXIS 2141 (9th Cir. 1991)* (Memorandum; unpublished) (negligent hiring and related claims against the San Diego Chargers not preempted in case challenging care given by team physician); *Jurevicius, supra, 2010 U.S. Dist. LEXIS 144096 at *32-*37* (negligent failure to warn and failure to undertake

proper procedures not preempted in case challenging hazardous condition at training facility); *Brown, supra,* 219 F. Supp. 2d at 375, 389 (claim regarding NFL referee who threw a weighted penalty flag that hit plaintiff's eye not preempted).

Other NFL cases that have held that negligence has been preempted because the claim was inextricably intertwined with a CBA are distinguishable. *See, e.g., Atwater, supra,* 626 F.3d at 1179-81 (case involving Financial Advisors Program, where duties arose directly from a CBA); *Stringer, supra* (heatstroke).

For the foregoing reasons, the NFL has not established that the negligence cause of action – particularly the duty – is connected to any CBA. If such a duty arose from, was dependent on, or was intertwined with a CBA provision, the NFL would have cited a specific provision that referred to latent and ongoing neuro-cognitive injuries that manifest long after the careers of NFL players are over and for which the Plaintiffs would require medical monitoring. The NFL would have quoted that provision on the first page of its Removal Petition. The NFL failed to provide the relevant quotation, because none exists.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs Michael Haddix, Gregory Brown and Lawrence Watkins respectfully request that this Court remand the case to the Superior Court of New

Jersey, Law Division, Camden County.   In the alternative, prior to ruling on this Motion, Plaintiffs respectfully request that the Court permit discovery as outlined above in aid of the Motion to Remand.

Respectfully submitted,

Dated: June 25, 2012

/s/ Gene Locks
LOCKS LAW FIRM, LLC
Gene Locks, Esquire
Michael A. Galpern, Esquire
Karl Friedrichs, Esquire
Jonathan W. Miller, Esquire
457 Haddonfield Road, Suite 500
Cherry Hill, NJ 08002
856-663-8200 (tel.)
856-661-8400 (fax)
glocks@lockslaw.com
mgalpern@lockslaw.com
kfriedrichs@lockslaw.com
jmiller@lockslaw.com

and

Craig R. Mitnick, Esquire
Mitnick Law Offices
35 Kings Highway East
Haddonfield, NJ 08033
856-427-9000 (tel.)
856-427-0360 (fax)

*Attorneys for Plaintiffs*