1  FRED D. HEATHER - State Bar No. 110650
   fheather@glaserweil.com
2  ADAM LEBERTHON - State Bar No. 145226
   aleberthon@glaserweil.com
3  MARY ANN T. NGUYEN - State Bar No. 269099
   mnguyen@glaserweil.com
4  GLASER WEIL FINK JACOBS
     HOWARD AVCHEN & SHAPIRO LLP
5  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
6  Telephone:  (310) 553-3000
   Facsimile:   (310) 556-2920
7
   THOMAS V. GIRARDI - State Bar No. 36603
8  GRAHAM B. LIPPSMITH - State Bar No. 221984
   CELENE S. CHAN - State Bar No. 260267
9  GIRARDI KEESE
   1126 Wilshire Boulevard
10 Los Angeles, California 90017
   Telephone: (213) 977-0211
11 Facsimile: (213) 481-1154

12 Attorneys for Plaintiffs
   Johnnie Morton, et al.
13

14            UNITED STATES DISTRICT COURT

15          EASTERN DISTRICT OF PENNSYLVANIA

16
   JOHNNIE MORTON; KEZ              MDL No. 2323
17 MCCORVEY; KURT BARBER; MIKE
   SHERRARD; STOCKAR MCDOUGLE       Master Case No. 12-md-2323
18 and his wife, OCTAVIA MCDOUGLE;  Individual Case No. 2:12-cv-05435
   TOI COOK and his wife, KRISTINE
19 COOK; BRIAN C. DUDLEY; BRAD      Hon. Anita B. Brody
   BOOTH; CHRIS HALE; JOHN
20 JACKSON and his wife, ANN        **FIRST AMENDED COMPLAINT**
   FRANCES JACKSON; DENNIS CLAY     **FOR:**
21 and his wife, STACEY CLAY;
   NORMAN SCOTT BYERS and his wife, 1.   Negligence;
22 STEPHANIE BYERS; DARRYL          2.   Fraud;
   CRANE; BENJAMIN J. SCOTTI; and   3.   Fraudulent Concealment;
23 RALPH V. GUGLIELMI,              4.   Negligent Misrepresentation;
                                    5.   Strict Liability for Design Defect;
24                Plaintiffs,       6.   Negligence;
                                    7.   Failure to Warn;
25 v.                              8.   Negligence;
                                    9.   Loss of Consortium.
26 NATIONAL FOOTBALL LEAGUE;
   NFL PROPERTIES, LLC; RIDDELL,    **DEMAND FOR JURY TRIAL**
27 INC. d/b/a/ RIDDELL SPORTS GROUP,
   INC.; ALL AMERICAN SPORTS
28 CORPORATION, d/b/a RIDDELL/ALL

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

AMERICAN; RIDDELL SPORTS
GROUP, INC.; EASTON-BELL
SPORTS, INC.; EASTON-BELL
SPORTS, LLC; EB SPORTS CORP.;
AND RBG HOLDINGS CORP.; and
Does 1 through 100, inclusive.

Defendants.

Plaintiffs, on behalf of themselves, by and through their attorneys, hereby

complain of Defendants named above, and hereby allege as follows:

## I.    INTRODUCTION

1.      This action is brought by Plaintiffs former National Football League

("NFL" or "League") players who seek damages for the long-term chronic injuries,

financial losses, expenses, and intangible losses they suffered as a result of

Defendants' wrongful conduct with respect to concussive brain injuries sustained by

Plaintiffs during their NFL careers and the subsequent damaging effects.

2.      For many decades, evidence has linked repetitive concussive brain

injuries to long-term neurological problems in many sports.  Defendants were aware

of the evidence and the subsequent damaging effects associated with repetitive

concussive brain injuries; however, Defendants deliberately ignored, misrepresented

and actively concealed the information from Plaintiffs and all others who participated

in organized football.

3.      In 1994, the NFL voluntarily undertook to create and fund the Mild

Traumatic Brain Injury Committee (the "MTBI") in an attempt to undermine existing

scientific studies and evidence that linked head concussions received by NFL players

to long-term neurological problems.  In 1997, Riddell became a part of the MTBI's

project of assessing concussions and health consequences to NFL players by

analyzing and reconstructing head impacts.  These studies have largely contradicted

over 75 years of weighted scientific evidence.

4.      Simply put, Defendants not only failed to inform players of the true risks

of concussive brain injuries and the subsequent damaging effects, but also

774834

1  fraudulently misrepresented and concealed medical evidence on the issue from

2  Plaintiffs.

3  ## II.   JURISDICTION AND VENUE

4  5.   Jurisdiction is based upon the California Constitution Article 6, Section

5  10.

6  6.   Venue is proper in this Court pursuant to Section 395(A) of the

7  California Code of Civil Procedure.

8  ## III.   IDENTIFICATION OF THE PARTIES

9  ### Plaintiffs

10  7.   Mr. Johnnie Morton is a resident of and is domiciled in the State of

11  California.

12  8.   Mr. Kez McCorvey is a resident of and is domiciled in the State of

13  Florida.

14  9.   Mr. Kurt Barber is a resident of and is domiciled in the State of

15  Kentucky.

16  10.   Mr. Mike Sherrard is a resident of and is domiciled in the State of

17  California.

18  11.   Mr. Stockar McDougle and his wife, Octavia, are residents of and are

19  domiciled in the State of Florida.

20  12.   Mr. Toi Cook and his wife, Kristine, are residents of and are domiciled

21  in the State of California.

22  13.   Mr. Brian C. Dudley is a resident of and is domiciled in the State of

23  California.

24  14.   Mr. Brad Booth is a resident of and is domiciled in the State of

25  California.

26  15.   Mr. Chris Hale is a resident of and is domiciled in the State of California.

27  16.   Mr. John Jackson and his wife, Ann Frances, are residents of and are

28  domiciled in the State of California.

774834

*Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP*

17.    Mr. Dennis Clay and his wife, Stacey, are residents of and are domiciled in the State of California.

18.    Mr. Norman Scott Byers and his wife, Stephanie, are residents of and are domiciled in the State of California.

19.    Mr. Darryl Crane is a resident of and is domiciled in the State of Florida.

20.    Mr. Benjamin J. Scotti is a resident of and is domiciled in the State of California.

21.    Mr. Ralph Guglielmi is a resident of and is domiciled in the State of North Carolina.

### Defendants

22.    Defendant National Football League (the "NFL") is an unincorporated association, consisting of 32 separately-owned and independently-operated member clubs, with its headquarters and principal place of business located at 280 Park Avenue, New York, New York 10017.  The NFL is engaged in interstate commerce and is in the business of, among other things, operating the sole major professional football league in the United States.  The NFL regularly conducts business in the State of California.

23.    Defendant NFL Properties, LLC, as the successor-in-interest to National Football League Properties, Inc. ("NFL Properties") is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York.  NFL Properties is engaged in, among other activities, the approving of licensing and the promotion of equipment used by all the NFL teams. NFL Properties regularly conducts business in the State of California.

24.    Defendant Riddell, Inc. (d/b/a Riddell Sports Group, Inc.) ("Riddell, Inc.") is a corporation organized and existing under the laws of the State of Illinois with its principal place of business at 3670 North Milwaukee Avenue, Chicago, Illinois 60641.  Riddell, Inc. is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL, and has

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

been the official helmet provider of the NFL since 1989.  Riddell, Inc. regularly conducts business in the State of California.

25.  Defendant All American Sports Corporation (d/b/a Riddell/All American) ("All American Sports") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 669 Sugar Lane, Elyria, Ohio 44035.  All American Sports is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL, and has been the official helmet provider of the NFL since 1989.  All American Sports regularly conducts business in the State of California.

26.  Defendant Riddell Sports Group, Inc. ("Riddell Sports Group") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6255 N. State Highway, Suite 300, Irving, Texas 76038. Riddell Sports Group operates as a subsidiary of Easton-Bell Sports, Inc.  Riddell Sport Groups regularly conducts business in the State of California.

27.  Defendant Easton-Bell Sports, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, California 91406.  Easton-Bell Sports, Inc. is a parent corporation of Riddell Sports Group.  Easton-Bell Sports, Inc. is engaged in the business of designing, developing and marketing branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand.  Easton-Bell Sports, Inc. regularly conducts business in the State of California.

28.  Defendant Easton-Bell Sports, LLC ("Easton-Bell Sports, LLC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 152 West 57th Street, New York, New York 10019. Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc.  Easton-Bell Sports, LLC regularly conducts business in the State of California.

29.  Defendant EB Sports Corp. is a corporation organized and existing under

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

the laws of the State of Delaware with its principal place of business at 7855 Haskell Avenue, Van Nuys, California 91406.  All of the issued and outstanding voting common stock of EB Sports Corp. is owned by Easton-Bell Sports, LLC.  EB Sports Corp. regularly conducts business in the State of California.

30.     Defendant RBG Holdings Corp. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, California 91406.  RBG Holdings Corp. is a wholly-owned subsidiary of EB Sports Corp.  RBG Holdings Corp. regularly conducts business in the State of California.

31.     Defendants Riddell, Inc., All American Sports, Riddell Sports Group, Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports Corp. and RBG Holdings Corp., shall hereinafter be referred to collectively as "Riddell" or the "Riddell Defendants."  The NFL and Riddell are collectively referred to as "Defendants."

## IV.     GENERAL ALLEGATIONS

### The NFL

32.     The NFL was founded as the American Professional Football Association in 1920 and has been known as the National Football League (NFL) since 1922.  The NFL is and was, at all times herein mentioned, engaged in the business of managing, governing and promoting the game of football, setting and enforcing rules and league policies, and regulating team ownership.

33.     Today, the NFL consists of 32 team members, generates over $9 billion annually, and has tremendous influence in the politics and medical research relating to football-related injuries.  According to a recent *Wall Street Journal* article, the NFL spent nearly $5.5 million on lobbying firms since 2006 to address a host of issues, including, player concussions.  According to NFL Commissioner Roger Goodell, the NFL has invested over $5 million in researching concussions alone.

34.     Upon information and belief, Plaintiffs sustained one or more concussive

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

brain injuries while playing and/or practicing during their NFL careers.

**Riddell**

35.     The Riddell Defendants are and were, at all times herein mentioned, engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL.  Since 1989, Riddell's helmets have been the "official helmet of the NFL."  Riddell is currently under contract with the NFL allowing Riddell to continue as the NFL's primary helmet provider through 2014. The NFL estimates that 75% of the helmets used in the NFL are manufactured by Riddell – Riddell estimates that figure is 77%.

36.     In 1997, Riddell became a part of the MTBI's project of assessing concussions and health consequences to NFL players by analyzing and reconstructing head impacts.

37.     In 2006, Riddell undertook a study appearing in *Neurosurgery* that was co-authored by members of the MTBI.  The study touted Riddell's "Revolution" helmet as reducing the risk of concussions in over 2,000 high school athletes in Western Pennsylvania.  The study has been publicly criticized as being worthless.

38.     Upon information and belief, Plaintiffs wore Riddell helmets at time while playing and/or practicing during their NFL careers.

**The CBA**

39.     Until March 2011, NFL players were all members of the National Football League Players Association ("NFLPA").  The NFLPA negotiates the Collective Bargaining Agreement (the "CBA") setting forth the general minimum contract for all players in the NFL with the National Football League Management Council ("NFLMC").

40.     The CBA was in place since 1993 and was amended in 1998 and again in 2006.  The CBA was originally scheduled to expire at the end of the 2012 season; however, in 2008, the owners exercised their right to opt-out of the CBA two years earlier.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

41.   In 2011, the parties failed to reach an agreement for a new CBA. Subsequently, the NFLPA was decertified as the players' representative for collective bargaining.

42.   Plaintiffs herein are all retirees, are not covered by the CBA, and are not subject of or parties to any collective bargaining between the NFL and the NFLPA. The CBA does not apply to Plaintiffs' present claims.  Thus, Plaintiffs' claims are not preempted by federal labor law.

### The Scientific Evidence On Concussion Risks

43.   Physicians and academics have exhaustively studied and reported the dangers of concussions suffered both inside and outside of sports for well over 75 years.

44.   In 1928, the first case of "Punch Drunk" syndrome in boxers was published in the *American Association Journal* by H.S. Martland, which found that cranial injuries may result in a degenerative progressive lesion or series of scars in the brain tissue, which may eventually result in the condition known as traumatic encephalitis.

45.   In 1952, the *New England Journal of Medicine*, Vol. 246, discussed a 1945 "three strike rule" for concussions in football – if you receive three concussions playing football, you should retire.

46.   In 1969, a report by the Royal College of Physicians of London confirmed the dangers of chronic brain damage occurring in boxers as a result of their careers.

47.   In 1973, neurosurgeon R.C. Schneider first described the risks of a disabling and sometimes deadly condition involving a second impact concussion occurring before symptoms of a first concussion disappear.  This phenomenon was termed "Second-impact syndrome" in 1984 by Dr. R.L. Saunders.

48.   In 1980, the *Clinical Neurosurgery* published an article titled, "Football head and neck injuries – an update," which concluded that: "Arbitrarily, most

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

physicians discourage further football participation if an athlete has suffered three cerebral concussions.  Strong consideration must be given, however, not only to the number and severity of the concussion, but also to any CAT scan evidence of cerebral edema, contusion, or hemorrhage.  With this incredibly sensitive diagnostic tool, one concussion, which is assorted with radiographic evidence of structural brain damage, may be enough to strongly discourage or forbid further football participation."

49.     In 1982, the *Canadian Medical Association Journal* published an article titled "Return to athletic competition following concussion," which concluded that: "The basic recommendation is that return to training and competition should be deferred until all associated symptoms such as headaches have completely resolved. The decision to return must take into account the nature of the sport, the athlete's level of participation and the cumulative effect of previous concussions.  Some athletes will have to avoid any further participation of their sport."

50.     In 1986, the *Physician and Sports Medicine Journal* published an article by Dr. Robert Cantu titled "Guidelines for return to contact sports after cerebral concussion," which established a system to grade the severity of concussions and corresponding guidelines for when players should return.  Specifically, the Cantu guidelines permit an athlete to return to play after one week of sustaining a first low-grade concussion *only* if the athlete is asymptomatic.

51.     In 1991, *JAMA* published an article titled "Concussion in sports. Guidelines for the prevention of catastrophic outcome," which described "a high school football player who died of diffuse brain swelling after repeated concussions without loss of consciousness" and guidelines "to reduce the risk of such serious catastrophic outcomes after concussion in sports."

52.     In 2000, a University of North Carolina study, published in the September-October issue of the American Journal of Sports Medicine, found that "the brain is more susceptible to injury when it has not had enough time to recover from a first injury" and "recurrences are more likely because injured players are returning to

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1    practice and to games too quickly after blows to the head."

2    53.    In 2001, a report by Dr. Frederick Mueller published in the *Journal of*
3    *Athlete Training* reported that at least one football-related fatality occurred every year
4    from 1945 through 1999, except for 1990. Head-related deaths accounted for 69% of
5    football fatalities. From 1984 through 1999, 69 football head-related injuries resulted
6    in permanent disability.

7    54.    In 2002, Dr. Bennet Omalu, a forensic pathologist and neuropathologist
8    in Pittsburgh, Pennsylvania, identified a brain condition termed "Chronic Traumatic
9    Encephalopathy" or "CTE." Dr. Omalu discovered the condition, marked by dark
10    brown protein staining on the brain while studying the brain of Mike Webster, a
11    National Football League Hall of Famer who died at the age of 50 after years of
12    severe depression and dementia that had reduced him to homelessness. By 2007, Dr.
13    Omalu had identified CTE in the brains of three other deceased former NFL players.
14    He determined the type of brain damage he found in the players was of the same type
15    found in punch-drunk boxers. To date, neuroanatomists have performed autopsies on
16    13 former NFL players who died after exhibiting signs of degenerative brain disease.
17    Twelve of these players were found to have suffered from CTE.

18    55.    In 2003, Dr. Kevin Guskiewicz of the University of North Carolina
19    found that having three or four concussions meant twice the risk of depression as
20    never-concussed players, and five or more concussions meant nearly a threefold risk.
21    In 2005, Dr. Guskiewicz also found that retired NFL players who sustained three or
22    more concussions were five times as likely to suffer Mild Cognitive Impairment
23    ("MCI") than retired NFL players who had no history of concussions.

24    56.    In 2003, a NCAA study of 2,905 college football players found that
25    those who have suffered concussions are more susceptible to further head trauma for
26    7 to 10 days after the injury.

27    57.    In 2008, Dr. Ann McKee ("McKee") of Boston University examined the
28    brain tissues of deceased NFL players – John Grimsley ("Grimsley") and Tom

McHale ("McHale") (both died at the age of 45). McKee found that Grimsley and McHale's brain tissue exhibited indications of CTE. McKee noted that "the easiest way to decrease the incidence of CTE is to decrease the number of concussions." McKee further noted that "there is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

58.     In 2008, Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy (CSTE) found signs of "severe degradation" in the brains of ex-NFL athletes. The CSTE also found that "former NFL players between the ages of thirty and forty-nine experienced memory loss at a rate *19 times higher* than the average population.

59.     In 2009, the University of Michigan's Institute for Social Research published a study of retired NFL players which found that retired NFL players are diagnosed with Alzheimer's disease or similar medical conditions far more often than the national population, including a rate of *19 times the normal incidence* for men aged 30 to 49.

60.     The foregoing references are by no means exhaustive.

**Defendants Have A Duty To The Players And The Public**

61.     The NFL possesses monopoly power over American Football and over the research and education of physicians, trainers, coaches and NFL players with brain damage such as Plaintiffs, as well as the public at large, with regard to football injuries. Even more, the NFL overtly undertook the duty to create and fund the MTBI to study concussions on behalf of all American Rules Football leagues and players. As a result, the NFL owed a duty to everyone, including Plaintiffs, in the following respects:

            (a)     It owed a duty of reasonable care to protect Plaintiffs while practicing or playing football during their NFL careers;

            (b)     It owed a duty of reasonable care to Plaintiffs to educate Plaintiffs and other players in the NFL about concussion injury and/or CTE;

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

(c)     It owed a duty of reasonable care to Plaintiff to educate physicians, trainers and coaches about concussion injury and/or CTE;

(d)     It owed a duty of reasonable care to Plaintiff to have in place strict return-to-play guidelines to prevent concussion injury and/or CTE;

(e)     It owed a duty of reasonable care to Plaintiffs to promote a "whistleblower" system where teammates may bring to the attention of a physician, trainer or coach that another player has sustained concussion injury;

(f)     It owned a duty of reasonable care to Plaintiffs to design rules and adequate penalties for players who use their head or upper body to hit or tackle;

(g)     It owed a duty of reasonable care to Plaintiffs to design rules to eliminate the risk of concussion during games and/or practices;

(h)     It owed a duty of reasonable care to Plaintiffs to promote research into and cure for concussion injury and/or CTE; and

(i)     It owed a duty of reasonable care to State governments, local sports organizations, all American Football leagues and players, and the public at large to protect against the long-term effects of concussion injury and/or CTE.

62.     In 1997, Riddell undertook to become a part of the MTBI's project of assessing concussions and health consequences to NFL players by analyzing and reconstructing head impacts.  In 2006, Riddell undertook a study appearing in *Neurosurgery* that was co-authored by members of the MTBI.  The study touted Riddell's "Revolution" helmet as reducing the risk of concussions in over 2,000 high school athletes in Western Pennsylvania.  The study has been publicly criticized as being worthless.

63.     The NFL and Riddell knew as early as the 1920's of the potential harmful effects on a player's brain of concussions, but concealed these facts from physicians, trainers, coaches, players and the public until June 2010.

64.     Prior to June 2010, Plaintiffs did not know, nor had reason to know, the

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

long-term effects of concussions and relied on the NFL and Riddell to protect them.

**Defendants' Knowledge Of Concussions Risks Threatening The Players**

65.    For decades, Defendants have known that concussions can lead to long-term brain injury, including headaches, dizziness, dementia, depression, Alzheimer's disease and death.  Defendants' knowledge of the concussion risks threatening the players is evidenced by Defendants' undertakings to study and/or fund concussion studies.

66.    In addition, for over 75 years, the scientific and medical community has produced and published medical literature in the United States and other industrialized countries relating to and discussing the harmful effect on humans – particularly players of American football – of repeated concessive blows to the head. These publications were all available and easily accessible to all Defendants.

**The NFL Ignored And Fraudulently Misrepresented**

**The Concussion Risks Threatening The Players**

67.    Despite over 75 years of study and knowledge within the scientific and medical community, the supervisory and management role of the NFL, and the studies funded by the NFL (as set forth more fully below), the NFL and its designated representatives, until more recently, have continuously and vehemently ignored any relationship between NFL players suffering concussions while playing, the NFL policies regarding tackling methodology or the NFL policies about return-to-play, and long-term problems such as headaches, dizziness, dementia, depression, and/or Alzheimer's disease that many retired players have experienced.  Such ignorance has been evidenced in NFL publications, NFL sponsored so-called medical studies, testimony of NFL representatives before Congress, and in the media.  Indeed, not only has the NFL ignored the causal connection, the NFL has also taken an active role in fraudulently concealing and downplaying any connection between concussions in football in the NFL and brain injury or illness.

68.    In the early 1970s, the NFL became aware of publications accounting for

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

the rate and seriousness of concussion in the sport of football. At the same time, the NFL became aware of the publication of a helmet standard, known as the National Operating Committee on Standards for Athletic Equipment (NOCSAE) for football helmets, and which was intended to improve upon the safety of helmets and minimize the risk of head injury. The NFL also learned that the NCAA and National High School Football Federations (NHSFF) had adopted a policy requiring by the beginning of the 1978 season that all helmets used in their respective organizations must be approved for sale and comply with the NOCSAE standard. However, the NFL did not make or adopt a similar policy at that time.

69.     In 1976, the NCAA and NHSFF began to recognize that the helmet-face mask combination was contributing to the use of the helmeted head as an offensive weapon, which in turn increased the rate of concussions. Accordingly, the NCAA and NHSFF initiated changes which prohibited contact of the head in blocking and tackling. While the NFL was aware of these risks and the changes made by the NCAA and NHSFF, it failed to take similar action at that time. Instead, during the 1970s, 1980s, 1990s and 2000s, NFL players were being coached, trained and encouraged to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. These techniques were condoned by the NFL and/or were not significantly condemned by the NFL.

70.     It was not until 1979 that the NFL finally issued a rule that charged a penalty (though trivial) against players who are found to have used their helmets to butt, spear or ram an opponent with the crown or top of the helmet. This undertaking by the NFL, based upon its duty of care to the NFL players, however, fell far short of the important safety and injury prevention that it should have taken. This rule came several years after the 1976 rules by the NCAA and NHSFF were adopted and limited the penalty only to contact with the crown or top of the helmet, which ignored the more prevalent practice of other helmet contact (contact other than with the crown or top of the helmet) that was causing a substantial and high rate of concussions among

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

1    NFL players.

2    71.    In 1994, the NFL voluntarily undertook to create and fund the MTBI –

3    it's so-called "expert" committee – to purportedly study the effects of concussions on

4    NFL players.  The MTBI was chaired by Dr. Elliot Pellman, a rheumatologist who

5    had no special knowledge of brain injuries or concussions.  As explained more fully

6    below, the MTBI's NFL-funded "studies" (based on bias data collection techniques,

7    which omitted large numbers of players from its studies) regularly contradicted

8    established findings and did nothing but fraudulently conceal, misrepresent and

9    downplay clear medical evidence that on-field concussive brain injury led directly to

10   long-term neurological problems for players.

11   72.    For example, in 2004, the MTBI published a paper in which it asserted

12   that it found there was "no evidence of worsening injury or chronic cumulative effects

13   of multiple [mild traumatic brain injury] in NFL players" and that there was no "7 to

14   10-day window of increased susceptibility to sustaining another concussion."

15   However, this article sends the message that it is acceptable to return players to play

16   while still symptomatic, which contradicts literature published over the past twenty

17   years finding that athletes should be returned to play only after one week of sustaining

18   the injury and only if they are asymptomatic.

19   73.    As a further example, in 2005, the MTBI published an article asserting

20   that returning to play after a concussion "does not involve significant risk of a second

21   injury either in the same game or during the season."  However, a 2003 NCAA study

22   of 2,905 college football players found just the opposite: "Those who have suffered

23   concussions *are* more susceptible to further head trauma…"  (Emphasis added).

24   74.    On August 14, 2007, the NFL issued a press release and "informational"

25   pamphlets to its players – misinforming and downplaying the risks of concussive

26   brain injuries and the subsequent damaging effects to its players.  The press release

27   and pamphlets stated that:

28          Current research with professional athletes has not shown that having

more than one or two concussions leads to permanent problems.... It is important to understand that there is no magic number for how many concussions is too many. (Emphasis added).

75.    In November 2008 (and reiterated in September 2009), NFL spokesman Greg Aiello ("Aiello") (again misinforming and downplaying the risks of concussive brain injuries and subsequent effects to the players) stated to the press:

Hundreds of thousands of people have played football and other sports without experiencing any problem of this type and there continues to be considerable debate within the medical community on the precise long-term effects of concussions and how they relate to other risk factors.

Aiello neglected to mention that the "debate" was principally between scientists paid by the NFL and scientists operating independently of the NFL and that players and teams have incentive for players to return to games despite persistent symptoms.

76.    Surprisingly, in a December 20, 2009 interview, Aiello – who had so steadfastly denied any causal link between concussions and brain injury just a few months earlier – admitted that "it's quite obvious from the medical research that's been done that concussions... lead to long-term problems."

77.    Nevertheless, at a January 2010 congressional hearing, Dr. Ira Casson of the MBTI provided oral and written testimony denying the validity of studies finding a causal link between concussions and long-term neurological problems.

78.    It was not until June 2010 that the NFL conceded that its efforts with respect to concussions and brain injury and its research by the MTBI were rife with duplicity, conflicts of interest and shocking ineptitude and it was not until this time that the NFL finally warned any player of the long-term risks associated with multiple concussions, including headaches, dizziness, dementia, depression, Alzheimer's disease, CTE and its related symptoms, and death.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

15
COMPLAINT

774834

## Riddell Abetted The NFL And Misrepresented The Concussion Risks
## Threatening The Players

79.     Riddell manufactures helmets for use by NFL players.  Since 1989, the Riddell helmet has been the NFL's official helmet and Riddell is the only helmet manufacturer allowed to display its logo on helmets used in NFL games.  Prior to the commencement of the 2010 season, Riddell renewed its contract with the NFL, allowing Riddell to continue as the NFL's primary helmet provider through 2014.  The NFL estimates that 75% of the helmets used in the NFL are manufactured by Riddell (Riddell estimates that figure is 77%).

80.     Riddell has long been aware of medical issues concerning head injuries and concussions.  Nonetheless, despite being the maker of the "official helmet" for the NFL, it did nothing to prevent the NFL's misrepresentations and concealment described in preceding paragraphs.

81.     Indeed, Riddell actively abetted the work of the NFL's MTBI.  In 1997, Riddell became a part of the MTBI's project of assessing concessions and health consequences to NFL players by analyzing and reconstructing head impacts.  In 2006, Riddell sponsored a study appearing in *Neurosurgery* that was co-authored by members of the MTBI.  The study touted Riddell's "Revolution" helmet as reducing the risk of concussions in over 2,000 high school athletes in Western Pennsylvania.  The study has been publicly criticized as providing players with a mistaken sense of security and being worthless.

82.     Riddell failed to warn active players of the risk of concussive brain injuries and the subsequent damaging effects until approximately the same time as the NFL.

## Defendants' Conduct Rises Beyond Mere Negligence

83.     The aforementioned acts and omissions of Defendants demonstrate that Defendants acted with callous indifference to the rights of and the duties owed to Plaintiffs, the all American Rules Football leagues and players, and the public at

large.

84.     The conduct of Defendants was willful and wanton and exhibits a reckless disregard for the rights and safety of the players.  Defendants, and each of them, knew that a substantial risk of physical and mental harm to NFL players existed in connection with repeated concussive brain injuries.  Defendants, and each of them, consciously, willfully, and deliberately disregarded the safety of others in continually undertaking to establish and promulgate rules for the NFL, but failing to address or disclose this substantial risk, as immediately aforesaid, in connection with such rules, and/or continuing to manufacture, sell, and distribute football helmets which they knew would not protect players against this risk.

85.     Why NFL policy changes, accurate information sharing and warnings of the long-term risks associated with multiple concussions were not recommended by the NFL's so called "expert" committee soon after its creation in 1994, or even earlier by the NFL and/or its "official helmet" manufacturer, or why it took the NFL 16 years to even admit that there was a problem is difficult to comprehend.

### Equitable Tolling

86.     The applicable statute of limitations is tolled because Defendants' fraudulent concealment of the dangers and adverse effects of head injuries and concussions made it impossible for Plaintiffs to learn of the hazards to their health.

87.     Plaintiffs did not become reasonably aware of the dangerous nature of or the adverse side effects associated with their head injuries and concussions prior to June 2010 when Defendants finally warned any player of the long-term risks associated with multiple concussions, including headaches, dizziness, dementia, depression, Alzheimer's disease, CTE and its related symptoms, and death.  The accrual of a complete cause of action relating to the cognizable physical manifestation of the injury did not exist until that time.

88.     Defendants were under a continuing duty to disclose the true nature of the head injuries and concussions received by Plaintiffs.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

89.     Defendants, in the court of their businesses, concealed and omitted material key facts about the dangers and adverse effects of head injuries and concussions received by Plaintiffs, which prevented Plaintiffs from discovering a link between their on-field head injuries and concussions and their long-term physical and mental health.  Because of Defendants' concealment and omission, Defendants are estopped from relying on any statute of limitation defense.

**Johnnie Morton**

90.     Plaintiff Johnnie Morton was born on October 7, 1971, in Inglewood, California.  He currently lives in Los Angeles, California.

91.     Plaintiff Johnnie Morton was drafted in the First Round of the NFL Draft, and played for the Detroit Lions from 1994 through 2001.  Following the 2001 season, Johnnie Morton joined the Kansas City Chiefs through 2004.  In 2005, he played for the San Francisco 49ers.

92.     Plaintiff Johnnie Morton suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

93.     Plaintiff Johnnie Morton was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

94.     Plaintiff Johnnie Morton suffers from multiple past traumatic brain injuries affecting multiple areas of his brain and includes but is not limited to the following symptoms: headaches, memory loss, dizziness and depression.

**Kez McCorvey**

95.     Plaintiff Kez McCorvey was born on January 23, 1972 in Gautier, Mississippi.  He currently lives in Tallahassee, Florida, with his wife and four children.

96.     Plaintiff Kez McCorvey was drafted in the Fifth Round, and played as a

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

18
COMPLAINT

Receiver for the Detroit Lions from 1995 through 1998.  In 1999, he attended camp with the Carolina Panthers.

97.    Plaintiff Kez McCorvey suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

98.    Plaintiff Kez McCorvey was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

99.    Plaintiff Kez McCorvey suffers from multiple past traumatic brain injuries affecting multiple areas of his brain and includes but is not limited to the following symptoms: headaches, memory loss, blurred vision, tingling in the neck, ringing in the ears, dizziness and depression.

### Kurt Barber

100.    Plaintiff Kurt Barber was born on January 5, 1969, in Kentucky.  He currently lives in Campbellsville, Kentucky.

101.    Plaintiff Barber played for the New York Jets from 1992 through 1995. Beginning in 1997, he attended camp with the Denver, Broncos, was released from the Broncos and finished camp with the Chicago Bears.

102.    Plaintiff Kurt Barber suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

103.    Plaintiff Kurt Barber was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

104.    Plaintiff Kurt Barber suffers from multiple past traumatic brain injuries affecting multiple areas of his brain and includes but is not limited to the following

774834

symptoms: short –term memory loss and depression.

## Mike Sherrard

105.   Plaintiff Mike Sherrard was born on June 21, 1963, in Oakland, California.  He currently lives in Calabasas, California.

106.   Plaintiff Mike Sherrard played for the Dallas Cowboys beginning in 1986, where he played until 1989.  Beginning in 1989 through the 1992 season, Mike Sherrard played for the San Francisco 49ers.  In 1993, Sherrard moved to the New York Giants, and played in New York until approximately 1995.  In his final year, 1996, Mike Sherrard played for the Denver Broncos.

107.   Plaintiff Mike Sherrard suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

108.   Plaintiff Mike Sherrard was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

## Stockar McDougle

109.   Plaintiff Stockar McDougle was born on January 11, 1977, in Fort Lauderdale, Florida.  He currently lives in Parkland, Florida.

110.   Plaintiff Stockar McDougle played for the Detroit Lions from 2000 to 2004, the Miami Dolphins in 2005 and the Jacksonville Jaguars in 2006 through 2008.

111.   Plaintiff Stockar McDougle suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

112.   Plaintiff Stockar McDougle was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

1  such injury.  This was a substantial factor in causing his current injury.

2      113.   Plaintiff Stockar McDougle suffers from multiple past traumatic brain

3  injuries affecting multiple areas of his brain and includes but is not limited to the

4  following symptoms: headaches, memory loss, ringing in the ears, double and blurred

5  vision, light sensitivity, sleeplessness and early on-set dementia.

6                                   **Toi Cook**

7      114.   Plaintiff Toi Cook was born on December 3, 1964, in Chicago, Illinois.

8  He currently lives in Westlake Village, California.

9      115.   Plaintiff Toi Cook played for the New Orleans Saints from 1987 through

10  1993.  Thereafter, he played for the San Francisco 49ers, from 1994 to 1995. During

11  the 1996 and 1997 seasons, Toi Cook played for the Carolina Panthers.

12      116.   Plaintiff Toi Cook suffered multiple concussions that were improperly

13  diagnosed and improperly treated throughout his career as a professional football

14  player in the NFL.

15      117.   Plaintiff Toi Cook was not warned by the NFL, NFL Properties, Inc. or

16  Riddell Defendants of the risk of long-term injury due to football-related concussions

17  or that the league-mandated equipment did not protect him from such injury.  This

18  was a substantial factor in causing his current injury.

19      118.   Plaintiff Toi Cook suffers from multiple past traumatic brain injuries

20  affecting multiple areas of his brain and includes but is not limited to the following

21  symptoms: sleeplessness.

22                                 **Brian C. Dudley**

23      119.    Plaintiff Brian C. Dudley was born on August 30, 1960, in Los Angeles,

24  California.  He currently lives in Los Angeles, California.

25      120.   Plaintiff Brian C. Dudley played for the Cleveland, Browns during the

26  1987 season.

27      121.   Plaintiff Brian C. Dudley suffered multiple concussions that were

28  improperly diagnosed and improperly treated throughout his career as a professional

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

1  football player in the NFL.

2      122.   Plaintiff Brian C. Dudley was not warned by the NFL, NFL Properties,

3  Inc. or Riddell Defendants of the risk of long-term injury due to football-related

4  concussions or that the league-mandated equipment did not protect him from such

5  injury.  This was a substantial factor in causing his current injury.

6      123.   Plaintiff Brian C. Dudley suffers from multiple past traumatic brain

7  injuries affecting multiple areas of his brain and includes but is not limited to the

8  following symptoms: short-term memory loss, headaches, blurred vision and sleep-

9  deprived anxiety.

10                             **Brad Booth**

11     124.   Plaintiff Brad Booth lives in Los Angeles, California.

12     125.   Plaintiff Brad Booth played for the Oilers from 1987 to 1988.

13     126.   Plaintiff Brad Booth suffered multiple concussions that were improperly

14  diagnosed and improperly treated throughout his career as a professional football

15  player in the NFL.

16     127.   Plaintiff Brad Booth was not warned by the NFL, NFL Properties, Inc. or

17  Riddell Defendants of the risk of long-term injury due to football-related concussions

18  or that the league-mandated equipment did not protect him from such injury.  This

19  was a substantial factor in causing his current injury.

20     128.   Plaintiff Brad Booth suffers from multiple past traumatic brain injuries

21  affecting multiple areas of his brain and includes but is not limited to the following

22  symptoms:

23                             **Chris Hale**

24     129.   Plaintiff Chris Hale was born on January 4, 1966, in Monrovia,

25  California. He currently lives in West Covina, California.

26     130.   Plaintiff Chris Hale played for the Buffalo Bills from 1989 through 1992.

27     131.   Plaintiff Chris Hale suffered multiple concussions that were improperly

28  diagnosed and improperly treated throughout his career as a professional football

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

1   player in the NFL.

2       132.   Plaintiff Chris Hale was not warned by the NFL, NFL Properties, Inc. or

3   Riddell Defendants of the risk of long-term injury due to football-related concussions

4   or that the league-mandated equipment did not protect him from such injury.  This

5   was a substantial factor in causing his current injury.

6       133.   Plaintiff Chris Hale suffers from multiple past traumatic brain injuries

7   affecting multiple areas of his brain and includes but is not limited to the following

8   symptoms: short-term memory loss.

9                       **John Jackson**

10       134.   Plaintiff John Jackson was born on January 2, 1967, in Brooklyn, New

11   York.  He currently lives in Diamond Bar, California, with his wife, Ann Frances.

12       135.   Plaintiff John Jackson played for the Arizona Cardinals from 1990

13   through 1992 and for the Chicago Bears in 1996.

14       136.   Plaintiff John Jackson suffered multiple concussions that were

15   improperly diagnosed and improperly treated throughout his career as a professional

16   football player in the NFL.

17       137.   Plaintiff John Jackson was not warned by the NFL, NFL Properties, Inc.

18   or Riddell Defendants of the risk of long-term injury due to football-related

19   concussions or that the league-mandated equipment did not protect him from such

20   injury.  This was a substantial factor in causing his current injury.

21       138.   Plaintiff John Jackson suffers from multiple past traumatic brain injuries

22   affecting multiple areas of his brain and includes but is not limited to the following

23   symptoms: short-term memory loss and anxiety.

24                       **Dennis Clay**

25       139.   Plaintiff Dennis Clay was born on February 5, 1960, in Los Angeles,

26   California.  He currently lives in Cerritos, California, with his wife, Stacey.

27       140.   Plaintiff Dennis Clay attended camp with the Dallas Cowboys in the

28   1983 pre-season.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

141.   During camp, Plaintiff Dennis Clay suffered at least one concussion that was improperly diagnosed and improperly treated.

142.   Plaintiff Dennis Clay was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

143.   Plaintiff Dennis Clay suffers from multiple past traumatic brain injuries affecting multiple areas of his brain and includes but is not limited to the following symptoms: headaches, blurred vision, short-term memory loss and anxiety.

**Norman Scott Byers**

144.   Plaintiff Norman Scott Byers was born on July 3, 1968, in Bayonne, New Jersey.  He currently lives in Los Angeles, California, with his wife, Stephanie.

145.   Plaintiff Norman Scott Byers played for the San Diego Chargers from 1982 through 1984.

146.   Plaintiff Norman Scott Byers suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

147.   Plaintiff Norman Scott Byers was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

148.   Plaintiff Norman Scott Byers suffers from multiple past traumatic brain injuries affecting multiple areas of his brain and includes but is not limited to the following symptoms: headaches, short-term memory loss and anxiety.

**Darryl Crane**

149.   Plaintiff Darryl Crane was born on October 24, 1960, in Jacksonville, Florida.  He currently lives in Orlando, Florida.

150.   Plaintiff Darryl Crane played for the Pittsburgh Steelers in the 1983 pre-

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1   season and the 1987 season.

2       151.   Plaintiff Darryl Crane suffered multiple concussions that were

3   improperly diagnosed and improperly treated throughout his career as a professional

4   football player in the NFL.

5       152.   Plaintiff Darryl Crane was not warned by the NFL, NFL Properties, Inc.

6   or Riddell Defendants of the risk of long-term injury due to football-related

7   concussions or that the league-mandated equipment did not protect him from such

8   injury.  This was a substantial factor in causing his current injury.

9       153.   Plaintiff Darryl Crane suffers from multiple past traumatic brain injuries

10  affecting multiple areas of his brain and includes but is not limited to the following

11  symptoms: chronic re-occurring TMJ, pain in the neck, constant headaches, sleep

12  deprivation, depression,  chronic fatigue, dizziness, memory loss,  sudden confusion,

13  blurred vision, diminished hearing, severe joint pain, numbness and stiffness, and loss

14  of taste sensory.

15                              **Benjamin J. Scotti**

16      154.   Plaintiff Benjamin J. Scotti was born on June 9, 1937, in Newark, New

17  Jersey.  He lives in Beverly Hills, California.

18      155.   Plaintiff Benjamin J. Scotti played for the Washington Redskins from

19  1959 through 1961, for the Philadelphia Eagles from 1962 through 1963, and for the

20  San Francisco 49ers in 1964.

21      156.   Plaintiff Benjamin J. Scotti suffered multiple concussions that were

22  improperly diagnosed and improperly treated throughout his career as a professional

23  football player in the NFL.

24      157.   Plaintiff Benjamin J. Scotti was not warned by the NFL, NFL Properties,

25  Inc. or Riddell Defendants of the risk of long-term injury due to football-related

26  concussions or that the league-mandated equipment did not protect him from such

27  injury.  This was a substantial factor in causing his current injury.

28      158.   Plaintiff Benjamin J. Scotti suffers from multiple past traumatic brain

774834

injuries affecting multiple areas of his brain and includes but is not limited to the following symptoms: manic depression, bipolar disorder and claustrophobia.

### Ralph V. Guglielmi

159.   Plaintiff Ralph V. Guglielmi was born on June 26, 1933, in Columbus, Ohio.  Mr. Guglielmi currently lives in Wallace, North Carolina.

160.   Plaintiff Ralph V. Guglielmi was drafted in the first round of the 1955 NFL draft and was the quarterback for the Washington Redskins from 1955 to 1960, for the St. Louis Cardinals in 1961, for the New York Giants from 1962 through 1963, and for the Philadelphia Eagles in 1964.

161.   Plaintiff Ralph V. Guglielmi suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL, including, but not limited to, a severe hit to his head which caused temporary loss of sensation in his legs.

162.   Plaintiff Ralph V. Guglielmi was not warned by the NFL, NFL Properties, Inc. or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

163.   Plaintiff Ralph V. Guglielmi suffers from multiple past traumatic brain injuries affecting multiple areas of his brain and includes but is not limited to the following symptoms: short term memory loss.

### FIRST CAUSE OF ACTION

### NEGLIGENCE

### (As Against The NFL)

164.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein at length.

165.   By managing, governing and promoting the game of football, setting and enforcing rules and league policies, regulating team ownership, affirmatively and voluntarily establishing the MTBI to examine the dangers and consequences of

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

concussive brain injuries to NFL players, and by and through its monopoly power in American football, the NFL assumed a gratuitous independent tort duty to protect the health and safety of its players, including Plaintiffs, including, but not limited to, a duty to establish and enforce rules that protect its players, a duty to use reasonable care in researching, studying and/or examining the dangers and risks of concussive brain injuries and the subsequent damaging effects to its players, a duty to inform and warn its players of such risks, and a duty to take other reasonable action to minimize such risks to its players.

166.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by failing to enact rules, policies and regulations to best protect its players, including, but not limited to, mandatory rules that would prevent a player who suffered a concussive brain injury from returning to play or practice at risk of further injury.

167.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by implementing standardized post-concussion guidelines, which permitted players to return to play or practice too soon after a concussive brain injury, which were false and misleading, and which failed to apprise Plaintiffs of the risks of concussive brain injuries and the subsequent damaging effects.

168.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by failing to invoke league-wide guidelines, policies and procedures regarding the identification and treatment of concussive brain injury, and the return to play after a concussive brain injury.

169.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by failing to provide complete, current, and competent information and directions to NFL physicians, trainers and coaches regarding concussive brain injuries and its prevention, symptoms

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

1    and treatment.

2        170.   The NFL breached its duty to its players, including Plaintiffs, to use

3    ordinary care to protect the health and safety of its players by failing to properly

4    inform or warn its players, including Plaintiffs, and the public of the risks of

5    concussive brain injuries and the subsequent damaging effects.

6        171.   The NFL breached its duty to its players, including Plaintiffs, to use

7    ordinary care to protect the health and safety of its players by failing to ensure

8    accurate diagnosis and recording of concussive brain injury be taken of its players so

9    conditions may be treated in an adequate and timely manner.

10       172.   The NFL breached its duty to its players, including Plaintiffs, to use

11   ordinary care to protect the health and safety of its players by failing to regulate and

12   monitor practices, games, equipment, and medical care so as to minimize the long-

13   term risks associated with concussive brain injuries suffered by its players, including

14   Plaintiffs.

15       173.   The NFL breached its duty to its players, including Plaintiffs, to use

16   ordinary care to protect the health and safety of its players by failing to license and

17   approve the best equipment available that will reduce the risk of concussive brain

18   injury.

19       174.   The NFL breached its duty to its players, including Plaintiffs, to use

20   ordinary care to protect the health and safety of its players by failing to use reasonable

21   care in the manner in which it created the MTBI and in the appointment of physicians

22   to head the MTBI who were not qualified for the job.

23       175.   The NFL breached its duty to its players, including Plaintiffs, to use

24   ordinary care to protect the health and safety of its players by failing to use reasonable

25   care in researching, studying and/or examining the risks of head injuries and/or

26   concussions in professional football and in downplaying (and in many cases, denying)

27   both the seriousness of such injuries and the clear causal connection between

28   concussions and brain damage.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

176.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by failing to use reasonable care in responding to independent scientific studies on the risk of concussive brain injuries and the subsequent damaging effects.

177.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by failing to use reasonable care in denying and/or ignoring scientific evidence connecting concussive brain injuries to the risk of brain disease.

178.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by engaging in practices that restrain the development of good science on the problem of concussion injuries.

179.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by failing to prevent its players, including Plaintiffs, from being coached, trained and encouraged to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads.

180.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by condoning or failing to significantly condemn its players, including Plaintiffs, from using of all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads.

181.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the health and safety of its players by subjecting players, including Plaintiffs, to an increased risk of concussive brain injury.

182.   Plaintiffs relied on the NFL's misrepresentations (including affirmative misrepresentations and omissions) detailed herein to their detriment.

183.   Had the NFL taken the necessary steps to oversee and protect its players, including Plaintiffs, by developing and implementing necessary guidelines, policies

1   and procedures and properly informing, educating and training all persons involved

2   with the NFL in the recognition, prevention and treatment of concussive brain

3   injuries, then the NFL players, including Plaintiffs, would not have suffered from the

4   subject condition, would have recovered from the subject condition, and/or would not

5   have suffered the subsequent damaging effects of the subject condition.

6       184.   Under all of the above circumstances, it was foreseeable that the NFL's

7   breach of its duties would cause or substantially contribute to the injuries suffered by

8   Plaintiffs.

9       185.   The NFL's omissions and commissions, collectively and severally,

10   constituted negligence.

11       186.   The NFL's negligence was a proximate and producing cause of the

12   injuries suffered by Plaintiffs.

13       187.   As a result of Plaintiffs' injuries, they are entitled to damages, as alleged

14   herein or allowed by law, from the NFL in an amount to be reasonably anticipated to

15   exceed the jurisdictional minimum of $25,000.

16                      **SECOND CAUSE OF ACTION**

17                               **FRAUD**

18                    **(As Against The NFL)**

19       188.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set

20   forth herein at length.

21       189.   Until June 2010, the NFL, through its MTBI, its agents and others, made

22   material misrepresentations (and omissions) to its players, former players, including

23   Plaintiffs, Congress and the public that there was no causal link between concussions

24   and subsequent brain injury, including headaches, dizziness, dementia, depression,

25   Alzheimer's disease, CTE and death and that NFL players, including Plaintiffs, were

26   not at an increased risk of head injury if they returned to play or practice too soon

27   after suffering a head injury.

28       190.   The material misrepresentations were made by agents of the NFL on

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1    multiple occasions, including, but not limited to MTBI publications, the August 14,

2    2007 press release and "informational" pamphlets issued to NFL players, and the

3    November 2008 press statement made by NFL spokesman Aiello.

4         191.   The persons who made the misrepresentations were agents of the NFL

5    and knew they were false when they were made.

6         192.   The persons who made the misrepresentations, as agents of the NFL,

7    intended to defraud, among others, Plaintiffs in this action and to prevent negative

8    publicity and increased scrutiny of its medical practices.

9         193.   Plaintiffs, among others, justifiably relied on these misrepresentations to

10   their detriment in returning to play or practice too soon or not seeking appropriate

11   medical care after sustaining a head injury.

12        194.   The NFL knew, or should have known, that Plaintiffs would rely on the

13   NFL's misrepresentations.

14        195.   Plaintiffs, among others, were damaged by these misrepresentations.

15   Among other things, they require increased home care, loss of employment, medical

16   costs and pain and suffering.

17        196.   As a result of Plaintiffs' injuries, they are entitled to damages, as alleged

18   herein or allowed by law, from the NFL in an amount to be reasonably anticipated to

19   exceed the jurisdictional minimum of $25,000.

## THIRD CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (Against the NFL)

23        197.   Plaintiffs incorporate by reference the foregoing paragraphs as if set fully

24   herein at length.

25        198.   The NFL and its MTBI concealed from Plaintiffs the risk of concussive

26   brain injuries and the risk to Plaintiffs if they returned to play or practice too soon

27   after suffering from a head injury.

28        199.   In particular, the NFL and its MBTI, through public statements,

774834

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1  published articles, testimony at congressional hearings, and the August 14, 2007
2  "informational" pamphlet (which was issued directly to NFL players), concealed and
3  misrepresented the known long-term risks of concussive brain injuries to NFL
4  players, including Plaintiffs.

5      200.   The NFL and its MBTI failed to disclose the clear link between
6  concussions and long-term neurological injuries and concealed this information from
7  its players, including Plaintiffs, with an intent to defraud Plaintiffs and prevent
8  negative publicity and increased scrutiny of its medical practices.

9      201.   The NFL, in managing, governing and promoting the game of football,
10  setting and enforcing rules and league policies, and regulating team ownership, had
11  the duty to disclose the risks faced by its players, including Plaintiffs, relating to
12  concussive brain injuries received by them during their NFL careers.

13      202.   NFL players, including Plaintiffs, relied on the NFL's and the MBTI's
14  public statements, published articles, testimony at congressional hearings and/or at
15  least the August 14, 2007 "informational" pamphlet, which was issued directly to all
16  NFL players.  Plaintiffs were unaware of the true risks of the concussive brain injuries
17  they sustained during their NFL careers.

18      203.   The NFL knew that Plaintiffs would rely on the inaccurate information in
19  selecting their course of action (i.e. returning to play or practice too soon or not
20  seeking appropriate medical care after sustaining a head injury).  In issuing the
21  "informational" pamphlet, the NFL stated, "[we want to make sure all N.F.L.
22  players… are fully informed and take advantage of the most up to date information
23  and resources as we continue to study the long-term impact on concussions."

24      204.   As a direct and proximate result of the NFL's fraudulent conduct,
25  Plaintiffs have suffered injuries, including, but not limited to short-term memory loss,
26  headaches, blurred vision, sleep deprived anxiety and economic loss.

27  **FOURTH CAUSE OF ACTION**
28  **NEGLIGENT MISREPRESENTATION**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**(Against the NFL)**

205.   Plaintiffs incorporate by reference the foregoing paragraphs as if set fully herein at length.

206.   The NFL misrepresented the dangers of concussive brain injuries received by its players and the dangers which its players faced in returning to play or practice too quickly after sustaining a head injury.  The NFL's MTBI, through public statements, published articles and the August 14, 2007 "informational" pamphlet, which it issued directly to all NFL players, misleadingly downplayed the long-term risks of concussions to NFL players.

207.   The NFL's material misrepresentations include, but are not limited to:

(a)   MBTI articles asserting that returning to play after a concussion "does not involve significant risk of a second injury either in the same game or during the season"; and

(b)   The NFL's press release and issuance of the August 14, 2007 pamphlet to NFL physicians, trainers, coaches and players, asserting that "Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems... It is important to understand that there is no magic number for how many concussions is too many."

208.   The NFL knew or should have known that such statements, articles and pamphlet were false and misleading.

209.   The NFL made these misrepresentations and actively concealed contrary information with the intent that its players, including Plaintiffs, would rely on the misrepresentations or omissions in selecting their course of action (i.e. returning to play or practice too soon or not seeking appropriate medical care after sustaining a head injury), to prevent negative publicity and to prevent increased scrutiny of its medical practices.

210.   Plaintiffs did not know, nor should Plaintiffs have known, that the NFL's

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

1    statements were false or misleading.

2        211.   Plaintiffs reasonably relied upon the misrepresentations of the NFL in

3    selecting their course of action during and after their NFL careers to their detriment.

4        212.   As a direct and proximate result of the NFL's fraudulent conduct,

5    Plaintiffs have suffered injury, including, but not limited to, short-term memory loss,

6    headaches, blurred vision, sleep deprived anxiety and economic loss.

7                          **FIFTH CAUSE OF ACTION**

8                 **STRICT LIABILITY FOR DESIGN DEFECT**

9                          **(As Against Riddell)**

10       213.   Plaintiffs incorporate by reference the foregoing paragraphs as if set

11   forth herein at length.

12       214.   Riddell designs, manufactures, sells and distributes football equipment,

13   including helmets, to the NFL, and has been the official helmet provider of the NFL

14   since 1989.

15       215.   At the time the helmets were designed, manufactured, sold and

16   distributed by Riddell, the helmets were defective in design, unreasonably dangerous,

17   and unsafe for their intended purpose because they did not provide adequate

18   protection against the foreseeable risk of concussive brain injury.  The design defect

19   includes, but is not limited to, the following:

20           (a)    Negligently failing to design the subject helmet with a safe means

21       of attenuating and absorbing the foreseeable forces of impact in order to

22       minimize and/or reduce the forces and energy directed to the player's head;

23           (b)    Negligently designing the subject helmet with a shock attenuating

24       system which was not safely configured for all portions of the helmets

25       reasonably foreseen to be used by players;

26           (c)    Negligently failing to properly and adequately test the helmet

27       model;

28           (d)    Negligently failing to warn players, including Plaintiffs, that their

774834

helmets would not protect against the long-term health consequences of concussive brain injury resulting from reasonably foreseen uses of the helmets by players; and

(e)     Other acts of negligence that may be discovered during the course of this matter.

216.   At all times, the helmets were used for the purpose for which they were intended.  All portions of the helmets were used by players, including Plaintiffs, to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads.  Such use was reasonably foreseeable to Riddell.

217.   Riddell is strictly liable for designing a defective and unreasonably dangerous product and for failing to warn players, including Plaintiffs, of the defective design and unreasonably dangerous condition of the helmets.

218.   The defective design and unreasonably dangerous condition of the helmets and Riddell's failure to warn were proximate and substantial causes of Plaintiffs' injuries and other damages, including, but not limited to, economic and non-economic damages.

219.   A safer alternative design was economically and technologically feasible at the time the product was designed, manufactured, sold and distributed by Riddell.

220.   As a result of Plaintiffs' injuries, Plaintiffs are entitled to damages from Riddell in an amount reasonably anticipated to exceed the jurisdiction minimum of $25,000.

## SIXTH CAUSE OF ACTION

## NEGLIGENCE

## (As Against Riddell)

221.   Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

222.   Riddell designs, manufactures, sells and distributes football equipment, including helmets, to the NFL, and has been the official helmet provider of the NFL

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

since 1989.  In 1997, Riddell became a part of the NFL's MTBI project of assessing concussions and health consequences to NFL players by analyzing and reconstructing head impacts.  In 2006, Riddell undertook a study appearing in *Neurosurgery* that was co-authored by members of the MTBI.  The study touted Riddell's "Revolution" helmet as reducing the risk of concussions in over 2,000 high school athletes in Western Pennsylvania.

223.   As such, Riddell has the duty to provide necessary and adequate safety and instructional materials, warnings and means to reduce and/or minimize the risks associated with concussive brain injuries sustained by players, including Plaintiffs, while playing football and while wearing Riddell's helmets.

224.   Riddell failed to provide the necessary and adequate safety and instructional materials, warnings and means to reduce and/or minimize the risks associated with concussive brain injuries sustained by players, including Plaintiffs, while playing football and while wearing Riddell's helmets.

225.   As a result of Riddell's breach of duty, Plaintiffs have suffered injuries, including, but not limited to, short-term memory loss, headaches, blurred vision, sleep deprived anxiety and economic loss.

226.   As a result of Plaintiffs' injuries, Plaintiffs are entitled to damages from Riddell in an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.

## SEVENTH CAUSE OF ACTION

## FAILURE TO WARN

### (As Against Riddell)

227.   Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

228.   Riddell designs, manufactures, sells and distributes football equipment, including helmets, to the NFL, and has been the official helmet provider of the NFL since 1989.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834

229.   At the time the helmets were designed, manufactured, sold and distributed by Riddell, Riddell knew or should have known of the substantial dangers involved in the reasonably foreseeable uses of the helmets.

230.   The risks involved in the reasonably foreseeable uses of the helmets presented a substantial danger to users of the helmets, including Plaintiffs.

231.   Ordinary consumers, including Plaintiffs, would not have recognized or known the potential risks and dangers involved in the reasonably foreseeable uses of the helmets.

232.   Riddell knew that these substantial dangers were not readily recognizable to ordinary consumers, including Plaintiffs, and that such persons, including Plaintiffs, would use the helmets without inspection for defects.

233.   Riddell failed to adequately warn (and instruct) users of the helmets, including Plaintiffs, of the risks involved in the reasonably foreseeable uses of the helmets.

234.   At all times, the helmets were used for the purpose for which they were intended.  All portions of the helmets were used by players, including Plaintiffs, to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads.  Such use was reasonably foreseeable to Riddell.

235.   As a result of the lack of sufficient warnings and/or instructions, Plaintiffs suffered injuries and damages, including, but not limited to, economic and non-economic damages.

236.   The lack of sufficient warnings and/or instructions was a substantial factor in causing Plaintiffs' injuries and other damages.

237.   As a result of Plaintiffs' injuries and damages, Plaintiffs are entitled to damages from Riddell in an amount reasonably anticipated to exceed the jurisdiction minimum of $25,000.

## **EIGHTH CAUSE OF ACTION**

## **NEGLIGENCE**

1

**(As Against NFL Properties)**

2    238.   Plaintiffs incorporate by reference the foregoing paragraphs as if set

3 forth herein at length.

4    239.   NFL Properties is engaged in, among other activities, the approving of

5 licensing and the promotion of equipment used by all NFL teams and NFL players,

6 including Plaintiffs.  As such, NFL Properties has a duty to ensure that the equipment

7 it licensed and approved were of the highest possible quality and were sufficient to

8 protect the NFL players, including Plaintiffs, from the risks associated with

9 concussive brain injuries.

10    240.   NFL Properties breached its duty by licensing Riddell's helmets and

11 approving and/or requiring the use of Riddell's helmets by the NFL players, including

12 Plaintiffs, while knowing, or having reason to know, that the helmets were

13 negligently and defectively designed and/or manufactured.

14    241.   As a result of these breaches by NFL Properties, Plaintiffs suffer injuries

15 and the effects of concussive brain injuries, including, but not limited to, short-term

16 memory loss, headaches, blurred vision, sleep deprived anxiety and economic loss.

17    242.   As a result of Plaintiffs' injuries, Plaintiffs are entitled to damages from

18 NFL Properties in an amount reasonably anticipated to exceed the jurisdictional

19 minimum of $25,000.

20    **NINTH CAUSE OF ACTION**

21    **LOSS OF CONSORTIUM**

22    **(As Against All Defendants)**

23    243.   Plaintiffs incorporate by reference the foregoing paragraphs as if set

24 forth herein at length.

25    244.   As a direct and proximate result of the carelessness, negligence and

26 recklessness of all Defendants and of the aforesaid injuries to their husbands, Octavia

27 McDougle, Kristine Cook, Ann Frances Jackson, Stacey Clay and Stephanie Byers

28 (collectively the "Wife Plaintiffs") have been damaged as follows:

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

38

COMPLAINT

1    (a)    They have been and will continue to be deprived of the services,
2    assistance, protection, affection, society and companionship of their husbands;

3    (b)    They have been and will continue to be required to spend money for
4    medical care and household care for the treatment of their husbands;

5    (c)    They have been and will continue to be deprived of the earnings of their
6    husbands.

7    245.   As a result of their husbands' injuries, the Wife Plaintiffs are entitled to
8    damages from the Defendants, in an amount reasonably anticipated to exceed the
9    jurisdiction minimum of $25,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.    For compensatory and general damages according to proof;

2.    For special and incidental damages according to proof;

3.    For punitive damages where applicable;

4.    For costs of the proceedings herein, including reasonable attorneys' fees, to the extent permitted by law; and

5.    For all such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED: July 3ᵣ, 2012

GLASER WEIL FINK JACOBS
HOWARD AVCHEN & SHAPIRO LLP


By: _____
FRED D. HEATHER
ADAM LEBERTHON
MARY ANN T. NGUYEN

Attorneys for Plaintiffs

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

774834