# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION

THIS DOCUMENT RELATES TO:

THOMAS FRANKLIN MCDONALD
and PATRICIA A. MCDONALD, h/w,

     Plaintiffs,

        v.

NATIONAL FOOTBALL LEAGUE and
NFL PROPERTIES LLC,

     Defendants.

MDL No.  2323
No. 12-md-2323-AB

CIVIL ACTION
No. 2:12-cv-02728-AB

**PLAINTIFFS' MOTION TO REMAND, FOR DISCOVERY IN AID OF REMAND, AND
FOR SANCTIONS, COSTS AND ATTORNEY'S FEES**

Plaintiffs, Thomas Franklin McDonald and Patricia McDonald, h/w, by counsel, move to remand their case to the Philadelphia Court of Common Pleas, move for discovery in aid of their motion to remand, and move for sanctions, costs and attorney's fees. In support of their motion,

Plaintiffs rely on and incorporate their Memorandum in Support which is incorporated herein by reference.

Respectfully submitted,

LOCKS LAW FIRM

Dated: June 18, 2012

/s/ *Gene Locks*

Gene Locks, Esquire (PA ID No. 12969)
Michael B. Leh, Esquire (PA ID No. 42962)
David D. Langfitt, Esquire (PA ID No. 66588)
Marc P. Weingarten, Esquire (PA ID No. 23718)
Jonathan W. Miller, Esquire (PA ID No. 15182)
601 Walnut Street, Suite 720 East
Philadelphia, PA 19106
215-893-0100 (tel.)
215-893-3444 (fax)
glocks@lockslaw.com
mleh@lockslaw.com
dlangfitt@lockslaw.com
mweingarten@lockslaw.com
jmiller@lockslaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  NATIONAL FOOTBALL<br>LEAGUE PLAYERS' CONCUSSION<br>INJURY LITIGATION | MDL No.  2323<br>No. 12-md-2323-AB |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION<br>No. 2:12-cv-02728-AB |
| THOMAS FRANKLIN MCDONALD<br>and PATRICIA A. MCDONALD, h/w, | |

Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE and
NFL PROPERTIES LLC,

Defendants.

## ORDER

**AND NOW,** this _____ day of _____, 2012, upon consideration of Plaintiffs' Motion to Remand, for Discovery in Aid of Remand, and for Sanctions, Costs and Attorney's Fees, ("Plaintiffs' Motion"), and any response thereto, it is hereby **ORDERED** and **DECREED** that Plaintiffs' Motion for Discovery in Aid of Remand as set forth in Plaintiffs' Motion is **GRANTED.**

It is further **ORDERED** that Plaintiffs' Motion to Remand and Plaintiffs' Motion for Sanctions, Costs and Attorney's Fees, are **HELD UNDER ADVISEMENT** pending the completion of the discovery authorized by this Order.

**BY THE COURT:**

_____
                                                            **J.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | MDL No. 2323<br>No. 12-md-2323-AB |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION<br>No. 2:12-cv-02728-AB |
| THOMAS FRANKLIN MCDONALD and PATRICIA A. MCDONALD, h/w, | |
| Plaintiffs, | |
| v. | |
| NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC, | |
| Defendants. | |

## ORDER

**AND NOW,** this _____ day of _____, 2012, upon consideration of Plaintiffs' Motion to Remand , for Discovery in Aid of Remand, and for Sanctions, Costs and Attorney's Fees,  and all opposition thereto, it is hereby **ORDERED** and **DECREED** as follows:

1. Plaintiffs' Motion to Remand is **GRANTED.**

2. The instant case is **REMANDED** to the Philadelphia Court of Common Pleas.

3. Plaintiffs' Motion for Sanctions, Costs and Attorney's Fees, is **GRANTED.** Plaintiffs shall have ten (10) days from the date of this Order to set forth their costs and attorney's fees incurred in connection with the instant Motion to Remand.

1

4.  Plaintiffs' Motion for Discovery in Aid of Remand is **MOOT.**

**BY THE COURT:**

_____
                                 **J.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | MDL No. 2323<br>No. 12-md-2323-AB |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION<br>No. 2:12-cv-02728-AB |
| THOMAS FRANKLIN MCDONALD and PATRICIA A. MCDONALD, h/w, | |
| Plaintiffs, | |
| v. | |
| NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND,
FOR DISCOVERY IN AID OF REMAND,
AND FOR SANCTIONS, COSTS, AND ATTORNEY'S FEES**

Plaintiffs, THOMAS FRANKLIN MCDONALD and PATRICIA A. MCDONALD, by counsel, respectfully submit this Memorandum in support of their Motion to Remand, for Discovery in Aid of Remand, and for Sanctions, Costs, and Attorney's Fees for filing a frivolous Notice of Removal.

## I.  SUMMARY OF ARGUMENT

A.     The Defendants' (hereinafter "NFL") Notice of Removal is clearly and obviously deficient, because there cannot be any federal jurisdiction in this case.  None of Mr. McDonald's claims could possibly arise from, be dependent upon, or be "inextricably intertwined" with any provision of the 1968 collective bargaining agreement ("CBA").  Mr. McDonald is a Hall of Fame former NFL player, who began playing in 1957 and retired before the beginning of the 1968 season, the first season in which players and teams had agreed to a CBA.  He was coaxed

out of retirement on a handshake to play nine (9) games in the 1968 season without a contract. Mr. McDonald caught a mere seven passes for 113 yards during limited time on the field during that season and, to the best of his recollection, sustained no injuries or impact during his brief appearances. During those brief appearances in 1968, he was largely a decoy.

      B.      As a result, this Court need not refer to any CBA at all. If, however, the Court chooses to review the 1968 CBA, the Court will find that there are no references to head impacts, concussive or sub-concussive injury, or neuro-cognitive injury to players. There is no reference to the party who might or might not be responsible for addressing those issues. Contrary to Defendants' argument for removal, the Court will not find in the 1968 CBA any incorporation by reference of the Bylaws and Constitution of the NFL, the two documents on which the Defendants rely for the argument that the CBA refers to negotiated rules governing player safety that address Mr. McDonald's claims. The notion that the 1968 CBA incorporates the Bylaws and Constitution is a fiction.

      C.      To the extent the Court determines that the arguments for remand are insufficient, Mr. McDonald respectfully requests that this Court allow discovery in aid of remand since factual issues are contested. *See USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 197-98 (3d Cir. 2003)* (on appeal from an order denying remand and denying jurisdictional discovery, Court reversed and remanded for jurisdictional discovery), *cert. den., 541 U.S. 903, 124 S. Ct. 1602, 158 L. Ed. 2d 244 (2004).* The specific discovery requested is set forth within this Memorandum.

## II. **RELEVANT FACTS**

      Tommy McDonald starting playing in the NFL in 1957 for the Philadelphia Eagles as a flanker and wide-out. Attached as Exhibit "A" is Mr. McDonald's Declaration. Mr. McDonald

played from 1957 to 1968.  Seven of those seasons were with the Philadelphia Eagles.  As a member of the Eagles, he caught the winning touchdown pass in the Eagles' only NFL championship season, in 1960.  In 1958, he led the NFL in touchdown receptions.  In 1961, he led the NFL in reception yardage and touchdowns.  He had a career total of 495 receptions, including 84 touchdowns and was selected to the Pro Bowl (the NFL's all-star game) six times.  He was elected to the NFL Hall of Fame in 1998.  *See* Exhibit "A."

Mr. McDonald states that he had retired as an NFL player at the end of the 1967 season.  While in retirement, he received a phone call a friend who coached the Cleveland Browns.  The friend asked him to play for the Browns, because a receiver had suffered a broken leg, and  the team needed help.  Mr. McDonald agreed, but never signed a contract.  He agreed to play on a handshake.  He never paid any dues to a collective bargaining check-off.  He was unaware that a CBA even existed.

Mr. McDonald starting playing in the middle of the 1968 season.  During his time with the Browns, he appeared in nine games and caught a mere seven passes.  With those catches, he gained a mere 113 yards.  To the best of his recollection, he had no blocking assignments and was either a receiver or a decoy.  He sustained no injuries or impacts that could contribute to his present physical condition.

By contrast, in Mr. McDonald's prior 11 seasons, he caught almost five hundred (500) hundred passes for more than 8,000 yards, returned punts and kickoffs, and sustained substantial injuries.  Nothwithstanding those injuries, he missed only three (3) games during those first eleven (11) seasons.  Presently, Mr. McDonald suffers from severe memory loss, mood disorders, and dementia.  *See* Exhbit "A."

The NFL's Petition for Removal relies on its standard argument for preemption under section 301 of the Labor Management Relations Act ("LMRA").  The NFL claims that the Court must interpret provisions of the 1968 CBA (attached as Exhibit B) to adjudicate the rights and duties of the parties in connection with Mr. McDonald's claims.  The NFL also claims that the Court must look to and interpret the NFL Constitution and Bylaws, which the 1968 CBA allegedly incorporates by reference.  *See* Notice of Removal [Document 1, ¶¶ 9-11, pp. 16-20]. The specific grounds alleged by Defendants for preemption are the following:

- Mr. McDonald's rights were allegedly created by the 1968 CBA;

- Mr. McDonald's rights are allegedly **not** based on a duty the NFL would owe to every person in society;

- Mr. McDonald's rights are allegedly inextricably intertwined with or substantially dependent on an interpretation of the 1968 CBA.

## III. ARGUMENT

### A. The NFL Has The Burden of Proof.

The NFL must prove jurisdiction in this Court. *Meddles v. Warminister Volunteer Ambulance Corps, 2006 U.S. Dist. LEXIS 81759, \*2-\*3 (E.D. Pa., Oct. 27, 2006)* (citing *Samuel-Bassett v. KIA Motors America, Inc., 357 F.3d 392, 397 (3d Cir. 2004)*). Removal statutes are to be "strictly construed against removal and all doubts should be resolved in favor of remand." *Gaul v. Neurocare Diagnostic, Inc., 2003 U.S. Dist. LEXIS 546, \*4 (E.D. Pa. Jan. 6, 2003)* (quoting *Steel Valley Auth. v. Union Switch & Signal Div., American Standard, Inc., 809 F.2d 1006, 1010 (3d Cir. 1987), cert. dismissed sub nom. American Standard, Inc. v. Steel Valley Auth., 484 U.S. 1021, 108 S. Ct. 739, 98 L. Ed. 2d 756 (1988)*). The district court must "assume

as true all factual allegations of the complaint." *Gaul, supra, 2003 U.S. Dist. LEXIS 546 at *4* (quoting *Steel Valley Auth., supra*).

## B. General Standards for Section 301 Preemption.

The "well-pleaded complaint rule" provides that federal jurisdiction exists only when a federal question is presented on the face of the complaint. *Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 2429, 96 L. Ed. 2d 318, 327 (1987)* (citation omitted). The plaintiff is the master of his or her claim: that is, federal jurisdiction may be avoided by exclusive reliance on state law. *Id.* (footnote omitted). Complete preemption is an independent corollary to the well-pleaded complaint rule, and converts a state law complaint into a federal claim in cases that raise Section 301 preemption. *Id., 482 U.S. at 393, 107 S. Ct. at 2430, 96 L. Ed. 2d at 327-328.* "In order for there to be § 301 preemption, the plaintiff must plead an action that requires interpretation of the collective bargaining agreement." *Henderson v. Merck & Co., Inc., 998 F. Supp. 532, 537 (E.D. Pa. 1998)* (citation omitted). The Supreme Court stated that the preemption exists if the court determines that the claim is "inextricably intertwined" with the CBA, *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213, 105 S. Ct. 1904, 1912, 85 L. Ed. 2d 206, 216 (1985)*, or that the claim is "substantially dependent on analysis" of a CBA. *Caterpillar, supra, 482 U.S. at 394, 107 S. Ct. at 2431, 96 L. Ed. 2d at 328* (citation omitted). In either case, the court must analyze the CBA and compare it to the plaintiff's claims (that is, the facts and circumstances of the plaintiff's allegations).

A state law claim is not preempted even if it addresses the same set of facts as a CBA, as long as the adjudication of the state law claim does not require interpretation of the CBA. *See Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 410, 108 S. Ct. 1877, 1883, 100 L. Ed. 2d 410, 421 (1988)*. A dispute that only tangentially involves a CBA may not be preempted.

*See id., 486 U.S. at 413 n. 12, 108 S. Ct. at 1884 n. 12, 100 L. Ed. 2d at 423 n. 12.*  Section 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law...." *Kline v. Security Guards, Inc., 386 F.3d 246, 254 (3d Cir. 2004)* (quoting *Livadas v. Bradshaw, 512 U.S. 107, 122-24, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994)*).

Section 301 preemption is narrow.  The Third Circuit has interpreted *Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Automobile, Aerospace, Agricultural Implement Workers of America, Int'l Union, 523 U.S. 653, 118 S. Ct. 1626, 140 L. Ed. 2d 863 (1998)* as taking "a very narrow view of federal jurisdiction under section 301," and as signaling "a narrow approach to section 301 jurisdiction." *Voilas v. Local # 731, Int'l Union, United Automobile Aerospace and Agricultural Implement Workers of America, 170 F. 3d 367, 375 n. 1 (3d Cir. 1999).*  The Court further said that *Textron* "suggests a correspondingly narrow scope for [Section 301] preemption." *Id.*

### C.  <u>Section 301 Does Not Apply To This Case.</u>

Defendants make three arguments in their Notice of Removal to justify complete preemption under Section 301.  None has merit.

One argument is that the duties of the NFL to Mr. McDonald were created by the 1968 CBA.  Notice of Removal [Document 1, ¶ 11, p. 19].  Defendants are absolutely wrong.  First, the 1968 CBA is not mentioned in the Complaint.  All seven Counts are traditional state law torts: action for declaratory relief – liability, medical monitoring, fraudulent concealment, fraud, negligent misrepresentation, negligence and loss of consortium.  Second, the CBA does not mention in any provision any negotiated duty by the NFL relating to latent neuro-cognitive injury that arises later in life as a result of repetitive head impacts in NFL games and practices.  Further, since the NFL relies on the 1968 CBA as the source for its duties to Mr. McDonald (and

presumably Mr. McDonald's rights to sue the NFL for latent neuro-cognitive injuries), <u>discovery</u> is needed to learn the provisions of the 1968 CBA on which Defendants rely and how those provisions allegedly created McDonald's rights and the NFL's duties in connection with the latent neuro-cognitive injuries from which Mr. McDonald now suffers.  Discovery is needed regarding the negotiation process of the CBA and whether anyone within that process ever thought that latent neuro-cognitive injuries that would arise later in Mr. McDonald's life were a negotiated subject of collective bargaining.  The NFL alludes to and quotes from selected excerpts of the 1968 CBA, but it did not attach a copy of the 1968 CBA to the Notice of Removal. A copy of the 1968 CBA is attached hereto as Exhibit "B."

The 1968 CBA is a thin document that has more to do with player travel stipends than it has to do with duties the NFL may or may not have to its players regarding injury.  Because the 1968 CBA is devoid of any language to support the NFL's argument, the NFL  failed to attach the document to its Notice of Removal.  The NFL also invokes the NFL Constitution and Bylaws, as if those documents are part of the 1968 CBA (which obviously they are not), and as if they were part of the collective bargaining process between the NFL and the players (which on information and belief they were not).

In its Notice of Removal, at paragraph 9, page 16, the NFL contends: "[f]or example, adjudicating plaintiffs' claims will hinge on a provision of the 1968 CBA relating to player medical care", yet there is no reference to player medical care in the 1968 CBA.  *See* Exhibit "B."  The NFL's reference concerning the home team providing a doctor and ambulance for each game is in the 1968 Constitution and Bylaws, not the CBA.  *See id.*, pp. 16-17.  The NFL's only cite in paragraph 9 to the 1968 CBA is to Article IX, which does not mention head impacts, latent neuro-cognitive injuries, the risk of early onset of dementia and encephalopathy, doctors,

ambulances, or player safety issues.  It only mentions <u>grievance procedures, relating to player</u> <u>contracts</u>.  *See id*, p. 17.  Grievance procedures are defined as: "'[g]rievance' shall mean a request or complaint by a player, the Association or a Member Club against any of the contracting parties to this Agreement relating to any matter involving the interpretation or application of any provision of this governing Agreement or the standard Player Contract."  See Exhibit B, 1968 CBA, Article IX, Section 1(a).

Mr. McDonald's lawsuit is not a grievance procedure.  It does not relate to any contract, because he played without a contract during the few games in which he made an appearance during the 1968 season.  Prior to the 1968 season, there was no CBA.  For that reason, this Court will not have to interpret, apply, or even refer to the grievance procedures of the 1968 CBA to determine the NFL duties to Mr. McDonald regarding the claims set forth in his Complaint.

Similarly, the Defendants' first sentence in paragraph 10 of the Notice of Removal [Document 1, ¶ 10, p. 17] states: "the 1968 CBA, like the later CBAs, delegates to the member clubs the responsibility to provide medical care to NFL players."  The NFL, however, fails to cite to the CBA but, rather, cites to the 1968 Constitution and Bylaws, which allegedly require the home team to provide a doctor and ambulance for each game.  As a "*see also*" cite, the NFL refers to Article XI, § 5 (really § 4) of the 1968 CBA, which does not refer to head injuries or doctors or ambulances or player safety, but to workers' compensation.  The NFL does not say how or why the worker's compensation provision allegedly covers head impacts and latent neuro-cognitive injury (to which it never refers), such as the early onset of dementia and encephalopathy.  The NFL does not explain how this negotiated provision allegedly created a right for Mr. McDonald to sue for such injuries under the 1968 CBA.

The NFL also makes the  unsupported assertion that the rights Mr. McDonald seeks to vindicate are not based on an independent duty "owed to every person in society," citing *United Steelworkers of America, AFL-CIO-CLC v. Rawson, 495 U.S. 362, 371, 110 S. Ct. 1904, 1910, 109 L. Ed. 2d 362, 374 (1990)*.  Notice of Removal [Document 1, ¶ 11, p. 19].  The NFL does not say why the duties set forth in the Complaint are not owed to every person in society.  For that reason, <u>discovery</u> is needed to determine why the NFL claims that the duties set forth in the Complaint are not owed to every person in society.

Moreover, the NFL's assertion - that the duty Mr. McDonald seeks to vindication must be owed to every person in society to avoid preemption - is incorrect.  The court in *Stringer v. National Football League, 474 F. Supp. 2d 894 (S.D. Ohio 2007)* rejected that argument based on *Rawson* and concluded that the relevant inquiry was "not to whom the duty is owed, but how it came into being." *Stringer, supra, 474 F. Supp. 2d at 908.*  The court in *Jurevicius v. Cleveland Browns Football Co. LLC, 2010 U.S. Dist. LEXIS 144096, *14-*15 (N.D. Ohio, March 31, 2010)* agreed with *Stringer*.

There are additional related issues that the NFL has ignored.  The NFL does not explicitly admit that 1968 is the first year there was a CBA or that for the first eleven years of Mr. McDonald's career, from 1957 to 1967, there was no CBA.  Preemption cannot apply when there is no CBA.  Moreover, pre-emption cannot apply to the claims asserted by Mr. McDonald by reference to a partial season during which Mr. McDonald barely played, had no contract, and never sustained injuries or impacts (to his head or otherwise). *See* Exhibit A.  That partial season is irrelevant to the prior eleven seasons during which Mr. McDonald caught nearly 500 passes for more than 8,000 yards and received constant blows to the head from which he now suffers progressive neuro-cognitive injury and decline. *Id.*

The NFL's reference to the NFL Constitution and Bylaws is spurious. *See, e.g.,* Notice of Removal [Document 1, ¶ 9, pp. 16-17]. Those documents were not the result of collective bargaining with Mr. McDonald, his representative, or any players, so they cannot be within the 1968 CBA. In any event, the 1968 never states that it "adopts" or "incorporates" those documents by reference. To the contrary, the 1968 CBA carefully separates the NFL Constitution and Bylaws from the CBA and states as follows:

> However, to the extent that any of these agreements [including the NFL Constitution and Bylaws] are inconsistent with, or by amendment become inconsistent with this Agreement, the provisions of this Agreement shall govern.

*See* Exhibit B, 1968 Collective Bargaining Agreement, Article III. For this reason, the NFL's argument is obviously mistaken.

Discovery is also needed to determine the basis for the NFL's reference to selected CBA provisions to justify preemption. In the Notice of Removal, the NFL lists certain provisions as examples. *See* Notice of Removal [Document 1, ¶ 9, pp. 16-17]. None of these provisions refers to concussions, repetitive head impacts, latent neuro-cognitive injury, or early onset of dementia and encephalopathy. In fact, not until August, 2011 does any CBA refer to "neuro-cognitive" injuries, and that CBA was negotiated and signed after the first brain injury lawsuits were filed.

The NFL, therefore, seeks to contort the 1968 CBA to include allegedly created "rights" for players and "duties" by the NFL that would purportedly cover latent neuro-cognitive injuries, which the NFL refused to recognize until August, 2011. The NFL's position is nonsense, and shows that the NFL cannot carry its burden of proof.

If the Court disagrees, Mr. McDonald respectfully requests leave to take discovery regarding the NFL's purported basis that the 1968 CBA addresses Mr. McDonald's rights (and the NFL's duties) regarding the head impacts and latent neuro-cognitive injuries sustained by

-10-

Mr. McDonald.  Discovery is needed to determine why the 1968 CBA provisions that do not
mention those issues, yet allegedly create rights and duties that directly relate to them.  The
discovery should include identification of the drafters and negotiators and production of the
relevant drafting documents.  This review of the 1968 CBA in order to determine whether or not
interpretation is needed of the 1968 CBA is "inherently strained," *see Henderson, supra, 998 F.*
*Supp. at 537,* but is permissible. *See Kline, supra, 386 F.3d at 256* ("the mere fact that we must
look at the CBA in order to determine that it is silent on any issue relevant to Appellants' state
claims does not mean that we have 'interpreted' the CBA").

### D.   **Mr. McDonald's Claims are Not Inextricably Intertwined With or Substantially Dependent on an Interpretation of the 1968 CBA.**

The NFL's main argument for Section 301 preemption is that Mr. McDonald's claims are
"inextricably intertwined" with or "substantially dependent" on an interpretation of the 1968
CBA.  Notice of Removal [Document 1, ¶ 8, p. 16].  This requires a claim by claim analysis. *See*
*Henderson, supra, 998 F. Supp. at 537* ("I must turn to the particular claims raised in
Henderson's complaint and determine whether resolution of these claims requires interpretation
of the collective bargaining agreements").  Unless the state law cause of action arose from the
CBA, is dependent on an analysis of the CBA, or is "inextricably intertwined" with the terms of
a CBA, section 301 does not preempt the cause of action. *See e.g. Bartholomew v. AGL Res.,*
*Inc.,* 361 F.3d 1333, 1338 (11th Cir. 2004) (referring to *Allis-Chalmers Corp. v. Lueck,* 471 U.S.
202, 213 (1985). *See also DeCoe v. General Motors Corp., 32 F.3d 212, 216-17 (6th Cir. 1994)*
("A tort claim will be preempted if: (1) it arose from the CBA or (2) resolution of the claim is
substantially dependent on an analysis of the terms of the CBA, or is inextricably intertwined
with it.").

A review of Mr. McDonald's claims shows that they do not arise from, are not "inextricably intertwined" with, and are not "substantially dependent" on an interpretation of the 1968 CBA.

## 1.  Count I: Action for Declaratory Relief – Liability

Count I requests four declarations of liability: (1) in summary, that the NFL knew or should have known of the risks of repeated traumatic brain and head impacts; (2) that the NFL had a duty to advise Plaintiff, Mr. McDonald of these risks; (3) that the NFL willfully and intentionally concealed these risks and misled Plaintiff, and (4) that the NFL recklessly endangered Plaintiff.  Complaint [Document 1, ¶ 195, pp. 64-65].  There is no basis for linking these declarations to the 1968 CBA.  There is no language in the 1968 CBA addressing repeated traumatic brain and head impacts or the risk of latent neuro-cognitive injury.

Even though there is no relevant language in the 1968 CBA, the NFL argues the thin references to workers compensation and the NFL Constitution and Bylaws inextricably intertwine Mr. McDonald's claims with the 1968 CBA.   Mr. McDonald respectfully requests discovery  to determine how and why the NFL's strained reading of the 1968 could possibly apply to his claims.   Specifically, discovery will determine the true purpose of the provisions upon which the NFL relies, and why there is an absence of any reference to head impacts and latent neuro-cognitive injury until the 2011 CBA.

## 2.  Count II: Medical Monitoring.

Count II requests medical monitoring because Mr. McDonald has a heightened risk of latent and progressive neuro-cognitive injury and related conditions.   Medical monitoring facilitates diagnosis and treatment.  Complaint [Document 1, ¶¶ 200, 204, pp. 65, 66].  The NFL has no basis to allege that medical monitoring is provided for in the 1968 CBA.  There is no

provision of the 1968 CBA that even approaches that concept, right or duty.   The seminal Pennsylvania case setting forth the seven elements of medical monitoring is *Redland Soccer Club, Inc. v. Dept. of the Army, 548 Pa. 178, 195-96, 696 A.2d 137, 145-46 (1997).*   One of the seven elements is that the hazardous exposure was caused by the defendant's negligence. *Redland Soccer Club, supra, 548 Pa. at 195, 696 A.2d at 145.*   Since medical monitoring involves negligence, preemption of medical monitoring will be discussed in connection with Count VI, negligence, *infra.*

### 3.   **Count III: Fraudulent Concealment.**

Count III alleges fraudulent concealment of facts and information which caused Mr. McDonald to become exposed to the harm previously described.  Complaint [Document 1, ¶ 216, p. 68].  By its very nature, fraudulent concealment alleges that something has been withheld. Something withheld could not be negotiated as part of the  1968 CBA, which, in any event, was signed after Mr. McDonald had retired.

Pennsylvania has adopted *Section 550, Restatement, Second, of Torts, Liability for Fraudulent Concealment. See Roberts v. Estate of Barbagallo, 366 Pa. Super. 559, 568, 531 A.2d 1125, 1130 (1987).   Section 550* requires concealment or other action that intentionally prevents a person from acquiring material information.  By definition, that information could not have been set forth in the 1968 CBA.

### 4.   **Count IV: Fraud.**

Count IV alleges fraud from the NFL's material misrepresentations that "there was no link (or an insufficient scientific link) between repetitive traumatic head impacts and/or concussions and later in life cognitive/brain injury, including CTE and its related symptoms." Complaint [Document 1, ¶ 222, p. 69].  This is an allegation of affirmative statements by the

-13-

NFL.   These affirmative statements are alleged specifically in the Complaint.   *See, e.g.,* Complaint [Document 1, ¶ 113, p. 50] (statement about lack of increased risk by the NFL's Mild Traumatic Brain Injury Committee).   None of the affirmative statements are connected in any way to the 1968 CBA, and there is no basis for the NFL's attempt to link the fraud claim to any provision in the 1968 CBA.

The Third Circuit's cases deny preemption of fraud counts, unless the claim is based on the specific subject matter of a CBA.   That circumstance does not apply here, because the 1968 CBA contains no language that references head injuries, repetitive concussive and subconcussive impacts, and latent neuro-cognitive injury.   *See Trans Penn Wax Corp. v. McCandless, 50 F.3d 217, 232 (3d Cir. 1995)* (fraud not preempted; "[a]n examination of the employer's behavior, motivation, and statements does not substantially depend upon the terms of the collective bargaining agreement"); *Voilas, supra, 170 F.3d at 378* (fraud not preempted; "[i]n sum, the fraud claim in this case is not directly based upon the collective bargaining agreements in force between the parties; nor will the resolution of the elements of common-law fraud require the interpretation of those bargaining agreements").  *See also Berda v. CBS, Inc., 881 F.2d 20, 26-28 (3d Cir. 1989)* (holding fraud claims not preempted), *cert. den., 493 U.S. 1062, 110 S. Ct. 879, 107 L. Ed 2d 962 (1990). Cf. Beidleman v. The Stroh Brewery Co., 182 F.3d 225, 234 (3d Cir. 1999)* (Court holds fraudulent misrepresentation preempted where the essence of the claim is that employees were denied their rights under a specific agreement).

Cases involving claims against the NFL for football-related injuries also hold that fraud claims are not preempted.   *See Jurevicius, supra, 2010 U.S. Dist. LEXIS 144096 at \*38-\*39; Bentley v. Cleveland Browns Football Co., LLC 194 Ohio App. 3d 826, 832, 958 N.E.2d 585,*

*589 (Ct. Appeals), discretionary appeal not allowed, 130 Ohio St. 3d 1476, 957 N.E. 2d 1168*

*(2011), cert. den., __ U.S. __, __ S. Ct. __, 182 L.Ed. 2d 808 (2012).*

### 5.  Count V: Negligent Misrepresentation.

Count V alleges negligent misrepresentation and arises from statements made by the NFL's Mild Traumatic Brain Injury ("MTBI") Committee about the dangers players face from repetitive traumatic head impacts. *See* Complaint [Document 1, ¶ 232, p. 70].  The statements, upon which Mr. McDonald (as a retired NFL player) relied, occurred between 26 and 42 years after the 1968 CBA, which never addressed any issue relating to repetitive traumatic head impacts and neuro-cognitive injury.  None of these negligent misrepresentations is set forth in the 1968 CBA or in any way could be related to the 1968, which never addressed these issues.

Cases involving claims against the NFL for football-related injuries hold that negligent misrepresentation claims are not preempted.  *See Jurevicius, supra, 2010 U.S. Dist. LEXIS 144096 at *37-*38* ("The duty underlying negligent misrepresentation is a duty owed by any professional to any person acting in justifiable reliance on that professional.  The CBA does not create this requirement."); *Bentley, supra, 194 Ohio App. 3d at 832, 958 N.E.2d at 589* (follows *Jurevicius*).  In *Atwater,* the complaint was based on claims arising in connection with a Financial Advisors Program that was directly connected with an NFL CBA.  *See Atwater, supra, 626 F.3d at 1174-75.*  Accordingly, when the court found preemption of plaintiff's claim for negligent misrepresentation in *Atwater, supra, 626 F.3d at 1182-83,*  it based its decision on a reference in the relevant CBA to a Career Planning Program.  This is distinguishable and completely different from the facts of Mr. McDonald's case.

### 6.  **Count VI: Negligence.**

Count VI alleges that the NFL breach an independently and voluntarily-assumed duty to its players to make rules that would protect their health and safety by failing to implement mandatory rules to minimize adverse consequences from repetitive traumatic head impacts and/or concussions, and to prevent such players from returning to play football too soon or at all. Complaint [Document 1, ¶¶ 247-254, pp. 73-74]  The Complaint alleges six additional specific failures that violated the NFL's voluntarily-assumed duty. *Id.* [Document 1, ¶ 256, pp. 74-75]. These include (1) the failure to require that an adequate sub-concussive and concussive brain injury history be taken; (2) the failure to accurately diagnose and record sub-concussive and concussive brain injuries; (3) the failure to establish guidelines, policies and procedures regarding identification and treatment of sub-concussive and concussive brain injury; (4) the failure to establish proper return-to-play criteria for players who suffered sub-concussive and concussive brain injury; (5) the failure to approve and use the equipment most likely to reduce the risk of sub-concussive and concussive brain injury; and (6) the failure to provide appropriate information to NFL participants regarding sub-concussive and concussive injuries. *Id.*  Neither the duty voluntarily assumed by the NFL nor the rights of Mr. McDonald that arise from the breach of that duty can be found anywhere in the 1968 CBA, which, in any event, does not apply to Mr. McDonald anyway.

The NFL's duty, in fact, arises from the common law, because the NFL voluntarily and historically assumed a duty as the guardian of player safety both before and after Mr. McDonald retired.  The conclusion that duty arises from the common law and not from an interpretation of the 1968 CBA is supported by the doctrine that a state law claim is not preempted even if it addresses the same facts as a CBA, so long as resolution of the state law claim does not require

-16-

interpretation of the CBA. *See Lingle, supra, 486 U.S. at 409-10, 108 S. Ct. at 1883, 100 L. Ed. 2d at 421.* At most, this dispute tangentially involves the 1968 CBA, s*ee id., 486 U.S. at 413 n. 12, 108 S. Ct. at 1884 n. 12, 100 L. Ed. 2d at 423 n. 12,* but only to the extent the Court must consult it to determine that it does not apply.

The conclusion of no preemption is supported by the admonition not to read Section 301 broadly to preempt non-negotiable rights conferred on employees as a matter of state law. *See Kline, supra, 386 F.3d at 254* (quoting *Livadas*). The conclusion of no preemption is also supported by the Third Circuit's interpretation of *Textron* as signaling a narrow approach to Section 301 jurisdiction, and suggesting a correspondingly narrow scope for Section 301 preemption. *See Voilas, supra, 170 F.3d at 375 n. 1.*

The conclusion of no preemption is also supported by football injury cases holding that negligence was not preempted. *See Hendy v. Losse, 1991 U.S. App. LEXIS 2141 (9th Cir. 1991)* (Memorandum; unpublished) (negligent hiring and related claims against the San Diego Chargers not preempted in case challenging care given by team physician); *Jurevicius, supra, 2010 U.S. Dist. LEXIS 144096 at *32-*37* (negligent failure to warn and failure to undertake proper procedures not preempted in case challenging hazardous condition at training facility); *Brown, supra, 219 F. Supp. 2d at 375, 389* (NFL referee threw a weighted penalty flag that hit the plaintiff in the eye).

Other NFL cases that have held that negligence has been preempted because the claim was inextricably intertwined with a CBA are distinguishable. *See, e.g., Atwater, supra,* 626 F.3d at 1179-81 (case involves a Financial Advisors Program, where duties arose directly from a CBA); *Duerson v. National Football League, Inc., 2012 U.S. Dist. LEXIS 66378 (N.D. Ill., May 11, 2012)* (allegation of negligently causing brain damage and death in a case where the court

-17-

found repetitive overlap between playing years with CBAs and admitted injuries); *Stringer, supra* (heatstroke).

Significantly, The NFL admits that the cases on which they rely did not interpret the 1968 CBA but rather, interpreted other CBAs whose provisions differ from the 1968 CBA. Notice of Removal [Document 1, ¶ 10, p. 18] The NFL then states in a conclusory fashion that the provisions of the 1968 CBA had the same substance as those later CBAs. *Id.* Discovery is required to test that proposition and compare the allegedly relevant language in the 1968 CBA with the allegedly similar language in the other CBAs.

In any event, the NFL has not established that the negligence cause of action – particularly the duty – is connected to the 1968 CBA. If such a duty arose from, was dependent on, or was intertwined with a 1968 CBA provision, that provision would specifically address the latent and ongoing neuro-cognitive injuries that manifest long after the careers of NFL players are over and for which Mr. McDonald requires medical monitoring. The NFL would have quoted that provision on the first page of its Notice of Removal. The NFL failed to provide the relevant quotation, because none exists.

### 7. **Count VII: Loss of Consortium.**

Count VII alleges a loss of consortium claim on behalf of Plaintiff, Patricia A. McDonald. Complaint [Document 1, ¶¶ 261-264, p. 76] This cause of action makes no reference to the 1968 CBA. The Notice of Removal provides no argument that Mrs. McDonald's claim is preempted.

### E. **This Court should Impose Sanctions, Costs, Expenses and Attorney Fees Against the NFL for Filing a Frivolous Notice of Removal.**

This Court has inherent power to impose sanctions. In addition, under *28 U.S.C.S. § 1447 (c),* this Court has the power to award "just costs and any actual expenses, including

attorney fees, incurred as a result of the removal." This Court should exercise all these powers because the NFL's Notice of Removal in this case was frivolous for the following reasons:

1. The NFL knew that Mr. McDonald played a miniscule amount of his career during the first year of the 1968 CBA and that Mr. McDonald rarely was on the field and engaged in activity.

2. The NFL knew or should have known that Mr. McDonald participated in the 1968 season without a contract, never paid dues to a collective bargaining check-off, and never knew that a CBA existed.

3. The NFL knew or should have known that in 1968 Mr. McDonald received no injuries or impacts that could have contributed to his present physical condition.

4. The NFL knows that the 1968 CBA does not incorporate by reference the NFL's Constitution and Bylaws.

## IV. **CONCLUSION**

For the foregoing reasons, Plaintiffs Thomas and Patricia McDonald respectfully request that this Court remand the case to the Philadelphia Court of Common Pleas.

In the alternative, prior to ruling on this Motion, Plaintiffs respectfully request that the Court permit discovery as outlined above in aid of the Motion to Remand.

Plaintiffs also request that this Court impose appropriate sanctions, just costs, and actual expenses, including attorney fees, incurred by counsel for the Plaintiffs to respond to a frivolous Notice of Removal. If the Court grants this last request, Plaintiffs request that they be allowed a

short time to present an itemization of their just costs and actual expenses, including attorney fees, to the Court.

Respectfully submitted,

LOCKS LAW FIRM

Dated: June 18, 2012

/s/ *Gene Locks*
Gene Locks, Esquire (PA ID No. 12969)
Michael B. Leh, Esquire (PA ID No. 42962)
David D. Langfitt, Esquire (PA ID No. 66588)
Marc P. Weingarten, Esquire (PA ID No. 23718)
Jonathan W. Miller, Esquire (PA ID No. 15182)
601 Walnut Street, Suite 720 East
Philadelphia, PA 19106
215-893-0100 (tel.)
215-893-3444 (fax)
glocks@lockslaw.com
mleh@lockslaw.com
dlangfitt@lockslaw.com
mweingarten@lockslaw.com
jmiller@lockslaw.com

# EXHIBIT A

## MEMORANDUM OF AGREEMENT

This Memorandum Agreement, dated July 10, 1968, made and entered into between the ten Clubs comprising the American Football League (hereinafter called the "Clubs"), and the American Football League Players Association (hereinafter called the "Association"). The Provisions of this Memorandum Agreement shall become effective July 10, 1968.

The Association represents that it contracts for and on behalf of all of the American Football League Players and individuals who may become such players during the term of this Agreement. The Clubs represent that they contract for and on behalf of themselves, any additional Clubs that may become members of the American Football League, and the successors thereof, and to the extent that the American Football League is obligated hereunder or under any plans or agreements made a part hereof, the Clubs shall cause the League to perform such obligations.

It is the purpose of this Memorandum Agreement to set forth in broad general terms the Agreements that the Parties have made and entered into this date to be memorialized at a future date between the respective counsels of the Parties hereto. Said Agreements are as follows:

7/10/68                                   -1-

1. RECOGNITION

The Clubs recognize the Association as the sole and exclusive collective bargaining representative of all players in the American Football League with regard to all terms and conditions of employment, including minimum players' salaries but excluding players' individual salaries in excess of minima.

2. CONTRACTS

The Standard Player Contract, the American Football League Player Retirement Plan, the American Football League Insurance, Health, Welfare and Major Medical Plan, the League By-Laws, Constitution and Rules, will not be amended or altered in any manner in conflict with the specific terms of this Agreement.  In the event any of the terms are in conflict the terms of this Agreement shall prevail.

3. OPTION EXERCISE DATE

The option in favor of the Clubs set forth in paragraph 10 of the American Football League Standard Players' Contract and paragraph 10 of the Standard Player Contract for Major Professional Football Operations shall be exercised on or before the first day of April or shall terminate.

-2-

7/10/68

4.   CHECK-OFF

Each Club shall deduct from the salary of each player
who is a member of the Association and who has authorized
such deduction, annual Association dues.  Such authorization
shall be in writing on a form provided for the purpose by
by the Association.

All moneys so deducted shall be transmitted within
ten (10) days following such deduction to the person
designated by the Association to receive such money.

5.   MANAGEMENT RIGHTS

Each of the Clubs retains the right to manage the Club
and to direct the players.  The Club, in the exercise of
its rights, shall observe the provisions of the Agreement.

6.   INDIVIDUAL PLAYER SALARY

Subject to the express provisions herein contained,
each player shall negotiate his individual salary, provided,
however, that he may in such negotiations be represented
by a third person, including counsel.

7.   COMPENSATION

Compensation pursuant to the Standard Players Contract
shall be paid immediately following each regularly scheduled
game commencing with the 1968 season.

The Club may withhold the last such payment for a period
up to ten (10) days in order that the Club may estimate and
deduct any charges for which the Player may have been
obligated to the Club during the year.

-3-

7/10/68

The Parties shall study, by Joint Committee, a plan to
establish a twenty-two (22) week pay period ending one week
after the last regularly scheduled League game.

8.   MOVING AND TRANSPORTATION EXPENSE

If and when a player is traded from one Club to another,
after reporting to camp and prior to end of season, he shall
be given moving and transportation expenses based on the
difference in time zones between the Club which he is leaving
and the Club to which he is directed to report, which sum
shall be fixed in advance by the Club he is being assigned to.

| | |
|---|---|
| Within one time zone | $300 |
| From one time zone to the next adjacent time zone | 600 |
| From one time zone to a time zone separated by an intervening time zone | 900 |
| From one time zone to a zone two time zones distant | 1,200 |

Twelve hundred dollars represents the maximum payment which
a player may receive as moving and transportation expenses.
These are standard allowances and shall be paid irrespective
of the actual expense involved.

9.   STANDARD PER DIEM ALLOWANCE FOR AWAY-FROM-HOME GAMES

Each Club shall provide a standard allowance in lieu
of any meal which it fails to provide a player while away

-4-

7/10/68

from home in connection with away-from-home games as
follows:

    Dinner                  $6.50

    Lunch                   2.50

    Breakfast          2.00

7/30/68

-5-

7/10/68                                         -6-

10.   THE DIVISION OF RECEIPTS OF POST-SEASON GAMES

The division and distribution of proceeds to the

players                    severally for all post-season

games which were played in 1967 shall remain the

same as it was in 1967.

11.   AFL ALL STAR GAME COMPENSATION

Each player on the roster of the winning team

shall receive $1,500 and each player on the roster

of the losing team shall receive $1,000.

12.   AFL-NFL ALL STAR GAME

Both parties hereto agree to do all possible to

cause an AFL-NFL All Star Game to be played.

13.   PROCEDURE FOR SETTLEMENT OF CONTRACT DISPUTES

The procedure for settling contract disputes

shall be set forth in complete detail as to manner

and time involved in said procedure in settling all

contract disputes between a player and a club.  The

intent herein is to establish a procedure which will

expedite the hearing of said disputes in a two-step

procedure.  The first step will be between the club

and the player and the second step will be a final

determination by the Commissioner.  At all steps the

club and the player shall have the right to be repre-

sented by counsel and the Association may intervene a

amicus curiae.

7/10/68

-7-

14.  SPECIAL PROCEDURE WITH REGARD TO
     DISCIPLINARY ACTION

        Complaints or grievances involving disciplinary

action such as a fine, suspension or tolling imposed upon

a player by a Club, shall be subject [                 ] to   7

this Section 14 as follows:

        a.  Notice of fines or suspension are to be

transmitted immediately upon their imposition

by the Club to the Association, the President

and the Commissioner.

        b.  The procedure for appeal to the Commis-

sioner will be worked out at a later date

with the intent to expedite any such hearing.

        c.  A player may, if he so desires, be repre-

sented at any step of the disciplinary grievance

procedure.

        d.  The schedule  fine for not reporting to

training camp or being absent from training camp

once having reported shall be set at $100.00 per

day.

15.  NO STRIKES OR LOCKOUTS

        a.  The Association agrees that, while this

contract is in effect, it shall not authorize

a strike, stoppage, or walkout by its member-

ship.  In the event of the occurrence of any

7/10/68                              -8-

unauthorized strike, stoppage or walkout by

any of the players acting in concer, the

Association will, upon being apprised thereof

at once use its best efforts to terminate

such action immediately.

b.  The Clubs, neither individually nor col-

lectively, shall conduct a lockout during the

life of this Agreement.

16.  COMPREHENSIVE AGREEMENT

This Memorandum Agreement (including the provisions

for joint study set forth herein) represents a full and

complete understanding on all bargainable subjects cover-

ing  players during the term of this Agreement, except

for such matters as are expressly excluded from the

terms of this Agreement.

All rights to bargain with on another concerning

any subject whatsoever, except as herein noted, regard-

ing players are expressly waived by the parties for the

duration of this Agreement.

17.  JOINT STUDY OF STANDARD PLAYER CONTRACT

The parties shall establish a joint committee to

review the current standard player contract and shall

endeavor to have established as soon as reasonably pos-

sible a mutually satisfactory new standard player

contract.

-9-

18. PENSION

The American Football League owners will make an additional contribution to the Pension Fund of fifty percent (50%) over and above their present contribution in each of the years 1968 and 1969.

The Pension Plan shall be administered jointly by a Committee designated by the owners and the players respectively, two (2) to be designated by each side.  In the event of an impasse in the Joint Administration Committee the issue shall be submitted to the Commissioner for resolution.

19. MAJOR MEDICAL INSURANCE

The owners will provide at no cost to the players Major Medical Insurance  that will provide a benefit of $50,000 per player and each member of the player's family.

20. CAREER ADJUSTMENT PAY

The parties recognize the desirability of providing a form of Career Adjustment Pay for players leaving the game and to assist such players in establishing themselves in another career after their playing years have ended.  A Joint Study Committee will be established to study what has happened to players who have left the game in the past and to develop constructive solutions to assist players in the future predicated upon past experience and projected problems, that the Committee may anticipate as a result of its study.  It is contemplated that some form of Career

7/10/6 8

-10-

Adjustment Pay be provided for and integrated into the
Pension Program. As part of its study the Committee will
also examine the feasibility of early retirement coupled
with the Career Adjustment Program. The substantial
additional contribution made to the Pension Plan contem-
plates the potential for earmarking a portion of such
additional contributions for the inauguration and establish-
ment of a Career Adjustment Pay Program.

21. The Players Association and the Owners League anticipate
that the Joint Study Committee will also provide the basis
for a continuing dialogue in which a forum will be provided
for discussion of problems of mutual interest with the
intention that the parties find constructive solutions to
such matters through rational examination of the facts and
an earnest effort to advance the welfare of the players,
the League and the game.

21. PRE-SEASON EXPENSE REIMBURSEMENT

Each Club will reimburse its players for expenses
involved during the pre-season in the following manner:

|     |                              |                      |
|-----|------------------------------|----------------------|
| a.  | Rookies                      | $100 per game played |
| b.  | Second Year Players          | 125 per game played  |
| c.  | Third and Fourth Year Players| 150 per game played  |
| d.  | Fifth Year and Over          | 250 per game played  |

and each Club will make payment of said expense money with-
out withholding any income tax therefrom.

7/10/68

-11-

Hereafter, commencing with the year 1969, the matter of
pre-season compensation shall not be a matter of negoti-
ation by the Players Association but will be integrated
as part of the annual compensation paid pursuant to the
Standard Players Contract.

22.  TERM OF AGREEMENT

This Agreement shall continue in full force and
effect from July 10, 1968, to February 1, 1970.

23.  EXECUTION OF FINAL AGREEMENT

The final agreement to be executed by the parties
shall be signed by the appropriate officers of the
Players Association and by the officers of each of the
Club members of the Owners Association.

IN WITNESS WHEREOF, the parties hereto have executed
this Agreement on the 10th day of July, 1968.

AMERICAN FOOTBALL LEAGUE          AMERICAN FOOTBALL LEAGUE
PLAYERS' ASSOCIATION              PLAYER RELATIONS COMMITTEE

By _____         By _____
Jack F. Kemp, President              Ralph C. Wilson, Jr.

                                  By _____
                                     Richard Kitchen

7/10/68

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION

MDL No.  2323
No. 12-md-2323-AB

THIS DOCUMENT RELATES TO:

CIVIL ACTION
No. 2:12-cv-02728-AB

THOMAS FRANKLIN MCDONALD
and PATRICIA A. MCDONALD, h/w,

     Plaintiffs,

        v.

NATIONAL FOOTBALL LEAGUE and
NFL PROPERTIES LLC,

     Defendants.

### DECLARATION OF THOMAS FRANKLIN MCDONALD
### IN SUPPORT OF MOTION TO REMAND

     I, THOMAS FRANKLIN MCDONALD, am competent to testify about the facts set forth below, and to the best of my knowledge and belief, hereby declare as follows:

1.  I am a retired NFL football player.  I currently reside in Montgomery County, Pennsylvania with my wife, Patricia A. McDonald.

2.  I played in the NFL as a flanker and wide-out for various teams from 1957 to 1968, including seven seasons with the Philadelphia Eagles.

3.  In 1960, as a member of the Eagles, I caught the winning touchdown pass in the Eagles' only NFL championship season.

4.  In 1958, I led the NFL in touchdown receptions.

5.  In 1961, I led the NFL in reception yardage and touchdowns.  During that year, I set the record for a Philadelphia Eagles receiver by catching seven passes for 237 yards in a single game against the New York Giants.  That record still stands.

6.  In my first eleven (11) seasons in the NFL, I missed only three games.

7.  I had a career total of 495 receptions, including 84 touchdowns, for more than 8,000 yards.

8.  I was selected to the Pro Bowl six times.

9.  I was elected to the NFL Hall of Fame in 1998.

10. I retired as a professional football player at the end of the 1967 season.

11. In the middle of the 1968 season, while I was enjoying my retirement, I received a phone call from a friend, a coach of the Cleveland Browns.  He asked me to play for the Browns, because a receiver had suffered a broken collarbone.  He needed someone, and I agreed.

12. When I began playing in the middle of that season, I did not sign a contract.  I played under a handshake.  I did not pay any dues to a collective bargaining check-off.  I did not know that a collective bargaining agreement existed or that it was created sometime in 1968.

13. I played in nine games in the 1968 season.  In those games, I caught seven passes; one was for a touchdown.

14. During the nine games in the 1968 season, I had no blocking assignments.  I played my traditional position, which was receiver.  Often, I was a decoy.

15. During the nine games in the 1968 season, I received no injuries.

16. During the nine games in the 1968 season, to the best of my knowledge and belief, I received no collisions or impacts that could contribute to my present condition.

17. In the prior seasons I played in the NFL, I caught nearly five hundred passes, was hit numerous times, and sustained substantial injuries, including repeated blows to the head.

18. I presently suffer from severe memory loss, mood disorders, and dementia.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _June_ , 2012, at _King of Prussia_, Pennsylvania.

Thomas Franklin McDonald

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION

MDL No.  2323
No. 12-md-2323-AB

THIS DOCUMENT RELATES TO:

THOMAS FRANKLIN MCDONALD
and PATRICIA A. MCDONALD, h/w,

CIVIL ACTION
No. 2:12-cv-02728-AB

     Plaintiffs,

         v.

NATIONAL FOOTBALL LEAGUE and
NFL PROPERTIES LLC,

     Defendants.

## CERTIFICATE OF SERVICE

I, Gene Locks, hereby certify that a true and correct copy of the foregoing Plaintiffs'
Motion to Remand, for Discovery in Aid of Remand, and for Sanctions, Costs and Attorney's
Fees, was served this date by the Judicial Panel on Multidistrict's Electronic Filing System to all
counsel of record.

DATE: June 18, 2012

                    /s/ *Gene Locks*

                    **Gene Locks**
                    *Counsel for Plaintiffs Thomas Franklin*
                    *McDonald, et al.*