UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>Plaintiffs' Amended Master Administrative Long-Form Complaint and the Applicable Associated Short-Form Complaints | |

**MEMORANDUM OF LAW OF DEFENDANTS NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN SUPPORT OF MOTION TO DISMISS THE AMENDED MASTER ADMINISTRATIVE <u>LONG-FORM COMPLAINT ON PREEMPTION GROUNDS</u>**

## Table of Contents

**Page**

Table of Authorities ............................................................................................................ ii

Preliminary Statement ......................................................................................................... 1

Background .......................................................................................................................... 5

    A.    The Parties ................................................................................................... 5

    B.    The NFL Collective Bargaining Agreements ...................................... 6

        1.    Player Medical Care Provisions .................................................. 7

        2.    Rule-Making and Player Safety Rule Provisions ....................... 9

        3.    Grievance Procedures ............................................................... 10

        4.    Player Benefits Provisions ........................................................ 10

    C.    The Master Administrative Complaint ................................................ 11

Argument ........................................................................................................................... 14

I. SECTION 301 OF THE LMRA PREEMPTS PLAINTIFFS'  CLAIMS
   AGAINST THE NFL ............................................................................................... 14

    A.    Resolution of Plaintiffs' Claims Against the NFL Would Substantially  Depend
        Upon Interpretation of the Terms of the CBAs ...................................... 17

        1.    Resolution of Plaintiffs' Negligence-Based Claims Would Require
            Interpretation of the Terms of the CBAs ................................. 17

        2.    Resolution of Plaintiffs' Fraud-Based Claims Would Require
            Interpretation of the Terms of the CBAs ................................. 26

    B.    Plaintiffs' Claims Against the NFL Arise Under the CBAs ................................ 30

II. SECTION 301 PREEMPTS PLAINTIFFS' CLAIMS AGAINST NFLP ............................. 32

Conclusion ......................................................................................................................... 35

## Table of Authorities

**Cases**                                                                                          **Page(s)**

*Alderney Dairy Co.* v. *Hawthorn Mellody, Inc.*,
    643 F.2d 113 (3d Cir. 1981)......................................................................................29

*Allied Chem. & Alkali Workers of Am., Local Union No. 1* v. *Pittsburgh Plate Glass Co.*,
    404 U.S. 157 (1971).............................................................................................29

*Allis-Chalmers Corp.* v. *Lueck*,
    471 U.S. 202 (1985)..........................................................................14, 15, 30, 32

*Althaus* v. *Cohen*,
    756 A.2d 1166 (Pa. 2000) ....................................................................................18

*Angst* v. *Mack Trucks, Inc.*,
    969 F.2d 1530 (3d Cir. 1992)..............................................................................15

*Antol* v. *Esposto*,
    100 F.3d 1111 (3d Cir. 1996)................................................................14, 15, 30

*Atwater* v. *Nat'l Football League Players Ass'n*,
    626 F.3d 1170 (11th Cir. 2010) .................................................................. passim

*Aubrey* v. *Sanders*,
    No. 07-CV-0137, 2008 WL 4443826 (W.D. Pa. Sept. 26, 2008)....................26, 27

*Barnes* v. *Am. Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998)................................................................................18

*Barnes* v. *Nat'l Football League*,
    No. 11-CV-08396, Dec. 8, 2011, Order (C.D. Cal.) ...........................................11

*Beidleman* v. *Stroh Brewery Co.*,
    182 F.3d 225 (3d Cir. 1999)........................................................................14, 15

*Brenner* v. *United Bhd. of Carpenters and Joiners of Am.*,
    927 F.2d 1283 (3d Cir. 1991)..............................................................................13

*Brown* v. *Nat'l Football League*,
    219 F. Supp. 2d 372 (S.D.N.Y. 2002)........................................................5, 7, 32

*Buck* v. *Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006)..................................................................................5

*Caronia* v. *Philip Morris USA, Inc.*,
No. 06-CV-224, 2011 WL 338425 (E.D.N.Y. Jan. 13, 2011) .................................18

*Clarett* v. *Nat'l Football League*,
369 F.3d 124 (2d Cir. 2004)...............................................................................7

*Clarke* v. *City of New York*,
82 A.D.3d 1143 (N.Y. App. Div. 2011) .............................................................13

*Corazzini* v. *Litton Loan Servicing LLP*,
No. 09-CV-0199, 2010 WL 1132683 (N.D.N.Y. Mar. 23, 2010) ..........................18

*Duerson* v. *Nat'l Football League*,
No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) ........................ passim

*Givens* v. *Tenn. Football, Inc.*,
684 F. Supp. 2d 985 (M.D. Tenn. 2010)...............................................4, 15, 17, 25

*Harper* v. *Am. Red Cross Blood Servs.*,
153 F. Supp. 2d 719 (E.D. Pa. 2001) .................................................................14

*Hayes* v. *Nat'l Football League*,
469 F. Supp. 252 (C.D. Cal. 1979) ......................................................................6

*Henderson* v. *Merck & Co.*,
998 F. Supp. 532 (E.D. Pa. 1998) .....................................................................15

*Holmes* v. *Nat'l Football League*,
939 F. Supp. 517 (N.D. Tex. 1996) .................................................................5, 25

*Hughes* v. *BCI Int'l Holdings, Inc.*,
452 F. Supp. 2d 290 (S.D.N.Y. 2006)................................................................18

*Hurst* v. *Consol. Freightways Corp.*,
No. 88-CV-0744, 1990 WL 43934 (M.D. Pa. Apr. 5, 1990)................................13

*Int'l Bhd. of Elec. Workers* v. *Hechler*,
481 U.S. 851 (1987)......................................................................................14, 24

*Jeffers* v. *D'Allessandro*,
681 S.E.2d 405 (N.C. Ct. App. 2009) .......................................................4, 17, 25

*Joseph M.* v. *Northeastern Educational Intermediate Unit 19*,
516 F. Supp. 2d 424 (M.D. Pa. 2007) ...............................................................18

*Manti's Transp., Inc.* v. *C.T. Lines, Inc.*,
68 A.D.3d 937 (N.Y. App. Div. 2009) ...............................................................26

*Maxwell* v. *Nat'l Football League*,
No. 11-CV-08394, Dec. 8, 2011, Order (C.D. Cal.) ........................................................ passim

*Pear* v. *Nat'l Football League*,
No. 11-CV-08395, Dec. 8, 2011, Order (C.D. Cal.) .............................................................11

*Peek* v. *Phila. Coca-Cola Bottling Co.*,
No. 97-3372, 1997 WL 399379 (E.D. Pa. July 16, 1997) ...............................................21, 32

*Schnell* v. *Bank of New York Mellon*,
828 F. Supp. 2d 798 (E.D. Pa. 2011) ...............................................................................18

*Sherwin* v. *Indianapolis Colts, Inc.*,
752 F. Supp. 1172 (N.D.N.Y. 1990) .......................................................................... passim

*Sluder* v. *United Mine Workers of Am., Int'l Union*,
892 F.2d 549 (7th Cir. 1989) ...........................................................................................24

*Smith* v. *Houston Oilers, Inc.*,
87 F.3d 717 (5th Cir. 1996) ..............................................................................................25

*Stringer* v. *Nat'l Football League*,
474 F. Supp. 2d 894 (S.D. Ohio 2007) ....................................................................... passim

*Sullivan* v. *Warminster Twp.*,
No. 07-4447, 2010 WL 2164520 (E.D. Pa. 2010) ............................................................18

*Tran* v. *Metro. Life Ins. Co.*,
408 F.3d 130 (3d Cir. 2005).............................................................................................27

*United Steelworkers of Am.* v. *Rawson*,
495 U.S. 362 (1990).........................................................................................14, 24, 31

*Williams* v. *Nat'l Football League*,
582 F.3d 863 (8th Cir. 2009) ...........................................................................4, 25, 27, 28

## Statutes

29 U.S.C. § 185(a) ...............................................................................................................14

Labor Management Relations Act, § 301 ................................................................... passim

## Other Authorities

Fed. R. Civ. P. 12(b)(6)..........................................................................................................5

Defendants National Football League ("NFL") and NFL Properties LLC ("NFLP," and together with the NFL, the "NFL Defendants") respectfully submit this memorandum in support of their motion to dismiss, on preemption grounds, the Amended Master Administrative Long-Form Complaint (the "Complaint," "Master Administrative Complaint," or "MAC") brought by Plaintiffs whose terms and conditions of NFL employment were defined by collective bargaining agreements (the "CBAs") and the NFL Constitution and Bylaws (the "Constitution").

## **Preliminary Statement**

Plaintiffs' action—contending that the NFL failed to fulfill a duty to ensure the safety of NFL players—is a labor dispute the resolution of which depends upon an interpretation of the terms of the applicable CBAs.  Accordingly, these claims should be dismissed.

For almost 45 years, professional football players have played under CBAs, painstakingly negotiated through their Union, that set forth the parties' understanding and agreement on how, among many other things, player health and safety will be protected. Although the CBAs evolved over time, each is a labor agreement that details and comprehensively governs the relationship among the NFL, its Clubs, and the players.  As a result of these negotiations, the CBAs to which the players expressly agreed:

(i)     provide that the NFL's Member Clubs and their medical staff have the responsibility for treating player injuries, including determining injury recovery times, deciding when players may "return to play," and advising the players of the risks of continued performance;

(ii)    set forth procedures for the promulgation and review of rules and regulations that affect and/or relate to player safety;

(iii)   provide for a player's right to compensation and other benefits in the event of injury; and

(iv)    set forth the dispute resolution procedures to be followed in the event of a dispute.

Years—and, in many cases, decades—after relying on these agreements, negotiated by their Union, Plaintiffs now contend that the NFL breached a duty to protect players from the risks of concussions and that this Court should ignore the CBAs governing those same issues and allow courts and juries to resolve Plaintiffs' grievances with the NFL, when the bargained-for CBAs expressly provide otherwise.  But parties whose terms and conditions of employment are determined by a collective bargaining agreement must grieve their employment-related disputes by the dispute resolution process prescribed by the CBA—not by bringing claims in court.

The CBAs—like all collective bargaining agreements affecting interstate commerce—are governed by section 301 of the Labor Management Relations Act (the "LMRA").  Section 301 ensures that disputes between parties to a labor agreement are resolved under a uniform body of federal labor law and adjudicated in accordance with the parties' agreed-to grievance procedures.  Thus, section 301 provides for preemption of all state-law claims—whether based in negligence or fraud—whose resolution is substantially dependent upon or inextricably intertwined with the terms of a CBA, or that arise under the CBA.

That is the case here.  Plaintiffs allege that the NFL breached its duties to inform NFL players of the risks associated with concussions and to provide safety regulations governing the health and safety of those same players.  To resolve Plaintiffs' claims, the Court would be required to interpret the CBAs—which not only address player safety, but also address the authority and responsibility relating to player safety of the NFL, the Clubs, and the Union—to determine whether the NFL had such duties, the scope of any such duties, and the reasonableness of the NFL's conduct in light of the CBA provisions.

For example, to adjudicate Plaintiffs' negligence claims, a court will have to determine whether the NFL had the duties that the players allege and whether the NFL acted "reasonably" in carrying out those duties.  The CBAs provide that the Clubs and their physicians have certain responsibilities relating to player medical care, including the responsibility for treating player injuries, making return-to-play decisions, and informing players of medical risks associated with continuing to play.  As two district courts considering the very claims now before this Court have held, these "physician provisions" of the CBAs "must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players." *Maxwell* v. *Nat'l Football League*, No. 11-CV-08394, Dec. 8, 2011, Order at 1-2 (C.D. Cal.) (ECF Dkt. No. 58); *see also Duerson* v. *Nat'l Football League*, No. 12 C 2513, 2012 WL 1658353, at *4 (N.D. Ill. May 11, 2012) (determining that any duty to warn imposed on the Clubs and their physicians under the CBA to protect player health and safety "would be one factor tending to show that the NFL's alleged failure to take action to protect [NFL players] from concussive brain trauma was reasonable").

These provisions on player health and safety likewise are integral to the resolution of Plaintiffs' fraud-based claims.  These claims, too, rest upon the breach of the NFL's alleged "duty to advise Plaintiffs of [the] heightened risk" of neurodegenerative diseases—a duty that cannot be measured without first considering the preexisting obligations regarding player health and safety in the CBAs.  Nor can a court determine whether Plaintiffs justifiably relied on information provided by the NFL without first interpreting the CBAs' health and safety provisions that allocate to Club physicians the task of providing injury-related information to players, including the risks of continuing to play football.

Indeed, numerous courts, consistent with settled labor preemption precedent, have held that player tort claims against the NFL and/or its Clubs—including certain of the concussion-related claims asserted in this action—are preempted under section 301. *See, e.g.*, *Duerson*, 2012 WL 1658353, at *6 (negligence claim preempted); *Maxwell*, No. 11-CV-08394, Order at 2 (negligence claim preempted); *Williams* v. *Nat'l Football League*, 582 F.3d 863, 881-82 (8th Cir. 2009) (breach of fiduciary duty, negligence, gross negligence, fraud, constructive fraud, negligent misrepresentation, and intentional infliction of emotional distress claims preempted); *Givens* v. *Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010) (outrageous conduct, negligent infliction of emotional distress, and breach of duty of good faith and fair dealing claims preempted); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 909-11 (S.D. Ohio 2007) (wrongful death claim preempted); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178-79 (N.D.N.Y. 1990) (negligence, fraud, negligent misrepresentation, negligent and intentional infliction of emotion distress claims preempted); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412 (N.C. Ct. App. 2009) (negligent retention and intentional misconduct preempted).

Plaintiffs' claims against the NFL here are preempted for an additional reason: they rest on purported obligations that arise under the CBAs. The crux of the Complaint is that the NFL had a "duty to provide players with rules and information" to protect them from the risks of concussions sustained while playing football (MAC ¶ 6), yet failed to "impose safety regulations governing this health and safety problem" (*Id.* ¶ 9), or "delayed implementing changes to the game" (*Id.* ¶ 291). The CBAs, however, expressly delineate the obligations of the NFL with respect to the promulgation and enforcement of health and safety-related rules for NFL players, and any such obligations therefore arise under the CBAs.

4

Plaintiffs' sole substantive "claim" against NFLP for "Civil Conspiracy/Fraudulent Concealment"—which lacks a single substantive factual allegation specific to NFLP—is preempted, because measuring NFLP's alleged duty also requires an interpretation of the CBAs' player health and safety provisions.

In sum, the Complaint should be dismissed with prejudice.

### Background

**A.     The Parties**

The NFL is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  (MAC ¶ 30); *see also Stringer*, 474 F. Supp. 2d at 898.[1]  NFLP is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  (*Id.* ¶ 31.)  NFLP "serves as the representative of the [NFL and its Clubs] for the licensing of their trademarks and logos." (www.nfl.info/NFLConsProd/Welcome/cpAgreement.htm.)   Plaintiffs are former professional football players, the representatives of the estates of former players, and the spouses of some of the former players.  (*See* MAC ¶ 28.)

---

[1]   This summary is based on the allegations of the Complaint—the factual averments of which the NFL assumes to be true for purposes of this motion only—and, where applicable, public records and documents integral to Plaintiffs' claims, including the CBAs, attached as exhibits to the accompanying Declaration of Dennis L. Curran, dated Aug. 28, 2012.  This Court may consider the CBAs in adjudicating this motion under Rule 12(b)(6) because the CBAs are integral to Plaintiffs' claims.  *See Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 383-84, 386-87 (S.D.N.Y. 2002) (considering CBA provisions in order to adjudicate NFL's motion to dismiss); *Holmes* v. *Nat'l Football League*, 939 F. Supp. 517, 520 n.2 (N.D. Tex. 1996) (same); *Duerson*, 2012 WL 1658353, at *4 (considering CBAs in connection with motion to remand); *Maxwell*, No. 11-CV-08394, Order at 1-2 (same).

**B.**     **The NFL Collective Bargaining Agreements**

The terms and conditions of Plaintiffs' employment as professional football players are defined by the CBAs that were operative during Plaintiffs' careers.[2]  The CBAs are the product of exhaustive arms'-length negotiations between, on the one hand, the NFL, the American Football League ("AFL") or the NFL Management Council (the exclusive bargaining representative of the NFL Clubs), and, on the other hand, the NFLPA (the exclusive bargaining representative of NFL players) or the AFL Players Association (the exclusive bargaining agent of AFL players).  The CBAs so negotiated thus "represent[] the complete understanding of the parties on all subjects covered [t]herein."[3]  Through their Union, the players further agree to be

---

[2]     Since 1968, the NFL has operated under a CBA with only two exceptions:  (1) the period between August 31, 1987 and March 29, 1993, when no CBA was in place, following the expiration of the 1982 CBA and prior to the execution of the 1993 CBA; and (2) the period between March 11, 2011 and August 4, 2011, not at issue in this matter.  The 1968 NFL CBA was effective from July 15, 1968 to February 1, 1970.  The 1968 AFL CBA was effective from July 10, 1968 to February 1, 1970.  The 1970 CBA was effective from February 1, 1970 to January 31, 1974.  The 1977 CBA was effective from February 1, 1974 to July 15, 1982.  The 1982 CBA was effective from July 16, 1982 to August 31, 1987.  The 1993 CBA (as amended June 6, 1996, February 25, 1998, December 4, 2000, and January 8, 2002) was effective from March 29, 1993 to March 7, 2006.  The 2006 CBA was effective from March 8, 2006 to March 10, 2011.  The 2011 CBA became effective on August 4, 2011 and expires March 1, 2020.  With respect to those plaintiffs who played during 1968 or later, to the extent that any individual plaintiff's claim is not preempted, the NFL will move at a later date for the dismissal of any such claim for failure to follow the required grievance procedures, because the parties at all times continued to follow those grievance procedures. *See Sherwin*, 752 F. Supp. at 1174 n.2 (noting no dispute that "the 1982 CBA continues to govern the relationship of the parties at least with respect to arbitration since the parties have continued to honor and utilize the arbitration provisions of the [expired] 1982 CBA"); *see also Hayes* v. *Nat'l Football League*, 469 F. Supp. 252, 254 (C.D. Cal. 1979) ("Technical expiration of the Collective Bargaining Agreement between the National Football League and the National Football League Players' Association subsequent to Plaintiff's selection but prior to his release by the Rams, does not excuse an otherwise existing requirement to exhaust the Collective Bargaining Agreement's grievance procedures.").

[3]     *See* Ex. 4,  1977 CBA Preamble and Art. II § 1; Ex. 5, 1982 CBA Preamble and Art. II § 1; Ex. 6, 1993 CBA Preamble and Art. III § 1; Ex. 10, 2006 CBA Preamble and Art. III § 1; Ex.

bound by the terms of the NFL Constitution, to the extent such terms do not conflict with the terms of the CBAs.[4]

The CBAs cover a broad range of subjects affecting the terms and conditions of employment for NFL players, including NFL player contracts and salary provisions, NFL draft rules, and player discipline.  Although the CBAs have changed over time pursuant to the collective bargaining process, every CBA expressly addresses player health and safety and provides grievance procedures for the resolution of disputes under the CBAs.

### 1.    Player Medical Care Provisions

The CBAs address in detail issues relating to assessment, diagnosis, and treatment of player injuries.  For example, certain CBAs provide that Club physicians have the responsibility for making "return to play" decisions and advising players of the risk of continued performance; several set forth the qualifications for Club medical staff.  Thus, the CBAs provide, for example:

- "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player.  If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity." (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 11, 2011 CBA Art. 39 § 1(c); Ex. 5, 1982 CBA Art. XXXI § 1.)

---

11, 2011 CBA Preamble and Art. 2 § 4(a); *see also* Ex. 2, 1968 NFL CBA Preamble and Art. I § 2; Ex. 1, 1968 AFL CBA Preamble and § 16; Ex. 3, 1970 CBA Preamble and Art. II § 4.

[4]    *See, e.g.*, Ex. 4,  1977 CBA Art. I § 2; Ex. 5, 1982 CBA Art. I § 2; *see also Clarett* v. *Nat'l Football League*, 369 F.3d 124, 142 (2d Cir. 2004) ("In the collective bargaining agreement, the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein[.]"); *Brown*, 219 F. Supp. 2d at 386 (The NFL "Constitution was bargained over and included within the scope of the CBA.").  For ease of reference, the NFL refers generally to the "CBAs" throughout this memorandum, but cites, where applicable, to both the CBAs and the Constitutions.

- "All determinations of recovery time for major and minor injuries must be by the Club's medical staff and in accordance with the Club's medical standards . . . . The prognosis of the player's recovery time should be as precise as possible." (*See, e.g.*, Ex. 13, 1980 Supp. to NFL Constitution Art. XVII.)

- "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ." (Ex. 6, 1993 CBA Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9; Ex. 11, 2011 CBA Appx. A § 9.)

- "Each Club will have a board-certified orthopedic surgeon as one of its Club physicians.  The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs." (Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 11, 2011 CBA Art. 39 § 1.)

- "All full-time head trainers and assistant trainers . . . will be certified by the National Athletic Trainers Association.  All part-time trainers must work under the direct supervision of a certified trainer." (Ex. 5, 1982 CBA Art. XXXI § 2; Ex. 6, 1993 CBA Art. XLIV § 2; Ex. 10, 2006 CBA Art. XLIV § 2; *see also* Ex. 11, 2011 CBA Art. 39 § 2.)

- "The home team shall provide a physician and an ambulance at each game available to both teams; said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams." (*See, e.g.*, Ex. 12, 1968 NFL and AFL Constitution Art. XIX § 19.5.)

Certain CBAs also set forth player rights and obligations related to medical care.

Thus, the CBAs provide:

- "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety." (Ex. 9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d); Ex. 11, 2011 CBA, Art. 50 § 1(d).)

- "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the costs of [these] medical services." (Ex. 5, 1982 CBA Art. XXXI § 3; Ex. 6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3; Ex. 11, 2011 CBA Art. 39 § 4.)

- "A player will have the right to choose the surgeon who will perform surgery . . . . Any such surgery will be at Club expense."  (Ex. 5, 1982 CBA Art. XXXI § 4;

Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 4; Ex. 11, 2011 CBA Art. 39 § 5.)

- "Each player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and will further undergo a "post-season physical examination" at the request of the player or Club. (Ex. 5, 1982 CBA Art. XXXI § 5; *see also* Ex. 6, 1993 CBA Art. XLIV § 5; Ex. 10, 2006 CBA Art. XLIV § 5; Ex. 11, 2011 CBA Art. 39 § 6.)

### 2.    Rule-Making and Player Safety Rule Provisions

The CBAs also set forth the manner in which playing rules addressing or affecting player safety are promulgated and enforced.  For example, all playing rule changes must be "presented to the [NFL]" or unanimously approved by a "standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes" (Ex. 14, 1984 NFL Constitution Art. XI § 11.2), and consisting of members appointed by the Clubs and the NFLPA.  The CBAs also provide that the Clubs, the NFLPA, and the NFL all have responsibility for reviewing player safety aspects of playing rules.  Thus, the CBAs provide:

- "A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee') will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects." (Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11, 2011 CBA Art. 50 § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI.)

- "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex. 11, 2011 CBA Art. 50 § 1(c).)

- "The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules.  One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules."  (Ex. 6, 1993 CBA Art. XIII § 2; Ex. 10, 2006 CBA Art. XIII § 2; Ex. 11, 2011 CBA Art. 50 § 2.)

### 3.    Grievance Procedures

Since 1977, all CBAs have contained a broad arbitration clause providing that all disputes involving "the interpretation of, application of, or compliance with, any provision of" the CBAs, player contracts, or any applicable provision of the Constitution "pertaining to terms and conditions of employment of NFL players," will be resolved exclusively in accordance with agreed-to arbitration procedures.  Moreover, since 1970, "injury grievances" have been subject to arbitration.  (*See* Ex. 6, 1993 CBA Art. IX § 1, Art. X § 6; Ex. 10, 2006 CBA Art. IX § 1, Art. X § 6; Ex. 11, 2011 CBA Art. 43 § 1, Art. 44 § 6; *see also* Ex. 3, 1970 CBA Art. XI § 6 & Appx. B; Ex. 4, 1977 CBA Art. VII § 1, Art. IX § 6; Ex. 5, 1982 CBA Art. VII § 1, Art. IX § 6.)  From 1968 to 1977, the CBA contained a dispute resolution procedure that required the NFL Commissioner to resolve non-injury grievances.  (Ex. 2, 1968 NFL CBA Art. IX; Ex. 1, 1968 AFL CBA Art. 13; Ex. 3, Art. 1970 CBA Art. X.)  Certain CBAs also expressly forbid players from bringing "any suit against . . . the NFL or any Club with respect to any claim relating to any conduct permitted by [the CBAs] . . . or any term of [the CBAs]" or "the Constitution and Bylaws of the NFL."  (Ex. 6, 1993 CBA Art. IV § 2; Ex. 10, 2006 CBA Art. IV § 2; Ex. 11, 2011 CBA Art. 3 § 2; *see also* Ex. 4, 1977 CBA Art. III § 2; Ex. 5, 1982 CBA Art. III § 2.)

### 4.    Player Benefits Provisions

Finally, the CBAs also include numerous provisions regarding the rights of players and former players to compensation and benefits in the event of injuries, including the right to workers' compensation and supplemental disability benefits,[5] as well as certain rights

---

[5]    *See, e.g.*, Ex. 2, 1968 NFL CBA Art. XI § 4; Ex. 3, 1970 CBA Art. XV § 7; Ex. 4, 1977 CBA Art. XXXIII; Ex. 5, 1982 CBA Art. XXIV, Art. XXXVI; Ex. 6, 1993 CBA Art. L, Art. LI, Art. LIV; Ex. 10, 2006 CBA Art. L, Art. LI, Art. LIV; Ex. 11, 2011 CBA Art. 41, Art. 60, Art. 61, Art. 62.

and benefits for eligible retirees, including the establishment of a plan to provide medical

benefits to eligible retirees determined to have dementia.[6]   For example:

- "[A] player . . . will receive an injury protection benefit . . . [when the] player . . . [has] been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician . . . ."  (Ex. 4, 1977 CBA Art. X § 1; Ex. 5, 1982 CBA Art. X § 1; *see also* Ex. 6, 1993 CBA Art. XII § 1; Ex. 10, 2006 CBA Art. XII § 1; Ex. 11, 2011 CBA Art. 45 § 1.)

- "The parties agree to design and establish a new plan . . . to provide medical benefits to former Players who are . . . determined . . . to have 'dementia.'"  (Ex. 10, 2006 CBA Art. XLVIII-D; *see also* Ex. 11, 2011 CBA Art. 58 § 1; Ex. 11, 2011 CBA Art. 65 § 1 ("[T]he Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have permanent, neuro-cognitive impairment . . . .").)

## C.   The Master Administrative Complaint

Notwithstanding the CBA provisions that require that all disputes involving the

interpretation of, application of, or compliance with the CBAs be resolved through grievance

procedures, in July and August 2011, former NFL players began filing actions against the NFL

and NFLP seeking relief for alleged concussion-related injuries sustained during their playing

careers.

This multi-district litigation (the "MDL") was established on January 31, 2012;

since that time, over 100 additional cases, brought on behalf of approximately 3,000 former NFL

players, have been included in the MDL.   To date, federal district courts have denied four

remand motions on preemption grounds.  *See Duerson*, 2012 WL 1658353, at *6; *Maxwell*, No.

11-CV-08394, Order at 2; *Pear* v. *Nat'l Football League*, No. 11-CV-08395, Dec. 8, 2011, Order

at 2 (C.D. Cal.) (ECF Dkt. No. 61); *Barnes* v. *Nat'l Football League*, No. 11-CV-08396, Dec. 8,

2011, Order at 2 (C.D. Cal.) (ECF Dkt. No. 58).   On July 17, 2012, pursuant to Case

---

[6]   *See* Ex. 10, 2006 CBA Art. XLVIII-D; Ex. 11, 2011 CBA Art. 58 § 1, Art. 65 § 1.

Management Order No. 2 (as amended), Plaintiffs filed the Master Administrative Complaint, which supersedes the allegations, claims, theories of recovery and/or prayers for relief contained in Plaintiffs' originally filed complaints.  In addition, and also pursuant to Case Management Order No. 2, Plaintiffs have filed, or will file, individual Short-Form Complaints.

In the Master Administrative Complaint, Plaintiffs allege that the NFL had a "duty to provide players with rules and information to protect the players as much as possible from short-term and long-term health risks" of repetitive traumatic brain injuries, a duty "to take all reasonable steps necessary to ensure the safety of players," including a "need to promulgate rules affecting the return-to-play rules when concussive events are detected," and a "duty to advise Plaintiffs" that "the repeated traumatic head impacts the Plaintiffs endured while playing NFL football were likely to expose them to excess risk to neurodegenerative disorders."  (MAC ¶¶ 6, 90, 248, 333.)  Plaintiffs allege that the NFL breached its purported duties by failing "to inform NFL players of the risks associated with MTBI [mild traumatic brain injury]" (*id.* ¶ 8), and failing "to warn and/or impose safety regulations governing this health and safety problem" (*id.* ¶ 9).  Generally, Plaintiffs accuse the NFL of failing "to exercise reasonable care."  (*Id.* ¶ 346.)

Plaintiffs also allege that the NFL misled Plaintiffs and "willfully and intentionally concealed from" them the "heightened risk" of neurodegenerative disorders (*id.* ¶ 248), and "concealed from then-current NFL players and former NFL players the risks of head injuries in NFL games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury."  (*Id.* ¶ 276).  Plaintiffs further claim that, "[b]efore June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress and the public at large that there was no

scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms." (*Id.* ¶ 308.)

Finally, Plaintiffs contend that the NFL negligently hired and retained unqualified persons for a Mild Traumatic Brain Injury Committee ("MTBI Committee") and allowed the MTBI Committee members "to mislead the Plaintiffs" regarding "the permanent brain injury risks associated with repetitive head impacts in the game of football" (*id.* ¶¶ 374, 381) and, somehow, along with NFLP (the NFL's licensing agent), "acted in concert to perpetrate the fraudulent concealment of the connection between repetitive MTBI and long-term neuro-cognitive damage, illness, and decline" (*id.* ¶ 423).

Plaintiffs purport to assert claims against the NFL for negligence, medical monitoring, fraudulent concealment, fraud, negligent misrepresentation, negligent hiring, negligent retention, wrongful death and survival, "civil conspiracy/fraudulent concealment," and declaratory relief, and, against NFLP, for "civil conspiracy/fraudulent concealment." (*Id.* ¶¶ 246-382, 422-25, and Prayer for Relief.)[7] Plaintiffs seek declaratory relief, "an injunction and/or other equitable relief against the NFL and in favor of Plaintiffs for the requested medical monitoring," and compensatory and punitive damages. (*Id.*, Prayer for Relief.)

---

[7]    The remaining claim, Plaintiffs' spouses' loss of consortium claim, brought against both the NFL and NFLP, is derivative of the former players' claims and thus requires no separate analysis. *See Hurst* v. *Consol. Freightways Corp.*, No. 88-CV-0744, 1990 WL 43934, at *5 (M.D. Pa. Apr. 5, 1990) (finding that spouse's loss of consortium claim failed where husband's state-law claims were preempted by section 301); *see also Brenner* v. *United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287 (3d Cir. 1991); *Clarke* v. *City of New York*, 82 A.D.3d 1143, 1144, (N.Y. App. Div. 2011) (loss of consortium claim is derivative of underlying claims); *cf. Sherwin*, 752 F. Supp. at 1179 (staying loss of consortium claim pending arbitration of underlying preempted claims). Certain Plaintiffs also purport to assert additional claims in their Short-Form Complaints. These claims are addressed *infra* at n.12 and Part II.

## Argument

## I.

## SECTION 301 OF THE LMRA PREEMPTS PLAINTIFFS' CLAIMS AGAINST THE NFL

It is a fundamental tenet of labor law that "'when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract,' the plaintiff's claim is pre-empted by § 301 of the Labor Management Relations Act." *Int'l Bhd. of Elec. Workers* v. *Hechler*, 481 U.S. 851, 852-53 (1987) (quoting *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 220 (1985)).  Thus, section 301 of the LMRA preempts all state law claims—including tort claims—the resolution of which is substantially dependent upon or inextricably intertwined with an interpretation of the terms of a collective bargaining agreement, or that arise under a collective bargaining agreement.  *See* 29 U.S.C. § 185(a) (codifying section 301(a)); *Allis-Chalmers Corp.*, 471 U.S. at 213, 220; *United Steelworkers of Am.* v. *Rawson*, 495 U.S. 362, 368 (1990);  *Beidleman* v. *Stroh Brewery Co.*, 182 F.3d 225, 231-32 (3d Cir. 1999); *Antol* v. *Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996).  Applying that basic principle, courts have found a wide range of labor-related claims—including those involving issues of workplace safety—to be preempted.  *See, e.g.*, *Rawson*, 495 U.S. at 368-72 (wrongful death action brought by survivors of miners killed in a fire and alleging negligence in mine inspections preempted); *Hechler*, 481 U.S. at 859, 862 ("state-law tort claim" brought by electrical apprentice for a breach "of a duty of care to provide . . . a safe workplace" preempted); *see also Allis-Chalmers*, 471 U.S. at 220-21, 230 (employee's suit for bad faith in handling of disability claim preempted); *Beidleman*, 182 F.3d at 234 (fraudulent misrepresentation claim preempted); *Harper* v. *Am. Red Cross Blood Servs.*, 153 F. Supp. 2d 719, 721 (E.D. Pa. 2001) ("[c]laims of retaliatory discharge for filing a workers' compensation claim" preempted);

*Henderson* v. *Merck & Co.*, 998 F. Supp. 532, 537 (E.D. Pa. 1998) (claims for breach of an implied covenant of good faith and fair dealing, intentional inflicting of emotional distress, and wrongful termination preempted).

Moreover, "a central tenet of federal labor-contract law under § 301 [is] that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Allis-Chalmers*, 471 U.S. at 219-20 (section 301 preemption "preserves the central role of arbitration in our system of industrial self-government"). Thus, "because preempted claims must first be presented through the arbitration procedure established in a collective bargaining agreement, those claims should be dismissed." *Givens*, 684 F. Supp. 2d at 991-92. To the extent that Plaintiffs have a claim addressing injuries incurred during their NFL careers, that claim may only proceed pursuant to the grievance procedures set forth in the CBAs. *See supra* Part. B.3; *see also Allis-Chalmers*, 471 U.S. at 220-21 (noting tort claims "should have been dismissed for failure to make use of the grievance procedure established in the collective bargaining agreement . . . or dismissed as pre-empted by § 301"); *Angst* v. *Mack Trucks, Inc.*, 969 F.2d 1530, 1558 (3d Cir. 1992) (holding that because the employees "ignored and failed to resort to their CBA's dispute-resolution process, the district court was obliged to dismiss their suit"). The "preemptive force of § 301 is so powerful," *Antol*, 100 F.3d at 1115, because of "'the need for uniform interpretation of contract terms to aid both the negotiation and the administration of collective bargaining agreements.'" *Beidleman*, 182 F.3d at 234 (quoting *Antol*, 100 F.3d at 1115); *see also Henderson*, 998 F. Supp. at 537.

For the reasons set forth below, Plaintiffs' claims—which bear directly on issues addressed by the CBAs' health and safety provisions—are preempted.[8]  Two recent federal district courts, each refusing to remand claims now part of this MDL, have so held.  In *Duerson*, the court held that resolution of plaintiff's concussion-related negligence claim would require a court to interpret several of the CBAs' provisions concerning player health and safety.  Because the court could "plausibly interpret those provisions to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could then reasonably exercise a lower standard of care in that area itself," the court concluded that the claims were preempted.  2012 WL 1658353, at *4.  In *Maxwell*, the court held that because the "CBA places primary responsibility for identifying . . . physical conditions on the team physicians," the "physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  *Maxwell*, No. 11-CV-08394, Order at 1-2.  As *Duerson* and *Maxwell* have already made clear, Plaintiffs' claims are substantially dependent upon an analysis of the CBAs, and, as a result, those claims are preempted by § 301.

---

[8]   As demonstrated below, each of Plaintiffs' claims—for negligence, medical monitoring, fraudulent concealment, fraud, negligent misrepresentation, negligent hiring, negligent retention, loss of consortium, wrongful death and survival, civil conspiracy/fraudulent concealment, and declaratory relief—is preempted, and should be dismissed.  To the extent, however, that any claim is found not to be preempted, the NFL intends to argue at a later date that such claims should be dismissed for failure to state a claim and failure to follow the agreed-upon grievance procedures, and because they are time-barred.  (*See* CMO No. 4, at ¶ 3 (June 21, 2012, ECF Dkt. No. 98).)

**A.      Resolution of Plaintiffs' Claims Against the NFL Would Substantially
         Depend Upon Interpretation of the Terms of the CBAs**

   The resolution of Plaintiffs' claims—whether based on negligence or fraud—
would substantially depend upon an interpretation of numerous health and safety provisions in
the applicable CBAs.   Indeed, several federal courts have determined that player injury
negligence and fraud claims, including concussion-related negligence claims, are preempted for
that very reason.   *See, e.g.*, *Duerson*, 2012 WL 1658353, at *3-4 (plaintiff's claim that "the NFL
is liable for negligently causing [Duerson's] brain damage and death by failing to fulfill its duty
to ensure his safety" was preempted because "evaluating the reasonableness of the NFL's
conduct will require interpretation of terms of the CBAs imposing duties on NFL clubs to protect
player health and safety"); *Maxwell*, No. 11-CV-08394, Order at 1-2 ("The physician provisions
of the CBA must be taken into account in determining the degree of care owed by the NFL and
how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental
health and safety of its players."); *Stringer*, 474 F. Supp. 2d at 909-11 (resolution of plaintiff's
claims regarding the NFL's alleged failure "to minimize the risk of heat-related illness" and
"establish regulations" was "'inextricably intertwined and substantially dependent' upon an
analysis of certain CBA provisions imposing duties on the clubs with respect to medical care and
treatment of NFL players"); *see also Givens*, 684 F. Supp. 2d at 990-91; *Sherwin*, 752 F. Supp. at
1177-79; *Jeffers*, 681 S.E.2d at 412.

   **1.      Resolution of Plaintiffs' Negligence-Based Claims Would Require
      Interpretation of the Terms of the CBAs**

   Plaintiffs'   claims   for   negligence,[9]   medical   monitoring,   negligent

---

[9] Plaintiffs purport to divide their negligence claim into four time periods: "Pre-1968," "Post-
1968," "Between 1987 and 1993," and "Post-1994."   As an initial matter, these divisions are
not supported by Plaintiffs' factual allegations, as neither the alleged conduct of the NFL nor

misrepresentation, negligent hiring, negligent retention, and wrongful death and survival[10]—each

of which is premised on a purported "duty to provide players with rules and information that

protect them as much as possible from [the] short-term and long-term health risks" of "sub-

---

the playing careers of the overwhelming majority of Plaintiffs bear any relationship to these artificial temporal categories. Moreover, for preemption purposes, what matters is not how Plaintiffs seek to plead their claims, but rather whether CBAs were in effect at the time of the Plaintiffs' alleged head traumas, purportedly suffered during Plaintiffs' NFL playing careers. *See Duerson*, 2012 WL 1658353, at *3 ("To prove the complaint's claims, Duerson must show that the CTE from which David Duerson suffered was caused by repeated blows to the head during his time as an NFL player. When making that showing, it would be exceedingly implausible to contend that the CTE was caused only by trauma suffered from 1987 through early 1993, and not by trauma from 1983 to 1986 or later in 1993. Any attempt to exclude head trauma suffered on certain dates from the claim would thus likely fail. Accordingly, the CBAs were in effect during at least some of the events alleged in the complaint."); *see also Atwater* v. *Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1175 n.3 (11th Cir. 2010) (analyzing provision from CBA that "was in effect at the time the events underlying this litigation occurred").

[10]   "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." *Althaus* v. *Cohen*, 756 A.2d 1166, 1168 (Pa. 2000); *Duerson*, 2012 WL 1658353, at *3.   "Negligence," in turn, is an element of plaintiffs' medical monitoring, negligent misrepresentation, negligent hiring, and negligent retention claims. *See Barnes* v. *Am. Tobacco Co.*, 161 F.3d 127, 138 (3d Cir. 1998); *Schnell* v. *Bank of New York Mellon*, 828 F. Supp. 2d 798, 806 (E.D. Pa. 2011); *Caronia* v. *Philip Morris USA, Inc.*, No. 06-CV-224, 2011 WL 338425, at *6 (E.D.N.Y. Jan. 13, 2011); *Hughes* v. *BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 303 (S.D.N.Y. 2006); *Corazzini* v. *Litton Loan Servicing LLP*, No. 09-cv-0199, 2010 WL 1132683, at *8 (N.D.N.Y. Mar. 23, 2010); *Joseph M.* v. *Northeastern Educational Intermediate Unit 19*, 516 F. Supp. 2d 424, 447 (M.D. Pa. 2007).   Similarly, because Plaintiffs' wrongful death and survival claims are premised on allegations sounding in negligence, they, too, require the breach of a duty. *See Sullivan* v. *Warminster Twp.*, No. 07-4447, 2010 WL 2164520, at *6 (E.D. Pa. 2010) ("Wrongful death and survival act claims are not substantive causes of action; rather, they provide a means of recovery for unlawful conduct that results in death.")   Although the underlying suits were brought in many different jurisdictions, the elements of Plaintiffs' claims are sufficiently similar across the various states that, for preemption purposes, the Court need not conduct a choice of law analysis at this stage. *See Duerson*, 2012 WL 1658353, at *3 (explaining that choice of law inquiry was "largely irrelevant" to preemption question). The NFL here cites primarily the substantive law of Pennsylvania, the forum, and of New York, where, according to Plaintiffs, "all NFL policies and decisions relevant to the conduct alleged herein [primarily] occurred."  (MAC ¶ 24.)  By citing to such law for illustrative purposes, however, the NFL does not take a position on which jurisdiction's laws apply to the underlying claims at issue here.

concussive and concussive injuries in football" (MAC ¶¶ 5-6, 91, 99)—are preempted because determining whether the NFL in fact owed a duty to Plaintiffs, assessing the scope of any such duty, and deciding whether the NFL acted reasonably in discharging any duty would substantially depend upon an interpretation of the health and safety provisions in the CBAs that address the conduct complained of here.

First, regarding the NFL's alleged "duty to advise Plaintiffs" that "the repeated traumatic head impacts the Plaintiffs endured while playing NFL football were likely to expose them to excess risk to neurodegenerative disorders," its alleged failure "to warn NFL players of the medical risks associated with repetitive head impacts during NFL games and practices," and the "need to promulgate rules affecting the return-to-play rules when concussive events are detected" (*id.* ¶¶ 102, 248, 333; *see also id.* ¶¶ 8, 276), the CBAs define the Clubs' responsibility for treating player injuries, determining recovery times, making return-to-play decisions, and warning players of the risks of continued performance.

Since 1968, the CBAs have imposed on Clubs the responsibility to provide medical care to NFL players by requiring the Clubs to "provide a physician and an ambulance at each game." (Ex. 12, 1968 NFL and AFL Constitution Art. XIX § 19.5.)  The later CBAs further mandate that each Club "have a board-certified orthopedic surgeon as one of its Club physicians," that "[a]ll full-time head trainers . . . be certified by the National Athletic Trainers Association," and that "[a]ll part-time trainers must work under the direct supervision of a certified trainer." (Ex. 5, 1982 CBA Art. XXXI §§ 1-2; Ex. 6, 1993 CBA Art. XLIV §§ 1-2; Ex. 10, 2006 CBA Art. XLIV §§ 1-2; *see also* Ex. 11, 2011 CBA Art. 39 §§ 1-2.)

Moreover, under the CBAs, "[a]ll determinations of recovery time for . . . injuries must be [made] by the Clubs' medical staff and in accordance with the Club's medical

standards" (Ex. 13, 1980 Supp. to NFL Constitution Art. XVII), and in certain instances in which a player's physical condition "could be significantly aggravated by continued performance, the physician will advise the player . . . before the player is again allowed to perform on-field activity." (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; Ex. 11, 2011 CBA Art. 39 § 1(c); *see also* Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 6, 1993 CBA Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9; Ex. 11, 2011 CBA Appx. A § 9 ("[I]f Player is injured . . . and promptly reports such injury to the Club physician . . . then Player will receive such medical . . . care . . . as the Club physician may deem necessary.").)

Accordingly, a determination of whether the NFL failed to exercise reasonable care, which depends first on the assessment of what, if any, duty was owed, cannot be made without first determining the scope of the duties placed on Club medical staff by the CBAs. For example, if Plaintiffs' alleged medical conditions were ones that "could be significantly aggravated by continued performance," the Clubs' medical staff may have had a duty to warn players before returning to play, which "would be one factor tending to show that the NFL's alleged failure to take action to protect [them] from concussive brain trauma was reasonable." *Duerson*, 2012 WL 1658353, at \*4.

Similarly, to assess whether the NFL acted reasonably by not promulgating the return-to-play rules suggested by Plaintiffs, the Court would first need to interpret the scope of the duty imposed by the CBA provisions providing that "[a]ll determinations of recovery time for . . . injuries" are to be made "by the Club's medical staff and in accordance with the Club's medical standards." *See Maxwell*, No. 11-CV-08394, Order at 1-2 ("The CBA places primary responsibility for identifying . . . physical conditions on the team physicians . . . . The physician provisions of the CBA must be taken into account in determining the degree of care owed by the

NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players.").[11]

Provisions requiring that each Club have a board-certified orthopedic surgeon as physician, provisions requiring that the Clubs pay the costs of certain medical care for its players, and provisions requiring that the Club physician perform a pre-season and in some cases a post-season physical examination could be interpreted "to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could reasonably rely on the clubs to notice and diagnose player health problems arising from playing in the NFL." *Duerson*, 2012 WL 1658353, at *4.

Other provisions that must be interpreted include the certification requirements imposed by the CBAs on the Club medical staff, including that head trainers be certified by the National Athletic Trainers Association and, as discussed above, that "[e]ach Club will have a board-certified orthopedic surgeon as one of its Club physicians."   If, as part of these certifications—and attendant education, training, and experience—the Club trainers and surgeons received instruction on the risks of repetitive head impacts, then the degree of care owed by the NFL in warning players about these issues necessarily would be diminished.   *See Stringer*, 474 F. Supp. 2d at 910 ("If, by virtue of the certification process, the trainers are fully

---

[11]   Nor can a court determine whether the NFL acted reasonably in purportedly hiring and retaining the "MTBI Committee" without interpreting CBA provisions addressing the duty to warn.   If Club medical staff was tasked to provide information "regarding the permanent brain injury risks associated with repetitive head impacts in the game of football" (MAC ¶ 381), then the duties owed by the NFL in hiring and retaining members of the "MTBI Committee" would be diminished.   *See Peek* v. *Phila. Coca-Cola Bottling Co.*, No. 97-3372, 1997 WL 399379, at *6 (E.D. Pa. July 16, 1997) ("Because any duty relating to the hiring, supervision, or retention of employees in the collective bargaining context would arise solely from the collective bargaining agreement, resolution of these types of claims would require interpretation of the agreement.") (internal quotation and citations omitted).

prepared to handle heat-related illnesses, the degree of care owed by the NFL in publishing the Hot Weather Guidelines is diminished.").  Simply put, "the degree of care owed cannot be considered in a vacuum," but "must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players." *Stringer*, 474 F. Supp. 2d at 910-11.

Second, regarding Plaintiffs' allegation that the NFL "avoid[ed] changes in rule-playing to minimize head injury" (MAC ¶ 333) and otherwise breached its duties relating to rule-making (*see id.* ¶¶ 92-93, 101), the CBAs establish the "Joint Committee on Player Safety and Welfare," comprised of three Club representatives and three NFLPA representatives, "for the purpose of discussing the player safety and welfare aspects of . . . playing rules." (Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11, 2011 CBA Art. 50 § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI.)  The CBAs also mandate that "[i]f the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate, and "request an advisory decision" by an arbitrator regarding the proposed change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex. 11, 2011 CBA Art. 50 § 1(c).)

Thus, because the CBAs expressly address responsibility for promulgating, reviewing, and investigating playing rules affecting player health and safety, the provisions of the CBAs first must be interpreted to determine the scope of the duties imposed on the NFL.  For example, to the extent that the NFLPA has certain duties regarding rules affecting player safety—such as those arising out of the establishment of the Joint Committee on Player Safety

and Welfare, or relating to the NFLPA's right to investigate rules that would adversely affect player safety—the NFL's own duties may be reduced.

Finally, the CBAs provide NFL players and their union, NFLPA, with certain rights and obligations relating to health and safety issues. *See, e.g.*, Ex. 9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d); Ex. 11, 2011 CBA Art. 50 § 1(d) (empowering the "NFLPA . . . to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety"); Ex. 5, 1982 CBA Art. XXXI § 3; Ex. 6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3; Ex. 11, 2011 CBA Art. 39 § 4 ("A player will have the opportunity to obtain a second medical opinion" at Club's expense); Ex. 5, 1982 CBA Art. XXXI § 4; Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 5 (guaranteeing a player's "right to choose the surgeon who will perform surgery" on the player); *see also* Ex. 6, 1993 CBA Art. XLIV § 5; Ex. 10, 2006 CBA Art. XLIV § 5; Ex. 11, 2011 CBA Art. 39 § 6 ("[e]ach player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and a "post-season physical examination" shall be conducted at the player's or Club's request). Again, to the extent that these provisions set forth the duties or rights of the Clubs, physicians, the NFLPA, or of the players themselves, an interpretation of the scope of those duties informs the scope of the NFL's own purported duties.[12]

---

[12]   Certain individual Plaintiffs, through the Short-Form Complaint process, purport to bring additional claims beyond those alleged in the Complaint. Many, if not all, of these claims find no support in the factual allegations of the Complaint itself, and, for that reason, if any such claims were to survive this motion to dismiss, the NFL will move to dismiss them for failure to state a claim, among other grounds. In any event, the additional claims are also preempted. For example, certain Plaintiffs purport to bring a claim for "negligence-monopolist" against the NFL, styled as a "negligence" claim and premised on duties allegedly owed by the NFL "to invoke rules that protect the health and safety of its players." (*See, e.g.*, Abrams Short-Form Compl. Attachment "A" (July 11, 2012) (ECF Dkt. No. 976)

Consistent with settled Supreme Court precedent finding unionized workers' safety grievances preempted, *see, e.g.*, *Hechler*, 481 U.S. at 861-62; *Rawson*, 495 U.S. at 371-72; *see also Sluder* v. *United Mine Workers of Am., Int'l Union*, 892 F.2d 549, 555-56 (7th Cir. 1989), a long line of NFL preemption cases—including *Duerson* and *Maxwell*, as discussed above—have held that resolution of player-injury claims substantially depends on CBA terms addressing player safety and confirms that Plaintiffs' claims are preempted here.  Likewise, the court in *Stringer* v. *National Football League*, held that a wrongful death claim against the NFL—premised on the NFL's alleged failure "to establish regulations" to ensure "adequate care and monitoring of players suffering from heat-related illness" and "regulation of . . . return to practice"—was preempted, because "the degree of care owed by the NFL" must "be considered in light of the contractual duties imposed on the team physicians."  *Stringer*, 474 F. Supp. 2d at 903-04, 910.  Because the "CBA places primary responsibility for identifying [certain] physical conditions on the team physicians," those provisions "must, therefore, be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances."  *Id.* at 910-11.

*Duerson*, *Maxwell*, and *Stringer* are all consistent with numerous other decisions holding that NFL player claims against the NFL or its Clubs relating to duties that are imposed by the CBAs are preempted, because they require interpretation of CBA terms.  *See, e.g.*, *Givens*,

---

¶¶ 1-7.)  Like the negligence claims contained in the Master Administrative Complaint, this claim is preempted because the Court will be required to interpret the health and safety provisions in the CBAs to determine the scope of any such duty and to assess whether the NFL acted reasonably.  These same Plaintiffs also have brought a claim for negligence against the NFL (and NFLP) based on an alleged "duty to ensure that the helmets they licensed, required, and/or approved were of the highest possible quality and sufficient to protect the NFL players."  (*Id.* ¶ 8.)  As explained in Part II, *infra*, this claim, too, is preempted.

684 F. Supp. 2d at 990-91 ("The questions raised by the Complaint, such as whether a physician's failure to advise a player of his medical condition should be imputed to the club or whether the club has a duty independent of the physician to advise a player of his medical condition, are 'inextricably intertwined' with the provisions of the CBA."); *Sherwin*, 752 F. Supp. at 1177-78 (former player's claims that the Club provided negligent medical treatment and fraudulently concealed the extent of the player's injury was preempted because the Club "did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the" CBAs); *Jeffers*, 681 S.E.2d at 412 (former NFL player's claims against Club—that team physician performed unauthorized procedures during knee surgery—was preempted because resolution of the claim was substantially dependent upon an analysis of CBA provisions setting forth the Clubs' and players' rights and duties in connection with medical care); *see also Williams*, 582 F.3d at 881 (negligence claim against the NFL preempted because "whether the NFL . . . owed the Players a duty to provide . . . a warning [that a supplement contained a banned substance under the NFL Drug Policy] cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy"); *Atwater*, 626 F.3d at 1182 (former players' claims preempted because court "would . . . have to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship"); *Smith* v. *Houston Oilers, Inc.*, 87 F.3d 717, 719-21 (5th Cir. 1996) (players' claims for coercion, duress, extortion, and assault and battery preempted); *Holmes*, 939 F. Supp. at 527-28 (player's claims for fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy preempted).

In sum, the adjudication of Plaintiffs' claims necessarily and substantially depends on an interpretation of the terms of the CBAs because a court cannot evaluate the purported duties owed by the NFL, the scope of the NFL's purported duties, or whether the NFL acted "reasonably" without first considering the obligations regarding player health and safety imposed by the CBAs.

### 2. Resolution of Plaintiffs' Fraud-Based Claims Would Require Interpretation of the Terms of the CBAs

Plaintiffs' claims for fraud, fraudulent concealment, "civil conspiracy/fraudulent concealment," and declaratory relief are preempted as well, as each would also require an interpretation of the same CBA provisions.

First, because these claims are founded on the same alleged duty as Plaintiffs' negligence claims, the same analysis applies here.[13]  Plaintiffs thus allege that the NFL "had a duty to advise Plaintiffs" of the "heightened risk" of "neurodegenerative disorders and diseases," which the NFL purportedly breached by "willfully and intentionally" misleading Plaintiffs and concealing the risk from Plaintiffs (MAC ¶¶ 248(a)-(c)), in the same way that Plaintiffs allege that "the NFL was negligent and failed to carry out [its] duty in that it failed to inform NFL players of the risks associated with MTBI" (*id.* ¶ 8).  Because a court cannot evaluate the scope of the NFL's purported duties without first considering the obligations regarding player health and safety imposed by the CBAs, resolution of these claims, too, substantially depends upon an interpretation of the terms of the CBAs.

---

[13]   An essential element of a fraudulent concealment claim is a duty to disclose.  *See Aubrey* v. *Sanders*, No. 07-CV-0137, 2008 WL 4443826, at *5-6 (W.D. Pa. Sept. 26, 2008); *Manti's Transp., Inc.* v. *C.T. Lines, Inc.*, 68 A.D.3d 937, 940 (N.Y. App. Div. 2009).  To the extent that Plaintiffs' claims for fraud, "civil conspiracy/fraudulent concealment," and declaratory relief are premised on fraudulent concealment, they, too, thus require a duty to disclose.

Second, Plaintiffs' fraud-based claims (as well as their negligent misrepresentation claim) require a showing of justifiable reliance. *See, e.g.*, *Aubrey*, 2008 WL 4443826, at *5. A court cannot determine whether Plaintiffs justifiably relied on information provided by the NFL, as Plaintiffs allege (*see, e.g.*, MAC ¶¶ 278, 283, 294, 299), without interpreting the CBAs' health and safety provisions. *See, e.g.*, *Williams*, 582 F.3d at 881 ("The Players' misrepresentation claims (fraud, constructive fraud, and negligent misrepresentation) are also preempted because the Players cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy.") In adjudicating a fraud claim, courts must consider the "relationship of the parties . . . and the nature of the transaction when determining whether one party's reliance . . . is justifiable." *Tran* v. *Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005) (internal quotations and citations omitted). Numerous provisions, discussed above, delineate that relationship here and thus inform the question of justifiable reliance.

For example, a court cannot determine whether Plaintiffs "justifiably and reasonably relied on the NFL's omissions and misrepresentations" (MAC ¶ 299) regarding "the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury" (*id.* ¶ 295) without first interpreting the CBAs' provisions addressing responsibility for treating player injuries, including decisions regarding "recovery time" for injuries (*see, e.g.*, Ex. 13, 1980 Supp. to NFL Constitution Art. XVII ("All determinations of recovery time for . . . injuries must be by the Club's medical staff and in accordance with the Club's medical standards.")).

Similarly, certain CBAs provide that when a "player's physical condition . . . could be significantly aggravated by continued performance, the physician will advise the player

27

of such fact in writing before the player is again allowed to perform on-field activity."  (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 11, 2011 CBA Art. 39 § 1(c).)   A court could reasonably determine that Plaintiffs' purported reliance on the NFL to provide such generic warnings was not reasonable if the parties to the CBA determined that warnings provided by the Club physician were sufficient. *See, e.g.*, *Williams*, 582 F.3d at 881 (players' fraud claim—that the NFL knew that a supplement contained a banned substance, but failed to warn the players—was "preempted because the Players cannot demonstrate the requisite reasonable reliance . . . without resorting to the CBA," which tasked players with responsibility for knowing the contents of supplements); *see also* *Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation claim was preempted because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language"); *Sherwin*, 752 F. Supp. at 1178 (fraud claim against Club preempted because "the court cannot resolve plaintiff's fraud and negligent misrepresentation claims without reference to" provisions of the CBA establishing "duty of a club physician, and arguably the club," to inform player of adverse physical conditions).  Similar provisions that may require interpretation to resolve such claims include those establishing the "Joint Committee on Player Safety and Welfare," which includes three NFLPA representatives, "for the purpose of discussing the player safety and welfare aspects of . . . playing rules."  To the extent that the players' representatives were specifically charged with responsibility in the area of player safety, the players' reliance on the NFL in the same area may not be reasonable.

The result is no different with respect to Plaintiffs' "post-retirement" fraudulent concealment and negligent misrepresentation allegations, which claim that the NFL's purported "concealment of the risks to which [Plaintiffs] had been exposed on the playing field delayed

their ability . . . to seek appropriate treatment of their latent neurodegenerative conditions." (MAC ¶ 282; *see also id.* ¶ 317.)  Where the union and employer negotiate benefits for retirees, retirees can proceed under section 301 to enforce a provision in the collective bargaining agreement to provide them with retirement benefits.  *See Allied Chem. & Alkali Workers of Am., Local Union No. 1* v. *Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20 (1971); *see also Alderney Dairy Co.* v. *Hawthorn Mellody, Inc.*, 643 F.2d 113, 117 (3d Cir. 1981) (recognizing that retirees could bring an action under section 301).   Correspondingly, claims will be preempted if "the court will be required to interpret or apply the CBA to resolve the retirees' claims."  *Atwater*, 626 F.3d at 1185.  That is precisely the case here, because Plaintiffs' fraudulent concealment and negligent misrepresentation claims hinge on a duty to disclose, and the assessment of any such duty on the part of the NFL requires an interpretation of the CBAs' numerous post-retirement benefits provisions, negotiated by the Union and the NFL, which benefits cover a wide range of subjects, including medical care and compensation for such medical care for eligible retirees, including, for example, in the case of "dementia."  (*See* Ex. 10, 2006 CBA Art. XLVIII-D ("The parties agree to . . . establish a . . . plan . . . to provide medical benefits to former Players who are . . . determined . . . to have 'dementia.'"); *see also* Ex. 11, 2011 CBA Art. 58 § 1; Ex. 11, 2011 CBA Art. 65 § 1 ("[T]he Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have permanent, neuro-cognitive impairment . . . .").)

Among other things, these provisions place responsibility on the players themselves for seeking medical care during retirement, while the NFL is tasked solely with paying the costs of certain such care for eligible retirees.  (*See id.*)  Thus, to resolve Plaintiffs' claims, a court first must assess these provisions to determine whether the NFL had any duty to

disclose, and, if so, the scope of that duty, and whether, as Plaintiffs allege, they "in fact did reasonably rely" on information provided by the NFL "after their NFL careers" (MAC ¶ 283). *See Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation claim—that the NFL provided inaccurate background information regarding investment advisors for the players—was preempted because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language," which placed responsibility for player finances on players themselves).

**B.** **Plaintiffs' Claims Against the NFL Arise Under the CBAs**

Plaintiffs' claims against the NFL also are preempted by section 301 because they are premised on rights and obligations that arise under the CBAs. *See Allis-Chalmers*, 471 U.S. at 213 ("state-law rights and obligations that do not exist independently of [collective bargaining] agreements" are preempted); *Antol*, 100 F.3d at 1117 ("[C]laims based squarely on a collective bargaining agreement or requiring analysis of its terms are preempted . . . .")

The CBAs define the relationship among the NFL, its Clubs, and the players. (*See* Ex. 4, 1977 CBA Art. II § 1; Ex. 5, 1982 CBA Art. II § 1; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1; Ex. 11, 2011 CBA Art. 2 § 4(a); *see also* Ex. 2, 1968 NFL CBA Art I § 2; Ex. 1, 1968 AFL CBA § 16; 1970 CBA Art. II § 4 (CBAs "represent[] a complete and final understanding on all bargainable subjects"); Ex. 2, 1968 NFL CBA Art. III § 1; Ex. 1, 1968 AFL CBA § 2; Ex. 3, 1970 CBA Art. II § 2; Ex. 4, 1977 CBA Art. I § 1; Ex. 5, 1982 CBA Art. II § 1; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1; Ex. 11, 2011 CBA Art. 2 § 1 (incorporating by reference the NFL Constitution).)

As the Complaint makes clear, Plaintiffs' claims allege that the NFL purportedly failed to implement "changes in rule-playing to minimize head injury" and failed "to impose

safety regulations governing this health and safety problem." (MAC ¶¶ 9, 333.) So, for example, Plaintiffs allege that the NFL should have adopted, earlier than it did, rules regarding "the employment of a neurologist on the sidelines," and "return-to-play rules consistent with proper medical management of MTBI." (*Id.* ¶ 289.) The CBAs, however, establish the duties of the NFL and its Clubs to provide medical care to NFL players. (*See* Ex. 12, 1968 NFL and AFL Constitution Art. XIX § 19.5; Ex. 5, 1982 CBA Art. XXXI §§ 1-2; Ex. 6, 1993 CBA Art. XLIV §§ 1-2; Ex. 10, 2006 CBA Art. XLIV §§ 1-2; Ex. 11, 2011 CBA Art. 39 §§ 1-2.) Similarly, the CBAs establish the duty of the NFL and its Clubs to implement and enforce rules regarding professional football generally, and health and safety-related rules in particular. Indeed, the CBAs provide that the NFL and its Clubs have the obligation to "amend[] or change[]" all NFL "[p]laying rules." (*See, e.g.*, Ex. 14, 1984 NFL Constitution Art. XI § 11.2; *see also* Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11, 2011 CBA Art. 50 § 1(c); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI (forming the "Joint Committee on Player Safety and Welfare," which is tasked with addressing "the player safety and welfare aspects of . . . playing rules"); Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex. 11, 2011 CBA Art. 50 § 1(c) (empowering the NFLPA to investigate potentially hazardous rules). Thus, the NFL's alleged duty—to "make the game of professional football safer for players"—expressly arises under the CBAs. (MAC ¶ 91.)

        That this purported obligation arises under the CBAs is confirmed by the fact that the duty does not exist independent of the CBAs:  the NFL does not owe duties to promulgate rules regarding player health and safety to "every person in society." *See Rawson*, 495 U.S. at 371 (holding a state law right arises outside of a CBA where defendant is "accused of acting in a

way that might violate the duty of reasonable care owed to every person in society"); *Peek*, 1997 WL 399379, at *6 ("[I]t does not appear that plaintiff's negligence and gross negligence claims derive from any general duty of care owed by Coca–Cola to all persons."); *Brown*, 219 F. Supp. 2d at 380 ("To be independent of the CBA, a tort claim must allege a violation of a duty 'owed to every person in society' as opposed to a duty owed only to employees covered by the collective bargaining agreement" (quoting *Rawson*, 495 U.S. at 362)); *Sherwin*, 752 F. Supp. at 1178 (finding fraud claim arose under CBA because "[t]he Colts owed a duty to . . . provide truthful information regarding medical treatment . . . only to their players covered by the standard player agreement and the CBA," not "to every person in society" (quoting *Rawson*, 495 U.S. at 371)); *but see Stringer*, 474 F. Supp. 2d at 908 (suggesting *Brown*'s reading of *Rawson* is "too broad" and holding that plaintiff's claims did not arise under the CBAs).

Accordingly, Plaintiffs' claims—which are premised on alleged duties owed to NFL players only—arise under the CBAs and consequently are preempted by section 301.  *See Allis-Chalmers*, 471 U.S. at 213.

## II.

## <u>SECTION 301 PREEMPTS PLAINTIFFS' CLAIMS AGAINST NFLP</u>

Plaintiffs' claim against NFLP for "Civil Conspiracy /Fraudulent Concealment" is preempted for the same reason that Plaintiffs' "Civil Conspiracy/Fraudulent Concealment" claim against the NFL is preempted:  its resolution, too, requires interpretation of the CBAs.

Plaintiffs allege no duty owed by NFLP, as opposed to a duty owed by the NFL; nor do Plaintiffs allege any breach of a duty by NFLP, as opposed to a purported breach by the NFL.  In fact, there are no factual substantive allegations in the Complaint specific to NFLP. Instead, NFLP is solely (and conclusorily) alleged to be liable along with the NFL for acting "in

concert to perpetuate the fraudulent concealment of the connection between repetitive MTBI and long-term neuro-cognitive damage, illness, and decline." (MAC ¶ 423.) Thus, to adjudicate the claim against NFLP (to the extent it even exists), a court will need first to assess the scope of any alleged duty on the part of NFLP—an assessment that must be measured according to the scope of the preexisting duties in the CBAs. *See supra* Part I.A.[14]

To the extent that some Plaintiffs, through the Short-Form Complaint process, have brought a claim for negligence against NFLP based on a purported "duty to ensure that the helmets they licensed, required, and/or approved were of the highest possible quality and sufficient to protect the NFL players" (*e.g.*, Abrams Short-Form Compl., at ¶ 8), that claim, if it can even be pled against NFLP in the absence of any specific factual allegations, is preempted.

At bottom, Plaintiffs assert that NFLP was obligated to protect NFL players from the risk of brain injury. But, as discussed, the CBAs contain numerous provisions that expressly address player health and safety, and place responsibility for implementing safety-related rules and regulations on the NFL, its Clubs, and the NFLPA, all of which must be interpreted to assess any such duty of NFLP. Moreover, with respect to playing equipment specifically, the CBAs establish the Joint Committee on Player Safety and Welfare to address, among other issues, "playing equipment." (Ex. 4, 1977 CBA Art. XI; Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11, 2011 CBA Art. 50 § 1(a); *see also* Ex. 3, 1970 CBA Art. V.) Thus, the scope of NFLP's alleged duty to license equipment that

---

[14] That NFLP is not a signatory to the CBAs "is not dispositive" because the "relevant question for preemption purposes is . . . whether Plaintiffs' state-law claims . . . would require the court to apply or interpret the CBA." *Atwater*, 626 F.3d at 1177-78 (noting that "courts have governed their determinations on . . . preemption by the necessity of referring to a CBA for resolution of the claim rather than by the individual status of the defendant") (internal quotations omitted). For the reasons set forth above, resolution of Plaintiffs' claims plainly depends upon an interpretation of the terms of the CBAs.

adequately protects players can be assessed only by reviewing and interpreting the Joint Committee's concomitant duty to discuss "playing equipment." [15] Thus, these claims, too, should be dismissed as preempted.

*          *          *

In sum, Plaintiffs' claims are preempted under section 301 and should be dismissed.

---

[15] Although the *Stringer* court held that a negligence claim based on the NFL Defendants' purported duty "to ensure that the players had safe equipment" was not preempted, its decision is predicated on two faulty premises. 474 F. Supp. 2d at 912. First, the court found the claim was not inextricably intertwined with the CBA because—although the CBA plainly establishes the "Joint Committee" for the "'purpose of discussing the player safety and welfare aspects of playing equipment'"—the "NFL Defendants are not members of that committee and are not required to adopt [its] recommendations." *Id*. (quoting CBA). But, as discussed, whether the NFL Defendants are members of the Committee, it is impossible to determine the scope of the NFL Defendants' purported duty—or whether they acted "reasonably" with regard to playing equipment—without first considering the express "purpose" of the Committee and the equipment-related duties imposed on its members. Second, the *Stringer* court intertwined that "the CBA imposes no duty on [the NFL Defendants] to ensure that the equipment . . . adequately protects from . . . injury[.]" *Id*. at 912. But, as noted, numerous CBA provisions in fact do delegate responsibility to the NFL, its Clubs, and the NFLPA for reviewing, investigating, and implementing equipment-related rules and regulations. (*See, e.g.,* Ex. 14, 1984 NFL Constitution Art. XI § 11.2; Ex. 12, 1968 NFL and AFL Constitution Art. XI § 11.2 (delegating to the NFL and its Clubs the responsibility for "amend[ing] or chang[ing]" playing rules); Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex. 11, 2011 CBA Art. 50 § 1(c) (authorizing the NFLPA to investigate and seek an advisory decision by an arbitrator regarding any playing rule change that it believes "would adversely affect player safety").)

## Conclusion

For the foregoing reasons, the NFL Defendants respectfully submit that section 301 preempts Plaintiffs' claims, and, as a result, the Complaint should be dismissed with prejudice.

Dated: August 30, 2012

Respectfully submitted,

_____/s/ Brad S. Karp_____
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Beth A. Wilkinson
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000

DECHERT LLP
Judy L. Leone (Pa. Atty. ID 41165)
Robert C. Heim (Pa. Atty. ID 15758)
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
Tel:   (215) 994-4000

DUANE MORRIS LLP
John J. Soroko (Pa. Atty. ID 25987)
Dana B. Klinges (Pa. Atty. ID 57943)
30 South 17th Street
Philadelphia, PA  19103-4196
Tel:   (215) 979-1000

*Attorneys for the National Football League and
NFL Properties LLC*