**Section 3. The Retirement Board:**

(a) The Retirement Plan shall provide that the Retirement Board shall be composed of four persons designated by the NFLPA and four persons designated by the Member Clubs. The NFLPA representatives shall be designated by the NFLPA in accordance with procedures approved by its membership and shall consist of two active players and two inactive vested players, with equal representation from the American Conference and the National Conference.

(b) The Commissioner of the NFL shall be Chairman of the Retirement Board and shall preside at all meetings of the Board. The Commissioner shall have no vote. Two Vice-chairmen shall be selected, one designated from among their number by the Retirement Board members representing the NFLPA and the other designated from among their number by the Board members representing the Member Clubs. The duties of the Vice-Chairmen shall be as stated in the Retirement Plan and the Bylaws of the Board and shall include, but not be limited to, submission of agendas for Retirement Board meetings and review of minutes prior to submission for approval by the Board.

(c) The Board shall act by the affirmative vote of five (5) members on matters related to interpretation of benefit, eligibility and other administrative provisions of the Plan. On all other matters, including amendments to the Plan, the Trust Agreement and the Bylaws of the Retirement Board (and other matters defined in Sub-section (d) as "substantial issues"), the Board shall act by the affirmative vote of six (6) members.

If any Board member is unable to attend a meeting of the Board, the side which designated such member may appoint an alternate to represent the absent member.

The quorum for a meeting of the Board shall be six (6) members.

(d) If the Board shall determine that any matter which the Board has been unable to resolve by action of the Board is a substantial issue, the Commissioner of the NFL shall be requested to offer his recommendations. If after consideration of the Commissioner's recommendation the Board is still unable to achieve resolution, the matter shall be submitted to the Commissioner for

19

arbitration, whose decision shall be final and binding unless rejected by six (6) votes.

A "substantial issue" shall be defined for purposes of this Subsection (d) as "any matter which six members of the Board designate as such," but in any event the following matters shall be conclusively considered to be substantial issues and shall require six votes for passage:

(1) Amendments to any documents;
(2) The Plan design;
(3) Selection of the actuary or actuaries;
(4) Selection of the Investment Manager;
(5) Investment policy determination;
(6) Selection of outside experts and the agency to handle the Plan;
(7) Definition of terms of the Plan, Trust and Bylaws.

(e) Except as limited by (f) below, the powers granted to the Retirement Board under the Retirement Plan shall include all powers incident to the operation of the Plan and the Trust, including but not limited to the power to amend the Plan, the Trust Agreement and any insurance contracts associated with the predecessor plans or this Plan, to construe the Plan and to reconcile inconsistencies in the Plan.

(f) No action of the Retirement Board shall:
1. Alter the amount of the contributions otherwise payable to the Plan;
2. Cause the Plan and the Trust to fail to qualify under Section 401 (a) and 501 (a), or cause any portion of contributions to the Plan to fail to be deductible to the Member Clubs under Section 404 (a) of the Internal Revenue Code;
3. Reduce, as a direct result of an amendment, any benefit credits already earned and otherwise payable under the Plan;
4. Amend the Plan in a manner that will render the Plan actuarially unsound.

(g) The Retirement Board shall:
1. Pay all reasonable and necessary expenses of the Plan

       and the Trust and cause the same to be paid currently out of the assets of the Trust; and

2. Allocate an annual amount out of contribution income to the amortization of unfunded actuarial liabilities so as to fund such liabilities on an actuarially sound basis, but not in excess of twenty (20) years from April 1, 1970.

**Section 4. Insurance:**

This Section 4 shall apply only to players and their families.

The Member Clubs agree that they will take out and maintain throughout the four years beginning April 1, 1970, a group life insurance policy acceptable to the NFLPA and similar to policies in effect during the 1969 season. The amounts of life insurance coverage for active and inactive vested players shall be maintained in accordance with the schedule in effect during the 1969 season.

In addition to the life insurance program, the Member Clubs agree that all players and their families shall be covered during the four years beginning April 1, 1970, by a group major medical policy with benefits equal to those in effect during the 1969 season. With respect to maternity benefits, said policy shall guarantee, effective as to dependent children conceived after March 31, 1970, that each player shall be reimbursed for all expenses up to and including the amount of $150, and eighty per cent (80%) of expenses in excess of $150.

The Member Clubs shall also provide dental benefits to players and their families under an insurance policy or policies to be effective not later than October 1, 1970, and continuing until March 31, 1974. A design of benefits with an annual cost not to exceed $125,000 shall be jointly approved by the NFLPA and the Member Clubs after receiving recommendations from the consultants representing the NFLPA and the Member Clubs.

## ARTICLE VII

## JOINT PLAYER PICTURE PROGRAM

The NFLPA and the NFLPRA shall establish a joint program (hereinafter referred to as the "Joint Program") relating to trading

cards and picture premiums pursuant to the following terms and conditions:

**Section 1. Property Rights:**

The NFLPRA shall make available to the Joint Program the logos, insignias and other property rights of the NFLPRA and its constituent Member Clubs. The NFLPA shall make available to the Joint Program the names, pictures, signatures and biographical data of members of the NFLPA and other property rights of the NFLPA.

**Section 2. Commencement:**

The Joint Program shall be in effect from the date hereof until January 31, 1974.

**Section 3. Income:**

Gross income realized from agreements entered into pursuant to the Joint Program (except for the provisions set forth in Section 6, of this Article VII) shall be allocated as follows:

1971—With the exception of revenues from the Topps, Coca-Cola and Visual Panographics Agreements, the first $75,000 of revenues earned from Joint Programs in the twelve month period commencing February 1, 1971, shall belong to and be forwarded to the NFLPRA. The NFLPRA obligation in 1971 granting the first $75,000 of monies earned in the year 1971 shall terminate as of January 31, 1972. Revenues in excess of $75,000 earned during this period shall be shared equally. Revenues earned during each of the twelve month periods beginning February 1, 1972, and February 1, 1973, respectively, with the exception of the Coca-Cola and Topps Agreements, shall be allocated as set forth below;

1972, 73—The first $50,000 shall belong to the NFLPRA; the next $50,000 shall belong to the NFLPA; the next $25,000 shall belong to the NFLPRA; the next $25,000 to the NFLPA and the revenues earned in excess of $150,000 during each of the 12 month periods, shall be shared on a 50-50 basis.

Gross income received from agreements entered into during the term of the Joint Program but extending beyond said term shall be

shared equally by the NFLPA and the NFLPRA notwithstanding any conditions in this Section 3.

**Section 4. Negotiation of Programs:**

All Joint Program agreements will be jointly negotiated by the NFLPA and the NFLPRA and shall be approved and executed by both the NFLPA and the NFLPRA.

**Section 5. Conditions:**

(i) The NFLPRA on behalf of the Member Clubs hereby covenants and agrees that no legal action will be instituted by the NFLPRA or any member clubs in connection with the NFLPA Agreements with Visual Panographics terminating on February 1, 1972.

(ii) In connection with any Joint Program, the NFLPRA hereby covenants that neither the Member Clubs nor the League office will interfere in any way with picture taking of NFL players in team uniforms by the NFLPA or its agents or licenses.

(iii) Payments owed to the NFLPA pursuant to the Article VII shall be paid to the NFLPA upon receipt. Should income be paid to the NFLPA office, the NFLPA agrees to forward the NFLPRA share immediately upon receipt.

(iv) Other than is provided in Section 6 herein, it is understood that the NFLPA shall be solely responsible for commissions due to any licensing agent employed by the NFLPA.

**Section 6. Visual Panographics:**

It is understood and agreed that until January 31, 1972, the NFLPA shall retain all income received by it pursuant to its Agreement with Visual Panographics. Thereafter, and for the balance of the term of the Collective Bargaining Agreement, the net proceeds of any new agreement with Visual Panographics (less the commissions due to LCA) shall be payable pursuant to the allocation set forth under Section 3 herein.

**Section 7. Topps:**

The NFLPRA shall have the right to negotiate with Topps Chewing Gum ("Topps") regarding improvements in the agreement currently in effect between the NFLPA and Topps, and the NFLPRA shall be entitled to retain any amounts negotiated in

23

excess of the amounts payable to the NFLPA, pursuant to its agreement with Topps.

**Section 8. Individual Rights:**

It is understood and agreed that individual NFL players may use club uniforms, insignias and game films for personal endorsements and personal commercial ventures in accordance with the provisions of the Standard Player Contract.

**Section 9.**

Nothing herein shall limit or inhibit in any way the right of the NFLPA or the NFLPRA to conduct their own licensing programs.

## ARTICLE VIII

## OPTION CLAUSE

Any NFL player who is playing out his option (performing the services required of him under his Standard Player Contract pursuant to the Option contained therein) shall be paid no less than ninety per cent (90%) of the total amount of his Standard Player Contract for the previous season, including amounts of deferred compensation and bonus payments attributable to that Contract. The phrase "rate of compensation" as set forth in paragraph 10 of the Standard Player Contract shall include deferred compensation and bonus payments excluding any signing bonus, of any nature whatsoever, and shall not be limited to the amount set forth in paragraph 3 of the Standard Player Contract. In order for a player to receive ninety per cent of his performance bonuses under this Article VIII, he must meet the previously established conditions of said bonus during the year in which he is playing out his option.

## ARTICLE IX

## WAIVER PROCEDURES AND REGULATIONS

The NFL and NFLPA shall, prior to the beginning of each football season during the term of this Agreement, jointly prepare and distribute to all NFL players a booklet explaining the Waiver Procedures and Regulations to be in effect for each such season. This booklet shall include, but not be limited to, an explanation of Waiver Procedures, the Move List, the Reserve List, the Active

List, Future List, the assignment of player contracts and player limits and eligibility. Every effort shall be made to prepare this booklet in a manner so as to be easily understood by all NFL players.

Coaches or any other persons connected with one NFL club shall be prohibited from notifying or contacting any NFL player employed by another NFL club regarding any action taken pursuant to the waiver procedures and regulations then in effect. Whenever possible the Member Clubs shall give a player written notice that he has cleared waivers within twenty-four (24) hours after he has cleared. This information shall not be made available to the media until twenty-four (24) hours after written notice has been received by the player.

Any NFL player who is declared ineligible to compete in official pre-season, regular season or post-season games because of a breach of waiver procedures and regulations or any other provision of the Constitution and Bylaws of the NFL by any NFL club by whom he is employed shall be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, shall be a minimum of one week's salary and, when applicable, per diem expense payments.

## ARTICLE X

## NON-INJURY GRIEVANCE PROCEDURE

A "grievance" shall be defined as "a claim or a complaint submitted by any NFL player and/or the NFLPA regarding the interpretation or the application of any provision of the Standard Player Contract, the NFL Constitution and Bylaws or any rules and regulations promulgated pursuant thereto insofar as the interpretation pertains to wages, hours and working conditions of a player's employment or the application of any provision of this agreement as it applies to an individual player. A player need not be under contract at the time his grievance is presented. The NFLPRA also has the right to institute a grievance against an individual player pursuant to the procedures set forth in this Article.

**Step 1.** Any NFL player or the NFLPA may present a written grievance to any Member Club or to the League itself within sixty (60) days from the date of the occurrence of the action that gives

rise to the grievance or the date on which the facts of the matter became known or should have become known, whichever is later. If agreement regarding the grievance is reached between the player and the Club, written notice of the facts and terms of settlement shall be forwarded to the NFLPA by the Club within ten (10) days from the date of such settlement.

**Step 2.** If the grievance remains unsettled for a period of ten (10) days from the time it is submitted to the club, either the NFLPA or the NFL player may appeal directly to the Commissioner of the NFL for his decision, which decision shall be final and binding on all parties to this agreement.

## ARTICLE XI

## INJURY GRIEVANCE PROCEDURE*

In the event a player believes that he is physically incapable of playing professional football at the time his Standard Player Contract is terminated as the result of a football injury, he may institute a claim against his Member Club under the injury grievance procedure set forth below:

### Section 1. Selection of Neutral Physician:

During the term of this Agreement the NFLPRA and NFLPA shall maintain a jointly approved list of neutral physicians, including at least two (2) orthopedic physicians in each city in which an NFL club is located. The entire list of neutral physicians shall be subject to review and modification every twelve (12) months. Each physician should be willing and able to examine NFL players promptly without delay.

### Section 2. Notification of Club:

A player who believes he has a claim must notify his Member Club in writing of his claim not more than twenty (20) days from the date he clears waivers or the date his standard player contract is terminated, whichever is later. Such notification shall set forth the approximate date of the alleged injury and its general nature. The Club has the burden of proving that the player did not suffer a new injury. If a player passes the physical examination of the team

---

*See letter of clarification and modification of the Injury Grievance Procedure at page 36.

physician, it will be presumed that such player was physically fit to play football on the date he reported.

**Section 3. Procedure:**

Within seventy-two (72) hours following receipt of the notification provided for in Section 2 above, the club may:

(a) Deny liability by sending the grievant notice in writing that the club has rejected his claim. If the club shall select this alternative (a), the player shall present himself for examination by the neutral physician within ten (10) days after receipt of notification; or,

(b) Notify the player in writing that the club wishes him to be examined by the club's physician or another physician chosen by the club. This examination should be scheduled as soon as possible and in no event later than forty-eight (48) hours from the date the player receives notice of the scheduled examination. The report of the physician selected by the club shall be sent to the grievant within forty-eight (48) hours following such examination. The club shall bear all reasonable expenses incurred by the grievant pursuant to this sub-paragraph (b). If the report of the club doctor or a physician chosen by the club shall be adverse to the player, he shall present himself for examination by a neutral physician within ten (10) days following the player's receipt of any such report; or

(c) Notify the player that he should proceed to be examined by a neutral physician, in which case the player shall present himself for examination by the neutral physician within ten (10) days after receipt of such notification; or,

(d) Raise any special defenses, including but not limited to the following:

(i) That the player did not pass the physical examination administered by the club physician at the beginning of each training period as provided for in paragraph 6 of the Standard Player Contract. It is understood and agreed that this particular defense shall not be available to the club if the player shall have participated in any contact drills during such period or shall have been active and in uniform for any exhibition game or any regular season game; or

27

  (ii) That the player's injury arose solely from a non-football related cause subsequent to the physical examination administered by the team physician as provided in paragraph 6 of the Standard Player Contract; or

  (iii) That the player's injury was not football related and that he had executed a waiver or release prior to his physical examination or his commencement of practice.

  (iv) That the player did not suffer a new injury nor aggravate an old injury during the contract year.

If the Club shall raise a special defense pursuant to this subsection (d) above, the player shall present himself for examination by a neutral physician within ten (10) days following receipt of notification that the club has elected to raise a special defense. If the report of the neutral physician supports the player, the special defense shall be processed pursuant to the provisions of Section 6 below as soon as possible.

**Section 4. Miscellaneous:**

  (a) If the club fails to respond within the applicable time periods set forth above, the player may present himself for examination by the neutral physician within ten (10) days subsequent to the date in which notification should have been given to the player.

  (b) The ten (10) day limitation set forth herein may be extended if no neutral physician within a reasonable proximity to the grievant is able to examine the grievant within said time period.

  (c) The club may present to the neutral physician the medical history of the player; provided, however, that such medical history contain no opinions with regard to the player's physical condition at the time of his release or whether or not he is able to perform the services required of him pursuant to his Standard Player Contract. Each copy of any such medical history which is submitted must also be furnished to the legal counsel for the NFLPA.

  (d) The player shall notify the club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to his selection by the player.

**Section 5. Finality of Medical Opinion, Payment and Appeal:**

  The report of the neutral physician shall be final and binding

on both parties. The club shall make payment to the player, if required, within ten (10) days following the receipt of the report of the neutral physician. However, in the event that the medical conclusions of the neutral physician contain ambiguities and a legitimate dispute remains as to the physician's findings, any party may request clarification from the neutral physician. Such clarification must be requested within three (3) days following receipt of the neutral physician's report. If, subsequent to such clarification, a legitimate dispute remains regarding the medical conclusions of the neutral physician, the matter may be appealed pursuant to Section 6 of this Article XI; provided, however, that such appeal must be made within ten (10) days subsequent to the receipt of the neutral physician's report or of the clarification if requested.

**Section 6. Appeal Procedure:**

Any dispute which may exist between an NFL player and/or the NFLPA and a Member Club of the National Football League relating to an injury incurred by an NFL player while performing the services required of him pursuant to the Standard Player Contract, including injuries incurred in connection with either a preseason, regular season or post-season game, and/or which arise out of or relate to an injury grievance filed by an NFL player or by the NFLPA on behalf of the NFL player in accordance with the injury grievance procedure then in effect under any existing collective bargaining agreement between such parties, or any injury grievance procedure contained in the Standard Player Contract, if applicable, shall be finally decided by an impartial arbitrator selected as follows:

1. The NFLPA, the NFL player or the affected club shall notify the Commissioner of the National Football League in writing that a dispute concerning an injury exists and that arbitration is desired in order to resolve the dispute.

2. Within five (5) days subsequent to the receipt of written notice requesting arbitration, the Commissioner shall disclose in writing (including TWX or telegram) to the parties the name of the person selected by him to act as the impartial arbitrator.

3. Either of the parties involved in the dispute shall have the right, in its or his sole discretion, to reject the person se-

lected by the Commissioner as the impartial arbitrator and shall notify the Commissioner and the other party or parties to the dispute in writing (including TWX or telegram) regarding its or his acceptance or rejection of such nominee within five (5) days of receipt of notice of any such appointment. In the event either party shall reject the nominee selected by the commissioner, the Commissioner shall, within five (5) days following receipt of such written notice of rejection, select another person to act as the impartial arbitrator. This procedure shall be repeated until a mutually acceptable impartial arbitrator is selected.

4. (a) The decision of the impartial arbitrator regarding the merits of the claim or grievance and the total amount to be awarded, if any, shall be final, binding and unappealable, notwithstanding the provisions of subparagraph (b) below. (b) The Commissioner shall have the right to review any decision or award rendered by the impartial arbitrator for the purpose of determining whether or not it requires adjustment by reason of the applicable provisions of the Constitution and Bylaws of the National Football League.

Anything in this paragraph to the contrary notwithstanding, it is hereby agreed that no claim or grievance hereunder shall exceed the total amount of compensation specified in the affected Standard Player Contract or contracts, including bonus or deferred compensation arrangements between the parties not set forth in the Standard Player Contract, involved in the decision and submitted to the impartial arbitrator, and no award by such impartial arbitrator may exceed the total amount of compensation specified in such Standard Player Contract or contracts including bonus or deferred compensation arrangement between the parties not set forth in the Standard Player Contract, involved in such dispute or grievance.

It is understood that the impartial arbitrator may award to the NFL player payments for medical expenses incurred or which will be incurred in connection with the injury, to the extent such expenses have not been provided for under any Workman's Compensation policy or by the Club, should it be self-insured.

**Section 7. Expenses of Procedure:**

The first one hundred dollars ($100) of expense charged by a neutral physician shall be shared equally by the Club and the

player. Any charge in excess of one hundred dollars shall be paid by the Club if the player is given an award, and paid by the player if he is not given an award. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice shall be borne by the player. The parties will share equally in the expense of any impartial arbitration engaged in pursuant to Section 5 herein.

**Section 8. Pension Credit:**

Any player who shall receive payment for three (3) or more regular season games during any year by reason of the procedure set forth above shall be credited with a year of service for pension vesting purposes pursuant to the Bert Bell NFL Player Retirement Plan.

## ARTICLE XII

### FINES

It is agreed between the NFLPA and the NFLPRA that the following policies shall govern with respect to Club fines:

(a) All Clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of fines which it intends to impose; such list shall specify clearly the type of violation and the amount of the fine.

(b) All fines shall be imposed uniformly on all players for the same offense; however, the Club may specify the events which create an escalation of the fine, providing the formula for escalation is uniform in its application.

(c) The schedule and formula on fines shall apply to each club individually. Each club shall have the right to establish its own fine policy independent of the policy of any other club.

(d) A club shall have the right to impose fines against players for any incident which it, in its sole discretion, believes should be the subject of a fine, despite the fact that such fine is not published; any such fine and amount thereof, however, may be made the subject of a grievance in accordance with the provisons of Article X hereof.

(e) The amount of any fine assessed against an NFL player shall be deducted from his total compensation reflected on his W-2 withholding statement.\*\*

\*\*See letter of modification at page 36.

## ARTICLE XIII
## ENDORSEMENTS — TELEVISION APPEARANCES

**Section 1. Endorsements:**

No Member Club may arbitrarily refuse to permit a player to endorse a product.

**Section 2. Television Appearances:**

No Club may unreasonably require a player to appear on radio or television.

## ARTICLE XIV
## RETENTION OF BENEFITS

Any player currently employed or employed after February 1, 1970, shall receive at least the minimum benefits set forth in this Agreement. No direct financial benefit granted by any club to its team during the life of the 1968 NFL and 1968 AFL Collective Bargaining Agreement and Memorandum of Agreement, respectively, shall be reduced during the term of this Agreement.

## ARTICLE XV
## MISCELLANEOUS

**Section 1. Off-season Training Camp:**

The NFLPA and the NFLPRA agree that no veteran player shall be required to perform any activities relating to professional football during the off-season except on a voluntary basis.

**Section 2. Deductions of Club House Expenses:**

The deduction of amounts from any compensation due to a player for the purpose of compensating any Club House personnel or any other Club attache is prohibited.

**Section 3. Adverse Public Statements:**

The NFLPA and NFLPRA agree that each will use its best efforts to avoid public comments by Clubs, owners, non-playing personnel, as well as by players or coaches, which express adverse criticism of the Club, the coach or the operation and policy thereof, or which tend to cast discredit upon a Club, a player or any other person involved in the operation of the Club or the League.

**Section 4. Exchange of Information and Accommodations for NFLPA Authorized Representatives at League Games:**

The Clubs shall furnish upon request to the NFLPA address

lists and telephone lists to the extent available, covering all players under contract to the Club.

Two press or other suitable complimentary tickets shall be furnished to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. The NFLPA will provide a list of authorized persons who qualify under this Section to the League Office. The NFLPA must notify the home Club of its desire to attend such game at least three (3) days prior to the date of the game. NFLPA representatives shall possess appropriate identification evidencing the authority of such persons to act as NFLPA representatives.

**Section 5. No Discrimination:**

There shall be no discrimination in any form against any player or any party to this Agreement by any party to this Agreement because of race, religion, national origin or activity on behalf of the National Football League Players' Association.

**Section 6. Tickets for Away Games:**

Each player will be afforded the opportunity to purchase two (2) tickets from the best tickets available for public sale immediately prior to the public sale for each away game.

**Section 7. Workman's Compensation Benefits:**

(a) In any state where Workman's Compensation coverage is not compulsory, a Club shall either voluntarily obtain coverage under the compensation laws of that state, or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this Section, such benefits shall be equivalent to those benefits paid under the Workman's Compensation Law of the state in which his Club is located.

(b) Nothing herein stated shall be interpreted as preventing a Club, which has the legal right to do so, from rejecting coverage under the Workman's Compensation Law of its state. However, if a Club elects to reject coverage under the Workman's Compensation Law of its state, it must nevertheless guarantee benefits to its players in the manner previously prescribed in this Section 7. Moreover, any Club that is excluded, for any reason, from coverage under the Workman's Compensation Laws of its state shall remain excluded from those laws if it elects to do so. However, such a Club shall be obligated to guarantee benefits to its players in the manner previously prescribed in this Section.

**Section 8. Players Injured Prior to Signing New Contracts:**

A player removed from the Active Roster by reason of injury between the beginning of the training camp period and the first regular season game and who has not signed a new contract shall be guaranteed one hundred per cent (100%) of the compensation provided in his contract for the contract year immediately preceding the year in which he is injured.

**Section 9. Right to Legal Counsel:**

An individual player shall have the right to have legal counsel represent him in his individual salary negotiations.

**Section 10. Travel Expenses to Training Camp:**

Member Clubs must reimburse players for reasonable traveling expenses incurred in reaching training camps from the player's residence. There shall be no deduction by the Member Club for this payment. A player who is cut shall be reimbursed for his return trip.

## ARTICLE XVI

## DURATION OF AGREEMENT

**Section 1. Effective Date:**

This Agreement shall be deemed effective as of February 1, 1970, following ratification of the NFLPA and the NFLPRA.

**Section 2. Expiration Date:**

This Agreement shall remain in full force and effect until January 31, 1974, and then shall automatically terminate. Negotiations between the NFLPA and NFLPRA shall commence not later than March 15, 1974.

NFLPA   March 29, 1971

By John Mackey /s/
President

Attest Edward R. Garvey /s/

By Marshall E. Leahy on
behalf of Texas E. Schramm
and the NFLPRA and
the Member Clubs
of the NFL June 17, 1971

Edward R. Garvey, Esq.[1]

March 1, 1971

Lindquist & Vennum

Dear Mr. Garvey:

    Please be advised that the NFLPRA's construction of the Collective Bargaining Agreement between the NFLPRA and the NFLPA is that, subject to the provisions of the agreement, any change in current practices affecting employment conditions of the players shall be negotiated in good faith.

                        Sincerely,
                        Marshall E. Leahy, Esq.
                        General Counsel to the NFLPRA

[1]Incorporated by reference in Article II, Sec. 4.

Edward R. Garvey, Esq.[2]                        March 1, 1971

Lindquist & Vennum

Dear Mr. Garvey:

    On behalf of the twenty-six Member Clubs of the National Football League, please be advised that there will not be any increase or decrease in the number of franchises during the term of the Collective Bargaining Agreement.

    If such an increase or decrease nevertheless takes place despite my assurances to the contrary, the Member Clubs will increase or decrease the annual contributions to the Pension Fund in the ratio that the number of franchises at such time bears to twenty-six.

                        Sincerely, Marshall E. Leahy, Esq.
                        General Counsel to the Twenty-Six
                        Member Clubs of the National Football League

[2]Incorporated by reference in Article VI, Sec. 2.

# APPENDIX B

## MODIFICATION AND CLARIFICATION OF THE COLLECTIVE BARGAINING AGREEMENT

### ARTICLE XI, Section 5

The neutral physician shall be requested to report solely on the physical condition of the grievant, and the extent of his injury, if any, at the time he is examined by the neutral physician. His report shall be confined to that question.

In the absence of a settlement following the report of the neutral physician, the case may be appealed by either party hereto pursuant to Section 6 of Article XI within five (5) days of the receipt by the NFLPA and the NFLPRA of the neutral physician's report. The appeal shall be heard by a neutral arbitrator selected in accordance with the procedure set forth below.

The neutral arbitrator shall consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of his injury at the time of his examination by the neutral physician. The neutral arbitrator shall decide the dispute in light of this finding and such other issues or defenses which may have properly been submitted to him.

The parties hereto agree to select a panel of neutral arbitrators to arbitrate injury grievances, pursuant to Article XI, and further that no less than 20 and no more than 50 shall constitute said panel. The NFLPA, the NFLPRA and the Commissioner of the NFL will nominate individuals for the panel no later than July 10, 1971, and agree that no individual may be selected unless the NFLPA and the NFLPRA accept his appointment to the panel. Representatives of the NFLPA and the NFLPRA will complete selection of the panel no later than August 10, 1971.

Whenever a neutral arbitrator is selected pursuant to Section 6 of Article XI of the Collective Bargaining Agreement, the Commissioner of the National Football League shall nominate three (3) members of the panel for consideration by the parties hereto within five (5) days of receipt of a written request to appoint an arbitrator. The NFLPA and the NFLPRA shall then have the right to veto one (1) such nominee within five (5) days of receipt of the

nominations from the Commissioner. The Commissioner shall then appoint one individual, not vetoed by either party, to serve as the arbitrator.

**OTHER CLARIFICATIONS**

It is understood that the NFLPA and the NFLPRA shall jointly prepare and submit a revenue ruling request to Internal Revenue with regard to Section (e) of Article XII (Fines). Said Section (e) shall be inoperable until January 1, 1972, or until the ruling is received whichever first occurs.

It is understood that the term "deferred compensation" as used in Section 8 (a) of Article IV of the Collective Bargaining Agreement refers to that portion of deferred compensation allocable to the current contract year in which the game is played.

It is understood that the Member Clubs and the League will use best faith efforts, to the extent possible, to avoid release to the media of information concerning the placing of players on waivers until 24 hours after the player has received written notice of same.

Article IV, Section 8, (b) (1), (ii) is modified by deleting the words "at least" in both places where they appear and further that (iii) of the same Section 8 is deleted in its entirety. The same words and subsection (iii) of Article IV, Section 8, (c) (ii) and (iii) shall be consistent with the above.

Agreed upon by the NFLPRA and the NFLPA on June 17, 1971.