contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18.   FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.   DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.   NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.   OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22.   LAW. This contract is made under and shall be governed by the laws of the State of _____.

213

Appendix C

23.   WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled <u>White</u> v. <u>National Football League</u>, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in <u>Brown</u> v. <u>Pro Football, Inc</u>. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in <u>White</u> ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the <u>White</u> class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.   OTHER PROVISIONS.
(a)   Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)   Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)   The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

214

## 25.   SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| _____ | _____ |
| PLAYER | CLUB |
| _____ | _____ |
| Home Address | By |
| _____ | _____ |
| Telephone Number | Club Address |
| | _____ |
| _____ | _____ |
| Date | Date |
| _____ | |
| PLAYER'S CERTIFIED AGENT | |
| _____ | |
| Address | |
| _____ | |
| _____ | |
| Telephone number | |
| _____ | |
| Date | |

Copy Distribution:   White–League Office      Yellow–Player
                     Green–Member Club        Blue–Management Council
                     Gold–NFLPA               Pink–Player Agent

215

# APPENDIX D

# FIRST REFUSAL OFFER SHEET

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:            Address of Prior Team:


Principal Terms of NFL Player Contract With New Team:

    [Supply Information on this Sheet or on Attachment]

    1.    Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized league-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

    2.    Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

    3.    Other terms (that need not be matched):

Player:                                  New Club:

By _____              By _____
                                            Chief Operating Officer

216

# APPENDIX E

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                           Date:

Address of Player:                        Name of New Team:

Name and Address of                       Name of Prior Team:
Player's Representative
Authorized to Act for Player:             Address of Prior Team:

   The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

                    Prior Team

                    By _____
                         Chief Operating Officer

**217**

Appendix F

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the <u>Reggie White</u> class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By _____

WITNESSED BY:

_____

218

# APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or already on the roster of the Club, and for whom the Club needs Room.

# APPENDIX H

# ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR of the member clubs of the NFL (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions and definitions contained in the Settlement Agreement. The information on the Schedule is to be the responsibility of the NFL Member Clubs' and the NFL's managements. The Accountants' responsibility will be to express an opinion on the Schedule based on their audit.

The NFL and Class Counsel or any Players Union are to retain a national accounting firm (the "Accountants"). The Accountants are to conduct an audit of the Schedule (the "Audit") in accordance with generally accepted auditing standards. Those standards require that the Accountants plan and perform the Audit to obtain reasonable assurance about whether the Schedule is free of material misstatement. The Audit shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Audit shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of 6 members with 3 representatives designated by each of the NFL and Class Counsel or any Players Union. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Audit described in the preceding paragraph and again before February 15th to review the results of the Audit before issuance of the final report for that playing season.

The procedures detailed below are designed for the Accountants to determine whether, in their opinion, the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the member clubs of the NFL for such season in accordance with the terms of the Settlement Agreement. The Accountants will audit the Schedule for each playing season.

The Accountants may rely on the auditing procedures performed by each member club's local accounting firm ("Local Accountants") or may test the procedures on a scope basis so as to permit the Accountants to ob-

220

tain a reasonable basis to express an overall opinion on the Schedule as referred above.

The Accountants will have access to the Local Accountants' audit workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the NFL and Class Counsel to be performed by the Accountants**

**General**
- The Settlement Agreement should be reviewed and understood.

- See Exhibit I for the form of the Accountants' Audit Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All audit workpapers of the Accountants relative to its report on the Schedule should be made available for review by representatives of the NFL and Class Counsel or any Players Union prior to issuance of the report.

- A summary of all Audit findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised during the Audit should be resolved by the Committee.

221

Appendix H

- Estimates should be reviewed in accordance with the Settlement Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be re-confirmed with third parties when possible.

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

**Procedures provided by the NFL and Class Counsel to be performed by the Local Accountants**

**General**
- Each NFL member club shall be audited in accordance with the Settlement Agreement. The Settlement Agreement should be reviewed and understood by all Local Accountants.

- See Exhibit II for the form of the Local Accoutants' Audit Report.

- Special rules for Cap Counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

**Team Salaries - Schedule 1**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the Settlement Agreement.

- Compare player names with all player lists for the season in question.

222

- Determine method used to value non-cash compensation is in compliance with methods outlined in the Settlement Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the Settlement Agreement.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

## Benefits - Schedule 2

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA - Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

223

Appendix H

## Player Costs - Schedule 3

- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the Agreement.

## Defined Gross Revenues - Schedule 4

- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the DGR Settlement Agreement. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

## Excluded DGR - Schedule 5

- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

## Questions - Schedule 6

- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

224

- Prepare a summary of all changes.

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

- Review supporting details of any changes.

Appendix H-Exhibit I

# EXHIBIT I

## ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, De-
fined Gross Revenues and excluded Defined Gross Revenues of the Mem-
ber Clubs of the National Football League ("NFL") for the _____
playing season (the "Schedule"). This information, which is not intended
to be a presentation in accordance with generally accepted accounting prin-
ciples, was prepared in accordance with the provisions and definitions con-
tained in the Stipulation and Settlement Agreement dated February 26,
1993, <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) (the "Settlement Agree-
ment"). The information on this schedule is the responsibility of the Mem-
ber Clubs and the NFL's management. Our responsibility is to express an
opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to
obtain reasonable assurances about whether the Schedule is free of mater-
ial misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the Schedule. An audit also in-
cludes assessing the significant estimates made by management, as well as
evaluating the overall Schedule presentation. We believe that our audit pro-
vides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all materi-
al respects, the Team Salaries, Benefits, Player Costs, Defined Gross Rev-
enues and Excluded Defined Gross Revenues of the Member Clubs of the
National Football League ("NFL") for the _____ playing season in
accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement
and should not be referred to or distributed to anyone outside of your or-
ganization for any other purpose, nor should it be related to the financial
statements of the NFL or any Member Club taken as a whole.

226

## EXHIBIT II

## LOCAL ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, De-
fined Gross Revenues and Excluded Defined Gross Revenues of the
_____ a Member Club of the National Football League ("NFL")
for the _____ playing season (the "Schedule"). This informa-
tion, which is not intended to be a presentation in accordance with gener-
ally accepted accounting principles, was prepared in accordance with the
provisions and definitions contained in the Stipulation and Settlement
Agreement dated February 26, 1993, White v. NFL, No. 4-92-906 (D.
Minn.) (the "Settlement Agreement"). The information on this schedule is
the responsibility of _____ management. Our responsibil-
ity is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to
obtain reasonable assurances about whether the Schedule is free of mater-
ial misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the Schedule. An audit also in-
cludes assessing the significant estimates made by management, as well as
evaluating the overall Schedule presentation. We believe that our audit pro-
vides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all materi-
al respects, the Team Salaries, Benefits, Player Costs, Defined Gross Rev-
enues and Excluded Defined Gross Revenues of the _____ for
the _____ playing season in accordance with the applicable terms
of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement
and should not be referred to or distributed to anyone outside of your or-
ganization for any other purpose, nor should it be related to the financial
statements of the _____ taken as a whole.

# APPENDIX I

## STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1.   History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons

2.   Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpation
   - chest
   - heart
   - visceral
   - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e. scars, birthmarks
   - height
   - weight
   - temperature
   - blood pressure
   - pulse
   - heart rate

228

**Orthopedic Examination**
Examination visually, including stress testing and range of motion for all of the following:

- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees—also knee jerk
- ankle—check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck

**EKG**
Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardio-vascular

**Blood Testing**
Standard grid. Testing for (including but not limited to):

- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen ⎫
- Tay Sachs  ⎬ Where applicable. If found,
- Sickle Cell ⎭ individual counseling necessary.
- VD

Appendix I

**Urinalysis**
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**
- peripheral vision
- standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for:  Tumor
            T.B.
            Lesions

**X-Ray all previously injured areas** (at physician's discretion)

230

# APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

Non-football related disability rates before retirement:

| Age | Rate |
|---|---|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

Football related disability rates:
.08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later.

Withdrawal rates:

| For Players With Service of | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

Election of early payment benefit:
35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993.

Retirement age:
47, except 55 for players with no credited seasons before 1993

Percent married:
Social Security awards in 1972

Age of Player's wife:
Three years younger than player

Appendix J

| | |
|---|---|
| Remarriage rates: | 1971 Railroad Retirement Board rates |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of plan year |
| Actuarial value of assets: | One-time write-up to market value as of March 31, 1993 followed by restart of the present procedure thereafter. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for Line-of-Duty disability benefits. |
| Amortization period: | 20 years beginning April 1, 1993; 19 years as of April 1, 1994, etc. In years when there is a zero or negative unfunded actuarial accrued liability, the amount which is expected to produce a zero unfunded actuarial accrued liability at the end of the plan year. |

232

# APPENDIX K

## EXTENSION CHART

*Salary Cap as Percentage of DGR*

|                     | 96 | 97 | 98 | 99 | 00 | 01 | 02 |
|---------------------|----|----|----|----|----|----|----|
| Immediately         | 63 | 62 | 62 | 62 | U  |    |    |
| No Notice to Cancel | 63 | 62 | 63 | 63 | 63 | 63 | U  |
| 12/1/97 PA Notice   | 63 | 62 | 62 | 62 | U  |    |    |
| 12/1/97 MC Notice   | 63 | 62 | 62 | 63 | U  |    |    |
| 12/1/98 PA Notice   | 63 | 62 | 63 | 63 | 62 | U  |    |
| 12/1/98 MC Notice   | 63 | 62 | 63 | 62 | 63 | U  |    |

U  =  Uncapped
PA = Players
MC = NFL Management Council

*Extension Agreement 6/6/96

233

# APPENDIX L

## OFF-SEASON WORKOUT RULES

*The 1993 Collective Bargaining Agreement with the NFLPA provides that, except for certain specified minicamps, any off-season workout programs or classroom instruction shall be voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for sixteen weeks between the end of the previous season and ten days prior to the start of veteran training camp. The CBA limits such workouts to four days per week, except weekends. Included in the sixteen weeks may be no more than fourteen days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.*

*Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.*

*Teams are to provide their players and the Management Council, at least fifteen days prior to the start of its off-season workout program, the time frame for the program including designation of any days on which organized team practice activity will take place. Prompt notification of any schedule changes must be provided to the Management Council, which will provide the NFLPA with prompt notification of both the original schedule and any changes.*

*The following rules shall also apply to the fourteen days of organized team practice activity:*

- *No pads except protective knee or elbow pads. Helmets are permitted.*
- *No live contact; no live contact drills between offensive and defensive linemen.*
- *7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.*
- *The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.*
- *Maximum six hours per day, with a maximum two hours on field, for any player.*

*\*Extension Agreement 6/6/96*

# APPENDIX M

## PSL EXAMPLES

*Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs):*

### 1. Subsection (x)(1)— Maximum Annual Allocation Amount

**Year 1 (1996)-** *PSL revenues received = $ 45 million*
*Remaining life of PSL = 16 years*
*WSJ Treasury Bill rate at 2/1/96 - 8%*
*Factor-Future Value of 8% annuity 15 years (maximum)*
*= 27.152 (annual compounding)*
*Future Value of $3 million/year for 15 years*
*= $3 million x 27.152 = $81.456 million*
*Interest Amount = $81.456 million - $45 million*
*= $36.456 million*

*Year 1 Annual Interest Allocation*
*= $36.456 million/15 years = $2.43 million/year*

*Year 1 PSL Allocation Amount*
*= PSL Amount = $45 million/15 years = $3.00 million*
*+ Allocated Interest = $2.43 million*
*Total Year 1 Allocation = $5.43 million*

*1996 PSL Maximum Annual Allocation Amount = $5.43 million*

Appendix M

**Year 2 (1997)-**  *PSL revenues received = $ 30 million*
*Remaining life of PSL  = 15 years*
*WSJ Treasury Bill rate at 2/1/97 - 7%*
*Factor-Future Value of 7% annuity 15 years = 25.129*
*(annual compounding)*
*Future Value of $2 million/year for 15 years*
*= $2m x 25.129   = $50.258 million*
*Interest Amount     = $50.258 million - $30 million*
*                             = $20.258 million*

*Year 2 Annual Interest Allocation*
*= $20.258 million/15 years = $1.35 million/year*

*Year 2 PSL Allocation Amount*
*= PSL Amount = $30 million/15 years = $2.00 million*
*+ Allocation Interest                   = $1.35 million*
*Total Year 2 Allocation              = $3.35 million*

*PSL Maximum Annual Allocation Amount*
*Year 1 PSL Allocation Amount      = $5.43 million*
*Year 2 PSL Allocation Amount      = $3.35 million*

*1997 PSL Maximum Annual Allocation Amount      = $8.78 million*

236

**Year 3 (1998)-**    *PSL revenues received = $ 7 million*
         *Remaining life of PSL = 14 years*
         *WSJ Treasury Bill rate at 2/1/98 - 7.5%*
         *Factor-Future Value of 7.5% annuity 14 years = 23.366*
         *Future Value of $.5 million/year for 14 years*
         *= $.5m x 23.366     = $11.683 million*
         *Interest Amount     = $11.683 million - $7 million*
                              *= $  4.683 million*

         *Year 3 Annual Interest Allocation*
         *= $4.683 million/14 years = $.335 million/year*

         *Year 3 PSL Allocation Amount*
         *= PSL Amount = $7 million/14 years= $ .500 million*
         *+ Allocated Interest        = $ .335 million*
         *Total Year 3 Allocation     = $ .835 million*

         *PSL Maximum Annual Allocation Amount*
         *Year 1 PSL Allocation Amount    = $5.430 million*
         *Year 2 PSL Allocation Amount    = $3.350 million*
         *Year 3 PSL Allocation Amount    = $ .835 million*

*1998 PSL Maximum Annual Allocation Amount    = $9.615 million*

2. *Subsection (x)(2)— PSL Revenues Used For Stadium Construction Or Renovation*

    *Assume the Team sells PSLs on the following terms:*
         *- Gross PSL revenues received in 1996 = $45 million*
         *- Income taxes paid on PSL revenues in 1996 = $12 million*
         *- Legal and marketing costs incurred relating to PSL*
           *revenues=$6 million*
         *- Stadium renovation costs = $56 million*

    *The PSL revenues included in DGR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.*

    *Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m - ($12m + 6m)) and the total stadium renovation costs were $30 million.*

    *The PSL revenues excluded from DGR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.*

237