the contract being extended, in which case the gross amount of the extension bonus shall be prorated).
*Side Letter 9/21/93: Sec. 17

* Any agreement to compensate a player at the minimum amount set forth in Article XXXV of the CBA for participation in an off-season workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.
*Side Letter 5/24/95: Sec. 2

* [A]ny salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Entering Player Pool shall not be treated as a renegotiation.
*Side Letter 11/7/97

* We have discussed whether an amendment to a Player Contract that changes the terms under which Signing Bonus is paid is or is not a "renegotiation" of the contract under the terms of Article I, Section 2(ab) and Article XXIV, Section 9 of the CBA (and corresponding provisions of the <u>White</u> Settlement Agreement)....We have agreed that any such agreement is a "renegotiation" under the terms of these provisions...
*Side Letter 5/13/99

**Section 10. Accounting Procedures:**
  (a)   **Special Purpose Letters and DGR Reporting.**
  (i)(A)   At least three days prior to the beginning of each League Year, the parties will be provided with an "Initial Special Purpose Letter" by an independent auditor (hereinafter "the Accountants") which compiles the preliminary reporting of the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each Club and the NFL for the League Year about to be concluded, utilizing information reported by independent Club and League auditors. The Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the Clubs and the League in providing information to the Accountants ("DGR Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The engage-

137

ment of the Accountants shall be deemed to be renewed annually unless the Accountants are discharged by either party during the period from May 1 to July 1 of that year.

(B) The amount of any Salary Cap and Minimum Team Salary that may apply in a League Year, and the extent to which Required Tenders and Qualifying Offers must be increased in a League Year, shall be determined utilizing: (i) the information contained in the Initial Special Purpose Letter for the immediately preceding League Year, and (ii) any adjustments resulting from prior League Years.

(ii) On or before the May 1 following the conclusion of each of the Capped Years hereunder, the parties will be provided with a "Final Special Purpose Letter" by the Accountants reporting the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each NFL Team and the NFL for the League Year just concluded. The review procedures to be performed by the Accountants are set forth in Appendix H attached hereto, or as otherwise agreed between the parties. To the extent that the amounts set forth in the Final Special Purpose Letter are different from those in the Initial Special Purpose Letter, such that the amount of any Salary Cap and/or Minimum Team Salary that League Year would have been different than that utilized as a result of the issuance of the Initial Special Purpose Letter, any such difference in the Salary Cap and/or Minimum Team Salary shall be credited or deducted, as the case may be, to any next Salary Cap and/or Minimum Team Salary (but subject in any case to Section 4(b)(i) above), with interest (using the one year Treasury *Note* rate as published in The Wall Street Journal on *February* 1 of each applicable League Year), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), if specified by the NFLPA. Notwithstanding the foregoing, in the Final Capped Year, the Final Special Purpose Letter shall be issued no later than March 1, and any such difference shall immediately be credited or deducted, as the case may be, to the Salary Cap and/or Minimum Team Salary for the Final Capped Year (but subject in any case to Section 4(b)(i) above), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program) if specified by the NFLPA.

*Extension Agreement 1/8/02*

(iii) The Accountants shall review the reasonableness of any estimates of revenues or expenses included in any Club's DGR Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made: (a) pursuant to Section 10(a)(ii) above for estimates corrected prior to the issuance of the Final Special Purpose Letter, and (b) in DGR for the following League Year, without interest, for estimates corrected thereafter.

(iv) With respect to expenses deducted by the NFL or the Clubs

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

from television, cable and radio broadcast revenues or any other revenues, the NFL and the Clubs shall report in the DGR Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i). All categories of expenses deducted from such revenues by the NFL or a Club in a DGR Report completed by the NFL or that Club shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

(v) Reasonably prior to the issuance of the Final Special Purpose Letter, the Accountants shall, as set forth in Appendix H attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Clubs or any other information contained in the DGR Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other information contained in the DGR Reports submitted by the Clubs.

(vi) In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the DGR Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of subsection (iv), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(vii) Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a DGR Report, shall be resolved by

139

the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(viii) After receiving the Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in the Final Special Purpose Letter.

    (b) **Projected Defined Gross Revenues**
    (i) For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4.5 and 10(a) above, and for any other purpose specifically stated in this Agreement, Defined Gross Revenues shall be projected ("Projected Defined Gross Revenues") utilizing one or more agreed-upon methods for the projection process so that the anticipated growth of Projected DGR (based upon factors such as anticipated new stadiums, expansion Clubs, and revenue provisions in the NFL's television and other contracts) over the course of League Years which are anticipated to be Capped Years shall be as accurate as practicable, subject to any agreement between the parties to allocate DGR over particular League Years pursuant to Section 1(a)(xiv) above. Notwithstanding the foregoing, any difference between Projected DGR and DGR for the prior League Year shall be credited or deducted, as the case may be, in the calculation of the Salary Cap and/or Minimum Team Salary for the next League Year using the method set forth in Sections 10(b)(ii) and (iii) below, subject in any case to Section 4(b)(i) above. Moreover, if on March 1 of the year, one or more League-wide television or local television and radio contracts are in effect for the next League Year, the actual revenues expected from such source under such contract shall be used in the determination of Projected Defined Gross Revenues, unless another allocation has been or is agreed to by the parties. If, after the initial calculation of Projected DGR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Projected DGR, and the Salary Cap and Minimum Team Salary shall immediately be adjusted accordingly. In addition, if one or more new Clubs are scheduled to be added to the NFL during the next League Year as one or more expansion Clubs, Projected DGR will include an additional projection of DGR determined in a manner agreed to by the parties. In addition, if, after the initial calculation of Projected DGR for a League Year, the number of scheduled regular season games per Club is increased above the standard of sixteen (16), Projected DGR will include an additional projection of DGR to account for such additional games as agreed upon by the NFLPA and the Management Council.
    (ii) In the event that actual Defined Gross Revenues for any League Year are less than Projected Defined Gross Revenues (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the differ-

ence shall be deducted from Projected Defined Gross Revenues for the next League Year.

 (iii) In the event that actual Defined Gross Revenues for any League Year exceeded Projected Defined Gross Revenues (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Defined Gross Revenues for the next League Year.

 (iv) Any adjustments pursuant to Section 10(a)(iii) above will be subtracted from or added to Projected DGR as appropriate.

 (c) **Projected Benefits.**
 (i) For purposes of computing the Salary Cap and Minimum Team Salary to be applied in any upcoming League Year in accordance with Sections 4-5 and 10(a) above, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the upcoming League Year pursuant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

 (ii) In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year.

 (iii) In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year.

 (iv) In the event the NFLPA exercises any right to reduce or freeze or increase certain Benefits pursuant to Article XLVI (Player Benefit Costs), Projected Benefits shall be adjusted immediately to reflect such changes.

 (v) In the event the amount of Projected Benefits is adjusted pursuant to (1) subsection (c)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

141

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY CAP AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** *A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time,* enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: *(a)* involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either *prior to,* during, *or after* the term of the Player Contract; and/or *(b) concerning the terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.*
\* *Amendment Agreement 12/4/00*

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Defined Gross Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap *&* Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Con-

tracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

**Section 5. Special Master Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

**Section 6. Sanctions:** *(a) Players and Agents.* In the event that the Special Master finds a violation of *subsection 1(a) or 1(b)* of this Article, *for each such violation:* (i) (1) the Special Master may impose a fine of up to $250,000 on any player or player agent found to have committed such violation, and (2) shall, unless the parties to this Agreement otherwise agree, order the player to disgorge any undisclosed compensation found to have been paid in violation of Section 1 of this Article unless the player establishes by a preponderance of the evidence that he was unaware of the violation; and (ii) the Commissioner shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

 *(b) Clubs.* In the event that the Special Master finds a violation of Section 1(a) of this Article, for each such violation, the Commissioner shall be authorized to: (i) impose a fine of up to $3,500,000, payable to the NFL, upon any Club found to have committed such violation; (ii) order the forfeiture of up to a maximum of two draft choices (without limitation as to round) by the Club found to have committed such violation; (iii) impose a fine of up to $250,000 on any Club executive or other Club personnel found to have committed such violation; and/or (iv) suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In the event that the Special Master finds a violation of subsection 1(b) of this Article, for each such violation, the Special Master may: (i) impose a fine of up to $3,500,000, payable to the NFL, upon any Club found to have committed such violation; and (ii) impose a fine of up to $250,000 on any Club executive or other Club personnel found to have committed such violation. In addition, in the event that the Special Master finds a violation of subsection 1(b) of this Article, for each such violation, the Commissioner (i) shall be authorized to order the forfeiture of up to a maximum of two draft choices (without limitation as to round) by the Club found to have committed such violation; and (ii) shall,

Article XXV Enforcement of the Salary Cap and Entering Player Pool

*unless the parties agree otherwise, suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In imposing sanctions pursuant to the immediately preceding sentence, the Commissioner shall apply the same standards that he would apply in the event of a violation of subsection 1(a), taking into account the sanctions, if any, imposed by the Special Master. By amending this Section 6 in December 2000, the parties have not waived or affected their respective positions as to whether the Commissioner does or does not have authority to impose discipline for such violations against any Club, Club executive, or other Club personnel greater than the sanctions set forth in this Article, and such amendment shall not be considered in any resolution of that issue. For purposes of this subsection 6(b), the term "Club personnel" shall not include players.*

*(c) Subject to the parties' mutual reservation of their respective positions in the last sentence of subsection 6(b) above, the sanctions set forth in subsections 6(a) and 6(b) above shall be the sole penalties under this Agreement for conduct in violation of Section 1 of this Article or Sections 1-3 of Article XXIX (Certifications), and each of the sanctions set forth in subsections 6(a) or 6(b) above may not be imposed more than once on the same person or Club for the same conduct, even if such conduct constitutes a violation of both Paragraph 1 of this Article and Paragraphs 1-3 of Article XXIX (Certifications). All fines collected from players and agents, and all disgorged compensation collected from players pursuant to this Section 6, shall be contributed and allocated as prescribed in Article XI (Commissioner Discipline), Section 6. For each League Year after the 2000 League Year, each of the maximum fines set forth in this Paragraph 6 shall increase by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (up to a maximum of ten percent (10%) per League Year). The sanctions set forth in Sections 6(a) and 6(b) above shall not be implemented until the conclusion of any appeals thereof.*

*\* Amendment Agreement 12/4/00*

**Section 7. DGR Circumvention:** In the event that a Club or anyone acting on its behalf fails to materially report or materially misreports Defined Gross Revenues, Excluded DGR, or non-DGR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to Defined Gross Revenues, the NFLPA and/or the Management Council shall have the right to initiate a proceeding before the Special Master to determine whether such conduct is in violation of this Section 7 of this Article. In the event that the Special Master finds a violation of this Section 7, the Special Master may impose a fine upon the Club of up to $2 million, which shall be donated as additional contributions to the youth football programs fund described in Article XXIV (Guaranteed League-wide Salary, Salary Cap, & Minimum Team Salary), Section 1(a)(xiii) above. *For each League Year after the 2000 League Year, the maximum fine set forth in this Paragraph 7 shall increase by the same percentage as the increase in Projected DGR for that League*

144

Year over the prior League Year's DGR (up to a maximum of ten percent (10%) per League Year).

* Amendment Agreement 12/4/00

**Section 8. Management Council Audit Right:** The Management Council shall have the right to audit records of Clubs and Club Affiliates to investigate allegations of violations of Section 1 of this Article. By amending this Section 8 in December 2000, the parties have not waived or affected their respective positions as to whether the Management Council may conduct any Club-related audits beyond those set forth in the preceding sentence, and such amendment shall not be considered in any resolution of that issue.

* Amendment Agreement 12/4/00

**Section 9. Prior Consultation:** Reasonably prior to the initiation of a proceeding alleging a violation of Section 1(a) or 1(b) above, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute, and the charging party shall disclose to the other party (either the NFLPA or the Management Council, as the case may be) all evidence (whether exculpatory or inculpatory) concerning such alleged violation (and provide a copy of all such evidence in documentary form), including but not limited to any such evidence that is the product of any investigation by or on behalf of the charging party. All such evidence subsequently acquired by the charging party shall be subject to disclosure to the other party in any resulting proceeding. This section shall not require the disclosure of any attorney-client communication, or any work product created by or at the request of an attorney. In addition, any attempt by the League, the Management Council, or any Club to have discipline imposed on any person (including but not limited to a Club) for conduct in violation of Section 1(a) or 1(b) above shall be immediately disclosed to the NFLPA.

* Amendment Agreement 12/4/00

# ARTICLE XXVI
# SPECIAL MASTER

**Section 1. Appointment**: The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in <u>White</u> v. <u>NFL</u> shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, *XXXVIII-A, XXXVIII-B*, and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.
*\* Extension Agreement 1/8/02*

**Section 2. Scope of Authority**: The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:
    (a)    The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;
    (b)    The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;
    (c)    Subject to subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;
    (d)    Except for any matters for which the Court has de novo review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the rec-

ommendation of the Special Master. The parties may seek appropriate relief to effectuate and enforce this provision.

   (e)   The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, *XXXVIII-A, XXXVIII-B,* and LVI-LVIII of this Agreement for Special Master review.

                                                             * *Extension Agreement 1/8/02*

**Section 3. Discovery**: In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement regarding any DGR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation**: The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures**: All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed

with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 6. Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

**Section 7. Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

148

# ARTICLE XXVII
# IMPARTIAL ARBITRATOR

**Section 1. Selection:** The parties shall agree upon an Impartial Arbitrator who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4. Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

**Section 6. Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

Article XXVII, Impartial Arbitrator

***Section 7*. Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree to submit the issue to the President of the ABA who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs, or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Impartial Arbitrator from among the names on such list, they shall alternatively strike names from said list, until only one name remains, and that person shall be the Impartial Arbitrator. The first strike shall be determined by a coin flip. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

# ARTICLE XXVIII
# ANTI-COLLUSION

**Section 1. Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

    (a)    whether to negotiate or not to negotiate with any player;

    (b)    whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

    (c)    whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

    (d)    whether to exercise or not to exercise a Right of First Refusal; or

    (e)    concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

> \* [U]nder Article XIV (NFL Player Contract), paragraph 3 of Article XXX (Consultation and Information Sharing), paragraph 4 of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), and Article XXVIII (Anti-Collusion Provisions) of the Collective Bargaining Agreement, any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA and Class Counsel, cannot be the basis of any claim of collusion. Class Counsel, the NFLPA, or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.
>     \*Side Letter 5/6/93

**Section 2. Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

    (a)    that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

    (b)    that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

    (c)    that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or
    (d)    that the player is or has been subject to any Right of First Refusal.

**Section 3. Club Discretion**: Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 4. League Disclosures**: Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 5. Enforcement of Anti-Collusion Provisions**: Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

**Section 6. Burden of Proof**: The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by

itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

**Section 7. Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

**Section 8. Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)     To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes

Article XXVIII, Anti-Collusion

place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

    (b)    To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

**Section 9. Computation of Damages**: Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

    (a)    Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section I of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

    (b)    Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

    (c)    Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $2,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $2,000,000. *For each League Year after the 2000 League Year, each of the enumerated fines set forth in this subsection 9(c) shall increase by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (up to a maximum of ten percent (10%) per League Year).*

                                                   *Amendment Agreement 12/4/00*

**Section 10. Player Election**: A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability

and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

*Section 11.* **Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

*Section 12.* **Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

*Section 13.* **Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

*Section 14.* **No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

*Section 15.* **Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable

basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

**Section 16. Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

    (a)    Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

    (b)    Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

    (c)    Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

    (d)    In order to terminate this Agreement:

    (i)    The proceeding must be brought by the NFLPA;

    (ii)    The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

    (iii)    The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.