and permanent disability benefit described in Section 5.1(d) of the Bert Bell/Pete Rozelle NFL Player Retirement Plan. In the case of a player who has reached his normal retirement date under the Bert Bell/Pete Rozelle Plan and who is receiving total and disability benefits under Section 5.1(a), 5.1(b), or 5.1(c) of the Bert Bell/Pete Rozelle Plan (including a player who has converted to retirement benefits under Section 5.4 of that Plan), the maximum benefit payable for any month shall be reduced, but not below zero, by the excess of (1) the monthly benefit the player would receive from both the Bert Bell/Pete Rozelle Plan and the Supplemental Disability Plan if he elected a Life Only form beginning on his normal retirement date, over (2) the monthly benefit the player would have received from the Bert Bell/Pete Rozelle Plan in a Life Only form beginning on his normal retirement date based solely on his Credited Seasons, as if he were not disabled. The parties will structure the benefits payable for or to eligible Players to reduce or eliminate taxes on such benefits, to the extent deemed possible. At the discretion of the 88 Board, payments for durable medical equipment and prescription medication may be made directly to the player.

**Section 3: Funding:** Effective February 1, 2007, and continuing for the term of this Agreement, the NFL Clubs will make advance contributions to the 88 Plan in an amount sufficient to pay benefits and all administrative expenses approved by the 88 Board which are not paid by the NFL Player Benefits Committee under Article XLVIII-E.

**Section 4: Term:** This Plan will continue to provide benefits as above after the Final League Year and after the expiration of this Agreement, but only to a former player who qualified during a Plan Year for which a Salary Cap was in effect and who remains qualified.

216

# ARTICLE XLVIII-E
# NFL PLAYER BENEFITS COMMITTEE

*Section 1.* **Establishment:** The parties agree to consider and, if feasible, jointly establish, as soon as administratively feasible, a labor-management committee as described in the Labor-Management Cooperation Act of 1978 that is exempt from Section 302 of the LMRA pursuant to Section 302(c)(9) of the LMRA. If established, the labor-management committee will be known as "NFL Player Benefits." The NFLPA and the Management Council will have the right to appoint an equal number of voting members of NFL Player Benefits. Prior to the first meeting of NFL Player Benefits, the advisors to NFL Player Benefits will be the same as the advisors to the NFL Player Second Career Savings Plan.

*Section 2.* **Function:** NFL Player Benefits, through an entity to be called NFL Player Benefits Administration, if established, will provide the services now provided by the Plan Office in Baltimore and such other services as the parties may direct it to perform. NFL Player Benefits Administration, if established, will also pay directly the expenses of the Bert Bell/Pete Rozelle NFL Player Retirement Plan, the NFL Player Second Career Savings Plan, the NFL Player Supplemental Disability Plan, the NFL Player Annuity Program, the 88 Plan, and the Health Reimbursement Plan, including investment, legal, actuarial, consulting, audit, and other expenses, except expenses that cannot be so paid by law, to the extent deemed appropriate by NFL Player Benefits.

*Section 3.* **Expenses:** The NFL Clubs will pay in advance amounts sufficient to fund each budget or expense of NFL Player Benefits Administration, if established, to the extent such budget or expense is approved by NFL Player Benefits. Such amounts will be a Player Benefit Cost for purposes of this Agreement.

*Section 4.* **Uncapped Years:** During League Years in which no Salary Cap applies, NFL Player Benefits Administration, if established, will be funded by the Bert Bell/Pete Rozelle NFL Player Retirement Plan, the NFL Player Supplemental Disability Plan, the NFL Player Second Career Savings Plan, the NFL Player Annuity Program, the 88 Plan, and the Health Reimbursement Plan proportionately in accordance with the services provided to each such plan, or otherwise to the extent the parties agree.

217

# ARTICLE XLIX
# GROUP INSURANCE

*Section 1.* **Group Benefits:** Players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)      **Life Insurance:** Effective September 6, 2006, a rookie player will be entitled to $300,000 in coverage, and a veteran player's coverage will be increased by $100,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan NFL Player Retirement Plan ("Retirement Plan")) up to a maximum of $800,000 in coverage.

(b)      **Medical:** Each player is required to pay an annual deductible of $400 per individual per plan year and $800 per family per plan year, with maximum out-of-pocket expenses of $1600 (including the deductible) for each covered individual. In addition:

(1)      the co-insurance paid by a covered individual for services rendered by out-of-network providers will be 30% of covered charges; and

(2)      the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and

(3)      a prescription drug card will be provided to covered individuals requiring a $5 co-pay for generic drugs and a $10 co-pay for brand name drugs if the generic or brand name drugs are obtained from participating pharmacies. The availability of participating pharmacies will not be significantly reduced below the level initially provided by CIGNA.

(4)      The maximum lifetime benefits paid on behalf of a covered individual will be $2.5 million.

(c)      **Dental:** Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)      Preventive care paid at 100% of UCR;

(2)      General services paid at 85% of UCR; and

(3)      Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

(d)      **Period of Benefits:** Subject to the extension provided in Section 2, players will continue to receive the benefits provided in this article through the end of the Plan Year in which they are released or otherwise sever employment. Effective September 7, 2005, players vested under the Retirement Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive the benefits provided under this section until the first regular season game of the season that begins in the following calendar year. Group benefits are guaranteed during the term of

218

Article XLIX, Group Insurance

this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

(e) **Family Medical and Dental Coverage for Deceased Players:** A player's enrolled dependents (including a child born to the player's wife within ten (10) months after the player's death) shall be entitled to continuing family medical and dental coverage effective August 1, 2001, as follows:

(1) for the dependents of a player on the Active, Inactive, Reserve/Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;

(2) for dependents of a player who was receiving coverage under this Article at the time of his death, coverage will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.

**Section 2. Extended Post-Career Medical and Dental Benefits:** The medical and dental benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)-(c) [*no longer applicable*]

(d) Players vested under the Retirement Plan who are released or otherwise sever employment at any time after the first regular season game in the 2002 season, and before the first regular season game in the 2005 season will continue to receive the benefits described in Subsections 1(b) and 1(c) above for forty-eight (48) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Subsection 1(d) of this Article.

(e) Players vested under the Retirement Plan who are released or otherwise sever employment at any time on or after the first regular season game in the 2005 season, and prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above through the end of the Plan Year in which such release or severance occurs and for the following sixty (60) month period.

(f) All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described above are provided, as if such additional benefits had not been provided.

**Section 3. Limitations and Rules for Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a) The benefits described in Subsections 2(d) and 2(e) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including,

219

without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)     Players eligible for coverage under Section 2 above are not obligated to enroll in any other health plan or program for health services offered by an employer

(c)     The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to, in the 2006 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4.** [*No longer applicable*]

**Section 5. Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will be entitled to appoint one of the Trustees of the NFL Players Insurance Plan. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

## ARTICLE L
## SEVERANCE PAY

**Section 1. Eligibility:** Only players with two (2) or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan), at least one of which is for a season occurring in 1993 through 2011, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay. Determinations of the Retirement Board with respect to Credited Seasons will be final and binding for purposes of determining severance pay.

**Section 2. Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; (c) $12,500 per Credited Season for each of the seasons 2000 through 2008; and (d) $15,000 per Credited Season for each of the seasons 2009 through 2011; for which a Salary Cap is in effect at the beginning of that Credited Season.

**Section 3. Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

**Section 4. Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
| --- | --- | --- |
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through the end of the League Year, or earlier | June 1 | June 30 |
| The beginning of the League Year through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

221

Article L, Severance Pay

**Section 5. Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay:** Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

222

# ARTICLE LI
# DISABILITY PLAN

*Section 1.* **Maintenance:** The NFL Player Supplemental Disability Plan ("Supplemental Disability Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Supplemental Disability Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:** For each Plan Year in which the Salary Cap applies, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and all administrative expenses approved by the Disability Board which are not paid by the NFL Player Benefits Administration under Article XLVIII-E. It will be the duty of the fiduciaries of the Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*Section 3.* **Extension:** For each Plan Year in which the Salary Cap applies, a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

223

## ARTICLE LII
## BENEFIT ARBITRATOR

*Section 1.* **Selection:** The Management Council and the NFLPA will sub-
mit five (5) candidates for Benefit Arbitrator to each other within two (2)
weeks of the ratification of this Agreement. If the parties are unable to agree
on a Benefit Arbitrator from among the ten (10) candidates submitted, a
flip of the coin, no later than three (3) weeks after ratification of the Agree-
ment, will determine which party first strikes a name from the other party's
list of candidates, and the parties will alternately strike names beginning
within 24 hours of the coin flip and continuing for no more than a total of
24 hours until the parties are able to agree on the selection of the Benefit
Arbitrator, or until only one candidate's name remains, which candidate
will become the Benefit Arbitrator. If for any reason this procedure does not
result in the selection of the Benefit Arbitrator within one month of the rat-
ification of this Agreement, the Notice Arbitrator provided for in Article IX
(Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her
choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitra-
tor, the procedure in this Section will be followed to fill the vacancy, substi-
tuting only the date of such vacancy for the date of ratification of this Agree-
ment, and permitting the party who lost the prior coin flip to strike the first
name from the other party's list of candidates. Either party may dismiss the
Benefit Arbitrator between May 1 and June 1 of each calendar year of this
Agreement by written notice to the Benefit Arbitrator and the other party.

*Section 2.* **Compensation:** To the extent that the fees and expenses of the
Benefit Arbitrator are not properly charged to and paid by one of the em-
ployee benefit plans described or created by this Agreement, such fees and
expenses will be divided equally between the parties.

*Section 3.* **Role:** The Benefit Arbitrator will resolve any and all disagree-
ments relating to Articles XLVI through LI of this Agreement. However, dis-
agreements relating to eligibility for pension, disability, or other benefits un-
der the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility
for disability benefits under the Supplemental Disability Plan will be re-
solved in accordance with the procedures that have previously been adopt-
ed by the Members of the Retirement Board of the Bert Bell/Pete Rozelle
Plan for the resolution of such issues under that Plan, or such other proce-
dures as may be jointly agreed upon by the parties. Also, prior to the merg-
er of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to
eligibility for benefits under the Pete Rozelle Plan will be resolved in accor-
dance with the procedures established under that Plan. The parties may
jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either
party may refer a matter to the Benefit Arbitrator by so notifying the Bene-

224

fit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two (2) weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three (3) days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

225

## ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

226

# ARTICLE LIV
# WORKERS' COMPENSATION

**Section 1. Benefits:** In any state where workers' compensation coverage is not compulsory or where a Club is excluded from a state's workers' compensation coverage, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its Players. In the event that a Player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its Players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its Players in the same manner provided in Section 1 above.

**Section 3. Arbitration:** In any state where a Club (e.g., Miami Dolphins/ Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a Player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Workers' Compensation Offset Provisions:** The parties agree that the following provisions shall exclusively govern any and all rights Clubs have with respect to workers' compensation credits or offsets during the remaining Capped Years of this Agreement.

(i)    **"Dollar-for-Dollar" Credits or Offsets.** No Club shall be entitled to claim or receive any dollar-for-dollar credit or offset for salary, benefits, or other compensation paid or payable to a Player against any award or settlement of workers' compensation benefits, either pursuant to Paragraph 10 of the NFL Player Contract or any provision of state law.

(ii)    **"Time" Credits or Offsets.** All Clubs are instead entitled only to a "time" credit or offset under Paragraph 10 of the NFL Player Contract or state law, as set forth more specifically in Subsections (A)-(F) below. This "time" credit or offset shall in all cases be expressed or granted as a reduction in the number of weeks of a Player's workers' compensation award or settlement that is attributable to the same period of weeks in which the Player is deemed entitled to salary payments or CBA benefits as described in this Section. The credit or offset shall be at the weekly rate specified under the state workers' compensation law in question. Because the period from the beginning of the regular season to the end of the League Year (25

227

weeks) is approximately 1.5 times longer than the seventeen (17) week period over which Players receive salary and/or Injury Protection payments, the parties agree that, in calculating the "time" credit or offset as set forth more particularly herein, the Club is entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week during the regular season for which a Player is awarded or executes a settlement agreement for workers' compensation benefits and for the same period of weeks is paid his full Paragraph 5 salary or Injury Protection payments.

(A)     In the case of salary payments pursuant to Paragraph 5 or 9 of the NFL Player Contract, the Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week during the regular season in which the Player is physically unable to perform his services under his contract due to an injury he suffers while performing services during that contract year, to a maximum of 25 weeks, provided that the Player receives his full salary as set forth in Paragraph 5 of his contract for the period in question. For example, if a Player receives three (3) weeks of Paragraph 5 salary subsequent to an injury that rendered him unable to perform for three (3) games (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 4.5 (= 3 x 1.5) weeks of the Player's workers' compensation award or settlement. As another example, if a Player receives seventeen (17) weeks of Paragraph 5 salary subsequent to an injury that rendered him unable to perform all 16 games of the regular season (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 (= 17 x 1.5) weeks of the Player's workers' compensation award or settlement.

(B)     In the case of Injury Protection payments, a Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week from the beginning of regular season to the end of the League Year that the Player receives full Injury Protection payments, to a maximum of 25 weeks. For example, if a Player receives the Injury Protection payments for 17 weeks (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 weeks of the Player's workers' compensation award or settlement. As another example, if a Player receives Injury Protection payments for three (3) weeks but then signs a contract for that season with another Club such that benefits payments cease, the Club will be entitled to a reduction of 4.5 weeks of the workers' compensation award or settlement. In the event that a Club pays a Player full Injury Protection payments prior to the first regular season game of the League Year, the Club will be entitled to a reduction of 1.5 weeks of the Player's workers' compensation award or settlement for each week during the regular season to the end of the League Year for which the Player's Injury Protection payments are made.

(C)     Nothing in this Section 4 shall be interpreted to preclude a Club from receiving the "time" credit or offset set forth in this Section for both

228

Article LIV, Workers' Compensation

salary payments and Injury Protection payments when both payments are made.

(D)    In the event that an Injury Grievance, Injury Protection, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, is settled between the Player and the Club, or in the event that a Club and Player execute an injury-related settlement agreement, the Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week that the Player is deemed entitled to receive his full Paragraph 5 salary or Injury Protection payments pursuant to the settlement, to a maximum of 25 weeks. The Club and Player shall be required to specify in the written settlement agreement the number of weeks for which the Player is receiving his full Paragraph 5 salary or Injury Protection payments under the settlement so that the appropriate number of weeks of the Player's workers' compensation award or settlement can be reduced. For example, if a Player and a Club settle an Injury Grievance, Injury Protection or injury guarantee claim for a specified period of three (3) weeks, the Club will be entitled to a reduction of 4.5 (= 3 x 1.5) weeks of the Player's workers' compensation award or settlement.

(E)    In the event that an Arbitrator awards Paragraph 5 salary or Injury Protection payments in an Injury Grievance, Injury Protection, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, for the same period of weeks for which a Player has already been awarded workers' compensation benefits or received a workers compensation settlement, the Club shall be entitled to a reduction of 1.5 weeks of the Player's workers' compensation award or settlement for each week the Player is deemed entitled to receive his full Paragraph 5 salary or Injury Protection payments pursuant to the Arbitrator's award. For example, if an Arbitrator awards a Player three (3) weeks of Paragraph 5 salary pursuant to an Injury Grievance award and the Player has already been awarded workers' compensation benefits or received a workers' compensation settlement for that same period, the Arbitrator shall reduce the award by an amount equal to 4.5 (= 3 x 1.5) weeks of workers' compensation benefits.

(F)    Clubs are not entitled to any credit or offset under this Article against any workers' compensation benefits attributable to the period of time after the last League Year for which the Player is entitled to receive salary payments (or, in cases where the Player receives Injury Protection payments, after such period) from the Club, even if the Player's entitlement to such payments is not determined until after the League Year in question. No payment of any of the following may be used by a Club as a basis for claiming any workers' compensation credit or offset under this Article:

(1) Signing bonus;

229

(2) Option bonus;

(3) Roster bonus;

(4) Incentive bonus;

(5) Performance-based pay earned prior to the date of injury (unless, for any period of time in which a Club would otherwise be entitled to a credit or offset pursuant to this Section, the Player's weekly salary would be less than the amount of weekly workers' compensation benefits payable under state law, in which case the performance-based pay could be added by the Club to the Player's Paragraph 5 salary for those weeks in which the Club would be entitled to a credit or offset under this Section);

(6) Deferred compensation (except where the deferred compensation is salary attributable to the weeks for which the Player has been awarded or has executed a settlement agreement for workers' compensation benefits as described in this Section in which case the Club is permitted a credit or offset in the same manner as if the salary was not deferred and instead was paid during the League Year in which the Player was physically unable to perform his services under his NFL Player Contract due to an injury he suffered while performing services during that contract year);

(7) Severance pay; or

(8) Any other form of compensation other than Paragraph 5 salary under the NFL Player Contract or Injury Protection payments under the CBA.

   (G) Total and Permanent, Line of Duty and Degenerative Disability Benefits paid pursuant to the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents are not subject to any credit or offset for workers' compensation benefits, whether or not those benefits are payable during the same period in which the disability payments are payable. Clubs are not entitled to any credit or offset under this Article for any workers' compensation benefits payable to any Player against any payments made to any Player under the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents; provided, however, that the receipt of such disability payments by the Player shall not affect the Club's right to claim or

230

receive any offsets or credits set forth elsewhere in this Article.

(iii)    **Pending cases.** The parties agree to settle those Players' workers' compensation claims and related cases that were pending or in any stage of appeal as of March 8, 2006, and thereafter in which a Player or former Player has claimed entitlement to workers' compensation benefits on account of an injury or injuries suffered while performing services under a NFL Player Contract and in which a Club is claiming any entitlement to a credit or offset greater than the credit or offset provided herein; all such settlements shall limit credits or offsets as set forth in this Article, regardless of any awards or decisions already entered in any particular case. Clubs specifically reserve the right to maintain any defenses they may have in such pending cases that are unrelated to the offset issue.

(iv)    **Remedies.** If, after March 8, 2006, despite the terms of this Article and the Clubs' obligation to comply with Subsection (iii) and all other provisions of this Article, a state court or other competent authority nevertheless renders a decision or other determination with an outcome inconsistent with the terms of this Section 4, then the Player shall have a right to immediate payment from the Club for the amount of any difference between such outcome and the outcome specified in Subsections (i)-(ii) above. A Player may initiate a claim under this Section by filing a written notice by certified mail or fax with the Management Council and furnishing a copy to the Club involved. The claim shall set forth the name of the matter and jurisdiction in which the improper award was made, the amount of payment requested and the basis for the calculation. The claim must be initiated within 45 days of either the date of execution of this Agreement or the date of any adverse order (whichever is later); provided, however, that in the event the Player files an appeal of any adverse order, the time for the Player to notify the Club will begin to run from the date the appeal is decided.

(v)    **Time-Offset Fund.** The NFL shall establish a fund which shall bear the cost of additional benefits or associated insurance and related costs (exclusive of professional fees, administrative overhead, penalties or similar costs) incurred by any Club as a direct result of the adoption of this Section 4. The parties shall use their best efforts to ensure that all parties involved including the Clubs and their insurance carriers will implement this Subsection (v) in such a manner as to minimize the costs and expenses associated with this fund.

(vi)    **Disputes**. Any dispute concerning the operation of Section 4 and/or any payments to a Player under Subsection (iv) will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 5. Preservation of Rights:** Beginning as of the Final League Year, the NFLPA and the Clubs preserve their prior positions (i.e., prior to March 8, 2006) with regard to the applicability and legality of workers' compensation offset provisions under state law, and nothing in this Article shall be-

231

ginning in the Final League Year prevent any Player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision (including, but not limited to, a state statute providing a Club with a dollar-for-dollar credit) is legally binding upon a Player.

232

# ARTICLE LV
## MISCELLANEOUS

**Section 1. Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product. Notwithstanding the foregoing, and without affecting interpretation of the preceding sentence, no player will be permitted to be a party to any endorsement arrangement of any kind with a company whose brand name is prominently associated with the production, manufacture, or distribution of a substance that has been banned by the Policy and Procedure with respect to Anabolic Steroids and Related Substances. The Management Council and the NFLPA will agree each year on a list of such companies.

**Section 2. Game Day Attire:**

(a)      Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

(b)      On game days, prior to the game and continuing until 90 minutes after the whistle ending each game (pre-season or regular season), players will be prohibited from wearing, displaying, or orally promoting equipment, apparel, or other items that carry commercial names or logos of companies in any televised interview on Club premises, unless such commercial identification has been approved in advance by the League office.

(c)      Notwithstanding Subsection (b) above, players will be permitted to wear apparel bearing the logo "Players Inc" and/or the logo "NFLPA" during televised interviews in the locker room following pre-season and regular season games, provided that such apparel does not display the names, logos, or other identifying marks of any other entity or product that is licensed by or associated with Players Inc or the NFLPA, including, but not limited to, the manufacturer of the apparel or any sponsor or licensee of Players Inc, the NFLPA, or any individual player.

(d)      The provisions in Subsection (b)-(c) above, shall not be used or referred to in any dispute between the parties over prohibition by the League and/or any Club of the wearing of unapproved commercial items in circumstances other than as expressly addressed in Subsections (b)-(c).

**Section 3. Appearances:** No Club may unreasonably require a player to appear on radio or television.

**Section 4. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction:** The involuntary deduction of amounts from any

233

Case 2:12-md-02323-AB   Document 3589-68   Filed 08/30/12   Page 19 of 25

compensation due to a player for the purpose of compensating any Club personnel is prohibited.

*Section 6.* **Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

*Section 7.* **Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

*Section 8.* **NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three (3) days prior to the date of the game. NFLPA representatives must possess appropriate identification.

*Section 9.* **Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

*Section 10.* **Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

*Section 11.* **League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing

234

Article LV, Miscellaneous

that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

**Section 16. Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

**Section 20. Prior Side Letters:** Except to the extent inconsistent with this

235

Agreement or superseded by a new side letter executed by the Parties after the date of this Agreement, all interpretative side letters executed prior to the date of this Agreement shall remain in full force and effect.

236

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap:** No Salary Cap shall be in effect during the Final League Year.

**Section 2. Free Agency If Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is in effect in the League Year prior to the Final League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six (6) or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five (5) Accrued Seasons in the Final League Year, as if such player had four (4) Accrued Seasons, except that the Qualifying Offer amounts specified in Article XIX (Veteran Free Agency), Section 2(b)(ii)(1)-(3) shall be $50,000 greater, and the Qualifying Offer amounts specified in Article XIX Section 2(b)(ii)(4)-(5) shall be $100,000 greater.

**Section 3. Free Agency If No Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five (5) Accrued Seasons.

**Section 4. Franchise and Transition Players:** As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS:
# LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Subject to the provisions of this Article, up-on the expiration (or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

*Section 2.* **Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

*Section 3.* **CBA Expiration:**

(a)      Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six (6) months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)      The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is

238

Article LVII, Mutual Reservation of Rights: Labor Exemption

or would be a sham, pretext, ineffective, requires additional steps, or has
not in fact occurred.

239

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1.** [*Omitted*]

**Section 2. Effective Date/Expiration Date:** Except as provided in Section 3 below, this Agreement shall be effective from March 8, 2006 until the last day of the 2012 League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire in the League Year immediately following the expiration or termination of this Agreement.

**Section 3. Termination Prior to Expiration Date:**

(a)     Either the NFLPA or the Management Council may terminate both of the final two Capped Years (2010 and 2011) by giving written notice to the other on or before November 8, 2008. In that event, the 2010 League Year would be the Final League Year, and the Agreement would continue in full force and effect until the last day of that League Year, except for the provisions related to the Draft, which would expire as prescribed in Article XVI, Section 1.

(b)     Either the NFLPA or the Management Council may terminate the final Capped Year of this Agreement (2011) by giving written notice to the other on or before November 8, 2009. In that event, the 2011 League Year would be the Final League Year, and the Agreement would continue in full force and effect until the last day of that League Year, except for the provisions related to the Draft, which would expire as prescribed in Article XVI, Section 1.

(c)     **Provision Invalidated:** If at any time after Court Approval during the term of this Agreement, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (Final League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d)     **Termination Due To Collusion:** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the

240