There is no change in the depreciation methods for all stadiums existing as of the 1997 League Year. In addition, if a new stadium replaces the stadiums in place as of January 26, 1999 for any of the following Clubs: Arizona Cardinals, Chicago Bears, Cincinnati Bengals, Denver Broncos, Detroit Lions, Minnesota Vikings, Philadelphia Eagles, Pittsburgh Steelers, San Diego Chargers, San Francisco 49ers, Seattle Seahawks, or Tennessee Titans, then the un-depreciated costs of the luxury boxes at the old stadium will be accelerated into the final League Year of the old stadium and deducted in full as depreciation expense against luxury box revenues. For Jack Kent Cooke Stadium (which went into service in the 1997 League Year), and any other new stadium put into service in the 1998 League Year or thereafter, the depreciable lives for luxury boxes shall be as follows: (i) depreciation on the physical structure of the box (e.g., the concrete, steel, etc. used in the construction of the box) shall be 30 years (however, if the stadium lease term is less than 30 years, the parties agree to revisit the depreciation period for the specific stadium); (ii) depreciation on fixtures for the box (e.g., wiring costs, internal fixtures, etc.) shall be 12 years; and (iii) depreciation on newly purchased furniture and movable fixtures shall be five (5) years.

Any revenues derived from or to be derived from any sale or conveyance of any right to revenue from luxury boxes, suites or premium seating that the NFL and NFLPA do not agree to treat as a PSL pursuant to Article XXIV, Section 1(a)(x)(7) will be included in TR on a straight line amortized basis over the period of time covered by the sale or conveyance of such rights, up to the maximum useful life of the luxury boxes, suites or premium seating, consistent with the first paragraph of this Section D. Any revenues derived from or to be derived from the multi-year lease or sale of luxury boxes, suites or premium seating, as a prepayment or otherwise, will be included in TR on a straight line amortized basis over the period of time covered by the multi-year lease or sale of such seating. If the Club or Club owner is required as part of the transaction to provide to the other party to the transaction with tickets to non-football events, the face value or fair market value of such tickets, whichever is lower, will not be included in the allocation.

## E.  Advertising

Advertising expenses in connection with broadcasts or cablecasts of games or other NFL-related programs are not allowable expenses, except that allowable reasonable and customary expenses for Clubs that produce the broadcast or cablecast themselves shall include payments to unrelated third parties for print, broadcast or cablecast advertising (including "spots") that promote the broadcast or cablecast itself (e.g., ads promoting the team alone are not an allowable expense, but ads promoting the broadcast or cablecast are an allowable expense).

271

## F.  Special Internet-Related Provisions

Revenues from the NFL Internet Network received by entities that are owned by substantially all of the NFL member Clubs and that are involved in Internet businesses related to the NFL (the "Network Entities"), or by any member Club of the NFL (including, without limitation, revenues from auctions to the extent the net revenues therefrom are no longer used for charitable purposes) will constitute revenue of the recipient entity to be included as part of such entity's contribution to TR, in accordance with Article XXIV, Section 1(a)(i)(3) or 1(a)(i)(4), as the case may be, subject to netting by each entity of the reasonable and customary expenses incurred to generate, and directly related to the generation of, such revenues by the recipient entity, as agreed upon by the parties, or in the absence of such agreement, as determined consistently with the principles applicable to NFL.com as of January 26, 2001, by the jointly-retained Accountant; provided, that no negative number may result from such netting for any member Club (and/or its respective Club Affiliate(s)); and further provided that the aggregate result of netting for the Network Entities collectively may not be a negative number. Payments made to Players Inc pursuant to the Internet Agreement, dated January 26, 2001, and as subsequently extended and modified by the parties ("Internet Agreement") shall then be netted against the Internet revenues of the entities identified above (and allocated among such entities in accordance with their respective net revenues from Internet activities as determined in accordance with this Section) in the League Year in which such sums are paid to Players Inc; provided that the aggregate result of such netting may not be a negative number. The payments made to Players Inc pursuant to the Internet Agreement shall not themselves be separately deducted from aggregate League-wide revenue in the calculation of TR. This paragraph does not apply to any non-Internet related revenues or expenses of any member Club, Club Affiliate, or Network Entity, which are governed by other provisions. The treatment of any negative numbers in connection with this paragraph shall be in accordance with the practice used as of the 2005 League Year.

If at any time, the Network Entities no longer dedicate auction proceeds to charity, then all proceeds from the auction site received by the Network Entities or any other NFL-related entity or the Clubs or any Club Affiliate will be included in calculating the NFL Ventures revenue included in TR in accordance with Article XXIV, Section 1(a)(i)(4), net of the recipient entity's reasonable and customary (1) cost of goods sold, (2) fulfillment costs, (3) payments to players (through Players Inc, in the case of players represented on a group basis by Players Inc as exclusive agent under the Group Licensing Program) for services or items, (4) commissions and listing fees paid to the auction provider, (5) authentication costs, and (6) third-party site development and maintenance costs, in each case provided that such

272

costs are incurred to generate, and are directly related to the generation of, such proceeds.

## G. NFL Ventures/Non-Internet Expense Deductions

In calculating the net consolidated revenue of NFL Ventures to be included in TR pursuant to Article XXIV, Section 1(a)(i)(4).

Expenses for NFL.com and Satellite TV that are both directly related to the project, and reasonable and customary, may be deducted from such revenues, with the amounts to be determined by the Accountants. Allocations of expenses are permitted if sufficient evidence is provided to support their qualification for deductibility, and are subject to review and adjustment by the Accountants. However, no allocations may be made for salaries and benefits of employees of the NFL or any NFL-related entity, unless the person is documented to and in fact works at least 75% of the time on NFL.com and/or Satellite TV.

Deductible advertising expenses for NFL.com and Satellite TV shall include payments to unrelated third parties for print and broadcast advertising (including "spots") that promote NFL.com and/or Satellite TV, but only if no other NFL product or service (or other product or service) is advertised.

## H. [*Omitted*]

## I. Naming Rights/Pouring Rights

    1.    If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to pouring rights, such revenues shall be included in TR except to the extent set forth below.

    2.    If a Club or Club Affiliate receives revenues in cash or barter for or in respect to pouring rights at a stadium that serves as a venue for both the Club and Major League Baseball, the proportion of such revenues to be included in TR shall be limited to: (i) for a Club or Club Affiliate that does not own or operate the stadium, any such revenues received by the Club or Club Affiliate from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such pouring rights revenues (for example, if, in connection with a pouring rights transaction, the Club receives $500,000 from an unrelated third party which owns and operates the stadium, transfers $300,000 in revenue to the MLB tenant, and receives real estate to be used as a parking lot with a value of $150,000 from the MLB tenant, $350,000 shall be included in TR); and (ii) for a Club or Club Affiliate that owns or operates the stadium, any such revenues received by the Club or Club Affiliate multiplied by a fraction, the numerator of which shall be the total at-

273

tendance for all NFL games in the facility during the League Year in question (the "NFL Attendance") and the denominator of which shall be the sum of the NFL Attendance in the League Year in question plus the total attendance at all MLB games, if any, in the facility during the League Year in question. In no case shall there be any double-counting of revenue.

3.      If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to naming rights, such revenues shall be included in TR except to the extent set forth below.

4.      Subject to Article XXIV, Section 4(e)(xi) above, such revenues shall not be included in TR to the extent that they are used to pay for construction of a new stadium or for stadium renovations that increase TR; such exclusions from TR shall be governed by the same rules used to determine the extent to which PSL revenues are excluded from TR, except that any allocation of naming rights lump sum payments among League Years shall be in accordance with Appendix H-3, Section J below.

5.      If a Club or Club Affiliate receives revenues in cash or barter for or in respect to naming rights at a stadium that serves as a venue for both the Club and Major League Baseball, the proportion of such revenues otherwise eligible for inclusion in TR (see Paragraph 4 of this Section I above) (the "eligible revenues") shall be limited to: (i)  for a Club or Club Affiliate that does not own or operate the stadium, any eligible revenues received from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such naming rights revenues (see the example in Paragraph 2 of this Section I above); and (ii)  for a Club or Club Affiliate that owns or operates the stadium, sixty percent of eligible revenues received by the Club or Club Affiliate. In no case shall there be any double-counting of revenue.

6.      The parties agree that to "operate" a stadium for purposes of this Section I means that the Club or Club Affiliate has the right to receive all naming and pouring rights revenues.

## J.   Lump Sum Payments, etc.

In the event that a Club or Club Affiliate receives or has received a lump sum payment for sponsorship or other rights for or with respect to multiple years, which revenues would otherwise constitute TR, such revenues shall be allocated among such years according to one of the following methods which the NFL Management Council may elect prior to the initial allocation of each respective lump sum payment:

(i)      in equal annual portions over a period of five (5) years or the duration of the rights, whichever is shorter; or

(ii)      in equal annual portions over a period of ten (10) years or the duration of rights, whichever is shorter; provided that interest from the League Year the revenues are received until the League Years the revenues

274

are allocated into TR shall be imputed and included in TR in equal portions over such periods, calculated on an annual compounded basis using the one-year Treasury Bill rate published in *The Wall Street Journal* of February 1 during the League Year in which the revenues are received.

If a Club enters into a multi-year contract pursuant to which revenues are to be received in different League Years, the contract's attribution of revenues to specific years shall not control the allocation of revenues among League Years for TR purposes if the allocation is inconsistent with the schedule for receipt of such revenues. In that case, and subject to the last two sentences in this paragraph, such revenues shall be allocated to the League Years they are received. If the amount received in any League Year is grossly disproportionate to the pro rata portion of the total amount to be paid, the Accountants shall bring such amount to the attention of the parties, which shall review the relevant facts and consider whether some other attribution is appropriate. For example, without limitation on any other example, if a three-year, $15 million sponsorship contract states that $4 million of the total amount to be paid to the Club is attributable to the first year, $5 million is attributable to the second year, and $6 million is attributable to the third year, but the Club in fact is paid $5 million in the 2006 League Year, and is scheduled to be paid $6 million in the 2007 League Year and $4 million in the 2008 League Year, then $5 million shall be allocated to TR in the 2006 League Year, and, if the other amounts are paid as scheduled, $6 million will be allocated to TR in the 2007 League Year, and $4 million will be allocated to TR in the 2008 League Year. This rule does not apply to the treatment of an initial or other payment received by a Club or Club Affiliate that the Club or Club Affiliate asserts is attributable to the entire term or more than one year of a multiyear broadcast, sponsorship, concession, signage, or other contract (for example, without limitation on any other example, a lump-sum, up-front payment for a multi-year sponsorship contract). This issue is expressly left open.

## K.  Revenue Sharing

The gross receipts described in clause (1) of NFL 1995 Resolution G-6 that are paid into the revenue sharing pool established by such resolution and/or to any successor revenue sharing pool established pursuant to or in connection with the revenue sharing plan referenced in Article XXIV, Section 11, shall, for TR accounting purposes, be considered revenue subject to gate receipt sharing among NFL Clubs, and thus be included in TR, subject to any applicable allocation or exclusion pursuant to Article XXIV, Section 1(a)(x)-(xi). Such revenue shall be included only once (i.e., for the Club whose home games generate such gross receipts but not for any Club receiving revenue sharing distributions from such pool).

275

## L.  Multi-Use Stadiums

When a Club plays its home games in a multi-use stadium (e.g., the stadium is used for both NFL games and Major League Baseball or Major League Soccer games) that is owned, operated, or leased by the Club or Club Affiliate, signage revenues which are received by the Club or a Club Affiliate in consideration for the right to display such signage during both NFL games and Major League Baseball games shall be allocated based on the total attendance in the stadium during the baseball and NFL seasons beginning in the same year (e.g., the 2005 baseball season and the 2005-06 NFL season). If a multi-use stadium is not used for Major League Baseball games or the revenues are received from an unrelated third party which owns, operates or leases the stadium, no allocation shall be made between the various sports and the entire amount of signage revenues received by the Club and/or Club Affiliate shall be included in the appropriate year(s).

Clubs may receive luxury box revenues in excess of ticket revenues subject to gate receipt sharing among NFL Clubs, when such revenue might also be attributable in part to the purchaser's right to use the luxury box to attend non-football events, such as baseball, if such right is included in the purchase of the box from the Club. When a Club receives revenues in excess of ticket revenue subject to gate receipt sharing among NFL Clubs from the sale of luxury box rights which also permit the purchaser to attend Major League Baseball games, a weighted allocation shall be made of such revenue between TR and baseball-related revenue, pursuant to the allocation method the parties agreed upon on October 20, 1994, based upon the respective ticket prices of the football and baseball tickets. No allocation shall be made, and the full amount of the revenues will be included in TR, to the extent that the purchaser also has the right to use the box to attend non-football events other than Major League Baseball. The allocation method agreed to by the parties will not affect the inclusion in TR of the ticket revenue subject to gate receipt sharing among NFL Clubs.

## M. Advertising/Barter Transactions

The value assigned to revenue from barter transactions associated with advertising is to be based on the rate cards, and all other non-ticket barter transactions are to be valued at the fair market value of the goods or services received. However:

(i)      For local radio and television promotions that are non-guaranteed (i.e., the station has the unilateral discretion to extinguish the Club's right to the promotion), the value assigned to revenues associated with such promotions will be zero, unless (a) such promotions have a stated value in the contract, in which case the assigned value will be twenty-five per-

276

cent (25%) of the stated value, or (b) the lack of a stated value is grossly disproportionate to the actual value. Any promotion that a Club may sell or otherwise transfer to a third party is agreed to be guaranteed, notwithstanding any other terms of the contract.

(ii)    For local radio and television promotions that are guaranteed, the value assigned to revenue associated with such promotions will be one hundred percent (100%) of rate card, or the stated amount in the contract where the contract specifies a stated dollar amount of advertising which the Club may draw against.

(iii)    Where the total revenue value provided by a Club in a barter transaction associated with advertising is greater, using rate card valuation, than the revenue value received by the Club, and where the Club is transferring to an unrelated party its rights to advertising, and where the goods and services received by the Club in the barter transaction have been valued at fair market value, the assigned value for the advertising provided by the Club may be reduced by the Accountants from the rate card valuation on a pro rata basis, where such reduction is needed to make the value of the goods and services provided by the Club equal to the value of the goods and services it received.

## N. Off-Site Pre-season Games

Clubs at times receive a flat amount for playing in off-site pre-season games (non-American Bowl), and also may be reimbursed for expenses. In such circumstances, only the flat amount received from the off-site game will be included in TR. Reimbursed expenses and unreimbursed expenses will not be included in TR.

## O. Club Related Entities

Any entity which has the same ownership as a Club, or is controlled by the same persons or entities which own or control a Club, and is engaged in transactions with the Club will be treated as the same entity for the purposes of the TR Reporting Package and any audit with respect thereto. Any entity which does not fit the rule set forth in the first sentence of this paragraph, but which has partial common ownership with a Club, which is engaged in transactions with the Club, will have its transactions reviewed by the local accountants and the Accountants to confirm that any revenues and expenses in such transaction are reasonable.

## P. Miscellaneous Revenues and Expenses

Revenue from premium charges on ticket sales in excess of the face value of the ticket (e.g., rebates from ticketing sources); revenue from scrimmages and training camps; and broadcast revenue from a Coach's show or pre-

277

game and post-game show received by a Club will be included in TR. However, revenue from scrimmages or training camps that are donated to charities will not be included in TR. Credit card charges related to ticket sales are not considered a deductible "surcharge" and will not be offset against gate receipts. If a Club charges a service fee on the tickets it sells in excess of the face value of the ticket, on a ticket account basis and not on a per-ticket basis (which fee is limited by the League to a $4 per ticket account), such service fee will not be TR.

Charitable contributions made by sponsors or other entities that have a commercial relationship with a Club, to charitable entities affiliated with or designated by a Club (e.g., charitable foundations), pursuant to a contract with the Club, are Club revenues, and shall be classified as TR or non-TR, as appropriate, except if the commercial relationship is a relationship between a Club and a player.

If a player fine is a deduction from a player's salary which is never paid (and thus not included in a W-2), it is not included in Salary or TR. If a fine is paid by the player, either as a deduction from gross salary or in a separate payment, it is counted as Salary. If the Club gives a fine to charity, it is not included in TR. If the Club spends a fine on behalf of all players for specific purposes that it (or any other Club) had previously earmarked as being paid by fine money for the benefit of all players (such as player parties), and the players were (and are) expressly notified of such specific earmarking, the fine is not included in TR. If the Club keeps a fine, it is included in TR. Any fine assessed by and paid to the League is not included in TR.

The value of in kind provisions to the League office under contracts made by NFL Ventures or its subsidiaries (e.g., airline tickets) will not be included in TR. The value of in kind provisions distributed or provided to Clubs under such contracts will be included in TR; the value of such provisions will be based upon actual usage or consumption by each Club (the Clubs will be responsible for tracking such usage or consumption).

Salary or other compensation paid to a Club owner relating to a pre-game or other broadcast program may not be deducted from TR as an expense item pursuant to Article XXIV, Section 1(a)(i)(2). Such salary or other compensation paid to coaches may be deducted as such an expense item, up to a maximum of $125,000 each League Year per Club per coach, if such expense is actually incurred.

# APPENDIX I
## STANDARD MINIMUM PRE-SEASON
## PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1. History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpation
   - chest
   - heart
   - visceral
   - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e. scars, birthmarks
   - height
   - weight
   - temperature
   - blood pressure
   - pulse
   - heart rate

279

**Orthopedic Examination**

Examination visually, including stress testing and range of motion for all of the following:

- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**

Testing of hamstrings and neck

**EKG**

Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardiovascular

**Blood Testing**

Standard grid. Testing for (including but not limited to):

- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*
- Sickle Cell*
- VD*

*Where applicable. If found, individual counseling necessary.

Appendix 1

**Urinalysis**

Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**
- peripheral vision
- standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for:          Tumor
                    T.B.
                    Lesions

**X-Ray all previously injured areas** (at physician's discretion)

281

# APPENDIX J
## ACTUARIAL ASSUMPTIONS AND
## ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins (Effective April 1, 2007: RP-2000 Table projected to 2006) |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table (Effective April 1, 2007: RP-2000 Table, disabled mortality) |

Nonfootball related disability rates before retirement:

| Age | Rate |
|---|---|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

(Effective April 1, 2007, the above rates are increased by 33⅓%.)

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. (Effective April 1, 2007, the .08% and .06% above are changed to .10% and .08%, respectively.) |

Withdrawal rates:

For Players

| With Service of | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two (2) years will elect the benefit two (2) years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no Credited Seasons before 1993. |

Appendix J

| | |
|---|---|
| Retirement age: | 47, except 55 for players with no Credited Seasons before 1993 |
| Percent married: | Social Security awards in 1972 |
| Age of Player's wife: | Three (3) years younger than player |
| Remarriage and mortality rates for widow's benefit: | 1971 Railroad Retirement Board rates (Effective April 1, 2007: 1980 Railroad Retirement Board rates) |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of Plan Year |
| Actuarial value of assets: | Write up of assets to market value and restart a new asset smoothing method as of April 1, 2007. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for line-of-duty disability benefits. |
| Amortization period: | The Plan's unfunded actuarial accrued liability as of April 1, 2006 will be amortized in level amounts over seven (7) years, beginning with the contribution for the 2006 Plan Year. In each Plan Year after the 2006 Plan Year, a new level seven-year amortization period will be established for the net change in the Plan's unfunded liability during the preceding Plan Year, other than for the unfunded liability attributable to the benefit increases to which the parties agreed in the 2006 Amendment to the CBA ("2006 Benefit Increase"). The unfunded liability of the 2006 Benefit Increase will be amortized over six (6) years, beginning with the contribution for the 2006 Plan Year, except that if the CBA is terminated by either party such that the last League Year subject to a Salary Cap is before 2011, the unamortized amount for the 2006 Benefit Increase may, at the Management |

283

Council's discretion, be amortized on a pro ra-
ta basis over the remaining League Year or
League Years subject to a Salary Cap, unless
otherwise agreed to by the parties. In no event
shall the contribution for a year exceed an
amount which is expected to produce a nega-
tive unfunded actuarial liability at the end of
the plan year; nor shall the contribution be less
than the minimum required under section 412
of the Internal Revenue Code.

## APPENDIX J-1
## HEALTH REIMBURSEMENT PLAN ACTUARIAL
## ASSUMPTIONS AND FUNDING

| | |
|---|---|
| **Valuation Date:** | April 1 |
| **Value of Assets:** | Market value |
| **Mortality Assumptions:** | None |
| **Players Included in Valuation:** | Players for whom a nominal balance has been established |
| **Player's Last Season:** | Each active player is assumed to have three (3) future Credited Seasons |
| **Date When Benefits Will Begin to be Paid:** | Each player with a nominal balance is assumed to begin distributions five (5) years after his expected last Credited Season |
| **Annual Distributions:** | Annual distributions will equal the estimated cost of a year's coverage for an active player under the Player Group Insurance Plan for the years in which a reimbursement is expected to be made |
| **Discount Rate:** | 60 basis points greater than the average yield of money market funds as published in *The Wall Street Journal* on each April 1 nearest the Valuation Date |
| **Expenses:** | $500,000 for the year beginning April 1, 2007, and, for each subsequent year, the actual expenses for the prior year |
| **Contributions and Amortization Period:** | As of April 1, 2006, a valuation is prepared based on the expected nominal balances for seasons prior to 2006 ("past service liability"), and the sum of the expected value of the balances to be earned during the |

285

2006 Season and the estimated expenses for the year ("normal cost"). A contribution will be made by March 31, 2007, of at least the sum of (1) the normal cost, (2) an amortization of the past service liability over five (5) years, and (3) the assumed expenses.

A valuation will be performed each subsequent year. Each year a new base will be established equal to the Plan's unfunded liability less the un-amortized amount of the bases for the past service liability and each of the bases established for 2006. Each year, a contribution will be made equal to the sum of (1) the normal cost for the year, (2) the amount for each amortization base amortized over five (5) years (until each base is fully amortized), and (3) interest to the end of the year. The contribution, however, will be reduced, but will not be less than zero, to the extent the assets exceed the Plan's liability.

## APPENDIX K
## EXTENSION CHART

Salary Cap as Percentage of TR

|     | 06 | 07 | 08   | 09   | 10 | 11 | 12 | 13 |
|-----|----|----|------|------|----|----|----|----|
|     | 57 | 57 | 57.5 | 57.5 | 58 | 58 | U  | D  |
| (1) | 57 | 57 | 57.5 | 57.5 | U  | D  | -  |    |
| (2) | 57 | 57 | 57.5 | 57.5 | 58 | U  | D  |    |

U = Uncapped
D = College Draft

(1)  If either party terminates final two Capped Years (2010 and 2011) by
     11/8/08.
(2)  If either party terminates final Capped Year (2011) by 11/8/09.

287

# APPENDIX L
## OFF-SEASON WORKOUT RULES

The Collective Bargaining Agreement with the NFLPA provides that, except for certain specified mini-camps, any off-season workout programs or classroom instruction shall be strictly voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for fourteen (14) weeks between the end of the previous season and ten (10) days prior to the start of veteran training camp. The CBA limits such workouts to four (4) days per week; such workout programs are not permitted on weekends. Included in the fourteen (14) weeks may be no more than fourteen (14) days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.

Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the Management Council the schedule for the program, including designation of any days on which organized team practice activity will take place, pursuant to the rules set forth in Article XXXV of the CBA, and any changes to the schedule for the program.

The following rules shall also apply to the fourteen (14) days of organized team practice activity:
- No pads except protective knee or elbow pads. Helmets are permitted.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.
- Maximum six (6) hours per day, with a maximum two (2) hours on field, for any player.

# APPENDIX M
## PSL EXAMPLES

Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs), based on the assumption that the NFLPA has approved the PSL deduction:

### 1. Subsection (x)(1) — Maximum Annual Allocation Amount

**Year 1 (2006)**  PSL revenues received = $ 45 million
Remaining life of PSL = 16 years
WSJ Treasury Note rate at 2/1/06 - 8%
Factor-Future Value of 8% annuity 15 years (maximum)
= 27.152 (annual compounding)
Future Value of $3 million/year for 15 years
= $3 million x 27.152 = $81.456 million
Interest Amount      = $81.456 million $45 million
= $36.456 million

Year 1 Annual Interest Allocation
= $36.456 million/15 years = $2.43 million/year

Year 1 PSL Allocation Amount
= PSL Amount = $45 million/15 years  = $3.00 million
+ Allocated Interest       = $2.43 million
Total Year 1 Allocation      = $5.43 million

2006 PSL Maximum Annual Allocation Amount      = $5.43 million

**Year 2 (2007)** PSL revenues received = $ 30 million
Remaining life of PSL = 15 years
WSJ Treasury Note rate at 2/1/07 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129    = $50.258 million
Interest Amount    = $50.258 million $30 million
= $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
=PSL Amount=$30 million/15 years    = $2.00 million
+ Allocation Interest    = $1.35 million
Total Year 2 Allocation    = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount    = $5.43 million
Year 2 PSL Allocation Amount    = $3.35 million

2007 PSL Maximum Annual Allocation Amount    = $8.78 million

290

Appendix M

**Year 3 (2008)**   PSL revenues received = $ 7 million
Remaining life of PSL = 14 years
WSJ Treasury Note rate at 2/1/08 7.5%
Factor-Future Value of 7.5% annuity 14 years = 23.366
Future Value of $ .5 million/year for 14 years
= $.5m x 23.366   = $11.683 million
Interest Amount    = $11.683 million $7 million
                   = $ 4.683 million

Year 3 Annual Interest Allocation
= $4.683 million/14 years = $.335 million/year

Year 3 PSL Allocation Amount
= PSL Amount = $7 million/14 years   = $  .500 million
+ Allocated Interest                 = $  .335 million
Total Year 3 Allocation              = $  .835 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount    = $5.430 million
Year 2 PSL Allocation Amount    = $3.350 million
Year 3 PSL Allocation Amount    = $  .835 million

2008 PSL Maximum Annual Allocation Amount   = $9.615 million

## 2. Subsection (x)(2) — PSL Revenues Used For Stadium Construction Or Renovation

Assume the Team sells PSLs on the following terms:
• Gross PSL revenues received in 2006 = $45 million
• Income taxes paid on PSL revenues in 2006 = $12 million
• Legal and marketing costs incurred relating to PSL revenues=$6 million
• Stadium renovation costs = $56 million

The PSL revenues included in TR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.

Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m ($12m + 6m)) and the total stadium renovation costs were $30 million.

The PSL revenues excluded from TR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.

291

**3.** [*Omitted*]

**4. Subsection (x)(3) — PSL Difference Credited To TR**

a. Assume that the new stadium is placed in service in June 2008.

| | |
|---|---|
| 2008 increase in TR directly related to new stadium: | |
| Increase in gate receipts | $6 million |
| Increase in Other TR | $2 million |
| Total TR increase | $8 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year TR Increase | PSL Difference |
|---|---|---|---|
| 2006 | $5.430 million | $8 million (assumed) | $ 0 |
| 2007 | $8.780 million | $8 million (assumed) | $.780 million |
| 2008 | $9.615 million | $8 million | $1.615 million |
| Cumulative PSL Difference | | | $2.395 million |

For purposes of computing the PSL Difference, we assume that the increase in TR was the same for 2006 and 2007 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million). $2.395 million would be credited into TR in the 2009 League Year.

b. Assume that the new stadium is placed in service in June 2008.

| | |
|---|---|
| 2008 increase in TR directly related to new stadium: | |
| Increase in gate receipts | $ 9 million |
| Increase in other TR | $16 million |
| Total TR increase | $25 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year TR Increase | PSL Difference |
|---|---|---|---|
| 2006 | $5.430 million | $25 million (assumed) | 0 |
| 2007 | $8.780 million | $25 million (assumed) | 0 |
| 2008 | $9.615 million | $25 million | 0 |
| Cumulative PSL Difference | | | 0 |

**292**

Since the increase in TR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year. No amount would be credited into TR in the 2009 League Year.

### 5. Subsection (x)(5) Carryover PSL Credit

Assume the following:
    New Stadium is placed in service in June 2008.
    2009 2002 Maximum Annual Allocation Amount is $9.615 million.
    Increases in TR directly related to New Stadium are as follows:

| | |
|---|---|
| 2009 | $ 8 million |
| 2010 | $ 9 million |
| 2011 | $14 million |

The Carryover PSL credits are calculated as follows:

| | |
|---|---|
| 2009 | $9.615m $8m = $1.615m |
| 2010 | $9.615m $9m = $ .615m |
| 2011 | (No carryover PSL credits) |

Under this scenario, year 2011 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 2009 and 2010 ($1.615m + $.615m) can be deducted in full from TR in League Year 2011. There would be no remaining Carryover PSL credits to deduct from TR in future League years.

### 6. Subsection (x)(6) Reduction In Premium Seat And Luxury Box Expenses

Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.

### 7. PSL Revenues Not Benefiting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium

In any case where:

(i) PSLs are sold by a Team or by a third party (such as a stadium corporation, a nonprofit private sector entity, or a governmental entity) pursuant to Team authorization; and

(ii) all net proceeds of such PSL sale are used to build a new stadium or con-

293

struct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and

(iii) such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or non-profit entity; and

(iv) the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and

(v) neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease; then, because the Team and its affiliates do not receive any net benefit arising out of the sale of PSLs other than through the stadium construction or improvements paid by the PSL revenues (all PSL revenues being spent on third-party costs and charges directly incurred as a result of the PSL sale, or on stadium construction or improvements), none of the proceeds received from the sale of the PSLs would be included in TR. Each of Example Nos. 1 through 6 above assumes that, for one or more reasons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts other than the PSL proceeds, including but not limited to any expense payments, may be treated as TR or non-TR under this Agreement. Moreover, the Special Master or the Court would have the authority to examine any transaction involving the Club or any of its affiliates and the Stadium landlord or any of its affiliates, to determine if such transaction transfers, in whole or in part, some or all of the economic benefit of any PSL revenues to the Club or any of its affiliates, and any such transferred economic benefits shall be treated as TR.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsections (xi)(1) through (xi)(6) call for calculations quite similar to those

discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

## APPENDIX N
## WRITTEN WARNING GOOD FAITH EFFORT

[date]

Dear [player]:

The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article XXIII of the Collective Bargaining Agreement if you are terminated before the end of this season.


[Club Official]
[Club name]

296

# APPENDIX O
## SALARY CAP CALCULATION EXAMPLE

If 2007 Salary Cap:          $109 million

If 2008 Projected TR equals $205 million per Club:

        57.5% = $117.875 million
        61.68% = $126.44 million

less assumed Projected Benefits/salary cap deductions of $20 million per Club:

        57.5% cap = $97.875 million
        61.68% max = $106.44 million

then, pursuant to Article XXIV, Section 4(c), the Salary Cap for 2008 is $106.44 million

297

# APPENDIX P
## ADJUSTMENT MECHANISM EXAMPLES

**Example #1: League Excess at the end of Year 1**

**Assumptions:**
5-Team League
At Year End League-wide Cash Player Costs exceed Trigger by $5M
Dollar amounts in millions

|  |  |  |  | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|---|---|---|---|---|---|---|---|---|
| Club | '06 Trigger | '06 Cash PC | Pro Rata Share | '07 | '08 | '09 | '10 | '11 |
| A | 102.0 | 101.5 |  |  |  |  |  |  |
| B | 102.0 | 99.0 |  |  |  |  |  |  |
| C | 102.0 | 100.5 |  |  |  |  |  |  |
| D | 102.0 | 109.5 | 75% | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| E | 102.0 | 104.5 | 25% | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| League-wide | 510.0 | 515.0 | 100% | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Excess/(Shortfall) |  | 5.0 |  |  |  |  |  |  |

298

Appendix P

**Example #2: League Shortfall at the end of Year 1**

**Assumptions:**
5-Team League
At Year End League-wide Cash Player Costs fall below Trigger by $9M
Dollar amounts in millions

|  |  |  |  | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|---|---|---|---|---|---|---|---|---|
| Club | '06 Trigger | '06 Cash PC | Pro Rata Share | '07 | '08 | '09 | '10 | '11 |
| A | 102.0 | 100.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| B | 102.0 | 102.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| C | 102.0 | 99.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| D | **102.0** | **106.0** | **20%** | **(.36)** | **(.36)** | **(.36)** | **(.36)** | **(.36)** |
| E | 102.0 | 94.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| League-wide | 510.0 | 501.0 | 100% | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) |
| Excess/(Shortfall) |  | (9.0) |  |  |  |  |  |  |

299

**Example #3: League Excess in Year 1 and League Shortfall in Year 2**

**Assumptions:**
5-Team League
League Excess of $5M at the end of Year 1 (Clubs D & E exceeded Trigger)
League Shortfall of $9M at the end of Year 2
Dollar amounts in millions

| Club | | '06 Excess | '07 Shortfall | '07 | '08 | '09 | '10 | '11 |
|------|------|------|------|------|------|------|------|------|
| | | | | Adjustment to Team Salary Over Remaining Capped Years | | | | |
| League-wide | | 5.0 | (9.0) | | | | | |
| A | Year 1 | | | | | | | |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| B | Year 1 | | | | | | | |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| C | Year 1 | | | | | | | |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| D | **Year 1** | | | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| E | **Year 1** | | | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| League-wide | | | | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 |

| League Year | Excess/ (Shortfall) | |
|------|------|------|
| 2006 | 5.0 | Allocate charge proportionately among Clubs that exceeded Trigger (D&E) |
| 2007 | (9.0) | Shortfall (to be offset by Prior Years' League Excess, then allocated equally among all Clubs) |
| | (4.0) | Pro rata deduction to be allocated to each Club's Team Salary |

Appendix P

**Example #4**: League Excess in Year 1, League Shortfall in Year 2 and League Excess in Year 3

**Assumptions:**
5-Team League
League Excess of $5M at the end of Year 1 (Clubs D & E exceeded Trigger)
League Shortfall of $9M at the end of Year 2
League Excess of $6M at the end of Year 3 (Clubs A & E exceeded Trigger equally)
Dollar amounts in millions

| Club | | '06 Excess | '07 Shortfall | '08 Excess | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | '07 | '08 | '09 | '10 | '11 |
| League-wide | | 5.0 | (9.0) | 6.0 | | | | | |
| A | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | **Year 3** | | | | | | 1.0 | 1.0 | 1.0 |
| B | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| C | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| D | **Year 1** | | | | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| E | **Year 1** | | | | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | **Year 3** | | | | | | 1.0 | 1.0 | 1.0 |
| League-wide | | | | | 1.0 | 0.0 | 3.0 | 3.0 | 3.0 |

| League Year | Excess/ (Shortfall) | |
|---|---|---|
| 2006 | 5.0 | Allocate charge proportionately among Clubs that exceeded Trigger (D&E) |
| 2007 | (9.0) | Shortfall (to be offset by Prior Years' League Excess, then allocated equally among all Clubs) |
| | (4.0) | Pro rata deduction to be allocated to each Clubs Team Salary |
| 2008 | 6.0 | Excess will offset "deductions" from any remaining League Shortfall in Prior Years ($6M-$3M), then allocate total League Excess charge ($6M) proportionately among Clubs that exceeded Trigger (A&E) |

301