designation right (and does not move to any other Club) even if the player moves to another Club, as a Restricted Free Agent or via waivers, before he would have become an Unrestricted Free Agent with the designated Club. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for (A) the applicable Cap Percentage Average of the ten largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) above at which he participated in the most plays during the prior League Year)) using the methodology set forth in Section 2(a)(i)(A) above; or (B) 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become a Transition Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Prior Club shall be entitled to designate a new Transition Player for that League Year. If a Prior Club becomes entitled to designate a new Transition Player pursuant to this Section 10, the prior Club may designate the new Transition Player for that League Year during the period prescribed by Section 3(a) above, in the League Year prior to the League Year in which the player initially designated would have become a Transition Player. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

*Section 11.* **Other Terms:** For the purposes of this Article, the Required Tenders of a one-year Player Contract for at least 120% (or 144%, if the player is eligible to receive such a Tender) of the Franchise Player's or 120% of the Transition Player's Prior Year Salaries shall in addition to the 120% or 144% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% (or 144%, if the player is eligible to receive such a Tender) of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (or ten, as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

*Section 12.* **Compensatory Draft Selection:** The rules and procedures for awarding Compensatory Draft Selections previously agreed upon by the NFL and the NFLPA shall remain in effect, subsequent to any future changes as to which the parties may agree.

*Section 13.* **Offer Sheets for Non-Exclusive Franchise and Transition Players:** The procedures and rules of Article 9, Section 3 shall apply to Non-Exclusive Franchise or Transition Players.

*Section 14.* **Signing Period for Transition Players:**

(a) In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 22 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00pm New York time.

(b) If a Transition Player described in Subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c) If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Salaries for the prior League Year for players at the player's specified position calculated as in Section 4(a) above, or 120% of his Prior Year Salary, whichever is greater. The Tender may be withdrawn at any time, but if such Tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 15.* **Signing Period for Franchise Players:**

(a) In the event that a player who is designated and tendered as a Franchise Player has not signed a Player Contract with a Club by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c) If any Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable Tender must be made and any 120% Tender shall be measured from the Player's Prior Year Salary. If such a player is redesignated as a Franchise Player for the League Year following the League Year in which he does not play, the player may be designated only under Section 2(a)(i) above, except that Draft Choice Compensation of only one first round draft selection and one third round draft selection

shall be made with respect to such player in the event he signs with the New Club. If such a player is designated as a Franchise Player for a third time, the terms of Section 2(b) above shall apply. If a Franchise Player who has sufficient Accrued Seasons to become an Unrestricted Free Agent is not designated as a Franchise Player or Transition Player for any League Year immediately following a League Year in which he does not play, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

# ARTICLE 11
# TRANSITION RULES FOR THE 2011 LEAGUE YEAR

*Section 1.* **Applicability:**

(a) Notwithstanding any other provisions of this Agreement, the following rules shall apply to the 2011 League Year. In the event of any conflict between the provisions of this Article and the provisions of any other Article in this Agreement, the provisions of this Article shall take precedence.

(b) All of the provisions of this Article are subject to the provisions of the Settlement Agreement (i.e., all of the transactions described below are conditional and subject to being declared void if the recertification and ratification requirements set forth in Paragraph 1 of the Settlement Agreement are not met within the specified time periods).

*Section 2.* **Calendar:**

(a) Beginning on July 25, 2011:

(i) The NFL will publish the 2011 Free Agency List (as described in Article 9), which will become effective July 29, 2011 at 6:00pm New York time.

(b) Beginning at 10:00am on July 26, 2011:

(i) Club facilities will be open for voluntary training, conditioning, and classroom instruction.

(ii) Trading begins for the 2011 League Year.

(iii) Subject to Subsection 2(e) below, commencing at 10:00am, New York time, Clubs may:

(1) Sign their Drafted Rookies (subject to the applicable rules set forth in Article 7); and

(2) Sign Undrafted Rookies (subject to the applicable rules set forth in Article 7).

(iv) Negotiate with, but not sign, their own: (1) Unrestricted Free Agents (i.e., an Unrestricted Free Agent who was under contract to that Club on the last day of the 2010 League Year); (2) Restricted Free Agents; (3) Exclusive Rights players; and (4) Franchise Players.

(v) Negotiate with, but not sign or give Offer Sheets to (1) other Clubs' Restricted Free Agents, or Franchise Players eligible to receive Offer Sheets pursuant to Articles 9-10 and Section 3 below; (2) Unrestricted Free Agents who were under contract to other Clubs on the last day of the 2010 League Year; or (3) Free Agents.

(c) Commencing at 4:01pm New York time on July 28, 2011, Clubs may waive or terminate Player Contracts.

(d) Beginning on July 29, 2011:

(i) Subject to Subsection 2(e) below, commencing at 6:00pm, New York time, Clubs may:

(1) Renegotiate the contracts of players under contract (subject to the applicable rules on renegotiation set forth in Article 13);

53

(2) Sign their own: (A) Unrestricted Free Agents (i.e., an Unrestricted Free Agent who was under contract to that Club on the last day of the 2010 League Year); (B) Restricted Free Agents; (C) Exclusive Rights players; and (D) Franchise Players;

(3) Sign, or extend Offer Sheets to, (1) other Clubs' Restricted Free Agents, or Franchise Players eligible to receive Offer Sheets pursuant to Articles 9–10 and Section 3 below; (2) Unrestricted Free Agents who were under contract to other Clubs on the last day of the 2010 League Year; or (3) Free Agents.

(e) Notwithstanding Subsections 2(b)(iii) and 2(d)(i) above, no payments of any kind may be made to any player signing a new contract until after ratification of this Agreement, as described in Paragraphs 1(b) and 6 of the Settlement Agreement.

(f) Preseason training camps may open for all NFL players under contract fifteen days (including one day for physical examinations, meetings, classroom instruction, running and conditioning and two days for non-contact activity) prior to the first scheduled preseason game for each player's Club.

(g) Veteran players who sign Player Contracts on or after 6:00pm, New York time, on July 29, 2011 shall be required to report to, and remain with, their Clubs in accordance with Subsection (f) above, except that, prior to the start of the 2011 League Year, such players may not participate in on-field activities, workouts, weight training or other physical activities, but shall be required to attend meetings, classroom instruction and any other non-physical activities scheduled during the Club's preseason training camp.

(h) The restrictions set forth in Subsection 2(g) above shall not apply to Drafted or Undrafted Rookies who are under contract regardless of the date upon which such players signed their Player Contracts. If any such player is injured as a result of participating in training camp activities, the terms of such player's contract shall cover such injury regardless of ratification.

(i) The 2011 League Year shall begin at 4:00pm New York time on August 4, 2011 or upon ratification of this Agreement, whichever is later, and further provided that the Salary Cap and Top 51 rule shall not apply until 4:00pm New York time on August 5, 2011.

*Section 3.* Free Agency:

(a) **Exclusive Rights Players.** Any player with fewer than three Accrued Seasons as of the end of the 2010 League Year who received an Exclusive Rights Minimum Salary Tender prior to the end of the 2010 League Year shall be an Exclusive Rights player.

(b) **Restricted Free Agents.**

(i) Any player with three Accrued Seasons but fewer than four Accrued Seasons as of the end of the 2010 League Year who received a Restricted Free Agent Qualifying Offer prior to the end of the 2010 League Year shall be a Restricted Free Agent ("RFA"). The provisions of Article 9, as modified in this Article, shall apply to such players. All Qualifying Offers extended to such RFAs prior to the end of the 2010 League Year shall be deemed valid and effective under this Agreement, and shall be at the Qualifying Offer amount and the Draft Choice Compensation level afforded such Qualifying Offer by the provisions of Article XIX of the Prior Agreement, provided that

any RFA who received a Qualifying Offer entitling the Prior Club to one first and one third round Draft Selection shall be deemed to have received a Qualifying Offer entitling the Prior Club to one first round Draft Selection at the amount applicable to such first round Qualifying Offer under Article XIX of the Prior Agreement. Any Restricted Free Agent Qualifying Offer tendered to a player who had more than three Accrued Seasons as of the end of the 2010 League Year shall be void.

(ii)   The signing period for RFAs shall be from 6:00pm, New York time, on July 29, 2011 to August 20, 2011.

(iii)   If an RFA receives an Offer Sheet, the Prior Club shall have four days in which to exercise any applicable Right of First Refusal.

(iv)   In order to maintain exclusive negotiating rights to an RFA who has not signed a Player Contract within the RFA signing period set forth in Subsection (ii) above, the Prior Club is not required to send such RFA a "June 1 Tender," unless the RFA received a Qualifying Offer for a Right of First Refusal Only, in which case any "June 1 Tender" to such an RFA must be sent by August 25, 2011.

(v)   The deadline for the "June 15 Tender" to RFAs shall be September 5, 2011.

(vi)   There shall be no payments of any kind made to any RFA until after ratification of this Agreement, as described in Paragraphs 1 and 6 of the Settlement Agreement.

(c)   **Franchise Players and Transition Players.**

(i)   Any player whose Player Contract had expired as of the beginning of the 2011 League Year and who had received a Franchise Player Tender from his Prior Club prior to the end of the 2010 League Year shall be considered a Franchise Player subject to that Tender. The amount of such Tender shall be determined using Article XX of the Prior Agreement.

(ii)   The deadline for any Franchise Player to sign a multiyear contract or extension with his Prior Club shall be 4:00pm New York time on September 20, 2011.

(iii)   Any Transition Player designation made for the 2011 League Year shall be void.

(d)   **Unrestricted Free Agents.** The "June 1 Tender" date for Unrestricted Free Agents shall be August 20, 2011.

(e)   **Signing Period for Unrestricted Free Agents.** In the event that an Unrestricted Free Agent who received the "June 1 Tender" described in Subsection (d) above has not signed a Player Contract with a Club by September 3, 2011, he may negotiate or sign a Player Contract from that date until the Tuesday following the tenth week of the regular season at 4:00pm New York time only with his Prior Club.

(f)   **Accrued Seasons.** The deadline for any player under contract to report to his Club shall be August 9, 2011. If he has not reported by that date, he shall not be eligible to earn an Accrued Season for the 2011 League Year, subject to a demonstration of extreme personal hardship as set forth in Article 8, Section 1(b).

(g)   **90-man Rosters.** The NFL has determined in its sole discretion that for the 2011 League Year, offseason rosters shall be expanded to a ninety-man limit beginning July 26, 2011.

*Section 4.* **Rookies:**
    (a)    Each Club shall be deemed to have given each of its 2011 Drafted Rookies the Tender described in Article 6, Section 3 of this Agreement.
    (b)    There will be no separate Club Rookie Orientations.

*Section 5.* **Salaries and Salary Cap Accounting:**
    (a)    **Top 51 Rule.** The Top 51 Rule applies beginning at 4:00pm on August 5, 2011. All Clubs must be within the Salary Cap at that time.
    (b)    **Proration from Preexisting Contracts.** For Preexisting Contracts, any proration under the Salary Cap rules under the Prior Agreement (including amounts treated as signing bonus) to any League Year covered by this Agreement shall continue to be charged to Team Salary for those League Years, provided that (i) no signing bonus proration to the League Years of this Agreement shall apply for any Preexisting Contract that was terminated, traded, or assigned via waivers prior to March 11, 2011, and (ii) any Preexisting Player Contract entered into in the 2010 League Year shall have maximum proration of six years (including the 2010 League Year). Notwithstanding the foregoing, any Preexisting Contract that was traded or assigned via waivers and then renegotiated or extended prior to March 11, 2011 to include any signing bonus or amount treated as signing bonus shall have such bonus prorated as if the renegotiation or extension were a new Player Contract, unless such second Player Contract was terminated, traded or assigned via waivers prior to March 11, 2011.
    (c)    **Preexisting Contract Measuring Dates.**
    (i)    If a Preexisting Contract contains a measuring date related to Salary and/or the exercise or nonexercise of any option, which measuring date: was expressed as (A) a calendar date that fell between March 4, 2011 and May 2, 2011 (e.g., a calendar date certain on which player had to be on the roster to earn a bonus such as "April 15, 2011" or "April 15 of the next League Year [now the 2011 League Year]") or (B) solely as being related to a certain number of days that is 50 days or fewer from the start of the 2011 League Year (e.g., "on or before the 10th day of the 2011 League Year"), such measuring date shall be deemed amended to be 4:00pm, New York time on July 29, 2011. Any measuring date that was expressed as (A) a calendar date that fell between May 3, 2011 and July 29, 2011 or (B) solely as being related to a certain number of days that is greater than 50 days from the start of the 2011 League Year (e.g., "on or before the 60th day of the 2011 League Year") shall be deemed amended to be the eighth day of the 2011 League Year. Notwithstanding the foregoing, any such measuring date related to a player's weight shall be deemed amended to be on or before twenty days after the start of preseason training camp, and further provided that if a player satisfies any weight condition on an earlier date than 20 days after the start of training camp, he will be deemed to have fulfilled that criteria (or earned that bonus, if the bonus were tied solely to his weight) on that day. (For example, if a Preexisting Contract provided that a player would earn a bonus if he were on the Club's roster on the "5th day of the 2011 League Year," or on "April 23, 2011," or on "April 24 of the 2011 League Year," such Contract shall be deemed amended to provide that the player would earn the bonus if he is on the Club's roster at 4:00pm, New York time, on July 29, 2011, and if the player's Contract had not been waived or terminated prior to 4:00pm, New York time, on July 29, 2011,

56

the player would earn the bonus (assuming all other conditions are met).) The foregoing shall not affect the payment dates for any earned bonus set forth in such Preexisting Contracts, provided that such payment date did not occur prior to the effective date of this Agreement. If the payment date has occurred, payment shall be made not later than five business days after the third day of the 2011 League Year. This Subsection also shall not adjust any measuring date linked to the occurrence of a specific event during the 2011 League Year which has not already occurred as of the effective date of this Agreement, including, without limitation, the end of preseason training camp, the day after a Club's first regular season game, etc.

(ii) A Club may require any player whose contract has any bonus with a measuring date affected by Subsection (i) above to report to the Club for a physical examination on either July 26, 2011 or July 27, 2011. If a Club requires a player to report for a physical examination, the measuring date described in Subsection (i) above shall be tolled until such time as the player reports for the physical (e.g., if a Club required a player with a bonus for being on the roster on the 8th day of the 2011 League Year to report for a physical on July 26 and the player did not report until July 27, the measuring date shall be 4:00pm, New York time, on July 30, 2011 (original measuring date, plus one day for tolling)).

(iii) If a player is traded or assigned via waivers such that any measuring date adjusted pursuant to Subsection (c)(i) above falls after the date on which the player was traded or waived, the acquiring Club shall pay the bonus. (E.g., if a player with a Preexisting Contract providing for a $100,000 roster bonus if the player is on the Club's roster on the 7th day of the 2011 League Year is traded to another Club prior to 4:00pm on the 1st day of the 2011 League Year, the acquiring Club, and not the trading Club, shall pay the bonus).

(iv) Any Preexisting Contract with any condition tied to reporting to training camp for the 2011 League Year shall be deemed amended to replace such condition with being on the Club's roster on the 8th day of the 2011 League Year.

(d) **Preexisting Contract Offseason Workout Bonuses.**

(i) Players with a Preexisting Contract containing terms for a bonus solely contingent on the player's participation in offseason workouts for the 2011 League Year shall be paid such bonuses in the following amount if the player is released prior to 4:00pm, New York time, on July 29, 2011: (A) if the bonus in the Preexisting Contract was for $50,000 or less, player shall be paid the full amount of the bonus; (B) if the bonus was for over $50,000 to $100,000, the player shall be paid $50,000; (C) if the bonus was for over $100,000, the player shall be paid 50% of the bonus, up to a maximum payment of $100,000. If a player with such a bonus is on his Club's roster on or after 4:00pm, New York time, on July 29, 2011, the player shall earn the full amount of the bonus. Payment shall be made within five business days of that date, or on the payment date specified in the contract, whichever is later, provided that no payment of any kind shall be made until after ratification of this Agreement, as described in Paragraphs 1 and 6 of the Settlement Agreement.

(ii) For any Preexisting Contract containing terms for a bonus contingent on the player's participation in offseason workouts for the 2011 League Year, which bonus is also subject to additional conditions (such as the player being on the Club's roster on a

certain day after the start of the 2011 League Year, or the player meeting a certain weight requirement), the player must fulfill all of the other conditions in order to be entitled to payment of the bonus. If earned, payment shall be made within five business days of fulfillment of all of the other conditions specified in the Contract, or on the payment date specified in the Player Contract, whichever is later, provided that no payments of any kind may be made until after ratification of this Agreement, as described in Paragraphs 1 and 6 of the Settlement Agreement.

    (iii) The condition of participation in offseason workouts for the 2011 League Year shall be deemed satisfied in any Preexisting Contract (e.g., if a player had a Preexisting Contract with a Paragraph 5 Salary escalator for the 2011 League Year that depended, in part, on the player participating in offseason workouts in the 2011 League Year, that condition shall be deemed satisfied and the player shall be eligible to earn the escalator if all other conditions for it are also met).

    (e) **Additional Salary Cap Room.**

    (i) For the 2011 League Year, each Club may designate up to three players who, as of July 25, 2011, have five or more Accrued Seasons and are under contract to the Club with a Salary of at least $1,000,000 over the Minimum Active/Inactive List Salary for such player, for each of whom the Club will receive a credit to Team Salary for the 2011 League Year of $1,000,000 provided that the player remains on the Active/Inactive Roster, Reserve/Injured List, or Physically Unable to Perform List of the Club throughout the 2011 League Year regular season. The amount of the credit shall be reduced proportionally for each week of the regular season such player is not on the Club's Roster as described in the immediately preceding sentence. The amount of any such credit to Team Salary in the 2011 League Year shall be offset by an equivalent charge to Team Salary, spread over the 2014–17 League Years in a manner to be determined by the Club. (By way of example, if Club A identifies two players with five or more Accrued Seasons who are under contract as of the effective date of this Agreement, Club A will receive a "credit" to Team Salary for the 2011 League Year of $2,000,000 (i.e., an additional $2,000,000 of Room). If one of those players is released after the eighth week of the regular season, the "credit" to Team Salary shall be immediately reduced by $529,000 (9/17ths of $1,000,000). Club A shall be charged $1,471,000 (i.e., ($2,000,000-$529,000) to its Team Salary across the 2014–17 League Years in a manner to be designated by Club A to offset the 2011 League Year Team Salary credit.) Each Club's designations of such players, if any, shall be made by written notice to the NFL no later than the first regular season game of the 2011 League Year. Additional Room shall become effective upon receipt by the NFL of such notice. The NFL shall promptly forward such notices to the NFLPA.

    (ii) For the 2012 League Year, each Club may designate up to three players who, as of July 25, 2011, have five or more Accrued Seasons and are under contract to the Club on the first day of the 2012 League Year with a Salary of at least $500,000 over the Minimum Active/Inactive List Salary for such player, for each of whom the Club will receive a credit to Team Salary for the 2012 League Year of $500,000 provided that the player is on the Active/Inactive Roster, Reserve/Injured List, or Physically Unable to Perform List of the Club throughout the 2012 League Year regular season. The amount of the credit shall be reduced proportionally for each week of the regular season such

player is not on the Club's Roster as described in the immediately preceding sentence in the same manner described in Subsection (i) above. The amount of any such credit to Team Salary in the 2012 League Year shall be offset by an equivalent charge to Team Salary, spread over the 2014–17 League Years in a manner to be determined by the Club. Each Club's designations of such players, if any, shall be made by written notice to the NFL no later than the first regular season game of that League Year. Additional Room shall become effective upon receipt by the NFL of such notice. The NFL shall promptly forward such notices to the NFLPA.

(iii) Clubs shall identify in writing to the NFL prior to the beginning of each of the 2014–17 League Years, the amount of any offset described in Subsections (i) and (ii) above that shall apply for such League Year. If a Club has not identified its entire offset as of the first day of the 2016 League Year, then the remaining offset balance shall apply in the 2017 League Year.

(f) **Acceleration.** For Preexisting Contracts and Player Contracts entered into after July 25, 2011 and before the end of the 2011 League Year, any required signing bonus acceleration after the effective date of this Agreement and before the end of the 2011 League Year shall be charged to Team Salary for the 2012 League Year.

(g) **Performance-Based Pool.** There shall be no Performance-Based Pool in the 2011 League Year.

(h) **End of 2011 League Year.** Unless the parties agree otherwise, the 2011 League Year shall end no later than March 11, 2012.

(i) **Time Periods.** All time periods set forth in this Article shall be determined without regard to the provisions of Article 34, Section 7.

(j) **Transactions under the Settlement Agreement.** Any player transactions (e.g., signings, waivers, terminations) occuring during the period between July 25, 2011 and the effective date of this Agreement shall be deemed to have taken place during the 2011 League Year for Team Salary and Cash Spending purposes.

**Section 6. Roster Exemption:** Any player whose contract had expired as of the end of the 2010 League Year, and at that time either (i) had two but less than three Accrued Seasons or (ii) was a Restricted Free Agent pursuant to Article XIX, Section 2 of the Prior Agreement, and who had been given the Required Tender pursuant to Article XVIII, Section 2, or Article XIX, Sections 2(b)(i) or (ii) of the Prior Agreement, as applicable, which player has not signed a contract and has not reported to his Club's preseason training camp, may be placed on the roster exempt list of his Club under the following conditions:

(a) If the player has not reported at least the day before the Club's fourth preseason game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

(b) Any roster exemption imposed under this Section shall commence with the first game immediately after a Restricted Free Agent reports and signs a Player Contract during the pendency of any League-imposed suspension.

(c) Any roster exemption imposed under this Section shall continue for its full duration after any trade of the player to another Club.

(d) Any player who is placed on the roster exempt list of his Club pursuant to this Section shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of Paragraph 5 Salary as a result of being placed on the roster exempt list. This Subsection shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with Subsection (i)) above. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

(e) No player may be placed on roster exempt under this Section unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's fourth preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with Subsection (a) above.

(f) For purposes of this Section, the Canton Hall of Fame Game shall not count.

(g) When placed on roster exempt pursuant to this Section, the player shall not be entitled to compensation.

## ARTICLE 12
## REVENUE ACCOUNTING AND CALCULATION OF THE SALARY CAP

*Section 1.* **All Revenues:** For purposes of this Article, and anywhere else stated in this Agreement, revenues shall be accounted for in the manner set forth below.

    (a)    **AR.**

    (i)    All Revenues ("AR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Clubs (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. AR shall include, without limitation:

    (1)    Regular season, preseason, and postseason gate receipts including ticket revenue from "luxury boxes," suites, and premium seating among NFL Clubs in all cases net of (A) admission taxes, (B) taxes on tickets regularly paid to governmental authorities by Clubs or Club Affiliates, provided such taxes are deducted for purposes of calculating gate receipts subject to revenue sharing and (C) surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing. For purposes of this Subsection, unless otherwise expressly agreed to by the parties, the portion of ticket revenue attributable to luxury boxes, suites and premium seating shall be the face value of the ticket, or any additional amounts which are subject to gate receipt sharing among NFL Clubs. Revenues from premium charges on ticket sales in excess of the face value of the ticket (e.g., rebates from ticketing sources) shall be included in AR. Credit card charges related to ticket sales are not considered a deductible "surcharge" and will not be offset against gate receipts. If a Club charges a service fee on the tickets it sells in excess of the face value of the ticket, on a ticket account basis and not on a per-ticket basis (up to a reasonable maximum amount prescribed by League policy, which as of the effective date of this Agreement is $4 per ticket account), such service fee will not be AR;

    (2)    Proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL preseason, regular season and playoff games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts, and all other means of distribution;

    (3)    Revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that described in Section 1(a)(i)(1) above (with "Super suites" (i.e., suites substantially larger in size than the largest suite regularly available for sale in the stadium) to have no additional value imputed in respect of them by virtue of such status), Internet operations (including merchandise sales), and sales of programs and novelties;

    (4)    The consolidated revenue generated by NFL Ventures L.P. ("NFL Ventures") (including but not limited to those categories of revenue currently or formerly generated by NFL Ventures' subsidiaries, NFL Properties LLC, NFL Enterprises LLC, and NFL Productions LLC d/b/a NFL Films, but excluding from NFL Ventures' reve-

nue any revenues otherwise included in AR pursuant to Subsections (a)(i)(1)–(3) above or Subsection (a)(i)(5) below). AR from NFL Properties LLC and NFL Productions LLC shall be calculated on a one-year lag, consistent with the parties' past practice under the Prior Agreement.

 (5) Barter income, which shall be valued at 90% of the fair market value of the goods or services received;

 (6) The value of equity instruments unconditionally received from third parties by the NFL or member Clubs (i.e., not equity instruments in business entities formed and owned exclusively by the NFL, NFL Ventures L.P. or any of its affiliates, or the member Clubs) derived from, relating to or arising out of the performance of players in NFL football games shall be included in AR beginning in the League Year in which the equity instrument vests at the fair value of such instrument on the date of such vesting, amortized over ten years. In subsequent League Years within the amortization period, the amortized amount shall be adjusted pursuant to the Black Sholes option pricing model methodology or as otherwise agreed. After the amortization period ends, the full amount of the Black Sholes (or other agreed) methodology shall be included in AR. In the event that the equity instrument is sold, AR for that League Year shall be the proceeds less the AR previously recognized.

 (7) Revenues received by a Club or Club Affiliate pursuant to a stadium lease or directly related stadium-use agreement with an unaffiliated third party, where the amount of such revenues is determined based upon activities that are unrelated to NFL football, in circumstances where the involved Club or Club Affiliate is not required to make a non-de minimis investment of capital or cash to receive such revenue (provided that the provisions of this Subsection (1)(a)(i)(7) shall not be retroactively applied to include in AR revenues generated from nonfootball business opportunities arising out of leases or other stadium use agreements entered into prior to January 1, 1993, the financial terms of which have not been amended since such date);

 (8) Recoveries under business interruption insurance policies that are received by any League- or Club-related entity, to the extent that such recoveries compensate such entity for lost revenues that would have been included in AR. The amount of such recoveries shall be included in AR net of (1) premiums paid for the policy/policies recovered under in the League Year(s) that include the events and the recoveries; and (2) deductible and unreimbursed expenses arising out of or related to the events giving rise to the insurance claim/recovery. Any lump sum payments will be allocated under the method separately agreed to by the parties;

 (9) Any expense reimbursements received by a Club or Club Affiliate from a governmental entity in connection with a stadium lease or a directly related stadium-use agreement, except as provided in Subsections 1(a)(ii)(2)(E)–(F) below; and

 (10) Proceeds from the sale or conveyance of any right to receive any of the revenues described above.

 (ii) **Non-AR.**

 (1) The following items are excluded from AR:

 (A) "Taxes/surcharges" on regular season, preseason, and postseason gate receipts (including ticket revenue from "luxury boxes," suites, and premium seating) which are comprised of (A) admission taxes, (B) taxes on tickets regularly paid to go-

vernmental authorities by Clubs or Club Affiliates, provided such taxes are deducted for purposes of calculating gate receipts subject to revenue sharing and (C) surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing (which amounts approximated in the aggregate $119,666,000 for the 2010 League Year);

 (B) Revenues derived from wholesale merchandising opportunities (i.e., the manufacture and distribution of merchandise to third-party retailers) conducted by Dallas Cowboys Merchandising ("DCM") other than any related royalty payments to any League entity, Club or Club Affiliate (which amounts are projected as of the effective date of this Agreement to be approximately $80 million for the 2011 League Year); and

 (C) Revenues from the PSLs sold by the New York Jets and New York Giants that are dedicated to the construction of New Meadowlands Stadium, including the amortization to League Years during the term of this Agreement of such previously-sold PSLs (which amounts are projected as of the effective date of this Agreement to be approximately $43 million for the 2011 League Year).

 (D) Any PSLs that were excluded from the calculation of Total Revenues under the Prior Agreement, to the extent that the amortization schedule has not expired.

 (2) The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Clubs which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "AR"):

 (A) Proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, franchise relocation fees, dues or capital contributions received by the NFL, fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries (other than those net business interruption insurance recoveries that are described in Section 1(a)(i)(8) above), sales of interests in real estate and non-AR-related property, and Club cheerleader revenues (provided that, if such cheerleader revenue is provided by an entity with which the Club has another commercial relationship, the Accountants will review the transactions and determine the appropriateness of any revenue allocations);

 (B) Revenues generated from stadium events unrelated to NFL football (e.g., concerts, soccer games) in which the Club or a Club Affiliate makes a non-de minimis investment of capital or cash, and the value of, and revenues generated from, stadium-related businesses and/or opportunities unrelated to NFL football in which the Club or an affiliate must invest a non-de minimis amount of capital, cash, or effort to generate revenue (other than real estate development opportunities, which are subject to Subsection 1(a)(ii)(I) below);

 (C) The value of promotional spots (e.g., television or radio spots) that are received from time to time by the NFL under national media contracts solely for its own use (either to promote the NFL's own football related businesses (and not the businesses of any other party), or for charitable purposes) and not for resale (although for clarity, the NFL's promotional spots may include references to or depict logos or marks of third party sponsors or providers (e.g., an advertisement promoting the NFL Shop may show merchandise with NFL sponsor logos) as long as the third-party does not provide consideration to be referenced or depicted in such spots);

(D)  The value of complimentary or other no-charge tickets distributed by a Club, up to 320,000 League-wide across all preseason games (i.e., an average of 5,000 tickets per preseason game), and up to 17,000 tickets per-Club across all home regular season games (i.e., an average of 2,125 tickets per regular season game) allocated at the Club's discretion, provided that such tickets are excluded from visiting team sharing requirements. NFLPA approval is required for any exclusion from AR of such tickets above the levels set forth in this Subsection.

(E)  Specifically designated day-of-game expense reimbursements received by a Club or Club Affiliate from a governmental entity, where such reimbursements are for legitimate expenses that the Club or Club Affiliate has incurred that the governmental entity previously incurred (including in connection with the Club's occupancy of a prior stadium, if the reimbursements arise out of the construction of a new stadium). This exclusion shall not apply to expense reimbursements received in connection with concession sales, operation of parking facilities, signage or advertising sales, or any other revenue generating activity at the stadium other than the conduct of the game itself (e.g., expense reimbursements for game-day security previously provided by the police, and post-game stadium clean-up previously provided by a municipality, are not treated as AR, if such reimbursement otherwise qualifies). All claims for this exclusion shall be supported by appropriate documentation evidencing the extent to which the Club or Club Affiliate incurred the designated day-of-game expense and the extent to which the governmental entity previously incurred the expense;

(F)  In addition to the amounts described in Subsection (E) above, 65% of other (i.e., non-day of game) operating or maintenance expense reimbursements only for the specific Teams and agreements as per Paragraph 3 of the letter agreement under the Prior Agreement dated November 21, 2007. If a Club has reimbursements under both Subsection (E) above and this Subsection (F), the allocation as between the two categories shall be consistent with how the parties treated such reimbursements under the Prior Agreement.

(G)  Investments in or contributions toward the purchase of concession equipment by concessionaires on behalf of a Club or a Club's Stadium, and the value of provided elements related to the operation and maintenance of the soft drink equipment in the Club's Stadium (i.e., dispensing/vending equipment, service); and

(H)  The value of luxury boxes that are (1) used by a Club owner for personal purposes or to promote the Club or the owner's other business interests; or (2) provided to stadium authorities, municipalities, and/or governmental officials, or (3) used or made available for use by the owner(s) of the visiting Club, or (4) provided for the use of a Club head coach; in each case where no revenue is actually received by the Club or a Club Affiliate, except that the value of such luxury boxes will be imputed as AR unless at least one luxury box in the stadium is available and unsold; provided that, in no event shall revenue be imputed for one luxury box that is used by the owner(s) of the Club, and one luxury box that is used or made available for use by the owner(s) of the Visiting Club. Without limiting the foregoing, the value of any luxury box that is provided to a former Club owner in connection with the sale of a Club shall be imputed into AR unless the prior owner is obliged to pay the club periodic consideration (i.e., annual rent) in