## ARTICLE 45
## INJURY PROTECTION

*Section 1.* **Qualification:** A player qualifying under the following criteria will receive an Injury Protection benefit in accordance with Section 2 below:

    (a)    The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician following a physical examination after the last game; or the player must have undergone Club-authorized surgery in the off-season following the season of injury; and

    (b)    The player must have undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and

    (c)    The player must have failed the preseason physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury. This preseason physical may be given by the Club physician prior to the beginning of preseason camp, so long as such fact is clearly communicated in writing to the player at the time of the physical exam. The preseason physical examination given for qualification need not be the entire Standard Minimum Preseason Physical Examination, but shall be that necessary and appropriate to evaluate the injury for which the benefit is sought.

    It is agreed that a player who qualifies for Injury Protection under Subsections 1(a) and 1(b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain Injury Protection liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade Injury Protection liability by early waiving.

*Section 2.* **Benefit:** A player qualifying under Section 1 above will receive an amount equal to 50% of his Paragraph 5 Salary for the season following the season of injury, up to a maximum payment of: $1,000,000, in the 2011–12 League Years; $1,050,000, in the 2013–14 League Years; $1,100,000, in the 2015–16 League Years; $1,150,000, in the 2017–18 League Years; and $1,200,000, in the 2019–2020 League Years; in each case unless he has individually negotiated more injury protection or a larger guaranteed salary in his contract. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated more injury protection or a larger guaranteed salary in that contract for the affected year in question or if he qualifies for the Extended Injury Protection benefit described below. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the season following the season of injury.

*Section 3.* **Disputes:** Any dispute under this Article will be processed under Article 43. In any grievance in which the NFLPA or a player is claiming an Injury Protection benefit, the NFLPA or the player may contend that the player should not have passed the preseason physical examination given by a Club following the season of a player's injury. In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the Club's preseason physical exam, provided that such physician conducted his examination of the player within fourteen days of the player's contract termination, but no later than the date of the first preseason cutdown. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 1(c) above shall be deemed to have been satisfied.

*Section 4.* **Extended Injury Protection Qualification:** A player who has qualified for and received the Injury Protection benefit set forth in Sections 1 and 2 above, and has a Player Contract for the second season following the season of injury (for the first five seasons of this Agreement, at the time he sustained such injury), shall qualify for the Extended Injury Protection Benefit if he satisfies all of the criteria below:

(a) The player must have remained physically unable, because of the same severe football injury or Club-authorized surgery for which he qualified for the Injury Protection benefit, to play football as certified by the Club physician following a physical examination within sixty (60) days of his former Club's last regular season game of the season following the season of injury, if such examination is requested by the player's former Club;

(b) The player must have continued to undergo whatever reasonable and customary rehabilitation treatment his former Club required of him. Following the physical examination referenced in Section 4(a) above, the Club may require Player to submit to a reasonable number of physical examinations. Such examinations directed by the Club may take place in the Club city or in another location designated by the Club; and

(c) The player must have failed a physical examination given by his former Club prior to June 1st of the season for which he is seeking the Extended Injury Protection benefit. This physical must be given by either the Club physician or a physician designated by his former Club so long as the fact that the examination is being given for the purpose of determining the player's eligibility for the Extended Injury Protection benefit is clearly communicated in writing to the player at the time of the physical exam. A Club cannot avoid Injury Protection liability by failing or refusing to perform the exam in a timely manner, provided that the player cooperates in the administration of the physical examination.

*Section 5.* **Extended Injury Protection Benefit:** A player qualifying under Section 4 above will receive an amount equal to 30% of his Paragraph 5 Salary for the second season following the season of injury, up to a maximum payment of: $500,000, for the 2012–14 League Years; $525,000, for the 2015–16 League Years; $550,000, for the 2017–18 League Years; and $575,000, for the 2019–20 League Years; in each case unless he has

individually negotiated more injury protection or a larger guaranteed salary in his contract for the affected year in question. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the second season following the season of injury.

*Section 6.* **Extended Injury Protection Disputes:** Any dispute under this Article will be processed under Article 43. In any grievance in which the NFLPA or a player is claiming an Extended Injury Protection benefit, the NFLPA or the player may contend that the player should not have passed the physical examination referenced in Subsection 4(c). In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the physical exam, provided that such physician conducted his examination of the player within fourteen days of the examination. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 4(c) above shall be deemed to have been satisfied.

*Section 7.* **Workers' Compensation Offset:** If a player elects to receive benefits under this Article, it is agreed that for the term of this Agreement fifty percent (50%) of all Injury Protection and Extended Injury Protection benefits are of the same character as, and are the functional equivalent of, a workers' compensation indemnity benefit, and the Club paying this benefit and/or its insurer shall be entitled to a dollar-for-dollar offset in an amount equal to fifty percent (50%) of the Injury Protection payments, including Injury Protection and Extended Injury Protection grievance settlements and awards, against any state workers' compensation indemnity award to which the player is or may become entitled to, including, but not limited to, temporary disability, wage loss, impaired earning capacity and permanent disability benefits, provided that there shall be no offset against a workers' compensation award of any medical coverage. For example, and without limitation, if a player qualifies to receive $200,000 in Injury Protection benefits pursuant to Section 2 and $150,000 in Extended Injury Protection benefits pursuant to Section 5, it is agreed that $100,000 of the Section 2 amount and $75,000 of the Section 5 amount (or $175,000 cumulatively) when paid, shall be the offset under this Section as described in the first sentence of this Section. This offset applies with regard to workers' compensation claims arising out of any injury with the Club whether such injury is acute or cumulative in nature provided that the injury that is the subject of the player's Injury Protection payment (and, if applicable, his Extended Injury Protection payment) is the principal basis for the player's workers' compensation award. The parties further agree that if, despite the terms of this Section and the parties' clear intent to treat fifty-percent (50%) of Injury Protection and Extended Injury Protection benefits as a payment of workers' compensation, a state court or other competent authority nevertheless renders a decision or other determination resulting in an outcome inconsistent with the full coor-

dination of Injury Protection, Extended Injury Protection, and workers' compensation benefits pursuant to this Section 7, then the Non-Injury Grievance Arbitrator shall have authority to immediately remedy any over-payment that results from said decision.

*Section 8.* **Filing:** Any player filing a claim for the Injury Protection benefit must follow the procedure set forth in Article 43. For purposes of this Article only, a grievance must be initiated by October 15th of the League Year in which the Injury Protection benefit is being claimed. A player requesting the Extended Injury Protection benefit must notify his former Club and the NFL in writing by January 31 (following his former Club's last regular season game of the season following the season of injury) that he believes he remains physically unable to play football. By submitting such written affirmation of his continued injury, the player will be deemed to have filed a claim for the Extended Injury Protection benefit provided for in this Article. If the claim is contested by the Club in writing, Player's written affirmation will automatically be deemed to constitute a non-injury grievance. Club's written notice denying the claim will be deemed the answer to the grievance and the Club may then order Player to submit to a physical examination as set forth in Section 4(a) above. By December 15 of each season covered under this Agreement, the NFL agrees to provide the NFLPA with a list of players who received, or filed a grievance for, Injury Protection for that season.

*Section 9.* **Costs:** Any reasonable costs associated with a player's travel to and from any medical examination performed at the Club's request as provided for in this Article shall be paid for by the Club.

## ARTICLE 46
## COMMISSIONER DISCIPLINE

*Section 1.* **League Discipline:** Notwithstanding anything stated in Article 43:

(a) All disputes involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b) Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c) The Commissioner (under Subsection (a)), or the person appointed by the Commissioner under Subsection (b), shall consult with the Executive Director of the NFLPA prior to issuing, for on-field conduct, any suspension or fine in excess of $50,000.

(d) The schedule of fines for on-field conduct will be provided to the NFLPA prior to the start of training camp in each season covered under this Agreement. The 2011 schedule of fines, which has been provided to and accepted by the NFLPA, shall serve as the basis of discipline for the infractions indentified on that schedule. The designated minimum fine amounts will increase by 5% for the 2012 League Year, and each League Year thereafter during the term of this Agreement. Where circumstances warrant, including, but not limited to, infractions that were flagrant and gratuitous, larger fines, suspension or other discipline may be imposed. On appeal, a player may assert, among other defenses, that any fine should be reduced because it is excessive when compared to the player's expected earnings for the season in question. However, a fine may be reduced on this basis only if it exceeds 25 percent of one week of a player's salary for a first offense, and 50 percent of one week of a player's salary for a second offense. A player may also argue on appeal that the circumstances do not warrant his receiving a fine above the amount stated in the schedule of fines.

*Section 2.* **Hearings:**

(a) **Hearing Officers.** For appeals under Section 1(a) above, the Commissioner shall, after consultation with the Executive Director of the NFLPA, appoint one or more designees to serve as hearing officers. For appeals under Section 1(b) above, the parties shall, on an annual basis, jointly select two (2) or more designees to serve as hearing officers. The salary and reasonable expenses for the designees' services shall be

shared equally by the NFL and the NFLPA. Notwithstanding the foregoing, the Commissioner may serve as hearing officer in any appeal under Section 1(a) of this Article at his discretion.

(b) **Representation.** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. The NFLPA and NFL have the right to attend all hearings provided for in this Article and to present, by testimony or otherwise, any evidence relevant to the hearing.

(c) **Telephone Hearings.** Upon agreement of the parties, hearings under this Article may be conducted by telephone conference call or videoconference.

(d) **Decision.** As soon as practicable following the conclusion of the hearing, the hearing officer will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s), Club(s) and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to Section 1(b) may only be affirmed, reduced, or vacated by the hearing officer, and may not be increased.

(e) **Costs.** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and other expenses associated with the appeal.

(f) **Additional Procedures for Appeals Under Section 1(a).**

(i) **Scheduling.** Appeal hearings under Section 1(a) will be scheduled to commence within ten (10) days following receipt of the notice of appeal, except that hearings on suspensions issued during the playing season (defined for this Section as the first preseason game through the Super Bowl) will be scheduled for the second Tuesday following the receipt of the notice of appeal, with the intent that the appeal shall be heard no fewer than eight (8) days and no more than thirteen (13) days following the suspension, absent mutual agreement of the parties or a finding by the hearing officer of extenuating circumstances. If unavailability of counsel is the basis for a continuance, a new hearing shall be scheduled on or before the Tuesday following the orignal hearing date, without exception.

(ii) **Discovery.** In appeals under Section 1(a), the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing. Failure to timely provide any intended exhibit shall preclude its introduction at the hearing.

(iii) **Record; Posthearing Briefs.** Unless the parties agree otherwise, all hearings conducted under Section 1(a) of this Article shall be transcribed. Posthearing briefs will not be permitted absent agreement of the NFL and NFLPA or the request of the hearing officer. If permitted, such briefs shall be limited to five pages (single-spaced) and must be filed no later than three (3) business days following the conclusion of the hearing.

*Section 3.* **Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the parties or by the hearing officer upon appropriate motion.

*Section 4.* **One Penalty:** The Commissioner and a Club will not both discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

*Section 5.* **Fine Money:**

(a) Fines will be deducted at the rate of no more than $2,500 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. For the 2016–2020 League Years, the amount will increase from a rate of $2,500 to $3,500 from each pay period.

(b) For any fine imposed upon a player under Section 1(b), no amount of the fine will be withheld from the player's pay pending the outcome of the appeal, except that if: (i) the fine is imposed on or after the thirteenth (13th) week of the regular season; (ii) the player or the NFLPA does not timely appeal; or (iii) the hearing on a fine imposed for conduct occurring through the thirteenth (13th) week of the regular season is delayed by the player or the NFLPA for any reason beyond the time provided for in Section 2(b) of this Article, the full amount of the fine shall be promptly collected.

(c) Unless otherwise agreed by the parties., fine money collected pursuant to this Article shall be allocated as follows: 50% to the Players Assistance Trust and 50% to charitable organizations jointly determined by the NFL and the NFLPA. In the absence of said joint determination, the NFL and the NFLPA shall each determine a charitable organization or organizations to which half of the second 50% shall be allocated.

## ARTICLE 47
## UNION SECURITY

*Section 1.* **Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

*Section 2.* **Check-off:** Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix M and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check-off.

*Section 3.* **NFLPA Meetings:** The NFLPA will have the right to conduct four meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule. The visits described in Article 21, Section 8(g) shall not apply toward the limit set forth in this Section.

*Section 4.* **NFLPA Player Group Licensing Program:** The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA (or any of its affiliates) and the NFL (or any of its affiliates). Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to Article 43. The first such grievance in any calendar year shall be treated on an expedited basis without counting against the number of grievances the NFLPA may expedite pursuant to Article 43, Section 4; all subsequent such grievances in that calendar year shall count against the number of grievances the NFLPA may expedite

pursuant to Article 43, Section 4. For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six (6) or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.), marketing, advertising and promotional programs: (a) in any one product and/or sponsorship category, as defined by industry standards; or (b) in different categories if a total of six or more players are used and (i) the products, marketing, advertising or promotional programs all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items. Group Player Licensing shall not include "non-consumer facing" appearances by NFL players at any individual corporate hospitality and/or other similar events by fewer than six (6) active NFL players. Nothing in this definition of Group Player Licensing shall be construed to limit the rights of the NFL or any NFL Club under applicable law, or any other provision of this Agreement.

*Section 5.* **Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article will be processed pursuant to Article 43. Any decision of an arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

*Section 6.* **Procedure for Enforcement:**
    (a)    Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article, the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article. The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.
    (b)    It is further agreed that the term "member in good standing" as used in this Article applies only to payment of dues or initiation fee and not any other factors involved in union discipline.
    (c)    It is further agreed that notwithstanding anything else in this Agreement, if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of this Article relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely

to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

*Section 7.* **NFLPA Responsibility:** It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

*Section 8.* **Orientations:** During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to reasonable space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine.

*Section 9.* **Rookie Symposium:** The parties will discuss the timing, structure, and content of one or more annual Rookie orientation programs.

## ARTICLE 48
## NFLPA AGENT CERTIFICATION

*Section 1.* **Exclusive Representation:** The NFL and the Clubs recognize that, pursuant to federal labor law, the NFLPA will regulate the conduct of agents who represent players in individual contract negotiations with Clubs. On or after the date on which the NFLPA notifies the NFL that an agent regulation system is in effect and provides the NFL with a list of the NFLPA-certified agents, Clubs are prohibited from engaging in individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players. The NFLPA shall provide and publish a list of agents who are currently certified in accordance with its agent regulation system, and shall notify the NFL and the Clubs of any deletions or additions to the list pursuant to its procedures. The NFLPA shall submit an updated list to the NFL monthly. The NFLPA agrees that it shall not delete any agent from its list until that agent has exhausted the opportunity to appeal the deletion pursuant to the NFLPA's agent regulation system, except: (i) where an agent has failed to pass a written examination given to agents by the NFLPA; (ii) in extraordinary circumstances where the NFLPA's investigation discloses that the agent's conduct is of such a serious nature as to justify immediately invalidating the agent's certification; (iii) where the agent has failed to pay his or her annual fee; (iv) where the agent has failed to attend an annual seminar required by the NFLPA; (v) where the agent's certification has expired due to the agent's inactivity in individual contract negotiations; (vi) where the agent has made improper contact with a college football player in violation of any applicable NFLPA rules governing contact with players related to NCAA or NFL Draft eligibility; and (vii) where the agent has failed to sign the end of year certification required by Article 18, Section 2(b) of this Agreement. The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent. The NFLPA agrees that it will not discipline, dismiss or decertify agents based upon the results they achieve or do not achieve in negotiating terms or conditions of employment with NFL Clubs. This Section shall not limit the NFLPA's ability to discipline agents for malfeasance or for violation of state or federal law.

*Section 2.* **Enforcement:** Under procedures to be established by agreement between the NFL and the NFLPA, the Commissioner shall disapprove any NFL Player Contract(s) between a player and a Club unless such player: (a) is represented in the negotiations with respect to such NFL Player Contract(s) by an agent or representative duly certified by the NFLPA in accordance with the NFLPA agent regulation system and authorized to represent him; or (b) acts on his own behalf in negotiating such NFL Player Contract(s).

*Section 3.* **Penalty:** Under procedures to be established by agreement between the NFL and the NFLPA, the NFL shall impose a fine of $30,000 upon any Club that negotiates any NFL Player Contract(s) with an agent or representative not certified by the NFLPA in accordance with the NFLPA agent regulation system if, at the time of such negotia-

tions, such Club either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NFLPA as to whether such agent or representative has been so certified. Such fine shall not apply, however, if the negotiation in question is the first violation of this Article by the Club during the term of this Agreement. It shall not be a violation of this Article for a Club to negotiate with any person named on (or not deleted from) the most recently published list of agents certified by the NFLPA to represent players. The fine amount set forth in this Section shall increase by 5% each League Year beginning in the 2012 League Year.

# ARTICLE 49
# PLAYER SECURITY

*Section 1.* **No Discrimination:** There will be no discrimination in any form against any player by the NFL, the Management Council, any Club or by the NFLPA because of race, religion, national origin, sexual orientation, or activity or lack of activity on behalf of the NFLPA.

*Section 2.* **Personal Appearance:** Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

## ARTICLE 50
## COMMITTEES

*Section 1.* **Joint Committee:**

(a)  A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

(b)  The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement.

(c)  Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article 43. A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and the arbitrator must render his decision within one (1) week of the hearing. No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

(d)  The NFLPA shall have the right to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety. Within 60 days of the initiation of an investigation, two or more neutral physicians will be selected to investigate and report to the Joint Committee on the situation. The neutral physicians shall issue a written report within 60

days of their selection, and their recommendations as to what steps shall be taken to address and correct any issues shall be acted upon by the Joint Committee.

*Section 2.* **Competition Committee:** The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.