## ARTICLE 64
## FORMER PLAYER LIFE IMPROVEMENT PLAN

*Section 1.* **Eligibility and Maintenance:**
    (a)    The Former Player Life Improvement Plan ("FPLI Plan"), previously known as the NFL Player Care Plan, was created, effective October 1, 2007, by amending the NFL Vested Inactive Players Life Insurance Plan to provide new benefits for eligible former players and a uniform administrative framework. The FPLI Plan, and all past and future amendments thereto as adopted in accordance with the terms of the FPLI Plan, are incorporated by reference and made a part of this Agreement, provided, however, that the terms used in the FPLI Plan and definitions of such terms are applicable only to the FPLI Plan and shall have no applicability to the Agreement unless the context of this Agreement specifically mandates the use of such terms. The FPLI Plan will be continued and maintained in full force and effect during the term of this Agreement.
    (b)    A retired player must be vested in the Retirement Plan based on Credited Seasons in order to meet the basic requirements to be eligible for benefits under the FPLI Plan; however, some benefits require additional criteria to be eligible.
    (c)    Under the FPLI Plan, eligible former players may receive benefits consisting of life insurance and assistance with obtaining joint replacements, prescription drugs, assisted living, Medicare supplemental insurance, spinal treatment, and neurological treatment as follows:
    (i)    **Joint Replacements.** Different levels of benefits are provided to eligible former players depending on whether they are covered by medical insurance.
    (A)    Former players covered by medical insurance will be entitled to the lesser of $5,250 ($10,500 in the case of a bilateral procedure) or the former player's co-insurance for health care items and services related to the joint replacement surgery, provided the expense was incurred within one year of the former player's surgery and would be eligible for payment under the NFL Player Insurance Plan.
    (B)    If a former player is not covered by insurance and qualifies to receive charitable care from the NFL Player Care Foundation under the charitable care standards established and interpreted by the NFL Player Care Foundation's board of directors (to the extent the NFL Player Care Foundation continues to provide such charitable care to former NFL players), the former player will be treated at a participating healthcare facility qualified to perform the joint replacement. The FPLI Plan will pay 20% of a pre-negotiated rate. In addition, if such former player experiences complications from joint replacement surgery, the FPLI Plan will pay 100% of the reasonable and customary amount charged for the treatment of the complications up to a maximum of $250,000, provided the expense is incurred within one year of surgery.
    (C)    **Limitations.** No benefits will be paid for revisions of prior procedures that replaced a joint. Bilateral procedures will not be available for former players who qualify for payment pursuant to Subsection 1(b) of this Article.
    (ii)    **Discount Prescription Drug Benefits.**
    (A)    Eligible former players and their dependents who are not eligible for coverage under the NFL Player Insurance Plan are eligible for a discount prescription

drug benefit. Eligible former players and their dependents will be issued a card that provides immediate discounts for prescription drugs at participating retail pharmacies in the United States.

(B) **Limitations.** There is no discount for over-the-counter or non-prescription medication. The discount card benefit may not be used in conjunction with any other plan or program, including Medicare, that provides similar benefits.

(iii) **Assisted Living Benefits.** All eligible former players will be entitled to certain discounts and preferred access at participating assisted living providers.

(iv) **Medicare Supplement Benefit.** All eligible former players who are at least age 65 and who have both Medicare Parts A and B coverage will be offered a range of Medicare supplement insurance plans provided by a Medicare supplement insurer. If an eligible former player enrolls in one of these options, the FPLI Plan will contribute $100 each month towards the applicable premium for this insurance; that monthly amount will increase to $120 for 2012–13, $140 for 2014–16, and $160 for 2017–2020, on March 31 of each of those years.

(v) **Spine Treatment Benefit.** Eligible former players will receive facilitated access and comprehensive, coordinated evaluation at participating medical centers. Each facility will designate one orthopedic surgeon as a point of contact to coordinate and oversee all aspects of an eligible former player's evaluation.

(vi) **Neurological Benefit.** Eligible former players will receive facilitated access and comprehensive, coordinated evaluation at participating medical centers. Each facility will designate one of its neurologists or neurosurgeons as a point of contact to coordinate and oversee all aspects of an eligible former player's evaluation.

(vii) **Life Insurance Benefit.** Eligible former players who (i) have neither reached their normal retirement age nor actually retired under the Retirement Plan and (ii) are not eligible for Life Insurance benefits under the NFL Player Insurance Plan, will be covered by a term life insurance policy in any amount equal to $20,000, plus $2,000 for each Credited Season in excess of a player's required number of seasons to vest under the Retirement Plan, up to a maximum of $50,000.

*Section 2.* **Administration:** The NFL shall administer the FPLI Plan.

*Section 3.* **NFLPA Review:** The NFLPA shall have the right to review and approve all programs and any changes made to the programs that are or have been implemented pursuant to the FPLI Plan.

## ARTICLE 65
## NEURO-COGNITIVE DISABILITY BENEFIT

*Section 1.* **Establishment:** Effective as of the first day of the month following the parties' approval of the standards to be established pursuant to this Article, and in all events no later than April 1, 2012, the Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have a permanent, neuro-cognitive impairment but are not receiving Line of Duty or Total & Permanent Benefits under the Disability Plan or Pension Benefits under the Retirement Plan. The medical standards for qualifying for this benefit will be proposed to the parties by a Special Committee made up of three healthcare professionals with expertise in neuro-cognitive disorders. One healthcare professional shall be selected by the NFLPA, one healthcare professional shall be selected by the Management Council, and a third healthcare professional by the other two healthcare professionals. This Special Committee shall recommend standards no later than December 1, 2011. The parties intend that the Special Committee shall recommend standards to qualify for the two benefits set forth in Paragraph 3 below. In making its recommendations, the Special Committee shall consider whether, and if so to what extent, evidence of behavior may be utilized in setting appropriate standards. An applicant will not be required to establish that the neuro-cognitive impairment arose out of football.

*Section 2.* **Eligibility:** Players shall be eligible for benefits under this Article where they (i) satisfy the standards set forth in Section 1; (ii) are under the age of 55; (iii) are vested under the Retirement Plan due to their Credited Seasons; (iv) have at least one Credited Season after 1994; and (v) have executed a release of claims and covenants not to sue in a form agreed upon by the parties to this Agreement. The parties agree that a player's right to receive benefits under this Article shall be contingent on the player's agreement to and execution of the release and covenant not to sue referenced above. The parties acknowledge and agree that the provision of the benefit under this Article shall not be construed as an admission or concession by the NFL Releasees or any of them that NFL football caused or causes, in whole or in part, the medical conditions covered by the benefit, or as an admission of liability or wrongdoing by the NFL Releasees or any of them, and the NFL Releasees expressly deny any such admission, concession, liability or wrongdoing.

*Section 3.* **Benefit:**
    (a)    Players who satisfy the standards established under Sections 1 and 2 shall be entitled to the following neuro-cognitive disability benefits which shall be payable for no more than 180 months beginning on the first day of the month following a qualifying exam; provided, however, no monthly neuro-cognitive benefits will be paid for any month after the month in which the player's 55th birthday occurs:
    (i)    **Moderately Impaired Benefit.** Players who qualify for a Moderately Impaired Benefit shall receive a monthly benefit equal to the sum of the Player's Benefit Credits, but no less than $3,000 (which such amount shall be increased in $500 increments every other year, beginning in 2013).

247

  (ii) **Mildly Impaired Benefit.** Players who qualify for a Mildly Impaired Benefit shall receive a monthly benefit equal to 50% of the sum of a Player's Benefit Credits, but no less than $1,500 (which such amount shall be increased in $375 increments every other year, beginning in 2013).

  (b) In addition to the monthly benefit, players shall be reimbursed for medical expenses related to the treatment of the player's neuro-cognitive disorder, but only if described in Section 213(d) of the Internal Revenue Code not to exceed $10,000 in any Plan Year. For purposes of reimbursing medical expenses under this Paragraph, the Plan in all cases will be the "secondary payor" to all other forms of insurance or reimbursement arrangements that the player may be eligible for including but not limited to the Gene Upshaw NFL Players Health Reimbursement Account Plan and the 88 Plan.

  (c) Players who are awarded benefits under Subsection 3(a)(ii) may voluntarily submit to additional evaluations after benefits under the Plan have begun, but not more often than once every 3 years, to determine if they qualify for benefits under Subsection 3(a)(i). Additionally, three members of the Plan's Board may also require a player to submit to an evaluation not more often than once every two years.

*Section 4.* **Special Committee:** Recognizing that advancements in neuro-cognitive testing and evaluation are occurring at a rapid pace, a special committee, the members of which shall be chosen in the same manner set forth in Section 1, shall review the Plan's standards every 2 years to determine if changes should be recommended to the parties.

*Section 5.* **Effect of Eligibility for Subsequent Disability Benefits:** If a player qualifies for the Moderately Impaired Benefit within 15 years of the player's last Credited Season and the player subsequently becomes eligible for Inactive B level Total and Permanent disability benefits, the benefit under this Article will cease and the player will begin to receive an additional benefit of $20,000 per year for the duration of his eligibility for the Inactive B benefit (e.g., $70,000 as the minimum Inactive B benefit prior to January 1, 2016), but this additional $20,000 benefit will not be paid for any month after the month in which the player's 55th birthday occurs.

## ARTICLE 66
## BENEFITS ARBITRATOR

*Section 1.* **Selection:**

(a) The NFL and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article 43, will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

(b) In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

*Section 2.* **Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

*Section 3.* **Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles 52 through 65 of this Agreement, except to the extent provided for in ERISA plans. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party,

the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Posthearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any posthearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that posthearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

# ARTICLE 67
## RETENTION OF BENEFITS

None of the following benefits, if provided by a Club free of charge to its players in each of the 2008–2010 seasons, may be reduced or eliminated by that Club during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable: meals, massage therapy services, nutritional services, and supplements provided by trainers or Club medical staff (subject to applicable League policies governing dietary and sports nutritional products).

## ARTICLE 68
## MUTUAL RESERVATION OF RIGHTS: LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Upon the expiration or termination of this Agreement, no party shall be deemed to have waived, by reason of this Agreement, or the settlement of any action, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Upon the expiration or termination of this Agreement, the Parties shall be free to make any available argument that any conduct occurring after the expiration or termination of this Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

# ARTICLE 69
# DURATION OF AGREEMENT

*Section 1.* **Effective Date/Expiration Date:** This Agreement shall be effective from August 4, 2011 until the last day of the 2020 League Year, except for the provisions relating to the Draft (Article 6), which shall remain in effect for the year immediately following the expiration or termination of this Agreement.

*Section 2.* **Termination Due To Collusion:**

(a) If at any time the conditions of Article 17, Section 16(a), (b), or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the System Arbitrator's decision finding the requisite conditions becomes final. The parties agree, however, that such termination shall be stayed if any party appeals such finding to the Appeals Panel, and to seek expedited review from the Appeals Panel.

(b) Any failure of the NFLPA to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of the NFLPA, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

# ARTICLE 70
# GOVERNING LAW AND PRINCIPLES

*Section 1.* **Governing Law:** To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

*Section 2.* **Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation of Articles 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement.

*Section 3.* **Mutual Drafting:** This Agreement shall be deemed to have been mutually drafted and shall be construed in accord with its terms. No party shall be entitled to any presumption or construction in such party's favor as a result of any party having assumed the primary burden of drafting any part of this Agreement.

*Section 4.* **Headings:** The headings in this Agreement are solely for the convenience of the parties, and shall not be deemed part of, or considered in construing, this Agreement.

*Section 5.* **Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

*Section 6.* **Authorization:** The NFL represents that it has been duly authorized to enter into and execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

*Section 7.* **Appendices and Exhibits:** All of the Appendices and Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

*Section 8.* **Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

*Section 9.* **Modification:** This Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties.

*Section 10.* **Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA, shall, upon the request of any party hereto, execute and deliver such further documents and instruments to take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

# ARTICLE 71
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a) To the NFL:
The National Football League Management Council
280 Park Avenue (after August 2011: 345 Park Avenue)
New York, New York 10017
Attention: Executive Vice President Labor & League Counsel

(b) To an NFL Club:
At the principal address of such Club as then
listed on the records of the NFL or at that Club's
principal office.
Attention: President

(c) To the NFLPA:
National Football League Players Association
63 Gene Upshaw Place
1133 20th Street, NW
Washington, D.C. 20036
Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION
By: [signature]

NATIONAL FOOTBALL
LEAGUE
By: [signature]

## APPENDIX A
## NFL PLAYER CONTRACT

THIS CONTRACT is between_____, hereinafter "Player," and _____, a _____ corporation (limited partnership) (partnership), hereinafter "Club," operating under the name of the _____ as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

1. TERM. This contract covers _____ football season(s), and will begin on the date of execution or March 1, _____, whichever is later, and end on February 28 or 29, _____, unless extended, terminated, or renewed as specified elsewhere in this contract.

2. EMPLOYMENT AND SERVICES. Club employs Player as a skilled football player. Player accepts such employment. He agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those associated with the game. Player will report promptly for and participate fully in Club's official mandatory minicamp(s), official preseason training camp, all Club meetings and practice sessions, and all preseason, regular season and postseason football games scheduled for or by Club. If invited, Player will practice for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the League unless the game is first approved by the League.

3. OTHER ACTIVITIES. Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a significant risk of personal injury.

4. PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
    (a)    Player hereby grants to Club and the League, separately and together, the right and authority to use, and to authorize others to use solely as described below, his name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph/signature (including facsimiles thereof), voice, biographical information and/or any and all other identifying characteristics (collectively, "Publicity Rights"), for any and all uses or purposes that publicize and promote NFL Football, the League or any of its

256

member clubs in any way in any and all media or formats, whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms. Without limiting the foregoing, this grant includes the right to use Player's Publicity Rights for the purpose of publicizing and promoting the following aspects of NFL Football, the League and/or any of its member clubs: brands, games, ticket sales, game broadcasts and telecasts, programming focused on the NFL, one or more NFL clubs and/or their games and events (e.g., coaches shows, highlight based shows such as *Inside the NFL*, behind-the-scenes programming such as *Hard Knocks*), other NFL-related media offerings (e.g., branded content segments featuring NFL game footage and other programming enhancements), media distribution platforms (e.g., NFL.com, NFL Mobile, NFL Network), official events (e.g., NFL Kickoff, NFL Draft), officially sanctioned awards programs (e.g., Rookie of the Year), and public service or community oriented initiatives (e.g., Play60). For purposes of clarity, the foregoing grant of rights includes the right and authority to use, and to authorize affiliates or business partners to use, after the term of this Agreement any Publicity Rights fixed in a tangible medium (e.g., filmed, photographed, recorded or otherwise captured) during the term of this Agreement solely for the purposes described herein. Notwithstanding anything to the contrary, the foregoing grant does not confer, during or after the term of this Agreement, any right or authority to use Player's Publicity Rights in a manner that constitutes any endorsement by Player of a third-party brand, product or service ("Endorsement"). For purposes of clarity, and without limitation, it shall not be an Endorsement for Club or the League to use, or authorize others to use, including, without limitation, in third party advertising and promotional materials, footage and photographs of Player's participation in NFL games or other NFL events that does not unduly focus on, feature, or highlight, Player in a manner that leads the reasonable consumer to believe that Player is a spokesperson for, or promoter of, a third-party commercial product or service.

 Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League.

 Player and National Football League Players Association, including any of its affiliates ("NFLPA") do not and will not contest during or after the term of this agreement, and this hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL member club (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all media now known or hereafter developed, any NFL games or any excerpts thereof and (ii) to produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL games or any excerpts thereof, in any and all media now known or hereafter developed, including, but not limited to, packaged or other electronic or digital media.

 Nothing herein shall be construed to grant any Publicity Rights for use in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel), other than such products that constitute programming (as described herein) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

(b) Player hereby assigns the NFLPA and its licensing affiliates, if any, the exclusive and unlimited right to use, license and sublicense the right to use his name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, biographical information and/or other personal indicia (individually and collectively, "Rights") for use in connection with any product, brand, service, appearance, product line or other commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form, media, or medium (now known or hereafter developed) during a consecutive 12-month period (a "group licensing program"). For sponsorships, endorsements, and promotions, group licensing programs are further defined as those: (a) in any one product category, as defined by industry standards; or (b) in different categories if the products all use similar or derivative design or artwork, or one player product is used to promote another player product.

The Rights may also be used for the promotion of the NFLPA, its affiliated entities and/or its designees (the "NFLPA Entities"), provided such promotion does not constitute an endorsement by Player of a commercial product not a part of a group licensing program. Player agrees to participate, upon request of the NFLPA and without additional compensation, in reasonable activities to promote the NFLPA Entities, which shall include (i) up to three (3) personal appearances per year or (ii) up to fifteen (15) minutes per week dedicated to promoting the NFLPA Entities. Player retains the right to grant permission to others to utilize his Rights if that individual or entity is not concurrently utilizing the Rights of five (5) or more other NFL players for any commercial purpose whatsoever. If Player's inclusion in an NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with immediate written notice of that preclusion, the NFLPA agrees to exclude Player from that particular program. Should Player fail to perform any of his obligations hereunder, the NFLPA may withhold payments owed to Player, if any, in connection with this Group Licensing Assignment.

In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA Board. The NFLPA further agrees to use reasonable efforts to promote the use of NFL player Rights in group licensing programs, to provide group licensing opportunities to all NFL players, and to monitor and police unauthorized third-party use of the Rights. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under Virginia law.

The assignment in this paragraph shall expire on December 31 of the latter of (i) the third year following the execution of this contract, or (ii) the year after this contract expires, and may not be revoked, terminated or otherwise assigned in any manner by Player until such date. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA.

Nothing in Paragraph 4b shall be construed or deemed to modify in any way the rights set forth in Paragraph 4a, and the fact that Paragraph 4b (or any of the terms thereof) appears in the Player Contract shall not be referred to, relied upon, or otherwise cited by Player and/or the NFLPA or any of its affiliates in any dispute or legal proceeding as evidence that the NFL, any NFL entity, any Club or Club Affiliate, or any licensee of any of the foregoing has consented, agreed, acknowledged, or does not contest the applicability or interpretation of Paragraph 4b.

5. COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$ _____ /* for the 20____ season;
$ _____ /* for the 20____ season;
$ _____ /* for the 20____ season;
$ _____ /* for the 20____ season;
$ _____ /* for the 20____ season.

(* - designates the compensation Club will pay player if the player is not on Club's Active/Inactive List)

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during preseason training and in connection with playing preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6. PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7. DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8. PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9. INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10. WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to

compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following Injury Grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to

fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of the NFL collective bargaining agreement or this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by