one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22. LAW. This contract is made under and shall be governed by the laws of the State of

_____.

23. WAIVER AND RELEASE. Player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, the Rookie Compensation Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to the express terms of any collective bargaining agreement during the term of any such agreement. This waiver and release also extends to any conduct engaged in pursuant to the express terms of the Stipulation and Settlement Agreement in *White*. This waiver and release does not waive any rights player may have to commence a grievance under the 2006 CBA or to commence a grievance or other arbitration under the 2011 CBA.

24. OTHER PROVISIONS.

      (a)    Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

      (b)    Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the collective bargaining agreement dated August 4, 2011, including but not limited to the Rookie Compensation

Pool and Salary Cap provisions; however, any conduct permitted by that Agreement shall not be considered a violation of this confirmation.

(c)     PERFORMANCE-BASED PAY. Player's attention is called to the fact that he may be entitled to Performance-Based Pay in accordance with the procedures outlined in Article 28, and that his eligibility for such pay is based on a formula that takes into account his playtime percentage and compensation

25. SPECIAL PROVISIONS. THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| _____ | _____ |
| PLAYER | CLUB |
| _____ | _____ |
| Home Address | By |
| _____ | _____ |
| Telephone Number | Club Address |
| _____ | _____ |
| Date | Date |
| _____ | |
| PLAYER'S AGENT | |
| _____ | |
| Address | |
| _____ | |
| Telephone Number | |
| _____ | |
| Date | |

Copy Distribution:

White-League Office    Yellow-Player
Green-Member Club    Blue-Management Council
Gold-NFLPA    Pink-Player Agent

**APPENDIX B**
**FIRST REFUSAL OFFER SHEET**

Name of Player:          Date:

Address of Player:          Name of New Team:

Name and Address of          Name of Prior Team:
Player's Representative
Authorized to Act for Player:

Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

[Supply Information on this Sheet or on Attachment]

1. Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide Honors [listed in Exhibit C to Article 13 of this Agreement]: [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

2. Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

3. Other terms (that need not be matched):

Player:          New Club:

By: _____          By: _____
                                   Chief Operating Officer

265

**APPENDIX C**
**FIRST REFUSAL EXERCISE NOTICE**

Name of Player:      Date:

Address of Player:      Name of New Team:

Name and Address of      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

Address of Prior Team:

The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

Prior Team

By:

_____
Chief Operating Officer

266

## APPENDIX D
## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in doing so, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By: _____

Witnessed by:

_____

267

APPENDIX E

EXAMPLES OF CAP PERCENTAGE AVERAGE FRANCHISE AND TRANSITION TENDER CALCULATIONS

Set forth below are hypothetical examples for illustrative purposes only.

**Example 1:** Calculation of the Non-Exclusive Franchise Tender for a linebacker for the 2012 League Year:

|  | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | '11–'07 Sum |
|---|---|---|---|---|---|---|---|
| Franchise Tag* | N/A | $10,091 | $9.68 | $8.304 | $8.065 | $7.206 | $43.346 |
| Salary Cap | $125.0 | $120.375 | $121.6875 | $123.0 | $116.0 | $109.0 | $590.0625 |

*Note: the "Franchise Tag" for 2011 equals the average of the five largest Salaries (as defined in Article 10) for linebackers from the 2010 League Year; the "Franchise Tag" for 2010 equals the average of the five largest Salaries (as defined in Article 10) for linebackers from the 2009 League Year, and so on.

Σ (Franchise Tags 2007–2011) ÷ Σ (Salary Caps 2007–2011) = 7.346% ($43.346 ÷ $590.0625). If the 2012 Salary Cap was $125 million, then the 2012 Non-Exclusive Franchise Tender for a linebacker would be $9.183 million (7.346% of $125 million), or 120% of the player's 2011 Salary (as defined in Article 10), whichever is greater.

**Example 2:** Calculation of the Transition Tender for a linebacker for the 2012 League Year:

|  | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | '11–'07 Sum |
|---|---|---|---|---|---|---|---|
| Transition Tag | N/A | $8.894 | $8.373 | $7.48 | $7.335 | $6.493 | $38.575 |
| Salary Cap | $125.0 | $120.375 | $121.6875 | $123.0 | $116.0 | $109.0 | $590.0625 |

*Note: the "Transition Tag" for 2011 equals the average of the ten largest Salaries (as defined in Article 10) for linebackers from the 2010 League Year; the "Transition Tag" for 2010 equals the average of the ten largest Salaries (as defined in Article 10) for linebackers from the 2009 League Year, and so on.

Σ (Transition Tags 2007–2011) ÷ Σ (Salary Caps 2007–2011) = 6.5374% ($38.575 ÷ $590.0625). If the 2012 Salary Cap was $125 million, then the 2012 Transition Tender for a Linebacker would be $8.172 million (6.5374% of $125 million).

268

# APPENDIX F
## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Cash Player Costs, and All Revenues ("AR") of the NFL and its member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions of this Agreement. The information on the Schedule is to be the responsibility of the management of the Clubs and the NFL.

The NFL and the NFLPA are to retain a national accounting firm (the "Accountants") which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Procedures shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six members with three representatives designated by each of the NFL and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Procedures described in the preceding paragraph and again to review the results of the Procedures reasonably before issuance of any Special Purpose Letter for that playing season.

The procedures detailed below and/or as otherwise agreed by the parties are and shall be designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Cash Player Costs and All Revenues of the NFL and its Clubs for such League Year in accordance with the provisions of this Agreement. The Accountants will perform the Procedures with respect to the Schedule for each League Year.

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), as agreed upon by the parties, or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report upon the Procedures as referred above.

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the NFL and the NFLPA to be performed by the Accountants**

**General**

- This Agreement and all relevant side letters should be reviewed and understood.

- See Exhibit 6.1 for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in AR where appropriate.

- The Player Compensation and Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule shall be made available for review by representatives of the NFL and the NFLPA prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with this Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from AR. All revenues excluded by the teams or League Office should be reviewed to determine proper

270

exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, AR.

**Procedures provided by the NFL and the NFLPA to be performed by the Local Accountants**

**General**

- The Local Accountants shall conduct procedures as agreed upon by the parties.

- This Agreement and all side letters should be reviewed and understood by all Local Accountants.

- See Exhibit 6.2 for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

**Team Salaries - Schedule 1**

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in this Agreement.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in this Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with this Agreement.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**

- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in this Agreement.

**Cash Spending - Schedule 3A**

- Perform procedures provided in Schedules 1 and 2 above and calculate Club's "Cash Spending" and amounts committed to be spent by Club in the year under review for Player Benefits, to determine the Club's contribution to Cash Spending (as defined in Article 12, Section 7) for such year.

**Revenues - Schedule 4**

- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

274

- Luxury box revenues should be included in AR in a manner consistent with this Agreement. Amounts included in AR, and any deductions against such revenues should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in AR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in AR. Test appropriateness of balances where appropriate.

## Questions

- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

## Revenue Reporting Procedures and List of Related Entities

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

275

**EXHIBIT F.1**
**ACCOUNTANTS' AGREED-UPON PROCEDURES REPORT**

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League, the National Football League Players Association and Class Counsel (collectively, the "Parties") with respect to the National Football League Office Reporting Package and the Reporting Packages of the Member Clubs of the National Football League, for the [insert] League Year, solely to assist the Parties in evaluating whether the Reporting Packages were prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and will not perform an audit or examination, the objective of which would be the expression of an opinion on the Reporting Packages. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an audit or examination of the Reporting Packages, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the National Football League, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

EXHIBIT F.2
## LOCAL ACCOUNTANTS' AGREED-UPON PROCEDURES REPORT

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of management of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule A either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the [Member Club Name], the National Football League, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

## APPENDIX G
## OFFSEASON WORKOUT RULES

Except for certain specified minicamps, any offseason workout programs or classroom instruction shall be strictly voluntary. No Club official shall indicate to a player that the Club's offseason workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club or any other adverse consequences). Offseason programs may take place for nine weeks. Workouts shall be limited to four days per week; such workout programs are not permitted on weekends. The nine weeks may include no more than ten days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all offseason workouts.

Voluntary offseason workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the NFL the schedule for the program, including designation of any days on which organized team practice activity will take place, pursuant to the rules set forth in Article 21 and any changes to the schedule for the program.

The following rules shall also apply to the ten days of organized team practice activity:

- No pads except protective knee or elbow pads. Helmets are permitted.
- All organized team practice activity shall be conducted pursuant to the rules for Phase Three activities, which are set forth in Article 21, Section 2(b)(iii) of this Agreement.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the offseason to ensure player safety and adherence to live contact guidelines.
- Maximum six hours per day, with a maximum two hours on field, for any player.

**APPENDIX H**
**NOTICE OF TERMINATION**

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

      ☐ You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

      ☐ You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

      ☐ In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

      ☐ You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

      ☐ In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

279

**APPENDIX I**
**WRITTEN WARNING GOOD FAITH EFFORT**

[date]

Dear [player]:

The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article 30 of the Collective Bargaining Agreement if you are terminated before the end of this season.

[Club Official]
[Club name]

280

APPENDIX J
## PRACTICE SQUAD PLAYER CONTRACT

## PRACTICE PLAYER CONTRACT

THIS                CONTRACT               is               between
_____, hereinafter   "Player,"   and
_____, a _____ corporation (limited partnership)
(partnership), hereinafter "Club," operating under the name of the _____
as a member of the National Football League, hereinafter "League." In consideration of
the promises made by each to the other, Player and Club agree as follows:

1. TERM. This contract covers the 20_ football season, and will begin on the
date of execution and end one week after the date of the Club's last regular season or
postseason game, unless terminated by Player pursuant to Paragraph 10 or by Club pur-
suant to Paragraph 6 or Paragraph 9.

2. EMPLOYMENT AND SERVICES. Club employs Player as a member of its
Practice Squad. Player accepts such employment. Player agrees to give his best efforts
and loyalty to the Club, and to conduct himself on and off the field with appropriate
recognition of the fact that the success of professional football depends largely on public
respect for and approval of those associated with the game. Player will report promptly
for and participate fully in all Club meetings and practice sessions, and all other football
activities as directed by Club. Player will not participate in any football game not spon-
sored by the League unless the game is first approved by the League. Nor, while this
contract is in effect, will Player play football or engage in activities related to football
other than for Club or engage in any activity other than football which may involve a
significant risk of personal injury without first obtaining Club's prior written consent.

3. PUBLICITY.
    (a)      Player hereby grants to Club and the League, separately and together, the
right and authority to use, and to authorize others to use solely as described below, his
name, nickname, initials, likeness, image, picture, photograph, animation, persona, auto-
graph/signature (including facsimiles thereof), voice, biographical information and/or
any and all other identifying characteristics (collectively, "Publicity Rights"), for any and
all uses or purposes that publicize and promote NFL Football, the League or any of its
member clubs in any way in any and all media or formats, whether analog, digital or
other, now known or hereafter developed, including, but not limited to, print, tape, disc,
computer file, radio, television, motion pictures, other audio-visual and audio works,
Internet, broadband platforms, mobile platforms, applications, and other distribution
platforms. Without limiting the foregoing, this grant includes the right to use Player's
Publicity Rights for the purpose of publicizing and promoting the following aspects of
NFL Football, the League and/or any of its member clubs: brands, games, ticket sales,
game broadcasts and telecasts, programming focused on the NFL, one or more NFL
clubs and/or their games and events (e.g., coaches shows, highlight based shows such as

*Inside the NFL*, behind-the-scenes programming such as *Hard Knocks*), other NFL-related media offerings (e.g., branded content segments featuring NFL game footage and other programming enhancements), media distribution platforms (e.g., NFL.com, NFL Mobile, NFL Network), official events (e.g., NFL Kickoff, NFL Draft), officially sanctioned awards programs (e.g., Rookie of the Year), and public service or community oriented initiatives (e.g., Play60). For purposes of clarity, the foregoing grant of rights includes the right and authority to use, and to authorize affiliates or business partners to use, after the term of this Agreement any Publicity Rights fixed in a tangible medium (e.g., filmed, photographed, recorded or otherwise captured) during the term of this Agreement solely for the purposes described herein. Notwithstanding anything to the contrary, the foregoing grant does not confer, during or after the term of this Agreement, any right or authority to use Player's Publicity Rights in a manner that constitutes any endorsement by Player of a third-party brand, product or service ("Endorsement"). For purposes of clarity, and without limitation, it shall not be an Endorsement for Club or the League to use, or authorize others to use, including, without limitation, in third party advertising and promotional materials, footage and photographs of Player's participation in NFL games or other NFL events that does not unduly focus on, feature, or highlight, Player in a manner that leads the reasonable consumer to believe that Player is a spokesperson for, or promoter of, a third-party commercial product or service.

Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League.

Player and National Football League Players Association, including any of its affiliates ("NFLPA") do not and will not contest during or after the term of this agreement, and this hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL member club (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all media now known or hereafter developed, any NFL games or any excerpts thereof and (ii) to produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL games or any excerpts thereof, in any and all media now known or hereafter developed, including, but not limited to, packaged or other electronic or digital media.

Nothing herein shall be construed to grant any Publicity Rights for use in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel), other than such products that constitute programming (as described herein) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

(b)     Player hereby assigns the NFLPA and its licensing affiliates, if any, the exclusive and unlimited right to use, license and sublicense the right to use his name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, biographical information and/or other personal indicia (individually and collectively, "Rights") for use in connection with any product, brand, service, appearance, product line or other commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form,