UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO: Plaintiffs' Master Administrative Class Action Complaint for Medical Monitoring | |

**MEMORANDUM OF LAW OF DEFENDANTS NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN SUPPORT OF MOTION TO DISMISS THE MASTER <u>ADMINISTRATIVE CLASS ACTION COMPLAINT ON PREEMPTION GROUNDS</u>**

**Table of Contents**

**Page**

Preliminary Statement ............................................................................................................ 1

Background ............................................................................................................................ 5

    A.    The Parties ................................................................................................... 5

    B.    The NFL Collective Bargaining Agreements ......................................... 6

        1.    Player Medical Care Provisions................................................ 7

        2.    Rule-Making and Player Safety Rule Provisions....................... 9

        3.    Grievance Procedures ............................................................... 9

        4.    Player Benefits Provisions ...................................................... 10

    C.    The Master Class Action Complaint...................................................... 11

Argument ............................................................................................................................ 12

I. SECTION 301 OF THE LMRA PREEMPTS PLAINTIFFS' CLAIMS
    AGAINST THE NFL.................................................................................................... 12

    A.    Resolution of Plaintiffs' Claims Against the NFL Would Substantially  Depend
        Upon Interpretation of the Terms of the CBAs ................................................... 15

        1.    Resolution of Plaintiffs' Medical Monitoring Claim Would Require
            Interpretation of the Terms of the CBAs .................................................. 16

        2.    Resolution of Plaintiffs' "Fraudulent Concealment/Negligent Omission"
            Claim Would Require Interpretation of the Terms of the CBAs .............. 23

    B.    Plaintiffs' Claims Against the NFL Arise Under the CBAs ................................ 26

II. SECTION 301 PREEMPTS PLAINTIFFS' CLAIMS AGAINST NFLP .............................. 28

Conclusion .......................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                       **Page(s)**

*Allis-Chalmers Corp.* v. *Lueck*,
    471 U.S. 202 (1985)................................................................12, 13, 26, 28

*Althaus* v. *Cohen*,
    756 A.2d 1166 (Pa. 2000) ..................................................................16

*Angst* v. *Mack Trucks, Inc.*,
    969 F.2d 1530 (3d Cir. 1992)..............................................................14

*Antol* v. *Esposto*,
    100 F.3d 1111 (3d Cir. 1996)...................................................13, 14, 26

*Atwater* v. *Nat'l Football League Players Ass'n*,
    626 F.3d 1170 (11th Cir. 2010) .............................................22, 25, 28

*Aubrey* v. *Sanders*,
    No. 07-CV-0137, 2008 WL 4443826 (W.D. Pa. Sept. 26, 2008)....................23, 24

*Barnes* v. *Am. Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998).................................................................16

*Barnes* v. *Nat'l Football League*,
    No. 11-CV-08396, Dec. 8, 2011, Order (C.D. Cal.) ..............................11

*Beidleman* v. *Stroh Brewery Co.*,
    182 F.3d 225 (3d Cir. 1999)...........................................................13, 14

*Brown* v. *Nat'l Football League*,
    219 F. Supp. 2d 372 (S.D.N.Y. 2002)..............................................5, 7, 27

*Buck* v. *Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006)...................................................................5

*Caronia* v. *Philip Morris USA, Inc.*,
    No. 06-CV-224, 2011 WL 338425 (E.D.N.Y. Jan. 13, 2011) .................16

*Clarett* v. *Nat'l Football League*,
    369 F.3d 124 (2d Cir. 2004)....................................................................7

*Duerson* v. *Nat'l Football League*,
    No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) ........................ passim

*Givens* v. *Tenn. Football, Inc.*,
    684 F. Supp. 2d 985 (M.D. Tenn. 2010) ...................................................4, 13, 16, 21

*Harper* v. *Am. Red Cross Blood Servs.*,
    153 F. Supp. 2d 719 (E.D. Pa. 2001) ...................................................................13

*Henderson* v. *Merck & Co.*,
    998 F. Supp. 532 (E.D. Pa. 1998) ...................................................................13, 14

*Holmes* v. *Nat'l Football League*,
    939 F. Supp. 517 (N.D. Tex. 1996) ...................................................................5, 22

*Int'l Bhd. of Elec. Workers* v. *Hechler*,
    481 U.S. 851 (1987) ...................................................................12, 13, 21

*Jeffers* v. *D'Allessandro*,
    681 S.E.2d 405 (N.C. Ct. App. 2009) ...................................................................4, 16, 22

*Manti's Transp., Inc.* v. *C.T. Lines, Inc.*,
    68 A.D.3d 937 (N.Y. App. Div. 2009) ...................................................................23

*Maxwell* v. *Nat'l Football League*,
    No. 11-CV-08394, Dec. 8, 2011, Order (C.D. Cal.) ................................................... passim

*Pear* v. *Nat'l Football League*,
    No. 11-CV-08395, Dec. 8, 2011, Order (C.D. Cal.) ...................................................................11

*Peek* v. *Phila. Coca-Cola Bottling Co.*,
    No. 97-3372, 1997 WL 399379 (E.D. Pa. July 10, 1997) ...................................................................27

*Sherwin* v. *Indianapolis Colts, Inc.*,
    752 F. Supp. 1172 (N.D.N.Y. 1990) ................................................... passim

*Sluder* v. *United Mine Workers of Am., Int'l Union*,
    892 F.2d 549 (7th Cir. 1989) ...................................................................21

*Smith* v. *Houston Oilers, Inc.*,
    87 F.3d 717 (5th Cir. 1996) ...................................................................22

*Stringer* v. *Nat'l Football League*,
    474 F. Supp. 2d 894 (S.D. Ohio 2007) ................................................... passim

*Tran* v. *Metro. Life Ins. Co.*,
    408 F.3d 130 (3d Cir. 2005) ...................................................................24

*United Steelworkers of Am.* v. *Rawson*,
    495 U.S. 362 (1990) ...................................................................12, 13, 21, 27, 28

*Williams* v. *Nat'l Football League*,
    582 F.3d 863 (8th Cir. 2009) ................................................................4, 22, 24, 25

**Statutes**

29 U.S.C. § 185(a) ..................................................................................................12

Labor Management Relations Act,  § 301 ........................................................ passim

**Other Authorities**

D. Scott Aberson, Note, *A Fifty-State Survey of Medical Monitoring and the Approach
    the Minnesota Supreme Court Should Take When Confronted With The Issue*, 32 WM.
    MITCHELL. L. REV. 1096 (2006) ...........................................................................16

Fed. R. Civ. P. 12(b)(6)............................................................................................5

Defendants National Football League ("NFL") and NFL Properties LLC ("NFLP," and together with the NFL, the "NFL Defendants") respectfully submit this memorandum in support of their motion to dismiss, on preemption grounds, the Master Administrative Class Action Complaint for Medical Monitoring and Original Class Action Complaint for Plaintiffs Allen, Kowalewski, Little, Wooden & Fellows (the "Class Complaint," "Master Class Action Complaint," or "MCC") brought by proposed class representatives ("Plaintiffs") on behalf of a putative class of retired or former players whose terms and conditions of NFL employment were defined by collective bargaining agreements (the "CBAs") and the NFL Constitution and Bylaws (the "Constitution").

## Preliminary Statement

Plaintiffs' action—contending that the NFL failed to fulfill a duty to ensure the safety of NFL players—is a labor dispute the resolution of which depends upon an interpretation of the terms of the applicable CBAs.  Accordingly, these claims should be dismissed.

For almost 45 years, professional football players have played under CBAs, painstakingly negotiated through their Union, that set forth the parties' understanding and agreement on how, among many other things, player health and safety will be protected. Although the CBAs evolved over time, each is a labor agreement that details and comprehensively governs the relationship among the NFL, its Clubs, and the players.  As a result of these negotiations, the CBAs to which the players expressly agreed:

(i)     provide that the NFL's Member Clubs and their medical staff have the responsibility for treating player injuries, including determining injury recovery times, deciding when players may "return to play," and advising the players of the risks of continued performance;

(ii)    set forth procedures for the promulgation and review of rules and regulations that affect and/or relate to player safety;

(iii)    provide for a player's right to compensation and other benefits in the event of injury; and

(iv)    set forth the dispute resolution procedures to be followed in the event of a dispute.

Years—and, in many cases, decades—after relying on these agreements, negotiated by their Union, Plaintiffs now contend that the NFL breached a duty to protect players from the risks of concussions and that this Court should ignore the CBAs governing those same issues and allow courts and juries to resolve Plaintiffs' grievances with the NFL, when the bargained-for CBAs expressly provide otherwise.  But parties whose terms and conditions of employment are determined by a collective bargaining agreement must grieve their employment-related disputes by the dispute resolution process prescribed by the CBA—not by bringing claims in court.

The CBAs—like all collective bargaining agreements affecting interstate commerce—are governed by section 301 of the Labor Management Relations Act (the "LMRA").  Section 301 ensures that disputes between parties to a labor agreement are resolved under a uniform body of federal labor law and adjudicated in accordance with the parties' agreed-to grievance procedures.  Thus, section 301 provides for preemption of all state-law claims—whether based in negligence or fraud—whose resolution is substantially dependent upon or inextricably intertwined with the terms of a CBA, or that arise under the CBA.

That is the case here.  Plaintiffs allege that the NFL breached its duties to inform NFL players of the risks associated with concussions and to provide safety regulations governing the health and safety of those same players.  To resolve Plaintiffs' claims, the Court would be required to interpret the CBAs—which not only address player safety, but also address the authority and responsibility relating to player safety of the NFL, the Clubs, and the Union—to

2

determine whether the NFL had such duties, the scope of any such duties, and the reasonableness of the NFL's conduct in light of the CBA provisions.

For example, to adjudicate Plaintiffs' medical monitoring claim, which is premised on the NFL's alleged negligence, a court will have to determine whether the NFL had the duties that the players allege and whether the NFL "breached . . . duties of reasonable and ordinary care."   The CBAs provide that the Clubs and their physicians have certain responsibilities relating to player medical care, including the responsibility for treating player injuries, making return-to-play decisions, and informing players of medical risks associated with continuing to play.  As two district courts considering claims now before this Court have held, these "physician provisions" of the CBAs "must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  *Maxwell* v. *Nat'l Football League*, No. 11-CV-08394, Dec. 8, 2011, Order at 1-2 (C.D. Cal.) (ECF Dkt. No. 58); *see also Duerson* v. *Nat'l Football League*, No. 12 C 2513, 2012 WL 1658353, at *4 (N.D. Ill. May 11, 2012) (determining that any duty to warn imposed on the Clubs and their physicians under the CBA to protect player health and safety "would be one factor tending to show that the NFL's alleged failure to take action to protect [NFL players] from concussive brain trauma was reasonable").

These provisions on player health and safety likewise are integral to the resolution of Plaintiffs' claim for "fraudulent concealment/negligent omission."  This claim, too, rests upon the NFL's alleged "duty to protect the health and safety of its players"—a duty that cannot be measured without first considering the preexisting obligations regarding player health and safety in the CBAs.  Nor can a court determine whether Plaintiffs justifiably relied on information

3

provided by the NFL without first interpreting the CBAs' health and safety provisions that allocate to Club physicians the task of providing injury-related information to players, including the risks of continuing to play football.

Indeed, numerous courts, consistent with settled labor preemption precedent, have held that player tort claims against the NFL and/or its Clubs—including certain of the concussion-related claims asserted in this action—are preempted under section 301. *See, e.g.*, *Duerson*, 2012 WL 1658353, at *6 (negligence claim preempted); *Maxwell*, No. 11-CV-08394, Order at 2 (negligence claim preempted); *Williams* v. *Nat'l Football League*, 582 F.3d 863, 881-82 (8th Cir. 2009) (breach of fiduciary duty, negligence, gross negligence, fraud, constructive fraud, negligent misrepresentation, and intentional infliction of emotional distress claims preempted); *Givens* v. *Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010) (outrageous conduct, negligent infliction of emotional distress, and breach of duty of good faith and fair dealing claims preempted); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 909-11 (S.D. Ohio 2007) (wrongful death claim preempted); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178-79 (N.D.N.Y. 1990) (negligence, fraud, negligent misrepresentation, negligent and intentional infliction of emotion distress claims preempted); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412 (N.C. Ct. App. 2009) (negligent retention and intentional misconduct preempted).

Plaintiffs' claims against the NFL here are preempted for an additional reason: they rest on purported obligations that arise under the CBAs.  The crux of the Class Complaint is that the NFL had a "duty to make the game of professional football safer for the players and to keep the players informed of safety information they needed to know" (MCC ¶ 69), yet failed "to take appropriate steps to prevent and mitigate repeated traumatic head impacts" (*id.* ¶ 13),

including by failing to enact new rules as a part of "carry[ing] out its duty to warn" (*id.* ¶ 78). The CBAs, however, expressly delineate the obligations of the NFL with respect to the promulgation and enforcement of health and safety-related rules for NFL players, and any such obligations therefore arise under the CBAs.

Plaintiffs' claims against NFLP—which lack a single substantive factual allegation specific to NFLP—are preempted, because measuring NFLP's alleged duty also requires an interpretation of the CBAs' player health and safety provisions.[1]

In sum, the Class Complaint should be dismissed with prejudice.

## Background

### A.   The Parties

The NFL is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.   (MCC ¶ 10); *see also Stringer*, 474 F. Supp. 2d at 898.[2]   NFLP is a limited liability company organized under the laws

---

[1]   While Plaintiffs purport to bring this action against the NFL Defendants, *i.e.*, both the NFL and NFLP, the overwhelming majority of Plaintiffs' substantive allegations relate solely to the NFL's purported duties and the NFL's purported breaches of those duties; the remainder of Plaintiffs' allegations conclusorily assert claims against the NFL Defendants together. There are no substantive allegations unique to NFLP.  Thus, while this Motion is brought on behalf of both NFL Defendants, NFLP expects that, due to the lack of any substantive allegations regarding its alleged conduct, any claim against it that is not dismissed as completely preempted should ultimately be dismissed for failure to state a claim.

[2]   This summary is based on the allegations of the Class Complaint—the factual averments of which the NFL assumes to be true for purposes of this motion only—and, where applicable, public records and documents integral to Plaintiffs' claims, including the CBAs, attached as exhibits to the accompanying Declaration of Dennis L. Curran, dated Aug. 28, 2012.  This Court may consider the CBAs in adjudicating this motion under Rule 12(b)(6) because the CBAs are integral to Plaintiffs' claims.  *See Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 383-84, 386-87 (S.D.N.Y. 2002) (considering CBA provisions in order to adjudicate NFL's motion to dismiss); *Holmes* v. *Nat'l Football League*, 939 F. Supp. 517, 520 n.2 (N.D. Tex. 1996) (same); *Duerson*, 2012 WL 1658353, at *4 (considering CBAs in connection with motion to remand); *Maxwell*, No. 11-CV-08394, Order at 1-2 (same).

of the State of Delaware and headquartered in New York.  (*Id.* ¶ 11.)  NFLP "serves as the representative of the [NFL and its Clubs] for the licensing of their trademarks and logos." (www.nfl.info/NFLConsProd/Welcome/cpAgreement.htm.)   Plaintiffs are former professional football players, the representatives of the estates of former players, and the spouses of some of the former players who played during various periods between 1966 and 2009.  (*See* MCC ¶¶ 5-9.)

**B.** **The NFL Collective Bargaining Agreements**

The terms and conditions of Plaintiffs' employment as professional football players are defined by the CBAs that were operative during Plaintiffs' careers.[3]  The CBAs are the product of exhaustive arms'-length negotiations between, on the one hand, the NFL, the American Football League ("AFL") or the NFL Management Council (the exclusive bargaining representative of the NFL Clubs), and, on the other hand, the NFLPA (the exclusive bargaining representative of NFL players) or the AFL Players Association (the exclusive bargaining agent of AFL players).  The CBAs so negotiated thus "represent[] the complete understanding of the parties on all subjects covered [t]herein."[4]  Through their Union, the players further agree to be

---

[3]   Since 1968, the NFL has operated under a CBA with only two exceptions:  (1) the period between August 31, 1987 and March 29, 1993, when no CBA was in place, following the expiration of the 1982 CBA and prior to the execution of the 1993 CBA; and (2) the period between March 11, 2011 and August 4, 2011, not at issue in this matter.  The 1968 NFL CBA was effective from July 15, 1968 to February 1, 1970.  The 1968 AFL CBA was effective from July 10, 1968 to February 1, 1970.  The 1970 CBA was effective from February 1, 1970 to January 31, 1974.  The 1977 CBA was effective from February 1, 1974 to July 15, 1982.  The 1982 CBA was effective from July 16, 1982 to August 31, 1987.  The 1993 CBA (as amended June 6, 1996, February 25, 1998, December 4, 2000, and January 8, 2002) was effective from March 29, 1993 to March 7, 2006.  The 2006 CBA was effective from March 8, 2006 to March 10, 2011.  The 2011 CBA became effective on August 4, 2011 and expires March 1, 2020.

[4]   *See* Ex. 4,  1977 CBA Preamble and Art. II § 1; Ex. 5, 1982 CBA Preamble and Art. II § 1; Ex. 6, 1993 CBA Preamble and Art. III § 1; Ex. 10, 2006 CBA Preamble and Art. III § 1; *see*

bound by the terms of the NFL Constitution, to the extent such terms do not conflict with the terms of the CBAs.[5]

The CBAs cover a broad range of subjects affecting the terms and conditions of employment for NFL players, including NFL player contracts and salary provisions, NFL draft rules, and player discipline. Although the CBAs have changed over time pursuant to the collective bargaining process, every CBA expressly addresses player health and safety and provides grievance procedures for the resolution of disputes under the CBAs.

### 1. Player Medical Care Provisions

The CBAs address in detail issues relating to assessment, diagnosis, and treatment of player injuries. For example, certain CBAs provide that Club physicians have the responsibility for making "return to play" decisions and advising players of the risk of continued performance; several set forth the qualifications for Club medical staff. Thus, the CBAs provide, for example:

- "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity." (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 5, 1982 CBA Art. XXXI § 1.)

---

*also* Ex. 2, 1968 NFL CBA Preamble and Art. I § 2; Ex. 1, 1968 AFL CBA Preamble and § 16; Ex. 3, 1970 CBA Preamble and Art. II § 4.

[5]   *See, e.g.*, Ex. 4,  1977 CBA Art. I § 2; Ex. 5, 1982 CBA Art. I § 2; *see also Clarett* v. *Nat'l Football League*, 369 F.3d 124, 142 (2d Cir. 2004) ("In the collective bargaining agreement, the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein[.]"); *Brown*, 219 F. Supp. 2d at 386 (The NFL "Constitution was bargained over and included within the scope of the CBA."). For ease of reference, the NFL refers generally to the "CBAs" throughout this memorandum, but cites, where applicable, to both the CBAs and the Constitutions.

- "All determinations of recovery time for major and minor injuries must be by the Club's medical staff and in accordance with the Club's medical standards . . . . The prognosis of the player's recovery time should be as precise as possible." (*See, e.g.*, Ex. 13, 1980 Supp. to NFL Constitution Art. XVII.)

- "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ." (Ex. 6, 1993 CBA Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9.)

- "Each Club will have a board-certified orthopedic surgeon as one of its Club physicians.  The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs." (Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1.)

- "All full-time head trainers and assistant trainers . . . will be certified by the National Athletic Trainers Association.  All part-time trainers must work under the direct supervision of a certified trainer." (Ex. 5, 1982 CBA Art. XXXI § 2; Ex. 6, 1993 CBA Art. XLIV § 2; Ex. 10, 2006 CBA Art. XLIV § 2.)

- "The home team shall provide a physician and an ambulance at each game available to both teams; said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams." (*See, e.g.*, Ex. 12, 1968 NFL and AFL Constitution Art. XIX § 19.5.)

Certain CBAs also set forth player rights and obligations related to medical care.

Thus, the CBAs provide:

- "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety." (Ex.9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d).)

- "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the costs of [these] medical services." (Ex. 5, 1982 CBA Art. XXXI § 3; Ex. 6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3.)

- "A player will have the right to choose the surgeon who will perform surgery . . . . Any such surgery will be at Club expense." (Ex. 5, 1982 CBA Art. XXXI § 4; Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 4.)

- "Each player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and will further

8

undergo a "post-season physical examination" at the request of the player or Club. (Ex. 5, 1982 CBA Art. XXXI § 5; *see also* Ex. 6, 1993 CBA Art. XLIV § 5; Ex. 10, 2006 CBA Art. XLIV § 5.)

### 2.    Rule-Making and Player Safety Rule Provisions

The CBAs also set forth the manner in which playing rules addressing or affecting player safety are promulgated and enforced.  For example, all playing rule changes must be "presented to the [NFL]" or unanimously approved by a "standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes" (Ex. 14 1984 NFL Constitution Art. XI § 11.2), and consisting of members appointed by the Clubs and the NFLPA.  The CBAs also provide that the Clubs, the NFLPA, and the NFL all have responsibility for reviewing player safety aspects of playing rules.  Thus, the CBAs provide:

- "A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee') will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects." (Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI.)

- "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c).)

- "The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules.  One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules."  (Ex. 6, 1993 CBA Art. XIII § 2; Ex. 10, 2006 CBA Art. XIII § 2.)

### 3.    Grievance Procedures

Since 1977, all CBAs have contained a broad arbitration clause providing that all disputes involving "the interpretation of, application of, or compliance with, any provision of" the CBAs, player contracts, or any applicable provision of the Constitution "pertaining to terms

and conditions of employment of NFL players," will be resolved exclusively in accordance with agreed-to arbitration procedures.  Moreover, since 1970, "injury grievances" have been subject to arbitration.  (*See* Ex. 6, 1993 CBA Art. IX § 1, Art. X § 6; Ex. 10, 2006 CBA Art. IX § 1, Art. X § 6; *see also* Ex. 3, 1970 CBA Art. XI § 6 & Appx. B; Ex. 4, 1977 CBA Art. VII § 1, Art. IX § 6; Ex. 5, 1982 CBA Art. VII § 1, Art. IX § 6.)  From 1968 to 1977, the CBA contained a dispute resolution procedure that required the NFL Commissioner to resolve non-injury grievances.  (Ex. 2, 1968 NFL CBA Art. IX; Ex. 1, 1968 AFL CBA Art. 13; Ex. 3, Art. 1970 CBA Art. X.)  Certain CBAs also expressly forbid players from bringing "any suit against . . . the NFL or any Club with respect to any claim relating to any conduct permitted by [the CBAs] . . . or any term of [the CBAs]" or "the Constitution and Bylaws of the NFL."  (Ex. 6, 1993 CBA Art. IV § 2; Ex. 10, 2006 CBA Art. IV § 2; *see also* Ex. 4, 1977 CBA Art. III § 2; Ex. 5, 1982 CBA Art. III § 2.)

### 4.    Player Benefits Provisions

Finally, the CBAs also include numerous provisions regarding the rights of players and former players to compensation and benefits in the event of injuries, including the right to workers' compensation and supplemental disability benefits,[6] as well as certain rights and benefits for eligible retirees, including the establishment of a plan to provide medical benefits to eligible retirees determined to have dementia.   For example:

- "[A] player . . . will receive an injury protection benefit . . . [when the] player . . . [has] been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician . . . ."  (Ex. 4, 1977 CBA Art. X § 1; Ex. 5, 1982 CBA Art. X § 1; *see also* Ex. 6, 1993 CBA Art. XII § 1; Ex. 10, 2006 CBA Art. XII § 1.)

---

[6]    *See, e.g.*, Ex. 2, 1968 NFL CBA Art. XI § 4; Ex. 3, 1970 CBA Art. XV § 7; Ex. 4, 1977 CBA Art. XXXIII; Ex. 5, 1982 CBA Art. XXIV, Art. XXXVI; Ex. 6, 1993 CBA Art. L, Art. LI, Art. LIV; Ex. 10, 2006 CBA Art. L, Art. LI, Art. LIV.

- "The parties agree to design and establish a new plan . . . to provide medical benefits to former Players who are . . . determined . . . to have 'dementia.'" (Ex. 10, 2006 CBA Art. XLVIII-D.)

**C.     The Master Class Action Complaint**

Notwithstanding the CBA provisions that require that all disputes involving the interpretation of, application of, or compliance with the CBAs be resolved through grievance procedures, in July and August 2011, former NFL players began filing actions against the NFL and NFLP seeking relief for alleged concussion-related injuries sustained during their playing careers.

This multi-district litigation (the "MDL") was established on January 31, 2012; since that time, over 100 additional cases, brought on behalf of approximately 3,000 former NFL players, have been included in the MDL.   To date, federal district courts have denied four remand motions on preemption grounds.  *See Duerson*, 2012 WL 1658353, at *6; *Maxwell*, No. 11-CV-08394, Order at 2; *Pear* v. *Nat'l Football League*, No. 11-CV-08395, Dec. 8, 2011, Order at 2 (C.D. Cal.) (ECF Dkt. No. 61); *Barnes* v. *Nat'l Football League*, No. 11-CV-08396, Dec. 8, 2011, Order at 2 (C.D. Cal.) (ECF Dkt. No. 58).  On June 7, 2012, pursuant to Case Management Order No. 2 (as amended), Plaintiffs filed the Master Class Action Complaint, which supersedes and replaces all putative class action claims that plead a national, California, or Florida medical monitoring class that are coordinated and/or consolidated in this MDL, including, to the extent that it is deemed separate from the Master Class Action Complaint, the "Original Class Action Complaint for Plaintiffs Allen, Kowalewski, Little, Wooden and Fellows."  (*See* CMO No. 4, at ¶ 1(b) (June 21, 2012, ECF Dkt. No. 98).)

In the Master Class Action Complaint, Plaintiffs allege that the NFL "owed a duty of reasonable care to keep NFL players informed of neurological risks, to inform NFL players

truthfully, and not to mislead NFL players about the risks of permanent neurological damage that can occur from [mild traumatic brain injuries, or 'MTBI'] incurred while playing football." (MCC ¶ 77.)  Plaintiffs allege that the NFL breached its purported duties by "failing to disclose the true risks of repeated traumatic head impacts in NFL football, and failing to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and the latent brain injury."  (*Id.* ¶ 13.)  Generally, the Plaintiffs accuse the NFL of failing to act "reasonably." (*Id.* ¶ 237.)

Plaintiffs purport to assert claims against the NFL for medical monitoring and "fraudulent concealment/negligent omission."   Plaintiffs seek class certification and "an injunction for the requested medical monitoring" for the proposed National Class, or, in the alternative, for the proposed Florida and California classes.  (*Id.*, Prayer for Relief.)

<u>**Argument**</u>

## I.

### <u>SECTION 301 OF THE LMRA PREEMPTS PLAINTIFFS' CLAIMS AGAINST THE NFL</u>

It is a fundamental tenet of labor law that "'when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract,' the plaintiff's claim is pre-empted by § 301 of the Labor Management Relations Act."  *Int'l Bhd. of Elec. Workers* v. *Hechler*, 481 U.S. 851, 852-53 (1987) (quoting *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 220 (1985)).  Thus, section 301 of the LMRA preempts all state law claims—including tort claims—the resolution of which is substantially dependent upon or inextricably intertwined with an interpretation of the terms of a collective bargaining agreement, or that arise under a collective bargaining agreement.  29 U.S.C. § 185(a) (codifying section 301(a)); *Allis-Chalmers Corp.*, 471 U.S. at 213, 220; *United Steelworkers of Am.* v.

*Rawson*, 495 U.S. 362, 368 (1990);  *Beidleman* v. *Stroh Brewery Co.*, 182 F.3d 225, 231-32 (3d

Cir. 1999); *Antol* v. *Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996).  Applying that basic principle,

courts have found a wide range of labor-related claims—including those involving issues of

workplace safety—to be preempted.  *See, e.g.*, *Rawson*, 495 U.S. at 368-72 (wrongful death

action brought by survivors of miners killed in a fire alleging negligence in mine inspections

preempted); *Hechler*, 481 U.S. at 859, 862 ("state-law tort claim" brought by electrical

apprentice for a breach "of a duty of care to provide . . . a safe workplace" preempted); *see also*

*Allis-Chalmers*, 471 U.S. at 220-21, 230 (employee's suit for bad faith in handling of disability

claim preempted); *Beidleman*, 182 F.3d at 234 (fraudulent misrepresentation claim preempted);

*Harper* v. *Am. Red Cross Blood Servs.*, 153 F. Supp. 2d 719, 721 (E.D. Pa. 2001) ("[c]laims of

retaliatory discharge for filing a workers' compensation claim" preempted); *Henderson* v. *Merck*

*& Co.*, 998 F. Supp. 532, 537 (E.D. Pa. 1998) (claims for breach of an implied covenant of good

faith and fair dealing, intentional inflicting of emotional distress, and wrongful termination

preempted).

Moreover, "a central tenet of federal labor-contract law under § 301 [is] that it is

the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first

instance."  *Allis-Chalmers*, 471 U.S. at 219-20 (section 301 preemption "preserves the central

role of arbitration in our system of industrial self-government").  Thus, "because preempted

claims must first be presented through the arbitration procedure established in a collective

bargaining agreement, those claims should be dismissed."  *Givens*, 684 F. Supp. 2d at 991-92.

To the extent that Plaintiffs have a claim addressing injuries incurred during their NFL careers,

that claim may only proceed pursuant to the grievance procedures set forth in the CBAs.  *See*

*supra* Part B.3; *see also Allis-Chalmers*, 471 U.S. at 220-21 (noting tort claims "should have

been dismissed for failure to make use of the grievance procedure established in the collective bargaining agreement . . . or dismissed as pre-empted by § 301"); *Angst* v. *Mack Trucks, Inc.*, 969 F.2d 1530, 1558 (3d Cir. 1992) (holding that because the employees "ignored and failed to resort to their CBA's dispute-resolution process, the district court was obliged to dismiss their suit"). The "preemptive force of § 301 is so powerful," *Antol*, 100 F.3d at 1115, because of "'the need for uniform interpretation of contract terms to aid both the negotiation and the administration of collective bargaining agreements.'" *Beidleman*, 182 F.3d at 234 (quoting *Antol*, 100 F.3d at 1115); *see also Henderson*, 998 F. Supp. at 537.

For the reasons set forth below, Plaintiffs' claims—which bear directly on issues addressed by the CBAs' health and safety provisions—are preempted.[7] Two recent federal district courts, each refusing to remand claims now part of this MDL, have so held. In *Duerson*, the court held that resolution of plaintiff's concussion-related negligence claim would require a court to interpret several of the CBAs' provisions concerning player health and safety. Because the court could "plausibly interpret those provisions to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could then

---

[7] The Class Complaint is brought on behalf of a proposed putative "National Class," defined by Plaintiffs as "All retired or former NFL professional football players who reside in the United States, who are not now salaried employees of the NFL or any member club, and who have not filed a personal injury action for latent brain injury." (MCC ¶ 16.) In the alternative, Plaintiffs propose putative "state only" classes for Florida and California, comprising residents of those states who otherwise meet the National Class definition. (MCC ¶¶ 18, 19.) The NFL Defendants here seek dismissal, on preemption grounds, of the Class Complaint in its entirety, including as to the National, Florida, and California putative Classes. To the extent, however, that any claim is found not to be preempted, the NFL intends to argue at a later date that such claims should be dismissed for failure to state a claim and failure to follow the agreed-upon grievance procedures, and because they are time-barred. (*See* CMO No. 4, at ¶ 3 (June 21, 2012, ECF Dkt. No. 98).) Issues of class certification—including the NFL Defendants' objection to class certification on numerous grounds—will also be addressed at a later date, if any claims are not dismissed.

reasonably exercise a lower standard of care in that area itself," the court concluded that the claims were preempted.  2012 WL 1658353, at *4.  In *Maxwell*, the court held that because the "CBA places primary responsibility for identifying . . . physical conditions on the team physicians," the "physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  *Maxwell*, No. 11-CV-08394, Order at 1-2.  As *Duerson* and *Maxwell* have already made clear, Plaintiffs' claims are substantially dependent upon an analysis of the CBAs, and, as a result, those claims are preempted by § 301.

**A.     Resolution of Plaintiffs' Claims Against the NFL Would Substantially Depend Upon Interpretation of the Terms of the CBAs**

The resolution of Plaintiffs' claims—whether based on negligence or fraud—would substantially depend upon an interpretation of numerous health and safety provisions in the applicable CBAs.   Indeed, several federal courts have determined that player injury negligence and fraud claims, including concussion-related negligence claims, are preempted for that very reason.  *See, e.g.*, *Duerson*, 2012 WL 1658353, at *3-4 (plaintiff's claim that "the NFL is liable for negligently causing [Duerson's] brain damage and death by failing to fulfill its duty to ensure his safety" was preempted because "evaluating the reasonableness of the NFL's conduct will require interpretation of terms of the CBAs imposing duties on NFL clubs to protect player health and safety"); *Maxwell*, No. 11-CV-08394, Order at 1-2 ("The physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."); *Stringer*, 474 F. Supp. 2d at 909-11 (resolution of plaintiff's claims regarding the NFL's alleged failure "to minimize the risk of heat-related illness" and

"establish regulations" was "'inextricably intertwined and substantially dependent' upon an analysis of certain CBA provisions imposing duties on the clubs with respect to medical care and treatment of NFL players"); *see also Givens*, 684 F. Supp. 2d at 990-91; *Sherwin*, 752 F. Supp. at 1177-79; *Jeffers*, 681 S.E.2d at 412.

### 1.   Resolution of Plaintiffs' Medical Monitoring Claim Would Require Interpretation of the Terms of the CBAs

Plaintiffs' claims for medical monitoring[8]—premised on a purported "duty of reasonable care to keep NFL players informed of neurological risks, to inform NFL players truthfully, and not to mislead NFL players about the risks of permanent neurological damage that can occur from MTBI incurred while playing football" (MCC ¶77)—is preempted because

---

[8]   A claim for medical monitoring is not viable in many states. *See generally* D. Scott Aberson, Note, *A Fifty-State Survey of Medical Monitoring and the Approach the Minnesota Supreme Court Should Take When Confronted With The Issue*, 32 WM. MITCHELL. L. REV. 1096 (2006). Those jurisdictions that recognize the claim require plaintiffs to plead substantially similar elements:

> (1) exposure at greater than background levels; (2) to a proven hazardous substance; (3) caused by defendant's tortious conduct; (4) as a proximate result of the exposure, plaintiff faces an elevated risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes early detection possible; (6) the monitoring program is different than the program normally prescribed in the absence of exposure; and (7) the monitoring program is reasonably necessary according to contemporary scientific principles.

*See, e.g.*, *Caronia* v. *Philip Morris USA, Inc.*, No. 06-CV-224, 2011 WL 338425, at *7 (E.D.N.Y. Jan. 13, 2011). "Negligence" is an element of the medical monitoring claim, *see Barnes* v. *Am. Tobacco Co.*, 161 F.3d 127, 138 (3d Cir. 1998); *Caronia*, 2011 WL 338425, at *6, and "the primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." *Althaus* v. *Cohen*, 756 A.2d 1166, 1168 (Pa. 2000); *see also Duerson*, 2012 WL 1658353, at *3. The NFL here cites primarily the substantive law of Pennsylvania, the forum, and of New York, where, according to Plaintiffs, "Defendant NFL policies and decision making relevant to its conduct and the risks of latent brain injury alleged herein[] occurred primarily." (MCC ¶ 14.) By citing such law here, however, the NFL does not at this time concede applicability of any particular jurisdiction's laws, on any issue.

determining whether the NFL in fact owed a duty to Plaintiffs, assessing the scope of any such duty, and deciding whether the NFL acted reasonably in discharging any duty would substantially depend upon an interpretation of the health and safety provisions in the CBAs that address the conduct complained of here.

First, regarding the NFL's alleged "duty of reasonable care to keep NFL players informed of neurological risks" (MCC ¶ 77), its alleged failure "to disclose the true risks of repeated traumatic head impacts in NFL football," and failure "to take appropriate steps to prevent and mitigate repeated traumatic head impacts" (*id.* ¶ 13), the CBAs define the Clubs' responsibility for treating player injuries, determining recovery times, making return-to-play decisions, and warning players of the risks of continued performance.

Since 1968, the CBAs have imposed on Clubs the responsibility to provide medical care to NFL players by requiring the Clubs to "provide a physician and an ambulance at each game." (Ex. 12, 1968 NFL and AFL Constitution Art. XIX § 19.5.) The later CBAs further mandate that each Club "have a board-certified orthopedic surgeon as one of its Club physicians," that "[a]ll full-time head trainers . . . be certified by the National Athletic Trainers Association," and that "[a]ll part-time trainers must work under the direct supervision of a certified trainer." (Ex. 5, 1982 CBA Art. XXXI §§ 1-2; Ex. 6, 1993 CBA Art. XLIV §§ 1-2; Ex. 10, 2006 CBA Art. XLIV §§ 1-2.)

Moreover, under the CBAs, "[a]ll determinations of recovery time for . . . injuries must be [made] by the Clubs' medical staff and in accordance with the Club's medical standards" (Ex. 13, 1980 Supp. to NFL Constitution Art. XVII), and in certain instances in which a player's physical condition "could be significantly aggravated by continued performance, the physician will advise the player . . . before the player is again allowed to perform on-field

activity."  (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 6, 1993 CBA Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9 ("[I]f Player is injured . . . and promptly reports such injury to the Club physician . . . then Player will receive such medical . . . care . . . as the Club physician may deem necessary.").)

Accordingly, a determination of whether the NFL failed to exercise reasonable care, which depends first on the assessment of what, if any, duty was owed, cannot be made without first determining the scope of the duties placed on Club medical staff by the CBAs.  For example, if Plaintiffs' alleged medical conditions were ones that "could be significantly aggravated by continued performance," the Clubs' medical staff may have had a duty to warn players before returning to play, which "would be one factor tending to show that the NFL's alleged failure to take action to protect [them] from concussive brain trauma was reasonable." *Duerson*, 2012 WL 1658353, at *4.

Similarly, to assess whether the NFL acted reasonably by not promulgating the return-to-play rules suggested by Plaintiffs (*see, e.g.*, MCC ¶¶ 117, 146), the Court would first need to interpret the scope of the duty imposed by the CBA provisions providing that "[a]ll determinations of recovery time for . . . injuries" are to be made "by the Club's medical staff and in accordance with the Club's medical standards."  *See Maxwell*, No. 11-CV-08394, Order at 1-2 ("The CBA places primary responsibility for identifying . . . physical conditions on the team physicians . . . .  The physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players.").

Provisions requiring that each Club have a board-certified orthopedic surgeon as physician, provisions requiring that the Clubs pay the costs of certain medical care for its

players, and provisions requiring that the Club physician perform a pre-season and in some cases a post-season physical examination could be interpreted "to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could reasonably rely on the clubs to notice and diagnose player health problems arising from playing in the NFL." *Duerson*, 2012 WL 1658353, at *4.

Other provisions that must be interpreted include the certification requirements imposed by the CBAs on the Club medical staff, including that head trainers be certified by the National Athletic Trainers Association and, as discussed above, that "[e]ach Club will have a board-certified orthopedic surgeon as one of its Club physicians." If, as part of these certifications—and attendant education, training, and experience—the Club trainers and surgeons received instruction on the risks of repetitive head impacts, then the degree of care owed by the NFL in warning players about these issues necessarily would be diminished. *See Stringer*, 474 F. Supp. 2d at 910 ("If, by virtue of the certification process, the trainers are fully prepared to handle heat-related illnesses, the degree of care owed by the NFL in publishing the Hot Weather Guidelines is diminished."). Simply put, "the degree of care owed cannot be considered in a vacuum," but "must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players." *Stringer*, 474 F. Supp. 2d at 910-11.

Second, regarding Plaintiffs' allegation that the NFL breached duties relating to rule-making (*see, e.g.*, MCC ¶¶ 77-79), the CBAs establish the "Joint Committee on Player Safety and Welfare," comprised of three Club representatives and three NFLPA representatives, "for the purpose of discussing the player safety and welfare aspects of . . . playing rules." (Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); *see*

19

*also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI.)  The CBAs also mandate that "[i]f the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate, and "request an advisory decision" by an arbitrator regarding the proposed change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c).)

Thus, because the CBAs expressly address responsibility for promulgating, reviewing, and investigating playing rules affecting player health and safety, the provisions of the CBAs first must be interpreted to determine the scope of the duties imposed on the NFL.  For example, to the extent that the NFLPA has certain duties regarding rules affecting player safety—such as those arising out of the establishment of the Joint Committee on Player Safety and Welfare, or relating to the NFLPA's right to investigate rules that would adversely affect player safety—the NFL's own duties may be reduced.

Finally, the CBAs provide NFL players and their union, NFLPA, with certain rights and obligations relating to health and safety issues.  *See, e.g.*, Ex. 9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d) (empowering the "NFLPA . . . to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety"); Ex. 5, 1982 CBA Art. XXXI § 3; Ex. 6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3 ("A player will have the opportunity to obtain a second medical opinion" at Club's expense); Ex. 5, 1982 CBA Art. XXXI § 4; Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 5 (guaranteeing a player's "right to choose the surgeon who will perform surgery" on the player); *see also* Ex. 6, 1993 CBA Art. XLIV § 5; Ex. 10, 2006 CBA Art. XLIV § 5 ("[e]ach player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club

physician," and a "post-season physical examination" shall be conducted at the player's or Club's request). Again, to the extent that these provisions set forth the duties or rights of the Clubs, physicians, the NFLPA, or of the players themselves, an interpretation of the scope of those duties informs the scope of the NFL's own purported duties.

Consistent with settled Supreme Court precedent finding unionized workers' safety grievances preempted, *see, e.g.*, *Hechler*, 481 U.S. at 861-62; *Rawson*, 495 U.S. at 371-72; *see also Sluder* v. *United Mine Workers of Am., Int'l Union*, 892 F.2d 549, 555-56 (7th Cir. 1989), a long line of NFL preemption cases—including *Duerson* and *Maxwell*, as discussed above—have held that resolution of player-injury claims substantially depends on CBA terms addressing player safety and confirms that Plaintiffs' claims are preempted here. Likewise, the court in *Stringer* v. *National Football League*, held that a wrongful death claim against the NFL—premised on the NFL's alleged failure "to establish regulations" to ensure "adequate care and monitoring of players suffering from heat-related illness" and "regulation of . . . return to practice"—was preempted, because "the degree of care owed by the NFL" must "be considered in light of the contractual duties imposed on the team physicians." *Stringer*, 474 F. Supp. 2d at 903-04, 910. Because the "CBA places primary responsibility for identifying [certain] physical conditions on the team physicians," those provisions "must, therefore, be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances." *Id.* at 910-11.

*Duerson*, *Maxwell*, and *Stringer* are all consistent with numerous other decisions holding that NFL player claims against the NFL or its Clubs relating to duties that are imposed by the CBAs are preempted, because they require interpretation of CBA terms. *See, e.g.*, *Givens*, 684 F. Supp. 2d at 990-91 ("The questions raised by the Complaint, such as whether a

physician's failure to advise a player of his medical condition should be imputed to the club or whether the club has a duty independent of the physician to advise a player of his medical condition, are 'inextricably intertwined' with the provisions of the CBA."); *Sherwin*, 752 F. Supp. at 1177-78 (former player's claims that the Club provided negligent medical treatment and fraudulently concealed the extent of the player's injury was preempted because the Club "did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the" CBAs); *Jeffers*, 681 S.E.2d at 412 (former NFL player's claims against Club—that team physician performed unauthorized procedures during knee surgery—was preempted because resolution of the claim was substantially dependent upon an analysis of CBA provisions setting forth the Clubs' and players' rights and duties in connection with medical care); *see also Williams*, 582 F.3d at 881 (negligence claim against the NFL preempted because "whether the NFL . . . owed the Players a duty to provide . . . a warning [that a supplement contained a banned substance under the NFL Drug Policy] cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy"); *Atwater* v. *Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1182 (11th Cir. 2010) (former players' claims preempted because court "would . . . have to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship"); *Smith* v. *Houston Oilers, Inc.*, 87 F.3d 717, 719-21 (5th Cir. 1996) (players' claims for coercion, duress, extortion, and assault and battery preempted); *Holmes*, 939 F. Supp. at 527-28 (player's claims for fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy preempted).

   In sum, the adjudication of Plaintiffs' medical monitoring claim necessarily and substantially depends on an interpretation of the terms of the CBAs because a court cannot

evaluate the purported duties owed by the NFL, the scope of the NFL's purported duties, or whether the NFL acted "reasonably" without first considering the obligations regarding player health and safety imposed by the CBAs.

> **2.  Resolution of Plaintiffs' "Fraudulent Concealment/Negligent Omission" Claim Would Require Interpretation of the Terms of the CBAs**

Plaintiffs' claim for "fraudulent concealment/negligent omission" is preempted as well, as it, too, would require an interpretation of the same CBA provisions.

First, because this claim is founded on the same alleged duty as Plaintiffs' medical monitoring claim, the same analysis applies here.[9]  Plaintiffs thus allege that the NFL had a "duty to take reasonable and prudent action to protect the health and safety of its players in the face of" the risks of repeated traumatic head impacts (MCC ¶ 248), which the NFL purportedly breached by "intentionally or negligently conceal[ing] and misrepresent[ing] material information concerning the increased risks of repeated traumatic head impacts" (*id*. ¶ 251), in the same way that Plaintiffs allege that the NFL "breached . . . duties of reasonable and ordinary care to the Plaintiffs" by "failing to disclose the true risks of repeated traumatic head impacts in NFL football, and failing to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and the latent brain injury" (*id*. ¶¶ 13, 237).  Because a court cannot evaluate the scope of the NFL's purported duties without first considering the obligations regarding player health and safety imposed by the

---

[9]  An essential element of a fraudulent concealment claim is a duty to disclose.  *See Aubrey* v. *Sanders*, No. 07-CV-0137, 2008 WL 4443826, at *5-6 (W.D. Pa. Sept. 26, 2008); *Manti's Transp., Inc.* v. *C.T. Lines, Inc.*, 68 A.D.3d 937, 940 (N.Y. App. Div. 2009).  As "negligent omission" is both negligence-based and concealment-based, the same is true with respect to that claim.

CBAs, resolution of these claims, too, substantially depends upon an interpretation of the terms of the CBAs.

Second, Plaintiffs' "fraudulent concealment/negligent omission" claim requires a showing of justifiable reliance. *See, e.g.*, *Aubrey*, 2008 WL 443826, at *5. A court cannot determine whether Plaintiffs "did reasonably and justifiably rely upon the NFL" (MCC ¶ 252) without interpreting the CBAs' health and safety provisions. *See, e.g.*, *Williams*, 582 F.3d at 881 ("The Players' misrepresentation claims (fraud, constructive fraud, and negligent misrepresentation) are also preempted because the Players cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy.") In adjudicating a fraud claim, courts must consider the "relationship of the parties . . . and the nature of the transaction when determining whether one party's reliance . . . is justifiable." *Tran* v. *Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005) (internal quotations and citations omitted). Numerous provisions, discussed above, delineate that relationship here and thus inform the question of justifiable reliance.

For example, a court cannot determine whether Plaintiffs "did reasonably and justifiably rely upon the NFL" (MCC ¶ 252) regarding "the true risks of repeated traumatic head impacts in NFL football" (*id.* ¶ 13) without first interpreting the CBAs' provisions addressing responsibility for treating player injuries, including decisions regarding "recovery time" for injuries (*see, e.g.*, Ex. 13, 1980 Supp. to NFL Constitution Art. XVII ("All determinations of recovery time for . . . injuries must be by the Club's medical staff and in accordance with the Club's medical standards.")).

Similarly, certain CBAs provide that when a "player's physical condition . . . could be significantly aggravated by continued performance, the physician will advise the player

of such fact in writing before the player is again allowed to perform on-field activity." (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 5, 1982 CBA Art. XXXI § 1.)  A court could reasonably determine that Plaintiffs' purported reliance on the NFL to provide such generic warnings was not reasonable if the parties to the CBA determined that warnings provided by the Club physician were sufficient.  *See, e.g.*, *Williams*, 582 F.3d at 881 (players' fraud claim—that the NFL knew that a supplement contained a banned substance, but failed to warn the players—was "preempted because the Players cannot demonstrate the requisite reasonable reliance . . . without resorting to the CBA," which tasked players with responsibility for knowing the contents of supplements); *see also Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation claim was preempted because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language"); *Sherwin*, 752 F. Supp. at 1178 (fraud claim against Club preempted because "the court cannot resolve plaintiff's fraud and negligent misrepresentation claims without reference to" provisions of the CBA establishing "duty of a club physician, and arguably the club," to inform player of adverse physical conditions).  Similar provisions that may require interpretation to resolve such claims include those establishing the "Joint Committee on Player Safety and Welfare," which includes three NFLPA representatives, "for the purpose of discussing the player safety and welfare aspects of . . . playing rules."  To the extent that the players' representatives were specifically charged with responsibility in the area of player safety, the players' reliance on the NFL in the same area may not be reasonable.

Accordingly, as with Plaintiffs' medical monitoring claim, the adjudication of Plaintiffs' "fraudulent concealment/negligent omission" claim necessarily and substantially depends on an interpretation of the terms of the CBAs, because a court cannot evaluate the

purported duties owed by the NFL, the scope of the NFL's purported duties, whether the NFL acted "reasonably," or whether Plaintiffs "reasonably and justifiably relied upon the NFL" without first considering the obligations regarding player health and safety imposed by the CBAs.

**B.    Plaintiffs' Claims Against the NFL Arise Under the CBAs**

Plaintiffs' claims against the NFL also are preempted by section 301 because they are premised on rights and obligations that arise under the CBAs.  *See Allis-Chalmers*, 471 U.S. at 213 ("state-law rights and obligations that do not exist independently of [collective bargaining] agreements" are preempted); *Antol*, 100 F.3d at 1117 ("[C]laims based squarely on a collective bargaining agreement or requiring analysis of its terms are preempted . . . .")

The CBAs define the relationship among the NFL, its Clubs, and the players. (*See* Ex. 4, 1977 CBA Art. II § 1; Ex.  5, 1982 CBA Art. II § 1; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1; *see also* Ex. 2, 1968 NFL CBA Art I § 2; Ex. 1, 1968 AFL CBA § 16; 1970 CBA Art. II § 4 (CBAs "represent[] a complete and final understanding on all bargainable subjects"); Ex. 2, 1968 NFL CBA Art. III § 1; Ex. 1, 1968 AFL CBA § 2; Ex. 5, 1970 CBA Art. II § 2; Ex. 4, 1977 CBA Art. I § 1; Ex. 5, 1982 CBA Art. II § 1; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1 (incorporating by reference the NFL Constitution).)

As the Class Complaint makes clear, Plaintiffs' claims allege that the NFL purportedly failed "to take appropriate steps to prevent and mitigate repeated traumatic head impacts." (MCC ¶ 13.)  So, for example, Plaintiffs take issue with the NFL's failure to enact rules that would prevent players suffering a concussion from returning to play during the same game or practice. (*See* MCC ¶¶ 117, 146; *see also id.* ¶¶ 77-79.)  The CBAs, however, establish the duties of the NFL and its Clubs to provide medical care to NFL players.  (*See* Ex. 12, 1968

NFL and AFL Constitution Art. XIX § 19.5; Ex. 5, 1982 CBA Art. XXXI §§ 1-2; Ex. 6, 1993 CBA Art. XLIV §§ 1-2; Ex. 10, 2006 CBA Art. XLIV §§ 1-2.)  Similarly, the CBAs establish the duty of the NFL and its Clubs to implement and enforce rules regarding professional football generally, and health and safety-related rules in particular.  Indeed, the CBAs provide that the NFL and its Clubs have the obligation to "amend[] or change[]" all NFL "[p]laying rules."  (*See, e.g.*, Ex. 14, 1984 NFL Constitution Art. XI § 11.2; *see also* Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI (forming the "Joint Committee on Player Safety and Welfare," which is tasked with addressing "the player safety and welfare aspects of . . . playing rules"); Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c) (empowering the NFLPA to investigate potentially hazardous rules).  Thus, the NFL's alleged duty—"to protect NFL players from dangerous circumstances on the field of play"—expressly arises under the CBAs.  (MCC ¶ 79.)

That this purported obligation arises under the CBAs is confirmed by the fact that the duty does not exist independent of the CBAs:  the NFL does not owe duties to promulgate rules regarding player health and safety to "every person in society."  *See Rawson*, 495 U.S. at 371 (holding a state law right arises outside of a CBA where defendant is "accused of acting in a way that might violate the duty of reasonable care owed to every person in society"); *Peek* v. *Phila. Coca-Cola Bottling Co.*, No. 97-3372, 1997 WL 399379, at *6 (E.D. Pa. July 10, 1997) ("[I]t does not appear that plaintiff's negligence and gross negligence claims derive from any general duty of care owed by Coca–Cola to all persons."); *Brown*, 219 F. Supp. 2d at 380 ("To be independent of the CBA, a tort claim must allege a violation of a duty 'owed to every person in society' as opposed to a duty owed only to employees covered by the collective bargaining

27

agreement" (quoting *Rawson*, 495 U.S. at 362)); *Sherwin*, 752 F. Supp. at 1178 (finding fraud claim arose under CBA because "[t]he Colts owed a duty to . . . provide truthful information regarding medical treatment . . . only to their players covered by the standard player agreement and the CBA," not "to every person in society" (quoting *Rawson*, 495 U.S. at 371)); *but see Stringer*, 474 F. Supp. 2d at 908 (suggesting *Brown*'s reading of *Rawson* is "too broad" and holding that plaintiff's claims did not arise under the CBAs).

Accordingly, Plaintiffs' claims—which are premised on alleged duties owed to NFL players only—arise under the CBAs and consequently are preempted by section 301. *See Allis-Chalmers*, 471 U.S. at 213.

## II.

### SECTION 301 PREEMPTS PLAINTIFFS' CLAIMS AGAINST NFLP

Plaintiffs' claims against NFLP are preempted for the same reason that Plaintiffs' claims against the NFL are preempted: their resolution, too, requires interpretation of the CBAs.

Plaintiffs allege no duty owed by NFLP, as opposed to a duty owed by the NFL; nor do Plaintiffs allege any breach of a duty by NFLP, as opposed to a purported breach by the NFL. In fact, there are no factual substantive allegations in the Class Complaint specific to NFLP. Instead, NFLP is conclusorily alleged to be liable along with the NFL. Thus, to adjudicate the claims against NFLP (to the extent they even exist), a court will need first to assess the scope of any alleged duty on the part of NFLP—an assessment that must be measured according to the scope of the preexisting duties in the CBAs. *See supra* Part I.A.[10]

---

[10]   That NFLP is not a signatory to the CBAs "is not dispositive" because the "relevant question for preemption purposes is . . . whether Plaintiffs' state-law claims . . . would require the court to apply or interpret the CBA." *Atwater*, 626 F.3d at 1177-78 (noting that "courts have governed their determinations on . . . preemption by the necessity of referring to a CBA for resolution of the claim rather than by the individual status of the defendant") (internal

                    *              *              *

        In sum, Plaintiffs' claims are preempted under section 301 and should be dismissed.

<u>**Conclusion**</u>

        For the foregoing reasons, the NFL Defendants respectfully submit that section 301 preempts Plaintiffs' claims, and, as a result, the Class Complaint should be dismissed with prejudice.

Dated: August 30, 2012

                              Respectfully submitted,

                              _____/s/ Brad S. Karp_____
                              PAUL, WEISS, RIFKIND, WHARTON &
                              GARRISON LLP
                              Brad S. Karp
                              Theodore V. Wells, Jr.
                              Beth A. Wilkinson
                              Lynn B. Bayard
                              1285 Avenue of the Americas
                              New York, NY 10019-6064
                              Tel:   (212) 373-3000


                              DECHERT LLP
                              Judy L. Leone (Pa. Atty. ID 41165)
                              Robert C. Heim (Pa. Atty. ID 15758)
                              Cira Centre
                              2929 Arch Street
                              Philadelphia, PA  19104-2808
                              Tel:   (215) 994-4000

_____

quotations omitted).  For the reasons set forth above, resolution of Plaintiffs' claims plainly depends upon an interpretation of the terms of the CBAs.

DUANE MORRIS LLP
John J. Soroko (Pa. Atty. ID 25987)
Dana B. Klinges (Pa. Atty. ID 57943)
30 South 17th Street
Philadelphia, PA  19103-4196
Tel:   (215) 979-1000

*Attorneys for the National Football League and
NFL Properties LLC*