(a) Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a club which relocates to a different home city, and before the first regular season game of the subsequent season, takes up permanent residence in the city of the club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b) Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

Section 2. **Moving Expenses:** A player who qualifies for reimbursement pursuant to Section 1 above will receive, immediately upon presentation of vouchers, reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family, provided he has notified his club prior to the move of at least two estimates of the cost of the move and his club approves one of the estimates, in writing, which approval will not be unreasonably withheld.

Section 3. **Travel Expenses:** Effective after the execution of this Agreement, any veteran player who is traded or claimed at any time during the calendar year or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the club to which he is traded or by which he is claimed will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and such payment shall not exceed $1,000; and (c) the room cost of seven days' stay at a hotel of the club's choice in the new team city for the player.

Section 4. **Transportation:** Each player who is traded or claimed during the pre-season or regular season will report to the club to which he is traded or by which he is claimed by the fastest available means of transportation. Any veteran player who is traded or claimed during the pre-season or regular

56

season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

# ARTICLE XXVIII
## POST-SEASON PAY

Section 1. **System:** Beginning with the post-season following the 1982 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be continued throughout the term of this Agreement.

Section 2. **Compensation:** Effective after the execution of this Agreement, a player who qualifies will receive the following amount for each post-season game played:

| | |
|---|---|
| Wild Card Game | $6,000 |
| Division Playoff Game | $10,000 |
| Conference Championship Game | $18,000 |
| Super Bowl Game | $18,000 |
| | (Losing Team) |
| | $36,000 |
| | (Winning Team) |

Section 3. **Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a club at the time of the game in question will be paid the full amount designated in Section 2 for that game.

Section 4. **Conference Championship; Super Bowl Game:**

(a) A player who at the time of the game in question is and has been on the Active List or Inactive List of a club participating in the game for at least three games (i.e. regular or post-season) will receive the full amount designated in Section 2 for such game.

(b) A player who at the time of the game in question is and has been on the Active List or Inactive List of a club participating in the game for less than three games (i.e. regular or post-season) will receive one-fourth the amount designated in Section 2 for such game.

(c) A player who at the time of the game in question is not on the Active List or Inactive List of a club participating in the

57

game but was on the Active or Inactive List for eight or more games (i.e. regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another NFL club at the time of the game in question.

(d) A player who at the time of the game in question is not on the Active List or Inactive List of a club participating in the game, but was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e. regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another NFL club at the time of the game in question.

(e) A veteran player injured during the regular season and removed from the Active List or Inactive List of a club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the club at the time of the game.

(f) A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the club at the time of the game.

(g) A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the club at the time of the game.

Section 5. **Payment:** Players will be paid under this Article within 15 days after the game in question has been played.

# ARTICLE XXIX
## PRO BOWL GAME

Section 1. **Compensation:** Effective after the execution of this Agreement, each player on the winning team in the AFC-NFC Pro Bowl game will receive $10,000 and each player on the losing team will receive $5,000.

Section 2. **Selection:** Pro Bowl game players will be chosen on the basis of two votes per club, one by the coaches and one by the players. The player rep will conduct the balloting of the players in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to insure participation in the game and prompt reporting by players selected.

Section 3. **Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

Section 4. **Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediate following season, the player will be paid by his club the weekly installments of his salary covering the games missed.

Section 5. **Payment:** Players will be paid for the Pro Bowl game within 15 days after the game is played.

# ARTICLE XXX
## RETENTION OF BENEFITS

No financial benefit granted by any club to its players as a group during the life of, but apart from, any previous collective bargaining agreement between the parties may be reduced or eliminated during the term of this Agreement.

# ARTICLE XXXI
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

Section 1. **Club Physician:** Each club will have a board certified orthopedic surgeon as one of its club physicians. The cost of medical services rendered by Club physicians will be the

59

responsibility of the respective clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which could adversely affect the player's performance or health, the physician will also advise the player.

Section 2. **Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

Section 3. **Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

Section 4. **Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult with the club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the club physician, the Club trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

Section 5. **Standard Minimum Pre-Season Physical:** Beginning in 1983, each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix D, which will be conducted by the Club physician. If either the Club or the player requests a post-season physical examination, the Club will provide such an examination and player will cooperate in such examination.

Section 6. **Chemical Dependency Program:** The parties agree that it is the responsibility of everyone in the industry to treat, care for and eliminate chemical dependency problems of

60

players. Accordingly, the parties agree to jointly designate Hazelden Foundation, Center City, Minnesota or its successor if such becomes necessary, to evaluate existing facilities to assure the highest degree of care and treatment and to assure the strictest observance of confidentiality. Any treatment facility which does not meet standards of adequacy will be eliminated and a successor facility in the same metropolitan area chosen solely by Hazelden. Hazelden will be responsible for conducting an ongoing educational program for all players and Club personnel regarding the detection, treatment and after-care of chemically dependent persons. The cost of retaining Hazelden will be paid by the clubs.

Section 7. **Testing:** The club physician may, upon reasonable cause, direct a player to Hazelden for testing for chemical abuse or dependency problems. There will not be any spot checking for chemical abuse or dependency by the club or club physician.

Section 8. **Confidentiality:** All medical bills incurred by any player at a local treatment facility will be processed exclusively through Hazelden which will eliminate all information identifying the patient before forwarding the bills to any insurance carrier for payment. Details concerning treatment any player receives will remain confidential within Hazelden and the local chemical dependency facility. After consultation with Hazelden and the player, the facility will advise the club of the player's treatment and such advice will not in and of itself be the basis for any disciplinary action. No information regarding a player's treatment will be publicly disclosed by Hazelden, the facility or the club.

# ARTICLE XXXII
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

Section 1. **Personnel Records:** Each club will within 7 days after a written request of any player, permit the player to inspect and copy his individual personnel file or any other document which objectively relates to his performance and which in turn relates to any grievance. Each club may, at its discretion, exclude from an individual player's personnel file

coaching and scouting reports, attorney-client privileged material or any other subjective material.

Section 2. **Medical Records:** Player may examine his medical and trainers' records in the possession of the club or club physician two times each year, once during the pre-season and again after the regular season. Player's personal physician may, upon presentation to the club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to the player or any other person.

# ARTICLE XXXIII
## GROUP INSURANCE

Section 1. **Life:** Effective after the execution of this Agreement, group insurance coverage will be increased to $50,000 for a rookie player, and a veteran's player's coverage will be increased by $10,000 for each Credited Season under the Bert Bell NFL Player Retirement Plan to a maximum of $100,000.

Section 2. **Major Medical:** Effective after the execution of this Agreement, the group major medical maximum for a player and his family will be increased to $1,000,000, and, subject to the $25 deductible, 80% of the first $3,000 and 100% of the excess eligible medical expenses for a player will be reimbursed.

Section 3. **Dental:** Effective after the execution of this Agreement, there will be a 75% increase, not to exceed reasonable and customary charges, in the dental benefit schedule; the dental maximum will be increased to $2,000 per year per person subject to the $25 deductible.

Section 4. **Other Benefits:** All other group insurance benefits effective during the 1981 season will be continued in effect during the term of this Agreement.

Section 5. **Carrier:** Following the execution of this Agreement, the parties will jointly shop the group insurance benefits provided for in this Article with insurance carriers, including the current one, and will thereafter jointly select a carrier or

carriers to provide such coverage. In order to qualify to be selected under this Article, a carrier must agree in writing as a part of any bid submitted to the parties that it will provide the coverage provided for in this Article at an average annual cost over the four years from September 1, 1983 to August 31, 1987 of no more than $3.8 million per year. In designing and shopping the insurance benefits the parties will provide insurance coverage for vested veteran players who are released after May 1 for a period ending with the first game of the next subsequent regular season.

## ARTICLE XXXIV
## RETIREMENT PLAN

Section 1. **Maintenance:** The Bert Bell NFL Player Retirement Plan and Trust Agreement (hereinafter referred to as the "Plan" and "Trust") will be continued and maintained in full force and effect during the term of this Agreement.

Section 2. **Contributions:** Contributions under the Plan will be made in the five Plan Years beginning April 1, 1982, and ending March 31, 1987, in accordance with the following schedule:

| Plan Year Beginning April 1 | Contributions Subject to §3 | Contributions Subject to §4 | Total Contributions |
|---|---|---|---|
| 1982 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1983 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1984 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1985 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1986 | $1,160,000 | $11,340,000 | $12,500,000 |

Contributions will be used exclusively to provide the benefits of the Plan and to pay for its investment management and administration costs. Contributions will be paid into the Trust on or before the last day of each Plan Year, provided that such contributions are allowable as deductions under the applicable provisions of the Internal Revenue Code. Any contribution not received by the Trustee on or before the date it is due will bear interest from the due date to the date of receipt by the Trustee at an annual rate of 6% interest. It will be the duty of the

63

Retirement Board to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. Contributions in future years will be as provided in the Collective Bargaining Agreement effective during such years, subject to Section 3 below.

Section 3. **1974 and 1975:** The then-26 clubs guarantee that contributions for the two Plan Years beginning April 1, 1974 and April 1, 1975, respectively, of $5,200,000 and $6,250,000 will be paid at the rate of $515,000 and $645,000, respectively, or a total of $1,160,000 annually, to March 31, 1990, provided that such contributions are allowable as deductions under the applicable provisions of the Internal Revenue Code. Any decrease in the number of NFL clubs after the conclusion of the Plan Year ending March 31, 1983, will decrease the above-stated contributions to the Trust in the ratio that the number of clubs at such time bears to 26.

Section 4. **Number of Clubs:** Any increase or decrease in the number of NFL clubs after the conclusion of the Plan Year ending March 31, 1982, will increase or decrease the contributions to the Trust stated in Section 2 above, less the portions stated in Section 3 above, in the ratio that the number of clubs at such time bears to 28.

Section 5. **Obligations:** The obligations of the clubs hereunder will apply only to the amount of contributions to be made by the clubs to the Plan. The clubs do not guarantee any benefits under the Plan, except as provided under the applicable law. Furthermore, it is agreed that the determination of the sources of revenue that will be used to satisfy the contribution obligation of the clubs will be exclusively within the control of the clubs.

Section 6. **Retirement Board:** The parties agree that it is in the best interests of the Plan and the Plan Beneficiaries that the members of the Board be divorced from the collective bargaining process to the extent possible.

Section 7. **Actuaries:** There shall be co-actuaries to advise the Board, one designated by the NFLPA and the other designated by the Management Council. The interest assumption used under the Plan will be 6% per annum unless otherwise determined by a vote of a majority of voting members of the Board.

Section 8. **Amendments:** Subject to the limitations of ERISA, the Retirement Board will, by a vote of a majority (four) of the voting members, promptly amend the Plan (subject to the restrictions contained in Article 8.5(A)(B)(C) and (E) of the Plan) to provide the following:

(a) Benefits: The Benefit Credit for each Credited Season will be as follows:

| Credited Season | Benefit Credit |
|---|---|
| 1965 and prior | 60 |
| 1966 and 1967 | 65 |
| 1968 and 1969 | 85 |
| 1970 | 110 |
| 1971 | 115 |
| 1972 through 1976 | 120 |
| 1977 through 1981 | 130 |
| 1982 through 1986 | 150 |

(b) Total and Permanent Disability: Effective with the amendment of the Plan, in the event of Total and Permanent Disability, the benefit will be the benefit earned to the date of disability, subject to a minimum of $4,000 per month if the disability results from a football injury incurred while an active player or $750 per month if the disability results from other than a football injury. In addition, $50 per month for each dependent child will be payable during the period of both types of disability.

(c) Widow's and Survivor Benefits: Effective with the amendment of the Plan, in the event of death or remarriage of a widow, present Widow's Benefit payments subject to a minimum of $600 per month will continue to any surviving children until one of the children last reaches age 19 (or, age 23 if in college), or continuously if any child is mentally or physically incapacitated. Players active in the 1982 season and thereafter will be entitled to a minimum Widow's Benefit of $1,500 per month payable for 48 months following the date of death; thereafter, survivor benefits will be payable as stated above.

(d) Line-of-Duty: Effective with the amendment of the Plan, the Line-of-Duty Disability Benefit will be subject to a minimum of $500 per month.

65

(e) Early Retirement Reduction Factor: The early retirement reduction factor currently in use under the Plan may not be increased.

(f) Other Amendments: The Plan will be amended to set up a Medical Advisory Board to make final determinations whether applicants for disability benefits have qualifying disabilities and will be amended to provide that Retirement Board disputes related to interpretation or application of benefit, eligibility and other administrative provisions of the Plan may be submitted to arbitration under Article VII of this Agreement, upon motion approved by at least three (3) Board members.

Section 9. **Conformance:** The Plan and Trust will be amended to conform to the provisions of this Agreement and any requirements of ERISA. All other provisions of the Plan and Trust will remain unchanged, unless duly amended by the Retirement Board.

# ARTICLE XXXV
# TERMINATION PAY

Section 1. **Payment:** Effective after the execution of this Agreement, any player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, and is released from the Active List, Inactive List or Injured Reserve List of his club after the commencement of the regular season schedule, but prior to the Thursday before the eighth regular season game, is entitled to claim and receive, after the end of the regular season schedule, termination pay in an amount equal to the unpaid balance of the initial 50% of his salary, exclusive of deferred compensation, but not less than an amount equal to one week's salary, up to a maximum of $6,000; provided, however, that (a) the player will not be entitled to such termination pay if he has signed a contract with another club for that same season; and (b) a player will not be entitled to such termination pay more than once during his playing career in the NFL.

Section 2. **One Week:** Any player who otherwise qualifies for termination pay under Section 1 above, but is released during the regular season after the time he would be entitled to

the unpaid balance of the initial 50% of his salary, will receive termination pay in an amount equal to one week's salary, up to a maximum of $6,000.

# ARTICLE XXXVI
## WORKER'S COMPENSATION

Section 1. **Benefits:** In any state where Worker's Compensation coverage is not compulsory, a club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his club is located.

Section 2. **Rejection of Coverage:** Nothing herein stated is to be interpreted as preventing a club, which has the legal right to do so, from rejecting coverage under the worker's compensation law of its state. However, if a club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner previously prescribed in Section 1 above. Moreover, any club may be excluded from those laws if it elects to do so. However, such a club will be obligated to guarantee benefits to its players in the same manner previously prescribed in Section 1 above.

Section 3. **Arbitration:** In any state where a club (e.g. Miami Dolphins/Florida) has legally elected not to be covered by the worker's compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article VII of this Agreement.

# ARTICLE XXXVII
## MISCELLANEOUS

Section 1. **Endorsements:** No club may arbitrarily refuse to permit a player to endorse a product.

Section 2. **Appearances:** No club may unreasonably require a player to appear on radio or television.

Section 3. **Promotion:** The NFLPA will use its best efforts to see that the players cooperate with the clubs and the news

media in reasonable promotional activities on behalf of the clubs and the NFL.

Section 4. **Deductions:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any clubhouse personnel or any other club attache is prohibited.

Section 5. **Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by club personnel or players which express criticism of any club, its coach or its operation and policy, or which tend to cast discredit upon a club, a player or any other person involved in the operation of a club, the NFL, the Management Council, or the NFLPA.

Section 6. **Addresses:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists clubs have covering all players who are under contract to the clubs as of October 1 for in-season and January 1 for off-season. The Management Council will not divulge player telephone numbers to the media. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the clubs.

Section 7. **NFLPA Tickets:** Two complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home club of its desire to attend such a game at least three days prior to the date of the game. NFLPA representatives must possess appropriate identification.

Section 8. **Player Tickets:** Two complimentary tickets will be made available to each player for each home game of his club. Each player will be afforded the opportunity to purchase two tickets for each away game of his club from the best tickets available for public sale immediately prior to the public sale for each game. Whatever practice a club had with respect to providing players the opportunity to purchase tickets to the 1982 Super Bowl game will be continued for the duration of this Agreement.

Section 9. **Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an

68

NFL club. A player is entitled to review the results of his psychological or personality tests upon request.

Section 10. **League Security**: A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has reasonable basis for believing that Commissioner discipline might result from the interview.

# ARTICLE XXXVIII
## DURATION OF AGREEMENT

Section 1. **Effective Date**: This Agreement will be effective as of July 16, 1982, except as specifically provided otherwise in this Agreement.

Section 2. **Termination Date**: Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on August 31, 1987, or thereafter by giving 60 days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

Section 3. **Termination**: If the continued operation of Article XIII or XV of this Collective Bargaining Agreement is effectively enjoined by a court of competent jurisdiction, or if any portion of Article III of this Agreement is effectively held invalid by a court of competent jurisdiction, then this Agreement, at the option of either party hereto, may be terminated upon the giving of written notice of termination. It is understood between the parties that, upon such termination, all rights, duties, obligations, and privileges of the parties provided for hereunder will cease to be effective; provided, however, that employment practices and procedures already followed pursuant to this Agreement and benefits already paid pursuant to this Agreement will be accepted as fully effective and agreed to between the parties for the period preceding such termination.

Section 4. **Ratification**: This Agreement is subject to ratification by the NFLPA and the Management Council in ac-

cordance with their internal procedures before it becomes effective. In the event of failure of ratification by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

NATIONAL                              NATIONAL
FOOTBALL                              FOOTBALL
LEAGUE                                LEAGUE
PLAYERS ASSOCIATION     MANAGEMENT COUNCIL


BY EDWARD R. GARVEY          BY J.M. DONLAN

Executive Director                    Executive Director


BY EUGENE UPSHAW              BY CHARLES W. SULLIVAN

President                                 Chairman

# APPENDIX A

# CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fee, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

☐ I direct that the initiation fee and the annual dues be deducted beginning on either the 30th day following the beginning of my employment as a player in the National Football League, or the commencement of the 1977 pre-season training camp, whichever is later.

☐ I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on either the 30th day following the beginning of my employment as a player in the National Football League, or the commencement of the 1977 pre-season training camp, whichever is later.

The foregoing authorized deductions are to be checked-off annually in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 1300 Connecticut Avenue, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and

71

direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each, or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.


Date


Signature


Player's Name—Type or Print


# APPENDIX C

# PROCEDURE FOR THE ENFORCEMENT OF THE UNION SECURITY AGREEMENT BETWEEN THE NFL MANAGEMENT COUNCIL AND THE NFLPA

On this day, December 11, 1982, the Management Council and the NFLPA have entered into a collective bargaining agreement ("Agreement") which includes Article IV containing a union security clause. To the extent permitted by federal and applicable state laws, the parties hereby agree to enforce the union security clause contained in Article IV, Section 1 of the Agreement according to the following procedure:

Upon written notification to the PCRC by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Article IV, Section 1, the PCRC will within seven days consider the matter. If there is no resolution of the matter within seven days, then the club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the club in writing that the suspended player has satisfied his obligation as contained in Article IV, Section 1 of the Agreement. The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

It is further agreed that the term "member in good standing" as used in Article IV of the Agreement applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

It is further agreed that Agreement on Article II relating to Scope of Agreement, Article III relating to No Strike/Lockout/Suit, and Article XXXVII relating to Duration of Agreement notwithstanding that if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of Article IV of the Agreement relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted action may be permitted by law in support of their positions.

# APPENDIX D

# STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1. History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons
2. Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpatation
   - chest
   - heart
   - visceral
     - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e., scars, birthmark
   - height
   - weight
   - temperature
   - blood pressure

—pulse
—heart rate

## Orthopedic Examination

Examination visually, including stress testing and range of motion for all of the following:

—neck and spine
—shoulder
—elbow
—wrist
—fingers
—hips
—knees—also knee jerk
—ankle—check Achilles tendon for abnormalities and by jerk test
—toes

## Flexibility

Testing of hamstrings and neck.

## EKG

Heart Abnormalities.

## Stress Testing (at physician's discretion)

(Treadmill or bicycle) for cardiovascular.

## Blood Testing

Standard grid. Testing for (including but not limited to):

—Chemistry
—Calcium
—Phosphorus
—Glucose
—Uric Acid
—Cholesterol
—Iron
—Triglyceride
—Lipids
—Sodium
—Chlorides
—White Blood Count
—Red Blood Count

75

—Mono-Screen
—Tay Sachs     } Where applicable. If found,
—Sickle Cell   individual counseling necessary.
—V.D.

**Urinalysis**
Check for (including but not limited to):
    —Protein
    —Glucose
    —PH Factor
    —Diabetes
    —Renal Failure
    —Gout

**Vision Testing**
    —peripheral vision
    —standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
    Check for: Tumor
               T.B.
               Lesions

**X-Ray all previously injured areas** (at physician's discretion)

76

# APPENDIX E

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with Article V, Section 1 of our Agreement executed on this date, the reference to "no discrimination" by any party against a player because of "activity or lack of activity on behalf of the NFLPA" is intended to mean that there will be no discrimination against a player for lack of support of the union just as there will be no discrimination for supporting the union, consistent with the National Labor Relations Act; further, the clause is not intended to affect application or enforcement of the *union security* or *check-off* provisions.

Sincerely,

J. M. DONLAN
Executive Director

JMD:db
Accepted:

Edward R. Garvey

# APPENDIX F

December 11, 1982

Mr. J. M. Donlan
Executive Director
NFL MANAGEMENT COUNCIL
681 Fifth Avenue
New York, N.Y. 10022

Dear Jack:

This is to confirm our agreement made in bargaining to undertake a joint study of the career and educational counseling needs of NFL players.

The purpose of the study will be to:
  (1) Evaluate what individual clubs are doing in career and education counseling area;
  (2) Develop accurate statistics concerning the educational levels achieved by NFL players prior to entering the league;
  (3) Determine what career and educational counseling assistance can be developed on a league-wide basis;
  (4) Determine what aspects of career and educational counseling assistance can best be implemented on the local club level.

The study will be completed within a year of the execution of the CBA, and both parties will use best efforts to implement the recommendations and findings which result.

Sincerely,

EDWARD R. GARVEY
Executive Director

Accepted:

J. M. Donlan

78

**APPENDIX G**

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement executed on this date, we have advised the union that we estimate that total player costs, paid or incurred, will reach or exceed $270 million for the 1983 season, $305 million for the 1984 season, $345 million for the 1985 season and $393 million for the 1986 season, or a total of $1.313 billion for the four seasons. We have said we are willing to guarantee total player costs, paid or incurred, of $1.28 billion of the projected $1.313 billion for the four seasons 1983 through 1986.

You asked if we would annualize our guarantee. We responded that we are willing to annualize the guarantee but not at the projected amounts since there will undoubtedly be fluctuations from projected costs year by year. We said we are willing to annually guarantee portions of the projected figures.

This will confirm that, in accordance with specific language to be agreed upon between the parties or determined by the mediator-arbitrator on the subjects set forth below, the Management Council guarantees that the current 28 member clubs of the NFL will pay or incur total player costs of $240 million for the 1983 season, $260 million for the 1984 season, $290 million for the 1985 season and $320 million for the 1986 season, and a total of $1.28 billion for the four seasons. To the extent that total player costs are less than guaranteed player costs for the 1983, 1984, 1985 and 1986 seasons, and for the four seasons in total, the Management Council will pay the differences to NFL players at times and in accordance with a "downs-played" formula to be agreed upon by the Management Council and the NFLPA.

The subjects on which agreement must be reached between the Management Council and the NFLPA or a determination made by the mediator-arbitrator in order to implement the guarantee include, without limitation: (1) a definition of what will be included in "total player costs" paid or incurred by NFL clubs (which will include the same formulations as utilized by Arthur Andersen & Co. in their reports covering each of the NFL seasons 1970 through 1981); (2) the accounting principles and procedures under which total player costs will be computed (which will be consistent with those utilized by Arthur Andersen & Co. in their reports covering each of the NFL seasons 1970 through 1981); (3) the unanticipated material events or occurrences beyond the reasonable control of the League or clubs which adversely impact upon League or club revenues in a manner so as to require an equitable or reasonable adjustment of the guarantees; (4) the amount of reduction in guaranteed player costs which would result from such material events or occurrences; (5) a method of resolution of disputes between the parties as to the operation of Nos. 3 and 4; and (6) the times and formula in accordance with which NFL players will receive any difference between total player costs and guaranteed player costs for the 1983, 1984, 1985 and 1986 seasons, and for the four-year period of 1983 through 1986.

In the event the parties are unable to agree upon these matters by May 1, 1983, their respective last proposals will be submitted to Sam Kagel for mediation-arbitration, along with briefs in support of their respective positions.

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

80

# APPENDIX H

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement signed this date, we have the following understandings:

1. If any member of the NFLPA Executive Committee, Board of Player Representatives or their Alternates is released by a club prior to the end of the 1982 season, he shall nevertheless receive the remainder of his salary for the unplayed games of the season. If his club participates in any play-off games, he will also receive post-season payments. If such a player signs a 1982 contract with another NFL club, whatever payments he receives from that club will be offset against his former club's payment obligations.

2. With respect to the NLRB cases involving Sam McCullum, Herb Orvis and Mike Kadish, we agreed that (a) unless settled by the parties, McCullum's case will proceed through the Board's processes, and (b) Orvis and Kadish will have the option either of receiving $60,000 each in Money Now and $130,000 each in Severance Pay under the new CBA, in which case the NFLPA will withdraw the pending unfair labor practice charges involving the two players, or of not receiving the Money Now and Severance Pay, with the NFLPA continuing to pursue the two charges through the Board processes.

3. As per NLRB Settlement Agreement signed this date, all other pending unfair labor practice charges, at whatever stage,

81

will be withdrawn by the NFLPA, or, if NLRB consent to withdrawal is required, the parties will jointly seek such consent.

Sincerely,

*J. M. Donlan*

J. M. DONLAN
Executive Director


Accepted:

*Ed Garvey*

Edward R. Garvey


# APPENDIX I

December 11, 1982

Mr. Edward R. Garvey
Executive Director
**NFL PLAYERS ASSOCIATION**
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

Upon ratification and execution of our Agreement, it is understood and agreed that the following game format will apply for the remainder of the 1982 regular season and the 1982-83 post-season:

Play will resume with games originally scheduled for the November 21-22 weekend, and continue through the remainder of the original regular season schedule. Players will be paid "game checks."

82

On the weekend of January 2-3, 1983, a "make-up" schedule of games, drawn from games not played because of the strike, will be played by all 28 teams. Players will be paid "game checks."

The top eight teams in each conference, as determined by winning percentage (and tie-breaking procedures, if necessary), will then qualify for the post-season.

On the weekend of January 8-9, four quarter-final playoff games will be played in each conference, with the following pairings:

Top Bracket:                  8 at 1, 5 at 4
Lower Bracket:                7 at 2, 6 at 3

Players will be paid "wild card" game payments under the new CBA.

The four winners in each conference will advance to the semifinal playoffs in each conference the weekend of January 15-16 (two games each day), with the highest seeded teams as the home teams. Players will be paid division playoff game payments under the new CBA.

The two winners in the conference semi-finals will play for the conference championships on Saturday and Sunday, January 22-23, and the two winners will advance to the Super Bowl, Sunday, January 30. Players will be paid the new conference championhip and Super Bowl game payments.

                              Sincerely,

                              J. M. DONLAN
                              Executive Director


ACCEPTED:

Edward R. Garvey

## APPENDIX J

December 11, 1982

Mr. Edward R. Garvey
Executive Director
**NFL PLAYERS ASSOCIATION**
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

RE: <em>NFLPA v. NFL, et al</em>

Dear Ed:

In connection with the Agreement executed today, we have agreed that the above-entitled action will be dismissed in accordance with the following procedure:

(1) The NFLPA and the Defendants will enter into a Stipulation dismissing, with prejudice and without cost, the Complaint, and all claims asserted therein, which is to be "so ordered" by the Court;

(2) All the proposed intervenors have, by praecipe, directed the Court to withdraw the Motion to Intervene, which they shall seek to be "so ordered" by the Court.

We have also agreed that plaintiff NFL clubs and defendant players will enter into stipulations dismissing, with prejudice and without costs, the complaints, and all claims asserted therein, in all state court actions growing out of the NFLPA-sponsored "All-Star" games.

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

84

# APPENDIX K

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement executed this date, this will
confirm our understanding that, with respect to Article X of the
Agreement on Injury Protection, the issues of (1) whether or
not at the time of injury a player must have a contract in
existence covering the season following the season of injury to
qualify for an injury protection benefit; and (2) in accordance
with what schedule a qualifying player must be paid an injury
protection benefit, will be determined for purposes of the
Agreement by Arbitrator Bert Luskin's decisions in the pend-
ing non-injury cases of *John Zook v. St. Louis Cardinals; Levi
Johnson v. Detroit Lions;* and *Bobby Moore v. Chicago Bears
and Tampa Bay Buccaneers.*

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

85

# APPENDIX L

December 11, 1982

Edward R. Garvey
Executive Director
NFL Players Association
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement executed this date, this will confirm our understanding that:

1. Dues/service fees will be checked-off from remaining 1982 game checks and, if the player chooses to sign a new xeroxed form giving his permission, from the "Money Now" bonus. The amount checked-off from "Money Now" may, at the option of the union, be more than the amount checked-off by the Clubs from game checks. The NFLPA will notify the Clubs of the amounts to be checked-off, the salary and/or bonus payment from which they are to be deducted, and the players who have authorized such check-offs to be made. The Clubs will rely on the NFLPA's representation in return for the commitment that the NFLPA will indemnify the NFLMC and the Clubs from any liability as a result of litigation brought by a player regarding check-off payments.

2. Players placed on waivers by Clubs on September 20, 1982, qualify for the "Money Now" bonus.

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

# APPENDIX M

December 11, 1982

Edward R. Garvey
Executive Director
NFL Players Association
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

We are executing this Agreement today based on your representation to us that the intervenors have agreed to the dismissal of the suit before Judge Penn and the withdrawal of their motion to intervene.

Sincerely,

J. M. DONLAN
Executive Director


ACCEPTED:

Edward R. Garvey