nation shall be exhausted in the latter situation. Such additional Compensatory Draft Selections shall not exceed a total of twenty during the term of this Agreement.

**Section 14. Other Terms:** For the purposes of this Article, the Required Tenders of a one year Player Contract for at least 120% of the Franchise Player's or Transition Player's Prior Year Salaries shall in addition to the 120% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (or ten, as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

**Section 15. Compensatory Draft Selection:** The procedures for awarding Compensatory Draft Selections shall be determined as agreed by the NFL and the NFLPA.

**Section 16. Signing Period for Transition Players:**

(a)     In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 15 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time.

(b)     If a Transition Player described in subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c)     If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Salaries for the prior League Year for players at the player's specified position, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such

**67**

tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

***Section 17.* Signing Period for Franchise Players:**

   (a)      If a Franchise Player has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

68

   (b)      If a Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable tender must be made and any 120% tender shall be measured from the Player's prior year salary. If a Franchise Player is not designated as a Franchise Player or Transition Player the second League Year, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

# ARTICLE XXI
# FINAL EIGHT PLAN

*Section 1.* **Application:** The provisions of this Article shall apply only in any League Year during the term of this Agreement in which no Salary Cap is in effect.

*Section 2.* **Top Four Teams:** Each of the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; and (c) any Unrestricted Free Agent signed pursuant to Section 4 below.

*Section 3.* **Next Four Teams:** Each of the four playoff Clubs that lost in the immediately preceding playoff games to the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; (c) any Unrestricted Free Agent signed pursuant to Section 4 below; and (d) any Unrestricted Free Agent as follows:

    (i)     one such player for a Player Contract that has a first year Salary of $1,500,000 or more; and

    (ii)    any number of such players for a Player Contract that has a first year Salary of no more than $1,000,000 and an annual increase in any future contract years of no more than 30% of the first contract year Salary, not including any amount attributed to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

*Section 4.* **Replacement of Free Agents Signed by Other Club:** Each of the eight Clubs subject to the provisions of this Article shall be permitted to negotiate and sign one Unrestricted Free Agent to a Player Contract ("New Player") for each Unrestricted Free Agent who was under contract to such Club on the last date of the prior League Year, who has signed with another Club ("Previous Player"), so long as the Player Contract for the New Player shall have a first year Salary of no more than the first year Salary of the Player Contract signed by the Previous Player with the New Club,

**69**

and an annual increase in any future contract years of no more than 30% of the first contract year Salary, excluding any amounts attributable to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this section may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 5. Increases:** The amounts specified in this Article ($1,500,000 and $1,000,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)). Notwithstanding the foregoing, in no event shall the amounts specified in this Article increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

**Section 6. Salary Definition**: For purposes of this Article, "Salary" means Paragraph 5 Salary, roster and reporting bonuses, prorata portions of signing bonuses, likely to be earned incentive bonuses, and other payments in compensation for the playing of professional football, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) below.

70

**Section 7. Trade Limitation:** No Club subject to the provisions of this Article may, for one League Year, trade for a player it otherwise would not be permitted to sign as an Unrestricted Free Agent as a result of the provisions in this Article.

# ARTICLE XXII
# WAIVER SYSTEM

*Section 1.* **Release**:

(a)    Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.

71

(b)    Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

*Section 2.* **Contact**: Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

*Section 3.* **Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or post-season game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and By-laws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

*Section 4.* **Notice of Termination**: The Notice of Termination form attached hereto as Appendix G will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice of Termination will

be sent to him by certified mail at his last address on file with the Club.

**Section 5. NFLPA's Right to Personnel Information:** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice between the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

**Section 6. Rosters:** The NFLMC shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

72

# ARTICLE XXIII
# TERMINATION PAY

*Section 1.* **Eligibility**: Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for termination pay under this Article if:

(1)   he is released after his Club's first regular season game; and

(2)   he has made the Inactive or Active List of his Club on or after the date of his Club's first regular season game.

The amount of termination pay payable to such player if he is released prior to the eighth regular season game shall be the unpaid balance of the initial 50% of his Paragraph 5 Salary, but not less than an amount equal to one week's salary, up to a maximum of $20,000. If he is released after such point but before 4:00 p.m. New York time on the Tuesday prior to the final regular season game, the amount shall be one week's salary, up to a maximum of $20,000. Termination pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to termination pay more than once during his playing career in the NFL.

*Section 2.* **Regular Season Signings**: The termination pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the unpaid balance of the initial 25% of such player's Paragraph 5 Salary. If such player is released after the eighth regular season game, his termination pay shall be one week's salary, up to a maximum of $20,000.

73

## ARTICLE XXIV
## GUARANTEED LEAGUE-WIDE SALARY,
## SALARY CAP & MINIMUM TEAM SALARY

*Section 1.* **Definitions:** For purposes of this Article, and anywhere else specifically stated in this Agreement, the following terms shall have the meanings set forth below:

(a)    **Defined Gross Revenues.**

(i)    "Defined Gross Revenues" (also referred to as "DGR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Defined Gross Revenues for each playing season during the term of this Agreement. Defined Gross Revenues shall include, without limitation:

(1)    regular season, pre-season, and post-season gate receipts (net of admission taxes, and surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing), including ticket revenue from "luxury boxes," suites and premium seating subject to gate receipt sharing among NFL Teams; and

(2)    proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL pre-season, regular season and play-off games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts (which shall not include any broadcast of an NFL pre-season, regular season or play-off game occurring more than 72 hours after the live exhibition of the game, unless the broadcast is the first broadcast in the market), and all other means of distribution, net of any reasonable and customary NFL expenses related to the project; and

(3)    proceeds from the sale or conveyance of any right to receive any of the revenues described above.

(ii)    The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Teams which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "DGR"): proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, dues or capital contributions received by the NFL, fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries, and sales of interests in real estate and other property.

(iii)    Notwithstanding subsection 1(a)(i) above, the following shall be

considered "Excluded DGR" and not included in Defined Gross Revenues: revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that included in subsection 1(a)(i)(1) above, sales of programs and novelties, and any categories of revenue (other than those listed in subsections 1(a)(i)(1)-(3) above) currently included under NFL Films and NFL Properties, Inc. and its subsidiaries.

(iv)     In calculating Defined Gross Revenues, the amount of Excluded DGR divided by the sum of Excluded DGR plus DGR from all sources except network television revenues shall not exceed the percentage resulting from dividing 1992 Excluded DGR by the sum of 1992 Excluded DGR plus 1992 DGR from all sources except network television revenues. In the event Excluded DGR for any season exceeds the percentage resulting from the above calculation, any excess Excluded DGR shall be included in DGR. For purposes of the calculations described in this subsection (iv), Excluded DGR shall not include any revenues referred to in subsection 1(a)(ii).

(v)     Notwithstanding the provisions of subsection 1(a)(i)(2) above, for the purposes of calculating Defined Gross Revenues for the 1993 League Year only, revenues derived from national network television shall be deemed to be $35 million per NFL Team. Any actual amounts received in excess of that amount shall be included pro rata in DGR for the 1994 and 1995 seasons.

(vi)     It is acknowledged by the parties hereto that for purposes of determining Defined Gross Revenues:

(1)     NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in Defined Gross Revenues) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in Defined Gross Revenues), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a); and

(2)     NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities").

(vii)     The reasonableness and includability in DGR of such allocations and transactions between Related Entities shall be determined by the nationally recognized accounting firm jointly retained by the parties, in accordance with the procedures described in Section 10 below.

(viii)     For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries,

75

Team Salary, or Salary, such amounts shall be rounded to the nearest $1,000.

(ix)     In calculating Defined Gross Revenues, each League Year up to $5 million per year shall be deducted from DGR to the extent that such sums are received that League Year by the NFLPA pursuant to Paragraphs 5, 12, 29 and 30 of the Stipulation and Settlement Agreement in NFLPA v. NFL Properties, Inc., No. 90-CV-4244 (MJL) (S.D.N.Y.).

(b)     **Benefits.**

"Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to or on behalf of present or former NFL players, but only for:

(i)     pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

(ii)     Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(iii)     injury protection (as described in Article XII);

(iv)     workers' compensation, payroll, unemployment compensation, and social security taxes;

(v)     pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(vi)     moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(vii)     post-season pay (as described in Article XLII and Article XLIII);

(viii)     player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year); and

(ix)     severance pay (as described in Article L).

Benefits will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII. Benefits also will not include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan,

76

and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

(c)    **Salary.**

(i)    "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

(ii)    A player's Salary shall also include any and all consideration received by the player or his Player Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the Impartial Arbitrator that the consideration paid to the player or Player Affiliate for such non-football services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar non-football playing services from an independent third party; and (2) the percentage of total compensation for non-football services received from third parties versus the Team or Team Affiliate.

(iii)    For purposes of this Article, Salary shall be computed pursuant to the additional rules below.

*Section 2.* **Trigger For Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary:** There shall be no Guaranteed League-wide Salary, Salary Cap, or Minimum Team Salary for NFL Teams during the 1993 League Year. If in the 1993 League Year or any subsequent League Year the total Player Costs for all NFL Teams equals or exceeds 67% of actual Defined Gross Revenues, there shall be a Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary in the amounts set forth below for the next League Year and all subsequent League Years, unless the Salary Cap is removed pursuant to Section 4(b)(ii)(4) below. Notwithstanding the immediately preceding sentence, there will be no Guaranteed League-wide Salary, Salary Cap or Minimum Team Salary for the 1999 League Year.

*Section 3.* **Guaranteed League-wide Salary:** In any League Year in which

77

a Salary Cap is in effect there shall be a Guaranteed League-wide Salary of 58% of actual Defined Gross Revenues. In the event that the Player Costs for all NFL Teams during any League Year in which a Salary Cap is in effect are less than 58% of actual Defined Gross Revenues for such season, then, on or before April 15 of the next League Year, the NFL shall pay an amount equal to such deficiency directly to players who played on NFL Teams during such season pursuant to the reasonable allocation instructions of the NFLPA.

**Section 4. Salary Cap Amounts:**

(a)     Subject to the adjustments set forth below, the amount of the Salary Cap for each NFL Team in years that it is in effect shall be (1) in the first League Year, 64% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (2) in the second League Year, 63% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; and (3) in the remaining League Years until 1999, or until the Cap is removed pursuant to subsection (b)(ii)(4) below, 62% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year.

78

(b)     The foregoing Salary Cap amounts shall be adjusted as follows:

(i)     The actual dollar amount of the Salary Cap shall not be less than the actual dollar amount of any Salary Cap in effect during the preceding League Year; provided, however, that at no time shall the Projected Benefits, plus the amount of the Salary Cap multiplied by the number of Teams in the NFL, exceed 70% of the Projected Defined Gross Revenues.

(ii)     If the total Player Costs of the NFL Teams during any League Year in which the Salary Cap is in effect falls below:

(1)     59% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 1% of Projected Defined Gross Revenues;

(2)     58% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 2% of Projected Defined Gross Revenues;

(3)     57% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 3% of Projected Defined Gross Revenues;

(4)     56% of actual Defined Gross Revenues, then there shall be no Salary Cap for the next League Year or any succeeding League Year unless and until the Salary Cap again becomes effective in accordance with Section 2 of this Article.

***Section 5*. Minimum Team Salary:**

(a)      With respect to each League Year for which a Salary Cap is in effect, there shall be a guaranteed Minimum Team Salary for each Team of 50% of Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the then current number of teams in the NFL. Each Team shall be required to have a Team Salary of at least the Minimum Team Salary at the end of each League Year.

(b)      Nothing contained herein shall preclude a Team from having a Team Salary in excess of the Minimum Team Salary, provided it does not exceed the Salary Cap.

(c)      Any shortfall in the Minimum Team Salary at the end of a League Year shall be paid, on or before April 15 of the next League Year, by the Teams having such shortfall, directly to the players who were on such Teams' roster at any time during the season, pursuant to reasonable allocation instructions of the NFLPA.

(d)      If the NFL agrees, or a judgment or award is entered by the Special Master, that a Team has failed by the end of the then current League Year to make the payments required to satisfy a Team's obligations to pay the Minimum Team Salary required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocation instructions of the NFLPA).

79

***Section 6*. Computation of Team Salary:** During any League Year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary:

(a)      **Player Contracts.** Subject to the rules below in Section 7 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised options, shall be included in Team Salary.

(b)      **Tenders.** (i) Drafted Rookies' Salaries shall be tendered automatically at the Rookie Minimum Active List Salary as of the day of the Draft and shall be included in Team Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Tuesday following the tenth week of the regular season (if the player is unsigned).

(ii)      For players with less than three Accrued Seasons whose contracts have expired, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished.

(iii)      For players who are Restricted Free Agents, the Qualifying Offer

will be included in Team Salary when tendered until the player is signed, the Qualifying Offer is withdrawn, or a "June 1 tender" (which may be made on or before June 1) is made. If the player is unsigned and the Team makes a June 1 tender or June 15 tender, such tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(iv)     For players who are Unrestricted Free Agents, the June 1 tender, if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(v)     For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi)     All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c)     **Practice Squad Contracts.** Any Practice Squad contract Salaries shall be included in Team Salary.

80

(d)     **Termination Pay.** Any type of Termination Pay liability will be included in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e)     **Grievances.** When a player salary grievance is filed against a Team, 50% of the amount claimed will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first; at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Team are more than the original 50% attributions and put the Team over the Salary Cap, the excess will be deducted from the Team's Salary Cap in the following League Year; if the net total grievance amounts paid are less than the original 50% attributions and the Team finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Team's Salary Cap for the following League Year. If an award or settlement is made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 50% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 50% attribution, the difference shall be deducted from Team Salary when the award is made.

(f)     **Expansion Bonuses.** Except as set forth in Article XXXI (Expan-

sion), any expansion bonuses paid to players shall be included in Team Salary.

(g) **Other Amounts**. Any other Salary not listed above paid to players shall be included in Team Salary.

***Section 7.*** **Valuation of Player Contracts**: Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap:

(a) **Paragraph 5.**

(i) The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between March 1 and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 7):

(1) Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2) Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii) **Deferred Salary.** Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be considered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the Treasury Bill rate published in The Wall Street Journal on March 1 in the year earned. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

(b) **Signing Bonuses.**

(i) **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract in determining Team and Player Salary, except that:

(1) Signing bonuses in contracts negotiated in a Capped Year may not be prorated more than three years beyond 1998;

(2) Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control, such issue shall be resolved by the Impartial Arbitrator.

(3) If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

81

(ii)     **Acceleration.**

(1)     For any player removed from the Team's roster on or before June 1, any unamortized signing bonus amounts will be included in Team Salary for such League Year. If such acceleration puts a Team over the Salary Cap, the Team will have seven days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)     For any player removed from the Team's roster after June 1, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

(3)     In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, then such signing bonus shall be accelerated as in subsection (ii)(1) above and the assignee Team's Team Salary will not include any portion of the signing bonus.

(4)     Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary. To the extent that such acceleration puts the Team over its Salary Cap, the difference shall be deducted from its Salary Cap for the following year.

82      (5)     The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)     **Prior Signing Bonuses.** All signing bonuses from League Years prior to 1993 will be prorated over the term of the original Player Contracts and included in Team Salary in the 1993 League Year and thereafter.

(iv)     **Amounts Treated as Signing Bonuses.** For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)     Any amount specifically described in a Player Contract as a signing bonus;

(2)     Any guaranteed reporting bonus;

(3)     Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)     Any option buyout amount, when paid or guaranteed; and

(5)     In the event that a Player Contract calls for a Salary in the second year of such Contract that is less than half the Salary called for in the first year of such Contract, the difference between the Salary in the second contract year and the first contract year shall be treated as a signing bonus.

(v)     **Credit for Signing Bonuses Refunded.** In the event that a Team receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a

signing bonus, such amount as has previously been included in Team Salary shall be added to the Team's Salary Cap for the next League Year.

(c) **Incentives.**

(i)     Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

(ii)     At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

(iii)     At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equalling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

(d) **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)     In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the 1998 League Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, **if** payment of the player's entire Salary for the 1998 League Year is not fully guaranteed. For example, if the Salary Cap is in effect during the 1997 and 1998 League Years, and the player enters a series of four one-year contracts which are not fully guaranteed for the 1997 and 1998 League Years, but are fully guaranteed for the 1999 and 2000 League Years, the full amount of the guaranteed Salary for the 1999 and 2000 League Years will be included in Team Salary for the 1997 and 1998 League Years in a proportion determined by the Team.

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond the 2001 League Year will be included in Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

83

(iii)    Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the Treasury Bill rate published in The Wall Street Journal of March 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Section 7(b)(ii)(1) above, shall apply.

(iv)    If any Player Contract entered into in a Capped Year provides for yearly Salary in a sequence that, in the 1998 League Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

(e)    **Other Amounts**.

(i)    **Loans**. The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

84

(ii)    **Salary Advances**. The full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

(iii)    **Non-Cash Provisions**. The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

(iv)    **Annuities**. The cost to the Team of any annuity provided to any player, computed at the Treasury Bill rate on March 1 of the applicable League Year, shall be included immediately in Team Salary.

(f)    **Traded Contracts**. In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

(g)    **Mid-Season Contracts**. In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

***Section 8. 30% Rules***:

    (a)    No NFL Player Contract entered into in an Uncapped Year prior to the 1999 League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the Contract per year. For example, a four-year Player Contract commencing in the 1993 League Year may not provide for an annual decrease of more than 30% of the Salary, excluding amounts treated as a signing bonus, in the 1993 League Year for each of the four years covered by the Contract.

    (b)    No NFL Player Contract entered into in a Capped Year and extending into the 1999 League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the 1998 League Year, per year, either in the 1999 League Year or in any subsequent League Year covered by the Player Contract. For example, a four-year Player Contract signed in the 1998 League Year (assuming it is a Capped Year) may not provide for an annual increase of more than 30% of the 1998 League Year Salary, excluding amounts treated as a signing bonus, in each of the three additional League Years covered by the Contract.

**85**

***Section 9. Renegotiations and Extensions***: Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

    (a)    The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

    (b)    No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

    (c)    No contract renegotiations may be done for a current season after the last regular season game of that season.

    (d)    A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(f).

    (e)    As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

***Section 10. Accounting Procedures***:

    (a)    **Special Purpose Letter and DGR Reporting.**

    (i)    On or before the February 7 following the conclusion of each of

the years hereunder, the parties will be provided with an "Initial Special Purpose Letter" by the NFL, gathered from independent Team auditors, preliminarily setting forth the Defined Gross Revenues and Excluded DGR of each NFL Team and the NFL for the League Year just concluded, for the purpose of determining the extent to which Required Tenders and Qualifying Offers must be increased the next League Year.

(ii)   On or before the March 1 following the conclusion of each of the years hereunder, the parties will be provided with a "Final Special Purpose Letter," by an independent auditor certifying the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each NFL Team and the NFL for the League Year just concluded. The independent auditor (hereinafter the "Accountants") shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The review procedures to be performed by the Accountants are set forth in Appendix H attached hereto. The Reporting Package to be used by the Teams in providing information to the Accountants ("DGR Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The engagement of the Auditor shall be deemed to be renewed annually unless the Auditor is discharged by either party during the period from the submission of the Final Special Purpose Letter up to July 1 of that year.

86

(iii)   The Accountants shall review the reasonableness of any estimates of revenues or expenses included in any Member Team's DGR Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made in DGR for the following League Year.

(iv)   With respect to expenses deducted by the NFL or the Member Teams from television, cable and radio broadcast revenues or any other revenues, the NFL and the Member Teams shall report in the DGR Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i). All categories of expenses deducted from such revenues by the NFL or a Member Team in a DGR Report completed by the NFL or that Team shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

(v)   As set forth in Appendix H attached hereto, the Accountants shall notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Member Teams or any other information contained in the DGR Reports submitted by the Member Teams; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other information contained in the DGR Reports submitted by the Member Teams.

(vi)   In the event of any dispute concerning the amounts (as opposed

to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the DGR Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of subsection (iv), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(vii)    Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Member Teams are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Member Teams are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Member Teams adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a DGR Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(viii)    After receiving the Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Teams to further verify the accuracy of the information in the Final Special Purpose Letter.

(b)    **Projected Defined Gross Revenues**.

(i)    For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4 and 5 above, and for any other purpose specifically stated in this Agreement, Defined Gross Revenues shall be projected ("Projected Defined Gross Revenues") to be the Defined Gross Revenues for the immediately preceding League Year increased by 4% (or the previous year's increase, whichever is greater) for gate receipt revenues, and 6% (or the previous

87

year's increase, whichever is greater) for other DGR except for League-wide
television revenues; provided, however, that if on March 1 of the year, one
or more League-wide television or local television and radio contracts are in
effect for the next League Year in lieu of using the prior year's DGR for such
source, the actual revenues expected from such source under such contract
(plus in the 1994 and 1995 League Years, the additional amounts allocat-
ed from the 1993 League Year DGR pursuant to Section 1(a)(v) above) shall
be used in the determination of Projected Defined Gross Revenues. If, after
the initial calculation of Projected DGR for a League Year, a new League-
wide television contract is entered into for that League Year, such amounts
(plus any adjustment pursuant to Section 1(a)(v) above) shall be substitut-
ed for the amount for League-wide television revenues previously included
in Projected DGR, and the Salary Cap and Minimum Team Salary shall im-
mediately be adjusted accordingly. In addition, if one or more new NFL
Teams is (or are) scheduled to be added to the NFL during the next League
Year as an expansion Team(s), Projected DGR will include an additional pro-
jection of DGR (excluding DGR from national, network or cable television
contracts) equal to the average of the top twenty-one Teams from the prior
League Year with the highest DGR. In addition, if, after the initial calcula-
tion of Projected DGR for a League Year, the number of scheduled regular
season games per team is increased above the standard of sixteen (16), Pro-
jected DGR will include an additional projection of DGR to account for
such additional games as agreed upon by the NFLPA and the Management
Council.

 (ii) In the event that actual Defined Gross Revenues for any League
Year are less than Projected Defined Gross Revenues (as calculated in ac-
cordance with Section 10(b)(i) above) for that League Year, then the differ-
ence shall be deducted from Projected Defined Gross Revenues for the next
League Year.

 (iii) In the event that actual Defined Gross Revenues for any League
Year exceeded Projected Defined Gross Revenues (as calculated in accor-
dance with Section 10(b)(i) above) for that League Year, then the amount
of such deficiency shall be added to Projected Defined Gross Revenues for
the next League Year.

 (iv) Any adjustments pursuant to Section 10(a)(ii) above will be sub-
tracted from or added to Projected DGR as appropriate.

 (c) **Projected Benefits.**

 (i) For purposes of computing the Salary Cap and Minimum Team
Salary to be applied in any upcoming League Year in accordance with Sec-
tions 4 and 5 above, and for any other purpose specifically stated in this
Agreement, Benefits shall be projected ("Projected Benefits") to be any Ben-
efits to be paid (or properly accrued) in the upcoming League Year pursuant
to this Agreement. If the amounts to be paid for any Benefit during the next
League Year are not reasonably calculable, then, for the purposes of calcu-

lating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii)     In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year.

(iii)    In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year.

(iv)    In the event the NFLPA exercises its right to reduce or freeze certain Benefits pursuant to Article XLVI (Player Benefit Costs), Section 1, Projected Benefits shall be adjusted immediately to reflect such changes.

(v)    In the event the amount of Projected Benefits is adjusted pursuant to (1) subsection (c)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

**89**

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY CAP AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** At the time a Club and a player enter into any Player Contract, or any renegotiation, extension or amendment of a Player Contract, there shall be no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, between such player and any Club involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Defined Gross Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

90

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Contracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

***Section 5***. **Special Master Review**: In the event that the Commissioner dis-approves a Player Contract pursuant to Section 4 above, the NFLPA, any af-fected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding be-fore the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Mas-ter shall review the dispute <u>de novo</u>, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disap-proval is upheld, the player and the Club shall have ten (10) days to at-tempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

***Section 6***. **Sanctions**: In the event that the Special Master finds a violation of this Section 1 of this Article, the Commissioner shall be authorized to impose a fine of up to $2,000,000 payable to the NFL, upon any Club found to have committed such violation, and shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

**91**

***Section 7***. **Prior Conference**: Prior to the initiation of a proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.