agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 5. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 6. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

117

**Section 7. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 8. Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 9. Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by

Rookie and Veteran players after the date of execution of this Agreement covering the 1993 and future League Years will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

*Section 10.* **Split Contracts:**

    (a)    After the point in the regular season at which a player who signed his Player Contract prior to the 1993 League Year has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

    (b)    After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent and during the 1993 League Year or thereafter has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

*Section 11.* **Funding of Deferred and Guaranteed Contracts:** The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury Bill rate as published in The Wall Street Journal on March 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

# ARTICLE XXXIX
## MEAL ALLOWANCE

***Section 1*. Reimbursement**: A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and post-season as follows: 1993-94 League Years—Breakfast $12.00, Lunch $15.00, Dinner $33.00; 1995-96 League Years—Breakfast $13.00, Lunch $17.00, Dinner $35.00; 1997-99 League Years—Breakfast $14.00, Lunch $19.00, Dinner $37.00. For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

***Section 2*. Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

119

# ARTICLE XL
# DAYS OFF

*Section 1*. **Rate**: All players will be permitted days off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2*. **Requirements**: During the 24-hour period constituting a day off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

120

# ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification**: A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses**: As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses**: Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent

121

that the player is legally obligated to such rent and each such payment shall not exceed $4,000 during the 1993-95 League Years, and $4,750 during the 1996-98 League Years; and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*Section 4.* **Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

122

# ARTICLE XLII
# POST-SEASON PAY

**Section 1. System**: Beginning with the post-season following the 1993 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation**: A player who qualifies will receive the following amount for each post-season game played:

|                                    | (years) | 93 | 94 | 95 | 96 | 97 | 98 | 99 |
|------------------------------------|---------|------|------|------|----|------|------|----|
| Wild Card Game (Div. Winner)       |         | $ 12 | 12 | 13 | 14 | 15 | 15 | 16 |
| (Other)                            |         | 7.5 | 7.5 | 7.5 | 10 | 10 | 10 | 10 |
| Division Playoff Game              |         | 12 | 12 | 13 | 14 | 15 | 15 | 16 |
| Conference Championship Game       |         | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 |
| Super Bowl Game (Winning Team)     |         | 38 | 42 | 42 | 48 | 48 | 53 | 58 |
| (Losing Team)                      |         | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 |
|                                    |         |    |    |    |    |    | (in thousands) | |

**Section 3. Wild Card Game; Division Play-off Game**: A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**123**

**Section 4. Conference Championship; Super Bowl Game**:

(a)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game.

(b)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or post-season) will receive one-half the amount designated in Section 2 for such game.

(c)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was

on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)    A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)    A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)    A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/ Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5.** **Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

124

# ARTICLE XLIII
# PRO BOWL GAME

**Section 1. Compensation:** Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $20,000 and each player on the losing Team will receive $10,000. These amounts shall be increased to $25,000 and $12,500 respectively for the Pro Bowls following the 1997 through 1999 seasons.

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

125

# ARTICLE XLIV
# PLAYERS' RIGHTS TO MEDICAL CARE
# AND TREATMENT

*Section 1.* **Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

*Section 2.* **Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

*Section 3.* **Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

126

*Section 4.* **Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 5.* **Standard Minimum Pre-Season Physical**: Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

*Section 6.* **Substance Abuse:**

(a)    **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)    **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)    **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

127

# ARTICLE XLV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal **128** physician to any other person.

# ARTICLE XLVI
## PLAYER BENEFIT COSTS

*Section 1.* **Right of Reduction**: The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) post-season pay (although the NFLPA will have the unilateral right to direct that post-season pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

*Section 2.* **Right of Restoration**: Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**129**

*Section 3.* **Definition**: For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)      pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

(b)      group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)      injury protection (as described in Article XII);

(d)      workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)      pre-season per diem amounts (as described in Sections 3 and 4

of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)      moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)      post-season pay (as described in Article XLII and Article XLIII);

(h)      player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year); and

(i)      severance pay (as described in Article L).

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article 130 XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, and the Supplemental Disability Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

**Section 4. Resolution of Disputes**: In the event the NFLPA and the Management Council are unable to agree by March 7 as to projected Player Benefit Costs for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)      The parties will submit in writing to the Benefit Arbitrator their

respective calculations of projected Player Benefit Costs for the forthcoming year. Such submissions to the Benefits Arbitrator will be made by each party by March 15.

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**131**

# ARTICLE XLVII
## RETIREMENT PLAN

*Section 1*. **Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan"), formed pursuant to Section 5 of this Article, will be continued and maintained in full force and effect during the term of this Agreement. Prior to such merger, the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan") and the Pete Rozelle NFL Player Retirement Plan (the "Pete Rozelle Plan") will each be continued and maintained in full force and effect. When used in other Articles in this Agreement, the terms "Bert Bell/Pete Rozelle Plan" and "Merged Plan" will also refer to each of the Bert Bell Plan and the Pete Rozelle Plan for the periods prior to such merger, as appropriate depending on the context in which such term is used.

*Section 2*. **Amendment by Bargaining Parties:** Promptly following the ratification of this Agreement, the parties will instruct the Members of the Retirement Board of the Bert Bell Plan and of the Retirement Committee of the Pete Rozelle Plan to amend the Bert Bell Plan and the Pete Rozelle Plan to allow the parties, when acting jointly, to directly amend the Bert Bell Plan and the Pete Rozelle Plan to (1) change the vesting schedule, (2) increase and revise benefits, (3) impose and remove limits on maximum benefits, (4) expand coverage (including but not limited to merger with other qualified plans), and (5) provide that, during the term of this Agreement, the Members of the Retirement Board of the Bert Bell Plan and the Members of the Retirement Committee of the Pete Rozelle Plan cannot increase benefits. These provisions will be continued in the Merged Plan.

**132**

*Section 3*. **Contributions:** For each of the seven Plan Years beginning April 1, 1993 and ending March 31, 2000, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year, except that a $1 million contribution for the 1993 Plan Year will be made to the Bert Bell Plan on or before twenty (20) business days following ratification of this Agreement. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after April 1, 2000 will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the

Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Amendment of Bert Bell and Pete Rozelle Plans:** Promptly following the amendment to the Bert Bell Plan and the Pete Rozelle Plan described in Section 2 above, the parties will jointly make the amendments in subsections (A) through (D) below.

(A)    Faster Vesting: Both the Bert Bell Plan and the Pete Rozelle Plan will be amended such that each participant who has three or more Credited Seasons and who has at least one Credited Season in the 1993 Plan Year or in a later Plan Year will be fully vested in his accrued benefit.

(B)    Benefits for Future Seasons: The Bert Bell Plan will be amended to provide the following Benefit Credits for Credited Seasons after 1992:

| Credited Season | Benefit Credit |
|-----------------|----------------|
| 1993 | $220 |
| 1994 | $220 |
| 1995 | $260 |
| 1996 | $260 |
| 1997 | $300 |
| 1998 | $300 |
| 1999 | $300 |

**133**

(C)    New and Revised Disability Benefits: The Bert Bell Plan will be further amended as follows:

(1)    Plan Section 5.1 will be deleted and replaced with language substantially equivalent to the following:

"Any Player or Vested Inactive Player, other than a Retired Player or a Player who has reached his Normal Retirement Date, who is determined by the Retirement Board upon written application to be totally and permanently disabled, as defined below, will be entitled to receive a monthly pension commencing after the expiration of a six (6) month waiting period measured from the date of such disability in an amount equal to 100% of the Benefit Credits of the Player at the date such disability occurs, including, if applicable, the scheduled Benefit Credit as provided in Section 4.1 for the Plan Year in which the disability occurs. This benefit may be increased as provided below.  All benefits provided by this Article will be retroactive to the date of disability and will be payable for life or until cessation of the total and permanent disability."

"(A) (Active Football). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) results from League foot-

ball activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled shortly after the disability(ies) first arises."

"(B) (Active Nonfootball). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) does not result from League football activities, but does arise while the Player is an Active Player and does cause the Player to be totally and permanently disabled shortly after the disability(ies) first arises."

"(C) (Football Degenerative). Effective April 1, 1993, the monthly pension shall be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (a) age 45, or (b) 12 years after the end of the Player's last Credited Season."

"(D) (Inactive Nonfootball). Effective April 1, 1993, the monthly pension shall be no less than $1,500 if the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player. The minimum benefits provided under this subsection (D) will be offset by any disability benefits provided by an employer other than the NFL or NFL Clubs, but will not be offset by worker's compensation."

"(E) (Dependent Child). Effective April 1, 1993, $100 per month for each dependent child will be payable during the period of total and permanent disability; provided, however, that notwithstanding anything in this Article 5 to the contrary, the additional benefit of $100 per month shall terminate as soon as the dependent child (in respect of whom it is paid) ceases to be the Player's dependent child."

**134**

"For purposes of this Section 5.1, the term "Active Player" means a Player who (1) is obligated to perform football playing services under contract with an Employer, or (2) is no longer obligated to perform football playing services under contract with an Employer, but is between the period beginning when the player's last contract under which the player was obligated to perform football playing services expired or was terminated for any reason, and ending on the later of (a) the July 15 following the beginning of the period or (b) the first day of preseason training camp."

"A Player who becomes totally and permanently disabled no later than six months after a disability(ies) arises will be conclusively deemed to have become totally and permanently disabled 'shortly after' as that phrase is used in subsections (A) and (B) above, and a Player who becomes totally and permanently disabled more than twelve months after a disability(ies) arises will be conclusively deemed not to have become totally and permanently disabled 'shortly after' as that phrase is used in subsections (A) and (B) above. In cases falling within this six to twelve month period, the Retirement Board will have the right and duty to determine whether the 'shortly after' standard is satisfied."

(2)     The first paragraph of Plan Section 5.2 will be amended to re-

place "prevented from or unable to engage in" with "substantially prevented from or substantially unable to engage in," and to add the following sentence at the end thereof:

"A Player or Vested Inactive Player shall not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2 merely because such person is employed by the NFL or an NFL Club, manages personal or family investments, is employed by or associated with a charitable organization, or is employed out of benevolence."

(3)     Plan Articles 5 and 6 will be amended to replace "football activities" each time it appears with "League football activities."

(4)     Plan Section 6.1 will be amended to change "sixty (60) months" to "ninety (90) months".

(5)     The second paragraph of Plan Section 6.1 will be amended to change "36 months" to "48 months".

(6)     Plan Section 6.3 will be amended to insert a period after "a month" the first time it occurs, and to delete the remaining language in that Section.

(7)     Plan Section 6.4(B) will be amended to change "60%" to "55%," and Plan Section 6.4(C) will be amended to change "80%" to "70%".

(8)     The final paragraph of Plan Section 6.4 will be amended to replace "and has resulted in" with "and was the most significant factor in".      135

(9)     The second sentence of Plan Section 6.5 will be amended to read as follows: "'Arising out of League football activities' shall not include any disablement resulting from other employment, or athletic activity for recreational purposes."

All of the changes in this Section 4(C) will be effective as of the first of the month following ratification of this Agreement, and will apply to applications for benefits by or on behalf of players first making application for such benefits on or after April 1, 1993 and who earn a Credited Season in 1993 or later, and will apply on the basis of all prior injuries, including injuries prior to April 1, 1993.

(D)     Removal of Early Retirement Option: The Bert Bell Plan and the Pete Rozelle Plan will each be amended such that players who have no Credited Seasons for Plan Years prior to the 1993 Plan Year will not be eligible to elect an early retirement pension prior to age 55, or to elect a 25% early payment benefit.

(E)     Joint Administration of Rozelle Plan: Within 30 days after ratification of this Agreement, the Pete Rozelle Plan will be maintained and jointly administered in the same manner as the Bert Bell Plan. The NFLPA and the Management Council will each appoint three members to the Retirement Committee of the Pete Rozelle Plan.

***Section 5*. Plan Merger and Further Amendments:**

(A)     Plan Merger: Promptly following the amendment described in Section 2 above and immediately after the amendments described in Section 4 above, the parties will merge the Bert Bell Plan with the Pete Rozelle Plan. The effect of such merger will be to bring Pete Rozelle Plan participants under the terms of the Bert Bell Plan, as modified pursuant to this Agreement, and the combined Plan will be called the "Bert Bell/Pete Rozelle NFL Player Retirement Plan" (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan").

(B)     Retroactive Increase in Benefit Credits for Prior Years: Upon or immediately following its creation, the parties will amend the Merged Plan to increase benefits for Credited Seasons prior to 1993 (including seasons prior to 1959 that are considered Credited Seasons pursuant to section 1.15(C) of the Bert Bell Plan) by forty percent (40%). These benefit increases will be retroactively effective for payments made on or after April 1, 1987 for participants in pay status as of March 1, 1993, but will be offset by retroactive payments made pursuant to the benefit increase resolution of the Retirement Board of the Bert Bell Plan adopted in September 1992. The retroactive portion of these increases will be paid in a lump sum as soon as administratively practicable.

**136**

(C)     Retroactive Increase in Minimums: Upon or immediately following its creation, the parties will amend the Merged Plan such that:

(1)     Effective April 1, 1987, the $750 per month minimum benefit for nonfootball total and permanent disability in Plan Section 5.1 will be increased to $1,500 per month; and the $50 per month per dependent child benefit in Plan Sections 5.1 and 5.4 will be increased to $100 per month;

(2)     Effective April 1, 1987, the $500 per month minimum "line-of-duty disability benefit" described in Plan Section 6.3 will be increased to $1,000 per month;

(3)     Effective April 1, 1987, the $600 per month minimum Widow's and Surviving Children's benefit described in the first paragraph of present Plan Section 7.3 will be increased to $1,200 per month, the $1,000 per month minimum Widow's and Surviving Children's benefit for players active in 1977 through 1981 described in the second paragraph of present Plan Section 7.3 will be increased to $2,000 per month, and the $1,500 per month minimum Widow's and Surviving Children's benefit for players active in the 1982 and later seasons described in the third paragraph of present Plan Section 7.3 will be increased to $3,000 per month.

All benefit increases in this subsection 5(C) will take effect retroactively for persons in pay status as of March 1, 1993, but will be offset by retroactive payments made pursuant to the benefit increase resolution of the Retirement Board of the Bert Bell Plan adopted in September 1992. The

retroactive portion of these increases will be paid in a lump sum as soon as administratively practicable.

(D)     Retroactive Extension of Total and Permanent Disability Benefits: Notwithstanding Section 4 above, the amendments described in paragraphs (1), (2), and (3) of Section 4(C) will also apply to (1) persons currently receiving total and permanent disability benefits under the Bert Bell Plan; and (2) any player who may subsequently apply for disability benefits under either the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, regardless of whether the player had a Credited Season after 1992 or when the disability(ies) arose, unless a previous application for benefits by such player that is related to the present disability(ies) was denied prior to the date of this Agreement. The parties will agree on those persons who, effective as of the first of the month following ratification of this Agreement, will be entitled to total and permanent disability benefits under Sections 5.1(A) (Active Football), 5.1(B) (Active Nonfootball), and 5.1(C) (Football Degenerative) of the Bert Bell Plan, as amended by this Agreement, on the basis of previous injuries. The provisions of the Bert Bell Plan and later the Merged Plan will determine whether persons should be entitled to such disability benefits beginning as of a later date on the basis of previous or subsequent injuries.

137

(E)     Timing and Contingency: The plan merger and all of the benefit increases in this section are contingent on such notice to and approval of the Internal Revenue Service and the Pension Benefit Guaranty Corporation as counsel deem appropriate. However, payment of all benefit increases under this Section 5, including the retroactive portion of these increases, will commence as soon as administratively practicable. To the extent that the plan merger and/or benefit increases are frustrated because of the lack of government approval or the action of a court, the parties will agree on the best method to accomplish the benefit increases in this Section 5 pro rata based solely on the available assets of the Bert Bell Plan and the Pete Rozelle Plan.

**Section 6.** **Benefits for Pre-1959 Seasons:** Promptly following the amendment described in Section 2 above, the parties will jointly amend the Bert Bell Plan, contingent on approval by the Internal Revenue Service, to include players who played football prior to the 1959 season as participants and to provide that each such player who has five or more Credited Seasons before 1959 will be credited with a monthly benefit at normal retirement age of $80 for each Credited Season prior to 1959, excluding any Credited Season prior to 1959 for which the participant was previously receiving benefits in accordance with Section 1.15(C) of the Bert Bell Plan. If a player, who would otherwise have been eligible for this benefit, died on or after July 1, 1987, and was married at the time of his death, the player's surviv-

ing spouse will receive a benefit equal to the amount she would have received had the player elected a joint and survivor annuity when the player would have been eligible to begin receiving benefits. This expansion of the Bert Bell Plan will take effect as of the first of the month following IRS approval. Also, as soon as administratively practicable following such IRS approval, players and surviving spouses receiving benefits under this Section will receive a lump sum payment equal to one-quarter of the benefit amount they would have received had IRS approval been obtained upon ratification. To the extent that this expansion of the Bert Bell Plan is prevented or frustrated because of the lack of government approval or the action of a court, this Section 6 will be nullified.

**138**

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

**Section 1. Establishment:** The parties will jointly establish a new plan, to be called the NFL Player Second Career Savings Plan (hereinafter referred to as "Savings Plan"). The Savings Plan will be jointly administered pursuant to the requirements of the Taft Hartley Act in a manner similar to the Bert Bell/Pete Rozelle Plan. The Savings Plan will be established as a tax-qualified multiemployer defined contribution profit-sharing plan, and will be submitted to the Internal Revenue Service for advance approval. The Plan Year will be the period April 1 to March 31.

**Section 2. Contributions:** For each of the Plan Years 1993 to 1999, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club, unless this figure is changed pursuant to this Agreement. Contributions to the Savings Plan for the Plan Years 1993 through 1999 will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year. Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

**Section 3. Allocation:** Contributions described in Section 2 above for a Plan Year will, after payment of the administrative expenses of the Savings Plan, be allocated to achieve, as nearly as possible, the effect of an equal allocation for each participant with full vesting after two (2) Credited Seasons.

**Section 4. Salary Reduction Contributions:** The Savings Plan will generally allow players to make salary reduction contributions pursuant to section 401(k) of the Internal Revenue Code. The parties may jointly restrict the ability to make salary reduction contributions if necessary or desired to avoid or minimize possible problems and administrative complications relating to the tests and limits of section 401(k)(3) and section 415 of the Internal Revenue Code or similar rules. The NFL Clubs will cooperate in the administration of salary reduction contributions.

**Section 5. Benefit Options:** A participant in the Savings Plan will be permitted to select from among the following options for the payout of his account balance: (1) a lump sum; (2) installment payments over a ten (10) year period, with one-tenth of the account balance paid as of the first of the month following election of this option, one-ninth of the remaining account balance payable one year later, etc.; (3) an annuity for the life of the player only; (4) an annuity for the life of the player with a 50% continuation benefit for his surviving spouse; and (5) any other annuity option

139

deemed appropriate by the fiduciaries of the Savings Plan. Where a player selects an annuity pursuant to options 3, 4, or 5 above, the Savings Plan will use his account balance to purchase such an annuity from a commercial insurer selected by the fiduciaries of the Savings Plan. No payments in any form will be made to a player before he attains age 45 and ceases to be employed by an NFL Club, except that a player employed by an NFL Club may elect to receive Savings Plan benefits after he attains age 59-1/2.

*Section 6.* **Death Benefits:** If a player dies prior to the time for receiving a benefit, his surviving spouse (or his designated beneficiary if no surviving spouse exists) will be entitled to 100% of his vested account balance, payable as a lump sum.

*Section 7.* **Investment:** Participants will be permitted to direct the investment of funds held on their behalf among at least three investment choices as determined by the fiduciaries of the Savings Plan, and to move funds among such choices quarterly. The Savings Plan will be valued quarterly and players will receive quarterly statements of their account balances.

140

# ARTICLE XLIX
# GROUP INSURANCE

*Section 1.* **Group Insurance Benefits:** Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)    Life Insurance: A rookie player will be entitled to $100,000 in coverage. A veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage.

(b)    Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual, $400 per family per plan year, with a maximum out-of-pocket expense of $800 per year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $1 million.

(c)    Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)    Preventive care paid at 100% of UCR,
(2)    General services paid at 85% of UCR, and
(3)    Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum annual benefit payable is $2,000 per covered individual.

Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 will continue to receive insurance coverage under this Article until the first game of the next regular season. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

*Section 2.* **Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any docu-

141