> \* [T]he definition of a "Signing Bonus" for purposes of the top 5 and top 10 minimum tenders is the same under the Salary Cap, that the prorata portion of such Signing Bonuses includes pro-rated amounts from prior Player Contracts, and that the Salary Cap acceleration rules for unamortized Signing Bonus amounts do not apply to the calculation of the top 5 and top 10 minimum tenders.
> *Side Letter 2/14/96*

> \* For purposes of calculating the minimum tenders to Franchise and Transition players under Article XX, if the present value of any deferred Paragraph 5 amount (as defined in Article XXIV, Section 7, Paragraph (a)(ii)) is at least $100,000 less than the initial Paragraph 5 amount (before being present valued), then the present value amount shall be used.
> *Side Letter 6/23/93: Sec. 5*

**Section 3. Transition Player Designations:**
    (a)    Each Club shall be permitted to designate two Unrestricted Free Agents as Transition Players by February 25, 1993; one Unrestricted Free Agent as a Transition Player between February 1 and February 15, 1994; and one Unrestricted Free Agent as a Transition Player between February 1 and February 15 *in the Final League Year.* In addition, in each League Year during the term of this Agreement, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player in lieu of designating a Franchise Player, if such Franchise Player designation is available to such Club, in addition to the Transition Player designations permitted by the immediately preceding sentence.
*Extension Agreement 6/6/96*

    (b)    Any Club that designates a Transition Player shall receive the Rights of First Refusal specified in this Article notwithstanding the number of his Accrued Seasons. Any Transition Player shall be completely free to negotiate and sign a Player Contract with any Club during the period from the first day of the League Year following the expiration of his last player contract to July 15, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs of any kind, subject only to the Prior Club's Right of First Refusal described in this Article.

**Section 4. Required Tender for Transition Players:**
    (a)    Any Club that designates a Transition Player shall be deemed on the first day of the League Year following the expiration of the player's last contract to have automatically tendered the player a one year NFL Player

Contract for the average of the ten largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

\*\* *See Page 67-68 - Article XX, Section 2(f) for Side Letter 6/23/93, Sec. 5 re: Calculation of Minimum Tender to Franchise and Transition Players.*

(b) For the 1993 League Year, any Club that designated a Transition Player who has not signed a Player Contract by 4:00 p.m. New York time on June 14, and which has not withdrawn its required tender, shall tender such player a one year NFL Player Contract for (i) the average of the ten largest Salaries in Player Contracts signed for the 1993 League Year as of May 6, 1993 for players at the position at which he played the most games during the prior League Year, or (ii) the amount of the required tender pursuant to subsection (a) above, whichever is greater. This tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c) The calculation of any ten largest Salaries pursuant to this Article shall not include: (i) any Player Contract amount resulting from an acceptance of a tender pursuant to subsection (b)(i) above, without any increase in Salary above the tender; or (ii) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date; provided, however, that Player Contract amounts in existence prior to such renegotiations shall be used if otherwise appropriate.

**Section 5. Right of First Refusal for Transition Players**: Any player designated as a Transition Player shall, at the expiration of his prior year Player Contract, be permitted to negotiate a Player Contract with any Club. When the Transition Player negotiates such an offer with a New Club, which the player desires to accept, he shall give to the Prior Club a completed Offer Sheet, signed by the player and the New Club, which shall contain the Principal Terms (as defined in Article XIX (Veteran Free Agency)) of the New

69

Club's offer. The Prior Club, within seven days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth in Sections 3(b)-(h), 4 and 6 of Article XIX (Veteran Free Agency) above, except that no Draft Choice Compensation shall be made with respect to such player, and, for the purposes of those provisions, the player and each Club shall otherwise have the same rights and obligations as for a Restricted Free Agent set forth in those provisions, notwithstanding the number of his Accrued Seasons.

**Section 6. Lists**: On each date following the dates set forth in Sections 1 and 3 above, the NFL shall provide to the NFLPA a list of each Unrestricted Free Agent designated as a Franchise Player or a Transition Player.

**Section 7. Salary Information:**
    (a)    No later than February 1 of each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten largest Prior Year Salaries for players at the following positions which shall be utilized for calculating the average Prior Year Salaries of players at the positions of Franchise Players and Transition Players: Quarterback, Running Back, Wide Receiver, Tight End, Offensive Line, Defensive End, Interior Defensive Line, Linebacker, Cornerback, Safety, and Kicker/Punter. For the 1993 League Year, such list shall be provided to the NFLPA by February 15.
    (b)    No later than ten days after the last day of the Restricted Free Agent Signing Period in each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten and five largest Salaries for players at the positions set forth in subparagraph (a) above which shall be utilized for calculating the applicable average Salaries of players at such positions as of the last day of the Restricted Free Agent Signing Period (including the amount of Salary in any executed Offer Sheets). For the 1993 League Year, such supplemental list shall be provided to the NFLPA no later than May 18, 1993 with respect to such Salaries as of May 6, 1993.
    (c)    Any dispute concerning the identity and Salaries of players included within each player position category, or any other matter regarding these figures, shall be submitted to and resolved by the Impartial Arbitrator during the period from February 1 to February 15, or within twenty-five days after the last day of the Restricted Free Agent Signing Period, respectively; for the 1993 League Year, any such dispute shall be submitted to and resolved by the Impartial Arbitrator prior to March 1 or May 31, respectively. The Impartial Arbitrator shall make an independent determination in writing. In arriving at his determination, the Impartial Arbitrator shall consider any relevant information furnished to him, and shall be provided access to all relevant Player Contracts. The Impartial Arbitrator's determination shall be final and binding upon all parties.

***Section 8.* No Assignment**: No Club may assign or otherwise transfer to any other Club the exclusive negotiating rights or any Right of First Refusal it may have for any Franchise Player, nor any Right of First Refusal it may have for any Transition Player, nor any designation rights it may have.

***Section 9.* Duration of Designation**: Each Club that signs a player it designated as a Franchise Player to a Player Contract shall be deemed each League Year thereafter to have utilized its Franchise Player designation for each League Year for which such player entered into a Player Contract with such Club at the time when such player was subject to such designation (unless the Club exercised a Right of First Refusal with respect to a Franchise Player tendered a Player Contract pursuant to Sections 2(b)(ii) or 2(c)(i) above, in which case the Club shall be deemed to have utilized its Franchise Player designation only in the League Year of the designation). For example, without limitation on any other applicable example, a Franchise Player who signs a Player Contract for two League Years at a time when the player was subject to the designation shall be deemed to be the Club's Franchise Player for both such League Years. However, in the event that the designated player retires or suffers a career-ending injury (or an injury that prevents or will prevent the player from playing in 32 consecutive regular season games) which prevents him from playing a contract year entered into while under such designation (or is unavailable for the season due to non-injury circumstances beyond the control of the Club), such Club shall be permitted to designate another player in lieu of such injured, retired or unavailable player for each remaining League Year covered by the Club's prior designation for such player, provided that the Club designates a new Franchise Player during the designation period prior to the first League Year to be covered by the re-designation. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

> *\* Beginning with the 1994 League Year, if a Club withdraws a Franchise Player designation after the last date of the signing period for Unrestricted Free Agents (i.e., July 15 or the first scheduled day of the first NFL training camp, whichever is later), and the Club subsequently signs a Player Contract for that season with the player who was subject to the designation, and does so before the later of (i)15 days after the withdrawal of the designation, or (ii) the day after the next scheduled NFL pre-season game for the Club (not including any game played outside the U.S.), the Club shall be deemed to have signed the player while he was subject to the designation, and, pursuant to Article VIII, Paragraph 9 of the Settlement Agreement, and Article XX, Section 9 of the CBA, the Club shall have utilized its Franchise Player designation for*

*each League Year for which such Player Contract was signed.*
    *Also, beginning with the 1994 League Year, if a Club withdraws a Franchise Player designation after the date of its final cutdown to the Active List limit for that season, and the Club subsequently signs a Player Contract for that season with the player who was subject to the designation, and does so before the day after the Club's second regular season game after the withdrawal of the designation, the Club shall be deemed to have signed the player while he was subject to the designation, and, pursuant to Article VIII, Paragraph 9 of the Settlement Agreement, and Article XX, Section 9 of the CBA, the Club shall have utilized its Franchise Player designation for each League Year for which such Player Contract was signed.*
                                        *\*Side Letter 1/18/94: Sec. 1*

*\* If a club executes a multi-year agreement with a player designated as a Franchise Player and trades the player the same day to another NFL club, the assignor club will be deemed to have used its franchise designation for only the League Year in which the contract was executed.*
                                          *\*Side Letter 4/21/95*

*\* If a Club and a player whom the Club had designated as a Franchise Player in a prior League Year agree to extend a Player Contract that was agreed to when the player was subject to the Franchise Player designation, such Club shall not thereby be deemed to have utilized its Franchise Player designation pursuant to Article XX, Section 9 of the CBA for the period of the extension.*
                                       *\* Side Letter 5/24/95: Sec. 10*

**Section 10. Franchise Player Designation Period**: A Club may designate a Franchise Player only during the periods and in the numbers specified in Section 1 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Franchise Player with respect to any first future League Year during the term of this Agreement for which such player is anticipated to be an Unrestricted Free Agent. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the five largest Prior Year Salaries for players at the position category at which he played the most games during the prior League Year, or 120% of the player's Prior-Year Salary, whichever is greater. If a player designated to become the Franchise Player in the future retires,

suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Club shall be entitled to designate a new Franchise Player for that League Year. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 11. Transition Player Designation Period**: A Club may designate a Transition Player (or players) only during the periods and in the numbers specified in Section 3 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Transition Player with respect to any first future League Year during the term of this Agreement for which such player becomes an Unrestricted Free Agent; any such future designation exhausts the Club's designation right (and does not move to any other Club) even if the player moves to another Club, as a Restricted Free Agent or via waivers, before he would have become an Unrestricted Free Agent with the designated Club. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the ten largest Prior Year Salaries for players at the position that he played the most games during the prior League Year, or 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become a Transition Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Prior Club shall be entitled to designate a new Transition Player for that League Year.

> \* *If a Prior Club becomes entitled to designate a new Transition Player pursuant to Article XX, Section 11 (penultimate sentence) of the Collective Bargaining Agreement, the prior Club may designate the new Transition Player for that League Year between February 1 and February 15 of any League Year prior to the League Year in which the player initially designated would have become a Transition Player.*
> \**Side Letter 5/24/95: Sec. 15*

Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

73

*Section 12.* **Prospective Designation**: Notwithstanding Sections 10 and 11 above, if in the 1993 League Year (or in the 1994 League Year, if no Salary Cap is in effect during the 1994 League Year), a Club designates a Franchise Player or Transition Player to apply to the first League Year a designated player is expected to be eligible to be an Unrestricted Free Agent under Article XIX (Veteran Free Agency), but that player turns out not to be an Unrestricted Free Agent because of the failure of the Salary Cap to be in effect that League Year, such designation shall apply to such player the next League Year in which the player becomes an Unrestricted Free Agent.

*Section 13.* **Right to Decline**: Each plaintiff who was a named plaintiff prior to February 26, 1993, in the following actions shall be permitted to decline any designation as a Franchise Player or Transition Player during the term of this Agreement, for any reason whatsoever, by notice to his prior Club within ten days of such designation for current year designations and within ten days of February 15 (or such other date as may be agreed upon by the NFL and the NFLPA) in the future League Year such designation becomes effective for future year designations: White v. NFL, Civ. No. 4-92-906 (D. Minn.); Lewis v. NFL, Civ. No. 3-93-87 (D. Minn.); McNeil v. NFL, Civ. No. 4-90-476 (D. Minn.); Allen v. Chargers Football Co., Civ. No. 91-4322 (C.D. Cal.); Joyner v. NFL, Civ. No. 92-2876 (E.D. Pa.); and Hebert v. NFL, Civ. No. S023546 (Sup. Ct. Cal.). In the event that a Club designates any such player as a Franchise Player or Transition Player, and such player declines such designation and signs with another Club, such designating Club shall be awarded Compensatory Draft Selection(s) in lieu of such designation. In the case of a Franchise Player, only one year's designation shall be exhausted in the latter situation. Such additional Compensatory Draft Selections shall not exceed a total of twenty during the term of this Agreement.

*Section 14.* **Other Terms**: For the purposes of this Article, the Required Tenders of a one year Player Contract for at least 120% of the Franchise Player's or Transition Player's Prior Year Salaries shall in addition to the 120% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (or ten, as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

*Section 15.* **Compensatory Draft Selection**: The procedures for awarding Compensatory Draft Selections shall be determined as agreed by the NFL and the NFLPA.

**Section 16. Signing Period for Transition Players:**

(a) In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 15 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time.

(b) If a Transition Player described in subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c) If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Salaries for the prior League Year for players at the player's specified position, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 17. Signing Period for Franchise Players:**

(a) If a Franchise Player has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(b) If a Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable tender must be made and any 120% tender shall be measured from the Player's prior

year salary. If a Franchise Player is not designated as a Franchise Player or Transition Player the second League Year, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

# ARTICLE XXI
# FINAL EIGHT PLAN

**Section 1. Application:** The provisions of this Article shall apply only in any League Year during the term of this Agreement in which no Salary Cap is in effect.

**Section 2. Top Four Teams:** Each of the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; and (c) any Unrestricted Free Agent signed pursuant to Section 4 below.

**Section 3. Next Four Teams:** Each of the four playoff Clubs that lost in the immediately preceding playoff games to the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player contract; (c) any Unrestricted Free Agent signed pursuant to Section 4 below; and (d) any Unrestricted Free Agent as follows:
    (i)    One such player for a Player Contract that has a first year Salary of $1,500,000 or more; and
    (ii)    Any number of such players for a Player Contract that has a first year Salary of no more than $1,000,000 and an annual increase in any future contract years of no more than 30% of the first contract year Salary, not including any amount attributed to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 4. Replacement of Free Agents Signed by Other Club:** Each of the eight Clubs subject to the provisions of this Article shall be permitted to negotiate and sign one Unrestricted Free Agent to a Player Contract ("New Player") for each Unrestricted Free Agent who was under contract to such Club on the last date of the prior League Year, who has signed with another Club ("Previous Player"), so long as the Player Contract for the New Player shall have a first year Salary of no more than the first year Salary of the Player Contract signed by the Previous Player with the New Club,

and an annual increase in any future contract years of no more than 30% of the first contract year Salary, excluding any amounts attributable to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 5. Increases**: The amounts specified in this Article ($1,500,000 and $1,000,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)). Notwithstanding the foregoing, in no event shall the amounts specified in this Article increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

**Section 6. Salary Definition**: For purposes of this Article, "Salary" means Paragraph 5 Salary, roster and reporting bonuses, prorata portions of signing bonuses, likely to be earned incentive bonuses, and other payments in compensation for the playing of professional football, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) below.

**Section 7. Trade Limitation**: No Club subject to the provisions of this Article may, for one League Year, trade for a player it otherwise would not be permitted to sign as an Unrestricted Free Agent as a result of the provisions in this Article.

> \* *[R]egarding whether Clubs subject to the Final Eight Plan are permitted to negotiate with and sign Transition Players, and Franchise Players who otherwise are permitted to negotiate and sign with other Clubs.... Final Eight Plan Clubs are permitted under the CBA to negotiate with and sign such players, since these players are not Unrestricted Free Agents.*
> *\*Side Letter 8/4/93*

> \* *For purposes of the Final Eight Plan provisions, each of the eight teams subject to the provisions of Article IX of the Stipulation and Settlement Agreement and Article XXI of the Collective Bargaining Agreement may, after the later of July 15 or the first scheduled day of the first NFL training camp, in any League Year in which the Final Eight Plan is in effect, sign any Unrestricted Free Agent whose team did not make the June 1 Tender or whose team subsequently withdrew that Tender.*
> *\*Side Letter 9/21/93: Sec. 20*

## ARTICLE XXII
## WAIVER SYSTEM

***Section 1*. Release:**
 (a) Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.
 (b) Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

***Section 2*. Contact:** Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

***Section 3*. Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or post-season game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and By-laws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

***Section 4*. Notice of Termination:** The Notice of Termination form attached hereto as Appendix G will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice

of Termination will be sent to him by certified mail at his last address on file with the Club.

**Section 5. NFLPA's Right to Personnel Information:** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice between the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

**Section 6. Rosters:** The NFLMC shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

# ARTICLE XXIII
# TERMINATION PAY

**Section 1. Eligibility:** Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for termination pay under this Article if:

(1)   He is released after his Club's first regular season game; and

(2)   He has made the Inactive or Active List of his Club on or after the date of his Club's first regular season game.

The amount of termination pay payable to such player if he is released prior to the eighth regular season game shall be the unpaid balance of the initial 50% of his Paragraph 5 Salary, but not less than an amount equal to one week's salary, up to a maximum of $20,000. If he is released after such point but before 4:00 p.m. New York time on the Tuesday prior to the final regular season game, the amount shall be one week's salary, up to a maximum of $20,000. Termination pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to termination pay more than once during his playing career in the NFL.

**Section 2. Regular Season Signings:** The termination pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the unpaid balance of the initial 25% of such player's Paragraph 5 Salary. If such player is released after the eighth regular season game, his termination pay shall be one week's salary, up to a maximum of $20,000.

> *A player shall not be eligible for Termination Pay if, without missing a game check at the Paragraph 5 rate stated in his terminated contract, he signs a Player Contract with the same Club that terminated his contract, which new contract provides for Paragraph 5 salary at a rate equal to or greater than that of his terminated contract. If the player's new contract is subsequently terminated, however, he shall be eligible for Termination Pay for such subsequent termination. This paragraph may not be used or referred to in any pending case that was filed prior to the date of this letter, except to enforce the terms of this sentence.*
>
> *Side Letter 3/3/97: Sec. 3

# ARTICLE XXIV
# GUARANTEED LEAGUE-WIDE SALARY, SALARY CAP, & MINIMUM TEAM SALARY

**Section 1. Definitions:** For purposes of this Article, and anywhere else specifically stated in this Agreement, the following terms shall have the meanings set forth below:

(a) **Defined Gross Revenues.**

(i) "Defined Gross Revenues" (also referred to as "DGR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall in good faith act and use their best efforts, consistent with sound business judgement, so as to maximize Defined Gross Revenues for each playing season during the term of this Agreement. Defined Gross Revenues shall include, without limitation:

(1) Regular season, pre-season, and post-season gate receipts (net of admission taxes, and surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing), including ticket revenue from "luxury boxes," suites and premium seating subject to gate receipt sharing among NFL Teams; and

(2) Proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL pre-season, regular season and play-off games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts (which shall not include any broadcast of an NFL pre-season, regular season or play-off game occurring more than 72 hours after the live exhibition of the game, unless the broadcast is the first broadcast in the market), and all other means of distribution, net of any reasonable and customary NFL expenses related to the project; and

(3) Proceeds from the sale or conveyance of any right to receive any of the revenues described above.

(ii) The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Teams which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "DGR"): proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, dues or capital contributions received by the NFL, fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries, and sales of interests in real estate and other property.

(iii) Notwithstanding subsection 1(a)(i) above, the following shall be

82

considered "Excluded DGR" and not included in Defined Gross Revenues: revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that included in subsection 1(a)(i)(1) above, sales of programs and novelties, and any categories of revenue (other than those listed in subsections 1(a)(i)(1)-(3) above) currently included under NFL Films and NFL Properties, Inc. and its subsidiaries.

(iv) In calculating Defined Gross Revenues, the amount of Excluded DGR divided by the sum of Excluded DGR plus DGR from all sources except network television revenues shall not exceed the percentage resulting from dividing 1992 Excluded DGR by the sum of 1992 Excluded DGR plus 1992 DGR from all sources except network television revenues. In the event Excluded DGR for any season exceeds the percentage resulting from the above calculation, any excess Excluded DGR shall be included in DGR. For purposes of the calculations described in this subsection (iv), Excluded DGR shall not include any revenues referred to in subsection l(a)(ii).

(v) Notwithstanding the provisions of subsection 1(a)(i)(2) above, for the purposes of calculating Defined Gross Revenues for the 1993 League Year only, revenues derived from national network television shall be deemed to be $35 million per NFL Team. Any actual amounts received in excess of that amount shall be included pro rata in DGR for the 1994 and 1995 seasons.

(vi) It is acknowledged by the parties hereto that for purposes of determining Defined Gross Revenues:

(1) NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in Defined Gross Revenues) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in Defined Gross Revenues), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a); and

(2) NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities").

(vii) The reasonableness and includability in DGR of such allocations and transactions between Related Entities shall be determined by the nationally recognized accounting firm jointly retained by the parties, in accordance with the procedures described in Section 10 below.

(viii) For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries,

Team Salary, or Salary, such amounts shall be rounded to the nearest $1,000.

(ix) In calculating Defined Gross Revenues, each League Year up to $5 million per year shall be deducted from DGR to the extent that such sums are received that League Year by the NFLPA pursuant to Paragraphs 5, 12, 29 and 30 of the Stipulation and Settlement Agreement in <u>NFLPA v. NFL Properties, Inc.</u>, No. 90-CV-4244 (MJL) (S.D.N.Y.).

(x)(1) *Without limiting the foregoing, except as specified in subsections (x)(2) through (x)(7) below, DGR shall include all revenues from Personal Seat Licenses ("PSLs") received by, or received by a third party and used, directly or indirectly, for the benefit of, the NFL or any Team or Team Affiliate, without any deduction for taxes or other expenses. Such revenues shall be allocated in equal portions, commencing in the League Year in which they are received, over the remaining life of the PSL, subject to a maximum allocation period of fifteen years; provided, however, that interest from the League Year the revenues are received until the League Years the revenues are allocated into DGR shall be imputed and included in DGR, in equal portions over such periods, calculated on an annual compounded basis using the Treasury Bill rate published in The Wall Street Journal of February 1 during the League Year in which the revenues are received. Each equal portion of PSL revenues allocated into DGR, plus an equal portion of the imputed interest specified above, shall be referred to as the "Maximum Annual Allocation Amount."*

(x)(2) *To the extent that PSL revenues are used to pay for the construction of a new stadium or for stadium renovation(s) that increase DGR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), <u>and</u> if such PSL revenues have received a waiver of any League requirement of sharing of "gross receipts," <u>then</u> such PSL revenues will not be included in a particular League Year in DGR or in Excluded DGR. Notwithstanding the foregoing, the maximum exclusion of PSL revenues each League Year from DGR shall be equal to any increase in DGR that directly results from such stadium construction or renovation (including through any spillover from Excluded DGR) as calculated in subsections (x)(3) through (x)(7) below.*

(x)(3) *Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of PSL revenues excluded each League Year shall be equal to the Maximum Annual Allocation Amount. If the actual increase in DGR directly resulting from such stadium construction or renovations during the first full League Year in which such stadium or renovations are put into service (the "First Year PSL Increases") is less than any Maximum Annual Allocation Amount for that League Year or any prior League Year (the "PSL Difference"), then the aggregate PSL Difference for every such League Year (assuming for purposes of calculating such PSL Difference, that the First Year PSL Increase had been received in each such League Year) shall be credited to DGR in the immediately following League Year.*

(x)(4) *Commencing with the first full League Year the new stadium or the*

84

*renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a)(ii) below) shall determine the increase in DGR that directly results each League Year from a stadium construction or renovation funded, in whole or in part, by PSL revenues. In the case of a new stadium, such calculation shall be made by comparing the DGR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the DGR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the DGR directly generated by those specific stadium facilities which are renovated, with the DGR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the DGR directly generated by the facilities prior to their renovation would equal either zero, or the amount of DGR directly generated by any facilities that were replaced by the renovation). If the NFL or the NFLPA agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in DGR throughout the stadium (e.g., increased concession, parking or novelty revenues spilling into DGR) as being directly generated by the renovation.*

*(x)(5)   If the calculations set forth in (x)(4) above result in an exclusion of PSL revenues from DGR that is less than the Maximum Annual Allocation Amount, the Accountants shall report the amount not excluded from DGR as a "Carryover PSL Credit." Such Carryover PSL Credits, if any, shall be deducted from a Team's DGR in the first future League Year in which the amount of DGR directly generated by the new stadium or the renovated facilities exceeds the Maximum Annual Allocation Amount (the "PSL Excess"), but only up to the amount of the PSL Excess. Each dollar of Carryover PSL Credit may be deducted from a Team's DGR only once, and only to the extent of any PSL Excess existing at the time of such deduction.*

*(x)(6)   Any applicable deduction from DGR or Excluded DGR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by PSL revenues excluded from DGR and Excluded DGR pursuant to subsection (x)(2) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total PSL revenues described in the first sentence of subsection (x)(2), and the denominator of which is (2) the total costs for construction of the new stadium or renovations.*

*(x)(7)   For purposes of this paragraph, the term "PSL" shall include any and all instruments of any nature, whether of temporary or permanent duration, that give the purchaser the right to acquire or retain tickets to NFL games and shall include, without limitation, seat options and bonds giving purchasers the right to acquire NFL tickets. PSL revenues shall also include revenues from any other device*

(e.g., periodic payments such as surcharges, loge maintenance fees, etc.) that the NFL and the NFLPA agree constitutes a PSL.

(xi)(1) Notwithstanding Section 1(a)(i)-(iv), above, premium seat revenues that otherwise would be included in Excluded DGR shall not be so included in a particular League Year to the extent that such revenues are used to pay for, or to pay financing costs for, the construction of a new stadium or for stadium renovation(s) that increase DGR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), <u>and</u> if such revenues have received a waiver of any League requirement of sharing of "gross receipts." The maximum exclusion of premium seat revenue from Excluded DGR each League Year shall be equal to any increase in DGR that directly results from such stadium construction or renovation (including through any spillover from Excluded DGR) as calculated in subsections (xi)(2) through (xi)(6) below.

(xi)(2) Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of premium seat revenues excluded each League Year shall be equal to the amount that receives a waiver of any League requirement of sharing of gross receipts (the "Non-Shared Amount"). If the actual increase in DGR during the first full League Year in which the new stadium or the renovated facilities are put into service (the "First Year Premium Seat Increase") is less than any Non-Shared Amount for that League Year or any prior League Year (the "Premium Seat Difference"), then the aggregate Premium Seat Difference for every such League Year (assuming for purposes of calculating such Premium Seat Difference that the First Year Premium Seat Increase had been received in each such League Year) shall be credited to Excluded DGR in the immediately following League Year.

(xi)(3) Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a)(ii) below) shall determine the increase in DGR that directly results each League Year from the stadium construction or renovation funded, in whole or in part, with premium seat revenues. In the case of a new stadium, such calculation shall be made by comparing the DGR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the DGR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the DGR directly generated by those specific stadium facilities which are renovated, with the DGR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the DGR directly generated by the facilities prior to their renovation would equal either zero, or the amount of DGR directly generated by any facilities that were replaced by the renovation). If the NFL and the NFLPA agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in DGR throughout the stadium (e.g., in-

86

*creased concession, parking or novelty revenues spilling into DGR) as being directly generated by the renovation.*

*(xi)(4) If the calculations set forth in (xi)(3) above result in an exclusion of premium seat revenues from Excluded DGR that is less than the Non-Shared Amount, the Accountants shall report the amount not excluded from Excluded DGR as a "Carryover Premium Seat Credit." Such Carryover Premium Seat Credits, if any, shall be deducted from a Team's Excluded DGR in the first future League Year in which the amount of DGR directly generated by the new stadium or the renovated facilities exceeds the Non-Shared Amount (the "Premium Seat Excess"), but only up to the amount of the Premium Seat Excess. Each Carryover Premium Seat Credit may be deducted from a Team's DGR only once, and only to the extent of any Premium Seat Excess existing at the time of such deduction.*

*(xi)(5) Any applicable deduction from DGR or Excluded DGR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by premium seat revenues excluded from Excluded DGR pursuant to subsection (xi)(1) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total premium seat Non-Shared Amount dedicated to funding the project during the allocation period, and (2) the denominator of which is the total costs for construction of the new stadium or renovations.*

*(xi)(6) For purposes of this paragraph, the term "Premium Seat Revenue" shall include revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.*

*\*Extension Agreement 6/6/96*

(b)   **Benefits.** "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to or on behalf of present or former NFL players, but only for:

(i)   Pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

(ii)   Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(iii)   Injury protection (as described in Article XII);

(iv)   Workers' compensation, payroll, unemployment compensation,