Article XXXVIII-A, Minimum Salary Benefit

*al compensation" of $25,000. Similarly, if a player receives from a single club, under a series of contracts, off-season workout payments specified on a per-day basis that average more than $90 per day, all of the off-season workout payments paid on a per-day basis shall count as "additional compensation."*

*\* Side Letter 6/17/02*

*\* For purposes of determining "additional compensation" under this Article, any incentives with respect to any League Year prior to the 2002 League Year (LTBE or not) shall be counted only to the extent such incentives were earned. For example, without limitation on any other example, if a player's 2001 Player Contract contained an incentive of $30,000 for rushing more than 1,000 yards and an incentive of $15,000 for rushing between 500 and 999 yards, and the player rushed for 900 yards and thus earned $15,000, only $15,000 shall count as "additional compensation" under this Article.*

*\* Side Letter 6/17/02*

# ARTICLE XXXVIII-B
# PERFORMANCE-BASED POOL

**Section 1. Creation Of Fund**: *Beginning in the 2002 League Year and continuing through the 2007 League Year, the NFL shall create a fund with (a) the difference in the minimum salaries negotiated in the January 8, 2002 amendments to this Agreement, and the minimum salaries that would have been calculated in the absence of such amendments, and (b) the difference in the Entering Player Pool negotiated in the January 8, 2002 amendments to this Agreement, and the Entering Player Pool that would have been calculated in the absence of such amendments.*

**Section 2. Annual Projection**: *Prior to each League Year, the fund will be projected on a League-wide basis and deducted from the calculation of the Salary Cap in the same manner as any other player benefit.*

**Section 3. Mandatory Distribution Each Year**: *There shall be mandatory distribution to players of the entire fund each year.*

**Section 4. Qualifying Players**: *The players who qualify for distributions shall be agreed upon by the NFLPA and the Management Council. If no agreement is reached, the fund from the Entering Player Pool difference shall be distributed to all qualifying Rookies, and the fund from the minimum salary difference shall be distributed to all qualifying Veterans.*

**Section 5. Methodology**: *The method of determining payments shall be: calculate total downs played, and award the players money based upon each individual's downs played in relation to the team's total downs (%), or such other rules as agreed upon by the NFLPA and the Management Council. Consideration will be given to awarding additional "points" for continuity with the same Club.*

*\* Extension Agreement 1/8/02*

183

Article XXXIX, Meal Allowance

# ARTICLE XXXIX
## MEAL ALLOWANCE

***Section 1*. Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the preseason, regular season and postseason as follows: 2002 League Year-Breakfast $15.00, Lunch $21.00, Dinner $39.00; 2003-04 League Years-Breakfast $16.00, Lunch $23.00, Dinner $41.00; *and 2005-07 League Years-Breakfast $17.00, Lunch $25.00, Dinner $43.00.* For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*\* Extension Agreement 1/8/02*

***Section 2*. Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

**184**

# ARTICLE XL
# DAYS OFF

***Section 1***. **Rate**: All players will be permitted days-off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

***Section 2***. **Requirements**: During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

# ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)   Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)   Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such

**186**

payment shall not exceed $5,000 during the 2002 League Year, $5,250 during the 2003-2004 League Years, *$5,500 during the 2005-06 League Years, and $5,750 during the 2007 League Year;* and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*\* Extension Agreement 1/8/02*

***Section 4.* Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

Article XLII, Post-Season Pay

# ARTICLE XLII
# POST-SEASON PAY

**Section 1. System:** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each postseason game played:

| (in $000's) | 02 | 03 | 04 | 05 | 06 | 07 |
|---|---|---|---|---|---|---|
| Wild Card Game | | | | | | |
| (Division Winner) | 17 | 18 | 18 | 19 | 19 | 20 |
| (Other) | 12.5 | 15 | 15 | 17 | 17 | 18 |
| Division Playoff Game | 17 | 18 | 18 | 19 | 19 | 20 |
| Conference Championship Game | 35 | 36.5 | 36.5 | 37 | 37 | 37.5 |
| Super Bowl Game | | | | | | |
| (Winning Team) | 63 | 68 | 68 | 73 | 73 | 78 |
| (Losing Team) | 35 | 36.5 | 36.5 | 38 | 38 | 40 |

* Extension Agreement 1/8/02

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**

(a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

(b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was

**188**

on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and postseason) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)     A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)     A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)     A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

*Section 5*. **Payment**: Players will be paid under this Article within fifteen (15) days after the game in question has been played.

189

# ARTICLE XLIII
# PRO BOWL GAME

**Section 1. Compensation**: Each player on the winning Team in the AFC-NFC Pro Bowl game will receive *$30,000* and each player on the losing Team will receive *$15,000*. These amounts shall be increased to $35,000 and $17,500 respectively for the Pro Bowls following the 2003 and 2004 seasons, *and to $40,000 and $20,000 respectively for the Pro Bowls following the 2005 through 2007 seasons.*

*\* Extension Agreement 1/8/02*

**Section 2. Selection**: Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives**: Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury**: In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment**: Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

**190**

# ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

Article XLIV, Players' Rights to Medical Care and Treatment

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

***Section 6.*** **Substance Abuse:**

(a)      **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)      **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)      **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

192

# ARTICLE XLV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

***Section 1*. Personnel Records**: Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

***Section 2*. Medical Records**: Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

# ARTICLE XLVI
# PLAYER BENEFIT COSTS

**Section 1.** (a) **General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b) **1998 Amendment Benefits:** During each League Year for which a Salary Cap applies, the NFLPA will have the unilateral right to increase, reduce or freeze each separate and individual Player Benefit Cost relating to 1998 Amendment Benefits that are set forth in Sections 5(c), 5(d) and 5(e) of this Article to the extent permitted by law, to ensure that the total cost of the 1998 Amendment Benefits does not exceed and is not less than the amount set forth below for each such League Year. Any increase shall be for one League Year only and shall not create a continuing obligation for the Clubs. The total cost of the 1998 Amendment Benefits for Capped Years in the 2002 League Year and thereafter *shall be* $100 million, *plus an additional amount, if necessary, sufficient to raise the Allocation under the Player Annuity Program to $65,000 for each player eligible for an Allocation, unless the parties agree otherwise.*

Notwithstanding the foregoing language regarding the total cost of 1998 Amendment Benefits for the 2002 League Year *and thereafter*, Class Counsel and the NFLPA may specify additional amounts to be used for additional increases in the Player Annuity Program described in Article *XLVIII-A* (Player Annuity Program), pursuant to Article XXIV, Section 10(a)(ii) for additional amounts generated from the 2002 League Year *and thereafter*. During each League Year for which a Salary Cap does not apply, the NFL shall be required to contribute with respect to the 1998 Amendment Benefits only the cost of those benefits that are set forth in Sections 5(a) *and* 5(b). If the NFLPA is notified in writing that the cost of the 1998 Amendment Benefits for a Capped Year is projected to exceed or to be less than the above total for a League Year, and the NFLPA does not specify which benefits are to be increased, reduced or frozen by the later of (1) the beginning of that League Year, and (2) 30 days after the date the NFLPA receives such notice, the Management Council shall have the unilateral right to reduce or increase 1998 Amendment Benefits to the extent permitted by

law, to achieve the above total cost for that League Year. Any reductions or increases in 1998 Amendment Benefits shall be implemented as of the beginning of a League Year by determining projected 1998 Amendment Benefits based on Projected Benefits, as defined in Article XXIV, Section 10(c).

(c) **Adjustment**: If the actual Player Benefit Costs of the 1998 Amendment Benefits exceed the applicable amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be reduced by such excess. If the actual Player Benefit Costs of the 1998 Amendment Benefits are less than the amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be increased by such shortfall.

**Section 2. Right of Restoration**: Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition**: For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)      Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII); *provided that all costs associated with the benefit increase, to which the parties agreed in 2002, under Article XLVII, Section 8, shall be allocated for Player Benefit Costs purposes in equal amounts to the 2002-2006 League Years;*

(b)      Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)      Injury protection (as described in Article XII);

(d)      Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)      Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)      Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)      Postseason pay (as described in Article XLII and Article XLIII);

**195**

Article XLVI, Player Benefit Costs

*and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary;*

(h)      Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year, beginning with the 1993 League Year);

(i)      Severance pay (as described in Article L);

(j)      The Player Annuity Program (as described in Article *XLVIII-A*);

(k)      *The Minimum Salary Benefit (as described in Article XXXVIII-A);*

(l)      *The Performance Based Pool (as described in Article XXXVIII-B); and*

(m)      *The Tuition Assistance Plan (as described in Article XLVIII-B).*

                                        * *Extension Agreement 1/8/02*

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, *and the Tuition Assistance Plan* will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

*Section 4.* **Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

**196**

(a)      The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b)      Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)      As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5**. **1998 Amendment Benefits**: For purposes of this Agreement, the term "1998 Amendment Benefits" means the following:

(a)      The increase in 1998 and future Benefit Credits to $425 described in Article XLVII, Section 2 and the increase in Benefit Credits for prior years described in Article XLVII, Section 4;

(b)      The decrease in the vesting requirement described in Article XLVII, Section 5;

(c)      The increases in the Second Career Savings Plan contributions described in Article XLVIII, Section 2;

(d)      The Player Annuity Program (as described in Article XLVIII-A); and

(e)      The increases in the Extended Post-Career Medical and Dental Insurance benefits described in Article XLIX, Section 2(c).

**Section 6. Limitations on Contributions**: *Effective March 1, 2002,*
*(a) No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, the Severance Pay Plan, or the Tuition Assistance Plan (individually, a "Player Benefit Plan") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Plan shall be amended to prevent any employer provided benefit from accruing or being otherwise credited, paid, or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Plan in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club. During an Uncapped Year, a payment of benefits under a Player Benefit Plan shall be made only if and to the extent the payment either is funded, or is required by ERISA.*

197

Article XLVI, Player Benefit Costs

(b)     The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be required to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

*Extension Agreement 1/8/02

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.

**Section 2. Additional Credited Seasons:** *[no longer applicable]*

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. *Benefit Credits:*** Effective for payments on and after *September* 1, *2001*, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to *provide* the *following* Benefit *Credits* for *the indicated* Credited *Seasons:*

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| *Before 1982* | $200 |
| 1982 through 1992 | 230 |
| 1993 and 1994 | 240 |
| 1995 and 1996 | 285 |
| 1997 | 330 |
| *1998 through the Plan Year that begins prior to the expiration of the Final League Year* | *425* |

199

Article XLVII, Retirement Plan

**Section 5. Decrease in Vesting Requirement:** Effective for payments on and after June 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan to provide that any player who (i) earned his last Credited Season prior to the 1975 Plan Year; (ii) is credited with at least four (4) Credited Seasons; and (iii) is alive on June 1, 1998, shall be fully vested in the right to receive a retirement benefit under the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment shall be entitled to receive any benefit under the Bert Bell/Pete Rozelle Plan other than his Normal, Deferred or Early Retirement Benefit. No player who is vested as a result of this amendment shall be entitled to elect to receive a retirement benefit in the optional form provided by Section 4.4(c)(3) of the Bert Bell/Pete Rozelle Plan. No beneficiary of a player who is vested as a result of this amendment and who dies prior to his Annuity Starting Date (as defined in the Bert Bell/Pete Rozelle Plan) shall be entitled to receive any benefit, except that the surviving spouse of such a player shall be entitled to receive a pre-retirement survivor annuity under rules similar to those in Section 4.9(b) of the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment who attained his Normal Retirement Age prior to June 1, 1998 shall be entitled to a benefit with respect to any period prior to June 1, 1998. Any Normal Retirement Benefit paid pursuant to this amendment will not be actuarially adjusted to reflect an Annuity Starting Date after the player's Normal Retirement Date, except to the extent the Annuity Starting Date is after June 1, 1998.

**Section 6. Medical Standards for Line-of-Duty Disability Benefits:** *The parties* agree *to amend the Bert Bell/Pete Rozelle Plan* to adopt revised medical standards for Line-of-Duty *disability* benefits based upon the American Medical Association's <u>Guides to the Evaluation of Permanent Impairment (Fourth Edition, Chicago, IL)</u> ("AMA Guides"). Effective for applications received on and after April 1, 2002, the parties will amend Section 6.4 of the Bert Bell/Pete Rozelle Plan to read substantially as follows:*

*"6.4 Definitions*
*(a) A "substantial* disablement" *is a "permanent" disability that*
*(1) Results in a 50% or greater loss of speech or sight; or*
*(2) Results in a 55% or greater loss of hearing; or*
*(3) Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or*

*(4) For orthopedic impairments, using the* <u>Guides to the Evaluation of Permanent Impairment (Fourth Edition, Chicago, IL)</u>,*is (a) a 55% or greater loss of use of the entire lower extremity; or (b) a 30% or greater loss of use of the entire upper extremity; or (c) an impairment to the spine that results in a 29% or greater whole body impairment. In each case for orthopedic impairments, a maximum of 10 percentage points will be allowed for symptoms of pain."*

\* Extension Agreement 1/8/02

Article XLVII, Retirement Plan

**Section 7. Practice Squad Credited Season:** *Effective April 1, 2001, the parties will amend Section 1.10 of the Bert Bell/Pete Rozelle Plan to add a new subsection (f) to read substantially as follows:*

"(f) *effective April 1, 2001, has a season with at least eight games on the practice squad in a Plan Year (either before or after April 1, 2001) in which he did not otherwise earn a Credited Season, provided that he is otherwise vested and earns a Credited Season in 2001 or later. A player may earn a maximum of one Credited Season under this Section 1.10 (f) regardless of the number of seasons in which he has at least eight games on the practice squad.*"

*Extension Agreement 1/8/02*

**Section 8. Increase in Past Service Credit:** *Effective for payments on and after September 1, 2001, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to increase the Benefit Credit in effect for each Credited Season prior to 1977 to $200. Payments reflecting this increase will begin with the March 1, 2002 payment. Benefits for affected players in pay status shall be proportionately increased based on the new and prior benefit credits.*

*Extension Agreement 1/8/02*

201

Article XLVIII, Second Career Savings Plan

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance**: The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:**

(a)      **Prior to 2001:** For each of the Plan Years 1993 through *1999, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club. For the 2000 Plan Year, a contribution of $250,000 will be made to the Savings Plan on behalf of each Club.* Such contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.

*\*Extension Agreement 2/25/98, as amended by Extension Agreement 1/8/02*

(b)      **2001 and Later Years**: For each *of the Plan Years 2001 and thereafter in which the Salary Cap applies,* a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)      Matching Contributions. The parties will amend the Savings Plan to require the NFL Clubs in the aggregate to contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two Dollars (up to a maximum of $20,000) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(a)      by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)      by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)      Minimum Contribution. The NFL Clubs in the aggregate will

202

Article XLVIII, Second Career Savings Plan

contribute to the Savings Plan, for each Plan Year *in which a Salary Cap applies,* a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)    Expenses. The NFL Clubs will make contributions to the Savings Plan at least quarterly in an amount sufficient to pay administrative expenses.

(c)    **Future Contributions and Collection:** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Extension Agreement 1/8/02*

**Section 3. Expansion of Eligible Employees:** *Effective as of April 1, 2002, the parties will amend the Savings Plan so that first year players (not including practice squad players) may participate and contribute to the Savings Plan, but will not receive employer contributions under Sections 3.2, 3.3, 3.4, or 3.6 of the Savings Plan for that Plan Year.*

*Extension Agreement 1/8/02*

Article XLVIII-A, Player Annuity Program

# ARTICLE XLVIII-A
# PLAYER ANNUITY PROGRAM

**Section 1. Establishment:** The parties will jointly establish a new benefit, to be called the NFL Player Annuity Program (hereinafter referred to as "Player Annuity Program"). The Player Annuity Program will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Annuity Year will be the period April 1 to March 31. The Player Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Program will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:** For each of the Annuity Years 2001 and thereafter in which a Salary Cap applies, a contribution will be made to the Player Annuity Program on behalf of the NFL Clubs unless this figure is changed pursuant to this Agreement, including the rights of the parties under Section 1(b) of Article XLVI of this Agreement, *in the amount of $73 million, but not less than an amount sufficient to fund an Allocation of $65,000 to each player eligible for an Allocation, unless the parties agree otherwise.*

*\* Extension Agreement 1/8/02*

Contributions to the Player Annuity Program for an Annuity Year will be made as follows:

1. Expenses: The NFL Clubs will prepay contributions to the Annuity Program at least quarterly in an amount sufficient to pay administrative expenses. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

2. Allocations: Allocations for the benefit of individual players will be made on and as of December 31 and March 31 of each Annuity Year, as described in Section 3(c) below.

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

**Section 3. Eligibility and Allocation:**
    (a)      **Points:** *For Annuity Year 2001 and each year thereafter for which a*

204

Article XLVIII-A, Player Annuity Program

*Salary Cap applies, players* who earn a Credited Season, as that term is defined in the Bert Bell/Pete Rozelle Plan, in an Annuity Year and who have a total of four or more Credited Seasons as of the end of such Annuity Year will receive *one point* for each such Credited Season.

(b)   **Individual Allocations:** The amount allocated to an individual player who receives *a point* in the 2001 and later Annuity Years will be calculated as follows: In December of each such year a good faith estimate will be made by the Annuity Board of the total contribution expected to be made during such Annuity Year under Section 2 above by all NFL Clubs, minus the estimated administrative expenses for the Annuity Year, and minus any retroactive allocations made to players under rules similar to those in Section 3.4 of the Savings Plan. A good faith estimate will also be made at that time by the Annuity Board of the total points expected to be earned during such Annuity Year by all players. The value of a point will be determined by (1) taking the total estimated available contributions as described above and (2) dividing by the estimate of the total points expected to be earned by all players. *The Allocation to each player eligible for an Allocation will, for each of the 2002 through 2006 Annuity Years, not be less than $65,000, unless the parties agree otherwise.*

*\*Extension Agreement 1/8/02*

(c)   **Timing:** Eligible players who earn a Credited Season by December 1 of an Annuity Year will receive their allocation on December 31 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive their allocation on March 31 of such Annuity Year.

**Section 4.** **Distributions:** A player may elect to begin receiving distributions under the Player Annuity Program in the form of annuity or installment payments at any time after the later of (a) the player's attainment of age 35, or (b) five years after the end of the Annuity Year containing the player's last Credited Season. Payments must begin no later than age 65. A player who elects to begin receiving annuity or installment payments under the preceding sentences may elect to receive such payments in substantially equal amounts for a period beginning on the date of commencement of such payments and ending upon the player's attainment of age 45, or such later age as he shall specify, or for life. Alternatively, a player may elect to defer his receipt of distributions under the Player Annuity Program. Upon a player's attainment of age 45, such player may elect to receive his benefit under the Player Annuity Program in the form of an annuity or a lump sum payment. If a player dies before making an election to receive benefits, the player's named beneficiary may make an election that otherwise would have been available to the player. A player's rights under the Player Annuity Program may not be transferred, assigned, or alienated.

205

Article XLVIII-A, Player Annuity Program

***Section 5*. Structure**: The Player Annuity Program will hold assets for the sole benefit of players and their beneficiaries. The parties agree that the Program will be administered by an Annuity Board, and that prior to the first meeting of the Annuity Board the advisors to the Player Annuity Program will be the same as the advisors to the Savings Plan. The Player Annuity Program is intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity as described in Section 6 below.