Article XL, Days Off

# ARTICLE XL
# DAYS OFF

*Section 1.* **Rate**: All players will be permitted days off at least at the rate of four (4) days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2.* **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

191

# ARTICLE XLI
# MOVING AND TRAVEL EXPENSES

*Section 1.* **Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)    Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)    Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

*Section 2.* **Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

*Section 3.* **Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

192

not exceed $5,500 during the 2006 League Year, $5,750 during the 2007-08 League Years; $6,100 during the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year; and $6,350 during the 2011 League Year if it is a Capped Year and the 2012 League Year; and (c) the room cost of seven (7) days' stay at a hotel of the Club's choice in the new team city for the player.

**Section 4. Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

# ARTICLE XLII
## POST-SEASON PAY

**Section 1. System:** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 06 | 07 | 08 | 09 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|
| **Wild Card Game** | | | | | | | |
| (Division Winner) | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| (Other) | 17 | 18 | 18 | 19 | 19 | 20 | 20 |
| **Division Playoff Game** | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| **Conf. Championship Game** | 37 | 37.5 | 37.5 | 38 | 38 | 40 | 40 |
| **Super Bowl Game** | | | | | | | |
| (Winning Team) | 73 | 78 | 78 | 83 | 83 | 88 | 88 |
| (Losing Team) | 38 | 40 | 40 | 42 | 42 | 44 | 44 |

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**

(a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three (3) previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

(b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three (3) previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight (8) or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three (3) and not more than seven (7) games (i.e., regular and postseason) will receive one-half the

194

amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)     A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)     A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)     A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5. Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

# ARTICLE XLIII
# PRO BOWL GAME

***Section 1. Compensation:*** For the 2006 and 2007 seasons, each player on the winning Team in the AFC- NFC Pro Bowl game will receive $40,000 and each player on the losing Team will receive $20,000. These amounts shall be increased to $45,000 and $22,500 respectively for the Pro Bowls following the 2008 through 2010 seasons, and to $50,000 and $25,000 respectively for the Pro Bowls following the 2011 and 2012 seasons.

***Section 2. Selection:*** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

***Section 3. Wives:*** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

***Section 4. Injury:*** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

***Section 5. Payment:*** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

# ARTICLE XLIV
# PLAYERS' RIGHT TO MEDICAL CARE AND TREATMENT

*Section 1.* **Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

*Section 2.* **Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

*Section 3.* **Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

*Section 4.* **Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 5.* **Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician, provided that no Club may conduct its own individual testing for anabolic steroids and related substances or drugs of abuse or alcohol. In addition, the League may conduct mandatory urinalysis testing of all players

197

at the beginning of the pre-season in the same manner as past seasons. The League may also conduct random testing for steroids and related substances as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

*Section 6.* **Substance Abuse**:

(a)     **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)     **Anabolic Steroids and Related Substances.** The Policy on Anabolic Steroids and Related Substances in effect as of March 8, 2006, shall remain in effect, except as modified by the parties due to scientific advances with respect to testing techniques or other matters, or as otherwise agreed by the parties. There shall be a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)     **Drugs of Abuse and Alcohol.** The NFL Policy and Program for Substances of Abuse in effect as of March 8, 2006, shall apply with respect to drugs of abuse and alcohol, including annual pre-season testing of all players, except as otherwise amended by the parties.

198

# ARTICLE XLV
# ACCESS TO PERSONNEL AND MEDICAL RECORDS

***Section 1.* Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

***Section 2.* Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two (2) times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

199

## ARTICLE XLVI
## PLAYER BENEFIT COSTS

**Section 1. (a) General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan"), (2) benefits under the NFL Player Supplemental Disability Plan (the "Disability Plan"), and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below 6% of Projected Total Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b)   **1998 Amendment Benefits:** [*No longer applicable*]

(c)   **NFLPA Right To Increase Certain Benefits:** In 2006 and each League Year thereafter for which a Salary Cap applies, the NFLPA will have the unilateral right to increase benefits under the NFL Player Second Career Savings Plan (as described in Article XLVIII) ("Second Career Savings Plan"), the NFL Player Annuity Program (as described in Article XLVIII-A) ("Player Annuity Program"), and the NFL Players Health Reimbursement Account (as described in Article XLVIII-C) ("Health Reimbursement Plan"), but only if such right is exercised on or before April 15 of such League Year, and only to the extent that the cost of such benefit increases is offset by reductions in other benefits pursuant to Section 1(a) of this Article. For 2010 and each League Year thereafter, the parties will jointly negotiate increases, if any, under the Second Career Savings Plan, the Player Annuity Program, the Health Reimbursement Plan, and/or the Severance Plan, but only if such League Year is a Capped Year. Any increase pursuant to this section shall be for one year only and shall not create a continuing obligation of the Clubs.

**Section 2. Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition:** For purposes of this Agreement, the term "Player Benefit Costs" shall be the same as defined in Article XXIV, Section 1(b).

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits

200

for the League Year beginning at approximately the previous March 1, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Total Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three (3) days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5.** 1998 Amendment Benefits: [*No longer applicable*]

**Section 6.** Limitations on Contributions:

(a)     No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Player Annuity Program, the Severance Pay Plan, the NFL Player Supplemental Disability Plan, the Health Reimbursement Account, the NFL Player Benefits Committee, the Workers' Compensation Time Offset Fund, the Performance Based Pool, or the Tuition Assistance Plan (individually, a "Player Benefit Arrangement") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Arrangement shall be amended to prevent any employer provided benefit from accruing or being otherwise credited or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

(b)     The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be re-

201

quired to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

(c)      The parties will amend all Player Benefit Arrangements and the Retirement Plan to the extent necessary to permit any expenses related thereto to be paid by NFL Player Benefits Administration, if established, pursuant to Article XLVIII-E, except for expenses that cannot by law be paid by NFL Player Benefits Administration, or that are not currently deductible under Section 162 of the Internal Revenue Code, notwithstanding any other provision of the plan or this Agreement.

**Section 7. Application of Salary Cap to Plan Years:** For purposes of Articles XLVI through LI, a Salary Cap applies to a Plan Year if a Salary Cap is in effect on the first day of that Plan Year.

**Section 8. Timing:** Player Benefit Costs for pension funding, the Second Career Savings Plan, the NFL Player Supplemental Disability Plan, the Player Annuity Program, the Tuition Assistance Plan, the Health Reimbursement Account, and the 88 Benefit will be deemed to be made in a League Year for purposes of this Agreement if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

202

## ARTICLE XLVII
## RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Retirement Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

**Section 2. Additional Credited Seasons:** [*No longer applicable*]

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Retirement Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Benefit Credits:** Effective for payments on and after June 1, 2006, the parties will amend Section 4.1 of the Retirement Plan to provide the following Benefit Credits for the indicated Credited Seasons:

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| Before 1982 | $250 |
| 1982 through 1992 | $255 |
| 1993 and 1994 | $265 |
| 1995 and 1996 | $315 |
| 1997 | $365 |
| 1998 through the Plan Year that begins prior to the expiration of the Final League Year | $470 |

203

Benefits for affected players in pay status shall be proportionately increased based on the new and prior Benefit Credits, except that the minimum increase for any affected Player will be $50 per month.

**Section 5. Disability Benefits:** The following changes shall be made to the Plan's disability benefits:

(a)     Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will delete the Dependent Children's benefit described in Retirement Plan Section 5.1(e).

(b)     Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will increase the minimum Inactive total and permanent disability benefit from $1,500 to $1,750.

(c)     Effective April 1, 2007, the parties will amend the rules contained in Section 5.3 of the Retirement Plan to read substantially as follows:

Any person receiving total and permanent disability benefits may be required to submit to periodic physical examinations for the purpose of re-examining his condition. The examinations will occur not more often than once every three (3) years, except that upon request of three (3) or more voting members of the Retirement Board, examinations may occur as frequently as once every six (6) months. For each calendar year in which a person receives total and permanent disability benefits, he must submit a complete copy, with all schedules and attachments, of his annual federal income tax return by July 1 of the following calendar year. A person who has not filed his annual federal income tax return by July 1 must either (1) submit a signed statement that he does not intend to file such tax return, and state the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year, and provide such federal income tax return promptly after it is filed. If the Retirement Board or the Disability Initial Claims Committee determines that such person is no longer totally and permanently disabled, the total and permanent disability benefits will terminate. The total and permanent disability benefits of any person refusing to submit to a required physical examination or to submit an annual federal income tax return (or equivalent) will be suspended until such refusal is resolved to the satisfaction of the Retirement Board. If such refusal is not resolved to the satisfaction of the Retirement Board within one year after such person is no-

204

tified of the consequences of his refusal, his total and permanent disability benefits will be terminated. In that event, such person must submit a new application to be eligible to receive any further total and permanent disability benefits, but the classification rules of Plan Section 5.6(a) and 5.6(b) will not apply.

**Section 6.** **Joint and Survivor Reset:** Effective for payments on and after April 1, 2006, the parties will amend the Retirement Plan to provide that the monthly benefit of a player who has elected either (1) a qualified joint and survivor annuity pursuant to Plan Section 4.4(c)(2) or (2) a life and contingent annuitant pension pursuant to Plan Section 4.4(c)(4) with his wife as the beneficiary, and who survives or has survived his wife, will increase to the amount that would have been paid if the player had elected a Life Only Pension as of his Annuity Starting Date (including subsequent benefit increases). The increase in benefit under the previous sentence will be paid beginning as of the later of (i) the first day of the month following the date of the wife's death, and (ii) April 1, 2006, and will continue for the life of the Player. However, no increase will be paid for any month that begins more than 42 months before the date upon which the player first notifies the Retirement Plan of his wife's death. The parties will also amend the Retirement Plan to provide a new table in Appendix B of the Retirement Plan to be used for a player with an Annuity Starting Date after March 31, 2007, which will provide the factors used to determine the actuarial equivalent of the benefit when the player's wife is his beneficiary.

**Section 7.** **Death Benefits:** Effective for payments on and after April 1, 2006, the parties will amend Section 7.2 of the Retirement Plan to insert "$3,600" in place of "$1,200"; "$6,000" in place of "2,000"; and "$9,000" in place of "$3,000."

205

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance:** The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:**

(a)     **Prior to 2006:** [*No longer applicable*]

(b)     **2006 and Later Years:** For each of the Plan Years 2006 and thereafter in which the Salary Cap applies, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)      **Matching Contributions.** The NFL Clubs in the aggregate will contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two dollars (up to a maximum of $20,000 for each of the Plan Years 2006 through 2008, $22,000 for the 2009 Plan Year, $24,000 for the 2010 Plan Year, and $26,000 for the 2011 Plan Year) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(a)     by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)     by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)     **Minimum Contribution.** The NFL Clubs in the aggregate will contribute to the Savings Plan, for each Plan Year in which a Salary Cap applies, a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three (3) or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two (2) Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce

206

his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)     **Expenses**. The NFL Clubs will make advance contributions to the Savings Plan in an amount sufficient to pay all administrative expenses approved by the Savings Board which are not paid by NFL Player Benefits Administration under Article XLVIII-E.

(c)     **Future Contributions and Collection**: Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

(d)     **Automatic Enrollment**: Effective beginning with the 2007 Plan Year, the Plan will be amended to automatically enroll each eligible player who does not otherwise elect to make, or not to make, salary reduction contributions such that his contribution will be 10% of his eligible compensation each pay period up to the maximum permitted under Section 402(g) of the Internal Revenue Code for the calendar year. Effective beginning with the 2008 Plan Year, the Plan will be further amended to allow permissible withdrawals to the full extent permitted under Section 414(w) of the Internal Revenue Code.

## ARTICLE XLVIII-A
## PLAYER ANNUITY PROGRAM

*Section 1.* **Establishment:** The NFL Player Annuity Program ("Annuity Program") will be continued and maintained in full force and effect during the term of this Agreement, except that the structure of the Program will be amended to include both a taxable portion ("Taxable Portion") and a tax-qualified portion ("Qualified Portion"). The Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

*Section 2.* **Contributions:** For each of the Annuity Years 2006 and thereafter in which a Salary Cap applies, a contribution will be made to the Annuity Program on behalf of the NFL Clubs as follows (unless changed by the NFLPA pursuant to Article XLVI of this Agreement):

(1)   **Expenses:** The NFL Clubs will make advance contributions to the Annuity Program in an amount sufficient to pay all administrative expenses approved by the Annuity Board which are not paid by NFL Player Benefits Administration under Article XLVIII-E. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

(2)   **Current Allocations:** An Allocation of $65,000 will be made for each eligible Player who earns a Credited Season (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan) in an Annuity Year and who has a total of four (4) or more Credited Seasons as of the end of such Annuity Year.

(3)   **Retroactive Allocations:** Retroactive Allocations will be made as provided in Section 3.4 of the Annuity Program.

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Section 3.* **Timing:** Effective April 1, 2006, an eligible player who earns a Credited Season through the sixth week of the regular season of an Annuity Year will receive an allocation on December 1 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive an allocation on March 31 of such Annuity Year.

*Section 4.* **Structure:** The Annuity Program will hold assets for the sole

208

benefit of players and their beneficiaries and to pay all expenses of the Annuity Program approved by the Annuity Board. The Annuity Program is currently intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity.

**Section 5. New Tax-Qualified Portion:** The parties agree to amend the Annuity Program so that a portion of the Allocations will be contributed to the Qualified Portion. The remaining portion of the Allocations will continue to be credited to the Taxable Portion. The portion of the Allocations to be contributed to the Qualified Portion will be the largest multiple of $1,000 that does not exceed (1) the amount that is currently deductible by the NFL Clubs under Section 404 of the Internal Revenue Code, or (2) the maximum amount permitted by Section 415 of the Internal Revenue Code.

The parties agree that, beginning with the 2006 Plan Year, a player who earns his second or third Credited Season will receive an allocation of $5,000 for that year in the new Qualified Portion, subject to a vesting schedule. Forfeitures will be used to reduce employer contributions. Allocations in later years for a player will be reduced to the extent such player receives an allocation for his second or third Credited Season.

**Section 6. NFL Player Annuity & Insurance Company Net Worth:** Unless unusual circumstances exist that warrant a greater Net Worth, the estimated Net Worth of the NFL Player Annuity & Insurance Company ("Company") at the end of each calendar year beginning with 2006 shall not exceed the greater of (1) one percent (1%) of the total Segregated Accounts, or (2) $3.5 million. For purposes of this calculation, Net Worth is defined as the net worth of the Company as shown in the pro forma financial statements. At its last meeting in each calendar year, the Company's Board of Directors shall determine:

(a)     Whether or not unusual circumstances exist that warrant a greater estimated Net Worth;

(b)     The amount of any payment to the player Segregated Accounts from the Company General Account for the current year, such that the estimated Net Worth for the current year does not exceed the above limits; and

(c)     The amount, if any, by which the Company charge to the player Segregated Accounts for the upcoming calendar year should be reduced, such that the estimated Net Worth at the end of the following calendar year is not expected to exceed the above limits.

209

## ARTICLE XLVIII-B
## TUITION ASSISTANCE PLAN

*Section 1.* **Establishment:** The NFL Player Tuition Assistance Plan will provide up to $15,000 per League Year for which a Salary Cap applies as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. The NFL Player Tuition Assistance Plan is a written plan that is intended to qualify as an educational assistance program under Section 127 of the Internal Revenue Code that provides benefits to a player in any calendar year up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan begins on April 1.

*Section 2.* **Eligibility:**

(a)     To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.

(b)     Effective April 1, 2006, a player, who (i)  is not eligible for benefits under 2(a) above, (ii)  has at least one Credited Season after the 2005 Season, and (iii)  has at least five (5) Credited Seasons under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, shall be eligible to be reimbursed for up to $45,000 of his expenses incurred for qualifying tuition, fees and books, provided such expenses are incurred within 36 months of the first day of the League Year immediately following the player's last regular or post season game and otherwise satisfy the conditions of the plan.

(c)     A player who has just completed his first Credited Season will be eligible to be reimbursed for a course that begins after his Club's final game of that season and prior to the next following season provided that:

(i)     if, on the day the course begins, the player is under contract with a Club; and

(ii)     if any portion of the course is taught after the start of his Club's off-season workout program, that the player does not have to travel more than 100 miles from that Club's main practice facility to take the course, provided that

(iii)     the Parties may waive the 100 mile limitation in any individual

210

case, based upon a showing of unreasonable hardship.

**Section 3. Reimbursement:** An eligible player will be reimbursed no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books.

## ARTICLE XLVIII-C
## NFL PLAYERS HEALTH REIMBURSEMENT ACCOUNT

*Section 1.* **Establishment:** The parties will jointly establish a new benefit, to be called the NFL Players Health Reimbursement Account Plan (hereinafter referred to as "Health Reimbursement Plan" or "Plan"). The Health Reimbursement Plan will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Plan Year begins on April 1. The Health Reimbursement Plan, and any and all future amendments thereto as adopted in accordance with the terms of that Plan, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:** For each of the Plan Years 2006 and thereafter in which a Salary Cap applies, a contribution will be made to the Health Reimbursement Plan on behalf of the NFL Clubs based on the actuarial assumptions and methods contained in Appendix J-1. If either party terminates the CBA such that the last League Year subject to a Salary Cap is before 2011, the unfunded present value of accrued nominal accounts shall be funded at a time or times selected by the NFL Management Council in an amount sufficient to pay reimbursements when they become due. All such contributions will be held for the exclusive benefit of Participants and their beneficiaries, and under no circumstances will any assets of the Plan ever revert to, or be used by, an Employer, the League, or the NFLPA. Notwithstanding the above, any contribution made by or on behalf of an Employer to the Plan due to a mistake of fact or law will be returned to such Employer within six (6) months of the determination that such contribution was in error. The return of contributions is limited to that portion of the contribution as to which there was a mistake of fact or law. A returned contribution will not include any earnings attributable to the contribution, but will be reduced by any losses attributable to the contribution. It will be the duty of the fiduciaries of the Health Reimbursement Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. No participant or beneficiary is required to or permitted to contribute, except as may be required by law. The present value of accrued nominal accounts will be determined based on the actuarial assumptions and methods contained in Appendix J-1.

*Section 3.* **Eligibility:** A Player participates in this Plan if (a) he earns a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement

212

Plan ("Retirement Plan") for 2006 or for any later Plan Year for which a Salary Cap applies and has a total of three (3) or more Credited Seasons as of the end of such Plan Year, or (b) his last Credited Season under the Retirement Plan is either 2004 or 2005 and he had a total of eight (8) or more Credited Seasons as of the end of the such Plan Year.

**Section 4. Health Reimbursement Accounts:** A nominal account will be established to account for the interest of each eligible player. No interest, other investment earnings, or losses will be credited to any nominal account, except as described under Section 7(b) below. Reimbursement payments from the Plan to eligible players, their spouses, and dependents will reduce the health reimbursement accounts dollar-for-dollar. Credits to the nominal accounts of eligible Players are determined as of March 31 of each Plan Year during which a Salary Cap applies as follows:

(a)    On March 31, 2007, the nominal account of each eligible player will be credited with $25,000 for each of his Credited Seasons.

(b)    On March 31, 2008 and at the end of each Plan Year thereafter for which a Salary Cap applies:

(i)    The nominal account of an eligible Player who earned a Credited Season in that Plan Year will be credited with $25,000; and

(ii)    The nominal account of a Player who first becomes eligible in that Plan Year because it is his third Credited Season will be credited with an additional $50,000 for that year only.

(c)    The determination by the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan of a Player's Credited Seasons will be binding on the Plan. A player who is awarded Credited Seasons by the Retirement Board and who thereby (1) becomes eligible to participate in the Plan or (2) becomes eligible for additional credits, will receive retroactive credits to his nominal account as of the end of the Plan Year in which the Retirement Board's Credited Season determination is made. The amount of the retroactive allocation will be $25,000 times the number of Credited Seasons not already counted under the Plan.

Total credits to an eligible player's nominal account shall not exceed $300,000.

**Section 5. Payments from Health Reimbursement Accounts:** The Plan will reimburse medical care expenses (within the meaning of Internal Revenue Code section 213(d), and including, without limitation, direct medical expenses, medical insurance premiums, and medical insurance copays and deductibles to the extent provided in such Internal Revenue Code section) incurred by eligible players and their spouses and dependents without regard to Section 152(b)(1), (b)(2) and (d)(1)(B)). The Plan will be established and administered to use the broadest allowable definition of "dependent" permitted by law. Payments will be made only to the extent that the player or the player's spouse or dependents have not been reimbursed

213

for the expense from any other plan. No player will have the right to receive cash or any taxable or nontaxable benefit other than the reimbursement of medical care expenses incurred by the player and his spouse and dependents. No reimbursement will be made to the extent that it would reduce the Player's Health Reimbursement Account below zero. A player's rights under this Health Reimbursement Plan may not be transferred, assigned, or alienated, except pursuant to a qualified medical child support order as defined in Section 609(a)(2) of ERISA.

Upon the death of a player, any remaining account balance may be used only to reimburse the medical care expenses of his surviving spouse and dependents. Upon the death of such surviving spouse and last dependent, or upon the death of the player if there is no surviving spouse or dependents, any unused remaining balance is cancelled.

A player may receive a reimbursement from this Plan only for expenses incurred during a period of time during which he is not covered by (a) the Group Insurance provided in Section 1 of Article XLIX and (b) the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article XLIX; except that a player who is covered by the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article XLIX by reason of COBRA may receive a reimbursement from this Plan.

**Section 6. Structure:** The Health Reimbursement Plan will hold assets for the exclusive benefit of players and their beneficiaries. The parties agree that the Plan will be administered by a Health Board, and that prior to the first meeting of the Health Board the advisors to the Health Reimbursement Plan will be the same as the advisors to the Savings Plan. The Health Reimbursement Plan is intended to be a health care reimbursement arrangement as described in IRS Notice 2002-45, 2002-28 IRB 93; Rev. Rul. 2002-41, 2002-28 IRB 75; and Situation 1 of IRS Revenue Ruling 2005-24.

**Section 7. Plan Operation in Uncapped Years:** The Plan will operate as follows in years for which no Salary Cap applies:

(a)      The Plan will continue in existence until all nominal accounts have been paid out or forfeited; and

(b)      The nominal accounts will not be credited with any earnings or interest except to the extent that, in the sole discretion of the Health Board, accumulated Plan earnings exceed current expenses and an appropriate reserve.

# ARTICLE XLVIII-D
# 88 BENEFIT

*Section 1:* **Establishment:** The parties agree to design and establish a new plan, effective February 1, 2007, to be called the "88 Plan," to provide medical benefits to former Players who are (1) vested due to their Credited Seasons or their total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (2) determined by the governing Board of the 88 Plan (the "88 Board") to have "dementia," as defined by the parties. The 88 Plan will be jointly administered, pursuant to the requirements of the Taft-Hartley Act, in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The 88 Plan, and any and all future amendments thereto, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Prior to the first meeting of the 88 Board, the advisors to the 88 Plan will be the same as the advisors to the Savings Plan. The Plan Year begins on April 1.

*Section 2:* **Benefits:** The Plan will reimburse, or pay for, certain costs related to dementia. In no event will the total payments to or on behalf of an eligible player exceed $88,000 in any year, and in no event will benefits be paid for any month or other period of time that precedes the later of (1) February 1, 2007, or (2) the date the 88 Board first receives a written application or similar letter requesting the benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit, except that an application received on or before May 15, 2007, will be deemed to have been received on February 1, 2007. The costs to be paid for an eligible player include:

(a)      For any month in which an eligible player was admitted as an inpatient at an eligible institution for all or part of the month, institutional custodial care, institutional charges, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $88,000; and

(b)      For any month in which an eligible player was not admitted as an in-patient at an eligible institution for all or part of the month, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $50,000.

The maximum benefit payable for any month shall be reduced, but not below zero, by the amount of any total and permanent disability benefits paid by the Bert Bell/Pete Rozelle NFL Player Retirement Plan and the NFL Player Supplemental Disability Plan. However, the maximum benefit payable for any month shall not be reduced by those total and permanent disability benefits paid to players who are receiving the Inactive total

215