NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty (30) days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty (30) days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten (10) days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)     **No Waiver:** Any failure of the NFL or the NFLPA to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

### Section 4. Effect of Early Termination on Player Contracts:

(a)     If otherwise in compliance with this Agreement upon execution prior to notice of early termination, a Player Contract may not be found to violate this Agreement solely by reason of a subsequent early termination of this Agreement. For example, a Player Contract that, upon execution, complies with the 30% Rule set forth in Article XXIV, Section 8(b), may not be found to violate the 30% Rule solely by reason of a subsequent early termination, although neither the Player nor the Club may, after notice of early termination of this Agreement, exercise any options, or otherwise exercise rights or take actions that would, upon exercise or implementation, cause the Player Contract to violate the 30% Rule.

(b)     Except as otherwise provided in Article XXIV, the Salary Cap accounting treatment accorded to Player Contracts executed, or any options or other rights exercised, prior to any notice of early termination of this Agreement will not change, and such contracts will not be re-valued, solely by reason of such early termination.

(c)     Contracts executed or renegotiated after any notice of early termination of this Agreement, as well as the exercise after such notice of any pre-existing option or contract rights shall be governed by the then-existing Salary Cap rules, taking into account the consequences of any such early termination (e.g., the conversion of 2009 to the Final Capped Year and the conversion of 2010 to an Uncapped Year).

### Section 5. Ratification: This Agreement is subject to ratification by the
NFLPA and the Management Council in accordance with their internal pro-

cedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

242

## ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this
Agreement, this Agreement shall be construed and interpreted under, and
shall be governed by, the laws applicable to contracts made and performed
in the State of New York.

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a)   To the National Football League Management Council:
      The National Football League
      Management Council
      280 Park Avenue
      New York, New York 10017
      Attention: Executive Vice President—Labor Relations

(b)   To an NFL Club:
      At the principal address of such Club as then
      listed on the records of the NFL or at that Club's
      principal office.
      Attention: President

(c)   To the NFLPA:
      National Football League Players Association
      2021 L Street, N.W.
      Washington, D.C. 20036
      Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE        NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION             MANAGEMENT COUNCIL


BY: _____     BY: _____

244

Appendix A

# APPENDIX A
## CHECK-OFF AUTHORIZATION FOR
## NATIONAL FOOTBALL LEAGUE PLAYERS
## ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven (7) days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management

245

Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

_____
Signature

_____
Player's Name—Type or Print

246

## APPENDIX B
## INJURY PROTECTION/EARLY WAIVER

    With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under Subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

# APPENDIX C
# NFL PLAYER CONTRACT

THIS CONTRACT is between _____,
hereinafter "Player," and_____,
a _____ corporation
(limited partnership) (partnership), hereinafter "Club," operating under
the name of the
as a member of the National Football League, hereinafter "League." In con-
sideration of the promises made by each to the other, Player and Club agree
as follows:

    1.    TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

    2.    EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory minicamp(s), official pre-season training
camp, all Club meetings and practice sessions, and all pre-season, regular
season and postseason football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

    3.    OTHER ACTIVITIES. Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experi-
ence as a football player, the loss of which cannot be estimated with any cer-
tainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

    4.    PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
(a)    Player grants to Club and the League, separately and together,

**248**

the authority to use his name and picture for publicity and the promotion
of NFL Football, the League or any of its member clubs in newspapers,
magazines, motion pictures, game programs and roster manuals, broad-
casts and telecasts, and all other publicity and advertising media, provided
such publicity and promotion does not constitute an endorsement by Play-
er of a commercial product. Player will cooperate with the news media, and
will participate upon request in reasonable activities to promote the Club
and the League. Player and National Football League Players Association,
hereinafter "NFLPA," will not contest the rights of the League and its mem-
ber clubs to telecast, broadcast, or otherwise transmit NFL Football or the
right of NFL Films to produce, sell, market, or distribute football game film
footage, except insofar as such broadcast, telecast, or transmission of
footage is used in any commercially marketable game or interactive use.
The League and its member clubs, and Player and the NFLPA, reserve their
respective rights as to the use of such broadcasts, telecasts or transmissions
of footage in such games or interactive uses, which shall be unaffected by
this subparagraph.

(b)      Player hereby assigns to the NFLPA and its licensing affiliates, if
any, the exclusive right to use and to grant to persons, firms, or corpora-
tions (collectively "licensees") the right to use his name, signature facsimi-
le, voice, picture, photograph, likeness, and/or biographical information
(collectively "image") in group licensing programs. Group licensing pro-
grams are defined as those licensing programs in which a licensee utilizes a
total of six (6) or more NFL player images on or in conjunction with prod-
ucts (including, but not limited to, trading cards, clothing, videogames,
computer games, collectibles, internet sites, fantasy games, etc.) that are
sold at retail or used as promotional or premium items. Player retains the
right to grant permission to a licensee to utilize his image if that licensee is
not concurrently utilizing the images of five (5) or more other NFL players
on products that are sold at retail or are used as promotional or premium
items. If Player's inclusion in a particular NFLPA program is precluded by
an individual exclusive endorsement agreement, and Player provides the
NFLPA with timely written notice of that preclusion, the NFLPA will ex-
clude Player from that particular program. In consideration for this assign-
ment of rights, the NFLPA will use the revenues it receives from group li-
censing programs to support the objectives as set forth in the Bylaws of the
NFLPA. The NFLPA will use its best efforts to promote the use of NFL play-
er images in group licensing programs, to provide group licensing oppor-
tunities to all NFL players, and to ensure that no entity utilizes the group
licensing rights granted to the NFLPA without first obtaining a license from
the NFLPA. This paragraph shall be construed under New York law with-
out reference to conflicts of law principles. The assignment in this para-
graph shall expire on December 31 of the later of (a) the third year follow-
ing the execution of this contract, or (b) the year in which this contract ex-

Appendix C

pires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

5.    COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____for the 20_____season;

$_____for the 20_____season;

$_____for the 20_____season;

$_____for the 20_____season;

$_____for the 20_____season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.    PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly por-

250

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7.   DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.   PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.   INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.   WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

251

deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.    SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.    TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.    INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14.    RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which

252

are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.  INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.  EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.  ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

253

18.    FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.    DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.    NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.    OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22.    LAW. This contract is made under and shall be governed by the laws of the State of _____.

254

23.    WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.    OTHER PROVISIONS.

(a)    Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)    Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)    The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

255

25.   SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

_____        _____
PLAYER                                  CLUB
_____        _____
Home Address                            By
_____        _____
Telephone Number                        Club Address
_____        _____
Date                                    Date
_____
PLAYER'S CERTIFIED AGENT
_____
Address
_____
Telephone Number
_____
Date

Copy Distribution:    White-League Office      Yellow-Player
                      Green-Member Club        Blue-Management Council
                      Gold-NFLPA               Pink-Player Agent

256

# APPENDIX D
## FIRST REFUSAL OFFER SHEET

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                         Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

   [Supply Information on this Sheet or on Attachment]

   1.      Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

   2.      Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

   3.      Other terms (that need not be matched):

Player:                                  New Club:

By: _____     By: _____
                                         Chief Operating Officer

257

## APPENDIX E
## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                    Date:

Address of Player:                 Name of New Team:

Name and Address of               Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                   Address of Prior Team:

    The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

Prior Team

By: _____
Chief Operating Officer

Appendix F

## APPENDIX F
## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By: _____

WITNESSED BY:

_____

259

**APPENDIX G**
**NOTICE OF TERMINATION**

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

260

# APPENDIX H
## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Cash Player Costs, and Total Revenues ("TR") of the NFL and its member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions of the CBA. The information on the Schedule is to be the responsibility of the management of the Clubs and the NFL.

The Management Council and the NFLPA are to retain a national accounting firm (the "Accountants") which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Procedures shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six (6) members with three (3) representatives designated by each of the Management Council and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Procedures described in the preceding paragraph and again to review the results of the Procedures reasonably before issuance of any Special Purpose Letter for that playing season.

The procedures detailed below and/or as otherwise agreed by the parties are and shall be designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Cash Player Costs and Total Revenues of the NFL and its Clubs for such League Year in accordance with the provisions of the CBA. The Accountants will perform the Procedures with respect to the Schedule for each League Year.

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), as agreed upon by the parties, or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report upon the Procedures as referred above.

261

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

## Procedures provided by the Management Council and the NFLPA to be performed by the Accountants

### General

- The CBA and all relevant side letters should be reviewed and understood.

- See Exhibit H.1 for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in TR where appropriate.

- The Player Compensation and Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule shall be made available for review by representatives of the Management Council and the NFLPA prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the Management Council and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with the CBA. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

262

- Revenue and expense amounts that have been estimated should be re-confirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from TR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, TR.

## Procedures provided by the Management Council and the NFLPA to be performed by the Local Accountants

### General

- The local accountants shall conduct procedures as agreed upon by the parties.

- The CBA and all side letters should be reviewed and understood by all Local Accountants.

- See Exhibit H.2 for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

### Team Salaries - Schedule 1

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the CBA.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the CBA.

263

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the CBA.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this CBA.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

## Benefits - Schedule 2

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

## Player Costs - Schedule 3

- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the CBA.

264

**Cash Player Costs - Schedule 3A**
- Perform procedures provided in Schedules 1 and 2 above and calculate Club's "Cash Salary" and amounts committed to be spent by Club in the year under review for Player Benefits, to determine the Club's contribution to Cash Player Costs (as defined in Article XXIV, Section 4(d)(iv) for such year.

**Revenues - Schedule 4**
- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included in TR in a manner consistent with the CBA. Amounts included in TR, and deductions against such revenues should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in TR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in TR. Test appropriateness of balances where appropriate.

**Questions**
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

265

**Revenue Reporting Procedures and List of Related Entities**

- Review with Controller or other representatives of the team all informa-
  tion included on both schedules.

- Prepare a summary of any changes, corrections or additions to either
  schedule.

266

## EXHIBIT H.1
## ACCOUNTANTS' AGREED-UPON PROCEDURES REPORT

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (collectively, the "Parties") with respect to the National Football League Office Reporting Package and the Reporting Packages of the Member Clubs of the National Football League, for the [insert] League Year, solely to assist the Parties in evaluating whether the Reporting Packages were prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and will not perform an audit or examination, the objective of which would be the expression of an opinion on the Reporting Packages. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an audit or examination of the Reporting Packages, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

267

## EXHIBIT H.2
## LOCAL ACCOUNTANTS' AGREED-UPON
## PROCEDURES REPORT

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of management of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule A either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the [Member Club Name], the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

## APPENDIX H-3
## REVENUE ACCOUNTING RULES

The following is a non-exclusive list of revenue accounting rules that were agreed to by the Parties prior to the 2006 League Year that continue in effect under this Agreement, as stated in Article XXIV, Section 1(a). These rules apply to TR as of the 2006 League Year, and to DGR or Excluded DGR, as appropriate, prior to then. These rules apply only to the extent expressly stated below and shall not be used to support or impose an interpretation of any provision of the Settlement Agreement or any other provision of this Agreement. The Parties hereby confirm that, absent an express provision of the Agreement or this Appendix to the contrary, all revenue accounting rules applied prior to the 2006 League Year continue in effect, regardless of whether or not they are set forth or referenced in this Appendix or the text of the Agreement.

### A. Cost of Goods Sold

In the event that a Club or Club Affiliate is regularly engaged in selling goods (e.g., concessions or merchandise) directly to the public, and incurs an actual out-of-pocket, direct cost for purchasing such goods (i.e., the purchase price paid to an unrelated third party including shipping costs and sales taxes paid, net of all discounts), and such goods are not sold to any individual or entity related in any manner to any Club owner or previous owner, then such "cost of goods sold" may be deducted from the calculation of the TR revenues for that Club. Allowable costs of goods deductions shall not include, without limitation: costs that are imputed or allocated in any manner; insurance; depreciation; amortization; costs incurred by any person other than the Club or Club Affiliate, including but not limited to such costs that are reimbursed by the Club or Club Affiliate; maintenance expenses; expenses that have in any manner been shifted from another revenue source that was previously included in TR on a gross basis; marketing; advertising or promotional expenses; and interest or financing costs.

In the event that a Club or Club Affiliate is regularly engaged in selling directly to the public printed materials promoting the Club, NFL players, or NFL football, and the Club or Club Affiliate incurs an actual, out-of-pocket, direct cost in the production of such printed materials, and such goods are not sold to any individual or entity related in any manner to any Club or previous owner, then thirty-three percent (33%) of such costs may be deducted from the printed material revenue included in the calculation of the TR revenues for that Club. This paragraph is intended to supplement without modifying the immediately preceding paragraph pertaining to costs of goods sold.

269

## B. Sponsorship Revenues

In the event that a Club provides tickets to any individual or entity having a sponsorship relationship with the Club (including tickets provided pursuant to any sponsorship contract), the face value of such tickets may be excluded from TR only if the tickets are excluded from TR under Article XXIV, Section 1(a)(ii)(E). In any case, all sponsorship revenue from sponsors (whether cash or barter) less only the face value of any tickets provided by the Club which are otherwise included in TR shall be included in TR (i.e., a revenue amount that a Club receives from a sponsor in connection with the sponsor receiving tickets shall not be counted more than once).

In the event that a Club provides tickets to any individual or entity not having a sponsorship relationship with the Club, and the Club receives anything of value from such individual or entity, then the fair market value of the consideration received by the Club (whether cash or barter), less only the face value of any tickets provided by the Club which would otherwise be included in TR, shall be included in TR.

## C. PSL Refunds

PSL revenues shall be reported net of actual refunds made in the year for which such revenues are reported. If an amount has been refunded, then the refunded amount shall be deducted from PSL revenues used in the calculation of TR. If there is a non-contingent contractual commitment to refund, but the refund is to be made at a later date, then the only amount included is the interest (i.e., deferred compensation interest rate) on the refund. Otherwise, all amounts are included regardless of any refund contingencies. If a refund contingency occurs and money previously included as PSL revenue is refunded, the NFL shall receive a credit against TR (i.e., League-wide TR shall be reduced) in the amount of the refund the next Salary Cap year.

## D. Luxury Boxes, Suites and Premium Seating

Non-shared revenues relating to luxury boxes, suites and premium seating that are included in TR that are not included in Article XXIV, Section 1(a)(i)(1) above will be included in the calculation only after the deduction of direct expenses for depreciation (subject to Article XXIV, Section 4(e)(xi)), rent, interest and taxes. Where a deduction for direct expenses for depreciation for such revenues is available, such direct expenses will be calculated using a reasonable period of depreciation, and will not include acquisition expenses not directly related to the construction or improvement of the luxury box, suite or premium seating.

270