# ARTICLE 2
# GOVERNING AGREEMENT

*Section 1.* **Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the Settlement Agreement, NFL Player Contract, the NFL Constitution and Bylaws, the NFL Rules, or any other document affecting terms and conditions of employment of NFL players, and all players, Clubs, the NFLPA, the NFL, and the Management Council will be bound hereby. For the avoidance of doubt, the NFL shall be considered a signatory to this Agreement.

*Section 2.* **Implementation:** The parties will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs. The NFL and NFLPA will use their best efforts to see that the terms and conditions of all NFL Player Contracts are carried out in full by players.

*Section 3.* **Management Rights:** The NFL Clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement.

*Section 4.* **Scope of Agreement:**
 (a) This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article 47, Section 6, on Union Security, the NFLPA and the NFL waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws; provided, however, that if any proposed change in the NFL Constitution and Bylaws could significantly affect the terms and conditions of employment of NFL players, then the NFL will give the NFLPA notice of and negotiate the proposed change in good faith.
 (b) The question of whether the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a Non-Injury Grievance under Article 43, which shall be the exclusive method for resolving disputes arising out of this Section 4. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations.

*Section 5.* **Rounding:** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, AR, Benefits, Player Costs,

5

Projected AR, Projected Benefits, Salary, Cash Spending, or Minimum Team Salary, such amounts shall be rounded to the nearest $1,000.

## ARTICLE 3
## NO STRIKE/LOCKOUT/SUIT

*Section 1.* **No Strike/Lockout:** Except as otherwise provided in Article 47 (Union Security), Section 6, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim that a party has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the party will have the right to submit such claim directly to the courts.

*Section 2.* **No Suit:** The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, or any term of this Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Rookie Compensation System, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, Guaranteed League-wide Cash Spending, the Salary Cap, Minimum Team Cash Spending, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the NFL, has: (1) breached the terms of this Agreement, the NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article 43 or asserting any claim before the System Arbitrator or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the *Brady* Settlement Agreement and from asserting such a claim before the System Arbitrator, Impartial Arbitrator, or the Appeals Panel, as provided for in the *Brady* Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the provisions of the Constitution and Bylaws of the NFL, which are appended to the side letter dated August 4, 2011, as they were operative and administered at the beginning date of the 2011 League Year; provided, however, that nothing herein shall prevent the NFLPA, its members, agents or bargaining unit members from asserting any rights they may have under the federal labor laws or under this Agreement or the *Brady* Settlement Agreement.

*Section 3.* **Releases and Covenants Not to Sue:**
    (a)    The NFLPA on behalf of itself, its members, and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit or proceeding (including any Special Master proceeding brought pursuant to the *White* SSA and/or the

7

Prior Agreement) against the NFL or any NFL Club or any NFL Affiliate with respect to any antitrust or other claim asserted in *White v. NFL* or *Brady v. NFL*, including, without limitation, any claim relating to the 2011 lockout, any restrictions on free agency, any franchise player designations, any transition player designations, the Draft, the Entering Player Pool, the Rookie Compensation Pool, Total Revenues ("TR") or television rights fees with respect to any League Year prior to 2011, collusion with respect to any League Year prior to 2011, or any claim that could have been asserted in *White* or *Brady* related to any other term or condition of employment with respect to conduct occurring prior to the execution of this Agreement. For purposes of clarity, this release does not cover any claim of any retired player.

(b) The NFL, on behalf of itself, the NFL, and the NFL Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit (including any Special Master proceeding brought pursuant to the *White* SSA and/or the Prior Agreement) against the NFLPA or any of its members, or agents acting on its behalf, or any member of its bargaining unit, with respect to conduct occurring prior to the execution of this Agreement.

(c) Other than as provided in the Settlement Agreement, the releases and covenants not to sue in Subsections (b) and (c) above shall not apply to any Injury or Non-Injury Grievance asserted under the Prior Agreement, or to any proceeding to confirm an Injury or Non-Injury Grievance award under the Prior Agreement.

(d) The parties shall take prompt and immediate steps to dismiss the litigation, grievances, and arbitration referenced in Paragraph 4 of the Settlement Agreement and the NLRB proceeding referenced in the side letter to the Settlement Agreement dated July 26, 2011.

# ARTICLE 4
# NFL PLAYER CONTRACT

*Section 1.* **Form:** The NFL Player Contract form attached hereto as Appendix A will be used for all player signings. This form cannot be amended without the approval of the NFL and the NFLPA.

*Section 2.* **Term:** The NFL Player Contract shall expire on the last day of the last League Year subject to such Contract.

*Section 3.* **Changes:**
    (a)    Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract consistent with the provisions of this Agreement.
    (b)    The NFL Player Contract shall provide that the player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to any collective bargaining agreement during the express term of such agreement.

*Section 4.* **Conformity:**
    (a)    All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement.
    (b)    Any reference in a Preexisting Contract or a Contract executed between July 25, 2011 and the effective date of this Agreement to a player being on the Club's 45-man roster shall be deemed amended to refer to the Club's 46-man roster.
    (c)    Any reference in a Preexisting Contract or a Contract executed between July 25, 2011 and the effective date of this Agreement to a player participating in a certain number of days of a Club's offseason workout program shall be deemed amended to refer to an equivalent number taking into account the maximum number of workouts in such a program under this Agreement as compared to the maximum number under the Prior Agreement (e.g., if a Preexisting Contract referred to a player participating in at least 40 workouts in an offseason program, it will be deemed amended to require participation in 26 workouts (40 out of a maximum of 56 workouts under the Prior Agreement is equivalent to 26 out of a maximum of 36 workouts in this Agreement).
    (d)    The parties reserve their rights with respect to the validity of forfeiture provisions in Preexisting Contracts.
    (e)    Any Player Contract signed after July 25, 2011 that uses the form from Appendix C of the Prior Agreement shall be deemed amended to use the form from Appendix A of this Agreement.
    (f)    The provisions of Paragraph 4 of the NFL Player Contract (as set forth in Appendix A of this Agreement) shall be deemed to be a part of any Player Contract in effect during the term of this Agreement.

9

(g) Any reference in a Player Contract signed after July 25, 2011 to "the Agreement" or to the Settlement Agreement shall be deemed amended to refer to the applicable provision of this Agreement.

*Section 5.* **Notices, Prohibitions, etc.:**

(a) Any agreement between any player and any Club concerning terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. Each Club shall provide to the NFL a copy of each such Player Contract within two days of the execution of such contract by the player and the Club. The NFL shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. It is anticipated that each Club will send a copy of each such Player Contract to the NFL by overnight mail the day it is so executed, and the NFL will send a copy of such copy to the NFLPA by overnight mail the day it is so received. The NFL shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article 7 and/or Article 13, within two business days following the NFL's receipt of such information. Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

(b) Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for nonfootball-related services shall be set forth in writing as a separate addendum to the player's Player Contract, which addendum shall state the amount of or otherwise describe such consideration. If such an agreement is executed subsequent to the execution of the player's NFL Player Contract, it must be submitted to the NFL as an addendum to that Player Contract within two days of the execution or making of the agreement. The NFL shall provide a copy of such addendum to the NFLPA within two business days of receipt.

(c) No Club shall pay or be obligated to pay any money or anything else of value to any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract (or any addendum thereto for nonfootball-related services as described in Subsection 5(b) above). Nothing contained in the immediately preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d) In addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This Subsection shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

(e) No Player Contract may contain any individually-negotiated term transferring any player intellectual property rights to any Club or Club Affiliate or any Club sponsor.

(f) No Club or player may agree upon any Player Contract provision concerning the termination of the contract that is inconsistent with the terms of this Agreement (including but not limited to the NFL Player Contract, Appendix A hereto), or the provisions of the NFL Constitution and Bylaws as set forth in the attachment to the letter dated August 4, 2011.

*Section 6.* **Commissioner Disapproval:**

(a) If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefore by noon on the date following such disapproval.

(b) In the event the Commissioner disapproves any Player Contract as being in violation of this Article, Article 7, Article 13, or any other provision of the this Agreement, the filing of an appeal of such disapproval pursuant to Article 14, Section 5 or Article 15, Section 1 of this Agreement, shall automatically stay the Commissioner's disapproval, and the player shall continue to be free to practice and play for the Club, until the System Arbitrator issues his or her ruling. Provided, however, that in the event such appeal is filed within one week of or after the first scheduled regular season game of the Club: (i) the appeal shall be conducted in an expedited manner and shall be concluded within five days of the filing date of such appeal; and (ii) the System Arbitrator shall issue his or her ruling by the end of such five day period. Provided, further, that, in the event the appeal is filed after the Club's first preseason game, but before the date one week before the Club's first scheduled regular season game: (i) the appeal shall be conducted in an expedited manner and shall be concluded within ten days of the filing date of such appeal; and (ii) the System Arbitrator shall issue his or her ruling by the end of such ten day period. If there is no ruling by the end of the periods prescribed in the preceding two sentences, or, for earlier filed appeals, by the day following the Club's third preseason game, the automatic stay shall be dissolved. If the Commissioner disapproves a Player Contract for any of the reasons stated above on a second occasion for the same player during a given League Year, and determines that such player should not be able to play, there shall be no stay of such disapproval pursuant to this Agreement, unless it is determined that the Commissioner's second disapproval is arbitrary or capricious.

*Section 7.* **NFLPA Group Licensing Program:** The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in Paragraph 4(b) of the NFL Player Contract (Appendix A hereto), regarding the NFLPA Group Licensing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision. No Club may enter into any agreement with a Player or a Player Affiliate that is inconsistent with any rights granted to the NFLPA pursuant to Paragraph 4(b) of the NFL Player Contract; provided that this sentence is not intended and shall not be construed to override or restrict the rights granted to the Club and the League pursuant to Paragraph 4(a) of the NFL Player Contract.

*Section 8.* Good Faith Negotiation:

(a) In addition to complying with specific provisions in this Agreement, any Club, any player, and any player agent or contract advisor engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

(b) A Club extending a Required Tender must, for so long as that Tender is extended, have a good faith intention to employ the player receiving the Tender at the Tender compensation level during the upcoming season. It shall be deemed to be a violation of this provision if, while the tender is outstanding, a Club insists that such a player agree to a Player Contract at a compensation level during the upcoming season below that of the Required Tender amount. The foregoing shall not affect any rights that a Club may have under the Player Contract or this Agreement, including but not limited to the right to terminate the contract, renegotiate the contract, or to trade the player if such termination, renegotiation, or trade is otherwise permitted by the Player Contract or this Agreement.

*Section 9.* **Forfeiture of Salary:** Players and Clubs may not agree upon contract provisions that authorize the Club to obtain a forfeiture of any Salary from a player except to the extent and in the circumstances provided in this Section 9. For the avoidance of doubt, Paragraph 5 Salary already earned may never be forfeited, and other Salary already earned may never be forfeited except as expressly provided herein. The maximum permitted forfeitures described below do not in any way obligate any player or Club to agree to any forfeiture.

(a) **Forfeitable Breach.** Any player who (i) willfully fails to report, practice or play with the result that the player's ability to fully participate and contribute to the team is substantially undermined (for example, without limitation, holding out or leaving the squad absent a showing of extreme personal hardship); or (ii) is unavailable to the team due to conduct by him that results in his incarceration; or (iii) is unavailable to the team due to a nonfootball injury that resulted from a material breach of Paragraph 3 of his NFL Player Contract; or (iv) voluntarily retires (collectively, any "Forfeitable Breach") may be required to forfeit signing bonus, roster bonus, option bonus and/or reporting bonus, and no other Salary, for each League Year in which a Forfeitable Breach occurs (collectively, "Forfeitable Salary Allocations"), as set forth below:

(i) **Training Camp.** If a player commits a Forfeitable Breach resulting in his absence for six preseason days after the start of training camp, the player may be required to forfeit up to 15% of his Forfeitable Salary Allocations, and up to an additional 1% of his Forfeitable Salary Allocations for each additional preseason day missed after the six days, up to a maximum of 25% of his Forfeitable Salary Allocations. A player who misses five days or less of training camp may not be subject to forfeiture.

(ii) **Continuing Violation.** If a player commits a Forfeitable Breach resulting in his absence from training camp and such absence continues into the regular season, in addition to the maximum forfeiture permitted by Subsection (i) above, the player may be required to forfeit an additional 25% of the remaining Forfeitable Salary Allocations upon missing the first regular season game. If such absence continues beyond the fourth week of the regular season, the player may be required to forfeit up to

12

his remaining Forfeitable Salary Allocations on a proportionate weekly basis (i.e., one-seventeenth for each missed regular season week after the fourth week).

(iii) **Regular Season.** If the player is not subject to Subsection (ii) above, and commits a Forfeitable Breach for the first time that League Year during the regular season, the player may be required to forfeit up to twenty-five percent (25%) of his Forfeitable Salary Allocations upon missing his first regular season game. If player's Forfeitable Breach continues beyond four (4) consecutive weeks, then player may be required to forfeit up to his remaining Forfeitable Salary Allocations on a proportionate weekly basis (i.e., one-seventeenth for each missed regular season week after the fourth week).

(iv) **Postseason.** For the period following the Club's last regular season game through the Club's last postseason game, a player who commits a Forfeitable Breach during such period may be required to forfeit up to 25% of his Forfeitable Salary Allocations for that League Year, subject to Subsection (d) below.

(v) **Second Forfeitable Breach.** If the player commits an initial Forfeitable Breach (including a Forfeitable Breach in training camp) and then commits a second Forfeitable Breach during the regular season or postseason in the same League Year, the player may be required to forfeit immediately the entirety of his remaining Forfeitable Salary Allocations for that League Year.

(vi) **Retirement.** Should a Forfeitable Breach occur due to player's retirement, a Club may demand repayment of all Forfeitable Salary Allocations attributable to the proportionate amount, if any, for the present year and the Forfeitable Salary Allocations for future years. If the player fails to repay such amounts, then the Club may seek an award from the System Arbitrator pursuant to Article 15, for repayment of all Forfeitable Salary Allocations attributable to present and future years. Repayment of Forfeitable Salary Allocations attributable to future League Years must be made by June 1st of each League Year for which each Forfeitable Salary Allocation is attributable. If the player returns to play for the Club in the subsequent season, then the Club must either (a) take the player back under his existing contract with no forfeiture of the remaining Forfeitable Salary Allocations, or (b) release the player and seek repayment of any remaining Forfeitable Salary Allocations for future League Years.

(b) **Forfeitable Salary Allocations.** For the purposes of this Section, the term "Forfeitable Salary Allocations" means: (i) for signing bonus, the Salary Cap allocation for the player's signing bonus for that League Year; and (ii) for roster, option and reporting bonuses that are earned in the same League Year as the Forfeitable Breach, the allocation of such bonus for that League Year, out of the total amount of such bonus as allocated over that League Year and any remaining League Years in the player's contract, notwithstanding the Salary Cap treatment of such bonuses. For example, without limitation, if a player has a $1 million roster bonus that is earned in the same year the player committed a Forfeitable Breach, then, regardless of when that roster bonus is to be paid, that bonus is attributable to the same year as the Forfeitable Breach; if the player has that year and one additional year remaining on his contract, then $500,000 of the roster bonus will be allocated to each of those years for purposes of any potential forfeiture calculation. If the Forfeitable Breach occurs in the second League Year in this example

13

(i.e., the League Year after the roster bonus in this example is earned), there shall be no forfeiture of any portion of such roster bonus.

(c) **Proportionate Forfeiture.** For purposes of this Section, a "proportionate" amount means one-seventeenth of the Forfeitable Salary Allocations for that League Year for each regular season week missed.

(d) **Maximum Forfeitable Salary.** Under this Section, and without limitation, under no circumstances may a player be required to forfeit more than 100% of his Forfeitable Salary Allocations for each League Year in which he commits a Forfeitable Breach. With respect to roster bonus, option bonus and reporting bonus, a forfeiture may only occur if the Forfeitable Breach occurs in the same League Year in which the bonus is scheduled to be earned.

(e) **Drug or Steroid Policy Violations.** Player Contracts may not contain individually negotiated provisions for forfeiture relating to violations of the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program on Substances of Abuse, or for failing any drug test. A player suspended by the League pursuant to either of those policies for a period encompassing regular season or postseason games shall be required to forfeit any Forfeitable Salary Allocations on a proportionate weekly basis.

(f) **Offseason.** Salary may not be subject to forfeiture for missing voluntary offseason programs or voluntary minicamps, provided that the Club may have non-proratable participation bonuses for its offseason workout program.

(g) **Voiding of Guarantees.** Notwithstanding any other provision of this Section 9, a Club and player may negotiate the circumstances under which the guarantee of any unearned Salary (including, without limitation, Paragraph 5 Salary and/or future year roster bonuses, option bonuses or reporting bonuses) may be voided. This Subsection (g) only applies to the guarantee aspect of the contract provision, and not to the amount that can be earned, and in no way expands the permissible scope of Forfeitable Salary under this Section.

(h) **Deduction/Payment.** Recovery of any forfeiture under this Section may be made from any payments owed to a player under any NFL Player Contract with the Club claiming the forfeiture, from any salary, bonus installments, Performance-Based Pay, Postseason Pay, Severance Pay or Termination Pay otherwise owed by the claiming Club. If the player challenges such recovery by filing a proceeding before the System Arbitrator, the Club shall be required to put the disputed sums in escrow pending receipt of a final award. The assignment and/or termination of a player's contract after events triggering the forfeiture shall not result in any waiver of the assigning or terminating Club's right to seek to recover the full amount of any forfeiture.

(i) **2006 CBA.** This Section is intended to supersede Section 9 of Article XIV of the Prior Agreement, and to overrule the decision in the proceeding under that Prior Agreement involving Plaxico Burress to the extent that the provisions in this Section 9 alter that decision with respect to Player Contracts entered into on or after July 25, 2011.

(j) **Dispute Resolution.** Any disputes regarding this Section, including any dispute regarding a player's failure to repay Salary pursuant to this Section, shall be resolved exclusively by the System Arbitrator under the provisions of Article 15.

(k) **Club Discretion.** Except as provided in Subsection (e), any attempt to seek or collect a forfeiture from a player shall be solely in the Club's discretion, and any failure by a Club to seek a forfeiture from a player under this Section shall not be deemed a violation of any provision of this Agreement.

(l) **Contract Provision.** It shall be permissible for a player and Club to agree in a Player Contract as follows: "Player shall be subject to forfeiture of Salary to the maximum extent permitted under Article 4, Section 9 of the Agreement dated July 25, 2011 [or "of the Collective Bargaining Agreement dated August 4, 2011]." A player is not in any way obligated to agree to any such forfeiture clause, or any lesser forfeiture permitted by this Section.

*Section 10.* **Return of Advanced Paragraph 5 Salary:** A player and Club may agree to the circumstances in which a player shall have to return any advanced Paragraph 5 Salary, so long as such agreement does not affect the player's ability to eventually earn such Paragraph 5 Salary by performing his services for the regular season week(s) in question. Nothing in this Section shall be construed to address the circumstances in which players are or are not entitled to Paragraph 5 Salary for such week(s).

## ARTICLE 5
## OPTION CLAUSES

*Section 1.* **Prohibition:** Other than as provided for in Article 7, Section 7, any option clause must be negotiated as a separate addendum to the NFL Player Contract form, and any negotiated option clause must state the dollar amount(s) of Salary to be paid to the player during the option year.

## ARTICLE 6
## COLLEGE DRAFT

*Section 1.* **Time of Draft:** There shall be an Annual Selection Meeting (the "College Draft" or "Draft") each League Year during the term of this Agreement and for the year immediately following the expiration or termination of this Agreement, with respect to which the following rules shall apply. In any League Year in which the NFL deems it appropriate, there may also be a Supplemental Draft.

*Section 2.* **Number of Choices and Eligibility:**

(a)  The Draft shall consist of seven rounds, with each round consisting of the same number of selection choices as there will be Clubs in the NFL the following League Year, plus a maximum number of additional Compensatory Draft Selections equal to the number of Clubs then in the League, with such Compensatory Draft Selections reserved for Clubs losing certain Unrestricted Free Agents. Each Draft shall be held between February 14 and June 2, on a date which shall be determined by the Commissioner.

(b)  No player shall be permitted to apply for special eligibility for selection in the Draft, or otherwise be eligible for the Draft, until three NFL regular seasons have begun and ended following either his graduation from high school or graduation of the class with which he entered high school, whichever is earlier. For example, if a player graduated from high school in December 2011, he would not be permitted to apply for special eligibility, and would not otherwise be eligible for selection, until the 2015 Draft.

(c)  If a player who was not eligible for the Draft in any League Year becomes eligible after the date of the Draft, he will be eligible to be selected in a Supplemental Draft, if the League elects to conduct such a Draft, on or before the seventh calendar day prior to the opening of the first training camp that League Year. No player may elect to bypass a Draft for which he is eligible to apply for selection in a Supplemental Draft. Any Club that selects a player in a Supplemental Draft must forfeit a choice in the same round in the next succeeding principal Draft.

(d)  No player shall be eligible to be employed by an NFL Club until he has been eligible for selection in an NFL Draft.

*Section 3.* **Required Tender:** A Club that drafts a player shall be deemed to have automatically tendered the player a four-year NFL Player Contract for the Minimum Active/Inactive List Salary for such League Years. The NFL or the Club shall provide the player with notice of such Required Tender before or immediately following the Draft.

*Section 4.* **Signing of Drafted Rookies:**

(a)  A drafted player may accept the Required Tender at any time up to and including the Tuesday following the tenth week of the regular season immediately following the Draft, at 4:00pm New York time. In the event the exclusive negotiating rights to the drafted player are assigned to another Club through the NFL waiver system, the acquiring Club must immediately extend the Required Tender following assignment. If

17

released through waivers, the player shall be treated as an Undrafted Rookie, with the right to sign an NFL Player Contract with any Club, subject to the provisions of Article 7.

    (b)    If a Drafted Rookie has not signed a Player Contract during the period from the date of such Draft to the thirtieth day prior to the first game of the regular season: (i) the Club that drafted the player may not thereafter trade to another Club either its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year; and (ii) the Club that drafted the player is the only Club with which the player may sign a Player Contract until the day of the Draft in the subsequent League Year, at which time such player is eligible to be drafted in the subsequent League Year's Draft by any Club except the Club that drafted him in the initial Draft. (After the Tuesday following the tenth week of the regular season, the player and the Club may sign a Player Contract only for future League Year(s)).

    (c)    If a Drafted Rookie has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

***Section 5.*** **Other Professional Teams:**

    (a)    Notwithstanding Section 4(b) above, if a player is drafted by a Club and, during the period between the Draft and the next annual Draft, signs a contract with, plays for, or is employed by a professional football team not in the NFL during all or any part of the 12-month period following the initial Draft, then the drafting Club (or any assignee Club) shall retain the exclusive NFL rights to negotiate for and sign a contract with the player until the day of the Draft three League Years after the initial Draft, and shall thereafter have a Right of First Refusal as described herein, and the player may receive offers from any Club at any time thereafter. The player shall notify the NFLPA and the NFL of his desire to sign a contract with an NFL Club and of the date on which the player will be free of his other contractual obligations of employment, if any. Within thirty days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL Club that drafted the player must tender a Player Contract as set forth in Section 3 above to the player in order to retain its rights to that player, as detailed below.

    (b)    For a player to whom the drafting Club retains the exclusive NFL rights pursuant to Section 4(a) above, the Club must tender a four-year NFL Player Contract for the Minimum Active/Inactive List Salary for such League Years, within the thirty day period specified in Subsection (a) above. If the player is released through waivers, the player immediately becomes an Undrafted Rookie, with the right to sign an NFL Player Contract with any Club, subject to the provisions of Article 7, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c) For players with respect to whom the drafting Club retains a Right of First Refusal pursuant to this Section 5, during each League Year the player shall be treated as if he were a Restricted Free Agent not subject to Draft Choice Compensation, as described in Article 9, Section 2, except as otherwise set forth in this Section 5. For such players subject to a Right of First Refusal, the Club must tender a four-year NFL Player Contract for the Minimum Active/Inactive List Salary for such League Years within the thirty day period specified in Subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall not be subject to the Rookie Compensation Pool. If the Club does not make or withdraws the Required Tender, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, subject to the applicable provisions of Article 7, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 6.* **Return to College:** If any college football player who becomes eligible for the Draft prior to exhausting his college football eligibility through participation is drafted by an NFL Club, and returns to college, the drafting Club's exclusive right to negotiate and sign a Player Contract with such player shall continue through the date of the Draft that follows the last season in which the player was eligible to participate in college football, and thereafter the player shall be treated and the Club shall have such exclusive rights as if he were drafted in such Draft by such Club (or assignee Club).

*Section 7.* **Assignment of Draft Rights:** In the event that the exclusive right to negotiate for a Drafted Rookie under Sections 4, 5 or 6 above is assigned from one Club to another Club, the Club to which such right has been assigned shall have the same, but no greater, right to such player, including the Right of First Refusal described in Section 5, as would the Club assigning such right, and such player shall have the same, but no greater, obligation to the NFL Club to which such right has been assigned as he had to the Club assigning such right.

*Section 8.* **Subsequent Draft:** A Club that, in a subsequent Draft, drafts a player who (a) was selected in an initial Draft, and (b) did not sign a contract with the NFL Club that drafted him or with any assignee Club during the signing period set forth in Sections 4 through 6 above, shall, during the period from the date of the subsequent Draft to the date of the Draft held the subsequent League Year, be the only NFL Club that may negotiate with or sign a Player Contract with such player. If such player has not signed a Player Contract within the period beginning on the date of the subsequent Draft and ending on the thirtieth day prior to the beginning of the regular season, the Club loses all rights to trade its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year. After the Tuesday following the tenth week of the regular season, the player and the Club may sign a Player Contract only for future League Year(s), except as provided in Section 4(c) above. If the player has not signed a Player Contract by the day of the next annual College Draft following the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right

19