connection with such use, in which case such consideration will be included as revenue in AR.

(I)     Revenues derived from real estate development opportunities in conjunction with or related to any stadium lease, land purchase agreement or other arrangement, provided that such revenues are not substitutions for revenues that would otherwise be included in AR.

(iii)    **Television Revenue Used To Fund Stadium Construction/Renovation.** Notwithstanding any other provision of this Agreement, the NFLPA and the NFL may agree, on a case-by-case basis, with no limitation on their exercise of discretion, not to include in AR network television revenue to the extent that such revenue is used to fund the construction or renovation of a stadium that results in an increase in AR.

(iv)    **Related Entities.** The parties hereto acknowledge that for purposes of determining AR:

(1)     NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in AR) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in AR), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a);

(2)     NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities"); and

(3)     The reasonableness and includability in AR of such allocations and transactions between Related Entities shall be determined by the Accountants, in accordance with the procedures described below.

(4)     Any entity which has the same ownership as a Club, or is controlled by the same persons or entities which own or control a Club, and is engaged in AR-related transactions with the Club will be treated as the same entity as the Club for the purposes of the AR Reporting Package and any audit with respect thereto.

(5)     For any entity which does not fit the rule set forth in Subsection (4) above, but which has partial common ownership with a Club, and which is engaged in AR-related transactions with the Club (a "Non-Controlled Related Entity"), if a Club contracts with such a Non-Controlled Related Entity for the right to provide goods or services (other than ticket or broadcast rights), revenues from the sale of which would be included in AR if sold directly by the Club, only the amount paid by the Non-Controlled Related Entity to the Club for the right to provide such goods or services (which amount must be negotiated in good faith and should reflect the amount that an independent third party would pay for the right to provide such goods or services) shall be included in AR. (For example, if a Club contracts with a Non-Controlled Related Entity when it could have contracted with an independent third party to be the concessionaire at a stadium, AR shall include the concessionaire fee, but not the revenues received by the Non-Controlled Related Entity for the sale of concessions.) The Local Accountants and Accountants shall have access to the payment terms of any such contracts to confirm

that the amount paid reflects fair market value. If there is a dispute about whether the amount reflects fair market value, the issue shall be resolved by a jointly-appointed arbitrator who has experience in the line of business in question, and the fair market value shall be included in AR.

    (6)    In the event of a question whether a business or enterprise owned (wholly or in part) by a Club, Club Affiliate, or Club owner is or is not involved in AR-related transactions, the NFLPA agrees to accept the written certification from the certified accountant of such business or enterprise, that such business or enterprise is not involved in AR-related transactions. Notwithstanding the foregoing, the NFLPA may seek an order from the System Arbitrator granting access to the records of such business or enterprise if it demonstrates that there is a reasonable basis for asserting that such business or enterprise is involved in AR-related activity.

    (v)    **Rounding.** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to AR, Projected AR, Benefits, Projected Benefits, the Player Cost Amount, Cash Spending, and the Stadium Credit, such amounts shall be rounded to the nearest $1,000. For purposes of any percentage to be calculated or used pursuant to this Agreement, unless otherwise specifically provided, such percentages shall be rounded to the nearest one-one hundredth of one percent (e.g., 47.00%).

    (vi)    **PSLs.**

    (1)    Subject to Subsection 1(a)(vi)(6) and Subsection 4(f) below, AR shall not include PSL proceeds that are segregated and unequivocally dedicated to stadium construction or stadium renovation projects commenced after the date of this Agreement, and that have received a waiver of any applicable League requirement of sharing of "gross receipts";

    (2)    Except as set forth in Subsection (1) above, AR shall include all revenues from PSLs received by, or received by a third party and used, directly or indirectly, for the benefit of, the NFL or any Team or Team Affiliate, subject to any deduction for taxes as provided in Section 1(a)(i) above and the provisions of Subsection (3) below with respect to PSL refunds. Such revenues shall be allocated in equal portions, commencing in the League Year in which they are received, over the remaining life of the PSL, subject to a maximum allocation period of fifteen years; provided, however, that Interest from the League Year the revenues are received until the League Years the revenues are allocated into AR shall be imputed and included in AR, in equal portions over such periods.

    (3)    For purposes of this Agreement, the term "PSL" shall include any and all instruments of any nature, whether of temporary or permanent duration, that give the purchaser the right to acquire or retain tickets to NFL games and shall include, without limitation, seat options; seat bonds; and suite bonds or long-term conveyances of suite occupancy rights where proceeds are segregated and unequivocally dedicated to stadium construction (e.g., Founders' Suite Programs) that directly or indirectly give purchasers the right to acquire NFL tickets. PSL revenues shall also include revenues from any other device (e.g., periodic payments such as surcharges, loge maintenance fees, etc.) that the NFL and the NFLPA agree constitutes a PSL.

    (4)    PSL revenues shall be reported net of actual refunds made in the year for which such revenues are reported. If an amount has been refunded, then the refunded amount shall be deducted from PSL revenues used in the calculation of AR. If there is a

non-contingent contractual commitment to refund, but the refund is to be made at a later date, then the only amount included is the Interest on the refund. Otherwise, all amounts are included regardless of any refund contingencies. If a refund contingency occurs and money previously included as PSL revenue is refunded, the NFL shall receive a credit against AR (i.e., League-wide AR shall be reduced) in the amount of the refund the next League Year.

(5)    In the event of a payment default and/or forfeiture of PSL revenue being received on an installment payment plan, the unamortized portion of such revenue, in excess of cash received, shall no longer be included in AR upon the date, and to the extent, of default/forfeiture. In the event that cash received at the time of the default/forfeiture exceeds life-to-date amortization of PSL revenue, amortization will continue as scheduled until equaling the amount of cash received. In the event that any such PSLs are re-sold, and the re-sale does not meet the criteria of Subsection 1(a)(vi)(1) above, the re-sale will be included in AR and amortized over the life of the PSL up to a maximum of fifteen years.

(6)    Exclusions from AR of PSL revenue in respect of funding for stadium projects initiated after the 2005 League Year will terminate upon sale of the recipient franchise if the waiver from revenue sharing also terminates.

(vii)   **Premium Seat Revenues ("PSRs").**

(1)    Subject to Subsection 1(a)(vii)(3) and Subsection 4(f) below, AR shall not include PSR proceeds that are dedicated to and used for stadium construction or stadium renovation projects commenced after the date of this Agreement, and that have received a waiver of any applicable League requirement of sharing of "gross receipts."

(2)    Except as provided in Subsection (1) above, AR shall include all PSRs net of amounts described in Subsection 1(a)(i)(1).

(3)    For purposes of this Agreement, the term "PSR" shall mean the revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.

(4)    Exclusions from AR of PSR revenue in respect of funding for stadium projects initiated after the 2005 League Year will terminate upon sale of the recipient franchise if the waiver from revenue sharing also terminates.

(viii)   **Naming Rights/Cornerstone Sponsorships.**

(1)    Subject to Subsection 1(a)(viii)(3) and Subsection 4(f) below, AR shall not include naming rights and cornerstone sponsorship proceeds that are dedicated to and used for stadium construction or stadium renovation projects commenced after the date of this Agreement, and that have received a waiver of any applicable League requirement of sharing of "gross receipts."

(2)    Except as provided in Subsection (1) above, AR shall include all naming rights and cornerstone sponsorship proceeds.

(3)    Exclusions from AR of naming rights revenue in respect of funding for stadium projects initiated after the 2005 League Year will terminate upon sale of the recipient franchise if the waiver from revenue sharing also terminates.

(ix)(1)   Notwithstanding Subsections (vi)–(viii) above, for any AR exclusions subject to the Cap Effect Guarantee described in Subsection 4(f) below: there shall be no requirement of a waiver from sharing of "gross receipts" provided that there is an economically-equivalent method of League support for such project (e.g., relief from payment of a League assessment). The NFL shall provide the NFLPA with prior notice of any such economically-equivalent method used with respect to such exclusions.

(2)   Notwithstanding Subsections (vi)–(viii) above, the NFL shall have the right to include in AR any revenues that would otherwise qualify for exclusion from AR under those Subsections.

(x)   **Allocations Over League Years.** The parties may agree to allocate AR received or to be received on an accrual basis in a particular League Year over one or more other League Years.

(xi)   **Cancelled Games.** If one or more weeks of any NFL season are cancelled or AR for any League Year substantially decreases, in either case due to a terrorist or military action, natural disaster, or similar event, the parties shall engage in good faith negotiations to adjust the provisions of this Agreement with respect to the projection of AR and the Salary Cap for the following League Year so that AR for the following League Year is projected in a fair manner consistent with the changed revenue projection caused by such action. In such circumstances, the parties agree to discuss in good faith the possibility of suspending the application of the Player Cost Amount floor for the 2012 or 2013 League Year as described in Section 5(c)(v) below.

(xii)   **Expense Deductions.**

(1)   No expense deductions shall be permitted to be taken in calculating AR, and all expense deductions that were previously permitted in the calculation of "Total Revenues" or "Defined Gross Revenues" or "Excluded Defined Gross Revenues" shall not be used in calculating AR, except as expressly provided herein.

(2)   An expense deduction for the reasonable and customary direct costs and initial investment (collectively, "direct costs") for projects in new lines of business of NFL Ventures may be taken, subject to the following rules:

(A)   Absent NFLPA approval, there may be no more than three projects in new lines of business to receive deductions in any League Year (i.e., for the 2012 League Year, there can be three projects in new lines of business receiving deductions; for the 2013 League Year, there could be six projects in new lines of business (three that began in 2012 and three that began in 2013).

(B)   Absent NFLPA approval, a project in a new line of business shall not qualify for this deduction if it has more than $10 million in direct costs in a League Year. This limit shall increase in each League Year after the 2012 League Year by the percentage change in AR.

(C)   Absent NFLPA approval, there may be no more than $120 million in direct costs across all projects that qualify for the deduction in the 2012 League Year (i.e., a maximum deduction of $60 million). For the avoidance of doubt, this Subsection (C) is subject to the requirements of Subsections (A) and (B) above. This maximum deduction amount shall increase each subsequent League Year by the same percentage increase (if any) of AR;

68

(D)     The expense deduction for the first three years of any qualifying new line of business project shall be 50% of the direct costs in each such League Year;

(E)     The expense deduction for years four through five of any qualifying new line of business project shall be 25% of the direct costs in each such League Year;

(F)     Unless the parties agree otherwise, after five years no further deductions shall be taken for any such project (and revenues from such projects shall be included in AR in the 45% bucket as described below);

(G)     The NFL shall provide the NFLPA with notice of the projects for which it will take the expense deduction, including the provision of business plans and budgets (subject to reasonable confidentiality and non-compete terms);

(H)     Pursuant to the provisions of Section 3 below, the Accountants shall review, and the NFLPA shall have audit rights regarding, such deductions to ensure their accuracy and reasonableness;

(I)     Deductions allowed shall be netted against related revenues, and the netting of expenses cannot result in a negative number (e.g., if 50% of the direct costs for a project exceed its revenues, the AR count for such project shall be zero).

(J)     For purposes of this Subsection 1(a)(xii)(2), if the NFL adds additional International Series regular season games (i.e., more than one International Series regular season game in any given League Year), each additional International Series game shall constitute a new line of business project, and further provided that the payment made by the NFL to reimburse the participating Clubs for lost revenue (which payment is included in AR) shall not be included in determining whether such Series is subject to either of the direct cost limits referenced in Subsection (B) or (C) above.

(xiii)   **Interest.** Unless otherwise specified, as used in this Article, "Interest" means interest calculated on an annual compounded basis using the one-year Treasury yields at constant maturities rate as published in The Wall Street Journal on February 1 (or the next date published) of the League Year in which the amount to receive interest accrues, is awarded, or occurs, as the case may be. If this rate is not published in The Wall Street Journal for any reason, the website of the Federal Reserve (http://www.federalreserve.gov) shall be used to obtain the interest rate.

(xiv)   **No Double-Counting.** No revenue may be included in AR more than once. All intra-company transactions between or among the NFL, any NFL Affiliate, Clubs, and Club Affiliates shall be eliminated in accordance with GAAP (treating all such transactions on a pro forma consolidated basis) (except as provided in Subsection 1(a)(xii)(J) above) for purposes of calculating AR. For any joint venture, if AR rights are granted to the venture, which in turn pays the NFL or the Clubs for the rights granted, the value of the rights shall only be included in AR once.

(xv)   Subject to their reasonable business judgment, the NFL and each NFL Team shall act in good faith and use commercially reasonable efforts to increase AR for each playing season during the term of this Agreement and not shift revenues attributable to League Years within the term of this Agreement to League Years after the term. There shall be no obligation to accelerate into League Years within the term of this Agreement revenues attributable to League Years following expiration of this Agreement. In evaluating compliance with this Subsection, the parties and the System Arbitrator shall consider and give substantial weight to the reasonable business judgment

of the NFL or the NFL Team but no deference will be applied where the NFL is alleged to have deferred or forgone revenues of $1 billion or more for the purpose of securing leverage in collective bargaining, in which case any finding of non-compliance shall require proof by a clear preponderance of the evidence. The following is a list of decisions in respect of which the business judgment of the NFL or an NFL Team shall conclusively be deemed reasonable: franchise location; stadium capacity or configuration; ticket or suite prices; number and location of games played; whether to outsource or operate a line of business; and whether to accept or decline a sponsorship, advertising or naming rights opportunity. The foregoing list shall not limit in any manner the circumstances in which the business judgment of the NFL or an NFL Team may be deemed reasonable.

(b)      **Additional Accounting Rules.** The calculation of AR shall be further subject to the rules set forth in Section 10 below.

(c)      **Revenue-related Arbitrators.** Wherever this Article provides for a jointly-retained arbitrator to resolve a revenue-related dispute, and if the parties cannot agree on the identity of such arbitrator, the parties shall use the procedures set forth in Article 15, Section 6 to select the arbitrator.

*Section 2.* **Benefits:**

(a)      "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for:

(i)      Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article 53) and the Second Career Savings Plan (as described in Article 54);

(ii)      Group insurance programs, including, life, medical, and dental coverage (as described in Article 59 or as required by law), and the Disability Plan (as described in Article 61);

(iii)      Injury Protection (for the 2011–2015 League Years only);

(iv)      Workers' compensation, payroll, unemployment compensation, social security taxes, and contributions to the fund described in Article 30, Section 4;

(v)      Preseason per diem amounts (as described in Sections 3 and 4 of Article 23) and regular season meal allowances (as described in Article 34);

(vi)      Expenses for travel, board and lodging for a player participating in an offseason workout program in accordance with Article 13, Section 6(e)(iv)(3);

(vii)      Payments or reimbursements made to players participating in a Club's Rookie Orientation Program (as described in Article 7);

(viii)      Moving and travel expenses (as described in Article 36);

(ix)      Postseason pay (as described in Articles 37 and 38) and salary paid to Practice Squad players pursuant to a Practice Squad Contract during the postseason, unless the Practice Squad Player Contract is executed or renegotiated after December 1 for more than the minimum Practice Squad salary, in which case all salary paid to such a Practice Squad player during the postseason will be counted as Salary.

(x)      Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player

70

injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year). Subject to the foregoing, player medical costs shall include one-third of each Club's expenses for tape used on players and one-third of each Club's player physical examination costs for signed players (player physical examination costs relating to the Combine or for Free Agents whom the Club does not sign are not included in Player Benefit Costs);

    (xi)    Severance pay (as described in Article 60);

    (xii)    The Player Annuity Program (as described in Article 55);

    (xiii)    The Minimum Salary Benefit (as described in Article 27);

    (xiv)    The Performance Based Pool (as described in Article 24), and further provided that there shall be no Performance Based Pool for the 2011 League Year;

    (xv)    The Tuition Assistance Plan (as described in Article 56);

    (xvi)    The Gene Upshaw NFL Players Health Reimbursement Account (as described in Article 63);

    (xvii)    The "88 Benefit" for former players suffering from dementia (as described in Article 58);

    (xviii)    The Rookie Redistribution Fund (as described in Article 7), to the extent that any portion of that Fund is not being used to offset the allocated Benefit Cost of the Legacy Benefit (as described further in Subsection (xix) below), and further provided that there shall be no Rookie Redistribution Fund for the 2011 League Year;

    (xix)    The Legacy Benefit (as described in Article 57) and further provided that of the $620 million aggregate contribution to the Legacy Benefit over the term of this Agreement, only 49% shall count as a Player Benefit Cost, and that the parties shall agree on the allocation of this Player Benefit Cost across the League Years covered by this Agreement, and further provided that the parties may not allocate any portion of this Player Benefit Cost to the 2011 League Year;

    (xx)    The Neuro-Cognitive Disability Benefit (as described in Article 65); and

    (xxi)    Beginning in the 2015 League Year, the Long-Term Care Insurance Program (as described in Article 63).

    (b)    If Benefits that are not currently taxed are subject to a new or materially different federal or state excise tax, the parties will negotiate in good faith about the appropriate adjustment, if any, in Benefits to account for such additional tax. In agreeing to this Section, neither party waives any right to contend that such tax amounts would meet or would not meet the definition of a Player Benefit Cost set forth in this Agreement, and this Section shall not be referred to in any dispute regarding such issue.

    (c)    Without limitation on any other provision of this Agreement, Benefits will not include (1) salary reduction contributions elected by a player to the Second Career Savings Plan described in Article 54; (2) any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (3) attorneys' fees, costs, or other legal expenses incurred by Clubs in connection with workers' compensation claims of players. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes

during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

### Section 3. Accounting Reports & Projections:

(a)    **Special Purpose Letters and AR Reporting.**

(i)(A)    As provided below, each League Year the parties will be provided with one or more "Special Purpose Letters" by an independent accounting firm (hereinafter "the Accountants") which report the AR, Player Cost Amount, Team Salary, Cash Spending, and Benefits of each Club and the NFL for that League Year, utilizing information reported by independent Club and League accounting firms, and information obtained by the Accountants through its review procedures. The Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the Clubs and the League in providing information to the Accountants ("Revenue Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties, and shall be reported on a March 31 year-end basis unless otherwise agreed by the parties. The basic review procedures to be performed by the Accountants are set forth below, and may be modified and/or supplemented by mutual agreement of the parties. The engagement of the Accountants shall be deemed to be renewed annually unless the Accountants are discharged by either party during the period from May 1 to July 1 of that year. Each Special Purpose Letter shall be based upon the best available information at the time of its issuance, and shall include a report of adjustments and new information obtained with respect to amounts previously reported for prior League Years.

(B)    The amount of any Salary Cap and League-Wide Cash Spending that may apply in a League Year shall be determined at the times and utilizing the Special Purpose Letters and other information described below.

(ii)    In the event than any error is found in AR, Benefits, or Player Cost Amount in respect of any League Year subsequent to the 2010 League Year, which, if it had not occurred, would have resulted in any increase or decrease in any Salary Cap in one or more prior League Years, the total amount of any such Salary Cap shortfall or overage, as the case may be, shall be added or subtracted, as the case may be, the next time the Salary Cap is calculated. An inaccuracy in an estimate that was made in a prior League Year shall not be considered an error for purposes of this Subsection, and such estimates shall be reconciled by the Accountants each League Year. In the event that an inaccuracy in an estimate is not reconciled, the failure to do so shall be considered an error for purposes of this Subsection. Any individual errors proposed for correction pursuant to this Subsection that are greater than $25,000 must be substantiated by evidence and be reviewed with the NFL, the NFLPA, and the Accountants prior to the correction being made. Any dispute regarding such corrections shall be subject to the procedures that apply under Subsections (ix)–(x) below.

(iii)    To the extent that the amounts and information set forth in a Special Purpose Letter indicates that the amount of any Salary Cap for any prior League Year

within the term of this Agreement should have been different from the amount actually utilized, any such difference shall be credited or deducted, as the case may be, to the next Salary Cap to be set, with Interest. Any such adjustment in the Final League Year shall be immediate.

(iv)    The Accountants shall review the reasonableness of any estimates included in any Club's Revenue Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made as provided in Subsection (ii) above.

(v)    The Accountants shall receive, in connection with their duties: (1) access to and copies of the Local Accountant workpapers with respect to the Schedule described in Appendix F; and (2) access to the financial audit workpapers of the Local Accountants or League Office (to the extent necessary), provided that any information derived from the access described in this clause (2) will be held in confidence and will not be part of any file subject to NFLPA review.

(vi)    The NFL will use its best efforts to ensure that any contract between the League, any Club, or any Club Affiliate, and any third party in connection with the sale or marketing of any source of AR shall include terms that provide to the Accountants and the NFLPA access to any and all financial and contractual information and documents in the possession, custody, or control of such third party to which the Club, Club Affiliate, or any other entity controlled by the owner of the Club has any right to any access, relating to such revenue source or any other financial or contractual relationship or transaction between such third party and the League, the Club involved in the sale or marketing of such revenue source, any Affiliate of that Club, or any of that Club's owners. In each case such access shall be subject to and limited by the rules set forth in this Agreement or otherwise agreed to by the parties regarding the dissemination of information provided to the Accountants and the NFLPA pursuant to the audit process. If the NFL, despite its best efforts, cannot ensure such access, the NFLPA shall have the right to obtain an order against the Club or Club Affiliate  requiring that such access be allowed.

(vii)    Reasonably prior to the issuance of a Special Purpose Letter, the Accountants shall, as set forth in Appendix F attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues reported by the Clubs or any other information contained in the Revenue Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue item or any other information contained in the Revenue Reports submitted by the Clubs.

(viii)    In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) to be included in the Revenue Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants related to Subsection 1(a)(xii)(2) above that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties. Notwithstanding the foregoing, either party shall have the right to contest, by commencing a System Arbitrator proceeding pursuant to

73

this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to System Arbitrator Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a Revenue Report, shall be resolved by the System Arbitrator appointed pursuant to this Agreement, as set forth in Article 15.

(ix)     After receiving a Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in such Final Special Purpose Letter through an auditor hired by the NFLPA (subject to notification and approval by the NFL, not to be unreasonably withheld) (the "NFLPA Auditor"). A representative of the NFL shall accompany the NFLPA Auditor on any site visits during any such audit, but shall not interfere with the conduct of the audit. The NFLPA Auditor shall make diligent efforts to complete its report no later than sixty (60) days prior to the scheduled issuance of the next Final Special Purpose Letter so that the Accountants and the parties may address any issues in advance of such next Final Special Purpose Letter. The Clubs shall provide reasonable cooperation in the audit process. The NFLPA Auditor may copy documents it reviews in the course of its audits and maintain copies of documents reviewed in its office. Other than as set forth in this Subsection, the NFLPA Auditor may not show any such copies to anyone other than its partners, employees, and agents. The documentation made available and the information contained therein shall be held in strict confidence and may be discussed only with individuals authorized in this Subsection, or as jointly authorized by the NFL and the NFLPA. The NFLPA Auditor may prepare one or more written or oral reports for the use of the NFLPA in connection with this Agreement, which may refer to and discuss the contents of documents reviewed, but which may not include copies of any such documents. Any such report shall not be referred to or distributed to anyone outside of the NFLPA or the NFLPA Auditor for any other purpose. If the NFLPA determines in the exercise of its judgment that matters discussed in the NFLPA Auditor's report may indicate a violation of this Agreement, then the NFLPA Auditor may show (but not provide) a copy of such documents (or portions thereof) that it considers in the exercise of its judgment to be relevant to such potential violation to counsel for the NFLPA, the Executive Director and General Counsel of the NFLPA, up to three NFLPA staff personnel (whose authority to

receive such information shall be disclosed in advance to the NFL) and up to three members of the NFLPA Executive Committee (whose authority to receive such information shall be disclosed in advance to the NFL). In addition, a copy of such documents may be presented to the System Arbitrator and/or a court in any proceeding to enforce this Agreement. At least four (4) business days prior to commencing any such proceeding based upon such documents, the NFLPA will advise the NFL of the alleged violation upon which the proceeding would be based; the parties shall stipulate to reasonable protective order terms and conditions to protect the confidentiality of such information. Except in connection with a proceeding as described in the preceding sentence, the NFLPA, its representatives and agents shall not refer to or distribute such copies to anyone outside of their organizations for any other purpose.

(b) **Projected AR, Projected Benefits, True-Ups, and Timetable.**

(i) Prior to the start of each League Year (other than the 2011 League Year), the parties will meet for the purpose of agreeing upon the projections to be used to determine Projected AR and Projected Benefits, including incremental stadium-related revenues from the opening or any new stadium or major renovation of an existing stadium, or any known modifications of an existing stadium lease, and contracted revenues and/or percentage adjustments to be used for League Media, NFL Ventures/Postseason, and Local AR from the prior League Year. In the absence of agreement of the parties otherwise, Projected AR shall be projected on the basis of: (A) for League Media AR, on the basis of the League Media contracts; (B) for NFL Ventures/Postseason AR, on the basis of League-level contracts and year-over-year growth rates for such AR not specified in a League-level contract; and (C) for Local AR, (1) for gate, on the basis of the average prior-year ticket price (taking into account any announced price increases or decreases for the upcoming season) multiplied by the actual prior-year attendance (adjusted to account for any new or significantly renovated stadiums, relocations, or expansions); and (2) for all other Local AR, on the basis of the year-over-year growth rates, or, in the absence of agreement on the growth rate, on the basis of the annual percentage increase for such revenues over the prior four League Years (using a compound annual growth rate), in either case adjusted to account for any new or significantly renovated stadiums, new revenue streams, relocations, or expansions. Projected Benefits shall be any Benefits projected to be paid (or properly accrued) in the applicable League Year pursuant to this Agreement, provided that if the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii) Based on the meeting described in Subsection (i), the Accountants shall prepare an Initial Special Purpose Letter based on the Clubs' January reporting submissions that will set forth Projected AR and Projected Benefits for the upcoming League Year and an initial calculation of actual AR and actual Benefits from the prior League Year. Following the method set forth in Section 6 below, any difference between the Salary Cap from the prior League Year and the Salary Cap that would have applied in that League Year had the updated AR and Benefits information been used as Projected AR and Projected Benefits when that Salary Cap was set shall be a "True-Up," to be

75

credited or deducted, as the case may be, in the calculation of the Salary Cap for the upcoming League Year using the method set forth in Section 6. Any such True-Up shall include Interest.

(iii)     No later than August 30 of each League Year (other than the 2011 League Year), the Accountants shall prepare a Final Special Purpose Letter based on the final reporting packages from the League and the Clubs from the prior League Year, that shall set forth (A) the final calculation of actual AR for the prior League Year, (B) the final calculation of actual Benefits for the prior League Year, and (C) the League-Wide Cash Spending for the prior League Year. Following the method set forth in Section 6 below, any difference between: (1) the Salary Cap from the prior League Year as adjusted by any True-Up made after the Initial Special Purpose Letter pursuant to Subsection (ii) above; and (2) the Salary Cap that would have applied if the AR and Benefits from the Final Special Purpose Letter had been used as Projected AR and Projected Benefits when that Salary Cap was set, shall be a further "True-Up," to be credited or deducted, as the case may be, in the calculation of the Salary Cap for the upcoming League Year using the method set forth in Section 6. Any such further True-Up shall include Interest.

(iv)     In the Final League Year, the Accountants shall issue the Final Special Purpose Letter by May 1st of the Final League Year, and any True-Up related to the Final League Year shall be implemented immediately.

(v)      Notwithstanding the foregoing or anything else in this Agreement, if, after the initial calculation of Projected AR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Projected AR. In addition, if one or more new Clubs are scheduled to be added to the NFL during the next League Year as one or more expansion Clubs, Projected AR will include an additional projection of AR determined in a manner agreed to by the parties. In all of the events described in this Subsection, the Accountants shall calculate a revised Projected AR, Projected Benefits, and Projected Player Cost Amount within fourteen (14) days of the triggering event, and the Salary Cap shall immediately be adjusted accordingly, utilizing the method set forth in Section 5.

(vi)     In the event that the NFLPA exercises any right to reduce or freeze or increase certain Benefits, Projected Benefits (and the Salary Cap) shall be adjusted immediately to reflect such changes.

(vii)    In the event the amount of Projected Benefits is adjusted pursuant to: (1) Subsection (vi) above; (2) the dispute resolution procedures of Article 52, Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, then the Salary Cap shall be immediately recalculated to reflect the adjustment in Projected Benefits.

*Section 4.* **Stadium Credit:**

(a)      For each League-approved stadium project beginning on or after the effective date of this Agreement, there shall be a credit of fifty percent (50%) of the private cost (whether incurred by a Club, Club Affiliate, or the League) to construct or renovate the stadium, or seventy-five percent (75%) of such cost for stadium construction or renovation in California, which cost shall include financing costs, amortized over a maximum of 15 years using an agreed-upon rate based on the NFL's long-term bor-