# ARTICLE 51
# MISCELLANEOUS

**Section 1. Endorsements:**

(a)     No Club may unreasonably refuse to permit a player to endorse a product. Notwithstanding the foregoing, and without affecting interpretation of the preceding sentence, no player will be permitted to be a party to any endorsement arrangement of any kind with a company associated with the production, manufacture, or distribution of a substance that has been banned by the Policy on Anabolic Steroids and Related Substances. The NFL and the NFLPA will agree each year on a list of such companies.

(b)     The placement of a sponsor's logo on a jersey does not constitute endorsement by any player of that sponsor. Players shall not challenge or refuse to wear jerseys with sponsor logos.

*Section 2.* **Player Attire:**

(a)     Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are based on safety or competitive considerations as determined by the NFL; the parties reserve their respective positions on whether the NFL or any of the Clubs may have any such rule relating solely to image considerations. The foregoing notwithstanding, the NFL and Clubs shall have the right to regulate any third party branding or other commercial identification that may appear on any footwear or gloves worn by players on the field or its environs on game days and/or at any Club's official mandatory minicamp(s), official preseason training camp, and all Club practice sessions.

(b)     On game days, prior to the game and continuing until 90 minutes after the whistle ending each game (preseason or regular season), as well as at any Club's official mandatory minicamp(s), official preseason training camp, and all Club practice sessions, players: (i) shall wear any uniforms and/or related items (e.g., practice jerseys) required by the NFL or Club (regardless of any third party branding that may appear on such uniforms and/or related items as may be determined by the NFL or Club), provided that no individual player and/or discrete group of players will be required to wear attire with third-party branding that is different from the branding on the attire of other players and further provided that no third-party sponsor will depict any player in advertising or promotional materials in a manner that constitutes an "Endorsement" as defined in Paragraph 4(a) of the Player Contract absent consent from the player; and (ii) will be prohibited from wearing, displaying, or orally promoting equipment, apparel, or other items that carry commercial names or logos of companies in any televised interview on Club premises, unless such commercial identification has been approved in advance by the League office.

(c)     Notwithstanding Subsection (b) above, players will be permitted to wear apparel bearing the logo "Players Inc." and/or the logo "NFLPA" during televised interviews in the locker room following preseason and regular season games, provided that such apparel does not display the names, logos, or other identifying marks of any other entity or product that is licensed by or associated with Players Inc. or the NFLPA, in-

cluding, but not limited to, the manufacturer of the apparel or any sponsor or licensee of Players Inc., the NFLPA, or any individual player. The parties reserve their respective positions on the applicability of this provision to apparel bearing the logo "NFL Players."

        (d)     The provisions in Subsections (a)–(c) above shall not be used or referred to in any dispute between the parties over prohibition by the League and/or any Club of the wearing of unapproved commercial items in circumstances other than as expressly addressed in those Subsections.

*Section 3.* **Appearances:** No Club may unreasonably require a player to appear on radio or television or other news media (including internet and print).

*Section 4.* **Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media (including television, radio, internet, print) in reasonable promotional activities on behalf of the Clubs and the NFL.

*Section 5.* **Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

*Section 6.* **Public Statements:** The NFLPA and the Management Council agree that each will use reasonable efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

*Section 7.* **Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for offseason information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first preseason cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

*Section 8.* **NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available four (4) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized representatives who may purchase tickets to the NFL. The NFLPA must notify the home Club of its desire to attend such a game at least five days prior to the date of the game. Such representatives must possess appropriate identification.

*Section 9.* **Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club for personal use and not for resale. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club (for personal use and not for resale) from the best tickets available for public

sale immediately prior to the public sale for each game. For purposes of this Section as it applies to preseason or regular season games, the word "player" shall be defined as any player on the Club's Active/Inactive List, Practice Squad, PUP or N-F/I List, or Injured Reserve List. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets. Clubs are not required to provide Practice Squad players with the opportunity to purchase Super Bowl tickets.

*Section 10.* **Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. This restriction does not apply to the League mandate regarding neuropsychological testing. A Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

*Section 11.* **League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

*Section 12.* **Career Planning Program:** The parties will continue their programs to provide information to current and former players concerning financial advisors and financial advisory firms and shall jointly (at the Annual Rookie Symposia and otherwise) and separately develop new methods to educate such players concerning the risks of various investment strategies and products, as well as the provision of any background investigation services. Neither the NFL, nor any Club, nor the NFLPA shall be responsible for any investment decisions made by players; players and any advisors who they select will bear sole responsibility for any investment or financial decisions that are made.

*Section 13.* **On-Field Microphones and Sensors:**

(a) During NFL games and for the express purpose of creating NFL programming, NFL Films will be permitted to put microphones on any players that NFL Films selects. During the regular season each starting quarterback will be required to wear a microphone at least once, and no player will be required to wear a microphone for this purpose more than four times during the course of any regular season. There will be no limitation with respect to the number of times a player can be required to wear a microphone during the preseason or postseason. None of the sound captured for this purpose can be used during the game in which the player is mic'd without the player's prior permission, and, unless such prior permission is given, none of the captured sound can be used until viewed and approved by the player or his selected team representative who will have the right to embargo any material he deems to be extremely sensitive or inappropriate. Players may also embargo for a limited time material deemed to be confidential or that might place the player or team at a competitive disadvantage. Players or their selected team representative must advise NFL Films of any material they wish to have embargoed within 24 hours of receiving the material.

217

(b)        For the television broadcast of all NFL preseason, regular season and postseason games NFL Broadcasting, on behalf of the League's network television partners, can require offensive linemen to wear microphones embedded in shoulder pads in order to capture ambient sound from the playing field. The pads will be wired by NFL Films-trained technicians. Microphones will be opened after the offense breaks the huddle and will be closed a few seconds after the snap of the ball. At no time will the microphones be open when the players are in the locker room, the huddle or the team bench areas and all transmissions will be encrypted. Audio captured in accordance with this provision will be used only in the live ambient audio mix of that particular game. The NFL will require its television partners to agree to use best efforts to refrain from broadcasting any captured audio that contains inappropriate or sensitive content, and that their failure to do so shall result in a loss of the right to broadcast such audio in the future.

(c)        The NFL may require all NFL players to wear during games and practices equipment that contains sensors or other nonobtrusive tracking devices for purposes of collecting information regarding the performance of NFL games, including players' performances and movements, as well as medical and other player safety-related data. Sensors shall not be placed on helmets without the NFLPA's consent. Before using sensors for health or medical purposes, the NFL shall obtain the NFLPA's consent.

*Section 14.* **Practice Squad Super Bowl Rings:** Practice Squad players on a Club that wins the Super Bowl at the time of the Super Bowl will be entitled to a ring similar in appearance to the one provided to players on the Active/Inactive List but the Club, in its sole discretion, may provide any Practice Squad player with a ring of lesser value.

# ARTICLE 52
# PLAYER BENEFIT COSTS

*Section 1.* **General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan"), (2) benefits under the NFL Player Disability Plan (the "Disability Plan"), and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below 5% of Projected AR, as defined in Article 12 and Player Benefit Costs required by law cannot be reduced.

*Section 2.* **Right of Restoration:** Each separate and individual Benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each Benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

*Section 3.* **Resolution of Disputes:** In the event the NFLPA and the NFL are unable to agree to Projected Benefits for the League Year for which the Salary Cap is being set, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved in time for the timely issuance of the Special Purpose Letter for that League Year. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year.

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than five (5) days prior to the scheduled issuance of the Special Purpose Letter.

*Section 4.* **Limitations on Contributions:**

(a)     No NFL Club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Player Annuity Program, the Severance Pay Plan, the NFL Player Disability Plan (except that portion of the Disability Plan refe-

219

renced in Section 4 of Article 61), the Gene Upshaw Health Reimbursement Account, the Neuro-Cognitive Disability Benefit, the Workers' Compensation Time Offset Fund, the Performance Based Pool, the Tuition Assistance Plan, the NFL Player Insurance Plan, the Player Long-Term Care Insurance Plan, or Legacy Benefit (individually, a "Player Benefit Arrangement") with respect to any year following expiration of this Agreement except to the extent required by the Internal Revenue Code or other applicable laws except to the extent preempted by ERISA. Each Player Benefit Arrangement shall be amended to prevent any employer-provided benefit from accruing or being otherwise credited or earned thereunder with respect to any year following the expiration of this Agreement, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in a year following the expiration of this Agreement shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

(b)      The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be required to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

*Section 5.* **Timing:** Player Benefit Costs for pension funding, the Second Career Savings Plan, the NFL Player Disability Plan, the Player Annuity Program, the Tuition Assistance Plan, the Gene Upshaw Health Reimbursement Account, the 88 Benefit, and the Player Long Term Insurance Plan, Neuro-Cognitive Disability Plan, and the Legacy Benefit will be deemed to be made in a League Year for purposes of this Agreement if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

220

## ARTICLE 53
## RETIREMENT PLAN

*Section 1.* **Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan" ) will be continued and maintained in full force and effect during the term of this Agreement, but no further benefits will accrue except as provided in Section 3. The Retirement Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

*Section 2.* **Contributions:** For the 2011 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix N. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Retirement Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

*Section 3.* **Benefit Credits:** Effective for payments on and after September 1, 2011, the parties will amend Section 4.1 of the Retirement Plan to provide the following Benefit Credits for the indicated Credited Seasons:

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| Before 1982 | $ 250 |
| 1982 through 1992 | $ 255 |
| 1993 and 1994 | $ 265 |
| 1995 and 1996 | $ 315 |
| 1997 | $ 365 |
| 1998 through 2011 | $ 470 |
| 2012 through 2014 | $ 560 |
| 2015 through 2017 | $ 660 |
| 2018 through 2020 | $ 760 |

Benefits for affected players in pay status shall be proportionately increased based on the new and prior Benefit Credits.

*Section 4.* **New Arbitration Procedures:** Effective for benefit disputes arising under Retirement Plan Section 8.3(c) on and after September 1, 2011, the parties will amend the Retirement Plan to provide that the arbitrator selected to resolve the dispute must base his decision solely on the administrative record that was before the Retirement Board, as it may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator. In addition, each side shall be permitted to take depositions of any expert relied on by the other side based on the administrative record, supplemented as provided above.

*Section 5.* **Annual Benefit Eligibility Audits:** The Retirement Board shall engage an independent firm mutually selected by the NFL and the NFLPA to examine annually a representative sample of persons receiving benefits under the Retirement Plan to ensure that each such person is eligible to receive the benefits being provided.

*Section 6.* **Vesting Requirements:** Effective March 31, 2012, for players who first earn an hour of service thereafter, a player who does not have three Credited Seasons shall vest only if he has earned five (5) Years of Service.

Section 7. Death Benefits: Effective for payments on or after September 1, 2011, the parties will amend Section 7.2 of the Retirement Plan to insert after "$3,600," the following: "($4,000 (effective January 1, 2014) and $4,400 (effective January 1, 2018))."

# ARTICLE 54
## SECOND CAREER SAVINGS PLAN

***Section 1.* Maintenance:** The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

***Section 2.* Contributions:**

      (a)    For each of the Plan Years 2011 and thereafter, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

      (i)    **Matching Contributions.** The NFL Clubs in the aggregate will contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two dollars (up to a maximum of: $24,000, for the 2011–14 Plan Years; $26,000, for the 2015–2018 Plan Years; and $28,000, for the 2019–2020 Plan Years) for each of the Plan Years 2011 through 2020 for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

      (A)    by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

      (B)    by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

      (ii)    **Minimum Contribution.** The NFL Clubs in the aggregate will contribute to the Savings Plan a contribution each League Year in the amount of (1) at least $3,600 for each player who earned a Credited Season during such Plan Year and who has at least three or more Credited Seasons after earning such Credited Season, (2) at least $7,200 for each player who earns a Credited Season during such Plan Year and who has exactly two Credited Seasons after earning such Credited Season, plus (3) to the extent necessary to support the combined tax deductions for both the Second Career Savings Plan and the qualified portions of the Player Annuity Program, at least $1,000 for each player who earns a Credited Season during such Plan Year and who has exactly one Credited Season after earning such season. Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (a)(i) above shall be made by and as of the last day of the Plan Year.

      (iii)    **Expenses.** The NFL Clubs will make advance contributions to the Savings Plan in an amount sufficient to pay all administrative expenses approved by the Savings Board.

      (b)    **Future Contributions and Collection.** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

224

# ARTICLE 55
# PLAYER ANNUITY PLAN

*Section 1.* **Establishment:** The NFL Player Annuity Program ("Annuity Program") will be continued and maintained in full force and effect during the term of this Agreement, except that the structure of the Program will be amended to include both a taxable portion ("Taxable Portion"), a tax-qualified portion ("Qualified Portion"), and, to the extent that contributions to such new tax-qualified portion would be deductible as business expenses in the year contributed, a second tax-qualified portion. The Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

*Section 2.* **Contributions:** For each League Year of this Agreement, a contribution will be made to the Annuity Program on behalf of the NFL Clubs as follows (unless changed by the NFLPA pursuant to Article 52 of this Agreement):

    (a)    **Expenses.** The NFL Clubs will make advance contributions to the Annuity Program in an amount sufficient to pay all administrative expenses approved by the Annuity Board. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

    (b)    **Allocation.** In the 2011–2020 League Years, an Allocation will be made for each eligible Player who earns a Credited Season (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan) in an Annuity Year and who has a total of four or more Credited Seasons as of the end of such Annuity Year. The amount of the Allocation will be: $65,000, for each of the Annuity Years 2011 through 2013; $80,000, for each of the Annuity Years 2014 through 2017; and $95,000, for each of the Annuity Years 2018 through 2020.

    (c)    **Future Contributions.** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Section 3.* **Timing:** An eligible player who earns a Credited Season through the sixth week of the regular season of an Annuity Year will receive an allocation on December 1 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive an allocation on March 31 of such Annuity Year.

*Section 4.* **Structure:** The Annuity Program will hold assets for the sole benefit of players and their beneficiaries and to pay all expenses of the Annuity Program approved by the Annuity Board. The Annuity Program is intended, except the tax qualified portions described below, to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will

be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual taxable allocation remaining after withholding taxes will be used to purchase an annuity.

*Section 5.* **New Tax-Qualified Portion:**

(a)     The parties agree, to the extent that contributions to such new tax-qualified portion would be deductible as business expenses in the year contributed, to amend the Player Annuity Program so that a portion of the Allocations will be contributed to a second Qualified Portion. The remaining portion of the Allocations, if any, will continue to be credited to the Taxable Portion. The portion of the Allocations to be contributed to the Qualified Portions will be the largest multiple of $1,000 that does not exceed (1) the amount that is currently deductible by the NFL Clubs under Section 404 of the Internal Revenue Code, and (2) the maximum amount permitted by Section 415 of the Internal Revenue Code.

(b)     The parties agree that a player who earns his second or third Credited Season will receive one allocation of $5,000 for that year in the Qualified Portion, subject to a vesting schedule. Forfeitures will be used to reduce employer contributions. Allocations in later years for a player will be reduced to the extent such player receives an allocation for his second or third Credited Season.

*Section 6.* **NFL Player Annuity & Insurance Company Net Worth:** Unless unusual circumstances exist that warrant a greater Net Worth, the estimated Net Worth of the NFL Player Annuity & Insurance Company ("Company") at the end of each calendar year shall not be less than the greater of (1) one percent (1%) of the total Segregated Accounts, or (2) $3.5 million. For purposes of this calculation, Net Worth is defined as the net worth of the Company as shown in the pro forma financial statements. At its last meeting in each calendar year, the Company's Board of Directors shall determine:

(a)     Whether or not unusual circumstances exist that warrant a greater estimated Net Worth;

(b)     The amount of any payment to the player Segregated Accounts from the Company General Account for the current year, such that the estimated Net Worth for the current year does not unreasonably exceed the above limits; and

(c)     The amount, if any, by which the Company charge to the player Segregated Accounts for the upcoming calendar year should be changed, such that the estimated Net Worth at the end of the following calendar year is not expected to unreasonably exceed or be less than the above limits.

# ARTICLE 56
# TUITION ASSISTANCE PLAN

*Section 1.* **Maintenance:** The NFL Player Tuition Assistance Plan will provide up to $15,000 per League Year ($20,000 per League Year for the 2015–2020 League Years) as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. The NFL Player Tuition Assistance Plan is a written plan that is intended to qualify as an educational assistance program under Section 127 of the Internal Revenue Code that provides benefits to a player in any calendar year up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan begins on April 1. The Plan and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Plan will be continued and maintained in full force and effect during the term of this Agreement and must at all times comply with the terms of this Article.

*Section 2.* **Eligibility:**

    (a)    To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.

    (b)    A player, who (i) is not eligible for benefits under 2(a) above, (ii) has at least one Credited Season after the 2005 Season, and (iii) has at least five (5) Credited Seasons under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, shall be eligible to be reimbursed for up to $45,000 (up to $60,000 in the 2015–2020 League Years) of his expenses incurred for qualifying tuition, fees and books, provided such expenses are incurred within 48 months of the first day of the League Year immediately following the player's last regular or post season game and otherwise satisfy the conditions of the plan.

    (c)    A player who has just completed his first Credited Season will be eligible to be reimbursed for a course that begins after his Club's final game of that season and prior to the next following season provided that:

        (i)    if, on the day the course begins, the player is under contract with a Club; and

(ii)      if any portion of the course is taught after the start of his Club's offseason workout program, that the player does not have to travel more than 100 miles from that Club's main practice facility to take the course, provided that

(iii)      the Parties may waive the 100 mile limitation in any individual case, based upon a showing of unreasonable hardship.

*Section 3.* **Reimbursement:** An eligible player will be reimbursed no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books, but only if his completed application is received by the Plan Administrator within six (6) months of the date he completes the course.

*Section 4.* **Administration:** The NFL shall administer the Tuition Assistance Plan.

228

# ARTICLE 57
## LEGACY BENEFIT

*Section 1.* **Establishment:**  Effective August 4, 2011, the NFL shall establish a benefit known as the "Legacy Benefit." The Legacy Benefit will be provided from the Retirement Plan to vested players who had Credited Seasons prior to 1993.

*Section 2.* **Benefit:** The parties will jointly determine no later than fourteen days after the effective date of this Agreement, the amount of the additional benefit to be provided under the Legacy Benefit and to whom it will be provided (e.g., to players who have no Credited Seasons after 1992, to players who had Credited Seasons before 1993 but no Credited Seasons after a specified season, or to all vested players with any Credited Seasons prior to 1993).

*Section 3.* **Cost:** The NFL and its Clubs shall make an aggregate contribution of approximately $620 million to the Legacy Benefit over the term of this Agreement, 49% of which shall count as a Player Benefit Cost.