## ARTICLE 58
## 88 BENEFIT

*Section 1.* **Establishment:** The parties established the "88 Plan," to provide medical benefits to former Players who are (1) vested due to their Credited Seasons or their total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (2) determined by the governing Board of the 88 Plan (the "88 Board") to have "dementia," amyotrophic lateral sclerosis (ALS), and/or Parkinson's disease as defined by the parties. The 88 Plan is jointly administered, pursuant to the requirements of the Taft-Hartley Act, in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The 88 Plan, and any and all future amendments thereto, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Plan Year begins on April 1.

*Section 2.* **Dementia Benefits:**
    (a)    The Plan will reimburse, or pay for, certain costs related to dementia, ALS, and/or Parkinson's disease, upon the diagnosis made by a physician with experience in the field of treating dementia, ALS, and/or Parkinson's disease. In no event will the total payments to or on behalf of an eligible player exceed $100,000 in any year ($130,000 beginning in the 2016 League Year), but in no event will benefits be paid for any month or other period of time that precedes the date the 88 Board first receives a written application or similar letter requesting the benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit. The costs to be paid for an eligible player include:
    (1)    For any month in which an eligible player was admitted as an in-patient at an eligible institution for all or part of the month, institutional custodial care, institutional charges, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $100,000 (1/12 of $130,000 beginning in the 2016 League Year); and
    (2)    For any month in which an eligible player was not admitted as an in-patient at an eligible institution for all or part of the month, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $88,000 (1/12 of $118,000 beginning in the 2016 League Year).
    (b)    The maximum benefit payable for any month shall be reduced, but not below zero, by the amount of any total and permanent disability benefits paid by the NFL Player Disability Plan. However, the maximum benefit payable for any month shall not be reduced by those total and permanent disability benefits paid to players who are receiving the Inactive "B" total and permanent disability benefit described in the Disability Plan. In the case of a Player who has reached his normal retirement date under the Bert Bell/Pete Rozelle Plan and who is receiving total and disability benefits under the Disability Plan in the Active Football, Active Nonfootball, or Inactive "A" categories, (including a player who has converted to retirement benefits under Section 5.4 of the

Bert Bell/Pete Rozelle NFL Player Retirement Plan), the maximum benefit payable for any month shall be reduced, but not below zero, by the excess of (1) the monthly benefit the player would receive from both the Bert Bell/Pete Rozelle Plan and the Disability Plan if he elected a Life Only form beginning on his normal retirement date, over (2) the monthly benefit the player would have received from the Bert Bell/Pete Rozelle Plan in a Life Only form beginning on his normal retirement date based solely on his Credited Seasons, as if he were not disabled. The parties will structure the benefits payable for or to eligible players to reduce or eliminate taxes on such benefits, to the extent deemed possible. At the discretion of the 88 Board, payments for durable medical equipment and prescription medication may be made directly to the player.

*Section 3.* **Funding:** The NFL Clubs will make advance contributions to the 88 Plan in an amount sufficient to pay benefits and all administrative expenses approved by the 88 Board.

*Section 4.* **Term:** This Plan will continue to provide benefits as above after the Final League Year and after the expiration of this Agreement, but only to a former player who qualified during the term of this Agreement and who remains qualified.

*Section 5.* **Committee:** The Parties shall establish a committee to develop guidelines for determining the reimbursement of covered expenses.

## ARTICLE 59
## GROUP INSURANCE

*Section 1.* **Maintenance:** The NFL Player Insurance Plan ("Insurance Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Plan will be continued and maintained in full force and effect during the term of this Agreement and must at all time comply with the terms of this Article. Under the Plan, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a) **Life Insurance.** Effective September 3, 2011, a rookie player will be entitled to $600,000 in coverage, and a veteran player's coverage will be increased by $200,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan NFL Player Retirement Plan ("Retirement Plan")) up to a maximum of $1,600,000 in coverage.

(b) **Medical.** Each player is required to pay an annual deductible of $600 per individual per plan year ($850 per plan year for the 2016–2020 League Years) and $1200 per family per plan year ($1700 per plan year for the 2016–2020 League Years), with maximum out-of-pocket expenses of $2000 (including the deductible) for each covered individual. In addition:

(1) the co-insurance paid by a covered individual for services rendered by out-of-network providers will be 30% of covered charges; and

(2) the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and

(3) a prescription drug card will be provided to covered individuals with a three-tier, $15/$25/$50 co-pay.

(4) One physical per year for the covered player and his spouse will be covered.

(5) The maximum lifetime infertility benefit shall be $25,000.

(c) **Dental.** Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1) Preventive care paid at 100% of UCR,
(2) General services paid at 85% of UCR, and
(3) Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

(d) **Period of Benefits.** Subject to the extension provided in Section 2, Players will continue to receive the benefits provided in this Article through the end of the Plan Year in which they are released or otherwise sever employment. Players vested due to their Credited Seasons under the Retirement Plan who are released or otherwise

232

sever employment after May 1 in a calendar year will continue to receive the benefits provided under this section until the first regular season game of the season that begins in the following calendar year. Group benefits are guaranteed during the term of this Agreement unless required to be modified by law.

(e)   **Family Medical and Dental Coverage for Deceased Players.** A player's enrolled dependents (including a child born to the player's wife within ten months after the player's death) shall be entitled to continuing family medical and dental coverage, as follows:

(1)   for the dependents of a player on the Active, Inactive, Reserve/Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;

(2)   for dependents of a player who was receiving coverage under this Article at the time of his death, coverage will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.

(f)   **Coverage for Players Receiving Injury Settlements.** Effective September 1, 2011, Section 2.1 of the Plan shall be amended to provide that a Player who was on a Qualifying List at any time during the preseason shall be eligible for Comprehensive Medical and Dental Benefits in the immediately following season if he is paid all or part of his salary for such season pursuant to an Injury Settlement Waiver or an Injury Grievance, as such terms are defined in the CBA, and shall be regarded as being released in that season for purposes of determining the date his eligibility terminates under Section 2.3 and his right to extended coverage, if any, begins, provided, however, that coverage under the Plan will not be provided retroactively for any period of time it was not then available. In addition, the definition of "Continuing Veteran" shall be amended to require that a player be regarded as a vested player only if he has earned three or more Credited Seasons.

*Section 2.* **Extended Post-Career Medical And Dental Benefits:**

(a) The medical and dental benefits described in Section 1 of this Article are continued, subject to limitations described in Section 3 below, as follows:

(i)   Players vested due to their Credited Seasons under the Retirement Plan who are released or otherwise sever employment at any time on or after the first regular season game, and prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above through the end of the Plan Year in which such release or severance occurs and for the following sixty (60) month period.

(ii)   All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described above are provided, as if such additional benefits had not been provided.

(iii)   Players vested due to their Credited Seasons under the Retirement Plan and who have a Credited Season in 2011 or thereafter who have completed their eligibility under this Section and under COBRA shall have the option, at the expiration of COBRA, to continue insurance coverage on the same terms as if COBRA had not ex-

pired (at their own expense) for the duration of this Agreement provided that no break in coverage occurs after the player's last Player Contract is terminated or expires. Each such player also will have the right to waive coverage under COBRA and elect coverage instead under a lower cost option mutually agreed to by the NFL and NFLPA.

***Section 3.*** **Limitations And Rules For Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

    (a) The benefits described in Subsections 2(e) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

    (b) Players eligible for coverage under Section 2 above are not obligated to enroll in any other health plan or program for health services offered by an employer.

    (c) The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

***Section 4.*** **Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The parties each shall have the right to appoint two (2) trustees for the NFL Players Insurance Plan. In the event of a tie vote by the trustees in any appeal, the matter will be referred to the Benefits Arbitrator under Article 66. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Medical, dental, and prescription drug benefits may be provided on a self-insured basis not subject to state insurance law mandates. The list of state mandates will be reviewed to determine which, if any, shall be continued, and the conversion procedure will be ended. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

## ARTICLE 60
## SEVERANCE PAY

*Section 1.* **Eligibility and Maintenance:** The NFL Player Severance Pay Plan ("Severance Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Severance Plan will be continued and maintained in full force and effect during the term of this Agreement and at all times comply with the terms of this Article. Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan), at least one of which is for a season occurring in 1993 through 2020, will be eligible for severance pay under this Plan. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay. Determinations of the Retirement Board with respect to Credited Seasons will be final and binding for purposes of determining severance pay.

*Section 2.* **Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; and (c) $12,500 per Credited Season for each of the seasons 2000 through 2008; (d) $15,000 for a Credited Season for the 2009 season, or for a Credited Season for the 2011 season; (e) $17,500 per Credited Season for each of the seasons 2012 through 2013; (f) $20,000 per Credited Season for each of the seasons 2014 through 2016; and (g) $22,500 per Credited Season for each of the seasons 2017 through 2020.

*Section 3.* **Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season. The payment will be made automatically on the last day of the calendar quarter in which the eligible player's "separation from service," within the meaning of Internal Revenue Code Section 409A, occurs, unless his separation from service occurs within twenty (20) days of such date, in which case his severance pay will be paid on the last day of the next following calendar quarter.

*Section 4.* **Second Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will be entitled to further severance pay based solely on his subsequent Credited Seasons.

*Section 5.* **Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

*Section 6.* **Administration:** The NFL shall continue to administer the Severance Plan.

*Section 7.* **Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player. Notwithstanding the preceding, (1) a player's severance pay will be assigned and paid to an "alternate payee," under a court order that satisfies the essential requirements to be a "qualified domestic relations order" within the meaning of Internal Revenue Code Section 414(p); and (2) a Club may offset against severance pay, at the time of payment, amounts to the extent permitted by Internal Revenue Code Section 409A and the regulations thereunder.

## ARTICLE 61
## NFL PLAYER DISABILITY PLAN

*Section 1.* **Maintenance:** The parties agree to create a new Taft-Hartley, welfare benefit plan for the payment of disability benefits to former players who are eligible and qualify. This new disability plan will combine the provisions of the Retirement Plan that deal with the payment of disability benefits, including but not limited to eligibility, criteria for qualifying for the benefit, and amounts of benefits and the provisions of the NFL Supplemental Disability Plan into one separate plan to be known as the NFL Player Disability Plan (the "Disability Plan"). Upon creation of this Disability Plan, the Retirement Plan shall be amended to eliminate its provisions relating to disability benefits that are incorporated into this new Disability Plan and the Supplemental Disability Plan shall terminate. The benefits payable under this new Disability Plan shall be reduced beginning at the player's normal retirement age by the monthly benefit the player is entitled to receive under the Retirement Plan beginning at the player's normal retirement age in the form of a life annuity. The benefits payable under this Disability Plan shall be reduced by the amount which would have resulted due to the application of Section 4.5 of the Retirement Plan due to the player electing an Early Payment Benefit. Subject to Section 4 below, this new Disability Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **New Disability Benefits:** All substantive provisions regarding the payment of disability benefits in the Retirement Plan and the Supplemental Disability Plan will be incorporated into this new Disability Plan so as not to change the current methodology or amount of the benefit except as follows:

    (a)    **New Disability Terms.**

        (i)    The Disability Plan will change the definition of "Total and Permanent Disability" to permit a player to receive up to $30,000 per year of earned income and to clarify that an applicant's educational level and prior training are not factors taken into account in determining whether he is "unable to engage in any occupation or employment for remuneration or profit." The new definition will define "permanent" for this purpose as follows: "A disability will be deemed to be "permanent" if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period."

        (ii)    The Disability Plan will provide that applications for benefits in the categories of Football Degenerative Total and Permanent Disability and Inactive Total and Permanent Disability shall no longer be accepted and such categories of benefits shall be eliminated. These disability benefits shall be replaced by two new Total and Permanent Disability Benefits referred to as Inactive A Disability Benefits and Inactive B Disability Benefits. Neither of these disabilities shall require the Total and Permanent Disability to have arisen out of football activities. Effective for applications received on or after September 1, 2011, players who file for Total and Permanent Disability Benefits within 15 years after their last Credited Season shall receive an Inactive A Disability Benefit in the amount specified in Section 3 below, if qualified, and players who file for Total and

Permanent Disability Benefits after 15 years of their last Credited Season shall receive an Inactive B Disability Benefit in the amount specified in Section 3 below, if qualified.

(iii) Players whose Total and Permanent Disability is caused by the use of, addiction to, or dependence upon any controlled substance as defined in 21 USC Sec. 802(b), alcohol, or illegal drugs, shall only be eligible for Inactive B Disability Benefits. Notwithstanding the foregoing, a player may, if otherwise qualified, receive Total and Permanent Disability Benefits in any category if his Total and Permanent Disability is caused by the use of, addiction to, or dependence upon any controlled substance as defined in 21 USC Sec. 802(b) and (a) such use of, addiction to, or dependence upon results from the substantially continuous use of a controlled substance that was prescribed for League football activities or for any injury (or injuries) or illness arising out of League football activities of the applicant while he was an active player, and (b) an application for Total and Permanent Disability Benefits is received based on such use of, addiction to, or dependence upon a controlled substance no later than eight years after the end of the player's last Credited Season.

(iv) Effective for applications received on or after September 1, 2011, to provide that the Line of Duty Benefit shall be no less than $2,000 per month (which such amount shall be increased in $500 increments every other year, beginning in 2013).

(b) The Disability Plan will permit players who elected to retire under the Retirement Plan prior to the Normal Retirement date and who subsequently receive a Social Security Disability award prior to attaining the age of 55 to receive a Total and Permanent disability benefit for which they qualify.

(c) The Disability Plan will contain a provision that reads substantially as follows: "Any person receiving total and permanent disability benefits may be required to submit to periodic physical examinations for the purpose of re-examining his condition. The examinations will occur not more often than once every five (5) years, except that upon request of three or more voting members of the Retirement Board, examinations may occur as frequently as once every six months. For each calendar year in which a person receives total and permanent disability benefits, he must submit an executed copy of IRS Form 4506-T by July 1 of the subsequent calendar year. A person who has not filed his annual federal income tax return by July 1 also must either (1) submit a signed statement that he does not intend to file such tax return, and state the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year. If the Disability Plan Board or the Disability Initial Claims Committee determines that such person is no longer totally and permanently disabled, the total and permanent disability benefits will terminate. The total and permanent disability benefits of any person refusing to submit to a required physical examination or to submit an IRS Form 4506-T annually will be suspended until such refusal is resolved to the satisfaction of the Disability Plan Board. If such refusal is not resolved to the satisfaction of the Disability Plan Board within one year after such person is notified of the consequences of his refusal, his total and permanent disability benefits will be terminated. In that event, such person must submit a new application to be eligible to receive any further total and permanent disability benefits, but the rules classifying the type of T&P benefit will not apply."

(d) The Disability Plan shall contain the same provisions as the Retirement Plan for resolving benefit disputes, including the following new provision: "Effective for benefit disputes arising under the Disability Plan on and after September 1, 2011, the arbitrator selected to resolve the dispute must base his decision solely on the administrative record that was before the Disability Board, as it may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator. In addition, each side shall be permitted to take depositions of any expert relied on by the other side based on the administrative record, supplemented as provided above."

(e) The Disability Board shall engage an independent firm mutually selected by the NFL and the NFLPA to examine annually a representative sample of persons receiving benefits under the Disability Plan to ensure that each such person is eligible to receive the benefits being provided.

(f) A healthcare professional designated by the parties shall become a member of the Disability Initial Claims Committee ("DICC"). He or she shall cast the deciding vote only on those cases that are preliminarily "deemed denials" because of a disagreement between the other two members of the DICC over a medical aspect of the case. Notwithstanding the foregoing, in situations where the designated healthcare professional determines that the medical evidence is either inconclusive or insufficient, he or she will abstain from voting resulting in the "deemed denial" becoming the final decision of the DICC.

*Section 3.* **Increase in Benefit Amounts**: Effective September 1, 2011, the minimum benefit amounts shall be increased as set forth below, both for future applications and for players currently in pay status. For this purpose, players currently receiving Football Degenerative Benefits shall be switched to Inactive A and players currently receiving Inactive Benefits shall be switched to Inactive B. Any player who was awarded a disability benefit prior to September 1, 2011 (including any player whose application for a disability benefit was received by the Disability Plan prior to September 1, 2011, that leads to an award of a benefit) will not be eligible for a benefit under the rules governing the award of disability benefits that go into effect on September 1, 2011, unless based on an impairment other than the one that originally qualified him for a disability benefit. Furthermore, the rules in effect prior to September 1, 2011, will govern all appeals and reclassifications of disability benefits that were awarded prior to September 1, 2011 (including any player whose application for a disability benefit was received by the Disability Plan prior to September 1, 2011, that leads to an award of a benefit):

| | |
|---|---|
| Active Football | $250,000 (increased to $265,000 effective January 1, 2016) |
| Active Nonfootball | $150,000 (increased to $165,000 effective January 1, 2016) |
| Inactive A | $120,000 (increased to $135,000 effective January 1, 2016) |
| Inactive B | $50,000 (increased to $60,000 effective January 1, 2016) |

*Section 4.* **Continuation of Benefits Following Term of Agreement:** After the term of the Agreement, the portion of the disability benefit that would have been paid under the Retirement Plan but for the changes made pursuant to this Article shall continue to

239

be paid from the Disability Plan, provided that the player continues to qualify for the benefit

*Section 5.* **Improvements:** The parties shall appoint designated representatives no later than October 31, 2011, to discuss in good faith additional improvements to the disability benefits provided under this Agreement including, but not limited to, expediting processing of applications, streamlining medical evaluation procedures, and maximizing benefits payable to the players. Among other things, the parties will discuss modifying the Disability Plan's benefit structure to make benefits hereunder tax-free to players.

# ARTICLE 62
# LONG TERM CARE INSURANCE PLAN

*Section 1.* **Eligibility and Maintenance:** The Long Term Care Insurance Plan ("LTC Plan") in effect as of the date hereof, and all future amendments thereto, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in the LTC Plan and the definitions of such terms are applicable only to the LTC Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The LTC Plan will be continued and maintained in full force and effect during the term of this Agreement; provided, however, that if the Management Council determines that it would be more efficient and economical to administer the LTC Plan under the Former Player Life Improvement Plan, the LTC Plan may be terminated and the benefits provided hereunder be provided under the Former Player Life Improvement Plan, subject to approval by the NFLPA. Only players who have permanently ceased playing professional football; who are vested under the Retirement Plan based on Credited Seasons; who have attained the age of 50 and not yet attained the age of 76; and who satisfy the underwriting requirements of the insurer are eligible for insurance under the LTC Plan.

*Section 2.* **Benefits:** All eligible players will be entitled to receive benefits under a long-term care insurance contract provided by a national insurer in the event the player is certified by a licensed health care provider as (i) requiring critical supervision, or (ii) requiring the presence of another person within arm's reach due to inability to perform a required number of defined activities of daily living. The long-term care insurance contract is renewable for life and entitles the player to receive a maximum daily benefit of $150 for a maximum of four years.

*Section 3.* **Limitations:** Benefits will not be paid for confinement, treatment, services or care: (i) resulting from alcoholism, drug addiction, or chemical dependency, unless as a result of medication prescribed by a physician; (ii) arising out of suicide (while sane or insane), attempted suicide, or intentionally self-inflicted injury; (iii) provided in a government facility (unless otherwise required by law), services for which benefits are payable under Medicare, or would be payable except for application of a deductible or coinsurance amount, or other governmental programs (except Medicaid), and services for which no charge is normally made in the absence of insurance; (iv) received outside the United States; (v) for which benefits are payable under any state or federal workers' compensation, employer's liability of occupational disease law; (vi) that are not included in a participant's plan of care; or (vii) that are prohibited by federal law.

*Section 4.* **Plan Benefits Primary:** Any player who is entitled to any payment or benefit under any other Article of this Agreement that would be eligible for payment or reimbursement under the LTC Plan will have such payment or benefit offset by the amount eligible for payment or reimbursement under the LTC Plan.

*Section 5.* **Administration:** The NFL shall administer the LTC Plan.

## ARTICLE 63
## GENE UPSHAW NFL PLAYER HEALTH REIMBURSEMENT ACCOUNT

*Section 1.* **Establishment:** The parties will jointly administer the Gene Upshaw NFL Player Health Reimbursement Account Plan (hereinafter referred to as "Health Reimbursement Plan" or "Plan") pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Plan Year begins on April 1. The Health Reimbursement Plan, and any and all future amendments thereto as adopted in accordance with the terms of that Plan, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:** For each of the Plan Years 2011 and thereafter, a contribution will be made to the Health Reimbursement Plan on behalf of the NFL Clubs based on the actuarial assumptions and methods contained in Appendix O. The unfunded present value of accrued nominal accounts shall be funded at a time or times selected by the NFL in an amount sufficient to pay reimbursements when they become due. All such contributions will be held for the exclusive benefit of Participants and their beneficiaries, and under no circumstances will any assets of the Plan ever revert to, or be used by, a Club, the League, or the NFLPA. Notwithstanding the above, any contribution made by or on behalf of a Club to the Plan due to a mistake of fact or law will be returned to such Club within six months of the determination that such contribution was in error. The return of contributions is limited to that portion of the contribution as to which there was a mistake of fact or law. A returned contribution will not include any earnings attributable to the contribution, but will be reduced by any losses attributable to the contribution. It will be the duty of the fiduciaries of the Health Reimbursement Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. No participant or beneficiary is required to or permitted to contribute, except as may be required by law. The present value of accrued nominal accounts will be determined based on the actuarial assumptions and methods contained in Appendix O.

*Section 3.* **Eligibility:** A Player participates in this Plan if (a) he earns a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Plan") for 2006 or for any later Plan Year for which a Salary Cap applies and has a total of three or more Credited Seasons as of the end of such Plan Year, or (b) his last Credited Season under the Retirement Plan is either 2004 or 2005 and he had a total of eight or more Credited Seasons as of the end of the such Plan Year.

*Section 4.* **Health Reimbursement Accounts:** A nominal account will be established to account for the interest of each eligible player. No interest, other investment earnings, or losses will be credited to any nominal account, except as described under Section 7(b)

below. Reimbursement payments from the Plan to eligible players, their spouses, and dependents will reduce the health reimbursement accounts dollar-for-dollar. Credits to the nominal accounts of eligible Players are determined as of March 31 of each Plan Year as follows:

  (a) The nominal account of an eligible Player who earns a Credited Season in a Plan Year, beginning with the 2011 Plan Year, will be credited with $25,000 ($30,000 for the 2016–2020 League Years); and

  (b) The nominal account of a Player who first becomes eligible in a Plan Year, beginning with the 2011 Plan Year, because it is his third Credited Season, or who earns his fourth Credited Season in the 2011 Plan Year and did not previously receive the enhanced credit pursuant to this Subsection, will be credited with an additional $50,000 for that year only.

  (c) The determination by the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan of a Player's Credited Seasons will be binding on the Plan. A player who is awarded Credited Seasons by the Retirement Board (other than a Credited Season for the 2010 Plan Year) and who thereby (1) becomes eligible to participate in the Plan or (2) becomes eligible for additional credits, will receive retroactive credits to his nominal account as of the end of the Plan Year in which the Retirement Board's Credited Season determination is made. The amount of the retroactive allocation will be $25,000 times the number of Credited Seasons not already counted under the Plan.

  (d) Total credits to an eligible player's nominal account for Credited Seasons before the 2011 League Year shall not exceed $300,000. Total credits to an eligible player's nominal account, including Credited Seasons after the 2010 League Year shall not exceed $350,000.

*Section 5.* **Payments from Health Reimbursement Accounts:** The Plan will reimburse medical care expenses (within the meaning of Internal Revenue Code section 213(d), and including, without limitation, direct medical expenses, medical insurance premiums, and medical insurance co-pays and deductibles to the extent provided in such Internal Revenue Code section) incurred by eligible players and their spouses and dependents without regard to section 152(b)(1), (b)(2) and (d)(1)(B)). The Plan will be established and administered to use the broadest allowable definition of "dependent" permitted by law and any individual who qualifies as a dependent in the plan year with respect to which the player receives a credit shall retain that status until that credit is exhausted. Payments will be made only to the extent that the player or the player's spouse or dependents have not been reimbursed for the expense from any other plan. No player will have the right to receive cash or any taxable or nontaxable benefit other than the reimbursement of medical care expenses incurred by the player and his spouse and dependents. No reimbursement will be made to the extent that it would reduce the Player's Health Reimbursement Account below zero. A player's rights under this Health Reimbursement Plan may not be transferred, assigned, or alienated, except pursuant to a qualified medical child support order as defined in Section 609(a)(2) of ERISA.

  Upon the death of a player, any remaining account balance may be used only to reimburse the medical care expenses of his surviving spouse and dependents. Upon the

death of such surviving spouse and last dependent, or upon the death of the player if there is no surviving spouse or dependents, any unused remaining balance is cancelled.

A player may receive a reimbursement from this Plan only for expenses incurred during a period of time during which he is not covered by (a) the Group Insurance provided in Section 1 of Article 59 and (b) the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article 59; except that a player who is covered by the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article 59 by reason of COBRA may receive a reimbursement from this Plan.

Effective September 1, 2011, the Plan shall be amended to provide that, notwithstanding any provision of the Plan, the credit standing to the account of a player found by the Trustees of the Insurance Plan to have defrauded the Insurance Plan shall be reduced by the lesser of (i) the amount of the fraud, or (ii) the remaining credit; and the Plan shall pay that amount to the Insurance Plan.

*Section 6.* **Structure:** The Health Reimbursement Plan will hold assets for the exclusive benefit of players and their beneficiaries. The parties agree that the Plan will be administered by a Health Board, and that prior to the first meeting of the Health Board the advisors to the Health Reimbursement Plan will be the same as the advisors to the Savings Plan. The Health Reimbursement Plan is intended to be a health care reimbursement arrangement as described in IRS Notice 2002-45, 2002-28 IRB 93; Rev. Rul. 2002-41, 2002-28 IRB 75; and Situation 1 of IRS Revenue Ruling 2005-24.

*Section 7.* **Plan Operation in Post-Expiration Years:**
(a)     After the expiration of this Agreement, the Plan will continue in existence until all nominal accounts have been paid out or forfeited.
(b)     The nominal accounts will not be credited with any earnings or interest except to the extent that, in the sole discretion of the Health Board, accumulated Plan earnings exceed current expenses and an appropriate reserve.