media, or medium (now known or hereafter developed) during a consecutive 12-month period (a "group licensing program"). For sponsorships, endorsements, and promotions, group licensing programs are further defined as those: (a) in any one product category, as defined by industry standards; or (b) in different categories if the products all use similar or derivative design or artwork, or one player product is used to promote another player product.

The Rights may also be used for the promotion of the NFLPA, its affiliated entities and/or its designees (the "NFLPA Entities"), provided such promotion does not constitute an endorsement by Player of a commercial product not a part of a group licensing program. Player agrees to participate, upon request of the NFLPA and without additional compensation, in reasonable activities to promote the NFLPA Entities, which shall include (i) up to three (3) personal appearances per year or (ii) up to fifteen (15) minutes per week dedicated to promoting the NFLPA Entities. Player retains the right to grant permission to others to utilize his Rights if that individual or entity is not concurrently utilizing the Rights of five (5) or more other NFL players for any commercial purpose whatsoever. If Player's inclusion in an NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with immediate written notice of that preclusion, the NFLPA agrees to exclude Player from that particular program. Should Player fail to perform any of his obligations hereunder, the NFLPA may withhold payments owed to Player, if any, in connection with this Group Licensing Assignment.

In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA Board. The NFLPA further agrees to use reasonable efforts to promote the use of NFL player Rights in group licensing programs, to provide group licensing opportunities to all NFL players, and to monitor and police unauthorized third-party use of the Rights. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under Virginia law.

The assignment in this paragraph shall expire on December 31 of the latter of (i) the third year following the execution of this contract, or (ii) the year after this contract expires, and may not be revoked, terminated or otherwise assigned in any manner by Player until such date. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA.

Nothing in Paragraph 3b shall be construed or deemed to modify in any way the rights set forth in Paragraph 3a, and the fact that Paragraph 3b (or any of the terms thereof) appears in the Player Contract shall not be referred to, relied upon, or otherwise cited by Player and/or the NFLPA or any of its affiliates in any dispute or legal proceeding as evidence that the NFL, any NFL entity, any Club or Club Affiliate, or any licensee of any of the foregoing has consented, agreed, acknowledged, or does not contest the applicability or interpretation of Paragraph 3b.

4. COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a weekly salary of $_____ for each week

during the Regular Season and each week that the Club is in the Postseason so long as Player is a member of Club's Practice Squad during the week preceding the game in question. Such salary will be payable on a weekly or bi-weekly basis as Club shall choose. In addition, Club will pay Player's necessary traveling expenses from his residence to Club's home city or other location to which the Player is directed to report; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses, if any, to which Practice Squad members are entitled pursuant to any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term and during any period for which the parties to that agreement agree to extend it.) In the event this Contract is terminated by the Club prior to 4:00 p.m., New York time, Tuesday, the Club shall not be obligated to pay Player for that week. If Player terminates this contract at any time, he will have no further right to receive any further compensation under this contract.

5. DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or a collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

6. PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player will make full and complete disclosure of any physical or mental condition known to him which might impair his performance under the contract and will respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

7. INJURY. If player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his weekly salary for so long, during the season of injury only and for no subsequent period, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his salary for the season of injury will be paid to his stated beneficiary or, in the absence of a stated beneficiary, to his estate.

8. WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term

of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

9. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's Practice Squad within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's Practice Squad, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or to attempt to sign, or another player or players who is or are already on Club's roster or Practice Squad, and for whom Club needs room.

10. TERMINATION BY PLAYER. Player may terminate this contract to sign an NFL Player Contract with another NFL club, except that Player may not sign an NFL Player Contract with Club's next opponent later than 4:00 p.m., New York time, on the sixth day preceding the game (except in bye-weeks, when the prohibition commences on the tenth day preceding the game). Player may not terminate this contract in order to sign a contract with another club to serve as a Practice Squad Player.

11. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon either Player or Club giving written notice to the other, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate his contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

12. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following Injury Grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance

with the procedures of the American Arbitration Association on application by either party.

13. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

14. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount, to suspend Player for a period certain or indefinitely, and/or to terminate this contract.

15. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, conflict between the terms of this contract and any collective bargaining agreement then in existence, or upon any ground allowed in such collective bargaining agreement. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

16. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of the NFL collective bargaining agreement or this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective

bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

17. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

18. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

19. LAW. This contract shall be governed by the laws of the State of _____.

20. WAIVER AND RELEASE. Player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, the Rookie Compensation Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to the express terms of any collective bargaining agreement during the term of any such agreement. This waiver and release also extends to any conduct engaged in pursuant to the express terms of the Stipulation and Settlement Agreement in *White*. This waiver and release does not waive any rights player may have to commence a grievance under the 2006 CBA or to commence a grievance or other arbitration under the 2011 CBA.

21. OTHER PROVISIONS.
(a)  Each of the undersigned hereby confirms that (i) this contract sets forth all components of the player's remuneration for playing professional football or serving as a Practice Player (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are no undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b) Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Collective Bargaining Agreement took place with respect to this contract.

THIS CONTRACT is executed in six copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection with respect to this contract.

_____          _____
PLAYER                                                   CLUB

_____          _____
Home Address                                        By


                                                              Club Address
_____          _____
Telephone Number (including area code)


_____          _____
Date                                                       Date


_____
PLAYER'S AGENT

_____
Date

## STANDARD CONTAGIOUS DISEASE ADDENDUM

_____ ("Practice Squad Player") and _____ ("Club") agree to the following terms:

1. The terms of this addendum, and the other terms set forth in the side letter dated June 24, 2010, will take effect if Practice Squad Player is elevated from Practice Squad to the 53-player Active/Inactive List for a game because the Club was given roster exemptions due to confirmed or suspected cases of a Contagious Disease among its players.

2. If Practice Squad Player is elevated to the Club's 53-player Active/Inactive List under these special circumstances, then Practice Squad Player's weekly compensation specified in Paragraph 4 of the Practice Player Contract will be adjusted for that game to 1/17th of the Paragraph 5 minimum salary for Active/Inactive List players with the same number of credited seasons. Unless otherwise provided for below in Paragraphs 3 and 4, Practice Squad Player will be paid the weekly compensation set forth in Paragraph 4 ("Compensation") of the Practice Player Contract after he automatically reverts to the Practice Squad.

3. In the event Practice Squad player: (1) sustains a football-related injury (either in a practice prior to the game or in the game itself) after being elevated to the 53-player Active/Inactive List under the circumstances described in Paragraph 1 above, and (2) is physically unable to practice or play for the club due to the injury, then the player's weekly compensation specified in Paragraph 4 of the Practice Player Contract will be adjusted to 1/17th of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of credited seasons. Player shall receive this weekly "salary continuation" for so long as he remains physically unable to perform the services required of him because of such injury. Once Practice Squad player is physically able to perform the services required of him by his Practice Player Contract, then his salary will be adjusted to the amount set forth in Paragraph 4 ("Compensation") of that contract for the period of time he remains on the club's Practice Squad.

4. If Practice Squad player sustains a football-related injury during the game in which he was elevated (or during a practice after being elevated but prior to the game) and is subsequently placed on Reserve/Injured, then he will be paid (for so long as he remains physically unable to perform the services required of him because of such injury) the prorated portion of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of credited seasons. A Practice Squad player, who is placed on Reserve/Injured under these circumstances, must be signed by his club to an NFL Player Contract at the time he is placed on that reserve list category.

_____   _____
Practice Squad Player         Club

_____   _____
Date                          Date

_____
Player's Certified Agent

_____
Date

## APPENDIX K
## STANDARD MINIMUM PRESEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

### General Medical Examination
1. History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons
2. Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpation
   - chest
   - heart
   - visceral
   - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e. scars, birthmarks
   - height
   - weight
   - temperature
   - blood pressure
   - pulse
   - heart rate

### Orthopedic Examination

Examination visually, including stress testing and range of motion for all of the following:
- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck

**EKG**
Heart Abnormalities
ECG with interpretation

**Echocardiography**
Stress testing available and performed when clinically-indicated

**Blood Testing**
Standard grid. Testing for (including but not limited to):
- CBC diff platelets
- Complete chemistry profile including but not limited to electrolytes, BUN/Creatinine, LFTs, glucose
- Lipid profile
- T4, TSH
- U/A
- Sickle Cell (only if not previously tested)
- G6PD (only if not previously tested)

**Neuropsychological Testing (Baseline)**

**Urinalysis**
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**
- peripheral vision
- standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (initial screening only, and then based on past history and complaints)
Check for: Tumor
  T.B.
  Lesions
**X-Ray all previously injured areas** (at physician's discretion)

## APPENDIX L
## INJURY SETTLEMENT

### SETTLEMENT AND RELEASE

Upon receipt of and in consideration for the sum of _____ ($ ), minus applicable taxes, _____ ("Player"), for himself and his heirs, executors, administrators, successors, and assigns, does hereby release and discharge the_____ ("Club"), its officers, directors, stockholders, employees, agents, and representatives, the NFL Management Council, and the National Football League, and their members, employees, agents, and representatives, from any and all liability relating to the Injury Grievance filed by Player and the NFL Players Association on _____ pursuant to Article 44 of the 2011 NFL Collective Bargaining Agreement. [Include IP and Extended IP release as appropriate]

By their signatures hereto, the parties acknowledge and affirm that this is a compromise settlement of a disputed claim, and that payment of the consideration for this release shall not be deemed or construed as an admission of liability by the Club. Under this Settlement and Release, the Player and the Club specifically reserve any and all rights they may have under federal and state law.

Player acknowledges that he has hereby been given notice that he may have rights under the applicable Workers' Compensation laws in _____ and jurisdictions other than _____, as a result of any claimed injuries in the scope of his employment with the Club, whether on a specific or cumulative trauma basis. [OPTIONAL]

The parties agree that the above-referenced $_____ represents payment to Player for \_\_\_\_\_ (\_\_) regular season games of Paragraph 5 salary for the purposes of Article 41, Section 4 [and entitles the player to a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (if applicable)]

By their signatures hereto, the parties certify that they have read this Settlement and Release, that they understand its meaning and content, and that they have executed it as a free and voluntary act.

_____      _____
For the CLUB                                              Player

_____
Title:

Subscribed and sworn to before            Subscribed and sworn to before
me this \_\_\_ day of _____, 2011.      me this \_\_\_ day of _____, 2011.

| _____ | _____ |
| Notary Public | Notary Public |

## APPENDIX M
## CHECK-OFF AUTHORIZATION FOR NFLPA
## DEDUCTIONS

I hereby authorize and direct my present club, or any other NFL club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the NFL.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 63 Gene Upshaw Place, 1133 20th Street, NW, Washington, DC 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the NFL and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the NFL and the Member Clubs of the NFL, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the NFL and the Member Clubs of the NFL, whichever occurs sooner.

Date:

Signature

Player's Name—Type or Print

# APPENDIX N
## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | RP-2000 Table projected to 2020 |
| Disability mortality before age 65: | RP-2000 Table, disabled mortality |

Nonfootball related disability rates before retirement:

Sample Rates

| Age | Rate* |
|---|---|
| 22 | .19% |
| 27 | .19% |
| 32 | .19% |
| 37 | .26% |
| 42 | .45% |
| 47 | .90% |
| 52 | 2.06% |
| 57 | 4.28% |
| 62 | 12.19% |

*Rounded

Football related disability rates: 35% per year for active players and 28% per year for inactive players up to 15 years after the player's last Credited Season.

Line-of Duty rates:

| Age | Rate |
|---|---|
| 25–29 | 1.25% |
| 30–39 | 5.00% |
| 40–44 | 2.50% |
| 45+ | 0.00% |

Withdrawal rates:

| For players w/service of: | Rate |
|---|---|
| 1 year | 19.5% |
| 2 years | 11.0% |
| 3 years | 16.5% |
| 4 years | 15.8% |
| 5 years | 17.4% |
| 6 years | 18.4% |
| 7 years | 19.9% |
| 8 years | 21.4% |
| 9 years | 24.6% |
| 10 years | 26.2% |
| 11 years | 28.2% |
| 12 years | 30.5% |

| | |
|---|---|
| 13 years | 35.6% |
| 14 years | 37.2% |
| 15 years | 42.5% |
| 16 years | 55.8% |
| 17 years | 68.7% |
| 18 years | 78.6% |
| 19 years | 90.6% |
| 20 years | 100.0% |

Election of early payment benefit: 35% of all players elect the benefit at termination. No assumption for players with no Credited Seasons before 1993.

Retirement age:

| Age | Player with Pre-93 Season Rate | Player without Pre-93 Season Rate |
|---|---|---|
| 45 | 15% | 0% |
| 46–49 | 3% | 0% |
| 50–54 | 2% | 0% |
| 55 | 25% | 50% |
| 56–59 | 5% | 5% |
| 60 | 10% | 10% |
| 61 | 5% | 5% |
| 62–63 | 10% | 10% |
| 64 | 25% | 25% |
| 65 | 100% | 100% |

Percent married: Social Security awards in 1972

Age of Player's wife: Three years younger than player

Remarriage and mortality rates for widows benefit: 1980 Railroad Retirement Board rates

Net investment return: 7.25%

Administration expenses: Actual for prior year

Valuation date: First day of Plan Year

Actuarial value of assets: Five-year asset smoothing method

Funding method: Unit credit cost method

Amortization period: The Plan's unfunded actuarial accrued liability as of April 1, 2011 will be amortized in level amounts over 7 years, beginning with the contribution for the 2011 Plan Year. Notwithstanding the above, the increased liability, if any, attributable to an amendment covering only pre-1993 players will be amortized over 10 years. In each Plan Year after the 2011 Plan Year, a new level 7-year amortization period will be established for the net change in the Plan's unfunded liability during the preceding Plan Year. In no event shall the contribution for a year exceed an amount which is expected to produce a negative unfunded actuarial liability at the end of the plan year; nor shall the contribution be less than the minimum required under ERISA.

## APPENDIX O
## HEALTH REIMBURSEMENT PLAN ACTUARIAL ASSUMPTIONS AND FUNDING

| | |
|---|---|
| **Valuation Date:** | April 1 |
| **Value of Assets:** | Market value |
| **Mortality Assumptions:** | None |
| **Players Included in Valuation:** | Players for whom a nominal balance has been established |
| **Player's Last Season:** | Each active player is assumed to have three future Credited Seasons |
| **Date When Benefits Will Begin to be Paid:** | Each player with a nominal balance is assumed to begin distributions five years after his expected last Credited Season |
| **Annual Distributions:** | Annual distributions will equal the estimated cost of a year's coverage for an active player under the Player Group Insurance Plan for the years in which a reimbursement is expected to be made |
| **Discount Rate:** | 60 basis points greater than the average yield of money market funds as published in The Wall Street Journal on each April 1 nearest the Valuation Date |
| **Expenses:** | The actual expenses for the prior year |
| **Contributions and Amortization Period:** | As of April 1, 2011, a valuation will be prepared based on the value of nominal balances as of April 1, 2011 ("past service liability"), and the expected value of nominal balances to be earned during the 2011 Season and the estimated expenses for the year ("normal cost"). The value of plan assets as of April 1, 2011 shall be subtracted from the past service liability to determine the unfunded past service liability. A contribution will be made as of March 31, 2012 of at least the sum of (1) the normal cost, (2) an amortization of the unfunded past service liability over ten years, and (3) interest to March 31, 2012. |

A valuation will be performed each subsequent year. Each year a new liability base will be established equal to the Plan's unfunded past service liability less the unamortized amount of the bases for the past service liability as of April 1, 2011 and each of the bases established after 2011. Each year, a contribution will be made equal to the sum of (1) the normal cost for the year, (2) the amount for each amortization base amortized over seven years (until each base is fully amortized), and (3) interest to the end of the year. The contribution, however, will be reduced, but will not be less than zero, to the extent the assets exceed the Plan's liability. If this last sentence applies, all bases will be considered fully amortized.