# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

_____ :
:
IN RE:  NATIONAL FOOTBALL : No. 12-md-2323-AB
LEAGUE PLAYERS' CONCUSSION :
INJURY LITIGATION : MDL No. 2323
:
_____ :
:
THIS DOCUMENT RELATES TO :
ALL ACTIONS :
:
_____ :


## BRIEF IN SUPPORT OF RIDDELL DEFENDANTS' MOTION TO DISMISS BASED ON LMRA § 301 PREEMPTION

Paul G. Cereghini                                    Robert L. Wise
Thomas C. Howard                                  Eden M. Darrell
BOWMAN AND BROOKE LLP               BOWMAN AND BROOKE LLP
2901 N. Central Avenue, Suite 1600          1111 E. Main Street, Suite 2100
Phoenix, AZ  85012                                 Richmond, VA 23219
Telephone:  (602) 643-2300                      Telephone:  (804) 649-8200
paul.cereghini@bowmanandbrooke.com     rob.wise@bowmanandbrooke.com
thomas.howard@bowmanandbrooke.com    eden.darrell@bowmanandbrooke.com


Thomas P. Wagner
Mary C. Doherty
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
2000 Market St., Suite 2300
Philadelphia, PA 19103
tpwagner@mdwcg.com
mcdoherty@mdwcg.com


Attorneys for Defendants RIDDELL, INC.; ALL AMERICAN SPORTS CORPORATION; RIDDELL SPORTS GROUP, INC.; EASTON-BELL SPORTS, INC.; EASTON-BELL SPORTS, LLC, EB SPORTS CORP.; and RBG HOLDINGS CORP.

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

SUMMARY OF ARGUMENT ...........................................................................................1

FACTS AND BACKGROUND ...........................................................................................4

    Plaintiffs' Claims ...........................................................................................................4

    The Collective Bargaining Agreements ........................................................................6

ARGUMENT ....................................................................................................................10

    The Labor Relations Management Act preempts Plaintiffs' claims against the
    Riddell Defendants..................................................................................................... 10

I.    Section 301 of the LMRA completely preempts claims that require interpretation
    of a collective bargaining agreement .........................................................................10

II.   A preemption finding compels dismissal, including as to claims against a non-
    signatory that nonetheless require interpretation of a CBA or are otherwise
    inextricably intertwined with a CBA .........................................................................13

III.  Plaintiffs' claims against the Riddell Defendants require interpretation of and are
    inextricably intertwined with the CBAs, as well as with preempted claims against
    the NFL Defendants and are, therefore, preempted .........................................................15

    A.   Plaintiff's negligence and failure-to-warn claims are inextricably
        intertwined with the CBAs...................................................................................15

        i.    Player-Plaintiffs' negligence and failure-to-warn claims
            necessarily require an analysis of the degree of care allegedly owed
            which, in turn, implicates and requires interpretation of the
            applicable CBAs ...........................................................................................16

        ii.   Other courts considering this issue have adopted this same "degree
            of care" reasoning from *Stringer* to find preemption in cases with
            virtually identical allegations as those found in the AMAC.....................20

        iii.  Plaintiffs' negligence and failure-to-warn claims here are similarly
            preempted in light of the necessary "degree of care" analysis
            inherent in such claims, which requires interpretation of the CBAs .........22

    B.   Plaintiffs' strict liability design and manufacturing claims also inextricably
        intertwine with the CBAs....................................................................................28

C.     <u>Plaintiffs' causation allegations further intertwine their claims against the Riddell Defendants with the CBAs</u>....................................................................30

D.     <u>Plaintiffs' punitive damages claim against the Riddell Defendants requires substantial interpretation of multiple CBA provisions</u> ...........................................31

E.     <u>Potential third-party fault and apportionment further require interpretation of the CBAs and, therefore, preemption</u> ..................................................................32

F.     <u>Plaintiffs' joint allegations against both the Riddell and NFL Defendants further intertwine their claims against the Riddell Defendants with the CBAs</u>....................................................................................33

<u>CONCLUSION</u> ..........................................................................................................35

## TABLE OF AUTHORITIES

### *Cases*

*Atwater v. Nat'l Football League Players Ass'n,*
   626 F.3d 1170 (11th Cir. 2010) ................................................................... 14, 19, 25

*Allis Chalmers Corp. v. Lueck,*
   471 U.S. 202 (1985) ................................................................................................. 12

*Antcliff v. State Emps. Credit Union,*
   414 Mich. 624 (1982) ............................................................................................... 23

*Antol v. Esposto,*
   100 F.3d 1111 (3d Cir. 1997) .................................................................................. 12

*Ass'n v. Pittsburgh & L.E.R.,*
   R., 858 F.2d 936 (3d Cir. 1988) .............................................................................. 11

*Beidleman v. Stroh Brewery Co.,*
   182 F.3d 225 (3d Cir. 1999) .................................................................................... 11

*Connolly v. Nicollet Hotel,*
   254 Minn. 373, 95 N.W.2d 657 (1959) ........................................................ 18, 19, 20

*Duerson v. Nat'l Football League,*
   No. 1:12-cv-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) ................... 20, 21, 31

*Fla. E. Coast Ry. Co. v. Soper,*
   146 So. 2d 605 (Fla. Dist. Ct. App. 1962) ............................................................. 23

*Flowers v. Torrance Mem. Hosp. Med. Ctr.,*
   8 Cal. 4th 992 (1994) ............................................................................................... 22

*Gordon v. Herzog,*
   410 N.W.2d 405 (Minn. Ct. App. 1987) ............................................................... 18

*Grand Trunk R. Co. v. Ives,*
   144 U.S. 408 (1892) ................................................................................................. 23

*Henderson v. Merck & Co., Inc.,*
   998 F. Supp. 532 (E.D. Pa. 1998) .......................................................................... 12

*Hinkley v. Safepro, Inc.,*
   853 F. Supp. 594 (N.D.N.Y. 1994) ........................................................................ 22

*Hurst v. Consol. Freightways Corp.,*
   No. 88-cv-0744, 1990 WL 43934 (M.D. Pa. Apr. 5, 1990) ................................... 15

*In re Bentz Metal Prods. Co.,*
   253 F.3d 283 (7th Cir. 2001) .................................................................................. 21

*Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp.,*
   977 F.2d 895 (4th Cir. 1992) .................................................................................. 13

*JLM Indus., Inc. v. Stolt-Neilsen,*
   387 F.3d 163 n.7 (2d Cir. 2004) ............................................................................. 14

*Jordan v. Lipsig, Sullivan, Mollen & Liapakis, PC,*
    689 F. Supp. 192 (S.D.N.Y. 1988) ....................................................... 15

*Krull v. Keene Corp.,*
    601 F. Supp. 547 (D.C. Ill. 1985) ....................................................... 22

*Lingle v. Norge Div. of Magic Chef, Inc.,*
    486 U.S. 399 n.3 (1988).............................................................. 25, 26

*Local 174, Teamsters v. Lucas Flour Co.,*
    369 U.S. 95 (1962) ................................................... 11, 12, 25, 28

*Metro. Life Ins. Co. v. Taylor,*
    481 U.S. 58 (1987)......................................................................... 11

*Micallef v. Miehle Co., Div. of Miehle-Goss Dexter, Inc.,*
    39 N.Y.2d 376 (1976) .................................................................... 22

*Mullins v. Int'l Union of Operating Eng'rs Local No. 77 AFL-CIO of Washington, D.C.,*
    214 F. Supp. 2d 655 (E.D. Va. 2002) .......................................... 13, 14

*Pahle v. Colebrookdale Tp.,*
    227 F. Supp. 2d 361 (E.D. Pa. 2002) ............................................. 15

*Shiflett v. I.T.O. Corp. of Baltimore,*
    202 F.3d 260, (4th Cir. 2000) ........................................................ 13

*St. Louis Sw. Ry. Co. v. Marks,*
    749 S.W.2d 911 (Tex. App. 1988)................................................. 23

*Stringer v. Nat'l Football League,*
    474 F. Supp. 2d 894 (S.D. Ohio 2007) .................................... passim

*Textile Workers Union of Am. v. Lincoln Mills of Ala.,*
    353 U.S. 448 (1957)....................................................................... 10

*Tran v. Metro. Life Ins. Co.,*
    408 F.3d 130 (3d Cir. 2005)........................................................... 26

*Voilas v. Gen. Motors Corp.,*
    170 F.3d 367 (3d Cir. 1999)............................................... 10, 11, 12

*Williams v. Nat'l Football League,*
    582 F.3d 863 (8th Cir. 2009) ................................................. 26, 31

*Wilson v. Ritto,*
    129 Cal. Rptr. 2d 336 (Cal. App. 2003)......................................... 32

*Wolf v. Rawlings Sporting Goods Co., Inc., No. 10 Civ. 3713 (JSR),*
    2010 U.S. Dist. LEXIS 116294 (S.D.N.Y. Oct. 26, 2010) ............. 14

*Wooddell v. Int'l Bd. of Elec. Workers,*
    502 U.S. 93 (1991)........................................................................... 3

***Statutes***

29 U.S.C. § 185(a) ................................................................... 1, 10

A.R.S. § 12-2506 ............................................................................................................... 32

Cal. Civ. Code § 1431.2(a) ................................................................................................ 32

Fla. Stat. § 768.81(3)......................................................................................................... 32

MCL 600.2957(1) & 600.6304(1) ..................................................................................... 32

### ***Rules***

Federal Rule of Civil Procedure 12(b)(6) ............................................................................ 1

INTRODUCTION

Defendants Riddell, Inc.; All American Sports Corporation; Riddell Sports Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp.[1] respectfully submit this brief in support of their motion to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of preemption under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a).[2]

SUMMARY OF ARGUMENT

For decades, the overwhelming majority of the player-Plaintiffs played under and enjoyed the benefits of their collective bargaining with National Football League management. Among other things, they bargained for pay and benefits, including injury and retirement benefits. They bargained for the right to participate in discussions concerning what equipment they wanted, what rules should be enacted, and how the game should be played to best protect them in what they knew was a dangerous sport. And they bargained for rights to have medical professionals and certified trainers on the sidelines to supervise and evaluate them, to diagnose on-field injuries, to decide when it was appropriate for them to return to play, and to protect them from further injury.

Despite all of these bargained-for rights and protections, Plaintiffs have sued the NFL and the Riddell Defendants, asserting various state-law claims, essentially claiming the NFL and Riddell Defendants should have done something more. But, most importantly for purposes of

---

[1] These Defendants will be referred to as the "Riddell Defendants," for convenience only, with no implication or concession that they are properly joined or named as Defendants. The "Riddell Defendants" reserve the right to move to dismiss some or all of them.

[2] By Court Order, agreement, and stipulation, the only issue covered in this motion is the Riddell Defendants' entitlement to dismissal based on preemption. All other grounds for seeking dismissal under Rule 12(b)(6), both as to the Amended Master Administrative Long-Form Complaint, or "AMAC," and the individual Short-Form Complaints ("SFCs") are reserved and may, if necessary, be raised in later motions practice as directed by the Court. (Case Management Order ("CMO") No. 4, ¶ 3.)

this motion, by pursuing this lawsuit, Plaintiffs are necessarily asking the Court to evaluate whether the NFL and Riddell Defendants acted "reasonably," which requires interpretation of various rights, duties and obligations created by collective bargaining agreements ("CBAs") between the players' union and NFL management. Indeed, as against both the NFL and Riddell Defendants, Plaintiffs' claims repeatedly implicate topics covered by the CBAs and, thus, require interpretation of those CBAs.

For example, their claims that the Riddell Defendants were negligent for not recommending and providing different equipment with different features implicates the numerous CBA provisions throughout the past several decades allocating responsibility for evaluating and recommending changes in equipment to the bargained-for Joint Committee on Player Safety and Welfare, which includes player representatives, but not the Riddell Defendants, who are not parties to the CBAs or members of this Joint Committee. Their claims that the Riddell Defendants failed to warn them of the risk of concussive injury are intertwined with CBA provisions containing bargained-for requirements for teams to provide certified and licensed medical and training professionals on the sidelines, whose job it was to evaluate, diagnose, and treat player injuries, including concussions and other head injuries. Moreover, Plaintiffs' claims against the Riddell Defendants are intertwined with their claims against the NFL, which means that the preemption of claims against the NFL Defendants mandates preemption of the claims against the Riddell Defendants as well.

Where, as here, Plaintiffs' state-law claims against the Riddell Defendants are, like the claims against the NFL, inextricably intertwined with the substantive provisions of the CBAs, such claims against the Riddell Defendants are completely preempted by federal law, as the Supreme Court and numerous other courts have concluded. This preemption applies even

though the Riddell Defendants were not parties to the CBAs, because, as the Supreme Court has explained, the doctrine of complete preemption barring state-law claims "is more aptly expressed not in terms of parties but in terms of the purpose of the lawsuit." *Wooddell v. Int'l Bd. of Elec. Workers*, 502 U.S. 93, 112 (1991).  And the purpose and effect of this lawsuit, as Plaintiffs have pled their claims, is to assess the reasonableness of the Riddell Defendants' conduct, which requires interpretation of many provisions of the CBAs.

For example, certain CBAs define the NFL Clubs' responsibilities for treating player injuries, determining recovery times, making return-to-play decisions and warning players of the risks of continued performance.  Other provisions set forth required qualifications for Club medical staff.  A determination of what, if any, duty and degree of care was owed by the Riddell Defendants, and whether they acted reasonably, cannot be made without first determining the scope of the duties allocated by various CBAs to the Clubs, their trainers, their physicians, the Joint Committee on Player Safety and Welfare, the NFL, the NFLPA, and the players themselves.

The likelihood of conflicting interpretations of the CBA provisions implicated by Plaintiffs' state-law claims adjudicated in multiple different jurisdictions, and the resulting damage those varying interpretations would inflict on the public policy encouraging uniform interpretation of CBA provisions, is the very reason why courts have held that completely preempted state-law claims like Plaintiffs' cannot proceed.  Rather, as numerous courts have held, those claims must be dismissed.  Following that established body of law, which was created to foster a uniform system of resolving labor-management disputes all for the public good, this Court should dismiss Plaintiffs' claims against the Riddell Defendants under the doctrine of

complete preemption.  Indeed, such a result not only is consistent with the law, but is also entirely consistent with what Plaintiffs negotiated and bargained for in the CBAs.

FACTS AND BACKGROUND

Plaintiffs' Claims

In this multitude of cases—more than 130 actions, as of the date of this filing—680 Plaintiffs[3] have sued the National Football League and NFL Properties LLC, along with one or more of the "Riddell Defendants" for claims allegedly arising out of the player-Plaintiffs' professional football careers, which collectively spanned a period from 1950 to 2011.  (*See generally* Am. Master Admin. Long-Form Compl. ("AMAC") (ECF No. 2642); Short Form Complaint ("SFC") (ECF No. 92-1)[4]; *see also Dickerson* Pl. Jill Stautner SFC (ECF No. 1009) ¶ 15 (alleging spouse's career began in 1950); *Simpson* Pl. Dominic Douglas SFC (ECF No. 3041) ¶ 12 (alleging a career ending in 2011).)  In general, Plaintiffs all claim the Riddell Defendants failed to warn the player-Plaintiffs of the risks of long-term brain injury from multiple concussive or sub-concussive events while playing football in the NFL—despite the fact that the alleged bases for such knowledge were all publicly available for decades. (AMAC ¶¶ 1-24, 406-15.) Indeed, beyond the paragraphs parroting statements from Riddell's website recounting the history of its helmets (*id.* ¶¶ 386(a)-(m)),[5] the majority of Plaintiffs' factual allegations against

---

[3] This figure includes the number of Plaintiffs who had filed an SFC naming a Riddell Defendant as of August 27, 2012 as well as the number of Plaintiffs in actions naming a Riddell Defendant recently transferred to the MDL—*Andrews*, *Bauman*, and *Gay*—who had not yet filed an SFC as of August 27. This figure does not include spouse-Plaintiffs joined with their player-Plaintiff husbands.

[4] For convenience, unless necessary to refer to an individual player's SFC, the Riddell Defendants will refer to the template SFC at ECF No. 92-1.

[5] The majority of the statements contained in these paragraphs were paraphrased from, if not directly cut and pasted from, Riddell's website found at http://www.riddell.com/innovation/history/.

the Riddell Defendants pertain to the latter's alleged duty to warn players "of the long-term health effect of concussions" (*id.* ¶¶ 390-96).

In addition to their failure-to-warn claim, Plaintiffs naming the Riddell Defendants also allege three other largely identical causes of action for strict liability for design and manufacturing defect and negligence, all based on claims of alleged negligence arising from some of those Defendants' involvement in the design, manufacture, sales, or distribution of football helmets.  (*Id.* ¶¶ 397-405, 416-21.)  However, along with vague and unidentified alleged design or manufacturing defects, those claims also hinge, in large part, on Plaintiffs' baseless assertions that the Riddell Defendants breached a jointly held duty with the NFL Defendants to warn the players of long-term effects of concussions. (*Id.* ¶¶ 389, 398(e), 403(e), 420.) Moreover, all of Plaintiffs' claims against the Riddell Defendants rely on the same factual allegations against the NFL Defendants. (*E.g.*, *id.* ¶ 397 (incorporating by reference ¶¶ 41-245, which contain "General Allegations Applicable to All Counts Against the NFL Defendants").) Finally, Plaintiffs allege loss of consortium on behalf of the spouse-Plaintiffs derivative of the player-Plaintiffs' liability claims—again, jointly against both the NFL and Riddell Defendants. (*Id.* ¶¶ 366-69.)

Through the AMAC, Plaintiffs allege only that "*[u]pon information and belief*, Plaintiffs wore Riddell helmets at times while playing and/or practicing during their NFL careers." (AMAC ¶ 387 (emphasis added).) Neither the AMAC nor the SFCs provide any specific identification of what Riddell helmet each player wore, when the player wore the helmet, or even if the helmet was being worn at the time of an alleged concussion. (*See generally* SFC.)  Instead, the SFCs instruct to check a box, if applicable, to indicate that the player "wore one or more helmets designed and/or manufactured by the Riddell Defendants during one or more years

Plaintiff (or decedent) played in the NFL and/or AFL." (SFC ¶ 14.) Nowhere in either the AMAC or the SFC do Plaintiffs allege a specific defect in any individual player-Plaintiff's helmet during any of the roughly sixty-year period covered by their claims.[6] Moreover, Plaintiffs do not explain why they are incapable of providing anything more than "information and belief" that they wore a Riddell helmet at one point or another during their careers, or why they cannot state unequivocally that they were, indeed, wearing any specific model Riddell helmet when they were allegedly injured.

The Collective Bargaining Agreements

Since 1968, the relationship between the NFL and Plaintiffs has been defined by a series of CBAs.[7]  These CBAs were in place for all or part of the overwhelming majority of player-Plaintiffs' careers.[8]  The NFL Defendants provide a detailed discussion of the CBAs and their effect, which the Riddell Defendants will adopt without repeating here.  The NFL Defendants also append copies of the CBAs and other materials, including exemplar league Constitution and Bylaws (which the Riddell Defendants include within the term when referring to the applicable

---

[6] The Riddell Defendants have repeatedly pointed out this glaring deficiency in the Complaints since the inception of these actions, including, for example, in their motions to dismiss in *Maxwell*, *Pear*, and *Barnes*.  (*See* Mots. to Dismiss Pls.' Am. Compls., refiled in master docket 2:12-md-2323 (ECF Nos. 24, 32, 42).) Moreover, the Riddell Defendants pointed out this continued deficiency in the process of Plaintiffs' preparation of the AMAC and SFC, and how they failed to provide the necessary factual support of any purported defect in any helmets actually worn by any players at any time. Nonetheless, Plaintiffs have ignored the Riddell Defendants' repeated protestations and have instead insisted on pleading their claims in this wholly deficient manner, which the Riddell Defendants will address in more detail, if necessary and by order and agreement, in later motions practice.

[7] To avoid duplication of filings, the Riddell Defendants rely on the CBAs as appended to the NFL's submissions and agree with the NFL Defendants concerning the propriety of relying on the CBAs on these motions to dismiss.

[8] There are only a very small percentage of players whose careers were not covered, in whole or in part, by one or more CBAs.   Nonetheless, for convenience, the Riddell Defendants' reference to "Plaintiffs" in the remainder of this filing acknowledges that small percentage and is intended to apply to those Plaintiffs as to whom there was a CBA in effect during some or all of the player-Plaintiffs' NFL careers.

"CBAs"), which are relevant to the preemption analysis and on which the Riddell Defendants rely.

In short, while the CBAs have evolved over time, they have all contained, in one form or another, provisions addressing player health and safety, as well as grievance procedures for disputes.  For example, and particularly relevant to the Riddell Defendants' requested relief, the CBAs and their incorporated materials contain the following provisions on player medical care and requirements for NFL teams (or "Clubs") to provide team physicians and trainers whose responsibility it is to assess medical conditions, including concussions and other head injuries, as well as fitness to play or to return to play:

- "Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs." (1982 CBA Art. XXXI, § 1; 1993 CBA Art. XLIV, § 1; 2006 CBA Art. XLIV, § 1.)

- "All full-time head trainers and assistant trainers . . . will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer." (1982 CBA Art. XXXI, § 2; 1993 CBA Art. XLIV, § 2; 2006 CBA Art. XLIV, § 2.)

- "The home team shall provide a physician and an ambulance at each game available to both teams. Said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams." (*See, e.g.*, 1969 NFL and American Football League Constitution and Bylaws Art. XIX, § 19.5.)

- "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity." (1993 CBA Art. XLIV, § 1; 2006 CBA Art. XLIV, § 1; *see also* 1982 CBA Art. XXXI, § 1.)

- "All determinations of recovery time for major and minor injuries must be by the Club's medical staff and in accordance with the Club's medical standards . . . . The prognosis of the player's recovery time should be as precise as possible." (*See, e.g.*, 1980 Supp. to NFL Constitution and Bylaws Art. XVII.)

- "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ." (1993 CBA Appx. C § 9; 2006 CBA Appx. C § 9.)

- "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety." (2002 Am. to 1993 CBA Art. XIII, § 1(d); 2006 CBA Art. XIII, § 1(d).)

- "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the cost of [these] medical services." (1982 CBA Art. XXXI, § 3; 1993 CBA Art. XLIV, § 3; 2006 CBA Art. XLIV, § 3.)

- "A player will have the right to choose the surgeon who will perform surgery . . . . Any such surgery will be at Club expense." (1982 CBA Art. XXXI, § 4; 1993 CBA Art. XLIV, § 4; 2006 CBA Art. XLIV, § 4.)

- "Each player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and will further undergo a "post-season physical examination" at the player or Club's request. (1982 CBA Art. XXXI § 5; *see also* 1993 CBA Art. XLIV, § 5; 2006 CBA Art. XLIV, § 5.)

For decades, the CBAs have also contained provisions addressing equipment, rules of play, and other on-field health and safety issues, including:

- "A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee') will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects." (1977 CBA Art. XI; 1982 CBA Art. XI; 1993 CBA Art. XIII, § 1(a); 2006 CBA Art. XIII, § 1(a); *see also* 1970 CBA Art. V.)

- "The Joint Committee may discuss and examine any subject related to player safety and welfare, . . ." and any recommendation of the Joint Committee on such issues, including playing equipment, "will be given serious and thorough consideration" by the league.  (1977 CBA Art. XI, § 4; 1982 CBA Art. XI, § 4.)

- The initial and ongoing tasks of the Joint Committee on Player Safety and Welfare have included "a review of all current materials on the player safety aspects of player equipment, . . . ."  (1977 CBA Art. XI, § 7; 1982 CBA Art. XI, § 7.)

- "The Committee may, if it desires, employ outside parties to assist in the performance of its functions."  (1970 CBA Art. V, § 5 ("Employment of Outside Consultants");

*see also* 1977 CBA Art. XI, § 5 ("Consultants") (generally, same); 1982 CBA Art. XI, § 5 ("Consultants") (same); 1993 CBA Art. XIII, § 1(b) (same); 2002 CBA Art. XIII, § 1(b) (same); 2006 CBA Art. XII, § 1(b) (same).)

- "Playing rules may be amended or changed at any Annual Meeting by the affirmative vote of not less than three-fourths or 21, whichever is greater, of the members of the League, provided the proposed amendment or change has been presented to the League in writing fifteen (15) days prior to the Annual Meeting or a recessed session thereof, or provided the proposed amendment or change carries the unanimous approval of a duly appointed standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes, in which case notice of at least 12 hours prior to the vote is required; and further provided that all playing rules proposals from clubs must be submitted in writing to the League office a minimum of thirty (30) days in advance of any Annual Meeting of the League. Otherwise unanimous consent is required for any amendment to the Playing Rules." (*See, e.g.*, 1984 NFL Constitution and Bylaws Art. XI, § 11.2.)

- "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change. (1982 CBA Art. XI, § 9; 1993 CBA Art. XIII, § 1(c); 2006 CBA Art. XIII, § 1(c).)

- "If . . . the Commissioner determines that the adoption of the playing rule change could adversely affect player safety, the Commissioner will refer the proposed playing rule change to [the Joint] Committee for consideration and recommendation." (1977 CBA Art. XI, § 8.)

Finally, the CBAs also contain exclusive grievance-procedure provisions covering all disputes arising under the CBAs but also involving an interpretation of the CBAs, an individual players' contract, or the NFL Constitution or Bylaws.  (*E.g.*, 2006 CBA Art. IX, § 1 ("Any dispute (hereinafter referred to as a 'grievance') arising after the execution of this Agreement and involving *the interpretation of*, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution or Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, . . . ." (emphasis added)); 1993 CBA Art. IX, § 1 (generally same); 1982 CBA Art. VII, § 1 (generally same); 1977 CBA Art. VII, § 1.)  Earlier

CBAs contained a similar grievance-procedure provision requiring grievances to be resolved exclusively by the Commissioner.  (1970 CBA Art. IX; 1968 CBA § 13.)

ARGUMENT

<u>The Labor Relations Management Act preempts Plaintiffs' claims against the Riddell Defendants.</u>

The adjudication of Plaintiffs' state-law claims all involve interpretation of the CBAs under which they played.  Under longstanding case law, such claims are preempted, meaning they cannot be pursued in court and must, instead, be dismissed.  This same result adheres not only as to the claims against the NFL Defendants, but also as to the intertwined claims against the Riddell Defendants.  Indeed, multiple courts have held that cases involving interpretation of CBAs are preempted even where the defendant is not a party to the CBA.  Thus, as explained in more detail below, the Court should grant the Riddell Defendants' motion and dismiss Plaintiffs' claims in their entirety.

I.   <u>Section 301 of the LMRA completely preempts claims that require interpretation of a collective bargaining agreement.</u>

LMRA § 301 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect of the amount in controversy or without regard to citizenship of the parties.

29 U.S.C. § 185(a) (a/k/a/ LMRA § 301(a)). As the Third Circuit explained, the Supreme Court "made clear that this provision is not merely jurisdictional, but is also one that calls on the federal courts to create a uniform federal common law of collective bargaining, with the primacy of arbitral resolution of industrial disputes as its centerpiece."  *Voilas v. Gen. Motors Corp.*, 170 F.3d 367, 372 (3d Cir. 1999) (citing *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353

10

U.S. 448, 455-56 (1957)); *see also Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 231-32 (3d Cir. 1999) ("if resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is preempted and federal-labor law principles . . . must be employed to resolve the dispute").

The Supreme Court has further explained that, in enacting LMRA § 301, Congress intended for federal law to preempt state law completely. *Ry. Labor Execs. Ass'n v. Pittsburgh & L.E.R.R.*, 858 F.2d 936, 939 (3d Cir. 1988) ("The complete preemption doctrine holds that 'Congress may so completely preempt a particular area, that any civil complaint raising this select group of claims is necessarily federal in character.'" (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987))).  The reasons for this complete preemption are to achieve national uniformity in interpretation of labor contract terms and the recognition that individual contract terms could have different meanings under state and federal law, compromising the integrity and certainty of labor/management negotiations and relations.  *See, e.g.*, *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962)).  Indeed, as the *Lucas Flour* Court explained:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert *a disruptive influence* upon both the negotiation and administration of collective agreements.  Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provision in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract.

*Id.*, *cited in Voilas*, 170 F.3d at 373 (emphasis added); *see also Beidleman*, 182 F.3d at 234 ("[T]he underlying reason for section 301 preemption . . . [is] 'the need for uniform interpretation of contract terms to aid both the negotiation and the administration of collective

bargaining agreements." (quoting *Antol v. Esposto*, 100 F.3d 1111, 1115 (3d Cir. 1997))); *Voilas*, 170 F.3d at 372-73 ("Accordingly, the Court has held that state laws that might produce differing interpretations of the parties' obligations under a collective bargaining agreement are preempted." (citing *Lucas Flour*, 369 U.S. at 103-04)).

Thus, "to preserve this uniformity, even suits based on torts, rather than on breach of collective bargaining agreements, are governed by federal law if their evaluation is 'inextricably intertwined with consideration of the terms of [a] labor contract.'" *Allis Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985); *see also Voilas*, 170 F.3d at 374 (explaining that a state-law action can only proceed "as long as the state-law action as pleaded does not require interpretation of the collection bargaining agreement"); *Stringer v. Nat'l Football League*, 474 F. Supp. 2d 894, 900 (S.D. Ohio 2007) ("If resolution of the state law claim is 'substantially dependent' on an analysis of the terms of the collective bargaining agreement, or 'inextricably intertwined with it, the claim will be preempted by § 301.") (quoting *Allis-Chalmers*, 471 U.S. at 220). As this Court has held, a purported state-law claim is "inextricably intertwined with" a collective bargaining agreement and, thereby, preempted where the claims "require interpretation of" the collective bargaining agreement. *Henderson v. Merck & Co., Inc.*, 998 F. Supp. 532 (E.D. Pa. 1998) (Brody, J.) (holding state-law claims requiring interpretation of CBA to be preempted and dismissing on that ground).

In short, if Plaintiffs' claims require interpretation of the CBAs, they are inextricably intertwined with those CBAs and, therefore, preempted. As explained below, that is exactly the case here.

II.     A preemption finding compels dismissal, including as to claims against a non-
        signatory that nonetheless require interpretation of a CBA or are otherwise
        inextricably intertwined with a CBA.

Where a plaintiff's state-law claims are substantially dependent on or inextricably intertwined with a CBA, preemption requires dismissal of those claims.    This same result adheres as to claims against a  non-signatory which nevertheless substantially depend on or are inextricably intertwined with—and therefore require interpretation of—the CBA, as is the case here.

For example, in *International Union, United Mine Workers of Am. v. Covenant Coal Corp.*, the Fourth Circuit considered whether LMRA § 301 preempted a union's state-law claims for tortious interference with a collective bargaining agreement against non-signatories to that agreement.  977 F.2d 895, 895 (4th Cir. 1992).  Finding that the inquiry into the state-law claim required interpretation of the CBA, the trial court dismissed the claim, and the Fourth Circuit affirmed.  *Id.* at 896, 899.

Similarly, in *Shiflett v. I.T.O. Corp. of Baltimore*, the plaintiff sued his former employer and his former supervisor, a non-signatory to the governing collective bargaining agreement.  202 F.3d 260, at *1, 6 (4th Cir. 2000) (unpublished).  The trial court dismissed the state-law claims as preempted under § 301.  *Id.* at *7.  The Fourth Circuit affirmed dismissal, agreeing that the state-law claims against the non-signatory supervisor required interpretation of the CBA and were, thus, preempted by § 301.  *Id.*

Likewise, in *Mullins v. International Union of Operating Engineers Local No. 77 AFL-CIO of Washington, D.C.*, a former employee sued his employer and former co-workers alleging, among other things, defamation.  214 F. Supp.2d 655, 658, 663 (E.D. Va. 2002).  Recognizing that § 301 preempts not only state-law claims "against parties to a collective bargaining

agreement, but also preempts state law claims against non-signatories where interpretation of the agreement is required for resolution," the court granted the co-workers' summary judgment, finding the defamation claims against them "inextricably intertwined with" the CBA there and, thus, § 301 preempted. *Id.* at 668-69.

These holdings precluding lawsuits against non-signatories on claims "inextricably intertwined" with and requiring interpretation of CBAs are consistent with numerous other cases involving the same CBAs applicable here, as well as similar circumstances against equipment manufacturers. *See, e.g.*, *Atwater v. Nat'l Football League*, *Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1177-78 (11th Cir. 2010) (explaining that whether a party is a signatory to a CBA "is not dispositive" of whether claims against that party are preempted and explaining that "[t]he relevant question is, instead, whether Plaintiffs state-law claims asserted against the NFL would require the court to apply or interpret the CBA"); *see also Wolf v. Rawlings Sporting Goods Co., Inc.*, No. 10 Civ. 3713 (JSR), 2010 U.S. Dist. LEXIS 116294 (S.D.N.Y. Oct. 26, 2010) (holding that plaintiff's claims alleging head and neurological injuries purportedly due to his helmet not adequately protecting him from a wild pitch against helmet-manufacturer Rawlings, a non-signatory to the applicable CBA, could not properly proceed in court "because plaintiff's disputes with [Rawlings] are intertwined with plaintiff's contract") (citing *JLM Indus., Inc. v. Stolt-Neilsen*, 387 F.3d 163, 178 n.7 (2d Cir. 2004)); *see also generally Stringer*, 474 F. Supp. 2d at 901-02 (explaining that CBA non-signatories can invoke § 301 preemption and citing cases).

Furthermore, the specific language of the CBAs in these cases supports dismissal of all claims requiring CBA interpretation regardless of whether the party seeking dismissal was a party to the CBA. Indeed, this is the result intended by the player-Plaintiffs when they

negotiated, through their bargaining representatives, the CBAs, including the provision stating

that "*[a]ny dispute . . .* involving interpretation of" the CBAs would not be pursued in court.

(*E.g*., 2006 CBA Art. IX, § 1 (emphasis added).)

III.   Plaintiffs' claims against the Riddell Defendants require interpretation of and are
       inextricably intertwined with the CBAs, as well as with preempted claims against
       the NFL Defendants and are, therefore, preempted.

Properly analyzed, Plaintiffs' claims against the Riddell Defendants are preempted

because they require interpretation of and are, therefore, inextricably intertwined with the CBAs

in many distinct ways.  Accordingly, dismissal of those preempted claims is required.

a.   Plaintiff's negligence and failure-to-warn claims are inextricably
     intertwined with the CBAs.

While Plaintiffs allege four primary counts against the Riddell Defendants,[9] their action

is, first and foremost, based on a purported failure to warn of alleged long-term risks associated

with multiple concussive brain injuries and, as to the Riddell Defendants, their alleged role in

this purported failure to warn.  (AMAC ¶¶ 1-24, 389 (alleging "Plaintiffs did not know of the

long-term effects of concussions and relied on the NFL and Riddell to protect them"), & 396

(alleging that "the Riddell Defendants have never warned any Plaintiff or retired player of the

long-term effects of concussions.").)  Indeed, all of their counts against the Riddell Defendants

---

[9] Count XI for alleged "Loss of Consortium" is entirely derivative claim of the four primary
claims against the Riddell Defendants.  Thus, upon a finding of preemption of those primary
claims, the derivative loss of consortium claim must also be dismissed, according to the law of
the majority, if not all, of the states whose laws Plaintiffs' claims would arguably implicate.  *See,
e.g.*, *Hurst v. Consol. Freightways Corp.*, No. 88-cv-0744, 1990 WL 43934, at *5 (M.D. Pa. Apr.
5, 1990) (rejecting spouse's loss of consortium claim after ruling husband's state-law claim was
preempted under § 301); *see also Pahle v. Colebrookdale Tp.*, 227 F. Supp. 2d 361, 374-75 (E.D.
Pa. 2002) (noting that a wife's loss of consortium claim is "derivative, i.e., dependent on the
success of the underlying claim asserted by her injured husband") (applying Pennsylvania law);
*see also Jordan v. Lipsig, Sullivan, Mollen & Liapakis, PC*, 689 F. Supp. 192, 196 (S.D.N.Y.
1988) ("A claim for loss of consortium or services is a derivative action, and in the common law
of New York, does not exist 'independent of the injured spouse's right to maintain an action for
injuries sustained.'").

(including, by extension, the derivative "Loss of Consortium" count) hinge, either in whole or in part, on allegations of purported failure to warn.  (*Id.* ¶¶ 398(e), 401, 403(e), 406-15, 419-20.)  In this manner, their claims against the Riddell Defendants are strikingly similar in substance to claims which another court found to be preempted.  *Stringer*, 474 F. Supp. 2d at 908-11.

> i. <u>Negligence and failure-to-warn claims like Plaintiffs' necessarily require an analysis of the duty and degree of care allegedly owed which, in turn, implicates and requires interpretation of the applicable CBAs.</u>

In *Stringer*, the plaintiff argued that the NFL breached a common-law duty to properly warn of the risk of heat-related illness in playing football in hot weather and of the proper treatment for heat-related illness.  *Id.* at 909-10.  The *Stringer* court found such a negligence and warnings-based claim against the NFL to be preempted by the very same CBA provisions covering the vast majority of the player-Plaintiffs in this case.  *Id.* at 908-11.

Despite the *Stringer* court's correct ruling regarding preemption of the negligence and warnings-based claims against the NFL, that court nonetheless concluded certain claims against the Riddell defendants were not preempted.[10]  However, for the reasons explained below, that latter conclusion was based on a flawed premise that the plaintiff's claims against the Riddell defendants there did not require interpretation of the duties of the Joint Committee.  Indeed, the court's decision did not discuss the implications of the CBA requirements for physicians and trainers on the degree of care allegedly owed by the Riddell defendants there.  Nor did *Stringer* address the specific duties of the Joint Committee or the manner in which negligence-based and

---

[10] Specifically, Riddell, Inc. and All American Sports Corp. were also defendants in *Stringer*, in which the court found that the plaintiff's product-based claims were not preempted.  *Id.* at 913-15.  The *Stringer* court ruled that the specific claims in that matter did not require interpretation of the CBA provision establishing the Joint Committee on Player Safety and Welfare because "resolution of Plaintiff's product liability and negligence claims against the Riddell Defendants is not in any way dependent on an interpretation of the meaning of this CBA provision." *Id.* at 914.

warnings-based design and manufacturing defect claims also directly bear on the degree of care owed by the Riddell Defendants. Likewise, *Stringer* did not deal with the obvious need that exists here to interpret CBA provisions bearing on Plaintiffs' causation allegations, as well as CBA provisions related to potential third-party comparative fault allocations. Further, *Stringer* did not involve the specific allegations of the AMAC, described below, which entangle these Plaintiffs' claims with numerous CBA provisions.

In short, a proper analysis—i.e., one applying the same reasoning applied to the claims against the NFL in *Stringer* to the claims against the Riddell Defendants here—leads to the conclusion that § 301 preempts Plaintiffs' claims against the Riddell Defendants. Specifically, consistent with applicable case law, in finding the plaintiff's claims against the NFL to be preempted, the *Stringer* court ruled that a defendant's status as a non-signatory to a CBA does not preclude a preemption defense. The court also ruled that negligence-based claims, such as a failure-to-warn claim, require determination of the degree of care owed to players, thereby necessitating interpretation of certain CBA provisions, which in *Stringer* led the court to find that the claims against the NFL were preempted. 474 F. Supp. 2d at 909-11.

The *Stringer* court arrived at its holding by noting that the plaintiff's claim of alleged negligent failure to warn of certain risks associated with playing football required her to show that the defendants owed her decedent a duty, that they breached that duty, "and that the breach was a proximate cause of Stringer's death." *Id.* at 909. The plaintiff there alleged the NFL had such a duty by voluntarily publishing certain Hot Weather Guidelines, which were not part of the CBA, but rather separate and apart from it.[11] *Id.* The court found that the question of whether

---

[11] The *Stringer* court determined earlier in the opinion that the Hot Weather Guidelines were not incorporated into the CBA, that there was "no provision in the CBA that expressly or impliedly imposes on the NFL the duty to take any action to protect NFL players from the risk of heat-

the NFL was negligent in publishing those guidelines and allegedly failing to properly warn the players was "inextricably intertwined with certain key provisions of the CBA," and, therefore, preempted. *Id.* at 910. Substantively, this same reasoning applies here with respect to Plaintiffs' negligence-based and warnings-based claims against the Riddell Defendants, i.e., they must be decided in the context of relevant provisions of the CBA.

The *Stringer* court based its preemption conclusion in part on Minnesota law's holding that, in negligence/warnings cases, "[w]hile the standard of care remains constant, *the degree of care* varies with the facts and circumstances of each particular case." *Id.* (citing *Gordon v. Herzog*, 410 N.W.2d 405, 408 (Minn. Ct. App. 1987) (quoting *Connolly v. Nicollet Hotel*, 254 Minn. 373, 95 N.W.2d 657, 664 (1959))) (emphasis added). "In other words," the *Stringer* court explained, "the degree of care owed *cannot be considered in a vacuum*." *Id.* (emphasis added). Rather, the *Stringer* court reasoned that the "degree of care owed by the NFL in republishing the Hot Weather Guidelines . . . , and what was reasonable under the circumstances, must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning general health and safety of NFL players." *Id.*

The *Stringer* court found that the plaintiff's failure-to-warn claims implicated at least two specific CBA provisions, the first being the requirement for teams to provide "full-time head trainers and assistant trainers" who were "certified by the National Athletic Trainers Association [NATA]," (2002 CBA, Art. XLIV, § 2). *Id.* The court explained that the "degree of care owed by the NFL in republishing the Hot Weather Guidelines cannot be determined without first

---

related illness," and, therefore, that the plaintiff's claim did not arise out of the CBA. *Id.* at 904-08. However, that determination addressed only the first basis of possible preemption and did not preclude a finding of preemption based on "inextricably intertwined" or "substantially dependent" bases. *Id.* at 900 (explaining the two-step approach for evaluating possible preemption).

analyzing the significance of the CBA provision requiring athletic trainers to be certified by the National Athletic Trainers Association."  *Id.*  The court further explained:

> As part of that certification process, the trainers may receive extensive instruction on how to prevent, recognize, and treat heat-related illness.  If, by virtue of the certification process, the trainers are fully prepared to handle heat-related illnesses, *the degree of care owed by the NFL in publishing the Hot Weather Guidelines is diminished*.  On the other hand, if, as part of the certification process, the trainers receive no instruction on how to prevent, recognize, and treat heat-related illnesses, the NFL's Hot Weather Guidelines obviously take on much greater significance, and *the degree of care owed by the NFL increases considerably.*

 *Id.* (emphases added). Based on this analysis, the court concluded:  "Resolution of Plaintiff's claim is therefore inextricably intertwined with this CBA provision."  *Id.*

    The *Stringer* court applied the same analysis with regard to a second implicated CBA provision, which outlined "duties imposed on the team physicians."  *Id.*  The court noted that the "CBA requires the team physicians to inform a player in writing if the player has a physical condition that will be 'significantly aggravated by continued performance,'" and that the "CBA places primary responsibility for identifying such physical conditions on the team physicians, who are presumably independently prepared, by virtue of medical school training and experience, to recognize the signs of heat-related illness and to treat it, and need not rely on the content of the NFL's Hot Weather Guidelines."  *Id.* at 910-11 (citing 2002 CBA, Art. XLIV, § 1).  The court further concluded:  "This provision must, therefore, be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances.  For this reason, resolution of Plaintiff's wrongful death claim is also inextricably intertwined with this contractual provision."  *Id.* at 911.

> ii.     Other courts considering this issue have adopted this same "degree of care" reasoning from *Stringer* to find preemption in cases with virtually identical allegations as those found in the AMAC.

In *Maxwell*, *Pear*, and *Barnes*, all three of which were transferred and are now in this MDL, the Central District of California, ruling on the NFL's opposition to motions to remand, determined *Stringer* was "persuasive" in denying 136 Plaintiffs' motions, concluding that resolution of those Plaintiffs' negligence claims against the NFL was "inextricably intertwined with and substantially dependent upon an analysis of certain CBA provisions imposing duties on the clubs with respect to the medical care and treatment of NFL players," thereby providing federal-question jurisdiction under the doctrine of complete preemption. *E.g.*, *Maxwell v. Nat'l Football League*, No. 2:11-cv-08394-R –MAN, Order at 1 (C.D. Cal. Dec. 8, 2011) (order denying remand). That *Maxwell* court elaborated: "The CBA provisions that relate to the duties of team physicians are implicated.  The CBA places primary responsibility for identifying such physical conditions on the team physicians." *Id.* (citing *Stringer*, 474 F. Supp. 2d at 910).  The *Maxwell* court added:  "The physician provisions of the CBA must be taken into account in determining the *degree of care* owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the health and safety of its players."  *Id.* at 2 (emphasis added).

Likewise, the Northern District of Illinois concluded similarly in denying remand to Plaintiff Tregg Duerson, whose action was recently also transferred to this MDL.  *Duerson v. Nat'l Football League*, No. 1:12-cv-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012). Specifically, the *Duerson* court agreed with the NFL that "evaluating the reasonableness of the NFL's conduct will require interpretation of terms of the CBAs imposing duties on NFL clubs to protect player health and safety."  *Id.* at *3-4 (citing 1993 CBA Art. XLIV, § 1).  The court

reasoned that if, by virtue of obligations under the CBA, the player's Club, rather than the NFL, had a duty to warn and protect players regarding concussive brain injury, "it would be one factor tending to show that the NFL's alleged failure to take action to protect Duerson from concussive brain trauma was reasonable." *Id.* at 4. The court further noted that "[o]ther provisions in the CBAs also address player health and safety, and may be interpreted to impose a general duty on the NFL clubs to diagnose and treat ongoing conditions like the concussive brain trauma . . . ." *Id.* (citing 1982 CBA Art. XXXI, §§ 1-2; 1993 CBA Art. XLIV, §§ 1-2). From this, the court concluded: "Determining the meaning of the CBA provisions is thus necessary to resolve Duerson's negligence claim." *Id.*

Moreover, the *Duerson* court rejected Plaintiff Duerson's argument that his claims were not preempted because he was not alleging a duty arising from the CBAs. *Id.* "[P]reemption is still possible even if the duty on which the claim is based arises independently of the CBA, so long as resolution of the claim requires interpretation of the CBA." *Id.* (citing *In re Bentz Metal Prods. Co.*, 253 F.3d 283, 286 (7th Cir. 2001) (en banc)).

It was unnecessary for the courts in *Maxwell*, *Pear*, *Barnes*, and *Duerson* to address the applicability of preemption of the claims against the Riddell Defendants once those courts concluded that at least one of the plaintiffs' claims in those actions was preempted. *E.g.*, *Maxwell*, No. 2:11-cv-08394-R –MAN, Order at 2. Indeed, after determining there was preemption as to at least one claim, both courts ruled that federal question jurisdiction existed and, therefore, denied remand. *Id.*; *Duerson*, 2012 WL 1658353, at *6. Nevertheless, as explained below, the reasoning those courts applied in ruling the negligence-based claims against the NFL Defendants to be preempted applies with equal force to Plaintiffs' negligence-based and

warning-based claims against the Riddell Defendants and supports a similar ruling of preemption as to those claims against the Riddell Defendants.

> iii.     Plaintiffs' negligence and failure-to-warn claims here are similarly preempted in light of the necessary duty and "degree of care" analysis inherent in such claims, which requires interpretation of the CBAs.

In accordance with the legal reasoning in *Stringer*, *Maxwell*, *Pear*, *Barnes*, and *Duerson*, Plaintiffs' claims in the AMAC, both as to the NFL Defendants and the Riddell Defendants, are inextricably intertwined with the CBAs.  Plaintiffs' claims against the Riddell Defendants implicate numerous provisions of the CBAs because of the necessary interpretation of those provisions when considering the duty, if any, and degree of care the Riddell Defendants allegedly owed and purportedly breached.

For example, similar to the claims in *Stringer*, it is impossible to evaluate Plaintiffs' negligence and failure-to-warn allegations, the requisite degree of care allegedly required, or whether the Riddell Defendants acted reasonably without first determining what training and instruction the NFL Clubs' trainers received in preventing, recognizing, and treating concussion-related injuries.  *See* 474 F. Supp. 2d at 910.  Indeed, Minnesota is not alone in its case-specific, fact-intensive consideration of the degree of care in evaluating negligence-based claims.  In fact, many—if not most or all—of the jurisdictions whose laws might properly be applied to these improperly joined Plaintiffs' claims apply the same analysis.[12]  Thus, if, by virtue of the training

---

[12] *E.g.*, *Hinkley v. Safepro, Inc.*, 853 F. Supp. 594, 596 (N.D.N.Y. 1994) (holding the degree of care "will vary with the surrounding circumstances and will involve a 'balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm'") (applying New York law and quoting *Micallef v. Miehle Co., Div. of Miehle-Goss Dexter, Inc.*, 39 N.Y.2d 376, 386 (1976)); *Krull v. Keene Corp.*, 601 F. Supp. 547, 548 (D.C. Ill. 1985) ("'Ordinary care' is by definition a reasonableness standard whose application varies with the circumstances.") (applying Illinois law); *Flowers v. Torrance Mem. Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997 (1994) ("Because application of [due care]

and certification process, the trainers were prepared or expected to handle concussion-related injuries, then the degree of care allegedly owed by the Riddell Defendants in warning the players or taking other steps regarding the risks of those injuries would, at the least, be diminished.[13] *See* 474 F. Supp. 2d at 910. In turn, this consideration must be resolved both as to the NFL and Riddell Defendants equally in terms of the substantive provisions of the CBAs.

The provision requiring NATA-certified trainers dates back to 1982 and has been in every CBA to the present. NFL CBA 2006-2012 Art. XLIV, § 2 ("Club Trainers"); NFL CBA 2002-2008 Art. XLIV, § 2 ("Club Trainers"); NFL CBA 1993-2005 Art. XLIV, § 2 ("Club Trainers"); NFL CBA 1993-2003 Art. XLIV, § 2 ("Club Trainers"); NFL CBA 1993-2000 Art. XLIV, § 2 ("Club Trainers"); 1982 CBA Art. XXXI, § 2 ("Club Trainers"). Whatever knowledge and experience the Club-provided, NATA-certified trainers had would impact the degree of care allegedly owed by the Riddell Defendants, if any, to warn independently—from the Club, the NFL, or anyone else—of concussion risks. This analysis implicates the CBAs and,

---

is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances." (citations omitted)); *Fla. E. Coast Ry. Co. v. Soper*, 146 So. 2d 605, 607 (Fla. Dist. Ct. App. 1962) ("However, the degree of care is variable and dependent upon the circumstances of a particular case."); *Antcliff v. State Emps. Credit Union*, 414 Mich. 624 (1982) ("Even though the standard itself never varies, the amount of care and the type of conduct required may vary with the circumstances."); *St. Louis Sw. Ry. Co. v. Marks*, 749 S.W.2d 911 (Tex. App. 1988) (holding as a legally correct instruction on Texas law that "[t]he degree of care required to be exercised depends upon the risk of danger involved under the circumstances"); *see also Grand Trunk R. Co. v. Ives*, 144 U.S. 408, 417 (1892) (explaining that there is "no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances," but rather, the degree of care owed must be evaluated in light of "the special circumstances and surroundings of each particular case"); *see also Duerson*, No. 1:12-cv-2513 (explaining that a detailed choice-of-law inquiry was not necessary to evaluate preemption given the similarity of states' laws in requiring a determination as to the degree of care owed in assessing negligence)

[13] The Riddell Defendants wholly deny any and all of Plaintiffs' allegations of alleged duties owed and breached.

therefore, results in preemption of the claims of at least every player-Plaintiff who was covered by a CBA during his playing career from 1982 forward, which includes the majority of Plaintiffs. *See* 474 F. Supp. 2d at 910.

Similarly, the CBA provisions regarding Club Physicians, who have "primary responsibility for identifying" medical conditions, also affect the degree of care allegedly owed by the Riddell Defendants. Specifically, as with the "Club Trainers" provision, CBAs since 1982 have all contained a provision requiring each NFL team to have their own "Club Physician." NFL CBA 2006-2012 Art. XLIV, § 1 ("Club Physician"); NFL CBA 2002-2008 Art. XLIV, § 1 ("Club Physician "); NFL CBA 1993-2005 Art. XLIV, § 1 ("Club Physician "); NFL CBA 1993-2003 Art. XLIV, § 1 ("Club Physician"); NFL CBA 1993-2000 Art. XLIV, § 1 ("Club Physician "); 1982 CBA Art. XXXI, § 1 ("Club Physician"). The "Club Physician" provision has, since that time and among other requirements, required the Club Physician to advise each player if the player experiences a condition that could adversely affect the player's health. *Id.* If those Club Physicians were knowledgeable as to concussion-related injuries and associated risks "by virtue of their medical school training and experience," then they would not need to rely on the Riddell Defendants for such information. *See Stinger*, 474 F. Supp. 2d at 910-11. Therefore, as with its "Club Trainers" counterpart, the "Club Physician" "provision must be taken into account in determining the degree of care owed by the [Riddell Defendants] and what was reasonable under the circumstances." *See id.* at 911. For this additional reason, the majority of Plaintiffs' claims are "inextricably intertwined with this contractual provision" as well, and, thus, those Plaintiffs' claims against the Riddell Defendants are "preempted by § 301." *See id.*

If not preempted, Plaintiffs' claims would require a court (or, more likely, many different courts) to interpret the meaning and scope of the various parties' obligations with respect to providing medical care, medical advice, medical information, and medical warnings under the CBAs, what those parties' duties were and were not, and of what risks regarding concussions the players could reasonably expect the NFL, its Clubs, and the Clubs' physicians and trainers to warn them.  It is precisely this threat of the dozens and dozens of individual Plaintiffs' claims against the Riddell Defendants presenting opportunities for conflict in the interpretation of those provisions under many different states' laws (as opposed to uniformly under federal law) that is at the heart of § 301 preemption reasoning.  Indeed, the Supreme Court explained:  "[T]he subject matter of § 301(a) 'is peculiarly one that calls for uniform law.'  . . .  The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements."  *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404 n.3 (1988) (quoting *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962)).  "If the state-law claim either arises out of a CBA or is dependent upon the meaning of a CBA, 'the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform through the Nation—must be employed to resolve the dispute.'"  *Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1176-77 (11th Cir. 2010) (quoting *Lingle*, 486 U.S. at 406).

Plaintiffs' negligence-based, warnings-based claims against the Riddell Defendants for allegedly failing to warn them and otherwise protect them from the risks of football-related concussive injuries cannot be considered in a vacuum.  Rather, Plaintiffs' claims can only be properly measured in the totality of the facts related to the CBA provisions that address the NFL

Clubs' duties to provide licensed medical doctors and certified trainers.  That is because those physicians and trainers had primary responsibility for recognizing, evaluating, and treating any injuries players sustained, educating players about the risks to their health and safety associated with those injuries, and clearing them for return to play.  Given the need to construe those CBA provisions to resolve Plaintiffs' claims and to determine the duty and degree of care the Riddell Defendants allegedly owed, the players' claims against the Riddell Defendants are necessarily preempted.  *See Lingle*, 486 U.S. at 407 (explaining that the only time preemption does not apply is when "resolution of the state-law claim does not require construing the collective-bargaining agreement"); *see also Stringer*, 474 F. Supp. 2d at 908-11.

This same reasoning applies to other aspects of Plaintiffs' failure-to-warn-based claims, including, for example, their reliance allegations.  (*E.g.*, AMAC ¶ 389.)  Their alleged reliance on the Riddell Defendants to warn them of injury risks associated with playing football implicates the CBAs and interpretation of their provisions concerning medical care and treatment, trainers, physician, injury protection, and player safety and health.  These provisions are the metric against which the reasonableness of the players' alleged reliance on the Riddell Defendants for their health and safety information must be assessed.  *Cf. Williams v. Nat'l Football League*, 582 F.3d 863, 881-82 (8th Cir. 2009) (finding preemption of plaintiffs' state common-law claims based on their arguments of reliance implicating the CBA to determine whether that alleged reliance was reasonable); *see also Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005) (explaining that court must consider the "relationship of the parties . . . and the nature of the transaction when determining whether one party's reliance . . . is justifiable").

Also, Plaintiffs allege the Riddell Defendants "failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other helmets provided greater shock attenuation from blows to the head area," in addition to alleging elsewhere the existence of these imaginary "safer alternative design[s]." (AMAC ¶¶ 401, 404, 409.) Analysis of this alleged duty to provide warning and instructional materials and the degree of care required in performing such a duty would necessarily hinge on interpretation of those same duties held by the Joint Committee, whose job it was "to undertake promptly upon execution of this Agreement . . . a review of all current materials on the player safety aspects of playing equipment, . . . ." (*E.g.*, 1977 CBA Art. XI, § 7.)

In addition, Plaintiffs all allege that the Riddell Defendants breached duties owed to them because they "failed to provide necessary and adequate safety and instructional materials and warnings of the risk and *means available to reduce and/or minimize the risk of concussive brain injuries while playing football*." (AMAC ¶ 408 (emphasis added).) This allegation thus asserts that the Riddell Defendants had a duty to tell the players how to play football. The assertion of the existence of such a duty owed by the Riddell Defendants is without merit; Plaintiffs allege it is the NFL's duty to define the rules of the game. (*See, e.g.*, *id.* ¶ 118(a)-(l).) In any case, this allegation that the Riddell Defendants had any rights or obligations to instruct on how to play the game necessarily implicates the CBAs and their provisions governing the establishment of rules and committees for that purpose and the expectations as to who would promulgate rules for the players' safety. (*See, e.g.*, 1982 CBA Art. XI and § 9; 1993 CBA Art. XIII § 1(a), (c); 2006 CBA Art. XIII § 1(a), (c); *see also* 1970 CBA Art. V, 1977 CBA Art. XI & § 8.)

Moreover, this allegation asserting a duty by the Riddell Defendants to instruct on the "means available to reduce and/or minimize the risk of concussive brain injuries while playing

football" attempts to impute an obligation to the Riddell Defendants even though they were not participants on the Joint Committee on Player Safety and Welfare or in the NFL rulemaking process.  By seeking to impose a duty and liability on the Riddell Defendants for not doing something that fell squarely within the bargained-for purview of the Joint Committee, these lawsuits require interpretation of the various CBA provisions, which, without preemption, would defeat the uniform interpretation of and performance under the CBAs that Congress contemplated when it enacted § 301.  *E.g.*, *Lucas Flour*, 369 U.S. at 103.

> b.   Plaintiffs' strict liability design and manufacturing claims also inextricably intertwine with the CBAs.

In addition to Plaintiffs basing their strict liability claims, in part, on allegations of purported failure to warn, (AMAC ¶¶ 398(e), 401, 403(e)), they also base those claims entirely on alleged negligent conduct (*id.* ¶¶ 398, 403).  Thus, their strict liability claims necessarily involve the same duty and "degree of care" analysis inherent in all negligence determinations and, for that reason, are similarly preempted for the same reasons explained above with regard to their other negligence-based/warnings-based claims.  *See supra* Part III.A.3.

In addition, Plaintiffs' vague product-defect allegations and the alleged duty to provide helmets that could protect players from the effects of "repeated blows to the head" also implicate the CBAs' various medical-care, rules of play, Joint Committee on Player Health and Safety, and many other CBA provisions in numerous ways.  (*See, e.g.*, AMAC ¶ 419.)  As a result, these claims are preempted on this additional ground, requiring their dismissal.

For example, as with the warnings-based allegations, whatever degree of care the Riddell Defendants allegedly violated in "[n]egligently designing the subject helmet with a shock attenuating system which was not safely configured (AMAC ¶ 398(b)) cannot be considered "in a vacuum."  *See Stringer*, 474 F. Supp. 2d at 910. Rather, that degree of care can only properly

be evaluated in light of the circumstances of the helmet's intended use, the players' rights to request equipment that would meet certain performance requirements and expectations, a determination of the role and obligation of the Joint Committee to speak on the safety of playing equipment, the amount of consideration the NFL was to give recommendations from the Joint Committee and its outside consultants as opposed to equipment manufacturers concerning equipment specifications and improvements, the medical care players received from trainers and physicians following any alleged concussion, the rules promulgated and conditions under which the helmets would be used, and other relevant factors, all of which the CBAs' bargained-for provisions address. *Cf. Stringer*, 474 F. Supp. 2d at 908-10 (discussing the degree of care analysis that implicated various CBA provisions); *but see id.* at 914. (*See also, e.g.*, 1982 CBA Art. XXXI §§ 1-2 (providing for Club physicians and trainers); 1977 CBA Art. XI (establishing a Joint Committee on Player Safety and Welfare to discuss "the player safety and welfare aspects of playing equipment, playing surfaces, . . . playing rules, . . . and other relevant subjects").)

Player-Plaintiffs, through their representatives, bargained for the establishment of that Joint Committee and the powers and authority it would have in the role of determining the performance expectations of playing equipment.  Moreover, they bargained for and obtained the right to employ expert outside consultants to assist them in evaluating current equipment options and assessing whether recommendations for changes in that equipment were necessary. (*E.g.*, *id.* § 1(b).)  In light of those CBA provisions, Plaintiffs cannot now ask this Court (and possibly others) to evaluate whether the Riddell Defendants acted reasonably without first interpreting the scope of the authority and obligations of the Joint Committee in determining what equipment should have been provided and how that equipment should perform.

Indeed, by asking a jury to determine what expectations there were for playing equipment at various times throughout NFL history, these lawsuits necessarily require interpretation of the Joint Committee's obligations and whether it was the Joint Committee's responsibility, primarily or even in part, to assess and recommend changes for helmets and other playing equipment. Because, if it were determined that the Joint Committee occupied that role, then the Riddell Defendants' alleged duty of care, and the assessment of whether the Riddell Defendants acted reasonably, would be affected.  This need to determine the scope and role of the Joint Committee in assessing the safety of playing equipment and recommending changes to that equipment presents yet another way in which Plaintiffs' product-defect claims are inextricably intertwined with the CBAs.

Moreover, under the CBAs, the players and NFL management bargained that the NFL was to give "serious and thorough consideration" to the recommendations of the Joint Committee and its outside consultants on equipment and player safety issues.  (*E.g.*, 2006 CBA Art. XIII, § 1(a).)  Obviously, the meaning of this provision, and the extent to which the NFL was obligated to consider the Joint Committee's recommendations must be determined in adjudicating any equipment-related claims, as this provision may have influenced equipment selection, equipment performance, and the rules of play in which such equipment was used in NFL practices and games.

     c.     <u>Plaintiffs' causation allegations further intertwine their claims against the Riddell Defendants with the CBAs.</u>

Plaintiffs' causation arguments also implicate and require interpretation of the CBAs' numerous medical-care provisions.  Specifically, Plaintiffs would be required to show that it was the Riddell Defendants' duty to protect them from the alleged risks of multiple concussions, and that the supposed failure to do so was the proximate cause of their injuries.  Yet, this argument

cannot be made without interpretation of the applicable CBAs and their extensive, relevant, and material provisions on player safety, rules, injury treatment and care, and the allocation of responsibility assigned under the CBAs to the NFL, its Clubs, the Club physicians and trainers, and the players' association, all of which must be interpreted to assess causation properly.  Thus, Plaintiffs' claims are preempted on this additional ground.

       d.      <u>Plaintiffs' punitive damages claim against the Riddell Defendants requires substantial interpretation of multiple CBA provisions.</u>

Plaintiffs request punitive damages[14] against the Riddell Defendants, even though they fail to allege any facts showing that the Riddell Defendants acted outrageously, reprehensibly, wantonly, egregiously, with reckless abandon, or to any other degree that would support such damages.  (*See* AMAC at 83 ("Wherefore" sub-clause D).)  Regardless of the deficiency of their pleading, the supposed degree of culpability of the Riddell Defendants' alleged conduct can only be evaluated in light of the procedures and mechanisms already in place that the players bargained for and obtained in the CBAs to obtain primary medical information, care, and treatment from sources other than the Riddell Defendants, including but not limited to in the "Club Trainers" and "Club Physician" provisions.  *See Williams*, 582 F.3d at 882 (finding preemption of plaintiffs' intentional infliction of emotional distress claim, which required showing of extreme, outrageous, and intentional or reckless conduct, because "one can only evaluate the outrageousness of the NFL's conduct, not disclosing to the Players that StarCaps contained bumetanide, in light of what the parties have agreed to in the Policy"); *Duerson*, 2012 WL 1658353, at *4 (noting the numerous provisions of the CBAs as placing the primary duty on

---

[14] The same analysis regarding punitive damages applies equally to the other causes of action as well.  Moreover, since punitive damages require underlying liability in the first place, they are necessarily derivative.  Thus, preemption of the underlying claims—i.e., failure to warn, strict liability, and negligence—compels preemption of any request for punitive damages as well.

NFL Clubs to diagnose, treat, monitor for, and determine fitness to return to play after concussive injuries); (*see also, e.g.*, 1993 CBA Art. XLIV, § 1 (requiring team physicians to advise players in writing of conditions which "could be significantly aggravated by continued performance . . . before the player is again allowed to perform on-field activity"); *id.* Appx. C, § 9 (providing in the players' contracts that "if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . ."); 1982 CBA Art. XXXI, § 3 ("A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility . . . for the cost of [those] medical services . . . ."); *id.* Art. XI ("A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee') will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects.").

e. Potential third-party fault and apportionment further require interpretation of the CBAs and, therefore, preemption.

Many jurisdictions have adopted comparative fault principles and some allow allocation of fault to non-parties.[15]  Thus, resolution of many Plaintiffs' claims against the Riddell Defendants will also necessarily require consideration of the obligations—as well as the alleged failure to perform any of those obligations—of the NFL entities, the Clubs, their physicians and trainers, and others implicated by and mentioned in the CBAs, including the players themselves.

---

[15] *E.g.*, A.R.S. § 12-2506 (requiring a jury, under Arizona comparative fault law, to "consider the fault of all persons who have contributed to the alleged injury . . . regardless of whether the person was, or could have been, named as a party to the suit"); Cal. Civ. Code § 1431.2(a) & *Wilson v. Ritto*, 129 Cal. Rptr. 2d 336, 340-41 (Cal. App. 2003) (generally same); Fla. Stat. § 768.81(3) (generally same); MCL 600.2957(1) & 600.6304(1) (same under Michigan law).  This is not an exhaustive listing, but merely a sampling of some of the states whose laws might apply to Plaintiffs' claims.

If the fault of those other CBA-covered entities must be considered in resolving claims against the Riddell Defendants, then interpretation of the CBAs necessary to find fault against those entities will also be necessary in those cases against the Riddell Defendants.

For instance, Plaintiffs allege numerous acts by the NFL and others that they contend caused or contributed to their alleged injuries, such as insufficient medical treatment and warnings after they purportedly suffered concussions.  (*See, e.g.*, AMAC ¶¶ 173, 289, 295, 299, 333) (alleging liability based on the fact that players were not properly diagnosed and treated after concussions and were encouraged to return to play prematurely); *see also id.* ¶ 390 (alleging that the Riddell Defendants provided warnings "reminding players to 'sit out' if they suffer a concussion").)  In being asked to determine whether legal fault lies with the Riddell Defendants or other CBA-implicated entities or some combination thereof, a jury would necessarily have to interpret the scope those other CBA-implicated entities' duties to protect the allegedly concussed players.  Moreover, given the intertwined nature of the allegations against both the NFL and Riddell Defendants (as discussed more fully below), to the extent interpretation of the CBAs would be necessary in resolving claims against the NFL, those interpretations would likewise be required to resolve claims against the Riddell Defendants.

      f.     <u>Plaintiffs' joint allegations against both the Riddell and NFL Defendants further intertwine their claims against the Riddell Defendants with the CBAs.</u>

Plaintiffs intertwine their claims against the Riddell Defendants not only with the CBAs, but also with their claims against the NFL Defendants, thereby further establishing preemption. For example, Plaintiffs allege an exclusive contract between the Riddell Defendants and the NFL, making Riddell helmets "the official helmets of the NFL."  (AMAC ¶¶ 32-33, 387.) Plaintiffs further allege they relied jointly on both the NFL and the Riddell Defendants for

information about the "long-term effects of concussions."  (*Id.* ¶ 389.)  They also allege that both the NFL and Riddell Defendants had a simultaneous duty to protect the players against the purported long-term risks of concussions.  (*Id.* ¶¶ 84-107, 390-96.)

Moreover, Plaintiffs also specifically incorporate by reference all of the allegations of conduct by the NFL Defendants into each of their claims against the Riddell Defendants and, thereby, hinge those claims on alleged joint conduct by the NFL Defendants and the Riddell Defendants.  (*Id.* ¶¶ 397, 402, 406, & 416.)  Likewise, Plaintiffs seek to hold all Defendants— both the NFL and Riddell Defendants—liable for the alleged loss of consortium.  (*Id.* ¶¶ 366-69; *id.* ¶ 367 ("As a result of named Defendants' misconduct, the named Defendants are liable to Plaintiffs' spouses.").)  Finally, even though Plaintiffs do not assert claims for civil conspiracy or fraudulent concealment against the Riddell Defendants, they nonetheless incorporate and rely on factual allegations of the Riddell Defendants' purported conduct in asserting such claims against the NFL Defendants.  (*Id.* ¶ 422 (incorporating ¶¶ 383-96, which allege the Riddell Defendants' purported duty to protect against long-term risks of concussions).)

Thus, not only are Plaintiffs' claims against the Riddell Defendants preempted on their own, they are also thoroughly intertwined with the claims against the NFL Defendants, which courts have already found to be preempted.  This intertwining further establishes that the claims against the Riddell Defendants are, likewise, preempted.  *Cf. Wolf*, 2010 U.S. Dist. LEXIS 116294.

<u>CONCLUSION</u>

All of Plaintiffs' claims against the Riddell Defendants implicate and require interpretation of the CBAs for one reason or another. They are all, thus, preempted under LMRA § 301. Therefore, the Court should dismiss them.

For the foregoing reasons, this Court should dismiss Plaintiffs' claims in their entirety against the Riddell Defendants with prejudice.

Respectfully Submitted,

/s/ Paul G. Cereghini_____
Paul G. Cereghini
Thomas C. Howard
BOWMAN AND BROOKE LLP
2901 N. Central Avenue
Suite 1600
Phoenix, AZ  85012
Telephone:  (602) 643-2300
Fax:  (602)248-0947
paul.cereghini@bowmanandbrooke.com
thomas.howard@bowmanandbrooke.com

Robert L. Wise
Eden M. Darrell
BOWMAN AND BROOKE LLP
1111 East Main Street, Suite 2100
Richmond, VA  23219
Telephone:  (804) 649-8200
Fax:  (804) 649-1762
rob.wise@bowmanandbrooke.com
eden.darrell@bowmanandbrooke.com

Thomas P. Wagner
Marshall, Dennehy, Warner, Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
Telephone:  (215) 575-4562
Facsimile:  (215) 575-0856
tpwagner@mdwcg.com

Attorneys for Defendants RIDDELL, INC.; ALL
AMERICAN SPORTS CORPORATION;
RIDDELL SPORTS GROUP, INC.; EASTON-
BELL SPORTS, INC.; EASTON-BELL SPORTS,
LLC, EB SPORTS CORP.; and RBG HOLDINGS
CORP.