**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| IN RE:  NATIONAL FOOTBALL | :   No. 12-md-2323-AB |
| LEAGUE PLAYERS' CONCUSSION | : |
| INJURY LITIGATION | :   MDL No. 2323 |
| | : |

_____   :
                                          :
THIS DOCUMENT RELATES TO                  :
ALL ACTIONS                               :
                                          :
_____   :


**BRIEF IN SUPPORT OF RIDDELL DEFENDANTS' MOTION TO SEVER**

Paul G. Cereghini                    Robert L. Wise
Thomas C. Howard                     Eden M. Darrell
BOWMAN AND BROOKE LLP                 BOWMAN AND BROOKE LLP
2901 N. Central Avenue, Suite 1600   1111 E. Main Street, Suite 2100
Phoenix, AZ  85012                   Richmond, VA 23219
Telephone:  (602) 643-2300           Telephone:  (804) 649-8200
paul.cereghini@bowmanandbrooke.com   rob.wise@bowmanandbrooke.com
thomas.howard@bowmanandbrooke.com    eden.darrell@bowmanandbrooke.com


Thomas P. Wagner
Mary C. Doherty
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
2000 Market St., Suite 2300
Philadelphia, PA 19103
tpwagner@mdwcg.com
mcdoherty@mdwcg.com


Attorneys for Defendants RIDDELL, INC.; ALL AMERICAN SPORTS CORPORATION;
RIDDELL SPORTS GROUP, INC.; EASTON-BELL SPORTS, INC.; EASTON-BELL
SPORTS, LLC, EB SPORTS CORP.; and RBG HOLDINGS CORP.

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................................1

FACTS ...................................................................................................................................2

ARGUMENT ........................................................................................................................6

Plaintiffs' misjoinder of multitudes of distinct actions violates the Federal Rules
of Civil Procedure, as well as established interpretive case law, and materially
prejudices the Riddell Defendants, requiring severance .......................................................6

I.      Rule 20 does not permit joinder of disparate actions, like Plaintiffs' ..................................6

II.     Plaintiffs' claims arise from vastly separate occurrences and widely disparate
        facts and, therefore, fail to support proper joinder under Rule 20(a).  To the
        contrary, they frustrate the very purpose of permissive joinder ........................................12

        A.      Plaintiffs' claims are factually disparate, precluding proper joinder ....................12

        B.      Legal disparities between Plaintiffs' claims also preclude proper joinder ...........19

III.    Joinder of Plaintiffs' claims would not promote the purpose of Rule 20, but rather
        would only cause delay, jury confusion, judicial inefficiency, and prejudice ..................23

IV.     Nothing about the nature of these MDL proceedings alleviates the need for
        severance ...........................................................................................................................26

        A.      MDL consolidation does not cure or alleviate Plaintiffs' misjoinder or
                minimize the need for severance ............................................................................26

        B.      Neither the AMAC nor the SFCs remedies Plaintiffs' misjoinder .......................28

CONCLUSION ....................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Am. Fid. Fire Ins. Co. v. Construcciones Werl, Inc.*,
  407 F. Supp. 164 (D.V.I. 1975) ................................................................ 28

*Am. Safety Equip. Corp. v. Winkler*,
  640 P.2d 216 (Colo. 1982) ....................................................................... 15

*Avila v. Citrus Cmty. Coll. Dist.*,
  38 Cal. 4th 148, 41 Cal. Rptr 3d 299, 131 P.3d 383 (2006) .................... 18

*Boschert v. Pfizer, Inc.*,
  No. 4:08-cv-1714 CAS, 2009 WL 1383183 (E.D. Mo. May 14, 2009) ............ 9, 10, 18, 19, 26

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ...................................................................... 21

*Chavez v. So. Pac. Transp. Co.*,
  413 F. Supp. 1203 (D.C. Cal. 1976) ......................................................... 30

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ......................................................... 23, 24, 25

*Cooper v. Fitzgerald*,
  266 F.R.D. 86 (E.D. Pa. 2010) .................................................................... 7

*DIRECTV v. Loussaert*,
  218 F.R.D. 639 (S.D. Iowa 2003) .............................................................. 10

*DIRECTV, Inc. v. Leto*,
  467 F.3d 842 (3d Cir. 2006) ......................................................................... 8

*Filak v. Consol. Rail Corp.*,
  No. 97-8022, 1997 WL 805167 (E.D. Pa. Dec. 31, 1997) ........................... 8

*Fritz v. White Consol. Indus., Inc.*,
  306 A.D.2d 896, 762 N.Y.S.2d 711 (N.Y. App. Div. 2003) ..................... 22

*Gallegos v. Citizens Ins. Agency*,
  779 P.2d 99 (N.M. 1989) ........................................................................... 23

*Gawenda v. Werner Co.*,
  932 F. Supp. 183 (E.D. Mich. 1996) ......................................................... 22

*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir. 1996) ........................................................................ 21

*Graven v. Vail Assocs., Inc.*,
  909 P.2d 514 (Colo. 1996) ......................................................................... 22

*Greenman v. Yuba Power Prods.*,
  59 Cal. 2d 57 (1963) ................................................................................. 30

*Holcim (US), Inc. v. Ohio Cas. Ins. Co.*,
   38 So. 3d 722 (Ala. 2009) ............................................................................. 22

*In re Asbestos Prods. Liab. Litig.*,
   MDL 875, Nos. 95-cv-01099, 08-cv-89125, 2008 WL 4455838 (E.D. Pa. Oct. 1, 2008) 23, 26, 28

*In re Asbestos Prods. Liab. Litig.*,
   MDL No. 875, Nos. 01-cv-00162, 08-cv-71147, 2009 WL 959539 (E.D. Pa. Apr. 6, 2009) .... 8

*In re Baycol Prods. Liab. Litig.*,
   MDL No. 1431, 2002 WL 32155269 (D. Minn. July 5, 2002) ............................................. 7, 27

*In re Baycol Prods. Liab. Litig.*,
   MDL No. 1431, Case No. 03-2931, 2003 WL 22341303 (D. Minn. 2003) .............................. 9

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
   MDL 1014, 1995 WL 428683 (E.D. Pa. July 17, 1995) ..................................................... 7, 27

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1996 WL 900346 (E.D. Pa. July 11, 1996)  8, 9

*In re Diet Drugs Prods. Liab. Litig.(Phentermine/ Fenfluramine/Dexfenfluramine)*
   No. 03-20229, 2004 WL 1211928 (E.D. Pa. June 2, 2004) ........................................... 7, 8, 28

*In re Diet Drugs Prods. Liab. Litig. (Phentermine/ Fenfluramine/Dexfenfluramine)*
   No. No. 98–20478, 1999 WL 554584 (E.D. Pa. July 16, 1999) ......................................... 8, 12

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II),*
   *MDL 2243, No.*, 11-3045, 2012 WL 1118780 (D.N.J. Apr. 3, 2012) ...................................... 12

*In re Rezulin Prods. Liab. Litig.*
   168 F. Supp. 2d 136 (S.D.N.Y. 2001) ................................................................................ 9, 18

*In re Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ............................................................................................. 20

*Kasel v. Remington Arms Co.*,
   24 Cal. App. 3d 711, 101 Cal. Rptr. 314 (1972) ............................................................. 19, 20

*Kirkland v. General Motors Corp.*,
   521 P.2d 1353 (Okl. 1974) ................................................................................................ 21

*Lister v. Bill Kelley Athletic, Inc.*,
   485 N.E.2d 483 (Ill. App. Ct. 1982) .................................................................................. 15

*McNaughton v. Merck & Co*,
   No. 04-cv-8297, 2004 WL 5180726, at *2 (S.D.N.Y. Dec. 17, 2004) ......................... 9, 11, 27

*Morrison v. Williams*,
   No. 98-2408, 1998 WL 372655 (E.D. Pa. May 14, 1998) ......................................... 8, 9, 12, 30

*Mosley v. General Motors Corp.*,
   497 F.2d 1330 (8th Cir. 1974) ..................................................................................... 10, 12

*Owens-Corning Fiberglass Corp. v. Watson*,
   243 Va. 135-36 (1992) ...................................................................................................... 29

*Powers v. Lycoming Engines, Inc.*,
    272 F.R.D. 414 (E.D. Pa. 2011) ........................................................................... 20

*Saval v. BL Ltd.*,
    710 F.2d 1027, 1031 (4th Cir. 1983) ........................................................... 9, 10, 12

*Simmons v. Wyeth Labs.*,
    No. 96-cv-6631, 1996 WL 617492 (E.D. Pa. Oct. 24, 1996) ........................ 6, 7, 8, 27

*Smith v. Fiber Controls Corp.*,
    300 N.C. 669 (1980) ........................................................................................... 22

*Testerman v. Riddell, Inc.*,
    161 Fed. Appx. 286 , 2006 WL 41193 (4th Cir. 2006) ........................................... 16

*Wash. Mut. Bank v. Superior Court*,
    24 Cal. 4th 906, 103 Cal. Rptr. 2d 320, 15 P.3d 1071 (2001) ............................... 21

*Wolfe v. Stork RMS-Protecon, Inc.*,
    683 N.E.2d 264 (Ind. App. 1997) ......................................................................... 22

*Wolford v. Budd. Co.*,
    149 F.R.D. 127 (W.D. Va. 1993) .......................................................................... 30

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ....................................................................... 20, 22

**Statutes**

Fla. Stat. § 768.81(3) ............................................................................................ 22

Fla. Stat. § 95.11(3)(a), (e) (2010) ......................................................................... 21

Md. Code Ann., Cts. & Jud. Proc. § 11-108 (West 2012) ........................................ 23

N.C. Gen. Stat. § 1-46.1 (West 2012) ..................................................................... 21

O.C.G.A. § 51-12-5.1 ............................................................................................ 23

Tenn. Code Ann. § 29-28-103(a) (West 2011) ........................................................ 21

Va. Code Ann. § 8.01-38.1 ..................................................................................... 23

Wash. Rev. Code § 4.22.005 ................................................................................... 22

**Rules**

Fed. R. Civ. Proc. 20 ..................................................................................... passim

Fed. R. Civ. Proc. 21 ............................................................................................ 1,8

<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Defendants Riddell, Inc.; All American Sports Corporation; Riddell Sports Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp. (collectively, the "Riddell Defendants")[1] respectfully submit this brief in support of their motion to sever pursuant to Rules 20 and 21 of the Federal Rules of Civil Procedure.

Plaintiffs' original complaints in the underlying transferred actions, and the Amended Master Administrative Complaint ("AMAC") and Short Form Complaints ("SFCs") that have replaced them, impermissibly consolidate hundreds of factually disparate, individual, personal injury, product liability claims against the seven Riddell Defendants. As a result, the Plaintiffs suing the Riddell Defendants have, among numerous other deficiencies, failed to identify any specific helmet or helmets worn during their professional football careers, any specific alleged defect in their helmets, any factually supported causal relationship between any supposed defect and a specific alleged injury, or any facts necessary to determine the applicable state product liability law, which is fundamental to determining dispositive defenses such as the expiration of statutes of limitations.

Product liability claims, like Plaintiffs', are highly individualized and factually disparate. They involve a particular product, which here might be one of a vast number of different helmet designs and configurations available over a sixty-year period spanning the introduction of plastic-shell suspension helmets to today's state-of-the-art helmet models. Each player's case involves a unique product with a distinct usage history that may include modifications, reconditioning, alteration, product misuse or abuse. Each case involves an individual player-

---

[1] Reference to the "Riddell Defendants" is for convenience only, with no implication or concession that they are properly joined or named as Defendants. The "Riddell Defendants" reserve the right to move to dismiss some or all of them.

1

Plaintiff's unique professional and pre-professional playing history—including from college dating back possibly into youth football—in addition to divergent personal and medical backgrounds, different head impact experiences, and distinct alleged injuries. Moreover, as the product and product warnings vary from player to player, so will each Plaintiff's specific defect allegations, as will the legal standards applicable to each individual Plaintiff's claims.

For these reasons, and to assure the orderly, fair and efficient administration of justice, Rule 20, as well as prior decisions of this and other courts, bar the joinder of actions like this and require each Plaintiff to plead, individually and in a separate action, the basis for his individual product liability claim. Because Plaintiffs failed to do so in the underlying actions transferred to this MDL, or in the superseding AMAC and SFCs they later filed, the Riddell Defendants respectfully request that the Court grant this motion and order that Plaintiffs' misjoined claims against the Riddell Defendants be severed and dropped, as appropriate, with an instruction that those Plaintiffs who wish to continue to pursue claims against the Riddell Defendants must each file separate, individual actions.[2]

## FACTS

Within this MDL, at present, are more than 130 cases with claims by or on behalf of more than 3,000 former player-Plaintiffs (not including their spouses). In addition to the NFL Defendants, the Plaintiffs' AMAC names seven Defendants to whom Plaintiffs collectively refer to as the "Riddell Defendants": Riddell, Inc. (erroneously styled as "d/b/a Riddell Sports Group,

---

[2] Consistent with CMO-2 and the Court's instructions at the April 25, 2012 hearing, this motion addresses only Plaintiffs' misjoinder and severance. The Riddell Defendants do not concede that any Plaintiffs have properly pled their claims. To the extent necessary, the Riddell Defendants will address the other numerous deficiencies in how Plaintiffs have pled their actions in later motions practice, including but not limited to under Rule 12(b)(6).

Inc."), All American Sports Corporation, Riddell Sports Group, Inc., Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp.  (*See generally* AMAC.)

 Of the more than 130 total cases at this time, only 32 of those actions name one or more of the Riddell Defendants.[3]  And of that latter subtotal, 25 cases are multi-Plaintiff actions, comprised of 680 total Plaintiffs (not including spouse-Plaintiffs joined with their player-Plaintiff husbands) suing one or more Riddell Defendants (along with the NFL Defendants).[4] According to Plaintiffs, two of these entities—Riddell, Inc. and All American Sports Corporation"—were "engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989 has been the official helmet of the NFL."  (*Id.* ¶¶ 32-33.)  As to the other five Riddell Defendants, the AMAC contains no specific allegations whatsoever of any involvement in the design, manufacture, sales, or distribution of football helmets, or any affiliation with Riddell, Inc. or All American Sports Corporation.[5]  (*Id.* ¶¶ 34-38.) Moreover, after introducing the Riddell entities, Plaintiffs never

---

[3] Only 24 of those actions were originally filed against Riddell Defendants.  Plaintiffs in *Alexander*, *Dickerson*, *Jordan*, *Myers*, *Parrish*, *Schobel*, *White*, and *Williams* named a Riddell Defendant for the first time in their SFC.  As indicated in Appendix 1-A, n.1, the Riddell Defendants reserve the right to address, at the appropriate time and as determined by the Court, these attempts to sue them only by filing SFCs.

[4] This motion addresses only those actions with claims by two or more Plaintiffs.  The Riddell Defendants provide in Appendix 1 a list of the specific actions—as of the date of this filing— which contain multiple misjoined Plaintiffs, as well as relevant information gleaned from the SFCs filed as of August 20, 2012.  While the Riddell Defendants can only address at this time cases that have been transferred into the MDL, they request the Court issue a standing order that would apply to all future multi-plaintiff filings, which, for the reasons asserted in this motion, would likewise be misjoined.  In addition, the seven single-Plaintiff actions are also deficient for numerous reasons, which the Riddell Defendants will address at the appropriate time, as the focus of this motion is misjoinder and severance.

[5] Plaintiffs generally alleged that the "Riddell Defendants" were "engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspection, distributing, and controlling the helmets and other similar equipment for use by Plaintiffs within the NFL," but do not specifically allege what role any entity played.  (AMAC ¶ 388.)

differentiate between any of them, even though, as the Riddell Defendants have previously demonstrated through publicly-available records, many of the Riddell Defendants were not even in existence when the player-Plaintiffs played in the NFL.  (*See generally id.*)[6]

As for their causes of action against the Riddell Defendants, Plaintiffs allege claims of strict liability for design and manufacturing defect, failure to warn, and negligence.  (AMAC ¶¶ 397-421.)  Meanwhile, Plaintiffs' claims against the NFL include causes of action for negligence (including negligent hiring and retention and negligent misrepresentation), fraud, and fraudulent concealment, as well as a cause of action jointly against both NFL Defendants for civil conspiracy and fraudulent concealment.  (*Id.* ¶¶ 273-365, 370-82, 422-25.)  Although Plaintiffs originally asserted their civil conspiracy and fraudulent concealment cause of action against the Riddell Defendants as well, by their AMAC, they dropped the Riddell Defendants from that cause of action.  Thus, there is no longer any claim by any Plaintiffs against the Riddell Defendants for civil conspiracy or fraudulent concealment.  In fact, with the exception of the request for joint or alternative liability for loss of consortium, there is no longer any claim asserted jointly against both the NFL and Riddell Defendants.

As for their alleged injuries, Plaintiffs assert in boilerplate fashion that they all suffer "from symptoms of brain injury caused by the repetitive traumatic sub-concussive and/or concussive head impacts the Plaintiff (or decedent) sustained during NFL games and/or practices," which period spanned more than sixty years.  (*See* Template SFC (ECF No. 92-1)[7] ¶

---

[6] The Riddell Defendants, by accompanying motion, ask the Court to take judicial notice of the same information they previously provided several Plaintiffs showing the dates of incorporation of the various Riddell Defendants.

[7] Except where reference to a particular Plaintiff's SFC is appropriate, the Riddell Defendants will refer to the template SFC, found at ECF No. 92-1.  Additionally, unless another case number is indicated, ECF Nos. cited in this Brief refer to those in the Master Docket for MDL 2323, No. 2:12-md-2323.

7; *see also Dickerson* Pl. Jill Stautner SFC (ECF No. 1009) ¶ 15 (alleging a career beginning in 1950; *Simpson* Pl. Dominic Douglas SFC (ECF No. 3041) ¶ 12 (alleging a career ending in 2011).)   Nonetheless, while their AMAC and SFCs fail to provide this information, Plaintiffs superseded original complaints evidence the great disparities in Plaintiffs alleged injuries and symptoms.   For example, in *Monk*, Plaintiff Brian Blades complains of blurred vision, headaches, and short-term memory loss.   (*Monk*, E.D. Pa. Case No. 2:12-cv-03533, Compl. (ECF Nos. 1-1, 1-2) ¶ 220.)   *Monk* Plaintiff David Palmer alleges that he suffers from migraines.   (*Id.* ¶ 410.)   And *Monk* Plaintiff Patrick Venzke complains of anxiety attacks, depression, inability to focus, and mood swings.   (*Id.* ¶ 390.)

None of the player-Plaintiffs—in either their originally filed Complaints, the AMAC, or their individually filed SFCs—allege what brand of helmet they were wearing when they experienced a concussion.   Instead, in their SFCs, they allege only that "[t]he Plaintiff (or decedent) wore *one or more helmets* designed and/or manufactured by the Riddell Defendants *during one or more years* Plaintiff (or decedent) played in the NFL and/or AFL." (*Id.* ¶ 14.) Nonetheless, given the span of their playing careers, Plaintiffs necessarily wore widely disparate helmet models, as the AMAC establishes.   (AMAC ¶¶ 384-386(a)-(m) (discussing evolution of Riddell helmets).)   Indeed, as shown through Riddell's website, from which Plaintiffs cut and pasted much of the information they allege concerning Riddell's history of helmet design and innovation, players through this sixty-year period have gone from wearing bare-bones plastic shell-suspension helmet to helmets with various types of face protection, to helmets with various forms of padding and cushioning technologies, to Riddell's most current helmet models. (*Id.*)[8]

---

[8]  Plaintiffs' obtained their AMAC information from Riddell's website page found at http://www.riddell.com/innovation/history/.   Scrolling over the photographs pulls up a text window, which contains, in many cases, the verbatim text alleged in the AMAC.   Riddell has

In addition, as evidenced by their SFCs, Plaintiffs are residents of 38 different states and played for thirty-two different NFL teams[9] in different cities and states.[10]  (*See* Pls.' SFCs filed in actions identified in Appendix 1-A and 1-B.)  In total, across these actions, at least 38 different jurisdictions' laws might arguably apply to Plaintiffs' claims.  However, Plaintiffs do not identify by which jurisdictions' laws their claims should be resolved, such as for purposes of applying the appropriate statute of limitations or assessing the viability of their claims under various product liability laws.[11]

<u>ARGUMENT</u>

<u>Plaintiffs' misjoinder of multitudes of distinct actions violates the Federal Rules of Civil Procedure, as well as established interpretive case law, and materially prejudices the Riddell Defendants, requiring severance</u>.

I.      <u>Rule 20 does not permit joinder of disparate actions, like Plaintiffs'</u>.

Federal Rule of Civil Procedure 20(a) permits the joinder of multiple plaintiffs in one action if:

> (A)     they assert any right to relief jointly, severally, or in the alternative in respect of or arising out the same transaction, occurrence, or series of transactions or occurrences; and

> (B)     if any question of law or fact common to all these persons will arise in the action.

Fed. R. Civ. P. 20(a); *see also Simmons v. Wyeth Labs*., No. 96-cv-6631, 1996 WL 617492, at * 3 (E.D. Pa. Oct. 24, 1996) ("Rule 20 has two specific requirements which must be fulfilled: plaintiffs' claims must arise from the same transaction or occurrence or series of transactions and

---

also attached as Appendix 2, a side-by-side comparison of Plaintiffs' allegations with Riddell's website.  As explained in Riddell's accompanying request for judicial notice, the Court can and should take judicial notice of the undisputed fact that football helmets have changed considerably between 1950 and 2011.

[9] Player-plaintiffs also played for four European teams.

[10] These figures are based on the Plaintiffs' SFCs filed as of August 20, 2012.

[11] The Riddell Defendants asked Plaintiffs to include this as well as other essential information in their SFCs, but Plaintiffs refused.

be based upon a common issue of fact or law.")  "[J]oinder is only appropriate if both elements of Rule 20(a) are met."  *Cooper v. Fitzgerald*, 266 F.R.D. 86, 88 (E.D. Pa. 2010) (citation omitted).  Rule 20 "is designed to promote judicial economy and reduce inconvenience, delay, and added expense."  *Id.* (citations omitted).

Permissive joinder under Federal Rule of Civil Procedure 20 requires that claims arise out of the same transaction, occurrence, or series of transactions or occurrences.  Fed. R. Civ. P. 20(a)(1)(A).  The transaction or occurrence standard of Rule 20(a) requires that "the central facts of each plaintiff's claim arise on a somewhat individualized basis out of the same set of circumstances."  *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL 1014, 1995 WL 428683, at *1 (E.D. Pa. July 17, 1995) (*In re Bone Screw I*).  Merely alleging similar problems with defendants' products is not enough to support proper joinder.  *See, e.g.*, *id.*, at *6 ("joinder based on the belief that the same occurrence or transaction is satisfied by the fact that claimants have the same or similar device of a defendant manufacturer implanted in or about their spine, is . . . not a proper joinder").  Additionally, it is not enough "that defendants' conduct is common to all of plaintiffs' claims and that the legal issues of duty, breach of duty and proximate cause and resulting harm are common."  *In re Baycol Prods. Liab. Litig.*, MDL 1431, 2002 WL 32155269, at *2 (D. Minn. July 5, 2002); *see also, e.g.*, *Simmons*, 1996 WL 617492, at *1.  Moreover, multiple plaintiffs cannot pass Rule 20(a)(1)'s test for proper permissive joinder where, as here, each plaintiff's claim arises from different circumstances.  *See, e.g.*, *In re Diet Drugs Prods. Liab. Litig. (Phentermine/ Fenfluramine/Dexfenfluramine)*, No. 03-20229, 2004 WL 1211928, at *1 (E.D. Pa. June 2, 2004) (*In re Diet Drugs II*) (dismissing misjoined claims under Rule 21 where the only thing plaintiffs had in common was that they allegedly ingested the diet drug Pondimin and/or Redux).

To remedy misjoinder, the court can dismiss or drop the misjoined parties "on such terms as are just" or sever the claims of misjoined parties and proceed with the claims separately. Fed. R. Civ. P. 21; *see also DIRECTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006). Indeed, that is exactly what this Court has ordered on numerous occasions.[12]

For example, in *Simmons*, this Court severed plaintiffs' claims in four multi-plaintiff cases involving injuries allegedly from contraceptive implants after determining those claims did not meet Rule 20's same transaction or occurrence requirement. 1996 WL 617492, at *1 (Bartle, J.). This Court found that the alleged similarity of the defendants' conduct, without more, was not a sufficient basis for joinder. *Id.* at *3. By way of analogy, this Court explained that "the marketing of defective automobiles by an automobile manufacturer will not, absent class action status, support joinder in one action of all those harmed by the defect; only those involved in the same accident are properly joined." *Id.*

In *In re Diet Drugs II*, this Court likewise determined there was improper joinder where the only thing the plaintiffs had in common was their alleged ingestion of the same diet drugs and the injuries they allegedly sustained as a result. 2004 WL 1211928, at *1 (Bartle, J.); s*ee also In re Diet Drugs Prods. Liab. Litig.*, No. 98–20478, 1999 WL 554584, at *4 (E.D. Pa. July 16, 1999) (*In re Diet Drugs I*) (Bechtle, J.) (disagreeing with "Plaintiffs' assertions that their

---

[12] *See, e.g.*, *In re Asbestos Prods. Liab. Litig.*, MDL 875, Nos. 01-cv-00162, 08-cv-71147, 2009 WL 959539 (E.D. Pa. Apr. 6, 2009) (*In re Asbestos II*) (Robreno, J.) (severing plaintiffs and ordering that each individual plaintiff file a severed and amended complaint); *In re Diet Drugs II*, 2004 WL 1211928 (Bartle, J.) (severing and dismissing misjoined plaintiffs); *Simmons*, 1996 WL 617492 (severing plaintiffs and ordering that plaintiffs re-file complaints to comply with Rule 20); *Morrison v. Williams*, No. 98-2408, 1998 WL 372655 (E.D. Pa. May 14, 1998) (Bartle, J.) (severing and splitting claims of plaintiffs into separate actions and ordering that each plaintiff file one new amended complaint and that all but the first named plaintiff pay the appropriate filing fee); *Filak v. Consol. Rail Corp.*, No. 97-8022, 1997 WL 805167 (E.D. Pa. Dec. 31, 1997) (Bartle, J.) (same); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1996 WL 900346 (E.D. Pa. July 11, 1996) (*In re Bone Screw II*) (Bechtle, J.) (severing misjoined plaintiffs and ordering that each one file a new complaint in a proper venue).

respective purchases and ingestion of diet drugs . . . [constituted] a series of transaction or occurrences which satisf[ied] Rule 20(a)").  Similarly, in *In re Bone Screw II*, this Court ruled joinder improper as to plaintiffs whose only common circumstances were that they had "received in the same state a pedicle screw implant manufactured by the same manufacturer." 1996 WL 900346, at *2-3 (Bechtle, J.).  And in *Morrison v. Williams*, this Court severed claims alleging asbestos-removal injuries.  1998 WL 372655, at *1 (Bartle, J.).  The Court pointed out that although the four plaintiffs had all worked at the same removal site during the same year, "there [was] no indication that they worked there at the same time that year or in the same location on the site." *Id.*

       In addition, like this Court, courts in other jurisdictions have repeatedly concluded that plaintiffs with varied histories cannot meet Rule 20's same transaction or occurrence requirement simply because they were allegedly injured by defendants' same or similar product(s) or because they were allegedly affected by defendants' similar conduct.[13]  For example, in *Saval v. BL Ltd.*, the Fourth Circuit upheld a district court's severance of four plaintiffs' claims due to lack of commonality and factual differences.  710 F.2d 1027, 1031 (4th Cir. 1983).  The *Saval* plaintiffs argued that their claims against automobile-seller defendants were properly joined because "they purchased their automobiles and experienced similar problems, none of which could be fixed

---

[13] *See, e.g.*, *Saval v. BL Ltd.*, 710 F.2d at 1031 (ruling plaintiffs' claims that they experienced similar problems with their automobiles insufficient to support joinder); *McNaughton v. Merck & Co.*, No. 04-cv-8297, 2004 WL 5180726, at *2 (S.D.N.Y. Dec. 17, 2004) (rejecting argument that alleged failure to warn consumers and doctor of the potential harms of Vioxx supported Rule 20(a) joinder); *In re Baycol Prods. Liab. Litig.*, MDL No. 1431, Case No. 03-2931, 2003 WL 22341303 (D. Minn. 2003) (ordering severance because allegations that plaintiffs all ingested the same drug and were residents of the same state, without more, did not satisfy Rule 20(a)); *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 144 (S.D.N.Y. 2001) (finding misjoinder because plaintiffs, who ingested the same drug, had different exposures to the drug, different injuries, and different medical histories); *Boschert v. Pfizer, Inc.*, No. 4:08-cv-1714 CAS, 2009 WL 1383183 (E.D. Mo. May 14, 2009) (finding misjoinder of plaintiffs who took the same drug but at different times and for different durations).

satisfactorily." *Id.* at 1031.  However, the *Saval* court noted the plaintiffs' "cars were purchased at different times, were driven differently, and had different service histories." *Id.*  The court upheld severance of the four plaintiffs' claims due to concerns over lack of commonality, factual differences between their claims, and failure of joinder to promote the purposes of Rule 20.  *Id.*

Similarly, in *Boschert v. Pfizer, Inc.*, the Eastern District of Missouri rejected an attempt by multiple plaintiffs to join together in a single case based on allegations that all plaintiffs ingested the same anti-smoking drug, Chantix.  No. 4:08-cv-1714 CAS, 2009 WL 1383183 (E.D. Mo. May 14, 2009).  Four plaintiffs asserted product liability claims, including failure to warn, against Chantix's manufacturer, arguing their claims arose out of the same transaction or occurrence or series of transactions or occurrences "because they all ingested the drug Chantix, albeit for different times and for different durations, and they all developed, to varying degrees, the same type of mental or behavioral injury as a result of defendant's alleged misconduct." *Id.* at *2.  "In short, according to [the *Boschert*] plaintiffs, the common transaction or occurrence in this case is Chantix." *Id.*

The *Boschert* court explained that although Rule 20's "same transaction or occurrence" requirement "may be construed liberally, this does not mean joinder is proper in the absence of a transactional link." *Id.* at *3 (quoting *DIRECTV v. Loussaert*, 218 F.R.D. 639, 642 (S.D. Iowa 2003) (citing *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974)).  In ruling joinder improper, the court pointed out that the prescriptions were provided through different health care providers, and the drug was taken at different times for various durations. *Id.*  Additionally, while the *Boschert* plaintiffs all alleged behavioral and mental side-effects, their alleged symptoms were not the same and their medical histories differed. *Id.*  Finally, the court noted, "not insignificantly," the fact that the plaintiffs were all from different states. *Id.*  Thus,

the court concluded "the mere fact the four plaintiffs took Chantix at some point in time and suffered some sort of mental or behavioral side-effect is not enough of a logical or factual connection to satisfy the same transaction or occurrence requirement." *Id.*

In fact, transferor courts of multi-plaintiff actions pending in this Court have also ruled similarly, holding that similarly disparate claims cannot be properly joined. *See Adams v. I-Flow Corp.*, C.D. Cal., Western Div. No. 2:09-cv-09550-R-SS, ECF No. 81 (Order dated 3/30/2010) (ruling of the *Maxwell*, *Pear*, *Barnes*, *Monk*, *Henderson*, *Kuechenberg*, *Kapp*, *Bauman*, *Rademacher*, *Morton*, and *Cunningham* transferor court as to misjoinder of claims by 140-plus plaintiffs against medical device manufacturer); *McNaughton v. Merck & Co.*, No. 04-cv-8297, 2004 WL 5180726, at *2 (S.D.N.Y. Dec. 17, 2004) (misjoinder ruling of the *Andrews* transferor court as to claims of 65 plaintiffs who all ingested the same drug).

Plaintiffs' claims here arise from widely different facts, occurring in dozens of different states, while wearing different football helmets with varying shell designs, padding, face guards, warning labels and other basic specifications. Additionally, while the exact time periods covered in each of the various misjoined complaints differ, they all involve alleged injuries that took place at different times, sometimes spanning six decades. The mere fact that Plaintiffs allege they were all wearing, at least for a brief period, the same general brand of helmet—which is the only commonality they allegedly share with respect to the Riddell Defendants—is wholly insufficient to support joinder. Following the established principles and case law outlined above, the Court should properly sever these misjoined actions because, as demonstrated below, they fail to meet Rule 20's requirements for proper joinder.

II.   Plaintiffs' claims arise from vastly separate occurrences and widely disparate
      facts and, therefore, fail to support proper joinder under Rule 20(a).   To the
      contrary, they frustrate the very purpose of permissive joinder.

"The joinder rules are designed 'to promote trial convenience and expedite the final determination of disputes.'" *In re Diet Drugs I*, 1999 WL 554584, at *3 (citing *Saval*, 710 F.2d at 1031 (citing *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330 (8th Cir. 1974))).   "The requirement of Rule 20 that claims arise from the same circumstances promotes judicial economy and efficiency."  *Morrison*, 1998 WL 372655, at *1.   On the other hand, joinder of factually varied claims that involve "divergent questions of law and fact" frustrates the purpose of permissive joinder and is improper.  *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, MDL 2243, No. 11-3045, 2012 WL 1118780, at *4-5 (D.N.J. Apr. 3, 2012) (severing claims after finding that "the factual, temporal, and geographic diversity among Plaintiffs' claims wholly disregards the purposes of permissive joinder because these are claims that no reasonable person would normally expect to be tried together" and "given the complicated causation questions that pervade drug product liability claims, Plaintiffs' claims will require divergent questions of law and fact") (citations omitted).

Plaintiffs' claims will involve vastly different questions of fact and law, such that joinder of their claims will significantly "obstruct and delay the adjudication process."  *See In re Diet Drugs I*, 1999 WL 554584, at *3.  Accordingly, joinder is improper.

a.   Plaintiffs' claims are factually disparate, precluding proper joinder.

Plaintiffs' claims are all factually disparate, each involving an array of unique facts.  As a starting point, the Plaintiffs largely wore different helmets over this sixty-year period, thus requiring individualized determination of the specific helmet model(s) worn.  As the AMAC alleges, over the half-century-plus time span covered, Riddell manufactured many different

helmet models with different features and designs within model lines. (AMAC ¶ 386(a)-(m).)[14] These differences included varied shell designs including early two-piece shells, and shells with different sizes, shapes, weights, centers of gravity, materials and other differences. Over these decades, helmets incorporated significantly different energy-absorbing liner designs, including suspension webbing, multi-crown suspension webbing, foam padding, air cells, liquid cells, combination pads and others. Some helmet lines offered optional supplemental padding. The photographs attached at Appendix 2 depict but a few of the distinct designs, features, and technologies in only the models Plaintiffs reference in their AMAC.

Moreover, in spanning more than six decades, Plaintiffs' claims against the Riddell Defendants cover helmets designed prior to the existence of industry standards and under different versions of standards promulgated after the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") formed in 1969. Material and manufacturing techniques used in today's helmets did not exist in the 1950's, 1960's, 1970's, and 1980's. The technical and scientific knowledge used in developing today's helmets did not exist in the 1990's. Over this wide time period, there were also vast differences in Riddell's competitors and competitive helmet products available to the different generations of player-Plaintiffs.

Plaintiffs' misjoined claims against the Riddell Defendants will require further player-by-player, helmet-by-helmet individualized determinations about whether each player-Plaintiff appropriately used or misused any helmet he claims to be deficient. For example, NOCSAE

---

[14] *See supra* n.7. Neither the AMAC, nor the Riddell website, identify all of the different helmet models, the different helmet designs, or the multitude of different helmet configurations available over the more than 60-year time period covered by Plaintiffs' claims. Nevertheless, they illustrate some of the significant differences in the helmets available over this vast time period.

guidelines for football helmet inspections,[15] highlight many of the individualized issues implicated by Plaintiffs' claims against the Riddell Defendants, including but not limited to the changes in those guidelines and industry standards over the years.

Plaintiffs' improperly joined actions also overlook individualized issues concerning reconditioned helmets.[16]   Often, football helmets are used for multiple seasons with periodic reconditioning.   Individualized determinations will include whether any allegedly deficient helmet had been reconditioned, whether such reconditioning was done by a third-party, and whether it was done properly and within the overall useful lifespan of the helmet.

The inappropriateness of joining even two Plaintiffs' claims, let alone claims by as many as 73 players,[17] is further underscored by the high probability that players wore multiple helmets during their professional careers, not to mention likely many other helmets before joining the professional ranks.   In addition, Plaintiffs allege that they sustained injuries from repetitive concussive events while playing professional football; however, each player-Plaintiff will have a unique and distinct playing history, including different head-impact experiences, and possibly concussions, before ever playing professionally.

With respect to Plaintiffs' warning claims against the Riddell Defendants, individualized player-by-player issues will include identification of the multitude of warning labels, instruction manuals, and other literature accompanying sixty years of helmet models.   Player-by-player,

---

[15]   Publicly available NOCSAE guidelines may be found at http://www.nocsae.org/standards/documents.html.

[16]   For example, NOCSAE explains that the National Athletic Equipment Reconditioners' Association ("NAERA") became an NOCSAE member in 1976.   (*About NOCSAE*, NATIONAL OPERATING COMMITTEE ON STANDARDS FOR ATHLETIC EQUIPMENT, http://www.nocsae.org/about/history.html (last visited Aug. 29, 2012). NAERA's website also contains detailed information on helmet reconditioning.   Reconditioning/Recertification Process, NAERA, http://www.naera.net/process.html (last visited Aug. 29, 2012).

[17]   This figure comes from *Maxwell*, E.D. Pa. Case No. 2:12-cv-01023-AB.   *See infra* App. 1-B.

helmet-by-helmet determinations will need to be made on whether individual player-Plaintiffs received, read, and heeded the different materials provided with their particular helmets. Such individualized and plaintiff-specific inquiries and analyses often factor into product litigation concerning helmets. *See, e.g.*, *Am. Safety Equip. Corp. v. Winkler*, 640 P.2d 216 (Colo. 1982) (examining whether plaintiff justifiably relied on manufacturer defendants' alleged misrepresentations in choosing to use one police helmet over the other for personal use when he knew or should have known that one of the model helmets had a quick release and the other did not); *Lister v. Bill Kelley Athletic, Inc*., 485 N.E.2d 483 (Ill. App. Ct. 1982) (discussing how specific warnings given to plaintiff by his football coaches regarding how to keep his head down when tackling were material to defeating plaintiff's duty-to-warn argument). Obviously, the materials available to a player in the 1950's differ from those available to a player in the 1990's, and differed even more in comparison to the materials available to a player who played in the past ten years. Then, there are further individualized issues concerning the removal, addition, or alteration of on-helmet labels by the player-Plaintiffs themselves, third-party helmet reconditioners, team equipment managers, and others.

Each player-Plaintiff's claim also requires an individualized determination of the information known to that player about the risks of playing football, including the risk of brain injury. Plaintiffs' cite numerous publicly-available examples of what they claim contain information on concussive brain-injury risk, with alleged publication dates spanning a time period from the 1920's to 2006. (AMAC ¶¶ 109-143.) Moreover, each player's personal experience with concussions, interactions with physicians and trainers, acknowledgement of risks in the contracts and releases they signed, and other career experiences, will all impact the liability and causation analyses implicated by Plaintiffs' warning claims.

Plaintiffs' claims also require individualized player-by-player, incident-by-incident consideration of the circumstances of individual concussion events to determine basic facts such as whether a concussion even occurred, what led to the concussion, whether the concussion involved helmet contact, whether any feasible alternative design existed at that point in time and, if so, whether it would have prevented the concussion. *See, e.g.*, *Testerman v. Riddell, Inc*., 161 Fed. Appx. 286, 289, 2006 WL 41193 (4th Cir. 2006) (granting summary judgment in football equipment case because plaintiff failed to prove which blow caused the alleged injury, whether the area of impact was covered by the equipment, or whether any alternative equipment would have made a difference). Further incident-by-incident considerations would include whether helmet modifications or maintenance issues played a part, or whether the concussion resulted from the player's violation of rules of the game or non-compliance with warnings and instructions.

Plaintiffs' claims are also improperly joined with respect to the seven individually named Riddell Defendants. Plaintiffs take a scattershot approach of asserting all claims against all of the Riddell Defendants, regardless of whether all of those Defendants even existed during the years when the player-Plaintiffs played professionally. In fact, dozens of player-Plaintiffs who retired earliest assert claims against Riddell Defendants that did not even exist when they played, and did not exist until many years after the players retired,[18] rendering it impossible that those Defendants could have been involved in those Plaintiffs' alleged injuries. (*See, e.g.*, *Henderson* Pl. Richard Palmer SFC (ECF No. 1713) (naming, among others, Riddell Defendants Easton-Bell Sports, Inc. and Easton-Bell Sports, LLC, even though those entities did not even exist until 2003, thirty-one years after Palmer retired from the NFL in 1972).) For this reason alone,

---

[18] The Riddell Defendants' accompanying filing asks the Court to take judicial notice of the publicly available and reliable state records showing Defendants' dates of incorporation.

severance is essential so that each individual Plaintiff who might choose to refile an individual action can do so against only appropriate defendants allegedly involved in the design, manufacture, distribution, or sale of the specific helmet or helmets that the Plaintiff might contend caused the alleged injury.

Additionally, many of the player-Plaintiffs joined in multi-plaintiff actions had vastly different professional playing experiences.  Each player alleges a different playing career for a different team or teams (sometimes as many as seven different teams) over the course of his career, during different time periods.  (*Compare, e.g.*, *Morton* Pl. Benjamin Scotti SFC (ECF No. 3021) ¶ 15 (alleging play for the 49ers, Eagles, Rams, and Redskins from 1959 to 1964), *with Morton* Pl. Stockar McDougle SFC (ECF No. 3034) ¶ 15 (alleging play for the Dolphins, Jaguars, and Lions between 2000 and 2008); and *Simpson* Pl. Willie Jackson SFC (ECF No. 3051) ¶ 12 (alleging play for the Bengals, Broncos, Cowboys, Falcons, Jaguars, Redskins, and Saints between 1994 and 2004), *with Simpson* Pl. Gordon Bell SFC (ECF No. 3043) ¶ 12 (alleging play for the Cardinals and Giants between 1976 and 1979).)   The player-Plaintiffs also played a variety of different positions with different levels of exposure to possible head injury. Moreover, as Plaintiffs themselves allege, the rules of professional football changed significantly over time.  (AMAC ¶¶ 88, 92.)

Furthermore, each player-Plaintiff's medical history will also vary significantly, providing a unique factual background for each alleged injury.  Practices of various team physicians, trainers and other clinicians, and their specific diagnosis and course of treatment for each individual player-Plaintiff after each alleged head injury will also vary.  The unique circumstances of each individual player's medical history and treatment will also provide differences in causation analysis, further necessitating individualized—not joined—consideration

17

and litigation. *See, e.g.*, *Avila v. Citrus Cmty. Coll. Dist.*, 38 Cal. 4th 148, 167-68, 41 Cal. Rptr 3d 299, 314-15, 131 P.3d 383 (2006) (holding that the host school for a sporting event breached no duty owed to an injured sports competitor because the competitor was under the care and supervision of his own team's coaches and trainers who had "exclusive authority" to determine whether the competitor could play or required medical attention). Moreover, Plaintiffs' claims necessarily raise individualized issues concerning the care each player-Plaintiff received for each alleged concussion event. Each such event will involve identification of the diagnosis and treatment provided, who provided it, why Plaintiffs believe they were improperly treated and diagnosed, and what, if anything, this has to do with Plaintiffs' claims against the Riddell Defendants.

In addition, the fact that Plaintiffs complain of different injuries or symptoms only further militates against proper joinder.[19] *See, e.g.*, *In re Rezulin*, 168 F. Supp. 2d at 144 (finding misjoinder of plaintiffs who ingested the same drug but had different exposures to the drug, different injuries, and different medical histories); *Boschert*, 2009 WL 1383183 (granting severance for misjoinder based, in part, on the fact that, while the six plaintiffs all claimed to have suffered the same side-effects from the allegedly defective drug, "their alleged symptoms are not the same").

Indeed, as even this brief sampling of Plaintiffs' claims reveals, their claims are far too factually disparate to support proper joinder. Therefore, the Court should sever them.

---

[19] Plaintiffs refused to include information about their specific alleged injuries in their SFCs, despite repeated requests from Defendants. Nonetheless, the original complaints, while superseded by the AMAC, reveal the disparities in the players' alleged injuries.

18

b.      Legal disparities between Plaintiffs' claims also preclude proper joinder.

In addition to the wide range of factual disparities, given the nature of the claims and the unique circumstances of each player's career, each claim is also likely—if not certain—to involve different legal standards based on complex choice-of-law analyses and even possibly, given the change the same jurisdiction's laws over time, the time period in which the alleged cause of action arose or during which the Riddell Defendants' conduct must be evaluated. *See, e.g.*, *Boschert*, 2009 WL 1383183, at *4 (ruling severance necessary because plaintiffs' claims would necessarily "be based on each plaintiff's respective state's law," which would require "separate legal analyses").   Moreover, allowing misjoined Plaintiffs' actions to proceed raises complex and unnecessary choice-of-law complications, if not due process concerns.

For example, and for the sake of argument only, applying California's choice-of-law analysis for the *Maxwell* action filed there, it is clear California substantive law should not apply across the board to all those Plaintiffs' claims if "either the plaintiff or the defendant has been forced into a forum devoid of any such contact as would justify application of its own law." *Kasel v. Remington Arms Co*., 24 Cal. App. 3d 711, 731, 101 Cal. Rptr. 314, 327-28 (1972). Dozens and dozens of Plaintiffs have no cognizable connection to California and, thus, no basis for application of California law to their claims.   *Maxwell* Plaintiff Chris Calloway—one of the 73 Plaintiffs in that action—played for the Pittsburgh Steelers, New York Giants, Atlanta Falcons, and New England Patriots, and now resides in Georgia.  (Pl. Chris Calloway SFC (ECF No. 1078) ¶¶ 5, 15.)   He alleges no connection whatsoever between his claims and California. The same applies for other *Maxwell* Plaintiffs, including Broderick Jones, who lives in Alabama, played for the Cleveland Browns and Baltimore/Indianapolis Colts, and fails to allege any connection between his claims and California. (Pl. Broderick Jones SFC ¶¶ 5, 15 (ECF No.

1118).) Plaintiffs' misjoined actions are replete with dozens and dozens of other examples of Plaintiffs with no connection whatsoever between their claims and the state in which they sued or its law, requiring their claims to be adjudicated under different states' laws.

In addition, and keeping with the example of *Maxwell*, filed in California, Plaintiffs' claims are all for alleged personal injuries.  While there is no bright-line rule under California's "governmental interest" approach to choice-of-law analysis, "[w]here the real issue involved in a case is compensation of the injured person, California courts have tended to apply the law of the place of the injured person's domicile, finding that that state has the greatest interest in compensating its domiciliaries." *Kasel*, 24 Cal. App. 3d at 734, 101 Cal. Rptr. at 330.  On this basis alone, and assuming arguendo that California choice-of-law analysis should apply to California-filed actions, and that Plaintiffs' place of residence alone were dispositive of the choice-of-law analysis (which the Riddell Defendants do not concede), Plaintiffs' claims in that one case alone would implicate thirty-three (33) different jurisdictions' product-liability/personal-injury laws.  Also, as courts have recognized, the laws of negligence and products liability "all differ in some respects from state to state." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1188 (9th Cir. 2001) (quoting *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300-01 (7th Cir. 1995)); *cf. Powers v. Lycoming Engines, Inc.*, 272 F.R.D. 414, 423 (E.D. Pa. 2011) (quoting *Zinser*, 253 F.3d at 1187, in denying nationwide class action as unmanageable, in part, due to varying laws to be applied in light of the fact that "every state has an interest in having its law applied to its resident claimants . . .").

Further compounding the confusion caused by Plaintiffs' improper joinder of disparate actions is the fact that a proper conflict-of-law analysis requires comparison of the forum state's laws with each non-forum jurisdiction's laws as to each individual claim.  *Zinser*, 253 F.3d at

1188 (citing *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 103 Cal. Rptr. 2d 320, 15 P.3d 1071, 1081 (2001) ("These [choice-of-law] rules apply whether the dispute arises out of contract or tort . . . and a separate conflict of laws inquiry must be made with respect to each issue in the case.")); *see also Castano v. Am. Tobacco Co*., 84 F.3d 734, 743 n.15 (5th Cir. 1996) ("'[B]ecause we must apply an individualized choice of law analysis to each of plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially . . . .'") (quoting *Georgine v. Amchem Prods., Inc*., 83 F.3d 610, 626 (3d Cir. 1996)). Thus, a proper choice-of-law analysis on these various misjoined actions would have to be performed as to each of the player-Plaintiffs' separate claims against the Riddell Defendants, as well as to the dozens of spouses' loss-of-consortium claims.

Should the Court not dismiss these claims outright based on the Riddell Defendants' motion to dismiss based on preemption, then performing a proper choice-of-law analysis would be imperative, as determining the controlling law would impact many potentially dispositive legal issues on which various jurisdictions' laws vary significantly. For example, numerous jurisdictions apply statutes of repose to products-liability claims like Plaintiffs, presenting additional grounds for possible dismissal.[20] Similarly, in addition to potentially applicable repose periods, different states have different limitations periods covering personal injury, product liability claims, as well as differing positions on when those limitations periods begin to run and whether and under what circumstances they can be tolled.[21]

Substantive product-liability law also varies significantly from state to state, including on issues such as standards for imposing liability (e.g., strict liability versus negligence), the

---

[20] *See, e.g*., Tenn. Code Ann. § 29-28-103(a) (West 2011); N.C. Gen. Stat. § 1-46.1 (West 2012).
[21] *Compare, e.g.*, Fla. Stat. § 95.11(3)(a), (e) (2010) (setting a four-year statute of limitations for product liability claims), *with Kirkland v. General Motors Corp*., 521 P.2d 1353, 1361 (Okl. 1974) ("[T]he limitation period to be applied in products liability actions is two (2) years.")

necessary elements for proving product defect (e.g., certain jurisdictions, like Michigan, require pleading and proof of an alternative feasible design), standards for proving product defect (e.g., risk/utility versus consumer expectations), and the availability of certain defenses (e.g., assumption of the risk, misuse/alteration/modification, compliance with industry or government standards, etc.).[22]   Likewise, the tests for causation can vary significantly, with some jurisdictions focusing on applying varying tests couched as "proximate cause," "substantial factor," or "substantial contributing cause."[23]

Adding yet another layer of distinct legal issues, depending on the applicable jurisdictions' laws, Plaintiffs' damages claims may involve vastly different limitations on recovery, set-offs, and possibly workers' compensation bars.   For example, recoverability of damages varies significantly from state to state, with some jurisdictions imposing caps on certain

---

[22] *See Gawenda v. Werner Co*., 932 F. Supp. 183, 187 (E.D. Mich. 1996) (explaining that, under Michigan law, "a plaintiff must prove, under a risk-utility analysis, that an available, safer, alternative design should have been adopted"); *see also Zinser*, 253 F.3d at 1188.

[23]   *See, e.g*., *Wolfe v. Stork RMS-Protecon, Inc*., 683 N.E.2d 264, 268 (Ind. App. 1997) ("Proximate cause is an essential element of, and is determined in the same manner in, both negligent and product liability actions."); *Fritz v. White Consol. Indus., Inc*., 306 A.D.2d 896, 897, 762 N.Y.S.2d 711, 714 (N.Y. App. Div. 2003) (explaining that a product liability plaintiff has the burden of showing that a defect was a "substantial factor" in causing injury); *Graven v. Vail Assocs., Inc*., 909 P.2d 514, 520 (Colo. 1996) ("To establish causation, the plaintiff must prove that the defendant's conduct was a substantial contributing cause of the injury."). In addition, different jurisdictions have different laws governing joint-and-several liability versus apportionment of fault, not to mention potential defenses such as contributory negligence. *Compare* Fla. Stat. § 768.81(3) ("In a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability."), *with Holcim (US), Inc. v. Ohio Cas. Ins. Co*., 38 So. 3d 722, 728-29 (Ala. 2009) (explaining that joint and several liability applies in Alabama, and, therefore, a tort-feasor whose negligent act or acts proximately contribute in causing an injury may be held liable for the entire resulting loss.); *also compare Smith v. Fiber Controls Corp*., 300 N.C. 669, 672 (1980) (contributory negligence will completely bar a plaintiff's recovery in a products liability action founded on negligence), *with* Wash. Rev. Code § 4.22.005 (providing that any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable to the claimant's contributory fault, but does not bar his recovery).

types of compensatory damages, punitive damages, or both.[24]  Moreover, many states' laws differ significantly in terms of the standards for proving entitlement to punitive damages in the first place.[25]

In fact, the drug, medical device, and asbestos cases cited above, while nonetheless misjoined, all involved far more similarity among the plaintiffs than exists here.  Unlike in those other cases, Plaintiffs' claims here involve dozens of different helmet designs and configurations, each with a multitude of possible modifications and differing accessories, a six-decade time period, varying and distinct usage histories and warnings that evolved over time, a dizzying array of different jurisdictions' laws and even variations of those laws within certain jurisdictions based on timing—to mention only a few of the numerous factual and legal disparaties between Plaintiffs' claims.  Thus, if anything, Plaintiffs' misjoinder here is even more glaring than in those other cases and even more deserving of severance.

III.     <u>Joinder of Plaintiffs' claims would not promote the purpose of Rule 20, but rather would only cause delay, jury confusion, judicial inefficiency, and prejudice.</u>

Even where the requirements of Rule 20(a) are met, the court may, pursuant to Rule 20(b), sever to prevent jury confusion and judicial inefficiency, and to prevent unfair prejudice. *See, e.g.*, *Coleman v. Quaker Oats Co*., 232 F.3d 1271 (9th Cir. 2000); *In re Asbestos Prods. Liab. Litig*., MDL 875, Nos. 95-cv-01099, 08-cv-89125, 2008 WL 4455838, at *1 (E.D. Pa. Oct. 1, 2008) (*In re Asbestos I*)  (severing claims of plaintiffs based in part on fact that plaintiffs'

---

[24] *See, e.g.*, Md. Code Ann., Cts. & Jud. Proc. § 11-108 (West 2012) (establishing a cap on all non-economic damages covering "personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury"); Va. Code Ann. § 8.01-38.1 (imposing a cap of $350,000 on punitive damages per action).

[25] *Compare* O.C.G.A. § 51-12-5.1 (requiring plaintiffs to prove entitlement to punitive damages "by clear and convincing evidence"), *with*, *Gallegos v. Citizens Ins. Agency*, 779 P.2d 99 (N.M. 1989) (requiring entitlement to punitive damages to be proven only by a preponderance of the evidence).

claims may have involved "different witnesses, different evidence, different legal theories and different defenses, which could lead to confusion of the jury if they were tried together".); Fed. R. Civ. P. 20 (b).

In *Coleman*, the Ninth Circuit upheld the district court's severance of plaintiffs' claims under Rule 20(b), even though plaintiffs' claims had been properly joined under Rule 20(a).  232 F.3d at 1296-97.  The ten plaintiffs there originally all jointly sued Quaker alleging age discrimination in connection with "reductions-in-force" that occurred between 1994 and 1995. 232 F.3d at 1277.  The District Court for the District of Arizona found that the plaintiffs satisfied the two prongs of FRCP 20(a) for proper permissive joinder, but the court also considered whether the claims should nonetheless be severed pursuant to FRCP 20(b) "and concluded that severance was appropriate."  232 F.3d at 1296.  Therefore, the district court "ordered the cases sent to the districts in which the plaintiffs had worked for Quaker," and allowed the three plaintiffs who worked in Arizona to proceed with that case there.  *Id*. at 1280.

The remaining three plaintiffs appealed, arguing that the district court had erred in severing their claims from the other original plaintiffs.  *Id*. at 1296.  The Ninth Circuit disagreed and affirmed.  *Id*. at 1297.  Specifically, the Ninth Circuit noted the district court's finding of prejudice to the defendants "by having all ten plaintiffs testify in one trial."  *Id*. at 1296; *id*. at 1297 ("The district court properly considered the potential prejudice to Quaker created by the parade of terminated employees and the possibility of factual and legal confusion on the part of the jury.").  The Ninth Circuit also noted the findings of likely jury confusion by requiring the jury "to examine individually [each plaintiff's] employment history as well as the explanations given by Quaker for not retaining him or her, explanations that would require testimony of each employee's supervisors and raters."  *Id*. at 1296.  The Ninth Circuit further noted the district

24

court's finding that "[l]egal confusion was also likely because the plaintiffs had worked for Quaker in six different states, and the jury would have had to evaluate their state law claims in light of the different laws of each state." *Id*.

On these findings, the Ninth Circuit found, the district court properly concluded that "the likelihood of prejudice and confusion outweighed the gains from judicial economy and any potential prejudice to the plaintiffs who would try their cases in the states in which they lived and worked." *Id*. Also, "[g]iven the broad discretion with which the district court is vested to make a decision granting severance and the fact that the district court carefully weighed the arguments in favor of and against joinder," the Ninth Circuit affirmed. *Id*. at 1297.

This Court should reach the same result as in *Coleman*. Even assuming the Court were to find proper joinder of some or all of Plaintiffs' claims in multi-plaintiff actions against the Riddell Defendants, it should nonetheless sever those claims and those actions. As in *Coleman*, the Riddell Defendants would be prejudiced by allowing these claims to proceed together, but that prejudice would be multiplied many-fold by having to deal with many more—sometimes dozens more—than ten Plaintiffs. And even more so than in *Coleman*, which involved actions occurring over only a two-year period, 232 F.3d at 1277-79, Plaintiffs' claims here span a period of roughly sixty years. Likewise, while the *Coleman* district court found likely jury confusion and prejudice based on the involvement of only six different states' laws, here, that concern is again magnified many times over, given the potential applicability of dozens of different jurisdictions' laws to these wildly disparate claims.

IV.   <u>Nothing about the nature of these MDL proceedings alleviates the need for severance.</u>

     a.   <u>MDL consolidation does not cure or alleviate Plaintiffs' misjoinder or minimize the need for severance.</u>

MDL consolidation does not insulate Plaintiffs' claims from misjoinder scrutiny.  To the contrary, as shown by numerous examples, MDL courts—including this one—frequently sever misjoined claims like Plaintiffs'.  *E.g.*, *In re Asbestos I*, 2008 WL 4455838, at *1 (Giles, J.) (severing claims of 146 plaintiffs' brought as one civil action).

In *In re Asbestos I*, this Court examined joinder of dozens of individual plaintiffs' claims into singular actions that had been consolidated and transferred to this Court as part of the federal multi-district asbestos litigation. *Generally* 2008 WL 4455838.  In finding misjoinder and ordering severance, this Court noted as one reason that separate trials would be necessary for the just, speedy, and efficient processing of the matter since, there, the plaintiffs' "lawsuits may involve different facts, different witnesses, different evidence, different legal theories, and different defenses, which could lead to confusion of the jury if they were all tried together." *Id*. In addition, and even more relevant in terms of coordinated and consolidated MDL pre-trial proceedings, the Court remarked that "it is obvious that permitting such multi-plaintiff actions with unrelated claims to proceed without severance would complicate discovery and interfere with its completion in accordance with assigned deadlines." *Id*.

Courts in other jurisdictions have reached the same result as this one, finding severance of consolidated multi-plaintiff actions appropriate to prevent delay, jury confusion, judicial inefficiency, and prejudice. *See, e.g.*, *Boschert*, 2009 WL 1383183, at *4 (granting severance in part because "four sets of jury instructions would be required to encompass the laws from four different states."); *In re Welding Rod Prods. Liab. Litig.*, MDL 1535, No. 1:03-cv-17000 (N.D.

Ohio Nov. 20, 2003) (severing claims of plaintiffs joined in multi-plaintiff actions that had been consolidated and transferred to the MDL court).

Moreover, MDL courts have also often rejected suggestions that factually and legally disparate claims, like Plaintiffs', should be joined rather than severed, even in MDL proceedings. *See, e.g.*, *In re Seroquel Prods. Liab. Litig.*, MDL 1769, Dkt. Nos. 109 & 129 (M.D. Fla. Dec. 22, 2006 & January 26, 2007) (adopting recommendation to sever the claims of thousands of plaintiffs joined in  106 different cases and rejecting plaintiffs' argument that the claims should be bundled to ease the multi-district aspect of the cases); *In re Baycol*, 2002 WL 32155269 (denying plaintiffs' motion to consolidate claims of 50 plaintiffs into a single action after rejecting plaintiffs' argument that joinder was appropriate to facilitate plaintiff participation in the MDL, save filing fees, and make it easier for plaintiffs' counsel to administer).  Additionally, as this Court has explained, "[t]o simply group plaintiffs . . . primarily for filing convenience, would not satisfy the terms required in Rule 20 nor the purpose for which Rule 20 seeks to ease the burden of litigation in groups of similarly situated persons."  *In re Bone Screw I*, 1995 WL 428683, at *2 (Bechtle, J.). This Court should follow its own experience and precedent, as well as that of numerous other MDL courts, in ordering severance of misjoined, consolidated MDL actions like these.

In addition, not only is severance required, but it is appropriate and necessary for this Court to order it at this time, instead of waiting or deferring to the transferor courts[26] (in the event of remand and if they are not earlier dismissed). *E.g.*, *Simmons*, 1996 WL 617492, at *4 (recognizing problems with waiting until before trial to sever claims) ("Clearly to have let this litigation proceed so far apace without remedying this [misjoinder] situation earlier was a

---

[26] As explained earlier, rulings from transferor courts indicate that those courts would reach the same conclusion on misjoinder and severance.  *Supra* p. 11 (citing *Adams* & *McNaughton*).

mistake.") (citing *Am. Fid. Fire Ins. Co. v. Construcciones Werl, Inc*., 407 F. Supp. 164, 189-90 (D.V.I. 1975).  As this Court has previously stated, "multi-plaintiff actions with unrelated claims impede the efficient administration of [the] MDL [and] . . . complicate discovery and interfere with its completion in accordance with assigned deadlines."  *In re Diet Drugs II*, 2004 WL 1211928, at *1 (Bartle, J.); *see also In re Asbestos I*, 2008 WL 4455838, at *1 (Giles, J.).  That is exactly the case here.  And that is exactly why, for any misjoined claims not otherwise dismissed on preemption grounds, the Court should sever those misjoined claims and require Plaintiffs to refile amended complaints providing the necessary and specific information about their claims in each amended complaint, so that the parties may more appropriately tailor discovery requests, conduct more relevant and efficient depositions, and otherwise streamline and optimize the pre-trial and discovery efficiency this MDL was created to deliver.

In short, severing Plaintiffs' misjoined claims will allow for the just, speedy, and efficient processing of these claims in this MDL.  Therefore, consistent with its past practice, this Court should order "each plaintiff to file a Severed and Amended Complaint that provides the necessary information about his . . . claims" against the Riddell Defendants.  *In re Diet Drugs II*, 2004 WL 1211928, at *1 (Bartle, J.).

  b.    Neither the AMAC nor the SFCs remedies Plaintiffs' misjoinder.

Plaintiffs' AMAC and SFCs do not alleviate any of the problems created by their misjoinder.  If anything, they only compound the problems, for numerous reasons.

The procedure of Plaintiffs pleading all of their claims together in one AMAC has wholly deprived the Riddell Defendants of proper notice of relevant, individualized facts purportedly supporting the individual players' claims against them.  For example, instead of providing facts relevant to a certain player and his career with respect to the Riddell Defendants, Plaintiffs have

pled their claims by incorporating wholesale most of the paragraphs in the AMAC (¶¶ 1-245), even though the vast majority of the paragraphs do not even mention the Riddell Defendants. (*See, e.g.*, AMAC ¶¶ 54-66 (discussing NFL Films).)

In addition, among those allegations are purported facts spanning decades with no explanation for whether they are intended to apply to any particular Plaintiff or how they could apply to particular Plaintiffs.  For instance, there is no explanation how the activities that allegedly took place in the 1960s and 1970s have anything to do with the reams of players who were not even born by that time.  This procedure of joining the claims of hundreds of player-Plaintiffs with wildly disparate backgrounds, for whom many alleged facts would have no arguable relevance whatsoever, creates a situation where the individual actions and the facts allegedly supporting them are confused and confusing, at best, and prejudicial and infringing on the Riddell Defendants due process rights to proper notice, at worst.

Additionally, Plaintiffs' generic and indiscriminate AMAC and SFCs do not properly plead viable causes of actions under certain states' laws.  For example, their failure-to-warn claims alleges the Riddell Defendants "knew or should have known" of certain alleged facts. (AMAC ¶¶ 407, 412.)  That is not even the proper standard in some jurisdictions, such as Virginia, which applies a "knew *or had reason to know*" standard and has specifically differentiated between the two standards and held them to be substantively distinct, such that a showing of "should have known" would not suffice to establish liability.  *Owens-Corning Fiberglass Corp. v. Watson*, 243 Va. 135-36 (1992).  Yet, through the improper process of Plaintiffs' misjoined claims and SFCs, this substantive point that Plaintiffs have failed to plead an appropriate claim under an appropriate jurisdiction's law is muddled, to say the least.

There are multiple other examples of the AMAC/SFC process compounding the problem of Plaintiffs' mass misjoinder, such as claims for strict liability being indiscriminately pled across an array of Plaintiffs spanning back to 1950, even before the first jurisdiction—California—ever recognized that legal doctrine for products liability actions in 1963. *See Chavez v. So. Pac. Transp. Co.*, 413 F. Supp. 1203, 1208-09 (D.C. Cal. 1976) (discussing the fact that California, in *Greenman v. Yuba Power Prods.*, 59 Cal. 2d. 57 (1963), was the first state to find that manufacturers could be strictly liable for injuries caused by their products). Other jurisdictions did not follow suit until many years later, and still more have never recognized strict liability at all. *See, e.g.*, *Wolford v. Budd Co.*, 149 F.R.D. 127, 131 (W.D. Va. 1993) ("Virginia . . . does not permit tort recovery on a strict-liability theory in products-liability cases."). Nonetheless, by Plaintiffs' check-the-box SFCs, the Riddell Defendants must contend with numerous claims in these MDL pre-trial proceedings for which there is no proper legal basis.

The AMAC and SFCs do not solve the problems Plaintiffs' improper misjoinder causes—they only compound those problems. Thus, they are no substitute for severance.

<u>CONCLUSION</u>

Plaintiffs' misjoinder not only violates the rules, it also prejudices the Riddell Defendants and promises only to confuse and complicate these proceedings and to frustrate and defeat the very efficiencies which this MDL was created to achieve. For all of these reasons, as it has done repeatedly in the past and in MDL proceedings like this one, the Court should grant this motion and order that Plaintiffs' misjoined claims against the Riddell Defendants be severed and dropped, as appropriate, with an instruction that those Plaintiffs who wish to continue to pursue claims against the Riddell Defendants must each file separate, individual actions. *E.g.*, *Morrison*, 1998 WL 372655, at *1 (Bartle, J.) (ordering, after severance, that each plaintiff file a new amended complaint and that all but the first named plaintiff pay the appropriate filing fee).

Respectfully Submitted,


/s/ Paul G. Cereghini
Paul G. Cereghini
Thomas C. Howard
BOWMAN AND BROOKE LLP
2901 N. Central Avenue
Suite 1600
Phoenix, AZ  85012
Telephone:  (602) 643-2300
Fax:  (602)248-0947
paul.cereghini@bowmanandbrooke.com
thomas.howard@bowmanandbrooke.com


Robert L. Wise
Eden M. Darrell
BOWMAN AND BROOKE LLP
1111 E. Main Street, Suite 2100
Richmond, VA 23219
Telephone:  (804) 649-8200
Fax:  (804) 649-1762
rob.wise@bowmanandbrooke.com
eden.darrell@bowmanandbrooke.com


Thomas P. Wagner
Mary C. Doherty
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
2000 Market St.
Suite 2300
Philadelphia, PA 19103
tpwagner@mdwcg.com
mcdoherty@mdwcg.com


Attorneys for Defendants RIDDELL, INC.;
ALL AMERICAN SPORTS CORPORATION;
RIDDELL SPORTS GROUP, INC.;
EASTON-BELL SPORTS, INC.; EASTON-
BELL SPORTS, LLC, EB SPORTS CORP.;
and RBG HOLDINGS CORP.

31