#02329    TAD\RAT\WTG\hdd    10/1/2012                                        2011N-0155

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| ------------------------------------------------------- | **SHORT FORM COMPLAINT** |
| **THIS DOCUMENT RELATES TO:** | **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** |
| **Plaintiff's Master Administrative Long-Form Complaint and** <u>**TREGG DUERSON, Estate of DAVID DUERSON**</u> **v. National Football League [et. al.], No.** <u>**ILN/1:12-cv-02513**</u> | **JURY TRIAL DEMANDED** |

## <u>SHORT FORM COMPLAINT</u>

1.  Plaintiff, TREGG DUERSON, Personal Representative of the Estate of DAVID DUERSON, brings this civil action as a related action in the matter entitled IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, MDL No. 2323.

2.  Plaintiff is filing this short form complaint as required by this Court's Case Management Order No. 2, filed April 26, 2012.

3.  Plaintiff incorporates by reference the allegations (as designated below) of the Master Administrative Long-Form Complaint, as may be amended, as if fully set forth at length in his Short Form Complaint.

4.  Plaintiff is filing this case in a representative capacity as the Personal Representative of the Estate of David Duerson, having been duly appointed as the Executor by the Probate Court of Dade County, Florida.  Copies of the Letters of Administration for a

wrongful death claim are annexed hereto.

5.      Plaintiff, TREGG DUERSON, is a resident and citizen of Cook County, Illinois and claims damages as set forth below.

6.      Not Applicable.

7.      On information and belief, the Plaintiff's decedent sustained repetitive, traumatic sub-concussive and/or concussive head impacts during NFL games and/or practices during an era in which the NFL operated without Collective Bargaining Agreements.  On information and belief, Plaintiff's decedent suffered from symptoms of brain injury caused by the repetitive, traumatic sub-concussive and/or concussive head impacts the Plaintiff's decedent sustained during NFL games and/or practices during an era in which the NFL operated without Collective Bargaining Agreements.  On information and belief, the Plaintiff's decedent's symptoms arise from injuries that were latent and developed over time.

8.      The original complaint by Plaintiff in this matter was filed in Cook County, Illinois and is attached hereto and incorporated hereto.  If the case is remanded, it should be remanded to Cook County, Illinois.

9.      Plaintiff claims damages as a result of:

☐ Injury to Herself/Himself

☐ Injury to the Person Represented

√ Wrongful death

☐ Survivorship Action

☐ Economic Loss

☐ Loss of Services

2

☐ Loss of Consortium

10.     Not Applicable.

11.     Plaintiff reserves the right to object to federal jurisdiction.

## **DEFENDANTS**

12.     Plaintiff brings this case against the following Defendants in this action:

√ National Football League

☐ NFL Properties, LLC

√ Riddell, Inc.

☐ All American Sports, Inc. (d/b/a Riddell Sports Group, Inc.)

√ Riddell Sports Group, Inc.

☐ Easton-Bell Sports, Inc.

☐ Easton-Bell Sports, LLC

☐ EB Sports Corporation

☐ RBG Holdings Corporation

13.     As to each of the Riddell Defendants references above, the claims asserted are: design defect and information defect.

14.     The Plaintiff's decedent wore one or more of the helmets designed and/or manufactured by the Riddell Defendants during one or more years Plaintiff's decedent played in the NFL.

15.     Plaintiff's decedent played in the National Football League ("NFL") during 1983-1993 for the following teams: Chicago Bears NFL franchise, New York Giants NFL franchise, and Arizona Cardinals NFL franchise.

## CAUSES OF ACTION

16.     Plaintiff adopts by reference the following Counts of the Master Administrative

Long-Form Complaint, along with the factual allegations incorporated by reference in those

Counts:

☐ Count I (Action for Declaratory Relief–Liability (Against the NFL))

☐ Count II (Medical Monitoring (Against the NFL))

√ Count III (Wrongful Death (Against the NFL))

√ Count IV (Fraudulent Concealment (Against NFL))

√ Count V (Fraud (Against NFL))

√ Count VI (Negligent Misrepresentation (Against NFL))

☐ Count VII (Negligence Pre-1968 (Against NFL))

√ Count VIII (Negligence Post-1968 (Against NFL))

√ Count IX (Negligence 1987-1993 (Against NFL))

√ Count X (Negligence Post-1994 (Against NFL))

☐ Count XI (Loss of Consortium (Against NFL and Riddell Defendants))

√ Count XII (Negligent Hiring (Against NFL))

√ Count XIII (Negligent Retention (Against NFL))

√ Count XIV (Strict Liability for Design Defect (Against the Riddell Defendants))

☐ Count XV (Strict Liability for Manufacturing Defect (Against the Riddell

Defendants))

√ Count XVI (Failure to Warn (Against the Riddell Defendants))

√ Count XVII (Negligence (Against the Riddell Defendants))

√ Count XVIII (Civil Conspiracy/Fraudulent Concealment (Against All the NFL Defendants))

17.    Plaintiff asserts the following additional causes of action attached hereto.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. An award of compensatory damages, the amount of which will be determined at trial;

B. For all applicable statutory damages of the state whose laws will govern this action;

C. For an award of attorneys' fees and costs;

D. An award of prejudgment interest and costs of suit; and

E. An award of such other and further relief as the Court deems just and proper.

## JURY DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury.

Dated:

RESPECTFULLY SUBMITTED:

William T. Gibbs

Thomas A. Demetrio
René A. Torrado, Jr.
William T. Gibbs
Corboy & Demetrio, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No.02329

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

IN RE: ESTATE OF      PROBATE DIVISION

   DAVID DUERSON a/k/a      File No.:
   DAVID R. DUERSON      11-3435 (P) 3
       Decedent.      Division:

STATE OF FLORIDA
COUNTY OF DADE
  I, THE UNDERSIGNED, Deputy Clerk, Circuit Court, Dade
County, Florida, DO HEREBY CERTIFY the within and foregoing
is a true and correct copy of the original as it appears on
record and file in this office of the Circuit Court, Dade County,
Florida, and that same is in full force and effect.
  WITNESS my hand and Seal of the Circuit Court at Miami,
Florida, this  SEP 13 2011  day of
A.D. 20
  HARVEY RUVIN, Clerk, Circuit Court
By            
    Deputy Clerk Circuit Court

## LETTERS OF ADMINISTRATION
### (single personal representative)

TO ALL WHOM IT MAY CONCERN

WHEREAS, David Duerson, a resident of Miami-Dade County, Florida, died on February

17, 2011, owning assets in the State of Florida, and

WHEREAS, Tregg Duerson, has been appointed personal representative of the estate of the

decedent and has performed all acts prerequisite to issuance of Letters of Administration in the

estate,

NOW, THEREFORE, I, the undersigned circuit judge, declare Tregg Duerson duly qualified

under the laws of the State of Florida to act as personal representative of the estate of David

Duerson, deceased, with full power to administer the estate according to law; to ask, demand, sue

for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the

assets of the estate will permit and the law directs; and to make distribution of the estate according

to law.

ORDERED on _Sept 13_, 2011.

                             Hon. _____
                                    Circuit Judge
                                    **Judge Maria M. Korvick**

THIS ESTATE MUST BE
CLOSED WITHIN 24 MONTHS.

THESE LETTERS DO NOT AUTHORIZE
THE SALE, ENCUMBRANCE OR
BORROWING OF ANY ASSETS WITHOUT
SPECIAL ORDER OF THE COURT

FILE RECEIPT OF ASSETS BY
RESTRICTED DEPOSITORY(IES)
WITHIN 30 DAYS OF ISSUANCE
OF LETTERS.

Copies furnished to:
Sacher, Martini & Sacher, P.A.
Charles S. Sacher, Esq.
W:\5546\wp\Letters of Adm (intestate).wpd

INVENTORY SHALL BE
FILED WITHIN 60 DAYS

THE PERSONAL REPRESENTATIVE SHALL PLACE
ALL LIQUID ASSETS IN A DEPOSITORY DESIGNATED
BY THE COURT PURSUANT TO THE F.S. 69.031
THIS IS A FROZEN ACCOUNT WHICH
MEANS THAT NO FUNDS CAN BE
WITHDRAWN WITHOUT ORDER
OF THE COURT

THESE LETTERS DO NOT AUTHORIZE
ENTRY INTO ANY SAFE DEPOSIT BOX
WITHOUT FURTHER ORDER OF COURT

2011 SEP 13 AM 11: 18
FILED FOR RECORD
CLERK OF CIRCUIT & COUNTY CTS
DADE COUNTY, FLORIDA


EXHIBIT
A

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

IN RE:  ESTATE OF

DAVID DUERSON a/k/a
DAVID R. DUERSON
     Decedent.

PROBATE DIVISION

File No.:     11-3435 CP 03

Division:

_____/

### ORDER TO OPEN THE ESTATE ON AN EMERGENCY BASIS

On the Petition of Tregg Duerson for an Order to Open the Estate On An Emergency Basis,

the Court, having reviewed the Petition and finding that the allegations contained therein are true,

it is

ORDERED and ADJUDGED that counsel for Tregg Duerson is authorized to open the estate

on an emergency basis during ex-parte hours.

DONE and SO ORDERED in Chambers this _____ day of _____, 2011.

_____
Circuit Court Judge

Conformed Copy
Conformed Copy
SEP 13 2011
Circuit Court Judge
Maria M. Korvick
Circuit Court Judge

Copy Furnished To:
Sacher, Martini & Sacher, P.A.

W:\5546\wp\Order to Open the Estate On An Emergency Basis.wpd

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

IN RE: ESTATE OF                          PROBATE DIVISION

  DAVID DUERSON a/k/a                      File No.: 11-8485 ᴼᴼ Λ 3
DAVID R. DUERSON
        Decedent.                          Division:

## ORDER DESIGNATING DEPOSITORY FOR CASH ASSETS

On the Petition of Tregg Duerson, the Personal Representative of the Estate of David

Duerson, for authorization to deposit cash assets belonging to the Estate with Gibraltar Private Bank

& Trust as a depository as provided by §69.031, Florida Statutes, it is

ADJUDGED:

1.      Gibraltar Private Bank & Trust is designated as the depository for said cash assets,

and is hereby authorized and directed to receive and hold as depository, pursuant to the provisions

of §69.031, Florida Statutes, cash assets of the Estate to be held by said depository in safekeeping

subject to such instructions by the Personal Representative of the Estate as authorized by Orders of

this Court directed to the depository, and to permit withdrawal thereof only upon order of this Court.

2.      A copy of this Order shall be delivered to the depository and the depository shall file

with this Court, if it has not already done so, its Acceptance or rejection within fifteen (15) days of

receipt of a copy of this Order.

3.      Any person or corporation having possession or control of any such cash assets of the

Estate or owning interest dividends, principal or other indebtedness on account thereof, shall upon

the demand of the depository designated herein or the Personal Representative's attorney, pay and

deliver such assets, interest, dividends, principal or other indebtedness to the depository and the

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

*Estate of David Duerson*
*Order Designating Depository for Cash Assets*
*Page 2*

receipt by the designated depository shall relieve the person or corporation from all further

responsibility therefore.

4.     Upon receipt of cash assets of the Estate, the depository shall file with this Court its

receipt therefore.

DONE and SO ORDERED in Chambers this ___ day of _____, 2011.

Hon. _____
                    Circuit Judge

Judge Maria M. Korvick

Copy Furnished To:
Sacher, Martini & Sacher, P.A.
Charles S. Sacher, Esq.
Gibraltar Private Bank & Trust

W:\5546\wp\Ord Desig Depository.wpd

STATE OF FLORIDA, COUNTY OF MIAMI-DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the
original on file in this office. SEP 13 2011 AD 20_____
HARVEY RUVIN, CLERK of Circuit and County Courts
               Deputy Clerk_____
                              ROBIN LEVROS

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

IN RE: ESTATE OF

  DAVID DUERSON a/k/a
DAVID R. DUERSON
      Decedent.

_____/

PROBATE DIVISION

File No.:  **11-3435** CP 0 3

Division:

## ORDER APPOINTING PERSONAL REPRESENTATIVE
(intestate -- single)

On the Petition of TREGG DUERSON for administration of the Estate of David Duerson,

deceased, the Court finding that the Decedent died on February 17, 2011, and that TREGG

DUERSON is entitled to appointment as Personal Representative as a result of his selection in

accordance with the provisions of Florida Statute 733.301(1)(b), and is otherwise qualified to act,

it is

ADJUDGED That TREGG DUERSON is appointed Personal Representative of the estate

of the Decedent, and that upon taking the prescribed oath, filing designation of resident agent and

acceptance, and entering into bond in the sum of _____, Letters of Administration shall

be issued.

ORDERED on _____, 2011.

                                           Conformed Copy

                                           SEP 1 3 2011

                                           Maria M. Korvick
                                         Circuit Court Judge

                          Hon. _____
                                      Circuit Judge

Copies furnished to:
Sacher, Martini & Sacher, P.A.
Charles S. Sacher, Esq.

                                5546   P

W:\5546\wp\Order Appointing Pers. Rep. (intestate, PR selected majority of interest) 2011.wpd

**THIS ESTATE MUST BE
CLOSED WITHIN 24 MONTHS.**

THE PERSONAL REPRESENTATIVE SHALL PLACE
ALL LIQUID ASSETS IN A DEPOSITORY DESIGNATED
BY THE COURT PURSUANT TO THE F.S. 69.031
THIS IS A FROZEN ACCOUNT WHICH
MEANS THAT NO FUNDS CAN BE
WITHDRAWN WITHOUT ORDER
OF THE COURT

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

TREGG DUERSON, Personal Representative
of the Estate of DAVID R. DUERSON,
Deceased,

        Plaintiff,

        v.

NATIONAL FOOTBALL LEAGUE, INC., a
corporation ("NFL"); and RIDDELL, INC., a
corporation, f/k/a EN&T ASSOCIATES, INC.,
and RIDDELL SPORTS GROUP, INC., a
corporation, (collectively "RIDDELL"),

        Defendants.

No.

**PLAINTIFF DEMANDS TRIAL BY JURY**



2012L002043
CALENDAR/ROOM X
TIME 00:00
PI Other

### COMPLAINT AT LAW

    Plaintiff, TREGG DUERSON, Personal Representative of the Estate of DAVID R.

DUERSON ("DAVE DUERSON"), Deceased, by and through his attorneys, CORBOY &

DEMETRIO, complaining of defendants, NFL and RIDDELL, states as follows:

### COUNT I:
### NFL's Negligence During Duerson's
### NFL Playing Career Caused Brain Damage and Death

    1.    On February 17, 2011, DAVE DUERSON, age 50, died as a result of a self-

inflicted gunshot wound to the chest.

    2.    Immediately prior to his death, DAVE DUERSON expressed his desire that his

brain be studied post-mortem, as he believed that "there's something going on" in his brain.

    3.    Neuro-pathological review of DAVE DUERSON's brain at Boston University

School of Medicine determined that DAVE DUERSON was, indeed, suffering from progressive,

advanced brain damage, commonly referred to as Chronic Traumatic Encephalopathy ("CTE").



EXHIBIT
B

4.      From 2001 to 2011, CTE caused progressive deterioration in DAVE DUERSON's brain, specifically, in the frontal cortex, temporal cortex (areas of the brain that control judgment, inhibition and impulse control), amygdala (an area of the brain that monitors impulse control, mood and behavior) and the hippocampus (an area of the brain responsible for memory).

5.      In the 10 years leading up to his death, as a result of the progressive brain degeneration, CTE, DAVE DUERSON, a man with no prior history of depression or psychological issues, complained of intense headaches, worsening short-term memory, language difficulties, vision trouble, and a growing problem with impulse control.  Additionally, he experienced a reversal of fortune in his professional life, and his marriage dissolved.

6.      CTE was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions[1] and/or sub-concussive head injuries.

7.      DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983 draft, as the 64th pick.

8.      From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season games and playing in over one hundred (100) regular season games.

9.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals NFL franchises, participating in four training camps, weekly practices and

---

[1] Concussion is defined as "a traumatically induced alteration in brain function manifested by an alteration of awareness or consciousness." Pellman, E, Viano, D, Tucker, A, et.al., *Concussion in Professional Football: Reconstruction of Game Impacts and Injuries,* Neurosurgery, Vol. 53(4) (2003).

playing in fifty-eight (58) regular season games.

10.     The NFL professes that there is nothing more important to the League than player safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest player safety issue.

11.     During his eleven (11) year NFL career, in practice and game situations, DAVE DUERSON sustained at least three (3) documented concussive brain traumas, in 1988, 1990 and 1992, as well as numerous undocumented concussive brain traumas.

12.     The NFL failed to prevent, diagnose and/or properly treat DAVE DUERSON's concussive brain traumas in 1988, 1990 and 1992 and throughout his career.

13.     Following documented concussions in 1988, 1990 and 1992, the NFL never warned DAVE DUERSON that playing through concussions could, and would, cause permanent brain damage.

14.     Prior to and during DAVE DUERSON's NFL career, the NFL knew, or should have known, that the helmets used by NFL players do not adequately protect players from concussions.

15.     Prior to and during DAVE DUERSON's career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

16.     DAVE DUERSON played through the documented and undocumented concussions and their associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

17.     On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged DAVE DUERSON, after suffering concussions, to return to

play in the same game and/or practice.

18.    The NFL did not document DAVE DUERSON's incidents of concussive head trauma.

19.    The cumulative effect of DAVE DUERSON's concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

20.    CTE caused, or contributed to cause, DAVE DUERSON'S death.

21.    The NFL governs and promotes the game of professional football, sets and enforces league guidelines, policies and game rules and promotes, markets and distributes broadcasting rights.

22.    The NFL had a duty to DAVE DUERSON and all NFL players to keep them reasonably safe during their NFL careers and to provide DAVE DUERSON with the most up-to-date medical information on all issues, including brain trauma.

23.    During his playing career, the NFL breached its duty to DAVE DUERSON by:

a.    Failing to educate players, including DAVE DUERSON, coaches and medical professionals about concussions - what they are, what symptoms to look for, and what to do if a player suspects he or a teammate has had a concussion;

b.    Failing to warn DAVE DUERSON and other NFL Players of the potential long-term impact of suffering numerous concussive head traumas;

c.    Failing to warn DAVE DUERSON and other NFL Players of the consequences of playing through the concussions and/or their symptoms;

d    Failing to ensure rapid, accurate diagnosis of DAVE DUERSON's concussive brain injuries during his playing career;

e.    Failing to establish sideline concussion assessment protocol to assist team physicians and trainers in their initial assessment of brain trauma;

4

  f.  Failing to implement policies to prevent DAVE DUERSON from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma;

  g.  Failing to require that DAVE DUERSON be cleared by both a team physician and by an independent neurological or neuro-physiological consultant prior to resuming football activities after suffering a concussion;

  h.  Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by DAVE DUERSON;

  i.  Failing to monitor and record DAVE DUERSON's concussive head traumas during his NFL career; and

  j.  Failing to protect DAVE DUERSON from suffering devastating concussive head traumas.

24. As a result of the NFL's acts and omissions, DAVE DUERSON developed CTE and its related symptoms, resulting in his suicide.

25. If the NFL would have taken the necessary steps to oversee and protect DAVE DUERSON by warning him of the dangers of head traumas, and educating and training all persons involved with the NFL teams in the recognition, prevention and treatment of concussive brain injuries, then DAVE DUERSON would not have suffered dangerous repetitive head trauma, would have recovered more rapidly, and would not have sustained permanent damage to his brain which contributed to cause his death.

26. As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention, companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

27.     TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

28.     During the relevant times when DAVE DUERSON'S documented concussive brain traumas were improperly handled by the NFL,  the NFL and NFLPA were operating without a Collective Bargaining Agreement (i.e., 1987 - 1993).

29.     TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories to any NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by Federal Labor Law.

30.     Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017.  The NFL conducts continuous and systematic business within the State of Illinois.

31.     DAVE DUERSON's permanent brain damage as a result of concussions sustained during his NFL career was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II:
### NFL's Fraudulent Concealment of Linkage Between Brain Trauma Sustained During NFL Playing Career and Permanent Brain Damage Caused Death

1.     DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983 draft, as the 64th pick.

6

2.      From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven NFL training camps, weekly practices, starting seventy-six (76) regular season games and playing in over one hundred (100) regular season games.

3.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals NFL franchises, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.      During his eleven (11) year NFL career, in practice and game situations, DAVE DUERSON sustained at least three (3) concussive brain traumas in 1988, 1990 and 1992, numerous undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

5.      DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

6.      The NFL failed to prevent, diagnose and/or properly treat DAVE DUERSON's brain traumas throughout his career.

7.      The NFL never warned DAVE DUERSON that playing through concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

8.      On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged DAVE DUERSON, after suffering concussions, to return to play in the same game and/or practice.

9.      The NFL did not document DAVE DUERSON's incidents of concussive or sub-concussive head trauma.

7

10.     In 1993, DAVE DUERSON retired from the NFL.

11.     Prior to, during, and after DAVE DUERSON's NFL career, the NFL knew of the harmful effects of poorly managed concussions, sub-concussive brain trauma and repetitive brain trauma.

12.     In 1994, through a Committee known as the NFL Committee on Mild Traumatic Brain Injury (hereinafter "MTBI Committee"), the NFL embarked upon a propaganda scheme designed to mislead NFL players and retirees regarding the long-term ramifications of concussions, sub-concussive brain trauma and repetitive brain trauma.

13.     The NFL's MTBI Committee was supposedly charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.[2]

14.     The NFL, through publications of its MTBI Committee, repeatedly misinformed its retirees that there exists **"no evidence of worsening injury or chronic cumulative effects"** from multiple concussions.[3]

15.     The NFL, through publications of its MTBI Committee, systematically falsely mandated that "many NFL players can be safely allowed to return to play" on the day of a concussion.

16.     The NFL, by publications of its MTBI Committee, continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by

---

[2] October 28, 2009 testimony of Andrew A. Tucker, M.D. before the Committee on the Judiciary, United States House of Representatives.

[3] MTBI Committee Report (2004).

8

stating definitively that **"there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players."**[4]

17.     Chronic Traumatic Encephalopathy ("CTE") was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions and/or sub-concussive head injuries.

18.     In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a 16 year NFL career (1974 - 1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain.

19.     Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

20.     The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical journal, *Neurosurgery.*

21.     The NFL, by and through its MTBI Committee, immediately wrote to the journal, *Neurosurgery,* requesting that Mike Webster's CTE paper be retracted, as it contradicted the NFL's propaganda scheme.

22.     In 2003, the NFL, by and through its MTBI Committee, purportedly began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in professional football.  This investigation was a sham - the study refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage.  The NFL's denial of a linkage between brain trauma during an NFL career and

---

[4] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery,* vol. 55, no. 6, Dec. 2004, p. 1299.

long-term brain damage was knowingly and fraudulently disingenuous.

23.     In 2004, Justin Strzelczyk died at age thirty-six (36) after a nine-year NFL career (1990-1998), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase.

24.     Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

25.     In 2005, Terry Long died at age forty-five (45) after an eight-year NFL career (1984 - 1991), as a result of drinking anti-freeze.

26.     Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a result of repeated blows to the head during his football career.

27.     In 2005, leading health professionals published a study of thousands of retired NFL players.[5] The study revealed that retired NFL players with three (3) or more concussions have a five-times (5x) higher prevalence of mild cognitive impairment diagnosis and a three-times (3x) higher prevalence of reported significant memory problems compared with those who had not sustained concussions.  One-fourth (25%) of players reported three or more concussions during their NFL career.

28.     In 2006, Andre Waters died at age forty-four (44) after a twelve-year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

29.     Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

---

[5] Guskiewicz, KM, Marshall, SW, Bailes, J, McCrea, M, Cantu, RC, Randolph C, Jordan, DD, *Association Between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players, Neurosurgery,* 2005 Oct., 57(5); 719-26.

30.     In October 2006, <u>Head Games - The NFL's Concussion Crisis</u>, written by Chris Nowinski, was published. This book contained numerous accounts of retired NFL players suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

31.     Also in October 2006, the NFL, by and through its MTBI Committee members, Drs. Pellman and Viano, published an interim report in *Neurological Focus* on the MTBI Committee's efforts that surveyed 12 years of data collection. The NFL reported that its MTBI Committee had analyzed and collected "data on mild TBIs sustained between 1996 and 2001" and concluded that:

> Because a significant percentage of players returned to play in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than one week, **it can be concluded that mild TBIs in professional football are not serious injuries.**[6]
> (Emphasis added).

32.     In June 2007, at the "NFL's Concussion Summit", in Rosemont, Illinois, Dr. Julian Bailes presented the neuro-pathological findings of the above-noted NFL players. Dr. Bailes, in point-blank fashion, again informed the NFL that multiple NFL concussions caused CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long, and Andre Waters, contributing to their untimely deaths.

33.     Also in 2007, researchers from the University of North Carolina's Center for Retired Players recorded results of a survey of retired NFL football players.[7] Their findings

---

[6] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection & Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4) (2006).

[7] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired Professional Football Players*, <u>39 Med. Sci. Sports Exercise </u>903 (2007).

showed that players who had multiple concussions were more likely to experience depression.  In fact, more than twenty-four percent (24%) of former NFL players who had sustained three or more concussions reported that they were suffering from depression.

34.     On August 14, 2007, the NFL stated in a press release[8] that:

> **Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems** *if each injury is managed properly.*  It is important to understand that there is no magic number for how many concussions is too many. [Players] should not be at greater risk of further injury *once [they] receive proper medical care for a concussion and are free of symptoms.* (Emphasis added)

35.     The NFL knew that DAVE DUERSON's NFL concussions were never "managed properly" and that he was never provided "proper medical care for a concussion" during his NFL career.

36.     In 2008, John Grimsley died at age forty-five (45) after a ten-year NFL career (1984 - 1993), as a result of a self-inflicted gunshot wound.  During the final 15 years of his life, John Grimsley's family began to notice impairments in his short-term memory, attention, concentration, organization, planning, problem solving, judgment, executive function and visual-spatial abnormalities.  These symptoms gradually increased and became pronounced by the time of his death.

37.     Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as a result of repeated blows to the head during his football career.

38.     In 2008, Thomas McHale died at age forty-five (45) after a nine-year NFL career

---

[8] Press Release, National Football League, *NFL Outlines for Players Steps Taken to Address Concussions*, (Aug. 14, 2007).

(1987 - 1995), as the result of an apparent drug overdose.

39.     Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE as a result of repeated blows to the head during his football career.

40.     In 2009, doctors from Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains of Mr. Grimsley and Mr. McHale.

41.     The NFL responded to the Center for the Study of Traumatic Encephalopathy findings as "isolated incidents" from which no conclusion could be drawn.

42.     From 1994 until DAVE DUERSON's death, the NFL closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

43.     During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[9]

44.     Despite knowledge of the above incidents and extensive literature, the NFL continuously refuted, denied, and inaccurately professed that chronic brain damage in former NFL football players was not a result of brain trauma sustained in the players' NFL careers.

45.     The NFL refused to acknowledge that brain damage in former NFL players is an epidemic that constitutes a national health crisis.

46.     The NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy

---

[9] Testimony of NFLPA Executive Director, DeMaurice Smith, at Congressional Hearing October 28, 2009, in the presence of NFL Commissioner, Roger Goodell.

13

that associates with football."[10]

47.      In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL athletes."

48.      From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

49.      Despite its publications and propaganda to the contrary, the NFL knew that former NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced concentration and/or agitation may have CTE and may be prone to suicide or other tragic death.[11]

50.      On February 17, 2011, DAVE DUERSON, age 50, died as a result of a self-inflicted gunshot wound to the chest.

51.      In the 10 years leading up to his death, as a result of the progressive brain degeneration, DAVE DUERSON, a man with no prior history of depression or psychological issues, complained of intense headaches, worsening short-term memory, language difficulties, vision trouble and a growing problem with impulse control.  Additionally, he experienced a reversal of fortune in his professional life, and his marriage dissolved.

---

[10] Alan Schwarz, New York Times, *Sixth NFL Player's Brain is Found to Have Brain Damage*, (Jan. 28, 2009).

[11] *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Journal of Neuropathology*, Vol. 68 Number 7, July 2009.

52.     Immediately prior to his death, DAVE DUERSON expressed wishes that his brain be studied post-mortem as he believed that "there's something going on" in his brain.

53.     Post-mortem, neuro-pathological review of DAVE DUERSON's brain revealed that DAVE DUERSON was suffering from progressive, advanced brain damage, commonly referred to as CTE.

54.     From 2001 to 2011, CTE had caused progressive deterioration in the frontal cortex, temporal cortex (areas of the brain that control judgment, inhibition and impulse control), amygdala (an area of the brain that monitors impulse control, mood and behavior) and the hippocampus (an area of the brain responsible for memory) of DAVE DUERSON's brain.

55.     The cumulative effect of DAVE DUERSON's concussive and sub-concussive brain trauma, and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

56.     The NFL has known for decades of the harmful effects on a player's brain of concussions; however, it concealed these facts from DAVE DUERSON, other players, retirees, NFL coaches, trainers, players and fans.

57.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during DAVE DUERSON's playing career and retirement caused an increased risk of debilitating injury which did, in fact, occur.

58.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during DAVE DUERSON's playing career caused him to remain ignorant to the harmful effects of playing through concussion symptoms, which was a cause of him developing CTE and committing suicide.

59.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information after DAVE DUERSON retired from football caused DAVE DUERSON to experience a seemingly inexplicable decline in mental health.

60.     The NFL knew that its misrepresentations, material omissions and/or concealment of relevant medical information were false and/or made the statements in reckless disregard of whether the statements were true or false.

61.     The NFL made the misrepresentations, material omissions and/or concealment of relevant medical information with the intent to induce DAVE DUERSON and others to refrain from pursuing medical care and treatment, benefits and claims available to him, and against the NFL, due to permanent brain injury sustained during his playing career.

62.     DAVE DUERSON reasonably believed that the misrepresentations, material omissions and/or concealment of relevant medical information made by the NFL were true and refrained from pursuing medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

63.     As a result of DAVE DUERSON's reliance upon the NFL's misrepresentations, he failed to pursue necessary counseling and medical care and treatment that would have prevented his death.

64.     As a result of DAVE DUERSON's reliance upon the NFL's misrepresentations, he experienced a seemingly inexplicable reversal of life's fortunes and committed suicide.

65.     As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson, and Tayler Duerson have lost the love, affection, care, attention,

companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

66.     TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

67.     Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017. The NFL conducts continuous and systematic business within the State of Illinois.

68.     TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories to the NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by Federal Labor Law.

69.     Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017. The NFL conducts continuous and systematic business within the State of Illinois.

70.     DAVE DUERSON's permanent brain damage was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

**COUNT III:**
**NFL League Officers and Members of its MTBI Committee Conspire to**
**Publish and Profess False Information to Its Players and Retirees**

1.      Plaintiff re-alleges paragraphs 1 through 59 of Count II and incorporates each allegation herein.

60.      In 1994, the League Officers of the NFL and the members of the NFL's MTBI Committee agreed to publish false statements in its reporting of medical research and findings regarding the linkage between repeated brain trauma experienced during an NFL career and permanent brain damage and/or purposefully endorsed ambiguous statements in an effort to create confusion and uncertainty on this subject.

61.      Creating ambiguity and/or making false statements regarding this critical medical information was unlawful, unethical and blatantly misleading.

62.      DAVE DUERSON reasonably believed that the statements made by the NFL were true and refrained from pursuing medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

63.      As a result of DAVE DUERSON's reliance upon the NFL's conspiracy, he failed to pursue necessary counseling and medical care and treatment that would have prevented his death.

64.      As a result of DAVE DUERSON's reliance upon the NFL's conspiracy, he experienced a seemingly inexplicable reversal of life's fortunes and committed suicide.

65.      As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention,

18

companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

66.    TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

67.    TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories to the NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by Federal Labor Law.

68.    Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017. The NFL conducts continuous and systematic business within the State of Illinois.

69.    DAVE DUERSON's permanent brain damage was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT IV:
### NFL's Negligence in Protecting and/or Warning its Retiree Caused Death

1.    DAVE DUERSON was drafted by the Chicago Bears National Football League franchise in the 1983 draft.

2.    From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season

games and playing in over one hundred (100) regular season games.

3.     From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals, both of the National Football League, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.     During his eleven (11) year NFL career, from 1983 - 1993, in practice and game situations, DAVE DUERSON sustained at least three (3) documented concussive brain traumas, numerous undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

5.     DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

6.     The NFL never warned DAVE DUERSON of the consequences of playing through the concussions, sub-concussive brain traumas and/or their symptoms.

7.     The NFL never warned DAVE DUERSON of the potential long-term impact of suffering numerous head traumas.

8.     On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged DAVE DUERSON, after suffering concussions, to return to play in the same game and/or practice.

9.     The NFL did not document DAVE DUERSON's incidents of concussive or sub-concussive head trauma.

10.     In 1993, DAVE DUERSON retired from the NFL.

11.     In 1994, through a Committee known as the "NFL Committee on Mild Traumatic

Brain Injury," the NFL voluntarily undertook a duty of care to its retired players to identify the long-term risks of brain damage as a result of playing professional football through research studies. This committee was charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.

12. From the inception of its MTBI Committee, the NFL misinformed its players and retirees that there exists "no evidence of worsening injury or chronic cumulative effects" from multiple concussions, found "many NFL players can be safely allowed to return to play" on the day of a concussion, and continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by stating definitively that "there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players."

13. In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a 16 year NFL career (1974 - 1990). During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain.

14. Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

15. The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical Journal, *Neurosurgery*. The MTBI Committee of the NFL immediately wrote a letter to the journal *Neurosurgery* requesting that they retract Mike Webster's CTE paper.

16. In 2003, the MTBI Committee began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in

21

professional football. The NFL funded this study. The study ultimately refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage.

17.    In 2004, Justin Strzelczyk died at age thirty-six (36), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase, after a nine-year NFL career (1990 - 1998).

18.    Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

19.    In 2005, Terry Long died at age forty-five (45), after an eight-year NFL career (1984 - 1991), as a result of drinking anti-freeze.

20.    Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a result of repeated blows to the head during his football career.

21.    In 2005, leading health professionals published a study of thousands of retired NFL players. The study revealed that retired NFL players with three (3) or more concussions had a five-fold prevalence of mild cognitive impairment diagnosis and a three-fold prevalence of significant memory problems compared with those who had not sustained concussions. One-fourth (25%) of players reported three or more concussions during their NFL career.

22.    In 2006, Andre Waters died at age forty-four (44), after a twelve-year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

23.    Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

24.    In October 2006, Head Games - The NFL's Concussion Crisis, written by Chris Nowinski, was published. This book contained numerous accounts of retired NFL players

22

suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

The book contained the following passage:

> The organization with the most money to study concussions and the biggest stage from which to speak the message at this point hasn't shown the ability to publicize the truth about these devastating injuries...Instead of promoting the proper information on safety, it uses its bully pulpit only to protect its business interests. The organization? The National Football League.

25.     In October of 2006, Pellman and Viano published an interim report in *Neurological Focus* on the MTBI Committee's efforts that surveyed 12 years of data collection. The authors analyzed collected "data on mild TBIs sustained between 1996 and 2001" and concluded that:

> Because a significant percentage of players returned to play in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than one week, **it can be concluded that mild TBIs in professional football are not serious injuries.** (Emphasis added).

26.     In June 2007, at the "NFL's Concussion Summit" in Rosemont, Illinois, Dr. Julian Bailes presented the neuro-pathological findings of the above-noted NFL players. Dr. Bailes again informed the NFL that multiple NFL concussions caused CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long and Andre Waters' brains, contributing to their untimely deaths.

27.     In 2007, researchers from the University of North Carolina's Center for Retired Players recorded results of a survey of retired NFL football players. Their findings showed that players who had multiple concussions were more likely to experience depression. In fact, more than twenty-percent (20%) of former NFL players who had sustained three or more concussions

reported they were suffering from depression.

28.    In 2008, John Grimsley died at age forty-five (45), as a result of a self-inflicted gunshot wound, after a ten-year NFL career (1984 - 1993). During the final 15 years of his life, John Grimsley's family began to notice impairments in his short-term memory, attention, concentration, organization, planning, problem solving, judgment, executive function and visual-spatial abnormalities. These symptoms gradually increased and became pronounced by the time of his death.

29.    Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as a result of repeated blows to the head during his football career.

30.    In 2008, Thomas McHale died at age forty-five (45), after a nine-year NFL career (1987 - 1995), as the result of an apparent drug overdose.

31.    Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE as a result of repeated blows to the head during his football career.

32.    In 2009, doctors from Boston University's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains Mr. Grimsley and Mr. McHale. The NFL responded that these findings were merely an "isolated incident" from which no conclusion could be drawn.

33.    From the time of its inception until DAVE DUERSON's death, the NFL's MTBI Committee closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

34.    During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.

24

35.     Despite knowledge of the above incidents and extensive literature, the NFL refused to acknowledge that chronic brain damage in former NFL football players was an epidemic that constituted a national health crisis.  Instead, the NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy that associates with football."

36.     In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL athletes."

37.     The NFL never warned its retirees that they may be experiencing long-term effects from the brain trauma they sustained during their NFL careers.

38.     From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

39.     Despite its publications and propaganda to the contrary, the NFL knew, or should have known, that former NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced concentration and/or agitation may have CTE and may be prone to suicide or other tragic death.[12]

40.     On October 28, 2009, the House of Representatives Committee on the Judiciary convened hearings to discuss the issues of long-term brain disease resulting from playing in the

---

[12] McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, Journal of Neuropathology, Vol. 68 Number 7, July 2009.

NFL. During these proceedings, in the presence of NFL Commissioner Roger Goodell, the Honorable John Conyers, Jr. (Michigan) stated that the issues of long-term brain disease resulting from playing in the NFL "are life and death issues."

41.    During those hearings, Dr. Robert Cantu testified that there exists "a serious public health problem today resulting from repetitive head trauma too often experienced by NFL players."

42.    At that hearing, Commissioner Roger Goodell acknowledged, on behalf of the NFL, for the first time, that "it is fair to assume that head trauma may play a role" in the cause of CTE and that "more can be done for the retired players."

43.    Also at that hearing, Commissioner Roger Goodell agreed that the NFL must "assist retired players and help identify not only those in need, but to determine what those needs are." After these acknowledgments, nothing was done to assist DAVE DUERSON.

44.    On December 20, 2009, NFL Spokesman, Greg Aiello, told the New York Times, "[i]t's quite obvious from the medical research that's been done that concussions can have lasting consequences."

45.    Following these acknowledgments, after years of denial, the NFL did nothing to determine whether DAVE DUERSON had medical needs regarding his developing CTE that originated as a result of his NFL career.

46.    The NFL never counseled DAVE DUERSON and/or provided mandatory medical care or treatment for his symptoms of CTE.

47.    On February 17, 2011, DAVE DUERSON, age 50, died as a result of a self-inflicted gunshot wound to the chest.

26

48.     Immediately prior to his death, DAVE DUERSON expressed wishes that his brain be studied post-mortem, as he believed that "there's something going on" in his brain.

49.     Post-mortem, neuro-pathological review of DAVE DUERSON's brain revealed that DAVE DUERSON was suffering from progressive, advanced brain damage, commonly referred to as Chronic Traumatic Encephalopathy ("CTE").

50.     From 2001 to 2011, CTE had caused progressive deterioration in the frontal cortex, temporal cortex (areas of the brain that control judgment, inhibition and impulse control), amygdala (an area of the brain that monitors impulse control, mood and behavior), and the hippocampus (an area of the brain responsible for memory) of DAVE DUERSON's brain.

51.     The cumulative affect of DAVE DUERSON's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

52.     In the 10 years leading up to his death, as a result of CTE, DAVE DUERSON, a man with no prior history of depression or psychological issues, complained of intense headaches, worsening short-term memory, language difficulties, vision problems and a growing problem with impulse control.  Additionally, he experienced a reversal of fortune in his professional life, and his marriage dissolved.

53.     After DAVE DUERSON retired from the NFL, the NFL breached its duty to DAVE DUERSON by:

       a.     Failing to adequately warn its retired players, including DAVE DUERSON, of the health risk associated with concussive injury;

       b.     Failing to warn DAVE DUERSON of the harm of the repetitive concussions/injuries he sustained during his NFL playing career;

27

  c. Failing to provide adequate, accurate medical care for DAVE DUERSON when it knew he likely suffered from CTE and was at risk of suicide; and

  d. Failing to fund, endorse, support and or generate advances in medical research in order to detect, treat and/or cure CTE in DAVE DUERSON's brain.

54. If the NFL would have taken the necessary steps to warn DAVE DUERSON of the critical, life-threatening nature of CTE caused by multiple head traumas during his NFL career, DAVE DUERSON would have received adequate and appropriate medical care, treatment, and counseling for the symptoms associated with CTE.

55. The NFL's failures contributed to cause the death of DAVE DUERSON.

56. As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention, companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

57. TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

58. Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017. The NFL conducts continuous and systematic business within Cook County, Illinois.

59. DAVE DUERSON's CTE was not discovered until May 2, 2011.

60. NFL retired players were not the subject of or a party to Collective Bargaining.

61. TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories

28

to the NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by Federal Labor Law.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT V:
### Riddell's Strict Liability for Failing to Warn that its
### Helmet Design Would Not Prevent Concussion Caused CTE and Death

1.     DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983 draft, as the 64th pick.

2.     From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season games and playing in over one hundred (100) regular season games.

3.     From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals, both of the National Football League, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.     During his eleven (11) year NFL career, from 1983 - 1993, in practice and game situations, DAVE DUERSON sustained at least three (3) documented concussive brain traumas, numerous un-documented concussive brain traumas and thousands of sub-concussive brain traumas that caused CTE.

5.     During DAVE DUERSON's NFL career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided

warnings for helmets used by NFL players.

6.      During his NFL career, DAVE DUERSON used a RIDDELL helmet in NFL practices and games. The NFL has estimated that 75% of the helmets used in the league are manufactured by RIDDELL; RIDDELL estimated that the figure was 77%.

7.      Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

8.      Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

9.      Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

10.      Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that its helmets used by NFL players do not adequately protect players from concussions and/or sub-concussive head injury.

11.      RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

12.      RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

13.      RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

14.     DAVE DUERSON neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

15.     DAVE DUERSON was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

16.     RIDDELL owed a duty to warn DAVE DUERSON of the risks of substantial harm associated with the foreseeable use of their products.

17.     RIDDELL never warned DAVE DUERSON that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

18.     DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

19.     The cumulative effect of DAVE DUERSON's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

20.     At the time its helmets were designed, manufactured, sold and/or distributed by RIDDELL, the helmets were unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate warning of the product's inability to protect against the foreseeable risk of concussive brain injury; specifically, RIDDELL failed to warn of one or more of the following:

      a.    That its helmets would not protect against concussive brain injury;

      b.    That its helmet did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the

forces and energy directed to the player's head;

c. That its helmet did not include a safely configured shock attenuating system; and

d. That it had not properly and adequately tested the helmet model.

21. RIDDELL's failure to warn caused DAVE DUERSON's head injuries.

22. The failure to warn of an unreasonably dangerous condition was a proximate cause of the wrongful death suffered by DAVE DUERSON.

23. As a result of RIDDELL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention, companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

24. TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

25. RIDDELL is a business with its principal place of business in Illinois.

26. DAVE DUERSON's permanent brain damage as a result of concussions sustained during his NFL career was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC. and RIDDELL SPORTS GROUP, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

32

## COUNT VI:
## Riddell's Negligence in Failing to Warn that its
## Helmet Design Would Not Prevent Concussion Caused CTE and Death

1.      DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983 draft, as the 64th pick.

2.      From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season games, and playing in over one hundred (100) regular season games.

3.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals, both of the National Football League, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.      During his eleven (11) year NFL career, from 1983 - 1993, in practice and game situations, DAVE  DUERSON sustained at least three (3) documented concussive brain traumas, numerous un-documented concussive brain traumas and thousands of sub-concussive brain traumas that caused CTE.

5.      During DAVE DUERSON's NFL career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings for helmets used by NFL players.

6.      During his NFL career, DAVE DUERSON used a RIDDELL helmet in NFL practices and games.  The NFL has estimated that 75% of the helmets used in the league are manufactured by RIDDELL; RIDDELL estimated that the figure was 77%.

7.   .   Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

33

8.     Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

9.     Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

10.     Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that its helmets used by NFL players do not adequately protect players from concussions and/or sub-concussive head injury.

11.     RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

12.     RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

13.     RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

14.     DAVE DUERSON neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

15.     DAVE DUERSON was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

16.     RIDDELL owed a duty to warn DAVE DUERSON of the risks of substantial harm associated with the foreseeable use of their products.

34

17.   RIDDELL never warned DAVE DUERSON that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

18.   DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

19.   The cumulative effect of DAVE DUERSON's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

20.   At the time its helmets were designed, manufactured, sold and/or distributed, RIDDELL was negligent in one or more of the following ways:

     a.   Failed to warn DAVE DUERSON that its helmets would not protect against concussive brain injury;

     b.   Failed to warn DAVE DUERSON that its helmet did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

     c.   Failed to warn DAVE DUERSON that its helmet did not include a safely configured shock attenuating system; and

     d.   Failed to warn DAVE DUERSON that it had not properly and adequately tested the helmet model.

21.   RIDDELL's failure to warn was a proximate cause of the wrongful death suffered by DAVE DUERSON.

22.   As a result of RIDDELL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention,

companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

23.     TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

24.     RIDDELL is a business with its principal place of business in Illinois.

25.     DAVE DUERSON's permanent brain damage as a result of concussions sustained during his NFL career was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC. and RIDDELL SPORTS GROUP, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

_____
William T. Gibbs

Thomas A. Demetrio
René A. Torrado, Jr.
William T. Gibbs
Corboy & Demetrio, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No.02329

36