# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO<br><br>All Actions | |

## MEMORANDUM OF PLAINTIFFS IN OPPOSITION TO DEFENDANTS NATIONAL FOOTBALL LEAGUE'S AND NFL PROPERTIES LLC'S MOTION TO DISMISS THE AMENDED MASTER ADMINISTRATIVE LONG-FORM COMPLAINT

Christopher Seeger
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, Pennsylvania 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

*Plaintiffs' Co-Lead Counsel*

David C. Frederick
Scott H. Angstreich
Joshua D. Branson
KELLOGG, HUBER, HANSEN,
    TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@khhte.com
sangstreich@khhte.com
jbranson@khhte.com
*On the Brief*

Jeannine Kenney (PA # 307635)
HAUSFELD LLP
1604 Locust Street
Second Floor
Philadelphia, Pennsylvania 19103
Phone: (215) 985-3270
Fax: (215) 985-3271
jkenney@hausfeldllp.com
*Plaintiffs' Liaison Counsel*

*(Additional Counsel Listed On Signature Pages)*

October 31, 2012

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    A.    The NFL's Historical Role As Guardian of Player Health .....................................3

    B.    The Concussion Crisis in Football ...........................................................................4

    C.    The NFL's Monetization of Violence ......................................................................5

    D.    The NFL's Cover-Up .................................................................................................6

    E.    The Collective Bargaining Agreements ....................................................................8

ARGUMENT .......................................................................................................................10

I.    Section 301 Preemption Is Limited to Claims That Require a Court To
Resolve a Bona Fide Interpretive Dispute Regarding a CBA's Terms ..........................11

II.    The NFL Fails To Show That Players' Claims Would Require This Court
To Resolve a Bona Fide Interpretive Dispute Over a CBA Provision ............................13

    A.    Players' Negligence Claims Do Not Require CBA Interpretation .......................14

        1.    Players' negligence claims do not require this Court to
interpret any CBA provision ..................................................................14

        2.    The NFL cannot cite any provision of the CBAs whose
meaning affects the scope of the NFL's common-law duty .....................16

    B.    Players' Fraud Claims Do Not Require CBA Interpretation ................................20

        1.    The NFL's preemption defense also fails to blunt Players'
fraud claims ............................................................................................20

        2.    The NFL's duty not to commit fraud did not depend on the
meaning of any CBA ...............................................................................21

    C.    Three Subsets of Players' Claims Categorically Avoid § 301
Preemption ...........................................................................................................24

    D.    Even if It Applies, § 301 Does Not Justify Dismissal of Players'
Claims ...................................................................................................................27

III.    The NFL's Arguments Are Unpersuasive ..........................................................28

    A.    The NFL's Cases Are Distinguishable and Unpersuasive .....................................28

        1.    The NFL's two principal cases offer it no support ...................................29

        2.    The NFL's invocation of *Stringer* fares no better.....................................31

        3.    The NFL's reliance on *Williams* is similarly misplaced...........................33

    B.    Players' Claims Do Not Arise Under the CBAs .....................................................34

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

Page

CASES

*Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999)..................................27

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985)....................................11

*American Guarantee & Liab. Ins. Co. v. Fojanini*, 90 F. Supp. 2d 615
    (E.D. Pa. 2000)......................................................22

*American Needle, Inc. v. NFL*, 130 S. Ct. 2201 (2010) ...................................3

*Antol v. Esposto*, 100 F.3d 1111 (3d Cir. 1996) ...................................34

*Atwater v. NFL*, 626 F.3d 1170 (11th Cir. 2010)..................................23, 29

*Baker v. ACandS*, 755 A.2d 664 (Pa. 2000)..................................17

*Barnes v. NFL*, No. CV 11-08396 (C.D. Cal. Dec. 8, 2011) ........................29

*Barrett v. Freifeld*, 64 A.D.3d 736 (N.Y. App. Div. 2009) ........................22

*Basa v. Rizza Chevrolet, Inc.*, 750 F. Supp. 2d 987 (N.D. Ill. 2010)..................13

*Beals v. Kiewit Pac. Co.*, 114 F.3d 892 (9th Cir. 1997) ........................13

*Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999).....................34

*Berda v. CBS Inc.*, 881 F.2d 20 (3d Cir. 1989)..................................11, 28, 34

*Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240 (W.D. Wash. 2007) ..................11

*Brown v. Holiday Stationstores, Inc.*, 723 F. Supp. 396 (D. Minn. 1989) ..................27

*Brown v. NFL*, 219 F. Supp. 2d 372 (S.D.N.Y. 2002)..................................19

*Burlington Coat Factory Sec. Litig.*, *In re*, 114 F.3d 1410 (3d Cir. 1997).....................8

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987)..................................18, 24

*Chavez v. Don Stoltzner Mason Contractor, Inc.*, No. 10 C 264,
    2010 WL 1417029 (N.D. Ill. Apr. 5, 2010) ........................13, 31

*Clarett v. NFL*, 369 F.3d 124 (2d Cir. 2004) ........................18

*Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22 (2d Cir. 1988) ........................27

*DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, No. 10-cv-1341,
    2012 WL 748760 (E.D.N.Y. Mar. 7, 2012) .................................................................10

*Destefano & Assocs., Inc. v. Cohen*, No. 2775JUNETERM2000, 2001 WL
    1807790 (Pa. Com. Pl. Apr. 9, 2001) .........................................................................21

*Dougherty v. Hooker Chem. Corp.*, 540 F.2d 174 (3d Cir. 1976) .................................16

*Duerson v. NFL*, No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012)...............29, 30, 31

*Exal Corp. v. Roeslein & Assocs., Inc.*, No. 4:12-CV-01830, 2012 WL 4754748
    (N.D. Ohio Oct. 2, 2012) ..............................................................................................11

*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987) ................................................27

*Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599 (M.D. Pa. 1994) ..........................22

*Foy v. Pratt & Whitney Group*, 127 F.3d 229 (2d Cir. 1997) ........................................24

*Gelow v. Central Pac. Mortg. Corp.*, No. Civ. S-07-1988 LKK/KJM,
    2008 WL 436935 (E.D. Cal. Feb. 14, 2008) ...............................................................11

*Gibbs v. Ernst*, 647 A.2d 882 (Pa. 1994). ......................................................................20

*Givens v. Tennessee Football, Inc.*, 684 F. Supp. 2d 985 (M.D. Tenn. 2010)...............28

*Graboff v. The Collern Firm*, Civil Action No. 10-1710, 2010 WL 4456923
    (E.D. Pa. Nov. 8, 2010) ...............................................................................................14

*Gray v. Keystone Steel & Wire Co.*, No. 08-1197, 2009 WL 187895
    (C.D. Ill. Jan. 21, 2009) ................................................................................................8

*Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214 (3d Cir. 2001) ...................................10

*Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. 2001)................................18

*Hendy v. Losse*, No. 89-55430, 1991 WL 17230 (9th Cir. Feb. 12, 1991) ...................19

*Holmes v. NFL*, 939 F. Supp. 517 (N.D. Tex. 1996) .....................................................29

*Jefferson v. D'Allessandro*, 681 S.E.2d 405 (N.C. Ct. App. 2009) ..........................23, 29

*Jurevicius v. Cleveland Browns Football Co.*, No. 1:09 CV 1803,
    2010 WL 8461220 (N.D. Ohio Mar. 31, 2010) ...........................................................18

*Kleinknecht v. Gettysburg College*, 989 F.2d 1360 (3d Cir. 1993) ..............................16

*Kline v. Security Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004)....................12, 13, 14, 16, 23, 31, 35

*LaRosa v. United Parcel Serv., Inc.*, 23 F. Supp. 2d 136 (D. Mass. 1998) ...................................27

*Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988)..........................................11, 27, 28

*Livadas v. Bradshaw*, 512 U.S. 107 (1994) ........................................................................ 11, 26, 28, 35

*Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962) ............................................11

*Lyon v. Ranger III*, 858 F.2d 22 (1st Cir. 1988) ...................................................16, 17

*Maxwell v. NFL*, No. CV 11-08394 (C.D. Cal. Dec. 8, 2011)............................29, 30, 31

*Morena v. South Hills Health Sys.*, 462 A.2d 680 (Pa. 1983) .........................................14

*Patentas v. United States*, 687 F.2d 707 (3d Cir. 1982) .......................................25

*Pear v. NFL*, No. CV 11-08395 (C.D. Cal. Dec. 8, 2011)..........................................29

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)..........................................10

*Prost v. Caldwell Store, Inc.*, 187 A.2d 273 (Pa. 1963)..........................................14

*Pyeritz v. Commonwealth*, 32 A.3d 687 (Pa. 2011)..........................................18

*R.W. v. Manzek*, 888 A.2d 740 (Pa. 2005) ........................................................ 15, 34-35

*Rice v. Panchal*, 65 F.3d 637 (7th Cir. 1995) ..........................................35

*Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883 (3d Cir. 1997)..........................................10

*Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215 (Pa. 2003)..........................................15-16

*Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172 (N.D.N.Y. 1990) ....................................28

*Smith v. Houston Oilers, Inc.*, 87 F.3d 717 (5th Cir. 1996)..........................................28

*Spence v. ESAB Group, Inc.*, 623 F.3d 212 (3d Cir. 2010)..........................................25

*Stringer v. NFL*, 474 F. Supp. 2d 894 (S.D. Ohio 2007) ...........................15, 20, 31, 32, 33, 34, 35

*Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186 (Pa. 2007) ..........................................24

*Tran v. Metropolitan Life Ins. Co.*, 408 F.3d 130 (3d Cir. 2005) ..........................................22, 23

*Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217 (3d Cir. 1995) ..........................................21, 22, 34

*U.S. Healthcare, Inc., In re*, 193 F.3d 151 (3d Cir. 1999) ..........................................29

*Union Stock Yards Co. of Omaha v. Chicago, B. & Q.R.R. Co.*, 196 U.S. 217 (1905)..........................................16

*United Steelworkers v. Rawson*, 495 U.S. 362 (1990)...................................................35

*Vicky M. v. Northeastern Educ. Intermediate Unit 19*, 486 F. Supp. 2d 437
    (M.D. Pa. 2007) ..................................................................................................26

*Voilas v. General Motors Corp.*, 170 F.3d 367 (3d Cir. 1999)......................12, 21, 22, 23, 24, 34

*Williams v. NFL*, 582 F.3d 863 (8th Cir. 2009), *cert. denied*, 131 S. Ct. 566 (2010)........19, 33, 34

*Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751 (7th Cir. 2008) ..................................13

*Wynn v. AC Rochester*, 273 F.3d 153 (2d Cir. 2001)......................................................13

STATUTES

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ...........................11

Federal Aviation Act of 1958, 49 U.S.C. § 40101 *et seq.* ...........................................27

Labor Management Relations Act, 1947, 29 U.S.C. § 141 *et seq.* ....................................2, 10, 11

    § 301, 29 U.S.C. § 185.................................................2, 10, 11, 12, 13, 16, 18, 24,
        26, 27, 28, 29, 31, 33, 34, 35

    § 301(a), 29 U.S.C. § 185(a) ........................................................................11

Lanham Act, 15 U.S.C. § 1051 *et seq.* ............................................................11

Railway Labor Act, 45 U.S.C. § 51 *et seq.* .................................................13

OTHER MATERIALS

57A Am. Jur. 2d *Negligence* § 80......................................................................16

Compl., *Duerson v. NFL*, No. 12 C 2513 (removed to N.D. Ill. Apr. 5, 2012)...........................30

Compl., *Maxwell v. NFL*, No. CV 11-08394 (removed to C.D. Cal. Oct. 11, 2011) ...................30

RESTATEMENT (SECOND) OF TORTS (1965)........................................................25

RESTATEMENT (THIRD) OF TORTS:  LIABILITY FOR PHYSICAL AND EMOTIONAL
    HARM (2010) ......................................................................................17

## INTRODUCTION

Nearly a century ago, medical studies first revealed that athletes who suffer repeated

blows to the head risk long-term brain damage.  The evidence since overwhelmingly establishes

that the head trauma routinely inflicted in professional football games can cause neurocognitive

decline, permanent mental disability, and even death.  Plaintiffs are retired football players

("Players") who suffered concussive and sub-concussive head injuries while participating in

football games supervised by the NFL.[1]  The Complaint alleges that the NFL failed to take

reasonable actions to protect Players from the chronic risks created by such injuries and

fraudulently concealed those risks from Players.

The NFL – as the central authority over professional football – had a longstanding duty

to protect Players from unreasonable harm.  From its very inception in the 1920s, the NFL acted

in accordance with that duty:  it promulgated equipment standards, implemented rules changes,

and created a host of off-the-field programs designed to manage Players' lives.  Through public

statements disseminated by its media empire, the NFL cultivated an image as football's

responsible steward, dedicated to protecting the game and its participants.  Players relied on the

NFL to live up to that image, and they trusted the NFL to exercise its enormous influence in a

manner reasonably consistent with their health and well-being.

When it came to brain injuries in football, the NFL abused that trust.  The NFL knew that

players were exposed to risks of severe neurological injuries, yet did nothing to prevent them.

It failed to warn players about the dangers of concussive and sub-concussive impacts; to

advocate prophylactic rule changes; or to implement equipment standards adapted for head

---

[1] This Opposition addresses the Memorandum of Law supporting the motion to dismiss filed by Defendants the National Football League and NFL Properties, LLC.  *See* Dkt. No. 3589-1 ("Def. Mem.").  Because the distinction between those two entities is immaterial to the arguments here, Players refer to them collectively as the "NFL."  *See* Plaintiffs' Amended Master Administrative Long-Form Complaint ¶¶ 30-31 ("Complaint" or "MAC").

trauma.  To the contrary, the NFL glorified the hyper-violent collisions most likely to lead to head trauma and orchestrated a disinformation campaign to conceal the resulting brain injuries.

The NFL urges this Court to take the extraordinary step of dismissing Players' claims, before any discovery, based on an affirmative defense:  preemption under § 301 of the Labor Management Relations Act, 1947 ("LMRA"), 29 U.S.C. § 185.  That section, however, has the narrow purpose of ensuring that collective bargaining agreements ("CBAs") are interpreted uniformly in accordance with federal law.  Accordingly, § 301 preempts a state-law claim only if the claim turns on the *interpretation* of a CBA provision – and only if the parties reasonably dispute the meaning of that provision.

The NFL has not met its burden of demonstrating that Players' claims would require this Court to resolve an interpretive dispute over any specific CBA provision.  Players' claims – which turn on the NFL's voluntary actions, public statements, and special relationship with Players – arise from historical actions, not CBA duties.  Indeed, of the spate of CBA provisions the NFL cites, none imposes any relevant duty on the NFL itself.  The NFL was not even a signatory to the vast majority of CBAs it cites.  Thus, the NFL must rely on CBA provisions that pertain exclusively to other parties – like teams and doctors – whose duties have nothing to do with the NFL's own independent duty to exercise reasonable care in safeguarding Players from neurological injuries.  And, even as to those provisions, the NFL cannot meet its burden of showing that this Court ever would be required to *interpret* them.  Section 301 preemption, therefore, cannot justify dismissal of Players' claims.

## STATEMENT OF FACTS

**A.     The NFL's Historical Role As Guardian of Player Health**

Since its inception, the NFL has been the organizer, policeman, and public face of professional football in America.  MAC ¶ 2.  The NFL is an unincorporated association separate from the football teams ("Clubs") that play under its auspices, and its supervisory interests often diverge from those of individual Clubs.  *See American Needle, Inc. v. NFL*, 130 S. Ct. 2201 (2010).  The NFL controls professional football, asserting authority over everything from team ownership to the mechanics of gameplay.  *Id.* ¶¶ 6, 43, 92.  Since 1929, the NFL has consistently exercised that authority in the name of player safety.  *Id.* ¶¶ 7, 11, 86, 92.  As the NFL itself explained, "[s]ince its earliest days, the league has continuously taken steps" to eliminate "unnecessary risk" to players, through measures like "changes and enhancements to game safety rules."  *Id.* ¶ 88.

In the 1930s, the NFL began to identify dangerous tackling techniques, to warn players against unsafe styles of play, and to implement helmet standards.  *Id.* ¶¶ 11, 92, 100.  The NFL also developed a range of programs purporting to improve players' lives by instructing them on how to handle media inquiries, manage their money, and conduct their personal lives.  *Id.* ¶ 94.  It likewise established insurance and retirement plans – which it unilaterally controls – for the players' benefit.  *Id.* ¶ 96.

The NFL's historical actions have been in service of two complementary objectives: maximizing football's profitability and popularity.  *Id.* ¶¶ 7, 23, 41-46.  From the beginning, the NFL has recognized that its profits depend on its carefully cultivated public image.  *Id.* ¶¶ 7, 23, 48-49, 53, 291.  To that end, the NFL has taken steps to protect player safety, and it has publicly touted those efforts as symbols of its integrity and good faith.  *Id.* ¶¶ 7, 19, 88, 93, 222.

Thus, football players of all ages (and their families) look to the NFL as the leading authority on all things football. *Id.* ¶¶ 10, 19. The league's public standing, influence, and long history of protecting players lends its public pronouncements unique credibility. *Id.* ¶¶ 48-49, 87-89, 312. Commissioner Roger Goodell recently acknowledged as much, stating that the NFL's power and influence require that it "act" in the "best interests" of all players. *Id.* ¶ 222.

**B.     The Concussion Crisis in Football**

On the NFL's watch, football has become the site of perhaps the gravest health crisis in the history of sports. Professional football, for all its aesthetic appeal and financial success, can be devastatingly violent. *Id.* ¶¶ 50-52, 68, 71. After the advent of the facemask – which permits the helmeted head to be used as a battering ram – that violence increasingly has been directed at the head. *Id.* ¶¶ 68, 121-122, 136-138. Sometimes head trauma is inflicted by acute, dramatic collisions that knock players unconscious. *Id.* ¶¶ 10, 65, 98. A player who experiences such a collision typically suffers a concussion, which can noticeably disrupt the normal functioning of the brain. *Id.* ¶ 68. More frequently, players suffer more insidious (yet no less permanently damaging) head trauma inflicted by mild sub-concussive impacts. *Id.* ¶¶ 12-13, 71, 74-75. Although sub-concussive impacts are not acute and do not result in a loss of consciousness, the long-term results are essentially the same. Players who sustain repeated concussive and sub-concussive impacts are at great risk of developing chronic traumatic encephalopathy ("CTE") and other serious neurological disorders. *Id.* ¶¶ 72-74. Those disorders, which remain latent for years, can culminate in severe disability and death. *Id.* ¶¶ 74, 133, 238.

For decades, medical studies have documented these long-term health risks. A 1928 study of boxers, for example, linked "mild concussions" to degenerative brain disease. *Id.* ¶ 109. Less than a decade later, the American Football Coaches Association published a study warning

that football players who sustain a concussion should be withheld from any further activity requiring physical contact.  *Id.* ¶ 110.  As subsequent studies reached similar conclusions, a consensus emerged:  concussive and sub-concussive injuries are linked to long-term brain injuries, and a player who suffers one concussion is significantly more likely to suffer another. *Id.* ¶¶ 71, 111-120, 123.  Studies of professional football players confirmed those conclusions, revealing that football players contract CTE and other brain diseases at alarming rates and that the rate of depression among former NFL players is almost triple that of the general population. *Id.* ¶¶ 76-78.  All told, brain disease has claimed the lives of at least 40 football players – and has ruined many more.  *Id.* ¶ 122.

## C.      The NFL's Monetization of Violence

Despite the chronic brain damage associated with head trauma in football, the NFL has long marketed the game by glorifying its brutality and ferocity.  *Id.* ¶ 50.  Through platforms like NFL Films, the NFL crafted a narrative of player as gladiator – invincible warriors for whom head trauma was simply part of the job.  *Id.* ¶¶ 53-55.  The undeniable message was that players could and should play through any injury, including brain injury.  *Id.* ¶¶ 61-64.  For the NFL, head injuries were little more than a nuisance that its player-gladiators must overcome; a concussed player supposedly had his "bell rung" or was "dinged," and should return to play immediately.  *Id.* ¶ 50.  The NFL even lauded the players who inflicted concussions on others. *Id.* ¶¶ 56-57, 66.  Although the NFL occasionally fined players for dangerous hits, it profited from those hits by selling photographs of the same collisions on its website.  *Id.* ¶ 66.  The result was a culture in which players were rewarded for inflicting head injuries and stigmatized for seeking to avoid them.  *Id.* ¶¶ 55, 61.  For the NFL, that culture was immensely profitable. *Id.* ¶¶ 23, 41-47.  For many Players, it ended with chronic brain disease.  *Id.* ¶¶ 71-72.

D.      **The NFL's Cover-Up**

The NFL has known for decades that Players were at serious risk of developing chronic

brain disease.  *Id.* ¶¶ 12-13, 132-134.  And the NFL has long been uniquely positioned to do

something about it.  The NFL's vantage point atop the sport of football, combined with its

unsurpassed resources, has made it an "institutional repository of accumulated knowledge" about

the neurological risks of playing football.  *Id.* ¶ 84.  The NFL also had an unrivaled ability –

stemming from its institutional gravitas and enormous media leverage – to spread information

about brain injuries.  *Id.* ¶¶ 48-49, 153.  The NFL likewise had the unilateral and monopolistic

ability to establish league policies and to influence key stakeholders.  *Id.* ¶ 89.

Accordingly, the NFL had a broad array of remedial tools to address the worsening

concussion crisis in football.  It could have developed standardized return-to-play protocols,

under which players would have been barred from resuming contact too soon after sustaining a

brain injury.  *Id.* ¶ 128.  It could have implemented rules changes to mitigate the incidence of

traumatic blows to the head (*id.* ¶¶ 6, 86-88, 92, 100, 154, 333) or safer helmet standards to

minimize the damage inflicted by those blows (*id.* ¶¶ 11, 91-93, 324-325, 333).  At the very

least, the NFL could have disclosed what it knew about the dangers of head trauma, creating

awareness among retired, current, and potential players.  *Id.* ¶ 147.

Yet the NFL did none of those things.  Quite the opposite:  for years it orchestrated a

campaign of disinformation designed to convince Players – and the broader public on whom its

legitimacy depends – that concussive and sub-concussive blows posed no real danger.  *Id.*

¶¶ 151-152.  Indeed, the NFL's history of ignoring the medical risks of head injuries dates to the

NFL's very inception.  *Id.* ¶¶ 4-5.  In 1994, as the evidence of those risks mounted, the NFL

created the Mild Traumatic Brain Injury ("MTBI") Committee.  *Id.* ¶¶ 14-15.  Although the

Committee's stated purpose was to institute "rule changes aimed at reducing head injuries," *id.* ¶ 154, its real purpose was to create a facade of scientific research that the NFL could invoke to conceal the fact that the game it oversaw – and from which it reaped billions of dollars – was slowly ruining the lives of many Players, *id.* ¶ 151.  To accomplish that deceit, the MTBI Committee performed several studies, purporting to find no link between football-related head trauma and long-term brain damage.  *Id.* ¶¶ 207-211, 217.

The MTBI Committee's findings were a sham.  *Id.* ¶ 105.  Its head, Dr. Elliot Pellman, was unqualified and served as a mere mouthpiece for the NFL's political agenda.  *Id.* ¶¶ 157-158, 204-205, 209.  It conducted severely flawed studies (*id.* ¶¶ 170-171, 187), fired scientists who dissented from its faulty conclusions (*id.* ¶ 188), and actively disputed other studies that revealed the truth (*id.* ¶¶ 189, 199, 213).  As one commenter noted, the core purpose of the Committee's work was not scientific inquiry, but to "send[ ] a message" that it is "acceptable to return players [to play] while still symptomatic."  *Id.* ¶ 172.

The NFL's false statements also extended beyond the MTBI Committee.  In August 2007, the league issued a concussion pamphlet stating that "[c]urrent research" had "not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly."  *Id.* ¶ 200.  During the same time period, Commissioner Goodell stated that the NFL "want[s] to make sure all NFL players . . . are fully informed and take advantage of the most up to date information" about concussions.  *Id.* ¶ 201 (ellipsis in original).  Before and after that statement, the NFL and the MTBI Committee continued to deny any link between football-related brain injuries and long-term cognitive decline.  *Id.* ¶¶ 207, 211-213, 217, 219.

It was not until 2010, after a series of congressional hearings sparked a firestorm of controversy, that the NFL began to acknowledge publicly the risks of head trauma in football –

risks the medical literature had recognized since the 1920s.  *Id.* ¶¶ 231-234.  Under intense

pressure, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical

Committee" and expelled several of its members.  *Id.* ¶¶ 233-234.  The new Medical Committee

admitted that the data collected by the MTBI Committee were "infected" (*id.* ¶ 234) as a result of

the former Committee's "inherent conflict of interest" that was "not acceptable by any modern

standards" (*id.* ¶ 236).  Finally, in 2011, the NFL adopted a number of changes designed to

reduce the risks of brain injury, including mandatory baseline cognitive testing, standardized

return-to-play rules, and active monitoring of players for MTBI.  *Id.* ¶ 289.

        For Players, the NFL's admission came too late.  As a result of repeated concussive and

sub-concussive head impacts, Players developed latent neurological disorders, which fully

manifested themselves only years after retirement.  *Id.* ¶¶ 71, 74-75, 254-261.  Players have felt

the brunt of those disorders decades after their careers, when they have been separated from

football, their teams, and their teams' doctors.  Honest information about their conditions during

retirement would have given Players the chance to seek appropriate diagnostic medical care and

treatment, as well as to prepare for necessary lifestyle and financial adjustments.  *Id.* ¶¶ 245, 317.

By actively concealing the risks of repeated head trauma for its own monetary gain, the NFL

prevented Players from obtaining the treatment and counseling they needed.

**E.      The Collective Bargaining Agreements**

        The NFL contends (at 6) that the "terms and conditions" of Players' employment were

"defined by the CBAs that were operative during [their] careers."  The Complaint, however,

makes no reference to any CBA, and it contains no claims that pertain to any CBA.[2]  Other than

---

[2] As extrinsic evidence outside the complaint, the NFL's attempt to insinuate factual matter at the pleadings stage is improper.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."); *Gray v. Keystone Steel & Wire Co.*, No. 08-1197, 2009 WL 187895, at *1 (C.D. Ill. Jan. 21, 2009) (refusing to "consider

the 2011 CBA (which is irrelevant to Players, who retired before 2011), the NFL itself was a signatory to only the 1968 CBA, which expired in 1970. *Compare* Ex. 2 (1968 CBA) at 1 *and* Ex. 11 (2011 CBA) at 255 *with* Exs. 3-10, 12-14.[3]  Moreover, before 1968 – and between 1987 and 1993 – there was no CBA in effect.  The NFL nonetheless cites a number of CBA provisions that it argues are relevant to this litigation, as well as provisions in the NFL Constitution and Bylaws.  Those various provisions – while imposing a bevy of duties on individual Clubs and Club personnel – impose no duties on the NFL itself.

The NFL cites (at 7-9) various CBA provisions relating to its constituent Clubs' duties to provide medical care to NFL players during their playing careers.[4]  Each provision sets forth Clubs' responsibilities to active NFL players, but is silent as to retired players.[5]  The NFL also cites one provision (first appearing in 1982) creating a "Joint Committee on Player Safety and Welfare," which shall "not have the power to commit or bind either the [NFL Players Association ("NFLPA")] or the Management Council on any issue."  Ex. 5, Art. XI § 3.  Similarly, the NFL cites (at 34 n.15) a provision of the NFL Constitution vesting the NFL with authority to make recommendations regarding proposed rules changes, but does not explain how or why that provision is relevant here.  *See* Ex. 14 (1984 NFL Constitution), Art. XI § 11.2.

---

the excerpts of the CBA" where complaint did not "refer to the CBA").  Nonetheless, because the CBAs are central to the NFL's preemption argument, this Opposition demonstrates that the CBAs are irrelevant to the duties that Players allege.

[3] "Ex." refers to exhibits to the Declaration of Dennis L. Curran, which the NFL submitted with its Motion to Dismiss.  *See* Dkt. No. 3589-3.

[4] *See* Ex. 6 (1993 CBA), Art. XLIV § 1, Ex. 10 (2006 CBA), Art. XLIV § 1 (Club physicians' duty to warn players about injuries "aggravated by continued performance"); Ex. 5 (1982 CBA), Art. XXXI § 2, Ex. 6, Art. XLIV § 2, Ex. 10, Art. XLIV § 2 (requirement that trainers obtain certification); Ex. 5, Art. XXXI § 1, Ex. 6, Art. XLIV § 1, Ex. 10 Art. XLIV § 1 (requirement that Clubs employ orthopedic surgeon); Ex. 13 (1980 Supp. Const.), Art. XVII, at 12 (procedure for predicting "recovery time" of players on "Reserve/Injured" list).

[5] The NFL also cites provisions relating to active players' rights to receive certain medical care, including the right to a second medical opinion (Ex. 5, Art. XXXI § 3; Ex. 6, Art. XLIV § 3; Ex. 10, Art. XLIV § 3); to choose a surgeon (Ex. 5, Art. XXXI § 4; Ex. 6, Art. XLIV § 4; Ex. 10, Art. XLIV § 4); and a standardized pre-season physical examination, conducted by a team physician (Ex. 5, Art. XXXI § 5; *see also* Ex. 6, Art. XLIV § 5; Ex. 10, Art. XLIV § 5).  Those provisions first appeared in 1982, and they relate exclusively to active players.

The NFL further refers (at 10) to what it calls the CBAs' "broad arbitration clause[s]" that provide for arbitration of disputes requiring the "interpretation or application of" a CBA provision. Ex. 4 (1977 CBA), Art. VII § 1. Since 1970, the CBAs also have included provisions for "injury grievance[s]," which apply to a player's claim that he was physically disabled at the time his "Standard Player Contract is terminated as the result of a football injury." Ex. 3 (1970 CBA), Art. XI; *see also* Ex. 4, Art. IX § 1; Ex. 5, Art. IX § 1. The Complaint contains no allegations about whether any Player contracts were terminated for injury reasons. The NFL states that it "intends to argue at a later date" – but does not now – that Players failed to follow the identified "grievance procedures." Def. Mem. 16 n.8; *see also id.* at 6 n.2.[6]

## ARGUMENT

Preemption is an affirmative defense on which the NFL bears the burden of proof. *See Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 230 (3d Cir. 2001). A motion to dismiss is not the "proper vehicle" for adjudicating such a defense unless it is "apparent on the face of the complaint." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997) (internal quotations omitted). In determining whether the NFL's preemption defense appears from the face of Players' allegations, this Court should construe those allegations "in the light most favorable" to Players. *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations omitted). Dismissal is proper only if the NFL can show that Players' allegations, so construed, are clearly preempted by LMRA § 301. *See DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, No. 10-cv-1341, 2012 WL 748760, at *10-11 (E.D.N.Y. Mar. 7, 2012)

---

[6] The NFL cites a number of provisions relating to workers' compensation and supplemental disability benefits. Ex. 2, Art. XI § 4; Ex. 3, Art. XV § 7; Ex. 4, Art. XXXIII; Ex. 5, Arts. XXIV, XXXVI; Ex. 6, Arts. L, LI, LIV; Ex. 10, 2006 CBA Arts. L, LI, LIV. The NFL also cites the 2006 CBA provision establishing, for the first time, a dementia benefit for retired NFL players. Ex. 10, Art. XLVIII-D; *see also* Ex. 11, Arts. 58 § 1, 65 § 1. The Complaint does not allege that Players are entitled to that dementia benefit, and Players take no position on its scope.

(denying motion to dismiss based on § 301 as "premature" because it was "unclear" whether CBA interpretation was required).[7]   The NFL falls well short of that standard here.

## I.   Section 301 Preemption Is Limited to Claims That Require a Court To Resolve a Bona Fide Interpretive Dispute Regarding a CBA's Terms

In enacting LMRA § 301,[8] Congress had only a "limited purpose":  to "ensur[e] that a uniform law is applied in interpreting [CBAs]."  *Berda v. CBS Inc.*, 881 F.2d 20, 27 (3d Cir. 1989).  To protect this narrow interest in interpretive uniformity, the LMRA preempts state-law claims whose resolution is "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract."  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).  Preemption of such claims forestalls the " 'possibility that individual contract terms might have different meanings under state and federal law.' "  *Id.* at 210 (quoting *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962)).

The Supreme Court long has recognized that achieving that narrow purpose does not require the preemption of "every dispute . . . tangentially involving a provision of a [CBA]."  *Id.* at 211.  Mere topical similarity between a claim and a CBA does not justify a finding of preemption.  *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408 (1988) (preemption requires more than mere "parallelism" between a "state-law analysis" and a CBA).  Nor does the "bare fact that a [CBA] will be consulted in the course of state-law litigation."  *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994).  Rather, § 301 preempts a state-law claim only if "resolution" of that claim will "require" the court to "constru[e] the [CBA]."  *Lingle*, 486 U.S. at 407.

---

[7] Courts have generally noted a "preference for allowing fuller factual development prior to ruling on preemption."  *Exal Corp. v. Roeslein & Assocs., Inc.*, No. 4:12-CV-01830, 2012 WL 4754748, at *3 (N.D. Ohio Oct. 2, 2012); *see Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1245-46 (W.D. Wash. 2007) (noting that Lanham Act preemption is typically "decided with a developed factual background on summary judgment"); *Gelow v. Central Pac. Mortg. Corp.*, No. Civ. S-07-1988 LKK/KJM, 2008 WL 436935, at *6 (E.D. Cal. Feb. 14, 2008) (same for Employee Retirement Income Security Act of 1974).

[8] LMRA § 301(a) provides in relevant part that "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . , or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties."  29 U.S.C. § 185(a).

The Third Circuit strictly observes those requirements and limits § 301 preemption to claims that force a court to resolve a concrete interpretive dispute over a specific CBA provision. Thus, in *Kline v. Security Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004), the Third Circuit held that employees' negligence claims – alleging that their employer subjected them to unreasonable electronic surveillance – were not preempted because a court could "define the scope of the duties alleged to have been breached" without construing any specific CBA provision. *Id.* at 261. Although the CBA was "part of the context in which [the employees'] claim must be addressed," § 301 preemption was unjustified "in the absence of some substantial dispute over the meaning" of a CBA provision. *Id.* at 257. Because the employer identified no such interpretive dispute, and instead could show only that the employees' claims might "relate to a subject . . . contemplated by the CBA," the court rejected its preemption argument. *Id.* at 256.

Similarly, in *Voilas v. General Motors Corp.*, 170 F.3d 367 (3d Cir. 1999), the Third Circuit found no preemption of a claim that "GM committed common-law fraud by intentionally lying . . . about the status of [a] plant in order to induce [employees] to leave." *Id.* at 376. Because GM failed to articulate any specific interpretive dispute over the terms of a relevant CBA provision, the court held that "[r]esolution of the common-law fraud issue . . . will not frustrate the uniform development of federal law governing labor contract interpretation." *Id.* at 378. At most, GM had shown that the "parties' agreements may be referred to in the course of deciding" the plaintiffs' claims; the court found such general reference to a CBA "of little moment to the preemption question." *Id.* at 377.

In sum, under the Third Circuit's demanding standard for § 301 preemption, a claim is preempted only if it requires a court to *interpret* the terms of a CBA provision, and only if the parties reasonably dispute the meaning of those terms. *See Kline*, 386 F.3d at 256. Without an

12

actual interpretive dispute, there is no § 301 preemption, even if a CBA provision may be tangentially relevant as a factual matter.  *See id.*

## II.    The NFL Fails To Show That Players' Claims Would Require This Court To Resolve a Bona Fide Interpretive Dispute Over a CBA Provision

The NFL makes little effort to satisfy the Third Circuit standard for § 301 preemption. Although the NFL asserts generally that various CBA provisions are relevant to Players' claims, it fails to identify any actual dispute over the proper interpretation of those provisions.  Whatever the theoretical merits of the NFL's arguments, its motion to dismiss is "premature" at best. *Chavez v. Don Stoltzner Mason Contractor, Inc.*, No. 10 C 264, 2010 WL 1417029, at *4 (N.D. Ill. Apr. 5, 2010) (denying motion to dismiss because the parties had "not yet staked out positions on the meaning of the relevant CBA provisions").  At this early stage of the litigation, neither Players nor the NFL have had occasion to take a position on the proper meaning of any CBA provision.  Unless and until both sides proffer competing and plausible interpretations of a specific provision – creating a bona fide interpretive dispute for this Court to resolve – Players' claims simply do not implicate § 301.  *See Kline*, 386 F.3d at 256.[9]

In any event, Players' claims do not depend on the legal meaning of any CBA provision. The CBAs are silent as to the NFL's duties to safeguard player health, and the NFL does not argue otherwise.  Instead, the NFL cites provisions that impose duties on Clubs and doctors, and that pertain exclusively to active (not retired) Players.  Players' claims do not require interpretation of those provisions.  At most, the NFL's arguments show that Players' claims

---

[9] *See also Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 758 (7th Cir. 2008) (holding analogous Railway Labor Act preemption provision inapplicable where "the parties do not dispute the interpretation of the relevant CBA provisions") (internal quotations and brackets omitted); *Wynn v. AC Rochester*, 273 F.3d 153, 158 (2d Cir. 2001) (finding no preemption because "there is no genuine issue between the parties concerning interpretation of the CBA"); *Beals v. Kiewit Pac. Co.*, 114 F.3d 892, 895 (9th Cir. 1997) (finding no preemption because "none of the terms of the CBA relevant to [plaintiff's] claim is subject to conflicting meanings"); *Basa v. Rizza Chevrolet, Inc.*, 750 F. Supp. 2d 987, 989 (N.D. Ill. 2010) (holding it "premature to rule on the question of [§ 301] preemption" where "defendant does not identify any disagreement with plaintiff over the meaning of any CBA provisions").

tangentially "relate to a subject . . . contemplated by the CBA." *Kline*, 386 F.3d at 256. That does not support preemption.

### A.     Players' Negligence Claims Do Not Require CBA Interpretation

**1.     Players' negligence claims do not require this Court to interpret any CBA provision.**[10] To prevail on those claims, Players must demonstrate that the NFL breached "a duty or obligation recognized by law" and "a causal connection between the conduct and the resulting injury." *Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 n.5 (Pa. 1983).[11] The common law recognizes a "social duty of every person" – created not by "contract" but "imposed by law" – to "take thought and have a care lest his action result in injuries to others." *Prost v. Caldwell Store, Inc.*, 187 A.2d 273, 276 (Pa. 1963) (internal quotations and emphasis omitted). Whether the NFL breached that fundamental duty depends not on any CBA obligation, but on whether it acted with a "lack of elementary forethought" required of every person in society. *Id.* (internal quotations omitted).

Players allege that the NFL acted negligently by spreading misinformation (or withholding information) about the risks of neurological injury associated with professional football (MAC ¶¶ 99, 103, 303-319); by failing to advocate helmet standards capable of reducing Players' exposure to head injuries (*id.* ¶¶ 11, 324-325, 333); by glorifying the type of violent hits

---

[10] For purposes of this Opposition, Players use the term "negligence claims" to refer to their claims for medical monitoring, MAC ¶¶ 249-266; negligent misrepresentation, *id.* ¶¶ 303-319; pre-1968 negligence, *id.* ¶¶ 320-333; post-1968 negligence, *id.* ¶¶ 334-347; negligence from 1987-1993, *id.* ¶¶ 348-351; post-1994 negligence, *id.* ¶¶ 352-365; negligent hiring, *id.* ¶¶ 370-375; and negligent retention, *id.* ¶¶ 376-382. By "fraud claims," Players refer to their claims for fraudulent concealment, *id.* ¶¶ 273-286; fraud, *id.* ¶¶ 287-302, and civil conspiracy/ fraudulent concealment, *id.* ¶¶ 422-425. The MAC's remaining counts – for declaratory relief, *id.* ¶¶ 246-248, wrongful death, *id.* ¶¶ 267-272, and loss of consortium, *id.* ¶¶ 366-369 – simply require some underlying tort and should proceed if any of Players' other claims survive the NFL's motion to dismiss.

[11] Like the NFL, *see* Def. Mem. 18 n.10, Players cite Pennsylvania law for illustrative purposes. Any choice-of-law analysis, however, should be reserved for a "later stage in the proceedings." *Graboff v. The Collern Firm*, Civil Action No. 10-1710, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010) (noting that "courts within the Third Circuit" decline to resolve complex choice-of-law issues "at the motion to dismiss stage"). And, until this Court determines the applicable law, it should allow Players' claims to proceed as long as they can avoid preemption under the law of *any* state. *See id.*

that led to brain damage (*id.* ¶¶ 50-66); by encouraging Players to return to play prematurely (*id.* ¶¶ 10, 50-52, 309, 333); and by failing to advocate rules changes to protect them from concussive injury (*id.* ¶¶ 6, 86-88, 92, 154, 333).  Those actions contravened the NFL's basic duty to take reasonable precautions to safeguard the health of its players.

That duty is rooted in the NFL's historical actions and statements, not in contract. Indeed, the NFL's role as overseer and protector of the game of football has a long history, much of which predates the creation of the first CBA in 1968.  *E.g.*, *id.* ¶¶ 91-93.  The NFL's duty thus arises from a series of historical actions:  its own statements holding itself out as a protector of player well-being (*id.* ¶¶ 86, 88, 93-94, 201, 310, 340); its successful efforts to obtain unparalleled access to comprehensive data concerning athletics and neurological risk (*id.* ¶¶ 84-85, 89, 278, 329, 333); its public glorification of football violence, which exacerbated the very risks that it refused to acknowledge (*id.* ¶¶ 50-66); and its voluntary decision to create the MTBI Committee to report on neurological risks to NFL players (*id.* ¶¶ 352-365).[12]

Thus, Players' allegations do not require a court even to consider the CBAs, let alone construe them.  Instead, determining whether the NFL's historical actions gave rise to the alleged duty of care will require a court to weigh:  (1) the "relationship" between the NFL and the Players; (2) the "utility" of the NFL's conduct; (3) the "nature" and "foreseeability" of the risk; (4) the "consequences of imposing [a] duty" on the NFL; and (5) the "overall public interest." *R.W. v. Manzek*, 888 A.2d 740, 746-47 (Pa. 2005) (internal quotations omitted).  Those factors reflect "considerations of public policy," not of contract.  *Id.* at 746; *see Sharpe v. St. Luke's*

---

[12] Players analyze these duties collectively because the NFL's preemption defense fails as to all of them. As a substantive matter, however, the alleged duties are independent:  the NFL's duty to warn Players about neurological risks, for example, is distinct from its duty to advocate rules changes to reduce the risk of concussive injuries.  *Compare* MAC ¶ 102 *with id.* ¶ 92.  It is the NFL's burden to demonstrate preemption separately as to *each* alleged duty.  Thus, even if this Court were to find *one* of Players' negligence claims preempted, that finding would not affect the remainder of Players' claims.  *See Stringer v. NFL*, 474 F. Supp. 2d 894 (S.D. Ohio 2007) (analyzing each negligence claim separately and finding only some preempted).

*Hosp.*, 821 A.2d 1215, 1220 n.3 (Pa. 2003) (the law may "impose a duty . . . against one operating under a contract, without reference to the terms of that contract"). Here, those considerations support liability:  the NFL's historical statements, marketing practices, and monetary exploitation of Players gave rise to a "special relationship" that demanded the exercise of heightened care.  MAC ¶¶ 99, 107.  As in *Kline*, none of those facts "invoke[s] any duty of care prescribed by the CBA."  386 F.3d at 261.[13]

**2.      The NFL cannot cite any provision of the CBAs whose meaning affects the scope of the NFL's common-law duty.**  In fact, the CBAs are wholly silent on whether the NFL had any health-related duties with respect to Players.  Given that silence, the NFL is forced to argue (at 20) that Players' claims are preempted because the CBAs placed separate duties on "Club medical staff" that in turn affected the scope of the NFL's own duties.  That argument misunderstands not only Third Circuit § 301 precedent, but also basic tort law.

**a.**      The NFL's argument rests on the premise that its own duties to Players somehow could be lessened if Clubs and doctors also owed them similar duties.  But "[i]n an action for injury alleged to result from a neglect of duty by the defendant, it is no defense that a similar duty rested upon another person."  57A Am. Jur. 2d *Negligence* § 80.[14]  As then-Judge Breyer explained, a party who fails to take reasonable precautions cannot escape liability "simply because two (or three, or thirty) colleagues also failed to take proper care."  *Lyon v. Ranger III*, 858 F.2d 22, 25 (1st Cir. 1988).  Were it otherwise, "individual responsibility" would "diminish . . . in direct proportion to" the number of actors involved, "thereby encouraging individual

---

[13]  *See, e.g., Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366-67 (3d Cir. 1993) (college's "special relationship" to lacrosse player gave rise to duty of care under Pennsylvania law).

[14]  *See also Union Stock Yards Co. of Omaha v. Chicago, B. & Q.R.R. Co.*, 196 U.S. 217, 227-28 (1905) (holding train terminal solely liable for negligent inspection, even though "railroad company" was "guilty of a like neglect of duty in failing to properly inspect the car"); *Dougherty v. Hooker Chem. Corp.*, 540 F.2d 174, 178 (3d Cir. 1976) (duty to warn requires "reasonable assurance that the information will reach those whose safety depends" on it, regardless of whether "third person" also has similar duty) (internal quotations omitted).

negligence." *Id.* at 25-26.  The scope of the NFL's duty therefore turns on its own statements, actions, and unique understanding of brain injuries.  If the NFL acted unreasonably in light of those facts, it is liable for Players' "entire damages award."  *Baker v. ACandS*, 755 A.2d 664, 669 (Pa. 2000).  The NFL's "recourse" for the possible negligence of others is not to reduce its own liability, but to "sue the nonpaying joint tortfeasors in contribution."  *Id.*  Only in a separate contribution action might the CBA provisions cited by the NFL become relevant.

The general principle that a party cannot shirk its own duty by pointing to the duties of others applies with particular force to the NFL.  The NFL deceived Club doctors (as well as Players) by insisting repeatedly that head trauma carried little long-term risk for football players. *Id.* ¶¶ 212-213.  The NFL cannot escape liability merely because those doctors followed the NFL's lead and failed to warn Players about the danger of repetitive head impacts.  *See* RESTATEMENT (THIRD) OF TORTS:  LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 19 (2010) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of . . . a third party.").

Moreover, the NFL alone had the capacity to address football-related head injuries at a systemic level; only the NFL had the requisite access to data, credibility with Players, and broad influence necessary to achieve meaningful reform.  MAC ¶¶ 2, 6, 48-53, 84-89, 93-94.  It also possessed a broad array of remedial tools, including education through existing platforms like the MTBI Committee (*id.* ¶¶ 148-150, 243-245), prophylactic rules changes (*id.* ¶¶ 6, 86-88, 92, 100, 154, 333), and equipment standards (*id.* ¶¶ 11, 91-93, 324-325, 333).  Clubs and doctors – who were limited to warning individual players episodically against returning to play – lacked any comparable means for addressing the concussion crisis writ large.  In fact, individual doctors were incapable of ameliorating the long-term effects of repeated *sub-concussive* impacts, which

17

resulted from *latent* conditions that manifested themselves only years after retirement. *Id.* ¶¶ 71, 74-75, 254-261. The common law therefore imposes a heightened duty of care on the NFL, not the doctors who were in an inferior position to implement meaningful reforms.[15]

      **b.**      Even if teams and doctors were relevant to the NFL's own duty of care, Players' claims would not require interpretation of any CBA provision. No matter what the CBAs may have required Clubs and doctors to do, they *in fact* failed to warn Players about the dangers of playing with concussive and sub-concussive injuries. *Id.* ¶¶ 62-66, 97-98, 204-206. At most, it is that *fact* – the Clubs' and doctors' failure to take effective steps to protect Players – that informed the NFL's duty. Whether the Clubs and doctors were in theoretical breach of their CBA duties is wholly irrelevant. To the extent the Clubs' practices are even pertinent, therefore, this Court can evaluate them without so much as looking at the CBAs. *See Jurevicius v. Cleveland Browns Football Co.*, No. 1:09 CV 1803, 2010 WL 8461220, at *13 (N.D. Ohio Mar. 31, 2010) (failure-to-warn claim not preempted because it merely required "a court to compare the procedures that [the team] actually followed with . . . common-law requirements").

      The CBA provisions that the NFL cites only illustrate the point. The NFL places great emphasis (at 19-20, 27) on a provision that "determinations of recovery time for . . . injuries must be by the club's medical staff and in accordance with the club's medical standards." Ex. 13, Art. XVII, at 12.[16] That provision cannot support § 301 preemption of any of Players' claims. At the

---

[15] *See Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1061 (N.Y. 2001) ("key" to duty analysis is whether actor is "in the best position to protect against the risk of harm"); *see also Pyeritz v. Commonwealth*, 32 A.3d 687, 692 (Pa. 2011) (negligence liability requires courts "to make a policy judgment" about imposing a duty).

[16] This "recovery time" provision appears only in the NFL Constitution and Bylaws, not in any CBA. Players are not parties to the Constitution and Bylaws, and neither the NFLPA nor any other bargaining unit representing Players negotiated the provisions of that document. *See* Ex. 5, Art I. § 2 (recognizing that the "NFLPA has not participated in the promulgation of the NFL Constitution and Bylaws"). Thus, it cannot serve as a basis for § 301 preemption. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 396 (1987) (holding claims based on "state-law contract rights" not preempted "so long as the contract relied upon is *not* a [CBA]"). Of the two cases that the NFL cites (at 7 n.4) to the contrary, one stated that it would "not determine" whether the CBAs incorporate the Constitution and Bylaws, *Clarett v. NFL*, 369 F.3d 124, 143 n.19 (2d Cir. 2004), while the other merely speculated in *dicta* that

NFL's own urging, Clubs routinely allowed Players to return to play soon after suffering a concussive injury. *E.g.*, MAC ¶¶ 10, 65, 97-98. Whether those return-to-play decisions were reasonable turns on "the facts and the procedure . . . actually followed," not the meaning of loosely related CBA provisions. *Williams v. NFL*, 582 F.3d 863, 876 (8th Cir. 2009), *cert. denied*, 131 S. Ct. 566 (2010). The NFL is liable because it promoted procedures that exposed Players to unreasonable harm. Whether any given return-to-play decision complied with the CBAs is irrelevant.

The NFL fares no better when it invokes other CBA provisions governing teams and doctors. The NFL points (at 19-20) to CBA provisions requiring Club doctors to "advise" players about injuries "significantly aggravated by continued performance," Ex. 6, Art. XLIV § 1,[17] and to obtain board certification, Ex. 5, Art. XXXI § 1. Again, those provisions pose (at most) *factual* questions: whether doctors actually advised players about neurological risk, and whether the board certification process actually prepared Club doctors and trainers for diagnosing and treating head trauma. Neither question depends on the legal meaning of any CBA provision. *See Hendy v. Losse*, No. 89-55430, 1991 WL 17230, at *2 (9th Cir. Feb. 12, 1991) (judgment noted at 925 F.2d 1470) (claim that team negligently hired doctor not preempted because player did "not allege the [team] failed to hire a certified orthopedist or that he was not treated when he was contractually entitled"). Indeed, Players' claims do not turn in any way on the scope of the Club doctors' separate duty to advise (active) players about injuries.

The NFL's reliance on the "Joint Committee on Player Safety and Welfare" is likewise misplaced. *Cf.* Def. Mem. 22-23. That Committee does "not have the power to commit or bind

---

the CBA might "incorporate[ ] by reference (at most) only the NFL Constitution and its Bylaws," *Brown v. NFL*, 219 F. Supp. 2d 372, 387 (S.D.N.Y. 2002). In any event, the "recovery time" provision did not appear in the Constitution and Bylaws until 1980; it is therefore inapplicable to any Player who retired before that date.

[17] The requirement that the physician must inform the player did not appear in any CBA until 1993, and so cannot preempt the claims of any Player who played before that year.

either the NFLPA or the Management Council on any issue," Ex. 5, Art. XI § 3, and the NFL

does not contend otherwise.  Rather, the NFL argues (at 22-23) that the Committee's ability to

"discuss" player safety and to obtain an "advisory decision" about rules changes, Ex. 5, Art. XI

§§ 4, 9, affects the scope of the NFL's own duty of care.  The NFL cites no authority for the

proposition that an entity with the NFL's power and influence – holding itself out as the principal

guardian of player health – can escape liability merely because some committee could issue non-

binding recommendations on the same general subject.  Put simply, the NFL is "not [a] member[ ]"

of the Joint Committee and is "not required to adopt the committee's recommendations."

*Stringer*, 474 F. Supp. 2d at 912.  Accordingly, a court can determine the NFL's duty to

implement equipment standards and other rules changes without construing any provision

concerning the Joint Committee.  *See id.* (holding that claim alleging NFL's failure to require

proper equipment did not require a court to "interpret that provision, or any other").

### B.     Players' Fraud Claims Do Not Require CBA Interpretation

### 1.     The NFL's preemption defense also fails to blunt Players' fraud claims.

Those claims require Players to show:  (1) a representation; (2) which is material; (3) knowingly

or recklessly made falsely; (4) with the intent of misleading Players; (5) justifiable reliance;

and (6) an injury proximately caused by that reliance.  *See Gibbs v. Ernst*, 647 A.2d 882, 889

(Pa. 1994).  Players allege that the NFL defrauded them by concealing the risks of brain injury to

which it purposefully exposed them and by actively defending return-to-play protocols that it

knew to be dangerous.  MAC ¶¶ 20-21, 151-153, 275-277, 289-293.  Determining whether those

actions were fraudulent would not require CBA interpretation.

The Third Circuit has squarely held that, where a plaintiff alleges fraud stemming from

statements issued outside of the CBA bargaining process, the "elements of state law fraud" do

"not depend on the [CBA]."  *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 232 (3d Cir.

1995).  The Third Circuit's holding controls this case.  Determining whether the NFL's

statements were misleading demands a purely factual inquiry unrelated to any CBA provision.

*See Voilas*, 170 F.3d at 378 (allegation that "statement" was "untrue without a timely disclosure"

of additional facts was independent of CBA).  Players' allegations that the NFL acted with intent

to defraud similarly raise *factual* questions, not issues of contract interpretation.  *See id.* at 376

(distinguishing "factual questions about motive" from "the interpretation of a [CBA]").  In short,

Players' fraud claims turn on whether the NFL spoke about concussions truthfully and on how

those statements actually "affect[ed] the decisions of the [Players]."  *Id.*  Neither question

demands "investigation into the terms of the [CBAs]."  *Id.*

       **2.**      **The NFL's duty not to commit fraud did not depend on the meaning of any**

**CBA.**  The NFL responds (at 26) to Players' fraud claims with the same argument – that the

CBAs affect the NFL's "duty" – that it advances with respect to Players' negligence claims.

*See supra* pp. 16-20.  That argument also lacks merit here.  Players do not allege merely that the

NFL remained silent in the face of the concussion crisis; they allege that the NFL orchestrated

an affirmative "campaign of disinformation" designed to manipulate Players' understanding of

neurological risk.  MAC ¶ 151; *see id.* ¶¶ 154-155, 171-172, 199-202, 293.  That active obfuscation

was fraudulent, whether or not the NFL had any free-standing duty to disclose.  *See Voilas*,

170 F.3d at 378 (holding that "affirmative misrepresentations" can be fraudulent "[e]ven where

no duty to speak exists") (internal quotations omitted).  But, even if the NFL only concealed

(as opposed to lied about) Players' exposure to long-term chronic brain injuries, Players "need not

demonstrate the existence of an independent duty to disclose."  *Destefano & Assocs., Inc. v. Cohen*,

No. 2775JUNETERM2000, 2001 WL 1807790, at *4 (Pa. Com. Pl. Apr. 9, 2001); *see also*

*Barrett v. Freifeld*, 64 A.D.3d 736, 738 (N.Y. App. Div. 2009) (non-disclosure can be fraudulent where "one party's superior knowledge of essential facts renders nondisclosure inherently unfair").

Far from owing its existence to the CBAs, the NFL's obligation to refrain from misleading Players about the risks of head trauma was "grounded in the general duty" to avoid falsehoods when "making representations that could result in reliance." *American Guarantee & Liab. Ins. Co. v. Fojanini*, 90 F. Supp. 2d 615, 623 (E.D. Pa. 2000). "[C]ontract issues" are at most "collateral" to that general duty to avoid "fraud and misrepresentation." *Id.* at 623 n.13. The NFL's concealment of Players' exposure to chronic brain damage was unlawful not because it breached some CBA obligation, but because the risk of such damage was "peculiarly within the knowledge of [the NFL] and of such a nature that the [Players were] justified in assuming [those risks'] nonexistence." *Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599, 609 (M.D. Pa. 1994) (internal quotations omitted). As with Players' negligence claims, those fraud allegations require only evidence of actual events, not contract interpretation.

Nor need a court interpret the CBAs to determine whether the Players justifiably relied on the NFL's statements. The Third Circuit has held that the "reliance inquiry" in fraud cases requires only an assessment of whether the defendant's representation is "worthy of belief." *Voilas*, 170 F.3d at 377. "Patently, this is not a question that depends upon an interpretation of the [CBA]." *Id.*; *see Trans Penn Wax*, 50 F.3d at 232 (holding fraud claim not preempted because the "essence of the employees' case is proof of justifiable reliance on the separate [representations], not on the [CBAs]").

The NFL seeks to avoid the Third Circuit's clear holding by arguing that reasonable reliance generally turns on the "'relationship of the parties.'" Def. Mem. 27 (quoting *Tran v. Metropolitan Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005)). The very case the NFL quotes

undermines its argument.  After observing pertinent characteristics of the insurer/insured

relationship, such as "expertise" and "trust," the *Tran* court held that a "reasonable expectation

of coverage" that conflicts with the "terms of the policy" can "prevail over the language of the

policy."  408 F.3d at 136 (internal quotations omitted).  In other words, a party who reasonably

relies on a defendant's false representations can prevail even in the face of flatly contrary

contract language.  *See id.*  Given the absence of such directly conflicting CBA language here,

it is even clearer that the reasonableness of Players' reliance does not depend on the meaning of

the CBAs.  *See Kline*, 386 F.3d at 258 (plaintiffs' "justifiable expectation" required a court

"simply [to] consider[ ] the conduct of [defendant] and the facts and circumstances of [plaintiffs']

workplace"); *Voilas*, 170 F.3d at 377 (reliance inquiry "focus[es] on the credence given the

representation by the claimant," not CBA terminology).[18]

Even if contract language were theoretically relevant to fraud allegations in general, none

of the CBA provisions that the NFL cites bears on Players' claims here.  The NFL did not sign

most of the CBAs, and no cited provision pertains to the NFL's duty to speak truthfully about

health-related issues.  Thus, the NFL relies (at 19-20) on the same irrelevant CBA provisions

already discussed, which imposed general duties on Clubs and doctors, and created a non-

binding Committee allowing (but not obligating) the NFLPA to "discuss[ ] . . . player safety and

welfare."[19]  The NFL cannot plausibly contend that those provisions – none of which even

---

[18] The absence of any such contractual disclaimer distinguishes several of the cases on which the NFL
relies.  In *Atwater v. NFL*, 626 F.3d 1170 (11th Cir. 2010), the court found preempted the plaintiffs'
misrepresentation claim, which alleged that the NFL mischaracterized its financial training program; the court did so
because of an explicit "disclaimer" in the CBA that "players shall be solely responsible for their personal finances."
*Id.* at 1183.  Similarly, in *Jefferson v. D'Allessandro*, 681 S.E.2d 405 (N.C. Ct. App. 2009), the court held that the
plaintiff's medical malpractice claim – brought against a team physician for performing unauthorized surgery –
required it to confront an express CBA disclaimer declaring that Clubs "will not be responsible for or incur any
liability . . . relating to the adequacy or competency of . . . surgery" performed by Club doctors.  *Id.* at 414.

[19] Ex. 5, Art. XI § 4; *see id.* Art. XI (creating the "Joint Committee on Player Safety and Welfare");
*see also* Ex. 13, Art. XVII, at 12 ("club's medical staff" makes "determinations of recovery time"); Ex. 6, Art.
XLIV § 1 (Club doctors should "advise" players of certain medical conditions).

mentions the NFL – render Players' reliance on the NFL unreasonable as a matter of law. "[J]ustifiable reliance is typically a *question of fact* for the *fact-finder* to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction." *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007) (emphases added). Here, the alleged facts establish the reasonableness of Players' reliance:  the NFL historically purported to act in Players' best interests (MAC ¶¶ 86, 90-96); issued statements designed to "create[ ] an atmosphere of trust" (*id.* ¶ 280); and amassed – by touting its extensive research and leveraging its enormous media influence – significant public credibility on the health effects of head trauma (*id.* ¶¶ 84-87, 312).  Given those facts, the NFL was obligated to tell the truth about concussions, no matter what the CBAs may have required of other parties.

Ultimately, the NFL's argument boils down to the proposition that a fraud claim is preempted whenever a CBA has any relevance whatsoever to some abstract aspect of the parties' "relationship."  As the Second Circuit put it, that "argument proves too much," because it leads to a rule under which "an employee is never justified in relying upon any promise by the employer that is not enforceable under a CBA."  *Foy v. Pratt & Whitney Group*, 127 F.3d 229, 234 (2d Cir. 1997).  If preemption required only some broad connection between a CBA and the parties' relationship, "the existence of a CBA would require preemption in all cases involving representations made to employees."  *Id.*  The Supreme Court and the Third Circuit have roundly rejected such an overbroad approach to § 301 preemption.  *See Caterpillar*, 482 U.S. at 394 (independent "state-law contract claims" not preempted); *Voilas*, 170 F.3d at 376-77 (same).

### C.    Three Subsets of Players' Claims Categorically Avoid § 301 Preemption

As explained above, the NFL's preemption defense has no merit as to any of Players' claims.  Independently, this Court should reject the NFL's arguments as to three particular

subsets of Players' claims:  those that (1) allege the NFL's negligent performance of its own

voluntary undertaking; (2) concern the NFL's conduct toward retired Players; and (3) belong

to Players who played solely during periods not governed by any CBA.

First, the NFL's arguments do not apply to Players' claims that the NFL gratuitously

assumed a duty to report accurately on the neurological risks facing football players.  *See* MAC

¶¶ 352-365 (separate count alleging post-1994 gratuitous undertaking).  Players allege that the

NFL arrogated to itself the responsibility to communicate directly with players – both active and

retired – about the risks of permanent brain damage from professional football.  *E.g.*, *id.* ¶¶ 6,

15(d), 22, 86, 91, 99, 324.  Specifically, while the NFL's MTBI Committee was publishing

papers downplaying the risk of neurocognitive injury associated with football-related head trauma

(*id.* ¶¶ 168-169), the NFL issued a pamphlet to players purporting to advise them on the status

of "[c]urrent research" on the "long-term effects of concussion[s] in NFL athletes" (*id.* ¶ 200)

(ellipsis in original).   Commissioner Goodell also announced that "[w]e want to make sure all

NFL players . . . are fully informed and take advantage of the most up to date information and

resources as we continue to study the long-term impact on concussions."  *Id.* ¶ 201 (ellipsis in

original).

The NFL's voluntary assumption of a duty to advise players about concussive risks

required it " 'to exercise reasonable care' " when performing that duty.  *Spence v. ESAB Group,*

*Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) (quoting RESTATEMENT (SECOND) OF TORTS § 323

(1965)).  The scope of such a gratuitously assumed duty "is measured by the scope of [the

party's] undertaking."  *Patentas v. United States*, 687 F.2d 707, 716 (3d Cir. 1982).  Players'

voluntary-undertaking claim therefore turns on the scope of what the NFL itself purported to do – not on what the CBAs required.[20]

*Second*, the NFL's preemption defense does not apply to claims that center on the NFL's treatment of retired players.  The MAC alleges (at ¶¶ 245, 282, 317) that the NFL's misrepresentations about football-related head injuries harmed retired Players by preventing them from seeking timely "treatment of their latent neurodegenerative conditions."  That allegation does not implicate any CBA provision.  The NFL cites (at 29) two "post-retirement benefits provisions," which it argues affect the NFL's "duty to disclose" to retired players the long-term risks of football-related head trauma.  But those "benefits provisions" did not appear in any CBA until 2006 and do not apply to retired Players who had already relied to their detriment on the NFL's prior misrepresentations.  Moreover, the CBA's post-hoc provision of benefits for former players already suffering from dementia – a program not implemented in any concrete way until the 2011 CBA, *see* Ex. 11, Art. 58 § 1 – has no bearing on whether the NFL breached a duty to protect those players from developing dementia in the first place.  Those benefits provisions are *remedial* provisions – unrelated to the NFL's *duty* of care – and therefore cannot support § 301 preemption.  *See Livadas*, 512 U.S. at 125 (holding that a CBA's relevance to "damages computation" does not justify § 301 preemption).

*Third*, the NFL's arguments are inapplicable to Players who retired before 1968, *see id.* ¶¶ 324-333, as well as those whose careers fell entirely between 1987 and 1993, *see id.* ¶¶ 348-351.  Because no CBA was in effect during those time periods, claims concerning those periods

---

[20] Players' negligent-hiring-and-retention claims are not preempted for similar reasons.  Players allege that the NFL negligently hired and retained unqualified employees to serve on the MTBI Committee.  MAC ¶¶ 370-382.  Those claims turn on the NFL's selection process for – and relationship to – its *own employees*, which no CBA even discusses.  *See Vicky M. v. Northeastern Educ. Intermediate Unit 19*, 486 F. Supp. 2d 437, 463 (M.D. Pa. 2007) (plaintiff stated claim for negligent hiring and negligent retention by alleging employer's failure "to exercise reasonable care in selecting, supervising and controlling employees") (internal quotations omitted).

do not implicate § 301.  *See Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25 (2d Cir.

1988) (holding that preemption applies "only where state law claims coincide with *current*

[CBAs]").  The NFL acknowledges (at 18 n.9) that its preemption defense turns on "whether

CBAs were in effect at the time of the Plaintiffs' alleged head traumas," which occurred "during

Plaintiffs' NFL playing careers."  At a minimum, then, the NFL's motion should be denied with

respect to any Player whose career did not coincide with a CBA.

### D.      Even if It Applies, § 301 Does Not Justify *Dismissal* of Players' Claims

Even if Players' claims implicated § 301, the NFL has not shown that they should be

dismissed.  Section 301 "pre-emption should not be lightly inferred," because preemption risks

usurping "the traditional police power of the State."  *Fort Halifax Packing Co. v. Coyne*, 482

U.S. 1, 21 (1987).  Thus, although CBA interpretation is necessary for § 301 preemption, it is not

sufficient.  The Supreme Court has recognized that many state-law claims "depend for [their]

resolution" on both "the interpretation of a [CBA]" and "a separate state-law analysis."  *Lingle*,

486 U.S. at 413 n.12.  For those claims, § 301 does not require *dismissal*, but merely supplies the

law under which the CBA should be interpreted in the course of performing the state-law

analysis.  *See id.* (noting that "federal law would govern the interpretation of the agreement, but

the separate state-law analysis would not be thereby pre-empted").[21]

Thus, even if Players' claims eventually will require this Court to resolve a dispute

between two plausible interpretations of a CBA provision, that alone would not trigger any § 301

preemption question at this time.  Rather, this Court should resolve the bulk of Players' claims in

---

[21] *See also LaRosa v. United Parcel Serv., Inc.*, 23 F. Supp. 2d 136, 148 n.12 (D. Mass. 1998) (applying *Lingle* and noting that, "[e]ven if . . . a part of the [state-law liability] analysis depends on an interpretation" of a CBA, that alone would "not result in preemption"); *Brown v. Holiday Stationstores, Inc.*, 723 F. Supp. 396, 405 (D. Minn. 1989) (applying *Lingle* and holding that possible "interpretation of the [CBA]" would merely "require application of federal law," not § 301 preemption); *cf. Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 375 (3d Cir. 1999) (although Federal Aviation Act of 1958 preempts the field of aviation safety, "traditional state . . . law remedies continue to exist for violation of those [federal] standards").

accordance with state-law principles, while simply applying federal law in due course to resolve any issues that may eventually necessitate CBA interpretation.  *See id.* (endorsing that methodology "as a general proposition"); *Livadas*, 512 U.S. at 123 n.17 (noting that § 301 does not forbid courts from "interpreting the terms of [CBAs] in resolving non-pre-empted claims"). That approach would further § 301's "limited purpose" of ensuring CBA interpretive uniformity. *Berda*, 881 F.2d at 27.  Dismissing Players' claims wholesale – especially at this early stage in the litigation – would therefore be inappropriate.

## III.    The NFL's Arguments Are Unpersuasive

The NFL does not explain in any detail how Players' claims would require this Court to resolve an actual interpretive dispute over the CBA provisions that it cites.  Instead, the NFL attempts to evade the Third Circuit standard by:  (1) urging (at 24) this Court to follow a so-called "long line of NFL preemption cases" from other courts; and (2) contending that Players' claims – even if not requiring interpretation of the CBAs – "arise under" those CBAs.  *Cf.* Def. Mem. 30-32.  Both arguments lack merit.

### A.    The NFL's Cases Are Distinguishable and Unpersuasive

Many of the cases in the NFL's "long line" of precedent are plainly inapplicable here. Some involved allegations against individual Clubs and doctors, on whom the CBAs impose a variety of health-related duties.[22]  Others involved a CBA provision disclaiming liability for the

---

[22] *Cf. Smith v. Houston Oilers, Inc.*, 87 F.3d 717, 720, 721 (5th Cir. 1996) (claim that Club "compelled participation" in a rehabilitation program "under threats of termination" required determination of whether such "rehabilitation demands were *permissible*" under the CBA); *Givens v. Tennessee Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010) (allegation that Club physician failed to disclose results of x-ray was preempted because of CBA provision directly requiring physician to "advise the player" of such results); *Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1174-78 (N.D.N.Y. 1990) (claim that team trainers and physicians "refused to discuss the nature of [plaintiff's] injury with him" was preempted because of CBA provision requiring Clubs to disclose known injuries to players).

very conduct that the plaintiff alleged.[23]  Another turned on whether a Club-required drug test

was a "condition of possible employment," which depended on the Club's authority under the

CBA.[24]  Players' claims bear little resemblance to the claims at issue in those cases, and the NFL

devotes only cursory attention to them.  *Cf.* Def. Mem. 24-25.  Instead, the NFL relies primarily

on the following four cases, none of which supports dismissal of Players' claims.

> **1.      The NFL's two principal cases offer it no support.**  The NFL relies most

heavily on *Duerson v. NFL*, No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012), and

*Maxwell v. NFL*, No. CV 11-08394 (C.D. Cal. Dec. 8, 2011), both of which are now part of this

MDL.[25]  That reliance is misplaced.  To begin with, both decisions concerned a motion to

remand and addressed only whether federal jurisdiction existed over the plaintiffs' claims.

As such, both courts confined their analysis to the plaintiffs' negligence claims, concluding that

§ 301 jurisdiction over those claims created supplemental jurisdiction over the fraud claims.

*See Duerson*, 2012 WL 1658353, at *6; *Maxwell* at 2.  That holding has no relevance to whether

§ 301 *preempts* Players' fraud claims.  *See supra* pp. 21-24.  Nor does the holding that § 301

*created* federal jurisdiction suggest that it compels *dismissal* of Players' negligence claims.

*See supra* pp. 27-28.[26]

---

[23] *See supra* p. 23 n. 18 (discussing *Atwater* and *Jefferson*).  *Atwater* is also distinguishable because the alleged duty – for the NFL to recommend competent financial advisors – "arose directly from the CBA" provisions directing the NFL to "use best efforts" in establishing a CBA-mandated "Career Planning Program."  626 F.3d at 1179, 1182.  Such is not the case here:  the NFL has identified no CBA provision requiring that the NFL itself *do anything* with respect to concussions, much less one requiring that it "use best efforts" in doing so.

[24] *Cf. Holmes v. NFL*, 939 F. Supp. 517, 520 (N.D. Tex. 1996).  The court held that the falsity of the Club's alleged misrepresentation – that a marijuana test was a required condition of employment – turned on whether the CBA actually gave the Club "the right to request that [the plaintiff] submit to a pre-employment drug test."  *Id.* at 527.

[25] The remaining two of the "four remand motions" that the NFL references (at 11) were related to *Maxwell* and resulted in materially identical orders.  *Cf. Pear v. NFL*, No. CV 11-08395 (C.D. Cal. Dec. 8, 2011); *Barnes v. NFL*, No. CV 11-08396 (C.D. Cal. Dec. 8, 2011).

[26] *Duerson* and *Maxwell* concerned the doctrine of "complete preemption," which "operates to confer original federal subject matter jurisdiction notwithstanding the absence of a federal cause of action on the face of the complaint."  *In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999).  By contrast, this case concerns "ordinary preemption," which is a "federal defense to a state-law claim."  *Id.*

Further, Players' negligence allegations are distinguishable from those that *Duerson* and *Maxwell* found subject to the complete preemption doctrine for removal purposes. Neither case involved the Complaint's detailed historical allegations showing that the NFL assumed a duty of care predating any CBA and stemming from the common law. *See supra* pp. 14-16. Nor did either involve a claim of an independent gratuitous undertaking. *See supra* pp. 25-26. Rather, Duerson alleged a generic duty "to keep [players] reasonably safe" and to provide "up-to-date medical information," while the *Maxwell* plaintiffs alleged a duty "to ensure accurate diagnosis and recording of concussive brain injury."[27] The courts found that those allegations – one shorn of historical context, the other suggesting that the NFL had a duty to collaborate with Club doctors to make medical diagnoses – depended on CBA provisions addressing Clubs' health-related duties.[28] Players' claims suffer from neither flaw.

Moreover, both the *Duerson* and the *Maxwell* courts simply assumed – without citation or significant analysis – that the CBA duties of Clubs and doctors might absolve the NFL of responsibility for its own negligence. *See Duerson*, 2012 WL 1658353, at *4 (assuming that, if the "NFL's clubs" had a duty "to monitor a player's health," the "NFL could then reasonably exercise a lower standard of care in that area itself"); *Maxwell* at 1-2 (similar). That erroneous assumption, which neither the *Duerson* nor the *Maxwell* plaintiffs ever challenged, underpinned both courts' holdings that the plaintiffs' claims required CBA interpretation. *See Duerson*, 2012 WL 1658353, at *4 (relying on that assumption to justify conclusion that CBA provisions "address[ing] player health and safety . . . may be interpreted"); *Maxwell* at 2 (relying on similar

---

[27] Compl. ¶ 22, *Duerson*, No. 12 C 2513 (removed to N.D. Ill. Apr. 5, 2012); Compl. ¶ 548(d), *Maxwell*, No. CV 11-08394 (removed to C.D. Cal. Oct. 11, 2011).

[28] *See Duerson*, 2012 WL 1658353, at *4 (holding that Duerson's claims required "interpretation of terms of the CBAs imposing duties on NFL clubs to protect player health and safety"); *Maxwell* at 2 (citing "accurate diagnosis" allegation and holding that the "physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL").

assumption in concluding that "physician provisions of the CBA must be taken into account"). Accordingly, *Duerson* and *Maxwell* are inapplicable because neither considered one of Players' core arguments:  that the NFL's voluntarily assumed duty of care is unaffected by the potentially parallel duties of Clubs and doctors.  *See supra* pp. 16-18.

Further, even if *Duerson* and *Maxwell* were relevant, this Court should decline to follow them.  Neither opinion identified any actual interpretive dispute over a CBA provision.  *Duerson*, for example, simply hypothesized that a court *might* "plausibly interpret" the CBAs to "impose a duty on the NFL's clubs to monitor a player's health."  2012 WL 1658353, at *4.  According to the court, such a hypothetical interpretation might ultimately permit the NFL to "exercise a lower standard of care."  *Id.*  Such speculation, however, cannot justify granting a motion to dismiss. Players may well demonstrate, after developing their claims through discovery, that the NFL's actions failed to conform to even the "lower standard of care" hypothesized by *Duerson*.  If so, the interpretation issue that the *Duerson* court postulated could not arise, thus obviating any need for this Court to resolve the hypothesized interpretive dispute.  *See Chavez*, 2010 WL 1417029, at *4 (dismissal premature unless parties have "staked out positions on the meaning" of a CBA). And, in the Third Circuit, the absence of an actual interpretive dispute is fatal to a § 301 preemption defense.  *See supra* pp. 12-13 (discussing *Kline*, 386 F.3d 246).

**2.**    **The NFL's invocation of *Stringer* fares no better.**  *Stringer* involved allegations that the NFL negligently caused Stringer to suffer a heatstroke during a summer practice.  474 F. Supp. 2d at 898.  Stringer's wife claimed that the NFL failed to ensure "accurate diagnosis" of and "proper and timely emergency medical care for" heat-related illnesses.  *Id.* at 904.  She also alleged that the NFL failed to enact proper equipment standards.  *Id.*  The Court held some (but not all) of her claims preempted.

*Stringer* hurts the NFL's position here more than it helps.  The court held that Stringer's claim that the NFL failed to ensure the use of proper equipment was *not* preempted.  *Id.* at 912. In doing so, the court squarely rejected the NFL's argument – which it recycles here – that CBA provisions creating the "Joint Committee on Player Safety and Welfare" preempt safety-related claims.  *Id.*; *cf.* Def. Mem. 8-9, 22-23, 28, 31.  Just as Stringer's claims that the NFL failed to optimize playing "equipment" for hot weather were not preempted, 474 F. Supp. 2d at 912-13, so too are Players' claims – that the NFL failed to adopt equipment standards adapted to minimize head trauma – independent of any CBA.  *See* MAC ¶¶ 11, 324-325, 333.[29]

 The claims that *Stringer* did find preempted were substantially dissimilar from Players' claims here.  Stringer did not allege that the NFL actively propagated a body of scientific research designed affirmatively to manipulate football players.  *Compare id.* ¶¶ 273-302 (fraud claims) *with Stringer*, 474 F. Supp. 2d at 909 (noting that Stringer alleged only that the NFL failed to "mak[e] sure that [its] guidelines were complete and were in accordance with . . . best practices").  Nor did Stringer articulate an independent historical basis for the NFL's alleged duty to protect players from heat-related illnesses.  Rather, she expressly tied the NFL's duty to those of team trainers, alleging that "[a]thletic trainers . . . serve as the first line of treatment" for "heat-related illness."  *Id.* at 910 (internal quotations omitted; brackets in original).  Given that allegation, the court concluded that Stringer's claims required interpretation of the CBA-created certification process governing the trainers on whom her claims depended.  *Id.* at 910-11.

Unlike Stringer, Players do not allege that the NFL should have collaborated with athletic trainers to diagnose players or that trainers were the "first line of treatment" for MTBI.  To the

---

[29] The NFL criticizes (at 34 n.15) *Stringer* for overlooking the provisions that supposedly "delegate responsibility to the NFL" for "equipment-related rules and regulations."  But the provisions that the NFL cites merely sets forth procedural rules relating to "amend[ing] or chang[ing]" football rules in general.  *E.g.*, Ex. 14, Art. XI § 11.2.  That ministerial demarcation of rulemaking authority has nothing to do with Players' claims.

contrary:  Players allege that they contracted *latent* neurodegenerative disorders as a result of individually mild, yet cumulatively devastating, sub-concussive blows to the head.  MAC ¶¶ 71, 74-75, 254-261.  Unlike heat stroke, these deceptively mild, initially asymptomatic injuries resist simple sideline diagnosis.  *Id.* ¶ 205.  The NFL – not trainers and doctors – was best positioned to spearhead reforms addressing those injuries at a systemic level.  *See supra* pp. 17-18.  *Stringer*'s holding about the CBA's certification process is therefore inapposite.

       **3.**       **The NFL's reliance on *Williams* is similarly misplaced.**  There, the plaintiffs alleged that the NFL's steroid testing policy, which was expressly incorporated into the CBA, violated state law.  582 F.3d at 868, 872.  The court held that § 301 preempted some (but not all) of the plaintiffs' claims.  *Compare id.* at 873-80 *with id.* at 881-83.

       Like *Stringer*, *Williams* hurts the NFL more than it helps.  The court acknowledged that the disputed drug-testing procedures stemmed from the CBA, but concluded that the legality of those procedures under two state statutes turned on "the facts and the procedure that the NFL actually followed with respect to its drug testing," not the meaning of the CBA creating them.  *Id.* at 876.  Thus, the plaintiffs' claims required only "reference[ ]" to – not "interpretation" of – the CBA, which was "insufficient to warrant preemption."  *Id.* at 877.  Moreover, the court emphasized that "it is the NFL's burden to establish preemption" and that the NFL had "failed to direct [it] to a specific provision of the CBA . . . that must be construed."  *Id.* at 879-80.

       As in *Williams*, Players' claims here require only an analysis of the "procedure[s] that the NFL actually followed" – not whether those procedures complied with the CBAs.  And, as in *Williams*, the NFL has not met its "burden" to identify a plausible interpretive dispute created by Players' claims.  If this Court follows *Williams*, it should hold Players' claims not preempted.[30]

---

[30] With respect to the common-law claims that *Williams* found preempted, the court's reasoning is inapplicable here.  There, the challenged steroid testing regime was set forth in detail in a written "Policy" that was

### B.   Players' Claims Do Not Arise Under the CBAs

Finally, the NFL argues (at 4) that Players' claims are preempted for the "additional reason" that they "rest on purported obligations that arise under the CBAs."  *See also* Def. Mem. 30-32.  The Third Circuit does not recognize this so-called "additional" ground for § 301 preemption.  Rather, the "preemption of state law engendered by section 301 is *only occasioned* when the claim raised on the face of the complaint substantially depends on interpretation of a [CBA]."  *Berda*, 881 F.2d at 24 (internal quotations omitted; emphasis added); *see also Trans Penn Wax*, 50 F.3d at 229 (holding that "a plaintiff may bring a state law tort action against an employer . . . so long as the state claim does not require interpretation of the [CBA]").  Of course, a claim may well require interpretation of CBA terminology *because* it is founded directly on a right arising under a CBA; such a claim would be preempted.[31]  But the NFL cites no case, much less a Third Circuit case, in which a court upheld preemption of a claim that did not require interpretation of a CBA provision.

In any event, Players' claims are not founded on the CBAs.  "[T]he NFL is not a party to the CBA and is not contractually obligated to take any action to protect NFL players from illness or injury."  *Stringer*, 474 F. Supp. 2d at 905.  Rather, the alleged duty is imposed by the common law and informed by the "public policy" considerations embedded in that law.  *Manzek*,

---

"expressly incorporate[d]" into the CBA.  582 F.3d at 868.  The court identified specific provisions of that Policy that the plaintiffs' common-law claims would have required it to interpret.  *Id.* at 881-82.  Players, by contrast, do not allege the existence of a written policy governing head injuries – and certainly not one expressly incorporated into any CBA.  In any event, the *Williams* court's conclusion that "reasonable reliance" required CBA interpretation is at odds with Third Circuit precedent, and this Court should decline to follow it.  *Compare id.* at 881 *with Voilas*, 170 F.3d at 377 (calling reasonable reliance "[p]atently . . . not a question that depends upon [CBA] interpretation").

[31] *See Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 234 (3d Cir. 1999) (calling the fact that a "claim stems directly from a [CBA]" alone "insufficient to support a finding of section 301 preemption," but holding claim preempted because it would require court to "interpret substantive provisions" of a CBA); *Antol v. Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996) (finding preempted a claim that was based "squarely on the terms of the [CBA]" and holding that it could not be resolved without adjudicating a "dispute[ ]" over "the terms of the [CBA]") (internal quotations omitted).

888 A.2d at 746.  The mere "fact that a [CBA]" is "part of the context" in which the duty arose

does not support § 301 preemption.  *Kline*, 386 F.3d at 257.

    The NFL argues that Players' claims arise under the CBAs because they do not allege

a duty that the NFL owes to "'every person in society.'"  Def. Mem. 31 (quoting *United*

*Steelworkers v. Rawson*, 495 U.S. 362, 371 (1990)).  But *Stringer* – which the NFL cites heavily

– rejected that very argument.  That court noted that *Rawson* involved a negligence action

against a union that had assumed a *contractual* duty under the CBA to protect its members from

the very sort of mining accident alleged by the plaintiffs.  *See* 474 F. Supp. 2d at 907.  This case,

like *Stringer*, concerns no such contractual duty.  Indeed, the "complaint in *Rawson* specifically

referred to the [CBA] as the source of the duty that was breached."  *Id.*; *see also Kline*, 386 F.3d

at 261 (distinguishing *Rawson* on similar grounds).  Because the Complaint alleges a common-

law duty independent of any CBA provision, *Rawson* is inapplicable.[32]

## CONCLUSION

    The NFL's motion to dismiss should be denied.

---

[32] In any case, the extent to which *Rawson* remains good law is unclear.  As the Seventh Circuit observed, some of *Rawson*'s language reflects a "very different" approach to § 301 than that followed the Supreme Court's more recent opinions (and in the Third Circuit).  *Rice v. Panchal*, 65 F.3d 637, 644 n.6 (7th Cir. 1995).  Indeed, *Rawson*'s reasoning – and its discussion of a duty owed to "every person in society" – is "conspicuously absent from the [Supreme] Court's most recent discussions of complete preemption under § 301."  *Id.*  Even if *Rawson* were relevant, then, this Court should follow the Supreme Court's more recent guidance, as clarified by the Third Circuit.  *See Livadas*, 512 U.S. at 124 (emphasizing that § 301 preemption turns on whether the "meaning of contract terms" is a "subject of dispute"); *Kline*, 386 F.3d at 254 (similar).

Dated:  October 31, 2012

Respectfully submitted,

*/s/ Sol Weiss*

Christopher Seeger
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Phone:  (212) 584-0700
Fax:  (212) 584-0799
cseeger@seegerweiss.com

Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, Pennsylvania 19103
Phone:  (215) 735-1130
Fax:  (215) 735-2024
sweiss@anapolschwartz.com

*Plaintiffs' Co-Lead Counsel*

David C. Frederick
Scott H. Angstreich
Joshua D. Branson
KELLOGG, HUBER, HANSEN,
   TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@khhte.com
sangstreich@khhte.com
jbranson@khhte.com
*On the Brief*

Jeannine Kenney (PA # 307635)
HAUSFELD LLP
1604 Locust Street
Second Floor
Philadelphia, Pennsylvania 19103
Phone:  (215) 985-3270
Fax:  (215) 985-3271
jkenney@hausfeldllp.com
*Plaintiffs' Liaison Counsel*
*On Behalf of All Undersigned*
*Counsel of Record*

David Buchanan
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Phone:  (212) 584-0700
Fax:  (212) 584-0799
dbuchanan@seegerweiss.com

Larry E. Coben
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, Pennsylvania 19103
Phone:  (215) 735-1130
Fax:  (215) 735-2024
lcoben@anapolschwartz.com

Thomas V. Girardi
Graham B. LippSmith
GIRARDI KEESE
1126 Wilshire Blvd
Los Angeles, California 90017
Phone:  (213) 977-0211
Fax:  (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Phone:  (202) 540-7200
Fax:  (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

Gene Locks
David D. Langfitt
LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, Pennsylvania 19106
Phone:  (215) 893-3434
Fax:  (215) 893-3444
glocks@lockslaw.com
dlangfitt@lockslaw.com

Steven C. Marks
Ricardo M. Martinez-Cid
PODHURST ORSECK P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, Florida 33130-1780
Phone:  (305) 358-2800
Fax:  (305) 358-2382
rmartinez-cid@podhurst.com
smarks@podhurst.com

*Plaintiffs' Executive Committee*

James R. Dugan, II
THE DUGAN LAW FIRM
One Canal Place, Suite 1000
365 Canal Street
New Orleans, Louisiana 70130
Phone:  (504) 648-0180
Fax:  (504) 648-0181
jdugan@dugan-lawfirm.com

Arnold Levin
LEVIN FISHBEIN SEDRAN
   & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Phone:  (215) 592-1500
Fax:  (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
RODANAST, PC
801 Estelle Drive
Lancaster, Pennsylvania 17601
Phone:  (717) 892-3000
Fax:  (717) 892-1200
dnast@rodanast.com

Anthony Tarricone
KREINDLER & KREINDLER LLP
277 Dartmouth Street
Boston, Massachusetts 02116
Phone:  (617) 424-9100
Fax:  (617) 424-9120
atarricone@kreindler.com

Michael L. McGlamry
POPE, MCGLAMRY, KILPATRICK
   MORRISON & NORWOOD, P.C.
3455 Peachtree Road, NE
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, Georgia 30326-3243
Phone:  (404) 523-7706
Fax:  (404) 524-1648
efile@pmkm.com

David A. Rosen
ROSE, KLEIN & MARIAS LLP
801 South Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Phone: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

Charles S. Zimmerman
ZIMMERMAN REED PLLP
1100 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Phone:  (612) 341-0400
Fax:  (612) 341-0844
charles.zimmerman@zimmreed.com

David S. Casey, Jr.
Fred Schenk
CASEY GERRY SCHENK
  FRANCAVILLA BLATT
  & PENFIELD LLP
110 Laurel Street
San Diego, California 92101-1486
Phone:  (619) 238-1811
Fax:  (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

Derriel McCorvey
THE LAW OFFICE OF
   DERRIEL C. MCCORVEY, LLC
115 W. Main Street, Suite 14
Lafayette, Louisiana 70501
Phone:  (337) 291-2431
Fax:  (337) 291-2433
derriel@mccorveylaw.com

*Plaintiffs' Steering Committee*

38