# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : | No. 2:12-md-02323-AB |
|  | : | MDL No. 2323 |
| THIS DOCUMENT RELATES TO | : : | |
| All Actions | : : | |

---

## SURREPLY OF PLAINTIFFS IN RESPONSE TO DEFENDANTS NATIONAL FOOTBALL LEAGUE'S AND NFL PROPERTIES LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO DISMISS THE MASTER ADMINISTRATIVE CLASS ACTION COMPLAINT

---

Christopher Seeger
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, Pennsylvania 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

*Plaintiffs' Co-Lead Counsel*

David C. Frederick
Scott H. Angstreich
Joshua D. Branson
KELLOGG, HUBER, HANSEN,
   TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@khhte.com
sangstreich@khhte.com
jbranson@khhte.com
*On the Brief*

Jeannine Kenney (PA # 307635)
HAUSFELD LLP
1604 Locust Street
Second Floor
Philadelphia, Pennsylvania 19103
Phone: (215) 985-3270
Fax: (215) 985-3271
jkenney@hausfeldllp.com
*Plaintiffs' Liaison Counsel*

*(Additional Counsel Listed On Signature Pages)*

January 28, 2013

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

I.      Section 301 Preemption Requires A Bona Fide Interpretive Dispute. ................. 3

II.     The NFL Has Not Identified a Bona Fide Interpretive Dispute Over Any Specific
        CBA Provision Related to Medical Monitoring. ...................................... 6

        A.      Players' Negligence-Based Medical Monitoring Claims Do Not Require
                CBA Interpretation. .................................................................... 6

                1.      The NFL's Duty of Care Was Independent of the CBA. ............... 6

                2.      Players' Negligence-Based Class Medical Monitoring Claims Do
                        Not Require Interpretationof CBA Provisions Governing Clubs
                        and Doctors ............................................................ 7

        B.      Players' Fraud Claims Do Not Require CBA Interpretation. ................... 15

                1.      The NFL's Argument That § 301 Preempts Players' Fraud-Based
                        Medical Monitoring Claims Conflicts with Third Circuit
                        Precedent. ............................................................. 15

                2.      Players' Fraud-Based Medical Monitoring Claims
                        Do Not Require Interpretation of CBA Provisions
                        Governing Clubs and Doctors. ......................................... 16

        C.      Players' Medical Monitoring Claims Categorically Avoid § 301
                Preemption. ............................................................................. 18

III.    The NFL's Remaining Arguments Lack Merit. .................................................... 21

        A.      The NFL's Cases Are Distinguishable and Unpersuasive. ..................... 21

                1.      *Duerson* and *Maxwell* ....................................................... 21

                2.      *Stringer* ............................................................... 24

                3.      *Williams* ............................................................. 25

        B.      Players' Medical Monitoring Claims Do Not "Arise Under" the CBAs. . 26

IV.   The NFL Has Not Shown That § 301 Requires Players' Class Medical Monitoring Claims To Be Dismissed...................................................................................... 28

    A.   The NFL's Preemption Defense Also Is Premature. ................................ 28

    B.   Section 301 Does Not Require *Dismissal* of Players' Class Medical Monitoring  Claims. ................................................................................ 30

CONCLUSION........................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Needle, Inc. v. NFL*,
 130 S. Ct. 2201 (2010) ................................................................................................8

*Atwater v. NFLPA*,
 626 F.3d 1170 (11th Cir. 2010) ...............................................................................18

*Augustin v. SecTek, Inc.*,
 807 F. Supp. 2d 519 (E.D. Va. 2011) .......................................................................18

*Baker v. Pennsylvania Econ. League, Inc. Retirement Income Plan*,
 811 F. Supp. 2d 1136 (E.D. Pa. 2011) .......................................................................7

*Barrett v. Freifeld*,
 64 A.D.3d 736 (N.Y. App. Div. 2009) ......................................................................17

*Basa v. Rizza Chevrolet, Inc.*,
 750 F. Supp. 2d 987 (N.D. Ill. 2010) ..................................................................29, 30

*Beals v. Kiewit Pac. Co.*,
 114 F.3d 892 (9th Cir. 1997) ......................................................................................5

*Beidleman v. Stroh Brewery Co.*,
 182 F.3d 225 (3d Cir. 1999) ........................................................................15, 16, 18

*Berda v. CBS Inc.*,
 881 F.2d 20 (3d Cir. 1989) ..........................................................................................3

*Blessing v. United States*,
 447 F. Supp. 1160 (E.D. Pa. 1978) ...........................................................................12

*Burlington Coat Factory Sec. Litig., In re*,
 114 F.3d 1410 (3d Cir. 1997) ...................................................................................29

*Caldwell v. Bechtel, Inc.*,
 631 F.2d 989 (D.C. Cir. 1980) ..................................................................................13

*Caterpillar Inc. v. Williams*,
 482 U.S. 386 (1987) ...................................................................................................27

*Cavallaro v. UMass Mem'l Healthcare, Inc.*,
 678 F.3d 1 (1st Cir. 2012) ...................................................................................18, 22

*Chavez v. Don Stoltzner Mason Contractor, Inc.*,
   No. 10 C 264, 2010 WL 1417029 (N.D. Ill. Apr. 5, 2010).....................................29

*Christie v. Public Serv. Elec. & Gas Co.*,
   No. Civ. 04-5978, 2006 WL 462588 (D.N.J. Feb. 24, 2006) .................................29

*City of Rome v. Glanton*,
   958 F. Supp. 1026 (E.D. Pa. 1997), *aff'd mem.*, 133 F.3d 909 (3d Cir. 1997)......................17

*Coronel v. U.S. Natural Res., Inc.*,
   No. SA-04-VA-0804-RF, 2005 WL 831843 (W.D. Tex. Apr. 4, 2005)................................10

*Cramer v. Consol.Freightways Inc.*,
   255 F.3d 683 (9th Cir. 2001) ........................................................................10, 20

*DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*,
   No. 10-cv-1341, 2012 WL 748760 (E.D.N.Y. Mar. 7, 2012).................................29

*Detabali v. St. Luke's Hosp.*,
   482 F.3d 1199 (9th Cir. 2007) ..........................................................................5

*Duerson v. NFL*,
   No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) .............................21, 22, 23, 24

*Ellerbee v. Union Zinc, Inc.*,
   881 F. Supp. 162 (E.D. Pa. 1995) ....................................................................19

*Espinoza v. Cargill Meat Solutions Corp.*,
   622 F.3d 432 (5th Cir. 2010) .........................................................................10

*Exal Corp. v. Roeslein & Assocs., Inc.*,
   No. 4:12-CV-01830, 2012 WL 4754748 (N.D. Ohio Oct. 2, 2012).......................................28

*Fox's Foods, Inc. v. Kmart Corp.*,
   870 F. Supp. 599 (M.D. Pa. 1994) ....................................................................17

*Foy v. Pratt & Whitney Grp.*,
   127 F.3d 229 (2d Cir. 1997)..........................................................................18

*Gehringer v. Atlantic Detroit Diesel Allison, LLC*,
   Civil Action No. 08-3917 (JLL), 2009 WL 806602 (D.N.J. Mar. 26, 2009) .........................29

*Givens v. Tenn. Football, Inc.*,
   684 F. Supp. 2d 985 (M.D. Tenn. 2010)...............................................................21

*Glatts v. Crozer-Keystone Health Sys.*,
   645 F. Supp. 2d 446 (E.D. Pa. 2009) .................................................................23

*Graboff v. The Collern Firm*,

Civil Action No. 10-1710, 2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ...............................30

*Gray v. Keystone Steel & Wire Co.*,
No. 08-1197, 2009 WL 187895 (C.D. Ill. Jan. 21, 2009) .......................................................29

*Guerrero v. Hovensa LLC*,
259 F. App'x 453 (3d Cir. 2007) ...........................................................................................15

*Hendy v. Losse*,
No. 89-55430, 1991 WL 17230 (9th Cir. Feb. 12, 1991) .......................................................14

*Holbrook v. Woodham*,
Civil Action No. 3:05-304, 2008 WL 4425606 (W.D. Pa. Sept. 30, 2008), *amended on recon. on other grounds*, 2009 WL 365681 (W.D. Pa. Feb. 13, 2009) .......................11, 12

*Int'l Bhd. of Elec. Workers v. Hechler*,
481 U.S. 851 (1987)................................................................................................................10

*Jackson v. Kimel*,
992 F.2d 1318 (4th Cir. 1993) ...........................................................................................5, 6

*Jamison v. Klem*,
544 F.3d 266 (3d Cir. 2008)...................................................................................................15

*JM Mechanical Corp. v. United States*,
716 F.2d 190 (3d Cir. 1983)...................................................................................................29

*Jurevicius v. Cleveland Browns Football Co.*,
No. 1:09 CV 1803, 2010 WL 8461220 (N.D. Ohio Mar. 31, 2010).......................................13

*Kleinknecht v. Gettysburg Coll.*,
989 F.2d 1360 (3d Cir. 1993)...................................................................................................9

*Kline v. Security Guards, Inc.*,
386 F.3d 246 (3d Cir. 2004)......................................................................................... passim

*Lingle v. Norge Div. of Magic Chef, Inc.*,
486 U.S. 399 (1988)...............................................................................................3, 20, 27

*Livadas v. Bradshaw*,
512 U.S. 107 (1994)...............................................................................................................4, 29

*Lyon v. Ranger III*,
858 F.2d 22 (1st Cir. 1988)........................................................................................................8

*Marshall v. Port Auth. of Allegheny Cnty.*,
568 A.2d 931 (Pa. 1990) ....................................................................................................11, 12

*Maxwell v. NFL*,
    No. CV 11-08394 (C.D. Cal. Dec. 8, 2011)...........................................21, 22, 23, 24

*McCormick v. AT&T Technologies, Inc.*,
    934 F.2d 531 (4th Cir. 1991) (en banc) ...........................................................5, 6

*Patentas v. United States*,
    687 F.2d 707 (3d Cir. 1982)...............................................................................19

*Peek v. Phila. Coca-Cola Bottling Co.*,
    Civil Action No. 97-3372, 1997 WL 399379 (E.D. Pa. July 16, 1997)................10

*Prost v. Caldwell Store, Inc.*,
    187 A.2d 273 (Pa. 1963) .....................................................................................9

*R.W. v. Manzek*,
    888 A.2d 740 (Pa. 2005) .................................................................................7, 8

*Rycoline Prods., Inc. v. C & W Unlimited*,
    109 F.3d 883 (3d Cir. 1997)...............................................................................28

*Schur v. L.A. Weight Loss Ctrs., Inc.*,
    577 F.3d 752 (7th Cir. 2009) .............................................................................13

*Sharpe v. St. Luke's Hosp.*,
    821 A.2d 1215 (Pa. 2003) ...................................................................................7

*Sherwin v. Indianapolis Colts, Inc.*,
    752 F. Supp. 1172 (N.D.N.Y. 1990) ...................................................................21

*Sikirica v. Nationwide Ins. Co.*,
    416 F.3d 214 (3d Cir. 2005)..................................................................................4

*Sluder v. United Mine Workers of Am., Int'l Union*,
    892 F.2d 549 (7th Cir. 1989) .............................................................................10

*Smith v. Houston Oilers, Inc.*,
    87 F.3d 717 (5th Cir. 1996) ...............................................................................21

*Spence v. ESAB Grp., Inc.*,
    623 F.3d 212 (3d Cir. 2010)...............................................................................19

*Stringer v. NFL*,
    474 F. Supp. 2d 894 (S.D. Ohio 2007) ...........................................14, 24, 25, 27, 28

*Tran v. Metropolitan Life Ins. Co.*,
    408 F.3d 130 (3d Cir. 2005)...............................................................................11

*Trans Penn Wax Corp. v. McCandless*,
   50 F.3d 217 (3d Cir. 1995)........................................................................16, 27

*Travel Agent Comm'n Antitrust Litig., In re*,
   290 F. Supp. 2d 1381 (JPML 2003)......................................................................23

*United Steelworkers v. Rawson*,
   495 U.S. 362 (1990)...........................................................................14, 28

*Voilas v. Gen. Motors Corp.*,
   170 F.3d 367 (3d Cir. 1999)...........................................................15, 16, 17

*Williams v. NFL*,
   582 F.3d 863 (8th Cir. 2009), *cert. denied*, 131 S. Ct. 566 (2010)..............................14, 25, 26

*Wisc. Cent., Ltd. v. Shannon*,
   539 F.3d 751 (7th Cir. 2008) ............................................................................5

*Wynn v. AC Rochester*,
   273 F.3d 153 (2d Cir. 2001)...........................................................................5

## STATUTES

Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* ..........................................................1

   § 301, 29 U.S.C. § 185...............................................................1, 2, 3, 4, 5, 7, 10, 11, 14, 15,

                             17, 18, 20, 22, 23, 26, 27, 28, 29, 30

Railway Labor Act, 45 U.S.C. § 151 *et seq.* .....................................................................5

## OTHER AUTHORITIES

57A Am. Jur. 2d *Negligence* § 80........................................................................8, 9

Compl., *Duerson v. NFL*, No. 12 C 2513 (removed to N.D. Ill. Apr. 5, 2012)...........................22

Compl., *Maxwell v. NFL*, No. CV 11-08394 (removed to C.D. Cal. Oct. 11, 2011) ...................22

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71, at 512 (5th ed.
   1984) ....................................................................................................9

RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 19
   (2010)..................................................................................................13

RESTATEMENT (SECOND) OF TORTS (1965)......................................................................19

## INTRODUCTION

The NFL has failed to meet its substantial burden of demonstrating that this Court should dismiss Players' class medical monitoring claims based on the affirmative defense of preemption under § 301 of the Labor Management Relations Act, 1947 ("LMRA"), 29 U.S.C. § 185.  The Third Circuit requires a defendant invoking that defense to establish that a claim will require the court to resolve an actual dispute over the meaning of a specific provision of a collective bargaining agreement ("CBA").  In 65 pages of briefs, the NFL has yet to identify a *single* CBA provision that addresses in any way medical monitoring for retired players.  That failure alone warrants denial of its Motion to Dismiss.  Even if any CBA provisions are relevant to Players' medical monitoring claims, nowhere in its briefing has the NFL met the Third Circuit's requirements for establishing that preemption could apply.[1]

Players' class medical monitoring claims do not require interpretation of any CBA provision.  Since its inception in the 1920s, the NFL has held itself out as a guardian of Player safety, and it purported to act in a manner consistent with that assumed role.  Before the first CBA was even signed, the NFL promulgated equipment standards, advocated rules changes, and portrayed itself as the responsible steward of professional football in America.  Those historical actions and statements – and the widespread credibility on health issues that the NFL carefully cultivated – gave rise to duties for the NFL to act in a manner reasonably consistent with Players' health and well-being.  With respect to head injuries, the NFL failed to live up to its responsibility:  it negligently heightened Players' exposure to repeated head trauma and

---

[1] As in their opening Opposition, Players use the term "NFL" to refer collectively to Defendants National Football League and NFL Properties, LLC.  *See* Dkt. No. 4131 ("Opp."), at 1 n.2.  The NFL suggests that Players' "refusal to distinguish" between the two requires dismissal of the claims against NFL Properties.  Dkt No. 4253 ("Reply"), at 29 n.13.  But this Court limited the present briefing to the issue of § 301 preemption, *see* Dkt. No. 98 (CMO No. 4) at 3-4, and the distinction between the Defendants is immaterial to that narrow issue.  If necessary, Players will show at a later date that they have stated a claim against all Defendants.  *See* Plaintiffs' Master Administrative Class Action Complaint for Medical Monitoring ¶¶ 10-11 ("Class Complaint" or "MCC").

fraudulently concealed the chronic brain injuries that resulted or were likely to result from that trauma.  By doing so, the NFL breached duties that both predated and arose independently of the separate contractual duties reflected in the CBAs.

The NFL scarcely contends otherwise.  The NFL has not and cannot cite a single CBA provision or CBA duty of the NFL, a team, or a player that relates to medical monitoring.  It does not argue that the CBAs impose any duties relevant to medical monitoring on the NFL itself. Instead, it attempts to make the CBAs relevant by citing a few provisions concerning the health-related duties of individual teams and doctors.  The actual CBA provisions it does identify and quote at length in its opening brief apply to *current* players or duties owed to current players. The singular exception to this point is the NFL's reliance on the 2006 "dementia benefit," which nonetheless is completely unrelated to medical monitoring of retired NFL players or any duty to engage in such monitoring.  Medical monitoring claims arise during Players' retirement, and thus do not require reference to team duties to current players. These CBA provisions identified by the NFL make no mention of the NFL itself, and the duties they impose on teams are legally irrelevant to the NFL's separate duty to safeguard Players who are at increased risk of latent neurodegenerative disease and therefore require monitoring.   Indeed, the CBAs are wholly silent regarding the core premise of the NFL's argument:  that the duties of individual teams somehow absolved the NFL itself of responsibility for head injuries in football.  Under well-settled Third Circuit precedent, this Court can recognize the CBAs' silence on that critical question without engaging in the sort of *interpretation* that triggers § 301 preemption.

Ultimately, the NFL's preemption argument boils down to its distaste for state law: because it fears scrutiny under the "disparate common law" of the states, the NFL insists that Players' claims must be shoehorned into the more defendant-friendly "procedural scheme" of

2

federal labor law.  Reply 1.  But § 301 is designed simply to ensure uniform CBA interpretation, not to protect defendants from the consequences of violating state law.  Because the NFL has identified no reasonable dispute over the meaning of any CBA provision, dismissing Players' claims at this early stage of the litigation would do nothing to advance § 301's narrow purpose.  Rather, dismissal now would simply immunize the NFL from state tort law.  Neither the LMRA nor Third Circuit precedent permits such a holding.

## ARGUMENT

**I.      Section 301 Preemption Requires A Bona Fide Interpretive Dispute.**

As Players have shown, LMRA § 301 serves a "'limited purpose.'"  Opp. 12 (quoting *Berda v. CBS Inc.*, 881 F.2d 20, 27 (3d Cir. 1989)).  Contrary to the NFL's assertion, that purpose is neither to immunize employers from state tort liability nor to protect employers broadly from "variation" in their "duties" under the laws of different states.  Reply 1; *see Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409 (1988) (noting that § 301 "says nothing about the substantive rights" that employees enjoy under state law).  Rather, § 301 simply "ensur[es] that a uniform law is applied in interpreting [CBAs]."  *Berda*, 881 F.2d at 27.  To that end, § 301 preempts only claims whose "resolution" will "require" a court to "constru[e] the [CBA]."  *Lingle*, 486 U.S at 407.  Claims raising mere "factual considerations" that "parallel[]" CBA provisions do not qualify.  *Id.* at 408.

In the Third Circuit, a defendant invoking § 301 preemption shoulders a heavy burden. *See* Opp. 12-13.  Merely identifying a CBA provision that forms "part of the context in which [a] claim must be addressed" does not suffice.  *Kline v. Security Guards, Inc.*, 386 F.3d 246, 257 (3d Cir. 2004).[2]  Nor does showing that a claim "relate[s] to a subject . . . contemplated by the

---

[2] In *Kline*, the plaintiffs' common-law claims focused on the employer's installation of a "surveillance" system monitoring the "entryway" to its facility.  386 F.3d at 250.  The NFL attempts to distinguish *Kline* by

CBA." *Id.* at 256.  Instead, a defendant can prevail on a § 301 preemption defense only if it demonstrates that a claim will require the court to resolve "some substantial dispute over the meaning" of a CBA provision.  *Id.* at 257.

A defendant cannot meet that standard by identifying an interpretive dispute that is merely theoretical.  *See* Opp. 13-15.  As *Kline* explained, § 301 preemption does not arise from a mere "'creative linkage between the subject matter of the claim and the wording of a CBA provision.'"  386 F.3d at 256 (quoting *Cramer v. Consol.Freightways Inc.*, 255 F.3d 683, 692 (9th Cir. 2001) (en banc)).  To the contrary, the defendant must point to a specific CBA provision whose meaning the parties actually dispute, and the defendant must show that its "'proffered interpretation argument'" reaches a "'reasonable level of credibility.'"  *Id.* (quoting *Cramer*, 255 F.3d at 691).   That requirement conforms to the ordinary rule that a party cannot create contract ambiguity by asserting an unreasonable reading of its terms; contract language "must not be tortured to create ambiguities where none exist[s]."  *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).   So too with § 301 preemption:  a defendant cannot prevail if a court can look at a CBA and "'discern that none of its terms is *reasonably* in dispute.'"  *Kline*, 386 F.3d at 256-57 (quoting *Cramer*, 255 F.3d at 692) (emphasis added).

*Kline*'s standard follows from the Supreme Court's instruction that "the bare fact that a [CBA] will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."  *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994).  Numerous other courts, like the Third Circuit, construe *Livadas* as precluding § 301 preemption based on implausible or

---

characterizing "electronic surveillance" as a "subject . . . far removed from the terms and conditions of employment."  Reply 6-7.  Even if that were correct as a factual matter – and the NFL cites no authority suggesting that it is – it is legally irrelevant.  *Kline* expressly rejected the employer's argument that § 301 preemption turns on whether a claim "relate[s] to a subject . . . contemplated by the CBA."  386 F.3d at 256.  Thus, the Third Circuit's holding rested not on some intuition about the nature of electronic surveillance, but on the employer's failure to "point to any specific provision" in the CBA "that must be interpreted in order to resolve [the plaintiffs'] claims."  *Id.*

theoretical interpretive disputes.  *See Kline*, 386 F.3d at 256; *Wynn v. AC Rochester*, 273 F.3d

153, 158 (2d Cir. 2001) (per curiam) (no preemption because "there is no genuine issue between

the parties concerning interpretation of the CBA"); *Beals v. Kiewit Pac. Co.*, 114 F.3d 892, 895

(9th Cir. 1997) (no preemption because "none of the terms of the CBA relevant to [plaintiff's]

claim is subject to conflicting meanings").[3]  This Court should do the same.

The *Kline* standard also rests on the sound judgment that, without the requirement of a

*bona fide* interpretive dispute, § 301 would threaten to engulf state tort law. The NFL's own

reasoning makes that plain.  When Players pointed out that the CBA provisions cited by the NFL

do not reference the NFL's own duties, the NFL responded that Players' argument "simply

reflects one interpretation of the CBA."  Reply 7.  But *any* tort defendant could make the same

argument:  an employer can *always* construct some implausible reason that the CBA might bar a

plaintiff's claims, and then label any counter-argument as a "dispute" requiring preemption.  Put

simply, the NFL has invented a phantom CBA provision (one supposedly intertwining the NFL's

common-law medical monitoring duties to retired Players with the duties of Clubs who no longer

have any relation with these Players) and then attempted to manufacture a supposed conflict in

CBA interpretation from Players' response.  Allowing such tactics "would mean every tort

relating to the work place would be preempted – a result [§ 301] neither supports nor requires."

*Jackson v. Kimel*, 992 F.2d 1318, 1326 (4th Cir. 1993).[4]

---

[3] *See also Wisc. Cent., Ltd. v. Shannon*, 539 F.3d 751, 760 (7th Cir. 2008) (holding analogous Railway Labor Act preemption provision inapplicable where "the parties have not yet staked out a position for the record as to what" the relevant "CBA provisions mean"); *Detabali v. St. Luke's Hosp.*, 482 F.3d 1199, 1203 (9th Cir. 2007) (finding no preemption because "there is no dispute over the meaning of any terms within the [CBA]").

[4] *McCormick v. AT&T Technologies, Inc.*, 934 F.2d 531, 536-37 (4th Cir. 1991) (en banc), on which the NFL relies, is not to the contrary.  Reply 7-8.  There, the court held preempted an emotional-distress claim based on the employer's "dispos[al] of the contents of [the plaintiff's] locker."  934 F.2d at 535.  That holding rested on the Fourth Circuit's view that "[c]leaning out a locker is not a matter of intrinsic moral import but a question of legal authority – whether management had the lawful right to proceed as it did."  *Id.* at 536.  With respect to such matters, the Court held that "[m]anagement simply could not have acted negligently or wrongfully if it acted in a manner contemplated by the [CBA]."  *Id.* at 537.  Here, by contrast, Players' medical monitoring Class Complaint alleges

To avoid those perverse results, this Court should follow and apply *Kline*.  A claim is preempted only if the NFL shows that it requires this Court to choose between two competing interpretations of a specific CBA provision, and only if the NFL's proffered interpretation is reasonable.  *See* Opp. 12-13.

## II.    The NFL Has Not Identified a Bona Fide Interpretive Dispute Over Any Specific CBA Provision Related to Medical Monitoring.

Players' class medical monitoring claims do not require bona fide interpretation of any CBA provision.  No CBA provision speaks to the NFL's duties to safeguard the health of retired Players, and no provision pertains to the NFL's duty to speak truthfully about the risk of latent neurological injuries.  The NFL's arguments simply require this Court to "look at the CBA in order to determine that it is silent" on the issues legally "relevant to [Players'] state claims." *Kline*, 386 F.3d at 256.  Under controlling Third Circuit law, therefore, Players' class medical monitoring claims are not preempted.  *See id.*

### A.  Players' Negligence-Based Medical Monitoring Claims Do Not Require CBA Interpretation.

#### 1.    The NFL's Duty of Care Was Independent of the CBA.

Players' negligence-based class medical monitoring claims will not require this Court to interpret any CBA provision. The NFL, like "'every person'" in society, has a "'social duty'" to "'take thought and have a care lest his action result in injuries to others.'"  Opp. 15 (quoting *Prost v. Caldwell Store, Inc.*, 187 A.2d 273, 276 (Pa. 1963)).  That duty stems from the NFL's historical actions and statements, not the CBA.  *See* Opp. 16.  The NFL long held itself out as a

---

that the NFL abused its relationship with retired Players by exposing them to the risk of latent brain disease and then failing to warn and monitor them after they had retired; that *does* involve questions of "moral import . . . committed to the common law of tort."  *Id.* at 536; *see* Opp. 15-17, 23-26.  As the Fourth Circuit later explained, "*McCormick* neither supports nor requires" preemption of such claims.  *Jackson*, 992 F.2d at 1326.  And even if it did, the Fourth Circuit's ruling would not bind this Court, which should instead apply Third Circuit law.  *See McCormick*, 934 F.2d at 546 n.4 (Phillips, J., dissenting) (noting that majority's holding was at odds with Third Circuit precedent).

guardian of player safety (MCC ¶¶ 64, 66, 71-72, 178); had unrivaled access to neurological-injury data (*id.* ¶¶ 62, 63, 67); and voluntarily created a committee to opine on the risks of brain injuries in football (*id.* ¶¶ 125-96).  Those facts together gave rise to duties to safeguard Players' health that were unrelated to the "'terms'" of any "'contract.'"  Opp. 17 (quoting *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1220 n.3 (Pa. 2003)).

Players allege that the NFL breached those duties by spreading misinformation (or withholding information) about latent neurological risks (MCC ¶¶ 128-30, 237-38, 251); failing to advocate helmet standards capable of reducing Players' exposure to head injuries (*id.* ¶¶ 69-71); glorifying the types of collisions responsible for Players' brain damage (*id.* ¶¶ 37-39); encouraging Players to return to play prematurely (*id.* ¶¶ 34-35); and failing to promote rules changes to protect them from head injuries (*id.* ¶¶ 64-66, 70, 131).  Evaluating Players' allegations will require this Court to weigh "considerations of public policy" embedded in the common law.  *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005).  Those considerations do not implicate § 301 because they do not depend on "'any duty of care prescribed by the CBA.'"  Opp. 17 (quoting *Kline*, 386 F.3d at 261).

> ### 2.    Players' Negligence-Based Class Medical Monitoring Claims Do Not Require Interpretation of CBA Provisions Governing Clubs and Doctors

The NFL does not dispute that the duty Players allege arose from historical events independent of the CBAs.  In fact, the Reply essentially concedes that the CBAs did not impose any relevant duties on the NFL itself.[5]  Rather, the NFL cites provisions imposing health-related

---

[5] The NFL suggests briefly that the distinction between the NFL and the Clubs is "artificial," because the NFL engages in a "joint enterprise" with the Clubs.  Reply 9-10.  But the NFL's opening brief argued the opposite, asserting that the CBA provisions regulating "the NFL's clubs" might permit the "NFL [to] reasonably exercise a lower standard of care . . . itself."  Dkt. No. 3590 ("Open Mem."), at 14-15 (internal quotations omitted).  This Court should reject the NFL's attempt to change position on reply.  *See Baker v. Pennsylvania Econ. League, Inc. Retirement Income Plan*, 811 F. Supp. 2d 1136, 1144 n.7 (E.D. Pa. 2011) (Brody, J.).  In any event, the Supreme

duties, relating to *current* players, on individual Clubs and doctors, maintaining that those

provisions – which do not reference the NFL – evince a "scheme in which the duties of any

single actor, including the NFL, can be defined only by assessing" the duties of others.[6]  Reply 7.

That argument does not reveal a bona fide interpretive dispute over any actual CBA provision

that would relate to medical monitoring of retired Players.

    **a.**      The NFL's argument rests on a faulty premise.  As Players have explained, the

NFL's preemption defense relies on the assumption that Clubs' duties under the CBAs affected

the scope of the NFL's independent tort duties to Players.  *See* Opp. 17-19.  That assumption is

legally incorrect.  "[I]t is no defense" to an alleged breach of common-law tort duties that a

"similar duty rested upon another person."  57A Am. Jur. 2d *Negligence* § 80; *see also* Opp. 18

n.18 (citing cases).  The rationale for that rule is simple:  conditioning an actor's duty on the

duties of third parties would encourage free-riding and diminish "'individual responsibility.'"

Opp. 18 (quoting *Lyon v. Ranger III*, 858 F.2d 22, 25-26 (1st Cir. 1988) (Breyer, J.)).  Thus, the

common law calibrates a party's duty to another person by analyzing his "relationship" to that

person; the "utility" of his conduct; his ability to "foresee[]" relevant risks; the "consequences of

imposing [a] duty"; and the "overall public interest."  *Manzek*, 888 A.2d at 746-47 (internal

quotations omitted).  None of those factors depends on the legal duties of third parties.

---

Court has rejected the NFL's new argument and held that Clubs possess divergent interests that distinguish them
from each other and from the NFL itself.  *See Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212-13 (2010).

    [6] The provisions that the NFL cites in its opening brief relate almost entirely to current players and are
facially irrelevant to a post-retirement medical monitoring claim.  Those provisions are as follows: (1) "Player
Medical Care Provisions", which apply only to *current* players, dealing with items such as which team provides an
ambulance at games and giving an active player his choice of surgeon, at the Club's expense (Open Mem. 7-9); (2)
"Rule-Making and Player Safety Rule Provisions", dealing only with rules that effect *current* players (*Id.* at 9); (3)
"Grievance Procedures", although class medical monitoring Players are not alleging any violation of any CBA
provision amenable to a grievance proceeding (*Id.* at 9-10); and (4) "Player Benefits Provisions", including the 2006
dementia benefit, the only provision cited by the NFL that relates in any way to retired Players, but which
nonetheless is irrelevant to any duty to monitor Players for the increased risk of latent brain disease (*Id.* at 10-11).

The inquiry is no different when a contract is involved.  According to the facts alleged in the Complaint – which are assumed to be true at this stage of the litigation – the NFL held itself out as a protector of player safety well before the inception of the first CBA in 1968.  *See* MCC ¶¶ 64, 66, 69-71.  By virtue of its historical actions and statements, the NFL formed a "special relationship" with Players that demanded the exercise of heightened care.  *Id.* ¶¶ 77, 85; *see Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1366-67 (3d Cir. 1993) (college's "special relationship" to lacrosse player supported duty of care under Pennsylvania law).  That duty – created not by "contract" but "imposed by law," *Prost*, 187 A.2d at 276 (internal quotations omitted) – was non-delegable:  the NFL "cannot avoid responsibility for its faithful discharge by contracting with another for its performance."  57A Am. Jur. 2d *Negligence* § 80; *accord* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71, at 512 (5th ed. 1984) (recognizing a class of "duties" reflecting a "responsibility . . . so important to the community" that a party "should not be permitted to transfer [them] to another").

Instead of disputing that fundamental principle, the NFL seeks to avoid it by employing a rhetorical slight-of-hand.  The NFL acknowledges that a party cannot "shirk its own duty" by pointing to the contract duties of others, but it purports to distinguish its argument as focusing on whether the NFL had a duty to Players "in the first place."  Reply 13 (brackets omitted).  The NFL's argument fails because it had long-standing common-law duties of care that *predated* the CBA.  *See* Opp. 15-17.  Thus, the NFL cannot plausibly maintain that it lacked a duty of care "in the first place"; rather, its argument must be that the CBAs somehow transferred the NFL's *pre-existing* tort duties to Clubs and doctors.  But a contract delegating tasks to a third party does not relieve a person of ultimate responsibility for ensuring compliance with his common-law duties.  *See* 57A Am. Jur. 2d *Negligence* § 80 (noting that "[o]ne upon whom the law devolves a duty

cannot shift it to another, so as to exonerate himself or herself from the consequence of its nonperformance"). Accordingly, any CBA provision that purported to allocate the NFL's tort duties to third parties – and the NFL identifies no such provision – would lack legal force.

Nor can the NFL avoid this principle by arguing that the CBAs' supposed assignment to Clubs of the NFL's common-law duties reflected "the arrangement the players bargained for." Reply 10. The NFL's argument – asking this Court to infer that Players waived their common-law right to rely on the NFL to safeguard their health – can succeed only if the CBAs include "'clear and unmistakable' language waiving the covered employees' state right." *Cramer*, 255 F.3d at 692 (quoting *Livadas*, 512 U.S. at 125). The CBAs contain no such language. The provisions the NFL cites merely require Club doctors to "advise" players of medical conditions, Ex. 6, Art. XLIV § 1; and to make "determinations of recovery time," Ex. 13, Art. XVII, at 12. Those provisions did not purport to absolve the NFL of all responsibility for head injuries in football, much less do so unmistakably. This Court may "look to the CBA[s] to determine" that they lack the requisite "clear and unmistakable waiver of state law rights without triggering § 301 preemption." *Cramer*, 255 F.3d at 692.

**b.** Tellingly, the NFL cites only three cases for its core proposition that an actor's tort duties must be "calibrat[ed] . . . against duties of other actors."[7] Reply 14. Two are wholly

---

[7] The NFL cites additional cases that stand merely for the unremarkable proposition that § 301 preempts claims alleging negligence by a party that has assumed a duty of care under the CBA for the very conduct alleged. Reply 14-15; *see Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 860 (1987) ("*IBEW*") (allegation against union turned on whether union "assume[d] a responsibility towards employees by accepting a duty of care through a [CBA]"); *Espinoza v. Cargill Meat Solutions Corp.*, 622 F.3d 432, 444 (5th Cir. 2010) (employee's negligence claim based on workplace injury preempted because the "CBA acknowledges [defendant's] responsibility to provide a safe workplace"); *Sluder v. United Mine Workers of Am., Int'l Union*, 892 F.2d 549, 554 (7th Cir. 1989) (claim that union improperly closed mine preempted because the CBA "outlines not only the union's responsibility with respect to the two mine safety committees but also limits [its] right to interfere in the operation of the mine"); *Coronel v. U.S. Natural Res., Inc.*, No. SA-04-VA-0804-RF, 2005 WL 831843, at *2 (W.D. Tex. Apr. 4, 2005) (claim alleging unsafe workplace preempted because defendant assumed partial "duty of care" to maintain workplace safety under the CBA); *Peek v. Phila. Coca-Cola Bottling Co.*, Civil Action No. 97-3372, 1997 WL 399379, at *5 (E.D. Pa. July 16, 1997) (slander claim preempted because it concerned statements made during an "investigation and subsequent grievance and arbitration proceeding[]" conducted under the CBA).

inapposite because they involved contracts explicitly disclaiming liability for the alleged

activities.  *See Marshall v. Port Auth. of Allegheny Cnty.*, 568 A.2d 931, 936  (Pa. 1990)

(contract providing that third party shall "'be solely responsible for all the construction means'");

*Holbrook v. Woodham*, Civil Action No. 3:05-304, 2008 WL 4425606, at *13 (W.D. Pa. Sept.

30, 2008) (defendants' contract "disclaimed all liability for the safety of the workers of

contractors"), *amended on recon. on other grounds*, 2009 WL 365681 (W.D. Pa. Feb. 13, 2009).

As just explained, the CBAs here contain no comparable provision.  *See also* Opp. 24 & n.21.

Indeed, the provisions the NFL cites do not even *mention* the NFL, let alone purport to re-assign

the NFL's tort duties to *retired* Players to Clubs and doctors from those Players' *active* playing

days.  *See*  Ex. 6, Art. XLIV § 1; Ex. 13, Art. XVII, at 12.  This Court therefore need not

interpret those provisions; it need merely "look at the CBA in order to determine that it is silent"

regarding the NFL's disclaimer of health-related duties to retired Players.  *Kline*, 386 F.3d at

256.  *Marshall* and *Holbrook* are distinguishable on that basis alone.

　　　　Moreover, even an explicit disclaimer akin to the provisions in *Marshall* and *Holbrook*

would not create § 301 preemption here.  As Players have explained, the law imposes heightened

tort duties on parties to special relationships, even in the face of flatly contrary contract

language.  *See* Opp. 24 (discussing *Tran v. Metropolitan Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir.

2005)).  *Tran*, which the NFL cited in its opening brief (at 24), aptly illustrates the principle.

Given an insured's "trust" in an insurer's "expertise" (among other factors), the Third Circuit

held that an insured might possess a "reasonable expectation of coverage" in circumstances

expressly disclaimed by the "terms of the policy."  *Tran*, 408 F.3d at 136 (internal quotations

omitted).  Players allege that they had a similar relationship with the NFL, which the NFL could

not escape by contract. *See supra* pp. 9-10. *Marshall* and *Holbrook*, which concerned independent contractors at a construction site, involved no such relationship.

The remaining case the NFL cites only demonstrates why Players' claims avoid preemption. In *Blessing v. United States*, 447 F. Supp. 1160 (E.D. Pa. 1978), workers alleged that they suffered injuries from equipment that the Occupational Safety and Health Administration ("OSHA") negligently failed to inspect. *Id.* at 1164. The NFL the court's holding that the United States could be liable only if OSHA "undertook not merely to supplement the employers' own safety inspections, but rather to supplant those inspections." Reply 14; 447 F. Supp. at 1194. That holding, however, was restricted to the plaintiffs' theory that the "duties and liability of [their employer] should also be imposed on [OSHA]." *Id.* It did not speak to whether OSHA may have *separately* "assumed duties of [its] own . . . by operation of such factors as reliance or increased risk of harm." *Id.*; *see id.* at 1196 (emphasizing that the holding the NFL quotes did not apply to this "alternative ground[]" for negligence).[8]

Players' allegations rest on precisely the "alternative ground[]" that *Blessing* recognized as independent of third-parties' duties. Unlike the principal claim rejected in *Blessing,* Players do not allege that the NFL assumed the contractual duties of Clubs and doctors. Instead, the NFL should be responsible for providing medical monitoring to Players because of its own, independent actions: its public glorification of violence in football; its dissemination of faulty research denying the link between head trauma and brain disease; and its refusal to promote rules

---

[8] The court ultimately dismissed the plaintiffs' claims under this alternative theory, holding that their "complaints [were] defective" and lacked "allegations that plaintiffs or their employers relied on the OSHA inspections or that [those inspections] increased the plaintiffs' risk of harm." *Blessing*, 447 F. Supp. at 1197.

changes reducing head impacts in football.  *See* Opp. 14-15.  The NFL's own duties arising from those actions do not depend on the nature of Clubs' and doctors' CBA obligations. [9]

**c.**       Even accepting the NFL's dubious premise that the CBA provisions governing individual Clubs are relevant, it has failed to show that Players' class medical monitoring  claims would require *interpretation* of those provisions.  Whatever the Clubs' and doctors' duties under the CBAs, they *in fact* failed to warn Players about the latent risks of playing with concussive and sub-concussive injuries.  *See* Opp. 19 (citing MCC ¶¶ 46-60, 75-76, 181-83).  The NFL knowingly abetted that failure, by insisting publicly that head trauma carried few long-term risks. MCC ¶¶ 59, 75-76, 189-91.  That fact alone defeats preemption.  The NFL cannot escape liability by relying on theoretical CBA duties that it knew to be unfulfilled.  *See* Restatement (Third) of Torts: Liability For Physical And Emotional Harm § 19 (2010) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of . . . a third party.").  The nature of those CBA duties is irrelevant; evaluating Players' claims will require this Court merely to  "compare the procedures" that were "*actually followed*" with "common-law requirements."  *Jurevicius v. Cleveland Browns Football Co.*, No. 1:09 CV 1803, 2010 WL 8461220, at *13 (N.D. Ohio Mar. 31, 2010) (emphasis added). [10]

The CBA provisions cited by the NFL demonstrate that point.  The NFL argues that the NFL's duty to warn might be diminished if "Club trainers and surgeons received instruction on

---

[9] Moreover, in calling it "well settled" that the duties of one party must be "calibrat[ed]" against those of others, the NFL ignores authority to the contrary.  Reply 14.  *See, e.g.*, *Caldwell v. Bechtel, Inc.*, 631 F.2d 989, 999 (D.C. Cir. 1980) (the "standard of care" of one who has assumed a duty to a third party is neither "increased [n]or diminished by" contractual obligations to another) (internal quotations omitted); *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 765 (7th Cir. 2009) (an agent's duties toward a third party are "neither increased nor diminished by his entrance upon the duties of agency") (internal quotations omitted).

[10] The NFL attempts to distinguish *Jurevicius* because it involved "safety conditions of team facilities." Reply 19 n.5.  That is true, but irrelevant.  *Jurevicius* held that the state-law claims were not preempted because "the CBA does not address any duty or lack of duty that [defendant] may have to Plaintiff regarding the facilities."  2010 WL 8461220 at *13.  So too here:  as the NFL admits, the CBAs contain no language addressing any "duty or lack of duty" that *the NFL itself* may have regarding head injuries.  As in *Jurevicius*, then, this Court need only "compare the procedures" that were "actually followed" with "common-law requirements."  *Id.*

13

the risks of repetitive head impacts" as part of their CBA-mandated certifications.  Reply 10-11.
But whether doctors "received instruction" pertaining to head injuries is a *factual* question; it
turns on "the facts and the procedure[s] . . . actually followed," not the hypothetical procedures
theoretically required under the CBAs.  *Williams v. NFL*, 582 F.3d 863, 876 (8th Cir. 2009), *cert.
denied*, 131 S. Ct. 566 (2010).  Evaluating those procedures requires this Court to look at
historical events, not at the meaning of the CBAs.  *See Kline*, 386 F.3d at 257 ("fact that a
[CBA]" is "part of the context" in which a claim arises does not support § 301 preemption).

The NFL's other arguments fare no better.  It invokes (Reply at 10-11) CBA provisions
requiring Club doctors to "advise" players about injuries "significantly aggravated by continued
performance," Ex. 6, Art. XLIV § 1, and to make "determinations of recovery time . . . in
accordance with the club's medical standards," Ex. 13, Art. XVII, at 12.[11]  But Players' claims
do not require interpretation of those provisions.  *See* Opp. 20.  At most, resolving Players'
claims may implicate *factual* questions about the degree to which doctors actually advised
Players about neurological risk and the nature of the "medical standards" actually employed in
making return-to-play decisions.  Neither question demands CBA interpretation.  *See Hendy v.
Losse*, No. 89-55430, 1991 WL 17230, at *2 (9th Cir. Feb. 12, 1991) (judgment noted at 925
F.2d 1470) (claim that team negligently hired doctor not preempted because player's claim did
not turn on whether "he was contractually entitled" to better treatment).[12]

---

[11] The NFL appears to concede that the CBA-created "Joint Committee on Player Safety and Welfare"
(cited at Open Mem. 19-20) is irrelevant to Players' class medical monitoring claims.  The Committee's
recommendations are non-binding and the NFL is "'not required to adopt the committee's recommendations.'"
Opp. 21 (quoting *Stringer*, 474 F. Supp. 2d at 912).  The NFL's Reply does not mention the Joint Committee.

[12] The NFL criticizes *Hendy* for stating that the defendant's argument about the CBA was "in the nature of
a defense."  Reply 19 n.5; *Hendy*, 1991 WL 17230 at *2.  But *Hendy* merely made that observation as one of many
reasons for distinguishing *United Steelworkers v. Rawson*, 495 U.S. 362 (1990), which is inapplicable here.  *See*
Opp. 35; *infra* pp. 27-28.  The Ninth Circuit's core holding – which the NFL does not address and which does apply
here – was that the player's failure-to-warn claim was "wholly independent of the [CBA]" because the alleged duty
to warn did not depend on whether "he was contractually entitled to treatment."  *Hendy*, 1991 WL 17230 at *2.

### B.  Players' Fraud Claims Do Not Require CBA Interpretation.

#### 1.     The NFL's Argument That § 301 Preempts Players' Fraud-Based Medical Monitoring Claims Conflicts with Third Circuit Precedent.

The NFL's preemption defense likewise fails with respect to Players' fraud claims.

Players allege that the NFL committed fraud by concealing the risks of brain injury to which it

purposely exposed them, and by promoting return-to-play protocols that it knew exacerbated

those risks.  *See* Opp. 22.  Under well-settled Third Circuit law, whether those allegations satisfy

the legal "'elements of state law fraud'" does "'not depend on [any CBA] provision.'"  *Id.*

(quoting *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 232 (3d Cir. 1995)).  Determining

whether the NFL's statements were misleading – and whether the NFL intended Players to rely

on them – depends on independent historical facts unrelated to the CBAs.  *See Voilas v. Gen.*

*Motors Corp.*, 170 F.3d 367, 378 (3d Cir. 1999) (allegation that "statement" was "untrue without

a timely disclosure" of additional facts was independent of CBA); *id.* at 376 (calling defendant's

fraudulent "motive" a "factual question[]" not requiring "interpretation of a [CBA]").

The NFL can cite no Third Circuit case holding any comparable fraud claim preempted.

In *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999) – the only published Third

Circuit opinion the NFL cites[13] – the plaintiffs alleged that their employers fraudulently claimed

they were "'not bound by the terms'" of the CBA itself.  Reply 22 n.8; 182 F.3d at 233

(emphasis omitted).  Because the CBA was the actual topic of the alleged misstatement, the court

could determine the statement's falsity only by analyzing whether the CBA "contain[ed] terms"

---

[13] The other Third Circuit decision the NFL cites is an unpublished, non-precedential opinion.  *See* Reply 22 n.8 (citing *Guerrero v. Hovensa LLC*, 259 F. App'x 453 (3d Cir. 2007)).  The Third Circuit has "steadfastly attempted to discourage District Courts as well as attorneys from relying on nonprecedential opinions of this court." *Jamison v. Klem*, 544 F.3d 266, 278 n.11 (3d Cir. 2008).  In any case, *Guerrero* offers the NFL's position no aid. There, the plaintiff alleged fraud based on the employer's representation of "facts surrounding [an employment] testing requirement, the manner in which the test was administered," and his "ultimate discharge" for "failure to pass the test." 259 F. App'x at 458.  The court found preemption because the "testing requirement and the necessity of passing are matters specifically addressed in the CBA." *Id.*  Here, by contrast, the NFL's fraudulent statements denying the risks of brain injury in football did not opine on a CBA-required condition of employment.

matching the employers' description.  *Id.*  The court therefore found preemption and distinguished *Voilas* – which concerned GM's "represent[ation] that closure of [a] plant was imminent," 170 F.3d at 376 – as lacking any similar "misrepresentation concerning the [CBA]." *Beidleman*, 182 F.3d at 234.

As in *Voilas*, but unlike in *Beidleman*, Players do not allege a "misrepresentation concerning the [CBA]."  Indeed, the Complaint does not even reference the CBAs, let alone allege that the NFL fraudulently "denied [Players] their rights under" those CBAs.  *Id.*  Rather, it alleges that the NFL "committed common-law fraud by intentionally lying" about independent empirical facts, *Voilas*, 170 F.3d at 376 – namely, the known neurological risks associated with football-related head trauma.  Evaluating those allegations requires an "'examination of the [NFL's] behavior, motivation, and statements.'"  *Id.* (quoting *Trans Penn Wax*, 50 F.3d at 232). That examination "does not substantially depend upon the terms of the [CBA]."  *Trans Penn Wax*, 50 F.3d at 232.

## 2.    Players' Fraud-Based Medical Monitoring Claims Do Not Require Interpretation of CBA Provisions Governing Clubs and Doctors.

Faced with Third Circuit precedent foreclosing preemption of Players' fraud claims, the NFL attempts to recycle its negligence arguments.  Specifically, it contends that Players' fraud claims resemble their negligence claims by requiring a similar "duty to disclose." Reply 19-20. That is plainly unresponsive to Players' litany of allegations concerning the NFL's *affirmative* misstatements.  *See* Opp. 23.  Because "affirmative misrepresentations" can be fraudulent "[e]ven where no duty to speak exists," Players' fraud claims do not depend on the existence of any duty, let alone one requiring interpretation of the CBAs.  *Voilas*, 170 F.3d at 378 (internal quotations omitted).  Whether or not the NFL could have remained silent in theory, the MCC alleges that it orchestrated an active campaign of disinformation about brain injuries.  MCC ¶

125-96.  Having chosen to speak extensively about those injuries, it assumed a duty to speak

truthfully.  *See Voilas*, 170 F.3d at 378; *City of Rome v. Glanton*, 958 F. Supp. 1026, 1038-39

(E.D. Pa. 1997) (noting that a "duty to speak" arises where "necessary to prevent an ambiguous

or partial statement from being misleading"), *aff'd mem.*, 133 F.3d 909 (3d Cir. 1997) (table).

 In any case, the NFL had an independent duty to disclose to Players their exposure to

chronic brain injuries.  *See* Opp. 23.  As Players have explained, a party assumes a duty to

disclose when its "'superior knowledge of essential facts renders nondisclosure inherently

unfair.'"  *Id.* (quoting *Barrett v. Freifeld*, 64 A.D.3d 736, 738 (N.Y. App. Div. 2009)).  So too

when the "relative position of the parties" results in a "confidential relationship."  *City of Rome*,

958 F. Supp. at 1038.  The NFL exercised power and influence over Players sufficient to

establish such a relationship.  *See* MCC ¶¶ 77, 85; *supra* p. 9.  Accordingly, the NFL's deliberate

concealment of neurological risks "'peculiarly within [its] knowledge'" was fraudulent,

irrespective of the CBA provisions imposing separate duties on Clubs and doctors.  Opp. 23

(quoting *Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599, 609 (M.D. Pa. 1994)).

 Further, this Court need not interpret the CBAs to determine whether Players reasonably

relied on the NFL's disinformation.  *See* Opp. 23-25.  As Players noted previously, the Third

Circuit has held that the state-law "'reliance inquiry'" – which turns on whether a statement is

"'worthy of belief'" – is "'[p]atently . . . not a question that depends upon an interpretation of the

[CBA].'"  Opp. 23 (quoting *Voilas*, 170 F.3d at 377).  Thus, the Third Circuit has repeatedly

rejected the argument that proving reasonable reliance requires the sort of CBA interpretation

that creates § 301 preemption.  *See* Opp. at 24 (citing cases).

 The NFL simply ignores the Third Circuit standard and string-cites fraud cases from

other jurisdictions.  Reply 20-21.  Even if it were appropriate to circumvent binding precedent in

17

this manner, the cases cited by the NFL prove little.  In each, the alleged misstatement itself

concerned the plaintiff's legal rights under a CBA and so arguably required CBA

interpretation.[14]  As the Third Circuit has noted, such claims that "employees were fraudulently

denied their rights under [a CBA]" can sometimes be preempted.  *Beidleman*, 182 F.3d at 234.

But where, as here, a plaintiff's fraud claims allege statements that were "separate from the

[CBA] between the parties," a defendant cannot shoehorn those claims into § 301 merely by

observing that fraud requires reasonable reliance.  *Id.* at 233.  Were it otherwise, a defendant

could invent a § 301 preemption defense in any fraud case "involving representations made to

employees."  *Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 234 (2d Cir. 1997).  The Third Circuit

does not permit such an overly broad interpretation of § 301 preemption.  *See* Opp. 25-26.

### C.  Players' Medical Monitoring Claims Categorically Avoid § 301 Preemption.

As Players noted in their class medical monitoring Opposition, this Court should

independently reject the NFL's preemption defense as to the class medical monitoring  claims

because those claims (1) rest on the NFL's gratuitous undertaking and  (2) concern the NFL's

conduct toward retired Players.  *See* Opp. 26-27.

*First*, the NFL has not demonstrated that § 301 preempts Players' negligence based claim

that the NFL gratuitously undertook to report accurately on latent neurological risks facing

retired Players.  *See* Opp. 26 (citing MCC ¶¶ 62-85, 125-96, 237, 250-54).  The NFL's

"'undertaking'" gave rise to a duty for it "'to exercise reasonable care'" in educating Players

---

[14] *See Cavallaro v. UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 6 (1st Cir. 2012) (allegation that plaintiffs were "misled into thinking" that "certain [work] time was uncompensated" required interpretation of "CBA provisions . . . guaranteeing payment for work" during specified times); *Atwater v. NFLPA*, 626 F.3d 1170, 1179, 1182  (11th Cir. 2010) (allegation that NFL gave misleading financial advice "arose directly from the CBA" because the CBA required NFL to "use best efforts" in establishing a mandatory "Career Planning Program"); *Augustin v. SecTek, Inc.*, 807 F. Supp. 2d 519, 525 (E.D. Va. 2011) (concealment claim concerning plaintiff's discharge for improper "time entry" preempted because the "CBA outline[d] what constitutes just cause for terminating an employee" and prescribed extensive "procedures" for time entry).

about the latent  neurological risk.  *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 217 (3d Cir. 2010)

(quoting RESTATEMENT (SECOND) OF TORTS § 323 (1965)).  That duty was extrinsic to the other

aspects of the parties' relationship:  its scope was "measured" not by the CBAs' default

allocation of responsibility, but "by the scope of [the NFL's] undertaking."  *Patentas v. United

States*, 687 F.2d 707, 716 (3d Cir. 1982).

    With respect to that theory of negligence, the NFL merely repeats its generic argument

that the NFL's duty "must be calibrated in light of the duties of others."  Reply 23.  The NFL's

argument, which fails as to all of Players' claims, is particularly unpersuasive here.  Even if the

CBAs theoretically relieved the NFL of responsibility for warning  Players about long-term risks

and the need for medical monitoring, once the NFL chose to educate Players about those risks, it

had a duty to exercise reasonable care in doing so.  *See* RESTATEMENT (SECOND) OF TORTS § 323

cmt. a (recognizing liability where a plaintiff suffers harm "from the defendant's negligent

conduct in the manner of his performance of the undertaking").  Whether the NFL's actions were

reasonable therefore turns on the *facts* about its undertaking.  Analyzing those facts does not

require CBA interpretation.  *See Kline*, 386 F.3d at 256 (preemption does not arise where facts

merely "relate to a subject . . . contemplated by the CBA").

    *Second*, the NFL's preemption defense fails as to Players' class medical monitoring

claims that relate exclusively to the NFL's treatment of retired players.  *See* Opp. 27.[15]  The NFL

asserts that those claims will require interpretation of CBA provisions providing "post-retirement

---

[15] The NFL argues that this Court should find preemption for the "dispositive" reason that the Complaint contains "mere allegations – not independent claims" about the NFL's post-retirement conduct.  Reply 23.  But § 301 preemption does not turn on such formalisms; what matters is the substance of Players' class medical monitoring allegations, not whether they technically have separated their post-retirement allegations into a separate count.  *Cf. Ellerbee v. Union Zinc, Inc.*, 881 F. Supp. 162, 166 n.3 (E.D. Pa. 1995) (Brody, J.) (refusing to prohibit removal based on similarly technical argument that would "tend unduly to exalt form over substance and legal flaw-picking over the orderly disposition of cases") (internal quotations omitted).  In any event, if this Court accepts the NFL's argument, Players respectfully request leave to amend to place their post-retirement medical monitoring allegations into a separate count.

benefits."  Reply 24.  But Players' claims do not turn on their entitlement to benefits under the

CBAs:  Players do not allege that the NFL misled them in a benefit proceeding; that the NFL

improperly denied them benefits; or that the NFL breached its CBA obligations to develop a plan

for providing benefits to players suffering from dementia.  *See* Opp. 11 n.7.  Rather, Players

allege that, in reliance on the NFL's misinformation about the long-term increased  risks of

football-related head trauma, they failed to seek out proper medical monitoring to prevent,

diagnose and mitigate injuries.  *See* MCC ¶¶ 222, 242.  The NFL cannot escape responsibility for

its misinformation merely because the CBAs provided retired Players a theoretical remedy.  *See*

Opp. 27; *see also Lingle*, 486 U.S. at 409-10 (no preemption "even if dispute resolution pursuant

to a [CBA]" and "state law" would "require addressing precisely the same set of facts").

Nevertheless, the NFL attempts to manufacture a dispute over the CBAs' benefit

provisions by suggesting they can be read "to allocate to the retirees themselves the

responsibility for seeking" medical care with respect to their head injuries.  Reply 24.  The

NFL's proffered interpretation lacks the "reasonable level of credibility" that § 301 requires.

*Kline*, 386 F.3d at 256 (internal quotations omitted).  None of the provisions the NFL cites even

remotely purports to impose substantive duties on Players regarding medical monitoring for the

risk of latent neurological injury.  *See* Ex. 3, Art. VI § 2(c)(2); Ex. 4, Art. XXXI § 8(d); Ex. 5,

Art. XXXIV § 8(b); Ex. 6, Art. XLVII § 4(C); Ex. 10, Art. XLVIII-D § 1.  And, even if they did,

that would not excuse the NFL's attempts to manipulate Players into forgoing such concerns.

*See* MCC ¶¶ 222, 242.  The NFL cannot "create a dispute" based on the CBA, in the face of

CBAs that are silent on the disputed issue, that justifies § 301 preemption by proffering an

interpretation refuted by a "cursory examination" of the CBAs.  *Cramer*, 255 F.3d at 694.

**III.     The NFL's Remaining Arguments Lack Merit.**

The NFL has failed to meet its burden, under Third Circuit law, to demonstrate that resolving any – let alone all – of Players' claims will require this Court to resolve a bona fide interpretive dispute over a CBA provision.  In its Reply, the NFL persists in its attempt to justify that failure by:  (1) invoking (Reply at 15) a so-called "wall of precedent" involving different claims in different courts; and (2) asserting (Reply at 25) preemption for the "independent" reason that Players' claims "arise under the CBA."  The NFL's attempt to escape compliance with the governing Third Circuit standard fails.

**A.     The NFL's Cases Are Distinguishable and Unpersuasive.**

The majority of cases invoked by the NFL involved plainly distinguishable allegations that either asserted misconduct by Clubs and doctors,[16] or conflicted directly with an explicit disclaimer contained in the CBAs, *see* Opp. at 28 n.23.  Thus, the NFL devotes most of its attention to the four cases that Players discussed at length in their Opposition.  *See* Opp. 29-33. None supports dismissal of Players' claims here.

**1.     *Duerson and Maxwell***

As in its opening brief, the NFL repeatedly cites two opinions denying motions to remand in cases now part of this MDL.  *See Duerson v. NFL*, No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012); *Maxwell v. NFL*, No. CV 11-08394 (C.D. Cal. Dec. 8, 2011).  These cases, however, neither bind this Court nor support dismissal of Players' claims.  *See* Opp. 29-31.

---

[16] *Cf. Smith v. Houston Oilers, Inc.*, 87 F.3d 717, 720, 721 (5th Cir. 1996) (claim that Club "compelled participation" in a rehabilitation program "under threats of termination" required determination of whether such "rehabilitation demands were *permissible*" under the CBA); *Givens v. Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010) (allegation that Club physician failed to disclose results of x-ray was preempted because of CBA provision directly requiring physician to "advise the player" of such results); *Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1174-78 (N.D.N.Y. 1990) (claim that team trainers and physicians "refused to discuss the nature of [plaintiff's] injury with him" was preempted because of CBA provision requiring Clubs to disclose known injuries to players).

As an initial matter, the NFL concedes that *Duerson* and *Maxwell* did not address medical monitoring claims because medical monitoring was not pled in those cases. *See* Reply 16. Further, the two cases addressed only Players' negligence claims and provide no support for § 301 preemption of Players' fraud claims. *See* Reply 16 (mischaracterizing Players' medical monitoring claims as entirely consisting of "Negligence-Based Medical Monitoring Claims"). In addition, both opinions merely denied motions to remand; they did not hold that the plaintiffs' claims should be *dismissed*. *See* Opp. 29.[17]

Further, neither *Duerson* nor *Maxwell* addressed the legal theories on which Players rely. Unlike in *Duerson* and *Maxwell*, the Complaint here alleges historical facts showing that the NFL assumed a duty of care *independent* of the Clubs and doctors whose duties the CBAs govern. Duerson alleged nothing similar: his complaint contained virtually no allegations about the historical sources of the NFL's common-law obligations, and he merely asserted a generic duty "to keep [players] reasonably safe." Compl. ¶ 22, *Duerson*, No. 12 C 2513 (removed to N.D. Ill. Apr. 5, 2012). The *Maxwell* plaintiffs, on the other hand, premised one of the NFL's alleged duties on the need to collaborate with Club doctors to make medical diagnoses.[18] The court viewed that theory as requiring the "physician provisions of the CBA [to] be taken into account." *Maxwell*, No. CV 11-03895, at 2. And, because the court was faced with a motion to

---

[17] The NFL asserts that "completely preempted claims must be dismissed," but cites no authority for that sweeping proposition. Reply 17. As one of the NFL's own cases noted, the "*disposition* of" completely preempted claims raises a "different set of issues" from the "*removal* of the case." Reply 21; *Cavallaro*, 678 F.3d at 6. Whatever the merits of *Duerson*'s and *Maxwell*'s jurisdictional holdings – which determined that the plaintiffs' claims should be decided by a *federal* court – they do not establish that this Court should dismiss Players' claims at this early stage of the litigation. *See* Opp. 28; *infra* pp. 28-30.

[18] *See* Compl. ¶ 548(d), *Maxwell*, No. CV 11-08394 (removed to C.D. Cal. Oct. 11, 2011) (alleging duty "to ensure accurate diagnosis and recording of concussive brain injury"). The NFL's response that the *Maxwell* plaintiffs described "the NFL's purported historical conduct" is beside the point. Reply 16. The court denied the plaintiffs' motion to remand not because of a dearth of historical allegations, but because one of the plaintiffs' theories focused on *medical diagnosis* and therefore arguably implicated Club doctors. *See Maxwell* at 2 (citing "accurate diagnosis" allegations and holding that they implicated "physician provisions of the CBA").

remand, it needed to address complete preemption with respect to only that one claim.  *See id.*
Players' allegations are not comparable.

The NFL attempts to equate Players' claims with those in *Duerson* and *Maxwell* because
the Judicial Panel on Multidistrict Litigation ("JPML") transferred both cases to this Court.
Reply 17.  That, however, shows only that *Duerson* and *Maxwell* "share factual issues" with the
other cases pending before this Court.  Dkt. No. 61 (Transfer Order) at 1.  It does not suggest a
"complete identity . . . of common factual and legal issues" or that the common issues lack
"different nuances."  *In re Travel Agent Comm'n Antitrust Litig.*, 290 F. Supp. 2d 1381, 1382
(JPML 2003) (holding that centralization does not depend on such factors).  Indeed, those
"nuances" make all the difference:  unlike the personal injury plaintiffs in *Duerson* and *Maxwell*,
Players class medical monitoring claims rely on negligence theories that simply do not implicate
the legal duties of Clubs and doctors.  *See supra* pp. 7-14.  This Court should not hold those
unique medical monitoring claims preempted merely because *Duerson* and *Maxwell* also
involved concussions.  *See Glatts v. Crozer-Keystone Health Sys.*, 645 F. Supp. 2d 446, 451 n.6
(E.D. Pa. 2009) (noting that § 301 preemption must rest not on "broad proposition[s]" but on
"case-by-case" analysis) (internal quotations omitted).

In any event, to the extent that *Duerson* and *Maxwell* support the NFL's argument, this
Court should decline to follow them.  As Players have explained, both decisions rested on the
same faulty premise as the NFL's arguments here:  that the NFL's common-law duties to retired
Players depended on the separate duties of Clubs and doctors to active Players under the CBAs.
*See* Opp. 30.  In both cases, that assumption drew no serious scrutiny from the court.  Players, by
contrast, have explained fully why that assumption is unwarranted here.  *See supra* pp. 7-13.

Finally, the NFL's Reply makes no mention of *Duerson*'s and *Maxwell*'s most fundamental flaw:  that neither identified an actual *dispute* over a relevant CBA provision. Indeed, *Duerson* merely speculated that the CBA provisions imposing duties on Clubs *might* ultimately permit the NFL to "exercise a lower standard of care."  2012 WL 1658353, at *4. Such speculation cannot justify preemption, however, because the evidence may well demonstrate that the NFL's actions failed to meet even the "lower standard of care" that *Duerson* hypothesized.  *See* Opp. 31.  If that turns out to be the case, this Court would never need to interpret the CBA provisions on which *Duerson* based its hypothesis.  Under controlling Third Circuit law, that defeats preemption.  *See id.*

### 2.  *Stringer*

The NFL's reliance on *Stringer* is similarly misplaced.  Like *Duerson* and *Maxwell*, *Stringer*'s lawsuit did not include a medical monitoring claim, nor did it address fraud.  Further, the NFL does not dispute that *Stringer* undermines its preemption defense as to Players' claims that the NFL failed to adopt equipment standards reasonably adapted to minimize head trauma in football.  *See* Opp. 31-32.  Nor does it dispute that *Stringer* is inapplicable to Players' fraud claims, given that Stringer's complaint lacked any allegation that the NFL misled players regarding heat-related illnesses.  *See id.*  Rather, the NFL merely observes broad parallels between Players' and Stringer's allegations:  that both generally criticized the NFL's failure to use "adequate care" or to promote reasonable policies concerning "return to practice."  Reply 18 (internal quotations omitted).  Those superficial similarities do not justify preemption here.  The reason, as Players have explained, is that Stringer expressly tied the NFL's duty to those of team trainers by alleging that "'[a]thletic trainers . . . serve as the first line of treatment'" for "heat-related illnesses.'"  Opp. 32 (quoting *Stringer*, 474 F. Supp. 2d at 910).  That allegation – and its

dependence on CBA provisions governing trainers – led *Stringer* to find preemption. *See* 474 F. Supp. 2d at 910-11.

Players allege the opposite: that the NFL had an independent duty unconnected to those of doctors and trainers. That distinct theory flows from a critical factual difference with *Stringer*. Unlike the acute heat stroke that Stringer suffered, which is amenable to sideline diagnosis by a club trainer, the risk of latent neurodegenerative disease for which Players seek class medical monitoring does not manifest until years and decades after a Player leaves the NFL. *See* MCC ¶¶ 182, 248. Individual club trainers cannot effectively serve as the "first line of defense" or otherwise have any impact on the health status of a retired Player at risk for latent brain disease. In fact, there is no relationship between retired Players and their former club(s) during the time that medical monitoring is so important. *See* Opp. 32-33. As such, the common law places an independent duty to address these long-term and latent risks on the only party capable of doing so effectively: the NFL. *See* Opp. 19. And, unlike in *Stringer*, that duty does not depend on the legal meaning ascribed to the CBA provisions governing athletic trainers.[19]

### 3. *Williams*

*Williams*, like *Stringer*, does not support dismissal of Players' claims. In finding two of the plaintiffs' claims not preempted, *Williams* emphasized that the NFL bears the "burden" of "direct[ing]" a court "to a specific provision of the CBA . . . that must be construed." 582 F.3d at 879-80. It also clarified that mere "reference[]" to – as opposed to "interpretation" of – does

---

[19] The NFL argues that Players' allegations about the NFL's superior ability to address neurological injuries requires "thorough consideration of the CBAs." Reply 12. Those allegations, however, concern empirical facts, not CBA provisions. The NFL had a superior ability to address head injuries because of its historical efforts to acquire neurological data, its credibility with relevant stakeholders, and its centralized vantage point from which to spearhead structural reforms. *See* Opp. 17-19. By comparison, individual doctors had no "means for addressing the concussion crisis writ large" because they lacked those same institutional advantages: the credibility, the data, and the vantage point. Opp. 19. Evaluating these issues requires only evidence of "the facts and the procedure[s] . . . actually followed," not the meaning of the CBAs. *Williams*, 582 F.3d at 876.

not "warrant preemption." *Id.* at 877. As Players seeking class medical monitoring relief have explained, faithful application of those principles here requires rejecting the NFL's preemption defense to the medical monitoring claims. *See* Opp. 33.

The NFL ignores the parts of *Williams* that undermine its argument and fixates (Reply at 18, 23) on the plaintiffs' claim that the NFL "voluntarily undertook to act or speak." 582 F.3d at 881. But Players' claims here bear little resemblance to the voluntary undertaking claim that *Williams* held preempted. *See* Opp. 33 n.29. There, the challenged steroid testing regime was set forth in a comprehensive written "Policy" that the CBA "expressly incorporate[d]." *Williams*, 582 F.3d at 868. Moreover, the disputed protocols that the Policy created were expressly "'conducted under the auspices of the [National Football League Management Council].'" *Id.* Because the alleged voluntary undertaking therefore concerned conduct in which the NFL engaged pursuant to CBA provisions that binding the NFL itself, the plaintiffs' claims were arguably preempted. *Id.* at 881. Here, by contrast, the NFL identifies no written policy specifically related to the increased risk of latent brain disease, and it certainly does not point out any CBA provision assigning responsibility for medical monitoring to the NFL. Accordingly, the CBAs merely form "part of the context" in which the NFL's duty arose, which does not create preemption. *Kline*, 386 F.3d at 257.

### B. Players' Medical Monitoring Claims Do Not "Arise Under" the CBAs.

The NFL's fall-back argument that Players' class medical monitoring claims "arise under" the CBAs also lacks merit. First, Players have shown that the Third Circuit limits § 301 preemption to claims requiring bona fide CBA interpretation. *See* Opp. 34; *supra* pp. 3-6. The NFL criticizes that argument as "disregard[ing] half the Supreme Court's governing test." Reply 6. The NFL's criticism, however, rests on a mischaracterization of the Supreme Court's

statement that § 301 "governs claims founded directly on rights created by [CBAs], and also claims substantially dependent on analysis of a [CBA]." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (internal quotations omitted). The next year, however, the Court clarified that "as long as the state-law claim can be resolved without interpreting the [CBA] itself, the claim is 'independent' of the [CBA] for § 301 pre-emption purposes." *Lingle*, 486 U.S. at 410; *see id.* at 410 n.10 (citing *Caterpillar*, 482 U.S. at 394). The Third Circuit has applied *Lingle* and held squarely that "a plaintiff may bring a state law tort action . . . so long as the state claim does not require interpretation of the [CBA]." *Trans Penn Wax*, 50 F.3d at 229. Notably, the NFL has *never* cited controlling precedent – whether from the Supreme Court or the Third Circuit – finding preemption of such a claim.

In any event, Players' class medical monitoring claims are not founded on the CBAs. The Class Complaint neither cites any CBA nor alleges that the NFL possessed contractual duties regarding Player health and safety, and the NFL has identified no CBA provisions imposing such duties. *See* Opp. 34-35. The best the NFL can do is point vaguely to CBA provisions creating broad procedures for "rule-making" in general. Reply 26-27. But rule-making procedures are patently irrelevant to the NFL's duties relating to medical monitoring of retired Players. Even if they were relevant, a claim's "relat[ion] to a subject . . . contemplated by the CBA" does not demonstrate that it arises under a CBA. *Kline*, 386 F.3d at 256. As *Stringer* observed, the "NFL is not a party to the CBA and is not contractually obligated to take any action to protect NFL players from illness or injury." 474 F. Supp. 2d at 905.[20] Players' claims therefore arise under the common law, not the CBAs. *See id.* at 904-08.

---

[20] The NFL's argument that it is "bound by the CBAs" does not alter that conclusion. Reply 12. Even if the NFL theoretically could be bound by CBA provisions requiring it to take action, *Stringer* correctly observed that no CBA provision imposes any requirements on the NFL with respect to Player health. 474 F. Supp. 2d at 905.

Unable to identify any CBA provision actually creating the duties that Players allege, the NFL argues that Players' claims *must* arise under the CBA because the duties they allege are not ones "'owed to every person in society.'"  Reply 26 (quoting *Rawson*, 495 U.S. at 371).  As Players have already explained, *Stringer* correctly disposed of that very argument by observing that the  "'complaint in *Rawson* specifically referred to the [CBA] as the source of the duty that was breached.'"  Opp. 35 (quoting *Stringer*, 474 F. Supp. 2d at 907).  The Third Circuit has distinguished *Rawson* on similar grounds.  *See Kline*, 386 F.3d at 261 (noting that the *Rawson* "plaintiffs' pleadings indicated that the duty of care relied on . . . was one allegedly assumed by the union in a [CBA]").  Accordingly, *Rawson* is inapplicable because the Complaint does not rely on the CBAs as the source of the NFL's alleged duties.

IV.    **The NFL Has Not Shown That § 301 Requires Players' Class Medical Monitoring Claims To Be Dismissed.**

A.  **The NFL's Preemption Defense Also Is Premature.**

The NFL's preemption defense, which lacks even theoretical merit, provides a particularly unpersuasive basis for dismissing Players' class medical monitoring claims at this early juncture.  A motion to dismiss is the "proper vehicle" for adjudicating an affirmative defense only if the defense is "apparent on the face of the complaint."  *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997) (internal quotations omitted).  Even if the NFL had demonstrated that Players' claims might ultimately implicate § 301, its argument for dismissing Players' claims now falls well short of meeting that strict standard.  *See* Opp. 11.

As a general matter, courts have noted a "'preference for allowing fuller factual development prior to ruling on preemption'" on the pleadings.  Opp. 11 n.8 (quoting *Exal Corp. v. Roeslein & Assocs., Inc.*, No. 4:12-CV-01830, 2012 WL 4754748, at *3 (N.D. Ohio Oct. 2, 2012)).  The need for factual development is particularly acute in § 301 preemption cases.  *See*

28

*id.* at 14.  That is because § 301 preemption is aimed at a very narrow problem:  the prospect that

"common terms" in CBAs will "be given different and potentially inconsistent interpretations in

different jurisdictions."  *Livadas*, 512 U.S. at 122.  If conflicting interpretations never

materialize, the reason for § 301 preemption evaporates.  Thus, courts routinely deny motions to

dismiss based on § 301 preemption where it is "unclear" whether CBA interpretation will

actually be required.  *DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, No. 10-cv-

1341, 2012 WL 748760, at *10-11 (E.D.N.Y. Mar. 7, 2012).[21]

      The NFL has not demonstrated that Players' claims on their face so clearly require CBA

interpretation that they should be dismissed.  To begin with, the NFL has not explained why this

Court should depart from the normal rule barring consideration of "'matters extraneous to the

pleadings'" on a motion to dismiss.  Opp. 9 n.3 (quoting *In re Burlington Coat Factory Sec.*

*Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).  Because the Complaint does not "refer to the

CBA[s]," the NFL's reliance on them at the pleadings stage is improper.  *Gray v. Keystone Steel*

*& Wire Co.*, No. 08-1197, 2009 WL 187895, at *1 (C.D. Ill. Jan. 21, 2009).[22]

      More importantly, the Complaint contains a host of factual allegations that, when

confirmed in discovery, will render immaterial every one of the NFL's arguments about the

CBAs.  For example, Players allege that the NFL assumed a "special relationship" to Players that

created an independent, non-delegable obligation for it to act in Players' best interest.  *See* Opp.

17; *supra* p. 8.  If discovery establishes that the NFL took on quasi-fiduciary duties of loyalty to

---

    [21] *See also Basa v. Rizza Chevrolet, Inc.*, 750 F. Supp. 2d 987, 989 (N.D. Ill. 2010) (finding dismissal "premature" because it was unclear "whether any provisions of the CBA are in dispute"); *Chavez v. Don Stoltzner Mason Contractor, Inc.*, No. 10 C 264, 2010 WL 1417029, at *4 (N.D. Ill. Apr. 5, 2010) (holding dismissal "premature" because court did "not yet know whether any provisions of the CBAs are in dispute"); *Gehringer v. Atlantic Detroit Diesel Allison, LLC*, Civil Action No. 08-3917 (JLL), 2009 WL 806602, at *5 (D.N.J. Mar. 26, 2009) (denying motion to dismiss even though "discovery may ultimately reveal" that "claim does involve interpretation of the CBA").

    [22] *See also JM Mechanical Corp. v. United States*, 716 F.2d 190, 197 (3d Cir. 1983) (reversing dismissal of claim based on "matters outside the bounds of the complaint"); *Christie v. Public Serv. Elec. & Gas Co.*, No. Civ. 04-5978, 2006 WL 462588, at *7-8 (D.N.J. Feb. 24, 2006) (declining to consider CBA on a motion to dismiss)

Players, the CBAs – however interpreted – could not relieve it of those duties.  *See supra* p. 7-10. If so, this Court would never need to interpret the CBA provisions cited by the NFL.

Similarly, the facts may show that the NFL was so grossly negligent that its conduct was unacceptable under any conceivable interpretation of the CBAs.  If so, then this Court would never need to consider the NFL's core argument that the CBA provisions imposing duties on individual Clubs permitted the NFL to exercise a "'lower standard of care in that area itself.'" Open Mem. 14-15 (quoting *Duerson*, 2012 WL 1658353 at *4)).  If evidence confirms that the NFL failed to live up to even that hypothetical "lower standard," then the question whether the CBAs create such a standard becomes irrelevant.  *See supra* pp. 23-24; *Basa*, 750 F. Supp. 2d at 989 (dismissal inappropriate unless "provisions of the CBA" actually "are in dispute").

Further, as this Court has not yet determined the substantive law governing Players' claims, dismissal is inappropriate.  The NFL does not dispute that the choice-of-law analysis here is fact-dependent and should be reserved for a "'later stage in the proceedings.'"  Opp. 15 n.15 (quoting *Graboff v. The Collern Firm*, No. 10-cv-1710, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010)).  The NFL cannot possibly demonstrate that Players' claims are preempted when this Court has not yet determined which law will define the elements of their claims.

### B.  Section 301 Does Not Require *Dismissal* of Players' Class Medical Monitoring Claims.

Class medical monitoring Players' argument on this point is identical to the argument set forth on pp. 29-30 of Players' Surreply in Opposition to Defendant NFL's Motion to Dismiss the Amended Master Administrative Long-Form Complaint.  Class Plaintiffs hereby incorporate that argument by reference.

### CONCLUSION

The NFL's Motion to Dismiss Players' Class Action Complaint should be denied.

Dated:  January 28, 2013

Respectfully submitted,

*/s/ Christopher Seeger*
Christopher Seeger
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Phone:  (212) 584-0700
Fax:  (212) 584-0799
cseeger@seegerweiss.com

*/s/ Sol Weiss*
Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, Pennsylvania 19103
Phone:  (215) 735-1130
Fax:  (215) 735-2024
sweiss@anapolschwartz.com

*Plaintiffs' Co-Lead Counsel*

David C. Frederick
Scott H. Angstreich
Joshua D. Branson
KELLOGG, HUBER, HANSEN,
   TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@khhte.com
sangstreich@khhte.com
jbranson@khhte.com
*On the Brief*

Jeannine Kenney (PA # 307635)
HAUSFELD LLP
1604 Locust Street
Second Floor
Philadelphia, Pennsylvania 19103
Phone:  (215) 985-3270
Fax:  (215) 985-3271
jkenney@hausfeldllp.com
*Plaintiffs' Liaison Counsel*

David Buchanan
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Phone:  (212) 584-0700
Fax:  (212) 584-0799
dbuchanan@seegerweiss.com

Larry E. Coben
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, Pennsylvania 19103
Phone:  (215) 735-1130
Fax:  (215) 735-2024
lcoben@anapolschwartz.com

Thomas V. Girardi
Graham B. LippSmith
GIRARDI KEESE
1126 Wilshire Blvd
Los Angeles, California 90017
Phone:  (213) 977-0211
Fax:  (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Phone:  (202) 540-7200
Fax:  (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

*Plaintiffs' Executive Committee*

Gene Locks
David D. Langfitt
LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, Pennsylvania 19106
Phone:  (215) 893-3434
Fax:  (215) 893-3444
glocks@lockslaw.com
dlangfitt@lockslaw.com

Steven C. Marks
Ricardo M. Martinez-Cid
PODHURST ORSECK P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, Florida 33130-1780
Phone:  (305) 358-2800
Fax:  (305) 358-2382
rmartinez-cid@podhurst.com
smarks@podhurst.com

*Plaintiffs' Executive Committee*

James R. Dugan, II
THE DUGAN LAW FIRM
One Canal Place, Suite 1000
365 Canal Street
New Orleans, Louisiana 70130
Phone:  (504) 648-0180
Fax:  (504) 648-0181
jdugan@dugan-lawfirm.com

Arnold Levin
LEVIN FISHBEIN SEDRAN
   & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Phone:  (215) 592-1500
Fax:  (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
RODANAST, PC
801 Estelle Drive
Lancaster, Pennsylvania 17601
Phone:  (717) 892-3000
Fax:  (717) 892-1200
dnast@rodanast.com

Anthony Tarricone
KREINDLER & KREINDLER LLP
277 Dartmouth Street
Boston, Massachusetts 02116
Phone:  (617) 424-9100
Fax:  (617) 424-9120
atarricone@kreindler.com

Michael L. McGlamry
POPE, MCGLAMRY, KILPATRICK
   MORRISON & NORWOOD, P.C.
3455 Peachtree Road, NE
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, Georgia 30326-3243
Phone:  (404) 523-7706
Fax:  (404) 524-1648
efile@pmkm.com

David A. Rosen
ROSE, KLEIN & MARIAS LLP
801 South Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Phone: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

*Plaintiffs' Steering Committee*

Charles S. Zimmerman
ZIMMERMAN REED PLLP
1100 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Phone:  (612) 341-0400
Fax:  (612) 341-0844
charles.zimmerman@zimmreed.com

David S. Casey, Jr.
Fred Schenk
CASEY GERRY SCHENK
   FRANCAVILLA BLATT
   & PENFIELD LLP
110 Laurel Street
San Diego, California 92101-1486
Phone:  (619) 238-1811
Fax:  (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

Derriel McCorvey
THE LAW OFFICE OF
   DERRIEL C. MCCORVEY, LLC
115 W. Main Street, Suite 14
Lafayette, Louisiana 70501
Phone:  (337) 291-2431
Fax:  (337) 291-2433
derriel@mccorveylaw.com

*Plaintiffs' Steering Committee*