```
                 UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF PENNSYLVANIA


IN RE:                          )   MDL NO. 2323
                                )   12-MD-2323

NATIONAL FOOTBALL LEAGUE        )   Philadelphia, PA
PLAYERS' CONCUSSION INJURY      )   April 9, 2013
LITIGATION                      )   10:00 a.m.



                 TRANSCRIPT OF ORAL ARGUMENTS
             BEFORE THE HONORABLE ANITA B. BRODY
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the NFL:             BETH WILKERSON, ESQUIRE
                         BRAD S. KARP, ESQUIRE
                         THEODORE V. WELLS, ESQUIRE
                         PAUL WEISS RIFKIND WHARTON &
                            GARRISON LLP
                         1285 Avenue of the Americas
                         New York, NY  10019

                         PAUL CLEMENT, ESQUIRE
                         BANCROFT PLLC
                         1919 M Street NW
                         Washington, D.C.  20036

                         ROBERT C. HEIM, ESQUIRE
                         DECHERT
                         4000 Bell Atlantic Tower
                         1717 Arch Street
                         Philadelphia, PA  19103

For Plaintiffs:          CHRISTOPHER A. SEEGER, ESQUIRE
                         SEEGER WEISS LLP
                         550 Broad Street - Suite 920
                         Newark, NJ  07102

For Plaintiffs:          MARTIN BUCHANAN, ESQUIRE
  Maxwell, et al         LAW OFFICES OF MARTIN BUCHANAN
                         655  West Broadway - Suite 1700
                         San Diego, CA  92101
```

APPEARANCES (Continued):

    Executive Committee    DAVID FREDERICK, ESQUIRE
                               SCOTT ANGSTREICH, ESQUIRE
                               JOSHUA BRANSON, ESQUIRE
                               KELLOGG, HUBER, HANSEN, TODD, EVANS
                                 & FIGEL, PLLC
                               1615 M Street NW - Suite 400
                               Washington, D.C. 20036

     Easterling, et al     SOL H. WEISS, ESQUIRE
                               ANAPOL SCHWARTZ WEISS COHAN
                                 FELDMAN & SMALLEY PC
                               1710 Spruce Street
                               Philadelphia, PA  19103

   For Defendants:      PAUL G. CEREGHINI, ESQUIRE
     Riddell             ROBERT WISE, ESQUIRE
                                 BOWMAN & BROOKE LLP
                               2901 North Central Avenue
                               Suite 1600
                               Phoenix, AZ  85012

     Riddell             THOMAS. M. MERRIGAN, ESQUIRE
                               (In-house counsel)

Audio Operator:          ROSALIND BURTON-HOOP

Transcribed by:          DIANA DOMAN TRANSCRIBING
                               P.O. Box 129
                               Gibbsboro, New Jersey  08026-0129
                               Office:   (856) 435-7172
                               Fax:      (856)  435-7124
                               E-mail:   dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1           (The following was heard in open court at 10:00 a.m.)

2                   COURTROOM DEPUTY:  All rise.  This is Court is now

3       in session, the Honorable Anita B. Brody presiding.

4                   Good morning, Your Honor.

5                   THE COURT:  Good morning.

6                   ALL ATTORNEYS:  Good morning, Your Honor.

7                   THE COURT:  Looks like -- well, please be seated.

8                   It looks like no one followed my instructions.  Off

9       with the ties and jackets.  I couldn't be more serious about

10      it.  It's a -- going to be -- I don't want anyone to have

11      problems.  I know some people can't do it, but I understand

12      that, but -- yes, please, please.  It's going to get hot in

13      here, and I -- please take off your tie and jacket.  I don't

14      want any people fainting and doing other things.  And nobody

15      knows what I have under my --  okay.

16                  All right.  Let's -- let's begin.  I have a few

17      things I wanted to -- will counsel come forward.  We'll

18      start -- would you like to introduce who's going to speak.

19                  MS. WILKINSON:  Yes, Your Honor, Beth Wilkinson, on

20      behalf of the NFL.  I'm here with Ted Wells and my partner,

21      Brad Karp, and Mr. Paul Clement will be arguing for us today.

22                  THE COURT:  Okay.

23                  MS. WILKINSON:  And --

24                  MR. FREDERICK:  Good morning, Your Honor.

25                  THE COURT:  Mister --

1          MR. FREDERICK:  On behalf of the plaintiffs'

2    Executive Committee, David Frederick and Steve Cross.

3          THE COURT:  Okay.  I have a few -- a few --

4          UNIDENTIFIED ATTORNEY:  Good morning, Your Honor.

5    I'm sorry to interrupt, but for the Riddell defendants, Paul

6    Cereghini will argue for us.

7          THE COURT:  Okay.  But you're not arguing until

8    after this -- the NFL is -- I'm just having the NFL and the --

9    I thought that was pretty clear, the NFL and the -- and the

10   plaintiffs arguing on the -- on the preemption issue, and then

11   you can go on to argue the -- your issues.

12         MR. FREDERICK:  We do have an argument on the

13   preemption issue, as well, though, Your Honor.

14         THE COURT:  Well, okay.  I'll see about that.  I

15   didn't understand that.  All right.

16         Let -- just a few ground rules.  This argument is --

17   pertains to the amended master administrative long form

18   complaint.  It's addressed to that, that's correct.  Is that

19   not correct, Mr. Clement?

20         MS. WILKINSON:  Yes, Your Honor.

21         MR. CLEMENT:  Yes.

22         THE COURT:  Okay.  Mr. Frederick, the NFL has the

23   burden of proof as the party asserting the LMRA claim,

24   preemption claim, is that correct?

25         MR. FREDERICK:  That's our position, Your Honor.

1    David Frederick, for the plaintiffs.

2              THE COURT:  Mr. Clement?

3              MR. CLEMENT:  We wouldn't take issue with that, Your

4    Honor.

5              THE COURT:  Okay.  And Third Circuit rule applies,

6    is that correct?  For me -- I mean the Supreme Court,

7    obviously, but also we're in the Third Circuit.  It's an MDL,

8    and the Third Circuit law applies.

9              Would you agree to that, Mr. Clement?

10             MR. CLEMENT:  Yes, Your Honor.

11             MR. FREDERICK:  Yes, Your Honor.

12             THE COURT:  All right.  All right.  Why don't -- you

13   have five minutes, that's what was the plan, to tell us about

14   your claims, and then Mr. Clement will then proceed.

15             You have two -- two -- you use one on the other

16   side, if you don't mind.

17             MR. FREDERICK: You want me to use this one?

18             THE COURT:  Yes, please.

19             MR. FREDERICK:  That's fine.

20             THE COURT:  So if you're both up here, then they'll

21   both have a place to -- to argue to.

22             MR. FREDERICK:  Thank you, Your Honor.  David

23   Frederick, for the retired players.  We appreciate the

24   opportunity to speak to you, and what I understand your

25   direction here to be to describe our claims in general.

1          Obviously, each of the individual players has his

2     own claim, or, in the case of the deceased players, their

3     widows and family members have claims that derive from their

4     loved ones' passing and the situation that that person faced.

5          But in general what I'd like to do is to describe

6     our claims in two basic clusters.  First are the negligence

7     claims, and the second are fraud-based claims.

8          Now, with respect to the negligence-based claims,

9     our position is that for you to apply LMRA preemption -- as

10    you just adduced, the NFL has the burden of proof, but that

11    burden of proof needs to show that the -- that the CBA,

12    Collective Bargaining Agreement, that would apply to each

13    individual player if there is indeed one to be applied, and

14    many of the players here played and were not under any

15    Collective Bargaining Agreement, has to address an

16    interpretive question of each element of the claim.

17         So with respect to the negligence claims I think

18    it's important to understand that there are three clusters of

19    negligence claims that our position is there's no interpretive

20    question whatsoever, there's not even an argument about that,

21    and let me go through those first.

22              THE COURT:  Okay.

23              MR. FREDERICK:  The first is that the NFL, beginning

24    in the 1920s, arrogated to itself the authority to be the

25    guarantor of player safety, and they did that through the

1  promulgation of rules, the development of equipment standards,

2  the decision to have helmets and when those helmets were

3  produced, what they were.

4         And over the course of decades, long before the

5  first Collective Bargaining Agreement was entered into in

6  1968, the NFL had held itself out to be the guarantor of

7  player safety.

8         And so when the NFL began to publicly monetize and

9  glorify violence on the field, it breached its duty of due

10 care because it was attempting to speak out of, in effect,

11 both sides of its mouth, and that was a breach of the duty of

12 due care that the league held itself out to the players.

13        There's nothing in the Collective Bargaining

14 Agreements that goes to marketing of player activities.

15        So when the NFL is glorifying player violence

16 through the production of NFL films that dramatize the hardest

17 hits in the game, that encourages players to go back to the

18 field of play and to show their manhood, if you will, by

19 playing hurt, these are all elements that are breached by the

20 NFL's failure to use due care.

21        The second basic negligence theory is that it

22 spread -- the NFL spread misinformation about neurological

23 risks, notwithstanding the fact that the first studies

24 concerning neurological risks date back decades and decades.

25        The NFL was not giving truthful information, even

1    though it knew or should have known that the neurological

2    information that was available in medical science would

3    indicate that repeated concussive and sub-concussive head

4    impacts would cause problems.

5         The third basic failure to warn claim goes to the

6    retired players, and there's nothing in the Collective

7    Bargaining Agreements requiring any interpretive question

8    whatsoever with respect to the league's duty to warn retired

9    players that as a result of the many concussive and sub-

10   concussive hits that they endured during practices and games,

11   that they needed to do something different with respect to

12   their medical care.

13        So with respect to those three negligence claims,

14   our position is that collective bargaining doesn't speak to

15   them at all.

16        THE COURT:  All right.  But the -- the elements of

17   those claims are of -- of the negligence claims the duty of

18   care, is that correct?

19        MR. FREDERICK:  Yes.

20        THE COURT:  Breach of the duty, causation and

21   damages.

22        MR. FREDERICK:  That's correct.

23        THE COURT:  Okay.  But -- okay.  Go on.  And so --

24        MR. FREDERICK:  So --

25        THE COURT:  -- just want to get that clear.  There

1    are elements of those claims.

2              MR. FREDERICK:  That's correct.

3              THE COURT:  Next.

4              MR. FREDERICK:  Now, there are two clusters of

5    claims that we don't believe have any question, but there is

6    at least an argument on the other side.  Those concern post-

7    1994 negligence for those players who played and retired in

8    that period, and the second was a -- is a negligence claim

9    that the league failed to adopt equipment standards.

10             Now, with respect to the first, the -- in 1994 the

11   complaint --

12             THE COURT:  Well -- yes, go on.

13             MR. FREDERICK:  -- alleges that the NFL began

14   voluntarily undertaking to report accurately on concussions in

15   sports.

16             The allegation in the complaint is that

17   notwithstanding that voluntary undertaking, they produced

18   misinformation, and so as a result the committed negligence

19   after they began to undertake the duty to accumulate

20   information about the concussive and sub-concussive impacts in

21   the -- on the players.

22             And with respect to the failure to adopt equipment

23   standards --

24             THE COURT:  I'm going to let -- I'm going to cut you

25   short.  I just really wanted the elements of the claims.  This

1    is a little bit further than that --

2              MR. FREDERICK:  So --

3              THE COURT:  -- so why don't you go on to the fraud

4    claim --

5              MR. FREDERICK:  Okay.

6              THE COURT:  -- so I -- we can go to the elements of

7    fraud claim so that that can be addressed by the defendant.

8              MR. FREDERICK:  Certainly.  And -- and, Your Honor,

9    I appreciate that we're doing this in a some -- something of a

10   free-flowing form, and we're -- I know my friend, Mr. Clement,

11   and I are here to address your questions and to handle this.

12             THE COURT:  Okay.

13             MR. FREDERICK:  This is a somewhat unconventional

14   argument in many ways, and --

15             THE COURT:  It's not the Supreme Court.

16             MR. FREDERICK:  But we're -- but we're -- we're here

17   to address your questions and --

18             THE COURT:  Okay.  All right.

19             MR. FREDERICK:  -- whatever you want.

20             THE COURT:  Okay.  Thank you.

21             MR. FREDERICK:  The basics of the fraud claim are as

22   follows, that the league knowingly spread misinformation,

23   particularly after 1994 when it set up a sham committee that

24   was designed to get information about neurological risks, but

25   in fact spread false information after 1994.

1    And then there's an omission claim that there was

2    fraudulent omission that the league knowingly did not disclose

3    the information that it had about neurological risks.   So

4    those -- and that fraud claim extends back well before 1994.

5    So those are the two basic --

6              THE COURT:   Okay.

7              MR. FREDERICK:   -- clusters of claims.

8              THE COURT:   All right.   And -- and the elements of

9    those -- the elements of the fraud claim, as I understand it,

10   are -- there's a representation which is material to the

11   transaction at hand that was made falsely with the intent of

12   misleading another into relying on it, justifiable reliance on

13   misrepresentation and a resulting injury, isn't that correct?

14             MR. FREDERICK:   That's correct.

15             THE COURT:   Okay.   Thank you very much.

16             MR. FREDERICK:   Thank you.

17             THE COURT:   All right.   Mr. Clement.

18             MR. CLEMENT:   Thank you, Your Honor.   Paul Clement,

19   for the NFL defendants, and may it please the Court.

20             This case is, at bottom, a case about workplace

21   safety at an industry in which issues at workplace safety were

22   a recurring subject of collective bargaining.

23             Plaintiffs would have you treat this no differently

24   from a case that arose in an industry with no collective

25   bargaining and without a CBA with numerous provisions

1   addressing issues of player health and safety.

2            THE COURT:  Well, that's what I'd like you to do.

3   I'd like you to address exactly what the -- what the

4   provisions are and how they impact on your -- on your

5   preemption claim.

6            MR. FREDERICK:  I'd -- I'd be delighted to do that,

7   and I think the -- the best way to think about this is to, as

8   you suggested, really think about the negligence issues on the

9   one hand and the fraud issues on the other.

10           THE COURT:  Okay.

11           MR. FREDERICK:  And Mr. Frederick said that -- that

12  there has to be preemption for each element of the claim.  I

13  don't know that he really meant that.  I mean I think that

14  certainly my understanding of black letter law is if there's

15  any element of the plaintiffs' claim that requires

16  interpretation of the CBA, that's enough for the claim to be

17  preempted.

18           THE COURT:  You agree with that, don't you?

19           MR. FREDERICK:  I do agree with that.

20           THE COURT:  All right.  Okay.

21           MR. CLEMENT:  Okay.  So I'm -- I may have misheard

22  him, but I think -- so, and I think when it comes to the

23  negligence claims, the key element of those claims that

24  requires interpretation is the issue of duty and obviously

25  then breach of that duty.

1           And the -- the fundamental problem here is that the

2    Collective Bargaining Agreements and a variety of provisions,

3    I'm happy to talk about them in -- in specifics, and they

4    obviously evolve over time.

5           So you start in 1968 with the original provision

6    that says there has to be a doctor at every game and an

7    ambulance every game, and as the Collective Bargaining

8    Agreements evolve, they become much, much, much more specific

9    so by the time you have 2006 you have very specific provisions

10   on player safety and health.  You have specific benefits for

11   dementia and ALS.

12          So there's this evolution in the agreements, but the

13   one thing that is constant throughout is that these agreements

14   put a sort of primary role and responsibility for player --

15   player safety on some combination of the players themselves,

16   the union and the clubs, and --

17          THE COURT:  Well, isn't the whole issue whether

18   you -- how specific you have to be when you talk about the

19   relationship between their claims and the Collective

20   Bargaining Agreement.  I mean that's where it is.

21          So is it -- is it enough to just have a mention of

22   safety, and -- I understand that health and safety is in a

23   committee that doesn't really have any real clout, isn't that

24   correct?  I mean it can make and it can say things, but it

25   doesn't -- it has no controlling effect.

1          MR. CLEMENT:  With respect, Your Honor, I mean just

2     the fact that you point to the committee and you raise a

3     question about the extent to which they have clout and whether

4     they're an advisory committee or they have some ability to

5     change things, I mean that almost indicates how you really

6     can't consider the duty claim here without interpreting the

7     provisions of the CBA because, you know, you can't think of

8     the league's responsibility here in a vacuum.

9          Those responsibilities are related to the

10    responsibilities certainly of the clubs because I think we all

11    recognize that the relationship between the clubs and the

12    leagues is a close relationship.

13         And the union also has certain rights and

14    responsibilities under the Collective Bargaining Agreement.

15         And so when, you know, if you would think sort of

16    some of their negligence claims would have you believe,

17    anyways, that one of the ways that the league was negligent is

18    not doing more to change the rules.

19         But if you look at the Collective Bargaining

20    Agreement, the league can't unilaterally change the rules.

21    Those are -- the responsibilities for changing the league

22    rule -- rules are given to the clubs, principally, with

23    participation by the union.

24         And so in thinking about the -- the duty of the

25    league to the players, I don't think it's possible to

1    ascertain the scope of that duty without interpreting the

2    various Collective Bargaining Agreements.

3            And, certainly, I think in doing that there would be

4    very specific terms that would end up being a dispute between

5    the parties, but, with respect, I don't think that, you know,

6    you have to get to the level of, you know, they say that a

7    particular condition is a condition --

8            THE COURT:  Well, that's the issue.

9            MR. CLEMENT:  Well --

10           THE COURT:  Give me an example.  Tell me how it

11   would work.

12           MR. CLEMENT:  Well, I -- I think -- let me try to

13   give you a broader example, and then let me, you know, try to

14   give you a very specific example.

15           At the broadest level, as -- as I indicated, I'm not

16   sure how one considers the duty of the league, for example,

17   to -- to change the rules or to provide certain information

18   without understanding that there's a Collective Bargaining

19   Agreement that's been negotiation, that gives the primary

20   responsibility for player health, particularly decisions about

21   returning to play and what kind of notification has to be

22   given to a player about a condition that creates serious risk

23   if they -- if they return to play.

24           And so just to consider the scope of the duty you'd

25   have to interpret the provision.

1              THE COURT:  So --

2              MR. CLEMENT:  Now, you might --

3              THE COURT:  -- the parameters of the duty, that's

4     what you're saying.  So that's -- this -- the key issue

5     here --

6              MR. CLEMENT:  On the negligence side.

7              THE COURT:  No question about -- may I ask --

8              MR. CLEMENT:  Sure.

9              THE COURT:  Mr. Frederick, you can come forward and

10    sit -- stand, and that's why I have two lecterns.

11              Would you like to answer that question, 'cause that

12    is really the key question, is how specific it has to be, and

13    how -- how tied does it have to be?

14              MR. FREDERICK:  Under the Klein case, which is

15    controlling precedent here from the Third Circuit --

16              THE COURT:  You -- you'll agree that the Klein case

17    is controlling?

18              MR. CLEMENT:  Like every other Third Circuit

19    precedent that is relevant.

20              THE COURT:  They --

21              MR. CLEMENT:  It's --

22              THE COURT:  They mock my papers, you know.

23              MR. CLEMENT:  I -- I understand that.  I understand

24    that, but Klein is hardly their on word on -- on --

25              THE COURT:  Yes, I --

1          MR. CLEMENT:  -- 301 preemption.

2          THE COURT:  Yes.

3          MR. FREDERICK:  Well, I will say that <u>Klein</u> has

4    directly rejected the two points that Mr. Clement has just

5    made.  I mean the <u>Klein</u> case says that a claim that, quote,

6    necessarily implicates, close quote, a Collective Bargaining

7    Agreement is not preempted.  That's at 386 F.3d at 256.

8          The <u>Klein</u> case also says that even if there is

9    linkage between the subject matter of the claim and, quote,

10   the wording of a CBA provision, that does not lead to an

11   interpretive dispute giving rise.  That's at cite 256

12         The <u>Klein</u> Court has also said, quote, that the CBA

13   can be part of the context in which an employee's claim must

14   be addressed, but that doesn't lead to preemption.

15         So the basic problem here, Your Honor, is that the

16   NFL would like you to look at its duty at the most broadly

17   crafted way, but the <u>Klein</u> Court has rejected that very kind

18   of an analysis, and if --

19         THE COURT:  But a lot of other cases have -- have

20   not rejected it.  I mean the two other cases that have looked

21   at this specific case have gone the other way, and also there

22   are a number of cases throughout the country that have gone

23   the other way.

24         MR. FREDERICK:  Well, they have done so in very

25   different context, Your Honor, and what I think is important

1   to keep clear is that because of the way Section 301

2   preemption arises it has both the jurisdictional component, as

3   well as the substantive component, that the cases -- and we

4   can talk about the specifics of the cases now or whenever you

5   want to get to that, but the -- the basic point is you're

6   bound, we understand you to be bound, by what the Supreme

7   Court and the Third Circuit have said about the nature of the

8   interpretive dispute.

9          And, you know, what we are talking about here --

10         THE COURT:  Well, let me -- let me hear from Mr.

11  Clement on that.  Thank you.

12         Mr. Clement, would you like to respond to that,

13  please?

14         MR. CLEMENT:  No, I would, Your Honor, because we

15  don't really -- I mean just at the broadest level we don't see

16  anything in Third Circuit precedent that's particularly

17  idiosyncratic.  We don't see anything in Third Circuit

18  precedent that suggests that the Duerson or the Maxwell case

19  would have been decided differently if they had been decided

20  by a Judge sitting in the Third Circuit.

21         As to the Klein case in particular, I think the

22  most -- we have no problem with the Klein case.  We think the

23  most important point of the Klein case, though, is, sure,

24  it -- it said what -- what Mr. Frederick suggested it said,

25  but almost every preemption case will say one of two things.

1    They will say, "Simply having to look at the Collective

2    Bargaining Agreement, you know, doesn't mean it's preempted,"

3    and they will also say, "But if you have to interpret it, it

4    is preempted."  And _Klein_'s consistent with that.

5          The key point in _Klein_ is the point at which the

6    Third Circuit says, "There's nothing in this Collective

7    Bargaining Agreement that addresses issues of wiretaps,

8    phones, monitoring, surveillance."

9          So the -- the subject of that dispute wasn't

10   mentioned in the Collective Bargaining Agreement.

11         Here, the subject of the disagreement, player health

12   and safety issues, is mentioned throughout these agreements,

13   and -- and obviously in different ways over time, but

14   throughout these agreements.  So that's the -- the critical

15   difference.

16         And I -- one way to think about _Klein_ is _Klein_ is a

17   more typical case because they are, instead of reaching out to

18   sue somebody who wasn't sort of the direct employer or a

19   union, which is how most of these cases arise, there they --

20   they did sue the employer.

21         And one way to think about our case is just think

22   about this case if they had sued the clubs, rather than the

23   leagues.  It would be obvious, I would submit, that that claim

24   would be 301 preempted, and I don't think they get out of that

25   result by reaching over the clubs to sue for the league,

1   especially when you can't figure out what the league's duties

2   are without first figuring out what the club's duties are,

3   which, of course, requires you to interpret the CBA.

4           MR. FREDERICK:  I think if you look, and we drill

5   down into the specific provisions, you're going to conclude

6   that none of them, none of them, impose any duty with respect

7   to health on the NFL itself, and that is our principal theme.

8           An individual team doctor making a decision on a

9   sideline can look at one player in that situation, a snapshot

10  in time -- physicians make those kinds of diagnostic decisions

11  all the time.

12          Our case is fundamentally different.  It's that over

13  a period of decades the NFL should have learned more

14  information about neurological science, and it should have

15  spread the truth so that all the clubs would have been

16  operating on the same page, and the league was in a unique

17  position to get that information and process it and use it,

18  and there's nothing in the Collective Bargaining Agreements

19  that addresses the league's duty or its failure to achieve

20  that duty in its interactions with the league as the

21  superintendent of the league.

22          MR. CLEMENT:  Your Honor, and, you know --

23          THE COURT:  I'm focusing on this because I think

24  this is the central issue.

25          MR. CLEMENT:  As do we, Your Honor, and I mean to --

1  to quote my friend from his -- his brief, he recognizes that

2  there are a bevity [sic] of provisions in the CBAs that talk

3  about the clubs' responsibilities to -- about player health

4  and safety.

5        And so, as I suggested if they had sued the clubs,

6  this would be a relatively straightforward case, 301

7  preemption.

8        Now, the plaintiffs here are not the first

9  plaintiffs to figure out that, well, if you sue the clubs who

10  are discussed directly in the CBAs, you're going to run into

11  301 preemption, so let's try to -- let's try to sue the league

12  instead.  And whatever else those cases have disagreed with --

13  I mean we've cited back and forth.  There's at least a dozen

14  cases involving the NFL as a defendant.

15        I don't think any of those cases, the results in

16  those cases turn on the fact that it was the league sued as

17  opposed to the club.  I think if you drill down into those

18  cases, they say, "All right, some of these topics are covered

19  by the CBA, and if they are, they're preempted."

20        If the topics are not covered by the CBA, like, you

21  know, whether in the Jurevicius case whether the facility

22  could have a staff infection, that wasn't covered by the CBA

23  so there wasn't preemption in that case.

24        But these cases have not turned on the simple

25  expedient of suing the league rather than the club, and I

1    think, especially in the context of this industry that would

2    be completely artificial.

3         And I also think it -- it misses the big point which

4    is, fine, you know, you've sued the league, just like in the

5    Stringer case, just like in some of the other cases.  You

6    said, "Well, the league had a voluntary undertaking."

7         Doesn't matter for purposes ascertaining the scope

8    of the duty because for ascertaining the scope of the duty if

9    there's a Collective Bargaining Agreement who gives primary

10   responsibility for safety and health issues to the clubs, you

11   can't just sue the league and ignore that fact and say, "Well,

12   we're not -- you're going to have to look at the CBA.

13        THE COURT:  Okay.

14        MR. FREDERICK:  Your Honor, one of the things that's

15   very fundamental here is that in those other cases that did

16   sue the league they were not addressing themselves to the same

17   theories of negligence that are brought here, and I think it's

18   really important for you to keep in mind that where the league

19   acts as the superintendent, it has access to a broader range

20   of information.

21        It make -- is making statements about neurological

22   science.  That part falls.  It is spreading misinformation,

23   and it is doing so in a broader context.  It is breaching its

24   basic duty of due care, and it can't delegate immunity and

25   obtain a delegation of immunity simply because clubs have a

1    contractual relationship with the players union.  That's just

2    not -- I mean tort law 101 says, "If I have a duty of due care

3    and I breach that, I am liable if -- if there are damages

4    and -- and those are caused from my breach of duty."

5         And all we're saying here is that what the league is

6    trying to do here is to get immunity because the clubs have

7    some specific duties with respect to certain individual

8    players in certain context, but that has nothing to do with

9    the basic breach of duty that we're asserting here.

10        THE COURT:  Well, let me ask you something.  Isn't

11   it -- isn't it true that with your theory every high school

12   player could possibly sue the NFL, because, after all, they

13   committed the same offense to all those high schools play --

14        MR. FREDERICK:  Your Honor, the same -- yes, the

15   same breach of duty arises, and this is an important question

16   because when the commissioner stands up and says, "We're, we,

17   the NFL, are the stewards of the game of football, and we want

18   to ensure player safety from the peewee level all the way up

19   to the professional ranks," he is assuming a duty of due care

20   to speak truthfully, to give accurate information.

21        Now, could a high school player sue for a breach of

22   that duty?  Probably not because it would be extremely

23   difficult to show proximate cause, which is the overriding

24   legal policy to show that, "In my particular circumstances it

25   was some far off statement or set of policies that -- that led

1    to that." It is a totally different kind of the issue.

2            But what the league has asserted for itself is the

3    duty to be the superintendent of the game of football from --

4    from Pop Warner, which is the junior league, all the way up.

5            THE COURT:  Mr. Clement.

6            MR. CLEMENT:  Sure.  No, I'd love -- I'd love to

7    address that 'cause I actually think that's a very helpful way

8    to thinking about this which is if they tried to bring a case

9    on behalf of high school students who had never played in the

10   NFL --

11           THE COURT:  I -- I have to reveal my grandson plays

12   football.

13           MR. CLEMENT:  So -- so -- hopefully, I won't -- we

14   didn't --

15           THE COURT:  That's irrelevant.

16           MR. CLEMENT:  Yeah, never accuse unless you're

17   there.

18           But if they were to bring that hypothetical case,

19   the duty, I think in some respects, would be the same.  I

20   don't think I'd be here with a preemption argument because the

21   Collective Bargaining Agreements wouldn't be relevant, but as

22   Mr. Frederick indicates, nobody's really going to bring that

23   suit because in that case any proximate cause connection is

24   fanciful.

25           Well, what -- there's two things that's different

1   with this suit compared to that suit.  One thing is, well, the

2   proximate cause issue is at least, you know, we think there

3   are lots of problems with it, but it's not fanciful.  At

4   least -- at least the players played in the NFL.

5          But, of course, the second thing that's different is

6   they played in an NFL, the vast, vast majority of them,

7   subject to Collective Bargaining Agreements that specifically

8   allocated responsibilities about player health and safety,

9   gave most of the responsibilities to the club, some

10   responsibilities to the union.

11          And so as they take a claim that would be fanciful

12   for proximate cause purposes, convert it into one that at

13   least gives them a colorable basis to argument -- argue

14   proximate cause, can't take the benefit of that shift without

15   taking with it the reality that the NFL players played subject

16   to Collective Bargaining Agreements that gave them certain

17   rights, gave them certain limitations on their remedies.

18          I mean Mr. Frederick will, I'm sure, throughout this

19   morning talk about immunity, but preemption and immunity

20   aren't the same thing.  I mean there are consequences of

21   preemption.  We all know that.

22          And so they -- they -- there was a Collective

23   Bargaining Agreement that gave them certain rights, certain

24   benefits, certain continuing benefits, including new benefits

25   in retirement, 'cause even the retired players' benefits are

1    subject of collective bargaining.

2          But in exchange for all that they -- they are

3    subject, you know, they -- their claims are subject to a need

4    to consider the Collective Bargaining Agreement.

5          MR. FREDERICK:  If -- if a league official went up

6    and hit a player, just randomly hit a player, would we have an

7    argument that there was a breach of the duty of due care?

8          Just because there's a Collective Bargaining

9    Agreement doesn't mean that a league official can just commit

10   a tort willy-nilly against the player.  It's an absurd

11   proposition.

12         And so all we're saying is that over the course of a

13   period of decades the league arrogated to itself certain

14   powers, responsibilities and duties with respect to these

15   horrific neurological conditions, horrific ones.

16         And instead of dealing with overt injuries which are

17   addressed in the Collective Bargaining Agreement, the

18   Collective Bargaining Agreements were silent with respect to

19   latent injuries, and they are silent with respect to the

20   league's duty of due care, to speak truthfully, to gather

21   information, to warn players, all of the kinds of things that

22   the league in its multi-billion dollar industry and the

23   production of films that sell hundreds of millions of dollars

24   and that glorify violence at the expense of the player safety.

25         That is something the league does for itself, and it

Oral Arguments                                          27

1    is independent of the clubs.  And the Supreme Court in the

2    American Needle case said, "There is a legal and juridical

3    difference between the clubs who compose the National Football

4    League and the National Football League itself."

5              And our theory of fraud and negligence here is that

6    the league breached those duties.

7              THE COURT:  Okay.  Thank you.  Let me -- let me go

8    back to Mr. Clement.

9              You want -- you can stay there or you -- it's

10   easier, I think, if you stay there.  Do you mind?

11             MR. FREDERICK:  No, not at all.

12             THE COURT:  Okay.  Mr. Clement, what's your next

13   argument about why it should be preempted?  It's your it's

14   your -- it's your burden.

15             MR. CLEMENT:  Well, I -- I'd like to focus on one

16   point, and then perhaps it would be helpful to talk about the

17   fraud claims for a minute --

18             THE COURT:  Yes.

19             MR. CLEMENT:  -- as well.

20             THE COURT:  That's what I'd like you to do.

21             MR. CLEMENT:  So I do think that the -- the point I

22   would want to leave with you in considering these is I do

23   think, consistent with the way that all of these cases that

24   involved an effort to sue the NFL have proceeded, the real way

25   to think about these cases is to ask the question, "All right.

1    Let's -- let's ignore for a minute that they have sued the

2    NFL, but let's look at what if this were a suit against the

3    clubs themselves?  What if this were a suit against the union

4    itself?  Is this something that is subject to the Collective

5    Bargaining Agreement?  We need to interpret the Collective

6    Bargaining Agreement or not in that context."

7              And if the answer is, as we submit it surely would

8    be, that you would have to interpret the Collective Bargaining

9    Agreement.  It's not enough to avoid preemption to simply file

10   the suit against the league, rather than the union and the --

11   and the clubs.

12             And I think, you know, I mean Mr. Frederick raises

13   the possibility that if a coach hit a player, that that would

14   or would not be granted.

15             And I don't know the answer to that.  I mean the --

16   but the way you'd answer it is you'd look at the Collective

17   Bargaining Agreement, and you determine whether or not it had

18   something meaningful to say about that issue, and, you know,

19   there's -- there's one case against the league, the <u>Brown</u>

20   case, that involved a player who was hit in the eye with --

21   with an NFL's referee's official.  And in that case the Court

22   said that's not covered by the -- by the Collective Bargaining

23   Agreement.

24             There are a host of cases involving health issues

25   that we've pointed you to, and in those cases the Court look

1  at it, and they say, "You know, well, the Collective

2  Bargaining Agreement talks about player health and safety all

3  over the place, and that is in fact preempted," and we think

4  this case falls squarely within those line of cases.

5          THE COURT:  Well, the question is -- the thing that

6  concerns me, Mr. Clement, is that you say it talks about it

7  all over.  That's a problem to me because I mean I -- it seems

8  to me that "talking about it all over" is not what -- what

9  <u>Klein</u> says.  <u>Klein</u> says it's got to be relatively specific,

10 and the -- the real issue is how specific it has to be.  I

11 mean that's what I've been -- will have to wrestle with.

12         MR. CLEMENT:  Right.  And let me just say three

13 things on that, Your Honor.  First, we don't think <u>Klein</u> is

14 any different from Supreme Court precedent or other circuit

15 precedent as to how specific it has to be in.

16         THE COURT:  I won't tell Judge Stapleton that.

17         MR. CLEMENT:  No, I -- I'll -- I'd be happy to tell

18 him myself.

19         THE COURT:  Okay.

20         MR. CLEMENT:  I mean I think it's perfectly

21 consistent.  I mean he -- he wasn't trying to deviate from the

22 Supreme Court.  He's just applying those cases faithfully, and

23 the -- the key there is he says that the Collective Bargaining

24 Agreement there doesn't say anything about surveillance,

25 wiretaps and what was at issue in that case.

1        And if, you know, if this were a case about

2   wiretapping, you know, locker rooms, it'd be a very different

3   case.  But here, this provision does specifically address all

4   of these issues, and then -- so the second thing I will say is

5   that since -- for the -- for the negligence claim in

6   particular the duty is going to be central.

7        You can't understand the duties of the league to the

8   players without understanding the club's duties.  But the

9   third thing I will say is there all sorts of interpretive

10  disputes that are -- that are specific here.

11       Mr. Frederick told you that in their view the

12  Collective Bargaining Agreement is silent on responsibilities

13  about these kind of injuries.  Well, I would submit to you

14  that the Collective Bargaining Agreement is not silent on

15  these kind of injuries.  I would submit to you that in

16  thinking about --

17       THE COURT:  Well, what are you -- tell me

18  specifically --

19       MR. CLEMENT:  Sure.  So --

20       THE COURT:  -- what -- I mean I -- I'll grant you

21  that now they're talking about it, you know, in -- especially

22  about retired players.  I'm talking about the -- the 88,

23  whatever you --

24       MR. CLEMENT:  Right, the 88 Plan.

25       THE COURT:  Yes, 88 -- yes, the 88 Plan and other

1    things like that.

2            But all along I don't understand how you -- how I'm

3    supposed to know that it -- that it relates to this?

4            MR. CLEMENT:  Well -- well, and -- and -- I mean

5    just to give you a concrete example, though -- and I don't

6    want to resist where you're going with this.  I just think --

7    I really think the problem with their claim is broader than

8    any specific example because I just don't think you can -- you

9    can lend the boundaries of the league's duty without

10   interpreting these other provisions.

11           And the reason that maybe hasn't arisen yet in Third

12   Circuit cases is because I think that's a unique feature of

13   suing the league rather than the employer or the union because

14   when you sort of go out and don't sue the normal party, you

15   sort of have to understand how people's duties relate to each

16   other.

17           And if I could be just very specific, though,

18   there -- since at least the 1993 Collective Bargaining

19   Agreement there's been a responsibility on the clubs to not

20   send a player back onto the field without written notice if

21   they have a condition that, quote, could be significantly

22   aggravated by a continued performance.

23           Now, it -- as I read, and Mr. Frederick's very, very

24   capable of speaking for himself, but as I read his papers, I

25   think that he would tell -- tell you something along the lines

1    of, well, that provision doesn't apply because, you know,

2    these are latent conditions, and that's -- that's not

3    triggered by that provision.

4           And I would say no, in fact, we think it does apply

5    to those conditions, and there would be one of what I think

6    would be -- it's just an illustration of the broader point

7    that there are interpretive disputes about whether we had

8    duties.

9           His position is the agreements are silent on our

10   duties, and he would say that the league's duty to the players

11   is unaffected by the provisions of the Collective Bargaining

12   Agreement.

13          And we would say back, "Oh, that's completely wrong.

14   You can't understand the contours of the league's duty without

15   figuring out the duties of the players themselves, the union

16   and the -- and the club."

17          THE COURT:  Let's hear --

18          MR. FREDERICK:  Let me offer --

19          THE COURT:  Let -- then we're going to get off this

20   topic 'cause there's some other things I'd like to discuss.

21          MR. FREDERICK:  Yeah, let me offer a framework for

22   applying Klein in this case.

23          THE COURT:  Yes.

24          MR. FREDERICK:  Our submission is that there are

25   three jobs that you have, Your Honor.  The first is you've got

1   to determine do the parties actually dispute the meaning of an

2   ambiguous collective bargaining provision; is there an actual

3   dispute that you have to resolve.   Okay.

4           They haven't pointed any provision.   They haven't

5   pointed any interpretation that they think anybody disputes.

6   Okay.   That's the first point.

7           The second point is both parties' position with

8   respect to interpretation have to be reasonable.   So if

9   there's an actual dispute and both sides have a reasonable

10  position, then the third thing is you must resolve the

11  interpretive -- do you have to resolve that interpretive

12  dispute to resolve our claim.

13          We think what -- that is what <u>Klein</u> is really

14  telling you in terms of how far you need to get into the weeds

15  to resolve the dispute.   Okay.

16          And here's the basic problem here.   By arguing at

17  such a, you know, a stratospheric level, there's planet Earth

18  down there, the league is avoiding a discussion of whether

19  there's any actual dispute over the meaning of any particular

20  collective bargaining provision.   Okay.

21          The second thing is when they say, "Our duties are

22  lessened because the clubs have greater duties," they're

23  taking an unreasonable position because none of the provisions

24  that they cite impose any obligation on the National Football

25  League itself, as opposed to the clubs.

1          So our position is they haven't even given you a

2     reasonable interpretation to resolve.

3          And then the third thing is, assuming I have not

4     persuaded you of those first two, the question is do you have

5     to resolve any interpretive dispute to decide to decide our

6     claims, and the answer to that is no.

7          Why?  Because nothing in the Collective Bargaining

8     Agreement speak to the marketing of -- of violence.  None of

9     the things in the Collective Bargaining Agreement address

10    giving the proper warnings to retired players.  Nothing in the

11    CBAs talks about spreading misinformation about neurological

12    safety.

13         Those are all things that -- that where the CBA is

14    completely silent, and the one thing that is absolutely clear

15    from the <u>Lingle</u> case by the Supreme Court is that you can have

16    parallel state tort duties, even if they touch upon subjects

17    of a collective bargaining so long as the Court is not

18    disrupting the uniformity of interpretation of contracts,

19    which is the whole reason why Congress enacted 301 and the

20    Supreme Court interpreted it to have a --

21              THE COURT:  I want to --

22              MR. FREDERICK:  -- preemptive component.

23              THE COURT:  Yes.  Mr. Clement, would you like to --

24    just --

25              MR. CLEMENT:  I'll --

 1          THE COURT:  I'd like you to address that.

 2          MR. CLEMENT:  You know, I'd -- I'd love to address

 3   those points.  I mean I have utmost respect for Judge

 4   Stapleton, and I don't think in -- I don't think in issuing

 5   the <u>Klein</u> decision he wanted to sort of create a new law of

 6   301 preemption or ignore Supreme Court cases.

 7          And Mister -- probably Mr. Fredericks sort of way --

 8   the only way you ever find 301 preemption is to get down to a

 9   specific dispute that they say tomato and they say tomato, and

10   that's -- it all turns on that case.  Is that -- that doesn't

11   begin to explain the Supreme Court's own cases.

12          Start with <u>Allis-Chalmers</u>, the granddaddy of them

13   all.  I mean there it's a provision where what the Court says

14   is it's preempted largely because under state law there could

15   be or, rather, largely under the Collective Bargaining

16   Agreement there could be an implied duty in the provision.

17          So they're not talking about a particular textual

18   provision there where there's a dispute.  The real dispute

19   there is whether there are additional implied duties of acting

20   in good faith in administering the terms of the Collective

21   Bargaining Agreement.

22          So the idea that you have to get down to this sort

23   of microscopic level of a dispute before you find preemption

24   is just not consistent with the case, and it's not consistent

25   with <u>Klein</u>.

1          Again, the -- the holding of <u>Klein</u> turns on the fact

2     that the Third Circuit's able to observe there's nothing in

3     this agreement about surveillance and wiretaps.

4          And if I could just say a word about the <u>Lingle</u>

5     case, which he also invoked, the <u>Lingle</u> case is a case that,

6     sure, we -- we don't take issue with the idea that there are

7     circumstances in which you can have a state tort claim that

8     doesn't require interpretation of the Collective Bargaining

9     Agreement and, therefore, can proceed.

10         But you can't read <u>Lingle</u> as overruling all the

11    cases that go before it, and the plaintiffs really like this

12    one footnote in <u>Lingle</u> that says, well, you know, it's not

13    preemptive if you have to look at the Collective Bargaining

14    Agreement.

15         But what they're talking about in <u>Lingle</u> and what

16    they're talking about in <u>Livadas</u> is when the Supreme Court

17    picks up on that one other time, is looking at the Collective

18    Bargaining Agreement to calculate the amount of back pay.  And

19    that's not what's at issue here.

20         THE COURT:  Okay.  I'd like to hear you first, if

21    you don't mind, on the years 1987 to 1993.

22         MR. FREDERICK:  Sure.  The players there were not

23    covered by a Collective Bargaining Agreement.  To the extent

24    that they played and they were not under a Collective

25    Bargaining Agreement there's no -- there can't possibly be any

1    preemption, just like there can't possibly be any preemption

2    with respect to the hundreds of players that we represent who

3    played before the year 1968 when the first Collective

4    Bargaining Agreement was -- was entered into.

5         I mean what -- what the NFL is arguing here is a

6    broadly overreaching preemption that if I happen to play

7    professional football at some point during the 20th Century, I

8    am, therefore, precluded from bringing a state court tort

9    claim because during certain periods of time there was a

10   Collective Bargaining Agreement in place, is a broad, broad

11   proposition we would urge you to reject.

12        And for those players who -- who played entirely

13   within that period it can't possibly be the right answer.

14   Even with respect to the players who played predominantly

15   within those periods it can't be the right answer because even

16   in the subsequent Collective Bargaining Agreements there's

17   nothing that speaks to the issue of dealing with latent

18   injuries and giving warnings to retired players.

19        MR. CLEMENT:  Sure.  And -- and, Your Honor, I mean

20   I -- certainly it meant that the -- that the gap year players,

21   some players who played exclusively in those years, are the

22   most difficult cases for us, are the most difficult --

23        THE COURT:  Oh, no question --

24        MR. CLEMENT:  -- issues for us.

25        THE COURT:  -- about that.

1                  MR. CLEMENT:  No question about it.  But I think

2          there's a couple of points to say about them.  One is I -- I

3          do think there's a fundamental difference between the

4          relatively small group of players that played just in the gap

5          years exclusively and those like Duerson whose career sort of

6          spanned the gap years but played before and after.

7                  And when Chief Judge Holderman confronted Duerson's

8          claim, he recognized, "Look, this -- there's no way to say

9          that, you know, it just so happened that the only hits that --

10         that hurt you were in those years, and the hits that you took

11         before and after are out of this," and he correctly, in our

12         view, as to the negligence claims, which is what he addressed,

13         found there was preemption, notwithstanding that there was

14         play during the gap year.

15                 So I distinguish between those two cases.

16                 Now, the -- the reason there is an argument,

17         certainly for preemption, even as to the players who used --

18         who played in the gap years is because it -- it may depend a

19         little bit on the specific claims that the plaintiffs are

20         bringing, but to the extent they're bringing claims that talk

21         about the responsibilities of those players when they were

22         retired, it's -- it -- those players who played in the gap

23         years still can get benefits under the current --

24                 THE COURT:  Well, that --

25                 MR. CLEMENT:  -- CBA.

1         THE COURT:  But that isn't the issue here.  There's

2    no question that your lasted one says that they -- that the

3    NFL has long-term responsibility for dementia.  I mean there's

4    no question that your -- but that's -- what year was that?

5    This --

6         MR. CLEMENT:  Well, it's 2006 when they say that,

7    Your Honor.

8         THE COURT:  Yes, right.

9         MR. CLEMENT:  But my point is simply that a player

10   who played four years in the gap year and, therefore, is

11   vested is going to qualify for those benefits just as much as

12   a player who played during any different period of time.

13        And so it's not like, you know, the -- it's not like

14   the gap years are treated like, you know, replacement players

15   or something that never happened or -- I mean, you know, the

16   gap year players can vest in the plan, they can continue to

17   get retirement benefits.

18        They have certain responsibilities, including the

19   responsibility to go to the doctor and take, you know, certain

20   responsibilities for themselves.  Mr. Frederick may have a

21   different view of their responsibilities as a retired player,

22   but that, again, shows that there's disputes about the scope

23   of the agreement, how it applies to even those players.

24        MR. FREDERICK;  A gratuitous remedy offered to

25   somebody does not divest that person of a tort remedy at law.

1    We're talking fundamentally here about common law duties that

2    we all owe to each other, everybody in this room, me to

3    Clement and he to I, and -- and that's what we're talking

4    about, the breach of -- the fact that Mr. Clement may walk out

5    of the courtroom and say, "Hey, Dave, great argument.  Here's

6    20 bucks, to buy yourself a beer," doesn't mean that I don't

7    have some tort duty or -- or liability if he then hits me.

8    And that's the basic point here.

9            Because the fact that the NFL is gratuitously

10   offering these types of benefits doesn't speak to anything

11   about the retired players who played long before and well

12   before those Collective Bargaining Agreements were entered

13   into.

14           MR. CLEMENT:  And -- and --

15           THE COURT:  Okay.

16           MR. CLEMENT:  And if I can say one last thing to

17   that 'cause here's the difference.  I mean, you know, if -- if

18   I give Mr. Frederick $20, that's very nice of me, but it

19   really is -- it's -- it is gratuity.

20           Here, what you have is a situation where the $20

21   didn't just come like manna from heaven.  It came from a

22   Collective Bargaining Agreement, and there's something

23   counterintuitive about the idea that the retired players are

24   both beneficiaries from the Collective Bargaining Agreement

25   and, therefore, have certain preemption responsibilities that

1   flow from it, but that's just because this is an unusual

2   industry.

3         In most industries the retired players, you know,

4   the retired workers are just kind of on their own.  But this

5   is an industry where, uniquely, both the union and the clubs

6   and the league actually are concerned about the retired

7   players.  They bargain over the subject.  The scope of those

8   benefits were bargained, just like everything else in the

9   agreement, and so there's no reason why they wouldn't be

10  treated the same for purposes of -- of preemption.

11        MR. FREDERICK:  That is the point of this lawsuit,

12  Your Honor, the fact that the NFL for decades and decades and

13  decades had information about neurological risks, and simply

14  because it didn't cause bleeding or it didn't cause broken

15  bones they didn't do anything about it.  And that's why we're

16  here.

17        THE COURT:  Okay.  I'm going to -- I understand that

18  argument.  I think you've covered everything, all of my

19  concerns, and obviously extremely well.

20        Let -- one minute.  Let me just speak with my law

21  clerk to see if there's anything I haven't -- I haven't talked

22  about with her that I haven't covered.

23        MR. CLEMENT:  Okay.  Could I -- could I also beg

24  your indulgence, though, to say one thing about the fraud

25  claims?

1          THE COURT:  Yes.  Oh, yes, of course.

2          MR. CLEMENT:  And -- and I'll be brief 'cause, you

3   know, I want to be --

4          THE COURT:  Oh, no, no.

5          MR. CLEMENT:  -- respectful of your time, and --

6          THE COURT:  No, that's okay.  No, no, no.  Come on.

7          MR. CLEMENT:  -- and, you know, and it is warm.

8          THE COURT:  There's nothing --

9          MR. CLEMENT:  But -- but here's -- here's the thing.

10  On the fraud claims, 'cause as you yourself correctly

11  identified, there's two -- there's lots of different counts in

12  the complaint, but there's basically two sets of claims.

13         THE COURT:  I agree with that.

14         MR. CLEMENT:  There's negligence claims and the

15  fraud claims.

16         As for the fraud claims, they're -- there are two

17  sets of fraud claims.  There are the -- the fraud claims that

18  are omission claims that -- that sort of flow from a duty, and

19  I would say it's to those claims you get back to the same

20  issue, which is you have to have the duty, and you have to

21  understand the scope of the duty, and you have to interpret

22  the agreement.

23         There are some affirmative misrepresentation claims,

24  and as to those I think the critical element is reasonable

25  reliance, and in the same way that I think you have to

1    interpret these agreements to have an understanding of the

2    scope of the league's duty, I think to understand whether or

3    not there is reliance and reasonable reliance you have to look

4    at the agreements again.  And there certainly are some kinds

5    of misrepresentations where that wouldn't be necessary.

6         I mean that's -- there's a Third Circuit case called

7    Vollis (phonetic) or Volias that, you know, involves a

8    situation where GM told some workers, "We're going to close

9    your plant," and in that case the, you know, there was no

10   issue of reasonable reliance because, you know, GM had -- was

11   the only one that knew whether they're going to close -- close

12   their -- their plant, and there was nothing in the agreement

13   that sort of addressed that so GM didn't even argue that.

14        But in this case and in prior NFL cases, both

15   Duerson and Maxwell, but also some of the ones involving other

16   kinds of injuries where there had been misrepresentation

17   claims joined with negligence claims it's the reasonable

18   reliance that's really been the key, and, again, there's been

19   the necessity to interpret the agreement.

20        THE COURT:  I want to hear from you on that --

21        MR. FREDERICK:  Sure.

22        THE COURT:  -- Mr. Frederick.

23        MR. FREDERICK:  Sure, I think Voilas and Trans Penn

24   Wax from the Third Circuit are directly on point with respect

25   to fraud claims, and it is a -- a clear, I think, statement of

1    law that if you make false statements independent of the

2    collective bargaining process, those are actionable in tort,

3    and both of those cases stand for that proposition.

4            THE COURT:  But what players does it affect?  I mean

5    when are you claiming that these false claims were made?

6            MR. FREDERICK:  So there are different theories, as

7    the NFL has acknowledged.  There's a post-'94 theory when they

8    set up the MTBI Committee, and then they disseminated false

9    information and made false statements about neurological

10   risks.

11           And then there are the omissions theories before

12   1994 that go to the not knowing, with scienter, withholding of

13   information that they knew about these neurological risks and

14   they didn't disseminate that information, and there's an

15   omission theory.

16           Now, with respect to the notion that a Collective

17   Bargaining Agreement can somehow water down a player's

18   reasonable reliance, that's an intensely fact-based question.

19   It is not an interpretive question.

20           All that you would be charged with doing in this

21   point -- at this point in the lawsuit is looking at any

22   provisions and say, "Do I need to interpret them to decide

23   whether or not the player's reasonable reliance is present in

24   the case?"

25           I think that what you would find is that there is no

1    provision, and they haven't cited any provision that you would

2    need to interpret, but the point here is that their actions,

3    their facts that are -- have arisen over a period of time and

4    those facts gave rise to the reliance in factual scenarios

5    where the league was, on the one hand fining players for the

6    hard hit and then putting that same player's picture with the

7    hit and making money off of it.

8                THE COURT:  Okay.  And let me hear --

9                MR. CLEMENT:  Sure.

10               THE COURT:  Short response.

11               MR. CLEMENT:  Yeah.  No, I -- I think the problem

12   with Mr. Frederick's reading of Third Circuit law, which is

13   where his answer starts, is that just like you don't just say,

14   "Well, negligence claims either are preempted or not," because

15   the question ultimately is whether you have to interpret the

16   Collective Bargaining Agreement.  With fraud claims it's the

17   same way.

18               So you just don't point to _Voilas_ and _Trans Penn_ --

19   _Trans Penn Wax_ and say, "Well, those were fraud claims and

20   they weren't preempted, and that's the end of the analysis.

21               THE COURT:  Of course not.

22               MR. CLEMENT:  If you look at those cases, they're

23   quite different, as I -- I already talked about _Voilas_ so I

24   won't belabor the point, but in _Trans Penn Wax_, there it was a

25   case very much like the Supreme Court's _Caterpillar_ case where

1    there were individual employment contracts and a Collective

2    Bargaining Agreement, and the claim was there was a fraud in

3    the individual employment contracts.

4           Well, that's an easy case because the -- the alleged

5    breach of contract and fraud all had to do with the individual

6    contracts and not with the Collective Bargaining Agreement.

7           Here, by contrast, these fraud claims are ones that

8    say that it was, you know, perfectly reasonable to rely only

9    on what the league was telling you, and it's not reasonable,

10   you know, and -- and in order to figure out whether that

11   reliance is reasonable or justifiable, I would think you'd

12   have to say, "Well, who else were you getting information

13   from," and to the extent you were getting information, say,

14   from the trainer, who, pursuant to the Collective Bargaining

15   Agreement had to be certified by the National Association, you

16   know, Training Institute, and to the extent you were getting

17   information from the team doctor who had a responsibility

18   under the Collective Bargaining Agreement not to send you back

19   onto the field if you had a condition that could cause serious

20   injury, it -- your reliance is very different, and, you know,

21   one way to think about it is would the fraud claim be the same

22   without the Collective Bargaining Agreement as it would --

23   would be with the Collective Bargaining Agreement, and the

24   answer is of course not.

25           MR. FREDERICK:  No, of course it would be the same.

1    That is our position.  It absolutely would be the same because

2    the Collective Bargaining Agreement doesn't even speak to any

3    of these notions about reliance.

4          These are fact questions ultimately, and if you

5    scour the 65 pages of briefs that the NFL put in this motion,

6    you're not going to find a single Collective Bargaining

7    Agreement provision that speaks on this question about

8    reliance, not one.

9          And so ultimately the fraud claims are completely

10   independent of the CBAs.  That is our position, and we think

11   under a control and Third Circuit precedent they have to go

12   forward.

13         THE COURT:  Okay.  I think I know -- I think I

14   understand.  Just one moment, if you don't mind.

15         I'm cutting my mic.  Yes, that's what I want to do.

16   Okay.  I want to speak with Ali one second.

17      (Pause)

18         THE COURT:  All right.  Thank you very much, and I

19   will rule when I sort this whole thing out for myself.

20         MR. CLEMENT:  Thank you very much, Your Honor.

21         MR. FREDERICK:  Thank you, Your Honor.

22         THE COURT:  You're very welcome.

23         MR. FREDERICK:  Appreciate it.

24         THE COURT:  Court is adjourned -- no, it's recessed.

25   I'm going to come back for the -- for the Riddell argument.

1    Okay.

2            ALL ATTORNEYS:  Thank you, Your Honor.

3         (Recess taken, 10:51 a.m. to 11:10 a.m.)

4            COURTROOM DEPUTY:  Please remain seated.  This Court

5    is now again in session.

6            THE COURT:  I'm not going to hear you on the -- on

7    this -- on this other issue, but I am going to hear you on the

8    motion to sever.

9            MR. CEREGHINI:  Good morning, Your Honor, and may it

10   please the Court.

11           THE COURT:  Okay.

12           MR. CEREGHINI:  The Riddell defendants have

13   developed, manufactured and sold dozens of different helmet

14   models over the more than 70 years that Riddell's been the

15   football helmet industry leader.

16           Helmet shells have changed.  Helmet suspension

17   systems and energy mitigation systems have evolved.  Face

18   masks, hardware have changed.  The on-product warnings, the

19   materials provided with helmets have changed over this 70-year

20   period.

21           Notwithstanding all of these changes there isn't one

22   plaintiff in this MBL who's singled out a particular helmet as

23   having a specific defect.  There's not one complaint in the

24   MBL that identifies a particular helmet worn by a particular

25   player.  There's nothing that alleges that a particular helmet

1    has particular defect.  There's not --

2           THE COURT:  But that goes to a motion to dismiss.

3    The only thing we're here to -- on today is a motion to sever.

4    So why don't you address that.

5           MR. CEREGHINI:  Yes.  Yes, I will.

6           And so what --

7           THE COURT:  Tell me what you want severed and why.

8           MR. CEREGHINI:  Well, what we want severed are

9    claims by the -- each of the plaintiffs' claims.  We would

10   like the claims severed and dropped, or we would like them

11   severed and then with leave for the plaintiffs to refile

12   appropriate individual amended severed complaints.

13          Now, the -- the reasons for that are because the

14   plaintiffs' clearly do not satisfy the requirements of Rule

15   20.  Under Rule 20 matters have to arise out of the same

16   transaction or occurrence, and they have to involve the

17   question of law or fact that's common to all of the

18   plaintiffs.

19          Here, the plaintiffs have failed in both of those

20   requirements.  We've cited two dozen cases, most of which come

21   from the Eastern District of Pennsylvania to the Court in our

22   briefs, and the plaintiffs have responded with really

23   primarily a handful of completely inapplicable employment

24   discrimination cases.

25          But the Eastern District of Pennsylvania cases have

1    been very clear, and they've said that joinder based on

2    plaintiffs' claiming simply that they used the same or similar

3    product is not sufficient.  It doesn't satisfy Rule 20.

4          Joinder claiming that the plaintiffs are making

5    similar claims against the same defendant or defendants isn't

6    appropriate.  They've said specifically that joining

7    plaintiffs simply for convenience is not permitted.

8          I'd like to highlight some of the Eastern District

9    of Pennsylvania cases that are instructive on this.  In In Re:

10   Diet Drugs Judge Bartle severed the claims of three plaintiffs

11   who had filed a joint complaint in an -- in an MDL.  They were

12   all suing the same defendant.  They had all taken one of just

13   two different diet drugs, and yet Judge Bartle found that the

14   mere similarity of defendants and claims didn't satisfy the

15   transaction or occurrence requirement.

16         In In Re:  Bone Screw Judge Bechtle found that

17   joinder wasn't proper where the plaintiffs were from different

18   states.  They had had different surgeries at different times.

19   They were treated for different reasons.

20         In In Re:  Asbestos in 2009 Judge Robreno severed a

21   complaint with 2100 plaintiffs, the complaint that alleged

22   common legal issues.  It had named some common defendants, but

23   the individual claims didn't arise out of the same transaction

24   and occurrence.

25         Judge Rendell suggested a very helpful analogy in

1    her decision in a case called <u>Simmons vs. Wyeth</u>.   In that

2    matter the plaintiffs had joined in four complaints, anywhere

3    from 12 to 50 plaintiffs per complaint, and the plaintiffs all

4    had Norplant implants, but they had received the implants at

5    different times from different doctors at different facilities

6    with different information.   So the Court found that the

7    requirements of Rule 20 weren't met.

8            And in the course of that -- reaching that decision

9    Judge Rendell gave a very helpful analogy.   She said that if

10   claims arose out of the same traffic crash, then possibly

11   those plaintiffs involved in the same crash could join their

12   actions, but if the claims arose out of different crashes,

13   then the claims could not be properly joined.

14           And what the plaintiffs are attempting here would be

15   no different than attempting to join claims by 62 years worth

16   of crashes, crash worthiness cases, against General Motors.

17   There'd be different vehicles involved, there'd be different

18   warnings involved, different usage, different causation,

19   different injuries and so forth.

20           So if Judge Rendell was correct in her analogy and

21   decision, as well as Judges Bartle, Bechtle and Robreno in

22   their decisions, then this Court, I would suggest, should

23   sever the claims by these plaintiffs.

24           THE COURT:  Okay.  Thank you very much.

25           MR. CEREGHINI:  Okay.

1          THE COURT:  However, I do want to go on -- get one

2    thing straight.  I don't think there is an argument that if

3    I -- if I find that the cases are preempted, that your cases

4    would be preempted, too.  Is that what your position is?

5          MR. CEREGHINI:  Our -- our position is --

6          THE COURT:  I'm talking under the -- under the Labor

7    Management Act.

8          MR. CEREGHINI:  Yes, that is the subject of our

9    preemption motion that we have filed, our motion to dismiss.

10         THE COURT:  Well, that's just one of the issues that

11   you -- that you raise, and I'm not sure it's -- it's

12   contested.

13         Who's going to argue Riddell?

14         MR. BUCHANAN:  I am, Your Honor.  Martin Buchanan.

15         THE COURT:  Okay.  Mr. Buchanan, just -- what's your

16   position on that?  Do you believe that if -- if it's

17   preempted, the case is preempted, it may be -- if the NFL

18   presides -- I mean, presides -- if they prevail, then -- then

19   it's preempted.

20         Would you believe that they -- the case against

21   Riddell was also preempted?

22         MR. BUCHANAN:  No, Your Honor.

23         THE COURT:  Oh.  Okay.  Then that has to be heard.

24   Okay.  I'm sorry.  That's okay.  Let me hear his argument, and

25   then I'll hear yours.

1          Do you want to -- you can stand --

2          MR. CEREGHINI:  Yes.

3          THE COURT:  -- wherever you want.

4          MR. CEREGHINi:  I'll stay right here, then, Your

5    Honor.  Thank you.

6          THE COURT:  Okay.

7          MR. BUCHANAN:  Your Honor, would you like to hear

8    the argument on the motion to sever first?

9          THE COURT:  Yes.

10         MR. BUCHANAN:  All right.

11         THE COURT:  That's -- well, yes.  Okay.

12         MR. BUCHANAN:  Okay.  First of all, I think what --

13   when -- when you asked exactly what Riddell is asking to have

14   severed here, if you look at their motion, all they're asking

15   to have severed is the plaintiffs' claims against Riddell.

16         There is no claim that the plaintiffs are improperly

17   joined together here for the purposes of asserting their

18   claims against the NFL, and I -- I think the logical result of

19   granting them the relief they're requesting here would be that

20   you would have plaintiffs suffering over the same indivisible

21   brain -- brain injuries, they would be suing in separate

22   forums over those same brain injuries against separate

23   defendants because they'd be suing Riddell in their

24   individually severed actions, and then they would remain

25   together to sue the NFL over those exact same injuries.

1          And Riddell itself makes a big point of saying in

2     its preemption motion that the claims against the NFL

3     defendants are indivisible -- are inseparable from the claims

4     against the Riddell defendants.  And in fact there is a

5     substantial overlap here, and the whole purpose of the liberal

6     joinder rules is to prevent the type of multiplicity of

7     actions over a single indivisible injury that would result if

8     you were to grant this motion.

9          The liberal joinder rules encourage joinder of all

10    parties and all claims to the maximum extent possible,

11    consistent with fairness.

12         Here, we have claims that are asserted, and I'm

13    going to focus in particular on the failure to warn claims.

14    Rule 20(a) does not require us to show predominance of common

15    issues.  It doesn't require us to show that most of the issues

16    are common.

17         Requires us to show that there's any theory of

18    relief that arises out of the same transactions or series of

19    transactions, and that there's any common question of fact or

20    law that will arise for all plaintiffs.

21         And the key word is "any."  It's not "most."  It's

22    not "all."  It's "any."  That's the operative word.

23         Now, the parties are in agreement that the basic

24    test is the logical relationship test; are these claims all

25    logically related against the NFL and against Riddell.

1          And they cite all these pharmaceutical and medical

2    device cases where the plaintiffs had absolutely nothing in

3    common other than their use of a particular pharmaceutical or

4    a particular medical device.

5          Here, though, we have a common thread that's running

6    through all of these cases, and that is the NFL.  The claims

7    that all these players are asserting, and their spouses, arise

8    out of their participation as players in a professional sports

9    league.

10         They all suffered these injuries as a result of

11   being NFL players and suffering these hits during NFL games

12   and practices, and they are all claiming that both the NFL and

13   the Riddell defendants had a duty to warn them.

14         So the duty to warn is really the unifying theme

15   here.  The players are asserting that nobody told them these

16   injuries could result in the kinds of long-term brain

17   repercussions that they have, and they are asserting that two

18   different sets of defendants had the duty to warn them, one,

19   on just a standard product -- product liability theory, the

20   Riddell defendants, and the other, the NFL defendants.

21         So -- and they're claiming that both of these

22   entities failed to warn them.  Those claims are logically

23   related to one another.  Rule 20 is liberal in nature, and it

24   allows broad joinder of all claims and theories that are

25   reasonably related to one another.

1           And, again, nobody's contesting, as I understand it,

2     that the claims -- the players improperly joined their claims

3     against the NFL.

4           So to grant this motion, I submit, would defeat the

5     purpose of Rule 20 by leading to a multiplicity of actions,

6     rather than joinder of reasonably related, logically related

7     claims.

8           THE COURT:  All right.  Let me hear from --

9           MR. CEREGHINI:  Yes.  Whether the NFL at some point

10    will make its motion to sever the plaintiffs' claims I guess

11    we'll have to wait and see.  There's no reason why they had to

12    do it at this point, and obviously the way the MDL has been

13    structured allowed the Court to get to the preemption issue

14    first, and it was very convenient to do it that way.

15          I -- I want to look at the facts here --

16          THE COURT:  Well, it was a logical way to do it.  I

17    mean it wasn't --

18          MR. CEREGHINI:  Well, it -- it made sense because it

19    got that threshold issue before the Court today.

20          THE COURT:  Exactly.

21          MR. CEREGHINI:  But in -- with respect to the claims

22    against Riddell, we have players whose careers span 62 years

23    in the NFL and professional football.

24          We have one plaintiff who started his career in

25    1950.  We have others who retired in 2011.  So each of these

1   plaintiffs who have claims against Riddell have individual

2   personal injury product liability claims.  That's what we're

3   talking about.  They involved unique employment histories

4   before the NFL.  They involved unique pre-NFL backgrounds.

5   They involve different personal histories.  Each wore a

6   different helmet.  The helmets had each its own his own

7   history --

8               THE COURT:  Well, that --

9               MR. CEREGHINI:  -- of use, modification and so

10  forth.

11              THE COURT:  That's -- isn't that -- excuse me.  I'm

12  sorry.

13              Isn't that more a certification issue?  I mean

14  whether I'm going to put all these people together?  I don't

15  understand at this stage of the litigation why it's a -- why

16  it's a severing issue.

17              MR. CEREGHINI:  No, no, it's not a certification

18  issue because with respect to Riddell for --

19              THE COURT:  I mean it may be certification.

20              MR. CEREGHINI:  Well, with respect to Riddell there

21  are no class action claims, anyway.

22              THE COURT:  And you -- you have no class action

23  claims --

24              MR. BUCHANAN:  That is correct.

25              THE COURT:  Okay.

 1            MR. CEREGHINI:  All right.  So the --

 2            THE COURT:  All right.  So that's not -- that's not

 3   an issue.  I'm sorry.

 4            MR. CEREGHINI:  Right.  And -- and the issue here

 5   really purely is one of Rule 20 joinder.

 6            THE COURT:  All right.

 7            MR. CEREGHINI:  And Rule 20 joinder is a threshold

 8   question.  It needs to be decided right off the bat.

 9            THE COURT:  Okay.

10            MR. CEREGHINI:  And there are a lot of reasons why

11   the Eastern District of Pennsylvania has severed so many cases

12   that are improperly joined like this.  They talk about how it

13   causes inefficiencies, it delays deadlines, it horribly

14   complicates discovery.

15            Here, Your Honor, we've got problems in that the

16   joinder that is improper is really obfuscating fundamental

17   problems with the plaintiffs' product liability cases against

18   Riddell.  Nobody even identifies a specific allegedly

19   defective helmet or how it supposedly caused an injury.

20            And those threshold issues ought to be reflected in

21   the plaintiffs' complaints.  And that's why so many of these

22   cases that I cited before have in fact -- and we've cited in

23   our briefs two dozen of these cases -- all of the authority is

24   in one direction, and -- and that's in the direction of

25   granting this motion, and granting it now is a threshold

1    question.

2              THE COURT:   Okay.   Let me just -- I'm -- I want to

3    know whether or not my former -- my former argument is

4    relevant to this case, and you say that it's not.   I mis -- I

5    thought that that was conceded.

6              You say that they -- the Riddell defendants are --

7    may still be liable, even if I find that there's preemption.

8              MR. BUCHANAN: Correct.

9              THE COURT:   And let me hear -- let me your argument

10   on that issue.

11             MR. BUCHANAN:   Certainly, Your Honor.

12             A lot of the arguments that Mr. Frederick made in

13   terms of the policies behind preemption are -- are applicable

14   here, but there is a distinct difference with the Riddell

15   defendants.

16             The claims that are being asserted against the

17   Riddell defendants are garden variety products liability

18   claims that do not arise from the Collective Bargaining

19   Agreement in any way, shape or form.   These are standard

20   duties that are imposed on a manufacturer in any state,

21   regardless of any Collective Bargaining Agreement, duties not

22   to sell a defectively designed product, duties not to sell a

23   defectively manufactured product, duties to warn of the known

24   dangers of foreseeable use of a product.

25             Those duties all arise completely, separately and

1   independently from any Collective Bargaining Agreement, and

2   Riddell not only is not a party to any Collective Bargaining

3   Agreement, it's not even part of the basic employment

4   relationship that's governed by the Collective Bargaining

5   Agreement.

6          So the key principle here that I think governs the

7   Riddell preemption motion is it comes from what Mr. Clement

8   referred to as the granddaddy of all the cases, the <u>Allis-</u>

9   <u>Chalmers</u> case, and it's a line that was also quoted by Judge

10  Stapleton in <u>Klein</u>, and it goes like this.

11         "It would be inconsistent with congressional intent

12  under Section 301 to preempt state rules that proscribe

13  conduct or establish rights and obligations independent of a

14  labor contract."

15         These product liability claims are state law rules

16  that establish rights and obligations completely independent

17  of any labor contract.  It wouldn't matter if the NFL were not

18  subject to any Collective Bargaining Agreement.  We would

19  still have our state law rights to assert product liability

20  claims against the Riddell defendants.  They have nothing to

21  do with the Collective Bargaining Agreement.

22         Now, we have cited, Your Honor, four cases that all

23  involve factual situations somewhat similar to this case, one

24  very similar, which is the <u>Stringer</u> case, and three others.

25  All of these cases are products liability cases where a

1    defendant said that the claims were preempted because the

2    plaintiff was injured by some piece of equipment on the job,

3    and the job situation was governed by a Collective Bargaining

4    Agreement that specifically addressed equipment safety.

5            In all four of those cases the Court said there was

6    no preemption, and the Courts reasoned -- and I'll give you

7    the cites, I -- I think they're in our brief, but all four of

8    these cases the Court reasoned that, number one, the

9    manufacturer's state law duties to provide a safe product

10   existed independently of the Collective Bargaining Agreement

11   and did not depend on any interpretation of the Collective

12   Bargaining Agreement.

13           Number two, the manufacturer was not a party to the

14   Collective Bargaining Agreement and was not subject to any

15   duties and restrictions under the agreement.

16           Number three, a claim is not preempted, as has

17   already been discussed, if it simply relates in some way to a

18   provision of a Collective Bargaining Agreement or the parties

19   to a Collective Bargaining Agreement.

20           And, finally, Section 301, preemption, does not

21   arise merely because the defendant intends to refer to a

22   Collective Bargaining Agreement in the course of its defense.

23           So the final point that I -- I'd like to make is

24   what's truly extraordinary about the Riddell motion, and

25   perhaps also the NFL motion, but more clearly the Riddell

1    motion, is it would leave these players and their spouses with

2    no remedy whatsoever for the state law product liability

3    claims.

4              Section 301 provides a federal form for breach of a

5    Collective Bargaining Agreement.  It provides uniform federal

6    law for cases arising under a breach of a Collective

7    Bargaining Agreement.   It does not provide any alternative

8    federal remedy for a product liability claim, such as the

9    claims that are being asserted against the Riddell defendants

10   here.

11             So if these claims are preempted, it means that

12   Congress entirely extinguished them, and that's a problem.  I

13   think it's a problem, and it's maybe more questionable with

14   respect to the NFL, but the NFL also is not a party to the

15   Collective Bargaining Agreement, and it's questionable whether

16   they're -- if they were preemption of the claims against the

17   NFL, what -- what claim is there left to assert.

18             So -- but it's -- it's more clear with the Riddell

19   defendants.  Those claims could not be asserted in any way,

20   shape or form if this Court were to find preemption.

21             MR. CEREGHINI:  Yes, Your Honor, I think it's

22   somewhat obvious that if the Court grants preemption with

23   respect to the NFL and NFL Properties, that the preemption

24   ought to also apply to the claims against Riddell.

25             We have to look at the claim specifically that's

1    made against Riddell, and the complaint says one thing, but

2    the briefs that the plaintiffs filed, and I think we heard it

3    here this morning, indicate that the crux of the claim against

4    Riddell is for a failure to warn of the long-term effects of

5    repetitive head impacts.

6          And we also know from the master administrative

7    complaint that even the strict liability claims that are made

8    against Riddell are pled based on negligence allegations.

9          So the issue before the Court is not the question of

10   whether the defendants or Riddell, in particular, is a

11   signatory to the CBA because it's not, but neither is NFL

12   Properties, and the NFL is only a signatory to one CBA that's

13   not a part of the test under Allis-Chalmers.

14         The question before the Court is whether the

15   plaintiffs' claims substantially depend on analysis of the

16   terms of a Collective Bargaining Agreement.

17         THE COURT:  Well, but the -- what I understand your

18   opponent is saying is that they're different claims.

19         MR. CEREGHINI:  Well, but -- but it -- I would

20   say --

21         THE COURT:  Don't you have to do a separate analysis

22   of the -- of the -- is that what you're saying?

23         MR. BUCHANAN:  Yes, Your Honor.

24         MR. CEREGHINI:  Well, I would say to the point that,

25   yes, the Court needs to look at the claims against us and the

1    provisions in the Collective Bargaining Agreements.  There are

2    17 of them that we cite in our brief that would need to be

3    interpreted and would apply to the claims against Riddell and

4    make that determination.

5           But with respect to the negligence claims, and the

6    plaintiffs have characterized their action as one sounding in

7    negligence against Riddell, negligence claims aren't decided

8    in a vacuum.

9           The Court asked the previous counsel about the

10   elements of a negligence claim.  Sure, one of the elements is

11   duty, and duty raises the question, what's reasonable under

12   the circumstances.

13          Stringer, Duerson, Maxwell all said:

14          "In determining what's reasonable under the

15          circumstances, we need to look at the degree of care

16          that's owed, and to determine the degree of care that's

17          owed we have to look at the duties of the team trainers,

18          the physicians, the teams themselves, the players union,

19          the players, and all of that calibrates what the degree

20          of care is that's owed by the other defendant."

21          That exact same degree of care analysis has to be

22   made with respect to this warnings claim and this negligence

23   claim against Riddell.

24          I'd like to give the Court one example which I think

25   would be, you know, somewhat helpful.  The claims that are

1   made against us for failure to warn are never going to be

2   evaluated in a vacuum.  Riddell for over 30 years has -- had

3   on product labels on its helmets with warnings that say, "No

4   helmet can prevent all head injuries."  Another one that I

5   believe has been there for 25 years, "Severe brain injuries

6   may occur while playing football."

7           Those are fairly clear, I think.  What the

8   plaintiffs are saying in their complaint and their arguments

9   that Riddell should have gone further and told them something

10  about the medical risk of a brain injury from repetitive head

11  impacts.

12          Well, that claim isn't going to be evaluated in a

13  vacuum.  It's going to be evaluated in the context of the use

14  of the helmets and with the information that the players had

15  available to them, not just from Riddell, but from the teams,

16  the physicians, the trainers, their players' union,

17  especially.

18          And one of the things in these CBAs -- and this goes

19  back to the 1970 CBA, but it gets much more specific in the

20  '77 CBA.  There is a provision in that CBA for a joint

21  committee, and that joint committee is charged, among other

22  things, with the responsibility to undertake promptly -- those

23  words are used -- undertake promptly a review of all current

24  materials on the player safety aspects of player equipment.

25          So what does that mean?  That has to be interpreted

1   because if that means that the players' union representatives

2   on the joint committee should have gone out and reviewed the

3   material that the plaintiffs say we should have provided to

4   them, then it goes to the issue of what they knew or what they

5   should have known --

6                THE COURT:  As I --

7                MR. CEREGHINI:  -- and, therefore --

8                THE COURT:  As I point --

9                MR. CEREGHINI:   -- interpretation's required --

10               THE COURT:  As I pointed out to Mr. Clement, I

11  believe it was, if the CBA is explicit that the committee

12  shall have no power to bind anyone -- I mean that's -- that is

13  clear.  I'm sure you -- you are aware of that, are you not?

14               MR. CEREGHINI:  Well, I -- I'm aware of -- I'm aware

15  of what he said, and I'm aware of what the CBAs say, but my

16  point is this, Your Honor.

17               In specifically directing that that committee

18  promptly undertake a review of material, and in the inclusion

19  of player union representatives on that committee that cannot

20  be ignored because if this medical literature, for example,

21  that the plaintiffs cite in their complaint, did relate to a

22  safety aspect of player equipment, then this committee was

23  obligated to review it, and that would go directly to the

24  degree of care owed by Riddell, and -- and there are many

25  relationships like that.  We cite 17 of them in our briefs.

1          THE COURT:  Okay.  I'll go -- or let me her your

2     response, and then we're going to call it a day because it's

3     hot.

4          MR. BUCHANAN:  Certainly, Your Honor.

5          The -- the arguments that counsel has just made

6     about the joint committee are arguments that were squarely

7     rejected in Stringer.  Stringer mentioned the joint committee,

8     and Stringer, again, is a products liability case against

9     Riddell regarding defective helmet.

10         THE COURT:  That was -- was that -- was that an

11    Eighth Circuit case?

12         MR. BUCHANAN:  No, that's a Southern District of

13    Ohio case, yes.

14         THE COURT:  Oh, okay.  Yes.  All right.

15         MR. BUCHANAN:  And the Court -- in that case the

16    defendant relied on the fact that there was this joint

17    committee, that it was supposed to address issues, including

18    equipment safety, that it included provisions that the players

19    report to training camp, et cetera, et cetera.

20         And the Court said those claims were not preempted,

21    including the negligence claims, the negligence claims against

22    Riddell for product liability, and also said the mere fact

23    that these provisions of the Collective Bargaining Agreement

24    were somewhat relevant and might be consulted in resolving the

25    product liability claims was not sufficient to require

1    preemption.

2            And that's consistent with the Third Circuit law

3    that just because a Collective Bargaining Agreement is

4    relevant and provides context for the claims, that doesn't

5    invoke preemption.

6            THE COURT:  All right.  Well, I will -- I will rule.

7    I will also thank you for sitting through this heat.  I very

8    much appreciate it.  This has been a -- an enlightening

9    morning.

10           MR. CEREGHINI:  Thank you, Your Honor.

11           THE COURT:  Thank you.

12           MR. BUCHANAN:  Thank you, Your Honor.  I appreciate

13   it.

14           THE COURT:  Okay,.

15           MS. WILKINSON:  Thank you, Your Honor.

16           THE COURT:  All right.  Court is adjourned.

17        (Proceedings concluded at 11:34 a.m.)

18                        *  *  *  *  *

1          C E R T I F I C A T I O N

2

3

4          I, Tara Martin, court-approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11    _____    _____

12    TARA MARTIN                          DATE

13    DIANA DOMAN TRANSCRIBING