# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAHIM AND DENISE ABDULLAH,
THORNTON AND KAREN CHANDLER,
ERVIN FARRIS, KELVIN KINNEY,
WESLEY LYONS, TONY MCCOMBS,
RICKY AND JAN MOORE, DARRYL
AND MONICA OLIVER, HENRY AND
CAPRICE PHILLIPS, DOMINIQUE ROSS,
BENJAMIN AND LESLIE RUDOLPH,
TRACY AND TWANDA SANDERS,
FERNANDO SMITH, JEWERL THOMAS,
GODFREY AND SHARON TURNER,
RONALD WAYNE WALKER, and
KENNETH WALTER,

        Plaintiffs,

      -against-

NATIONAL FOOTBALL LEAGUE, INC.
and NFL PROPERTIES, LLC as successor
in interest to NATIONAL FOOTBALL
LEAGUE PROPERTIES, INC., RIDDELL,
INC., RIDDELL SPORTS GROUP, INC.,
ALL AMERICAN SPORTS CORP., and
EASTON-BELL SPORTS, LLC.

        Defendants.

CIVIL ACTION NO.   12-CV-06774-AB

**AMENDED CIVIL ACTION COMPLAINT
FOR DECLARATORY RELIEF, MEDICAL
MONITORING, INJUNCTIVE RELIEF AND
DAMAGES**

**JURY TRIAL DEMAND FOR ALL CLAIMS
TRIABLE BY A JURY**

## <u>AMENDED COMPLAINT</u>

Plaintiffs, Rahim and Denise Abdullah, et al., sue Defendants National Football League,

Inc. and NFL Properties, LLC successor in interest to National Football League Properties, Inc.

(hereinafter "NFL" or "League" ) and Riddell, Inc.; Riddell Sports Group, Inc.; All American

Sports Corp., and Easton-Bell Sports, LLC, (hereinafter "Riddell" or "Riddell Defendants") and

state as follows:

- 1 -

1.     This action seeks declaratory relief, medical monitoring, injunctive relief and compensation for long-term/chronic injuries, financial losses, expenses and intangible losses suffered by Plaintiffs as a result of Defendants' carelessness, negligence, intentional and tortious misconduct, and concealment of information in connection with Defendants' voluntary undertaking with regard to the health effects of repeated head impacts. Plaintiffs are former National Football League ("NFL" or "League") players and certain of their spouses. The injuries include concussions and repeated head impacts and their sequelae suffered by Plaintiffs during their play in the NFL, including traumatic brain injuries, repetitive sub-concussive head traumas, and latent neurodegenerative disorders and diseases. Among other things, Defendants failed to protect and warn Plaintiffs and other NFL players against the harmful effects of, and injuries resulting from, repeated head impacts during football training, practice and games.

2.     Plaintiffs incorporate by reference all of the claims set forth in the Plaintiffs' Master Administrative Class Action Complaint and Original Class Action Complaint, In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323, pending in the Eastern District of Pennsylvania before the Honorable Anita Brody, J. and bring this action individually and as potential members of the class or subclasses under New York law and other applicable law.

3.     The action further seeks to recover fair compensation for the Plaintiffs who are the spouses of the players based upon their right to seek loss of consortium. The allegations herein, except as to Plaintiffs themselves, are based on information and belief.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy as to each Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because complete diversity exists between the parties, because the Plaintiffs are

1092635.1

citizens of states which are different from the states where Defendants are incorporated and/or have their principal places of business. This is an action for damages as well as medical monitoring under the common and statutory laws of the State of New York and the recovery of individual damages for Plaintiffs and certain Plaintiffs' spouses based upon, among other claims, negligence and concealment in the inducement under the laws of the State of New York, and of the other applicable states' laws.

5.      This Court has personal jurisdiction over Defendants because they have substantial and continuous business contacts in the State of New York, and because several have headquarters in New York.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(a) and (b), and 42 U.S.C. § 2000e-5(f)(3), because Defendants conduct business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district.

## THE PARTIES

### PLAINTIFFS

7.      Plaintiff Rahim Abdullah is 36 years old and resides with his wife, Denise Abdullah in Georgia. They are citizens and residents of Lawrenceville, Georgia. Mr. Abdullah was an outside linebacker for the NFL. He played for the Cleveland Browns (1999-2001). Mr. Abdullah suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Abdullah has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Abdullah suffered, Plaintiff Denise Abdullah was

- 3 -

deprived of marital services including, but not limited to, loss of companionship, affection and support.

8.      Plaintiff Thornton Chandler is 48 years old and resides with his wife Karen in Texas. Plaintiffs are citizens and residents of Humble, Texas. Mr. Chandler was a tight end for the NFL. He played for the Dallas Cowboys (1986-1989) and the New York Giants (1990). Mr. Chandler suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Chandler has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, pain in his back, depression, isolation, mental anguish and diminished self-esteem. As a result of the injuries Mr. Chandler suffered, Plaintiff Karen Chandler was deprived of marital services including, but not limited to, loss of companionship, affection and support.

9.      Plaintiff Ervin Farris is 46 years old and is a citizen and resident of Arlington, Texas. Mr. Farris was a full back for the NFL. He played for the Dallas Cowboys (1989) and the Philadelphia Eagles (1990). Mr. Farris suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Farris has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, pinched nerves, a sunken disc in his neck, sleep issues, speech problems, memory loss, depression, mental anguish and diminished self-esteem.

10.      Plaintiff Kelvin Kinney is 41 years old and is a citizen and resident of Tampa, Florida. Mr. Kinney was a defensive end for the NFL. He played for the Washington Redskins (1996-1999). Mr. Kinney suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain

- 4 -

disease.  Mr. Kinney has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish and diminished self-esteem.  He has been diagnosed as mentally disabled as a result of his repeated and chronic head injuries suffered while playing professional football for the NFL.

11.     Plaintiff Wesley Lyons is 24 years old and is a resident and citizen of Braddock, PA.  Mr. Lyons was a wide receiver for the NFL.  He played for the Pittsburgh Steelers (2011-2012).  Mr. Lyons suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease.  Mr. Lyons suffered a concussion when he played against the Redskins.  Mr. Lyons has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, speech issues, memory loss, depression, isolation, mental anguish and diminished self-esteem.

12.     Plaintiff Tony McCombs is 38 years old and is a citizen and resident of Barbourville, Kentucky.  Mr. McCombs was a linebacker for the NFL.  He played for the Arizona Cardinals (1997-1999) and for the Cleveland Browns (2001).  Mr. McCombs suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. McCombs has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, emotional distress, mental anguish and diminished self-esteem.

13.     Plaintiff Ricky Moore is 49 and resides with his wife Jan in Georgia.  Plaintiffs are citizens and residents of Powder Springs, Georgia.  Mr. Moore was a running back for the NFL.  He played for the San Francisco 49-ers (1985), the Buffalo Bills (1986), the Green Bay Packers (1987), and the Arizona Cardinals (1988).  Mr. Moore suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he

- 5 -

is at increased risk of latent brain disease. Mr. Moore has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, speech issues, memory loss, depression, isolation, mental anguish and diminished self-esteem.  As a result of the injuries Mr. Moore suffered, Plaintiff Jan Moore was deprived of marital services including, but not limited to, loss of companionship, affection and support.

14.    Plaintiff Darryl Oliver is 48 years old and resides with his wife Monica in Florida. Plaintiffs are citizens and residents of Palm Coast, Florida.  Mr. Oliver was a running back for the NFL.  He played for the Seattle Seahawks (1987), the Tampa Bay Buccaneers (1987), the Atlanta Falcons (1987) and the New York Jets (1988). Mr. Oliver suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Oliver has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, pain in the neck, shoulders and back, memory issues, depression, isolation, mental anguish and diminished self-esteem.  As a result of the injuries Mr. Oliver suffered, Plaintiff Monica Oliver was deprived of marital services including, but not limited to, loss of companionship, affection and support.

15.    Plaintiff Henry Phillips is 55 years old and resides with his wife Caprice. Plaintiffs are citizens and residents of Corona, California.  Mr. Phillips was a wide receiver for the NFL and played for the San Diego Chargers (1982-1983).  Mr. Phillips suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Phillips has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish and diminished self-esteem.  As a result of the injuries Mr.

Phillips suffered, Plaintiff Caprice Phillips was deprived of marital services including, but not limited to, loss of companionship, affection and support.

16.     Plaintiff Dominique Ross is 41 years old and is a citizen and resident of Jacksonville, Florida.  Mr. Ross was a running back and a member of special teams for the NFL. He played for the Dallas Cowboys (1995-1997) and the Tampa Bay Buccaneers (1998-1999). Mr. Ross played in the Super Bowl 1995-1996 Season.  Mr. Ross suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Ross has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish and diminished self-esteem.

17.     Plaintiff Benjamin Rudolph is 55 years old and resides with his wife Leslie in Alabama.  Plaintiffs are citizens and residents of Mobile, Alabama.  Mr. Rudolph was a defensive tackle and defensive end for the NFL.  He played for the New York Jets (1981-1986) and practiced with the Dallas Cowboys training camp (1987).  Mr. Rudolph suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Rudolph has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, tremors, muscle twitching, memory loss, depression, isolation, mental anguish and diminished self-esteem.  As a result of the injuries Mr. Rudolph suffered, Plaintiff Leslie Rudolph was deprived of marital services including, but not limited to, loss of companionship, affection and support.

18.     Plaintiff Tracy Sanders is 46 and resides with his wife Twanda in Florida. Plaintiffs are citizens and residents of Palmetto, Florida.  Mr. Sanders was a corner back for the NFL.  He played for the Buffalo Bills (1989-1990), practiced with the Oakland Raiders in

- 7 -

training camp (1992) and the Green Bay Packers in training camp (1993). Mr. Sanders suffered

repeated and chronic head impacts during his career in the NFL, both in play as well as in

practice; and as a result, he is at increased risk of latent brain disease. Mr. Sanders has suffered

and continues to suffer from permanent injuries including, but not limited to, sleep issues, severe

headaches, neck pain, numbness, mental anguish and diminished self-esteem. As a result of the

injuries Mr. Sanders suffered, Plaintiff Twanda Sanders was deprived of marital services

including, but not limited to, loss of companionship, affection and support.

19.     Plaintiff Fernando Smith is 41 years old and is a resident and citizen of Lake

Buena Vista, Florida. Mr. Smith was a defensive end for the NFL. He played for the Minnesota

Vikings (1994 -1997), the Jacksonville Jaguars (1998), the Baltimore Ravens (1999), the St.

Louis Rams (2000), the Minnesota Vikings (2000) and the Carolina Panthers (2001). In late

August 2001, Mr. Smith was playing for the Carolina Panthers and was making a tackle and

broke his neck. He was paralyzed as a result. He suffered repeated and chronic head impacts

and concussions during his career in the NFL, both in play as well as in practice; and as a result,

he is at increased risk of latent brain disease. Mr. Smith has suffered and continues to suffer from

permanent injuries including, but not limited to, severe migraine headaches requiring

hospitalization, speech  issues, memory loss, depression, isolation, mental anguish and

diminished self-esteem.

20.     Plaintiff Jewerl Thomas is 55 years old and is a resident and citizen of Union

City, CA. Mr. Thomas was a running back for the NFL. He played for the Los Angeles Rams

(1980-1982), the Kansas City Chiefs (1983),  and the San Diego Chargers (1984). Mr. Thomas

suffered repeated and chronic head impacts during his career in the NFL, both in play as well as

in practice; and as a result, he is at increased risk of latent brain disease. Mr. Thomas has

- 8 -

suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, speech issues, memory loss, depression, isolation, mental anguish and diminished self-esteem.

21.     Plaintiff Godfrey Turner is 56 years old and resides with his wife Sharon in Texas. Plaintiffs are citizens and residents of Grand Prairie, Texas. Mr. Turner was a wide receiver for the NFL. He played for the Atlanta Falcons (1979). Mr. Turner suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Turner has suffered and continues to suffer from permanent injuries including, but not limited to severe headaches, tremors, speech issues, memory loss, depression, isolation, mental anguish and diminished self-esteem. As a result of the injuries Mr. Turner suffered, Plaintiff Sharon Turner was deprived of marital services including, but not limited to, loss of companionship, affection and support.

22.     Plaintiff Ronald Wayne Walker is 45 years old and is a citizen and resident of Waco, Texas. Mr. Walker was a wide receiver and punt returner for the NFL. He played for the San Diego Chargers (1989-1990), the Minnesota Vikings (1991) and the Buffalo Bills (1992). Mr. Walker suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Walker suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, back, neck and shoulder pain, memory loss, depression, mental anguish and diminished self-esteem.

23.     Plaintiff Kenneth Walter is 54 and is a citizen and resident of Maurice, Louisiana. Mr. Walter was a center and a guard for the NFL. He played for the Baltimore Colts (1980) and the Green Bay Packers (1984-1985). Mr. Walter suffered repeated and chronic head impacts

- 9 -

during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Walter has suffered and continues to suffer from permanent injuries including but not limited to, severe headaches, memory loss, depression and diminished self-esteem.

## **DEFENDANTS**

24.     Defendant NFL, which maintains its offices at 280 Park Avenue, New York, New York, is an unincorporated association consisting of the 32 separately-owned and independently-operated professional football teams that are listed below.  The NFL is engaged in interstate commerce in the business of, among other things, operating the sole major professional football league in the United States.

25.     The NFL is not, and has not been, the employer of Plaintiffs, all of whom were employed during their respective careers in professional football by the clubs indicated above. The United States Supreme Court held last year in American Needle, Inc. v. NFL, 130 S.Ct. 2201, 2212-13 (2010), that each team that is a member of the NFL association is a legally distinct and separate entity from both other teams and the League itself:

>        The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined" by "separate corporate consciousness," and "[t]heir objectives are" not "common." . . . . The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel.

26.     The 32 separately-owned and independently-operated professional football teams mentioned above are:

- 10 -

| NFL Team Owner | State of Organization | Team Name (City) |
|---|---|---|
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns LLC | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars Ltd. | Florida | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |

- 11 -

1092635.1

| NFL Team Owner | State of Organization | Team Name (City) |
| --- | --- | --- |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partnership | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football Inc. | Maryland | Washington Redskins |

27.     Defendant NFL Properties, LLC as the successor-in-interest to National Football League Properties Inc. ("NFL Properties") is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York. NFL Properties, LLC is engaged in, among other activities, approving, licensing and promoting equipment used by all the NFL teams. NFL Properties, LLC regularly conducts business in New York.

28.     The NFL caused or contributed to the injuries alleged herein through its voluntary undertaking including its acts and omissions in misrepresenting the true risks of repeated traumatic brain and head impacts in NFL football, and failing to take appropriate steps to prevent

- 12 -

and mitigate repeated traumatic brain and head impacts in the NFL and the latent

neurodegenerative disorders and diseases caused by these impacts.

29.     Defendant Riddell, Inc. (d/b/a/ Riddell Sports Group, Inc.) is a corporation

organized and existing under the laws of the state of Illinois, and is engaged in the business of

designing, manufacturing, selling and distributing football equipment, including helmets, to the

NFL and since 1989, has been the official helmet of the NFL. Riddell, Inc. regularly does

business in the State of New York as well as throughout the U.S.

30.     Defendant All American Sports Corporation (d/b/a Riddell\All American) is a

corporation organized and existing under the laws of the state of Delaware and is engaged in the

business of designing, manufacturing, selling, and distributing football equipment including

helmets to the NFL; since 1989, Defendant All American Sports Corporation has been the

official helmet of the NFL.  All American Sports regularly conducts business in the state of New

York as well as throughout the United States.

31.     Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal

place of business at 6255 North State Highway, #300, Irving, Texas 76038.  Riddell Sports

Group, Inc. regularly conducts business in the state of New York as well as throughout the

United States.

32.     Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell

Sports, Inc. and is incorporated in Delaware, with its principal place of business at 152 West

57th Street, New York, New York 10019.  Easton-Bell Sports, Inc. designs, develops, and

markets branded athletic equipment and accessories, including marketing and licensing products

under the Riddell brand.  Easton-Bell Sports, LLC regularly conducts business in the state of

New York as well as throughout the United States.

- 13 -

33.     Defendants Riddell, Inc., Riddell Sports Group, Inc., All American Sports Corporation, and Easton Bell Sports, LLC are alter egos and agents of one another and were so intertwined in the business of designing, manufacturing, advertising, promoting, selling and distributing the helmets at issue as to make it impossible to discern the difference between and among them.

## COMMON ALLEGATIONS

34.     Joinder is permissible pursuant to Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same series of occurrences, and questions of law or fact common to all Plaintiffs arise in this action.

35.     Common questions of law and fact will arise in this action including, but not limited to the following questions which could be jointly tried, herein or in connection with the related cases before the Court in MDL 2323:

        a.      Whether the NFL, through its own voluntary undertaking, was negligent in its response to the health effects of repeated head impacts and the injuries suffered by Plaintiffs;

        b.      Whether § 301 of the Labor Relations Management Act preempts Plaintiffs' tort law claims pled herein, to which Plaintiffs uniformly disagree;

        c.      Whether the NFL committed negligence and/or fraud in misrepresenting the risks of repeated head impacts in NFL play to Plaintiffs;

        d.      Whether the NFL engaged in a civil conspiracy with Riddell, Inc. and others to hide the truth and misinform the players about the true risks posed by repetitive head traumas; and,

        e.      Whether repeated head impacts during play in the NFL cause latent neurodegenerative brain disorders and disease.

## NATURE OF THE NFL'S BUSINESS

36.     The primary business in which the NFL and its member clubs are engaged is the

operation of major league professional football teams and the sale of tickets and telecast rights to

the public for the exhibition of the individual and collective football talents of players such as

Plaintiffs.

37.     The NFL's transactions involve collective annual expenditures and receipts in

excess of $9.3 billion.  But, as Dan Greeley, CEO of Network Insights, has noted:

> The NFL is like Procter & Gamble. There's the holding company,
> the core operation, but then each brand has its own team and world
> of revenue. Like Tide: That's a P&G product but within that there
> are different types of Tide and a number of people that make
> money from it. So the $9.3 billion pie just scratches the surface and
> doesn't get into how much is spent around stadiums, merchandise,
> agents, all the way down to mom-and-pop shops.

38.     Annually, the NFL redistributes upwards of $4 billion in radio, television and

digital earnings to the clubs that are part of the NFL association —$125 million apiece, plus an

equal share for the league—and that number shows no sign of declining.  The 19 highest-rated

fall television programs (and 28 of the top 30) were NFL games, and this year's Super Bowl was

the most-watched program ever.  The NFL earns enormous amounts annually from its telecasting

deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox

($712.5 million), and CBS ($622.5 million).

39.     Companies pour money into the League's coffers for the right to associate their

brands with the NFL.  Among those making such contributions are Pepsi ($560 million over

eight years, starting in 2004) and Gatorade ($45 million a year, plus marketing costs and free

Gatorade for teams).  Verizon is paying $720 million over four years to be the League's wireless

service provider.  Nike paid $1.1 billion to acquire the NFL's apparel sponsorship.  Previous

partner Reebok had been selling $350 million annually in NFL-themed gear.  The League has a

$1.2 billion, six-year deal with beer sponsor Anheuser-Busch, but teams still cut their own deals when it comes to pouring rights at stadiums. On September 7, 2011, it was announced that the NFL signed a new 10-year $2.3 billion deal with Pepsi, which is one of the largest sponsorship deals in sports history.  It encompasses a number of Pepsi brands (Pepsi, Frito-Lay, Tropicana, Quaker Oats and Gatorade).  This deal, combined with a number of other new sponsorships, ticket sales projections & TV ratings, means that the NFL is projecting record revenues of over $9.5 billion this season.

40.     Teams can collect $25-$30 million for stadium naming rights, usually on 10-year deals.  The largest is Reliant Energy's $10 million per year contract with the Houston Texans.  In Los Angeles, Farmers Insurance has promised $700 million over 30 years to name a stadium for a team that does not even exist yet.

41.     Many clubs that are part of the NFL association own in whole or in part the stadiums in which they play, which can be a source of major commercial value, as reflected in the following chart:

| STADIUM, TEAM | OPENED | PRICE (2010 DOLLARS) | % PRIVATE |
|---|---|---|---|
| New Meadowlands, NY | 2010 | $1.6B | 100 |
| Cowboys Stadium, DAL | 2009 | $1.15B | 56 |
| Lucas Oil Field, IND | 2008 | $780M | 13 |
| U. of Phoenix Stadium, ARI | 2006 | $493M | 32 |
| Lincoln Financial, PHI | 2003 | $588M | 65 |

| | | | |
|---|---|---|---|
| Ford Field, DET | 2002 | $504M | 49 |
| Gillette Stadium, NE | 2002 | $373M | 100 |
| Reliant Stadium, HOU | 2002 | $526M | 39 |
| Qwest Field, SEA | 2002 | $422M | 29 |
| Invesco Field, DEN | 2001 | $683M | 39 |
| Heinz Field, PIT | 2001 | $312M | 16 |

42.    In 2010, more than 17 million fans passed through turnstiles operated by clubs that are part of the NFL association, paying anywhere from $54.51 (Cleveland Browns) to $117.84 (New England Patriots) for the average game ticket.  Though the League will not disclose the exact amounts, the numbers for the publicly-held Green Bay Packers ("Packers") offer some insight into what teams reap at the ticket office and concession stands.  In 2010, the Packers cleared $60,059,646 from home and away game tickets plus private boxes per game.  Projected over 32 teams, that is nearly $2 billion annually.  The Packers reaped $13 million from concessions, parking and local media in 2010, which translates to $416 million on a league-wide basis.

## FACTUAL ALLEGATIONS

### A.    Concussions And Head Injuries: the Science And the NFL's Responses To It.

43.    A 2011 article in the *Journal of Sports & Entertainment Law* of Harvard Law School summed up the consequences of concussions to athletes (footnotes omitted):

> From high school leagues to the NFL, football players are
> becoming bigger, faster, and stronger, thereby increasing the  force
> of collisions  that  occur  during  a game and increasing the
> potential for serious injuries. The brain is a soft organ, surrounded
> by cerebrospinal fluid and protected by the tough, bony skull.
> Normally, the fluid around the brain serves as a protective cushion
> for the brain, isolating it from direct impact to the skull. When the

- 17 -

head suffers violent impact, the brain can hit the skull, causing the brain temporarily to stop working normally. This is called a concussion.

More serious injuries occur after the initial concussion. A concussion causes brain cells to become depolarized and allows neurotransmitters to behave in an abnormal fashion, causing such symptoms as memory loss, nausea, and confusion. After the initial concussion, when the brain is not fully healed, it is very fragile and susceptible to minor accelerative forces. Thus, subsequent minor hits may cause traumatic and permanent brain injury. This is the heart of the problem: players returning to the football field before allowing their initial concussion to heal fully. When the player returns to the field too early, he is at risk for what is known as Second Impact Syndrome (SIS). SIS is the event that ensues when there is a subsequent brain impact before the initial concussion has been given time to heal. Additionally, when concussions occur with high frequency, a disease called Chronic Traumatic Encephalopathy (CTE) may occur in the brain. "CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain which eventually leads to dementia." While CTE was originally diagnosed most commonly in boxers, it is now regularly found in football players. **Of all sports related injuries, concussions are the injuries that most often go unnoticed and untreated, especially in football**. (Emphasis added).

44.    The following chart, excerpted from a 2010 article in the *New England Journal of Medicine* entitled "Traumatic Brain Injury--Football, Warfare And Long-Term Effects" shows how even repetitive mild traumas can have lasting consequences:

1092635.1



**Spectrum of Pathologic Features and Outcomes of Traumatic Brain Injury (TBI).**
In the left inset, Bielschowsky silver stain shows intraneuronal and extracellular neurofibrillary tangles in temporal cortex from a retired boxer with dementia pugilistica.[1] The right inset shows diffuse Aβ plaque deposits in temporal cortex from a subject who sustained severe TBI.[2]

45.    The NFL's responses to the issue of brain injuries caused to retired NFL players because of concussions or head impacts received during the period that they played professional football has been, until very recently, one of deception and denial. The NFL and several of the scientists it employed actively tried to conceal the extent of the problem until recently.

- 19 -

46.     The response of the League once it acknowledged the medical concern posed by repetitive head impacts has been inadequate.

47.     The collective bargaining agreements ("CBAs"), negotiated between the League and the NFL Players' Association, do not address or otherwise create obligations of the NFL to disclose the risks associated with, prevent, or treat concussions or brain injuries incurred by present or former NFL players. Nor did any CBA deal with the creation or operation of the Mild Traumatic Brain Injury Committee ("MTBI Committee," sometimes also referred to in press reports as the "Concussion Committee"), which was created by the NFL's own initiative and voluntary undertaking in 1994. The "experts" who functioned on the MTBI Committee operated independently of any CBA and were not a party to any CBA. To the extent that the NFL or its agents (including, but not limited to, the MTBI and its members) issued pronouncements, assurances or warnings about the dangers or risks of concussions, they have done so independently of any CBA.

48.     The League's disinformation campaign was spearheaded by its MTBI Committee, which was chaired from 1994 to February of 2007 by Dr. Elliott Pellman ("Pellman"), a rheumatologist who reportedly attended medical school in Guadalajara, Mexico. Dr. Pellman worked with two other scientists on the MTBI Committee—Dr. Ira Casson ("Casson"), a neurologist, and Dr. David Viano ("Viano"), a biomechanical engineer—to attempt to discredit a slew of scientific studies that linked head impacts and concussions received by NFL players to brain injuries. Drs. Casson and Viano replaced Dr. Pellman as co-chairs of the MTBI Committee in February 2007.

49.     Since 1994, the MTBI Committee had been conducting a study to determine the effect of concussions on the long-term health of retired NFL players. In a November 2007 report

to Congress, NFL Commissioner Roger Goodell ("Goodell") said that the MTBI Committee's

study was in its "initial" data collection phase and that "[w]e do not know when this study will

be completed, although it is likely that a comprehensive study will require at least several years

of research and analysis."

50.    In October of 2006, Drs. Pellman and Viano published in *Neurological Focus* an

interim report on the MTBI Committee's efforts that surveyed 12 years of data collection. The

authors analyzed collected "data on mild TBIs sustained between 1996 and 2001" and concluded

that:

> **[B]ecause a significant percentage of players returned to play
> in the same game [as they suffered a mild traumatic brain
> injury] and the overwhelming majority of players with
> concussions were kept out of football-related activities for less
> than 1 week, it can be concluded that mild TBIs in professional
> football are not serious injuries.** (Emphasis added).

51.    As explained further below, this conclusion was against the weight of the

scientific evidence, a fact that the members of the MTBI Committee well knew; it was also based

on biased data collection techniques.  As ESPN reported in February of 2007:

> **Last fall, ESPN The Magazine reported that Pellman was
> selective in his use of injury reports in reaching his conclusions
> and omitted large numbers of players from the league's
> concussion study. His findings also contradicted other scientific
> studies into the effects of concussions:**
>
> **• In January 2005, Pellman and his colleagues wrote that
> returning to play after a concussion "does not involve
> significant risk of a second injury either in the same game or
> during the season." But a 2003 NCAA study of 2,905 college
> football players found just the opposite: Those who have
> suffered concussions are more susceptible to further head
> trauma for seven to 10 days after the injury.**
>
> **• Pellman, a rheumatologist, and his group have also stated
> repeatedly that their work shows "no evidence of worsening
> injury or chronic cumulative effects of multiple [mild
> traumatic brain injury] in NFL players." But a 2003 report by**

- 21 -

> **the Center for the Study of Retired Athletes at the University of North Carolina found a link between multiple concussions and depression among former pro players with histories of concussions. And a 2005 follow-up study at the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.** (Emphases added).

52.    The concerns about head injuries associated with the playing of football— and the refusal to recognize those concerns by those in charge of the game—have a long history. On Monday, February 1st, 2010, Dr. Bennet Omalu ("Omalu"), Co-Director of the Brain Injury Institute at West Virginia University, spoke before members of the House Judiciary Committee at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football." In his prepared testimony, he explained:

> Glenn Pop Warner [1871 – 1954] founded the Pop Warner youth football league in 1929. He still remains one of the greatest football coaches in the history of American football. The single event, which necessitated the use of pads and helmets by football players, took place in 1888 when the annual rules convention for the emerging sport of college football passed a rule permitting tackling below the waist.

> "Football changed dramatically. Teams no longer arrayed themselves across the entire breath of the field. Teams bunched themselves around the runner to block for him. The wedge and mass play arrived. Football became, for a time, a savage sport full of fights, brawling, even fatalities."

> **In 1912, Pop Warner said: "Playing without helmets gives players more confidence, saves their heads from many hard jolts, and keeps their ears from becoming torn or sore. I do not encourage their use. I have never seen an accident to the head which was serious, but I have many times seen cases when hard bumps on the head so dazed the player receiving them that he lost his memory for a time and had to be removed from the game."**

> We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub- concussions both have the capacity to cause permanent brain damage. During practice and during

- 22 -

games, a single player can sustain close to one thousand or more
hits to the head in only one season without any documented or
reported incapacitating concussion. Such repeated blows over
several years, no doubt, can result in permanent impairment of
brain functioning especially in a child. (Footnotes omitted;
emphases added).

53.     The scientific evidence on concussions and subsequent brain disease in boxing

and other sports has been mounting, but for a long period, the NFL attempted to deny, discredit,

and ignore it.

54.     The risk of repeated head impacts in certain sports and brain disease has been

understood for decades.  In 1928, a New Jersey pathologist, Harrison Martland, described the

clinical spectrum of abnormalities found in "nearly one half of the fighters who stayed in the

game long enough."  Follow-up studies on encephalopathy and repeated head impacts in sport

were published in 1952.  The risk of second impacts (Second Impact Syndrome) in sport was

identified in 1973.  It was also clear by the 1970's that the patterns of neuro-degeneration

associated with head impacts in boxing also occurred in other sports.

55.     From 1931 to 2006, the National Center for Catastrophic Sport Injury Research

has reported 1,006 direct and 683 indirect fatalities resulting from participation in all organized

football in the United States; the annual number of indirect fatalities has remained near 9.0 per

year.

56.     A 1994 Ball State University survey found that "players in the 1980s suffered

serious injuries and underwent operations at twice the rate of those who played in the 1950s or

earlier."

57.     A study presented at the American Academy of Neurology's 52nd Annual

Meeting in 2000 and authored principally by Dr. Barry Jordan, Director of the Brain Injury

Program at Burke Rehabilitation Hospital in White Plains, New York, surveyed 1,094 former

- 23 -

NFL players between the ages of 27 and 86 and found that: (a) more than 61% had suffered at least one concussion in their careers with 30% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16 % were unable to dress themselves; and 11% were unable to feed themselves; and (e) eight suffered from Alzheimer's disease.

58.     A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athlete Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.

59.     A series of important studies emanated from the University of North Carolina ("UNC"), which were attacked by members of the NFL's MTBI Committee.

60.     A 2000 UNC study found that in the period between 1977 and 1998, an annual average of 13 athletes had suffered catastrophic injuries (primarily permanent paralysis) as the direct result of participation in football. The study also found that between 1977 and 1998, 200 football players received a permanent cervical cord injury, and 66 sustained a permanent cerebral injury." As reported in *Science Daily*:

> The study, published in the September-October issue of the American Journal of Sports Medicine, suggests that the brain is more susceptible to injury when it has not had enough time to recover from a first injury. Researchers say the finding is important because concussions can lead to permanent brain damage, vision impairment or even death if not managed properly.
>
> **"We believe recurrences are more likely because injured players are returning to practice and to games too quickly after blows to the head," said Dr. Kevin M. Guskiewicz, assistant professor of exercise and sport science at UNC-CH**

- 24 -

**and study leader. "Many clinicians are not following the medical guidelines that players should be symptom-free for several days before returning."** (Emphases added).

61.     A 2003 study partially authored by the aforementioned Dr. Kevin Guskiewicz ("Guskiewicz") of UNC analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression.  The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

62.     In November of 2003, Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research. Pellman, who was also going to be on the show, called Guskiewicz.  "I had never spoken with him before, and he attacked me from the get-go," Guskiewicz said.  "He questioned whether it was in my best interest to do the show. He was a bull in a china shop."  **On the program, Pellman said unequivocally, "[w]hen I look at that study, I don't believe it."** (Emphasis added).

63.     In 2005, Guskiewicz did a follow-up to his 2003 study and found that retired NFL players who sustained three or more concussions had a fivefold greater likelihood of suffering Mild Cognitive Impairment ("MCI") than retired NFL players who had no history of concussions. Guskiewicz based his conclusions on a survey of over 2,550 former NFL players. **Dr. Mark Lovell ("Lovell") of the NFL's MTBI Committee asserted that Guskiewicz's study lacked "scientific rigor" and that one couldn't tell anything from a survey.**  (Emphasis added).

64.     **"Pellman's committee has repeatedly questioned and disagreed with the findings of researchers who didn't come from their own injury group," said Julian Bailes, Chairman of Neurosurgery at West Virginia University.**  (Emphasis added).

65.     The MTBI Committee decided to respond to these types of studies by presenting biased research derived from its ongoing survey of retired NFL players.  *ESPN The Magazine* described what happened:

> In October 2003, Pellman and members of his committee published the first of a long-running series on concussions in Neurosurgery, a scholarly journal edited by Mike Apuzzo, the New York Giants' neurosurgical consultant. The committee's earliest studies used crash test dummies to reenact helmet blows. Later, the group decided to explore the ill effects of multiple concussions, and Pellman charged one of its members, Mark Lovell, head of the University of Pittsburgh Medical Center's Sports Medicine Concussion Program, to oversee the collection and analysis of leaguewide data.  Pellman chose Lovell because he had conducted neuropsychological tests for the Steelers as early as 1993. And in 1995, Lovell began to run the NFL's neuropsychology program, which encouraged teams to gather data to help decide when to return players to games. Using the information they would obtain, Pellman, Lovell and the committee planned to look at baseline results and identify a normal range of scores for uninjured NFL players.  Then, comparing postinjury scores to baseline data would show the effects of concussions. Comparing data from players with multiple concussions to that of all injured players would show whether concussive effects changed as injuries accumulated.
>
> **A lot was riding on the analysis.** The committee had never imposed recommendations on team medical staffs. **But this was the first study ever to analyze the brain function of NFL athletes. If it showed that concussions were significantly impairing players, the league might be forced to institute new rules for evaluating and treating head injuries.** Pellman and Lovell both say they invited all teams to participate in the research (Lovell says 11 teams elected to join the study) and tried to collect as many results as they could. As Lovell puts it, "More data is always better." **Several of the doctors involved,  however, tell a different story.**  [William] Barr [a europsychologist at Long Island Jewish Hospital], for example, conducted 217 baseline tests from 1996 to 2001. Periodically, he forwarded results to the league, but at the time Barr learned the committee was planning to publish its results, he had sent only 149. Barr remembers finding Pellman in the Jets' training room in 2003 and saying, "Elliot, I haven't sent data for a year." **According  to  Barr, Pellman didn't want the additional tests.** "I don't want the data to be biased because I'm with the Jets," Barr recalls him saying, suggesting that additional results would skew the data because the Jets would be

overrepresented in the sample. **That made no sense to Barr. A scientific study should include, or at least address, all available data.**

Pellman denies this conversation ever took place. "Bill Barr was a consultant for the Jets who tested individual players to help us make decisions," he says. "I did not discuss the committee's research with him." **Whoever is right, the fact is the group didn't have all of Barr's data for its paper.**

Barr's wasn't the only research that didn't make the cut. Over the period covered by the committee's research, Christopher Randolph, a Chicago neuropsychologist, collected baselines for 287 Bears players. **He says Lovell never asked for his data, either.**

**Nor did the committee seek complete data from John Woodard, neuropsychologist for the [Atlanta] Falcons** and associate psychology professor at the Rosalind Franklin University of Medicine and Science in North Chicago. According to Woodard, in December 2003, Lovell said the league was pressuring him to compile team results. "I was asked to provide data on only concussed players," Woodard says. "I had data for slightly more than 200 baseline evaluations. I don't know why I was not asked for them."

In 2004, Lovell also asked Richard Naugle, consultant to the Browns and head neuropsychologist at the Cleveland Clinic, for data on just the players who had already suffered concussions, according to an e-mail Naugle wrote to a colleague in March 2005. Naugle declined to comment for this story, citing a confidentiality deal between his medical group and the NFL, but The Magazine has obtained a copy of that message. "I don't have that sorted out from the results of other testing," Naugle wrote of the request. "I explained that and added that if he could name players, I could send data on those individuals. I recall sending him data on two or three players … I have a few hundred baselines."

**This means Pellman, Lovell and their colleagues didn't include at least 850 baseline test results in their research—more than the 655 that ultimately made it into their 2004 Neurosurgery paper. At best, their numbers were incomplete. At worst, they were biased.**

\*\*\*\*

Pellman, Lovell and their colleagues published their sixth paper in *Neurosurgery* in December 2004. It examined baseline data on 655

- 27 -

players and results for 95 players who had undergone both baseline testing and postconcussion testing. It concluded that NFL players did not show a decline in brain function after suffering concussions. Further analysis found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.

**The paper didn't explain where the players in the groups came from specifically or why certain players were included and hundreds of others were not. Neither Pellman nor Lovell has provided those details since.** (Emphases added).

66.     Scientists concurred with this assessment.  As the *ESPN The Magazine* article noted:

The decision to publish the paper was controversial. **"I highly doubt this study would have seen the light of day at this journal were it not for the subject matter of NFL players,"** says Robert Cantú, chief of neurosurgery and director of sports medicine at Emerson Hospital in Concord, Mass., and a senior editor at Neurosurgery. **"The extremely small sample size and voluntary participation suggest there was bias in choosing the sample.  The findings are extremely preliminary at best, and no conclusions should be drawn from them at this time."**

One of the scientists who reviewed the committee's work is equally blunt. **"They're basically trying to prepare a defense for when one of these players sues,"** he says. **"They are trying to say that what's done in the NFL is okay because in their studies, it doesn't look like bad things are happening from concussions. But the studies are flawed beyond belief."** (Emphases added).

67.     Dr. Guskiewicz was also quoted as saying, **"[t]he data that hasn't shown up makes their work questionable industry-funded research."** (Emphasis added).

68.     Dr. Pellman was not the only NFL hired gun peddling disinformation about head impacts or concussions and brain injuries.  Drs. Casson and Viano of the NFL's MTBI Committee were playing a similar role, assisted by Lovell.

69.     Between 2005 and 2007, Dr. Omalu and Dr. Robert Cantu ("Cantu"), Co-Director for the Center for the Study of Traumatic Encephalopathy ("CSTE") at the Boston

- 28 -

University School of Medicine ("BUSM"), examined the brain tissue of three deceased NFL

players: (a) Mike Webster ("Webster") of the Pittsburgh Steelers, who died of heart failure at the

age of 50; (b) Terry Long ("Long") of the Pittsburgh Steelers, who died at 45 after drinking

antifreeze; and (c) Andre Waters ("Waters") of the Philadelphia Eagles and Arizona Cardinals,

who committed suicide at the age of 44. All three of these individuals suffered multiple

concussions during their respective NFL careers. All three exhibited symptoms of sharply

deteriorated cognitive functions, paranoia, panic attacks, and depression. In articles published in

Neurosurgery in 2005 and 2006, Dr. Omalu found that Webster's and Long's respective deaths

were partially caused by CTE, related to multiple NFL concussions suffered during their

professional playing years. Cantu reached a similar conclusion as to Waters in an article

published in Neurosurgery in 2007.

70.     The following photographs, available from Brain-Pad Blog, show the contrast

between a normal brain (depicted on the left) and Webster's autopsied brain (depicted on the

right):



71.     In response to Dr. Omalu's article on Webster, Dr. Casson of the NFL's MTBI

Committee wrote a letter in July of 2005 to the editor of *Neurosurgery* asking that Omalu's

article be retracted as unreliable.

72.     In 2008, Dr. Ann McKee ("McKee") of the CSTE at BUSM examined the brain

tissue of two other deceased NFL players: (a) John Grimsley ("Grimsley") of the Houston Oilers,

who died of a gunshot wound at the age of 45; and (b) Tom McHale ("McHale") of the Tampa

Bay Buccaneers, the Philadelphia Eagles and the Miami Dolphins, who died of a drug overdose

at the age of 45.  McKee found that Grimsley and McHale's brain tissue exhibited indications of

CTE.  As she stated, **"the easiest way to decrease the incidence of CTE [in contact sport**

**athletes] is to decrease the number of concussions."** (Emphasis added).  She further noted that

"[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

A *Washington Post* article published in early 2009 reported the following comments by McKee

with respect to her analysis of McHale's brain:

> "Is this something that happened by chance?" asked Ann McKee, a
> neuropathologist at Boston University pointing to pictures of
> McHale's brain that she said resembled that of a 72-year-old boxer.
> **"I can tell you I've been looking at brains for 22 years, and this**
> **is not a normal part of aging. This is not a normal part of the**
> **brain."** (Emphasis added).

73.     In response to McKee's studies, Dr. Casson continued his campaign of NFL-

sponsored disinformation by characterizing each as an isolated incident from which no

conclusion could be drawn and said he would wait to comment further until Dr. McKee's

research was published in a peer-reviewed journal.  When it was so published in 2009,  Dr.

Casson asserted that **"there is not enough valid, reliable or objective scientific evidence at**

**present to determine whether...repeat head impacts in professional football result in long[-**

**]term brain damage."** (Emphasis added).

74.     The increasing controversy drew the attention of Congress. On June 23, 2007,

hearings on the NFL's compensation of retired players were held before the Commercial and

Administrative Law Subcommittee of the Judiciary Committee of the United States House of

Representatives ("C&A Subcommittee").  Goodell was one of those who testified at this hearing.

In follow-up responses to the C&A Committee that Goodell sent in November of 2007, he

continued to rely on the discredited survey research being undertaken by the MTBI Committee.

- 30 -

75.     In response to these hearings and associated media reports, the League scheduled

a Concussion Summit in June of 2007.  Independent scientists, including Drs. Omalu, Cantu and

Guskiewicz, presented their research to League and to representatives of the NFLPA. As one

contemporaneous news article reported:

> "I'm not even sure we athletes know what a concussion is," said
> safety Troy Vincent, who also is president of the NFL Players
> Association. "Outside of being knocked out, I stayed in the game."
>
> . . . .
>
> **The NFL commission, after reviewing five years of on-field
> concussions, found no evidence for an increase in
> secondary brain injuries after a concussion, a conclusion
> that has met with skepticism.**
>
> "Science is very clear that returning guys to play in the same game,
> or quickly within a few days, contributes to neuron loss and long-
> term problems," said former pro wrestler Christopher Nowinski,
> who retired after repeated concussions and has written a book on
> the controversy. "With the NFL being both the only and most
> prominent voice to say it doesn't exist, it slows down acceptance
> and adoption of policies to reduce risk."
>
> **While the NFL commission has focused on short-term effects
> of concussions, recent findings suggest players may suffer
> depression, dementia and other symptoms later in life.**
> (Emphases added).

76.     The result of this conference was a complete whitewash by the NFL of the

problem.  The League issued a press release and pamphlet to players on August 14, 2007.  It

stated that:

> **Current research with professional athletes has not shown that
> having more than one or two concussions leads to permanent
> problems…. It is important to understand that there is no
> magic number for how many concussions is too many.**
> (Emphasis added).

77.     This act of denial and deception was consistent with the positions taken by NFL

doctors Pellman, Casson, Lovell, and Viano as described above.

- 31 -

78.     In November of 2008, NFL spokesman Greg Aiello ("Aiello") sounded a similar theme, saying to the press **that "[h]undreds of thousands of people have played football and other sports without experiencing any problem of this type and there continues to be considerable debate within the medical community on the precise long-term effects of concussions and how they relate to other risk factors."** (Emphasis added).  He neglected to mention that the debate was principally between the scientists being paid by the League and scientists operating independently of the League.

79.     The disingenuous nature of the NFL position was exposed on September 10, 2009, when the University of Michigan's Institute for Social Research published a study of retired NFL players commissioned by the NFL Player Care Foundation.  The study found that retired NFL players are diagnosed with Alzheimer's disease or similar medical conditions far more often than the national population—including a rate of 19 times the normal incidence for men aged 30 through 49.

80.     Despite these findings from a study that the League sponsored, the NFL continued to deny publicly any link between concussions on the playing field and dementia.  A September 29, 2009 *New York Times* article reported as follows:

> **An N.F.L. spokesman, Greg Aiello, said in an e-mail message that the study did not formally diagnose dementia, that it was subject to shortcomings of telephone surveys and that "there are thousands of retired players who do not have memory problems."**
>
> "Memory disorders affect many people who never played football or other sports," Mr. Aiello said. "We are trying to understand it as it relates to our retired players."
>
> As scrutiny of brain injuries in football players has escalated the past three years, with prominent professionals reporting cognitive problems and academic studies supporting a link more generally, the N.F.L. and its medical committee on concussions have steadfastly denied the existence of reliable data on the issue. The

- 32 -

league pledged to pursue its own studies, including the one at the University of Michigan.

**Dr. Ira Casson, a co-chairman of the concussions committee who has been the league's primary voice denying any evidence connecting N.F.L. football and dementia, said: "What I take from this report is there's a need for further studies to see whether or not this finding is going to pan out, if it's really there or not. I can see that the respondents believe they have been diagnosed. But the next step is to determine whether that is so."**

The N.F.L. is conducting its own rigorous study of 120 retired players, with results expected within a few years. All neurological examinations are being conducted  by Dr. Casson. (Emphases added).

81.     After the publication of the University of Michigan study, the House Judiciary

Committee commenced an inquiry into "Legal Issues Relating To Football Head Injuries," and

held its first hearing on October 28, 2009.  Representative John Conyers ("Conyers")

summarized the evidence:

**There appears to be growing evidence that playing football may be linked to long-term brain damage.** For example, a 2003 University of North Carolina study found that professional players who suffered multiple concussions were three times more likely to suffer clinical depression than the general population. A follow- up study in 2005 showed NFL players suffering concussions had five times the rate of cognitive impairment. And retired players were 37 percent more likely to suffer from Alzheimer's than the population as a whole. Earlier this year, the University of Michigan released a study that found that 6.1 percent of NFL players over 50 years of age reported they had received a dementia-related diagnosis—a statistic five times higher than the national average. Players age 30 through 49 showed a rate of 1.9 percent of dementia-related diagnosis 19 times that of the national average.

\*\*\*\*

The National Football League is performing its own long-term study, **and has largely sought to discredit these reports or some of the conclusions drawn from some of these reports. The football league described the reports as flawed.**

- 33 -

> **Dr. Ira Casson, the co-chair of the NFL's Mild Traumatic Brain Injury Committee, denied the linkage on six separate occasions. When asked whether there was any linkage between playing football and CTE, Dr. Casson stated that it has never been scientifically, validly documented. The league said the recent University of Michigan study was flawed and that further study was necessary.** The *New York Times* data released last week was, they said, for self-promotional and lobbying purposes of the union. Given there is no consensus between the league and its players and the medical community about the causes of these cognitive disorders, it should come as no surprise there is little agreement about how to respond. (Emphases added).

82.     Representative Linda Sanchez ("Sanchez"), who had participated in the 2007 hearings mentioned earlier, was present and stated:

> **There are increasing studies and a body of evidence that show that there is a significant risk to individuals who suffer repeated head trauma, whether it's in the NFL, in professional boxing, or even high school sports, and while there are those here today who will argue against the validity of some of these studies, there appears to be a preponderance of evidence that a number of professional athletes who suffer repeated head trauma experience physical and mental decline earlier than the general population at large, and it would seem to me—and I stated this to Commissioner Goodell at the last hearing that we held that it would be better for the NFL and the NFLPA to be proactive in alerting its players to the risks that they face, and it's my hope that in the discussion that we have here today, the NFL and the NFLPA will make continued improvements in educating players on the dangers they face by playing with a concussion, treating those athletes appropriately who do have concussions, and removing the stigma that pressures players to play through the injury, and one of the most recent quotes that was heard on November 29th, 2009, was an interview during the pregame show before the Steelers' matchup with the Ravens when somebody said, basically, that he had been dinged up and got right back into the game and that, you know, just because somebody's having headaches, pretty much the quote is, you know, they need to suck it up and continue to play on, and the fact of the matter is that sucking it up and continuing to play on may mean very serious and grave consequences down the line.**

> Many witnesses that we have had before the Committee have testified about how the NFL, like it or not, influences the lower

levels of football, and the actions that they take or the actions that
they choose to ignore to take have significant impact on players at
lower levels. The NFL, quite frankly, has vast resources available
to its disposal to educate coaches and players and medical
personnel on the proper way to handle a concussed player, and if
they have all these resources available to them and are not
addressing the problem, imagine how can we expect every high
school or college to be able to properly treat a concussed player if
that proper action isn't being taken at the very top levels of the
sport? (Emphases added).

83.     Despite this overwhelming evidence, Roger Goodell refused to answer questions

of whether NFL-related concussions led to cognitive decline among retired players.  The

Judiciary Committee played a televised interview of Dr. Casson denying any links between NFL

players' multiple head injuries and subsequent cognitive deterioration. The widely-publicized

videoclip can be found at <http://www.youtube.com/watch?v=R4NbU_HaB3Y>.

84.     Representative Sanchez pressed the issue with Mr. Goodell during his testimony

as follows:

Now, the question that I have for you is, I am a little concerned,
and I hear the concern expressed by some of the witnesses on the
panel today, that **the NFL sort of has this kind of blanket denial
or minimizing of the fact that there may be this, you know,
link. And it sort of reminds me of the tobacco companies pre-
1990's when they kept saying no, there is no link between
smoking and damage to your health or ill health effects. And
they were forced to admit that that was incorrect through a
spate of litigation in the 1990's.** And my question to you is
wouldn't the league be better off legally, and wouldn't high school
and college football players be better off, if instead of trying to
minimize this issue, the league took the opposite perspective and
said, look, even if there is a risk, however minuscule, that there
may be this link, so we really need to jump on top of it and make
kids and parents aware of this so that there isn't this sort of sense
that the NFL is really just slow walking the issue to death by
saying, well, we have been studying the issue for 15 years, we are
going to maybe study it another 15 more years, when there is
already non-NFL paid for research that suggests that there is this
very high correlation with cognitive impairment? Don't you think
the league, you know, would be better off legally, and that our
youth might be a little bit better off in terms of knowledge, if you

- 35 -

guys just embraced that there is research that suggests this and admitted to it? (Emphases added).

Mr. GOODELL. Well, Congresswoman, I do believe that we have embraced the research, the medical study of this issue. As you point out——

Ms. SANCHEZ. You are talking about one study, and that is the NFL's study. You are not talking about the independent studies that have been conducted by other researchers. Am I correct in stating that?

Mr. GOODELL. I am not sure of your question.

Ms. SANCHEZ. There are other studies, research in dementia and CTE that show that there is a link. But again the league seems to downplay that and say, well, you know, we are conducting our own study and, you know, when we have that study completed then we will know.

Mr. GOODELL. No, I think what we are doing is because we have to a large extent driven this issue by making sure that we have medical professionals studying this issue. I am not a medical professional.

\*\*\*\*

[Ms. SANCHEZ.] So my question is why are you even going through, you know, the charade of presenting the final analysis of going through this study if the determination, in my opinion, has already been made by Dr. Casson and, you know, is denied in the pamphlet that they hand out to NFL players?

Mr. GOODELL. Well, first let me say I do not, and I think you stated that he is the only one examining these patients and the findings. That is not correct.

Ms. SANCHEZ. He is not controlling the examinations or the findings?

Mr. GOODELL. I would not say he is controlling that at all, no.

Ms. SANCHEZ. He is participating in it, though.

Mr. GOODELL. I do not know if he is participating in the examinations. I can find that out.

1092635.1

Ms. SANCHEZ. And he has been a consultant to the NFL, is that correct?

Mr. GOODELL. He has been on our MTBI committee for several years, yes.

Ms. SANCHEZ. **And some of the people who are participating in this study have other conflicts of interest. You know, one of the committee members on the concussion committee owns the company that makes and markets, mainly through its use by most of the NFL teams, the neuropsychological test that is used in the study. Isn't that true?**

Mr. GOODELL. I don't know the answer to that question, but I will find out for you.

\*\*\*\*

**Ms. SANCHEZ. My suggestion would be, and my time has expired, but my suggestion would be that instead of having NFL-connected consultants and doctors, that perhaps the true findings of a truly unbiased study would be better conducted by people who have not been on the payroll or not been retained by the NFL in any capacity.** (Emphases added).

85.     The NFL thereafter reacted to this barrage of criticism by having Dr. Casson and Dr. Viano, who had replaced Dr. Pellman as co-chairs of the MTBI Committee, resign, and suspending that Committee's research. The League also pledged to donate a paltry $1 million to subsidize the CSTE's research on CTE.

86.     On December 2, 2009, Mr. Goodell announced an update on concussion guidelines for the League's players. The statement outlined several changes. First, players who sustained a concussion should not return to practice or game play the same day if the following signs or symptoms are present: loss of consciousness, confusion, amnesia or other memory problems, abnormal neurological exam, new and persistent headache, or any other persistent concussion signs. Second, if a player is held from a game, clearance for return to play should be determined by both the team physician and an independent neurological consultant. Return to

play should not be considered until the athlete is asymptomatic, both at rest and with exertion, has a normal neurological exam, and has normal neuropsychological testing.  The NFL subsequently clarified that primary sports care physicians could be treated as independent neurological consultants.

87.     Greg Aiello, the League spokesperson who had made staunch denials of the link between concussions and brain injury as late as September of 2009, made the following admission in a December 20, 2009 interview with a reporter for the *New York Times*:

> **After weeks of transforming its approach to concussions and its research into their long-term effects among players, the N.F.L. not only announced Sunday that it would support research by its most vocal critics but also conceded publicly for the first time that concussions can have lasting consequences.**
>
> "It's quite obvious from the medical research that's been done that concussions can lead to long-term problems," the league spokesman Greg Aiello said in a telephone interview.  He was discussing how the league could donate $1 million or more to the Center for the Study of Traumatic Encephalopathy at Boston University, whose discoveries of brain damage commonly associated with boxers in the brains of deceased football players were regularly discredited by the N.F.L.
>
> **Told that his statement was the first time any league official had publicly acknowledged any long-term effects of concussions, and that it contradicted past statements made by the league, its doctors and literature currently given to players, Aiello said: "We all share the same interest. That's as much as I'm going to say."**
>
> Since an Oct. 28 hearing before the House Judiciary Committee, when the league's approach to science was compared to that of the tobacco industry, the N.F.L. has accepted the resignations of the co-chairmen of its concussion committee and overhauled its policies toward concussion management. Players now must be cleared by brain-injury experts unaffiliated with the team, and cannot return to a game or practice in which they have shown any significant sign of concussion.
>
> The second rule has since been recommended by an N.C.A.A. committee as standard policy for athletes in all sports, and will be

considered by several state legislatures that have bills governing high school athletics before them.

The recent changes by the N.F.L. had amounted to tacit acknowledgments that it was no longer able to defend a position that conflicted with nearly all scientific understanding of head trauma.

**Until recently, the league and its committee on concussions had consistently minimized evidence testifying to the risks of repeated brain trauma in N.F.L. players—from researchers like those at Boston University, to phone surveys the league itself commissioned, to demographic analysis of players known to have early-onset dementia. While discrediting such evidence, a pamphlet on concussions currently given to players states, "Research is currently underway to determine if there are any long-term effects of concussion in N.F.L. athletes."**

That research study, conducted by the N.F.L.'s committee on concussions, was recently suspended amid strong criticism of its design and execution by outside experts, players and members of Congress.

"Mr. Aiello's statement is long overdue — it's a clear sign of how the culture of football has changed in recent months," Dr. Robert Stern, a co-director of the Boston University center and its Alzheimer's Disease Clinical and Research Program, said in a telephone interview.

"There is no doubt that repetitive blows to the head result in long-term problems in the brain, including progressive dementia. With the N.F.L. taking these recent actions, we are finally at a point to move forward in our research and ultimately solve this important problem — for professional athletes and collegiate and youth players." (Emphases added).

88.     In March of 2010, the MTBI Committee got a new name and new co- chairs.  It

was rechristened as the Head, Neck and Spine Medical Committee, and became jointly chaired

by Dr. H. Hunt Batjer ("Batjer") of Northwestern Memorial Hospital, and Dr. Richard

Ellenbogen ("Ellenbogen") of Harborview Medical Center in Seattle. Drs. Batjer and Ellenbogen

replaced Drs. Casson and Viano, who in turn had replaced Dr. Pellman.

- 39 -

89.     In a May 2010 Congressional hearing, Representative Anthony Weiner addressed Drs. Batjer and Ellenbogen as follows: **"[y]ou have years of an infected system here, [and] your job is...to mop [it] up."** (Emphasis added).

90.     Drs. Batjer and Ellenbogen conceded in June of 2010 that the League's efforts with respect to concussions and brain injury were riddled with duplicity, conflicts of interest and shocking ineptitude.  As was reported in a June 1, 2010 *New York Times* article:

> **They accused a fellow doctor of minimizing solid evidence of the dangers of football concussions. They concurred that data collected by the N.F.L.'s former brain-injury leadership was "infected," said that their committee should be assembled anew, and formally requested that the group's former chairman, Dr. Elliot Pellman, not speak at a conference Wednesday.**
>
> For the first time these remarks came not from outside critics of N.F.L. research but from those now in charge of it — Dr. H. Hunt Batjer and Dr. Richard G. Ellenbogen, prominent neurosurgeons who became co-chairmen of a new league committee in March. One week after two members of Congress accused the doctors of sounding too much like their predecessors, and on the eve of a league-sponsored symposium in Washington held by Johns Hopkins Medicine, Batjer and Ellenbogen made clear they planned to chart a new course.
>
> The two doctors criticized Johns Hopkins's promotional brochure for Wednesday's conference — which was open only to N.F.L. medical personnel, other doctors and members of the United States Department of Defense — for playing down existing evidence of brain damage in retired football players.
>
> The opening paragraph described the disease chronic traumatic encephalopathy as "now being reported in football players, although with unknown frequency." It added that these and related matters had been reported by the news media "with considerable hype around assertions of long-term harm to players from head injuries."
>
> **Batjer and Ellenbogen said that the frequency of reports of C.T.E. in players is not unknown — a Boston University research group has diagnosed it in all 12 former college and N.F.L. players of various ages it had tested for the condition.**

- 40 -

**"They aren't assertions or hype — they are facts," said Ellenbogen, the chief of neurological surgery at Harborview Medical Center in Seattle, who has been instrumental in drafting legislation to protect young athletes from head injuries.**

He added: "Doctors were relatively ineffectual for 25 years on this issue. Then it's on the front page and everything focuses like a laser beam and things begin to change from baby steps to giant steps forward protecting kids. From a doctor-patient perspective, it's been the single best thing that has happened to this subject."

Dr. Constantine G. Lyketsos, a professor of psychiatry and behavioral sciences at Johns Hopkins who is directing Wednesday's conference, said in a telephone interview that he wrote the brochure and that the N.F.L. had no role with the event, other than providing financing. He defended his choice of words.

"We know of 12 cases" of C.T.E., Lyketsos said. "We don't know how many don't have it."

Regarding news media coverage of the harm caused by repeated concussions in football players, Lyketsos said: "There is a concern that I have that the possibility of serious long-term consequences are being overemphasized without clear evidence. It could turn out correct. It could turn out incorrect. We don't know."

He added: "I worry that it might be a disservice. That's a possibility."

The league spokesman Greg Aiello declined to comment on Lyketsos's statements, other than saying that the league has given $1 million to the Boston University group to support its research.

The former leaders of the N.F.L. concussion committee generally agreed with Lyketsos, an attitude that ultimately came to the attention of Congress and led to several hearings on the subject of sports concussions in athletes of all ages. Batjer and Ellenbogen had a shaky debut before some frustrated members of the House Judiciary Committee during a forum in New York on May 24, but in the following days they made sure they would no longer resemble their predecessors.

**The doctors said the old committee's ongoing studies on helmets and retired players' cognitive decline — whose structure and data were strongly criticized by outside experts — would not be used in any way moving forward. They said**

- 41 -

they were influenced by a comment made to them last Monday by Representative Anthony D. Weiner, Democrat of New York: "You have years of an infected system here that your job is to some degree to mop up."

"The word 'infected' hit me right between the eyes," said Ellenbogen. He and Batjer became co-chairmen of the N.F.L. committee in March.

Batjer added: "We all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas that was not acceptable by any modern standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

Batjer said that he and Ellenbogen had begun reconstituting their committee from scratch. He said that six members had been selected so far, none of them holdovers from the prior regime.

The doctors so wanted to distance themselves from the past that on Monday they requested that Pellman, who was scheduled to deliver some opening remarks at the Johns Hopkins symposium, be removed from the program. Pellman was the chairman of the N.F.L. concussion committee from 1994 to 2007 and stayed on it until he resigned in March. He remains the league's medical director and helped with the conference's logistics.

On Tuesday, an e-mail message was distributed to conference organizers saying that Pellman would not attend the conference for family-related reasons.

"Neither Rich nor I thought he should appear to represent the N.F.L. in what would look like a leadership role," Batjer said. "It's not about Elliot. It's about a complete severance from all prior relationships from that committee." (Emphases added).

91.     As reported in a July 26, 2010 article in the *New York Times*, on June 10, 2010, the NFL issued a warning poster that was placed in the locker rooms of member clubs and was also turned into a pamphlet. A copy of the poster is reproduced below. It stands in stark contrast to the pamphlet issued by the League in April of 2007. This advice was never given previously

by the NFL and was certainly not given to players who retired prior to June of 2010. As the same

article went on to note:

> **The league's reversal is not necessarily complete. On April 30, an outside lawyer for the league, Lawrence L. Lamade, wrote a memo to the lead lawyer for the league's and union's joint disability plan, Douglas Ell, discrediting connections between football head trauma and cognitive decline. The letter, obtained by The New York Times, explained, "We can point to the current state of uncertainty in scientific and medical understanding" on the subject to deny players' claims that their neurological impairments are related to football.** (Emphases added).

- 43 -

 

# CONCUSSION

 

## A Must Read for NFL Players
### Let's Take Brain Injuries Out of Play

### Concussion Facts

Concussion is a *brain injury* that alters the way your brain functions

Concussion can occur from a blow to the head/body:
- following helmet to helmet contact, and / or
- contact with the ground, object or another player

Most concussions occur *without* being knocked unconscious

Severity of injury depends *on many factors* and is not known until symptoms resolve and brain function is back to normal

*All concussions are not created equally.* Each player is different, each injury is different and *all injuries* should be evaluated by your team medical staff

### Concussion Symptoms

*Different symptoms can occur and may not show up for several hours.* Common symptoms include:

- Confusion
- Headache
- Amnesia / Difficulty remembering
- Balance problems
- Irritability
- Dizziness
- Difficulty concentrating
- Nausea

- Feeling sluggish, foggy or groggy
- Sensitivity to noise
  - Sensitivity to light
- Double / fuzzy vision
- Slowed reaction time
- Feeling more emotional
- Sleep disturbances
- Loss of consciousness

*Symptoms may worsen with physical or mental exertion (e.g. lifting, computer use, reading)*

### Why Should I Report My Symptoms?

- Practicing or playing while still experiencing symptoms can prolong the time to recover and return to play.
- Unlike other injuries, there may be significant consequences of "playing through" a concussion. Repetitive brain injury, when not treated promptly and properly may cause permanent damage to your brain.

### What Should I Do If I Think I've Had a Concussion?

**Report it.** Never ignore symptoms even if they appear mild. Look out for your teammates. Tell your Athletic Trainer or Team Physician if you think you or a teammate may have had a concussion.

**Get Checked Out.** Your team medical staff has your health and well being as its first priority. They will manage your concussions according to NFL / NFLPA Guidelines which include being fully asymptomatic, both at rest and after exertion, having a normal neurologic examination, normal neuropsychological testing, and clearance to play by both the team medical staff and the independent neurologic consultant.

**Take Care of Your Brain.** According to the CDC*, "traumatic brain injury can cause a wide range of short– or long term changes affecting thinking, sensation, language , or emotions". These changes may lead to problems with memory and communication , personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever.

  

Work smart. Use your head, don't lead with it. Help make our game safer. Other athletes are watching...

 

*for more information about traumatic brain injury and concussion, go to http://www.cdc.gov/concussion

- 44 -

92.     Yet even after this new warning, NFL players are still going out on the field after receiving significant concussions. In a September 19, 2010 posting by Sam Donellon on philly.com, it was noted:

> A THOUSAND pardons. For the game plan, for the execution, for the ever-present "Not putting the guys in the right places" to succeed during Sunday's 27-20 loss to the Green Bay Packers.
>
> [Philadelphia Eagles Head Coach] Andy Reid issued his familiar post-loss mea culpas yesterday, vowing to "tighten up" special teams play, execution particularly on offense, and even his play-calling.
>
> The only thing he didn't apologize for was how, or why, two of his stars were allowed to re-enter the game after getting concussed Sunday afternoon at Lincoln Financial Field.
>
> That's because in his mind, and apparently in the minds of too many still involved in the NFL, he and his medical staff did what it was supposed to do in the cases of Stewart Bradley and Kevin Kolb. Asked all the right questions, got all the right answers, sent both back into a game even after both had displayed, for a national audience to see, evidence of head trauma.
>
> To wit:
>
> Kolb lying face down for several seconds before rising slowly, grass hanging from his facemask, walking slowly from the field;
>
> Bradley bouncing up after an inadvertent knee-to-helmet hit, only to stumble back down to the ground, clearly disoriented.
>
> That's a key word, disoriented. It's used in those famous updated guidelines the NFL issued last December to teams regarding concussions in the wake of congressional hearings and some high-profile injuries, including the repeated concussions to former Eagle Brian Westbrook.
>
> "A player who suffers a concussion should not return to play or practice on the same day," said an NFL release on those guidelines, which lists among symptoms "Loss of consciousness" and "Confusion as evidenced by disorientation to person, time or place; inability to respond appropriately to questions; or inability to remember assignments or plays."

- 45 -

So what are we missing here? Reid said repeatedly Sunday, and again yesterday, that appropriate answers were given to questions. He said Kolb's inability to remember plays was only evident after he returned to play, and he was yanked after a three-and-out series.

But both men were clearly disoriented when they first reached their feet, and this is where we tread into the NFL's continued ambiguity over what it views as serious head trauma. Was Bradley's stumble due to poor balance or dizziness? The guidelines say poor balance necessitates removal, dizziness not necessarily so. But what's the difference and how the hell can anyone tell? Aren't they the same thing?

93.    As another example, the Concussion Blog reported on Austin Collie ("Collie"), a wide receiver who played for the Indianapolis Colts in 2010. Collie suffered a concussion in Week 9 of the regular season and was benched in Week 10. He returned in Week 11, and was withdrawn after playing part of that game because of "worsening symptoms." He was benched in Weeks 12-14, but returned in Week 15, only to receive yet another concussion. As Concussion Blog noted:

> NFL "Policy" indicates that a player will not return from a concussion unless they pass all tests. Therefore if Indianapolis followed the "policy" then Collie was cleared and passed all tests by Week 11, and his first concussion resolved. The reports of more/worsening symptoms after 1st half of Pats game indicates that he MUST have sustained a second concussion. Then upon returning this week that would have meant that he cleared all tests and AGAIN sustained a concussion, his THIRD. Let me be clear here, you can only "aggravate" a concussion if you have not recovered from the first. And a player SHOULD NOT be playing with an unresolved concussion, by "policy". . . . The Colts already re spinning this one, but no matter how you look at it they either failed the "policy" or knowingly put him back into action with a concussion. At the very least they misreported the second. If he were returned in Week 11 and "aggravated" it then he was not properly handled the first time.

94.    While these issues remain unresolved, retired NFL players continue to die from brain injuries caused during their time playing for the NFL. One example is provided by the case of Dave Duerson ("Duerson"), a former safety for the Chicago Bears and the New York Giants.

- 46 -

After suffering months of headaches, blurred vision and deteriorating memory, Duerson committed suicide at the age of 50 on February 17, 2011. His final note asked that his brain be given to the NFL brain bank for evaluation.

95.     On May 2, 2011, researchers at CTSE at Boston University reported that Mr. Duerson was suffering from CTE and released photographs of the autopsy of his brain. Examples of those photographs obtained from the website of CBS Chicago are reproduced below:



Dave Duerson

The top row of photographs depicts three half sections of Mr. Duerson's brain that exhibit multiple areas of damage (brown coloring) in the frontal and temporal cortex, hippocampus and amygdala. The bottom row of photographs depicts microscopic images from these damaged areas, showing severe neurodegeneration. As CBS Chicago reported:

> Dr. Robert Cantu, co-director of the CTSE, said at a news conference that such results normally are published first, but **the Duerson family wanted them released earlier.**
>
> **"It is our hope that through this research questions that go beyond our interests may be answered," The Duerson family said in a statement. "Questions that lead to a safer game of football, from professional to Pop Warner; Questions that lead to better diagnostic tests for those alive; and Questions that lead to a cure; will all hopefully be answered."** (Emphases added).

- 47 -

96.     When this information was reported, DeMaurice Smith, Executive Director of the NFLPA, stated that the fact that Duerson was suffering from CTE "makes it abundantly clear what the cost of football is for the men who played and the families. It seems to me that any decision or course of action that doesn't recognize that as the truth is not only perpetuating a lie, but doing a disservice to what Dave feared and what he wanted to result from the donation of his brain to science."

97.     Another example is provided by the case of John Mackey ("Mackey"), the former tight end of the Chicago Bears, who died in July of 2011.  Mackey was diagnosed with front-temporal dementia in 2007, forcing him to live full-time in an assisted living facility.  The NFLPA refused to pay a disability income to him because it claimed that there was no proven direct link between brain injury and NFL game participation. Ultimately, Mackey received payments under an NFL benefit plan, but they were far less than his family's costs.  Mackey made less than a total of $500,000 during his decade-long NFL career.  His wife, Sylvia, had to work as a flight attendant to supplement his NFL pension of $2,500 a month after they sold their California home to provide for his extensive medical care.  The legendary Chicago Bears player, Gale Sayers, was asked about Mackey's demise by a reporter for the *Chicago Tribune* and his response was reported as follows: "Sayers feels the NFL could have done more to help Mackey during his final years. 'You know, John Mackey died at 60-something (69),' said Sayers. '(The NFL) could have helped him more, I felt. But they didn't, and the players (NFLPA) could have helped more, and it didn't happen.'"

98.     On information and belief, proposals have been submitted to the NFL MTBI Committee about concussion concerns and the need to do regular testing of players. To the best of Plaintiffs' knowledge, the League has never acted on them.

99.     During the telecast of Super Bowl XLVI on February 5, 2012, the NFL aired a 60 second safety commercial believed to have been prepared by NFL Properties. It depicted the evolution of the game, showing how certain playing techniques (e.g., the "flying wedge," abandoned long before the NFL came into existence, or the "clothesline tackle") have ceased being used. The commercial did not mention the duplicitous industry of the MTBI, the League's flip-flop on concussion warnings to players, how its 2010 concussion guidelines are routinely flouted, and how recidivist violators like James Harrison (who has had five illegal hits on quarterbacks in three seasons) are allowed to continue to play the game. Brad Adgate, a Senior Vice-President of Horizon Media, was quoted as follows about this advertisement:

> The one kind of black eye the N.F.L. has is probably the health of its players, and this is a great opportunity to target soccer moms who let their kids play. The object of the Super Bowl ad is not only to be entertaining, it's also to sell a product. This is a subject the N.F.L. has been very touchy about.
>
> Finally, they have adjusted that this is a serious issue.

100.    The NFL's conduct stands in sharp contrast to what has been done or promulgated by other sports or medical bodies.

101.    For example, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: **"[b]oxers that suffered concussion by KO, should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including but not limited to KO's, and should not compete in a boxing match in less than 75 days."** (Emphasis added).

102.    The Second International Conference on Concussion in Sport met in Prague in 2004 and released the following statement: **"[w]hen a player shows ANY symptoms or signs of a concussion . . . the player should not be allowed to return to play in the current game or practice . . . . When in doubt, sit them out!"** (Emphasis added). This directive echoed the

position taken by the First International Conference on Concussion in Sport, held in Vienna in 2001.

103.     As ESPN has noted, **"[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."** (Emphasis added).

104.     Another example is provided by the National Collegiate Athletic Association ("NCAA"), which also recognized inexcusably late the link between head impacts and brain injuries, not taking affirmative action until 2010. The NCAA is the subject of class action suits for this tardiness. Nevertheless, once it did act, it did so in a manner that was more decisive than the NFL. The NCAA's webpage on concussion-related resources (see <http://www.ncaa.org/wps/portal/ncaahome?WCM_GLOBAL_CONTEXT=/ncaa/NCAA/Academics+and+Athletes/Personal+Welfare/Health+and+Safety/Concussion>) indicates that it has entered into an educational partnership with the Centers for Disease Control and Prevention. The NCAA has supplied each member college campus with two posters and two sets of fact sheets addressing concussion awareness, prevention, and management. It has issued the "NCAA Sports Medicine Handbook - Guideline on Concussions in the Athlete" that recommends best practices. And the NCAA requires each member college to develop a "Concussion Management Plan." One exemplar plan offered on the NCAA's website is the University of Georgia Athletic Association's ("UGAA") "Concussion Management Guidelines," which read as follows:

> **1. UGAA will require student-athletes to sign a statement in which student-athletes accept the responsibility for reporting their injuries and illnesses to the sports medicine staff, including signs and symptoms of concussions (attachment A).** During the review and signing process student-athletes will watch a NCAA video on concussions and be provided with educational material1 on concussions (attachment B).

**2. UGAA will have on file and annually update an emergency action plan (attachment C) for each athletics venue to respond to student-athlete catastrophic injuries and illnesses,** including but not limited to concussions, heat illness, spine injury, cardiac arrest, respiratory distress (e.g. asthma), and sickle cell trait collapses. All athletics healthcare providers and coaches shall review and practice the plan annually. These sessions will be conducted prior to the start of the sport season. The UGAA compliance office will maintain a list of staff that have completed the requirement on file.

**3. UGAA sports medicine staff members shall be empowered to determine management and return-to- play of any ill or injured student-athlete, as he or she deems appropriate.** Conflicts or concerns will be forwarded to Ron Courson (director of sports medicine) and Fred Reifsteck, MD (head team physician) for remediation.

**4. UGAA shall have on file a written team physician– directed concussion management plan (attachment D) that specifically outlines the roles of athletics healthcare staff (e.g., physician, certified athletic trainer, nurse practitioner, physician assistant, neuropsychologist). In addition, the following components have been specifically identified for the collegiate environment:**

**a. UGAA coaches will receive a copy of the concussion management plan,** a fact sheet on concussions in sport, and view a video on concussions annually. The UGAA compliance office will maintain a list of staff that have completed the requirement on file.

**b. UGAA sports medicine staff members and other athletics healthcare providers will practice within the standards as established for their professional practice** (e.g., team physician, certified athletic trainer, physical therapist, nurse practitioner, physician assistant, neurologist, neuropsychologist).

**c. UGAA shall record a baseline assessment for each student-athlete in the sports of baseball, basketball, cheerleading, diving, equestrian, football, gymnastics, pole vaulting, soccer, and softball, at a minimum. In addition, a baseline assessment will be recorded for student-athletes with a known history of concussion. The same baseline assessment tools should be used post-injury at appropriate time intervals. The baseline assessment should consist of the use of: 1) symptoms checklist, 2) standardized balance assessment (Neurocom) and 3)**

- 51 -

neuropsychological testing (computerized IMPACT test).
Neuropsychological testing has been shown to be effective in
the evaluation and management of concussion. The
neuropsychological testing program should be performed in
consultation with a neuropsychologist. Post injury
neuropsychological test data will be interpreted by a
neuropsychologist prior to return to play. Neuropsychological
testing has proven to be an effective tool in assessing
neurocognitive changes following concussion and can serve as
an important component of an institution's concussion
management plan. However, neuropsychological tests should
not be used as a standalone measure to diagnose the presence
or absence of a concussion as UGAA uses a comprehensive
assessment by its sports medicine staff.

d. **When a student-athlete shows any signs, symptoms or
behaviors consistent with a concussion, the athlete will be
removed from practice or competition, by either a member of
the coaching staff or sports medicine staff. If removed by a
coaching staff member, the coach will refer the student-athlete
for evaluation by a member of the sports medicine staff.
During competitions, on the field of play injuries will be under
the purview of the official and playing rules of the sport.
UGAA staff will follow such rules and attend to medical
situations as they arise. Visiting sport team members
evaluated by UGAA sports medicine staff will be managed in
the same manner as UGAA student-athletes.**

e. **A student-athlete diagnosed with a concussion will be
withheld from the competition or practice and not return to
activity for the remainder of that day.** Student-athletes that
sustain a concussion outside of their sport will be managed in the
same manner as those sustained during sport activity.

f. **The student-athlete will receive serial monitoring for
deterioration.** Athletes will be provided with written home
instructions (attachment E) upon discharge; preferably with a
roommate, guardian, or someone that can follow the instructions.

g. **The student-athlete will be monitored for recurrence of
symptoms both from physical exertion and also mental
exertion,** such as reading, phone texting, computer games,
watching film, athletic meetings, working on a computer,
classroom work, or taking a test. Academic advisors and professors
will be notified of student-athlete's concussion, with permission
for release of information from the student-athlete.

- 52 -

**h. The student-athlete will be evaluated by a team physician as outlined within the concussion management plan.** Once asymptomatic and post- exertion assessments are within normal baseline limits, return to play shall follow a medically supervised stepwise process.

i. Final authority for Return-to-Play shall reside with the team physician or the physician's designee as noted in the concussion management flowchart.

**5. UGAA will document the incident, evaluation, continued management, and clearance of the student- athlete with a concussion.** Aggregate concussion numbers per sport will be reported to the Director of Athletics annually.

**6. Athletics staff, student-athletes and officials will continue to emphasize that purposeful or flagrant head or neck contact in any sport should not be permitted.** (Emphases added).

### B. <u>Riddell's Participation With The NFL In Misrepresenting The Risk Of Repeated Head Impacts.</u>

105.    The Riddell Defendants have operated an enterprise engaged in designing, developing, manufacturing, selling, and distributing football equipment, including helmets since 1922. As early as the 1930s, players began using helmets during football games. These early helmets were constructed from pieces of cobbled leather. In the early 1940s, John T. Riddell, who later formed John T. Riddell Incorporated, invented the first plastic suspension helmet. In 1949, plastic helmets became legalized.

106.    Throughout the latter half of the 20th century, and continuing to the present day, Riddell has designed, developed, manufactured, sold, and distributed equipment used in the NFL including equipment used by Plaintiffs, including but not limited to the following:

a.    In the 1950s, Riddell manufactured a face mask component for its helmets, which was eventually patented;

- 53 -

b.      In 1952, Riddell used a "U"-shaped nose protector with a shell (known as

the TK-2) molded out of polycarbonate.  Riddell also designed an

open\closed cell form and composite liner system for the model to

increase the efficiency of the webbed suspension;

c.      In 1963, Riddell developed the TAK-29 helmet, which was the first to use

air inflation for fitting the helmet snug to the head.  The TAK-29 shell,

like the TK-2, displayed the protective polycarbonate plastic in addition to

including tough shock- and cut-resistant face mask attachment straps;

d.      In 1969, recognizing that head protection was a key factor in helmet

design requiring durable head protection, Riddell constructed a micro-

thick helmet model with injection-molded technology to create a one-

piece shell to improve the structural integrity of the whole of the entire

helmet;

e.      In 1973, Riddell developed, designed, manufactured, sold and/or

distributed an air-cushioned helmet whose interior system consisted of

individual vinyl air cushions with layers of fitting and energy-absorbing

foam.  When a blow was struck, the air in the cushion was expelled

through a single vent, greatly reducing the initial impact.  While the

exhausting of the air cushion, the compressed fitting foam was further

compressed, reducing impact;

f.      In 1977, Riddell developed, designed, manufactured, sold, and/or

distributed a stainless steel face mask, which offered greater bend

resistance that prevented helmet breakage at the drill holes;

g.   In 1981, Riddell developed, designed, manufactured, sold and/or distributed an "air cushion engineered helmet";

h.   In 1982, Riddell developed, designed, manufactured, sold and/or distributed a M-155 helmet model with a combination of foam and liquid-filled cells used for padding. On impact the liquid would be throttled from one cell to the next, resulting in energy attenuation. The M-155 helmet model included one piece injection molded face masks, which were mar and rust resistant in addition to polyurethane face mask straps and universal jaw pads;

i.   In 2002, Riddell developed, designed, manufactured, sold and/or distributed the Riddell Revolution helmet designed with the intent of reducing the risk of concussion;

j.   In 2003, Riddell developed, designed, manufactured, sold and/or distributed a real-time Head Impact Telemetry System ("HITS") to monitor and record significant incidents of head impact sustained during a football game or practice. The system measured the location, magnitude, duration and direction of head acceleration and transmitted that information wirelessly to the sidelines;

k.   In 2006, Riddell provided the research grants in the University of Pittsburgh Medical Center for head injury research. The study compared rates of high school athletes who wore the Riddell Revolution helmet with those who wore traditional helmets;

- 55 -

1092635.1

l.      In 2007, Riddell developed, designed, manufactured, sold and/or distributed an individual helmet system, called the Revolution IQ Hits™, allowing players to monitor the number and severity of impacts received during games and practices.  The on-board electronics record every impact allowing players to upload and evaluate each occurrence on their home computers;

m.     In 2001, Riddell developed, designed, manufactured, sold and/or distributed the 360 helmet which uses energy-managing materials and a face mask attachment system to disperse the energy of the impacts. According to Riddell, it developed this helmet using over 1.4 million impacts collected through Riddell HITS technology;

n.     Riddell is currently the official helmet of the NFL.  As the official helmet for the NFL, Riddell is the only helmet manufacturer allowed to display its logo on helmets worn by players during NFL games.  Upon information and belief Plaintiffs wore Riddell helmets at all times while playing and/or practicing during their NFL careers; and

o.     The Riddell Defendants are and were at all times herein mentioned engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspecting, distributing, and/or controlling the helmets and other similar equipment used by Plaintiffs and within the NFL.

107.    Riddell manufactures helmets for use by NFL players.  Since 1989, with the support of NFL and NFL Properties, Riddell has manufactured the official helmet for the League

- 56 -

and is the only helmet manufacturer allowed to display its logo on helmets used in League games. Prior to the commencement of the 2010 season, Riddell renewed its contract with the League allowing it to continue as the NFL's primary helmet provider through 2014. The NFL has estimated that 75% of the helmets used in the League are manufactured by Riddell; Riddell estimated that the figure was 77%.

108.     Riddell has long been aware of medical issues concerning concussions. Yet despite being the maker of the official helmet for the NFL, it did nothing to prevent the disinformation campaign engaged in by the League that is described in the preceding paragraphs.

109.     Indeed, Riddell actively abetted the work of the NFL's MTBI Committee. In 1997, it became part of that Committee's project of assessing concussions and health consequences to NFL players by analyzing and reconstructing head impacts.

110.     In 2006, Riddell sponsored a study that appeared in *Neurosurgery* that was co-authored by Dr. Lovell, Dr. Joe Maroon of the MTBI Committee, and Dr. Mickey Collins of the University of Pittsburgh Medical Center, who works closely with various NFL member clubs, that touted Riddell's "Revolution" helmet (introduced in 2002) as reducing the incidence of concussions in over 2000 high school athletes in Western Pennsylvania. Dr. Cantu publicly criticized the study as being worthless.

111.     Riddell's helmets have failed to protect Plaintiffs, are defectively designed and should and could have been designed in an alternatively feasible manner to protect Plaintiffs.

## FIRST CLAIM FOR RELIEF
### Action For Declaratory Relief

112.     Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

113.    There is a case and controversy among Plaintiffs on the one hand and the Defendants on the other.

114.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaration that Defendants knew or reasonably should have known that the repeated traumatic brain and head impacts, as well as concussions, suffered by Plaintiffs while playing NFL football were likely to put them at excess risk of neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

115.    Plaintiffs seek a declaration that the Defendants, through their voluntary undertakings, had a duty to advise players and protect players from these risks.

116.    Plaintiffs seek a declaration that the Defendants willfully and intentionally misled Plaintiffs concerning these medical risks.

117.    Plaintiffs seek a declaration that the Defendants thereby recklessly endangered Plaintiffs.

## SECOND CLAIM FOR RELIEF
### Action For Negligence as to NFL Defendants

118.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

119.    The NFL has historically assumed a gratuitous independent tort duty to create and enforce rules that protect the health and safety of its players, and it has violated Section 323 of the Restatement (Second) of Torts, and the common law.

120.    Throughout the history of the NFL, the League has purported to exercise its duty to protect the health and safety of its players by implementing rules, policies and regulations in a purported attempt to best protect its players.

- 58 -

121.    By enacting rules to protect the health and safety of its players, the NFL has repeatedly confirmed its duty to take reasonable and prudent actions to protect the health and safety of its players when known and foreseeable risks exist.

122.    The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the physical and mental health of players by implementing standardized post-concussion guidelines and by failing to implement mandatory rules that would prevent a player who suffered a mild traumatic brain injury from re-entering a football game or practice.

123.    Throughout the many years that the NFL has repeatedly established its duty to protect the health and safety of its players when known and foreseeable risks exist, until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer a concussive brain injury during a game.

124.    The NFL failed to establish any adequate guidelines or policies to protect the mental health and safety of its players.  As explained above, the guidelines that the League offered in 2007 were false and misleading and failed to apprise Plaintiffs of the risks associated with on-field concussions

125.    The NFL's failure to fulfill its assumed duty to protect its players includes, but is not limited to, the following failures:

    a.    Failure to use reasonable care in the research of the concussions issue;

    b.    Failure to use reasonable care in responding to independent scientific studies on the risk of concussions and brain disease in sport, and in football in particular;

    c.    Failure to use reasonable care in denying the scientific evidence connecting NFL play to the risk of an occurrence of brain disease;

- 59 -

d.      Failure to use reasonable care in appointing competent and independent doctors and scientists to the MTBI Committee; and

e.      Failure to use reasonable care in protecting Plaintiffs from the risk of brain disease and the sequelae of the concussions experienced by Plaintiffs.

126.    Plaintiffs relied on the misrepresentations of Defendants (including affirmative misrepresentation and omissions) detailed herein to their detriment.

127.    The NFL breached its assumed duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

128.    The NFL failed to provide complete, current, and competent information and directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

129.    If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs, by developing and implementing necessary guidelines, policies, and procedures; providing reasonably safe helmets; and educating and training all persons involved with the NFL clubs in the recognition, prevention, and treatment of concussive brain injuries, the NFL players, such as Plaintiffs, would not have suffered from the subject condition or the effects of that condition, would have recovered more rapidly, or would not have suffered long-term brain damage, including CTE, MCI, Alzheimer's disease or similar cognitive- impairing condition.

130.    Under all of the above circumstances, it was foreseeable that the NFL's violations of its duties would cause or substantially contribute to personal injuries suffered by the Plaintiffs.

131.    The NFL committed acts of omission and commission, which collectively and severally, constituted negligence.  The League's negligence was a proximate and producing cause of injuries suffered by Plaintiffs.

132.    In addition to the injuries suffered by Plaintiffs described herein, Defendants' negligent conduct caused or contributed to the personal injuries of the individual named Plaintiffs including neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions, past and future medical expenses, past and future loss of earnings, past and future emotional distress, and punitive damages.

133.    As a result of the Plaintiffs' injuries, they are entitled to damages, as alleged herein or allowed by law.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages in a sum in excess of $75,000, together with punitive damages, interest, attorneys' fees, cost of suit, and all such other relief as the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### Action For Fraud

134.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

135.    Until June of 2010, the NFL, through its MTBI Committee, the statements and actions of its Commissioner and its other agents and employees, made material misrepresentations (and omissions) to its players, former players, the Congress and the public at large that there was no link between concussions and brain injury, including CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

- 61 -

136.    The persons who made the misrepresentations as agents of the NFL and the NFL knew the statements were false.

137.    The persons who made the misrepresentations as agents of the Riddell and Riddell knew the statements were false.

138.    The persons who made the misrepresentations as agents of the NFL and Riddell intended to defraud the Plaintiffs.

139.    Plaintiffs justifiably relied on these misrepresentations to their detriment in getting care for their injuries.

140.    Plaintiffs were damaged by these misrepresentations.

141.    In addition to the injuries suffered by Plaintiffs described herein, Defendants' fraudulent conduct caused or contributed to the personal injuries of the individual named Plaintiffs including neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions, past and future medical expenses, past and future loss of earnings, past and future emotional distress, and punitive damages.

142.    As a result of the injuries Plaintiffs are entitled to the damages, as alleged herein or allowed by law.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages in a sum in excess of $75,000, together with punitive damages, interest, attorneys' fees, cost of suit, and all such other relief as the Court deems just and proper.

- 62 -

## FOURTH CLAIM FOR RELIEF
### Fraudulent Concealment

143.    Plaintiffs repeat and allege each of the allegations contained in the foregoing paragraphs.

144.    Defendants and the NFL's MTBI Committee concealed and misrepresented information to the Plaintiffs and the public regarding the brain disease risks of repeated head impacts and concussions in NFL play, over the time period relevant to this Amended Complaint.

145.    At no time prior to June 2010 did any Defendant correct these misrepresentations. Even after June 2010, Defendants failed to adequately advise Plaintiffs and the public of these risks.

146.    Defendants knew their statements in regard to concussions and medical risks were false, and they knew the Plaintiffs would specifically rely on these statements.

147.    In addition to the injuries suffered by Plaintiffs described herein, Defendants' negligent conduct caused or contributed to the personal injuries of the Plaintiffs including neurodegenerative disorders and diseases including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions, past and future medical expenses, past and future loss of earnings, past and future emotional distress, and punitive damages

148.    As a result of the injuries, Plaintiffs are entitled to the damages, as alleged herein or allowed by law.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages in a sum in excess of $75,000, together with punitive damages, interest, attorneys' fees, cost of suit, and all such other relief as the Court deems just and proper.

- 63 -

1092635.1

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy

149.    Plaintiffs repeat and allege each of the allegations contained in the foregoing paragraphs.

150.    The Riddell Defendants and the NFL actively, aggressively and deliberately conspired with its team members and/or independent contractors, and each other, to continuously discount and reject the causal connection between multiple concussions and repetitive head traumas suffered while playing in the NFL as well as the return to play policy for players suffering concussions and repetitive head traumas and the chronic long term effects of those head injuries.

151.    This conduct between Defendants and the other team members as well as the other Defendants are the proximate cause of the chronic injuries, illnesses and damages suffered by Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages in a sum in excess of $75,000, together with punitive damages, interest, attorneys' fees, cost of suit, and all such other relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### Medical Monitoring

152.    Plaintiffs repeat and allege each of the allegations contained in the foregoing paragraphs.

153.    Plaintiffs have been exposed to a greater number of concussions and subconcussions, which have increased their risk of suffering long term injuries and illnesses as set forth above.

- 64 -

154.     Plaintiffs, some of whom have yet to begin to show evidence of the long term physical and mental effects of Defendants' misconduct, require specialized testing that is not generally given to the public at large, for the early detection of the long term effects of concussions and subconcussions.

155.     By monitoring and testing Plaintiffs who are suspected to have suffered concussions, repetitive head traumas or subconcussions, or who will suffer from same in the future, it can be determined whether each player is sufficiently healthy to return to play and/or it will significantly reduce each player's risk of developing long term injuries, diseases and losses as described herein.

156.     Until now, Defendants have failed to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered a concussion or subconcussion.  To minimize the risk of long term injury and illness, medical monitoring is the most appropriate method by which to determine whether a Plaintiff is now at risk.

157.     Accordingly, Defendants should be required to establish a medical monitoring program that includes, *inter alia*:  (a) establishing a trust fund in an amount to be determined, to pay for the medical monitoring of Plaintiffs; (b) notifying the Plaintiffs in writing regarding the specific regime recommended and the need for, and importance of, frequent monitoring; and (c) providing information to treating team physicians, other physicians and team members to aid them in detecting concussions and subconcussions, and to assist them in determining when the player is subjected to an increased risk of harm.

158.     Medical monitoring is appropriate because:  (a) the exposure to concussions and subconcussions and their related ramifications are greater than normal background rates; (b) the harm as a result of the creation of subpar techniques and/or the failure to create proper and/or

- 65 -

adequate techniques; (c) which were promoted to the direct result of Defendants' failure to institute and follow safety policies they knew or should have known about; (d) as a proximate result of exposure to the aforementioned harm, Plaintiffs have an increased risk of developing serious and potentially life threatening latent neurogenic disease processes caused by head trauma; (e) a monitoring procedure exists to detect neurogenic deficits including but not limited to dementia, permanent memory loss and other life altering diseases and illnesses; (f) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and (g) the prescribed monitoring regime is reasonably necessary according to specific principles and according to those within the medical community who specialized in closed head trauma.

159.    The above-described medical monitoring regime, which  is specifically designed for individuals exposed to repetitive head traumas, concussions and subconcussions is feasible, available, beneficial, and recommended by medical specialists who study, diagnose, and treat closed head injuries and their connection to memory loss, early-onset dementia, and other effects, and is different from that recommended for the general population.

160.    Defendants' negligent and wrongful conduct is the proximate cause of Plaintiffs' suffering and increased risk of serious injury, medical problems, and disease, which they will continue to suffer into the future.  Plaintiffs have been subjected to repetitive heads traumas and concussions. They therefore experience current anxiety and emotional distress, and also face a serious and increased risk that they will suffer from severe neurological diseases that affect the brain, and may require additional medical expenses, additional medical care and more therapies and medications.  This increased risk makes periodic and medical examinations reasonable and necessary.

161.    Early detection and diagnosis of the medical problems is clinically invaluable because such detection and diagnosis can prevent, reduce, and significantly delay resulting discomfort, suffering, and additional medical treatment and care.

162.    Feasible, cost-effective monitoring and testing procedures exist that make early detection, treatment, and continued monitoring of such injuries possible and beneficial.  Early diagnosis of the potentially damaging conditions caused by repetitive head injuries will allow prompt and effective treatment that will reduce the risk of significant harm to Plaintiffs who would suffer if treatment were delayed.

163.    Expenditures by Plaintiffs for prospective medical testing and evaluation are necessary to reduce the risk of significant harm to Plaintiffs as identified above.  Such testing would be unnecessary if Plaintiffs had not suffered from these repetitive head injuries.

164.    The increased susceptibility to injuries and irreparable threat to the health of Plaintiffs resulting from repetitive head injuries can only be mitigated or addressed by the creation of a comprehensive medical monitoring program.  Plaintiffs request that the following medical monitoring program be funded by the NFL and implemented under the Court's supervision:

      a.    Notifying individuals who played with the NFL during the relevant time period of the potential harm from repetitive head traumas;

      b.    Providing for regular medical examinations for all members of the class and sub-classes identified in the Master Administrative Medical Monitoring Complaint including CT scans, MRIs, PET scans or other appropriate procedures and testing methodologies;

      c.    Funding further studies of the long-term effects of the repetitive head traumas, concussions and sub-concussions; and,

- 67 -

      d.     Publishing and otherwise disseminating all such information to members of the Class, their physicians, the medical community at large, and the community.

165.    Plaintiffs, individually and as members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate for the continuing nature of the harm to them. A Court-supervised monitoring program will enable Plaintiffs and other Class members to ascertain the presence of injury and/or disease. Early detection of such conditions aids in Plaintiffs' and other Class members' treatment and may prevent greater injuries if adverse conditions caused by repetitive head traumas are treated before they become worse.

166.    Without a Court-approved medical monitoring program, the subjects of the repetitive head traumas will not receive prompt medical care that could prolong their productive lives, reduce the risk of disability, and increase prospects for improvement of their condition.

167.    In short, a medical monitoring program is both reasonable and necessary here because:

      a.     Plaintiffs and each member of the Class have played for the NFL and have suffered from repetitive head traumas in play as well as in practice and training;

      b.     repetitive head traumas pose a substantial risk to Plaintiffs and the other members of the Class of a serious, painful, debilitating injuries; and,

      c.     early detection and diagnosis of the medical problems incident to the repetitive head traumas and concussions are clinically invaluable.

168.    Defendants have a continuing duty to warn the Class and the public at large of all potential risks and dangers of which they become or should become aware. The NFL should be required to provide timely information concerning effective testing and treatment options for

those suffering from, or at risk for, problems incident to injuries caused by repetitive head traumas.

## SEVENTH CLAIM FOR RELIEF
### Action for Strict Liability Against the Riddell Defendants

169.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

170.    At all times herein mentioned, the Riddell Defendants are and were in the business of and did design, research, develop, license, manufacture, test, advertise, promote, market, sell, distribute and/or introduce into interstate commerce, either directly or indirectly through third parties, related entities, or recently acquired entities, the helmets as described  used by Plaintiffs.

171.    That the helmets were expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were designed, produced, manufactured, sold, distributed, and marketed by the Riddell Defendants.

172.    At those times, the helmets were in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, to Plaintiffs.

173.    The helmets, designed, researched, developed, licensed, manufactured, tested, advertised, promoted, marketed, sold, distributed and/or introduced into interstate commerce, by the Riddell Defendants, either directly or indirectly through third parties, related entities, or recently acquired entities, were defective in design in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design of the helmets.

174.    The helmets designed, researched, developed, licensed, manufactured, tested, advertised, promoted, marketed, sold, distributed and/or introduced into interstate commerce, by the Riddell Defendants, either directly or indirectly through third parties, related entities, or recently acquired entities, were defective in design because when they left the hands of the Riddell Defendants manufacturers and/or suppliers, they were unreasonably dangerous, and they were more dangerous than an ordinary consumer would expect.

175.    At all times herein mentioned, the Helmets were in a defective condition and unsafe, and Riddell Defendants knew or had reason to know that said products were defective and unsafe, especially when used in the form and manner as provided by the Riddell Defendants.

176.    Defendants knew, or should have known that at all times herein mentioned the helmets were in a defective condition, and were and are inherently dangerous and unsafe.

177.    At the time of the Plaintiffs use of the helmets, the helmets were being used for the purpose and in a manner normally intended.

178.    The Riddell Defendants with this knowledge voluntarily designed their helmets in a dangerous condition for use by the NFL players, and in particular the Plaintiffs.

179.    The Riddell Defendants had a duty to create a product that was not unreasonably dangerous for their normal, intended use.

180.    The Riddell Defendants created products unreasonably dangerous for their normal, intended use.

181.    Plaintiffs could not by the exercise of reasonable care, have discovered the helmets' defects herein mentioned and perceived their danger.

- 70 -

182.    The helmets designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Riddell Defendants were defective due to inadequate warnings and/or inadequate testing.

183.    The Riddell Defendants designed, researched, developed, licensed, manufactured, tested, advertised, promoted, marketed, sold, distributed and/or introduced into interstate commerce, either directly or indirectly through third parties, related entities, or recently acquired entities, defective products which created an unreasonable risk to the health of the NFL players and to the Plaintiffs in particular, and the Riddell Defendants are therefore strictly liable for the injuries sustained by Plaintiffs.

184.    By reason of the foregoing, the Riddell Defendants have become strictly liable in tort to Plaintiffs for the designing, researching, developing, licensing, manufacturing, testing, advertising, promoting, marketing, selling, distributing, and/or introducing into interstate commerce of the helmets, which were defectives.

185.    The Riddell Defendants' defective design, manufacturing defect, and inadequate warnings of the Helmets were acts that amount to willful, wanton, and/or reckless conduct by the Riddell Defendants.

186.    That said defects in the Riddell Defendants' product substantially contributed to the cause of Plaintiffs' injuries and damages.

187.    As a foreseeable, direct, and proximate result of the aforementioned wrongful acts and omissions of the Riddell Defendants, Plaintiffs were caused to suffer the aforementioned injuries and damages.

WHEREFORE, Plaintiffs demand judgment against the Riddell Defendants, and each of them, individually, jointly and severally and requests compensatory damages in a sum in excess

- 71 -

of $75,000, together with punitive damages, interest, attorneys' fees, cost of suit, and all such other relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF
### Negligence Against the Riddell Defendants

188.   Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

189.   At all times herein mentioned, the Riddell Defendants are and were in the business of and did design, research, develop, license, manufacture, test, advertise, promote, market, sell, distribute and/or introduce into interstate commerce, either directly or indirectly through third parties, related entities, or recently acquired entities, the helmets as described used by Plaintiffs.

190.   That the helmets were expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were designed, produced, manufactured, sold, distributed, and marketed by the Riddell Defendants.

191.   At those times, the helmets were in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, to Plaintiffs.

192.   The helmets, designed, researched, developed, licensed, manufactured, tested, advertised, promoted, marketed, sold, distributed and/or introduced into interstate commerce, by the Riddell Defendants, either directly or indirectly through third parties, related entities, or recently acquired entities, were defective in design in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design of the helmets.

1092635.1

193.   The helmets designed, researched, developed, licensed, manufactured, tested, advertised, promoted, marketed, sold, distributed and/or introduced into interstate commerce, by the Riddell Defendants, either directly or indirectly through third parties, related entities, or recently acquired entities, were defective in design because when they left the hands of the Riddell Defendants manufacturers and/or suppliers, they were unreasonably dangerous, and they were more dangerous than an ordinary consumer would expect.

194.   At all times herein mentioned, the helmets were in a defective condition and unsafe, and the Riddell Defendants knew or had reason to know that said products were defective and unsafe, especially when used in the form and manner as provided by the Defendants.

195.   Defendants knew, or should have known that at all times herein mentioned the Helmets were in a defective condition, and were and are inherently dangerous and unsafe.

196.   At the time of the Plaintiffs' use of the helmets, the helmets were being used for the purpose and in a manner normally intended.

197.   The Riddell Defendants, with this knowledge, voluntarily designed their helmets in a dangerous condition for use by the NFL players, and in particular the Plaintiffs.

198.   The Riddell Defendants had a duty to create a product that was not unreasonably dangerous for their normal, intended use.

199.   The Riddell Defendants created products unreasonably dangerous for their normal, intended use.

200.   Despite the fact that the Riddell Defendants knew or should have known that the helmets  caused unreasonably dangerous side effects, the Riddell Defendants continued and continue to manufacture, advertise, promote, market, sell, and/or distribute the helmets  to consumers, including the Plaintiffs.

- 73 -

201.    The Riddell Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of the Riddell Defendants' failure to exercise ordinary care, as set forth above.

202.    Plaintiffs could not by the exercise of reasonable care, have discovered the helmets' defects herein mentioned and perceived their danger.

203.    The Riddell Defendants' negligence was the proximate cause of Plaintiffs' injuries, harm and economic loss which they suffered and/or will suffer.

204.    As a foreseeable, direct, and proximate result of the aforementioned wrongful acts and omissions of the Riddell Defendants, Plaintiffs were caused to suffer the aforementioned injuries and damages.

WHEREFORE, Plaintiffs demand judgment against the Riddell Defendants, and each of them, individually, jointly and severally and requests compensatory damages in a sum in excess of $75,000, together with punitive damages, interest, attorneys' fees, cost of suit, and all such other relief as the Court deems just and proper.

## NINTH CLAIM FOR RELIEF
### Action for Loss of Consortium

205.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs.

206.    Spouse Plaintiffs have suffered damages in the past and will suffer damages in the future as a direct result of the injuries described above.

207.    Spouse Plaintiffs seek to recover for past and future loss of consortium and other harm to their relationship and marriage.

208.    As a result of the injuries of the players as alleged herein, Spouse Plaintiffs are entitled to the damages, as alleged herein or allowed by law.

- 74 -

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages in a sum in excess of $75,000, together with punitive damages, interest, attorneys' fees, cost of suit, and all such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Amended Complaint as follows:

1.      With respect to First Claim for Relief, granting the declaratory relief requested pursuant to 28 U.S.C. § 2201;

2.      With respect to Second through Fifth Claims and Seventh through Ninth Claims for Relief, granting compensatory and punitive damages where applicable;

3.      With respect to Sixth Claim for Relief, granting the injunctive relief requested;

4.      With respect to all Claims, awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law; and,

5.      With respect to all Claims, granting Plaintiffs such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all matters so triable.

1092635.1

Dated: April 19, 2013

Respectfully submitted,

By: _____

Wendy R. Fleishman, Bar No. WF 3017
LIEFF CABRASER HEIMMAN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Elizabeth A. Alexander
LIEFF CABRASER HEIMMAN &
BERNSTEIN, LLP
One Nashville Place
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile:  (615) 313-9965

Elizabeth J. Cabraser
LIEFF CABRASER HEIMMAN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

*Attorneys for Plaintiffs*

1092635.1