# UNITED STATES DISTRICT COURT
## FOR.THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLIE ANDERSON, CHARLES E. ARBUCKLE, ROD BERNSTINE, CURTIS CEASAR, JR., HARRY COLON, ELBERT CRAWFORD III, CLYDE P. GLOSSON, NILO SILVAN, FRANKIE SMITH, JERMAINE SMITH, ERIC J. SWANN and ANTHONY TONEY  <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL FOOTBALL LEAGUE, INC. and NFL PROPERTIES, LLC as successor in interest to NATIONAL FOOTBALL LEAGUE PROPERTIES, INC., <br><br> Defendants. | Case No. 2:13-cv-01981 <br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMAND FOR ALL CLAIMS TRIABLE BY A JURY** |

The Plaintiffs set forth above in the case caption bring this Amended Complaint and state as follows:

1.     This action seeks a declaration of liability, injunctive relief and financial compensation for the long-term chronic injuries, financial losses, expenses and intangible losses suffered by the Plaintiffs as a result of the defendants' intentional tortuous misconduct (by voluntary undertaking), negligence, fraud and conspiracy.

2.     This action arises from the pathological and debilitating effects of head injuries and concussions that have afflicted present and former professional football players in the National Football League (the "NFL").  For many decades, evidence has linked repetitive traumatic brain injury to long-term neurological problems in many sports.  The NFL, as the

organizer, marketer and face of the most popular sport in the United States, in which head trauma is a regular occurrence, was aware of the evidence and the risks associated with repetitive traumatic brain injuries and concussions for decades, but deliberately ignored and actively concealed the information from the Plaintiffs and all others who participated in organized football at all levels.

3.      Moreover, in or around 1994 and possibly earlier, the NFL voluntarily inserted itself into the scientific research and discussion concerning the relationship between concussions and short-term and long-term impairment of the brain.   After doing so, the NFL then intentionally and fraudulently mislead present and former players and all people who reasonably rely upon the NFL's expertise about its own sport, regarding the short-term and long-term risks posed by concussions and head trauma.

4.      Rather than warn players that they risked permanent brain injury if they returned to play too soon after sustaining a concussion, the NFL actively deceived players by misrepresenting to them that concussions did not present serious, life-altering risks.

5.      The NFL, through its own initiative and voluntary undertaking, created the Mild Traumatic Brain Injury Committee (the "MTBI Committee") in 1994 to research and ameliorate the impact of concussions on NFL players.   Notwithstanding this purported purpose, and despite clear medical evidence that on-field concussions led directly to brain injuries with tragic results for players at every level of the sport, the NFL failed to inform its current and former players of the true risks associated with such head trauma and purposefully misrepresented and/or concealed medical evidence on that issue.

6.      Athletes who suffered repetitive traumatic brain injuries and/or concussions in other professional sports were restricted from playing full games or even seasons, yet NFL players who had similar trauma were regularly returned to play.

7.      The NFL's active and purposeful concealment and misrepresentation of the severe neurological risks of repetitive traumatic brain injury exposed players to dangers they could have avoided had the NFL provided them with truthful and accurate information.   Many of these players have suffered brain damage and latent neurodegenerative disorders and diseases as a result of the NFL's acts and/or omissions.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and (b) and 28 U. S. C. § 1332(d)(11).   All of the plaintiffs and all of the defendants are citizens of different states.  The amount in controversy exceeds $75,000, exclusive of interest and costs, for each Plaintiff.  The amount in controversy for all Plaintiffs in this mass action exceeds five million dollars ($5,000,000) exclusive of interest and costs.  This matter can be tried jointly in that the Plaintiffs' claims involve common questions of law and fact.

9.      This Court has personal jurisdiction over the Defendants because they conduct business in the State of Mississippi.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) and (b)(2) because some of the Plaintiffs' injuries occurred in this district and division.

## PARTIES

11.     Plaintiff Charlie Anderson is 32 years old and a former NFL linebacker/defensive end who resides in Missouri City, TX.  Mr. Anderson played in the NFL from 2004 through 2010 for the Houston Texans, Miami Dolphins and Kansas City Chiefs. During his career, Mr.

Anderson sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Anderson suffers from various neurological conditions and symptoms related to multiple head traumas.

12.     Plaintiff Charles E. Arbuckle is 44 years old and a former NFL tight end who resides in Charlottee, North Carolina. Mr. Arbuckle played in the NFL from 1992 through 1995 for the Indianapolis Colts. During his career, Mr. Arbuckle sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Arbuckle suffers from various neurological conditions and symptoms related to multiple head traumas.

13.     Plaintiff Rod Bernstine is 42 years old and a former NFL running back/tight end who resides in Aurora, CO. Mr. Bernstine played in the NFL from 1987 through 1996 for the San Diego Chargers and Denver Broncos. During his career, Mr. Bernstine sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Bernstine suffers from various neurological conditions and symptoms related to multiple head traumas.

14.     Plaintiff Curtis Ceasar, Jr. is 40 years old and a former NFL wide receiver who resides in Tucker, GA. Mr. Ceasar played in the NFL in 1995 for the New York Jets. During his career, Mr. Ceasar sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Ceasar suffers from various neurological conditions and symptoms related to multiple head traumas.

15.     Plaintiff Harry Colon is 43 years old and a former NFL defensive back who resides in Charlotte, NC. Mr. Colon played in the NFL from 1991 through 1997 for the New England Patriots, Detroit Lions and Jacksonville Jaguars. During his career, Mr. Colon sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.

Currently, Mr. Colon suffers from various neurological conditions and symptoms related to multiple head traumas.

16.     Plaintiff Elbert Crawford III is 46 years old and a former NFL guard/center who resides in Little Rock, AR.  Mr. Crawford played in the NFL from 1990 through 1992 for the Denver Broncos and New England Patriots.  During his career, Mr. Crawford sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Crawford suffers from various neurological conditions and symptoms related to multiple head traumas.

17.     Plaintiff Clyde P. Glosson is 66 years old and a former NFL wide receiver who resides in San Antonio, TX.  Mr. Glosson played in the NFL in 1970 for the Buffalo Bills.  During his career, Mr. Glosson sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Glosson suffers from various neurological conditions and symptoms related to multiple head traumas.

18.     Plaintiff Nilo Silvan is 39 years old and a former NFL wide receiver who resides in Covington, LA.  Mr. Silvan played in the NFL from 1996 through 1998 for the Tampa Bay Buccaneers.  During his career, Mr. Silvan sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Silvan suffers from various neurological conditions and symptoms related to multiple head traumas.

19.     Plaintiff Frankie Smith is 44 years old and a former NFL cornerback/safety who resides in Groesheck, TX.  Mr. Smith played in the NFL from 1993 through 2001 for the Miami Dolphins, San Francisco 49ers and Chicago Bears.  During his career, Mr. Smith sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently,

Mr. Smith suffers from various neurological conditions and symptoms related to multiple head traumas.

20.     Plaintiff Jermaine Smith is 35 years old and a former NFL cornerback who resides in Manuel, TX.  Mr. Smith played in the NFL from 2000 through 2001 for the Baltimore Ravens and Seattle Seahawks.  During his career, Mr. Smith sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Smith suffers from various neurological conditions and symptoms related to multiple head traumas.

21.     Plaintiff Eric J. Swann is 42 years old and a former NFL defensive tackle who resides in Minneapolis, MN.  Mr. Swann played in the NFL from 1991 through 2000 for the Arizona Cardinals and Carolina Panthers.  During his career, Mr. Swann sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions.  Currently, Mr. Swann suffers from various neurological conditions and symptoms related to multiple head traumas.

22.     Plaintiff Anthony Toney is 50 years old and a former NFL running back who resides in Salinas, CA. Mr. Toney played in the NFL from 1986-1990 for the Philadelphia Eagles. During his career, Mr. Toney sustained repetitive traumatic impacts to his head and/or concussions on multiple occasions. Currently, Mr. Toney suffers from various neurological conditions and symptoms related to multiple head traumas.

23. All Defendants were in some fashion legally responsible for the injuries and damages complained of in this Amended Complaint.

24.     Defendant NFL, which maintains its principal place of business at 345 Park Avenue, New York, NY 10017, is an unincorporated association consisting of the 32 separately owned and independently-operated professional football teams listed below.  The NFL is engaged in interstate commerce in the business of, among other things, licensing, promoting,

operating, organizing and regulating the major professional football league in the United States. The NFL is not, and has not, been the employer of the Plaintiff(s), who were employed during their respective careers in professional football by the independent clubs (hereinafter "Teams" or "Clubs") set forth below.  The United States Supreme Court held in *American Needle, Inc., v. NFL,* 130 S. Ct. 2201, 2212-13 (2010) that each team that is a member of the NFL is a legally distinct and separate entity from both the other teams and the NFL itself.

      25.    The 32 separately owned and independently-operated teams are:

| NFL Team Owner | State of Organization | Team Name (City) |
| --- | --- | --- |
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns, Inc. | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars, Ltd. | Florida | Jacksonville Jaguars |

| NFL Team Owner | State of Organization | Team Name (City) |
| --- | --- | --- |
| Kansas City Chief Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburg Steelers Sports, Inc. | Pennsylvania | Pittsburg Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partners | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football, Inc. | Maryland | Washington Redskins |

26.    Defendant NFL Properties, LLC is the successor-in-interest to National Football League Properties, Inc. ("NFL Properties") and is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York.

NFL Properties is engaged in, among other activities, approving, licensing and promoting equipment used by the NFL teams.  NFL Properties regularly conducts business in Mississippi.

27.     The Defendants National Football League and NFL Properties shall be referred to collectively herein as the "NFL."

28.     The NFL caused or contributed to the injuries and increased risks to Plaintiffs through its acts and omissions: (a) by failing to disclose the true risks of repeated traumatic brain and head impacts in NFL football; (b) by failing to take appropriate steps to prevent, minimize and/or mitigate repeated traumatic brain and head impacts in NFL football; and (c) by deliberately creating false scientific studies and spreading misinformation concerning the cause and effect relation between brain trauma in NFL games and practices and latent neurodegenerative disorders and diseases.

29.     Defendant Riddell, Inc. (d/b/a Riddell Sports Group, Inc.) is a corporation organized and existing under the laws of the state of Illinois, and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989, has been the official helmet of the NFL. Riddell, Inc. regularly does business in the State of New York as well as throughout the U.S.

30.     Defendant All American Sports Corporation (d/b/a Riddell/All American) is a corporation organized and existing under the laws of the state of Delaware and is engaged in the business of designing, manufacturing, selling, and distributing football equipment including helmets to the NFL; since 1989, Defendant All American Sports Corporation has been the official helmet of the NFL. All American Sports regularly conducts business in the state of New York as well as throughout the United States.

31.     Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business at 6255 North State Highway, #300, Irving, Texas 76038. Riddell Sports Group, Inc. regularly conducts business in the state of New York as well as throughout the United States.

32.     Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc. and is incorporated in Delaware, with its principal place of business at 152 West 57th Street, New York, New York 10019. Easton-Bell Sports, Inc. designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand. Easton-Bell Sports, LLC regularly conducts business in the state of New York as well as throughout the United States.

33.     Defendants Riddell, Inc., Riddell Sports Group, Inc., All American Sports Corporation, and Easton Bell Sports, LLC (collectively the "Riddell Defendants") are alter egos and agents of one another and were so intertwined in the business of designing, manufacturing, advertising, promoting, selling and distributing the helmets at issue as to make it impossible to discern the difference between and among them.

34.     On information and belief, NFL policies and decisions relevant to the conduct alleged herein occurred primarily in the NFL corporate offices in New York City.

35.     On information and belief, those polices and decisions were part of a conspiracy whose objectives were to prevent players from having accurate and correct scientific information regarding the cause and effect relationship between: (a) concussions and brain trauma during NFL games and practices; and (b) long-term neurological brain damage, including the early onset of dementia, memory loss and Chronic Traumatic Encephalopathy ("CTE").

36.     On information and belief, those polices and decisions were part of a conspiracy whose objectives were to prevent players from having accurate and correct scientific information regarding the cause and effect relationship between: (a) concussions and brain trauma during NFL games and practices; and (b) long-term neurological brain damage, including the early onset of dementia, memory loss and Chronic Traumatic Encephalopathy ("CTE").

37.     Another objective of the conspiracy was to prevent persons bargaining on behalf of players to have sufficient knowledge to demand that policies, procedures and conditions be included in the Collective Bargaining Agreements and other contracts that were sufficient for the protection of players in connection with brain trauma and concussions.

38.     The NFL conspiracy also included a third objective, which was to deprive players of their right to seek damages for concussion-related injuries in court by using the Collective Bargaining Agreements as a bar to any civil court action by players.

39.     However, since the public and widely promoted position of the NFL was that concussions in NFL games and practices were not a long-term risk to players and unconnected to brain degeneration and the brain disorders of early dementia and CTE, the Collective Bargaining Agreements cannot be the source of the duties of the NFL as to concussions.

40.     Moreover, the voluntary insertion of the NFL into concussion research and public discussion meant that NFL had a duty: (a) to make truthful statements; (b) not to wrongfully advance improper, biased and falsified industry-generated studies; and (c) not to discredit well-researched and credible studies that came to a conclusion that did not comport with the NFL's financial and political interests.

41.     This duty extended not merely to NFL players, but also to all persons who play the game of football nationwide at every level; that is, millions of children, high school students and college students.

42.     In light of the NFL conspiracy, Plaintiffs seek a declaration that no Collective Bargaining Agreements are a bar to this lawsuit, because they were induced by fraud.

43.     Third parties that conspired with the NFL in the conspiracy and other tortious conduct alleged herein included, but not limited to, the Teams, physicians and health care providers who contracted with the Teams and NFL, NFL Properties, LLC, and various persons in leadership positions in the NFL, the Teams, and NFL Properties, LLC.

## MASS ACTION AND JOINDER ALLEGATIONS

44.     Joinder is permissible under Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same occurrences, and questions of law and/or fact common to all Plaintiffs arise in this action.

45.     Common questions of law and fact will arise in this action, including but not limited to the following:

> (a)     Whether the NFL, through its own voluntary undertaking, was negligent in its response to the health effects of repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices and other activities;
>
> (b)     Whether the NFL conspired to defraud the Plaintiffs by ignoring and/or misrepresenting the risks of repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices and other activities; and
>
> (c)     Whether the repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices and other activities cause, among other things, latent neurodegenerative brain disorders, memory loss and brain disease.

**FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

**The National Football League**

46.     The NFL oversees America's most popular spectator sport, professional football, and acts as a trade association for the benefit of the 32 independently-operated Teams.   The NFL's average attendance per game in 2009 was 67,509.

47.     The NFL is engaged in assisting and guiding the operations of the Teams, and the sale of tickets and telecast rights to the public for the exhibition of the individual and collective talents of players such as the Plaintiffs-Players.

48.     The NFL as a business collects annual receipts in excess of $9.3 billion.

49.     The NFL earns billions of dollars from its telecasting deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million) and CBS ($622.5 million).

50.     Annually, the NFL redistributes approximately $4 billion in radio, television and digital earnings to the Teams or approximately $125 million per Team.  Those revenue members show no sign of declining and have increased since 2009.

51.     The NFL receives additional sources of revenue through companies that seek to associate their brands with the NFL.  The NFL has contracts with companies, such as Pepsi ($560 million over eight years, starting in 2004) and Gatorade ($45 million a year, plus marketing costs and free Gatorade for teams).  Verizon is paying $720 million over four years to be the league's wireless service provider.  Nike paid $1.1 billion to acquire the NFL's apparel sponsorship.  Previous partner Reebok had been selling $350 million annually in NFL-themed gear.

52.     On September 7, 2011, it was announced that the NFL signed a new 10-year $2.3 billion contract with Pepsi, which is one of the largest sponsorship deals in sports history.  It encompasses a number of Pepsi brands (Pepsi, Frito-Lay, Tropicana, Quaker Oaks and Gatorade).  This contract, combined with a number of other new sponsorships, ticket sales projections and TV ratings, means that the NFL is projecting record revenues of over $9.5 billion in the 2011-2012 season.

53.     The Teams often collect $25-30 million for stadium naming rights, such as MetLife Stadium in New Jersey and Lincoln Financial Field in Philadelphia, usually on 10-year naming right contacts.  Reliant Energy has a $10 million per year contract with the Houston Texans for naming rights.  In Los Angeles, Farmers Insurance has promised $700 million over 30 years to name a stadium for a team that does not exist yet.

54.     The League has a $1.2 billion, six-year contract with beer sponsor Anheuser-Busch.

55.     Many Teams that are part of the NFL own in whole or in part the stadiums in which they play, which can be a source of major commercial value, as reflected in the following chart:

| STADIUM TEAM | OPENED | PRICE (2010 Dollars) | % PRIVATE |
| --- | --- | --- | --- |
| New Meadowlands, NY | 2010 | $1.6B | 100 |
| Cowboys Stadium, DAL | 2009 | $1.15B | 56 |
| Lucas Oil Field, IND | 2008 | $780M | 13 |
| U. of Phoenix Stadium, ARI | 2006 | $493M | 32 |
| Lincoln Financial, PHI | 2003 | $588M | 65 |
| Ford Field, DET | 2002 | $504M | 49 |

| Gillette Stadium, NE | 2002 | $373M | 100 |
| Reliant Stadium, HOU | 2002 | $526M | 39 |
| Qwest Field, SEA | 2002 | $422M | 29 |
| Invesco Field, DEN | 2001 | $683M | 39 |
| Heinz Field, PIT | 2001 | $312M | 16 |

56.     In 2010, more than 17 million fans passed through turnstiles operated by Teams and paid between $54.51 (Cleveland Browns) to $117.84 (New England Patriots) for the average game ticket.  Although the NFL will not allow others to see its financial records, financial results for the publicly-held Green Bay Packers ("Packers") offer some insight into the revenues Teams receive at the ticket office and concession stands.  In 2010, the Packers received $60,059,646 in revenue from home and away game tickets plus private boxes.  Projected over 32 teams, the revenue was nearly $2 billion annually.  The Packers received $13 million from concessions, parking and local media in 2010, which translates to $416 million on a league-wide basis.

57.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the federal Sports Broadcasting Act that allows that the NFL to sell television rights for all 32 teams as a single unit.

58.     A *Forbes* magazine article recently stated that 19 NFL franchises are worth $1 billion or more.  Even the lowest-valued NFL Teams are worth approximately $800 million.

### The NFL's Influence

59.     In part because of its financial power and monopoly status in American professional football, the NFL has enormous influence over physicians, trainers, coaches, professional players and amateur players at all levels of the game regarding many issues.  Those

issues include research and education regarding the diagnosis, treatment and effects of injuries that arise in both professional and amateur football practices, scrimmages and games.

60.     The website www.nflhealthandsafety.com states that USA Football, the sport's national governing body, "is the Official Youth Football Development Partner of the NFL and the NFL Players Association ("NFLPA").

61.     USA Football leads the development of youth, high school and international amateur football.  In addition, USA Football operates programs and builds resources to address key health and safety issues in partnership with leading medical organizations.  The organization was endowed by the NFL and NFLPA through the NFL Youth Football Fund in 2002.  USA Football stands among the leaders in youth sports concussion education, particularly for football.

### The Scientific Evidence on Concussions and Head Injuries

62.     The American Association of Neurological Surgeons ("AANS") defines a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury ("TBI") as follows:

> as a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.   Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.  Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

63.     The injury generally occurs when the head either accelerates rapidly and then is stopped, or is spun rapidly.  The results frequently include confusion, blurred vision, memory loss, nausea and, sometimes, unconsciousness.

64.     Medical evidence has shown that symptoms of a traumatic brain injury or concussion can reappear hours or days after the injury, showing that the injured party had not healed from the initial blow.

65.     According to neurologists, once a person suffers a concussion, he is as much as four times more likely to sustain a second one.  Additionally, after several concussions, a lesser blow may cause the injury, and the injured player requires more time to recover.

66.     Clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple concussions sustained during an NFL player's career cause severe cognitive problems such as depression and early-onset dementia.

67.     Chronic Traumatic Encephalopathy (that is, CTE) is a progressive degenerative disease of the brain found in athletes (and others) with a history of repetitive concussions.  Conclusive studies have shown this condition to be prevalent in retired professional football players who have a history of head injury.

68.     Repetitive traumatic brain injury, including concussions, triggers the progressive degeneration of the brain tissue seen in CTE.  The symptoms associated with these degenerative changes can begin months, years or even decades after the last concussion or end of the athlete's active involvement in the sport.  The progressive degeneration results in memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression and, eventually, progressive dementia.

69.     Medical professionals have understood the risks of repeated head impacts in certain sports and the onset of brain disease for decades.  In 1928, New Jersey pathologist, Harrison Martland, described the clinical spectrum of abnormalities found in "nearly one half of the fighters [boxers] who stayed in the game long enough."   Follow-up studies on

encephalopathy and repeated head impacts in sport were published in 1952. The risk of second impacts (Second Impact Syndrome) in sport was identified in 1973. It was also clear by the 1970's that the patterns of neurodegeneration associated with head impacts in boxing also occurred in other sports.

70.    From 1931 to 2006, the National Center for Catastrophic Sport Injury Research reported 1,006 direct and 683 indirect fatalities resulting from participation in all organized football in the United States; the annual number of indirect fatalities has remained near 9.0 per year.

71.    A 1994 Ball State University survey found that "players in the 1980s suffered serious injuries and underwent operations at twice the rate of those who played in the 1950s or earlier."

72.    A study presented at the American Academy of Neurology's 52nd Annual Meeting in 2000 and authored principally by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, surveyed 1,094 former NFL players between the ages of 27 and 86 found that:   (a) more than 61% had suffered at least one concussion in their careers with 30% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; and 11% were unable to feed themselves; and (e) eight suffered from Alzheimer's disease.

73.    In 1999, former Pittsburg Steeler and Hall of Fame inductee Mike Webster filed with NFL"s Retirement Plan ("NFL Plan") a request that he receive complete disability benefits

based on the fact that he sustained repeated and disabling head impacts while a player for the Steelers.  In 1999, Webster submitted to the NFL Plan extensive medical reports and testimony that stated, among other things, that Webster suffered from "traumatic or punch drunk encephalopathy [brain disease]" sustained from playing football that left Webster totally and permanently disabled as of 1991.

74.     The NFL Plan's own physician independently examined Webster and concluded that Webster was mentally "complete and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

75.     Although the NFL Plan gave Webster less than all of the benefits available, it did set the date of his onset of total disability at 1996, six years after Webster was no longer an active player.

76.     Webster died in 2002 at the age of fifty.  In December 2006, the Webster's Estate received an unpublished opinion from the United States Court of Appeals for the Fourth Circuit that affirmed the decision of the District that the administrator wrongly denied him benefits.  In its unpublished opinion, the Fourth Circuit stated that the NFL Plan had acknowledged that the multiple head injuries Webster sustained during his playing career (1974 to 1990) "…caused Webster eventually to suffer total and permanent mental disability…."

77.     Thus, as early as 1999, the NFL, through expert medical testimony presented by Webster and the NFL Plan itself, knew and accepted that repetitive traumatic brain injuries sustained by an NFL offensive lineman led to long-term encephalopathy and permanent mental disability.

78.     A 2001 report by Dr. Frederick Mueller that was published in the Journal of Athlete Training reported that a football-related fatality has occurred every year from 1945

through 1999, except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%. High school football produced the greatest number of football head-related deaths. From 1984 through 1999, 69 football head-related injuries resulted in permanent disability.

79.    The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a clear correlation between NFL football and depression, dementia and other cognitive impairment.

80.    In 2010 an article in the *New England Journal of Medicine* entitled Traumatic Brain Injury—Football, Warfare, and Long-Term Effects, illustrated that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.

81.    To date, neuro-anatomists have performed autopsies on thirteen deceased NFL players who after their playing careers had exhibited signs of degenerative brain disease. Twelve of those players were found to have suffered from CTE.

### The NFL's Response to the Concussion Issue

82.    The NFL's repetitive traumatic brain injury and concussion problem is not new. In 1994, following the well-publicized retirements on NFL players Al Toon and Merrill Hoge, both of whom sustained serious head injuries while playing and development post concussion syndrome, then-NFL Commissioner Paul Tagliabue established the MTBI Committee to study, among other things, post concussion syndrome in NFL players.

83.    At that time, the current NFL Commissioner, Roger Goodell, was the NFL's Vice President and Chief Operating Officer.

84.     Thus, with the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.   In doing so, the NFL assumed a duty to use reasonable care in:

       a)     the study of post-concussion syndrome;

       b)     the study of any kind of brain trauma relevant to the sport of football;

       c)     the use of information developed; and

       d)     the publication of data and/or pronouncements from the MTBI Committee.

85.     Rather than exercising reasonable care in these duties, the NFL engaged in fraud, which included a campaign of disinformation designed to: (a) dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injury (concussions) and degenerative brain disease such as CTE; and (b) create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

86.     The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players caused by concussions and repetitive brain trauma received during their years as professional football players had been, until very recently, a conspiracy of deception and denial.  The NFL actively tried to conceal the extent of the concussion and brain trauma problem, the risk to the Plaintiffs, and the risks to anyone else who played football.

87.     Instead of naming a noted neurologist to chair the newly formed MTBI Committee, or at least a physician with extensive training and experience treating head injuries, Tagliabue appointed Elliot Pellman, a rheumatologist, who was a paid physician and trainer for

the New York Jets.  Pellman's training was in the treatment of joints and muscles, not head injuries.

88.    The fact that Pellman was a paid physician for an NFL Team was a conflict of interest.  At no time was Pellman independent of the NFL because an NFL Team paid him on an ongoing basis.

89.    Pellman chaired the MTBI Committee from 1994 to 2007.

90.    Under Pellman, the MTBI Committee spearheaded a disinformation campaign.

91.    Pellman and two other scientist, Ira Casson ("Casson"), a neurologist and David Viano ("Viano"), a biomedical engineer, worked to discredit scientific studies that linked head impacts and concussions received by NFL players to brain injuries.

92.    By 1994, when the NFL formed the MTBI Committee, scientists and neurologists alike were convinced that all concussions—even seemingly mild ones—were serious injuries that permanently damage the brain, impair thinking ability and memory and hasten the onset of mental decay and senility, especially when they are inflicted frequently.

93.    In 1994, the MTBI Committee began a purported study to determine the effect of concussions on the long-term health of retired NFL players.

94.    Thirteen years later, in a November 2007 report to Congress, NFL Commissioner Roger Goodell ("Goodell") characterized the study as an "initial" data collection phase and stated that "[w] e do not know when this study will be completed, although it is likely that a comprehensive study will require at least several years of research and analysis."

95.    In October of 2006, Pellman and Viano (both of whom were unqualified) published in *Neurological Focus* an interim report on the MTBI Committee's efforts that surveyed 12 years of data collection.  Pellman and Viano claimed to have analyzed "data on mild

TBIs sustained between 1996 and 2001" and concluded, "…mild TBIs in professional football are not serious injuries."

96.     Their conclusion was against the weight of the scientific evidence and based on biased data collection techniques.  This was exposed in February 2007 by *ESPN The Magazine,* which reported that Pellman was selective in his use of injury reports, omitted large numbers of players from the concussion study, and presented findings that contradicted other scientific studies into the effects of concussions.

97.     Pellman concluded that returning to play after a concussion "does not involve significant risk of a second injury either in the same game or during the season."  However, a 2003 NCAA study of 2,905 college football players found the opposite:  that those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury.

98.     Pellman and his group stated repeatedly that the NFL study showed "no evidence of worsening injury or choice cumulative effects of multiple [mild traumatic brain injury] in NFL players."  However, the 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina found a link between multiple concussions and depression among former professional players with histories of concussions.  A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

99.     Moreover, the conclusions of the MTBI Committee contradicted the medical testimony regarding Mike Webster submitted to the NFL Plan in 1999, including testimony submitted by the NFL Plan's own paid expert.

100.    As the allegations in the foregoing paragraphs of this Amended Complaint demonstrate, the research and medical conclusions concerning head injuries associated with the playing of football have a long history that contradicts the conclusions and pronouncements of the MTBI Committee.

101.    On February 1, 2010, Dr. Bennett Omalu ("Omalu"), Co-Director of the Brain Injury Institute at West Virginia University, spoke before members of the House Judiciary Committee at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football."   In his prepared testimony, Omalu stated: (a) that the medical community has known about concussions and the effects of concussions in football for over a century; (b) that every blow to the head is dangerous; and (c) that repeated concussions and traumatic brain injury have the capacity to cause permanent brain damage.

102.    A 2000 University of North Carolina study by Kevin Guskiewicz, Ph.D., found that from 1977 to 1998, an annual average of 13 athletes suffered catastrophic injuries (primarily permanent paralysis) as the direct result of participation in football.  The study also found that between 1977 and 1998, 200 football players received a permanent cervical cord injury, and 66 sustained a permanent cerebral injury.   The results of the study suggested that regarding concussions, the brain is more susceptible to injury when it has not had enough time to recover from a first injury.   The finding is important, according to the study, because concussions can lead to, *inter alia,* permanent brain damage, memory loss, vision impairment or even death if not managed properly.

103.    According to Guskiewicz, recurrent brain injuries are more likely because injured players are returning to practice and to games too quickly after blows to the head.  Guskiewicz

observed that many Team providers were not following medical guidelines that players should be symptom-free for several days before returning.

104.    A 2003 study partially authored by Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the players suffered from depression.  The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

105.    The NFL's MTBI Committee attacked these studies.

106.    In November of 2003, Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research.  Pellman called Guskiewicz in advance and questioned whether it was in the best interest of Guskiewicz to appear on the program.  On the program, Pellman (a rheumatologist unqualified in the study of traumatic brain injury) stated unequivocally that he did not believe the results of the study led by Guskiewicz.

107.    In a 2005 follow-up study, Guskiewicz found that retired NFL players who sustained three or more concussions had a fivefold greater likelihood of suffering Mild Cognitive Impairment ("MCI") than retired NFL players who had no history of concussions.  Guskiewicz based his conclusions on a survey of over 2,550 former NFL players.

108.    Later, in 2011, Guskiewicz received an award and was named a fellow by the John D. and Catherine T. McArthur Foundation, in part, because of his research and publications on mild traumatic brain injuries and concussions.

109.    Dr. Mark Lovell ("Lovell") of the MTBI Committee criticized the Guskiewicz study as lacking "scientific rigor."  The MTBI Committee also responded by presenting biased research derived from its ongoing survey of retired NFL players.  Pellman and other MTBI

Committee members published a series of studies in *Neurosurgery,* a scholarly journal edited by Mike Apuzzo, the New York Giant's neurosurgical consultant.

110.     The results reported by Pellman and the MTBI Committee selectively excluded 850 baseline tests in their data, yet included only 655 baseline tests.  In a paper published in *Neurosurgery* in December 2004, Pellman and other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concusison testing.  They concluded that NFL players did not show a decline in brain function after suffering concussions.  Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.  The paper did not explain where the players in the study groups came from specifically or why certain player data was included and that of hundreds of others was not.

111.     A November 2006 *ESPN The Magazine* article reported on how the MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players when studying the effects of concussion.

112.     Neuropsychologist William Barr (a consultant to the New York Jets and the MTBI Committee from New York University) voiced concern that Pellman might be selecting data that would downplay the effects of concussions.

113.     Later, Barr gave a lecture to the Brain Injury Association in New York and reported on a study of concussions in 3,000 college athletes.  In the lecture, Barr stated that the research showed that the best time to do neuropsychological testing was after the concussion symptoms had completely cleared, which was contrary to NFL practice.

114.     According to Barr, Pellman called him and ordered him not to make recommendations about the treatment about sports concussions without first discussing it with

Pellman.  Pellman added that if Barr ever published his NFL data, Barr would hear from the NFL's lawyers.

115.    Barr protested, and Pellman fired him as a consultant to the Jets and MTBI Committee.  Barr later memorialized the conversation in a letter to the Dean of the NYU Medical School, Richard Levin.

116.    Robert Cantú, Chief of Neurosurgery and Director of Sports Medicine at Emerson Hospital in Concord, Massachusetts, and a Senior Editor at *Neurosurgery,* observed that the extremely small sample size and voluntary participation in the NFL's study suggested there was bias in choosing the sample.  According to Cantú, no conclusions should be drawn from the NFL study.

117.    Cantú also stated that the NFL appeared to be primarily preparing a defense for when injured players eventually sued and seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

118.    Guskiewicz observed that the studies were "questionable industry-funded research."

119.    Between 2005 and 2007, Omalu and Cantú, who is also the Co-Director for the Center for the Study of Traumatic Encephalopathy ("CSTE") at the Boston University School of Medicine ("BUSM"), examined the brain tissue of three deceased NFL players:

     (a)    Mike Webster of the Pittsburg Steelers, who died of heart failure at the age of 50;

     (b)    Terry Long of the Pittsburg Steelers, who died at 45 after drinking antifreeze; and

     (c)    Andre Waters of the Philadelphia Eagles and Arizona Cardinals, who committed suicide at the age of 44.

120.    All three of these individuals suffered multiple concussions during their respective NFL careers.   All three exhibited symptoms of sharply deteriorated cognitive functions, paranoia, panic attacks and depression.

121.    In articles published in *Neurosurgery* in 2005 and 2006, Omalu found that Webster and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their professional playing years in the NFL.

122.    Cantú reached a similar conclusion as to Waters in an article published in *Neurosurgery* in 2007.

123.    In response to Omalu's article on Webster, Casson wrote a letter in July 2005 to the editor of *Neurosurgery* asking that Omalu's article be retracted.

## Pellman's Removal From the MTBI Committee

124.    Pellman stepped down as the head of the MTBI Committee in February 2007.

125.    Guskiewicz, who is research director of UNC's Center for the Study of Retired Athletes, said at the time that Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

126.    Regarding the work of Pellman, Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions; "but " [Pellman] continued to say on the record that's not what they find and there's no truth to it."

127.    Pellman was replaced as chair of the MTBI Committee by Casson and Viano, who continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries sustained by NFL players during their playing days.  When

asked in 2007 whether concussions could lead to brain damage, dementia or depression, Casson denied the linkage six separate times.

128.    In June 2007, the NFL convened a Concussion Summit for team doctors and trainers.   Independent scientists, including Omalu, Cantú, and Guskewicz, presented their research to the NFL.

129.    At the summit, Casson told team doctors and trainers that CTE has never been scientifically documented in football players.   After reviewing five years of data of on-field concussions, the NFL concluded that there was **no evidence** for an increase in secondary brain injuries after a concussion.   Two months later, the NFL issued a concussion pamphlet to players that claimed:

> [C]urrent research with professional athletes **has not shown** that having more than one or two concussions leads to permanent problems if each injury is managed properly.  It is important to understand that **there is no magic number for how many concussions is too many**."   (Emphasis added).

130.    The Plaintiffs relied on the pamphlet and all the other prior disinformation provided by the NFL, all of which was contrary to the findings of the independent scientists Guskiewicz, Cantú, Omalu and Bailes regarding the casual link between multiple concussions and cognitive decline.

131.    The NFL's conflict of interest and motive to suppress information regarding the risks of repetitive traumatic brain injuries and concussions was vividly demonstrated by Pellman's treatment of a concussion sustained by former star New York Jets player Wayne Chrebet.  This occurred in 2003, the same time period during which Pellman chaired the MBTI Committee.

132.    In November 2003, Chrebet sustained a concussion from another player's knee to the back of his head.  The impact left him face down on the field in an unconscious state for several minutes.  Once Chrebet was on the sideline and conscious, Pellman administered tests. Pellman knew that Chrebet sustained a concussion, but reportedly Chrebet performed adequately on standard memory tests.  According to news reports, Pellman asked Chrebet some questions, including whether he was "okay."  Chrebet responded that he was.  Reportedly, Pellman told Chrebet, "This is very important for your career," and sent Chrebet back into the game.  Shortly thereafter, Chrebet was diagnosed with post-concussion syndrome and kept out of games for the remainder of the 2003 season.

133.    Today Chrebet is 34 years old and reportedly suffers from depression and memory problems.

134.    The incident shows that the culture of the football and the economic incentives within the NFL encourage NFL employees to return players to the field in the same game even after being knocked unconscious and sustaining significant concussions.  The absence of star players like Chrebet for any significant length of time can and will adversely affect the competitiveness of the NFL Team for which the player plays, the Team's ticket and merchandise sales and its overall revenue.

135.    Moreover, the majority of NFL player contracts do not guarantee any payment and require the player to pass physical and medical examinations at the beginning of every season.  Further, college teams supply the NFL every year with hundreds of new players, all of whom seek to replace existing players.  As a result, players are encouraged to under report repetitive traumatic brain injury and concussions and return to the field despite such injuries to maintain their positions on the field and maintain their contracts.

Amended Complaint                                                                                                   **30** | P a g e

136.    In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part.  The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

137.    The NFL, which commissioned the study, responded to the results by claiming that the study was incomplete.  NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose dementia.  Casson, the new co-chair of the MTBI Committee, implied that the Michigan study was inconclusive and stated that further work was required.

138.    In 2008, Dr. Ann McKee ("McKee") of the CSTE at BUSM examined the brain tissue of two other deceased NFL players:  (a) John Grimsley ("Grimsley") of the Houston Oilers, who died of a gunshot wound at the age of 45; and (b) Tom McHale ("McHale") of the Tampa Bay Buccaneers, Philadelphia Eagles and Miami Dolphins, who died of a drug overdose at the age of 45.  McKee found that Grimsley and McHale's brain tissue exhibited indications of CTE and stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions."  McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

139.    In response, Casson criticized McKee's studies by characterizing each result as an isolated incident from which no conclusion could be drawn and said he would wait to comment further until McKee's research was published in a peer-reviewed journal.  When McKee's research was published in 2009, Casson asserted, "There is not enough valid, reliable or

objective scientific evidence at present to determine whether…repeat head impacts in professional football result in long term brain damage."

140.    Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Omalu and other independent studies linking multiple NFL head injuries with cognitive decline.  Bailes recalled that the MTBI Committee's reaction to his presentation was adversarial:  "The Committee got mad…we got into it.  And I'm thinking, 'this is a …disease in America's most popular sport and how are its leaders responding?  Alienate the scientist who found it?  Refuse to accept the science coming from him?'"

### The Congressional Inquiry

141.    Shortly after the Michigan study was released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

142.    Cantú and McKee testified before the House of Representatives, Committee on the Judiciary, to discuss the long-term impact of football-related head injuries.

143.    In the first hearing, in October 2009, Rep. Maxine Waters stated, "I believe you are an $8 billion organization that has failed in your responsibility to the players.  We all know it's a dangerous sport.  Players are always going to get injured.  The only question is are you going to pay for it?  I know that you dearly want to hold on to your profits.  I think it's the responsibility of Congress to look at your antitrust exemption and take it away."

144.    NFL Commissioner Roger Goodell admitted to the extraordinary power and influence of the NFL.  He testified at the hearing that the NFL is "fortunate to be the most popular spectator sport in America.  In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players

also do so and nearly seventy five thousand collegiate players as well.  We must act in their best interest even if these young men never play professional football."

145.    Goodell also testified regarding the work of the MTBI Committee and stated that "[i]n the past 15 years, the N.F.L. has made significant investments in medical and biomechanical research.  All of that information has been made public, subjected to thorough and on-going peer review, published in leading journals, and distributed to the N.F.L.P.A. and their medical consultants.  We have been open and transparent, and have invited dialogue throughout the medical community."

146.    When Representative Sanchez questioned Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies and the potential for bias, Goodell evaded answering the questions.

147.    At the same hearing, NFLPA Executive Director DeMaurice Smith took a very different view from Goodell and testified:

> While this is the first N.F.L.-accepted study that demonstrated a connection between on-field injury and post career mental illness, there have been studies over the last decade highlighting that fact. Unfortunately, the N.F.L. has diminished those studies, urged the suppression of the findings and for years, moved slowly in an area where speed should have been the impetus.

148.    After the Congressional hearings, the NFLPA called for the removal of Casson as MTBI Committee co-chair and stated, "Our review is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

149.    Casson and Viano resigned as co-committee chairmen after the 2009 congressional hearings.  During the hearings, Casson was criticized for his "continued denials of

any link among retired players between injuries sustained in professional football and heightened rates of dementia."

150.    Shortly after the Congressional hearings, the NFL announced that it would impose rules that required players who exhibit concussion symptoms to be removed from a game or practice and be barred from returning the same day.  In a change of policy, the NFL decided that "independent experts" would decide who returns to play and who has to sit out so their brain can heal.

151.    The change contradicted past statements by the MTBI Committee, which had recommended as safe the league's practice of returning players after a concussion.  In the journal *Neurosurgery* in 2005, for example, the MTBI Committee had stated, "[P]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

152.    In December 2009, NFL spokesman Aiello, who had vigorously denied the link between concussions and brain injury in September 2009, contradicted the NFL's previous pronouncements and stated that it was "quite obvious from the medical research that's been done that concussions can lead to long-term problems."

153.    Though "quite obvious" to sophisticated professionals involved in the study of concussions, the NFL, its MTBI Committee, and its so called "experts" deliberately obfuscated, denied, and attempted to repudiate accepted science for the previous fifteen years.

154.    On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, age 26, who played in the NFL from 2004 to 2009, died after falling from the back of a pickup truck.

Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed Henry with CTE.

155.    In November 2009 the Associated Press surveyed one hundred and sixty NFL players.  Thirty stated that they did not report or under-reported concussions and returned to play, even though suffering from blurred vision and other concussions symptoms.

156.    In January 2010, the House Judiciary Committee held further hearings on Football Player Head Injuries.  Chairman Conyers noted, "Until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

157.    The problem, however, continued.  Casson provided oral and written testimony at the January 2010 hearings and continued to deny the validity of other studies, stating, "[T]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

158.    Rep. Linda Sanchez soundly criticized the NFL at the hearings and stated:

> I find it really ridiculous that he's saying that concussions don't cause long-term cognitive problems.  I think most people you ask on the street would figure that repeated blows to the head aren't good for you.

159.    Rep. Linda Sanchez further commented that:

> It seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years.  Why did it take 15 years?

### The NFL's New Medical Committee

160.    In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (hereinafter the "Medical Committee") and announced that Pellman would no longer be a member of the panel.  Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Casson and Viano.  The two new co-chairmen selected Dr. Mitchell S. Berger to serve on the new committee.

Amended Complaint

161.     Under its new leadership, the Medical Committee admitted that data collected by the NFL's former brain-injury leadership was "infected," and said that their Committee should be assembled anew.  The Medical Committee formally requested that Pellman not speak at one of the Medical Committee's initial conferences.

162.     During a May 2010 hearing, the Congressional Committee made it plain to Batjer and Ellenbogen that the NFL: "[had] years of an infected system here, and your job is…to mop [it] up."

163.     Shortly after the May 2010 hearing, Batjer was quoted as saying, "[W]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us.  I wouldn't put up with that, our universities wouldn't put up with that and we don't want our professional reputations damaged by conflicts that were put upon us."

164.     The NFL continued its deficient response to head injuries as the 2010 season began and the league's concussion problems continued.  In the first game of the 2010 season, Philadelphia Eagles middle linebacker Stewart Bradley sustained a head injury, staggered when he attempted to walk and collapsed.

165.     Former Dallas Cowboys quarterback Troy Aikman, who suffered multiple concussions as a player, was analyzing the game on television and commented, "[I]t's hard to imagine [Bradley] coming back into this game in light of what we just saw."  Four minutes later, however, Bradley was back in the game.

166.     In the same game, Eagles quarterback Kevin Kolb was sidelined by a concussion. He also re-entered the game.

167.     Recently, former New York Giants linebacker Harry Carson was asked about the concussion issue and was quoted as saying:

> Physically, I have aches and pains, but that comes with playing the game. But if somebody tells you neurologically you could sustain some kind of brain damage that will go with you the rest of your life.  If somebody had told me that a long time ago, I don't frankly think I would have [played].

### The NFL's New Player Safety Rules

168.     After decades of ignoring the issue and sixteen (16) years of a fraudulent campaign of disinformation, in October of 2010, the NFL finally addressed the concussion issue in a meaningful way.  On October 20, 2010, in the wake of a series of dangerous and flagrant hits resulting in concussions, the NFL levied fines totaling $175,000 on three players, James Harrison, Brandon Meriweather and Duanta Robinson.

169.     In discussing Meriweather's helmet to helmet hit on Baltimore Ravens tight end Todd Heap, NFL Executive Vice President of Football Operations Ray Anderson stated:

> [I]n our view, the hit was flagrant and egregious.  *Effective immediately,* that's going to be looked at at a very aggressive level, which would include suspension without pay…What I would tell you is that if there are flagrant and egregious violations of our current rules, we will be enforcing, *effective immediately,* discipline at a higher level.  (Emphasis added).

170.     That same day, NFL Commissioner Roger Goodell forwarded a memorandum to all 32 NFL teams with a message that was to be read to all players and coaches.  Also forwarded to each team was a video showing the types of hits that are against NFL rules.

171.     The NFL memorandum provided, in part, that:

> Violations of the playing rules that unreasonably put the safety of another player in jeopardy have no place in the game, and that is especially true in the case of hits to the head and neck.  Accordingly, from this point forward, you should be clear on the following points:  (1) Players are expected to play within the rules.  Those who do not will face increased discipline, including suspensions, starting with the first offense; (2)

> Coaches are expected to teach playing within the rules.  Failure to do so will subject both the coach and the employing club to discipline; (3) Game officials have been directed to emphasize protecting players from illegal and dangerous hits, and particularly from hits to the head and neck.  In appropriate cases, they have the authority eject players from a game.

172.    Two days later, the NFL sent a second memorandum to all teams providing each coach with the names of the team's players who have multiple infractions of the new NFL safety rules.  NFL Spokesman Aiello stated regarding the second memorandum, "the purpose was to provide an opportunity for the coach to give extra caution to those players to abide by the safety rules."

173.    On February 17, 2011, former Chicago Bears and New York Giants player Dave Duerson committed suicide.  Only 50 at the time, Duerson had suffered months of headaches, blurred vision and faltering memory.   After his death, Cantú determined that Duerson was suffering from CTE.

174.    Before his death, Duerson wrote a final note that asked that his brain be given to the NFL brain bank for evaluation.

175.    In connection with Duerson's death, the Duerson family made a public statement that it was their hope that, through research, questions would be answered that would lead to a safer game of football, from professional to Pop Warner level.

176.    When this information was reported, NFLPA Executive Director DeMaurice Smith stated that the fact that Duerson was suffering from CTE "makes it abundantly clear what the cost of football is for the men who played and the families.  It seems to me that any decision or course of action that doesn't recognize that as the truth is not only perpetuating a lie, but doing a disservice to what Dave feared and what he wanted to result from the donation of his brain to science."

177.    Another example is provided by the case of John Mackey ("Mackey"), the former tight end of the Baltimore Colts, who died in July 2011 and for whom the 88 Plan described below was named.  Mackey was diagnosed with front temporal lobe dementia in 2007, forcing him to live full-time in an assisted living facility.

178.    The NFLPA refused to pay a disability income to him because it claimed that there was no proven direct link between brain injury and NFL game participation.  When the 88 Plan came into being, Mackey received payments, but far less than his family's cost.  Mackey made less than a total of $500,000 during his decade-long NFL career.

179.    In October 2011, Dr. Berger of the NFL's Medical Committee announced that a new study was in the planning process and disassociated himself and the Medical Committee from the previous work of the MTBI Committee.  Addressing problems with the previous NFL long-range study, a *New York Times* article reported that Dr. Berger said, "There was no science in that."  Dr. Berger further stated that data from the previous NFL study would not be used.  "We're really moving on from that data.  There's really nothing we can do with that data in terms of how it was collected and assessed."

180.    In November 2011, the NFL's injury and safety panel issued a directive telling its game officials to watch closely for concussion symptoms in players.  The directive came 10 days after San Diego guard Kris Dielman sustained a head injury during a game on October 23, finished playing in the game and was not assessed until afterward.  On the team's flight home, Dielman suffered a grand mal seizure.

### The NFL's Power and Influence

181.    The NFL possesses monopoly power over American football.  As such, it also possesses overwhelming influence over the research and education relating to football injuries,

and that influence reaches every person who plays football or who has a family member who plays football.

182.    The NFL voluntarily and purposefully asserted this influence over physicians, trainers, coaches, individuals with brain damages such as the Plaintiffs, children and teenagers who play the game, and parents and families of football players.  Those persons reasonably relied on the NFL to act with prudence and care, not to ignore a serious health problem and not to propagate false and misleading information about that problem.  The NFL owed a duty to the foregoing persons, including the Plaintiffs, in the following respects:

a)    The NFL owed a duty of reasonable care to protect Plaintiffs-Players on the playing field;

b)    The NFL owed a duty of reasonable care to Plaintiffs-Players to educate them and other players in the NFL about CTE and/or concussion injury;

c)    The NFL owed a duty of reasonable care to Plaintiffs-Players to educate trainers, physicians, and coaches about CTE and/or concussion injury;

d)    The NFL owed a duty of reasonable care to Plaintiffs-Players to have in place strict return-to-play guidelines to prevent CTE and/or concussion injury;

e)    The NFL owed a duty of reasonable care to Plaintiffs-Players to promote a "whistleblower" system where teammates would bring to the attention of a trainer, physician or coach that another player had sustained concussion injury;

f)    The NFL owed a duty of reasonable care to Plaintiffs-Players to design rules to eliminate the risk of concussion during games and/or practices;

g)    The NFL owed a duty of reasonable care to Plaintiffs-Players to minimize the risk of concussion during games and/or practices;

h)    The NFL owed a duty of reasonable care to Plaintiffs-Players and their respective families to promote valid research into and cure for CTE and the effects of concussion injury over a period of time; and

i)      The NFL owed a duty of reasonable care to local sports organization, all American Rules Football leagues, players at all levels of the game and the public at large to protect against the long-term effects of repetitive traumatic brain injury concussions.

### The NFL's Knowledge of the Risks

183.    For decades, the NFL has known that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression and CTE and its related symptoms.

184.    Throughout the past century and through the present, medical literature in the United States and other industrialized countries has included case reports, studies, reviews and peer-reviewed articles relating to and discussing the harmful effect on humans, particularly players of American football, of repeated blows to the head.  These publications were all available and easily accessible to all Defendants.

185.    The NFL, in fact, had acknowledged in its dispute with Mike Webster over disability benefits that the multiple head injuries Webster sustained during his playing career (1974 to 1990) "…had caused Webster eventually to suffer total and permanent mental disability…." However, until June of 2010, the NFL concealed these facts from other players, coaches, trainers and the public and actively spread disinformation to prevent the true facts from coming to light.

186.    The NFL knew of the risks, but undertook measures that did not sufficiently or adequately protect against the risks:

a)      In 1977, the NFL enacted an inadequate rule that prohibited players from slapping the head of another player during play.  This rule was referred to as the "Deacon Jones Rule," named after the Rams' defensive end who frequently used this technique;

b)      In 1977, the NFL enacted an inadequate rule that prohibited offensive linemen from thrusting their heads into a defender's neck, face or head;

c)      In 1980, the NFL enacted an inadequate rule that prohibited players from using their helmets to butt, spear or ram an opponent;

d)      In 1980, the NFL enacted inadequate rule changes that prohibited players from directly striking, swinging, or clubbing the head, neck or face ("personal foul");

e)      In 1983, the NFL enacted an inadequate rule that prohibited players from using a helmet as a weapon to strike or hit an opponent;

f)      In 1988, the NFL enacted an inadequate rule that prohibited defensive players from hitting quarterbacks below the waist while they are still in the pocket.  (The rule was unofficially called the "Andre Waters Rule" based upon a hit that Waters placed on Los Angeles Ram quarterback Jim Everett in 1988); and

g)      Following the 2004-2005 season, the NFL's Competition Committee reviewed video of the entire season and concluded that the horse-collar tackle resulted in six serious injuries.  On May 23, 2005, the NFL owners voted 27-5 to ban such tackles.  The ban states that horse-collar tackle is an open-field tackle in which a defender uses the shoulder pads to immediately bring a ball carrier down.

187.    None of the foregoing measures adequately addressed repetitive traumatic brain injuries and concussions.

188.    On August 14, 2007, while the MTBI Committee was still spreading misinformation, the NFL issued inadequate and insufficient concussion guidelines, many of which stemmed from an NFL conference in June of 2007 involving a team of trainers and doctors.  Those inadequate guidelines were sent to all current players and team personnel.

189.    The insufficient and inadequate guidelines included an informational pamphlet provided to all current NFL players to aid in identifying symptoms of a concussion.  This information was later withdrawn by one of the outside counsel of the NFL in a separate letter to

its disability plan.  The NFL's August 14, 2007 press release denied that "more than one or two concussions" lead to permanent problems.

190.    In a statement issued by the NFL on August 14, 2007, NFL Commissioner Goodell, introduced the NFL's 2007 concussion guidelines by saying, "We want to make sure all NFL players, coaches and staff members are fully informed and take advantage of the most up-to-date information and resources as we continue to study the long-term impact of concussions."

191.    The NFL Commissioner also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

192.    The NFL, however, later acknowledged that the 2007 guidelines were inadequate and insufficient.  As a result, the NFL enacted more strict regulations to handle concussions starting in the 2009 season.  Specifically, the NFL announced new rules on managing concussions requiring players who exhibit any significant concussion signs to be removed from a game or practice and be barred from returning the same day.

193.    Nevertheless, it was not until June of 2010 that the NFL warned any player of the long-term risks associated with multiple concussions, including dementia, memory loss, CTE and other symptoms.

194.    The NFL's conduct stands in sharp contrast to what has been done or promulgated by other sports or medical bodies.

195.    For example, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states:  "[b]oxers that suffered concussion by KO, should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including not limited to KO's, and should not compete in a boxing match in less than 75 days."

196.    The Second International Conference on Concussion in Sport met in Prague in 2004 and released the following statement:  "[W]hen a player shows ANY symptoms or signs of a concussion…the player should not be allowed to return to play in the current game or practice…When in doubt, sit them out!"  (Emphasis added.)  This directive echoed the position taken by the First International Conference on Concussion in Sport held in Vienna in 2001.

197.    As ESPN reported in 2006, "[A]ll standard U. S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

198.    Another example is provided by the National Collegiate Athletic Association ("NCAA"), which also recognized inexcusably late the link between head impacts and brain injuries and did not take affirmative action on this until 2010.  The NCAA is the subject of at least two class action suits for this tardiness.  Nevertheless, once it did act, it did so in a manner that was more decisive than the NFL.

199.    The NCAA's webpage on concussion-related resources indicates that in an educational partnership with the Centers for Disease Control and Prevention, the NCAA has supplied each member college campus with two posters and two sets of fact sheets addressing concussion awareness, prevention and management.  It has issued the "NCAA Sports Medicine Handbook – Guideline on Concussions in the Athlete," which recommends best practices.  The NCAA also requires each member college to develop a "Concussion Management Plan."  One exemplar plan offered on the NCAA's website is the University of Georgia Athletic Association's ("UGAA") "Concussion Management Guidelines," which requires, among other things, a concussion management plan baseline assessments of all student-athletes in any sport, whether or not they have a history of concussions or concussion-like symptoms.

**The NFL's Conduct Rises Beyond Mere Negligence**

200.     The aforementioned acts and omissions of the NFL show that the NFL acted with callous indifference to the duty it voluntarily assumed to the Plaintiffs and players at every level of the game.

201.     The NFL acted willfully, wantonly, egregiously, with reckless abandon and with a high degree of moral culpability.   The NFL knew that a substantial risk of permanent and debilitating physical and mental harm to the Plaintiffs existed in connection with repeated concussive blows to the head; namely, the danger of irreversible brain-damage and/or dementia. The NFL willfully and deliberately disregarded the safety of the Plaintiffs and players at every level of the game by: (a) failing to address or disclose the substantial short-term and long-term risk associated with concussions; (b) actively engaging in a campaign of misinformation on the risks and dangers of repetitive traumatic brain injuries and concussions; and (c) promulgating rules within in the NFL Teams that permitted injured players to return to the playing fields immediately or soon after they had sustained a traumatic brain injury and/or a concussion.

## COUNT I

## ACTION FOR DECLARATORY RELIEF--LIABILITY

202.     Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

203.     There is a case and controversy among Plaintiffs on the one hand and the NFL on the other.

204.     Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaration as to the following:

    a)     that the Defendant NFL knew or reasonably should have known that the repeated traumatic brain and head impacts, as well as concussions, suffered by the Plaintiffs-Players while playing NFL football were likely to put them at excess risk to neurodegenerative

    disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions;

 b) that the Defendant NFL had a duty to advise Plaintiffs-Players of these medical risks;

 c) that Defendant NFL willfully and intentionally concealed from and misled the Plaintiffs-Players concerning these medical risks; and

 d) that Defendant NFL recklessly endangered Plaintiffs-Players.

## COUNT II

## CONSPIRACY TO DEFRAUD

205. Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

206. The Defendant NFL actively and deliberately agreed and conspired with its Team members, independent contractors and/or agents to minimize, discount and reject the casual connection between multiple concussions suffered by present and former NFL players and neurodegenerative disease and other mental health symptoms.

207. The common goal of the co-conspirators was to discourage talented players from retiring and to persuade all players to return to football games regardless of the concussions and brain trauma they sustained.  Rather than implementing a rational science-based protocol that would force players to not play in games (or possibly retire), the NFL conspired with members of the MTBI Committee to conceal and/or misrepresent scientific research and the truth of the risks to players.

208. The MTBI Committee was an instrumentality of the conspiracy.  Upon its creation, the MTBI Committee was highly publicized as the NFL's purported good faith effort to search for the truth and report its finding to the general public, players and NFLPA.

209.    The MTBI Committee, however, acted to refute and criticize the proof showing the causal link between multiple traumatic brain injuries and permanent cognitive decline and to create competing studies that were biased, against the weight of scientific knowledge and opinion, and purposefully designed to justify the NFL's publicly stated opinion that there was no causal link between multiple traumatic brain injuries and permanent cognitive decline.

210.    The MTBI Committee was created and authorized by the executive leadership of the NFL.  Its members included trainers and physicians employed by NFL Teams.

211.    Instead of hiring unbiased scientists of unimpeachable integrity and national reputations, the NFL leadership, based in New York, selected Pellman to Chair of the MTBI Committee.

212.    Pellman was and is a Team trainer paid by the New York Jets.

213.    Under the leadership of Pellman (and even after Pellman resigned), the MTBI Committee purposefully misrepresented to players and the public the true risks associated with repetitive traumatic brain injuries.

214.    Other third parties who conspired with the NFL include, but are not limited to, the Teams, NFL Properties, LLC and various as yet un-named persons in leadership positions in the NFL, the Teams and NFL Properties, LLC.

215.    On information and belief, the agreements among the co-conspirators occurred primarily in the NFL corporate offices in New York City.

216.    On information and belief, the agreements among the co-conspirators led to policies and decisions by the NFL whose objectives were to prevent players from having accurate and correct scientific information regarding the cause and effect relationship between: (a) concussions and brain trauma during NFL games and practices; and (b) long-term

Amended Complaint                                                                                    **47** | P a g e

neurological brain damage, including the early onset of dementia and Chronic Traumatic Encephalopathy ("CTE").

217.   Another objective of the conspiracy was to prevent persons bargaining on behalf of players to have sufficient knowledge to demand that policies, procedures and conditions be included in the Collective Bargaining Agreements and other contracts that were sufficient for the protection of players in connection with brain trauma and concussions.

218.   The conspiracy also included a third objective, which was to deprive players of their right to seek damages for concussion-related injuries in court by using the Collective Bargaining Agreements as a purported future bar to any civil court action by players.

219.   Since, however, the public and widely promoted position of the NFL was that concussions in NFL games and practices were not a long-term risk to players and unconnected to degenerative brain disease and disorders, the Collective Bargaining Agreements cannot be the source of the duties of the NFL as to repetitive traumatic brain injuries and concussions.

220.   As a result, the NFL conspiracy to defraud caused or contributed to the injuries and increased risks to Plaintiffs-Players through the NFL's acts and omissions by: (a) failing to disclose the true risks of repeated traumatic brain and head impacts in NFL football; (b) failing to take appropriate steps to minimize and mitigate repetitive traumatic brain injuries and concussions in NFL football games and practices; and (c) deliberately creating misleading scientific studies and spreading misinformation concerning the cause and effect relation between brain trauma in NFL games and practices and latent neurodegenerative disorders and diseases.

221.   The misconduct by the Defendants was a proximate cause of the chronic injuries and damages suffered by the Plaintiffs.

222.     As a result of the Defendants' misconduct, Defendants are jointly and severally liable to Plaintiffs.

## COUNT III

### FRAUDULENT CONCEALMENT

223.     Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

224.     Defendant NFL concealed facts and information that caused all the Plaintiffs-Players to become exposed to the harm referenced above.

225.     As a result of the Defendants' misconduct, Defendants are liable to Plaintiffs.

226.     As a proximate cause of the concealment of the Defendant NFL, each Plaintiff Player suffered harm described above and each has suffered damages that are continuing in nature and as yet have not been fully ascertained.

227.     The Plaintiffs-Players demand compensatory damages from Defendant NFL in an amount to be determined at trial, plus interest, costs and attorney's fees.

## COUNT IV

### FRAUD

228.     Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

229.     From 1994 through June of 2010, the NFL made material misrepresentations to its players, former players, Congress and the public at large that there was no link between concussions and later life cognitive/brain injury, including CTE and its related symptoms.

230.     Agents of the NFL and the NFL itself intended to defraud, among others, the Plaintiffs-Players in this action.

231.    The   Plaintiffs-Players   justifiably   and   reasonably   relied   on   these misrepresentations to their detriment.

232.    As a result of the Defendants' misconduct as alleged herein, Defendants are liable to Plaintiffs-Players.

233.    The Plaintiffs were damaged by the misrepresentations and now require or will require in the future, among other things, medical care. Plaintiffs also suffered loss of consortium, loss of employment, medical costs and pain and suffering.

234.    As a result of the injuries and damages Plaintiffs have suffered and will suffer, they are entitled to damages from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000 for each Plaintiff-Player and Plaintiff-Spouse.

## COUNT V

## NEGLIGENT MISREPRESENTATION

235.    Plaintiffs   incorporate   by   reference   all   prior   paragraphs   of   this   Amended Complaint.

236.    Defendant NFL misrepresented the dangers that the Plaintiffs-Players faced in returning to action too quickly after sustaining a head injury.  The NFL's MTBI Committee made public statements, published articles and issued the concussion pamphlet, which the NFL knew or should have known was misleading, downplaying and obfuscating the true risks of concussions to NFL players.

237.    The MTBI Committee made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings and information issued to Plaintiffs-Players.

238.     The Defendants' misrepresentations included statements that present and former NFL players were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering head trauma.

239.     The Defendants made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of knowledge, that the Plaintiffs faced health problems if they returned to a game too soon.

240.     The Defendants knew or should have known the misleading nature of the statements when they were made.

241.     The Defendants made the misrepresentations and actively concealed information with the intention that the Plaintiffs-Players would rely on the misrepresentations or omissions in selecting a course of action.

242.     As a result of the Defendants' misconduct, Defendants are liable to Plaintiffs.

243.     As a direct and proximate result of the Defendants' negligence, careless and negligent conduct and omissions, the Plaintiffs-Players suffered personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering and emotional distress. The Plaintiff-Players' spouses suffered loss of consortium.

## COUNT VI

## NEGLIGENCE

244.     Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

245.     The NFL has historically assumed an independent and voluntary duty to invoke rules that protect the health and safety of its players.

246.    Throughout its history, the NFL has consistently adopted and exercised a duty to protect the health and safety of its players by implementing rules, policies and regulations.

247.    By enacting such rules, policies and regulations, the NFL has repeatedly confirmed its duty to take reasonable and prudent action to protect the health and safety of its players in the fact of a known and foreseeable risk.

248.    The NFL breached its duty to its players, including the Plaintiffs-Players, by failing to implement mandatory rules that would prevent a player who suffered a traumatic brain injury and/or concussion from re-entering a football game or practice.

249.    Not until 2007 did the NFL implement league-wide guidelines concerning the treatment and monitoring of players who suffer a concussive brain injury during a game.  Those the NFL did implement were insufficient and inadequate.

250.    The NFL breached the duty it voluntarily assumed by the following failures:

    a)    Failure to institute acclimation requirements or procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

    b)    Failure to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiffs-Players;

    c)    Failure to require that an adequate concussive brain injury history be taken of all NFL players;

    d)    Failure to accurately diagnose and record concussive brain injuries so the condition can be treated adequately and timely;

    e)    Failure to establish league-wide guidelines, policies and procedures regarding the identification and treatment of concussive brain injury;

    f)    Failure to establish protective, responsible and medically-based return-to play criteria for players who have suffered concussive brain injury;

g)      Failure to license and approve the best equipment available that will reduce the risks of concussive brain injury; and

h)      Failure to provide complete, current and competent information and directions to NFL athletic trainers, physicians and coaches regarding concussive brain injuries and its prevention, symptoms and treatment.

251.    As a result of the Defendants' misconduct, Defendants are liable to Plaintiffs.

252.    Had the NFL taken the necessary steps to oversee and protect the NFL players, including the Plaintiffs-Players, by developing and implementing necessary guidelines, policies and procedures, providing reasonably safe helmets, and educating and training all persons involved with the NFL Teams in the recognition, prevention and treatment of concussive brain injuries, the Plaintiffs-Players would not have suffered from their current and progressive conditions, which include, but are not limited to, long-term brain damage, memory loss, early on-set of dementia and depression.

253.    Under all of the above circumstances, it was foreseeable that the NFL's violations of its duties would cause or substantially contribute to the personal injuries suffered by the Plaintiffs-Players and the Plaintiff-Spouses.

254.    The NFL committed acts of omission and commission, which collectively and severally, constituted negligence.  The NFL's negligence was a proximate and producing cause of the injuries and other damages suffered by the Plaintiffs.

255.    As a result of the injuries, the Plaintiffs are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $75,000 for each Plaintiff-Player.

## COUNT VII

## MEDICAL MONITORING

256.    Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

257.    The Plaintiffs-Players experienced repeated traumatic brain and head impacts, including concussions, during their respective NFL careers that increased their risk to neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions.

258.    Defendant NFL was aware of the danger of exposing the Plaintiff-Players to further injury by allowing them to play with these injuries or to play prior to the time that such injuries could heal.  Until June 2010, the Defendant NFL failed to warn players of these medical risks.   Instead, Defendant NFL attempted to conceal the harmful effects of football-related concussions from all players prior to that time.  Furthermore, Defendant NFL breached its duty of reasonable and ordinary care to the Plaintiffs-Players by failing to protect their physical and mental health and failing to provide necessary, adequate and truthful safety information.

259.    As proximate result of Defendant NFL's tortious conduct, the Plaintiffs-Players have experienced an increased risk of developing serious latent neurodegenerative disorders and diseases including but not limited to CTE, Alzheimer's disease and other cognitive-impairing conditions.

260.    Monitoring procedures exist that comport with contemporary scientific principles and make early detection of cognitive impairment possible.  Such monitoring includes baseline exams, diagnostic exams and behavioral and pharmaceutical interventions, which will prevent or mitigate the adverse consequences of the latent neurodegenerative disorders and diseases

associated with the repeated traumatic brain and head impacts. Further, such monitoring is not available pursuant to the normal medical treatment proscribed for adult males.

261.    Plaintiffs-Players seek an injunction creating an NFL-funded medical monitoring regime for the Plaintiffs-Players that will: (a) monitor, detect and diagnose as quickly as possible brain damage and/or other related conditions that have arisen from the repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs-Players; and (b) provide adequate treatment in the event a neurodegenerative disorder or disease is diagnosed.

262.    The medical monitoring regime should include, *inter alia:*

a)      a trust fund in an amount to be determined to pay for the medical monitoring of all NFL players as frequently and appropriately as necessary; and

b)      notification to all Plaintiffs-Players in writing (in addition to notices to each Team member of the NFL and health care providers) that specific former and current players require frequent medical monitoring; and

c)      a trust fund in an amount to be determined to pay for the medical treatment of the Plaintiffs-Players diagnosed with brain damage and/or other related conditions that have arisen from the repetitive traumatic brain injuries and/or concussions they sustained.

263.    Plaintiffs-Players have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to repetitive traumatic brain impacts, concussions and/or sub-concussive injuries.

Without a Court approved and/or established medical monitoring program, the Plaintiffs-Players will continue to face an unreasonable risk of injury and disability.

## ALLEGATIONS AGAINST THE RIDDELL DEFENDANTS

264.    The Riddell Defendants have operated as a business through designing, developing, manufacturing, selling, and distributing football equipment, including helmets, in one form or another since 1992.

265.    As early as the 1930s, players began using helmets during football games.  These early helmets were constructed from pieces of cobbled leather.

266.    In the early 1940s, John T. Riddell, who later formed John T. Riddell Incorporated, invented the first plastic suspension helmet.  In 1949, plastic helmets legalized.

267.    Throughout the latter half of the 20th century and continuing to present day, the Riddell Defendants have designed, developed, manufactured, sold, and distributed equipment used in the NFL, including equipment used by Plaintiffs, including, but not limited to, the following:

(a) In the 1950s, the Riddell Defendants manufactured a face-mask component for its helmets, which was eventually patented.

(b) In 1962, the Riddell Defendants used a "U" shaped nose protector with a shell (known as the TK2) molded out of polycarbonate.  The Riddell Defendants also designed an open/closed cell foam and composite liner system for this model to increase the efficiency of the webbed suspension.

(c) In 1963, the Riddell Defendants developed the TAK-29 helmet, which was the first to use air inflation for fitting the helmet snug to the head.  The TAK-29 shell, like the TK2, displayed the protective polycarbonate plastic, in addition to including tough shock and

cut-resistant face-mask attachment straps.

(d) In 1969, recognizing that head protection was a key factor in helmet design requiring durable head protection, the Riddell Defendants constructed a micro-fit helmet model with injection molding technology to create a one-piece shell to improve the structural integrity of the entire helmet.

(e) In 1973, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed an air cushion helmet whose interior system consisted of individual vinyl air cushions with layers of fitting and energy absorbing foam.  When a blow was struck, the air in the cushion was expelled through a single vent, greatly reducing the initial impact. With the exhausting or the air cushion, the compressed fitting foam was further compressed, reducing impact.

(f) In 1977, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed a stainless steel face-mask which offered greater bend resistance that prevented helmet breakage at the drill holes.

(g) In 1981, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed an Air Cushion Engineered helmet.

(h) In 1982, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed a M155 helmet model with a combination of foam and liquid-filled cells used for padding.  On impact, the liquid would be throttled from one cell to the next, resulting in energy attenuation.  The M155 helmet model included one-piece injection-molded face-masks which were mar and rust-resistant, in addition to polyurethane face mask straps and universal jaw pads.

(i) In 2002, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed the Riddell Revolution helmet designed with the intent of reducing the risk of concussion.

(j) In 2003, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed a real-time, Head Impact Telemetry System (HITS) to monitor and record significant incidences of head impact sustained during a football game or practice. The system measured the location, magnitude, duration, and direction of head acceleration and transmitted that information wirelessly to the sideline.

(k) In 2006, the Riddell Defendants provided a research grant to the University of Pittsburgh Medical Center for head injury research. The study compared rates of high school athletes who wore the Riddell Revolution helmet with those who wore the traditional helmets.

(l) In 2007, the Riddell Defendants developed, manufactured, sold, and/or distributed an individual helmet system, Revolution IQ Hits[TM], allowing players to monitor the number and severity of impacts received during games and practices. On-board electronics record every impact, allowing players to upload and evaluate each occurrence on their home computers.

(m) In 2001, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed the 360 helmet which uses energy-managing materials and a face mask attachment system to disperse the energy of frontal impacts. According to Riddell, it developed this helmet using over 14 million impacts collected through Riddell's HITS technology.

268.     The Riddell Defendants; helmets are currently the official helmets of the NFL. As the official helmets for the NFL, the Riddell logo is the only helmet logo the NFL allows to be displayed on the helmets worn by players during NFL games.  Upon information and belief, Plaintiffs wore Riddell helmets at times while playing and/or practicing during their NFL careers.

269.     The Riddell Defendants at all times herein mentioned engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspecting, distributing, and controlling the helmets and other similar equipment for use by Plaintiffs and within the NFL.

270.     Plaintiffs did not know the long-term effects of concussions and relied on the NFL and Riddell to protect them.

### The Riddell Defendants' Duty to Protect Against the Long-Term Risk of Concussions

271.     Despite years of science and medicine linking the risk of long term brain injury from repeat concussions, it was not until the release of the Revolution Helmet wherein a modification reminding players to "sit out" if they suffer a concussion was placed on the Revolution helmet.

272.     Around the same time period, the Riddell Defendants developed the HITS system to monitor the severity and incident of impacts that a player receives.

273.     Based on a 2003 University of Pittsburgh Medical Center study funded by a grant from the Riddell Defendants, the Riddell Defendants began to market the Revolution helmet as reducing concussions by 31%.

274.    However, both the HITS system and the Revolution helmet, both created by the Riddell Defendants and their employees have been criticized by experts for their inaccurate marketing as being safer in reducing the risk of concussion.

275.    A study published in the Journal of Neurosurgery showed that the study by UPMC was flawed in that is discounted low impact hits and in turn proved that the Revolution did not reduce the risk of concussions.

276.    Even to this day the Riddell Defendants do not acknowledge a link between repeat concussions and later life cognitive problems.

277.    In fact, the Riddell Defendants have never warned any Plaintiff or retired player of the long-term health effects of concussions.

**COUNT VII**
**STRICT LIABILITY FOR DESIGN DEFECT**
**(Against the Riddell Defendants)**

278.    Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

279.    At the time the helmets were designed, manufactured, sold, and distributed by the Riddell Defendants, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury.  The design defect includes, but is not limited to the following:

(a) Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact  in order to minimize and/or reduce the forces and energy directed to the player's head;

(b) Negligently designing the subject helmet with a shock attenuating system which was

not safely configured;

(c) Negligently failing to properly and adequately test the helmet model;

(d) Other acts of negligence that may be discovered during the course of this matter;

(e) Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury;

(f) Prior to 2002, the Riddell Defendants made no attempt to design a helmet to protect against concussive injuries. The two helmets they marketed, the AF2 (discontinued in 1997) and the VSR4, had insufficient padding to protect against concussive injuries; and

(g) Even the Riddell Revolution Helmets (introduced in 2002) were not designed to sufficiently protect against concussions as was shown by the demonstration before a congressional panel, by P. David Halstead, Technical Director of Southern Impact Research Center ("SIRC") on January 4, 2012.

280.    The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

281.    At all times, the helmets were being used for the purpose for which they were intended.

282.    The Riddell Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein. A safer alternative design was economically and technological feasible at the time the product left the control of the Riddell Defendants.

## COUNT IX
## STRICT LIABILITY FOR MANUFACTURING DEFECT
### (Against the Riddell Defendants)

283.    Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

284.    At the time the helmets were designed, manufactured, sold and distributed by the Riddell Defendants, the helmets were defective in their manufacturing and unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury.  The Riddell Defendants' failure to design the helmets to design and manufacturing specifications resulted in, among other things, the following:

(a) Negligently failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

(b) Negligently manufacturing the subject helmet with a shock attenuating system which was not safely configured;

(c) Negligently failing to properly and adequately inspect and/or test the helmet model;

(d) Other acts of negligence that may be discovered during the course of this matter; and

(e) Failure to warn Plaintiffs that its helmets wouldn't protect against concussive brain injury.

285.    The manufacturing defect was a proximate and producing cause of the personal injuries suffered by Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

286.    The Riddell Defendants are strictly liable for manufacturing and placing in the stream of commerce a defective and unreasonably dangerous product which was a proximate and producing cause of the personal injuries and other damages, including but not limited to, economic damages and non-economic damages.  A safe alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants.

### COUNT X
### FAILURE TO WARN
### (Against the Riddell Defendants)

287.    Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

288.    The Riddell Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the helmets.

289.    The Riddell Defendants failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

290.    The Riddell Defendants failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

291.    The Riddell Defendants ignored 18 years of published literature, read by their general counsel Richard Lester, warning of the dangers of concussive injuries until 2002, when a warning involving return to play after a concussion was placed on all Riddell helmets.  The warning was still defective and inadequate and remains today defective and inadequate because it does not warn about the later life cognitive effects of concussive injury.

292.    The Riddell Defendants knew that these substantial dangers were not readily recognizable to an ordinary consumer or user and that such person would use these products without inspection for defects.

293.    Plaintiffs neither knew, nor had reason to know of the existence of the aforementioned defects, or increased risks of harm.

294.    Plaintiffs were using the helmets in a reasonably foreseeable manner at all times.

295.    Plaintiffs' damages were the legal and proximate result of the actions of the Riddell Defendants who owed a duty to warn Plaintiffs of the risks of substantial harm associated with the foreseeable use of their products.

296.    The Riddell Defendants' failure to warn caused the Plaintiffs' personal injuries.

## COUNTY XI
## NEGLIGENCE
### (Against the Riddell Defendants)

297.    Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint.

298.    The Riddell Defendants were negligent in their design, testing, assembly, manufacture, marketing, and engineering of the helmets as described herein.

299.    The Riddell Defendants owed a duty of care to the Plaintiffs in their design, testing, manufacture, assembly, marketing and sale of the helmets and all components and sub-assemblies of the helmets.

300.    The Riddell Defendants should have been well aware that since 1928 repeated blows to the head can lead to CTE, commonly known as "punch-drunk syndrome".

301.    The Riddell Defendants breached their duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of risk and

means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

302.    As a result of the Riddell Defendants' breach of duty, Plaintiffs have sustained permanent injury.

## PRAYER FOR RELIEF

For these reasons**,** Plaintiffs request a judgment as follows:

A.    With respect to Count I, granting the declaratory relief requested pursuant to 28 USC § 2201;

B.    With respect to Count II through VI, granting an award of compensatory and punitive damages where applicable;

C.    With respect to Count VII, granting an injunction and/or other equitable relief for the requested medical monitoring and treatment of all Plaintiffs-Players.

D.    With respect to all counts, awarding Plaintiffs such other and further relief as may be appropriate, including prejudgment interest, costs and attorneys fees.

## JURY DEMANDED

Plaintiffs demand a trial by jury on all matters so triable.

This the 24 day of July, 2013.

Respectfully Submitted,

**WASHINGTON & ASSOCIATES, PLLC**

/s/ Mickey Washington
Mickey Washington
Texas State Bar No.: 24039233

5020 Montrose Blvd., Suite 800
Houston, Texas 77006
Telephone No.: (713) 284–5208
Facsimile No.: (713) 284-5250
Email: mw@mickeywashington.com


**THE CANADY LAW FIRM**
James Carlos Canady
Texas State Bar No.: 24034357
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
Telephone No.: (713) 284–5204
Facsimile No.: (713) 284-5250
Email: ccanady@canadylawfirm.com


**LUBEL VOYLES, LLP**
Lance Lubel
Texas State Bar No.: 12651125
Adam Voyles
Texas State Bar No.: 24003121
Montrose Blvd., Suite 800
Houston, TX 77006
Telephone No.: (713) 284-5200
Facsimile No.: (713) 284-5250
Email: adam@lubelvoyles.com
lance@lubelvoyles.com

**ATTORNEYS FOR PLAINTIFFS**