# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE: PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br><br> MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,* <br> Plaintiffs, <br><br> v. <br><br> National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., <br> Defendants. | CIVIL ACTION NO: 14-29 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## CLASS ACTION SETTLEMENT AGREEMENT

**TABLE OF CONTENTS**

**Page**

ARTICLE I        Definitions of Settlement Class and Subclasses ..................................... 3

ARTICLE II       Definitions ..................................................................................... 4

ARTICLE III      Settlement Benefits for Class Members ............................................. 15

ARTICLE IV       Information and Registration Process................................................. 16

ARTICLE V        Baseline Assessment Program ........................................................... 19

ARTICLE VI       Monetary Awards for Qualifying Diagnoses....................................... 29

ARTICLE VII      Derivative Claimant Awards .............................................................. 32

ARTICLE VIII     Submission and Review of Claim Packages  and Derivative
                 Claim Packages.................................................................................. 33

ARTICLE IX       Notice of Claim Determinations, Payments, and Appeals ................. 36

ARTICLE X        Class Action Settlement Administration ............................................. 43

ARTICLE XI       Identification and Satisfaction of Liens.............................................. 52

ARTICLE XII      Education Fund.................................................................................. 57

ARTICLE XIII     Preliminary Approval and Class Certification.................................... 57

ARTICLE XIV      Notice, Opt Out, and Objections........................................................ 59

ARTICLE XV       Communications to the Public............................................................ 61

ARTICLE XVI      Termination....................................................................................... 62

ARTICLE XVII     Treatment of Confidential Information .............................................. 63

ARTICLE XVIII    Releases and Covenant Not to Sue ..................................................... 64

ARTICLE XIX      Bar Order ......................................................................................... 68

ARTICLE XX       Final Order and Judgment and Dismissal With Prejudice................. 69

ARTICLE XXI      Attorneys' Fees ................................................................................. 70

ARTICLE XXII     Enforceability of Settlement Agreement and Dismissal of
                 Claims............................................................................................... 70

i

ARTICLE XXIII   NFL Payment Obligations ................................................................... 71

ARTICLE XXIV   Denial of Wrongdoing, No Admission of Liability ............................ 77

ARTICLE XXV   Representations and Warranties ......................................................... 78

ARTICLE XXVI   Cooperation ........................................................................................ 79

ARTICLE XXVII   Continuing Jurisdiction .................................................................... 80

ARTICLE XXVIII Role of Co-Lead Class Counsel, Class Counsel and Subclass
                          Counsel ............................................................................................. 80

ARTICLE XXIX   Bargained-For Benefits ...................................................................... 81

ARTICLE XXX   Miscellaneous Provisions ................................................................... 81

## IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, MDL 2323, CLASS ACTION SETTLEMENT AGREEMENT
### (subject to Court approval)

### PREAMBLE

This SETTLEMENT AGREEMENT, dated as of January 6, 2014 (the "Settlement Date"), is made and entered into by and among defendants the National Football League ("NFL") and NFL Properties LLC ("NFL Properties") (collectively, "NFL Parties"), by and through their attorneys, and the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, by and through Co-Lead Class Counsel, Class Counsel and Subclass Counsel. This Settlement Agreement is intended by the Parties fully, finally, and forever to resolve, discharge, and settle all Released Claims against the Released Parties, as set forth below, subject to review and approval by the Court.[1]

### RECITALS

A.    On January 31, 2012, a federal multidistrict litigation was established in the United States District Court for the Eastern District of Pennsylvania, In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323. Plaintiffs in MDL No. 2323 filed a Master Administrative Long-Form Complaint and a Master Administrative Class Action Complaint for Medical Monitoring on June 7, 2012. Plaintiffs filed an Amended Master Administrative Long-Form Complaint on July 17, 2012. Additional similar lawsuits are pending in various state and federal courts.

B.    The lawsuits arise from the alleged effects of mild traumatic brain injury allegedly caused by the concussive and sub-concussive impacts experienced by former NFL Football players. Plaintiffs seek to hold the NFL Parties responsible for their alleged injuries under various theories of liability, including that the NFL Parties allegedly breached a duty to NFL Football players to warn and protect them from the long-term health problems associated with concussions and that the NFL Parties allegedly concealed and misrepresented the connection between concussions and long-term chronic brain injury.

C.    On August 30, 2012, the NFL Parties filed motions to dismiss the Master Administrative Class Action Complaint for Medical Monitoring and the Amended Master Administrative Long-Form Complaint on preemption grounds. Plaintiffs filed their oppositions to the motions on October 31, 2012, the NFL Parties filed reply memoranda of law on December 17, 2012, and plaintiffs filed sur-reply memoranda of law on January 28, 2013. Oral argument on the NFL Parties' motions to dismiss on preemption grounds was held on April 9, 2013.

---

[1]    Capitalized terms have the meanings provided in ARTICLE II, unless a section or subsection of this Settlement Agreement provides otherwise.

D. On July 8, 2013, prior to ruling on the motions to dismiss, the Court ordered the plaintiffs and NFL Parties to engage in mediation to determine if consensual resolution was possible and appointed retired United States District Court Judge Layn Phillips of Irell & Manella LLP as mediator.

E. Over the course of the following two months, the Parties, by and through their respective counsel, engaged in settlement negotiations under the direction of Judge Phillips. On August 29, 2013, the Parties signed a settlement term sheet setting forth the material terms of a settlement agreement. On the same day, the Court issued an order deferring a ruling on the NFL Parties' motions to dismiss and ordering the Parties to submit, as soon as possible, the full documentation relating to the settlement, along with a motion seeking preliminary approval of the settlement and notice plan.

F. In conjunction with the filing of this Settlement Agreement, the Class and Subclass Representatives filed Plaintiffs' Class Action Complaint ("Class Action Complaint") on January 6, 2014. In the Class Action Complaint, the Class and Subclass Representatives allege claims for equitable, injunctive and declaratory relief pursuant to Federal Rules of Civil Procedure 23(a)(1-4) & (b)(2), or, alternatively, for compensatory damages pursuant to Federal Rule of Civil Procedure 23(b)(3), for negligence, negligent hiring, negligent retention, negligent misrepresentation, fraud, fraudulent concealment, medical monitoring, wrongful death and survival, and loss of consortium, all under state law.

G. The NFL Parties deny the Class and Subclass Representatives' allegations, and the allegations in Related Lawsuits, and deny any liability to the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member for any claims, causes of action, costs, expenses, attorneys' fees, or damages of any kind, and would assert a number of substantial legal and factual defenses against plaintiffs' claims if they were litigated to conclusion.

H. The Class and Subclass Representatives, through their counsel, have engaged in substantial fact gathering to evaluate the merits of their claims and the NFL Parties' defenses. In addition, the Class and Subclass Representatives have analyzed the legal issues raised by their claims and the NFL Parties' defenses, including, without limitation, the NFL Parties' motions to dismiss the Amended Master Administrative Long-Form Complaint and Master Administrative Class Action Complaint on preemption grounds.

I. After careful consideration, the Class and Subclass Representatives, and their respective Counsel, have concluded that it is in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses to compromise and settle all Released Claims against the Released Parties for consideration reflected in the terms and benefits of this Settlement Agreement. After arm's length negotiations with Counsel for the NFL Parties, including through the efforts of the court-appointed mediator, the Class and Subclass Representatives have considered, among other things: (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of fact gathering completed; (3) the potential for the

2

NFL Parties to prevail on threshold issues and on the merits; and (4) the range of possible recovery, and have determined that this Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses.

J. The NFL Parties have concluded, in light of the costs, risks, and burden of litigation, that this Settlement Agreement in this complex putative class action litigation is appropriate. The NFL Parties and Counsel for the NFL Parties agree with the Class and Subclass Representatives and their respective counsel that this Settlement Agreement is a fair, reasonable, and adequate resolution of the Released Claims. The NFL Parties reached this conclusion after considering the factual and legal issues relating to the litigation, the substantial benefits of this Settlement Agreement, the expense that would be necessary to defend claims by Settlement Class Members through trial and any appeals that might be taken, the benefits of disposing of protracted and complex litigation, and the desire of the NFL Parties to conduct their business unhampered by the costs, distraction and risks of continued litigation over Released Claims.

K. The Parties desire to settle, compromise, and resolve fully all Released Claims.

L. The Parties desire and intend to seek Court review and approval of the Settlement Agreement, and, upon preliminary approval by the Court, the Parties intend to seek a Final Order and Judgment from the Court dismissing with prejudice the Class Action Complaint and ordering the dismissal with prejudice of Related Lawsuits.

M. This Settlement Agreement will not be construed as evidence of, or as an admission by, the NFL Parties of any liability or wrongdoing whatsoever or as an admission by the Class or Subclass Representatives, or Settlement Class Members, of any lack of merit in their claims.

NOW, THEREFORE, it is agreed that the foregoing recitals are hereby expressly incorporated into this Settlement Agreement and made a part hereof and further, that in consideration of the agreements, promises, and covenants set forth in this Settlement Agreement, including the Releases and Covenant Not to Sue in ARTICLE XVIII, the entry by the Court of the Final Order and Judgment dismissing the Class Action Complaint with prejudice and approving the terms and conditions of the Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, this action shall be settled and compromised under the following terms and conditions:

## ARTICLE I
### Definitions of Settlement Class and Subclasses

Section 1.1    Definition of Settlement Class

(a)    "Settlement Class" means all Retired NFL Football Players, Representative Claimants and Derivative Claimants.

3

     (b)     Excluded from the Settlement Class are any Retired NFL Football Players, Representative Claimants or Derivative Claimants who timely and properly exercise the right to be excluded from the Settlement Class ("Opt Outs").

### Section 1.2    Definition of Subclasses

     (a)     "Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

     (b)     "Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

### ARTICLE II
### Definitions

### Section 2.1    Definitions

     For the purposes of this Settlement Agreement, the following terms (designated by initial capitalization throughout this Agreement) will have the meanings set forth in this Section.

     Unless the context requires otherwise, (i) words expressed in the masculine will include the feminine and neuter gender and vice versa; (ii) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (iii) the word "or" will not be exclusive; (iv) the word "extent" in the phrase "to the extent" will mean the degree to which a subject or other thing extends, and such phrase will not simply mean "if"; (v) references to "day" or "days" in the lower case are to calendar days, but if the last day is a Saturday, Sunday, or legal holiday (as defined in Fed. R. Civ. P. 6(a)(6)), the period will continue to run until the end of the next day that is not a Saturday, Sunday, or legal holiday; (vi) references to this Settlement Agreement will include all exhibits, schedules, and annexes hereto; (vii) references to any law will include all rules and regulations promulgated thereunder; (viii) the terms "include," "includes," and "including" will be deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of similar import; and (ix) references to dollars or "$" are to United States dollars.

     (a)     "Active List" means the list of all players physically present, eligible and under contract to play for a Member Club on a particular game day within any applicable roster or squad limits set forth in the applicable NFL or American Football League Constitution and Bylaws.

(b)     "Additional   Contingent   Contribution"   means   the conditional monetary payment by the NFL Parties, as set forth in Section 23.5.

(c)     "Affiliate" means, with respect to any person or entity, any other person or entity that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person or entity, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies, whether through the ownership of voting shares, by contract, or otherwise.

(d)     "ALS" means amyotrophic lateral sclerosis, also known as Lou Gehrig's Disease, as defined in Exhibit 1.

(e)     "Alzheimer's Disease" is defined in Exhibit 1.

(f)     "American Football League" means the former professional football league that merged with the NFL.

(g)     "Appeals Form" means that document that Settlement Class Members, the NFL Parties or Co-Lead Class Counsel, as the case may be, will submit when appealing Monetary Award or Derivative Claimant Award determinations by the Claims Administrator, as set forth in Section 9.7.

(h)     "Appeals Advisory Panel" means a panel of physicians, composed of, in any combination, three neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, board-certified neurologists and/or board-certified neurosurgeons, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise the Court or the Special Master with respect to medical aspects of the Class Action Settlement.

(i)     "Baseline   Assessment   Program"   ("BAP")   means   the program described in ARTICLE V.

(j)     "Baseline Assessment Program Supplemental Benefits" or "BAP Supplemental Benefits" means medical treatment, including, as needed, counseling and pharmaceutical coverage, for Level 1 Neurocognitive Impairment (as set forth in Exhibit 1) within a network of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s), respectively, established by the BAP Administrator, as set forth in Section 5.11.

(k)     "Baseline Assessment Program Fund Administrator" or "BAP Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the BAP Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE V.

5

(l)     "Baseline Assessment Program Fund" or "BAP Fund" means the fund to pay BAP costs and expenses, as set forth in ARTICLE V.

(m)     "Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant claiming a Monetary Award, as set forth in ARTICLE VIII.

(n)     "Claim Package" means the Claim Form and other documentation, as set forth in Section 8.2(a).

(o)     "Claims Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Claims Administrator under this Settlement Agreement, including, without limitation, as set forth in Section 10.2.

(p)     "Class Action Complaint" means the complaint captioned Plaintiffs' Class Action Complaint filed on consent in the Court on January 6, 2014.

(q)     "Class Action Settlement" means that settlement set forth in this Settlement Agreement.

(r)     "Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Steven C. Marks of Podhurst Orseck, P.A. and Gene Locks of Locks Law Firm, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class.

(s)     "Class Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be appointed by the Court as the representatives of the Settlement Class.

(t)     "CMS" means the Centers for Medicare & Medicaid Services, the agency within the United States Department of Health and Human Services responsible for administration of the Medicare Program and the Medicaid Program.

(u)     "Co-Lead Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Christopher A. Seeger of Seeger Weiss LLP and Sol Weiss of Anapol Schwartz, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class in a lead role.

(v)     "Collective Bargaining Agreement" means the August 4, 2011 Collective Bargaining Agreement between the NFL Management Council and the NFL Players Association, individually and together with all previous and future NFL Football collective bargaining agreements governing NFL Football players.

6

(w)   "Counsel for the NFL Parties" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, or any law firm or attorney so designated in writing by the NFL Parties.

(x)   "Court" means the United States District Court for the Eastern District of Pennsylvania, Judge Anita Brody (or any successor judge designated by the United States District Court for the Eastern District of Pennsylvania), presiding in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323.

(y)   "Covenant Not to Sue" means the covenant not to sue set forth in Section 18.4.

(z)   "CTE" means Chronic Traumatic Encephalopathy.

(aa)   "Death with CTE" is defined in Exhibit 1.

(bb)   "Deficiency" means any failure of a Settlement Class Member to provide required information or documentation to the Claims Administrator, as set forth in Section 8.5.

(cc)   "Derivative Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Derivative Claimant claiming a Derivative Claimant Award, as set forth in ARTICLE VIII.

(dd)   "Derivative Claim Package" means the Derivative Claim Form and other documentation, as set forth in Section 8.2(b).

(ee)   "Derivative Claimants" means spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

(ff)   "Derivative Claimant Award" means the payment of money from the Monetary Award of the subject Retired NFL Football Player to a Settlement Class Member who is a Derivative Claimant, as set forth in ARTICLE VII.

(gg)   "Diagnosing Physician Certification" means that document which a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant must submit either as part of a Claim Package in order to receive a Monetary Award, as set forth in Section 8.2(a), or to receive BAP Supplemental Benefits, as set forth in Section 5.11, the contents of which shall be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties and that shall include, without limitation: (i) a certification under penalty of perjury by the diagnosing physician that the information provided is true and correct, (ii) the Qualifying Diagnosis being made consistent with the criteria in Exhibit 1 (Injury Definitions) and the date of diagnosis, and (iii) the qualifications of the diagnosing physician.

7

(hh) "Education Fund" means a fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

(ii) "Education Fund Amount" means the amount of Ten Million United States dollars (U.S. $10,000,000), as set forth in Section 23.1(b).

(jj) "Effective Date" means (i) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment approving the Settlement Agreement and certifying the Settlement Class (or for appealing any ruling on a timely motion for reconsideration of such Final Order, whichever is later), if no such appeal is filed; or (ii) if an appeal of the Final Order and Judgment is filed, the date upon which all appellate courts with jurisdiction (including the United States Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible.

(kk) "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was: (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury. A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games.

(ll) "Fairness Hearing" means the hearing scheduled by the Court to consider the fairness, reasonableness, and adequacy of this Settlement Agreement under Rule 23(e)(2) of the Federal Rules of Civil Procedure, and to determine whether a Final Order and Judgment should be entered.

(mm) "Final Approval Date" means the date on which the Court enters the Final Order and Judgment.

(nn) "Final Order and Judgment" means the final judgment and order entered by the Court, substantially in the form of Exhibit 4, and as set forth in ARTICLE XX.

(oo) "Funds" means the Settlement Trust Account, the BAP Fund, the Monetary Award Fund, along with the Education Fund.

(pp) "Governmental Payor" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs,

including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

(qq) "HIPAA" means the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of 42 U.S.C.) and the implementing regulations issued by the United States Department of Health and Human Services thereunder, and incorporates by reference the provisions of the Health Information Technology for Economic and Clinical Health Act (Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (2009)) pertaining to Protected Health Information.

(rr) This definition is intentionally left blank.

(ss) This definition is intentionally left blank.

(tt) This definition is intentionally left blank.

(uu) "Lien" means any statutory lien of a Government Payor or Medicare Part C or Part D Program sponsor; or any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any person or entity, where there is a legal obligation to withhold payment of a Monetary Award, Supplemental Monetary Award, Derivative Claimant Award, or some portion thereof, to a Settlement Class Member under applicable federal or state law.

(vv) "Lien Resolution Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Lien Resolution Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE XI.

(ww) "Medicaid Program" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq.*

(xx) "Medicare Part C or Part D Program" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with CMS.

(yy) "Medicare Program" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*

(zz) "Member Club" means any past or present member club of the NFL or any past member club of the American Football League.

9

(aaa) "Monetary Award" means the payment of money from the Monetary Award Fund to a Settlement Class Member, other than a Derivative Claimant, as set forth in ARTICLE VI.

(bbb) "Monetary Award Fund" means the sixty-five (65) year fund, as set forth in Section 6.8.

(ccc) "Monetary Award Grid" means that document attached as Exhibit 3.

(ddd) "MSP Laws" means the Medicare Secondary Payer Act set forth at 42 U.S.C. § 1395y(b), as amended from time to time, and implementing regulations, and other applicable written CMS guidance.

(eee) "NFL CBA Medical and Disability Benefits" means any disability or medical benefits available under the Collective Bargaining Agreement, including the benefits available under the Bert Bell/Pete Rozelle NFL Player Retirement Plan; NFL Player Supplemental Disability Plan, including the Neuro-Cognitive Disability Benefit provided for under Article 65 of the Collective Bargaining Agreement; the 88 Plan; Gene Upshaw NFL Player Health Reimbursement Account Plan; Former Player Life Improvement Plan; NFL Player Insurance Plan; and/or the Long Term Care Insurance Plan.

(fff) "NFL Football" means the sport of professional football as played in the NFL, the American Football League, the World League of American Football, the NFL Europe League, and the NFL Europa League. NFL Football excludes football played by all other past, present or future professional football leagues, including, without limitation, the All-American Football Conference.

(ggg) "NFL Medical Committees" means the various past and present medical committees, subcommittees and panels that operated or operate at the request and/or direction of the NFL, whether independent or not, including, without limitation, the Injury and Safety Panel, Mild Traumatic Brain Injury Committee, Head Neck and Spine Medical Committee, Foot and Ankle Subcommittee, Cardiovascular Health Subcommittee, and Medical Grants Subcommittee, and all persons, whether employees, agents or independent of the NFL, who at any time were members of or participated on each such panel, committee, or subcommittee.

(hhh) "Notice of Challenge Determination" means the written notice set forth in Section 4.3(a)(ii)-(iii).

(iii) "Notice of Deficiency" means that document that the Claims Administrator sends to any Settlement Class Member whose Claim Package or Derivative Claim Package contains a Deficiency, as set forth in Section 8.5.

(jjj) "Notice of Derivative Claimant Award Determination" means the written notice set forth in Section 9.2.

(kkk) "Notice of Monetary Award Claim Determination" means the written notice set forth in Section 9.1.

(lll) "Notice of Registration Determination" means the written notice set forth in Section 4.3.

(mmm)"Offsets" means downward adjustments to Monetary Awards, as set forth in Section 6.5(b).

(nnn) "Opt Out," when used as a verb, means the process by which any Retired NFL Football Player, Representative Claimant or Derivative Claimant otherwise included in the Settlement Class exercises the right to exclude himself or herself from the Settlement Class in accordance with Fed. R. Civ. P. 23(c)(2).

(ooo) "Opt Outs," when used as a noun, means those Retired NFL Football Players, Representative Claimants and Derivative Claimants who would otherwise have been included in the Settlement Class and who have timely and properly exercised their rights to Opt Out and therefore, after the Effective Date, are not Settlement Class Members.

(ppp) "Other Party" means every person, entity, or party other than the Released Parties.

(qqq) "Parkinson's Disease" is defined in Exhibit 1.

(rrr) "Parties" means the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, and the NFL Parties.

(sss) "Personal Signature" means the actual signature by the person whose signature is required on the document. Unless otherwise specified in this Settlement Agreement, a document requiring a Personal Signature may be submitted by an actual original "wet ink" signature on hard copy, or a PDF or other electronic image of an actual signature, but cannot be submitted by an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

(ttt) "Preliminary Approval and Class Certification Order" means the order, upon entry by the Court, preliminarily approving the Class Action Settlement and conditionally certifying the Settlement Class and Subclasses.

(uuu) "Protected Health Information" means individually identifiable health information, as defined in 45 C.F.R. § 160.103.

(vvv) **"Qualified BAP Providers"** means neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, and board-

11

certified neurologists, eligible to conduct baseline assessments of Retired NFL Football Players under the BAP, as set forth in Section 5.7(a).

(www) "Qualified Pharmacy Vendor(s)" means one or more nationwide mail order pharmacies contracted to provide approved pharmaceutical prescriptions as part of the BAP Supplemental Benefits, as set forth in Section 5.7(b).

(xxx) "Qualifying Diagnosis" or "Qualifying Diagnoses" means Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE, as set forth in Exhibit 1 (Injury Definitions).

(yyy) "Related Lawsuits" means all past, present and future actions brought by one or more Releasors against one or more Released Parties pending in the Court, other than the Class Action Complaint, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum that arise out of, are based upon or are related to the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, alleged, or referred to in the Class Action Complaint, except that Settlement Class Members' claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits are not Related Lawsuits.

(zzz) "Released Claims" means those claims released as set forth in Section 18.1 and Section 18.2.

(aaaa) "Released Parties" for purposes of the Released Claims means (i) the NFL Parties (including all persons, entities, subsidiaries, divisions, and business units composed thereby), together with (ii) each of the Member Clubs, (iii) each of the NFL Parties' and Member Clubs' respective past, present, and future agents, directors, officers, employees, independent contractors, general or limited partners, members, joint venturers, shareholders, attorneys, trustees, insurers (solely in their capacities as liability insurers of those persons or entities referred to in subparagraphs (i) and (ii) above and/or arising out of their relationship as liability insurers to such persons or entities), predecessors, successors, indemnitees, and assigns, and their past, present, and future spouses, heirs, beneficiaries, estates, executors, administrators, and personal representatives, including, without limitation, all past and present physicians who have been employed or retained by any Member Club and members of all past and present NFL Medical Committees; and (iv) any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the NFL Parties or the Member Clubs, in their respective capacities as such; and, as to (i)-(ii) above, each of their respective Affiliates, including their Affiliates' officers, directors, shareholders, employees, and agents. For the avoidance of any doubt, Riddell is not a Released Party.

(bbbb) "Releases" means the releases set forth in ARTICLE XVIII.

(cccc)     "Releasors" means the releasors set forth in Section 18.1.

(dddd)     "Representative Claimants" means authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players.

(eeee)     "Retired NFL Football Players" means all living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

(ffff)     "Riddell" means Riddell, Inc.; All American Sports Corporation; Riddell Sports Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp., and each of their respective past, present, and future Affiliates, directors, officers, employees, general or limited partners, members, joint venturers, shareholders, agents, trustees, insurers (solely in their capacities as such), reinsurers (solely in their capacities as such), predecessors, successors, indemnitees, and assigns.

(gggg)     "Special Master" means that person appointed by the Court pursuant to Federal Rule of Civil Procedure 53 to oversee the administration of the Settlement Agreement, as set forth in Section 10.1.

(hhhh)     "Settlement Agreement" means this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

(iiii)     "Settlement Amount" means the amount of Seven Hundred and Fifty Million United States dollars (U.S. $750,000,000), as set forth in Section 23.1(a).

(jjjj)     "Settlement Class and Subclasses" is defined in Section 1.1 and Section 1.2.

(kkkk)     "Settlement Class Member" means each Retired NFL Football Player, Representative Claimant and/or Derivative Claimant in the Settlement Class; provided, however, that the term Settlement Class Member as used herein with respect to any right or obligation after the Effective Date does not include any Opt Outs.

13

(llll)        "Settlement Class Notice" means that notice, in the form of Exhibit 5, and as set forth in Section 14.1, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

(mmmm)        "Settlement Class Notice Agent" means that person or entity who will implement the Settlement Class Notice Plan and who will be responsible for the publication and provision of the Settlement Class Notice.

(nnnn)        "Settlement Class Notice Payment" means a maximum of Four Million United States dollars (U.S. $4,000,000), as set forth in Section 23.1(c), for the costs of Settlement Class Notice, including any supplemental notice required, and compensation of the Settlement Class Notice Agent and the Claims Administrator to the extent the Claims Administrator performs notice-related duties that have been agreed to by the NFL Parties.

(oooo)        "Settlement Class Notice Plan" means that document which sets forth the methods, timetable, and responsibilities for providing Settlement Class Notice to Settlement Class Members, as set forth in Section 14.1.

(pppp)        "Settlement Date" means the date by which Co-Lead Class Counsel, Class Counsel, Subclass Counsel, and Counsel for the NFL Parties have all signed this Settlement Agreement on behalf of the Class and Subclass Representatives, Settlement Class and Subclasses, and the NFL Parties, respectively.

(qqqq)        "Settlement Trust" means the trust enacted pursuant to the Settlement Trust Agreement, as set forth in Section 23.7.

(rrrr)        "Settlement Trust Account" means that account created under the Settlement Trust Agreement and held by the Trustee into which the NFL Parties will make payments pursuant to ARTICLE XXIII of this Settlement Agreement.

(ssss)        "Settlement Trust Agreement" means the agreement that will establish the Settlement Trust and will be entered into by Co-Lead Class Counsel, the NFL Parties, and the Trustee, as set forth in Section 23.7(c).

(tttt)        "Signature" means the actual signature by the person whose signature is required on the document, or on behalf of such person by a person authorized by a power of attorney or equivalent document to sign such documents on behalf of such person. Unless otherwise specified in this Settlement Agreement, a document requiring a Signature may be submitted by: (i) an actual original "wet ink" signature on hard copy; (ii) a PDF or other electronic image of an actual signature; or (iii) an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

(uuuu)        "Stadium Program Bonds" means the NFL's G3 and G4 bonds.

14

(vvvv) "Stroke" means stroke, as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10). A medically diagnosed Stroke does not include a transient cerebral ischaemic attack and related syndromes, as defined by ICD-10.

(wwww) "Subclass Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely Arnold Levin of Levin, Fishbein, Sedran & Berman for Subclass 1, and Dianne M. Nast of NastLaw LLC for Subclass 2, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Subclasses 1 and 2.

(xxxx) "Subclass Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be designated by the Court as the representatives of the Settlement Subclasses 1 and 2.

(yyyy) "Supplemental Monetary Award" means the supplemental payment of monies from the Monetary Award Fund to a Settlement Class Member, as set forth in Section 6.6.

(zzzz) "Traumatic Brain Injury" means severe traumatic brain injury unrelated to NFL Football play, that occurs during or after the time the Retired NFL Football Player played NFL Football, consistent with the definitions in the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), Codes 854.04, 854.05, 854.14 and 854.15, and the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), Codes S06.9x5 and S06.9x6.

(aaaaa) "Tricare" means the federal program managed and administered by the United States Department of Defense through the Tricare Management Activity under which certain medical items, services, and/or prescription drugs are furnished to eligible members of the military services, military retirees, and military dependents under 10 U.S.C. § 1071, *et seq.*

(bbbbb) "Trustee" means that person or entity approved by the Court as trustee of the Settlement Trust Account and as administrator of the qualified settlement fund for purposes of Treasury Regulation §1.468B-2(k)(3), as set forth in ARTICLE XXIII.

## ARTICLE III
### Settlement Benefits for Class Members

Section 3.1 The Class and Subclass Representatives, by and through Co-Lead Class Counsel, Class Counsel and Subclass Counsel, and the NFL Parties, by and through Counsel for the NFL Parties, agree that, in consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of the Class Action Complaint and the Related Lawsuits, and subject to the terms and

15

conditions of this Settlement Agreement, the NFL Parties will, in addition to other obligations set forth in this Settlement Agreement:

(a)     Provide compensation, as prescribed elsewhere in this Settlement Agreement, to those Settlement Class Members who are determined by the Claims Administrator to qualify for Monetary Awards or Derivative Claimant Awards pursuant to the proof and documentation requirements and criteria set forth in this Settlement Agreement;

(b)     Provide qualified Settlement Class Members who are Retired NFL Football Players with the option to participate in the BAP and receive a BAP baseline assessment examination and BAP Supplemental Benefits, if eligible, pursuant to the requirements and criteria set forth in this Settlement Agreement; and

(c)     Establish the Education Fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

## ARTICLE IV
### Information and Registration Process

Section 4.1     Information

(a)     Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel will cause to be established and maintained a public website containing information about the Class Action Settlement (the "Settlement Website"), including the Settlement Class Notice and "Frequently Asked Questions." Within ninety (90) days after the Effective Date, Co-Lead Class Counsel will cause the Settlement Website to be transitioned for claims administration purposes. The Settlement Website will be the launching site for secure web-based portals established and maintained by the Claims Administrator, BAP Administrator, and/or Lien Resolution Administrator for use by Settlement Class Members and their designated attorneys throughout the term of the Class Action Settlement. The Claims Administrator will post all necessary information about the Class Action Settlement on the Settlement Website, including, as they become available, information about registration deadlines and methods to participate in the BAP, the Claim Package requirements and Monetary Awards, and the Derivative Claim Package requirements and Derivative Claimant Awards. All content posted on the Settlement Website will be subject to advance approval by Co-Lead Class Counsel and Counsel for the NFL Parties.

(b)     Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel also will cause to be established and maintained an automated telephone system that uses a toll-free number or numbers to provide information about the Class Action Settlement. Within ninety (90) days after the

Effective Date, Co-Lead Class Counsel will cause the automated telephone system to be transitioned for claims administration purposes. Through this system, Settlement Class Members may request and obtain copies of the Settlement Class Notice, Settlement Agreement, Claim Form, Derivative Claim Form, and Appeals Form, and they may speak with operators for further information.

Section 4.2      Registration Methods and Requirements

(a)      The Claims Administrator will establish and administer both online and hard copy registration methods for participation in the Class Action Settlement.

(b)      The registration requirements will include information sufficient to determine if a registrant is a Settlement Class Member, including: (i) name; (ii) address; (iii) date of birth; (iv) Social Security Number (if any); (v) email address (if any), and whether email, the web-based portal on the Settlement Website, or U.S. mail is the preferred method of communication; (vi) identification as a Retired NFL Football Player, Representative Claimant or Derivative Claimant; (vii) dates and nature of NFL Football employment (e.g., Active List, practice squad, developmental squad), and corresponding identification of the employer Member Club(s) or assigned team(s) (for Retired NFL Football Players, or, for the subject Retired NFL Football Player or deceased Retired NFL Football Player in the case of Representative Claimants and Derivative Claimants); and (viii) Signature of the registering purported Settlement Class Member.

(i)      In addition to the registration requirements in this Section 4.2(b), Representative Claimants also will identify the subject deceased or legally incapacitated or incompetent Retired NFL Football Player, including name, last known address, date of birth, and Social Security Number (if any), and will provide a copy of the court order, or other document issued by an official of competent jurisdiction, providing the authority to act on behalf of that deceased or legally incapacitated or incompetent Retired NFL Football Player.

(ii)      In addition to the registration requirements in this Section 4.2(b), Derivative Claimants also will identify the subject Retired NFL Football Player or deceased Retired NFL Football Player and the relationship by which they assert the right under applicable state law to sue independently or derivatively.

(c)      Unless good cause, as set forth in subsection (i), is shown, Settlement Class Members must register on or before 180 days from the date after the Effective Date that the Claims Administrator provides notice of the registration methods and requirements on the Settlement Website and on the automated telephone system. If a Settlement Class Member does not register by that deadline, that Settlement Class Member will be deemed ineligible for the BAP and BAP Supplemental Benefits, Monetary Awards and Derivative Claimant Awards.

17

(i)     Good cause will include, without limitation, (a) that a Settlement Class Member who is a Representative Claimant had not been ordered by a court or other official of competent jurisdiction to be the authorized representative of the subject deceased or legally incapacitated or incompetent Retired NFL Football Player prior to the registration deadline (and the Representative Claimant seeks to register within 180 days of authorization by the court or other official of competent jurisdiction), or (b) that the subject Retired NFL Football Player timely registered prior to his death or becoming legally incapacitated or incompetent and his Representative Claimant seeks to register for that Retired NFL Football Player; or (c) that the subject Retired NFL Football Player timely registered and the Derivative Claimant seeks to register within thirty (30) days of that Retired NFL Football Player's submission of a Claim Package.

Section 4.3     Registration Review

(a)     Upon receipt of a purported Settlement Class Member's registration, the Claims Administrator will review the information to determine whether the purported Settlement Class Member is a Settlement Class Member under the Settlement Agreement, and whether he or she has timely registered.   In order to determine qualification for the BAP, as set forth in Section 5.1, the Claims Administrator will also determine if a registering Retired NFL Football Player has identified his participation in NFL Football that earns him at least one half of an Eligible Season. The Claims Administrator will then issue a favorable or adverse Notice of Registration Determination, within forty-five (45) days of receipt of the purported Settlement Class Member's registration, informing the purported Settlement Class Member whether he or she is a Settlement Class Member who has properly registered.  To the extent the volume of registrations warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties.

(i)     Favorable Notices of Registration Determination will include information regarding the sections of the Settlement Website and/or secure web-based portals that provide detailed information regarding the Claim Package and Monetary Awards, the Derivative Claim Package and Derivative Claimant Awards and, for Settlement Class Members who are Retired NFL Football Players, information regarding the BAP. The Notice of Registration Determination will inform the Settlement Class Member of his or her unique identifying number for future use, including on a Claim Form or Derivative Claimant Form.

(ii)     Adverse Notices of Registration Determination will include information regarding how the purported Settlement Class Member can challenge the determination.   The purported Settlement Class Member may submit a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination.  The purported Settlement Class Member must present a sworn statement or other evidence in support of any written challenge.  The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iii)    The NFL Parties can challenge, for good cause, a favorable Notice of Registration Determination by submitting a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination. The NFL Parties must present evidence in support of the written challenge. The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iv)    Any Notice of Challenge Determination may be appealed by the purported Settlement Class Member or the NFL Parties, provided that the NFL Parties' appeal is limited to challenging the purported Retired NFL Football Player's or subject Retired NFL Football Player's status as a Retired NFL Football Player, in writing to the Court within sixty (60) days after the date of the Notice of Challenge Determination. The parties may present evidence in support of, or in opposition to, the appeal. The Court will be provided access to all documents and information available to the Claims Administrator to aid in determining the appeal. The Court may, in its discretion, refer the appeal to the Special Master. The decision of the Court or the Special Master shall be final and binding.

(v)    If either Co-Lead Class Counsel or Counsel for the NFL Parties believe that the Claims Administrator has issued a Notice of Registration Determination that reflects an improper interpretation of the Settlement Class definition set forth in Section 1.1, such counsel may petition the Court to resolve the issue, as set forth in Section 10.1(b)(i)(2). The Court may, in its discretion, refer the matter to the Special Master. If the Court or the Special Master determines that the Claims Administrator misinterpreted the Settlement Class definition, the decision of the Court or the Special Master will supersede the prior determination by the Claims Administrator.

## ARTICLE V
## Baseline Assessment Program

Section 5.1    Qualification. All Retired NFL Football Players with at least one half of an Eligible Season, as defined in Section 2.1(kk), who timely registered to participate in the Class Action Settlement, as set forth in ARTICLE IV, will qualify for the BAP. For the avoidance of any doubt, an eligible Retired NFL Football Player who submits a claim for a Monetary Award, whether successful or not, may participate in the BAP, except a Retired NFL Football Player who submits a successful claim for a Monetary Award is not eligible to later receive BAP Supplemental Benefits.

Section 5.2    Scope of Program. The BAP will provide the opportunity for each qualified Retired NFL Football Player, as set forth in Section 5.1, to receive one (1) baseline assessment examination, which includes: (a) a standardized neuropsychological examination in accordance with the testing protocol set forth in Exhibit 2 performed by a neuropsychologist certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, who is a Qualified BAP Provider; and (b) a basic

neurological examination performed by a board-certified neurologist who is a Qualified BAP Provider. The diagnosis of Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment made pursuant to the BAP must be agreed to by both the neuropsychologist and board-certified neurologist serving as Qualified BAP Providers. BAP baseline assessment examinations are intended to establish a physician/patient relationship between the Retired NFL Football Player and his Qualified BAP Providers. Retired NFL Football Players diagnosed during their BAP baseline assessment examinations by Qualified BAP Providers with Level 1 Neurocognitive Impairment will be eligible to receive BAP Supplemental Benefits, as set forth in Section 5.11. For the avoidance of any doubt, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, ALS or Death with CTE shall not be made through the BAP baseline assessment examination.

Section 5.3    Deadline for BAP Baseline Assessment Examination. A Retired NFL Football Player electing to receive a BAP baseline assessment examination must take it: (i) within two (2) years of the commencement of the BAP if he is age 43 or older on the Effective Date; or (ii) if he is younger than age 43 on the Effective Date, before his 45th birthday or within ten (10) years of the commencement of the BAP, whichever occurs earlier.

Section 5.4    Monetary Award Offset. If a Retired NFL Football Player in Subclass 1 chooses not to participate in the BAP and receives a Qualifying Diagnosis, as set forth in Section 6.3, on or after the Effective Date, that Retired NFL Football Player will be subject to a Monetary Award Offset (as set forth in Section 6.5(b)(iv)) based on his non-participation in the BAP unless the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis other than ALS prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3. This Offset does not apply to a Retired NFL Football Player who is in Subclass 2.

Section 5.5    BAP Term. The BAP will commence one hundred and twenty (120) days after the Effective Date and will end ten (10) years after it commences, except that the provision of BAP Supplemental Benefits to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment, as set forth in Exhibit 1, may extend beyond the term of the BAP for up to five (5) years as set forth in Section 5.11. Retired NFL Football Players, who are qualified as set forth in Section 5.1, will be entitled to one (1) baseline assessment examination within the applicable time limitations set forth in Section 5.3.

Section 5.6    BAP Administrator

(a)    Appointment and Oversight

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Co-Lead Class Counsel, Class Counsel and Subclass Counsel will request that the Court appoint The Garretson Resolution Group, Inc. ("Garretson Group") as BAP Administrator. Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the BAP Administrator appointed by the Court.

20

(ii)     Co-Lead Class Counsel's retention agreement with the BAP Administrator will provide that the BAP Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the BAP-related provisions of the Settlement Agreement, and will require that the BAP Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)     The Court may, at its sole discretion, request reports or information from the BAP Administrator. The BAP Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)     The Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) will oversee the BAP Administrator, and may, at his or her sole discretion, request reports or information from the BAP Administrator.

(v)     Beyond the reporting requirements set forth in Section 5.6(a)(iii)-(iv), beginning one month after the Effective Date, the BAP Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the BAP, and thereafter on a quarterly basis, or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, regarding the status and progress of the BAP. The monthly (or quarterly) report will include, without limitation, information regarding activity in the BAP, including: (a) the number and identity of Retired NFL Football Players with pending BAP appointments, (b) the monthly and total number of Retired NFL Football Players who took part in the BAP, and the identity of each Settlement Class Member who took part in the preceding month; (c) the monthly and total monetary amounts paid to Qualified BAP Providers; (d) the monthly and total number of Retired NFL Football Players eligible for BAP Supplemental Benefits, as set forth in Section 5.11, and the identity of each such Settlement Class Member; (e) any Retired NFL Football Player complaints regarding specific Qualified BAP Providers; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the BAP Administrator in the preceding month; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi)     Beginning on the first January after the Effective Date, the BAP Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding: (a) the number of Retired NFL Football Players who took part in the BAP; (b) the monetary amount paid to Qualified BAP Providers; (c) the number of Retired NFL Football Players eligible for BAP Supplemental Benefits; (d) the

expenses/administrative costs incurred by the BAP Administrator; (e) the projected expenses/administrative costs for the remainder of the BAP Fund term; (f) the monies remaining in the BAP Fund; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(b)     Compensation and Expenses. Reasonable compensation of the BAP Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the BAP Administrator's responsibilities will be paid out of the BAP Fund. The BAP Administrator shall submit an annual budget to the Court for review and approval. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the BAP Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses. If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the BAP Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the BAP Administrator will refund that amount to the BAP Fund.

(c)     Liability.     The Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the BAP Administrator.

(d)     Replacement.     The BAP Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If the BAP Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed BAP Administrator for appointment by the Court.

(e)     Conflicts of Interest.     Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the BAP Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the BAP Administrator, including, without limitation, its executive leadership team and all employees conducting BAP-related work, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand. Co-Lead Class Counsel, Counsel for the NFL Parties, and the BAP Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate. Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the BAP Administrator regularly provides settlement administration, lien resolution, and other related services to settling parties and their attorneys, and Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master acknowledge and

22

agree that it shall not be a conflict of interest for the BAP Administrator to provide such services to such individuals or to receive compensation for such work.

Section 5.7    Retention and Oversight of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s)

(a)    Qualified BAP Providers

(i)    Within ninety (90) days after the Effective Date, the BAP Administrator will establish and maintain a network of Qualified BAP Providers to provide baseline assessment examinations to Retired NFL Football Players, and to provide medical treatment to Retired NFL Football Players who receive BAP Supplemental Benefits, as set forth in Section 5.11. The BAP Administrator's selection of all Qualified BAP Providers will be subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties, each of which will have the right to veto the selection of seven (7) Qualified BAP Providers unconditionally.

(ii)    The BAP Administrator will select Qualified BAP Providers based on the following criteria:    (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified baseline assessment examinations under the BAP; (c) ability to provide medical services under the BAP Supplemental Benefits; (d) ability to provide all required examinations and services in a timely manner; (e) geographic proximity to Retired NFL Football Players; and (f) rate structure and payment terms. Under no circumstances will a Qualified BAP Provider be selected or approved who has been convicted of a crime of dishonesty.

(iii)    In order to be eligible for selection, each Qualified BAP Provider must provide the following information to the BAP Administrator: (a) state professional license number; (b) National Provider Identifier; (c) board-certification information, if any; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide the specified baseline assessment examinations; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken; (m) criminal record; and (n) such other information as the BAP Administrator may reasonably request.

(iv)    The BAP Administrator will enter into a written contract with each Qualified BAP Provider (the "Provider Contract") to provide the specified baseline assessment examinations under the BAP and authorized medical services under the BAP Supplemental Benefits. The Provider Contract will include, among other things, a description of the baseline assessment examinations that will be provided under the BAP; rates, billing, and payment terms; terms relating to licensing, credentials, board certification, and other qualifications; the amount and type of insurance to be maintained by the Qualified BAP Provider; procedures for scheduling, rescheduling, and cancelling BAP appointments; document retention policies and

23

procedures; and fraud policies. The Provider Contract will further provide: (a) that the Qualified BAP Provider will release and hold harmless the Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Provider as part of the BAP; (b) that the Qualified BAP Provider will not seek payment from the Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any medical service(s), examination(s), and/or test(s) or any medical treatment or care that are not part of the specified baseline assessment examinations or authorized for payment under the terms of the BAP Supplemental Benefits, except that the Qualified BAP Provider may seek payment from a Retired NFL Football Player or, where applicable, his or her insurer for any medical service(s), examination(s), and/or test(s) or any medical treatment or care that are not part of the specified baseline assessment examinations or BAP Supplemental Benefits, where the Retired NFL Football Player, or, where applicable, his or her insurer, has agreed in writing to authorize and pay for such medical service(s), examination(s), and/or test(s) or any medical treatment or care; and (c) that the Qualified BAP Provider will retain medical records for Retired NFL Football Players in accordance with Section 5.10.

        (1)     The Provider Contract will be drafted by the BAP Administrator, as overseen by the Special Master, and in consultation with and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties.

        (2)     The Provider Contract's fraud policies will contain the following warning against fraudulent conduct: "As a Qualified BAP Provider you have agreed to provide your services and make your diagnosis in good faith in accordance with best medical practices. Your diagnoses and billings will be audited on a periodic and random basis subject to the discretion of the BAP Administrator and Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof). Any finding of fraudulent diagnoses or billings by you will be subject to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, the immediate termination of this contract, and your disqualification from serving as a diagnosing physician in any aspect of the Class Action Settlement."

        (v)     The BAP Administrator will audit the credentialing and performance of Qualified BAP Providers on an annual (or, as needed, more frequent) basis. The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL Parties. The BAP Administrator may conduct onsite visits at the Qualified BAP Providers on a random or adverse selection basis to confirm their compliance with the Provider Contract described in Section 5.7(a)(iv).

(vi)     All Qualified BAP Providers will bill the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP. The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for BAP baseline assessment examinations and treatments under the BAP Supplemental Benefits, subject to the coverage limits of the BAP Supplemental Benefits, consistent with the Provider Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider. The BAP Administrator will establish and administer a system to audit Qualified BAP Providers' procedures for billing and providing BAP baseline assessment examinations and BAP Supplemental Benefits treatments. This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized medical services. The BAP Administrator will bring abusive and fraudulent Qualified BAP Provider billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii)     The BAP Administrator may terminate the Provider Contract of any Qualified BAP Providers that are not in compliance with its terms.

(b)     Qualified Pharmacy Vendor(s)

(i)     Within ninety (90) days after the Effective Date, the BAP Administrator will contract with one or more Qualified BAP Pharmacy Vendor(s) to provide pharmaceuticals covered by the BAP Supplemental Benefits, as set forth in Section 5.11. The BAP Administrator's selection of the Qualified BAP Pharmacy Vendor(s) will be subject to written approval of the Special Master, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

(ii)     The BAP Administrator will select Qualified BAP Pharmacy Vendor(s) based on the following criteria: (a) proper licensing for operation as a mail order pharmacy in all U.S. states and territories; (b) nationwide coverage and ease of administration; and (c) rate structure and payment terms.

(iii)     In order to be eligible for selection, each Qualified BAP Pharmacy Vendor must provide the following information to the BAP Administrator: (a) federal DEA and/or state license numbers, as applicable; (b) evidence of proper licensing under applicable state laws; (c) experience, including number of years as a mail order pharmacy; (d) information about processes required to submit and fulfill mail order prescriptions; (e) average processing and delivery time from submission of a valid prescription; (f) policies related to generic substitution of name-brand pharmaceutical products; (g) mailing and billing addresses; (h) tax identification information; (i) languages spoken; and (j) such other information as the BAP Administrator may reasonably request.

(iv)     The BAP Administrator will enter into a written contract with each Qualified BAP Pharmacy Vendor (the "Pharmacy Contract") to provide the pharmaceuticals covered under the BAP Supplemental Benefits. The

Pharmacy Contract will include, among other things, a description of the pharmaceutical therapies that will be covered under the BAP Supplemental Benefits; rates, billing, and payment terms; terms relating to qualifications; procedures for submitting, filling, and shipping prescriptions; document retention policies and procedures; and fraud policies. The Pharmacy Contract will further provide:  (a) that the Qualified BAP Pharmacy Vendor will release and hold harmless the Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Pharmacy Vendor as part of the BAP; and (b) that the Qualified BAP Pharmacy Vendor will not seek payment from the Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any prescriptions that are authorized for payment under the terms of the BAP Supplemental Benefits.

(v)    The BAP Administrator will audit the performance of Qualified BAP Pharmacy Vendor(s) on an annual (or, as needed, more frequent) basis. The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL.

(vi)    All Qualified BAP Pharmacy Vendors will be reimbursed by the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP, subject to the coverage limits of the BAP Supplemental Benefits. The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for covered prescriptions consistent with the Pharmacy Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider.   The BAP Administrator will establish and administer a system to audit Qualified BAP Pharmacy Vendor(s)' procedures for billing and providing approved BAP Supplemental Benefits prescriptions. This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized prescriptions. The BAP Administrator will bring abusive and fraudulent Qualified BAP Pharmacy Vendor billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii)    The BAP Administrator may terminate the Pharmacy Contract of any Qualified BAP Pharmacy Vendor that are not in compliance with its terms.

Section 5.8    Scheduling and Providing Baseline Assessment Examinations.   The Parties will establish, subject to Court approval, processes and procedures governing the scheduling and provision of BAP examinations.

26

Section 5.9    Other Communications with Retired NFL Football Players

(a)    The BAP Administrator will send an Explanation of Benefits ("EOB") statement to each Retired NFL Football Player following a BAP appointment. The statement will describe the services and medical examinations that were performed during the appointment.

(b)    Beginning one (1) year after the Effective Date of the Settlement Agreement, the BAP Administrator will send Retired NFL Football Players who have not received baseline assessments and remain eligible to do so, an annual statement describing the BAP and requesting that he update any contact information that has changed in the preceding year.

(c)    If a Retired NFL Football Player is represented by counsel and has provided such notice to the BAP Administrator, the BAP Administrator will copy his counsel of record on any written communications with the Retired NFL Football Player.

Section 5.10    Use and Retention of Medical Records

(a)    All Retired NFL Football Players who participate in the BAP will be encouraged to provide their confidential medical records for use in medical research into cognitive impairment and safety and injury prevention with respect to football players. The provision of such medical records shall be subject to the reasonable informed consent of the Retired NFL Football Players, and in compliance with applicable law, including a HIPAA-compliant authorization form. Medical records and information used in medical research will be kept confidential.

(b)    The BAP Administrator will retain the medical records of Retired NFL Football Players and other program-defined forms that must be completed by the Qualified BAP Providers.

(c)    Qualified BAP Providers who provide BAP baseline assessment examinations will be required to retain all medical records from such visits in compliance with applicable state and federal laws; provided, however, that each Qualified BAP Provider will be required to retain all medical records in the format(s) prescribed by applicable state and federal laws and, notwithstanding any shorter time period permitted under applicable laws, will be required to retain such medical records for not less than ten (10) years after the conclusion of the BAP term.

(d)    All Retired NFL Football Player medical records will be treated as confidential, as set forth in Section 17.2.

Section 5.11    BAP Supplemental Benefits.  Each Retired NFL Football Player diagnosed by Qualified BAP Providers with a Level 1 Neurocognitive Impairment, as defined in Exhibit 1, shall be eligible for BAP Supplemental Benefits related to the Retired NFL Football Player's impairment in the form of medical treatment, counseling and/or examination by Qualified BAP Providers, including, if medically

27

needed and prescribed by a Qualified BAP Provider, pharmaceuticals by Qualified BAP Pharmacy Vendor(s). BAP Supplemental Benefits shall comprise medical treatments and/or examinations generally accepted by the medical community. Subject to Sections 5.14, 23.1(a) and 23.3 of this Agreement, the monetary parameters for these benefits, taking into account such factors as the number of Retired NFL Football Players using the BAP and diagnosed with Level 1 Neurocognitive Impairment, shall be determined by Co-Lead Class Counsel and Counsel for the NFL Parties, in consultation with the BAP Administrator, and with the approval of the Court. The BAP Supplemental Benefits must be used within the term of the BAP or within five (5) years of diagnosis of Level 1 Neurocognitive Impairment by Qualified BAP Providers, even if the five (5) year period extends beyond the term of the BAP, whichever is later. The BAP Administrator, as overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), and in consultation with, and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties, will establish the procedures governing BAP Supplemental Benefits.

Section 5.12 <u>Diagnosing Physician Certifications</u>. Qualified BAP Providers who diagnose a Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, as set forth in Exhibit 1, must support that diagnosis with a Diagnosing Physician Certification and supporting medical records. The Qualified BAP Provider must provide the Diagnosing Physician Certification and copies of the supporting medical records to the Retired NFL Football Player, his counsel (if any), and the BAP Administrator.

Section 5.13 <u>Conflicting Opinions of Qualified BAP Providers</u>. If there is a lack of agreement, as required by Section 5.2 and Exhibit 1, between the two Qualified BAP Providers regarding whether a Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, the BAP Administrator may in its discretion: (a) request that the Qualified BAP Providers confer with each other in an attempt to resolve the conflict; (b) request that a second BAP baseline assessment examination be conducted by different Qualified BAP Providers; or (c) refer the results of the BAP baseline assessment examination and all relevant medical records to the Court for review and decision. In the event the conflict is referred to the Court, the decision of the Court as to whether the Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, will be final and binding.

Section 5.14 <u>Funding</u>. All aspects of the BAP, including, without limitation, its costs and expenses, payment of Qualified BAP providers, compensation of the BAP Administrator, and BAP Supplemental Benefits, will be paid from the BAP Fund. At the conclusion of the term of the BAP, the BAP Administrator will determine, in consultation with the Court, the maximum coverage amount necessary to hold in reserve for up to five (5) years for the provision of BAP Supplemental Benefits to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment during the term of the BAP, as set forth in Section 5.11. Any funds remaining in the BAP Fund after all BAP Supplemental Benefits have been provided to or otherwise reserved for

eligible Retired NFL Football Players will be transferred to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

## ARTICLE VI
## Monetary Awards for Qualifying Diagnoses

Section 6.1     Eligible Retired NFL Football Players and Representative Claimants will be entitled to Monetary Awards as set forth in this Article.

### Section 6.2     Eligibility

(a)     A Settlement Class Member who is a Retired NFL Football Player or Representative Claimant is eligible for a Monetary Award if, and only if: (i) the Settlement Class Member timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (ii) the subject Retired NFL Football Player or deceased Retired NFL Football Player was diagnosed with a Qualifying Diagnosis; and (iii) the Settlement Class Member timely submits a Claim Package, subject to the terms and conditions set forth in ARTICLE VIII.

(b)     A Representative Claimant of a deceased Retired NFL Football Player will be eligible for a Monetary Award only if the deceased Retired NFL Football Player died on or after January 1, 2006, or if the Court determines that a wrongful death or survival claim filed by the Representative Claimant would not be barred by the statute of limitations under applicable state law as of: (i) the date the Representative Claimant filed litigation against the NFL (and, where applicable, NFL Properties) relating to the subject matter of these lawsuits, if such a wrongful death or survival claim was filed prior to the Settlement Date; or (ii) the Settlement Date, where no such suit has previously been filed.

### Section 6.3     Qualifying Diagnoses

(a)     The following, as defined in Exhibit 1, are Qualifying Diagnoses eligible for a Monetary Award: (a) Level 1.5 Neurocognitive Impairment; (b) Level 2 Neurocognitive Impairment; (c) Alzheimer's Disease; (d) Parkinson's Disease; (e) Death with CTE; and (f) ALS.

(b)     All Qualifying Diagnoses must be made by properly credentialed physicians as set forth in Exhibit 1 (Injury Definitions) for the particular Qualifying Diagnosis. A Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may be made through a BAP baseline assessment examination as set forth in Section 5.2 and consistent with the terms of Exhibit 1 (Injury Definitions).

### Section 6.4     Modification of Qualifying Diagnoses

(a)     Following the Effective Date, on a periodic basis not to exceed once every ten (10) years, Co-Lead Class Counsel and Counsel for the NFL Parties agree to discuss in good faith possible modifications to the definitions of

29

Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science. No such modifications can be made absent written agreement between Co-Lead Class Counsel and Counsel for the NFL Parties and approval by the Court.

(b)     In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s) as set forth in Section 6.7.

Section 6.5     Determination of Monetary Awards

(a)     Settlement Class Members who the Claims Administrator determines are entitled to Monetary Awards will be compensated in accordance with the terms of the Monetary Award Grid and all applicable Offsets, as set forth in Exhibit 3 and below, except such compensation will be reduced by one percent (1%) to the extent that any Derivative Claimants submit for, and are entitled to, a Derivative Claimant Award based upon their relationships with the Retired NFL Football Player, as set forth in ARTICLE VII.

(b)     Offsets. All Monetary Awards will be subject to downward adjustments, including based on a Settlement Class Member's age at the time of the Qualifying Diagnosis (as reflected in the Monetary Award Grid, as set forth in Exhibit 3), and as follows:

(i)     Number of Eligible Seasons:

(1)     4.5 Eligible Seasons:     - 10%

(2)     4 Eligible Seasons:     - 20%

(3)     3.5 Eligible Seasons:     - 30%

(4)     3 Eligible Seasons:     - 40%

(5)     2.5 Eligible Seasons:     - 50%

(6)     2 Eligible Seasons:     - 60%

(7)     1.5 Eligible Seasons:     - 70%

(8)     1 Eligible Season:     - 80%

(9)     0.5 Eligible Seasons:     - 90%

(10)     0 Eligible Seasons:     - 97.5%

(ii)     Medically diagnosed Stroke occurring prior to a Qualifying Diagnosis: - 75%

30

(iii)     Medically diagnosed Traumatic Brain Injury occurring prior to a Qualifying Diagnosis: - 75%

(iv)     Non-participation in the BAP by a Retired NFL Football Player in Subclass 1, except where the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3: - 10%

(c)     For purposes of calculating the total number of Eligible Seasons earned by a Retired NFL Football Player or deceased Retired NFL Football Player under this Settlement Agreement, each Eligible Season and each half of an Eligible Season for which the subject Retired NFL Football Player did not otherwise earn an Eligible Season, will be summed together to reach a total number of Eligible Seasons (*e.g.*, 3.5 Eligible Seasons).

(i)     For the avoidance of any doubt, seasons in the World League of American Football, the NFL Europe League, or the NFL Europa League are specifically excluded from the calculation of an Eligible Season.

(d)     If the Retired NFL Football Player receives a Qualifying Diagnosis prior to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, then the 75% Offset for medically diagnosed Stroke or medically diagnosed Traumatic Brain Injury will not apply.  If the Retired NFL Football Player receives a Qualifying Diagnosis subsequent to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, and if the Settlement Class Member demonstrates, by clear and convincing evidence, that the Qualifying Diagnosis was not causally related to the Stroke or the Traumatic Brain Injury, then the 75% Offset will not apply.

(e)     Multiple Offsets will be applied individually and in a serial manner to any Monetary Award or Supplemental Monetary Award.  For example, if the Monetary Award before the application of Offsets is $1,000,000, and two 10% Offsets apply, there will be a 19% aggregate downward adjustment of the award (*i.e.*, application of the first Offset will reduce the award by 10%, or $100,000, to $900,000, and application of the second Offset will reduce the award by an additional 10%, or $90,000, to $810,000).

Section 6.6     Supplemental Monetary Awards.  If, during the term of the Monetary Award Fund, a Retired NFL Football Player who has received a Monetary Award based on a certain Qualifying Diagnosis subsequently is diagnosed with a different Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) may be entitled to a Supplemental Monetary Award.  If the Monetary Award level in the Monetary Award Grid ("Grid Level") for the subsequent Qualifying Diagnosis is greater than the Grid Level for the earlier Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) will be entitled to a payment that is equal to the Grid Level for the subsequent Qualifying Diagnosis, after application of all applicable Offsets, minus the Grid Level for the earlier Qualifying Diagnosis, after application of all applicable Offsets, but prior to any

31

deductions for the satisfaction of Liens. In other words, any amounts deducted from the earlier Monetary Award to satisfy Liens will not be considered in the calculation of the Supplemental Monetary Award, which may also require an amount deducted to satisfy any subsequent Liens. (By way of example only, a Retired NFL Football Player who receives a Monetary Award for Level 1.5 Neurocognitive Impairment that is $1,000,000 after application of all Offsets, which is then reduced by $20,000 to $980,000 to satisfy a Lien, and who later receives a Qualifying Diagnosis for Level 2 Neurocognitive Impairment that would pay $1,200,000 after application of all Offsets, where there are no additional Liens, shall be entitled to a Supplemental Monetary Award of $200,000.)

Section 6.7    Inflation Adjustment.    Monetary Award amounts set forth in Exhibit 3 will be subject to an annual inflation adjustment, beginning one year after the Effective Date, not to exceed two and a half percent (2.5%), the precise amount subject to the sound judgment of the Special Master (or the Claims Administrator after expiration of the term of the Special Master).

Section 6.8    Monetary Award Fund Term.    The Monetary Award Fund will commence on the Effective Date and will end sixty-five (65) years after the Effective Date.

## ARTICLE VII
### Derivative Claimant Awards

Section 7.1    All Settlement Class Members who are Derivative Claimants seeking Derivative Claimant Awards must do so through the submission of Derivative Claim Packages containing all required proof, as set forth in Section 8.2(b).

Section 7.2    Eligibility.    A Settlement Class Member who is a Derivative Claimant is entitled to a Derivative Claimant Award if, and only if:  (a) the Derivative Claimant timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (b) the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) has received a Monetary Award; (c) the Settlement Class Member timely submits a Derivative Claim Package, subject to the terms and conditions set forth in ARTICLE VIII; and (d) the Claims Administrator determines, based on a review of the records provided in the Derivative Claim Package and applicable state law, that the Derivative Claimant has a relationship with the subject Retired NFL Football Player that properly and legally provides the right under applicable state law to sue independently and derivatively.

Section 7.3    Determination of Derivative Claimant Awards.    Settlement Class Members who the Claims Administrator determines are entitled to Derivative Claimant Awards will be compensated from the Monetary Award of the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant), and from any Supplemental Monetary Award, in the amount of one percent (1%) of that Monetary Award and any Supplemental Monetary Award. If

32

there are multiple Derivative Claimants asserting valid claims based on the same subject Retired NFL Football Player, the Claims Administrator will divide and distribute the Derivative Claimant Award among those Derivative Claimants pursuant to the laws of the domicile of the Retired NFL Football Player (or his Representative Claimant, if any).

## ARTICLE VIII
### Submission and Review of Claim Packages
### and Derivative Claim Packages

Section 8.1    All Settlement Class Members applying for Monetary Awards or Derivative Claimant Awards must submit Claim Packages or Derivative Claim Packages to the Claims Administrator.

Section 8.2    Content

(a)    The content of Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation: (i) a Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form; (ii) a Diagnosing Physician Certification; (iii) medical records reflecting the Qualifying Diagnosis; (iv) a HIPAA-compliant authorization form; and (v) records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

(i)    Representative Claimants of Retired NFL Football Players who died prior to the Effective Date do not need to include a Diagnosing Physician Certification in the Claim Package if the physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, also died prior to the Effective Date or was deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date. Instead, the Representative Claimant must provide evidence of that physician's death, incapacity or incompetence and of the qualifications of the diagnosing physician. For the avoidance of any doubt, all other content of Claim Packages must be submitted, including medical records reflecting the Qualifying Diagnosis.

(ii)    In cases where a Retired NFL Football Player has received a Qualifying Diagnosis and the diagnosing physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, has died or has been deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date, or otherwise prior to completing a Diagnosing Physician Certification, the Retired NFL Football Player (or his Representative Claimant, if applicable) may obtain a Diagnosing Physician Certification from a separate qualified physician for the Qualifying Diagnosis as specified in Exhibit 1 based on an independent examination by the qualified physician and a review of the Retired NFL Football Player's medical records that formed the basis of the Qualifying Diagnosis by the deceased or legally incapacitated or incompetent physician. If the same Qualifying Diagnosis is found by both doctors, the date of

Qualifying Diagnosis used to calculate Monetary Awards shall be the date of the earlier Qualifying Diagnosis.

(b)     The content of Derivative Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation: (i) a Derivative Claim Form with the Personal Signature of the Derivative Claimant either on the Derivative Claim Form or on an acknowledgement form verifying the contents of the Derivative Claim Form; and (ii) records sufficient to verify the relationship with the subject Retired NFL Football Player or deceased Retired NFL Football Player that properly and legally provides the Derivative Claimant the right under applicable state law to sue independently and derivatively.

(c)     All statements made in Claim Forms, Derivative Claim Forms, any acknowledgement forms, and Diagnosing Physician Certifications will be sworn statements under penalty of perjury.

(d)     Each Settlement Class Member has the obligation to submit to the Claims Administrator all of the documents required in Sections 8.1 and 8.2 to receive a Monetary Award or Derivative Claimant Award.

Section 8.3     Submission

(a)     Settlement Class Members must submit Claim Packages and Derivative Claim Packages to the Claims Administrator in accordance with Section 30.15.

(i)     Claim Packages must be submitted to the Claims Administrator no later than two (2) years after the date of the Qualifying Diagnosis or within two (2) years of the Effective Date, whichever is later. Failure to comply with this two (2) year time limitation will preclude a Monetary Award for that Qualifying Diagnosis, unless the Settlement Class Member can show substantial hardship that extends beyond the Retired NFL Football Player's Qualifying Diagnosis and that precluded the Settlement Class Member from complying with the two (2) year deadline, and submits the Claim Package within four (4) years after the date of the Qualifying Diagnosis or of the Effective Date, whichever is later.

(ii)     Derivative Claim Packages must be submitted to the Claims Administrator no later than thirty (30) days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) receives a Notice of Monetary Award Claim Determination that provides a determination that the Retired NFL Football Player (or his Representative Claimant) is entitled to a Monetary Award. Failure to comply with this time limitation will preclude a Derivative Claimant Award based on that Monetary Award.

(b)     Each Settlement Class Member will promptly notify the Claims Administrator of any changes or updates to the information the Settlement Class

34

Member has provided in the Claim Package or Derivative Claim Package, including any change in mailing address.

(c) All information submitted by Settlement Class Members to the Claims Administrator will be recorded in a computerized database that will be maintained and secured in accordance with all applicable federal, state and local laws, regulations and guidelines, including, without limitation, HIPAA. The Claims Administrator must ensure that information is recorded and used properly, that an orderly system of data management and maintenance is adopted, and that the information is retained under responsible custody. The Claims Administrator will keep the database in a form that grants access for claims administration use, but otherwise restricts access rights, including to employees of the Claims Administrator who are not working on claims administration for the Class Action Settlement.

(i) The Claims Administrator and Lien Resolution Administrator, and their respective agents, representatives, and professionals who are administering the Class Action Settlement, will have access to all information submitted by Settlement Class Members to the Claims Administrator and/or Lien Resolution Administrator necessary to perform their responsibilities under the Settlement Agreement.

(ii) All information submitted by Settlement Class Members to the Claims Administrator will be treated as confidential, as set forth in Section 17.2.

Section 8.4 Preliminary Review

(a) Within forty-five (45) days of the date on which the Claims Administrator receives a Claim Package or Derivative Claim Package from a Settlement Class Member, the Claims Administrator will determine the sufficiency and completeness of the required contents, as set forth in Section 8.2. To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b) The Claims Administrator will reject a claim submitted by a Settlement Class Member, subject to the cure provisions of Section 8.5, if the Claims Administrator has not received all required content.

Section 8.5 Deficiencies and Cure. For rejected Claim Packages or Derivative Claim Packages, the Claims Administrator will send a Notice of Deficiency to the Settlement Class Member, which Notice will contain a brief explanation of the Deficiency(ies) giving rise to rejection of the Claim Package or Derivative Claim Package, and will, where necessary, request additional information and/or documentation. The Claims Administrator will make available to the Settlement Class Member through a secure online web interface any document(s) with a Deficiency

35

needing correction or, upon request from the Settlement Class Member, will mail the Settlement Class Member a copy of such document(s). The Notice of Deficiency will be sent no later than forty-five (45) days from the date of receipt of the Claim Package or Derivative Claim Package by the Claims Administrator. To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof). The Notice of Deficiency will contain a recommendation for how, if possible, the Settlement Class Member can cure the Deficiency, and will provide a reasonable deadline not less than 120 days (from the date the Notice of Deficiency is sent to the Settlement Class Member) for the Settlement Class Member to submit Deficiency cure materials. Within that time period, the Settlement Class Member will have the opportunity to cure all Deficiencies and provide any requested additional information or documentation, except that the failure to submit timely a Claim Package or Derivative Claim Package in accordance with the terms of this Settlement Agreement cannot be cured other than upon a showing of substantial hardship as set forth in Section 8.3(a)(i). Any Claim Package or Derivative Claim Package that continues to suffer from a Deficiency identified on the Notice of Deficiency following the submission of documentation intended to cure the Deficiency will be denied by the Claims Administrator.

Section 8.6    Verification and Investigation

(a)    Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will authorize the Claims Administrator and/or Lien Resolution Administrator, as applicable, consistent with HIPAA and other applicable privacy laws, to verify facts and details of any aspect of the Claim Package or Derivative Claim Package and/or the existence and amounts, if any, of any Liens. The Claims Administrator or Lien Resolution Administrator, at its sole discretion, may request additional documentation, which each Settlement Class Member agrees to provide in order to claim a Monetary Award or Derivative Claimant Award.

(b)    The Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation, including, without limitation, as set forth in Section 10.3.

## ARTICLE IX
## Notice of Claim Determinations, Payments, and Appeals

Section 9.1    Monetary Award Determination.  Based upon its review of the Claim Package, and the results of any investigations of the Settlement Class Member's claim, the Claims Administrator will determine whether a Settlement Class Member qualifies for a Monetary Award and the amount of any such Award. In order to decide whether a Settlement Class Member is entitled to a Monetary Award, and at what level, the Claims Administrator will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has a Qualifying Diagnosis according to the Diagnosing Physician Certification, including consideration of, without limitation, the

qualifications of the diagnosing physician, or in the case of a deceased Retired NFL Football Player diagnosed by a deceased physician, as set forth in Section 8.2(a)(i), according to the supporting medical records.  If the Claims Administrator determines that there is a Qualifying Diagnosis, it will determine the level of Monetary Award based on the Monetary Award Grid (attached as Exhibit 3) and a review of the Diagnosing Physician Certification for the age at the time of the Qualifying Diagnosis, and will review the Claim Package, including the Claim Form and medical records reflecting the Qualifying Diagnosis, for information relating to all other Offsets, and must apply all applicable Offsets to the Monetary Award.  For the avoidance of any doubt, the Claims Administrator has no discretion to make a Monetary Award determination other than as set forth above.

(a)     Evidence of NFL Employment and Participation.  To the extent that the Claims Administrator determines that the Settlement Class Member has provided in the Claim Package insufficient evidence of the Retired NFL Football Player's NFL employment and participation to substantiate the claimed Eligible Seasons, the Claims Administrator will request that the NFL Parties and Member Clubs provide any employment or participation records of the Retired NFL Football Player in their reasonable possession, custody or control, which the NFL Parties and Member Clubs will provide in good faith.  The Claims Administrator will consider all of the evidence provided to it by the Retired NFL Football Player and the NFL Parties and Member Clubs in determining the appropriate number of Eligible Seasons to apply to the Retired NFL Football Player's claim.  The Claims Administrator shall credit only the Eligible Seasons substantiated by the overall evidence.  To the extent there is no documentary evidence regarding an Eligible Season claimed by the Retired NFL Football Player beyond his sworn statement, the Claims Administrator will take into account the reasons offered by the Retired NFL Football Player for the lack of such documentation in arriving at its final decision.

(b)     Timing of Monetary Award Determination.  The Claims Administrator will make such determination and will send a corresponding Notice of Monetary Award Claim Determination to the Settlement Class Member and the NFL Parties no later than sixty (60) days from the later of:  (i) the date when a completed Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date, if any, when all Deficiencies with a Settlement Class Member's Claim Package have been deemed cured by the Claims Administrator; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely provided to the Claims Administrator; or (iv) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

37

(c)     Notice Content

(i)     Notices of Monetary Award Claim Determinations that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7. An adverse Notice of Monetary Award Claim Determination does not preclude a Settlement Class Member from submitting a Claim Package in the future for a Monetary Award should the Retired NFL Football Player's medical condition change. The Claims Administrator shall develop reasonable procedures and rules to ensure the right of Settlement Class Members to submit a Claim Package for the same or different Qualifying Diagnoses in the future, while preventing unwarranted repetitive claims that do not disclose materially changed circumstances from prior claims made by the Settlement Class Member.

(ii)    Notices of Monetary Award Claim Determinations that provide a determination that the Settlement Class Member is entitled to a Monetary Award will provide: (a) the net amount of that Monetary Award after application of Offsets; (b) a listing of the Offsets applied to that Monetary Award; (c) the Lien Resolution Administrator's determination of any amount deducted from the Monetary Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award under which identified Liens shall be resolved, as set forth in ARTICLE XI; (d) information regarding how the Settlement Class Member can appeal the Monetary Award determination, as set forth in Section 9.7; and (e) information regarding the timing of payment, as set forth in Section 9.3.

(d)     NFL Parties' and Co-Lead Class Counsel's Review of Claim Package. If a Notice of Monetary Award Determination provides a determination that the Settlement Class Member is entitled to a Monetary Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.2     Derivative Claimant Award Determination. Based upon its review of the Derivative Claim Package, and the results of any investigations of the Derivative Claimant's claim, the Claims Administrator will determine whether a Derivative Claimant qualifies for a Derivative Claimant Award, as set forth in Section 7.3.

(a)     Timing of Derivative Claimant Award Determination. The Claims Administrator will make such determination and will send a corresponding Notice of Derivative Claimant Award Determination to the Settlement Class Member and the NFL Parties no later than thirty (30) days from the later of: (i) the date when a completed Derivative Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date when all Deficiencies with a Settlement Class Member's Derivative Claim Package have been determined by the Claims Administrator to be satisfactorily cured; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely

provided to the Claims Administrator; or (iv) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b)     Notice Content

(i)     Notices     of     Derivative     Claimant     Award Determinations that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7. An adverse Notice of Derivative Claimant Award Determination does not preclude a Derivative Claimant from submitting a Derivative Claim Package in the future for a Derivative Claimant Award should the Retired NFL Football Player receive a Supplemental Monetary Award or succeed on an appeal of a previously denied claim for a Monetary Award.

(ii)     Notices     of     Derivative     Claimant     Award Determinations that provide a determination that the Settlement Class Member is entitled to a Derivative Claimant Award will provide: (a) the amount of that Derivative Claimant Award; (b) the Lien Resolution Administrator's determination of any amount deducted from the Derivative Claimant Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Derivative Claimant Award under which identified Liens will be resolved, as set forth in ARTICLE XI; (c) information regarding how the Derivative Claimant can appeal the Derivative Claimant Award determination, as set forth in Section 9.7; and (d) information regarding the timing of payment, as set forth in Section 9.4.

(c)     NFL Parties' and Co-Lead Class Counsel's Review of Derivative Claim Package.   If a Notice of Derivative Claimant Award Determination provides a determination that the Settlement Class Member is entitled to a Derivative Claimant Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.3     Remuneration and Payment of Monetary Awards.

(a)     The Claims Administrator will promptly pay any Monetary Awards to Settlement Class Members who qualify under the terms of the Monetary Award Grid and all applicable Offsets after the Claims Administrator sends a Notice of Monetary Award Claim Determination; provided, however, any such payment will not occur until after the completion of the processes for (i) appealing Monetary Award determinations, as set forth in Section 9.7; (ii) auditing claims and investigating claims for fraud, as set forth in Section 10.3; (iii) identifying and satisfying Liens, as set forth in

39

ARTICLE XI; and (iv) determining if any Derivative Claimants have filed timely, and are entitled to, Derivative Claimant Awards based on their relationship with the subject Retired NFL Football Player.

(b)     In connection with a Monetary Award issued to a Representative Claimant, the Claims Administrator will abide by all substantive laws of the domicile of such Representative Claimant concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment. Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Representative Claimant.   The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

(c)     Upon the completion of the Monetary Award Fund term, as set forth in Section 6.8, the Court shall determine the proper disposition of any funds remaining in the Monetary Award Fund consistent with the purpose of this Settlement, including to promote safety and injury prevention with respect to football players and/or the treatment or prevention of traumatic brain injuries.

Section 9.4     Remuneration and Payment of Derivative Claimant Awards

(a)     The Claims Administrator will promptly pay any Derivative Claimant Awards to Settlement Class Members who qualify; provided, however, any such payment will not occur until after expiration or completion of: (i) the time period for Derivative Claimants to file Derivative Claim Packages, as set forth in Section 8.3(a)(ii), has expired; (ii) the process for appealing Derivative Claimant Awards, including appeals by any other Derivative Claimants asserting claims based on the same Retired NFL Football Player, as set forth in Section 9.7; (iii) the process for auditing claims and investigating claims for fraud, set forth in Section 10.3; and (iv) the process for identifying and satisfying Liens, as set forth in ARTICLE XI.

(b)     In paying a Derivative Claimant Award to a minor, the Claims Administrator will abide by all substantive laws of the domicile of such Settlement Class Member concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment. Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Settlement Class Members.   The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

Section 9.5    Scope of Appeals.    The Claims Administrator's determination as to whether a Settlement Class Member is entitled to a Monetary Award or Derivative Claimant Award under this Settlement Agreement, and/or the calculation of the Monetary Award or Derivative Claimant Award, is appealable by the Settlement Class Member, Co-Lead Class Counsel, or the NFL Parties based on their respective good faith belief that the determination by the Claims Administrator was incorrect.

Section 9.6    Appellant Fees and Limitations

(a)    Any Settlement Class Member taking an appeal will be charged a fee of One Thousand United States dollars (U.S. $1,000) by the Claims Administrator that must be paid before the appeal may proceed, which fee will be refunded if the Settlement Class Member's appeal is successful. If the appeal is unsuccessful, the fee will be paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(b)    The NFL Parties may appeal up to ten (10) Monetary Award or Derivative Claimant Award determinations per calendar year, provided that, upon application by the NFL Parties, the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may permit the NFL Parties to take additional appeals in a calendar year on the basis of good cause. If the NFL Parties' appeal is unsuccessful, they will pay all administrative costs directly resulting from the appeal, and reasonable attorneys' fees, if any, incurred by the Settlement Class Member as a direct result of the appeal (collectively, "Appeal Costs"), provided that in no event will the NFL Parties be required to pay Appeal Costs in an amount greater than Two Thousand United States dollars (U.S. $2,000).

(i)    If the NFL Parties' appeal is unsuccessful, and the Appeal Costs exceed Two Thousand United States dollars (U.S. $2,000), the NFL Parties' payment of Two Thousand United States dollars (U.S. $2,000) will be divided pro-rata between the reimbursement of administrative costs and the reasonable attorneys' fees, if any, so long as each respective payment does not exceed the actual amount of such administrative costs or reasonable attorneys' fees.

(ii)    The NFL Parties' payment of administrative costs hereunder will be made to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(c)    Co-Lead Class Counsel may appeal up to ten (10) Monetary Award or Derivative Claimant Award determinations per calendar year on the basis of good cause.

Section 9.7    Submissions on Appeals

(a)    The appellant must submit to the Court his or her notice of appeal, using an Appeals Form to be agreed upon by Co-Lead Class Counsel and the NFL Parties and provided by the Claims Administrator, with written copy to the appellee(s) Settlement Class Member or the NFL Parties (as applicable), and to the

41

Claims Administrator, no later than thirty (30) days after receipt of a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Appellants must present evidence in support of their appeal, and any written statements may not exceed five (5) single-spaced pages in length.

(b)     The appellee(s) may submit a written opposition to the appeal no later than thirty (30) days after receipt of the Appeals Form. This written opposition must not exceed five (5) single-spaced pages in length. The Court will not deem the lack of an opposition to be an admission regarding the merits of the appeal. The appellant may not submit a reply.

Section 9.8     Review and Decision.     The Court will make a determination based upon a showing by the appellant of clear and convincing evidence. The Court may be assisted, in its discretion, by any member of the Appeals Advisory Panel. The decision of the Court will be final and binding.

(a)     Appeals Advisory Panel

(i)     Within ninety (90) days after the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to, and jointly recommend to the Court for appointment, the members of the Appeals Advisory Panel. Under no circumstances may a member of the Appeals Advisory Panel have been convicted of a crime of dishonesty, or have been retained as an expert consultant or expert witness by one of the parties or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

(ii)     Co-Lead Class Counsel and Counsel for the NFL Parties will jointly retain the members of the Appeals Advisory Panel appointed by the Court.

(iii)     Upon request of the Court or the Special Master, the Appeals Advisory Panel will take all steps necessary to provide sound advice with respect to medical aspects of the Class Action Settlement.

(iv)     The Court will oversee the Appeals Advisory Panel, and may, in its discretion, request reports or information from the Appeals Advisory Panel.

(v)     Compensation of the Appeals Advisory Panel, at a reasonable rate for their time agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, will be paid out of the Monetary Award Fund, except that compensation of an Appeals Advisory Panel member will be paid out of the BAP fund for reviewing and advising the Court whether a Retired NFL Football player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, in cases where there are conflicting diagnoses by Qualified BAP Providers.

(vi)     Members of the Appeals Advisory Panel may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL

42

Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If any member of the Appeals Advisory Panel resigns, dies, is replaced, or is otherwise unable to continue in his or her position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed member for appointment by the Court.

        (b)    <u>Conflicts of Interest</u>. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between members of the Appeals Advisory Panel, on the one hand, and an appellant or appellee(s), on the other hand. Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate. For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

### ARTICLE X
### Class Action Settlement Administration

Section 10.1    <u>Special Master</u>

        (a)    <u>Appointment and Oversight</u>

        (i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Co-Lead Class Counsel, Class Counsel and Subclass Counsel will request that the Court appoint a Special Master pursuant to Federal Rule of Civil Procedure 53.

        (ii)    It is the intention of the Parties that the Special Master will perform his or her responsibilities and take all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement for a term of five (5) years commencing on the Effective Date. The term of the Special Master may be extended by the Court.

        (iii)    The Special Master will maintain at all times appropriate and sufficient bonding insurance in connection with his or her performance of responsibilities under the Settlement Agreement. The cost for this insurance will be paid out of the Monetary Award Fund.

        (iv)    The Court may, at its sole discretion, request reports or information from the Special Master. The Special Master will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs. The Claims Administrator may assist with such reports if requested by the Special Master.

(v)     Following the five (5) year term of the Special Master, and any extension(s) thereof, oversight of the administration of the Class Action Settlement will revert to the Court.

(b)     Roles and Responsibilities

(i)     The Special Master will, among other responsibilities set forth in this Settlement Agreement:

(1)     Provide reports or information that the Court may, at its sole discretion, request from the Special Master.  The Special Master will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(2)     Oversee complaints raised by Co-Lead Class Counsel, Counsel for the NFL Parties, the BAP Administrator, Claims Administrator and/or the Lien Resolution Administrator regarding aspects of the Class Action Settlement;

(3)     Hear appeals of registration determinations, if requested by the Court, as set forth in Section 4.3(a)(iv).

(4)     Oversee the BAP Administrator, Claims Administrator and Lien Resolution Administrator, as set forth in Section 5.6(a)(iv), Section 10.2(a)(iv), and Section 11.1(a)(iv), and receive monthly and annual reports from those Administrators; and

(5)     Oversee fraud detection and prevention procedures, and review and decide the appropriate disposition of potentially fraudulent claims as further specified in Section 10.3(i).

(c)     Compensation and Expenses.  Annual compensation of the Special Master will not exceed Two Hundred Thousand United States dollars (U.S. $200,000).  Such annual compensation will be shared equally by the NFL Parties and the Monetary Award Fund for the five (5) year term and any extensions thereof.  The reasonable out-of-pocket costs and expenses of the Special Master directly incurred as a result of the performance of his or her responsibilities will be paid out of the Monetary Award Fund.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Special Master's out-of-pocket costs and expenses, in which case the Court will determine the reasonableness of such costs and expenses.  If the Court determines that any costs and expenses are unreasonable, the Special Master will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Special Master will refund that amount to the Monetary Award Fund.

(d)     Replacement.  The Court, in its discretion, can replace the Special Master for good cause.  If the Special Master resigns, dies, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties may file a motion for the appointment by the Court of a new Special Master.

(e)     Conflicts of Interest.   Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Special Master, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), Co-Lead Class Counsel, Class Counsel, Subclass Counsel, the NFL Parties, Counsel for the NFL Parties, the BAP Administrator, the Claims Administrator, or the Lien Resolution Administrator, on the other hand.  Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Court, may modify such procedures in the future, if appropriate.  For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

### Section 10.2   Claims Administrator

(a)     Appointment and Oversight

(i)     The Motion for Preliminary Approval of the Class Action Settlement filed by Co-Lead Class Counsel, Class Counsel and Subclass Counsel will request that the Court appoint BrownGreer PLC as Claims Administrator.  Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Claims Administrator appointed by the Court.

(ii)     Co-Lead Class Counsel's retention agreement with the Claims Administrator will provide that the Claims Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Settlement Agreement, and will require that the Claims Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)     The Court may, at its sole discretion, request reports or information from the Claims Administrator.  The Claims Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)     The Special Master, for the duration of his or her term, will oversee the Claims Administrator, and may, at his or her sole discretion, request reports or information from the Claims Administrator.

(v)     Beyond the reporting requirements set forth in Section 10.2(a)(iii)-(iv), beginning one month after the Effective Date, the Claims Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the Monetary Award Fund, and thereafter on a quarterly basis or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and the NFL Parties, regarding the status and progress of claims administration.  The monthly (or quarterly) report will include,

45

without limitation: (a) the monthly and total number of Settlement Class Members who registered timely, and the biographical information for each Settlement Class Member who registered timely in the preceding month, as set forth in Section 4.2(c); (b) the identity of each Settlement Class Member who submitted a Claim Package or Derivative Claim Package in the preceding month, the review status of such package (*e.g*, under preliminary review, subject to a Notice of Deficiency, subject to verification and investigation, received a Notice of Claim Determination), and the monthly and total number of Settlement Class Member claims for Monetary Awards and Derivative Claimant Awards; (c) the monthly and total number of Monetary Awards and Derivative Claimant Awards paid; (d) the monthly and total number of each Qualifying Diagnosis for which a Monetary Award has been paid; (e) the monthly and total number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (f) the monthly identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant Awards; (g) the monthly expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; and (h) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi)     Beginning on the first January after the Effective Date, the Claims Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding: (a) the number of Settlement Class Members, broken down by Qualifying Diagnosis, who received Monetary Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Monetary Awards; (b) the number of Settlement Class Members who received Derivative Claimant Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Derivative Claimant Awards; (c) the monetary amounts paid through Monetary Awards and Derivative Claimant Awards, including the monetary amounts over the term of the Class Action Settlement; (d) the number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (e) the identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant Awards; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; (g) the projected expenses/administrative costs for the remainder of the Monetary Award Fund term; (h) the monies remaining in the Monetary Award Fund; and (i) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vii)     The NFL Parties may elect, at their own expense, to cause an audit to be performed by a certified public accountant of the financial records of

the Claims Administrator, and the Claims Administrator shall cooperate in good faith with the audit. Audits may be conducted at any time during the term of the Monetary Award Fund. Complete copies of the audit findings report will be provided to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties.

        (b)    Roles and Responsibilities

        (i)    The Claims Administrator will, among other responsibilities set forth in this Settlement Agreement:

        (1)    Maintain the Settlement Website, as set forth in Section 4.1(a);

        (2)    Maintain an automated telephone system to provide information about the Class Action Settlement, as set forth in Section 4.1(b);

        (3)    Establish and administer both online and hard copy registration methods, as set forth in Section 4.2(a);

        (4)    Review a purported Settlement Class Member's registration and determine its validity, as set forth in Section 4.3;

        (5)    Process and review Claim Packages and Derivative Claim Packages, as set forth in ARTICLE VIII;

        (6)    Determine whether Settlement Class Members who submit Claim Packages and Derivative Claim Packages are entitled to Monetary Awards or Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII;

        (7)    Audit Claim Packages and Derivative Claim Packages, and establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund, as set forth in Section 10.3; and

        (8)    Perform such other tasks reasonably necessary to accomplish the goals contemplated by this Settlement Agreement, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.

        (c)    Compensation and Expenses. Reasonable compensation of the Claims Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Claims Administrator's responsibilities set forth in this Settlement Agreement will be paid out of the Monetary Award Fund. The Claims Administrator shall submit an annual budget to the Court for review and approval. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Claims Administrator's out-of-pocket costs and expenses, in which case the Court will determine

47

(or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses. If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the Claims Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Claims Administrator will refund that amount to the Monetary Award Fund.

(d)     Liability.   The Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Claims Administrator.

(e)     Replacement.  The Claims Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If the Claims Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend a new proposed Claims Administrator for appointment by the Court.

(f)     Conflicts of Interest.   Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Claims Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Claims Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members and their counsel (if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand.    Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate. Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Claims Administrator regularly provides settlement claims administration and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that it shall not be a conflict of interest for the Claims Administrator to provide such services to such individuals or to receive compensation for such work.

### Section 10.3    Audit Rights and Detection and Prevention of Fraud

(a)     Co-Lead Class Counsel and Counsel for the NFL Parties each will have the absolute right and discretion, at any time, but at its sole expense, in good faith to conduct, or have conducted by an independent auditor, audits to verify Monetary Award and Derivative Claimant Award claims submitted by Settlement Class Members.

(b)     In addition, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator will establish and implement procedures to detect

48

and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund. Among other fraud detection and prevention procedures, the Claims Administrator, with the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, will institute the following procedures relating to claim audits:

(i)     A Settlement Class Member whose claim has been selected for audit by the Claims Administrator, Co-Lead Class Counsel or Counsel for the NFL Parties may be required to submit additional records, including medical records, and information as requested by the party auditing the claim; and

(ii)     A Settlement Class Member who refuses to cooperate with an audit, including by unreasonably failing or refusing to provide the auditing party with all records and information sought within the time frame specified, will have the claim denied by the Claims Administrator, without right to an appeal.

(c)     On a monthly basis, the Claims Administrator will audit five percent (5%) of the total Claim Packages and Derivative Claim Packages that the Claims Administrator has found to qualify for Monetary Awards or Derivative Claimant Award during the preceding month. The Claims Administrator will select such Claim Packages and Derivative Claim Packages for auditing on a random basis or to address a specific concern raised by a Claim Package or Derivative Claim Package, but will audit at least one Claim Package, if any qualify, each month.

(d)     In addition, the Claims Administrator will audit Claim Packages that: (i) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player took part in the BAP within the prior 365 days and was not diagnosed with that Qualifying Diagnosis during the BAP baseline assessment examination; (ii) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player submitted a different Claim Package within the prior 365 days based upon a diagnosis of that same Qualifying Diagnosis by a different physician, and that Claim Package was found not to qualify for a Monetary Award; and (iii) reflect a Qualifying Diagnosis made through a medical examination conducted at a location other than a standard treatment or diagnosis setting (*e.g.*, hotel rooms).

(e)     Upon selection of a Settlement Class Member's Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include the following records and information:

(i)     All of the Retired NFL Football Player's medical records in the Settlement Class Member's possession, custody, or control that relate to the underlying medical condition that is the basis for the Qualifying Diagnosis claimed by the Settlement Class Member;

49

(ii) A list of all health care providers seen by the Retired NFL Football Player in the last five (5) years;

(iii) The Settlement Class Member's (or subject Retired NFL Football Player's) employment records from Member Clubs or other NFL Football employers, but only to the extent that the Settlement Class Member is authorized under applicable state law or Collective Bargaining Agreement to request and receive such records from the Member Club or other NFL Football employer;

(iv) Such other relevant documents or information within the Settlement Class Member's possession, custody, or control as may reasonably be requested by the Claims Administrator under the circumstances, including, if necessary, authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) created or obtained by any health care providers seen by the Settlement Class Member (or subject Retired NFL Football Player) in the last five (5) years; and

(v) Where the audit is conducted because of the circumstances set forth in Section 10.3(d), authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) held by the primary care physician of the Retired NFL Football Player and the medical records of all other physicians or neuropsychologists who have examined the Retired NFL Football Player relating to the Qualifying Diagnosis.

(f) Upon selection of a Settlement Class Member's Derivative Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include relevant documents or information within the Settlement Class Member's possession, custody, or control as may reasonably be requested by the Claims Administrator under the circumstances.

(g) When auditing a Settlement Class Member's claim for a Monetary Award or Derivative Claimant Award, the Claims Administrator will review the records and information relating to that claim and determine whether the Claim Form or Derivative Claim Form misrepresents, omits, and/or conceals material facts that affect the claim.

(h) If, upon completion of an audit, the Claims Administrator determines that there has not been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the process of issuing a Monetary Award or Derivative Claimant Award, subject to appeal, will proceed.

50

(i)     If, upon completion of an audit, the Claims Administrator determines that there has been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the Claims Administrator will notify the Settlement Class Member and will refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings. The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the following relief, without limitation:  (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or (f) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(j)     In addition, if the Claims Administrator at any time makes a finding (based on its own detection processes or from information received from Co-Lead Class Counsel or Counsel for the NFL Parties) of fraud by a Settlement Class Member submitting a claim for a Monetary Award or Derivative Claimant Award, and/or by the physician providing the Qualifying Diagnosis, including, without limitation, misrepresentations, omissions, or concealment of material facts relating to the claim, the Claims Administrator will notify the Settlement Class Member and will make a recommendation to Co-Lead Class Counsel and Counsel for the NFL Parties to refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings that may include, without limitation, those set forth in Section 10.3(i).

(i)     If both Co-Lead Class Counsel and Counsel for the NFL Parties do not agree with the Claims Administrator's recommendation to refer a claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), they will notify the Claims Administrator, who will continue with the processing of the claim.

Section 10.4   The Claims Administrator will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot "red flags" of fraud, including, without limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud.

## ARTICLE XI
### Identification and Satisfaction of Liens

Section 11.1    Lien Resolution Administrator

      (a)    Appointment and Oversight

          (i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Co-Lead Class Counsel, Class Counsel and Subclass Counsel will request that the Court appoint Garretson Group as Lien Resolution Administrator. Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Lien Resolution Administrator appointed by the Court.

          (ii)    Co-Lead Class Counsel's retention agreement with the Lien Resolution Administrator will provide that the Lien Resolution Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Lien-related provisions of the Settlement Agreement, and will require that the Lien Resolution Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

          (iii)    The Court may, at its sole discretion, request reports or information from the Lien Resolution Administrator.   The Lien Resolution Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

          (iv)    The Special Master, for the duration of his or her term, will oversee the Lien Resolution Administrator, and may, at his or her sole discretion, request reports or information from the Lien Resolution Administrator.

      (b)    Roles and Responsibilities.    The Lien Resolution Administrator will, among other responsibilities set forth in this Settlement Agreement, administer the process for the identification and satisfaction of all applicable Liens, as set forth in Section 11.3. Each Settlement Class Member (and his or her respective counsel, if applicable) claiming a Monetary Award or Derivative Claimant Award, however, will be solely responsible for the satisfaction and discharge of all Liens.

      (c)    Compensation and Expenses. Reasonable compensation of the Lien Resolution Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Lien Resolution Administrator's responsibilities will be paid out of the Monetary Award Fund, unless otherwise specified herein.   The Lien Resolution Administrator shall submit an annual budget to the Court for review and approval.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Lien Resolution Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses.  If the Court or Special Master, as applicable determines that any costs and expenses are unreasonable,

the Lien Resolution Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Lien Resolution Administrator will refund that amount to the Monetary Award Fund.

(d)  Liability.  The Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Lien Resolution Administrator.

(e)  Replacement.  The Lien Resolution Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.  If the Lien Resolution Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Lien Resolution Administrator for appointment by the Court.

Section 11.2  Conflicts of Interest.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Lien Resolution Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Lien Resolution Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand.  Co-Lead Class Counsel, Counsel for the NFL Parties, and the Lien Resolution Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Lien Resolution Administrator regularly provides lien resolution and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that it shall not be a conflict of interest for the Lien Resolution Administrator to provide such services to such individuals or to receive compensation for such work.

Section 11.3  Lien Identification, Satisfaction and Discharge

(a)  Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award in his or her Claim Form or Derivative Claim Form.

(b)  Each Settlement Class Member (and counsel individually representing him or her, if any) shall cooperate with the Lien Resolution Administrator to identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D

Program sponsors with respect to any Monetary Award or Derivative Claimant Award as a prerequisite to receiving payment of any Monetary Award or Derivative Claimant Award, including by providing the requested information and authorizations to the Lien Resolution Administrator and/or Claims Administrator in the timeframe specified for so doing.

(c) Among other things, each Settlement Class Member will authorize the Lien Resolution Administrator to:

(i) Establish procedures and protocols to identify and resolve Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award;

(ii) Undertake to obtain an agreement in writing and other supporting documentation with CMS promptly following the Effective Date that:

(1) Establishes a global repayment amount per Qualifying Diagnosis and/or for all or certain Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program, or, alternatively, otherwise sets forth a conditional payment resolution process. Such amounts will be based on the routine costs associated with the medically accepted standard of care for the treatment and management of each Qualifying Diagnosis. The agreement, in writing, and supporting documentation with CMS will demonstrate reasonable proof of satisfaction of Medicare's Part A and/or Part B fee-for-service recovery claim in connection with Settlement Class Member's (who are or were beneficiaries of the Medicare Program) receipt of any Monetary Award or Derivative Claimant Award and any benefits provided pursuant to this Settlement Agreement.

(2) Establishes reporting processes recognized by CMS as satisfying the reporting obligations, if any, under the mandatory Medicare reporting requirements of Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007, 110 Pub. L. No. 173, 121 Stat. 2492 ("MMSEA") in connection with this Settlement Agreement.

(iii) Fulfill all state and federal reporting obligations, including those to CMS that are agreed upon with CMS;

(iv) Satisfy Lien amounts owed to a Governmental Payor or, to the extent identified by the Class Member pursuant to Section 11.3(a), Medicare Part C or Part D Program sponsor for medical items, services, and/or prescription drugs paid on behalf of Settlement Class Members out of any Monetary Award or Derivative Claimant Award to the Settlement Class Member pursuant to this Settlement Agreement; and

(v) Transmit all information received from any Governmental Payor or Medicare Part C or Part D Program sponsor pursuant to such authorizations (i) to the NFL Parties, Claims Administrator, and/or Special Master solely for purposes of verifying compliance with the MSP Laws or other similar reporting

54

obligations and for verifying satisfaction and full discharge of all such Liens, or (ii) as otherwise directed by the Court.

(d) If the Lien Resolution Administrator is unable to negotiate a global repayment amount for some or all of the Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program with CMS, as set forth in Section 11.3(c)(ii)(1), the Lien Resolution Administrator will put in place a mechanism for resolving these Liens on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties. In addition, the Lien Resolution Administrator will put in place a mechanism for resolving Liens owed to other Governmental Payors or Medicare Part C or Part D Program sponsors on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties. These mechanisms for resolving such Liens on an individual basis will allow the Lien Resolution Administrator to: (i) satisfy such Lien amounts owed for medical items, services, and/or prescription drugs paid on behalf of a Settlement Class Member out of any Monetary Award to the Settlement Class Member, subject to the Settlement Class Member's right to object to the fact and/or amount of such Lien amount; and (ii) provide that the Lien Resolution Administrator's reasonable costs and expenses incurred in resolving such Liens, including the reasonable compensation of the Lien Resolution Administrator for such efforts, will be paid out of any Monetary Award to the Settlement Class Member.

(e) The Parties further understand and agree that the Lien Resolution Administrator's performance of functions described in this Article is not intended to modify the legal and financial rights and obligations of Settlement Class Members, including the duty to pay and/or arrange for reimbursement of each Settlement Class Member's past, current, or future bills or costs, if any, for medical items, services, and/and prescription drugs, and to satisfy and discharge any and all statutory recovery obligations for any Liens.

(f) Notwithstanding any other provision of this Settlement Agreement relating to timely payment, the Claims Administrator will not pay any Monetary Award to a Settlement Class Member who is or was entitled to benefits under a Governmental Payor program or Medicare Part C or Part D Program prior to: (i) the Lien Resolution Administrator's determination of the final amount needed to satisfy the reimbursement obligation that any Governmental Payor or Medicare Part C or Part D Program sponsor states is due and owing (as reflected in a final demand letter or other formal written communication), and satisfaction and discharge of that reimbursement obligation as evidenced by the Lien Resolution Administrator's receipt of a written satisfaction and discharge from the applicable Governmental Payor or Medicare Part C or Part D Program sponsor; or (ii) the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(g) Notwithstanding any other provision of this Settlement Agreement relating to timely payment, if any person or entity claims any Liens, other than those set forth in Section 11.3(f), with respect to a Settlement Class Member's

Monetary Award or Derivative Claimant Award, then the Claims Administrator will not pay any such Monetary Award or Derivative Claimant Award if the Claims Administrator or Lien Resolution Administrator has received notice of that Lien and there is a legal obligation to withhold payment to the Settlement Class Member under applicable federal or state law. The Claims Administrator will hold such Monetary Award or Derivative Claimant Award in an escrow account until the Settlement Class Member (and counsel individually representing him or her, if any) presents documentary proof, such as a court order or release or notice of satisfaction by the party asserting the Lien, that such Lien has been satisfied and discharged; or until the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award, Supplemental Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(h)     Settlement Class Members who are or were entitled to benefits under Medicare Part C or Part D Programs may be required by statute or otherwise, when making a claim for and/or receiving compensation pursuant to this Settlement Agreement, to notify the relevant Medicare Part C or Part D Program sponsor or others of the existence of, and that Settlement Class Member's participation in, this Class Action Settlement. It is the sole responsibility of each Settlement Class Member to determine whether he or she has such a notice obligation, and to perform timely any such notice reporting.

Section 11.4   Indemnification. Each Settlement Class Member, on his or her own behalf, and on behalf of his or her estate, predecessors, successors, assigns, representatives, heirs, beneficiaries, executors, and administrators, in return for the benefits and consideration provided in this Settlement Agreement, will indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities, including the costs of defense and attorneys' fees of, the Released Parties against any and all claims by Other Parties arising from, relating to, or resulting from (a) any undisclosed Lien relating to, or resulting from, compensation or benefits received by a Settlement Class Member pursuant to this Class Action Settlement and/or (b) the failure of a Settlement Class Member timely and accurately to report or provide information that is necessary for compliance with the MSP Laws, or for the Lien Resolution Administrator to identify and/or satisfy all Governmental Payors or Medicare Part C or Part D Program sponsors who may hold or assert a reimbursement right. The amount of indemnification will not exceed the total Monetary Award or Derivative Claimant Award for that Settlement Class Member's claim. **CLASS AND SUBCLASS REPRESENTATIVES AND SETTLEMENT CLASS MEMBERS ACKNOWLEDGE THAT THIS SECTION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

Section 11.5   No Admission.  Any reporting performed by the Lien Resolution Administrator and/or Claims Administrator for the purpose of resolving Liens, if any, related to compensation provided to Settlement Class Members pursuant to

this Settlement Agreement does not constitute an admission by any Settlement Class Member or any Released Party of any liability or evidence of liability in any manner.

Section 11.6    The foregoing provisions of this Article are solely for the several benefit of the NFL Parties, the Lien Resolution Administrator, the Special Master, and the Claims Administrator.   No Settlement Class Member (or counsel individually representing them, if any) will have any rights or defenses based upon or arising out of any act or omission of the NFL Parties or any Administrator with respect to this Article.

## ARTICLE XII
### Education Fund

Section 12.1    An Education Fund will be established to fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players.

The Court shall approve these education programs, with input from Co-Lead Class Counsel, Counsel for the NFL Parties and medical experts, as further set forth below.   Co-Lead Class Counsel and Counsel for the NFL Parties will agree to a protocol through which Retired NFL Football Players will actively participate in such initiatives.

Section 12.2    Co-Lead Class Counsel, with input from Counsel for the NFL Parties, and with Court approval, will take all necessary steps to establish the Education Fund and establish procedures and controls to manage and account for the disbursement of funds to the education projects and all other costs associated with the Education Fund.

## ARTICLE XIII
### Preliminary Approval and Class Certification

Section 13.1    Promptly after execution, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will file the Motion for Preliminary Approval of the Class Action Settlement and the Settlement Agreement as an exhibit thereto.   Simultaneously, the Class and Subclass Representatives will file a Motion for Certification of Rule 23(b)(3) Class and Subclasses for Purposes of Settlement.

Section 13.2    The Parties agree to take all actions reasonably necessary to obtain the Preliminary Approval and Class Certification Order from the Court.

Section 13.3    The Parties agree to jointly request that the Court stay this action, and enjoin all Settlement Class Members, unless and until they have been excluded from the Settlement Class by action of the Court, or until the Court denies approval of the Class Action Settlement (and such denial is affirmed by the Court of last resort), or until the Settlement Agreement is otherwise terminated, from filing, commencing, prosecuting, intervening in, participating in and/or maintaining, as plaintiffs, claimants, or class members in, any other lawsuit or administrative, regulatory,

arbitration, or other proceeding in any jurisdiction based on, relating to, or arising out of the claims and causes of action, or the facts and circumstances at issue, in the Class Action Complaint and/or the Released Claims, except that claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits will not be stayed or enjoined. For the avoidance of any doubt, the Parties are not requesting that the Court stay any actions against Riddell.

(a)  The Parties recognize that there may be further pleadings, discovery responses, documents, testimony, or other matters or materials owed by the Parties to each other pursuant to existing pleading requirements, discovery requests, pretrial rules, procedures, orders, decisions, or otherwise. As of the Settlement Date, each Party expressly waives any right to receive, inspect, or hear such pleadings, discovery, testimony, or other matters or materials during the pendency of the settlement proceedings contemplated by this Settlement Agreement and subject to further order of the Court.

Section 13.4  The Parties agree that any certification of the Settlement Class and Subclasses will be for settlement purposes only. The Parties do not waive or concede any position or arguments they have for or against certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this Settlement Agreement will not constitute an admission by the NFL Parties, or finding or evidence, that the Class and Subclass Representatives' claims, or the claims of any other Settlement Class Member, or the claims of the Settlement Class, are appropriate for class treatment if the claims were contested in this or any other federal, state, arbitral, or foreign forum. If the Court enters the proposed form of Preliminary Approval and Class Certification Order, the Final Order and Judgment will provide for vacation of the Final Order and Judgment and the Preliminary Approval and Class Certification Order in the event that this Settlement Agreement does not become effective.

Section 13.5  Upon entry of the Preliminary Approval and Class Certification Order, the statutes of limitation applicable to any and all claims or causes of action that have been or could be asserted by or on behalf of any Settlement Class Members related to the subject matter of the Settlement Agreement will be tolled and stayed to the extent not already tolled by the initiation of an action in this litigation or a Related Lawsuit. The limitations period will not begin to run again for any Settlement Class Member unless and until he or she is deemed to have Opted Out of the Settlement Class or this Settlement Agreement is terminated pursuant to ARTICLE XVI. In the event the Settlement Agreement is terminated pursuant to ARTICLE XVI, to the extent not otherwise tolled, the limitations period for each Settlement Class Member as to whom the limitations period had not expired as of the date of the Preliminary Approval and Class Certification Order will extend for the longer of thirty (30) days from the last required issuance of notice of termination or the period otherwise remaining before expiration. Notwithstanding the tolling agreement herein, the Parties recognize that any time already elapsed for any Class or Subclass Representatives or Settlement Class Members on any applicable statutes of limitations will not be reset, and no expired claims will be revived, by virtue of this tolling agreement. Class and Subclass Representatives

and Settlement Class Members do not admit, by entering into this Settlement Agreement, that they have waived any applicable tolling protections available as a matter of law or equity. Nothing in this Settlement Agreement will constitute an admission in any manner that the statute of limitations has been tolled for anyone outside the Settlement Class, nor does it constitute a waiver of legal positions regarding tolling.

## ARTICLE XIV
## Notice, Opt Out, and Objections

### Section 14.1   Notice

(a)     As part of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Plaintiffs will submit to the Court a Settlement Class Notice Plan agreed upon by Co-Lead Class Counsel, Class Counsel, Subclass Counsel, and Counsel for the NFL Parties.

(b)     The Settlement Class Notice Plan, to be implemented by the Settlement Class Notice Agent following the Court's entry of the Preliminary Approval and Class Certification Order, and approval of the Settlement Class Notice (in the form of Exhibit 5), at the NFL Parties' expense, but not to exceed Four Million United States dollars (U.S. $4,000,000), will be designed to meet the requirements of Fed. R. Civ. P. 23 (c)(2)(B), and will include: (i) direct notice by first-class mail; (ii) broad notice through the use of paid media including national radio spots, national consumer magazines, television and internet advertising; and (iii) electronic notice through the Settlement Website created under Section 4.1(a) and an automated telephone system created under Section 4.1(b).

(c)     For the avoidance of any doubt, if there are any unused monies under the Four Million United States dollars (U.S. $4,000,000) cap set forth in Section 14.1(b), those unused monies will remain with, or revert to, the NFL Parties.

(d)     The Parties and the Claims Administrator will maintain a list of the names and addresses of each person to whom the Settlement Class Notice is transmitted in accordance with any order entered by the Court pursuant to ARTICLE XIII. These names and addresses will be kept strictly confidential and will be used only for purposes of administering this Class Action Settlement, except as otherwise ordered by the Court.

### Section 14.2   Opt Outs

(a)     The Settlement Class Notice will provide instructions regarding the procedures that must be followed to Opt Out of the Settlement Class pursuant to Fed. R. Civ. P. 23(c)(2)(B)(v). The Parties agree that, to Opt Out validly from the Settlement Class, a Settlement Class Member must submit a written request to Opt Out stating "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323" (or substantially similar clear and unambiguous language) to the Claims Administrator on or before such date as is ordered by the Court. That written request also will contain the

Settlement Class Member's printed name, address, telephone number, and date of birth and enclose a copy of his or her driver's license or other government issued identification. A written request to Opt Out may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant seeking to exclude himself or herself from the Settlement Class. Attorneys for Settlement Class Members may submit a written request to Opt Out on behalf of a Settlement Class Member, but such request must contain the Personal Signature of the Settlement Class Member. The Claims Administrator will provide copies of all requests to Opt Out to Co-Lead Class Counsel, Class Counsel, Subclass Counsel and Counsel for the NFL Parties within seven (7) days of receipt of each such request. Valid requests to Opt Out from the Settlement Class will become effective on the Effective Date.

(b)     All Settlement Class Members who do not timely and properly Opt Out from the Settlement Class will in all respects be bound by all terms of this Settlement Agreement and the Final Order and Judgment upon the Effective Date, will be entitled to all procedural opportunities and protections described in this Settlement Agreement and provided by the Court, and to all compensation and benefits for which they qualify under its terms, and will be barred permanently and forever from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Parties in any court of law or equity, arbitration tribunal, or administrative or other forum.

(c)     Prior to the Final Approval Date, any Retired NFL Football Player, Representative Claimant, or Derivative Claimant may seek to revoke his or her Opt Out from the Settlement Class and thereby receive the benefits of this Class Action Settlement by submitting a written request to Co-Lead Class Counsel and Counsel for the NFL Parties stating "I wish to revoke my request to be excluded from the Settlement Class" (or substantially similar clear and unambiguous language), and also containing the Settlement Class Member's printed name, address, phone number, and date of birth. The written request to revoke an Opt Out must contain the Personal Signature of the Settlement Class Member seeking to revoke his or her Opt Out.

Section 14.3     Objections

(a)     Provided a Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a), the Settlement Class Member may present written objections, if any, explaining why he or she believes the Class Action Settlement should not be approved by the Court as fair, reasonable, and adequate. No later than such date as is ordered by the Court, a Settlement Class Member who wishes to object to any aspect of the Class Action Settlement must file with the Court, or as the Court otherwise may direct, a written statement of the objection(s). The written statement of objection(s) must include a detailed statement of the Settlement Class Member's objection(s), as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention. That written statement also will contain the Settlement Class Member's printed name, address, telephone number, and date of birth, written evidence

60

establishing that the objector is a Settlement Class Member, and any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection. A written objection may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant seeking to exclude himself or herself from the Settlement Class. Settlement Class Members who do not follow the procedures will be deemed to have waived any objections they may have.

(b) A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided the Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a). Attorneys asserting objections on behalf of Settlement Class Members must: (i) file a notice of appearance with the Court by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct; (ii) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (iii) comply with the procedures described in this Section.

(c) A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct, a written notice of his or her intention to appear at the Fairness Hearing, in accordance with the requirements set forth in the Preliminary Approval and Class Certification Order.

(d) Any Settlement Class Member who fails to comply with the provisions of this Section 14.3 will waive and forfeit any and all rights he or she may have to object to the Class Action Settlement.

## ARTICLE XV
### Communications to the Public

Section 15.1 The form, content, and timing of any public statement announcing the filing of this Settlement Agreement will be subject to mutual agreement by Co-Lead Class Counsel, Class Counsel, Subclass Counsel and Counsel for the NFL Parties. The Parties and their counsel agree not to make any public statements, including statements to the media, that are inconsistent with the Settlement Agreement. Any communications to the public or the media made by or on behalf of the Parties and their respective counsel regarding the Class Action Settlement will be made in good faith and will be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of this Class Action Settlement. Any information contained in such communications will be balanced, fair, accurate, and consistent with the content of the Settlement Class Notice.

(a) Nothing herein is intended or will be interpreted to inhibit or interfere with the ability of Co-Lead Class Counsel, Class Counsel, Subclass Counsel,

or Counsel for the NFL Parties to communicate with the Court, their clients, or Settlement Class Members and/or their counsel.

(b)     Co-Lead Class Counsel, Class Counsel and Subclass Counsel acknowledge and agree, and the Preliminary Approval and Class Certification Order will provide, that the NFL Parties have the right to communicate orally and in writing with, and to respond to inquiries from, Settlement Class Members on matters unrelated to the Class Action Settlement in connection with the NFL Parties' normal business.

## ARTICLE XVI
## Termination

Section 16.1    Walk-Away Right of NFL Parties. Without limiting any other rights under this Settlement Agreement, the NFL Parties will have the absolute and unconditional right, in their sole good faith discretion, to unilaterally terminate and render null and void this Class Action Settlement and Settlement Agreement for any reason whatsoever following notice of Opt Outs and prior to the Fairness Hearing. The NFL Parties must provide written election to terminate this Settlement Agreement to Co-Lead Class Counsel, Class Counsel, Subclass Counsel, and the Court prior to the Fairness Hearing.

Section 16.2    Party Termination Rights

(a)     Co-Lead Class Counsel, Class Counsel, Subclass Counsel, and Counsel for the NFL Parties each have the absolute and unconditional right, in their sole discretion, which discretion will be exercised in good faith, to terminate and render null and void this Class Action Settlement and Settlement Agreement if (i) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Settlement Agreement that Co-Lead Class Counsel, Class Counsel, Subclass Counsel or Counsel for the NFL Parties reasonably and in good faith determines is material, including, without limitation, the Releases or the definition of the Settlement Class, or (ii) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the proposed Preliminary Approval and Class Certification Order or the proposed Final Order and Judgment (Exhibit 4) that Co-Lead Class Counsel, Class Counsel, Subclass Counsel or Counsel for the NFL Parties reasonably and in good faith believes is material. Such written election to terminate this Settlement Agreement must be made to the Court within thirty (30) days of such Court order.

(b)     Co-Lead Class Counsel, Class Counsel and Subclass Counsel may not terminate and render null and void this Class Action Settlement and Settlement Agreement on the basis of the attorneys' fees award ordered, or modified, by the Court or any appellate court(s), as set forth in ARTICLE XXI.

Section 16.3    Post-Termination Actions

(a)     In the event this Settlement Agreement is terminated or becomes null and void, this Settlement Agreement will not be offered into evidence or

62

used in this or in any other action in the Court, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum for any purpose, including, but not limited to, the existence, certification, or maintenance of any purported class. In addition, in such event, this Settlement Agreement and all negotiations, proceedings, documents prepared and statements made in connection with this Settlement Agreement will be without prejudice to all Parties and will not be admissible into evidence and will not be deemed or construed to be an admission or concession by any of the Parties of any fact, matter, or proposition of law and will not be used in any manner for any purpose, and all Parties will stand in the same position as if this Settlement Agreement had not been negotiated, made, or filed with the Court.

(b)     In the event this Settlement Agreement is terminated or becomes null and void, the Parties will jointly move the Court to vacate the Preliminary Approval and Certification Order and any other orders certifying a Settlement Class provided.

(c)     If this Settlement Agreement is terminated or becomes null and void after notice has been given, the Parties will provide Court-approved notice of termination to the Settlement Class. If a Party terminates the Settlement Agreement in accordance with Section 16.1 or Section 16.2, that Party will pay the cost of notice of termination.

(d)     In the event this Settlement Agreement is terminated or becomes null and void, any unspent and uncommitted monies in the Funds will revert to the NFL Parties within ten (10) days, and all data provided by the NFL Parties, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, and/or Settlement Class Members shall be returned or destroyed.

## ARTICLE XVII
### Treatment of Confidential Information

Section 17.1   Confidentiality of Information Relating to the Settlement Agreement.   The Parties will treat all confidential or proprietary information shared hereunder, or in connection herewith, either prior to, on or after the Settlement Date, and any and all prior or subsequent drafts, representations, negotiations, conversations, correspondence, understandings, analyses, proposals, term sheets, and letters, whether oral or written, of any kind or nature, with respect to the subject matter hereof ("Confidential Information") in conformity with strict confidence and will not disclose Confidential Information to any non-Party without the prior written consent of the Party that shared the Confidential Information, except:   (i) as required by applicable law, regulation, or by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization (including subpoena or document request), provided that the Party that shared the Confidential Information is given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment thereof, provided further that the Party subject to such requirement or request cooperates fully with the Party that shared the Confidential Information in connection therewith, and only such Confidential Information is disclosed as is legally required to be

63

disclosed in the opinion of legal counsel for the disclosing Party; (ii) under legal (including contractual) or ethical obligations of confidentiality, on an as-needed and confidential basis to such Party's present and future accountants, counsel, insurers, or reinsurers; or (iii) with regard to any information that is already publicly known through no fault of such Party or its Affiliates. This Settlement Agreement, all exhibits hereto, any other documents filed in connection with the Class Action Settlement, and any information disclosed through a public court proceeding shall not be deemed Confidential Information.

### Section 17.2    Confidentiality of Retired NFL Football Player Information

(a)    All information relating to a Retired NFL Football Player that is disclosed to or obtained by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, or the Court, may be used only by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, or the Court for the administration of this Class Action Settlement according to the Settlement Agreement terms and conditions. All such information relating to a Retired NFL Football Player will be treated as Confidential Information hereunder, will be subject to the terms of Section 17.1 hereof, and, where applicable, will be treated as Protected Health Information subject to HIPAA and other applicable privacy laws.

## ARTICLE XVIII
## Releases and Covenant Not to Sue

### Section 18.1    Releases

(a)    In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class, the Class and Subclass Representatives, and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of any Settlement Class Member (the "Releasors"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that the Releasors, and each of them, had, has, or may have in the future arising out of, in any way relating to or in

connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

(i)     that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

(ii)    arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

(iii)   arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

(iv)    arising out of, or relating to, CTE; and/or

(v)     arising out of, or relating to, loss of support, services, consortium, companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi)    arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events, and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii)   arising out of, or relating to, medical screening and medical monitoring for undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events; and/or

(viii)  premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b)     In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims,

65

arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under this Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes any Settlement Class Member's right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c)    In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien  in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member pursuant to this Settlement Agreement.

(d)    In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

Section 18.2   Release of Unknown Claims.   In connection with the releases in Section 18.1, the Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class acknowledge that they are aware that they may hereafter discover Claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions or matters released herein. Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class explicitly took unknown or unsuspected claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims as provided in Section 18.1 with respect to all such matters.

Section 18.3    Scope of Releases

(a)    Each Party acknowledges that it has been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by its counsel and that it does hereby expressly waive and relinquish all rights and benefits, if any, which it, he or she has or may have under said section (and similar sections) which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(b)    The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into this Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c)    The Releasors intend to be legally bound by the Releases.

(d)    The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e)    Nothing in the Releases will preclude any action to enforce the terms of this Settlement Agreement in the Court.

(f)    The Parties represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in this Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in this Settlement Agreement.

Section 18.4    Covenant Not to Sue.  From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Class and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Releasors, and each of them, covenant, promise, and agree that they will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her, or its behalf, or on behalf of any other individual or entity, any proceeding:  (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1; or (b) challenging the validity of the Releases.  To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, the Releasors covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

Section 18.5    Covenant    Regarding    Amateur    Football    Litigation. Settlement Class Members who receive Monetary Awards will agree, as a condition precedent to receiving Monetary Awards, to dismiss pending, and/or forebear from bringing, litigation relating to cognitive injuries against the National Collegiate Athletic Association and/or other collegiate, amateur or youth football organizations and entities.

Section 18.6    No Release for Insurance Coverage.

(a)    Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b)    Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(aaaa)(i)-(ii).

Section 18.7    Nothing contained in this Settlement Agreement, including the Release and Covenant Not to Sue provisions in this ARTICLE XVIII, affects the rights of Settlement Class Members to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

## ARTICLE XIX
### Bar Order

Section 19.1    Bar Order.    As a condition to the Settlement, the Parties agree to move the Court for a bar order, as part of the Final Order and Judgment (substantially in the form of Exhibit 4), as set forth in Section 20.1.

Section 19.2    Judgment Reduction.    With respect to any litigation by the Releasors against Riddell, the Releasors further agree that if a verdict in their favor results in a verdict or judgment for contribution or indemnity against the Released Parties, the Releasors will not enforce their right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties.  In such event, the Releasors agree that they will reduce their claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

68

**ARTICLE XX**
**Final Order and Judgment and Dismissal With Prejudice**

Section 20.1    The Parties will jointly seek a Final Order and Judgment from the Court, substantially in the form of Exhibit 4, approval and entry of which shall be a condition of this Settlement Agreement, that:

(a)    Approves the Class Action Settlement in its entirety pursuant to Fed. R. Civ. P. 23(e) as fair, reasonable, and adequate;

(b)    Finds that this Settlement Agreement, with respect to each Subclass, is fair, reasonable, and adequate;

(c)    Confirms the certification of the Settlement Class for settlement purposes only;

(d)    Confirms the appointment of the Class and Subclass Representatives;

(e)    Confirms the appointment of Co-Lead Class Counsel, Class Counsel and Subclass Counsel;

(f)    Finds that the Settlement Class Notice satisfied the requirements set forth in Fed. R. Civ. P. 23(c)(2)(B);

(g)    Permanently bars, enjoins and restrains the Releasors (and each of them) from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Party;

(h)    Dismisses with prejudice the Class Action Complaint, without further costs, including claims for interest, penalties, costs and attorneys' fees, except that the motion for an award of attorneys' fees and reasonable costs, as set forth in in Section 21.1, will be made at an appropriate time to be determined by the Court;

(i)    Orders the dismissal with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, of all Related Lawsuits pending in the Court as to the Released Parties, thereby effectuating in part the Releases;

(j)    Orders all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, promptly to dismiss with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, all such Related Lawsuits as to the Released Parties, thereby effectuating in part the Releases;

(k)    Permanently bars and enjoins the commencement, assertion, and/or prosecution of any claim for contribution and/or indemnity in the Court, in any other federal court, state court, arbitration, regulatory agency, or other tribunal or

69

forum between the Released Parties and all alleged joint tortfeasors, other than Riddell, together with an appropriate judgment reduction provision;

(l) Confirms the appointment of the Special Master, Garretson Group as the BAP Administrator, BrownGreer as the Claims Administrator, Garretson Group as the Liens Resolution Administrator, and Citibank, N.A. as the Trustee, and confirms that the Court retains continuing jurisdiction over those appointed;

(m) Confirms that the Court retains continuing jurisdiction over the "qualified settlement funds," as defined under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended, created under the Settlement Agreement; and

(n) Expressly incorporates the terms of this Settlement Agreement and provides that the Court retains continuing and exclusive jurisdiction over the Parties, the Settlement Class Members and this Settlement Agreement, to interpret, implement, administer and enforce the Settlement Agreement in accordance with its terms.

## ARTICLE XXI
## Attorneys' Fees

Section 21.1 Award. Separately and in addition to the NFL Parties' payment of the monies set forth in ARTICLE XXIII and any consideration received by Settlement Class Members under this Settlement, the NFL Parties shall pay class attorneys' fees and reasonable costs. Co-Lead Class Counsel, Class Counsel and Subclass Counsel shall be entitled, at an appropriate time to be determined by the Court, to petition the Court on behalf of all entitled attorneys for an award of class attorneys' fees and reasonable costs. Provided that said petition does not seek an award of class attorneys' fees and reasonable costs exceeding One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000), the NFL Parties agree not to oppose or object to the petition. Ultimately, the award of class attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

Section 21.2 Payment. No later than sixty (60) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000) into the Attorneys' Fees Qualified Settlement Fund, as set forth in Section 23.9, to be held in escrow until such payment shall be made as directed by the Court.

## ARTICLE XXII
## Enforceability of Settlement Agreement and Dismissal of Claims

Section 22.1 It is a condition of this Settlement Agreement that the Court approve and enter the Preliminary Approval and Class Certification Order and Final Order and Judgment substantially in the form of Exhibit 4.

Section 22.2  The Parties agree that this Class Action Settlement is not final and enforceable until the Effective Date, except that upon entry of the Preliminary Approval and Class Certification Order, the NFL Parties will be obligated to make the Settlement Class Notice Payment as set forth in Sections 14.1 and 23.1.

Section 22.3  From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Court will dismiss with prejudice all Released Claims by any and all Releasors against any and all Released Parties pending in the Court, and any and all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, will dismiss with prejudice the Related Lawsuits as to the Released Parties, including any related appeals.

Section 22.4  From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Parties agree that each and every Releasor will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action against any Released Party with respect to any and all Released Claims.

Section 22.5  From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, this Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Releasors against any and all Released Parties, and no Releasor will recover, directly or indirectly, any sums from any Released Parties for Released Claims other than those received for the Released Claims under the terms of this Settlement Agreement, if any.

Section 22.6  From and after the Effective Date, if any Releasor, in violation of Section 18.4, commences, files, initiates, or institutes any new action or other proceeding for any Released Claims against any Released Parties, or continues to prosecute any pending claims, or challenges the validity of the Releases, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, such action or other proceeding will be dismissed with prejudice and at such Releasor's cost; provided, however, before any costs may be assessed, counsel for such Releasor or, if not represented, such Releasor, will be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice. Furthermore, if the NFL Parties or any other Released Party brings any legal action before the Court to enforce its rights under this Settlement Agreement against a Settlement Class Member and prevails in such action, that Released Party will be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Releasor found to be in violation or breach of his or her obligations under this Article.

### ARTICLE XXIII
### NFL Payment Obligations

Section 23.1  <u>Funding Amount</u>.  In consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of

the Class Action Complaint and the Related Lawsuits, and subject to the terms and conditions of this Settlement Agreement, the NFL Parties will pay in accordance with the funding terms set forth herein:

(a)     Settlement Amount.   Seven Hundred and Fifty Million United States dollars (U.S. $750,000,000), which monies will be used to fund the BAP (up to a maximum of Seventy Five Million United States dollars (U.S. $75,000,000)) and the Monetary Award Fund;

(b)     Education Fund Amount.   Ten Million United States dollars (U.S. $10,000,000), which monies will be used exclusively to fund the Education Fund;

(c)     Settlement Class Notice Payment.   Up to a maximum of Four Million United States dollars (U.S. $4,000,000); and

(d)     Part of the Annual Compensation of the Special Master. Fifty percent (50%) of the annual compensation of the Special Master appointed by the Court, whose total annual compensation shall not exceed Two Hundred Thousand United States dollars (U.S. $200,000).

(e)     Notwithstanding any provision of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, or any subsequent legislation mandating or subsidizing health insurance coverage, the NFL Parties will pay, or cause to be paid, in full the amounts set forth above in Section 23.1(a)-(d), and will not bill any Governmental Payor or Medicare Part C or Part D Program for any such costs.

Section 23.2   Exclusive Payments.   For the avoidance of any doubt, other than as set forth in Sections 9.6(b), 21.2 and 23.5, the NFL Parties will have no additional payment obligations in connection with this Settlement Agreement.

Section 23.3   Funding Terms

(a)     The NFL Parties' payment obligations will be funded as follows:

(b)     No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Ten Million United States dollars (U.S. $10,000,000) into the Settlement Trust Account, as set forth in Section 23.7, for transfer by the Trustee into the Education Fund.

(c)     No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of One Hundred and Eighty-Seven Million, Five Hundred Thousand United States dollars (U.S. $187,500,000) into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund.

(d)     No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Thirty-Five Million United States dollars (U.S. $35,000,000) into the Settlement Trust Account for transfer by the Trustee into the BAP Fund.

(e)     On the one-year anniversary of the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Seventy-Five Million United States dollars (U.S. $75,000,000) into the Settlement Trust Account for transfer by the Trustee into the BAP Fund and/or Monetary Award Fund. The NFL Parties' payment will be allocated between the BAP Fund and Monetary Award Fund by the Trustee such that Ten Million United States dollars (U.S. $10,000,000) is maintained in the BAP Fund immediately following that transfer. If the BAP Fund holds more than Ten Million dollars (U.S. $10,000,000) on the one-year anniversary of the Effective Date, the full Seventy-Five Million United States dollars (U.S. $75,000,000) will be transferred from the Settlement Trust Account into the Monetary Award Fund. Thereafter, if at any point during the second year of the BAP the balance of the BAP Fund falls below Ten Million United States dollars (U.S. $10,000,000), the BAP Administrator and/or Co-Lead Class Counsel may request that the Special Master direct that additional sums from the Monetary Award Fund be allocated and transferred to the BAP Fund in order to maintain a balance of no less than Ten Million United States dollars (U.S. $10,000,000), subject to the cap on BAP funding.

(f)     On the two-year anniversary of the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Seventy-Five Million United States dollars (U.S. $75,000,000) into the Settlement Trust Account for transfer by the Trustee into the BAP Fund and/or Monetary Award Fund. The NFL Parties' payment will be allocated between the BAP Fund and Monetary Award Fund by the Trustee such that Ten Million United States dollars (U.S. $10,000,000) is maintained in the BAP Fund immediately following that transfer. If the BAP Fund holds more than Ten Million United States dollars (U.S. $10,000,000) on the two-year anniversary of the Effective Date, the full Seventy-Five Million United States dollars (U.S. $75,000,000) will be transferred from the Settlement Trust Account into the Monetary Award Fund. Thereafter, if at any point during the third year of the BAP the balance of the BAP Fund falls below Ten Million United States dollars (U.S. $10,000,000), the BAP Administrator and/or Co-Lead Class Counsel may request that the Special Master direct that additional sums from the Monetary Award Fund be allocated and transferred to the BAP Fund in order to maintain a balance of no less than Ten Million United States dollars (U.S. $10,000,000) in the BAP Fund, subject to the cap on BAP funding.

(g)     Beginning on the three-year anniversary of the Effective Date, and for the remainder of the funding term that concludes on the twenty-year anniversary of the Effective Date, the NFL Parties will pay, or cause to be paid, equal annual installment payments, sufficient in aggregate to pay the remaining unfunded Settlement Amount, into the Settlement Trust Account for transfer by the Trustee into the BAP Fund and/or Monetary Award Fund. The NFL Parties' annual payment will be allocated between the BAP Fund and Monetary Award Fund by the Trustee such that Ten Million United States dollars (U.S. $10,000,000) is maintained in the BAP Fund

73

immediately following that transfer, except that under no circumstances will the aggregate transfers to the BAP Fund exceed Seventy-Five Million United States dollars (U.S. $75,000,000) over the term of the BAP Fund.

(h)     The NFL Parties will have the right (but not the obligation) to prepay, or cause to be prepaid, any of their payment obligations to the Funds under the Settlement Agreement. In connection with any such prepayment, the NFL Parties will designate in writing the payment obligation that is being prepaid and how such prepayment should affect the NFL Parties' remaining payment obligations (*i.e.*, whether the amount prepaid should be credited against the next payment obligation or to one or more subsequent payment obligations or a combination thereof).

Section 23.4    Notwithstanding the NFL Parties' funding obligations during the initial two (2) years of the Class Action Settlement and thereafter, if at any point following the Effective Date the balance of the Monetary Award Fund falls below Fifty Million United States dollars (U.S. $50,000,000), the NFL Parties, upon forty-five (45) days advance written notice, and at the direction of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), will pay, or cause to be paid, additional installments of the remaining unfunded Settlement Amount into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund in order to maintain a balance of no less than Fifty Million United States dollars (U.S. $50,000,000) in the Monetary Award Fund, unless a payment scheduled under Section 23.3 will occur within the forty-five (45) day notice period and that payment will maintain a balance of no less than Fifty Million United States dollars (U.S. $50,000,000), or unless less than Fifty Million United States dollars (U.S. $50,000,000) of the Settlement Amount remains unfunded. In such event, the remaining equal annual installment payments into the Settlement Trust Account for the remainder of the funding term will be recalculated accordingly.

Section 23.5    Additional Contingent Contribution.  In the event that Co-Lead Class Counsel, Counsel for the NFL Parties and the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) agree that the Settlement Amount is insufficient to pay all approved claims from the Monetary Award Fund, the Special Master (or the Claims Administrator after expiration of the term of the Special Master) will make a recommendation to the Court that the NFL Parties pay, or cause to be paid, an additional contribution up to a maximum amount of Thirty-Seven Million, Five Hundred Thousand United States dollars (U.S. $37,500,000) into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund. Upon Court approval of the recommendation, the NFL Parties will make this Additional Contingent Contribution into the Settlement Trust Account within sixty (60) days. In no event will the aggregate Additional Contingent Contribution made by the NFL Parties pursuant to this paragraph exceed Thirty-Seven Million, Five Hundred Thousand United States dollars (U.S. $37,500,000).

Section 23.6    No Interest or Inflation Adjustment.  For the avoidance of any doubt, the payments set forth in Section 23.1, and the contingent payments set forth in Section 23.5, will not be subject to any interest obligation or inflation adjustment.

Section 23.7    Settlement Trust

(a)    Promptly following the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will file a motion seeking the creation of a Settlement Trust under Delaware law and the appointment of the Trustee. Co-Lead Class Counsel and Counsel for the NFL Parties will file a proposed Settlement Trust Agreement with the Court.

(b)    Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend Citibank, N.A. as the Trustee, subject to the approval of the Court. The Trustee may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, and granted by the Court. If the Trustee resigns, dies, is replaced, or is otherwise unable to continue employment in that position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Trustee for appointment by the Court.

(c)    Upon Court approval of the proposed Settlement Trust Agreement, Co-Lead Class Counsel, the NFL Parties, the Trustee and the Special Master, will execute the Settlement Trust Agreement approved by the Court, thereby creating the Settlement Trust. The Settlement Trust will be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended.

(d)    The Settlement Trust will be composed of the Funds. The Trustee will establish the Settlement Trust Account, into which the NFL Parties will make payments as required by this Settlement Agreement. The Trustee will also establish three separate funds (the "Funds"), into which the Trustee will transfer funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and extension(s) thereof) and pursuant to the terms of this Settlement Agreement and on which the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) will have signatory authority. These Funds will constitute a single qualified settlement fund:

(i)    The BAP Fund, which will be used to make payments for the BAP, as set forth in ARTICLE V.

(ii)    The Monetary Award Fund, which will be used to make payments for: (a) all Monetary Awards and Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII; (b) certain costs and expenses of the appeals process, as set forth in ARTICLE IX; (c) costs and expenses of claims administration, excluding the fifty percent (50%) of the annual compensation of the Special Master paid by the NFL Parties, as set forth in ARTICLE X; and (d) certain costs and expenses of the Lien identification and resolution process, as set forth in ARTICLE XI;

(iii)     The Education Fund, which will be used exclusively to make payments to support education programs and initiatives, as set forth in ARTICLE XII; and

(iv)     The Settlement Trust Account, which will be used solely to transfer funds into the Funds described above in Section 23.7(d)(i)-(iii).

(e)     The Settlement Trust will be managed by the Trustee as provided in the Settlement Trust Agreement, and both the Settlement Trust and Trustee will be subject to the continuing jurisdiction and supervision of the Court. Each of the Funds will be maintained in separate bank accounts at one or more federally insured depository institutions approved by Co-Lead Class Counsel and Counsel for the NFL Parties. The Trustee will have the authority to make payments from the Settlement Trust Account into the other Funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) and to make disbursements from the Funds at the direction of the Special Master (or the Claims Administrator at the direction of Co-Lead Class Counsel and Counsel for the NFL Parties, after expiration of the term of the Special Master and any extension(s) thereof), and consistent with the terms of this Settlement Agreement and the Settlement Trust Agreement.

(f)     The Trustee will be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Settlement Trust and responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority. The Trustee also will be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Settlement Trust, as well as paying any associated interest and penalties. Any such taxes, interest, and penalty payments will be paid by the Trustee from the Monetary Award Fund.

Section 23.8     Funds Investment

(a)     Amounts deposited in each of the Funds will be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk.

(b)     Any earnings attributable to the BAP Fund, the Monetary Award Fund, and/or the Education Fund will be retained in the respective Fund.

Section 23.9     Attorneys' Fees Qualified Settlement Fund. Unless the Court directs otherwise, a separate fund (intended to qualify as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended) will be established out of which attorneys' fees will be paid pursuant to order of the Court, as set forth in ARTICLE XXI. This separate qualified settlement fund will be established pursuant to order of the Court, and will operate under Court supervision and control. This separate qualified settlement fund will be separate from the qualified settlement fund described in

Section 23.7(c) and any of the Funds described therein, and will not be administered by the Trustee. The Court will determine the form and manner of administering this fund, in which the NFL Parties will have no reversionary interest.

Section 23.10 Trustee Satisfaction of Monetary Obligations. Wherever in this Settlement Agreement the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator is authorized or directed, as the context may reflect, to pay, disburse, reimburse, hold, waive, or satisfy any monetary obligation provided for or recognized under any of the terms of this Settlement Agreement, the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator may comply with such authorization or direction by directing the Trustee to, as appropriate, pay, disburse, reimburse, hold, waive, or satisfy any such monetary obligation.

## ARTICLE XXIV
## Denial of Wrongdoing, No Admission of Liability

Section 24.1 This Settlement Agreement, whether or not the Class Action Settlement becomes effective, is for settlement purposes only and is to be construed solely as a reflection of the Parties' desire to facilitate a resolution of the Class Action Complaint and of the Released Claims and Related Lawsuits. The NFL Parties expressly deny that they, or the other Released Parties, have violated any duty to, breached any obligation to, committed any fraud on, or otherwise engaged in any wrongdoing with respect to, the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member, and expressly deny the allegations asserted in the Class Action Complaint and Related Lawsuits, and deny any and all liability related thereto. Neither this Settlement Agreement nor any actions undertaken by the NFL Parties or the Released Parties in the negotiation, execution, or satisfaction of this Settlement Agreement will constitute, or be construed as, an admission of any liability or wrongdoing, or recognition of the validity of any claim made by the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member in this or any other action or proceeding.

Section 24.2 In no event will the Settlement Agreement, whether or not the Class Action Settlement becomes effective, or any of its provisions, or any negotiations, statements, or court proceedings relating to its provisions, or any actions undertaken in this Settlement Agreement, in any way be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, or any of the Released Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement. Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in this Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or an admission

77

or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, or as a waiver by the Released Parties of any applicable defense, or as a waiver by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member of any claims, causes of action, or remedies. This Section 24.2 shall not apply to disputes between the NFL Parties and their insurers, as to which the NFL Parties reserve all rights.

## ARTICLE XXV
## Representations and Warranties

Section 25.1   Authority.   Co-Lead Class Counsel, Class Counsel and Subclass Counsel represent and warrant as of the Settlement Date that they have authority to enter into this Settlement Agreement on behalf of the Class and Subclass Representatives.

Section 25.2   Class and Subclass Representatives. Each of the Class and Subclass Representatives, through a duly authorized representative, represents and warrants that he: (i) has agreed to serve as a representative of the Settlement Class proposed to be certified herein; (ii) is willing, able, and ready to perform all of the duties and obligations as a representative of the Settlement Class; (iii) is familiar with the pleadings in In re: National Football League Players' Concussion Injury Litigation, MDL 2323, or has had the contents of such pleadings described to him; (iv) is familiar with the terms of this Settlement Agreement, including the exhibits attached to this Settlement Agreement, or has received a description of the Settlement Agreement from Co-Lead Class Counsel, Class Counsel and/or Subclass Counsel, and has agreed to its terms; (v) has consulted with, and received legal advice from, Co-Lead Class Counsel, Class Counsel and/or Subclass Counsel about the litigation, this Settlement Agreement (including the advisability of entering into this Settlement Agreement and its Releases and the legal effects of this Settlement Agreements and its Releases), and the obligations of a representative of the Settlement Class; (vi) has authorized Co-Lead Class Counsel, Class Counsel and/or Subclass Counsel to execute this Settlement Agreement on his behalf; and (vii) will remain in and not request exclusion from the Settlement Class and will serve as a representative of the Settlement Class until the terms of this Settlement Agreement are effectuated, this Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that such Class or Subclass Representative cannot represent the Settlement Class.

Section 25.3   NFL Parties. The NFL Parties represent and warrant as of the Settlement Date that: (i) they have all requisite corporate power and authority to execute, deliver, and perform this Settlement Agreement; (ii) the execution, delivery, and performance by the NFL Parties of this Settlement Agreement has been duly authorized by all necessary corporate action; (iii) this Settlement Agreement has been duly and validly executed and delivered by the NFL Parties; and (iv) this Settlement Agreement constitutes their legal, valid, and binding obligation.

Section 25.4   Investigation and Future Events.   The Parties and their counsel represent and warrant that they have each performed an independent

investigation of the allegations of fact and law made in connection with the Class Action Complaint in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323, and may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of this Settlement Agreement. Nevertheless, the Parties intend to resolve their disputes pursuant to the terms of this Settlement Agreement and thus, in furtherance of their intentions, this Settlement Agreement will remain in full force and effect notwithstanding the discovery of any additional facts or law, or changes in law, and this Settlement Agreement will not be subject to rescission or modification by reason of any change or difference in facts or law.

Section 25.5   Security

(a)      The NFL Parties represent and warrant that the NFL currently maintains an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings. If the rating on the Stadium Program Bonds falls below investment grade during the twenty-year funding term of the Monetary Award Fund, Co-Lead Class Counsel and Counsel for the NFL Parties will negotiate in good faith regarding a security arrangement on the remaining unfunded portion of the Settlement Amount.

(b)      If the identity of the rating agency that rates the NFL's Stadium Program Bonds changes during the funding term of the Monetary Award Fund, then an investment grade rating by the new rating agency on the NFL's Stadium Program Bonds will satisfy the NFL Parties' obligations under Section 25.5(a).

(c)      The applicable definition of "investment grade" will be as provided by the rating agency rating the NFL's Stadium Program Bonds.

**ARTICLE XXVI**
**Cooperation**

Section 26.1   The Parties will cooperate, assist, and undertake all reasonable actions to accomplish the steps contemplated by this Settlement Agreement and to implement the Class Action Settlement on the terms and conditions provided herein.

Section 26.2   The Parties agree to take all actions necessary to obtain final approval of the Class Action Settlement and entry of a Final Order and Judgment, including the terms and provisions described in this Settlement Agreement, and, upon final approval and entry of such order, an order dismissing the Class Action Complaint and Related Lawsuits with prejudice as to the Class and Subclass Representatives, the Settlement Class, and each Settlement Class Member.

Section 26.3   The Parties and their counsel agree to support the final approval and implementation of this Settlement Agreement and defend it against objections, appeal, collateral attack or any efforts to hinder or delay its approval and implementation. Neither the Parties nor their counsel, directly or indirectly, will encourage any person to object to the Class Action Settlement or assist them in doing so.

79

## ARTICLE XXVII
## Continuing Jurisdiction

Section 27.1    Pursuant to the Final Order and Judgment, the Court will retain continuing and exclusive jurisdiction over the Parties and their counsel, all Settlement Class Members, the Special Master, BAP Administrator, Claims Administrator, Liens Resolution Administrator, Appeals Advisory Panel, and Trustee with respect to the terms of the Settlement Agreement. Any disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement Agreement will be made by motion to the Court. In addition, the Parties, including each Settlement Class Member, are hereby deemed to have submitted to the exclusive jurisdiction of this Court for any suit, action, proceeding, or dispute arising out of, or relating to, this Settlement Agreement. The terms of the Settlement Agreement will be incorporated into the Final Order and Judgment of the Court, which will allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Settlement Agreement.

(a)    Notwithstanding any contrary law applicable to the underlying claims, this Settlement Agreement and the Releases hereunder will be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles.

## ARTICLE XXVIII
## Role of Co-Lead Class Counsel, Class Counsel and Subclass Counsel

Section 28.1    Co-Lead Class Counsel and Class Counsel acknowledge that, under applicable law, their respective duty is to the entire Settlement Class, to act in the best interest of the Settlement Class as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the Settlement Class.

Section 28.2    Subclass Counsel acknowledge that, under applicable law, their respective duty is to their respective Subclasses, to act in the best interest of the respective Subclass as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the respective Subclass.

## ARTICLE XXIX
### Bargained-For Benefits

Section 29.1   Nothing in the Collective Bargaining Agreement will preclude Settlement Class Members from receiving benefits under the Settlement Agreement. In addition, the fact that a Settlement Class Member has signed, or will sign, a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement will not preclude the Settlement Class Member from receiving benefits under the Settlement Agreement, and the NFL Parties agree not to assert any defense or objection to the Settlement Class Member's receipt of benefits under the Settlement Agreement on the ground that he executed a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement.

Section 29.2   A Retired NFL Football Player's participation in the Settlement Agreement will not in any way affect his eligibility for bargained-for benefits under the Collective Bargaining Agreement or the terms or conditions under which those benefits are provided, except as set forth in Section 18.1.

## ARTICLE XXX
### Miscellaneous Provisions

Section 30.1   <u>No Assignment of Claims</u>.   Neither the Settlement Class nor any Class or Subclass Representative or Settlement Class Member has assigned, will assign, or will attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint. Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

Section 30.2   <u>Individual Counsel</u>

(a)   Counsel individually representing a Settlement Class Member, and acting on his or her behalf, may submit all claim forms, proof, correspondence, or other documents to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator on behalf of that Settlement Class Member; provided, however, that counsel individually representing a Settlement Class Member may not sign, on behalf of that Settlement Class Member: (i) an Opt Out request; (ii) a revocation of an Opt Out; (iii) an objection, as set forth in Section 14.3; (iv) a Claim Form, (v) a Derivative Claim Form, or (vi) an Appeals Form.

(b)   Where a Settlement Class Member indicates in writing to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator that he or she is individually represented by counsel, the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator will copy the counsel individually representing a Settlement Class Member on any written communications with the Settlement Class Member. Any communications, whether

written or oral, by the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator with counsel individually representing a Settlement Class Member will be deemed to be a communication directly with such individually represented Settlement Class Member.

Section 30.3    Integration.  This Settlement Agreement and its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, letters, conversations, agreements, term sheets, and understandings, whether written or oral, relating to the subject matter of this Settlement Agreement, including the Settlement Term Sheet dated August 29, 2013.  The Parties acknowledge, stipulate, and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, agreement, arrangement, or understanding, whether written or oral, concerning any part or all of the subject matter of this Settlement Agreement has been made or relied on except as expressly set forth in this Settlement Agreement.

Section 30.4    Headings.  The headings used in this Settlement Agreement are intended for the convenience of the reader only and will not affect the meaning or interpretation of this Settlement Agreement in any manner.  Any inconsistency between the headings used in this Settlement Agreement and the text of the Articles and Sections of this Settlement Agreement will be resolved in favor of the text.

Section 30.5    Incorporation of Exhibits.  All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein. Notwithstanding the foregoing, any inconsistency between this Settlement Agreement and any attachments, exhibits, or appendices hereto will be resolved in favor of this Settlement Agreement.

Section 30.6    Amendment.  This Settlement Agreement will not be subject to any change, modification, amendment, or addition without the express written consent of Co-Lead Class Counsel, Class Counsel, Subclass Counsel, and Counsel for the NFL Parties, on behalf of all Parties to this Settlement Agreement.

Section 30.7    Mutual Preparation.  The Parties have negotiated all of the terms and conditions of this Settlement Agreement at arms' length.   Neither the Settlement Class Members nor the NFL Parties, nor any one of them, nor any of their counsel will be considered to be the sole drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Settlement Agreement.  This Settlement Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

Section 30.8    Beneficiaries.  This Settlement Agreement will be binding upon the Parties and will inure to the benefit of the Settlement Class Members and the Released Parties.  All Released Parties who are not the NFL Parties are intended third-party beneficiaries who are entitled to enforce the terms of the Releases and Covenant

Not to Sue set forth in ARTICLE XVIII. No provision in this Settlement Agreement is intended to create any third-party beneficiary to this Settlement Agreement other than the Released Parties. Nothing expressed or implied in this Settlement Agreement is intended to or will be construed to confer upon or give any person or entity other than Class and Subclass Representatives, the Settlement Class Members, Co-Lead Class Counsel, Class Counsel and Subclass Counsel, the NFL Parties, the Released Parties, and Counsel for the NFL Parties, any right or remedy under or by reason of this Settlement Agreement.

Section 30.9  Extensions of Time.  Co-Lead Class Counsel and Counsel for the NFL Parties may agree in writing, subject to approval of the Court where required, to reasonable extensions of time to implement the provisions of this Settlement Agreement.

Section 30.10 Execution in Counterparts.  This Settlement Agreement may be executed in counterparts, and a facsimile signature will be deemed an original signature for purposes of this Settlement Agreement.

Section 30.11 Good Faith Implementation.  Co-Lead Class Counsel and Counsel for the NFL Parties will undertake to implement the terms of this Settlement Agreement in good faith.  Before filing any motion or petition in the Court raising a dispute arising out of or related to this Settlement Agreement, Co-Lead Class Counsel and Counsel for the NFL Parties will consult with each other in good faith and certify to the Court that they have conferred in good faith.

Section 30.12 Force Majeure.  The Parties will be excused from any failure to perform timely any obligation hereunder to the extent such failure is caused by war, acts of public enemies or terrorists, strikes or other labor disturbances, fires, floods, acts of God, or any causes of the like or different kind beyond the reasonable control of the Parties.

Section 30.13 Waiver.  The waiver by any Party of any breach of this Settlement Agreement by another Party will not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of this Settlement Agreement.

Section 30.14 Tax Consequences.  No opinion regarding the tax consequences of this Settlement Agreement to any individual Settlement Class Member is being given or will be given by the NFL Parties, Counsel for the NFL Parties, Class and Subclass Representatives, Co-Lead Class Counsel, Class Counsel, or Subclass Counsel, nor is any representation or warranty in this regard made by virtue of this Settlement Agreement.  Settlement Class Members must consult their own tax advisors regarding the tax consequences of the Settlement Agreement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto. Each Settlement Class Member's tax obligations, and the determination thereof, are his or her sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member. The NFL Parties, Counsel for the NFL Parties, Co-Lead Class Counsel, Class Counsel

and Subclass Counsel will have no liability or responsibility whatsoever for any such tax consequences resulting from payments under this Settlement Agreement. To the extent required by law, the Claims Administrator will report payments made under the Settlement Agreement to the appropriate authorities.

Section 30.15 <u>Issuance of Notices and Submission of Materials</u>. In any instance in which this Settlement Agreement requires the issuance of any notice regarding registration, a claim or an award, unless specified otherwise in this Settlement Agreement, such notice must be issued by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose to the Settlement Class Member or NFL Parties, which shall be accompanied by an email certifying receipt; or (b) U.S. mail (or its foreign equivalent). In any instance in which this Settlement Agreement requires submission of materials by or on behalf of a Settlement Class Member or the NFL Parties, unless specified otherwise in this Settlement Agreement, such submission must be made by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose; or (b) U.S. mail (or its foreign equivalent; or (c) delivery. Written notice to the Class Representatives or Co-Lead Class Counsel must be given to: Christopher A. Seeger, Seeger Weiss LLP, 77 Water Street, New York, New York 10005; and Sol Weiss, Anapol Schwartz, 1710 Spruce Street, Philadelphia, PA 19103. Written notice to the NFL Parties or Counsel for the NFL Parties must be given to: Jeffrey Pash, Executive Vice President and General Counsel, National Football League, 345 Park Avenue, New York, New York 10154; Anastasia Danias, Senior Vice President and Chief Litigation Officer, National Football League, 345 Park Avenue, New York, New York 10154; and Brad S. Karp, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, or such other person or persons as shall be designated by the Parties.

84

Section 30.16 <u>Party Burden</u>.    Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 6th day of January, 2014.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President


COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard


CO-LEAD CLASS COUNSEL

By: _____    By: _____
    SEEGER WEISS LLP            ANAPOL SCHWARTZ
    Christopher A. Seeger        Sol Weiss

CLASS COUNSEL

By: _____    By: _____
    PODHURST ORSECK, P.A.       LOCKS LAW FIRM
    Steven C. Marks           Gene Locks

SUBCLASS COUNSEL

By: _____    By: _____
    LEVIN, FISHBEIN, SEDRAN &    NASTLAW LLC
    BERMAN                 Dianne M. Nast
    Arnold Levin

85

Section 30.16 <u>Party Burden</u>.   Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.


Agreed to as of this 6th day of January, 2014.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By:   _____
    Jeffrey Pash
    NFL Executive Vice President


COUNSEL FOR THE NFL PARTIES

By:   _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard


CO-LEAD CLASS COUNSEL

By:   _____      By:   _____
    SEEGER WEISS LLP              ANAPOL SCHWARTZ
    Christopher A. Seeger           Sol Weiss

CLASS COUNSEL

By:   _____      By:   _____
    PODHURST ORSECK, P.A.        LOCKS LAW FIRM
    Steven C. Marks              Gene Locks

SUBCLASS COUNSEL

By:   _____      By:   _____
    LEVIN, FISHBEIN, SEDRAN &     NASTLAW LLC
    BERMAN                   Dianne M. Nast
    Arnold Levin

Section 30.16 <u>Party Burden</u>.   Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 6th day of January, 2014.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____ _____
    Jeffrey Pash
    NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: _____ ____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: _____
    SEEGER WEISS LLP
    Christopher A. Seeger

By: _____
    ANAPOL SCHWARTZ
    Sol Weiss

CLASS COUNSEL

By: _____
    PODHURST ORSECK, P.A.
    Steven C. Marks

By: _____
    LOCKS LAW FIRM
    Gene Locks

SUBCLASS COUNSEL

By: _____
    LEVIN, FISHBEIN, SEDRAN &
    BERMAN
    Arnold Levin

By: _____
    NASTLAW LLC
    Dianne M. Nast

Section 30.16 <u>Party Burden</u>.    Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 6th day of January, 2014.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: _____
    SEEGER WEISS LLP
    Christopher A. Seeger

By: _____
    ANAPOL SCHWARTZ
    Sol Weiss

CLASS COUNSEL

By: _____
    PODHURST ORSECK, P.A.
    Steven C. Marks

By: _____
    LOCKS LAW FIRM
    Gene Locks

SUBCLASS COUNSEL

By: _____
    LEVIN, FISHBEIN, SEDRAN &
    BERMAN
    Arnold Levin

By: _____
    NASTLAW LLC
    Dianne M. Nast

Section 30.16 Party Burden.  Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 6th day of January, 2014.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: _____
    SEEGER WEISS LLP
    Christopher A. Seeger

CLASS COUNSEL

By: _____
    PODHURST ORSECK, P.A.
    Steven C. Marks

SUBCLASS COUNSEL

By: _____
    LEVIN, FISHBEIN, SEDRAN &
    BERMAN
    Arnold Levin

By: _____
    ANAPOL SCHWARTZ
    Sol Weiss

By: _____
    LOCKS LAW FIRM
    Gene Locks

By: _____
    NASTLAW LLC
    Dianne M. Nast

85

Section 30.16 <u>Party Burden</u>.   Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 6th day of January, 2014.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: _____     By: _____
    SEEGER WEISS LLP                    ANAPOL SCHWARTZ
    Christopher A. Seeger               Sol Weiss

CLASS COUNSEL

By: _____     By: _____
    PODHURST ORSECK, P.A.               LOCKS LAW FIRM
    Steven C. Marks                     Gene Locks

SUBCLASS COUNSEL

By: _____     By: _____
    LEVIN, FISHBEIN, SEDRAN &            NASTLAW LLC
    BERMAN                              Dianne M. Nast
    Arnold Levin

Section 30.16 <u>Party Burden</u>.   Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 6th day of January, 2014.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: _____
    SEEGER WEISS LLP
    Christopher A. Seeger

By: _____
    ANAPOL SCHWARTZ
    Sol Weiss

CLASS COUNSEL

By: _____
    PODHURST ORSECK, P.A.
    Steven C. Marks

By: _____
    LOCKS LAW FIRM
    Gene Locks

SUBCLASS COUNSEL

By: _____
    LEVIN, FISHBEIN, SEDRAN &
    BERMAN
    Arnold Levin

By: _____
    NASTLAW LLC
    Dianne M. Nast

85

# Exhibit B-1

| INJURY DEFINITIONS |
|---|

## DIAGNOSIS FOR BAP SUPPLEMENTAL BENEFITS

### Level 1 Neurocognitive Impairment

(a)   The following are the diagnostic criteria for Level 1 Neurocognitive Impairment:

(i)   Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a decline in cognitive function;

(ii)   Evidence of moderate cognitive decline from a previous level of performance in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial) as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement;

(iii)   The Retired NFL Football Player exhibits functional impairment consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 0.5 (Questionable) in the areas of Community Affairs, Home & Hobbies, and Personal Care; and

(iv)   The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)   Level 1 Neurocognitive Impairment, for the purposes of this Settlement Agreement, may only be diagnosed by Qualified BAP Providers during a BAP baseline assessment examination, with agreement on the diagnosis by the Qualified BAP Providers.

Exhibit 1                                                                                     Page 1

## QUALIFYING DIAGNOSES FOR MONETARY AWARDS

1.     **Level 1.5 Neurocognitive Impairment**

(a)     For Retired NFL Football Players diagnosed through the BAP:

(i)     Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function;

(ii)     Evidence of moderate to severe cognitive decline from a previous level of performance in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial) as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement;

(iii)     The Retired NFL Football Player exhibits functional impairment consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care; and

(iv)     The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)     For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician that the Retired NFL Football Player suffers from neurocognitive impairment consistent with the diagnostic criteria for Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia.

(c)     For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis while the Retired NFL Football Player was living by either a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, that the Retired NFL Football Player suffered from neurocognitive impairment consistent with the diagnostic criteria for Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia.

Exhibit 1                                                                                                    Page 2

2. **Level 2 Neurocognitive Impairment**

(a)     For Retired NFL Football Players diagnosed through the BAP:

(i)     Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function;

(ii)     Evidence of severe cognitive decline from a previous level of performance in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial) as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement;

(iii)    The Retired NFL Football Player exhibits functional impairment consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care; and

(iv)    The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)     For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician that the Retired NFL Football Player suffers from neurocognitive impairment consistent with the diagnostic criteria for Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia.

(c)     For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis while the Retired NFL Football Player was living by either a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, that the Retired NFL Football Player suffered from neurocognitive impairment consistent with the diagnostic criteria for Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia.

3. **Alzheimer's Disease**

(a)     For living Retired NFL Football Players, a diagnosis by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(b)     For Retired NFL Football Players who died prior to the Effective Date, a diagnosis while the Retired NFL Football Player was living by either a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a

Exhibit 1                                                                                              Page 3

physician with sufficient qualifications in the field of neurology to make such a diagnosis, that the Retired NFL Football Player suffered from Alzheimer's Disease or probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

### 4. Parkinson's Disease

(a)     For living Retired NFL Football Players, a diagnosis by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or the *Diagnostic and Statistical Manual of Mental Disorders*.

(b)     For Retired NFL Football Players who died prior to the Effective Date, a diagnosis while the Retired NFL Football Player was living by either a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, that the Retired NFL Football Player suffered from Parkinson's Disease.

### 5. Death with Chronic Traumatic Encephalopathy (CTE)

For Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, a post-mortem diagnosis by a board-certified neuropathologist of CTE.

### 6. Amyotrophic Lateral Sclerosis (ALS)

(a)     For living Retired NFL Football Players, a diagnosis by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease ("ALS"), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(b)     For Retired NFL Football Players who died prior to the Effective Date, a diagnosis while the Retired NFL Football Player was living by either a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, that the Retired NFL Football Player suffered from ALS.

Exhibit 1                                                                                          Page 4

# Exhibit B-2

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1. Test Battery

| Estimating Premorbid Intellectual Ability | Learning and Memory (6 scores) |
|---|---|
| ACS Test of Premorbid Functioning (TOPF) | WMS-IV Logical Memory I |
| **Complex Attention/Processing Speed (6 scores)** | WMS-IV Logical Memory II |
| WAIS-IV Digit Span | WMS-IV Verbal Paired Associates I |
| WAIS-IV Arithmetic | WMS-IV Verbal Paired Associates II |
| WAIS-IV Letter Number Sequencing | WMS-IV Visual Reproduction I |
| WAIS-IV Coding | WMS-IV Visual Reproduction II |
| | |
| WAIS-IV Symbol Search | **Language (3 scores)** |
| WAIS-IV Cancellation | Boston Naming Test |
| **Executive Functioning (4 scores)** | Category Fluency (Animal Naming) |
| Verbal Fluency (FAS) | BDAE Complex Ideational Material |
| Trails B | **Spatial-Perceptual (3 scores)** |
| Booklet Category Test | WAIS-IV Block Design |
| WAIS-IV Similarities | WAIS-IV Visual Puzzles |
| **Effort/Performance Validity (8 scores)** | WAIS-IV Matrix Reasoning |
| *ACS Effort Scores* | **Mental Health** |
| ACS-WAIS-IV Reliable Digit Span | MMPI-2RF |
| ACS-WMS-IV Logical Memory Recognition | Mini International Neuropsychiatric Interview |
| ACS-WMS-IV Verbal Paired Associates Recognition | |
| ACS-WMS-IV Visual Reproduction Recognition | |
| ACS-Word Choice | |
| *Additional Effort Tests* | |
| Test of Memory Malingering (TOMM) | |
| Medical Symptom Validity Test (MSVT) | |

Exhibit 2                                                                                      Page 1

## Section 2: Evaluate Effort

The Advanced Clinical Solutions (ACS) Suboptimal Effort measures include five performance validity measures: one external (Word Choice) and four embedded (see list in Section 2). These measures are designed to identify unexpectedly low performance that might reflect deliberately poor effort. Cut-off scores are derived for each measure based on the performance of a large clinical sample that includes cases with significant cognitive impairment. Performing well below the overall clinical sample (e.g., worse that 90% of all clinical cases) suggests that the examinee's performance is atypical. Multiple atypical scores strongly suggest invalid performance. Tables are presented in the ACS manual that provide interpretive criteria for the 5 ACS Suboptimal Effort measures.

In addition to the ACS Suboptimal Effort measures described above, it is also necessary to include two additional tests designed to detect poor effort. These two free-standing tests will include the Test of Memory Malingering (TOMM) and the Medical Symptom Validity Test (MSVT).

If a Retired NFL Football Player fails any two of the seven effort tests (external, embedded, or free-standing), the examiner must assess effort and symptom validity using the method set forth in Slick et al. 1999, and revised in 2013. Using that method, examiners should determine whether any of the following factors influenced test performance.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

Exhibit 2　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 2

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

Exhibit 2                                                                                                    Page 3

**Section 3. Estimate Premorbid Intellectual Ability**

| Test | Ability | |
|------|---------|---|
| Test of Premorbid Functioning (TOPF) | Reading<br><br>Reading + Demographic Variables | |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

Exhibit 2                                                                                           Page 4

**Section 4. Neuropsychological Test Score Criteria by Domain of Cognitive Functioning**

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain.  A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

| Domain/Test | Ability |
| --- | --- |
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

Exhibit 2                                                                                       Page 5

**Impairment Criteria:** *Below Average* **Estimated Intellectual Functioning (A1 – E1)**

| **A1.  Complex Attention (6 test scores)** |
| --- |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 30 |
| **B1.  Executive Function (4 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **C1.  Learning and Memory (6 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 30 |
| **D1.  Language (3 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 35 |
| **E1.  Visual-Perceptual (3 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 35 |

Exhibit 2                                                                                                   Page 6

**Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)**

| |
|---|
| **A2.  Complex Attention (6 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **B2.  Executive Function (4 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **C2.  Learning and Memory (6 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **D2.  Language (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 35 |
| **E2.  Visual-Perceptual (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 35 |

Exhibit 2                                                                                                      Page 7

**Impairment Criteria:** *Above Average* **Estimated Intellectual Functioning (A3 – E3)**

| |
|---|
| **A3.  Complex Attention (6 test scores)** |
| 1.   Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.   Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37 |
| 3.   Level 2 Impairment: 3 or more scores below a T score of 35 |
| **B3.  Executive Function (4 test scores)** |
| 1.   Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2.   Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30 |
| 3.   Level 2 Impairment: 2 or more scores below a T score of 30 |
| **C3.  Learning and Memory (6 test scores)** |
| 1.   Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.   Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37 |
| 3.   Level 2 Impairment: 3 or more scores below a T score of 35 |
| **D3.  Language (3 test scores)** |
| 1.   Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2.   Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37 |
| 3.   Level 2 Impairment: 2 or more scores below a T score of 37 |
| **E3.  Visual-Perceptual (3 test scores)** |
| 1.   Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2.   Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37 |
| 3.   Level 2 Impairment: 2 or more scores below a T score of 37 |

Exhibit 2                                                                                              Page 8

**Section 5: Mental Health Assessment**

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

Exhibit 2                                                                                   Page 9

# Exhibit B-3

## MONETARY AWARD GRID
## (BY AGE AT TIME OF QUALIFYING DIAGNOSIS)

| Age Group | ALS | Death w/CTE | Parkinson's | Alzheimer's | Level 2 | Level 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45-49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50-54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55-59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60-64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65-69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70-74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75-79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

The above Monetary Award levels are the average base Monetary Awards for each of the Qualifying Diagnoses for particular age groups, except for the "Under 45" and "80+" rows, which list the maximum and minimum base Monetary Awards, respectively, for those age groups. A Settlement Class Member's actual base Monetary Award for ages 45-79 may be higher or lower than the average base Monetary Award listed for the Retired NFL Football Player's age group, depending on the Retired NFL Football Player's actual age at the time of Qualifying Diagnosis.

Base Monetary Awards are subject to: (a) upward adjustment for inflation, as provided in Section 6.7 of the Settlement Agreement; and (b) downward adjustment based on Offsets (Number of Eligible Seasons, medically diagnosed Stroke occurring prior to a Qualifying Diagnosis, medically diagnosed Traumatic Brain Injury occurring prior to a Qualifying Diagnosis, and non-participation in the BAP by a Retired NFL Football Player in Subclass 1, under the circumstances described in detail in the Settlement Agreement), as provided in Section 6.5(b) of the Settlement Agreement.

Exhibit 3                                                                                                                Page 1

# Exhibit B-4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br>            Plaintiffs,<br><br>            v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>            Defendants. | : : : : : : : : : : : : : | CIVIL ACTION NO: *14-29* |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : : : | |

### [PROPOSED] FINAL ORDER AND JUDGMENT

On January 6, 2014, Plaintiffs in the above-referenced action ("Action") filed a

Class Action Complaint and on January 6, 2014 a Settlement Agreement was entered into by and

among defendants the National Football League ("NFL") and NFL Properties LLC ("NFL

Properties") (collectively, "NFL Parties"), by and through their attorneys, and the Class

Representatives and Subclass Representatives, individually and on behalf of the Settlement Class

and Subclasses, by and through Co-Lead Class Counsel, Class Counsel and Subclass Counsel.

On [DATE], the Court entered a Preliminary Approval and Conditional Class

Certification Order ("Preliminary Order") that, among other things: (i) preliminarily approved

Exhibit 4                                                                                        Page 1

the Settlement Agreement; (ii) for purposes of the Settlement Agreement only, conditionally certified the Settlement Class and Subclasses; (iii) appointed Co-Lead Class Counsel, Class Counsel, and Subclass Counsel; (iv) approved the form and method of notice of the Settlement Agreement to the Settlement Class and Subclasses and directed that appropriate notice of the Settlement Agreement be disseminated; (v) scheduled a Fairness Hearing for final approval of the Settlement Agreement; and (vi) stayed this matter and all Related Lawsuits in this Court and enjoined proposed Settlement Class Members from pursuing Related Lawsuits.

In its Preliminary Order, pursuant to Fed. R. Civ. P. 23(b)(3), the Court defined and certified the Settlement Class as follows:

(i) All living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players"); and

(ii) Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and

(iii) Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").

In its Preliminary Order, pursuant to Fed. R. Civ. P. 23(b)(3), the Court defined and certified the Subclasses as follows:

(i) "Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

Exhibit 4       Page 2

(ii)   "Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

Notice was provided to Settlement Class Members pursuant to the Settlement Class Notice Plan approved in the Preliminary Order. (*See* Settlement Class Notice Plan attached to the Declaration of Katherine Kinsella, Class Notice Agent.) Counsel for the NFL Parties, Co-Lead Class Counsel, Class Counsel and Subclass Counsel worked together with the Settlement Class Notice Agent to fashion a Settlement Class Notice Plan that was tailored to the specific claims and Settlement Class Members of this case. Settlement Class Notice was disseminated to all known Settlement Class Members by U.S. first-class mail by [INSERT DATE]. In addition, a Summary Notice was published in accordance with the Settlement Class Notice Plan and Co-Lead Class Counsel caused to be established an automated telephone system that uses a toll-free number to respond to questions from Settlement Class Members. Co-Lead Class Counsel also caused to be established and maintained a public website that provided information about the proposed Class Action Settlement, including the Settlement Agreement, frequently asked questions, the Preliminary Order, and relevant dates for objecting to the Class Action Settlement, opting out of the Settlement Class, and the date and place of the Fairness Hearing. The website allowed Settlement Class Members to identify themselves so that Settlement Class Notice could be mailed to them. Co-Lead Class Counsel, Class Counsel and Subclass Counsel have established that the Settlement Class Notice Plan was implemented.

Exhibit 4                                                                                                    Page 3

[    ] Settlement Class Members have chosen to be excluded from the Settlement Class by timely filing written requests for exclusion ("Opt Outs"). The Opt Outs are listed at the end of this Order in Exhibit [ ].

[    ] Settlement Class Members submitted objections to the Class Action Settlement under the process set by the Preliminary Order.

On [DATE], at [TIME], the Court held the Fairness Hearing to consider whether the Class Action Settlement was fair, reasonable, adequate, and in the best interests of the Settlement Class and Subclasses. At the Fairness Hearing, [NAMES] appeared on behalf of the Class Representatives, Subclass Representatives and Settlement Class Members, and [NAMES] appeared on behalf of the NFL Parties. Additionally, the following individuals also appeared at the Fairness Hearing having timely submitted a Notice of Intention to Appear. [INSERT LIST]

The Court, having heard arguments of counsel for the Parties and of the persons who appeared at the Fairness Hearing [REFERENCE OBJECTIONS, if any], having reviewed all materials submitted, having considered all of the files, records, and proceedings in this Action, and being otherwise fully advised,

## HEREBY ORDERS THAT:

1.    Jurisdiction. This Court retains continuing and exclusive jurisdiction over the Action, Parties and their counsel, all Settlement Class Members, the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, Appeals Judge Panel, Appeals Advisory Panel, Trustee and Settlement Agreement, including its enforcement and interpretation, and all other matters relating to it. This Court also retains continuing jurisdiction over the "qualified settlement funds," as defined under § 1.468B-1 of the Treasury Regulations

Exhibit 4                                                                                                    Page 4

promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986 as amended, created under the Settlement Agreement.

      2.     <u>Incorporation of Settlement Documents.</u>  This Order and Judgment incorporates and makes a part hereof: (a) the Settlement Agreement and exhibits filed with the Court on [DATE], including definitions of the terms used therein and (b) the Settlement Class Notice Plan and the Summary Notice, both of which were filed with the Court on [DATE]. Unless otherwise defined in this Final Order and Judgment, the capitalized terms herein shall have the same meaning as they have in the *In re: National Football League Players' Concussion Injury Litigation*, MDL 2323, Class Action Settlement Agreement dated [DATE].

      3.     <u>Confirmation of Settlement Class.</u>  The provisions of the Preliminary Order that conditionally certified the Settlement Class and Subclasses should be, and hereby are, confirmed in all respects as a final class certification order under Fed. R. Civ. P. 23 for the purposes of implementing the Settlement Agreement. As set forth in the Preliminary Order, the Court finds that, for purposes of effectuating the Settlement Agreement: (a) the Settlement Class Members are so numerous that their joinder is impracticable; (b) there are questions of law and fact common to the Class and Subclasses; (c) the claims of the Class Representatives and Subclass Representatives are typical of the Settlement Class Members and the respective Subclass Members; (d) the Class Representatives and Subclass Representatives and Co-Lead Class Counsel, Class Counsel and Subclass Counsel have fairly and adequately represented and protected the interests of all Settlement Class Members; and (e) the questions of law or fact common to the Class and Subclasses predominate over any questions affecting only individual Settlement Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

4.     Settlement Notice.  The Court finds that pursuant to Federal Rule of Civil Procedure 23(c)(2)(B) the dissemination of the Settlement Class Notice and the publication of the Summary Notice: (i) were implemented in accordance with the Preliminary Order; (ii) constituted the best notice practicable under the circumstances; (iii) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members (a) of the effect of the Settlement Agreement (including the Releases provided for therein), (b) that the NFL Parties agreed not to object to a petition for class attorneys' fees and reasonable incurred costs up to $112.5 million, and that at a later date, to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel may petition the Court for an award of attorneys' fees and reasonable incurred costs, and Settlement Class Members may comment on or object to the petition, (c) of their right to opt out or object to any aspect of the Settlement Agreement, (d) of their right to revoke an Opt Out prior to the Final Approval Date, and (e) of their right to appear at the Fairness Hearing; (iv) constituted due, adequate, and sufficient notice to all persons or entities entitled to receive notice of the proposed Settlement Agreement; and (v) satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause) and other applicable laws and rules.  The Notice given by the NFL Parties to state and federal officials pursuant to 28 U.S.C. § 1715 fully satisfied the requirements of that statute.

5.     Confirmation of Appointment of Class and Subclass Representatives.  As set forth in the Preliminary Order, the Court confirms the appointment of Shawn Wooden and Kevin Turner as Class Representatives and Shawn Wooden as Subclass 1 Representative and Kevin Turner as Subclass 2 Representative.

Exhibit 4                                                                                     Page 6

6.     Confirmation of Appointment of Co-Lead Class Counsel, Class Counsel and Subclass Counsel. Pursuant to Fed. R. Civ. P. 23(g), the Court confirms the appointment of Christopher A. Seeger and Sol Weiss as Co-Lead Class Counsel, Steven C. Marks and Gene Locks as Class Counsel and Arnold Levin and Dianne M. Nast as Subclass Counsel. Co-Lead Class Counsel, Class Counsel and Subclass Counsel are familiar with the claims in this case and have done work investigating the claims. They have consulted with other counsel in the case and have experience in handling class actions and other complex litigation. They have knowledge of the applicable laws and the resources to commit to the representation of Settlement Class Members and the Settlement Class and Subclasses.

7.     Approval of Class Action Settlement. Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, this Court hereby fully and finally approves the Settlement Agreement in its entirety (including, without limitation, the NFL Parties' payment obligations, as set forth in Article XXIII of the Settlement Agreement, the Releases provided for therein, and the dismissal with prejudice of claims against the NFL Parties) and finds that the Settlement Agreement is fair, reasonable and adequate. The Court also finds that the Settlement Agreement is fair, reasonable and adequate, and in the best interests of, the Class and Subclass Representatives and all Settlement Class Members, including, without limitation, the members of the Subclasses.

The Parties are ordered to implement, perform and consummate each of the obligations set forth in the Settlement Agreement in accordance with its terms and provisions. All objections to the Settlement Agreement are found to be without merit and are overruled.

Exhibit 4                                                                                                    Page 7

8. __Dismissal of Class Action Complaint.__ The Class Action Complaint is hereby dismissed with prejudice, without further costs, including claims for interest, penalties, costs and attorneys' fees, except that Co-Lead Class Counsel's, Class Counsel's and Subclass Counsel's motion for an award of class attorneys' fees and reasonable incurred costs, as contemplated by the Parties in Section 21.1 of the Settlement Agreement, will be made at an appropriate time to be determined by the Court.

9. __Dismissal of Released Claims.__ As set forth in Article XVIII of the Settlement Agreement, the Settlement Class, the Class and Subclass Representatives and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of any Settlement Class Member (the "Releasors"), have waived and released, forever discharged and held harmless the Released Parties, and each of them:

> a. Of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that the Releasors, and each of them, had, has, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, the Claims identified in Section 18.1(a)(i)-(viii) of the Settlement Agreement.

Exhibit 4                                                                                                     Page 8

b.    Of and from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor and/or Medicare Part C or Part D Program sponsor, regarding any claim for benefits under this Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes any Settlement Class Member's right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

c.    Of and from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member pursuant to this Settlement Agreement.

d.    And the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees, of and from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

Accordingly, the Court hereby orders the dismissal with prejudice of all Released Claims by the Releasors against the Released Parties pending in the Court and without further costs, including claims for interest, penalties, costs and attorneys' fees.  All Releasors with Released Claims pending in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, against the Released Parties are ordered to promptly dismiss with prejudice all such Released Claims, and without further costs, including

Exhibit 4                                                                                          Page 9

claims for interest, penalties, costs, and attorneys' fees. This Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Releasors against any of the Released Parties, and no Releasor shall recover, directly or indirectly, any sums from any Released Parties for Released Claims other than those received for Released Claims under the terms of the Settlement Agreement, if any. However, nothing contained in the Settlement Agreement, including the Release and Covenant Not to Sue provisions in Article XVIII, affects the rights of Settlement Class Members to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

10. Dismissal of Related Lawsuits. All Related Lawsuits pending in the Court are hereby dismissed with prejudice, without further costs, including claims for interest, penalties, costs and attorneys' fees. All Releasors with Related Lawsuits pending in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, are ordered to promptly dismiss with prejudice such Related Lawsuits, and without further costs, including claims for interest, penalties, costs, and attorneys' fees.

11. Covenant Not to Sue. Consistent with Section 18.4 of the Settlement Agreement, the Class and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Releasors, and each of them, are hereby barred, enjoined and restrained from, at any time, continuing to prosecute, commencing, filing, initiating, instituting, causing to be instituted, assisting in instituting, or permitting to be instituted on their, his, her, or its behalf, or on behalf of any other individual or entity, any proceeding: (i) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Article XVIII of the Settlement Agreement; or (ii) challenging

Exhibit 4                                                                                          Page 10

the validity of the Releases. To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, the Releasors are ordered to withdraw and seek dismissal with prejudice of such proceeding forthwith.

12.     Complete Bar Order and Judgment Reduction.    It is ordered that any person or entity, other than Riddell (as defined in the Settlement Agreement), that becomes liable to any Releasor, or to any other alleged tortfeasor, co-tortfeasor, co-conspirator or co-obligor, by reason of judgment or settlement, for any claims that are or could have been asserted in this Action or in any Related Lawsuit, or that arise out of or relate to any claims that are or could have been asserted in this Action or in any Related Lawsuit, or that arise out of or relate to any facts in connection with this Action or any Related Lawsuit (collectively, the "Non-Settling Defendants"), are hereby permanently BARRED, ENJOINED and RESTRAINED from commencing, prosecuting, or asserting any claim for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise) against the Released Parties that seeks to recover from the Released Parties any part of any judgment entered against the Non-Settling Defendants and/or any settlement reached with any of the Non-Settling Defendants, in connection with any claims that are or could have been asserted against the Non-Settling Defendants in this Action or in any Related Lawsuit or that arise out of or relate to any claims that are or could have been asserted in this Action or in any Related Lawsuit, or that arise out of or relate to any facts in connection with this Action or any Related Lawsuit, whether arising under state, federal, or foreign law as claims, cross-claims, counterclaims, or third-party claims, whether asserted in this Action, in any Related Lawsuit, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere.

Exhibit 4                                                                                      Page 11

It is further ordered that the Released Parties are hereby permanently BARRED, ENJOINED AND RESTRAINED from commencing, prosecuting, or asserting any claim for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise) against any of the Non-Settling Defendants that seeks to recover any part of the NFL Parties' payment obligations as set forth in Article XXIII of the Settlement Agreement, whether arising under state, federal, or foreign law as claims, cross-claims, counterclaims, or third-party claims, whether asserted in this Action, in any Related Lawsuit, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere.

It is further ordered that any judgment or award obtained by the Releasors against any such Non-Settling Defendant shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve the Released Parties of all liability to such Non-Settling Defendants on claims barred pursuant to this Paragraph 12. Such judgment reduction, partial or complete release, settlement credit, relief, or setoff, if any, shall be in an amount or percentage sufficient under applicable law to compensate such Non-Settling Defendants for the loss of any such barred claims pursuant to this Paragraph 12 against the Released Parties.

13. No Release for Insurance Coverage. Notwithstanding anything to the contrary in this Final Order and Judgment, this Final Order and Judgment and the Settlement Agreement are not intended to and do not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(aaaa)(i)-(ii) of the Settlement Agreement.

Exhibit 4      Page 12

14.     Riddell.     As set forth in the Settlement Agreement, it is hereby ordered that, with respect to any litigation by the Releasors against Riddell, if a verdict in a Releasor's favor results in verdict or judgment for contribution or indemnity against any of the Released Parties, the Releasors shall not enforce their right to collect this verdict or judgment to the extent that such enforcement creates liability against such Released Parties.  In such event, the Releasors shall reduce their claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity. _

15.     Confirmation of Administrative Appointments.     As set forth in the Preliminary Order, the Court confirms the appointment of The Garretson Resolution Group, Inc. as the BAP Administrator, BrownGreer PLC as the Claims Administrator, The Garretson Resolution Group, Inc. as the Liens Resolution Administrator and Citibank, N.A. as the Trustee, and confirms that the Court retains continuing jurisdiction over those appointed.  Pursuant to Federal Rule of Civil Procedure 53 and the inherent authority of the Court, the Court [further extends the appointment of Mr. Perry Golkin as Special Master first made in this Court's Order Appointing Special Master, dated December 16, 2013, to perform the duties of the Special Master as set forth in the Settlement Agreement for a five-year term] [appoints _____ as Special Master to perform the duties of the Special Master as set forth in the Settlement Agreement for a five-year term].

16.     No Admission.     This Final Order and Judgment, the Settlement Agreement, and the documents relating thereto, and any actions taken by the NFL Parties or the Released Parties in the negotiation, execution, or satisfaction of the Settlement Agreement: (a) do not and shall not, in any event, constitute, or be construed as, an admission of any liability or

Exhibit 4                                                                                              Page 13

wrongdoing, or recognition of the validity of any claim made by the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member in this or any other action or proceeding; and (b) shall not, in any way, be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, or any of the Released Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement. Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in this Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, or as a waiver by the Released Parties of any applicable defense, or as a waiver by the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member, of any claims, causes of action, or remedies. This Paragraph shall not apply to disputes between the NFL Parties and their insurers, as to which the NFL Parties reserve all rights.

17. <u>Modification of the Settlement Agreement.</u> Without further approval from the Court, Co-Lead Class Counsel, Class Counsel, Subclass Counsel and Counsel for the NFL Parties, on behalf of all Parties, are hereby authorized to agree to and adopt, by the express written consent of each Party, such amendments and modifications of the Settlement Agreement, or any exhibits attached thereto, to effectuate the Settlement Agreement that: (i) are not

Exhibit 4         Page 14

materially inconsistent with this Final Order and Judgment; and (ii) do not materially limit the rights of Class Members in connection with the Class Action Settlement. Without further order of the Court, Co-Lead Class Counsel, Class Counsel, Subclass Counsel and Counsel for the NFL Parties, on behalf of all Parties, may agree, by the express written consent of each Party, to reasonable extensions of time to carry out any provisions of the Settlement Agreement.

18. **Binding Effect.** The terms of the Settlement Agreement and of this Final Order and Judgment shall be forever binding on the Parties (regardless of whether or not any individual Settlement Class Member receives payment of a Monetary Award or Derivative Claimant Award or participates in a BAP baseline assessment examination), as well as their respective heirs, executors, administrators, predecessors, successors, affiliates and assigns. The Opt Outs listed in Exhibit [   ] hereto are excluded from the Settlement Class pursuant to request and are not bound by the terms of the Settlement Agreement or this Final Order and Judgment.

19. **Termination.** If the Settlement Agreement is terminated as provided in Article XVI of the Settlement Agreement, then this Final Order and Judgment (and any orders of the Court relating to the Settlement Agreement) shall be null and void and be of no further force or effect, except as otherwise provided by the Settlement Agreement, and any unspent and uncommitted monies in the Funds will revert to, and shall be paid to, the NFL Parties within ten (10) days.

20. **Entry of Final Judgment.** There is no just reason to delay the entry of this Final Order and Judgment as a final judgment in this Action. Accordingly, the Clerk of Court is hereby directed, in accordance with this Final Order and Judgment and pursuant to Fed. R. Civ. P. 54, to: (i) enter final judgment dismissing with prejudice this Action and any Related Lawsuits

---

Exhibit 4                                                                                    Page 15

in this Court in which Released Parties (or any of them) are the only defendants, and (ii) enter

final judgment dismissing with prejudice all Released Claims asserted against Released Parties

(or any of them) in any other Related Lawsuits in this Court in which there are named defendants

other than Released Parties.


SO ORDERED this _____ day of _____, 2014.




_____
Anita B. Brody
United States District Court Judge


Exhibit 4                                                                                          Page 16

# Exhibit B-5

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# $760 Million NFL Concussion Litigation Settlement

## Retired NFL Football Players May Be Eligible for Money and Medical Benefits

*A federal court authorized this Notice. This is not a solicitation from a lawyer.*

- The National Football League ("NFL") and NFL Properties LLC (collectively, "NFL Parties") have agreed to a $760 million Settlement of a class action lawsuit seeking medical monitoring and compensation for brain injuries allegedly caused by head impacts experienced in NFL football. The NFL Parties deny that they did anything wrong.

- The Settlement includes all retired players of the NFL, the American Football League ("AFL") that merged with the NFL, the World League of American Football, NFL Europe League, and NFL Europa League, as well as immediate family members of retired players and legal representatives of incapacitated, incompetent or deceased retired players.

- The Settlement will provide eligible retired players with:

  - Baseline neuropsychological and neurological exams to determine if retired players are: a) currently suffering from any neurocognitive impairment, including impairment serious enough for compensation, and b) eligible for additional testing and/or treatment ($75 million);

  - Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death ($675 million); and

  - Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

- To get money, proof that injuries were caused by playing NFL football is not required.

- **Settlement Class Members <u>must</u> register to get benefits. Sign up at the website for notification of the registration date.**

- Your legal rights are affected even if you do nothing. Please read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **STAY IN THE SETTLEMENT CLASS** | You do not need to do anything to be included in the Settlement Class. However, once the Court approves the Settlement, you will be bound by the terms and releases contained in the Settlement. There will be later notice to explain when and how to register for Settlement benefits (*see* Question 26). |
| **ASK TO BE EXCLUDED** | You will get no benefits from the Settlement if you exclude yourself ("opt-out") from the Settlement. Excluding yourself is the only option that allows you to participate in any other lawsuit against the NFL Parties about the claims in this case (*see* Question 30). |
| **OBJECT** | Write to the Court if you do not like the Settlement (*see* Question 35). Ask to speak in Court about the fairness of the Settlement at the final approval hearing (*see* Question 39). |

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                          Page 1

- The Court in charge of this case still has to decide whether to approve the Settlement.

- **This Notice is only a summary of the Settlement Agreement and your rights.  You are encouraged to carefully review the complete Settlement Agreement at www.NFLConcussionSettlement.com.**

| What This Notice Contains | |
|---|---|

## CHAPTER 1: INTRODUCTION

**BASIC INFORMATION**.................................................................................**Page 5**
1.   Why is this Notice being provided?
2.   What is the litigation about?
3.   What is a class action?
4.   Why is there a Settlement?
5.   What are the benefits of the Settlement?

**WHO IS PART OF THE SETTLEMENT?** ............................................................**Page 7**
6.   Who is included in the Settlement Class?
7.   What players are not included in the Settlement Class?
8.   What if I am not sure whether I am included in the Settlement Class?
9.   What are the different levels of neurocognitive impairment?
10.  Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

## CHAPTER 2: SETTLEMENT BENEFITS

**THE BASELINE ASSESSMENT PROGRAM**...........................................................**Page 9**
11.  What is the Baseline Assessment Program ("BAP")?
12.  Why should I get a BAP baseline examination?
13.  How do I schedule a baseline assessment examination and where can I get it done?

**MONETARY AWARDS**...................................................................................**Page 10**
14.  What diagnoses qualify for monetary awards?
15.  Do I need to prove that playing professional football caused my Qualifying Diagnosis?
16.  How much money will I receive?
17.  How does the age of the retired player at the time of first diagnosis affect his monetary award?
18.  How does the number of seasons a retired player played affect his monetary award?
19.  How do prior strokes or brain injuries of a retired player affect his monetary award?
20.  How is a retired player's monetary award affected if he does not participate in the BAP program?
21.  Can I receive a monetary award even though the retired player is dead?
22.  Will this Settlement affect my participation in NFL or NFLPA related benefits programs?
23.  Will this Settlement prevent me from bringing workers' compensation claims?

**EDUCATION FUND**......................................................................................**Page 14**
24.  What type of education programs are supported by the Settlement?

## CHAPTER 3: YOUR RIGHTS

**REMAINING IN THE SETTLEMENT**...................................................................**Page 14**
25.  What am I giving up to stay in the Settlement Class?

**HOW TO GET BENEFITS**.............................................................................**Page 15**

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                    Page 3

26.    How do I get Settlement benefits?
27.    Is there a time limit for Retired NFL Football Players to file claims for monetary awards?
28.    Can I re-apply for compensation if my claim is denied?
29.    Can I appeal the determination of my monetary award claim?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**.............................................**Page 15**
30.    How do I get out of the Settlement?
31.    If I do not exclude myself, can I sue the NFL Parties for the same thing later?
32.    If I exclude myself, can I still get benefits from this Settlement?

**THE LAWYERS REPRESENTING YOU**...................................................................**Page 16**
33.    Do I have a lawyer in the case?
34.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**.......................................................................**Page 17**
35.    How do I tell the Court if I do not like the Settlement?
36.    What is the difference between objecting to the Settlement and excluding myself?

**THE COURT'S FAIRNESS HEARING**.....................................................................**Page 18**
37.    When and where will the Court decide whether to approve the Settlement?
38.    Do I have to attend the hearing?
39.    May I speak at the hearing?

**GETTING MORE INFORMATION**............................................................................**Page 19**
40.    How do I get more information?

Exhibit 5                                                                                                   Page 4

# CHAPTER 1: INTRODUCTION

## BASIC INFORMATION

### 1. Why is this Notice being provided?

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement.  This Notice summarizes the Settlement and explains your legal rights and options.

Judge Anita B. Brody of the United States District Court for the Eastern District of Pennsylvania is overseeing this case.  The case is known as *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323.  The people who sued are called the "Plaintiffs."  The National Football League and NFL Properties LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are:  (a) a retired player of the NFL, AFL, World League of American Football, NFL Europe League, or NFL Europa League, (b) an authorized representative of a deceased or legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.

### 2. What is the litigation about?

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems.  The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players.  The NFL Parties deny the claims in the litigation.

### 3. What is a class action?

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims.  All of these people together are the proposed "class" or "class members."  When a class action is settled, one court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves from the settlement.  In this case, the proposed class representatives are Kevin Turner and Shawn Wooden.  Excluding yourself means that you will not receive any benefits from the Settlement.  The process for excluding yourself is described in Question 30 of this Notice.

### 4. Why is there a Settlement?

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, the Plaintiffs and the NFL Parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit.  Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant.  A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                          Page 5

If the Court approves this Settlement, the claims of all persons affected (*see* Question 6) and the litigation between these persons and the NFL Parties are over. The persons affected by the Settlement are eligible for the benefits summarized in this Notice and the NFL Parties will no longer be legally responsible to defend against the claims made in this litigation.

The Court has not and will not decide in favor of the retired players or the other persons affected by the Settlement or the NFL Parties, and by reviewing this Settlement the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel," *see* Question 33) believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel, and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals, and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available at www.NFLConcussionSettlement.com.

**5. What are the benefits of the Settlement?**

Under the Settlement, the NFL Parties will pay $760 million to fund:

- Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, "Baseline Assessment Program") (*see* Questions 11-13);

- Monetary awards for diagnoses of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) and Death with CTE prior to [Date of Preliminary Approval Order] ($675 million, "Monetary Award Fund") (*see* Questions 14-21); and

- Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives. ($10 million) (*see* Question 24).

In addition, the NFL Parties will pay the cost of notice (up to $4 million) and half of the compensation for a Special Master to assist the Court in overseeing aspects of the Settlement, for the first 5 years of the Settlement. The Court may extend the term for the Special Master. Other administrative costs and expenses will be paid out of the Monetary Award Fund, except for Baseline Assessment Program costs and expenses, which will be paid out of the Baseline Assessment Program Fund.

In the event the Monetary Award Fund is insufficient to pay all approved monetary claims, the NFL Parties have agreed to contribute up to an additional $37.5 million, subject to Court approval. Based on extensive consultation with economic and medical experts, Co-Lead Class Counsel, Class Counsel, and Subclass Counsel believe the funding will be sufficient to pay all eligible monetary claims.

The details of the Settlement benefits are in the Settlement Agreement, which is available at www.NFLConcussionSettlement.com.

**Note:** The Baseline Assessment Program and Monetary Award Fund are completely independent of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims.

## WHO IS PART OF THE SETTLEMENT?

You need to decide whether you are included in the Settlement.

**6. Who is included in the Settlement Class?**

This Settlement Class includes three types of people:

Retired NFL Football Players: Prior to [Date of Preliminary Approval Order], you (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League, and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

Representative Claimants: An authorized representative, ordered by a court or other official of competent jurisdiction under applicable state law, of a deceased or legally incapacitated or incompetent Retired NFL Football Player.

Derivative Claimants: A spouse, parent, dependent child, or any other person who properly under applicable state law asserts the right to sue independently or derivatively by reason of his or her relationship with a living or deceased Retired NFL Football Player. (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status as of [Date of Preliminary Approval Order]:

- Subclass 1 includes Retired NFL Football Players who were not diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE prior to [Date of Preliminary Approval Order], and their Representative Claimants and Derivative Claimants.

- Subclass 2 includes:

    (a) Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to [Date of Preliminary Approval Order], and their Representative Claimants and Derivative Claimants; and

(b) Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to death or who died prior to [Date of Preliminary Approval Order] and received a diagnosis of Death with CTE.

## 7. What players are not included in the Settlement Class?

The Settlement Class does not include:  (a) current NFL players, and (b) people who tried out for NFL or AFL Member Clubs, or World League of American Football, NFL Europe League or NFL Europa League teams, but did not make it onto preseason, regular season or postseason rosters, or practice squads, developmental squads or taxi squads.

## 8. What if I am not sure whether I am included in the Settlement Class?

If you are not sure whether you are included in the Settlement Class, you may call 1-800-000-0000 with questions or visit www.NFLConcussionSettlement.com.  You may also write with questions to NFL Concussion Settlement, P.O. Box 0000, City, ST 00000.  You may also consult with your own attorney.

## 9. What are the different levels of neurocognitive impairment?

Various levels of neurocognitive impairment are used in this Notice.  More details can be found in the Injury Definitions, which are available at www.NFLConcussionSettlement.com or by calling 1-800-000-0000.

- Level 1 Neurocognitive Impairment covers *moderate cognitive impairment*.  It will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing (such as complex attention, executive function, learning, memory, language and perceptual skill) and related functional impairment.

- Level 1.5 Neurocognitive Impairment covers *early Dementia*.  It will be established in part with evidence of moderate to severe cognitive decline, which includes a decline in performance in at least two areas subject to clinical evaluative testing (such as complex attention, executive function, learning, memory, language and perceptual skill) and related functional impairment.

- Level 2 Neurocognitive Impairment covers *moderate Dementia*.  It will be established in part with evidence of severe decline in performance in at least two areas subject to clinical evaluative testing (such as complex attention, executive function, learning, memory, language and perceptual skill) and related functional impairment.

If neurocognitive impairment is temporary and only occurs with delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

## 10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

No.  A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

**QUESTIONS?  CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                      Page 8

# CHAPTER 2:  SETTLEMENT BENEFITS

## THE BASELINE ASSESSMENT PROGRAM

### 11.  What is the Baseline Assessment Program ("BAP")?

All living retired players who have earned at least one-half of an Eligible Season (*see* Question 18), who do not exclude themselves from the Settlement (*see* Question 30), and who timely register to participate in the Settlement (*see* Question 26) may participate in the Baseline Assessment Program ("BAP").

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment.  Retired players will have from two to ten years, depending on their age as of the date the Settlement is finally approved and any appeals are fully resolved, to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date the Settlement goes into effect will need to have a baseline examination within two years of the start of the program.

- Retired players under the age of 43 as of the date the Settlement goes into effect will need to have a baseline examination within 10 years, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition for the ten-year term of the BAP or five years from diagnosis, whichever is longer.

Settlement Class Members who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, you do not need to participate in the BAP to receive a monetary award, but your award may be reduced by 10% if you do not participate in the BAP, as explained in more detail in Question 20.

### 12.  Why should I get a BAP baseline examination?

Getting a BAP baseline examination will be beneficial to you and your family.  It will determine whether you have any cognitive impairment, and if you are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment), you are eligible to receive further medical testing and/or treatment for that condition.  In addition, whether or not you have any cognitive impairment today, the results of the BAP baseline examination can be used as a comparison to measure any subsequent deterioration of your cognitive condition over the course of your life.  Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist, and the retired player and/or

his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

Participation in the BAP does not prevent you from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if they develop a Qualifying Diagnosis (*see* Question 14). Participation in the BAP also will help ensure that, to the extent you receive a Qualifying Diagnosis in the future, you receive the maximum monetary award to which you are entitled (*see* Question 20).

**13. How do I schedule a baseline assessment examination and where can I get it done?**

You need to register for Settlement benefits before you can get a baseline assessment examination. Registration will not be available until after the Court grants final approval to the Settlement and any appeals are fully resolved. **You can sign-up at www.NFLConcussionSettlement.com or by calling 1-800-000-0000 to receive additional notice about registration when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

## MONETARY AWARDS

**14. What diagnoses qualify for monetary awards?**

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia), or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis can occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation.

**15. Do I need to prove that playing professional football caused my Qualifying Diagnosis?**

No. You do not need to prove that a Qualifying Diagnosis was caused by playing professional football or that you experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League, or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

**16. How much money will I receive?**

The amount of money you will receive depends on the retired player's:

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                         Page 10

- Specific Qualifying Diagnosis,
- Age at the time he was diagnosed (*see* Question 17),
- Number of seasons played or practiced in the NFL or the AFL (*see* Question 18),
- Diagnosis of a prior stroke or traumatic brain injury (*see* Question 19),
- Participation in a baseline assessment exam (*see* Question 20), and
- Whether there are any legally enforceable liens on your award.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons (*see* Question 18) and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award. If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

**17. How does the age of the retired player at the time of first diagnosis affect his monetary award?**

Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award for people diagnosed between the ages of 45-49; and
- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH W/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

### 18. How does the number of seasons a retired player played affect his monetary award?

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL or AFL. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

- A retired player also earns one-half of an Eligible Season for each season where he was on an NFL or AFL Member Club's practice, developmental, or taxi squad for at least eight games, but did not otherwise earn an Eligible Season.

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

Time spent playing or practicing in the World League of American Football, NFL Europe League, and NFL Europa League does not count towards an Eligible Season.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons

credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |
| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

**19. How do prior strokes or traumatic brain injuries of a retired player affect his monetary award?**

It depends. A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced a medically diagnosed stroke that occurred:

- Before receiving a Qualifying Diagnosis, or
- A severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

**20. How is a retired player's monetary award affected if he does not participate in the BAP program?**

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award if the retired player does not participate in the BAP and:

- Did not receive a Qualifying Diagnosis prior to [Date of Preliminary Approval Order], and

- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

**21. Can I receive a monetary award even though the retired player is dead?**

Yes. Representative Claimants for deceased retired players with a Qualifying Diagnoses will be eligible to receive monetary awards. If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives (*see* Question 16).

QUESTIONS? CALL **1-800-000-0000** OR VISIT **WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                   Page 13

**22. Will this Settlement affect my participation in NFL or NFLPA-related benefits programs?**

No.  The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association.  This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note:**  The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

**23. Will this Settlement prevent me from bringing workers' compensation claims?**

Claims for workers' compensation will not be released by this Settlement.

## EDUCATION FUND

**24. What type of education programs are supported by the Settlement?**

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

# CHAPTER 3:  YOUR RIGHTS

## REMAINING IN THE SETTLEMENT

**25. What am I giving up to stay in the Settlement Class?**

Unless you exclude yourself from the Settlement, you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case.  This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time.  You also are promising not to sue the National Collegiate Athletic Association or other collegiate, amateur or youth football organizations and entities for your cognitive injuries if you receive a monetary award under this Settlement.  **However, the Settlement does not release any claims for workers' compensation (*see* Question 23) or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement**.

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp.).  **They are not parties to this Settlement and claims against them are not released by this Settlement**.

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                                          Page 14

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves from the Settlement, so please read it carefully. The Settlement Agreement is available at www.NFLConcussionSettlement.com. If you have any questions you can talk to the law firms listed in Question 33 for free or you can talk to your own lawyer if you have questions about what this means.

## How To Get Benefits

### 26. How do I get Settlement benefits?

To get benefits, you will need to register. Registration will not begin until after the Settlement is approved by the Court (*see* Question 37) and any appeals are fully resolved. Once that occurs, further notice will be provided about how to register for benefits. In the meantime, please go to www.NFLConcussionSettlement.com or call 1-800-000-0000 to sign-up for notice of registration. Registration must be completed in the time permitted (180 days from the time notice of registration is provided) if you wish to receive any of the benefits provided through this Settlement.

### 27. Is there a time limit for Retired NFL Football Players to file claims for monetary awards?

Yes. Retired NFL Football Players and Representative Claimants must submit claims for monetary awards within two years after the date of the diagnosis for which they claim a monetary award, or the date the Settlement is granted final approval and any appeals are fully resolved, whichever is later. This deadline may be extended to within four years of the Qualifying Diagnosis or the date the Settlement is granted final approval and any appeals are fully resolved if the Retired NFL Football Player or Representative Claimant can show substantial hardship beyond the Qualifying Diagnosis. Derivative Claimants must submit claims no later than 30 days after the Retired NFL Football Player through whom the close relationship is the basis for the claim (or the Representative Claimant of that retired player) receives a notice that he is entitled to a monetary award.

All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

### 28. Can I re-apply for compensation if my claim is denied?

Yes. A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

### 29. Can I appeal the determination of my monetary award claim?

Yes. The Settlement establishes a process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

## Excluding Yourself From The Settlement

If you do not want to receive benefits from this Settlement, and you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement. You can do this by asking to be excluded – sometimes referred to as "opting out" of – the Settlement Class.

**Questions? Call 1-800-000-0000 or visit www.NFLConcussionSettlement.com**

Exhibit 5                                                                                          Page 15

### 30. How do I get out of the Settlement?

To exclude yourself from the Settlement, you must mail a letter or other written document to the Claims Administrator. Your request must include:

- Your name, address, telephone number, and date of birth;

- A copy of your driver's license or other government issued identification;

- A statement that "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and

- Your signature by hand (not any form of electronic signature), and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion request, postmarked no later than **Month 00, 0000** [Date ordered by the Court], to [INSERT INFORMATION], City, ST 00000.

### 31. If I do not exclude myself, can I sue the NFL Parties for the same thing later?

No. Unless you exclude yourself, you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves. If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself by **Month 00, 0000.**

### 32. If I exclude myself, can I still get benefits from this Settlement?

No. **If you exclude yourself from the settlement you will not get any Settlement benefits**. You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

## THE LAWYERS REPRESENTING YOU

### 33. Do I have a lawyer in the case?

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel" (*see* Question 6). They are:

| | |
|---|---|
| Christopher A. Seeger<br>**SEEGER WEISS LLP**<br>77 Water Street<br>New York, NY 10005<br><br>***Co-Lead Class Counsel*** | Sol Weiss<br>**ANAPOL SCHWARTZ**<br>1710 Spruce Street<br>Philadelphia, PA 19103<br><br>***Co-Lead Class Counsel*** |
| Steven C. Marks<br>**PODHURST ORSECK P.A.**<br>City National Bank Building<br>25 W. Flagler Street, Suite 800 | Gene Locks<br>**LOCKS LAW FIRM**<br>The Curtis Center, Suite 720 East<br>601 Walnut Street |

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5      Page 16

| Miami, FL 33130-1780 | Philadelphia, PA 19106 |
|---|---|
| ***Class Counsel*** | ***Class Counsel*** |
| Arnold Levin | Dianne M. Nast |
| **LEVIN FISHBEIN SEDRAN & BERMAN** | **NAST LAW LLC** |
| 510 Walnut Street, Suite 500 | 1101 Market Street, Suite 2801 |
| Philadelphia, PA 19106 | Philadelphia, Pennsylvania 19107 |
| ***Counsel for Subclass 1*** | ***Counsel for Subclass 2*** |

You will not be charged for contacting these lawyers. If you are already represented by an attorney, you may contact your attorney to discuss the proposed settlement. If you are not already represented by an attorney, and you want to be represented by your own lawyer, you may hire one at your own expense.

**33. How will the lawyers be paid?**

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs. The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million, These fees and incurred costs will be paid separately by the NFL Parties and not from the $760 million settlement funds. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time. Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

## OBJECTING TO THE SETTLEMENT

You can tell the Court that you do not agree with the Settlement or some part of it.

**35. How do I tell the Court if I do not like the Settlement?**

If you do not exclude yourself from the Settlement Class, you can object to the Settlement if you do not like some part of it. The Court will consider your views. To object to the Settlement, you or your attorney must submit your written objection to the Court. The objection must include the following:

- The name of the case and multi-district litigation, *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- The name of the Retired NFL Football Player through which you are a Representative Claimant or Derivative Claimant (if you are not a retired player);

- Written evidence establishing that you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                 Page 17

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand (not any form of electronic signature), and the date on which you signed it (even if represented by an attorney).

In addition, if you intend to appear at the final approval hearing (the "Fairness Hearing"), you must submit a written notice of your intent [INSERT REQUIREMENTS FROM PRELIMINARY APPROVAL ORDER] by [INSERT DATE.]

The requirements to object to the Settlement are described in detail in the Settlement Agreement in section 14.3.

You must file your objection with the Court no later than **Month 00, 0000 [date ordered by the Court]**:

| **COURT** |
|:---:|
| Clerk of the Court/Judge Anita B. Brody |
| United States District Court for the Eastern District of Pennsylvania |
| James A. Byrne U.S. Courthouse, |
| 601 Market Street, |
| Philadelphia, PA 19106-1797 |

### 36. What is the difference between objecting to the Settlement and excluding myself?

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different. You can object only if you do not exclude yourself from the Settlement Class. Excluding yourself is telling the Court that you do not want to be part of the Settlement Class and you do not want to receive any Settlement benefits. If you exclude yourself, you have no basis to object because the case no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak, but you do not have to. The Court will determine if you are allowed to speak if you request to do so (*see* Question 39).

### 37. When and where will the Court decide whether to approve the Settlement?

The Court will hold the Fairness Hearing at XX:00 x.m. on **Month 00, 0000**, at the United States District Court for the Eastern District of Pennsylvania, located at the James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106-1797. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call 1-800-000-0000. At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                    Page 18

The Court will consider the request for attorneys' fees and reasonable costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel (*see* Question 34) after the Fairness Hearing, which will be set at a later date by the Court.

## 38. Do I have to attend the hearing?

No. Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have. But you are welcome to attend at your own expense. If you timely file an objection, you do not have to come to Court to talk about it. As long as you filed your written objection on time, the Court will consider it. You may also have your own lawyer attend at your expense, but it is not necessary.

## 39. May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing. The Court will determine whether to grant you permission to speak. To make such a request, you must file a written notice stating that it is your intent to appear at the *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323 Fairness Hearing ("Notice of Intention to Appear"). Be sure to include your name, address, telephone number, and your signature. Your Notice of Intention to Appear must be filed with the Court no later than **Month 00, 0000**.

## GETTING MORE INFORMATION

## 40. How do I get more information?

This Notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at www.NFLConcussionSettlement.com. You also may write with questions to NFL Concussion Settlement, P.O. Box 0000, City, ST 00000 or call 1-800-000-0000.

**PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LAWSUIT.**