# Exhibit C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  NATIONAL FOOTBALL LEAGUE
PLAYERS' CONCUSSION INJURY
LITIGATION

No. 2:12-md-02323

No. 14-29

**DECLARATION OF KATHERINE
KINSELLA**

I, Katherine Kinsella, being duly sworn, hereby declare as follows:

1.  I am President of Kinsella Media, LLC ("KM"), an advertising and legal notification firm
    in Washington, D.C. specializing in the design and implementation of notification
    programs to reach unidentified putative class members primarily in consumer and
    antitrust class actions and claimants in bankruptcy and mass tort litigation. My business
    address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037.   My telephone
    number is (202) 686-4111.

2.  I submit this declaration at the request of the parties in connection with *In re: National
    Football League Players' Concussion Injury Litigation.*   A detailed Notice Plan is
    attached.

3.  This declaration is based upon my personal knowledge and upon information provided by
    the parties, my associates, and staff.  The information is of a type reasonably relied upon
    in the fields of advertising, media and communications.

4.  KM has developed and directed some of the largest and most complex national
    notification programs in the country.  The scope of the firm's work includes notification
    programs in antitrust, bankruptcy, consumer fraud, mass tort, and product liability
    litigation.  Specific cases have involved, among others, asbestos, breast implants, home
    siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing,

tobacco, and Holocaust claims. The firm has developed or consulted on over 700 notification programs and has placed over $300 million in media notice.

5. Courts have admitted expert testimony from KM on our firm's quantitative and qualitative evaluations of notice programs. Many Courts have commented favorably, on the record, regarding the effectiveness of notice plans prepared by KM.

6. I have testified as an expert at trial and in a deposition in *Engle v. R. J. Reynolds Tobacco*, No. 94-08273 (Fla. Cir. Ct., Dade County). I have been deposed as an expert in *In re NASDAQ Market-Makers Antitrust Litigation*, M21-68 RWS), 94-CIV. 3994 (RWS), M.D.L. No. 123 (S.D.N.Y.), *In re Dow Corning*, No. 95-20512 (Bankr. E.D. Mich.), *Georgine v. Amchem, Inc. et al.*, C.A. No. 93-CV-0215 (E.D. Pa.), *In re W. R. Grace & Co.*, Chapter 11, No.01-01139 (JJF) (Bankr. D. Del.), *Gross v. Chrysler Corp.*, No. 061170 (Md. Cir. Ct., Montgomery County), *In re Bluetooth Headset Products Liability Litigation*, No. 2:07-ML-1822-DSF-E (C.D. Cal.), and *Donovan v. Philip Morris USA, Inc.*, No. 06-CA-12234 (D. Mass.). I have testified in court in *In re Swan Transportation Company*, Chapter 11, Case No. 01-11690, *Cox v. Shell Oil Co.*, No. 18,844 (Tenn. Ch. Ct., Obion County), *Ahearn v. Fibreboard Corporation*, C.A. No. 6:93cv526 (E.D. Tex.) and *Continental Casualty Co. v. Rudd*, C.A. No. 6:94cv458 (E.D. Tex.).

7. I am the author of the following:

   a. *Buyer Beware: Eight Pitfalls That Can Jeopardize Your Class Action Notice Program*, published in the July 12, 2013 issue of Class Action Litigation Report.

b. *The Plain Language Tool Kit for Class Action Notice*, published in 2010 in <u>A Practitioner's Guide to Class Actions</u>, as well as the October 25, 2002 issue of <u>Class Action Litigation Report</u>;

c. *Quantifying Notice Results in Class Actions – the Daubert/Kumho Mandate,* published in 2010 in <u>A Practitioner's Guide to Class Actions</u>, as well as the July 27, 2001 issue of <u>Class Action Litigation Report</u> and the August 7, 2001 issue of <u>The United States Law Week</u>; and

d. *The Ten Commandments of Class Action Notice,* published in the September 24, 1997 issue of the <u>Toxics Law Reporter</u>.

8. I am also co-author of the following:

a. *International Class Action Notice*, published in 2012 in <u>World Class Action: A Guide to Group and Representative Actions Around the Globe</u>;

b. *Class Notice and Claims Administration*, published in 2010 in <u>Private Enforcement of Antitrust Law in the United States: A Handbook</u> and in 2012 in <u>The International Handbook on Private Enforcement of Competition Law</u>;

c. *REALITY CHECK: The State of New Media Options for Class Action Notice*, published in 2010 in <u>A Practitioner's Guide to Class Actions</u>, as well as the February 26, 2010 issue of the <u>Class Action Litigation Report</u>; and

d. *How Viable Is the Internet for Class Action Notice,* published in the March 25, 2005 issue of <u>Class Action Litigation Report</u>.

9. KM was retained to design and implement the Notice Plan in this litigation. I submit this declaration to describe the elements of the Notice Plan.

## Proposed Notice Plan

10. A two-part notification plan was designed and includes:

    a. Direct notice by first-class mail to all known Retired NFL Football Players and heirs of deceased retired players; and

    b. Broad notice through the use of paid media including national consumer magazines, trade publications, television, radio, and Internet advertising.

11. A Supplemental Notice Plan will be prepared after the Settlement becomes effective to inform the Settlement Class about registration.

## Direct Mail Notice

12. The Settlement Class is made up of a number of discrete groups. In addition to the Retired NFL Football Players, there are legal representatives and family members. To determine the size and make-up of the Settlement Class, KM worked with proposed Claims Administrator, BrownGreer PLC ("BrownGreer"), to develop a comprehensive list of Settlement Class Members to whom direct notice can be mailed.

13. BrownGreer worked through a total of 29 datasets, which included some combination of living and deceased players' names, dates of birth, dates of death, team names, years played, and the names, addresses, dates of birth, and dates of death of players' beneficiaries. In order to build the most comprehensive list, BrownGreer:

    a. Compiled all 29 datasets into one;

    b. Removed duplicate records; and

    c. Separated records of deceased NFL Football Players; and

    d. Deleted records that only had a name and no address information.

14. BrownGreer worked with LexisNexis in several steps to:

    a. Find the best-known addresses for each individual;

      b. Run through its death database to identify which individuals are deceased; and

      c. Run the dataset of deceased individuals through their first-degree relative database to identify known relatives and their best-known addresses. First-degree relatives include children, spouses, parents, and siblings.

15. BrownGreer will combine the list of living players and beneficiaries with the list of deceased players' relatives to form the notice mailing list. More detailed information about all of BrownGreer's efforts is included in the Notice Plan.

16. Direct Mail Notice will consist of mailing a cover letter and the Long-form Notice ("Notice") (attached as Exhibit 3 to the Notice Plan) to potential Settlement Class Members to inform them of their rights and how they may participate in the Class Action Settlement. This Direct Mail Notice will be distributed via first-class mail to:

      a. All readily identifiable Settlement Class Members, which includes Retired Football NFL Players and heirs of deceased retired players developed through the process previously outlined.

      b. Anyone who calls the toll-free information line, or writes or emails the Claims Administrator to request the Long-form Notice.

17. The Notice will also be available on the Settlement Website as a PDF file.

## Paid Media Notice

18. As detailed in the Notice Plan, KM undertook an analysis of the Settlement Class and determined there are ethnic, age, and gender differences among the Settlement Class Members. The Settlement Class is made up of a number of discrete groups, each of which consumes different media based on their demographics. In addition to the Retired NFL Football Players, there are legal representatives and family members.

19. The Notice Plan is based on specifically reaching consumers who fit within these demographic groups of Settlement Class Members. Therefore, specific media was chosen to reach all of the demographic groups included in the Settlement Class. Further details about why each medium was chosen are available in the Notice Plan.

**Paid Media Placements**

20. The proposed media schedule includes advertising in national consumer magazines, trade publications, television, radio, and Internet advertising to reach the groups mentioned above.

21. The short-form notice ("Summary Notice") will appear in national consumer magazines as follows:

   a. A two-page, color spread (9.75" x 6.875') once in *Jet* with an estimated circulation of 900,000.

   b. A full-page, color ad (7" x 10") twice in *People* with an estimated circulation of 3,475,000.

   c. A full-page, color ad (7" x 10") once in *Sports Illustrated* with an estimated circulation of 3,000,000.

   d. A full-page, color ad (7" x 10") once in *Time* with an estimated circulation of 3,250,000.

22. The Summary Notice will appear in trade publications as follows:

   a. A full-page, color ad (7" x 10") in *Long-Term Living* with an estimated circulation of 50,080.

   b. A full-page, color ad (7.25" x 10") in *McKnight's Long-Term Care News & Assisted Living* with an estimated circulation of 40,200.

    c. A full-page, color ad (7" x 10") in *Provider* with an estimated circulation of 50,200.

    d. A full-page, color ad (7" x 10") in *Senior Living Executive* with an estimated circulation of 21,808.

23. Thirty-second television commercials ("TV Spots"), which will prominently feature the toll-free number and the Settlement Website address, will appear for two to three weeks across a variety of national channels and programs. The TV Spots will run throughout the day in different program environments in order to reach the highest number of viewers.

24. Thirty-second radio commercials, which will prominently feature the toll-free number and the Settlement Website address, will run for two to three weeks on American Urban Radio Networks ("AURN"). For this Notice Plan, network radio is being used to primarily reach African American Settlement Class Members, as well as Retired NFL Football Players. Radio usage is especially high among African Americans as compared to the general population.[1]

25. Internet advertising will include the following placements for a 30-day period:

    a. Banner advertisements measuring 728x90, 300x250, and 160x600 pixels on a rotating basis, on the following targeted websites:

        i. CNN.com

        ii. Weather.com

        iii. Facebook.com

    b. A variety of advertisements on the following networks:

---

[1] Target Market News, *Media Audit study shows African Americans more engaged with media*, at http://www.targetmarketnews.com/storyid07260702.htm (last visited Nov. 9, 2013).

     i. Microsoft Media Network

     ii. Specific Media

     iii. Yahoo!

## Advertising on NFL Properties

26. The NFL has agreed to provide notice on the NFL Network. The Notice Plan calls for 30-second TV Spots to be aired throughout the day in different program environments to reach the highest number of viewers over a period of two to three weeks. It is expected that the TV Spots will appear across all programming on the NFL Network.

27. NFL Network viewers are primarily male, which may help reach Retired NFL Football Players and male heirs to whom direct mail notice is not possible. It is likely that given the importance of having a retired NFL player as part of the family, relatives of these individuals may be engaged in following NFL football and are potential viewers of the NFL programming.

28. The NFL has also agreed to provide notice on NFL.com. Notice on NFL.com will allow Settlement Class Members to click on a banner ad on that website and be directed to the Settlement Website or provide the address to Settlement Class Members textually. Banner advertisements (728x90 pixels and 300x250 pixels) will appear on pages all over the site.

29. It is expected that some percentage of Retired NFL Football Players who cannot be reached through direct mail notice, as well as family members, will visit the NFL.com website.

**Additional Outreach**

30. In order to reach those people who may know Retired NFL Football Players, and ask them to pass along information about the Settlement, KM will undertake additional outreach as part of the Notice Plan. This will include:

    a. A mailing to the directors of approximately 60,000 nursing homes, assisted living facilities, and rehab facilities. The mailing will include a cover letter requesting their assistance in locating Retired NFL Football Players that are in their facilities, as well as a copy of the summary notice.

    b. Reaching out to various NFL organizations to request they inform their members of the Settlement and assist in locating Retired NFL Football Players whose address are unknown. This includes outreach to individual team organizations, alumni groups, and the NFL Player Care Foundation.

**Electronic Notice**

31. A Settlement Website will be established to enable potential Settlement Class Members to get information on the Settlement.

32. In order to help search engine users locate the Settlement Website – both those specifically looking for it and those looking for related topics – KM will purchase sponsored links that could appear when searchers enter certain terms on Google and Bing search engines.

**Content and Form of Notices**

33. Rule 23(c)(2) of the Federal Rules of Civil Procedure requires class action notices to be written in "plain, easily understood language." KM applies the plain language requirement in drafting notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its

experience and expertise to draft notices that effectively convey the necessary information to Settlement Class Members.

34. The Summary Notice, attached as Exhibit 5 to the Notice Plan, is designed to get the reader's attention. The Summary Notice concisely and clearly states, in plain easily understandable language, all required information. The Summary Notice refers readers to the availability of a Long-form Notice, which is available to those who call or visit the website.

35. The Long-form Notice will be available at the website or by calling the toll-free number. The Long-form Notice provides substantial information, including all specific instructions Settlement Class Members need to follow to properly exercise their rights, and background on the issues in the case. It is designed to encourage readership and understanding, in a well-organized and reader-friendly format.

## Conclusion

36. KM estimates that the Direct Mail Notice, in combination with the Paid Media Placements, will reach over 90% of Settlement Class Members. It is my opinion that the Notice Plan will provide the best notice practicable under the circumstances, and it is consistent with the standards employed by KM in notification plans designed to reach unidentified members of settlement groups or classes. The Notice Plan as designed is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.

I declare under penalty of perjury that the foregoing is true and correct.

Katherine Kinsella                     January 6, 2014

_____        _____
Katherine Kinsella                     Date



# NOTICE PLAN

*In re: National Football League Players'*
*Concussion Injury Litigation*
No. 2:12-md-02323

United States District Court for the Eastern District of
Pennsylvania

© 2013 KINSELLA MEDIA, LLC

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| FIRM OVERVIEW | 1 |
| CASE BACKGROUND | |
| Class Definition | 3 |
| Situation Analysis | 4 |
| NOTICE PLAN OVERVIEW | |
| Plan Components | 8 |
| Direct Notice | 9 |
| Paid Media Program | 10 |
| Paid Media Placements Summary | 11 |
| PAID MEDIA PLACEMENTS | |
| Overview | 13 |
| Consumer Magazines | 14 |
| Trade Publications | 16 |
| Television | 18 |
| National Radio | 19 |
| Internet Advertising | 20 |
| EFFECTIVENESS OF NOTICE PLAN | 22 |
| NOTICE DESIGN | |
| Long-form Notice | 24 |
| Summary Notice | 25 |
| Radio and TV Ads | 26 |
| Website and Internet Ads | 27 |
| TOLL-FREE TELEPHONE SUPPORT | 28 |
| ADDITIONAL OUTREACH OPPORTUNITIES | 29 |
| EXHIBITS | |
| Exhibit 1 – Selected KM Cases | |
| Exhibit 2 – Judicial Comments | |
| Exhibit 3 – Long-form Notice | |
| Exhibit 4 – Envelope | |
| Exhibit 5 – Summary Notice | |

© 2013 KINSELLA MEDIA, LLC

*In re: National Football League Players' Concussion Injury Litigation*

# FIRM OVERVIEW

Kinsella Media, LLC ("KM") is a nationally recognized legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members primarily in consumer and antitrust class actions and claimants in bankruptcy and mass tort litigation.

KM has developed and directed some of the largest and most complex national notification programs, primarily in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation. Specific cases have spanned a broad spectrum of issues, including asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco, and Holocaust claims. The firm has developed or consulted on over 700 notification programs and has placed over $300 million in paid media notice. A selection of KM's case experience and judicial comments on our notification program are attached as Exhibits 1 and 2.

KM develops advertisements, press materials, websites, and other notice materials that bridge the gap between litigation complexities and the need for a clear and simple explanation of legal rights. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court, and ensures all notice materials are in "plain language" and are fully compliant with Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and comparable state guidelines.

*In re: National Football League Players' Concussion Injury Litigation*

# CASE BACKGROUND

© 2013 KINSELLA MEDIA, LLC

*In re: National Football League Players' Concussion Injury Litigation*

# CASE BACKGROUND:
# CLASS DEFINITION

The Settlement Class consists of:

➢ All living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players");

➢ Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and

➢ Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").

The Settlement Class includes the following Subclasses:

➢ Subclass 1, which shall consist of: "Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants";[1] and,

➢ Subclass 2, which shall consist of: "Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE."

---

[1] "Qualifying Diagnosis" or "Qualifying Diagnoses" means Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE, as defined in Exhibit 1 (Injury Definitions) of the Settlement Agreement.

*In re: National Football League Players' Concussion Injury Litigation*

## CASE BACKGROUND:
## SITUATION ANALYSIS

The Settlement Class is made up of a number of discrete groups. In addition to the Retired NFL Football Players, there are legal representatives and family members.

To determine the size and make-up of the Settlement Class, KM worked with proposed Claims Administrator, BrownGreer PLC, to develop a comprehensive list of Settlement Class Members to whom direct notice could be provided.

The following work has been completed or is in process to build a comprehensive mailing list:

- BrownGreer ultimately received 27 datasets and created two more, for a total of 29 datasets, which included some combination of living and deceased players' names, dates of birth, dates of death, team names, years played, and the names, addresses, dates of birth, and dates of death of players' beneficiaries. None of the datasets provided the same data points.

  o The National Football League ("NFL") provided BrownGreer with seven sets of player data and one set of player and beneficiary data.

  o KM provided BrownGreer with three sets of player data, one set of beneficiary data, and three sets of combined player and beneficiary data, compiled for use in Dryer v. NFL, Case No. 09-cv-02182-PAM-AJB (D.Minn.)

  o Consulting firm ARPC provided BrownGreer with a dataset of deceased players.

  o Various NFL teams provided BrownGreer with datasets for living and deceased players and coaches.

  o BrownGreer programmed a web crawler to pull publicly available data from NFL.com, the official website of the NFL. A web crawler is a program designed to systematically search public websites and record information made available by those sites. It maintains a database of statistics for current and historical players, and BrownGreer pulled player names, dates of birth, and/or places of birth. Using this tool, BrownGreer pulled the full names and dates of birth for 27,267 players that the NFL lists as current and past players. This website does not provide mailing addresses for any players.

  o BrownGreer also programmed a web crawler to pull publicly available data from databasesports.com. Databasesports.com maintains an online database of statistics and other information for popular sports, including football. BrownGreer pulled player names, positions, dates of birth, and places of birth from that website. After

*In re: National Football League Players' Concussion Injury Litigation*

comparing this dataset to one KM provided, BrownGreer determined the sets were identical and excluded the databasesports.com set from the master dataset as redundant.

- BrownGreer compiled the datasets described in the preceding paragraphs into a master dataset that included approximately 205,000 names, many of which contained duplicative information.

- To identify and remove duplicate records from the dataset, BrownGreer designed 20 tests and database queries to run against the following fields: name, address, date of birth, and date of death.

  o Before running the tests, BrownGreer removed spaces and special characters from names and addresses. BrownGreer also standardized the abbreviations of directions, street suffixes, and other common address terms in all addresses.

- The first test identified all records that included only a name with no address information, date of birth, or date of death. BrownGreer removed these records from the dataset because LexisNexis, to whom BrownGreer will send the completed dataset, is unable to locate an address or other identifying information based on a name alone. LexisNexis provides addresses, dates of death, and known relative information based on their extensive sources, including the Social Security Death Index, the National Change of Address Database, national credit agencies and other databases.

- The other 19 tests compared names, addresses, dates of birth, and dates of death to identify duplicate records, retained the most complete record from among the duplicates, and extracted information one record was missing from a less complete, but otherwise duplicative record.

- After running the 20 tests, BrownGreer removed approximately 130,000 records from the dataset.

- The final dataset included approximately 75,000 living and deceased players and beneficiaries.

- BrownGreer then separated out the known deceased individuals and sent the dataset of the remaining individuals to LexisNexis.

- LexisNexis ran the dataset through their address database and provided BrownGreer with a list of best-known addresses for each individual.

- BrownGreer scrubbed the dataset by identifying and removing any duplicate records from the results and returned the dataset to LexisNexis.

© 2013 KINSELLA MEDIA, LLC

*In re: National Football League Players' Concussion Injury Litigation*

- LexisNexis ran the dataset through their death database and identified which individuals are deceased in addition to the previously identified individuals as deceased.

- BrownGreer combined the list of individuals LexisNexis identified as deceased to the list of known deceased individuals and returned this dataset to LexisNexis.

- LexisNexis will run the dataset of deceased individuals through their first-degree relative database to identify known relatives and their best-known addresses. First-degree relatives include children, spouses, parents, and siblings.

- BrownGreer will combine the list of living players and beneficiaries with the list of deceased players' relatives to form the notice mailing list.

Because direct notice in this case will not reach all potential Settlement Class Members, a paid media notice program targeted to unidentified Settlement Class Members and other third parties is necessary. The various groups we are trying to reach – unidentified Retired NFL Football Players, spouses, family members, legal representatives, heirs, and caregivers – have different ethnic, age, and gender differences. They, therefore, consume different media based on their demographics. The Notice Plan that follows takes into consideration different media consumption habits as well as the need to reach out to third parties to assist with finding unidentified Retired NFL Football Players.

*In re: National Football League Players' Concussion Injury Litigation*

# NOTICE PLAN OVERVIEW

*In re: National Football League Players' Concussion Injury Litigation*

## NOTICE PLAN OVERVIEW:
## PLAN COMPONENTS

This Notice Plan outlines procedures to provide notice of the Settlement of *In re: National Football League Players' Concussion Injury Litigation* as a class action, consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure.

Based on information provided by Co-Lead Class Counsel, and the results of research on the Settlement Class, KM recommends the following Notice Plan.

> **DIRECT NOTICE:** The Long-form Notice (Exhibit 3) will be:

>> Sent via first-class mail to all individuals:

>>> Whose names and addresses are readily identifiable; and

>>> Who request a copy via the toll-free information line or Settlement Website detailed in the Publication Notice.

>> Available on the informational website as a PDF file.

> **PAID MEDIA-BASED NOTICE:** After careful research of the demographics of Settlement Class Members, KM recommends broad paid media notice comprised of print, broadcast, and Internet vehicles that will reach those Settlement Class Members, including:

>> National consumer magazines and trade publications;

>> National television/radio spots;

>> NFL Network television;

>> NFL.com Internet advertising; and

>> Internet banner ads on additional networks and hundreds of targeted websites.

To complement the Notice Plan and to ensure Settlement Class Members' easy access to updated information, KM recommends a dedicated informational website, and Internet search engine sponsorships through keyword/phrase searches to facilitate Settlement Class Members' access to the site.

**SUPPLEMENTAL NOTICE:** A Supplemental Notice Plan will be prepared after the Settlement becomes effective to inform the Settlement Class about registration.

*In re: National Football League Players' Concussion Injury Litigation*

# NOTICE PLAN OVERVIEW:
## DIRECT NOTICE

Direct mail notice will consist of mailing the Long-form Notice in a large 9" x 12" envelope to identifiable Settlement Class Members, informing them of their legal rights and how they may participate in the Class Action Settlement. Attached as Exhibit 4 is a depiction of the envelope in which the Long-form Notice will be mailed.

The Long-form Notice will be sent to:

➤ All readily identifiable Settlement Class Members, which includes Retired NFL Football Players and heirs of deceased retired players developed through the process previously outlined. It is anticipated that the final list will include over 20,000 recipients.

➤ Anyone who calls a toll-free information line, or writes or emails the Claims Administrator to request the Long-form Notice. The toll-free information line and informational website address will appear prominently in the Publication Notice. Settlement Class Members may also download the Long-form Notice in PDF format from the informational website.

*In re: National Football League Players' Concussion Injury Litigation*

## NOTICE PLAN OVERVIEW:
## PAID MEDIA PROGRAM

Direct notice will be provided to all identifiable Settlement Class Members. Paid media will be used to reach unidentifiable Settlement Class Members as it is guaranteed to appear and allows for control of the content, timing, and positioning of the message. Newspapers, consumer magazines, television, radio, and the Internet, among other sources, offer paid media opportunities.

KM researched the most appropriate media vehicles that would meet the requirements of due process in reaching unidentifiable Settlement Class Members. KM reviewed available consumer magazines, newspaper supplements, and Internet advertising, and determined that the media discussed below will provide an efficient plan for reaching potential Settlement Class Members.

*In re: National Football League Players' Concussion Injury Litigation*

# NOTICE PLAN OVERVIEW:
## PAID MEDIA PLACEMENTS SUMMARY

The following list provides a brief summary of KM's recommended media placements in this case.

## PRINT PUBLICATIONS

**Consumer Magazines**
- *Jet*
- *People*
- *Sports Illustrated*
- *Time*

**Trade Publications**
- *Long Term Living*
- *McKnight's Long-Term Care News*
- *Provider*
- *Senior Living Executive*

## BROADCAST

**Television**
- Network Television and Cable
    - May include:
        - ABC
        - CBS
        - CNN
        - Headline News
        - The Weather Channel
- NFL Network

**Radio**
- American Urban Radio Networks

## ONLINE MEDIA

**Internet Banner Ads**
- NFL.com
- CNN.com
- Facebook.com
- Weather.com
- Microsoft Media Network
- Specific Media
- Yahoo!

**Keyword Search**
- Google (includes Google, AOL, and Ask.com)
- Bing (Includes Bing/MSN and Yahoo!)

---

*In re: National Football League Players' Concussion Injury Litigation*

# PAID MEDIA PLACEMENTS

*In re: National Football League Players' Concussion Injury Litigation*

## PAID MEDIA PLACEMENTS:
# OVERVIEW

The Paid Media placements have been chosen to reach Retired NFL Football Players, spouses, family members, legal representatives, heirs, and caregivers. As outlined below, some of the media will reach multiple groups providing greater opportunities for exposure to the message about the Settlement.

*In re: National Football League Players' Concussion Injury Litigation*

## PAID MEDIA PLACEMENTS:
## CONSUMER MAGAZINES

Most adults read one or more magazines during an average month and nearly three out of five adults read or look at a magazine daily. Heavy readers read 16 or more magazines per month. Weekly magazines quickly accumulate readership and provide timely and efficient notice to readers.

KM recommends the following consumer magazine placements:

# TIME

➢ A full-page, color ad (7" x 10") in *Time* with an estimated circulation of 3,250,000.

➢ *Time* is a weekly news magazine covering national and international people, places, and events.

➢ Over 50% of *Time* readers are Adults 50+.



➢ A two-page, color spread in *Jet* with an estimated circulation of 900,000.

➢ *Jet* is the leading news weekly for the African-American community, covering national and global news.

➢ 25% of African-American Adults 18+ read an average issue of *Jet*.

➢ An average issue of *Jet* magazine has 9.7 readers per copy.



➢ A full-page, color ad (7" x 10") twice in *People* with an estimated circulation of 3,475,000.

➢ *People* is a weekly publication covering contemporary personalities in entertainment, politics, business, and other current events.

➢ *People* is the highest-ranking weekly magazine in coverage of Adults 18+.

© 2013 KINSELLA MEDIA, LLC

*In re: National Football League Players' Concussion Injury Litigation*

➢ An average issue of *People* has 11.87 readers per copy.

**Sports Illustrated**

➢ A full-page, color ad (7" x 10") in *Sports Illustrated* with an estimated circulation of 3,000,000.

➢ *Sports Illustrated* is a weekly magazine covering sporting events and personalities through in-depth articles and stories.

➢ Over 35% of *Sports Illustrated*'s readers are 50+.

➢ Men 50+ are 36% more likely than the average adult to read *Sports Illustrated*.

*In re: National Football League Players' Concussion Injury Litigation*

PAID MEDIA PLACEMENTS:
## TRADE PUBLICATIONS

An important component of the Notice Plan is advertising in trade publications that are read by individuals who run or work at facilities where Retired NFL Football Players may now live.

KM recommends the following trade publication placements:



> ➢ A full-page ad (7" x 10") in *Long-Term Living* with an estimated circulation of 50,080.

> ➢ *Long-Term Living* is published 9 times per year and provides practical, in-depth, business-building, and patient/resident care information. Its readers are owners, administrators and directors of nursing at skilled nursing care and assisted living facilities; continuing care retirement centers; post-acute care facilities; and independent living communities.

## McKnight's
**Long-Term Care News & AssistedLiving**

> ➢ A full-page ad (7.25" x 10") in *McKnight's Long-Term Care News & Assisted Living* with an estimated circulation of 40,200.

> ➢ *McKnight's Long-Term Care News & Assisted Living* is published monthly. Editorial content provides reports on the events that affect the way care is delivered across the entire long-term care spectrum, ranging from the lower acuity assisted living setting, to the high acuity skilled nursing setting.

# Provider

> ➢ A full-page ad (7" x 10") in *Provider* with an estimated circulation of 50,200.

> ➢ *Provider* is published monthly and is targeted to administrators, owners, multi-facility CEOs, medical directors, directors of nursing, certified nurse assistants, MD/DD staff and other key long-term staff specialists in facilities throughout the United States. *Provider's* editorial focuses on key areas of industry concern, including: legislative and regulatory policy initiatives, business development and management, facility administration, nursing, marketing and consumer relations, resident care, financing and reimbursement, legal issues, and products and services.

*In re: National Football League Players' Concussion Injury Litigation*

# SENIOR LIVING
# Executive
PUBLISHED BY ALFA TO ADVANCE EXCELLENCE IN SENIOR LIVING

➢ A full-page ad (7" x 10") in *Senior Living Executive* with an estimated circulation of 21,808.

➢ *Senior Living Executive* is published six times per year and is the official publication of the Assisted Living Federation of America.  The magazine reaches mid to large size owners and operators of professionally managed assisted living communities.  Written to top-level executives, the magazine offers solutions and strategies aimed at helping readers improve their companies' operational excellence including merger/acquisition pointers, performance management strategies, systems and infrastructure enhancements and services to residents.

*In re: National Football League Players' Concussion Injury Litigation*

PAID MEDIA PLACEMENTS:
## TELEVISION

Television has the ability to reach a wide number of target audience members with an immediate and accessible message.  The combination of audio and visual message delivery increases the message impact.  Viewers can quickly ascertain if the message is important and if so, decide to respond.

For this notice, there will be two television components:

> ➢ First, the NFL has agreed to make the NFL Network available for television advertisements.  Notice will be aired through the day in different program environments to reach the highest number of viewers over a period of three weeks.

> ➢ Second, television advertisements will be aired across channels and programs targeting Adults 50+.  The Notice Plan calls for notice to be aired throughout the day in different program environments to reach the highest number of viewers.  A combination of broadcast and cable networks will be chosen, including, but not limited to, ABC, CBS, CNN, The Weather Channel, and Headline News.

Delivery Estimates:

> ➢ KM is requesting that the NFL deliver an estimated 10 Gross Rating Points ("GRPs") against Men 18+[2] by airing 30-second commercials across all programming/dayparts[3] on the NFL Network.

> ➢ An estimated 82 television and cable Gross Rating Points ("GRPs") over a total of two weeks generating 84,976,600 gross impressions[4] against Adults 50+.

The television schedule will be allocated as follows:



6.50%
4.50%
8.60%

- ■ Network Daytime (9A-3P)
- ■ Network Evening News (5P-7P)
- ■ Network Prime (8P-11P)
- ■ Cable Daytime (9A-3P)
- ■ Cable Early Fringe (3P-5P)
- ■ Cable Prime (8P-11P)

---

[2] Gross Rating Points (GRPs) represent the sum of all ratings delivered by the media vehicles in a schedule.  A rating is the percentage of households or persons in the target audience who have been exposed to the media vehicles in the schedule.  One GRP equals 1% of a given target population.

[3] Dayparts are time segments into which the broadcast day is divided.  In television, the dayparts are usually daytime (morning and afternoon), early fringe, prime time and late fringe.  Other designations can be used such as early news or late news.

[4] Gross Impressions are the duplicated sum of audiences of all media vehicles containing the notice.

*In re: National Football League Players' Concussion Injury Litigation*

## PAID MEDIA PLACEMENTS:
# NATIONAL RADIO

National radio is bought in the form of network programming. This programming can be tailored for a specific age group of people based on the typical listeners to a network. For this Notice Plan, network radio will be purchased primarily to reach African American Settlement Class Members, as well as Retired NFL Football Players. Radio usage is especially high among African Americans as compared to the general population, as is television usage.[5]

The Radio Spot for this plan will be designed to appeal specifically to Settlement Class Members. Each 30-second spot will heavily promote the Settlement Website address for Settlement Class Members to obtain more information and register for benefits after the Settlement becomes effective. The Radio Spot will alert Settlement Class Members to the nature of the litigation.

KM recommends placing the Radio Spot on:

## AMERICAN URBAN RADIO NETWORKS
> American Urban Radio Networks ("AURN") is the largest network reaching Urban America. AURN reaches an estimated 20 million listeners each week. Networks include programming such as: "Russ Par Weekend Show," "Bobby Jones Gospel Countdown," "The Bev Smith Show," and "Dr. Ian Smith," among others. These radio networks provide additional coverage in markets across the U.S. that have significant African American populations.

---

[5] Target Market News, *Media Audit study shows African Americans more engaged with media,* available at http://www.targetmarketnews.com/storyid07260702.htm.

© 2013 KINSELLA MEDIA, LLC

*In re: National Football League Players' Concussion Injury Litigation*

## PAID MEDIA PLACEMENTS:
## INTERNET ADVERTISING

Like the television portion of the Notice Plan, there are two components to the Internet portion of the Notice Plan. First, the NFL has agreed to provide Internet advertising on NFL.com. Second, KM recommends Internet on additional networks and targeted sites to reach potential Settlement Class Members. Internet advertising will provide potential Settlement Class Members with additional national notice opportunities beyond the broad-reaching print, radio, and television program. Internet advertising delivers an immediate message and allows the viewer of an advertisement to instantly click through to a website for further information.

Delivery of Internet impressions to specific sites and categories within sites are subject to availability at the time KM purchases the media.

### WEBSITE ADVERTISING

KM recommends placing ads on the following targeted websites:

> ➢ CNN.com
> ➢ Weather.com
> ➢ Facebook.com
> ➢ NFL.com

KM recommends placing Internet advertising on the following networks for approximately 30 days:



> ➢ Microsoft Media Network is a premium ad network of top-ranked commercial sites.

**specificmedia**

> ➢ Specific Media is a leading portfolio of websites attracting large and engaged audiences on the web.

**YAHOO!**

> ➢ Yahoo! is a leading Internet brand and a global online network of integrated services providing users with entertainment and other quality content.

© 2013 KINSELLA MEDIA, LLC

*In re: National Football League Players' Concussion Injury Litigation*

## KEYWORD SEARCH ADS

Search engines are among the Internet's most frequently used sites. In order to help search engine users locate the informational website about this case – both those specifically looking for it and those looking for related topics – KM will purchase sponsored links that may appear when searchers enter certain terms.

Keyword search ads will appear on Google (includes Google, AOL, and Ask.com) and Bing (includes Bing/MSN and Yahoo!) search engines. KM will contract with Google AdWords to place Google ads, and with Microsoft Ad Center to place Bing ads. Possible keyword/phrase searches could include:

➢ NFL Concussion Class Action
➢ NFL Concussion Settlement
➢ NFL Concussion Lawsuit
➢ NFL Brain Injury

After KM contracts with the search engines for sponsored links of the selected keywords/phrases, a user entering an applicable keyword/phrase may see an ad similar to the sample ad below either in the section above non-sponsored results or in the right-hand column under the Sponsored Sites/Results section:

**<u>NFL Concussion Settlement</u>**
**$760 million Settlement**
**benefits retired players & families**
http://www.NFLConcussionSettlement.com

*In re: National Football League Players' Concussion Injury Litigation*

# EFFECTIVENESS OF NOTICE PLAN

The paid media program outlined in this plan provides Settlement Class Members with multiple exposure opportunities to media vehicles carrying the Notice.

In addition to the paid media, Direct Notice to known Settlement Class Members will increase opportunities to reach the Settlement Class. Also, given the prominence of the NFL and the issues resolved by this Settlement, KM believes that extensive media coverage will result when the Settlement Agreement is filed and made public. This coverage is expected to further increase the reach of the Plan by making unknown Settlement Class Members aware of the Settlement, providing an option to contact the Claims Administrator for more information.

➤ KM estimates that the Direct Notice, in combination with the Paid Media Placements, will reach over 90% of the Settlement Class Members.

*In re: National Football League Players' Concussion Injury Litigation*

# NOTICE DESIGN

*In re: National Football League Players' Concussion Injury Litigation*

# NOTICE DESIGN:
# LONG-FORM NOTICE

The Long-form Notice is compliant with Rule 23 and consistent with the Federal Judicial Center's "illustrative" class action notices. Specifically, the Long-form Notice clearly and concisely states in plain, easily understood language:

- ➢ The nature of the action;
- ➢ The definition of the settlement class to be finally certified;
- ➢ The class claims, issues, or defenses;
- ➢ That a settlement class member may enter an appearance through an attorney if the member so desires;
- ➢ That the Court will exclude from the settlement class any member who requests exclusion;
- ➢ The time and manner for requesting exclusion; and
- ➢ The binding effect of a class judgment on members under Rule 23 (c)(3).

The Long-form Notice has been designed to draw attention to all sections, and laid out so that complicated information can be more easily digested. The Long-form Notice will prominently feature a toll-free number and website address for Settlement Class Members to obtain more information and to register to receive benefits after the Settlement becomes effective.

*In re: National Football League Players' Concussion Injury Litigation*

## Notice Design:
## Summary Notice

Rule 23(c)(2) of the Federal Rules of Civil Procedure requires notices in 23(b)(3) class actions to be written in "plain, easily understood language." KM applies the plain language requirement in drafting all notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Settlement Class Members.

The plain language Summary Notice (Exhibit 5) is designed to alert Settlement Class Members to the litigation by using a bold headline. This headline will enable Settlement Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Settlement Class definition and the legal rights available to Settlement Class Members. The Summary Notice will include all the substantive information required by Rule 23.

Each advertisement will prominently feature a toll-free number and website for Settlement Class Members to obtain the Long-form Notice and other information.

*In re: National Football League Players' Concussion Injury Litigation*

## NOTICE DESIGN:
# RADIO AND TV ADS

The Radio and Television Spots will be designed to appeal to Settlement Class Members and attract their attention. The audio of the Radio Spot and the visuals of the TV Spot will quickly alert listeners and viewers to the subject matter of the Settlement and help them determine whether they may be potential Settlement Class Members.   Both Spots will prominently feature the address of the Settlement Website and toll-free telephone number where Settlement Class Members can obtain more information and register for benefits after the Settlement becomes effective.  Both the Radio Spot and the Television Spot will run for 30 seconds.

© 2013 KINSELLA MEDIA, LLC

*In re: National Football League Players' Concussion Injury Litigation*

NOTICE DESIGN:
# WEBSITE AND INTERNET ADS

An informational interactive website is a critical component of the Notice Plan. A website is a constant information source instantly accessible to millions. In this case, the Settlement Website will capitalize on the Internet's ability to distribute information and provide access to customer service. Internet banner ads and keyword search ads will help direct Settlement Class Members to the Settlement Website.

## WEBSITE DESIGN

Combining clean site design, consistent site navigation cues and search engine optimization, the Settlement Website will provide Settlement Class Members with easy access to the details of the litigation.

> ➢ **CLEAN DESIGN:** The site will be designed for ease of navigation and comprehension, with user-friendly words and icons. Clearly labeled content will include the Detailed Notice, court documents, and answers to frequently asked questions. A "Contact Us" page will provide a toll-free number for individuals seeking additional information and the address or email of Co-Lead Class Counsel, Class Counsel, and Subclass Counsel.

> ➢ **ONLINE REGISTRATION:** In an effort to make it even easier for Settlement Class Members to receive information and/or register for benefits after the Settlement becomes effective, the Settlement Website will allow users to request hard copies of materials, and/or register online.

## INTERNET BANNER AD DESIGN

KM will design Internet advertisements to alert Settlement Class Members to the litigation by using a bold headline. The headline will enable Settlement Class Members to determine quickly if they may be affected by the litigation. When users click on the banner advertisement, they will be connected to the informational website that contains complete information about their legal rights.

*In re: National Football League Players' Concussion Injury Litigation*

# TOLL-FREE TELEPHONE SUPPORT

A toll-free phone information line will be established to service Settlement Class Members calling as a result of seeing the paid media notice or receiving a Long-form Notice in the mail. Live operators will staff the toll-free line call center during business hours. An interactive voice response ("IVR") system will be used to provide answers to frequently asked questions during the hours that the call center will not have live operators. Potential Settlement Class Members will also have the ability to leave their name and telephone number to receive a call back.

*In re: National Football League Players' Concussion Injury Litigation*

# ADDITIONAL OUTREACH OPPORTUNITIES

One important component of the Notice Plan is reaching people who may know Retired NFL Football Players, and asking them to pass along information about the Settlement to those retired players. This may include friends, family members, and potential caregivers of Retired NFL Football Players. KM recommends the following outreach:

## DIRECT MAILING TO REST HOMES/NURSING FACILITIES

KM will mail a notice to the directors of approximately 60,000 nursing homes, assisted living facilities, rehab facilities. The mailing will include a cover letter and summary notice requesting their assistance in locating Retired NFL Football Players that are in their facilities.

## OUTREACH TO NFL ORGANIZATIONS

KM will reach out to various NFL organizations to request that they inform their members of the Settlement and assist in locating Retired NFL Football Players whose addresses are unknown. This includes outreach to individual team organizations, alumni groups, and the NFL Player Care Foundation.

# EXHIBIT 1



## Kinsella Media, LLC

### Relevant Case Experience

*Antitrust*

*Big Valley Milling, Inc. v. Archer Daniels Midland Co.,* No. 65-C2-96-000215 (Minn. Dist. Ct. Renville County) (lysine).

*Carlson v. Abbott Laboratories,* No. 94-CV-002608 (Wis. Cir. Ct. Milwaukee County) (infant formula).

*Comes v. Microsoft Corp.,* No. CL8231 (Iowa Dist. Ct. Polk County)

*Connecticut v. Mylan Laboratories, Inc.,* No. 99-276, MDL No. 1290 (D.D.C.) (pharmaceutical).

*Conroy v. 3M Corp.,* No. C-00-2810 CW (N.D. Cal.) (invisible tape).

*Copper Antitrust Litigation,* MDL 1303 (W.D. Wis.) (physical copper).

*Cox v. Microsoft Corp.,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County) (software).

*D.C. 37 Health & Security Plan v. Medi-Span,* No. 07-cv-10988 (D.Mass.); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.,* No. 1:05-CV-11148 (D. Mass.) (pharmaceutical).

*Ferrell v. Wyeth-Ayerst Laboratories, Ltd.,* No. C-1-01-447 (S.D. Ohio)

*Giral v. Hoffman-LaRoche Ltd.,* C.A. No. 98 CA 7467 (W. Va. Cir. Ct., Kanawha County) (vitamins).

*In re Buspirone Antitrust Litigation,* MDL No. 1413 (S.D.N.Y.) (pharmaceutical).

*In re Cardizem Antitrust Litigation,* 200 F.R.D. 326 (E.D. Mich.) (pharmaceutical).

*In re Compact Disc Minimum Price Antitrust Litigation,* MDL No. 1361 (D. Me.) (compact discs).

*In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663 Civil No. 04-5184 (FSH) (D.N.J.) (insurance).

*In re International Air Transportation Surcharge Antitrust Litigation,* No. M 06-1793, MDL No. 1793 (N.D. Cal.) (airline fuel surcharges).

*In re Monosodium Glutamate Antitrust Litig.,* D-0202-CV-0200306168, D-202-CV-200306168 (N.M. Dist. Ct., Bernalillo County) (MSG).

*In re Motorsports Merchandise Antitrust Litigation,* No. 1:97-CV-2314-TWT (N.D. Ga.) (merchandise).

*In re Nasdaq Market-Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.) (securities).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. CA:01-CV-12257, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re Toys "R" Us Antitrust Litigation*, No. CV-97-5750, MDL No. 1211, (E.D.N.Y.) (toys and other products).

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

*Kelley Supply, Inc. v. Eastman Chemical Co.,* No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates).

*Ohio vs. Bristol-Myers Squibb, Co.,* No. 1:02-cv-01080 (D.D.C.) (pharmaceutical).

*Raz v. Archer Daniels Midland Co., Inc.,* No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid).

**Consumer and Product Liability**

*Azizian v. Federated Department Stores, Inc.,* No. 4:03 CV-03359 (N.D. Cal.) (cosmetics).

*Baird v. Thomson Consumer Elecs.,* No. 00-L-000761 (Ill. Cir. Ct., Madison County) (television).

*Bonilla v. Trebol Motors Corp.,* No. 92-1795 (D.P.R.) (automobiles).

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W. Va. Cir. Ct., Brooke County) (Fen Phen).

*Cosby v. Masonite Corp., No.* CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding product); *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product).

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct. Obion County) (polybutylene pipe).



*Daniel v. AON Corp.,* No. 99 CH 11893 (Ill. Cir. Ct. Cook County) (insurance).

*Fettke v. McDonald's Corp.,* No. 044109 (Cal. Super Ct. Marin County) (trans fatty acids).

*Florida v. Nine West Group, Inc.,* No. 00 CIV 1707 (S.D.N.Y.) (shoes).

*Foothill/De Anza Community College Dist. v. Northwest Pipe Co.,* No. 00-20749-JF(N.D. Cal.) (fire sprinklers).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition).

*Government Employees Hospital Association v. Serono International,* No. 5-11935 (D. Mass.), and *Francis v. Serono Laboratories, Inc.,* No. 6-10613 (D. Mass.).

*Hoorman v. GlaxoSmithKline,* No. 04-L-715 (Ill. Cir. Ct., Madison Cty.) (Paxil pharmaceutical*).*

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114 (N.D. Cal.) (oriented strand board).

*In re Tri-State Crematory Litig,* MDL 1467 (N.D. Ga.) (improper burial).

*Lebrilla v. Farmers Group Inc.,* No. 00-CC-07185 (Cal. Super. Ct., Orange County) (auto insurance).

*Lovelis v. Titflex,* No. 04-211 (Ak. Cir. Ct., Clark County) (gas transmission pipe).

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product).

*Peterson v. BASF Corp.,* No. C2-97-295 (D. Minn.) (herbicide).

*Posey v. Dryvit Sys., Inc.* No. 17,715-IV (Tenn. Cir. Ct., Jefferson County) (EIFS stucco).

*Reiff v. Epson America, Inc. and Latham v. Epson Am., Inc.,* J.C.C.P. No. 4347 (Cal. Super. Ct., L.A. County) (ink jet printers).

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct. San Joaquin County) (roofing product).

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct. Hanover County) (synthetic stucco product).



*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct. Contra Costa County) (roofing product).

*Shields vs. Bridgestone/Firestone, Inc., Bridgestone Corp.,* No. E-167.637 (D. Tex.) (tires).

*Smith v. Behr Process Corp.,* No. 98-2-00635 (Wash. Super. Ct., Gray Harbor County) (stain product).

*Weiner v. Cal-Shake, Inc.,* J.C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product).

*Wholesale Elec. Antitrust Cases I & II,* J.C.C.P. Nos. 4204 & 4205 (Cal. Super. Ct., San Diego County) (energy).

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct., Los Angeles County) (automobiles).

**Mass Tort**

*Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex); *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex) (asbestos injury).

*Backstrom v. The Methodist Hospital,* No. H.-94-1877 (S.D. Tex.) (TMJ injury).

*Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 (Fla. Cir. Ct. Dade County) (tobacco injury).

*Georgine v. Amchem, Inc.,* No. 93-CV-0215 (E.D. Pa.) (asbestos injury).

**Bankruptcies**

*In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.).

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implants).

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos).

*In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK) (D. Del).

*In re Owens Corning,* No. 00-03837 (Bankr. D. Del.).

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos).

*In re The Celotex Corp.,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (asbestos).



*In re U.S. Brass Corp.,* No.94-40823S (Bankr. E.D. Tex.) (polybutylene).

*In re USG Corp.,* Nos. 01-2094 - 01-2104 (Bankr. D. Del.).

*In re W.R. Grace & Co.,* No. 01-01139 (Bankr. D. Del.).

**Insurance**

*McNeil v. American General Life and Accident Insurance Co.,* No. 8-99-1157 (M.D. Tenn.) (insurance).

*Nealy v. Woodmen of the World Life Insurance Co.,* No. 3:93 CV-536 (S.D. Miss.) (insurance).

**Holocaust Victims Reparations**

*In re Holocaust Victim Assets Litigation,* Nos. CV 96-4849, CV-5161 and CV 97-461 (E.D.N.Y.) (Holocaust).

The International Commission on Holocaust Era Insurance Claims Outreach

**Pension Benefits**

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.); Page v. Pension Benefit Guarantee Corp., No. 89-2997 (D.D.C.).

*Forbush v. J. C. Penney Co., Inc.,* Nos. 3:90-2719 and 3:92-0109 (N.D. Tex.).

**International**

*Ahearn v. Fiberboard Corporation,* No. 6:93cv526 (E.D. Tex) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.) (asbestos injury) (1993).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*In re Holocaust Victims Assets Litigation,* No. CV 96-4849 (ERK) (MDG) (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.) (2003).

*In re Owens Corning, Chapter 11,* No. 00-03837 (MFW) (Bankr. D. Del.) (2006).

*In re The Celotex Corporation, Chapter 11,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (1996).



*In re USG Corporation, Chapter 11,* Nos. 01-2094 (RJN) through 01-2104(RJN) (Bankr. D. Del.) (2006).

*In re W.R. Grace & Co., Chapter 11,* No. 01-01139 (Bankr. D. Del.) (bankruptcy) (2001).

*In re Western Union Money Transfer Litigation,* No. 01 0335 (CPS) (VVP) (E.D.N.Y.) (wire transactions) (2004).

International Committee on Holocaust Era Insurance Claims (1999).

### *Product Recall*

Central Sprinkler Voluntary Omega Sprinkler Replacement Program

*Hart v. Central Sprinkler Corp.,* No. BC17627 (Cal. Super. Ct. Los Angeles County) & *County of Santa Clara v. Central Sprinkler Corp., No.* CV 17710119 (Cal. Super. Ct. Santa Clara County)

### *Telecom*

*Bidner, et al. v. LCI International Telecom Corp d/b/a Qwest Communications.*

*Community Health Association v. Lucent Technologies, Inc.,* No. 99-C-237, (W.Va. Cir. Ct., Kanawha County).

*Cundiff et al. v. Verizon California, Inc.,* No. 237806 (Cal. Super Ct., Los Angeles County).

*Kushner v. AT&T Corporation,* No. GIC 795315 (Cal. Super. Ct., San Diego County).

*Rish Enterprise v. Verizon New Jersey,* No. MID-L-8946-02 (N.J. Super. Ct.).

*Sonnier, et. al. v. Radiofone, Inc.,* No. 44-844, (L.A. Jud. Dist. Ct., Plaqueimes Parish County).

*State of Louisiana v. Sprint Communications Company L.P.,* No. 26,334 (Jud. Dis. Ct., Parish of West Baton Rouge) and *State of Louisiana v. WilTel, Inc.,* No. 26,304 (Jud. Dis. Ct., Parish of West Baton Rouge).

### *Other*

*Cobell v. Salazar,* No. 96-01285 (D.D.C.) (Individual Indian Money accounts).

*Dryer v. National Football League,* No. 9-02182 (D. Minn.) (publicity rights).



*In re Black Farmers Discrimination Litigation*, No. 08-511 (D.D.C.) (African American farm loans).

*Keepseagle v. Vilsack*, No. 99-03119 (D.D.C.) (Native American farm loans).



# EXHIBIT 2



## Kinsella Media, LLC

## Judicial Comments

*Ahearn v. Fibreboard Corp.*, No. 6:93 cv526 (E.D. Tex.); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex.).

In approving the notice plan for implementation in the Ahearn and Rudd class actions in 1994, Judge Parker stated, "I have reviewed the plan of dissemination, and I have compared them to my knowledge at least of similar cases, the notices that Judge Weinstein has worked with [Agent Orange] and Judge Pointer [Silicon Gel Breast Implants], and it appears to be clearly superior." - Chief Judge Robert M. Parker (1994)

*Azizian v. Federated Department Stores, Inc.*, No. 3:03 CV-03359 (N.D. Cal.).

"The notice was reasonable and the best notice practicable under the circumstances; was due, adequate and sufficient notice to all class members; and complied fully with the laws of the United States and of the Federal Rules for Civil Procedure, due process and any other applicable rules of court." - Hon. Sandra Brown Armstrong (2004)

*Collins v. Pension Benefit Guarantee Corp.*, No. 88-3406 (D.D.C.).

"The notice provided was the best notice practicable under the circumstances. Indeed, the record shows that the notice given was consistent with the highest standards of compliance with Rule 23(e)." (1996)

*Cox v. Microsoft Corporation*, No. 105193/00 (N.Y. Sup. Ct. N.Y. County).

"The court finds that the combination of individual mailing, e-mail, website and publication notice in this action is the most effective and best notice practicable under all the circumstances, constitutes due, adequate and reasonable notice to all Class members and otherwise satisfies the requirements of CPLR 904, 908 and other applicable rules. The Settlement meets the due process requirement for class actions by providing Class members an opportunity either to be heard and participate in the litigation or to remove themselves from the Class." - Hon. Karla Moskowitz (2006)

*Cox v. Shell Oil Co.,* No. 95-CV-2 (Tenn. Ch. Ct. Obion County)

In the order approving the settlement of the polybutylene pipe class action, Judge Maloan stated, "The Court finds the notice program is excellent. As specified in the findings below, the evidence supports the conclusion that the notice program is one of the most comprehensive class notice campaigns ever undertaken." (1995)

*Foothill/De Anza Community College District v. Northwest Pipe Co.,* No. CV-00-20749 (N.D. Cal.)

"The Court finds that the settling parties undertook a thorough and extensive notice campaign designed by Kinsella/Novak Communications, Ltd., a nationally-recognized expert in this specialized field. The Court finds and concludes that the Notice Program as designed and implemented provides the best practicable notice to the Class, and satisfied requirements of due process." - Hon. Jeremy Fogel (2004)

*Galanti v. The Goodyear Tire & Rubber Co.,* No. 03-209 (D.N.J.)

"The published notice, direct notice and Internet posting constituted the best practicable notice of the Fairness Hearing, the proposed Amended Agreement, Class Counsels' application for fees, expenses and costs, and other matters set forth in the Class Notice and the Summary Notice. The notice constituted valid, due and sufficient notice to all members of the Settlement Classes, and complied fully with the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Constitution of the United States, the laws of New Jersey and any other applicable law." – Hon. Stanley R. Chesler (2004)

*Georgine v. Amchem*, 158 F.R.D. 314, 326 (E.D. Pa.).

Judge Reed explained that the notice program developed by Kinsella "goes beyond that provided in [previous cases]" and "the efforts here are more than adequate to meet the requirements of Rule 23(c)(2)." (1993)

*Higgins v. Archer-Daniels Midland Co.,* Second Judicial District Court, County of Bernalillo C-202-CV-200306168 (N.M. 2d Jud. Dist. Bernalillo County)

"The Court finds that the form and method of notice given to the Settlement Class, including both mailed notice to persons and firms for whom such notice was practical and extensive notice by publication through multiple national and specialized publications, complied with the requirements of Rule 1-023 NMRA 2006, satisfied the requirements of due process, was the best notice practicable under the circumstances, and constituted due and sufficient notice of the Settlement Agreements and their Final Approval Hearing, and other matters referred to in the Notice. The notice given to the Settlement Class was reasonably calculated under the circumstances to inform them of the pendency of the actions involved in this case, of all material elements of the proposed Settlements, and of their opportunity to exclude themselves from, object to, or comment on the Settlements and to appear at the Final Approval Hearing." -Hon. William F. Lang (2006)

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*, MDL No. 1361 (D. Me.).

In approving the notice plan for implementation in the Compact Disc Minimum Advertised Price Antitrust Litigation, Judge D. Brock Hornby stated, "(the plan) provided the best practicable notice under the circumstances and complied with the requirements of both 15 U.S.C. 15c(b) (1) . . . the



notice distribution was excellently designed, reasonably calculated to reach potential class members, and ultimately highly successful in doing so." - Hon. D. Brock Hornby (2002/2003)

*In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal.).

In approving the notice plan in this litigation that involved a proposed settlement of more than $200 million for U.S. and U.K. class members, U.S. District Judge Charles Breyer repeatedly praised KNC: "I think the notice is remarkable in this case. . . . This is brilliant. This is the best notice I've seen since I've been on the bench. . . . Turning back to the settlement, again I want to applaud the parties for the notice. I mean it's amazing. You know, it really is good. And I don't know where this person practices, I don't even know that she's a lawyer. But she really did a good job on this announcement, this notice. So thank you very much. . . . And I once again want to express my sincere appreciation of the notice. I mean, I was just extraordinarily impressed. Extraordinarily impressed." – Hon. Charles Breyer (2008)

*In re The Celotex Corporation,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.).

"...all counsel should be complimented on the fact that they have gone to every possible conceivable method of giving notice from putting it on TV and advertising it in papers..... the record should also reflect the Court's appreciation to Ms. Kinsella for all the work she's done, not only in pure noticing, but ensuring that what noticing we did was done correctly and professionally." - Hon. Thomas E. Baynes, Jr.

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

"This notice program fully complied with Federal Rule of Civil Procedure 23 and the requirements of due process. It provided to the MDL Class the best notice practicable under the circumstances." - Hon. Philip M. Pro (2007)

*Johns-Manville Corp.* 68 B.R. 618, 626 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom. *Kane v. Johns-Manville Corp.* 843 F.2d. 636 (2d Cir. 1988).

In approving the notification plan in the Johns-Manville Bankruptcy Reorganization, the court referred to it as "an extensive campaign designed to provide the maximum amount of publicity ... that was reasonable to expect of man and media." - Hon. Burton Lifland (1996/1998)

*Lovelis v. Titeflex Corp.,* No. CIV-2004-211 (Ark. 9th Cir. Ct. Clark Co.)

"Accordingly, the Notice as disseminated is finally approved as fair, reasonable, and adequate notice under the circumstances. The Court finds and concludes that due and adequate notice of the pendency



of this Action, the Stipulation, and the Final Settlement Hearing has been provided to members of the Settlement Class, and the Court further finds and concludes that the Notice campaign described in the Preliminary Approval Order and completed by the Parties complied fully with the requirements of Arkansas Rule of Civil Procedure 23 and the requirements of due process under the Arkansas and United States Constitutions. The Court further finds that the Notice campaign undertaken concisely and clearly states in plain, easily understood language:

(a.) the nature of the action;

(b.) the definition of the class certified;

(c.) the class claims, issues or defenses;

(d.) that a Class Member may enter an appearance and participate in person or through counsel if the member so desires;

(e.) that the Court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and

(f.) the binding effect of the Final Order and Judgment on Class Members.

- Hon. John A. Thomas

*Naef v. Masonite Corp.*, No. CV-94-4033 (Ala. Cir. Ct. Mobile County)

"In November, 1997, the Court approved a massive Notice Program to apprise class members of the class action Settlement, including the individually mailed, notices, publication notice and notification by way of other avenues nationally and locally. This Notice Program was designed by recognized experts, approved by the mediator and the Court, and implemented diligently by the parties, at defendants' cost. It provided the best notice practicable to the Class, comports with due process, and was clearly adequate under Alabama Rule of Civil Procedure 23(e), the United States Constitution, and other applicable law." - Hon. Robert G. Kendall (1997)

*Keepseagle v. Vilsack*, No. 99–3119 (D.D.C.)

"I'm not going to review in detail the exhaustive notice plan created and implemented by Plaintiffs' counsel at this time. For those interested, I invite you to examine the several motions on the docket relating to notice with affidavits from Kinsella Media, who class counsel have hired as Notice Administrators." – Hon. Emmet G. Sullivan (2011)

"In my view, the notice program was excellent and it persuades the Court that the parties worked extremely hard to notify the entire class about the settlement so that as many class members as possible can obtain monetary and other relief under the settlement." – Hon. Emmet G. Sullivan (2011)



# EXHIBIT 3

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# $760 Million NFL Concussion Litigation Settlement

## Retired NFL Football Players May Be Eligible for Money and Medical Benefits

*A federal court authorized this Notice. This is not a solicitation from a lawyer.*

- The National Football League ("NFL") and NFL Properties LLC (collectively, "NFL Parties") have agreed to a $760 million Settlement of a class action lawsuit seeking medical monitoring and compensation for brain injuries allegedly caused by head impacts experienced in NFL football. The NFL Parties deny that they did anything wrong.

- The Settlement includes all retired players of the NFL, the American Football League ("AFL") that merged with the NFL, the World League of American Football, NFL Europe League, and NFL Europa League, as well as immediate family members of retired players and legal representatives of incapacitated, incompetent or deceased retired players.

- The Settlement will provide eligible retired players with:

    - Baseline neuropsychological and neurological exams to determine if retired players are: a) currently suffering from any neurocognitive impairment, including impairment serious enough for compensation, and b) eligible for additional testing and/or treatment ($75 million);

    - Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death ($675 million); and

    - Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

- To get money, proof that injuries were caused by playing NFL football is not required.

- **Settlement Class Members must register to get benefits. Sign up at the website for notification of the registration date.**

- Your legal rights are affected even if you do nothing. Please read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **STAY IN THE SETTLEMENT CLASS** | You do not need to do anything to be included in the Settlement Class. However, once the Court approves the Settlement, you will be bound by the terms and releases contained in the Settlement. There will be later notice to explain when and how to register for Settlement benefits (*see* Question 26). |
| **ASK TO BE EXCLUDED** | You will get no benefits from the Settlement if you exclude yourself ("opt-out") from the Settlement. Excluding yourself is the only option that allows you to participate in any other lawsuit against the NFL Parties about the claims in this case (*see* Question 30). |
| **OBJECT** | Write to the Court if you do not like the Settlement (*see* Question 35). Ask to speak in Court about the fairness of the Settlement at the final approval hearing (*see* Question 39). |

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

- The Court in charge of this case still has to decide whether to approve the Settlement.

- **This Notice is only a summary of the Settlement Agreement and your rights. You are encouraged to carefully review the complete Settlement Agreement at www.NFLConcussionSettlement.com.**

| What This Notice Contains |
|---|

## CHAPTER 1: INTRODUCTION

**BASIC INFORMATION**...................................................................**Page 5**
1.   Why is this Notice being provided?
2.   What is the litigation about?
3.   What is a class action?
4.   Why is there a Settlement?
5.   What are the benefits of the Settlement?

**WHO IS PART OF THE SETTLEMENT?** ...............................................**Page 7**
6.   Who is included in the Settlement Class?
7.   What players are not included in the Settlement Class?
8.   What if I am not sure whether I am included in the Settlement Class?
9.   What are the different levels of neurocognitive impairment?
10.  Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

## CHAPTER 2: SETTLEMENT BENEFITS

**THE BASELINE ASSESSMENT PROGRAM**..........................................**Page 9**
11.  What is the Baseline Assessment Program ("BAP")?
12.  Why should I get a BAP baseline examination?
13.  How do I schedule a baseline assessment examination and where can I get it done?

**MONETARY AWARDS**...................................................................**Page 10**
14.  What diagnoses qualify for monetary awards?
15.  Do I need to prove that playing professional football caused my Qualifying Diagnosis?
16.  How much money will I receive?
17.  How does the age of the retired player at the time of first diagnosis affect his monetary award?
18.  How does the number of seasons a retired player played affect his monetary award?
19.  How do prior strokes or brain injuries of a retired player affect his monetary award?
20.  How is a retired player's monetary award affected if he does not participate in the BAP program?
21.  Can I receive a monetary award even though the retired player is dead?
22.  Will this Settlement affect my participation in NFL or NFLPA related benefits programs?
23.  Will this Settlement prevent me from bringing workers' compensation claims?

**EDUCATION FUND**.......................................................................**Page 14**
24.  What type of education programs are supported by the Settlement?

## CHAPTER 3: YOUR RIGHTS

**REMAINING IN THE SETTLEMENT**...................................................**Page 14**
25.  What am I giving up to stay in the Settlement Class?

**HOW TO GET BENEFITS**..............................................................**Page 15**

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

26.   How do I get Settlement benefits?
27.   Is there a time limit for Retired NFL Football Players to file claims for monetary awards?
28.   Can I re-apply for compensation if my claim is denied?
29.   Can I appeal the determination of my monetary award claim?

**EXCLUDING YOURSELF FROM THE SETTLEMENT.............................................Page 15**
30.   How do I get out of the Settlement?
31.   If I do not exclude myself, can I sue the NFL Parties for the same thing later?
32.   If I exclude myself, can I still get benefits from this Settlement?

**THE LAWYERS REPRESENTING YOU...................................................................Page 16**
33.   Do I have a lawyer in the case?
34.   How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT.......................................................................Page 17**
35.   How do I tell the Court if I do not like the Settlement?
36.   What is the difference between objecting to the Settlement and excluding myself?

**THE COURT'S FAIRNESS HEARING.....................................................................Page 18**
37.   When and where will the Court decide whether to approve the Settlement?
38.   Do I have to attend the hearing?
39.   May I speak at the hearing?

**GETTING MORE INFORMATION............................................................................Page 19**
40.   How do I get more information?

# CHAPTER 1: INTRODUCTION

## BASIC INFORMATION

### 1. Why is this Notice being provided?

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This Notice summarizes the Settlement and explains your legal rights and options.

Judge Anita B. Brody of the United States District Court for the Eastern District of Pennsylvania is overseeing this case. The case is known as *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323. The people who sued are called the "Plaintiffs." The National Football League and NFL Properties LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are: (a) a retired player of the NFL, AFL, World League of American Football, NFL Europe League, or NFL Europa League, (b) an authorized representative of a deceased or legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.

### 2. What is the litigation about?

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems. The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players. The NFL Parties deny the claims in the litigation.

### 3. What is a class action?

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims. All of these people together are the proposed "class" or "class members." When a class action is settled, one court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves from the settlement. In this case, the proposed class representatives are Kevin Turner and Shawn Wooden. Excluding yourself means that you will not receive any benefits from the Settlement. The process for excluding yourself is described in Question 30 in this Notice.

### 4. Why is there a Settlement?

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, the Plaintiffs and the NFL Parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the claims of all persons affected (*see* Question 6) and the litigation between these persons and the NFL Parties are over. The persons affected by the Settlement are eligible for the benefits summarized in this Notice and the NFL Parties will no longer be legally responsible to defend against the claims made in this litigation.

The Court has not and will not decide in favor of the retired players or the other persons affected by the Settlement or the NFL Parties, and by reviewing this Settlement the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel," *see* Question 33) believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel, and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals, and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available at www.NFLConcussionSettlement.com.

## 5.  What are the benefits of the Settlement?

Under the Settlement, the NFL Parties will pay $760 million to fund:

- Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, "Baseline Assessment Program") (*see* Questions 11-13);

- Monetary awards for diagnoses of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) and Death with CTE prior to [Date of Preliminary Approval Order] ($675 million, "Monetary Award Fund") (*see* Questions 14-21); and

- Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives. ($10 million) (*see* Question 24).

In addition, the NFL Parties will pay the cost of notice (up to $4 million) and half of the compensation for a Special Master to assist the Court in overseeing aspects of the Settlement, for the first 5 years of the Settlement. The Court may extend the term for the Special Master. Other administrative costs and expenses will be paid out of the Monetary Award Fund, except for Baseline Assessment Program costs and expenses, which will be paid out of the Baseline Assessment Program Fund.

In the event the Monetary Award Fund is insufficient to pay all approved monetary claims, the NFL Parties have agreed to contribute up to an additional $37.5 million, subject to Court approval. Based on extensive consultation with economic and medical experts, Co-Lead Class Counsel, Class Counsel, and Subclass Counsel believe the funding will be sufficient to pay all eligible monetary claims.

The details of the Settlement benefits are in the Settlement Agreement, which is available at www.NFLConcussionSettlement.com.

**Note:** The Baseline Assessment Program and Monetary Award Fund are completely independent of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims.

# WHO IS PART OF THE SETTLEMENT?

You need to decide whether you are included in the Settlement.

**6. Who is included in the Settlement Class?**

This Settlement Class includes three types of people:

Retired NFL Football Players: Prior to [Date of Preliminary Approval Order], you (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League, and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

Representative Claimants: An authorized representative, ordered by a court or other official of competent jurisdiction under applicable state law, of a deceased or legally incapacitated or incompetent Retired NFL Football Player.

Derivative Claimants: A spouse, parent, dependent child, or any other person who properly under applicable state law asserts the right to sue independently or derivatively by reason of his or her relationship with a living or deceased Retired NFL Football Player. (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status as of [Date of Preliminary Approval Order]:

- Subclass 1 includes Retired NFL Football Players who were not diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE prior to [Date of Preliminary Approval Order], and their Representative Claimants and Derivative Claimants.

- Subclass 2 includes:

    (a) Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to [Date of Preliminary Approval Order], and their Representative Claimants and Derivative Claimants; and

(b) Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to death or who died prior to [Date of Preliminary Approval Order] and received a diagnosis of Death with CTE.

## 7. What players are not included in the Settlement Class?

The Settlement Class does not include:  (a) current NFL players, and (b) people who tried out for NFL or AFL Member Clubs, or World League of American Football, NFL Europe League or NFL Europa League teams, but did not make it onto preseason, regular season or postseason rosters, or practice squads, developmental squads or taxi squads.

## 8. What if I am not sure whether I am included in the Settlement Class?

If you are not sure whether you are included in the Settlement Class, you may call 1-800-000-0000 with questions or visit www.NFLConcussionSettlement.com.  You may also write with questions to NFL Concussion Settlement, P.O. Box 0000, City, ST 00000.  You may also consult with your own attorney.

## 9. What are the different levels of neurocognitive impairment?

Various levels of neurocognitive impairment are used in this Notice.  More details can be found in the Injury Definitions, which are available at www.NFLConcussionSettlement.com or by calling 1-800-000-0000.

- Level 1 Neurocognitive Impairment covers *moderate cognitive impairment*.  It will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing (such as complex attention, executive function, learning, memory, language and perceptual skill) and related functional impairment.

- Level 1.5 Neurocognitive Impairment covers *early Dementia*.  It will be established in part with evidence of moderate to severe cognitive decline, which includes a decline in performance in at least two areas subject to clinical evaluative testing (such as complex attention, executive function, learning, memory, language and perceptual skill) and related functional impairment.

- Level 2 Neurocognitive Impairment covers *moderate Dementia*.  It will be established in part with evidence of severe decline in performance in at least two areas subject to clinical evaluative testing (such as complex attention, executive function, learning, memory, language and perceptual skill) and related functional impairment.

If neurocognitive impairment is temporary and only occurs with delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

## 10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

No.  A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

# CHAPTER 2:  SETTLEMENT BENEFITS

## THE BASELINE ASSESSMENT PROGRAM

**11.  What is the Baseline Assessment Program ("BAP")?**

All living retired players who have earned at least one-half of an Eligible Season (*see* Question 18), who do not exclude themselves from the Settlement (*see* Question 30), and who timely register to participate in the Settlement (*see* Question 26) may participate in the Baseline Assessment Program ("BAP").

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment.  Retired players will have from two to ten years, depending on their age as of the date the Settlement is finally approved and any appeals are fully resolved, to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date the Settlement goes into effect will need to have a baseline examination within two years of the start of the program.

- Retired players under the age of 43 as of the date the Settlement goes into effect will need to have a baseline examination within 10 years, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition for the ten-year term of the BAP or five years from diagnosis, whichever is longer.

Settlement Class Members who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, you do not need to participate in the BAP to receive a monetary award, but your award may be reduced by 10% if you do not participate in the BAP, as explained in more detail in Question 20.

**12.  Why should I get a BAP baseline examination?**

Getting a BAP baseline examination will be beneficial to you and your family.  It will determine whether you have any cognitive impairment, and if you are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment), you are eligible to receive further medical testing and/or treatment for that condition.  In addition, whether or not you have any cognitive impairment today, the results of the BAP baseline examination can be used as a comparison to measure any subsequent deterioration of your cognitive condition over the course of your life.  Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist, and the retired player and/or

his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

Participation in the BAP does not prevent you from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if they develop a Qualifying Diagnosis (*see* Question 14). Participation in the BAP also will help ensure that, to the extent you receive a Qualifying Diagnosis in the future, you receive the maximum monetary award to which you are entitled (*see* Question 20).

### 13. How do I schedule a baseline assessment examination and where can I get it done?

You need to register for Settlement benefits before you can get a baseline assessment examination. Registration will not be available until after the Court grants final approval to the Settlement and any appeals are fully resolved. **You can sign-up at www.NFLConcussionSettlement.com or by calling 1-800-000-0000 to receive additional notice about registration when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

## MONETARY AWARDS

### 14. What diagnoses qualify for monetary awards?

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia), or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis can occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation.

### 15. Do I need to prove that playing professional football caused my Qualifying Diagnosis?

No. You do not need to prove that a Qualifying Diagnosis was caused by playing professional football or that you experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League, or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

### 16. How much money will I receive?

The amount of money you will receive depends on the retired player's:

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

- Specific Qualifying Diagnosis,
- Age at the time he was diagnosed (*see* Question 17),
- Number of seasons played or practiced in the NFL or the AFL (*see* Question 18),
- Diagnosis of a prior stroke or traumatic brain injury (*see* Question 19),
- Participation in a baseline assessment exam (*see* Question 20), and
- Whether there are any legally enforceable liens on your award.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons (*see* Question 18) and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award. If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

**17. How does the age of the retired player at the time of first diagnosis affect his monetary award?**

Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award for people diagnosed between the ages of 45-49; and
- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH W/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

### 18. How does the number of seasons a retired player played affect his monetary award?

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL or AFL. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

- A retired player also earns one-half of an Eligible Season for each season where he was on an NFL or AFL Member Club's practice, developmental, or taxi squad for at least eight games, but did not otherwise earn an Eligible Season.

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

Time spent playing or practicing in the World League of American Football, NFL Europe League, and NFL Europa League does not count towards an Eligible Season.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons

credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons.  For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |
| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

**19. How do prior strokes or traumatic brain injuries of a retired player affect his monetary award?**

It depends.  A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced a medically diagnosed stroke that occurred:

- Before receiving a Qualifying Diagnosis, or
- A severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

**20. How is a retired player's monetary award affected if he does not participate in the BAP program?**

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award if the retired player does not participate in the BAP and:

- Did not receive a Qualifying Diagnosis prior to [Date of Preliminary Approval Order], and

- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

**21. Can I receive a monetary award even though the retired player is dead?**

Yes.  Representative Claimants for deceased retired players with a Qualifying Diagnoses will be eligible to receive monetary awards.  If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives (*see* Question 16).

QUESTIONS?  CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

**22. Will this Settlement affect my participation in NFL or NFLPA-related benefits programs?**

No.  The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association.  This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note:**  The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

**23. Will this Settlement prevent me from bringing workers' compensation claims?**

Claims for workers' compensation will not be released by this Settlement.

## EDUCATION FUND

**24. What type of education programs are supported by the Settlement?**

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

# CHAPTER 3:  YOUR RIGHTS

## REMAINING IN THE SETTLEMENT

**25. What am I giving up to stay in the Settlement Class?**

Unless you exclude yourself from the Settlement, you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case.  This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time.  You also are promising not to sue the National Collegiate Athletic Association or other collegiate, amateur or youth football organizations and entities for your cognitive injuries if you receive a monetary award under this Settlement.  **However, the Settlement does not release any claims for workers' compensation (*see* Question 23) or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement.**

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp.).  **They are not parties to this Settlement and claims against them are not released by this Settlement.**

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves from the Settlement, so please read it carefully. The Settlement Agreement is available at www.NFLConcussionSettlement.com. If you have any questions you can talk to the law firms listed in Question 33 for free or you can talk to your own lawyer if you have questions about what this means.

## HOW TO GET BENEFITS

### 26. How do I get Settlement benefits?

To get benefits, you will need to register. Registration will not begin until after the Settlement is approved by the Court (*see* Question 37) and any appeals are fully resolved. Once that occurs, further notice will be provided about how to register for benefits. In the meantime, please go to www.NFLConcussionSettlement.com or call 1-800-000-0000 to sign-up for notice of registration. Registration must be completed in the time permitted (180 days from the time notice of registration is provided) if you wish to receive any of the benefits provided through this Settlement.

### 27. Is there a time limit for Retired NFL Football Players to file claims for monetary awards?

Yes. Retired NFL Football Players and Representative Claimants must submit claims for monetary awards within two years after the date of the diagnosis for which they claim a monetary award, or the date the Settlement is granted final approval and any appeals are fully resolved, whichever is later. This deadline may be extended to within four years of the Qualifying Diagnosis or the date the Settlement is granted final approval and any appeals are fully resolved if the Retired NFL Football Player or Representative Claimant can show substantial hardship beyond the Qualifying Diagnosis. Derivative Claimants must submit claims no later than 30 days after the Retired NFL Football Player through whom the close relationship is the basis for the claim (or the Representative Claimant of that retired player) receives a notice that he is entitled to a monetary award.

All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

### 28. Can I re-apply for compensation if my claim is denied?

Yes. A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

### 29. Can I appeal the determination of my monetary award claim?

Yes. The Settlement establishes a process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you do not want to receive benefits from this Settlement, and you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement. You can do this by asking to be excluded – sometimes referred to as "opting out" of – the Settlement Class.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

**30. How do I get out of the Settlement?**

To exclude yourself from the Settlement, you must mail a letter or other written document to the Claims Administrator. Your request must include:

- Your name, address, telephone number, and date of birth;

- A copy of your driver's license or other government issued identification;

- A statement that "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and

- Your signature by hand (not any form of electronic signature), and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion request, postmarked no later than **Month 00, 0000** [Date ordered by the Court], to [INSERT INFORMATION], City, ST 00000.

**31. If I do not exclude myself, can I sue the NFL Parties for the same thing later?**

No. Unless you exclude yourself, you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves. If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself by **Month 00, 0000.**

**32. If I exclude myself, can I still get benefits from this Settlement?**

No. **If you exclude yourself from the settlement you will not get any Settlement benefits**. You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

## THE LAWYERS REPRESENTING YOU

**33. Do I have a lawyer in the case?**

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel" (*see* Question 6). They are:

| Christopher A. Seeger | Sol Weiss |
|---|---|
| **SEEGER WEISS LLP** | **ANAPOL SCHWARTZ** |
| 77 Water Street | 1710 Spruce Street |
| New York, NY 10005 | Philadelphia, PA 19103 |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |
| Steven C. Marks | Gene Locks |
| **PODHURST ORSECK P.A.** | **LOCKS LAW FIRM** |
| City National Bank Building | The Curtis Center, Suite 720 East |
| 25 W. Flagler Street, Suite 800 | 601 Walnut Street |

QUESTIONS? CALL 1-800-000-0000 OR VISIT www.NFLConcussionSettlement.com

| Miami, FL 33130-1780 | Philadelphia, PA 19106 |
|---|---|
| *Class Counsel* | *Class Counsel* |
| Arnold Levin | Dianne M. Nast |
| **LEVIN FISHBEIN SEDRAN & BERMAN** | **NAST LAW LLC** |
| 510 Walnut Street, Suite 500 | 1101 Market Street, Suite 2801 |
| Philadelphia, PA 19106 | Philadelphia, Pennsylvania 19107 |
| *Counsel for Subclass 1* | *Counsel for Subclass 2* |

You will not be charged for contacting these lawyers. If you are already represented by an attorney, you may contact your attorney to discuss the proposed settlement. If you are not already represented by an attorney, and you want to be represented by your own lawyer, you may hire one at your own expense.

**34. How will the lawyers be paid?**

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs. The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million, These fees and incurred costs will be paid separately by the NFL Parties and not from the $760 million settlement funds. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time. Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

# OBJECTING TO THE SETTLEMENT

You can tell the Court that you do not agree with the Settlement or some part of it.

**35. How do I tell the Court if I do not like the Settlement?**

If you do not exclude yourself from the Settlement Class, you can object to the Settlement if you do not like some part of it. The Court will consider your views. To object to the Settlement, you or your attorney must submit your written objection to the Court. The objection must include the following:

- The name of the case and multi-district litigation, *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- The name of the Retired NFL Football Player through which you are a Representative Claimant or Derivative Claimant (if you are not a retired player);

- Written evidence establishing that you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand (not any form of electronic signature), and the date on which you signed it (even if represented by an attorney).

In addition, if you intend to appear at the final approval hearing (the "Fairness Hearing"), you must submit a written notice of your intent [INSERT REQUIREMENTS FROM PRELIMINARY APPROVAL ORDER] by [INSERT DATE.]

The requirements to object to the Settlement are described in detail in the Settlement Agreement in section 14.3.

You must file your objection with the Court no later than **Month 00, 0000 [date ordered by the Court]**:

| COURT |
|---|
| Clerk of the Court/Judge Anita B. Brody<br>United States District Court for the Eastern District of Pennsylvania<br>James A. Byrne U.S. Courthouse,<br>601 Market Street,<br>Philadelphia, PA 19106-1797 |

**36.  What is the difference between objecting to the Settlement and excluding myself?**

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different.  You can object only if you do not exclude yourself from the Settlement Class. Excluding yourself is telling the Court that you do not want to be part of the Settlement Class and you do not want to receive any Settlement benefits.  If you exclude yourself, you have no basis to object because the case no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement.  You may attend and you may ask to speak, but you do not have to.  The Court will determine if you are allowed to speak if you request to do so (*see* Question 39).

**37.  When and where will the Court decide whether to approve the Settlement?**

The Court will hold the Fairness Hearing at XX:00 x.m. on **Month 00, 0000**, at the United States District Court for the Eastern District of Pennsylvania, located at the James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106-1797.  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call 1-800-000-0000.  At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing.  After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

QUESTIONS?  CALL **1-800-000-0000** OR VISIT **WWW.NFLCONCUSSIONSETTLEMENT.COM**

The Court will consider the request for attorneys' fees and reasonable costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel (*see* Question 34) after the Fairness Hearing, which will be set at a later date by the Court.

### 38. Do I have to attend the hearing?

No. Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have. But you are welcome to attend at your own expense. If you timely file an objection, you do not have to come to Court to talk about it. As long as you filed your written objection on time, the Court will consider it. You may also have your own lawyer attend at your expense, but it is not necessary.

### 39. May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing. The Court will determine whether to grant you permission to speak. To make such a request, you must file a written notice stating that it is your intent to appear at the *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323 Fairness Hearing ("Notice of Intention to Appear"). Be sure to include your name, address, telephone number, and your signature. Your Notice of Intention to Appear must be filed with the Court no later than **Month 00, 0000**.

## GETTING MORE INFORMATION

### 40. How do I get more information?

This Notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at www.NFLConcussionSettlement.com. You also may write with questions to NFL Concussion Settlement, P.O. Box 0000, City, ST 00000 or call 1-800-000-0000.

**PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LAWSUIT.**

# EXHIBIT 4

NFL Concussion Claims Administrator
PO BOX 0000
City, State  00000-0000



PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID

# <u>NFL Concussion Settlement</u>
**Important Information Inside**

NAME
ADDRESS
CITY STATE ZIP CODE

# $760 Million NFL Concussion Settlement

## Retired NFL Players and Their Families Could Get Money and Benefits

# EXHIBIT 5



# $760 Million NFL Concussion Settlement

The NFL and NFL Properties have agreed to a settlement that retired players who accuse the NFL of failing to warn of or protect them against the dangers of brain injury.

| | |
|---|---|
| **Who is included in the Settlement?** | The Settlement generally includes all retired players of the NFL, AFL, World League of American Football, NFL Europe League and NFL Europa League. The Settlement includes immediate family members of retired players, and incompetent or deceased players. The NFL and NFL Properties deny that they did anything wrong. |
| **What does the Settlement provide?** | The Settlement provides $760 million in funds for three benefits: |

- Baseline medical exams to determine if retired players suffer from neurocognitive impairment and are entitled to additional testing and/or treatment ($75 million),

- Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death ($675 million), and

- Education programs and initiatives related to football safety ($10 million).

Retired players do not have to prove that their injuries were caused by playing NFL football to get money from the Settlement.

## How can I get benefits?

You will need to register for benefits. Please go to the website or call 1-800-000-0000 to learn more.

## What are my rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue the NFL yourself, you must exclude yourself from the Class by **Month 00, 2014**. If you stay in the Class, you may object to the Settlement by **Month 00, 2014**.

The Court will hold a hearing on **Month 00, 2014** to consider whether to approve the Settlement. You or your own lawyer may appear and request to speak at the hearing at your own expense. At a later date to be determined by the Court, the attorneys will ask the Court for approval of an award of attorneys' fees and reasonable costs. The NFL and NFL Properties have agreed not to oppose or object to the request for attorneys' fees and reasonable costs, if the request does not exceed $112.5 million. This money would be paid by the NFL and NFL Properties and would be in addition to the $760 million Settlement.

## Please Share this Notice with Other Retired Players and Their Families