# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                     Plaintiffs,<br><br>                     v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                     Defendants. | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody**<br><br>CIVIL ACTION NO: *14-29* |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**DECLARATION OF MEDIATOR AND FORMER
UNITED STATES DISTRICT COURT JUDGE LAYN R. PHILLIPS
IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT**

Layn R. Phillips declares as follows:

1. I am the Court-appointed mediator in this action and a former United States District Court Judge. I submit this declaration in support of preliminary approval of the proposed class action settlement between the proposed Plaintiff Class and defendants NFL and NFL Properties LLC (collectively, the "NFL Parties").

2. At the request of the Court, I conducted an extensive mediation over the course of the last five months that produced the proposed settlement now before the Court for preliminary approval. The parties negotiated this settlement under my supervision. The talks were vigorous,

at arm's length, and in good faith. Based on my extensive experience as a mediator and former judge, my frequent and detailed discussions with the parties, and the information made available to me during the mediation, I believe that the $760 million proposed settlement (plus attorneys' fees and reasonable costs) represents a fair and reasonable settlement given the substantial risks involved for both sides. Without waiver of the mediation privilege, I describe below the reasons for my view.

### Qualifications and Experience

3. I am a partner at Irell & Manella LLP. I am a member of the bars of Oklahoma, Texas, California and the District of Columbia, as well as the United States Courts of Appeals for the Ninth and Tenth Circuits. I am the former United States Attorney for the Northern District of Oklahoma and a former United States District Court Judge for the Western District of Oklahoma. I founded the Irell & Manella Alternative Dispute Resolution Center, where I have headed the firm's ADR practice since 1991.

4. I have successfully mediated complex commercial cases, including hundreds of class actions, for over twenty years. Before that, as a federal judge, I presided over hundreds of settlement conferences in complex business disputes and class actions. I have been appointed Special Master by numerous federal courts in complex civil proceedings. It is not uncommon for me to settle billions of dollars of disputes on an annual basis. It is my understanding that I was nominated by the parties and appointed by the Court to mediate this important matter in part because of my extensive experience resolving complex, high-visibility disputes of this kind.

### The Mediation Process

5. Under my supervision, beginning immediately upon my appointment by the Court in July of this year, the parties engaged in arm's-length, hard-fought negotiations. As is my

practice, I conducted multiple face-to-face mediation sessions with both sides present, as well as many separate caucus sessions where I met only with one side or the other. All of these in-person mediation sessions were conducted in New York City. However, I also engaged in considerable telephonic follow-up work with all of the parties involved. In addition, counsel for the parties conducted extensive negotiations outside my presence pursuant to requests and directions that I gave to them. I dedicated more than twelve full days to mediate this matter in addition to the considerable hours I invested in discussions with the parties outside these formal sessions.

6. At all times, the parties aggressively asserted their respective positions on a host of issues. On occasion, the negotiations were contentious (although both sides were always professional). Because of the schedule that the Court imposed and the number and complexity of issues to be resolved, members of my mediation team and I sometimes multi-tracked mediation efforts by separately addressing different sets of issues with various counsel and the parties' experts during in-person mediation sessions in New York City, as well as during the telephonic follow-up process. On almost every day between my appointment as mediator and the announcement of the settlement on August 29, the parties and I discussed issues relating to possible settlement.

7. Plaintiffs and the NFL Parties each were represented by highly experienced, effective and aggressive counsel. I was satisfied throughout the negotiations that the parties' positions were thoroughly explored and advanced. Multiple law firms and individual counsel were involved on behalf of both sides. These counsel presented an impressive array of legal experience, talent, and expertise. Moreover, in order to ensure the adequate and unconflicted representation of all of the proposed class members, Plaintiffs agreed during the negotiations to

create two proposed separate subclasses, each represented by separate counsel. Generally speaking, one subclass is composed of retired NFL players who have diagnosed cognitive impairments; the other subclass is composed of retired players without a diagnosis of cognitive impairment. Plaintiffs believed—and I agreed—that having these two separate subclasses would ensure that any final resolution did not favor retired players who are currently suffering from compensable injuries from those who have not been diagnosed and who may not develop compensable injuries for years to come, if ever.

8. In addition to highly experienced counsel, both Plaintiffs and the NFL Parties retained various medical and actuarial/economics experts to assist them in the settlement negotiations. The medical experts advised the parties on the multiplicity of medical definition issues and other medical aspects of the settlement. The parties' economists and actuaries assisted in modeling the likely disease incidence and adequacy of the funding provisions and benefit levels contained in the proposed settlement. I met personally with certain of the parties' experts during the mediation to satisfy myself that the parties were being expertly advised and were considering the relevant issues. The parties' experts also answered many of the questions I had about how the proposed settlement would operate, as well as any underlying considerations they had made and their analysis and conclusions. It was clear to me that both sides had experts that were extremely well-versed in the medical literature and issues relevant to arriving at a fair settlement that would function efficiently over the course of the settlement period.

9. During the course of the mediation and at my request, the parties submitted various mediation materials to me and made multiple presentations regarding their positions on various factual and legal issues. I was assisted in my work and analysis by colleagues at my law firm, who independently reviewed the materials and the relevant law. During the mediation

sessions, there were extensive discussions of the strengths and weaknesses of the parties' various positions and of possible settlement structures.

10. As would be expected, the proposed terms of the settlement changed substantially over the course of time. On numerous occasions, although the parties shared a common goal, they proposed very different visions of how to achieve that goal. I worked constructively with counsel to offer possible compromises and solutions.

11. At all times, Plaintiffs' counsel zealously represented the proposed class and subclasses. They regularly and passionately expressed the need to protect the interests of the retirees and their families and fought hard for the greatest possible benefits in the context of a settlement that the NFL Parties could accept. It was evident throughout the mediation process that Plaintiffs' counsel were prepared to litigate and try these cases, and face the risk of losing with no chance to recover for their labor or their expenses, if they were not able to achieve a fair and reasonable settlement result for the proposed class.

12. At the same time, Plaintiffs' counsel recognized—correctly in my judgment—the significant legal and factual hurdles Plaintiffs faced if they proceeded with the litigation. First and foremost, a litigation of this size and complexity can take many years to litigate. By resolving the litigation at this time, Plaintiffs' counsel, in part, sought to compensate impaired retired NFL players who need money now in order to address their medical conditions. They also ensured that compensation and medical testing will be available for retired NFL players who are not impaired at present, but may become so in the future.

13. Second, Plaintiffs faced the serious risk that the Court would find that their claims were preempted, in whole or in part, by federal labor law and under the various Collective Bargaining Agreements. I reviewed the parties' briefs on the NFL Parties' motions to dismiss

and the transcript of the oral argument before this Court. Both sides made compelling arguments for their clients. Plaintiffs' counsel recognized that the claims of many members of the class may have been dismissed outright if the NFL Parties prevailed on the motions to dismiss, thereby impairing the ability of many Plaintiffs to proceed in the litigation. Plaintiffs' counsel provided a strong response to the NFL Parties' motion, relying heavily on *Kline v. Security Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004), a Third Circuit case that was discussed extensively at the hearing before this Court. Thus, the NFL Parties also faced risk that their motions would be denied, in whole or in part, and that the claims of many players would proceed through litigation. Although the parties did not know (and still do not know) the outcome of the motions to dismiss, the significant risks for both sides squarely presented before the Court in the motion papers hastened the parties' settlement efforts.

14. Third, Plaintiffs also faced significant hurdles in proving causation, *i.e.*, that the players suffered cognizable injuries *as a result of* concussions and sub-concussive hits they experienced while playing in the NFL. There is little doubt that both general and case-specific causation would be hotly contested if these matters were litigated, and Plaintiffs faced a significant risk that they would not be able to prevail in the end. In particular, Plaintiffs would likely be faced with having to prove that their alleged injuries were caused by their NFL careers rather than by some cause unrelated to football or by prior football experience in middle school, high school and college. Many members of the proposed class had short NFL careers and played substantially more football before joining the NFL, which made this burden all the more challenging. There are also many members of the proposed class who developed their symptoms later in life and may therefore have had difficulty proving that their alleged injuries are not a result of the normal aging process. More broadly, the science regarding concussions and sub-

concussive hits and cognitive impairment is still evolving, which makes it more difficult to prove negligence or fraud the earlier a player played. The research is often contradictory, thereby creating additional hurdles for a successful prosecution of Plaintiffs' claims.

15. Plaintiffs faced other legal hurdles as well, including, but not limited to, various statute of limitations arguments and the assertion of the "assumption of risk" defense based on the argument that the retired NFL players knew at the time they played that football could be a dangerous activity and that the players assumed that risk when they chose to play.

16. Like Plaintiffs, the NFL Parties also faced great risks if they chose to litigate these cases. There was a significant risk that the Court would not accept, in whole or in part, the NFL Parties' preemption defense, which in turn would leave much of the case intact. The same was true of the NFL Parties' other legal defenses of statute of limitations and assumption of risk. If the NFL Parties did not succeed on dismissing all of these cases as a matter of law, they faced years of very expensive discovery and potentially hundreds of trials in state and federal courts around the country. Among Plaintiffs' many claims and allegations, the NFL Parties faced the risks of litigating issues relating to helmet safety standards and rules of football play. Each potential lawsuit carried with it the risk of a significant damage verdict and a negative precedent that could affect all cases that followed.

17. In short, both sides faced substantial risks if they chose to litigate these matters and tremendous benefits if they could fairly resolve their differences.

**The Fairness and Adequacy of the Proposed Settlement**

18. The negotiated settlement produced by the mediation process, as reflected in the parties' proposed settlement agreement, represents a thoughtful, deliberative, extraordinary and comprehensive settlement that will benefit thousands of NFL retirees and their families. If the

settlement is approved, NFL retirees immediately will be entitled to an innovative baseline testing program and, depending on their diagnosis, certain supplemental medical benefits. In addition, players that are diagnosed with serious forms of dementia, ALS, Alzheimer's Disease, Parkinson's Disease, and certain instances of CTE will be eligible to receive cash awards of up to $5 million, depending on the disease, the age of the player at diagnosis, the length of the player's career playing in the NFL and certain associated leagues and certain other relevant factors. The benefits will be made available promptly after the Effective Date of the settlement and will remain available for sixty-five years, ensuring that players who appear healthy today but develop these kinds of medical issues in the future will have the comfort of knowing that compensation is available through the settlement fund. The settlement also allocates substantial funding for education to advance the safety of the sport, including in youth football. At the same time, the settlement protects the rights of retired NFL players to continue to benefit from benefits that have been collectively bargained for between the NFL and the NFL Players Association, including pension benefits, and medical and disability benefits such as the 88 Plan and the Neuro-Cognitive Disability Benefit that was introduced in the 2011 Collective Bargaining Agreement. Plaintiffs' counsel fought hard to ensure that the retired NFL players could continue to apply for these extensive benefits, and the NFL Parties agreed that they would not enforce any release that had been signed by a class member in connection with applying for the Neuro-Cognitive Disability Benefit when he seeks to take part in the settlement benefits.

19.     Based upon my extensive experience in this case and other complex actions, I believe that the settlement benefits provided to the class members as described above are fair and reasonable in light of the parties' claims and defenses, and the expense, uncertainty and time inherent in litigating the retired players' claims to judgment. In particular, it is my considered

judgment that Plaintiffs would be unlikely to have obtained more money and benefits without going through years of discovery and trial, where they would face substantial risks of loss due to their inability to prove negligence or fraud on the part of the NFL Parties or judgments below what they will receive in this proposed settlement. In addition, even after judgment, the parties likely would have been engaged in years of appellate proceedings before any judgment would be finalized.

20. Equally important, based on my review of the analyses conducted by the independent economists or actuaries retained by the parties, I believe that the $760 million paid by the NFL Parties for the settlement is fair and reasonable and will be sufficient to fund the benefits to which the parties have agreed. It is my understanding that Plaintiffs plan on presenting a summary of their experts' work in this area at the final settlement hearing.

21. Finally, I should note that the NFL Parties also have agreed not to object to an award of attorneys' fees and reasonable costs of up to $112.5 million *in addition to* the $760 million settlement. This is another significant benefit that Plaintiffs' counsel obtained for the proposed class, as compared to the vast majority of other class settlements where the attorneys' fee and reasonable cost component is deducted from the common fund. Ultimately, the total settlement, with attorneys' fees and reasonable costs, will approach $900 million. This, in my judgment, is an outstanding result for the class members.

**Conclusion**

For all the reasons set forth above, the proposed settlement of these actions was the result of a fair, vigorous, and arm's-length mediated negotiation process. The settlement itself is, in my judgment, fair and reasonable to the proposed class members, given the risks of these

litigations and the cost and complexity of trying them to judgment. I therefore enthusiastically support Plaintiffs' motion for preliminary approval of the proposed settlement.

I declare that the foregoing is true and correct.

Executed this 3rd day of January 2014.

_____
LAYN R. PHILLIPS
Former United States District Court Judge