# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br><br>     Plaintiffs,<br><br>     v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>     Defendants. | CIVIL ACTION NO: 14-29 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION OF PROPOSED CO-LEAD CLASS COUNSEL, CLASS COUNSEL AND SUBCLASS COUNSEL FOR AN ORDER:  (1) GRANTING PRELIMINARY APPROVAL OF THE CLASS ACTION SETTLEMENT AGREEMENT; (2)  CONDITIONALLY CERTIFYING A SETTLEMENT CLASS AND SUBCLASSES; (3) APPOINTING CO-LEAD CLASS COUNSEL, CLASS COUNSEL, AND SUBCLASS COUNSEL; (4) APPROVING THE DISSEMINATION OF CLASS NOTICE; (5) SCHEDULING A FAIRNESS HEARING;  AND (6) STAYING CLAIMS AS TO THE NFL PARTIES AND ENJOINING PROPOSED SETTLEMENT CLASS MEMBERS FROM PURSUING <u>RELATED LAWSUITS</u>

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................... 3

II.   FACTUAL BACKGROUND ............................................................................. 5

      A.    Plaintiffs' Claims .................................................................................... 5

      B.    Formation of the NFL Players' Concussion Injury Multidistrict Litigation ........... 6

      C.    Proceedings in this Court ........................................................................ 7

      D.    Mediation ................................................................................................. 8

      E.    Public Announcement of the Proposed Settlement ................................. 9

      F.    Court Appointment of a Special Master .................................................. 9

III.  MATERIAL TERMS OF THE SETTLEMENT .............................................. 10

      A.    Settlement Class and Subclasses ............................................................ 10

      B.    Settlement Benefits ................................................................................. 12

            1.    Baseline Assessment Program ..................................................... 15

            2.    Monetary Awards and Derivative Claimant Awards .................... 17

                  a)    Maximum Awards .............................................................. 17

                  b)    Supplemental Awards ......................................................... 19

                  c)    Credited Eligible Seasons .................................................. 19

                  d)    Offsets ................................................................................ 20

                  e)    Lien Resolution .................................................................. 21

                  f)    Derivative Claimant Awards .............................................. 21

                  g)    Appeals .............................................................................. 21

                  h)    Funding and Additional Contingent Contribution ............ 22

            3.    Education Fund ............................................................................. 23

i

|   |   | 4. | Preservation of Collective Bargaining Benefits and Claims for Workers' Compensation | 24 |

|   |   | 5. | Waiver of Causation, Statutes of Limitations, and Other Defenses | 25 |

|   |   | 6. | Attorneys' Fees | 26 |

|   | C. | | Releases, Covenant Not To Sue And Bar Order | 26 |

|   | D. | | Class Notice | 27 |

| IV. | | | ARGUMENT | 29 |

|   | A. | | Preliminary Approval of the Settlement Is Appropriate | 29 |

|   |   | 1. | The Proposed Settlement Is the Product of Good Faith, Extensive Arm's Length Negotiations | 35 |

|   |   | 2. | The Class Counsel's Investigation of Both Plaintiffs' Claims and the NFL Parties' Defenses Supports Preliminary Approval | 36 |

|   |   | 3. | There Is No Preferential Treatment of Certain Class Members and Class Representatives Support the Settlement | 38 |

|   |   | 4. | There Are No Other "Obvious Deficiencies" To Doubt the Proposed Settlement's Fairness | 39 |

|   | B. | | The Settlement Class And Subclasses Should Be Certified For Settlement Purposes | 40 |

|   |   | 1. | The Settlement Class and Subclasses Meet the Requirements Under Rule 23(a) | 41 |

|   |   |   | a) Numerosity | 41 |

|   |   |   | b) Commonality | 41 |

|   |   |   | c) Typicality | 42 |

|   |   |   | d) Adequacy of Representation | 43 |

|   |   | 2. | Common Questions of Law and Fact Predominate and the Superiority Requirement Is Met | 48 |

|   | C. | | Plaintiffs Faced Significant Challenges and Obstacles in the Litigation | 50 |

|   |   | 1. | Preemption | 51 |

|  | 2. | Causation | 53 |
|---|---|---|---|
|  | 3. | Statutes of Limitation | 54 |
|  | 4. | Assumption of Risk | 57 |
|  | 5. | Other Defenses | 59 |
| D. | | The Proposed Form and Method of Class Notice Satisfy Due Process | 61 |
| E. | | The Court Should Enjoin Related Litigation By Settlement Class Members | 64 |
| V. | | CONCLUSION | 67 |

## TABLE OF AUTHORITIES

**Federal Cases**

*Al-Ameen v. Atlantic Roofing Corp.*, 151 F. Supp. 2d 604 (E.D. Pa. 2001) .................................. 60

*Alberton v. Commonwealth Land Title Ins. Co.*, No. 06-3755, 2008 WL 1849774

    (E.D. Pa. Apr. 25, 2008) ......................................................................................................... 64

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) .................................................................... 51

*Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp.*,

    478 F.2d 540 (3d Cir. 1973) .................................................................................................... 49

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .................................................................. passim

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ............................................................................ 42

*Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877 (11th Cir.1989) .............................................. 66

*Britenriker v. Mock*, No. 3:08 CV 1890, 2009 WL 2392917 (N.D. Ohio July 31, 2009) ............ 59

*Brown v. National Football League*, 219 F. Supp. 2d 372 (S.D.N.Y. 2002)........................... 58, 59

*Carlough v. Amchem Prods., Inc.,* 10 F.3d 189 (3d Cir. 1993) ...................................................... 66

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) .................................................................. 38

*DeJulius v. New England Health Care Emps. Pension Fund,* 429 F.3d 935 (10th Cir. 2005)..... 61

*Denney v. Deutsche Bank AG,* 443 F.3d 253 (2d Cir. 2006) ......................................................... 46

*Dewey v. Volkswagen Aktiengsellschaft,* 681 F.3d 170 (3d Cir. 2012) ......................................... 45

*Dryer v. National Football League*, Civ No.09-2182- PAM-AJB, 2013 WL 5888231

    (D. Minn. Nov. 1, 2013) ............................................................................................. 27, 28, 63

*Duerson v. National Football League*, No. 12-C-2513,

    2012 WL 1658353 (N.D. Ill. May 11, 2012) ........................................................................ 51

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010) ................................................... 29, 30

*Eisen v. Carlisle & Jacqueline*, 417 U.S. 156 (1974) ................................................................... 61

*Evans v. Jeff D.*, 475 U.S. 717 (1986)........................................................................................... 32

*Fulgham v. Daniels J. Keating Co.*, 285 F. Supp. 2d 525 (D.N.J. 2003) ...................................... 59

*Gates v. Rohm & Haas Co.*, 248 F.R.D. 434 (E.D. Pa. 2008) ................................................ 35, 36

*Grunewald v. Kasperbauer*, 235 F.R.D. 599 (E.D. Pa. 2006) ...................................................... 63

*Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d 516 (10th Cir. 1979).......................................... 58

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1997) ............................................................ 65

iv

*In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426,
2004 WL 1068807 (E.D. Pa. May 11, 2004) ................................................................. 33, 35

*In re Baldwin-United Corp.*, 770 F.2d 328 (2d Cir. 1985) ................................................ 66

*In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222 (E.D. Pa. 2012) ................................ 41, 42

*In re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.*,
269 F.R.D. 468 (E.D. Pa. 2010) ................................................................................ 62, 63

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047,
2013 WL 499474 (E.D. La. Feb. 7, 2013) ........................................................................ 31

*In re CIGNA Corp. Sec. Litig.*, No. 02-8088, 2007 WL 2071898 (E.D. Pa. July 13, 2007) ........ 35

*In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332 (5th Cir. 1981) ........................... 66

*In re Countrywide Financial Corp. Customer Data Sec. Breach Litig.*,
No. 3:08-MD-01998, 2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) ...................................... 47

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
No. 1203, 99-20593 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ............................... 31, 46, 47

*In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524 (3d Cir. 2009) ....................................... 31

*In re Diet Drugs Prods. Liab. Litig.*, 275 F.3d 34 (3d Cir. 2001) ........................................ 46

*In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141 (3d Cir. 2005) ...................................... 46

*In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220 (3d Cir. 2002) .................................... 65, 66

*In re General Motors Corp. Pick-up Truck Fuel Tank Prod. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) ....................................................................................... 33, 34

*In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................................ 64

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ........................... 62

*In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) ................................. 44

*In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330 (N.D. Ohio 2001) ........................... 45

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................. 34, 54

*In re Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005) ................... 64

*In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379 (D. Md. 1983) ........................... 33

*In re National Football League Players' Concussion Injury Litig.*, MDL 2323,
842 F. Supp.2d 1378 (J.P.M.L. 2012) ............................................................................. 6, 7

*In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012) ........... 32, 33, 36, 40

*In re Prudential Ins. Co. of Am. Sales Prac. Litig.*, 261 F.3d 355 (3d Cir. 2001) ............ 65, 66, 67

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) .......................... 63

*In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir.), *cert. denied*, 479 U.S. 852 (1986) ............. 42

*In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221 (S.D. W.Va. 2005) ........................................ 45

*In re Smithkline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525 (E.D. Pa. 1990) ........................... 39

*In re Uponor, Inc.*, No. 11-MD-2247,

    2012 U.S. Dist. LEXIS 5339 (D. Minn. Jan. 18, 2012) ............................................................ 65

*In re Vioxx Prods. Liab. Litig.,* 650 F.Supp.2d 549 (E.D. La. 2009) ............................................ 30

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .................................... passim

*Kline v. Security Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004), ........................................................ 52

*Mack Trucks, Inc. v. Int'l Union, UAW*, No. 07-3737,

    2011 WL 1833108 (E.D. Pa. May 12, 2011) ............................................................................ 34

*Marcus v. BMW of North America, LLC*, 687 F.3d 583 (3d Cir. 2012) ........................................ 38

*Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467 (E.D. Pa. 2007) ...................................... 33, 34

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ......................................... 61

*Ortiz v. Fibreboard Corp*, 52 U.S. 815 (1999) ................................................................. 30, 45, 46

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) .......................................................... 44

*Prandini v. National Tea Co.,* 585 F.2d 47 (3d Cir. 1978) ........................................................... 26

*Rodriguez v. National City Bank*, 726 F.3d 372 (3d Cir. 2013) ......................................... 32, 40, 42

*Rolick v. Collins Pine Co.*, 925 F.2d 661 (3d Cir. 1991) .............................................................. 60

*Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009) ........................................................... 45

*Stringer v. National Football League*, 474 F. Supp.2d 894 (S.D. Ohio 2007) ............................. 51

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001) ...................................................................... 41

*Sullivan v. DB Investors, Inc.*, 667 F.3d 273 (3d Cir. 2010) ................................................... passim

*Tenuto v. Transworld Sys.,* No. 99-4228, 2001 WL 1347235 (E.D. Pa. Oct. 31, 2001) ........ 34, 39

*Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217 (3d Cir. 1995) ............................................ 53

*Trist v. First Federal Savings & Loan Assoc. of Chester*, 89 F.R.D. 1 (E.D. Pa. 1980) .............. 64

*Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) .............................................. 31

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (U.S. 2011) ............................................ 32, 42, 48

*Winkler v. Eli Lilly & Co.*, 101 F.3d 1196 (7th Cir. 1996) .......................................................... 66

*Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86 (3d Cir. 1985) ............... 63

**State Cases**

*Allen v. Kamp's Beauty Salon, Inc.*, 177 So. 2d 678 (Fla. Dist. Ct. App. 1965) ......................... 59

*Alqurashi v. Party of Four, Inc.*, 89 A.D.3d 1047 (N.Y. App. Div. 2d Dept. 2011) .................... 57

*Anson v. Am. Motors Corp.*, 747 P.2d 581 (Ariz. Ct. App. 1987) ................................................ 55

*Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650 (1989) .................................................... 58

*Bowen v. Eli Lilly & Co., Inc.*, 557 N.E.2d 739 (Mass. 1990) ..................................................... 55

*Carr v. Anding*, 793 S.W.2d 148 (Mo. Ct. App. 1990) ................................................................. 55

*Chalmers v. Toyota Motor* Sales, 935 S.W.2d 258 (Ark. 1996) .................................................... 55

*Collins v. Nat'l R.R. Passenger Corp.*, 9 A.3d 56 (Md. 2010) ..................................................... 59

*Coomer v. Kansas City Royals Baseball Corp.*, Nos. WD 73984, WD 74040,

   2013 WL 150838 (Mo. Ct. App. Jan. 15, 2013) ..................................................................... 57

*Dreyer-Lefevre v. Morissette*, No. 56653, 2011 WL 2623955 (Nev. July 1, 2011) .................... 55

*Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433 (Tex. 2009) ............................................ 60

*Finlay v. Storage Tech. Corp.*, 764 P.2d 62 (Colo. 1988) ............................................................ 60

*Fortier v. Los Rios Cmty. Coll. Dist.*, 52 Cal. Rptr. 2d 812 (Cal. App. 4th 1996) ................ 57, 58

*Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914 (Cal. 2005) .................................................... 55

*Funston v. Sch. Town of Munster*, 849 N.E.2d 595 (Ind. 2006) ................................................... 59

*Garrett v. NationsBank, N.A. (S.)*, 491 S.E.2d 158 (Ga. App. 1997) .......................................... 59

*Glazier v. Keuka Coll.*, 275 A.D.2d 1039 (N.Y. App. Div. 4th Dept. 2000) ................................ 58

*Herrmann v. McMenomy v. Severson*, 590 N.W.2d 641 (Minn. 1999) ......................................... 55

*Hunt v. Skaneateles Cent. Sch. Dist.*, 227 A.D.2d 939 (N.Y. App. Div. 4th Dept. 1996) ............. 58

*Johnston v. Dow & Coulombe, Inc.*, 686 A.2d 1064 (Me. 1996) .................................................. 55

*Koenig v. Lambert*, 527 N.W.2d 903 (S.D. 1995) ........................................................................ 56

*Koenig v. Lambert*, 567 N.W.2d 220 (S.D. 1997) ........................................................................ 56

*Manor v. Nestle Food Co.*, 932 P.2d 628 (Wash. 1997) ............................................................... 60

*McDonald v. Levinson Steel Co.*, 302 Pa. 287 (1930) .................................................................. 60

*McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992) .................................................................... 59

*Pedersen v. Zielski*, 822 P.2d 903 (Alaska 1991) ........................................................................ 55

*Roberts v. City of Alexandria*, 246 Va. 17 (1993) .......................................................................... 60

*Savino v. Robertson*, 652 N.E.2d 1240 (Ill. App. 1995) ................................................................ 57

*Smith v. McGittigan*, 376 So. 2d 598 (La. Ct. App. 1979) ............................................................ 59

*Stallings v. Food Lion, Inc.*, 539 S.E.2d 331 (N.C. App. 2000) .................................................... 59

*Utilities Bd. of Opp. v. Shuler Bros., Inc.*, No. 1111558,

    2013 WL 3154011 (Ala. June 21, 2013) ................................................................................... 55

*Valley Elec., Inc.* v. *Doughty*, 528 P.2d 927 (Colo. Ct. App. 1974) ............................................... 59

*Washington Indep. Tel. Ass'n v. Washington Utilities & Transp. Comm'n*,

    64 P.3d 606 (Wash. 2003) ...................................................................................................... 60

*Young v. Envtl. Air Products, Inc.*, 665 P.2d 40 (Ariz. 1983) ........................................................ 60

*Zamudio v. City & Cnty. of San Francisco*, 82 Cal. Rptr. 2d 664 (Cal. App. 1999) .................... 60

**Federal Statutes**

15 U.S.C. §1691 ........................................................................................................................... 32

28 U.S.C. §1407 .................................................................................................................. 6, 7, 49

28 U.S.C. §1651(a) ..................................................................................................................... 65

28 U.S.C. §2283 .......................................................................................................................... 65

29 U.S.C. §185(a) ....................................................................................................................... 51

42 U.S.C. § 3605 ......................................................................................................................... 32

**State Statutes**

42 PA. CONS. STAT. ANN. § 7102 ................................................................................................. 59

77 PA. CONS. STAT. ANN § 52 ...................................................................................................... 60

ARIZ. REV. STAT. ANN. § 12-2505 ............................................................................................... 59

CONN. GEN. STAT. § 52-584 ......................................................................................................... 55

IDAHO CODE ANN. § 5-219(4) ...................................................................................................... 55

MASS. GEN. LAWS ANN. ch. 231, § 85 ......................................................................................... 59

MICH. COMP. LAWS ANN. § 600.2959 .......................................................................................... 59

MINN. STAT. ANN. § 604.01 ......................................................................................................... 59

N.Y.C.P.L.R. § 2-14 .................................................................................................................... 56

OHIO REV. CODE § 2315.19(B)(4) ............................................................................................... 59

TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 ............................................................................ 59

Va. Code Ann. § 8.01-230 ........................................................................................... 56

Wash. Rev. Code Ann. § 4.22.005 ............................................................................. 59

**Rules**

Fed. R. Civ. P. 23 .................................................................................................... passim

**Other Authorities**

Manual for Complex Litigation (4th ed. 2004) ......................................... 32, 33, 34, 40

Newberg on Class Actions (4th ed. 2002) ............................................................ passim

## MEMORANDUM OF LAW

Plaintiffs, through their proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel, and Defendants National Football League and NFL Properties LLC (collectively, "the NFL Parties" and, together with Plaintiffs, the "Settling Parties"), have negotiated and agreed to a Class Action Settlement (or "Settlement") that will resolve all claims against the NFL Parties in the *In re: National Football League Players' Concussion Injury Litigation*, MDL 2323, and Related Lawsuits.[1]  In addition to the NFL Parties, Plaintiffs have sued Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp. (collectively, the "Riddell Defendants").  The Riddell Defendants are not a party to the proposed Settlement.

This Memorandum of Law is submitted in support of the Motion of Proposed Co-Lead Class Counsel, Class Counsel, and Subclass Counsel, for an Order:  (1) granting Preliminary Approval of the Class Action Settlement Agreement;  (2) conditionally certifying a Settlement Class and Subclasses;  (3) appointing Co-Lead Class Counsel, Class Counsel, Subclass Counsel and Of Counsel;  (4) approving dissemination of Class Notice;  (5) scheduling a Fairness Hearing; and (6) staying claims as to the NFL Parties and enjoining proposed Settlement Class Members from pursuing Related Lawsuits ("Motion for Preliminary Approval and Class Certification" or "Motion"), brought pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3) and 23(e).  This Motion is unopposed by the NFL Parties.[2]  For the reasons set forth below,

---

[1] Except where otherwise noted, the capitalized terms in this Memorandum of Law are taken from, and have the same meaning as those in, the Settlement Agreement, submitted herewith as Exhibit B to the Motion which this Memorandum of Law supports.

[2] The parties reserve all of their rights, including the right to propose or oppose class certification of a litigation class or class certification of a settlement class in the future, and the right to raise any argument not raised herein concerning any current or future litigated issue, should the Settlement Agreement be terminated or not consummated

Plaintiffs respectfully submit that this Class Action Settlement is within the "range of possible approval" under FED. R. CIV. P. 23(e) and request that the Court enter the proposed Preliminary Approval and Class Certification Order finding that:   preliminarily, the Settlement is fair, reasonable, and adequate; the requirements for conditionally certifying the Settlement Class and Subclasses, for settlement purposes only, under Rules 23(a)(1)-(4) and 23(b)(3) have been met; and Settlement Class Members should be notified of the terms of the Settlement and of their rights in connection therewith.

Accordingly, Plaintiffs request that the Court: (1) approve the Long-Form Notice and Summary Notice submitted herewith; (2) approve the Class Notice Plan; (3) establish dates for the mailing and publication of Class Notice, the submission of opt out notices and objections to the Settlement, and other relevant deadlines; and (4) schedule a Fairness Hearing to determine whether the Settlement should be given final approval.   In addition, Plaintiffs request that the instant litigation and all other Related Lawsuits against the NFL Parties in this Court be stayed pending final approval of the Settlement, and that all Settlement Class Members be enjoined from continuing or commencing litigation, other than for claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits, in any other forum relating to the facts of the Class Action Complaint unless and until the Settlement Class Member is excluded from the Settlement Class, the Court denies approval of the Class Action Settlement, or the Settlement Agreement is otherwise terminated.

---

for any reason, or should any portion of the litigation proceed.  Section C of the Argument section of this Memorandum discusses some of the anticipated arguments of the respective parties absent a Settlement at this juncture.  The inclusion herein of such anticipated arguments is not, and shall not be deemed, an acquiescence, admission, or agreement by any party as to the viability or strength of the opposing party's argument, should the litigation continue.

2

## I.     INTRODUCTION

In July 2011, the first lawsuit was filed by Retired NFL Football Players against the NFL Parties related to the NFL Parties' alleged actions (and inactions) with regard to alleged concussion-related injuries. Since then, more than 4,500 former players have filed substantially similar lawsuits. This Class Action Settlement represents the proposed resolution of these and thousands of other Retired NFL Football Players' claims.

The Class Action Settlement now before the Court for preliminary approval provides that the NFL Parties will make payments totaling $760 million over a period of years to create a:

- Baseline Assessment Program ("BAP") Fund that will offer eligible Retired NFL Football Players baseline neuropsychological and neurological evaluations to determine the existence and extent of any cognitive deficits, and in the event retired players are found to suffer from moderate cognitive impairment ("Level 1 Neurocognitive Impairment") (as defined in Exhibit 1 to the Settlement Agreement), certain supplemental benefits in the form of specified medical treatment and/or evaluation, including, as needed, counseling and pharmaceutical coverage (a maximum of $75 million will be used to fund the BAP, inclusive of the costs to administer it);

- Monetary Award Fund that will provide cash to Retired NFL Football Players, their representatives, and their families for Qualifying Diagnoses (as defined in Exhibit 1 to the Settlement Agreement) of Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Amyotrophic Lateral Sclerosis ("ALS"), Alzheimer's Disease, Parkinson's Disease, and/or Death with chronic traumatic encephalopathy ("CTE"), without

3

requiring any proof of causation (\$675 million will be used to fund the Monetary Award Fund, inclusive of the costs of administering the Settlement, other than the BAP, and half of the compensation of a Special Master); and

- Education Fund that will fund education programs promoting safety and injury prevention in football players, including youth football players, and the education of Retired NFL Football Players regarding the NFL's medical and disability benefits programs and initiatives (\$10 million will be used exclusively to fund the Education Fund).

Additionally, the NFL Parties will pay the cost of Class Notice (up to \$4 million) and half of the compensation for a Special Master to oversee aspects of the Settlement.

The Settlement is for the benefit of a proposed nationwide Settlement Class, consisting of three types of claimants, each of which is ascertainable based on objective criteria: (1) Retired NFL Football Players; (2) authorized representatives, ordered by a court or other official of competent jurisdiction, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and (3) close family members of Retired NFL Football Players or any other persons who properly under applicable state law assert the right to sue by virtue of their relationship with the Retired NFL Football Player ("Derivative Claimants"). The Settlement Class is composed of two Subclasses: (1) Retired NFL Football Players who were *not* diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order (and their Representative Claimants and Derivative Claimants); and (2) Retired NFL Football Players who *were* diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order (and their Representative Claimants and Derivative Claimants) and the Representative Claimants of deceased Retired NFL

4

Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs' Claims

Plaintiffs, Kevin Turner and Shawn Wooden, are Retired NFL Football Players who allegedly suffered concussive and sub-concussive head injuries while playing football in the NFL. Mr. Turner played eight (8) seasons in the NFL for the New England Patriots and the Philadelphia Eagles. Mr. Wooden played in the NFL for nine (9) seasons for the Miami Dolphins and the Chicago Bears. The Class Action Complaint (the "Complaint"), filed on January 6, 2014, alleges generally that the NFL breached its duties to Plaintiffs by failing to take reasonable actions to protect players from the chronic risks created by concussive and sub-concussive head injuries and that the NFL concealed those risks. Plaintiffs contend that, for many decades, evidence has linked repetitive head injuries to long-term neurological problems in many sports, including football. Plaintiffs further contend that the NFL Parties, as the organizers, marketers, and the face of the most popular sport in the United States, in which head injuries are a regular occurrence and in which players are at risk for head injuries, were aware of the evidence and the risks associated with repetitive traumatic brain injuries, but failed to take reasonable action to address the risks and deliberately ignored and actively concealed the information from Plaintiffs. The Complaint seeks injunctive relief, medical monitoring, and financial compensation for the long-term cognitive injuries, financial losses, expenses, and

5

intangible losses suffered by the Plaintiffs and proposed Class, as a result of the NFL Parties' alleged tortious conduct, including negligence and misrepresentations.[3]

### B. Formation of the NFL Players' Concussion Injury Multidistrict Litigation

On July 19, 2011, seventy-three (73) former NFL players and certain of their wives filed a complaint in the Superior Court of California against the NFL Parties and the Riddell Defendants alleging, among other things, that the NFL Parties breached a duty to protect the health and safety of its players by failing to warn and protect them against the long-term risks associated with football-related concussions. *See* Complaint, *Maxwell v. National Football League*, BC465842 (Super. Ct. Cal. July 19, 2011). Shortly thereafter, two more groups of former NFL players filed substantially similar complaints in California state court, and a fourth group of plaintiffs filed a substantially similar complaint in the Eastern District of Pennsylvania. *See* Complaint, *Pear v. National Football League*, LC094453 (Super. Ct. Cal. Aug. 3, 2011); Complaint, *Easterling v. National Football League*, 2:11-cv-05209 (E.D. Pa. Aug. 17, 2011); Complaint, *Barnes v. National Football League*, BC468483 (Super. Ct. Cal. Aug. 26, 2011). The NFL Parties removed the state cases to federal court on the basis of federal preemption under the Labor Management Relations Act ("LMRA").

This multi-district litigation was established on January 31, 2012 when the Judicial Panel on Multidistrict Litigation ("JPML") transferred these four actions to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1407. *See In re National Football League Players' Concussion Injury Litigation*, MDL 2323, 842 F. Supp.2d 1378 (J.P.M.L. 2012). The JPML

---

[3] The Class Action Complaint includes claims for medical monitoring, negligent misrepresentation, pre-1968 negligence, post-1968 negligence, negligence from 1987-1993, post-1994 negligence, negligent hiring, negligent retention, fraudulent concealment, fraud, wrongful death and survival actions, civil conspiracy based on fraudulent concealment, and loss of consortium.

found that these cases "share factual issues arising from allegations against the NFL stemming from injuries sustained while playing professional football, including damages resulting from the permanent long-term effects of concussions while playing professional football in the NFL" and that "centralization under Section 1407 in the Eastern District of Pennsylvania will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *Id.* at 1379. At the time of argument before the JPML in January 2012, there were sixteen potentially related actions pending against the NFL Parties. *Id.* at 1378. Since that time, 123 cases have been directly filed in the MDL or removed from Pennsylvania state court to the MDL, and an additional 163 cases have been transferred to the MDL by the JPML. Currently, there are 290 cases consolidated in the MDL, consisting of both individual lawsuits and class actions. In addition, there are eight cases that remain pending in various state courts, and one case that remains pending in a federal court other than the Eastern District of Pennsylvania, against the NFL Parties that assert similar allegations to those asserted in the MDL proceedings.

### C.     Proceedings in this Court

The Court's Case Management Order 1 set a date of April 25, 2012 for the initial conference of this MDL. At the April 25 status conference, the Court selected Christopher A. Seeger of Seeger Weiss LLP as Plaintiffs' Co-Lead Counsel for the MDL proceedings, and requested that another co-lead counsel from a Philadelphia-based firm also be selected. Docket Entry ("D.E.") # 64. Plaintiffs selected Sol Weiss of Anapol Schwartz as Co-Lead Counsel. D.E. # 72. Plaintiffs also created a Plaintiffs' Executive Committee ("PEC") and Steering Committee composed of various of the counsel for plaintiffs in the cases pending before the Court, which the Court approved. *Id.* The PEC includes proposed Class Counsel, Gene Locks

7

and Steven C. Marks, and the Steering Committee includes proposed Subclass Counsel, Arnold Levin and Dianne M. Nast.

The Court established a schedule for Plaintiffs to file Master Administrative Complaints and for the NFL Parties to brief the threshold legal issue of whether Plaintiffs' claims were preempted by federal labor law. D.E. # 64. Plaintiffs filed a Master Administrative Long-Form Complaint, D.E. # 83, and a Master Administrative Class Action Complaint for Medical Monitoring, D.E. # 84, on June 7, 2012. Plaintiffs then filed an Amended Master Administrative Long-Form Complaint, D.E. # 2642, on July 17, 2012. The NFL Parties filed motions to dismiss Plaintiffs' Master Administrative Complaints on preemption grounds on August 30, 2012, D.E. ## 3589, 3590, and Plaintiffs opposed, D.E. ## 4130-34. The NFL Parties filed replies, D.E. ## 4254-55, and Plaintiffs' sur-replies closed the briefing, D.E. ## 4589, 4591. The Court heard oral argument on the motions on April 9, 2013, and the Court's ruling remains pending.

**D. Mediation**

On July 8, 2013, the Court ordered Plaintiffs and the NFL Parties to enter mediation. The Court appointed retired United States District Court Judge Layn R. Phillips as the mediator, and ordered that Judge Phillips report back to the Court on or before September 3, 2013, with the results of mediation. The Court held its ruling on the NFL Parties' motions to dismiss on preemption grounds in abeyance until the September 3, 2013 deadline, and instructed the Settling Parties and their counsel to refrain from publicly discussing the mediation process or disclosing any discussions they may have as part of that process, without further order of the Court. In addition to proposed Co-Lead Class Counsel for Plaintiffs, Christopher A. Seeger and Sol Weiss, proposed Class Counsel, Steven C. Marks and Gene Locks, and proposed Subclass Counsel, Arnold Levin and Dianne M. Nast, were brought into the mediation on behalf of Plaintiffs.

Following his appointment by the Court, Judge Phillips actively supervised and participated in the mediation process, and he regularly kept the Court apprised of the status of the process. Judge Phillips presided over numerous negotiation/mediation sessions, including in-person and telephonic meetings with counsel, either jointly or in separate groups. The mediation process culminated in the execution of a Term Sheet on August 29, 2013. *See* Declaration of Mediator and Former United States District Court Judge Layn R. Phillips attached to the Motion for Preliminary Approval and Class Certification ("Phillips Declaration") as Exhibit D. Thereafter, the Settling Parties negotiated the definitive Settlement Agreement submitted herewith for Preliminary Approval.

### E.    Public Announcement of the Proposed Settlement

On August 29, 2013, the Court announced that "in accordance with the reporting requirements in [its] order of July 8, 2013, the Honorable Layn Phillips, the court-appointed mediator, informed [the Court] that the plaintiffs and the NFL defendants had signed a Term Sheet incorporating the principal terms of a settlement." D.E. # 5235. In its Order, the Court reserved judgment on the fairness and adequacy of the Settlement pending the Settling Parties' presentation to the Court of the Settlement Agreement, along with motions for preliminary and final approval. *Id.*

### F.    Court Appointment of a Special Master

On December 16, 2013, pursuant to Fed. R. Civ. P. 53, the Court appointed Perry Golkin to serve as Special Master to assist the Court in evaluating the financial aspects of the proposed settlement in view of its financial complexities. Mr. Golkin has agreed to serve in this capacity without compensation. All expenses reasonably necessary to fulfill his duties will be shared

equally by the Plaintiffs and the NFL Parties prior to final approval, and the allocation may be adjusted at the time of final approval.

It is anticipated that Mr. Golkin's appointment as Special Master will be extended, or someone else will be appointed to serve as the Special Master at final approval. As per the Settlement Agreement, that individual will serve a five-year term (which may be extended by the Court), and will receive compensation.

## III.   MATERIAL TERMS OF THE SETTLEMENT

### A.   Settlement Class and Subclasses

The Settlement provides that the NFL Parties shall pay $760 million, plus up to $4 million for Class Notice,[4] for the benefit of a nationwide Settlement Class consisting of three types of Claimants:

> (1) All living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players");
>
> (2) Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and
>
> (3) Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue

---

[4] In addition, the Settlement provides that the NFL Parties and the Monetary Award Fund will share equally the annual compensation of the Special Master, which shall not exceed $200,000, for a five-year term, plus any extensions by the Court.

independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").

The Settlement Class consists of two Subclasses: <u>Subclass 1</u> is defined as Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order, and their Representative Claimants and Derivative Claimants; and <u>Subclass 2</u> is defined as Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE. A Qualifying Diagnosis is defined as Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE (post-mortem diagnosis prior to the date of the Preliminary Approval and Class Certification Order). *See* Exhibit 1 (Injury Definitions) to Settlement Agreement.

The proposed Settlement Class is clearly defined. Membership is ascertainable from the NFL Parties' records, the NFL's pension plans, and other objective criteria. Current NFL Football players are *not* included in the proposed Settlement Class. Additionally, persons who tried out for a Member Club or team of the American Football League, World League of American Football, NFL Europe League or NFL Europa League, but did not make a preseason, regular season or postseason roster, practice squad, developmental squad, or taxi squad, are *not* included in the proposed Settlement Class.

11

**B.   Settlement Benefits**

The proposed Settlement provides three potential sources of benefits for Settlement Class Members.  First, the BAP provides eligible Retired NFL Football Players the opportunity to obtain baseline neuropsychological and neurological examinations within a specified time period to determine whether they suffer from any cognitive impairment, and if so, to what degree.  For players diagnosed with Level 1 Neurocognitive Impairment,[5] BAP Supplemental Benefits will be provided based on need, and may include medical treatment and/or examination by Qualified BAP Providers, counseling and pharmaceuticals.   Second, Retired NFL Football Players diagnosed with Level 1.5 Neurocognitive Impairment (early Dementia),[6] Level 2 Neurocognitive

---

[5] Level 1 Neurocognitive Impairment is defined as follows:

(a)  The following are the diagnostic criteria for Level 1 Neurocognitive Impairment:

(i)  Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a decline in cognitive function;

(ii)  Evidence of moderate cognitive decline from a previous level of performance in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial) as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement;

(iii) The Retired NFL Football Player exhibits functional impairment consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 0.5 (Questionable) in the areas of Community Affairs, Home & Hobbies, and Personal Care; and

(iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b) Level 1 Neurocognitive Impairment, for the purposes of this Settlement Agreement, may only be diagnosed by Qualified BAP Providers during a BAP baseline assessment examination, with agreement on the diagnosis by the Qualified BAP Providers.

[6] Level 1.5 Neurocognitive Impairment is defined to be:

(a)  For Retired NFL Football Players diagnosed through the BAP:

(i)  Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function;

(ii)  Evidence of moderate to severe cognitive decline from a previous level of performance in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial) as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement;

(iii) The Retired NFL Football Player exhibits functional impairment consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care; and

(iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

Impairment (moderate Dementia),[7] ALS, Alzheimer's Disease, or Parkinson's Disease, and representatives of certain deceased Retired NFL Football Players diagnosed post-mortem with CTE[8] will be eligible for a cash Monetary Award from the Monetary Award Fund, based on the retired player's age at the time of diagnosis, the number of NFL Football seasons played, and other applicable offsets agreed to by the Settling Parties. Representative and Derivative Claimants may apply for a Monetary Award as well. Third, the Settlement will establish an Education Fund to fund education programs promoting safety and injury prevention with regard to football players, including safety-related initiatives in youth football, and to educate Retired

---

(b) For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician that the Retired NFL Football Player suffers from neurocognitive impairment consistent with the diagnostic criteria for Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia.

(c) For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis while the Retired NFL Football Player was living by either a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, that the Retired NFL Football Player suffered from neurocognitive impairment consistent with the diagnostic criteria for Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia.

[7] Level 2 Neurocognitive Impairment is defined to be:

(a) For Retired NFL Football Players diagnosed through the BAP:

(i) Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function;

(ii) Evidence of severe cognitive decline from a previous level of performance in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial) as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement;

(iii) The Retired NFL Football Player exhibits functional impairment consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care; and

(iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b) For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician that the Retired NFL Football Player suffers from neurocognitive impairment consistent with the diagnostic criteria for Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia.

(c) For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis while the Retired NFL Football Player was living by either a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, that the Retired NFL Football Player suffered from neurocognitive impairment consistent with the diagnostic criteria for Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia.

[8] ALS, Alzheimer's Disease, Parkinson's Disease and Death with Chronic Traumatic Encephalopathy are defined specifically in the Injury Definitions attached as Exhibit 1 to the Settlement Agreement.

NFL Football Players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Importantly, the Settlement does *not* require Settlement Class Members to prove that the Retired NFL Football Player's cognitive injuries were caused by NFL-related concussions or sub-concussive head injuries. Upon timely submission of a complete Claim Package, the Settlement Class Member will be eligible to receive benefits in accordance with the Settlement Agreement.

Registration for Settlement benefits will be overseen by the Claims Administrator, who will establish and administer both online and hard copy registration methods. Unless good cause is shown, individuals must register within 180 days from the date that the Claims Administrator provides notice of registration methods and requirements. Purported Settlement Class Members and the NFL Parties, in certain circumstances, may challenge registration determinations to the Claims Administrator and may appeal that determination to the Court (which may, in its discretion, refer the matter to the Special Master), whose decision shall be final and binding.

Notably, Retired NFL Football Players are not precluded from participating in the Settlement as a result of having received benefits related to neurocognitive injuries pursuant to benefit programs provided under a Collective Bargaining Agreement ("CBA") with the NFL (*e.g.,* the 88 Plan) or because they signed releases and covenants not to sue the NFL pursuant to the Neuro-Cognitive Disability Benefit under Article 65 of the 2011 CBA. The NFL Parties have agreed not to assert any defense or objection to a Settlement Class Member's receipt of benefits under the Settlement Agreement on the ground that he executed the Article 65 release and covenant not to sue. As discussed below, apart from and in addition to Settlement benefits,

14

Retired NFL Football Players are entitled to seek all applicable bargained-for benefits in the Collective Bargaining Agreements with the NFL.

### 1. Baseline Assessment Program

The Settlement will create a BAP to evaluate retired players objectively for evidence of cognitive decline and provide medical treatment and further testing for any player found to be suffering from Level 1 Neurocognitive Impairment. In addition to detecting any cognitive impairment, the results of BAP examinations can be used as a comparison against any future tests to determine whether a Retired NFL Football Player's cognitive abilities have deteriorated. The BAP examinations also serve to inform Retired NFL Football Players and their families of the player's current level of cognitive functioning. The NFL Parties will make an initial deposit of $35 million to fund the BAP, and will pay an additional $40 million to continue funding the BAP, as necessary.

A BAP Administrator will be appointed to set up a network of qualified medical providers ("Qualified BAP Providers") to administer the baseline assessment examinations for Retired NFL Football Players. A Special Master will be appointed for a 5-year term to oversee the BAP Administrator, among other responsibilities.[9]

All Retired NFL Football Players who are credited with at least one-half of an Eligible Season, as described below, and who timely register to participate in the Class Action Settlement, may participate in the BAP and receive a baseline assessment examination. A

---

[9] In addition to overseeing the BAP Administrator, the Special Master will oversee the functions of the Claims Administrator, appointed to process claims for Monetary Awards, as described below. At the expiration of the 5-year term (unless the term is extended), the Special Master's role and responsibilities will revert to the Court. The NFL Parties have agreed to pay one-half of the compensation of the Special Master, which is capped at $200,000 per year. The BAP Fund will pay the compensation, reasonable costs and expenses of the BAP Administrator. The Monetary Award Fund will pay the compensation, reasonable costs and expenses of the Claims Administrator, the reasonable costs and expenses of the Special Master, and the other half of the Special Master's compensation.

15

baseline assessment examination includes a detailed, standardized neuropsychological examination performed by a neuropsychologist certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, and a basic neurological examination performed by a board-certified neurologist. The deadline for receiving a baseline assessment examination depends on the age of the Retired NFL Football Player as of the Effective Date of the Settlement Agreement. Retired NFL Football Players 43 or older as of the Effective Date, and who elect to participate in the BAP, must receive the baseline assessment examination within two years of the Effective Date. Retired NFL Football Players under the age of 43 as of the Effective Date, and who elect to participate in the BAP, must receive the baseline assessment examination within 10 years after commencement of the BAP, or before they turn 45, whichever occurs first. In the event a Retired NFL Football Player who is a member of Subclass 1 does not participate in the BAP, he remains eligible for a Monetary Award if he develops a Qualifying Diagnosis, except that any such Monetary Award will be reduced by ten percent (except for a diagnosis of ALS), unless the Retired NFL Football Player received his Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination.

Retired NFL Football Players who are diagnosed during a BAP baseline assessment examination with Level 1 Neurocognitive Impairment will receive BAP Supplemental Benefits that entitle them to medical testing and/or treatment, including, as needed, counseling and pharmaceutical coverage, within a network of Qualified BAP Providers and Qualified BAP Pharmacy Vendors. If Retired NFL Football Players are diagnosed with Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, during a BAP baseline

16

assessment examination, they may seek a cash Monetary Award from the Monetary Award Fund.

A web portal linked to the Settlement Website will be set up to assist Settlement Class Members with access to BAP services. All eligible Retired NFL Football Players will be encouraged to take advantage of the BAP.

### 2. Monetary Awards and Derivative Claimant Awards

The largest component of the Settlement is a $675 million Monetary Award Fund, which funds, in part, provide for payment of cash Monetary Awards and Derivative Claimant Awards to Retired NFL Football Players diagnosed with a Qualifying Diagnosis, as set forth in the Injury Definitions (attached as Exhibit 1 to the Settlement Agreement), and their Representative and Derivative Claimants. A Qualifying Diagnosis is defined as Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE (post-mortem diagnosis prior to the date of the Preliminary Approval and Class Certification Order). Qualifying Diagnoses shall be made by appropriately credentialed physicians as set forth in the Injury Definitions (*id.*). Details regarding the Retired NFL Football Player's Qualifying Diagnosis must be provided with the Settlement Class Member's Claim Package or Derivative Claim Package and will form the basis for the Claims Administrator's review and award determination.

### a) Maximum Awards

The *maximum* Monetary Award for each Qualifying Diagnosis category is as follows:

| Qualifying Diagnosis | Maximum Award |
|---|---|
| ALS | $5 million |
| Death with CTE | $4 million |
| Alzheimer's Disease | $3.5 million |
| Parkinson's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment | $3 million |
| Level 1.5 Neurocognitive Impairment | $1.5 million |

Monetary Awards will be processed by a Claims Administrator appointed by the Court. The costs of the Claims Administrator will be paid from the Monetary Award Fund. Monetary Awards are based on the particular Qualifying Diagnosis that the retired player receives and will be downwardly adjusted based on the retired player's age at the time of that diagnosis and all other applicable Offsets. Generally, the younger a Retired NFL Football Player is when he receives a Qualifying Diagnosis, the greater the base compensation for the Monetary Award. *See* Monetary Award Grid, at Exhibit 3 to the Settlement Agreement. Conversely, the older a Retired NFL Football Player is when he receives a Qualifying Diagnosis, the lower the base compensation for the Monetary Award. At age 80 or older, the base Monetary Award for ALS becomes fixed at $300,000, before application of Offsets. *Id.* The base Monetary Awards for Retired NFL Football Players diagnosed at age 80 or older with Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or Death with CTE are fixed at $50,000, before application of Offsets, and for Level 1.5 Neurocognitive Impairment, the base award is fixed at $25,000, before application of Offsets. *Id.* The Award levels based on a Retired NFL Football Player's age at the time of the Qualifying Diagnosis and the percentage reduction of any applicable Offsets are laid out in the Settlement Agreement and Monetary Award Grid attached thereto.

All Monetary Awards will be adjusted upwards annually for inflation, up to 2.5% per year, the precise amount subject to the sound judgment of the Special Master (or the Claims Administrator after expiration of the term of the Special Master).

### b) Supplemental Awards

If, after receiving an initial Monetary Award, a Retired NFL Football Player becomes eligible for a larger Award (after Offsets) because of a different Qualifying Diagnosis, the retired player will be provided with a Supplemental Monetary Award to ensure that the retired player receives the maximum award to which he is entitled.

### c) Credited Eligible Seasons

Retired NFL Football Players who are credited with at least five Eligible Seasons will receive the maximum Monetary Award for their injury and their age, absent other applicable Offsets. For Retired NFL Football Players with fewer than five Eligible Seasons, the Monetary Award will be reduced anywhere between 10% (for players with 4.5 Eligible Seasons) and 97.5% (for players with 0 Eligible Seasons), as set forth in the following chart.

| Number of Credited Eligible Seasons | Percentage of Reduction in Monetary Award |
|---|---|
| 4.5 | 10% |
| 4.0 | 20% |
| 3.5 | 30% |
| 3.0 | 40% |
| 2.5 | 50% |
| 2.0 | 60% |
| 1.5 | 70% |
| 1.0 | 80% |
| 0.5 | 90% |
| 0 | 97.5% |

Pursuant to the Settlement Agreement, a Retired NFL Football Player earns one Eligible Season for each season in which the retired player was on an NFL or AFL Member Club's

19

Active List on the date of three or more regular season or postseason games, or on the date of one or more regular or postseason games and then spent two regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury. A Retired NFL Football Player earns one-half of an Eligible Season for each season in which the player was on an NFL or AFL Member Club's practice, developmental, or taxi squad for at least eight games, but for which he did not otherwise earn an Eligible Season. Time spent playing for the World League of American Football, NFL Europe League, and NFL Europa League does not count towards, and is specifically excluded from, the calculation of an Eligible Season. To determine the total number of Eligible Seasons credited to a player, all of the earned Eligible Seasons and half Eligible Seasons are summed together. For example, if a retired player has earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons, and his award will be reduced by 30%.

### d)      Offsets

In addition to Offsets for shorter football careers, Monetary Awards may be reduced significantly (by 75%) for Retired NFL Football Players who suffered a medically diagnosed stroke or Traumatic Brain Injury (such as in an automobile accident), after commencing NFL Football play and prior to receiving the Qualifying Diagnosis reflecting a presumptive attribution of the retired player's injury to non-NFL Football causes. Retired NFL Football Players subject to these Offsets will have the opportunity to present clear and convincing evidence to the Claims Administrator that the stroke or brain injury is not related to the Qualifying Diagnosis in order to avoid the Offset.

In addition, as described above, a 10% reduction in Monetary Awards applies to those Qualifying Diagnoses obtained by Subclass 1 members outside the BAP (except for diagnoses of

20

ALS), unless the Retired NFL Football Player participates in the BAP or receives his Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination. The purpose of this Offset is to encourage Retired NFL Football Players to make use of the BAP.

### e)     Lien Resolution

Once the Monetary Awards are calculated by the Claims Administrator, the Lien Resolution Administrator will administer the process for the identification and settlement of all applicable and legally enforceable liens, which may include, among others, those related to state or federal governmental payors, Medicare Parts A and B (as contemplated by the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)), Medicare Part C or Part D plans, Medicaid, and other state or federal governmental healthcare programs with statutory reimbursement or subrogation rights (such as TRICARE, the Department of Veterans Affairs, and Indian Health Services).

### f)     Derivative Claimant Awards

Derivative Claimants will be entitled to 1% of the Monetary Award received by the Retired NFL Football Players or Representative Claimants (for deceased, incompetent, or incapacitated retired players) through whom the relationship is the basis of the claim (such that the Retired NFL Football Player or Representative Claimant will receive 99% of the Award). If there are multiple Derivative Claimants, the 1% award will be divided among them based on the laws of the state where the Retired NFL Football Player to whom they are related is domiciled.

### g)     Appeals

Settlement Class Members, the NFL Parties, and Co-Lead Class Counsel have a right to appeal either a determination of whether a Settlement Class Member is entitled to a Monetary Award or the amount of the Award. Appeals will be overseen by the Court, which may seek the

advice of a panel of physicians appointed by the Court, as defined in Section 2.1(h) of the Settlement Agreement ("Appeals Advisory Panel"). The Court may, in its discretion, refer the appeal to the Special Master, who also may seek advice from the Appeals Advisory Panel. Appellants must present clear and convincing evidence in support of the appeal. To discourage appeals that lack merit, Settlement Class Members will be charged a fee of $1,000 to appeal their claim determination; however, this sum will be refunded if the appeal is successful. The NFL Parties may appeal up to ten (10) Monetary Award or Derivative Claimant Award determinations per year and may appeal more if good cause is shown. If the NFL Parties' appeal is unsuccessful, they will pay all administrative costs directly resulting from the appeal, and reasonable attorneys' fees, if any, provided that in no event will the total amount paid by the NFL Parties exceed $2,000.

Co-Lead Class Counsel also may appeal up to ten (10) Monetary Award or Derivative Claimant Award determinations per calendar year on the basis of good cause.

### h)     Funding and Additional Contingent Contribution

The Settling Parties consulted extensively over many months with their own medical experts, actuaries, and economists, and with the assistance of the court-appointed mediator. *See* Phillips Declaration, at ¶ 8. Plaintiffs' economists conducted thorough analyses regarding funding the Settlement to ensure that there would be enough money to provide benefits to all eligible Settlement Class Members, taking into account the size of the proposed Settlement Class and projecting the incidence rates of each Qualifying Diagnosis over the term of the Settlement. After hard-fought negotiations, the Settling Parties arrived at an aggregate sum that proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel believe is sufficient to compensate all

Retired NFL Football Players who may be diagnosed with Qualifying Diagnoses and their Representative and Derivative Claimants.

Within two years after the Effective Date of the Settlement Agreement, over $300 million of the $675 million earmarked for the Monetary Award Fund will be deposited. The NFL Parties shall make additional deposits over the next 17 years, until the Monetary Award Fund is fully funded. If the value of the Monetary Award Fund dips below $50 million at any time, the NFL Parties will deposit additional monies into the fund, up to their maximum obligation of $675 million, to bring the fund back to a level of at least $50 million. The Monetary Award Fund will be available for a term of 65 years, which proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel expect to be long enough to compensate the youngest Retired NFL Football Player in the event he develops a Qualifying Diagnosis. The Settlement further provides that in the event of a funding shortfall, the NFL Parties will contribute up to an additional $37.5 million to the Monetary Award Fund.

### 3. Education Fund

The NFL Parties have agreed to contribute $10 million to establish an Education Fund for the benefit of the Settlement Class. This fund will support education, as directed by the Court with input from Co-Lead Class Counsel, Counsel for the NFL Parties, and medical experts, into cognitive impairment, safety and injury prevention with regard to football players. Subject to the reasonable informed consent of Retired NFL Football Players, in compliance with applicable privacy and health laws, and any other customary authorization, medical data generated through the Class Action Settlement will be made available for use by those conducting medical research in cognitive impairment, safety and injury prevention. In addition, the Settling Parties have agreed that a portion of the Education Fund will be used to fund education programs benefiting

Retired NFL Football Players and safety-related initiatives in youth football, among other programs, to be approved by the Court. The fund also will have an education component that will inform Retired NFL Football Players and their families about the NFL's medical and disability benefits programs and other programs and initiatives that would inure to their benefit.

### 4. Preservation of Collective Bargaining Benefits and Claims for Workers' Compensation

The Settlement preserves Retired NFL Football Players' rights to pursue any and all benefits under the current 2011 NFL Collective Bargaining Agreement, the 88 Plan, and any other current or future applicable collective bargaining agreement. Participation in the Settlement will not affect a Retired NFL Football Player's ability to pursue any bargained-for benefits, including the NFL's Neuro-Cognitive Disability Benefit.

In addition, the Settlement will ensure that the provision included in Article 65 of the current CBA, Section 2—requiring that players execute a release of claims and covenant not to sue in order to be eligible for the NFL's Neuro-Cognitive Disability Benefit—will not be enforced or used against the Settlement Class Members in connection with this Settlement, except if they exclude themselves from the Settlement Class. The NFL Parties have agreed not to enforce that release with regard to Settlement benefits to the extent a Settlement Class Member previously signed it when submitting an application. Without the NFL's agreement on this point, certain Retired NFL Football Players would be barred from receiving any Settlement benefits and would be limited to benefits made available under the CBA only.

Moreover, as part of the release that Settlement Class Members will provide to the NFL Parties in exchange for the former's participation in the Settlement and right to Settlement benefits, Retired NFL Football Players will *not* be required to release or dismiss claims for

24

workers' compensation or claims alleging entitlement to NFL CBA Medical and Disability Benefits.

### 5. Waiver of Causation, Statutes of Limitations, and Other Defenses

The Settlement eliminates many serious obstacles that Retired NFL Football Players would have faced in the litigation, as summarized below in more detail. Moreover, even within the confines of the Settlement, Retired NFL Football Players (and their Representative Claimants) with a Qualifying Diagnosis do not have to prove or submit any evidence of causation in order to receive Monetary Awards. IN OTHER WORDS, THEY DO *NOT* NEED TO SHOW THAT THEIR QUALIFYING DIAGNOSES RESULTED FROM CONCUSSIONS RELATED TO NFL FOOTBALL. They only need to provide a qualified medical professional's diagnosis of a Qualifying Diagnosis and timely and completely submit the required paperwork and proof, as outlined in the Settlement Agreement.

In addition, currently undiagnosed Retired NFL Football Players can seek Monetary Awards if they later receive a Qualifying Diagnosis during the term of the Monetary Award Fund. Retired NFL Football Players who already received a Qualifying Diagnosis by the time of the issuance of the Preliminary Approval and Class Certification Order are entitled to Monetary Awards regardless of when they played NFL Football or how long ago they may have received a concussion, except for Retired NFL Football Players who died prior to January 1, 2006. No Monetary Awards will be made where the Retired NFL Football Player died prior to January 1, 2006, unless the Court determines that the claim of the pre-2006 decedent would not be barred by the applicable statute of limitations. Absent the Settlement, these claimants would confront the same statute of limitations hurdle on a wrongful death claim.

### 6.    Attorneys' Fees

The Settling Parties did not discuss the issue of attorneys' fees at any point during the mediation sessions (except to defer the issue), until *after* an agreement in principal was reached on all material Settlement terms providing benefits to the Settlement Class and Subclass Members and *after* the Term Sheet was inked, in accordance with *Prandini v. National Tea Co.*, 585 F.2d 47, 53 (3d Cir. 1978). The NFL Parties have since agreed not to object to a petition for an award of attorneys' fees and reasonable incurred costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel, provided the amount requested does not exceed $112.5 million. The $112.5 million to be paid by the NFL Parties is *in addition* to the $760 million that will fund the BAP Fund, the Monetary Award Fund and the Education Fund, and the up to $4 million for Class Notice and one-half of the compensation for the Special Master.    Unlike traditional common fund cases where attorneys' fees are obtained directly from the common fund, the Settlement Class is further benefitted by the separate payment of attorneys' fees by the NFL Parties.

The Court will determine the amount of the Class attorneys' fee and cost award in accordance with applicable common benefit fee jurisprudence. Settlement Class Members will have an opportunity to comment on or object to these fees at an appropriate time. Having the NFL Parties pay Class attorneys' fees and reasonable incurred costs separate from the $760 million is another very significant benefit to Settlement Class Members.

### C.    Releases, Covenant Not To Sue And Bar Order

In exchange for the benefits provided under the Settlement Agreement, Settlement Class Members and their related parties (the "Releasors") will release all claims and dismiss with prejudice all actions and claims against, and covenant not to sue, the NFL Parties and others (the

"Released Parties") in this litigation and all Related Lawsuits in this Court and other courts, in accordance with the terms of Article XVIII set forth in the Settlement Agreement.

Class Members that receive Monetary Awards also will be required to dismiss pending suits and/or forebear from bringing litigation relating to cognitive injuries against the National Collegiate Athletic Association and any other collegiate, amateur, or youth football organizations and entities, in accordance with Section 18.5 of the Settlement Agreement, since they will have been compensated for their cognitive injuries in this Settlement.

As a condition to approval of the Settlement, the Settling Parties also intend to move the Court for a bar order and judgment reduction provision, as part of the Final Order and Judgment. *See* Exhibit 4 to the Settlement Agreement. The bar order will bar other parties from seeking indemnification or contribution from the Released Parties for claims relating to this litigation.

Plaintiffs' claims against the Riddell Defendants will *not* be released or dismissed by the Settlement.

### D. Class Notice

The Settlement terms are complex, but must and will be explained in simple, clear notices to the Settlement Class. To effectuate such notice, Co-Lead Class Counsel has worked with Katherine Kinsella, President of Kinsella Media, LLC, an advertising and legal notification firm specializing in the design and implementation of notification plans. *See* Declaration of Katherine Kinsella ("Kinsella Declaration"). The Settling Parties estimate that the number of readily identifiable Settlement Class Members is over 20,000. In comparison, the settlement class in *Dryer v. NFL*,[10] which was finally approved on November 4, 2013, *Dryer v. National Football*

---

[10]   The *Dryer* case was finally approved in the federal district court of Minnesota. *Dryer* is a certified settlement class action, alleging that the NFL's use of former players' identities after the players' retirement violated their state law rights of publicity, the Lanham Act, and other state law provisions. The certified settlement class is "any

*League*, Civil No. 09-2182-PAM/AJB, 2013 WL 5888231 (D. Minn. Nov. 1, 2013) and D.E. # 432, has a total of 27,347 retired players, with 21,289 living players and 6,058 deceased players. Co-Lead Class Counsel, Class Counsel and Subclass Counsel believe there are approximately an additional 2,000 AFL, World League of American Football, NFL Europa and NFL Europe players who are in the proposed Settlement Class, and who are not in the *Dryer* case, and several thousand other Settlement Class Members who were on preseason rosters only.

Many Retired NFL Football Players will be reachable through direct individual notice, due to the existence, through the NFL Parties and the NFL Players Association, of multiple lists identifying former NFL players. These sources include: the current Bert Bell/Pete Rozelle NFL Player Retirement Plan pension list; Retired NFL Football Player address data collected and used in the *Dryer* case; a list of NFL players active through 2010 compiled by STATS; a list of former NFL Europe, World League and NFL Europa players; and a list of former AFL players. Co-Lead Class Counsel will utilize: (1) the social security death index to determine additional deceased Retired NFL Football Players; (2) LexisNexis's relative search to find the nearest relative or last person to live with the deceased Retired NFL Football Player; and (3) the national change of address database, as applicable, to get the most recent address for Settlement Class Members.

The proposed Notice Plan attached to the Kinsella Declaration (which is Exhibit C to the Motion) has multiple features to ensure compliance with Due Process. The Plan will include: (1) direct individual notice to identifiable Retired NFL Football Players and heirs of deceased Retired NFL Football Players; (2) paid publication notice in various media sources; and

---

Retired Player, and if a Retired Player is deceased, all of his respective heirs, executors, administrators, beneficiaries, successors, and assigns who own or control his Publicity Rights." D.E. # 262-1, at ¶¶ 1, 6.

28

(3) notice to targeted third parties, such as nursing homes, designed to reach additional retirees who may be incapacitated or incompetent.

The Long-Form Notice included in the direct mailings will describe the Settlement in plain, easily understood language and advise Settlement Class Members of their rights regarding opting out of the Settlement and/or objecting thereto. The notice will explain to Settlement Class Members that it is necessary for them to register in order to be eligible for Settlement benefits. Notice will be sent to Settlement Class Members via first-class mail.

For paid media coverage, Co-Lead Class Counsel plan to use print, television, radio and Internet advertisements to reach Settlement Class Members, including Retired NFL Football Players, legal representatives, spouses, family members and heirs. Print advertisements will include full-page color ads in selected consumer magazines. Thirty-second television spots will appear on the NFL Network, as well as cable and broadcast outlets. Radio spots also will be used. Internet ads using non-static pre-roll, flash, and rich media are also planned. The Notice Plan will be implemented after Preliminary Approval of the Proposed Settlement, commencing with the posting of the notice on the Court's website. If and when Final Approval is granted, additional notice will be used to inform Settlement Class Members of the dates of the registration period.

## IV. ARGUMENT

### A. Preliminary Approval of the Settlement Is Appropriate

There exists a strong judicial policy favoring pretrial settlement of complex class action lawsuits, where substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation. *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding

public interest in settling class action litigation and it should therefore be encouraged."). Settlement is favored, in part, because of the complexity and size of class actions and the ability of a settlement to conserve judicial resources while providing meaningful relief. *See Ehrheart*, 609 F.3d at 594-95 (the presumption in favor of settlement is especially strong in class actions and other complex cases where substantial juridical resources can be conserved by avoiding formal litigation.") (citation and quotation marks omitted).

These principles were most recently reinforced forcefully by the Third Circuit in *Sullivan v. DB Investors, Inc.*, 667 F.3d 273, 311 (3d Cir. 2010) (*en banc*). There, the Third Circuit sitting *en banc* recognized, especially in class actions, the "strong presumption in favor of voluntary settlement agreements." *Id.* Although *Sullivan* affirmed the class settlement of a lawsuit involving antitrust claims, in his concurring opinion, Judge Scirica commented upon personal injury class action settlements. Judge Scirica noted that in the immediate aftermath of *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) or *Ortiz v. Fibreboard Corp*, 52 U.S. 815 (1999), personal injury class settlements were thought to be difficult to achieve. *Id.* at 334. Recognizing this early reaction to *Amchem* to be erroneous, Judge Scirica observed anecdotally a movement away from class settlements. He noted that in the *Vioxx* litigation, before the Honorable Eldon E. Fallon, the parties settled personal injury claims in a fashion that was not subject to judicial scrutiny under Rule 23. *See In re Vioxx Products Liability Litig.*, MDL No. 1657, Current Developments - November 9, 2007 (E.D. La.), available at http://vioxx.laed.uscourts.gov/; *In re Vioxx Products Liability Litig.*, 650 F.Supp.2d 549, 552-53 (E.D. La. 2009)(characterizing the settlement as a "voluntary opt-in agreement"). Despite the fact that the *Vioxx* litigation settled on a non-class basis and the problems presented by complex class actions post-*Amchem*, Judge Scirica recognized that public policy strongly supports the

30

resolution of mass claims, such as those presented here, on a class basis that provides the structural, procedural and substantive guarantees of fairness. Otherwise, parties seeking to settle mass harm claims would be forced to do so outside direct judicial supervision, contrary to the public interest. *Id.* at 340.

Proof that litigants are not seeking to avoid scrutiny under Rule 23 in connection with personal injury claims exists within Judge Fallon's courtroom. He recently has approved a flurry of class actions settling personal injury claims. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2013 WL 499474, *10 (E.D. La. Feb. 7, 2013) ("After considering all available scientific evidence, the Court finds that the Global Settlement and other pending settlements provide for personal injuries in a manner that is fair, reasonable, and adequate."). Before *Chinese-Manufactured Drywall*, Judge Fallon also had certified a similar property damage and personal injury class action. *See Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006).

Indeed, one of the largest (if not, the largest and most innovative) personal injury class actions in history occurred within the Third Circuit – *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litig.*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)(C.J. Bechtle & Bartle). The Third Circuit has referred to this multi-state personal injury settlement as "a landmark effort to reconcile the rights of millions of individual plaintiffs with the efficiencies and fairness of a class-based settlement." *In re Diet Drugs*, 582 F.3d 524, 544 n. 37 (3d Cir. 2009). Not surprisingly, the Supreme Court in *Amchem* allowed for the possibility of personal injury class actions in appropriate circumstances. *See Amchem*, 521 U.S. at 625 ("the

31

text of the Rule does not categorically exclude mass tort cases from class certification.").[11]  The structure of this multi-state personal injury class is remarkably similar to *the Diet Drug* settlement, although it is by far smaller and less prolix.

Federal Rule of Civil Procedure 23(e) requires court approval for any compromise of a class action. *See Amchem*, 521 U.S. at 617;  *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986); *Sullivan*, 667 F.3d at 295; *In re Processed Egg Prods. Antitrust Litig. ("Processed Egg")*, 284 F.R.D. 249, 259 (E.D. Pa. 2012).  Approval of a class action settlement involves a two-step process.  First, counsel submits the proposed terms of settlement to the court for a preliminary fairness evaluation. *See* Manual for Complex Litigation, § 21.632 (4th ed. 2004) (hereinafter "MCL 4th"); *see also* 4 Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS § 11:25,

---

[11] Since *Sullivan* was decided, Judge Jordan, the author of the dissent in *Sullivan*, along with Judges Scirica and Fisher, recently reviewed the settlement of a racial discrimination class action under the Fair Housing Act, 42 U.S.C. § 3605, and the Equal Credit Opportunity Act, 15 U.S.C. §1691. *See Rodriguez v. National City Bank*, 726 F.3d 372 (3d Cir. 2013).  The *Rodriguez* class plaintiffs had sought to prove disparate overall impact amongst class members by using a preliminary statistical analyses employing regression analysis of bank loans. Following a mediation, the parties agreed to a class action settlement. The district court (Judge Robreno) preliminarily approved the class and notice issued. Prior to final approval, however, the United States Supreme Court handed down its opinion in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (U.S. 2011).  The cases bore many similarities in that the facts alleged in *Rodriguez*, as in *Dukes*, turned on the subjective decision making by multiple individual actors, rather than a uniform policy applied by the defendant to the class as a whole. The district court, applying *Dukes*, found that the allegations of the class complaint could not establish overall impact or any direct policy that applied to the class as a whole. Nor, given the nature of the proposed proof, could the class mechanism establish discrimination by individual loan officers. As such, the district court declined to approve the settlement or certify the class. Although National City Bank initially supported the settlement in the district court, on appeal it switched positions and opposed the settlement. In this unusual procedural posture, the Third Circuit considered whether the settlement was fair, reasonable and adequate, and whether the requirements of FED. R. CIV. P. 23 had been met. Under the deferential standard of review given to a district court decision to certify or to not certify a class, the Court of Appeals affirmed the district court's discretionary finding that there was insufficient evidence of commonality presented by the class proponent's preliminary statistical analysis. *Rodriguez*, 726 F.3d at 380-81. The Third Circuit found that plaintiffs "have not shown that [the bank's employment policy] affected all class members in all regions and bank branches in a common way." *Id.* at 385. *Rodriguez* and *Dukes* address a situation far different from the present case. Here, unlike in *Dukes* or *Rodriguez*, the Complaint sets out claims and causes of all injuries suffered by class members that are allegedly attributable directly to all the Defendants, with no intermediary actors whose illegal behavior would be the ultimate source of liability. *See infra* at Commonality Section, at Argument Section IV.B.1(b). The Complaint sets out the specific duties allegedly owed by the NFL, the alleged specific breaches of those duties by the NFL, and the consequent harm suffered by the proposed Class. Those are the common issues that define the causes of action in the Class Action Complaint, and they form the basis for the Settlement.

at 38-39 (4th ed. 2002) (hereinafter "NEWBERG ON CLASS ACTIONS") (endorsing two-step process). If a preliminary evaluation of fairness is made, the second step is to conduct a formal fairness and final approval hearing after notice has been disseminated to the settlement class members.[12]  *Id.* At this time, Plaintiffs request only that this Court grant preliminary approval.

A court's review of preliminary approval is less stringent than during final approval. *See Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007);  MCL 4th § 21.63 (2004) ("At the stage of preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval.").    There need not be a "definitive proceeding on the fairness of the proposed settlement," and the court must make clear that "the determination permitting notice to members of the class is not a finding that the settlement is fair, reasonable and adequate." *Processed Egg*, No. 08-md-02002, (E.D. Pa. July 15, 2010) (Order Preliminarily Approving Settlement at 3 n.1) (D.E. #387) (quoting *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983));  *see also In re General Motors Corp.  Pick-up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (distinguishing between preliminary approval and final approval); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *1-2 (E.D. Pa. May 11, 2004) (same).

---

[12] The fairness, reasonableness, and adequacy of the settlement are assessed in the second step of the process at a final hearing after settlement class members have had an opportunity to opt out from or object to the settlement. The factors considered for final approval of a class settlement include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Sullivan*, 667 F.3d at 319-20 (citations omitted).

In determining whether preliminary approval is warranted, the sole issue before the Court is whether:

> the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval.

*Mehling*, 246 F.R.D. at 472 (citations omitted); *Mack Trucks, Inc. v. Int'l Union, UAW*, No. 07-3737, 2011 WL 1833108, at *2 (E.D. Pa. May 12, 2011) (stating same standard); *Tenuto v. Transworld Sys.*, No. 99-4228, 2001 WL 1347235, at *1 (E.D. Pa. Oct. 31, 2001) (same); *see also* MCL 4th § 21.633. Under Rule 23, a settlement falls within the "range of possible approval," if there is a conceivable basis for presuming that the standard applied for final approval—fairness, adequacy and reasonableness—will be satisfied. *See Mehling*, 246 F.R.D. at 472 (at preliminary approval stage, courts inquire as to whether "the settlement appears to fall within the range of possible approval" under Rule 23(e)). In making this preliminary determination, some courts consider whether: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.[13] *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003); *see also General Motors Corp.*, 55 F.3d at 785.

Here, as explained below, there are no grounds to doubt the fairness of the proposed Settlement and Plaintiffs, without opposition from the NFL Parties, respectfully request that this Court preliminarily approve the proposed Settlement.

---

[13] Although some courts list the fourth factor as part of the preliminary evaluation analysis, it is more properly considered at the final fairness hearing, after notice to class members has been disseminated. Nonetheless, while the total number of opt outs cannot be quantified at this time, the participation of Co-Lead Class Counsel, Class Counsel and Subclass Counsel throughout the negotiation process protects the interests of all members of the Settlement Class and supports the presumptive reasonableness and fairness of the Settlement and the settlement process.

### 1. The Proposed Settlement Is the Product of Good Faith, Extensive Arm's Length Negotiations

Whether a settlement arises from arm's length negotiations is a key factor in deciding whether to grant preliminary approval. *See In re CIGNA Corp. Sec. Litig.*, No. 02-8088, 2007 WL 2071898, at *2 (E.D. Pa. July 13, 2007) (noting that a presumption of fairness exists where parties negotiate at arm's length, assisted by a retired federal judge who was privately retained and served as a mediator); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 439, 444 (E.D. Pa. 2008) (stressing the importance of arms-length negotiations and highlighting the fact that the negotiations included "two full days of mediation"); *In re Auto. Refinishing Paint Antitrust Litig*, MCL No. 1426, 2004 WL 1068807 , at *2 (E.D. Pa. May 11, 2004) (preliminarily approving class action settlement that "was reached after extensive arms-length negotiation between very experienced and competent counsel"); *see also* NEWBERG ON CLASS ACTIONS § 11:41 (noting that courts usually adopt "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval"). Such is the case here.

The Settling Parties participated in settlement discussions under the auspices of retired United States District Court Judge Layn R. Phillips. *See generally* Phillips Declaration (Exhibit D to this Motion). From the beginning, the sessions involved Plaintiffs' Co-Lead Class Counsel, Christopher A. Seeger and Sol Weiss, and counsel for the NFL Parties. Additionally, proposed Class Counsel, Steven C. Marks and Gene Locks, and Subclass Counsel Arnold Levin and Dianne M. Nast, were brought into the process on behalf of Plaintiffs. Some members of the PEC participated as well. Toward the conclusion of the mediation process, several NFL franchise owners, representing the NFL team owners collectively, and the Commissioner of the

NFL, also were brought into the process. At all times, the negotiations were conducted at arm's length and sometimes the negotiations were quite contentious.

In addition to the Parties within the litigation, multiple consultants were brought in to flesh out the details of an agreement as part of the settlement process. The Settling Parties met with multiple medical, actuarial, and economic experts to determine, develop and test an appropriate settlement framework to meet the needs of Retired NFL Football Players suffering from, or at risk for, the claimed injuries. The Settling Parties discussed settlement structures, baseline testing, and injury categories during the negotiations.

Judge Phillips guided the Settling Parties through a grueling mediation period of nearly two months, during which the Parties attended numerous mediation sessions, and aggressively asserted their respective positions. Although amicable, the discussions were at times contentious, and both sides often required Judge Phillips' input in order to resolve contested issues. *See* Phillips Declaration, at ¶¶ 5-6. In the end, the Settling Parties arrived at an agreement in principal during hard-fought, contentious and arm's length negotiations.

### 2. The Investigation of Both Plaintiffs' Claims and the NFL Parties' Defenses Supports Preliminary Approval

Although the Settling Parties have not reached the discovery stage of litigation,[14] proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel possess adequate information concerning the strengths and weaknesses of the litigation against the NFL Parties. Proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel thoroughly investigated

---

[14] Courts have preliminarily approved class action settlements where the litigation is in its early stages and minimal discovery has occurred. *See In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (preliminarily approving class action settlement when "no formal discovery was conducted in this case during the time of the . . . Settlement negotiations or agreement[.]"); *see also Gates* v. *Rohm & Haas Co.*, 248 F.R.D. 434, 444 (E.D. Pa. 2008) (preliminarily approving class settlement when parties had not yet conducted discovery on the merits).

the claims brought in the Class Action Complaints, researched and briefed opposition papers in response to the NFL Parties' motions to dismiss on preemption grounds, and exchanged information with the NFL Parties during negotiation and mediation sessions, including expert calculations of damages and Settlement Class Members' injuries. As discussed more fully *infra*, the significant legal challenges for each side, should the litigation continue, support preliminary approval of the proposed Settlement. Proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel are especially cognizant of the toll imposed upon the plaintiff client base by continued prosecution of litigation towards an uncertain result, in contrast to the certitude presented by the proposed settlement. This factor is a significant incentive to resolve the litigation.

In addition, the proponents of the Settlement are highly experienced in complex class action litigation. The Class and Subclasses are represented by lawyers who have extensive complex class action experience. Proposed Co-Lead Class Counsel, Christopher A. Seeger of Seeger Weiss LLP, and Sol Weiss of Anapol Schwartz, Class Counsel, Gene Locks of Locks Law Firm, and Steven C. Marks of Podhurst Orseck P.A., and Subclass Counsel, Arnold Levin of Levin Fishbein Sedran & Berman and Dianne M. Nast of Nast Law LLC, are all members of the court-appointed PEC and/or the Steering Committee. The Court is familiar with each counsel's experience after the vetting process of the appointment of counsel. They are highly competent counsel, each with decades of experience litigating complex class action and multidistrict cases.

37

### 3. There Is No Preferential Treatment of Certain Settlement Class Members and Class Representatives Support the Settlement

Although formal notice of the Settlement has not yet been disseminated, and, therefore, no formal objections have been made, the proposed Settlement treats all Settlement Class Members fairly and does not provide undue preferential treatment to any individual Settlement Class Member or Subclass. The Settlement Class Members—composed of: (1) all Retired NFL Football Players, (2) the legal representatives of deceased, incompetent or incapacitated Retired NFL Football Players, and (3) family members or others with a legal right to sue independently or derivatively based on their relationship to the Retired NFL Football Player—are readily ascertainable and identifiable using objective criteria.[15] All Settlement Class Members are invited to be part of the Settlement Class and no interests are excluded.

Moreover, the Settling Parties created two Subclasses, each with its own representation during the Settlement negotiations to ensure that all Settlement Class Members' interests were protected. Subclass 1 includes Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order, and their Representative and Derivative Claimants. Subclass 2 includes Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the Preliminary Approval and Class Certification Order and their Representative and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnoses prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE. Subclass

---

[15] This Class definition complies with the requirements of the Third Circuit's recent decision in *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013), and *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 593 (3d Cir. 2012). This is *not* a case where "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials[.]'" *Marcus*, 687 F.2d at 593.

Counsel for the separate subclasses ensure that their respective clients' interests were protected and that currently diagnosed players were not favored over retired players without a diagnosis who may not develop diagnosable injuries (if ever) until years in the future (or vice versa).

### 4. There Are No Other "Obvious Deficiencies" To Doubt the Proposed Settlement's Fairness

As explained above, the complexity, expense, uncertainty, and likely duration of the litigation militate in favor of completing the settlement process. The Settlement defines a clearly identifiable and ascertainable Settlement Class, contains the material economic terms of the agreement, the manner and form of notice to be given to the Settlement Class, the contingencies or conditions to the Settlement's final approval, and other relevant terms. Moreover, the NFL Parties have agreed not to object to the mediator's proposal of a maximum attorneys' fee and reasonably incurred costs award of $112.5 million *in addition to* the $760 million that will fund the BAP Fund, Monetary Award Fund and Education Fund, up to $4 million for Class Notice and one-half of the compensation for the Special Master. *See* NEWBERG ON CLASS ACTIONS § 14:6 (indicating that attorneys' fees of between 22% and 33% is normal for common fund cases); *Tenuto*, 2001 U.S. Dist. LEXIS 17694 at *4 (preliminarily approving class action settlement where attorneys' fees were 30% of the fund); *In re Smithkline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990) (noting that the general range of attorneys' fees in common fund cases is 19% to 45%). The payment by the NFL Parties of attorneys' fees in addition to the Settlement Fund is a significant benefit to Settlement Class Members. The Court retains the final authority to determine the ultimate attorneys' fee and cost award.

**B.** **The Settlement Class and Subclasses Should Be Conditionally Certified for Settlement Purposes**

Class actions certified in conjunction with settlements are well recognized. *See, e.g., Sullivan*, 667 F.3d at 311; *Processed Egg*, 284 F.R.D. at 253-54. The Court must consider whether the settlement class proposed is appropriate under FED. R. CIV. P. 23. *See Amchem*, 521 U.S. at 620; *Rodriguez v. City National Bank*, 726 F.3d 372, 380 (3d Cir. 2013); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004); *Sullivan*, 667 F.3d at 296; *Processed Egg*, 284 F.R.D. at 253-54. The *Manual for Complex Litigation (Fourth)* advises that in cases presented for both preliminary approval and class certification, the "judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)." MCL 4th, § 21.632.

Under Rule 23, Plaintiffs must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defense of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. The court is to apply a "rigorous analysis" to insure that each of the requirements of Rule 23 are met. *See Sullivan*, 667 F.3d at 306. However, when a court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620; *see also Sullivan*, 667 F.3d at 322 n.56 (same). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Under the

rigorous analysis standard, the Settlement easily meets each of the requirements of Rule 23(a) and Rule 23(b)(3) for the proposed Settlement Class and Subclasses.

### 1. The Settlement Class and Subclasses Meet the Requirements Under Rule 23(a)

#### a) Numerosity

Rule 23(a)(1) requires that a class be "so numerous that their joinder before the Court would be impracticable." *In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 232 (E.D. Pa. 2012). In these MDL proceedings, thousands of Retired NFL Football Players have filed suit against the NFL Parties alleging entitlement to damages for injuries sustained as a result of traumatic head impacts, including concussions, received during their NFL Football careers, and/or medical assessments to determine whether they have suffered any cognitive impairment. There are over 20,000 Settlement Class Members, including Retired NFL Football Players, Representative Claimants, and Derivative Claimants based upon the records of the NFL Parties. The numerosity requirement of Rule 23(a) is, therefore, easily met here. *See Stewart v. Abraham*, 275 F.3d 220, 227-28 (3d Cir. 2001) (noting that there is no minimum number to satisfy numerosity and observing that generally requirement is met if potential number of plaintiffs exceeds 40).

#### b) Commonality

FED. R. CIV. P. 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class." "A finding of commonality does not require that all class members share identical claims." *In re Warfarin*, 391 F.3d at 530 (citation and internal quotation marks omitted). Indeed, the commonality element requires only that plaintiffs "share at least one question of fact or law with the grievances of the prospective class." *Id.* at 527-28 (citations omitted).

41

Applying these principles, it is evident that the commonality requirement of Rule 23(a)(2) is easily met here. Questions surrounding the dangers of playing NFL Football, the effect concussions can have on cognitive impairment, and the knowledge of the NFL Parties as to the health risks presented by football-related concussions are issues common to Plaintiffs and the other members of the Settlement Class, thereby satisfying Rule 23(a)(2)'s commonality requirement. *See In re School Asbestos Litig.*, 789 F.2d 996, 1009 (3d Cir.), *cert. denied*, 479 U.S. 852 (1986) (affirming commonality based upon common factual issues such as "the health hazards of asbestos, the defendants' knowledge of those dangers, the failure to warn or test, and the defendants' concert of action or conspiracy in the formation of and adherence to industry practices. The court also believed that the proof of these matters would not vary widely from one class member to another"). *Compare Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (U.S. 2011) *and Rodriguez, supra* (plaintiffs were unable to establish a single common question).

### c)   Typicality

FED. R. CIV. P. 23(a)(3) requires that the class representatives' claims be "typical of the claims . . . of the class." As the Third Circuit explained:

> The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented.

*Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994); *see also In re Warfarin*, 391 F.3d at 532 (finding typicality prong met where "claims of representative plaintiffs arise from the same alleged wrongful conduct"); *In re Blood Reagents*, 283 F.R.D. at 233 ("If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same

42

legal theory as the claims of the class.") (citation and quotation marks omitted). "The typicality criterion focuses on whether there exists a relationship between the plaintiff's claims and the claims alleged on behalf of the class." NEWBERG ON CLASS ACTIONS§ 3:13.

Plaintiff Class Representatives meet the typicality prong. Shawn Wooden is a Retired NFL Football Player who has not been diagnosed with a Qualifying Diagnosis and is a representative of Subclass 1. He has sued the NFL Parties seeking medical monitoring in the form of baseline assessment screening to determine whether he has any neurocognitive impairment owing to his years of playing NFL Football. If he is diagnosed with a Qualifying Diagnosis in the future, he will seek a Monetary Award.

Kevin Turner is a Retired NFL Football Player who has been diagnosed with ALS. He played eight seasons in the NFL. He is a representative of Subclass 2 and seeks compensation from the NFL Parties for his injuries.

Both of the Subclass Representatives seek to hold the NFL Parties liable for damages resulting from the NFL Parties' alleged failure to warn and concealment of the dangers of NFL Football. Their claims are typical of the other Settlement Class Members in their respective Subclasses.

### d) Adequacy of Representation

FED. R. CIV. P. 23(a)(4) requires representative parties to "fairly and adequately protect the interests of the class." This requirement "seeks to uncover conflicts of interest between the named parties and the class they seek to represent." *In re Warfarin*, 391 F.3d at 532. This requirement is satisfied here, as the named Plaintiffs vigorously have pursued the claims of the Settlement Class and the Subclass they purport to represent, and there is no disabling intra-class conflict.

The named Plaintiffs' interests are aligned with those of the Settlement Class and their respective Subclasses. Plaintiffs have filed the Class Action Complaint to seek baseline assessment examinations and compensation for their neurocognitive injuries and damages. These claims are co-extensive with those of the absent Settlement Class Members. All Settlement Class Members, like Plaintiffs, share an interest in obtaining redress from the NFL Parties for their alleged negligence and fraud. And all Settlement Class Members who are Retired NFL Football Players, like many Plaintiffs, have suffered repetitive blows to the head as NFL Football players, and have alleged a heightened risk of developing severe neurocognitive impairments as a result of those repetitive blows. Thus, the interests of all Settlement Class Members – including those with a present Qualifying Diagnosis and those at risk of developing significant neurocognitive impairment in the future – have been accounted for through the Settlement's BAP Fund and Monetary Award Fund.

Additionally, all eligible Settlement Class Members who timely and properly register under the Settlement Agreement may participate in the BAP and, if applicable, seek Monetary Awards or Derivative Claimant Awards. The award amount paid to any one Settlement Class Member has no bearing on the amount payable to any other (except between Derivative Claimants if there are is more than one asserting a valid claim based on the same Retired NFL Football Player). That the Monetary Award Grid, at Exhibit 3 to the Settlement Agreement, provides for different levels of compensation for different impairments "is simply a reflection of the extent of the injury that certain class members incurred and does not clearly suggest that class members ha[ve] antagonistic interests." *In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("[A]lmost every settlement will involve different awards for various class members."); *In*

44

*re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 239 (S.D. W.Va.  2005) ("By nature of the settlement, the parties have negotiated values to assign to claims based on the severity of physical injury.  [The Court] do[es] not consider the assignment of a lower value to claims where injuries are less serious to be evidence of conflict.").

Moreover, unlike the failed settlements in *Amchem*, 521 U.S. 591, and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the proposed Settlement here provides "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627.  By dividing the Settlement Class into two Subclasses and providing each Subclass with its own counsel, the Settlement has cured any antagonism that may exist between the interests of those Settlement Class Members who have already been diagnosed with a Qualifying Diagnosis (Subclass 2) and those who have not (Subclass 1).  *See In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, (N.D. Ohio 2001) (holding that subclasses cured potential intra-class conflict); *cf. Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189-90 (3d Cir. 2012) (holding that dividing class into subclasses on remand would satisfy adequacy requirement).[16]

Also, the Settlement further protects the interests of those who may develop severe neurocognitive impairments in the future by: (i) indexing the Monetary Awards for inflation; (ii) providing that the Parties and the Special Master (or the Claims Administrator after expiration of

---

[16]   In *Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009), for example, window buyers brought a class action against the manufacturer, alleging fraudulent concealment of an inherent product defect.  The defendants argued that adequacy of representation was not satisfied, in part, because "the interests of the latent and manifest defect groups are not aligned in that individuals with manifest defects will want immediate payments, and those with latent defects will want a go-to fund for future use." *Id.* at 480.  The court found that *Amchem* was not controlling, noting that there the "'named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses.'" *Id.* at 483.  The court found that, in contrast to *Amchem*, the plaintiffs in *Saltzman* had "proposed discrete subclasses designed around the type of injury to the class member.  Named Plaintiffs are alleging a mixture of latently defective and manifestly defective windows (both replaced and not yet replaced), so they will adequately be able to represent all of the certified subclasses." *Id.*

the term of the Special Master and any extension(s) thereof) may agree at some point that the Settlement Amount is insufficient to pay all approved claims from the Monetary Award Fund, which, upon Court approval, will trigger an additional contribution by the NFL Parties to the Monetary Award Fund in an amount not to exceed $37.5 million; and (iii) providing eligible Settlement Class Members with Supplemental Monetary Awards, if and when they are diagnosed with additional Qualifying Diagnoses. *See In re Diet Drugs*, No. 1203, 99-20593, 2000 WL 1222042, *49 (E.D. Pa. Aug. 28, 2000) (holding that "step-up" provision and inflation indexing provided adequate structural protections), *aff'd without opinion*, 275 F.3d 34 (3d Cir. 2001); *see also In re Diet Drugs Liab. Litig.*, 431 F.3d 141, 147 (3d Cir. 2005) ("The District Court specifically found that this Settlement Agreement includes structural protections to protect class members with varying diagnoses, pointing to the ability of a particular class member to 'step up' to higher compensation levels as their disease progresses.").

In addition, since all Settlement Class Members who are Retired NFL Football Players, are aware, of course, that they suffered impacts to the head while playing NFL Football, and the identities of approximately 18,000 Settlement Class Members are already known, Class Members are readily ascertainable, can be notified effectively, and can make an informed decision about whether to opt out of the Settlement Class. Consequently, they stand in sharp contrast to the conflicting, amorphous, and sprawling classes in *Amchem* and *Ortiz*, who numbered in the tens of millions, could not be identified in advance, and might well have been unaware that materials in their homes or workplaces contained the asbestos at issue in those actions. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 269 (2d Cir. 2006) (distinguishing *Amchem* on the grounds that "all members of the [class at issue] have been identified, have been given notice of the settlement, and have had the opportunity to voice objections or to opt out

46

entirely"); *Diet Drugs*, 2000 WL 1222042 at *46 (holding that there was no *Amchem* "futures" problem because "all class members are aware of their exposure to [the subject drugs]").

Indeed, unlike *Amchem*, where the settlement class included members who were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods, and who may not even have been aware they were exposed, and some who suffered no physical injury or had only asymptomatic pleural changes, and did not have lung cancer or asbestosis or mesothelioma, the proposed Settlement Class here has a great deal of cohesion as all Retired NFL Football Players and their families are aware they played NFL Football. The Plaintiffs and Settlement Class Members all allege that their injuries arise from one cause (head impact while playing football), involving two defendants (the NFL and NFL Properties), over a defined period of time, and render them at increased risk of suffering only certain, particular types of injuries. And, all Settlement Class Members raise the same claims within their respective Subclasses. Thus, unlike in *Amchem*, the named Class Representatives' interests here are closely aligned with those of the Settlement Class, such that fair and adequate representation can be ensured and sufficient unity exists for settlement class certification purposes. *Compare Amchem*, 521 U.S. at 626.[17]

---

[17] The facts underlying the proposed Settlement are analogous to those of other cases in which courts have held that settlements complied with the adequacy concerns of *Amchem*. For example, in *In re Countrywide Financial Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352 (W.D. Ky. Dec. 22, 2009), mortgage customers brought a nationwide class action alleging consumer law violations based on Countrywide's failure to secure their personal financial information, which resulted in a theft of that information from a database by a Countrywide employee. In challenging the proposed settlement, some of the objectors argued that there was an inherent conflict of interest between presently injured plaintiffs (*i.e.*, plaintiffs who had been victims of identity theft) with uninjured plaintiffs or "future" plaintiffs, and that these future plaintiffs were not adequately represented in the settlement negotiations. *Id.* at *4. The objectors argued that, like in *Amchem*, the settlement would bind persons who may experience future identity theft, and that the interests of these future plaintiffs were, therefore, not adequately represented. *Id.* The court disagreed, noting that the "representative Class Members ... possess the same interests as all other members of the class. *All class members have been subjected to the same alleged conduct by Countrywide* whereby private information was compromised, and the impact of this conduct has already or possibly will produce a similar result for all members. The Court does not shy away from the fact that, at present, not all class members have suffered the same injury. But unlike an asbestos mass tort action *where unknown plaintiffs may*

### 2. Common Questions of Law and Fact Predominate and the Superiority Requirement Is Met

In order to satisfy Rule 23(b)(3)'s requirement that common questions of law and fact predominate, "the predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit." NEWBERG ON CLASS ACTIONS § 4:25; *see also Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.") (citing 7A Wright, Miller, & Kane 518-19); *In re Warfarin*, 391 F.3d at 527-28; *Sullivan*, 667 F.3d at 297.

Plaintiffs contend that the issues surrounding the NFL Parties' alleged liability for the injuries suffered by Settlement Class Members predominate over any individual issues involving the Plaintiffs. These predominating common questions of fact easily comport with *Dukes, supra*. Moreover, a class settlement will ensure that all available funds are allocated equitably among those with claims against the NFL Parties. In this case, the class action vehicle is best suited for the resolution of Plaintiffs' and the other Settlement Class Members' claims. Plaintiffs' claims for compensatory relief and medical monitoring are founded upon a common legal theory related to the singular body of facts concerning the NFL Parties' knowledge and alleged concealment of the dangers that concussions in football pose to NFL Football players. A class settlement will insure that a fully developed, well-designed claims process exists to compensate Plaintiffs and other Settlement Class Members for their damages.

In addition to the predominance requirement, Rule 23(b)(3) requires that the class action device be superior to other methods of adjudication. Factors the court may consider include:

---

*develop symptoms decades later, this action involves an objectively identifiable class.* Class members who are fearful of the possibility of future identity theft will have been given notice of the settlement and have the opportunity to opt out." *Id.* at *5 (emphasis added).

(A)    the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the difficulties likely to be encountered in the management of a class action.[18]

FED. R. CIV. P. 23(b)(3)(A)-(D).

Courts have recognized the benefits of "concentrating the litigation of claims in a single superior forum," rather than requiring "numerous individual suits brought by claimants." *Sullivan*, 667 F.3d at 311-12; *see also Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 543 (3d Cir. 1973) ("The 'superiority requirement' was intended to refer to the preferability of adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit, and possibly requiring a defendant to answer suits growing out of one incident in geographically separated courts.").

Moreover, in light of the JPML's Order transferring these cases and consolidating them before this Court pursuant to 28 U.S.C. § 1407, "[t]his factor should . . . be of little or no significance in resolving the superiority issue." NEWBERG ON CLASS ACTIONS, § 4:31. The JPML previously considered, pursuant to 28 U.S.C. § 1407, the desirability of centralizing the various concussion injury suits against the NFL Parties in this particular forum.

---

[18] As stated earlier, any difficulties of management of this Settlement Class need not be considered when the Court is confronted with a request for settlement-only class certification because the proposal is that there be no trial. *See Amchem*, 521 U.S. at 620; *Sullivan*, 667 F.3d at 322 n.56.

49

In this case, Plaintiffs contend that it makes good sense to resolve promptly the claims against the NFL Parties in this forum through the class action device. Given the thousands of suits already commenced against the NFL Parties in federal and state courts, approval of the Settlement and resolution of all concussion injury claims against the NFL Parties in this forum benefits all Parties. Further, a class action suit is superior to any other form of adjudication because it provides the best way of managing and resolving the claims at issue here. "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin*, 391 F.3d at 533-34 (citation and quotation marks omitted).

Consideration of judicial economy and prompt resolution of claims underscore the superiority of the class action in this case. Should each of the cases filed by Plaintiffs against the NFL Parties be litigated individually, the Parties could face decades of litigation and significant expense in many different state and federal courts throughout the country, potentially resulting in conflicting rulings. In addition, compensation resulting from litigation is highly uncertain, especially given the preemption issue at stake in this case, and may not be received, in any event, before lengthy and costly trial and appellate proceedings are complete. Moreover, the Settlement removes the overwhelming and redundant costs of individual trials. *See Sullivan*, 667 F.3d at 310-12.

In sum, the requirements of Rule 23 are readily satisfied at this preliminary stage and certification of the Settlement Class and Subclasses is appropriate.

## C. **Plaintiffs Faced Significant Challenges and Obstacles in the Litigation**

Plaintiffs faced stiff and complex challenges in the litigation. *See* Phillips Decl. at ¶12. Their claims could have been dismissed in their entirety or drastically reduced on the basis of the

50

NFL Parties' threshold legal arguments and defenses. Whether Plaintiffs could have maintained their claims and met their burden of proof when faced with a number of the arguments summarized below was a significant consideration in agreeing to the proposed Settlement Agreement.

### 1. Preemption

Plaintiffs' claims were at risk due to the NFL Parties' threshold legal argument that federal labor law precludes the litigation of Plaintiffs' claims in court. *See* Phillips Decl. at ¶13. In particular, in the Motions to Dismiss the Master Administrative Class Action Complaint and the Amended Master Administrative Long-Form Complaint on Preemption Grounds, the NFL Parties claimed that Section 301 of the Labor Management Relations Act ("LMRA") mandates the preemption of all state-law claims—whether based in negligence or fraud—whose resolution is substantially dependent upon or inextricably intertwined with the terms of a Collective Bargaining Agreement ("CBA"), or that arise under the CBA. *See* 29 U.S.C. §185(a) (codifying Section 301(a)); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). Citing decisions from courts around the country, the NFL Parties contended that resolution of Plaintiffs' claims would substantially depend upon interpretations of the terms of the CBAs and that Plaintiffs' claims arose under the CBA. *See, e.g., Duerson v. National Football League*, No. 12-C-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012); *Maxwell v. National Football League*, Civ. No. 11-08394, Order (C.D. Cal. Dec. 8, 2011); *see also Stringer v. National Football League*, 474 F. Supp.2d 894 (S.D. Ohio 2007). Each of these decisions found that the NFL players' claims against the NFL or its Member Clubs relating to duties that are imposed by the CBAs were preempted because they required interpretation of CBA terms.

In support of this argument, the NFL Parties cited various CBA provisions relating to the Member Clubs' duties to provide medical care to NFL players during their playing careers. *See, e.g.*, Art. XLIV §1 (1993 CBA); Art. XLIV §1 (2006 CBA) (club physicians' duty to warn players about injuries "aggravated by continued performance"). The NFL Parties further highlighted other CBA provisions addressing rule-making, player safety rule provisions, grievance procedures, player benefits, as well as provisions of the NFL Constitution. The volume of CBA provisions and favorable court decisions on the preemption issue support the NFL Parties' argument that the degree of care owed to retired NFL Football players must be considered in light of the pre-existing contractual duties imposed by the CBAs. The same arguments apply to Plaintiffs' claims of fraudulent concealment and negligent misrepresentation.

The Plaintiffs offered well-reasoned arguments to oppose the NFL Parties' preemption defense. In particular, Plaintiffs asserted that controlling authority in the Third Circuit, *Kline v. Security Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004), requires the presence of a concrete interpretive dispute over a specific CBA provision. Without an actual interpretive dispute of a specific term, there is no § 301 preemption, even if a CBA provision may be tangentially relevant as a factual matter. Despite the NFL Parties' reference to myriad CBA provisions, the Plaintiffs contended that none of the provisions gave rise to an *actual* dispute over the *interpretation* of any provision, and that the NFL Parties' arguments were theoretical at best.

Plaintiffs asserted factual arguments to distinguish their claims as well. For example, certain of the Retired NFL Football players played their entire NFL careers during periods of time when no CBA was in effect (meaning there could be no preemption defense against these players). As to those Retired NFL Football Players for which a CBA was in effect during their NFL careers, the question of whether their claims turn on the interpretation of a CBA provision

52

was disputed by Plaintiffs. For example, the NFL was not a signatory to a vast majority of the CBAs supposedly at issue.

As to Plaintiffs' fraudulent concealment and negligent misrepresentation claims, Plaintiffs powerfully asserted that the Third Circuit squarely held that where a plaintiff alleges fraud stemming from statements issued outside of the CBA bargaining process, the "elements of state law fraud" do "not depend on the [CBA]." *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 232 (3d Cir. 1995). Plaintiffs thus argued that their fraud claims turned on whether the NFL Parties had spoken about concussions truthfully, and on how those statements affected the decisions of the players. Since neither question demanded an investigation into the terms of the CBAs, Plaintiffs argued that the preemption defense could be defeated.

Thus, the legal issue of Section 301 LMRA preemption presented a significant challenge for both sides. The NFL Parties had strong arguments, legal authority, and facts. Plaintiffs, in turn, presented a forceful response. After extensive briefing on the matter, the Court heard oral argument on April 9, 2013, taking the matter under advisement. Had the Court accepted the NFL Parties' arguments, the Plaintiffs' claims could have been dismissed outright, rendered impracticable, or severely jeopardized or impaired.

### 2. Causation

Here, the Retired NFL Football Players brought suit for injuries allegedly resulting from head trauma they suffered during their NFL careers. Plaintiffs allege that had the NFL Parties properly treated these head traumas and, had they provided Plaintiffs with information they possessed concerning the risk of concussion, these players would not have suffered such debilitating injuries or the injuries could have been minimized. In deciding whether to resolve the Plaintiffs' claims outside of litigation, Co-Lead Class Counsel, Class Counsel and

Subclass Counsel took into consideration the significant legal impediments surrounding the Plaintiffs' ability to prove causation and obtain verdicts in the absence of a settlement. Specifically, but for the proposed Settlement, Plaintiffs would have had to demonstrate that the actions of the NFL Parties, in allegedly concealing risks of concussion and exposing them to head traumas on numerous occasions, was the legal cause of their injuries. Plaintiffs anticipate that the NFL Parties would have argued that Plaintiffs could not meet their burden because it was also possible that the injuries resulted from some other cause unrelated to football, or from head impacts suffered playing football in middle school, high school and/or college.

### 3. Statutes of Limitation

In the NFL Parties' motions to dismiss on preemption grounds, discussed above, the NFL Parties reserved the right to assert statute of limitations defenses in future motions to dismiss. "'Challenges based on the statute of limitations . . . have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.'" *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 163 (3d Cir. 2002) (quoting NEWBERG ON CLASS ACTIONS § 4.26 (3d ed.)). Nevertheless, a significant potential risk for Plaintiffs and Settlement Class Members moving forward with this litigation is that the NFL Parties could invoke a statute of limitations defense. *See* Phillips Decl. at ¶15. Many of the Retired NFL Football Players have not played for years, or even decades. Certain Settlement Class Members' brain injuries and symptoms have been present for several years or even decades. This scenario presents a serious challenge as the NFL Parties could argue that as a result of the timing of certain Plaintiffs' injuries, their claims are outside the applicable statute of limitations.

In cases where the causal connection between a plaintiff's injury and another's conduct is not apparent, many states have adopted a "discovery rule" that delays the accrual of a plaintiff's claim until the plaintiff discovers or reasonably should have discovered that they suffered an injury and that the injury was caused by the defendant. *See, e.g., Pedersen v. Zielski*, 822 P.2d 903, 906 (Alaska 1991) (stating that statute does not begin to run under discovery rule until claimant discovers, or reasonably should have discovered, existence of elements essential to his cause of action); *Anson v. Am. Motors Corp.*, 747 P.2d 581, 584 (Ariz. Ct. App. 1987) (recognizing that cause of action does not accrue until plaintiff discovers or should have discovered that he had been injured by defendant's conduct).[19]

However, several states have declined to adopt a "discovery rule," holding that a plaintiff's claim accrues upon the date of the injury. *See, e.g., Utilities Bd. of Opp v. Shuler Bros., Inc.*, No. 1111558, 2013 WL 3154011, at \*4 (Ala. June 21, 2013) (stating that there is no discovery rule for negligence claims); *Chalmers v. Toyota Motor* Sales, 935 S.W.2d 258, 261 (Ark. 1996) (stating that there is no discovery rule for personal injury cases); *Johnston v. Dow & Coulombe, Inc.*, 686 A.2d 1064, 1066 (Me. 1996) (discovery rule is limited to claims for legal malpractice, medical malpractice, and asbestosis).[20]

---

[19] *See, e.g., Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005) (stating that discovery rule postpones accrual of cause of action until plaintiff discovers, or has reason to discover, cause of action); CONN. GEN. STAT. § 52-584 (statute of limitations begins to run from date when injury is first sustained or discovered or in exercise of reasonable care should have been discovered); IDAHO CODE ANN. § 5-219(4) (when fact of damage has been fraudulently and knowingly concealed, a cause of action accrues when injured party knows or in exercise of reasonable care should have been put on inquiry of condition); *Bowen v. Eli Lilly & Co., Inc.*, 557 N.E.2d 739, 741 (Mass. 1990) (stating that under discovery rule, cause of action accrues when event or events have occurred that were reasonably likely to put plaintiff on notice that someone may have caused his injury).

[20] *See also Herrmann v. McMenomy v. Severson*, 590 N.W.2d 641, 643 (Minn. 1999) (statute of limitations is not tolled by ignorance of cause of action); *Carr v. Anding*, 793 S.W.2d 148, 150 (Mo. Ct. App. 1990) (recognizing that Missouri has rejected discovery rule and statute of limitations runs when fact of damage is capable of ascertainment, although not actually discovered); *Dreyer-Lefevre v. Morissette*, No. 56653, 2011 WL 2623955, at \*2 (Nev. July 1, 2011) (discovery rule does not apply to cause of action for injuries to person caused by wrongful act or neglect of

As noted above, many of the players have been retired from NFL Football for many years or even decades. Therefore, the repetitive, traumatic sub-concussive and/or concussive head impacts which occurred while participating in games and practice happened a long time ago. Thus, in states that have not adopted a discovery rule, the NFL Parties could argue that each player's cause of action accrued at the time of the initial impact that caused the players to suffer a traumatic brain injury. Accordingly, Plaintiffs' claims would likely be subject to the defense that each player who suffered his initial head impact outside the applicable statute of limitations does not have timely claims and should be dismissed.

Further, in each of the states that has adopted a discovery rule, the NFL Parties could argue that Plaintiffs' causes of action are untimely when applying the applicable discovery rule. The NFL Parties could assert that certain Plaintiffs have been aware of their injuries for years and believed that NFL Football caused their injuries. Moreover, the NFL Parties may argue that the public records put Plaintiffs on notice of their potential claims years ago, such that certain Plaintiffs failed to file their claims in a timely manner.

Based on the foregoing, the statute of limitations defenses available to the NFL Parties pose a significant risk to the claims of many of the Plaintiffs and Settlement Class Members. This proposed Settlement appropriately factors in, and avoids, the significant risks presented by the NFL Parties' statute of limitation defenses.

---

another); N.Y.C.P.L.R. § 2-14 (discovery rule is limited to toxic tort and foreign object causes of action); *Koenig v. Lambert*, 527 N.W.2d 903, 905 (S.D. 1995) (recognizing that legislature has acknowledged and rejected discovery rule), *overruled on other grounds*, 567 N.W.2d 220 (S.D. 1997); VA.. CODE ANN. § 8.01-230 ("the right of action shall be deemed to accrue and the prescribed limitation period shall begin from the date the injury is sustained in the case of injury to the person").

### 4.    Assumption of Risk

As the NFL has done in other litigation, the NFL Parties are expected to raise the defense that Plaintiffs had assumed the risks of the cognitive injuries they developed. *See* Phillips Decl. at ¶15. It is well known that football poses serious injury risks as countless individuals (at all levels of the sport) incur personal injuries every year while playing the sport. It is also well known that countless individuals suffer serious head trauma, including concussions, while playing football. Therefore, it would not be unexpected that the NFL Parties would present a strong assumption of risk argument in opposing the Plaintiffs' claims.

Under the doctrine of assumption of risk, one who voluntarily participates in an activity, such as tackle football, consents to those commonly appreciated risks that are inherent in and arise out of the nature of the activity generally and flow from such participation. *See Alqurashi v. Party of Four, Inc.*, 89 A.D.3d 1047, 1047 (N.Y. App. Div. 2d Dept. 2011) ("The doctrine of primary assumption of risk provides that a voluntary participant in a sporting or recreational activity consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation") (citations and internal quotations omitted).[21]

Therefore, in light of the great risk of physical injury that is inherent in football, the doctrine of assumption of risk poses a significant challenge to Plaintiffs' claims going forward.

---

[21]    *See also Savino v. Robertson*, 652 N.E.2d 1240, 1244 (Ill. App. 1995) (enactment of Illinois' modified comparative fault statute has no effect on express assumption of risk, where plaintiff expressly assumes dangers and risks created by activity or defendant's negligence, or on primary implied assumption of risk, where plaintiff knowingly and voluntarily assumes risks inherent in particular situation or defendant's negligence); *Coomer v. Kansas City Royals Baseball Corp.*, Nos. WD 73984, WD 74040, 2013 WL 150838, at *3 (Mo. Ct. App. Jan. 15, 2013) ("Primary implied assumption of risk operates to negate the negligence element of duty . . . [t]he plaintiff's voluntary participation in the activity serves as consent to the known, inherent, risks of the activity and relieves the defendant of the duty to protect the plaintiff from those harms.") (internal citations omitted); *Fortier v. Los Rios Cmty. Coll. Dist.*, 52 Cal. Rptr. 2d 812 (Cal. App. 4th 1996) (applying doctrine of assumption of risk to preclude football player's claims for personal injuries).

Indeed, the doctrine has been recognized or applied in numerous cases involving football players who were injured while playing the sport. *See, e.g., Brown v. National Football League*, 219 F. Supp. 2d 372, 389 (S.D.N.Y. 2002) (noting that state law claims by NFL player for injuries incurred while playing professional football" will "implicate . . . ordinary concepts of negligence and assumption of risk"); *Glazier v. Keuka Coll.*, 275 A.D.2d 1039 (N.Y. App. Div. 2000) (plaintiffs assumed risk of injuries, as matter of law, by engaging in tackle football game between two residence halls); *Hunt v. Skaneateles Cent. Sch. Dist.*, 227 A.D.2d 939 (N.Y. App. Div. 1996) (high school student assumed risk of football related injury); *Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650 (1989) (same); *Fortier v. Los Rios Cmty. Coll. Dist.*, 52 Cal. Rptr. 2d 812 (Cal. App. 4th 1996) (doctrine of assumption of risk precluded collegiate football player from recovering from community college for personal injuries sustained during football practice); *cf. Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d 516, 520 (10th Cir. 1979) (noting that theory of negligence would not support holding NFL team liable, "since subjecting another to unreasonable risk of harm, the essence of negligence, is inherent in the game of football, for admittedly it is violent," and drawing distinction that where football player is subject to intentional conduct that results in infliction of injuries in reckless disregard of his rights, only then may NFL team be liable for such intentional conduct, since it is "highly questionable whether a professional football player consents or submits to injuries caused by conduct not within the rules").

Even in those states that do not recognize assumption of risk as a defense, such states will nevertheless consider concepts such as contributory negligence or comparative fault to limit any recovery by a plaintiff, where that plaintiff is deemed to have engaged in a dangerous activity

that contributed to his or her injuries.[22] *See generally Brown*, 219 F. Supp. 2d at 384 n.5 (noting

that "implied assumption of risk is no longer a complete defense, but is subsumed under

New York's comparative fault statute"); *see also Britenriker v. Mock*, No. 3:08 CV 1890, 2009

WL 2392917, at *5 (N.D. Ohio July 31, 2009) (same; applying Ohio law).

Therefore, based on the well-known risks of injury associated with football, to proceed

with this litigation would expose Plaintiffs to significant risks and challenges based on the

defenses of assumption of risk, contributory negligence, and comparative fault.

### 5.    Other Defenses

The NFL Parties also may assert a statutory employer defense in this litigation. Pursuant

to this defense, a general contractor (or other similarly situated employer) can be held immune

from suit, with the applicable Workers Compensation Act providing the exclusive remedy to an

injured employee of a subcontractor. *See Fulgham v. Daniels J. Keating Co.*, 285 F. Supp. 2d

525, 537 (D.N.J. 2003) (once employer qualifies as statutory employer under Pennsylvania

Workers' Compensation Act, it is immune from suit even if injured worker's immediate

---

[22]    *See, e.g.,* ARIZ. REV. STAT. ANN. § 12-2505 (contributory negligence is defense in Arizona); *Valley Elec., Inc. v. Doughty*, 528 P.2d 927, 928 (Colo. Ct. App. 1974) (contributory negligence is defense where plaintiff engaged in dangerous activity); *Allen v. Kamp's Beauty Salon, Inc.*, 177 So. 2d 678, 679 (Fla. Dist. Ct. App. 1965) (contributory negligence is defense in Florida); *Garrett v. NationsBank, N.A. (S.)*, 491 S.E.2d 158 (Ga. App. 1997) (contributory negligence is defense in Georgia); *Funston v. Sch. Town of Munster*, 849 N.E.2d 595 (Ind. 2006) (contributory negligence is defense in Indiana); *Smith v. McGittigan*, 376 So. 2d 598 (La. Ct. App. 1979) (contributory negligence is defense in Louisiana); *Collins v. Nat'l R.R. Passenger Corp.*, 9 A.3d 56 (Md. 2010) (contributory negligence is defense in Maryland); MASS. GEN. LAWS ANN. ch. 231, § 85 (contributory negligence is defense in Massachusetts); MICH. COMP. LAWS ANN. § 600.2959 (comparative fault is defense in Michigan); MINN. STAT. ANN. § 604.01 (comparative fault is defense in Minnesota); *Stallings v. Food Lion, Inc.*, 539 S.E.2d 331 (N.C. App. 2000) (contributory negligence is defense under North Carolina law); OHIO REV. CODE § 2315.19(B)(4) (comparative fault is defense under Ohio law); 42 PA. CONS. STAT. ANN. § 7102 (comparative negligence is defense in Pennsylvania); *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992) (comparative fault is defense in Tennessee); TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 (comparative fault is defense in Texas); WASH. REV. CODE ANN. § 4.22.005 (West) (contributory fault is defense in Washington).

employer provides benefits; statutory employer retains its common law immunity in exchange for its secondary liability under Workers' Compensation Act).

In Pennsylvania, to create the relation of statutory employer under section 203 of the act (77 PA. CONS. STAT. ANN. § 52), all of the following elements essential to a statutory employer's liability must be present: (1) an employer who is under contract with an owner or one in the position of an owner; (2) premises occupied by or under the control of such employer; (3) a subcontract made by such employer; (4) part of the employer's regular business is entrusted to such subcontractor; and (5) an employee of such subcontractor. *Rolick v. Collins Pine Co.*, 925 F.2d 661, 663 (3d Cir. 1991) (citing *McDonald v. Levinson Steel Co.*, 302 Pa. 287 (1930)); *see also Al-Ameen v. Atlantic Roofing Corp.*, 151 F. Supp. 2d 604, 606 (E.D. Pa. 2001) (citing *McDonald* test).

The statutory employer defense is widely recognized as precluding injured employees of subcontractors from recovering damages from general contractors.[23] In such cases, courts recognize that the injured employee's claims are in the nature of Workers' Compensation claims, and that both the subcontractor and general contractor should be immunized from common law liability.

Thus, one may expect the NFL Parties to pursue the statutory employer defense in this case. The NFL Parties may argue it is similarly situated to a general contractor with respect to

---

[23] *See, e.g., Young v. Envtl. Air Products, Inc.*, 665 P.2d 40, 45-46 (Ariz. 1983) (Arizona recognizes the statutory employer defense); *Zamudio v. City & Cnty. of San Francisco*, 82 Cal. Rptr. 2d 664 (Cal. App. 1999) (California recognizes statutory employer defense); *Finlay v. Storage Tech. Corp.*, 764 P.2d 62 (Colo. 1988) (Colorado recognizes statutory employer defense); *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433 (Tex. 2009) (Texas recognizes statutory employer defense); *Roberts v. City of Alexandria*, 246 Va. 17, 19 (1993) (Virginia recognizes statutory employer defense); *Manor v. Nestle Food Co.*, 932 P.2d 628, 632 (Wash. 1997) *amended*, 945 P.2d 1119 (Wash. 1997) and *disapproved of on other grounds* by *Washington Indep. Tel. Ass'n v. Washington Utilities & Transp. Comm'n*, 64 P.3d 606 (Wash. 2003) (Washington recognizes statutory employer defense).

the injured players, and the injured players are akin to the employees of subcontractors. Therefore, if this litigation goes forward in the absence of a settlement agreement, the NFL Parties may argue that they are immune from suit as the statutory employer of the injured Retired NFL Football Players.

**D.     The Proposed Form and Method of Class Notice Satisfy Due Process**

Under Rule 23(e)(1) of the Federal Rules of Civil Procedure, when approving a class action settlement, the district court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." FED. R. CIV. P. 23(e)(1). In addition, for classes certified under Rule 23(b)(3), courts must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B); *see Amchem*, 521 U.S. at 617; *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173 (1974).

Due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005). Rule 23(c)(2)(B) provides that the "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." FED. R. CIV. P. 23(c)(2)(B).

61

The form and content of the proposed Long-form notice (the "Notice") and the short-form notice ("Summary Notice") satisfy all these legal parameters. *See* Exhibits 3 and 5 at Notice Plan, appended to the Kinsella Declaration (Exhibit C to this Motion). Each form of notice is written in plain and straightforward language consistent with Rules 23(c)(2)(B) and 23(e)(1). The Notice objectively and neutrally apprises all Settlement Class Members of the nature of the action; the definition of the Settlement Class sought to be certified for purposes of the Settlement; the Settlement Class claims and issues; that Settlement Class Members may enter an appearance through an attorney before the Court at the Fairness Hearing (in accordance with the procedures set forth in the Notice); that the Court will exclude from the Settlement Class anyone who elects to opt out of the Settlement (and sets forth the procedures and deadlines for doing so); and the binding effect of a class judgment on Settlement Class Members under Rule 23(c)(3)(B). The Notice additionally discloses the date, time, and location of the Fairness Hearing, and the procedures and deadlines for the submission of objections to any aspect of the Settlement. These disclosures are complete and should be approved by the Court. *See In re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 482-83 (E.D. Pa. 2010); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 175 (E.D. Pa. 2000).

To deliver the best notice practicable to Settlement Class Members, Co-Lead Class Counsel, together with their notice agent, Katherine Kinsella, President of Kinsella Media LLC, have developed a comprehensive and innovative Notice Plan that far exceeds the requirements of Rule 23 and due process. As described earlier, the notice plan supplements traditional methods of direct and publication notice with an ambitious outreach strategy designed to find missing Settlement Class Members who are Retired NFL Football Players. *See* Kinsella Declaration, ¶30. The direct notice will be accomplished by mailing the Long-form notice to each known

Settlement Class Member. The Settlement Class Members' addresses will be extracted from the following data sets: current Bert Bell/Pete Rozelle NFL Player Retirement Plan pension list; Retired NFL Football Player address data collected and used in the *Dryer* case; a list of NFL players active through 2010 compiled by STATS; a list of former World League of American Football, NFL Europe, and NFL Europa players; and a list of former AFL players. Unlike many class actions, this direct mailed notice will provide for actual individual notice to a great many Settlement Class Members.

Further, the Social Security Death Index will be used to identify additional deceased Retired NFL Football Players, the LexisNexis Relative Search will be used to find a nearest relative or last person to live with the deceased player, and the National Change of Address Database will be used to get the most recent addresses. In addition, publication notice will be accomplished through full-page color advertisements in consumer magazines, thirty-second radio and television advertisements, and internet advertisements. *See* Kinsella Declaration, ¶¶19-23. These direct notice and publication notice strategies, alone, satisfy the requirements of Rule 23 and due process. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirements of both FED. R. CIV. P. 23 and the due process clause."); *In re Certainteed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. at 482-83 (finding that direct mailing and advertisements on television and internet satisfied requirements of Rule 23 and due process); *Grunewald v. Kasperbauer*, 235 F.R.D. 599, 609 (E.D. Pa. 2006) (same for direct mailing and advertisements in three newspapers and internet); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210-11 (S.D.N.Y. 1995) (finding that notice by first class mail is the best notice practicable, and publication in a major newspaper "will have the

63

broadest reach to inform those members of the Class who, for some reason, may not receive the mailed Notice"); *Trist v. First Federal Savings & Loan Assoc. of Chester*, 89 F.R.D. 1, 2 (E.D. Pa. 1980) (notice that failed to reach one-eighth of class was sufficient). Similar levels of penetration have been deemed adequate under Rule 23 and the Due Process clause. *See In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1061 (S.D. Tex. 2012) (notice plan that expert estimated would reach 81.4% of class was sufficient); *Alberton v. Commonwealth Land Title Ins. Co.*, No. 06-3755, 2008 WL 1849774, at *3 (E.D. Pa. Apr. 25, 2008) (direct notice projected to reach 70% of class plus publication in newspapers and internet was sufficient); *Grunewald*, 235 F.R.D. at 609 (direct mail to 55% of class and publication in three newspapers and internet was sufficient); *In re Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75, 96 (D. Mass. 2005) (notice plan that experts predicted would expose 80% of class to notice was sufficient).

Plaintiffs' Notice experts estimate that the Notice Plan, as a whole, will reach approximately 90% of the Settlement Class Members. *See* Kinsella Declaration, ¶36. Because the proposed notice plan easily fulfills the requirements of Rule 23 and the due process, it should be approved by the Court.

## E.     The Court Should Stay This Action and Enjoin Related Lawsuits By Settlement Class Members

Along with staying the instant litigation and all other Related Lawsuits against the NFL Parties (and other Released Parties) in this Court, the Court should enjoin all Settlement Class Members, unless and until they have been excluded from the Settlement Class by action of the Court, or until the Court denies approval of the Class Action Settlement (and such denial is affirmed by the Court of last resort), or until the Settlement Agreement is otherwise terminated,

from filing, commencing, prosecuting, continuing to prosecute, supporting, intervening in, or participating as plaintiffs, claimants, or class members in any other lawsuit or administrative, regulatory, arbitration, or other proceeding in any jurisdiction based on, relating to, or arising out of the claims and causes of action, or the facts and circumstances at issue, in the Class Action Complaint and/or the Released Claims.   No such injunction would apply to the Riddell Defendants.   Such "injunctive relief is commonly granted in preliminary approvals of class-action  settlements pursuant to the All Writs Act and the Anti-Injunction Act."   *In re Uponor, Inc.*, No. 11-MD-2247, 2012 U.S. Dist. LEXIS 5339, 23-34 (D. Minn. Jan. 18, 2012); *see also In re Prudential Ins. Co. of Am. Sales Prac. Litig.*, 261 F.3d 355, 360-61 (3d Cir. 2001) (upholding order enjoining all class members from "filing, commencing, prosecuting, continuing, litigating, intervening in or participating as class members in, any lawsuit in any jurisdiction based on or related to the facts and circumstances underlying the claims and causes of action in this lawsuit, unless and until such [class member] has timely excluded herself or himself from the Class."); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1018, 1025 (9th Cir. 1997) (upholding preliminary class settlement approval order enjoining duplicative state actions).

The All Writs Act authorizes courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  While the Anti-Injunction Act limits a federal court's powers under the All Writs Act, it expressly authorizes a federal court to enjoin parallel state court proceedings—including indirectly, by enjoining the parties to state court proceedings—"where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283; *see also In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 233 (3d Cir. 2002) ("An order directed at the parties and their representatives, but not at the court itself, does not remove it from the scope of the Anti-

Injunction Act."). *See generally Winkler v. Eli Lilly & Co.,* 101 F.3d 1196, 1202 (7th Cir. 1996); *Carlough v. Amchem Prods., Inc.,* 10 F.3d 189, 202–04 (3d Cir. 1993); *Battle v. Liberty Nat'l Life Ins. Co.,* 877 F.2d 877, 882 (11th Cir. 1989); *In re Corrugated Container Antitrust Litig.,* 659 F.2d 1332, 1334–35 (5th Cir. 1981).

Here, issuance of this injunction is necessary and appropriate in aid of the Court's jurisdiction because, as recognized by the Third Circuit, "[t]he threat to the federal court's jurisdiction posed by parallel state actions is particularly significant where there are conditional class certifications and impending settlements in federal action." *Diet Drugs*, 282 F.3d at 236 (citations omitted)("In complex cases where certification or settlement has received conditional approval ... the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal court."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 314 F.3d 99, 104 (3d Cir. 2002) ("[D]istrict courts overseeing complex federal litigation are especially susceptible to disruption by related actions in state fora."). Indeed, the "success of any federal settlement [is] dependent on the parties' ability to agree to the release of any and all related civil claims[.]" *In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985). Parallel state actions threaten this interest by undermining "the finality of any federal settlement." *Id.*

That is precisely the case here. This is a complex, multi-district litigation involving nearly 300 consolidated actions and over 7,000 plaintiffs (and with the proposed class, involves thousands more), multiple rounds of motion practice, and oral argument. The Settling Parties have engaged in hard-fought, difficult negotiations and reached a comprehensive, global settlement. Yet the NFL Parties could remain exposed to "countless suits in state court despite settlement of the federal claims" that might "seriously undermine the possibility for settling any

large, multi-district class action" and throw into doubt the finality of the releases the NFL Parties bargained for, and the validity of the entire agreement. *See Prudential Ins.*, 314 F.3d at 104-105 (citations omitted). In addition, an injunction will permit Settlement Class Members to review the notice materials discussing the terms of the proposed nationwide settlement and to assess their rights and options without the distraction and confusion that would be occasioned by competing actions.

## V. CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion.

Dated:    January 6, 2014                          Respectfully submitted,


/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

*Co-Lead Class Counsel*

Sol Weiss
**ANAPOL SCHWARTZ**
1710 Spruce Street
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

*Co-Lead Class Counsel*

67

## *Class Counsel*

Steven C. Marks
**PODHURST ORSECK P.A.**
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com

Gene Locks
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: 866-562-5752
Fax: (215) 893-3444
glocks@lockslaw.com

## *Subclass Counsel*

Arnold Levin
**LEVIN FISHBEIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
**NAST LAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Fax: (215) 923-9302
DNast@nastlaw.com

*Counsel for Subclass 1*

*Counsel for Subclass 2*

## *Of Counsel*

Thomas V. Girardi
Graham B. LippSmith
**GIRARDI KEESE**
1126 Wilshire Blvd
Los Angeles, CA 90017
Phone: (213) 977-0211
Fax: (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

James R. Dugan, II
**THE DUGAN LAW FIRM**
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Phone: (504) 648-0180
Fax: (504) 648-0181
jdugan@dugan-lawfirm.com

Michael L. McGlamry
**POPE, MCGLAMRY, KILPATRICK
MORRISON & NORWOOD, P.C.**
3455 Peachtree Road, NE
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, GA 30326-3243
Phone: (404) 523-7706
Fax: (404) 524-1648
efile@pmkm.com

Charles S. Zimmerman
**ZIMMERMAN REED PLLP**
1100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: (612) 341-0400
Fax: (612) 341-0844
charles.zimmerman@zimmreed.com

David S. Casey, Jr.
Fred Schenk
**CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD
LLP**
110 Laurel Street
San Diego, CA  92101-1486
Phone: (619) 238-1811
Fax: (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

Anthony Tarricone
**KREINDLER & KREINDLER LLP**
277 Dartmouth Street
Boston, MA 02116
Phone: (617) 424-9100
Fax: (617) 424-9120
atarricone@kreindler.com

David A. Rosen
**ROSE, KLEIN & MARIAS LLP**
801 South Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Phone: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

Derriel McCorvey
**THE LAW FIRM OF DERRIEL C.
MCCORVEY**
115 W. Main Street, Suite 14
P.O. Box 2473
Lafayette, LA 70501
Phone: (337) 291-2431
derriel@mccorveylaw.com