IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                        :
IN RE: NATIONAL FOOTBALL                :
LEAGUE PLAYERS' CONCUSSION              :
INJURY LITIGATION                       :   MDL No. 2323
_____  :   12-md-2323
                                        :
THIS DOCUMENT RELATES TO:               :
ALL ACTIONS                             :
_____

**January 14, 2014**                                    **Anita B. Brody, J.**

## MEMORANDUM

  Plaintiffs, through their proposed Co-Lead Class Counsel, Class Counsel, and Subclass Counsel, and Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties")[1] have negotiated and agreed to a Class Action Settlement ("Settlement") that will resolve all claims against the NFL Parties in this multidistrict litigation and Related Lawsuits.[2] To that end, proposed Co-Lead Class Counsel, Class Counsel, and Subclass Counsel have filed a Motion for Preliminary Approval and Class Certification ("Motion"). This Motion is unopposed by the NFL Parties. In light of my duty to protect the rights of all potential class members and the insufficiency of the current record, I will deny the Motion without prejudice.

---

[1] Plaintiffs have also sued Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp. (collectively, the "Riddell Defendants"). The Riddell Defendants are not a party to the proposed Settlement.

[2] Except where otherwise noted, the capitalized terms in this Memorandum are taken from, and have the same meaning as those in, the Settlement Agreement. Pl. Mot. Ex. B, Jan. 6, 2014, ECF No. 5634.

## I. BACKGROUND

In July 2011, Retired NFL Football Players filed the first lawsuit against the NFL Parties alleging, *inter alia*, that the NFL Parties breached their duties to the players by failing to take reasonable actions to protect players from the chronic risks created by concussive and sub-concussive head injuries and that the NFL Parties concealed those risks. Since then, more than 4,500 former players have filed substantially similar lawsuits. These lawsuits have been consolidated before me as a multidistrict litigation ("MDL"), pursuant to 28 U.S.C. § 1407. *See* Panel on Multidistrict Litigation Transfer Order, Jan. 31, 2012, ECF No. 1. As the transferee judge, I exercise authority over any coordinated or consolidated pretrial proceedings, including settlement proceedings. *See In re Patenaude*, 210 F.3d 135, 144-45 (3d Cir. 2000); 15 Charles Alan Wright et al., *Federal Practice & Procedure* § 3866 (4th ed. 2013) ("The transferee judge inherits the entire pretrial jurisdiction that the transferor court could have exercised had the case not been transferred.").

On July 8, 2013, I directed the parties to mediation before retired U.S. District Judge Layn Phillips. Order, July 8, 2013, ECF No. 5128. During the course of the mediation, "[t]he Settling Parties met with multiple medical, actuarial, and economic experts to determine, develop and test an appropriate settlement framework to meet the needs of Retired NFL Football Players suffering from, or at risk for, the claimed injuries." Pl. Mem. Law 36, Jan. 6, 2014, ECF No. 5634. "The parties' economists and actuaries assisted in modeling the likely disease incidence and adequacy of the funding provisions and benefit levels contained in the proposed settlement." Pl. Mot. Ex. D, Phillips Decl. ¶ 8, Jan. 6, 2014, ECF No. 5634. On August 29, 2013, Judge Phillips informed me that the Plaintiffs and the NFL Parties had signed a term sheet

incorporating the principal terms of a settlement.  Order, Aug. 29, 2013, ECF No. 5235.  On December 16, 2013, pursuant to Federal Rule of Civil Procedure 53, I appointed Perry Golkin as Special Master to assist me in analyzing the financial aspects of the Settlement.  Order Appointing Special Master, Dec. 16, 2013, ECF No. 5607.  Plaintiffs filed their Class Action Complaint on January 6, 2014.  Class Action Compl., Turner v. Nat'l Football League, No. 14-29 (E.D. Pa. Jan. 6, 2014), ECF No. 1.

## II. THE PROPOSED CLASS ACTION SETTLEMENT

### A. The Proposed Settlement Class

The Settlement provides for a nationwide Settlement Class consisting of three types of claimants: (1) Retired NFL Football Players; (2) authorized representatives, ordered by a court or other official of competent jurisdiction, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and (3) close family members of Retired NFL Football Players or any other persons who properly assert, under applicable state law, the right to sue by virtue of their relationship with the Retired NFL Football Player ("Derivative Claimants").  Based on the records of the NFL Parties, there are more than 20,000 Settlement Class Members.  Pl. Mem. Law 41, Jan. 6, 2014, ECF No. 5634.

The Settlement Class consists of two Subclasses: Subclass 1 is defined as Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order, and their Representative Claimants and Derivative Claimants; and Subclass 2 is defined as Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a

Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of chronic traumatic encephalopathy ("CTE"). A Qualifying Diagnosis is defined as Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, amyotropic lateral sclerosis ("ALS"), and/or Death with CTE.

### B. The Proposed Settlement

As explained in the Plaintiffs' Memorandum of Law accompanying the Motion, the NFL Parties will make payments totaling $760 million over a period of 20 years to create three potential sources of benefits for Settlement Class Members.

First, the Settlement provides for a $75 million Baseline Assessment Program ("BAP") that will offer eligible Retired NFL Football Players baseline neuropsychological and neurological evaluations to determine the existence and extent of any cognitive deficits. In the event that retired players are found to suffer from moderate cognitive impairments, they may receive certain BAP Supplemental Benefits in the form of specified medical treatment and/or evaluation, including counseling and pharmaceutical coverage.

Second, the Settlement provides for a $675 million Monetary Award Fund that will award cash to Retired NFL Football Players who already have a Qualifying Diagnosis or receive one in the future.[3] Representative Claimants and Derivative Claimants related to such players will also be eligible for cash awards. The Qualifying Diagnoses and their maximum Monetary Award levels are as follows: Level 1.5 Neurocognitive Impairment ($1.5 million); Level 2 Neurocognitive Impairment ($3 million); Alzheimer's Disease ($3.5 million); Parkinson's

---

[3] The Settlement further provides that in the event of a funding shortfall, the NFL Parties will contribute up to an additional $37.5 million to the Monetary Award Fund.

Disease ($3.5 million); ALS ($5 million); Death with CTE ($4 million).  These awards may be reduced based on a retired player's age at the time of diagnosis, the number of NFL seasons played, and other applicable offsets outlined in the Settlement Agreement.

Third, the Settlement establishes a $10 million Education Fund to fund education programs promoting safety and injury prevention with regard to football players, including safety-related initiatives in youth football.  This Fund will also educate Retired NFL Football Players regarding the NFL's medical and disability programs.

In addition, the NFL Parties will pay up to $4 million in notice expenses.  The NFL Parties will also pay attorneys' fees and costs, which Plaintiffs' Co-Lead Counsel will seek in an amount not to exceed $112.5 million.  These amounts are in addition to the $760 million for the BAP, the Monetary Award Fund, and the Education Fund.

The Settlement includes a complex system of administration to manage the distribution of benefits.  A Special Master, appointed for a five-year term, will oversee the work of a BAP Administrator, a Claims Administrator, and other administrative staff.  The NFL Parties have agreed to pay one-half of the compensation of the Special Master, which is capped at $200,000 per year.  The BAP Fund will pay the compensation and reasonable costs and expenses of the BAP Administrator.  The Monetary Award Fund will pay the compensation and reasonable costs and expenses of the Claims Administrator; the reasonable costs and expenses of the Special Master; and the other half of the Special Master's compensation.

In exchange for the benefits provided in the Settlement, Settlement Class Members and their related parties will release all claims and dismiss with prejudice all actions against, and covenant not to sue, the NFL Parties and others in this litigation and all Related Lawsuits in this Court and other courts.  Settlement Class Members who receive Monetary Awards will also be

required to dismiss pending and/or forebear from bringing litigation relating to cognitive injuries against the National Collegiate Athletic Association ("NCAA") and any other collegiate, amateur, or youth football organizations and entities.

### III. DISCUSSION

#### A. Nature of a Class Action

Plaintiffs have chosen to structure this case as a class action. "Class actions are a form of representative litigation. One or more class representatives litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative's litigation." 1 William B. Rubenstein, *Newberg on Class Actions* § 1:1 (5th ed. 2013) [hereinafter Rubenstein, *Class Actions*]. Class certification enables courts to treat common claims together, obviating the need for repeated adjudications of the same issues. Rubenstein, *Class Actions* at § 1:6. Class actions achieve "the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims." *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 402-03 (1980).

Despite the potential benefits of class actions, their binding effect on absentee parties remains a significant concern. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) [hereinafter, *General Motors*]. Following the resolution of a class action, class members are barred from relitigating their claims against the defendant, and the defendant may present the class action judgment as an affirmative defense to any such suit. Rubenstein, *Class Actions* at § 1:6. "The class member may not protest that she was not

present at the class action: her membership in the class constitutes her presence for preclusion purposes." *Id*.

Accordingly, under Federal Rule of Civil Procedure 23, the court must assure "to the greatest extent possible, that the actions are prosecuted on behalf of the actual class members in a way that makes it fair to bind their interests." *General Motors*, 55 F.3d at 785. "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims." 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:46 (4th ed. 2002). Courts have described their duties as a "fiduciary responsibility, as the guardian of the rights of the absentee class members." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see General Motors*, 55 F.3d at 784; *In re Warner Commun. Sec. Litig.,* 798 F.2d 35, 37 (2d Cir. 1986). "The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995).

### B. Preliminary Approval of the Proposed Settlement[4]

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval, which may issue only "on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Review of a proposed class action settlement typically proceeds in two stages. At the first stage, the parties submit the proposed settlement to the court, which must make "a preliminary fairness evaluation." *Manual for Complex Litigation*

---

[4] Where, as here, the Court has not already certified a class, the Court must also determine whether the proposed settlement class satisfies the requirements of Rule 23. *Amchem v. Windsor,* 521 U.S. 591, 620 (1997). At the preliminary approval stage, the Court may conditionally certify the class for purposes of providing notice. *Manual for Complex Litigation (Fourth)* § 21.632 (2004) ("The judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."). Because I am denying preliminary approval of the settlement on other grounds, I will not address the issue of conditional class certification at this time.

*(Fourth)* § 21.632 (2004) [hereinafter, *MCL*]. If the proposed settlement is preliminarily acceptable, the court then directs that notice be provided to all class members who would be bound by the proposed settlement in order to afford them an opportunity to be heard on, object to, and opt out of the settlement. *See* Fed. R. Civ. P. 23(c)(3), (e)(1), (e)(5); *see also Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 120 (8th Cir. 1975) ("[D]ue process requires that notice of a proposed settlement be given to the class."). At the second stage, after class members are notified of the settlement, the court holds a formal fairness hearing where class members may object to the settlement. *See* Fed. R. Civ. P. 23(e)(1)(B). If the court concludes that the settlement is "fair, reasonable and adequate," the settlement is given final approval. At this time, Plaintiffs request only that I grant preliminary approval.

  a. **Standard of Review**

At the preliminary approval stage, the bar to meet the "fair, reasonable and adequate" standard is lowered, and the court is required to determine whether "the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval." *Thomas v. NCO Fin. Sys.,* No. 00-5118, 2002 WL 1773035, at *5 (E.D. Pa. July 31, 2002) (Waldman, J.) (citing *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 209 (S.D.N.Y. 1995)).[5] To determine whether a settlement "falls within the range of possible approval," a court must "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re*

---

[5] At the final approval stage, the fairness, reasonableness and adequacy of the settlement are assessed by considering the following factors: (1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Girsh,* 521 F.2d at 156–57.

*Tableware Antitrust Litig.,* 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). In *General Motors*, the Third Circuit stated that "an initial presumption of fairness [exists] when the court finds that (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." 55 F.3d at 785-86. This examination is generally "made on the basis of information already known, supplemented as necessary by briefs, motions, or informal presentations by parties." *MCL* at § 21.632. The purpose of this examination is in part to detect defects in the settlement that would risk making "notice to the class, with its attendant expenses, and a hearing . . . futile gestures." 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:25 (4th ed. 2002).

That said, preliminary approval is not simply a judicial "rubber stamp" of the parties' agreement. *In re Inter–Op Hip Prosthesis Liab. Litig.,* 204 F.R.D. 330, 338 (N.D. Ohio 2001). "Judicial review must be exacting and thorough. The task is demanding because the adversariness of litigation is often lost after the agreement to settle." *MCL* at § 21.61. "In cases such as this, where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, we require district courts to be even 'more scrupulous than usual' when examining the fairness of the proposed settlement." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (citing *General Motors,* 55 F.3d at 805). Accordingly:

> Even though the preliminary approval analysis set forth by the Third Circuit in *General Motors* is not rigorous, there is no bar to conducting a more thorough analysis at the preliminary approval stage. Motions for preliminary approval of a class action settlement, especially before the class is certified pursuant to Fed. R. Civ. P. 23, are not perfunctory. If a proposed settlement appears obviously deficient, the ruling should be issued before rather than after the parties incur the administrative expense to publish notice to the class and handle any objections.

*Zimmerman v. Zwicker & Assocs., P.C.,* No. 09–3905, 2011 WL 65912, at *3 n. 5 (D.N.J. Jan. 10, 2011) (citations omitted) (denying a motion for preliminary approval where, among other concerns, the class members received insufficient value for the release of their claims).

      **b. Analysis**

Counsel for the Plaintiffs and the NFL Parties have made a commendable effort to reach a negotiated resolution to this dispute. There is nothing to indicate that the Settlement is not the result of good faith, arm's-length negotiations between adversaries. Nonetheless, on the basis of the present record, I am not yet satisfied that the Settlement "has no obvious deficiencies, grants no preferential treatment to segments of the class, and falls within the range of possible approval." *Cordy v. USS-Posco Indus.*, No. 12-553, 2013 WL 4028627, at *3 (N.D. Cal. July 31, 2013).

I am primarily concerned that not all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their related claimants will be paid.[6] The Settlement fixes the size of the Monetary Award Fund. It also fixes the Monetary Award level for each Qualifying Diagnosis, subject to a variety of offsets. In various hypothetical scenarios, the Monetary Award Fund may lack the necessary funds to pay Monetary Awards for Qualifying Diagnoses. More specifically, the Settlement contemplates a $675 million Monetary Award Fund with a 65-year lifespan for a Settlement Class of approximately 20,000 people. Retired NFL Football Players with a Qualifying Diagnosis of Parkinson's Disease, for example, are eligible for a maximum award of $3.5 million; those with a Qualifying Diagnosis of ALS may receive up to $5 million. Even if only 10 percent of Retired NFL Football Players eventually receive a Qualifying

---

[6] I have additional concerns including, but not limited to, the adequacy of the BAP Fund and the release of the NCAA and other amateur football organizations. These concerns will also have to be addressed.

Diagnosis, it is difficult to see how the Monetary Award Fund would have the funds available over its lifespan to pay all claimants at these significant award levels.

The parties are responsible for supplementing the record to provide the court with the information needed to evaluate the fairness or adequacy of a proposed settlement. *MCL* at § 21.632. *See Martin v. Cargill, Inc.*, No. 13-2563, 2013 WL 5806165, at *3 (D. Minn. Oct. 29, 2013) (holding that the evidence submitted by the parties was insufficient to support preliminary approval of the class settlement where the parties' submissions provided almost no information enabling the court to gauge the value of the proposed class' claims); *Custom LED, LLC v. eBay, Inc.,* No. 12-350, 2013 WL 4552789, at *9 (N.D. Cal. Aug. 27, 2013) (denying a motion to preliminarily approve settlement where, *inter alia*, the parties "provided the Court with no information as to the class members' potential range of recovery"); *Galloway v. Kansas City Landsmen, LLC*, No. 11-1020, 2013 WL 3336636, at *4 (W.D. Mo. July 2, 2013) (denying a motion for preliminary approval where the court remained concerned that the amended settlement offered insufficient value for class members' claims and the record was insufficient to determine the approximate value of the class members' claims and the amended settlement); *Sobel v. Hertz Corp.*, No. 06-545, 2011 WL 2559565, at *10 (D. Nev. June 27, 2011) (finding the court could not "even begin th[e] inquiry" where "the parties ha[d] failed to provide . . . evidence of . . . the total amount of . . . fees that were charged to the class members, let alone potential ranges of recovery and the chances of obtaining it").

The current record does not sufficiently address my concerns. The Declaration from Judge Phillips refers to "analyses conducted by the independent economists or actuaries retained by the parties" to justify his belief that the $760 million to be paid by the NFL Parties "is fair and reasonable and will be sufficient to fund the benefits to which the parties have agreed." Pl. Mot.

Ex. D, Phillips Decl. ¶ 20, Jan. 6, 2014, ECF No. 5634.  Plaintiffs allege that their economists conducted analyses to ensure that there would be sufficient funding to provide benefits to all eligible Class Members given the size of the Settlement Class and projected incidence rates, and Plaintiffs' counsel "believe" that the aggregate sum is sufficient to compensate all Retired NFL Football Players who may receive Qualifying Diagnoses.  Pl. Mem. Law 22, Jan. 6, 2014, ECF No. 5634.  Unfortunately, no such analyses were provided to me in support of the Plaintiffs' Motion.  In the absence of additional supporting evidence, I have concerns about the fairness, reasonableness, and adequacy of the Settlement.

## IV. CONCLUSION

I will deny the Motion for Preliminary Approval and Class Certification without prejudice.  As a first step toward preliminary approval, I will order the parties to share the documentation referred to in their submissions with the Court through the Special Master.

**s/Anita B. Brody**

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to: