# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## MOTION TO INTERVENE BROUGHT BY
### SEAN MOREY, ALAN FANECA, BEN HAMILTON, ROBERT ROYAL, RODERICK CARTWRIGHT, JEFF ROHRER, AND SEAN CONSIDINE

Pursuant to Federal Rule of Civil Procedure 24(a), Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine (the "Intervenors") respectfully move to intervene as of right in Civil Action No. 2:14-cv-00029-AB and MDL No. 2323. Alternatively, the Intervenors request permissive intervention under Rule 24(b).

For the reasons set forth more fully in the accompanying Memorandum, which is incorporated herein as if fully set forth, the Intervenors are entitled to intervention as of right. As putative class members, the Intervenors have an interest in the outcome of this litigation that will be impaired by resolution of this case. Settlement negotiations are occurring at which the

substantial rights and interests of Intervenors and similarly situated class members are being affected.  The Intervenors' interests are not adequately represented by the current parties to the litigation.  Finally, the Intervenors' application is timely.  Accordingly, the Intervenors are entitled to plaintiff-intervenor status in Civil Action No. 2:14-cv-00029-AB.  *See* Fed. R. Civ. P. 23(a)(2).

In the alternative, because Intervenors share with the main action common questions of law and fact, they are entitled to permissive intervention.  *See* Fed. R. Civ. P. 23(b).

In satisfaction of Federal Rule of Civil Procedure 24(c), the Intervenors attach as Exhibit A Plaintiffs' Class Action Complaint.

WHEREFORE, for the reasons stated above and in the accompanying Memorandum of Law, Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine respectfully request that this Court enter an order granting them leave to intervene.

Dated: May 5, 2014

/s/ William T. Hangley

William T. Hangley
Michele D. Hangley
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
(215) 496-7001 (telephone)
(215) 568-0300 (facsimile)
whangley@hangley.com
mdh@hangley.com

*Attorneys for Intervenors*

*Of Counsel* (*Pro Hac Vice* applications to be submitted):

Steven F. Molo
Thomas J. Wiegand
Kaitlin R. O'Donnell
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
kodonnell@mololamken.com

Eric R. Nitz
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
enitz@mololamken.com

Linda S. Mullenix
2305 Barton Creek Blvd., Unit 2
Austin, TX 78735
(512) 263-9330 (telephone)
lmullenix@hotmail.com

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br>        Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>        Defendants. | CIVIL ACTION NO: _____ |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## PLAINTIFFS' CLASS ACTION COMPLAINT

## INTRODUCTION

1.  Plaintiffs bring this action, pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on their own behalf and as representatives of a class of persons consisting of:

> (1) All living NFL Football Players who, prior to the date of the Preliminary
> Approval and Class Certification Order, retired, formally or informally, from
> playing professional football with the NFL or any Member Club, including
> American Football League, World League of American Football, NFL Europe
> League and NFL Europa League players, or were formerly on any roster,
> including preseason, regular season, or postseason, of any such Member Club or
> league and who no longer are under contract to a Member Club and are not
> seeking active employment as players with any Member Club, whether signed to
> a roster or signed to any practice squad, developmental squad, or taxi squad of a
> Member Club ("Retired NFL Football Players"); (2) Authorized representatives,
> ordered by a court or other official of competent jurisdiction under applicable
> state law, of deceased or legally incapacitated or incompetent Retired NFL
> Football Players ("Representative Claimants"); and (3) Spouses, parents, children
> who are dependents, or any other persons who properly under applicable state law
> assert the right to sue independently or derivatively by reason of their relationship
> with a Retired NFL Football Player or deceased Retired NFL Football Player
> ("Derivative Claimants").

2.  Plaintiffs bring this action individually and as Class and Subclass

representatives against the National Football League and NFL Properties, LLC (together, "NFL

Defendants" or "Defendants") (i) to obtain medical monitoring and treatment for neurocognitive

impairment in Retired NFL Football Players, (ii) to recover monetary awards for Retired NFL

Football Players, their Representative Claimants, and their Derivative Claimants for injuries

sustained by the Retired NFL Football Players as a proximate result of playing professional

football, such as dementia, Alzheimer's Disease ("Alzheimer's"), Parkinson's Disease

("Parkinson's"), Amyotrophic Lateral Sclerosis ("ALS") and Death with Chronic Traumatic

Encephalopathy ("CTE"), and (iii) to establish an education fund to fund education programs

promoting safety and injury prevention with respect to football players, including safety-related

initiatives in youth football, and the education of Retired NFL Football Players regarding the

NFL's medical and disability benefits programs and other educational programs and initiatives. The allegations herein, except as to the Plaintiffs, are based on information and belief.

      3.     This action arises from the effects of mild traumatic brain injuries (referenced herein as "MTBI") caused by the concussive and sub-concussive impacts that have afflicted former professional football players in the NFL. For many decades, evidence has linked repetitive MTBI to long-term neurological problems in many sports, including football. The NFL, as the organizer, marketer, and face of the most popular sport in the United States, in which MTBI is a regular occurrence and in which players are at risk for MTBI, was aware of the evidence and the risks associated with repetitive traumatic brain injuries, but deliberately ignored and actively concealed the information from the Plaintiffs and all others who participated in organized football at all levels.

## PARTIES

      4.     Plaintiff Shawn Wooden is a resident and citizen of the State of Florida, residing in Pembroke Pines, Florida. Mr. Wooden is a retired NFL football player. He played professional football in the NFL from 1996-2004. He played as a safety for the Miami Dolphins and the Chicago Bears. During his career in the NFL he experienced repeated traumatic head impacts. After his retirement from football he has experienced neurological symptoms. Mr. Wooden has not been diagnosed with any neurocognitive impairment, but is at increased risk of developing dementia, Alzheimer's, Parkinson's, or ALS, as a proximate result of his having played professional football in the NFL, and, therefore, is in need of medical monitoring.

      5.     Plaintiff Marcia Wooden is married to Shawn Wooden and is a resident of Florida. Mrs. Wooden is a Derivative Claimant.

6.      Plaintiffs Blake Wooden, Shane Wooden, Brooke Wooden, and Taiya Wooden are Shawn Wooden's children.  They reside in Florida and are Derivative Claimants.

7.      Plaintiff Kevin Turner is a resident and citizen of the State of Alabama, residing in Birmingham, Alabama.  Mr. Turner is a retired NFL football player.  He played professional football in the NFL from 1992-1994 for the New England Patriots and from 1995-1999 for the Philadelphia Eagles as a fullback.  Mr. Turner was diagnosed with ALS in June 2010.

8.      Plaintiffs Cole Turner, Nolan Turner and Natalie Turner are Kevin Turner's children.  They reside in Birmingham, Alabama.  They are Derivative Claimants.

9.      Defendant NFL, which maintains its offices at 345 Park Avenue, New York, New York, is an unincorporated association consisting of separately owned and independently-operated professional football teams which operate out of many different cities and states within this country.  The NFL is engaged in interstate commerce in the business of, among other things, promoting, operating, organizing, and regulating the major professional football league in the United States.  NFL regularly conducts business in Pennsylvania and in this judicial district.

10.     The NFL is not, and has not been, the employer of the Plaintiffs Shawn Wooden or Kevin Turner, who were employed during their respective careers in professional football by the independent clubs (hereinafter "Teams" or "Clubs") set forth above.  The United States Supreme Court held in *American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212-13 (2010), that each team that is a member of the NFL is a legally distinct and separate entity from both the other teams and the NFL itself.

11.     Defendant NFL Properties, LLC, as the successor-in-interest to National Football League Properties Inc. ("NFL Properties"), is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York. NFL Properties is engaged in, among other activities, approving, licensing and promoting equipment used by all the National Football League teams.  NFL Properties regularly conducts business in Pennsylvania and in this judicial district.

12.     On information and belief, NFL Defendants' policies and decision-making relevant to its conduct and the risks of latent brain injury alleged herein, occurred primarily at its corporate offices in New York City.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and is a class action in which members of the proposed Class and Subclasses of Plaintiffs are citizens of a State different from the Defendants.

14.     This Court has personal jurisdiction over the Defendants because they conduct substantial and continuous business in the Commonwealth of Pennsylvania.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events or omissions that give rise to the claims occurred within the Commonwealth of Pennsylvania and this district, because the Defendants conduct a substantial part of their business within this district, and because the Judicial Panel on Multi-District Litigation decided to consolidate and transfer these cases to this Court.

## CLASS ACTION ALLEGATIONS

16. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on their own behalf and as representatives of a Class consisting of:

> (1) All living NFL Football Players who, prior to the date of the Preliminary
> Approval and Class Certification Order, retired, formally or informally, from
> playing professional football with the NFL or any Member Club, including
> American Football League, World League of American Football, NFL Europe
> League and NFL Europa League players, or were formerly on any roster,
> including preseason, regular season, or postseason, of any such Member Club or
> league and who no longer are under contract to a Member Club and are not
> seeking active employment as players with any Member Club, whether signed to
> a roster or signed to any practice squad, developmental squad, or taxi squad of a
> Member Club ("Retired NFL Football Players"); (2) Authorized representatives,
> ordered by a court or other official of competent jurisdiction under applicable
> state law, of deceased or legally incapacitated or incompetent Retired NFL
> Football Players ("Representative Claimants"); and (3) Spouses, parents, children
> who are dependents, or any other persons properly under applicable state law
> assert the right to sue independently or derivatively by reason of their relationship
> with a Retired NFL Football Player or deceased Retired NFL Football Player
> ("Derivative Claimants").

17. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the following

Plaintiffs bring this action on behalf of the following Subclasses.

a. Plaintiff Shawn Wooden brings this case individually and on

behalf of Subclass 1, which shall consist of all Retired NFL Football Players who were

not diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or

Death with CTE prior to the date of the Preliminary Approval and Class Certification

Order and their Representative Claimants and Derivative Claimants.

b. Plaintiff Kevin Turner brings this case individually and on behalf

of Subclass 2, which shall consist of all Retired NFL Football Players who were

diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death

with CTE prior to the date of the Preliminary Approval and Class Certification Order and

their Representative Claimants and Derivative Claimants, and the Representative

Claimants of deceased Retired NFL Football Players who were diagnosed with

dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE prior

to death or who died prior to the date of the Preliminary Approval and Class

Certification Order and received a post-mortem diagnosis of CTE.

18.    Plaintiffs, the Class and each of the Subclasses bring this action for

equitable and injunctive relief pursuant to Federal Rule of Civil Procedure 23(a)(1-4) & (b)(2)

(with a right of opt-out) or alternatively pursuant to Rule 23(b)(3) to create a Court-supervised

fund to provide medical monitoring and treatment for neurocognitive impairment to assure that

Retired NFL Football Players receive a prompt and proper diagnosis of and treatment for

neurocognitive impairment, and to provide education programs promoting safety and injury

prevention in football players, and education of retired NFL players regarding the NFL's medical

and disability benefits programs and other education programs and initiatives.

19.    Plaintiffs, the Class and each of the Subclasses, bring this action for

compensatory damages pursuant to Federal Rule of Civil Procedure 23(b)(3).  Retired NFL

Football Players are at increased risk for and/or have suffered personal injury as a direct and

proximate result of their having played professional football, for which an award of damages is

appropriate to them or their Representative Claimants.  In addition, the Derivative Claimants

have suffered damages as a direct and proximate result of the fact that the Retired NFL Football

Players to whom they are related played professional football, for which an award of damages is

appropriate.

20.     The named plaintiffs herein are members of the Class and each Subclass they seek to represent.  Plaintiff Shawn Wooden is a member of Subclass 1.   Plaintiff Kevin Turner is a member of Subclass 2.

21.     The Class and each Subclass includes thousands of individuals who are geographically widely dispersed, and therefore the members of the Class and Subclasses are each so numerous that joinder of all members is impracticable.

22.     There are questions of law and fact common to the members of the Class and Subclasses.

23.     Plaintiffs' claims are typical of the claims of the members of the Class and the respective Subclasses they seek to represent, in that each named Plaintiff and all members of the proposed Subclass are Retired NFL Football Players or assert rights and claims as a "Derivative Claimant" or "Representative Claimant" of a Retired NFL Football Player, as these terms are defined in the proposed Class and Subclass definitions.

24.     In the case of the proposed medical monitoring program, which includes baseline assessments, and an education fund, the representative Plaintiffs and the Subclass members as a whole will benefit from such relief, and their interests are aligned, because they retired from playing professional football for the NFL, and because of their consequential increased risk of neurocognitive impairment, including ALS, Alzheimer's, Parkinson's, and dementia.  The diagnostic testing, education, and collection of data will work to benefit the entire Class.

25.     Plaintiffs will fairly and adequately protect the interests of the proposed Class and Subclasses.

26.     Questions of law and fact common to the members of the Class and Subclasses predominate over any questions affecting only individual members of the Class or Subclasses. These include the following:

a.      Whether Plaintiffs and the Class and Subclasses are entitled to injunctive relief in the form of a Court-supervised medical monitoring program and an education fund;

b.      Whether Plaintiffs and the Class and Subclasses are entitled to compensation for neurocognitive impairment, like ALS, Alzheimer's, Parkinson's, dementia, and Death with CTE, proximately caused by injuries sustained while playing professional football in the NFL;

c.      Whether the Defendants have any affirmative defenses that can be litigated on a classwide basis;

d.      Whether the Defendants' conduct was tortious and caused members of the Class and Subclasses to be at increased risk of neurocognitive impairment;

e.      Whether medical monitoring is reasonably necessary for Retired NFL Football Players in the Class and Subclasses to obtain early diagnosis of neurocognitive impairment;

f.      Whether such medical monitoring is beyond the routine medical care provided to men of a similar age as members of the Class and Subclasses; and

g.      Whether early diagnosis of neurocognitive impairment will lead to improved treatment for the medical, cognitive, psychological and behavioral sequelae of the same.

27.     The members of the Class and Subclasses are ascertainable.

28.     A class action is superior to other available methods for fairly and
efficiently adjudicating the controversy.

## FACTUAL ALLEGATIONS

### The NFL

29.     The NFL generates approximately $9,300,000,000 in gross income per
year.

30.     The organization oversees America's most popular spectator sport, acting
as a trade association for the benefit of the 32 independently operated Teams.  The NFL's
average attendance per game in 2009 was 67,509.

31.     The NFL has, since its inception in the first half of the twentieth century,
governed and promoted the game of football, and as referenced in detail herein, it was created
and established to act as the governing body, establishing rules related to player health and
safety, League policies, and team ownership.

32.     The NFL generates revenue mostly through marketing sponsorships,
licensing merchandise, and by selling national broadcasting rights to the games.  The Teams
share a percentage of the League's overall revenue.

33.     The NFL earns billions of dollars from its telecasting deals with, inter alia,
ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS
($622.5 million).

34.     Annually, the NFL redistributes approximately $4 billion in radio,
television, and digital earnings to the Teams or approximately $125 million per Team.  Those
revenue numbers show no sign of declining and have increased since 2009.

9

35.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 teams as a single unit.

### The NFL's Influence

36.     In part because of their financial power, monopoly status, and high visibility, the NFL Defendants have had enormous influence over the game of football at all levels of the game.

37.     Over many decades, the NFL Defendants' influence has been expanded through their use of the media.  Through NFL films, the NFL Network, and www.NFL.com, the NFL Defendants have promoted NFL football via every mass communication medium available.

### The NFL's Use of the Media

38.     Part of the NFL Defendants' strategy to promote NFL football is to glorify the accomplishments of individuals and Teams, not discourage aggressiveness and collisions on the field, and simultaneously make the fraudulent representation that "getting your bell rung," "being dinged" and putting big hits on others does not seriously threaten one's health.

39.     As a result of this strategy, the NFL Defendants have propagated the false myth that collisions of all kinds, many of which lead to short-term and long-term neurological damage to current and former NFL players, are an acceptable, desired, and natural consequence of the game, and a measure of the courage and heroism of those involved in football at every level of the game.

40.     As a result of this strategy, and the overwhelming influence of the NFL Defendants at every level of the game, the NFL Defendants have generated for themselves and others billions of dollars every year.

## NFL Films

41.     NFL Films is an agent and instrumentality of the NFL Defendants devoted
to producing promotional films for the NFL.  NFL Films is known for the style it features in all
of its productions, capturing the NFL games, plays, players, and overall NFL environment in an
artistic, promotional fashion.  NFL Films' cinematography is intended to create compelling
storylines and highlight certain aspects of the game.  NFL Films takes viewers right into the
football action with close-ups and slow motion depiction of all the hard-hitting action taking
place on the football field.

42.     The NFL focuses on collisions as one of the NFL's greatest selling points:
the football player as gladiator.  To advance the NFL Defendants' purpose, NFL Films has
created numerous highlight features that focus solely on the hardest-hits that take place on the
football field.

43.     The list of videos created by NFL Films glorifying aggressive plays
includes, but is not limited to, the following titles:  *NFL: Moment of Impact* (2007); *NFL's 100
Greatest Tackles* (1995); *Big Blocks and King Size Hits* (1990); *The Best of Thunder and
Destruction – NFL's Hardest Hits*; *NFL Films Video: Strike Force* (1989); *The NFL's Greatest
Hits* (1989); *Crunch Course*; *Crunch Course II* (1988); *Crunch Masters*; *In the Crunch* (1987);
*NFL Rocks*; *NFL Rocks: Extreme Football*.

44.     NFL Films created the "*Top Ten Most Feared Tacklers*" series that was
shown on the NFL Network, and it now has its own section on the NFL's website.  These
features comprise videos highlighting the most aggressive tacklers the NFL has ever seen.

45.     An explicit example of how the NFL Defendants marketed the aggressive
nature of the NFL can be found on the back cover of the 2007 film "*Moment of Impact*."  The

11

back cover of "*Moment of Impact*" advertises the film as follows: "First you hear the breathing, then you feel the wind coming through your helmet's ear hole. Suddenly you're down, and you're looking through your helmet's ear hole. Pain? That's for tomorrow morning. Right now you've gotta focus – focus on the play and try not to focus on the next moment of impact." The entire message deemphasizes the acute and chronic risks associated with these head impacts.

46.     NFL Films, therefore, advances the NFL Defendants' agenda to promote the most aggressive aspects of NFL football and to urge players at every level of the game to disregard the results of head impacts.

47.     The NFL Defendants strategically utilize NFL Films' cinematography and sound to exaggerate and emphasize hard hits to the head. The magnitude of the hit is emphasized by the slow-motion footage and the on-field microphones. Hard hits captured by NFL Films take on the appearance of the slow-motion crash safety test videos that appear in many car commercials – with players taking on the role of the crash-test dummy.

48.     The NFL Defendants, through NFL Films, promotes a culture in which playing hurt or with an injury is both expected and acclaimed in its mythical gladiator world. Through NFL Films, the NFL has produced videos that praise players who embody the ethos of playing hurt (for example, "*Top Ten Gutsiest Performances*"). This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players must and often do play through any injury, including MTBI.

49.     This is part of the overall culture in which NFL players are encouraged to play despite an injury, in part, because failure to play through an injury creates the risk of losing playing time, a starting position, and possibly a career.

12

50. Within this culture, the NFL Defendants profit from the aggression they promote.

51. This culture of aggression, sponsored and encouraged by the NFL Defendants, can be demonstrated through many examples.

52. For instance, after joining the NFL, the Cleveland Browns were led by Hall of Famer Otto Graham to many consecutive championships. The media and the NFL management at the time were well aware of the targeted blows to the head suffered by Graham, with resulting loss of consciousness. Nevertheless, Graham was encouraged to come back and play in each game.

53. In the decades of the 1980s, 1990s and 2000s, players were lauded by the NFL Defendants for their "head hunting" skills. As recently as October 2010, the NFL fined some players for what it characterized as "illegal and dangerous hits" and yet, notwithstanding those fines, in an effort to profit, the NFL Defendants sold photos of the illegal hits on its website for between $54.95 and $249.95.

**Head Injuries, Concussions, and Neurological Damage**

54. Medical science has known for many decades that repetitive jarring of the head or impact to the head can cause MTBI with a heightened risk of long-term, chronic neurocognitive sequelae.

55. The NFL Defendants have known or should have known for many years that the American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

a blow or jolt to the head, or a penetrating head injury that disrupts the
normal function of the brain. TBI can result when the head suddenly and
violently hits an object, or when an object pierces the skull and enters
brain tissue. Symptoms of a TBI can be mild, moderate or severe,
depending on the extent of damage to the brain. Mild cases may result in
a brief change in mental state or consciousness, while severe cases may
result in extended periods of unconsciousness, coma or even death.

56.     The NFL Defendants have known or should have known for many years
that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is
rotated rapidly. The results frequently include, among other things, confusion, blurred vision,
memory loss, nausea, and sometimes unconsciousness.

57.     The NFL Defendants have known or should have known for many years
that medical evidence has shown that symptoms of MTBI can appear hours or days after the
injury, indicating that the injured party has not healed from the initial blow.

58.     The NFL Defendants have known or should have known for many years
that once a person suffers an MTBI, he is up to four times more likely to sustain a second one.
Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may
cause MTBI, and the injured person requires more time to recover. This goes to the heart of the
problem: players being unaware of the serious risk posed to their long-term cognitive health.

59.     The NFL Defendants have known or should have known for many years
that clinical and neuropathological studies by some of the nation's foremost experts demonstrate
that multiple head injuries or concussions sustained during an NFL player's career can cause
severe cognitive problems such as depression and early-onset dementia.

60.     The NFL Defendants have known or should have known for many years
that published peer-reviewed scientific studies have shown that repeated traumatic head impacts
(including sub-concussive blows and concussions) cause ongoing and latent brain injury. These

14

injuries have been documented and associated with sports-related head impacts in both football and boxing.

61.     The NFL Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as CTE. The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also is associated with an increased risk of suicide.

62.     The NFL Defendants have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers have shown that this condition is prevalent in retired professional football players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

63.     The NFL Defendants have known for many years about the reported papers and studies documenting autopsies on over 25 former NFL players. Reports show that over 90% of the players suffered from CTE.

64.    As a result, published peer-reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing professional football are linked to significant risk of permanent brain injury.

### The NFL Was In a Superior Position of Knowledge and Authority, and Owed a Duty to the Class

65.    At all times, the NFL has had access to data relating the effect of head impacts on football players and decades of accumulated knowledge about head injuries to players.

66.    The NFL's accumulated knowledge about head injuries to players, and the associated health risks therefrom, was at all times vastly superior to that readily available to the Retired NFL Football Players, their Representative Claimants, or Derivative Claimants.

67.    From its inception, the NFL unilaterally created for itself the role of protecting players, informing players of safety concerns, and imposing unilaterally a wide variety of rules to protect players from injuries that were costly to the player, the game, and profits. From the beginning, the NFL held itself out and acted as the guardian of the players' best interests on health and safety issues.

68.    For these reasons, Plaintiffs, the Class and Subclasses have relied on the NFL to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

69.    In a recent public admission, the NFL stated that "[s]ince its earliest days, the league has continuously taken steps to ensure that the game is played as fairly as possible without unnecessary risk to its participants, including making changes and enhancements to game safety rules." (www.nflhealthsasfety.com/commitment/regulations) (2011-2012).

16

70.     On information and belief, since its inception, the NFL received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and sub-concussive injuries.  Such ongoing medical advice and knowledge placed the NFL in position of ongoing superior knowledge compared to the players.  Combined with the NFL's unilateral and monopolistic power to set rules and determine policies throughout its game, the NFL at all relevant times was in a position to influence and dictate how the game would be played and to define the risks to which players would be exposed.

71.     As a result, the NFL unilaterally assumed a duty to act in the best interests of the health and safety of NFL players, to provide truthful information to NFL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

72.     The NFL's voluntary actions and authority throughout its history show that as early as the 1920s the NFL shouldered for itself the common law duty to make the game of professional football safer for the players and to keep the players informed of safety information they needed to know.

73.     The NFL's historical actions in connection with these legal duties have included, but are not limited to, the following: adding a field judge (1929); establishing hash-marks at 10 yards from the sidelines (1933); establishing the penalty of unnecessary roughness for a deliberate rough contact on the passer after the pass is made (1938); making helmets mandatory (1943); adding a back field judge (1947); establishing a rule that the ball is dead when a runner touches the ground with any part of his body except his hands while in the grasp of an opponent (1955); establishing a rule that the ball is dead immediately if the runner touches the ground with any part of his body except his hands after being contacted by a defensive player

17

(1956); establishing a penalty for grabbing the face mask of any opponent except a runner (1956); establishing a penalty of grabbing the face mask of any opponent (1962); requiring that goal posts be offset from the goal line (1966); establishing a rule that a player who signals for a fair catch cannot block or initiate contact with one of the kicking team's players until the ball touches a player (1967); establishing a rule that a defensive player who jumps or stands on a teammate or who is picked up by a teammate cannot attempt to block an opponent's kick (1973); establishing a rule that no receiver can be blocked below the waist after moving beyond the line of scrimmage (1974); establishing a rule that eligible receivers who take a position more than two yards from the tackle cannot be blocked below the waist (1974); establishing a rule that a defender is not permitted to run or dive into a ball carrier who has fallen to the ground untouched (1976); establishing a rule that it is illegal for a defensive lineman to strike an opponent above the shoulders during his initial charge (1977) (previously the NFL made this illegal only during the first step); establishing that it is illegal for a wide receiver to clip an opponent anywhere (1977); establishing rules as to mandatory equipment (1979); establishing that it is illegal for a player in the backfield to chop an outside rusher on a pass play (1979); establishing that it is illegal to throw a punch or forearm or to kick an opponent (1979); and establishing that it is illegal to strike, swing, or club an opponent in the head, neck or face (1980).

74.     As the sport's governing entity (with monopolistic power), the NFL has made it known to players and teams alike that the NFL actively and pervasively governs player conduct and health and safety both on and off the field.  In public statements since its inception, the NFL has stated that its goals include taking necessary steps for the safety, health and well-being of players and their families.

18

75.     The NFL's approach has been paternalistic and has included comprehensive rookie training programs to teach new players how to manage their personal lives, inquiries from the media, and newly acquired income.

76.     For decades, the NFL voluntarily instituted programs to support player health and safety on and off the field, and the players and their families looked to the NFL for guidance on these issues.

77.     By way of example only, in 1959, the NFL unilaterally established medical, life insurance, and retirement plans, funded the plans, and controlled the nature and extent of each of these plans without any player involvement.  The NFL made all changes to the plans unilaterally.

78.     Despite its unilateral duty and power to govern player conduct on and off the field, the NFL has for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

79.     As one example, Cleveland Browns Quarterback Otto Graham was knocked unconscious during a game against the San Francisco 49ers in 1953 and he was carried off the field.  After regaining consciousness, however, Graham returned to the field and played the balance of the game, even though his jaw required fifteen stitches after the game.

80.     Thus, since its inception, and continuing into the present, the NFL has been in a position that affords it a special relationship to NFL players as the guardian of their health and safety.  For that reason, from its inception and continuing into the present, the NFL owed a duty of reasonable care to keep NFL players informed of neurological risks, to inform

NFL players truthfully, and not to mislead NFL players about the risks of permanent neurological damage that can occur from MTBI incurred while playing football.

81.    By way of example only, during the decades of the 1930s through the 1960s, the NFL – in its supervisory role as guardian of player safety – identified tackling techniques that exposed players to increased risks of injury, including head, neck, and leg injuries.  Once identified, the NFL issued regulations set forth in Paragraph 73, which served as daily warnings to players of the hazardous nature of continuing to follow hazardous tackling techniques.

82.    As a result of its position of authority and repository of a composite of information throughout the League, the NFL was aware of how to protect NFL players from dangerous circumstances on the field of play and took unilateral, but insufficient, measures to do so.

83.    For decades, the NFL ignored the risks and/or was willfully blind to the risks and/or actively concealed the risks from NFL players, despite its historic and proactive role as the guardian of player safety.

84.    Moreover, from 1994 until 2010, the NFL publicly inserted itself into the business of head injury research and openly disputed that any short-term or long-term harmful effects arose from football-related sub-concussive and concussive injuries.  The NFL propagated its own industry-funded and falsified research to support its position, despite its historic role as the guardian of player safety, and despite the fact that independent medical scientists had already come to the opposite conclusion.

85.    On information and belief, over the past two decades, the NFL continued to exercise this common law duty and its unilateral authority to investigate and advise NFL

20

players on many diverse and important topics, and that should have included the recognition of circumstances that can precipitate MTBI, the long-term potential consequences of MTBI to NFL players, and solutions for players who have sustained MTBI.

86.    During this time period, beginning in the early 1990s, the NFL voluntarily and gratuitously inserted itself into the business of sponsoring medical research regarding the link between repetitive head impacts sustained while playing football and MTBI that can and does result in short-term and long-term neurocognitive injury and decline.

87.    As such, the NFL continued to undertake its existing common law duty to provide truthful scientific research and information about the risks of concussive and sub-concussive injuries to NFL players, including the Retired NFL Football Players, who relied on the NFL's research and pronouncements on that subject.

88.    The NFL knew, reasonably expected, and intended that NFL players, including the Retired NFL Football Players, would rely on its research and pronouncements on that subject, in part, because of the historic special relationship between the NFL and the players and, in part, because the NFL knew that the vast majority of NFL players played under non-guaranteed contracts and would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to maintain those non-guaranteed contracts.  The NFL encouraged players to sacrifice all for "the game" as an essential mentality for play in the NFL.  The 2007 NFL Films video "*Moment of Impact*" emphasized that "3rd and 4th stringers, special team players will risk life and limb to catch the coach's eye" for a spot on an NFL roster.  During a voice-over emphasizing that these players hope "to make the team by making an impact," the video depicts a Buffalo Bills defender delivering a devastating blow

directly to the head of the vulnerable Indianapolis Colts' kick-return man who had just caught the ball.

## The NFL Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions

89.    For decades, the NFL has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

90.    In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study").  The article was published in the *Journal of the American Medical Association.*  The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

91.    In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

92.    In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers.  After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c)  post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily

his boxing license if the physician notes that boxer suffers significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

93.     The recommendations were codified as rules of the New York State Athletic Commission.

94.     In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

95.     That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.*, recommending that players cease to play football after receiving their third concussion).

96.     In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

97.     A 1963 study by Drs. Mawdsley & Ferguson found that some boxers sustain chronic neurological damages as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function. *See* "Neurological Disease in Boxers," *Lancet* 2:795-81.

98.     A 1967 study examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.  Drs. Hughes & Hendrix, "Telemetered EEG from a Football Player in Action," *Electroencephalography & Clinical Neurophysiology* 24:183-86.

99.     In 1969 (and then again in the 1973 book entitled Head and Neck Injuries in Football), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries recommended that any concussive event with

transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

100.    In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing.  This study outlined the neuropathological characteristics of "Dementia Pugilistica" ("DP"), including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

101.    A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion.  The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

102.    In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram.  By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

103.    In 1973, a potentially fatal condition known as "Second Impact Syndrome" – in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate – was identified.  It did not receive this name until 1984.  Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least 40 football players.

104.   Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, and the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions.  These studies collectively established that:

> [R]epetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;
>
> encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;
>
> acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;
> with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
>
> immediate retrograde memory issues occur following concussions;
> mild head injury requires recovery time without risk of subjection to further injury;
>
> head trauma is linked to dementia;
>
> a football player who suffers a concussion requires significant rest before being subjected to further contact; and
>
> minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

105.   In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

106.    In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

107.    The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

108.    In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which he later updated in 2001.

109.    By 1991, three distinct medical professionals/entities, all independent from the NFL – Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society – developed return-to-play criteria for football players suspected of having sustained head injuries.

110.    On information and belief, by 1991, the NCAA football conferences and individual college teams' medical staffs, along with many lower-level football groups (*e.g.*, high school, junior high school, and pee-wee league) had disseminated information and adopted criteria to protect football players even remotely suspected of having sustained concussions.

111.    Further, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states:  "[b]oxers that suffered concussion by KO [loss of consciousness], should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma,

including, but not limited to, KO's, and should not compete in a boxing match in less than 75 days."

112.   In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

113.   In 1999, former Pittsburgh Steeler and Hall of Fame inductee Mike Webster filed with the NFL a request that he receive complete disability benefits based on the fact that he had sustained repeated and disabling head impacts while a player for the Steelers.  In 1999, Webster submitted extensive medical reports and testimony that stated, among other things, that Webster suffered from "traumatic or punch drunk encephalopathy [brain disease]" sustained from playing football that left Webster totally and permanently disabled as of 1991.

114.   The NFL's own physician independently examined Webster and concluded that Webster was mentally "completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

115.   Webster died in 2002 at the age of fifty.  In December 2006, the Estate of Webster received an unpublished opinion from the United States Court of Appeals for the Fourth Circuit that affirmed the decision of the District Court that the administrator had wrongly denied him benefits.  In its opinion, the Fourth Circuit stated that the NFL Plan had acknowledged that the multiple head injuries Webster sustained during his playing career (1974-1990) ". . . had caused Webster eventually to suffer total and permanent mental disability . . . ."

116.   Thus, the NFL, through its own expert medical testimony and the expert testimony submitted by Webster knew and accepted that repetitive traumatic brain injuries

27

sustained by a Hall of Fame player led to long-term encephalopathy and permanent mental disability.

117.    A 2000 study, which surveyed 1,090 former NFL players, found that more than 60% percent had suffered at least one concussion, and 26% percent had suffered three or more, during their careers.  Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

118.    Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (3) eight suffered from Alzheimer's.

119.    A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, 69 football head-related injuries resulted in permanent disability.

120.   In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

121.   This echoed similar medical protocol established at a Vienna conference in 2001.  These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

122.   The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

123.   An article in the 2010 *New England Journal of Medicine* entitled "Traumatic Brain Injury – Football, Warfare, and Long-Term Effects," shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.

124.   A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

125.   Indeed, while the NFL knew for decades of the harmful effects of concussions on a player's brain, it actively concealed these facts from coaches, players, and the public.

126.    On information and belief during every decade referenced above, the NFL was advised by physicians of all kinds regarding the risks associated with playing the game of football, including the risks associated with head impacts and MTBI.

127.    As described above, the NFL has known for decades that MTBI can and does lead to long-term brain injury, including, but not limited to, memory loss, dementia, Alzheimer's Disease, Parkinson's Disease, ALS, depression, and CTE and its related symptoms.

**The NFL Voluntarily Undertook the Responsibility of Studying Head Impacts in Football, Yet Fraudulently Concealed Their Long-Term Effects**

128.    In 1994, then-NFL commissioner Paul Tagliabue agreed to fund a committee to study the issue of head injury in the NFL. The NFL voluntarily and unilaterally proceeded to form the committee to study the issue.  This Committee, the Mild Traumatic Brain Injury Committee ("MTBI Committee"), voluntarily undertook the responsibility of studying the effects of concussions and sub-concussive injury on NFL players.

129.    At that time, the current NFL Commissioner, Roger Goodell ("Goodell"), was the NFL's Vice President and Chief Operating Officer.

130.    With the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.  Through its voluntary creation of the MTBI Committee, the NFL affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players; the study of any kind of brain trauma relevant to the sport of football; the use of information developed; and the publication of data and/or pronouncements from the MTBI Committee.

131.    Rather than exercising reasonable care in these duties, the NFL engaged in fraudulent and negligent conduct, which included a campaign of misinformation designed to (a)

dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and (b) to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

132.    The NFL's unparalleled status in the world of football imbued its MTBI Committee's pronouncements on concussions with a unique authoritativeness as a source of information to players. The Plaintiffs therefore reasonably relied on the NFL's pronouncements and/or silence on this vital health issue.

133.    The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players caused by concussions and repetitive brain trauma received during their years as professional football players has been, until very recently, a concerted effort of deception and denial. The NFL actively tried to and did conceal the extent of the concussion and brain trauma problem, the risk to the Retired NFL Football Players, and the risks to anyone else who played football.

134.    The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the League, and to outline solutions. Ironically, the MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

135.    By 1994, when the NFL formed the MTBI Committee, independent scientists and neurologists alike were already convinced that all concussions – even seemingly mild ones – were serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

31

136.    The MTBI Committee was publicized by the NFL as independent from the NFL, consisting of a combination of doctors and researchers.

137.    The MTBI Committee, however, was not independent.  It consisted of at least five persons who were already affiliated with the NFL.

138.    Instead of naming a noted neurologist to chair the newly formed MTBI Committee, or at least a physician with extensive training and experience treating head injuries, Tagliabue appointed Dr. Elliot Pellman, a rheumatologist who lacked any specialized training or education relating to concussions, and who was a paid physician and trainer for the New York Jets.

139.    Dr. Pellman had reportedly been fired by Major League Baseball for lying to Congress regarding his resume.

140.    Dr. Pellman would go on to chair the MTBI Committee from 1994-2007, and his leadership of the Committee came under frequent and harsh criticism related to his deficient medical training, background, and experience.

141.    The fact that Dr. Pellman was a paid physician for an NFL Team was an obvious conflict of interest.  At no time was Dr. Pellman independent of the NFL, because he was paid on an ongoing basis by an NFL Team.

142.    The NFL failed to appoint any neuropathologist to the MTBI Committee.

143.    From its inception in 1994, the MTBI Committee allegedly began conducting studies to determine the effect of concussions on the long-term health of NFL players.

144.    Goodell confirmed this in June 2007 when he stated publicly that the NFL had been studying the effects of traumatic brain injury for "close to 14 years ...."

145.   Under Dr. Pellman, the MTBI Committee spearheaded a disinformation campaign.

146.   Dr. Pellman and two other MTBI Committee members, Dr. Ira Casson, a neurologist, and Dr. David Viano, a biomedical engineer, worked to discredit scientific studies that linked head impacts and concussions received by NFL players to neurocognitive disorders and disabilities.

147.   The MTBI Committee did not publish its first findings on active players until 2003.  In that publication, the MTBI Committee stated, contrary to years of (independent) findings, that there was no long-term negative health consequence associated with concussions.

148.   The MTBI Committee published its findings in a series of 16 papers between 2003 and 2009.  According to the MTBI Committee, all of their findings supported a conclusion that there was no long term negative health consequence associated with concussions or sub-concussive injuries sustained by NFL players.  These findings regularly contradicted the research and experiences of neurologists who treat sports concussions and the players who endured them.

149.   Completely contrary to peer-reviewed scientific publications, the NFL's team of hand-picked so-called experts on the MTBI Committee did not find concussions to be of significant concern and felt it appropriate for players suffering a concussion to continue playing football during the same game or practice in which one was suffered.  This recommendation and practice by the NFL, promoted by the MTBI Committee, was irresponsible and dangerous.

150.   The MTBI Committee's methodology and the conclusions reached in its research were criticized by independent experts due to the numerous flaws in the study design,

methodology, and interpretation of the data, which led to conclusions at odds with common medical knowledge and basic scientific protocol.

151.    For example, in 2004 the MTBI Committee published a conclusion in which it claimed that its research found no risk of repeated concussions in players with previous concussions and that there was no "7-to-10 day window of increased susceptibility to sustaining another concussion."

152.    In a comment to this publication, one independent doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."

153.    As a further example, an MTBI Committee conclusion in 2005 stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season." "These data suggest," the MTBI Committee reported, "that these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

154.    Yet, a 2003 NCAA study of 2,905 college football players found just the opposite: "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

155.    Support for this same conclusion was developed as early as 1982 in studies conducted at the University of Virginia.

156.   Dr. Pellman and his group stated repeatedly that the NFL study showed "no evidence of worsening injury or chronic cumulative effects of multiple [MTBI] in NFL players."

157.   The 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina, however, found a link between multiple concussions and depression among former professional players with histories of concussions. A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's among retired NFL players.

158.   Other contrary conclusions that the MTBI Committee published at the behest, urging, and sponsorship of NFL over several years include, but are not limited to, the following:

> Drs. Pellman and Viano stated that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [TBIs] in professional football are not serious injuries";
>
> that NFL players did not show a decline in brain function after a concussion;
>
> that there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;
>
> that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions"; and
>
> that NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

159.   The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data collection techniques. They received significant criticism in the scientific and medical media from independent doctors and

researchers and were met with skepticism in peer-review segments following each article's publication.

160.    Moreover, the conclusions of the MTBI Committee completely contradicted the medical testimony Hall of Fame player Mike Webster submitted to the NFL in his application for disability, including the testimony the NFL's own paid expert submitted in connection with Mr. Webster's application.

161.    Renowned experts Dr. Robert Cantu and Dr. Julian Bailes wrote harshly critical reviews of the studies' conclusions.

162.    Dr. Cantu observed that the extremely small sample size and voluntary participation in the NFL's study suggested there was bias in choosing the sample.  According to Dr. Cantu, no conclusions should be drawn from the NFL study.

163.    A different scientist who reviewed the MTBI Committee's work further stated that the NFL appeared to be primarily preparing a defense for when injured players eventually sued, and that it seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

164.    Dr. Kevin Guskiewicz has stated that the "data that hasn't shown up makes their work questionable industry-funded research."

165.    The MTBI Committee's work was criticized when repeated inconsistencies and irregularities in the MTBI Committee's data were revealed.

166.    The MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports.

167.     The results reported by Dr. Pellman and the MTBI Committee selectively excluded at least 850 baseline tests.  In a paper published in Neurosurgery in December 2004, Dr. Pellman and the other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing.  They concluded that NFL players did not show a decline in brain function after suffering concussions.  Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.  The paper did not explain where the players in the study groups came from specifically or why certain player data was included and that data from hundreds of other players was not.

168.     Dr. Pellman subsequently fired William Barr, a neuropsychologist for the New York Jets, after Dr. Barr presented at a conference some NCAA study findings that contradicted NFL practices.

169.     As described in the following paragraphs, when faced with studies which tended to show a causal link between MTBI and cognitive degeneration, the NFL, through the MTBI Committee, produced contrary findings that were false, distorted, and deceptive to NFL players, participants in football nationwide, and the public at large.

170.     Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.  Dr. Omalu concluded that the players suffered from CTE.

171.     All of these individuals suffered multiple concussions during their NFL careers.  Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression.

172.     Some of Dr. Omalu's findings were published in *Neurosurgery*. Those findings included that Webster's and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their activity in the NFL.

173.     In response to Dr. Omalu's articles, the MTBI Committee wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

174.     In an article published in *Neurosurgery* in 2007, Dr. Cantu reached a similar conclusion regarding Waters as Dr. Omalu had reached as to Webster and Long.

175.     A 2003 study partially authored by Dr. Kevin Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression.  The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

176.     The NFL's MTBI Committee attacked these studies.

177.     In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research.  Dr. Pellman called Dr. Guskiewicz in advance and questioned whether it was in the best interest of Dr. Guskiewicz to appear on the program.  On the program, Dr. Pellman stated unequivocally that he did not believe the results of the study led by Dr. Guskiewicz.

178.     In 2005, Dr. Guskiewicz performed a clinical follow-up study, and found that retired players who sustained three or more concussions in the NFL had a fivefold prevalence of mild cognitive impairment in comparison to NFL retirees without a history of concussions.  In doing this research, Dr. Guskiewicz conducted a survey of over 2,550 former NFL athletes.

179.    The MBTI Committee attacked and sought to undermine the study, issuing the following excuse and delay tactic: "We want to apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening. . . . You cannot tell that from a survey."

180.    In August 2007, the NFL, in keeping with its scheme of fraud and deceit, issued a concussion pamphlet to players which stated:

> Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly. It is important to understand that there is no magic number for how many concussions is too many. Research is currently underway to determine if there are any long-term effects of concussion[s] in NFL athletes.

181.    In a statement made around the time that the concussion pamphlet was released, Goodell said, "We want to make sure all NFL players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions." The NFL decided that the "most up to date information" did not include the various independent studies indicating a causal link between multiple concussions and cognitive decline in later life.

182.    Goodell also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

183.    The Retired NFL Football Players relied to their detriment on the NFL's misinformation, all of which was contrary to the findings of the independent scientists who had studied the issue, including Drs. Guskiewicz, Cantu, Omalu, and Bailes, regarding the causal link between multiple head injuries and concussions and cognitive decline.

184.     The NFL's conflict of interest and motive to suppress information regarding the risks of repetitive traumatic brain injuries and concussions was vividly demonstrated by Dr. Pellman's treatment of a concussion sustained by former star New York Jets player Wayne Chrebet. This occurred in 2003, the same time period when Dr. Pellman chaired the MTBI Committee.

185.     In November 2003, Chrebet sustained a concussion from another player's knee to the back of his head. The impact left him face down on the field in an unconscious state for several minutes. Once Chrebet was on the sideline and conscious, Dr. Pellman administered tests. Dr. Pellman knew that Chrebet had sustained a concussion, but reportedly Chrebet performed adequately on standard memory tests. According to reports, Dr. Pellman asked Chrebet some questions, including whether he was "okay." Chrebet responded that he was. Reportedly, Dr. Pellman told Chrebet that, "This is very important for your career," and sent Chrebet back into the game. Shortly thereafter, Chrebet was diagnosed with post-concussion syndrome and kept out of games for the remainder of the 2003 season.

186.     Today, Chrebet is 40 years old and reportedly suffers from depression and memory problems.

187.     In 2005, the MTBI Committee published a paper that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season."

188.     Facing increasing media scrutiny over the MTBI Committee's questionable studies, Dr. Pellman eventually resigned as the head of the Committee in February

2007. He was replaced as head by Dr. Ira Casson and Dr. David Viano, but remained a member of the Committee.

189.   Dr. Guskiewicz, research director of the University of North Carolina's Center for the Study of Retired Athletes, said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

190.   Regarding Dr. Pellman's work, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions," but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

191.   Drs. Casson and Viano continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries.  In 2007, in a televised interview on HBO's Real Sports, Dr. Casson definitively and unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's, or "anything like [that] whatsoever."

192.   In June 2007, the NFL convened a concussion summit for team doctors and trainers.  Independent scientists, including Drs. Cantu, and Guskiewicz, presented their research to the NFL.

193.   Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline.  Dr. Bailes recalled that the MTBI's Committee's reaction to his presentation was adversarial: "The Committee got mad . . . we got into it.  And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its

41

leaders responding?  Alienate the scientist who found it?  Refuse to accept the science coming from him?'"

194.   At the summit, Dr. Casson told team doctors and trainers that CTE has never been scientifically documented in football players.

195.   After reviewing five years of data of on-field concussions, the NFL falsely concluded that there was no evidence for an increase in secondary brain injuries after a concussion.

196.   In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale.  Dr. McKee stated: "[T]he easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions."  Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

197.   A MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn, and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal.  When Dr. McKee's research was published in 2009, Dr. Casson asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long[-]term brain damage."

198.   In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players.  Over 1,000 former NFL players took part in the study.  The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been

diagnosed in the league's former players vastly more often than in the national population –

including a rate of 19 times the normal rate for men ages 30 through 49."

       199.    The NFL, who commissioned the study, responded to these results by

claiming that the study was incomplete, and that further findings would be needed.  NFL

spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally

diagnose dementia.  Dr. Casson implied that the Michigan study was inconclusive and stated that

further work was required.  Other experts in the field found the NFL's reaction to be "bizarre,"

noting that "they paid for the study, yet they tried to distance themselves from it."

### The Congressional Inquiry and The NFL's Acknowledgement of the Concussion Crisis

      200.    Shortly after the results of the Michigan study were released,

Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for

hearings on the impact of head injuries sustained by NFL players.

      201.    Drs. Cantu and McKee testified before the House of Representatives,

Committee on the Judiciary, to discuss the long-term impact of football-related head injuries.

      202.    At the first hearing in October 2009, Goodell acknowledged that the NFL

owes a duty to the public at large to educate them as to the risks of concussions due to the

League's unique position of influence: "In addition to our millions of fans, more than three

million youngsters aged 6-14 play tackle football each year; more than one million high school

players also do so and nearly seventy five thousand collegiate players as well.  We must act in

their best interests even if these young men never play professional football."

      203.    When Representative Sanchez questioned Goodell about the limited nature

of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the

conflicts of interest of those directing the studies, and the potential for bias, Goodell evaded
answering the questions.

204.    On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry,
26, who played in the NFL from 2004 to 2009, died after falling from the back of a truck. Drs.
Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed him with CTE.

205.    In January 2010, the House Judiciary Committee held further hearings on
football player head injuries. Representative Conyers observed that "until recently, the NFL had
minimized and disputed evidence linking head injuries to mental impairment in the future."

206.    Representative Linda Sanchez commented that "[i]t seems to me that the
N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take
15 years?"

207.    In the 2010 Congressional hearings, Dr. Casson gave testimony that
denied the validity of other non-NFL studies and stated that "[t]here is not enough valid, reliable
or objective scientific evidence at present to determine whether or not repeat head impacts in
professional football result in long term brain damage."

208.    The members of the MTBI Committee, however, knew of the decades old
studies linking MTBI to long-term neurological problems. Casson, a MTBI Committee member
since its inception, stated before Congress on January 4, 2010, that he was "the lead author of a
landmark paper on brain damage in modern boxers that was published in the [Journal of the
American Medical Association] in 1984." That paper, which referenced the many studies
documenting CTE in boxers, studied eighteen former and active boxers and found that eighty-
seven percent of the professional boxers had definite evidence of brain damage. Specifically, the

44

study determined that the subjects performed particularly poorly on neuropsychological tests measuring short-term memory.

209.    In his written statement to Congress, Casson stated that he has "been concerned about the possibility of long term effects on the brain related to football for close to thirty years." Dr. Casson offered that one of the reasons he "was asked to be on the NFL MTBI committee was because of [his] knowledge of and experience treating boxers with chronic traumatic encephalopathy (CTE)."

210.    This testimony contradicted Casson's testimony that "there is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

211.    On February 1, 2010, Dr. Omalu spoke before members of the House Judiciary Committee at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football." In his prepared testimony, he explained:

> Glenn Pop Warner [1871-1954] founded the Pop Warner youth football league in 1929. He still remains one of the greatest football coaches in the history of American football. The single event, which necessitated the use of pads and helmets by football players took place in 1888 when the annual rules convention for the emerging sport of college football passed a rule permitting tackling below the waist. Football changed dramatically. Teams no longer arrayed themselves across the entire breath of the field. Teams bunched themselves around the runner to block for him. The wedge and mass play arrived. Football became, for a time, a savage sport full of fights, brawling, even fatalities." In 1912, Pop Warner said: "Playing without helmets gives players more confidence, saves their heads from many hard jolts, and keeps their ears from becoming torn or sore. I do not encourage their use. I have never seen an accident to the head which was serious, but I have many times seen cases when hard bumps on the head so dazed the player receiving them that he lost his memory for a time and had to be removed from the game." We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub-

45

concussions both have the capacity to cause permanent brain damage. During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion. Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

212.    After the Congressional hearings, the NFLPA called for the removal of Dr. Casson as MTBI Committee co-chair, and stated, "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

213.    In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (the "Medical Committee") and announced that Dr. Pellman would no longer be a member of the panel. Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Casson and Viano. The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the new Medical Committee.

214.    Under its new leadership, the Committee admitted that data collected by the NFL's formerly appointed brain-injury leadership was "infected," and said that their Committee should be assembled anew. The Medical Committee formally requested that Dr. Pellman not speak at one of its initial conferences.

215.    During a May 2010 Congressional hearing, a Congressman made it plain to Drs. Batjer and Ellenbogen that the NFL: "[had] years of an infected system here, and your job is . . . to mop [it] up."

216.    Shortly after the May 2010 hearing, Dr. Batjer was quoted as admitting, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable

to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want

our professional reputations damaged by conflicts that were put upon us."

217.   In June 2010, scientific evidence linked multiple concussions to ALS,

commonly referred to as "Lou Gehrig's Disease."

218.   On February 17, 2011, former Chicago Bears and New York Giants player

Dave Duerson committed suicide. Fifty years old at the time, Duerson had suffered months of

headaches, blurred vision, and faltering memory.

219.   Before his death, Duerson wrote a final note that asked that his brain be

given to the NFL brain bank for evaluation. After his death, Dr. Cantu determined that Duerson

was suffering from CTE.

220.   When this information was reported, NFLPA Executive Director

DeMaurice Smith stated that the fact that Duerson was suffering from CTE

> makes it abundantly clear what the cost of football is for the men who
> played and the families. It seems to me that any decision or course of
> action that doesn't recognize that as the truth is not only perpetuating a lie,
> but doing a disservice to what [Duerson] feared and what he wanted to
> result from the donation of his brain to science.

221.   In July 2011, John Mackey, former tight end of the Baltimore Colts died.

Mackey was diagnosed with front temporal lobe dementia in 2007, forcing him to live full-time

in an assisted living facility.

222.   In October 2011, Dr. Mitchel Berger of the NFL's Head, Neck, and Spine

Medical Committee announced that a new study was in the planning process. He admitted that

the MTBI Committee's previous long-range study was useless because "[t]here was no science

in that." Dr. Berger further stated that data from the previous study would not be used. "We're

47

really moving on from that data.  There's really nothing we can do with that data in terms of how it was collected and assessed."

### The NFL's New Committee

223.    Why in 1994 (and far earlier) the NFL (and its MTBI Committee) failed to share accurate information and take appropriate actions is difficult to comprehend in light of the fact that the NFL has known for decades that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms. Instead, the NFL misled players, coaches, trainers, and the public, and actively spread disinformation.

224.    It took decades for the NFL to admit that there was a problem and 16 years to admit that its information was false and inaccurate.  The NFL's conduct in this regard is willful and exhibits a reckless disregard for the safety of its players and the public at large.  At a minimum, the NFL acted with callous indifference to the duty it voluntarily assumed to the Retired NFL Football Players and players at every level of the game.

225.    As a direct result of the fraudulent concealment and misrepresentations by the NFL, former players have for many decades been led to believe that the symptoms of early-onset dementia, ALS, loss of memory, headaches, confusion, and the inability to function were not caused by events occurring while they played in the NFL.  And, as a result of this willful and malicious conduct, these former players have been deprived of medical treatment, incurred expenses, lost employment, suffered humiliation and other damages to be specified.

### The Need for Medical Monitoring

226.    Published peer-reviewed scientific studies have shown that playing professional football is associated with significant risk for permanent brain injury.

227. For example, studies have shown that 28% of the NFL retirees studied, suffered from depression, whereas the prevalence of depression in the general population is 9.5%.

228. Similarly, 36% of NFL retirees, age 65-75, who were studied, suffered from dementia, whereas the prevalence of dementia in the general population for the same age group is 2.2-6.5%.

229. Retired NFL players with three or more reported concussions had a fivefold prevalence of mild cognitive impairment (MCI) and a threefold prevalence of significant memory problems, compared to other retirees. In a study of NFL retirees, 11.1% of all respondents reported having a prior or current diagnosis of clinical depression.

230. NFL retirees experienced earlier onset of Alzheimer's more frequently than the general American male population in the same age range.

231. Once there is a finding of impairment of mental functioning, the prognosis is poor; the vast majority of such patients go on to develop Alzheimer's within a decade.

232. Published peer-review scientific studies have shown that 6.1% of retired NFL players over the age of 50 receive a dementia-related diagnosis compared to the 1.2% national average for men of the same age.

233. Published peer-reviewed scientific studies have shown that the incidence of brain trauma in retired NFL players has been associated with mild cognitive impairment and depression.

234. The Boston University Center for the Study of Traumatic Encephalopathy has performed autopsy examinations of the brains of deceased NFL players indicating an estimated lifetime prevalence of CTE of 3.7% percent of all retired players.

235.    The evidence that CTE is caused by repeated sublethal brain trauma is overwhelming.

236.    Published peer-reviewed scientific studies have shown that more than 61% of former NFL players have experienced concussions and a greater number have experienced repeated sub-concussive blows.

237.    Brain injury and brain disease in NFL retirees is a latent disease that can appear years or decades after the player experiences head trauma in his NFL career.

238.    Experts consider concussions the "tip of the iceberg," and believe repetitive sub-concussive blows to the head are the cause of significant brain disease in NFL retirees.

239.    Retired NFL Football Players are exposed to a significant number of sub-concussive blows and concussions as a result of their professional NFL football careers. The general public does not experience this type of brain trauma.

240.    Historically, the NFL has treated repeated sub-concussive blows and concussions as "dings" and having one's "bell rung," and fraudulently concealed and negligently misrepresented facts that would assist Retired NFL Football Players in the Class and Subclasses in being able to obtain adequate brain injury diagnosis, management, and treatment of the condition to facilitate recovery and rehabilitation.

241.    The Defendants' fraudulent concealment and negligent misrepresentations as to the risks of chronic sub-concussive blows and concussions has increased the risks for Retired NFL Football Players in the Class and Subclasses to neurocognitive impairment and its sequelae, including cognitive, mental health, and neurological disorders during the years after retirement.

242.    Management of concussion requires a gradual, multistep process involving medical monitoring, baseline testing, and neurocognitive examination.

243.    For sports, such as football, in which repeated blows to the head are likely, proper concussion assessment and management is paramount for preventing and mitigating long-term consequences.

244.    Medical monitoring for neurocognitive impairment identifies deficits that are amenable to treatment through medical, cognitive, psychological and behavioral counseling (for the patient and his spouse and family), as well as through pharmaceutical treatment, lifestyle modifications, and other therapeutic interventions.

245.    Testing of cognitive functioning for early signs or symptoms of neurologic dysfunction is medically necessary to assure early diagnosis and effective treatment of brain injury.

246.    Medical monitoring for latent brain injury is highly specialized and different from the medical care that is normally recommended to other men of a similar age, in the absence of a history of chronic repeated sub-concussive impacts and concussions.

247.    Well-established and specialized medical monitoring procedures exist to provide early diagnosis of neurocognitive impairment, which greatly enhances successful treatment, rehabilitation, and prevention or mitigation of cognitive, psychological, and behavioral deficits.

248.    Such procedures include brain imaging studies and neuropsychological evaluations targeted on identifying the deficits associated with chronic and repeated sub-concussive blows and concussions experienced by Retired NFL Football Players in the Class and Subclasses.

51

249.    Medical monitoring for neurocognitive impairment is reasonably necessary to provide for early diagnosis, leading to benefits in treatment, management, rehabilitation, and prevention or mitigation of damage.

## COUNT I

## MEDICAL MONITORING

250.    Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 249 set forth above as if fully set forth herein.

251.    Plaintiffs seek to certify a Class and Subclasses.

252.    During their respective NFL careers, Retired NFL Football Players experienced repeated traumatic head impacts, including sub-concussive blows and concussions, with greater frequency and severity than the general population of men of a similar age, significantly increasing their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's, ALS, Parkinson's, dementia, and other similar cognitive-impairing conditions.

253.    Repetitive MTBI during NFL practices and games has a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau protein – sometimes over decades – causes CTE, which is the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

254.    The game of football as played in the NFL, including both practices and game play, has exposed former players to hazardous conditions and out-of-the-ordinary risks of harm. These repetitive head accelerations to which the Retired NFL Football Players have been

52

exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendants' negligence, fraud, and misrepresentations, the Retired NFL Football Players' exposure to the risks of harm as described above would have been materially lower.

255.    Accordingly, the repetitive head impacts sustained by NFL players in NFL games and practices exposed Retired NFL Football Players in the Class and Subclasses, to subtle and repetitive changes within the brain on the cellular level and substantive hazards.

256.    Depending on many factors, including the amount of the exposure to repetitive head impacts and the release of Tau protein, the player/victim will develop a range of subtle to significant neurocognitive changes over time.

257.    The latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neurocognitive impairment, disability, decline, personality change, mood swings, rage, and, sometimes, fully developed encephalopathy.

258.    The NFL was fully aware of the danger of exposing all NFL players to repetitive head impacts, including the repetitive sub-concussive and concussive blows that increase the risk to NFL players of, among other latent injuries, encephalopathy.

259.    As noted above, by its actions and omissions and fraudulent conduct, from 1994 through 2010, the NFL further breached its duty (which it had assumed as long ago as the 1930s) of reasonable and ordinary care to the Plaintiffs, the Class and Subclasses by failing to provide NFL players, including the Retired NFL Football Players, their Representative Claimants and Derivative Claimants, with necessary, adequate, and truthful information about the heightened risks of neurological damage that arise from repetitive head impacts during NFL games and practices.

260.. As a proximate result of the NFL's tortious conduct, the Retired NFL Football Players in the Class and Subclasses have experienced an increased risk of developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's, Parkinson's, ALS, dementia, and/or other and similar cognitive-impairing conditions.

261. The latent brain injuries from which Retired NFL Football Players in the Class and Subclasses suffer require specialized testing (with resultant treatment) that is not generally given to the public at large.

262. The available medical monitoring techniques are specific for individuals exposed to repetitive head trauma and are different from what is normally recommended in the absence of exposure to this risk of harm.

263. Medical monitoring includes, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with football-related MTBI. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Retired NFL Football Players experienced in the NFL.

264. The available medical monitoring examinations and tests are reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis of head injuries and their potential link to, inter alia, memory loss, impulse rage, depression, early-onset dementia, CTE, Alzheimer-like syndromes, and similar cognitive-impairing conditions.

265.    By monitoring and testing the Retired NFL Football Players in the Class and Subclasses, the risk that they will suffer long term injuries, disease, and losses will be significantly reduced.

266.    Plaintiffs, the Class and Subclasses, therefore, seek an injunction creating a Court-supervised, NFL-funded medical monitoring program, which will facilitate the diagnosis and adequate treatment of Retired NFL Football Players for neurocognitive impairment. The medical monitoring program should include a trust fund to pay for the baseline assessments and treatment of Retired NFL Football Players as frequently and appropriately as necessary.

267.    Plaintiffs, the Class and Subclasses have no adequate remedy at law in that monetary damages alone cannot compensate them for the continued risk of developing long-term physical and economic losses due to concussions and sub-concussive injuries. Without Court-approved medical monitoring as described herein, or established by the Court, the Plaintiffs, Class and Subclasses will continue to face an unreasonable risk of continued injury and disability.

**COUNT II**

**WRONGFUL DEATH AND SURVIVAL ACTIONS**

268.    Retired NFL Football Players and their Representative Claimants and Derivative Claimants in the Class and Subclasses incorporate by reference paragraphs 1 through 267 set forth above as if fully set forth herein.

269.    The Representative Claimants of deceased Retired NFL Football Players bring this action in their representative capacity of the decedent's Estate and next of kin and on behalf of the respective survivors of those deceased Retired NFL Football Players.

270.    As a direct and proximate cause of the conduct alleged herein, the NFL caused the Retired NFL Football Players to develop the debilitating brain diseases and conditions set forth above, which diseases and conditions caused extreme pain, suffering, and anguish and, ultimately, the deaths of some Retired NFL Football Players.

271.    The Representative Claimants of the deceased Retired NFL Football Players and their Derivative Claimants claim damages recoverable under applicable law for all pecuniary and non-pecuniary losses suffered by the deceased Retired NFL Football Players by reason of their deaths.

272.    As a direct and proximate result of the untimely deaths of the deceased Retired NFL Football Players, their respective survivors and/or surviving distributees have been deprived of the earnings, maintenance, guidance, support and comfort that they would have received from for the rest of the respective deceased Retired NFL Football Players' natural lives, and have suffered commensurate pecuniary and non-pecuniary losses because of the Retired NFL Football Players' wrongful deaths.

273.    The Representative Claimants and the Derivative Claimants of deceased Retired NFL Football Players claim the full measure of damages allowed under applicable law.

## COUNT III

### FRAUDULENT CONCEALMENT

274.    Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 273 set forth above as if fully set forth herein.

275.    Between the early 1950s and 1994, the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm to, for example, boxers who receive repetitive impacts to the head during boxing practices and matches.

56

276.     The NFL has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which NFL players are exposed.

277.     During that time period, the NFL knowingly and fraudulently concealed from then-current NFL players and former NFL players the risks of head injuries in NFL games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

278.     From 1994 through June of 2010, the NFL's fraudulent concealment continued.

279.     During that time period, the NFL voluntarily funded and produced its own purported scientific research and through that research repeatedly misrepresented to then current and former NFL players, the United States Congress, and the general public that there is no link (or an insufficient scientific link) between MTBI in NFL activities and later-in-life cognitive/brain injury, including CTE and its related symptoms.

280.     Given the NFL's superior and unique vantage point, the Retired NFL Football Players reasonably looked to the NFL for guidance on head injuries and concussions.

281.     The NFL's MTBI Committee published articles and the concussion pamphlet referenced above, all of which concealed and minimized the risks of repetitive brain impacts the NFL knew existed for its then-current players and for its former players, who reasonably relied on the NFL's pronouncements and/or silence on this vital health issue.

282.     The NFL's concussion pamphlet created an atmosphere of trust that the NFL had carefully undertaken its voluntary responsibility to research, test, study, and report

57

accurate findings to the players and former players. The NFL stated that "[w]e want to make sure all NFL players ... are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact of concussions."

283.    The concealment was ongoing. Dr. Casson provided oral and written testimony at the 2010 Congressional hearings in which he continued to deny the validity of other studies. Dr. Casson also denied the link between repetitive brain impacts and short- and long-term brain damage in public interviews.

284.    The NFL, therefore, concealed material facts and information with the intent to deceive and defraud, which caused Retired NFL Football Players in the Class and Subclasses to become exposed to the harm referenced above.

285.    For those Retired NFL Football Players who had retired prior to the above-mentioned misrepresentations, the NFL's concerted concealment of the risks to which they had been exposed on the playing field delayed their ability to plan for the future of themselves and their families and to seek appropriate treatment of their latent neurodegenerative conditions.

286.    The NFL knew and expected that Plaintiffs, the Class and Subclasses would rely on the inaccurate information provided by the NFL, and Plaintiffs, the Class and Subclasses in fact did reasonably rely on the inaccurate information provided by the NFL during and after the careers of the Retired NFL Football Players.

287.    As a direct and proximate result of the NFL's fraudulent conduct, the Retired NFL Football Players in the Class and Subclass have suffered physical injury, including, but not limited to, existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

58

288. As a direct and proximate result of the NFL's willful concealment, Retired NFL Football Players in the Class and Subclasses have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

289. As a result of the NFL's misconduct as alleged herein, the NFL is liable to Plaintiffs, the Class and Subclasses for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

290. As a result of the NFL's fraudulent conduct as alleged herein, Plaintiffs and the members of the Class and Subclasses are entitled to injunctive relief in the form of a medical monitoring program and an education fund to promote safety and injury prevention in football players and to educate Retired NFL Football Players regarding the NFL's medical and disability benefits programs and other educational programs and initiatives.

291. As a result of the NFL's fraudulent conduct as alleged herein, Plaintiffs and the members of the Class and Subclasses are entitled to compensatory damages, as allowed by law, from the NFL.

<u>**COUNT IV**</u>

<u>**FRAUD**</u>

292. Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 291 set forth above as if fully set forth herein.

293. At least since the early 1950's the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches.

294.    At least since the early 1950's the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches.

295.    The NFL, however, withheld the information it knew about the risks of head injuries in the game from then-current NFL players and former NFL players and ignored the known risks to all NFL players.

296.    On information and belief, the NFL deliberately delayed implementing the changes to the game it knew could reduce players' exposure to the risk of life-altering head injuries because those changes would be expensive and would reduce the profitability of the League.

297.    The NFL has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which NFL players are exposed.

298.    The NFL and its agents – employed to formulate the MTBI committee and populate the published scientific literature with "studies" intent on disputing the conclusions of independent researchers regarding the long-term chronic disabilities and injuries associated with head injury – made these material misrepresentations with the intent to defraud the Plaintiffs, the Class and Subclasses.

299.    Given the NFL's superior and unique vantage point, the Plaintiffs, the Class and Subclasses reasonably looked to the NFL for guidance on head injuries and concussions.

300.    During that time period, the NFL knowingly and fraudulently concealed from then-current NFL players and former NFL players the risks of head injuries in NFL games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

301.    The NFL, however, withheld this information from then-current NFL players and former NFL players and ignored the known risks to all NFL players.

302.    Beginning in 1994, the NFL and its agents funded and created a falsified body of purported scientific research that misrepresented to then-current NFL players, all former NFL players, the United States Congress, and the general public that there was no scientifically proven link between repetitive sub-concussive and concussive injuries sustained during football and brain injury, including but not limited to CTE and its related symptoms.

303.    During their playing days and after their retirement from the NFL, the Plaintiffs, the Class and Subclasses justifiably and reasonably relied on the NFL's omissions and misrepresentations to their detriment.

304.    As a result of the NFL's misconduct as alleged herein, the NFL is liable to Plaintiffs, the Class and Subclasses.

305.    The Plaintiffs, the Class and Subclasses were damaged by the NFL's misconduct.  They have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

306.    As a result of the NFL's fraud, the NFL is liable to Plaintiffs, the Class and Subclasses for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT V

## NEGLIGENT MISREPRESENTATION

307.    Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 306 set forth above as if fully set forth herein.

308.    A special relationship exists between the NFL and the Plaintiffs, the Class and Subclasses sufficient to impose a duty on the NFL to disclose accurate information to the Plaintiffs.

309.    Prior to 1994, the NFL knew that repetitive head impacts in football games and practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches.

310.    Prior to 1994, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NFL players were exposed.

311.    The NFL, however, withheld this information from NFL players and ignored the risks to NFL players.

312.    From 1994 through June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

313.     Defendant NFL, therefore, misrepresented the dangers the NFL Players faced in returning to action after sustaining a head injury and the long-term effects of continuing to play football after a head injury.

314.     The NFL's MTBI Committee made public statements, published articles, and issued the concussion pamphlet to its players, which the NFL knew or should have known were misleading, downplaying and obfuscating to NFL players the true and serious risks of repetitive traumatic head impacts.

315.     The MTBI Committee made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings and other information issued to current and former NFL Players.

316.     The Plaintiffs' reliance on the NFL was reasonable, given the NFL's superior and unique vantage point on these issues.

317.     The Defendant's misrepresentations included the false statement that present NFL players were not at an increased risk of short-term and long-term adverse consequences if they returned too soon to an NFL games or practices after suffering head trauma and, therefore, that former players had not been exposed to such increased risk during their time in the NFL.

318.     The NFL's misrepresentations included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of head impacts which NFL players regularly sustained.

319.     The NFL made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of

63

knowledge, that the NFL Players faced serious health problems if they returned to a game too soon after sustaining a concussion.

320.    The NFL knew or should have known the misleading nature of their statements when they were made.

321.    The NFL made the misrepresentations and actively concealed information knowing that the Plaintiffs, the Class and Subclasses would and did rely on the misrepresentations or omissions in, among other things, how the Plaintiffs addressed the concussive and sub-concussive injuries they sustained.

322.    As a result of the NFL's misrepresentations, it is liable to Plaintiffs, the Class and Subclasses.

323.    As a direct and proximate result of the NFL's negligent misrepresentations, Retired NFL Football Players in the Class and Subclasses have suffered and continue to suffer serious personal injury, including neurocognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, emotional distress, and loss of consortium.  Plaintiffs, the Class and Subclasses seek the full measure of damages allowed under applicable law.

## COUNT VI

### NEGLIGENCE: PRE-1968 CONDUCT OF THE NFL

324.    Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 323 set forth above as if fully set forth herein.

325.    In 1922, the American Professional Football Association became the National Football League and in 1933, the NFL began developing rules and regulations of play

that were significantly different than those previously followed and were used by collegiate football leagues.

326.    In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

327.    Between 1933 and 1968, the NFL assumed and carried out a duty to supervise how the game of football was played in the United States.

328.    Between 1933 and 1968, the NFL assumed and carried out a duty to inform and advise players and teams of the foreseeable harm that can arise from such things as the use of leather helmets, the need to wear hard plastic helmets to reduce head wounds and internal injury (1943) and the grabbing of an opponent's facemask—to minimize or avoid head and neck injuries (1956/1962).  These warnings and imposed safety rules were furnished by the NFL because it had assumed a duty to provide a safe environment for players and because of its superior knowledge of the risks of injury players.

329.    Based on information and belief, the NFL voluntarily inserted itself into the tasks assumed by others to develop helmet safety standards to reduce the risk of head injury while playing football. Despite its voluntary participation in these activities, the defendant negligently failed to adopt these standards for a considerable period of time after others had done so.

330.    During this time period, the NFL was advised or should have been advised by medical scientists and health professionals, including neurologists and neurosurgeons, regarding the risks of short and long term neurocognitive disabilities and deficits to NFL players.

331.    During this time period, the NFL knew or should have known that repetitive sub-concussive and concussive blows to the heads of NFL players can and do result in short-term and long-term brain damage.

332.    During this time period, the NFL knew or should have known that it was the practice in the NFL to compel or cajole players to play with injuries, including sub-concussive injuries, concussive injuries and injuries involving a loss of consciousness.

333.    During this time period, the NFL had superior knowledge (as compared to the NFL players themselves) that athletic sporting events causing sub-concussive and concussive injuries posed a serious risk of short-term and long-term cognitive disabilities.

334.    The NFL's failure to address the continuing health risks associated with sub-concussive and/or concussive injuries that NFL players sustained before 1968 constituted a breach of its duty to these players, which has resulted in long-term neurocognitive problems and disabilities to former NFL players, including the Retired NFL Football Players.

335.    During this time period, the NFL's continuing perpetration of the dangerous myth that NFL players are tough and can withstand "getting their bell rung," "suffering dings," or temporarily losing consciousness while playing constitutes causative negligence.  The perpetration of misleading and false statements and a philosophy of invincibility nurtured and publicized by the NFL throughout this time period constitute continuing negligent conduct which the NFL never stopped perpetrating until subject to Congressional scrutiny and the filing of civil lawsuits.

336.    Given the NFL's superior and unique vantage point on the issue of head injuries and concussions, the Plaintiffs reasonably relied to their detriment on the NFL's actions and omissions on the subject.

337.     The failure of the NFL to publicize within the League – to active players –
and to the public at large, including retired players, the mounting evidence in the scientific
literature of the evolving and chronic neurocognitive problems amongst former players caused
then-current players and retired players to believe that their physical and psychological problems
(as described herein) were neither serious nor related to football.  These commissions or
omissions caused the plaintiffs to ignore the need for necessary treatment.  Likewise, these
omissions and commissions had the institutional effect of reducing the interest in helmet safety
research, avoiding changes in rule-playing to minimize head injury, avoiding the need to
promulgate rules affecting the return to play rules when concussive events are detected, and
establishing programs to educate players about the risks of sub-concussive and concussive long-
term risk to their health.

## COUNT VII

## NEGLIGENCE: POST-1968 CONDUCT OF THE NFL

338.     Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1
through 337 set forth above as if fully set forth herein.

339.     Increasingly, during the 1970s, 1980s and 1990s, the NFL Defendants
marketed the game of football as acceptably aggressive and it rewarded its most aggressive
players.  This marketing technique was directed to the general public, the football community of
players associated with organized football from sandlot to college.  In pursuing these concerted
marketing techniques, the NFL Defendants knew or should have known that its conflation of
concussive-inducing aggression with heroism would induce NFL players and those who
espoused to play in the NFL to play recklessly.

340.   In its marketing scheme, the NFL Defendants developed print and film packages that were widely distributed throughout the United States to media outlets and organized football programs as a powerful method to convince current players and those in college and high school football that the greater the hit the bigger the accolades.

341.   In the early 1990s, the NFL voluntarily undertook to study the issue of neurocognitive injuries in former NFL players.

342.   In 1994, in connection with that voluntary undertaking, the NFL created the aforementioned MTBI Committee.

343.   The NFL recognized that its voluntary undertaking to study and report information about the effect of head impacts on NFL players would not just be for the benefit of then-present and former NFL players alone.  Since the NFL is the most prominent and influential entity in the sport of football, the NFL knew or should have known that its MTBI Committee's statements would have a broad public impact.

344.   By voluntarily undertaking to study and report on the issue of the neurocognitive effects of head impacts in professional football, the NFL assumed a duty to exercise reasonable care in the MTBI Committee's work and the NFL and its agents' public statements about the substance of the Committee's work.

345.   However, the MTBI Committee negligently performed the NFL's voluntarily undertaken research mission.

346.   In addition, from 1994 through June of 2010, the NFL and its MTBI Committee made material misrepresentations to players, former players, the United States Congress, and the public at large that there was no scientifically valid link between repetitive

traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

347.    The NFL's failure to exercise reasonable care in its voluntarily assumed duty increased the risk that the Plaintiffs would suffer long-term neurocognitive injuries.

348.    The Plaintiffs, the Class and Subclasses reasonably relied to their detriment on the NFL's actions and omissions on the subject.

349.    Under all of the above circumstances, it was foreseeable that the NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties would cause or substantially contribute to the personal injuries suffered by the Retired NFL Football Players.

350.    The NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties proximately caused or contributed to Plaintiffs' injuries.

351.    As a result of the NFL's negligence, the NFL is liable to Plaintiffs, the Class and Subclasses, and the Plaintiffs are entitled to, and seek, all damages allowed by applicable law.

## COUNT VIII

## NEGLIGENCE: CONDUCT OF THE NFL (BETWEEN 1987 AND 1993)

352.    Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 351 set forth above as if fully set forth herein.

353.    This Count relates to the misconduct of the NFL Defendants during the years 1987 and 1993, and pertains only to Retired NFL Football Players who played in the NFL during this time period.

354.    During this time period, the NFL Defendants actively recognized its common law duties (described in Counts VI and VII above) and continued, albeit negligently, to carry them out.

355.    Consequently, each factual and legal claim set forth in Counts VI and VII set forth above is incorporated by reference herein as if they were set forth at length.

### COUNT IX

### NEGLIGENCE:  POST-1994 CONDUCT OF THE NFL

356.    Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 355 set forth above, with the exception of paragraphs 31, 65 and 67-88.

357.    Increasingly, during the 1970s, 1980s and 1990s, the NFL Defendants marketed the game of football as acceptably aggressive, and it rewarded its most aggressive players.  This marketing technique was directed to the general public, the football community of players associated with organized football from sandlot to college.  In pursuing these concerted marketing techniques, the NFL Defendants knew or should have known that its conflation of concussive-inducing aggression with heroism would induce NFL players and those who espoused to play in the NFL to play recklessly.

358.    In its marketing scheme, the NFL Defendants developed print and film packages that were widely distributed throughout the United States to media outlets and organized football programs as a powerful method to convince current players and those in college and high school football that the greater the hit, the bigger the accolades.

359.    In the early 1990s, the NFL voluntarily undertook to study the issue of neurocognitive injuries in former NFL players.

360.    In 1994, in connection with that voluntary undertaking, the NFL created the aforementioned MTBI Committee.

361.    The NFL recognized that its voluntary undertaking to study and report information about the effect of head impacts on NFL players would not just be for the benefit of then-present and former NFL players alone.  Since the NFL is the most prominent and influential entity in the sport of football, the NFL knew or should have known that its MTBI Committee's statements would have a broad public impact.

362.    By voluntarily undertaking to study and report on the issue of the neurocognitive effects of head impacts in professional football, the NFL assumed a duty to exercise reasonable care in the MTBI Committee's work and the NFL and its agents' public statements about the substance of the Committee's work.

363.    However, the MTBI Committee negligently performed the NFL's voluntarily undertaken research mission.

364.    In addition, from 1994 through June of 2010, the NFL and its MTBI Committee made material misrepresentations to players, former players, the United States Congress, and the public at large that there was no scientifically valid link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

365.    The NFL's failure to exercise reasonable care in its voluntarily assumed duty increased the risk that the Plaintiffs would suffer long-term neurocognitive injuries.

366.    Given the NFL's superior and unique vantage point on the issue of head injuries and concussions, the Plaintiffs, the Class and Subclasses reasonably relied to their detriment on the NFL's actions and omissions on the subject.

71

367.    The NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties proximately caused or contributed to Retired NFL Football Players' injuries.

368.    As a result of the NFL's negligence, the NFL is liable to Plaintiffs, the Class and Subclasses, and the Plaintiffs are entitled to, and do seek, all damages allowed by applicable law.

**COUNT X**

**LOSS OF CONSORTIUM**

369.    Retired NFL Football Players and their Spouses incorporate by reference paragraphs 1 through 368 set forth above as if fully set forth herein.

370.    As a result of the NFL Defendants' misconduct, the NFL Defendants are liable to the Spouses of Retired NFL Football Players.

371.    As a direct and proximate result of the intentional misconduct, carelessness, negligence, and recklessness, the Retired NFL Football Players have sustained the aforesaid injuries, and their Spouses have been damaged as follows:

    a.    They have been and will continue to be deprived of the services, society and companionship of their respective husbands;

    b.    They have, will be and will continue to be required to spend money for medical care and household care for the treatment of their respective husbands; and

    c.    They have been and will continue to be deprived of the earnings of their respective husbands.

372.   As a result of the injuries to Retired NFL Football Players, their Spouses are entitled to damages, as alleged herein or allowed by law.

## COUNT XI

## NEGLIGENT HIRING

373.   Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1 through 372 set forth above as if fully set forth herein.

374.   The NFL voluntarily and gratuitously inserted itself into the business of studying (and subsequently rendering expert opinions about) the relationship between repetitive head impacts in football and brain injury.

375.   In doing so, the NFL assumed a duty to the Plaintiffs and the general public to retain and employ persons within the MTBI Committee who were professionally competent to study and render opinions on the relationship between repetitive head impacts in football and brain injury and to ensure that those whom it hired had no conflict of interest and that each had the professional and personal qualifications to conduct those studies and render opinions that were scientifically rigorous, valid, defensible, and honest.

376.   The NFL breached its duty to the Plaintiffs, the Class and Subclasses and the general public by hiring persons who:

  a.   were unqualified;

  b.   were not competent to engage in rigorous and defensible scientific research;

  c.   were not competent to render valid and defensible opinions;

  d.   created fraudulent industry-funded research; and/or

73

e.      attacked as not credible the valid and defensible research and

opinions generated by neuroscientists who were unconnected to and not paid by the NFL.

377.    The NFL's negligence in this regard resulted in a body of falsified

industry-funded research that purposefully and/or negligently contested and suppressed valid and

truthful bio-medical science.  The NFL's negligence allowed the MTBI Committee to use

falsified industry-funded research to mislead the Plaintiffs, the Class and Subclasses, and the

general public regarding the risks associated with repetitive head impacts in the game of football.

378.    As a result of the NFL's negligence, the Retired NFL Football Players

have sustained brain injuries that are progressive and latent and did not take protective measures

or seek the diagnosis and treatment they would have sought had they been told the truth.

## COUNT XII

## NEGLIGENT RETENTION

379.    Plaintiffs, the Class and Subclasses incorporate by reference paragraphs 1

through 378 set forth above as if fully set forth herein.

380.    The NFL knew or should have known that the controlling members of the

MTBI Committee demonstrated an ongoing lack of competence, objectivity and inadequate

judgment to study and render expert opinions on the issue of the relationship between repetitive

head impacts in football and brain injury.

381.    The NFL voluntarily assumed a duty to the Plaintiffs and the general

public not to allow those incompetent persons it had hired within the MTBI Committee to

continue to conduct incompetent and falsified studies and render incompetent opinions on the

relationship between repetitive head impacts in football and brain injury.

382.   During the time period when the MTBI was conducting its purported research and rendering its purported opinions, the NFL knew or should have known that the purported research and opinions of the MTBI were false and indefensible.

383.   The NFL breached its duty to the Plaintiffs, the Class and Subclasses, and the general public by allowing these incompetent and unqualified persons, under the auspices and with the imprimatur of the NFL:

      a.       to continue to create incompetent and indefensible research,

      b.       to continue to render invalid and indefensible opinions, and

      c.       to continue to attack the credible and defensible research and

opinions of neuroscientists not connected to or paid by the NFL.

384.   The NFL's negligence allowed the incompetent members of the MTBI Committee to continue to advance their false and incompetent research and opinions in an attempt to suppress valid bio-medical science.  The NFL's negligence allowed the MTBI Committee members to mislead the Plaintiffs, other former NFL players, and the general public regarding the permanent brain injury risks associated with repetitive head impacts in the game of football.

385.   As a result of the NFL's failure, the Retired NFL Football Players have sustained brain injuries that are progressive and latent and did not take protective measures or seek the diagnosis and treatment they would have sought had they been told the truth.

## COUNT XIII

## CIVIL CONSPIRACY/FRAUDULENT CONCEALMENT

386.   Plaintiffs incorporate by reference paragraphs 1 through 385 set forth above as if fully set forth herein.

387.   For decades, the Defendants, along with others who were employed by the NFL, including those who participated in the NFL MTBI Committee, acted in concert to perpetrate the fraudulent concealment of the connection between repetitive MTBI and long-term neurocognitive damage, illness, and decline.

388.   The Defendants, along with those who participated in the concerted efforts referenced above, knowingly failed to disclose and/or made continuing misrepresentations of material fact that there was an absence of any scientific basis to believe that repetitive MTBI created any known long-term neurocognitive risks to NFL players.  That misconduct by the Defendants exposed Plaintiffs to an increased risk of brain injury and was the proximate cause of the Plaintiffs' brain injuries.

389.   Plaintiffs have suffered personal injuries as a result of the named Defendants' concerted activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class and Subclasses pray for judgment with respect to their Complaint as follows:

1.   With respect to Count I, certifying the Class and Subclasses proposed in this Complaint pursuant to Fed. R. Civ. P. 23(a)(1-4) & 23(b)(2) (with a right to opt out) or alternatively pursuant to Fed. R. Civ. P. 23(b)(3);

2.      With respect to Count I, granting an injunction for the requested medical monitoring relief;

3.      With respect to Counts II through XIII, certifying the Class and Subclasses proposed in this Complaint pursuant to Fed. R. Civ. P. 23(a)(1-4) & 23(b)(3);

4.      With respect to all counts, awarding Plaintiffs and Class and Subclass members damages, their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law;

5.      With respect to all counts, granting Plaintiffs and Class and Subclass members such other and further relief as may be appropriate;

6.      Granting an award to all Plaintiffs in the Class and Subclasses prejudgment interest, costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all matters so triable.

Dated:  January 6, 2014

Respectfully Submitted:

Christopher A. Seeger
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Phone:  (212) 584-0700
Fax:  (212) 584-0799
cseeger@seegerweiss.com

*Co-Lead Class Counsel*

/s/ Sol Weiss
Sol Weiss
**ANAPOL SCHWARTZ**
1710 Spruce Street
Philadelphia, PA 19103
Phone:  (215) 735-1130
Fax:  (215) 735-2024
sweiss@anapolschwartz.com

*Co-Lead Class Counsel*

77

### *Class Counsel*

/s/Steven C. Marks
Steven C. Marks
**PODHURST ORSECK P.A.**
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com

/s/ Gene Locks
Gene Locks
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: 866-562-5752
Fax: (215) 893-3444
glocks@lockslaw.com

### *Subclass Counsel*

/s/ Arnold Levin
Arnold Levin
**LEVIN FISHBEIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

/s/ Dianne M. Nast
Dianne M. Nast
**NAST LAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Fax: (215) 923-9302
DNast@nastlaw.com

*Counsel for Subclass 1*

*Counsel for Subclass 2*

### *Of Counsel*

Thomas V. Girardi
Graham B. LippSmith
**GIRARDI KEESE**
1126 Wilshire Blvd
Los Angeles, CA 90017
Phone: (213) 977-0211
Fax: (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

James R. Dugan, II
**THE DUGAN LAW FIRM**
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Phone: (504) 648-0180
Fax: (504) 648-0181
jdugan@dugan-lawfirm.com

Anthony Tarricone
**KREINDLER & KREINDLER LLP**
277 Dartmouth Street
Boston, MA 02116
Phone: (617) 424-9100
Fax: (617) 424-9120
atarricone@kreindler.com

Michael L. McGlamry
**POPE, MCGLAMRY, KILPATRICK
MORRISON & NORWOOD, P.C.**
3455 Peachtree Road, NE
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, GA 30326-3243
Phone: (404) 523-7706
Fax: (404) 524-1648
efile@pmkm.com

Charles S. Zimmerman
**ZIMMERMAN REED PLLP**
1100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: (612) 341-0400
Fax: (612) 341-0844
charles.zimmerman@zimmreed.com

David S. Casey, Jr.
Fred Schenk
**CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD
LLP**
110 Laurel Street
San Diego, CA  92101-1486
Phone: (619) 238-1811
Fax: (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

David A. Rosen
**ROSE, KLEIN & MARIAS LLP**
801 South Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Phone: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

Derriel McCorvey
**THE LAW FIRM OF DERRIEL C.
MCCORVEY**
115 W. Main Street, Suite 14
P.O. Box 2473
Lafayette, LA 70501
Phone: (337) 291-2431
derriel@mccorveylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2014, I caused the foregoing Motion to Intervene, proposed Order, and Memorandum of Law to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties.

*/s/ William T. Hangley*