# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br><br>          Plaintiffs,<br><br>          v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>          Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................2

I.    Background of Proposed Intervenors ...............................................................2

II.   The Class Action Complaint ............................................................................5

III.  The Proposed Settlement ...............................................................................10

ARGUMENT ...........................................................................................................12

I.    This Court Should Grant Intervenors' Motion Under Rule 24(a) To Ensure
      Adequate Protection of Their Interests and Those of Similarly Situated
      Putative Class Members ................................................................................13

      A.    Intervenors' Interests – and Those of Players Like Them – Are Not Currently
            Represented Before the Court..............................................................14

            1.    Representative Plaintiffs Negotiated and Advocated a Settlement That
                  Addressed Their Own Injuries but Failed To Address the Injuries of
                  Intervenors and Other Class Members ...................................15

            2.    The 75% Offset for Stroke and Traumatic Brain Injury Also
                  Demonstrates Conflict Between the Intervenors' Interests and
                  Those of the Representative Plaintiffs....................................19

      B.    The Intervenors' Request Is Timely and Will Neither Prejudice
            the Parties Nor Cause Undue Delay ....................................................21

II.   Alternatively, Permissive Intervention Should Be Granted Under Rule 24(b) ................23

III.  The Intervenors Have Complied with the Procedural Requirements
      for Intervention ...............................................................................25

CONCLUSION ........................................................................................................27

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Abramson v. Pennwood Inv. Corp.*, 392 F.2d 759 (2d Cir. 1968)................................................27

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)........................................................18, 21

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................................25

*Brody v. Spang*, 957 F.2d 1108 (3d Cir. 1992)..........................................................................13

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005)....................................................*passim*

*Contawe v. Crescent Heights of Am., Inc.*, No. Civ. A. 04-2304,
2004 WL 2966931 (E.D. Pa. Dec. 21, 2004)....................................................................27

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ..............................*passim*

*Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401 (9th Cir. 1989)................................13, 15

*Gaskin ex rel. Gaskin v. Pennsylvania*, 197 F. App'x 141 (3d Cir. 2006) ...................................27

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Litig.*, 55 F.3d 768
(3d Cir. 1995).............................................................................................14, 22, 24, 25

*Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 474936
(N.D. Cal. Jan. 17, 2007).........................................................................................13, 15

*Koprowski v. Wistar Inst. of Anatomy & Biology*, No. CIV. A. 92-CV-1182,
1993 WL 332061 (E.D. Pa. Aug. 19, 1993) ....................................................................13

*Kozak v. Wells*, 278 F.2d 104 (8th Cir. 1960).............................................................................13

*Lexington Ins. Co. v. Caleco, Inc.*, No. Civ. A. 01-5196, 2003 WL 21652163
(E.D. Pa. Jan. 25, 2003)..................................................................................................27

*Lusardi v. Xerox Corp.*, 975 F.2d 964 (3d Cir. 1992) ................................................................23

*In re Mapp*, No. 85-2745, 1986 WL 8340 (E.D. Pa. July 25, 1986) ...........................................26

*Mars Steel v. Cont'l Ill. Nat'l Bank & Trust*, 834 F.2d 677 (7th Cir. 1987) ...............................22

*McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380 (3d Cir. 2002) ........................................22

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361
(3d Cir. 1995)..................................................................................................................22

*NAACP v. New York*, 413 U.S. 345 (1973) ...............................................................21

*Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008).................................................24

*Pereira v. Foot Locker, Inc.*, No. 07-cv-2157, 2009 WL 4673865
    (E.D. Pa. Dec. 7, 2009).........................................................................................26

*Phila. Recycling & Transfer Sta., Inc.*, No. Civ. A. 95-4597, 1995 WL 517644
    (E.D. Pa. Aug. 29, 1995) ...............................................................................25, 27

*Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985)................................................26

*In re Safeguard Scientifics*, 220 F.R.D. 43 (E.D. Pa. 2004) .....................................14

*Sierra Club v. Robertson*, 960 F.2d 83 (8th Cir. 1992) .............................................13

*Sullivan v. DB Invs., Inc.*, No. CIV.A. 04-2819, 2006 WL 892707
    (D.N.J. Apr. 6, 2006) ..........................................................................................21

*Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 (1972) ................................14

*United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174 (3d Cir. 1994) ...................13, 21

*United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002).........................12

*WJA Realty, Ltd. P'ship v. Nelson*, 708 F. Supp. 1268 (S.D. Fla. 1989)...................27

## STATUTES AND RULES

Fed. R. Civ. P. 23....................................................................................................13

Fed. R. Civ. P. 24..................................................................................12, 13, 14, 25

Fed. R. Civ. P. 24(a) ...............................................................................................13

Fed. R. Civ. P. 24(a)(2)............................................................................................15

Fed. R. Civ. P. 24(b) ...............................................................................................23

Fed. R. Civ. P. 24(b)(3) ...........................................................................................23

Fed. R. Civ. P. 24(c) ...........................................................................................25, 27

## OTHER AUTHORITIES

A.C. McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*,
    Brain: A Journal of Neurology 3 (Dec. 2012) ..........................................9, 10, 16, 17

Barry D. Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*,
9 Nature Reviews Neurology 222 (2013) ...........................................................................9, 16

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
(3d ed. 2013) ..................................................................................................................27

Eddie Matz, *Stick Route*, ESPN The Magazine (Nov. 28, 2011) ..................................20

Erin D. Bigler, *Neuropsychology and Clinical Neuroscience of Persistent Post-Concussive Syndrome*, 14 J. Int'l Neuropsychological Soc'y 1 (2008).....................7, 8, 9, 19

Frontline, transcript of *League of Denial: The NFL's Concussion Crisis* .....................16

James F. Burke *et al.*, *Traumatic Brain Injury May Be an Independent Risk Factor for
Stroke*, Neurology (June 26, 2013) ......................................................................................20

Mark Hollmer, *Alzheimer's Diagnosis May Gain from PET Imaging of Tau Proteins*,
FierceDiagnostics (Sept. 20, 2013) ......................................................................................17

M. Maruyama *et al.*, *Imaging of Tau Pathology in a Tauopathy Mouse Model and in
Alzheimer Patients Compared to Normal Controls*, 79 Neuron 1094 (2013) ..........................17

Nathaniel Penn, *The Violent Life and Sudden Death of Junior Seau*, GQ
(Sept. 2003)..................................................................................................................10

Neal Emery, *How to Diagnose a Battered Brain Before It's Too Late*,
The Atlantic (May 8, 2012) .........................................................................................9, 17

Paul Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl
Star*, Men's Journal (May 2011)..........................................................................................10

Roche, FDA-Mandated Warning Label for Toradol ...............................................8, 19

Sally Jenkins & Rick Maese, *Pain and Pain Management in NFL Spawn a Culture of
Prescription Drug Use and Abuse*, The Washington Post (Apr. 13, 2013)..............................8

Steve Fainaru & Mark Fainaru-Wada, *Lawyers Fight Over Settlement Details*,
ESPN.com (Jan. 24, 2014, 8:18 PM)......................................................................................25

Steven T. DeKosky *et al.*, *Traumatic Brain Injury – Football, Warfare, and Long-Term
Effects*, The New England Journal of Medicine 1293 (2010) ..................................................17

United Nations Department of Economic and Social Affairs, *Consolidated List of
Products Whose Consumption and/or Sale Have Been Banned, Withdrawn, Severely
Restricted or Not Approved by Governments* (2005)................................................................8

W. Zhang, *A Highly Selective and Specific PET Tracer for Imaging of Tau Pathologies*,
31 J. Alzheimers Disease 601 (2012) ....................................................................................17

## INTRODUCTION

This Court has rejected a settlement proposal by the Representative Plaintiffs and their counsel, noting that the Monetary Award Fund may not "have the funds available over its lifespan to pay all claimants." Dkt. No. 5657 at 11. However, equally troubling is the fact that the settlement provided no monetary recovery – nothing at all – for class members suffering from many of the residual effects most commonly linked to recurrent and repetitive mild traumatic brain injury ("MTBI"), while releasing every claim these class members may have against the NFL.

The Representative Plaintiffs negotiated a deal that compensated the subset of class members diagnosed with ALS, Alzheimer's Disease, Parkinson's Disease, some types of dementia, and in certain circumstances chronic traumatic encephalopathy ("CTE") while funds last. But that deal did not provide a single dollar, nor adequate medical treatment, to the many more class members who suffer from afflictions that inhibit their ability to work or function fully in their daily lives. Symptoms may include memory loss, headaches, chronic pain, depression, impulsivity, diminished executive function, speech impairment, concentration and attention deficits – all conditions that have been associated with CTE. The Representative Plaintiffs, moreover, were willing to arbitrarily limit recovery for CTE. To date, essentially every brain of a deceased NFL retiree examined for CTE has shown signs of the disease. The proposed settlement, however, compensated *only* CTE in players who would die before preliminary approval of the settlement, giving nothing to retired players currently suffering from conditions that may progress to CTE.

Intervenors Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine (the "Intervenors") are among the ranks of injured class members who suffer from a range of those afflictions, conditions that developed as a result

1

of MTBI sustained throughout their NFL careers.  While they are members of the putative class, none of the Intervenors would have qualified for medical treatment or intervention, or compensation under the Representative Plaintiffs' deal.  Intervenors' interests have gone without adequate representation, a fact evidenced by a settlement proposal that would have "fully, finally and forever . . . settle[d] and release[d] all Claims" that Intervenors have against the NFL without securing anything approaching fair compensation in return.   Dkt. No. 5634 Ex. B  § 18.2 ("Settlement").

Indeed, the Intervenors' interests are not protected by either Representative Plaintiff. Unlike Intervenors, Kevin Turner has been diagnosed with ALS – a disease diagnosed in none of the Intervenors – and the settlement he proposed would have allowed him to receive up to $5 million.  And Shawn Wooden has not alleged that he suffers from the range of afflictions that currently affects the Intervenors.  He thus has no interest in securing compensation for those injuries and cannot adequately represent the interests of retired players who do.  Nor has Mr. Wooden alleged an increased risk of developing CTE.  He likewise cannot adequately represent the interests of players who currently display the symptoms of CTE and whose condition may ultimately progress to a diagnosis of CTE.

This Court should not allow the interests of Intervenors and other class members similarly situated to go unrepresented any longer.  Intervenors seek to intervene to fulfill that role.

## BACKGROUND

### I.      Background of Proposed Intervenors

Sean Morey played nine seasons with the New England Patriots, Philadelphia Eagles, Pittsburgh Steelers, Arizona Cardinals, and Barcelona Dragons, an NFL Europe team.  An Ivy League stand-out at Brown University, Mr. Morey set multiple collegiate records and graduated

with academic honors.  In 1999, the New England Patriots selected him as a seventh round draft pick.   In 2003, Mr. Morey won the Special Teams MVP award while playing with the Philadelphia Eagles.  In 2004, Mr. Morey moved to the Pittsburgh Steelers, where he was captain of the special teams and earned a Super Bowl ring.   He eventually moved to the Arizona Cardinals and was named to the 2008 Pro Bowl.  Mr. Morey retired just before the 2010 season. While an active player, Mr. Morey co-chaired the NFLPA Mackey White Traumatic Brain Injury Committee and served as a representative in collective bargaining negotiations with the NFL. He was recently appointed head coach of the sprint football team at Princeton University.

Alan Faneca played 13 seasons in the NFL as an offensive lineman.  A star at Louisiana State University, Mr. Faneca received consensus All-American honors as a junior and was named a finalist for the prestigious Outland Trophy, which recognizes the best interior lineman in college football.  Selected by the Pittsburgh Steelers in the first round of the 1998 NFL draft, Mr. Faneca was named the team's rookie of the year.  A fixture on the Steelers' offensive line for ten seasons, Mr. Faneca earned a Super Bowl ring in 2006.  In 2007, Steeler fans elected him to the Steelers' 75th Anniversary All Time Team.  Mr. Faneca left the Steelers in 2008 for two seasons with the New York Jets and joined the Arizona Cardinals for his final season in 2010. He was named to the Pro Bowl every year from 2001 through 2009.   Since retiring from professional football, Mr. Faneca has been a tireless advocate for epilepsy research.

Ben Hamilton played ten seasons in the NFL as an offensive lineman for the Denver Broncos from 2001 until 2009, and for the Seattle Seahawks in 2010.  He was a fourth-round draft pick out of the University of Minnesota.  He is currently a high school math teacher at a private Christian high school in Colorado.

3

Robert Royal played nine seasons in the NFL from 2002 until 2010 with the Washington Redskins, Buffalo Bills, and Cleveland Browns.  An All-SEC tight end at Louisiana State University, Mr. Royal averaged nearly ten yards per reception over the course of his NFL career. Mr. Royal now serves as CEO of the Robert Royal Foundation, an organization he founded to promote childhood health, fitness, and education and to combat youth violence.  Mr. Royal is also involved in several private equity ventures.

Roderick "Rock" Cartwright played ten seasons in the NFL after a stellar collegiate career at Kansas State University.  A fullback and kick return specialist, Mr. Cartwright played with the Washington Redskins from 2002 until 2009 and the Oakland Raiders from 2010 until 2011.  In 2006, Mr. Cartwright amassed 1,541 kick-off return yards, setting a Redskins record. Since retiring from the NFL, Mr. Cartwright has actively involved himself in charity work, volunteering at a summer sports camp hosted by the Robert Royal Foundation, among others. Mr. Cartwright is also a manager with Cartwright Energy Partners LLC, an oil production development firm.

Jeff Rohrer, a second-round draft pick out of Yale University, played seven seasons in the NFL with the Dallas Cowboys from 1982 until 1989.  An outside linebacker, Mr. Rohrer received All-Ivy League honors and was the Cowboys' second- and third-leading tackler in 1986 and 1987, respectively.  Since retiring from the NFL, Mr. Rohrer has worked in the film industry.  He is currently a partner and executive producer at Recommended, a Los Angeles-based production company.

Sean Considine played eight seasons in the NFL as a strong safety and on special teams from 2005 until 2012.  After attending the University of Iowa, Mr. Considine was drafted by the Philadelphia Eagles and played four seasons with them and then two seasons with the

Jacksonville Jaguars.  In 2011, he signed with the Carolina Panthers, finishing that season with the Arizona Cardinals.  Mr. Considine joined the Baltimore Ravens in 2012, earning a Super Bowl ring.  Since retiring from professional football, Mr. Considine has been active with numerous charities in his hometown and recently became a small business owner.

Since leaving the NFL, Intervenors each have experienced one or more of a wide range of symptoms linked to repetitive mild traumatic brain injury ("MTBI"), including a sensitivity to noise, visuospatial issues, visual impairment, chronic pain, executive function deficit, episodic depression, mood and personality changes, chronic headaches, dysnomia, a decreased ability to multi-task, peripheral nerve dysfunction (numbness, burning, and/or tingling), cervical spinal disorders, sleep dysfunction, attention and concentration deficits, short- and long-term memory deficits, and somatic disorders.  Additionally, under certain circumstances some of the Intervenors also have experienced a decreased ability to interpret, regulate, express, or control complex emotions.  These precise conditions have been associated with CTE and may broaden or intensify.

Although the Intervenors' claims for their injuries would be released by the settlement that was proposed and advocated by Representative Plaintiffs and their counsel, none would qualify for any relief under the settlement beyond participation in the Baseline Assessment Program (BAP).  And the BAP – which measures cognitive deficits such as memory impairment and loss of attention – did not even screen for many of these neurobehavioral conditions or neuropsychiatric presentations.

## II.    The Class Action Complaint

The Class Action Complaint ("Complaint"), attached to the accompanying Motion as Exhibit A, defines a class consisting of all living NFL players who have retired from the NFL before preliminary approval of the proposed settlement agreement as well as the legal

representatives of such players who have died or become legally incapacitated. Compl. ¶¶ 1, 16. The class also includes spouses, parents, dependent children, and any other person who under state law may sue the NFL by virtue of his or her relationship with the retired player. *Id.* The Complaint further divides the class into two sub-classes. Subclass 1 consists of all retired players (and their representative and derivative claimants) who "were not diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE prior to the date of the Preliminary Approval and Class Certification Order." *Id.* ¶ 17(a). Subclass 2 consists of all retired players (and their representative and derivative claimants) who "were diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE prior to the date of the Preliminary Approval and Class Certification Order." *Id.* ¶ 17(b). Subclass 2 also includes the representative and derivative claimants of retired players who died before preliminary approval of the settlement and who received a post-mortem diagnosis of Death with CTE. *Id.*

The Complaint names Shawn Wooden and Kevin Turner as the Representative Plaintiffs for the class. Mr. Wooden represents Subclass 1. Compl. ¶ 17(a). A safety, Mr. Wooden played in the NFL from 1996 until 2004 with the Miami Dolphins and the Chicago Bears. *Id.* ¶ 4. He is alleged to have "experienced" unspecified "neurological symptoms" but "has not been diagnosed with any neurocognitive impairment." *Id.* The Complaint states that Mr. Wooden has an "increased risk of developing dementia, Alzheimer's, Parkinson's, or ALS." *Id.* **Mr. Wooden does not plead an increased risk of developing CTE.** *Id.* Mr. Turner represents Subclass 2. *Id.* ¶ 17(b). A running back, Mr. Turner played in the NFL from 1992 until 1999 with the New England Patriots and the Philadelphia Eagles. *Id.* ¶ 7. He was diagnosed with ALS in 2010. *Id.*

The Complaint alleges that the NFL voluntarily undertook a duty to inform its players of the risks resulting from repeated concussive and sub-concussive head impacts and to provide its players with advice concerning the treatment and prevention of head injuries. Compl. ¶¶ 128-199. It alleges that the NFL not only performed this task negligently, but also purposefully spread misinformation to conceal from its players the risks of repetitive head trauma. *Id.* Not only did the NFL's concealment delay players from seeking and receiving adequate medical treatment for the injuries they sustained while playing, *id.* ¶ 285, the NFL's behavior forced players to incur an increased, additional incremental risk of permanent brain damage with every mismanaged concussion.

The Complaint also pleads a causal connection between football and neurodegenerative disease. Compl. ¶¶ 54-88. It identifies several studies demonstrating that the repeated head injuries or concussions sustained during an NFL player's career cause severe neurological problems such as depression, dementia, and other neurodegenerative diseases. *Id.*[1] It alleges the NFL's knowledge of these studies and the link between MTBI and neurodegenerative disease, describing the NFL's efforts to intentionally conceal and cover up these dangers. *Id.* ¶¶ 89-199. Specifically, the Complaint alleges that in 1994 the NFL established a committee of experts to study brain injury in football (the MTBI Committee), which published reports and reached conclusions inconsistent with the weight of scientific evidence and which concealed from players the true risks of continued head trauma. *Id.*

---

[1] Indeed, at least one study has "confirm[ed] the presence of acute pathological changes in the brain that can occur from . . . blows to the head that are below the threshold for producing what behaviorally would be classified as a concussion." Erin D. Bigler, *Neuropsychology and Clinical Neuroscience of Persistent Post-Concussive Syndrome*, 14 J. Int'l Neuropsychological Soc'y 1, 7 (2008).

Complaints filed against the NFL in other courts have also alleged that the NFL's actions exacerbated the injuries that players sustained while playing football. For example, the complaint in *Finn v. National Football League* describes the routine pre-game mass administration of Toradol, a blood-thinning pain-killer, to players without their informed consent regarding the health risks of the drug. Complaint, *Finn v. Nat'l Football League*, No. 2:11-cv-07067-JLL-MAH, ¶¶ 135-143 (D.N.J. Dec. 8, 2011) (Dkt. 4) ("*Finn Compl.*"). Toradol's use typically is limited to the surgical setting, and several European countries have banned it. Sally Jenkins & Rick Maese, *Pain and Pain Management in NFL Spawn a Culture of Prescription Drug Use and Abuse*, The Washington Post (Apr. 13, 2013);[2] *see also* United Nations Department of Economic and Social Affairs, *Consolidated List of Products Whose Consumption and/or Sale Have Been Banned, Withdrawn, Severely Restricted or Not Approved by Governments* 156-57 (2005) (entry for ketorolac).[3]

Because Toradol has blood-thinning properties, it is contraindicated for "patients . . . at high risk of bleeding" and presents an increased risk of stroke. *Finn Compl.* ¶ 137; *see also* Roche, FDA-Mandated Warning Label for Toradol, at 1-2.[4] On top of those risks, Toradol "mask[s] pain" and "prevent[s] the feeling of injury," *Finn Compl.* ¶¶ 135, 140, which makes it more likely that a player will report that he feels no or little pain from a precise trauma and then return to play. Because "a prior concussion increases the likelihood of a second concussion," Bigler, *supra*, at 8, the routine administration of Toradol compounded the risk that players would

---

[2] *Available at* http://www.washingtonpost.com/sports/redskins/pain-and-pain-management-in-nfl-spawn-a-culture-of-prescription-drug-use-and-abuse/2013/04/13/3b36f4de-a1e9-11e2-bd52-614156372695_story.html.

[3] *Available at* http://www.un.org/esa/coordination/CL12.pdf.

[4] *Available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/019645s019lbl.pdf.

suffer multiple instances of head trauma in a single game or practice.[5]  The Intervenors include players who have received those Toradol injections.

The Complaint specifically identifies several long-term injuries arising from MTBI, "including, **but not limited to** memory loss, dementia, Alzheimer's Disease, Parkinson's Disease, ALS, depression, and CTE and its related symptoms."  Compl. ¶ 127 (emphasis added).  "CTE is the long-term neurological consequence of repetitive mild TBI."  Barry D. Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*, 9 Nature Reviews Neurology 222, 225 (2013).  The condition results from the build-up in the brain of mis-folded tau protein.  Neal Emery, *How to Diagnose a Battered Brain Before It's Too Late*, The Atlantic (May 8, 2012);[6] A.C. McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, Brain: A Journal of Neurology 3 (Dec. 2012).  More extensive tau build-up indicates a more advanced stage of CTE.  Jordan, *supra*, at 227 (Box 5).

Currently, doctors can only diagnose CTE through a post-mortem brain autopsy.  Jordan, *supra*, at 226.[7]  Nevertheless, researchers have identified pre-death clinical presentations of CTE.  Among others, these presentations include: aggression, agitation, impulsivity, depression, suicidality, impaired attention or concentration, memory problems, executive dysfunction, dementia, and language impairment.  *Id.*; McKee, *supra*, at 10, 13-14, 16-17.  While some of

---

[5] A prior concussion also results in a "greater morbidity of the second concussion."  Bigler, *supra*, at 8.

[6] *Available at* http://www.theatlantic.com/health/archive/2012/05/how-to-diagnose-a-battered-brain-before-its-too-late/256877/.

[7] But see footnote 14, *infra*.  Scientific advances may soon make CTE detectable before death.

those conditions appear more pronounced in advanced Stage III and Stage IV CTE, suicidality presents at all stages. McKee, *supra*, at 10, 13-14, 16-17.[8]

Limited studies thus far have shown CTE to be present regularly in the brains of NFL players. Of the 34 deceased NFL retirees whose brains have been tested for CTE, 33 had the disease. McKee, *supra*, at 17. Of those 33, nearly half showed signs of Stage III or Stage IV CTE – CTE's two most severe stages. *Id.* And almost all of these players – 94% – were symptomatic during their lifetimes. *Id.* The most common symptoms were short-term memory loss, executive dysfunction, and attention and concentration problems. *Id.* As described above, Intervenors currently exhibit these conditions, which other complaints filed against the NFL have identified as injuries linked to MTBI. *See Finn Compl.* ¶ 36 (identifying "memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, [and] depression" as afflictions resulting from football-related MTBI).

## III.    The Proposed Settlement

The Representative Plaintiffs filed their settlement proposal and motion for preliminary approval on January 6, 2014. *See* Dkt. No. 5634. Notwithstanding the breadth of afflictions linked to MTBI, that settlement compensated only a few diseases. ALS claimants were to receive a maximum award of $5 million. Settlement Ex. 3. Retired players diagnosed with

---

[8] Junior Seau and Dave Duerson – two prominent former NFL players – committed suicide by shooting themselves in the heart in order to preserve their brains for study. *See* Nathaniel Penn, *The Violent Life and Sudden Death of Junior Seau*, GQ (Sept. 2003), http://www.gq.com/ entertainment/sports/201309/junior-seau-nfl-death-concussions-brain-injury;   Paul   Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star*, Men's Journal (May 2011), http://www.mensjournal.com/magazine/dave-duerson-the-ferocious-life-and-tragic-death-of-a-super-bowl-star-20121002. Before committing suicide, Seau battled insomnia, headaches, dizziness, and other conditions linked to CTE. Penn, *supra*. Like Seau, Duerson also showed signs of CTE before his suicide, which manifested as "starburst headaches," blurred vision, and short-term memory deficits. Solotaroff, *supra*.

Parkinson's Disease or Alzheimer's Disease were to receive a maximum $3.5 million award. *Id.*

And class members exhibiting Level 2 or Level 1.5 dementia were to receive at most $3 million

or $1.5 million, respectively. *Id.* The settlement also compensated cases of CTE with a

maximum $4 million award, *but only if the retired player died before preliminary approval* of

the settlement. Settlement §§ 2.1(xxx), 6.3 & Ex. 1 ¶ 5. Players suffering from CTE who died

after that date were to receive nothing. Moreover, players suffering from the clinical

presentations of CTE were to receive no compensation under the settlement unless they

independently qualified for compensation through a diagnosis of Level 1.5 or Level 2 dementia.

*Id.* § 6.3.

The settlement also articulated a schedule of offsets that could reduce a claimant's award.

For example, class members who played fewer seasons in the NFL or who were older at the time

of the qualifying diagnosis were to receive only a percentage of the maximum award for their

condition. *See* Settlement Ex. 5. Additionally, any player who suffered a *single* stroke or a

*single* instance of traumatic brain injury after his playing career ended was to receive a 75%

offset – that is, such a player would recover only 25% of what he was otherwise entitled to

receive under the settlement. Settlement § 6.5(b)(ii)-(iii).

The settlement also would have barred any and all MTBI-related claims of every retired

NFL player who did not opt out of the settlement. Class members would:

> waive and release . . . any and all past, present and future claims, counterclaims,
> actions, rights or causes of action . . . in law or in equity . . . known or unknown,
> suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued
> or unaccrued, liquidated or unliquidated [that any settling plaintiff] had, has, or
> may have in the future arising out of, in any way relating to or in connection with
> the allegations, transactions, facts, matters, occurrences, representations or
> omissions involved, set forth, referred to or relating to the Class Action Complaint
> and/or Related Lawsuits . . . .

Settlement § 18.1(a). That release required class members to acknowledge that they "explicitly took unknown or unsuspected claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims" falling within the scope of the allegations in the Complaint and related lawsuits. *Id.* § 18.2. This includes not only claims against the NFL but also, with no explanation, claims of players who accept a monetary award under the proposed settlement that are (or could be) brought against the National Collegiate Athletic Association ("NCAA"). *Id.* § 18.5. The NCAA was not named as a defendant in any of the underlying lawsuits filed in this MDL proceeding.[9]

On January 14, 2014, this Court denied Co-Lead Class Counsel's motion for preliminary approval of the settlement, declining to find that the settlement "has no obvious deficiencies, grants no preferential treatment to segments of the class, and falls within the range of possible approval." Dkt. No. 5657 at 10 (quotation marks omitted). Instead, the Court recognized that the "Monetary Award Fund may lack the necessary funds to pay Monetary Awards for Qualifying Diagnoses" and "order[ed] the parties to share the [actuarial and economic] documentation" relied upon during settlement "with the Court through the Special Master." *Id.* at 10, 12.

## ARGUMENT

When parties propose a class-wide settlement before class certification, a putative class member seeking to ensure adequate representation of its interests may move to intervene. Fed. R. Civ. P. 24. Generally, a court should interpret the requirements for establishing intervention "broadly" and in favor of its occurrence. *United States v. City of Los Angeles*, 288 F.3d 391, 397

---

[9] Claims against the NCAA for injuries arising from concussions are the subject of a separate multidistrict litigation. *See In re Nat'l Coll. Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492, 1:13-cv-09116 (N.D. Ill.).

(9th Cir. 2002) (quotation marks omitted); *see also United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1180 (3d Cir. 1994) (noting 1966 amendments to Rule 24 were made to "facilitate intervention"). "Doubts regarding the propriety of permitting intervention should be resolved in favor of allowing it, because this serves the judicial system's interest in resolving all related controversies in a single action." *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992); *see also Kozak v. Wells*, 278 F.2d 104, 112 (8th Cir. 1960); *Koprowski v. Wistar Inst. of Anatomy & Biology*, No. CIV. A. 92-CV-1182, 1993 WL 332061, at *2 (E.D. Pa. Aug. 19, 1993). All of these purposes are well-served by allowing intervention here.

I.    **This Court Should Grant Intervenors' Motion Under Rule 24(a) To Ensure Adequate Protection of Their Interests and Those of Similarly Situated Putative Class Members**

Under Rule 24(a), intervention as of right is permitted where (1) the proposed intervenor is not adequately represented by an existing party in the litigation; (2) he has a sufficient interest in the litigation; (3) that interest may be affected or impaired by the disposition of the action; and (4) his application is timely. Fed. R. Civ. P. 24(a); *Alcan Aluminum*, 25 F.3d at 1181-83; *see also Brody v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992). "In the class action context, the second and third prongs" – that the intervenor have a sufficient interest in the litigation that is affected or impaired by the disposition of the case – "are satisfied by the very nature of Rule 23 representative litigation." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005); *see also Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 474936, at *3 n.1 (N.D. Cal. Jan. 17, 2007) (quoting *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1405 n.1 (9th Cir.

1989)).[10]  Thus, intervention is proper if the existing parties to the litigation do not adequately represent the Intervenors' interests and if Intervenors' application is timely.

Under this standard, Intervenors have the right to intervene on behalf of players suffering from MTBI-related conditions, including symptoms of CTE, who would have received no monetary compensation under the proposed settlement.  No existing party to the litigation adequately represents their interests and, in fact, those interests have been compromised. Because the settlement would have compensated only a small subset of MTBI-related conditions to the exclusion of the others, there is a conflict of interest between the class representatives and many class members.  Intervenors' application is also timely, coming even before the settling parties have resubmitted the settlement for preliminary approval and just four months after the settling parties publicly revealed the details of the settlement.

**A.  Intervenors' Interests – and Those of Players Like Them – Are Not Currently Represented Before the Court**

On a motion to intervene under Rule 24, the burden of showing inadequate representation "should be treated as minimal." *In re Safeguard Scientifics*, 220 F.R.D. 43, 48 (E.D. Pa. 2004) (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)).  The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Litig.*, 55 F.3d 768, 800 (3d Cir. 1995) ("*GM Trucks*").

---

[10] Intervenors' interests in this putative class action are no exception.  The parties in this case have reached a settlement that would globally dispose of all class members' MTBI-related claims against the NFL but would leave players like Intervenors uncompensated for their injuries.  They thus have a clear interest that would be substantially impaired if the settlement – as it now stands – is eventually approved.

Intervenors' interests do not align with those of the Representative Plaintiffs for at least two reasons, either of which justifies intervention. First, Intervenors' MTBI-related afflictions – afflictions from which the Representative Plaintiffs do not claim to suffer and for which they have not sought relief – would have received no monetary compensation under the settlement. Second, the settlement would have imposed a stark 75% offset for instances of stroke – a medical condition that Intervenors are at increased risk of suffering as a result of the NFL's own conduct in administering Toradol to players. Thus, Intervenors have more than satisfied their burden of showing that their interests are not adequately represented. *See* Fed. R. Civ. P. 24(a)(2); *id.* (Advisory Committee Note to 1966 Amendment); *see also Cmty. Bank*, 418 F.3d at 314-15; *Diaz*, 876 F.2d at 1405 n.1; *Glass*, 2007 WL 474936, at *3 n.1.

**1.    Representative Plaintiffs Negotiated and Advocated a Settlement That Addressed Their Own Injuries but Failed To Address the Injuries of Intervenors and Other Class Members**

The settlement would have compensated only a small subset of MTBI-related injuries to the exclusion of all others, creating conflict between the interests of those who suffer from compensated injuries and those whose injuries go without relief. *See Dewey*, 681 F.3d at 183. As a result of their NFL careers, the Intervenors suffer from a range of significant medical conditions: visuospatial difficulties, executive function deficit, chronic headaches, dysnomia, decreased emotional stability, increased impulsivity, and attention and concentration deficits. None of these conditions would receive compensation or medical treatment under the settlement. The failure to compensate or treat these afflictions is made more notable by Co-Lead Class Counsels' own recognition of the links between MTBI and these uncompensated conditions. *See, e.g.*, Compl. ¶ 127 (noting "MTBI can and does lead to long-term brain injury, ***including, but not limited to, memory loss***, dementia, Alzheimer's Disease, Parkinson's Disease, ALS,

15

*depression*, and CTE and *its related symptoms*." (emphasis added)); *Finn Compl.* ¶¶ 36, 100-145.[11]

The disparate – and arbitrary – treatment of class members suffering from these uncompensated afflictions is particularly stark in light of the settlement's framework for compensating CTE. The uncompensated conditions afflicting Intervenors are among the well-documented symptoms of CTE. McKee, *supra*, at 18; Jordan, *supra*, at 226-27. And while CTE found in a retired player who died on the eve of preliminary approval would have been the basis for a $4 million payment, that same condition would have gone uncompensated if the player died one day later, after preliminary approval. That is because the settlement defined "qualifying diagnosis" to include "a post-mortem diagnosis . . . of CTE" *only* "[f]or Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order." Settlement Ex. 1 ¶ 5; *see also* Settlement ¶¶ 2.1(xxx), 6.2(a). Thus, former players like the Intervenors who are currently managing the cumulative effects of MTBI – many of which are consistent with the presentation of CTE – would have received no compensation and would continue bearing their medical costs even if their condition progressed to full-blown CTE.

That limitation on CTE compensation is remarkable: Given that 33 of the 34 deceased NFL players whose brains have been examined for CTE have been diagnosed with the condition, one of the lead CTE researchers has wondered whether "every single football player doesn't have" CTE.[12] Yet notwithstanding the widespread prevalence of CTE among NFL retirees, the settlement provided *no compensation* to players with CTE who die after preliminary approval of

---

[11] Co-Lead Class Counsel is one of the attorneys representing the plaintiffs in *Finn*.

[12] Frontline, transcript of *League of Denial: The NFL's Concussion Crisis*, http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/transcript-50/.

the settlement – likely a large percentage of the 20,000-member putative class.[13]  Co-Lead Class
Counsel have never explained or justified the basis for such a stark difference in treatment
among players suffering from the exact same MTBI-related condition.

The consequences of denying compensation to class members like the Intervenors will
multiply over time.  Many diseases linked to MTBI exhibit variable latency periods, meaning
that the symptoms of MTBI-related afflictions will present earlier in retirement for some former
NFL players than for others.  Steven T. DeKosky *et al.*, *Traumatic Brain Injury – Football,
Warfare, and Long-Term Effects*, The New England Journal of Medicine 1293, 1293-94 (2010).
As science advances, moreover, it is likely that MTBI will be shown to correlate with additional
diseases, and that CTE will be detectable before death.[14]  Yet the settlement provided no
flexibility for adding to the list of qualifying diseases or compensating new conditions.  *See*

---

[13]  In theory, a retired player suffering from CTE could receive compensation through an
independent qualifying diagnosis of, for example, Level 1.5 dementia.  But dementia does not
always accompany the injuries that Intervenors have suffered and not all stages of CTE exhibit
dementia.  In one study, for example, no individual presenting with Stage I or II CTE showed
signs of dementia despite showing symptoms similar to those that Intervenors are experiencing.
McKee, *supra*, at 10, 13.  Even some players with advanced stages of CTE *still* were not
considered cognitively impaired.  *Id.* at 14 (noting 25% of the individuals diagnosed with stage
III CTE were not considered cognitively impaired).  Indeed, it seems apparent from what is
known about the behavior and symptoms of some deceased football players found to have CTE,
such as Junior Seau and Dave Duerson, that at least some (and perhaps many) of those deceased
players would not have qualified for compensation at all had they not died before preliminary
approval of the settlement.

[14] The likelihood that scientific advancements will soon allow for testing of tau protein build-up
in a living brain – and therefore allow detection of CTE before the retired player dies – is high.
*See* Emery, *supra* (noting "pilot studies show promise for [using] diagnostic MRI and MRS
scans [to diagnose CTE] as brain imaging technology improves").  Indeed, several researchers
have already identified chemicals that bind tau protein in living brain tissue.  M. Maruyama *et
al.*, *Imaging of Tau Pathology in a Tauopathy Mouse Model and in Alzheimer Patients
Compared to Normal Controls*, 79 Neuron 1094 (2013); W. Zhang, *A Highly Selective and
Specific PET Tracer for Imaging of Tau Pathologies*, 31 J. Alzheimers Disease 601 (2012); *see
also* Mark Hollmer, *Alzheimer's Diagnosis May Gain from PET Imaging of Tau Proteins*,
FierceDiagnostics (Sept. 20, 2013), http://www.fiercediagnostics.com/story/alzheimers-
diagnosis-may-gain-pet-imaging-tau-proteins/2013-09-20.

Settlement § 6.4(a) ("In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s)."). Class members in Intervenors' shoes thus have a strong need for representatives who will press for settlement "provisions that can keep pace with changing science and medicine, rather than freezing in place the science" known at the time of settlement. *Dewey*, 681 F.3d at 182 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 610-11 (1997)).

The Representative Plaintiffs cannot fulfill that role. Neither of the Representative Plaintiffs shares the Intervenors' interests in securing compensation for other MTBI-related conditions and for *all cases* of CTE. Mr. Turner, who suffers from ALS, has a diagnosed medical condition the parties specifically intend to compensate under the settlement (and rightly so). Compl. ¶ 7. But he is not poised to represent the interests of those who have suffered different injuries and would have received nothing under the proposed settlement. Neither is Mr. Wooden. Intervenors presently exhibit MTBI-related injuries that are clinical indications of CTE. Mr. Wooden, by contrast, has not alleged that he suffers from any MTBI-related affliction. Nor has he alleged that he is at "[an] increased risk of developing" CTE, even though he does assert such a risk for dementia, Alzheimer's Disease, Parkinson's Disease, and ALS. Compl. ¶ 4. Mr. Wooden's interests therefore lie in securing future compensation for those four afflictions, not in securing payment for the conditions experienced by the Intervenors.[15]

---

[15] Even if Mr. Wooden were to now report that he, too, suffers from the conditions affecting Intervenors or that he fears the onset of CTE, he cannot reliably represent those interests going forward: He has abdicated any responsibility to those interests by advocating a proposed settlement that ignores those injuries.

2.     **The 75% Offset for Stroke and Traumatic Brain Injury Also Demonstrates Conflict Between the Intervenors' Interests and Those of the Representative Plaintiffs**

The proposed settlement also would have provided for offsets that create conflict between Intervenors' interests and those of the Representative Plaintiffs. *See Dewey*, 681 F.3d at 183. The proposed settlement imposed a *75% offset* for a *single instance* of non-football-related traumatic brain injury ("TBI") or stroke occurring after the player's NFL career has ended. Settlement § 6.5(b)(ii).   That 75% offset applied regardless of the severity of traumatic brain injury that the player sustained while playing football.   And it presumed that a single non-football-related instance of TBI accounts for 75% of a player's MTBI-related injuries, even though that player may have sustained numerous diagnosed and undiagnosed head traumas throughout his NFL career.   That is both devoid of scientific justification and grossly unfair.

Instances of stroke, moreover, should be compensated injuries, not offsets that reduce recovery, *because the NFL itself has increased Intervenors' risk of stroke. See Finn Compl.* ¶¶ 135-143.  NFL-administered Toradol injections increased that risk in two ways.  First, as a pain-killer, Toradol masks injuries that players may have suffered, encouraging their continued participation in the game and increasing the risk that a player would suffer multiple instances of MTBI in one game.  Second, MTBI suffered after a Toradol injection occurs at a time when the cerebrovascular architecture of the brain is particularly weak.  *See* Bigler, *supra*, at 8 (noting that "in TBI the same mechanisms that stretch the neuron can stretch the blood vessel [which] may impair the neurogenic response of the blood vessel").  Toradol is a powerful blood-thinner that increases the risk of stroke and micro-hemorrhaging in players under Toradol's effect.  *Finn Compl.* ¶¶ 135-143; *see also* FDA-Mandated Warning Label, at 1.

Large groups of players who weekly received pre-game Toradol injections thus suffered repetitive MTBI at a time when their brains were most susceptible to permanent damage and

injury. That damage itself enhances a retired player's risk of experiencing a stroke later in life. *See* James F. Burke *et al.*, *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, Neurology (June 26, 2013). On top of these effects, the effects of sustained, long-term use of Toradol are completely unknown. *See* Eddie Matz, *Stick Route*, ESPN The Magazine (Nov. 28, 2011).[16] Thus, the NFL's own negligent and fraudulent actions have contributed to the prevalence of stroke among retired players. Co-Lead Class Counsel knew of these allegations – indeed, he represents the *Finn* plaintiffs – yet the settlement makes no mention of these injuries except to release any claims for them and to inexplicably select them as bases for reducing the retired player's compensation.

As with the Intervenors' interests in securing compensation for CTE and its related symptoms, the Representative Plaintiffs do not adequately represent Intervenors' interests in eliminating or reducing the offset related to stroke and post-NFL TBI. Neither Mr. Turner nor Mr. Wooden claims an increased risk of stroke through NFL-administered Toradol use. As a result, neither can adequately represent those Intervenors who some day may suffer such a stroke – and the resulting drop in compensation under the proposed settlement – as a result of the NFL's own conduct.[17]

* * * * *

---

[16] *Available at* http://espn.go.com/nfl/story/_/id/7243606/nfl-players-tony-romo-ronde-barber-rely-new-painkiller-toradol.

[17] The proposed settlement was flawed in other ways. For example, it required claimants to register within a mere 180 days from its effective date, disallowing any claims from class members who do not so register. Settlement §§ 4.2(c), 6.2(a). And as this Court has noted, the proposed settlement's release extended to claims against the NCAA, a non-party to the suit. Dkt. No. 5657 at 10 n.6. Derivative claimants, notwithstanding the independent injuries they have suffered, were to receive a mere 1% recovery. Settlement § 7.3

The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183. Intervenors' interests and the Representative Plaintiffs' interests simply do not align. *Compare Sullivan v. DB Invs., Inc.*, No. CIV.A. 04-2819, 2006 WL 892707 (D.N.J. Apr. 6, 2006) (finding representation adequate where subclasses within the settlement were vigorously and independently represented). In fact, they conflict. While the Representative Plaintiffs' interests lie in securing present and future payment for certain MTBI-related diseases – specifically, those for which Mr. Wooden has alleged an increase risk – the Intervenors' interests lie in securing present and future payment for *other* MTBI-related conditions. *See Amchem*, 521 U.S. at 620-21. The Court should therefore grant the Intervenors party status for the purpose of ensuring that the views of retired players suffering from these conditions – which may progress to CTE – are represented in the settlement process.

**B.     The Intervenors' Request Is Timely and Will Neither Prejudice the Parties Nor Cause Undue Delay**

Timeliness, in this context, is not merely a matter of counting days or months; instead, it is viewed under the totality of the circumstances. *See Alcan Aluminum*, 25 F.3d at 1182; *see also NAACP v. New York*, 413 U.S. 345, 365-66 (1973) ("[T]he point to which [a] suit has progressed is one factor in the determination of timeliness, [but] it is not solely dispositive"; rather, it "is to be determined from all the circumstances ... by the court in the exercise of its sound discretion."). Because only when " 'the existence and limits of the class have been established and notice of membership has been sent out does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it,' " the "time frame in which a class member may file a motion to intervene challenging the adequacy of class representation must be at least as long as the time in which s/he may opt-out of the class." *Cmty. Bank*, 418 F.3d at 314

(quoting *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 384 (3d Cir. 2002)).   The Intervenors amply satisfy the timeliness requirement here.  Aware of both the specific terms of the settlement agreement and their inability to recover under it, Intervenors properly move to intervene well before "the time in which [they] may opt-out of the class" – indeed, they are acting before any class has been certified.  *Cmty. Bank*, 418 F.3d at 314.

The procedural posture of this case highlights the timeliness of Intervenors' motion and the present need for their participation.  Preliminary approval of a class settlement would create a presumption that the settlement is fair.  *GM Trucks*, 55 F.3d at 785.  Thus, preliminary approval itself impairs Intervenors' rights.  Allowing Intervenors' participation in the case after condition-al class certification, which accompanies preliminary approval, would deprive Intervenors of the right to voice their interests before the Court decides those issues.  Intervention after preliminary approval would therefore come too late.  As *GM Trucks* explained, "'where notice of the class action is . . . sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a fait accompli.'"  *Id.* at 789 (alterations omitted) (quoting *Mars Steel v. Cont'l Ill. Nat'l Bank & Trust*, 834 F.2d 677, 680-81 (7th Cir. 1987)).

Moreover, intervention at this time would not prejudice the parties or cause undue delay.  The critical inquiry when assessing delay or prejudice is "what proceedings of substance on the merits have occurred," such as whether there have been a large number of "depositions taken, dispositive motions filed, or decrees entered."  *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369-70 (3d Cir. 1995).  From a procedural perspective, this is a young case.  There has been little motion practice, absolutely no fact or expert discovery, and nothing in the way of trial preparation.  Thus, granting intervention will not reopen matters that have been fully resolved or require a reopening of discovery or an extensive re-examination of

factors already considered.   Should an examination of some issues already considered be necessary, it can occur simultaneously with the study by the Special Master.   If anything, Intervenors' involvement can better ensure that all segments of the proposed settlement class are heard, and that the Special Master is not provided only those materials that support the proposed settlement. *Cf. Lusardi v. Xerox Corp.*, 975 F.2d 964, 984 n.34 (3d Cir. 1992).

In sum, the Intervenors here, far from showing up late to the game, timely seek intervention to address a clear and direct risk of impairment to their − and numerous other putative class members' − rights.   Furthermore, they do so without creating a risk of undue delay or prejudice to the parties, as intervention will not require re-litigating any steps already taken, whether in terms of discovery, consideration of issues presented, or court proceedings.   Finally, intervention offers the added benefit of moving this litigation more swiftly towards a final resolution with less resistance from segments of the putative settlement class who feel that their interests may not be voiced during the Court's preliminary consideration of the settlement.

## II.   Alternatively, Permissive Intervention Should Be Granted Under Rule 24(b)

Permissive intervention requires only "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).   Additionally, the rule requires a court to consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).   Intervenors satisfy these requirements here.

The Intervenors' claims match those of the other plaintiffs: all seek relief for the NFL's acts or refusals to act regarding the risks of repeated head trauma and brain injury.   They share common questions of law or fact with the main action that are expressly set forth in the Complaint.   In short, they are putative class members who would be bound by any settlement that may be approved.

Granting Intervenors' motion will neither prejudice the parties nor cause undue delay. In brief, their motion is timely and granting it here will not interfere with or require repeating any prior proceedings (as there have been few), will not require revisiting discovery already performed (as there has been none), and will not introduce completely new issues into the litigation.

Intervenors will provide a service to the Court and to other members of the class by providing a check against the Representative Plaintiffs and their counsel – who appear not to have pursued the interests of all class members zealously. For example, Class Counsel settled the case without any discovery, making it impossible to appreciate fully the merits – and value – of plaintiffs' claims. *See Cmty. Bank*, 418 F.3d at 307 (finding inadequate representation where, among other things, no formal discovery had occurred); *GM Trucks*, 55 F.3d at 806, 814 (finding class settlement unfair where, among other things, amount of discovery inadequate). Additionally, the procedure by which Co-Lead Class Counsel selected Sub-Class Counsel and the role Sub-Class Counsel played in the negotiations are complete unknowns. In fact, the mediator never states that he met with Sub-Class Counsel individually. *See* Dkt. No. 5634-4 Ex. D ¶¶ 5-7 (repeatedly indicating mediator met with "both sides," in reference to the plaintiffs collectively and the NFL). Nor is the extent of the Representative Plaintiffs' participation in the negotiations – and thus their ability to protect the interests of the class – known. *See Olden v. Gardner*, 294 F. App'x 210, 219 (6th Cir. 2008) (finding class settlement unfair where, among other things, the class representatives "provided no meaningful oversight of the class counsel

during the settlement negotiations"). Further, media reports suggest that Co-Lead Class Counsel has "clashed with his own clients."[18]

And the attorneys' fees provision raises additional red flags. First, the NFL agreed not to dispute Co-Lead Class Counsel's fee request, Settlement § 21.1, which "increases the likelihood that class counsel will have bargained away something of value to the class," *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (quotation marks omitted). Second, "fee negotiations [should] be postponed until the settlement [is] judicially approved, not merely until the date the parties allege to have reached an agreement." *GM Trucks*, 55 F.3d at 804. Notwithstanding that warning, the settling parties here negotiated attorneys' fees before even filing the proposed settlement with the Court.

It is evident that the Intervenors' interests here are not adequately represented due to the antagonism between their interests and those of the Representative Plaintiffs. Allowing intervention will ensure that Intervenors' interests are both adequately represented and protected. Accordingly, this Court should allow these retired players to permissively intervene.

## III.    The Intervenors Have Complied with the Procedural Requirements for Intervention

The purpose of Rule 24's procedural requirements is to "provid[e] notice to the existing parties of the basis and nature of the intervenor's claim." *Phila. Recycling & Transfer Sta., Inc.*, No. Civ. A. 95-4597, 1995 WL 517644, at *3 (E.D. Pa. Aug. 29, 1995); *see* Fed. R. Civ. P. 24(c). When an intervenor's motion and memorandum have satisfied that purpose, "[l]iberal construction of [Rule 24(c)] is especially appropriate." *Id.* The Intervenors have provided such notice in their Motion to Intervene and accompanying Memorandum. They seek intervention

---

[18] Steve Fainaru & Mark Fainaru-Wada, *Lawyers Fight Over Settlement Details*, ESPN.com (Jan. 24, 2014, 8:18 PM), http://espn.go.com/espn/otl/story/_/id/10346091/lead-negotiator-facing-strong-opposition-concussion-settlement.

because the Representative Plaintiffs have abandoned their interests, as demonstrated by advocating approval of a settlement that would have released all claims for their MTBI-related afflictions without providing any monetary compensation or medical treatment. Thus, those afflictions either were not considered during settlement negotiations or compensation for those afflictions was bargained away. Regardless of the reason, the Intervenors' interests were not adequately represented.

While Rule 24(c) mentions proposed intervenors attaching a pleading to their motion to intervene, courts have recognized that an independent complaint is not necessary when the proposed intervenor has otherwise given notice of the grounds for intervention as the Intervenors have here. *In re Mapp*, for example, granted intervention in a class action – without a separate complaint – where the "applicants' motion to intervene was specific enough to inform the parties of the issues at stake in their claim." No. 85-2745, 1986 WL 8340, at *3 (E.D. Pa. July 25, 1986). *Pereira v. Foot Locker, Inc.* also allowed intervention in a class action – without a separate complaint – because the intervenors "stat[ed] the grounds for their intervention" and "stated that they wish[ed] to intervene as full party plaintiffs and participate in the litigation as such." No. 07-cv-2157, 2009 WL 4673865, at *5 (E.D. Pa. Dec. 7, 2009). And as the Eleventh Circuit has observed, when a person seeks intervention "only to protect the minority members of the plaintiff-class" because "Lead Counsel [are] not properly representing the interests of these members," a separate complaint is unnecessary. *Piambino v. Bailey*, 757 F.2d 1112, 1121 (11th Cir. 1985). "Everyone kn[ows] the nature of the [intervenors'] substantive claims" – they are "the very claims Lead Counsel had asserted in their complaint." *Id.* Because the Intervenors have identified the basis of their intervention, are members of the putative class, and are seeking to intervene only to protect the unrepresented interests of certain class members, the Intervenors

have satisfied the requirements of Rule 24(c).[19]  Nevertheless, in an abundance of caution and in

technical compliance with Rule 24(c), the Intervenors attach Plaintiffs' Class Action Complaint,

which sets forth their claims.[20]

Should the Court find deficient the Intervenors' attachment of the Class Action

Complaint, they request that the Court grant their motion conditional on filing of "a supple-

mental pleading to be filed within a short period of time." *Phila. Recycling*, 1995 WL 517644, at

*3 (citing *WJA Realty, Ltd. P'ship v. Nelson*, 708 F. Supp. 1268, 1272 (S.D. Fla. 1989)).

## CONCLUSION

The Representative Plaintiffs are not adequately representing the interests of all members

of the class.  They have already proposed and advocated a settlement that would provide a

monetary benefit to only a small group of class members who were diagnosed with one of four

medical conditions, or are deceased with a diagnosis of CTE, yet require all class members to

release all claims.  The Court should grant Intervenors plaintiff-intervenor status in Civil Action

No. 2:14-cv-00029-AB for purposes of participating in settlement negotiations on behalf of

retired NFL players who, like themselves, have displayed medical conditions consistent with the

---

[19] When courts have cited Rule 24(c) in denying a motion to intervene, they have done so when the motion itself does not identify the claims or defenses for which intervention is sought. *See Gaskin ex rel. Gaskin v. Pennsylvania*, 197 F. App'x 141, 143-44 (3d Cir. 2006); *Contawe v. Crescent Heights of Am., Inc.*, No. Civ. A. 04-2304, 2004 WL 2966931, at *8 (E.D. Pa. Dec. 21, 2004); *Lexington Ins. Co. v. Caleco, Inc.*, No. Civ. A. 01-5196, 2003 WL 21652163, at *6 (E.D. Pa. Jan. 25, 2003); *see also* 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1914 (3d ed. 2013) ("Wright & Miller") (noting that cases strictly applying Rule 24(c) "also ha[ve] discussed reasons of substance why intervention should not be allowed").

[20] In the limited context of shareholder derivative litigation, some courts have found it insufficient under Rule 24(c) to rely on the original complaint because shareholder derivative complaints must be verified. *E.g.*, *Abramson v. Pennwood Inv. Corp.*, 392 F.2d 759, 761 (2d Cir. 1968). *See generally* 7C Wright & Miller § 1914 & n.11. The personal injury and medical monitoring complaint here requires no verification.  In any event, requiring an independent complaint setting forth the same claims as the Class Action Complaint would only result in needless duplication and repetition.

symptoms of CTE and are at risk of developing CTE and whose interests are otherwise in conflict with those of Representative Plaintiffs, who have failed to adequately represent them.

Dated:  May 5, 2014

Respectfully submitted,

*/s/ William T. Hangley*

William T. Hangley
Michele D. Hangley
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
(215) 496-7001 (telephone)
(215) 568-0300 (facsimile)
whangley@hangley.com
mdh@hangley.com

*Attorneys for Intervenors*

*Of Counsel* (*Pro Hac Vice* applications to be submitted):
Steven F. Molo
Thomas J. Wiegand
Kaitlin R. O'Donnell
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
kodonnell@mololamken.com

Eric R. Nitz
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
enitz@mololamken.com

Linda S. Mullenix
2305 Barton Creek Blvd., Unit 2
Austin, TX 78735
(512) 263-9330 (telephone)
lmullenix@hotmail.com