**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | : | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | : | |
| INJURY LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | **Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, | : | |
| *on behalf of themselves and* | : | |
| *others similarly situated,* | : | |
| Plaintiffs, | : | Civ. Action No. 14-00029-AB |
| | : | |
| v. | : | |
| | : | |
| National Football League and | : | |
| NFL Properties, LLC, | : | |
| successor-in-interest to | : | |
| NFL Properties, Inc., | : | |
| Defendants. | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |
| | : | |

**July 7, 2014**                                                    **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

Plaintiffs Kevin Turner and Shawn Wooden, through their proposed Co-Lead Class

Counsel, Class Counsel, and Subclass Counsel, and Defendants National Football League and

NFL Properties, LLC (collectively, the "NFL Parties")[1] have negotiated and agreed to a Class

Action Settlement ("Settlement") that will resolve all claims against the NFL Parties in this

multidistrict litigation.[2]  On June 25, 2014, Plaintiffs filed an unopposed motion for an order: (1)

---

[1] Plaintiffs have also sued Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp. (collectively, the "Riddell Defendants").  The Riddell Defendants are not a party to the proposed Settlement.

[2] Capitalized terms used in this Memorandum have the same meaning as those in the June 25, 2014 Class Action

granting preliminary approval of the proposed Class Action Settlement Agreement; (2) conditionally certifying a Settlement Class and Subclasses; (3) appointing Co-Lead Class Counsel, Class Counsel, and Subclass Counsel; (4) approving the dissemination of class notice; (5) scheduling a Fairness Hearing; and (6) staying matters as to the Released Parties and enjoining proposed Settlement Class Members from pursuing Related Lawsuits.  For the following reasons, I will grant the motion.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In July 2011, the first retired players filed lawsuits against the NFL Parties alleging, *inter alia*, that the NFL Parties breached their duties to the players by failing to take reasonable actions to protect players from the chronic risks created by concussive and sub-concussive head injuries and that the NFL Parties concealed those risks from the players.  Since that time, more than 5,000 former players have filed substantially similar lawsuits.  These lawsuits have been consolidated before me as a multidistrict litigation ("MDL"), pursuant to 28 U.S.C. § 1407.  *See* MDL Panel Transfer Order, Jan. 31, 2012, ECF No. 1.

On July 8, 2013, I directed the parties to mediation before retired U.S. District Court Judge Layn Phillips.  Order, July 8, 2013, ECF No. 5128.  On August 29, 2013, Judge Phillips informed me that Plaintiffs and the NFL Parties had signed a term sheet incorporating the principal terms of a settlement.  Order, Aug. 29, 2013, ECF No. 5235.  On December 16, 2013, pursuant to Federal Rule of Civil Procedure 53, I appointed Perry Golkin as Special Master to assist me in analyzing the financial aspects of any settlement.  Order Appointing Special Master, Dec. 16, 2013, ECF No. 5607.

On January 6, 2014, Plaintiffs moved for entry of an order preliminarily approving their proposed settlement and conditionally granting class certification.  Pl.'s Mot., Jan. 6, 2014, ECF

Settlement Agreement.  Pl.'s Mot. Ex. B, June 25, 2014, ECF No. 6037.

No. 5634.  At the same time, Plaintiffs filed their Class Action Complaint.  Class Action Compl.,

Turner v. Nat'l Football League, No. 14-00029 (E.D. Pa. Jan. 6, 2014), ECF No. 1.  On January

14, 2014, I denied the motion without prejudice, expressing concern as to the adequacy of the

proposed $675 million Monetary Award Fund in light of the 65-year lifespan of the Monetary

Award Fund, the settlement class size of more than 20,000 members, and the potential

magnitude of the awards.  Order, Jan. 14, 2014, ECF No. 5658.

      After six months of additional negotiation, guided by my January 14, 2014 opinion and

Special Master Golkin, the parties reached a revised Settlement aimed at providing assurance

that all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their

related claimants will be paid.  Special Master Golkin has been a critical source of advice and

financial expertise for the parties and me.[3]  As a result of the negotiations, the Monetary Award

Fund is no longer fixed at $675 million, and the NFL Parties must pay all valid claims for the

next 65 years.  The revised Settlement retains the same significant Monetary Award levels and

the NFL Parties' obligation to pay for the costs and expenses of claims administration.  It also

includes new measures designed to prevent fraudulent claims.

## II.     THE PROPOSED CLASS ACTION SETTLEMENT

### A.  The Proposed Settlement Class

      The Settlement provides for a nationwide Settlement Class consisting of three types of

claimants: (1) Retired NFL Football Players, generally defined as all living NFL football players

who, prior to the date of the Preliminary Approval and Class Certification Order,[4] retired,

formally or informally, from playing professional football with the NFL or any Member Club,

---

[3] I am grateful to Special Master Golkin for his time and effort.
[4] "Preliminary Approval and Class Certification Order" is defined in the June 25, 2014 Class Action Settlement
Agreement as the Court's order preliminarily approving the Class Action Settlement and conditionally certifying the
Settlement Class and Subclasses.  See Pl.'s Mot. Ex. B, June 25, 2014, ECF No. 6037.  For the avoidance of any
ambiguity, the order accompanying this Memorandum is the "Preliminary Approval and Class Certification Order."

including American Football League, World League of American Football, NFL Europe League, and NFL Europa League players; (2) authorized representatives, ordered by a court or other official of competent jurisdiction, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and (3) close family members of Retired NFL Football Players or any other persons who properly assert, under applicable state law, the right to sue by virtue of their relationship with a Retired NFL Football Player ("Derivative Claimants").  Based on the records of the NFL Parties, there are more than 20,000 Settlement Class Members.  Pl.'s Mem. Law 33, June 25, 2014, ECF No. 6073.

The Settlement Class consists of two Subclasses: Subclass 1 is defined as Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order, and their Representative Claimants and Derivative Claimants; and Subclass 2 is defined as Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of chronic traumatic encephalopathy ("CTE").  A Qualifying Diagnosis is defined as Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, Amyotropic Lateral Sclerosis ("ALS"), and/or Death with CTE.

### B.  The Proposed Settlement

The current Settlement provides that the NFL Parties will make payments over a period of years to create three sources of benefits for Settlement Class Members.

First, the Settlement provides for a $75 million Baseline Assessment Program ("BAP") that will offer all eligible Retired NFL Football Players baseline neuropsychological and neurological evaluations to determine the existence and extent of any cognitive deficits.  In the event that retired players are found to suffer from Level 1 Neurocognitive Impairment (moderate cognitive impairment), they may receive certain BAP Supplemental Benefits in the form of specified medical treatment and/or evaluation, including counseling and pharmaceutical coverage.  In addition to detecting any cognitive impairment, the results of BAP examinations may be used as a comparison against any future tests to determine whether a Retired NFL Football Player's cognitive abilities have deteriorated.  Further, subject to the reasonable informed consent of Retired NFL Football Players, in compliance with applicable privacy and health laws, and any other customary authorization, medical data generated will be made available for use by those conducting medical research on cognitive impairment, safety, and injury prevention.

Second, the Settlement provides for a 65-year Monetary Award Fund that will award cash to Retired NFL Football Players who already have a Qualifying Diagnosis or receive one in the future.  Representative Claimants and Derivative Claimants related to such players will also be eligible for cash awards.  The Qualifying Diagnoses and their maximum Monetary Award levels are as follows: Level 1.5 Neurocognitive Impairment ($1.5 million); Level 2 Neurocognitive Impairment ($3 million); Alzheimer's Disease ($3.5 million); Parkinson's Disease ($3.5

million); ALS ($5 million); Death with CTE ($4 million).[5]  These awards may be reduced based

on a retired player's age at the time of diagnosis, the number of NFL seasons played, and other

applicable offsets outlined in the Settlement.  If, after receiving an initial Monetary Award, a

Retired NFL Football Player becomes eligible for a larger Award because of a different

Qualifying Diagnosis, the retired player will be provided with a Supplemental Monetary Award

to ensure that the retired player receives the maximum award to which he is entitled.  The

Settlement does not require Settlement Class Members to prove that the Retired NFL Football

Player's cognitive injuries were caused by NFL-related concussions or sub-concussive head

injuries.  Both Settlement Class Members and the NFL Parties have the right to appeal a Class

Member's entitlement to a Monetary Award.

Third, the Settlement establishes a $10 million Education Fund to fund education

programs promoting safety and injury prevention with regard to football players, including

safety-related initiatives in youth football.  This Fund will also educate Retired NFL Football

Players regarding the NFL's medical and disability programs.

A Special Master will oversee the functions of a Claims Administrator who will process

claims for Monetary Awards and Derivative Claimant Awards.  The Monetary Award Fund,

which is funded by the NFL Parties, will pay for the compensation and reasonable costs and

expenses of the Special Master and Claims Administrator.

In addition, the NFL Parties will pay up to $4 million in notice expenses.  The NFL

Parties will also pay attorneys' fees and costs and have agreed not to object to a petition for fees

and costs that does not exceed $112.5 million.  This amount to be paid by the NFL Parties is *in

addition* to the amounts that the NFL Parties will pay to satisfy all Monetary Awards, finance the

---

[5] Beginning one year after the Effective Date of the Settlement, all Monetary Awards will be adjusted upwards by as
much as 2.5% per year for inflation.

BAP Fund and Education Fund, and cover the costs for Class Notice and other administrative expenses.

Furthermore, Retired NFL Football Players are not precluded from participating in the Settlement as a result of having received benefits pursuant to benefit programs provided under a Collective Bargaining Agreement ("CBA") with the NFL (e.g., the 88 Plan) or because they signed releases and covenants not to sue the NFL pursuant to the Neuro-Cognitive Disability Benefit under Article 65 of the 2011 CBA. In addition to Settlement benefits, Retired NFL Football Players are entitled to seek all applicable bargained-for benefits in the Collective Bargaining Agreements with the NFL.

In exchange for the benefits provided in the Settlement, Settlement Class Members and their related parties agree to release all claims and dismiss with prejudice all actions against, and covenant not to sue, the NFL Parties and other Released Parties and all Related Lawsuits in this Court and other courts. In contrast to the previous version of the Settlement, Settlement Class Members who receive Monetary Awards are not required to dismiss pending and/or forebear from bringing litigation relating to cognitive injuries against the National Collegiate Athletic Association ("NCAA") and any other collegiate, amateur, or youth football organizations.

## III. DISCUSSION

### A.  Preliminary Approval of the Proposed Settlement

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval. Fed. R. Civ. P. 23(e)(2). Review of a proposed class action settlement typically proceeds in two stages. At the first stage, the parties submit the proposed settlement to the court, which must make a preliminary fairness evaluation. If the proposed settlement is preliminarily acceptable, the court then directs that notice be provided to all class members who would be

bound by the proposed settlement in order to afford them an opportunity to be heard on, object

to, and opt out of the settlement.  *See* Fed. R. Civ. P. 23(c)(3), (e)(1), (e)(5).  At the second stage,

after class members are notified of the settlement, the court holds a formal fairness hearing

where class members may object to the settlement.  *See* Fed. R. Civ. P. 23(e)(1)(B).  If the court

concludes that the settlement is "fair, reasonable and adequate," the settlement is given final

approval.  Fed. R. Civ. P. 23(e)(2).  At this time, Plaintiffs request that I grant preliminary

approval.

### 1.  Standard of Review

In deciding whether to grant preliminary approval, a court determines whether:

> the proposed settlement discloses grounds to doubt its fairness or other
> obvious deficiencies such as unduly preferential treatment of class
> representatives or segments of the class, or excessive compensation of
> attorneys, and whether it appears to fall within the range of possible approval.

*Mehling v. New York Life Ins.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007) (citations omitted);  *Mack*

*Trucks, Inc. v. Int'l Union, UAW*, No. 07-3737, 2011 WL 1833108, at *2 (E.D. Pa. May 12,

2011) (stating same standard); *Tenuto v. Transworld Sys.*, No. 99-4228, 2001 WL 1347235, at *1

(E.D. Pa. Oct. 31, 2001) (same).  Under Rule 23, a settlement falls within the "range of possible

approval," if there is a conceivable basis for presuming that the standard applied for final

approval—fairness, adequacy, and reasonableness—will be satisfied.  *See Mehling*, 246 F.R.D.

at 472.  In making a preliminary determination, my first and primary concern is whether there are

any obvious deficiencies that would cast doubt on the proposed settlement's fairness.  I will also

consider whether the negotiations occurred at arm's length, whether there was significant

investigation of Plaintiffs' claims, and whether the proposed settlement provides preferential

treatment to certain class members.  *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631,

638 (E.D. Pa. 2003).

### 2.   Analysis

#### a)   There Are No Obvious Deficiencies to Cast Doubt on the Proposed Settlement's Fairness

The revised proposed Settlement is a significant improvement over the proposed settlement presented in January.  The new Settlement ensures that there are sufficient funds available to pay all claims through the 65-year term of the Settlement and improves the manner in which diagnoses are made to protect against fraud.  The original proposed Settlement with a Monetary Fund "capped" at $675 million—no matter how well supported by the parties' actuarial analyses—entailed some degree of uncertainty of payment over the 65-year term.  That risk should not be imposed on the Settlement Class Members.  Under the revised proposed Settlement, the Monetary Award levels remain the same, but the NFL Parties have agreed to "uncap" their obligation to pay Monetary Awards to every claimant who demonstrates a bona fide compensable condition.  The parties have satisfied my concern on this fundamental issue.

#### b)   The Proposed Settlement Appears to Be the Product of Good Faith, Extensive Arm's Length Negotiations

Whether a settlement arises from arm's length negotiations is a key factor in deciding whether to grant preliminary approval.  *See In re CIGNA Corp. Sec. Litig.*, No. 02-8088, 2007 WL 2071898, at *2 (E.D. Pa. July 13, 2007) (noting that a presumption of fairness exists where parties negotiate at arm's length, assisted by a mediator);  *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 439, 444 (E.D. Pa. 2008) (stressing the importance of arm's length negotiations and highlighting the fact that the negotiations included "two full days of mediation");  *In re Auto. Refinishing Paint Antitrust Litig*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (preliminarily approving class action settlement that "was reached after extensive arms-length negotiation between very experienced and competent counsel"); *see also* 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 11:41 (4th ed. 2010) (noting that courts usually

9

adopt "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval").

Here, the parties participated in settlement discussions under the auspices of Judge Phillips.  *See generally* Pl.'s Mot. Ex. D, Declaration of Layn R. Phillips ("Phillips Decl."), June 25, 2014, ECF No. 6073.  Judge Phillips guided the parties through nearly two months of negotiations.   The parties attended numerous mediation sessions and aggressively asserted their respective positions.  The discussions were at times contentious.  *See* Phillips Decl. ¶¶ 5-6.  In the end, the parties arrived at an agreement that remains the foundation for the revised Settlement.  Since the denial without prejudice of the prior motion for preliminary approval, the parties, with guidance from Special Master Golkin, conducted further hard-fought negotiations to satisfy my concerns.  Therefore, it appears that the proposed Settlement is the product of good faith, arm's length negotiations.

### c)   The Investigation of Plaintiffs' Claims and the NFL Parties' Defenses Supports Preliminary Approval

Although the parties have not reached the discovery stage of litigation,[6] proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel possess adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties.  First, the proposed Settlement was reached after the parties briefed and argued the threshold issue of whether Plaintiffs' claims were preempted by federal labor law.  Many, if not all, of Plaintiffs' claims could have been dismissed at this early stage of the litigation if the NFL Parties prevailed on the preemption issue.  The NFL Parties could also invoke a statute of limitations defense,

---

[6] Courts have preliminarily approved class action settlements where the litigation is in its early stages and minimal discovery has occurred.  *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 444 (E.D. Pa. 2008); *see also Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (In regards to class action settlements, "formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement.").

given that many of the Retired NFL Football Players have not played for years, or even decades, and may have had their injuries or symptoms for the same amount of time.  In addition, the doctrine of assumption of risk could pose a challenge to Plaintiffs' claims in light of the risk of injury that is inherent in football.  The NFL could also contest whether there existed a consensus in the scientific and medical communities at the time each player played sufficient to prove that the NFL Parties knew or should have known—and concealed—the cognitive risks of football-related concussions and sub-concussive hits.  Plaintiffs also would face hurdles in proving their case-in-chief.  If the litigation were to continue, Plaintiffs would be required to demonstrate that retired players' injuries were caused by NFL football play, as opposed to unrelated causes, the natural aging process, or concussions or sub-concussive hits experienced in youth or college football.  Therefore, the significant legal challenges facing Plaintiffs support preliminary approval of the proposed Settlement.

### d)    There Appears to Be No Preferential Treatment of Certain Settlement Class Members

The proposed Settlement does not appear to provide undue preferential treatment to any individual Settlement Class Member or Subclass.  Each of the two Subclasses had its own representation during settlement negotiations to ensure that all Settlement Class Members' interests were protected.  The Settlement further protects the interests of those who may develop severe neurocognitive impairments in the future by "uncapping" the Monetary Award Fund; indexing the Monetary Awards for inflation; and providing eligible Settlement Class Members with Supplemental Monetary Awards if they are diagnosed with additional Qualifying Diagnoses.  With the "uncapped" Monetary Award Fund, the awards paid to retired players today will have no bearing on the amount available in the future to retired players.  At the same time, the Settlement provides for significant Monetary Awards to be quickly and efficiently

distributed to players currently suffering from diagnosed cognitive impairments.  Therefore, I preliminarily find that the Settlement does not provide preferential treatment to any segment of the Settlement Class.

In sum, the Settlement falls within the range of possible approval.

**B.  Conditional Certification of the Settlement Class and Subclasses**

**1.  Standard of Review**

A court must determine whether the proposed Settlement Class and Subclasses satisfy the requirements of Federal Rule of Civil Procedure 23.  *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc).  At the preliminary approval stage, a court may conditionally certify the class for purposes of providing notice, leaving the final certification decision for the subsequent fairness hearing.  *See Manual for Complex Litigation (Fourth)* § 21.632 (2004).

Under Rule 23(a), Plaintiffs must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Rule 23(b)(3), under which Plaintiffs seek class certification, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  However, when a court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."  *Amchem v. Windsor*, 521 U.S. 591, 620 (1997).

### 2.  Analysis

#### a)  Rule 23(a)

##### (i)  Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  In these MDL proceedings, thousands of Retired NFL Football Players have filed suit against the NFL Parties, and the records of the NFL Parties suggest that there are over 20,000 Settlement Class Members.  Pl.'s Mem. 33, June 25, 2014, ECF No. 6073.  Therefore, the numerosity requirement of Rule 23(a) is easily met.  *See*, *e.g.*, *Stewart v. Abraham*, 275 F.3d 220, 227-28 (3d Cir. 2001).

##### (ii)  Commonality

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class."  The commonality element requires that plaintiffs "share at least one question of fact or law with the grievances of the prospective class."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527-28 (3d Cir. 2004) (citations omitted).  To satisfy Rule 23's commonality requirement, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).

Questions and answers surrounding the dangers of playing NFL Football, the impairment of cognitive abilities caused by concussions, and the knowledge of the NFL Parties as to the risks presented by football-related head impacts are common to the negligence and fraud claims asserted by both the named Plaintiffs and the other members of the Settlement Class.  Plaintiffs allege that the NFL Parties used the formation of the Mild Traumatic Brain Injury Committee to fraudulently conceal and to affirmatively misrepresent the long-term effects of these injuries.

The answer to the question whether the NFL Parties engaged in such fraudulent concealment and/or affirmative misrepresentation is relevant to the claims of all Settlement Class Members. Thus, the commonality requirement is tentatively satisfied by this common question and answer.

**(iii)    Typicality**

Rule 23(a)(3) requires that the class representatives' claims be "typical of the claims . . . of the class." "The typicality inquiry is intended to assess . . . whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994); *see also In re Warfarin*, 391 F.3d at 532 (finding typicality prong met where "claims of representative plaintiffs arise from the same alleged wrongful conduct").

Shawn Wooden is a Retired NFL Football Player who has not been diagnosed with a Qualifying Diagnosis and is a representative of Subclass 1.  Like many other proposed Settlement Class Members, he has sued the NFL Parties seeking a baseline assessment screening to determine whether he has any neurocognitive impairment resulting from his years of playing NFL football.  In the event he is diagnosed with a Qualifying Diagnosis in the future, he has indicated that he will seek a Monetary Award.  Kevin Turner is a Retired NFL Football Player who has been diagnosed with ALS and is a representative of Subclass 2.  Similar to other proposed Settlement Class Members who have already received a diagnosis of cognitive impairment, he seeks compensation from the NFL Parties for his injuries.  In all cases, the claims of the Subclass Representatives and other Settlement Class Members are based on the same legal theories of negligence and fraud and arise from the same alleged wrongful conduct by the NFL Parties.  Thus, Wooden's and Turner's claims appear typical of those of other Settlement Class Members in their respective Subclasses and the Settlement Class as a whole, and the typicality requirement is satisfied for the purposes of preliminary approval.

14

**(iv)     Adequacy of Representation**

Rule 23(a)(4) requires representative parties to "fairly and adequately protect the interests of the class."  This requirement "serves to uncover conflicts of interest between the named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625.  A class action settlement must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected."  *Id*. at 627.

First, each Subclass Representative's interests reflect the interests of the Subclass as a whole.  As with all other retired players who have already received a Qualifying Diagnosis, Kevin Turner is interested in immediately obtaining the greatest possible compensation for his injuries and symptoms.  Shawn Wooden, like all other retired players who were exposed to the risk of head injury but have not yet received a Qualifying Diagnosis, is interested not only in compensation for a future diagnosis, but also a guarantee that compensation will be available at that time.  Thus, the interests of all Settlement Class Members—both those who have already received a Qualifying Diagnoses and those who remain at risk for receiving one—are protected by the Subclass Representatives.

Second, by dividing the Settlement Class into two Subclasses and providing each Subclass with its own counsel, the Settlement is structured to alleviate any possible conflict between the interests of those Settlement Class Members who have already been diagnosed with a Qualifying Diagnosis (Subclass 2) and those who have not (Subclass 1).  *See Ortiz v. Fibreboard,* 527 U.S. 815, 856 (1999) (holding that an intra-class conflict "require[d] division into homogeneous subclasses . . . with separate representation to eliminate conflicting interests").  The "uncapped" Monetary Award Fund, inflation-adjusted Monetary Awards, and Supplemental Monetary Awards for retired players subsequently diagnosed with more severe Qualifying Diagnoses all protect the interests of Subclass 1.  *See In re Diet Drugs Prods. Liab. Litig.*, No.

15

1203, 99-20593, 2000 WL 1222042, *49 (E.D. Pa. Aug. 28, 2000) (holding that "step-up"

provision and inflation indexing provided adequate structural protections).  This factor weighs in

favor of conditionally certifying the Settlement Class and Subclasses.

<b>b)</b>    <b>Rule 23(b)(3)</b>

Under Federal Rule of Civil Procedure 23(b)(3), a class action may be maintained if

common questions of law or fact predominate questions arguably affecting only individuals.  The

predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation," *Amchem*, 521 U.S. at 624, and assesses whether a class action

"would achieve economies of time, effort, and expense, and promote uniformity of decision as to

persons similarly situated." Fed. R. Civ. P. 23(b)(3) Advisory Committee's Note to 1966

Amendment.

Plaintiffs' claims for medical monitoring and compensatory relief rely upon a common

legal theory related to the singular body of facts concerning the NFL Parties' knowledge and

alleged concealment and misrepresentation of the dangers of concussions in football.  *See Amgen

Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S.Ct. 1184, 1191 (2013) ("Because

materiality is judged according to an objective standard, the materiality of Amgen's alleged

misrepresentations and omissions is a question common to all members of the class . . . .").  The

issues surrounding the NFL Parties' alleged liability for the injuries suffered by Settlement Class

Members appear to predominate over any individual issues involving Plaintiffs.

Rule 23(b)(3)'s "superiority requirement asks the court to balance, in terms of fairness

and efficiency, the merits of a class action against those of alternative available methods of

adjudication."  *In re Warfarin*, 391 F.3d at 533-34 (citation and internal quotation marks

omitted).  Given the hundreds of suits already commenced against the Released Parties in federal

and state courts, a class action Settlement and resolution of all claims against the NFL Parties in

16

this forum seems to be a superior alternative to other methods of adjudication.  If the cases filed

by Plaintiffs against the NFL Parties were litigated individually, the parties could face decades of

litigation and significant expense in many different state and federal courts, potentially resulting

in conflicting rulings.  Compensation resulting from litigation is highly uncertain and may not be

received before lengthy and costly trial and appellate proceedings are complete.  Many members

of the proposed Settlement Class suffer from severe neurodegenerative conditions that may

worsen over time.  The proposed class action Settlement should more quickly make resources

and compensation available for these retired players.  A class action settlement that offers

prompt relief is superior to the likely alternative—years of expensive, difficult, and uncertain

litigation, with no assurance of recovery, while retired players' physical and mental conditions

continue to deteriorate.

The Settlement Class and Subclasses preliminarily satisfy the requirements of Rule 23,

and conditional certification is appropriate.

### C.  Approval of the Notice Plan and Proposed Notice Forms

#### 1.  Standard of Review

Under Rule 23(e)(1) of the Federal Rules of Civil Procedure, a district court "must direct

notice in a reasonable manner to all class members who would be bound by the proposal."  Fed.

R. Civ. P. 23(e)(1).  In addition, for classes certified under Rule 23(b)(3), courts must ensure that

class members receive "the best notice that is practicable under the circumstances, including

individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ.

P. 23(c)(2)(B); *see Amchem*, 521 U.S. at 617.

Due process requires that notice be "reasonably calculated, under all the circumstances,

to apprise interested parties of the pendency of the action and afford them an opportunity to

present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314

(1950).  Rule 23(c)(2)(B) provides that the "notice must clearly and concisely state in plain,

easily understood language: (i) the nature of the action; (ii) the definition of the class certified;

(iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance

through an attorney if the member so desires; (v) that the court will exclude from the class any

member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the

binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

## 2.  Analysis

The dissemination of notice under the proposed Settlement Class Notice Plan ("Notice

Plan") satisfies the requirements of Rule 23 and due process.  *See Zimmer Paper Prods., Inc. v.*

*Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual

situation first-class mail and publication in the press fully satisfy the notice requirements of both

Fed. R. Civ. P. 23 and the due process clause.").  The Notice Plan includes direct individual

notice to identifiable Retired NFL Football Players and their heirs and paid publication notice in

various media sources including targeted notice to third parties, such as nursing homes.  *See* Pl.'s

Mot. Ex. C, Declaration of Katherine Kinsella ("Kinsella Decl."), June 25, 2014, ECF No. 6073.

Many Retired NFL Football Players will be reachable through direct individual notice due to the

existence of multiple lists—including pension program lists and lists compiled in prior

litigation—identifying former NFL players.  Co-Lead Class Counsel also plan to use full-page

color ads in selected consumer magazines; thirty-second television spots on the NFL Network,

other cable networks, and broadcast outlets; Internet ads using non-static pre-roll, flash, and rich

media; and radio spots to disseminate notice.  Plaintiffs' notice experts estimate that the Notice

Plan will reach approximately 90% of the Settlement Class Members, well above levels deemed

adequate in other class actions. *See* Kinsella Decl. ¶36; *see also In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1061 (S.D. Tex. 2012) (notice plan that expert estimated would reach 81.4% of class was sufficient); *Alberton v. Commonwealth Land Title Ins. Co.*, No. 06-3755, 2008 WL 1849774, at *3 (E.D. Pa. Apr. 25, 2008) (direct notice projected to reach 70% of class plus publication in newspapers and Internet was sufficient); *Grunewald v. Kasperbauer*, 235 F.R.D. 599, 609 (E.D. Pa. 2006) (direct mail to 55% of class and publication in three newspapers and Internet was sufficient).

The form and content of the proposed Long-Form Notice and Summary Notice also satisfy the requirements of Rule 23 and the Due Process clause. *See* Pl.'s Mem. Ex. C, Ex. 3 & 5, June 25, 2014, ECF No. 6073. Each form of notice is written in plain and straightforward language consistent with Rules 23(c)(2)(B) and 23(e)(1). The Long-Form Notice objectively apprises all Settlement Class Members of the nature of the action; the definition of the Settlement Class; the Settlement Class claims and issues; that Settlement Class Members may enter an appearance through an attorney at the Fairness Hearing (in accordance with the procedures set forth in the Notice); that Settlement Class Members may elect to opt out of the Settlement (and sets forth the procedures and deadlines for doing so); and the binding effect of a class judgment on Settlement Class Members under Rule 23(c)(3)(B). The Long-Form Notice also discloses the date, time, and location of the Fairness Hearing. Finally, the proposed Notice Plan provides that the Class Members will have approximately 90 days to opt out. It is well-settled that between 30 and 60 days is sufficient to allow class members to make their decisions to accept the settlement, object, or exclude themselves. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997) (citing cases).

I will approve the proposed Settlement Class Notice Plan and proposed notices because they meet the requirements of Rule 23 and due process.

### D.  Stay and Injunction

Plaintiffs request that I stay this action and all actions consolidated before me in this MDL.  Plaintiffs also request that I enjoin all proposed Settlement Class Members from commencing, prosecuting, or participating in any way in any other lawsuit or legal action based on the facts and circumstances at issue in this case in any jurisdiction unless and until they have opted out of the Settlement Class, approval of the Class Action Settlement is denied, or the Settlement Agreement is otherwise terminated.[7]

The All Writs Act authorizes courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  However, the Anti-Injunction Act limits a court's authority to issue "an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283. "The parallel 'necessary in aid of jurisdiction' language is construed similarly in both the All-Writs Act and the Anti-Injunction Act."  *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 201 n.9 (1993).  "The two statutes act in concert to permit issuance of an injunction."  *Id.*

"Under an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction."  *In re Diet Drugs*, 282 F.3d 220, 235 (3d Cir. 2002).  Thus, the "necessary in aid of its jurisdiction" exception to the Anti-Injunction Act applies to

---

[7] No such stay or injunction applies to the Riddell Defendants.

"consolidated multidistrict litigation, where a parallel state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 365 (3d Cir. 2001) (internal quotation marks omitted). "The threat to the federal court's jurisdiction posed by parallel state actions is particularly significant where there are conditional class certifications and impending settlements in federal actions." *In re Diet Drugs*, 282 F.3d at 236.  "In complex cases where certification or settlement has received conditional approval . . . the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal court." *Id.*

This is a complex, multidistrict litigation involving more than 300 consolidated actions with over 5,000 plaintiffs and a proposed class with over 20,000 members.  Without the requested stay and injunction, the NFL Parties and other Released Parties remain exposed to "countless suits in state court despite settlement of the federal claims" that "would seriously undermine the possibility for settling [this] large, multi-district class action." *In re Prudential*, 261 F.3d at 367.  Therefore, I will issue the requested stay and injunction.

## IV. CONCLUSION

For the foregoing reasons, I will grant Plaintiffs' motion.  An appropriate order with deadlines follows.                                           s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: