# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| – – – – – – – – – – – – – – – – – – – – – | **SHORT FORM COMPLAINT** |
| **THIS DOCUMENT RELATES TO:** | **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** |
| Plaintiffs' Master Administrative Long-Form Complaint and (if applicable) ***Cheryl Shepherd*** | |
| v. ~~National Football League [et al.],~~ ***Kansas City Chiefs Football Club, Inc.***, only **No. 2:14-cv-03380-AB** | **JURY TRIAL DEMANDED** |

## SHORT FORM COMPLAINT

1.      Plaintiff(s), __Cheryl Shepherd_____, (and, if applicable, Plaintiff's Spouse) _____, bring(s) this civil action as a related action in the matter entitled IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, MDL No. 2323.

2.      Plaintiff (and, if applicable, Plaintiff's Spouse) is/are filing this short form complaint as required by this Court's Case Management Order No. 2, filed April 26, 2012.

3.      Plaintiff (and, if applicable Plaintiff's Spouse), incorporate(s) by reference the allegations (as designated below) of the Master Administrative Long-Form Complaint, as may be amended, as if fully set forth at length in this Short Form Complaint.

4.      [Fill in if applicable]  Plaintiff is filing this case in a representative capacity as the

Personal Representative_____   of Jovan Henry Allen Belcher, having been duly appointed as the

Personal Representative_____   by the Probate Court of Jackson County, Missouri__.   (Cross   out

sentence below if not applicable.) ~~Copies of the Letters of Administration/Letters Testamentary~~

~~for a wrongful death claim are annexed hereto if such Letters are required for the commencement~~

~~of such a claim by the Probate, Surrogate or other appropriate court of the jurisdiction of the~~

~~decedent.~~

5.      Plaintiff, _____Cheryl Shepherd_____is a resident and citizen of

_____**New York**_____ and claims damages as set forth below.

6.      [Fill in if applicable] Plaintiff's spouse, _____, is  a  resident

and citizen of _____, and claims damages as a result of loss of consortium proximately

caused by the harm suffered by her Plaintiff husband/decedent.

7.      On  information  and  belief,  the  Plaintiff  (or  decedent)  sustained  repetitive,

traumatic  sub-concussive  and/or  concussive  head  impacts  during  NFL  games  and/or  practices.

On information and belief, Plaintiff suffers (or decedent suffered) from symptoms of brain injury

caused by the repetitive, traumatic sub-concussive and/or concussive head impacts the Plaintiff

(or decedent) sustained during NFL games and/or practices. On information and belief,

the Plaintiff's (or decedent's) symptoms arise from injuries that are latent and have developed

and continue to develop over time.

8.      [Fill in if applicable] The original complaint by Plaintiff(s) in this matter was filed

in __the 16ᵗʰ Circuit Court of Jackson County, Missouri_. If the case is remanded, it should be

remanded to **the 16ᵗʰ Circuit Court of Jackson County, Missouri**.

9.      Plaintiff claims damages as a result of [check all that apply]:

     \_\_     Injury to Herself/Himself

     **X**     Injury to the Person Represented

     **X**     Wrongful Death

     **X**     Survivorship Action

     **X**     Economic Loss

     **X**     Loss of Services

     \_\_     Loss of Consortium

10.     [Fill in if applicable] As a result of the injuries to her husband,

_____, Plaintiff's Spouse, _____, suffers

from a loss of consortium, including the following injuries:

     \_\_     loss of marital services;

     \_\_     loss of companionship, affection or society;

     \_\_     loss of support; and

     \_\_     monetary losses in the form of unreimbursed costs she has had to expend

for the health care and personal care of her husband.

11.     [Check if applicable]  **X**  Plaintiff (and Plaintiff's Spouse, if applicable)

reserve(s) the right to object to federal jurisdiction.

**DEFENDANTS**

12.    Plaintiff (and Plaintiff's Spouse, if applicable) bring(s) this case against the following Defendants in this action [check all that apply]: ***Plaintiff brings this case against the Kansas City Chiefs Football Club, Inc., only, which is not identified below.***

    __   National Football League

    __   NFL Properties, LLC

    __   Riddell, Inc.

    __   All American Sports, Inc. (d/b/a Riddell Sports Group, Inc.)

    __   Riddell Sports Group, Inc.

    __   Easton-Bell Sports, Inc.

    __   Easton-Bell Sports, LLC

    __   EB Sports Corporation

    __   RBG Holdings Corporation

13.    [Check where applicable] As to each of the Riddell Defendants referenced above, the claims asserted are: ___ design defect; ___ informational defect; ___ manufacturing defect.

14.    [Check if applicable] ___ The Plaintiff (or decedent) wore one or more helmets designed and/or manufactured by the Riddell Defendants during one or more years Plaintiff (or decedent) played in the NFL and/or AFL.

15.    Plaintiff played in [check if applicable] **X** the National Football League ("NFL") and/or in [check if applicable] ___ the American Football League ("AFL") during

<u>2009-2012</u>    for the following teams: <u>**The Kansas City Chiefs**</u>

---

## CAUSES OF ACTION

16. Plaintiff herein adopts by reference the following Counts of the Master Administrative Long-Form Complaint, along with the factual allegations incorporated by reference in those Counts [check all that apply]: ***Plaintiff brings this case against the Kansas City Chiefs Football Club, Inc., only, which is not identified below. Likewise, Plaintiff's causes of against the Kansas City Chiefs Football Club, Inc., are not identified below. Plaintiff's causes of action are set forth in Para. 17.***

  ___  Count I (Action for Declaratory Relief – Liability (Against the NFL))

  ___  Count II (Medical Monitoring (Against the NFL))

  ___  Count III (Wrongful Death and Survival Actions (Against the NFL))

  ___  Count IV (Fraudulent Concealment (Against the NFL))

  ___  Count V (Fraud (Against the NFL))

  ___  Count VI (Negligent Misrepresentation (Against the NFL))

  ___  Count VII (Negligence Pre-1968 (Against the NFL))

  ___  Count VIII (Negligence Post-1968 (Against the NFL))

  ___  Count IX (Negligence 1987-1993 (Against the NFL))

  ___  Count X (Negligence Post-1994 (Against the NFL))

\_\_\_     Count XI (Loss of Consortium (Against the NFL and Riddell Defendants))

\_\_\_     Count XII (Negligent Hiring (Against the NFL))

\_\_\_     Count XIII (Negligent Retention (Against the NFL))

\_\_\_     Count XIV (Strict Liability for Design Defect (Against the Riddell Defendants))

\_\_\_     Count XV (Strict Liability for Manufacturing Defect (Against the Riddell Defendants))

\_\_\_     Count XVI (Failure to Warn (Against the Riddell Defendants))

\_\_\_     Count XVII (Negligence (Against the Riddell Defendants))

\_\_\_     Count XVIII (Civil Conspiracy/Fraudulent Concealment (Against All Defendants))

17.     Plaintiff asserts the following additional causes of action [write in or **attach**]:

**Plaintiff herein adopts by reference the Counts set forth in Plaintiffs' Petition, filed in the Circuit Court of Jackson County, Missouri, Case No. 1416-CV00038, and attached hereto as Attachment A, along with the factual allegations incorporated by reference in those Counts.  See Attachment A.**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff (and Plaintiff's Spouse, if applicable) pray(s) for judgment as follows:

    A.  An award of compensatory damages, the amount of which will be determined at trial;

    B.  For punitive and exemplary damages as applicable;

    C.  For all applicable statutory damages of the state whose laws will govern this action;

    D.  For medical monitoring, whether denominated as damages or in the form of equitable relief;

    E.  For an award of attorneys' fees and costs;

    F.  An award of prejudgment interest and costs of suit; and

    G.  An award of such other and further relief as the Court deems just and proper.

## JURY DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff(s) hereby demand(s) a trial by jury.

RESPECTFULLY SUBMITTED:

GREGORY LEYH, P.C.

/s/ Gregory Leyh
104 N.E. 72nd Street, Suite A
Gladstone, Missouri 64118
(816) 283-3380
(816) 283-0489 (Facsimile)
gleyh@leyhlaw.com
**ATTORNEY FOR PLAINTIFF**

# ATTACHMENT A

1416-CV00038

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT INDEPENDENCE

| | |
|---|---|
| CHERYL SHEPHERD, as personal representative of JOVAN HENRY ALLEN BELCHER,<br><br>   Plaintiff,<br><br>  v.<br><br>KANSAS CITY CHIEFS FOOTBALL CLUB, INC., et al,<br>   Serve at Registered Agent:<br>   Seigfreid Bingham Levy<br>   Selzer & Gee, P.C.<br>   911 Main Street, Suite 2800<br>   Kansas City, MO 64105<br><br>   Defendant. | Case No.:<br><br>Division |

## PETITION FOR DAMAGES

COMES NOW Plaintiff Cheryl Shepherd individually, as administrator and personal representative of the Estate of Jovan Henry Allen Belcher, and as Representative for all persons identified by § 537.080 RSMO and for her claims and causes of action against the Defendant, upon information and belief, state:

## INTRODUCTION

1. This case is about Jovan Belcher's mother who gave her life to ensure that Jovan could fulfill his dream of being a professional football player. Over the course of a four-year career in the National Football League, Jovan unknowingly sacrificed his brain in order to provide for his family. Tragically, the Defendant's wrongful conduct destroyed multiple lives, tore apart families and ultimately caused or contributed to cause Jovan's death.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

## PLAINTIFF

2.      Plaintiff Cheryl Shepherd is the natural mother of Decedent Jovan Henry Allen Belcher and a resident of the State of New York, residing at 31 Mathews Ave., West Babylon, New York 11704.

3.      Pursuant to RSMo § 537.080, the aforesaid Plaintiff is the proper party to bring this action for the wrongful death of Decedent Jovan Belcher.

## PLAINTIFF'S DECEDENT

4.      Decedent Jovan Belcher was a resident of Missouri. Decedent was employed as a professional football player with the Kansas City Chiefs Football Club, Inc., from March 2009 through December 1, 2012.

5.      During the course of Decedent's employment with the Chiefs, he was exposed to repetitive brain trauma and suffered multiple concussive and subconcussive blows to the head which caused or contributed to cause a constellation of neurologic/brain harms, including post-concussion syndrome (affecting mood, behavior, cognition, and other brain mediated functions) and traumatic brain injuries, such as Chronic Traumatic Encephalopathy ("CTE").

6.      Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Decedent to develop post-concussion syndrome (affecting mood, behavior, cognition, and other brain mediated functions), neurological impairments/damage, such as CTE, and caused or contributed to cause irresistible and/or insane impulses.

## DEFENDANT

7.      Defendant Kansas City Chiefs Football Club, Inc. (Kansas City Chiefs) is a Texas corporation with its principal place of business in Jackson County at: 1 Arrowhead Drive, Kansas City, Missouri 64129. At all times relevant herein, Defendant Kansas City Chiefs was

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

Decedent's employer. Defendant is a member of the National Football League (NFL), which is an unincorporated association consisting of 32 separately owned and independently operated professional football teams.

## JURISDICTION

8.      Jurisdiction is proper in this Court pursuant to RSMo § 506.500 in that the tortious acts alleged herein took place in Missouri.

9.      This is an action requesting relief under the common and statutory laws of the State of Missouri. Defendant owed Decedent non-delegable and non-negotiable duties that are separate and independent from any collective bargaining agreement (CBA). Because federal labor law is not applicable to Plaintiff's claims, and no interpretation of a CBA is required, section 301 of the Labor Management Relations Act cannot provide a basis for federal jurisdiction.

10.     Plaintiff's claims do not arise out of an "accident," as the term is defined under Missouri's Workers' Compensation Law. Plaintiff's occupational disease-related claims were not caused by a specific event during a single work shift injury.

11.     Plaintiff's claims are not within the scope of workers' compensation and they are not subject to the exclusivity provisions of workers' compensation.

## VENUE

12.     Venue is proper with this Court pursuant to RSMo § 508.010. Upon information and belief, Decedent was first exposed by the wrongful acts and negligent conduct alleged herein in Jackson County, Missouri.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

## GENERAL ALLEGATIONS

13.    In the months leading up to Decedent's death, Defendant was aware of Decedent's symptoms and signs of cognitive and neuropsychiatric impairment. Defendant micromanaged virtually every aspect of Decedent's life when it came to his physical abilities to perform in the workplace, including analyzing his diet, speed, strength and body-mass index. Yet when it came to monitoring Decedent's mental health and neurological capacities, Defendant disregarded evidence of impairments and fostered an environment where Decedent was required to play through his injuries and become exposed to further neurological harm.

14.    During his first season employed with Defendant, Decedent was knocked unconscious during the Jacksonville Jaguars game on November 8, 2009. Contrary to safe practices, Defendant did not immediately escort Decedent to the locker room to be evaluated and Defendant did not permit time to fully recover.  On information and belief, Decedent was back to practice within a matter of days, being exposed to repetitive head trauma, and played the following Sunday against the Oakland Raiders. Because Decedent did not receive proper post-injury treatment, his recovery time was short-circuited which substantially increased his risk of brain injury.

15.    Defendant voluntarily assumed a duty to, *inter alia,* provide competent healthcare services to Decedent. In evidence of that duty, Defendant ordered him to see a counselor on at least two separate occasions between October and November 2012.

16.    Defendant caused, or contributed to cause, Decedent's cognitive and neuropsychiatric impairment by exposing him to repetitive head trauma in practice and play both

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

before and after November 18, 2012, even though he was allegedly exhibiting changes in mood, behavior and cognition.

17.     On November 18, 2012, the Kansas City Chiefs played the Cincinnati Bengals at Arrowhead Stadium. Throughout the game, Decedent was exposed to multiple subconcussive blows. With less than six minutes remaining in the game, Decedent suffered what should have been recognized as an acute concussion. He remained seated for a few seconds, was helped up by his teammates, and shook his head clearly showing signs and symptoms of a concussion. Despite exhibiting obvious symptoms, Decedent was never removed from play for evaluation and recovery.

18.     Decedent's family members, teammates and friends noticed further changes/deterioration in his mental cognition and inhibition after the Chiefs/Bengals game. Decedent experienced symptoms including but not limited to: memory loss, confusion, depression, mood swings and explosivity. On information and belief, Decedent was suffering from post-concussion syndrome and neurological impairments, such as incipient CTE. Despite these warning signs, Defendant continued to cause or contributed to cause Decedent's injuries by exposing him to repetitive head trauma in practice and in games.

19.     Before and after November 18, 2012, Defendant's coaching staff and management engaged in a systematic campaign of mental abuse to "motivate" Decedent to play through his injuries. General Manager Scott Pioli and other agents of Defendant Kansas City Chiefs often berated Decedent, telling him on numerous occasions, that, "he was just an accident, and they would get rid of him." The Defendant's constant bullying pressure and stress coupled with Decedent's occupational neurological impairments caused or contributed to cause Decedent to become insane.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

20.     On the morning of December 1, 2012, while suffering from neurological impairments and insane and/or irresistible impulses overriding his ability to control his actions, Decedent killed Zoey's natural mother, Kasandra Perkins, he then drove to the Chiefs' facility where he took his own life.

21.     Defendant knew that Decedent's behavior and acts of personal physical violence were uncharacteristic of the loving father, son, teammate and advocate for victims of domestic violence that Defendant hired in 2009. Nevertheless, Defendant publicly sought to marginalize, suppress and/or misrepresent the role repetitive head trauma played in Decedent's death by stating, Decedent was, "a player who had not had a long concussion history."

22.     Further evidencing its effort to conceal the link between repetitive head trauma and neurological impairment, Defendant failed to take any steps to investigate, preserve, request and/or obtain Decedent's brain to perform a neuropathological analysis. Just seven months prior to Decedent's death, in May 2012, the NFL, its agents and a member team, the San Diego Chargers, meticulously dictated where and to whom Junior Seau's brain would go to be analyzed for CTE.[1] With Decedent, however, Defendant purposefully took no action in order to conceal and/or cause essential evidence to be damaged or destroyed.

23.     Defendant's effort to minimize the relationship between head trauma and resulting health conditions is analogous to the tactics used by the tobacco industry. Just as the tobacco industry proposed alternative causes for the health conditions of its consumers, Defendant has suggested that the Decedent's health conditions and abnormal behaviors were caused by: alcohol, steroids, depression, and aggressive personality traits.

---

[1] Seau committed suicide on May 2, 2012. Following a contentious fight for Seau's brain, it was subsequently determined that Seau was suffering from CTE.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

24.     Defendant knew or should have known that since 1966 the Congress of Neurological Surgeons defined a concussion as a, "clinical syndrome characterized by immediate and transient impairment of neural functions, such as alteration of consciousness, disturbance of vision, equilibrium, etc., due to mechanical forces."

25.     Defendant has known or should have known that an individual is at an increased risk of brain damage if he is returned to play before he is asymptomatic. Thus, an individual should never be exposed to head trauma while symptomatic. Despite this consensus among the medical community, Defendant regularly returned Decedent to play—based upon their flawed "studies"—while experiencing concussion symptoms.

26.     Defendant has known or should have known for many years that Post-Concussion Syndrome (PCS) and cognitive impairment occurs in football players. PCS is defined by the fourth edition of the *Diagnostic and Statistics Manual* as (1) cognitive deficits in attention or memory and (2) at least 3 or more of the following symptoms: fatigue, sleep disturbance, headache, dizziness, irritability, affective disturbance, apathy, or personality change. Similarly, the World Health Organization's International Classification of Diseases (ICD-10) defines PCS as involving 3 or more of the following symptoms: headaches, dizziness, fatigue, irritability, insomnia, concentration difficulty, or memory difficulty.

27.     For decades, the scientific community has known that repetitive head trauma can lead to permanent and debilitating neurological impairments.

28.     For many years, Defendant knew or should have known that neurologic dysfunction is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers, easily accessible to Defendant, have shown that this

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

condition is prevalent in athletes who have a history of head injuries. The changes in the brain begin when the brain is subjected to repetitive trauma.

29.     In 1928, pathologist Harrison Martland first described the link between repetitive head trauma and degenerative brain disease as the, "punch drunk syndrome" in the *Journal of the American Medical Association.*

30.     In 1934, Dr. Harry Parker published a study confirming Martland's findings and argued that neurological degeneration in boxers was based on the volume of brain trauma sustained. Parker further opined, "the frequency of occurrence of conditions of this kind as reported by…people who followed the profession of pugilism makes it seem very likely that [the patients'] profession led to their ultimate disablement…."

31.     On December 29, 1937, at the Seventeenth Annual Meeting of the American Football Coaches Association, the football community acknowledged its keen awareness of the serious risks of concussions, and the necessity of removing an individual from play if they have suffered a concussion:

> During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true….Sports demanding personal contact should be eliminated after an individual has suffered one concussion.

32.     In 1937, J.A. Millspaugh introduced the term dementia pugilistica to describe the syndrome characterized by motor deficits and mental confusion in boxers. Millspaugh also noted that the disease is likely not limited to boxers but could extend to other sports where repetitive brain trauma is present: "The mental unbalance more commonly encountered among pugilists is also observed among other sports representatives who sustain considerable head trauma." He further opined, "[r]epeat and frequent concussions…are, to say the least, not conducive to stabilized mental equilibrium."

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

33.     In 1949, British neurologist Macdonald Critchley published the first of two important studies on head trauma in boxers. In *Punch Drunk Syndrome: The Chronic Traumatic Encephalophathy of Boxers*, Critchley described the latent effects of repetitive brain trauma, explaining that the condition was generally not observable until a number of years had passed since the onset of boxing.  In 1957, Critchley published an article in the *British Medical Journal* and described the symptoms of, "chronic progressive traumatic encephalopathy" to include, "progressive slowing of speech and thoughts…slowness of movement, and tremors." Critchley further noted that brain damage produced by repetitive trauma could lead to personality changes, and that the effects of chronic head trauma are dependent on the volume of impacts as well as the magnitude of those events.

34.     Over the next several decades, the link between repetitive head trauma and neurological diseases was overwhelmingly clear. Numerous studies were published in medical journals including the *Journal of the American Medical Association, Neurology, Journal of Neurotrauma, Brain – A Journal of Neurology, Clinics in Sports Medicine, Journal of Neuropathhology and Experimental Neurology, Lancet, the New England Journal of Medicine* and *Physician and Sports Medicine* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid decelerations of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

9

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

- immediate retrograde amnesia occurs following concussions;

- mild head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

35.    Although the condition now known as CTE has been discussed widely in the medical literature for more than eight decades, it was not until 2002 that CTE was officially diagnosed post-mortem in professional football players. Upon information and belief, this late disclosure was caused by or contributed to be caused by the Defendant's effort to conceal and/or minimize the link between repetitive head trauma in football and neurological diseases. Since 2002, more than 90% of all former players that have been examined post-mortem exhibited pathological symptoms consistent with CTE.

36.    The first professional football player to be diagnosed with CTE was a former Kansas City Chiefs player, "Iron Mike" Webster. Webster played 17 years in the NFL and tragically died only 12 years after retirement at the age of 50. During the latter part of his life, Webster manifested progressive symptoms and signs of cognitive and neuropsychiatric impairment consistent with CTE.

37.    Even before this discovery in a former Chiefs' player, Defendant knew or should have known that repetitive head trauma contributed to murder-suicide.   In 1980, All-Pro offensive lineman for the Kansas City Chiefs, Jim Tyrer, murdered his wife and then committed suicide. On information and belief, Tyrer's behavior was also consistent with CTE. Thus, at this

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

time, if not well before, Defendant should have established a monitoring system to detect the warning signs of neurological and behavioral impairments.

38.     Research suggests that neurological dysfunction such as CTE may have been the true primary cause of death for many professional football players that died as a result of neurodegenerative diseases. Accordingly, it is likely that the rate of neurological dysfunction such as CTE in professional football players is significantly higher than once believed.

39.     The clinical manifestations/neurological dysfunction such as CTE are quite variable but can include a number of signs and symptoms such as: headaches, short-term memory difficulties, aggressive tendencies, depression, impulse control, mood lability, explosivity, poor judgment, loss of attention and concentration, executive dysfunction, impulsivity, language difficulties, suicidal ideations, and ultimately, cognitive impairment. All such earlier symptoms can then worsen, leading to more severe depression, mood swings become more violent, severe memory loss, and motor neuron disease may develop. End stage encephalopathy can then set in, with severe memory loss, dementia, executive dysfunction, language difficulties, explosivity, paranoia, gait, disturbance, and increased suicidal ideations and violence toward others.

40.     Upon information and belief, Decedent experienced clinical symptoms consistent with neurologic dysfunction. Yet, Defendant never, *inter alia*, warned Decedent about the risks of PCS, CTE or CTE-like syndromes. To the contrary, Defendant affirmatively misrepresented to Decedent that his symptoms were not the result of PCS and/or neurodegenerative diseases caused by repetitive head trauma.

41.     To date, more than 52 former NFL players have been diagnosed post-mortem with CTE. Defendant has failed to take steps to implement a monitoring system to detect

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

neurological, mood, behavioral and cognitive impairments. Defendant knew or should have known that abnormal mood, behavioral and cognition impairments, from head trauma can precede the pathological features of CTE.

42.     In 2010, a current NFL player was diagnosed post-mortem with CTE. Chris Henry, 26, died after he was involved in an altercation with his fiancée. According to reports, Henry also experienced clinical symptoms consistent with CTE, including mood swings and headaches. Thus, Defendant was clearly aware and on notice that neurodegenerative diseases, including CTE, and their concomitant behavioral patterns were affecting current NFL players.

43.     Defendant, however, never took reasonable measures to monitor the mental health of Decedent despite the disconcerting statistics of suicides by current and former players in the three years leading up to Decedent's death. On information and belief, the chart below identifies the list of players that died of an apparent suicide within the last three years:

| **Date of Suicide** | **Name of Deceased** | **Age** |
|---|---|---|
| September 2010 | Kenny McKinley | 23 |
| February 2011 | Dave Duerson | 50 |
| January 2012 | Mike Current | 66 |
| April 2012 | Ray Easterling | 62 |
| May 2012 | Junior Seau | 43 |
| July 2012 | OJ Murdock | 25 |
| December 2012 | Jovan Belcher | 25 |
| September 2013 | Paul Oliver | 29 |

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

44.     Through various acts, errors, omissions and and/or misrepresentations, Defendant sought to conceal, misrepresent, minimize and/or create doubt about the validity of subconcussions, concussions, neurological impairment and CTE. From at least 1994, and likely well before, the Defendant and its agents voluntarily assumed a duty to research the risks of concussions and subconcussions through the creation of two separate Brain-Injury Committees (i.e., Mild Traumatic Brain Injury Committee (1994–2010) and the Head, Neck and Spine Committee (2010 – Present)). Instead of carrying out this assumed duty in a reasonable way, Defendant and its agents created, ratified, authorized and/or condoned the publication of invalid scientific studies and sought to suppress, willfully ignore and/or minimize scientifically valid studies. These "studies" formed the basis for the Defendant's flawed policies, or lack thereof, as they related to the monitoring of concussions, subconcussions and other neurological diseases, such as CTE.

45.     Despite the substantial body of independent scientific studies directly linking repetitive head trauma in football and neurological diseases, including CTE, Defendant never warned Decedent and instead willfully ignored, minimized, concealed and/or affirmatively denied and misrepresented the risks.

46.     As the purveyor of football in America, and as the leading expert in the field, Defendant owed a continuous duty to keep abreast of the scientific developments relating to football injuries, and it was required to notify Decedent and its employees of any potential short-term and long-term risks of repetitive head trauma, and take affirmative steps to minimize harm to players.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

47.     Defendant's duty to warn was commensurate not only with its actual knowledge gained from its "research" and published studies but also with its constructive knowledge as measured by the abundance of scientific literature and other available means of communication.

48.     Upon information and belief, Defendant knew or should have known of the short-term and long-term effects of concussive and sub-concussive injuries long before Decedent was exposed to repetitive brain trauma. Defendant had or should have had knowledge of studies that demonstrated a positive link between repetitive head trauma and neurological diseases, including CTE, in the 1920s, 1930s, 1940s, 1950s, 1960s, 1970s, 1980s, 1990s, 2000s and 2010s. During those decades, the Defendant's knowledge about the hazards of repetitive head trauma continued to accumulate, yet Defendant failed to warn Decedent about those hazards.

## COUNT I
## NEGLIGENCE

49.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 48 as if fully set forth herein.

50.     Defendant had a common law duty, separate and independent of the CBA, to use ordinary care to make its work environment reasonably safe.

51.     Defendant owed a non-delegable and non-negotiable duty to maintain a safe working environment, a duty not to expose Decedent to unreasonable risks of harm, a duty to warn Decedent about the existence of dangers, including latent neurological diseases, of which he could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose its employees, including Decedent, to unreasonable risk of injury or death and a duty to take steps to minimize resultant harm.

52.     Defendant failed to use due care under the circumstances, and was thereby negligent in the performance of its non-delegable and non-negotiable duties.

14

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

53.     Defendant by its respective active and passive negligence failed to exercise the standard of care and skill it was obligated to exercise by reason of its relationship with Decedent, undertakings and assumption of a duty thereby causing, creating or permitting an increased risk of exposure to repetitive brain trauma, and thereby failing to properly safeguard and warn Decedent.

54.     Defendant further breached its duty of care owed to Decedent in the following, but not limited to, ways:

a.     Failing to warn him about the short-term, long-term and permanent risks of concussions and subconcussions with resultant neurological dysfunction;

b.     Failing to identify and remove Decedent from practices or games after he suffered significant head trauma (such as that in the November 18, 2012 game) and to evaluate, "clear" and remove from further head trauma;

c.     Failing to educate Decedent about concussions, subconcussions, and other neurological harms;

d.     Failing to monitor him for neurologic dysfunction, such as alteration in mood, behavior and cognition;

e.     Failing to treat, monitor and/or clinically diagnose Decedent with neurological dysfunction; and

f.     Taking on the assumed responsibility to provide counseling without fully informing the counselor of known dangers of repetitive head trauma and/or failing to obtain counselor input as to the safest future course of action for the health of Decedent.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

55.     Such negligence directly caused or directly contributed to cause Decedent to suffer from severe and persistent headaches, PCS, depression, mood swings, explosivity, suicidal ideations, irresistible and insane impulses, and, upon information and belief neurologic dysfunction such as CTE, all of which contributed to cause his death.

56.     Because of the untimely death of Decedent, Plaintiff has been, and in the future will be, deprived of services, support, maintenance, guidance, companionship, comfort, and Plaintiff has sustained other damages which can reasonably be measured in money. Plaintiff has also incurred burial and other expenses as a direct result of the death of Decedent.

57.     By reason of the foregoing, Plaintiff has been damaged and is entitled to full and fair compensation.

58.     The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Decedent and damages for aggravating circumstances should be assessed against Defendant.

WHEREFORE, Plaintiff prays judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, and/or aggravating circumstances, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## COUNT II
## NEGLIGENT MISREPRESENTATION

59.     To the extent they are not inconsistent with the allegations in this Count, Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 58 as if fully set forth herein.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

60.     Defendant had a common law duty, separate and independent of the CBA, to use ordinary care to make its work environment reasonably safe.

61.     Defendant owed a non-delegable and non-negotiable duty to maintain a safe working environment, a duty not to expose Decedent to unreasonable risks of harm, a duty to warn employees about the existence of dangers, including latent neurological diseases, of which Decedent could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose Decedent to unreasonable risk of injury.

62.     Defendant and its agents represented to Decedent that the incidence and risks of CTE were not scientifically proven.

63.     Defendant and its agents represented to Decedent that, "*...we are learning a little bit more about long-term brain damage. No direct cause and effect has been established yet.*" (emphasis added).

64.     Defendant and its agents represented to Decedent the following in a pamphlet published in 2007 and posted in Defendant's workplace:

    a.     **Q:** Am I at risk for further injury if I have had a concussion? **A:** Current research with professional athletes has shown that you should not be at greater risk of further injury once you receive proper medical care for a concussion and are free of symptoms.

    *b.*     **Q:** If I have had more than one concussion, am I at increased risk for another injury? **A:** *Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems* if each injury is managed properly. It is important to understand that there is no magic number for how many concussions is too many. *Research is currently underway to determine if there are any long-term effects of concussion in NFL athletes.* (emphasis added).

65.     Defendant and its agents represented to Decedent that his mental-health issues were not related to repetitive head trauma sustained during football.

17

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

66.     When Defendant and its agents made these representations to Decedent, the representations were driven by profit motives so that Decedent would continue to play despite the risks of latent neurological dysfunction and diseases such as CTE.

67.     Defendant failed to exercise reasonable care and competence when communicating this information, and as a result the information presented to Decedent was false and misleading.

68.     Decedent justifiably relied upon this information since Defendant was in a superior position of knowledge and Defendant could foresee that Decedent would rely and intended that he do so.

69.     Defendant's negligent misrepresentations directly caused or directly contributed to cause Decedent to suffer from severe and persistent headaches, PCS, depression, mood swings, explosivity, suicidal ideations, irresistible and insane impulses, and, upon information and belief neurologic dysfunction such as CTE, all of which contributed to cause his death.

70.     Because of the untimely death of Decedent, Plaintiff has been, and in the future will be, deprived of services, support, maintenance, guidance, companionship, comfort, and Plaintiff has sustained other damages which can reasonably be measured in money. Plaintiff has also incurred burial and other expenses as a direct result of the death of Decedent.

71.     By reason of the foregoing, Plaintiff has been damaged and is entitled to full and fair compensation.

72.     The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Decedent and damages for aggravating circumstances should be assessed against Defendant.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

WHEREFORE, Plaintiff prays judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, and/or aggravating circumstances, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## COUNT III
## FRAUDULENT CONCEALMENT

73.   To the extent they are not inconsistent with the allegations in this Count, Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 72 as if fully set forth herein.

74.   At all relevant times hereto, Defendant was in a position of superior knowledge, which was not within the fair and reasonable reach of Decedent, nor would it have been discovered through the exercise of Decedent's ordinary diligence.

75.   Defendant knew that repetitive head trauma in football created a risk of neurological diseases, such as CTE.

76.   Defendant was aware of, knew and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive head trauma in football, to which Decedent was exposed.

77.   Defendant had a non-delegable and non-negotiable duty, separate and independent of the CBA, to disclose and/or inform Decedent about these risks.

78.   Defendant knew that such information was material to Decedent, and knew that Decedent would rely upon it for accurate information.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

79.     Defendant knowingly and fraudulently concealed from Decedent the risks of repetitive head trauma, including the risk of neurological disorders, intending that Decedent would rely upon such concealment.

80.     Decedent relied upon the Defendant's inaccurate information and incomplete science.

81.     Defendant's fraudulent concealment directly caused or directly contributed to cause Decedent to suffer from severe and persistent headaches, PCS, depression, mood swings, explosivity, suicidal ideations, irresistible and insane impulses, and, upon information and belief neurologic dysfunction such as CTE, all of which contributed to cause his death.

82.     Because of the untimely death of Decedent, Plaintiff has been, and in the future will be, deprived of services, support, maintenance, guidance, companionship, comfort, and Plaintiff has sustained other damages which can reasonably be measured in money. Plaintiff has also incurred burial and other expenses as a direct result of the death of Decedent.

83.     By reason of the foregoing, Plaintiff has been damaged and is entitled to full and fair compensation.

84.     The conduct of the Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Decedent and damages for aggravating circumstances should be assessed against the Defendant.

WHEREFORE, Plaintiff prays judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, and/or aggravating circumstances, for the costs of this action, and for such relief as the Court deems fair and reasonable.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

## COUNT IV
## WRONGFUL DEATH, PURSUANT TO RSMo § 537.080

85.     To the extent they are not inconsistent with the allegations in this Count, Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 84 as if fully set forth herein.

86.     Plaintiff makes this separate claim for the wrongful death of Jovan Belcher, who died on December 1, 2012, while suffering from severe and persistent headaches, PCS, depression, mood swings, explosivity, suicidal ideations, irresistible and insane impulses and, upon information and belief neurologic dysfunction such as CTE, which were caused or contributed to cause by Defendant's wrongful conduct.

87.     Defendant's wrongful conduct as described above caused or contributed to cause Decedent to suffer multiple concussive and subconcussive blows to the head which caused or contributed to cause a constellation of neurologic/brain harms, including post-concussion syndrome and traumatic brain injuries, such as CTE. Decedent's ability to function normally was greatly impaired; he suffered physical pain, mental and emotional distress, and loss of sleep until his death.

88.     Defendant's wrongful conduct as described above further caused or contributed to cause Plaintiff to incur funeral expenses, mental anguish, suffering and bereavement both prior to and subsequent to the death of Decedent; loss of companionship, comfort, protection, care, attention, advice, counsel and guidance; loss of financial support and loss of services of the deceased to Plaintiff's actual damage in a sum exceeding Fifteen Thousand Dollars ($15,000.00).

89.     The conduct of the Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Decedent and damages for aggravating circumstances should be assessed against the Defendant.

Electronically Filed - Jackson - Independence - December 31, 2013 - 01:42 PM

WHEREFORE, Plaintiff prays judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, and/or aggravating circumstances, for the costs of this action, and for such relief as the Court deems fair and reasonable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues in this matter.

RESPECTFULLY SUBMITTED,

GREGORY LEYH, P.C.

/s/ Gregory Leyh
Gregory Leyh, #42283
Gregory Leyh, P.C.
104 N.E. 72nd Street, Suite A
Gladstone, Missouri  64118
(816) 283-3380
(816) 283-0489 (Facsimile)
gleyh@leyhlaw.com
ATTORNEY FOR PLAINTIFF