## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| – – – – – – – – – – – – – – – – – – – – – – | **SHORT FORM COMPLAINT** |
| **THIS DOCUMENT RELATES TO:** | **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** |
| Plaintiffs' Master Administrative Long-Form Complaint and (if applicable) *Horn et al.* | |
| v. ~~National Football League [et al.],~~ *Kansas City Chiefs Football Club, Inc.*, **only** | |
| **No. 2:14-cv-03382-AB** | |
| | **JURY TRIAL DEMANDED** |

### SHORT FORM COMPLAINT

1.      Plaintiff(s),  __**Tamarick Vanover**__      ,  (and,  if  applicable,  Plaintiff's

Spouse) _____ ,  bring(s)  this  civil  action  as  a  related  action  in  the  matter

entitled  IN RE: NATIONAL  FOOTBALL  LEAGUE  PLAYERS'  CONCUSSION  INJURY

LITIGATION, MDL No. 2323.

2.      Plaintiff  (and,  if  applicable,  Plaintiff's  Spouse)  is/are  filing  this  short  form

complaint as required by this Court's Case Management Order No. 2, filed April 26, 2012.

3.      Plaintiff  (and,  if  applicable  Plaintiff's  Spouse),  incorporate(s)  by  reference  the

allegations  (as  designated  below)  of  the  Master  Administrative  Long-Form  Complaint,  as  may

be amended, as if fully set forth at length in this Short Form Complaint.

~ 1 ~

4.      [Fill in if applicable]  Plaintiff is filing this case in a representative capacity as the

_____ of _____, having been duly appointed as the

_____ by  the  _____  Court  of  _____.  (Cross  out

sentence below if not applicable.) Copies of the Letters of Administration/Letters Testamentary

for a wrongful death claim are annexed hereto if such Letters are required for the commencement

of such a claim by the Probate, Surrogate or other appropriate court of the jurisdiction of the

decedent.

5.      Plaintiff, ___**Tamarick Vanover**_____ is a resident and citizen of

_____**Florida**_____ and claims damages as set forth below.

6.      [Fill in if applicable] Plaintiff's spouse, _____, is a resident

and citizen of _____, and claims damages as a result of loss of consortium proximately

caused by the harm suffered by her Plaintiff husband/decedent.

7.      On information and belief, the Plaintiff (or decedent) sustained repetitive,

traumatic sub-concussive and/or concussive head impacts during NFL games and/or practices.

On information and belief, Plaintiff suffers (or decedent suffered) from symptoms of brain injury

caused by the repetitive, traumatic sub-concussive and/or concussive head impacts the Plaintiff

(or decedent) sustained during NFL games and/or practices. On information and belief,

the Plaintiff's (or decedent's) symptoms arise from injuries that are latent and have developed

and continue to develop over time.

8.      [Fill in if applicable] The original complaint by Plaintiff(s) in this matter was filed

in _ **the 16ᵗʰ Circuit Court of Jackson County, Missouri** . If the case is remanded, it should be

remanded to **the 16ᵗʰ Circuit Court of Jackson County, Missouri**.

9.      Plaintiff claims damages as a result of [check all that apply]:

    **X**      Injury to Herself/Himself

    ___      Injury to the Person Represented

    ___      Wrongful Death

    ___      Survivorship Action

    **X**      Economic Loss

    ___      Loss of Services

    ___      Loss of Consortium

10.     [Fill in if applicable] As a result of the injuries to her husband,

_____, Plaintiff's Spouse, _____,      suffers

from a loss of consortium, including the following injuries:

    ___      loss of marital services;

    ___      loss of companionship, affection or society;

    ___      loss of support; and

    ___      monetary losses in the form of unreimbursed costs she has had to expend

for the health care and personal care of her husband.

11.     [Check if applicable]  **X**  Plaintiff (and Plaintiff's Spouse, if applicable)

reserve(s) the right to object to federal jurisdiction.

## DEFENDANTS

12.     Plaintiff (and Plaintiff's Spouse, if applicable) bring(s) this case against the following Defendants in this action [check all that apply]: ***Plaintiff brings this case against the Kansas City Chiefs Football Club, Inc., only, which is not identified below.***

        __   National Football League

        __   NFL Properties, LLC

        __   Riddell, Inc.

        __   All American Sports, Inc. (d/b/a Riddell Sports Group, Inc.)

        __   Riddell Sports Group, Inc.

        __   Easton-Bell Sports, Inc.

        __   Easton-Bell Sports, LLC

        __   EB Sports Corporation

        __   RBG Holdings Corporation

13.     [Check where applicable] As to each of the Riddell Defendants referenced above, the claims asserted are: ____ design defect; ____ informational defect; ____ manufacturing defect.

14.     [Check if applicable] ____ The Plaintiff (or decedent) wore one or more helmets designed and/or manufactured by the Riddell Defendants during one or more years Plaintiff (or decedent) played in the NFL and/or AFL.

15.     Plaintiff played in [check if applicable] **X** the National Football League ("NFL") and/or in [check if applicable] ____ the American Football League ("AFL") during

~ 4 ~

__1995-2000_____   for the following teams:  __The Kansas City Chiefs_____

_____

_____

## CAUSES OF ACTION

16.    Plaintiff herein adopts by reference the following Counts of the Master Administrative Long-Form Complaint, along with the factual allegations incorporated by reference in those Counts [check all that apply]:  ***Plaintiff brings this case against the Kansas City Chiefs Football Club, Inc., only, which is not identified below. Likewise, Plaintiff's causes of against the Kansas City Chiefs Football Club, Inc., are not identified below. Plaintiff's causes of action are set forth in Para. 17.***

___    Count I (Action for Declaratory Relief – Liability (Against the NFL))

___    Count II (Medical Monitoring (Against the NFL))

___    Count III (Wrongful Death and Survival Actions (Against the NFL))

___    Count IV (Fraudulent Concealment (Against the NFL))

___    Count V (Fraud (Against the NFL))

___    Count VI (Negligent Misrepresentation (Against the NFL))

___    Count VII (Negligence Pre-1968 (Against the NFL))

___    Count VIII (Negligence Post-1968 (Against the NFL))

___    Count IX (Negligence 1987-1993 (Against the NFL))

___    Count X (Negligence Post-1994 (Against the NFL))

___   Count XI (Loss of Consortium (Against the NFL and Riddell Defendants))

___   Count XII (Negligent Hiring (Against the NFL))

___   Count XIII (Negligent Retention (Against the NFL))

___   Count XIV (Strict Liability for Design Defect (Against the Riddell Defendants))

___   Count XV (Strict Liability for Manufacturing Defect (Against the Riddell Defendants))

___   Count XVI (Failure to Warn (Against the Riddell Defendants))

___   Count XVII (Negligence (Against the Riddell Defendants))

___   Count XVIII (Civil Conspiracy/Fraudulent Concealment (Against All Defendants))

17.   Plaintiff asserts the following additional causes of action [write in or **attach**]:

____   **Plaintiff herein adopts by reference the Counts set forth in Plaintiffs' Petition, filed in the Circuit Court of Jackson County, Missouri, Case No. 1316-CV31940, and attached hereto as Attachment A, along with the factual allegations incorporated by reference in those Counts. See Attachment A.**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff (and Plaintiff's Spouse, if applicable) pray(s) for judgment as follows:

A. An award of compensatory damages, the amount of which will be determined at trial;

B. For punitive and exemplary damages as applicable;

C. For all applicable statutory damages of the state whose laws will govern this action;

D. For medical monitoring, whether denominated as damages or in the form of equitable relief;

E. For an award of attorneys' fees and costs;

F. An award of prejudgment interest and costs of suit; and

G. An award of such other and further relief as the Court deems just and proper.

## JURY DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff(s) hereby demand(s) a trial by jury.

RESPECTFULLY SUBMITTED:

GREGORY LEYH, P.C.

/s/ Gregory Leyh
104 N.E. 72nd Street, Suite A
Gladstone, Missouri 64118
(816) 283-3380
(816) 283-0489 (Facsimile)
gleyh@leyhlaw.com
**ATTORNEY FOR PLAINTIFF**

# ATTACHMENT A

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

**1316-CV31940**

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT INDEPENDENCE

| | | |
|---|---|---|
| JOSEPH HORN | ) | |
|     3919 Nemours Trail | ) | |
|     Kennesaw, GA 30152 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TAMARICK VANOVER | ) | |
|     2500 Merchants Row Blvd. | ) | |
|     Tallahassee, FL 32311 Apt. 17 | ) | **JURY TRIAL DEMANDED** |
| | ) | |
|     Plaintiffs, | ) | Case No.: |
| | ) | |
| v. | ) | |
| | ) | |
| KANSAS CITY CHIEFS | ) | |
| FOOTBALL CLUB, INC. | ) | |
| Serve at Registered Agent: | ) | |
|     Seigfreid Bingham Levy | ) | |
|     Selzer & Gee, P.C. | ) | |
|     911 Main Street, Suite 2800 | ) | |
|     Kansas City MO 64105 | ) | |
| | ) | |
|     Defendant. | ) | |

## PETITION FOR DAMAGES

COMES NOW Plaintiffs, and for their claims and causes of action against Defendant, upon information and belief, state:

### PLAINTIFFS

1.    Plaintiff Joseph Horn is a resident of Georgia. Mr. Horn was employed as a professional football player with the Kansas City Chiefs between 1996 and 2000.

2.    Throughout his employment with the Kansas City Chiefs, Mr. Horn suffered multiple concussive and subconcussive blows to the head which caused or contributed to cause a constellation of neurologic/brain harms, including post-concussion syndrome and traumatic brain injuries, such as Chronic Traumatic Encephalopathy.

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

3.     Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Horn to develop post-concussion syndrome and other neurologic/brain harms.

4.     Plaintiff Tamarick Vanover is a resident of Florida. Mr. Vanover was employed as a professional football player with the Kansas City Chiefs between 1995 and 2000.

5.     Throughout his employment with the Kansas City Chiefs, Mr. Vanover suffered multiple concussive and subconcussive blows to the head which caused or contributed to cause a constellation of neurologic/brain harms, including post-concussion syndrome and traumatic brain injuries, such as Chronic Traumatic Encephalopathy.

6.     Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Vanover to develop post-concussion syndrome and other neurologic/brain harms.

### DEFENDANT

7.     Defendant Kansas City Chiefs Football Club, Inc. is a Texas corporation with its principal place of business at One Arrowhead Drive, Kansas City, 64129, Jackson County, Missouri. At all times relevant herein, Defendant Kansas City Chiefs was Plaintiffs' employer. Defendant is a member of the National Football League ("NFL"), which is an unincorporated association consisting of 32 separately owned and independently operated professional football teams.

### JURISDICTION

8.     Jurisdiction is proper in this Court pursuant to R.S. Mo. 506.500 in that the tortious acts alleged herein took place in Missouri.

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

9.      This is an action requesting relief under the common and statutory laws of the State of Missouri. Although Plaintiffs worked under a collective bargaining agreement, the collective bargaining agreement does not address the non-delegable and non-negotiable duties owed by the Kansas City Chiefs to its employees. Because federal labor law is not applicable to Plaintiffs' claims, and no interpretation of a CBA is required, section 301 of the Labor Management Relations Act cannot provide a basis for federal jurisdiction.

10.     Plaintiffs' claims are based exclusively on violations of Missouri common law, which arise separate and independent from any CBA. Accordingly, Plaintiffs are not required to exhaust any purported grievance procedures.

11.     Plaintiffs' claims do not arise out of an "accident," as that term is defined under Missouri's Workers' Compensation Law. Plaintiffs' occupational disease-related claims were not caused by a specific event during a single work shift injury.

12.     Plaintiffs' claims are not within the scope of workers' compensation and they are not subject to the exclusivity provisions of workers' compensation.

**VENUE**

13.     Venue is proper with this Court pursuant to § 508.010. Upon information and belief, Plaintiffs were first injured by the wrongful acts and negligent conduct alleged herein in Jackson County, Missouri.

**JOINDER OF CLAIMS**

14.     Joinder of Plaintiffs' claims are permissible pursuant to Rule 52.05(a) in that the claims alleged herein arise out of the same series of occurrences and involve common questions of law and fact.

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

## TOLLING

15.    Plaintiffs' membership in the putative class action currently pending in the Eastern District of Pennsylvania[1] tolled the running of the applicable statute of limitations. In addition, Defendant's fraudulent concealment of its bad acts as alleged herein prevented Plaintiffs from ascertaining the existence of these causes of action and their latent injuries, including a diagnosis of post-concussion syndrome and/or other latent neurological harms.

## GENERAL ALLEGATIONS

16.    Like the tobacco industry in its efforts to minimize the relation between its products and serious health conditions such as proposing alternative causes of those conditions, the professional football industry as exemplified by Defendant has taken efforts to minimize the relation between its "product" which involves repetitive head trauma and serious health conditions, such as proposing alternative causes of those conditions and abnormal behaviors, including alcohol, steroids, depression, aggressive personality traits, etc.

17.    Defendant has known or should have known that since 1966 the Congress of Neurological Surgeons defined a concussion as a "clinical syndrome characterized by immediate and transient impairment of neural functions, such as alteration of consciousness, disturbance of vision, equilibrium, etc. due to mechanical forces." Defendant marginalized the risks of brain injuries and regularly referred to concussions as "getting your bell rung" or a "ding."

18.    Defendant exacerbated Plaintiffs' risk of exposure to brain trauma by regularly returning concussed players to play. Defendant fostered a draconian working environment where Plaintiffs were forced to play through the exposure of repetitive head trauma. On multiple occasions, Defendant increased the dangers of the working environment by giving Plaintiffs

---

[1] *In re NFL Players' Concussion Injury Litigation,* No. 2:12-md-02323-AB; *See also, Charles Ray Easterling, et al v. NFL*, No. 11-cv-0509 (filed August 17, 2011).

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

ammonia inhalants, caffeine cocktails and/or Toradol to abbreviate the need for concussed employees to miss working time due to a brain injury.

19.     Defendant has known or should have known for many years that post-concussion syndrome (PCS) and cognitive impairment occurs in football players. PCS is defined by the fourth edition of the *Diagnostic and Statistics Manual* as (1) cognitive deficits in attention or memory and (2) at least 3 or more of the following symptoms: fatigue, sleep disturbance, headache, dizziness, irritability, affective disturbance, apathy, or personality change. Similarly, the World Health Organization's International Classification of Diseases (ICD-10) defines PCS as involving 3 or more of the following symptoms: headaches, dizziness, fatigue, irritability, insomnia, concentration difficulty, or memory difficulty.

20.     For decades, the scientific community has known that repetitive head trauma can lead to permanent and debilitating neurological impairments, including Chronic Traumatic Encephalopathy ("CTE").

21.     Defendant has known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers, easily accessible to Defendant, have shown that this condition is prevalent in boxers and retired professional football players who have a history of head injuries. The changes in the brain begin when the brain is subjected to repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of athletic involvement.

22.     In 1928, pathologist Harrison Martland first described the link between repetitive head trauma and degenerative brain disease as the "punch drunk syndrome" in the *Journal of the American Medical Association*.

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

23.     In 1934, Dr. Harry Parker published a study confirming Martland's findings and argued that neurological degeneration in boxers was based on the volume of brain trauma sustained. He further opined, "the frequency of occurrence of conditions of this kind as reported by…people who followed the profession of pugilism makes it seem very likely that [the patients'] profession led to their ultimate disablement…."

24.     On December 29, 1937, at the Seventeenth Annual Meeting of the American Football Coaches Association, the football community acknowledged its keen awareness of the serious risks of concussions, and the necessity of removing an individual from play if they have suffered a concussion:

> During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true….Sports demanding personal contact should be eliminated after an individual has suffered one concussion.

25.     In 1937, J.A. Millspaugh introduced the term dementia pugilistica to describe the syndrome characterized by motor deficits and mental confusion in boxers. Millspaugh also noted that the disease is likely not limited to boxers but could extend to other sports where repetitive brain trauma is present: "The mental unbalance more commonly encountered among pugilists is also observed among other sports representatives who sustain considerable head trauma." He further opined, "[r]epeat and frequent concussions…are, to say the least, not conducive to stabilized mental equilibrium."

26.     In 1949, British neurologist Macdonald Critchley published the first of two important studies on head trauma in boxers. In *Punch Drunk Syndrome: The Chronic Traumatic Encephalophathy of Boxers*, Critchley described the latent effects of repetitive brain trauma, explaining that the condition was generally not observable until a number of years had passed since the onset of boxing. In 1957, Critchley published an article in the *British Medical Journal*

6

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

and described the symptoms of "chronic progressive traumatic encephalopathy" to include "progressive slowing of speech and thoughts…slowness of movement, and tremors." Critchley further noted that brain damage produced by repetitive trauma could lead to personality changes, and that the effects of chronic head trauma are dependent on the volume of impacts as well as the magnitude of those events.

27.     Over the next several decades, the evidence of the link between repetitive head trauma and neurological diseases was overwhelmingly clear. Numerous studies were published in medical journals including the *Journal of the American Medical Association, Neurology, Lancet,* the *New England Journal of Medicine* and *Physician and Sports Medicine* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

> encephalopathy is caused in boxers, steeplechasers and football players by repeated sub-concussive and concussive blows to the head;

> acceleration and rapid decelerations of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

> immediate retrograde amnesia occurs following concussions;

> mild head injury requires recovery time without risk of subjection to further injury;

> a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

> minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

28.     Although the condition now known as CTE has been discussed widely in the medical literature for more than eight decades, it was not until 2002 that CTE was officially diagnosed post-mortem in professional football players. Upon information and belief, this late finding was due to the Defendant's and its agents' concerted effort to conceal the link between repetitive head trauma in football and neurological diseases. Since 2002, more than 90% of all former players that have been examined post-mortem exhibited pathological symptoms consistent with CTE. The leading neuropathologist studying CTE, Dr. Ann McKee, believes that it is more likely than not that every single NFL player has some level of CTE.

29.     The first professional football player to be diagnosed with CTE was a former Kansas City Chiefs player, Mike Webster. Webster played 17 years—his final two (1989 and 1990) with the Chiefs—in the NFL and tragically died only 12 years after retirement at the age of 50. During the latter part of his life, and while serving on Defendant's coaching staff, Webster manifested progressive symptoms and signs of cognitive and neuropsychiatric impairment consistent with CTE.

30.     Research suggests that CTE may have been the true primary cause of death for a majority of professional football players that died as a result of neurodegenerative diseases. Accordingly, it is likely that the rate of CTE in professional football players is significantly higher than once believed.

31.     The clinical manifestations of CTE are quite variable but can include a number of stages. In the first stage, former players experience headaches, short-term memory difficulties, aggressive tendencies, depression and impulse control. In the second stage, as the disease progresses, the symptoms include depression, mode lability, explosivity, poor judgment, loss of attention and concentration, executive dysfunction, impulsivity, language difficulties and suicidal

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

ideations. In the third stage, cognitive impairment becomes much more rampant, depression worsens and mood swings become more violent, severe memory loss occurs, and motor neuron disease may develop. Finally, in the fourth stage, full-blown encephalopathy sets in, causing severe memory loss with dementia, executive dysfunction, language difficulties, explosivity, paranoia, gait and increased suicidal ideations. In the latter stages of CTE, the symptoms are consistent with Parkinsonism and end-stage dementia.

32.     The National Institute for Occupational Safety and Health recently issued a warning letter—since the Defendant failed to do so—to all former NFL players that played at least five seasons during 1959 to 1988, stating: due to the exposure of repetitive mild traumatic brain injuries the "risk of dying with a brain or nervous system disorder was more than 3 times higher among players." The warning letter went on to conclude that this study confirms a similar study that was done "*years*" ago. Further evidencing the campaign of deception and concealment, prior to the dissemination of this warning letter, a member of the NFL's Head, Neck and Spine Committee sought to remove any mention of CTE.

33.     To date, more than fifty-two former NFL players have been diagnosed post-mortem with CTE.

34.     Throughout Plaintiffs' employment, Defendant sought to conceal, minimize, misrepresent and create doubt about the validity of subconcussions, concussions, post-concussion syndrome and CTE.

35.     In 1994, NFL commissioner Paul Tagliabue dismissed the concerns surrounding concussions in football, stating, "Concussions, I think, is one of these pack journalism issues, frankly. There's no increase is concussions and the number is relatively small." Upon

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

information and belief, Defendant condoned and/or ratified this finding and adopted policies and procedures to conform to this conclusion.

36.     From at least 1994, and likely well before, Defendant, by and through it agents, and the NFL voluntarily assumed a duty to research the risks of concussions and subconcussions through the creation of the Mild Traumatic Brain Injury Committee. One of Defendant's agents served on this Committee from 1995 through 2009.

37.     Instead of carrying out their duty to use reasonable care in the study of concussions and neurological diseases, Defendant and its agents engaged in various acts, errors, misrepresentations and/or omissions through the publication of multiple scientific "studies." These discredited studies formed the basis for the Defendant's flawed policies, or the lack thereof, as they related to the monitoring of concussions, subconcussions, post-concussion syndrome and CTE.

38.     Despite the substantial body of independent scientific studies directly linking repetitive head trauma in football and neurological diseases, including CTE, Defendant never warned Plaintiffs and instead willfully misrepresented, minimized and/or concealed the risks.

39.     As the purveyor of football in America, and as the leading expert in the field, Defendant owed a continuous duty to keep abreast of the scientific developments relating to brain trauma which its employees were regularly exposed, and it was required to notify, inform, minimize the harm and educate Plaintiffs and the public of any potential long-term risks of repetitive head trauma.

40.     The Defendant's duty to warn was commensurate not only with its actual knowledge gained from its "research" and published studies but also with its constructive knowledge as measured by scientific literature and other available means of communication.

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

41.    Upon information and belief, Defendant knew or should have known of the nature and long-term effects of concussive and sub-concussive injuries long before Plaintiffs were exposed to repetitive brain trauma. Defendant had or should have had knowledge of studies that demonstrated a positive link between repetitive head trauma and neurological diseases in the 1920s, 1930s, 1940s, 1950s, 1960s, 1970s, 1980s, and 1990s. During those decades, Defendant's knowledge about the hazards of repetitive head trauma continued to accumulate, yet Defendant failed to warn Plaintiffs about those hazards.

## COUNT I
## NEGLIGENCE

42.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 41 as if fully set forth herein.

43.    Defendant had a common law duty, separate and independent of any CBA, to use ordinary care to make its work environment reasonably safe.

44.    Defendant owed a non-delegable and non-negotiable duty to maintain a safe working environment, a duty not to expose Plaintiffs to unreasonable risks of harm, a duty to warn employees about the existence of dangers, including latent neurologic diseases, of which they could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose its employees, including Plaintiffs, to unreasonable risk of injury.

45.    Defendant failed to use due care under the circumstances, and was thereby negligent in the performance of its non-delegable and non-negotiable duties.

46.    Defendant by its respective active and passive negligence failed to exercise the standard of care and skill it was obligated to exercise by reason of its relationship with Plaintiffs, undertakings and assumption of a duty thereby causing, creating or permitting an increased risk

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

of exposure to repetitive brain trauma, and thereby failing to properly safeguard and warn Plaintiffs.

47.     Such negligence directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and other neurologic/brain harms.

48.     The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs and punitive and exemplary damages should be assessed against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**

49.     To the extent they are not inconsistent with the allegations in this Count, Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 48 as if fully set forth herein.

50.     Defendant had a common law duty, separate and independent of any CBA, to use ordinary care to make its work environment reasonably safe.

51.     Defendant owed a non-delegable and non-negotiable duty to maintain a safe working environment, a duty not to expose Plaintiffs to unreasonable risks of harm, a duty to warn employees about the existence of dangers, including latent neurologic diseases, of which employees could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose Plaintiffs to unreasonable risk of injury.

12

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

52.     Defendant and its agents represented to Plaintiffs that concussions are not a serious injury.

53.     Defendant and its agents represented to Plaintiffs that there are no long-term effects of concussions in NFL athletes.

54.     When Defendant and its agents made these representations to Plaintiffs, the representations were driven by profit motives so that Plaintiffs would continue to play unimpeded by the risks of latent neurological diseases.

55.     Defendant failed to exercise reasonable care and competence when communicating this information, and as a result, the information presented to Plaintiffs was false and misleading.

56.     Plaintiffs justifiably relied upon this information since Defendant was in a superior position of knowledge and Defendant could foresee that Plaintiffs would rely and intended that they do so.

57.     Defendant's negligent misrepresentations directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and other neurologic/brain harms.

58.     The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs and punitive and exemplary damages should be assessed against the Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

## COUNT III
## FRAUDULENT CONCEALMENT

59.     To the extent they are not inconsistent with the allegations in this Count, Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 58 as if fully set forth herein.

60.     At all relevant times hereto, Defendant was in a position of superior knowledge, which was not within the fair and reasonable reach of the Plaintiffs, nor would it have been discovered through the exercise of Plaintiffs' ordinary diligence.

61.     Defendant knew that repetitive head trauma in football created a risk of neurological diseases.

62.     Defendant was aware of, knew and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive head trauma in football, to which Plaintiffs were exposed.

63.     Defendant had a non-delegable and non-negotiable duty, separate and independent of any CBA, to disclose and/or inform Plaintiffs about these risks.

64.     Defendant knew that such information was material to Plaintiffs, and knew that Plaintiffs would rely upon it for accurate information.

65.     Defendant knowingly and fraudulently concealed from Plaintiffs the risks of repetitive head trauma, including the risk of latent brain disease, intending that Plaintiffs would rely upon such concealment.

66.     Plaintiffs relied upon the Defendant's inaccurate and misleading information.

14

Electronically Filed - Jackson - Independence - December 30, 2013 - 09:29 AM

67.     Defendant's fraudulent concealment directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and other neurologic/brain harms.

68.     The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs and punitive and exemplary damages should be assessed against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues in this matter.

RESPECTFULLY SUBMITTED,

GREGORY LEYH, P.C.


/s/ Gregory Leyh
Gregory Leyh, #42283
Gregory Leyh, P.C.
104 N.E. 72nd Street, Suite A
Gladstone, Missouri  64118
(816) 283-3380
(816) 283-0489 (Facsimile)
gleyh@leyhlaw.com
**ATTORNEY FOR PLAINTIFFS**