# Exhibit C

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>      Plaintiffs,<br><br>      v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>      Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**OBJECTION TO JUNE 25, 2014 CLASS ACTION SETTLEMENT AND
OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF
SEAN MOREY, ALAN FANECA, BEN HAMILTON, ROBERT ROYAL, RODERICK
CARTWRIGHT, JEFF ROHRER, AND SEAN CONSIDINE**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.    Background of Objectors ................................................................................ 2

II.   The Class Action Complaint ........................................................................ 5

III.  The Initial Settlement ................................................................................ 11

IV.  The Revised Settlement ............................................................................. 15

ARGUMENT ................................................................................................... 18

I.    The Proposed Class Contains Internal Conflicts Rendering It Uncertifiable ................. 19

      A.    The Revised Settlement Leaves Many Injured Class Members Uncompensated ................................................................................. 20

      B.    The 75% Offsets Also Create a Conflict Within the Class .................................. 26

      C.    Class Members Who Played in NFL Europe Are Not Given Credit for the Seasons They Played There ..................................................... 28

II.   Other Factors Call Into Question Whether the Settlement Can Be Approved as Fair, Adequate, and Reasonable .................................................................... 29

      A.    The Proposed Notice Is False and Misleading ........................................... 29

      B.    The Settlement Establishes Unduly Burdensome Procedural Requirements That Will Effectively Deny Class Members Recovery ................................. 32

      C.    The Proposed Settlement Is Not the Product of Arm's Length Negotiation ......... 35

            1.    Intra-Class Conflict Suggests the Absence of an Arm's Length Negotiation ......................................................................... 36

            2.    The Attorneys' Fee Provision Raises Concerns That Class Counsel Bargained Away Class Members' Interests ....................................... 37

            3.    The Role of Sub-Class Counsel and Representative Plaintiffs Is Unknown ............................................................................ 38

4.      The Settlement Negotiation Process Has Lacked Transparency ..............39

D.    The Lack of Discovery Precludes Preliminary Approval of the Proposed
       Settlement .............................................................................................................40

       1.      Class Counsel Could Not Possibly Have Fulfilled Their Duties to the
               Class Without Taking Any Discovery ......................................................40

       2.      Without Discovery, Neither the Court Nor the Class Members Can
               Assess the Settlement..................................................................................42

       3.      Discovery Would Have Allowed Class Counsel To Overcome – or at
               Least Understand – What They Claim Are "Significant Challenges and
               Obstacles in the Litigation" .....................................................................42

CONCLUSION........................................................................................................................ 47

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Air Lines Stewards & Stewardesses Ass'n, Local 550 v. Am. Airlines, Inc.*,
    455 F.2d 101 (7th Cir. 1972) ............................................................................31

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) ...............................................43

*Amchem v. Windsor Prods. Inc.*, 521 U.S. 591 (1997) ...................................19, 23, 29

*Barani v. Wells Fargo Bank, N.A*, 2014 WL 1389329
    (S.D. Cal. Apr. 9, 2014) ...................................................................................42

*Barnes v. Am. Tobacco Co.*, 984 F. Supp. 842 (E.D. Pa. 1997) ...................................46

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)...................37

*Boggess v. Hogan*, 410 F. Supp. 433 (N.D. Ill. 1975) .................................................31

*Bohus v. Beloff*, 950 F.2d 919 (3d Cir. 1991) ............................................................45

*Buckley v. Valeo*, 424 U.S. 1 (1976) .........................................................................39

*In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257 (N.D. Cal. 1996)........................38

*Caterpillar, Inc. v. Williams*, 482 U.S. 386 (1987)....................................................43

*Childers v. Power Line Equip. Rentals, Inc.*,
    452 Pa. Super. 94 (1996)...................................................................................46

*Ciccarelli v. Carey Can. Mines, Ltd.*, 757 F.2d 548 (3d Cir. 1985) .............................45

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005).......................................39, 40

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ............... *passim*

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013).......................................35

*Eubank v. Pella Corp.*, __ F.3d __, 2014 WL 2444388
    (7th Cir. June 2, 2014) .................................................................32, 33, 35, 39

*Gates v. Rohm & Haas Co.*, 248 F.R.D. 434 (E.D. Pa. 2008) .....................................42

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995).............................................................................. *passim*

iii

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) ....................................23

*Green v. Ariz. Cardinals Football Club, LLC*, No. 14-CV-461,
2014 WL 1920468 (E.D. Mo. May 14, 2014) ..................................................43, 44

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir.).........................................31

*Hemi Group, LLC v. City of New York*, 130 S.Ct. 983 (2010) ......................................44

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009).............................25

*Jamison v. Westinghouse Elec. Corp.*, 375 F.2d 465 (3d Cir. 1967).........................45

*Mehling v. N.Y. Life Ins. Co.*, 246 F.R.D. 467 (E.D. Pa. 2007).................................19

*Mest v. Cabot Corp.*, 449 F.3d 502 (3d Cir. 2006) ......................................................45

*Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479 (1929)................................46

*In re Nat'l Football League Players' Concussion Injury Litig.*,
961 F. Supp. 2d 708 (E.D. Pa. 2014) ................................................................ *passim*

*Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 WL 950616
(E.D. Pa. Apr. 22, 2005) .................................................................................29, 31

*Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008).......................................... *passim*

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ..........................................................29

*In re Pet Food Prods.*, 629 F.3d 333 (3d Cir. 2010).....................................................28

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) .........................................25

*Pozza v. United States*, 324 F. Supp. 2d 709 (W.D. Pa. 2004) ....................................47

*In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249
(E.D. Pa. 2012)....................................................................................................42

*In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221 (S.D. W. Va. 2005)........................25

*Staub v. Proctor Hosp.*, 131 S.Ct. 1186 (2011) ...........................................................44

*Stipanovich v. Westinghouse Elec. Corp.*, 210 Pa. Super. 98 (1967) .........................46

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)................................28

*Walter v. Hughes Commc'ns, Inc.*, No. 09-2136, 2011 WL 2650711
(N.D. Cal. July 6, 2011).......................................................................................35

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)...........................29

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991) .......................37

*Williams v. Nat'l Football League*, 582 F.3d 863 (8th Cir. 2009)...............................44

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)...................................................40

## STATUTES AND RULES

Labor Management Relations Act, 29 U.S.C. § 141 *et seq.*......................................43

Fed. R. Civ. P. 23(a)(4)...............................................................................................19

Fed. R. Civ. P. 23(c)(2)(B) .........................................................................................29

Fed. R. Civ. P. 23(d) ...................................................................................................32

Fed. R. Civ. P. 23(e) ...................................................................................................18

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V.............................................................................................29, 32

## OTHER AUTHORITIES

A.C. McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain: A Journal of Neurology 43 (2012).......................9, 10, 11, 21, 22

Ann C. McKee *et al.*, *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, 68 J. Neuropathology & Experimental Neurology 709 (2009) ......................................................................10

Associated Press, *NFL, Ex-Players Agree to $765M Settlement in Concussions Suit*, NFL.com (Aug. 29, 2013 12:42 PM), http://www.nfl.com/news/story/0ap1000000235494/ article/nfl-explayers-agree-to-765m-settlement-in-concussions-suit .............................................12, 31

Barry D. Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*, 9 Nature Reviews Neurology 222 (2013) .........................................................9, 21

Brent Schrotenboer, *NFL Takes Aim at $25 Billion, but at What Price?*, USA Today (Feb. 5, 2014 1:42 PM EST), http://www.usatoday.com/story/sports/nfl/super/2014/01/30/super-bowl-nfl-revenue-denver-broncos-seattle-seahawks/5061197/ ..............................................35

Christine M. Baugh *et al.*, *Chronic Traumatic Encephalopathy: Neurodegeneration Following Repetitive Concussive and Subconcussive Brain Trauma*, Brain Imaging and Behavior 3 (May 3, 2012) ................................10

Dan McGrath, *Illinois Eye Institute Project Aims to Identify CTE in the Living*, Chicago Sun-Times (June 14, 2014 4:35 PM), http://www.suntimes.com/sports/28048920-419/illinois-eye-institute-project-aims-to-identify-cte-in-the-living.html#.U7QLlvldVIQ ..........................................................10

Daniel Kaplan, *Goodell Sets Revenue Goal of $25 Billion by 2027 for NFL*, Sports Business Journal (Apr. 5, 2010), http://www.sportsbusinessdaily.com/Journal/Issues/2010/04/20100405/This-Weeks-News/Goodell-Sets-Revenue-Goal-Of-$25B-By-2027-For-NFL.aspx .....................35

Des Toups, *How Many Times Will You Crash Your Car?*, Forbes (July 27, 2011 6:50 PM), http://www.forbes.com/sites/moneybuilder/2011/07/27/how-many-times-will-you-crash-your-car/ ...............................................................................26

Don Banks, *Former Players: Devil Is in the Details with NFL Concussion Settlement*, Sports Illustrated (Aug. 23, 2013), http://www.si.com /nfl/2013/08/29/nfl-concussion-lawsuit-settlement-player-reaction-kevin-mawae ...................................................................................................................15

Eddie Matz, *Stick Route*, ESPN The Magazine (Nov. 28, 2011), http://espn.go.com/nfl/story/_/id/7243606/nfl-players-tony-romo-ronde-barber-rely-new-painkiller-toradol ........................................................................27

Erin D. Bigler, *Neuropsychology and Clinical Neuroscience of Persistent Post-Concussive Syndrome*, 14 J. Int'l Neuropsychological Soc'y 1 (2008).........................7, 9, 27

Frontline, Transcript of *League of Denial: The NFL's Concussion Crisis*, http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/transcript-50/. .................................................................................................................22

James F. Burke *et al.*, *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 Neurology 1 (2013) ..............................................................27

Jason M. Breslow, *Judge Rejects $765 Million NFL Concussion Settlement*, Frontline (Jan. 14, 2014 3:59 PM), http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/judge-rejects-765-million-nfl-concussion-settlement/ ...................................................31

Kyle Wagner, *Can Science See Inside an NFL Player's Skull Before It's Too Late?*, Deadspin (June 21, 2012 9:00 AM), http://regressing.deadspin.com/5920006/can-science-see-inside-an-nfl-players-skull-before-its-too-late ...............................................................10

L. Brandeis, *Other People's Money* (Nat'l Home Library Found. Ed. 1933) ...............39

L. Elaine Halchin, *Former NFL Players: Disabilities, Benefits, and Related Issues*, Congressional Research Service (Apr. 8, 2008) .........................................34

vi

M. Maruyama *et al.*, *Imaging of Tau Pathology in a Tauopathy Mouse Model and in Alzheimer Patients Compared to Normal Controls*, 79 Neuron 1094 (2013) ....................10

Manual for Complex Litigation § 21.61 (4th ed. 2004)...............................................................18

Mark Hollmer, *Alzheimer's Diagnosis May Gain from PET Imaging of Tau Proteins*, FierceDiagnostics (Sept. 20, 2013), http://www.fiercediagnostics.com/story/alzheimers-diagnosis-may-gain-pet-imaging-tau-proteins/2013-09-20...............................................................................10

Michael Leahy, *The Pain Game*, Washington Post Magazine (Feb. 3, 2008)..............................34

Michael O'Keefe, *Still Plenty of Skeptics After NFL Reaches New Deal with Players to Settle Concussion-Related Lawsuit*, New York Daily News (June 28, 2014 11:40 AM), http://www.nydailynews.com/sports/football/score-nfl-deny-issues-article-1.1847588 ....................................34

Michael Rosenberg, *"Permanently Disabled," Harrison Fighting for Benefits NFL Took Away*, Sports Illustrated (Jan. 29, 2014), http://www.si.com/nfl/2014/01/29/dwight-harrison-nfl-pension.............................................34

Nathaniel Penn, *The Violent Life and Sudden Death of Junior Seau*, GQ Magazine (Sept. 2003), http://www.gq.com/entertainment/sports/201309/junior-seau-nfl-death-concussions-brain-injury ........................................................11

National Institute for Occupational Safety and Health, *Brain and Nervous System Disorders Among NFL Players* (Jan. 2013), http://www.cdc.gov/niosh/pgms/worknotify/pdfs/NFL_Notification_02.pdf........................22

Neal Emery, *How to Diagnose a Battered Brain Before It's Too Late*, The Atlantic (May 8, 2012), http://www.theatlantic.com/health/archive/2012/05/how-to-diagnose-a-battered-brain-before-its-too-late/256877/. ................................9

NFL Concussion Class Settlement (May 1, 2014), https://www.youtube.com/watch?v=9EWNBNgMoEk..........................................................31

Pablo S. Torre, *How (and Why) Athletes Go Broke*, Sports Illustrated (Mar. 23, 2009), http://sportsillustrated.cnn.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke ........................................................33

Patrick Hruby, *Show Us Some Math*, Sportsonearth.com (Jan. 20, 2014), http://www.sportsonearth.com/article/66858180/the-nfls-concussion-deal-may-not-cover-all-former-players-with-cte#!7gQFt...............................................39

Patrick Hruby, *Raw Deal*, Sportsonearth.com (Jan. 10, 2014), http://www.sportsonearth.com/article/66471614/nfl-concussion-settlement-inadequate#!7gQc9 ......................................................31

Paul Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star*, Men's Journal (May 2011), http://www.mensjournal.com/magazine/dave-duerson-the-ferocious-life-and-tragic-death-of-a-super-bowl-star-20121002 ..........................................................................11

Press Release, *NFL, Retired Players Resolve Concussion Litigation*, Irell & Manella LLP, http://static.nfl.com/static/content/public/photo/2013/08/29/0ap2000000235504.pdf ........................................................................................12

Restatement (Second) of Torts (1965) ............................................................................45

Robert A. Stern *et al.*, *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neurology 1122 (2013) ..........................................................11

Roche, *FDA-Mandated Warning Label for Toradol*, http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/019645s019lbl.pdf...............8, 27

Ryan Wilson, *NFL Paid Roger Goodell $35.1 Million Last Year*, CBSSports.com (Feb. 14, 2014 3:25 PM), http://www.cbssports.com/nfl/eye-on-football/24443392/report-nfl-paid-roger-goodell-351-million-last-year ......................35

Sally Jenkins & Rick Maese, *Pain and Pain Management in NFL Spawn a Culture of Prescription Drug Use and Abuse*, The Washington Post (Apr. 13, 2013), http://www.washingtonpost.com/sports/redskins/pain-and-pain-management-in-nfl-spawn-a-culture-of-prescription-drug-use-and-abuse/2013/04/13/3b36f4de-a1e9-11e2-bd52-614156372695_story.html................................8

Scott Fujita, *Mixed Feelings Over N.F.L. Concussion Settlement*, N.Y. Times (Sept. 2, 2013), http://www.nytimes.com/2013/09/03/sports/football/mixed-feelings-over-nfl-concussions-settlement.html?pagewanted=all&_r=0; ..............................15

Sophia Pearson & Jeff Feeley, *NFL's $914 Million Concussion Deal Submitted to Federal Court*, The Morning Journal (Jan. 18, 2014 9:23 AM), http://www.morningjournal.com/sports/20140108/nfls-914-million-concussion-deal-submitted-to-federal-court..............................31

Steve Almond, *The NFL Gets Off Easy in Concussion Settlement*, The Boston Globe (June 27, 2014), http://www.bostonglobe.com/opinion/2014/06/26/the-nfl-gets-off-easy-concussion-settlement/PUFYxln6dFqlOdbe6wnhzJ/story.html ..............................14

Steve Fainaru & Mark Fainaru-Wada, *Lawyers Fight Over Settlement Details*, ESPN.com (Jan. 24, 2014, 8:18 PM), http://espn.go.com/espn/otl/story/_/id/10346091/lead-negotiator-facing-strong-opposition-concussion-settlement ........................................................39

Steve Fainaru & Mark Fainaru-Wada, *Some Players May Be Out of NFL Deal*,
ESPN.com (Sept. 20, 2013 1:04 PM),
http://espn.go.com/chicago/story/_/id/9690036/older-players-cut-nfl-
settlement-concerns-growing-whether-enough-money-exists ..........................................11, 15

Steven T. DeKosky *et al.*, *Traumatic Brain Injury – Football, Warfare, and Long-
Term Effects*, The New England Journal of Medicine 1293 (2010) ........................................23

United Nations Department of Economic and Social Affairs, *Consolidated List of
Products Whose Consumption and/or Sale Have Been Banned, Withdrawn,
Severely Restricted or Not Approved by Governments* (2005) ...................................................8

William Jagust, *Time for Tau*, 137 Brain: A Journal of Neurology 1570 (2014).........................10

Written Testimony of Dr. Robert Stern before the Senate Special Committee
on Aging (June 25, 2014), http://www.aging.senate.gov/imo/media/
doc/Stern_6_25_14.pdf. ...............................................................................................10, 21, 23

## INTRODUCTION

The Revised Settlement is a great deal – for the NFL and Class Counsel.  It is a lousy deal for the retired players, whose rights have been bargained away without adequate or independent representation.

Class Counsel bear the burden of demonstrating that their Revised Settlement presents a certifiable class and appears to fall within the range of possible approval.  Demonstrating the latter means the proposed settlement must not disclose grounds to doubt its fairness.  The Revised Settlement proposes a class with significant conflicts that render it uncertifiable and it suffers other defects that render it anything but fair.

Its fatal defects include:

- The rights of at least three groups of class members – those suffering from, or displaying symptoms consistent with, CTE who do not die before preliminary approval; those who have suffered or are at risk of suffering a stroke or non-football traumatic brain injury; and those who played in NFL Europe – were bargained away without adequate representation;

- The proposed notice is false and misleading;

- The claims process is so onerous and confusing that it raises due process as well as fairness concerns;

- It was not the product of arm's length negotiation – as evidenced by the intra-class conflicts, the lack of transparency, and the $112.5 million fee award to Class Counsel; and

- Class Counsel conducted no discovery – thus there is no factual record on which to evaluate the strength of the claims and defenses.

With much fanfare, Class Counsel proclaim they "have lifted the cap" and thereby addressed any concern about the settlement fund's adequacy.  Thus, they contend, this Court should grant preliminary approval.  But cap or no cap, the Revised Settlement comes nowhere near being fair, adequate, and reasonable.

Every former player surrenders his right to sue the NFL for cognitive injuries – including CTE, which science shows a significant number may have.  In exchange, those former players – often operating with cognitive challenges – get the right to navigate a procedural labyrinth designed to limit the number and the amount of settlement payouts.

Significantly, Class Counsel have boasted that in lifting the cap, they have not really increased the financial exposure to the NFL.[1]  It is clear now why.  Given the limitations on who qualifies for compensation and the complex, one-sided process for determining that, it is likely the settlement will cost the NFL less than $765 million.

Preliminary approval should be denied.

## BACKGROUND

### I.    Background of Objectors

Objectors are seven former players who each had a significant career in the NFL, having played, on average, nine seasons.  They include linemen, as well as so-called "skill position" and special teams players.  The most senior began his NFL career in 1982 and the most junior retired in 2012.  Three of them played on Super Bowl championship teams.[2]

**Sean Morey** played nine seasons with the New England Patriots, Philadelphia Eagles, Pittsburgh Steelers, Arizona Cardinals, and Barcelona Dragons, an NFL Europe team.  An Ivy League stand-out at Brown University, Mr. Morey set multiple collegiate records and graduated with academic honors.  In 1999, the New England Patriots selected him as a seventh round draft pick.  In 2003, Mr. Morey won the Special Teams MVP award while playing with the

---

[1] *See* Mem. 1 ("[T]he Settling Parties became so confident in the prior actuarial assumptions and projections that an agreement to uncap the amount of the Monetary Award Fund was reached.").

[2] As described in greater detail *infra* at page 14, Objectors are the same group of players who moved to intervene on May 5, 2014.

Philadelphia Eagles.  In 2004, Mr. Morey moved to the Pittsburgh Steelers, where he was captain of the special teams and earned a Super Bowl ring.  He eventually moved to the Arizona Cardinals and was named to the 2008 Pro Bowl.  Mr. Morey retired just before the 2010 season. While an active player, Mr. Morey co-chaired the NFLPA Mackey White Traumatic Brain Injury Committee and served as a representative in collective bargaining negotiations with the NFL. He is currently head coach of the sprint football team at Princeton University.

*Alan Faneca* played 13 seasons in the NFL as an offensive lineman.  A star at Louisiana State University, Mr. Faneca received consensus All-American honors as a junior and was named a finalist for the prestigious Outland Trophy, which recognizes the best interior lineman in college football.  Selected by the Pittsburgh Steelers in the first round of the 1998 NFL draft, Mr. Faneca was named the team's rookie of the year.  A fixture on the Steelers' offensive line for ten seasons, Mr. Faneca earned a Super Bowl ring in 2006.  In 2007, Steeler fans elected him to the Steelers' 75th Anniversary All Time Team.  Mr. Faneca left the Steelers in 2008 for two seasons with the New York Jets and joined the Arizona Cardinals for his final season in 2010. He was named to the Pro Bowl every year from 2001 through 2009.  Since retiring from professional football, Mr. Faneca has been a tireless advocate for epilepsy research.

*Ben Hamilton* played ten seasons in the NFL as an offensive lineman for the Denver Broncos from 2001 until 2009, and for the Seattle Seahawks in 2010.  He was a fourth-round draft pick out of the University of Minnesota.  He is currently a high school math teacher at a private Christian high school in Colorado.

*Robert Royal* played nine seasons in the NFL from 2002 until 2010 with the Washington Redskins, Buffalo Bills, and Cleveland Browns.  An All-SEC tight end at Louisiana State University, Mr. Royal averaged nearly ten yards per reception over the course of his NFL career.

Mr. Royal now serves as CEO of the Robert Royal Foundation, an organization he founded to promote childhood health, fitness, and education and to combat youth violence.  Mr. Royal is also involved in several private equity ventures.

*Roderick "Rock" Cartwright* played ten seasons in the NFL after a stellar collegiate career at Kansas State University.  A fullback and kick return specialist, Mr. Cartwright played with the Washington Redskins from 2002 until 2009 and the Oakland Raiders from 2010 until 2011.  In 2006, Mr. Cartwright amassed 1,541 kick-off return yards, setting a Redskins record.  Since retiring from the NFL, Mr. Cartwright has actively involved himself in charity work, volunteering at a summer sports camp hosted by the Robert Royal Foundation, among others.  Mr. Cartwright is also a manager with Cartwright Energy Partners LLC, an oil production development firm.

*Jeff Rohrer*, a second-round draft pick out of Yale University, played seven seasons in the NFL with the Dallas Cowboys from 1982 until 1989.  An outside linebacker, Mr. Rohrer received All-Ivy League honors and was the Cowboys' second- and third-leading tackler in 1986 and 1987, respectively.  Since retiring from the NFL, Mr. Rohrer has worked in the film industry.  He is currently a partner and executive producer at Recommended, a Los Angeles-based production company.

*Sean Considine* played eight seasons in the NFL as a strong safety and on special teams from 2005 until 2012.  After attending the University of Iowa, Mr. Considine was drafted by the Philadelphia Eagles and played four seasons with them and then two seasons with the Jacksonville Jaguars.  In 2011, he signed with the Carolina Panthers, finishing that season with the Arizona Cardinals.  Mr. Considine joined the Baltimore Ravens in 2012, earning a Super

Bowl ring. Since retiring from professional football, Mr. Considine has been active with numerous charities in his hometown and recently became a small business owner.

Since leaving the NFL, Objectors each have experienced one or more of a wide range of symptoms linked to repetitive mild traumatic brain injury ("MTBI"), including a sensitivity to noise, visuospatial issues, visual impairment, chronic pain, executive function deficit, episodic depression, mood and personality changes, chronic headaches, dysnomia, a decreased ability to multi-task, peripheral nerve dysfunction (numbness, burning, and/or tingling), cervical spinal disorders, sleep dysfunction, attention and concentration deficits, short- and long-term memory deficits, and somatic disorders. Additionally, under certain circumstances some of the Objectors also have experienced a decreased ability to interpret, regulate, express, or control complex emotions. These precise conditions have been associated with CTE and may broaden or intensify.

Although the Objectors' claims for their injuries would be released by the Revised Settlement, none would qualify for any relief under the settlement beyond participation in the Baseline Assessment Program ("BAP"). And the BAP – which measures cognitive deficits such as memory impairment and loss of attention – does not even screen for many of the Objectors' neurobehavioral conditions or neuropsychiatric presentations.

## II.     The Class Action Complaint

The Class Action Complaint defines a class consisting of all living, retired NFL Football Players who have retired from the NFL before preliminary approval of the proposed settlement agreement as well as representatives of retired NFL players who have died or become legally incapacitated. *Turner v. Nat'l Football League*, Civ. A. No. 2:14-cv-29-AB, Dkt. No. 1 ¶¶ 1, 16 (E.D. Pa. Jan. 6, 2014) ("Complaint"). It further defines NFL Football Players to include not just players in the NFL and its member clubs but also players in the American Football League,

which merged with the NFL, and the NFL Europa League. *Id.* ¶ 1.[3] The class also includes spouses, parents, dependent children, and any other person who under state law may sue the NFL by virtue of his or her relationship with the retired player. *Id.*

The Complaint divides the class into two sub-classes. Subclass 1 consists of all retired players (and their representative and derivative claimants) who "were not diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE prior to the date of the Preliminary Approval and Class Certification Order." *Id.* ¶ 17(a). Subclass 2 consists of all retired players (and their representative and derivative claimants) who "were diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE prior to the date of the Preliminary Approval and Class Certification Order." *Id.* ¶ 17(b). Subclass 2 also includes the representative and derivative claimants of retired players "who died before Preliminary Approval" of the settlement and who "received a post-mortem diagnosis" of Death with CTE. *Id.*

The Complaint names Shawn Wooden and Kevin Turner as the Representative Plaintiffs for the class. Mr. Wooden represents Subclass 1. Compl. ¶ 17(a). A safety, Mr. Wooden played in the NFL from 1996 until 2004 with the Miami Dolphins and the Chicago Bears. *Id.* ¶ 4. He is alleged to have "experienced" unspecified "neurological symptoms" but "has not been diagnosed with any neurocognitive impairment." *Id.* The Complaint states that Mr. Wooden has an "increased risk of developing dementia, Alzheimer's, Parkinson's, or ALS." *Id.* ***Mr. Wooden does not plead an increased risk of developing CTE***. *Id.* Mr. Turner represents Subclass 2. *Id.* ¶ 17(b). A running back, Mr. Turner played in the NFL from 1992 until 1999

---

[3] The settlement class also includes players in the World League of American Football and the NFL Europe League, both predecessors to NFL Europa. Compl. ¶ 1.

with the New England Patriots and the Philadelphia Eagles. *Id.* ¶ 7. He was diagnosed with ALS in 2010. *Id.*

The Complaint alleges that the NFL voluntarily undertook a duty to inform its players of the risks resulting from repeated concussive and sub-concussive head impacts and to provide its players with advice concerning the treatment and prevention of head injuries. Compl. ¶¶ 128-199. It alleges that the NFL not only performed this task negligently, but also purposefully spread misinformation to conceal from its players the risks of repetitive head trauma. *Id.* Not only did the NFL's concealment delay players from seeking and receiving adequate medical treatment for the injuries they sustained while playing, *id*. ¶ 285, the NFL's behavior caused players to incur an increased, additional incremental risk of permanent brain damage with every mismanaged concussion, *id.* ¶ 384.

The Complaint also pleads a causal connection between football and neurodegenerative disease. Compl. ¶¶ 54-88. It identifies several studies demonstrating that the repeated head injuries or concussions sustained during an NFL player's career cause severe neurological problems such as depression, dementia, and other neurodegenerative diseases. *Id.*[4] It alleges the NFL's knowledge of these studies and the link between MTBI and neurodegenerative disease, describing the NFL's efforts to intentionally conceal and cover up these dangers. *Id.* ¶¶ 89-199. Specifically, the Complaint alleges that in 1994 the NFL established a committee of experts to study brain injury in football (the MTBI Committee), which published reports and reached

---

[4] Indeed, at least one study has "confirm[ed] the presence of acute pathological changes in the brain that can occur from . . . blows to the head that are below the threshold for producing what behaviorally would be classified as a concussion." Erin D. Bigler, *Neuropsychology and Clinical Neuroscience of Persistent Post-Concussive Syndrome*, 14 J. Int'l Neuropsychological Soc'y 1, 7 (2008).

conclusions inconsistent with the weight of scientific evidence and which concealed from players the true risks of continued head trauma.  *Id.* ¶¶ 128-199.

Complaints filed against the NFL in other courts have also alleged that the NFL's actions exacerbated the injuries that players sustained while playing football.  For example, the complaint in *Finn v. National Football League* describes the routine pre-game mass administration of Toradol, a blood-thinning pain-killer, to players without their informed consent regarding the health risks of the drug.  Complaint, *Finn v. Nat'l Football League*, No. 2:11-cv-07067-JLL-MAH, ¶¶ 135-143 (D.N.J. Dec. 8, 2011) (Dkt. 4) ("Finn Compl.").  Toradol's use typically is limited to the surgical setting, and several European countries have banned it.  Sally Jenkins & Rick Maese, *Pain and Pain Management in NFL Spawn a Culture of Prescription Drug Use and Abuse*, The Washington Post (Apr. 13, 2013);[5] *see also* United Nations Department of Economic and Social Affairs, *Consolidated List of Products Whose Consumption and/or Sale Have Been Banned, Withdrawn, Severely Restricted or Not Approved by Governments* 156-57 (2005) (entry for ketorolac).[6]

Because Toradol has blood-thinning properties, it is ***contraindicated*** for "patients . . . at high risk of bleeding" and presents an increased risk of stroke.  *Finn* Compl. ¶ 137; *see also* Roche, FDA-Mandated Warning Label for Toradol, at 1-2.[7]  On top of those risks, Toradol "mask[s] pain" and "prevent[s] the feeling of injury," *Finn* Compl. ¶¶ 135, 140, which makes it more likely that a player will report that he feels no or little pain from a precise trauma and then

---

[5]  *Available at*  http://www.washingtonpost.com/sports/redskins/pain-and-pain-management-in-nfl-spawn-a-culture-of-prescription-drug-use-and-abuse/2013/04/13/3b36f4de-a1e9-11e2-bd52-614156372695_story.html.

[6] *Available at* http://www.un.org/esa/coordination/CL12.pdf.

[7] *Available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/019645s019lbl.pdf.

return to play.  Because "a prior concussion increases the likelihood of a second concussion," Bigler, *supra*, at 8, the routine administration of Toradol compounded the risk that players would suffer multiple instances of head trauma in a single game or practice.[8]  The Objectors include players who have received those Toradol injections.

The Complaint specifically identifies several long-term injuries arising from MTBI, "including, ***but not limited to*** memory loss, dementia, Alzheimer's Disease, Parkinson's Disease, ALS, depression, and CTE and its related symptoms."  Compl. ¶ 127 (emphasis added).  "CTE is the long-term neurological consequence of repetitive mild TBI."  Barry D. Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*, 9 Nature Reviews Neurology 222, 225 (2013).  The condition results from the build-up in the brain of mis-folded tau protein.  Neal Emery, *How to Diagnose a Battered Brain Before It's Too Late*, The Atlantic (May 8, 2012);[9] A.C. McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain: A Journal of Neurology 43, 45 (2012) ("McKee 2012").  More extensive tau build-up indicates a more advanced stage of CTE.  Jordan, *supra*, at 227 (Box 5).

While a devastating medical condition, CTE is not readily diagnosed absent a post-mortem brain autopsy.  Jordan, *supra*, at 226.  Scientific advances, however, are making it possible to detect CTE earlier.[10]  Researchers in Chicago, for example, are developing a CTE screening test that relies on irregularities in vision, eye movements, and retinal/optic nerve

---

[8] A prior concussion also results in a "greater morbidity of the second concussion."  Bigler, *supra*, at 8.

[9] *Available at* http://www.theatlantic.com/health/archive/2012/05/how-to-diagnose-a-battered-brain-before-its-too-late/256877/.

[10] *See* Emery, *supra* (noting "pilot studies show promise for [using] diagnostic MRI and MRS scans [to diagnose CTE] as brain imaging technology improves").

structure as indicators of CTE.[11] And a number of different research teams are developing bio-markers that highlight the tau protein tangles responsible for CTE using conventional diagnostic imaging technology.[12] Thus, long before the Revised Settlement concludes its 65-year term, it is likely that a large number of class members will have received a diagnosis of CTE before they die. That diagnosis will not entitle them to any compensation under the Revised Settlement.

Even with current technology, doctors can identify likely cases of CTE based on other neurocognitive symptoms that display during an individual's lifetime and that correlate with a post-mortem diagnosis of CTE. Among others, these presentations include: aggression, agitation, impulsivity, depression, suicidality, impaired attention or concentration, memory problems, executive dysfunction, dementia, and language impairment. Written Testimony of Dr. Robert Stern before the Senate Special Committee on Aging, at 4-5 (June 25, 2014) ("Stern Testimony");[13] Jordan, *supra*, at 226; McKee 2012, *supra*, at 52, 55-56, 58-59; Ann C. McKee *et al.*, *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, 68 J. Neuropathology & Experimental Neurology 709, 710 (2009) ("McKee 2009); Christine M. Baugh *et al.*, *Chronic Traumatic Encephalopathy: Neurodegeneration Following Repetitive Concussive and Subconcussive Brain Trauma*, Brain Imaging and Behavior, 3 (May 3,

---

[11] Dan McGrath, *Illinois Eye Institute Project Aims to Identify CTE in the Living*, Chicago Sun-Times (June 14, 2014 4:35 PM), http://www.suntimes.com/sports/28048920-419/illinois-eye-institute-project-aims-to-identify-cte-in-the-living.html#.U6CR0fldV8E.

[12] *E.g.*, Kyle Wagner, *Can Science See Inside an NFL Player's Skull Before It's Too Late?*, Deadspin (June 21, 2012 9:00 AM), http://regressing.deadspin.com/5920006/can-science-see-inside-an-nfl-players-skull-before-its-too-late; M. Maruyama *et al.*, *Imaging of Tau Pathology in a Tauopathy Mouse Model and in Alzheimer Patients Compared to Normal Controls*, 79 Neuron 1094 (2013); Mark Hollmer, *Alzheimer's Diagnosis May Gain from PET Imaging of Tau Proteins*, FierceDiagnostics (Sept. 20, 2013), http://www.fiercediagnostics.com/story/alzheimers-diagnosis-may-gain-pet-imaging-tau-proteins/2013-09-20; William Jagust, *Time for Tau*, 137 Brain: A Journal of Neurology 1570 (2014).

[13] *Available at* http://www.aging.senate.gov/imo/media/doc/Stern_6_25_14.pdf.

2012); Robert A. Stern *et al.*, *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neurology 1122, 1126 (2013). While some of those conditions appear more pronounced in advanced Stage III and Stage IV CTE, suicidality presents at all stages. McKee 2012, *supra*, at 49-51 (Table 2), 55-56, 58-59.[14]

Studies to date have suggested an alarming number of NFL players will be afflicted with CTE. Of the 34 deceased NFL retirees whose brains have been tested for CTE, 33 had the disease. McKee 2012, *supra*, at 59.[15] Of those 33, nearly half showed signs of Stage III or Stage IV CTE – CTE's two most severe stages. *Id.* And almost all of these players – 94% – were symptomatic during their lifetimes. *Id.* The most common symptoms were short-term memory loss, executive dysfunction, and attention and concentration problems. *Id.*

## III. The Initial Settlement

In August 2013, the court-appointed mediator informed the Court that Class Counsel and NFL Defendants would globally settle all claims arising from the NFL's fraudulent and misleading conduct relating to the effects of MTBI. *See* Dkt. No. 5235. In a press release announcing the settlement, the mediator explained that the settlement called for a $675 million

---

[14] Junior Seau and Dave Duerson – two prominent former NFL players – committed suicide by shooting themselves in the heart to preserve their brains for study. *See* Nathaniel Penn, *The Violent Life and Sudden Death of Junior Seau*, GQ Magazine (Sept. 2003), http://www.gq.com/entertainment/sports/201309/junior-seau-nfl-death-concussions-brain-injury; Paul Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star*, Men's Journal (May 2011), *available at* http://www.mensjournal.com/magazine/dave-duerson-the-ferocious-life-and-tragic-death-of-a-super-bowl-star-20121002. Before committing suicide, Seau battled insomnia, headaches, dizziness, and other conditions linked to CTE. Penn, *supra*. Like Seau, Duerson also showed signs of CTE before his suicide, which manifested as "starburst headaches," blurred vision, and short-term memory deficits. Solotaroff, *supra*.

[15] Media reports suggest that 54 brains of retired NFL players have been examined for CTE. Of those, 52 showed signs of the disease. Steve Fainaru & Mark Fainaru-Wada, *Some Players May Be Out of NFL Deal*, ESPN.com (Sept. 20, 2013 1:04 PM), http://espn.go.com/chicago/story/_/id/9690036/older-players-cut-nfl-settlement-concerns-growing-whether-enough-money-exists

fund to "compensate former players who have suffered cognitive injury or their families," among other terms.[16]  The fund was to compensate "severe cognitive impairment, dementia, Alzheimer's, [and] ALS."[17]  "The precise amount of compensation," the mediator stated, "will be based upon the specific diagnosis, as well as other factors including age, number of seasons played in the NFL, and other relevant medical conditions."[18]  Neither Class Counsel nor the mediator ever suggested that the settlement would compensate only those few cases of CTE detected before preliminary approval of the settlement, to the exclusion of all future cases.[19]

Five months later, on January 6, 2014, Class Counsel for the first time publicly revealed the specific terms of the settlement when they filed their first motion for preliminary approval. *See* Dkt. No. 5634.  Notwithstanding the breadth of afflictions linked to MTBI, that settlement compensated only a limited number of diseases and limited total class-wide compensation for those injuries to $675 million.[20]  *See* Dkt. No. 5634-2 §§ 23.1-23.5.  ALS claimants were to receive a maximum award of $5 million.  *See id.* at Ex. 3.  Retired players diagnosed with Parkinson's Disease or Alzheimer's Disease were to receive a maximum $3.5 million award.  *Id.* And class members exhibiting Level 2 or Level 1.5 dementia were to receive at most $3 million or $1.5 million, respectively.  *Id.*  The full written initial settlement also revealed that – contrary to previous public statements from Class Counsel – it would compensate cases of CTE with a

---

[16] Press Release, *NFL, Retired Players Resolve Concussion Litigation*, Irell & Manella LLP, http://static.nfl.com/static/content/public/photo/2013/08/29/0ap2000000235504.pdf.

[17] *Id.*

[18] *Id.*

[19] *Id.*; Associated Press, *NFL, Ex-Players Agree to $765M Settlement in Concussions Suit*, NFL.com (Aug. 29, 2013 12:42 PM), http://www.nfl.com/news/story/0ap1000000235494/article/ nfl-explayers-agree-to-765m-settlement-in-concussions-suit

[20] Calling it a $675 million fund was not, in fact, accurate.  It was a $300 million fund paid over two years, with another $375 million paid over 17 years.  *See* Dkt. No. 5634-2 §§ 23.1-23.5.

maximum $4 million award **only if the retired player died before preliminary approval** of the settlement. *See* Dkt. No. 5634-2 §§ 2.1(xxx), 6.3 & Ex. 1 ¶ 5.[21] Players suffering from CTE who would be diagnosed or who died after that date were to receive nothing. Moreover, players suffering from the clinical presentations of CTE were to receive no compensation under the settlement unless they independently qualified for compensation through one of the other specified diseases. *Id.* § 6.3.

The initial settlement also created a Baseline Assessment Program ("BAP") that would have provided class members the opportunity to undergo a baseline assessment examination, which would establish the class member's baseline neurocognitive functioning and screen for dementia and neurocognitive impairment. Dkt. 5634-2 § 5.2. Class members who were diagnosed with Level 1 dementia in the baseline assessment examination would be entitled to supplemental benefits that would cover the costs of medical treatments related to the dementia. *Id.* §§ 5.2, 5.11. The term of the BAP was to last ten years, but class members receiving supplemental benefits would continue to do so for up to five years beyond that ten-year term. *Id.* §§ 5.5, 5.11. The initial settlement capped the BAP Fund at $75 million. *Id.* § 23.3(g).

On January 14, 2014, this Court, *sua sponte*, denied Class Counsel's motion for preliminary approval of the settlement, declining to find that the settlement "has no obvious deficiencies, grants no preferential treatment to segments of the class, and falls within the range of possible approval." *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 715 (E.D. Pa. 2014) ("NFL Concussion") (quotation marks omitted). Instead, the Court recognized that the "Monetary Award Fund may lack the necessary funds to pay Monetary

---

[21] Compensation for CTE is further limited by the Revised Settlement's exclusion of compensation for most class members who died before 2006. Revised Settlement § 6.2(b).

Awards for Qualifying Diagnoses" and "[*a*]*s a first step* toward preliminary approval" "order[ed] the parties to share the [actuarial and economic] documentation" relied upon during settlement "with the Court through the Special Master." *Id.* at 715-16 (emphasis added).[22]

Following the Court's denial of preliminary approval, Objectors moved to intervene. *See* Dkt. No. 6019. They explained that their interests were not adequately represented during the negotiation of the initial settlement, in part, because that settlement arbitrarily denied compensation to individuals whose CTE went undetected until after preliminary approval. Because each Objector exhibits MTBI-related conditions that are also symptoms of CTE, each is at risk of developing CTE but – even though the settlement awarded $4 million to the families of players who died with CTE before final approval of the settlement – they and their families would receive nothing. *Id.* at 13-18. In opposing the motion to intervene, Class Counsel ignored this fact entirely, offering no explanation for the disparate treatment of CTE claimants. *See* Dkt. No. 6046. Objectors also criticized the 75% offset imposed on any player who suffers a *single* stroke or a *single* instance of non-football related traumatic brain injury ("TBI"). Dkt. 5634-2 § 6.5(b)(ii)-(iii). Such a player would recover only 25% of what he is otherwise entitled to receive under the settlement. Again, Class Counsel's opposition was devoid of any explanation for this offset. *See* Dkt. No. 6046. Objectors noted other defects in the initial settlement and other class members voiced criticism as well.[23]

---

[22] Class Counsel never fully informed the class about whether they complied. The most assurance they have given to this effect is that they have "made concerted efforts to evaluate this Court's directives and address them in a fruitful and productive manner." Dkt. 6046 at 10.

[23] *See, e.g.*, Dkt. Nos. 5686, 5771; Steve Almond, *The NFL Gets Off Easy in Concussion Settlement*, The Boston Globe (June 27, 2014), *available at* http://www.bostonglobe.com/opinion/2014/06/26/the-nfl-gets-off-easy-concussion-settlement/PUFYxln6dFqlOdbe6wnhzJ/story.html; Steve Fainaru & Mark Fainaru-Wada, *Some Players May Be Out of NFL Deal*, ESPN Outside the Lines (Sept. 20, 2013 1:04 pm), *available at* http://espn.go.com/espn/otl/story/_/id/9690036

## IV.    The Revised Settlement

Notwithstanding those criticisms of the initial settlement, Class Counsel on June 25, 2014 submitted a revised settlement agreement that retained the same structure, and almost all of the key provisions of the initial settlement.  *See* Dkt. No. 6073-2 ("Revised Settlement").  Class Counsel moved for preliminary class certification and for preliminary approval of the Revised Settlement.  *See* Dkt. No. 6073.

Like the initial settlement, the Revised Settlement compensates only the same limited subset of diseases that have been linked to MTBI: ALS, Parkinson's, Alzheimer's, Level 2 dementia, and Level 1.5 dementia.  Revised Settlement Ex. B-3.  It also retains the maximum compensation awards provided for each of these diseases in the initial settlement.  *Id.*  And like the initial settlement, the Revised Settlement compensates cases of CTE with $4 million, but ***only if the claimant dies before preliminary approval of the settlement agreement.***  Revised Settlement §§ 2.1(yyy), 6.2(a) (providing compensation for a "Qualifying Diagnosis"); *id.* Ex. B-1 at 5.[24]  Unlike its predecessor, the Revised Settlement does not cap total compensation for ALS, Parkinson's, Alzheimer's, and Levels 1.5 and 2 dementia, but it retains the $75 million cap on the BAP Fund.  *See* Dkt. 6073-5 at 4 ("Mem.").

---

/older-players-cut-nfl-settlement-concerns-growing-whether-enough-money-exists;  Scott Fujita, *Mixed Feelings Over N.F.L. Concussion Settlement*, N.Y. Times (Sept. 2, 2013), *available at* http://www.nytimes.com/2013/09/03/sports/football/mixed-feelings-over-nfl-concussions-settlement.html?pagewanted=all&_r=0; Don Banks,  *Former Players: Devil Is in the Details with NFL Concussion Settlement*, SI.com (Aug. 23, 2013), *available at* http://www.si.com /nfl/2013/08/29/nfl-concussion-lawsuit-settlement-player-reaction-kevin-mawae.

[24]  Section 6.2(a) of the Revised Settlement provides compensation for any "Qualifying Diagnosis."  Section 2.1(yyy) defines "Qualifying Diagnosis" to include "Death with CTE." Exhibit B-1 defines "Death with CTE" as follows: "For Retired NFL Football Players ***who died prior to the date of the Preliminary Approval and Class Certification Order***, a post-mortem diagnosis of CTE made by a board-certified neuropathologist."  Revised Settlement Ex. B-1 at 5 (emphasis added).

The Revised Settlement still has a series of offsets that reduce a claimant's compensation. Most notably, without explanation, the Revised Settlement retains the 75% offset for a single stroke or a single TBI. *Id.* § 6.7(b)(ii)-(iii). Additionally, class members who played fewer "Eligible Seasons" in the NFL receive only a percentage of the maximum award for their condition. *See* Revised Settlement § 6.7(b)(i). Although class members receive "Eligible Season" credit for service on "practice, developmental, or taxi squad[s]," time spent playing for NFL Europe or NFL Europa (collectively, "NFL Europe") does not apply to the "Eligible Season" determination. *Id.* §§ 2.1(kk), 6.7(c)(1). Similarly, class members who are older at the time of the Qualifying Diagnosis receive only a percentage of the maximum award for their condition. *See* Revised Settlement § 6.7(b) & Ex. B-3.

A complex series of administrative procedures governs the distribution of benefits. Class members must register with the Claims Administrator within 180 days of Settlement Class Supplemental Notice. Revised Settlement § 4.2(c). Failure to do so renders the player ***completely ineligible*** for any benefits, yet the release would be binding. *Id.* Additionally, the undiagnosed players in Subclass 1 must undergo the baseline assessment examination to receive the full award; failure to undergo the examination results in a 10% reduction in benefit. *Id.* §§ 5.4, 6.7(b)(iv). The Baseline Assessment Program itself imposes a series of deadlines. Players aged 43 and older must obtain the BAP examination within two years after the BAP commences; younger players must do so by the earlier of their 45th birthday or the BAP's tenth year. *Id.* § 5.3. Both the NFL and claimants may appeal adverse claim determinations. *Id.* §§ 9.5-9.7. The initial settlement limited the NFL to ten appeals per year, but the Revised Settlement allows unlimited appeals by the NFL. *Compare* Dkt. No. 5634-2 § 9.6(b) *with*

Revised Settlement § 9.6(b). Claimants – but not the NFL – must pay a $1,000 fee to docket an appeal. Revised Settlement § 9.6(a). The fee is refunded if the appeal is successful. *Id.*

The Revised Settlement broadly releases all MTBI-related claims of every class member who does not opt out, including claims of class members who played in NFL Europe and its predecessors. Class members:

> waive and release . . . any and all past, present and future claims, counterclaims, actions, rights or causes of action . . . in law or in equity . . . known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated [that any settling plaintiff] had, has, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits . . . .

Revised Settlement § 18.1(a). The Revised Settlement states that the claims it releases include, among others, claims "arising out of, or relating to . . . head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events . . . of whatever cause" and claims "arising out of, or relating to, CTE." *Id.* § 18.1(a)(i), (iv), (vi). The settlement's release also requires class members to acknowledge that they "explicitly took unknown or unsuspected claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims" falling within the scope of the allegations in the Complaint and related lawsuits. *Id.* § 18.2.

The Revised Settlement calls for a $112.5 million attorneys' fee, which the NFL Defendants have agreed not to oppose. Revised Settlement § 21.1. It also authorizes Co-Lead Class Counsel to "petition the Court to set aside up to five percent (5%) of each Monetary Award . . . to facilitate the Settlement program and related efforts of Class Counsel." *Id.* The initial

settlement did not contain this set-aside provision.  *Compare id. with* Dkt. No. 5634-2 § 21.1.[25]
The Revised Settlement places no limits on how Co-Lead Class Counsel may use the set aside.

## ARGUMENT

To receive preliminary approval of a proposed class settlement, Class Counsel must first demonstrate the existence of a certifiable class.  *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 794 (3d Cir. 1995), *cert. denied* 516 U.S. 824 (1995) (denying approval of settlement where class not certifiable).  Second, Class Counsel must proffer a settlement that "discloses [no] grounds to doubt its fairness . . . and appears to fall within the range of possible approval."  *In re Nat'l Football League Players Concussion Injury Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) (quotation marks omitted) ("NFL Concussion"); *see also* Fed. R. Civ. P. 23(e) (class settlement may be approved only if "it is fair, reasonable, and adequate").  In assessing whether a settlement "discloses grounds to doubt its fairness," the Court must consider whether: (1) the negotiations occurred at arm's length, (2) there was sufficient discovery, (3) the proponents of the settlement are experienced in similar litigation, and (4) the class substantially favors the settlement.  *NFL Concussion*, 961 F. Supp. 2d at 714.

If the proposed settlement appears to be the product of informed negotiations, contains no obvious deficiencies, does not improperly give preferential treatment to certain class members, and falls within the range of possible approval, preliminary approval will be granted.  *See* Manual for Complex Litigation § 21.61 (4th ed. 2004).  Conversely, if "the proposed settlement discloses grounds to doubt its fairness . . . such as unduly preferential treatment of class

---

[25] The NFL Defendants have taken no position on the propriety of the set aside, noting that "any such proposed set aside application is a matter strictly between and among Settlement Class Members, Class Counsel, and individual counsel for Settlement Class Members."  Revised Settlement § 21.1.

representatives or segments of the class, or excessive compensation of attorneys," and does not "appear[] to fall within the range of possible approval," preliminary approval will be denied. *NFL Concussion*, 961 F. Supp. 2d at 714 (quotation marks omitted); *see, e.g.*, *Mehling v. N.Y. Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007).

## I.     The Proposed Class Contains Internal Conflicts Rendering It Uncertifiable

Class Counsel have not put forth a certifiable class.  Rule 23 plainly states, "one or members of a class may sue or be sued as representative parties on behalf of all members only if: . . . (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The proposed class fails this requirement.

The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183, 187-88 (3d Cir. 2012) (emphasis added) (denying preliminary class certification where interests of representative plaintiffs and absent class members diverged).  Thus, "adversity among subgroups" – an intra-class conflict – requires that the class not be certified.  *Amchem v. Windsor Prods. Inc.*, 521 U.S. 591, 627 (1997) (quotation marks omitted) (denying class certification where conflict existed between present and future claimants).

When assessing the adequacy of representation, "a judge must focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class."  *GM Trucks*, 55 F.3d at 797 (finding representation inadequate where settlement terms preferred some class members over others).  Thus, "a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group."  *Id.*  "Offer[ing]

considerably more value to one class of plaintiffs" is precisely what the Revised Settlement does here.

The Revised Settlement suffers from at least three intra-class conflicts that preclude preliminary certification. *First*, the Revised Settlement arbitrarily limits compensation for CTE – a disease that neither Representative Plaintiff claims to be at increased risk of developing – to individuals who died before preliminary approval of the settlement. Class members whose CTE is discovered in the future receive nothing. The settlement also does not compensate Objectors' MTBI-related afflictions, many of which are potential indicators of CTE, and none of which the Representative Plaintiffs claim to suffer. *Second*, the Revised Settlement reduces a claimant's award by 75% if (i) the claimant has suffered a stroke, even though the NFL Defendants' own conduct in administering Toradol increased some Objectors' risk of stroke, or (ii) the claimant has suffered a *single* TBI, even though one TBI is dwarfed by the dozens of diagnosed and undiagnosed TBIs that the retired NFL player received while playing in the NFL. *Third*, the settlement class includes veterans of NFL Europe, but the Revised Settlement does not credit seasons played in that league as "eligible seasons."

### A. The Revised Settlement Leaves Many Injured Class Members Uncompensated

The Revised Settlement compensates only a small subset of MTBI-related injuries to the exclusion of all others, creating conflict between the interests of those who suffer from compensated injuries and those whose injuries go without relief. *See Dewey*, 681 F.3d at 183, 187-88 (denying class certification where settlement terms preferred some class members over others). As a result of their NFL careers, Objectors suffer from a range of significant medical conditions: visuospatial difficulties, executive function deficit, chronic headaches, dysnomia, decreased emotional stability, increased impulsivity, and attention and concentration deficits.

None of these conditions receives compensation or medical treatment under the settlement. The failure to compensate or treat these afflictions is made more notable by Co-Lead Class Counsels' own recognition of the links between MTBI and these uncompensated conditions. *See, e.g.*, Compl. ¶ 127 (noting "MTBI can and does lead to long-term brain injury, ***including, but not limited to, memory loss***, dementia, Alzheimer's Disease, Parkinson's Disease, ALS, ***depression***, and ***CTE*** and ***its related symptoms***." (emphasis added)); *Finn* Compl. ¶¶ 36, 100-145.[26]

The disparate – and arbitrary – treatment of class members suffering from these uncompensated afflictions is particularly stark in light of the Revised Settlement's framework for compensating CTE. The uncompensated conditions afflicting Objectors are among the well-documented symptoms of CTE. McKee 2012, *supra*, at 60; Jordan, *supra*, at 226-27.[27] And while CTE found in a retired player who died on the eve of preliminary approval calls for a $4 million payment under the Revised Settlement, that same condition goes uncompensated if the player dies one day later, after preliminary approval. That is because the settlement defines "qualifying diagnosis" to include "a post-mortem diagnosis of CTE" ***only*** "[f]or Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order." Revised Settlement Ex. B-1 ¶ 5; *see also* Revised Settlement ¶¶ 2.1(yyy), 6.3(a).[28] Thus, former players like Objectors who currently are managing the cumulative effects of MTBI – many of which are consistent with the presentation of CTE – would have received no compensation and would continue bearing their medical costs even if their condition progressed to full-blown CTE.

---

[26] Co-Lead Class Counsel is one of the attorneys representing the plaintiffs in *Finn*.

[27] *See Stern Testimony*, *supra*.

[28] These terms remain unchanged from the initial settlement notwithstanding Objectors' Motion to Intervene, which shouted this deficiency to Class Counsel.

That limitation on CTE compensation is remarkable:  Given that 33 of the 34 deceased NFL players whose brains have been examined for CTE have been diagnosed with the condition, one of the lead CTE researchers has wondered whether "every single football player doesn't have" CTE.[29]  By contrast, one study examining NFL retirees who played at least five seasons between 1959 and 1988 recorded seven cases of ALS, seven cases of Alzheimer's, and three cases of Parkinson's in **3,439** retired players.  National Institute for Occupational Safety and Health, *Brain and Nervous System Disorders Among NFL Players* (Jan. 2013).[30]  Yet notwithstanding the widespread prevalence of CTE among NFL retirees, the settlement provides **no compensation** to players with CTE who die after preliminary approval of the settlement – likely a large percentage of the 20,000-member putative class.[31]  Co-Lead Class Counsel have never explained or justified the basis for such a stark difference in treatment among players suffering from the exact same MTBI-related condition, even after Objectors identified this deficiency in their Motion to Intervene.[32]

---

[29] Frontline, transcript of *League of Denial: The NFL's Concussion Crisis*, http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/transcript-50/.

[30] *Available at* http://www.cdc.gov/niosh/pgms/worknotify/pdfs/NFL_Notification_02.pdf.

[31] In theory, a retired player suffering from CTE could receive compensation through an independent qualifying diagnosis of, for example, Level 1.5 dementia.  But dementia does not always accompany the injuries that Objectors have suffered and not all cases of CTE exhibit dementia.  In one study, for example, no individual presenting with Stage I or II CTE showed signs of dementia despite showing symptoms similar to those that Objectors are experiencing.  McKee 2012, *supra*, at 52, 55.  Even several players with advanced stages of CTE were not considered cognitively impaired.  *Id.* at 56 (noting 25% of the individuals diagnosed with stage III CTE were not considered cognitively impaired).  Indeed, it seems apparent from what is known about the behavior and symptoms of some deceased football players found to have CTE, such as Junior Seau and Dave Duerson, that at least some (and perhaps many) of those deceased players would not have qualified for compensation at all had they not died before preliminary approval of the settlement.

[32] The decision to compensate all ALS, Alzheimer's, and Parkinson's claims but not all CTE claims certainly cannot be justified with reference to the relative severity of the diseases.  As Dr.

The consequences of denying compensation to class members like the Objectors will multiply over time.  Many diseases linked to MTBI exhibit variable latency periods, meaning that the symptoms of MTBI-related afflictions will present earlier in retirement for some former NFL players than for others.  Steven T. DeKosky *et al.*, *Traumatic Brain Injury – Football, Warfare, and Long-Term Effects*, The New England Journal of Medicine 1293, 1293-94 (2010). As science advances, moreover, it is likely that MTBI will be shown to correlate with additional diseases, and that CTE will be easily detectable before death.  Yet the settlement provides no flexibility for adding to the list of qualifying diseases, compensating new conditions, or compensating pre-death diagnoses of CTE.  *See* Revised Settlement § 6.6(c) ("In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s).").

Indeed, the Revised Settlement anticipates relevant advances in science and medicine that will allow more precise diagnosis of the effects of MTBIs – *but only to disallow them*.[33]  Class members had a strong need for representatives who would have pressed for settlement "provisions that can keep pace with changing science and medicine, rather than freezing in place the science" known at the time of settlement.  *Amchem*, 521 U.S. at 610-11 (holding class representation inadequate where settlement did not account for the interests of class members who may develop disease in the future); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630-31

---

Robert Stern explained to the Senate Committee on Aging, CTE causes one's "life [to be] destroyed by the progressive destruction of the brain."  *Stern Testimony*, *supra*, at 4.

[33] The Revised Settlement does not compensate a disease detected "through a blood test, genetic test, imaging technique, or otherwise" that "has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment."  Revised Settlement § 6.6(b).  Thus, class members cannot avail themselves of technological advances allowing for earlier detection of qualifying diseases by using compensation under the settlement to fund preventive treatment that might forestall the onset of "actual cognitive impairment."

(3d Cir. 1996) (finding class representation inadequate where conflict between currently injured plaintiffs' interest in maximizing current payouts and future plaintiffs' interest in delaying opt-out due to "changing science and medicine" and "difficulty in forecasting what their futures hold"). That the Representative Plaintiffs did not do.

In fact, the Representative Plaintiffs could not fulfill that role. Neither Representative Plaintiff shares Objectors' interest in securing compensation for **all cases** of CTE and other MTBI-related conditions. Mr. Turner, who suffers from ALS, has a diagnosed medical condition that specifically receives compensation under the Revised Settlement (and rightly so). Compl. ¶ 7. But he was not poised to represent the interests of those who have suffered different injuries and receive nothing under the settlement. Neither is Mr. Wooden. Objectors presently exhibit MTBI-related injuries that are clinical indications of CTE. Mr. Wooden, by contrast, has not alleged that he suffers from any MTBI-related affliction. Nor has he alleged that he is at "[an] increased risk of developing" CTE, even though he does assert such a risk for dementia, Alzheimer's Disease, Parkinson's Disease, and ALS. Compl. ¶ 4. Mr. Wooden's interests therefore lie in securing future compensation for those four afflictions, not in securing payment for the Objectors' conditions and for future cases of CTE.[34]

Class Counsel's discussion of the proposed subclasses thus misses the mark. *See* Mem. 52-53. Even if Mr. Wooden adequately represents the interests of Retired Players at risk of developing ALS, Alzheimer's, Parkinson's, or dementia in the future, he cannot represent the interests of Retired Players at risk of developing CTE in the future. Class Counsel has no

---

[34] Even if Mr. Wooden were to now report that he, too, suffers from the conditions affecting Objectors or that he fears the onset of CTE, he cannot reliably represent those interests going forward: He has abdicated any responsibility to those interests by advocating a proposed settlement that ignores those injuries.

response for that criticism.  Mem. 52-53.  For that reason, the subclasses do not ensure adequate representation.  They do not "align[] [the] interests and incentives [of] the representative plaintiffs and the rest of the class."  *Dewey*, 681 F.3d at 183 (denying class certification where interests of representative plaintiffs and absent class members diverged).

Nor do Class Counsel offer any justification for the arbitrary treatment of CTE claimants under the Revised Settlement.  Instead, Class Counsel assert that the adequacy of representation requirement is met because the Representative Plaintiffs' "claims are co-extensive with those of the absent Settlement Class Members" and because "[a]ll Settlement Class Members, like Plaintiffs, share an interest in obtaining redress from the NFL Parties for their alleged negligence and fraud."  Mem. 51.  But "[t]o state that class members were united in the interest of maximizing over-all recovery begs the question."  *GM Trucks*, 55 F.3d at 797.

When assessing the adequacy of representation, "a judge must focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class."  *GM Trucks*, 55 F.3d at 797.  Class Counsel do not address ***any*** of the Revised Settlement's distribution terms, except to state that "provid[ing] for different levels of compensation for different impairments 'is simply a reflection of the extent of the injury that certain class members incurred and does not clearly suggest that class members ha[ve] antagonistic interests.'"  Mem. 52 (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009)).  But whether a Retired Player with CTE dies before preliminary approval or after, "the extent of [his] injury" is the same.[35]  Indeed, Class Counsel have never attempted to identify a rationale for the disparate treatment that similarly situated CTE claimants

---

[35] That same rationale distinguishes *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999), and *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 239 (S.D. W. Va. 2005).

receive under the Revised Settlement.  Mem. 51-55; Dkt. No. 6046.  On this point, the heavily touted uncapped compensation fund is irrelevant – an uncapped fund means little to a claimant whose injuries are not among those eligible for medical care, treatment, or fair compensation.

## B.     The 75% Offsets Also Create a Conflict Within the Class

The Revised Settlement also imposes offsets that create an additional class conflict.  *See Dewey*, 681 F.3d at 183.  The proposed settlement **reduces a claimant's award by 75%** for a **single instance** of non-football-related traumatic brain injury ("TBI") or stroke.  Revised Settlement § 6.5(b)(ii)-(iii).  That 75% offset applies regardless of the severity of traumatic brain injury that the player sustained while playing football.  And it presumes that a single non-football-related instance of TBI accounts for 75% of a player's MTBI-related injuries, even though that player may have sustained numerous diagnosed and undiagnosed head traumas throughout his NFL career.[36]  That is both devoid of scientific justification and grossly unfair.

Instances of stroke, moreover, should be compensated injuries, not offsets that reduce recovery, **because the NFL itself has increased the risk of stroke for Objectors and other class members**.  *See Finn* Compl. ¶¶ 135-143.  NFL-administered Toradol injections increased that risk in two ways.  First, as a pain-killer, Toradol masks injuries that players may have suffered, encouraging their continued participation in the game and increasing the risk that a player would suffer multiple instances of MTBI in one game.  Second, MTBI suffered after a Toradol injection occurs at a time when the cerebrovascular architecture of the brain is particularly weak.  *See*

---

[36] The possibility that a class member will sustain an instance of non-football related TBI is not remote.  For example, the car insurance industry estimates that the average driver will be involved in a car collision – which could qualify as a TBI that triggers the offset – once every 18 years.  Des Toups, *How Many Times Will You Crash Your Car?*, Forbes (July 27, 2011 6:50 PM),  http://www.forbes.com/sites/moneybuilder/2011/07/27/how-many-times-will-you-crash-your-car/.

Bigler, *supra*, at 8 (noting that "in TBI the same mechanisms that stretch the neuron can stretch the blood vessel [which] may impair the neurogenic response of the blood vessel"). Toradol is a powerful blood-thinner that increases the risk of stroke and micro-hemorrhaging in players under Toradol's effect. *Finn* Compl. ¶¶ 135-143; *see also* FDA-Mandated Warning Label, *supra*, at 1.

Large groups of players who weekly received pre-game Toradol injections thus suffered repetitive MTBI at a time when their brains were most susceptible to permanent damage and injury. That damage itself enhances a retired player's risk of experiencing a stroke later in life. *See* James F. Burke *et al.*, *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 Neurology 1 (2013). On top of these effects, the effects of sustained, long-term Toradol use are completely unknown. *See* Eddie Matz, *Stick Route*, ESPN The Magazine (Nov. 28, 2011).[37] Thus, the NFL's own negligent and fraudulent actions have contributed to the prevalence of stroke among retired players. Co-Lead Class Counsel knew of these allegations – indeed, he represents the *Finn* plaintiffs – yet the settlement makes no mention of these injuries except to release any claims for them and to inexplicably select them as bases for reducing the retired player's compensation.

Representative Plaintiffs did not adequately represent Objectors' interests in eliminating or reducing the offset related to stroke and post-NFL TBI. Neither Mr. Turner nor Mr. Wooden claims an increased risk of stroke through NFL-administered Toradol use. As a result, neither can adequately represent those class members who some day may suffer such a stroke – and the resulting drop in compensation under the proposed settlement – as a result of the NFL's own conduct.

---

[37] *Available at* http://espn.go.com/nfl/story/_/id/7243606/nfl-players-tony-romo-ronde-barber-rely-new-painkiller-toradol.

C. **Class Members Who Played in NFL Europe Are Not Given Credit for the Seasons They Played There**

Inexplicably, the Revised Settlement, while releasing all claims of NFL Europe players, does not award class members "Eligible Season" credit for time spent playing in NFL Europe or its predecessors. Revised Settlement § 6.7(c)(i). Thus, a class member who played five years in the NFL will receive a larger settlement award than a class member who played two years of his career in NFL Europe and three years in the NFL. That is true even though players in NFL Europe undoubtedly sustain repeated concussive and subconcussive impacts, just like players in the NFL. Again, Class Counsel offer no justification for this arbitrary distinction. And because neither Mr. Turner nor Mr. Wooden alleges that he played in NFL Europe, neither adequately represents the interests of players who did play there – thus, explaining why NFL Europe players are treated disparately. *See GM Trucks*, 55 F.3d at 800 (finding class representation inadequate where "settlement appears to create antagonism within the class").

\* \* \* \* \*

Simply put, there are distinct groups within the proposed class whose rights have been bargained away without representation. These intra-class conflicts preclude preliminary certification of the settlement class.[38] "The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. Where "the interests of the representative plaintiffs and the interests of [absentee class members] align[] in opposing

---

[38] Courts also recognize intra-class conflicts as an indication that a settlement is not reasonable at the final approval stage. *See In re GM*, 55 F.3d at 808. A "disparity in the relief afforded under the settlement to the named plaintiffs, on the one hand, and the unnamed class members, on the other hand, [makes] the settlement unfair." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) (reversing district court's approval of a settlement). A court should reject a settlement where such an intra-class conflict is present on the grounds that it does not represent the "best possible recovery" for all putative class members. *In re Pet Food Prods.*, 629 F.3d 333, 355 (3d Cir. 2010).

directions," class representation is inadequate. *Dewey*, 681 F.3d at 188; *see also Amchem*, 521 U.S. at 627 (denying class certification where settlement not agreed to by representatives of all sub-classes); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (holding that intra-class conflict "require[d] division into homogenous subclasses . . . with separate representation to eliminate conflicting interests").[39]

## II. Other Factors Call Into Question Whether the Settlement Can Be Approved as Fair, Adequate, and Reasonable

### A. The Proposed Notice Is False and Misleading

"The due process requirements of the Fifth Amendment and the Federal Rules of Civil Procedure require adequate notice to class members of a proposed settlement." *Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. Apr. 22, 2005). Notice must be "the best notice practicable under the circumstances," "concisely and clearly stat[ing] in plain, easily understood language," *inter alia*, "the nature of the action[,] the definition of the class certified[, and] the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(2)(B).

For this Court to properly evaluate the reaction of the class at the final approval stage, the notice must clearly describe the settlement's benefits and limitations – including that class members will receive ***no recovery for CTE***, even if it is discovered upon autopsy. The proposed notices do not do so. *See* Mem. Exs. C-3, C-5. To the contrary, the long-form and short-form notice aim to ***sell*** the settlement to players, not to explain the actual implications of its terms.

---

[39] Should the Court agree that intra-class conflicts prevent preliminary certification, the Court should "simply divide the groups into subclasses," *Dewey*, 681 F.3d at 189, so that "separate counsel [can] provide[] adequate structural protections to assure that differently situated plaintiffs negotiate for their own unique interests," *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 (3d Cir. 2004) (quotation marks omitted).

Both highlight the availability of monetary awards for players diagnosed with CTE.  But neither explains – or so much as indicates – that while *past* diagnosed cases of CTE are covered if a class member dies before preliminary approval, ***no future cases of CTE post-preliminary approval are covered***.  A mere superficial examination of the notices' language shows this muddying of actual benefits:

**Short Form Notice:**



**What does the Settlement provide?**

The Settlement provides money for three benefits:

- Baseline medical exams to determine if retired players suffer from neurocognitive impairment and are entitled to additional testing and/or treatment ($75 million);

- Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death.  The maximum monetary awards range from $1.5 million to $5 million depending on the diagnosis.  All valid claims will be paid in full for 65 years; and

- Education programs and initiatives related to football safety ($10 million).

Mem. Ex. C-5.

**Long Form Notice:**

## MONETARY AWARDS

**14. What diagnoses qualify for monetary awards?**

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia), or Death with CTE (the "Qualifying Diagnoses").  A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

Mem. Ex. C-3, at 10.  Moreover, the long form notice provides a clearly false and deceptive statement regarding what constitutes a "qualifying diagnosis."  Although the notice states that "[a] Qualifying Diagnosis may occur *at any time* until the end of the 65-year term of the Monetary Award Fund," such plainly is not the reality.  *Id.*  If a player is diagnosed with CTE

30

after the preliminary approval stage, he is entitled to **nothing forever** – regardless of the Monetary Award Fund's duration.

This obfuscation of the actual terms of the settlement is even more egregious because retired players received the **contrary assurance** through a widespread media campaign in the last four months of 2013 – they were expressly informed the settlement would provide $4 million if they die with CTE.[40]   Indeed, class counsel have been touting the settlement on YouTube even before filing the Revised Settlement with the Court.[41]   Any notice sent at this point would require a custom-designed media campaign explaining the truth of the settlement's restrictions on payments for CTE only for deceased players, and nothing for living players who have or are later found to have CTE.

 "It is a generally accepted principle that due process requires that the notice of a settlement proposal must reasonably apprise members of the class of the terms of the settlement and of the options open to those who would dissent."  *Boggess v. Hogan*, 410 F. Supp. 433, 442 (N.D. Ill. 1975) (citing *Air Lines Stewards & Stewardesses Ass'n, Local 550 v. Am. Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir.)), *cert denied*, 423 U.S. 864 (1975)); *Nichols*, 2005 WL 950616, at *9.  The notice here fails to adequately inform class members of the terms of the settlement because of the power of

---

[40]  Associated Press, *supra*; *see also* Sophia Pearson & Jeff Feeley, *NFL's $914 Million Concussion Deal Submitted to Federal Court*, The Morning Journal (Jan. 18, 2014 9:23 AM), http://www.morningjournal.com/sports/20140108/nfls-914-million-concussion-deal-submitted-to-federal-court; Jason M. Breslow, *Judge Rejects $765 Million NFL Concussion Settlement*, Frontline (Jan. 14, 2014 3:59 PM), http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/judge-rejects-765-million-nfl-concussion-settlement/; Patrick Hruby, *Raw Deal*, SportsonEarth.com (Jan. 10, 2014), http://www.sportsonearth.com/article/66471614/#!6oxsi.

[41]  The NFL Concussion Class Settlement (May 1, 2014), https://www.youtube.com/watch?v=9EWNBNgMoEk (last visited May 27, 2014).

the misinformation that came before it, and because it continues that deception, by failing to state that ***players suffering from CTE and their families will receive nothing***.[42]

Such procedurally and substantively deficient notice fails the requirements of Rule 23 and amounts to a denial of due process.

### B. The Settlement Establishes Unduly Burdensome Procedural Requirements That Will Effectively Deny Class Members Recovery

To receive ***any*** recovery, class members must navigate a complex and burdensome administrative process that appears designed to decrease the cost to the NFL. Like the class settlement recently rejected in *Eubank v. Pella Corp.*, __ F.3d __, 2014 WL 2444388, at *7 (7th Cir. June 2, 2014), the Revised Settlement "strews obstacles in the path of any" class member seeking recovery by imposing requirements and deadlines that, if unsatisfied, reduce or completely bar recovery. This unwieldy and onerous claims process does not fundamentally protect class members' rights, does not satisfy Rule 23(d)'s requirements, and raises clear due process concerns. *See* U.S. Const. amend. V; Fed. R. Civ. P. 23(d).

For example:

- class members have 180 days to register with the Claims Administrator; but those who do not are ***ineligible for any benefits***, even though their claims are released, Revised Settlement § 4.2(c);

- certain class members must undergo baseline assessment examinations by arbitrary deadlines or suffer a 10% offset, *id.* §§ 5.4, 6.7(b)(iv);

---

[42] By the time the players actually would receive the proposed notices, their ability to recover for CTE will have been completely foreclosed, because the notices would be sent or published only after preliminary approval — which is the cut-off date for "Death with CTE" awards.

32

- class members who comply with these preliminary requirements must file an extensive "Claim Package" within two years of receiving a qualifying diagnosis, *id.* §§ 8.2(a), 8.3(a)(i); and

- Class Counsel has not provided the Court with the proposed claim form and instructions that class members – many of whom are suffering serious cognitive impairment – are to use to navigate this procedural labyrinth.

That alone justifies rejecting the settlement. *See Eubank*, 2014 WL 2444388, at *8 (rejecting class settlement and criticizing complexity of claim forms). But it gets worse. Once a claim is submitted, the Claims Administrator can investigate and "request additional documentation," which the class member must supply "in order to claim a Monetary Award . . . ." Revised Settlement § 8.6(a).

Class members whose claims are denied may appeal, but only after paying a $1,000 fee (which is refundable if the appeal is successful). Revised Settlement § 9.6(a).[43] But, the NFL may appeal an unlimited number of claim determinations without payment of any fee. *Id.* § 9.6(b). Appellants must "present evidence in support of their appeal." *Id.* § 9.7(a). Appeals are decided by the Court, who may consult with an Appeals Advisory Panel consisting of members jointly recommended by Co-Lead Class Counsel and the NFL Parties. *Id.* § 9.8. By affording the NFL unlimited appeals without disincentive to do so and by requiring appellants to

---

[43] That appeal fee will discourage many retired players from challenging adverse claim determinations. Within two years of retirement, 78% of former NFL players are under financial stress. Pablo S. Torre, *How (and Why) Athletes Go Broke*, Sports Illustrated (Mar. 23, 2009), http://sportsillustrated.cnn.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke.

present evidence on appeal, the Revised Settlement essentially requires that class members submit to a multi-tiered, mini-arbitration to receive their benefit awards.[44]

Finally, the Revised Settlement imposes a series of "anti-fraud" provisions that appear designed to decrease the number of, and the amount of awards and save the NFL money. The Claims Administrator must audit 10% of all applicants each month. Revised Settlement § 10.3(c). Auditors may demand additional information and documents from the class member.[45] Even partial non-compliance with the demand requires denial of the claim "without right to an appeal." *Id.* § 10.3(b)(ii).

This complex procedural framework is a transparent attempt to minimize the cost of the settlement to the NFL – a consideration of tremendous importance now that the so-called "cap has been lifted."[46] Class Counsel certainly could have negotiated a simpler payment process.

---

[44] The claims administration process may ultimately operate in a manner similar to current disability programs jointly administered by the NFL and the NFLPA. Just 34% of the applications submitted for temporary and permanent disability are approved in the initial stage. L. Elaine Halchin, *Former NFL Players: Disabilities, Benefits, and Related Issues*, Congressional Research Service, at 82 (Apr. 8, 2008). Those disability programs, moreover, have been heavily criticized for improperly denying meritorious claims. *See id.* at 76-77 (quoting Michael Leahy, *The Pain Game*, Washington Post Magazine, at 10, 23 (Feb. 3, 2008)); *see also* Michael Rosenberg, *"Permanently Disabled," Harrison Fighting for Benefits NFL Took Away*, Sports Illustrated (Jan. 29, 2014), http://www.si.com/nfl/2014/01/29/dwight -harrison-nfl-pension; Michael O'Keefe, *Still Plenty of Skeptics After NFL Reaches New Deal with Players to Settle Concussion-Related Lawsuit*, New York Daily News (June 28, 2014 11:40 AM), http://www.nydailynews.com/sports/football/score-nfl-deny-issues-article-1.1847588.

[45] The scope of the information demand is extensive, including such items as all medical records in the class member's control relating to the qualifying diagnosis and a "list of all health care providers seen by the Retired NFL Football Player in the last five (5) years." Revised Settlement § 10.3(e)(i)-(ii); *see also id.* § 10.3(e).

[46] The cap's lifting is a ceremonial gesture: the NFL Parties repeatedly emphasize that they "remain undeterred in their belief that the $760 million deal originally struck would have been sufficient to compensate all Class Members with valid claims over the term of the Monetary Award Fund." Mem. 12; *see also id.* at 1, 42. But their uncapped-with-strings-attached settlement is even more troubling when the NFL Parties' ability to withstand a settlement even greater than the $765 million figure they deem sufficient is considered. The NFL projects that its

34

They did so for themselves – they will receive their $112.5 million payment within 60 days after the Revised Settlement takes effect. Revised Settlement § 21.2. Yet, their abandoned clients – many suffering serious cognitive impairment – will be left to figure it out on their own, wandering through an administrative maze that allows the NFL to say "gotcha" at every turn.

Courts have refused to approve settlements with benefits that are illusory in light of the procedural difficulty to realize them. *See Eubank*, 2014 WL 2444388, at *7-10 (rejecting settlement that "strews obstacles in the path of any" class member); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718-19, 721 (6th Cir. 2013) (rejecting class settlement, in part, due to an onerous claims process); *Walter v. Hughes Commc'ns, Inc.*, No. 09-2136, 2011 WL 2650711, at *14 (N.D. Cal. July 6, 2011) (rejecting class settlement where "[m]any hurdles stand between a class member and the receipt of . . . payment" and claim form was "unnecessarily complex," "confusingly arranged," and "invites user error"). The deficient claims process here requires denial of preliminary approval.

### C.    The Proposed Settlement Is Not the Product of Arm's Length Negotiation

Because class counsel and defendants have strong incentives to collude in crafting a class settlement, *see, e.g.*, *GM Trucks*, 55 F.3d at 787-89, a proposed settlement must arise from arm's length negotiations to receive preliminary approval. First, the settlement is riddled with intra-

---

revenues will be upwards of $25 billion by 2027. *See* Daniel Kaplan, *Goodell Sets Revenue Goal of $25 Billion by 2027 for NFL*, Sports Business Journal (Apr. 5, 2010), http://www.sportsbusinessdaily.com/Journal/Issues/2010/04/20100405/This-Weeks-News/Goodell-Sets-Revenue-Goal-Of-$25B-By-2027-For-NFL.aspx; Brent Schrotenboer, *NFL Takes Aim at $25 Billion, But At What Price?*, USA Today (Feb. 5, 2014), http://www.usatoday.com/story/sports/nfl/super/2014/01/30/super-bowl-nfl-revenue-denver-broncos-seattle-seahawks/5061197/. And last year alone the NFL had an annual revenue of more than $10 billion, Schrotenboer, *supra*, earned a reported $1 billion from licensing alone, and paid its commissioner more than $35 million, Ryan Wilson, *NFL Paid Roger Goodell $35.1 Million Last Year*, CBSSports.com (Feb. 14, 2014 3:25 PM), http://www.cbssports.com/nfl/eye-on-football/24443392/report-nfl-paid-roger-goodell-351-million-last-year.

class conflict.  Second, the generous attorneys' fee provision raises red flags that Class Counsel may have bargained away the interests of some segments of the class.  Third, the Revised Settlement gives no indication that Sub-Class Counsel and Representative Plaintiffs meaningfully participated in the negotiation process and exercised effective control and supervision over Class Counsel.  Fourth, the entire negotiation process has been burdened with a lack of transparency calling into question any alleged fairness of the proposed settlement.[47]

### 1. Intra-Class Conflict Suggests the Absence of an Arm's Length Negotiation

The intra-class conflicts in the Revised Settlement smack of a lack of arm's length negotiations.  "[T]he mere fact that negotiations transpired does not tend to prove that the class's interests were pursued," *GM Trucks*, 55 F.3d at 814, particularly "where the potential for intra-class conflict . . . [i]mperils the class's representation," *id.* at 797.  Courts cannot preliminarily approve settlements that contain "obvious deficiencies such as ***unduly preferential treatment of class representatives or segments of the class*** . . . ."  *NFL Concussion*, 961 F. Supp. 2d at 714 (emphasis added).  That is precisely the case here.  The settlement short-changes class members at future risk of developing CTE by limiting recovery to those who die before preliminary approval.  It short-changes class members who experienced a stroke or non-football related TBI by reducing awards by 75%.  And it short-changes veterans of NFL Europe by denying them credit for the seasons they played in that league.  Even "vigorous, arm's length negotiations" are meaningless unless "the lawyers actually negotiating really were doing so on behalf of the ***entire*** class."  *GM Trucks*, 55 F.3d at 797.  Class Counsel certainly did not do so here.

---

[47] When the Court previously suggested that "[t]here is nothing to indicate that the Settlement is not the result of good faith, arm's-length negotiations between adversaries," *NFL Concussion*, 961 F. Supp. 2d at 715, it did not have before it many of the concerns that Objectors raise.

2. **The Attorneys' Fee Provision Raises Concerns That Class Counsel Bargained Away Class Members' Interests**

"Collusion" between class counsel and defendants "may not always be evident on the face of a settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). Accordingly, courts have a duty to scrutinize settlements for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect negotiations." *Id.*; *see also NFL Concussion*, 961 F. Supp. 2d at 714 (noting "excessive compensation of attorneys" can preclude preliminary approval). The attorneys' fee provision here is far from a "subtle" sign. If anything, it is flashing neon.

First, the NFL Defendants – in what is known as a "clear sailing agreement" – have consented not to object to Class Counsel's fee petition. Revised Settlement § 21.1. The "'very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value'" – like compensation for all cases of CTE – "'to the class.'" *Bluetooth Headset*, 654 F.3d at 948 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)). Thus, clear sailing agreements are "disfavored." *Id.* at 949.

Second, "fee negotiations [should] be postponed until the settlement [is] *judicially approved*, not merely until the date the parties allege to have reached an agreement." *GM Trucks*, 55 F.3d at 804 (emphasis added). The circumstances suggest Class Counsel "pursued a deal with the defendants separate from . . . the deal negotiated on behalf of the class." *GM Trucks*, 55 F.3d at 803-04. In any event, this Court need not "'place . . . dispositive weight on the parties' self-serving remarks,'" *Bluetooth Headset*, 654 F.3d at 948 (quoting *GM Trucks*, 55 F.3d at 804), that the "Settling Parties did not discuss the issue of attorneys' fees at any point during the mediation sessions," Mem. 30. The timing of the Settling Parties' fee negotiations,

37

which occurred even before public release of the initial settlement agreement, suggests the absence of arm's-length negotiations.

Finally, the attorneys' fee provision authorizes Class Counsel to petition the Court for a 5% set aside – ***drawn from each claimant's settlement award*** – to "facilitate the Settlement program and related efforts of Class Counsel."  Revised Settlement § 21.1.  That provision places no limits on how Class Counsel may use the set aside (although it does require that any petition describe "how the money will be used").  *Id.*  More importantly, the provision gives no mechanism for noticing class members of Class Counsel's petition for the set aside nor does it authorize any procedures by which class members can oppose that petition.  In short, the set aside allows Class Counsel the opportunity to augment their $112.5 million attorney fee at the expense of the class.

### 3.  The Role of Sub-Class Counsel and Representative Plaintiffs Is Unknown

The role of Representative Plaintiffs and Sub-Class Counsel in negotiating the settlement and overseeing Class Counsel has been entirely hidden, further suggesting that the negotiations did not occur at arm's length.  "The protection of the absentee[ ] [class members'] rights depends in part on the extent the named plaintiffs are adequately interested to monitor the attorneys . . . ."  *GM Trucks*, 55 F.3d at 784.  Thus, the "specter of collusion" is present when "'class counsel [are] allowed to prosecute an action and negotiate settlement terms without meaningful oversight by the class representative.'"  *Olden v. Gardner*, 294 F. App'x 210, 219 (6th Cir. 2008) (quoting *In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257, 262 (N.D. Cal. 1996)).  Class Counsel have not shown such meaningful oversight here.  Although the Revised Settlement states that Representative Plaintiffs were shown the agreement and were familiar with the agreement, it says nothing about Representative Plaintiffs' participation in the negotiations.  Revised

Settlement § 25.2.  Nor did the mediator describe Representative Plaintiffs' role.  Dkt. No. 6073-4.  Indeed, media reports indicate that Co-Lead Class Counsel has "clashed with his own clients."[48]  When "class representatives provide[] no meaningful oversight of the class counsel during the settlement negotiations," the "risk of collusion weighs against the settlement."  *Olden*, 294 F. App'x at 219.

Similarly, Class Counsel offer no description of the role that Sub-Class Counsel played in the negotiation.  In fact, Class Counsel did not recruit Sub-Class Counsel until negotiations were *already underway* before the mediator.  *See* Dkt. No. 6073-4 ¶ 7.

### 4.    The Settlement Negotiation Process Has Lacked Transparency

The class members – many of whom have their own counsel – have been left in the dark throughout the process.  *See* Patrick Hruby, *Show Us Some Math*, Sportsonearth.com (Jan. 20, 2014) (describing the settlement process as "cloak[ed] [in] secrecy").[49]  There has been no indication of the bid and ask throughout the negotiations.  And despite the Court's order that economic and actuarial information should be shared with the Special Master, it is not clear that it was; and it certainly was not provided, even in summary form, to the class.  "'Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.'"  *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (per curiam) (quoting L. Brandeis, *Other People's Money* 62 (Nat'l Home Library Found. ed. 1933)).  That is particularly so in the class settlement context, where the court lacks the "clash of adversaries" that ordinarily "generate[s] the information that the judge needs to decide the case."  *Eubank*, 2014 WL 2444388, at *2 (rejecting class settlement); *see also In re*

---

[48] Steve Fainaru & Mark Fainaru-Wada, *Lawyers Fight Over Settlement Details*, ESPN.com (Jan. 24, 2014, 8:18 PM), http://espn.go.com/espn/otl/story/_/id/10346091/lead-negotiator-facing-strong-opposition-concussion-settlement.

[49] *Available at* http://www.patrickhruby.net/2014/01/show-us-some-math.html.

*Cmty. Bank of N. Va.*, 418 F.3d 277, 319 (3d Cir. 2005) (rejecting approval of settlement where district court "entrusted class counsel to prepare . . . findings [of fact] in an *ex parte* closed door session" without participation of other class members).  In the absence of transparency regarding the settlement negotiations, neither the Court nor the class members can be assured that Class Counsel zealously negotiated on behalf of absent class members.

### D. The Lack of Discovery Precludes Preliminary Approval of the Proposed Settlement

Class Counsel appear to have conducted ***no discovery*** – none.[50]  The absence of even a basic factual record precludes any reasonably valid assessment of the value of the class's claims.  Class Counsel cannot possibly have fulfilled their duty to do so and accordingly they have provided neither the class nor the Court with any basis for determining that the compromise reached is fair, adequate, and reasonable.  "[A]chiev[ing] the settlement after little or no discovery . . . raise[s] a red flag." *GM Trucks*, 55 F.3d at 806.

### 1. Class Counsel Could Not Possibly Have Fulfilled Their Duties to the Class Without Taking Any Discovery

Discovery allows counsel to develop "an adequate appreciation of the merits of the case before negotiating." *GM Trucks*, 55 F.3d at 813.  " 'The deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered.' " *Olden*, 294 F. App'x at 219 (quoting *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983)).  Thus, when no discovery is taken, courts "question[ ] whether class counsel could have negotiated in [the] best interests" of absent class members.  *Cmty. Bank*, 418 F.3d at 307 (rejecting class settlement).

---

[50]  In describing their investigation of the facts, Class Counsel describe only an informal exchange of information and point to no formal discovery.  There is no indication that any was taken.  *See* Mem. 43.

Merits discovery is particularly important in a case alleging claims like fraud and negligent concealment, where the best evidence is likely in the NFL Defendants' hands. The Complaint lists dozens of media reports and facts demonstrating the NFL's cover-up of information and willful dissemination of misinformation regarding the risks of head trauma from football. *E.g.*, Compl. ¶¶ 128-199. Investigation of these facts through discovery of the NFL's internal files could yield powerful and compelling evidence of the NFL's culpability – strengthening Class Counsel's hand at the negotiating table. Yet Class Counsel settled this case without taking a single deposition and without the NFL producing a single document related to the merits of the underlying claims. Instead, Class Counsel purport to have "exchanged information" with the NFL during the negotiation, including "expert calculations of damages." Mem. 43. But references to unspecified "information" and damages calculations say nothing about the NFL's ***liability*** and the strength of Plaintiffs' case.

That limited exchange of "information" cannot support preliminary approval of a class settlement, as *Olden v. Gardner* makes clear. In that case, class members brought suit against a corporation alleging property damage and personal injuries arising from pollution emissions from the defendant's cement plant. *Olden*, 294 F. App'x at 211. Following class certification, the class counsel entered into settlement negotiations with the defendant corporation, without obtaining any expert opinions on the alleged claims or defenses, engaging in discovery, or notifying any of the class representatives that such negotiations were taking place. *Id.* at 213-14. These factors strongly weighed against approval of the settlement on appeal because "[o]btaining expert opinions and engaging in formal discovery are usually essential to establishing a level

playing field in the settlement arena [as] it enables the class counsel to develop the merits of their case." *Id.* at 218.[51]

Negotiating blindly, Class Counsel "could not have entered into the settlement negotiations with much more than an uneducated guess as to the merits of the case and the propriety and fair value of a settlement." *Olden*, 294 F. App'x at 218. They could not "fairly, safely, and appropriately decide to settle the action." *GM Trucks*, 55 F.3d at 814.

### 2. Without Discovery, Neither the Court Nor the Class Members Can Assess the Settlement

This Court made clear that Class Counsel must "provide the court with the information needed to evaluate the fairness or adequacy of a proposed settlement." *NFL Concussion*, 961 F. Supp. 2d at 715-16 (citing cases). Without discovery on the merits, "courts have no other basis on which to conclude that counsel adequately developed the claims before deciding to settle." *GM Trucks*, 55 F.3d at 814. Neither do class members. They cannot make an informed decision about whether to go along with the settlement, object, or opt out.

### 3. Discovery Would Have Allowed Class Counsel To Overcome – or at Least Understand – What They Claim Are "Significant Challenges and Obstacles in the Litigation"

Class Counsel devote ten pages of their Memorandum in Support to discussing preemption, causation, statute of limitations, assumption of the risk, and "other defenses." Mem.

---

[51] Class Counsel's reliance on *In re Processed Egg Products Antitrust Litigation*, 284 F.R.D. 249, 267 (E.D. Pa. 2012), and *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 444 (E.D. Pa. 2008), is misplaced. *See* Mem. 43 n.17. Both cases involved extensive productions of information on the merits of the case. *Gates*, 248 F.R.D. at 444 (noting "dozens of depositions," "hundreds of pages of expert reports," and "hundreds of thousands of pages of documents" produced); *Processed Egg*, 284 F.R.D. at 271 (describing informal discovery of over 3,200 documents that described defendant's "participation in the conspiracy"). *Barani v. Wells Fargo Bank, N.A.*, on which Class Counsel also rely, similarly involved "substantial discovery." 2014 WL 1389329, at *5 (S.D. Cal. Apr. 9, 2014). The parties in *Barani* engaged in both formal and informal discovery, conducting precisely the "thorough[ ] investigat[ion]" absent here. *Id.* at *6.

61-71.  They claim that this is a tough case and that they face "stiff and complex challenges."  *Id.*
at 61.  Then, they meekly offer that whether they could have "met their burden of proof" was a
"significant consideration" in settling at this time.  *Id.*  However, it is hard to understand how
they can say this, given that whether a burden of proof is met is a question of fact, and they
developed no facts through discovery.  Had they done so, they may not have considered those
"obstacles" so "significant."

**Preemption**: Class Counsel contend that preemption under § 301 of the Labor
Management Relations Act (LMRA) presents a "significant" legal challenge for Plaintiffs in
light of the NFL Parties' referenced collective-bargaining agreements (CBAs).  Mem. 61-64.
However, § 301 only preempts "claims founded ***directly*** on rights created by collective-
bargaining agreements," or claims "***substantially dependent*** on analysis of a collective-
bargaining agreement."  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (emphasis
added) (former employees' claims against former employer were not preempted because claims
arose out of individual employment contracts and did not touch on CBA provisions).

Class Counsel ignore the importance of this point, and do not even acknowledge the
recent decision *Green v. Arizona Cardinals Football Club*, where the district court, relying on
*Caterpillar*, held that the claims of retired NFL players against the Arizona Cardinals for brain
injuries resulting from TBI ***were not precluded by the CBA***.  *Green v. Ariz. Cardinals Football
Club, LLC*, No. 14-CV-461, 2014 WL 1920468, at *3 (E.D. Mo. May 14, 2014).  The court's
reasoning holds true here:  Preemption is not triggered where a dispute only "tangentially
involve[s] a provision of a [CBA]."  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).
Stated differently, "section 301 does not preempt state law claims merely because the parties
involved are subject to a CBA and the events underlying the claim occurred on the job."

*Williams v. Nat'l Football League*, 582 F.3d 863, 874 (8th Cir. 2009). What matters is whether the plaintiffs' claims turn on rights that are actually set forth in a CBA provision or that "require interpretation or construction of the CBA" itself. *Green*, 2014 WL 1920468, at *3 (quoting *Williams*, 582 F.3d at 876) (rejecting preemption argument on ground that alleged NFL CBAs were not the source of players' claims of negligence, misrepresentation, and fraudulent concealment).

Plaintiffs' claims here turn on factual questions about the NFL's conduct – what actions or representations it did or did not perform and when and why it decided to perform them. For example, when did the NFL first learn of the connection between MTBI and neurodegenerative disease? What data did the NFL collect? How and why did it craft its public statements on concussions? Why were some of these statements directed to high school and college players, and even to parents deciding whether to allow their children to play football? Discovery is needed before any realistic assessment as to the "challenges or obstacles" Plaintiffs might face regarding preemption.

**Causation**: Class Counsel claim they face "significant legal impediments surrounding [their] ability to prove causation and obtain verdicts in the absence of a settlement." Mem. 64. But "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) (citing *Hemi Group, LLC v. City of New York,* 130 S. Ct. 983, 989 (2010)). So long as the NFL Parties' conduct constituted "a substantial factor in bringing about harm to" putative class members, that is enough to impose liability – even if Defendants "neither foresaw nor should have foreseen the

extent of the harm or the manner in which it occurred" to Plaintiffs. Restatement (Second) of Torts § 435(1) (1965).

Class Counsel are wrong to cede any ground to this defense without obtaining discovery into the Defendants' conduct. When the NFL first learned of the connection between head trauma and neurodegenerative disease, what studies it undertook concerning this information, and how and why it crafted its public statements concerning concussions, are questions that should be pursued through discovery to address the purported causation "impediment."

**Statute of Limitations**: Class Counsel contend their claims faced "a significant potential risk" of dismissal in light of the "serious challenge" presented by a statute of limitations. Mem. 65. This professed concern ignores the doctrine of fraudulent concealment, which "tolls the statute of limitations where 'through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry.'" *Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006) (quoting *Ciccarelli v. Carey Can. Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir. 1985)) (whether defendants made misrepresentations to plaintiffs and the nature of any misrepresentations is relevant to determining if fraudulent concealment tolled limitations period).

Significantly, Class Counsel ***urged*** that a statute of limitations defense should fail on this very ground in other litigation. *See Finn* Compl. ¶¶ 144-148 (the "applicable statute of limitations is tolled because Defendant's fraudulent concealment of the dangers and adverse effects of head injuries made it impossible for Plaintiffs to learn of the hazards to their health"). The question is whether a defendant undertook some "affirmative and independent act of concealment that would prevent the plaintiff from discovering the injury[,] despite the exercise of reasonable diligence." *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir. 1991). But rather than answer that factual question through evidence developed in discovery to negotiate a settlement

that compensates all injured class members, Class Counsel punted. The proposed settlement thus excludes all class members who died before January 1, 2006, unless the claimant can demonstrate that the statute of limitations would not apply. Revised Settlement § 6.2(b)

**Assumption of the Risk**: Class Counsel argue that an "assumption-of-risk" defense also potentially blocks Plaintiffs' claims. Mem. 67-70. But the assumption of the risk "doctrine is very narrow," limited only to circumstances where it is clear that "the 'nature and extent' of the risk were 'fully appreciated' and that the plaintiff voluntarily proceeded to face that risk." *Barnes v. Am. Tobacco Co.*, 984 F. Supp. 842, 869 (E.D. Pa. 1997) (quoting *Childers v. Power Line Equip. Rentals, Inc.*, 452 Pa. Super. 94 (1996)). The retired players unquestionably assumed certain bodily risks, but they did not consent to face the types of harm alleged here – harm concealed from them by Defendants. *See Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 482-83 (1929) ("One who takes part in [ ] a sport accepts the dangers that inhere in it so far as they are obvious and necessary, . . . [but a] different case would be here if the dangers inherent in the sport were obscure or unobserved, or so serious as to justify the belief that precautions of some kind must have been taken to avert them.").

Class Counsel pled facts – for which they presumably had a good-faith basis – that would easily defeat an assumption of the risk defense. The evidence supporting those allegations has not been developed through discovery.

**Statutory Employer**: Class Counsel also state that the NFL Defendants "***may*** argue they are similarly situated to a general contractor with respect to the injured players, and the injured players are akin to the employees of subcontractors." Mem. 71 (emphasis added). However, "very great care . . . must be exercised before allowing an employer to avoid his liability at common law by asserting that he is a statutory employer." *Stipanovich v. Westinghouse Elec.*

*Corp.*, 210 Pa. Super. 98, 106 (1967).  In the Third Circuit, Defendants must identify "an owner, a principal contractor[,] and a subcontractor" for the defense to apply; a party "**cannot be both the owner (or in the position of owner) and statutory employer at the same time**."  *Pozza v. United States*, 324 F. Supp. 2d 709, 712 (W.D. Pa. 2004) (citing *Jamison v. Westinghouse Elec. Corp.*, 375 F.2d 465, 469 (3d Cir. 1967) (emphasis added)).  If the defense were to be asserted, discovery would be needed into the NFL, the individual teams, and the teams' owners to examine their corporate structure and contractual relationships.

## CONCLUSION

For these reasons, the Court should deny Class Counsel's motion for conditional certification of the proposed class and subclasses and for preliminary approval of the Revised Settlement.

Dated: July 2, 2014

Respectfully submitted,

*/s/ Steven F. Molo*

William T. Hangley
Michele D. Hangley
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
(215) 496-7001 (telephone)
(215) 568-0300 (facsimile)
whangley@hangley.com
mdh@hangley.com

Linda S. Mullenix
2305 Barton Creek Blvd.
Unit 2
Austin, TX 78735
(512) 263-9330 (telephone)
lmullenix@hotmail.com

Steven F. Molo
Thomas J. Wiegand
Kaitlin R. O'Donnell
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
kodonnell@mololamken.com

Eric R. Nitz
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
enitz@mololamken.com

*Attorneys for Objectors*

47

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2014, I caused the foregoing Objection to June 25, 2014 Class Action Settlement and Opposition to Motion for Preliminary Approval of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

*Steven F. Molo*

Steven F. Molo