# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB) |
| – – – – – – – – – – – – – – – – – – – – – – – | MDL No. 2323 |
| **THIS DOCUMENT RELATES TO:** | |
| **ALL ACTIONS** | |

**CO-LEAD CLASS COUNSEL'S OMNIBUS RESPONSE TO:**
1) **DUERSON'S EMERGENCY MOTION TO MODIFY OR AMEND THE JULY 7, 2014 ORDER REQUIRING OPT-OUTS ON OR BEFORE OCTOBER 14, 2014 ["DUERSON MOTION"] [ECF No. 6172];**
2) **BUSH FAMILY'S JOINDER IN DUERSON MOTION [ECF No. 6173]; AND**
3) **RESPONSE OF 23 FORMER EMPLOYEE-PLAYERS OF THE KANSAS CITY CHIEFS TO DUERSON MOTION AND JOINDER IN DUERSON MOTION [ECF No. 6179]**

## I.  INTRODUCTION

Presently before the Court is Duerson's Emergency Motion to Modify or Amend the July 7, 2014 Order Requiring Opt-Outs On or Before October 14, 2014 [ECF No. 6172] [hereafter the "Duerson Motion"].  The Bush Family has joined in that motion [ECF No. 6173] [hereafter the "Bush Family Joinder"], and 23 former employee-players of the Kansas City Chiefs have also joined in and responded to that motion [ECF No. 6179] [hereafter the "23 Kansas City Chiefs Joinder"].[1]  Co-Lead Class Counsel oppose this motion because it seeks to alter the basic tenets of class procedure by allowing absent class members to opt out of the proposed Settlement *after* the Fairness Hearing.  The Bush Family goes so far as to request the right to opt out of the

---

[1] The Myles Plaintiffs have also filed an Emergency Motion to Modify the July 7, 2014 Order (ECF No. 6048) by Continuing the Objection and Opt-Out Deadlines to a Date After Class Counsel File Their Final Approval Papers [ECF No. 6178].  Co-Lead Class Counsel respond to that motion separately.

Settlement even "after the terms of the settlement become final and binding."[2]  This motion presents neither an emergency nor a valid basis for disrupting the orderly schedule crafted by this Court for conducting preliminary and final approval of the pending class Settlement.

The Duerson Motion should be denied.

II.     **FACTUAL BACKGROUND**

On June 25, 2014, Plaintiffs filed their unopposed motion for an Order: 1) granting preliminary approval of the proposed Class Action Settlement Agreement; (2) conditionally certifying a Settlement Class and Subclasses; (3) appointing Co-Lead Class Counsel, Class Counsel, and Subclass Counsel; (4) approving the dissemination of class notice; (5) scheduling a Fairness Hearing; and (6) staying matters as to the Released Parties and enjoining proposed Settlement Class Members from pursuing Related Lawsuits [ECF No. 6073].  Attached to that motion as Exhibit B was the complete June 25, 2014 Class Action Settlement Agreement and exhibits [ECF No. 6073-2].

Two-and-a-half months ago, on July 7, 2014, this Court issued its Order granting Plaintiffs' motion.  Therein, the Court established a traditional class settlement schedule providing deadlines for disseminating and publishing class notice, followed by deadlines for filing objections and requests for exclusion (*i.e.*, opt-out requests), followed by and culminating in a Fairness Hearing to determine whether the Settlement warrants final approval.[3]  Sequencing these actions in this precise fashion is entirely consistent with accepted judicial norms.  *See* William B. Rubenstein, 4 NEWBERG ON CLASS ACTIONS § 13:42 (5th ed. 2014) ("After preliminarily approving a proposed class action settlement, a court will order the parties to send

---

[2] Bush Family Motion at 2.

[3] The Order also provides a deadline for the Claims Administrator to file and serve, by November 3, 2014, a list of all persons who have timely opted out of the class settlement.

notice to the class of the terms of the settlement and of the class members' rights to object or opt out. The notice will specifically identify a date and time for the fairness hearing and advise class members that they may – though they need not – attend the hearing.") (citations omitted); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) ["MCL"] §§21.632 - 21.634 (2004) (expressly stating that objections should be filed "*in advance of*" the Fairness Hearing).[4]

Although the complete Settlement Agreement was submitted into the public record on June 25, 2014 and has been the subject of intense media scrutiny ever since, Duerson erroneously contends that "the real terms" of the Settlement somehow "have remained shrouded in secrecy."[5]  Duerson apparently believes that these "secrets," of which class members "may not be aware," will be revealed at the Fairness Hearing, and Duerson promises this will be "eye-opening."[6]  As a consequence, Duerson demands that the October 14, 2014 deadline for opting out of the Settlement must be extended until *after* the Fairness Hearing.  Incredibly, Duerson proposes – without any legal support – that class members be provided with multiple opportunities before and after the Fairness Hearing to see what happens to avoid being bound by any decision, so that they may "re-consider" whether they want to participate in the Settlement or pursue litigation against the NFL parties.  According to Duerson, absent class members should be afforded the right to object to the Settlement, await a decision from the Court on the

---

[4] The MCL 4th does not specifically address the timing of opt-out rights, but, as discussed *infra*, in accordance with the well-established principle that only class members may object to the settlement, courts regularly set the same deadline for opt-outs and objections.

[5] Duerson Motion at 2.

[6] *Id*. at 2-3.

Settlement's fairness, and then, if unhappy with the results, they should have "a chance to re-consider."[7]

The Duerson Motion is joined by the Bush Family.  The Bush Family Joinder alleges that their claims are "uncompensateble" under the Settlement Agreement because Lewis Bush died from takotsubo cardiomyopathy.[8]  They further acknowledge that their counsel has advised them of the perils of forfeiting their claims against the NFL "should they fail to opt-out of the settlement."[9]  Apparently, they wish to object to the Settlement, but recognizing that by opting out they would lose their standing to object, they also seek to extend the deadline for opting out. Their position is extreme in that they make the untenable request that the deadline should be extended until "after the terms of the settlement become final and binding."[10]

Similarly, the 23 Kansas City Chiefs joining in the Duerson Motion seek an opportunity to opt out of the Settlement "*after* its approval."[11]  However, they also suggest strangely that the Court must bifurcate the Fairness Hearing so that final approval of the Settlement is adjudicated *prior to* Settlement class certification proceedings.  They assert that the Court must send two separate notices to the class – first, to advise the class of the proposed Settlement and allow objections thereto, and then following the Settlement's approval, another notice to advise the class of Settlement class certification proceedings and the opportunity to opt out if the class is

---

[7] *Id.* at 3-4.

[8] Bush Family Joinder at 6.

[9] *Id.*

[10] Bush Family Joinder at 2.

[11] 23 Kansas City Chiefs Joinder at 3.

certified.[12]  They cite to no precedent sanctioning their proposal, but, rather, they contend that the Manual for Complex Litigation "has led the Court astray."[13]

The Duerson Motion and the joinders by the Bush Family and the 23 Kansas City Chiefs cannot withstand scrutiny.

## III.   ARGUMENT

### A.   The Proposed Settlement Before the Court Constitutes the Entire Agreement.

The Settlement Agreement and all exhibits, including testing protocols, injury definitions, and a detailed grid of specific monetary awards, have been placed on the record and made available to all class members.  The Settlement provides an uncapped fund that will pay all valid claims for monetary awards during the Settlement's 65-year term.  At any point during the Settlement, if a retired NFL Player receives a diagnosis for ALS, Alzheimer's Disease, Parkinson's Disease, Level 2 Neurocognitive Impairment (moderate Dementia), or Level 1.5 Neurocognitive Impairment (early Dementia), that player will be compensated.  The fact that Subclass 1 class members do not know today whether or when their medical condition will worsen such that they may be entitled to a monetary award does not render the Settlement unfair or the notice misleading.  *See, e.g.*, *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997) ("Nor does the adequacy of notice turn on the ability of an individual Class Member to calculate the amount of his or her actual recovery under the settlement.").  The actuarial analyses relied upon by the parties during their original negotiations that resulted in a capped Monetary Award Fund of $675 million are less relevant, and arguably irrelevant, now

---

[12] *Id.* at 5 ("the next step, after affording the 'notice class' an opportunity to object to the proposed settlement in accordance with Rule 23(e)(5), is to either grant or refuse certification of the class and, if certified and if the settlement is finally approved, then, and only then, may the court provide class members an opportunity to request exclusion.").

[13] *Id.* at fn. 3.

that the deal has been uncapped.  All class members will be compensated during the life of the Settlement if and when they receive a Qualifying Diagnosis of ALS, Alzheimer's, Parkinson's, or Dementia.  The class notice makes clear that only claims for diagnoses of Death with CTE prior to July 7, 2014 will be paid.[14]  There simply are no secret Settlement terms in existence, and there is no other relevant information that is needed for class members to decide whether to object to, remain in, or opt out of the Settlement.

**B.      Absent Class Members Do Not Need Any More Information or Time To Evaluate the Settlement.**

Duerson's claim that "many former NFL Players cannot, and will not, comprehend the ramifications" of the Settlement by October 14, 2014, and need additional time and information to do so, is baseless.[15]  Duerson did not, and indeed cannot, identify a single piece of information that class members would need, but have not received, to make an informed decision.

As the Court found in preliminarily approving the Settlement, the robust Notice campaign undertaken in this case, which Plaintiffs' experts predict will reach approximately 90% of Settlement class members and includes direct individual notice to identifiable Retired NFL Football Players and their heirs and paid publication notice in various media sources, including targeted notice to third parties, such as nursing homes, far exceeds the requirements of Rule 23(e)(1).[16]  The effectiveness of the Notice cannot seriously be challenged.  To date, the Settlement Website, www.NFLCONCUSSIONSETTLEMENT.com, has had 60,577 unique visitors and over 63,000 total visits.  The Call Center has received inquiries from 4,125 callers. In addition, more than 4,000 potential Settlement beneficiaries (2,850 Retired NFL Players,

---

[14] *See* Class Notice at pp. 6-8 [ECF 6093-1].

[15] Duerson Motion at 1-2.

[16] ECF No. 6083 at 18-19.

1,168 family members, 79 attorneys for class members, and others) have registered to receive further notices regarding the Settlement and the claims process.[17]  For a class of approximately 20,000 Retired NFL Players, this level of response is remarkable.  And, contrasted with only nine (9) opt-outs, the favorable interest by absent class members in the Settlement is patent.

Moreover, as effective as the Notice Plan has been, it has been supplemented by intense media scrutiny of the Settlement.  Literally hundreds of news stories addressing the settlement have been published in print, television, and online.  *See* Exhibit A (results of Google searches regarding the Settlement); *see also In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 327 n.91 (3d Cir. 1998) (noting the extensive press coverage of the settlement in concluding that notice was adequate).

Further, pursuant to this Court's September 8, 2014 Order, the parties publicly filed on September 12, 2014 the actuarial reports that they provided to the Special Master.  Duerson's counsel has since parsed those documents down to the footnotes, and absent class members have had the benefit of major news stories about many aspects of the actuarial reports.[18]  *See* Exhibit A.  The actuarial report and tabulations of Co-Lead Class Counsel's expert include incidence rates of the Qualifying Diagnoses, which allow class members in Subclass 1 to estimate the likelihood that they will develop such conditions in the future.  Amongst other things, Co-Lead

---

[17] The Settlement Agreement also contemplates that a Supplemental Class Notice will be posted on the Settlement Website to advise Class Members when the period for registration for Settlement benefits begins, when the Baseline Assessment Program commences, and when the period for submission of Claim Packages starts for Retired Players with a Qualifying Diagnosis as of the Effective Date.  *See* Settlement Agreement, §§ 4.2(c), 5.5, 8.3(a)(i).

[18] *See*, *e.g*., Ken Belson, Brain Trauma to Affect One in Three Players, N.F.L. Agrees, N.Y. Times, Sept. 12, 2014, at A1, available at http://www.nytimes.com/2014/09/13/sports/football/actuarial-reports-in-nfl-concussion-deal-are-released.html?src=twr&_r=1; Steve Fainaru and Mark Fainaru-Wada, Brain impairment begins younger, Espn.com, Sept. 13, 2014, available at http://espn.go.com/nfl/story/_/id/11513442/data-estimates-3-10-nfl-retirees-face-cognitive-woes.

Class Counsel's actuarial report also reveals the number of players expected to be compensated, and the number of players expected to enroll in the Baseline Assessment Program and provides the scientific literature supporting their conclusions.

Given the extended reach of the parties' Notice Plan and the abundance of information conveyed through the media, it cannot seriously be argued that class members have been deprived of the "required information" to make an informed opt-out decision. *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 834 (3d Cir. 1973).  In fact, it is difficult to imagine what more can be done to inform the class of the Settlement's terms and benefits.[19]

The movants nonetheless suggest that class members need to hear Objectors' challenges to the terms of the Settlement at the Fairness Hearing before making their decisions.  But there is nothing preventing them or their counsel, or any other class member for that matter, from speaking freely now about their challenges to the terms of the Settlement.

---

[19] Rule 23(e) does not require that notice of a class settlement contain "every specific detail related to the settlement." *In re Ins. Brokerage Antitrust Litig*. 282 F.R.D. 92, 110 (D.N.J. 2012). Rather, "settlement notices need only describe the terms of the settlement generally." *In re Michael Milken & Assocs. Sec. Litig*., 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (citations omitted). Given the adequacy and breadth of notice in this case, there is no reason class members cannot comply with the Court's opt-out and objection deadlines prior to the Fairness Hearing. *See Silber v. Mabon*, 18 F.3d 1449, 1451 (9th Cir. 1994) (affirming that mailing individual notice forms 40 days before the opt-out deadline and publishing notice 35 days before the opt-out deadline met best practicable notice standard); *Brown v. Colegio de Abogados de Puerto Rico*, 277 F.R.D. 73, 81-82 (D.P.R. 2011) (denying motion to extend the opt-out deadline where class members were given one month to opt out and "the opt out procedures were extremely simple"); *In re Prudential Ins. Co. of America Sales Practices Litig.*, 177 F.R.D. 216, 240 (D.N.J. 1997) (rejecting objection that a 45-day opt-out period was too short).

C.    **The Opt-Out Deadline Must Precede the Fairness Hearing to Ensure That All Objectors Have Standing to Participate and the Court Has Access to Critical Information.**

None of the movants cite a single authority that supports their request to move the opt-out deadline for all class members past the objection deadline and Fairness Hearing.[20]  Nor has our research uncovered a precedent for inverting the customary sequence of events.  Indeed, there is a good reason not to deviate from the tried-and-true sequence: allowing class members to object and participate in the Fairness Hearing and then opt out if they do not agree with the Court's rulings would be inconsistent with the well-established principle that only members of the class, *i.e.*, those who have not opted out, have standing to object to the class settlement.  *See In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.C. Cir. 2000) ("[C]lass members who have opted out of a 23(b)(3) class action have no standing to object to a subsequent class settlement; by opting out they 'escape the binding effect of the class settlement.'") (quoting *Mayfield v. Barr*, 985 F.2d 1090, 1093 (D.C. Cir. 1993)); *Wixon v. Wyndham Resort Dev. Corp.*, 2011 WL 3443650, *1 n.2 (N.D. Cal. Aug. 8, 2011) ("At the hearing on this matter, the Court advised all present that it would not hear from class members who had opted out of the Settlement Agreement, because, by opting out, those person excluded themselves from the Class,

---

[20] The only authority Duerson cites for his request to extend the opt-out deadline, MCL 4th §§ 22.611 and 22.924, does not help him.  Those sections of the MCL address Rule 23(e)(4), which provides that "[i]f the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so." Fed. R. Civ. P. 23(e)(4).  That provision does not apply here, because the action has not "previously [been] certified under Rule 23(b)(3)."  *See In re HealthSouth Corp. Sec. Litig.*, 334 Fed. App'x 248, 254 n.12 (11th Cir. 2009) (noting that Rule 23(e)(4) addresses "a situation in which the class was certified prior to approval of a settlement").  In any event, even if the class were previously certified, the provision of a second opportunity to opt out is within the sound discretion of the district court.  *See Denney v. Deutsche Bank, AG*, 443 F.3d 253, 271 (2d Cir. 2006) ("The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion.") (quoting Adv. Comm. 2003 Notes).

are not bound by the Settlement Agreement, and, thus, do not have standing to object to the

Settlement Agreement."); *Brown v. Esmor Correctional Svcs.*, 2005 WL 2474835, *3 (D.N.J.

Oct. 5, 2005) (recognizing that opt-outs "will be unaffected by the settlement agreement . . . and

have no standing to object to it"); 4 NEWBERG ON CLASS ACTIONS § 13:22 ("[C]lass members

who opt out of the settlement are no longer class members and hence, by opting out of the class,

lose the standing to object conferred by Rule 23 upon class members.").

A similar request to object and opt out if the objections were overruled was rejected in

*Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922 (E.D. Mich. 2007), where the court instructively

held:

> If an absent class member . . . desires to affect the settlement by filing objections,
> then the objector must abide by the result and be bound by the consequences.  If
> the settlement is unpalatable, the class member may opt out and avoid the binding
> effect of the settlement judgment.  To allow the class member to have it both
> ways, however, would countenance the practice of influencing litigation – or
> attempting to do so – in which the class member really has no stake.  That result is
> unacceptable.

*Id.* at 931 (citations omitted).

Similarly, in *Weinberger v. Kendrick*, 698 F.2d 61, 71-72 (2d Cir. 1982), *cert. denied sub*

*nom. Coyne v. Weinberger*, 464 U.S. 818 (1983), the Second Circuit addressed an objection by

some class members that the approved notice schedule was improper because it required that

requests to opt out be filed before the fairness hearing.  The court found that by requiring class

members to opt out *before* the fairness hearing, prospective objectors were placed in a position

no worse than that which occurs when formal class certification precedes settlement.  Thus, the

court opined, their position may even be better because they "kn[o]w the terms of the proposed

settlement before having to decide whether to opt out."  *Id*. at 72.  Other courts have held that

requiring class members to opt out before the fairness hearing complies with due process.  *See*, *e.g.*, *In re Farmers Group Stock Options Litig.*, 1991 WL 332500 (E.D. Pa. 1991).

Postponing the opt-out deadline until after the Fairness Hearing would also deprive the Court of critical information.  One of the factors the Court must consider in assessing the fairness of the Settlement is the reaction of the class to the Settlement.  *Sullivan v. DB Investors, Inc.*, 667 F.3d 273, 319-20 (3d Cir.  2011) (*en banc*) (citations omitted); *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).  The number of opt-outs and objections before the Fairness Hearing is therefore relevant to the Court's consideration.  *See*, *e.g.*,  *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (approving settlement where "only" 29 objections were made in a 281-member class); *Wallace v. Powell*, 288 F.R.D. 347, 368 (M.D. Pa. 2012) (finding "lack of objections and the low number of opt outs demonstrate a general acceptance of the Settlement by Class Members"); *Alexander v. Washington Mut., Inc.*, No. 07-4426, 2012 WL 6021098, at *8 (E.D. Pa. Dec. 4, 2012) (reaction of class favored approval of settlement where only 5 class members opted out and no formal objections were filed to the settlement); *Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 312 (E.D. Pa. 2012) (reaction of the class favored approval of settlement where "less than 1 percent of the eligible class members opted out of the settlement"); *Ins. Brokerage*, 282 F.R.D. at 103 (80 opt-outs and only 7 potential objectors out of 1.2 million class members "weighs in favor of approval."); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990) (approving settlement based on "absence of objections" and "nominal number" of opt-outs).

Duerson's proposal, along with the joinders of the Bush Family and the 23 Kansas City Chiefs, would allow class members to react *after* the Court has already ruled on the fairness of the Settlement.  Not only have these Plaintiffs cited no case law permitting such practice, their

proposal is contrary to the case law upholding schedules requiring opt-out decisions to be made *prior* to the fairness hearing.

> **D.      Extending the Opt-Out Deadline Past the Final Fairness Hearing**
> **Would Impermissibly Modify the Terms of the Settlement.**

Under the Settlement Agreement, the NFL Parties have the "absolute and unconditional right, in their sole good faith discretion, to unilaterally terminate … [the] Class Action Settlement and Settlement Agreement for any reason whatsoever following notice of Opt Outs and *prior to* the Fairness Hearing."[21]  An extension of the opt-out deadline until *after* the Fairness Hearing would impermissibly interfere with and effectively nullify the NFL's walk-away right in this case.  *See In re Diet Drugs Prods. Liab. Litig.*, 2005 WL 459641, *2 (E.D. Pa. Feb. 25, 2005) (in refusing to extend the opt-out deadline for an individual class member, the court recognized the prejudice that such extension would impose on the settling defendant that negotiated a walk-away right based on class participation); *In re Diet Drugs Prods. Liab. Litig.*, 92 Fed. App'x 890 (3d Cir. 2004) (affirming district court's refusal to permit an untimely opt-out from class settlement because the settlement contained a similar walk-away right and "being able to determine the total number of initial opt-outs by a certain date was essential to the deal between [the defendant] and the class"); *cf. Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 312 (3d Cir. 2011) (*en banc*) (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir.2010)) ("A district court is not a party to the settlement, nor may it modify the terms of a voluntary settlement agreement between parties.").

---

[21] Settlement Agreement, § 16.1 (emphasis added).  In contrast, a provision of the Settlement Agreement actually permits someone who has opted out to request, "[p]rior to the Final Approval Date," that the parties permit him or her to "revoke his or her Opt Out[.]"  *Id.* at § 14.2(c).

### E.   Rule 23 Does Not Require a Second Notice.

Without citing a single authority, the 23 Kansas City Chiefs claim the Court ran afoul of Rule 23 by setting an opt-out date prior to certifying the class, and that Rule 23 requires a second notice (with an opportunity to opt out) to be sent to class members if the Court certifies the class and approves the Settlement.  However, in addition to the MCL 4th § 21.632, which they acknowledge endorses the orderly process established by the Court but unconvincingly dismiss as wrong, Third Circuit precedent forecloses their argument.

In *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir.), *cert. denied*, 516 U.S. 8 (1995), the court squarely addressed the propriety of "a settlement class," *i.e.*, "certify[ing] the class for settlement purposes only and send[ing] a combined notice of class pendency and settlements to the class members." *Id.* at 786.  After thoroughly evaluating the merits of this procedure, the court held that "settlement classes are cognizable under Rule 23."  *Id.* at 794; *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 223 (5th Cir. 1981) (rejecting the argument that "notice of the class action should not have been combined with notice of the settlements" as "specious").

Contrary to the 23 Kansas City Chiefs' suggestion, the 2003 Amendments to Rule 23(c)(1)(C), which deleted the provision that a class certification "may be conditional," are irrelevant.  While the Third Circuit acknowledged "conditional certification" under Rule 23(c)(1) in a footnote, *see id.* at 793 at n.14, its holding did not turn on that provision.  Rather, the court recognized that an order preliminarily approving a settlement and directing notice to class members can also be conceived as creating a "tentative," "temporary," or "provisional" class, *id.* at 792-94, authorized by "the broad grant of authority in Rule 23(d)," *id.* at 792, and "the more general policies of Rule 23 – promoting justice and realizing judicial efficiencies," *id.* at 793.

13

Moreover, the Third Circuit's affirmance of class settlements that have used this procedure after 2003 confirms that the 2003 amendments did not change the well-established law in this regard. *See*, *e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 339-40 (3d Cir. 2010); *see also Denney*, 443 F.3d at 270 & n.8 (holding that "conditional certification survives the 2003 amendment to Rule 23(c)(1)" and rejecting claim that amendment to Rule 23(c)(2)(B) "indicates that no opt-out notice can be sent until after certification").

## IV.    <u>CONCLUSION</u>

Movants, facing the uncertainty of their legal claims, seek to maximize their ability to participate in the class Settlement, even to the extent of objecting to its terms.  But they still seek to preserve their right to avoid being bound by the class judgment, should it issue.  Movants can not have it both ways.  In litigation, parties and their counsel frequently have to confront and make difficult decisions.  This case is no exception.

Because there is no justification for extending the opt-out deadline until *after* the Fairness Hearing, the Duerson Motion and the related joinders of the Bush Family and the 23 Kansas City Chiefs to extend the opt-out deadline should be denied.

Dated:  October 2, 2014

                                   Respectfully submitted,

                                   /s/ Christopher A. Seeger_____
                                   Christopher A. Seeger
                                   SEEGER WEISS LLP
                                   77 Water Street
                                   New York, NY 10005
                                   Phone:  (212) 584-0700
                                   Fax:  (212) 584-0799
                                   cseeger@seegerweiss.com

                                   **Co-Lead Class Counsel**

Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, PA 19103
Phone:  (215) 735-1130
Fax:  (215) 735-2024

**Co-Lead Class Counsel**

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing was served electronically via the

Court's electronic filing system on the 2nd day of October, 2014, upon all counsel of record.

Dated: October 2, 2014

/s/ Christopher A. Seeger

Christopher A. Seeger