**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>        Plaintiffs,<br><br>            v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>        Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**OBJECTION OF SEAN MOREY, ALAN FANECA, BEN HAMILTON,
ROBERT ROYAL, RODERICK "ROCK" CARTWRIGHT,
JEFF ROHRER, AND SEAN CONSIDINE
TO CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

I.     Procedural History ................................................................................................ 4

     A.    Initial Litigation ..........................................................................................4

     B.    The January 6, 2014 Class Action Complaint and Initial Settlement .....................4

           1.    The Class Action Complaint .........................................................5

                 a.    The NFL's Duty of Care and the MTBI Committee ........................6

                 b.    Criticism of the MTBI Committee ...................................7

                 c.    The NFL's Representations About Head Injuries ..........................9

           2.    The Initial Settlement ...............................................................11

     C.    Objectors' Motion To Intervene ................................................................12

     D.    The Revised Settlement ............................................................................13

           1.    Compensation ...........................................................................13

           2.    Eligibility .................................................................................14

           3.    The Release ...............................................................................16

           4.    Attorneys' Fees ........................................................................16

     E.    Opposition to Preliminary Approval ...........................................................17

     F.    Preliminary Approval ...............................................................................17

II.    Background of Objectors ..................................................................................... 18

ARGUMENT .................................................................................................................. 19

I.     The Lack of Adequate Representation Precludes Certification ........................................ 20

i

A.    The Failure-To-Compensate-CTE Conflict Demonstrates Lack of
      Adequate Representation ..................................................................22

      1.    Chronic Traumatic Encephalopathy (CTE) ...............................22

      2.    CTE in the NFL ...............................................................24

      3.    The Settlement Compensates Only a Few Prior Cases of CTE to the
            Exclusion of Current and Future Cases of CTE ........................25

            a.    Arbitrary Limitation of CTE Awards ...........................25

            b.    The Representative Plaintiffs Did Not Protect the Interests
                  of Class Members Who Suffer from or Who Are at Risk of
                  Suffering from CTE .................................................27

            c.    There Is No Justification for the Settlement's Failure To
                  Compensate Current and Future Cases of CTE ...........29

B.    The 75% Offsets Demonstrate Lack of Adequate Representation ......33

C.    The Failure To Credit Seasons Played in NFL Europe Demonstrates Lack of
      Adequate Representation ..................................................................35

II.   The Notice Is False, Misleading, and Inconsistent with Rule 23 and Due Process ........ 38

A.    The Notice Contains Overtly False and Misleading Statements .........................39

      1.    The Short Form Notice ....................................................39

      2.    The Long Form Notice .....................................................41

B.    The Notice Is Similar to Communications Courts Have Found Misleading in
      Other Contexts ...............................................................................46

C.    Class Counsel's Propaganda Campaign Has Compounded the False and
      Misleading Nature of the Notice ........................................................49

D.    False and Misleading Notice Has, in Fact, Misinformed Players and Falsely
      Assured Them That the Settlement Provides Benefits It Lacks .........................53

III.  The Settlement Is Unfair, Unreasonable, and Inadequate ................................. 54

A.    The Complete Absence of Discovery Weighs Against Approval of
      the Settlement ...............................................................................56

B.    The NFL's Ability To Withstand a Far Greater Judgment Than That
      Provided by the Settlement Weighs Against Approval of the Settlement ............58

C.    The Negative Reaction of the Class Weighs Against
      Approval of the Settlement .......................................................................60

D.    The Risks of Establishing Liability and Damages Weigh Against
      Approval of the Settlement .......................................................................62

      1.    Even Without Discovery, Publicly Available Information Shows the
            Strength of Plaintiffs' Claims .....................................................62

            a.    The NFL Assumed a Duty of Care To Guard Player Health
                  and Safety.........................................................................62

            b.    Medical Studies Show That the NFL Knew or Should Have
                  Known of the Link Between MTBI and Brain Damage,
                  Particularly the Onset of CTE.........................................63

            c.    The NFL Actively Worked To Conceal the Correlation
                  Between MTBI and Brain Damage...................................64

      2.    Discovery Would Have Allowed Class Counsel To Overcome –
            or at Least Understand – the Supposed "Stiff and Complex
            Challenges" to a Successful Suit ...................................................65

E.    The Best Possible Recovery and the Risks of Litigation Weigh Against
      Approval of the Settlement .......................................................................70

      1.    The Proffered Value of the Settlement Is Illusory Because the
            Settlement Leaves Many Class Members Without Compensation for
            Their MTBI-Related Diseases ......................................................70

      2.    The Proffered Value of the Settlement Is Illusory Because It Sets an
            Unreasonably High Bar To Qualify for Dementia ...................72

      3.    The Proffered Value of the Settlement Is Illusory Because the
            Baseline Assessment Program Is Underinclusive ....................73

      4.    The Proffered Value of the Settlement Is Illusory Because the
            Settlement Requires Class Members To Navigate a Complex
            Procedural Maze To Secure Recovery ......................................74

            a.    Class Members Are Required To "Opt In" and Meet
                  Arbitrary Examination Deadlines .................................75

   b. Class Members Are Required To Prepare and File an Unreasonably Complex and Ambiguous "Claim Package" ..........76

   c. Class Members Are Subject to Additional Arbitrary Procedures That Will Limit Compensation ..............................778

  5. Other Factors Demonstrate That the Value of the Settlement Is Unreasonable in Light of the Best Possible Recovery ...........................79

   a. The Attorneys' Fee Provision ....................................... 80

   b. The Role of the Representative Plaintiffs .................................. 81

   c. The Settlement Negotiation Process ............................................. 82

 F. The Likelihood of Maintaining Class Status Weighs Against Approval of the Settlement.........................................................................................82

 G. The Potential Complexity, Expense, and Likely Duration of the Litigation Weigh Against Approval of the Settlement .........................................84

IV. Objectors Should Be Permitted To Object and Appear at the Fairness Hearing Even if They Later Opt Out ................................................................ 85

CONCLUSION ..................................................................................................... 88

APPENDIX A: BACKGROUND OF OBJECTORS.................................................A1

APPENDIX B: CTE AND ITS SYMPTOMS.................................................A4

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971).....................55

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985)...................................66

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)........................... *passim*

*Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476 (Mass. 2004)..........................48

*Barani v. Wells Fargo Bank, N.A.*, No. 12-2999, 2014 WL 1389329
    (S.D. Cal. Apr. 9, 2014)...........................................................58

*Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998).................................68

*Barnes v. Am. Tobacco Co.*, 984 F. Supp. 842 (E.D. Pa. 1997) ...........................68

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)...............80

*Bohus v. Beloff*, 950 F.2d 919 (3d Cir. 1991) ...........................................68

*In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 333 F.3d 763
    (7th Cir. 2003)...................................................................85

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) .......................................82

*In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257 (N.D. Cal. 1996)...................81

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993) ..............................47

*Caterpillar, Inc. v. Williams*, 482 U.S. 386 (1987)......................................66

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)...........................55, 58, 85

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005) ...........................56, 82

*County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295
    (2d Cir. 1990)...................................................................55

*Devlin v. Scardelletti*, 536 U.S. 1 (2002) ...............................................87

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ............21, 28, 37

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013)...............................79

*Eichenholtz v. Brennan*, 52 F.3d 478 (3d Cir. 1995) ................................86, 87

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)............................... *passim*

*Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107 (3d Cir. 1992) .......................................86

*Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004) ...................46

*Gates v. Rohm & Haas Co.*, 248 F.R.D. 434 (E.D. Pa. 2008) ........................................58

*In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106
    (7th Cir. 1979)......................................................................................................55

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768
    (3d Cir. 1995)................................................................................................ *passim*

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) ...................................28

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).........................................3, 19, 55, 57, 82

*Green v. Ariz. Cardinals Football Club, LLC*, No. 14-CV-461,
    2014 WL 1920468 (E.D. Mo. May 14, 2014) ........................................................66

*Jamison v. Westinghouse Elec. Corp.*, 375 F.2d 465 (3d Cir. 1967)...........................69

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*,
    285 F. Supp. 2d 389 (S.D.N.Y. 2003).....................................................................47

*Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105 (D. Conn. 2005)....................................47

*In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010) ......................39, 45

*Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997).......................................84

*Larson v. AT&T Mobility LLC*, 687 F.3d 109 (3d Cir. 2012).......................................38

*In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258
    (S.D.N.Y. 2011).....................................................................................................47

*Manual for Complex Litigation* (4th) § 21.311-.312 ...................................................37

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297
    (C.D. Cal. 1996).....................................................................................................46

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677
    (7th Cir. 1987)...................................................................................................19, 55

*McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227 (Cal. Ct. App. 2006).......................48

*McNeil-PPC, Inc. v. Pfizer, Inc.*, 351 F. Supp. 2d 226 (S.D.N.Y. 2005) .....................48

*Mest v. Cabot Corp.*, 449 F.3d 502 (3d Cir. 2006)......................................................68

*Mills v. Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008)..................................................57

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ........................................................39, 45

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773
    (3d Cir. 2001)..................................................................................................85

*Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479 (1929)...................................68

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    961 F. Supp. 2d 708 (E.D. Pa. 2014) ...............................................................12

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154
    (3d Cir. 2001)..................................................................................................83

*Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008)...................................................81

*Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004)................................................84

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158
     (E.D. Pa. 1997)...............................................................................................83

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .................................................37, 59

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ...............................................84

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010).................................19

*Phila. Housing Auth. v. Am. Radiator & Standard Sanitary Corp.*,
    323 F. Supp. 364 (E.D. Pa. 1970) ....................................................................53

*Pozza v. United States*, 324 F. Supp. 2d 709 (W.D. Pa. 2004).....................................69

*In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012) .............58

*In re Prudential Ins.*, 148 F.3d 283 (3d Cir. 1998).................................................58, 83

*Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827 (3d Cir. 1995)....................87

*In re Sch. Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986)...............................................83

*SEC v. Rana Research, Inc.*, 8 F.3d 1358 (Fed. Cir. 1993) .....................................46, 49

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981) ...............................................................55

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)....................47

*Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011) .........................................................67

*Sterling Drug, Inc. v. FTC*, 741 F.2d 1146 (9th Cir. 1984) ....................................48

*Stipanovich v. Westinghouse Elec. Corp.*, 210 Pa. Super. 98 (1967) ...........................69

*Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) .......................................46, 49

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)................................70

*Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) ....................57

*Walter v. Hughes Commc'ns, Inc.*, No. 09-2136, 2011 WL 2650711
    (N.D. Cal. July 6, 2011) ........................................................................79

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)....................37, 58

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991) ........................80

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ..............................................55

*Williams v. Nat'l Football League*, 582 F.3d 863 (8th Cir. 2009)................................66

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)..............................................56

## STATUTES & RULES

15 U.S.C. § 45...................................................................................................48

15 U.S.C. § 52...................................................................................................48

28 U.S.C. § 185.................................................................................................66

Fed. R. Civ. P. 23..............................................................................................20

Fed. R. Civ. P. 23(a)....................................................................................82, 83

Fed. R. Civ. P. 23(a)(1)......................................................................................83

Fed. R. Civ. P. 23(a)(2)......................................................................................83

Fed. R. Civ. P. 23(a)(3)......................................................................................83

Fed. R. Civ. P. 23(a)(4).............................................................................. *passim*

Fed. R. Civ. P. 23(b)(3).............................................................................. *passim*

Fed. R. Civ. P. 23(c)(2)......................................................................................38

Fed. R. Civ. P. 23(c)(2)(B).........................................................................2, 20, 38

Fed. R. Civ. P. 23(e) ...........................................................................19, 20, 38, 55

Fed. R. Civ. P. 23(e)(1) ........................................................................................38

Fed. R. Civ. P. 23(f) ................................................................................17, 29, 30, 85

Cal. Bus. & Prof. Code §§17200 *et seq.* ..............................................................48

### OTHER AUTHORITIES

7AA *Federal Practice & Procedure* § 1785.3 (3d ed. 2014) .......................................56

Ayala *et al.*, *Racial/Ethnic Disparities in Mortality by Stroke Subtype in the United States, 1995-1998*, 154 Am. J. of Epidemiology 1057 (2001) .................................71

Banks, *Former Players: Devil Is in the Details with NFL Concussion Settlement*, SI.com (Aug. 29, 2013), http://www.si.com/nfl/2013/08/29/nfl-concussion-lawsuit-settlement-player-reaction-kevin-mawae ......................................................................61

Battista, *A Player's Concussion, a Family's Ordeal*, N.Y. Times (Sept. 15, 2012), http://www.nytimes.com/2012/09/16/sports/football/former-nfl-player-mitch-white-learns-to-adjust-to-postconcussion-life.html?pagewanted=all .................................36

Baugh *et al.*, *Chronic Traumatic Encephalopathy: Neurodegeneration Following Repetitive Concussive and Subconcussive Brain Trauma*, 6 Brain Imaging & Behavior 244 (2012) ..........................................................................................31

Baugh *et al.*, *Current Understanding of Chronic Traumatic Encephalopathy*, 16 Current Treatment Options in Neurology 306 (2014) .......................................23

Belson, *For Retirees, Decision on Concussion Settlement Will Not Be a Simple One*, N.Y. Times (July 22, 2014), http://www.nytimes.com/2014/07/23/sports/football/nfl-concussion-settlement-divides-former-players.html?_r=0 ....................................50

Bigler, *Neuropsychology and Clinical Neuroscience of Persistent Post-Concussive Syndrome*, 14 J. Int'l Neuropsychological Soc'y 1 (2008).......................................34

Borden, *Brain Trauma Extends Reach into Soccer*, N.Y. Times (Sept. 23, 2014), http://www.nytimes.com/2014/09/24/sports/soccer/soccer-star-bellini-is-found-to-have-had-brain-trauma.html?_r=1 ........................................................................32

Brandeis, *Other People's Money* (Nat'l Home Library Found. ed. 1933) .................82

Breslow, *76 of 79 Deceased NFL Players Found to Have Brain Disease*, PBS Frontline (Sept. 30, 2014), http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/76-of-79-deceased-nfl-players-found-to-have-brain-disease/ ............................24

Burke *et al.*, *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 Neurology 1 (2013)........................................................................................34

Busse & Silverman, *Electroencephalographic Changes in Professional Boxers*,
   149 J.A.M.A. 1522 (1952) ..............................................................................................63

Cantu, *Chronic Traumatic Encephalopathy in the National Football League Player*,
   61 Neurosurgery 223 (2007) ..........................................................................................63

Casson *et al.*, *Is There Chronic Brain Damage in Retired NFL Players? Neuroradiology,
   Neuropsychology, and Neurology Examinations of 45 Retired Players*, 6 Sports
   Health 384 (2014) ..........................................................................................................34

Dale, *NFL: Nearly Three in 10 Ex-Players Will Develop Debilitating Conditions*,
   Associated Press (Sept. 12, 2014), http://online.wsj.com/articles/nfl-nearly-three-in-
   10-ex-players-will-develop-debilitating-brain-conditions-1410571935................................54

DeGory, *New Concussion Settlement a Win-Win*, SI.com (June 26, 2014),
   http://mmqb.si.com/2014/06/26/new-concussion-settlement-kevin-turner ...........................51

ESPN.com, *Reaction to the Concussion Deal* (Aug. 30, 2013),
   espn.go.com/nfl/story/_/id/9612672/reaction-nfl-concussion-settlement...............................60

Fainaru & Fainaru-Wada, *Brain Impairment Begins Younger*, ESPN.com
   (Sept. 13, 2014), http://espn.go.com/nfl/story/_/id/11513442/data-estimates-3-10-nfl-
   retirees-face-cognitive-woes ..........................................................................................53

Fainaru & Fainaru-Wada, *Lawyers Fight Over Settlement Details*, ESPN.com
   (Jan. 24, 2014, 8:18 PM), http://espn.go.com/espn/otl/story/_/id/10346091/lead-
   negotiator-facing-strong-opposition-concussion-settlement.................................................81

Fainaru-Wada & Fainaru, *League of Denial* (2013).........................................................25, 26, 63

Fainaru-Wada & Fainaru, *Seaus to Opt Out of Concussion Deal* (Sept. 3, 2014),
   http://abcnews.go.com/Sports/seaus-opt-concussion-deal/story?id=25230257 ....................51

Fenno, *Hall of Famer Joe DeLamielleure Will Object to NFL Concussion Deal*, The L.A.
   Times (Sept. 4, 2014), http://www.latimes.com/sports/sportsnow/la-sp-sn-nfl-
   concussion-deal-joe-delamielleure-20140904-story.html ..................................................61

Futterman & Clark, *Deal in Concussion Suit Gives NFL a Big Victory*,
   Wall St. J. (Aug. 29, 2013), online.wsj.com/article/SB1000142412
   7887324463604579042980915590474.html ..................................................................60

Futterman *et al.*, *NFL: The League that Runs TV*, Wall St. J.
   (Dec. 15, 2011), http://online.wsj.com/article/SB10001424052970
   2040268045770987740370758332.html ......................................................................59

Gavett *et al.*, *Chronic Traumatic Encephalopathy: A Potential Late Effect of Sport-
   Related Concussive and Subconcussive Head Trauma*, 30 Clinical Sports Medicine
   179 (2011)....................................................................................................................23

Guskiewicz *et al.*, *Association Between Recurrent Concussion and Late-Life Cognitive Impairment in Retired Professional Football Players*, 57 Neurosurgery 719 (2005) ............63

Halchin, *Former NFL Players: Disabilities, Benefits, and Related Issues*, Congressional Research Service (2008) ....................................................................78

Hruby, *Cutting them Short*, Sportsonearth.com (July 18, 2014), http://www. sportsonearth.com/article/85045740/nfl-concussion-settlement-cuts-cte-coverage-short-patrick-hruby ...............................................................................................53

Hruby, *Show Us Some Math*, Sportsonearth.com (Jan. 20, 2014), http://www.patrickhruby.net/2014/01/show-us-some-math.html ...........................................82

Hruby, *The Case Against the NFL*, The Post Game (Feb. 29, 2012), www.thepostgame.com/blog/hruby-tuesday/201202/case-against-nfl ..................................64

Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*, 9 Nature Reviews Neurology 222 (2013) ....................................................................22

Kain, *It's Just a Concussion: The National Football League's Denial of a Causal Link Between Multiple Concussions and Later-Life Cognitive Decline*, 40 Rutgers L.J. 697 (2009) .................................................................................63

Kakar *et al.*, *Cerebral Microbleeds: A New Dilemma in Stroke Medicine*, 1 J. Royal Soc'y of Med. Cardiovascular Disease 1 (2012) ....................................34

Kaplan, *Goodell Sets Revenue Goal of $25B by 2027 for NFL*, Sports Business Journal (Apr. 5, 2010), http://www.sportsbusinessdaily.com/Journal/Issues/2010/04/20100405/This-Weeks-News/Goodell-Sets-Revenue-Goal-Of-$25B-By-2027-For-NFL.aspx ..................................59

Leahy, *The Pain Game*, Washington Post Magazine (Feb. 3, 2008)...........................................78

*Legal Issues Relating to Football Head Injuries (Part I & II): Hearings Before the H. Comm. on the Judiciary*, 111th Congress (2010), http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg53092/pdf/CHRG-111hhrg53092.pdf ..........65

Lehman *et al.*, *Neurodegenerative Causes of Death Among Retired National Football League Players*, 79 Neurology 1970 (2012)....................................................................32

Martland, *Punch Drunk*, 91 J.A.M.A. 1103 (1928)....................................................................63

McKee *et al.*, *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, 68 J. Neuropathology & Experimental Neurology 709 (2009)....................................................................................................63

McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43 (2013) ............................................................................ *passim*

Mihoces, *NFL Reaches Concussion Settlement*, USA Today (Aug. 29, 2013), http://
www.usatoday.com/story/sports/nfl/2013/08/29/nfl-concussion-settlement-judge-
anita-brody-tony-dorsett-jim-mcmahon-junior-seau/2727483 ................................52

Mitsis *et al.*, *Tauopathy PET and Amyloid PET in the Diagnosis of Chronic Traumatic
Encephalopathies*, 4 Translational Psychiatry 1, (2014) ....................................22, 32

Montenigro *et al.*, *Clinical Subtypes of Chronic Traumatic Encephalopathy*,
6 Alzheimer's Research & Therapy 68 (2014) .....................................................23

Moran, *Seau Family Says "No" to NFL Settlement*, U-T San Diego
(Sept. 3, 2014), http://www.utsandiego.com/news/2014/sep/03/seau-family-says-no-
to-nfl-settlement/.................................................................................................61

National Football League, *NFL Outlines for Players Steps Taken to Address Concussions*
(Aug. 14, 2007), http://www.nfl.com/news/story/09000d5d8017
cc67/article/nfl-outlines-for-players-steps-taken-to-address-concussions...............65

National Institute for Occupational Safety and Health, *Brain and Nervous System
Disorders Among NFL Players* (Jan. 2013),
http://www.cdc.gov/niosh/pgms/worknotify/pdfs/NFL_
Notification_02.pdf.............................................................................................26

*Newberg on Class Actions* § 9:43 (5th ed.)..............................................................85

*Newberg on Class Actions* § 13:23 (5th ed.)............................................................86

NFL.com, *Players* (entry for "George Halas"),
http://www.nfl.com/player/georgehalas/2515602/profile......................................76

*NFL Concussions Fast Facts*, CNN U.S. (July 21, 2014),
http://www.cnn.com/2013/08/30/us/nfl-concussions-fast-facts/ ...........................64

*NFL Concussion Settlement, REAL Information You Need to Know*, Real Football Wives
(and Lives) (Sept. 2, 2014), http://www.blogtalkradio.com/realfootballwives/
2014/09/02/nfl-concussion-settlement-real-information-you-need-to-know .........52

*The NFL CTE Question*, The Pro Football Concussion Report (July 22, 2014),
http://profootballconcussions.com/the-nfl-cte-question ........................................51

NFL Europe/WLAF Player Register, *The Football Database*, http://www.foot
balldb.com/nfl-europe/nfleplayers.html...............................................................72

Nicholson, *NFL Europe's Injured Flown to Birmingham*,
Birmingham Business Journal (July 1, 2001),
http://www.bizjournals.com/birmingham/stories/2001/07/02/story2.html?page=all ..............36

O'Keefe, *Still Plenty of Skeptics After NFL Reaches New Deal with Players to Settle Concussion-Related Lawsuit*, N.Y. Daily News (June 28, 2014), http://www.nydailynews.com/sports/football/score-nfl-deny-issues-article-1.1847588 ........78

Omalu *et al.*, *Chronic Traumatic Encephalopahty in a National Football League*, 57 Neurosurgery 128 (2005) ...................................................................................................63

Omalu *et al.*, *Chronic Traumatic Encehpalopathy in a National Football League Player: Part II*, 59 Neurosurgery 1086 (2006) ...................................................................63

Pellman *et al.*, *Concussion in Professional Football: Summary of the Research Conducted by the National Football League's Committee on Mild Traumatic Brain Injury*, 21 Neurosurgery Focus 1 (2006)....................................................................64

*Restatement (Third) of Torts: Phys. & Emot. Harm* § 36 (2010) .................................67

Roberts, *Brain Damage in Boxers: A Study of the Prevalence of Traumatic Encephalopathy Among Ex-Professional Boxers* 61 (1969)........................................63

Rosenberg, *"Permanently Disabled," Harrison Fighting for Benefits NFL Took Away*, Sports Illustrated (Jan. 29, 2014), http://www.si.com/nfl/2014/01/29/dwight-harrison-nfl-pension ...........................................................................................................................78

Saulle & Greenwald, *Chronic Traumatic Encephalopathy: A Review*, Rehabilitation Research & Practice (2012) .............................................................................................22

Schrotenboer, *NFL Takes Aim at $25 Billion, But At What Price?*, USA Today (Feb. 5, 2014), http://www.usatoday.com/story/sports/nfl/super/2014/01/30/super-bowl-nfl-revenue-denver-broncos-seattle-seahawks/5061197/ .............................................................59

Schwarz, *Concussion Committee Breaks with Predecessor*, N.Y. Times (June 1, 2010), http://www.nytimes.com/2010/06/02/sports/football/02concussion.html ...................................................................................................................10

Schwarz, *Expert Ties Ex-Player's Suicide to Brain Damage*, http://www.nytimes.com/2007/01/18/sports/football/18waters.html?pagewanted=all N.Y. Times (Jan. 18, 2007)..................................................................................25, 63

Schwarz, *N.F.L. Acknowledges Long-Term Concussion Effects*, N.Y. Times (Dec. 20, 2009), http://www.nytimes.com/2009/12/21/sports/football/21concussions.html?_r=0 .................................................................................10

Smith, *In Depth with Graham Bensinger* (Sept. 18, 2014), http://sports.yahoo.com/video/emmitt-smith-20k-concussion-settlement-110000539.html .......................................................................................................61

*State of Play: Brain Injuries and Diseases of Aging: Hearing Before the S. Special*
   *Comm. on Aging*, 113th Cong. 3 (2014),
      http://www.aging.senate.gov/imo/media/doc/Stern_6_25_14.pdf ...................................23, 31

Steele, *Players Wrong on Key Factor in NFL Concussion Settlement*,
   Sporting News (July 14, 2014), http://www.sportingnews.com/nfl/story/2014-07-
   14/nfl-concussions-lawsuit-cte-symp
   toms-eligible-settlement-tony-dorsett-wycheck-seeger ...........................................................50

Stern *et al.*, *Clinical Presentation of Chronic Traumatic Encephalopathy*,
   81 Neurology 1123 (2013)...................................................................................................23, 30

Torre, *How (and Why) Athletes Go Broke*, Sports Illustrated (Mar. 23, 2009), www.
   si.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke..................................77

Toups, *How Many Times Will You Crash Your Car?*, Forbes (July 27, 2011),
   http://www.forbes.com/sites/moneybuilder/
   2011/07/27/how-many-times-will-you-crash-your-car/ ........................................................33

Wilson, *NFL Paid Roger Goodell $35.1 Million Last Year*, CBSSports.com
   (Feb. 14, 2014), http://www.cbssports.com/nfl/eye-on-football/24443392/report-nfl-
   paid-roger-goodell-351-million-last-year ...........................................................................59

Wolfley, *Dorsey Levens Rips Settlement of Concussion Lawsuit Against NFL*, Milwaukee
   Journal Sentinel (Sept. 18, 2013), http://www.jsonline.com/sports/dorsey-levens-rips-
   settlement-of-concussion-lawsuit-against-nfl-b99101255z1-224335851.html .....................60

Zorumski & Rubin, *The Financial Cost of Dementia*, Psychology Today
   (Oct. 10, 2013); http://www.psychologytoday.com/blog/demystifying-
   psychiatry/201310/the-financial-cost-dementia....................................................................73

## INTRODUCTION

Objectors agree that "the interests of all parties would be best served by a negotiated resolution of this case." Dkt. No. 5235. Many class members suffer from seriously debilitating injuries in need of immediate medical intervention. Sadly, those injuries affect not only those former players but also their wives, girlfriends, and others around them. Moreover, Defendants' significant misconduct – as alleged in the Class Complaint and trumpeted by Co-Lead Class Counsel early in the case – should not go unaddressed. Yet a settlement that forever adjudicates the rights of thousands of absent class members must be both substantively and procedurally fair, adequate, and reasonable. This Settlement is not, and it should be rejected.

A fair settlement is a compromise with each side giving and getting. But here, the real benefits run to the NFL, which gets a near-absolute release without providing adequate and reasonable compensation in return, and to Class Counsel, who get an extraordinary fee as part of the process. A settlement under these terms is no compromise. It is capitulation.

The Settlement's defects can be fairly summarized as follows:

*A lack of adequate representation.* The rights of a significant percentage of class members were bargained away without representation by a representative class member or counsel, and the Settlement fails to provide structural assurance of due process protections to all class members. The Settlement includes three conflicts of interest that clearly violate Federal Rule of Civil Procedure 23(a)(4) and the Supreme Court's holding in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997): (1) the failure to compensate chronic traumatic encephalopathy (CTE) in those who suffer or die after July 7, 2014; (2) the 75% offsets for non-NFL experienced traumatic brain injuries and strokes; and (3) the failure to credit time played in NFL Europe.

*A failure to compensate core class injuries.* Co-Lead Class Counsel have rightly proclaimed that "CTE is believed to be the most serious and harmful disease that results from

1

NFL and concussions."[1]   "Thousands of football players, many of whom are thought to have suffered more than one hundred mild traumatic brain injuries, are dealing with horrible and debilitating symptoms."[2]   There is little co-morbidity among CTE and the other diseases compensated in the Settlement.  In other words, players can have CTE without having the other diseases.  Yet the Settlement provides a $4 million payment for death with CTE before July 7, 2014, but nothing for players suffering from – or even dying from – CTE after that date.  Nor does the Settlement compensate other maladies – including unprovoked seizures and depression – caused by head injuries class members suffered while playing in the NFL.

   ***A lack of proper notice.***  The slickly packaged notice fails to fairly inform class members of their rights in "plain, easily understood language."  Fed. R. Civ. P. 23(c)(2)(B).  The notice is misleading at its best, and outright false at its worst.  And Class Counsel and their colleagues

---

[1] Co-Lead Class Counsel Seeger Weiss used to have on its website a tutorial relating to MTBI and football:

> Frequent brain trauma or multiple football concussions . . . has shown to cause serious mental health problems.  ***Thousands of football players, many of whom are thought to have suffered more than one hundred mild traumatic brain injuries, are dealing with horrible and debilitating symptoms***.

> Multiple medical studies have found direct correlation between football concussions and suffering from symptoms of chronic traumatic encephalopathy, also known as CTE.  ***CTE is believed to be the most serious and harmful disease that results from NFL and concussions.***  CTE is a progressive degenerative disease that causes damage to the brain tissue and the accumulation of Tau Proteins.

*Up-To-Date Information on NFL Concussions*, Seeger Weiss LLP, (Sept. 9, 2014), http://www.seegerweiss.com/football-concussions/#ixzz3CByVHxui (emphasis added) (attached as Exhibit 1) (all exhibit references refer to exhibits attached to the Declaration of Eric R. Nitz).  Seeger Weiss quickly removed that language after oral argument in the Third Circuit on September 10, 2014, at which the inadequate representation and failure to compensate CTE, as well as this language on their website, was raised.

[2] *Id.*

have compounded the problem with an aggressive propaganda campaign – laced with misinformation – urging players to accept the settlement.

**An unnecessarily complex and confusing claims process.**   The claims administration process establishes what is essentially an opt-in class, with players required to register within 180 days or forfeit any benefits.   Once registered, class members – many of whom are neurocognitively and economically challenged – face a complex and ill-defined process that includes undergoing unreasonable and burdensome testing as well as unlimited appeals at no cost to the NFL but a $1,000 fee for appeals by class members.   The inevitable effect and undeniable intent is to limit claims paid.

**A failure to use appropriate testing to determine qualifications for compensation.**   The Settlement's evaluative testing is not appropriate for determining whether retired professional football players have brain damage, neurodegenerative diseases, or neurocognitive diseases. Rather, it is appropriate only in evaluating younger individuals.   Further, the Settlement requires an unrealistically high level of cognitive impairment that would leave many class members with documented cognitive deficits without compensation.

**A failure to demonstrate the other indicia required for a fair, adequate, and reasonable settlement.**   The Third Circuit has articulated a series of factors to be considered in determining whether a class settlement should be approved.   *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).   The Settlement falls flat when those factors are considered.   For example: there was no formal discovery; the NFL can withstand a far greater judgment than what will be paid; the reaction of the class has been understandably negative; and the risks of establishing liability and attendant damages are not high.

In sum, the Settlement is legally defective and plainly unfair.   Approval should be denied.

## BACKGROUND

### I.   Procedural History

#### A.   Initial Litigation

In 2011, retired NFL players and their families began suing the NFL, alleging that the NFL breached its duty to protect the health and safety of players and actively misled them about the risks of repeated mild traumatic brain injuries (MTBI).  Dkt. No. 6073-5.  In 2012, the Judicial Panel on Multidistrict Litigation consolidated these cases in the Eastern District of Pennsylvania.  Dkt. No. 1.  The NFL Defendants moved to dismiss the complaints on file on preemption grounds, and the Court heard argument on those motions on April 9, 2013.  Dkt. Nos. 3590, 4737, 4738.  On July 8, 2013, the Court ordered the parties to mediation, which occurred that month.  Dkt. No. 5128.

#### B.   The January 6, 2014 Class Action Complaint and Initial Settlement

In August 2013, the court-appointed mediator informed the Court that Class Counsel and NFL Defendants would globally settle all claims arising from the NFL's fraudulent and misleading conduct relating to the effects of MTBI.  *See* Dkt. No. 5235.  In an August 2013 press release announcing the broad terms of the settlement – issued five months before the Complaint was filed – the mediator stated that the settlement called for a $675 million fund to "compensate former players who have suffered cognitive injury or their families," among other terms.  Press Release, *NFL, Retired Players Resolve Concussion Litigation*, Irell & Manella LLP, http://static.nfl.com/static/content/public/photo/2013/08/29/0ap2000000235504.pdf (attached as Exhibit 2).  The fund was to compensate "severe cognitive impairment, dementia, Alzheimer's, [and] ALS."  *Id.*  "The precise amount of compensation," the mediator stated, "will be based upon the specific diagnosis, as well as other factors including age, number of seasons played in the NFL, and other relevant medical conditions."  *Id.*  On January 6, 2014, Class Counsel for the

first time publicly revealed the specific terms of the settlement when they filed their Class Action Complaint, settlement agreement, and first motion for preliminary approval.  *See* Dkt. No. 5634.

### 1.    The Class Action Complaint

The Class Action Complaint defines a class consisting of all living, retired NFL Football Players who have retired from the NFL before preliminary approval of the proposed settlement agreement as well as representatives of retired NFL players who have died or become legally incapacitated.  *See Turner v. Nat'l Football League*, Civ. A. No. 2:14-cv-29-AB, Dkt. No. 1 ¶¶ 1, 16 (E.D. Pa. Jan. 6, 2014) ("Complaint," or "Compl.").  It further defines NFL Football Players to include not just players in the NFL and its member clubs but also players in the American Football League, which merged with the NFL, the NFL Europe League, and the World League of American Football.  *Id.* ¶ 1.  The class also includes spouses, parents, dependent children, and any other person who under state law may sue the NFL by virtue of his or her relationship with the retired player.  *Id.*

The Complaint divides the class into two sub-classes.  Subclass 1 consists of all retired players (and their representative and derivative claimants) who "were not diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE prior to the date of the Preliminary Approval and Class Certification Order."  Compl. ¶ 17(a).  Subclass 2 consists of all retired players (and their representative and derivative claimants) who "were diagnosed with dementia, Alzheimer's Disease, Parkinson's Disease, ALS and/or Death with CTE prior to the date of the Preliminary Approval and Class Certification Order."  *Id.* ¶ 17(b).  Subclass 2 also includes the representative and derivative claimants of retired players "who died before Preliminary Approval" of the settlement and who "received a post-mortem diagnosis" of Death with CTE.  *Id.*

Shawn Wooden and Kevin Turner are the Representative Plaintiffs for the class.  Mr. Wooden represents Subclass 1.  Compl. ¶ 17(a).  A safety, Mr. Wooden played in the NFL from 1996 until 2004 with the Miami Dolphins and the Chicago Bears.  *Id.* ¶ 4.  He is alleged to have "experienced" unspecified "neurological symptoms" but "has not been diagnosed with any neurocognitive impairment."  *Id.*  The Complaint states that Mr. Wooden has an "increased risk of developing dementia, Alzheimer's, Parkinson's, or ALS."  *Id.*  Mr. Turner represents Subclass 2.  *Id.* ¶ 17(b).  A running back, Mr. Turner played in the NFL from 1992 until 1999 with the New England Patriots and the Philadelphia Eagles.  *Id.* ¶ 7.  He was diagnosed with ALS in 2010.  *Id.*  ***Neither Mr. Wooden nor Mr. Turner alleges that he suffers from CTE or faces an increased risk of suffering from CTE***.

Although neither Mr. Wooden nor Mr. Turner alleges that he suffers from CTE or faces an increased risk of suffering from CTE, the Complaint identifies several long-term injuries arising from MTBI, "including, but not limited to . . . ***CTE and its related symptoms***."  Compl. ¶ 127 (emphasis added).

### a.        The NFL's Duty of Care and the MTBI Committee

The Complaint alleges that the NFL assumed a duty of care to protect its players from the adverse consequences of the repeated head injury they sustained while playing football.  Throughout its existence, the NFL received medical advice about the health risks of repeated MTBI, placing it in a superior position of knowledge over the players.  Compl. ¶ 70.

The Complaint explains that, by the mid-1990s, the link between repetitive mild head trauma and neurodegenerative disease had been well-established.  As early as 1952, the *New England Journal of Medicine* had recommended a three-strike rule for concussions in football, recommending that a player retire after having received his third concussion.  Compl. ¶ 95.  In

the 1980s, published studies had identified long-term brain damage and unexpected cognitive impairment in patients who had experienced MTBI. *Id.* ¶ 105.

As the Complaint explains, by the mid-1990s, the NFL had begun sponsoring its own medical research into the effect of concussions and repeated head injury on NFL football players. Compl. ¶ 84. It founded the Mild Traumatic Brain Injury Committee (MTBI Committee), which was publicized as independent from the NFL and tasked with studying the effects of brain injury in football players. *Id.* ¶¶ 134-136. Despite promises of independence, the League appointed as chairman Dr. Elliott Pellman, a team doctor and rheumatologist with no clinical or research experience in neurology. *Id.* ¶ 138. The other four members also were affiliated with the NFL. *Id.* ¶ 137. The MTBI Committee was aware of the long line of medical research tying repeated head injury to neurodegenerative disease. Dr. Pellman's eventual successor as chairman, Dr. Ira Casson, stated in written testimony before Congress in January 2010 that he had "been concerned about the possibility of long term effects on the brain related to football for close to thirty years." *Id.* ¶ 209.

### b.   Criticism of the MTBI Committee

The Complaint alleges that the MTBI Committee's "research" stood in stark contrast to studies previously published. Despite years of contrary research by leading authorities, the ***NFL's MTBI Committee*** – in its first published paper in 2003 – ***concluded that concussions presented no long-term health risk***. Compl. ¶ 147. Between 2003 and 2009, the MTBI Committee published ***fifteen more papers***, all of which supported the NFL's position that ***concussions presented no long-term adverse risks***. *Id.* ¶ 148. The Complaint cites a 2004 article, for example, that found no risk of repeated concussions in players who had suffered a previous concussion and denied the existence of a "7-to-10 day window of increased susceptibility to sustaining another concussion." *Id.* ¶ 151. In the commentary on that

publication, another physician wrote that the "article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days." *Id.* ¶ 152.  Nevertheless, the Committee repeated the conclusion a year later: "Return to play does not involve a significant risk of a second injury either in the same game or during the season." *Id.* ¶ 153.

As criticism of the MTBI Committee's research grew, the Committee went on the offensive.  Researchers who published conclusions contrary to the MTBI Committee's position were attacked.  For example, after Dr. William Barr presented NCAA study findings that contradicted NFL practices, Dr. Pellman fired Dr. Barr from his position as a neuropsychologist for the New York Jets.  Compl. ¶ 168.  And after Dr. Bennet Omalu began identifying cases of CTE in retired football players, the MTBI Committee pressured the journal that published Dr. Omalu's studies to retract them.  *Id.* ¶ 173.  When one neurosurgeon presented to the MTBI Committee studies linking NFL head injuries with cognitive decline, "[t]he Committee got mad." *Id.* ¶ 193.[3]  By 2008, Dr. Ann McKee of Boston University had built on Dr. Omalu's work and identified CTE in two more retired football players.  *Id.* ¶ 196.  The MTBI Committee characterized her work as an "isolated incident" and dismissed it:  "[T]here is not enough valid, reliable or objective scientific evidence at present," Dr. Casson argued, "to determine whether . . . repeat head impacts in professional football result in long term brain injury." *Id.* ¶ 197.

Even after Dr. Casson and Dr. David Viano replaced Dr. Pellman as chair of the MTBI Committee (Pellman is now the NFL Medical Director), the Committee continued denying the

---

[3] The neurosurgeon further stated that "we got into it.  And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding?  Alienate the scientist who found it?  Refuse to accept the science coming from him?'" Compl. ¶ 193.

link between MTBI and brain disease.  Compl. ¶¶ 188, 191.  For example, in 2007 Dr. Casson unequivocally denied any link between concussions and depression, dementia, Alzheimer's, or "anything like [that] whatsoever."  *Id.* ¶ 191.

### c.  The NFL's Representations About Head Injuries

The NFL relied on the MTBI Committee's heavily criticized research in communicating with its players.  For example, as the Complaint alleges, in 2007 the NFL provided each player with a concussion pamphlet stating that "[c]urrent research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly.  It is important to understand that there is no magic number for how many concussions is too many."  Compl. ¶ 180.  When the pamphlet was released, Commissioner Roger Goodell issued a statement explaining that he wanted to ensure players "are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."  *Id.* ¶ 181.  Nonetheless, the pamphlet did not refer to or cite the numerous studies demonstrating a link between repeated concussions and neurodegenerative brain diseases, such as CTE.  *Id.*

The Complaint also describes how, by 2010, the NFL had renamed the MTBI Committee the "Head, Neck, and Spine Medical Committee."  Compl. ¶ 213.  Dr. Pellman was removed from the Committee and Dr. H. Hunt Batjer and Dr. Richard Ellenbogen were named co-chairs. *Id.*  The Head, Neck, and Spine Medical Committee admitted that the MTBI Committee's data was "infected" and should be collected anew.  *Id.* ¶ 214.  Dr. Batjer even admitted that the MTBI Committee's research was methodologically flawed and was "not acceptable by any modern standards."  *Id.* ¶ 216.  And when a promotional brochure for a league-sponsored symposium described the concussion crisis as "hype around assertions of long-term harm to players from

head injuries," Dr. Batjer disagreed.  "They aren't assertions or hype," he said referring to the scientific evidence of the link between MTBI and long-term brain damage.[4]  "They are facts."[5]

In 2011, another member of the Head, Neck, and Spine Medical Committee admitted that the MTBI Committee's previous long-range study had "no science" in it and that the data from that study would not be used in a new study that was underway.  Compl. ¶ 222.  In recognizing the validity of science suggesting a link between long-term brain damage and concussions, the Head, Neck, and Spine Medical Committee was late to the game, even by NFL standards.  Two years earlier, NFL spokesman Greg Aiello had admitted:  "It's quite obvious from the medical research that's been done that concussions can lead to long-term problems."[6]

The Complaint notes that, throughout this time period, the NFL fostered a culture where head trauma, "dings," and "getting your bell rung" were considered badges of honor.  For example, the NFL glorified – and profited handsomely from – players' most violent hits.  It created a series of videos through NFL Films that featured in slow motion the League's most aggressive and violent plays.  Compl. ¶¶ 41-42, 47.  Among the names of these films: *Big Blocks and King Size Hits*, *The Best of Thunder and Destruction – NFL's Hardest Hits*, *Crunch Course*, *Crunch Course II*, *The NFL's Greatest Hits*, and *Moment of Impact*.  *Id.* ¶ 43.

## 2.    The Initial Settlement

Notwithstanding the breadth of afflictions linked to MTBI, the initial settlement compensated only a limited number of diseases and limited total class-wide compensation for

---

[4] Schwarz, *Concussion Committee Breaks with Predecessor*, N.Y. Times (June 1, 2010), http://www.nytimes.com/2010/06/02/sports/football/02concussion.html (attached as Exhibit 3).

[5] *Id.*

[6] Schwarz, *N.F.L. Acknowledges Long-Term Concussion Effects*, N.Y. Times (Dec. 20, 2009), http://www.nytimes.com/2009/12/21/sports/football/21concussions.html?_r=0 (attached as Exhibit 4).

those injuries to $675 million.[7]   *See* Dkt. No. 5634-2 §§ 23.1-23.5.   ALS claimants were to receive a maximum award of $5 million.   *See id.* at Ex. 3.   Retired players diagnosed with Parkinson's Disease or Alzheimer's Disease were to receive a maximum $3.5 million award.   *Id.* And class members exhibiting Level 2 or Level 1.5 dementia were to receive at most $3 million or $1.5 million, respectively.   *Id.*   The full written initial settlement also revealed that – contrary to previous public statements from Co-Lead Class Counsel – it would compensate cases of CTE with a maximum $4 million award ***only if the retired player died before preliminary approval*** of the settlement.   *See* Dkt. No. 5634-2 §§ 2.1(xxx), 6.3 & Ex. 1 ¶ 5.   Players suffering from CTE who would be diagnosed or died after that date were to receive nothing.   Moreover, players suffering from the mood and behavioral symptoms of CTE were to receive no compensation under the settlement unless they independently qualified for compensation through one of the other qualifying diagnoses.   *Id.* § 6.3.

The initial settlement also created a Baseline Assessment Program ("BAP") that would have provided class members the opportunity to undergo a baseline assessment examination, which would establish the class member's baseline neurocognitive functioning and screen for dementia and neurocognitive impairment.   Dkt. 5634-2 § 5.2.   Class members who were diagnosed with Level 1 dementia in the baseline assessment examination would be entitled to supplemental benefits that would cover the costs of medical treatments related to the dementia. *Id.* §§ 5.2, 5.11.   The term of the BAP was to be ten years, but class members receiving supplemental benefits would continue to do so for up to five years beyond that ten-year term.   *Id.* §§ 5.5, 5.11.   The initial settlement capped the BAP Fund at $75 million.   *Id.* § 23.3(g).

---

[7] Calling it a $675 million fund was not accurate.   It was a $300 million fund paid over two years, with another $375 million paid over 17 years.   *See* Dkt. No. 5634-2 §§ 23.1-23.5.

On January 14, 2014, this Court, *sua sponte*, denied Class Counsel's motion for preliminary approval of the settlement. *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708 (E.D. Pa. 2014). The Court recognized that the "Monetary Award Fund may lack the necessary funds to pay Monetary Awards for Qualifying Diagnoses" and "[a]s a first step toward preliminary approval" "order[ed] the parties to share the [actuarial and economic] documentation" relied upon during settlement "with the Court through the Special Master." *Id.* at 715-16.

### C.    Objectors' Motion To Intervene

Objectors moved to intervene. *See* Dkt. No. 6019. They explained that their interests were not adequately represented during the negotiation of the initial settlement, in part because that settlement arbitrarily denied compensation to individuals whose CTE went undetected until after preliminary approval. Because each Objector exhibits MTBI-related conditions that are also symptoms of CTE, each is at risk of developing CTE. Even though the settlement would have awarded $4 million to the families of players who died with CTE before final approval of the settlement, Objectors and their families would receive nothing if later diagnosed with CTE. *Id.* at 13-18. In opposing the motion to intervene, Class Counsel ignored this fact entirely, offering no explanation for the disparate treatment of CTE claimants. *See* Dkt. No. 6046. Objectors also criticized the 75% offset imposed on any player who suffers a ***single*** stroke or a ***single*** instance of non-football related traumatic brain injury ("TBI"). Dkt. 5634-2 § 6.5(b)(ii)-(iii). Such a player would recover only 25% of what he is otherwise entitled to receive under the settlement. Again, Class Counsel's opposition was devoid of any explanation for this offset. *See* Dkt. No. 6046. Objectors noted other defects in the initial settlement and other class members voiced criticism as well. *See, e.g.*, Dkt. Nos. 5686, 5771.

12

### D.     The Revised Settlement

Notwithstanding those criticisms of the initial settlement, Class Counsel on June 25, 2014 submitted a revised settlement agreement that retained the same structure and almost all of the key provisions of the initial settlement.  *See* Dkt. No. 6073-2 ("Settlement").  Class Counsel moved for "conditional" class certification and preliminary approval of the Revised Settlement. *See* Dkt. No. 6073.

#### 1.     Compensation

Like the initial settlement, the Settlement compensates only the same limited subset of the diseases that have been linked to MTBI: ALS, Parkinson's, Alzheimer's, Level 2 dementia, and Level 1.5 dementia.  Settlement Ex. B-3.  It also retains the maximum compensation awards provided for each of these diseases in the initial settlement.  *Id.*  Similar to the initial settlement, the Settlement compensates cases of CTE with $4 million, but ***only if the claimant dies before preliminary approval of the settlement agreement.***  Settlement §§ 2.1(yyy), 6.2(a) (providing compensation for a "Qualifying Diagnosis"); *id.* Ex. B-1 at 5.[8]  Unlike its predecessor, the Settlement does not cap total compensation for ALS, Parkinson's, Alzheimer's, and Levels 1.5 and 2 dementia, but it retains the $75 million cap on the BAP Fund.  *See* Dkt. 6073-5 at 4.

The Settlement still has a series of offsets that reduce a claimant's compensation.  Most notably, the Settlement retains the 75% offset for a single stroke or a single non-football related TBI – and an offset that is compounded if a class member suffers both.  Settlement §§ 6.7(b)(ii)-(iii), (e).  Additionally, class members who played fewer "Eligible Seasons" in the NFL receive

---

[8] Section 6.2(a) of the Settlement provides compensation for any "Qualifying Diagnosis." Section 2.1(yyy) defines "Qualifying Diagnosis" to include "Death with CTE." Exhibit B-1 defines "Death with CTE" as follows: "For Retired NFL Football Players ***who died prior to the date of the Preliminary Approval and Class Certification Order***, a post-mortem diagnosis of CTE made by a board-certified neuropathologist."  Settlement Ex. B-1 at 5 (emphasis added).

only a percentage of the maximum award for their condition.  *See* Settlement § 6.7(b)(i).  Although class members receive "Eligible Season" credit for service on "practice, developmental, or taxi squad[s]," time spent playing for NFL Europe or its related leagues does not apply to the "Eligible Season" determination.  *Id.* §§ 2.1(kk), 6.7(c)(1).  Similarly, class members who are older at the time of the Qualifying Diagnosis receive only a percentage of the maximum award for their condition.  *See id.* § 6.7(b) & Ex. B-3.

### 2.    Eligibility

A complex series of administrative procedures governs the distribution of benefits.  Class members must register with the Claims Administrator within 180 days of Settlement Class Supplemental Notice.  Settlement § 4.2(c).  Failure to do so renders the player ***completely ineligible*** for any benefits, yet the release would be binding.  *Id.*  Additionally, the undiagnosed players in Subclass 1 must undergo the baseline assessment examination to receive the full award; failure to undergo the examination results in a 10% reduction in benefit.  *Id.* §§ 5.4, 6.7(b)(iv).  The Baseline Assessment Program itself imposes a series of deadlines.  Players aged 43 and older must obtain the BAP examination within two years after the BAP commences; younger players must do so by the earlier of their 45th birthday or the BAP's tenth year.  *Id.* § 5.3.

The BAP requires players to participate in neuropsychological tests that do not evaluate the relevant neurodegenerative diseases for purposes of determining relief.  For example, instead of targeting the neurodegenerative diseases of CTE or Alzheimer's, the tests are designed for younger traumatic brain injury patients.  *See* Decl. of Robert A. Stern ("Stern Decl.") ¶ 43.  Moreover, the tests are not consistent with the neuropsychological tests typically employed by doctors to evaluate patients for mild cognitive impairment or Alzheimer's disease dementia.  *Id.* ¶¶ 43-46.

The tests also do not determine whether a former player suffers from the specific types of behavioral and mood disorders affiliated with a history of head trauma, including aggression, impulsivity, or dementia. Stern Decl. ¶¶ 31, 45. Not only are these tests entirely inappropriate for purposes of identifying the compensable neurodegenerative diseases under the Settlement, but the manner and timing in which they are administrated will produce inaccurate results. *Id.* ¶¶ 44-46. If a patient has a disease at the level of severity required for compensation, the length and complexity of testing to which he must submit himself is far too long; indeed, the extra tests only increase the likelihood that a patient will not be able to complete the exam. *Id.* ¶ 44. In short, the Settlement requires players to submit to the wrong medical tests with unfairly high evaluation bars that by no means ensure proper or accurate medical evaluations.

Both the NFL and claimants may appeal adverse claim determinations. Settlement §§ 9.5-9.7. The initial settlement limited the NFL to ten appeals per year, but the Settlement allows unlimited appeals by the NFL. *Compare* Dkt. No. 5634-2 § 9.6(b) *with* Settlement § 9.6(b). Claimants – but not the NFL – must pay a $1,000 fee to docket an appeal. Settlement § 9.6(a). The fee is refunded if the appeal is successful. *Id.*

### 3.    The Release

The Settlement broadly releases all MTBI-related claims of every class member who does not opt out, including claims of class members who played in NFL Europe and its predecessors. Class members:

> waive and release . . . any and all past, present and future claims, counterclaims, actions, rights or causes of action . . . in law or in equity . . . known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated [that any settling plaintiff] had, has, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits . . . .

15

Settlement § 18.1(a).  The Settlement states that the claims it releases include, among others, claims "arising out of, or relating to . . . head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events . . . of whatever cause" and claims "arising out of, or relating to, CTE."  *Id.* § 18.1(a)(ii), (iv).  The Settlement's release also requires class members to acknowledge that they "explicitly took unknown or unsuspected claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims" falling within the scope of the allegations in the Complaint and related lawsuits.  *Id.* § 18.2.

### 4.    Attorneys' Fees

The Settlement calls for a $112.5 million attorneys' fee to be paid within 60 days after the Settlement is final, which the NFL Defendants have agreed not to oppose.  Settlement §§ 21.1-.2.[9]  It also authorizes Co-Lead Class Counsel to "petition the Court to set aside up to five percent (5%) of each Monetary Award . . . to facilitate the Settlement program and related efforts of Class Counsel."  *Id.*  The initial settlement did not contain this set-aside provision. *Compare id. with* Dkt. No. 5634-2 § 21.1.  The Settlement places no limits on how Co-Lead Class Counsel may use the set aside.

### E.    Opposition to Preliminary Approval

One week after Class Counsel moved for preliminary approval, Objectors filed an objection to the settlement and opposed the motion for preliminary approval.  They argued, among other things, that intra-class conflicts precluded certification under Rule 23(a)(4).  Dkt.

---

[9] The NFL Defendants have taken no position on the propriety of the fee award, noting that "any such proposed set aside application is a matter strictly between and among Settlement Class Members, Class Counsel, and individual counsel for Settlement Class Members."  Settlement § 21.1.

No. 6082 at 19-29.   Most notably, class members suffering from CTE would receive no compensation after preliminary approval but those who died before approval would receive up to $4 million.   *Id.* at 20-26.   Objectors also challenged the proposed notice because it falsely indicated that the settlement compensated future cases of CTE.   *Id.* at 29-32.   And Objectors objected to the labyrinth of procedural requirements for obtaining relief, which would likely prevent many class members from recovering.   *Id.* at 32-35.

### F.   Preliminary Approval

On July 7, 2014, this Court certified the class for settlement only, preliminarily approved the Settlement, established an opt-out/objection procedure, and scheduled a fairness hearing. Dkt. Nos. 6083, 6084.   Objectors petitioned to appeal the class certification decision under Rule 23(f), and the Third Circuit denied that petition on September 11, 2014.   Dkt. No. 6166.

## II.   Background of Objectors

Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine are all class members and NFL veterans; one also played in NFL Europe.   They played, on average, eight years in the league, and most received NFL-administered injections of Toradol, a pain-killer.   They are collegiate All-Americans, team captains, Pro-Bowlers, and Super Bowl Champions.   *See* Dkt. No. 6082 at 2-5.   A more extensive statement of the Objectors' background is included as Appendix A to this Objection.

Since leaving the NFL, Objectors have experienced one or more of a wide range of symptoms linked to repetitive mild traumatic brain injury (MTBI), including a sensitivity to noise, visuospatial issues, visual impairment, chronic pain, executive function deficit, episodic depression, mood and personality changes, chronic headaches, dysnomia, a decreased ability to multi-task, peripheral nerve dysfunction (numbness, burning, and/or tingling), cervical spinal disorders, sleep dysfunction, attention and concentration deficits, short- and long-term memory

deficits, and somatic disorders.  Additionally, some of the Objectors also have experienced a decreased ability to interpret, regulate, express, or control complex emotions.  These conditions have been associated with CTE and may broaden or intensify as time passes.

Although the Objectors' claims for their injuries would be released by the Settlement, it appears that none would qualify for any relief under the settlement beyond participation in the Baseline Assessment Program ("BAP").  And the BAP – which measures cognitive deficits such as memory impairment and loss of attention – does not even screen for many of the Objectors' common neurobehavioral conditions or neuropsychiatric presentations.

## **ARGUMENT**

This Court has a "fiduciary responsibility as the guardian of the rights of the absentee class members."  *Girsh v. Jepson*, 521 F.3d 153, 157 (3d Cir. 1975); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010) ("Rule 23(e) places a duty on district courts to safeguard the interests of class members").  That responsibility arises because class actions present the unique circumstance where class counsel have "the incentive . . . , in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers."  *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014).

Courts must "be even more scrupulous than usual in approving settlements where no class has yet been formally certified."  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995) ("*GM Trucks*").  Such caution is necessary because "the 'danger of a premature, even a collusive, settlement [is] increased when . . . the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates.' "  *Id.* at 788 (quoting *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 680 (7th Cir. 1987)).

"Pre-certification negotiations also hamper a court's ability to review the true value of the settlement or the legal services after the fact," and "deny[ ] other plaintiffs' counsel information that is necessary for them to make an effective evaluation of the fairness of any settlement that results." *GM Trucks*, 55 F.3d at 788.  And "where notice of the class action is . . . sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a fait accompli." *Mars Steel*, 834 F.2d at 680-81.  As a result, "even if [class members] have enough information to conclude the settlement is insufficient and unsatisfactory, the mere presentation of the settlement notice with the class notice may pressure even skeptical class members to accept the settlement out of the belief that . . . they really have no choice." *GM Trucks*, 55 F.3d at 789.

In short, the need for the Court's guardianship of absentee class members is particularly acute where, as here, a class settlement is negotiated before certification.  The Court's exercise of that guardianship includes an assessment of the adequacy of class representation under Federal Rule of Civil Procedure 23(a)(4).  *See Amchem*, 521 U.S. at 621; *GM Trucks*, 55 F.3d at 794 (denying approval of settlement where class not certifiable for lack of adequate representation).  If the settlement terms create " 'adversity among subgroups[,] . . . the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.' " *Amchem*, 521 U.S. at 627.  In the presence of such intra-class conflicts, the settlement requires the "structural assurance of fair and adequate representation." *Id.*  The Court must also consider whether the settlement provides "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).  A false or misleading notice does not "clearly and concisely state in plain, easily understood language . . . the nature of the action[,] the definition of the class certified[, and] the class claims,

issues, or defenses." *Id.*  Finally, the Court must determine that the settlement "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e).  The settling parties must carry the burden of proving that these requirements are met.  *See GM Trucks*, 55 F.3d at 785.

## I.      The Lack of Adequate Representation Precludes Certification

A fair settlement requires a certifiable class with the interests of all class members adequately represented.  *GM Trucks*, 55 F.3d at 784.  Rule 23 demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The proposed class fails this requirement.   The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183, 187-88 (3d Cir. 2012) (denying preliminary class certification where interests of representative plaintiffs and absent class members diverged).  When assessing the adequacy of representation, "a judge must focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class."  *GM Trucks*, 55 F.3d at 797 (representation inadequate where settlement terms preferred some class members over others).  Thus, "a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group."  *Id.* Offering considerably more value to one class of plaintiffs is precisely what the Settlement does here.

The lack of adequate representation here has manifested itself primarily through three intra-class conflicts.  ***First***, the Settlement arbitrarily limits compensation for CTE to individuals who died before preliminary approval of the Settlement.   Class members whose CTE is discovered in the future receive nothing.  ***Second***, the Settlement reduces a claimant's award by 75% if (i) the claimant has suffered a stroke, even though the NFL Defendants' own conduct in

administering Toradol increased some Objectors' risk of stroke, or (ii) the claimant has suffered a ***single*** non-football related TBI, even though one TBI is dwarfed by the dozens of diagnosed and undiagnosed TBIs that the retired NFL player received while playing in the NFL.  ***Third***, the settlement class includes veterans of NFL Europe, but the Settlement does not credit seasons played in that league as "eligible seasons."

## A.    The Failure-To-Compensate-CTE Conflict Demonstrates Lack of Adequate Representation

The greatest of the Settlement's many flaws is its failure to compensate players who are living with CTE or who die with it after July 7, 2014 – notwithstanding that the family of a player who died with CTE before July 7, 2014 receives $4 million.  Medical evidence demonstrates that CTE is likely to be far and away the most common neurocognitive disease suffered by the class.  ***Neither class representative alleges that he has CTE or is at increased risk of developing CTE.***  Yet all class members release their claims related to CTE.  They receive nothing but the right to participate in the BAP – with its ill-defined benefits and $75 million total cap.

Class Counsel bargained away the rights of more than 20,000 former NFL players – many of whom are suffering the serious effects of CTE, fairly called "football's industrial disease."  This alone is reason to reject the settlement.

### 1.    Chronic Traumatic Encephalopathy (CTE)

"CTE is a unique neurodegenerative condition that is associated with repetitive mild traumatic brain injury."[10]  CTE has been found in football players, boxers, hockey players,

---

[10] McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43, 62 (2013) ("McKee *et al.* 2013") (attached as Exhibit 5); *see also, e.g.*, Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*, 9 Nature Reviews Neurology 222, 225 (2013) ("CTE is the long-term neurological consequence of repetitive mild TBI.") (attached as

military veterans exposed to explosions, and domestic violence victims.[11]  It is "a distinct neurodegeneration" disease different from, for example, Alzheimer's, Parkinson's, or ALS.[12]  It "is the only known neurodegenerative dementia" caused specifically by repetitive head trauma.[13]  Thus, of the diseases addressed in the Settlement, it is the only one that occurs **only** by being hit in the head.

CTE's neuropsychological and neuropsychiatric effects typically fall into one of three categories: mood/behavioral, motor, and cognitive.[14]  Researchers have identified four stages of CTE.[15]  Stage I symptoms include headache, loss of attention and concentration, short-term memory difficulties, aggression, depression, executive dysfunction, and explosivity.[16]  Stage II

---

[11] Mitsis *et al.*, *Tauopathy PET and Amyloid PET in the Diagnosis of Chronic Traumatic Encephalopathies*, 4 Translational Psychiatry 1, 1 (2014) (attached as Exhibit 8).

[12] Baugh *et al.*, *Current Understanding of Chronic Traumatic Encephalopathy*, 16 Current Treatment Options in Neurology 306, at 1/13 (2014) ("Baugh *et al.* 2014") (attached as Exhibit 9); *see also* Montenigro *et al.*, *Clinical Subtypes of Chronic Traumatic Encephalopathy*, 6 Alzheimer's Research & Therapy 68, at 1/17 (2014) (noting that CTE "is a neurodegenerative disease" that is "unique" from other diseases, including Alzheimer's) (attached as Exhibit 10); McKee *et al.* 2013, *supra*, at 44 (noting that CTE can be "clinically mistaken for Alzheimer's disease or frontotemporal dementia").

[13] Gavett *et al.*, *Chronic Traumatic Encephalopathy: A Potential Late Effect of Sport-Related Concussive and Subconcussive Head Trauma*, 30 Clinical Sports Medicine 179, 184 (2011) (attached as Exhibit 11).

[14] *Id.*; *see also* Stern *et al.*, *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neurology 1122, 1124-25 (2013) ("Stern *et al.* 2013") (attached as Exhibit 12); *State of Play: Brain Injuries and Diseases of Aging: Hearing Before the S. Special Comm. on Aging*, 113th Cong. 3 (2014), at 5 (written statement of Dr. Robert Stern) ("Stern Testimony"), http://www.aging.senate.gov/imo/media/doc/Stern_6_25_14.pdf; Jordan, *supra*, at 226 box 3 (attached as Exhibit 13).

[15] McKee *et al.* 2013, *supra*, at 51-59.

[16] *Id.* at 52.

symptoms are similar, but also may include suicidality and language difficulties.[17]   Stage III involves further cognitive impairment.[18]   Stage IV – where "[m]ean brain weight [i]s significantly smaller than lower stage CTE" – involves symptoms including severe memory loss with dementia, profound loss of attention and concentration, language difficulties, aggression, paranoia, and gait difficulties.[19]   A more fulsome discussion of CTE is included as Appendix B to this Objection.

### 2.      CTE in the NFL

As Co-Lead Class Counsel explained on its website, "***CTE is believed to be the most serious and harmful disease that results from NFL and concussions.***"  Ex. 1 (Seeger Weiss website as of Sept. 3, 2014) (emphasis added).[20]   Studies to date have confirmed that an alarming number of NFL players will be afflicted with CTE.  The nation's largest brain bank focused on traumatic brain injury recently announced that it had found evidence of CTE in ***76 of 79*** brains of former NFL players it examined.[21]   An earlier study by that same research group reported that of 34 deceased NFL retirees whose brains it had tested for CTE, ***all but one*** had the disease.[22]   Of those 33, nearly half showed signs of Stage III or Stage IV CTE – CTE's two most severe

---

[17] *Id.* at 55.

[18] *Id.* at 56.

[19] *Id.* at 57, 59.

[20] Seeger Weiss quickly removed that language after oral argument in the Third Circuit on September 10, 2014, where the inadequate representation and failure to compensate CTE, as well as this language on their website, was raised.

[21] Breslow, *76 of 79 Deceased NFL Players Found to Have Brain Disease*, PBS Frontline (Sept. 30, 2014), http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/76-of-79-deceased-nfl-players-found-to-have-brain-disease/ (attached as Exhibit 14).

[22] McKee *et al.* 2013, *supra*, at 59.

stages.[23]   And almost all of these players – 94% – were symptomatic during their lifetimes.[24] The most common symptoms were "short-term memory loss, executive dysfunction and attention and concentration problems."[25]

In fact, the NFL's own doctors have recognized the link between neurocognitive impairment and MTBI.  When in 1999 Mike Webster, Hall of Fame center for the Pittsburgh Steelers, was examined by a neurologist hand-picked by the NFL as part of his disability application, that neurologist told the disability board: "With the history of multiple head injuries that all football players have and the history that the patient has predominately problems with what appears to be frontal lobe function, I think we can be pretty comfortable that this is related to injury."[26]   The Retirement Board later agreed that Webster's medical reports "indicate that his disability is the result of head injuries suffered as a football player with the Pittsburgh Steelers and Kansas City Chiefs."[27]   Webster later became the first NFL retiree to be diagnosed with CTE when in 2002, Dr. Bennet Omalu, a forensic pathologist, examined Webster's brain and observed CTE's characteristic tau build-up.[28]   Dr. Omalu found CTE again in 2005 and 2006 in former players Terry Long and Andre Waters, who both committed suicide.[29]

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] Fainaru-Wada & Fainaru, *League of Denial* 99 (2013).

[27] *Id.*

[28] *Id.* at 158, 163.

[29] Schwarz, *Expert Ties Ex-Player's Suicide to Brain Damage*, N.Y. Times (Jan. 18, 2007), http://www.nytimes.com/2007/01/18/sports/football/18waters.html?pagewanted=all ("Schwarz 2007") (attached as Exhibit 15).

### 3.   The Settlement Compensates Only a Few Prior Cases of CTE to the Exclusion of Current and Future Cases of CTE

#### a.   Arbitrary Limitation of CTE Awards

Notwithstanding the fact that CTE is "the most serious and most harmful disease that results from NFL and concussions," Ex. 1 (Seeger Weiss website), the Settlement leaves all class members with current and future cases of CTE without compensation.   That is because the Settlement defines "qualifying diagnosis" to include "a post-mortem diagnosis of CTE ***only*** "[f]or Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order."   Settlement Ex. B-1 ¶ 5; *see also* Settlement ¶¶ 2.1(yyy), 6.3(a). Thus, while CTE found in a retired player who died on the eve of preliminary approval allows a $4 million payment, that same condition goes uncompensated if the player dies one day later, after preliminary approval.   The conditions afflicting Objectors are among the well-documented symptoms of CTE.  *See* Appendix B.  Former players like Objectors who currently are managing the cumulative effects of MTBI – many of which are consistent with the presentation of CTE – would receive no compensation and would continue bearing their medical costs even if their condition progresses to full-blown CTE.

That arbitrary limitation on CTE compensation is remarkable:  All but three of the 79 deceased NFL players whose brains have been examined for CTE have been diagnosed with the condition.  *See* p. 24, *supra*.  The ubiquity of CTE in retired NFL players dwarfs the prevalence of the other conditions that receive compensation.   For example, one study examining NFL retirees who played at least five seasons between 1959 and 1988 recorded seven cases of ALS, seven cases of Alzheimer's, and three cases of Parkinson's in ***3,439*** retired players.  National Institute for Occupational Safety and Health, *Brain and Nervous System Disorders Among NFL Players* (Jan. 2013), http://www.cdc.gov/niosh/pgms/worknotify/pdfs/NFL_Notification_02.pdf

(attached as Exhibit 16).  And Class Counsel's own actuary estimates 31 cases of ALS and 24 cases of Parkinson's disease in the 21,000-member class.  Dkt. No. 6167 at 20.  Notwithstanding the widespread prevalence of CTE among NFL retirees, the Settlement provides ***no compensation*** to players with CTE who die after preliminary approval of the Settlement – likely a large percentage of the 21,000-member putative class.

The negative effects of denying compensation to class members like the Objectors who are at an increased risk of CTE will multiply over time.  As science advances, it is likely that CTE will be reliably detectable before death; within five to ten years, CTE will likely be diagnosed in the living.  Stern Decl. ¶ 38.  Yet the Settlement provides no flexibility for modifying the list of qualifying diseases to compensate a pre-death diagnosis of CTE.  *See* Settlement § 6.6(c) ("In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s).").

Indeed, the Settlement anticipates relevant advances in science and medicine that will allow a more precise diagnosis of diseases related to MTBI – ***but only to disallow recovery***.  For example, the Settlement precludes compensation of diseases detected "through a blood test, genetic test, imaging technique, or otherwise" that "has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment."  Settlement § 6.6(b).  For individuals with a disease like CTE, which frequently presents first with behavioral and mood symptoms – symptoms that can be as debilitating as CTE's neurocognitive symptoms – the Settlement's rejection of diagnostic testing as a basis for compensation can have a profoundly negative effect: It will prevent individuals with a known degenerative brain disease from using settlement money to access medical care or treatment that might forestall or prevent the onset of neurocognitive impairment.

**b.      The Representative Plaintiffs Did Not Protect the Interests of Class Members Who Suffer from or Who Are at Risk of Suffering from CTE**

Class members had a strong need for representatives who would have pressed for settlement "provisions that can keep pace with changing science and medicine, rather than freezing in place the science" known at the time of settlement.  *Amchem*, 521 U.S. at 610-11 (class representation inadequate where settlement did not account for the interests of class members who may develop disease in the future); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630-31 (3d Cir. 1996) (class representation inadequate because of conflict between currently injured plaintiffs' interest in maximizing current payouts and future plaintiffs' interest in delaying opt-out due to "changing science and medicine" and "difficulty in forecasting what their futures hold"), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  The Representative Plaintiffs did not fulfill this crucial role.

The Representative Plaintiffs ***could not*** fulfill that role.  Neither Representative Plaintiff shares Objectors' interest in securing compensation for ***all cases*** of CTE.  Mr. Turner, who suffers from ALS, has a diagnosed medical condition that receives compensation under the Settlement (and rightly so).  Compl. ¶ 7.  But he was not poised to represent the interests of those who have suffered different injuries and receive nothing under the Settlement.  Mr. Wooden likewise could not represent the interests of the entire class.  Objectors currently exhibit MTBI-related injuries that are clinical indications of CTE.  Mr. Wooden, by contrast, has not alleged that he suffers from CTE.  Nor has he alleged that he is at "[an] increased risk of developing" CTE, even though he does assert such a risk for dementia, Alzheimer's Disease, Parkinson's Disease, and ALS.  Compl. ¶ 4.  Mr. Wooden's interests therefore lie in securing future compensation for those four afflictions, not in securing payment for the Objectors' conditions and for future cases of CTE.  As a result, the proposed subclasses do not "align[ ] [the]

27

interests and incentives [of] the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183 (denying class certification where interests of representative plaintiffs and absent class members diverged).

> ### c.   There Is No Justification for the Settlement's Failure To Compensate Current and Future Cases of CTE

Class Counsel and the NFL have offered no justification for the Settlement's failure to compensate current and future cases of CTE – while at the same time requiring a release of all CTE claims.  Class Counsel have stated that, "[f]or those retired players who have already died, and who did not carry a diagnosis of a compensable disease or condition while living, a post-mortem autopsy diagnosis of CTE serves as sufficient evidence of harm for purposes of establishing compensation."  Plaintiffs-Respondents' Answer to Rule 23(f) Petition, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 14-8103, at 14 (3d Cir. July 29, 2014) ("Class Counsel 23(f) Opp.").  But there is no reason why a CTE diagnosis ***before*** preliminary approval should be sufficient to demonstrate entitlement to a multi-million dollar award while a ***future*** diagnosis entitles a class member to nothing.

Class Counsel and the NFL have also contended that the Settlement need not compensate CTE specifically because it otherwise compensates "actual" or "demonstrated" neurocognitive or neuromuscular "impairment" or "deficits" through the monetary awards for dementia, ALS, Parkinson's, and Alzheimer's.  Class Counsel 23(f) Opp. at 14 & 15 n.6; NFL Answer in Opposition to Rule 23(f) Petition, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 14-8103, at 18 (3d Cir. July 31, 2014) ("NFL 23(f) Opp.").  That justification, too, falls short.

CTE's symptoms extend far beyond cognitive impairment – they include "behavioral and mood disorders" that are "just as important, just as serious, and just as amenable to detection and

diagnosis, as cognitive disorders." Stern Decl. ¶ 32; *see* Appendix B. These behavioral and mood symptoms, moreover, do not always present alongside CTE's cognitive symptoms. In one study, "22 of 33 deceased former athletes with neuropathologically confirmed CTE (and no other abnormal brain findings) were reported to have behavior or mood problems as their initial difficulties, prior to any cognitive impairment," and "[o]nly 10 of 33 were ever diagnosed with dementia at any time prior to death." Stern Decl. ¶ 32; *see also* Stern *et al.* 2013, *supra*, at 1123. In another study of 51 confirmed cases of CTE, only 22 cases progressed to dementia before death. McKee *et al.* 2013, *supra*, at 56 tbl. 4. But the Settlement offers nothing for behavioral and mood disorders.

Additionally, dementia typically does not present unless the individual progresses to Stage III or Stage IV CTE. McKee *et al.* 2013, *supra*, at 56 tbl. 4; Stern *et al.* 2013, *supra*, at 1123. Thus, while behavioral and mood symptoms typically present early in CTE's course, *see* Appendix B, the cognitive symptoms that receive compensation under the Settlement do not appear until the disease has progressed to its later stages, depriving class members of the ability to use compensation under the Settlement to seek intervention and medical treatment in the earlier stages of CTE.

Class Counsel's reliance on the Settlement's compensation for dementia to justify the exclusion of CTE is misplaced for yet another reason – it is inconsistent with the Settlement's treatment of Alzheimer's. Like CTE, Alzheimer's is a "neurodegenerative disease[ ] that can lead to dementia." Stern Decl. ¶ 40. Thus, if monetary awards for dementia suffice to adequately compensate CTE, they should also suffice to compensate Alzheimer's. But CTE and

Alzheimer's are treated differently.  Future cases of Alzheimer's are compensated, future cases of CTE are not.[30]

Nor can Class Counsel and the NFL justify the exclusion of CTE by urging that CTE sufferers might also be afflicted with (and compensated for) ALS, Parkinson's or Alzheimer's. CTE "is a unique disease, easily distinguished from [Alzheimer's Disease] and other diseases." Stern Testimony, *supra*, at 2; *see also* Baugh *et al.*, *Chronic Traumatic Encephalopathy: Neurodegeneration Following Repetitive Concussive and Subconcussive Brain Trauma*, 6 Brain Imaging & Behavior 244, 246 (2012) ("Baugh *et al.* 2012") (attached as Exhibit 17) (noting "the early presentation and course of CTE can distinguish it from most other causes of dementia"). Thus, it is "pathologically distinct from other neurodegenerative diseases, including Alzheimer's disease and Frontotemporal Lobar Degeneration."  Baugh *et al.* 2012, *supra*, at 245.  And it is "the **only** known neurodegenerative dementia with a specific identifiable cause; in this case, **head trauma**."  Gavett, *supra*, at 184 (emphasis added).

The Complaint itself places CTE front-and-center, pleading it as an independent, MTBI-related disease.  It alleges that "the NFL has known for decades that MTBI can and does lead to long-term brain injury, including, but not limited to memory loss, dementia, Alzheimer's Disease, Parkinson's Disease, ALS, depression, **and CTE and its related symptoms**."  Compl. ¶ 127 (emphasis added).  In pleading the NFL's knowledge of the dangers and risks associated with repetitive MTBI, no fewer than **nine paragraphs** specifically reference CTE, encephalopathy, dementia pugilistica, or punch drunk syndrome.  *See* Compl. ¶¶ 89, 92, 94, 96,

---

[30] The Settlement's treatment of Alzheimer's also disposes of Class Counsel's argument that future cases of CTE are uncompensated because CTE cannot be diagnosed while living.  Class Counsel 23(f) Opp. at 14.  Alzheimer's can currently be diagnosed definitively only through a pathological post-mortem examination of brain tissue.  Stern Decl. ¶ 37.  Besides, the technology to reliably diagnose CTE (and Alzheimer's) before death is years – not decades – away.  *Id.* ¶ 38.

97, 100, 104, 113, 116.  By contrast, one paragraph mentions Alzheimer's, *id.* ¶ 118, and one paragraph mentions ALS and Parkinson's, *id.* ¶ 127, when addressing the NFL's knowledge of the dangers.  CTE is also central to the Complaint's fraudulent concealment allegations, which plead that the NFL's MTBI Committee publicly attacked researchers who suggested a link between the NFL and CTE.  *See, e.g., id.* ¶¶ 170-174, 193-194, 196-197.

The correlation between CTE and the other qualifying diagnoses, moreover, is weak.  In one study of 68 individuals with CTE, eight presented with motor neuron disease (such as ALS), seven presented with Alzheimer's Diseases, and six presented with Parkinson's Disease.  McKee *et al.* 2013, *supra*, at 44, 50-51, 61.  Over **two-thirds**, however, presented **only** with CTE.  *Id.* And to the extent that ALS (or another motor neuron disorder), Parkinson's, or Alzheimer's presents alongside CTE, **CTE itself** could have caused the ALS-like, Parkinson's-like, or Alzheimer's-like symptoms; in those situations, the patient is actually suffering from CTE, not ALS, Parkinson's, or Alzheimer's.  As one group of scientists wrote, "it is now known that neurologic conditions previously attributed to [Alzheimer's Disease, Parkinson's Disease], and ALS may actually have been related to CTE."[31]  Other research also indicates that individuals previously thought to have Alzheimer's disease in reality suffer from CTE.[32]

As CTE becomes more readily detectable before death, the NFL will be able to use this research to further limit payouts to the class.  With the ability to diagnose CTE in the living,

---

[31] Lehman *et al.*, *Neurodegenerative Causes of Death Among Retired National Football League Players*, 79 Neurology 1970, 1971 (2012) (attached as Exhibit 18).

[32] *See* Mitsis, *supra*, at 7 (reporting on test results of former NFL player who "had many features of [Alzheimer's]" and concluding the player suffered from CTE instead); Borden, *Brain Trauma Extends Reach into Soccer*, N.Y. Times (Sept. 23, 2014) (noting soccer star Bellini, previously thought to have had Alzheimer's, actually suffered from CTE), http://www.nytimes.com/2014/09/24/sports/soccer/soccer-star-bellini-is-found-to-have-had-brain-trauma.html?_r=1 (attached as Exhibit 19).

cases previously diagnosed as ALS, Parkinson's, and Alzheimer's – and compensated as such under the Settlement – could instead be diagnosed as CTE.  Class members in that situation will get nothing.

Thus, the Settlement fails to compensate class members suffering what is likely the most common injury attributable to Defendants' conduct.

### B.     The 75% Offsets Demonstrate Lack of Adequate Representation

The Settlement also imposes offsets that create an additional class conflict.   The Settlement **reduces a claimant's award by 75%** for a **single instance** of non-football-related traumatic brain injury ("TBI") or stroke.   Settlement § 6.7(b)(ii)-(iii).   That 75% offset applies regardless of the severity of traumatic brain injury that the player sustained while playing football.  And it presumes that a single non-football-related instance of TBI accounts for 75% of a player's MTBI-related injuries, even though that player may have sustained numerous diagnosed and undiagnosed head traumas throughout his NFL career.[33]  As Class Counsel have conceded, "[t]housands of football players, many of whom are thought to have suffered more than one hundred mild traumatic brain injuries, are dealing with horrible and debilitating symptoms."[34]  The 75% offset is both devoid of scientific justification and grossly unfair.

Instances of stroke, moreover, should be compensated injuries, not offsets that reduce recovery, **because the NFL itself has increased the risk of stroke for Objectors and other class members**.  *See* Amended Complaint, *Finn v. Nat'l Football League*, No. 2:11-cv-07067-JLL-

---

[33] The possibility that a class member will sustain a non-football related TBI is not remote.  For example, the car insurance industry estimates that the average driver will be involved in a car collision once every 18 years.  Des Toups, *How Many Times Will You Crash Your Car?*, Forbes (July 27, 2011  6:50 PM),  http://www.forbes.com/sites/moneybuilder/2011/07/27/how-many-times-will-you-crash-your-car/ (attached as Exhibit 20).

[34] *See* Ex. 1.

MAH, Dkt. No. 4 ¶¶ 135-143 (D.N.J. Dec. 8, 2011) (*Finn* Compl.).  Traumatic brain injury can increase the risk of stroke and cause damage to the blood vasculature in the brain.[35]  Dr. Ira Casson, a former chairman of the NFL's MTBI Committee, has found brain microbleeds that "are likely related to head trauma occurring in football at some level."[36]  "Statistical analysis determined an association between total number of dings reported at all levels of football and the presence of microbleeds," which added "further support to the suggestion that head trauma is related to" microbleeding.[37]  Such cerebral microbleeds, moreover, increase the risk of intracerebral hemorrhage and ischemic stroke.[38]

NFL-administered Toradol injections have magnified this problem.  Toradol, a blood-thinning pain-killer, was routinely given to NFL players without their informed consent regarding the health risks of the drug.  As a blood-thinning pain-killer, Toradol masks injuries that players may have suffered, encouraging their continued participation in the game and increasing the risk that a player would suffer multiple instances of MTBI in one game.  Such repeated exposure to MTBI increased a player's risk of stroke beyond that which would result if the player had not taken Toradol (because more MTBI increases microbleeding, which in turn increases the likelihood of stroke).  Thus, the NFL's own negligent and fraudulent actions have

---

[35] *See* Burke *et al.*, *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 Neurology 1 (2013) (attached as Exhibit 21); Bigler, *Neuropsychology and Clinical Neuroscience of Persistent Post-Concussive Syndrome*, 14 J. Int'l Neuropsychological Soc'y 1, 8 (2008) ("Thus, in TBI the same mechanisms that stretch the neuron can stretch the blood vessel and this may impair the neurogenic response of the blood vessel.") (attached as Exhibit 22).

[36] Casson *et al.*, *Is There Chronic Brain Damage in Retired NFL Players? Neuroradiology, Neuropsychology, and Neurology Examinations of 45 Retired Players*, 6 Sports Health 384, 391 (2014) (attached as Exhibit 23).

[37] *Id.*

[38] *See* Kakar *et al.*, *Cerebral Microbleeds: A New Dilemma in Stroke Medicine*, 1 J. Royal Soc'y of Med. Cardiovascular Disease 1, 5-7 (2012) (attached as Exhibit 24).

contributed to the prevalence of stroke among retired players.  Co-Lead Class Counsel knew of these allegations – indeed, he represents a group of plaintiffs who sued the NFL based in part on its administration of Toradol.  *See Finn* Compl. ¶¶ 135-143.  But the Settlement makes no mention of these injuries except to release any claims for them and to inexplicably select them as bases for reducing the retired player's compensation.

Representative Plaintiffs did not adequately represent Objectors' interests in eliminating or reducing the offset related to stroke and post-NFL TBI.  ***Neither Mr. Turner nor Mr. Wooden claims an increased risk of stroke or non-football-related TBI.***  As a result, neither can adequately represent those class members who someday may suffer such a stroke or non-football related instance of TBI – and the resulting drop in compensation under the Settlement – due to the NFL's own conduct.

### C.   The Failure To Credit Seasons Played in NFL Europe Demonstrates Lack of Adequate Representation

The Settlement, while releasing all claims of NFL Europe players, does not award class members "Eligible Season" credit for time spent playing in NFL Europe or its predecessors. Settlement § 6.7(c)(i).  Thus, a class member who played five years in the NFL will receive a larger settlement award than a class member who played two years of his career in NFL Europe and three years in the NFL.  In effect, veterans of NFL Europe receive no compensation for the time they spent playing there.  That is true even though players in NFL Europe undoubtedly sustained repeated concussive and subconcussive impacts, just like players in the NFL.  *See* Morey Decl. ¶¶ 4, 6.

Players in NFL Europe experienced repeated MTBI, just like their counterparts in the United States.  NFL Europe played on the same size field, for the same length of time, and adopted rules that were rooted in the NFL Rulebook.  Morey Decl. ¶ 6.  The NFL Europe season,

moreover, lasted ten games, *id.* ¶ 5, which exceeds the "three or more" NFL games required to accrue an eligible season, Settlement § 2.1(kk).  And because the NFL Europe season did not overlap with the NFL season, at least some players would play **full seasons** in **both leagues.**  Mr. Morey, for example, played 33 games in the 2003 season – ten in NFL Europe and 23 (including pre- and post-season) in the NFL.  Morey Decl. ¶ 7.

Nor were the injuries that players sustained in NFL Europe insignificant.  Severely injured players were sometimes flown to Birmingham, Alabama for treatment.[39]  In one season, as many as 70 players in the six-team league were transported back to the United States.[40]

Class Counsel and the NFL offer no justification for the arbitrary discrimination against class members who played in NFL Europe.  Indeed, Co-Lead Class Counsel has admitted that the claims of NFL Europe players were bargained away:

> This was a complicated transaction.  **The case was specifically brought to provide help to players in the NFL.**  NFL Europe, um, is part of the deal, but, you know, nobody, I think, is going to argue that they're playing at the level that the NFL in the United States is playing at or that they're getting hit like they are there.  So I'm not saying they should be squeezed out.  I'm not poo-pooing that play over there.  **But I'm simply saying that in the context of a compromise where there's give and take, you know, we had to focus on what our primary objective was, and that was getting help to players playing in the NFL who need it right now.**

Audio file: Interview of Chris Seeger, CBS Sports Radio, The Mojo Show, at 9:09-9:45 (aired July 10, 2014) (emphasis added).  To sum up Mr. Seeger's comments:  The claims of players in

---

[39] Nicholson, *NFL Europe's Injured Flown to Birmingham*, Birmingham Business Journal (July 1, 2001), http://www.bizjournals.com/birmingham/stories/2001/07/02/story2.html?page=all (attached as Exhibit 25); *see also* Battista, *A Player's Concussion, a Family's Ordeal*, The N.Y. Times (Sept. 15, 2012) (describing the career-ending hit one NFL Europe player suffered during training camp), http://www.nytimes.com/2012/09/16/sports/football/former-nfl-player-mitch-white-learns-to-adjust-to-postconcussion-life.html?pagewanted=all (attached as Exhibit 26).

[40] Nicholson, *supra*.

NFL Europe were bargained away to serve the "primary objective" of "getting help to players playing in the NFL."

     ***Neither Mr. Turner nor Mr. Wooden alleges that he played in NFL Europe.***   Thus, neither adequately represents the interests of players who did, explaining why NFL Europe players are treated disparately.  *See GM Trucks*, 55 F.3d at 800 (finding class representation inadequate where "settlement appears to create antagonism within the class").[41]

* * * * *

     Simply put, distinct groups within the class had their rights bargained away without adequate representation.  These intra-class conflicts preclude certification of the settlement class. "The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class."  *Amchem*, 521 U.S. at 627.  However, where "the interests of the representative plaintiffs and the interests of [absentee class members] align[] in opposing directions," class representation is inadequate.  *Dewey*, 681 F.3d at 188; *see also Amchem*, 521 U.S. at 627 (denying class certification where settlement not agreed to by representatives of all sub-classes); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (holding that intra-class conflict "require[d] division into homogenous subclasses . . . with separate representation to eliminate conflicting interests").[42]

---

[41] Players in NFL Europe are not the only NFL veterans who go without full credit for the time they spent in the league.  Class members who spent time on "practice, developmental, or taxi squad roster[s] for at least eight (8) regular or postseason games" receive only "half of an Eligible Season."  Settlement ¶ 2.1(kk).

[42] If the Court agrees that intra-class conflicts prevent certification, it may "simply divide the groups into subclasses," *Dewey*, 681 F.3d at 189, so that "separate counsel [can] provide[] adequate structural protections to assure that differently situated plaintiffs negotiate for their own unique interests," *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 (3d Cir. 2004) (quotation marks omitted).

**II.      The Notice Is False, Misleading, and Inconsistent with Rule 23 and Due Process**

Through misleading language, confusing juxtaposition, and outright false statements, the notice obscures the fact that the Settlement bargains away the rights of a large portion of the class in a way that will provide those class members with no compensation.  Courts in class actions and other areas of law have construed such defects to be legally inadequate.  Class Counsel have compounded the problem of inadequate notice by engaging in a propaganda campaign advocating the Settlement.

Approval of a class settlement under Rule 23(b)(3) requires that class counsel furnish notice in compliance with Rules 23(c)(2) and (e).  *See Manual for Complex Litigation* (4th) § 21.311-.312.  Rule 23(c)(2) requires "the court [to] direct to class members the best notice that is practicable under the circumstances" that "clearly and concisely state[s] in plain, easily understood language" the nature of the action, the claims and defenses asserted, and the right of class members to request exclusion.  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(e) requires the court to approve any settlement, and to "direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).

Notice protects class members' due process rights.  *See, e.g.*, *Larson v. AT&T Mobility LLC*, 687 F.3d 109, 126 (3d Cir. 2012) (notice scheme deficient when it did not require defendant to search billing records to identify affected class members, and vacating approval of settlement).  In *Larson*, for example, the Third Circuit explained that it is "stringent in enforcing the individual notice requirement" because "a procedure such as the class action, which has a formidable if not irretrievable, effect on substantive rights, can comport with constitutional standards of due process only if there is a maximum opportunity for notice to the absentee class member."  *Id*. at 126 (quotation marks omitted).

Notice is insufficient when it is false or misleads class members about the terms of the settlement.  *See Eubank v. Pella Corp.*, 753 F.3d 718, 728 (7th Cir. 2014) (vacating approval of settlement, in part because notice was "incomplete and misleading" and did not "provide a truthful basis for deciding whether to opt out."); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197-98 (5th Cir. 2010) (vacating approval of settlement where notice "did not inform class members of the possibility that they would not receive any direct benefit from the settlement" and "did not provide interested parties with knowledge critical to an informed decision as to whether to object to class certification and settlement."); *Molski v. Gleich*, 318 F.3d 937, 951 (9th Cir. 2003) (vacating approval of settlement, in part because "notice misled the putative class members" about which kinds of claims would be released).

**A.     The Notice Contains Overtly False and Misleading Statements**

The notice misleads class members about the basic compromise of the settlement because it fails to alert class members to the fact that they will not be compensated for current or future CTE, while significantly limiting the NFL Defendants' liability.

**1.     The Short Form Notice**

The short form notice, which was extensively publicized, is patently false.  Dkt. No. 6093-2 ("Short Form Notice").  It was required to appear as a full-page, color advertisement in *Ebony*, *People*, *Sports Illustrated*, and *Time* magazines, and was downloadable on the settlement website, at www.nflconcussionsettlement.com ("Settlement Website").  Dkt. No. 6073-3 (Kinsella Decl.) at 6-7.  According to the notice plan, the Short Form Notice "is designed to get the reader's attention" and "concisely and clearly states, in plain easily understandable language, all required information."  *Id*. at 10.

The first sentence of the Short Form Notice assures players that their "valid claims" will be "paid in full" for 65 years:

## NFL Concussion Settlement

**All Valid Claims of Retired NFL Football Players to be Paid in Full for 65 Years Monetary Awards, Baseline Medical Exams and Other Benefits Provided**

The Short Form Notice continues, with more detail about the benefits of the Settlement:

> The Settlement provides money for three benefits:
>
> - Baseline medical exams to determine if retired players suffer from neurocognitive impairment and are entitled to additional testing and/ or treatment ($75 million),
>
> - Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death.  The maximum monetary awards range from $1.5 million to $5 million depending on the diagnosis.  All valid claims will be paid in full for 65 years; and
>
> - Education programs and initiatives related to football safety ($10 million).

This language plainly states that "[t]he Settlement will provide . . . [m]onetary awards for . . . certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death," and proclaims that "all valid claims will be paid in full for 65 years." Dkt. No. 6093-2.  A player reading this language – who might be concerned about CTE – would reasonably, but incorrectly, conclude that even though he might not get compensated for developing CTE during his lifetime, at least after his death his family will be compensated.

Nearly identical language appears on the front page of the Settlement Website:

Retired players, legal representatives of incapacitated or deceased players, and families of deceased players may be eligible to receive benefits from this Settlement.

The proposed settlement provides for three benefits:

1. Baseline medical exams for retired NFL players;
2. Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death; and
3. Education programs and initiatives related to football safety.

All valid claims for injury will be paid in full for 65 years.

NFL Concussion Settlement, http://www.nflconcussionsettlement.com (last visited Oct. 3, 2014). The website was advertised using paid links on popular search engines like Google. Kinsella Decl. at 10. Thus, any player curious about the Settlement who types the phrase "NFL concussion" into Google is greeted with a paid link to the Settlement Website as the first result:



Once he has clicked, the Settlement Website provides the misleading language, described above, about benefits for players who die with a diagnosis of CTE.

### 2.    The Long Form Notice

The long form notice was direct-mailed to readily identifiable retired players, and was available for download on the Settlement Website. Dkt. No. 6093-1 ("Long Form Notice"), *available at* https://www.nflconcussionsettlement.com/Documents/Long-form_Notice.pdf; Kin-

sella Decl. at 9.  A full-color, glossy booklet invoking football imagery, the Long Form Notice

does more to mislead than to educate class members.

　　　　While the Long Form notice does reveal the cut-off for CTE claims, it does so obliquely.

It states:

**5. WHAT ARE THE BENEFITS OF THE SETTLEMENT?**

Under the Settlement, the NFL Parties will pay to fund:

•　Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, "Baseline Assessment Program") (*see* Questions 11-13);

•　Monetary awards for diagnoses of Death with CTE prior to **July 7, 2014**, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) and Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) (*see* Questions 14-21). **All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement (the "Monetary Award Fund")**; and

Long Form Notice at 7.  This language does not outright disclose that players who die with a

diagnosis of CTE after July 7, 2014, will not be compensated.  Instead, it states that "the NFL

Parties will pay to fund . . . [m]onetary awards for diagnoses of Death with CTE prior to July 7,

2014" and leaves it to the reader to conclude that every other class member with CTE will not be

compensated for that disease.

　　　　In any event, this flash of "candor" is overwhelmed by repeated false and misleading

statements about CTE.  In the "Monetary Awards" section, on which players might reasonably

focus, the Long Form Notice states:

**14. WHAT DIAGNOSES QUALIFY FOR MONETARY AWARDS?**

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE (the "Qualifying Diagnoses").  A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

Long Form Notice at 12.  The notice states that "Death with CTE" is a "Qualifying Diagnosis."

The term "Qualifying Diagnosis" is likewise defined in the notice to include "Death with CTE."

But many statements in the notice are false when applied to "Death with CTE."  For example, the notice states that "[a] Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund," which is false as applied to *every* future diagnosis of "Death with CTE."  Similarly, in the same section on monetary benefits:

**21. CAN I RECEIVE A MONETARY AWARD EVEN THOUGH THE RETIRED PLAYER IS DEAD?**

Yes.  Representative Claimants for deceased retired players with a Qualifying Diagnoses will be eligible to receive monetary awards.  If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives (*see* Question 16).

Representative and Derivative Claimants will also need to register for Settlement benefits (*see* Question 26).

Long Form Notice at 16.  Contrary to this assertion in the notice, Representative Claimants for deceased retired players who die with a diagnosis of CTE are, as a category, *not* eligible to receive monetary awards.  A player with CTE is eligible only if he died by July 7, 2014.  The notice compounds the deception by stating that "[i]f the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law." *Id.*  This language creates the misimpression that while there may be limits on compensation for those who die before January 1, 2006, those who die after will be compensated.  That is not true.

The "Monetary Awards" section also includes a table showing award amounts:

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Long Form Notice at 13. The table lists "Death with CTE" as a "Qualifying Diagnosis" in a column along with ALS, Parkinson's, Alzheimer's, Level 2 Neurocognitive Impairment, and Level 1.5 Neurocognitive Impairment. The maximum award for "Death with CTE" is listed as $4 million. Nowhere in this section does it state that players will be compensated for "Death with CTE" only if they die before July 7, 2014. Instead, the notice suggests to readers that "Death with CTE" will be treated similarly to the other diseases, which have no cut-off date. The next table is equally misleading:

| AGE AT DIAGNOSIS | ALS | DEATH w/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

*Id.* at 14.  The table shows how awards decrease with age at diagnosis.  It creates the misleading impression that, as with the other listed diseases, claims for "Death w/CTE" will be paid out to players who are diagnosed potentially many years in the future when they are older.  Any player reading this section on monetary compensation would be left with the clear, but false, understanding that he will be compensated if he dies with CTE, just as he would if he developed ALS or one of the other diseases listed as a "Qualifying Diagnosis."  But any player who lives to read the notice will not be eligible for compensation for CTE under the Settlement.

These tables are misleading in other ways.  Notwithstanding the presence of multi-million dollar payments, the notice does not disclose that Class Counsel's own actuary predicts that many class members will never realize these maximum awards.  For example, Class Counsel's actuary estimates the average claimant will be 77 years old at the time of diagnosis, Dkt. No. 6167 at 7, which will reduce the ALS award by 80% and reduce the awards for CTE, Parkinson's, Alzheimer's, and Level 2 dementia by 96% to 97%, Settlement Ex. 3.  Nor does the notice disclose that Class Counsel's actuary predicts only 3,600 class members – out of 21,000 – are estimated to receive any monetary compensation at all.  Dkt. No. 6167 at 3-4.

The notice has the same shortcomings as notices courts have found inadequate in other settlement cases.  Like the notice in *Eubank*, 753 F.3d at 728, which the court found deficient because it implied that class members would receive cash even though some would only be entitled to coupons, the notice implies that those who die with a diagnosis of CTE will be compensated up to $4 million – even though only those who die by July 7, 2014 will be compensated.  *See also Katrina Canal Breaches Litig.*, 628 F.3d at 197-98 (settlement vacated when notice failed to inform class members that they might not receive any direct benefit from the settlement).  Like the notice in *Molski*, 318 F.3d at 951, which the court found misleading

44

because it implied that the settlement would preserve certain claims, the NFL players' notice misleadingly implies that CTE claims will be compensable over the life of the Settlement.  In fact, they will not.

> **B.**   **The Notice Is Similar to Communications Courts Have Found Misleading in Other Contexts**

The NFL Defendants and Class Counsel cling to the few statements of truthful information about the CTE benefit in the notice, and argue that this somehow offsets deception elsewhere.  However, the law generally recognizes that the limited disclosure of truthful information amidst a sea of false and inaccurate information cannot salvage a communication from being misleading.

When a communication contains misleading statements, the fact that it may contain some truth will not save it if it still misleads taken as a whole.  The Supreme Court has noted that "not every mixture with the true will neutralize the deceptive." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (finding that true statements embedded among misleading ones in a proxy statement were insufficient to render the proxy as a whole not misleading); *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1363 (9th Cir. 1993) (denying defendants' motion for summary judgment in securities fraud action because "grain of truth embedded" in subsequent press release did not neutralize misleading statements in earlier press release); *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F. Supp. 1297, 1307-08 (C.D. Cal. 1996) (disclosure of truthful information in the appendix of a Form 10-K submission did not as a matter of law dispel the effect of misleading accounting statements).

In analyzing proxy statements and offering materials or prospectuses for securities, courts have determined that a statement "can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact." *Fogarazzo v. Lehman Bros., Inc.*, 341

F. Supp. 2d 274, 294 (S.D.N.Y. 2004) (plaintiff sufficiently alleged a misrepresentation in a securities fraud action concerning misleading research reports).  Thus, courts have recognized that what matters "is not whether the particular statements, taken separately, were literally true, but whether . . . [the] representations, taken together and in context, would have misled."  *In re Lehman Bros. Sec. & ERISA Litig.,* 799 F. Supp. 2d 258, 314 (S.D.N.Y. 2011) (denying motion to dismiss because the court could not conclude as a matter of law that "inconspicuous and scattered warnings" neutralized "repeated and emphasized [misleading] statements" in the offering materials for a security).  In determining whether communications are misleading, taken as a whole, courts have looked to "the prominence of disclosures or warnings as a factor."  *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 121 (D. Conn. 2005) (finding that plaintiff adequately alleged that financial statements were misleading in a securities fraud action).

Courts have analyzed misleading communications in the context of false advertising claims similarly.  In an advertisement, "statement[s], although literally true, can for all practical purposes, convey a false message."  *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 392-93 (S.D.N.Y. 2003) (advertisement created a misleading impression despite being literally true, and a disclaimer was "insufficient to dispel the false message"); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993) (noting that "a court must analyze the message conveyed [in an advertisement] in full context" and upholding trial court finding that advertisement claims were literally false by necessary implication).  Courts also recognize that evidence of actual confusion among people who are the target of a communication is relevant, and that "[e]ven if an advertisement is not literally false, relief is available . . . if it can be shown that the advertisement has misled, confused, or deceived the consuming public."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir.

1997) (reversing district court's grant of summary judgment in favor of defendant in a false advertising action because triable issues of fact existed as to whether consumers were actually deceived by literally true statements).

Consumer protection laws apply the same analysis. Under Massachusetts consumer protection law, for example, "advertising need not be totally false in order to be deemed deceptive." *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 487 (Mass. 2004) (granting class certification in an action involving advertisements in which cigarette manufacturers implied "light" cigarettes contained less nicotine and tar). "The criticized advertising may consist of a half truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information." *Id.* Under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, fraudulent business practices include those "based on representations to the public which are untrue, and also those which may be accurate on some level but will nonetheless tend to mislead or deceive." *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 239 (Cal. Ct. App. 2006). Under the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 52, "[t]he failure to disclose material information may [also] cause an advertisement to be deceptive, even if it does not state false facts." *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984) (finding advertisement was misleading as to whether it contained aspirin as a pain-killer). Moreover, courts recognize that "[a] few words of disclaimer [can be] lost when [a communication is] considered as a whole." *McNeil-PPC, Inc. v. Pfizer, Inc.*, 351 F. Supp. 2d 226, 254 (S.D.N.Y. 2005) (granting a preliminary injunction in a case where an advertisement misleadingly suggested that mouthwash was a replacement for flossing, even though the ads contained a disclaimer telling consumers "[t]here's no replacement for flossing.").

These principles apply with no less force when considering whether the notice here, taken as a whole, is misleading to players and their families.  As is the case with proxy statements, where people are asked to vote as to their rights on the basis of complex documents, a "grain of truth embedded" in the Long Form Notice, *Rana Research*, 8 F.3d at 1363, should not save an otherwise misleading notice.  That is particularly true when the "disclosure" is not featured prominently in the highly publicized and distributed Short Form Notice, nor in the Long Form Notice's section describing "Monetary Benefits," the section players are most likely to read. Were the situation not so serious, it would be ironic that individuals entitled to compensation due to cognitive injures are being asked to navigate this complex maze to simply learn their rights. "The point of a [notice], after all, should be to inform, not to challenge the [players'] critical wits." *Va. Bankshares*, 501 U.S. at 1097.

### C.    Class Counsel's Propaganda Campaign Has Compounded the False and Misleading Nature of the Notice

To make matters worse, Class Counsel – who stand to receive a huge payday upon approval – have falsely described the Settlement to the media.  The propaganda campaign started shortly after the preliminary approval of the Settlement.  An article in the *New York Times* quoted Co-Lead Class Counsel's representations about the CTE benefit:

> [O]ne of the lead lawyers for the plaintiffs in the class action, said the objectors had misread the settlement. The families of dead players who were found to have C.T.E. might receive awards because the players could no longer receive a diagnosis. C.T.E. was not included for living players because the settlement would cover those symptoms if they were to develop.
>
> 'Going forward, any retired player who is sick with a qualifying condition will get compensated, as C.T.E. cannot be currently diagnosed in living people,' he said. 'Whether you have C.T.E. or not, or whether or not you can prove you have

C.T.E., if you have symptoms of a qualifying condition, you will be compensated."[43]

A recent article in Sporting News further stated: "[t]he attorneys representing the players in the NFL concussion lawsuit are now at work getting the word out to all the retired players affected by the revised settlement."[44]   Co-Lead Class Counsel states in the article that "CTE is not a relevant marker for anything in this settlement.   It's the symptoms – if you have all the symptoms that are related to CTE, or the diseases that are related, like dementia and Alzheimer's and ALS, then that determines it.   If a player thinks he has any symptoms of it, that's the very reason to stay in the deal."   *Id.*   But Co-Lead Class Counsel's hypothetical player, someone who "thinks he has any symptoms of [CTE]" and "stay[s] in the deal" will only get compensated if he is diagnosed with one of the other qualified diseases.   That hypothetical player may well get no compensation at all in return for "stay[ing] in the deal" and bargaining away his right to sue the NFL Defendants for his injuries.[45]   But that hypothetical player, reading the notice in light of Co-Lead Class Counsel's public comments, is likely to be misled into thinking otherwise.

An article that appeared on *profootballconcussions.com*, which bills itself as "A Fan's Look at Head Injuries and the Concussion Crisis," repeated Co-Lead Class Counsel's misleading

---

[43] Belson, *For Retirees, Decision on Concussion Settlement Will Not Be a Simple One*, N.Y. Times (July 22, 2014), http://www.nytimes.com/2014/07/23/sports/football/nfl-concussion-settlement-divides-former-players.html?_r=0 (attached as Exhibit 27).

[44] Steele, *Players Wrong on Key Factor in NFL Concussion Settlement*, Sporting News (July 14, 2014), http://www.sportingnews.com/nfl/story/2014-07-14/nfl-concussions-lawsuit-cte-symptoms-eligible-settlement-tony-dorsett-wycheck-seeger (attached as Exhibit 28).

[45] *See* Stern Decl. ¶ 41 ("The only symptoms related to CTE that are compensable (other than those that overlap with Alzheimer's disease, ALS or Parkinson's) are cognitive difficulties, and only cognitive difficulties that are severe enough that the Class Member would have significant impairments in critical aspects of daily living and independence.  Several key symptoms of CTE that are identified in the scientific and medical literature and in my clinical and research experience are not compensable.").

assertions: "If you get sick, period, you still get paid. We're telling everybody to go get tested. You'll be in the system. You're protected (by the settlement)."[46]

In an article in ABC News, which discusses former player Junior Seau, who committed suicide in 2012 and was diagnosed after his death with CTE, Co-Lead Class Counsel is quoted as saying:

> If Mr. Strauss [the lawyer for Seau's family] believes the $4 million his client is eligible for under the settlement is insufficient, he can choose to permanently forfeit these benefits and face all the significant risks associated with continued litigation . . . . We would advise any class member against opting out of this agreement, considering the tremendous guaranteed benefits it provides.[47]

Co-Lead Class Counsel fails to mention that had Mr. Seau died today, his family would be entitled to nothing.

In an article on *SportsIllustrated.com*,[48] Co-Lead Class Counsel again hyped the Settlement: "There is no scenario where a player won't get paid . . . [t]he biggest news of this is that in 15 or 25 years, you are still guaranteed to be compensated." Like Co-Lead Class Counsel's other public statements, this one is calculated to mislead players into believing that they are signing onto a comprehensive settlement, when in fact the Settlement fails to cover a significant class of claims.

An article in USA Today, which quoted Co-Lead Class Counsel extensively, states:

---

[46] *The NFL CTE Question*, The Pro Football Concussion Report (July 22, 2014), http://profootballconcussions.com/the-nfl-cte-question (attached as Exhibit 29).

[47] Fainaru-Wada & Fainaru, *Seaus to Opt Out of Concussion Deal*, ABC News (Sept. 3, 2014), http://abcnews.go.com/Sports/seaus-opt-concussion-deal/story?id=25230257 (attached as Exhibit 30).

[48] DeGory, *New Concussion Settlement a Win-Win*, SportsIllustrated.com (June 26, 2014), http://mmqb.si.com/2014/06/26/new-concussion-settlement-kevin-turner (attached as Exhibit 31).

"This is the only program where everybody gets justice. . . . Everybody wins," [Co-Lead Class Counsel] said.

He said all retired players, not just those who sued, will be eligible for a brain assessment program, and those found to have a certain level of impairment will receive a medical benefit card that be used for further testing and treatment. . . .

[Co-Lead Class Counsel] said former players will not have to prove their brain conditions are linked to NFL concussions.

"You don't have to prove that your neurological problem is related to a concussion. You don't have to prove in the settlement that you sustained a concussion in the NFL," [Co-Lead Class Counsel] said. "You just need to be a former retired player and you're in the program."[49]

"You just need to be a former retired player and you're in the program." This language is superbly calculated to reassure players of something that is just not true – that the Settlement is comprehensive and will take care of them no matter what happens. Co-Lead Class Counsel makes no mention of the limitation on CTE compensation. Further, in saying "you don't have to prove in the settlement that you sustained a concussion in the NFL," he fails to mention that you do if you wish to avoid the 75% offset for non-NFL TBI. In cheerleading the Settlement, he has been deceiving players about what the Settlement covers.

As the deadline for opting out draws near, the propaganda has intensified. Co-Lead Class Counsel recently gave an interview on *Real Football Lives and Wives*, an online radio program aimed at the families of current and retired NFL players.[50] Over the course of 45 minutes, Co-Lead Class Counsel extensively discussed the Settlement and exhorted class members to not opt out. However, at no time during the entire interview did Co-Lead Class Counsel ever mention

---

[49] Mihoces, *NFL Reaches Concussion Settlement*, USA Today (Aug. 29, 2013), http://www.usatoday.com/story/sports/nfl/2013/08/29/nfl-concussion-settlement-judge-anita-brody-tony-dorsett-jim-mcmahon-junior-seau/2727483 (attached as Exhibit 32).

[50] *NFL Concussion Settlement, REAL Information You Need to Know*, Real Football Wives (and Lives) (Sept. 2, 2014), http://www.blogtalkradio.com/realfootballwives/2014/09/02/nfl-concuss ion-settlement-real-information-you-need-to-know.

that the families of players who die with a diagnosis of CTE after July 7, 2014, will receive no compensation.  Nor did he mention that Class Counsel's own actuary estimates that only 3,600 out of 21,000 class members will receive any monetary compensation at all. Dkt. No. 6167 at 3-4.

"Whether a claimant would want to accept or reject the proposed settlement is a decision to be made by him independently and without influence or pressure from those competing parties who either favor or oppose the settlement." *Phila. Housing Auth. v. Am. Radiator & Standard Sanitary Corp.*, 323 F. Supp. 364, 378 (E.D. Pa. 1970).  By combining the misleading notice with a misleading propaganda campaign, Class Counsel have fundamentally undermined the ability of class members to make this decision "without influence or pressure."

### D.   False and Misleading Notice Has, in Fact, Misinformed Players and Falsely Assured Them That the Settlement Provides Benefits It Lacks

The confusion caused by the notice is not theoretical, it is real.  In an article on *Sports On Earth*, columnist Patrick Hruby describes his conversation with former player Dave Pear:

> "Is it a good deal?" Pear said. "It only covers certain people at certain times. Based on what I've read, you won't get compensation for CTE [chronic traumatic encephalopathy] until after you're dead."

> Not exactly, I told him. To receive cash awards for CTE, a neurodegenerative disease that currently only can be diagnosed posthumously, former players must have died by a specific cutoff date.[51]

The media is confused too:  In a recent article,[52]  ESPN characterized the settlement:

---

[51] Hruby, *Cutting them Short*, Sportsonearth.com (July 18, 2014), http://www.sportsonearth.com/ article/85045740/nfl-concussion-settlement-cuts-cte-coverage-short-patrick-hruby  (attached  as Exhibit 33).

[52] Fainaru & Fainaru-Wada, *Brain Impairment Begins Younger*, ESPN.com (Sept. 13, 2014), http://espn.go.com/nfl/story/_/id/11513442/data-estimates-3-10-nfl-retirees-face-cognitive-woes (attached as Exhibit 34).

> The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.
>
> However, only men younger than 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed at a more advanced age.

This description of the settlement seems to be taken straight from the false and misleading notice.  Even though it takes care to note other limitations of the Settlement, such as the sliding scale of awards for players over 45, it fails to mention that CTE claims will only be compensated if the player dies by July 7, 2014, and misleadingly implies that all "deaths involving CTE" are eligible for up to $4 million.  Showing the reach of Class Counsel's propaganda campaign, these two paragraphs appeared in nearly identical form in write-ups published in September 2014 on the websites of the *Wall Street Journal*,[53] the *Philly.com Blog*,[54] *Huffington Post*,[55] *FoxSports.com*,[56] the *Dallas Morning News*,[57] and the *Minneapolis Star Tribune*.[58]  None of these sources noted the July 7, 2014 cut-off date for CTE claims.

---

[53] Dale, *NFL: Nearly Three in 10 Ex-Players Will Develop Debilitating Conditions*, Associated Press (Sept. 12, 2014), *republished at* http://online.wsj.com/articles/nfl-nearly-three-in-10-ex-players-will-develop-debilitating-brain-conditions-1410571935 (attached as Exhibit 35).

[54] *Available at* http://www.philly.com/philly/blogs/sports/eagles/20140912_ap_0487fc0938bf47d9836b379dee6f9aca.html (attached as Exhibit 36).

[55] *Available at* http://www.huffingtonpost.com/2014/09/12/nfl-players-alzheimers-dementia_n_5812504.html (attached as Exhibit 37).

[56] *Available at* http://www.foxsports.com/nfl/story/nfl-players-lawyers-detail-lasting-effects-of-concussions-091214 (attached as Exhibit 38).

[57] *Available at* http://www.dallasnews.com/sports/dallas-cowboys/headlines/20140912-players-lawyers-data-estimates-3-in-10-nfl-retirees-face-cognitive-woes.ece (attached as Exhibit 39).

[58] *Available at* http://www.startribune.com/lifestyle/health/274914621.html (attached as Exhibit 40).

## III.     The Settlement Is Unfair, Unreasonable, and Inadequate

A class settlement cannot be approved unless it "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). Where, as here, a class settlement is negotiated *before* certification, the Court must "be even more scrupulous than usual in approving" the settlement because "the 'danger of a premature, even a collusive, settlement [is] increased.'" *GM Trucks*, 55 F.3d at 788, 805. Consequently, for pre-certification settlements, the settling parties must "make a higher showing of fairness to sustain the[ ] settlement[ ]." *Id.* at 805.[59]

In assessing whether a settlement is fair, reasonable, and adequate, the Court must consider: (1) the stage of the proceedings and the amount of discovery; (2) the ability of the NFL to withstand a greater judgment; (3) the reaction of the class; (4) the risks of establishing liability and damages; (5) the reasonableness of the settlement in light of the best possible recovery and the attendant risks of litigation; (6) the likelihood of maintaining class status throughout the litigation; and (7) the complexity, expense, and likely duration of the litigation. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 (3d Cir. 2001) (applying the *Girsh* factors). Each of these factors demonstrates why the Settlement should not be approved.

---

[59] *See also Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971) ("[W]hen the settlement is not negotiated by a court designated class representative the court must be doubly careful in evaluating the fairness of the settlement to the plaintiff's class."); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1125 (7th Cir. 1979) (attributing a need for heightened scrutiny of the settlement to the potential for collusive settlement); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (higher showing of fairness required in pre-certification settlements, and special focus on assuring adequate representation and the absence of collusion); *Mars Steel*, 834 F.2d at 681 (noting "a more careful scrutiny of the fairness of the settlement is required"); *Simer v. Rios*, 661 F.2d 655, 664-66 (7th Cir. 1981) (requiring a higher showing of fairness where settlement negotiated before certification); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir. 1990) ("A proffered settlement that is in large part negotiated prior to certification of the class – as occurred herein – is subject to a higher degree of scrutiny than is usual in assessing a settlement's fairness.").

### A.   The Complete Absence of Discovery Weighs Against Approval of the Settlement

"[A] decision to settle that occurs at too incipient a stage of the proceedings . . . weighs *against* settlement approval." *GM Trucks*, 55 F.3d at 810 (emphasis added). The presumption against approval is particularly strong where the parties engaged in no formal discovery. "[C]ourts frequently have ruled that discovery relating to the issue whether a class action is appropriate *needs to be undertaken* before deciding whether to allow the action to proceed on a class basis." Wright *et al.*, 7AA *Federal Practice & Procedure* § 1785.3 (3d ed. 2014) (emphasis added). Discovery allows counsel to develop "an adequate appreciation of the merits of the case before negotiating." *GM Trucks*, 55 F.3d at 813. "The deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered." *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983). Thus, when no discovery is taken, a court must "question[ ] whether class counsel could have negotiated in [the] best interests" of absent class members. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 307 (3d Cir. 2005) (rejecting class settlement). In other words, *"achiev[ing] the settlement after little or no discovery . . . raise[s] a red flag."* *GM Trucks*, 55 F.3d at 806 (emphasis added).

Here, Class Counsel appear to have conducted *no discovery* – none. The absence of even a basic factual record precludes any reasonably valid assessment of the value of the class's claims. Put differently, there is no basis to determine whether the Settlement is fair, adequate, and reasonable. The absence of discovery is particularly glaring because the Complaint alleges fraud and negligent concealment, where the best evidence is likely in the Defendants' hands. The Complaint lists dozens of media reports and facts demonstrating the NFL's cover-up of information and willful dissemination of misinformation regarding the risks of head trauma from football. *E.g.*, Compl. ¶¶ 128-199. Investigation of these facts through discovery of the NFL's

internal files could yield powerful and compelling evidence of the NFL's culpability – strengthening Class Counsel's hand at the negotiating table.  Yet Class Counsel settled this case without taking a single deposition and without the NFL producing a single document related to the merits of the underlying claims.

Instead, Class Counsel purport to have "exchanged information" with the NFL during the negotiation, including "expert calculations of damages."   Dkt. No. 6073-5 at 43.   That is insufficient.   Nothing in the record demonstrates that Class Counsel "conducted significant independent discovery or investigations ***to develop the merits of their case (as opposed to supporting the value of the settlement)***."  *GM Trucks*, 55 F.3d at 814 (emphasis added).[60]  In the absence of such discovery, this Court must lack "confidence that the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action."  *Id.*

Courts routinely refuse to approve class settlements in the absence of adequate discovery.  In *GM Trucks*, for example, the Third Circuit found that the "district court clearly erred in finding that this [*Girsh*] factor weighed in favor of settlement" where the district court failed to "assur[e] that adequate discovery had been taken."  55 F.3d at 814.  And in *Mills v. Foremost Insurance Co.*, 511 F.3d 1300 (11th Cir. 2008), the Eleventh Circuit concluded that "the district court's class certification ruling was premature" because of the absence of discovery.  *Id.* at 1309; *see also Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) ("propriety of a class action cannot be determined in some cases without discovery").

By contrast, when courts have found this *Girsh* factor to weigh in favor of settlement, the settling parties have engaged in far more extensive investigation and discovery than what has

---

[60] The actuarial reports have no impact on this *Girsh* factor because that information bears only on "the value of the settlement," not "the merits of [plaintiffs'] case."  *GM Trucks*, 55 F.3d at 814.

occurred here.  *See, e.g., Cendant Corp.*, 264 F.3d at 235-36 ( "extensive discovery," review of produced documents and witness interviews, and retention of a damages expert); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) ( "hundreds of thousands of documents . . . , numerous depositions, and consultations with experts"); *In re Prudential Ins.*, 148 F.3d 283, 319 (3d Cir. 1998) (review of a "multitude of documents," interviews with hundreds of potential witnesses, and 20 depositions).  And cases where courts granted final approval in the absence of formal discovery have similarly involved far more extensive informal investigations than Class Counsel performed in this case.[61]  Class Counsel's discovery efforts to date fall well short of the benchmark established by these cases.

Negotiating blindly, Class Counsel entered into the settlement negotiations with nothing more than an uneducated guess as to the merits of the case.  They could not "fairly, safely, and appropriately decide to settle the action."  *GM Trucks*, 55 F.3d at 814.

**B.      The NFL's Ability To Withstand a Far Greater Judgment Than That Provided by the Settlement Weighs Against Approval of the Settlement**

A defendant's ability to "withstand a judgment for an amount significantly greater" than the proposed settlement weighs against approval.  *Cendant Corp.*, 264 F.3d at 240-41 (finding that this factor weighed against settlement when the defendant could "pay significantly more than [the] $2.85 billion" settlement).  Undoubtedly, the NFL can.

---

[61] *See Barani v. Wells Fargo Bank, N.A.*, No. 12-2999, 2014 WL 1389329, at *5-6 (S.D. Cal. Apr. 9, 2014) (noting "substantial discovery" and "thorough[ ] investigat[ion]"); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 271 (E.D. Pa. 2012) (describing informal discovery of over 3,200 documents that described defendant's "participation in the conspiracy"); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 444 (E.D. Pa. 2008) (noting "dozens of depositions," "hundreds of pages of expert reports," and "hundreds of thousands of pages of documents" produced even though "the parties have not yet officially conducted discovery on the merits").

Although the Monetary Award Fund is no longer capped, lifting the cap is a cosmetic gesture.  The settling parties have emphasized repeatedly that they "remain undeterred in their belief that the $760 million deal originally struck would have been sufficient to compensate all Class Members with valid claims over the term of the Monetary Award Fund."  Dkt. No. 6073-5 at 12; *see also* Dkt. Nos. 6167, 6168.  And the hurdles imposed on those seeking to file a claim will reduce the value of the Settlement further still.  *See* pp. 71-80, *infra*.

The NFL can withstand a judgment many times the amount of the settling parties' own valuation of the Settlement.  Last year alone the NFL had annual revenue of more than $10 billion,[62] earned a reported $1 billion from licensing, and paid its commissioner more than $35 million.[63]  The NFL's $950 million TV contract for **one season** of Sunday Night Football would itself cover the cost of the current Settlement.[64]  And the NFL projects revenues of $25 billion by 2027.[65]  Moreover, the NFL has not disclosed how much it, rather than its insurers, would have to pay to settle these claims.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 863-64 (1999) (vacating settlement, in part because the district court failed to evaluate the fairness of the settlement in light of the available assets of both the defendant and its insurers).

---

[62] Schrotenboer, *NFL Takes Aim at $25 Billion, But At What Price?*, USA Today (Feb. 5, 2014), http://www.usatoday.com/story/sports/nfl/super/2014/01/30/super-bowl-nfl-revenue-denver-broncos-seattle-seahawks/5061197/ (attached as Exhibit 41).

[63] Wilson, *NFL Paid Roger Goodell $35.1 Million Last Year*, CBSSports.com (Feb. 14, 2014), http://www.cbssports.com/nfl/eye-on-football/24443392/report-nfl-paid-roger-goodell-351-million-last-year (attached as Exhibit 42).

[64] Futterman *et al.*, *NFL: The League that Runs TV*, Wall St. J. (Dec. 15, 2011), http://online.wsj.com/article/SB10001424052970204026804577098774037075832.html (attached as Exhibit 43).

[65] *See* Kaplan, *Goodell Sets Revenue Goal of $25B by 2027 for NFL*, Sports Business Journal (Apr. 5, 2010), http://www.sportsbusinessdaily.com/Journal/Issues/2010/04/20100405/This-Weeks-News/Goodell-Sets-Revenue-Goal-Of-$25B-By-2027-For-NFL.aspx (attached as Exhibit 44).

C.      The Negative Reaction of the Class Weighs Against Approval of the Settlement

Inquiry into the reaction of the class generally looks at "the number and vociferousness of the objectors" and opt-outs. *GM Trucks*, 55 F.3d at 812. From the outset, the reaction of the class has been negative:

- Chidi Ahanotu: "The key part of this will be the people who determine who qualifies and who's eligible. . . . If it's like the NFL's disability benefit program, ***this isn't a win for the players***. That panel denies most requests."[66]

- Kevin Mawae: "Basically, for the cost of their least valuable team, the NFL was able to remove a huge monkey off their back. . . . At the end of the day, it's a very small price to pay considering the negative outcome that could have happened to the NFL if the players had taken this to court."[67]

- Leroy Hoard: "They (the NFL) put a big settlement number out there, but guess what? They say you have to qualify, how easy will they make that?"[68]

- Wade Smith: "At the surface it looks like a good deal. But in the long run I don't think it is. That's usually how it works when it comes to players and ownership."[69]

- Dorsey Levens: "This is a great victory for them [the NFL]. I didn't understand how they got off so lightly."[70]

After this Court *sua sponte* rejected the initial settlement, criticism of the settlement agreement continued. Within two weeks of this Court's Order, for example, the Seau family

---

[66] Banks, *Former Players: Devil Is in the Details with NFL Concussion Settlement*, SI.com (Aug. 29, 2013) (emphasis added), http://www.si.com/nfl/2013/08/29/nfl-concussion-lawsuit-settlement-player-reaction-kevin-mawae (attached as Exhibit 45).

[67] Futterman & Clark, *Deal in Concussion Suit Gives NFL a Big Victory*, Wall St. J. (Aug. 29, 2013), online.wsj.com/article/SB10001424127887324463604579042980915590474.html (attached as Exhibit 46).

[68] ESPN.com, *Reaction to the Concussion Deal* (Aug. 30, 2013) ("ESPN Reactions"), espn.go.com/nfl/story/_/id/9612672/reaction-nfl-concussion-settlement (attached as Exhibit 47).

[69] *Id.*

[70] Wolfley, *Dorsey Levens Rips Settlement of Concussion Lawsuit Against NFL*, Milwaukee Journal Sentinel (Sept. 18, 2013), http://www.jsonline.com/sports/dorsey-levens-rips-settlement-of-concussion-lawsuit-against-nfl-b99101255z1-224335851.html (attached as Exhibit 48).

filed a statement noting their objections to the settlement.  *See* Dkt. No. 5695.  Another 214

plaintiffs filed shortly thereafter, seeking "thorough analysis of the proposed settlement."  Dkt.

No. 5778 at 1-2.

After preliminary approval, class members have maintained their opposition.  The Seau

family has continued its criticism.[71]  Joe DeLamielleure is "going to tell everyone I know to

object."[72]  NFL legend and Hall of Famer Emmitt Smith called the settlement "nothing."[73]  Class

members are already filing objections.  *See* Dkt. No. 6175.  Indeed, the settling parties' actuaries

estimate that as much as **40% of the class will not participate in the Settlement** for one reason or

another.  Dkt. No. 6167 at 38; Dkt. No. 6168 at 33.

All this criticism indicates that the number of opt-outs and objectors will be high.  But

even if the number of opt-outs and objectors comprises only a small percentage of the class, that

would not support approval because the class notice "was not neutral and it did not provide a

truthful basis for deciding whether to opt out."  *Eubank*, 753 F.3d at 728 (holding small number

of objectors did not weigh in favor of settlement); *accord GM Trucks*, 55 F.3d at 813 (lack of

objectors did not weigh in favor of approval because the "notice largely defeats the potential for

objection since" it was incomplete); *see also* pp. 38-55, *supra*.

---

[71]  Moran, *Seau Family Says "No" to NFL Settlement*, U-T San Diego (Sept. 3, 2014), http://www.utsandiego.com/news/2014/sep/03/seau-family-says-no-to-nfl-settlement/   (attached as Exhibit 49).

[72]  Fenno, *Hall of Famer Joe DeLamielleure Will Object to NFL Concussion Deal*, The L.A. Times (Sept. 4, 2014), http://www.latimes.com/sports/sportsnow/la-sp-sn-nfl-concussion-deal-joe-delamielleure-20140904-story.html (attached as Exhibit 50).

[73]  Interview with Emmitt Smith, *In Depth with Graham Bensinger*, at 3:03 (Sept. 18, 2014), http://sports.yahoo.com/video/emmitt-smith-20k-concussion-settlement-110000539.html.

### D. The Risks of Establishing Liability and Damages Weigh Against Approval of the Settlement

The absence of even a basic factual record – because no discovery has occurred – precludes a complete assessment of the risks of establishing liability and damages. However, the public information that *is* available demonstrates that the class's claims are strong and the NFL's defenses are weak.

### 1. Even Without Discovery, Publicly Available Information Shows the Strength of Plaintiffs' Claims

The publicly available facts show that the NFL was aware of its responsibility to protect its players, knew or should have known that its policies and conduct were leading to widespread exposure to neurodegenerative diseases, and that – far from helping protect its players from brain trauma – the NFL sought to quash any research drawing a connection between the two. *See* pp. 5-10, *supra*.

### a. The NFL Assumed a Duty of Care To Guard Player Health and Safety

The NFL has publicly represented that "[s]ince its earliest days, the league has continuously taken steps to ensure that the game is played as fairly as possible without unnecessary risk to its participants, including making changes and enhancements to game safety rules." Compl. ¶ 69; *see also id.* ¶¶ 73-81. It formed an MTBI Committee whose ostensible purpose was to study links between head injuries and neurodegenerative diseases. But the Committee's supposed research – which was disseminated widely – repeatedly found no links between the two and stood in stark contrast to research by the scientific community.

> **b.      Medical Studies Show That the NFL Knew or Should Have Known of the Link Between MTBI and Brain Damage, Particularly the Onset of CTE**

Countless studies, dating back to the 1920s, show that both concussive and sub-concussive head trauma leads to, among other things, cognitive impairment, memory loss, and depression.[74]   In recent years, these studies have focused on the presence of CTE in athletes, particularly those who had sustained repeated head trauma.   In 2002, Dr. Bennet Omalu, a forensic pathologist, identified CTE in the brain of former Pittsburgh Steelers' center Mike Webster.[75]   Dr. Omalu identified CTE again in 2005 and 2006 in the brains of former players Terry Long and Andre Waters – both of whom committed suicide.[76]   And numerous medical studies – issued at approximately the same time as the NFL's misinformation campaign – have addressed the issue of CTE and/or cognitive impairment arising from concussions sustained during football.[77]

---

[74] *See, e.g.*, Kain, *It's Just a Concussion: The National Football League's Denial of a Causal Link Between Multiple Concussions and Later-Life Cognitive Decline*, 40 Rutgers L.J. 697, 701-02 & n.26 (2009); Roberts, *Brain Damage in Boxers: A Study of the Prevalence of Traumatic Encephalopathy Among Ex-Professional Boxers* 61 (1969); Busse & Silverman, *Electroencephalographic Changes in Professional Boxers*, 149 J.A.M.A. 1522 (1952) (attached as Exhibit 51); Martland, *Punch Drunk*, 91 J.A.M.A. 1103 (1928) (attached as Exhibit 52).

[75] Fainaru-Wada & Fainaru, *League of Denial*, *supra*, at 158, 163.

[76] Schwarz 2007, *supra*.

[77] *See, e.g.*, McKee *et al.* 2013, *supra*, at 59; McKee *et al.*, *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, 68 J. Neuropathology & Experimental Neurology 709, 710 (2009) (attached as Exhibit 53); Cantu, *Chronic Traumatic Encephalopathy in the National Football League Player*, 61 Neurosurgery 223 (2007) (attached as Exhibit 54); Guskiewicz *et al.*, *Association Between Recurrent Concussion and Late-Life Cognitive Impairment in Retired Professional Football Players*, 57 Neurosurgery 719 (2005) (attached as Exhibit 55); Omalu *et al.*, *Chronic Traumatic Encephalopahty in a National Football League*, 57 Neurosurgery 128 (2005) (attached as Exhibit 56); Omalu *et al.*, *Chronic Traumatic Encephalopathy in a National Football League Player: Part II*, 59 Neurosurgery 1086 (2006) (attached as Exhibit 57).

c.     **The NFL Actively Worked To Conceal the Correlation
Between MTBI and Brain Damage**

The NFL's MTBI Committee devoted its resources to artificially creating "scientific" papers of its own that directly contradicted decades of research on brain trauma.  For example, in 2005, the MTBI Committee concluded that returning to play after sustaining a concussion "does not involve significant risk of a second injury either in the same game or during the season."[78]  In another paper, the MTBI Committee represented: "mild TBIs in professional football *are not serious injuries*"; "[i]n players with four or more concussions there was a greater chance of personality change, and fatigue, but the number *did not reach statistical significance*"; "this 6-year study indicates that *no NFL player experienced second-impact syndrome, chronic cumulative injury, or chronic traumatic encephalopathy from repeated injuries*;" "players who become asymptomatic and have normal results on examinations performed at any time after injury, while the game is still in progress, have been and *can continue to be safely returned to play on that day*."[79]  In a 2007 interview on HBO's *Real Sports*, moreover, then-NFL MTBI Committee co-chair Ira Casson insisted there was no link between multiple head injuries in professional football players and such conditions as depression, dementia, and early-onset Alzheimer's.[80]

These representations were not outliers.  In its 2007 concussion guidelines, the NFL represented: "Current research with professional athletes has shown that you *should not be at*

---

[78]   CNN Library, *NFL Concussions Fast Facts*, CNN U.S. (July 21, 2014), http://www.cnn.com/2013/08/30/us/nfl-concussions-fast-facts/ (attached as Exhibit 58).

[79] Pellman *et al.*, *Concussion in Professional Football: Summary of the Research Conducted by the National Football League's Committee on Mild Traumatic Brain Injury*, 21 Neurosurgery Focus 1, 9-10 (2006) (emphasis added) (attached as Exhibit 59).

[80] Hruby, *The Case Against the NFL*, The Post Game (Feb. 29, 2012), www.thepostgame.com/blog/hruby-tuesday/201202/case-against-nfl (attached as Exhibit 60).

*greater risk of further injury* once you receive proper medical care for a concussion and are free of symptoms," that "[c]urrent research with professional athletes has **not shown that having more than one or two concussions leads to permanent problems** if each injury is managed properly," and that "there is **no magic number** for how many concussions is **too many**."[81]  In January 2010, during a House Judiciary Committee hearing, Dr. Casson further denied a link between repeat head impacts and long-term brain damage.[82]

At the very least, publicly available information establishes that, despite the absence of discovery, Plaintiffs' claims are viable.

> **2.      Discovery Would Have Allowed Class Counsel To Overcome – or at Least Understand – the Supposed "Stiff and Complex Challenges" to a Successful Suit**

The absence of discovery also hampers class members' abilities to evaluate the strength of the NFL's defenses.  *See* pp. 56-59, *supra*.  In moving for preliminary approval of the settlement, Class Counsel focused on the "stiff and complex challenges" they purportedly faced in surmounting Defendants' defenses: preemption, causation, statute of limitations, assumption of the risk, and "other defenses."  Dkt. 6073-5 at 61-71.  Although Class Counsel claim that whether they could satisfy their burden of proof was a "significant consideration" in settling, *id.*, that is a red herring.  Whether a burden of proof is met is a question of fact, and Plaintiffs developed no facts through discovery.  Had they done so, they may not have considered the

---

[81] National Football League, *NFL Outlines for Players Steps Taken to Address Concussions*, NFL.com (Aug. 14, 2007) (emphasis added), http://www.nfl.com/news/story/09000d5d8017 cc67/article/nfl-outlines-for-players-steps-taken-to-address-concussions (attached as Exhibit 61).

[82] *Legal Issues Relating to Football Head Injuries (Part I & II): Hearings Before the H. Comm. on the Judiciary*, 111th Congress 334-35 (2010) (statement of Ira R. Casson, M.D.), http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg53092/pdf/CHRG-111hhrg53092.pdf.

challenges so "stiff and complex."  But even based on the information currently available, the NFL's claimed defenses are weak.

**_Preemption._**  Class Counsel contend that preemption under § 301 of the Labor Management Relations Act (LMRA), 28 U.S.C. § 185, presents a "significant" legal challenge for Plaintiffs in light of the NFL Defendants' referenced collective-bargaining agreements (CBAs).  Dkt. No. 6073-5 at 61-64.  But § 301 only preempts "claims founded **_directly_** on rights created by collective-bargaining agreements," or claims "**_substantially dependent_** on analysis of a collective-bargaining agreement."  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (emphasis added) (quotation marks omitted) (former employees' claims against former employer were not preempted because claims arose out of individual employment contracts and did not touch on CBA provisions).

In fact, in *Green v. Arizona Cardinals Football Club*, the district court, relying on *Caterpillar*, recently held that the claims of retired NFL players against the Arizona Cardinals for brain injuries resulting from TBI **_were not precluded by the CBA_**.  *Green v. Ariz. Cardinals Football Club, LLC*, No. 14-CV-461, 2014 WL 1920468, at *3 (E.D. Mo. May 14, 2014).  The court's reasoning holds true here:  Preemption is not triggered where a dispute only "tangentially involv[es] a provision of a [CBA]."  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).  Stated differently, "section 301 does not preempt state law claims merely because the parties involved are subject to a CBA and the events underlying the claim occurred on the job."  *Williams v. Nat'l Football League*, 582 F.3d 863, 874 (8th Cir. 2009).  What matters is whether the plaintiffs' claims turn on rights that are actually set forth in a CBA provision or that "'require interpretation or construction of the CBA'" itself.  *Green*, 2014 WL 1920468, at *3 (quoting *Williams*, 582 F.3d at 876) (rejecting preemption argument on ground that alleged NFL CBAs

were not the source of players' claims of negligence, misrepresentation, and fraudulent concealment).

Plaintiffs' claims here turn on factual questions about the NFL's conduct – what actions or representations it did or did not perform and when and why it decided to perform them.  For example:  When did the NFL first learn of the connection between MTBI and neurodegenerative disease?  What data did the NFL collect?  How and why did it craft its public statements on concussions?  Discovery is needed before making any realistic assessment as to the "challenges or obstacles" Plaintiffs might face regarding preemption.

*Causation.*  Class Counsel claim they face "significant legal impediments surrounding [their] ability to prove causation and obtain verdicts in the absence of a settlement."  Dkt. No. 6073-5 at 64.  But "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'"  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011).  Unless the NFL Defendants' conduct was a "trivial contribution" to the putative class members' "cause of harm," the NFL Defendants' conduct is a proximate cause of the class members' injuries. *Restatement (Third) of Torts: Phys. & Emot. Harm* § 36 (2010).

Class Counsel are wrong to cede any ground to this defense without obtaining discovery into the Defendants' conduct.  When the NFL first learned of the connection between head trauma and neurodegenerative disease, what studies it undertook concerning this information, and how and why it crafted its public statements concerning concussions, are questions that should be pursued through discovery to address the purported causation "impediment."

*Statute of Limitations.*  Class Counsel contend their claims faced "a significant potential risk" of dismissal in light of the "serious challenge" presented by a statute of limitations.  Dkt.

6073- at 65.  This professed concern ignores the doctrine of fraudulent concealment, which "tolls the statute of limitations where 'through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry.' "  *Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006) (whether defendants made misrepresentations and the nature of any misrepresentations is relevant to determining if fraudulent concealment tolled limitations period).

Significantly, Class Counsel urged that a statute of limitations defense should fail on this very ground in other litigation.  *See Finn* Compl. ¶¶ 144-148 (the "applicable statute of limitations is tolled because Defendant's fraudulent concealment of the dangers and adverse effects of head injuries made it impossible for Plaintiffs to learn of the hazards to their health").  The question is whether a defendant undertook some "affirmative and independent act of concealment that would prevent the plaintiff from discovering the injury[,] despite the exercise of reasonable diligence."  *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir. 1991).  Rather than answer that factual question through evidence developed in discovery to negotiate a settlement that compensates all injured class members, Class Counsel punted by excluding all class members who died before January 1, 2006, unless the claimant can demonstrate that the statute of limitations would not apply.  Settlement § 6.2(b)

***Assumption of the Risk.***  Class Counsel argue that an "assumption-of-risk" defense also potentially blocks Plaintiffs' claims.  Dkt. No. 6073-5 at 67-70.  But the assumption of risk "doctrine is very narrow," limited only to circumstances where it is clear that "the 'nature and extent' of the risk were 'fully appreciated' and that the plaintiff voluntarily proceeded to face that risk."  *Barnes v. Am. Tobacco Co.*, 984 F. Supp. 842, 869 (E.D. Pa. 1997).  The retired players unquestionably assumed certain bodily risks, but they did not consent to face the types of harm alleged here – harm concealed from them by Defendants.  *See, e.g., Murphy v.*

67

*Steeplechase Amusement Co.*, 250 N.Y. 479, 482-83 (1929) ("One who takes part in [ ] a sport accepts the dangers that inhere in it so far as they are obvious and necessary, . . . [but a] different case would be here if the dangers inherent in the sport were obscure or unobserved, or so serious as to justify the belief that precautions of some kind must have been taken to avert them.").

Class Counsel pled facts – for which they presumably had a good-faith basis – that would easily defeat an assumption of the risk defense.  The evidence supporting those allegations has not been developed through discovery.

***Statutory Employer.***  Class Counsel also state that the NFL Defendants "may argue they are similarly situated to a general contractor with respect to the injured players, and the injured players are akin to the employees of subcontractors."  Dkt. No. 6073-5 at 71.  However, "very great care . . . must be exercised before allowing an employer to avoid his liability at common law by asserting that he is a statutory employer."  *Stipanovich v. Westinghouse Elec. Corp.*, 210 Pa. Super. 98, 106 (1967).  In the Third Circuit, defendants must identify "an owner, a principal contractor[,] and a subcontractor" for the defense to apply; a party "***cannot be both the owner (or in the position of owner) and statutory employer at the same time***."  *Pozza v. United States*, 324 F. Supp. 2d 709, 712 (W.D. Pa. 2004) (citing *Jamison v. Westinghouse Elec. Corp.*, 375 F.2d 465, 469 (3d Cir. 1967) (emphasis added)).  If the defense were to be asserted, discovery would be needed into the NFL, the individual teams, and the teams' owners to examine their corporate structure and contractual relationships.

\* \* \* \* \*

In sum, the absence of discovery makes it impossible for class members to accurately assess the risks of establishing liability and damages.  But even on the information that is

available, class members have strong arguments that the NFL is liable and that damages can be proven.

### E.    The Best Possible Recovery and the Risks of Litigation Weigh Against Approval of the Settlement

A court must examine "the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case." *GM Trucks*, 55 F.3d at 806.  This Settlement is a sell-out.  The Settlement terms do include multi-million dollar maximum awards and an uncapped monetary award fund.  But that generosity is illusory.  From the MTBI-related injuries that go completely uncompensated to the offsets that reduce individual awards and the procedural maze that claimants must navigate to receive payment, the Settlement is designed to dramatically reduce the number of claims on which the NFL must actually pay.  Where, as here, the "real value" of a settlement to the class falls well short of its ostensible face value, the settlement is not reasonable in light of the "best possible recovery" and the attendant risks of litigation.  *See GM Trucks*, 55 F.3d at 807-10.

### 1.    The Proffered Value of the Settlement Is Illusory Because the Settlement Leaves Many Class Members Without Compensation for Their MTBI-Related Diseases

A settlement is not the "best possible recovery" where "some segments of the class are treated differently from others."  *GM Trucks*, 55 F.3d at 808; *see Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) ("disparity in the relief afforded under the settlement to the named plaintiffs, on the one hand, and the unnamed class members, on the other, [makes] the settlement unfair").  "In the class action context, 'the relief sought in the complaint' serves as a useful benchmark in deciding the reasonableness of a settlement."  *GM Trucks*, 55 F.3d at 810.  CTE is at the heart of the Class Action Complaint and was a driving force of this lawsuit.  *See* pp. 31-32, *supra*.  The total failure to compensate current and future cases of CTE shows that the

Settlement is not reasonable in light of the best possible recovery. *See GM Trucks*, 55 F.3d at 810 (settlement not reasonable where "coupons offered by [defendant] simply do not address the safety defect that formed the central basis of the amended complaint filed barely four months before the settlement").[83]

The 75% offset for stroke and TBI further reduces the actual value of the settlement relative to the best possible recovery. Both Class Counsel and the NFL accounted for the 75% offset in their actuarial estimates evaluating the settlement. *See* Dkt. No. 6167 at 18-19; Dkt. No. 6168 at 37-38. Both relied on the incidence of stroke in the general population. Class Counsel assumed that 9.1% of Alzheimer's patients and 8.4% of dementia patients would suffer a stroke before the onset of disease. Dkt. No. 6167 at 18-19. The NFL assumed a rate of stroke at 4.5%. Dkt. No. 6168 at 37. But any reliance on figures for the general population is seriously flawed. Former NFL players likely face a ***higher risk*** of stroke precisely because of the head injuries they suffered in the NFL. *See* pp. 33-34, *supra*.

The stroke offset also disproportionately burdens some class members more than others. African-Americans are 1.3 times more likely to have a stroke than others.[84]   Yet the Settlement

---

[83] The Settlement is not reasonable even according to Class Counsel's own flawed figures. Although CTE is likely to be the most common neurocognitive disease suffered by the class, Class Counsel identified only 46 cases of CTE from among 1,700 class members who have died. *See* Dkt. No. 6167 at 3, 5. Applying that absurdly low 2.7% rate of CTE across the 19,400 class members living today, *id.* at 3, would indicate that there will be 525 more cases of CTE in the future. Accepting the settling parties' own valuation of CTE as a $1.44 million injury (after discounting for age at time of diagnosis and years played, Dkt. 6167 at 8 tbl. 2-4), the total value of future CTE claims would still be ***$756 million***. But the Settlement reduces that figure to ***zero***. On that basis alone, the Settlement is unreasonable. *See Eubank*, 753 F.3d at 726 ("A class recovery of little more than $1 million is a long way from the $90 million that the district judge thought the class members likely to receive were the suit to be litigated.").

[84] *See* Ayala *et al.*, *Racial/Ethnic Disparities in Mortality by Stroke Subtype in the United States, 1995-1998*, 154 Am. J. of Epidemiology 1057 (2001) (attached as Exhibit 62).

severely reduces recovery for an event that disproportionately affects a significant percentage of the settlement class.

The Settlement also provides no credit for seasons played in NFL Europe, notwithstanding that the risk of injury in NFL Europe did not differ from the risk in the NFL in any meaningful way.  *See* pp. 35-37, *supra*; Morey Decl. ¶ 6.  Neither the NFL nor Class Counsel estimate the number of class members whose service in NFL Europe rather than the NFL reduced their overall recovery.  But one collection of football statistics identifies ***over 3,600 players*** who spent time in the league.[85]  Thus, the failure to credit seasons played in NFL Europe could affect a large number of class members.

In short, the "fact that the . . . settlement benefits certain groups of the class more than others" weighs against final approval, and demonstrates that the settlement was "a sell-out of an otherwise strong case."  *GM Trucks*, 55 F.3d at 806, 808.

> **2.**     **The Proffered Value of the Settlement Is Illusory Because It Sets an Unreasonably High Bar To Qualify for Dementia**

The Settlement sets an unreasonably high bar to qualify even for Level 1.5 dementia.  To do so, a class member must be unable to function independently at a job, shopping, volunteer or social activities; must be unable to complete difficult chores or complicated hobbies; ***and*** must require prompting to engage in personal care such as dressing, bathing, and using the bathroom. Stern Decl. ¶ 47.  Junior Seau and Dave Duerson – two NFL greats who killed themselves and were found to have CTE – reportedly experienced "years of significant changes in mood and behavior, including depression, hopelessness, aggression, and poor impulse control."  *Id.* ¶ 35. "Based on public reports of their functioning by their family members and friends," however, "it

---

[85] *See* NFL Europe/WLAF Player Register, *The Football Database*, http://www.footballdb.com/ nfl-europe/nfleplayers.html (accessed Sept. 24, 2014).

is unlikely that their cognitive skills were impaired to the degree of meeting the criteria for Level 1.5 or Level 2 Neurocognitive Impairment." *Id.*

> ### 3. The Proffered Value of the Settlement Is Illusory Because the Baseline Assessment Program Is Underinclusive

The Baseline Assessment Program (BAP) offers far less value than the Settlement proclaims.  Class Counsel agreed to a ***$75 million cap*** on the baseline assessment fund without any evidence that the capped amount was adequate.  Indeed, Class Counsel's actuaries made no projections about the estimated draw on the BAP, *see* Dkt. No. 6167, although the NFL's actuary did, *see* Dkt. No. 6168 at 42-44.  Class Counsel thus either agreed to a cap without any assessment of whether the fund was adequate or agreed to a cap on the basis of representations made by their adversary across the negotiating table.  Either way, Class Counsel did not fulfill their fiduciary obligation to the class.

The NFL's analysis of the adequacy of the BAP fund, moreover, is seriously flawed.  The actuaries were "***instructed to assume*** that, for players diagnosed with a Level 1 diagnosis" of dementia, "the cost of further testing, treatment, and related drug therapy would not exceed $35,000 per player."  Dkt. No. 6168 at 43 (emphasis added).  But the actual cost of treating dementia can reach $56,000 ***a year***.[86]  A BAP fund that ignores actual data and includes a cap based on an obviously flawed assumption is grossly inadequate and will run out long before the end of a Settlement that is supposed to last for 65 years.

The BAP, moreover, is flawed as a matter of design and will deprive deserving class members of compensation for their MTBI-related injuries.  ***The BAP does not even test at all for***

---

[86] Zorumski & Rubin, *The Financial Cost of Dementia*, Psychology Today (Oct. 10, 2013), http://www.psychologytoday.com/blog/demystifying-psychiatry/201310/the-financial-cost-dementia (attached as Exhibit 63).

*the mood and behavioral disorders* that plague many individuals with CTE.  Stern Decl. ¶¶ 31, 45.  And many class members entitled to compensation under the Settlement will not receive a diagnosis of dementia under the BAP.  Administering the complete battery of tests "would take approximately five hours without any break."  Stern Decl. ¶ 44.  There is no justification for a five-hour test.  The testing protocols prescribed by the Settlement are generally considered inappropriate for the evaluation of individuals with neurodegenerative diseases.  *Id.* ¶ 43.  As Dr. Stern explains, a five-hour test without any break would "result in refusals to complete the evaluation" by many individuals suffering from dementia who would otherwise be compensated under the Settlement.  *Id.* ¶ 44.

The testing battery also incorporates several effort and performance metrics that are inappropriate for use on individuals suffering from the levels of cognitive impairment compensated under the Settlement.  Stern Decl. ¶¶ 45-46.  Effort metrics are typically included in a neuropsychological test battery to screen for individuals whose low scores result from a lack of effort rather than diminished cognitive ability.  "[B]ecause patients with dementia are so impaired cognitively," however, "they may perform poorly on the effort test due to their actual cognitive impairment rather than poor effort."  *Id.* ¶ 48.

In short, because the testing battery prevents deserving class members with valid claims from obtaining the awards to which they are entitled under the Settlement, the Settlement is unreasonable in light of the best possible recovery.

4.    **The Proffered Value of the Settlement Is Illusory Because the Settlement Requires Class Members To Navigate a Complex Procedural Maze To Secure Recovery**

To receive *any* recovery, class members must navigate a complex and burdensome administrative process that appears designed to decrease the cost of the Settlement to the NFL. Because many cognitively impaired class members may find themselves unable to steer through

this procedural thicket, their valid claims will be denied or reduced, limiting the NFL's total payout under the Settlement and diminishing the value of the Settlement relative to the best possible recovery.  *See GM Trucks*, 55 F.3d at 808 (holding concerns about "real value" of settlement weighed against final approval); *see also Eubank*, 753 F.3d at 726 (reversing approval of settlement where "restrictions that [defendant] was allowed to place on the settlement would, if upheld, enormously reduce the class members' recovery").  Like the class settlement recently rejected in *Eubank*, 753 F.3d at 724, the Settlement "strews obstacles in the path of any" class member seeking recovery by imposing requirements and deadlines that, if unsatisfied, reduce or completely bar recovery.

### a.   Class Members Are Required To "Opt In" and Meet Arbitrary Examination Deadlines

Class members have 180 days to register with the Claims Administrator, essentially requiring class members to opt in even though they never opted out of the class in the first place. Any class member who fails to do so is ***ineligible for any benefits***, even though their claims are released.  Settlement § 4.2(c).  And even those class members who do register in a timely fashion may find themselves battling the NFL from the outset – the NFL can "challenge" a Notice of Registration Determination in favor of a class member.  *Id.* § 4.3(a)(iii).

Some class members, moreover, must undergo baseline assessment examinations by arbitrary deadlines.  For example, any class member who has not received a qualifying diagnosis by the Settlement's effective date must undergo the baseline assessment (1) within two years after the BAP begins if the class member is 43 or older on the effective date; or (2) by the earlier of his 45th birthday or within 10 years after the BAP begins, if the class member is younger than 43 on the effective date.  Settlement § 5.3.  Class members who forgo the baseline assessment suffer a 10% offset if they later develop a qualifying diagnosis.  *Id.* §§ 5.4, 6.7(b)(iv).

        **b.**     **Class Members Are Required To Prepare and File an Unreasonably Complex and Ambiguous "Claim Package"**

The claims process erects other barriers to recovery. Class members must file an extensive "Claim Package" within two years of receiving a qualifying diagnosis. Settlement §§ 8.2(a), 8.3(a)(i). But Class Counsel have not even disclosed the proposed claim form and instructions for submitting the claims packet. Class members are left to trust Class Counsel that the claim form they negotiate will help, rather than hinder, class members' ability to file valid claims. If the rest of the claims process is any indication, class members should be skeptical.

It gets worse. Class members are required to provide "objective evidence beyond [a] sworn statement" of NFL employment and participation in more than one eligible season. Settlement § 9.1(a)(i). Class members who cannot produce such evidence are limited to compensation for one eligible season (which results in an *80%* offset, *id.* § 6.7(b)(i)(8)). *Id.* There is no possible justification for this procedural hurdle because *the NFL itself has this data*. The NFL tracks player statistics as far back as 1920, including number of seasons played.[87] As this requirement demonstrates, the claims process is meant to thwart rather than facilitate payments under this purportedly uncapped Settlement.

Once a claim is submitted, moreover, the Claims Administrator can investigate and "request additional documentation." Settlement § 8.6(a). A class member must supply that documentation "in order to claim a Monetary Award." *Id.* Otherwise, his claim will be rejected.

The process of obtaining a qualifying diagnosis is also burdensome. After the effective date of the Settlement, a qualifying diagnosis can be made only by "Qualified MAF Physicians."

---

[87] *See, e.g.*, NFL.com, *Players*, http://www.nfl.com/player/georgehalas/2515602/profile (entry for "George Halas" showing "10 seasons" of "experience" from 1920 to 1929) (attached as Exhibit 64).

Settlement § 6.3(b).   To receive that designation, physicians must "be approved by Co-Lead Class Counsel and Counsel for the NFL Parties."   *Id.* § 6.5(a).[88]   The Settlement, moreover, contains no hardship provisions for individuals who may live far away from any Qualified MAF Physician or who may, because of their medical condition, be unable to travel long (or even short) distances to a Qualified MAF Physician.   To the contrary, the Settlement provides that "[t]o the extent a Retired NFL Football Player is examined by a Qualified MAF Physician, such visit and examination shall be at the Retired NFL Football Player's own expense."   *Id.* § 6.5(a).[89]

Class members whose claims are denied may appeal, but only after paying a $1,000 fee (which is refundable if the appeal is successful).   Settlement § 9.6(a).   But the NFL may appeal an unlimited number of claim determinations without paying any fee.   *Id.* § 9.6(b).[90]   Class members who appeal must "present evidence in support of their appeal" and satisfy a "clear and convincing evidence" standard to prevail.   *Id.* §§ 9.7(a), 9.8.   Briefing, however, is limited to five pages.   *Id.* § 9.7(a).   By affording the NFL unlimited appeals and by requiring class members to pay to appeal while operating under unreasonable procedural requirements, the Settlement

---

[88] The Settlement also hampers the ability of opt-outs to prosecute their claims against the NFL even if the Settlement is approved.   Qualified MAF Physicians, Qualified BAP Providers, and members of the Appeals Advisory Panel and Appeals Advisory Panel Consultants are all prohibited from serving as a consultant or expert witness against the NFL in a concussion-related case; medical professionals who are serving in such a capacity, moreover, are ineligible for appointment to any of those positions.   Settlement §§ 5.7(a)(ii), 6.5(b).

[89] That requirement may discourage many players from even seeking out the qualifying diagnosis.   Within two years of retirement, 78% of former NFL players are under financial stress.   Torre, *How (and Why) Athletes Go Broke*, Sports Illustrated (Mar. 23, 2009), www. si.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke (attached as Exhibit 65).

[90] The initial settlement, by contrast, limits the NFL to ten appeals per year.   *See* Dkt. No. 5634-2 § 9.6(b).   It also required the NFL to pay up to $2,000 in attorneys' fees and costs if it lost the appeal.   *Id.*   These provisions were eliminated from the current Settlement.

establishes an asymmetric appellate system tilted decidedly in favor of the NFL and against the class.[91]

### c.   Class Members Are Subject to Additional Arbitrary Procedures That Will Limit Compensation

The Settlement imposes a series of so-called "anti-fraud" provisions that will, in practice, operate as "anti-payment" provisions.   The Claims Administrator must audit 10% of all applicants each month.  Settlement § 10.3(c).  The NFL, moreover, can "at any time" request an audit to verify claims submitted by class members.   *Id.* § 10.3(a).   Auditors may demand additional information and documents from the class member including all medical records and a list of all health care providers seen in the past five years, among others.   *Id.* § 10.3(e).   Even partial non-compliance with an auditor's demand requires denial of the claim "without right to an appeal."   *Id.* § 10.3(b)(ii).

\* \* \* \* \*

This complex procedural framework is a transparent attempt to minimize the cost of the settlement to the NFL – a consideration of tremendous importance now that the Settlement is purportedly uncapped.   The lowest tiers of compensation from the Monetary Award Fund require a class member "to be so severely impaired in several areas of cognitive functioning that they

---

[91] The claims administration process is at risk of operating in a manner similar to current, flawed disability programs jointly administered by the NFL and the NFLPA.   Just 34% of the applications submitted for temporary and permanent disability are approved in the initial stage. Halchin, *Former NFL Players: Disabilities, Benefits, and Related Issues*, Congressional Research Service 82 (2008) (attached as Exhibit 66).  Those disability programs, moreover, have been heavily criticized for improperly denying meritorious claims.   *See id.* at 76-77 (quoting Leahy, *The Pain Game*, Washington Post Magazine, at 10, 23 (Feb. 3, 2008)); *see also* Rosenberg, *"Permanently Disabled," Harrison Fighting for Benefits NFL Took Away*, Sports Illustrated (Jan.  29,  2014), http://www.si.com/nfl/2014/01/29/dwight-harrison-nfl-pension (attached as Exhibit 67); O'Keefe, *Still Plenty of Skeptics After NFL Reaches New Deal with Players to Settle Concussion-Related Lawsuit*, N.Y. Daily News (June 28, 2014), http://www.nydaily news.com/sports/football/score-nfl-deny-issues-article-1.1847588 (attached as Exhibit 68).

would require assistance in many activities of daily living (in Level 1.5) or be almost fully dependent on another person for most activities of daily living, such as bathing and toileting (for Level 2.0)."  Stern Decl. ¶ 47.  Someone laboring under such impairment has little hope of navigating the procedural morass required to claim payment under the Settlement.

Class Counsel certainly could have negotiated a simpler payment process.  They did so for themselves – they will receive their $112.5 million payment within 60 days after the Settlement takes effect.  Settlement § 21.2.  Yet their clients – many suffering serious cognitive impairment – will be left wandering through an administrative maze that allows the NFL to say "gotcha" at every turn.

Courts have refused to approve settlements with benefits that are illusory in light of the procedural difficulty to realize them.  *See Eubank*, 753 F.3d at 724-25 (rejecting settlement that "strew[ed] obstacles in the path of any" class member); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718-19, 721 (6th Cir. 2013) (rejecting class settlement, in part, due to an onerous claims process); *Walter v. Hughes Commc'ns, Inc.*, No. 09-2136, 2011 WL 2650711, at *14 (N.D. Cal. July 6, 2011) (rejecting class settlement where "[m]any hurdles stand between a class member and the receipt of . . . payment" and claim form was "unnecessarily complex," "confusingly arranged," and "invites user error").  The Court should do so here.

### 5.    Other Factors Demonstrate That the Value of the Settlement Is Unreasonable in Light of the Best Possible Recovery

Several other factors demonstrate the unreasonableness and inadequacy of the Settlement. The attorneys' fee provision, the unknown role of the Representative Plaintiffs, and the lack of transparency throughout the settlement process all show that the settlement is a "sell-out of an otherwise strong case."  *GM Trucks*, 55 F.3d at 806.

### a.   *The Attorneys' Fee Provision*

The NFL Defendants – in what is known as a "clear sailing agreement" – have agreed not to object to Class Counsel's $112.5 million attorneys' fee award.  Settlement § 21.1.  The "'very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value'" – like compensation for all cases of CTE – "'to the class.'"  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)).  As a result, clear sailing agreements are "disfavored."  *Id.* at 949.

It appears that Class Counsel "pursued a deal with the defendants separate from . . . the deal negotiated on behalf of the class."  *GM Trucks*, 55 F.3d at 803.  Although Class Counsel have stated that the "Settling Parties did not discuss the issue of attorneys' fees at any point during the mediation sessions," Dkt. No. 6073-5 at 30, those remarks are "self-serving" and may be ignored, *Bluetooth Headset*, 654 F.3d at 948 (quoting *GM Trucks*, 55 F.3d at 804).  Instead, the timing of the Settling Parties' fee negotiations, which occurred even before public release of the initial settlement agreement, as well as the extraordinary sum to be paid, demonstrates the absence of arm's-length negotiations.

As if a nine-figure attorneys' fee award for conducting no discovery whatsoever were not enough, the Settlement authorizes Class Counsel to petition the Court for a 5% set aside – ***drawn from each claimant's settlement award*** – to "facilitate the Settlement program and related efforts of Class Counsel."  Settlement § 21.1.  That provision – which was not even in the initial, rejected settlement – places no limits on how Class Counsel may use the set aside (although it does require that any petition describe "how the money will be used").  *Id.*  The provision gives no mechanism for providing notice to class members of Class Counsel's petition for the set aside.  It also does not authorize any procedures by which class members can oppose that

petition.  The set aside thus allows Class Counsel the opportunity to augment their $112.5 million attorneys' fee at the expense of the class.

### b.  *The Role of the Representative Plaintiffs*

The role of the Representative Plaintiffs has not been disclosed.  The protection of absentee class members' rights "depends in part on the extent the named plaintiffs are adequately interested to monitor the attorneys."  *GM Trucks*, 55 F.3d at 784.  The "specter of collusion" is present when class counsel " 'prosecute an action and negotiate settlement terms without meaningful oversight by the class representative.' "  *Olden v. Gardner*, 294 F. App'x 210, 219 (6th Cir. 2008) (quoting *In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257, 262 (N.D. Cal. 1996)).  The Representative Plaintiffs have not shown such meaningful oversight here.  Although the Settlement states that Representative Plaintiffs were shown and were familiar with the agreement, it says nothing about their participation in the negotiations.  Settlement § 25.2.  Nor did the mediator describe their role.  Dkt. No. 6073-4.  And media reports indicate that Co-Lead Class Counsel has "clashed with his own clients."[92]  When "class representatives provide[] no meaningful oversight of the class counsel during the settlement negotiations," the "risk of collusion weighs against the settlement."  *Olden*, 294 F. App'x at 219.[93]

### c.  *The Settlement Negotiation Process*

The class members have been left in the dark throughout the settlement process.  *See* Hruby, *Show Us Some Math*, Sportsonearth.com (Jan. 20, 2014) (attached as Exhibit 70)

---

[92] Fainaru & Fainaru-Wada, *Lawyers Fight Over Settlement Details*, ESPN.com (Jan. 24, 2014, 8:18 PM), http://espn.go.com/espn/otl/story/_/id/10346091/lead-negotiator-facing-strong-opposition-concussion-settlement (attached as Exhibit 69).

[93] Similarly, Class Counsel offer no description of the role that Sub-Class Counsel played in the negotiation.  In fact, Class Counsel did not recruit Sub-Class Counsel until negotiations were ***already underway*** before the mediator.  *See* Dkt. No. 6073-4 ¶ 7.

(describing the settlement process as "cloak[ed] [in] secrecy").[94]  Absent class members have

not, for example, had access to all negotiation documents and studies exchanged among the

settling parties, Mediator, and Special Master.  " 'Sunlight is said to be the best of disinfectants;

electric light the most efficient policeman.' "  *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (per

curiam) (quoting Brandeis, *Other People's Money* 62 (Nat'l Home Library Found. ed. 1933)).

That is particularly so in the class settlement context, where the court lacks the "clash of the

adversaries" that ordinarily "generate[s] the information that the judge needs to decide the case."

*Eubank*, 753 F.3d at 720 (rejecting class settlement); *see also Cmty. Bank*, 418 F.3d at 319

(rejecting class settlement where district court "entrusted class counsel to prepare . . . findings [of

fact] in an *ex parte* closed door session" without participation of other class members).  In the

absence of transparency regarding the settlement negotiations, neither the Court nor the class

members can be assured that Class Counsel zealously negotiated on behalf of absent class

members.

### F.     The Likelihood of Maintaining Class Status Weighs Against Approval of the Settlement

A court must also consider "the risks of maintaining the class action through trial."

*Girsh*, 521 F.2d at 157; *see also* Fed. R. Civ. P. 23(a).  When the class is likely to maintain class

status throughout trial, this factor weighs in favor of settlement.  *GM Trucks*, 55 F.3d at 817-

18.[95]  Here, apart from deficiencies in the adequacy of representation, the remaining class

---

[94] *Available at* http://www.patrickhruby.net/2014/01/show-us-some-math.html.

[95] Courts recognize this factor to be "more 'toothless' after *Amchem*.  *In re Prudential Ins.*, 148 F.3d at 321.  *Amchem* held that when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems" because "the proposal" at that point in time "is that there be no trial." *Id.* (citing *Amchem Prods.*, 521 U.S. at 620).  Post-*Amchem* case law thus recognizes that "the manageability inquiry in settlement-only class actions may not be significant."  *Id.* at 321.

certification requirements of Rule 23(a) – numerosity, commonality, and typicality – are all satisfied.  Fed. R. Civ. P. 23(a).  So too is the predominance requirement.  Fed. R. Civ. P. 23(b)(3).  In other words, although this factor weighs in favor of *a* settlement, it weighs against ***this Settlement*** because of the deficiencies in the adequacy of representation.

**Numerosity.**  Rule 23(a)(1) permits class action treatment if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The NFL Defendants themselves have conceded that this requirement is "easily met here."  Dkt. No. 6073-5 at 48.

**Commonality.** Commonality – a threshold that "is not high," *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) – exists if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2).  Numerous issues here "arise[ ] from a 'common nucleus of operative facts,' " *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 174 (E.D. Pa. 1997), including:  the NFL Defendants' knowledge and concealment of the health risks posed by football-related concussions, and the NFL Defendants' representations concerning those known health risks, among others.

**Typicality.**  Typicality, also a "low threshold," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001), requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Here, for example, all class members share the same claims and suffered the same harm: neurodegenerative diseases resulting from the NFL Defendants' knowledge, concealment, and failure to warn of the severe health risks associated with repetitive blows producing sub-concussive and concussive results.

**Predominance.**  Rule 23(b)(3) class certification also requires that "the questions of law or fact common to class members predominate over any" individual questions, and that a class

action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are satisfied because the crux of class members' claims concerns "the general increased risk of the class suffering medical problems," whether now or "in the future," because of Defendants' intentional or negligent misrepresentations and cover up. *Olden v. LaFarge Corp.*, 383 F.3d 495, 508-09 (6th Cir. 2004) (Rule 23(b)(3)'s predominance requirement satisfied in class action against defendant manufacturing plant where defendant's negligent conduct was the cause of class members' personal injuries and property damages, even where individual damage determinations might vary across members).[96]

### G. The Potential Complexity, Expense, and Likely Duration of the Litigation Weigh Against Approval of the Settlement

The complexity and likely duration of this litigation do not favor settlement. Although "[t]his factor is intended to capture 'the probable costs, in both time and money, of continued litigation,'" *GM Trucks*, 55 F.3d at 811, "all class action law suits involve complex issues, which are costly to resolve and often result in protracted proceedings," *Lachance v. Harrington*, 965 F. Supp. 630, 645 (E.D. Pa. 1997). Thus, courts focus on whether the case "involves unique issues of law or unusual fact patterns unique" to that particular species of litigation. *Id.* at 645-46. The claims presented by the retired players are hornbook tort law, presenting questions of whether the NFL assumed a duty of care, whether the NFL breached that duty, and whether that breach caused injury.

---

[96] Even if individual questions as to damages exist, moreover, this should not affect the predominance inquiry because "[a] district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone." *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010).

To be sure, settlement would forestall the expenses of discovery, trial preparation, and other litigation expenses. *See Cendant Corp. Litig.*, 264 F.3d at 233. But *every* settlement does that. And when a class action ends in an unfair and inadequate settlement, the litigation costs are not "saved." Rather, they are transferred to those class members whose valid claims go uncompensated because their interests were not adequately represented during the negotiation.

## IV.  Objectors Should Be Permitted To Object and Appear at the Fairness Hearing Even if They Later Opt Out

The "threshold requirement for exercising the opt-out right is a court's certification of a class" under Rule 23(b)(3). *Newberg on Class Actions* § 9:43 (5th ed.). "[N]o statute or rule requires notice, and an opportunity to opt out, before the certification decision is made; it is a post-certification step." *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 333 F.3d 763, 769 (7th Cir. 2003). This Court "conditionally certif[ied] the class for purposes of providing notice, leaving the final certification decision for the subsequent fairness hearing." Dkt. No. 6083 at 12.[97] Thus, until this Court issues a final order certifying a class action under Rule 23(b)(3), Objectors cannot be required to opt out.

Even if the Court's July 7 Order qualifies as a class certification decision that triggers the opt-out period, Objectors nevertheless have standing to object to the Settlement notwithstanding any opt-out request they may later execute. As an initial matter, someone who opts out of the

---

[97] Objectors previously took the position that this Court's July 7 Order was an order granting or denying class certification under Rule 23(f). But the Third Circuit disagreed. Dkt. No. 6166. Because the Third Circuit "never accepted or adopted" that position, Objectors are not bound by that position in later litigation. *See Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 781-82 (3d Cir. 2001). By contrast, the settling parties, having defeated Objectors' petition in the Third Circuit, cannot now urge that this Court's July 7 Order did certify a class. " '[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.' " *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121 (3d Cir. 1992).

Settlement may, without any need for court approval, revoke their prior opt out request before the Court enters an order of final approval.  Settlement § 14.2(c).  Thus, until the opt-out request becomes final upon entry of a final approval order, even those who execute an opt-out request retain an interest in the terms of the Settlement agreement because they can, at their own choosing, avail themselves of the benefits of the Settlement – and might well do so if it is improved.

Additionally, a non-settling party, like a party who opts out of a class action, may still object to a class settlement agreement that causes the party legal prejudice.  *See Eichenholtz v. Brennan*, 52 F.3d 478, 482-83 (3d Cir. 1995); *Newberg on Class Actions* § 13:23 (5th ed.) ("While the black letter rule is that opt-outs have no standing to object because they are not impacted, if the settlement does, for some reason, impact the rights of opt-outs, that effect could provide standing to file an objection.").  This settlement would impair Objectors' legal rights in two ways, should they decide to exercise their right to opt out: It impairs their ability to fully litigate their own claims against the NFL, and it potentially deprives them of the ability to challenge a flawed class certification decision.

Further, Objectors' participation in the fairness hearing is their only opportunity to challenge a flawed class certification decision.  As Objectors have noted, adequate representation was lacking here:  The proposed class contains serious, fundamental intra-class conflicts that render class representation inadequate under Rule 23(a)(4).  *See* pp. 20-37, *supra*.  Class members' right "to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class," *GM Trucks*, 55 F.3d at 809.  In *Amchem*, for example, the Supreme Court ruled that the settlement at issue there was defective for lack of adequate representation – even though class members had the right to

opt out.  521 U.S. at 625-27.  Objectors are entitled to challenge a decision certifying a conflicted class regardless of whether they opt out.  But if an opt-out request prevents Objectors from objecting and participating in the fairness hearing, they face the threat of being unable to challenge that certification decision on appeal.  *Cf. Devlin v. Scardelletti*, 536 U.S. 1, 6-7, 14 (2002) (holding objectors have standing and are considered a "party" for purposes of appeal).

The Settlement also hinders Objectors' ability to prosecute their own claims against the NFL because it impairs opt-out class members' ability to retain and hire experts and litigation consultants.  The Settlement precludes medical professionals from serving as an expert witness or a consultant for any opt out if the professional holds a position as a BAP Provider, MAF Physician, or serves on the Appeals Advisory Panel or as an Appeals Advisory Panel Consultant. *See* p. 78 n.88, *supra*.  The need for such expert testimony in a case such as this is not merely a strategic advantage or a luxury – it is a firm requirement.  When "the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson . . . the law requires that expert medical testimony be employed."  *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 852 (3d Cir. 1995) (quotation marks omitted).  Thus, the Settlement's effect on opt-out class members' ability to retain and hire medical experts has the effect of "strip[ping] [the opt-outs] of a legal claim or cause of action."  *Eichenholtz*, 52 F.3d at 482.

## **CONCLUSION**

The Court should deny final approval of the Settlement.  The Court should also permit objectors to appear and be heard at the fairness hearing even if they opt out of the class before final approval.

Dated: October __, 2014

Respectfully submitted,

William T. Hangley
Michele D. Hangley
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
(215) 496-7001 (telephone)
(215) 568-0300 (facsimile)
whangley@hangley.com
mdh@hangley.com

Linda S. Mullenix
2305 Barton Creek Blvd.
Unit 2
Austin, TX 78735
(512) 263-9330 (telephone)
lmullenix@hotmail.com

Steven F. Molo
Thomas J. Wiegand
Kaitlin R. O'Donnell
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
kodonnell@mololamken.com

Martin V. Totaro
Eric R. Nitz
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
mtotaro@mololamken.com
enitz@mololamken.com

*Attorneys for Objectors Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal,*
*Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine*

Date: _October 6TH_, 2014

_____

Sean J. Morey
14 Riverside Drive
Princeton, New Jersey  08540

Telephone: (781) 718-3058

Date of Birth: <span style="color:red">Redacted L.R. 5.1.3</span> 76

Date: _October   4_, 2014

_____

Alan Faneca
8112 Spring Hill Farm Drive
McLean, VA 22102

Telephone: _504-234-5967_

Date of Birth: <span style="color:red">Redacted L.R. 5.1.3</span>

Date: _September 26_ 2014

Ben Hamilton
5240 Golden Ridge Court
Parker, CO  80134

Telephone: (720) 318-7778

Redacted L.R. 5.1.3

Date of Birth: ___

Date: _September 30_ , 2014

Roderick "Rock" Cartwright
11765 King Rd.
Roswell, GA  30075

Telephone: (202) 714-1921

Redacted L.R. 5.1.3

Date of Birth:                    __

Date: ___9/26___, 2014

_____

Robert Royal
43268 Hill Head Place
Leesburg, VA 20176

Telephone: (202) 320-2265

Redacted L.R. 5.1.3

Date of Birth: _

Date: ___10/1/14___, 2014

Jeffrey C. Rohrer
837 Venice Boulevard
Venice Beach, CA  90291

Telephone: (310) 991-2350

Redacted L.R. 5.1.3

Date of Birth: _____

Date: 10-6-14
2014

Sean Considine
3064 Water Road
Byron, IL  61010

Telephone: (815) 222-0652

Date of Birth:

Redacted L.R. 5.1.3

# Appendices

## **TABLE OF CONTENTS**

Page

APPENDIX A: BACKGROUND OF OBJECTORS ................................................................A1

APPENDIX B: CTE AND ITS SYMPTOMS ....................................................................A4

I.      CTE's Symptoms ........................................................................................ A5

        A.      Mood and Behavioral Symptoms .................................................... A5

        B.      Cognitive and Motor Symptoms ...................................................... A9

II.     Diagnosing CTE ....................................................................................... A10

## **TABLE OF AUTHORITIES**

Page(s)

Baugh *et al.*, *Chronic Traumatic Encephalopathy: Neurodegeneration Following Repetitive Concussive and Subconcussive Brain Trauma*, 6 Brain Imaging & Behavior 244 (2012) ................................................................................................ *passim*

Breslow, *76 of 79 Deceased NFL Players Found to Have Brain Disease*, PBS Frontline (Sept. 30, 2014 2:57 PM ET), http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/76-of-79-deceased-nfl-players-found-to-have-brain-disease/ ................................................................ A5

Daneshvar *et al.*, *Long-Term Consequences: Effects on Normal Development Profile After Concussion*, 22 Physical Medicine and Rehabilitation Clinics of North America 683 (2011) ........................................................................ A4, A10

Emison, *Will NFL & NFLPA Admit Concussion Link to Domestic Violence?*, The Legal Examiner (Sept. 16, 2014), http://kansascity.legalexaminer.com/?p=3871&preview=true ................................ A9

Emery, *How to Diagnose a Battered Brain Before It's Too Late*, The Atlantic (May 8, 2012), http://www.theatlantic.com/health/archive/2012/05/how-to-diagnose-a-battered-brain-before-its-too-late/256877/ .................................................... A4, A10

Frankel, *Real Sports with Bryant Gumbel* (Sept. 23, 2014), http://deadline.com/2014/09/real-sports-with-bryant-gumbel-nfl-domestic-violence-head-injuries-839904/ ...................................................................................... A9

Gavett *et al.*, *Chronic Traumatic Encephalopathy: A Potential Late Effect of Sport-Related Concussive and Subconcussive Head Trauma*, 30 Clinical Sports Medicine 179 (2011) ................................................................................................................ A5

Hollmer, *Alzheimer's Diagnosis May Gain from PET Imaging of Tau Proteins*, FierceDiagnostics (Sept. 20, 2013), http://www.fiercediagnostics.com/story/alzheimers-diagnosis-may-gain-pet-imaging-tau-proteins/2013-09-20 ........................................................................................ A11

Jagust, *Time for Tau*, 137 Brain 1570 (2014) ........................................................ A11

Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*, 9 Nature Reviews Neurology 222 (2013) .................................................... A4, A5, A10

Maruyama *et al.*, *Imaging of Tau Pathology in a Tauopathy Mouse Model and in Alzheimer Patients Compared to Normal Controls*, 79 Neuron 1094 (2013) .................... A11

McGrath, *Illinois Eye Institute Project Aims to Identify CTE in the Living*, Chicago Sun-Times (June 14, 2014), http://www.suntimes.com/sports/28048920-419/illinois-eye-institute-project-aims-to-identify-cte-in-the-living.html#.U6CR0fldV8E ...........................A11

McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43 (2013) ............................................................................ *passim*

Mitsis *et al.*, *Tauopathy PET and Amyloid PET in the Diagnosis of Chronic Traumatic Encephalopathies*, 4 Translational Psychiatry 1(2014) .........................................A4, A7, A11

Omalu *et al.*, *Chronic Traumatic Encehpalopathy in a National Football League Player: Part II*, 59 Neurosurgery 1086 (2006) ...........................................................................A7, A8

Penn, *The Violent Life and Sudden Death of Junior Seau*, GQ Magazine (Sept. 2003), http://www.gq.com/entertainment/sports/201309/junior-seau-nfl-death-concussions-brain-injury ......................................................................................................................A7

Saulle & Greenwald, *Chronic Traumatic Encephalopathy: A Review*, Rehabilitation Research & Practice 4 (2012) ..................................................................................A7

Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star*, Men's Journal (May 2011), http://www.mensjournal.com/magazine/dave-duerson-the-ferocious-life-and-tragic-death-of-a-super-bowl-star-20121002.....................................A8

Seichepine *et al.*, *Profile of Self-Reported Problems with Executive Functioning in College and Professional Football Players*, 30 J. Neurotrauma 1299 (2013).......................A9

*State of Play: Brain Injuries and Diseases of Aging: Hearing Before the S. Special Comm. on Aging*, 113th Cong. 3 (2014), *available at* http://www.aging.senate.gov/imo/media/doc/Stern_6_25_14.pdf ...............................A8, A10

Stern *et al.*, *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neurology 1122 (2013)....................................................................................................................A5

Wagner, *Can Science See Inside an NFL Player's Skull Before It's Too Late?*, Deadspin (June 21, 2012), http://regressing.deadspin.com/5920006/can-science-see-inside-an-nfl-players-skull-before-its-too-late......................................................................A11

Zirin, *Are Head Injuries the Bridge Between the NFL Playing Field and Domestic Violence*, The Nation (Sept. 21, 2014), http://www.thenation.com/blog/181695/are-head-injuries-bridge-between-nfl-playing-field-and-domestic-violence#..............................A9

## Appendix A: Background of Objectors

Objectors are seven former players who each had a significant career in the NFL.  They include linemen, as well as so-called "skill position" and special teams players.  The most senior began his NFL career in 1982 and the most junior retired in 2012.  Three of them played on Super Bowl championship teams.

***Sean Morey*** played for a decade with the New England Patriots, Philadelphia Eagles, Pittsburgh Steelers, Arizona Cardinals, and Barcelona Dragons, an NFL Europe team.  An Ivy League stand-out at Brown University, Mr. Morey set multiple collegiate records and graduated with academic honors.  In 1999, the New England Patriots selected him as a seventh round draft pick.   In 2003, Mr. Morey won the Special Teams MVP award while playing with the Philadelphia Eagles.  In 2004, Mr. Morey moved to the Pittsburgh Steelers, where he was captain of the special teams and earned a Super Bowl ring.  He eventually moved to the Arizona Cardinals and was named to the 2008 Pro Bowl.  Mr. Morey retired just before the 2010 season. While an active player, Mr. Morey co-chaired the NFLPA Mackey White Traumatic Brain Injury Committee and served as a representative in collective bargaining negotiations with the NFL. He is currently head coach of the sprint football team at Princeton University.

***Alan Faneca*** played 13 seasons in the NFL as an offensive lineman.  A star at Louisiana State University, Mr. Faneca received consensus All-American honors as a junior and was named a finalist for the prestigious Outland Trophy, which recognizes the best interior lineman in college football.  Selected by the Pittsburgh Steelers in the first round of the 1998 NFL draft, Mr. Faneca was named the team's rookie of the year.  A fixture on the Steelers' offensive line for ten seasons, Mr. Faneca earned a Super Bowl ring in 2006.  In 2007, Steeler fans elected him to the Steelers' 75th Anniversary All Time Team.  Mr. Faneca left the Steelers in 2008 for two

seasons with the New York Jets and joined the Arizona Cardinals for his final season in 2010. He was named to the Pro Bowl every year from 2001 through 2009.  Since retiring from professional football, Mr. Faneca has been a tireless advocate for epilepsy research.

*Ben Hamilton* played ten seasons in the NFL as an offensive lineman for the Denver Broncos from 2001 until 2009, and for the Seattle Seahawks in 2010.  He was a fourth-round draft pick out of the University of Minnesota.  He is currently a high school math teacher at a private Christian high school in Colorado.

*Robert Royal* played nine seasons in the NFL from 2002 until 2010 with the Washington Redskins, Buffalo Bills, and Cleveland Browns.  An All-SEC tight end at Louisiana State University, Mr. Royal averaged nearly ten yards per reception over the course of his NFL career. Mr. Royal now serves as CEO of the Robert Royal Foundation, an organization he founded to promote childhood health, fitness, and education and to combat youth violence.  Mr. Royal is also involved in several private equity ventures.

*Roderick "Rock" Cartwright* played ten seasons in the NFL after a stellar collegiate career at Kansas State University.  A fullback and kick return specialist, Mr. Cartwright played with the Washington Redskins from 2002 until 2009 and the Oakland Raiders from 2010 until 2011.  In 2006, Mr. Cartwright amassed 1,541 kick-off return yards, setting a Redskins record. Since retiring from the NFL, Mr. Cartwright has actively involved himself in charity work, volunteering at a summer sports camp hosted by the Robert Royal Foundation, among others. Mr. Cartwright is also a manager with Cartwright Energy Partners LLC, an oil production development firm.

*Jeff Rohrer*, a second-round draft pick out of Yale University, played seven seasons in the NFL with the Dallas Cowboys from 1982 until 1989.  An outside linebacker, Mr. Rohrer

received All-Ivy League honors and was the Cowboys' second- and third-leading tackler in 1986 and 1987, respectively.   Since retiring from the NFL, Mr. Rohrer has worked in the film industry.   He is currently a partner and executive producer at Recommended, a Los Angeles-based production company.

*Sean Considine* played eight seasons in the NFL as a strong safety and on special teams from 2005 until 2012.   After attending the University of Iowa, Mr. Considine was drafted by the Philadelphia Eagles and played four seasons with them and then two seasons with the Jacksonville Jaguars.   In 2011, he signed with the Carolina Panthers, finishing that season with the Arizona Cardinals.   Mr. Considine joined the Baltimore Ravens in 2012, earning a Super Bowl ring.   Since retiring from professional football, Mr. Considine has been active with numerous charities in his hometown and recently became a small business owner.

## Appendix B: CTE and Its Symptoms

CTE is a distinct neurodegenerative condition caused by repetitive mild traumatic brain injury.  The condition results from the build-up in the brain of mis-folded tau protein.[1]  More extensive tau build-up indicates a more advanced stage of CTE.[2]  CTE typically takes years to manifest itself.  Symptoms "usually begin 8-10 years after experiencing repetitive mild traumatic brain injury."[3]  And it "spreads slowly over decades."[4]  Scientists have repeatedly documented CTE's latency period in individuals who have been exposed to repeated head trauma.[5]  CTE's symptoms include significant mood and behavioral changes as well as cognitive and motor deterioration.  The symptoms worsen as the disease progresses.  At present time, CTE is not readily diagnosed absent a post-mortem brain autopsy.  But advances in science are making it

---

[1] Emery, *How to Diagnose a Battered Brain Before It's Too Late*, The Atlantic (May 8, 2012), http://www.theatlantic.com/health/archive/2012/05/how-to-diagnose-a-battered-brain-before-its-too-late/256877/ (attached as Exhibit 71); McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43, 45 (2013) ("McKee *et al.* 2013") (attached as Exhibit 5)

[2] Jordan, *The Clinical Spectrum of Sport-Related Traumatic Brain Injury*, 9 Nature Reviews Neurology 222, 225, 227 box 5 (2013) ("CTE is the long-term neurological consequence of repetitive mild TBI.") (attached as Exhibit 6)

[3] McKee *et al.* 2013, *supra*, at 44.

[4] *Id.* at 60.

[5] *See, e.g.*, Mitsis *et al.*, *Tauopathy PET and Amyloid PET in the Diagnosis of Chronic Traumatic Encephalopathies*, 4 Translational Psychiatry 1, 2 (2014) (attached as Exhibit 8) ("CTE begin[s] insidiously" and "typically presents in midlife after a latency period, usually years or decades after exposure to the repetitive trauma."); Baugh *et al.*, *Chronic Traumatic Encephalopathy: Neurodegeneration Following Repetitive Concussive and Subconcussive Brain Trauma*, 6 Brain Imaging & Behavior 244, 245, 246 (2012) ("Baugh *et al.* 2012") ("the symptoms of CTE typically do not present until years after the trauma-producing activity," and CTE has "a slow prolonged course of progression") (attached as Exhibit 17); Daneshvar *et al.*, *Long-Term Consequences: Effects on Normal Development Profile After Concussion*, 22 Physical Medicine and Rehabilitation Clinics of North America 683, 691 (2011) ("Although the disease process likely starts at the time of injury, the initial signs of CTE do not typically manifest until decades later.") (attached as Exhibit 72).

possible to detect CTE earlier.  The prevalence of CTE in class members cannot be overstated. The nation's largest brain bank focused on traumatic brain injury has found evidence of CTE in *76 of the 79* former players it examined.[6]

## I.     CTE's Symptoms

### A.     Mood and Behavioral Symptoms

"Mood and behavior changes are hallmark features of CTE."[7]   Mood symptoms "typically include depression, apathy, and irritability, as well as suicidality."[8]  Manic behavior, anxiety, and feelings of hopelessness have also been found in players with CTE.[9]  Behavioral symptoms are numerous.  They "primarily include poor impulse control, with individuals described as having a 'short fuse' or being 'out of control.'"[10]  Behavioral changes also result in "[a]ggression and increased violence," as well as "[d]isinhibition."[11]

Behavioral and mood symptoms "are often the earliest findings in CTE."[12]   So too are severe headaches.[13]   Aggressive tendencies, depression, and explosivity have also been

---

[6] Breslow, *76 of 79 Deceased NFL Players Found to Have Brain Disease*, PBS Frontline (Sept. 30, 2014 2:57 PM ET), http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/76-of-79-deceased-nfl-players-found-to-have-brain-disease/ (attached as Exhibit 14).

[7] Baugh *et al.* 2012, *supra*, at 247.

[8] *Id.* at 246; *see also* McKee *et al.* 2013, *supra*, at 44, 52, 55-56, 58-59; Jordan, *supra*, at 226 & Box 3.

[9] Stern *et al.*, *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neurology 1122, 1126 tbl. 3 (2013) ("Stern *et al.* 2013") (attached as Exhibit 12).

[10] Baugh *et al.*, *supra*, at 246.

[11] *Id.*

[12] Jordan, *supra*, at 226; Gavett *et al.*, *Chronic Traumatic Encephalopathy: A Potential Late Effect of Sport-Related Concussive and Subconcussive Head Trauma*, 30 Clinical Sports Medicine 179, 180 (2011) (attached as Exhibit 11) (noting "[i]n some individuals, the early manifestations of CTE affect behavior").

[13] McKee *et al.* 2013, *supra*, at 52, 55; *see also* Baugh *et al.* 2012, *supra*, at 246 ("Early cognitive symptoms primarily include learning and memory impairment as well as executive

A5

documented in cases of Stage I, and suicide was the cause of death in at least one documented case of Stage I CTE in a former NFL player.[14]  Those symptoms have also been reported in Stage II, in addition to mood instability, impulsivity, and suicidality, which was the cause of death in at least one documented case of Stage II.[15]  By the time CTE progresses to Stage III, depression, mood swings, and aggression are "frequently found"; other Stage III symptoms include impulsivity, and apathy.[16]  Suicidality is also present.[17]  For individuals whose CTE has progressed to Stage IV, one study found that nearly one-third experienced suicidal thoughts at some point.[18]

These behavioral and mood symptoms can have a profound and pernicious impact on a person's life – as well as the lives of those around them.  As one study noted, CTE can lead to "worsening of cognitive and social functioning" and can "lead[ ] to poor money management, bankruptcy, social phobias, paranoid ideation, insomnia, poor relationships, divorce, emotional/physical abuse, and substance abuse."[19]  For example, one individual reported to have CTE – a 59-year-old physician who had suffered a traumatic brain injury while skiing – "would

---

dysfunction.  Mood changes typically include depression, apathy, and irritability, as well as suicidality.  The behavioral changes primarily include poor impulse control, with individuals described as having a 'short fuse' or being 'out of control.'  Aggression and increased violence are often experienced.  Disinhibition and problems with substance and other forms of abuse also occur.").

[14] McKee *et al.* 2013, *supra*, at 49 tbl. 2, 52.

[15] *Id.* at 50 tbl. 2, 55.

[16] *Id.* at 56.

[17] *Id.* at 50 tbl. 2.

[18] *Id.* at 59.

[19] Saulle & Greenwald, *Chronic Traumatic Encephalopathy: A Review*, Rehabilitation Research & Practice 4 (2012) (attached as Exhibit 7).

become angry and agitated, and would 'act out' in the presence of his family."[20]  "His mood could change rapidly, and he would become withdrawn or belligerent.  When in a depressed state he expressed suicidal ideation.  According to the family, the patient was less emotionally available for things that had been important to him (for example, family relationships)."[21]

Another reported case of CTE involved a retired NFL football player who "became extremely reclusive and distanced himself from all personal interactions with family and friends."[22]  CTE's influence on his behavior and mood pervaded his post-NFL career:

> His business activities and decisions were regarded as extraordinarily risky, ambitious, and rather irrational.  In business dealings, he also exhibited sudden and unexpected fluctuations in mood and personality.  At some times, he appeared hard working, ambitious, and highly driven, but at others, he exhibited sudden bouts of agitation and irritability with no clear instigator.
>
> . . .
>
> He became progressively incapable of mentally handling very complex rational thoughts in matters of daily living and business.  He became increasingly impulsive and paranoid.  His erratic behavior continued to worsen; he exhibited disinhibition, began having financial problems, and could not sustain his businesses.[23]

---

[20] Mitsis, *supra*, at 3.

[21] *Id.*

[22] Omalu *et al.*, *Chronic Traumatic Encehpalopathy in a National Football League Player: Part II*, 59 Neurosurgery 1086, 1087 (2006) ("Omalu *et al.* 2006") (attached as Exhibit 57).

[23] *Id.*  Such behavior is consistent with that of Dave Duerson and Junior Seau, two other prominent NFL greats diagnosed with CTE, who exhibited similarly reckless behavior and who both ultimately committed suicide in such a way as to preserve their brains for further study.  *See* Stern Decl. ¶ 35; Penn, *The Violent Life and Sudden Death of Junior Seau*, GQ Magazine (Sept. 2003), http://www.gq.com/entertainment/sports/201309/junior-seau-nfl-death-concussions-brain-injury (attached as Exhibit 73); Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star*, Men's Journal (May 2011), http://www.mensjournal.com/magazine/dave-duerson-the-ferocious-life-and-tragic-death-of-a-super-bowl-star-20121002 (attached as Exhibit 74).

In 2005, he was indicted on charges of arson and wrongful business transactions; he had tried to burn down a factory he owned.[24]

Individuals suffering from CTE are not the only ones negatively affected by these changes in behavior and mood. The "mood and behavioral changes associated with CTE are often the most concerning to family members and caregivers."[25] As Dr. Robert Stern – one of the world's leading experts on CTE who has interviewed the family members of approximately 100 individuals who suffered from CTE – has explained, "the significant changes in mood and behavior relatively early in life . . . can lead to significant distress for the individual with CTE as well as their family, friends, and other loved ones."[26] As Dr. Stern told Congress, "I have learned about the tremendous pain and suffering the family members experienced while their loved one's life was destroyed by the progressive destruction of the brain," by speaking with adult children of CTE victims "whose fathers had dramatic changes in personality, the development of aggressive and out-of-control behavior, and suicidal thoughts."[27]

Indeed, the aggressive and violent behavior that often results from CTE may contribute to – though certainly does not in any way excuse – the high rates of domestic violence among current and former NFL players.[28] As one study found, NFL players are 55.4% more likely to be

---

[24] Omalu *et al.* 2006, *supra*, at 27.

[25] Baugh *et al.* 2012, *supra*, at 247.

[26] *State of Play: Brain Injuries and Diseases of Aging: Hearing Before the S. Special Comm. on Aging*, 113th Cong. 3 (2014), at 3 (written statement of Dr. Robert Stern ("Stern Testimony") (attached as Exhibit 13), http://www.aging.senate.gov/imo/media/doc/Stern_6_25_14.pdf.

[27] *Id.* at 4-5.

[28] *See* Zirin, *Are Head Injuries the Bridge Between the NFL Playing Field and Domestic Violence*, The Nation (Sept. 21, 2014), http://www.thenation.com/blog/181695/are-head-injuries-bridge-between-nfl-playing-field-and-domestic-violence# (attached as Exhibit 75); Emison, *Will NFL & NFLPA Admit Concussion Link to Domestic Violence?*, The Legal Examiner (Sept. 16, 2014), http://kansascity.legalexaminer.com/?p=3871&preview=true (attached as Exhibit 76);

arrested for domestic violence relative to the national average for men ages 25 to 29.[29]  In three

cases of domestic violence committed by an NFL player, the:

> similarities were stunning.  In all three cases, the violence was precipitated either
> by migraine headaches or self-medicating – drugs or alcohol – to manage
> migraines.  In all three cases, the survivors spoke about their NFL husbands
> becoming disoriented or light-sensitive, easily frustrated and quick to anger in
> ways that did not exist earlier in the relationship.[30]

All are symptoms and clinical presentations of CTE.  And "football players may be aware of any

effects they may have on others, but are unable to change their behavior because of weaknesses

in thinking flexibly and inhibition."[31]  That, in turn, might "contribute to depression observed in

former athletes with CTE" because they know what they are doing is harmful but have decreased

ability to control their impulses.[32]

### B.     Cognitive and Motor Symptoms

The symptoms of CTE extend far beyond mood and behavioral disorders.  CTE also

affects cognitive and motor abilities.  CTE's cognitive symptoms typically present as memory

impairment, executive dysfunction (such as problems with planning, organization, multi-tasking,

and judgment), language impairment, visuospatial difficulties, and impaired concentration and

---

Frankel, *Real Sports with Bryant Gumbel* (Sept. 23, 2014), http://deadline.com/2014/09/real-sports-with-bryant-gumbel-nfl-domestic-violence-head-injuries-839904/ (describing domestic violence committed by former NFL player who was ultimately diagnosed with CTE).

[29] Emison, *supra*.

[30] Zirin, *supra*.

[31] Seichepine *et al.*, *Profile of Self-Reported Problems with Executive Functioning in College and Professional Football Players*, 30 J. Neurotrauma 1299, 1302 (2013) (attached as Exhibit 77).

[32] *Id.*

attention.[33]  Although some cognitive symptoms present during the earlier stages of the disease, dementia typically does not occur until the CTE reaches Stage III and Stage IV.[34]

CTE also results in a panoply of movement disorders and motor presentations.  These symptoms include gait disturbance, tremors, muscle weakness, and spasticity.[35] They also include slowed, slurred, and dysarthic speech.[36]  "The severity of the clinical manifestation progresses through the course of the disease as the neurodegeneration increases."[37]  These extreme symptoms are consistent with the "generalized atrophy of the brain with reduced brain weight" that occurs in advanced stages of CTE.[38]

## II.    Diagnosing CTE

While a devastating, degenerative, and distinct medical condition, CTE is not readily diagnosed absent a post-mortem brain autopsy.[39]  Scientific advances, however, are making it possible to detect CTE earlier.[40]  Just a few months ago, researchers at Mt. Sinai in New York City reported a combination of tracers that bind to various brain proteins to diagnose CTE in living patients – one of whom was a former NFL player.[41]   And researchers in Chicago are

---

[33] Jordan, *supra*, at 226 box 3; Baugh *et al.* 2012, *supra*, at 246; Stern Testimony, *supra*, at 5.

[34] McKee *et al.* 2013, *supra*, at 56 tbl. 4, 60.

[35] Jordan, *supra*, at 226, box 3; Stern Testimony, *supra*, at 5; McKee *et al.* 2013, *supra*, at 59; Baugh *et al.* 2012, *supra*, at 247; Daneshvar *et al.*, *supra*, at 691.

[36] Jordan, *supra*, at 226 box 3; Stern Testimony, *supra*, at 5.

[37] Baugh *et al.* 2012, *supra*, at 246.

[38] *Id.* at 247.

[39] Jordan, *supra*, at 226.

[40] *See* Emery, *supra* (noting "pilot studies show promise for [using] diagnostic MRI and MRS scans [to diagnose CTE] as brain imaging technology improves").

[41] Mitsis, *supra*, at 1-2, 7-8.  Other research teams are also working to develop tracers for the tau protein that is indicative of CTE.  *E.g.*, Wagner, *Can Science See Inside an NFL Player's Skull Before It's Too Late?*, Deadspin (June 21, 2012), http://regressing.deadspin.com/5920006/can-

developing a CTE screening test that relies on irregularities in vision, eye movements, and retinal/optic nerve structure as indicators of CTE.[42]  Thus, long before the Settlement concludes its 65-year term, it is likely that a large number of living class members will have received a diagnosis of CTE before they die.  Even with current technology, doctors can identify likely cases of CTE based on an individual's exposure to repeated concussive and sub-concussive head impacts and symptoms – behavioral/mood, cognitive, and motor – that display during an individual's lifetime and that correlate with a post-mortem diagnosis of CTE.

---

science-see-inside-an-nfl-players-skull-before-its-too-late (attached as Exhibit 78); Maruyama *et al.*, *Imaging of Tau Pathology in a Tauopathy Mouse Model and in Alzheimer Patients Compared to Normal Controls*, 79 Neuron 1094 (2013) (attached as Exhibit 79); Hollmer, *Alzheimer's Diagnosis May Gain from PET Imaging of Tau Proteins*, FierceDiagnostics (Sept. 20, 2013), http://www.fiercediagnostics.com/story/alzheimers-diagnosis-may-gain-pet-imaging-tau-proteins/2013-09-20 (attached as Exhibit 80); Jagust, *Time for Tau*, 137 Brain 1570 (2014) (attached as Exhibit 81).

[42] McGrath, *Illinois Eye Institute Project Aims to Identify CTE in the Living*, Chicago Sun-Times (June 14, 2014 4:35 PM), http://www.suntimes.com/sports/28048920-419/illinois-eye-institute-project-aims-to-identify-cte-in-the-living.html#.U6CR0fldV8E (attached as Exhibit 82).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2014, I caused the foregoing Objection to the June 25, 2014 Class Action Settlement and supporting documents to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

<u>/s/ Steven F. Molo</u>
Steven F. Molo