# EXHIBIT 26

# The New York Times

September 15, 2012

# A Player's Concussion, a Family's Ordeal
By **JUDY BATTISTA**

FORT WORTH — Mitch White watched football last Sunday, a framed New Orleans Saints jersey mounted on a wall over his shoulder at his home. White watches football differently from most people. He likes to analyze the offensive line, fitting for a tackle out of Oregon State who was a sixth-round draft pick of the Saints in 2001. And on most days, around the hour the early games reach halftime, White needs to lie down for a nap.

The Saints jersey has its spot, but there were other stops with other teams, too, so many that White sometimes is confused about what order the teams came in and who the coach was. Everywhere it was the same, though. White never played in a regular-season game, always stopped by a freakish injury, a newly signed player, or even one extended battle with the staph infection known as MRSA. After that, White asked the Tampa Bay Buccaneers to allocate him to N.F.L. Europe, now defunct, hoping it would help him get back into shape. White was a journeyman backup and practice squad player, on perhaps the most anonymous rung in the N.F.L. player hierarchy, trying to hang on to his career.

Now, seven years and one crushing hit later, he is one of the more than 3,000 former N.F.L. players who are suing the league over concussions. At 34, White is unable to work and is sometimes so debilitated by migraines that he cannot care for his two young daughters. He takes as many as eight medications at a time to ease his headaches, to smooth his erratic moods, to soothe his sleeplessness. He spends much of his time exploring treatments to find relief that rarely lasts longer than a few days: Botox injections, massage, sensory deprivation.

White and perhaps just a few hundred plaintiffs like him did not enjoy much of the glory or the riches that playing on Sundays usually bring. But they suffered the damage that they believe is the N.F.L.'s calling card, too.

In White's case, it was one hit at an N.F.L. Europe training camp in March 2005, when a blitzing middle linebacker crashed into the right side of White's head as White was pulling from his right tackle position. That sent him tumbling to the grass, knocking him out for a few moments and altering him so ineffably that his mother said, "When he first came home, it was like my son was gone."

To see White now is to get a glimpse of the challenges of living with the effects of a head injury.

He looks healthy, back down to his high school weight of 245 pounds, down from his high N.F.L. weight of 335. He and his family live in a comfortable house with a big portrait of their daughters on a mantle, in a well-maintained subdivision. This was a good day, his wife, Jennifer, said, meaning he got some sleep and had restrained himself from physical activity enough — a workout at the gym can set him back for three days. The headache, while there from the moment he woke up, was at least tolerable until midafternoon.

But after 90 minutes of talking, White's energy waned. His speech became more deliberate. Sitting on his sofa, he shaded his eyes from the overhead lights in his living room. He gets lost if he drives more than a few miles from home.

The Whites were recently out to dinner with friends, and after two hours, White said he could not talk or think normally. When they have plans, White said, he will load up on medication and try to get through it. Or they will simply cancel. He used to be really funny, he has told his wife. He misses that, she said.

"I try to act normal," White said. "I just want to be normal."

White did not start playing football until he was 16 as a high school sophomore, and he does not remember sustaining any concussions in high school or college. The hit that injured him, White said, was not even the hardest one he had ever taken, although he thought his helmet was not inflated properly.

"I tried to stand up, and fell over — I did that like twice," White said, sitting in his living room, which is usually kept cool and dark because heat and light can make his headaches worse. "A lot of people have told me — I don't remember like two or three days after that — I guess I walked up to the huddle, I thought I was in the huddle, but I was three feet behind the huddle.

"All I remember is I went back in. I just remember being in my stance and trying to lift my head up, and it was excruciating."

White's odyssey through postconcussion life winds through doctors and hotel rooms, starting first in Tampa, Fla., when he was given Tylenol and Advil for his relentless headache, but still told to go to meetings and watch practice the next day. The nadir came during three months in Birmingham, Ala., where players with longer-term injuries were sent. One doctor told him he had a mild concussion and should be ready to go in another week or so. But he could not sleep. He was made to run at one point, and ended up vomiting. He spent most of his time alone, in a dark hotel room.

"I wasn't thinking clearly at all," White said. "I was severely depressed. I had suicidal thoughts,

big time. It just kept popping in my head. I was thinking of hanging myself with shoe string, or every time I was in a car, I had an urge to jump out of the car on the freeway.

"I knew that was wrong. I couldn't control it."

A neurologist finally told White that the concussion he had was more moderate to severe. Later, a doctor in Pittsburgh was irate that White had been isolated in Birmingham. He told White to go home, to be around family members who could be supportive.

His mother called that time "a disaster." She and Mitch fought, and he had mood swings. "It was like he had a void in his eyes, there was no emotion," his mother, Donna Stacy, said.

Finally, doctors told White he would never play football again. He was stunned.

"I was waiting to get better," he said. "It's just the mentality; you just want to be in there, you feel like you're letting your friends down. I just thought it was like a knee injury. Rehab and get better and go. It was extreme depression."

White worked briefly with his brother in a food delivery service. But working a full day made his headaches worse and led him to take more migraine medicine than he was supposed to. He had to cancel meetings and lie on his office floor when the migraines struck. After about six months, he stopped altogether.

"It drives me crazy just sitting around," White said. "We are meant to work."

White was able to live off savings for about a year, and now he receives about $8,000 a month in payments from the N.F.L. and players union funds. His closest friends understand why White stays at home. But the mothers who take their children over to play with his daughters sometimes may wonder why he is in bed, he said.

White met his wife after he was injured, and everything about their lives together is clouded by his health. Jennifer White works the overnight shift as a registered nurse two days a week, so she is home to help care for their children. When she is not there, he calls his mother or mother-in-law for help.

Jennifer White is due to give birth to a son this year, and she doubts her husband will be able to care for three children. Stacy lives about 20 minutes away, but she is considering moving closer.

Some people have asked why they are having another child, given the situation, and Jennifer White replies: "We're not going to not have children. We're trying not to let it take over."

Jennifer White would like to quit working when their son is born, but they count on her job for medical insurance. One of Mitch White's doctors, Gary Tunell of Texas Neurology, hopes that eventually, White will not have to take so much medicine, but Tunell cannot guarantee that White's symptoms will get substantially better.

"That this has gone on seven years makes you more doubtful," Tunell said. "I think they will be diminishing in severity over time. I've tried to get Mitch to carry on normal activities. He needs to do some form of progressive exercise, and try to work through these headaches. Because right now, they are controlling his life."

The Whites have not given up hope that some new treatment might work. But the awful possibilities loom, every day.

"What he fears is early-onset Alzheimer's," she said. They do not expect much money from the lawsuit, although White is convinced that the league concealed for years its knowledge of the potential risks for players. They hope that improved education about concussions will prevent someone else from going through what White has.

Last month, the N.F.L. filed a motion to have the lawsuits dismissed, arguing that they should be resolved under the terms of the collective bargaining agreement and not by the courts.

"The N.F.L. has long made player safety a priority and continues to do so," the league said in a statement. "Any allegation that the N.F.L. intentionally sought to mislead players has no merit."

As for White, he said he would let his son play football. "I don't hate the N.F.L.," he said. "I love the sport. I in no way want to damage the league. I just thought I'd get better eventually. I had no idea this could be for the rest of your life. That this will affect you, your family, your wife.

"I expected to be hurt. I knew there was a possibility I could be paralyzed. Did I know I could get brain injury and be like this? No. I couldn't fathom that happening."

# EXHIBIT 27

**The New York Times** | http://nyti.ms/1udgSF4

PRO FOOTBALL | ANALYSIS    NYT NOW

# For Retirees, Decision on Concussion Settlement Will Not Be a Simple One

N.F.L. Concussion Settlement Divides Former Players

By KEN BELSON    JULY 22, 2014

Class-action settlements are often messy. When enough aggrieved people are thrown together, it is natural that some of them will be unhappy with a deal that is a result of a negotiation between parties trying to avoid a long, expensive trial with an uncertain outcome.

The proposed settlement in the case brought by more than 4,500 retired N.F.L. players who claim the league hid from them the dangers of concussions is similar. Asking 10 retired players what they think of the settlement might elicit 10 opinions.

In the coming weeks, though, the 20,000 retired players and their beneficiaries will have to make a final decision to accept the proposed deal, which includes an unlimited number of cash awards for a small set of severe neurological conditions; to opt out and perhaps sue the league for more; or to object and possibly appeal the settlement.

To make informed choices, retired players will have to pore over the settlement, consult their lawyers and doctors and consider their own health and financial needs. They will also have to weigh a host of arguments for and against accepting the plan.

Jeff Nixon, who played for the Buffalo Bills from 1979 to 1982, is among those who view the settlement as the best of several bad options. Going to trial, he said, was no slam dunk because the players would have to clear

several significant legal hurdles, most notably the league's argument that the collective bargaining agreement governed player injuries.

"The lawyers fought as hard as they could and got as much as they could from the settlement," said Nixon, who writes a blog about the settlement. "To continue litigation was pretty risky."

The settlement, he said, will get money into the hands of the former players who are in the worst shape, such as those with Parkinson's disease or Alzheimer's disease, and will act as an insurance policy for players whose health might deteriorate.

"We didn't get everything we wanted, but we got the N.F.L. to say, 'We'll give you guys money if you have symptoms,' " he said. "The bottom line is if you've got impairments and symptoms, you'll get paid."

There are many retired players, though, who say the settlement is irreparably flawed, and seven of them took the unusual step Monday of asking a federal appeals court to intervene to correct what they see as deficiencies.

Sean Morey, Alan Faneca and five other former players argued that most retirees would never see any money because many of their ailments would not be covered by the settlement. "The class, as certified, is doomed," they wrote in their filing.

They noted that players who had been found to have chronic traumatic encephalopathy, or C.T.E., a degenerative brain disease closely related with Alzheimer's disease, and who had died before the settlement was finalized, could receive up to $4 million. Anyone with a diagnosis of C.T.E. after the settlement was finalized could not receive an award.

Christopher Seeger, one of the lead lawyers for the plaintiffs in the class action, said the objectors had misread the settlement. The families of dead players who were found to have C.T.E. might receive awards because the players could no longer receive a diagnosis. C.T.E. was not included for living players because the settlement would cover those symptoms if they were to develop.

"Going forward, any retired player who is sick with a qualifying

condition will get compensated, as C.T.E. cannot be currently diagnosed in living people," he said. "Whether you have C.T.E. or not, or whether or not you can prove you have C.T.E., if you have symptoms of a qualifying condition, you will be compensated."

Susan Owens, whose husband, R. C. Owens, played for the San Francisco 49ers, the Baltimore Colts and the Giants and died two years ago from Alzheimer's disease, raised another potential inconsistency. Under the settlement, younger retired players would receive larger awards than older players on the presumption that head trauma from playing football, and not old age, had contributed to their severe neurological conditions.

But Owens pointed to research by the Mayo Clinic and others who found that people with early-onset Alzheimer's often get the disease because it runs in their families. Other research, though, has shown that moderate or severe brain trauma may raise the risk of developing Alzheimer's disease.

Owens said her husband might have had Alzheimer's disease years before he received a diagnosis because he did not want to admit he was losing his memory. If he had received a diagnosis earlier, he might have been eligible for more money.

"My husband would never admit to anything," said Owens, who has said she might file an objection. "He was an expert at not letting people know how he was."

Retired players will also have to consider Article XI of the settlement, which essentially says that state and federal governments have the right to recover expenses associated with treatment for a player's illness. If a player were eligible for a $500,000 award and Medicare had paid $200,000 to treat his condition, the player would receive only $300,000.

The problem for players is figuring out how much the government has spent. A liens administrator will be appointed to determine those amounts, but players may not get answers until after the settlement has been completed. That means they may not know what they could receive until it is too late, said Michael Kaplen, a lawyer who represents clients with traumatic brain injuries.

"Unless they know what the numbers are, then how can they decide whether to opt out?" he asked.

Seeger, the plaintiffs' lawyer, said that in other settlements he had worked on, he negotiated a fixed deduction that was drastically lower than the amount that the recipients owed. The government, he said, prefers the certainty of receiving small amounts from every recipient rather than spending years trying to claw back money from many people.

"The government likes these deals because rather than chasing these people individually, they can receive a fixed amount for each disease," he said.

Seeger said he was actively negotiating deductions now.

A version of this article appears in print on July 23, 2014, on page B13 of the New York edition with the headline: For Retirees, Decision on Concussion Settlement Will Not Be a Simple One.

© 2014 The New York Times Company

# EXHIBIT 28

- Videos
- Photos
- Scores
- Menu

- nfl
- mlb
- nba
- nhl
- ncaaf
- ncaab
- nascar
- soccer
- fantasy
- linemakers

- Facebook
- Twitter
- Google+
- Search
  Search Sporting News
  Search

# Players wrong on key factor in NFL concussion settlement



- David Steele @david_c_steele
  Email RSS
- July 14, 2014 11:07am EDT

- facebook
- twitter
- googleplus
- tumblr
- pinterest
- Email

The attorneys representing the players in the NFL concussion lawsuit are now at work getting the word out to all the retired players affected by the revised settlement. That includes the ones who are getting misinformation or inaccurate information – including those publicly claiming that they can't get money from the settlement despite having CTE.

"CTE is not a relevant marker for anything in this settlement. It's the symptoms— if you have all the symptoms that are related to CTE, or the diseases that are related, like dementia and Alzheimer's and ALS, then that determines it," said Christopher Seeger, the co-lead counsel for the more than 5,000 players in the settlement.

Frank Wychek (AP Photo)

"If a player thinks he has any symptoms of it, that's the very reason to stay in the deal,'' he added. "Proving that it's actually CTE is not necessary."

Several players and observers have challenged the settlement, in court by seven retired players and in published interviews by Hall of Famer Tony Dorsett and others. The settlement was revised on June 25 to uncap the amount available to them, and U.S. District Court Judge Anita Brody gave preliminary approval last Monday.

The challenges center on language that implied that those suffering from the degenerative brain disease chronic traumatic encephalopathy (CTE) would not be eligible for a payment if they filed after the date of the revised settlement, and that they wouldn't get anything at all because the disease still can't be definitely diagnosed before death.

That, Seeger said, is a fact about the settlement that "they just get wrong."

Players will be part of the payment pool just for showing the commonly-recognizable signs of CTE, without having to prove they have a disease that is still subject to medical research, widespread theory about the cause, and potential challenges by the NFL and its experts.

"If you get sick, period, you still get paid,'' he said. "We're telling everybody to go get tested. You'll be in the system. You're protected (by the settlement)."

Seeger, co-counsel Sol Weiss and the legal team specifically fought to make sure CTE was not used to determine eligibility, he said, because they didn't want anyone to challenge players to have to prove they have it—and that it was specifically related to concussions, and then only to ones suffered as an NFL player. It was a hurdle the lawyers did not want to subject players to.

"We're taking that argument out of the equation,'' Seeger said, adding, "You don't have to prove the causation. If you get sick from these symptoms or illnesses, we're going to assume that it was caused by concussions.''

The land mine the players have to avoid, he said, was putting too much on the current testing being done to diagnose CTE in living patients—such as the program at UCLA in which Dorsett, among others, was diagnosed with symptoms last fall. Besides the obvious worries about the health implications, it now has left the notion that the test is definitive when it's still just preliminary research that likely would not withstand a legal challenge.

In addition, retired tight end Frank Wycheck told The Tennessean that he was sure that "I am not eligible to receive a dime" despite his symptoms.

Without referring specifically to any player or his objections, Seeger said that was not true. The class action covers roughly 19,000 retired players, he said, and if they played and are suffering (or believe they will suffer) from the effects of concussions, they are covered.

The challenge, he said, is convincing players not to opt out of the settlement and trying to go it alone in court—and possibly lose a chance at payments or benefits forever. Seeger worries that players might end up "listening to a guy who's been listening to television ads and wants to gather plaintiffs to file a case and make some money off of it."

"If there ever was an opportunity to opt out,'' he said, "this is not the case to do it.''

- facebook
- twitter
- googleplus
- tumblr
- pinterest
- Email

# EXHIBIT 29

October 01, 2014

Search site… Go

- Home
- On TV & Video
- Science & Medical
- Document Archive
- Contact

A Fan's Look at Head Injuries and the Concussion Crisis in Football

## The NFL CTE Question



Tony Dorsett may be the current face of the NFL Settlement CTE question (AP)

07.22.14

Plaintiffs attorneys for the former NFL football players are trying to clear up the question of CTE in regard to the proposed concussion settlement. A recent Sporting News piece addressed the controversial issue with the former players Co-lead Counsel, Chris Seeger.

> "Seeger, co-counsel Sol Weiss and the legal team specifically fought to make sure CTE was not used to determine eligibility, he said, because they didn't want anyone to challenge players to have to prove they have it—and that it was specifically related to concussions, and then only to ones suffered as an NFL player. It was a hurdle the lawyers did not want to subject players to."

According to the Sporting News piece, the rationale seems to be that:

1. It is still too early to diagnose CTE in living people. The work that is currently being done toward this goal is preliminary and may not have withstood a legal challenge.

2. Diagnosis of CTE is not necessary because suffering from the symptoms of CTE may make a player eligible for compensation.

> *If you get sick, period, you still get paid. We're telling everybody to go get tested. You'll be in the system. You're protected (by the settlement).*
> *~ Co-lead Class Counsel Chris Seeger*

3. Players won't have to prove that CTE came from playing in the NFL. Although this of course is one of the main advantages of the settlement, former players do not have to show causation of their injuries, they also don't have to show it in order to be compensated for the other illnesses (ALS, Parkinson's, Alzheimer's and Dementia) which are listed on the grid.

> *If a player thinks he has any symptoms of it, that's the very reason to stay in the deal. Proving that it's actually CTE is not necessary.*

So moving forward, it will be critical to see if the symptoms of CTE manifest themselves in the diagnoses that the NFL settlement compensates.

In June, concussion plaintiffs lawyers Mike McGlamry and Bruce Hagen hosted a session at Emory University's Alzheimer's Disease Research Center that focused on the diseases and testing that is associated with the settlement.



Plaintiffs lawyers host a medical information session at Emory University

The 1 1/2 hour video has a lot of information about the medical issues including the diagnosis of Level 1.5 and Level 2.0 dementia. Without specific diagnoses of ALS, Alzheimer's or Parkinson's, the 1.5 and 2.0 levels of dementia may be looked at as a sort of catch-all or predecessor to the more specific named illnesses.

- ![Facebook]
- ![Twitter]
- ![Google+]

Return to Home

# EXHIBIT 30



# Seaus to opt out of concussion deal

**MARK FAINARU-WADA AND STEVE FAINARU via [ESPN](#)**

—

Relatives of former linebacker Junior Seau, whose suicide in 2012 put the NFL's concussion crisis on the national agenda, will reject a proposed settlement between the league and thousands of former players, a lawyer representing the family told "Outside the Lines" on Tuesday.

The decision to opt out means the Seaus will proceed with a wrongful death lawsuit they filed in January 2013. That suit alleges that the NFL concealed the dangers of football-related head trauma over a period of several years. After his death, Seau was diagnosed with chronic traumatic encephalopathy, or CTE, a neurodegenerative disease that has been found in dozens of deceased NFL players.

The announcement, coming on the eve of the 2014 season, is a serious blow to the NFL's efforts to put the concussion issue to rest. It raises the specter of continuing litigation that would pit the NFL against the family of one of its most popular players. Seau, a certain Hall of Famer, played 20 years in the NFL.

"The family want to know why this settlement seems designed for expediency for the NFL and to ensure that information doesn't come out," said Seau lawyer Steven Strauss, a partner in the firm Cooley LLP. "And the Seau family wants the truth to come out. Since this litigation started, there hasn't been one document produced, there hasn't been one deposition taken. It seems very clearly designed to nip this in the bud and not have the truth come out, and that's not acceptable to the Seau family, and it's not acceptable to Junior's legacy."

The settlement received preliminary approval from a federal judge in July. The deal calls for payments to former players who qualify under a complicated system that measures the level of neurocognitive impairment related to diseases such as ALS (Lou Gehrig's disease) and CTE. An initial $765 million deal was resubmitted after the judge raised questions about whether it provided enough money for the potentially large number of players who qualified. The total payout is now unlimited.

Strauss said the Seaus concluded that the deal does not address several concerns, including adequate compensation for the descendants of the former players. Seau's lawyers filed a previous motion objecting to the first proposed settlement, and Strauss said the revised deal did nothing to address those issues.

Strauss said Seau's family, including his four children, is "not suing for his pain and suffering. They're suing for their own. This settlement doesn't address that."

Under the proposed settlement, relatives of some players found to have CTE qualify for compensation up to $4 million.

Chris Seeger, an attorney who negotiated the settlement on behalf of the players, noted that those who opt out not only forfeit compensation and medical treatment provided by the deal but also face significant legal hurdles.

"If Mr. Strauss believes the $4 million his client is eligible for under the settlement is insufficient, he can choose to permanently forfeit these benefits and face all the significant risks associated with continued litigation," Seeger, a partner at Seeger Weiss LLP, said in a statement. "We would advise any class member against opting out of this agreement, considering the tremendous guaranteed benefits it provides."

An NFL spokesman did not respond to inquiries.

Seeger and other supporters of the settlement have argued that the deal was necessary in part because the case against the NFL is difficult to prove. The players, they noted, will have to show that the brain damage was caused by their years in the NFL even though the players participated in youth, high school and college football. They also will have to prove that the NFL suppressed the link between football and brain damage from players and fans even though that connection was discovered relatively recently.

Strauss repeated concerns that have been voiced by other attorneys, who argued that the negotiations that resulted in the deal lacked transparency. Many believe that the case never should have been treated as a class action because the players and their families have such disparate issues and injuries.

Strauss said he hoped other players might follow the Seau family's lead and opt out of the deal to force the two sides to negotiate a better deal.

"Ideally, our opt-out may cause others to consider that, and, in the ideal world, would cause the league and the plaintiffs [lead attorneys] to perhaps re-examine the settlement so they come up with something that addresses the claims of all those in the [lawsuit] and not just the few," Strauss said.

It is unclear how many other players, if any, have signaled their intent to oppose the deal. Strauss said the Seau family will formally notify an administrator of its intent to opt out before an Oct. 14 deadline. Players also have until that deadline to formally object to the deal. A large number of opt-outs could become a factor in the judge's decision to give final approval.

It's also not clear how -- and when -- Seau's case would be allowed to proceed back in California Superior Court in San Diego. It first needs to be remanded back to that court by Judge Anita Brody, who is overseeing the mass case, which conceivably could be held up for years in appeals.

"That's another problem; our case could be held hostage by the settlement," Strauss said. "We're opting out, but also want to proceed, want to be able to get on with the case."

Seau, who was 43, shot himself in the chest with a .357 Magnum revolver following years in which his family and friends noticed marked changes in his behavior. Previously a responsible and loving father, Seau lost control of his finances, gambled excessively and became disconnected from his relatives, including his children.

Shortly after his death, the NFL intervened in an unseemly battle among neuroscientists who wanted to study his brain. Members of the NFL's concussion committee helped direct the brain to the National Institutes of Health, where five separate neuroscientists found signs of the destructive neurofibrillary tangles that cause CTE.

Seau's case might pose a larger threat to the NFL than any other player suing the league. In addition to his name recognition and popularity, his medical record and clinical history are well-documented. In addition, his career coincided with an era in which the NFL's own research arm, created by former commissioner Paul Tagliabue, denied repeatedly in scientific articles and public statements that NFL players are susceptible to brain damage.

That committee, led by Tagliabue's personal physician, Elliot Pellman, who was also the New York Jets' team doctor, attacked neuroscientists who presented evidence suggesting that, in fact, the repeated head trauma related to football had led to significant brain damage in an alarming number of former players, including Hall of Fame Pittsburgh Steelers center Mike Webster and Chicago Bears defensive back Dave Duerson.

Duerson's relatives also sued the NFL. They have not yet indicated whether they intend to opt out of the deal.

Duerson's lawyers also have complained about the unwillingness of the NFL and lead counsel for the players to share information about how the settlement was reached and how the grid designating payoffs for various cognitive issues was crafted. In response to motions by entities such as ESPN, Bloomberg and several players, the league and the lead counsel for the plaintiffs signaled this week that they will produce the documents if the judge orders them to do so.

"We'd like all the info, we can't determine how the grid was even determined," Strauss said. "How did they come up with the grid amounts? We'd like to know the foundational basis that was presented to ... the court for approval. There has been a real sound of secrecy around these settlement discussions and the whole process."

Copyright © 2014 ABC News Internet Ventures