EXHIBIT 31





# New Concussion Settlement a Win-Win

June 26, 2014 by Andy DeGory

A new proposed settlement in the NFL concussion litigation should alleviate many worries when it comes to compensation for players affected by brain injuries. The revised agreement removes the cap on the NFL's obligations to the monetary award fund, and guarantees that any retired player who develops a qualifying neurocognitive condition will receive compensation. Ultimately, it looks like a win-win for the NFL and the players.

In a Wednesday conference call, Chris Seeger, co-lead counsel for the retired NFL players, said the plaintiffs' counsel team had been confident that the $765 million initially agreed upon last August would have been enough to cover the 65-year lifespan of the fund. They were supported by actuarial estimates from both parties. However, concerns over the fund's long-term future arose from both the court and the players.

"We heard concerns from players who needed to trust that the money would be there in, say, 40 years," Seeger said.

U.S. District Judge Anita B. Brody denied the motion for preliminary approval for the settlement in January. After six months of work under the supervision of Brody and the court's special master, Perry Golkin, the agreement was reached to uncap the fund and fully guarantee that retired players would receive the necessary benefits during the 65-year plan.

In regards to the actuarial estimates that led to the initial $765 million agreement, Seeger stated that those are now irrelevant due to the removal of the fund's cap.

"There is no scenario where a player won't get paid," said Seeger. "The biggest news of this is that in 15 or 25 years, you are still guaranteed to be compensated."

According to Seeger, aside from tightening some details the agreement between the players and the league remains largely unchanged. The standard will remain the same for players seeking benefits; severe



The compensation of Kevin Turner, a class representative in the suit who suffers from ALS, will not change. (Charles Dharapak/AP)

cognitive impairment will need to be proven to receive benefits. If, during a baseline assessment, mild cognitive issues are identified, players will be eligible for follow-up treatment as part of the program.

The monetary grid and scale to determine a player's compensation will remain unchanged as well. Seeger said that the plaintiffs never thought of trying to change the grid or its pay values during the revision of the settlement.

One change of note is that the NFL's ability to appeal claims is now unlimited, whereas they were limited to 10 appeals a year in the July agreement. Some argue that this could give the league a loophole to minimize claims.

Kevin Turner, a former Eagles and Patriots fullback, now suffers from ALS. A class representative in the lawsuit, his compensation ceiling of $5 million will not change with the new agreement. Turner's statement:

"The compensation provided in this settlement will lift a heavy burden off of the men who are suffering," Turner said in a statement. "I am also personally comforted by the knowledge that this settlement is guaranteed to be there for any retired player who needs it. This settlement is another important step for ensuring that future generations of football players do not suffer the way that many in my generation have."

It appears as though both sides got it right on the second iteration. The uncapping of the fund ensures the effectiveness of the compensation program. It alleviates concern over the long-term viability of the initial $765-million agreement, and expedites the process for players who are in need right now.

> *There is no scenario where a player won't get paid," said Seeger. "In 15 or 25 years, you are still guaranteed to be compensated.*

Judge Brody and Special Master Golkin deserve credit for working through the initial settlement and ultimately ensuring that the appropriate compensation was allocated. Brody's decision to reject the first settlement looks like it was the right move.

During the conference call, Seeger used the phrase "100% guarantee" multiple times when addressing players' ability to receive benefits. The NFL and the retired players have to be pleased on two fronts: Once the settlement is approved, the compensation program will come into effect soon and start providing benefits to players in need; and recent retirees who could be affected in the future now know that the coverage will be there.



☺

EXHIBIT 32

# NFL reaches concussion settlement

**Gary Mihoces, USA TODAY Sports**   *7:08 p.m. EDT August 29, 2013*



*(Photo: Evan Habeeb, USA TODAY Sports)*

The NFL and more than 4,500 former players want to resolve concussion-related lawsuits with a $765 million settlement that would fund medical exams, concussion-related compensation and medical research, a federal judge said Thursday.

**MORE:** The judge's order (http://i.usatoday.net/sports/nfl/2013-08-29-NFL-Concussion-Litigation-Settlement.pdf)

**Q&A:** What this means (http://www.usatoday.com/story/sports/nfl/2013/08/29/nfl-concussion-lawsuit-settlement-judge-layn-phillips/2727589/)

The plaintiffs include at least 10 members of the Pro Football Hall of Fame, including former Dallas Cowboys running back Tony Dorsett. They also include Super Bowl-winning quarterback Jim McMahon and the family of Pro Bowl linebacker Junior Seau, who committed suicide last year.

**BELL:** Right time for settlement (http://www.usatoday.com/story/sports/nfl/columnist/bell/2013/08/29/nfl-bell-concussion-lawsuit/2729447/)

**HEADS UP:** Can game be made safer for kids? (http://www.usatoday.com/story/sports/nfl/2013/08/27/heads-up-youth-football-nfl-roger-goodell/2711317/)

Senior U.S. District Judge Anita Brody in Philadelphia announced the proposed settlement Thursday after months of court-ordered mediation. She still must approve it at a later date.

Former NFL fullback Kevin Turner, who suffers from ALS, also known as Lou Gehrig's Disease, spoke in a halting voice during a teleconference Thursday as he welcomed the settlement.

"It's been a struggle to get to this point, but today … I am very proud that the NFL has decided to stand up for all the former players who are suffering from brain injuries," said Turner, 44, who played with the Philadelphia Eagles and New England Patriots and was a plaintiff in the suits.

"You know it's easy to forget just how many men have played in the NFL throughout the years. That's why today is so important for those who are hurting. This will bring help for them."

He added: "The compensation provided in this settlement will lift the huge burden off the men who are suffering right now, both them and their and families. It will give them the peace of mind to have the best quality of life they are able to have. They'll no longer have to make decisions regarding their health based on what they can afford."

Although some might see the settlement as low, the case was complicated and not a slam-dunk for the ex-players. Meanwhile, the NFL was battling a public relations nightmare of appearing to be a bully for even fighting the case.

Players attorney Christopher Seeger acknowledged there would have been risks in litigation. The lawsuits might have been dismissed.



USA TODAY Sports' Jarrett Bell analyzes the $765 million settlement.

"This is the only program where everybody get justice. … Everybody wins," Seeger said.

He said all retired players, not just those who sued, will be eligible for a brain assessment program, and those found to have a certain level of impairment will receive a medical benefit card that be used for further testing and treatment.

Seeger said players who develop problems such as ALS, Alzheimer's or severe dementia will receive a benefit, in some cases as high as $5 million. He also said the families of players who committed suicide will be eligible for "a seven-figure payout."

Seeger said former players will not have to prove their brain conditions are linked to NFL concussions.

"You don't have to prove that your neurological problem is related to a concussion. You don't have to prove in the settlement that you sustained a concussion in the NFL," Seeger said. "You just need to be a former retired player and you're in the program."

Many former players with neurological conditions believe their problems stem from on-field concussions. The lawsuits accused the league of hiding known risks of concussions for decades to return players to games and protect its image.

The NFL has denied any wrongdoing and has insisted that safety has always been a top priority.

**A BETTER HELMET:** Or just wishful thinking? (http://m.usatoday.com/article/sports/2601063)

**DATA:** Concussions keep players out longer (http://www.usatoday.com/story/sports/nfl/2013/07/31/concussions-keeping-nfl-players-off-the-field-longer/2604023/)

The settlement likely means the NFL won't have to disclose internal files about what it knew and when, about concussion-linked brain problems. Lawyers had been eager to learn, for instance, about the workings of the league's Mild Traumatic Brain Injury Committee, which was led for more than a decade by a rheumatologist.

In court arguments in April, NFL lawyer Paul Clement asked Brody to dismiss the lawsuits and send them to arbitration under terms of the players' contract. He said that individual teams bear the chief responsibility for health and safety under the collective bargaining agreement, along with the players' union and the players themselves.

One players lawyer, David Frederick, accused the league of concealing studies linking concussions to neurological problems for decades. But Seeger took the money over a peek into the NFL's files through discovery.

"It's always my preference not to continue to drag the litigation into a settlement process. It's not productive," Seeger said. "We made some pretty serious allegations in our complaint. But when we got into a point where we were looking to settle the case, I put that aside and only had one goal in negotiating and that was achieving the right result for players."

He said the primary goal was "substantial payouts" for severely injured players and testing and care for the others.

"I know many people would have been interested in seeing everything in the NFL's files, but at this point because we achieved the result we achieved and the NFL stepped up and settled the case, it's not a big concern for me. We got what we wanted."

**MORE:** Former QB Rypien applauds settlement (http://www.usatoday.com/story/sports/nhl/2013/08/29/former-washington-redskins-quarterback-mark-rypien-nfl-concussion-settlement/2728781/)

Brody had initially planned to rule in July, but then delayed her ruling and ordered the two sides to meet to decide which plaintiffs, if any, had the right to sue. She also issued a gag order, so it has been unclear in recent weeks whether any progress was being made.

The lawyers were due to report back to her Tuesday, but Brody instead announced in court files Thursday that the case had settled.

In recent years, a string of former NFL players and other concussed athletes have been diagnosed after their deaths with chronic traumatic encephalopathy, or CTE. Those ex-players included Seau and lead plaintiff Ray Easterling, who filed the first suit in Philadelphia in August 2011 but later committed suicide.

About one-third of the league's 12,000 former players have joined the litigation since 2011. They include a few hundred "gap" players, who played during years when there was no labor contract in place, and were therefore considered likely to win the right to sue.

In their suits, the former players allege that for decades the NFL knowingly failed to protect players from concussions. The suits allege long-term effects such as depression, dementia and suicide, such as the 2012 death of Seau and the 2011 suicide of former Chicago Bears great Dave Duerson.

More than 200 suits filed across the country against the NFL by ex-players were consolidated in Philadelphia. Brody had been expected to rule July 22 on an NFL motion to dismiss the suits. The league argued that because the players were covered by collective bargaining agreements, the matter should be settled by arbitration.

Brody ordered the mediation after what she described as an "exploratory" telephone conference with the attorneys for both sides.

"I order parties, through their lead counsel, to engage in mediation to determine if consensual resolution is possible," she wrote.

Brody appointed Layn Phillips, a retired federal judge, as mediator. Brody ordered Phillips to report to her by Sept. 3 on the results of the mediation and said she would not rule on the NFL's motion to dismiss until then.

The two sides responded with brief statements saying they would comply with the order and make no further comment.

*Contributing: The Associated Press*

**PHOTOS: Concussions and the NFL**



**CONCUSSIONS AND THE NFL**

**RELATED VIDEO**



**Is the 'Patriot Way' still working?**

# EXHIBIT 33

# SPORTS ON EARTH



## PATRICK HRUBY

July 18, 2014

# CUTTING THEM SHORT



Former NFL linebacker Junior Seau was diagnosed with CTE posthumously. In one study, 33 of 34 football players tested positive for the disease. (Getty Images)

Dave Pear was still alive. Potentially, this was a problem. It was the day after a federal judge had granted preliminary approval of a proposed settlement of a class action brain damage lawsuit brought by retired players against the National Football League, and Pear was on the phone with me, trying to make sense of the deal. What kind of illness and injury did it cover? How much money could suffering retirees expect? Why did the agreement make all sorts of seemingly arbitrary, non-medical distinctions, like one between different degrees of dementia?

Pear didn't know. He said his lawyer didn't know, either. A 61-year-old former Pro Bowl defensive tackle now afflicted by a variety of football-induced maladies -- vertigo, memory loss, constant physical pain following multiple neck, back and hip surgeries -- Pear already had spent years fighting to receive benefits from the NFL's much-maligned disability system, a treacherous legal and medical thicket that many retirees insist has been designed to cut costs by denying claims. He hoped the proposed settlement was different. That it would help everyone in need, every broken family and battered brain. Including his own.

"Is it a good deal?" Pear said. "It only covers certain people at certain times. Based on what I've read, you won't get compensation for CTE [chronic traumatic encephalopathy] until after you're dead."

Not exactly, I told him. To receive cash awards for CTE, a neurodegenerative disease that currently only can be diagnosed posthumously, former players must have died by a specific cutoff date.

"Well, what's the date?" Pear said.

Yesterday, I said.

Silence.

"That's horrible," Pear said. "That stinks. Unbelievable."

Believe it: According to the terms of the proposed settlement, NFL retirees may receive awards of up to $4 million for "Death with CTE," but only if they've died between Jan. 1, 2006 and July 7, 2014. Anyone who died earlier is shut out. As is anyone reading this. Forever. Never mind that CTE -- a condition found in contact sports athletes, military personnel exposed to explosive blasts and others subjected to repetitive concussive and subconcussive head trauma, marked by widespread, irreversible accumulation of destructive tau protein in the brain -- is at the heart of the lawsuits against the league. That it's the disease of Junior Seau and Dave Duerson, Andre Waters and Justin Strzelczyk. That it's the *deus ex machina* of "League of Denial," a malady that the NFL's handpicked, under-qualified, since-discredited concussion doctors insisted neither existed nor could be linked to football, all while the neuropathologist who first discovered CTE's telltale tau tangles in Hall of Fame center Mike Webster's brain, Bennet Omalu, considered calling it *footballer's dementia*.

Never mind, too, that the proposed settlement does not assign similar cutoff dates to former players diagnosed with amyotrophic lateral sclerosis (Lou Gehrig's disease), Alzheimer's or Parkinson's -- even though a 2013 National Institute for Occupational Safety and Health study of nearly 3,500 NFL retirees who played at least five seasons between 1959 and 1988 recorded just 17 combined cases of the aforementioned diseases, while 33 of the 34 deceased NFL players in a 2010 study were diagnosed with CTE. This left neuropathologist Ann McKee to wonder whether "every single football player doesn't have" it.

"[The cutoff] is one of those things that when you say it out loud, it just sounds ridiculous," says Alan Faneca, a former NFL lineman and one of seven retirees who have filed an objection to the proposed settlement. "It sounds crazy. To have such a small window -- the guys like Mike Webster who helped build and create the game having passed away before and their kids and families don't get anything, and the current guys who luckily enough lived past Fourth of July weekend not getting anything either? It doesn't make sense. It's a line drawn in the sand, entirely not on the right place."

A lawyer who requested anonymity because of his ongoing work on football brain damage litigation is more blunt. Picture the settlement's upcoming fairness hearing, he says, currently scheduled for November, in which Judge Anita Brody must listen to objections and concerns

before giving the deal final approval. Now picture Omalu or McKee standing in a federal courtroom in Philadelphia, holding aloft two jars.

In Jar No. 1: The brain of an NFL retiree who died before July 7.

In Jar No. 2: The brain of a retiree who died afterward.

"Just imagine [them saying], 'both show significant signs of brain damage, yet only this one is entitled to $4 million,'" the lawyer says. "'Preposterous, your honor.'"

* * *

Preposterous? Not at all. More like a simple misunderstanding. At least according to Chris Seeger, the co-lead attorney for the players on the proposed settlement. Two nights after I spoke with Pear, Seeger was a guest on CBS Sports radio. He wanted to, in his words, "straighten this out." (Full disclosure: Seeger specifically wanted to straighten *me* out -- the previous evening, I had been a guest on the same show, and had criticized both the death with CTE cutoff date and other aspects of the settlement).

"You know, frankly, we didn't care if you have CTE or not," Seeger said.

The settlement, Seeger explained, wasn't set up to help NFL retirees with CTE. It was set up to help retirees who are sick. Sick enough to show symptoms of neurodegenerative disease. The deal awards cash payments to former players who receive a "qualifying diagnosis" of ALS, Parkinson's, Alzheimer's or dementia. The first two conditions can be definitively diagnosed in the living. CTE cannot. Instead, a definitive diagnoses requires an autopsy, same as Alzheimer's and some types of dementia. A neuropathologist must cut a patient's brain into thin slices, stain them with chemical markers and examine the results under a microscope.

Rather than pay the families and estates of deceased ex-players who have been diagnosed with CTE, the settlement seeks to dispense money to retirees while they are still alive. How? In order to be eligible for a payout, former players must enroll in a Baseline Assessment Program, a neuropsychological testing program that screens for signs of cognitive impairment. If a retiree with CTE has enough impairment to qualify for dementia or Alzheimer's -- both of which have some symptoms which overlap with those of CTE -- he'll get his award in the here and now. Which means he won't need a death with CTE payout. Hence the cutoff date.

That's the logic, at least.

"I think people got really hung up on CTE, but, you know, this is all about symptoms," Seeger said on the radio. "If you're sick, and your activities of daily living are being interfered with, you can't function, you're going to get paid whether or not you have CTE."

This sounds reasonable. Unless you've read the scientific literature written by researchers who study CTE. Or have talked to family members of men who have succumbed to the disease. In which case, it sounds like a sneaky evasion. And also completely ludicrous. Despite Seeger's reassurances, the settlement not only figures to stiff-arm every current NFL retiree unfortunate enough to have CTE and die after July 7, but also many of those same retirees who have to *live* with the disease in the meantime. The very same symptomatic ex-players struggling with daily life who Seeger insists are covered by the deal.

Consider Lew Carpenter.

Carpenter was a football lifer. He played on the Green Bay Packers under Vince Lombardi. Coached in the NFL for 31 years. When he died from pulmonary fibrosis four years ago at age 78, Boston University researchers studying CTE called his daughter Lisa's house. They had an unusual request. They wanted to examine Lew's brain. His family had never heard of the disease. They said *yes* anyway, knowing Lew would have wanted to help other players. Lew's other daughter, Rebecca, wasn't sure what to expect. Dad had taken plenty of hits as running back, receiver and defensive back, but never had been diagnosed with a concussion. Well into his 50s, he had remained mentally sharp -- sharp enough to serve as an assistant coach for eight different NFL teams, as well as sideline stints with the World League of American Football's Frankfurt Galaxy and Southwest Texas State University. Only in his final years did Lew seem obviously impaired: he had trouble finding the right words, remaining organized, remembering why he was going to the doctor.

Rebecca was at her home in Los Angeles when the call came from Boston. *Your father had CTE. An advanced case. No signs of Alzheimer's or any other neurodegenerative diseases.* She was sick to her stomach. Didn't believe it. Didn't know a thing about CTE, either. Thought it might

10/1/2014

Case 2:12-md-02323-AB   Document 6201-8   Filed 10/06/14   Page 13 of 29
How the NFL's concussion settlement cuts coverage. | SportsonEarth.com : Patrick Hruby Article

be bullshit, a made-up disease, hyped by opportunistic lawyers and overeager scientists. Football was the greatest thing in her father's life, a sport that had lifted him out of childhood poverty, given him everything ... and *this* was what it had done to him? No. Just no. Even when Rebecca read the pathology report a few months later, she remained in denial. Until she saw the images of her father's brain, dotted with dark splotches of stained tau. "It was really shocking how much damage there was," she says. "On a scale of one to four, he was a four. Then I looked at the symptoms and was like, 'oh my god, that was a symptom. That was a symptom.'"

Suddenly, some of her father's inexplicable past behavior started to make sense. Like his mood swings. Like when someone would let the family's dogs into the house, and Dad would start screaming, totally spooked, as if someone had planted a live IED in the living room. *Goddamnit, who let the dogs in!* "He would call up and say, 'how is such and such,' and I would say, 'Dad, that was last year!' Rebecca says. "I would get mad and frustrated and think he doesn't care, he's not listening. But he had brain damage. And we didn't know. He was really high functioning in a lot of ways, but still had a lot of brain damage that impaired his ability to be in relationships and hold down jobs. You can look drunk, like under the influence of drugs. People don't know. It comes and goes. It's intermittent. It's crazy. It's like a frog in a pot of cold water and you slowly turn up the heat, and by the time they are boiling to death they don't even notice the change."

Rebecca talked to her mom, Ann, who first met Lew when she was 15.

*Mom, when did it start to go south?*

*It was really in his 40s.*

Among CTE case studies, Lew's story is hardly unique. Mood and behavioral problems often come first, followed by cognitive impairment. Duerson followed that path, his marriage ending, his business empire imploding, his dreams of becoming mayor of Chicago dashed, all before he began having blurred vision and headaches, memory loss and problems spelling common words. In 2011, he shot himself in the heart with a revolver, asking that his brain be donated to CTE researchers. Prior to committing suicide in 2012, Seau likely would not have been diagnosed with dementia or Alzheimer's. He was functional. Still there. Nevertheless, something had shifted, gone awry: He was womanizing, drinking heavily, gambling too much, acting impulsively, making bad financial decisions, hiding depression, forgetting things, having trouble sleeping.

Last year, Boston University CTE researcher Robert Stern and other scientists published a study of 36 adult males who had the disease. All were athletes. Twenty-nine played football. None suffered from any other neurodegenerative or motor neuron disease. Three were asymptomatic when they died. The rest were not. They fell into two clinically distinct groups, labeled "cognitive" and "behavior/mood." Each group was consistent with earlier case reports of CTE in boxers.

The first group consisted of 11 men. As patients, they suffered first from cognitive impairment -- memory problems, executive dysfunction. They tended to live longer, and their symptoms tended to show up later in life, typically in their late 50s. By contrast, the 22 men were in second group generally died younger, and their symptoms appeared earlier. Moreover, the symptoms themselves were totally different: Emotional explosiveness, impulsive behavior, outbursts of violence, depression and hopelessness.

When Duerson was 45 years old, he inexplicably threw his wife, Alicia, against a wall during an argument. She later told *Men's Journal* that he had never been violent before, and that his behavior came from "the changes" -- a new hair-trigger temper, sudden downshifts in mood and a lack of impulse control.

Back to the settlement. *If you get sick,* Seeger says, *you get paid. This is all about symptoms.* Is it? Is it about Duerson's "changes?" The following symptoms are associated with both brain damage and CTE: Sensitivity to noise, visual impairment, chronic pain, chronic headaches, numbness, burning, tingling, incessant ringing in the ears, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions. None of these are covered by the settlement. Remember the Baseline Assessment Program? It screens for "sick." It defines "symptoms." It is the first tollbooth on the road to cash awards. As previously mentioned, it consists of neuropsychological tests used to detect cognitive impairment. Not mood and behavioral issues.

In other words, the proposed deal has been designed as if only the first group from the Stern CTE study matters. Meanwhile, members of group two -- the Duerson and Seau cohort, and quite possibly the bigger cohort -- will be ignored, not paid a dime, at least until they live and suffer long enough, like Carpenter, to join the first group in measurable cognitive decline. And even that isn't guaranteed: In one study of CTE, a quarter of the individuals diagnosed with Stage III of the disease -- CTE runs on a scale, with IV being the most advanced stage --

were not considered cognitively impaired.

In the Stern study, only 10 of the 33 symptomatic subjects were ever diagnosed with dementia.

"I once happened to run into a social worker who helps rehabilitate former gang members," says Carpenter, who is working on a film about her father, My Dad's Brain, and has spent the last two years crisscrossing the country interviewing former football players and scientists to better understand how blunt force head trauma and neurodegenerative diseases can affect personality and behavior. "It turns out one of their first intake questions is, 'have you ever had a blow to a head?' They understand that a guy with that may need special intervention if they can help him at all, because that can have a major impact on your ability to regulate emotion and anger. Only that isn't covered by the settlement at all. That leaves me scratching my head."

"Stern says there are two types of CTE," says Gordon Johnson, a Wisconsin-based brain injury lawyer and advocate. "In this settlement, I don't know how you get compensated for the second type without having already killed yourself."

More head-scratching: Many scientists believe that there will be a way to detect CTE in the living within the next decade. This isn't blind faith in the march of progress, like expecting warp drives and flying cars. It's a pragmatic assumption, rooted in current research. Scientists in Chicago are experimenting with a screening test that measures vision, eye movement and optic nerve irregularities. Stern's team in Boston is currently conducting a comprehensive study of 100 NFL retirees, hoping to identify CTE biomarkers. Other researchers are developing and refining scanning technology to see tau deposits in the brain; just this week, scientists from Massachusetts General Hospital attending the Alzheimer's Association International Conference in Copenhagen announced a new type of brain imaging that can show tau tangles in living people for the first time.

Inexplicably, the settlement barely takes future scientific advances into account. While the deal covers the next 65 years, it specifically prohibits the NFL and the players' top lawyers from meeting more than once every 10 years to discuss possible changes to both the agreement's qualifying diagnoses and the protocols for making them, with actual modifications needing approval from both sides. (Translation: If the NFL doesn't want to accept a new method of detecting CTE, it doesn't have to). More significantly, any and all changes will not affect the bottom line. From Section 6.4 of the settlement, "Modification of Qualifying Diagnoses":

*In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s)*

"CTE isn't just being written out here, it's being written out for three generations," Gordon says. "How stupid is this settlement going to look in 10 years if a brain scan can prove CTE, and we have 1,000 players with this disease, and they can't get an award, and there's nothing you can do in this agreement to change if they *should* get an award?"

* * *

The lawyer was incredulous. His clients were confused. He couldn't go on the record -- he represents a group of NFL retirees within the class action suit, and is still figuring how what to advise them in terms of objecting to the deal or opting out altogether -- but asked me to call, anyway.

He wanted to vent.

The lawyer had seen a set of brain scans. Three former players. One in his 30s, one in his 40s, one in his 70s. All still alive. The scans were experimental, provided by a scientist researching neurodegenerative disease. *You can see it,* the lawyer said. *You can see the CTE.*

"Why aren't these players entitled to that diagnostic advantage today -- or in the future?" he said. "Nothing in the settlement provides for that. This started out as a CTE case. It is a CTE case. You have 33 of 34 autopsies confirming CTE. And on top of that, if someone dies today and an autopsy is performed and CTE is found, their family gets nothing? That's not representing these players well. It's ridiculous."

In his interview with *The Sporting News,* Seeger said that he and co-counsel Sol Weiss specifically fought to make sure CTE was not used to determine eligibility for cash awards because: 1) they didn't want anyone to challenge players to have to prove they have it; 2) they didn't want players to have to prove that the disease was specifically related to concussions. This makes little sense. Medical experts can see CTE in the dead. They will be able to see it in the living. How much more proof is necessary? As for the link between football-induced brain damage and neurodegenerative disease, there is no definitive proof that the former causes the latter. Not yet. However, there is a growing

10/1/2014

Case 2:12-md-02323-AB   Document 6201-8   Filed 10/06/14   Page 15 of 29
How the NFL's concussion settlement cuts coverage. | SportsonEarth.com : Patrick Hruby Article

body of suggestive, supportive evidence. And given that evidence, no honest scientist would argue that getting hit in the head over and over is anything but bad for one's brain.

In the case of CTE, the tau deposit patterns that identify the disease -- and distinguish it from, say, Alzheimer's -- have been found only in people who have endured repeated head hits or at least one battlefield blast injury. No brain insult? No CTE, according to McKee and other neuropathologists. On the other hand, while medical experts suspect that the other neurodegenerative diseases compensated by the settlement -- ALS, Parkinson's, Alzheimer's and dementia - may be triggered and/or accelerated by years of bashing helmets with opposing middle linebackers, those same illnesses also occur in people who haven't experienced brain trauma. The link to football is less clear.

By Seeger and Weiss' own logic, then, the settlement's award structure ought to prioritize CTE over other ailments. So what gives? Why are symptomatic former players being left high and dry? Why has the deal become the equivalent of an asbestos lawsuit settlement that severely restricts future mesothelioma claims?

The answers may lie in basic math.

When Seeger and the NFL first asked Judge Brody for preliminary settlement approval in January, the deal's award fund was capped at $675 million, an amount that player and league attorneys both claimed was enough to cover 65 years' worth of potential claims from an estimated pool of 20,000 retirees. Brody disagreed, denying their motion. The NFL and Seeger resubmitted the settlement in June, this time "uncapping" the fund -- but still confidently claiming in court documents that total payments by the league over the agreement's lifetime would not exceed the original amount.

During his interview with CBS Sports radio, Seeger was asked by show host and former NFL linebacker Brian Jones how he arrived at $675 million. Seeger said that he hired "the best economists and actuaries in the country, guys that do this kind of work." They looked at the rates of the neurodegenerative diseases covered by the settlement within the general population, compared those rates to every published study of the same diseases in NFL players, factored in football career length, and came up with an amount that Seeger was "extremely comfortable with."

"Sitting here right now, I'm still comfortable that those numbers are good," Seeger said.

"What percentage of the players," Jones said, "by your estimation, are going to receive compensation as a result of this settlement?"

"It could be as high as 3,000, 4,000, maybe 5,000 players at the end of the day, over the lifecycle of this agreement, will get cash compensation," Seeger said.

Headline: *National Football League expects as many as 25 percent of its former players to develop devastating, diagnosable neurodegenerative diseases.* Not the greatest endorsement for the sport. Putting that aside, however, let's do some arithmetic. Seeger estimates that between 3,000 and 5,000 former players will be compensated. By silent assent, the NFL concurs. Both parties insist that $675 million is sufficient to pay those retirees off under the terms of the settlement. Perform long division, and that means the average expected award is between $135,000 and $225,000.

That's a far cry from the settlement's maximum $5 million award for ALS. From its $3.5 million max for Alzheimer's and Parkinson's. From its $1.5-3 million max for dementia. Moreover, it isn't even close to the roughly $10 million in total lifetime costs -- including lost productivity and medical and custodial care -- that University of Toronto neurosurgeon Charles Tator estimates for each and every case of repetitive traumatic brain injury.

Oh, and also, it's as much as 833 times smaller than a separate $112.5 million that the NFL is required to pay Seeger, Weiss and four other attorneys within 60 days of the settlement receiving final judicial approval.

How do you get the NFL to sign off on a deal that theoretically exposes the league to uncapped, *unlimited* future financial liability? Easy. You make sure that said liability is, in fact, quite limited. Under the terms of the settlement:

• All cash awards are subject to reductions based on a grid that accounts for career length and retiree age at the time of receiving a qualifying diagnosis. Former players with fewer than five credited years of NFL experience will see their awards reduced, some by more than half. The same holds true for retirees over 45 -- the older players are when diagnosed, the less money they'll receive.

10/1/2014

Case 2:12-md-02323-AB   Document 6201-8   Filed 10/06/14   Page 16 of 29
How the NFL's concussion settlement cuts coverage. | SportsonEarth.com : Patrick Hruby Article

• Any retiree who has suffered a single non-football related traumatic brain injury or stroke will have their award reduced by 75 percent, never mind that 1) there is no scientific reason to presume that a single non-football brain injury accounts for three-quarters of a player's afflictions; 2) NFL team doctors increased former players' risk of stroke (and likely, their risk of brain injury) by administering the painkilling drug Toradol.

• Retirees do not receive credited seasons for playing in NFL Europe, even though time spent on "practice, developmental, or taxi squad[s]," *is* credited, and the laws of physics and biology with regards to collisions and concussions still apply on the other side of the Atlantic Ocean.

• The settlement's diagnostic program and claims process is rife with potential pitfalls that could make it difficult for a completely healthy person to receive an award, never mind a brain-damaged former player with cognitive or emotional challenges. Example No. 1: Retirees who fail to register with the settlement within 180 days of a supplemental notice being distributed are totally ineligible for benefits, as are players over age 43 who fail to get a Baseline Assessment Program exam within two years. Meanwhile, some of the ex-players who most need help are indigent. Example No. 2: The NFL is allowed to make unlimited appeals of player claims, and players must pay a $1,000 fee to contest them. Example No. 3: BAP program neuropsychologists cannot make qualifying diagnoses of Alzheimer's, Parkinson's or ALS; instead, retirees must visit a settlement-approved doctor and pay for both their medical testing and related travel expenses themselves.

## RELATED ARTICLES

### THE DEVIL IS IN THE DETAILS
Federal judge Anita Brody granted preliminary approval to the revised, "uncapped" brain damage lawsuit settlement... More»

### THE NCAA RUTZ-O-METER
The ongoing federal antitrust trial pitting former UCLA basketball player Ed O'Bannon against the NCAA is a... More»

### A SECOND ATTEMPT
The National Football League and lead lawyers for more than 4,500 former players suing the league over concussions... More»

### EPISODE 41: SHAUN POWELL
More»

### FREEDOM FOR ALL
The NCAA actually said that amateurism is "uniquely American," which is laughable to the point that it's nearly... More»

Similarly, the settlement's restrictions on CTE seems designed to cut the NFL's costs. The grid reduces the size of individual death with CTE payouts, while the cutoff date limits the total number. In disallowing future award changes regardless of medical advances -- in essence, the potential creation of a "Life with CTE" qualifying diagnosis -- the settlement shrinks the eligible player pool even further, same as pretending NFL Europe hits to the head don't count. By exclusively focusing on cognitive impairment, the same BAP program that is supposed to assist CTE sufferers by giving them a general dementia diagnosis actually *forecloses* on retirees who are suffering from mood, behavioral and other non-cognitive symptoms like chronic migraines -- all while saving the league money by ensuring that living ex-players with CTE who *do* manage to qualify for a dementia award are more likely to be older, and therefore subject to a greater payout reduction according to the aforementioned offset grid.

Think back to that NIOSH study. Almost 3,500 NFL retirees. Just 17 cases of Parkinson's, Alzheimer's and ALS over a 29-year-span. By contrast, neuropathologists have been looking in earnest for CTE in the brains of former football players for less than a decade -- and since they've started, they've mostly found it. If you were a league lawyer or negotiator working on the settlement, which of those diseases would you most try to write out of a deal?

"[The settlement] is a money grab," Faneca says. "A money grab by lawyers trying to get paid and get out. And by the NFL trying to keep this is as small as possible. Of course the league would agree to an unlimited number, because the window is still so small in terms of neurological disorders they agree to cover compared to the broad stroke of things."

Eleanor Perfetto has a related problem with the settlement. Her husband, Ralph Wenzel, played in the NFL. After a slow, painful,

emotionally agonizing physical and mental decline, Ralph died in 2012 at the age of 69. He was posthumously diagnosed with Alzheimer's and CTE -- but originally diagnosed with early dementia in 1999.

During his first visit with a neurologist, Ralph was asked when he first began to have trouble remembering things. He told the story of a 1994 high school football practice, where he bean to teach his linemen a new blocking technique.

*Hey, coach, you taught us that yesterday.*

Ralph was dubious. He asked his players to explain the technique in question. They did so perfectly, precisely the way he planned to teach it. Because he *had* taught it. Only he didn't recall doing so. That same year, the NFL formed its Mild Traumatic Brain Injury Committee -- a group that spent more than a decade producing junk science, denying and downplaying links between football and brain damage, between concussions and long-term neurological harm. A group whose discredited work and dangerous medical recommendations are at the core of the lawsuits that have produced the proposed settlement.

"With many of the older [NFL retirees], the date of their formal diagnoses is probably many years after they became sick," says Perfetto, a University of Maryland professor specializing in health policy and epidemiology, and a plaintiff in the lawsuits against the league. "So like Ralph, maybe they had symptoms for five or 10 years before a formal diagnosis. And one of the reasons they didn't realize they needed to get checked out, or did get checked out but doctors couldn't figure out what was wrong with them, was all of the efforts the NFL made to smokescreen that this problem didn't exist. Which is exactly what plaintiffs are suing for."

Back to the settlement's award grid. Perfetto says her attorney told her that her husband is due a $1.4 million payout for his postmortem diagnosis of CTE, based on his official dementia diagnosis at age 56. Had he instead been diagnosed in 1994, his award would have been closer to $3 million. Or consider a widow Perfetto knows, a woman in her 80s. She cared for her sick husband, a former NFL player, for more than 30 years. Behavior problems began in his early 50s. Cognitive impairment emerged in his 60s. Confused doctors misdiagnosed him with bipolar disorder and other illnesses, and only diagnosed him with dementia when he was nearing 70.

The man died in his early 80s. Researchers found CTE in his brain. Thanks to the grid and her husband's late age of formal dementia diagnosis, the widow is due to receive $600,000 -- millions less than the league would be required to pay out had the man's mood and behavioral symptoms counted toward a qualifying diagnosis, and a scenario that figures to be repeated if the current settlement proposal receives final approval.

"This is the one thing that bothers me a lot," Perfetto says. "The NFL has actually managed to reward themselves for their deceit."

* * *

Tony Dorsett had no idea. For that matter, neither did Brad Townsend. It was late afternoon on the day that Brody had granted the settlement preliminary approval, and Townsend, a reporter with the *Dallas Morning News*, had called the Hall of Fame running back for his reaction.

"It was the right decision," Dorsett told Townsend.

Now 60, Dorsett is a plaintiff in the brain-damage lawsuits. He also is struggling. Last year, he was diagnosed by doctors at the University of California, Los Angeles as having signs of CTE. Townsend had talked to Dorsett over the phone last August, and again in November. His ability to hold a steady train of thought seemed to have deteriorated. Nevertheless, he told Townsend that he didn't know the size of the award that he might receive from the settlement, and that perhaps it didn't much matter.

"My brain is priceless," Dorsett said. "There isn't enough money that they can give me to make me want to look the other way."

When I saw Townsend's subsequent article, I sent him an email. Did Dorsett realize that the only way for him to receive a CTE award from the settlement was to have dropped dead the previous night?

Townsend wrote back. He said he would give Dorsett another call. The next day, he sent me a follow-up note:

*... I spoke to Dorsett. He said he frequently communicates with his attorney and this is the first he's heard of a CTE loophole ... He said he was*

*"going to get all over this"* and call his attorney ...

Dorsett wasn't alone in missing the settlement's death with CTE award cutoff date. An Associated Press story on Brody's preliminary approval didn't make note of it. Neither did a piece in the *Minneapolis Star-Tribune*. The first page of a proposed long form settlement notice that will be sent to NFL retirees doesn't mention it specifically -- instead vaguely stating that the deal will provide "monetary awards" for "certain cases of CTE" that are "diagnosed after death" -- while a YouTube video supporting the settlement aimed at former players and produced by plaintiff's lawyers doesn't mention it at all.



In a way, Faneca says, he can understand not knowing. Not *wanting* to know. Ignoring the fine print. Even though the objection to the settlement filed by him and six other former NFL players in late June takes issue with many aspects of the settlement, including the cutoff date.

"[Neurological problems] are definitely not something you like to think about, especially for you own family or families of your friends and people you know," he says. "You first instinct is denial. You think, 'it's not going to happen to me.' It's not a fun conversation with your wife.

"But the likelihood, as we now know it, is that there is a more than strong chance that I'm going to know somebody who is going to be going through these issues in some form or fashion. Guys will be needing help, and we need to broaden the scope of the settlement, open it up and get more guys covered."

And how do you do that?

"Right now, there's tons of guys who have no idea what is going on," Faneca says. "I have guys contacting me, asking to be informed. The settlement is a little daunting to comprehend, the ins and outs and all the exclusions. Who wants to read that stuff? But sometimes you have to suck it up and start handling it."



8 Comments    Sports on Earth         Login

Sort by Best           Share   Favorite

Join the discussion...

Ira Pellman Goodell · a month ago

# EXHIBIT 34

 **ESPN.com:** NFL

[Print without images]



Friday, September 12, 2014

# Brain impairment begins younger

By Steve Fainaru and Mark Fainaru-Wada
ESPN.com

NFL players are likely to suffer chronic brain injury at a "significantly higher" rate than the general population and also show neurocognitive impairment at a much younger age, according to documents filed on behalf of the league in federal court Friday.

Former players between 50 and 59 years old develop Alzheimer's disease and dementia at rates 14 to 23 times higher than the general population of the same age range, according to the documents. The rates for players between 60-64 are as much as 35 times the rate of the general population, the documents reported.

The figures, compiled by actuarials hired by the NFL, appeared to be the first public admission by the league that retired players incur brain damage more frequently than the general public. The report did not specify why the rates for retired players are significantly higher.

The NFL's report, along with one filed by the plaintiffs, was prepared for U.S. District Judge Anita B. Brody, who is presiding over the lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries. Brody sought the documents as evidence that a settlement the two sides reached in the case is sound.

"These results validate that our assumptions are reasonable and conservative because when compared to prevalence rates among the general population, they are significantly higher," wrote The Segal Group in the documents prepared for and presented by the NFL. "Moreover, as anticipated, the model determines that players will first be diagnosed with qualifying diagnoses at a younger age than the general population, which is consistent with plaintiffs' allegations."

Nearly three in 10 former NFL players will develop at least moderate neurocognitive problems and qualify for payments under the proposed concussion settlement, according to documents filed by the league and the players.

The Segal Group estimates that 3,488 former players will make nearly 6,700 claims for payments related to brain injuries caused by playing football, according to the documents. Of those 3,488 claims, 94 percent would be for Alzheimer's, Parkinson's disease or moderate dementia, but the NFL's documents show that many, if not the majority of, players will be ineligible for compensation before reaching age 80.

The settlement has come under intense criticism from several lawyers involved in the case, although it remains unclear whether that opposition could derail it. For months, many of those attorneys have been requesting the underlying actuarial data that negotiators relied upon to close the deal.

After reviewing the documents, one prominent lawyer who represents several former players said the data refuted the claims of lead negotiators that the settlement provides adequate compensation for players with chronic brain damage.

"They're going around saying what a great settlement it is, when the average Parkinson's player gets $320,000; that's utter nonsense," said the lawyer, who asked not to be identified for fear of upsetting Brody. "The average Alzheimer's guy gets $340,000. That's just utter nonsense."



The players' actuary estimated that former players were at twice the risk for Alzheimer's, Parkinson's, Lou Gehrig's disease and dementia as the general population between the ages of 20-60 years old. After that, they estimated the ex-players' risk would be closer to normal.

The NFL's actuary reported significantly higher rates of Alzheimer's and dementia for all age groups. Players younger than 50 were at least eight times more likely to develop those diseases, for example.

In 2009, the NFL funded a University of Michigan study that showed that former players between 30-49 were 19 times more likely to have Alzheimer's and other mental disorders than men of the same age. But the league disavowed the study, saying that it did not specifically study dementia and was based on unreliable phone surveys.

Roger Goodell and the NFL agreed this summer to pay out more than the $675 million for player awards agreed to in the concussion settlement.

The documents released Friday have been sought for months by attorneys and media to understand how negotiators arrived at the settlement. The two sides announced in August 2013 that the NFL would pay $765 million -- $675 million designated to retired players with neurological impairment.

One actuary who reviewed both reports for ESPN said he was struck by how similar the findings were.

"It is common to have experts employed by each side wind up with substantially different conclusions," said Scott Witt, owner of Witt Actuarials and a frequent expert in damage calculations. "In this case, I was struck that both experts' reports are fairly harmonious."

Numerous retired players and attorneys have questioned whether the money was sufficient to cover the growing number of players with confirmed brain damage. At the time the proposed settlement was first announced, Christopher Seeger, a lead co-counsel who negotiated the deal for the players, promised that "analysis from economists, actuaries and medical experts" would prove that the settlement will cover "all eligible retired players."

But Seeger and the NFL refused to produce the information. Some attorneys speculated that the NFL was withholding the data because it contained potentially damaging information: the league's own estimates of how many players are likely to suffer brain damage.

That information goes to the heart of questions about the long-term health effects of tackle football. Despite mounting evidence about the link between football and brain damage, scientists have not yet established the prevalence of diseases such as chronic traumatic encephalopathy, or CTE, which has been discovered in dozens of NFL players following their deaths.

In January, Brody refused to provide preliminary approval for the deal. She ordered negotiators to turn over all documentation used to support the settlement, including the analysis by actuaries and economists, noting her concerns that not all qualifying players would be paid.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3

million for moderate dementia and other neurocognitive problems.

However, only men younger than 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed at a more advanced age.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

About 28 percent of all retired players are expected to be diagnosed with a neurocognitive injury that is eligible for compensation under the plan. But only 60 percent of them are expected to seek awards, based on prior class-action litigation.

---

EXHIBIT 35

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

    • See a sample reprint in PDF format.          • Order a reprint of this article now

NFL

# NFL: Nearly Three in 10 Ex-Players Will Develop Debilitating Brain Conditions

*League Makes Disclosure As Part of Proposed Settlement of Concussion Suits*

Associated Press

Sept. 12, 2014 9:32 p.m. ET

PHILADELPHIA—The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in separate actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28%, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL report said the ex-players' diagnosis rates would be "materially higher than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 % annually. Ms. Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Ms. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack 'an informed understanding of the dynamics of the settlement discussions and negotiations.' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Mr. Duerson, the popular Chicago Bears safety, committed suicide in 2011.

The family of former linebacker Junior Seau, who also committed suicide, has announced plans to opt out. He and Mr. Duerson are among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic encephalopathy. Known as CTE, it can only be diagnosed after death.

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 % for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60% of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

—Copyright 2014 Associated Press

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

# EXHIBIT 36

Friday, September 19, 2014

Member Login: **Sign In** | **Register**



66° John Bolaris' Forecast »
Philadelphia, PA

philly•com

*Search*

The Inquirer
DAILY NEWS

| 🏠 | News | **Sports** | Entertainment | Business | Opinion | Food | Lifestyle | Health | More |

EAGLES  PHILLIES  FLYERS  SIXERS  UNION  COLLEGE  HIGH SCHOOL  OTHER SPORTS  VIDEO  FORUMS  ODDS  TICKETS  SHOP

AdChoices▷      Close Ad ✕

# NFL: 3 in 10 ex-players face Alzheimer's, dementia

| Share | Tweet | | Reddit | Email |



Tight end John Carlson #89 of the Seattle Seahawks is carted off the field after an apparent head injury in the first quarter against the Chicago Bears in the 2011 NFC divisional playoff game at Soldier Field on January 16, 2011 in Chicago, Illinois. (Photo by Jonathan Daniel/Getty Images)

**MARYCLAIRE DALE,** *The Associated Press*
POSTED: Friday, September 12, 2014, 3:50 PM

PHILADELPHIA (AP) - The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in separate actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion

**Advertise Here**

*Latest Videos:*



The Ceilings for Penn State & Temple

**Kern: Ceiling for Penn State & Temple**

  

*Most Viewed Sports Stories:*


Cooper admits he's pressing


Analyst doubts Birds are Top 10

Howard the key to Phils' future

lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28 percent, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL report said the ex-players' diagnosis rates would be "materially higher than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 percent annually. Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack 'an informed understanding of the dynamics of the settlement discussions and negotiations,' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Duerson, the popular Chicago Bears safety, committed suicide in 2011.

The family of former linebacker Junior Seau, who also committed suicide, has announced plans to opt out. He and




Flyers want more from Couturier


Kendrick struggles in Phils' loss



*Also on Philly.com:*

NEWS:

Schuylkill boardwalk opens soon

BUSINESS:

10 electric and hybrid cars that get 40 MPG or more

HEALTH:

Does Philly have a doctor shortage?

FOOD:

First Street Steaks: Cheesesteaks under the El

ENTERTAINMENT:

Choreographer sues Cher, alleges racial discrimination

CARS:

Watch: World's first 3D printed electric car

*Stay Connected*

*Travel Deals*

$140 & up -- Downtown D.C. Hotel Sale thru Fall, 20% Off

See all travel deals »

Duerson are among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic encephalopathy. Known as CTE, it can only be diagnosed after death.

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 percent for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60 percent of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

---

**MARYCLAIRE DALE**
*The Associated Press*

---

Get the latest Sports Wrap Up newsletter delivered to your email. Sign up now!

Enter email address to sign up

Already a philly.com member?  ○ Yes  ○ No

Share   Tweet   Reddit   Email

---

**Share this story with friends who would like it.**
We recommend which of your friends would enjoy this story.

Promoted Links by Taboola