# EXHIBIT 45

Former players: Devil is in the details with NFL concussion settlement - SI.com

NFL

# Former players: Devil is in the details with NFL concussion settlement

Print



BY DON BANKS

Posted:
**Thu Aug. 29, 2013**

Updated:
**Mon Jun. 16, 2014**



*"The guys who need it now won, but the rest of us have lost the ability to take the bully behind the shed," Former NFLPA president Kevin Mawae said.*

Don't try telling former NFL players union president **Kevin Mawae** that Thursday's concussion litigation settlement was an even-handed resolution to the most contentious and significant issue facing the sport as the NFL's 2013 regular season looms.

Mawae, a retired 16-year NFL veteran and two-term NFLPA president, said only the ex-players in the most dire need of financial and medical assistance truly won a victory with **Thursday's announcement of a $765 million mediated settlement.**

"I think the league won big on this, because the players settled for a pittance,'' Mawae told SI.com, on the phone from his home near Baton Rouge, La. "It's a relative drop in the bucket. I'm not going to say the players caved, because it would do an injustice to the older men who really need the help now, but at some point in time, the collective body of players, retired and active, have got to be willing to go all the way to the wall with this issue.

"They didn't this time. The league won this hands down. I know as soon as you print that there's going to be a bunch of former players pissed off at me for saying that, but it's true. The league won.''

**KING: The NFL's nuclear-winter scenario has vanished**

Mawae, the former **Seahawks'**, **Jets'** and **Titans'** center, did not add his name to

the list of roughly 4,500 ex-NFL players who sued the league over the effects of brain injuries they contend were incurred on the field, saying he knew football posed inherent risks all along, but they were worth the rewards.

But the settlement is a setback for players in the long run, Mawae said, because it keeps the NFL from having to release information in court about what it knew in regards to the connection between brain injuries and football, and when it knew it. And that opportunity lost represents a discovery process that can't have a dollar value placed upon it.

"Everybody had been asking me what was going to happen with the lawsuit, and I've said all along they're going to settle it,'' said Mawae, who retired after the 2009 season.

"Because in the end, settling it for however much money is a whole lot better for
the league than giving up everything they have as far as information and potentially
harming the shield for good. There's too much potential for information that could
have done damage to the NFL, and it's better to just pay it off with $765 million,
plus court costs."

**Peter King: The owners win in concussion settlement**

The MMQB's Peter King call the NFL owners the winners in the concussion lawsuit,

The NFL's class of elderly retired players understandably cannot be blamed for not
being able to afford to take the long view in regards to the concussion litigation
settlement. The different agendas between that group of ex-players, and those of
Mawae's era, made Thursday's development capable of being seen from vastly
different perspectives.

"If it helps the neediest men, in the most dire situations, then, yes, it's a good day,"
Mawae said. "But it depends on how long it takes for them to get that money. If
those guys who are destitute, or have no insurance, or have struggles with
dementia, if they can get this help immediately, that's a positive. Especially the
older players who helped lay the foundation of this game. We owe them that."

But today's players, and those recently retired, lost out, Mawae said.

"The guys who need it now won, but the rest of us have lost the ability to take the
bully behind the shed," he said. "From my standpoint, I'd rather take the bully
behind the shed and beat the crap out of him, and let him know he can't bully us

around. But now, essentially what we've done is taken a little bit of our milk money
back and gotten the promise that he won't touch us again.

"But there's no ability to go and finish off the fight. The league, at the end of the
day, was willing to spend $765 million, plus another $200 million in legal fees, and
that's like spending the Jacksonville Jaguars in order to not have to divulge
information you had that the players could have used to finish the fight. It's like
taking it 99 yards, but not getting that last yard."

**McCANN: Here's what happens next in the concussion lawsuit settlement**

Several ex-NFL players SI.com spoke to acknowledged that the devil is in the
details in a deal as complicated as the concussion litigation settlement, and said
they are still waiting to see if the agreement can be executed swiftly and fairly. One
of those was ex-Bucs defensive lineman Chidi Ahanotu, 42, a 12-year NFL
veteran who signed his name to the concussion litigation and recruited ex-Tampa
Bay teammates Hardy Nickerson, Eric Curry and Mike McGruder to do the same.

"It's decent money, but the key part of this will be the people who determine who
qualifies and who's eligible," said Ahanotu, who played for five teams between
1993-2004, spending nine seasons in Tampa Bay. "If it's like the NFL's disability
benefit program, this isn't a win for the players. That panel denies most requests.
We have access to the benefits, but that doesn't mean you get them.

"That's why the jury is still out on this. I want to say we won, but you can't do that
until you see how this money can be accessed and by whom. The fact that this
money is here is great, but [how the money is distributed] is the most important

part of the process. That's everything."

Ahanotu said he has suffered from memory loss and a lack of mental clarity since his playing career ended, and worries that his long NFL career will lead to future cognitive issues. He was not surprised by Thursday's settlement, but thought the negotiation process would take longer.

"I was expecting them to settle, because it's just a PR nightmare for the NFL," he said. "Now that the season is close to starting, the league doesn't want this issue looming over everything. But I thought it'd take longer than this."

Reached as he was about to go on Fox Sports1 to talk about the concussion litigation settlement, former **Saints** linebacker **Scott Fujita**, now an NFL analyst on that network, was trying to quickly digest the news and impact of the agreement.

"It looks good on paper, and the press release sounds fantastic, all that kind of stuff," said Fujita, who did not join the lawsuit. "But we're all trying to figure out the details and what they mean. That will tell the story."

**Cowboys** quarterbacks coach **Wade Wilson**, himself a former NFL quarterback of 17 seasons, called the settlement a potential "win-win for both sides," in that it hopefully allows for closure for the league and its players on this issue.

"Any time you can get care to the ex-players who are really needing it, that's a phenomenal thing," said Wilson, who did not join the lawsuit and said he didn't even know any former teammates who had. "I really do think it's a good day for the NFL, because any time there's litigation out there and you get it resolved, it's a plus. Hopefully now we can start to put it behind us and move on to football and the games."

# EXHIBIT 46

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

• See a sample reprint in PDF format.     • Order a reprint of this article now

NFL

# Deal in Concussion Suit Gives NFL a Big Victory

By MATTHEW FUTTERMAN and KEVIN CLARK

Updated Aug. 29, 2013 11:22 p.m. ET

After years of damaging publicity, the National Football League reached a surprise settlement with a group of 4,500 former players who sued it over concussion-related issues.

The settlement represents a major victory for the NFL. Just a week before the 2013 season, the league has largely removed an issue that has dogged it for years and led some to suggest the sport should be banned.

The agreement, reached at 2 a.m. Thursday Eastern time after nine weeks of intense mediation, came far earlier than most expected. It calls for the NFL to pay $765 million, mostly for medical benefits and injury compensation for the retired players, in addition to funding medical research and covering legal expenses.

The settlement includes all retired NFL players who present medical evidence of severe cognitive impairment, not just those who joined the suit.

The NFL admitted no wrongdoing or liability in the agreement, which must be approved by Anita Brody, the federal judge in Philadelphia overseeing the case. She is likely to approve the agreement, said a person familiar with the matter.

The plaintiffs don't have to approve the settlement, but anyone can opt out, a league spokesman said.



The National Football League and 4,500 former players suing the league over concussion-related issues reached an agreement on a settlement. WSJ's Kevin Clark and NFL Hall of Fame quarterback and SmallBizClub.com Founder and CEO Fran Tarkenton discuss. Photo: AP.

Layn Phillips, a former U.S. District judge who mediated the settlement, said in a statement that it would "provide relief and support where it is needed at a time when it is most needed," while avoiding a long legal process.

"This settlement is a very important step for ensuring that future generations of football players do not suffer the same way that many in my generation have," said Kevin Turner, an NFL running back in the 1990s and a lead

Former Chicago Bears quarterback Jim McMahon in 1987. (AP Photo/Doug Jennings) *Associated Press*

**Related Articles**

**A Look at the Prominent Plaintiffs**

plaintiff who suffers from amyotrophic lateral sclerosis, a motor neuron disease known as Lou Gehrig's disease.

The settlement will cost each of the NFL's 32 franchises $24 million over 20 years, or roughly $1.2 million a year. Projected league revenues this season are $10 billion, and the NFL finalized a series of media-rights deals last year that guarantee more than $40 billion through 2022.

The agreement doesn't prevent future players from making claims or suing the NFL for injuries incurred while playing. But because all current players are party to the current collective-bargaining agreement between the NFL's owners and the league's players' union, those claims would be handled through the arbitration process outlined in the labor deal.

NFL Executive Vice President Jeffrey Pash, who spearheaded the case for the league, called the deal "an important step that builds on the significant changes we've made in recent years to make the game safer, and we will continue our work to better the long-term health and well-being of NFL players."

The lead plaintiffs' attorney, Christopher Seeger, said the settlement is an opportunity for the most severely affected players to get medical coverage quickly and covers retired NFL players for the next 60 years. Former players who suffer from ALS, Parkinson's disease, Alzheimer's disease, dementia and other neurological conditions will receive "substantial benefits," some as high as $5 million, he said.

Mr. Seeger said the deal will "get help quickly to the men who suffered neurological injuries. It will do so faster and at far less cost, both financially and emotionally, than could have ever been accomplished by continuing to litigate."

Legal experts familiar with the case say the plaintiffs' attorneys didn't believe they had enough firepower to win in court. NFL lawyers were prepared to probe each plaintiff about his athletic history to try to convince the court the NFL couldn't be held liable for injuries that could have come from youth, high-school or college football—or substance abuse.

John Goldman, a litigator with Herrick, Feinstein LLP, who was following the case, said the plaintiffs had "tough legal hurdles," given the inability of players to prove what caused their injuries.

Current executives at the NFL Players Association issued a terse statement: "All of the plaintiffs involved are part of our player community, and we look forward to learning more about the settlement."

Kevin Mawae, a former president of the NFLPA who wasn't a plaintiff, said the settlement was far too small. "Basically, for the cost of their least valuable team, the NFL was able to remove a huge monkey off their back," Mr. Mawae said. "But even worse than the money, it's that they don't have to admit guilt and the players will never be able to know the information that the league knew about this issue."

**Big Settlements**

**NFL** (2013): The professional football league and a class of former players agreed to settle a concussions-related lawsuit for $765 million. The NFL generated $9.5 billion in revenue in 2012.

**Goldman Sachs** (2010): The bank paid $550 million to settle its civil litigation with the Securities and

He said, "At end of the day it's a very small price to pay considering the negative outcome that could have happened to the NFL if the players had taken this to court."

The settlement calls for $75 million of the NFL payment to go to baseline medical exams for ex-players, $675 million to go toward compensation and $10 million to go to

Exchange Commission, which charged that Goldman profited off the housing market's collapse by selling clients mortgage securities. The firm reported $34.1 billion in revenue last year.

**Countrywide** (2011): Bank of America settled for $335 million a discriminatory mortgage-lending suit filed by the Justice Department against its Countrywide unit. BofA reported $84.2 billion in revenue last year.

**Dow Corning** (1998): The company agreed to settle a lawsuit related to its silicone-breast implants for $3.2 billion. Its revenues in 2012 were $6.1 billion.

**Tobacco** (1998): The four largest cigarette makers in the U.S. settled state claims for $206 billion to be paid over 25 years.

research and education.

The cost of notifying members of the class won't exceed $4 million. Legal fee payment will be determined by the district court. The NFL will pay 50% of the settlement over the next three years, then the balance over the next 17 years.

If the initial funds are exhausted, the NFL will have to contribute a maximum of $37.5 million to supplement the fund, bringing the total to just over $800 million, not including legal fees, which are expected to be as much as $100 million, according to a person familiar with the matter.

Players in the suits include Pro Football Hall of Famers Chris Doleman and Bruce Smith and recent stars such as former Jacksonville Jaguars running back Fred Taylor.

Families of players with chronic traumatic encephalopathy who have been posthumously diagnosed, including those who committed suicide as did former NFL linebacker Junior Seau, also will be eligible for millions of dollars in compensation, Mr. Seeger said.

Former Minnesota Vikings quarterback Fran Tarkenton said the deal is a good one for the players, simply because most older players have little money. "They are just broke, they've got dementia, they've got ALS, all types of brain damage and what this does, it puts the money into these people to let them live their live with some type of dignity."

Helmet maker Riddell, a party in many of the lawsuits, wasn't a part of the settlement, Mr. Seeger said. A Riddell spokesman declined to comment.

—Ben Cohen contributed to this article.

**Write to** Matthew Futterman at matthew.futterman@wsj.com and Kevin Clark at kevin.clark@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

EXHIBIT 47

  **ESPN.com:** NFL                    [Print without images]        

Thursday, August 29, 2013
# Reaction to the concussion deal

ESPN.com news services

*Reaction to Thursday's order from Senior U.S. District Judge Anita Brody outlining a proposed $765 million settlement between the NFL and more than 4,500 former players who want to resolve concussion-related lawsuits:*

---

"From the outset of this litigation, I have expressed my belief that the interests of all parties would be best served by a negotiated resolution of this case. The settlement holds the prospect of avoiding lengthy, expensive and uncertain litigation, and of enhancing the game of football." -- Brody

---

"It's a great day. My preference was when players were done playing, we'd have some kind of aftercare. It's a great thing for both sides of football that guys can get aftercare now. That's the most important thing." -- former NFL quarterback Mark Rypien to USA Today Sports

---

"It's frustrating. Frustrating. And to have a 10-year-old daughter who says to her mother, 'Daddy can't do this because Daddy won't remember how to do it,' it's not a good feeling. I'm glad to see there's been ... acknowledgment that football has had something to do with a lot of the issues us players are going through right now." -- former Dallas Cowboys running back Tony Dorsett

---

"Concussions are part of the game. I know a lot of the old players need a lot of help, and it's quite a settlement, from what I understand. ... I think people have hid behind this too long. It's time it's out in the open. It's out in the open now so we'll see what happens." -- former Chicago Bears coach and ESPN analyst Mike Ditka

---

"I'm not a part of it, but it seems fair. There have been a lot of guys that have suffered. Take Sam Huff, I saw him carried off the field on a stretcher twice in one game. I'm glad they're addressing it. I hope the players are satisfied and they're taken care of." -- former NFL quarterback Sonny Jurgensen

---

"They (the NFL) put a big settlement number out there, but guess what? They say you have to qualify, how easy will they make that? Then you get 50 percent in the first three years and the rest of it you have to wait for over a period of 17 years? Some of the guys who need to be compensated will be dead by then. A guy who has alzheimer's now. ... how relevant is that number to them? Who cares?" -- former NFL running back Leroy Hoard

---

"From what the first offer was to where it is now, I think it's a fair deal. The thing that I'm happy about is they are going to take of some of these guys that are really affected by this. They will do the baseline testing and get these guys the help that they need, more so than the money." -- Hall of Fame quarterback

Warren Moon

"I'm surprised, I'm surprised it ended. I'm surprised they settled. There's a lot of older guys, guys older than me that are ailing right now, suffering so I can understand that you can say 'OK, I'll take the short term gain.' But it doesn't fix the problem. The thing that gets me is I still wanna know what is the NFL not telling us? I have been trying to figure it out. I have gone through this, gone through my first training camp and I remember getting my helmets and pads the first time and I've never had anyone tell me about concussions or anything like that so I want to know what the NFL is not telling us. But I'm happy for the guys that are part of the settlement." -- former Rams defensive tackle D'Marco Farr.

"I hope this settlement is the NFL saying, 'We're taking concussions seriously. We're going to keep working on it.' The worst case scenario for me is the NFL saying, 'We paid you money. Now go away.' ... "It felt like for the longest time we were making stuff up, that we were after money. I would give $200 million for my dad to be back here and be alive. There's no price on the hell you go through with this." -- Garrett Webster, son of former Steelers center Mike Webster, who died in 2002 from brain disease.

"At the surface it looks like a good deal. But in the long run i don't think it is. That's usually how it works when it comes to players and ownership. ... I'm pretty sure (the lawsuit) changed things. There's a certain protocols and fine systems and safety precautions that are being taken back on the field because of them trying to get ahead of lawsuits and stuff like that that come up later. I think that's affected how the game's being officiated and rule changes and stuff." -- Texans left guard Wade Smith



**Kevin Mawae** @KevinMawae   [Follow]

NFL concussion lawsuit net outcome? Big loss for the players now and the future!  Estimated NFL revenue by 2025 = $27 BILLION

2:34 PM - 29 Aug 2013

**114** RETWEETS **11** FAVORITES



**Chris Kluwe** @ChrisWarcraft   [Follow]

Glad to see the older guys are getting taken care of with the concussion settlement. It'll never be enough, but it's a start.

12:49 PM - 29 Aug 2013

**24** RETWEETS **24** FAVORITES

"I am able to live my life the same way I was, but now -- chances are, I am 44 now, I won't make it to 50 or 60 -- I have money now to put back for my children to go to college and for a little something to be there financially. ... The compensation provided in this settlement will lift a huge burden off the men who are suffering right now, for both them and their families, of course. It will give them the peace of mind to have the best quality of life they can have. No longer have to make decisions regarding their health based on what they can afford, but based on what is the best treatment for them." -- former NFL running back Kevin Turner, who has Lou Gehrig's disease.



The settlement includes much-needed medical care and monitoring of former players, as well as a commitment to research funding. -- The Boston University Center for the Study of Traumatic Encephalopathy, which has been examining brains of deceased NFL players to try to determine what sort of connection exists between football and brain disease.

The NFL is far and away the most popular spectator sport in this country, so it has a symbolic power to lead the way on this issue. Now they are free to help raise awareness and fund prevention and treatment that will save millions from an injury that affects what it means to be human. -- agent Leigh Steinberg in op-ed on Forbes.com.



"I'm shocked that it is settled. I'm used to the NFL taking a hard-line approach as they have throughout the years with strikes and everything else. I'm curious how they came up with the figure and I've got a lot

of questions, but I am happy that it's done. Any time the NFL acknowledges they are ready to settle something, it shows they knew they had some sort of negligence." -- former offensive lineman Lomas Brown, a seven-time Pro Bowler who had sued the league



**Aaron Curry**
@AaronCurry51

Follow

Settlement on #concussions not gonna make up for early death, forgetting kids name and rest of stuff that come w/ brain trauma.
Prayers

1:17 PM - 29 Aug 2013

**17** RETWEETS **13** FAVORITES

*Information from ESPN's Kelly Naqi, ESPN.com's Nicholas Wagoner, Scott Wagner and The Associated Press was used in this report.*

EXHIBIT 48





SportsDay

# Dorsey Levens rips settlement of concussion lawsuit against NFL

Sept. 18, 2013

One of the segments that aired Tuesday night on HBO's "Real Sports with **Bryant Gumbel**" dealt with the issue of the $765 million settlement of the NFL concussion lawsuit.

Former Green Bay Packers running back **Dorsey Levens** was interviewed at length about his reaction to the settlement.

The correspondent on the story, **Jon Frankel**, also interviewed **Christopher Seeger**, the lead attorney for the plaintiffs, and **Kevin Turner**, a former NFL player who suffers from ALS, known as Lou Gehrig's disease.

Both Levens and Turner were among the more than 4,500 plaintiffs in the lawsuit. Levens said he was upset about the decision to settle. He wanted the case to go to trial.

"This is a great victory for them," Levens said. "I didn't understand how they got off so lightly."

Levens, who played for Green Bay from 1994-2001, was asked what his expectations were for the lawsuit.

"It was about getting guys help," Levens said. "You know, and when a guy calls me and says, 'I've called the NFL five times. I can't get a response. My head hurts all the time. And if I can't get help, I'm going to take care of it.' I couldn't sleep. What do you say to a guy like that? I'm going to do my best to help you out."

Levens wanted a trial that could have cost the NFL billions and forced the league to reveal that it knew all along players were at risk.

"I wanted to know what they knew and when they knew it," Levens said.

Seeger defended the amount of the settlement.

"I think we got every nickel we could get," Seeger said. "I know the NFL has lots of nickels. But we got every nickel that we could get."

Seeger said the players' case was not without its weaknesses

"I'm not making the argument for the NFL, but as the lawyer for the players, I have to recognize one thing about this case," Seeger said. "Many of the players, you know, who play two or three years in the

NFL, four years in the NFL, spent more time playing football outside the NFL."

Frankel asked Turner if he thought "the NFL got away cheap."

Said Turner: "If you call three quarters of a billion cheap, certainly. And to them, maybe it is. Maybe they're behind closed doors, laughing their (expletive) off. But so far the people that I've seen that are complaining, I don't think any of those people are symptomatic right now. The people that have dementia, ALS are happy with it. You know, because they need it now."

Levens said he was happy for those like Turner who are able to get help from the suit but said he worried about future cases.

Levens was asked if he thought he had any traumatic brain injury symptoms.

"I do," Levens said. "The sleeplessness, the blurred vision, the ringing in the ears. You know, some irritability. It's there."

Levens said his nightmare is that he could suffer the same fate as Turner and that there was nothing he could do to safeguard himself from what might happen.

"It's too late," Levens said. "If there was any damage, it's already done. Now you just got to wait and see. Now you play the waiting game, which is terrifying in itself because the first time you forget where your keys are, you know, you kind of lose — it's just like — it's happening. You know, any little thing that happens, you start to question it."

Levens said the lawsuit's conclusion is not really an ending.

"This issue's not going away," Levens said. "Just because the lawsuit is over, this concussion issue is not going away. It's just the tip of the iceberg."

## Fixing the blame

ESPN.com asked its readers: "Which is more to blame for the bizarre ending to the Wisconsin-Arizona State game?"

Out of the nearly 19,900 responses, 70% answered "the officials" and 30% said the "Wisconsin offense."

In the state-by-state breakdown, no state's majority of voters thought the Wisconsin offense was more to blame.

In Wisconsin it was 85% officials and 15% Wisconsin offense.

In Arizona, it was 53% officials and 47% Wisconsin offense.

## Pitcher's pitch goes awry

New York Mets pitcher **Matt Harvey**, interviewed Wednesday on "The **DanPatrick** Show," took product endorsement to a particularly irritating level.

Instead of talking about his elbow injury, he kept plugging Qualcomm. Harvey later apologized for his annoying patter on the show.

Harvey has decided to rehab instead of undergoing surgery on his arm.

During the discussion with Patrick about that issue, Harvey said: "I strongly believe that that's going to work and pay off but today, I'm here talking about Qualcomm and hoping I can help them out as much as possible."

Harvey then went on and on about Qualcomm, until Patrick mercifully ended the segment.

Said Patrick: "Man, that's a bummer. That's the first time we had him on....That was bad. That was bad. And I wasted people's time there."

*Call SportsDay at (414) 223-5531 or send email to* [bwolfley@journalsentinel.com](mailto:bwolfley@journalsentinel.com)

**Find this article at:**
http://www.jsonline.com/sports/dorsey-levens-rips-settlement-of-concussion-lawsuit-against-nfl-b99101255z1-224335851.html

☐ Check the box to include the list of links referenced in the article.

EXHIBIT 49

# Seau family says 'no' to NFL settlement

## Lawyer says deal doesn't cover heirs or ensure public airing of concussion issues

By Greg Moran (/staff/greg-moran/)   10:06 a.m.   Sept. 3, 2014   Updated   6:19 p.m.



Linebacker Junior Seau at a press conference Friday March 14, 2003 at Seau's restaurant in Mission Valley. — *John Gastaldo*

The family of San Diego Chargers great Junior Seau won't be part of a proposed settlement between the National Football League and thousands of former players who sued over health problems attributed to repeated concussions.

The decision to withdraw from the settlement means the Seau family will pursue its own wrongful death lawsuit against the league, said Steven Strauss, attorney for the family.

It also may imperil the proposed settlement, to which a federal judge gave preliminary approval in June. Seau is perhaps the most prominent name involved in the litigation, as his suicide in 2012 rocked the league and its fans and heightened attention on the growing concussion crisis.

Strauss said the proposed deal does not address the wrongful death claims the family has sued under and will not provide compensation for relatives of former players, such as Seau's four children. Under the terms of the pending deal, the family would get $4 million.

"The settlement provides medical benefits and compensation for certain players, for past damages," Strauss said. "It doesn't include compensation to heirs or successors."

Strauss said the family also wants more information about the concussion and head trauma issue to come out.

"They want to know what happened to their dad," he said. "This settlement isn't designed for that. Not one deposition has been taken. Not one document has been produced."

The decision by the family could start a domino effect, as other players and families may decide to follow suit. That could break up the entire deal.

Anyone opting out of the deal has until Oct. 14 to notify the federal judge overseeing the case in Pennsylvania. A hearing that would finalize the settlement is set for Nov. 19.

Christopher Seeger, a New York attorney who was the chief negotiator for the settlement on behalf of the players, said in a statement that other players should not follow Seau and risk giving up the "tremendous guaranteed benefits" they would get.

"If Mr. Strauss believes the $4 million his client is eligible for under the settlement is insufficient, he can choose to permanently forfeit these benefits and face all the significant risks associated with continued litigation," he said.

The NFL did not respond to a request for comment.

Also on Wednesday, seven former players filed formal objections to the settlement in federal court in Philadelphia, saying the potential payouts called for in the suit under a complex formula weren't enough, among other criticisms. By objecting, the former players remain in the suit but tell the judge what they don't like. It's different from opting out, which removes a party from the case.

More than 4,500 players are involved in the suit, alleging a variety of wrongdoing by the league that includes claims of fraud for how it handled concussions and other brain injuries. An original settlement deal in 2013 provided for $675 million in compensation for all players who claimed some kind of brain injury as well as funds for testing and research. Lawyers for the players would also get $112 million.

The deal was roundly criticized, and U.S. District Judge Anita Brody questioned if the compensation fund was large enough. In July, after the league agreed to remove the cap on damage claims, a revised settlement agreement was given preliminary approval by the judge.

While there is no longer a cap, the settlement contains a grid that details how much a player would get based on age and diagnosed ailment. For example, someone under 45 diagnosed with Lou Gehrig's disease would get $5 million.

Seau played 20 years in a Hall of Fame career, but while in the game and after retiring in 2010, he suffered from insomnia, depression, anxiety, alcohol abuse, mood swings and emotional detachment. He shot himself once in the chest on May 2, 2012, at his Oceanside home.

After his death an evaluation of his brain by the National Institutes of Health concluded he had evidence of chronic traumatic encephalopathy, or CTE, a degenerative brain disease, likely the result of repetitive head trauma as a linebacker.

Shaun Martin, a law professor at the University of San Diego School of Law, said it's rare to see enough people opting out of a settlement in a class-action lawsuit so as to scuttle the settlement. Seau's move was not surprising.

"You would rather not have someone as high profile as Junior Seau opt out," he said. "But anyone who really thought about it knew he would. He has uniquely powerful claims, about the NFL causing his suicide. Even more bluntly, it's not in the ballpark of what the estate of Junior Seau would take to settle the case."

The family lawsuit was filed in San Diego Superior Court in January 2013, alleging among other things the league concealed the dangers of concussions and head trauma from players for years.

The league has consistently denied such allegations.

It's unclear what will now happen to the suit, said Strauss, a partner at the law firm Cooley LLP. He said he wanted the Seau case sent back to San Diego to proceed. But it is also possible that Brody, the Pennsylvania judge, could hold on to this case, and any other "opt -out" cases, until the larger settlement is finalized.

That could take several years, if any party to the settlement decides to appeal to the federal courts.

© Copyright 2014 The San Diego Union-Tribune, LLC. An MLIM LLC Company. All rights reserved.

# EXHIBIT 50

# Hall of Famer Joe DeLamielleure will object to NFL concussion deal



Pro Football Hall of Famer Joe DeLamielleure doesn't believe the NFL has the best interest of its former players at heart. (Mark Duncan / Associated Press)

**By NATHAN FENNO**

SEPTEMBER 4, 2014, 3:50 PM

oe DeLamielleure, the Pro Football Hall of Fame offensive lineman, plans to object to the proposed NFL concussion settlement.

"I'm going to tell everyone I know to object," said DeLamielleure, who played for the Buffalo Bills and Cleveland Browns from 1973 to 1985, in a recent interview with The Times.

The information packet mailed to each retired player that includes a 24-page summary of the proposed settlement didn't assuage DeLamielleure's concerns. Neither did an August meeting, in Canton, Ohio, before the Pro Football Hall of Fame inductions, with attorneys who negotiated the settlement.

A longtime critic of the NFL and NFL Players Assn., DeLamielleure doesn't believe many of the

estimated 20,000 retired players will receive monetary awards from the proposed settlement. He is also frustrated by a variety of other issues in the settlement that were granted preliminary approval by a federal judge in July, including retired players' having to pay $1,000 to appeal an awards decision. The money would be refunded if they win.

Retired players have until Oct. 14 to object or opt out of the settlement. If enough retired players object, DeLamielleure believes they can unravel the settlement.

"It's going to take 4,000 to 5,000 guys to object or opt out," he said. "But I bet there's not even 4,000 or 5,000 guys who know this is going on."

On Wednesday, an attorney for the family of the late San Diego Chargers linebacker Junior Seau announced they would bypass a potential $4-million award and opt out of the settlement to continue wrongful-death litigation against the NFL on their own.

Others are waiting to make a decision on their participation until they know the outcome of next week's hearing in the U.S. Court of Appeals for the Third Circuit in Philadelphia, where seven retired players asked the court to intervene in the proposed settlement.

"Any objection threatens to delay approval of this settlement and endanger its guaranteed benefits for retired players who are in desperate need," plaintiffs' co-counsel Christopher Seeger said in a statement. "We look forward to finalizing this agreement so that former NFL players can soon begin taking advantage of its benefits."

A fairness hearing is scheduled for Nov. 19 in Philadelphia in front of U.S. District Judge Anita Brody.

**Follow me on Twitter: @nathan fenno.**

Copyright © 2014, Los Angeles Times

# EXHIBIT 51

ensued about 17 hours after the ingestion of the poison, important quantities of the poison were found in the stomach. Brandl and Tappeiner [10] and Gadaskina and Shtessel [11] presented data on the excretion of fluoride through the gastrointestinal tract, and Charnot [12] described fluoride excretion in the bile. Thus it is possible that gastroenterohematic circulation of fluorine compounds exists. Because of these data and the high toxicity of fluoroacetate repeated gastric lavages seem to be advisable.

The total quantity of fluoroacetate recovered from the organs and body fluids tested was 465 mg. Since the patient weighed approximately 140 lb. (63.5 kg.), disregarding the fluoroacetate present in organs from which no sample was available for toxicological study, he ingested a minimum of 6 mg. per kilogram of fluoroacetate.

The therapy used in this case was essentially symptomatic: barbiturates to decrease convulsions, intracardial procaine hydrochloride to inhibit ventricular fibrillation, atropine sulfate to decrease bronchial mucus secretion, and plasma transfusion and oxygen to offset vasomotor and respiratory failure. Experimental studies have suggested the use of certain specific antidotes.[6] Of these

monacetin was directed for the treatment of this case; however, it arrived too late to be employed.

SUMMARY

1. A case history of fluoroacetate poisoning has been described together with postmortem examination and chemical analysis of the fluoroacetate content of organs and body fluids.

2. It appears that there is no important difference between postmortem findings of sodium fluoroacetate and sodium fluoride poisoning. The additional biochemical effects of sodium fluoroacetate thus seem to have no pathological manifestation of diagnostic significance.

3. Because of indications of gastrointestinal excretion and reabsorption of fluorine compounds, repeated gastric lavages seem to be advisable.

4. Other therapeutic aspects are briefly discussed.

1921 Walnut St. (Dr. Harrisson).

10. Brandl, J., and Tappeiner, H.: Über die Ablagerung der Fluorverbindungen im Organismus nach Fütterung mit Fluornatrium, Ztschr. f. Biol. München u. Leipz. **10**: 518, 1891-1892.

11. Gadaskina, I. P., and Shtessel, T. A.: Resorption, Distribution and Elimination of Fluorine After Experimental Poisoning with Sodium Fluoride, J. Physiol. U.S.S.R. **19**: 1245, 1935.

12. Charnot, A.: Influence de quelque composés minéraux sur les effets toxiques du fluorure de calcium, Bull. Acad. de méd., Paris **120**: 224 (Oct. 18) 1938.

# ELECTROENCEPHALOGRAPHIC CHANGES IN PROFESSIONAL BOXERS

*Ewald W. Busse, M.D.*

*and*

*Albert J. Silverman, M.D., Denver*

Since the days of the Roman gladiators, men have fought each other and other persons have watched. The sport of boxing, as it exists today, is largely the product of psychological forces that have not changed in essence for 2,000 years. It is the feeling of many persons that in spite of periodic criticism and the efforts to ban prize fighting, the sport will persist. Since it appears unlikely that athletic contests requiring physical contact will ever cease, the physician should attempt to safeguard the physical and mental health of the participants.

Much has been accomplished to protect the athlete in such sports as football and ice hockey, but protective measures for the amateur and professional pugilist have not kept pace. Jokl [1] in his monograph (1941), which is concerned with the medical aspects of boxing, recognized and deplored this situation, and he collected a wide va-

riety of case material that was representative of possible sequelae due to boxing injuries. Raevuori-Nallinmaa [2] in a recent publication states his belief that the usual cause of death related to boxing is intracranial hemorrhage. Tragic and sobering though they be, deaths of this kind are relatively rare. More important, and certainly much commoner, are the mild psychic changes observed in a high percentage of boxers. These changes are due to brain damage, which is also responsible for the less frequently seen, so-called "punch-drunk" person, who is in fact in a state of traumatic dementia and reveals severe psychic and neurological abnormalities.

The syndrome of boxing encephalopathy is probably due to multiple concussion hemorrhages as well as to contusion and laceration of the brain. The "knockouts" and "technical or near knockouts" (representing states of commotio cerebri) are usually the result of a trauma that alters brain function. If the trauma is severe or is mild but repeated at intervals that do not permit the brain to return to normal functioning, permanent damage may result.

Many investigators have reported on the value of the electroencephalogram in the detection of brain injuries. Dow, Ulett, and Raff,[3] in doing electroencephalograms of persons immediately after injury, reported that a

Professor of Psychiatry (Dr. Busse), and Resident in Psychiatry and Electroencephalography (Dr. Silverman).

Mr. W. Asmus, Executive Director, and Mr. E. Bohn, Chairman of the State Athletic Commission of Colorado, assisted in the preparation of this study.

From the Electroencephalograph Laboratory of the Colorado Psychopathic Hospital and the Division of Psychosomatic Medicine, University of Colorado Medical Center.

1. Jokl, E.: The Medical Aspect of Boxing, Pretoria, S. Africa, J. L. Van Schaik, Ltd., 1941.

2. Raevuori-Nallinmaa, S.: Brain Injuries Attributable to Boxing, Acta psychiat. et neurol., supp. 60, p. 51, 1951.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

mild cerebral trauma produced electroencephalographic changes that decreased in abnormality within a few minutes. If amnesia was associated with the trauma, but the patient was clear-minded when his record was taken, there was only a slight increase in the percentage of abnormal records. If consciousness was at all impaired at the time of the electroencephalogram, there were invariable, accompanying electroencephalographic changes. Abnormal findings recorded immediately after head trauma may become normal, however, for Dow and associates found that a larger number of records were abnormal when taken less than a half hour after injury. This points to some mechanism in concussion other than such factors as petechia, contusion, and emboli, each of which would take several days to disappear. Williams [4] found invariable electroencephalographic changes accompanying altered consciousness as a result of head injury and stated that concussion is the result of widespread disorganization of cerebral function. Strauss [5] found diffuse slowing in patients with clouded consciousness but noted a more selective slowing in frontal areas of patients showing facetiousness. Ward and Clark [6] indicated that concussion or localized blows to the cortex resulted in changes in the electroencephalogram identical to those produced by rapid rises in intracranial pressure. Jokl [1] supported this by his contention that at the moment of the blow to the head there was a sharp rise of intracranial pressure.

In their experimental studies Zimmerman and Putnam [7] reported that minimum cell changes could occur without electroencephalographic changes but found that when the trauma was severe enough to cause "incompletely reversible cell changes" there was a direct relationship between severity of cell changes and severity of electroencephalographic abnormalities. They also reported a reduction in voltages that was directly proportional to the amount of force applied. Heppanstall and Hill [8] stated that focal findings were generally significant of symptomatic rather than idiopathic disorders and that there was a greater chance of permanent electroencephalographic changes in persons who sustained head injuries when they were under the age of 20. Kaufman and Walker [9] reported that in about two-thirds of their patients convulsive disorders developed after acute and severe head injuries. Abnormal electroencephalograms were seen in 90% of those patients in whom seizures developed and in more than 75% of those without seizures. Focal abnormalities were noted in over 80% of the epileptics and in over 65% of the nonepileptics. Greenblatt, [10] reporting on post-traumatic patients with convulsions, fainting spells, psychoses, or other personality disorders, found that 68% had disturbed electroencephalograms. Regarding minor head injuries, Harris and co-workers [11] stated that abnormal waves may be found in hyperventilation only and that a good prognosis can be made from serial electroencephalograms in which the tracings become more normal. Other investigators, in discussing electroencephalographic changes following head injury, reported different findings. Amplitude asymmetries [12] and bursts of six to eight per second activity [13] were noted by some, while others [14] reported decreases in voltage and increases or decreases in frequency.

Thus, it is evident that the electroencephalogram has no specific pattern in head injury and that any abnormality may be seen, depending on whether there is a temporary physiological disturbance or actual organic damage. The site of injury also has some bearing on electroencephalographic findings.

METHOD AND PROCEDURE

In order to help prevent serious injuries or death, the state athletic commission of Colorado, acting on the recommendation of one of the authors of this article (E. W. B.), unanimously passed a regulation requiring periodic electroencephalographic examinations on all professional boxers performing in Colorado. Although several states recommend the examination in specific cases, the authors do not know of any other state in which such electroencephalograms are compulsory. The regulations as set up by the state athletic commission were as follows: 1. A professional boxer must have an electroencephalogram at least once a year. 2. In the case of a "knockout," an electroencephalogram must be done within two weeks of the injury. 3. Frequent, repeated examinations could be done in the case of a boxer with suspicious recording.

Our purpose in this article is to record the results obtained from the first year's electroencephalograms as an initial report and to attempt to evaluate the worth of the electroencephalogram in safeguarding the health of those who participate in boxing. A Grass eight-channel electroencephalograph was used. So-called active lead placements were left and right frontals, motors, occipitals, and anterior and posterior temporals. Reference electrodes included the ears and vertex leads. Additional leads were used in specific cases as indicated. Records were classified according to the method described by Gibbs, Gibbs, and Lennox. [15] Activation with hyperventilation was performed routinely. Monopolar and bipolar tracings were done in each case, and a natural sleep record was obtained whenever possible.

3. Dow, R. S.; Ulett, G., and Raff, J.: Electroencephalograph Studies Immediately Following Head Injury, Am. J. Psychiat. 101: 174 (Sept.) 1944.

4. Williams, D.: Electro-Encephalogram in Acute Head Injuries, J. Neurol. & Psychiat. 4: 107 (April) 1941.

5. Strauss, H.: Clinical and Electroencephalographic Studies: Correlation of Mental, Electroencephalographic and Anatomic Changes in Cases with Organic Brain Disease, Am. J. Psychiat. 101: 42 (July) 1944.

6. Ward, J. W., and Clark, S. L.: The Electroencephalograph in Experimental Concussion and Related Conditions, J. Neurophysiol. 11: 59 (March) 1948.

7. Zimmerman, F. T., and Putnam, T. J.: Relationship Between Electroencephalographic and Histologic Changes Following Application of Graded Force to the Cortex, Arch. Neurol. & Psychiat. 57: 521 (May) 1947.

8. Heppanstall, M. E., and Hill, D.: Electroencephalography in Chronic Post-Traumatic Syndromes, Lancet 1: 261 (Feb. 27) 1943.

9. Kaufman, I. C., and Walker, A. E.: Electroencephalogram After Head Injury, J. Nerv. & Ment. Dis. 109: 383 (May) 1949.

10. Greenblatt, M.: The EEG in Late Post-Traumatic Cases, Am. J. Psychiat. 100: 378 (Nov.) 1943.

11. Harris, H. I.; Wittson, C. L., and Hunt, W. A.: Value of Electroencephalogram in Prognosis of Minor Head Injuries: Preliminary Report, War Med. 4: 374 (Oct.) 1943.

12. Laufer, M. W., and Perkins, R. F.: Study of Electroencephalographic Findings in 209 Cases Admitted as Head Injuries to Army Neurological-Neuro-Surgical Center, J. Nerv. & Ment. Dis. 104: 583 (Dec.) 1946.

13. Marmor, J., and Savitsky, N.: Electro-Encephalography in Cases of Head Injury, J. Nerv. & Ment. Dis. 95: 285 (March) 1942.

14. Gotze, W.: Bioelectrische Nachuntersuchungen an Hirnverletzen, Zentralbl. f. Neurochir. 7: 67, 1942.

15. Gibbs, F. A.; Gibbs, E. L., and Lennox, W. G.: Electroencephalographic Classification of Epileptic Patients and Control Subjects, Arch. Neurol. & Psychiat. 50: 111 (Aug.) 1943.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

## RESULTS

Thirty electroencephalograms as outlined above were done on 24 boxers. Their age distribution (divided arbitrarily into four groups) was as follows:

| No. of Men | Age Group, Yr. |
|---|---|
| 3 | 18-20 |
| 12 | 21-23 |
| 5 | 24-26 |
| 4 | 27-29 |

Of the electroencephalograms done on these men, 4 showed severe disturbance, 5 were moderately dysrhythmic, and 15 were within normal limits; thus, the total number of records showing disturbance amounted to 37.5% of the series. This is well above the 10 to 15% reported by Gibbs, Gibbs, and Lennox [15] and others in control groups, whose findings are in accord with those in our own control series.[16] These figures have statistical significance in that there are only three chances in a hundred that they are due to coincidence.



Fig. 1.—Incidence of abnormal electroencephalograms in boxers by age groups.

*Type of Abnormality Seen.*—There were four records showing severe disturbance. Three of these showed a temporal slow-wave focus, and one revealed diffuse slowing and paroxysms. Five records showing moderate disturbance were noted. Three of these were diffusely slow, and two were indicative of temporal slow-wave foci. Thus, in totaling the severely and moderately disturbed records, five were found to be focal and four showed diffuse findings. (In addition, paroxysms were seen in one each of the focal and diffuse records.) One record showing diffuse disturbance was found in each of the four age groups, while all the focal disturbances were present in the two youngest age groups. It was also noted that, although abnormalities were found in each age group, records showing disturbance seemed to be more frequent in the youngest men; but because of the few cases involved, this could not be statistically corroborated (fig. 1). In order to evaluate the report of decreased voltages in post-traumatic cases,[14] our records were also reviewed with this in mind, and six were found in which voltages were generally decreased. This was

16. In our control series of 329 patients, whose ages ranged from 18 to 54 years, it was noted that 36 (10.94%) showed moderate disturbances and 10 (3.04%) severe dysrhythmias, so that the total of records showing disturbance was 13.98%.

not significantly more than the 20% of low-voltage records expected in normal persons.

When we attempted to correlate history of knockouts with electroencephalogram disturbance, the following facts were noted: Ten of the 24 fighters had been knocked out in their ring careers at least once. Four of the 10 had dysrhythmic records, three being severely



Fig. 2.—Comparative electroencephalographic findings of boxers with and without a history of knockout.

abnormal and one only moderately so. In the remaining 14 fighters, none of whom had ever been knocked out, one record showing severe disturbance and four showing moderate abnormalities were found. Because the number of records under study was not large enough, these findings are not statistically significant. It is noteworthy, however, that although there was an equal number of records showing disturbance in both groups, the men who had been rendered unconscious had electroencephalograms showing the severer disturbances. These findings were consistent with those of other investigators previously mentioned (fig. 2).

An attempt was also made to determine if length of ring career could be correlated with electroencephalographic disturbances, but no correlation was found. Elec-



Fig. 3.—Initial electroencephalogram of professional boxer in case reported. Note the slow-wave focus in the left anterior temporal area.

troencephalograms showing severe disturbances were seen in boxers who had been in from 2 to 50 fights, moderate dysrhythmias in men who had had from 1 to 15 fights, and normal records in men who had participated in from 1 to 106 fights. This lack of correlation is commented on below.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

### REPORT OF A CASE

The patient, a professional boxer, aged 21, was first seen by us in November, 1950. He had had three professional fights prior to his first electroencephalogram. In July, 1950, he was knocked out, but the following month he won his next fight by a technical knockout in the first round. Three days before a scheduled fight in November, 1950, the patient had his first electroencephalogram, which revealed a left temporal slow-wave focus.



Fig. 4.—Repeat electroencephalographic examination of boxer in case reported. By comparison with figure 3, the focal disturbance now appears to consist of higher amplitude and slower waves.

The fight was cancelled. A repeat electroencephalogram revealed more extensive temporal focal findings. (The patient, incidentally, showed no abnormal neurological or psychological signs or symptoms at any time.) He was temporarily suspended from boxing, but continued to train. A third electroencephalogram in January, 1951, revealed the persistence of the focus and the addition of paroxysms. This suggested that he had received additional brain injury during the period of training, from which he could not legally be prohibited. It was now believed that this man had suffered some degree of irreversible damage, and he was permanently suspended from boxing on Jan. 16, 1951, for his own good. It was felt that in this case the electroencephalogram had picked up intracranial damage before it had become clinically apparent and that late neurological disability or even death had possibly been averted by this decision (fig. 3, 4, and 5).



Fig. 5.—Final electroencephalographic examination of boxer in case reported. Note the persistence of the left anterior temporal slow-wave focus and its occasional reflection in the right temporal area. Note also the brief paroxysm of slow waves occurring in the frontal area.

### COMMENT

Even in this small group of professional boxers used as a pilot study, it was at once apparent that their series of electroencephalograms were more frequently abnormal than those seen in control studies. It was noted that as many disturbed records were seen in the group who had not been knocked out as in their more unfortunate colleagues. In spite of this there was some indication that those who had definitely been knocked out showed severer disturbances. It should be pointed out that very little background material was actually available to us; for example, the number of times a man had been hit severely enough to cause him to be dazed without actual loss of consciousness, the number of amateur fights, and the extent and severity of training were not known. Thus, because of lack of such information, the correlation between number of professional fights and the electroencephalogram reading had no apparent meaning.

Concerning the abnormalities seen, diffuse records were found in every age group, while focal records were confined to the younger men. Thus, abnormal findings appeared more frequently in the younger age groups because of this very preponderance of focal records in them. These findings support the well-known fact that focal disturbances are good evidence of actual brain damage. There were relatively fewer records showing disturbance in the older men in our study. One can speculate that these men, for the most part, had been fighting for years and, having escaped brain damage in their first fights, were more experienced and better able to avoid injury in the ring. In addition, attention should be directed to the established fact that there are individual differences regarding susceptibility to trauma, so that in any group of boxers exposed to injury over a period of time it is likely that the more susceptible men are soon damaged permanently and retire from the ring, leaving their less susceptible fellows to carry on. An interesting clinical observation made during this study was that the men who showed focal temporal electroencephalographic abnormalities appeared to be, generally speaking, much more aggressive while fighting; and it is our feeling that this aggressiveness, together with the hint of impaired judgment as noted, may be associated in some way with the temporal lobe foci seen in these men. We feel that case material provided by boxers will provide much information about minor repeated head injuries, and future, better controlled, more extensive studies on larger groups may bring much interesting knowledge to light.

### SUMMARY AND CONCLUSION

Compulsory electroencephalographic examinations were made on 24 professional boxers with the cooperation of the state athletic commission of Colorado. A statistically significant, increased incidence of dysrhythmic electroencephalograms was found in nine boxers (37.5%) in our series. There was some indication that men who had been knocked out showed severer electroencephalographic disturbances than those who had not been knocked out. Focal disturbances were more frequent in the younger men than in the older men, who also, generally speaking, had fewer electroencephalographic disturbances. A case of a boxer is presented who was finally suspended from boxing largely on the basis of progressive encephalographic abnormalities. From the above findings it is concluded that periodic, compulsory electroencephalographic examinations contribute to the protection of boxers and should be a required part of routine examinations.

4200 E. Ninth Ave. (Dr. Busse).

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014