# EXHIBIT 67

# 'Permanently disabled', Harrison fighting for benefits NFL took away

Print



BY MICHAEL ROSENBERG



Photo: AP

*Dwight Harrison played 10 years in the NFL and now suffers from dementia, but he has been repeatedly denied benefits from the NFL that he feels he deserves.*

Posted:
**Wed Jan. 29, 2014**

Updated:
**Tue Jun. 10, 2014**

Dwight Harrison played in the NFL for 10 years. Recently, he was terrified of a phone call.

"I was up all night," he told me, "scared to death. At times, I can't even speak. I'm afraid to talk to you."

I am not in the habit of scaring people to death. But Harrison worried he would say the wrong thing. He worried I wouldn't believe him, which is understandable. His story is so absurd, so unfair, that it sounds like a sick joke. But it is not a joke. It is Harrison's life. And here is what happened:

Harrison requested higher disability pay from his NFL retirement plan.

The plan's trustees said no ... and took away *his entire pension*.

**MICHAEL McCANN: Judge rejects $765 million NFL concussion settlement**

Then they charged him for legal fees.

Now Harrison lives alone in Beaumont, Texas, in what he calls "a little FEMA house," because a hurricane wiped out his other one. He is 65. He is on Medicaid now. He is still fighting for the money, and the acknowledgment that he deserves it. But it is not a fair fight. After too many hits to the head, his brain flickers on and off.

"My situation ... sometimes it's bright, sometimes it's dim, and sometimes the light don't come on at all," said Harrison, who in his 10-year career from 1971 to '80 played for the **Oakland Raiders**, **Buffalo Bills**, Baltimore Colts and **Denver Broncos**. "I can't sometimes keep my thoughts. Forgive me, please."

The night before our first talk a few months ago, Harrison's light went on, and he wanted to take advantage of it. He grabbed a recorder that he keeps on a small table next to his old standard-definition television and spoke his thoughts. The next day, a few minutes after he mustered the courage to answer my call, he placed his recorder next to the phone and pushed PLAY.

*****

We will let the trustees of the Bert Bell/Pete Rozelle NFL Player Retirement Plan begin this story. The year was 1993.

There are six trustees on the board at any given time: Three that represent owners, and three that ostensibly represent players. Former players have long grumbled that the board is more interested in protecting owners and the union than helping former players.

Former Bears star Dave Duerson was appointed by the union but publicly doubted that former players were suffering because of football hits. Duerson later committed suicide and was found to have chronic traumatic encephalopathy (CTE), a brain disease commonly linked to concussions. His tragic story seems to epitomize the NFL's concussion problem: Denial for too long, until it was too late.

But in 1993, the trustees examined Harrison's medical records and determined he was "totally and permanently disabled."

We repeat: The *trustees* said Harrison was "totally and permanently disabled."

They awarded him a $1,729 monthly disability benefit. They also determined that Harrison had been disabled since Jan. 1, 1984, and awarded him a lump sum of $184,756 in retroactive benefits.

Still, Harrison felt he deserved more. He had good reasons to believe that. The retirement plan featured four tiers of "total and permanent disability" benefits, depending mostly on how a player was disabled. The trustees put him on the lowest tier. They determined that, while Harrison clearly had serious medical problems, they did not result from playing in the NFL. He disagreed, and his wife sent a letter to the board asking them to reconsider.

In 1994, the trustees again acknowledged Harrison's "total and permanent disability," at age 45 ... but they would not give him more money. Instead, they informed him that his "disorder has its origin in an incident that occurred while you were playing college football, not League football." They also said that his depression was "of recent origin".

Yes, the trustees tied Harrison's health problems to his life before *and* after his NFL career ... but said he was not damaged *during* his career.

### SI VAULT: Wives and girlfriends often bear the burden of caring for suffering former NFL players

How did they reach this conclusion? In part, they used Harrison's honesty against him. He had told at least one doctor he was traumatized seeing a teammate suffer a broken neck and paralysis his senior year at Texas A&I (now Texas A&M-Kingsville). That allowed the trustees to trace his problems to his college career, instead of his NFL career.

And of course, it's reasonable to assume that his memory loss, depression and diminished cognitive function got worse after he retired. That enabled the trustees to say his depression was "of recent origin".

Still, there was no debate about his disabilities. Two doctors had confirmed them -- and one of them was appointed by the retirement plan, not by Harrison. The only dispute was what caused him to be disabled.

Harrison appealed. And this is when his case and his savings began to disintegrate.

The trustees argued that he failed to appear for a psychiatrist's examination, failed to respond to requests for counsel, then failed to appear for another examination. The trustees alleged that when a process server approached Harrison, Harrison drove away quickly, did not stop and kept shaking his head, trying to lose the process server.

They said he did not provide financial information. They said he participated in activities that "include socializing with college football teammates at a team reunion, direct participation in real estate transactions and other business activities." They claim he was trying to run a rodeo out of his backyard. They say witnesses described him as a "businessman" who was "interested in anything to make money." They said he missed appointments with their doctors. He also missed two court hearings.

They denied his appeal and suspended his benefits.

Then they filed a counterclaim to recoup everything they had paid him.

In 1994, the trustees again acknowledged Harrison's "total and permanent disability," at age 45 ... but they would not give him more money. Instead, they informed him that his "disorder has its origin in an incident that occurred while you were playing college football, not League football."

The trustees could have denied his request for more money and kept him on the lowest tier. Instead, they basically called him a crook. In 1996, three years after their chosen doctor wrote a withering report detailing Harrison's maladies, the trustees determined that Harrison was "not now totally and permanently disabled."

That makes it sound like Harrison suddenly got healthy, or had been faking it the whole time. Harrison says now that he never received the notices that the trustees sent him. He says communication broke down when his court-appointed attorney left the case. Harrison, who never graduated from college, represented himself in court.

Why would a man ask for increase in disability pay, then hide from the people who can give it to him? The trustees and their lawyers did not seem to consider that a man with serious mental and physical ailments might miss a few appointments.

The trustees argued that Harrison was "unjustly enriched" by $236,626 -- every last dollar they had paid him. Because Harrison failed to show up in court, the trustees won a default judgment against him. Harrison was ordered to return all his disability payments, along with $99,112.50 in legal fees.

The total default judgment against Harrison (including interest) was $352,252.06.

Harrison's average annual NFL salary: $49,750.

It got worse. Harrison also had a pension, which is separate from disability pay. The trustees determined that his pension was worth $130,528, and they successfully offset that against the money he suddenly owed them. So they took his pension.

Harrison sued to get his money back. He had another court-appointed attorney, who resigned. Harrison represented himself again. He knew what was happening was wrong, but he did not understand the legal arguments against it. He was not capable of arguing that his pension should have been exempt from any judgments against him, according to the Employee Retirement Income Security Act of 1974. He just attached a copy of his original complaint and stated his case.

A magistrate judge said his motion "simply relies on his pleadings, and therefore is insufficient."

In 2003, the NFL started giving Harrison retirement benefits again. But that was apparently an accident. In 2007, they cut him off again.

Then, in 2011, when the NFL and the Players Association signed a new collective bargaining agreement, they created a $620 million Legacy Fund for players who retired before 1993. The NFL proudly announced that every player who retired before 1993 would receive at least $600 per month, "regardless of the form of benefit". It doesn't matter if the player is disabled or healthy, wealthy or poor.

Harrison received a form letter from NFL commissioner Roger Goodell saying he was entitled to Legacy Fund payments. By the league's calculation, a player with Harrison's experience should have received $1,144 per month from the Legacy Fund. But in 2012 the trustees voted to offset Harrison's Legacy money against the default judgment. So there went his Legacy Fund benefit.

"I had a little faith in the legal system," Harrison said, "and it just crapped on me."

Harrison's current lawyer, Jeffrey Dahl, argues that the trustees had no legal right to touch Harrison's pension, and he is fighting to have it restored. But attorneys for the retirement plan wrote in a court filing last summer that Harrison has "unquestionably already received more than his fair share of benefits." They also wrote: "Harrison's first lawsuit against the Plan nearly 20 years ago exposed him as a fraud."

A fraud?

Dwight Harrison?

"I'm not a doctor," Harrison says. "If you're going to accuse anybody of fraud, charge them, not me."

Yes, the doctors. Harrison gave me access to his medical records but asked me not to quote them directly out of respect for his privacy. They tell a thorough and heartbreaking version of the horror story you have heard about other retired NFL players: post-concussion syndrome, memory loss and ... well, one thing Harrison still has left is pride. He asked me not to go into detail. But I can say this: The records are extremely detailed, and they are painful to read.

The trustees have decided that when several doctors diagnose a man with mental

problems, including memory loss, and that man misses a few appointments, he is a "fraud" who doesn't deserve any benefits or his pension. And if that man has dementia now, he should apply for benefits elsewhere.

Six doctors have reached the same conclusion about Harrison, independent of each other. The first was in 1993. The most recent was in 2008. And in some cases, the doctor was a neutral psychologist chosen with the approval of the trustees.

Also, in 2008, the Social Security Administration confirmed their findings and said his condition was "due to head injury."

It's a pretty convincing case ... unless you really, really don't want to be convinced.

*****

So what is the NFL's response to all this? Well, Mike Miller, the Director of NFL Player Benefits, did not return several calls. The three current league-appointed trustees (executives Ted Phillips of the Bears, Dick Cass of the Ravens, and Katie Blackburn of the Bengals) referred me to the Groom Law Group, counsel to the plan.

Doug Ell, an attorney with Groom, repeated via email his contention that the plan "has been subjected to both fraud and frivolous litigation by Mr. Harrison."

I asked Ell about the six doctors who have examined Harrison, including at least one who was appointed by the league. Did Harrison dupe them?

Ell's response: "I do not know what doctor reports you refer to, when they were written, or what they say."

I sent Ell a 45-page file of medical records -- which, of course, has been in the record of the case. I asked again if he thinks Harrison duped the doctors.

In his response, Ell did not answer that question or even acknowledge the medical records. Instead, he wrote that Harrison lost benefits because he did not take a medical exam.

"Mr. Harrison was explicitly and repeatedly warned of it, and a federal judge even ordered him to attend, and he refused to do so," Ell wrote.

Ell also wrote: "There is a very generous benefit plan for former NFL Players who have dementia. It is called the '88 Plan. You might encourage Mr. Harrison to seek those benefits."

Why would Ell suggest that Harrison apply for the '88 plan, when his firm has argued in court filings, for many years, that Harrison does not have dementia?

Ell's response: "I do not know whether Mr. Harrison currently has dementia. If he does, there are generous benefits. I do not understand why he would not seek those benefits if he does have dementia."

Dahl, Harrison's lawyer, is skeptical about getting '88 Plan benefits, because the trustees have declared he is no longer a participant in the NFL retirement plan.

To sum up: The trustees have decided that when several doctors diagnose a man with mental problems, including memory loss, and that man misses a few appointments, he is a "fraud" who doesn't deserve any benefits or his pension. And if that man has dementia now, he should apply for benefits elsewhere. After all, the trustees are tired of his "frivolous" actions.

The trustees convinced courts they were right, but Harrison was severely under-lawyered. They have taken a few anecdotes about Harrison trying to conduct business, meeting with college teammates and failing to show up for doctor's exams and court appointments, and used them to punish him for two decades.

*****

How do you measure what is left of a broken man?

Harrison's memories are scattered like leaves on a windy day. He recalls watching game film as a player and not remembering that he played in the game. Sometimes he does not even remember all of his injuries.

Harrison was 44 when this fight began. He is 65 now. His battle for benefits has lasted twice as long as his NFL career. He could have lived a more comfortable life, with better medical care, if the NFL had not cut off the payments he deserved.

For Harrison, the pain cuts deeper than the money he lost. The trustees have essentially told him that his life did not happen the way he says it happened.

"They've got it in there that I am a fraudulent person," he says, and is there a worse charge than that?

"Why?" Harrison asked me. "Why in the world are they treating us so bad? You are dealing with some evil people."

He knows that his only hope is through the legal system. But he is worried about showing up in court and hearing the trustees and their lawyers call him a fraud.

"I don't know if I could take it," he says. "You ruined my life."

I didn't realize it when I called, but this story will remove another piece of Dwight Harrison. The stress of defending himself overwhelmed him.

"I'm not going to give another interview," he said. "It was just too much."

EXHIBIT 68

NEW YORK   NEWS   POLITICS   SPORTS   ENTERTAINMENT   OPINION   LIVING   AUTOS

JETER | BASEBALL | FOOTBALL | BASKETBALL | HOCKEY | COLLEGE | HIGH SCHOOL | SOCCER | I-TEAM | MORE SPORTS | BLOGS

# Still plenty of skeptics after NFL reaches new deal with players to settle concussion-related lawsuit



BY MICHAEL OKEEFFE

Hopefully the settlement will provide medical care, support and hope to thousands of guys who have suffered because of injuries incurred playing America's most brutal sport at its highest level.

NEW YORK DAILY NEWS  /  Saturday, June 28, 2014, 11:40 AM

A A A

SHARE THIS URL

20    84    g+1    ❤    nydn.us/UUkuMj



COREY SIPKIN/NEW YORK DAILY NEWS

The NFL and commissioner Roger Goodell don't need to admit concussion coverup as part of a new settlement reached last week with thousands of players.

**RELATED STORIES**



Jim McMahon blasts NFL for not providing 'appropriate care'



Dan Marino withdrawing from NFL concussion lawsuit



Brent Boyd has earned the right to be cynical: When the NFL's disability board denied his concussion claim in 2001, he says, they told him his blinding headaches, depression and lethargy had nothing to do with the injuries he suffered during his seven years as an offensive lineman for the Minnesota Vikings.

Back then, the NFL was still denying that brain injuries caused long-term health problem, and Boyd and other former players complained that the disability program jointly run by the league and its union was designed to stonewall players.

"Delay, deny and hope they die," is how former Cleveland Browns cornerback Bernie Parrish puts it.

So when the NFL and lawyers for the 4,500 former NFL retirees who filed a lawsuit that accused the league of covering up the long-term consequences of traumatic brain injuries submitted a proposed settlement that lifted the cap on concussion-related damages last week, Boyd was skeptical. Will the administrators of this plan also look for ways to deny legitimate claims? Will this deal only benefit the most desperate and leave everybody else hanging?

## NFL VIDEO



RALPH VACCHIANO — THE BLUE SCREEN

July 1, 1:05PM    BY EBENEZER SAMUEL

Stevie Brown expects to be training camp full go

June 25, 2:11PM    BY EBENEZER SAMUEL

With Will Hill gone, Demps could step in as third safety

June 19, 11:51PM    BY EBENEZER SAMUEL



Former NY Giants CB Aaron Ross signs with Baltimore Ravens

VIEW FULL BLOG

MANISH MEHTA — THE JETS STREAM





John Madden: NFL announcer gets locker room painkiller shot

Eight ex-players sue NFL over painkiller abuse

"My fear is that they won't give us any real remedies until we are too sick to know it or we are dead," Boyd says.

This new settlement, the result of six months of negotiations after U.S District Court Judge Anita Brody rejected a deal that capped the NFL's responsibility at $765 million in January, is hardly perfect. It won't compensate Boyd for income he lost because he's been unable to work for so many years. It won't make whole players who have lost marriages, families and careers because of the physical and emotional pain caused by their brain injuries. It won't bring back men like Junior Seau and others who committed suicide because they could not endure any more suffering.

But it certainly can't be any worse than the cruelty dished out for years by the NFL's disability board, and, hopefully, it will provide medical care, support and hope to thousands of guys who have suffered because of injuries incurred playing America's most brutal sport at its highest level.

"At the end of the day, you can't make the settling defendant do everything you want," says Christopher Seeger, one of the lead attorneys for the players.

Michael Kaplen, a New York attorney who specializes in brain injury issues and teaches at George Washington University Law School, criticizes the proposal because the NFL is not required to acknowledge that it covered up the long-term consequences of concussions for so many years. He says the deal won't help retirees at the low end of the dementia scale who nevertheless have experienced behavioral and emotional problems as a result of brain injuries.

"A mild brain injury is only mild if it is someone else's brain," Kaplen says. "The silent majority of players who have cognitive, emotional, and behavioral impairments because of their reliance on the fraudulent conduct by the NFL will remain uncompensated under this settlement."

Seeger acknowledges that players with comparatively mild symptoms may not qualify for compensation. But they will be eligible for baseline testing, and if their conditions become more severe, they will get paid. "We had to make sure the sickest players were taken care of," he says.

Seeger understands Boyd's fears about stonewalling panels that seem to delight in denying help to suffering people. But he says this proposal, if approved by Brody and the players, will be different. The lawyers will put together a team of independent doctors and administrators that will review claims and make payments. The league will be able to appeal what it believes are fraudulent claims, but this time it won't be running the show.

"I want the NFL to pay for concussion-related injuries and put something new in place for these players, and we did that," he says.

Unfortunately, Roger Goodell will never stand at the 50-yard line at MetLife Stadium and apologize to the players and families who suffered while the NFL and its medical hit men denied the damages of concussions.

But Seeger bristles when people blast the deal because the NFL did not have to acknowledge any wrongdoing. The $9 billion a year league spoke volumes last week, he says, when it agreed to remove the cap on concussion payments.

"Does anybody," Seeger asks, "think they didn't admit liability with that kind of payment?"

## PROMOTED STORIES

June 26, 10:43AM    BY SETH WALDER



Mike Goodson absent at court hearing

June 22, 10:47PM    BY SETH WALDER

Rex Ryan seen at World Cup match

June 19, 12:25PM    BY SETH WALDER



Mike Pettine: Patriots may have had Jets defensive playbook

VIEW FULL BLOG

EXHIBIT 69

 **ESPN.com:** OTL          [Print without images] 

**Friday, January 24, 2014**

# Lawyers fight over settlement details

By Steve Fainaru and Mark Fainaru-Wada
ESPN.com

One week after a federal judge refused to grant preliminary approval of the NFL concussion settlement, the lead negotiator for the players is engaged in an increasingly bitter campaign to beat back opposition to the $765 million deal.

In conversations and private meetings, Chris Seeger, one of the settlement's main architects, has clashed with his own clients and with attorneys for other players, lobbying for the agreement while lashing out at critics and the media, according to details provided to "Outside the Lines."

Legal experts said the growing fissures among former players and lawyers could undermine the settlement after Judge Anita B. Brody's surprise ruling, which requested more information amid concerns there is not enough money to cover all qualifying players.

To get the settlement approved, proponents will have to convince Brody not only that it provides enough money but also that thousands of former players have enough in common to be legally considered a "class." Several attorneys involved in the case have argued that they don't.

"That's an argument the judge will have to take very seriously," said William Hubbard, a civil litigation expert at the University of Chicago Law School. "Some very famous cases have gone up in flames because of exactly that issue."

In private conversations, several former players have expressed their dissatisfaction to Seeger, their attorney, about the deal; one said he believed that the concussion suit has been "hijacked" by lawyers and that he's expecting a "high number of opt-outs and objections" among Seeger's clients as the settlement moves forward.

On Tuesday, during a meeting of about 60 lawyers at a Manhattan hotel, Seeger was challenged for several minutes by Tom Demetrio, who represents the family of former Chicago Bears defensive back Dave Duerson. One lawyer present described the tense scene as "almost a cross-examination." Seeger angered other lawyers in the informational meeting when he repeatedly deflected questions by citing a "gag order" that he said prevented him from sharing information. The lawyers said they were unaware of any such order.

On Thursday, two days after confronting Seeger, Demetrio filed a motion requesting that Brody direct Seeger and co-lead counsel Sol Weiss to "supply all Plaintiffs' attorneys of record with all of the data utilized by them in reaching the proposed settlement agreement."

Lawyers for former San Diego Chargers great Junior Seau launched their own attack less than 24 hours later, objecting to other aspects of the settlement and citing "serious deficiencies." In a motion filed Friday morning, the lawyers zeroed in on a provision that prevents a player who rejects the deal from pursuing a lawsuit against the

Concussion lawyers fight over settlement details

NFL until the settlement is fully resolved -- possibly delaying cases for years. Seau's lawyers argued that the settlement limits wrongful death claims, suggesting that Seau's children could not collect for the "wrong the NFL did to them."

The challenges are potentially ominous for Seeger and other proponents of the deal, signaling that the families of two prominent players -- Duerson and Seau, both of whom committed suicide by shooting themselves in the chest and were later diagnosed with brain damage -- are considering opting out of the deal.

"This extraordinary settlement could not have been achieved without the contributions of our fellow attorneys, who have been skillful and steadfast advocates for the retired NFL players they represent," Seeger and Weiss said in a statement Friday. "We organized Tuesday's meeting to provide an open forum to discuss the details of the settlement and for lawyers to learn more about how this agreement benefits their clients. There were many productive exchanges, and we are confident that attendees left better equipped to help retired players take advantage of this settlement once it is approved. The retired player community has provided overwhelming support for this agreement, and we look forward to finalizing it soon so they can begin taking advantage of its benefits."

When Brody denied preliminary approval Jan. 14, she ordered negotiators to turn over all data used to come up with a dollar amount for the settlement. The NFL and the players conducted separate analyses, sources familiar with the negotiations said, potentially resulting in different projections on the key question of how many NFL players are likely to get different forms of brain damage.

At the New York meeting, Seeger assured the attorneys in the room that the data existed and that it would reflect that the settlement is sufficient. However, when pressed for details, Seeger referenced the gag order and said his "hands were tied" by Brody. He also surprised many in attendance by announcing that it would be another 30 to 60 days before negotiators are able to refile their motion for preliminary approval -- further delaying a settlement that was announced on the eve of the NFL season.

"New York was a complete and utter waste of time," said one lawyer who attended the meeting. "Nothing, nothing at this informational meeting resembled information. It was a dog and pony show without any dog and without any pony."

Seeger did not respond to an interview request. This week, in an interview with Sports Illustrated writer Peter King, he said he was unconcerned about Brody's ruling and suggested that one reason he pushed the settlement was because he did not think the players had a good case against the NFL.

"I've already settled cases, much bigger than this one," said Seeger, who was co-lead counsel in the class action lawsuit over the pain medication Vioxx, which resulted in a $4.85 billion settlement. "I've had a good career. My legacy case wasn't going to be a case that didn't work. It wasn't going to be a case that I wasn't totally proud of. Because I know that most of the people involved in this, including the judge, are going to be thought of more for the NFL case than anything else that they will do in their career. That's silly if you ask me, but it's reality."

The players' executive committee -- a select group of lawyers that oversees the negotiations -- already had begun to splinter even before Brody rejected the motion for preliminary approval. Of the six attorneys originally named to the committee, two -- Tom Girardi and Michael Hausfeld -- were kept out of the discussions, according to sources close to the negotiations.

Seeger said he removed Girardi, a Los Angeles-based attorney who has become one of the settlement's main critics, from the negotiating committee because he believed he was leaking information to the media, according to people familiar with the conversations.

Girardi, who says he represents 1,200 former players, complained to "Outside the Lines" last week that he had

no input despite his role on the negotiating committee. Seeger has confirmed that in private conversations, the sources said.

Hausfeld was kept out of the negotiations because of his controversial role in a separate case involving proceeds from the NFL's licensing agreements, according to sources close to the case. He remains unpopular among some players but also played a leading role in the concussion suit before he was marginalized.

Like Girardi, Hausfeld has expressed strong reservations about the terms of the settlement.

Seeger and Weiss have clashed with other lawyers on the case. John Giddens, a Jackson, Miss., attorney who represents 240 former players, said he tried to raise questions about the settlement -- including an apparent disparity that awards players without legal representation more money -- on a conference call this month but was shouted down by Weiss.

"In Mississippi, you say your dog's name over and over and they were talking to me like a dog: 'John, John, John, what did we tell you, John?'" Giddens said. "Maybe it's just that these guys are from Philadelphia. I'm so glad we had him on speakerphone, because I was with [attorney] Philip Thomas and another lawyer and we were just looking at each other in disbelief. Here we are on the same side and he's just going off on us."

Shortly after the call, Giddens and Thomas filed a motion on behalf of 177 former players opposing preliminary approval -- the first formal objection to the deal.

When he arrived at the meeting in New York, "I thought there'd be plastic on the floor and walls, like in 'Goodfellas,'" Giddens said. "These guys, you don't want to piss them off. They're pretty scary dudes. They're used to getting their way. We decided to go against the grain. To hell with pissing them off. We weren't going out like that. We just did what was best for our clients, let the chips fall where they may."

How much the acrimony will affect the suit is unclear. Several lawyers involved in the case said they're waiting for additional information before deciding whether to recommend to their clients to take the deal or opt out.

Asked whether he supported the settlement, one attorney, underscoring his skepticism, said: "I think the settlement is a terrific thing as long as they keep the opt-out provision. This is gonna have a longer shelf life than people think."

---

# EXHIBIT 70

7/2/2014    The NFL's concussion settlement may not cover all former players with CTE | Sports on Earth | Patrick Hruby Articles

Case 2:12-md-02323-AB   Document 6201-13   Filed 10/06/14   Page 16 of 24






# SPORTS ON EARTH


## PATRICK HRUBY

January 20, 2014

# SHOW US SOME MATH



NFL commissioner Roger Goodell has defended the league's concussion settlement, but judge Anita B. Brody denied preliminary approval of the plan last week. (AP)

Imagine this: You're in the market for a used car. You go to a dealership, find something promising, sit down with a salesperson. Wary of purchasing a lemon, you ask for a comprehensive vehicle history report.



*Sorry. Not now. You can have it when we close the sale. But trust me, the car runs great!*

Er, OK. So, have you at least seen the document yourself?

*Nope. The head of the sales department won't share it with me. In fact, I'm not even sure it exists. But trust me, the car runs great!*

Sounds sketchy, right? Guess what: All of the above basically describes the proposed settlement of the consolidated National Football League concussion lawsuits. The car is the $765 million deal, intended to compensate brain-damaged former football players. The dealership salespeople are the top negotiators for both the NFL and the players. And starring in the role of buyer?

The federal judge presiding over the case. The more than 4,500 retired players suing the league. Oh, and many -- seemingly most -- of the attorneys representing those players.

Like I said: things are sketchy.

Last week, judge Anita Brody refused to grant preliminary approval of the settlement, which allocates $675 million to compensate retired players suffering from neurological diseases and another $75 million for brain damage diagnosis. Why the red light? To give a go-ahead, Brody has to conclude that the deal is fair, reasonable and adequate -- that the settlement is large enough to cover approximately 20,000 former players over a 65-year span, at least by its own terms.

Right now, she simply doesn't have enough evidence to make that judgment.

On paper, the settlement promises to pay as much as $5 million to NFL retirees with conditions like Parkinson's and amyotrophic lateral sclerosis (ALS). Former players with chronic traumatic brain injuries that fail to rise to the level of degenerative disease -- think memory lapses, explosive anger, debilitating migraine headaches -- will receive far less. (Read: nothing or close to it). In a motion for approval and supporting documents submitted to Brody, top negotiators for both the NFL and the players claim that the math behind the deal checks out. That medical experts, actuaries and economists have produced "thorough analyses" predicting: (a) how many former football players are brain damaged; (b) what the extent of that damage will be; (c) how much that damage will cost under the terms of the settlement.

The problem? The NFL and players' lawyers didn't provide their analyses to Brody -- essentially asking her to start the vehicle-buying process without giving her a history report. *But trust me, the car runs great!* In her rejection of the settlement, Brody noted as much:

*... even if only 10 percent of Retired NFL Football Players eventually receive a Qualifying Diagnosis, it is difficult to see how the Monetary Award Fund would have the funds available over its lifespan to pay all claimants at these significant award levels ....*

*... Plaintiffs allege that their economists conducted analyses to ensure that there would be sufficient funding to provide benefits to all eligible Class Members given the size of the Settlement Class and projected incidence rates, and Plaintiffs' counsel "believe" that the aggregate sum is sufficient to compensate all Retired NFL Football Players who may receive Qualifying Diagnoses. Unfortunately, no such analyses were provided to me in support of the Plaintiffs' Motion ...*

Believe it or not, things get sketchier. Shortly after Brody's rejection, attorney Thomas Demetrio - who represents the family of Dave Duerson, a former Chicago Bears defensive back who committed suicide and was later found to have the neurodegenerative disease chronic traumatic encephalopathy (CTE) - told ESPN's Outside the Lines that the players' lead co-counsels, Chris Seeger and Sol Weiss, have operated in a "cloak of secrecy" and that he hasn't seen any analyses, either. "Maybe they don't exist," he said. "Maybe they don't substantiate the $765 million figure." Meanwhile, attorney Thomas Girardi -- who represents 1,200 former players and was one of the first lawyers to file a concussion suit against the NFL -- told Outside the Lines that he was analyzing the settlement "right now" to see which of his clients would be better off opting out, a number he predicted would be "substantial."

I contacted Demetrio last Thursday. He said the "majority" of the players' lawyers haven't seen any of the settlement's supporting analyses. Two other player attorneys who requested anonymity told me the same thing. One of those attorneys sits on the players' executive committee, a small group of lawyers overseeing negotiations. He said Girardi was "right on." He also said that he didn't think that *anyone* on the executive committee had seen the analyses -- and even more significantly, nobody saw them before the initial agreement with the NFL was reached last fall, either.

Also last week, I emailed every player lawyer listed on the preliminary approval motion except Seeger and Weiss. I asked five questions, starting with this: *Did you actually see, read and evaluate the analyses before submitting the motion for preliminary approval?* Most didn't answer. Those that did declined to go on the record. Not one said they had seen the analyses.

"In decades of practice," the executive committee attorney told me, "I've never seen a deal done with such cloak."

This matters greatly. For two reasons. First, the documents submitted to Brody claim that the settlement is fair, reasonable and adequate. Specifically, they state:

*... after hard-fought negotiations, the Settling Parties arrived at* **an aggregate sum that proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel believe is sufficient to compensate (bold added)** *all Retired NFL Football Players who may be diagnosed with Qualifying Diagnoses and their Representative and Derivative Claimants.*

If most of the above counsels -- that is, top players' lawyers -- haven't seen the math behind the settlement, then how can they believe it's sufficient? Moreover, why would that make a case in court? Isn't that a bit unethical? Doesn't that pretty much mean they're bulls----ing Brody?

Is bulls----ing a federal judge ever a good idea?

Next point: Similar to Brody, the 4,500-plus former players -- and/or families of deceased retirees -- suing the NFL have a decision to make. Is the settlement fair? Will it take care of their needs? Is the money enough? Or should they opt out of the agreement, and continue to fight the league in court for a bigger, better deal?

In order to answer those questions, they need to see settlement's supporting numbers. So do their attorneys. *All* of their attorneys, and not just the ones who negotiated the proposed agreement with the NFL. To continue the used car analogy: if you hired someone to help you find and buy a vehicle, wouldn't you both want to see the history report?

"Because I have not seen the analyses, I don't have a clue as to whether or not they will help me evaluate the fairness of any proposed settlement," Demetrio said. "Will they help me decide if any of my clients should opt out? I don't have a clue."

"Without the numbers, you can't provide your clients accurate information and advice," said another players' lawyer who asked to remain anonymous. "All I can do is look at my 500 people and say, 'my numbers [of players with neurodegenerative diseases] are way above 10 percent. So how the hell is this going to work?'"

Believe it or not, things get sketchier still. According to a document submitted to Brody by former federal judge and settlement mediator Layn Phillips, the players' top attorneys planned on presenting a summary of their experts' analysis -- but not until the final settlement hearing, scheduled to take place *after* the player opt-out period.

In used car terms, that's like being handed a vehicle history report as you drive off the lot.

"Unconscionable," said the executive committee attorney.

"You're the lawyers who asked a judge to approve the settlement, and you didn't attach the documents, and now lawyers who are on your own executive committee don't have those numbers, either?" said Dionne Koller, a University of Baltimore law professor. "Plus you're litigating a case of this much importance and this much public awareness? This thing will be torpedoed if they don't come up with the numbers. And by holding them back, they've created a question: do they even have them?

"Is it unethical? There's a fine line between stupid and unethical. As a legal strategy, I'm scratching my head."

Me, too. How could this happen? Four theories:

**1. Hubris:** According to the executive committee attorney, both Seeger and Weiss and the lead negotiators for the NFL -- league legal mastermind Jeff Pash and outside counsel Brad Karp -- may have believed they could push the settlement through federal court with little resistance. "My clue," the attorney said, "is that there was a high degree of arrogance."

Assuming that's true, the NFL and the players' top lawyers have miscalculated. While a truly fair, reasonable and adequate settlement is in everyone's interest -- our overloaded judicial system; brain-damaged former players who need medical care and financial help; an image-conscious league that would like to avoid the public relations water-boarding that would accompany prolonged litigation, damaging discovery and the *drip-drip-drip* of news stories pointing out that football can be very bad for the human brain -- a lemon of a deal would be the opposite.

Hurting players would be left to suffer. The NFL would appear even more sociopathic, capping its legal liability without fully addressing the damage left in its industrial wake. Meanwhile, Brody would look like a duty-shirking, rubber-stamping stooge, something no judge aspires to.

As such, it's hardly surprising that Brody wants to see the numbers. The lead negotiators should have known better.

**2. The NFL has something to hide:** Any complex analysis supporting the adequacy of the settlement ultimately has to answer two simple questions -- what percentage of retired professional football players will end up with neurodegenerative diseases resulting in cash awards, and what percentage will end up with brain damage that doesn't rise to that level but still may qualify for some form of medical monitoring and/or limited assistance by the terms of the settlement? Ten and 30 percent? Five and 20? Whatever the number, it isn't good for the league: *Together We Make Football, and also 2,000 cases of early-onset dementia.*

"What if the data is worse than the public knows, a higher percentage of serious trauma and injury?" said Warren Zola, a Boston College sports law professor. "That could be something that one side does not want released because of an overwhelming negative response."

Speaking of data: We're talking about projections. Risk models. Future figures based on imperfect assumptions, given that football-induced brain damage isn't well-understood and that no one -- not the NFL; not the players' union; not the Centers for Disease Control -- has ever bothered to conduct a rigorous clinical census of the retired player population. Moreover, we're talking about financial projections as well -- how much money the settlement fund will actually pay out to injured retirees based on their diagnoses, age, number of years played in the league and factors that reduce awards or disqualify players altogether. (Diagnosed with depression? No money for you.) What if the settlement's math only adds up because the qualifying diagnostic process deliberately has been engineered to limit or deny the vast majority of claims -- a familiar, all-too-common phenomenon when it comes to health benefits and workers' compensation for former NFL players?

If that's part of what's going on, the league's lawyers may not be the only ones with something to hide.

**3. The players' lawyers are covering their tails:** Let's get a little more conspiratorial. Could it be that all or most of the top players' lawyers saw the settlement's math and knew it was somehow shaky. In the interest of expediency and a nice guaranteed payday -- thanks to a settlement-mandated, NFL-funded $112 million legal fee fund -- they nevertheless decided to roll the dice and see if Brody would fall for an okey-doke.

Now that the judge has called their bluff -- in embarrassing public fashion, no less -- they're covering up. Claiming they've been kept in the dark. Throwing Seeger and Weiss under the bus. And why would they do that?

"To reassure their clients," Zola said.

Consider: Girardi told Outside the Lines that the settlement might not make financial sense for many of the former players he represents *after* Brody rejected the deal. Not before. If the numbers don't work, why did he wait so long to either (a) run them; (b) speak up?

**4. The players' lawyers are fighting for more money:** Follow me down the rabbit hole. The NFL wants the concussion lawsuits resolved as soon as possible -- otherwise, why settle in the first place? Seeger and Weiss know this. They know the league doesn't want any football brain damage statistics made public. They also know that the Super Bowl is coming up.

Timing is everything. Perhaps creating negative headlines and casting doubt on the agreement is part of their overarching strategy -- a way to pressure the league into throwing a few more coins into the cup, the better to seal the deal, shut up squabbling lawyers and make the whole thing go away.

"Maybe you don't attach the numbers knowing full well that judge Brody won't accept it," Koller said. "Now this clouds the Super Bowl,

7/2/2014　The NFL's concussion deal may not cover all former players with CTE | Patrick Hruby : SportsonEarth.com : Official MLB Website

Case 2:12-md-02323-AB　Document 6201-13　Filed 10/06/14　Page 20 of 24

continues to drag on, and it becomes 'let's get to a billion and call it a day.'"

Maybe. Or maybe there's another reason the settlement's main lawyers haven't shown their work. Whatever the case, Brody is right. No more. Phillips, the mediator, says the numbers are sound. Let's see 'em. The court needs to know. Player attorneys need to know. Players themselves need to know -- not just the players suing the league, but *all* retired players, since the settlement covers them, too. Even the public should get a look. After all, we're the ones trying to figure out if our children should play football; if the settlement is inadequate, we'll be the ones picking up ex-player medical bills through Medicare and higher insurance premiums. We deserve to know the costs. We deserve to know the risks. This is a large private settlement with larger public ramifications. It should never be comparable to a sketchy used car deal.

If anything, said sketchiness is a loud and clear signal that the entire deal merits additional scrutiny. Skepticism, too. Negotiations between the NFL and the top player lawyers should be re-examined, both by Brody and a third-party representing the interests of former players who haven't filed suit. Every actuarial assumption should be examined; every medical and economic data point picked apart by independent experts; every part of the agreement subject to a basic question: does this serve the interests of a small group of highly skilled lawyers? Or does it serve the interests of brain-damaged men and their suffering families, people who need appropriate care and recompense? After all, the NFL concussion settlement doesn't cover a 2002 Honda Civic with a funky smell and a flickering CHECK ENGINE light. It covers human lives. *Caveat emptor.* Show the math.

# EXHIBIT 71

Case 2:12-md-02323-AB   Document 6201-13   Filed 10/06/14   Page 22 of 24



Print | Close



- SUBSCRIBE
- RENEW
- GIVE A GIFT
- DIGITAL EDITION

# How to Diagnose a Battered Brain Before It's Too Late

*By Neal Emery*

*High-impact activities like football are known to cause creeping brain damage that can't easily be detected until after death. But promising research may give rise to new methods of diagnosing chronic traumatic encephalopathy.*



REUTERS/Jeff Haynes

In 1996, the brain of an alcoholic dwarf circus clown perplexed scientists with a disease normally limited to boxers. Over 15 years of being shot from a cannon at a circus, the clown developed *dementia pugilistica*, or as its 1928 discoverer Harrison Martland called it, "punch drunk." Less than ten years after the publication of a study on that cannon-rattled brain, an autopsy diagnosed deceased NFL Hall of Famer Mike Webster with the same condition, but now called chronic traumatic encephalopathy (CTE). An upswell in public interest and research following this death brought to light the danger that brain injuries present for athletes in all contact sports. A string of suicides and bizarre deaths by professional athletes, primarily football and hockey players, catalyzed a movement of more than 100 athletes to donate their brains for scientific study.

Junior Seau is the most recent athlete to donate his brain. The day after Junior Seau's suicide last

week, the co-directors of the Boston University Center for the Study of Traumatic Encephalopathy published a paper, titled "Chronic traumatic encephalopathy: neurodegeneration following repetitive concussive and subconcussive brain trauma," in the medical journal *Brain Imaging and Behavior*. Even though Corsellis first identified the signs of CTE in the brains of boxers in 1973, significant gaps remain in our knowledge of this disease.

Repeated blows to the head -- from football tackles, blasts from a circus cannon or some other trauma -- put the brain at risk for CTE. Although typically associated with concussions or serious head injuries, brains of football players with CTE but without any concussive history demonstrate that repeated, less severe "subconcussive" injuries provide sufficient trigger for this disease. While individual trauma may produce short-term symptoms, the effects of CTE manifest years after the injuries as the disease progresses and the brain breaks down. Yet many athletes with recurrent head injuries evade CTE; it appears repeated head trauma are necessary, but not sufficient, to trigger CTE. Researchers believe that the nature of the head trauma -- and the severity, frequency, and age of the recipient -- may play a role in whether or not CTE develops. But, for now, why the disease overtakes some and spares others remains a mystery.

### MORE ON SPORTS INJURY



**Can America Quit Football?**



**Junior Seau Is Dead**



**The NFL's Punishment of the Saints Is Harsh and Hypocritical**



**How to Fix Sports' Concussion Crisis**

The answer hides somewhere amidst tangled neurons and wasted brain tissue. During autopsy, scientists diagnose CTE through the pattern of brain decay and the buildup of tau protein. Normally, the tau protein stabilizes the brain cell skeleton. In both CTE and Alzheimer's, two distinct diseases, enzymes cause the protein to release from the skeleton and cluster in cells to form neurofibrillary tangles (NFTs). Researchers remain uncertain about the tangles' exact effect on the brain, says Dr. Brandon Gavett, a neuropsychologist at the University of Colorado-Colorado Springs. Unlike Alzheimer's, which is characterized by the even spread of NFTs, in CTE, NFTs cluster around blood vessels and dead tissue. According to Gavett, some researchers hypothesize that damage to blood vessels during head trauma may cause the brain to wither and form NFTs but thus far no mechanism of disease has been proven.

Brain damage associated with CTE triggers crippling psychological effects. Because the disease can only be diagnosed by autopsy, the changes in behavior and mood must be pieced together by interviews with family members after the afflicted person's death. Family members report that their loved ones exhibited problems with learning, remembering new information, and organization. Judgement and impulse control also frequently gave way to aggressive behavior and problems with addiction. Additionally, those affected by CTE frequently became depressed, agitated, and -- in what ultimately takes the lives of many with CTE -- suicidal. On top of these emotional changes, difficulty with balance,

gait, and speech similar to Parkinson's disease often accompany CTE.

Despite the wealth of symptoms identified, these psychological factors need to be integrated with genetic susceptibility, chemical analysis of blood and cerebrospinal fluid, and brain imaging in order to accurately diagnose CTE in living patients. Possible chemical markers and genetic predispositions for CTE have been identified from research on Alzheimer's disease, and pilot studies show promise for diagnostic MRI and MRS scans as brain imaging technology improves. Late last year, Boston University CSTE began a study of NFL players and non-contact athletes to begin integrating these parts and develop methods to diagnose CTE before death. Some knowledge needed for such a diagnosis still evades researchers, but scientific advancement creeps closer to this goal every day.

Over the last 7 years, the exponential eruption of public interest and outrage around chronic traumatic encephalopathy has dwarfed the incremental advancements in research. Tremendous holes remain in what we know about how and why CTE develops in battered brains. These questions should not serve as grounds for the public health hazard's dismissal, but should instead prompt caution with a still unfamiliar threat.

This article available online at:

http://www.theatlantic.com/health/archive/2012/05/how-to-diagnose-a-battered-brain-before-its-too-late/256877/

Copyright © 2014 by The Atlantic Monthly Group. All Rights Reserved.