# EXHIBIT 72

# Long-Term Consequences: Effects on Normal Development Profile After Concussion

Daniel H. Daneshvar, MA[a],*, David O. Riley, SB[a],
Christopher J. Nowinski, AB[a,b], Ann C. McKee, MD[c],
Robert A. Stern, PhD[a], Robert C. Cantu, MD[a,b,d,e,f]

**KEYWORDS**

- Concussion • Development
- Chronic traumatic encephalopathy
- Postconcussion syndrome • Youth

In the United States, approximately 1.7 million people sustain a traumatic brain injury (TBI) annually; these injuries account for 1.365 million emergency room visits and 275,000 hospitalizations each year.[1] The majority of these TBIs are minor, with 75% of these injuries classified as mild TBIs (mTBI) or concussions.[2] These numbers

This work was supported by the Boston University Alzheimer's Disease Center NIA P30 AG13846, supplement 0572063345-5, the National Operating Committee on Standards for Athletic Equipment, the National Collegiate Athletic Association, the National Federation of State High School Associations, the American Football Coaches Association, and the Sports Legacy Institute.

The authors have nothing to disclose.

[a] Department of Neurology, Center for the Study of Traumatic Encephalopathy (CSTE), Boston University School of Medicine (BUSM), 72 East Concord Street, B7800, Boston 02118, MA, USA
[b] Sports Legacy Institute, PO Box 181225, Waltham, MA, USA
[c] Department of Neurology, Center for the Study of Traumatic Encephalopathy (CSTE), Bedford VA Hospital, Boston University School of Medicine (BUSM), 200 Springs Road, 182-B, Boston, MA 01730, USA
[d] Department of Neurosurgery, Neurologic Sports Injury Center, Brigham and Women's Hospital, 5 Francis Street, Boston, MA, USA
[e] Department of Surgery, Emerson Hospital,131 Old Road to Nine Acre Corner, Concord, MA, USA
[f] Department of Neurosurgery, Center for the Study of Traumatic Encephalopathy (CSTE), Boston University School of Medicine (BUSM), John Cuming Building, Suite 820, 131 ORNAC, Concord, MA 01742, USA
* Corresponding author.
E-mail address: ddanesh@bu.edu

1047-9651/11/$ – see front matter © 2011 Elsevier Inc. All rights reserved.

Case 2:12-md-02323-AB   Document 6201-14   Filed 10/06/14   Page 3 of 43

may, however, vastly underestimate the total incidence of concussion, as many individuals suffering from mild or moderate TBI do not seek medical advice, especially in the 81% to 92% of cases when the concussion is not accompanied by loss of consciousness.[1,3–5] Beyond the burden of the injury itself, these TBIs have significant direct and indirect economic consequences, estimated at more than $60 billion annually in the United States alone.[6]

A concussion is a brain injury caused by a force transmitted to the head from a direct or indirect contact with the head, face, neck, or elsewhere, which results either in a collision between the brain and skull or in a strain on the neural tissue and vasculature.[7,8] This impact or strain is believed to cause the symptoms of concussion through a cascade characterized by abrupt neuronal depolarization, release of excitatory neurotransmitters, ionic shifts, altered glucose metabolism and cerebral blood flow, and impaired axonal function.[8] Although these injuries are known to cause short-term deficits, the long-term effects of this neuropathologic cascade are less defined.[9–14]

Clinically the acute signs and symptoms of a concussion are similar in children and adults, and can include physical signs (eg, loss of consciousness, amnesia), behavioral changes (eg, irritability), cognitive impairment (eg, slowed reaction times), sleep disturbances (eg, drowsiness), somatic symptoms (eg, headaches), cognitive symptoms (eg, feeling "in a fog"), and/or emotional symptoms (eg, emotional lability).[15] These deficits are observed in the absence of structural brain damage in diagnostic magnetic resonance imaging (MRI).[16,17] While the vast majority of these symptoms resolve spontaneously, many others may linger.[9] In addition, no two concussions have the same presentation or identical outcomes.[18]

The specific mechanism underlying neural tissue damage, however, appears to be different in the adult versus the developing brain.[19,20] While severe TBI has been shown to have both serious and long-term consequences on personality, mood, and cognition, the precise effect of concussions on development has yet to be fully elucidated.[21–27] Furthermore, immature neural tissue differs from mature tissue in response to injury, in terms of both plasticity and altered developmental trajectory.[28] The structure of the brain, in relation to the skull and its musculature, is also dissimilar in adults and children, leading to different biomechanics and thus different injury profiles.[29,30] As a result, different presentations and outcomes would be expected in response to a concussion experienced in youth as compared with one experienced as an adult.

## LONG-TERM EFFECTS OF POSTCONCUSSION SYNDROME

The symptoms of a concussion may take some time to resolve, resulting in significant long-term burden. When the symptoms of concussion persist as a variety of cognitive, somatic, and behavioral changes, these lingering deficits comprise postconcussion syndrome (PCS).[17,31–33] PCS is defined by the *International Classification of Diseases, 10th Revision* (ICD-10) as the occurrence within 1 month of injury of at least 3 of the 8 symptom categories listed in **Box 1**.[34] The *Diagnostic and Statistical Manual of Mental Disorders* (Fourth Edition, Text Revised) (DSM-IV-R) requires the presence of symptoms in at least 3 of 6 categories for at least 3 months after injury in addition to evidence of neuropsychological dysfunction, as outlined in **Box 2**.[35] Whether PCS is experienced following an mTBI seems to be dependent on a combination of factors, including premorbid vulnerability, postinjury psychological adjustment, and postinjury changes in brain function.[36] While most of these symptoms typically resolve within a few days or weeks following mTBI or other head injury, some individuals suffer from PCS for months or longer and, although studies remain conflicting, it is believed

---

**Box 1**
**Characteristics of postconcussion syndrome according to the ICD-10**

History of head trauma with loss of consciousness precedes symptom onset by maximum of 4 weeks

*Three or more symptom categories:*

- Headache, dizziness, malaise, fatigue, noise intolerance
- Irritability, depression, anxiety, emotional lability
- Subjective concentration, memory, or intellectual difficulties without neuropsychological evidence of marked impairment
- Insomnia
- Reduced alcohol intolerance

Preoccupation with above symptoms and fear of brain damage with hypochondriacal concern and adoption of sick role

*Data From* World Health Organization. The ICD-10 classification of mental and behavioral disorders: diagnostic criteria for research. Geneva (Switzerland): World Health Organization; 1993.

---

that as many as 15% of people with a history of mTBI still suffer from deficits 1 year after injury.[17,37,38]

Adults with PCS often initially present with physical symptoms such as dizziness and headache in the first weeks following injury, with psychosocial symptoms such as depression and irritability first appearing up to a month later.[39] These findings mimic those of rodent models, which have reported both impaired learning and

---

**Box 2**
**Characteristics of postconcussion syndrome according to the DSM-IV-R**

A history of head trauma that has caused significant cerebral concussion (eg, with loss of consciousness, posttraumatic amnesia, or seizures)

Neuropsychological evidence of difficulty in attention or memory

*Three or more symptoms that last at least 3 months and have an onset shortly after head trauma or represent substantial worsening of previous symptoms:*

- Fatigue
- Disordered sleep
- Headache
- Dizziness
- Irritability or aggression with little or no provocation
- Anxiety, depression, or affect lability
- Changes in personality
- Apathy or lack of spontaneity

The symptoms result in significant impairment in daily functioning that reflects a decline from previous level

*Data from* American Psychiatric Association. Diagnostic and statistical manual of mental disorders. 4th edition. Washington, DC: American Psychiatric Association; 1994.

depressive-like behavior in mice following mTBI, perhaps mediated by apoptotic cell death.[40–42] In addition, single and repeated concussions in adults have been shown to be correlated with cognitive deficits months following the injury.[43] Executive functioning impairment also appears to persist, with adults who had experienced an mTBI 6 months prior found to have significantly decreased information processing speed.[44] At 1 year after injury, the most common symptoms appear to be a combination of the physical, the psychosocial, and the cognitive, with reports of headaches, dizziness, disturbances of senses, light and noise sensitivity, and various psychiatric symptoms, including depression, anxiety, coping issues, and psychosocial disability.[45,46] In addition, studies have suggested that women are more likely to develop PCS, in terms of both more symptoms reported and a longer duration of impairment.[47]

Some adults continue to show motor deficits, functional deficits, and persistent depressive symptoms more than 1 year after injury.[48–50] The data here are conflicting, however, with other studies indicating that neuropsychological deficits appear to resolve by 1 year after injury. These latter studies tend to include all individuals who had been exposed to any mTBI rather than just those who experienced PCS symptoms; as a result, the sample is overly dilute and the resulting lack of association is not surprising.[51–54]

Of interest, several studies have looked at how beliefs regarding expected outcome in response to brain injury might influence an individual's risk of developing PCS. One study found that individuals who had suffered an mTBI and who indicated that they believed their symptoms would have serious negative consequences on their lives were significantly more likely to experience PCS at 3 months following the injury. In fact, these beliefs regarding the perceived severity at the time of injury were more predictive of PCS symptoms at 3 months than were the total number of PCS symptoms reported immediately following the injury.[45] Another study evaluating attitudes surrounding injury recovery found that self-ratings of PCS symptoms were positively related to emotion-focused coping strategies and negatively related to problem-focused coping in adults who had experienced an mTBI.[55] These findings suggest that one's attitudes can influence the extent to which a concussion has long-term, persistent effects.

Although PCS is considered to be fully recoverable with proper treatment, suffering from PCS-related symptoms for an extended time may delay an individual's return to work, adversely affect one's quality of life, and result in additional social and economic costs.[17,31,45] The deficits caused by these symptoms may also have an indirect long-term effect by exacerbating a preexisting depression or impairing the ability to adequately cope with stress.[56–58] In addition, there is some evidence that concussions result in chronic motor and neuropsychological changes over 3 decades following injury[59]; however, these findings may be attributable to an early-stage neurodegenerative disease associated with concussion, as discussed later.

Although studies and diagnostic criteria of PCS initially reported dissimilar symptoms for adult and pediatric populations, it is now acknowledged that children and young adults report a PCS that is similar to adults and may suffer from the same behavioral, emotional, and somatic difficulties following mTBI.[36,60] Many of these initial studies of youth concussions focused on athletes, as they tend to be at increased risk of experiencing concussions.[5] Although college football athletes report a higher incidence of concussion than high school athletes, it has been reported that high school athletes take longer to recover, based on neuropsychological testing.[61] This finding of increased youth susceptibility to PCS has been extended to other sports and activities, and is perhaps explained by the fact that the frontal lobes do

not fully develop until late adolescence.[43] Rodent models have also suggested that the immature brain is more susceptible than the adult brain to apoptosis following mTBI.[62,63] In fact, one prospective cohort study found that age at the time of injury and extent of extracranial injury were the two strongest independent predictors of functional outcome at 6 months after injury.[64] Even in young adults well enough to enroll and continue in college, there is evidence that PCS symptoms may last for years, and that there may be gender differences in PCS resolution, with women reporting more lingering mood and anxiety symptoms.[65]

Children differ significantly from adults and adolescents not only in size but also biomechanically, pathophysiologically, neurobehaviorally, and developmentally.[28] Because the developing brain is more plastic than the mature brain, younger age at the time of injury was originally thought to have a beneficial effect on recovery and expected outcome.[66] However, current literature indicates that this is not the case; the developing brain appears, in fact, to be more vulnerable to diffuse brain injury. Traumatic injury to the immature brain results in a prolonged period of pathogenesis in both cortical and subcortical structures, leading to progressive neurodegeneration, hyperactivity, and sustained cognitive impairments.[67,68]

Although early studies showed either a small or no effect of head injuries on the developing brain, many of these studies had flawed designs; less than half of the 56 studies reviewed by Satz and colleagues[69,70] from 1970 through 1998 met even 4 of the 6 following recommendations for methodologically sound studies: (1) the inclusion of control groups (either with no injury or with other body injury); (2) the use of a longitudinal design with follow-up assessment post injury; (3) a clear definition of mild injury, without the inclusion of children with more severe injuries; (4) the inclusion of at least 20 children with mTBI; (5) the use of standardized tests to measure outcomes; and (6) controls for preinjury risk factors.

The most methodologically sound studies have found that children report worse cognitive symptoms more than 1 year after concussion than adults. These deficits are first reported months after the original injury and affect the child's school work or abilities to function at home.[71] Children aged 6 to 12 years with mTBI have impaired executive functioning and attention 1 year after injury compared with noninjured controls.[72] An mTBI may also cause linguistic changes that adversely affect Verbal IQ and expressive language. Of note, although these deficiencies improved by 6 months after injury, no additional improvement was observed between 6 and 24 months.[73] In such cases where symptoms persist, PCS may adversely affect a child's conduct and personality, and can lead to extended school absence and limitations on athletic play. In fact, one study reported that children who showed more PCS symptoms displayed worse overall adjustment in comparison with children with fewer PCS symptoms.[36] It has also been suggested that individuals with higher cognitive ability have better outcomes following head injury, because they may be able to recruit alternative and additional neural substrates to compensate for tissue damage.[71,74,75]

Although animal models have elucidated the general pathophysiology responsible for acute concussive symptoms, the underlying cause of sustained PCS remains a matter of debate. However, several pathologic mechanisms have been proposed. Some make the pathophysiologic case that a contributing factor for sustained PCS is the microstructural damage of the brain from head injury. Given that the acute injury causes the aforementioned pathophysiologic cascade, it is not unlikely that some of the resulting microstructural damage can persist in some cases and result in the persisting symptoms of PCS sometimes observed.[31] However, as already mentioned for mTBI in adults, the correlation between increased risk of sustained PCS in children

Daneshvar et al

with negative coping strategies or beliefs about their mTBI symptoms indicates that there may also be a psychopathologic cause to this long-term PCS.[45,55]

This matter is further complicated by various methodologic shortcomings in mTBI and PCS research.[76] These limitations may include retrospective, cross-sectional designs, a lack of appropriate control groups, and a failure to separate different degrees of PCS.[36,39] In addition, studies rely heavily on the self-report of postconcussive symptoms by patients; this has a history of being unreliable, and studies show that a patient's self-report may be the result of simple malingering, an involvement in litigation, or recall biases such as the "good old days" bias, the idea that individuals who sustain an injury often underestimate problems preinjury.[17,77] Finally, whereas PCS is an acknowledged condition, there is a disagreement between ICD-10 and DSM-IV diagnostic criteria; this disagreement emphasizes the confusion over the underlying cause of long-term PCS. Whereas the ICD-10 criteria classifies PCS as symptoms without neuropsychological impairment and focuses instead on premorbid conditions and postinjury psychological adjustment, the DSM-IV criteria do require this neuropsychological impairment and seem to assume that PCS and related symptoms are at least partially caused by an underlying brain trauma.[78] The variability in diagnostic criteria, and the assumptions about PCS that this variation implies, result in different incidence estimates and limited diagnostic agreement when dealing with PCS patients.[79]

The enduring effects of PCS appear to be a combination of the biologic, the physiologic, the psychological, and the social. For both the pediatric and adult population, future research that incorporates genetics, advanced neuroimaging, refined cognitive and postconcussive symptom measures, and social environment research can help to achieve an integrated "biopsychosocial" model that may aid in the management of long-term PCS.[78] This, along with effective education and rehabilitation of patients, will work to reduce the incidence and burden of long-term PCS in TBI patients.

## EFFECTS ON BEHAVIOR

Having sustained a previous concussion may alter a child's long-term developmental trajectory years after the symptoms of PCS subside. Studies of PCS typically only follow children for up to 1 year after injury, potentially before the full effects of the injury have manifested themselves. As a result, these studies are unable to measure the extent of the long-term detrimental effects of an mTBI on the developing brain. To properly evaluate the long-term consequences of youth concussion, studies must examine cognitively mature individuals who previously experienced a concussion in their youth.[80]

Because the prefrontal cortex is one of the last brain structures to mature, it is not surprising that parents report attention deficits, hyperactivity, or conduct disorder following a head injury to their child.[60] In addition, it has been shown that the number of long-term neurobehavioral symptoms in children is related to the severity of the initial mTBI as well as the child's neuropsychological functioning, academic performance, emotional adjustment, and adaptive functioning.[36,81]

The majority of previous studies examining the effects of brain injuries on development years after the injury have focused on more severe injuries.[82–85] However, these studies of moderate and severe TBI suggest a specific window of time during which the brain may be more vulnerable to injury; TBI experienced in middle childhood and later appears to be less detrimental than injuries sustained earlier.[86–91]

One cohort study of 490 children who experienced an mTBI before age 14 years, and who had no prior history of psychiatric illness, found that these children were

significantly more likely to have psychiatric issues in the 3 years following injury than were uninjured controls. The children most commonly presented with attentional problems in the first year following injury. However, there was no difference observed in children who had already had a prior history of psychiatric illness in the year preceding the injury.[92]

These studies are complicated by the fact that the children more likely to experience concussions were also more likely to have undiagnosed psychiatric issues. To circumvent this issue, some studies have used detailed retrospective questionnaires to assess preinjury psychiatric status. One prospective longitudinal study found that children who experienced an mTBI requiring hospitalization before age 10 years displayed increased hyperactivity/inattention and conduct disorder between the ages of 10 and 13 compared with children who had not experienced an mTBI, as rated both by their mothers and their teachers.[89] This cohort has been followed through age 16, and these issues have been shown to persist.[93] However, these children did not display any deficits in intelligence or academic skills. In addition, children whose injuries did not require hospitalization showed no differences from control children without a history of mTBI. Although there were differences observed in hyperactivity/inattention and conduct disorder based on age at the time of injury (those injured between 0 and 5 years old and those injured between 5 and 10 years old), these differences were not statistically significant.[89] A later study confirmed these findings and also reported that children injured in preschool had progressively worsening parent and teacher ratings of hyperactivity/inattention and conduct disorder when followed longitudinally from age 7 to 13 years.[80] Another study of 45 adults, with an average age at injury of 8.9 years (standard deviation of 3.3), found that those who experienced posttraumatic amnesia for at least 30 minutes had statistically significant decreases in measures of attention and memory more than 2 decades later.[94] These attentional findings are not surprising, as the prefrontal cortex does not fully develop until late adolescence. In addition, these deficits were not observed in individuals injured as adults.[95]

The effects of mTBI on children do not always end with the resolution of PCS, but may have long-term effects on cognitive processing, mood, and behavior. These delayed behavioral impairments suggest the need for continued monitoring and intervention in children, even years after initial concussion.

## WHEN TO RETIRE AFTER A CONCUSSION

Following a concussion, the absolute contraindications to return to a contact/collision practice or competition sport include:

1. Abnormal neurologic assessment
2. Symptomatic of postconcussion signs/symptoms at rest or exertion
3. If done, neuropsychological battery not baseline or above
4. If done, head computed tomography or MRI shows a lesion placing the athlete at increased risk of head injury (edema, hemorrhage, hydrocephalus, cavum septum pellucidum, arachnoid cyst).

The relative contraindications to return to collision practice or competition include:

1. Postconcussion symptoms that last many months and not days
2. Mild or indirect blows (whiplash) that produce significant and lengthy postconcussion symptoms.

Thus there are absolute and relative indicators for retirement. Neither are based on a particular number of concussions, but rather on the athlete's response, including

duration of symptoms and ease of being concussed. Keeping in mind the increased vulnerability of the developing brain, it is suggested that one might be even more conservative in the under-18 age group as compared with adults.[96]

## DEGENERATIVE DISEASE

Brain trauma has long been thought to play a role in initiating or accelerating the molecular cascade involved in several degenerative diseases, including Alzheimer disease (AD), Parkinson disease (PD), and amyotrophic lateral sclerosis (ALS).[97–99] In addition, repetitive concussive and subconcussive brain trauma has been implicated as the primary risk factor for developing the progressive neurodegenerative disease chronic traumatic encephalopathy (CTE), as well as the motor neuron disease variant chronic traumatic encephalomyelopathy (CTE-M).[100,101]

### Alzheimer Disease

Several epidemiologic studies have found a relationship between head trauma and AD in later life.[102–108] However, all of these studies based their analyses on a clinical diagnosis of possible or probable AD. Without neuropathologic confirmation of disease, it is possible that other neurodegenerative diseases, such as CTE, were in fact partially or fully responsible for the observed clinical dementia.[109] However, one retrospective study found that individuals with a history of TBI had a higher than expected prevalence of AD pathology observed at autopsy.[110] This result could in part be explained by the fact that β-amyloid precursor protein (APP) is shown to temporarily accumulate in response to acute TBI in genetically susceptible mice; the cleavage of APP results in the β-amyloid (Aβ) characteristic of AD.[111,112] More research is certainly needed, both to elucidate the relationship between AD and mTBI, and to disambiguate potential cases of CTE from clinically diagnosed cases of probable and possible AD.

### Parkinson Disease

TBI has also been implicated as a risk factor for PD.[98,113] Although the nature of the relationship is poorly understood, animal models suggest that TBI results in α-synuclein deposition, a protein shown to be the primary building block of the Lewy bodies in PD.[112,114,115] However, neither animal models nor human studies have conclusively shown a relationship between concussions and the development of PD.

### Chronic Traumatic Encephalopathy

CTE is a progressive neurodegenerative tauopathy caused by repeated concussive and subconcussive impacts. Because repeated impacts are thought to be necessary to initiate the disease process, CTE is typically found in those at high risk for experiencing repetitive head trauma, including athletes, those with exposure to injury due to military service or occupation, and individuals who exhibit seizures and/or head-banging behavior.[100,109] In fact, CTE was initially named dementia pugilistica because of its association with the repetitive head trauma experienced by boxers in the ring.

However, head trauma alone is not sufficient to initiate the neuropathologic cascade of CTE. There are many potential risk factors that likely play a role in determining which individuals develop CTE and which individuals do not, given similar head trauma histories. There is some evidence that the ApoE E4 allele may be associated with CTE development.[100,101] In addition, the relationship between the development of CTE and the number or severity of head injuries is not yet clear, as some athletes diagnosed with CTE had no reported concussion history despite a history of repetitive subconcussive head trauma.[100,101] In addition, the age at which an individual begins

experiencing head injury and the time interval between concussions may play a role in the development of CTE.

Although the disease process likely starts at the time of injury, the initial signs of CTE do not typically manifest until decades later. Therefore, the time course for the presentation of CTE symptoms distinguish it from the cumulative effects of multiple injuries or a form of prolonged PCS. CTE can only be diagnosed post mortem at this time, and as such the precise clinical presentation and the cascade of events preceding it are not yet known.[116] In addition, because the diagnosis of CTE relies on postmortem tissue analysis, the precise epidemiology of CTE is not yet known. Although the majority of professional and collegiate athletes examined for CTE have in fact been found to have had the disease, this represents a biased sample in that families who suspect their loved ones may be impaired are more likely to agree to brain donation for research purposes.

However, CTE is believed to be characterized clinically by a progressive decline of memory and executive functioning; mood and behavioral disturbances that include depression, apathy, impulsivity, anger, irritability, suicidal behavior, and aggressiveness; gait changes that resemble Parkinsonism; and, eventually, progression to dementia. Once this disease process is initiated, the neurodegeneration typically progresses slowly, with a mean survival duration of 18 years following the onset of symptoms.[100,117–119]

CTE is characterized neuropathologically by a distinctive pattern of extensive tau-immunoreactive inclusions scattered throughout the cerebral cortex in a patchy, superficial distribution, with focal epicenters at the depths of sulci and around the cerebral vasculature; extensive tau-immunoreactive inclusions in limbic and paralimbic regions as well as brainstem nuclei; and a relative absence of Aβ deposits. On gross examination, CTE is characterized by generalized atrophy and enlarged ventricles, specific atrophy of the frontal and medial temporal lobes, degenerations of white matter fiber bundles, cavum septum pellucidum often with fenestrations, thinning of the hypothalamic floor, and shrinkage of the mammillary bodies.[100]

Although CTE may have similarities with AD, they are two quite distinct diseases. Clinically, CTE typically presents with age of onset in the 40s and 50s as opposed to onset after age 65 years in sporadic AD. In addition, the clinical progression of disease is much slower, often lasting decades, and is characterized by a subtle deterioration in personality and behavior.[100] Neuropathologically both diseases share tau immunoreactivity, but the widespread distribution of neurofibrillary and glial tangles in the frontal, insular, and temporal cortices, white matter, diencephalon, brainstem, and spinal cord is considerably more extensive in CTE than in AD. Furthermore, the pattern of the neurofibrillary abnormalities is entirely distinct from AD or any other tauopathy, especially when considering the absence of the neuritic Aβ deposits characteristic of AD.[100,120] However, additional research is needed to better understand the mechanism underlying these changes.

### Motor Neuron Disease

Although genetic mutations have been identified that cause ALS, 90% to 95% of ALS cases are sporadic.[121,122] Many risk factors have been identified as possibly contributing to these sporadic cases, but trauma specifically has been implicated as a risk factor that may initiate the molecular cascades resulting in ALS.[99,123] In one case-control study, researchers found that injuries that had occurred in the previous 10 years had the strongest association with diagnosis of ALS.[99] Another case-control study also found that the risk of ALS increased when the last head injury occurred closer to the time of diagnosis.[124] However, other studies have disputed this

association.[125] On the whole, these findings suggest that head injury may play a role in triggering the onset of motor neuron disease.

Motor neurons in sporadic ALS are often found with TDP-43–immunoreactive inclusion bodies that appear either as rounded hyaline inclusions or as skein-like inclusions; as a result, TDP-43 has been implicated in the pathogenesis of motor neuron disease.[126,127] Widespread TDP-43–positive inclusions have also been found in the vast majority of cases of CTE, and are typically found in the brainstem, basal ganglia, diencephalon, medial temporal lobe, frontal, temporal, and insular cortices, and subcortical white matter. A subset of individuals with CTE also develops a progressive motor neuron disease characterized by profound weakness, atrophy, spasticity, and fasciculations. In these individuals, both tau neurofibrillary pathology and extensive TDP-43–immunoreactive inclusions and neurites were found in the motor cortex of the brain and in the spinal cord in a distribution not characteristic of sporadic ALS.[101] Although these initial findings merit further investigation, the co-occurrence of widespread TDP-43 and tau proteinopathies in CTE suggests that repetitive head injury might be associated with the deposition of two abnormally phosphorylated, misfolded proteins, and that in some individuals the TDP-43 proteinopathy is associated with the development of a motor neuron disease.

## IMPLICATIONS ON ATHLETIC PARTICIPATION

As a result of these potential long-term consequences, both the incidence and the severity of youth concussion must be reduced. There are several approaches worth evaluating toward this end.

One potential solution involves the development and introduction of better equipment (eg, helmets and mouth guards) that are specifically designed to attenuate the forces associated with concussions. However, although helmets have been shown to decrease the incidence of facial injury as well as moderate and severe TBI, and mouth guards help protect against dental and orofacial injury, there has been no evidence to date that the newest equipment reduces the incidence of concussions or severity of concussion symptoms.[5]

In addition, when new equipment requirements are introduced into a sport, athletes' behavior often changes, resulting in a riskier style of play reflecting their increased feeling of protection.[128] In some cases, this has been associated with a paradoxic increase in concussion incidence within an activity.[129]

A potentially more fruitful approach would be to limit an athlete's exposure to the impacts that might result in concussion. This goal could be accomplished through several means, such as decreasing the number of contact practices an athlete participates in each week; practice alone is responsible for up to 1500 impacts of 10 g or more for some football players.[130] Ivy League colleges have taken the lead and recently began implementing this policy, and it is hoped that others will follow suit. In addition, sport-specific rule changes might help reduce the frequency of unnecessary and dangerous collisions, thereby decreasing the burden of athletic concussion.

In most instances, when concussions are properly treated they are not believed to be associated with any long-term sequelae. Ensuring that individuals receive proper medical care, and are given adequate physical and mental rest during recovery, should ensure that these injuries fully heal. Adopting uniform return-to-play guidelines, such as those already discussed here, would help ensure athletes are not permitted to play too soon.

Along these lines, proper education of athletes, coaches, medical professionals, and the general public is necessary to identify and properly treat concussions. There

are many organizations, such as the Centers for Disease Control and Prevention, the Brain Injury Association, and the Sports Legacy Institute, working to improve concussion awareness and educational outreach.

## SUMMARY

While most concussions fully resolve within weeks of the injury, for some these concussions can have serious, long-term effects. Concussed individuals can sometimes experience prolonged PCS, lasting for months or even years, which can result in significant physical, emotional, and cognitive stress. In addition, in children and young adults, months of PCS can adversely affect one's developmental trajectory by keeping students out of class and straining personal relationships. In adults, suffering from PCS for an extended period of time may delay one's ability to return to work, resulting in an additional financial and social burden on the concussed individual.

Once the symptoms of concussion subside, in some cases a prior concussion may also have a lasting effect on behavior. These issues are more common in children, as those who have been concussed are more likely to have symptoms of mood or conduct disorders reported by parents and teachers years after injury. Although these findings may in part be due to undiagnosed mood or conduct disorders in children, which resulted in an original injury, the fact that the prefrontal cortex has not fully developed in these injured children provides an additional explanation of aberrant behavior.

In addition, concussions and subconcussive impacts have been shown to increase the risk of developing degenerative disease, sometimes even decades after the injury. There is a good deal of epidemiologic evidence linking a history of head injury with the development of AD, supported by evidence from animal models in response to acute head injury, but additional work is necessary to separate clinically diagnosed AD from other dementias. TBI has also been linked to PD through transient increases in $\alpha$-synuclein resulting in an increase in the formation of Lewy bodies. However, the strongest evidence for a direct link between repetitive concussive and subconcussive injury and neurodegenerative disease later in life comes from the study of CTE. Originally found in boxers, CTE has been diagnosed in a wide variety of individuals, all of whom had been exposed to repetitive head injury, be it through participation in athletics, military service, occupational hazards, or some other cause. While the tau diagnostic of CTE may begin to aggregate and form inclusions as early as in the second decade, the first clinical signs of CTE are not typically observed until one's 30s or 40s. CTE presents with cognitive deficits, depression, and behavioral disinhibition, and eventually progresses to full-blown dementia.

Although concussions were once considered relatively benign, mounting evidence indicates that concussions can have long-term consequences, sometimes for years or even decades after the injury. Improved understanding of the risks associated with concussions, and their potentially debilitating consequences, highlights the need for better diagnosis, treatment, and prevention.

## REFERENCES

1. Faul M, Xu L, Wald MM, et al. Traumatic brain injury in the United States: emergency department visits, hospitalizations and deaths 2002–2006. Washington, DC: US Department of Health and Human Services; 2010.
2. CDC. Report to Congress on mild traumatic brain injury in the United States: steps to prevent a serious public health problem. Atlanta (GA): National Center for Injury Prevention and Control; 2003.

3. Langlois JA, Rutland-Brown W, Wald MM. The epidemiology and impact of traumatic brain injury: a brief overview. J Head Trauma Rehabil 2006;21(5):375–8.

4. CDC. Nonfatal traumatic brain injuries from sports and recreation activities—United States, 2001–2005. Atlanta (GA): Centers for Disease Control and Prevention; 2007.

5. Daneshvar DH, Nowinski CJ, McKee AC, et al. The epidemiology of sport-related concussion. Clin Sports Med 2011;30(1):1–17, vii.

6. Finkelstein E, Corso P, Miller T. The incidence and economic burden of injuries in the United States. New York: Oxford University Press; 2006.

7. Concussion (mild traumatic brain injury) and the team physician: a consensus statement. Med Sci Sports Exerc 2006;38(2):395–9.

8. Barkhoudarian G, Hovda DA, Giza CC. The molecular pathophysiology of concussive brain injury. Clin Sports Med 2011;30(1):33–48, vii–iii.

9. Cantu RC, Herring SA, Putukian M. Concussion. N Engl J Med 2007;356(17): 1787 [author reply: 1789].

10. Covassin T, Stearne D, Elbin R. Concussion history and postconcussion neurocognitive performance and symptoms in collegiate athletes. J Athl Train 2008;43(2):119–24.

11. Belanger HG, Vanderploeg RD. The neuropsychological impact of sports-related concussion: a meta-analysis. J Int Neuropsychol Soc 2005;11(4):345–57.

12. McCrea M, Guskiewicz KM, Marshall SW, et al. Acute effects and recovery time following concussion in collegiate football players: the NCAA Concussion Study. JAMA 2003;290(19):2556–63.

13. Bailes JE, Cantu RC. Head injury in athletes. Neurosurgery 2001;48(1):26–45 [discussion: 45–6].

14. Nolin P. Executive memory dysfunctions following mild traumatic brain injury. J Head Trauma Rehabil 2006;21(1):68–75.

15. McCrory P, Meeuwisse W, Johnston K, et al. Consensus statement on concussion in sport—the 3rd International Conference on concussion in sport, held in Zurich, November 2008. J Clin Neurosci 2009;16(6):755–63.

16. Davis GA, Iverson GL, Guskiewicz KM, et al. Contributions of neuroimaging, balance testing, electrophysiology and blood markers to the assessment of sport-related concussion. Br J Sports Med 2009;43(Suppl 1):i36–45.

17. Hall RC, Chapman MJ. Definition, diagnosis, and forensic implications of post-concussional syndrome. Psychosomatics 2005;46(3):195–202.

18. Cantu RC. Return to play guidelines after a head injury. Clin Sports Med 1998; 17(1):45–60.

19. Teasdale GM, Murray GD, Nicoll JA. The association between APOE epsilon4, age and outcome after head injury: a prospective cohort study. Brain 2005; 128(Pt 11):2556–61.

20. Shah SA, Prough DS, Garcia JM, et al. Molecular correlates of age-specific responses to traumatic brain injury in mice. Exp Gerontol 2006;41(11):1201–5.

21. Cantu RC, Guskiewicz K, Register-Mihalik JK. A retrospective clinical analysis of moderate to severe athletic concussions. PM R 2010;2(12):1088–93.

22. Levin HS, Song J, Ewing-Cobbs L, et al. Word fluency in relation to severity of closed head injury, associated frontal brain lesions, and age at injury in children. Neuropsychologia 2001;39(2):122–31.

23. Temkin NR, Corrigan JD, Dikmen SS, et al. Social functioning after traumatic brain injury. J Head Trauma Rehabil 2009;24(6):460–7.

24. Bombardier CH, Fann JR, Temkin NR, et al. Rates of major depressive disorder and clinical outcomes following traumatic brain injury. JAMA 2010;303(19): 1938–45.

25. Taylor HG, Swartwout MD, Yeates KO, et al. Traumatic brain injury in young children: postacute effects on cognitive and school readiness skills. J Int Neuropsychol Soc 2008;14(5):734–45.

26. Gerrard-Morris A, Taylor HG, Yeates KO, et al. Cognitive development after traumatic brain injury in young children. J Int Neuropsychol Soc 2010;16(1):157–68.

27. Anderson V, Catroppa C, Morse S, et al. Recovery of intellectual ability following traumatic brain injury in childhood: impact of injury severity and age at injury. Pediatr Neurosurg 2000;32(6):282–90.

28. Kirkwood MW, Yeates KO, Wilson PE. Pediatric sport-related concussion: a review of the clinical management of an oft-neglected population. Pediatrics 2006;117(4):1359–71.

29. Prins ML, Hovda DA. Developing experimental models to address traumatic brain injury in children. J Neurotrauma 2003;20(2):123–37.

30. Cantu RC, Mueller FO. The prevention of catastrophic head and spine injuries in high school and college sports. Br J Sports Med 2009;43(13):981–6.

31. Sterr A, Herron KA, Hayward C, et al. Are mild head injuries as mild as we think? Neurobehavioral concomitants of chronic post-concussion syndrome. BMC Neurol 2006;6:7.

32. Gosselin N, Tellier M. Patients with traumatic brain injury are at high risk of developing chronic sleep-wake disturbances. J Neurol Neurosurg Psychiatry 2010;81(12):1297.

33. Sojka P, Stalnacke BM, Bjornstig U, et al. One-year follow-up of patients with mild traumatic brain injury: occurrence of post-traumatic stress-related symptoms at follow-up and serum levels of cortisol, S-100B and neuron-specific enolase in acute phase. Brain Inj 2006;20(6):613–20.

34. WHO. The ICD-10 classification of mental and behavioural disorders: diagnostic criteria for research. Geneva (Switzerland): WHO; 1993.

35. APA. Diagnostic and statistical manual of mental disorders. 4th edition. Washington, DC: APA; 1994.

36. Yeates KO, Luria J, Bartkowski H, et al. Postconcussive symptoms in children with mild closed head injuries. J Head Trauma Rehabil 1999;14(4):337–50.

37. Carroll LJ, Cassidy JD, Peloso PM, et al. Prognosis for mild traumatic brain injury: results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury. J Rehabil Med 2004;(Suppl 43):84–105.

38. Rees PM. Contemporary issues in mild traumatic brain injury. Arch Phys Med Rehabil 2003;84(12):1885–94.

39. Yang CC, Tu YK, Hua MS, et al. The association between the postconcussion symptoms and clinical outcomes for patients with mild traumatic brain injury. J Trauma 2007;62(3):657–63.

40. Milman A, Rosenberg A, Weizman R, et al. Mild traumatic brain injury induces persistent cognitive deficits and behavioral disturbances in mice. J Neurotrauma 2005;22(9):1003–10.

41. Tashlykov V, Katz Y, Volkov A, et al. Minimal traumatic brain injury induces apoptotic cell death in mice. J Mol Neurosci 2009;37(1):16–24.

42. Tweedie D, Milman A, Holloway HW, et al. Apoptotic and behavioral sequelae of mild brain trauma in mice. J Neurosci Res 2007;85(4):805–15.

43. Wall SE, Williams WH, Cartwright-Hatton S, et al. Neuropsychological dysfunction following repeat concussions in jockeys. J Neurol Neurosurg Psychiatry 2006;77(4):518–20.

44. Johansson B, Berglund P, Ronnback L. Mental fatigue and impaired information processing after mild and moderate traumatic brain injury. Brain Inj 2009; 23(13–14):1027–40.

45. Whittaker R, Kemp S, House A. Illness perceptions and outcome in mild head injury: a longitudinal study. J Neurol Neurosurg Psychiatry 2007;78(6):644–6.

46. Panayiotou A, Jackson M, Crowe SF. A meta-analytic review of the emotional symptoms associated with mild traumatic brain injury. J Clin Exp Neuropsychol 2010;32(5):463–73.

47. Farace E, Alves WM. Do women fare worse: a metaanalysis of gender differences in traumatic brain injury outcome. J Neurosurg 2000;93(4):539–45.

48. Pagulayan KF, Hoffman JM, Temkin NR, et al. Functional limitations and depression after traumatic brain injury: examination of the temporal relationship. Arch Phys Med Rehabil 2008;89(10):1887–92.

49. Bell KR, Hoffman JM, Temkin NR, et al. The effect of telephone counselling on reducing post-traumatic symptoms after mild traumatic brain injury: a randomised trial. J Neurol Neurosurg Psychiatry 2008;79(11):1275–81.

50. Heitger MH, Jones RD, Dalrymple-Alford JC, et al. Motor deficits and recovery during the first year following mild closed head injury. Brain Inj 2006;20(8):807–24.

51. Dikmen SS, Corrigan JD, Levin HS, et al. Cognitive outcome following traumatic brain injury. J Head Trauma Rehabil 2009;24(6):430–8.

52. Straume-Naesheim TM, Andersen TE, Dvorak J, et al. Effects of heading exposure and previous concussions on neuropsychological performance among Norwegian elite footballers. Br J Sports Med 2005;39(Suppl 1):i70–7.

53. Broglio SP, Ferrara MS, Piland SG, et al. Concussion history is not a predictor of computerised neurocognitive performance. Br J Sports Med 2006;40(9):802–5 [discussion: 802–5].

54. Collie A, McCrory P, Makdissi M. Does history of concussion affect current cognitive status? Br J Sports Med 2006;40(6):550–1.

55. Woodrome SE, Yeates KO, Taylor HG, et al. Coping strategies as a predictor of post-concussive symptoms in children with mild traumatic brain injury versus mild orthopedic injury. J Int Neuropsychol Soc 2011;17(2):1–10.

56. Killam C, Cautin RL, Santucci AC. Assessing the enduring residual neuropsychological effects of head trauma in college athletes who participate in contact sports. Arch Clin Neuropsychol 2005;20(5):599–611.

57. Sawchyn JM, Brulot MM, Strauss E. Note on the use of the Postconcussion Syndrome Checklist. Arch Clin Neuropsychol 2000;15(1):1–8.

58. Machulda MM, Bergquist TF, Ito V, et al. Relationship between stress, coping, and postconcussion symptoms in a healthy adult population. Arch Clin Neuropsychol 1998;13(5):415–24.

59. De Beaumont L, Theoret H, Mongeon D, et al. Brain function decline in healthy retired athletes who sustained their last sports concussion in early adulthood. Brain 2009;132(Pt 3):695–708.

60. Mittenberg W, Wittner MS, Miller LJ. Postconcussion syndrome occurs in children. Neuropsychology 1997;11(3):447–52.

61. Field M, Collins MW, Lovell MR, et al. Does age play a role in recovery from sports-related concussion? A comparison of high school and collegiate athletes. J Pediatr 2003;142(5):546–53.

62. Bayly PV, Dikranian KT, Black EE, et al. Spatiotemporal evolution of apoptotic neurodegeneration following traumatic injury to the developing rat brain. Brain Res 2006;1107(1):70–81.

63. Bittigau P, Sifringer M, Pohl D, et al. Apoptotic neurodegeneration following trauma is markedly enhanced in the immature brain. Ann Neurol 1999;45(6):724–35.

64. Jacobs B, Beems T, Stulemeijer M, et al. Outcome prediction in mild traumatic brain injury: age and clinical variables are stronger predictors than CT abnormalities. J Neurotrauma 2010;27(4):655–68.

65. Santa Maria MP, Pinkston JB, Miller SR, et al. Stability of postconcussion symptomatology differs between high and low responders and by gender but not by mild head injury status. Arch Clin Neuropsychol 2001;16(2):133–40.

66. Schneider GE. Is it really better to have your brain lesion early? A revision of the "Kennard principle". Neuropsychologia 1979;17(6):557–83.

67. Pullela R, Raber J, Pfankuch T, et al. Traumatic injury to the immature brain results in progressive neuronal loss, hyperactivity and delayed cognitive impairments. Dev Neurosci 2006;28(4–5):396–409.

68. Huh JW, Widing AG, Raghupathi R. Midline brain injury in the immature rat induces sustained cognitive deficits, bihemispheric axonal injury and neurodegeneration. Exp Neurol 2008;213(1):84–92.

69. Satz P, Zaucha K, McCleary C, et al. Mild head injury in children and adolescents: a review of studies (1970–1995). Psychol Bull 1997;122(2):107–31.

70. Satz P. Mild head injury in children and adolescents. Curr Dir Psychol Sci 2001; 10:106–9.

71. Fay TB, Yeates KO, Taylor HG, et al. Cognitive reserve as a moderator of postconcussive symptoms in children with complicated and uncomplicated mild traumatic brain injury. J Int Neuropsychol Soc 2010;16(1):94–105.

72. Catale C, Marique P, Closset A, et al. Attentional and executive functioning following mild traumatic brain injury in children using the Test for Attentional Performance (TAP) battery. J Clin Exp Neuropsychol 2009;31(3):331–8.

73. Ewing-Cobbs L, Fletcher JM, Levin HS, et al. Longitudinal neuropsychological outcome in infants and preschoolers with traumatic brain injury. J Int Neuropsychol Soc 1997;3(6):581–91.

74. Dawson KS, Batchelor J, Meares S, et al. Applicability of neural reserve theory in mild traumatic brain injury. Brain Inj 2007;21(9):943–9.

75. Stern Y. What is cognitive reserve? Theory and research application of the reserve concept. J Int Neuropsychol Soc 2002;8(3):448–60.

76. Dikmen SS, Levin HS. Methodological issues in the study of mild head injury. J Head Trauma Rehabil 1993;8(3):30–7.

77. Iverson GL, Lange RT, Brooks BL, et al. "Good old days" bias following mild traumatic brain injury. Clin Neuropsychol 2010;24(1):17–37.

78. Yeates KO, Taylor HG. Neurobehavioural outcomes of mild head injury in children and adolescents. Pediatr Rehabil 2005;8(1):5–16.

79. Yeates KO. Mild traumatic brain injury and postconcussive symptoms in children and adolescents. J Int Neuropsychol Soc 2010;16(6):953–60.

80. McKinlay A, Grace RC, Horwood LJ, et al. Long-term behavioural outcomes of pre-school mild traumatic brain injury. Child Care Health Dev 2010;36(1): 22–30.

81. Yeates KO, Taylor HG, Rusin J, et al. Longitudinal trajectories of postconcussive symptoms in children with mild traumatic brain injuries and their relationship to acute clinical status. Pediatrics 2009;123(3):735–43.

82. Timonen M, Miettunen J, Hakko H, et al. The association of preceding traumatic brain injury with mental disorders, alcoholism and criminality: the Northern Finland 1966 Birth Cohort Study. Psychiatry Res 2002;113(3):217–26.

83. Roncadin C, Guger S, Archibald J, et al. Working memory after mild, moderate, or severe childhood closed head injury. Dev Neuropsychol 2004; 25(1–2):21–36.

84. Ewing-Cobbs L, Barnes M, Fletcher JM, et al. Modeling of longitudinal academic achievement scores after pediatric traumatic brain injury. Dev Neuropsychol 2004;25(1–2):107–33.

85. Anderson SW, Damasio H, Tranel D, et al. Long-term sequelae of prefrontal cortex damage acquired in early childhood. Dev Neuropsychol 2000;18(3):281–96.

86. Jacobs R, Harvey AS, Anderson V. Executive function following focal frontal lobe lesions: impact of timing of lesion on outcome. Cortex 2007;43(6):792–805.

87. Catroppa C, Anderson VA, Morse SA, et al. Children's attentional skills 5 years post-TBI. J Pediatr Psychol 2007;32(3):354–69.

88. Anderson V, Catroppa C. Recovery of executive skills following paediatric traumatic brain injury (TBI): a 2 year follow-up. Brain Inj 2005;19(6):459–70.

89. McKinlay A, Dalrymple-Alford JC, Horwood LJ, et al. Long term psychosocial outcomes after mild head injury in early childhood. J Neurol Neurosurg Psychiatry 2002;73(3):281–8.

90. Anderson V, Catroppa C, Morse S, et al. Functional plasticity or vulnerability after early brain injury? Pediatrics 2005;116(6):1374–82.

91. Bonnier C, Marique P, Van Hout A, et al. Neurodevelopmental outcome after severe traumatic brain injury in very young children: role for subcortical lesions. J Child Neurol 2007;22(5):519–29.

92. Massagli TL, Fann JR, Burington BE, et al. Psychiatric illness after mild traumatic brain injury in children. Arch Phys Med Rehabil 2004;85(9):1428–34.

93. McKinlay A, Grace R, Horwood J, et al. Adolescent psychiatric symptoms following preschool childhood mild traumatic brain injury: evidence from a birth cohort. J Head Trauma Rehabil 2009;24(3):221–7.

94. Hessen E, Nestvold K, Sundet K. Neuropsychological function in a group of patients 25 years after sustaining minor head injuries as children and adolescents. Scand J Psychol 2006;47(4):245–51.

95. Hessen E, Nestvold K, Anderson V. Neuropsychological function 23 years after mild traumatic brain injury: a comparison of outcome after paediatric and adult head injuries. Brain Inj 2007;21(9):963–79.

96. Cantu RC. Recurrent athletic head injury: risks and when to retire. Clin Sports Med 2003;22(3):593–603, x.

97. Mortimer JA, van Duijn CM, Chandra V, et al. Head trauma as a risk factor for Alzheimer's disease: a collaborative re-analysis of case-control studies. EURODEM Risk Factors Research Group. Int J Epidemiol 1991;20(Suppl 2):S28–35.

98. Goldman SM, Tanner CM, Oakes D, et al. Head injury and Parkinson's disease risk in twins. Ann Neurol 2006;60(1):65–72.

99. Chen H, Richard M, Sandler DP, et al. Head injury and amyotrophic lateral sclerosis. Am J Epidemiol 2007;166(7):810–6.

100. McKee AC, Cantu RC, Nowinski CJ, et al. Chronic traumatic encephalopathy in athletes: progressive tauopathy after repetitive head injury. J Neuropathol Exp Neurol 2009;68(7):709–35.

101. McKee AC, Gavett BE, Stern RA, et al. TDP-43 proteinopathy and motor neuron disease in chronic traumatic encephalopathy. J Neuropathol Exp Neurol 2010;69(9):918–29.

102. Fleminger S, Oliver DL, Lovestone S, et al. Head injury as a risk factor for Alzheimer's disease: the evidence 10 years on; a partial replication. J Neurol Neurosurg Psychiatry 2003;74(7):857–62.

103. Mortimer JA, French LR, Hutton JT, et al. Head injury as a risk factor for Alzheimer's disease. Neurology 1985;35(2):264–7.

104. O'Meara ES, Kukull WA, Sheppard L, et al. Head injury and risk of Alzheimer's disease by apolipoprotein E genotype. Am J Epidemiol 1997; 146(5):373–84.

105. Mehta KM, Ott A, Kalmijn S, et al. Head trauma and risk of dementia and Alzheimer's disease: The Rotterdam Study. Neurology 1999;53(9):1959–62.

106. Katzman R, Galasko DR, Saitoh T, et al. Apolipoprotein-epsilon4 and head trauma: synergistic or additive risks? Neurology 1996;46(3):889–91.

107. Mayeux R, Ottman R, Maestre G, et al. Synergistic effects of traumatic head injury and apolipoprotein-epsilon 4 in patients with Alzheimer's disease. Neurology 1995;45(3 Pt 1):555–7.

108. Plassman BL, Havlik RJ, Steffens DC, et al. Documented head injury in early adulthood and risk of Alzheimer's disease and other dementias. Neurology 2000;55(8):1158–66.

109. Gavett BE, Stern RA, Cantu RC, et al. Mild traumatic brain injury: a risk factor for neurodegeneration. Alzheimers Res Ther 2010;2(3):18.

110. Jellinger KA, Paulus W, Wrocklage C, et al. Traumatic brain injury as a risk factor for Alzheimer disease. Comparison of two retrospective autopsy cohorts with evaluation of ApoE genotype. BMC Neurol 2001;1:3.

111. Corrigan F, Pham CL, Vink R, et al. The neuroprotective domains of the amyloid precursor protein, in traumatic brain injury, are located in the two growth factor domains. Brain Res 2011;1378:137–43.

112. Smith DH, Uryu K, Saatman KE, et al. Protein accumulation in traumatic brain injury. Neuromolecular Med 2003;4(1–2):59–72.

113. Bower JH, Maraganore DM, Peterson BJ, et al. Head trauma preceding PD: a case-control study. Neurology 2003;60(10):1610–5.

114. Uryu K, Giasson BI, Longhi L, et al. Age-dependent synuclein pathology following traumatic brain injury in mice. Exp Neurol 2003;184(1):214–24.

115. Newell KL, Boyer P, Gomez-Tortosa E, et al. Alpha-synuclein immunoreactivity is present in axonal swellings in neuroaxonal dystrophy and acute traumatic brain injury. J Neuropathol Exp Neurol 1999;58(12):1263–8.

116. Gavett BE, Stern RA, McKee AC. Chronic traumatic encephalopathy: a potential late effect of sport-related concussive and subconcussive head trauma. Clin Sports Med 2011;30(1):179–88, xi.

117. Belanger HG, Spiegel E, Vanderploeg RD. Neuropsychological performance following a history of multiple self-reported concussions: a meta-analysis. J Int Neuropsychol Soc 2010;16(2):262–7.

118. Omalu BI, Bailes J, Hammers JL, et al. Chronic traumatic encephalopathy, suicides and parasuicides in professional American athletes: the role of the forensic pathologist. Am J Forensic Med Pathol 2010;31(2):130–2.

119. Guskiewicz KM, Marshall SW, Bailes J, et al. Recurrent concussion and risk of depression in retired professional football players. Med Sci Sports Exerc 2007;39(6):903–9.

120. Braak H, Braak E. Neuropathological staging of Alzheimer-related changes. Acta Neuropathol 1991;82(4):239–59.

121. Bruijn LI, Miller TM, Cleveland DW. Unraveling the mechanisms involved in motor neuron degeneration in ALS. Annu Rev Neurosci 2004;27:723–49.

122. Mulder DW, Kurland LT, Offord KP, et al. Familial adult motor neuron disease: amyotrophic lateral sclerosis. Neurology 1986;36(4):511–7.

123. Schmidt S, Kwee LC, Allen KD, et al. Association of ALS with head injury, cigarette smoking and APOE genotypes. J Neurol Sci 2010;291(1–2): 22–9.

124. Binazzi A, Belli S, Uccelli R, et al. An exploratory case-control study on spinal and bulbar forms of amyotrophic lateral sclerosis in the province of Rome. Amyotroph Lateral Scler 2009;10(5-6):361–9.

125. Armon C. Sports and trauma in amyotrophic lateral sclerosis revisited. J Neurol Sci 2007;262(1–2):45–53.

126. Dickson DW. Neuropathology of non-Alzheimer degenerative disorders. Int J Clin Exp Pathol 2009;3(1):1–23.

127. Geser F, Martinez-Lage M, Kwong LK, et al. Amyotrophic lateral sclerosis, frontotemporal dementia and beyond: the TDP-43 diseases. J Neurol 2009;256(8): 1205–14.

128. Hagel B, Meeuwisse W. Risk compensation: a "side effect" of sport injury prevention? Clin J Sport Med 2004;14:193–6.

129. Dick R, Romani WA, Agel J, et al. Descriptive epidemiology of collegiate men's lacrosse injuries: National Collegiate Athletic Association Injury Surveillance System, 1988-1989 through 2003-2004. J Athl Train 2007;42(2):255–61.

130. Crisco JJ, Fiore R, Beckwith JG, et al. Frequency and location of head impact exposures in individual collegiate football players. J Athl Train 2010;45(6): 549–59.

# EXHIBIT 73



LOOK SHARP    LIVE SMART

Sports

# The Violent Life and Sudden Death of Junior Seau

When the legendary NFL linebacker retired for good in 2010, he seemed set for life: supremely wealthy, beloved across the league, a hero in his hometown of San Diego. Two years later, he was dead. On a lonely morning in a big empty house, Seau shot himself through the chest. It's no longer a secret how much damage pro football can do to the men who play it, but never before had we witnessed it destroy a genuine superstar—not until Junior Seau. in this GQ special report, Seau's friends and former teammates try to make sense of how a life so filled with triumph could go so wrong so fast

BY NATHANIEL PENN

September 2013



The average NFL career lasts 3.5 years. Junior Seau, one of the greatest linebackers in the history of the NFL, played for twenty—and San Diego, where he starred most of those years for the Chargers, was his city as much as New York is Derek Jeter's. Seau invested in San Diego both as a businessman and as the head of a foundation serving at-risk kids. But after retiring as a very wealthy man in 2010—he earned more than $50 million over the course of his long career—he began to behave uncharacteristically.

He withdrew from family and friends. He made terrible business decisions. He abused pills. He drank. He gambled away terrifying sums. It was evident to those who knew him well that he was struggling, but no one foresaw his suicide on the morning of May 2, 2012.

Eight months after his death, the scientists who examined his brain announced they had found evidence of CTE (chronic traumatic encephalopathy), a dire neurological disease linked to concussions, which has been a factor in the deaths of many other NFL players. It's impossible to pinpoint the degree to which CTE drove Seau's rapid decline; the disease has been connected to depression, insomnia, emotional withdrawal, and compulsive behavior—all of which afflicted him. But there's one thing everybody close to Seau agrees on: In his final years, Junior was no longer the Junior they had known and loved.



*Seau was a star linebacker for twenty seasons, primarily with the San Diego Chargers, where he was legendary for his seeming indestructibility.*

● ● ●

## 1. The Man Who Loved to Hit

**Natrone Means** *(San Diego Chargers running back, ex-teammate):* God Almighty, he was fast. He was strong, man. He was hands-down the best football player I ever played with.

**Aaron Taylor** *(Chargers guard, ex-teammate, friend):* Any time you play a sport that requires an ambulance to be on-site, it's inherently a fucking dangerous game, right? "Getting your bell rung" was the euphemism, and I think we all took pride in it. If you didn't light somebody up or get lit up in a collision, there was a sense that we weren't doing our jobs.

**Warren Moon** *(NFL Hall of Fame quarterback, friend):* You have two guys running full speed into each other and butting heads. And that's during *practice.* You don't do anything like that in a game.



*Seau at USC with the Chargers.*

**Jay Michael Auwae** *(friend):* I once asked Junior what the biggest hit was that he could recall. He said, "Buddy, it wasn't in a game. It was in practice. Natrone Means was talking trash; I was talking trash. I said, 'Bring it on!' " Junior said Natrone hit him so hard, and he hit Natrone so hard, that they both were knocked out.

**Means:** I don't recall this. Maybe it was such a big collision that it's gone from my memory. But I can remember countless times I've seen Junior just smash guys out there. Fights would break out all the time. You want to make a name for yourself. And if you have a name, you want to prove why you have the name.

**Taylor:** I personally watched him take multiple injections, because he was in front of me in line for them. The 'Caine sisters: Marcaine, lidocaine. Toradol and steroidals to calm down inflammation. I can't say for certain what it was he took, but I would imagine they're not going to give him anything different than what we would've gotten for similar injuries. It was what you did.

**Means:** I remember him playing in the AFC Championship game [in 1995] with the pinched nerve, man. I mean, sixteen tackles. With a pinched nerve. God Almighty. Never coming out of the game.

**Mark Walczak** *(Chargers tight end, ex-teammate, friend):* I couldn't believe the number of surgeries he had. There were like 15 or 16.

**Means:** It was the "smelling salts and get back in there" generation.

**Taylor:** You cannot show vulnerability in the locker room. It's despised. Who wants to be a bitch?

**Moon:** One thing I read that was peculiar to me—he had never been diagnosed with a concussion. That tells me he

wasn't reporting what was wrong with him. For a guy that played linebacker for twenty years, somewhere in there he would've had a concussion.

● ● ●

## 2. "What Do You Do with Your Day Now?"

*As early as the mid-1990s, when Seau was in his twenties, he was privately complaining of headaches and bouts of dizziness. He also developed insomnia and began to pull away from his wife (they would divorce in 2002) and children. But there were no signs of that man when Seau announced his retirement on August 14, 2006. Instead he struck a more hopeful note: "I'm not retiring," he said. "I am graduating." Just four days later, he changed his mind and signed with the New England Patriots, where for the next four seasons he chased after an elusive Super Bowl ring. In January 2010, a few days before his forty-first birthday, he retired for good. "I'm going to surf," he said.*



*With his ever present ukulele, Seau was a fixture on the streets and beaches of Oceanside, his suburban San Diego hometown. But soon he began drinking heavily to cope with his insomnia, while also taking Ambien, a sleeping medication prescribed to him by the controversial former Chargers team physician David Chao (who has since, in an unrelated case, been found liable for malpractice). A downward spiral was taking shape: Seau's worsening health affected his business acumen—and when he made bad financial decisions, he would try to gamble his way out of them.*



*Seau moments after the Patriots' crushing last-minute loss to the Giants in the Super Bowl in 2008.*

**Taylor:** [In 2003] Junior reached out to me. I had retired, and he was thinking of retirement. We had our history together of partying pretty heavily, but he had also watched my transformation. I've been sober eleven years, but [before that] I crashed and burned. So we went for sushi up in Encinitas and talked about the struggles of transition. I was telling him how my first feeling was relief that I didn't have to put my body through that anymore, but very quickly sadness set in. I didn't know what to do. I didn't have schedules; like, I was a blank slate. I had an infinite number of choices, and it was overwhelming and daunting. He expressed some fears of letting go and what's next: "What's it been like? What do you do with your day now? Is it hard?"

**Means:** If you were to write a script on how to exit the game, Junior's would be an ideal story. The only thing missing was the ring. Coming from the San Diego area, you go up to USC, you come back, and you play for the Chargers. It's almost storybook.

**Taylor:** The amount of adrenaline and endorphins that is released into our bodies when we run out of a tunnel or make a great play—there's nothing that can replace that [after we retire]. But it doesn't mean that we don't try—and that's where we get into trouble.

**Dale Yahnke** (*Seau's financial adviser*): My goal was to make sure that when he retired, he could work as he wanted to, not because he had to. I think we were there. I didn't like seeing him doing things that were destructive. I knew that what he was doing in Vegas was going to end only one way, and I thought it would be humiliating for him. I tried to talk him out of it. He didn't listen. It clearly was accelerating toward the end.

## DID FOOTBALL KILL JUNIOR SEAU?

When a schizophrenic commits suicide, we understand it's his

**Auwae:** We landed in Vegas one time and immediately, within hours, he won 800-something thousand dollars, okay? So he comes back up to the room. I said, "Let's go home, surf, chill, pay some bills." But after dinner a whale-watcher [a casino handler charged with roping in big-money gamblers] comes up to the room. I'm saying, "June, enough already." And he goes, "No, bro. One more time. I'm gonna clip 'em." Not even two hours later, he comes back up and hits the table with a glass and starts cussing. I was like, "Please don't tell me—" He had lost it all. He's lying on his bed looking at the ceiling, and I go, "Buddy, you gotta stop this, man." He goes, "We got this. We'll get 'em tomorrow." The next morning the whale-watchers show up. June got another half-million dollars, and he goes back down and loses the whole thing.

**Taylor:** He felt an inordinate amount of financial pressure for a lot of different reasons. He had had some money taken by John Gillette [a San Diego financial adviser who was convicted of stealing millions from his clients]. He had gotten divorced.

**Moon:** [Seau's The Restaurant, a local institution] wasn't doing as well, because another sports-bar chain had moved in to the same complex, and they were starting to take a lot of his business.

**Walczak:** He tried to open [another] restaurant in Temecula, which failed. I know that he put his personal guarantee on the restaurant and was continuing to pay the lease when the business was no longer there. Without a doubt his decision-making was impaired.

**Auwae:** He lost, what, $1 million trying to do [a chain of] Ruby Tuesdays.

**Taylor:** He shared with me that there were a lot of demands on him: from friends, family, the community. And it was overwhelming—the calls he would get to help pay $5,000 for a prom dress or a party or, or, or...

**Yahnke:** I'll just put it this way—he was very generous. I can't comment on the other side. I have opinions on it, but I can't comment on it.

**Taylor:** He was a guy from the hood who had made it. He was an icon, and I think because of that, he had a hard time saying no.

disease that really killed him. But did CTE kill Junior Seau? In the brief period of his life after he retired from pro football, he battled alcoholism, insomnia, prescription-drug abuse, depression, and a gambling addiction. Individually, each has been linked to CTE, but in combination the cause-and-effect relationships are impossibly tangled.

As Seau's friend Aaron Taylor observes, "It's a murky pot of gumbo." Russell Lonser, the former chief of surgical neurology at the National Institutes of Health, oversaw the investigation into Seau's brain that confirmed the presence of CTE. But unfortunately that's about all the study told us. "We are just in the infancy of studying CTE," Lonser told *GQ*. "We don't know if it's progressive or reversible. We don't know the incidence or prevalence or the treatment modalities. Did Junior Seau commit suicide because of CTE? Absolutely no one can answer that."—N.P.

**Yahnke:** What he needed was for someone to say, "This is destructive behavior, and you need to stop doing it." I tried; didn't work. [The former head of Seau's foundation] tried; didn't work. So I don't know what it would've taken. He has great kids. I would've liked to see him spend more time with them. I think he was conflicted about it. He spent a lot of time at bars and things like that. His foundation helped a lot of kids around San Diego, but why he didn't spend more time with his own kids, who he loved, I don't know. I think deep down, Junior was lonely. He had a lot of what he would call buddies, but I don't think there was anybody that he could truly open up his soul to.

**Taylor:** Guys keep things to themselves. They suck it up. It allows us to be good football players, but it slices our throats on the back end, because we use the same tools in this new arena that allowed us to be successful during our careers. The alcohol was a numbing-out of all the things that troubled him: He had financial demands, he had familial issues, he had marriage issues. I know he had deep, deep guilt about how he was not showing up as a father toward the end.

● ● ●

### 3. From Ali to Urkel

*Throughout his career, Seau was the gentlest of men off the field, but after his retirement he sometimes became aggressive and even violent with those close to him. At approximately 12:20 a.m. on October 18, 2010, he was arrested on suspicion of domestic violence after an incident with a girlfriend. Within hours of posting bail, he was involved in a bizarre accident on a coastal road in Carlsbad, California. The story made national headlines.*

**Walczak:** He was up all night with the police. Finally they got it sorted out, and he was driving south, and he told me he fell asleep and drove off the cliff. At that time, I had no reason not to believe him. I wish I'd gone and looked at the site where it happened, because it wasn't an accident. I've been there lots of times, and it just doesn't work. It would be a ninety-degree turn. You'd have to crank the wheel so hard, and you'd have to time it just so.

**Taylor:** He was a beaten-down man. His confidence was gone. He seemed worn-out. It was hard for him to articulate coherent thoughts. There was a degradation of the dude that I remember playing with. I played with Muhammad Ali, and I had lunch with a guy that showed up with the machismo of Urkel. He looked like a crackhead walking in off the street. He said, "I need help. I don't know what to do. I'm an addict of a lot of things. Tell me what to do, man."

**Walczak:** Ambien is a crazy, hallucinogenic, mind-altering, addictive, terrible drug. I think part of his struggles were with that [drug] altering his ability to make sense or judgments. He didn't take it as prescribed; he'd take three over the course of the night.

**Jamie Paulin** *(Nashville songwriter, friend):* We'd talk about [a job in] sportscasting, where he'd be like, "Oh yeah, I'm going to get on that," and then the next day there would be no thought of it. It was, like, too much to think about.



*Seau, post-retirement, in a harbinger of tragedy to come, Seau drove his car off a beachside cliff but somehow survived the crash.*

**Auwae:** He would forget the phone on the back of the [car's] hood and drive two miles and not know where the phone is. Ukuleles, leaving them in different places. Missing appointments—like [his daughter] Sydney's volleyball game.

**Taylor:** We went to a meeting of a twelve-step program. He introduced himself as an addict and shared where he was at. I knew how much courage it took, because I know how hard it was for me, and I was a nobody as a player. *Everybody* in San Diego knew what happened with his car. I was very encouraged. But pretty quickly after that, he went dark.

**Auwae:** We went to a bar in Carlsbad [in late April 2012]. This fan comes up to him: "Mr. Seau, you mind if—" And he's like, *"Get the fuck out of here, man."* Dude, that's not Junior. This is so not him. I go, "What's wrong with you?" He just said, "I'm tired of it, man."

● ● ●

## 4. A Bullet to the Chest

*In late April 2012, Walczak spent the week of his fiftieth birthday with Seau. The men spent that week hopping around local restaurants and bars, always returning to Seau's house across the street from the Pacific Ocean. Throughout, Seau regularly requested that they play music together—in particular a song that Paulin had written called "Who I Ain't."*



*The extended Seau family carries Junior's coffin at his funeral in Oceanside, California.*

**Walczak:** I've suffered many, many concussions, and at certain times I can't remember anything. He cracked on me: "Buddy, do you got Sometimer's or Alzheimer's?" We had cocktails and relaxed near the ocean. He seemed to be really right. We talked about Dave Duerson [the former Chicago Bears All-Pro safety who had shot himself; later he was discovered to have been suffering from CTE], because it came up on ESPN. I asked him: "How do you feel? Do you have symptoms of anything?" He said, "I feel great."

**Auwae:** Everybody talked about the suicide note; it wasn't a suicide note, it was the lyrics of a song.

**Paulin:** "Who I Ain't" was written ten years ago by me and Justin Lantz. It's about a guy who has made a lot of mistakes but then finds peace and redemption. Junior was here [in Nashville] that April, and he said, "Oh, you gotta send me a copy of that." We told him the chords and wrote down the lyrics for him.

**Walczak:** During the course of that week, we probably sang the song together fifty times, getting it right. When he found a song that he liked, man, he'd play it over and over. It goes, *Cuz I've broke the hearts of angels, cursed my fellow man / Turned from the Bible with a bottle in my hand / My only hope for forgiveness, when the good Lord calls my*

*name / Is that he knows who I am and who I ain't.* Maybe he knew that he was going to end it. Maybe this was his way of being at peace with it and sharing his peace.

**Paulin:** I never thought he felt he was carrying any unfixable mistakes. Apparently he felt he was.

*On Tuesday, May 1, Seau sent a group text to family members: "I LOVE YOU." He spent that evening watching a Lakers game on TV with a girlfriend. The following morning, she discovered his body. Among the mysteries of that day: The SIM card from Seau's cell phone was never found. Auwae has speculated that Seau received a collections call from a Las Vegas casino, which may have contributed to his suicide. In any event, Seau's gambling debts were forgiven following his death.*

**Walczak:** He didn't tell me he owned a gun. I do know this: He had probably never, ever fired a gun in his life before.

**Mark Malamatos** *(investigator for county medical examiner's office; from his report):* At approximately 0915 hours, [Seau's girlfriend] left her gym and attempted to telephone [Seau] four or five times. When he did not answer, she decided to drive by the gym where he worked out. She then went back to the house, and when she entered through the garage, she had a feeling that it was unusually quiet. When she walked up the steps to the living room/kitchen area, she saw [Seau's] dog, and knew it was unusual for him to be in there. She then walked down the hallway to the master bedroom and did not see [Seau] in bed. She noticed that one of the spare bedroom doors was shut, which again she thought was very unusual. As she walked into the spare bedroom, she saw the decedent lying on the bed.



**Auwae:** What's weird about the whole thing is he didn't even kill himself in his room. He went to a spare room. He sat in bed, grabbed the gun, pressed it hard against his chest, and blew a hollow-point round right through himself.

*Seau's mother after her son's suicide.*

**Walczak:** It was completely uncharacteristic of a guy who was the constant competitor, the most generous person in the world, the biggest lover of people. It's just strange that his life would end in a way that symbolized uncaring and selfishness and thoughtlessness. He somehow lost his mind.

• • •

## 5. The Life and Afterlife of Junior Seau

*In April 2013, the Seau family joined more than 4,400 former players in a mass of lawsuits charging that the NFL and the helmet manufacturer Riddell had misrepresented or suppressed data about the risks associated with concussions. Of the players involved in wrongful-death lawsuits, Junior Seau is one of the youngest. "We know this lawsuit will not bring back Junior," the Seau family said in a statement published by the Associated Press. "But it will send a message that the NFL needs to care for its former players, acknowledge its decades of deception on the issue of head injuries and player safety, and make the game safer for future generations."*

**Taylor:** Junior was different. Junior was special. There's legendary stories of him playing with broken forearms and compound fractures. I don't know if I ever saw him for any reason leave a game. Junior fought through so much pain. There would be times that he wouldn't practice because he couldn't walk, but magically he would show up on Sunday.

**Means:** I remember when I left San Diego in 1996 and went to Jacksonville. I was thinking, "I guess every NFL team has a Junior Seau linebacker." I'm out there that first day of practice, I'm looking around, I'm like, "Okay, where's the Junior Seau at?" You see a lot of guys who look the part, but I'm like, "Naw, that's not the one…. No, that's not the guy…." That's when it really hit me: "Oh shit. Okay, now I get it."

**Auwae:** Once he told me about his first gym workout as a rookie. He was nervous about making the team. His dad wanted to buy the house he lives in now, but Junior didn't even have a bank account. At the gym, the most feared guy on the team starts flinging up the weights, and he's struggling. Junior grabbed the same weights and pressed them like nothing. He could feel everybody looking at him, impressed with him. Afterward he went to the phone and called his mom. He goes, "Mom, tell Dad to go buy the house. We're gonna be here for a while."

EXHIBIT 74

# MEN'S JOURNAL

## Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star

By Paul Solotaroff   May 2011

For years ex-Bear Dave Duerson had a hand in turning down scores of disability claims of retired players -- though he likely suffered from brain injuries himself. In February, 2011, he shot himself in the heart. Was it because he couldn't bear to admit his betrayal?

*Editor's Note: On May 2, 2011, doctors at the Center for Study of Traumatic Encephalopathy at the Boston University School of Medicine announced that Dave Duerson was suffering from a "moderately advanced" case of chronic traumatic encephalopathy (CTE) – a disease linked to repeated blows to the head whose symptoms can include memory loss, depression and dementia – when he committed suicide three months earlier. 17 months later, after four years of research, Duerson's CTE was confirmed in the scientific journal 'Brain.' In February 2011, Paul Solotaroff and Rick Telander covered Duerson's once-charmed life and sad end.*

Dave Duerson set the scene with a hangman's care before climbing into bed with the revolver. The former Pro Bowl safety for the Super Bowl–champion 1985 Chicago Bears drew the curtains of his beachfront Florida condo, laid a shrine of framed medals and an American flag to his father, a World War II vet, and pulled the top sheet up over his naked body, a kindness to whoever found him later. On the dining room table were notes and a typed letter that were alternately intimate and official, telling his former wife where his assets were and whom to get in touch with to settle affairs. He detailed his motives for ending his life, citing the rupture of his family and the collapse of his finances, a five-year cliff dive from multimillionaire to a man who couldn't pay his condo fees. Mostly, though, he talked about a raft of ailments that pained and depressed him past all tolerance: starburst headaches and blurred vision, maddening craters in his short-term memory, and his helplessness getting around the towns he knew. Once a man so acute he aced his finals at Notre Dame with little study time, he found himself now having to dash down memos about what he was doing and when. Names, simple words, what he'd eaten for dinner – it was all washing out in one long wave.

No one had to tell him what those symptoms implied or what lay in store if he stuck around. Once a savage hitter on the best defense the game has ever seen, Duerson filled the punch list for chronic traumatic encephalopathy (CTE), the neuron-killing condition so rampant these days among middle-aged veterans of the National Football League. Andre Waters and Terry Long, both dead by their own hands; John Mackey and Ralph Wenzel, hopelessly brain-broke in their 50s. It was a bad way to die and a worse way to live, warehoused for decades in a fog, unable, finally, to know your own kids when they came to see you at the home.

Among the personal effects Duerson arranged that night in February was the master clue to the act he'd soon commit, Exhibit A in a life turned sideways: his 1987 NFL Man of the Year trophy. It was a testimonial to a former colossus, a player whose brilliance on the football field was a taste of much grander things to come. Future meat-processing magnate and potential congressman, or successor to

10/1/2014

Case 2:12-md-02323-AB   Document 6201-14   Filed 10/06/14   Page 29 of 43
Men's Journal Magazine - Men's Style, Travel, Fitness and Gear

Gene Upshaw as director of the NFL Players Association – that Dave Duerson was all forward motion, the rarest amalgam of outsize smarts and inborn ambition. This version, though – the one slumped in bed with the .38 Special to his chest – this one had run into walls, head lowered, and he, not the walls, had buckled first.

Still, when someone turns a gun on himself, there are bound to be messy questions. Why, given the spate of concussions in the NFL season just past, would Duerson elect to keep silent about his suspected ailment at precisely the moment he should have spoken? Why would a man who knew as much about brain woes as anyone who's ever played the game, having served for six years and read thousands of case files as a trustee on the NFL's pension board, not have sought treatment and financial compensation from the very committee he sat on? And why, bizarrely, did he deny those very benefits to the men who needed them most, brain-dimmed veterans living in pain and squalor and seeking relief from the league?

Perhaps to stanch these questions, Duerson dispatched a blitz of texts in the last couple of hours of his life, some of them making an emphatic plea: Get my brain to the NFL's brain bank in Boston. The meaning of the texts seems plain enough: I'm sick and my mind's failing from all the helmet-to-helmet collisions in 11 brutal seasons in the NFL. Please see to it that my cortex is studied by doctors seeking treatments for brain trauma – and inquire no further about my reasons. It was a grandiose gesture, killing himself at 50 so that current and future players might be spared this horror, and was italicized by a second theatrical stroke: He shot himself through the heart, not the head, to preserve his brain for science.

But the dramatics of the act didn't sanctify him or absolve him of blame for the part he'd played in the suffering of other ex-players. If anything, Duerson's death has become a referendum on his, and his sport's, brutality, a prism through which to finally take a look at the cost of all those hits.
If you're the kind of fan who keeps a mental lineup of ex-players headed for bad endings, Dave Duerson was the last name to make your list. Virtually from birth he'd been a special case, a gold-star guy who didn't bull through problems so much as soar above them. The youngest of four children born to Julia and Arthur Duerson Jr. in working-class Muncie, Indiana, he was as exceptional off the field as he was on it. A big, powerful kid with a nose for the ball and the long-stride speed to get there first, he dominated boys two and three years older in football from the time he hit sixth grade. (He excelled at baseball and basketball, as well.) Even then, though, his dreams were broader than jock stardom. Among friends he talked brashly about owning his own factories and running for the Senate someday. Duerson made the National Honor Society in high school, learned the trumpet and tuba by the age of 15, and toured overseas in an ambassador's band while earning 10 varsity letters.

With his pick of football factories like Texas and USC, Duerson chose South Bend for its glorious campus and network of corporate contacts. "From when I met him in seventh grade, he was positioning himself for a career after football," says Dave Adams, Duerson's teammate at Northside High and his roommate at Notre Dame. He interned at a law firm, then for Indiana Senator Richard Lugar.

"Sports were the springboard," says his ex-wife Alicia, who met him at a bowl game his freshman year. "He made so many plans for such a young age and had the brains to pull it all off. He had a photographic memory, which used to make me mad, because he'd barely study and get A's, where I'd be up a week of nights and be happy to get a B." A four-year starter at Notre Dame and a team captain, Duerson was as proud of his degree in economics as of making All-American, which he did twice.

Duerson was nothing if not complicated. He had, besides ambition and swagger to burn, a deep well of kindness and soul. You could see it in the way he honored Muncie, returning each summer to run a camp for poor kids in memory of a high school friend who'd drowned, and you could hear it later from the teens he sent to college after making it big with the Bears. "Everything he did was a teaching tool," says Michael Gorin, a family friend and retired teacher from Muncie whose son Brandon attended Duerson's

10/1/2014
Case 2:12-md-02323-AB   Document 6201-14   Filed 10/06/14   Page 30 of 43
Men's Journal Magazine - Men's Style, Travel, Fitness and Gear

camp and went on to play nine years in the NFL. "He had the Super Bowl rings but kept harping on academics. My son says they talk about him at Harvard."

Harvard would come later, after Duerson got done playing and commuted to Cambridge for an executive program at the business school. Long before that, though, he got a brawler's education when he showed up at Bears training camp as a third-round pick. He should have gone higher in the '83 draft, but his talk about law school and political aspirations probably set him back a round or two. Buddy Ryan, the great, brutish coordinator of Chicago's 46 defense, loathed rookies, especially rookies with more on their mind than earholing Packers. "He knew I'd gone to Notre Dame and asked if I was one of those doctors or lawyers," Duerson said in an interview he gave last year for a book about Americans turning 50. "I said, 'Yes, sir.' He said, 'Well, you won't be here long, because I don't like smart niggers'" – a comment Ryan has denied making.

Dan Hampton, a Hall of Fame lineman on that absurdly dominant Bears defense, offers a different take. "Buddy didn't care if you were black, white, or green: He wanted smashmouth, and Duerson wouldn't nail guys. In practice, Buddy'd yell, 'That shit ain't cuttin' it! You dive on the ground again, I'm firing you!'"

Duerson submitted to doing it Ryan's way and became a ferocious hitter. He mostly covered kicks his first two seasons and backed up Pro Bowl safety Todd Bell. Then, in '85, Bell held out for more money, and Ryan had no choice but to start Duerson. "I played through that whole season with [Buddy] telling me that he was rooting for me to screw up," Duerson said in a 2005 interview. "So I became an All-Pro myself." On that banzai unit, which jammed the line with 10 men, Duerson came screaming off the edge on blitzes. In 1986, his second season as a starter, he had seven sacks, a record for defensive backs that stood till 2005. He made the Pro Bowl four years running, a breakout star on a squad of loud assassins. Tellingly, it was Duerson who, with linebacker Otis Wilson, developed the unit's calling card. After an especially vicious shot, they'd stand over their victim, barking and baying like junkyard dogs.

Of course, football has a way of evening things up between predators and prey. In his 11-year run with the Bears, Giants (where he won another Super Bowl, in 1990), and Cardinals, Duerson suffered multiple minor concussions, though he was never knocked out cold. Emerging after games in a pair of dark glasses and wincing against the dusk, he'd complain of nausea and ringing headaches, says his ex-wife Alicia. "Dave would get concussed on the first or second series and play the whole way through, or get a dinger in the second half and be back at practice Wednesday morning," she says. "Dave had one speed, and that was full-out."

In the years to come, he'd have cause to rethink that, at least when it came to his kids. His middle son, Tregg, now a bank analyst in Chicago, was a highly regarded prep-school running back who'd go on to play defensive back at Notre Dame. One game in high school, Tregg was dazed from a tackle and wobbled off the field. Watching from the stands, Duerson ran down to the sideline and snatched Tregg's helmet so he couldn't return; at halftime he whisked him off to the hospital to be checked out. Tregg had a concussion. "Just to be on the safe side," says Alicia, "Dave wouldn't let him play for three games." As his playing days dwindled, Duerson weighed his options, beginning with politics. "Both the Republican and Democratic parties in Chicago tabbed him to run for office," says Harold Rice, one of Duerson's oldest friends and the man who accompanied Alicia and Tregg to Florida after Duerson's death. "Dave wanted to be a difference maker, but realized pretty quick that it wasn't worth the scrutiny."

Rice, who owned a McDonald's, urged him to enter his business instead. Duerson opened a franchise in Louisville, Kentucky, his first year out of football, then got an attractive offer from a McDonald's supplier: There was an ownership opportunity in a meat-processing plant an hour outside Chicago. Duerson bought a controlling stake and, with his contacts and charm, promptly doubled the plant's

10/1/2014

Case 2:12-md-02323-AB   Document 6201-14   Filed 10/06/14   Page 31 of 43
Men's Journal Magazine - Men's Style, Travel, Fitness and Gear

revenue to more than $60 million a year. He bought himself a huge house in Highland Park, just up the road from Michael Jordan's place, engraved his jersey number, NFL 22, on the driveway pillars, and spent a bundle on exotic cars, including a midnight-blue Mercedes SL 600 with the vanity plate DD22. By then he'd had four kids with Alicia, had local sports talk shows on both radio and television, and was jetting off to Cambridge, Massachusetts, for months at a time for the executive program there. "Dave loved it at Harvard, getting to network with CEOs and bounce ideas off presidents of foreign companies," says Alicia. "When he took us to Europe, it was first class all the way: stretch limos, four-star dining, and – his big dream – flying in the Concorde."

But friction eventually sparked between Duerson and his partner at the plant, who resented his comings and goings. In 2002, Duerson sold his interest to open his own processing plant nearby. It was the first big mistake in a life of shrewd decisions, and caught Duerson flat-footed, stunned by failure.

From the beginning, Duerson Foods had disaster written all over it. He shelled out millions to gut and double the factory's floor space, then borrowed heavily to buy state-of-the-art freezers from a company in the Netherlands. They were impressive to look at but so unsound that he had to postpone opening by six months. He fell behind on his schedule to supply Burger King and Olive Garden, and soon he was leveraged to the hilt. At his swank offices in Lincolnshire, Illinois, employees, some of them relatives, saw a change. His niece, Yvette Fuse, would call Rice in a panic to say that "Dave was berating people, acting mean." Duerson borrowed more, using his house as collateral, and sued the freezer maker. He won a $34 million judgment, but the company filed for bankruptcy and never paid him a dime. By 2006, creditors were raining down lawsuits, and Duerson, broke and heartsick, shut the plant. He'd lost his mother to a heart attack and his house to the finance company, and his father was ailing with Alzheimer's (he died in 2009). "The pressure on him was phenomenal," said Rice. "It would've taken Superman not to break."

As it turned out, Duerson had broken, if briefly. In February 2005, he and Alicia drove to South Bend for a meeting of Notre Dame's board of trustees, of which he was a member. During a small-hours argument at their hotel, he threw her out the door of their room into the hallway wall. Alicia suffered cuts to her head and went to the ER with dizziness and pain. Duerson was charged with several misdemeanor counts and later pleaded guilty to domestic battery. In an interview, he called that night "a three-second snap," but it was played up big in the Chicago papers and forced his resignation from Notre Dame's board of trustees. Alicia, looking back now through the prism of his death, sees a clear demarcation in his conduct. The old Dave, she says, "would never do that; he never showed violence toward me. It was the changes," she says of his new hair-trigger temper, sudden downshifts in mood, and lack of impulse control – all signs of brain trauma.

His missteps, meanwhile, were beginning to throw shade on his fine reputation in the game – a reputation he'd carefully nursed since the day he entered the league. As a rookie in Chicago, Duerson had been chosen by his teammates to be the Bears' union representative. He was the son of a strong labor man at General Motors and "wanted to make things better for the guys," says Alicia.

For more than 60 years, the owners had run roughshod over the players, shackling stars to teams and imposing whatever terms they liked in collective negotiations. Duerson deftly held the Bears together through the bitter 1987 strike and beyond, and became a key adviser to, and close friend of, Gene Upshaw, the union's chief executive. "The two of them traveled together, even during the season, to talk to players about their rights," says Alicia. "Dave believed in the cause with all his heart and set himself to learning about labor laws so he could explain it clearly to the guys."

In 1992 and 1993, the players finally turned the tables in a pair of historic trials in federal court. Duerson was a featured plaintiff in one, and his tour de force performance on the witness stand helped fray the owners' resolve to keep on fighting. "He was so knowledgeable on the facts and spoke them so

10/1/2014
Case 2:12-md-02323-AB    Document 6201-14    Filed 10/06/14    Page 32 of 43
Men's Journal Magazine - Men's Style, Travel, Fitness and Gear

beautifully that you could really feel the tide start to turn," says ESPN.com legal analyst Lester Munson, who covered the trial for Sports Illustrated.

The owners grudgingly cut a deal, awarding free agency and a broad slate of rights to players. Among the key gains was the creation of a board to hear the disability claims not only of active players but of retirees whose injuries prevented them from holding a job. The board was composed of six trustees (three each of management and union members, the latter being appointed by Upshaw), and the disability money, many hundreds of millions of dollars, was funded almost entirely by owners.

Right from its inception, though, an odd thing happened: In case after case before the board, former players were denied assistance or put through a maze of second opinions and paperwork. Men with bent spines and diced joints were told they could still hold a paying job and so were ineligible for aid. Then there were the veterans coming forward in their 40s and 50s with the brain scans of aging boxers who also had their claims voted down by the board. "They made it real clear that they'd fight me to the death, like they did with Mike Webster," says Brent Boyd, a Vikings guard in the '80s who suffers from clinical depression related to brain trauma. (Webster, the Hall of Fame center of the Steelers, was profoundly impaired by CTE and lived out of his truck at times before he died at 50.) "They were supposed to push for us, but were in the owners' pockets. You had to live in a wheelchair to collect."

In 2006, a particularly fraught time in the struggles between veterans and the players union, Upshaw decided to name his old friend Duerson to the pension board. This seemed a peculiar choice at best: Duerson had been out of the sport for a decade, was tarnished by the recent incident in South Bend, and ran a company that was coming apart. Any doubts about Duerson – and Upshaw's critics had plenty – were quickly ratified by his demeanor. The man who'd been so eloquent in federal court under the grilling of NFL lawyers was barging around town like a pit bull on crank, attacking former players at every turn. At a congressional hearing in 2007 to investigate the ex-players' charges, Duerson started a shoving match with Sam Huff and Bernie Parrish, two former greats speaking out for injured vets. He maligned Brent Boyd to a Senate committee, questioning whether his documented brain woes were actually caused by football. He took to talk radio to disparage Mike Ditka, saying his old coach, who'd raised money for vets, had never cared about his players' health. The worst of it, though, was his sliming of Brian DeMarco, a crippled veteran with several crushed vertebrae who'd gone public about his rejection by the union. Duerson tore into him on a call-in radio show, deriding him as a liar and an insurance fraud, then appeared on a Chicago TV program to ambush DeMarco in person.

His mad-dog behavior was very much in line with the way he voted on claims. Says Cy Smith, the lawyer who won a landmark lawsuit on behalf of Mike Webster's estate: "I get dozens of these files coming across my desk – stark, sad cases of guys really banged up – and the vast majority of these judgments are 6–0 against the players. That's a gross breach of practice by the board and a clear pattern of bias against paying." That Duerson was siding with management – and, apparently, Upshaw – is no surprise to his critics. Says Huff, the New York Giants Hall of Fame linebacker: "Dave wanted Gene's job when he finally stepped down, and was saying and doing whatever Gene wanted, or whatever he thought he wanted." Indeed, Duerson told people he'd been handpicked by Upshaw to succeed him as union chief, a position that paid nearly $7 million a year and was essentially a lifetime appointment. When Upshaw died in 2008, Duerson didn't get the post (attorney DeMaurice Smith did), though he retained his seat on the board.

Whatever Duerson's motives for voting against veterans, they ran counter to a life spent helping others. At Duerson Foods, he'd paid the healthcare premiums for his factory-floor workers and footed the college tuition for kids from inner-city Chicago. That doesn't assuage the retired players he turned down, whose rancor isn't softened by his death. "He caused more suffering personally than all the other board members combined," says Boyd. Adds John Hogan, a lawyer who assists former players with their disability

claims: "He really could've changed the story for vets, and done it from the inside without saying mea culpa. He didn't have to indict the system. All he had to do was say, publicly, 'I'm sick, and I need help like these other guys.' "

The last years of his life, duerson knew he was in decline. He'd gotten divorced from Alicia in 2009 and fled to Florida in glum retreat, dropping out of sight for months on end. (He'd bought the condo, in the twin-tower Ocean One, in Sunny Isles Beach, as a winter house in 2000, but hadn't much used it until he moved in.) On his trips to Chicago to see his kids, he'd complain to Alicia about persistent headaches and frightening spells of blurred vision. "He thought at first he was getting old, but seemed more concerned as time went on," she says. His memory was shot, he wasn't sleeping much, and he had to ask her directions to get around Chicago – a town he'd known cold for 25 years. "He could hide the changes from friends and such, but he couldn't hide them from me. He'd say, 'Remember the time we did such and such?' as if to prove he wasn't fading, but he was."

He was a step above flat broke and trying to hide that, too. He hocked his wedding ring and Rolex watch, unloaded a newer Mercedes and his beloved Harley, and borrowed heavily against the equity in his apartment, though he'd put the place in trust for his four children. Even so, he couldn't make his child-support payments or keep up with his condo fees, and the stress and shame compounded his symptoms and began, it seemed, to derange him.

Says Ron Ben-David, who took over as building manager at the Ocean One towers in 2008: "I called Dave down and asked him politely why he hadn't paid his dues in almost a year. He told me someone had broken into his closet and stolen three paintings he'd bought in Cuba, and unless we reimbursed him the $7,000, he wasn't going to pay the arrears." But Duerson hadn't phoned the cops about his loss or filed an insurance claim, and ultimately paid his back-maintenance fees via wire transfer. A year later, his checks stopped coming again, and again Ben-David called him down. "He said, 'Well, someone stole my paintings. Aren't you going to reimburse me?' And this time they were worth $30,000."

"He was definitely getting worse. I could hear it over the phone," says Alicia. "He was trying to reinvent who he was at 50, and that's hard even when you're thinking straight." Duerson talked a lot about having "irons in the fire" – some deals in the works with Costco and the USDA – but nothing ever seemed to pan out. When he filed for bankruptcy in Florida last year, he showed annual expenditures of $74,000, an income of less than $34,000, and a consulting business whose only assets were the furniture and equipment in his study. His one frail hope, a Hail Mary, was to get hired as a coach in the NFL. Last fall he phoned Steve Zucker, his former agent, and asked him to make some calls on his behalf. At the time, he had several ex-teammates running teams – Jeff Fisher, then with the Titans, Mike Singletary, then with the 49ers, and Leslie Frazier, who'd taken over in Minnesota – all three also proud alumni of that great Bears defense of the '80s. "His plan was to get a position-coach thing or a job in someone's front office," says Zucker, once a Chicago superagent who is now in his 70s and mostly retired. "I talked to him all the time and had no idea. He sounded so positive on the phone."

With the exception of Alicia and a couple of his old cronies, Duerson told no one how grim things had gotten or how badly his symptoms had unhinged him. He holed up in Florida, where he avoided his neighbors. Beyond the occasional visit from one of his kids, the only break in the deepening gloom was a last-chance love affair. He'd met Antoinette Sykes in May 2010 at a business conference in Las Vegas, where he gave a talk to aspiring entrepreneurs about growing and selling a million-dollar company. By summer, he and Sykes, who owns her own PR and marketing firm in Washington, D.C., were speaking or texting 10 times a day and flying to each other's homes for weeklong stays. In the fall, he proudly showed her off to building manager Ben-David, calling her his "angel" and fiancée. They were scheduled to be married in April 2011, when his daughter, who would be on spring recess, could attend.

"What we shared was so sacred and joyful," Sykes said over the phone from D.C. "I knew he had headaches and – and a lump on his skull that he was worried about, but what I'm reading in the papers now about his brain, it's thrown me for such a loop. Maybe he wanted to shield me, but he seemed so excited about spending the rest of our lives together. On our last night, Valentine's, he joked that I owed him 29 more because we'd committed to 30 years of wedded bliss. And then I flew home to pack my things to move down there…" She breaks off, convulsing.

On February 17, Sykes woke up in Washington to a text from Duerson. It began, "My dear Angel, I love you so much and I'm sorry for my past, but I think this knot on my head is the real deal." Sykes called him, heard nothing back, and became frantic as the morning passed. Sometime after two that afternoon, she called Ben-David and asked him to knock on Duerson's door. When no one answered, she faxed him her permission to use a spare key. "I got the door open, but there was a chair wedged against it. That's when I called 911," he says. Paramedics and cops arrived and pushed their way in. "I heard them in the bedroom, yelling 'Sir! Sir! Is everything all right?' Then they asked me to leave," says Ben-David. Duerson was found shortly after 3 pm. He had shot himself about 12 hours earlier. Apart from the large patch of blood beneath him, the place was immaculate, said Miami-Dade police officers. Veteran detectives, they said they'd never seen a suicide planned and executed so meticulously.

In the months after his death, Duerson has become a wedge for practically anyone with a connection to the sport. The media has mostly lined up with 'Time' magazine, which called him "football's first martyr." Ex-players have sourly mocked his sanctification, denying him any credit for calling attention to CTE in death when he could have worked for justice while alive. Even his Bears teammates are badly split: Some are saddened and shocked by his death, while others deem him selfish and arrogant – "political to the end," groused a former lineman. The dissonance was put best by his son Tregg, now 25. "I just wish he'd played baseball," he told the New York Times five days after Duerson died. But, he added, sobbing, that his father "was looking for an answer and was hoping to be part of an answer."

At some point, it's hoped, Duerson's motives will matter less than the long-haul impact of his passing. A tremor has gone through the league, deep and wide; players are talking openly about football and brain cells and fretting over their own neural health. "Is it something that I think about? Yeah, absolutely," Baltimore Ravens center Matt Birk told the Times. He's one of more than a hundred current and former players who've signed over their brains for postmortem study at Boston University. You'd expect forward thinking from a Harvard grad like Birk, rated the sixth-smartest man in sports by Sporting News last year. But the message is getting across to less cerebral types, too. Jim McMahon, the ex-passer and party monster who loved to celebrate touchdowns with ringing head butts, is battling serious memory problems and has also agreed to send his brain to Boston. "What the fuck do I need it for when I'm dead?" he says. That gesture, if not the sentiment, will be part of the answer to the questions Duerson lived and died to raise.

EXHIBIT 75

Case 2:12-md-02323-AB   Document 6201-14   Filed 10/06/14   Page 36 of 43

Blogs » Dave Zirin » Are Head Injuries the Bridge Between the NFL Playing Field and Domestic Violence?



# Dave Zirin

Follow @EdgeofSports   38.5K followers          RSS Feed

Where sports and politics collide.

# Are Head Injuries the Bridge Between the NFL Playing Field and Domestic Violence?

*Dave Zirin* on September 21, 2014 - 7:13 PM ET

Share   Tweet   g+1



*NFL Commissioner Roger Goodell (AP Photo/Seth Wenig)*

There is an unspoken question lurking behind the NFL domestic violence cover-up saga that has emerged over the last month. It is whether the brutality of the game, particularly head injuries, plays a role in the prevalence of players committing acts of violence against women. The NFL has a vested interest in not having this discussion. On head injuries, as the title of the award-winning book said so clearly, it remains "a league of denial." If, in the name of public relations, the owners won't have a discussion about the connection between their sport and horrific post-concussive syndromes like ALS and early-onset dementia, are they really going to talk about links between head injuries and domestic violence? The sports media are largely in denial about this topic as well, as there was not one question in Roger Goodell's instantly infamous Friday press conference about whether the league would investigate whether brain injuries could be the bridge between the violence at work and the violence at home.

Yet many domestic violence advocates are also—understandably—not thrilled with this line of discussion. Partner abuse occurs in all walks of life, all professions and among all income groups, and post-concussive syndromes are almost always not a part of those stories. Additionally, to blame it on concussions seems to be excusing domestic violence and denying the fact that NFL players have agency and choice before becoming abusers. This resistance is very understandable. But attempting to explore and explain the shockingly high rates of domestic violence in the NFL is not the same as excusing it.

So is there a connection? As my friend Ruth, who is a DV counselor, says, "When it comes to

domestic violence, it is extremely difficult to generalize across the board, in the NFL or otherwise." In other words, every case is distinct, reflecting the interpersonal relationships of the parties involved. But there are factors that appear to show themselves in the football cases with alarming regularity. Some of these factors are high rates of stress, a culture of entitlement for sports stars that predates their life in the NFL, and an inability to turn off the violence of the game once the pads are off. This is when we see the most toxic part of the sport's hyper-masculinist culture poison the relationships between the men who play the game —as well as the men who own teams—and the women in their lives. But among many players, this question of the role of head injuries still lingers in the background.

Dan Diamond over at *Forbes* is one of the few journalists I have seen explore these links in detail. In one piece, he cites a "disturbing new report" that shows "3 in 10 NFL players suffer from at least moderate brain disease." Diamond then details many examples of former players who were found in their autopsies to have the repetitive post-concussive syndromes known as CTE, and were also arrested at some point or another for domestic violence. He writes:

> The key issue is whether suffering *repeated head trauma* lowers a person's self-
> control. And while many pro football players haven't been diagnosed with concussions
> in the NFL, nearly all of them have been playing football since they were young and
> suffered repetitive, frequent blows that can add up over time. And researchers know
> that those concussions can change a person. Even a pillar of the community.

This connects anecdotally with much of my own research. Over the last two months, I have spoken with three different women whose husbands are or were NFL players. All three are domestic violence survivors. In one case, the marriage was mended and endures to this day. In one case, it ended in divorce. In one case it ended with the suicide of the player in question. Yet that is where the differences ended. The similarities were stunning. In all three cases, the violence was precipitated either by migraine headaches or self-medicating—drugs or alcohol —to manage migraines. In all three cases, the survivors spoke about their NFL husbands becoming disoriented or light-sensitive, easily frustrated and quick to anger in ways that did not exist earlier in the relationship. In all three cases, they spoke about bizarre looks on their husbands' faces when they committed the abuse, from a chillingly peaceful calm to quizzical smiles. Whatever the look, they spoke of being in the presence of someone they "did not recognize."

**Please support our journalism. Get a digital subscription for just $9.50!**

I also spoke with Matt Chaney, a former college football player and author of the book *Spiral of Denial: Muscle Doping in American Football* , about whether he believed there was a causal link between concussions and domestic violence. He e-mailed me back the following. "I can't speak as medical authority on any link but as a journalist and academic who's read and filed tens of thousand documents on football hazards from violence to drugs, and one who's interviewed a thousand people, along with being a former college player who has knowledge of countless athletes and their relationships, I believe football brain injuries lead many players to violence they wouldn't otherwise have committed, ranging from domestic cases to random acts.… I think brain injuries, after studying the topic as we all have in recent years, now explains much about the perplexing cases of violence and other irrational behavior among football players I've known. And while I thought I abhorred street fighting, before college football, I found myself nearly involved with or nearly instigating such trouble on more than one occasion while I was in full-contact activity, fall and spring practices, banging my head. If I didn't have headache after a college contact session, I didn't think I'd done anything."

This question, of course, has profound implications well beyond the sport. It is about the choice families make whether to let their children play tackle football. It is about the health and safety of women in relationships with NFL players, and whether recognizing warning signs of CTE can create opportunities for intervention before abuse takes place. It is about the degree

Case 2:12-md-02323-AB Document 6201-14 Filed 10/06/14 Page 38 of 43

to which the league's very violence bears some complicity in their abuse. This is a difficult
question, one Roger Goodell is loathe to discuss. That is exactly why we need to keep asking
it.

EXHIBIT 76

Sign In

# THE LEGAL EXAMINER

10 06 2014 **Headline:** HBO Real Sports to Examine Link Between NFL Concussions and Domestic Violence 2 weeks ago

[ Search ]

## Kansas City, Missouri

Home › Missouri › Kansas City




Brett Emison

Attorney • (866) 735-1102 Ext 461

### Will NFL & NFLPA Admit Concussion Link to Domestic Violence?

**Posted by Brett Emison**
September 16, 2014 8:32 AM

5 comments

Tweet    Recommend ⟨ 84    g+1    Share



By now, most of America has seen (or at least heard about) the horrific video show NFL running back Ray Rice knocking out his fiancee in an elevator and then dragging her out into a casino hotel. You've also heard about problems with NFL running back Adrian Peterson or defensive end Greg Hardy or defensive end Ray McDonald. Most of America has also heard about the issue of concussions plaguing current and former NFL players. Most - if not all - of the media have been treating these issues as separate "crises" for the NFL and NFLPA. But science and medicine suggest we should be looking at these issues as symptoms of the same problem.

Medical science has told us for years that brain injury is linked to violent acts. In 2013, the Toronto Sun reported that athletes who experienced repeated head injuries have an increased risk of becoming angry and violent. 73% of the young men studied were described as "explosive"; 64% were described as "out of control"; and 68% were described as physically violent.

An 8-year study published by the University of Michigan School of Public Health in the journal _Pediatrics_ "does support some of the sports research that's been going on with concussions." Researchers noted that long-term effects of head trauma can include changes in cognition, language, emotion, irritability, impulsiveness, and violence.

> "Head injuries range along a continuum from athletic concussions to traumatic brain injury suffered in war or a result of an accident. This study looks at head injuries from a broad perspective and confirms previous findings about the connection between violence and head injuries."
>
> - Lead author, Sarah Stoddard, Ph.D, via PsychCentral

SUBSCRIBE TO THE LEGAL EXAMINER

Keep up with the latest updates using your favorite RSS reader

   


click here for
**LIVE CHAT**
ONLINE NOW

The Legal Examiner Kansas City is brought to you by Langdon & Emison

### Langdon & Emison
**(800) 397-4910**
www.langdonemison.com

911 Main St
P.O. Box 220
Lexington, Missouri 64067
[Show Map]

1828 Swift Ave
Suite 333
North Kansas City, Missouri 64116
[Show Map]

55 W. Monroe
Suite 3700
Chicago, Illinois 60606
[Show Map]

110 East Lockwood
St. Louis, Missouri 63119
[Show Map]


LANGDON
& EMISON
ATTORNEYS AT LAW

  

View firm profile

LIVE CHAT

The study found that violent effects could be seen quickly following a head injury.

> Researchers studied the timing between a head injury and violent behavior and
> found that an injury reported in year seven of the study predicted violent behavior
> in year eight.
>
> "We found that the link between a head injury and later violence was stronger
> when a head injury was more recent, even after controlling for other factors
> including previous violent behavior," Stoddard said.
>
> - Rick Nauert, Ph. D. at PsychCentral

According to the group, synapse, people suffering head trauma may develop behaviors leading to
domestic violence.

We all tend to let our hair down with family, as opposed to strangers or acquaintances. Of course,
after a brain injury a person's interpretation of letting hair down may be well beyond what most
would consider acceptable, particularly if their self-awareness has been affected. They may justify
their violence by saying that others provoked them, not realizing that the brain injury has
increased their sensitivity to stress and decreased their ability to handle it.

> The frontal lobe is often damaged in brain injury. This area of the brain is involved
> in reasoning, problem solving and controlling our more basic instincts such as
> anger. An individual who has sustained a brain injury has often lost these skills and
> therefore may have trouble controlling anger and violent outbursts. In many cases
> brain injured individuals often lose some of the social judgment capabilities and
> are not effectively able to reason out the appropriateness of either their own
> behavior or the behavior they expect from others.
>
> - synapse, Domestic Violence and Brain Injury

 A 2005 study noted that aggressive behavior after a concussion or other
traumatic brain injury includes explosive behavior that can be set off by
minimal provocation and occur without warning. A number of studies
have found frontal and prefrontal injuries or other abnormalities in
people prone to impulsive aggression and violence. The frontal lobe and
prefrontal network generally control impulse and behavioral reactions to
provocation. Uninjured people are able to control negative feelings
voluntarily and can process restraint-producing cues from their
environment, including facial and vocal signs of anger or fear. However, when frontal and
prefrontal areas of the brain are injured, victims are less able to control their emotions and
impulses. They are also more prone anger, aggression, and violence.

> For More Information About
> NFLPA Concussion Lawsuits
> Click Here

Why have we not seen any discussion of the link between concussions and other head trauma and
domestic violence in the NFL? Just last Friday, the NFL dumped piles of data showing the severe
risk its players at at for traumatic brain injury. According to the NFL data, nearly 30% of players
will suffer brain injury significant enough to result in moderate-to-severe dementia. Twice the
rate of the regular population at age 71.

**Personal Injury Lawyers Serving:**
Langdon & Emison tries cases across the
country from offices in St. Louis and
near Kansas City. Greater Kansas City
areas include Kansas City,
Independence, Lee's Summit, Blue
Springs, Raytown, Gladstone, Liberty,
Grandview, Belton, Sedalia,
Warrensburg, Marshall, Raymore,
Excelsior Springs.

**Archives**

Select Month ▼

**Categories**

Automobile Accidents

Defective & Dangerous Products

FDA & Prescription Drugs

Head & Brain Injuries

Mass Transit (Airline, Cruise Ship, Train, Bus)

Medical Devices & Implants

Medical Malpractice

Miscellaneous

Nursing Home & Elder Abuse

Property Owner's Liability (Slip & Fall)

Spinal Cord Injuries

Toxic Substances

Tractor-Trailer Accidents

Uncategorized

Workplace Discrimination

Workplace Injuries

Wrongful Death



Greg Hardy – found guilty of domestic violence in July 2014 – suffered a concussion during the 2010 NFL season. The other players in the news have not had a concussion documented on an injury report, but each of them is likely to have suffered numerous head traumas in their grinding NFL careers. Ray Rice even bragged that new NFL rules prohibiting running backs from using the crown of their helmet to contact defenders outside the tackle box would not change his running style.

> "I don't like it," Rice told the Ravens' official web site. "I'm just telling you right now, there's not going to be a guy that's going to be able to get a free lick on me and think it's all right. I will defend my case, and I will defend myself as a runner."
>
> ***
>
> Rice and others contend that it's impossible for a back to protect himself without dipping his head and making contact.
>
> "If I'm in the open field and you're coming at me and I'm coming at you, and I lower my shoulder and I get flagged, I'll appeal it," Rice said. You're going to protect yourself as a runner. Not one running back, you ask anyone in the league, not one is going to change their game."
>
> - Kareem Copeland, NFL.com

It just makes sense that when the NFL generates a higher-than-normal level of brain injury, it generates a higher-than-normal level of domestic violence.



Since 2000, there have been 83 domestic violence arrests of NFL players, making this by far the

10/6/2014          Will NFL's Brain Injury and Domestic Violence Problems Converge? | Kansas City Brain Injury and Personal Injury Lawyer

Case 2:12-md-02323-AB Document 6201-14 Filed 10/06/14 Page 43 of 43

NFL's worst category with a relative arrest rate of 55.4%. As Benjamin Morris at FiveThirtyEight, points out, this is "extremely high relative to expectations."

> That 55.4 percent is more than four times worse than the league's arrest rate for all offenses (13 percent), and domestic violence accounts for 48 percent of arrests for violent crimes among NFL players, compared to our estimated 21 percent nationally.
>
> Moreover, relative to the income level (top 1 percent) and poverty rate (0 percent) of NFL players, the domestic violence arrest rate is downright extraordinary.
>
> – Benjamin Morris at FiveThirtyEight

No one is defending the actions of these players off the field. I'm certainly not doing that here. A brain injury can never be an excuse for domestic violence. But why hasn't the league and why hasn't the Players Association made the link between the level of brain injury and the level of domestic violence when the science is so strong and so straightforward.

The NFL and the NFLPA have a concussion and brain injury problem. The league and the Players Association have a domestic violence problem. But the science suggests they are not separate problems at all.

When the NFL has already acknowledged significant brain injury resulting in dementia in almost 30% of its players, why isn't the league and – more importantly – why isn't the NFLPA doing something more to protect these players and their families?

**Read More:**

- Domestic Violence and Brain Injury [synopsis]
- Breaking the Silence: Violence as a Cause and a Consequence of Traumatic Brain Injury [Jean Langlois at Brain Injury Professional magazine via brainline.org]
- Ray Rice: New helmet rule won't change my game [Kareem Copeland at NFL.com]
- The Rate of Domestic Violence Arrests Among NFL Players [Benjamin Morris at FiveThirtyEight]
- Violence and Aggression – The Dana Guide [Antonio Damasio at The Dana Foundation]
- Study: 30% of Former NFL Players Will Develop Dementia
- NFL Star Suffering Memory Loss After Concussion Injuries
- More Players Join Concussion Lawsuits Against NFLPA

© Copyright 2014 Brett A. Emison

Follow @BrettEmison on Twitter.

**Tags:** Adrian Peterson, Aggression, Alzheimer's, Alzheimer's Disease, Brain Injury, Class Action, Concussion, CTE, Dementia, Domestic Violence, Greg Hardy, Head Trauma, Lawsuit, Litigation, NFL, NFLPA, Parkinson's, Parkinson's Disease, Players Association, Ray McDonald, Ray Rice, Settlement, TBI, Violence