## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIG., | ) ) ) ) | 2:12-md-02323-AB |

### OBJECTION TO SETTLEMENT

Class members Cleo Miller, Judson Flint, Elmer Underwood, Vincent Clark, Sr., Fred Smerlas, Ken Jones, Jim Rourke, Lou Piccone, James David Wilkins II and Robert Jackson hereby object to the proposed settlement, and give notice of their intention to appear at the November 19, 2014 fairness hearing through their undersigned counsel.

Objectors hereby adopt and incorporate the Objection of Sean Morey *et al.* filed on October 6, 2014  (Document 6201).

Cleo Miller played nine seasons in the NFL as a fullback for the Kansas City Chiefs and Cleveland Browns.  Mr. Miller signed with the Chiefs in 1974, and was released by the Chiefs the next year.  He then signed with the Browns in 1975, where he played until 1982.

Judson Flint played three seasons for the Cleveland Browns and one season for the Buffalo Bills as a defensive back between 1980 and 1983.

Robert Jackson played eight seasons for the Cincinnati Bengals as a safety between 1982 and 1989, after graduating from Central Michigan University.

Elmer ("E.J.")  Underwood played three seasons in the NFL for the New York Jets, New York Giants, and Buffalo Bills between 2006 and 2009.

Vincent Clark, Sr. played six years in the NFL from 1991 to 1997 for the Green Bay Packers, Atlanta Falcons, New Orleans Saints and the Jacksonville Jaguars.

Ken Jones played ten years for the Buffalo Bills as a tackle between 1976 and 1986.  He played one year for the New York Jets in 1987.

Jim Rourke played nine seasons in the NFL for the Kansas City Chiefs, New Orleans Saints and Cincinnati Bengals as an offensive lineman between 1980 and 1988.

Fred Smerlas played fourteen NFL seasons for the Buffalo Bills, San Francisco 49ers and the New England Patriots as a nose tackle.  He was selected to the Pro Bowl five times.

Lou Piccone played three seasons for the New York Jets and six seasons for the Buffalo Bills as a wide receiver and kick returner between 1974 and 1982.

James David Wilkins II played one season each as a defensive end for the San Francisco 49ers and the Indianapolis Colts.

Each of the objectors is already suffering with several of the symptoms associated with CTE listed in the Morey Objection.

The named plaintiffs failed to adequately represent class members like objectors who are at risk of developing CTE in the future, and the settlement arbitrarily favors the subclass of players who died with CTE prior to July 7, 2014, at the expense of those who will die with CTE in the future.

I.      The Settlement Class May Not Be Certified
        Due to Fatal Intraclass Conflicts.

The settlement favors currently injured class members at the expense of those who will die or be diagnosed with CTE in the future.  Therefore, it fails the adequacy test set forth in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and must be rejected. The named plaintiffs and other class members seeking to maximize immediate

compensation do not share the same interests as those players whose symptoms have yet to fully manifest, or whose future deaths may be found to be related to CTE.

> [N]amed parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs...

*Id*. at 626.

Here, the conflict between those currently injured and those whose diseases will manifest in the future is starker than it was in *Amchem*. Players who have already died with a diagnosis of CTE before July 7, 2014 are eligible to receive up to $4 million. Players who will die after July 7, 2014 with the exact same diagnosis will receive *nothing*, while releasing all of their claims. This is so arbitrary and indefensible that Class Counsel have to date offered *no defense* of it, other than the fact that they have somehow persuaded the named plaintiffs to sign off on it. But that is simply further evidence of the named plaintiffs' inadequacy, since an adequate named plaintiff would have perceived the clear unfairness of such a settlement, and advocated for treating similarly situated class members the same.

Representative Plaintiff Turner currently suffers from ALS, which is the condition most highly compensated under the settlement. He does not represent the interests of those class members who have suffered different injuries or will do so in the future. Representative Plaintiff Wooden claims that he is an adequate representative of those class members whose diseases will manifest in the future, because he currently has not been diagnosed with one of the compensable conditions. However, Mr. Wooden has never alleged that he is at increased risk for developing CTE, which makes him a *per se*

inadequate representative for the majority of the class, who, like the objectors, are already suffering from some symptoms of CTE and will almost certainly develop that condition during their lifetimes.

## II.    The Settlement is not Fair, Reasonable and Adequate as to Future Claimants.

As *Amchem* made clear, questions of class certification are antecedent to the determination of a settlement's fairness.  Because the vast majority of class members whose diseases have not yet manifested were not adequately represented here, the settlement class must be decertified, and the settlement as a result becomes moot.

The settlement is, of course, relevant to the question of adequacy of representation.

> We agree with petitioners to this limited extent: settlement is relevant to class certification... the Court of Appeals in fact did not ignore the settlement; instead, that court homed in on settlement terms in explaining why it found the absentees' interests inadequately represented.

*Id*. at 619.  The settlement in this case illustrates the inadequacy of representation, in that the settlement leaves all class members who will die with CTE in the future uncompensated, while paying those that have already died with the same condition up to $4 million.  That smacks of a tradeoff of high current payouts in exchange for very low (or non-existent) payouts to future claimants, whose interests were easily sacrificed since no party in the case was looking out for them.

The principle of equitable distribution requires that similarly-situated class members be treated the same.  If deceased class members who were found to have CTE will receive up to $4 million, then all class members who die during the settlement's duration must be eligible for the same payment.  An arbitrary cutoff date of July 7, 2014,

when compensation drops from $4 million to zero for the same diagnosis, is simply unfair, unreasonable and inadequate as to those class members who are denied compensation.

The fact that the settlement is now uncapped is entirely irrelevant.  The settlement proposed in *Amchem* was also uncapped:  "Although this is not a 'limited fund' case ... the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability."  *Id*. at 627.  The same can be said about this settlement.  While the ceiling on total class payouts has been removed, a more important ceiling of zero has been placed on all individual class members' claims for death with CTE after July 7, 2014.  This will significantly limit the defendants' liability by hundreds of millions of dollars, rendering the removal of the previous $675 million ceiling all but irrelevant.

The unfairness of the arbitrary limitation on class members' recovery for Death with CTE is magnified by the fact that CTE is the condition that the vast majority of class members are likely to develop during their lifetimes.  ALS, Parkinson's and Alzehimer's are, thankfully, relative rare diagnoses, and only a small percentage of retired players will ever be diagnosed with one of these conditions.  But neurocognitive impairment, and CTE, are widespread among former players, and probably the majority of former players suffers from one or more symptoms associated with CTE.  The most devastating diseases of ALS, Parkinson's and Alzheimer's are really a distraction from what this case should have been about all along – NCI and CTE – and the large cash awards offered for those catastrophic conditions is a smoke screen distracting from the overall inadequacy of this settlement for the vast majority of former players, who will develop CTE.

III.    **The Negotiation of a Separate $112.5 Million Payment
to Class Counsel Is Improper.**

In addition to tradeoff of future CTE claims for generous immediate payments to the subclass of class members already eligible for payment, the negotiation of a separate fee payment to Class Counsel, in excess of the maximum fee allowable by law, raises red flags and indicates collusion and self-dealing.

This settlement does not create a common fund.  Therefore, the only basis for fees is the contention that plaintiffs are the prevailing party.  The maximum attorneys' fee that a court could shift to a defendant is Class Counsel's lodestar without any enhancement. *Perdue v. Kenny A.*, 130 S. Ct. 1662 (2010).

To the extent that the defendant has agreed to pay Class Counsel a fee that is greater than the one that could be imposed upon it under the law, there must have been a tradeoff in the form of lower benefits to the class members.  That tradeoff in this case is the wholesale release of all future CTE claims.

The settlement creates no common fund, and certainly no fund that could justify a $112.5 million fee.  For a fee of that size to be reasonable under a percentage of the fund analysis, there would have to be at least $750 million in benefits paid to the class.  The fact that there is no cap on payments does not guarantee that $750 million, or any amount, will actually be paid out to class members.  Class Counsel could simply have made their fee contingent on payments actually made to class members, by requiring the NFL to make a payment to Class Counsel of 15% of any and all payments made to class members, up to a ceiling of $112.5 million.  Instead, Class Counsel negotiated for themselves a preferential payment of $112.5 million, while the class members will have to wait up to 65 years for their benefits, if any.

Finally, a 5% set aside in addition to the preferential up-front payment of $112.5 million is excessive and an attempt at "double-dipping."  Class Counsel should receive no more than their unenhanced lodestar, or 15% of amounts actually paid to class members, but not both.

**IV.     The Notice is Highly Misleading.**

As detailed in the Objection of Sean Morey, the Notice in this case is ambiguous and misleading on the issue of whether future deaths with CTE are eligible for monetary compensation.  While an attorney skilled at parsing legal documents may be able to determine that no deaths from CTE after July 7, 2014 are compensable, the average class member would not be alerted to this fact.  Instead, ¶5 of the Long Form Notice states that "All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement..."  ¶14 defines valid claims to include "ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 [NCI], Level 1.5 [NCI], or Death with CTE (the 'Qualifying Diagnoses').  A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund."  Nowhere in ¶14 is it revealed that Death with CTE does not apply to any deaths that occur after July 7, 2014.  Read on its own, ¶14 implies that Death with CTE qualifies for monetary compensation if it occurs at any time during the next 65 years.  One must turn to other portions of the Notice, and ultimately to the Settlement Agreement, to determine whether Death with CTE is compensated for class members who are still alive.

Many class members will not take the time to pore through the entire Settlement Agreement.  They will reasonably read the "Monetary Awards" section of the Notice, and conclude that Death with CTE is a compensable diagnosis for the next 65 years.

The Notice affirmatively misrepresents the treatment of Death with CTE during the term of the settlement.  It is false to state that Death with CTE is a "Qualifying Diagnosis," and that a Qualifying Diagnosis may occur at any time during the next 65 years.  By definition in the Settlement Agreement, Death with CTE must already have occurred in order for it to be a Qualifying Diagnosis under the settlement.  Therefore, it is highly misleading and false to include it in the paragraph that is describing which conditions will be compensated during the 65-year term of the settlement.

## V.      The Release Should Be Narrowed To Conform to the Compensated Claims.

As an alternative to rejection of the entire settlement due to the intraclass conflict, the Court could require the parties to narrow the release to except claims for CTE and Death with CTE.  The Release in this settlement currently includes claims

(iii) arising out of, or relating to, neurocognitive deficits
or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or
(iv) **arising out of, or relating to, CTE**

Thus, this settlement would release all future claims for CTE or Death with CTE, while providing no compensation whatsoever for those claims.  There is a failure of consideration for the release of CTE claims.  Indeed, the CTE claims have not been adequately developed in this lawsuit.  It is likely premature for any resolution of these claims, which are only starting to be studied.  Diagnostic techniques may be developed within the next five years that will allow for the diagnosis of CTE during a person's lifetime.  Therefore, the class of 20,000 former players should not have their CTE claims resolved for the next 65 years by this lawsuit when this settlement has failed to adequately develop those claims, and has achieved nothing for future CTE sufferers.

Carving out the CTE claims would permit the remainder of the settlement for ALS, Alzheimer's, Parkinson's and dementia to be approved at this time for the players who have developed or will develop those conditions.  This would remove the unfairness from the settlement, and avoid the need for thousands of former players to opt out en masse from this settlement that offers them nothing, and locks in place current medical capabilities for the next 65 years.

If the CTE claims are carved out, the class members who have already died with CTE could be compensated separately outside of this settlement.  They really do not belong in this settlement, since this case was never really about CTE, and the focus of this case has not been CTE.  Indeed, their inclusion may be an attempt to obscure the abject failure of this case and settlement to do anything for the thousands of former players who are likely to develop CTE and no other qualifying diagnosis during their lifetimes.  For example, the settlement's compensation of a handful of preexisting Death with CTE claims was used in the Notice to create the misrepresentation that Death with CTE claims will be compensated up to $4 million for the next 65 years.

It is premature to enter into any binding settlement of future CTE claims, let alone one that will freeze science in place and deny compensation for the next 65 years.  CTE claims should be carved out of this case, and excluded from the Release in this case.  If that is done, the remaining settlement may be adequate to pass muster with the Third Circuit and Supreme Court.

## CONCLUSION

Objectors urge this Court to decertify the settlement class, and to require the establishment of a future injury subclass with an adequate subclass representative who is already suffering with symptoms of CTE, and who has an incentive to maximize compensation for former players who are diagnosed with CTE or Death with CTE in the future.  It goes without saying that the Court must reject the proposed settlement, because it was negotiated without adequate representation, and because it is unfair and arbitrary on its face.  In the alternative, the Court should exclude CTE claims from the Release.

Respectfully submitted,
Cleo Miller, Judson Flint,
Elmer Underwood, Vincent Clark, Sr.,
Ken Jones, Fred Smerlas, Jim Rourke,
Lou Piccone, James David Wilkins II, and
Robert Jackson,
By their attorneys,

*/s/ John J Pentz*
John J. Pentz
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

Edward W. Cochran
20030 Marchmont Rd.
Cleveland Ohio 44122
Phone: (216) 751-5546
EdwardCochran@wowway.com

Date:  October    , 2014

Vincent Clark, Sr.
1120 Virescent Court
Cincinnati, Ohio 45224
Telephone: 513-807-3299
Date of Birth: Jan. 22, 1969

10

Date:  October      , 2014

Judson Flint
3¢6 Federal St.
Farrell, Pa. 16121
Telephone:  724-866-5782
Date of Birth: Jan. 26, 1957

10

Date:   October 13, 2014

Ken Jones
2722 Independence Ave.
Niagara Falls, NY 14301
Telephone:  716-284-9225
Date of Birth: Dec. 1, 1952

13

Date:   October 9  , 2014

_____
Cleo Miller
5080 Brainard Road
Solon, Ohio 44139
Telephone:  216-310-4749
Date of Birth: Sept. 5, 1952

Date: October 13, 2014

Lou Piccone

Telephone: 716-908-2525
Date of Birth: July 17, 1949

Home Address:
Lou & Jo Anne Piccone
325 North Forest Road
Williamsville, New York
14221

Date: October    , 2014

Robert Jackson
3163 Roesch Blvd., Unit 7
Fairfield, Ohio 45014
Telephone: 513-289-2756
Date of Birth: Oct. 10, 1958

12

Date:   October  //  , 2014

Jim Rourke
163 Bishop forest Dr.
Waltham  Ma.  02452
Telephone: 781-405-2602
Date of Birth: Feb. 10, 1957

Date:   October      , 2014

Fred Smerlas
11 Saddle Ridge Road
Sudbury, MA 01776
Telephone: 617-304-4819
Date of Birth: April 8, 1957

Date:   October 13, 2014

Elmer Underwood
5611 Courage Dr,. Unit C
New Albany, Ohio  43054
Telephone: 614-906-4668
Date of Birth: Aug. 4, 1983

11

Date:   October      , 2014

James David Wilkins, II
1029 Archland Drive
Cincinnati, Ohio 45224
Telephone:  513-410-5171
Date of Birth: Feb. 24, 1969

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed via the ECF filing system on October 14, 2014, and that as a result electronic notice of the filing was served upon all attorneys of record.


*/s/ John J. Pentz*
John J. Pentz