UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION      No. 2:12-md-02323-AB
INJURY LITIGATION                MDL No. 2323

_____

Kevin Turner and Shawn Wooden,   Civil Action No. 2:14-cv-00029-A

on behalf of themselves and

others similarly situated,

         Plaintiffs,

    v.

National Football League and

NFL Properties, LLC,

successor-in-interest to

NFL Properties, Inc.,

         Defendants.

_____

**MEMORANDUM OF PUBLIC CITIZEN, INC.
AS AMICUS CURIAE
WITH RESPECT TO MOTION FOR
APPROVAL OF CLASS ACTION SETTLEMENT**

      This memorandum is submitted by Public Citizen, Inc., as amicus curiae with respect to the motion for approval of the proposed class settlement in this action. The interests of Public Citizen are set forth in the motion for leave to file this memorandum.

      This memorandum focuses on two points: First, it discusses examples of conflicts created by the proposed settlement that preclude certification of the proposed settlement class under

1

Federal Rule of Civil Procedure 23(a). Second, the memorandum discusses three other serious deficiencies that prevent approval of the settlement in its current form, because it does not satisfy the "fair, reasonable, and adequate" requirement of Rule 23(e)(2).

## I. INTRA-CLASS CONFLICTS CREATED BY THE SETTLEMENT AGREEMENT PRECLUDE CLASS CERTIFICATION UNDER RULE 23(a).

Under Rule 23(a), class certification requires that the Court find that the class is sufficiently numerous that joinder of all class members is impracticable, that the claims of the named plaintiffs have common questions of law or fact with the class, that those claims are typical of those of the class as a whole, and that the named plaintiffs and their counsel will adequately represent the class. Because this class certification motion is being made in the context of a settlement agreement that specifically creates and limits rights of class members, the requisites of Rule 23(a) must be assessed in light of the treatment of all class members under the terms of that agreement. Thus, the fact that all class members suffered concussions while playing in the NFL is only the beginning of the inquiry.

The proposed settlement creates serious intra-class conflicts because, under the agreement, some class members will receive substantial recoveries, while other class members will receive no recovery or a substantially reduced one. Those conflicts directly undercut the adequacy of representation requirement and, therefore, necessitate denial of certification of the class that was conditionally certified, which would also preclude final settlement approval.

The first set of conflicts is explained in the Morey objections. Those conflicts are between the "haves"—those on the settlement's damages grid—and the "have-nots"— those who are not on the grid. The have-nots receive nothing because they now have, or in the future will have, "only" CTE or one of the other diseases, conditions, or symptoms listed in the Morey

memorandum (ECF 6201, pp. 17-18) and in the declaration of the medical experts on concussion-related injuries submitted by the Brain Injury Association in its motion for leave to file as an amicus curiae in this action. ECF 6180-2. Indeed, the releases under Section 18.1(a) of the settlement agreement (ECF 6073-2) extend to these diseases, conditions, and symptoms, even though no compensation will be paid for them.

This conflict is underscored by the fact that sub-class representative Kevin Turner has a disease on the grid, but there is no class or sub-class representative for the damages class who has one of the many diagnosable conditions that are off the grid. Shawn Wooden—the other sub-class representative—cannot serve that function because he does not have any of the off-grid diseases, nor does he claim to be at risk of contracting any, let alone all, of them. If there were other class members or un-conflicted class counsel who urged inclusion for all concussion-related injuries, no such showing has been made by class counsel. As a result, on this record, no class representative and no attorney who participated in the bargaining process spoke for the very substantial number of class members who will recover nothing under the settlement. This structural flaw demonstrates the inadequacy of representation that makes this settlement class uncertifiable.

Amicus recognizes that there could be clear evidentiary support for excluding some claims, such as that concussions cause stomach cancer, that might justify denying benefits to players with those conditions.  Such evidence might, in theory, also justify treating the five covered diseases on the grid better than all others, although the Brain Injury Association's experts make a compelling argument to the contrary. ECF 6180-2, Section A.  At the very least, when large numbers of players will be categorically excluded, the settling parties must present evidence to support the disparate treatment of the excluded diseases and conditions, even if the

excluded players have adequate representation. But here, without a sub-class representative and the participation in settlement discussions by counsel for that sub-class, class certification must be denied or that sub-class excluded from the settlement's class definition.

The second set of conflicts is plain on the face of the grid, which makes distinctions regarding the amounts to be paid based on type of disease and age of the class member at the time of diagnosis, as well as the 20 percent reduction in benefits for players with less than five years eligible service. Kevin Turner, the sole class representative with a currently compensable injury, has ALS and is under 45, with eight years of eligible service. Accordingly, he will receive the maximum benefits under the grid. Shawn Wooden, who represents the futures/injunctive relief subclass, has nine years of service and, at just shy of 41 years of age, may anticipate a likelihood of diagnosis at an age that will produce an award at or near the top of the grid. But again, no class member represents former players with other diseases on the grid, with less than five years of service, or with an age greater than 45 at the time of diagnosis, and there is no lawyer who represented these other class members with compensable injuries, but reduced benefits. In a battle over who gets what share of the settlement pie, each group needs to have a champion. Here, that requirement for ensuring that class members' due process and Rule 23 rights are respected does not appear to have been met. Again, there may be some factual or legal basis for some of the distinctions, but particularly in the absence of any explanation of *why* class counsel divided the pie as they did, and without evidence to support those distinctions, the inadequacy of representation precludes approval of the grid or the settlement of which it is an integral part.[1]

---

[1] As the declaration of the Brain Injury Association experts (ECF 6180-2) points out in paragraph 16, one concussion can lead to severe impairments, which casts into serious doubt the

The third set of conflicts relates to how and why the dollar figures were assigned for each compensated disease category on the grid. Football concussion litigation is not an area of the law in which there are many prior verdicts and settlements, even among the five listed categories on the grid, and from which reasonable values could be established. This is a totally new area of law, and there is no evidentiary basis for these numbers. In these circumstances, the decision to assign values to particular conditions reflects nothing more than negotiating tradeoffs. Without representation of class members who fall into each category, there is no assurance that those tradeoffs reflect adequate consideration of the interests of those in the categories that receive less favored treatment.

These three overlapping conflicts have one other significant impact on both the class certification and Rule 23(e)(2) reasonableness determinations. If a lawyer has multiple clients, some on the grid and some off, or some with higher benefits and others with lower ones, that lawyer cannot ethically support the settlement—which would be against the interests of the clients who would get less or nothing at all—or oppose the settlement—which would be against the interests of clients who stand to receive significant benefits under the grid. That ethical dilemma is not the fault of the now-conflicted lawyer but is the direct result of the settlement structure. Not only does the settlement agreement effectively deprive class members who are represented by ethical lawyers with a substantial number of clients of their lawyers' advice, but the Court is being denied the views of those lawyers because they cannot ethically take any position on either class certification or the merits of the settlement.

---

evidentiary basis for the 20% per year reduction in benefits for class members who have less than five years eligible service.

5

As the Supreme Court has made clear, these kinds of intra-class conflicts require separate class representatives and separate sub-class counsel to negotiate with class counsel and the NFL. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (finding class representatives inadequate where class representatives had "critical goal [of] generous immediate payment" that "tug[ged] against" interests of other class members in "inflation-protected fund for futures"); *see also Larson v. AT & T Mobility LLC*, 687 F.3d 109, 132-33 (3d Cir. 2012) (explaining that Rule 23(a)(4) requires "that the Class Representatives have 'the ability and the incentive to represent the claims of the class vigorously'" and questioning adequacy of class representatives where none were current customers and lacked "the interest, much less the incentive, to stop [the defendant] from enforcing [allegedly illegal penalties] against its current customers" (quoting *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 291 (3d Cir. 2010)); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) (finding inadequate representation by class representatives who did not face same "substantial impediments" to redeeming settlement relief as one group within the class and expressing concern that class representatives "could skew the terms of the settlement to their own benefit"); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 254 (2d Cir. 2011) ("[T]he interests of class members who hold only Category C claims fundamentally conflict with those of class members who hold Category A and B claims. Although all class members share an interest in maximizing the collective recovery, their interests diverge as to the distribution of that recovery because each category of claim is of different strength and therefore commands a different settlement value . . . . The interests of Category C-only plaintiffs could be protected only by the formation of a subclass and the advocacy of independent counsel").

Where a settlement provides varying compensation based on gradations of injury, it is not necessary to create subclasses for every level of compensation where there are objective bases for distinguishing the degree of injury. *See, e.g., In re Insurance Brokerage Antitrust Litig.,* 579 F.3d 241, 272 (3d Cir. 2009). But where different class members have suffered injuries of fundamentally different natures, and recovery for one is traded off against recovery for another, with no factual or legal basis to support the differing treatment accorded those other class members, the need for representation of each subclass is essential. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 (3d Cir. 2012). In the absence of separate counsel and class representatives to negotiate for the most significant subclasses, the Court should not certify the class.

## II. OTHER FLAWS IN THE SETTLEMENT AND NOTICE RENDER THE SETTLEMENT UN-APPROVABLE.

A.     *Attorneys' Fees*

Class counsel have not yet submitted their fee application, and so neither the Court nor class members can learn about how this case was litigated and what steps were taken to protect the class as a whole—matters that bear on certification and settlement approval. The absence of a fee application in itself prevents a complete evaluation of the fairness of the settlement at this point, because assessment of counsel's request for fees is essential to consideration of the fairness of a proposed settlement. *See*, *e.g.*, *In re Gen. Motors*, 55 F.3d at 802-03 & n.23. In addition, class counsel have asked for permission to levy *an additional five percent* charge on all recoveries under the grid, with no explanation of why that money is justified or for what it will be used other than the boilerplate assertion that it will be used to "facilitate the Settlement program and related efforts by Class Counsel." ECF 6073-2, section 21.1, p. 81. The Court should disapprove that kind of open-ended request and also require class counsel to file the

justification for the $112.5 million fee request now, and permit class members to comment on its relevance to the settlement approval, *before* the Court renders its decision on final approval.

Moreover, the class notice does not adequately describe an important matter relating to attorneys' fees. Specifically, the long form notice to the class in question 24 asks, "How will the lawyers be paid?" The answer refers to the $112.5 million that will be sought by class counsel. But if a careful reader went back to question 16 (page 11 of Doc. 6084), which asks, in effect, "How much money will I receive?" the reader would see listed as one factor "Any retainer agreement with an attorney." This modest mention, buried among 22 pages and 40 questions, is insufficient to alert all class members to the fact that, in addition to the $112.5 million (or more) that may be paid to class counsel, players may have to pay an additional amount out of their recovery equal to the percentage agreed upon in their contingency fee agreement with their own lawyer. Those percentages vary, but one-third to forty percent is fairly common, especially in cases such as this one, which are expected to be complicated and prolonged when the client signs the retainer. Approximately 4,500 players have filed suits, and every one of those players likely has a retainer agreement with an attorney. Understanding the amount of fees owed is crucial to a class member's assessment of whether to support the settlement, to file an objection, or to opt out. But because of this crucially misleading information about attorneys' fees and how they may affect the recovery of every class member, the class must be re-notified and given a further opportunity to decide whether to remain in the class, opt out, or object.

Further, Rule 23(h) requires that attorneys' fees in a certified class action may be approved only if they are "reasonable." No one disputes that that requirement applies to class counsel's request for $112.5 million, but it also should apply to the implicit request that class counsel be allowed to take fees under retainer agreements with their individual clients *in addition*

*to their share of the $112.5 million for work as class counsel*. Approval of a $112.5 million fee for class counsel and, on top of that, a contingency fee from each client who recovers under the settlement would be unreasonable and contradicts the approval requirement of Rule 23(h).

        B.        *Burdensome and Unauthorized Objection Procedures*

The parties proposed and this Court approved objection procedures that are unnecessarily burdensome and calculated to discourage objections. Specifically, the objection procedures set forth in section 14.3 of the settlement agreement and explained in the long form notice to the class require that any objection bear the class member's "signature by hand" even if the objecting class member is represented by an attorney. Doc. 6084-1 at 18. This provision is contrary to Federal Rule of Civil Procedure 23(c)(2)(B)(iv), which provides that a class member "may enter an appearance through an attorney if the member so desires," and 28 U.S.C. § 1654, which allows individuals to appear and conduct their cases through counsel. Somewhat ironically, the class representatives did not sign the settlement agreement, but proceeded through their counsel. There is no reason why other class members should not be able to object using that same procedure. Indeed, the sole explanation that has been offered for the provision (in class counsel's response to our amicus brief in support of the Rule 23(f) appeal) is that the requirement serves a purported interested in preventing counsel from *opting out* class members en masse. But that argument is a non sequitur: Objecting is not the same as opting out, and thus even if there were some legitimate interest in preventing counsel from assisting groups of class members from opting out, that interest would not justify this barrier to consideration of class members' objections when presented through their attorneys.

   Beyond violating section 1654 and being in any event unnecessary, the signature requirement may have a significant impact on how this Court views objections. In this MDL

9

proceeding, lawyers may represent many clients who oppose the settlement because they have diseases that would entitle them to no compensation under the settlement or would be subject to substantial reductions because of their age or number of seasons played. In a typical class action settlement proceeding, a lawyer would file an objection on behalf of all of his or her clients. But under section 14.3, the lawyer has to obtain written evidence of class membership, plus the individual signature (written and not electronic) on the objection itself, which imposes a logistical burden on the lawyer and clients alike.[2]

As a result of these additional burdens, many lawyers in this case will choose to file objections on behalf of only one or two clients, rather than all, because the lawyer can make the same substantive point regardless of the number of objectors. Yet an objection on behalf of a few clients may have a lesser impact than an objection on behalf of 20 or 30 clients on the Court's consideration of the proposed settlement, because judges often take the number of objectors into account when assessing the fairness, adequacy, and reasonableness of a proposed class-action settlement. *See, e.g., Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 321 (3d Cir. 2011) (noting that district court acted within its discretion in finding "that the minimal number of objections and requests for exclusion . . . favor[ed] settlement"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004) (agreeing with the district court's determination that "the insignificant number of objections filed weighed in favor of approving the settlement"). Because these procedures place logistical hurdles in front of class members' ability to object, the Court should not take into account the number of objections in assessing the fairness of the settlement,

---

[2] There is no explanation of what constitutes "written evidence"—will a statement signed under perjury pursuant to 28 U.S.C. § 1746 suffice? Moreover, if there is any doubt of a player's status, the NFL surely knows the names of everyone who played during the relevant time.

because to do so would unfairly tip the balance in favor of approving the settlement and thereby reward class counsel for imposing an unjustified burden on class members.

*C. Medicare and Medicaid Liens*

Even if the current settlement were otherwise satisfactory, the impact of the Medicare Secondary Payer Act, 42 USC 1395y(b)(2), could indefinitely block payments to class members. Similar provisions under Medicaid, 42 USC § 1396a(a)(25), pose the same problem, and private insurance plans may pose significant, but lesser, barriers to prompt payment. As explained below, the potentially significant impact of those laws, and the NFL's insistence on full compliance with them before any money can be paid out to any class member, have not been disclosed to the class in a way that could be readily comprehended. Because the potential impact of such laws is so great, and the disclosure so insufficient, the settlement should not be approved prior to providing class members with a full explanation and making modifications to address these problems.

The notice to the class did not mention Medicare or Medicaid, but the long form notice question 16 (page 11 of Doc. 6084), addressing how much money the class member will receive, refers to possible reductions in recovery based on "any legally enforceable liens on the award." There is no explanation that would enable a class member, or even most attorneys, to understand what that phrase means or to evaluate the impact of such a lien. In fact, the impact of those laws is so significant that the failure to make meaningful disclosures on this aspect of the settlement is an independent basis for requiring that the class be re-noticed. The operation of liens under the settlement agreement (ECF 6073-2, section 11.3, pp. 59-62) is quite complicated, but a simple auto accident case can illustrate the basic principle, from which the Medicare provisions as applied to this case can be understood.

Under the well-established principle known as "subrogation," if a medical insurer paid the medical bills of a party injured in an accident, the insurer is entitled to recoup its costs if the injured party recovers from the person who caused the injury. That principle applies to the law governing Medicare. It requires liability insurers and self-insured entities—here the NFL—to determine if a claimant has received, or may receive, Medicare benefits for injuries covered by a settlement, report that amount to Medicare, and be responsible for repayment. The application of the law to future medical expenses is quite explicit, 42 U.S.C. § 1395y(b)(2)(A)(i) (prohibition on payment to claimant applies to services for which "payment has been made, or can reasonably expected to be made"). But if there were any doubt, section 11.3(f) of the settlement agreement expressly includes "past, current, or future bills or costs," and section 11.3(g) forbids any payments from the settlement fund until a class member's medical liens have been satisfied.

In the auto case, by the time of settlement, most of the medical expenses have been incurred, and the remainder can generally be reasonably estimated. The NFL concussion settlement presents a more complicated situation because it provides for compensation at the front end, as soon as a player is diagnosed with a qualifying disease. As a result, the ratio of incurred to estimated future medical costs is inverted because most of the medical treatment will be provided in the future, but the class member's future course of treatment cannot be known then. If Medicare must give its approval on a case by case basis, there will be a substantial delay in payment even after the player received a qualifying diagnosis, because the settlement specifies that Medicare must be satisfied first.

The settlement contemplates a possible global settlement with Medicare, but that presents its own set of problems. Currently, no one knows how many class members will develop a compensable disease and, if so, which ones, at what ages, and at what levels of severity.

Diagnosis alone does not answer what kind of treatment is necessary over what period, and when in the future those needs will arise. As difficult as is the retail process discussed above, attempting to apply that to the class of 20,000 could well amount to little more than rolling the dice, or taking a wild guess, which no one—the government, the class or the NFL—may be willing to do. In addition, if an agreement on an appropriate amount could be reached, the Court would have to approve it because it would reduce the settlement amounts promised to class members in the settlement and the class notice.

Even if a global settlement of the Medicare liens were reached, the Court and the class could not know at this time how the payment to Medicare would be allocated because the settlement has no cap and payments must fit within a pre-determined grid. The settlement administrator would have to determine an amount applicable to each disease category, but the uncertainties noted above make that an almost impossible task. Even with such a formula, the actual reduction for each class member would also depend on how many members would contract a disease for which Medicare would have a claim. There is simply no way of answering that question with even a remote degree of certainty or fairness.

Section 11.1 of the settlement agreement creates the position of Lien Resolution Administrator, whose duties appear to include negotiating with Medicare to try to resolve these issues either on a case by case basis, or by reaching a global settlement with Medicare (and any other lien holders) under which lien holders would accept a fixed amount or perhaps a formula for all class members. However, under section 11.1(a)(i), the lien administrator will not be appointed until after the effective date, which is the date when all appeals are concluded, Section 2.1(jj), and is likely to be several years in the future. Any such resolution will necessarily be complex and take time, which means that the promise of prompt payments upon final approval is

illusory. Indeed, the liens present so many open questions, which go to the very heart of how much benefit class members will derive from the settlement, that the Court cannot determine whether the proposed settlement is fair, reasonable, and adequate until the lien questions are resolved. The complexity of these questions underscores the total inadequacy of the notice's reference on the issue of how much each player will receive to whether "[t]here are any legally enforceable liens on the award." That phrase does not reasonably inform a lawyer of these pitfalls, let alone a class member suffering from the after effects of concussions suffered while playing in the NFL.

  Two solutions would greatly ameliorate the problem. First, the NFL could step into the shoes of the players, conduct the negotiations with Medicare, and pay the agreed-upon figure on top of the settlement amount. General Motors has agreed to this approach for claimants who will be paid for deaths or injuries arising from defects in its ignition switches. *See* http://www.gmignitioncompensation.com/docs/FINAL%20PROTOCOL%20June%2030%20%202014.pdf, section VII (C). The NFL could do that globally or on a case by case basis as the claims arise. Class counsel and the NFL have stated that $675 million is sufficient to pay all claims, and even if as much as 20 percent represented medical liens held by Medicare, that amount would be only $135 million spread over the 65 year life of the benefits fund—barely a blip on the NFL's income statement when compared with NFL Commissioner Roger Goodell's 2012 salary of $44 million. *See* http://www.usatoday.com/story/sports/nfl/2014/02/14/nfl-commissioner-roger-goodell-salary-44-million-dollars-2012/5493943.

  Second, the settlement could be restructured so that the reimbursement of the government for benefits already paid by Medicare, as well as the direct payment of all future medical and related expenses, broadly defined, would come from the settlement fund. The NFL would, in

effect, broaden its medical insurance to cover retired players with traumatic brain injuries. Such a settlement could also include payments for lost income and pain and suffering, and with that form of insurance plan, there would be no reason to limit eligibility to certain diseases, and no basis to differentiate class members based on their age or years played, thereby also eliminating most current objections to class certification. If a player has an injury resulting from a concussion, the NFL would take care of his medical and living expenses for the rest of his life and eliminate the lien problem from this settlement.

The two alternative approaches are, of course, very different from the settlement now before the Court. Because the Court lacks authority to revise the settlement, it should reject the settlement and direct the parties to go back and re-negotiate a proposal that is not beset with the flaws of the current version.

## CONCLUSION

For the forgoing reasons, and those set forth in other objections filed in this case, the proposed class certification and the settlement agreement on which it is based should not be approved.

October 14, 2014                                                  Respectfully submitted,

                                                                                 /s/ *Alan B. Morrison*

Allison M. Zieve                                                  Alan B. Morrison
Scott L. Nelson                                                    George Washington University
Public Citizen Litigation Group                          Law School
1600 20th Street NW                                        2000 H Street NW
Washington, DC 20009                                    Washington, DC 20052
(202) 588-1000                                                  (202) 994-7120
azieve@citizen.org                                            abmorrison@law.gwu.edu

Counsel for Amicus Curiae
Public Citizen, Inc.

15