IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| KEVIN TURNER and SHAWN WOODEN, on behalf of themselves and others similarly situated, | : : : : : | Civil Action No. 2:14-cv-00029-AB |
| Plaintiffs, | : : | |
| v. | : : | |
| NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES, LLC, successor-in-interest to NFL PROPERTIES, INC., | : : : : : | |
| Defendants. | : : | |
| THIS DOCUMENTS RELATES TO: ALL ACTIONS | : : : | |

## OBJECTION OF CRAIG HEIMBURGER AND DAWN HEIMBURGER

**Table of Contents**

TABLE OF CONTENTS ........................................................................................... I

TABLE OF AUTHORITIES ..................................................................................... II

INTRODUCTION ..................................................................................................... 1

I.   CRAIG HEIMBURGER IS A CLASS MEMBER. ........................................ 3

II.  STANDARDS FOR SETTLEMENT REVIEW. ............................................. 5

III. THE CLASS CANNOT BE CERTIFIED. ....................................................... 7

     A.    Adequacy is absent. ..................................................................... 7

          1.    *Amchem* dispositively demonstrates an intra-class conflict. ........ 9

          2.    Typicality is absent as well. ........................................ 12

          3.    The upside-down class representative selection independently precludes class certification. ........................................ 12

     B.    Commonality is absent ........................................ 13

     C.    Predominance is absent. ........................................ 15

IV.  NOTICE FAILED TO COMPLY WITH DUE PROCESS. ........................... 18

V.   THE SETTLEMENT CREATES UNFAIR BARRIERS DESIGNED TO THROTTLE RECOVERY, AND THE ACTUAL RECOVERY REALIZED BY THE CLASS WILL THUS BE UNFAIR. ................................................... 18

VI.  "QUESTIONABLE PROVISIONS" DEMONSTRATE A CONFLICT OF INTEREST BY CLASS COUNSEL THAT SHOULD PRECLUDE SETTLEMENT APPROVAL, ESPECIALLY WHEN RULE 23(H) HAS BEEN VIOLATED. ........................................................................................... 19

VII. THE $10 MILLION FUND BREACHES CLASS COUNSEL'S FIDUCIARY DUTY TO THE CLASS. ................................................................................ 21

VIII. THE SETTLEMENT IS UNFAIR TO THE EXTENT THAT IT PERMITS DOUBLE-DIPPING. ................................................................................... 24

CONCLUSION ....................................................................................................... 24

## Table of Authorities

<u>**Cases**</u>

*Accord Steering Comm. V. Exxon Mobil Corp.,*
461 F.3d 598, 601-02, 603-04 (5th Cir. 2006)………………….…………15, 16

*Amchem Prods v. Windsor,*
521 U.S. 591, 611-12, 619, at 620 n.16,
623-24, 625-27 (1997)………………………………………8, 9, 10, 11, 13, 15, 16

*Berger Compaq Computer Corp.,*
257 F.3d 475, 479-80 (5th Cir. 2001)…………………………………………...8

*Castano,*
84 F.3d at 745 n.19…………………………………………………………….15

*Cf. Radcliffe v. Experian Info. Solutions,*
715 F.3d 1157, 1163-67 (9th Cir. 2013)…………………………………………13

*Comcast Corp. v. Behrend,*
133 S.Ct. 1426, 1433 (2013)…………………………………………………16

*Day v. Persels & Assocs., LLC,*
729 F.3d 1309, 1315 (11th Cir. 2013)…………………………………………7

*Dennis v. Kellogg,*
697 F.3d 858, at 868……………………………………………………19, 23

*Dewey v. Volkswagen AG,*
681 F.3d 170, 189 n.19 (3d Cir. 2012)…………………………………...7, 10

*Eubank v. Pella Corp.,*
753 F.3d 718, 723 (7th Cir. 2014)………………...…………...7, 8, 12, 18, 19, 20

*Figueroa v. Sharper Image Corp.,*
517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007)……………………………...5

*Georgine v. Amchem Prods.,*
83 F.3d 610, 626-38 (3rd Cir. 1996)…………………………14, 15, 16, 17

*Hansberry v. Lee,*
311 U.S. 32 (1940)……………………………………………………12

*Holmes v. Cont'l Can Co.,*
706 F2.d 1144, 1147 (11th Cirl 1983)…………………………………...5

*In re Am. Medical Sys.,*
    75 F.3d 1069, 1083-85 (6th Cir. 1996)……………………………………12, 15

*In re Asbestos Litigation,*
    134 F.3d 668, 677 (5th Cir.)……………………………………………….9

*In re Asbestos Litig.*
    90 F.3d 963, 1015 (5th Cir. 1996)…………………………..………13, 14

*In re Baby Prods. Antitrust Litig.,*
    708 F.3d 163,173, 174, 175, 178-79 (3d Cir. 2013)…………..……5, 7, 18, 22, 23

*In re Bluetooth Headset Prod. Liab. Litig.,*
    654 F.3d at 935, 945-49 (9th Cir. 2011)…………………………6, 7, 19, 20, 21, 23

In re Citigroup Sec. Litig.,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013)………………………..…………………21

*In re Dry Max Pampers Litig.,*
    724 F.3d 713, 715, 717-18, 721 (6th Cir. 2013)……………..……………..5, 6, 7

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab., Litig.,*
    55 F.3d 768, 786-800, 807, 820-21 (3d Cir. 1995)(*"GM Trucks"*)……..…..…6, 7

*In re Katrina Canal Breaches Litig.,*
    628 F.3d 185, 193-194 (5th Cir. 2010)………………………………..…………8

*In re Literary Works,*
    654 F.3d 242, 246, 251, 252 (2nd Cir. 2011)…………………………..………..11

*In re Monster Worldwide, Inc. Secs Litig.,*
    251 F.R.D. 132, 135-36 (S.D.N.Y. July 14, 2008)………………..…………12

*In re Pet Foods Prod. Liab. Litig.,*
    629 F.3d 333, 358 (#d Cir. 2010)…………………………………………………23

*In re Thornburg Mortg., Inc. Secs. Litig.,*
    885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012)…………………..…………23

*In re Vitamins Antitrust Class Actions,*
    215 F.3d 26, 30 (D.C. Cir. 2000)……………………………………………9

*In re Vioxx Prods. Liab. Litig.,*
    MDL No. 1657, 239 F.R.D. 450, 460-63 (E.D. La. 2006)………………..…17

*Ira Holtzman, C.P.A. & Assocs. Ltd. V. Turza,*
 728 F.3d 682, 689 (7th Cir. 2013)……………………………………..……22, 23

*Johnston v. Comerica Mortg. Corp.,*
 83 D.3d 241, 246 (8th Cir. 1996)………………………………………..……11

*Lobatz v. U.S. West Cellular of Cal., Inc.,*
 222 F.3d 1142, 1147 (9th Cir. 2000)……………………………………….……20

*Klier v. Elf Atochen N. Am., Inc.,*
 658 F.3d 468, 474, 475, 478, at 480 (5th Cir. 2011)………………….…..21, 22, 23

*Madison v. Chalmette Ref., L.L.C.,*
 637 D.3d 551 (5th Cir. 2011)…………………………………………..……..16

*Marek v. Lane,*
 134 S.Ct. 8, 9 (2013)……………………………………………………………..22

*MD v. Perry,*
 675 F.3d 832, 839-41 (5th Cir. 2012)…………………………...……………13, 14

*Mirfasihi v. Fleet Mortgage Corp.,*
 356 F.3d 781, , 784, 785 (7th Cir. 2004)…………………………………….5, 23

*Mullen v. Treasure Chest Casino, L.L.C.,*
 186 F.3d 620, 625 (5th Cir. 1999)…………………………………………..13

*Nachshin v. AOL, LLC,*
 663 F.3d 103, 1038 (9th Cir. 2011)………………………………………….23

*Ortiz v. Fibreboard Corp.,*
 527 U.S. 815, at 844 n.20, 856, 857 (1999)………………..……...…..9, 11, 13, 16

*Redman v. RadioShack, Corp.,*
 -- F.3d --, 2014 U.S. App. LEXIS 18181 (7th Cir. Set. 19, 2014)…………..7, 12

*Reynolds v. Beneficial Nat'l Bank,*
 288 F.3d 277, 282 (7th Cir. 2002)………………………………………….10, 12

*Silber v. Mabon,*
 957 F.2d 697, 701 (9th Cir. 1992)………………………………………….5

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
 463 F.3d 646, 652 (7th Cir. 2006)…………………………………………….5

*U.S. v. City of Miami,*
    614 F.2nd 1322, 1331 (5th Cir. 1980)......................................................5

*U.S. v. City of Miami,*
    664 F.2nd 435 (5th Cir. 1981)(*en banc*)..........................................5

*Walmart,*
    135 S.Ct. at 2551, 8556.........................................................14, 15

*Weinberger v. Great N. Nekoosa Corp.,*
    925 F.2d 518, 524, 525 (1st Cir. 1991)........................................19, 20

**Rules and Statutes**

15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6)...................................................19
Fed. R. Civ. Proc. 23(a)..................................................................6
Fed. R. Civ. Proc. 23(a)(3)..............................................................12
Fed. R. Civ. Proc. 23(a)(4)...........................................7, 8, 9, 10, 11, 12
Fed. R. Civ. Proc. 23(b)(1)(B)...........................................................10
Fed. R. Civ. Proc. 23(b)(3)..............................................................15
Fed. R. Civ. Proc. 23(c)(5)...............................................................9
Fed. R. Civ. Proc. 23(e)................................................................6, 9
Fed. R. Civ. Proc. 23(e)(3)..............................................................24
Fed. R. Civ. Proc. 23(h)..............................................................19, 21

Other Authorities

ALEXANDRA N. ROTHMAN
    *Note: Bringing an End to the rend; Cutting Judicial "Approval"*
    *"Rejection" out of Non-Class Mass Settlement,*
    80 Fordham L. Rev. 319, 324 (2011).............................................17

AM. LAW INSTITUTE
    *Principles of the Law of Aggregate Litig.* § 3.05(c),
    §3.07 §  3.13 (2010)..........................................................7, 19, 22

CHARLES SILVER
    *Due Process and the Lodestar Method,*
    74 Tulane L. Rev. 1809,1839 (2000)..............................................21

FEDERAL JUDICIAL CENTER
    *Manual for Complex Litigation §21.612, § 21.71*  (4th ed. 2004)...............6, 19

LAWYER BARONS
    522-25.........................................................................21

MARTIN C. FELDMAN
    *Predominance and Products Liability Class Actions:*
    *An Idea Whose Time Has Passed?,*
    74 Tul. L. Rev. 1621 (2000)...............................................................17

MARTIN H. REDISH, PETER JULIAN & SAMANTHA ZYONTA
    *Cy Pres Relief and the Pathologies of the Modern Class*
    *Action: A Normative and Empirical Analysis,*
    62 Fla L. Rev. 617, 657 n.171, 661 (2010).........................................22

RICHARD NAGAREDA
    *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U.L.
    Rev. 97, 132 (2009).....................................................................15

THOMAS E. WILLGING & EMERY G. LEE III
    *From Class Actions to Multidistrict Consolidations:*
    *Aggregate Mass-Tort  Litigation after Ortiz,*
    58 U. Kan. L. Rev. 775, 806 (2010)..................................................17

## Introduction

Chronic traumatic encephalopathy, or "CTE," is endemic among former NFL football players. With current medical technology, CTE can only be definitively identified posthumously, but the Department of Veterans' Affairs, in a study of 79 deceased NFL players, found that 76 suffered from CTE. "76 of 79 Deceased NFL Players Found to Have Brain Disease," PBS Frontline, Sep. 30, 2014.

It is thus virtually certain that objector and retired NFL player Craig Heimburger suffers from CTE. Heimburger, who is only 37, is already suffering personality changes, cognitive impairment, and hypopituitarism after a career as an offensive lineman that required him to play through concussions. But a class action settlement that will pay attorneys $112,500,000 in clear sailing fees (plus whatever else those class attorneys collect from class members whose retainer agreements permit them to collect more) pays Heimburger and most class members nothing, unless they can jump through extraordinary hoops and show extraordinary cognitive impairment—and still compensates him nothing for CTE and head trauma consequences like personality changes and hypopituitarism because he does not easily fit within the arbitrary grid categories that only compensate certain uncertified subclasses of the class. Worse, class members like Heimburger—an offensive lineman who played years in the NFL and in NFL-operated leagues, suffering in-game concussions that he was required by team doctors to play through, who will almost certainly be diagnosed with CTE after the preliminary approval date—will have any compensation from the settlement reduced 40% to 60% because he will not get full credit for a fifteen-game season and preseason in NFL Europe or his time in full-contact practices and playing in preseason games. For example, Heimburger practiced for and played offensive line in four preseason games for the Houston Texans, games where the NFL charged fans full-price tickets, and where Heimburger was getting hit just as hard by NFL-caliber players—but receives no "credit" for that time's contribution to his CTE, because he was cut from the active roster before the season started after suffering a career-ending shoulder injury in practice. As the

Morey objection persuasively shows, the two-settlement-subclass structure suffers from fatal Rule 23(a)(4) flaws of adequate representation.

Too, the grid's arbitrary and capricious nature shows exactly why appellate courts consistently refuse to permit personal-injury classes to be certified. It is arbitrary and capricious to say a field-goal kicker with five years' service (playing in a handful of plays each game, and rarely in contact with other players) has a case twice as good as, for example, an offensive or defensive lineman (who plays nearly half of the plays on average, and who is getting hit each play by large strong fast men) who played two full seasons in the NFL and a full season in NFL Europe, and then parts of other preseasons, and suffered multiple concussions. But the procrustean settlement structure blurs these individualized circumstances. This is wrong, and precludes class certification.

The settlement has other fatal flaws. The clear sailing and separate fund for the attorneys' fees have been identified as "questionable provisions" by multiple appellate courts that deprive the class of their due. It is further problematic that the attorneys will be paid from this separate fund based on actuarial estimates that plaintiffs have the incentive to inflate now, rather than what the protocols actually provide over the decades, and still more problematic if retainer agreements that permit class counsel to engage in double-dipping are not voided. There is no guarantee that class counsel will not ultimately receive more than the class. The settlement further fails to prioritize class recovery by counting as a "benefit" self-promotional money the NFL will pay to non-class members. That $10 million should be reserved for class members.

Heimburger adopts and joins in full the Morey objection, the objections in the Public Citizen amicus brief and any other filed objection (and those objections' supporting evidence) to the extent those objections and evidence are not inconsistent with this one. Heimburger objects to any settlement provision purporting to limit his right to object or appeal adverse rulings.

## I.   Craig and Dawn Heimburger are class members.

Craig Heimburger played offensive line in the NFL and NFL Europe for five teams between 1999 and 2002. His address is 2022 Cerney Court, Millstadt, IL 62260; his phone number is (618) 410-7805; and his date of birth is February 3, 1977. Dawn Heimburger is his wife, and thus also a class member. Mr. Heimburger's attached declaration details his playing history and injuries in detail, but we summarize here.

The Green Bay Packers drafted Heimburger in the fifth round in 1999. He played four preseason games and two regular-season games and spent time four games on the Active List, and several other games on the practice squad before suffering a tear of his MCL in the second half of the season in a collision that bent his steel knee brace in half. Section 2.1(kk) of the settlement credits Heimburger with an "Eligible Season" for this time.

In 2000, the Green Bay Packers required Heimburger to play in NFL Europe for the Rhein Fire in Dusseldorf, Germany. Heimburger played four preseason games, ten regular season games, and the championship game. That season, Heimburger suffered a serious concussion in a game, but stayed in the game despite memory loss and vomiting. Section 2.1(kk) of the settlement credits Heimburger with 0 "Eligible Seasons" for these fifteen games where the NFL realized revenue.

In 2000, Heimburger played four preseason games for the Green Bay Packers, and spent most of the season on the Packers practice squad. Later in the season, he was signed by the Cincinnati Bengals, where he was on the active roster, but did not appear in a regular-season game. While he was on the 53-man roster and participated in full contact practices there, he did not play in any regular-season games, and he was only on the 46-man "dress list" for the final two games of the season. It is ambiguous from the settlement definitions whether the settlement will credit Heimburger with an "Eligible Season" for this time, though his role as a backup lineman meant that his practices and injury exposure were more intense than many players who have "Eligible Season" status for the same year.

In 2001, Heimburger played four preseason and eleven regular season games for the Buffalo Bills. He suffered concussions in at least two games (both times during a dangerous "kickoff return wedge" banned by the NFL in 2009 for safety reasons but then standard procedure for most teams), but was required to stay in the game despite memory loss and nausea. The settlement credits Heimburger with an "Eligible Season" for 2001.

In 2002, Heimburger played four preseason games for the Houston Texans, but was cut before the regular season started because of a shoulder injury he suffered during special teams practice. Heimburger receives no credit for this NFL time, though the NFL charged full price for these games, which were broadcast on television.

While much of Heimburger's NFL time was spent on the practice squad, this time is full-contact time, and often results in more collisions than active players realize, because lineman on the practice squad are playing both offense and defense and special teams with very few breaks. Journeymen players on the practice squad are always on the cusp of being cut from the team without pay. A player who complains of migraines and head injuries will be suspected of being insufficiently tough or of malingering.

The overwhelming majority of NFL players who have been autopsied suffer CTE. It is virtually certain that Heimburger, who suffered multiple concussions and was regularly hit while playing and practicing in the trenches of NFL and NFL Europe line play, has CTE. Among the symptoms of his head trauma are personality changes, memory loss, cognitive impairment, and hypopituitarism. Only some of these CTE and head-trauma-related symptoms are compensated by the settlement—and should Heimburger be able to jump through the hoops and demonstrate cognitive impairment within the narrow scope of settlement relief, any recovery will face a 40% to 60% deduction because it fails to fully credit him with 33 games he played for NFL entities plus his brutal time on the practice squad, because those games and practice time were not "regular or postseason" NFL games. Unfortunately, for thousands of players like Heimburger, head trauma cares not whether the hits count in the league standings.

4

## II. Standards for settlement review.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval. In contrast, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations. And thus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). "Careful scrutiny by the court is 'necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members.'" *Holmes v. Cont'l Can Co.,* 706 F.2d 1144, 1147 (11th Cir. 1983) (quoting *U.S. v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980), *modified on other grounds*, 664 F.2d 435 (5th Cir. 1981) (*en banc*)). ."Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (same). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). This duty is "akin to the high duty of care that the law requires of fiduciaries." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006)).

The Court's oversight role does not end at making sure that the settling parties engaged in properly adversarial arm's length settlement negotiations. "In class-action settlements, the adversarial process—or what the parties here refer to as their 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members. For the

economic reality [is] that a settling defendant is concerned only with its total liability, and thus a settlement's allocation between the class payment and the attorneys' fees is of little or no interest to the defense…. And that means the courts must carefully scrutinize whether [class counsel's and the named representatives'] fiduciary obligations have been met." *Pampers*, 724 F.3d at 717-18 (internal quotations omitted).

This is especially true in this case, because that burden is yet heightened because this settlement has been proposed before class certification. Delaying certification until settlement poses various problems, *see In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786-800 (3d Cir. 1995) ("*GM Trucks*"), and calls for heightened judicial scrutiny of the certification and the accompanying settlement. *Id.* at 807; *Pampers,* 724 F.3d at 721; *Bluetooth*, 654 F.3d at 946-47 (9th Cir. 2011) (citing cases from Second, Third, Seventh and Ninth Circuits); Federal Judicial Center, *Manual for Complex Litigation* § 21.612 (4th ed. 2004).

While it is *necessary* that a settlement is at "arm's length" without express collusion between the settling parties, it is not *sufficient.* "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (internal quotation omitted). Heimburger thus objects to the declaration of Layn Phillips to the extent it purports to issue a legal opinion as to the fairness of the settlement. Judge Phillips saw only the settling parties' *ex parte* presentation, did not consider any objections or views of absent class members, and has the biased incentive to proclaim his mediation work a success to promote other high-paying and high-profile assignments. Judge Phillips has given his imprimatur to settlements and fee requests he mediated that were later struck down by appellate courts or district courts as unreasonable and unfair. *E.g.*, *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013). Moreover, the Phillips declaration contains a basic error of both law and economics, in claiming that the "questionable provision" of a segregated fee request is a class benefit that doesn't come at class expense. Courts disagree.

*Compare* Phillips Decl. ¶ 21 *with In re GMC Pick-Up Trucks Fuel-Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995) ("*GM Trucks*") (A severable fee structure "is, for practical purposes, a constructive common fund."); *GM Trucks*, 55 F.3d at 821 ("[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."); *Redman v. RadioShack Corp.*, -- F.3d --, 2014 U.S. App. LEXIS 18181 (7th Cir. Sep. 19, 2014); *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014); *Bluetooth*, 654 F.3d at 947-49.

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." Am. Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010). "The burden of proving the fairness of the settlement is on the proponents." *Pampers*, 724 F.3d at 718 (compiling cases and authorities). An actual showing is required, beyond a court's "complete confidence in the ability and integrity of counsel." *Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1315 (11th Cir. 2013).

The settling parties focus on the *Girsh/Sullivan* factors for settlement fairness, but those factors are not exclusive. Thus, for example, *In re Baby Products Litig.* struck a settlement because it did not prioritize direct class recovery. 708 F.3d at 178-79. *Dewey v. Volkswagen AG* reversed a settlement approval where the *Girsh* factors were not challenged, but the parties failed to provide separate representation as Rule 23(a)(4) requires to an uncertified subclass disadvantaged in settlement recovery. 681 F.3d 170 (3d Cir. 2012).

## III.   The class cannot be certified.

Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013). The settlement classes do not meet these stringent requirements.

### A.   Adequacy is absent.

Pages 20 through 36 of the Morey objection make a sound and dispositive argument against both class certification under Rule 23(a)(4) and settlement fairness, and Heimburger

adopts it in full, in particular the arguments relating to NFL Europe and the arguments relating to the problem of narrow settlement benefits that arbitrarily exclude many class members who suffer injury. (It is unclear whether Mr. Heimburger's suffering will be deemed to rise to the level of "Level 1.5 Cognitive Impairment," and unfair that he is being required to guess what "approved" doctors will say.) Two settlement classes are not enough for a fact-pattern this complex (and even if it were, the separate representation is questionable when each of the attorneys for each of the subclasses separately represented individual clients in the other subclass and did not ever disclose that conflict). There are many intra-class conflicts, but the one affecting Heimburger personally is particularly egregious: NFL Europe players had their rights bargained away to increase the recovery to more prestigious players who were valued enough to be given an offseason to recover and not have to play in both a spring season and a fall season. The failure to credit this service time is especially problematic because it falls most heavily on journeymen players who (1) faced especially brutal practices in an attempt to prove themselves worthy of staying on the team and (2) are less likely to have five years of full NFL service time. Class counsel has explicitly admitted that he compromised this unrepresented subclass of players. Morey Obj. 35. None of the class representatives played for NFL Europe, and even if they had, separate representation would have been required. *Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012). Indeed, this settlement is *worse* for the prejudiced unrepresented subclass than the one in *Dewey*. In *Dewey*, the disfavored unrepresented and uncertified subclass still had a right of recovery, but the *hypothetical* prejudice to the disfavored subgroup required class decertification in the absence of separate representation—even though there was an explicit finding by the district court, affirmed by the Third Circuit, that all of the subgroups were treated fairly and received adequate relief.

Moreover, put simply, the intra-class equity requirement cannot be met when class members suffered a wide variety of diverse injuries in diverse circumstances. *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 193-194 (5th Cir. 2010). Settlement approval and the U.S. Constitution require a finding of adequacy of class representatives under Rule 23(a)(4). The Rule

23 adequacy inquiry is intended to uncover "conflicts of interest between the named plaintiffs and the class they seek to represent." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001) (*quoting Amchem Prods. v. Windsor*, 521 U.S. 591, 625, (1997)). The settling parties cannot meet this constitutional requirement. For this independent reason, the class cannot be certified.

While the Morey objection makes a persuasive case against finding Rule 23(a)(4) adequacy, it misses some directly on-point precedent and other arguments against class certification. Heimburger thus supplements the Morey objection as follows, while attempting to minimize duplication in briefing.

### 1. *Amchem* dispositively demonstrates an intra-class conflict.

It "is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under [what is now Rule 23(c)(5)], with separate representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (citing, *inter alia, Amchem,* 521 U.S. at 627).

A "district court has a duty under Fed. R. Civ. P. 23(e) to ensure that [a settlement] is fair, adequate, and reasonable and is not the product of collusion between the parties. Thus Rule 23(e) provides a check against settlement dynamics that may 'lead the negotiating parties—even those with the best intentions—to give insufficient weight to the interests of at least some class members.'" *In re Vitamins Antitrust Class Actions,* 215 F.3d 26, 30 (D.C. Cir. 2000). Unfortunately, insufficient weight was given to multiple groups of class members. This precludes certification as a matter of law. As Judge Smith noted in dissent in *In re Asbestos Litigation*, class "representative must possess the same interest and suffer the same injury as the class members and must be aligned in interest such that no conflicts exist between the representative and any discrete subclasses within the broader class he purports to represent. *Amchem* demands a structural assurance of fair and adequate representation for the diverse

groups and individuals affected." 134 F.3d 668, 677 (5th Cir. 1999). That dissent was vindicated when the Supreme Court reversed the Fifth Circuit for just this reason in *Ortiz*, 527 U.S. 815. This Court should not repeat the error, and must deny class certification.

As a first principle, it is "altogether proper" to conduct a "close inspection" of the terms of settlement when evaluating whether adequacy is met. *See Amchem., v. Windsor*, 521 U.S. 591, 619-20 (1997); *accord Radcliffe, supra* ("[O]ur [23(a)(4)] analysis focuses on the agreement."). Unless the stakes are "modest[]," a settlement paying differently situated class members the same is a "defect" creating an unsupportable intraclass "conflict of interest." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (citing *inter alia Amchem*).

Where a class fails on a structural level, it must be vacated without regard to whether "the class members' interests were not actually damaged." *Dewey v. Volkswagen AG*, 681 F.3d 170, 189 n.19 (3d Cir. 2012). When a portion of the class lacks representation, the Rule 23(a)(4) failure cannot be solved by claiming "no harm, no foul"—and it's far from clear here that there was no harm, given the prejudice to (1) class members who played in NFL Europe but do not have five years' "Eligible Seasons", and (2) class members who suffer cognitive injury (such as personal changes or hypopituitarism) that is not compensated by the settlement. Too, the settlement irrationally treats three regular-season games as a kicker or punter as identical in service time to a full twenty-game preseason and regular season played by a lineman who is getting hit on nearly every play—with the spectrum of quarterbacks, defensive backs, wide receivers, linebackers, and running backs in between.

Any attempt to distinguish *Amchem* fails. That this class is smaller than the *Amchem* class does not preclude a Rule 23(a)(4) conflicts problem; the issue is the scope of the class, and nothing in *Amchem* turned on a threshold size of the class—and in any event a class of thousands of people is hardly small. That this is supposedly an uncapped fund (assuming the NFL still exists in a decade's time) is irrelevant: the district court in *Amchem* explicitly found that Amchem's "assets suffice to pay claims under the settlement." 521 U.S. at 626. The Supreme Court found that irrelevant: "Although this is not a 'limited fund' case certified under Rule

23(b)(1)(B), the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability." *Id.* at 626-27. The same is true here. *Accord Dewey, supra* (decertifying class even though parties alleged that limited fund could have compensated disfavored, uncertified, and unrepresented subgroup of settlement class).

*In re Literary Works* provides another example directly on point. 654 F.3d 242 (2d Cir. 2011). Class counsel attempted to negotiate compensation from Google for three separate "categories" of class members in a single settlement class action. *Id.* at 246. Each category received a different damages formula. *Id.* As in this case, each class representative "served generally as representative for the whole, not for a separate constituency." *Id.* at 251 (quoting *Amchem*, 521 U.S. at 627). The Second Circuit did not dispute that each category had differently valued claims; nor did it make any finding that the compensation negotiated for any category was unfair or inadequate. Nevertheless, the settlement was stricken on Rule 23(a)(4) grounds: the class representatives "cannot have had an interest in maximizing compensation for *every* category." *Id.* at 252 (emphasis in original). *See generally Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). This case is in a considerably worse posture than *Literary Works*, which had only three separate categories that were relatively similar in nature. Here, the grid is in dozens of categories, with many individualized class differences read out, other immaterial class differences used to create unfair discounts, and numerous injuries going without compensation altogether.

*Amchem, Dewey,* and *Literary Works* are correct.

That the NFL has not provided a single settlement fund, but has agreed to pay all claims that come, does not change the analysis. The NFL was not negotiating in a vacuum: it had a dollar figure it was willing to settle the case for, and every dollar extracted for clear-sailing attorneys' fees and the favored uncertified subclasses of more high-profile players came at the expense of the disfavored uncertified subclasses (such as NFL Europe players). "[I]n essence the entire settlement amount comes from the same source." *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996). Thus, whether a settlement is limited-fund or an uncapped fund

that the defendant estimates the value of *ex ante* matters not a jot in the Rule 23(a)(4) conflicts analysis.

### 2.      Typicality is absent as well.

Similarly, because of the adequacy problems discussed above, and the predominance and commonality problems discussed below, the class representatives do not satisfy typicality. Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members. *In re Am. Medical Sys.*, 75 F.3d 1069, 1083 (6th Cir. 1996). These representative requirements are rooted in constitutional due process concerns because of the preclusive effect of a class action judgment or settlement. *See Hansberry v. Lee*, 311 U.S. 32 (1940). As relatively successful players, neither Wooden nor Turner played in NFL Europe nor accumulated fewer than five "Eligible Seasons." While Wooden has ALS, neither Wooden nor Turner have the injuries manifested by Heimburger, which may or may not ever ultimately qualify for a compensation category given the limitations of the neurological criteria identified by the Morey Objection.

### 3.      The upside-down class representative selection independently precludes class certification.

The procedural posture of this case provides an independent reason why it is inappropriate to certify as a class action. First, there were Plaintiffs' Executive and Steering Committees with hundreds of individual personal-injury cases (including Heimburger's, *see* Docket No. 9, Short-Form Complaint); then there were settlement negotiations; and only then did the PEC/PSC select class representatives to ratify a *fait accompli*. When this happens, it makes a mockery of the class action process, and Rule 23(a)(4) adequacy cannot be satisfied: the "willing pawn of counsel" cannot be appointed class representative, because they cannot meaningfully supervise class counsel when they have been handpicked to rubber-stamp class

counsel's decisions. *In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 135-36 (S.D.N.Y. July 14, 2008); *cf. Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) (class counsel selecting new representatives to replace ones objecting to settlement); *Redman, supra.* Every class representative in this case represented class counsel, and was handpicked to support what class counsel wanted, which in this case was legal certainty to generate over $100 million in fees for themselves. *Cf. Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1163-67 (9th Cir. 2013). Thus, the *ipse dixit* of these class representatives cannot assure adequacy. *Id.* at 1166; *cf. Ortiz*, 527 U.S. at 857 n.31.

### B.     Commonality is absent

The Supreme Court's 2011 decision in *Wal-Mart* marked a sea change in the law of commonality. *E.g., M.D. v. Perry*, 675 F.3d 832, 839-40 (5th Cir. 2012). The bygone lenient (a)(2) standard of some circuits simply required "at least one issue, the resolution of which will affect all or a significant number of class members." *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625 (5th Cir. 1999). Post *Wal-Mart*, however, commonality requires the plaintiff to demonstrate that the class members have "suffered the same injury." *M.D.*, 675 F.3d at 840 (quoting *Wal-Mart*, 135 S. Ct. at 2551) (internal quotation omitted). "This does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart*, 135 S. Ct. at 2551.

The problem here is that class members have been injured in unique and disparate ways, they have not "suffered the same injury" even though they may have all "suffered a violation of the same provision of law." Class members have individualized experiences (reduced in procrustean to service time regardless of the number of damaging hits they suffered) and individualized manifestations of CTE (only some of which are compensated by the settlement).

The common questions that matter for determining commonality and cohesion are those "that qualify each class member's case as a genuine controversy." *Amchem*, 521 U.S. at 623. There is a further problem of bringing a class action attempting to waive rights regarding *future*

*injury* that has not yet manifested. There is considerable doubt that exposure to the cause of a potentially latent injury alone is sufficient to overcome the threshold for Article III standing. *See, e.g., Ortiz*, 527 U.S. at 831; *Amchem*, 521 U.S. at 611-12; *In re Asbestos Litig.*, 90 F.3d 963, 1015 (5th Cir. 1996) (Smith J., dissenting) ("The majority's decision to affirm certification in this case, however, obligates it to address *sua sponte* if necessary the troubling jurisdictional problems raised by the district court's approval of the settlement."); *Georgine v. Amchem Prods.*, 83 F.3d 610, 635-38 (3d Cir. 1996) (Wellford J., concurring) (finding an Article III impediment to exposure-only class members). This is problematic for someone like Heimburger, who, might, for example, if he knew for sure that he would be diagnosed with ALS before 2022, be willing to accept the settlement benefits if the settlement gave him full credit for his service time without deduction. But in a world where Heimburger cannot know whether he will suffer future injuries that fit within category definitions or future injuries that fall outside of category definitions, he cannot make an intelligent decision whether to stay in or opt out. He stays in in the hopes that his objection fixes the problems with the settlement, so that there is a settlement that fairly compensates him and players similarly situated to him.

Abstracting to this degree is akin to the exact analytical efforts rejected in *Wal-Mart* and *M.D.* Just as Title VII injuries can occur in varied ways (*Wal-Mart*), and injuries from a dysfunctional foster care system can occur in varied ways (*M.D.*), personal injuries suffered here will manifest in varied ways and have a variety of potential causes. Heimburger, who clearly suffered head trauma through multiple in-game concussions and migraines throughout his career, is differently situated than a player without that injury history.[1]

---

[1] Notably, the district court in *Amchem* also relied upon the commonality of the "exposure" question. 521 U.S. at 623. Justice Ginsburg's opinion held that even assuming that it satisfied commonality, such an issue would not satisfy (b)(3) predominance: "Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard." *Id.* at 624. *See infra* §I.B.

A court must "'focus' on dissimilarities among the proposed class members 'in order to determine whether there is even a single common question.'" *M.D.*, 675 F.3d at 841 (quoting *Wal-Mart*, 135 S.Ct. at 8556). "What matters to class certification…is not the raising of common 'questions'—even in droves— but, rather the capacity of a classwide proceeding to generate common *answers*.... Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 135 S. Ct. at 2551 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). The dissimilarities in the type, kind and magnitude of injury suffered by medical benefit class members undermines the ability to generate any common answer via a class proceeding.

### C.      Predominance is absent.

Appellate courts simply do not permit the certification of personal-injury classes because of the predominance problem.

"Even if Rule 23(a)'s commonality requirement may be satisfied by…shared experience, the predominance criterion is far more demanding." *Amchem*, 521 U.S. at 623-24. *Accord Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601-02, 603 (5th Cir. 2006). "The predominance inquiry requires that questions of law or fact common to members of the class predominate over any questions affecting only individual members." *Steering Comm.* 461 F.3d at 601. The "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

Although generally applicable conduct is likely *necessary* to a finding of (b)(3) predominance as well as (a)(2) commonality, it is not *sufficient*. The general rule is this:

> "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits." [*Steering Comm*, 461 F.3d. at 604 (quoting Advisory Committee's Note to Fed. R. Civ. P. 23(b)(3) and citing *Castano*, 84 F.3d at 745 n.19; *Georgine v. Amchem Prods. Inc.*,

83 F.3d 610, 627-28 (3d Cir. 1996); *In re Am. Medical Sys.*, 75 F.3d 1069, 1084-85 (6th Cir. 1996)).]

In *Steering Comm.*, the Fifth Circuit rejected certification of a class of individuals allegedly exposed to toxic smoke from fire at a chemical plant. Significantly, "it [was] clear from the record that the damages claims [were] not subject to any sort of formulaic calculation." 461 F.3d at 602; *accord Comcast Corp., v. Behrend*, 133 S.Ct. 1426, 1433 (2013) (without a methodology to calculate damage measurement, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."); *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551 (5th Cir. 2011). So too here, where the damages claims are individualized and not subject to any sort of meaningful, organic, formulaic calculation. Instead, there is merely the artificial and procrustean matrix designed by class counsel. Indeed, once again, this case is worse situated than *Steering Committee* or *Madison*, each of which alleged injury from a single incident; here, class members have individualized injury histories and different experiences with concussions and head injuries.

That this is a settlement class makes no difference. *Amchem*, 521 U.S. at 620 (expressing need for "undiluted, even heightened attention" to certification criteria in settlement context); *Ortiz*, 527 U.S. at 844 n.20. "Proposed settlement classes sometimes warrant more, not less, caution on the question of certification." *Amchem*, 521 U.S. at 620 n.16 (citing *Georgine v. Amchem Prods.*, 83 F.3d 610, 626-35 (3d Cir. 1996)).

*Amchem*, consistent with the Advisory Committee's "call for caution when individual stakes are high and disparities among class members are great," concluded that a putative class of mass tort victims failed to satisfy (b)(3) predominance. *Amchem*, 521 U.S. at 624. *Amchem's* reasoning can be imported almost seamlessly to the facts of this case. Predominance is not satisfied when

> "[c]lass members were exposed to [different sources of injury], for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only [superficial damage], while others suffer from [severe and chronic ailments]...Each

has a different [health history], a factor that complicates the causation inquiry. The exposure-only plaintiffs especially share little in common with each other or with the presented injured class members. It is unclear whether they will contract [CTE-related symptoms] and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories" *Id.* (quoting *Georgine*, 83 F.3d at 626).

While the parties are to be commended for creating a future-injury and a past-injury subclass, curing one of the many failings of *Amchem*, this was necessary, but not sufficient— even if one assumes that the separate representation was really separate.

The consensus against mass-tort personal-injury class actions is so weighty that it spawned the present generation of non-class aggregation litigation. *See* Thomas E. Willging & Emery G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation after Ortiz*, 58 U. KAN. L. REV. 775, 806 (2010); *see also* Alexandra N. Rothman, *Note: Bringing an End to the Trend: Cutting Judicial "Approval" and "Rejection" out of Non-Class Mass Settlement*, 80 FORDHAM L. REV. 319, 324 (2011) (citing *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 239 F.R.D. 450, 460-63 (E.D. La. 2006) (denying class certification under Rule 23(b)(3) because common issues of fact did not predominate) and Martin L.C. Feldman, *Predominance and Products Liability Class Actions: An Idea Whose Time Has Passed?*, 74 TUL. L. REV. 1621 (2000) (noting the resistance to certification under Rule 23(b)(3) for products liability cases)). "This progression away from the class action, particularly in the context of mass torts, is an oft-told story." Rothman, *supra*, at 327 n.53; *see also* Deborah R. Hensler, *Has the Fat Lady Sung? The Future of Mass Toxic Torts*, 26 REV. LITIG. 883 (2007) (discussing the rising future in non-class aggregative disposition of mass toxic torts in lieu of class actions).

~ ~ ~

For these multiple independent reasons, certification of just two subclasses is not permissible.

**IV.     Notice failed to comply with due process.**

Heimburger adopts by reference the Morey Objection's arguments in Section II of their objection at pages 37-53.

**V.     The settlement creates unfair barriers designed to throttle recovery, and the actual recovery realized by the class will thus be unfair.**

Heimburger adopts by reference the Morey Objection's arguments at pages 54 through 84, with the exception of Section III.F.

In particular, the Morey Objection fails to make perhaps one of its strongest arguments in favor of Section III.E.4: the complex settlement procedure here is not just comparable to the one rejected in *Eubank v. Pella Corp.*, but is considerably worse than the procedure ultimately rejected by the Third Circuit in *Baby Products*. In *Baby Products,* the parties made $35.5 million available in a settlement fund—but then created a claims process that resulted in less than $3 million actually distributed to the class. This failure to prioritize direct recovery, and the district court's failure to consider what the class would *actually* receive, resulted in reversal of the settlement approval. As *Eubank* shows, an actuarial expert estimate of future claims (especially when that estimate was designed to demonstrate via stress test the worst-case scenario for settlement-fund exhaustion) does not substitute for an analysis of how many claims will actually satisfy the hoops. As *Baby Products* shows, even a five-page claim form can deter much of a settlement fund from being claimed. And this settlement has many more hoops than *Baby Products,* and a much more arduous secondary litigation before recovery is possible than *Eubank.*

A multistage claims process should not be treated as identical to a settlement where the NFL writes hundreds of millions of dollars of checks. While there is no dispute about the need for a claims process, treating the actuarial prediction of maximum recovery without any discounting for the fact that cognitively injured football players are poorly situated to protect their rights runs afoul exactly of the problem in *Baby Products* and *Eubank*: class counsel

obtaining an exaggerated share of the settlement proceeds by creating the illusion of relief without actually requiring the defendant to forfeit cash. 753 F.3d at 723-26. *See also* Advisory Committee Notes on 2003 Amendments to Rule 23 ("it may be appropriate to defer some portion of the fee award until *actual payouts* to class members are known" (emphasis added)); *id.* ("fundamental focus is the result *actually achieved* for class members" (emphasis added); *id.* (*citing* 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest *actually paid* to the class" (emphasis added))). *See also* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.13 (2010) ("*ALI Principles*"); Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71 (2004) ("In cases involving a claims procedure ... , the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits *actually delivered.*"); *cf. Dennis*, 697 F.3d at 868 (chronicling problem of "fictitious" fund valuations that "serve[] only the 'self-interests' of the attorneys and the parties, and not the class."). Class counsel should only be paid when class members are paid.

The problem of the *Girsh/Prudential* factors is especially exacerbated given that the Morey motions for discovery have not been honored. That said, Heimburger's other objections are independent of any factual findings on the *Girsh/Prudential* factors.

## VI.    "Questionable provisions" demonstrate a conflict of interest by class counsel that should preclude settlement approval, especially when Rule 23(h) has been violated.

Class counsel has negotiated a nine-digit sum for themselves, paid upfront, even as class members will only be paid over the ensuing decades, and subject to a clear-sailing agreement forbidding the NFL from challenging the request. A clear sailing clause stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great N. Nekoosa Corp.*, 925

F.2d 518, 525 (1st Cir. 1991). The clear sailing clause lays the groundwork for lawyers to "urge a class settlement ... on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; *accord Bluetooth*, 654 F.3d at 947. The fee is placed in a segregated fund, so that any reduction of an excessive fee request redounds to the benefit of the NFL, rather than the class, even though the NFL was willing to put that money on the table. Here, class counsel put its own fees ahead of the interests of the class by negotiating provisions that insulated those fees from challenge by the defendant and the class. Notwithstanding the Phillips Declaration's laudatory praise, this is an abusive and "questionable" settlement structure. *Eubank*, 753 F.3d at 723. The Court should require the parties to "delete" this provision, so that any reduction in the fee request redounds to the class in the form of an augmented payment structure or elimination of arbitrary deductions. *Id.*

Such reversion is also known as a "kicker." A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Bluetooth*, 654 F.3d at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* The kicker, like the disproportionate allocation and like the clear-sailing agreement, is a sign "that class counsel have allowed pursuit of their own self-interests ... to infect the negotiations." *Id.* at 947. The *Bluetooth* warning signs create a special obligation for the district court "to assure itself that the fees awarded in the agreement were not unreasonably high ... for if they were, 'the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained.' " *Id.* at 947. If "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000).

The problem is that, normally, when attorneys demand excessive fees from a single common fund, a district court can correct any settlement unfairness problem by denying the Rule

23(h) request in part, and reallocating the excess to the class. *E.g., In re Citigroup Sec. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (reducing excessive fee request by $26.7M for benefit of shareholders). But such a settlement cure to a disproportionate oversized fee request is impossible when clear-sailing fees are effectively placed in a segregated fund away from the class's reach—unless, as *Eubank* suggests, the court requires the parties to "delete" the "questionable" provision. "If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is ***no apparent reason*** the class should not benefit from the excess allotted for fees." *Bluetooth*, 654 F.3d at 949 (emphasis added).

Such reversions are bad public policy for other reasons. The reversionary fee arrangement is "a strategic effort to insulate a fee award from attack." Charles Silver, *Due Process and the Lodestar Method*, 74 TULANE L. REV. 1809, 1839 (2000). Professor Lester Brickman deems such provisions *per se* unethical precisely because of the possibility of reversion to the defendant. LAWYER BARONS 522-25 (2011). When segregated funds cause excessive fees to revert to the defendant instead of the class, and there is also a clear sailing award, it will often mean that a judge will see only an *ex parte* presentation of the fee request.

The Court should require the parties to correct these problems before approving the settlement.

### VII.   The $10 million fund breaches class counsel's fiduciary duty to the class.

The settlement provides for a separate $10 million fund to promote the NFL's safety measures to future football players. This *ex ante cy pres* for the benefit of non-class members is in and of itself unfair.

The legal construct of *cy pres* (from the French "*cy pres comme possible*"—"as near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its literal terms. *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011). Imported to the class action context, *cy pres* is a "misnomer—though

one common in the legal literature." *Ira Holtzman, C.P.A., & Assocs. Ltd. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013) ("*Turza*"). Nevertheless, *cy pres* has recently become an increasingly popular method of distributing settlement funds to non-class third parties in lieu of class members. *Marek v. Lane*, 134 S.Ct. 8, 9 (2013) (Roberts, C.J., respecting denial of *certiorari*); Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 661 (2010). An *ex ante cy pres* award includes an award "that was designated as part of a settlement agreement or judgment [where] an amount and at least one charity was named as a recipient of part of the fund from the outset and the charity's receipt of the award was not contingent on there being remaining/unclaimed funds in the settlement fund." *Id.* at 657 n.171.

*Cy pres* is improper when it is feasible to make further distributions to class members, at least when such distributions do not result in a legal windfall. Section 3.07(a) of the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATION LITIGATION ("ALI PRINCIPLES") succinctly codifies the limitation: "If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members." This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d 468, 474 (5th Cir. 2011) (citing *ALI PRINCIPLES* § 3.07 cmt. (b)).

It was indubitably feasible to distribute the millions of dollars to class members. But rather than negotiate for using the $10 million to compensate class members or through higher matrix payments to those injured, eliminating the NFL Europe discount, class counsel gave that money away to non-class entities in dereliction of its fiduciary obligations.

*Cy pres* distributions are non-compensatory, disfavored among both courts and commentators alike, and remain an inferior avenue of last resort. *See e.g., In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("*Cy pres* distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated

and at worse illusory"); *id.* at 174 ("Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either"); *Klier*, 658 F.3d at 475 ("[The *cy pres*] option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly."); *Turza,* 782 F.3d at 689 (same); *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012) (*cy pres* settlement can easily become "a paper tiger"); *Nachshin v. AOL, LLC*, 663 F.3d 103, 1038 (9th Cir. 2011) ("[A] growing number of scholars and courts have observed, the cy pres doctrine...poses many nascent dangers to the fairness of the distribution process") (citing authorities); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); Redish et al., *Cy Pres Relief and Pathologies, supra.*

Legal windfall may constitute a reason to authorize a *cy pres* remedy. *See Klier*, 658 F.3d at 475. But it is mistaken to assert "full compensation" here. Augmenting claimants' distributions, especially those facing unfair discounts, would not constitute a legal windfall. Windfall compensation should be determined by comparing the relief obtained to the full measure of legal damages sought in the complaint, not to the agreed-upon payment ceiling of the settlement matrix. *See Klier*, 658 F.3d at 480 ("The fact that the members of Subclass A have received payment authorized by the settlement agreement does not mean that they have been fully compensated."); *cf. also Bluetooth*, 654 F.3d at 945 n.8 (examining whether relief obtained in settlement matched theory of the complaint). As in *Klier*, the personal injury "[c]laimants ... have already received some measure of compensation for their injuries, but it is far from full." 658 F.3d at 478.

The bare legitimacy of *cy pres* in the class action context is controvertible with good reason. *See In re Pet Foods Prod. Liab. Litig.*, 629 F.3d 333, 358 (3d Cir. 2010) (Weis, J., concurring and dissenting); *Marek, supra*; *Turza, supra*; *Klier*, 658 F.3d at 480-82 (Jones J., concurring); Redish et al., *supra*; *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012) (collecting sources). Although *cy pres* has been given a narrow berth in the Third Circuit, for the foregoing reasons, this particular application must be rejected.

**VIII.   The settlement is unfair to the extent that it permits double-dipping.**

Class counsel, on information and belief, have retainer agreements with hundreds of class members permitting them to recover contingent fees and unspecified "expenses" in excess of the $112 million provided by the fee agreement. Rule 23(e)(3) requires disclosure of these additional fee agreements, and class counsel should not be permitted two sets of recovery at the expense of class members—especially class members like Heimburger who have been prejudiced by a class-action settlement structure designed to maximize recovery to favored subclasses and the attorneys without fair compensation to him and class members situated like him.

**Conclusion**

For the foregoing reasons, settlement approval and class certification must be rejected.

At a minimum: (1) attorneys' fees should be tied to actual class recovery with no credit for moneys paid to non-class third parties, with any reversion to the class instead of the defendants; and (2) class counsel's fee agreements with class members should be voided to the extent they result in double-dipping.

DATED:  October 14, 2014                           Respectfully submitted,

_Gary P. Lightman, Esquire_
Gary P. Lightman, Esquire
Glenn A. Manochi, Esquire
1520 Locust Street, 12th Floor
Philadelphia, PA 19102
(215) 545-3000

*Attorneys for Craig A. Heimburger and*
*Dawn Heimburger*

For the foregoing reasons, we object to this settlement.

DATED: October /4, 2014

Craig Heimburger
2022 Cerney Court
Millstadt, IL 62260
(618) 410-7805

DOB: February 3, 1977

DATED: October /4, 2014

Dawn Heimburger
2022 Cerney Court
Millstadt, IL 62260
(618) 410-7805

DOB: July 17, 1976

25

## CERTIFICATE OF SERVICE

I hereby certify that on this the 14th day of October, 2014, I filed the foregoing with the

Clerk of the Court in the United States District Court for the Eastern District of Pennsylvania.   I

further certify that on this date a true and correct copy of the foregoing document has been

forwarded to all counsel below via U.S.  first class mail.

DATED:  October 14, 2014

Christopher A. Seeger
Co-Lead Class Counsel
SEEGER WEISS LLP
77 Water Street
New York, NY 10005

Steven C. Marks
Class Counsel
PODHURST ORSECK P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780

Arnold Levin
Counsel - Subclass 1
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Co-Lead Class Counsel
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, PA 19103

Gene Locks
Class Counsel
LOCKS LAW FIRM
The Curtis Center, Suite 720 East
601 Walnut Street
Philadelphia, PA 19106

Dianne M. Nast
Counsel - Subclass 2
NAST LAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107

Glenn A. Manochi [1]