# THE COFFMAN LAW FIRM

A PROFESSIONAL CORPORATION

FIRST CITY BUILDING

505 ORLEANS STREET, SUITE 505

BEAUMONT, TEXAS 77701

(409) 833-7700

(866) 835-8250 FACSIMILE

www.coffmanlawfirm.com

www.xdlgroup.com

RICHARD L. COFFMAN
rcoffman@coffmanlawfirm.com

SONYA B. COFFMAN
scoffman@coffmanlawfirm.com

October 13, 2014

Mr. Michael E. Kunz, Clerk of Court                    **VIA OVERNIGHT DELIVERY**
NFL Concussion Settlement
U.S. District Court for the Eastern District of Pennsylvania
James A. Byrne United States Courthouse
601 Market Street
Philadelphia, PA 19106-1797

Re:    Armstrong Objectors' Amended Objection to the June 25, 2014 Class Action Settlement
       Agreement in In re *National Football League Players' Concussion Injury Litigation;* MDL
       No. 2323

Dear Mr. Kunz:

Pursuant to the Court's directive, enclosed, for filing, are the following submissions:

1.  Amended Objection to the June 25, 2014 Class Action Settlement Agreement by Ramon
    Armstrong, Nathaniel Newton, Jr., Larry Brown, Kenneth Davis, Michael McGruder,
    Clifton L. Odom, George Teague, Drew Coleman, Dennis DeVaughn, Alvin Harper,
    Ernest Jones, Michael Kiselak, Jeremy Loyd, Gary Wayne Lewis, Lorenzo Lynch, Hurles
    Scales, Gregory Evans, David Mims, Evan Ogelsby, Phillip E. Epps, Charles L. Haley,
    Sr., Kevin Rey Smith, Darryl Gerard Lewis, Curtis Bernard Wilson, Kelvin Mack
    Edwards, Sr., Dwayne Levels, Solomon Page, and Tim McKyer (collectively, the
    "Armstrong Objectors").

2.  Declaration of Richard L. Coffman.

3.  Declaration of Mitchell A. Toups.

4.  Declaration of Jason C. Webster.

Should you have any questions, please call or email me.

Very truly yours,

Richard L. Coffman

RLC:ap

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | |
| _____ | § | No. 12-md-2323 (AB) |
| | § | |
| | § | MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | § | |
| ALL ACTIONS | § | |

**AMENDED OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT
AGREEMENT BY RAMON ARMSTRONG, NATHANIEL NEWTON, JR., LARRY
BROWN, KENNETH DAVIS, MICHAEL MCGRUDER, CLIFTON L. ODOM, GEORGE
TEAGUE, DREW COLEMAN, DENNIS DEVAUGHN, ALVIN HARPER, ERNEST
JONES, MICHAEL KISELAK, JEREMY LOYD, GARY WAYNE LEWIS, LORENZO
LYNCH, HURLES SCALES, GREGORY EVANS, DAVID MIMS, EVAN OGLESBY,
PHILLIP E. EPPS, CHARLES L. HALEY, SR., KEVIN REY SMITH, DARRYL
GERARD LEWIS, CURTIS BERNARD WILSON, KELVIN MACK EDWARDS, SR.,
DWAYNE LEVELS, SOLOMON PAGE, AND TIM MCKYER**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Settlement Class Members Ramon Armstrong, Nathaniel Newton, Jr., Larry Brown,

Kenneth Davis, Michael McGruder, Clifton L. Odom, George Teague, Drew Coleman, Dennis

DeVaughn, Alvin Harper, Ernest Jones, Michael Kiselak, Jeremy Loyd, Gary Wayne Lewis,

Lorenzo Lynch, Hurles Scales, Gregory Evans, David Mims, Evan Oglesby, Phillip E. Epps,

Charles L. Haley, Sr., Kevin Rey Smith, Darryl Gerard Lewis, Curtis Bernard Wilson, Kelvin

Mack Edwards, Sr., Dwayne Levels, Solomon Page, and Tim McKyer (collectively, the

"Armstrong Objectors") file this Amended Objection to the revised settlement set forth in the

June 25, 2014 Class Action Settlement Agreement (Doc. #6087) (the "RSA"), and respectfully

show the following:

1

## THE ARMSTRONG OBJECTORS

The Armstrong Objectors are twenty-eight (28) former National Football League ("NFL") players with distinguished playing careers.  The Armstrong Objectors collectively played an average of over six seasons with over twenty different teams. They include offensive and defensive linemen, linebackers, defensive backs, wide receivers, tight ends and a running back.  The Armstrong Objectors include Pro Bowl selections, All-Pros, All-Americans, Super Bowl champions, and a Super Bowl MVP.  The oldest Armstrong Objector began his NFL career in 1960.  The youngest Armstrong Objector retired after the 2011 season.  One played on five Super Bowl Championship teams, four played on three Super Bowl Championship teams, one played on two Super Bowl Championship teams, one played on one Super Bowl Championship team, and two others played in five Super Bowls between them.

*Ramon Armstrong* played one season as a defensive tackle with the Oakland Raiders. Mr. Armstrong began his professional football career after playing for Texas Christian University.  Mr. Armstrong retired from the old AFL after the 1960 season.

*Nathaniel Newton, Jr.* played fourteen seasons as an offensive lineman with the Dallas Cowboys and Carolina Panthers.  Prior to his NFL career, he played two years for the Tampa Bay Bandits in the United States Football League.  Mr. Newton was a six-time Pro Bowl selection, twice named All-Pro, and played on three Super Bowl Championship teams with the Dallas Cowboys (XXVII, XXVIII, and XXX).  He also was named to the USFL All-Time Team. Mr. Newton began his NFL professional football career in 1986 after playing for Florida A&M University — where he was first team All-MEAC as a senior.  Mr. Newton retired from the NFL after the 1999 season.  He is a radio and television broadcaster in Dallas, Texas.

2

*Larry Brown* played eight seasons as a defensive back with the Dallas Cowboys and Oakland Raiders.  He played on three Super Bowl Championship teams with the Dallas Cowboys (XXVII, XXVIII, and XXX), and was named MVP of Super Bowl XXX.  He was also named to the NFL all-rookie team.  Mr. Brown began his professional football career in 1991 after playing for both Los Angeles Southwest College and Texas Christian University.  After his senior season at TCU, he was invited to play in the Blue–Gray Football Classic where he was named MVP.  Mr. Brown retired from the NFL after the 1998 season.  He is a cohost of the Dallas Cowboys Radio Network Pregame and Postgame Shows on the Dallas Cowboys Radio Network.

*Kenneth Davis* played nine seasons as a running back with the Green Bay Packers and Buffalo Bills.  He played in four consecutive Super Bowls (XXV, XXVI, XXVII and XXVIII) with the Buffalo Bills.  Mr. Davis began his professional football career in 1986 after playing for Texas Christian University — where he was first team All-American and had the fifth most votes of all candidates for the Heisman Trophy as a junior.  Mr. Davis retired from the NFL after the 1994 season.  He is the Athletic Director and former head football coach at Bishop Dunne Catholic School in Dallas, Texas.

*Michael McGruder* played nine seasons as a defensive back with the Green Bay Packers, Miami Dolphins, San Francisco 49ers, Tampa Bay Buccaneers, and New England Patriots — with whom he played in Super Bowl XXXI.  Prior to his NFL career, he played three seasons in the Canadian Football League with the Saskatchewan Roughriders.  Mr. McGruder received the NFL Extra Effort Award and was a finalist for the NFL Bart Starr Award in 1997.  He began his NFL professional football career in 1989 after starting four years at Kent State University where he was captain of the football team his senior year, and a 2-year captain of the track team.  Mr.

McGruder retired from the NFL after the 1997 season.  In 2009, Mr. McGruder founded Platinum Charities, a charitable organization dedicated to motivating at-risk youth and empowering disadvantaged families to reach higher levels of achievement.  Platinum Charities champions programs that create life changing opportunities to lift children and families out of poverty through scholarship initiatives, youth based programs, and home ownership opportunities in Ohio, Georgia, and Texas.

*Clifton L. Odom* played thirteen seasons as a linebacker with the Cleveland Browns, Baltimore and Indianapolis Colts, and Miami Dolphins.  Mr. Odom began his professional football career in 1980 after playing for the University of Texas Christian-Arlington.  Mr. Odom retired from the NFL after the 1993 season.

*George Teague*, a first round pick in the 1993 NFL Draft, played nine seasons as a defensive back with the Green Bay Packers, Dallas Cowboys, and Miami Dolphins.  Mr. Teague began his professional football career after playing for the University of Alabama.  In 2002, he started the George Teague & Friends Foundation, a charitable organization focusing on youth development programs that involves many former University of Alabama football players.  Mr. Teague retired from the NFL after the 2001 season.  He is the Director of Athletics and Physical Education and Head Football Coach for the Shelton School in Dallas, Texas.

*Drew Coleman* began his professional football career in 2006 after playing cornerback for the Texas Christian University Mountain West Conference Championship team.  He played four seasons with the New York Jets and one season with the Jacksonville Jaguars.  Mr. Coleman retired from the NFL after the 2011 season.

*Dennis DeVaughn* was captain of the Bishop College football team and named MVP of the 1981 Sheridan Black College All-Star game.  He played defensive back for the Philadelphia

4

Eagles for two years (1982-1983). After retiring from professional football, Mr. DeVaughn helped found, and became President of, Athletes for Change, an organization that provides treatment services to youth with emotional or behavioral disorders.

*Alvin Harper* played college football at the University of Tennessee.  He was a first round draft pick of the Dallas Cowboys in 1991 after earning All-Southeastern Conference First Team honors in 1990 and being named MVP of the 1991 Hula Bowl.  As a wide receiver, Mr. Harper helped lead the Dallas Cowboys to back to back Super Bowl Championships (XXVII and XXVIII).  After playing for the Cowboys for four seasons, Mr. Harper played one year each for the Tampa Bay Buccaneers, Washington Redskins and New Orleans Saints.  He returned to Dallas for his final NFL season in 1999.

*Ernest Jones* was drafted by the Los Angeles Rams in 1994 and played in the NFL for six seasons.  Mr. Jones also was a defensive lineman for the New Orleans Saints, Carolina Panthers, and Denver Broncos on the Super Bowl XXXII Championship team.  Since retiring from the NFL in 2000, Mr. Jones has worked as a personal trainer for young athletes in Chandler, Arizona.

*Mike Kiselak* played one season with the Dallas Cowboys as an offensive lineman in 1998.  Prior to his NFL career, he played for the University of Maryland where he was named the Atlantic Coast Conference Offensive Lineman of the Week in October 1989.  Mr. Kiselak is a minister and a member of the board of directors for Kids Matters International.

*Gary Wayne Lewis* played college football at the University of Texas at Arlington.  A second round draft pick by the Green Bay Packers in 1981, he played four seasons in the NFL as a tight end.  Mr. Lewis retired from the NFL after the 1984 season.

**ARMSTRONG OBJECTORS' AMENDED OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT**

*Jeremy Loyd* played college football at Iowa State University.  He played two seasons as a linebacker for the St. Louis Rams, retiring from the NFL after the 2005 season.

*Lorenzo Lynch* was a cornerback and safety for the Chicago Bears, Arizona Cardinals, and Oakland Raiders.  He played eleven seasons before retiring from the NFL after the 1997 season.

*Hurles Scales* played two seasons as a defensive back for the St. Louis Cardinals, Chicago Bears and Green Bay Packers.  He retired from the NFL after the 1975 season.  Mr. Scales previously served as First Vice President of the National Football League Players Association Dallas, Texas Chapter.  He previously was an advisor at Mountain View College where he currently serves as an instructor.

*Gregory Evans*, a safety, played two seasons with the Buffalo Bills (1994-1995) and one season with the Washington Redskins (1998).  He retired from the NFL after the 1998 season.  Mr. Evans is an Emergency Medical Services Lieutenant with the City of Dallas Fire and Rescue Department.  He also holds certifications as a state certified firefighter and paramedic.

*David Mims* played college football at Baylor University.  He was signed by the Atlanta Falcons in 1993 as an undrafted free agent.  Mr. Mims played wide receiver for the Atlanta Falcons in 1993 and 1994, retiring from the NFL after the 1994 season.

*Evan Oglesby* originally signed with the Buffalo Bills in 2005 as an undrafted free agent. Thereafter, Mr. Oglesby played six seasons as a cornerback for the Baltimore Ravens, Dallas Cowboys and Miami Dolphins.  Mr. Oglesby retired from the NFL after the 2010 season.

*Phillip E. Epps* played college football at Texas Christian University.  He was a wide receiver for the Green Bay Packers (1982-1988) and New York Jets (1989).  Mr. Epps retired from the NFL after the 1989 season.

6

***Charles Lewis Haley, Sr.*** played college football at James Madison University where he was a defensive starter and twice earned All-American honors.  Mr. Haley, a linebacker and defensive end, played for five Super Bowl Championship teams.  He played for the San Francisco 49ers from 1986-1991 and 1998-1999, winning two Super Bowls (XXIII and XXIV). He also played for the Dallas Cowboys from 1992-1996, where he won three Super Bowls (XXVII, XXVIII, and XXX).  Mr. Haley was named All-Pro five times.  He retired after the 1999 season.  Mr. Haley was selected to the College Hall of Fame in 2011 and Virginia Sports Hall of Fame in 2006.  Mr. Haley, who also is enshrined in the Dallas Cowboys Ring of Honor, is a two-time finalist for the NFL Hall of Fame.

***Kevin Rey Smith*** played college football at Texas A&M University where he was a member of two Southwest Conference Championship teams.  He was an All-Southwest Conference selection for three years, and a 1991 consensus All-American.   Mr. Smith, a first round draft pick, played his entire NFL career as a cornerback with the Dallas Cowboys (1992-2000)—including three Super Bowl Championship teams (XXVII, XXVIII, and XXX).  Mr. Smith retired after the 2000 season.  He was inducted into the Texas A&M Athletic Hall of Fame in 1997.

***Darryl Gerard Lewis*** played college football at the University of Texas at Arlington. He played one season as tight end for the Cleveland Browns in 1984.

***Curtis Bernard Wilson*** played college football at the University of Houston and Texas A&I University at Kingsville.  Mr. Wilson, an undrafted free agent, played defensive back for the San Diego Chargers.

***Kelvin Mack Edwards, Sr.*** played college football at Liberty University.  He was a wide receiver for the New Orleans Saints and Dallas Cowboys from 1986 through 1988.

**Dwayne Levels** played college football at Oklahoma State University. He was a linebacker for the Cincinnati Bengals in 2002 and 2003.

**Solomon Page** played college football at West Virginia University. Mr. Page, an offensive lineman, was drafted in the second round by the Dallas Cowboys in 1999. During his career with the Dallas Cowboys (1999-2002), he played both right guard and right tackle. Mr. Page played with the San Diego Chargers in 2003, after which he retired from the NFL.

**Tim McKyer** played college football at the University of Texas at Arlington. A cornerback, he was a third round draft pick of the San Francisco 49ers in 1986. Mr. McKyer played for the 49ers (1986-1989), Miami Dolphins (1990), Atlanta Falcons (1991-1992), Detroit Lions (1993), Pittsburgh Steelers (1994), Carolina Panthers (1995), Atlanta Falcons (1996), and Denver Broncos (1997). He was a member of three Super Bowl Championship teams in 1988 and 1989 (San Francisco), and 1997 (Denver) (XXII, XXIII, and XXXII, respectively). Mr. McKyer, a two-time All Pro, retired from the NFL after the 1997 season.

Since retiring from the NFL, each of the Armstrong Objectors has experienced one or more of a wide range of symptoms linked to repetitive mild traumatic brain injury ("TBI"), including a sensitivity to noise, visuospatial issues, visual impairment, chronic pain, executive function deficit, episodic depression, mood and personality changes, chronic headaches, dysnomia, a decreased ability to multi-task, peripheral nerve dysfunction (numbness, burning, and/or tingling), cervical spinal disorders, sleep dysfunction, attention and concentration deficits, short- and long-term memory deficits, and somatic disorders. Some of the Armstrong Objectors also have experienced a decreased ability to interpret, regulate, express, or control complex emotions — all of which are associated with chronic traumatic encephalopathy ("CTE") and may broaden or intensify.

Although the Armstrong Objectors' injury claims would be released by the RSA, none would qualify for any relief under the RSA beyond participation in the proposed Baseline Assessment Program ("BAP"). Even then, the BAP — which measures cognitive deficits such as memory impairment and loss of attention — does not screen for many of their neurobehavioral conditions or neuropsychiatric presentations.

## ARMSTRONG OBJECTORS' OBJECTIONS TO THE RSA

The Armstrong Objectors object to the RSA because of the following deficiencies, all of which are curable by rejecting it in its current form and amending it.

**1.    Numerous physical and behavioral consequences of traumatic brain injury are excluded from the list of qualifying diagnoses for treatment and compensation under the RSA.**[1] The Armstrong Objectors object to the RSA because numerous mild TBI physical and behavioral consequences are excluded from the list of qualifying diagnoses for treatment and compensation.

A mild TBI, also known as a concussion, is a complex pathophysiological process induced by biomechanical forces to the head or to another part of the body that transmit to the head. The injury produces an alteration of brain function that results in a wide range of neurological, physical, cognitive, and neuropsychological impairments. These impairments can appear on an intermittent or persistent basis immediately or as many as ten or more years after injury.

---

[1]    This portion of the Armstrong Objectors' Amended Objection is taken from Paragraphs 7-11 of the Declaration of Brent E. Masel and Gregory J. O'Shanick (Doc. # 6180-2) (Exhibit A), which is incorporated herein by reference. Doctors Masel and O'Shanick are the National Medical Director and National Medical Director Emeritus, respectively, of the Brain Injury Association of America ("BIAA"). They filed their Declaration in support of BIAA's motion for leave to file an *amicus curiae* brief (Doc. #6180).

The neurologic consequences of mild TBI include motor, sensory, and autonomic dysfunction as well as vestibular (balance) disturbances, visual perceptual (depth perception, visual figure ground) and oculomotor deterioration (impaired eye tracking, eye-hand coordination), anosmia (loss of sense of smell), ageusia (loss of sense of taste), and posttraumatic headache.  A mild TBI can bring about movement disorders, such as Parkinsonism and epilepsy. The risk of developing epilepsy as long as ten years after a TBI is 1.5 times that of non-injured persons.  Sleep abnormalities (including central sleep apnea) are common in individuals with mild TBI and are associated with an increased risk of stroke.  A mild TBI also increases the risk of pituitary hormonal dysfunction.  Symptoms from these deficits include atherosclerosis (hardening of the arteries), fatigue, decreased muscle mass and weakness, mood abnormalities, and cognitive changes.  A recent study of 68 retired NFL players who were screened for pituitary dysfunction found hormonal abnormalities in approximately 24% of those studied.

The cognitive challenges associated with a mild TBI vary and change over time.  Early in recovery, arousal, attention, and concentration difficulties are prominent, as are memory-encoding problems.  Later, difficulties with divided attention, memory retrieval and executive functioning, such as reasoning, planning, sequencing, decision-making and judgment, may emerge.  Cognitive recovery evolves at a different pace for each person, with many interdependent factors affecting recovery.  Some individuals with mild TBI recover well and return to previous levels of functioning; others do not.  Even after returning to routine activities, individuals with mild TBI may experience reduced cognitive efficiency and inconsistency of performance.  Such patients may have persistent difficulty recognizing, assessing and managing novel, complex or stressful situations, making it difficult to monitor changes in their health or to reliably comply with medication or medical treatment regimens.

10

The neurobehavioral consequences of mild TBI are significant.  Population-based studies demonstrate a several fold increase in depression, anxiety and impulse control disorders, such as disinhibition, aggression and substance abuse in patients with mild TBI.  Even subtle damage to frontal lobe systems can prevent the person with mild TBI from effectively suppressing or consistently managing undesirable behavior, including suicide and suicidal ideation.  Thus, loss of frontal lobe inhibitory control in tandem with escalating depression and the tendency for males to seek self-medication solutions for physical or emotional pain form a potentially explosive combination for those with mild TBI.

Many of the physical, neurological and neurobehavioral consequences of TBI are missing from the list of qualifying diagnoses in the RSA.  The Armstrong Objectors, therefore, propose the RSA be revised to include the missing TBI physical, neurological and neurobehavioral consequences identified by Doctors Masel and O'Shanick.

**2.     The RSA's approach to diagnosis of neurocognitive impairment is flawed, excluding certain former NFL players and limit the access of others to medical benefits and compensation.[2]**  The Armstrong Objectors object to the RSA because the determination of eligibility for compensation is heavily weighted towards those with severe memory dysfunction and/or evidence of neuromuscular abnormality, which is reflected in the reliance on neuropsychological evaluation in isolation from other indices of functional impairment in day-to-day settings (including information from reliable family members, etc.).  In addition, the specification of a basic neurological evaluation excludes the abundance of literature on the multiplicity of other neurological abnormalities potentially present after mild TBI that would be

---

[2]   This portion of the Armstrong Objectors' Amended Objection is taken from Paragraphs 12-15 of the Masel/O'Shanick Declaration (Doc. # 6180-2) (Exhibit A), which is incorporated herein by reference.

undetected by a "basic" neurological examination.  To be maximally effective at identifying those players with residual deficits, it is well accepted by the brain injury professional community that an approach that is more holistic, human-based, and less linguistically reliant is preferred.  A more broadly based performance assessment that will not under-estimate pre-morbid intelligence for a personal baseline TBI comparison is needed.  Such subtleties reinforce the need for clinical experience to make proper judgment in these assessments.

The RSA provides for a "standard" or "basic" neurological examination, which is not sufficient to diagnose and document all symptoms associated with post-concussion syndrome or mild TBI.  An elemental or basic neurological examination commonly assesses for those motor and sensory abnormalities that reflect either spinal cord dysfunction or motor or sensory cortex injury/disease and fails routinely to incorporate those regions of the brain involved in integrating multi-sensory or sensorimotor aspects of brain function.  While it is reasonable that with an appropriately developed neuropsychological battery one can omit the mental status/cognitive portion of a neurological examination, it is a major deficit to omit detailed assessments of Cranial Nerves I-XII, motor integration, balance, fine motor control, pathological reflexes involving frontal suppressive systems, and extrapyramidal functions to name but a few.  The "standard" neurological evaluation must be a detailed neurological evaluation.

Eligibility for compensation is based on a discrepancy between current function and an estimate of pre-morbid function.  The Test of Premorbid Function ("TOPF") is used to assess pre-morbid function.  The TOPF is a word reading test that requires the subject to read a list of words and pronounce them "exactly."  Thus, individuals who speak with a dialect or accent are at a disadvantage, as are individuals with TBI-related speech impairments like dysarthria.  (Estimates of the prevalence of dysarthria following traumatic brain injury vary from 10% to

12

60%).  In addition, the TOPF is unreliable in cases where there is a history of reading disability or in cases where injury or illness affects reading ability.

The way in which moderate cognitive decline is defined is also flawed.  If a player has impairment in language or visual spatial function, but not in executive function, learning or memory, they would not qualify.  This will exclude people with significant impairment in single domains, like aphasia, or severe memory dysfunction.  While the prevalence of aphasia post-TBI is unknown, it presents in a variety of ways, sometimes independent of other impairment. In addition, if a player is severely impaired in only a single domain, such as memory, he would be excluded from receiving benefits.

The Armstrong Objectors, therefore, propose the RSA's approach to diagnosis of neurocognitive impairment be revised as suggested by Doctors Masel and O'Shanick.

**3.    The maximum monetary awards are insufficient.**  The Armstrong Objectors object to the RSA because individual awards for qualifying players and/or their families remain capped at the following maximum amounts: (i) Dementia ($1.5 – $3 million), (ii) Alzheimer's and Parkinson's ($3.5 million), (iii) ALS ($5 million), and (iv) Death with CTE ($4 million). *See* Monetary Award Grid, Exhibit B-3 to the RSA. These amounts are insufficient to compensate the injured players and/or their families — especially once they are present value affected since they will not be paid immediately.  The maximum individual awards also are subject to further reductions (*see* below).

Perhaps the best indicator of the anticipated average payout per claimant is Co-Lead Class Counsel's analysis.  Counsel believes that even though the RSA is uncapped, it is worth $675 million to the former players.  Co-Lead Class Counsel also estimates that between 3,000 and 5,000 former players will be compensated.  Performing simple long division confirms that

13

the average anticipated monetary award per player is between $135,000 and $225,000 — before attorneys' fees and expenses are deducted.  These amounts are not even close to the maximum awards in the Monetary Award Grid.  Moreover, it is not even close to the roughly $10 million in total lifetime costs — including lost productivity and medical and custodial care — that University of Toronto Professor of Neurosurgery Charles Tator estimates for each case of repetitive traumatic brain injury.  *See* http://www.medscape.com/viewarticle/810904#2 (last visited August 20, 2014).  *See also* CHARLES H. TATOR, CATASTROPHIC INJURIES IN SPORTS AND RECREATION: CAUSES AND PREVENTION: A CANADIAN STUDY (2d ed. 2008) (calculating the average cost of a non-fatal catastrophic injury at about $7.5 million (Canadian dollars, normalized to 2006) in lost earnings, lifetime care, and rehabilitation services).

The Armstrong Objectors, therefore, propose the RSA be revised to increase the maximum awards, which could be funded by, *inter alia*, (i) eliminating and utilizing some of the $112.5 million allocated to Co-Lead Class Counsel as additional attorneys' fees (*see* below), (ii) eliminating the 5% "set-aside (*see* below), (iii) eliminating and utilizing the $10 million allocated to the up-front *cy pres* Education Fund (*see* below), and/or (iv) increasing the cost of living percentage to at least 3-4% or peg it to a consumer price index.

**4.      The downward adjustment of monetary awards on the basis of the number of eligible seasons, a Class Member's age at the time of the qualifying diagnosis, and/or the presence of stroke or TBI is flawed.[3]**  The Armstrong Objectors object to the RSA because all of the above maximum monetary awards are subject to reductions — often, significant reductions — based on offsets for age and career length.  *See* RSA §6.7, Exhibit B-3.  Former

---

[3]    A portion of this section of the Armstrong Objectors' Amended Objection is taken from Paragraphs 16-18 of the Masel/O'Shanick Declaration (Doc. # 6180-2) (Exhibit A), which is incorporated herein by reference.

players with fewer than five years of NFL experience will see their awards reduced, some by as much as 95 percent. *Id.* The same holds true for retirees over 45 — the older a player is when diagnosed with brain damage, the less money he will receive. *Id*.

For example, assume a player died before July 7, 2014, the date the RSA was preliminarily approved, and there is a post-mortem CTE finding. If the player was Junior Seau, his family would receive $4 million according to the Monetary Award Grid (Exhibit B-3 to the RSA). But, under the Monetary Award Grid age-based reductions, the family of Dave Duerson, who also committed suicide, would receive only $2.3 million. Both are subject to further reductions for attorneys' fees (one-third is the typical arrangement) and expenses. More important is that the family members of a few deceased players will receive some of the largest awards as compared to living players who desperately need medical care, but will receive very small awards, if any.

A single concussion, whether diagnosed or not, is capable of generating debilitating physical, cognitive and behavioral impairments that interfere with the activities of daily living and require treatment throughout the lifespan. Therefore, the nature and extent of the impairment – not the number of seasons played – should be the determining factor in any monetary award. Many retired NFL players who sustained concussions went undiagnosed or were not held-out from play or practice. Thus, the definition of eligible season unfairly excludes players who may have been concussed but did not spend "at least two (2) regular or postseason games on the injured reserve list or inactive list due to a concussion or head injury." Similarly, while it is reasonable to assume that exposure to mild TBI increases as playing time increases, it is not reasonable to assume that multiple concussions sustained over a short period of time are less debilitating than multiple concussions sustained over a long period of time. In fact, the

opposite is true.  A patient who sustains repetitive concussions that go unresolved will exhibit symptoms akin to more severe TBI.

Similarly, it is unfair to offset a monetary award by 75% based on the existence of a stroke or TBI occurring prior to a qualifying diagnosis.  Persons who sustain one concussion are predisposed to re-injury, both on and off the field.  Severity of injury increases with recurrent injury, as does the likelihood of disability.  In a study of over 30,000 individuals in Taiwan, individuals with mild TBI had a 1.7 times increased risk of stroke over those who had not sustained a brain injury.

A Class Member's age at the time of qualifying diagnosis also should not be a factor in calculating a monetary award.  The consequences of a brain injury are the same whether experienced in the past (as with the case of a hypothetical 60-year-old retired player who has exhibited symptoms for decades) or the future (as with the case of a hypothetical 30-year-old retired player who has not yet exhibited symptoms).

Attempting to calculate the estimated award a typical retired NFL player facing problems resulting from concussions would receive is difficult.  By all counts, there will be many players facing dementia after the age of 60.  The Monetary Award Grid provides a payment of $580,000 to a 60-year-old NFL veteran diagnosed with a moderate form of dementia at age 60 or later.  After paying attorneys' fees and expenses, the player would collect something $375,000.  The Armstrong Objectors, therefore, propose the RSA be revised to eliminate the age and career length reductions.  There is no correlation between age and career length, on the one hand, and developing dementia, on the other hand.  A single severe concussion in the first game of a player's career could cause a player to suffer dementia.

The RSA also reduces monetary awards by 75% for any former player who has suffered a single non-football related traumatic brain injury or stroke (*id.*, §6.7 (b)(iii)) — even though (i) there is no scientific reason to presume that a single non-football brain injury accounts for 75% of a player's afflictions, and (ii) NFL team doctors spent at least two decades increasing former players' risk of stroke (and likely, brain injury) by liberally administering the pain-killing, blood-thinning drug Toradol against Food and Drug Administration warning label guidelines.

The Armstrong Objectors also propose the Revised Settlement be revised to eliminate this artificial monetary award reduction. The sole factor in determining monetary awards should be the nature and extent of a Class Member's impairment. *See also* Masel/O'Shanick Declaration at ¶ 18.

**5.      Death with CTE benefits are severely limited.**  The Armstrong Objectors object to the RSA because a "Death with CTE" qualifying diagnosis requires retirees to have died and been diagnosed with CTE prior to July 7, 2014. RSA, §6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board certified neuropathologist of CTE."). Thus, if an NFL retiree dies after July 7, 2014, and regardless of whether the player commits suicide and it is ultimately determined he suffered from CTE, his family will not qualify for an award. This is absurd. There should not be any deadlines based on when death occurred.

This provision also ignores that CTE — a condition found in contact sport athletes, military personnel exposed to explosive blasts and others subjected to repetitive concussive and sub-concussive head trauma, marked by widespread, irreversible accumulation of destructive tau protein in the brain — is at the heart of this litigation. What's more, the RSA does not assign

17

similar cutoff dates to former players diagnosed with ALS, Alzheimer's or Parkinson's — even though a 2013 National Institute for Occupational Safety and Health study of nearly 3,500 NFL retirees who played at least five seasons between 1959 and 1988 recorded just 17 combined cases of these diseases[4] while, in a 2010 study, 33 of the 34 studied deceased NFL players were diagnosed with CTE.

CTE is the disease that made football brain damage a national issue and a public health concern.  Without it, neither this litigation, nor the RSA likely would exist.  Yet the RSA forecloses every NFL retiree who has yet to die and be diagnosed with CTE from receiving a "Death by CTE" award as if there will never be another case—which cannot be true.

The Armstrong Objectors further object to the RSA because the qualifying "Death with CTE" diagnosis is too limited.  The following symptoms are associated with both brain damage and CTE: sensitivity to noise, visual impairment, chronic pain, chronic headaches, numbness, burning, tingling, incessant ringing in the ears, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions.  None of these symptoms, however, are addressed by the RSA, nor is there any compensation allowed for these conditions.

The CTE restrictions under the RSA are designed to save the NFL a substantial amount of money on the very disease giving rise to the litigation.  The Monetary Award Grid reduces the size of individual Death with CTE payouts, while the cutoff date limits the total number.  In disallowing future award changes regardless of medical advances — in essence, the potential creation of a "Life with CTE" qualifying diagnosis — the RSA shrinks the eligible player pool

---

[4]      On the other hand, while medical experts suspect that the other neurodegenerative diseases compensated by the RSA — ALS, Parkinson's, Alzheimer's and dementia — may be triggered and/or accelerated by years of bashing football helmets, these illnesses also occur in people who have not experienced brain trauma.  The link to football is less clear.

even further.  By exclusively focusing on cognitive impairment, the same BAP program that is supposed to assist CTE sufferers by giving them a general dementia diagnosis excludes retirees suffering from mood, behavioral and other non-cognitive symptoms (such as chronic migraines) — all the while saving the NFL money by ensuring that living ex-players with CTE who qualify for a dementia award are more likely to be older and, therefore, subject to a greater payout reduction according to the Monetary Award Grid.

The Armstrong Objectors, therefore, propose the RSA be revised to delete the date parameters of the "Death with CTE" qualifying diagnosis and expand the list of CTE symptoms that qualify for compensation and lift the restriction on the date of death.

**6.     The Baseline Assessment Program ("BAP") participation requirements are too onerous and limited.**  The Armstrong Objectors object to the RSA because of the length of the program and the tight deadlines under which retired NFL players with cognitive issues must operate.  *See* RSA, Art. V.  Retired players must register for the BAP within 180 days after notice is posted on a special settlement website.  RSA, §4.2(c).  Otherwise, they will be deemed ineligible for baseline tests and monetary awards.  *Id.*  Thereafter, players older than age 43 must take their baseline exams within two years after the BAP is launched, while younger players must take the exams before their 45th birthday or within ten years of the start of the program. RSA, §5.3.  After 10 years, no baseline exams will be conducted (RSA, §5.5), and without a baseline exam, it is nearly impossible to qualify for a monetary award under the RSA.

The BAP also screens for cognitive deficits and signs of dementia, but only offers monetary awards for specific neurodegenerative diseases — leaving players who suffer from memory loss, headaches, chronic pain, depression, impulsivity, diminished executive function, speech impairment, attention deficits and other ailments linked to repetitive brain injury, but do

not rise to the level of Parkinson's or ALS, receiving nothing more than counseling and prescription drug coverage, even though their conditions can drastically affect their quality of life and ability to work.

BAP program neuropsychologists also cannot make qualifying diagnoses of Alzheimer's, Parkinson's or ALS.  Instead, retirees must visit a settlement-approved doctor and pay for their own medical testing and related travel expenses.

The Armstrong Objectors, therefore, propose the RSA be revised to extend the deadlines for registering for, and taking, the baseline exams by two years, and extend the life of the BAP beyond ten years to possibly twenty years, which could be funded by, *inter alia*, (i) eliminating and utilizing some of the $112.5 million allocated to Co-Lead Class Counsel as additional attorneys' fees (*see* below), (ii) eliminating the 5% "set-aside (*see* below), (iii) eliminating and utilizing the $10 million allocated to the up-front *cy pres* Education Fund (*see* below), and/or (iv) additional funds from the NFL.

**7.** **The amount of compensation can only be determined by neuropsychologists pre-selected for the BAP.**  The Armstrong Objectors object to the RSA because disability can only be determined by neuropsychologists who are pre-selected for the BAP.  *See* RSA, Article V.  The neuropsychologists who register to be part of the BAP are likely to be far more conservative in "calling" impairment than a neuropsychologist chosen by a player.  Requiring neuropsychologists to pre-register for the BAP also will substantially reduce the number of treating doctors involved.  Treating physicians rarely seek this kind of work.  The physician selection criteria also will dissuade most busy treating doctors from participating.  The doctors who typically work for insurance defense law firms are more likely to register.  And, for a biased

doctor, the malingering tests specifically authorized under the RSA are a huge weapon to be used against the players.

The RSA also should have forbidden the use of the "Fake Bad Scale," which can be included in an MMPI assessment, although it has been rejected by most courts as unreliable.  The RSA will only be fair if the majority of doctors registering for the BAP believe mild brain injury deficits equal the defined monetary award categories.  Yet, the manifestations of early onset of *dementia pugilistica* in football are more behavioral than cognitive.

The Armstrong Objectors, therefore, propose the RSA be revised to allow the players to select and utilize the treating physicians of their choice, without penalty, as long as the treating physicians are Board Certified in Neurology and Board Certified in Brain Injury Medicine, a joint sub-specialty Board certification established by the American Boards of Psychiatry and Neurology and the American Board of Physical Medicine and Rehabilitation in September 2011. *See* Masel/O'Shanick Declaration at ¶ 19.  Years of experience, involvement in relevant scientific and professional societies, peer-reviewed journal publications, invited presentations, federal grant awards, and/or active practice on the Joint Commission on Accreditation of Healthcare Organizations or Commission on Accreditation of Rehabilitation Facilities programs also are reliable indicators of expertise in diagnosing and treating the complex and heterogeneous consequences of TBI and should be taken into consideration in selecting their treating physicians. *Id*.

The RSA also fails to recognize the full extent of the treatment team that may be required to support injured players in recovering or maintaining physical, cognitive and behavioral function after MTBI.  *Id*. at ¶ 21.  The standard of care for patients with TBI dictates that rehabilitation and other medical treatment plans be developed and carried out by a multi-

disciplinary team of licensed, credentialed clinicians working in specialized settings and accredited programs.  *Id*.  The specialties may include endocrinology, physical medicine, ophthalmology, neuro-optometry, otolaryngology, psychiatry, physical therapy, occupational therapy, speech language therapy, and neurobehavioral therapy.  *Id*.  Settings may include inpatient rehabilitation hospitals or units, residential rehabilitation facilities, outpatient clinics or at home by licensed providers.  *Id*.  The Armstrong Objectors further propose the RSA be revised to design, develop, and implement a unique rehabilitation and other medical treatment plan for each Class Member that will be carried out by a multi-disciplinary team of licensed, credentialed clinicians working in specialized settings and accredited programs in order to support former NFL players with TBI of any kind in recovering from such injuries and/or maintaining physical, cognitive and behavioral functions.

The RSA also should be revised to specifically forbid the use of the "Fake Bad Scale" in MMPI assessments.

8. **A neuropsychological opinion required.** The Armstrong Objectors object to the RSA because determination of the cognitive impairment groups is based entirely on the neuropsychological determination of cognitive impairment.  Type I CTE – which impacts younger players – is almost entirely a behavioral problem, not a cognitive problem.  Any cognitive changes will be the type not susceptible to measurement in someone under age 60.  While some behavioral problems may have cognitive manifestations, they are not likely to manifest themselves in examinations in non-stressful environments, like a neuropsychologist's office.  The Armstrong Objectors, therefore, propose the RSA be revised to allow for compensation for these behavioral problems and their own physicians to diagnose same.

9.      **The RSA limits pharmacy vendors to mail order providers.**[5]  While the establishment of a consistent means for providing routine and stable medications to injured players is appropriate, some medications – particularly human growth hormone (costing $15-20,000 yearly for life) used to treat pituitary dysfunction in patients with mild TBI – require distribution that controls for temperature, light, vibration and other conditions and cannot be reliably distributed by mail order.  Further, during periods of medication adjustment and trials to determine efficacy and dosage amounts, the use of a mail order pharmacy slows down the turnaround time in medication acquisition, preventing the physician from making quick and immediate medication changes, and, typically can only refill for a 90-day period which may be excessively wasteful should a therapeutic trial be unsuccessful after several days or even weeks.

Requiring the use of a mail order pharmacy also will deprive Class Members of the personal, face-to-face counseling available at local "brick and mortar" pharmacies where Class Members may have longstanding relationships with their pharmacists who have personal knowledge of Class Members' medical histories and current prescriptions that, in turn, could identify and prevent negative drug interactions.

The Armstrong Objectors, therefore, propose the RSA be revised to allow Class Members to utilize the pharmacy provider of their choice.

10.     **The RSA provides for unlimited appeals.**  The Armstrong Objectors object to the RSA because the NFL may appeal as many monetary awards as it chooses — for free.  In the initial, rejected version of the settlement, the NFL was limited to ten appeals per year.  However, under the RSA, and regardless of a retired player's mental state or financial need, the NFL can

---

[5]     A portion of this section of the Armstrong Objectors' Amended Objection is taken from Paragraph 20 of the Masel/O'Shanick Declaration (Doc. # 6180-2) (Exhibit A), which is incorporated herein by reference.

delay payment by simply appealing an unlimited number of claims.  RSA, § 9.6(b).  What's more, while there is no charge for the NFL to appeal a monetary award, players must pay a $1000 fee to file an appeal.  RSA, § 9.6(a).  It also is unfair to place retired players with cognitive issues, such as memory problems, issues with punctuality, difficulty keeping appointments and staying on top of paperwork, in a position of having to deal with the prospect of an unlimited number of appeals.

The RSA also requires an appealing player to prove his appeal with "clear and convincing evidence."   RSA, § 9.8.  Yet, an appellant will have only five pages of argument to carry his burden of proof.  RSA, § 9.7(a).  The "clear and convincing" standard is substantially more difficult to prove than the "proximate cause" standard — the normal burden of proof in a civil lawsuit at the courthouse—which only requires proof of probability of slightly greater than 50%.  Having to prove a significant behavioral CTE manifestation, for example, in by "clear and convincing" evidence in only five pages will make a successful appeal extremely rare.

The Armstrong Objectors, therefore, propose the RSA be revised to (i) eliminate the NFL's right to appeal a player's monetary award (or, in the alternative, limit the number of appeals the NFL may file to ten per year, as set forth in the initial version of the settlement), (ii) eliminate the $1000 fee charged to players for filing an appeal, and (iii) change the "clear and convincing" burden of proof standard to the "proximate cause" standard.

**11.    The amount of the RSA settlement fund is insufficient.**  The Armstrong Objectors object to the RSA because of the insertion intermediate monetary award caps and reductions.  According to Co-Lead Class Counsel, the initial, rejected settlement had an ultimate capped value to the players of $675 million[6] — which was based on analyses performed by

---

[6]    An additional $75 million is earmarked for the BAP.

medical experts, actuaries and economists predicting (i) the number of former NFL players who are brain damaged, (ii) the ultimate nature and extent of their brain damage, and (c) the money necessary to compensate such brain damage under the initial, rejected settlement.  The NFL and Class Counsel, however, did not share their analyses with the Court, and the Court, in part, rejected the initial settlement as insufficient because of the ultimate cap.

Even though the cap was eliminated in the RSA, the NFL and Co-Lead Class Counsel confidently state that $675 million will still be enough to fund the deal.  The only way this can be true is by implementing the above-described and objected-to aspects of the RSA; to wit, *e.g.*, the omitted TBI coverage, limiting qualification criteria, treatment limitations, and intermediate monetary award caps, reductions, and penalties.  Indeed, the February 10, 2014 report written for Class Counsel by Thomas Vasquez, Ph.D., entitled *NFL Concussion Liability Forecast* (Doc. #6167), states that only an estimated 3600 out of the 21,000 former NFL players (17.14%) "are estimated to develop compensable injuries and participate in the settlement." *Id.* at 3.  If $675 million was not enough the first time, it definitely is not enough now.  The Armstrong Objectors, therefore, propose the RSA be revised to require the NFL to increase the settlement fund, include the omitted TBI, and eliminate the limiting qualification criteria, treatment limitations, and intermediate monetary award caps, reductions, and penalties..

**12.      The full extent of the analyses and supporting documents and information underlying the RSA have not been disclosed.**  The Armstrong Objectors object to the RSA because the NFL and Co-Lead Class Counsel have not disclosed the full extent of the underlying analyses, documents and information on which the RSA is predicated.  Brain damage from playing football is a public health issue and a public policy issue, both from the standpoint of the safety and well-being of our children and loved ones, and the shared medical costs (private

25

insurance and/or Medicare) of treating the afflicted.  If the NFL has information about the incidence and prevalence of the cognitive costs of playing football, such information should be shared with the public.  The public has a need and a right to know just as in any other case involving a public harm.

The RSA also will foreclose any future discovery on the issue from the NFL, which means the public will never know what the NFL knew about brain damage and when the NFL knew it.  According to Alan C. Milstein, a Temple University School of Law professor who specializes in bioethics and clinical trials litigation, disclosure of the underlying analyses, documents and information is not about the NFL, but about:

> [T]he NCAA and high school football and junior high football and peewee football. And about parents understanding whether or not they should let their kid play football. We will never know that critical information about the seriousness of concussions because the NFL is buying peace and they are also buying silence. That is what is really wrong with this situation.

Alan C. Milstein, *Brutality's the Winner in the NFL Settlement*, THE NAT'L LAW J. (September 9, 2013)**.**  The Armstrong Objectors, therefore, propose the Revised Settlement be revised to require the NFL and Co-Lead Class Counsel to disclose the analyses, documents and information underpinning the RSA or give counsel herein at least 180 days to conduct discovery against the NFL and present the evidence to the Court.  There is no reason to rush to a settlement when 21,000 Class Members' medical future is at stake for the next 65 years.

**13.     The RSA does not take scientific advances into consideration.**  The Armstrong Objectors object to the RSA because although it is designed to last for 65 years, it does not adequately allow for advances in neuroscience.  Many scientists believe there will be a way to detect CTE in the living within the next decade.  Scientists in Chicago are experimenting with a screening test that measures vision, eye movement and optic nerve irregularities.  Boston

University CTE researcher Robert Stern and his team of scientists are conducting a comprehensive study of 100 NFL retirees with the goal of identifying CTE biomarkers.  Other researchers are developing and refining scanning technology to see tau deposits in the brain.  In July 2014, Massachusetts General Hospital scientists attending the Alzheimer's Association International Conference in Copenhagen announced a new type of brain imaging that can show tau tangles in living people for the first time.  The RSA, however, barely considers future scientific advances.

Although 65 years in length, the RSA specifically prohibits the NFL and Co-Lead Class Counsel from meeting more than once every ten years to discuss possible changes to the qualifying diagnoses and protocols for making them, with actual modifications requiring approval from both sides.  RSA, §6.6(a).  In other words, if the NFL unilaterally does not want to accept a new method of detecting CTE, for example, it will not be required to do so.  Nor is there any mechanism in the RSA to force the NFL to do so.  Even then, any such scientific advances incorporated into the RSA going forward will not change the Monetary Award Grid.

The Armstrong Objectors, therefore, propose the RSA be revised to provide for a more frequent and democratic mechanism (perhaps a third-party arbitrator to break any ties) for reviewing, identifying, incorporating, and implementing qualifying diagnoses and the protocols for making them based on scientific advances over the term of the RSA.

**14.    The additional attorneys' fees and expenses are excessive.**   The Armstrong Objectors object to the $112.5 million of additional attorneys' fees and expenses payable to Co-Lead Class Counsel and other lawyers in leadership positions (RSA, Article XXI) — despite conducting no discovery against the NFL.  Without discovery, Co-Lead Class Counsel was severely hamstrung in their ability to thoroughly and accurately evaluate the case and the NFL's

settlement offers.  Based on the discovery taken to date — *i.e.*, none — how can Counsel for the NFL and Co-Lead Class Counsel, all of whom are officers of the Court, possibly represent in good faith to the Court that the RSA is fair and reasonable?  How could $112.5 million of additional attorneys' fees and expenses have been earned?

What's more, the $112.5 million of attorneys' fees and expenses are in addition to the contingent attorneys' fees and expenses payable to the lawyers by the players under their individual fee agreements; the $112.5 million of attorneys' fees and expenses are a "double dip" and a windfall.   Many of the players who have filed Short Form Complaints are represented by attorneys who are requesting, or will request, part of the $112.5 million of attorneys' fees.  It is unfair for these Class Members to pay attorneys' fees twice, and any Class Counsel who is awarded attorneys' fees should not be allowed to also recover attorneys' fees under the individual contracts with their clients.  Further, their clients may not be paid for years under the RSA even though the NFL will pay the $112.5 million of additional fees and expenses into a fund within sixty days after the effective date of the RSA.  *Id.*, §21.2.  Not only should these additional attorneys' fees be reduced, but no double dipping should be allowed and any lawyer, including Co-Lead Class Counsel, receiving attorneys' fees should be obligated to continue to help the players secure relief under the RSA, or a committee should be established to help Class Members with the committee members paid for their time on a reasonable hourly basis.

The $112.5 million of additional fees and expenses also is excessive when compared on an "apples to apples" basis to the Co-Lead Class Counsel's projected value of the monetary awards under the RSA (*i.e.*, $675 million).  Assuming the entire $675 million is paid to the former players in equal annual payments over 65 years, the present value of the RSA monetary awards computed using a discount rate of 3.2 % (the August 18, 2014 30-year Treasury bond

rate) is approximately $292 million.  The present value of the additional attorneys' fees and expenses (*i.e.*, $112.5 million) is 38.52% of the present value of the RSA — which is an excessive percentage in and of itself, but even more offensive since no discovery was taken and the fact that all plaintiffs' counsel will be paid under the individual contracts with their clients.

Also buried deep in the RSA is a vague provision calling for a potential five percent (5%) "set-aside" on every monetary award that Co-Lead Class Counsel may petition the Court to award to them to "facilitate the Settlement program and related efforts of Class Counsel" (RSA, §21.3) — whatever that means.

The Armstrong Objectors, therefore, propose the RSA be further revised to reduce the $112.5 million award of additional attorneys' fees and expenses and eliminate the 5% set aside completely.  All lawyers should receive their fees under their individual client contracts over time as their clients actually receive their RSA monetary awards, unless they are recovering class fees, in which case they should not be allowed to double dip.  This will ensure that the lawyers will continue to work in the best interests of their clients to make sure their clients are appropriately compensated from the RSA.  The up-front payment of $112.5 million of additional attorneys' fees and expenses will only incentivize counsel to "take their money and run" to the next big case, leaving their clients to fend for themselves against the NFL when the clients need their lawyers the most.  A portion of the $112.5 million of additional attorneys' fees and expenses and eliminated 5% set aside could then fund additional player benefits (as set forth above).

**15.    The Education Fund should be eliminated.**  The Armstrong Objectors object to the $10 million Education Fund in the RSA.  *Id.*, Article XII; §2.1(hh);(ii).  It is ill-defined on many levels.  The scope, nature, extent, protocols, education programs, recipients, management

and administration of the Education Fund will be determined at a later date.  *Id.*  To the extent the Education Fund will be used for "the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players" (RSA, §12.1), the Parties should not receive credit because this education is already being (or should be) provided by the NFL.  To the extent any tangible benefits will be provided by the Education Fund, they will further be reduced because the "costs and expenses to administer the Education Fund will be paid out of the [$10 million]." RSA, §12.2.

Most important, the Armstrong Objectors object to the Education Fund because it is an improper initial *cy pres* fund[7] that diverts $10 million of settlement funds away from the players to unnamed recipients for undefined activities.  Such funds should be utilized for the benefit of the players (as described above), rather than directed from the get go to unidentified third parties who have no claims in this litigation.

In a class action settlement, "[t]he *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) (citation omitted). *Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity. *Id.*

---

[7]     The term "*cy pres*" is derived from the Norman French expression *cy pres comme possible,* which means "as near as possible." *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 84 F.3d 451, 455 n.1 (D.C. Cir. 1996). The *cy pres* doctrine originated in trusts-and-estates law as a rule of construction used to preserve testamentary charitable gifts that otherwise would fail. "When it becomes impossible to carry out the charitable gift as the testator intended, the doctrine allows the 'next best' use of the funds to satisfy the testator's intent 'as near as possible.'" *Id.* (quoting Natalie A. DeJarlais, Note, *The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions,* 38 HASTINGS L.J. 729, 730 (1987)).

Direct distributions to settlement class members are preferred over *cy pres* distributions. *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013). The private causes of action aggregated in this proceeding—as in other class actions—were initiated to allow plaintiffs to recover compensatory damages for their injuries. *Cy pres* distributions imperfectly serve that purpose by substituting for such direct compensation an indirect benefit that is, at best, attenuated and, at worse, illusory. *Id.* (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784–85 (7th Cir. 2004)). *Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because including a *cy pres* distribution may increase a settlement fund, and with it, attorneys' fees, without increasing the direct benefit to the class. *In re Baby Products Antitrust Litig.*, 708 F.3d at 173. Where a court fears counsel is conflicted, it should subject the settlement to increased scrutiny. *Id.*

That said, *cy pres* is an accepted method of addressing leftover, or residual, funds remaining in a settlement account once all known settlement class members have been made whole. *Cy pres* may be used in class action settlements "where the proof of individual claims would be burdensome or distribution of damages costly." *Dennis v. Kellogg Co.,* 697 F.3d 858, 865 (9th Cir. 2012). Under principles established by the American Law Institute ("ALI"), any leftover funds should first be distributed to known class members; only when it is not economically viable to do so should a court engage in a *cy pres* program:

> A court may approve a settlement that proposes a *cy pres* remedy even if such a remedy could not be ordered in a contested case. The court must apply the following criteria in determining whether a *cy pres* award is appropriate:
>
> (a)     If individual class members can be identified through a reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.

(b)     If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.

(c)     If the court finds that individual distributions are not viable based on the criteria set forth in subsections (a) and (b), the settlement may utilize a *cy pres* approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interests reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 (Am. Law. Inst. 2010); *see also In re Checking Account Overdraft Litig.*, Case No. 1:09-MD-02036-JLK, at 2–3 (S.D. Fla. Apr. 15, 2013) (Exhibit A). The ALI further clarifies in its comments to § 3.07:

[A]ssuming that further distributions to the previously identified class members would be economically viable, that approach is preferable to *cy pres* distributions. This Section rejects the position urged by a few commentators that a *cy pres* remedy is preferable to further distributions to class members. . . . This Section takes the view that in most circumstances, distributions to class members better approximate the goals of the substantive laws than distributions to third parties that were not directly injured by the defendant's conduct.

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 cmt.b.

A *cy pres* distribution, therefore, should take place only when a court cannot distribute settlement funds to known class members. *See In re Checking Account Overdraft Litig.*, at 3; *Nachshin*, 663 F.3d at 1038 ("In the context of class action settlements, a court may employ the *cy pres* doctrine to 'put the *unclaimed fund* to its next best compensation use, *e.g.*, for the aggregate, indirect, prospective benefit of the class.'") (emphasis added) (citing *Masters v.*

*Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir. 2007) (quoting 2 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 10:17 (4th ed. 2002))).

Similar to the proposed Education Fund *cy pres* in the Revised Settlement, the settlement in *In re Checking Account Overdraft Litigation* skipped over the "distribution to known class members" provided for by the ALI procedures and moved directly to *cy pres* through an "initial *cy pres* program." *In re Checking Account Overdraft Litig.*, at 3. There, the "initial *cy pres* program" set aside 12.5% of the net settlement fund as the estimated amount that would have been paid to the settlement class members who the lawyers estimated were "unidentifiable due to a dearth of adequate banking records." *Id.* at 3–4. While the settlement agreement allowed for the remainder of the fund to be paid to known settlement class members for whom the parties had adequate data, the 12.5% set aside would go directly to the *cy pres* fund. *Id.* at 4.

The court, however, went on to hold that such a settlement provision did not comply with the ALI principles outlined above, requiring unidentifiable class members' shares of settlement funds to be paid to known settlement class members before any *cy pres* program is enacted. *Id.* In fact, the court changed its mind regarding the *cy pres*, noting that an objector correctly argued at the final fairness hearing that "*cy pres* is intended to be a residual program, what you do with the remainder," and that this initial pre-distribution of funds was not *cy pres* at all, because the known class members have not yet been made whole. *Id* (citations omitted).

The court ultimately required the 12.5% set aside to be given to known settlement class members ahead of non-party *cy pres* charities, noting the 12.5% set aside "was, and is, not a proper *cy pres* program," but instead "a diversion of funds that does not comport with the proper procedure for utilizing a *cy pres* program in the distribution of class action settlement funds as outlined by the ALI." *Id.* at 4–5; *see also Dennis*, 697 F.3d at 865–67 (rejection of initial *cy pres*

33

fund comprising $5.5 million of Kellogg food items to be donated to charities feeding the indigent — albeit for reasons other than ALI class settlement fund distribution principles).

Similarly, here, the proposed Education Fund is not a proper *cy pres* program, but instead, a diversion of funds away from the players—the Class Members—that does not comport with the proper procedure for a *cy pres* program under the ALI principles and governing case law.  It is indisputable the RSA will not make the players whole.  That being the case, the Armstrong Objectors propose the RSA be revised to eliminate the Education Fund so that the $10 million can be utilized for the direct benefit of the players (as described above).

   **16.    The release is too broad**.  The Armstrong Objectors object to the release in the RSA.  The Court most likely is aware of *Dent, et al, v. National Football League*; Cause No. C-14-2324 KAW; in the United States District Court for the Northern District of California, a putative class action, wherein plaintiffs sued the NFL regarding the promotion and use of various medications that were either improperly used or illegally used and dispensed.  One of the medications, Toradol, as stated above, can actually increase the likelihood of a concussion according to some medical reports.  The release in the RSA arguably releases the Class Members' claims in *Dent*.  The Armstrong Objectors, therefore, propose the release in the RSA be revised and narrowed to release only the claims being compensated in the settlement of this litigation.

***

   **WHEREFORE,** the Armstrong Objectors respectfully request that the Court (i) enter an order (a) denying final approval of the settlement embodied in the June 25, 2014 Class Action Settlement Agreement (Doc. #6087), and (b) recommending the Parties revise the Class Action

34

Settlement Agreement as set forth above, and (ii) grant such other and further relief to themselves and Class Members the Court deems just and proper.

Date:  October 13, 2014

Respectfully submitted,

Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans St., Ste. 505
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Mitchell A. Toups
WELLER, GREEN, TOUPS & TERRELL, LLP
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com

Jason Webster
THE WEBSTER LAW FIRM
6200 Savoy, Suite 515
Houston, TX 77036
Telephone: (713) 581-3900
Facsimile: (713) 409-6464
Email: jwebster@thewebsterlawfirm.com

Mike Warner
THE WARNER LAW FIRM
101 Southeast 11th Suite 301
Amarillo, TX 79101
Telephone:  (806) 372-2595
Facsimile:
Email:  mike@thewarnerlawfirm.com

**Counsel for Ramon Armstrong, Nathaniel Newton, Jr., Larry Brown, Kenneth Davis, Michael McGruder, Clifton L. Odom, George**

35

Jeremy Loyd, Gary Wayne Lewis, Lorenzo Lynch, Hurles Scales, Gregory Evans, David Mims, Evan Ogelsby, Phillip E. Epps, Charles L. Haley, Sr., Kevin Rey Smith, Darryl Gerard Lewis, Curtis Bernard Wilson, Kelvin Mack Edwards, Sr., Dwayne Levels, Solomon Page, and Tim McKyer

## CERTIFICATE OF SERVICE

I certify that a true copy of the Amended Objection to the June 25, 2014 Class Action Settlement Agreement by Ramon Armstrong, Nathaniel Newton, Jr., Larry Brown, Kenneth Davis, Michael McGruder, Clifton L. Odom, George Teague, Drew Coleman, Dennis DeVaughn, Alvin Harper, Ernest Jones, Michael Kiselak, Jeremy Loyd, Gary Wayne Lewis, Lorenzo Lynch, Hurles Scales, Gregory Evans, David Mims, Evan Ogelsby, Phillip E. Epps, Charles L. Haley, Sr., Kevin Rey Smith, Darryl Gerard Lewis, Curtis Bernard Wilson, Kelvin Mack Edwards, Sr., Dwayne Levels, Solomon Page, and Tim McKyer was filed directly with the Court, via overnight delivery, on October 13, 2014.

Richard L. Coffman

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

10-9-14

Ramon Armstrong (DOB: October 6, 1937)     Date
1103 Oak Creek Drive
Ennis, TX 75119
(214) 538-6420

38

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Nathaniel Newton, Jr. (DOB: December 20, 1961)        October 6, 2014
936 Oakcrest Drive                                    Date
Wylie, TX 75098
(972) 741-9566

39

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          OCT 12 2014

Larry Brown (DOB: November 30, 1969)          Date
5603 Sycamore Drive
Colleyville, TX 76034
(817) 723-5601

40

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.


Kenneth Davis (DOB: April 16, 1962)           10 - 10 - 14
1224 Brooklawn Drive                          Date
Arlington, TX 76018
(817) 680-8307

41

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          Oct 8, 2014
Michael McGruder (DOB: May 6, 1964)        _____
835 East Lamar Blvd. #236                   Date
Arlington, TX 76011
(214) 208-0240

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          10-6-2014
Clifton L. Odom (DOB: April 15, 1958)          Date
6708 Martha's Vineyard Drive
Arlington, TX 76034
(817) 602-6617

ARMSTRONG OBJECTORS' AMENDED OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

George Teague (DOB: February 18, 1971)
1000 Delaware Drive
Carrollton, TX 75010
(469) 742-3630

Date   10/7/14

44

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_Drew Coleman_

Drew Coleman (DOB: April 22, 1982)
17515 Bermondsey Court
Tomball, TX 77377
(817) 205-8048

10/9/14

Date

45

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          10/10/14
Dennis DeVaughn (DOB: October 28, 1960)   Date
2416 Clear Field Drive
Plano, TX 75025
(214) 414-6981

46

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Alvin Harper (DOB: July 6, 2967)
3632 Madbury Circle
Lakeland, FL 33810
(310) 467-8357

Date 10/12/14

47

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          Oct 6, 2014
Ernest Jones (DOB: December 13, 1964)     _____
3101 Highland Meadows                     Date
Seagoville, TX 75159
(469) 516-9094

48

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          $10 - 6 - 2014$
Michael Kiselak (DOB: March 9, 1967)          Date
906 Chimney Hill Trail
Southlake, TX 76092
(214) 797-6363

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Gary Wayne Lewis (DOB: December 31, 1958)
1225 Town Center Drive #3007
Pflugerville, TX 78660
(903) 573-3149

10-2-2014
Date

50

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          _10/10/14_____
Jeremy Loyd (DOB: July 30, 1980)          Date
10858 Deer Creek Drive
Tyler, TX 75707
(903) 570-7059

51

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Lorenzo Lynch (DOB: April 6, 1963)                    Date
864 Bentwater Parkway
Cedar Hill, TX 75104
(214) 435-3389

Oct 6, 2014

52

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____     _Oct 10, 2014_
Hurles Scales (DOB: December 1, 1950)      Date
3110 Royal Lane
Dallas, TX 75229
(214) 542-8419

53

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Gregory Evans (DOB: June 28, 1971)
6004 Lost Valley Drive
Denton, TX 75056
(214) 235-2660

10/12/14
Date

54

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

David Mims (DOB: May 18, 1988)
280 CR 3104 Mason
Daingerfield, TX 75638
(832) 332-5891

Oct 9, 2014
Date

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Evan Oglesby (DOB: December 18, 1981)
154 Hughes Street
Toccoa, GA 30577
(256) 648-1766

Date  10/9/14

56

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

*Phillip E. Epps*                              10·8·14
Phillip E. Epps (DOB: November 11, 1938)            Date
2920 Berissa
Grand Prairie, TX 75054
(214) 478-9943

57

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member. I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Charles L. Haley, Sr. (DOB: January 6, 1964)
10428 Rosser Cir
Dallas, TX 75229
(469) 853-5650

Date

58

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Kevin Rey Smith (DOB: April 7, 1970)
6000 Ohio Dr., #3515
Plano, TX 75093
(214) 562-2296

Date

59

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_Daryl Gerard Lewis (DOB: April 16, 1961)_
574 County Rd 3109
Omaha, TX 75571
(903) 380-0696

10-7-2014
Date

60

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Curtis Bernard Wilson (DOB: June 28, 1960)
8154 Glenhollow
Houston, Texas 77033
(832) 888-3682

Date 10/8/2014

61

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

_____          _____
Kelvin Mack Edwards, Sr. (DOB: July 19, 1964)          Date
1716 Brook Arbor Ct
Arlington, TX 76018
(469) 223-1484

ARMSTRONG OBJECTORS' AMENDED OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Dwayne Levels (DOB!  5/9/1979
11400 Domain Dr. #5217
Austin, TX 757858
(214) 641-1939

Date  10/8/14

63

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Solomon Page (DOB: February 27, 1976)
9302 Vista Circle
Irving, TX 75063
(214) 927-3313

Date   10 · 8 · 14

64

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Amended Objection to the June 25, 2014 Class Action Settlement Agreement in this matter, and I authorize my above-listed Counsel to file the Amended Objection on my behalf.

Tim McKyer (DOB: September 5, 1963)
11201 Golden Dr.
Charlotte, NC 28216
(704) 819-5203

10 — 9 - 12 14
Date

65