# 611506          TAD\WTG\2012S-1000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*, | Civil Action No. 2:14-cv-00029-AB |
| Plaintiffs, | |
| v. | |
| National Football League and NFL Propoerties, LLC, Sucessor-in-interest to NFL Properties, Inc., | |
| Defendants. | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**ESTATE OF DAVID DUERSON, ESTATE OF FORREST BLUE, THOMAS DELEONE, GERALD SULLIVAN, BARRY DARROW, RAY AUSTIN, BRUCE HERRON, JOHN CORNELL, TORI NOEL and MIKE ADAMLE'S OBJECTIONS TO CLASS ACTION SETTLEMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

THE OBJECTORS ................................................................................................3

    I.     The Estate of David Duerson, Deceased ................................................3

    II.    The Estate of Forrest Blue, Deceased ...................................................5

    III.   Tom DeLeone ...........................................................................................6

    IV.   Gerald Sullivan ........................................................................................7

    V.    Barry Darrow ...........................................................................................7

    VI.   Ray Austin ................................................................................................8

    VII.  Bruce Herron ...........................................................................................8

    VIII. John Cornell .............................................................................................9

    IX.   Tori Noel ...................................................................................................9

    X.    Mike Adamle .........................................................................................10

THE OBJECTIONS ...........................................................................................10

    I.     This Case is Not a Class Action .........................................................11

    II.    The Current and Future CTE Cases were not Adequately Represented, Resulting in an Unfair Settlement that Places Arbitrary Caps on Existing Wrongful Death Cases and Estops Future Cases Entirely Without Any Explanation As to Why .......................................................................14

          A.    Only Seven (7) Percent of this Proposed Settlement is Earmarked for Death with CTE cases.  Class Representatives Could Not, and Did Not, Fairly and Adequately Protect the Interests of Those Afflicted With, or to be Afflicted with CTE .........................................................15

          B.    The Proposed Settlement Ignores The Vast Percentage of Players Living with CTE Who Suffer From *Mood* and *Behavioral* Impairments .........................................................................................18

III.    Even Those Who are Supposed to be Covered By this Settlement Are Short-
        Changed: Only 3 % of Living Former NFL Players Will Be Paid in the First
        Year of this Settlement; Only 18% Over its Lifetime.............................................21

        A.    Age at Time of Diagnosis or Death is a Thinly Veiled Attempt to
              Perpetuate the NFL's Denial....................................................................21

        B.    The Baseline Assessment Program is Fundamentally Flawed..................23

        C.    The Science is Frozen in Place ...............................................................25

        D.    No Epilepsy Compensation ......................................................................25

        E.    The 75% reduction for TBI or Stroke is Unfounded and Unfair .............25

        F.    Eligible Seasons Reductions Should be Eliminated ................................27

IV.     Other Procedural Issues Tank this Proposal ..........................................................28

        A.    The Lack of Delayed Opt-Outs ...............................................................28

        B.    Inadequate Notice ...................................................................................29

V.      The Class and Subclass Representatives and their Respective Counsel
        Should be Replaced...............................................................................................32

CONCLUSION .........................................................................................................................34

## INTRODUCTION

*Brain trauma, in some people, sparks a disease that starts as a small point in your brain. The structures within your brain on a cell-by-cell level start to fall apart. It has the ability to spread, relatively slowly, but we believe it continues to spread for the rest of your life. At some point, it has attacked or impaired so many neurons that your behavior changes. You've lost enough cells in the parts of the brain that control specific things like memory or emotion, that you change. Almost always, for the worse.*[1]

Scientifically, this debilitating phenomenon is known as Chronic Traumatic Encephalopathy ("CTE"). CTE is extremely prevalent amongst former NFL players, due to the repetitive head trauma sustained during their NFL careers.[2] Of the diagnoses that can result from repetitive head trauma sustained over the course of an NFL career, "**CTE is believed to be the most serious and harmful disease that results from NFL and concussions**."[3]

The settlement proposal currently before this Court seeks estoppel of any CTE claim, from

---

[1] Sactown Magazine, *The Hollow Man*, http://www.sactownmag.com/February-March-2012/The-Hollow-Man/ (last visited Oct. 14, 2014), attached herein as Exhibit A.

[2] Initially, 33 of 34 brains of former NFL football players studied post-mortem at Boston University had evidence of CTE. Of those 33, nearly half showed signs of CTE's most severe stages—Stage III or Stage IV. A.C. McKee et al., *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain: A Journal of Neurology 43, 45 (2012), *available at* http://brain.oxfordjournals.org/content/136/1/43.full.pdf. In a recent medical journal, it was reported that 76 of 79 brains of former NFL players demonstrate CTE. Frontline, *76 of 79 Deceased NFL Players Found to Have Brain Disease*, http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/76-of-79-deceased-nfl-players-found-to-have-brain-disease/ (last visited Oct. 14, 2014).

[3] Seeger Weiss LLP, *Up-To-Date Information on NFL Football Concussions*, http://www.seegerweiss.com/football-concussions. (Sept. 9, 2014). Co-Lead Class Counsel Seeger Weiss used to have this quote on its website. *See* Morey et al. Objection Exhibit 1, ECF No. 6201-2. Seeger Weiss quickly removed that language after oral argument in the Third Circuit on September 10, 2014, at which the inadequate representation and failure to compensate CTE, as well as this language on their website, was raised. Objectors adopt and incorporate ECF. No 6201-2 as Ex. C

July 7, 2014 forward, against the NFL.[4]  In exchange, the NFL would be obligated only to pay an average of $1.44 MIL to certain families[5] of former players who died during an eight-and-a-half (8.5) year period.[6]  Death prior to January 1, 2006 will not be compensable.  Death after July 7, 2014 will likewise be without legal recourse.  Those CTE claims will disappear forever if the NFL/Seeger settlement is approved.

This mass tort MDL case currently consolidates approximately 5,000 Plaintiffs.  However, by structuring the proposed settlement as a *class action settlement*, the proposal affects not just those 5,000 men, but the entire community of nearly 21,000 retired NFL players and their heirs.  Men who may be suffering from, or will suffer from, CTE will have their claims eviscerated, even when science advances and CTE is discovered in the living.[7]  Families who will lose their loved ones and discover CTE in their brains will have no recourse or remedy.  Such a deprivation of future rights

---

[4] *See* Class Action Settlement Agreement as of June 25, 2014, ECF No. 6073-2, preliminarily approved on July 7, 2014:

> In consideration of the benefits described and the agreements and covenants contained in this Settlement Agreement. . . each Settlement Class Member, on his or her own behalf and on behalf of his. . . heirs, next of kin, estates, beneficiaries, executors, administrators. . . hereby waive and release, forever discharge and hold harmless the [NFL] of an from any and all past, present or future claims...including, without limitation, Claims. . .arising out of, or related to, CTE.

ECF No. 6073-2 at § 18.1(a)(iv).

[5] A discrepancy exists in the data provided by the parties to this settlement regarding the number of Death with CTE cases existing from 2006 - Preliminary Approval.  The NFL predicts that fifty-one (51) Death with CTE claims will be paid, while Co-Lead Counsel account for only forty-six (46).  *Compare* ECF No. 6168-7 at 4–6 *with* ECF No. 6167 at 6.

[6] *See* Class Action Settlement Agreement Ex. B-5, ECF No. 6073-2, at 147.

[7] Decl. of Robert A. Stern, Ph.D. ¶¶ 17–19, 38, ECF No. 6201-16 ("I am confident that within the next five to ten years there will be highly accurate, clinically accepted, and FDA-approved methods to diagnose CTE during life.").  The Objectors here wholly adopt and hereby incorporate the Declaration of Dr. Stern, in its entirety, as Exhibit B.

cannot stand without adequate consideration. None exists here.

The men suffering from these horrific injuries (and/or their families), and those players that will inevitably suffer later in life, deserve fair, just and reasonable compensation. Given the enormity of this CTE problem, its solution cannot be the trivial proposal currently before the Court.

## THE OBJECTORS

Objectors are former players, or their family members, with differing levels of resulting neurological impairment as a result of their NFL careers and/or the NFL's fraud. While former NFL players knew that playing professional football could precipitate bum knees, aching backs, and mangled fingers, none imagined that their chosen careers would ultimately alter their essence, change their personality, or riddle their brain with forgetfulness, confusion and irritability. To ask, "What's for dinner?" two hours after eating; to have a towel wrapped around the waist, but not remember whether you are going into, or coming out of, the shower; to tell friends, children, wives the same story once, twice, or three times in the same conversation; to have relationships fall apart; to contemplate, and at times even commit, suicide—these are all unfortunately typical experiences for the proud men that strapped on their shoulder pads and helmets and went to war during practice and on Sunday afternoons for our entertainment, and the NFL's economic benefit.

### I.    The Estate of David Duerson, Deceased

Dave Duerson was drafted by the Chicago Bears as the 64th Pick in the 1983 Draft. During the course of his eleven (11) year NFL career he was a two-time Super Bowl Champion, a four-time Pro Bowl selection and the recipient of the 1987 NFL Man of the Year Award.

Upon his retirement in 1993, Dave Duerson was destined for greatness as a successful businessman with political aspirations. He had a loving marriage. He was a wonderful father to his

four (4) children.  He was gregarious, happy, smart, kind and loving.

Then, the manifestations of CTE began to emerge.

In the 10 years leading up to his suicide at age fifty (50), as a result of the progressive brain degeneration, CTE, Dave Duerson, a man with no prior history of depression or psychological issues, complained of intense headaches, worsening short-term memory, language difficulties, vision trouble, and a growing problem with impulse control.  Additionally, he experienced a reversal of fortune in his professional life, and his marriage dissolved.

On February 17, 2011, Dave Duerson shot himself in the chest.  Mr. Duerson ensured that his brain was preserved.  He laid out directions for his survivors—telling them that he realized his brain was riddled with disease due to his NFL playing career.  He wrote: "I'm not sure what happened to me, but depression and short memory sure did... Please, see that my brain is given to the NFL's brain bank."

Post-mortem neuropatholical review demonstrated CTE, resulting in significant deterioration in his brain's Frontal Cortex, the area of the brain that controls the ability to recognize future consequences and choose between good and bad activities; the Temporal Cortex, the area of the brain that controls judgment, inhibition and impulse control; the Amygdala, the area of the brain that monitors impulse control, mood and behavior; and  the Hippocampus, the area of the brain responsible for memory.

Duerson did not kill himself for CTE to be forever eviscerated from the NFL's lexicon.  The proposed settlement is an insult to his legacy.  For the hundreds, maybe thousands, that may, like Duerson, suffer from CTE , the Estate of David Duerson objects to this arbitrarily capped settlement as unfair, inadequate and entirely unreasonable.

4

## II.   *The Estate of Forrest Blue, Deceased*

Former San Francisco 49ers center Forrest Blue, a first-round pick in the 1968 NFL draft, died at age 65.  Blue, a four-time Pro Bowl selection, spent most of his years after NFL retirement battling dementia.

Prior to the manifestations of dementia and CTE, Mr. Blue, "one of the NFL's best centers [of his time]," was funny, personable and smart.  During his playing career, Mr. Blue enjoyed taking his two daughters horseback riding and to their games, playing softball and soccer in the yard with them, dancing in the living room and teaching them how to do work around the house.

Forrest Blue retired from the NFL in 1978.  CTE then caused his life to unravel.  The outgoing and social man became periodically depressed and shunned his daughters.  Forrest, who loved to be the center of attention, became strangely silent and reclusive; his marriage dissolved; he made questionable business decisions; he developed frequent and violent nightmares; his memory was shot; and he had difficulty tracking conversations.   Then, violent hallucinations, constant forgetfulness, deep depression, suicidal thoughts, bizarre irritability, irrational behavior, and an inability to nurture meaningful familial relationships became the norm.

Towards the end of his life, Forrest Blue spent many sleepless nights battling, fighting and trying to hide from "the bad guys" and "little people" who he thought were after him.

The final twenty-two (22) months of Forrest Blue's life were spent at an assisted-living facility, where he often talked about "the little people that lived in the walls," could not perform activities of daily living and spoke in gibberish.  During his last month, he was completely unable to communicate or move.

Upon his death, Forrest Blue's brain was examined at Boston University's Sports Legacy

Institute where post-mortem neuropathological review confirmed that Forrest Blue's brain was riddled with CTE and Lewy Body Dementia as a result of his eleven (11) year NFL career. Having two brain diseases, or "mixed cases," is not common, but "happens in a minority of our older [aged] CTE cases."[8]

Forrest Blue is survived by his two daughters, Brandi and Brittney, each of whom lost their father to CTE long before his death. This settlement entitles them to six-figure compensation for the premature loss of their father's love, affection, case, guidance and counsel. Brittney and Brandi object to this settlement as unfair, inadequate and entirely unreasonable.

### III.    Thomas DeLeone

Tom DeLeone, born August 13, 1950, played thirteen (13) seasons in the NFL with the Cleveland Browns and Cincinnati Bengals, after graduating from Ohio State University, where he was a starting center and an All-Big Ten and first-team All-American selection.

Tom DeLeone retired from football in 1984. After retirement, he worked for the United States government for twenty-two (22) years as a criminal investigator with the U.S. Department of the Treasury, rising to a Senior Special Agent position within the U.S. Customs Service.

Tom DeLeone now suffers from dementia as a result of his NFL playing career.

It is unclear whether Mr. DeLeone's dementia diagnosis will entitle him to compensation from the NFL according to the terms of this settlement. What is crystal clear is that because Tom DeLeone survived beyond the Fourth of July weekend this year, his family is entitled to nothing upon his death. Tom DeLeone objects to this unfair notion. Mr. DeLeone objects to this settlement as

---

[8] Tim Swanson, *The Hollow Man,* Sactown Magazine, http://www.sactownmag.com/ February-March-2012/The-Hollow-Man/, attached herein as Exhibit A.

unfair, inadequate and entirely unreasonable.

### IV.    *Gerald Sullivan*

Gerry Sullivan, a teammate of Tom DeLeone's on the Cleveland Browns' Kardiac Kids team, played eight seasons with the Cleveland Browns from 1974-81.

A former Chief Operating Officer for a company that leased automatic icemakers, Sullivan was highly respected by his colleagues until his career unraveled when his behavior became erratic, vacillating between "manic hilarity and extreme anger," according to a letter provided by the company's president to the NFL's retirement board in support of his claim for disability.

The NFL's retirement board granted Sullivan's disability request in 2005.  In so granting, the board took into consideration the recommendation of a Chicago-area psychiatrist who determined that Sullivan was suffering from "cognitive impairment and behavioral disinhibition," stemming from "League football activities."  Incredibly, the League had written months before that "there is no evidence . . . of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players."[9]  A year later, the NFL "concluded that mild TBIs in professional football are not serious injuries."[10]  Mr. Sullivan objects to this settlement as unfair, inadequate and entirely unreasonable.

### V.    *Barry Darrow*

A teammate of Sullivan and DeLeone's on the Cleveland Browns Kardiac Kids teams of the 1970s, Barry Darrow played four (4) years in the NFL upon his graduation from the University of

---

[9] Elliot J. Pellman et al.*, Concussion in Professional Football: Neuropsychological Testing — Part 6,* 57 Neurosurgery 1290, 1299 (Dec. 2004).

[10] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection & Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4) (2006).

Montana.  Mr. Darrow objects to this settlement as it is unfair, inadequate and unreasonable.

### VI.    Ray Austin

CTE's ramifications do not just affect the players of the 1970s and '80s.  Ray Austin, age 38, is living with dementia.  Mr. Austin played three (3) years in the NFL with the New York Jets and Chicago Bears after college at the University of Tennessee.   The unrecognized and untreated concussive and subconcussive blows he sustained in practices and games during those three years have left him with severe memory loss and mood disorders.

According to the proposed settlement's terms, Ray Austin should be entitled to a reduced compensatory award.  Yet, when he dies, his family is entitled to nothing if his brain is found to have CTE.  Mr. Austin objects to this settlement as unfair, inadequate and entirely unreasonable.

### VII.    Bruce Herron

Bruce Wayne Herron, born April 14, 1954, in Victoria, Texas, played linebacker for five (5) seasons for the Chicago Bears and prior to that for the Miami Dolphins.  At age sixty (60), his short-term memory is lacking and he deals with intense headaches.  The director of national accounts for a design, engineering and manufacturing company is scared of whether, and how, his brain's damage might progress.

Should Bruce Herron have CTE, he will be entitled to nothing from this settlement unless his disease fits into a Dementia or Alzheimer's diagnosis.  This is true even if science progresses during his lifetime that would allow for his CTE to be seen on PET scans or other diagnostic tests—and it will progress.  Shockingly, Mr. Herron's family will be entitled to no compensation and will be estopped from pursuing a claim for damages if his brain demonstrates CTE upon a post-mortem neuropathical examination.  Mr. Herron objects to this settlement as unfair, inadequate

and entirely unreasonable.

### VIII.    John Cornell

During his college years at Northwestern, John Cornell, a ferocious hitter, was nicknamed ''Bumps'' because he had knobs on his forehead from collisions.[11]  He was a no-nonsense, intense, team-oriented man. A perfect football teammate.

Upon graduation, Cornell was invited to try-out for the New Orleans Saints.  He was placed on their 'taxi-squad' in Virginia, where practices were full of constant head-banging and games were loosely monitored.  During one game, Cornell was knocked out, cold.  He spent a night in the hospital—and was back on the practice field forty-eight (48) hours later.[12]

Today, Mr. Cornell spends his retirement dealing with the consequences of dementia.  He keeps a notepad nearby to keep track of all that his brain can no longer keep track of.  Despite his documented dementia as a result of brain trauma sustained while playing for an NFL taxi squad, Mr. Cornell stands to receive a pittance from the proposed settlement due to reductions for Eligible Seasons.  Mr. Cornell objects to this settlement as unfair, inadequate and entirely unreasonable.

### IX.    Tori Noel

Tori Noel, a former star defensive back for the Tennessee Volunteers, was signed by the then Super Bowl champion Denver Broncos where he quickly gained the admiration and respect of

---

[11]  Rick Telander, *NFL's brain trauma issue won't go away,* Chicago Sun-Times, January 16, 2014, http://www.suntimes.com/sports/25003492-419/telander-brain-trauma-in-the-nfl-an-issue-that-wont-go-away.html#.VDf2XvnF9IE, attached herein as Exhibit D

[12]  Yet physical and cognitive rest is the hallmark of initial concussion management. *See* Report of Robert C. Cantu, M.A., M.D., F.A.C.S., F.A.C.S.M., *Adrian Arrington et al., v. National Collegiate Athletic Association,* No. 11-cv-06356, ECF No. 180 ("Report of Dr. Cantu") ("Either physical or cognitive exertion may greatly exacerbate concussion symptoms and retard recovery.)

teammates for his aggressive play.  Tori's promising career in the NFL was cut short by a serious neck injury.  Mr. Noel objects to this settlement as unfair, inadequate and entirely unreasonable.

### X.  *Mike Adamle*

Michael David Adamle played collegiate football for Northwestern University, where he was team captain, an All-American fullback, and the Big Ten MVP in 1970.  Adamle's 316 rushing yards against the Wisconsin Badgers in 1969 still stands as a school record for the most rushing yards in a game.  Upon graduation in 1971, he was drafted by the Kansas City Chiefs.  He played for seven (7) years in the NFL.

Now a popular sports anchor and reporter at WMAQ-TV in Chicago, Illinois, Mr. Adamle suffers from epilepsy and may have CTE as a result of his NFL playing career.  Despite the fact that epilepsy is known to result from brain trauma, epilepsy is not compensable in the proposed settlement.  If and when Mr. Adamle's brain demonstrates the presence of CTE, neither he, nor his family, will be compensated.  Mr. Adamle objects to this settlement as unfair, inadequate and entirely unreasonable.

### THE OBJECTIONS

This has always been a CTE case.  Now, after conducting <u>no discovery</u>, 'Co-Lead Counsel' and the NFL desire to settle nearly 5,000 pending cases and <u>all cases for the next sixty-five (65) years</u> without an iota of concern for the nearly twenty-thousand (20,000) former NFL players that are suffering from CTE, will suffer from CTE, or will die with CTE.  If this settlement is approved, CTE will have been judicially annihilated at Mr. Seeger and the NFL's request.

As far back as 1994, the NFL closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.  During this

10

time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[13]  Yet, the NFL continuously refuted, denied, and inaccurately professed that chronic brain damage in former NFL football players was not a result of brain trauma sustained in the players' NFL careers.  Now, Co-Lead Counsel join the foray and advocate for a settlement that would have everyone believe that CTE is non-existent.  It is as if Duerson and Blue's death were for naught.  The NFL's denial continues.

### I.      These Cases are Not a Class Action

The only party that benefits from structuring these cases as a class action is the NFL.  The League's motivation is clear—it desires to, once and for all time, forever ban any more lawsuits for damages as a result of its decades long fraudulent concealment of the link between repetitive head trauma and later in life cognitive and mental health deficiencies.  But, in attempting to do so, the NFL blatantly ignores the mental health deficits affecting its former players.  And, it utterly fails to account for CTE.

In *AmChem Products, Inc. v. Windsor*, the United States Supreme Court ruled that, in order for a settlement class to be certified, the cases must meet the requirements espoused in Federal Rules of Civil Procedure 23(a) and (b).  *AmChem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).  The Court reiterated that Rule 23 "demand[s] undiluted, even heightened, attention in the settlement context."  *Id*. at 620.  If this Court's attention to Rule 23 is heightened, this Settlement will sink.

The *AmChem* Court rejected the parties' proposed nationwide settlement involving hundreds of thousands of class members and multiple asbestos manufacturers because the proposed class was

---

[13] *Legal Issues Relating to Football Head Injuries*: *Hearings Before the Committee on the Judiciary House of Representatives*, 111th Cong. 37 (2009-2010) (testimony of DeMaurice Smith, NFLPA Executive Director, in the presence of NFL Commissioner, Roger Goodell).

"sprawling" and because common issues failed to predominate over individual issues, as required

for an opt-out class action under Rule 23(b)(3).  *Id*. at 622–25.[14]  The lack of cohesiveness implicated

Rule 23(a)(4)'s adequacy of representation requirement because the interests of some class members

and representatives conflicted with those of other members.   Specifically, the Court noted,  the

interest of *present claimants* asserting asbestos-related injuries conflicted with the interests of *future*

*claimants*, including both those who knew they had been exposed but had not shown injury and those

that did not know they had been exposed.  *Id*. at 625-628.

Here, even the *present CTE claimants* were in conflict with the *other present claimants*.[15]

Yet, there was not a Class Representative who had endured the tragic consequences of CTE resulting

---

[14] Since *AmChem*, a number of Circuits have refused to certify dispersed personal injury or property damage mass tort class actions, or have decertified them.  *See In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 288 F. 3d 1012 (7th Cir. 2002); *Spence v. Glock*, 227 F. 3d 308 (5th Cir. 2000); *Barnes v. Am. Tobacco Co.*, 161 F. 3d 127 (3d Cir. 1998).   These cases found that varying state laws, individual issues of exposure, causation, and damages defeat the predominance requirement of Rule 23(b)(3).

After *AmChem*, a number of district courts have also refused to certify, or have decertified, mass tort class actions proposed for settlements, or have refused to approve the settlement terms.  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 209 F.R.D. (S.D.N.Y. 2002); *Walker v. Liggett Group*, 175 F.R.D. 226 (S.D. W. Va. 1997).   For example, in a case involving a proposed settlement arising out of alleged intentional exposure of workers to radioactive isotopes, the judge rejected a proposed settlement because it favored the interests of past employees and retirees.  *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 548-49 (S.D. Ohio 2000) (noting, after *AmChem*, "if class certification is not appropriate under Rule 23(a) and (b), then the Court *cannot* approve the proposed Agreement.").

[15] According to the data provided by the NFL, ***only 665 claims will be paid*** in the first effective year of this settlement:

> 17 cases of ALS;
> 14 cases of Parkinson's Disease;
> 153 cases of Alzheimer's Disease;
> 440 cases of Dementia; and
> 51 cases of Death with CTE.

ECF No. 6168.

in Death.  Instead of structuring a settlement that fairly provided for the families of those who have died with CTE to present their damages, an arbitrarily capped fund to dispose of these cases was thrown into the settlement. There is absolutely no reason why damages should be capped. This is not a situation where the Defendant is unable to satisfy its obligations.  For a $10 billion/year business, the $69 MIL set aside for Death with CTE cases is petty cash.[16]  This is illustrated by the fact that nearly double that ($112.5 MIL) is set aside for the lawyers that capitulated to the NFL's desire to eradicate all CTE cases, for all time without conducting one minute of discovery.

*Future CTE claimants* were aced out of the settlement.  Obviously, this group was in conflict with the *other present claimants* and *other future claimants*.  Yet there was not a Class Representative that was looking out for those that inevitably will die with CTE over the next 65 years.

Though the United States Supreme Court unequivocally stated in *AmChem* that the sections of Rule 23 "blocking . . . overbroad class definitions . . . demand undiluted, even heightened, attention in the settlement context," here, an expansive and varied class of plaintiffs is being forced to fit into classes into which they do not belong.  As it remains undisputed that the Class Representatives were neither family members of those who have died with CTE nor former players that fear the impact of CTE on themselves and their loved ones, Class Certification and Final Approval must be denied.

---

[16]     In addition, the NFL is attempting to have its insurance carriers pay this proposed settlement.

13

## II.   The Current and Future CTE Cases were Inadequately Represented, Resulting in an Unfair Settlement that Places Arbitrary Caps on Existing Wrongful Death Cases and Estops Future Cases Entirely Without Any Explanation As to Why

*"CTE is believed to be the most serious and harmful disease*
*that results from NFL and concussions."*
- Seeger Weiss LLP, Lead Counsel[17]

A fair settlement requires a certifiable class with the interests of all class members adequately represented. *GM Trucks*, 55 F. 3d at 784. Rule 23 demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F. 3d 170, 183, 187-88 (3d Cir. 2012) (denying preliminary class certification where interests of representative plaintiffs and absent class members diverged). When assessing the adequacy of representation, "a judge must focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class." *GM Trucks*, 55 F. 3d at 797 (finding representation inadequate where settlement terms preferred some class members over others). Thus, "a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group" *Id.*

Those that have felt CTE's impact are minimally compensated. The future claimants who either have not yet demonstrated signs of CTE or do not even realize that they will not be

---

[17] Seeger Weiss LLP, *Up-To-Date Information on NFL Football Concussions*, http://www.seegerweiss.com/football-concussions (Sept. 9, 2014), attached herein as Exhibit C.

compensated should they develop CTE,[18] have seen their future rights, and the rights of their heirs, bargained away for nothing.

### A. Only Seven (7) Percent of this Proposed Settlement is Earmarked for Death with CTE cases, as the Class Representatives Could Not, and Did Not, Fairly and Adequately Protect these Claimants' Interests

The class action, although a worthwhile supplement to conventional litigation procedure where there are too numerous claims for joinder, is highly controversial and embattled because it is frequently abused. *Eubank v. Pella Corporation*, No. 06-C-4481, at 10 (7th Cir. June 2, 2014), ECF No. 95. This proposed mechanism for resolving the Wrongful Death CTE cases is an example of such an abuse.

Rule 23 of the Federal Rules of Civil Procedure mandates that one or more members of a class may sue or be sued as representative parties on behalf of all members ***only if*** the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods.*, *Inc. v. Windsor*, 521 U.S. 591, 625 (1997). More specifically, the inquiry has two purposes: "to determine (1) that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously and (2) that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re Community Bank of Northern Virginia*, 622 F.3d 275, 291 (3d Cir. 2010).

This Settlement undoubtedly lacks the requisite structural assurance of fair and adequate

---

[18] The Notice that went out to former players misled them into believing that Death with CTE would be compensable for the next 65 years. It is not. Section III, (b) below addresses this glaring deficiency. This, alone, necessitates denial of Final Approval as the Class has not been properly informed of this settlement's ramifications.

representation for the Wrongful Death CTE cases. *See AmChem,* 521 U.S. at 627. One living player with ALS, Kevin Turner, and one currently asymptomatic player, Shawn Wooden, who may be diagnosed with ALS, dementia, Parkinsonism or Alzheimers sometime down the road, serve as the only Class Representatives. Each likely advocated for a settlement that adequately compensated them, and others like them.

CTE is associated with symptoms of irritability, short-term memory loss, confusion, impaired judgment, impulse control problems, aggression, depression, heightened suicidality and, *in some cases*, progressive dementia. Its prevalence is well-documented.

In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a 16 year NFL career (1974 - 1990). During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain. Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

In the years that followed, numerous young men's post-mortem, neuro-pathological review revealed that they, too, had CTE as a result of repeated blows to the head during their NFL careers. Their families reported that they began to notice increasing impairments in short-term memory, attention, concentration, organization, planning, problem solving, judgment, executive function and visual-spatial abnormalities. The suicidal deaths of Dave Duerson, Junior Seau and others demonstrate the horrific ramifications of CTE on retired NFL players and their families.

Yet, the Proposed Settlement unfairly and arbitrarily caps the Wrongful Death damages of the families of Dave Duerson, Forrest Blue, and others with confirmed cases of CTE. How and why are Wrongful Death cases against a viable Defendant arbitrarily capped, without any regard for the

16

familial relationships that give rise to the claims for loss of love, affection, care, guidance, comfort and counsel? Age at death is certainly not a fair determiner for these damages.

Dave Duerson's son, Tregg Duerson, and Forrest Blue's daughter, Brittney Blue, vehemently object to this Proposed Settlement that discredits their fathers' legacy, dismisses the families of those who died with CTE before 2006, and disenfranchises the families who will inevitably suffer the horrific ramifications of CTE.

"No conflict" must exist for a settlement to be approved–the Class Representatives and their Counsel must not have interests antagonistic to those of the class. *Larson v. AT&T Mobility LLC,* 687 F.3d 109, 132 (3d Cir. 2012). Yet this Class encompasses living players who may need cash compensation for medical needs associated with ALS, Parkinson's Disease, Dementia or Alzheimer's. But, this Proposed Class also encompasses spouses, children, and extended family members of deceased players who have died with CTE. Clearly, no one was at the negotiation table for them.

The admitted goal of this Settlement is ***not*** to provide adequate compensation to families of deceased CTE victims. The goal was ***not*** to provide compensation for former players afflicted by CTE, manifesting in mood or behavioral issues.

It is now estimated that compensation for CTE will only amount to <u>$64.9 million</u>, a mere <u>7% of the total estimated compensation</u>.[19] This is entirely inadequate and further proof of the inadequate representation for heirs of deceased NFL players with CTE.

Even Class Representative, Shawn Wooden, finds the exclusion of future CTE cases

---

[19] Report of Class Counsel, MDL No. 2:12-md-02323-AB (E.D. Penn Sep. 12, 2014), ECF No. 6167, at 6.

repulsive—"The guys who died of CTE after that date, then you're not covered at all— I don't agree with that."[20]  But Mr. Wooden was not charged with representing this Subclass of individuals.  No one was.

This glaring deficiency is a 'get-out-of-jail-free' card for the NFL.  By lumping CTE into this Proposed Release (§18.1(a)(iv)), the NFL avoids exposure to the major concern raised in this litigation, CTE.  This cannot stand.

### B.    The Proposed Settlement Ignores The Vast Percentage of Players Living with CTE Suffering From *Mood* and *Behavioral* Impairment

CTE manifests in cognitive deficits _and/or_ behavioral and mood deficiencies.[21]  The manifestations of CTE often begin with mood and behavioral issues along with short-term memory issues and, *sometimes*, progresses to effect cognition.[22]   In short, CTE can, and does, have a deleterious effect on the quality and dignity of former NFL players lives with, or without, diagnoses of Dementia or Alzheimer's disease.[23]

In response to criticism from former players and their families that elimination of Death with

---

[20] Brent Schrotenboer, *Ex-players clash on NFL concussion lawsuit settlement*, USA Today, August 19, 2014, http://www.usatoday.com/story/sports/nfl/2014/08/19/nfl-concussion-lawsuit-settlement-sean-morey-plaintiffs/14303249/, attached herein as Exhibit E.

[21] Report of Dr. Cantu ¶ 57 ("CTE is clinical[ly] associated with symptoms of irritability, impulsivity, aggression, depression, short-term memory loss and heightened suicidality that usually begin 8-10 years after experiencing repetitive mild traumatic brain injury.").

[22] Declaration of Robert A. Stern, Ph.D. ¶¶ 31–35, ECF No. 6201-16.  Objectors adopt this Declaration and the Objections advanced in ECF No. 6201-16, and incorporate them by reference.

[23] Of the 33 deceased former athletes with neuropathologically confirmed CTE, 22 were reprted to have behavior or mood problems as their initial difficulties, prior to any cognitive impairment.  Only 10 of 33 were ever diagnosed with dementia at any time prior to death. Stern Decl. ¶ 32–35, ECF No. 6201-16.

CTE benefits after July 7, 2014 is patently unfair, Class Counsel believes that those suffering from CTE will qualify for compensation during their lifetimes. This demonstrates a lack of understanding of the complexities of CTE.

This misunderstanding is curious, given that Class Counsel has written the following on his website:

Symptoms of CTE include:

- Dementia

- Memory loss

- Depression

- Aggression

- And difficulty controlling impulses[24]

But, this proposed settlement only compensates those that suffer from Dementia.[25]

While 'Death with CTE' from 2006 through July 7, 2014 is compensable at an arbitrarily capped level, CTE in living Plaintiffs is not. Depression is not. Aggression is not. Impulse control deficiencies are not.

In 2007, researchers from the University of North Carolina's Center for Retired Players recorded results of a survey of retired NFL football players.[26] Their findings showed that players

---

[24] Seeger Weiss LLP, *Up-To-Date Information on NFL Football Concussions*, http://www.seegerweiss.com/football-concussions. (Sept. 9, 2014), attached herein as Exhibit C.

[25] The proposed manner and method of testing for dementia in former players is profoundly flawed. Decl. of Stern ¶ 43–53, ECF No. 6201-16.

[26] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired Professional Football Players*, 39 Med. Sci. Sports Exercise 903 (2007).

who had multiple concussions were more likely to experience depression.  In fact, more than twenty-four percent (24%) of former NFL players who had sustained three or more concussions reported that they were suffering from depression.  Just last year, Boston University CTE researchers published a study of 36 adult males who had CTE, twenty-nine (29) of whom played football.[27]  Eleven (11) men suffered from cognitive impairment, while twenty-two (22) suffered from mood and behavioral symptoms: emotional explosiveness, impulsive behavior, outbursts of violence, depression, and hopelessness.[28]

This proposed settlement purportedly provides assurance for players that are not yet diagnosable, but may be diagnosed with ALS, dementia, Parkinsonism or Alzheimers.  It presumes that these men *may*[29] be compensated someday down the road, should they develop a *cognitive* disorder.  Admittedly, neurobehavioral symptoms are not compensable, nor will they ever be, according to the Settlement's terms.[30]

This Settlement proposes to take care of the minority of retired NFL players who suffer from cognitive impairment, while leaving the majority of former players with nothing.  Those who are suffering from symptoms that are associated with both brain damage and CTE—sensitivity to noise, visual impairment, chronic pain, chronic headaches, incessant ringing in the ears, attention disorders,

---

[27] Robert A. Stein et al., *Clinical presentation of chronic traumatic encephalopathy,* 81 Neurology 1122, 1122-1129 (2013), *available at* http://www.bu.edu/cte/files/2013/09/CTE-Neurology-2013-Stern-1122-9.pdf.

[28] *Id*. at 1122.

[29] *See* Objection of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine, In Re: National Football League Players' Concussion Injury Litigation, MDL No. 2323 (E.D. Penn. July 2, 2014), ECF No. 6082.

[30] *See* Specific Objection to science 'freezing in place', below at § III(c).

trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions—simply aren't covered.[31]

### III. Even Those Who are Supposed to be Covered by This Settlement Are Short-Changed: Only 3 % of Living Former NFL Players Will Be Paid in the First Year of this Settlement; Only 18% Over its Lifetime

In addition to the unexplained exclusion of CTE claims going forward and arbitrarily capped damages related to CTE claims that have accrued, the Proposed Settlement cannot be approved because it is unfair for even those claimants that appear to benefit from its terms. The proof is in the pudding—very few former NFL players will ever be paid.[32]

### A. Age at Time of Diagnosis or Death is a Thinly Veiled Attempt to Perpetuate the NFL's Denial

By creating a compensation scheme dependent upon age at diagnosis as the primary determinative factor in determining levels of compensation, the League benefits, extraordinarily, from its years of denial of the link between brain trauma suffered by its players and CTE-related effects. From the inception of its mTBI Committee in 1994, the NFL spun the science to create doubt and uncertainty in players' and players' families' minds about the impact professional football had on its participants. Thus, players and families were discouraged from seeking medical care or counseling related to perceived cognitive and mental health issues. Brilliantly, the proposed compensation scheme plays right into this deceit. By diminishing compensation based upon one's age at diagnosis or death, the NFL saves money.

---

[31] *See* Patrick Hruby, *Cutting Them Short,* Sports on Earth (July 18, 2014), http://www.sportsonearth.com/article/85045740/nfl-concussion-settlement-cuts-cte-coverage-short-patrick-hruby#!bOtPCE., attached herein as Exhibit F.

[32] Less than 20% of current NFL retirees will be paid over the 65 year term of this proposal. ECF No. 6168-7, at 6 ("We project that 3,488 total expected claimants will make 6,674 claims".).

For example, Forrest Blue was officially diagnosed with dementia in 2008, while he was age 63. This likely entitles his Estate to a compensation level of approximately $250,000.00.[33] But, if the NFL had been truthful and forthcoming about the link between repetitive head trauma sustained during an NFL career and later-in-life cognitive and mental heath disorders, his family would have pushed for a diagnosis years, probably decades, earlier. Had a Level 1.5 Dementia diagnosis been made in 1998 or 1988, the compensation levels would have been $600,000.00 or $3 million, respectively. There are many men out there like Forrest, who will see their compensation dip because they were not proactive in obtaining qualifying diagnoses, due to the League's denials.

This proposed Settlement permits the NFL to capitalize on its prior misrepresentations by compensating the Blue Family in accordance with an age-specific chart that penalizes players and families for not getting diagnosed earlier in life, when the reason there was a lack of diagnosis was due to the NFL's fraud. No wonder many have referred to this as a 'sham' settlement.

Long before the NFL ever acquiesced to the prevailing views of the majority of scientists and finally acknowledged that its former players were suffering as a result of their playing careers, former players' spouses and family members saw distinct and definitive changes in their loved ones. Yet, due to the NFL's professions from its bully pulpit, football-related disease never even crossed their minds.

If the NFL had been proactive with its retired player population, benefits and/or truthful information would have been available to these players, often giving rise to a diagnosis well before the diagnoses that are utilized to provide compensation in this settlement. Instead, players were left

_____

[33] His subsequent Death with CTE in 2011 at age 65 entitles the Estate to approximately $960,000.00.

to wonder what was wrong with them—and families lacked an understanding of how and why the changes they saw and felt were occurring.

These arbitrarily capped damages strategically and coincidentally correlate with the NFL's age old stance in opposition to the realities facing its retirees.  This settlement cannot stand.

### B.      The Baseline Assessment Program is Fundamentally Flawed

All medical experts to date agree that the Proposed Settlement's BAP approach is deeply flawed.[34]  The proposed Baseline Assessment Program is deficient, underinclusive, and substantially flawed.

A court must examine "the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case." *GM Trucks,* 55 F. 3d at 806.  Here, its difficult to ascertain as there was no discovery.  Where the "real value" of a settlement to the class falls well short of its ostensible face value, the settlement is not reasonable in light of the "best possible recovery."  *See GM Trucks*, 55 F. 3d at 807-10.  This Settlement is a sell-out.

The BAP does not test for the mood and behavioral disorders that plague many individuals who suffer from CTE, effectively excluding a significant number of Class Members from the possibility of compensation.[35]

Remarkably, the manner and methods required for compensation under this proposed

---

[34] *See generally* Decl. of Stern, ECF No. 6201-16; Decl. of Masel/O'Shanick ¶ 12-15, ECF No. 6180-2.

[35] *See* Decl. of Stern at 73, ECF No. 6201-16.

settlement would have shut out Dave Duerson out of this settlement.[36]  This Court cannot endorse such a shoddy scheme.

A settlement is not the "best possible recovery" where "some segments of the class are treated differently from others."  *GM Trucks*, 55 F. 3d at 808; *see Vassalle v. Midland Funding LLC,* 708 F. 3d 747, 755 (6th Cir. 2013) ("disparity in the relief afforded under the settlement to the named plaintiffs, on the one hand, and the unnamed class members, on the other, [makes] the settlement unfair.")  The "fact that the . . . settlement benefits certain groups of the class more than others" weighs against final approval, and demonstrates that the settlement was "a sell-out of an otherwise strong case."  *GM Trucks*, 55 F. 3d at 806, 808.

The only symptoms related to CTE that are compensable (other than those that overlap with Alzheimer's, ALS, or Parkinsons) are cognitive difficulties that are severe enough that the Class Member would have significant impairments in critical aspects of daily living and independence.[37]

Because of this high hurdle, a substantial number of suffering Class Members will not be entitled to compensation under the settlement.

Dr. Stern flatly stated that "[t]he evaluation protocols required by the Settlement are generally considered inappropriate for the evaluation of individuals with neurodegenerative diseases."[38]  Instead of being designed to appropriately evaluate former NFL players for signs and symptoms of CTE and other neurodegenerative disease, the 'BAP' program merely attempts to freeze out hundreds, if not thousands, of former players from this settlement.

---

[36] Decl. of Stern ¶ 35, ECF No. 6201-16.

[37] Decl. of Stern ¶ 41, ECF No. 6201-16.

[38] Decl. of Stern ¶ 43, ECF No. 6201-16.

### C.      The Science is Frozen in Place

The evaluation and treatment of brain damage following brain trauma endured during an NFL career is an emerging field.   Advancements are being made every day.   Yet, this settlement only allows for Co-Lead Counsel and the NFL to revisit the appropriate tests and revitalize the settlement in line with changing science *once every ten years*.   Does anyone really believe that science will remain at its 2014 level of understanding all the way until 2024?

### D.      No Epilepsy Compensation

"The risk of developing epilepsy as long as ten years after TBI is 1.5 times that of non-injured persons,"[39] yet, this Proposed Settlement fails to address this sequella of brain trauma.   A fair settlement must include seizure disorder associated with repetitive head trauma.

### E.      The 75% Reduction for TBI or Stroke is Unfounded and Unfair

The Revised Settlement reduces a player's monetary award by ***75%*** for a ***single*** medically diagnosed stroke or traumatic brain injury occurring prior to a qualifying diagnosis.[40]   The only justification for this presumption that a single non-football related injury accounts for three-fourths of a player's ailment is that "because Alzheimer's and neurocognitive disorders are *sometimes* attributed to a prior history of stroke, the incidence of these diseases was adjusted to account for this joint casualty."[41]

The 75% offset applies regardless of how the brain injury occurred, and regardless of the

---

[39] Declaration of Drs. Brent E. Masel and Gregory J. O'Shanick in Support of BIAA's Motion for Leave to File *Amicus Curiae* Brief ¶ 8, ECF No. 6180-2.

[40] Proposed Settlement Agreement at 40, ECF No. 6073-2.

[41] ECF No. 6167 at 19.

number of traumatic brain injuries a player actually suffered throughout their NFL career.  All that is required is one medical record from an emergency room after a car accident that caused a concussion with a notation of a traumatic brain injury and suddenly a player (or their family) can only recover *25%* of what they were otherwise entitled to.

The 75% offset for a TBI is more outlandish considering the fact that CTE has been proven to cause poor impulse control.  By way of example, if a former player was diagnosed with Level 1.5 Dementia in December 2004, he should be entitled to a $600,000.00 monetary award.  But, if he had a car collision with concussion at any time since retiring from football, his award would be cut to $150,000.00.  Even more troubling, if that player, after his diagnosis, participates in erratic and dangerous behavior as a result of the concussive and subconcussive blows he endured in his eight years in the NFL, his additional 'step up' level of compensation would be again diminished by subsequent TBI.  His Level 2 Dementia that should entitle him to a supplemental $600,000, would again be reduced.

These offsets are ridiculous when partaking in these dangerous activities and the resulting injuries are *the fault of the NFL,* for masking the risks and side effects of continuous blows to the head and for incentivizing players to return to the field before they were healed.  Yet again, the NFL rewards itself, with Mr. Seeger's help, to the detriment of its former players, for its efforts to make light of concussions and conceal their risks from the players.  The irony cannot be overstated.

The offset is even more outrageous in light of the fact that Toradol, a pain-killer the NFL administered to its players, actually *increases the risk of stroke.*[42]  In other words, the NFL

---

[42] *See* Roche, FDA-Manded Warning Label for Toradol at 1, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/019645s019lbl.pdf, attached herein as Exhibit G ("NSAIDs may cause an increased risk of serious cardiovascular thrombotic events,

administered Toradol, which masks injuries, encourages players to continue playing, and increases the risk of players suffering multiple injuries in a game—and subsequently ***used it against its players*** to reduce their award by 75%.[43]  This radical reduction is anything but fair, adequate, and reasonable.

### F.    Eligible Seasons Reductions Should be Eliminated

The random offsets applicable to retired players' claims if they played less than five "Eligible Seasons," is neither fair nor reasonable.[44]   Supporting bases are not explained in the proposed Settlement.

The reality is that Concussive head impacts can occur during training camp, practices, preseason games, or during the first few regular season games.  If the players' concussion is not promptly recognized, adequately treated and thoughtfully rehabilitated, additional blows to the head can, and will, cause lasting damage most often in the form of CTE.

Retired player who had less than five eligible seasons were just as likely to suffer concussions, and perhaps even more so.  Training camps and preseason games were the time to demonstrate toughness and an ability to hit as hard or harder than other players.  Plaintiffs played in an era when training camps and the preseason were much more brutal than today. Training camps were full contact, twice a day, often for 3.5 hours.

---

myocardial infarction, and *stroke* which can be fatal.") (emphasis added). *See also id*. at 14 ("Toradol, like other NSAIDs, may cause serious CV side effects, such as MI or stroke, which may result in hospitalization or even death."); *id*. at 23 ("NSAID medicines may increase the chance of a heart attack or stroke that can lead to death. This chance increases with longer use of NSAID medicines.")

[43] ECF No. 6180-2  ¶17

[44] ECF No. 6180-2  ¶16

IV.     **Other Procedural Issues Tank this Proposal**

A.      **The Lack of a Back-End Opt-Out Procedure**

It was not until September 12, 2014, approximately thirty (30) days before the scheduled

deadline for opting-out of this Settlement, that the settling parties finally disclosed, pursuant to Court

Order, their reports that had been provided to the Special Master, and long ago promised to all

Plaintiffs' Counsel.  These reports demonstrate that:

- Only a small minority (approximately 16.5%) of this Class of 21,000 are expected to receive any real compensation from this Settlement.[45]

- The rest (approximately 83.5%) of former NFL players' brain damage claims will be forever extinguished in consideration of a benefit equal to three-thousand-two-hundred dollars ($3,200.00).[46]
- For those that do receive compensation, the amount will be minimal - the average compensation amounts are:

  ▸     Dementia        =       $190,000

  ▸     Alzheimer's     =       $270,000

  ▸     Parkinson's     =       $230,000.[47]

Yet, this historic Multi-District Litigation stemming from the repercussions of the NFL's

denial of, and spinning of the science on, the link between repetitive head trauma and later-in-life

cognitive and mental health decline was preliminarily approved for settlement on July 7, 2014.[48]

---

[45] ECF No. 6167 ¶ 8; ECF No. 6168 at 40.

[46] In the recently released "NFL Concussion Liability Forecast," published by  Thomas Vasquez and presented to the Special Master by Seeger Weiss, it is projected that the vast majority of the class (approximately 15,000 out of a class of 21,000 former NFL players) will only qualify for a baseline examination that costs $3,200.00. ECF 6167 at 42.

[47] ECF No. 6167 ¶ 4.

[48] ECF No. 6048.

Given the course of conduct of Co-Lead Counsel and the NFL, the October 14, 2014 Opt-Out date was unrealistic as many former NFL Players could not comprehend the ramifications of such a critical decision by that time.

The opt-out period is intended to allow absent class members an opportunity to reflect on and consider the settlement and its affect. *See Greenfield v. Villager Industries, Inc.,* 483 F. 2d 824, 834-6 (3d Cir 1973). Here, the real terms of that settlement were shrouded in secrecy. Worse, the Notice to the Class[49] confused, muddled and distorted the real terms of the settlement.

Because of the settling attorneys' advocacy for the settlement they crafted, and their resulting failure to volunteer all the information needed to fully understand the settlement's real terms and their effect, many Absent Class Members and their families were not aware of the significant rights that were negotiated away in this Proposed Settlement. Many still may not be aware of the enormity of this proposal and its consequences upon them and their families if/when they develop disease as a result of their NFL career.

The Court must not accept this Proposed Settlement without allowing the thousands upon thousands of former NFL players and their families additional opportunities to opt-out of this construct. Once the distribution plan is adequately related to former NFL Players, and they can determine how much they may actually recover (or, if not modified or further negotiated, how their rights have been relinquished), a delayed opportunity after the Fairness Hearing to opt-out should be permitted.

**B.    The Class Action Notice was Inaccurate and Misleading**

The notice sent to former players and their families was misleading, at best—blatantly wrong,

---

[49] ECF No. 6073-5 Exs. C-3, C-5.

at worst.  The Notice told the reader that Death with CTE will be compensated *for the next 65 years*,

when, in fact, any such death after July 7, 2014 will not be entitled to compensation.

Imagine the following scene in the living room of a former NFL players' home:

CLAUD:      Clara, did you see this Notice from that Concussion
            Case in Philadelphia everyone's been talking about?

CLARA:      Oh, Claud, that won't affect us...we never did hire that
            nice young man to file a case like we had talked
            about.

CLAUD:      But, Clara, this says we didn't need to.  Your ship
            might come in after all—this says if I die in the next
            65 years with that CTE stuff, you'd get $4 million.

CLARA:      Let me just see here for a second...hmmm... lets see
            ... oh, you might be right, this Notice does define
            "Qualifying Diagnosis" as "the diagnosis of ALS,
            Parkinson's Disease, Alzheimer's Disease, Level 2
            neurocognitive impairment (i.e. moderate dementia),
            level 1.5   neurocognitive impairment (i.e. early
            dementia) or Death with CTE."

            And, by golly, you're right, it promises that "a
            Qualifying Diagnosis may occur at any time until the
            end of the sixty-five year term of the settlement."

CLAUD now stands, smiling broadly.

CLAUD:      When's breakfast?

CLARA:      Claud, we just ate breakfast, an hour ago.  I just can't
            believe this.  This is amazing.  I need to call the kids.

CLAUD:      Hang on a second, we're sure it says that, right?

CLARA:      Its plain as day, right here Claud, on page 10, under
            question 14 where it asks 'What diagnoses qualify for
            monetary awards?'

CLAUD:      I never, in my wildest...what a great deal!

30

CLARA:          Lets call the kids, ok?

CLARA grabs the phone and dials.

CLAUD, JR.:  Hello

CLARA:          Claudie?  Its your mother.  We just got some exciting mail we thought we'd share the news.

CLAUD, JR.:  Uhhh...ok.

CLARA:          You know that Concussion settlement out in Philadelphia?  Well, if your father were to pass, you get his brain out to Boston University, you hear me? It needs to be checked for CTE.  Get this, if there is CTE, we'd get $4 million.

CLAUD, JR.:  Wait a second, I'm in front of my computer...let me see if I can check this out.

CLARA:          Oh, please do...its very important we know everything there is to know about this.

CLAUD, JR.:  Holy smokes, ma...you're right.  The website says: Retired player, legal representatives of incapacitated or deceased players, and families of deceased players may be eligible to received benefits from this settlement.

The proposed settlement provides three benefits:
1.     Baseline medical exams for retired NFL players;
2.     Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death; and
3.     Education programs and incentives related to football safety.

All valid claims for injury will be paid in full for 65 years.

31

> CLARA:      See, I told you your father was a bigshot back in the
>             day.
>
> CLAUD:      I'm still a bigshot, Clara!  When's breakfast?
>
> Fade...

Of course, everything Claud, Clara and Claud, Jr. read was untrue.  "Only pre-settlement

diagnoses of Death with CTE are eligible for compensation."[50]

No mention is made of the July 7, 2014 cut-off for Death with CTE claims on the portions

this family read.  They remain blissfully ignorant of the sad, but true, reality that even if Claud's

brain demonstrates significant CTE upon his death, they will get nothing.

But, there is still time to save them from the empty promises.  Should this Court permit a

Supplemental Notice to be distributed that informs the reader, point blank, that

NO CTE CLAIMS WILL BE PAID FOR A DEATH OCCURRING AFTER JULY 7, 2014,

then the Absent Class Members can make well-informed decisions on whether to opt-out of this

settlement by the 'back-end opt-out' date.

## V.    The Class and Subclass Representatives and their Respective Counsel, Should be Replaced

*After careful consideration, the Class and Subclass Representatives, and their respective Counsel, have concluded that it in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses to compromise and settle all Released Claims against the Released Parties for consideration reflected in the terms and benefits of this Settlement Agreement . . . the Class and Subclass Representatives have considered, among other things, (1) the compexity, expense, and likely duration of the litigation, (2) the stage of the litigation and amount of fact gathering completed, (3) the potential for the NFL Parties to prevail on threshold issues and on the merits; and (4) the range of possible recovery, and have determined that this Settlement Agreement is fair reasonable, adequate, and in the best interests of the Class and Subclass Representatives and the Settlement Class*

---

[50] ECF No. 6167 at 18, n. 12.

*and Subclasses.*[51]

This Court's appointed Co-Lead Counsel and their Subclass Counsel determined that it is in the best interests of the Class for all 21,000 men to release the NFL for liability related to CTE and other neurodegeneragive disease in exchange for payment of 665 current claims and the establishment of a compensatory scheme that places substantial hurdles before the former players who wish to be compensated.  To make matters worse, if a former player is one of the 18% that will, someday, qualify for compensation, these Counsel consent to an appeals process that permits the NFL unlimited appeals while individual players must post a $1,000 'appeal bond' if they seek review of an initial determination.  That reasonable minds could come to the conclusion that this agreement is in the best interests of the Absent Class members defies logic.

Messrs. Seeger and Weiss' willingness to acquiesce to such a one-sided resolution demands reprove.  Their advocacy for the proposal and their attempts to temper opposition to it should be admonished.  At the least, they should be removed from their position as the court-appointed leaders of the former players' case.

---

[51]Class Action Settlement Agreement as of June 25, 2014 at Recitals, § J.

## <u>CONCLUSION</u>

In addition to the reasons stated above, these Objectors hereby adopt and incorporate the following:

• Objection of Sean Morey, et al., filed on October 6, 2014 (ECF No. 6201), and its supporting exhibits.

• The Memorandum of Public Citizen, Inc. as *Amicus Curiae* with Respect to Motion for Approval of Class Action Settlement (ECF No. 6214-1).

• Objection of Roderick Cartwright et al., filed on October 14, 2014 (ECF No. 6232), and its supporting exhibits.

For these reasons, and the reasons to be fully explored and unearthed at the Fairness Hearing, the Objectors respectfully request that this Court deny Final Approval of the Proposed Settlement Agreement.

Dated: October 14, 2014

Respectfully submitted,

*/s/ Thomas A. Demetrio*              */s/ William T. Gibbs*
Thomas A. Demetrio                    William T. Gibbs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*, | Civil Action No. 2:14-cv-00029-AB |
| Plaintiffs, | |
| v. | |
| National Football League and NFL Propoerties, LLC, Sucessor-in-interest to NFL Properties, Inc., | |
| Defendants. | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

### DECLARATION OF WILLIAM T. GIBBS

William T. Gibbs declares, pursuant to 28 U.S.C. § 1746:

1.      I am an attorney at Corboy & Demetrio.

2.      The Estate of David Duerson has retained Corboy & Demetrio in connection with

the above-captioned matter, and I represent the Estate of David Duerson in this matter.

3.      The Estate of Forrest Blue has retained Corboy & Demetrio in connection with

        the

above-captioned matter, and I represent the Estate of Forrest Blue in this matter.

4.      Thomas DeLeone has retained Corboy & Demetrio in connection with the above-

captioned matter, and I represent Thomas DeLeone in this matter.

5.      Gerald Sullivan has retained Corboy & Demetrio in connection with the above-captioned matter, and I represent Gerald Sullivan in this matter.

6.      Barry Darrow has retained Corboy & Demetrio in connection with the above-captioned matter, and I represent Barry Darrow in this matter.

7.      Ray Austin has retained Corboy & Demetrio in connection with the above-captioned matter, and I represent Ray Austin in this matter.

8.      Bruce Herron has retained Corboy & Demetrio in connection with the above-captioned matter, and I represent Bruce Herron in this matter.

9.      John Cornell has retained Corboy & Demetrio in connection with the above-captioned matter, and I represent John Cornell in this matter.

10.     Tori Noel has retained Corboy & Demetrio in connection with the above-captioned matter, and I represent Tori Noel in this matter.

11.     Mike Adamle has retained Corboy & Demetrio in connection with the above-captioned matter, and I represent Mike Adamle in this matter.

11.     Attached as Exhibit A is a true and correct copy of Sactown Magazine, *The Hollow Man*, http://www.sactownmag.com/February-March-2012/The-Hollow-Man/ (last visited Oct. 14, 2014).

12.     Attached as Exhibit B is a true and correct copy of the Declaration. of Robert A. Stern, Ph.D., Exhibit 16 to the Objection of Morey et al., ECF No. 6201-16.

14.     Attached as Exhibit C is a true and correct copy of Seeger Weiss LLP, *Up-To-Date Information on NFL Football Concussions*, http://www.seegerweiss.com/football-

15.     Attached as Exhibit D is a true and correct copy of Rick Telander, *NFL's brain trauma issue won't go away,* Chicago Sun-Times, January 16, 2014, http://www.suntimes.com/sports/25003492-419/telander-brain-trauma-in-the-nfl-an -issue-that-wont-go-away.html#.VDf2XvnF9IE.

16.     Attached as Exhibit E is a true and correct copy of Brent Schrotenboer, *Ex-players clash on NFL concussion lawsuit settlement*, USA Today, August 19, 2014, http://www.usatoday.com/story/sports/nfl/2014/08/19/nfl-concussion-lawsuit-settlement-sean-morey-plaintiffs/14303249/.

17.     Attached as Exhibit F is a true and correct copy of Patrick Hruby, *Cutting Them Short,* Sports on Earth (July 18, 2014), http://www.sportsonearth.com/article/85045740/nfl-concussion-settlement-cuts-cte-coverage-short-patrick-hruby#!bOtPCE.

18.     Attached as Exhibit G is a true and correct copy of Roche, FDA-Manded Warning Label for Toradol at 1, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/019645s019lbl.pdf

I declare under penalty of perjury that the foregoing is true and correct.


Dated: October 14, 2014


William T. Gibbs

3

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Mike Adamle, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.    <u>Name</u>: Mike Adamle

2.    <u>Address</u>: 83 Holabird Loop, Highwood, Illinois 60040

3.    <u>Telephone Number</u>: (312) 836-5665 (Cell)

4.    <u>Date of Birth</u>: 10/4/1949

5.    <u>Written Statement</u>: I, Mike Adamle, qualify as a Settlement Class Member, as I

am an NFL Football player who, prior to July 7, 2014, retired from playing professional football

with the NFL. I played with the Kansas City Chiefs (1971-1972), the New York Jets (1973-

1974), and the Chicago Bears (1975-1976).

6.    Attorney Filing on Mike Adamle's Behalf:

         Thomas A. Demetrio
         William T. Gibbs
         Corboy & Demetrio, P.C.
         33 North Dearborn Street
         Suite 2100
         Chicago, Illinois  60602
         312-346-3191
         Attorney I.D. No. 611506

_____10/14/2014_____          _____
             Date                              Mike Adamle

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Ray Austin, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.  <u>Name</u>: Ray Austin

2.  <u>Address</u>: 427 East 42nd Place, #1, Chicago, IL 60653

3.  <u>Telephone Number</u>: (312) 659-2202 (Cell)

4.  <u>Date of Birth</u>: 12/21/1974

5.  <u>Written Statement</u>: I, Ray Austin, qualify as a Settlement Class Member, as I am

an NFL Football player who, prior to July 7, 2014, retired from playing professional football with

the NFL. I played with the New York Jets (1997) and the Chicago Bears (1998-1999).

6.  Attorney Filing on Ray Austin's Behalf:

> Thomas A. Demetrio
> William T. Gibbs
> Corboy & Demetrio, P.C.
> 33 North Dearborn Street
> Suite 2100
> Chicago, Illinois 60602
> 312-346-3191
> Attorney I.D. No. 611506

_____    _____
            Date                                        Ray Austin

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Brittney Blue, Special Administrator of the Estate of Forrest Blue, deceased, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.   Name: Brittney Blue

2.   Address: 3892 Otay Street, West Sacramento, CA 95691

3.   Telephone Number: (916) 788-2309 (Work) | (916) 849-4949 (Cell)

4.   Date of Birth: 11/5/1972

5.   Representative Claimant of: Forrest Blue, Deceased

6.   Written Statement: I, Brittney Blue, have been Court approved as the Special Administrator of the Estate of Forrest Blue and therefore qualify as a Representative Claimant of a Retired NFL Football Player, Forrest Blue, who died on 7/16/2011 and was diagnosed with CTE upon his death. Forrest Blue played for the San Francisco 49ers (1968-1974) and the Baltimore Colts (1975-1978). I, Brittney Blue, am a Plaintiff in the current MDL Litigation No. 2323. *See Brittney Blue, Special Administrator of the Estate of Forrest Blue v. National Football League et al.,* No. ILN/2:13-cv-00095-AB, ECF No. 5321.

7.   Attorney Filing on Brittney Blue's Behalf:

Thomas A. Demetrio
William T. Gibbs
Corboy & Demetrio, P.C.
33 North Dearborn Street
Suite 2100
Chicago, Illinois  60602
312-346-3191
Attorney I.D. No. 611506

10/10/14
_____
Date

_____
Brittney Blue, Special Administrator of the
Estate of Forrest Blue, Deceased

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, John J. Cornell, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.  <u>Name</u>: John J. Cornell

2.  <u>Address</u>: 1327 South Indiana Parkway, Chicago, IL 60605

3.  <u>Telephone Number</u>: (312) 945-3309 (Home) | (312) 952-0267 (Cell)

4.  <u>Date of Birth</u>: 2/9/1947

5.  <u>Written Statement</u>: I, John Cornell, qualify as a Settlement Class Member, as I was a member of the New Orleans Saints' taxi squad, Richmond Roadrunners (1969). During the 1970 football season, I was on a preseason roster of a Member Club (New Orleans Saints). I am no longer under contract to a Member Club and am not seeking active employment as a player with any Member Club.

6.  Attorney Filing on John Cornell's Behalf:

    Thomas A. Demetrio
    William T. Gibbs
    Corboy & Demetrio, P.C.
    33 North Dearborn Street
    Suite 2100
    Chicago, Illinois 60602
    312-346-3191
    Attorney I.D. No. 611506

_10/13/14_
Date

John Cornell

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Barry Darrow, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.    <u>Name</u>: Barry Darrow

2.    <u>Address</u>: 2709 Highwood Drive, Missoula, MT 59803

3.    <u>Telephone Number</u>: (406) 523-4110 (Work) | (406) 546-0906 (Cell)

4.    <u>Date of Birth</u>: 6/27/1950

5.    <u>Written Statement</u>: I, Barry Darrow, qualify as a Settlement Class Member, as I am an NFL Football player who, prior to July 7, 2014, retired from playing professional football with the NFL. I played with the Cleveland Browns from 1974-1978.

6.    Attorney Filing on Barry Darrow's Behalf:

> Thomas A. Demetrio
> William T. Gibbs
> Corboy & Demetrio, P.C.
> 33 North Dearborn Street
> Suite 2100
> Chicago, Illinois 60602
> 312-346-3191
> Attorney I.D. No. 611506

_10/10/2014_                        _Barry W. Darrow_
Date                                         Barry Darrow

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Tom DeLeone, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.    Name: Thomas (Tom) DeLeone

2.    Address: P.O. Box 681472, Park City, UT 84068

3.    Telephone Number: (435) 655-~~1574~~ - 1754

4.    Date of Birth: 8/13/1950

5.    Written Statement: I, Thomas DeLeone, qualify as a Settlement Class Member, as

I am a NFL Football player who, prior to July 7, 2014, retired from playing professional football

with the NFL. I played with the Cincinnati Bengals (1972-1973) and the Cleveland Browns

(1974-1984).

6.    Attorney Filing on Thomas DeLeone's Behalf:

Thomas A. Demetrio
William T. Gibbs
Corboy & Demetrio, P.C.
33 North Dearborn Street
Suite 2100
Chicago, Illinois 60602
312-346-3191
Attorney I.D. No. 611506

10/10/14
_____
Date

_____
Thomas DeLeone

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Tregg Duerson, Personal Representative of the Estate of David R. Duerson, deceased, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.    <u>Name</u>: Tregg Duerson

2.    <u>Address</u>: 172 West Burton Place, Garden Unit, Chicago, IL 60610

3.    <u>Telephone Number</u>: (312) 655-5314 (Work) | (312) 502-5933 (Cell)

4.    <u>Date of Birth</u>: 9/30/1985

5.    <u>Representative Claimant of</u>: David R. Duerson, Deceased

6.    <u>Written Statement</u>: I, Tregg Duerson, have been Court approved as the Personal Representative of the Estate of David R. Duerson and therefore qualify as a Representative Claimant of a Retired NFL Football Player, David R. Duerson, who died on 2/17/2011 and was diagnosed with CTE upon his death. David Duerson played for the Chicago Bears (1983-1989), the New York Giants (1990), and the Pheonix Cardinals (1991-1993). I, Tregg Duerson am a Plaintiff in the current MDL Litigation No. 2323. *See Tregg Duerson, Estate of David Duerson v. National Football League et al.,* No. ILN/1:12-cv-02513, ECF 4106.

7.    Attorney Filing on Tregg Duerson's Behalf:
      Thomas A. Demetrio
      William T. Gibbs
      Corboy & Demetrio, P.C.
      33 North Dearborn Street
      Suite 2100
      Chicago, Illinois  60602
      312-346-3191
      Attorney I.D. No. 611506

10/13/2,14
_____
Date

_____
Tregg Duerson, Personal Representative of
the Estate of David R. Duerson, Deceased

# STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Bruce Herron, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1. __Name:__ Bruce Herron

2. __Address:__ 1133 East 83rd Street, Unit 218, Chicago, IL 60619

3. __Telephone Number:__ (312) 953-9280 (Cell)

4. __Date of Birth:__ 4/14/1954

5. __Written Statement:__ I, Bruce Herron, qualify as a Settlement Class Member, as I am an NFL Football player who, prior to July 7, 2014, retired from playing professional football with the NFL. I played with the Chicago Bears from 1978-1982.

6. Attorney Filing on Bruce Herron's Behalf:

   Thomas A. Demetrio
   William T. Gibbs
   Corboy & Demetrio, P.C.
   33 North Dearborn Street
   Suite 2100
   Chicago, Illinois 60602
   312-346-3191
   Attorney I.D. No. 611506

_____   10.14.14
Date                       Bruce Herron

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Tori Noel, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.  <u>Name</u>: Tori Noel

2.  <u>Address</u>: 53 Linden Avenue, Unit 6, Long Beach, California 90802

3.  <u>Telephone Number</u>: (562) 234-5204 (Cell)

4.  <u>Date of Birth</u>: 02/17/1975

5.  <u>Written Statement</u>: I, Tori Noel, qualify as a Settlement Class Member, as I am an NFL Football player who, prior to July 7, 2014, retired from playing professional football with the NFL. I played with the Denver Broncos (1999).

6.  Attorney Filing on Tori Noel's Behalf:

    Thomas A. Demetrio
    William T. Gibbs
    Corboy & Demetrio, P.C.
    33 North Dearborn Street
    Suite 2100
    Chicago, Illinois  60602
    312-346-3191
    Attorney I.D. No. 611506

10/9/14
_____
Date

_____
Tori Noel

## STATEMENT OF OBJECTION

For the reasons stated in the attached objection, I, Gerry Sullivan, object to the Class Action Settlement proposed in MDL No. 2323, Civil Action No. 2:12-md-02323 and 14-cv-0029.

1.  <u>Name</u>: Gerald (Gerry) Sullivan

2.  <u>Address</u>: 854 North Odgen Avenue, Chicago, IL 60622

3.  <u>Telephone Number</u>: (708) 310-9920 (Cell)

4.  <u>Date of Birth</u>: 1/15/1952

5.  Written Statement: I, Gerry Sullivan, qualify as a Settlement Class Member, as I am an NFL Football player who, prior to July 7, 2014, retired from playing professional football with the NFL. I played with the Cleveland Browns from 1974-1981.

6..  Attorney Filing on Gerry Sullivan's Behalf:

      Thomas A. Demetrio
      William T. Gibbs
      Corboy & Demetrio, P.C.
      33 North Dearborn Street
      Suite 2100
      Chicago, Illinois  60602
      312-346-3191
      Attorney I.D. No. 611506

10/10/14
_____
Date

_____
Gerry Sullivan