

# SPORTS ON EARTH



## PATRICK HRUBY

July 18, 2014

# CUTTING THEM SHORT



Former NFL linebacker Junior Seau was diagnosed with CTE posthumously. In one study, 33 of 34 football players tested positive for the disease. (Getty Images)

Dave Pear was still alive. Potentially, this was a problem. It was the day after a federal judge had granted preliminary approval of a proposed settlement of a class action brain damage lawsuit brought by retired players against the National Football League, and Pear was on the phone with me, trying to make sense of the deal. What kind of illness and injury did it cover? How much money could suffering retirees expect? Why did the agreement make all sorts of seemingly arbitrary, non-medical distinctions, like one between different degrees of dementia?

Pear didn't know. He said his lawyer didn't know, either. A 61-year-old former Pro Bowl defensive tackle now afflicted by a variety of football-induced maladies -- vertigo, memory loss, constant physical pain following multiple neck, back and hip surgeries -- Pear already had spent years fighting to receive benefits from the NFL's much-maligned disability system, a treacherous legal and medical thicket that many retirees insist has been designed to cut costs by denying claims. He hoped the proposed settlement was different. That it would help everyone in need, every broken family and battered brain. Including his own.

"Is it a good deal?" Pear said. "It only covers certain people at certain times. Based on what I've read, you won't get compensation for CTE [chronic traumatic encephalopathy] until after you're dead."

Not exactly, I told him. To receive cash awards for CTE, a neurodegenerative disease that currently only can be diagnosed posthumously, former players must have died by a specific cutoff date.

"Well, what's the date?" Pear said.

Yesterday, I said.

Silence.

"That's horrible," Pear said. "That stinks. Unbelievable."

Believe it: According to the terms of the proposed settlement, NFL retirees may receive awards of up to $4 million for "Death with CTE," but only if they've died between Jan. 1, 2006 and July 7, 2014. Anyone who died earlier is shut out. As is anyone reading this. Forever. Never mind that CTE -- a condition found in contact sport athletes, military personnel exposed to explosive blasts and others subjected to repetitive concussive and subconcussive head trauma, marked by widespread, irreversible accumulation of destructive tau protein in the brain -- is at the heart of the lawsuits against the league. That it's the disease of Junior Seau and Dave Duerson, Andre Waters and Justin Strzelczyk. That it's the *deus ex machina* of "League of Denial," a malady that the NFL's handpicked, under-qualified, since-discredited concussion doctors insisted neither existed nor could be linked to football, all while the neuropathologist who first discovered CTE's telltale tau tangles in Hall of Fame center Mike Webster's brain, Bennet Omalu, considered calling it *footballer's dementia*.

Case 2:12-md-02323-AB   Document 6241-6   Filed 10/14/14   Page 3 of 10

Never mind, too, that the proposed settlement does not assign similar cutoff dates to former players diagnosed with amyotrophic lateral sclerosis (Lou Gehrig's disease), Alzheimer's or Parkinson's -- even though a 2013 National Institute for Occupational Safety and Health study of nearly 3,500 NFL retirees who played at least five seasons between 1959 and 1988 recorded just 17 combined cases of the aforementioned diseases, while 33 of the 34 deceased NFL players in a 2010 study were diagnosed with CTE. This left neuropathologist Ann McKee to wonder whether "every single football player doesn't have" it.

"[The cutoff] is one of those things that when you say it out loud, it just sounds ridiculous," says Alan Faneca, a former NFL lineman and one of seven retirees who have filed an objection to the proposed settlement. "It sounds crazy. To have such a small window -- the guys like Mike Webster who helped build and create the game having passed away before and their kids and families don't get anything, and the current guys who luckily enough lived past Fourth of July weekend not getting anything either? It doesn't make sense. It's a line drawn in the sand, entirely not on the right place."

A lawyer who requested anonymity because of his ongoing work on football brain damage litigation is more blunt. Picture the settlement's upcoming fairness hearing, he says, currently scheduled for November, in which Judge Anita Brody must listen to objections and concerns before giving the deal final approval. Now picture Omalu or McKee standing in a federal courtroom in Philadelphia, holding aloft two jars.

In Jar No. 1: The brain of an NFL retiree who died before July 7.

In Jar No. 2: The brain of a retiree who died afterward.

"Just imagine [them saying], 'both show significant signs of brain damage, yet only this one is entitled to $4 million,'" the lawyer says. "'Preposterous, your honor.'"

* * *

Preposterous? Not at all. More like a simple misunderstanding. At least according to Chris Seeger, the co-lead attorney for the players on the proposed settlement. Two nights after I spoke with Pear, Seeger was a guest on CBS Sports radio. He wanted to, in his words, "straighten this out." (Full disclosure: Seeger specifically wanted to straighten *me* out -- the previous evening, I had been a guest on the same show, and had criticized both the death with CTE cutoff date and other aspects of the settlement).

"You know, frankly, we didn't care if you have CTE or not," Seeger said.

The settlement, Seeger explained, wasn't set up to help NFL retirees with CTE. It was set up to help retirees who are sick. Sick enough to show symptoms of neurodegenerative disease. The deal awards cash payments to former players who receive a "qualifying diagnosis" of ALS, Parkinson's, Alzheimer's or dementia. The first two conditions can be definitively diagnosed in the living. CTE cannot. Instead, a definitive diagnoses requires an autopsy, same as Alzheimer's and some types of dementia. A neuropathologist must cut a patient's brain into thin slices, stain them with chemical markers and examine the results under a microscope.

Rather than pay the families and estates of deceased ex-players who have been diagnosed with CTE, the settlement seeks to dispense money to retirees while they are still alive. How? In order to be eligible for a payout, former players must enroll in a Baseline Assessment Program, a neuropsychological testing program that screens for signs of cognitive impairment. If a retiree with CTE has enough impairment to qualify for dementia or Alzheimer's -- both of which have some symptoms which overlap with those of CTE -- he'll get his award in the here and now. Which means he won't need a death with CTE payout. Hence the cutoff date.

That's the logic, at least.

"I think people got really hung up on CTE, but, you know, this is all about symptoms," Seeger said on the radio. "If you're sick, and your activities of daily living are being interfered with, you can't function, you're going to get paid whether or not you have CTE."

This sounds reasonable. Unless you've read the scientific literature written by researchers who study CTE. Or have talked to family members of men who have succumbed to the disease. In which case, it sounds like a sneaky evasion. And also completely ludicrous. Despite Seeger's reassurances, the settlement not only figures to stiff-arm every current NFL retiree unfortunate enough to have CTE and die after July 7, but also many of those same retirees who have to *live* with the disease in the meantime. The very same symptomatic ex-

players struggling with daily life who Seeger insists are covered by the deal.

Consider Lew Carpenter.

Carpenter was a football lifer. He played on the Green Bay Packers under Vince Lombardi. Coached in the NFL for 31 years. When he died from pulmonary fibrosis four years ago at age 78, Boston University researchers studying CTE called his daughter Lisa's house. They had an unusual request. They wanted to examine Lew's brain. His family had never heard of the disease. They said *yes* anyway, knowing Lew would have wanted to help other players. Lew's other daughter, Rebecca, wasn't sure what to expect. Dad had taken plenty of hits as running back, receiver and defensive back, but never had been diagnosed with a concussion. Well into his 50s, he had remained mentally sharp -- sharp enough to serve as an assistant coach for eight different NFL teams, as well as sideline stints with the World League of American Football's Frankfurt Galaxy and Southwest Texas State University. Only in his final years did Lew seem obviously impaired: he had trouble finding the right words, remaining organized, remembering why he was going to the doctor.

Rebecca was at her home in Los Angeles when the call came from Boston. *Your father had CTE. An advanced case. No signs of Alzheimer's or any other neurodegenerative diseases.* She was sick to her stomach. Didn't believe it. Didn't know a thing about CTE, either. Thought it might be bullshit, a made-up disease, hyped by opportunistic lawyers and overeager scientists. Football was the greatest thing in her father's life, a sport that had lifted him out of childhood poverty, given him everything ... and *this* was what it had done to him? No. Just no. Even when Rebecca read the pathology report a few months later, she remained in denial. Until she saw the images of her father's brain, dotted with dark splotches of stained tau. "It was really shocking how much damage there was," she says. "On a scale of one to four, he was a four. Then I looked at the symptoms and was like, 'oh my god, that was a symptom. That was a symptom.'"

Suddenly, some of her father's inexplicable past behavior started to make sense. Like his mood swings. Like when someone would let the family's dogs into the house, and Dad would start screaming, totally spooked, as if someone had planted a live IED in the living room. *Goddamnit, who let the dogs in!* "He would call up and say, 'how is such and such,' and I would say, 'Dad, that was last year!' Rebecca says. "I would get mad and frustrated and think he doesn't care, he's not listening. But he had brain damage. And we didn't know. He was really high functioning in a lot of ways, but still had a lot of brain damage that impaired his ability to be in relationships and hold down jobs. You can look drunk, like under the influence of drugs. People don't know. It comes and goes. It's intermittent. It's crazy. It's like a frog in a pot of cold water and you slowly turn up the heat, and by the time they are boiling to death they don't even notice the change."

Rebecca talked to her mom, Ann, who first met Lew when she was 15.

*Mom, when did it start to go south?*

*It was really in his 40s.*

Among CTE case studies, Lew's story is hardly unique. Mood and behavioral problems often come first, followed by cognitive impairment. Duerson followed that path, his marriage ending, his business empire imploding, his dreams of becoming mayor of Chicago dashed, all before he began having blurred vision and headaches, memory loss and problems spelling common words. In 2011, he shot himself in the heart with a revolver, asking that his brain be donated to CTE researchers. Prior to committing suicide in 2012, Seau likely would not have been diagnosed with dementia or Alzheimer's. He was functional. Still there. Nevertheless, something had shifted, gone awry: He was womanizing, drinking heavily, gambling too much, acting impulsively, making bad financial decisions, hiding depression, forgetting things, having trouble sleeping.

Last year, Boston University CTE researcher Robert Stern and other scientists published a study of 36 adult males who had the disease. All were athletes. Twenty-nine played football. None suffered from any other neurodegenerative or motor neuron disease. Three were asymptomatic when they died. The rest were not. They fell into two clinically distinct groups, labeled "cognitive" and "behavior/mood." Each group was consistent with earlier case reports of CTE in boxers.

The first group consisted of 11 men. As patients, they suffered first from cognitive impairment -- memory problems, executive dysfunction. They tended to live longer, and their symptoms tended to show up later in life, typically in their late 50s. By contrast, the 22 men were in second group generally died younger, and their symptoms appeared earlier. Moreover, the symptoms themselves were totally different: Emotional explosiveness, impulsive behavior, outbursts of violence, depression and hopelessness.

When Duerson was 45 years old, he inexplicably threw his wife, Alicia, against a wall during an argument. She later told *Men's Journal* that

he had never been violent before, and that his behavior came from "the changes" -- a new hair-trigger temper, sudden downshifts in mood and a lack of impulse control.

Back to the settlement. *If you get sick,* Seeger says, *you get paid. This is all about symptoms.* Is it? Is it about Duerson's "changes?" The following symptoms are associated with both brain damage and CTE: Sensitivity to noise, visual impairment, chronic pain, chronic headaches, numbness, burning, tingling, incessant ringing in the ears, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions. None of these are covered by the settlement. Remember the Baseline Assessment Program? It screens for "sick." It defines "symptoms." It is the first tollbooth on the road to cash awards. As previously mentioned, it consists of neuropsychological tests used to detect cognitive impairment. Not mood and behavioral issues.

In other words, the proposed deal has been designed as if only the first group from the Stern CTE study matters. Meanwhile, members of group two -- the Duerson and Seau cohort, and quite possibly the bigger cohort -- will be ignored, not paid a dime, at least until they live and suffer long enough, like Carpenter, to join the first group in measurable cognitive decline. And even that isn't guaranteed: In one study of CTE, a quarter of the individuals diagnosed with Stage III of the disease -- CTE runs on a scale, with IV being the most advanced stage -- were not considered cognitively impaired.

In the Stern study, only 10 of the 33 symptomatic subjects were ever diagnosed with dementia.

"I once happened to run into a social worker who helps rehabilitate former gang members," says Carpenter, who is [working on a film about her father](), *My Dad's Brain,* and has spent the last two years crisscrossing the country interviewing former football players and scientists to better understand how blunt force head trauma and neurodegenerative diseases can affect personality and behavior. "It turns out one of their first intake questions is, 'have you ever had a blow to a head?' They understand that a guy with that may need special intervention if they can help him at all, because that can have a major impact on your ability to regulate emotion and anger. Only that isn't covered by the settlement at all. That leaves me scratching my head."

"Stern says there are two types of CTE," says Gordon Johnson, a Wisconsin-based brain injury lawyer and advocate. "In this settlement, I don't know how you get compensated for the second type without having already killed yourself."

More head-scratching: Many scientists believe that there will be a way to detect CTE in the living within the next decade. This isn't blind faith in the march of progress, like expecting warp drives and flying cars. It's a pragmatic assumption, rooted in current research. Scientists in Chicago are experimenting with a screening test that measures vision, eye movement and optic nerve irregularities. Stern's team in Boston is currently conducting a comprehensive study of 100 NFL retirees, hoping to identify CTE biomarkers. Other researchers are developing and refining scanning technology to see tau deposits in the brain; just this week, scientists from Massachusetts General Hospital attending the Alzheimer's Association International Conference in Copenhagen [announced a new type of brain imaging]() that can show tau tangles in living people for the first time.

Inexplicably, the settlement barely takes future scientific advances into account. While the deal covers the next 65 years, it specifically prohibits the NFL and the players' top lawyers from meeting more than once every 10 years to discuss possible changes to both the agreement's qualifying diagnoses and the protocols for making them, with actual modifications needing approval from both sides. (Translation: If the NFL doesn't want to accept a new method of detecting CTE, it doesn't have to). More significantly, any and all changes will not affect the bottom line. From Section 6.4 of the settlement, "Modification of Qualifying Diagnoses":

*In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s)*

"CTE isn't just being written out here, it's being written out for three generations," Gordon says. "How stupid is this settlement going to look in 10 years if a brain scan can prove CTE, and we have 1,000 players with this disease, and they can't get an award, and there's nothing you can do in this agreement to change if they *should* get an award?"

\* \* \*

The lawyer was incredulous. His clients were confused. He couldn't go on the record -- he represents a group of NFL retirees within the class action suit, and is still figuring how what to advise them in terms of objecting to the deal or opting out altogether -- but asked me to call, anyway.

Case 2:12-md-02323-AB   Document 6241-6   Filed 10/14/14   Page 6 of 10

He wanted to vent.

The lawyer had seen a set of brain scans. Three former players. One in his 30s, one in his 40s, one in his 70s. All still alive. The scans were experimental, provided by a scientist researching neurodegenerative disease. *You can see it,* the lawyer said. *You can see the CTE.*

"Why aren't these players entitled to that diagnostic advantage today -- or in the future?" he said. "Nothing in the settlement provides for that. This started out as a CTE case. It is a CTE case. You have 33 of 34 autopsies confirming CTE. And on top of that, if someone dies today and an autopsy is performed and CTE is found, their family gets nothing? That's not representing these players well. It's ridiculous."

In his interview with *The Sporting News,* Seeger said that he and co-counsel Sol Weiss specifically fought to make sure CTE was not used to determine eligibility for cash awards because: 1) they didn't want anyone to challenge players to have to prove they have it; 2) they didn't want players to have to prove that the disease was specifically related to concussions. This makes little sense. Medical experts can see CTE in the dead. They will be able to see it in the living. How much more proof is necessary? As for the link between football-induced brain damage and neurodegenerative disease, there is no definitive proof that the former causes the latter. Not yet. However, there is a [growing body of suggestive, supportive evidence](). And given that evidence, no honest scientist would argue that getting hit in the head over and over is anything but bad for one's brain.

In the case of CTE, the tau deposit patterns that identify the disease -- and distinguish it from, say, Alzheimer's -- have been found only in people who have endured repeated head hits or at least one battlefield blast injury. No brain insult? No CTE, according to McKee and other neuropathologists. On the other hand, while medical experts suspect that the other neurodegenerative diseases compensated by the settlement -- ALS, Parkinson's, Alzheimer's and dementia - may be triggered and/or accelerated by years of bashing helmets with opposing middle linebackers, those same illnesses also occur in people who haven't experienced brain trauma. The link to football is less clear.

By Seeger and Weiss' own logic, then, the settlement's award structure ought to prioritize CTE over other ailments. So what gives? Why are symptomatic former players being left high and dry? Why has the deal become the equivalent of an asbestos lawsuit settlement that severely restricts future mesothelioma claims?

The answers may lie in basic math.

When Seeger and the NFL first asked Judge Brody for preliminary settlement approval in January, the deal's award fund was capped at $675 million, an amount that player and league attorneys both claimed was enough to cover 65 years' worth of potential claims from an estimated pool of 20,000 retirees. Brody disagreed, denying their motion. The NFL and Seeger resubmitted the settlement in June, this time "uncapping" the fund -- but still confidently claiming in court documents that total payments by the league over the agreement's lifetime would not exceed the original amount.

During his interview with CBS Sports radio, Seeger was asked by show host and former NFL linebacker Brian Jones how he arrived at $675 million. Seeger said that he hired "the best economists and actuaries in the country, guys that do this kind of work." They looked at the rates of the neurodegenerative diseases covered by the settlement within the general population, compared those rates to every published study of the same diseases in NFL players, factored in football career length, and came up with an amount that Seeger was "extremely comfortable with."

"Sitting here right now, I'm still comfortable that those numbers are good," Seeger said.

"What percentage of the players," Jones said, "by your estimation, are going to receive compensation as a result of this settlement?"

"It could be as high as 3,000, 4,000, maybe 5,000 players at the end of the day, over the lifecycle of this agreement, will get cash compensation," Seeger said.

Headline: *National Football League expects as many as 25 percent of its former players to develop devastating, diagnosable neurodegenerative diseases.* Not the greatest endorsement for the sport. Putting that aside, however, let's do some arithmetic. Seeger estimates that between 3,000 and 5,000 former players will be compensated. By silent assent, the NFL concurs. Both parties insist that $675 million is sufficient to pay those retirees off under the terms of the settlement. Perform long division, and that means the average expected award is between $135,000 and $225,000.

That's a far cry from the settlement's maximum $5 million award for ALS. From its $3.5 million max for Alzheimer's and Parkinson's. From its $1.5-3 million max for dementia. Moreover, it isn't even close to the roughly $10 million in total lifetime costs -- including lost productivity and medical and custodial care -- that University of Toronto neurosurgeon Charles Tator estimates for each and every case of repetitive traumatic brain injury.

Oh, and also, it's as much as 833 times smaller than a separate $112.5 million that the NFL is required to pay Seeger, Weiss and four other attorneys within 60 days of the settlement receiving final judicial approval.

How do you get the NFL to sign off on a deal that theoretically exposes the league to uncapped, *unlimited* future financial liability? Easy. You make sure that said liability is, in fact, quite limited. Under the terms of the settlement:

• All cash awards are subject to reductions based on a grid that accounts for career length and retiree age at the time of receiving a qualifying diagnosis. Former players with fewer than five credited years of NFL experience will see their awards reduced, some by more than half. The same holds true for retirees over 45 -- the older players are when diagnosed, the less money they'll receive.

• Any retiree who has suffered a single non-football related traumatic brain injury or stroke will have their award reduced by 75 percent, never mind that 1) there is no scientific reason to presume that a single non-football brain injury accounts for three-quarters of a player's afflictions; 2) NFL team doctors increased former players' risk of stroke (and likely, their risk of brain injury) by administering the painkilling drug Toradol.

• Retirees do not receive credited seasons for playing in NFL Europe, even though time spent on "practice, developmental, or taxi squad[s]," *is* credited, and the laws of physics and biology with regards to collisions and concussions still apply on the other side of the Atlantic Ocean.

• The settlement's diagnostic program and claims process is rife with potential pitfalls that could make it difficult for a completely healthy person to receive an award, never mind a brain-damaged former player with cognitive or emotional challenges. Example No. 1: Retirees who fail to register with the settlement within 180 days of a supplemental notice being distributed are totally ineligible for benefits, as are players over age 43 who fail to get a Baseline Assessment Program exam within two years. Meanwhile, some of the ex-players who most need help are indigent. Example No. 2: The NFL is allowed to make unlimited appeals of player claims, and players must pay a $1,000 fee to contest them. Example No. 3: BAP program neuropsychologists cannot make qualifying diagnoses of Alzheimer's, Parkinson's or ALS; instead, retirees must visit a settlement-approved doctor and pay for both their medical testing and related travel expenses themselves.

### RELATED ARTICLES

#### THE DEVIL IS IN THE DETAILS
Federal judge Anita Brody granted preliminary approval to the revised, "uncapped" brain damage lawsuit settlement… More»

#### THE NCAA HUTZ-O-METER
The ongoing federal antitrust trial pitting former UCLA basketball player Ed O'Bannon against the NCAA is a… More»

#### A SECOND ATTEMPT
The National Football League and lead lawyers for more than 4,500 former players suing the league over concussions… More»

#### EPISODE 41: SHAUN POWELL
More»

#### FREEDOM FOR ALL
The NCAA actually said that amateurism is "uniquely American," which is laughable to the point that it's nearly… More»

Similarly, the settlement's restrictions on CTE seems designed to cut the NFL's costs. The grid reduces the size of individual death with CTE payouts, while the cutoff date limits the total number. In disallowing future award changes regardless of medical advances -- in essence, the potential creation of a "Life with CTE" qualifying diagnosis -- the settlement shrinks the eligible player pool even further,

Case 2:12-md-02323-AB Document 6241-6 Filed 10/14/14 Page 8 of 10

same as pretending NFL Europe hits to the head don't count. By exclusively focusing on cognitive impairment, the same BAP program that is supposed to assist CTE sufferers by giving them a general dementia diagnosis actually *forecloses* on retirees who are suffering from mood, behavioral and other non-cognitive symptoms like chronic migraines -- all while saving the league money by ensuring that living ex-players with CTE who *do* manage to qualify for a dementia award are more likely to be older, and therefore subject to a greater payout reduction according to the aforementioned offset grid.

Think back to that NIOSH study. Almost 3,500 NFL retirees. Just 17 cases of Parkinson's, Alzheimer's and ALS over a 29-year-span. By contrast, neuropathologists have been looking in earnest for CTE in the brains of former football players for less than a decade -- and since they've started, they've mostly found it. If you were a league lawyer or negotiator working on the settlement, which of those diseases would you most try to write out of a deal?

"[The settlement] is a money grab," Faneca says. "A money grab by lawyers trying to get paid and get out. And by the NFL trying to keep this is as small as possible. Of course the league would agree to an unlimited number, because the window is still so small in terms of neurological disorders they agree to cover compared to the broad stroke of things."

Eleanor Perfetto has a related problem with the settlement. Her husband, Ralph Wenzel, played in the NFL. After a slow, painful, emotionally agonizing [physical and mental decline](), Ralph died in 2012 at the age of 69. He was posthumously diagnosed with Alzheimer's and CTE -- but originally diagnosed with early dementia in 1999.

During his first visit with a neurologist, Ralph was asked when he first began to have trouble remembering things. He told the story of a 1994 high school football practice, where he bean to teach his linemen a new blocking technique.

*Hey, coach, you taught us that yesterday.*

Ralph was dubious. He asked his players to explain the technique in question. They did so perfectly, precisely the way he planned to teach it. Because he *had* taught it. Only he didn't recall doing so. That same year, the NFL formed its Mild Traumatic Brain Injury Committee -- a group that spent more than a decade producing junk science, denying and downplaying links between football and brain damage, between concussions and long-term neurological harm. A group whose discredited work and dangerous medical recommendations are at the core of the lawsuits that have produced the proposed settlement.

"With many of the older [NFL retirees], the date of their formal diagnoses is probably many years after they became sick," says Perfetto, a University of Maryland professor specializing in health policy and epidemiology, and a plaintiff in the lawsuits against the league. "So like Ralph, maybe they had symptoms for five or 10 years before a formal diagnosis. And one of the reasons they didn't realize they needed to get checked out, or did get checked out but doctors couldn't figure out what was wrong with them, was all of the efforts the NFL made to smokescreen that this problem didn't exist. Which is exactly what plaintiffs are suing for."

Back to the settlement's award grid. Perfetto says her attorney told her that her husband is due a $1.4 million payout for his postmortem diagnosis of CTE, based on his official dementia diagnosis at age 56. Had he instead been diagnosed in 1994, his award would have been closer to $3 million. Or consider a widow Perfetto knows, a woman in her 80s. She cared for her sick husband, a former NFL player, for more than 30 years. Behavior problems began in his early 50s. Cognitive impairment emerged in his 60s. Confused doctors misdiagnosed him with bipolar disorder and other illnesses, and only diagnosed him with dementia when he was nearing 70.

The man died in his early 80s. Researchers found CTE in his brain. Thanks to the grid and her husband's late age of formal dementia diagnosis, the widow is due to receive $600,000 -- millions less than the league would be required to pay out had the man's mood and behavioral symptoms counted toward a qualifying diagnosis, and a scenario that figures to be repeated if the current settlement proposal receives final approval.

"This is the one thing that bothers me a lot," Perfetto says. "The NFL has actually managed to reward themselves for their deceit."

\* \* \*

Tony Dorsett had no idea. For that matter, neither did Brad Townsend. It was late afternoon on the day that Brody had granted the settlement preliminary approval, and Townsend, a reporter with the *Dallas Morning News*, had called the Hall of Fame running back for his reaction.

"It was the right decision," Dorsett told Townsend.

Now 60, Dorsett is a plaintiff in the brain-damage lawsuits. He also is struggling. Last year, he was diagnosed by doctors at the University of California, Los Angeles as having signs of CTE. Townsend had talked to Dorsett over the phone last August, and again in November. His ability to hold a steady train of thought seemed to have deteriorated. Nevertheless, he told Townsend that he didn't know the size of the award that he might receive from the settlement, and that perhaps it didn't much matter.

"My brain is priceless," Dorsett said. "There isn't enough money that they can give me to make me want to look the other way."

When I saw Townsend's subsequent article, I sent him an email. Did Dorsett realize that the only way for him to receive a CTE award from the settlement was to have dropped dead the previous night?

Townsend wrote back. He said he would give Dorsett another call. The next day, he sent me a follow-up note:

*... I spoke to Dorsett. He said he frequently communicates with his attorney and this is the first he's heard of a CTE loophole ... He said he was "going to get all over this" and call his attorney ...*

Dorsett wasn't alone in missing the settlement's death with CTE award cutoff date. An Associated Press story on Brody's preliminary approval didn't make note of it. Neither did a piece in the *Minneapolis Star-Tribune*. The first page of a proposed long form settlement notice that will be sent to NFL retirees doesn't mention it specifically -- instead vaguely stating that the deal will provide "monetary awards" for "certain cases of CTE" that are "diagnosed after death" -- while a YouTube video supporting the settlement aimed at former players and produced by plaintiff's lawyers doesn't mention it at all.



In a way, Faneca says, he can understand not knowing. Not *wanting* to know. Ignoring the fine print. Even though the objection to the settlement filed by him and six other former NFL players in late June takes issue with many aspects of the settlement, including the cutoff date.

"[Neurological problems] are definitely not something you like to think about, especially for you own family or families of your friends and people you know," he says. "You first instinct is denial. You think, 'it's not going to happen to me.' It's not a fun conversation with your wife.

"But the likelihood, as we now know it, is that there is a more than strong chance that I'm going to know somebody who is going to be going through these issues in some form or fashion. Guys will be needing help, and we need to broaden the scope of the settlement, open it up and get more guys covered."

And how do you do that?

"Right now, there's tons of guys who have no idea what is going on," Faneca says. "I have guys contacting me, asking to be informed. The settlement is a little daunting to comprehend, the ins and outs and all the exclusions. Who wants to read that stuff? But sometimes you have to suck it up and start handling it."

8 Comments　　Sports on Earth　　　　　　　　　　　　　　　　　　　　　　　🔓 Login ▾

Sort by Best ▾　　　　　　　　　　　　　　　　　　　　　　　　　　　　Share 　　Favorite ★

　　Join the discussion…

**Ira Pellman Goodell** • 3 months ago
Who needs science. Truly sick does not include brain damage. Sure. I need to get my fee. Lawyers don't do science.

You can only imagine Seeger, Mitnick and Weiss sitting around opining, "players are too stupid or too brain damaged to realize they are getting played, completely played."

The NFL really knows how to write up a settlement. The so-called plaintiff lawyers get paid; the plaintiffs don't. 5% to 10% of the promised numbers, if that.

Judge Brody needs to stop this now. Did she realize that both sets of lawyers were busy working to their own benefit at the expense of the players? Better get this locked in before scientists the NFL doesn't control start diagnosing CTE. This is a sham.

Oh and where are Robert Cantu, Bob Stern and Chris Nowinski? Blah Blah Blah CTE until they get a bunch of brains from players' families and milk the NFL for tens of millions of dollars. Now they say nothing. BU is focusing on hit counts and Aussie football. I gather BU will execute a money squeeze the Aussie leagues and FIFA and go quiet. Contrary to Cantu's representation, the NFL money did come with strings attached whether implicitly or explicitly.

2 ▲ ｜ ▽ • Reply • Share ›

　**Aaron** • 3 months ago
Unfortunately, I think this case shows a lot of plusses and minuses about class-action suits.
But, the question is, what would be an equitable settlement? We can slam this thing all day, but what would be a good deal? Seriously, I'm asking.
▲ ｜ ▽ • Reply • Share ›

　**Adam** ➚ Aaron • 3 months ago
An equitable settlement is what two sides mutually agree upon. It really is that simple. If two sides agree, that's all that matters. The rest of us aren't involved, and it isn't for us to say.

Personally, I would have said that was $0.00. The more the former players talk, the more they sound like people who knew what they were getting into. They made a Robert Johnson deal and when they found out it wasn't what they thought it was they're complaining. If you smash your head into another person's head, you're engaging in dangerous activity. If you ingest drugs without knowing their consequences, you're engaging in dangerous activity. This was common knowledge when the players were playing as it is now. The players rolled the dice, and it didn't pay off. They really have no one to blame but themselves.

What most people are missing is that the class action lawyers get paid a percentage of settlement, so it's to their benefit to get as much as they can. Not only that, the settlement has to be approved by a judge. The only reason to think something else is going on suggests illegal activity on the part of the attorneys, and besides random speculation and tinfoil hat theories from some of the nanny state book-bright street-stupid lunatic fringe, there isn't anything to suggest that's the case.

http://class-actions.lawyers.c...

If they're getting paid a percentage of the settlement, it stands to reason that given the amount at stake that they're going to want a higher settlement if it's available. If we accept that lawyers are greedy, we also accept that a greater settlement caters more to their greed than a lesser settlement does. But when you point that out to the anti-NFL zealots, that's conveniently ignored because it's easier to believe in a complex set of backdoor shenanigans