IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | No. 2:12-md-02323 (AB)<br>MDL No. 2323 |

## OBJECTIONS OF SIXTEEN PLAINTIFFS TO APPROVAL OF SETTLEMENT

For the reasons set forth in the accompanying Memorandum of Law, Plaintiffs Aloyouis Chesley, Delbert Cowsette, Dustin Fox, James "Scottie" Graham, Frank Grant, Jimmie Jones, Herb Mul-key, Spain Musgrove, Lonnie Perrin, Kurt Pierce, Ricky Ray, Virgil Seay, Jesse Solomon[1], John Stufflebeem, Ted Vactor, and Michael Wilcher respectfully object to the settlement and request that the Court decline approval of any settlement proposal unless and until the Court has appointed subclass representatives and counsel for Plaintiffs that currently have, or are at risk of developing, CTE after the settlement and the CTE subclass has approved a settlement.

Respectfully submitted,

s/ Dwight P. Bostwick
Dwight P. Bostwick
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: dbostwick@zuckerman.com
*Attorney for Plaintiffs*

Dated: October 14, 2014

---

[1] Mr. Solomon is represented by the law firm of Zuckerman Spaeder LLP for purposes of his NFL disability claims and by the firm of Rose, Klein & Marias LLP for purposes of the NFL concussion lawsuit. Mr. Solomon has requested to join in this objection, which request is approved by all counsel.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | No. 2:12-md-02323 (AB)<br>MDL No. 2323 |

### MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS OF SIXTEEN PLAINTIFFS TO APPROVAL OF SETTLEMENT[2]

The sixteen former NFL players joining in these objections ("Objectors") agree that a negotiated settlement is the most appropriate resolution of this case and that the settlement contains a number of positive provisions. They object to the settlement in its present form because it contains one central flaw rendering it substantively and procedurally unfair, unreasonable and inadequate. The central flaw is this: the thousands of former NFL players who currently suffer, or will suffer, from chronic traumatic encephalopathy (commonly referred to as "CTE") were not represented as a subclass and have been carved out of the settlement entirely. The failure to provide representation for a CTE subclass has resulted in a flawed settlement that excludes CTE victims diagnosed *after* the settlement while including CTE victims diagnosed *before* the settlement. The law of the Third Circuit and the Supreme Court do not permit approval of a class settlement in such circumstances.

The driving motivation for this lawsuit – and a major thrust of the operative Complaints – was the growing recognition that CTE is the most serious and harmful concussion-related injury

---

[2] Aloyouis Chesley, Delbert Cowsette, Dustin Fox, James "Scottie" Graham, Frank Grant, Jimmie Jones, Herb Mulkey, Spain Musgrove, Lonnie Perrin, Kurt Pierce, Ricky Ray, Virgil Seay, Jesse Solomon (Mr. Solomon is represented by the law firm of Zuckerman Spaeder LLP for purposes of his NFL disability claims and by the firm of Rose, Klein & Marias LLP for purposes of the NFL concussion lawsuit. Mr. Solomon has requested to join in this objection, which request is approved by all counsel), John Stufflebeem, Ted Vactor, and Michael Wilcher.

2

facing former NFL players. Even as the NFL employed junk science and self-serving committees to obscure this fact, former players including Mike Webster, Dave Duerson and Junior Seau died and/or committed suicide. Autopsies of these players revealed that they, like many others, suffered from NFL's industrial disease, a progressive brain disease called CTE that is distinct from ALS, Parkinson's, Alzheimer's and dementia. Players like them, who have been diagnosed and/or will die with this degenerative brain disease after the proposed settlement rather than before, are completely cut off from any CTE-related settlement benefits. This is an outrageous injustice. It is the equivalent of a global class settlement in a tobacco lawsuit that completely carves out compensation for victims of lung cancer and lung disease while providing compensation for a limited number of other conditions.

It is as easy to identify the remedy for this injustice as it is to identify the injustice itself. Under the current class framework there were only two class representatives. Neither of them claimed an existing or potential CTE injury. As a result, there was no structural mechanism for representation of the thousands of Plaintiffs seeking to recover in the future for CTE as opposed to those seeking recovery for other diseases. Governing law makes it abundantly clear that this structural deficiency dooms the approval of a proposed class action settlement. As the Second Circuit noted in a passage approvingly quoted in Justice Ginsburg's opinion for the Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 627 (1997) (citation omitted):

> [W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by the consents of those who understand that their role is to represent solely the members of their respective subgroups.

The situation in this case is worse than that described in the above quotation, because the two putative class representatives—one for each sub-class—do not even purport to be members of the CTE subclass, much less "to represent solely the members of [that] respective subgroup[]."[3] Thus, as in *Amchem*, "[t]he settling parties . . . achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." 521 U.S. at 595.

If the Court does consider the settlement for approval at this juncture, it will have to withhold approval under governing law because the settlement is unfair to former players that currently have or are at risk of developing and being diagnosed with CTE – by far the largest part of the class according to data presented by settling counsel and disclosed to the class at Objectors' request. *See* ECF Nos. 6167 & 6168. Instead, the Court can and should correct the structural defect in the representation of the class by certifying a CTE subclass *before* considering a settlement for approval. The appointment of new representatives and separate counsel to participate in the negotiations on behalf of the CTE subclass is the best way to assure the substantive fairness of the settlement.

---

[3] The CTE subclass fits within Subclass 1, represented by Shawn Wooden. But the Complaint alleges only that Mr. Wooden is at "increased risk of developing dementia, Alzheimer's Parkinson's or ALS," *not* CTE.

## **BACKGROUND OF OBJECTORS**

Objectors are former NFL players and members of the class. As alleged in their Complaints, Objectors have experienced one or more of a variety of symptoms that have been linked to repetitive mild traumatic brain injury and CTE in particular. These symptoms include, but are not limited to, chronic headaches, depression, mood disorders, sleep dysfunction, attention and concentration deficits, and memory loss. Objectors have specifically alleged that they are at increased risk of latent brain disease such as CTE. The following allegations are typical of those made by Objectors in their Complaints:

> Stufflebeem suffered repeated and chronic head impacts during his career in the NFL and is at an increased risk of latent brain disease. As a result, Stufflebeem has experienced cognitive and other difficulties, including, but not limited to, loss of memory, impulse control problems, depression, fatigue, sleep problems, irritability, and numbness/tingling.

Compl. ¶ 62 (*Stabler, et al. v. NFL*, Case No. 12-cv-04156-AB).

> Wilcher suffered repeated and chronic head impacts during his career in the NFL and is at an increased risk of latent brain disease. As a result, Wilcher has experienced cognitive and other difficulties, including, but not limited to, headaches, dizziness, loss of memory, depression, suicidal thoughts, fatigue, sleep problems, irritability, neck or cervical spine arthritis with associated numbness/tingling.

*Id.* ¶ 72.

> Chesley suffered repeated and chronic head impacts during his career in the NFL and is at an increased risk of latent brain disease. As a result Chesley has experienced cognitive and other difficulties, including, but not limited to, headaches, dizziness, loss of memory, chronic brain injury, impulse control problems, sleep problems, irritability, neck and/or cervical spine arthritis and associated numbness/tingling.

*Id.* ¶ 10.

> Graham suffered repeated and chronic head impacts during his career in the NFL and is at an increased risk of latent brain disease, As a result, J. Graham has experienced cognitive difficulties, including, but not limited to, loss of memory, depression, suicidal thoughts, neck or cervical spine arthritis with associated numbness/tingling.

*Id.* ¶ 21. *See also id.* ¶¶ 13, 22, 46, 52, 54, 57, & 67; Compl. ¶ 6 (*Budness, et al. v. NFL*, Case No. 13-cv-05078-AB); Compl. ¶¶ 4, 8, & 11 (*Chambers, et al. v. NFL*, Case No. 12-cv-07153-AB).

The injuries alleged by the Objectors are associated with CTE and, because CTE is a latent, degenerative brain disease, these symptoms are expected to broaden and intensify with the passage of time. *See* Ex. 1 ¶¶ 31-34. While all claims for the injuries suffered by Objectors would be released by the settlement, it is likely that some or all of the Objectors will not receive any qualifying diagnosis (Parkinson's, Alzheimer's, ALS, or dementia) over the sixty-five year settlement period. If they receive a diagnosis of CTE during their lifetime (either as a result of existing or future diagnostic techniques), or if they are diagnosed with CTE after death, the settlement provides for no CTE benefit. As a result, some or all of these Objectors would be qualified to serve as representatives of a CTE subclass.[4]

---

[4] Other Plaintiffs have also objected to the settlement on the ground that CTE is not included as qualifying condition and that the current class representatives are not adequate representatives for those with CTE-related injury. Some or all of these objectors also appear qualified to serve as representatives of a CTE subclass. Most notably, Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer and Sean Considine filed a detailed objection to the settlement on this basis (and on the basis of other objections). *See* ECF No. 6201, Objection of Sean Morey, *et al.* to Class Action Settlement (filed Oct. 6, 2014). To avoid repetition and to reduce the volume of filings, we join in those portions (and only those portions) of their objection relating to CTE. Specifically, we adopt as if set forth herein, the factual background, legal argument, legal citations and exhibits contained and referred to within pages 4-18 and 18-32 of their filing.

**ARGUMENT**

**I.    THE COURT SHOULD NOT APPROVE A SETTLEMENT UNTIL THE CTE SUBCLASS IS INDEPENDENTLY REPRESENTED.**

    **A.    The Proposed Settlement Denies Compensation for CTE, the Most Serious, Harmful and Prevalent Brain Disease Caused by Football Related Concussions.**

The proposed settlement provides compensation to members of Subclass 1 who develop ALS, Parkinson's, Alzheimer's, or severe neurocognitive disorders classified as Level 2 or Level 1.5 dementia. Conspicuously absent from that list is CTE. This carve-out is nothing short of extraordinary especially in light of settling counsel's statement that "CTE is believed to be the most serious and harmful disease that results from NFL and concussions." Ex. 2 at 2. That statement is borne out by extensive research and medical opinion. *See, e.g.*, Ex. 1. Moreover, harm caused by the progressive brain disease called CTE is central to the general allegations relating to injury contained in all operative complaints against the NFL as well as to the specific injury allegations set forth by Objectors.

The history of one of the Objectors, Jesse Solomon, provides a graphic illustration of the central problem with the settlement. Mr. Solomon played linebacker for five teams over eight seasons in the NFL. He is currently 51 years old. He has been evaluated by a Neuropsychologist. *See* Ex. 3[5]. For years Mr. Solomon has suffered from degenerative symptoms linked to concussions suffered while playing football. His symptoms include decreased attention, poor concentration, slurred speech, severe memory loss, increased irritability, severe headaches on a near daily basis, sensitivity to light, and severe symptoms of depression and anxiety. *Id.* at 4. The Neuropsychologist concluded that Mr. Solomon exhibits the signs and symptoms of CTE. *Id.* at 7. A "neutral physician" approved by the NFL evaluated

---

[5] This exhibit, which contains personal and confidential HIPAA protected information is being filed under seal.

Mr. Solomon in connection with his application for total and permanent disability benefits under the NFL Player Retirement Plan. This physician agreed with the conclusion that Mr. Solomon is experiencing the symptoms of severe post-concussion syndrome and probably is demonstrating features of CTE. *Id.* The physician believes that Mr. Solomon is totally and permanently disabled. *Id.* at 2. Despite that severe harm attributable to the most prevalent and harmful consequence of the misconduct alleged in the Complaint, Mr. Solomon's prospects for recovery under the proposed settlement are uncertain. There is no specific diagnosis of ALS, Parkinson's, or Alzheimer's and, the report does not state expressly whether Mr. Solomon's symptoms would qualify him for compensation for dementia level 1.5 or 2.0. Thus, there exists for Mr. Solomon, an NFL player who has been diagnosed with signs and symptoms of CTE and is completely and permanently disabled, the possibility that he would receive no recovery at all under the current settlement. Moreover, it is a certainty that Mr. Solomon would receive no compensation for the CTE-linked mood and behavioral symptoms of CTE that contribute to his total and permanent disability.

The predicted incidence of CTE among the class is far higher than the predicted incidence of ALS, Parkinson's, or Alzheimer's. Unlike CTE, these other diseases may develop regardless of NFL-related concussions and are far more prevalent in the general population. For example, recent studies have shown that 76 of 79 deceased former NFL players whose brains have been examined for CTE have been diagnosed with this degenerative brain disease. Ex. 4. In stark contrast, even the most cursory review of the actuarial tables and schedules provided by the NFL and Plaintiffs' settling counsel in support of the settlement make clear that only a handful of former NFL players are likely to develop ALS, Alzheimer's, and Parkinson's over the sixty-five year term of the settlement. *See* ECF Nos. 6167 & 6168. Consistent with these

actuarial predictions, a recent study examining retired NFL players between 1959 and 1988 recorded only 7 cases of ALS, 7 cases of Alzheimer's, and 3 cases of Parkinson's in 3,439 former players. Ex. 5. This low predictive rate for non-CTE diseases is dramatically different than the 76 of 79 former players autopsied who have been diagnosed with CTE. Yet ALS, Alzheimer's, and Parkinson's are fully covered for sixty-five years while CTE diagnosed after the settlement is not covered at all. Any settlement that completely carves out compensation for the most harmful and prevalent consequence of the NFL's wrongful conduct as alleged in the Complaint is, on its face, unfair, unreasonable and inadequate in violation of Rule 23.

The CTE carve-out cannot be explained by arguing that under today's medical standards a definitive diagnosis is impossible before death and post-mortem examination. *First*, it is likely that medical advances will soon make possible a diagnosis of CTE while players are still alive (Ex. 1 ¶¶ 38-39), but the settlement releases the players' claims without compensation even if that occurs.[6] *Second*, CTE can and will be confirmed for many former players when they die within the sixty-five year period of the settlement (even if it can only be done post-mortem). But, under the proposed settlement, there will be no compensation for those who die after the settlement and within this period. *Third*, compensating players who develop Level 2 or Level 1.5 dementia is not the same as providing compensation for CTE. Dementia is not and cannot be a valid proxy for CTE. CTE is a distinct diagnosis characterized by many conditions including impaired mood, behavior and depression that are also not covered by the settlement. *Id.* ¶¶ 31-41. The fact that some portion of those with dementia may also have a separate diagnosis of

---

[6] Many believe that CTE can be diagnosed effectively using current technology. Indeed a neurologist and an NFL-approved doctor agree that Mr. Solomon is currently living with CTE. Ex. 3 at 7.

CTE or that some with CTE may also have dementia provides no justification at all for carving recovery for CTE out of the settlement.[7]

The exclusion of compensation for CTE also is not explained by any litigation risks peculiar to CTE. Most litigation risks for Plaintiffs with CTE are the same as for those for Plaintiffs without CTE. There is one significant exception: the risks related to proving causation are far lower for CTE than for ALS, Parkinson's, Alzheimer's, and dementia because these non-CTE conditions are prevalent in the general population while CTE is correlated far more directly with repeated blows to the head from football. Causation risks in non-CTE conditions have been factored into the damage recovery amounts in the negotiated settlement. Those causation questions favor proportionately greater compensation for CTE victims than for those suffering from any other qualifying condition. While there is good reason to consider giving a CTE diagnosis greater proportional recovery between and among qualifying conditions whose victims will receive recovery in this case, there is absolutely no justification for excluding CTE as a qualifying condition.

> **B.    The Existing Class Representatives Can Not Adequately Represent the Subclass of Former NFL Players that Currently Have or Will Develop CTE.**

All operative Complaints in this case focus directly and extensively on CTE. The Objectors have specifically alleged CTE-related symptoms and an increased risk of latent brain disease. But allegations relating to CTE and the increase risk of latent brain disease are conspicuously absent from the allegations made by the two proposed class representatives in this case.

---

[7] The current settlement already guards against double recovery for those with more than one condition so adding CTE as a qualifying disease would not lead to double recovery.

The Complaint alleges that Shawn Wooden, the Subclass 1 Representative, "has not been diagnosed with any neurocognitive impairment, but is at increased risk of developing dementia, Alzheimer's Parkinson's, or ALS." Compl. ¶ 4. There are no allegations that Mr. Wooden is at risk of developing CTE, or has depression or any of the other mood or behavioral symptoms of CTE. Consequently, even if Mr. Wooden is at risk of developing CTE, he has legally disqualified himself as a representative of players seeking compensation for future CTE because he makes no such claim.[8] He is therefore no more appropriate a representative of the interest of players who will suffer from CTE and want compensation for this condition than a named plaintiff who has chosen not to advance, or cannot advance, any other claim available to other class members.

A similar situation was presented in the case of *In re Community Bank of Northern Virginia*, 418 F.3d 277, 307 (3d Cir. 2005), where the Third Circuit remanded with directions to consider, *inter alia*, the "feasibility of dividing the class into sub-classes so that a court examining the proposed settlement could have judged the fairness of the settlement as it applied to similarly situated class members" (citations omitted). In that case, the class complaint challenging lending practices did not allege claims under TILA and HOEPA, even though the settlement released such claims. The named plaintiffs' own claims were time-barred, but other members of the class may have had viable TILA and HOEPA claims. The Circuit Court was "not convinced based on the present record that the named plaintiffs adequately represent the interests of the entire class," because "the named plaintiffs appear to have no incentive to maximize such claims for the approximately 14,000 class members who may still retain this

---

[8] The same is true for Mr. Turner, the class representative for subclass 2.

11

valuable cause of action." *Id.* at 306-07. The Third Circuit declined to review the substance of the proposed settlement because of the procedural flaws in how it was reached.

Likewise, in *In re GM Corp. Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir. 1995) ("*GM Trucks*"), the Court of Appeals concluded that the settlement class represented exclusively by *individual* vehicle owners did not adequately represent the interests of *fleet* owners, resulting in a settlement that "leaves fleet owners with significantly less value than individual owners." *Id.* at 800-01. The same issue is present in this case. The named class representatives have no "incentive to maximize" claims for potential injury due to CTE that they do not assert. Without the involvement and oversight of class representatives with an incentive to seek relief for CTE-based injuries (including those that manifest principally in mood and behavior disorders), the Court cannot have the requisite degree of confidence that those interests were adequately represented in the negotiations leading to the settlement. "At the very least, the class should have been divided into [additional] sub-classes so that a court examining the settlement could consider settlement impacts that would be uniform at least within the sub-classes." *GM Trucks*, 55 F.3d at 801.

C. **Under Governing Law, the Court Can Not and Should Not Approve a Settlement Without a Proper Class Structure That Includes a CTE Subclass.**

It is abundantly clear under Rule 23 and governing law that this Court may not approve the settlement before determining whether the structure of the class – including the adequacy of subclasses – is appropriate.[9] In deciding whether to approve a class action settlement, "the

---

[9] The Third Circuit encourages certification of subclasses in settlements in which the benefits of the settlement are reasonably distributed among subgroups. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 & nn.13-14 (3d Cir. 2004) (noting that all class members have the opportunity to recover 15% of their payments for the allegedly overpriced drug); *see also id.* at 533 (involvement of separate counsel for subgroups in settlement negotiations mitigated the absence of subclass certification). Thus, the Court would be on solid legal footing if it approved a CTE subclass and the benefits of the settlement are reasonably distributed among subclasses including those with CTE.

12

district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *GM Trucks*, 55 F.3d at 785 (citations omitted). The Third Circuit also "affirm[ed] the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified." *Id.* at 805. This Third Circuit admonition regarding settlements offered on behalf of uncertified classes applies especially where, as here, settling counsel recently persuaded the Third Circuit not to review the structure of the class in the context of the settlement of this case on the ground that "[t]here is no such order [granting or denying class action certification] below, only preliminary approval [of a settlement] by a district court." *In re NFL Players Concussion Injury Litigation,* Answer to Rule 23(f) Petition, No. 14-8103, at 1. Settling counsel are estopped from arguing to this Court that it has already made a certification ruling.

The Court must consider the certification question – and in particular the adequacy of the representation of former players at risk of developing CTE – before approval of the settlement. The plain language of Rule 23(c)(2)(B) states that the members of the class are entitled to an opportunity to opt-out *after* certification. Class members cannot be required to opt-out before the certification decision has been made.[10]

Certification of a class is generally a precondition to evaluating the fairness of a settlement. *GM Trucks*, 55 F.3d at 787-88. When class certification is rolled into settlement approval, "the court performs its role as supervisor/protector [of absent class members] without the benefit of full adversarial briefing on the certification issues." *Id.* at 787. Basing certification on settlement alone deprives the court of valuable information about the adequacy of representation, which is not just a matter of counsel's skill and experience but also the degree

---

[10] The Court has, in any event, discretionary authority to allow a further opportunity to opt-out. Fed. R. Civ. P. 23(e)(4).

13

to which the incentives of the class representatives are fully aligned with the interests of the class. This is especially true given the fact that there has been no discovery at all in this case, which deprives the Court (and the members of the class) from gaining valuable information about the comparative strength of different claims presented by members of the class that may bear not only the total value of the settlement, but also its allocation.

Nothing in the materials submitted to the Court in support of preliminary approval of the proposed settlement justifies the conclusion that the interests of players in CTE compensation were adequately represented in settlement discussions in the absence of a subclass representative. Judge Phillips' assessment of the performance of class counsel in mediation concerns the vigor with which they presented the claims they pursued, not those they chose not to pursue. Moreover, his assessment that the value of the settlement was as high as the settling counsel could have achieved does not and cannot reflect the value of CTE compensation claims that they did not pursue or the fairness of decisions about how to *allocate* settlement benefits among class members who suffer different harms from repeated MTBI. Settling counsel's submission also glosses over and fails to explain the omission of relief for CTE.

Review of the appropriateness of the class and subclass structure at this juncture is particularly important because the settlement before the Court "does more than simply provide a general recovery fund . . . [r]ather, it makes important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some claimants over others." *Amchem*, 521 U.S. at 610 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630 (3d Cir. 1996)). Indeed, settling counsel in this case recognized that subclasses are necessary in order to ensure adequate representation in making allocation judgments of former players who had already suffered detectable injuries and those who had not; they just failed to go

far enough.  *See Amchem*, 521 U.S. at 627 (even in the absence of an overall cap on compensation, "the terms of the settlement reflect essential allocation decisions" between class members who are currently injured by asbestos exposure and those exposed to risk of future injury).  Subclasses are equally necessary to protect the interests of class members pursuing claims for the risk of CTE, who are not represented by either named Plaintiff.  Without this structural protection, any district court approval of the current settlement would be reversed as was the settlement in *Amchem*, where "[t]he settling parties . . . achieved a global compromise with no structural assurance of fair and adequate representation of the diverse groups and individuals affected." *Id.* at 595.

The Supreme Court in *Amchem* stressed the greater precision of the structural class certification safeguards in Rule 23(a) and (b) over "appraisals of the chancellor's foot kind – class certifications dependent upon the court's gestalt judgment or overarching impression of a settlement's fairness." *Id.* at 621.  The same reasoning applies to this case.  *Amchem* teaches that certification of a properly structured class that provides adequate representation to all members must come before consideration and approval of settlement.  This is true because it is only through properly structured classes and subclasses that the Court can receive any assurance that the interests of thousands of Plaintiffs who want the settlement to include recovery for CTE have been appropriately represented.  Approval of the current settlement without such an assurance would be subject to reversal under the clear guidance of the Third Circuit and the Supreme Court.

**CONCLUSION**

The Court should defer consideration of the settlement until representatives and counsel have been appointed to represent the subclass of former players who currently have, or are at risk of developing, CTE.

s/ Dwight P. Bostwick
Dwight P. Bostwick
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
Tel:  (202) 778-1800
Fax:  (202) 822-8106
E-mail:  dbostwick@zuckerman.com

*Attorney for Plaintiffs*

Dated: October 14, 2014

## CERTIFICATE OF SERVICE

I, Dwight P. Bostwick, hereby certify that on this 14th day of October, 2014, a true and correct copy of the foregoing **OBJECTIONS OF SIXTEEN PLAINTIFFS TO APPROVAL OF SETTLEMENT**, was served electronically upon all counsel of record via the Court's ECF filing system.

/s/ Dwight P. Bostwick