# EXHIBIT B

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**OBJECTIONS TO THE CLASS ACTION SETTLEMENT**
**AGREEMENT DATED JUNE 25, 2014**

I.      **INTRODUCTION**[1]

The Revised Settlement Agreement ("RSA") includes misleading language that

appears to confer benefits upon Plaintiffs while actually not performing as advertised.  A

---

[1] Capitalized terms are used to mean the same thing they mean under the Revised Settlement Agreement.  The "NFL" means "NFL Parties" from the Revised Settlement Agreement ("RSA"). "Class Counsel" includes Co-Lead Class Counsel. "Class Representatives" includes Subclass Representatives.

careful review of some of its clauses reveals that the benefits promised are illusory or that benefits given by the right hand are taken away by the left.

Class Counsel and Class Representatives have conducted an aggressive sales campaign selling the RSA by pointing to some of these purported benefits. They might have failed to point out the loopholes and traps in the RSA and might not have provided balanced view of the issues, pro and con, to Prospective Plaintiffs ("Plaintiffs").

Meanwhile, Class Counsel collectively stand to receive $112.5 million *from the NFL* for a successful sales job. And Class Representatives stand to gain a foreseeable benefits from the RSA if the Court approves it. But the vast majority of Plaintiffs stand to receive little or nothing in the near future from the RSA since they won't develop manifest symptoms for some years to com. Yet, their voice is the least represented in this matter.

Ben Utecht's objections detailed below focus on a few examples of the misleading clauses in the RSA. He asks the Court to consider *whether Plaintiffs have been fully informed by their lawyers* about the loopholes and traps available to the NFL to deprive Plaintiffs of benefits that have been touted by the NFL, Class Counsel and Class Representatives in the sales campaign. It would be a serious mistake for the Court to give final approval without carefully inquiring into what Plaintiffs have been told about the RSA and how what they have been told stacks up compared to the actual "legal effect" of the RSA.

Utecht's objections ask the Court to examine specific clauses of the RSA and to compel testimony from Class Counsel and Class Representatives concerning the accuracy certain representations and warranties they have made in the RSA: that they have been

advised by Class Counsel of the "legal effect" of RSA as relates certain clauses of the RSA. And also whether they have made any representations to Plaintiffs contrary to the legal effect of the clause.

Considering the severe conflicts of interest between Class Counsel and Class Representatives, on one hand, and the vast majority of other Plaintiffs whose claims lie in the future, it behooves the Court to directly inquire into whether statements they have made to Plaintiffs in the sales process, urging them to cooperate and not to opt out, are accurate and fairly represent the actual "legal effect" of the RSA. Thousands of Plaintiffs and their families are relying upon the Court to protect them and the integrity of process used to sell the RSA to Plaintiffs.

Following are the objections of Ben Utecht.

## II. OBJECTIONS

A. THE DEADLINE TO OPT OUT SHOULD BE EXTENDED UNTIL AFTER PLAINTIFFS HAVE AN OPPORTUNITY TO EXAMINE THE FINAL SETTLEMENT AGREEMENT.

The Opt-Out and Objections clauses prohibit Plaintiffs (a) from objecting if they opt out and (b) opting out after the actual terms of the final settlement agreement are known.

1. <u>Plaintiff Who Disagree with the RSA Must Opt Out (Sec. 14.2) by Oct. 14th or File Objections (Sec. 14.3) by Oct. 14th</u>. If he opts out, he is not permitted to object. And if he objects, he is not permitted to opt out. The RSA should give every Plaintiff the opportunities both (i) to object (including proposing changes to the RSA); and (ii) to opt out <u>after</u> examining the RSA as finally approved by the Court.

Case 2:12-md-02323-AB Document 6243-2 Filed 11/03/14 Page 5 of 22

2.   <u>Each Plaintiff is Forced to Choose:</u> between (a) making objections and forfeiting his right to opt out (*i.e.*, being forced to permanently surrender his legal rights and claims pursuant to an agreement to which he objects), or (b) withholding his objections and opting out, waiting to see the final terms of the RSA as later approved by the Court, and then (i) revoking his opt-out and rejoining the class if the final RSA is acceptable to him, or (ii) remaining as an "opt-out" and preserving his legal rights and claims.

3.   <u>This Scheme is Designed to Deter Plaintiffs Both from Opting Out and Objecting.</u>

a.   *The scheme prevents objections from being heard.* Plaintiffs who opt out likely have objections that cause them to opt out. But they are not permitted to make objections once they have opted out. Yet, they are permitted to revoke their opt-out after the RSA is approved in its final form if they decide to surrender their rights and claims in exchange for the benefits of the RSA. The only effect of this exercise is to prevent them from making objections. Since they opted out, they likely had objections. The Court is denied access to these objections. This part of the scheme is obviously designed to minimize the risk that the Court will be influenced by the objections that don't get made by a Plaintiff who opts out.

b.   *The scheme deters objections by punishing those who make them.* Plaintiffs who object are required to permanently surrender their legal rights and claims in exchange for the benefits of the RSA to which they object. They are not permitted, as are the opt-outs, to wait and see the RSA as finally approved by the court

and then decide whether they wish to surrender their rights and claims in exchange for its benefits. This part of the scheme simply discourages objectors by punishing them.

        c.    *Plaintiffs' should to be free from coercion when they decide whether or not to opt out based on the final RSA to which they will be contractually bound.* The <u>explicit</u> but <u>illegitimate</u> purpose of this scheme is to deprive nearly 20,000 of Plaintiffs of <u>their</u> freedom to speak and decide for <u>themselves</u> whether to opt out. And they should not be forced into agreeing to an RSA before it's in the final form. If all Plaintiffs do not retain their right to approve or opt out of the RSA—<u>in its final form</u>— the settlement will be open to the claim that no contract was formed since there will not have been a meeting of the minds, the most essential requirement to form a contract, between the Plaintiffs and the NFL on the RSA in its final form. Plaintiffs might seek to rescind it.

        d.    *The Court should not lend its judicial authority to this scheme.* By finally approving the RSA including Sections 14.2 and 14.3, the Court would be lending its legal power and authority to a deal between the NFL which, by it, seeks releases from as many Plaintiffs as possible, and Class Counsel who stand to receive $112.5 million <u>from</u> the NFL for delivering the releases of the Plaintiffs. The Court should be vigilant in light of Class Counsels' gross conflict of interest to protect the rights and interests of nearly 20,000 Plaintiffs whose voices are not being heard.

        e.    *The Court should condition any final approval of the RSA on its modification to permit time for all Plaintiffs to object and decide whether or not to opt-out after they have had time to consider the RSA in its final form.* As now drafted, Plaintiffs who have objected were coerced into surrendering their right to opt out as a

condition of objecting. Their right to opt out should be restored to them. In addition, Plaintiffs who opted out by Oct. 14th were denied the opportunity to object. They should be given a reasonable time to file objections. <u>All Plaintiffs should have the right to opt out **after** they have reviewed the RSA in its final form</u>. This might require extending the time before the fairness hearing.

B.    CLASS    AND    SUBCLASS    REPRESENTATIVES    MAKE REPRESENTATIONS    AND    WARRANTIES    THAT    ARE    OF    DOUBTFUL VERACITY.

1.    <u>Each of the Class Representatives Represents and Warrants That He Has Been Advised by Class Counsel of the Legal Effects of the RSA</u>:

> Each of the Class and Subclass Representatives, … represents and warrants that he: . . . (iv) is familiar with the terms of this Settlement Agreement, … or has received a description of the Settlement Agreement, . . . from Class Counsel, and has agreed to its terms; <u>(v) has consulted with, and received legal advice from, Class Counsel about . . ., this Settlement Agreement (including the advisability of entering into this Settlement Agreement and its Releases and the **legal effects** of this Settlement Agreements (*sic*) and its Releases)</u>, and . . .; (vi) has authorized Class Counsel to execute this Settlement Agreement on his behalf; . . . *RSA, Section 25.2* (Emphasis added).

2.    <u>These    Representations    and    Warranties    bind    the    Class Representative and all Plaintiffs to the language of the RSA</u>. The Class Representatives are making them on behalf of nearly 20,000 Plaintiffs who are, by this Sec. 25.2, legally bound to the "<u>legal effects</u>" of the language of the RSA. If a Class Representative later complains that he did not understand the legal effect of what he signed it won't matter, all 20,000 will be stuck with his representation and warranty. This means that if there is language in the RSA that leads Plaintiffs to believe that there are safeguards in place to protect them, they are bound to the language as written even if they later discover that the supposed safeguards are illusory and do not protect them in a meaningful way.

3. <u>The Court should require testimony from Class Counsel and Class Representatives concerning the Class Representatives' representations and warranties</u>. They should be required to testify that they were advised by Class Counsel about the "legal effects" of the language cited in the objections enumerated below so that the Court may be assured that Class Representatives understand the legal effect of the sections of the RSA cited, and also to confirm that Class Counsel and Class Representatives have not made false representations about the "legal effects" to the Plaintiffs.  There is a high risk of misrepresentation considering that Class Counsel and Class Representatives have been aggressively marketing the RSA.  This is especially critical considering that <u>Class Counsel stands to receive $112.5 million from the NFL</u> for delivering the Plaintiffs' releases and <u>Class Representatives stand to receive benefits</u> under the RSA that are not available to the vast majority of Plaintiffs who do not presently manifest the symptoms required to receive benefits under the RSA.  Simply put, <u>extreme conflicts of interest demand serious vigilance from the Court</u>.

C. EXAMPLES OF MISLEADING LANGUAGE IN THE RSA.

1. <u>Contrary to Appearances, There is No Reason to Expect that Diagnoses Will be Added to Qualified Diagnoses in the Future.</u>

a. *The RSA provides*:

. . . on a periodic basis not to exceed once every ten (10) years, Co-Lead Class Counsel and Counsel for the NFL Parties agree to <u>discuss in good faith</u> possible prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science. <u>No such modifications can be made absent written agreement</u> between Co-Lead Class Counsel and Counsel <u>for the NFL Parties</u> and approval by the Court, and <u>neither</u> Co-Lead Class Counsel nor Counsel for the NFL Parties <u>shall seek modification</u> to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses <u>other than with the written</u>

7

agreement of the other regarding such modifications.  *RSA*, *Section 6.6(a)* (emphasis added).

        b.    *The Representation and Warranty Made by Class Representatives in re RSA, Section 6.6(a).*  For a Class Representative to represent and warrant that he  "has consulted with, and received legal advice from, Class Counsel about . . ., <u>the legal effects</u> of [Sec. 6.6(a) of the] Settlement Agreement . . ." (emphasis added), he would have to be able to testify that Class Counsel advised him that <u>the NFL has no actual obligation whatsoever</u> to agree to a "modification[] to the definitions of Qualifying Diagnoses . . . in light of generally accepted advances in medical science" since that is the "legal effect" of the language. The NFL's obligation to "discuss" it in "good faith" is purely illusory and misleading to the untrained Plaintiff's eye.  It would be a child-like fantasy to believe that the NFL would agree to add diagnoses that would increase their liability after they have received the Plaintiffs' releases since they would be getting nothing in exchange.

      Much controversy surrounds the limitation of Qualified Diagnoses under the RSA, and many Plaintiffs might have been led to believe that future diagnoses <u>might</u> be added.  Obviously, none will.  Class Counsel and Class Representatives should be required to testify under oath that their representation and warranty made under Sec. 25.2(v) as it relates to adding future diagnoses to Qualified Diagnoses is true:  That is that (a) <u>they have been advised that Sec. 6.6(a) does not provide any reason to expect that future additions to Qualified Diagnoses will be made; and (b) that they have not suggested to Plaintiffs that it does</u>.

        2.    <u>Contrary to Express Language in the RSA the NFL Provides No Security Backing Up Its Payment Obligations During the First Ten Years</u>.

a. *Sec. 25.6 of the RSA is captioned* **"Security"** *(emphasis in the original) and makes the following misleading statement.* This conveys to the untrained eye of a Plaintiff that the NFL guarantees payments under the RSA by backing up its obligations with collateral security.

> The NFL Parties represent and warrant that the NFL currently maintains, and will continue to maintain, an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings. This investment grade rating <u>shall serve as security</u> that the NFL Parties will meet their payment obligations as set forth in Section 23.3 for the first ten years of the Settlement following the Effective Date. (Emphasis added).

b. *No actual security exists.* By saying that a rating will be maintained on bonds and that the rating "shall serve as security" <u>the RSA attempts to convey the idea that the bonds back the NFL's payment obligation.</u> If this were true, Plaintiffs really *would* have "security" like the heading of this section—titled "**Security**"—implies. While this is misleading, it is not fraudulent because it actually conveys to a careful lawyer that the "rating" shall serve as security; not the bonds. In fact, there is no security.

c. *There is no assurance that the NFL will actually pay.* A less deceptive way of saying what this means is that the NFL has a good credit rating that serves as "assurance" that the NFL will not lack the money it needs to pay its obligations. But it does not follow from this fact that the NFL will pay when due. And since there is no collateral pledged from which Plaintiffs may collect, there is no assurance that the NFL will pay just because they have the money available. There is no sense in which it is true that "[t]his investment grade rating shall serve as security that the NFL Parties will meet their payment obligations." <u>There is no security or assurance of any kind whatsoever</u> other than the terms of the RSA. This clause adds nothing. So why is it

9

here?  Because it can be used in selling the RSA as evidence that the NFL's obligations are "secured".

        d.    *The legal effect of this language is that there is no legal effect.*  This language is gratuitous and is included to mislead.  Its value is to attract Plaintiffs to cooperate believing that there is "security" backing the NFL's obligations.  It benefits only people interested to persuade Plaintiffs not to opt out and not to object.  For a Class Representative to represent and warrant that he "has consulted with, and received legal advice from, Class Counsel about . . ., <u>the legal effects</u> of [Sec. 25.6(a) of the] Settlement Agreement . . ." (emphasis added), he would have to be able to testify that Class Counsel has advised him that the "legal effect" of the language is that it does not "secure" the NFL's obligations in any way, shape or form.

        e.    Class Counsel and Class Representatives should be required to testify under oath that their representation and warranty made under Sec. 25.2(v) as it relates to "Security" backing the NFL's payment obligations is true:  (a) <u>that Class Counsel has advised them that Sec. 25.6(a) does not provide any "security" backing the NFL's payment obligations, and (b) that they have not suggested to Plaintiffs that it does</u>.

        3.    <u>Contrary to Express Language in the RSA, the Amount the NFL Promises to Set Aside by the Tenth Anniversary to Pay All Future Claims Cannot be Relied Upon to Actually Pay Them</u>

        a.    *Also under the heading of "**<u>Security</u>**", Sec. 25.6(d) misleads the reader to believe what it actually does say*: That the NFL will deposit funds in a trust in an amount "sufficient to satisfy the NFL Parties' remaining anticipated payment

10

obligations,…" for the 55 years from year 11 through year 65.  And that these funds will

be available <u>only</u> to make payments required under the RSA.   Except for one thing:  <u>the</u>

<u>NFL has the right to withdraw some of the funds for themselves in future years</u>.  Here is

where this story begins.

> No later than the tenth anniversary of the Effective Date …, the NFL
> Parties shall establish, or cause to be established, a special-purpose
> Delaware statutory trust …, with an independent trustee, that will be
> funded and managed as follows: the NFL Parties shall contribute cash to
> the Statutory Trust so that as of the Tenth Anniversary Date, it shall
> contain funds that, <u>in the reasonable **belief** of the NFL Parties, and after</u>
> <u>taking into account reasonably expected investment returns over time, will</u>
> <u>be sufficient to satisfy the NFL Parties' remaining anticipated payment</u>
> <u>obligations, as set forth in Section 23.5(d)(ii)[2], as they come due</u>. *RSA*,
> *Section 25.6(d)* (emphasis added).

     b.    *What amount of funds is "sufficient" is whatever the NFL*

*reasonably "**believes**" is sufficient based upon "expected investment returns over time*

*"—**over the next 55 years***.  To put this into perspective, this is the same as saying that

investment returns could be accurately predicted from President Eisenhower's last year in

office until now.  If this were possible, there would be a lot more people like Warren

Buffet than just the one Warren Buffet who started investing about then.[3]  But wait,

that's not all.  In addition to predicting <u>investment returns</u> 55 years into the future, the

amount of future <u>monetary awards;</u> and of future <u>costs of appeals, administration, and</u>

<u>lien resolutions</u> must also be accurately predicted 55 years into the future.  Even a

completely inexperienced person has enough common sense to know that these four

amounts cannot be predicted 55 years in advance; that <u>what is promised here is literally</u>

---

[2] 23.5(d)(ii) The Monetary Award Fund, which will be used to make payments for: (a) all
Monetary Awards and Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE
VII; (b) certain costs and expenses of the appeals process, as set forth in ARTICLE IX; (c) costs
and expenses of claims administration, as set forth in ARTICLE X; and (d) certain costs and
expenses of the Lien identification and resolution process, as set forth in ARTICLE XI;
[3] http://www.investopedia.com/university/greatest/warrenbuffett.asp

impossible to actually deliver.  It is because financial returns and risk of loss cannot be accurately predicted 55 years into the future that insurance companies exist.[4]  By agreeing to the RSA, Class Counsel stake the financial well being of thousands of Plaintiffs and their families expected to have valid claims in the distant future on the flimsy reed of the "belief" of the NFL whose clear and obvious interest is to put as little as possible into the trust and to withdraw as much as possible from it.

        c.     It gets worse.  After making the contribution of funds just <u>one</u> time by the Tenth Anniversary, Sec. 25.6(d) also provides that <u>the NFL can take money back out of the trust</u> any time they want to for the next 55 years:

> NFL Parties may direct how the funds in the Statutory Trust are invested from time to time, but the Trustee will be instructed to permit withdrawals of funds from the Statutory Trust only for the limited purposes of: [payments authorized by the RSA and] … (iii) the <u>return of excess monies in the Statutory Trust to the NFL Parties based on attaining **investment returns** exceeding the amount necessary</u> to satisfy the NFL Parties' remaining anticipated payment obligations, but only upon Court approval; (iv) the <u>return of excess monies in the Statutory Trust to the NFL Parties based on reductions to the NFL Parties' remaining anticipated **payment obligations**</u>, but only upon Court approval; … To the extent that <u>Court approval</u> is required for the withdrawal of funds from the Statutory Trust, such **approval shall be granted** <u>unless there has been either a material default on the NFL Parties' payment obligations within the prior thirty (30) days, or upon a showing, by clear and convincing evidence, that the proposed withdrawal would materially impair the Settlement Agreement</u>. *RSA, Section 25.6(d)* (emphasis added).

        d.     This section provides that in the <u>unlikely</u> event that investment results generate more money than the NFL previously "believed" in, and the highly <u>likely</u>

---

[4] Since it is nearly impossible to predict investment returns along with the other three components even a few years into the future, we have laws that require insurance companies to maintain truly sufficient reserves to pay claims.  They do this by spreading risks of loss and investment returns across millions of people covering trillions of dollars of insurance so that claims can be paid down through the decades even as <u>loss rates and investment returns vary drastically through time</u>. The RSA, in the other hand, permits the NFL to make what is nothing more than an educated guess (even a mere "belief") to secure its obligations.

event that the NFL will later "believe" that they invested more money than needed, they will "re-believe" that less money is required to be "sufficient" to pay their obligations for whatever balance remains of 55 years.  When, <u>not if</u>, they do this, they may withdraw money from the fund that was previously pledged to pay claims of Plaintiffs and others.

Even where court approval is required for the protection of the Plaintiffs, the Court's approval of NFL withdrawals "shall be granted" unless the NFL has materially defaulted.  Absent a default (which the NFL has within its power to prevent), the Court may deny the NFL's request to withdraw funds which they "believe" are not necessary to pay claims <u>only if the Plaintiffs "show by clear and convincing evidence</u>" that the proposed withdrawal would materially impair the Settlement Agreement. Since it is impossible to prove, even a very low standard of proof, how much money it takes to be "sufficient" to pay claims decades from now, there is no possibility that the Plaintiffs can carry the burden to prove this. (See II, C, 3 (b) *supra*)

Simply put, the NFL, whose economic interest is to withdraw money whenever they can, may withdraw money whenever they <u>say</u> they "<u>believe</u>" the money they want to withdraw is not necessary to pay <u>the NFL's obligations</u>.  And for the Plaintiffs to stop the NFL from withdrawing money the NFL previously "believed" was necessary to pay Plaintiffs' claims, Plaintiffs must prove to an extraordinarily high standard of proof that the money is necessary.   This would require proof that the NFL's "belief" is not reasonable when they say that they "reasonably believe" that funds remaining after a withdrawal will be sufficient.  <u>Proving that their "belief" is not reasonable by clear and convincing evidence will be impossible</u>. The NFL will call witnesses from the finance and insurance industries who will make a solid case that the Plaintiffs cannot prove by

clear and convincing evidence that the NFL's belief is not reasonable. After all, it's just a belief. And everyone knows that no one can accurate predict investment returns and claims payments 55 years into the future. So who's to say the NFL is wrong?

e. _It gets much worse: There is no provision in the RSA requiring the NFL to add more money to this trust when the money runs out._ Sec. 23.1(a) provides that the "Monetary Award Fund Amount" is "[t]he amount of money sufficient to make all payments set forth in Section 23.3(b) for sixty-five (65) years from the Effective Date." Immediately following, Sec. 23.2 provides that: "For the avoidance of any doubt, … the NFL Parties will have no additional payment obligations in connection with this Settlement Agreement. Sec. 23.3(b) provides that "[t]he NFL Parties will pay, or cause to be paid six initial monthly installments of Twenty Million United States dollars each, into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund,…" which must be paid "in accordance with the procedures set forth in section 23.3(b)(i)-(iv)." (These sections establish the rules governing the Monetary Award Fund.) Sec. 25.6(d) requires the establishment of a Delaware Statutory Trust into which the NFL is required to deposit funds sufficient to pay all claims from years 11-65 "as set forth in Section 23.5(d)(ii), as they come due." Sec. 23.5(d)(ii) establishes the Monetary Award Fund from which all claims of Plaintiffs plus other costs and expenses are required to be paid. Sec. 25.6(d) provides for the NFL to withdraw money from the trust if it "reasonably believes" the funds will not be necessary. Nowhere in this scheme does the RSA require the NFL to put more money into the fund. In fact the RSA provides just the opposite: "For the avoidance of any doubt, … the NFL Parties will have no additional payment obligations in connection with this Settlement Agreement. (Sec. 23.2).

14

       f.    *It all boils down to this*: First, the NFL will put up enough money to appease the many Plaintiffs, courts, Congress and the public, impressing them all by putting up $120 million in the first six months. Next, claims will be administered through year 10 paying claims as provided in Sec. 23.3(b)(i)-(iv). Then, from year 11 through year 55, claims will be paid from the Statutory Trust for the vast majority of Plaintiffs whose symptoms will not develop severely enough to manifest a Qualified Diagnosis until after year 10. As the years go by the NFL will "believe" that there is more money in the trust than needed to pay future claims. When they ask the Court to let them withdraw what they believe is the excess, the Court will be required to grant their motion because the Plaintiffs will not be able to prove by clear and convincing evidence that the NFL is wrong. Then, when the money runs out due to another market crash, deep recession, or because far more claims are made than the NFL "believed" would be made, there will be nothing the Plaintiffs can do to force the NFL to put more money in the trust. The NFL will cite Sec. 23.2 which provides that: <u>"For the avoidance of any doubt, … the NFL Parties will have no additional payment obligations in connection with this Settlement Agreement</u>. It doesn't take an ethical genius to understand what's wrong with this.

       g.    For a Class Representative to represent and warrant that he "has consulted with, and received legal advice from, Class Counsel about…, <u>the legal effects of [Sec. 25.6(d) of the] Settlement Agreement…</u>" (emphasis added), he would have to be able to testify that Class Counsel advised him that the trust fund created on the tenth anniversary cannot be relied upon to "secure" payment to Plaintiffs from year 11 through year 65 as promised.

h.      Class Counsel and Class Representatives should be required to testify under oath that the representation and warranty made under Sec. 25.2(v) as it relates to securing payment of the obligations of the NFL from years 11-65 is *true*: (1) that they have been advised that Sec. 25.6(d) provides no guarantee that funds will be available to secure the NFL's payment obligations for years 11-65, and (2) that they have not suggested to any Plaintiffs that it assures or guarantees payments to them.

4.      Contrary to Express Language in the RSA, There Are No Grounds Under the RSA Upon Which a Court Could Base an Order Voiding the Plaintiffs' Releases if the NFL Does Not Fulfill its Obligations.

a.      *Rescission of releases is not a remedy available to Plaintiffs.*[5]  As does the example under Sec. 25.6(a) of the RSA, the following example under Sec. 25.6(g) also appears under the caption "Security." It purports to provide "security" that Plaintiffs can sue the NFL all over again if the NFL fails to perform its obligations to them.  In fact, it provides no such security.  It states,

> In the event the Court enters an order pursuant to Section 25.6(e)[[6]] directing the NFL Parties to meet their payment obligations pursuant to Section 23.3 and the NFL Parties fail materially to comply with such Order, as set forth in Section 25.6(e), Co-Lead Class Counsel may request that the Court provide the NFL Parties sixty (60) days to show cause why the Court shall not render null

---

[5] Rendering releases "null and void" is what happens when they are rescinded.

[6] 25.6(e) provides: In the event of a material default by the NFL Parties in satisfying their payment obligations as set forth in this Settlement Agreement, and the NFL Parties' failure to cure any such material default within sixty (60) days of written notification of such default by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel shall have the right to petition the Court to make a finding that there has been a material, uncured default in satisfying the NFL Parties' payment obligations and to enter an order directing the NFL Parties to meet their payment obligations. Beginning on the Tenth Anniversary Date, any such petition by Co-Lead Class Counsel may request that the Court direct the NFL Parties to meet their payment obligations with the funds available in the Statutory Trust established by the NFL Parties pursuant to Section 25.6(d).

16

and void the Releases and Covenants Not to Sue provided to
Released Parties, as set forth in Section 18.1, by Settlement Class
Members who: (i) have received a final, favorable Notice of
Registration Determination, as set forth in Section 4.3, and have
not received a final and accrued Monetary Award or final and
accrued Derivative Claimant Award as of the date of such
application; or (ii) who have only received a final and accrued
Monetary Award for a Level 1.5 Neurocognitive Impairment or a
final and accrued Derivative Claimant Award for a Level 1.5
Neurocognitive Impairment as of the date of such application. For
the avoidance of any doubt, all other Releases and Covenants Not
to Sue shall remain effective. . . . (emphasis added).

As in the case of the misleading language assuring Plaintiffs that there is a

prospect that additional diagnoses might be added to Qualified Diagnoses, and that they

are "secured" by a bond rating, this language, too, is deceptive. It appears to be

calculated to lead Plaintiffs to believe they can start a lawsuit against the NFL based on

previously released claims in the event that the NFL fails to perform its obligations. In

fact, it says only that "Co-Lead Class Counsel may request" that the Court issue an order

to show cause. The Court may deny a motion for an order to show cause. And it does

not have the legal power to rescind the releases absent the NFL's agreement to expose

themselves to this remedy or very egregious conduct by the NFL which it is not likely to

commit. The NFL has agreed only to be exposed to claims for breach of contract.

     b.    For a Class Representative to represent and warrant that he "has

consulted with, and received legal advice from, Class Counsel about…, the legal effects

[of Sec. 25.6(d) of the] Settlement Agreement…" (emphasis added), he would have to be

able to testify that Class Counsel advised him that there is no provision in the RSA in

which the NFL agrees that the "Releases and Covenants Not to Sue" provided to the NFL

by the Plaintiffs may be rescinded or "rendered null and void" by the Court if the NFL

fails to perform its obligations. The fact that the NFL consents to Class Counsel seeking

an "order to show cause" means only what it says. It does not change the substantive legal rights of the parties under the RSA. The Plaintiffs have the right to seek relief from a court for the NFL's breach of contract. This does not necessarily include the rescission of the release and covenant not to sue.

        c.     Class Counsel and Class Representatives should be required to testify under oath that the representation and warranty made under Sec. 25.2(v) as it relates to starting a new lawsuit based on previously released claims if the NFL fails to perform its obligations under the RSA is *true*: (1) <u>that they have been advised that Sec. 25.6(g) provides no assurance that they will be able to sue the NFL based on previously released claims if the NFL fails to perform its obligations, and (2) that they have not suggested to any Plaintiffs that it does</u>.


### III.    CONCLUSION

      The only people who will receive a windfall under the RSA are Class Counsel. And they are being paid by the NFL who has agreed in advance not to object to their receipt of $112.5 million from the NFL. The NFL is paying this to Class Counsel in exchange for releases of Plaintiffs delivered by Class Counsel. Meanwhile, Class Representatives also stand to receive foreseeable benefits. But the vast majority of the nearly 20,0000 prospective Plaintiffs stand to receive benefits under the RSA as many as 65 years into the future. They are by far the most numerous class with the most at stake collectively. Yet, they have the weakest voice in this matter.

Case 2:12-md-02323-AB   Document 6243   Filed 10/14/14   Page 20 of 22

In their behalf, Ben Utecht urges the Court to exercise great vigilance in the protection of these Plaintiffs.  Many of them are still young.  And, like Ben, they have families who might one day depend on the benefits of the RSA.

Protecting them calls both for a reexamination of the RSA asking the questions: Does it really do what the NFL, Class Counsel, and Class Representatives have promised in their sales campaign?   And have Plaintiffs been correctly informed of what the RSA does NOT do.  By requiring Class Counsel and Class Representatives to testify as these objections urge the Court to do, light will be shed on both questions.

There is only one chance to get this right.  And the consequences of getting it wrong will fall on thousands of families for several generations to come.  Here's hoping everyone does what's necessary to get it right.

A good start would be to guarantee every prospective Plaintiff the right to see the RSA in its final form so that they are free to decide whether they wish to surrender their legal rights and claims in exchange for its benefits.

Dated this 13th day of October, 2014.

SETTLEMENT CLASS MEMBER


Benjamin J. Utecht
12058 Lucerne Trail
Lakeville, MN 55044
Phone: (952) 469-2868
Date of Birth: June 30, 1981


GUARDIAN LAW GROUP, LLC


Scott D. Hillstrom
Guardian Law Group, LLC
527 Marquette Ave. S., Suite 1660
Minneapolis, MN 55402
Phone: (612) 332-8063
Email: scott.hillstrom@me.com

*Attorney for Benjamin J. Utecht*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2014, I caused the foregoing OBJECTIONS TO THE

CLASS ACTION SETTLEMENT AGREEMENT DATED JUNE 25, 2014 to be filed with the

United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF

system, which will provide electronic notice to all counsel of record and by First Class U.S. Mail

to:

Clerk of the District Court / NFL Concussion Settlement
U.S. District Court for the Eastern District of Pennsylvania
United States Courthouse
601 Market Street
Philadelphia, PA 19106-1797


/s/ Scott D. Hillstrom
Scott D. Hillstrom