# WELLER, GREEN, TOUPS & TERRELL, L.L.P.

## Attorneys at Law

**MITCHELL A. TOUPS, LTD.**

'OARD CERTIFIED
ERSONAL INJURY TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

**BOARD CERTIFIED**
CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

**BOARD CERTIFIED CIVIL TRIAL LAW**
NATIONAL BOARD OF TRIAL ADVOCACY

**BOARD CERTIFIED CIVIL PRETRIAL PRACTICE**
NATIONAL BOARD OF TRIAL ADVOCACY

**LICENSED TO PRACTICE TEXAS & NEW YORK**

*Beaumont Office (Principal Office)*:
**BANK OF AMERICA TOWER**
**2615 CALDER STREET, SUITE 400**
**BEAUMONT, TX 77702**

*MITCHELL A. TOUPS, LTD.*
*Houston Office*:
**3900 Essex, Suite 690**
**Houston, TX 77027**

*Mailing Address*:
**POST OFFICE BOX 350**
**BEAUMONT, TX 77704**
**(409) 838-0101**
**Fax: (409) 832-8577**

B. ADAM TERRELL
E. HART GREEN
STEVEN C. TOUPS, P.C.

EDWARD H. GREEN*
Of Counsel
GEORGE A. WELLER
(1911-1986)

JANNEY GORDON, CLA
Certified Legal Assistant

Email Addresses:
matoups@wgttlaw.com
jgordon@wgttlaw.com

Direct Dial: (409) 951-2351

September 3, 2014

Mr. Michael E. Kunz
Clerk of the District Court/*NFL Concussion Settlement*
U.S. District Court for the Eastern District of Pennsylvania
United States Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797



**RE:   No. 2:12-MD-2323-AB**
**IN RE: National Football Players' Concussion Injury Litigation**
**(Anderson Objectors)**

Dear Mr. Kunz:

Enclosed please find ***Objection to June 25, 2014, Class Action Settlement Agreement by Ramon Armstrong, Nathaniel Newton, Jr., Larry Brown, Kenneth Davis, Michael McGruder, Clifton L. Odom & George Teague*** for filing in the above-referenced MDL.

If you have any questions or need any additional information, please do not hesitate to contact me.

Sincerely,

Mitchell A. Toups

/jg
Enclosures

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION LITIGATION | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

**OBJECTION TO JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT BY RAMON ARMSTRONG, NATHANIEL NEWTON, JR., LARRY BROWN, KENNETH DAVIS, MICHAEL MCGRUDER, CLIFTON L. ODOM & GEORGE TEAGUE**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Settlement Class Members Ramon Armstrong, Nathaniel Newton, Jr., Larry Brown, Kenneth Davis, Michael McGruder, Clifton L. Odom, and George Teague (collectively, the "Armstrong Objectors") file this Objection to the revised settlement in the Class Action Settlement Agreement as of June 25, 2014 (Doc. #6087) (the "RSA"), and respectfully show the following:

## THE ARMSTRONG OBJECTORS

The Armstrong Objectors are seven retired National Football League ("NFL") players, each of whom had a distinguished playing career. The Armstrong Objectors collectively played an average of nine seasons with eleven different teams. They include offensive and defensive linemen, a running back, a linebacker, and defensive backs. The Armstrong Objectors include Pro Bowl participants, All-Pros, All-Americans, and a Super Bowl MVP. The oldest Armstrong Objector began his NFL career in 1960. The youngest Armstrong Objector retired in 2003. Two played on three Super Bowl championship teams each; two others in five Super Bowls.

***Ramon Armstrong*** played one season as a defensive tackle with the Oakland Raiders.   Mr. Armstrong began his professional football career after playing for Texas Christian University.  Mr. Armstrong retired from the old AFL after the 1960 season.

***Nathaniel Newton, Jr.*** played fourteen seasons as an offensive lineman with the Dallas Cowboys and Carolina Panthers.  Prior to his NFL career, he played two years for the Tampa Bay Bandits in the United States Football League.  Mr. Newton was a six-time Pro Bowl selection, twice named All-Pro, and played on three Super Bowl Champion teams with the Dallas Cowboys (XXVII, XXVIII, and XXX).  He also was named to the USFL All-Time Team.  Mr. Newton began his NFL professional football career in 1986 after playing for Florida A&M University — where he was first team All-MEAC as a senior.  Mr. Newton retired from the NFL after the 1999 season.  He is a radio and television broadcaster in Dallas, Texas.

***Larry Brown*** played eight seasons as a defensive back with the Dallas Cowboys and Oakland Raiders.  He played on three Super Bowl Champion teams with the Dallas Cowboys (XXVII, XXVIII, and XXX), and was named MVP of Super Bowl XXX.  He was also named to the NFL all-rookie team.  Mr. Brown began his professional football career in 1991 after playing for both Los Angeles Southwest College and Texas Christian University.  After his senior season at TCU, he was invited to play in the Blue–Gray Football Classic where he was named MVP.  Mr. Brown retired from the NFL after the 1998 season.  He is a cohost of the Dallas Cowboys Radio Network Pregame and Postgame Shows on the Dallas Cowboys Radio Network.

***Kenneth Davis*** played nine seasons as a running back with the Green Bay Packers and Buffalo Bills.  He played in four consecutive Super Bowls (XXV, XXVI, XXVII and XXVIII) with the Buffalo Bills.  Mr. Davis began his professional football career in 1986 after playing for Texas Christian University — where he was first team All-American and had the fifth most votes

2

of all candidates for the Heisman Trophy as a junior. Mr. Davis retired from the NFL after the 1994 season. He is the Athletic Director and former head football coach at Bishop Dunne Catholic School in Dallas, Texas.

*Michael McGruder* played nine seasons as a defensive back with the Green Bay Packers, Miami Dolphins, San Francisco 49ers, Tampa Bay Buccaneers, and New England Patriots —with whom he played in Super Bowl XXXI. Prior to his NFL career, he played three seasons in the Canadian Football League with the Saskatchewan Roughriders. Mr. McGruder received the NFL Extra Effort Award and was a finalist for the NFL Bart Starr Award in 1997. He began his NFL professional football career in 1989 after starting four years at Kent State University where he was captain of the football team his senior year, and a 2-year captain of the track team. Mr. McGruder retired from the NFL after the 1997 season. In 2009, Mr. McGruder founded Platinum Charities, a charitable organization dedicated to motivating at-risk youth and empowering disadvantaged families to reach higher levels of achievement. Platinum Charities champions programs that create life changing opportunities to lift children and families out of poverty through scholarship initiatives, youth based programs, and home ownership opportunities in Ohio, Georgia, and Texas.

*Clifton L. Odom* played thirteen seasons as a linebacker with the Cleveland Browns, Baltimore and Indianapolis Colts, and Miami Dolphins. Mr. Odom began his professional football career in 1980 after playing for the University of Texas Christian-Arlington. Mr. Odom retired from the NFL after the 1993 season.

*George Teague*, a first round pick in the 1993 NFL Draft, played nine seasons as a defensive back with the Green Bay Packers, Dallas Cowboys, and Miami Dolphins. Mr. Teague began his professional football career after playing for the University of Alabama. In 2002, he started the George Teague & Friends Foundation, a charitable organization focusing on youth

3

development programs that involves many former University of Alabama football players.  Mr. Teague retired from the NFL after the 2001 season.  He is the Director of Athletics and Physical Education and Head Football Coach for the Shelton School in Dallas, Texas.

Since retiring from the NFL, each of the Armstrong Objectors has experienced one or more of a wide range of symptoms linked to repetitive mild traumatic brain injury ("MTBI"), including a sensitivity to noise, visuospatial issues, visual impairment, chronic pain, executive function deficit, episodic depression, mood and personality changes, chronic headaches, dysnomia, a decreased ability to multi-task, peripheral nerve dysfunction (numbness, burning, and/or tingling), cervical spinal  disorders, sleep dysfunction, attention and concentration deficits, short- and long-term memory deficits, and somatic disorders.  Some of the Armstrong Objectors also have experienced a decreased ability to interpret, regulate, express, or control complex emotions — all of which are associated with chronic traumatic encephalopathy ("CTE") and may broaden or intensify.

Although the Armstrong Objectors' injury claims would be released by the RSA, none would qualify for any relief under the RSA beyond participation in the proposed Baseline Assessment Program ("BAP").  Even then, the BAP — which measures cognitive deficits such as memory impairment and loss of attention — does not screen for many of their neurobehavioral conditions or neuropsychiatric presentations.

## ARMSTRONG OBJECTORS' OBJECTIONS TO THE RSA

The Armstrong Objectors object to the RSA because of the following deficiencies, all of which are curable by rejecting it in its current form and amending it.

1.     **Maximum monetary awards are insufficient.**  The Armstrong Objectors object to the RSA because individual awards for qualifying players and/or their families remain capped

<div align="center">4</div>

at the following maximum amounts: (i) Dementia ($1.5 – $3 million), (ii) Alzheimer's and Parkinson's ($3.5 million), (iii) ALS ($5 million), and (iv) Death with CTE ($4 million). *See* Monetary Award Grid, Exhibit B-3 to the RSA. These amounts are insufficient to compensate the injured players and/or their families — especially once they are present value affected since they will not be paid immediately. The maximum individual awards also are subject to further reductions (*see* below).

Perhaps the best indicator of the anticipated average payout per claimant is Co-Lead Class Counsel's analysis. Counsel believes that even though the RSA is uncapped, it is worth $675 million to the former players. Co-Lead Class Counsel also estimates that between 3,000 and 5,000 former players will be compensated. Performing simple long division confirms that the average anticipated monetary award per player is between $135,000 and $225,000 — before attorneys' fees and expenses are deducted. These amounts are not even close to the maximum awards in the Monetary Award Grid. Moreover, it is not even close to the roughly $10 million in total lifetime costs — including lost productivity and medical and custodial care — that University of Toronto Professor of Neurosurgery Charles Tator estimates for each case of repetitive traumatic brain injury. *See* http://www.medscape.com/viewarticle/810904#2 (last visited August 20, 2014). *See also* CHARLES H. TATOR, CATASTROPHIC INJURIES IN SPORTS AND RECREATION: CAUSES AND PREVENTION: A CANADIAN STUDY (2d ed. 2008) (calculating the average cost of a non-fatal catastrophic injury at about $7.5 million (Canadian dollars, normalized to 2006) in lost earnings, lifetime care, and rehabilitation services).

The Armstrong Objectors, therefore, propose the RSA be revised to increase the maximum awards, which could be funded by, *inter alia*, (i) eliminating and utilizing some of the $112.5 million allocated to Co-Lead Class Counsel as additional attorneys' fees (*see* below), (ii)

eliminating the 5% "set-aside (*see* below), (iii) eliminating and utilizing the $10 million allocated to the up-front *cy pres* Education Fund (*see* below), and/or (iv) increasing the cost of living percentage to at least 3-4% or peg it to a consumer price index.

      **2.**        **Reductions to maximum monetary awards.** The Armstrong Objectors object to the RSA because all of the above maximum monetary awards are subject to reductions — often, significant reductions — based on offsets for age and career length. *See* RSA §6.7, Exhibit B-3. Former players with fewer than five years of NFL experience will see their awards reduced, some by as much as 95 percent. *Id.* The same holds true for retirees over 45 — the older a player is when diagnosed with brain damage, the less money he will receive. *Id.*

      For example, assume a player died before July 7, 2014, the date the RSA was preliminarily approved, and there is a post-mortem CTE finding. If the player was Junior Seau, his family would receive $4 million according to the Monetary Award Grid (Exhibit B-3 to the RSA). But, under the Monetary Award Grid age-based reductions, the family of Dave Duerson, who also committed suicide, would receive only $2.3 million. Both are subject to further reductions for attorneys' fees (one-third is the typical arrangement) and expenses. More important is that the family members of a few deceased players will receive some of the largest awards as compared to living players who desperately need medical care, but will receive very small awards, if any.

      Attempting to calculate the estimated award a typical retired NFL player facing problems resulting from concussions would receive is difficult. By all counts, there will be many players facing dementia after the age of 60. The Monetary Award Grid provides a payment of $580,000 to a 60-year-old NFL veteran diagnosed with a moderate form of dementia at age 60 or later. After paying attorneys' fees and expenses, the player would collect something $375,000. The Armstrong Objectors, therefore, propose the RSA be revised to eliminate the age and career length

reductions. There is no correlation between age and career length, on the one hand, and developing dementia, on the other hand. A single severe concussion in the first game of a player's career could cause a player to suffer dementia.

The RSA also reduces monetary awards by 75% for any former player who has suffered a single non-football related traumatic brain injury or stroke (*id.*, §6.7 (b)(iii)) — even though (i) there is no scientific reason to presume that a single non-football brain injury accounts for 75% of a player's afflictions, and (ii) NFL team doctors spent at least two decades increasing former players' risk of stroke (and likely, brain injury) by liberally administering the pain-killing, blood-thinning drug Toradol against Food and Drug Administration warning label guidelines.

The Armstrong Objectors also propose the Revised Settlement be revised to eliminate this artificial monetary award reduction.

3.      **Death with CTE.**  The Armstrong Objectors object to the RSA because a "Death with CTE" qualifying diagnosis requires retirees to have died and been diagnosed with CTE prior to July 7, 2014. RSA, §6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board certified neuropathologist of CTE."). Thus, if an NFL retiree dies after July 7, 2014, and regardless of whether the player commits suicide and it is ultimately determined he suffered from CTE, his family will not qualify for an award. This is absurd. There should not be any deadlines based on when death occurred.

This provision also ignores that CTE — a condition found in contact sport athletes, military personnel exposed to explosive blasts and others subjected to repetitive concussive and sub-concussive head trauma, marked by widespread, irreversible accumulation of destructive tau protein in the brain — is at the heart of this litigation. What's more, the RSA does not assign

7

similar cutoff dates to former players diagnosed with ALS, Alzheimer's or Parkinson's — even though a 2013 National Institute for Occupational Safety and Health study of nearly 3,500 NFL retirees who played at least five seasons between 1959 and 1988 recorded just 17 combined cases of these diseases[1] while, in a 2010 study, 33 of the 34 studied deceased NFL players were diagnosed with CTE.

CTE is the disease that made football brain damage a national issue and a public health concern. Without it, neither this litigation, nor the RSA likely would exist. Yet the RSA forecloses every NFL retiree who has yet to die and be diagnosed with CTE from receiving a "Death by CTE" award as if there will never be another case—which cannot be true.

The Armstrong Objectors further object to the RSA because the qualifying "Death with CTE" diagnosis is too limited. The following symptoms are associated with both brain damage and CTE: sensitivity to noise, visual impairment, chronic pain, chronic headaches, numbness, burning, tingling, incessant ringing in the ears, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions. None of these symptoms, however, are addressed by the RSA, nor is there any compensation allowed for these conditions.

The CTE restrictions under the RSA are designed to save the NFL a substantial amount of money on the very disease giving rise to the litigation. The Monetary Award Grid reduces the size of individual Death with CTE payouts, while the cutoff date limits the total number. In disallowing future award changes regardless of medical advances — in essence, the potential creation of a

---

[1]     On the other hand, while medical experts suspect that the other neurodegenerative diseases compensated by the RSA — ALS, Parkinson's, Alzheimer's and dementia — may be triggered and/or accelerated by years of bashing football helmets, these illnesses also occur in people who have not experienced brain trauma. The link to football is less clear.

"Life with CTE" qualifying diagnosis ⸺ the RSA shrinks the eligible player pool even further. By exclusively focusing on cognitive impairment, the same BAP program that is supposed to assist CTE sufferers by giving them a general dementia diagnosis excludes retirees suffering from mood, behavioral and other non-cognitive symptoms (such as chronic migraines) — all the while saving the NFL money by ensuring that living ex-players with CTE who qualify for a dementia award are more likely to be older and, therefore, subject to a greater payout reduction according to the Monetary Award Grid.

The Armstrong Objectors, therefore, propose the RSA be revised to delete the date parameters of the "Death with CTE" qualifying diagnosis and expand the list of CTE symptoms that qualify for compensation and lift the restriction on the date of death as well as increase the size of the awards for death with CTE.

4.      **Baseline Assessment Program ("BAP").** The Armstrong Objectors object to the RSA because of the length of the program and the tight deadlines under which retired NFL players with cognitive issues must operate. *See* RSA, Art. V. Retired players must register for the BAP within 180 days after notice is posted on a special settlement website. RSA, §4.2(c). Otherwise, they will be deemed ineligible for baseline tests and monetary awards. *Id.* Thereafter, players older than age 43 must take their baseline exams within two years after the BAP is launched, while younger players must take the exams before their 45th birthday or within ten years of the start of the program. RSA, §5.3. After 10 years, no baseline exams will be conducted (RSA, §5.5), and without a baseline exam, it is nearly impossible to qualify for a monetary award under the RSA.

The BAP also screens for cognitive deficits and signs of dementia, but only offers monetary awards for specific neurodegenerative diseases — leaving players who suffer from memory loss, headaches, chronic pain, depression, impulsivity, diminished executive function, speech

9

impairment, attention deficits and other ailments linked to repetitive brain injury, but do not rise to the level of Parkinson's or ALS, receiving nothing more than counseling and prescription drug coverage, even though their conditions can drastically affect their quality of life and ability to work.

BAP program neuropsychologists also cannot make qualifying diagnoses of Alzheimer's, Parkinson's or ALS.  Instead, retirees must visit a settlement-approved doctor and pay for their own medical testing and related travel expenses.

The Armstrong Objectors, therefore, propose the RSA be revised to extend the deadlines for registering for, and taking, the baseline exams by two years, and extend the life of the BAP beyond ten years to possibly twenty years, which could be funded by, *inter alia*, (i) eliminating and utilizing some of the $112.5 million allocated to Co-Lead Class Counsel as additional attorneys' fees (*see* below), (ii) eliminating the 5% "set-aside (*see* below), (iii) eliminating and utilizing the $10 million allocated to the up-front *cy pres* Education Fund (*see* below), and/or (iv) additional funds from the NFL.

5.    **Amount of compensation paid depends on fair providers.**  The Armstrong Objectors object to the RSA because disability can only be determined by neuropsychologists who are pre-selected for the BAP. *See* RSA, Article V. The neuropsychologists who register to be part of the BAP are likely to be far more conservative in "calling" impairment than a neuropsychologist chosen by a player.    Requiring neuropsychologists to pre-register for the BAP also will substantially reduce the number of treating doctors involved.  Treating physicians rarely seek this kind of work.  The physician selection criteria also will dissuade most busy treating doctors from participating.  The doctors who typically work for insurance defense law firms are more likely to

register.  And, for a biased doctor, the malingering tests specifically authorized under the RSA are a huge weapon to be used against the players.

The RSA also should have forbidden the use of the "Fake Bad Scale," which can be included in an MMPI assessment, although it has been rejected by most courts as unreliable.  The RSA will only be fair if the majority of doctors registering for the BAP believe mild brain injury deficits equal the defined monetary award categories.  Yet, the manifestations of early onset of *dementia pugilistica* in football are more behavioral than cognitive.

The Armstrong Objectors, therefore, propose the RSA be revised to allow the players to select and utilize their treating physicians, without penalty, as long as the treating physicians are Board Certified in neurology, and specifically forbid the use of the "Fake Bad Scale" in MMPI assessments.

6.     **Neuropsychological opinion required.** The Armstrong Objectors object to the RSA because determination of the cognitive impairment groups is based entirely on the neuropsychological determination of cognitive impairment.  Type I CTE – which impacts younger players – is almost entirely a behavioral problem, not a cognitive problem.  Any cognitive changes will be the type not susceptible to measurement in someone under age 60. While some behavioral problems may have cognitive manifestations, they are not likely to manifest themselves in examinations in non-stressful environments, like a neuropsychologist's office.  The Armstrong Objectors, therefore, propose the RSA be revised to allow for compensation for these behavioral problems and their own physicians to diagnose same.

7.     **Unlimited appeals.** The Armstrong Objectors object to the RSA because the NFL may appeal as many monetary awards as it chooses — for free.  In the initial, rejected version of the settlement, the NFL was limited to ten appeals per year.  However, under the RSA, and

regardless of a retired player's mental state or financial need, the NFL can delay payment by simply appealing an unlimited number of claims. RSA, § 9.6(b). What's more, while there is no charge for the NFL to appeal a monetary award, players must pay a $1000 fee to file an appeal. RSA, § 9.6(a). It also is unfair to place retired players with cognitive issues, such as memory problems, issues with punctuality, difficulty keeping appointments and staying on top of paperwork, in a position of having to deal with the prospect of an unlimited number of appeals.

The RSA also requires an appealing player to prove his appeal with "clear and convincing evidence." RSA, § 9.8. Yet, an appellant will have only five pages of argument to carry his burden of proof. RSA, § 9.7(a). The "clear and convincing" standard is substantially more difficult to prove than the "proximate cause" standard — the normal burden of proof in a civil lawsuit at the courthouse—which only requires proof of probability of slightly greater than 50%. Having to prove a significant behavioral CTE manifestation, for example, in by "clear and convincing" evidence in only five pages will make a successful appeal extremely rare.

The Armstrong Objectors, therefore, propose the RSA be revised to (i) eliminate the NFL's right to appeal a player's monetary award (or, in the alternative, limit the number of appeals the NFL may file to ten per year, as set forth in the initial version of the settlement), (ii) eliminate the $1000 fee charged to players for filing an appeal, and (iii) change the "clear and convincing" burden of proof standard to the "proximate cause" standard.

**8.      Amount of the RSA is insufficient.** The Armstrong Objectors object to the RSA because of the insertion intermediate monetary award caps and reductions. According to Co-Lead Class Counsel, the initial, rejected settlement had an ultimate capped value to the players of $675 million — which was based on analyses allegedly performed by medical experts, actuaries and economists predicting (i) the number of former NFL players who are brain damaged, (ii) the

ultimate nature and extent of their brain damage, and (c) the money necessary to compensate such brain damage under the initial, rejected settlement. The NFL and Class Counsel, however, did not share their analyses with the Court, and the Court, in part, rejected the initial settlement as insufficient because of the ultimate cap.

Even though the cap was eliminated in the RSA, the NFL and Co-Lead Class Counsel confidently state that $675 million will still be enough to fund the deal. The only way this could be true is by implementing intermediate monetary award caps and reductions to keep the ultimate — theoretically uncapped — amount of the RSA in check. If $675 million was not enough the first time, it should not be enough now. The Armstrong Objectors, therefore, propose the RSA be revised to require the NFL to increase the settlement fund.

9. **Underlying analyses and supporting documents and information.** The Armstrong Objectors object to the RSA because the NFL and Co-Lead Class Counsel have not disclosed the underlying analyses, documents and information on which the RSA is predicated. Brain damage from playing football is a public health issue and a public policy issue, both from the standpoint of the safety and well-being of our children and loved ones, and the shared medical costs (private insurance and/or Medicare) of treating the afflicted. If the NFL has information about the incidence and prevalence of the cognitive costs of playing football, such information should be shared with the public. The public has a need and a right to know just as in any other case involving a public harm.

The RSA also will foreclose any future discovery on the issue from the NFL, which means the public will never know what the NFL knew about brain damage and when the NFL knew it. According to Alan C. Milstein, a Temple University School of Law professor who specializes in

bioethics and clinical trials litigation, disclosure of the underlying analyses, documents and information is not about the NFL, but about:

> [T]he NCAA and high school football and junior high football and peewee football. And about parents understanding whether or not they should let their kid play football. We will never know that critical information about the seriousness of concussions because the NFL is buying peace and they are also buying silence. That is what is really wrong with this situation.

Alan C. Milstein, *Brutality's the Winner in the NFL Settlement*, THE NAT'L LAW J. (September 9, 2013). The Armstrong Objectors, therefore, propose the Revised Settlement be revised to require the NFL and Co-Lead Class Counsel to disclose the analyses, documents and information underpinning the RSA or give counsel herein at least 180 days to conduct discovery against the NFL and present the evidence to the Court. There is no reason to rush to a settlement when 20,000 class members' medical future is at stake for the next 65 years.

        **10.**    **No consideration of scientific advances.** The Armstrong Objectors object to the RSA because although it is designed to last for 65 years, it does not adequately allow for advances in neuroscience. Many scientists believe there will be a way to detect CTE in the living within the next decade. Scientists in Chicago are experimenting with a screening test that measures vision, eye movement and optic nerve irregularities. Boston University CTE researcher Robert Stern and his team of scientists are conducting a comprehensive study of 100 NFL retirees with the goal of identifying CTE biomarkers. Other researchers are developing and refining scanning technology to see tau deposits in the brain. In July 2014, Massachusetts General Hospital scientists attending the Alzheimer's Association International Conference in Copenhagen announced a new type of brain imaging that can show tau tangles in living people for the first time. The RSA, however, barely considers future scientific advances.

Although 65 years in length, the RSA specifically prohibits the NFL and Co-Lead Class Counsel from meeting more than once every ten years to discuss possible changes to the qualifying diagnoses and protocols for making them, with actual modifications requiring approval from both sides. RSA, §6.6(a). In other words, if the NFL unilaterally does not want to accept a new method of detecting CTE, for example, it will not be required to do so. Nor is there any mechanism in the RSA to force the NFL to do so. Even then, any such scientific advances incorporated into the RSA going forward will not change the Monetary Award Grid.

The Armstrong Objectors, therefore, propose the RSA be revised to provide for a more frequent and democratic mechanism (perhaps a third-party arbitrator to break any ties) for reviewing, identifying, incorporating, and implementing qualifying diagnoses and the protocols for making them based on scientific advances over the term of the RSA.

**11.     The additional attorneys' fees and expenses are excessive.**   The Armstrong Objectors object to the $112.5 million of additional attorneys' fees and expenses payable to Co-Lead Class Counsel and other lawyers in leadership positions (RSA, Article XXI) — despite conducting no discovery against the NFL. Without discovery, Co-Lead Class Counsel was severely hamstrung in their ability to thoroughly and accurately evaluate the case and the NFL's settlement offers. Based on the discovery taken to date — *i.e.*, none — how can Counsel for the NFL and Co-Lead Class Counsel, all of whom are officers of the Court, possibly represent in good faith to the Court that the RSA is fair and reasonable? How could $112.5 million of additional attorneys' fees and expenses have been earned?

What's more, the $112.5 million of attorneys' fees and expenses are in addition to the contingent attorneys' fees and expenses payable to the lawyers by the players under their individual fee agreements; the $112.5 million of attorneys' fees and expenses are a "double dip"

and a windfall.   Many of the players who have filed Short Form Complaints are represented by attorneys who are requesting, or will request, part of the $112.5 million of attorneys' fees.   It is unfair for these class members to pay attorneys' fees twice, and any class counsel who is awarded attorneys' fees should not be allowed to also recover attorneys' fees under the individual contracts with their clients.   Further, their clients may not be paid for years under the RSA even though the NFL will pay the $112.5 million of additional fees and expenses into a fund within sixty days after the effective date of the RSA.   *Id.*, §21.2.   Not only should these additional attorneys' fees be reduced, but no double dipping should be allowed and any lawyer, including Co-Lead Class Counsel, receiving attorneys' fees should be obligated to continue to help the players secure relief under the RSA, or a committee should be established to help class members with the committee members paid for their time on a reasonable hourly basis.

The $112.5 million of additional fees and expenses also is excessive when compared on an "apples to apples" basis to the Co-Lead Class Counsel's projected value of the monetary awards under the RSA (*i.e.*, $675 million).   Assuming the entire $675 million is paid to the former players in equal annual payments over 65 years, the present value of the RSA monetary awards computed using a discount rate of 3.2 % (the August 18, 2014 30-year Treasury bond rate) is approximately $292 million.   The present value of the additional attorneys' fees and expenses (*i.e.*, $112.5 million) is 38.52% of the present value of the RSA — which is an excessive percentage in and of itself, but even more offensive since no discovery was taken and the fact that all plaintiffs' counsel will be paid under the individual contracts with their clients.

Also buried deep in the RSA is a vague provision calling for a potential five percent (5%) "set-aside" on every monetary award that Co-Lead Class Counsel may petition the Court to award

to them to "facilitate the Settlement program and related efforts of Class Counsel" (RSA, §21.3) — whatever that means.

The Armstrong Objectors, therefore, propose the RSA be further revised to reduce the $112.5 million award of additional attorneys' fees and expenses and eliminate the 5% set aside completely. All lawyers should receive their fees under their individual client contracts over time as their clients actually receive their RSA monetary awards, unless they are recovering class fees, in which case they should not be allowed to double dip. This will ensure that the lawyers will continue to work in the best interests of their clients to make sure their clients are appropriately compensated from the RSA. The up-front payment of $112.5 million of additional attorneys' fees and expenses will only incentivize counsel to "take their money and run" to the next big case, leaving their clients to fend for themselves against the NFL when the clients need their lawyers the most. A portion of the $112.5 million of additional attorneys' fees and expenses and eliminated 5% set aside could then fund additional player benefits (as set forth above).

12.     **The Education Fund should be eliminated.** The Armstrong Objectors object to the $10 million Education Fund in the RSA. *Id.*, Article XII; §2.1(hh);(ii). It is ill-defined on many levels. The scope, nature, extent, protocols, education programs, recipients, management and administration of the Education Fund will be determined at a later date. *Id.* To the extent the Education Fund will be used for "the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players" (RSA, §12.1), the Parties should not receive credit because this education is already being (or should be) provided by the NFL. To the extent any tangible benefits will be provided by the Education Fund, they will further be reduced because the "costs and expenses to administer the Education Fund will be paid out of the [$10 million]." RSA, §12.2.

17

Most important, the Armstrong Objectors object to the Education Fund because it is an improper initial *cy pres* fund[2] that diverts $10 million of settlement funds away from the players to unnamed recipients for undefined activities. Such funds should be utilized for the benefit of the players (as described above), rather than directed from the get go to unidentified third parties who have no claims in this litigation.

In a class action settlement, "[t]he *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) (citation omitted). *Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity. *Id.*

Direct distributions to settlement class members are preferred over *cy pres* distributions. *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013). The private causes of action aggregated in this proceeding—as in other class actions—were initiated to allow plaintiffs to recover compensatory damages for their injuries. *Cy pres* distributions imperfectly serve that purpose by substituting for such direct compensation an indirect benefit that is, at best, attenuated and, at worse, illusory. *Id.* (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784–85 (7th Cir. 2004)). *Cy pres* distributions also present a potential conflict of interest between class counsel and

---

[2] The term "*cy pres*" is derived from the Norman French expression *cy pres comme possible,* which means "as near as possible." *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 84 F.3d 451, 455 n.1 (D.C. Cir. 1996). The *cy pres* doctrine originated in trusts-andestates law as a rule of construction used to preserve testamentary charitable gifts that otherwise would fail. "When it becomes impossible to carry out the charitable gift as the testator intended, the doctrine allows the 'next best' use of the funds to satisfy the testator's intent 'as near as possible.'" *Id.* (quoting Natalie A. DeJarlais, Note, *The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions,* 38 HASTINGS L.J. 729, 730 (1987)).

their clients because including a *cy pres* distribution may increase a settlement fund, and with it, attorneys' fees, without increasing the direct benefit to the class. *In re Baby Products Antitrust Litig.*, 708 F.3d at 173. Where a court fears counsel is conflicted, it should subject the settlement to increased scrutiny. *Id.*

That said, *cy pres* is an accepted method of addressing leftover, or residual, funds remaining in a settlement account once all known settlement class members have been made whole. *Cy pres* may be used in class action settlements "where the proof of individual claims would be burdensome or distribution of damages costly." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012). Under principles established by the American Law Institute ("ALI"), any leftover funds should first be distributed to known class members; only when it is not economically viable to do so should a court engage in a *cy pres* program:

> A court may approve a settlement that proposes a *cy pres* remedy even if such a remedy could not be ordered in a contested case. The court must apply the following criteria in determining whether a *cy pres* award is appropriate:
>
> (a)    If individual class members can be identified through a reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.
>
> (b)    If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.
>
> (c)    If the court finds that individual distributions are not viable based on the criteria set forth in subsections (a) and (b), the settlement may utilize a *cy pres* approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interests reasonably approximate those being pursued by the class can be identified after

19

thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 (Am. Law. Inst. 2010); *see also In re Checking Account Overdraft Litig.*, Case No. 1:09-MD-02036-JLK, at 2–3 (S.D. Fla. Apr. 15, 2013) (Exhibit A). The ALI further clarifies in its comments to § 3.07:

> [A]ssuming that further distributions to the previously identified class members would be economically viable, that approach is preferable to *cy pres* distributions. This Section rejects the position urged by a few commentators that a *cy pres* remedy is preferable to further distributions to class members. . . . This Section takes the view that in most circumstances, distributions to class members better approximate the goals of the substantive laws than distributions to third parties that were not directly injured by the defendant's conduct.

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 cmt.b.

A *cy pres* distribution, therefore, should take place only when a court cannot distribute settlement funds to known class members. *See In re Checking Account Overdraft Litig.*, at 3; *Nachshin*, 663 F.3d at 1038 ("In the context of class action settlements, a court may employ the *cy pres* doctrine to 'put the *unclaimed fund* to its next best compensation use, *e.g.*, for the aggregate, indirect, prospective benefit of the class.'") (emphasis added) (citing *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir. 2007) (quoting 2 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 10:17 (4th ed. 2002))).

Similar to the proposed Education Fund *cy pres* in the Revised Settlement, the settlement in *In re Checking Account Overdraft Litigation* skipped over the "distribution to known class members" provided for by the ALI procedures and moved directly to *cy pres* through an "initial *cy pres* program." *In re Checking Account Overdraft Litig.*, at 3. There, the "initial *cy pres* program" set aside 12.5% of the net settlement fund as the estimated amount that would have been paid to the settlement class members who the lawyers estimated were "unidentifiable due to a dearth of adequate banking records." *Id.* at 3–4. While the settlement agreement allowed for the

20

remainder of the fund to be paid to known settlement class members for whom the parties had adequate data, the 12.5% set aside would go directly to the *cy pres* fund. *Id.* at 4.

The court, however, went on to hold that such a settlement provision did not comply with the ALI principles outlined above, requiring unidentifiable class members' shares of settlement funds to be paid to known settlement class members before any *cy pres* program is enacted. *Id.* In fact, the court changed its mind regarding the *cy pres*, noting that an objector correctly argued at the final fairness hearing that "*cy pres* is intended to be a residual program, what you do with the remainder," and that this initial pre-distribution of funds was not *cy pres* at all, because the known class members have not yet been made whole. *Id* (citations omitted).

The court ultimately required the 12.5% set aside to be given to known settlement class members ahead of non-party *cy pres* charities, noting the 12.5% set aside "was, and is, not a proper *cy pres* program," but instead "a diversion of funds that does not comport with the proper procedure for utilizing a *cy pres* program in the distribution of class action settlement funds as outlined by the ALI." *Id.* at 4–5; *see also Dennis*, 697 F.3d at 865–67 (rejection of initial *cy pres* fund comprising $5.5 million of Kellogg food items to be donated to charities feeding the indigent — albeit for reasons other than ALI class settlement fund distribution principles).

Similarly, here, the proposed Education Fund is not a proper *cy pres* program, but instead, a diversion of funds away from the players—the Settlement Class Members—that does not comport with the proper procedure for a *cy pres* program under the ALI principles and governing case law.  It is indisputable the RSA will not make the players whole.  That being the case, the Armstrong Objectors propose the RSA be revised to eliminate the Education Fund so that the $10 million can be utilized for the direct benefit of the players (as described above).

13.     **The release is too broad**.  The Armstrong Objectors object to the release in the RSA.  The Court most likely is aware of *Dent, et al, v. National Football League*; Cause No. C-14-2324 KAW; in the United States District Court for the Northern District of California, a putative class action, wherein plaintiffs sued the NFL regarding the promotion and use of various medications that were either improperly used or illegally used and dispensed.   One of the medications, Toradol, as stated above, can actually increase the likelihood of a concussion according to some medical reports.  The release in the RSA arguably releases the class members' claims in *Dent*.  The Armstrong Objectors, therefore, propose the release in the RSA be revised and narrowed to release only the claims being compensated in the settlement of this litigation.

<center>***</center>

**WHEREFORE,** the Armstrong Objectors respectfully request that the Court (i) enter an order (a) denying final approval of the settlement embodied in the Class Action Settlement Agreement as of June 25, 2014 (Doc. #6087), and (b) recommending the Parties revise the Class Action Settlement Agreement as set forth above, and (ii) grant such other and further relief to the former NFL players the Court deems just and proper.

Date:  September 3, 2014

<div style="margin-left:40%;">
Respectfully submitted,

/s/  Mitchell A. Toups
Mitchell A. Toups
**WELLER, GREEN, TOUPS & TERRELL, LLP**
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com
</div>

<center>22</center>

Richard L. Coffman
**THE COFFMAN LAW FIRM**
505 Orleans St., Ste. 505
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Jason Webster
**THE WEBSTER LAW FIRM**
6200 Savoy, Suite 515
Houston, TX 77036
Telephone: (713) 581-3900
Facsimile: (713) 409-6464
Email: jwebster@thewebsterlawfirm.com

Mike Warner
**THE WARNER LAW FIRM**
101 Southeast 11th Suite 301
Amarillo, TX 79101
Telephone:  (806) 372-2595
Facsimile:
Email:  mike@thewarnerlawfirm.com

## CERTIFICATE OF SERVICE

I certify that a true copy of the Objection to the June 25, 2014 Revised Class Settlement by Nathaniel Newton, Jr., Ramon Armstrong, Larry Brown, Kenneth Davis, Michael McGruder, Clifton L. Odom, and George Teague was served on all counsel of record, via the Court's ECF System, on September 3, 2014.

/s/ *Mitchell A. Toups*
Mitchell A. Toups

23

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

Nathaniel Newton, Jr. (DOB: December 20, 1961)          Date  8-25-14
936 Oakcrest Drive
Wylie, TX 75098
(972) 741-9566


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

Ray Armstrong (DOB: October 6, 1937)          Date
1103 Oak Creek Drive
Ennis, TX 75119
(214) 538-6420


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

Larry Brown (DOB: November 30, 1969)          Date
5603 Sycamore Drive
Colleyville, TX 76034
(817) 723-5601


24

ARMSTRONG OBJECTORS' OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____          _____
Michael McGruder (DOB: May 6, 1964)                Date
835 East Lamar Blvd., No. 236
Arlington, TX 76011
(214) 208-0240


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_Ramon Armstrong_                                  _8-26-14_____
Ramon Armstrong (DOB: October 6, 1937)             Date
1103 Oak Creek Drive
Ennis, TX 75119
(214) 538-6420


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____          _____
Larry Brown (DOB: November 30, 1969)               Date
5603 Sycamore Drive
Colleyville, TX 76034
(817) 723-5601


24

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____        _____
Nathaniel Newton, Jr. (DOB: December 20, 1961)        Date
936 Oakcrest Drive
Wylie, TX 75098
(972) 741-9566


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____        _____
Ray Armstrong (DOB: October 6, 1937)        Date
1103 Oak Creek Drive
Ennis, TX 75119
(214) 538-6420


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____        _Aug 26, 2014_____
Larry Brown (DOB: November 30, 1969)        Date
5603 Sycamore Drive
Colleyville, TX 76034
(817) 723-5601

24

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____          8 - 2 6 - 14
Kenneth Davis (DOB: April 16, 1962)       Date
1224 Brooklawn Drive              15
Arlington, TX 76018
(817) 680-8307


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____          _____
Michael McGruder (DOB: May 6, 1964)       Date
835 East Lamar Blvd., No. 236
Arlington, TX 76011
(214) 208-0240


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____          _____
Clifton L. Odom (DOB: April 15, 1958)     Date
6708 Martha's Vineyard Drive
Arlington, TX 76034
(817) 602-6617


25

**ARMSTRONG OBJECTORS' OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT**

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf,

_____     _____

Kenneth Davis (DOB: April 16, 1962)          Date
1224 Brooklawn Drive
Arlington, TX 76018
(817) 680-8307


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____     _____Aug  25  2014_____

Michael McGruder (DOB: May 6, 1964)          Date
835 East Lamar Blvd., No. 236
Arlington, TX 76011
(214) 208-0240


Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____     _____

Clifton L. Odom (DOB: April 15, 1958)          Date
6708 Martha's Vineyard Drive
Arlington, TX 76034
(817) 602-6617


25

ARMSTRONG OBJECTORS' OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____                    _____
Kenneth Davis (DOB: April 16, 1962)                 Date
1224 Brooklawn Drive
Arlington, TX 76018
(817) 680-8307

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____                    _____
Michael McGruder (DOB: May 6, 1964)                 Date
835 East Lamar Blvd., No. 236
Arlington, TX 76011
(214) 208-0240

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____                    _____
Clifton L. Odom (DOB: April 15, 1958)               Date
6708 Martha's Vineyard Drive    AugusT 15, 1958     8-25-2014
Arlington, TX 76034
(817) 602-6617

25

Under 28 U.S.C. § 1746, I declare that I am a Settlement Class Member, I agree with the above and foregoing Objection to the June 25, 2014 Revised Class Settlement in this matter, and I authorize my above-listed Counsel to file the Objection on my behalf.

_____          ___8/26/2014_____
George Teague (DOB: February 18, 1971)     Date
1000 Delaware Drive
Carrollton, TX 75010
(469) 742-3630

ARMSTRONG OBJECTORS' OBJECTION TO THE JUNE 25, 2014 CLASS ACTION SETTLEMENT AGREEMENT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION LITIGATION | § § § § § § | No. 12-md-2323 (AB) MDL No. 2323 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | § § | |

## DECLARATION OF MITCHELL A. TOUPS

I, Mitchell A. Toups, Esq., hereby declare as follows:

1.       I am a partner with the law firm of Mitchell A. Toups, Esq., Weller, Green, Toups & Terrell LLP ("WGTT"), P.O. Box 350, Beaumont, Texas 77704, duly admitted to practice before the courts of the State of Texas.

2.       WGTT, along with The Coffman Law Firm (CLF), The Webster Law Firm (WLF) and The Warner Law Firm ("TWLF"), have been retained to represent Ramon Armstrong, Nathaniel Newton, Jr.; Larry Brown; Kenneth Davis; Michael McGruder; Clifton L. Odom; and George Teague, with regard to their claims in the above-referenced litigation.

3.       All of these Plaintiffs have executed engagement agreements authorizing the WGTT, CLF, WLF and TWLF to take all necessary action to investigate and to prosecute any and all claims related to the NFL Concussion Litigation, including objections to this settlement.

4.       I declare under the penalty of perjury that to the best of my knowledge, the foregoing is true and accurate.

DATED this 3rd day of September, 2014.

_____
Mitchell A. Toups, Esq.