Submitted: October 13, 2014

RE: National Football League Players' Concussion Injury Litigation, No. 2:12-md-02323

Submitted by:    Eleanor M. Perfetto, Ph.D., M.S.
921 Creek Drive
Annapolis, MD 21403
410-963-4566
DOB 9/12/1958

I am submitting this request to speak at the fairness hearing on November 19, 2014.



Submitted: October 13, 2014

RE: National Football League Players' Concussion Injury Litigation, No. 2:12-md-02323

Submitted by:	Eleanor M. Perfetto, Ph.D., M.S.
921 Creek Drive
Annapolis, MD 21403
410-963-4566
DOB 9/12/1958

*[signature]* Eleanor M. Perfetto   10/13/2014

Representative claimant as the widow of Ralph R. Wenzel. A short-form complaint was filed on my behalf in this litigation on July 11, 2012.

Ralph R. Wenzel and I married on January 2, 1987, in North Kingstown, RI. Ralph R. Wenzel died from dementia on June 18, 2012. His brain was analyzed by the team at the Sports Legacy Institute and Boston University and it was confirmed that he died from dementia due to Chronic Traumatic Encephalopathy (CTE) and Alzheimer's Disease.

Detailed statement of objection:

I am submitting this document as a formal objection to the settlement offered by the National Football League (NFL) in the National Football League Players' Concussion Injury Litigation, No. 2:12-md-02323. I have a number of objections to the offer, however here, I specifically focus on the issue I believe most relevant to the wives of older players who are now infirmed or deceased due to CTE.

My objection is to the way in which the offer uses the player's age at diagnosis to calculate the Monetary Award for that player according to the proposed Monetary Award Grid (Exhibit 3, page 1). This approach actually rewards the NFL for the very actions it is being sued for. The suit clearly states, "Plaintiffs seek to hold the NFL Parties responsible for their alleged injuries under various theories of liability, including that the NFL Parties allegedly *breached a duty to NFL Football players to warn and protect them* from the long-term health problems associated with concussions and that the NFL Parties allegedly *concealed and misrepresented* the connection between concussions and long-term chronic brain injury."

No one outside the League knows who at the NFL knew what information about head injury and subsequent neurological damage or in what year it was known and with the settlement agreement, the public may never know these facts. The suit asserts that starting in the early 1990s, the NFL ran an at least twenty-year campaign of subterfuge, denying the effects of traumatic brain injury. In 1994, the NFL instituted a Mild Traumatic Brain Injury Committee, which dedicated its time, money, and efforts to producing false research that concluded head injuries occurring while playing football were not dangerous. The plaintiffs in this case allege that the NFL and its Committees created erroneous information and improperly refuted accurate evidence about the life-long ramifications of head injury.

1

Due to these actions, there was likely a **ten to twenty year delay** in informing players, former players, and the public about the dangers. This tactic likely saved the NFL many millions and perhaps over a billion dollars over the last several decades in unpaid disability and litigation payouts. Ironically, in the preliminarily approved agreement, the NFL will again save millions of dollars due directly to those early deceptive tactics and inside knowledge that perhaps goes back to the 1980s or even 1970s.

According to the Monetary Award Grid, which reflects how much each former player with a diagnosed condition such as dementia or amyotrophic lateral sclerosis (ALS) will receive in compensation, a key factor is the former player's **age at diagnosis**. The younger a player is at diagnosis, the more the player or his family receives. A 45-year old diagnosed with dementia gets more than a 55-year old, who gets more than a 65-year old. On the surface, this might makes actuarial sense, as the younger man will lose more years of work life productivity and quality of life with his family.

However, that logic only applies to those being diagnosed now and in the future, those who are now more informed and know what to look for in terms of the symptoms and illnesses they may be facing. When the same logic is applied to former players who were ill and diagnosed in the past, the logic falls apart -- thanks to the deceptive efforts of the NFL and its Committee, which **delayed information dissemination to players and, as a direct consequence, delayed diagnosis by years**. Instead of being held responsible for the deceit, the NFL has been rewarded. The negotiated grid is wrong for the older players, but right for the NFL.

Thus, I object to two points with regard to the Monetary Award Grid. The first is that it accounts for age in an actuarial sense, which is not applicable given the circumstances of this suit resulting in unjustly lowering payments for older players. Second, there is a significant lack of transparency in how the age criterion will be operationalized. The grid and the supporting documentation are not clear in describing how an award is to be arrived at using age at diagnosis (e.g., Amounts are referred to as "average base Monetary Awards." What are they the average of? Many men experience multiple diagnoses over time. Which age at which diagnosis applies?) The grid seems to be based actuarially on current and future players who will be monitored into the future and whose diagnoses should be made early. This method does not work for past and deceased players and is counter to the core complaint of the suit.

I will provide my own and one other wife's experiences in illustration. My husband, Ralph Wenzel, was age 56 when formally diagnosed in 1999 with early dementia. In fact, he had suffered symptoms for years before; we just didn't know at the time what we were dealing with. During our first visit with his neurologist, Ralph was asked, "When did you first notice your memory problems?" He told the doctor how, in 1994, while coaching high-school football, he began to teach his defensive line a new blocking technique. His players said, "Coach, you taught us that yesterday." His reply was that if he taught it to them yesterday, they needed to explain to him exactly what it was he said the day before. The boys proceeded to do just that, describing to him precisely what it was he was about to teach them. He had, in fact, taught it to them the day before, but had no recollection of doing so.

2

That event took place in 1994, five years before we were having the conversation in the doctor's office. Notably, 1994 was the same year the NFL Mild Traumatic Brain Injury Committee was formed. If the NFL had informed players and families, instead of forming a bogus committee dedicated to creating false information, my husband might have been diagnosed and gotten appropriate care at least five years sooner. The first recorded diagnosis in his medical record was at age 56, but his problems started at least 5 years before. An earlier diagnosis was prevented thanks to the NFL's actions – exactly the actions the plaintiffs are suing for.

My husband Ralph's example demonstrates the irony of age criterion in this suit, but another wife's journey demonstrates the injustice. A woman, now in her 80s, cared for her husband through well over 30 years of illness and disability. His problems started in his early 50's and he died in his early 80s. During the first 10 years (1980 to 1989) his problems were primarily behavioral and mood changes. He lost jobs due to poor impulse control and inappropriate behavior; lost money due to impulsive purchases and gambling; lost friendships due to aggressive behavior and withdrawal; and lost the ability to do chores around the house or pay bills due to poor organizational, planning, and multi-tasking skills. These burdens all fell on his wife.

More cognitive difficulties began in his 60's (during the 1990s), including memory problems, language difficulties, poor judgment, etc. His doctors didn't know what the problem was. Early on, they stated it was normal aging or just his personality. Over years of examinations that began in his mid 50s, he was misdiagnosed with bipolar disorder and intermittent explosive disorder. Finally, after almost 20 years of illness, he received a diagnosis of mild cognitive impairment and dementia at about age 70.

His wife persevered through over 30 painful and stressful years, which included extreme emotional and financial burden. She endured her husband's early loss of employment, paying out-of-pocket the high costs for nine expensive years of nursing home care, the struggle to find care facilities to take her husband because of his size and aggressive behavior, and even the lack of money to pay for her own medications for the stress-related illnesses she experienced. Her husband died just a few years ago, in his early 80s, and was diagnosed with very severe CTE on autopsy.

In interpreting the grid, the first question is which "age at diagnosis" counts, since that is very unclear. Over time, this gentleman had early symptoms of CTE and Levels 1, 1.5, and 2 dementia. He was misdiagnosed for 20 years prior to a proper diagnosis. According the grid the payments could be:

| | |
|---|---|
| Diagnosed post-mortem with CTE at age 80 | $ 50,000 |
| Formally diagnosed with dementia at age 70 (Level 2) | $210,000 |
| Likely had level 1 and 1.5 at age 60 which was not properly diagnosed | $290,000 |
| Symptoms of CTE starting at age 50 CTE is not on the grid. | $ 0 |
| If symptoms of CTE such as depression, impulsive behavior, aggression are counted in levels 1.5 and 2 | $1,200,000 |

3

It is unclear from the document how much this widow will receive. If, due to the NFL's years of deception and withholding of information, she receives only $50,000 for the over 30 years of heartbreaking care she provided, and the NFL keeps millions of dollars in its coffers, it is a tragic injustice.

My husband Ralph had a post-mortem diagnosis of both CTE and Alzheimer's disease, played for 7 years in the NFL, and was age 69 at the date of the post-mortem diagnosis. Prior to that, over a 15-year period of time, my husband suffered through early CTE (which is not on the grid) and Levels 1, 1.5, and 2 dementia. It is unclear what the award will be, yet I and other wives are required to decide if we will accept, opt out, or object.

I don't believe demographic information has been publicly released on the 150 players who receive (or have prior to their death received) benefits through the NFL 88 Plan, which assists former players with dementia-related, long-term care costs. However, if one estimates that just half of the 150 disabled players were *formally* diagnosed at an older age, over age 54, but like my husband and many other former players, had been undiagnosed disease for years prior, then the NFL's deceit has the potential to save it many millions of dollars and deny a reasonable award to many who are in dire need.

In conclusion, the Monetary Award Grid is flawed and should be replaced with an approach that considers more fairly that older players' diagnoses were often significantly delayed and which accounts for their pathway through the disease of CTE. This is especially true for the many players and families who suffered the burden of CTE for 10 to 20 or more years.

US DISTRICT COURT
601 MARKET ST
LBBY
PHILADELPHIA PA 19106

P: GREY     S: ASC2     I: 305
0301-3897
1Z165A69011447   9300
SMZ1LMR   PAPHI197   OCT 14 07:19:04 2014   1030
US   1916   HIP 14.3.1   OKILEB10

This envelope is for use with the following services:

**UPS Next Day Air®**
**UPS Worldwide Express℠**
**UPS 2nd Day Air®**

Apply shipping documents on this side.

Do not use this envelope for:

**UPS Ground**
**UPS Standard**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

ELEANOR PERFETTO
(410) 963-4566
THE UPS STORE #4439
1783 FOREST DR
ANNAPOLIS   MD 21401-4229

SHIP  US DISTRICT COURT
TO:   CLERK OF NFL CONCUSSION SETTLEMENT
      LBBY
      601 MARKET ST

      PHILADELPHIA PA 19106-1737

0.2 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 13 OCT 2014

UPS NEXT DAY AIR
TRACKING #: 1Z 165 A69 01 1447 9300

PA 191 9-40

BILLING: P/P

ISH 13.00N E2B44 54.5V 7/2014