**OBJECTION TO PRELIMINARY SETTLEMENT**
**Case Reference: In re: National Football League Players' Concussion Injury Litigation, No. 2:12-md-02323**

Eugene Moore
322 W. 52nd Street, #165
New York, NY 10101
917-597-6463
5/12/1947

## NFL History

1969 – Drafted and signed by the San Francisco 49ers: 4th round, running back (Occidental College): training camp; played in
6 preseason games; played in 5 regular season games (7, by my count)

1970 – San Francisco 49ers: training camp; played in 3 preseason games; waived

1970 – Baltimore Colts: training camp; played 1 preseason game; waived

1970 – Chicago Bears: signed as free agent; taxi squad; waived (1971 off season)

1971 – Baltimore Colts: signed as free agent; training camp; played in 1 preseason game; waived

1971 – New Orleans Saints: signed as free agent; played in 2 preseason games; waived

I am a well educated and thoughtful individual whose profession involves researching and distilling various issues and subjects in order to create "digestible" education and communications tools. I only characterize my background in this manner because I have carefully read the NFL Concussion Settlement Notice documents several times and still find them <u>extremely convoluted and confusing</u>. Even after reviewing the Notice documents with the substantial help of a savvy and experienced legal advisor, I find the proposed structure illogical and unrealistic.

Accordingly, I formally "Object" to the National Football League Players' Concussion Settlement proposal for the following reasons:

## 1. EXCLUSION OF CLASS: TRAINING CAMP & PRE-SEASON NFL PLAYERS

I am part of a huge group of players whose total NFL employment has not even been taken into consideration: training camps and preseason games. Training camp players are not even included in the Settlement Class definitions, and, even though preseason players are included, they have been **excluded** from the "benefits" of the Settlement. In my own particular case, although credited with 1.5 years, I also participated in and was compensated for five training camps and thirteen preseason games over a 3 year period, for 4 different teams.
(Multiple year-multiple team NFL employment in training camps; pre-season games; regular season games; and taxi squad squad activities.)

As currently proposed, regular season games and the number of years /games played serve as the only determining NFL employment factors on the compensation "Grid". This is a monumental, egregious omission, given what is currently known about concussive and sub-concussive events as relates to ALS, Parkinson's, Alzheimer's diseases and Dementia, as well as the onset and development of tau proteins – the scientifically proven cause of Chronic Traumatic Encephalopathy (CTE).

Why? Because a significant number of a NFL football player's collisions occur during training camp and preseason. This reality is especially relevant for players "employed" by the NFL prior to the last 2 years: "live" practices, drills and scrimmages having since been reduced in acknowledgment by the NFL of the physical forces that contribute to the above mentioned conditions and tau protein creation.

That said, most players in the training camp or preseason mode, past or present, ferociously battle to hang on to their jobs, crack the starting lineup or simply make the roster. This is the case whether the players are veteran starters, backups, rookies, free agents or coming off of injured reserve status. "It's literally crunch time!" That cauldron is a free-for-all of perpetual collisions – the competitive intensity often marked by on-the-field training camp fights. Guys are trying to leave indelible impressions on position coaches, offensive and defensive coordinators and head coaches, who will determine the short/long term fate of their employment. As a consequence, the hitting in scrimmages and live practices was (is) just as intense, if not more so, than in the regular season games. In fact, the hardest concussive collision I ever experienced was in a scrimmage during my rookie season.

2

Did I see stars? Yes! Was I woozy? Yes! Was taking myself out of play a consideration? No! That course of action wasn't even on the radar screen or in our vocabulary.

Then, there is the matter of the drills. As a running back, we had one-on-one or one-on-two blocking and "breaking tackle" drills, with colorful names such as "The Nutcracker." If you were unwilling to take a guy on at full speed, right in the numbers and /or using your helmeted head as a battering ram you were considered "soft" and would soon be shown the door. (Speaking of the 1960's /1970's helmets, they now seem more like toy memorabilia in construction, compared to today's modern helmets. And, the "rock-hard" substrate of early cost-saving synthetic turfs were likely another contributing concussion factor.)

To summarize: throughout the decades of our "gladiator" training camps and preseason games, thousands of NFL regular season player prospects, myself included, were "employed" by our respective teams, under the governing body of the NFL. We received training camp per-diems, per-game preseason payments, and were insured by whatever policies were in place at the time, which I don't recall ever seeing.

How is it that such a significant class could have been released from the Settlement? By what calculus and objective rationale? It strikes me as arbitrary and discriminatory partitioning of the potential qualifying player population.

## 2. NARROW CTE INJURY INCLUSION: DEATH & IRRATIONAL CUTOFF DATES

The CTE cutoff date makes no sense at all. It currently applies, into perpetuity, to a very small percentage of the entire class – those who have a qualifying neuro-cognitive diagnosis. Yet, the controversy surrounding the players who have chosen to object publicly or opt out leads me to the conclusion (and feeling) that it has been crafted without meaningful concern for the lives of the majority of the class. Retired players who do not have severe neuro-cognitive conditions, but who suffer, or will suffer, from serious and devastating CTE behavioral and mood impairments are not actually entitled to receive a "qualifying diagnoses." In fact, the Baseline Assessment Test (BAT) isn't even designed to screen for such disorders.

3

Uncontrollable, unpredictable fits of rage, anger and aggression; increasing memory loss; debilitating depression, despair and suicide, and the toll these conditions take on their spouses, partners and children somehow don't count – figuratively, literally and financially. Embraced as family by the NFL (and team ownership) when they were active, these retired players and their families find themselves "benched on the sidelines" without meaningful compensation from the business superpower they helped build. This can rightly be termed, "NFL not caring about lives." The annual celebratory in-season reunions cannot paper over this sad conclusion. Former players come to these events to bond and reminisce with their brothers, and to celebrate the game they loved. And they bring their families to share in that rare experience.

Extrapolating from numerous self-reports in a variety of media and statements from several experts, the retired player "sub-class" comprising CTE mood and behavioral disorders is an enormously significant number and will continue to grow. If, as reported, the NFL is now considering expenditures to help current players deal with the off-field psychological stresses of playing an ultra-competitive and violent game, how much less incumbent is it on the NFL to include and compensate retired NFL players with mood and behavioral disorders that are a result of having played the very same game.

## 3. UNREALISTIC, INEQUITABLE COMPENSATION GRID

As for the "Grid" – the "holy grail" of the compensation calculus – should one qualify, it appears to be constructed to provide the NFL with minimal exposure, even with an uncapped payout. I have read everything I could get my hands on regarding concussions and sub-concussions and many experts in the field assert that number of years / games played and/or the age of the retired player are not and should not function as the determinant compensation factors and payout "discounts."

Using the Grid calculations, based on age 70 (I am presently 67), the "discounts" applied would leave me with compensation that wouldn't even begin to cover my medical expenses, no matter the condition. Given the average career lifespan of NFL players, there are no doubt thousands of other retired players in the same position. The "awards" actually feel more like punishment, and may, in fact, be discriminatory. The older the retired player, the greater the financial burden placed upon the spouses, children and even parents of the retired players.

Because of Judge Brody's discomfort with the initial payout figure of $765 million for the qualifying classes, the NFL offered to "uncap" the number, which was subsequently included in the revised Settlement.

This revision, as well as the NFL'S own projected growth of the business, actually begs the following question. Why shouldn't the National Football League demonstrate that it <u>really cares</u> about and respects its former players and their families. It could immediately compensate the retired players who are suffering with severe neuro-cognitive diseases and open up the Settlement in order to achieve an enduring, just and equitable agreement. Scrap the Grid; include the excluded classes noted above and those cited elsewhere; review the brain science every 2 years instead of every 10 years; and just do the right thing by the courageous warriors (and their families) who were essential to building the brand, equity and entertainment presence the NFL / owners currently enjoy.

Otherwise, the offer to "uncap" the payout is really nothing more than a red herring – designed for public consumption and to confuse as many retired players as possible. It doesn't affect the NFL'S "exposure" one iota, as long as the compensation discount factors and class exclusions remain!

It is worth repeating what many other retired players have said: We all signed up knowing that sprains, dislocations, breaks, tears and other physical injuries were part of the game. What we didn't know, but what (at some point) the NFL knew; failed to disclose; and officially denied for years was that brain injuries were also a part of the game: that concussive and sub-concussive collisions can and do cause neuro-cognitive diseases and CTE.

Even though my career wasn't very long, I loved playing football.
I was proud to have been one of the select few to have been able to wear the NFL Shield and play on Sundays. I am not anti-Settlement. I do, however, <u>object</u> in the strongest terms to the structure and terms of the preliminary Settlement and the position of the League.

To the NFL, and on behalf of thousands of "brothers" and families,
I simply say: you can do the right thing <u>and</u> protect and enhance your brand and assets, and the game we loved.

Make us proud!

Very truly yours,

*[signature: Eugene Moore]*

Eugene Moore
October 13, 2014

UNITED STATES POSTAL SERVICE
Visit us at usps.com

Label 107R, January 2006

7014 2120 0003 0538 6174

To:
Clerk of the District Court/NFL Concussion
Settlement
U.S. District Court for the Eastern District
of Pennsylvania
United States Courthouse
601 Market Street
Philadelphia, PA 19106-1797



U.S. POSTAGE
PAID
NEW YORK, NY
10001
OCT 14, 14
AMOUNT
$11.75
00108562-71

1006
19106