## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden,<br>*on behalf of themselves and*<br>*others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and<br>NFL Properties, LLC,<br>successor-in-interest to<br>NFL Properties, Inc.,<br><br>Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

### SUPPLEMENT TO OCTOBER 6, 2014, OBJECTION OF SEAN MOREY, ALAN FANECA, BEN HAMILTON, ROBERT ROYAL, RODERICK CARTWRIGHT, JEFF ROHRER, AND SEAN CONSIDINE

Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine (collectively, "Objectors") submit this motion in further support of their Objection filed on October 6, 2014, Dkt. No. 6201 ("Objection"). Objectors supplement their argument, set forth in Part III.B of the Objection, that the National Football League ("NFL") is able to withstand a far greater judgment than that provided by the Settlement.

A court assessing the fairness, reasonableness, and adequacy of a settlement must consider, among other factors, "the ability of the defendants to withstand a greater judgment," with "[t]he proponents of the settlement bear[ing] the burden of proving" that this factor weighs in favor of approval. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55

F.3d 768, 785 (3d Cir. 1995).  The settling parties have failed to meet this burden.  The Settlement – to the extent the NFL and not its insurers pays for it – is a drop in the bucket considering the financial situation of Defendants.

## I.        The Settling Parties' Valuation of the Cost of the Settlement

When this Court denied the settling parties' initial proposed settlement, it "express[ed] concern as to the adequacy of the proposed $675 million Monetary Award Fund in light of the 65-year lifespan of the Monetary Award Fund, the settlement class size of more than 20,000 members, and the potential magnitude of the awards."  Dkt. No. 6083 at 3; *see also* Dkt. No. 5657 at 10-11 ("Even if only 10 percent of Retired NFL Football Players eventually receive a Qualifying Diagnosis, it is difficult to see how the Monetary Award Fund would have the funds available over its lifespan to pay all claimants at these significant award levels.").  The settling parties did not respond by increasing the value of the Settlement.  Instead, the settling parties in their own words "became so confident in the prior actuarial assumptions and projections" that they agreed to an uncapped settlement because they did not think it would affect the compensation the NFL would have to actually pay.  Dkt. No. 6073-5 at 1.  In other words, the settling parties are confident Defendants will never have to pay anything more than an amount that this Court questioned as inadequate.

Although the settling parties proclaim the purportedly "clear benefits of an uncapped class action," the settling parties themselves "remain undeterred in their belief that the $760 million deal originally struck would have been sufficient."  Dkt. No. 6073-5 at 2, 12.  Class Counsel's actuary estimates only about 17% of class members will receive any monetary compensation at all.  Dkt. No. 6167 at 3-4.  The NFL's actuarial report shows that out of the sample of 1,592 retired players surveyed as part of the actuarial study, only 175 (11%) would receive a Qualifying Diagnosis.  See Dkt. No. 6168 at 19.  The settling parties, moreover, have

established a complex procedural labyrinth that players – many of whom currently are suffering from cognitive injuries – must navigate to qualify for relief.  *See* Dkt. No. 6201 at 73-78.

Though the settling parties have made numerous representations to both the players and the press about the tremendous value of the current Settlement and its all-but guaranteed payment to players, *see* Dkt. No. 6201 at 48-52, the NFL has tellingly remained tight-lipped about how much it – as opposed to its insurers – will be paying out to the players.[1]  In short, absent class members do not know how much, if anything, of the Settlement will come out of the NFL's own pocket.

## II.    The NFL Can Afford To Pay More

The NFL unquestionably can afford to pay more for the harm it has caused.  The NFL is a veritable money-making machine with extraordinary individual sources of revenue that, alone, could fund the Settlement in very little time.  The NFL's 2013 revenue exceeded $10 billion, and it projects annual revenue of $25 billion by 2027.[2]  Moreover, it enjoys tremendous tax benefits.  Unlike the National Basketball Assocation and Major League Baseball, the NFL enjoys a special

---

[1] This question is currently being litigated in courts across the country.  *See Discovery Prop. & Cas. et al. v. NFL*, Index No. 652933-2012 (N.Y. Sup. Ct. filed Aug. 21, 2012) (insurers sued the NFL for forcing them to pay to defend it for failing to protect players from brain injury); *NFL v. Fireman's Fund Ins. Co.*, Index No. 490342 (Sup. Ct. Los Angeles Cnty. filed Aug. 15, 2012) (suit brought by the NFL based on its insurers' refusal to defend or indemnify for damages arising from a judgment or settlement in this case); *Alterra Am. Ins. Co. v. NFL*, Index No. 652813-2012 (N.Y. Sup. Ct. filed Aug. 13, 2012).  As one reporter aptly noted, "[t]he National Football League's financial settlement of former players' concussion-related litigation likely will be paid with a combination of insurer funds and higher prices for game tickets and media rights."  Sheena Harrison, *NFL Concussion Settlement Funds Will Come from Insurers and Higher Ticket Prices*, BusinessInsurance.com (Aug. 17, 2004), http://www.businessinsurance.com/article/2014 0817/NEWS06/140819894.

[2] Brent Schrotenboer, *NFL Takes Aim at $25 Billion, but at What Price?*, USA Today (Feb. 5, 2014),    http://www.usatoday.com/story/sports/nfl/super/2014/01/30/super-bowl-nfl-revenue-denver-broncos-seattle-seahawks/5061197.

tax exemption as a supposedly nonprofit "trade association" that shields it from millions of dollars of federal tax liability.[3]

The ability of the NFL to pay more becomes all the more clear when specific sources of revenue are considered.  Some examples:

**Broadcasting Rights Deals**

***Broadcast TV.***  The NFL has agreements with NBC, Fox, and CBS that will reach nearly $28 billion in fees over nine years.[4]  The broadcast television contracts alone could cover the cost of the NFL's estimated value of the Settlement in under three months.

CBS alone has agreed to pay a reported $275 million in 2014 for rights to air Thursday night NFL games.[5]  The Thursday night television contract alone could cover the cost of the NFL's estimated value of the Settlement in under three years.

***Monday Night Football***.  In 2011, the NFL renewed its "Monday Night Football" contract – representing the highest-rated show on cable television – with ESPN until 2021.[6] Under that agreement, the NFL will receive $1.9 billion annually, for a total of $15.2 billion over the eight-year life of the contract.[7]  The Monday Night Football contract alone could cover the cost of the NFL's estimated value of the Settlement in only five months.

---

[3] Drew Griffin and Sean Kennedy, *Is the NFL Skirting the Tax Man?*, CNN U.S. (Sept. 23, 2014), http://www.cnn.com/2014/09/22/us/nfl-nonprofit-taxes.

[4] Joe Flint, *NFL Signs TV Rights Deals with Fox, NBC and CBS*, Los Angeles Times (Dec. 15, 2011), http://articles.latimes.com/2011/dec/15/business/la-fi-ct-nfl-deals-20111215.

[5] Daniel Kaplan, *TV Money Up 20 Percent for NFL Clubs*, Sports Business ournal (July 21, 2014), http://www.sportsbusinessdaily.com/Journal/Issues/2014/07/21/Finance/NFL-revenue. aspx; John Ourand, *How CBS Won Thursday Night*, Sports Business Journal (Feb. 10, 2014), http://www.sportsbusinessdaily.com/Journal/Issues/2014/02/10/Media/NFL-CBS.aspx.

[6] Richard Sandomir, *ESPN Extends Deal with N.F.L. for $15 Billion*, The N. Y. Times (Sept. 8, 2011), http://www.nytimes.com/2011/09/09/sports/football/espn-extends-deal-with-nfl-for-15-bil lion.html.

[7] *Id*.;  Kaplan, *supra* n.5

***DirecTV.*** The NFL has provided DirecTV with "the exclusive right to air out-of-market games."[8] That deal is estimated to bring the NFL nearly $1.5 billion per year over eight years.[9] The DirecTV contract alone could cover the cost of the NFL's value of the Settlement in six months.

When these long-term television agreements are all combined, it is estimated the NFL will receive $6.45 billion annually – almost ten times the amount the NFL asserts is sufficient to cover the debilitating diseases of retired players over the next 65 years.[10]

### Ticket Sales

The NFL's 32 teams average approximately $50 million annually in ticket sales, or $1.6 billion total.[11] Ticket sales alone could fund the NFL's perceived value of the Settlement twice-over in under a year.

---

[8] Darren Rovell, *NFL, DirecTV Extend Deal for 8 Years*, ESPN.com (Oct. 1, 2014), http://espn.go.com/nfl/story/_/id/11624442/nfl-extends-sunday-ticket-deal-directv.

[9] *Id.*

[10] *Id.*; *see also* Kaplan, *supra* n.5 ("The NFL in 2011 signed new deals with NBC, Fox and CBS, taking the deals that ended in 2013 through 2022," with "[t]he average price paid annually from the three deals r[ising] from $1.9 billion to $3 billion collectively.").

[11] Darren Rovell, *Package Renewals Hit 90.6 Percent*, ESPN.com (Aug. 17, 2012), http://espn. go.com/nfl/story/_/id/8278246/nfl-season-ticket-renewals-league-says (noting that the $102.5 million in average television revenues made by each team annually is about double of what the average team makes in ticket sales). The Super Bowl alone probably generates ***annual*** ticket sales far exceeding $100 million. Jon C. Ogg, *Super Bowl XLVII by the Numbers*, USA Today (Feb. 2, 2013), http://www.usatoday.com/story/money/business/2013/02/01/super-bowl-factoids-24-7/1880601/. And one estimate has concluded that "NFL teams make $160 million in revenue from a sold-out pre-season." Jesse Lawrence, *How Do Prices for Pre-Season NFL Tickets Compare to Regular Season?*, Forbes (Sept. 3, 2013), http://www.forbes.com/sites/jesselawrence/2013/09/03/how-do-prices-for-pre-season-nfl-tickets-compare-to-regular-season.

### Club Seats

"The Cowboys, Washington Redskins and New York Giants all generate at least $75 million annually from club seats and luxury suites."[12]  Club seats and luxury suites from those three teams alone could fund the NFL's perceived value of the Settlement in just over a decade.

### Super Bowl Ads

The NFL brings in incredible amounts of money from advertising.  In the last decade, advertisers have spent $1.85 billion during the Super Bowl alone.[13]  And in 2013, the price of a single 30-second Super Bowl ad was over $4 million.[14]  Future Super Bowl advertising revenue could fund the NFL's perceived value of the Settlement in under three years.[15]

### The Verizon Deal

Television networks are not the only sources of large revenue.  The NFL will receive approximately $1 billion over the next four years from Verizon Wireless for granting it mobile phone streaming rights – and those rights only include Sunday afternoon and playoff games.[16]  The Verizon contract alone could fund the cost of the NFL's estimated value of the Settlement in under three years.

---

[12]  Kurt Badenhausen, *NFL Stadiums: By the Numbers*, Forbes (Aug. 14, 2013), http://www.forbes.com/sites/kurtbadenhausen/2013/08/14/nfl-stadiums-by-the-numbers.

[13] Toni Fitzgerald, *Big Game: Super Bowl by the Numbers*, MediaLife Magazine (Jan. 25, 2013), http://www.medialifemagazine.com/big-game-super-bowl-by-the-numbers.

[14]  Chris Isidore, *Why Football Is Still a Money Machine*, CNN Money (Feb. 1, 2013), http://money.cnn.com/2013/02/01/news/companies/nfl-money-super-bowl/index.html.   That is the same figure the proposed Settlement offers the family of players who died with CTE before July 7, 2014 – but not the families of players who die with CTE after that date.

[15] Ed Molina, *Super Bowl 2014 News: Super Bowl XXLVIII Expected to Bring Big Super Ad Revenues for Fox Sports* (Feb.1, 2014), http://www.latinopost.com/articles/3713/20140201/ super-bowl-super-bowl-2014-super-bowl-2014-commercials-fox-sports-denver-brocos-vs-seattle-seahawks-super-bowl-2014-super-bowl-2014-advertising-costs.htm#ixzz3IneS3UYQ.

[16] Katie Lobosco, *Verizon Inks Deal to Live-Stream Sunday Afternoon NFL Games*, CNN Money (June 5, 2013), http://money.cnn.com/2013/06/05/technology/mobile/verizon-nfl.

**The Nike Deal**

News outlets reported that Nike's five-year apparel deal with the NFL is valued at over $200 million a year.[17]  The Nike deal alone could fund the cost of the NFL's estimated value of the Settlement in under four years.

**The Microsoft Deal**

The NFL has partnered with Microsoft and sold it the rights to create "exclusive interactive experiences" on its "Xbox One" and "Surface" products.[18]  In exchange, the NFL will receive more than $400 million over the next five years.  The Microsoft contract alone could fund over half the cost of the NFL's estimated value of the Settlement.

**The PepsiCo. Deal**

In 2011, the NFL renewed its marketing partnership agreement with PepsiCo., extending its contract for another 10 years.[19]  In return for making PepsiCo. its official marketing partner, the NFL will receive nearly $90 million annually and approximately $1 billion over the life of the agreement.  The PepsiCo. contract alone could fund all of the cost of the NFL's estimated value of the Settlement in eight years.

---

[17]  Erik Siemers, *Nike's NFL Apparel Deal Valued at $1.1 Billion* (Mar. 11, 2011), http://www.bizjournals.com/portland/blog/2011/03/nikes-nfl-apparel-deal-valued-at-11b.html?page=all.

[18] David Cushnan, *NFL and Microsoft Agree US$400m Partnership*, SportsProMedia.com (May 22, 2013), http://www.sportspromedia.com/news/nfl_and_microsoft_agree_us400_million_partnership.

[19]  Associated Press, *PepsiCo, NFL Renew Sponsorship Deal*, ESPN.comL (Sept. 6, 2011), http://espn.go.com/nfl/story/_/id/6935541/pepsico-nfl-renew-long-term-sponsorship-deal.

**The Bose Deal**

Motorola previously paid the NFL $40 million per year for the past 13 years in exchange for being one of only four corporate partners with in-game branding rights at NFL stadiums.[20] Bose is now scheduled to replace Motorola as the League's exclusive headphone and headset sponsor.[21]   While it is unclear what the exact terms of this agreement are, if it were comparable to the NFL's agreement with Motorola, the Bose agreement alone could cover the cost of the NFL's estimated value of the Settlement in less than two decades.

**Stadium Naming Rights and Other Advertising Revenue**

Individual teams generate substantial revenue from sponsorship and advertising.   The Dallas Cowboys, for example, "earned $100 million from sponsorships and advertising signage" in 2012.[22]   At that rate, these revenues alone could cover the cost of the NFL's estimated value of the Settlement in less than eight years.

**Merchandising and Licensing**

Estimates also show that the NFL receives at least $1 billion annually in merchandising and licensing revenue – money brought in from the sale of every NFL-branded product, like jerseys.[23]   In a particularly good year, NFL merchandise sales exceed $2 billion.[24]   These revenues alone would pay for the Settlement's purported 65-year payout period in less than half a year.

---

[20] David Cushnan, *Bose Replaces Motorola as NFL Headset Provider*, SportsProMedia.com (Mar. 25, 2014), http://www.sportspromedia.com/news/bose_replaces_motorola_as_nfls_headset _manufacturer.

[21] *Id.*

[22] Badenhausen, *supra* n.12.

[23] Schrotenboer, *supra* n.2.

[24] Daniel Roberts, *The Biggest Losers in an NFL Lockout? Everyone.*, Fortune (Mar. 4, 2011), http://archive.fortune.com/2011/03/03/news/companies/nfl_lockout_losers_labor.fortune/index.h tm (estimating 2010 NFL merchandise sales were $2.1 billion, and 2009 sales were $2.5 billion).

* * * * *

As these examples demonstrate, the NFL can clearly withstand a judgment far greater than this Settlement would provide.  The NFL can also afford to pay a substantial amount more in a renegotiated settlement that would provide meaningful compensation to those who are diagnosed with CTE or die with CTE after July 7, 2014.

The NFL has projected it will reach nearly *$25 billion* in annual revenue in only 13 years.[25]  That number dwarfs the $765 million the NFL touts as sufficient for compensating the thousands of seriously debilitated former players over the next 65 years.

### III. An Alternative Settlement Structure Should Maximize Money Available to Players

The settling parties have engineered a Settlement to ensure that players, their families, and taxpayers (through programs such as Medicare and Medicaid), shoulder most of the burden of taking care of players who have serious, debilitating, and degenerative brain injuries.  That is precisely the opposite of what a fair, reasonable, and adequate settlement should look like.  This Court has discretion when determining whether the Settlement should be approved.  But "[d]iscretion is not whim, and limiting discretion according to legal standards" promotes justice and fairness.  *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005).  Here, the Settlement fails to meet any reasonable conception of an agreement that complies with Rule 23 and due process.

There are a range of possible settlements that could warrant approval.  For example, if *all* cases of death with CTE were adequately compensated; if the 75% offsets for a single traumatic

---

[25] Monte Burke, *How the National Football League Can Reach $25 Billion in Annual Revenues*, Forbes (Aug. 17, 2013), http://www.forbes.com/sites/monteburke/2013/08/17/how-the-national-football-league-can-reach-25-billion-in-annual-revenues/.

brain injury or stroke were removed; and if credit were given for seasons in NFL Europe, the Settlement would look far more reasonable.[26]

Instead of minimizing the number of claimants and the amount of money the NFL pays, a reasonable settlement could also do more to maximize the dollars available to players across the class. A more reasonable settlement could, for example, allow players to participate in a revised, uncapped, baseline assessment program that would provide *both screening and meaningful treatment*; even the original proposed settlement rejected by this Court had an uncapped baseline assessment program. A more reasonable settlement could also compensate players with brain injuries for their reduced future earning capacity. Or a more reasonable settlement could use a lump sum to purchase health insurance for players who later suffer from cognitive illnesses. By purchasing health insurance now – instead of announcing a purportedly uncapped settlement while acknowledging that the vast majority of players will never recover a dime – the NFL would ensure that it, rather than players, their families, and federal and state governments, would be responsible for the cost of treating retired players. Doing so would also give the NFL a strong incentive to invest in advancing the science behind the injuries, so illness could be diagnosed and

---

[26] The prevalence of CTE among absent class members cannot be overstated. One study found that evidence of CTE was found in *76 of 79* deceased NFL players whose brains were autopsied. Jason Breslow, *76 of 79 Deceased NFL Players Found to Have Brain Disease*, PBS Frontline (Sept. 30, 2014), http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/76-of-79-deceased-nfl-players-found-to-have-brain-disease. There is no indication that this rate will diminish. Numerous players are still suffering from tremendous hits and resulting concussions. *See, e.g.*, Tom Pelissero, *Seahawks WR Sidney Rice Retires Because of Concussions*, USA Today (July 23, 2014), http://www.usatoday.com/story/sports/nfl/seahawks/2014/07/23/sidney-rice-seattle-retires-concussions/13060401/; Josh Katzenstein, *Lions' Waddle Returned to Field with Brain Injury*, The Detroit News (Oct. 23, 2014), http://www.detroitnews.com/story/sports/nfl/lions/2014/10/23/lions-waddle-returned-field-brain-injury/17764267/; Dan Diamond, *Did LeSean McCoy Have a Concussion? Eagles Star RB Takes Hit to Head, Fans Erupt*, Forbes (Sept. 21, 2014), http://www.forbes.com/sites/dandiamond/2014/09/21/did-lesean-mccoy-have-a-concussion-eagles-star-takes-hit-to-head-fans-erupt/; Josh Weinfuss, *LB John Abraham Leaves Cardinals*, ESPN.com (Sept. 10, 2014), http://espn.go.com/nfl/story/_/id/11502913/john-abraham-leaves-arizona-cardinals-suffering-memory-loss.

treated early (and ultimately at lower cost to everyone).  The current Settlement does none of these things.[27]

## **CONCLUSION**

The NFL has the ability to pay far more money than the inadequate sum agreed to by Class Counsel – who stand to receive an enormous fee in a case on which they took no discovery, and never litigated past the briefing and argument of a motion to dismiss.  The failure of Class Counsel to enter into a reasonable settlement is even starker when other alternative settlement structures are obvious and could provide more immediate and effective relief.

---

[27] A future settlement could also address the issues cited by Class Counsel in their complaint but left unaddressed by the settlement.  For example, Class Counsel noted the "overall culture in which NFL players are encouraged to play despite an injury, in part, because failure to play through an injury creates the risk of losing playing time, a starting position, and possibly a career."  *Turner v. NFL*, Civ. A. No. 2:14-cv-29-AB, Dkt. No. 1 ¶49 (E.D. Pa. Jan. 6, 2014).  The Settlement does nothing to curb this conduct or to encourage the NFL to change its dangerous workplace environment in which players are forced to choose between sacrificing their health and furthering their careers.

Dated: November 11, 2014

<u>/s/ Steven F. Molo</u>

William T. Hangley
Michele D. Hangley
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
(215) 496-7001 (telephone)
(215) 568-0300 (facsimile)
whangley@hangley.com
mdh@hangley.com

Steven F. Molo
Thomas J. Wiegand
Kaitlin R. O'Donnell
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
kodonnell@mololamken.com

Martin V. Totaro
Eric R. Nitz
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
mtotaro@mololamken.com
enitz@mololamken.com

Linda S. Mullenix
2305 Barton Creek Blvd., Unit 2
Austin, TX 78735
(512) 263-9330 (telephone)
lmullenix@hotmail.com

*Attorneys for Objectors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 11, 2014, I caused the foregoing Motion for Production of Evidence to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties.

<u>/s/ Steven F. Molo</u>