# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| : | |
| IN RE: NATIONAL FOOTBALL LEAGUE: | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION : | |
| INJURY LITIGATION : | MDL No. 2323 |
| : | |
| : | |
| Kevin Turner and Shawn Wooden, : | |
| *on behalf of themselves and* : | |
| *others similarly situated,* : | |
| Plaintiffs, : | CIVIL ACTION NO: 14-cv-0029 |
| : | |
| v. : | |
| : | |
| National Football League and : | **Hon. Anita B. Brody** |
| NFL Properties LLC, : | |
| successor-in-interest to : | |
| NFL Properties, Inc., : | |
| Defendants. : | |
| : | |
| : | |
| THIS DOCUMENT RELATES TO: : | |
| ALL ACTIONS : | |
| : | |

**NATIONAL FOOTBALL LEAGUE'S AND NFL PROPERTIES LLC'S
MEMORANDUM OF LAW IN SUPPORT OF
FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT AGREEMENT
AND IN RESPONSE TO OBJECTIONS**

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................7

    A.    The Parties and Initial Lawsuits ...............................................7

    B.    MDL 2323 and the MDL Plaintiffs' Allegations ......................9

    C.    Motion to Dismiss Based on Section 301 LMRA Preemption.................12

    D.    The Settlement Agreement .......................................................14

        1.    Benefits of the Settlement................................................15

            (a)    The Monetary Award Fund ...............................16

            (b)    Baseline Assessment Program...........................19

            (c)    Education Fund...................................................21

        2.    Claims and Appeals Process....................................21

        3.    Security......................................................................23

        4.    Release of Claims, Covenant Not to Sue and Bar Order.............24

        5.    Attorneys' Fees .........................................................26

    E.    The Settlement Agreement Was the Product of Extensive, Arm's-Length Negotiations.................................................................26

    F.    Settlement Class Notice............................................................30

    G.    Opt Outs and Objections...........................................................32

ARGUMENT.........................................................................................................36

I.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ................36

    A.    The Settlement Is Presumptively Fair.......................................38

    B.    An Evaluation of the *Girsh* Factors Confirms that the Settlement Is Fair, Reasonable and Adequate ................................................41

        1.    The Complex Legal, Factual and Scientific Issues in This Case Would Make Continued Litigation Significantly Prolonged and Expensive ...........................................42

        2.    99% of Settlement Class Members Have Remained in the Class Without Objection..........................................45

        3.    Class Counsel Adequately Appreciated the Merits of the Case Prior to Settlement Negotiations............................47

        4.    Absent Settlement, Plaintiffs Face Significant Hurdles to Establishing Liability and Damages ............................55

5. Absent Settlement, Plaintiffs Face the Risk of Maintaining a Class Action Through Trial ..................................................68

6. The Ability of the NFL Parties to Withstand a Greater Judgment Is Irrelevant Because the Settlement Fund Is Uncapped ..............................................................................69

7. The Settlement Is Well Within the Range of Reasonableness in Light of the Best Possible Recovery and the Attendant Risks of Litigation...................................................70

C. The *Prudential* Factors Also Support Approval of the Settlement...........74

II. THE OBJECTIONS ARE MERITLESS AND FAIL TO REBUT THAT THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ................76

A. The CTE-Related Objections Should Be Overruled..................................77

1. The Settlement Compensates Individuals with CTE Who Manifest Impairment While Living ...............................................80

2. The NFL Parties Reasonably Determined Not to Compensate Mood and Behavioral Symptoms.............................83

3. The Science Regarding CTE Is New ..........................................85

4. Scientific Developments Will Have No Impact on the Settlement ...................................................................................87

5. "Death by CTE" Was Included in the Settlement Because Decedents with CTE are Unable to Obtain Compensable Diagnoses....................................................................................88

6. Shawn Wooden Is an Adequate Subclass Representative Regarding CTE Issues and No CTE Subclass Is Necessary..........89

B. The Standard for a Qualifying Diagnosis of Dementia Is Scientifically Valid and Reasonable ..........................................................91

C. There Is No Requirement that the Settlement Compensate Multiple Sclerosis or Epilepsy....................................................................................93

D. Objections Concerning the Amount of, and Offsets to, Monetary Awards Have No Merit....................................................................................95

1. Maximum Awards Are Sufficient ...............................................95

2. Reduction by Age at Time of Qualifying Diagnosis Is Fair ..........98

(a) Age Reduction Is Reasonable ...........................................98

(b) Measuring Age Reduction from Date of Qualifying Diagnosis Promotes Efficiency and Reduces Fraud........100

3. The Stroke Offset Is Scientifically Justified and Reasonable......102

4. The Traumatic Brain Injury Offset Is Scientifically Justified and Reasonable..............................................................105

5.  The Eligible Seasons Offset Is Fair and Reasonable ..................106

    (a)  Reasonableness of Offset for Exposure ..........................107

    (b)  Reasonableness of Covered Activities............................108

        (i)  Training Camp/Preseason ....................................108

        (ii)  NFL Europe ........................................................109

    (c)  Use of "Eligible Season" as Opposed to "Credited Season" ................................................................................111

6.  The Offset for Non-Participation in BAP Encourages Use of a Substantial Settlement Benefit................................................113

E.  Limiting Representative Claimants' Eligibility for Monetary Awards Is Fair..........................................................................114

1.  Use of 2006 Date as Cut-Off ....................................................114

2.  Use of Settlement Date for Measuring Timeliness.....................116

F.  The Scope of the BAP Is Sufficient and Appropriate.............................117

1.  Sufficiency of Funding ...............................................................117

2.  Appropriateness of Testing Protocols.........................................118

    (a)  The Test Battery and Specific Impairment Criteria Are Based on Well-Accepted and Scientifically Validated Tests ....................................................................119

    (b)  The Pre-Selection of Qualified Neuropsychologists Is Appropriate and Necessary to Ensure Medically Sound Diagnoses ...............................................................121

    (c)  Mail Order Pharmacies are Reasonable for Distributing Non-Experimental Medication ...................122

G.  The Settlement Program Procedures Are Justifiable and Fair................123

1.  Cognitively Impaired Settlement Class Members .......................123

2.  The Registration Requirements ..................................................124

3.  The BAP Baseline Assessment Examination Deadline...............127

4.  The Claim Package .....................................................................129

5.  Qualified MAF Physicians .........................................................133

6.  The Appeal Procedures...............................................................135

7.  The Anti-Fraud Provisions .........................................................137

8.  Objectors' Case Law Is Inapposite ............................................139

H.  The Education Fund Is Not a *Cy Pres* Distribution.................................142

I.  The Release Is Appropriate ........................................................................146

|    | 1.  | Death with CTE ........................................................................146 |
|    | 2.  | Claims in *Dent* Litigation ..........................................................147 |

| J. | The NFL Parties Have Provided Adequate Security ...............................149 |
| K. | The Opt-Out Deadline Is Appropriate ....................................................152 |
| L. | The Objector Signature Requirement Is Appropriate .............................154 |
| M. | Notice Was Proper ....................................................................................155 |

|    | 1.  | The Objections Relating to the Purported Deficiencies in the Notice Are Meritless ...............................................................156 |
|    | 2.  | The Notice Satisfies the Requirements of Rule 23 and Due Process ......................................................................................158 |

| N. | Attorneys' Fees Do Not Counsel Against Approval ..............................161 |

CONCLUSION...........................................................................................................162

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

*Adams* v. *S. Farm Bureau Life Ins. Co.*,
   493 F.3d 1276 (11th Cir. 2007) .............................................................................158

*In re Aetna Inc. Sec. Litig.*,
   MDL No. 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ........................58, 71, 77, 96

*Alin* v. *Honda Motor Co.*,
   2012 WL 8751045 (D.N.J. Apr. 13, 2012)..................................................................96

*Alqurashi* v. *Party of Four, Inc.*,
   89 A.D.3d 1047 (N.Y. App. Div. 2011) ....................................................................65

*In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*,
   No. 2:05-cv-232, 2008 WL 4974782 (E.D. Pa. Nov. 21, 2008)...................46, 96, 161

*Amchem Prods., Inc.* v. *Windsor*,
   521 U.S. 591 (1997)................................................................................................158

*American Pipe & Constr. Co.* v. *Utah*,
   414 U.S. 538 (1974)................................................................................................116

*In re Apple Computer, Inc. Derivative Litig.*,
   2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ......................................................49, 58

*In re AT&T Corp. Sec. Litig.*,
   455 F.3d 160 (3d Cir. 2006) ..............................................................................71, 73

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) .......................................................................49

*In re ATI Techs., Inc. Sec. Litig.*,
   No. 2:01-cv-02541, 2003 WL 1962400 (E.D. Pa. Apr. 28, 2003) .............................50

*In re Auto. Refinishing Paint Antitrust Litig.*,
   617 F. Supp. 2d 336 (E.D. Pa. 2007).......................................................................45

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
   MDL No. 187, 2013 WL 4828225 (E.D. Pa. Sept. 9, 2013) ....................................147

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013) ........................................................140, 141, 144, 145

*In re BankAmerica Corp. Sec. Litig*.,
    210 F.R.D. 694 (E.D. Mo. 2002) ................................................................................69

*Barnes* v. *Nat'l Football League*,
    No. 2:11-cv-08396, Doc. No. 58 (C.D. Cal. Dec. 8, 2011) .........................................57

*Benitez* v. *N.Y.C. Bd. of Educ.*,
    541 N.E.2d 29 (N.Y. 1989).....................................................................................47, 66

*Blanco* v. *Am. Tel. & Tel. Co*.,
    689 N.E.2d 506 (N.Y. 1997)........................................................................................65

*In re Bluetooth Headset Prods. Liab. Litig*.,
    654 F.3d 935 (9th Cir. 2011) .....................................................................................162

*Bradburn Parent Teacher Store, Inc.* v. *3M*,
    513 F. Supp. 2d 322 (E.D. Pa. 2007) .......................................................................159

*Breheny* v. *Catholic Univ. of Am.*,
    1989 WL 1124134 (D.D.C. Nov. 22, 1989) ................................................................66

*Briggs* v. *Hartford Fin. Servs. Grp. Inc.*,
    No. 2:07-cv-5190, 2009 WL 2370061 (E.D. Pa. July 31, 2009) .................................48

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001) .................................................................................*passim*

*In re CertainTeed Fiber Cement Siding Litig.*,
    MDL No. 2270, Doc. No. 25-2 (E.D. Pa. Sept. 30, 2013)........................................155

*Chalmers* v. *Toyota Motor Sales Actions USA, Inc.*,
    935 S.W.2d 258 (Ark. 1996) .......................................................................................65

*In re Checking Account Overdraft Litig.*,
    MDL No. 2036, Doc. No. 3430 (S.D. Fla. Apr. 15, 2013)........................................145

*In re Cigna Corp. Sec. Litig*.,
    No. 2:02-cv-08088, 2007 WL 2071898 (E.D. Pa. July 13, 2007) ..............................38

*Ciocca* v. *BJ's Wholesale Club, Inc*.,
    No. 2:04-cv-05605, 2011 WL 5553646 (E.D. Pa. Nov. 14, 2011)..............................66

*In re Citigroup, Sec. Litig*. *Inc*.,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) ......................................................................162

*In re Cmty. Bank of N. Va.*,
    467 F. Supp. 2d 466 (W.D. Pa. 2006).........................................................................53

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005)..................................................53

*Coker* v. *Great Am. Ins. Co.*,
  659 S.E.2d 625 (Ga. Ct. App. 2008) ........................................................................... 111

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981) ....................................................................................... 47

*Cotton* v. *Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ...................................................................................... 77

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. 2009) ................................................................................. 97

*Dalrymple* v. *Brown*,
  701 A.2d 164 (Pa. 1997) ............................................................................................... 64

*DeJulius* v. *New Eng. Health Care Emps. Pension Fund*,
  429 F.3d 935 (10th Cir. 2005) .................................................................................... 158

*Dennis* v. *Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) ...................................................................................... 145

*Dick* v. *Sprint Commc'ns Co. L.P.*,
  297 F.R.D. 283 (W.D. Ky. 2014) ............................................................................... 147

*In re Diet Drugs Prods. Liab. Litig.*,
  MDL No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ........................... *passim*

*In re Diet Drugs Prods. Liab. Litig.*,
  226 F.R.D. 498 (E.D. Pa. 2005) ..................................................................... 40, 72, 73

*In re Diet Drugs Prods. Liab. Litig.*,
  434 F. Supp. 2d 323 (E.D. Pa. 2006) ......................................................................... 138

*In re Diet Drugs Prods. Liab. Litig.*,
  No. 99-cv-20593, 2007 WL 433476 (E.D. Pa. Feb. 2, 2007) .................................... 126

*In re Diet Drugs Prods. Liab. Litig.*,
  573 F. App'x 178 (3d Cir. 2014) ................................................................................ 137

*In re Dry Max Pampers Litig.*,
  724 F.3d 713 (6th Cir. 2013) ...................................................................................... 139

*Dryer* v. *Nat'l Football League*,
  No. 0:09-cv-02182, Doc. No. 270 (D. Minn. Apr. 8, 2013) ................................ 31, 155

*Duerson* v. *Nat'l Football League*,
  2012 WL 1658353 (N.D. Ill. May 11, 2012) ................................................ 13, 56, 107

*Ehrheart* v. *Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010) ............................................................36

*Eubank* v. *Pella Corp.*,
  753 F.3d 718 (7th Cir. 2014) .........................................................140

*Fineman* v. *Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992) ..........................................................147

*First State Orthopaedics* v. *Concentra, Inc.*,
  534 F. Supp. 2d 500 (E.D. Pa. 2007) ...............................................41

*Garrett* v. *NationsBank, N.A. (S.)*,
  491 S.E.2d 158 (Ga. Ct. App. 1997)................................................67

*Gates* v. *Rohm & Haas Co.*,
  No. 2:06-cv-01743, 2008 WL 4078456 (E.D. Pa. Aug. 22, 2008)............................73

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ......................................................*passim*

*Girsh* v. *Jepson*,
  521 F.2d 153 (3d Cir. 1975) .....................................................*passim*

*Givens* v. *Tenn. Football, Inc.*,
  684 F. Supp. 2d 985 (M.D. Tenn. 2010)...........................................57

*Glazier* v. *Keuka Coll.*,
  275 A.D.2d 1039 (N.Y. App. Div. 2000) ...........................................66

*Green* v. *Ariz. Cardinals Football Club*,
  2014 WL 1920468 (E.D. Mo. May 14, 2014) .....................................57

*Gulfstream Land & Dev. Corp.* v. *Wilkerson*,
  420 So. 2d 587 (Fla. 1982) ............................................................111

*Hall* v. *AT&T Mobility LLC*,
  2010 WL 4053547 (D.N.J. Oct. 13, 2010) .........................................97

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
  851 F. Supp. 2d 1040 (S.D. Tex. 2012)........................................49, 58

*Henderson* v. *Volvo Cars of N. Am., LLC*,
  2013 WL 1192479 (D.N.J. Mar. 22, 2013) .........................................96

*Hunt* v. *Skaneateles Cent. Sch. Dist.*,
  227 A.D.2d 939 (N.Y. App. Div. 1996) .............................................66

*In re Imprelis Herbicide Mktg. Sales Practices & Prods. Liab. Litig.*,
    296 F.R.D. 351 (E.D. Pa. 2013)....................................................................37, 44, 68

*In re Ins. Brokerage Antitrust Litig.*,
    2007 WL 542227 (D.N.J. Feb. 16, 2007) ...............................................................130

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.*
    v. *Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) ....................................................................................91

*Ira Holtzman, C.P.A.* v. *Turza*,
    728 F.3d 682 (7th Cir. 2013) .................................................................................145

*Jeffers* v. *D'Allessandro*,
    681 S.E.2d 405 (N.C. Ct. App. 2009).......................................................................57

*Johnston* v. *Dow & Coulombe, Inc.*,
    686 A.2d 1064 (Me. 1996) ........................................................................................65

*Klier* v. *Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) .................................................................................145

*Knight* v. *Jewett*,
    834 P.2d 696 (Cal. 1992)...........................................................................................66

*Koenig* v. *Lambert*,
    527 N.W.2d 903 (S.D. 1995).....................................................................................65

*Lake* v. *First Nationwide Bank*,
    900 F. Supp. 726 (E.D. Pa. 1995)............................................................................38

*Lazy Oil* v. *Wotco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997)........................................................................71

*Lenahan* v. *Sears, Roebuck & Co.*,
    2006 WL 2085282 (D.N.J. July 24, 2006) ...............................................................42

*Little-King* v. *Hayt Hayt & Landau*,
    2013 WL 4874349 (D.N.J. Sept. 10, 2013)...................................................46, 51, 68

*Litchford* v. *Hancock*, 352 S.E.2d 335 (Va. 1987) ........................................................67

*In re LivingSocial Mktg. & Sales Practice Litig.*,
    298 F.R.D. 1 (D.D.C. 2013) ...................................................................................145

*Lobatz* v. *U.S. W. Cellular of Cal., Inc.*,
    222 F.3d 1142 (9th Cir. 2000) ...............................................................................162

*In re Managed Care Litig.*,
  2010 WL 6532982 (S.D. Fla. Aug. 15, 2010) .........................................147

*In re Matzo Food Prods. Litig.*,
  156 F.R.D. 600 (D.N.J. 1994).................................................................145

*Maxwell* v. *Nat'l Football League*,
  No. 2:11-cv-08394, Doc. No. 67 (C.D. Cal. Dec. 8, 2011) .........................56

*McCoy* v. *Health Net, Inc.*,
  569 F. Supp. 2d 448 (D.N.J. 2008).............................................................40

*McDonough* v. *Toys "R" Us, Inc.*,
  834 F. Supp. 2d 329 (E.D. Pa. 2011) .......................................................142

*Mendoza* v. *Tucson Sch. Dist. No. 1*,
  623 F.2d 1338 (9th Cir. 1980) .................................................................157

*In re Metro. Life Ins. Co. Sales Practices Litig.*,
  1999 WL 33957871 (W.D. Pa. Dec. 28, 1999) .........................................46

*Mullane* v. *Cen. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950).................................................................................158

*Nachsin* v. *AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) .................................................................145

*In re Oil Spill by Oil Rig Deepwater Horizon*,
  910 F. Supp. 2d 891 (E.D. La. 2012).......................................................137

*In re Oil Spill by Oil Rig Deepwater Horizon*,
  295 F.R.D. 112 (E.D. La. 2013) .......................................................*passim*

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
  246 F.3d 315 (3d Cir. 2001) ....................................................................126

*Ortiz* v. *Fibreboard*,
  527 U.S. 815 (1999)...................................................................................70

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997)...............................................................70

*Pear* v. *Nat'l Football League*,
  No. 2:11-cv-08395, Doc. No. 61 (C.D. Cal. Dec. 8, 2011) .........................57

*Perry* v. *FleetBoston Fin. Corp.*,
  229 F.R.D. 105 (E.D. Pa. 2005)...........................................................55, 67

*In re Pet Food Prods. Liab. Litig.*,
  2008 WL 4937632 (D.N.J. Nov. 18, 2008) .................................................62, 74, 101

*In re Pet Food Prods. Liab. Litig.*,
  629 F.3d 333 (3d Cir. 2010) .................................................................*passim*

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
  588 F.3d 24 (1st Cir. 2009).................................................................145

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
  227 F.R.D. 553 (W.D. Wash. 2004) .................................................99, 115

*Prandini* v. *Nat'l Tea Co.*,
  557 F.2d 1015 (3d Cir. 1977) .................................................................75

*Prandini* v. *Nat'l Tea Co.*,
  585 F.2d 47 (3d Cir. 1978) .................................................................76

*Priddy* v. *Edelman*,
  883 F.2d 438 (6th Cir. 1989) .................................................................96

*In re Processed Egg Prods. Antitrust Litig.*,
  284 F.R.D. 249 (E.D. Pa. 2012).................................................................*passim*

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  962 F. Supp. 450 (D.N.J. 1997).................................................................68, 160

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  148 F.3d 283 (3d Cir. 1998) .................................................................*passim*

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  261 F.3d 355 (3d Cir. 2001) .................................................................148

*In re Remeron End-Payor Antitrust Litig.*,
  2005 WL 2230314 (D.N.J. Sept. 13, 2005) .................................................69

*In re Rent-Way Sec. Litig.*,
  305 F. Supp. 2d 491 (W.D. Pa. 2003).................................................................71

*Sherwin* v. *Indianapolis Colts, Inc.*,
  752 F. Supp. 1172 (N.D.N.Y. 1990).................................................................57

*Soldo* v. *Sandoz Pharm. Corp.*,
  244 F. Supp. 2d 434 (W.D. Pa. 2003).................................................................59

*Stoetzner* v. *U.S. Steel Corp.*,
  897 F.2d 115 (3d Cir. 1990) .................................................................45

*Stringer* v. *Nat'l Football League*,
    474 F. Supp. 2d 894 (S.D. Ohio 2007) ...................................................57

*Sullivan* v. *DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) ....................................................................90

*Thomas* v. *Albright*,
    139 F.3d 227 (D.C. Cir. 1998) .................................................................96

*In re Thornburg Mort., Inc. Sec. Litig.*,
    885 F. Supp. 2d 1097 (D.N.M. July 24, 2012) .......................................145

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,
    & Prods. Liab. Litig.*,
    2013 WL 3224585 (C.D. Cal. June 17, 2013) ..........................................96

*Trombley* v. *Nat'l City Bank*,
    826 F. Supp. 2d 179 (D.D.C. 2011).........................................................49

*Varacallo* v. *Mass. Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005)................................................46, 131, 157

*Walter* v. *Hughes Commc'ns, Inc.*,
    2011 WL 2650711 (N.D. Cal. July 6, 2011) ...................................139, 140

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ...........................................................*passim*

*Weiss* v. *Mercedes Benz of N. Am., Inc.*,
    899 F. Supp. 1297 (D.N.J. 1995).............................................................46

*Williams* v. *Nat'l Football League*,
    582 F.3d 863 (8th Cir. 2009) ...................................................................57

*Zemke* v. *Arreola*,
    2006 WL 1587101 (Cal. Ct. App. June 12, 2006)................................48, 66

*Zimmer Paper Prods., Inc.* v. *Berger & Montague, P.C.*,
    758 F.2d 86 (3d Cir. 1985) .....................................................................160

## STATUTES

28 U.S.C. § 1654........................................................................................154

Fla. Stat. § 440 ...................................................................................110, 111

Ga. Code Ann. § 34-9-11......................................................................110, 111

Ga. Code Ann. § 34-9-224.........................................................................111

Ga. Code Ann. § 34-9-242............................................................................111

Ga. Code Ann. § 34-9-280............................................................................110

La. Civ. Code art. 2315.1.............................................................................115

Labor Management Relations Act, section 301....................................*passim*

Mass. Gen. Laws Ann. ch. 231, § 85...............................................................67

Mich. Comp. Laws Ann. § 600.2959................................................................67

N.Y. C.P.L.R. § 213(8)................................................................................115

N.Y. C.P.L.R. § 214.......................................................................................64

42 Pa. Cons. Stat. Ann. § 5524(2) .................................................................64

42 Pa. Cons. Stat. Ann. § 7102 ......................................................................67

Va. Code Ann. § 8.01-230 .............................................................................65

## OTHER AUTHORITIES

Amy Borenstein Graves et al., *The Association Between Head Trauma and
   Alzheimer's Disease*, 131 Am J. Epidemiology 491 (1990).....................105

Andrew Gardner et al., *Chronic Traumatic Encephalopathy in Sport: A
   Systematic Review*, 48 Brit. J. Sports Med. 84 (2014)................................86

Ann C. McKee et al., *The Spectrum of Disease in Chronic Traumatic
   Encephalopathy*, 136 Brain 43 (2013)............................................80, 81, 88

Brandon E. Gavett, Robert A. Stern & Ann C. McKee, *Chronic Traumatic
   Encephalopathy:  A Potential Late Effect of Sport-Related Concussive
   and Subconcussive Head Trauma*, 30 Clinical J. Sports Med. 179
   (2011)......................................................................................................108

C.C.H. Pfleger et al., *Head Injury Is Not a Risk Factor for Multiple
   Sclerosis: A Prospective Cohort Study*, 15 Multiple Sclerosis 294
   (2009)........................................................................................................94

Chia-Hsuin Chang et al., *Increased Risk of Stroke Associated with
   Nonsteroidal Anti-Inflammatory Drugs: A Nationwide Case—
   Crossover Study*, 41 Stroke 1884 (2010)................................................105

Chien-Chang Liao et al., *Stroke Risk and Outcomes in Patients with
   Traumatic Brain Injury: 2 Nationwide Studies*, 89 Mayo Clinic Proc.
   163 (2014) ...............................................................................................104

Christopher Randolph, Stella Karantzoulis & Kevin Guskiewicz,
*Prevalence and Characterization of Mild Cognitive Impairment in
Retired National Football League Players*, 19 J. Int'l
Neuropsychological Soc'y 873 (2013) .................................................................60

Claims Administrator Update as of Nov. 9, 2014 .......................................32, 46

Erik Brady, *Q&A: Robert Stern Sheds Light on BU Brain Study*, USA
Today, Mar. 8, 2011 .......................................................................................108

Grant L. Iverson, *Chronic Traumatic Encephalopathy and Risk of Suicide
in Former Athletes*, 48 Brit. J. Sports Med. 162 (2014) ...............................84

Independent External Investigation of the Deepwater Horizon Court-
Supervised Settlement Program, *In re Oil Spill by Oil Rig Deepwater
Horizon*, No. 2:10-md-02179, Doc. No. 11287 (E.D. La. Sept. 6, 2013).................137

Ira R. Casson et al., *Is There Chronic Brain Damage in Retired NFL
Players? Neuroradiology, Neuropsychology, and Neurology
Examination of 45 Retired Players*, 6 Sports Health 384 (2014) .............................104

Jacob S. Elkins et al., *Pre-existing Hypertension and the Impact of Stroke
on Cognitive Function*, 58 Annals Neurology 68 (2005) ...........................102

James F. Burke et al., *Traumatic Brain Injury May Be an Independent
Risk Factor for Stroke*, 81 Neurology 33 (2013) .......................................103

Jesse Mez, Robert A. Stern & Ann C. McKee, *Chronic Traumatic
Encephalopathy: Where Are We and Where Are We Going?*, 13
Current Neurology & Neuroscience Rep. 407 (2013) ................................86

John F. Annegers et al., *A Population-Based Study of Seizures After
Traumatic Brain Injuries*, 338 New Eng. J. Med. 20 (1998).......................94

Ken Belson & Bill Pennington, *Former N.F.L. Players Face Deadline to
Opt Out of Concussion Settlement*, N.Y. Times, Oct. 14, 2014 ..................46

Ken Belson, *For Retirees, Decision on Concussion Settlement Will Not Be
a Simple One*, N.Y. Times, July 22, 2014 ..................................................46

Ken Belson, *N.F.L. Agrees to Settle Concussion Suit for $765 Million*,
N.Y. Times, Aug. 29, 2013.........................................................................47

Lauren K. Wolf, *Racing to Detect Brain Trauma*, 92 Chem. & Eng'g
News 9 (2014).............................................................................................85

M. Anne Harris et al., *Head Injuries and Parkinson's Disease in a Case-
Control Study*, 70 Occupational & Envtl. Med. 839 (2013).......................106

2 McLaughlin § 6:7 (10th ed.) ......................................................................41

M.J. Goldacre et al., *Risk of Multiple Sclerosis After Head Injury: Record Linkage Study*, 77 J. Neurology, Neurosurgery & Psychiatry 351 (2006)........................................................................................................94

Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief & the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617 (2010) ..........................................................142

Nat'l Insts. of Health, *Report on the Neuropathology of Chronic Traumatic Encephalopathy Workshop* (2012)...........................................62

Newberg on Class Actions § 16:20 (4th ed.) ...............................................157

Paul McCrory et al., *Consensus Statement on Concussion in Sport: The 4th International Conference on Concussion in Sport Held in Zurich, November 2012*, 47 Brit. J. Sports Med. 250 (2013)....................................61

Principles of the Law of Aggregate Litigation § 3.07, American Law Institute ......................................................................................................145

Puneet Kakar et al., *Cerebral Microbleeds: A New Dilemma in Stroke Medicine*, 1 J. Royal Soc'y Med. Cardiovascular Disease 1 (2012) .........104

Ramesh Sahathevan et al., *Dementia, Stroke and Vascular Risk Factors; a Review*, 7 Int'l J. Stroke 61 (2012) .............................................................102

Richard Sandomir, *ESPN Extends Deal with N.F.L. for $15 Billion*, N.Y. Times, Sept. 8, 2011 .....................................................................................150

Rummana Hussain, *Hoge Wins Lawsuit Against Doctor*, Chi. Trib., July 22, 2000 ......................................................................................................73

Sam Farmer, *Revised NFL Concussion Settlement Gets U.S. Judge's Preliminary OK*, L.A. Times (July 7, 2014)................................................47

Inst. of Med. of the Nat'l Acads., *Sports-Related Concussions in Youth: Improving the Science, Changing the Culture* (2013) .................................62

Yi-Hua Chen et al., *Patients with Traumatic Brain Injury: Population-Based Study Suggests Increased Risk of Stroke*, 42 Stroke 2733 (2011)...................103

Yi-Kung Lee et al., *Increased Risk of Dementia in Patients with Mild Traumatic Brain Injury: A Nationwide Cohort Study*, 8 PLOS ONE 1, 7 (2013)........................................................................................................105

xv

Defendants National Football League ("NFL") and NFL Properties LLC ("NFLP," and together with the NFL, the "NFL Parties") respectfully submit this memorandum in support of final approval of the Class Action Settlement Agreement dated June 25, 2014 ("Settlement Agreement" or "Settlement") and preliminarily approved by this Court on July 7, 2014.  (*See* Order, July 7, 2014, Doc. No. 6084.)

## PRELIMINARY STATEMENT

This Court should approve the historic settlement between the NFL and its retired players and their families.

The NFL agreed to the proposed settlement because it believes it is doing the right thing by putting aside its strong legal defenses and agreeing to provide substantial compensation to its retired players when they experience debilitating neurocognitive and neuromuscular decline, irrespective of whether NFL football was the cause.  The proposed settlement does just that in a way that is fair, reasonable and adequate, and which provides benefits for more than a half a century.

It is fair to say that the proposed settlement has been more carefully and relentlessly scrutinized than any previous class settlement, even in the Third Circuit.  The debate over its merits has been widespread and intense.  That debate is nearly over, and the results are unequivocal.  The proposed settlement has been endorsed by more than 99 percent of the class because they recognize that it offers substantial monetary and other benefits, that it will pay those benefits promptly and in a consistent way, and that it will spare thousands of retirees and their families the financial and emotional cost associated with years of litigation, which would more likely than not leave the plaintiffs exhausted and with no meaningful recovery.

The proposed settlement offers monetary awards of up to $5 million to retired NFL players who develop the neurocognitive and neuromuscular impairments associated with dementia, Alzheimer's Disease, Parkinson's Disease and ALS (Lou Gehrig's disease).  It does so without requiring any showing that playing in the NFL caused the players' impairments—eliminating a central barrier to recovery if these matters were litigated.  The settlement program lasts 65 years—sufficient to cover all currently retired players; its monetary awards are inflation-protected; and the NFL has guaranteed the payment of full settlement compensation to every eligible retired player with no cap on the NFL's ultimate total liability.

The proposed settlement goes beyond these generous monetary awards and provides baseline neurocognitive testing for retired players at the NFL's expense and supplemental benefits in the form of therapy, treatment and medicine to eligible players who show early signs of neurocognitive decline.  The settlement also establishes a $10 million education fund to support safety and injury prevention programs in all levels of football, in addition to educating retired players about the NFL's widespread benefits programs.  On top of these very substantial benefits, the NFL's current collectively bargained health and disability programs are expressly and fully protected under the settlement.

Not only does the proposed settlement provide substantial, inflation-adjusted, guaranteed benefits to all eligible retired players, but it does so while eliminating entirely the cost to retired players of years of expensive litigation and a very significant risk of defeat.  The NFL has argued in its pending motions that these cases should be dismissed because they are governed by the players' collective bargaining

agreements with the NFL and therefore are preempted by federal labor law.  While this Court has not decided the NFL's motions, numerous other courts have agreed with the NFL's position, and there is a substantial likelihood of the same result here.  This single threshold issue poses enormous risk to retired players who choose to litigate rather than settle their claims.

Even if the players' cases survived a preemption ruling, the players still would face substantial additional legal hurdles that could defeat their claims at the outset. Absent settlement, currently symptomatic retirees will spend years and millions of dollars in legal fees litigating uncertain claims that likely will leave them empty-handed in the end.  And non-symptomatic retirees will face a future knowing that if ever they develop a serious neurocognitive condition, they will then have to embark on perilous, costly and long-lasting litigation with an uncertain outcome, and with their claims likely weakened by rulings in earlier litigation.  The proposed settlement provides all retired players— symptomatic or not—with the peace of mind that substantial benefits will be available if and when they are needed.

The Court need not rely solely on the substantial benefits of the settlement and substantial risks of litigation to demonstrate the settlement's fairness to retired players.  After extensive (if not unprecedented) publicity surrounding the settlement and individual mailed notice to every known retired player or their representatives, more than 99% of the 20,000+ retired players agreed to stay in the settlement class rather than litigate.  This show of support for a negotiated settlement demonstrates the fairness of the proposed settlement from the perspective of the class members themselves.

3

Even a cursory review of longstanding principles demonstrates that, as a matter of law, the proposed settlement fully satisfies the requirements for court approval. Under settled Third Circuit law, the settlement is entitled to a presumption of fairness. As the Court already has found, it was negotiated by reputable counsel with vast experience in similar cases in hard-fought, arm's-length negotiations supervised by a court-appointed mediator (himself a former federal judge). As this Court also found, class counsel had more than adequate information to assess the strengths and weaknesses of Plaintiffs' claims—including the law of preemption, the players' medical histories, and the relevant medical and scientific literature and expert advice.

Consideration of the relevant factors identified by the Third Circuit (*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)) confirms the fairness, reasonableness and adequacy of this class action settlement.

First, there is no dispute that litigation of Plaintiffs' claims (assuming that some survive preemption and other potentially dispositive legal defenses) would be exceedingly complex and take years and substantial sums of money. The scope of the litigation is vast, involving thousands of players who played nearly a century of NFL football. Individualized, case-by-case fact and expert discovery—concerning many hotly-debated scientific and medical issues—would be extensive and expensive.

Second, as noted above, the settlement class almost unanimously approves of the settlement, which strongly supports the conclusion that the settlement is fair, reasonable and adequate.

Third, Class Counsel fully appreciated the merits of their claims, notwithstanding the absence of formal discovery. Putting to one side the serious risk of

4

dismissal based on preemption, of which Class Counsel were aware, Class Counsel are well versed in the science on which critical elements of their case depends as well as the legal challenges posed by the law of causation.

Fourth, beyond preemption and causation, Plaintiffs face significant additional obstacles to recovery. These include the statutes of limitations that likely bar the claims of almost all Plaintiffs, the vast majority of whom allegedly were injured years, if not decades, ago; the assumption of risk defense, since case law has long recognized that severe injuries, including concussions, are inherent risks of the sport of football; and the doctrines of comparative fault and contributory negligence that would reduce, and in some circumstances eliminate, Plaintiffs' damages.

Fifth, the relief provided by the settlement is well within the range of reasonableness where, as here, retired players are eligible quickly and efficiently to recover significant awards while avoiding the significant expense, delay and risks inherent in the litigation process.

The objections to the settlement are without merit.

First and foremost, much has been made of the repeated allegation that CTE is "not covered" by the proposed settlement. That simply is not true. This settlement will compensate retired players who are found to have serious neurocognitive and neuromuscular impairments without requiring a showing of causation. And on that front, the settlement *does* compensate the significant neurocognitive and neuromuscular impairments that allegedly are associated with CTE, such as memory loss, loss of executive function and loss of spatial and reasoning skills. In short, the assertion that "CTE is not covered" is factually erroneous.

5

The other major CTE-related objection—that the settlement does not compensate mood disorders and depression allegedly associated with CTE—misses the point. Mood disorders and depression are not compensable under the proposed settlement because these conditions are widely distributed across the general population and have multiple proven causes entirely unrelated to football and/or CTE. The fact that the proposed settlement draws this particular line on compensable conditions at this particular level of severity is an entirely reasonable and fair result of the parties' hard-fought negotiations, based on scientifically validated issues of causation and proof.

The objectors' other major issues are equally unfounded. For example, the reductions and offsets contained in the settlement for "age of diagnosis" and "Eligible Seasons" are entirely proper proxies for causation and exposure, fully supported by medical science and elementary concepts of fairness. It is common knowledge—even outside the medical community—that neurocognitive and neuromuscular decline increases as one ages for reasons entirely independent of playing football. And to the extent retired players have alleged that playing football caused their injuries, it makes good sense to use the amount of time a retiree played in the NFL as a fair proxy for alleged exposure to repetitive concussive and subconcussive events—the key common allegation in all these cases.

Finally, the allegation that the proposed settlement imposes unfair administrative burdens on retired players is misdirected. In fact, retired players are required to do no more than obtain a diagnosis of an eligible condition from a roster of highly qualified independent medical specialists and submit that information with appropriate supporting documentation. A retired player seeking millions of dollars of

monetary benefits can hardly object to this process.  And the NFL—which has agreed to pay these substantial benefits without any cap on liability—is entitled to a claims process that is fair and free, ideally, from fraud and abuse.  That is precisely the kind of administrative process that the parties agreed to here.

The remainder of the objections are equally meritless, as we show below.

\*                    \*                    \*

The NFL respectfully urges the Court, for all the reasons discussed in detail below, to overrule the objections, to find that the proposed settlement is fair, reasonable and adequate, and to grant final approval.

## BACKGROUND

### A.    The Parties and Initial Lawsuits

The litigations proposed to be resolved by this Settlement arise out of claims against the NFL Parties, and certain NFL Member Clubs, seeking relief for alleged repetitive head trauma injuries sustained during the playing careers of Retired NFL Football Players.[1]   Plaintiffs are retired professional football players, the representatives of the estates of retired players, and the spouses and children of some of the retired players.  The NFL is an unincorporated association of 32 Member Clubs that promotes, organizes and regulates the sport of professional football in the United States.  NFLP is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  NFLP is the authorized representative of the NFL and its Member Clubs for the licensing and protection of their trademarks and logos.  The terms and conditions of professional football players' employment are defined by the

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

collective bargaining agreements ("CBAs") that were operative during the players'
careers.

   The first of the concussion-related lawsuits was filed in July 2011 by 73
retired NFL players and certain of their wives in the Superior Court of California, Los
Angeles County against the NFL Parties and Riddell, Inc., All American Sports
Corporation, Riddell Sports Group, Inc., Easton-Bell Sports, Inc., Easton-Bell Sports,
LLC, EB Sports Corp., and RBG Holdings Corp. (collectively, the "Riddell
Defendants").[2]  *See* Compl., *Maxwell* v. *Nat'l Football League*, No. BC465842 (Cal.
Super. Ct. July 19, 2011).[3]  The NFL Parties removed the action to the United States
District Court for the Central District of California on the basis of federal question
jurisdiction under section 301 of the Labor Management Relations Act ("LMRA"), on the
ground that plaintiffs' claims arose from or were substantially dependent upon the terms
of the CBAs and thus were preempted by section 301.  *See, e.g.,* Notice of Removal,
*Maxwell*, No. 2:11-cv-08394, Doc. No. 1 (C.D. Cal. Oct. 11, 2011).

   Plaintiffs moved to remand.  *See, e.g.,* Pls.' Mot. to Remand, *Maxwell*, No.
11-cv-08394, Doc. No. 21 (C.D. Cal. Nov. 7, 2011).  On December 8, 2011, the court,
following a long line of NFL-related preemption case law, denied plaintiffs' remand
motion and held that plaintiffs' negligence claims were preempted because they were

---

[2] The Riddell Defendants are not parties to the Settlement Agreement.

[3] Two other substantially similar concussion-related cases were filed in the same court
at about the same time as *Maxwell*.  *See* Compl., *Pear* v. *Nat'l Football League*, No.
LC094453 (Cal. Super. Ct. Aug. 3, 2011); Compl., *Barnes* v. *Nat'l Football League*,
No. BC468483 (Cal. Super. Ct. Aug. 26, 2011).  A fourth substantially similar class
action complaint, *Easterling* v. *National Football League*, No. 2:11-cv-05209, Doc.
No. 1 (E.D. Pa. Aug. 17, 2011), was filed in the Eastern District of Pennsylvania.  As
explained below, *see infra* p. 9, *Maxwell, Pear, Barnes* and *Easterling* were the first
four cases transferred to MDL 2323.

"inextricably intertwined with and substantially dependent upon an analysis of certain CBA provisions imposing duties on the clubs with respect to the medical care and treatment of NFL players."  Order Den. Pls.' Mot. to Remand at 1-2, *Maxwell*, No. 2:11-cv-08394, Doc. No. 58 (C.D. Cal. Dec. 8, 2011).

Following the denial of plaintiffs' motion to remand, the NFL (and NFLP, where applicable) moved to dismiss the amended complaints in *Maxwell, Pear, Barnes* and *Easterling* (which was a purported class action) on numerous grounds, including preemption, failure to state a claim, and statutes of limitations.  *See, e.g.*, Defs.' Mot. to Dismiss, *Easterling*, No. 2:11-cv-05209, Doc. No. 19 (E.D. Pa. Nov. 9, 2011); Defs.' Mot. to Dismiss, *Maxwell*, No. 2:11-cv-08394, Doc. No. 67 (C.D. Cal. Dec. 20, 2011).

**B.     MDL 2323 and the MDL Plaintiffs' Allegations**

On January 31, 2012, prior to a decision on those motions and by motion of the NFL Parties, the Judicial Panel on Multidistrict Litigation consolidated *Maxwell, Pear, Barnes* and *Easterling* in the United States District Court for the Eastern District of Pennsylvania as *In re: National Football League Players' Concussion Injury Litigation* ("MDL 2323").  (Transfer Order, Doc. No. 1.)  Since that time, more than 5,000 former players have filed over 300 substantially similar lawsuits, nearly all of which have been consolidated in this Court.

Upon the creation of MDL 2323, this Court took prompt steps to ensure that the MDL proceeded in an orderly fashion.  On April 26, 2012, the Court appointed Co-Lead Counsel, an Executive Committee, and a Steering Committee for Plaintiffs. (Case Mgmt. Order No. 2 ("CMO No. 2") at 1-2, Doc. No. 64; *see also* Case Mgmt. Order No. 3, Doc. No. 72 (appointing additional Co-Lead Counsel and additional members of the Steering Committee).)  In an effort to streamline the hundreds of cases in

MDL 2323, this Court ordered the MDL Plaintiffs to submit both a Master Administrative Long-Form Complaint ("MAC") and a Master Administrative Class Action Complaint ("MACAC," and together with the MAC, the "Complaints"), which were filed on June 7, 2012.  (Doc. Nos. 83-84; *see also* CMO No. 2 at 3.)  The MAC was amended on July 17, 2012.  (Doc. No. 2642 (the "Am. MAC").)  These Complaints superseded all complaints filed by individual Plaintiffs and all putative class action complaints pleading nationwide classes, and together with each MDL Plaintiff's Short-Form Complaint, became the operative pleadings.  (Case Mgmt. Order No. 4 ("CMO No. 4") ¶ 1, Doc. No. 98.)

The MDL Plaintiffs allege generally that the NFL had a "duty to provide players with rules and information to protect the players as much as possible from short-term and long-term health risks" of repetitive traumatic brain injuries, a duty "to take all reasonable steps necessary to ensure the safety of players," including "promulgat[ing] rules affecting the return-to-play rules when concussive events are detected," and a "duty to advise Plaintiffs" that "the repeated traumatic head impacts the Plaintiffs endured while playing NFL football were likely to expose them to excess risk to neurodegenerative disorders."   (Am. MAC ¶¶ 6, 90, 248, 333.)   Among those neurodegenerative disorders—like dementia, Alzheimer's Disease and Amyotrophic lateral sclerosis ("ALS")—Plaintiffs allege that the repetitive head trauma sustained while playing football causes the "gradual build-up of Tau protein" which, in turn, causes chronic traumatic encephalopathy ("CTE").  (*Id.* ¶ 251.)  Plaintiffs allege that CTE causes "neuro-cognitive changes over time" that manifest in "varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage and, sometimes, fully

developed encephalopathy." (*Id.* ¶¶ 254-55.)  Plaintiffs allege that the NFL breached

purported duties by failing "to inform NFL players of the risks associated with MTBI

[mild traumatic brain injury]," and failing "to warn and/or impose safety regulations

governing this health and safety problem." (*Id.* ¶¶ 8-9.)  Generally, Plaintiffs accuse the

NFL of failing "to exercise reasonable care." (*See*, *e.g.*, *id.* ¶ 346.)

Plaintiffs also allege that the NFL misled Plaintiffs and "willfully and

intentionally concealed from" them the "heightened risk" of neurodegenerative disorders

(*id.* ¶ 248), and "concealed from then-current NFL players and former NFL players the

risks of head injuries in NFL games and practices, including the risks associated with

returning to physical activity too soon after sustaining a sub-concussive or concussive

injury." (*Id.* ¶ 276.)  Plaintiffs further claim that, "[b]efore June of 2010, the NFL made

material misrepresentations to its players, former players, the United States Congress and

the public at large that there was no scientifically proven link between repetitive

traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its

related symptoms" (*id.* ¶ 308), and allowed members of its Mild Traumatic Brain Injury

Committee ("MTBI Committee") "to mislead the Plaintiffs" regarding "the permanent

brain injury risks associated with repetitive head impacts in the game of football." (*Id.* ¶¶

374, 381.)

Plaintiffs purported to assert claims against the NFL for negligence,

medical monitoring, fraudulent concealment, fraud, negligent misrepresentation,

negligent hiring, negligent retention, wrongful death and survival, "civil

conspiracy/fraudulent concealment," loss of consortium, and declaratory relief, and,

against NFLP, for "civil conspiracy/fraudulent concealment." (*Id.* ¶¶ 246-382, 422-25,

and Prayer for Relief.)  Plaintiffs seek declaratory relief, "an injunction and/or other equitable relief against the NFL and in favor of Plaintiffs for the requested medical monitoring," and compensatory and punitive damages.  (*Id.*, Prayer for Relief.)  Plaintiffs further claim that the NFL Parties' actions caused them to suffer a variety of purported injuries, including headaches, depression, dementia, ALS, Alzheimer's Disease, CTE, loss of memory, sleeplessness, mood swings, personality changes, confusion, the inability to function, dizziness, deficits in cognitive functioning, and reduced processing speed, attention and reasoning.  (*Id.* ¶¶ 18, 58, 72-74, 214, 245.)

C.    **Motion to Dismiss Based on Section 301 LMRA Preemption**

As part of its initial case management orders, the Court determined that the NFL Parties' threshold preemption defense—which could result in the dismissal of all or many of Plaintiffs' claims—should be heard before proceeding to the merits of the litigation.  (CMO No. 2 at 2-3; CMO No. 4 ¶ 3.)  Accordingly, the Court stayed all other matters, including discovery, and denied a pending discovery motion filed by Co-Lead Counsel Sol Weiss of Anapol Schwartz, P.C.  (*See* Order, Aug. 21, 2012, Doc. No. 3384.)

The NFL Parties filed their preemption motions to dismiss the Complaints on August 30, 2012.  (Defs.' Mot. to Dismiss Am. MAC, Doc. No. 3589; Defs.' Mot. to Dismiss MACAC, Doc. No. 3590.)  The NFL Parties argued that, to resolve Plaintiffs' claims, the Court would be required to interpret the CBAs—which address player safety, including authority and responsibilities for player safety allocated to the NFL, the Member Clubs, and the Union—to determine whether the NFL had any pertinent duties, the scope of any such duties, and the reasonableness of the NFL Parties' conduct in light

of the CBA provisions.  (*See* Defs.' Mem. in Supp. of Mot. to Dismiss Am. MAC, Doc. No. 3589-1; Defs.' Mem. in Supp. of Mot. to Dismiss MACAC, Doc. No. 3590-1.)

For example, the CBAs provide that the Member Clubs and their physicians have certain responsibilities relating to player medical care, including the responsibility for treating player injuries, making return-to-play decisions, and informing players of medical risks associated with continued play.  As two district courts considering the very claims presented in MDL 2323 already have held, these "physician provisions" of the CBAs "must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  Order Den. Pls.' Mot to Remand at 2, *Maxwell*, No. 2:11-cv-08394, Doc. No. 58 (C.D. Cal. Dec. 8, 2011); *Duerson* v. *Nat'l Football League*, 2012 WL 1658353, at *1, 4 (N.D. Ill. May 11, 2012) (denying remand and holding that Plaintiffs' claims were preempted because the court could "plausibly interpret [the player health and safety CBA provisions] to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football" such that the "NFL could then reasonably exercise a lower standard of care in that area itself").

The parties completed briefing on January 28, 2013, and the Court heard oral argument on April 9, 2013.  Prior to ruling on the motions to dismiss, the Court ordered the NFL Parties and Co-Lead Counsel to mediation with retired United States District Court Judge Layn R. Phillips to determine whether or not settlement was possible.  (Order, July 8, 2013, Doc. No. 5128.)  As detailed below, *see infra* at pp. 26-

29, the parties engaged in settlement discussions over the course of one year, which negotiations resulted in the Settlement Agreement now before this Court.

## D.        The Settlement Agreement

On June 25, 2014, Class Counsel filed the Settlement Agreement now before this Court for final approval.[4]   The Settlement Agreement provides substantial benefits to a Settlement Class of all Retired NFL Football Players and their Representative and Derivative Claimants.[5]   The Settlement Class is divided into two Subclasses: Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis (as defined in the Settlement Agreement) prior to the Court's preliminary

---

[4]   In connection with the parties' settlement, Plaintiffs' Class Action Complaint was filed on January 6, 2014. *See* Compl., *Turner* v. *Nat'l Football League*, No. 2:14-cv-00029, Doc. No. 1 (E.D. Pa. Jan. 6, 2014) (the "Turner Complaint").   The *Turner* Complaint is substantially similar to the Complaints and includes additional allegations relating to class treatment.

[5]   As outlined in Sections 2.1(ee), (eeee), and (ffff) of the Settlement Agreement, the Settlement Class consists of three groups of class members:

(1) All living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players");

(2) Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and

(3) Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").

approval of the Settlement Agreement on July 7, 2014; and Retired NFL Football Players who had no such diagnosis as of that date.[6]  (Order ¶ 2, July 7, 2014, Doc. No. 6084; *see also* Settlement Agreement §§ 1.1, 1.2.)

      **1.**      **Benefits of the Settlement**

      The Settlement Agreement provides:  (i) an uncapped, inflation-adjusted 65-year Monetary Award Fund for making payments to all Retired NFL Football Players (and their Representative Claimants or Derivative Claimants) who have or receive in the future a Qualifying Diagnosis, as defined in Exhibit 1 of the Settlement Agreement; (ii) a $75 million Baseline Assessment Program ("BAP") that provides a baseline neuropsychological and neurological evaluation of each qualified Retired NFL Football Player and BAP Supplemental Benefits in the form of certain medical treatment benefits to those diagnosed with moderate neurocognitive impairment; and (iii) a $10 million Education Fund to support safety and injury prevention programs for football players of all ages and to educate Settlement Class Members regarding the NFL's existing medical and disability programs, all as further described below.  The administration of the Settlement will be overseen by the Court through a court-appointed Special Master. (Settlement Agreement §§ 2.1(uuuu), 10.1(a)(ii).)

---

[6]    The Subclasses are defined in Section 1.2 of the Settlement Agreement:

"Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

"Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a postmortem diagnosis of CTE.

(a)      **The Monetary Award Fund**

The Monetary Award Fund is a 65-year, uncapped, inflation-adjusted fund from which Settlement Class Members will receive Monetary and Derivative Claimant Awards for Qualifying Diagnoses, in accordance with the terms of the Settlement Agreement.  (Settlement Agreement Art. VI.)  The Qualifying Diagnoses include Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, ALS, and Death with CTE.  (*Id*. § 6.3(a).)

Exhibit 1 of the Settlement Agreement (the "Injury Definitions") defines the criteria by which each of the Qualifying Diagnoses must be made.  Briefly, Level 1.5 (early dementia) and Level 2 Neurocognitive Impairment (moderate dementia) may be diagnosed where the Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Level 1.5 Neurocognitive Impairment) or Category 2.0 (Level 2 Neurocognitive Impairment) in specified areas relating to functioning at home and in the community.  (Settlement Agreement Ex. 1, at 2-3.)  Diagnoses of ALS, Alzheimer's Disease and Parkinson's Disease must meet the definitions contained in the World Health Organization's International Classification of Diseases, 9th Edition ("ICD-9") or the World Health Organization's International Classification of Diseases, 10th Edition ("ICD-10").  (*Id*. at 4-5.)  Diagnoses of Alzheimer's Disease or Parkinson's Disease may alternatively meet the definitions provided by the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5").  (*Id*. at 4.)  Death with CTE includes only post-mortem diagnoses of CTE made by a board-certified neuropathologist where the Retired NFL Football Player died prior to the date of

preliminary approval on July 7, 2014.  (*Id*. at 5.)  Qualifying Diagnoses shall be made by Qualified MAF Physicians or Qualified BAP Providers approved by both the NFL Parties and Class Counsel, or by otherwise appropriately credentialed medical professionals, as set forth in the Settlement Agreement's Injury Definitions and Section 6.3 of the Settlement Agreement.  (*See* Settlement Agreement §§ 5.7(a)(i), 6.3, 6.5(a); *id.* Ex. 1.)

A Retired NFL Football Player's maximum Monetary Award[7] is calculated by his age at the time of his Qualifying Diagnosis, with headline awards decreasing as he ages.  (Settlement Agreement § 6.7(b).)  The maximum recovery for each Qualifying Diagnosis is as follows:

- Level 1.5 Neurocognitive Impairment:  $1.5 million

- Level 2 Neurocognitive Impairment:  $3 million

- Alzheimer's Disease:  $3.5 million

- Parkinson's Disease:  $3.5 million

- Death with CTE:  $4 million

- ALS:  $5 million

(*See* Settlement Agreement Ex. 5, at 11.)

A Settlement Class Member's individual Monetary Award also depends on the applicability of the Offsets, summarized below, which are applied individually and

---

[7]    Derivative Claimants are entitled to 1% of the Monetary Award (*i.e.* a "Derivative Claimant Award") received by the Retired NFL Football Player or Representative Claimant (for deceased, incompetent, or incapacitated retired players) through whom the relationship is the basis of the claim (such that the Retired NFL Football Player or Representative Claimant will receive 99% of the Award).  If there are multiple Derivative Claimants, then the Derivative Claimant Award will be divided among them based on the laws of the state where the Retired NFL Football Player to whom they are related is domiciled.  (Settlement Agreement § 7.3.)

in a serial manner.[8]  (*See id*. § 6.7(e).)  First, as a proxy for the exposure of a Retired NFL Football Player to repetitive head impacts while playing in the NFL, the Settlement Agreement applies an Offset based on the number of Eligible Seasons played.  Thus, the more Eligible Seasons played, the smaller the Offset.  (*Id*. § 6.7(b)(i).)

Second, because Stroke and/or Traumatic Brain Injury[9] are major contributive factors for neurocognitive impairment, the Settlement Agreement applies a 75% Offset if the Retired NFL Football Player suffered such injuries before receiving a Qualifying Diagnosis.  (*Id*. § 6.7(b)(ii)-(iii).)  Moreover, these Offsets are tailored to include only a limited subset of the universe of strokes and traumatic brain injury and neither Offset includes injuries sustained during and relating to the Retired NFL Football Player's NFL Football career.  (*See* Settlement Agreement § 2.1 (wwww), (aaaaa).)  In addition, Retired NFL Football Players subject to these Offsets will have the opportunity to present clear and convincing evidence to the Claims Administrator that the Stroke or severe Traumatic Brain Injury is not related to the Qualifying Diagnosis in order to avoid the Offset.  (*Id*. § 6.7(d).)

Third, the Settlement Agreement applies a 10% Offset to certain Retired NFL Football Players who do not participate in the BAP.  (*Id*. § 6.7(b)(iv).)  The 10% Offset does not apply to (a) Retired NFL Football Players in Subclass 1 (*i.e.*, those

---

[8]   For example, "if the Monetary Award before the application of Offsets is $1,000,000, and two 10% Offsets apply, there will be a 19% aggregate downward adjustment of the award (*i.e.*, application of the first Offset will reduce the award by 10%, or $100,000, to $900,000, and application of the second Offset will reduce the award by an additional 10%, or $90,000, to $810,000)."  (Settlement Agreement §  6.7 (e).)

[9]   The Settlement Agreement provides full definitions based on ICD-9 or ICD-10 (Stroke), and ICD-9 (Codes 854.04, 854.05, 854.14 and 854.15) or ICD-10 (Codes S06.9x5 and S06.9x6) (Traumatic Brain Injury).  (Settlement Agreement § 2.1 (wwww), (aaaaa).)

without Qualifying Diagnoses prior to July 7, 2014) who later receive (i) a Qualifying

Diagnosis of ALS or (ii) any Qualifying Diagnosis prior to his deadline to receive a BAP

baseline assessment examination; or (b) Retired NFL Football Players in Subclass 2 (*i.e.*,

those with Qualifying Diagnoses prior to July 7, 2014).  (*Id.*)

     Every Settlement Class Member who timely registers and qualifies for a

Monetary or Derivative Claimant Award during the term of the Monetary Award Fund

will receive that Award on an inflation-adjusted basis.  (*Id.* § 6.9.)  For Representative

Claimants of deceased Retired NFL Football Players who died prior to January 1, 2006,

the Representative Claimant may receive a Monetary Award only if the "Court

determines that a wrongful death or survival claim filed by the Representative Claimant

would not be barred by the statute of limitations under applicable state law" as of the date

the Representative Claimant filed a litigation or the Settlement Date, whichever is earlier.

(*Id.* § 6.2(b).)  If, after receiving an initial Monetary Award, a Retired NFL Football

Player later receives a different Qualifying Diagnosis, that Retired NFL Football Player

may receive a Supplemental Monetary Award—representing the difference between the

two awards—to ensure that he receives the maximum award to which he is entitled.  (*Id.*

§ 6.8.)  Importantly, the Settlement Class Member need not prove that participation in the

NFL caused the Qualifying Diagnosis or that the NFL Parties are legally responsible for

his injuries.

   **(b)**  **Baseline Assessment Program**

     The BAP allows each Retired NFL Football Player to obtain a baseline

neuropsychological and neurological evaluation.  (*Id.* §§ 5.1-5.2.)  This program serves

several purposes.  First, it may result in diagnoses entitling the Retired NFL Football

Player to BAP Supplemental Benefits or to a Monetary Award under the Monetary

Award Fund.   BAP Supplemental Benefits include medical treatment, including counseling and pharmaceutical coverage, to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment (moderate neurocognitive impairment).   (*Id*. §§ 2.1(j), 5.11; *id*. Ex. 1.)   Second, the results of the BAP examinations may be used as a benchmark against which to measure any future tests to determine whether the Retired NFL Football Player's neurocognitive abilities have deteriorated.   Third, if the informed consent of the Retired NFL Football Player is obtained and all applicable privacy and health laws are complied with, the medical data generated can be made available for use by those conducting medical research on neurocognitive impairment, safety, and injury prevention. (*Id*. § 5.10.)

          The BAP baseline assessment examination is a detailed, standardized neuropsychological examination performed by a neuropsychologist certified by the American Board of Professional Psychology or the American Board of Clinical Neuropsychology, a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, and a basic neurological examination performed by a board-certified neurologist.   (*Id*. § 5.2.)   The Settlement Agreement provides for the appointment of a BAP Administrator who will set up a network of qualified medical providers ("Qualified BAP Providers") to administer the baseline assessment examinations for Retired NFL Football Players.   (*Id*. §§ 5.6-5.7.)   All Retired NFL Football Players who are credited with at least one-half of an Eligible Season and who timely register to participate in the Class Action Settlement may participate in the BAP and receive an examination.   (*Id*. § 5.1.)   All Retired NFL Football Players age 43 or older as of the Effective Date must receive the examination within two years of the

Effective Date if they choose to participate.  (*Id*. § 5.3.)  Retired NFL Football Players under the age of 43 as of the Effective Date must receive the examination within 10 years of the commencement of the BAP, or before they turn 45, whichever occurs first.  (*Id*.)

        **(c)**      **Education Fund**

        The Settlement Agreement establishes a $10 million Education Fund to support safety and injury prevention programs for football players of all ages.  (*Id*. §§ 12.1-12.2.)  This Fund will also promote education of Settlement Class Members regarding the NFL's existing medical and disability programs.  (*Id*.)

        **2.**      **Claims and Appeals Process**

        The Settlement Agreement establishes an orderly claims process under which Settlement Class Members generally have 180 days to register for Settlement benefits from the date that the Claims Administrator provides notice, which deadline can be extended for "good cause."  (Settlement Agreement § 4.2(c).)  Once registered, Claim Packages must be submitted within two years of receiving a Qualifying Diagnosis, or two years after Supplemental Notice (which is notice disseminated within 30 days of the Effective Date of the Settlement that will include previously disclosed deadlines for registration, participation in the BAP, and submission of Claim Packages) is posted on the Settlement Website, whichever is later.[10]  (*Id*. §§ 8.3(a), 14.1(d).)  There is an exception to the deadline where the Settlement Class Member can demonstrate "substantial hardship" and submits the Claim Package within four years of the date of the Qualifying Diagnosis (or the Settlement Class Supplemental Notice being posted on the

---

[10]   A Derivative Claim Package must be submitted no later than 30 days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant, as applicable) receives notification that he has been determined to be entitled to a Monetary Award.  (Settlement Agreement § 8.3(a)(ii).)

Settlement Website, whichever is later).  (*Id*. § 8.3(a)(1).)  The Claim Package must include information in support of the Retired NFL Football Player's Qualifying Diagnosis and NFL Football career and will form the basis for the Claims Administrator's Award determination.  (*Id*. § 8.2.)

Either the NFL Parties or the Settlement Class Member may appeal the Claims Administrator's Award determination.  The appellant will submit an appeal through use of an Appeals Form, present evidence in support of the appeal, and satisfy a clear and convincing evidentiary standard to prevail.  (*Id*. §§ 9.7-9.8.)  Co-Lead Class Counsel also have the right to submit papers in support of, or in opposition to, an appeal.  (*Id*. § 9.7(c).)  The NFL Parties may take an appeal only in "good faith."  (*Id*. § 9.6(b).)  Although Settlement Class Members are charged $1,000 to discourage appeals that lack merit, a Settlement Class Member who takes a successful appeal is reimbursed the fee in full.  (*Id*. § 9.6(a).)

The Settlement Agreement also includes anti-fraud provisions beyond the already-mentioned appeal fee.  For example, each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award authorizes the Claims Administrator to "verify facts and details of the Claim Package or Derivative Claim Package." (*Id*. § 8.6(a).)  This will be accomplished by the Claims Administrator conducting an audit of 10% of the total Claim Packages and Derivative Claims Packages that were found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month—either on a random basis or to address a specific concern raised by a Claim Package or Derivative Claim Package.  (*Id*. § 10.3(c).)  The NFL Parties or Co-Lead Class Counsel likewise have the right to conduct an audit to verify a Monetary Award

claim, although this right is limited in that the audit must be taken in good faith and at their sole expense.  (*Id.* § 10.3(a).)  Claimants are required to reasonably cooperate with an audit by providing additional records and information.  (*Id.* § 10.3(b)(i)-(ii).)

       **3.**    **Security**

       The Settlement Agreement includes a representation and warranty by the NFL Parties that the NFL currently maintains, and will continue to maintain, an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings, which investment grade rating shall serve as security that the NFL Parties will meet their payment obligations for the first ten years of the Settlement.  (*Id.* § 25.6(a).)  By the tenth anniversary of the Settlement, the NFL Parties agree to establish a Statutory Trust that they will fund so that, by the tenth anniversary, it shall contain funds that in the reasonable belief of the NFL Parties, and after taking into account reasonably expected investment returns over time, will be sufficient to satisfy the NFL Parties' remaining anticipated payment obligations as they come due over the 65-year term.  (*Id.* § 25.6(d).) The NFL Parties cannot pledge or assign the property of the Statutory Trust to any third-party and no other creditor of any of the NFL Parties shall have any rights in the property. (*Id.*)  Funds may be withdrawn only to satisfy payment obligations under the Settlement Agreement, for costs and expenses related to the Statutory Trust, and for certain other limited purposes that require approval of the Court.  (*Id.*)

       In addition, to the extent that the NFL Parties materially default in satisfying payment obligations under the Settlement Agreement, and fail to cure such material default in compliance with an order from this Court, then this Court may ultimately render null and void the Releases and Covenants Not to Sue provided to Released Parties by Settlement Class Members who have received a final, favorable

Notice of Registration Determination and have not received a final and accrued Monetary Award or final and accrued Derivative Claimant Award as of the date of such application, or who have only received a final and accrued Monetary Award for a Level 1.5 Neurocognitive Impairment or a final and accrued Derivative Claimant Award for a Level 1.5 Neurocognitive Impairment as of the date of such application.  (*Id*. § 25.6(e), (g).)

>    **4.      Release of Claims, Covenant Not to Sue and Bar Order**

In exchange for the significant benefits provided under the Settlement Agreement, Settlement Class Members will release, covenant not to sue, and dismiss with prejudice actions and claims against the Released Parties.  (*See id*. § 18.)  The Release covers all claims and actions "arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits," including, without limitation, claims and actions that "were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit" or "arising out of, or relating to, head, brain and/or cognitive injury[.]"  (*Id*. § 18.1(a).)  In addition, as a condition to approval of the Class Action Settlement, the parties have moved the Court for a bar order and judgment reduction provision, as part of the Final Order and Judgment.  (*See id*. Ex. 4, ¶ 12.)  The bar order will bar other parties from seeking indemnification or contribution from the Released Parties for claims relating to this litigation.  (*Id*.)

The Settlement preserves Retired NFL Football Players' rights to pursue workers' compensation claims and to participate in or claim entitlement to any medical or disability benefits available under the current 2011 NFL CBA, including the 88 Plan and

Neuro-Cognitive Disability Benefit. (*Id.* §§ 18.6, 29.1-29.2.)   In addition, although Retired NFL Football Players ordinarily must execute a release of claims and covenant not to sue in order to receive the Neuro-Cognitive Disability Benefit, the Settlement Agreement provides that the NFL will not enforce or use that provision against Retired NFL Football Players in connection with the acceptance of Settlement benefits (except where they opted out of the Settlement Class).  (*Id.* § 29.1)

These benefits are substantial and include, for certain Retired NFL Football Players:  (i) 88 Plan medical benefits, which reimburse certain costs related to dementia, ALS, and/or Parkinson's Disease currently up to $100,000 per year if an in-patient at an eligible institution, or up to $88,000 per year if not so admitted; (ii) the Neuro-Cognitive Disability Benefit, which pays monthly payments for 180 months (or until a player's 55th birthday, whichever occurs first) in the form of either a Moderately Impaired Benefit (currently paying no less than $3,500 per month) or a Mildly Impaired Benefit (currently paying no less than $1,875 per month); (iii) Total and Permanent Disability Benefits, which currently pay a minimum of between $50,000 and $250,000 per year depending on injury categorization; (iv) a Line of Duty Disability Benefit for former players with a substantial permanent disability as a result of NFL football activities who apply within 48 months of retiring from the NFL (or longer for those who played four or more seasons), which provides a monthly payment of no less than $2,000 for 90 months; (v) the Player Insurance Plan and the Gene Upshaw NFL Player Health Reimbursement Account Plan, which provide medical benefits for 60 months following retirement and thereafter provide health credits to reimburse medical expenses, currently worth $25,000 per Credited Season up to a maximum account balance of $300,000 or

$350,000 (depending on years of play); (vi) Long Term Care Insurance for which the NFL pays premiums for those ages 50 to 76 if they satisfy the underwriting requirements, and for which the maximum benefit is $219,000; and (vii) a Former Player Life Improvement Plan that, among other things, coordinates comprehensive neurological care evaluation at top tier medical facilities, provides a Medicare benefit ($120 per month toward supplemental Medicare insurance), provides a discount prescription drug benefit, and provides an assisted living benefit that provides special discounts and preferred access to providers throughout the United States.  (*See* Decl. of Dennis L. Curran ¶¶ 6, 9, 11-17.)

       **5.**    **Attorneys' Fees**

Under the terms of the Settlement Agreement, the NFL Parties will not object to an application by Class Counsel for an award of attorneys' fees of up to $112.5 million.  (Settlement Agreement § 21.1.)  Attorneys' fees will be paid by the NFL Parties separate from and in addition to all of their other funding obligations under the Settlement Agreement.  (*Id*. § 23.7.)  The provision of attorneys' fees was not negotiated between the parties until after the material terms of the Settlement Agreement were agreed upon.   (Mem. in Supp. of Prelim. Approval at 30, June 25, 2014, Doc. No. 6073-5.)

**E.**    **The Settlement Agreement Was the Product of**
          **Extensive, Arm's-Length Negotiations**

The Settlement Agreement preliminarily approved on July 7, 2014 is the result of hard-fought, arm's-length negotiations that commenced in July 2013 and lasted one year.  The parties were represented by experienced counsel and assisted by retired U.S. District Court Judge Layn R. Phillips as mediator; a court-appointed Special Master,

Perry Golkin; numerous medical experts, including the NFL Parties' experts Dr. Kristine Yaffe and Dr. Scott Millis; and actuaries and economists, including the NFL Parties' consultants at The Segal Group and Class Counsel's consultants at ARPC.

The negotiations began with court-ordered mediation. (Order, July 8, 2013, Doc. No. 5128.) Under Judge Phillips's supervision, the parties conducted "arm's-length, hard-fought negotiations" for over two months. (Decl. of Layn R. Phillips ("Phillips Decl.") ¶ 5, Doc. No. 6073-4.) During this time, the parties met for "more than twelve full days" of formal mediation and spent "considerable hours" negotiating outside the formal sessions during which the parties discussed issues relating to possible settlement with the mediator "[o]n almost every day between [his] appointment as mediator and the announcement of the settlement." (*Id.* ¶¶ 5-6.) "[T]he parties aggressively asserted their respective positions on a host of issues," and "[o]n occasion, the negotiations were contentious." (*Id.* ¶ 6.) On August 29, 2013, the parties executed a term sheet setting forth the "principal terms of a settlement." (*See* Order, Aug. 29, 2013, Doc. No. 5235.)

Following the announcement of the August 29, 2013 term sheet, the parties proceeded to negotiate the detailed terms of the settlement agreement itself. These continued negotiations remained arm's-length and hard-fought. On January 6, 2014—after four months of additional negotiations—Co-Lead Class Counsel, Class Counsel, and Subclass Counsel filed the *Turner* Complaint on behalf of named Plaintiffs Kevin Turner and Shawn Wooden and a motion for preliminary approval of a proposed settlement agreement and preliminary class certification. (Mot. for Prelim. Approval, Jan. 6, 2014, Doc. No. 5634.) The January settlement agreement had the basic structure

described above, but limited the funding of the settlement to $760 million, which the parties and their actuarial and economic experts believed was sufficient to pay all benefits.  (Mem. in Supp. of Prelim. Approval at 3, Jan. 6, 2014, Doc. No. 5634-5.)

Approximately one week later, the Court *sua sponte* denied the motion for preliminary approval of the settlement and preliminary class certification without prejudice.  (Order Den. Mot. for Prelim. Approval, Doc. No. 5657.)  The Court expressed concern as to the adequacy of the proposed $760 million settlement fund and assigned Special Master Perry Golkin[11] to supervise the parties' efforts to reach a revised settlement.  (*Id*. at 10-12.)

Guided by the Court's opinion and the Special Master,[12] the parties engaged in an additional six months of negotiations and financially restructured the settlement to provide the Court with the assurance that during the entire term "all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their related claimants will be paid."  (*Id*. at 10.)  These further negotiations resulted in an uncapped Monetary Award Fund, thereby guaranteeing payment to Settlement Class Members with Qualifying Diagnoses no matter when in the Settlement Agreement's 65-year term they received their Diagnoses.  (Settlement Agreement § 6.10.)  In addition, the parties strengthened the anti-fraud provisions.  On June 25, 2014, Co-Lead Class Counsel, Class Counsel, and Subclass Counsel filed a motion for preliminary approval of the revised

---

[11]  The Court appointed the Special Master on December 16, 2013 in light of the "expected financial complexity of the proposed settlement."  (Order Appointing Special Master at 1, Doc. No. 5607.)

[12]  The actuarial and/or economic reports provided by the NFL Parties and Co-Lead Class Counsel to the Special Master were made publicly available on the Court's docket on September 12, 2014.  (Doc. Nos. 6167, 6168; *see also* Order, Sept. 8, 2014, Doc. No. 6160.)

proposed settlement agreement and preliminary class certification.  (Mem. in Supp. of Prelim. Approval, June 25, 2014, Doc. No. 6073-5.)

On July 7, 2014, the Court granted the motion for preliminary approval of the Settlement Agreement and preliminary class certification.  (Mem. Op., July 7, 2014, Doc. No. 6083.)   The Court concluded there were no obvious deficiencies in the Settlement Agreement, it appeared to be "the product of good faith, arm's-length negotiations," "proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel possess adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties," and the Settlement Agreement did "not appear to provide undue preferential treatment to any individual Settlement Class Member or Subclass." (*Id*. at 9-11.)  Additionally, following an analysis of the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, the Court held that "[t]he Settlement Class and Subclasses preliminarily satisfy the Requirements of Rule 23, and certification is appropriate." (*Id*. at 17.)  Consequently, the Court preliminarily certified a Settlement Class of "[a]ll living NFL Football Players who . . . retired . . . from playing professional football with the NFL or any Member Club," their Representative Claimants, and their Derivative Claimants.  (Order ¶ 2, July 7, 2014, Doc. No. 6084.)  The Court also preliminarily certified two subclasses of Retired NFL Football Players (and their Representative Claimants and Derivative Claimants) who received a Qualifying Diagnosis prior to the date of preliminary approval (July 7, 2014) and those who did not (but some of whom may receive a Qualifying Diagnosis in the future). (*Id*.)

In addition, the Court established a process and schedule for Settlement Class Members to object or opt out of the Settlement Agreement.  Pursuant to the Court's

order, Settlement Class Members had until October 14, 2014 to file written objections or an opt-out request.  (*Id*. ¶ 4.)  In addition, the Court ordered Settlement Class Members wishing to be heard at the Fairness Hearing to submit a written notice to the Court by November 3, 2014.  (*Id*.)  Finally, the Court ordered that a Fairness Hearing be held on November 19, 2014 to determine whether to finally approve the Settlement Agreement as fair, reasonable and adequate, and finally certify the Settlement Class.  (*Id*. ¶ 5.)

## F.       <u>Settlement Class Notice</u>

In connection with Preliminary Approval, the Court concluded that "[t]he dissemination[,] . . . form and content of the proposed Long-Form Notice and Summary Notice . . . satisfy the requirements of Rule 23 and Due Process."   (Mem. Op. at 18-19, July 7, 2014, Doc. No. 6083; *see also* Order ¶ 4, July 7, 2014, Doc. No. 6084.)   The Settlement Class Notice described the Settlement Agreement in plain, easily understood language and advised Settlement Class Members of the definition of the Settlement Class, their rights regarding opting out of the Class Action Settlement or objecting thereto, and the date, time, and location of the Fairness Hearing.  (Mot. for Approval of Completed Versions of Long-Form Notice and Summ. Notice Ex. 1 ("Long-Form Notice"), Doc. No. 6086-1.)  The Settlement Class Notice also apprised all Settlement Class Members of the nature of the action and the Settlement Class claims and issues including, among other things, the maximum recovery for Monetary Awards, Offsets to Monetary Awards, and that the Qualifying Diagnosis of Death with CTE includes only "diagnoses of Death with CTE prior to **July 7, 2014**." (Long-Form Notice at 6, 12-14 (emphasis in original).)  As such, the Court directed Co-Lead Class Counsel to notify Settlement Class Members about the Settlement Agreement pursuant to the Settlement Class Notice Plan.  (Order ¶ 4, July 7, 2014, Doc. No. 6084.)

Pursuant to the Court's order, Co-Lead Class Counsel established a website (http://www.nflconcussionsettlement.com/ (the "Settlement Website")) by July 11, 2014—90 days before the Settlement Class Members' deadline for opting out or objecting to the Settlement Agreement—and mailed Settlement Class Notice to Settlement Class Members on July 24, 2014.  (Order ¶ 4, July 7, 2014, Doc. No. 6084; Mot. for Prelim. Approval Ex. C ("Kinsella Decl.") ¶¶ 12-18, 32, Doc. No. 6073-3.) Using a number of sources—including the NFL, the National Football League Players Association, various NFL Member Clubs, publicly available websites, and player and beneficiary data compiled for use in the class action settlement in *Dryer* v. *National Football League*, No. 0:09-cv-02182 (D. Minn.)—Co-Lead Class Counsel, upon information and belief, sent Settlement Class Notice directly to over 30,000 Settlement Class Members' addresses.  (*See* Kinsella Decl., Notice Plan p. 9.)  In addition, Co-Lead Class Counsel supplemented this notice through advertisements on television, radio, and in other media.  (*See* Kinsella Decl. ¶¶ 24-26, Doc. No. 6073-3.)

In accordance with the Notice Plan, upon information and belief, Co-Lead Class Counsel published the one page short-form notice in various publications, including *Time*, *Ebony*, *People*, and *Sports Illustrated* by September 15, 2014.  (*Id.* ¶ 22; Order ¶ 4, July 7, 2014, Doc. No. 6084.)  The short-form notice provides similar information in condensed form, and stated, among other things, that the Settlement Agreement provides recovery for "*certain* cases of chronic traumatic encephalopathy or CTE . . . diagnosed after death."  (Mot. for Approval of Completed Versions of Long-Form Notice and Summ. Notice, Ex. 2 ("Short-Form Notice") at 1, Doc. No. 6086-2 (emphasis added).)

Both the Short-Form Notice and Long-Form Notice also were made available on the Settlement Website, which links to numerous other documents and information related to the Class Action Settlement, including the Settlement Agreement, the Court's preliminary approval order and opinion, Class Counsel's moving papers in support of preliminary approval, and the declaration of Judge Layn R. Phillips in support of preliminary approval. The Settlement Website also includes a Frequently Asked Questions page explaining, among other things, the basics of the Settlement Agreement and how to access additional information, including through use of a phone hotline.

The Settlement Website has been widely used by Settlement Class Members. Over 64,000 unique visitors have accessed the website, and over 5,200 Settlement Class Members have signed up to receive additional information and updates concerning the Class Action Settlement, including information on registration for Settlement benefits. (*See* Decl. of Douglas M. Burns ("Burns Decl.") Ex. 1, Claims Administrator Update as of Nov. 9, 2014.)

## G.  <u>Opt Outs and Objections</u>

Out of more than 20,000 known Retired NFL Football Players and the thousands of their family members and unknown Retired NFL Football Players, only 234 Settlement Class Members—consisting of 209 Retired NFL Football Players/and their estates, 23 other Settlement Class Members and 2 other individuals whose status has not been determined—filed requests to opt out.[13] The total opt outs represent no more than 1% of the Settlement Class.

---

[13]  This total number of Opt Outs includes both requests that the Claims Administrator under the Settlement Agreement deemed timely and untimely. (Opt Out Report Submitted by the Claims Administrator at 2, Doc. No. 6340.)

For those Settlement Class Members who remained in the Class, 205 of them objected to the Settlement, consisting of 201 Retired NFL Football Players and their estates and 4 other Settlement Class Members.[14]   The 205 Objectors filed 82 written submissions, many of which adopt the objections of others.   The objections addressed herein are briefly summarized below and synthesized into general subject matter areas.   A list of Objectors is provided in Appendix A.

First, Objectors claim that the scope of the Qualifying Diagnoses and amount of the Monetary Awards are insufficient.   Objectors argue that diagnoses of CTE made after preliminary approval should be compensated and that the standard for a Qualifying Diagnosis of dementia is unreasonably high.   They also argue that there exist other medical conditions (*e.g.*, multiple sclerosis and epilepsy) that are omitted from the Settlement making the Settlement unfair and, in some instances, creating class certification problems.   Relatedly, Objectors argue that the maximum Monetary Awards available for Qualifying Diagnoses are insufficient and that the potential reductions to the Awards (due to a Retired NFL Football Player's age or any applicable Offsets) are improper.

Second, Objectors challenge the requirement that, in order to receive a Monetary Award, Representative Claimants of Retired NFL Football Players who died prior to January 1, 2006 (more than seven years before the Preliminary Approval date)

---

[14]   These totals include both timely and untimely filings; six submissions were untimely. (*See* Anderson Obj., Doc. No. 6248; Cosbie Obj., Doc. No. 6414; Hetherington Obj., Doc. No. 6394; Johnson Doc., No. 6395; Mauck Obj., Doc. No. 6405; Werner Obj., Doc. No. 6412.)   In addition, they include four Retired NFL Football Players (Sean Morey, Ben Hamilton, Robert Royal, and Roderick "Rock" Cartwright) who opted out of the Settlement Agreement and, as a result, are no longer proper Objectors.

must demonstrate that their claim would not be barred by any applicable statutes of limitations.

Third, Objectors contend that the $75 million BAP Fund is inadequate because it will not cover the cost of treating dementia and that the particular BAP testing protocols described in the Settlement Agreement are too burdensome.

Fourth, Objectors criticize the Settlement process, including the registration and claims processes, the deadline for enrollment in the BAP, the Settlement provisions requiring the use of Qualified MAF Physicians, the Claim Package, the appeals process for Monetary Award determinations, and the anti-fraud provisions relating to the Claims Administrator's investigation and audit of Claim Packages.

Fifth, although the Monetary Award Fund is uncapped, Objectors argue that the $10 million Education Fund is an inappropriate *cy pres* award that diverts monies away from Settlement Class Members.

Sixth, Objectors contend that the Release is overbroad because it allegedly releases without compensation claims for CTE after the preliminary approval date and certain claims made in *Dent* v. *National Football League*, a proposed class action pending in the Northern District of California concerning the alleged improper use of medications in the NFL.

Seventh, Objectors argue that the NFL Parties may default on the payments required by the Settlement Agreement because the provision of security is insufficient.

Eighth, Objectors argue that the timing of the opt-out deadline is unfair and should be revised. Specifically, Objectors argue that: (i) a delayed opportunity to

opt out after the Fairness Hearing should be permitted, and (ii) Objectors should be permitted to object and appear at the Fairness Hearing even if they later opt out.

Ninth, Objectors claim that the notice provided and approved by this Court was deficient and misleading in its characterization of the instances of CTE that are compensated.

Finally, Objectors contend that the attorneys' fees provision renders the Settlement unfair because, among other reasons, the NFL Parties' agreement to place $112.5 million into an Attorneys' Fees Qualified Settlement Fund constitutes an inappropriate "kicker arrangement reverting unpaid attorneys' fees to the defendant."

\*          \*          \*

For the reasons below, the Settlement Agreement should be finally approved.

**ARGUMENT**

**I.**
**THE SETTLEMENT IS**
**FAIR, REASONABLE AND ADEQUATE**

Third Circuit law strongly favors pretrial settlement of complex class actions and repeatedly recognizes "an overriding public interest in settling class action litigation." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *see also Ehrheart* v. *Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010) ("We reaffirm the overriding public interest in settling class action litigation." (internal quotation marks omitted)); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

As the "fiduciary [who] guard[s] the claims and rights of the absent class members," the district court must determine whether the settlement is fair, reasonable and adequate. *Pet Food*, 629 F.3d at 349-50 (internal quotation marks omitted). At the outset of the evaluation of a class action settlement, a district court should "apply an initial presumption of fairness [to the settlement] where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Warfarin*, 391 F.3d at 535 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

The court then considers the factors set forth in *Girsh* v. *Jepson*, 521 F.2d 153, 157 (3d Cir. 1975):

36

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

A court also may consider additional factors identified by the Third Circuit in *In re Prudential Insurance Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998),[15] as appropriate, for a "thoroughgoing analysis of a settlement's terms." *See Pet Food*, 629 F.3d at 350.

No single factor is dispositive, and not every factor need weigh in favor of the settlement for it to be approved. *See Cendant*, 264 F.3d at 242-43 (affirming a final settlement approval when not all factors weighed in favor of approval); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 277-78 (E.D. Pa. 2012) (same). Moreover, "because a settlement represents the result of a process by which opposing parties attempt to weigh and balance the factual and legal issues that neither side chooses to risk taking to final resolution, courts have given considerable weight to the views of experienced counsel as to the merits of a settlement." *In re Imprelis Herbicide Mktg. Sales Practices*

---

[15] These "*Prudential* factors" are: "[(1)] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [(2)] the existence and probable outcome of claims by other classes and subclasses; [(3)] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [(4)] whether class or subclass members are accorded the right to opt out of the settlement; [(5)] whether any provisions for attorneys' fees are reasonable; and [(6)] whether the procedure for processing individual claims under the settlement is fair and reasonable." *Prudential*, 148 F.3d at 323.

& *Prods. Liab. Litig.*, 296 F.R.D. 351, 364 (E.D. Pa. 2013); *Lake* v. *First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class." (internal quotation marks omitted)).

Here, as detailed below, the Settlement Agreement—negotiated by experienced counsel in hard-fought negotiations and accepted by over 99% of Settlement Class Members—is presumptively fair.  The *Girsh* and *Prudential* factors confirm that presumption and overwhelmingly favor approval.

## A.     The Settlement Is Presumptively Fair

Each of the criteria for applying an initial presumption of fairness is satisfied here.

First, the settlement negotiations occurred at arm's length and there is no evidence of collusion.  As the record reflects, and as this Court already has found in connection with preliminary approval, the Settlement Agreement was the "product of good faith, arm's length negotiations" over many months, overseen by both a Court-appointed mediator and a Special Master, and "does not appear to provide undue preferential treatment to any individual Settlement Class Member or Subclass" and also "ensure[s] that all Settlement Class Members' interests were protected."  (Mem. Op. at 10-11, July 7, 2014, Doc. No. 6083; *see also In re Cigna Corp. Sec. Litig.*, No. 2:02-cv-08088, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007) (agreement presumptively fair where "negotiations for the settlement occurred at arm's length, as the parties were assisted by a . . . mediator").)  Moreover, attorneys' fees were not discussed until the parties had reached an agreement in principle, and the Settlement Agreement provides

that attorneys' fees will be paid by the NFL Parties separate from the funds available to Settlement Class Members.[16]

Second, as discussed more fully below (*see infra* § I.B.3), although formal discovery in this case was stayed pending consideration of a threshold jurisdictional preemption issue that may have ended the litigation, the various counsel "possess adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties." (Mem. Op. 10-11, July 7, 2014, Doc. No. 6083.)  Here, Class Counsel thoroughly investigated the claims brought in the Complaints, researched and briefed opposition papers in response to the NFL Parties' motions to dismiss on preemption grounds, and exchanged information with the NFL Parties during negotiation and mediation sessions, including information regarding various Retired NFL Football Players' alleged injuries.  (*See* Mem. in Supp. of Prelim. Approval at 43, June 25, 2014, Doc. No. 6073-5.)  Moreover, as reported by the Court-appointed mediator, former U.S. District Court Judge Layn R. Phillips, over the course of settlement negotiations, Class Counsel retained various medical and economics experts to advise on the multiplicity of medical definition issues, other medical aspects of the Settlement, the modeling of the possible disease incidence and adequacy of the funding provisions and benefit levels contained in the Settlement Agreement, and Class Counsel were "extremely well-versed in the medical literature and issues relevant to arriving at a fair settlement" and on which

---

[16]  *See* Settlement Agreement § 21.1 ("Separately and in addition to the NFL Parties' payment of the monies set forth in ARTICLE XXIII ["NFL Payment Obligations"] and any consideration received by Settlement Class Members under this Settlement, the NFL Parties shall pay class attorneys' fees and reasonable costs."); Mem. Op. at 6-7, July 7, 2014, Doc. No. 6083 ("The NFL Parties will also pay attorneys' fees and costs . . . *in addition* to the amounts that the NFL Parties will pay to satisfy all Monetary Awards, finance the BAP Fund and Education Fund, and cover the costs for Class Notice and other administrative expenses." (emphasis in original)).

the merits of Plaintiffs' claims stand or fall.   (Phillips Decl. ¶ 8.)   Under these circumstances, courts have held that the presumption of fairness applies even where no formal discovery has taken place.  *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 235-36 (3d Cir. 2001) (affirming approval of settlement even though litigation was "settled at an early stage" after only "informal" discovery because "Lead Plaintiff had an excellent idea of the merits of its case . . . before Settlement"); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (despite no formal discovery, presumption of fairness applied where Class Counsel had "independently investigat[ed] the merits" of the claims prior to filing the complaint).

Third, the presumption of fairness properly attaches where the settlement "resulted after intense arm's length negotiations between experienced counsel."  *In re Diet Drugs Prods. Liab. Litig.*, 226 F.R.D. 498, 521 (E.D. Pa. 2005).[17]  As noted by Judge Phillips, "Plaintiffs . . . were represented by highly experienced, effective and aggressive counsel," and "[m]ultiple law firms and individual counsel were involved on behalf of both sides [and] presented an impressive array of legal experience, talent, and expertise," such that he "was satisfied throughout the negotiations that the parties' positions were thoroughly explored and advanced."  (Phillips Decl. ¶ 7.)

Finally, and significantly, as discussed more fully below, objections to the Class Action Settlement were due on October 14, 2014.  (Order ¶ 4, July 7, 2014, Doc. No. 6084.)  Less than 1% of the Settlement Class objected to the Settlement Agreement

---

[17]  *See also Processed Egg*, 284 F.R.D. at 267 (settlement was presumptively fair where "Interim Co-Lead Counsel [we]re extremely experienced in class action litigation, and specifically, similar antitrust litigation"); *McCoy* v. *Health Net, Inc.*, 569 F. Supp. 2d 448, 458-59 (D.N.J. 2008) (presumption of fairness applied where settlement was negotiated by "well-seasoned" counsel who "demonstrated adequacy and tenacity" during the negotiations).

and less than 1% opted out.  This amount is similar to, or less than, the amount of objections in other cases involving settlements that courts have presumed to be fair and reasonable.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (district court did not abuse its discretion in determining that the presumption of fairness properly attached to a settlement that "was objected to by only a small fraction of the purported class"); *First State Orthopaedics* v. *Concentra, Inc.*, 534 F. Supp. 2d 500, 516 (E.D. Pa. 2007) (presumption of fairness met when "only 0.16% of the class opted out or objected to the settlement").

In sum, the Settlement Agreement is presumptively fair.

**B.      An Evaluation of the *Girsh* Factors Confirms that the**
**Settlement Is Fair, Reasonable and Adequate**

Because a rebuttable presumption of fairness attaches to this Settlement Agreement (*see supra* § I.A), Objectors bear the burden of establishing that the Settlement is unreasonable under the *Girsh* factors.  *See First State Orthopaedics* v. *Concentra Inc.*, 534 F. Supp. 2d 500, 516 (E.D. Pa. 2007) ("[T]he settlement should be presumed fair. However, this is a rebuttable presumption."); *see also* 2 McLaughlin on Class Actions § 6:7 (10th ed.) ("While the initial presumption of fairness does not dilute the court's review on final approval, it does place the burden on any objectors of persuading the court that the proposed settlement is unreasonable." (citing *New Eng. Health Care Emps. Pension Fund* v. *Fruit of the Loom, Inc*., 234 F.R.D. 627, 631 (W.D. Ky. 2006), *aff'd sub nom. Fidel* v. *Farley*, 534 F.3d 508 (6th Cir. 2008))).  Objectors have not and cannot meet this burden because the application of the *Girsh* factors confirms that the Settlement Agreement is fair, reasonable and adequate and should be finally approved.

1.      **The Complex Legal, Factual and Scientific Issues in This Case Would Make Continued Litigation Significantly Prolonged and Expensive**

Under the first *Girsh* factor the court "must balance the Proposed Settlement against the time and expense of achieving a potentially more favorable result through further litigation.   Where the complexity, expense and likely duration of litigation are significant, the Court will view this factor as weighing in favor of settlement."[18] *Lenahan* v. *Sears, Roebuck & Co.*, 2006 WL 2085282, at *12 (D.N.J. July 24, 2006) (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 536 (D.N.J. 1997)), *aff'd*, 266 F. App'x 114 (3d Cir. 2008)).   More specifically, courts in this Circuit consider:  (i) the scope and breadth of the litigation; (ii) whether complex scientific issues would likely require multiple experts, at an "enormous cost," who would be delving "into somewhat new territory"; (3) the likelihood that discovery would be extensive and require significant resources; and (4) counsels' representation that litigating the action through pretrial motion practice, formal discovery, and trial would add additional years to the litigation and could deprive class members of relief. *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010).   Each consideration is satisfied here.

No party could rationally dispute—and, indeed, no objection has seriously contested—that continued litigation of the matters in MDL 2323 would be exceedingly

---

[18]   Certain Objectors argue that the first *Girsh* factor weighs against final approval because the "claims presented by the retired players are hornbook tort law" and any advantage gained in diminished litigation costs is outweighed by the detriment to "those class members whose valid claims go uncompensated because their interests were not adequately represented during the negotiation."  (Morey Obj. at 83-84, Doc. No. 6201; *see* Alexander Obj. at 4, Doc. No. 6237.)  Objectors entirely miss the point. These cases hardly represent issues of hornbook law.  And even if they did, the scope of the litigation and scientific issues underlying it complicate the prosecution of the cases.

complex, take years to resolve, and cost significant sums of money (assuming Plaintiffs could overcome the NFL Parties' threshold jurisdictional preemption defense). The sheer size of the litigation alone weighs in favor of settlement.

First, the scope and breadth of the litigation are vast. The Settlement Class includes over 20,000 known Retired NFL Football Players whose alleged injuries date back over half a century, and although the NFL Parties are the primary defendants in the litigations, the cases involve numerous NFL Member Clubs, each with its own medical staff. *See, e.g., In re Prudential Insurance Co. of Am. Sales Practices Litigation.*, 148 F.3d 283, 318 (3d Cir. 1998) (noting the "sheer magnitude of the proposed settlement class" in discussing this factor); *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) ("number of defendants" favored settlement); *Pet Foods*, 629 F.3d at 351 (noting the number and nationwide character of the related lawsuits).

Second, the medical and scientific issues involved are complex and will require numerous experts. Should this litigation continue, it would demand a comprehensive analysis of the relationship between concussive and sub-concussive repetitive head trauma injuries sustained while playing NFL Football and long-term brain injury, including physical, psychiatric and neurocognitive impairment, *and* a scientific analysis as to whether the Retired NFL Football Player's repetitive head trauma caused his neurocognitive, neuromuscular or other impairment. Such an analysis would require multiple experts in the fields of neuroscience and general medicine, among others.

Third, discovery in this litigation would be extensive and require significant resources. Class Counsel would have to expend substantial resources taking discovery of multiple defendants. The NFL Parties, in turn, would seek to depose all of

the named Plaintiffs in this litigation who reside throughout the country on numerous issues including their medical histories, their playing histories, the types of treatment received for concussions or other head injuries, and their purported knowledge and reliance on statements made by the NFL concerning the underlying facts at issue in this litigation, among numerous other issues. And, as noted above, expert discovery in these cases would be far-reaching.

Finally, as Judge Phillips noted: "Plaintiffs would be unlikely to have obtained more money and benefits without going through years of discovery and trial, where they would face substantial risks of loss due to their inability to prove negligence or fraud on the part of the NFL Parties or judgments below what they will receive in this proposed settlement. In addition, even after judgment, the parties likely would have been engaged in years of appellate proceedings before any judgment would be finalized." (Phillips Decl. ¶ 19.) Moreover, as discussed in more detail below, Plaintiffs would face significant threats to the viability of their claims at every turn. Indeed, several more months of litigation and a ruling on preemption could have resulted in the vast majority, if not all, of Plaintiffs' claims being dismissed.

By contrast, a settlement now, at this stage of the litigation, "save[s] both sides from incurring significant additional expense for experts, for discovery compliance, and for legal fees and time," which "weighs heavily in favor of the settlement." *In re Imprelis Herbicide Mktg. Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 365 (E.D. Pa. 2013); *Pet Food*, 629 F.3d at 351 (first *Girsh* factor favored settlement where "the complex medical and toxicological issues" would have required multiple experts and

there was likelihood that discovery would be "extensive and require significant resources" (internal quotation marks omitted)).

### 2.   99% of Settlement Class Members Have Remained in the Class Without Objection

Under the second *Girsh* factor, where, as here, the members of the class support the settlement—close to unanimously—courts infer that the settlement is fair, reasonable and adequate and should be approved.  Indeed, "[t]he vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement."  *See Cendant*, 264 F.3d at 235; *see also In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 342 (E.D. Pa. 2007) ("The fact that an overwhelming majority of the Class did not file objections is a significant element to consider in determining the overall fairness of the settlements.").

That presumption is well founded here.  Upon information and belief, the extensive Notice Plan reached over 90% of Settlement Class Members by means of the Direct Mail Notice in combination with Paid Media Placements.  (Kinsella Decl. ¶ 37.) To date, out of a settlement class size of more than 20,000 Retired NFL Football Players, only 205 Settlement Class Members have filed objections to the Class Action Settlement and only 234 have opted out.  This amounts to an objection rate of less than 1% and an opt-out rate of less than 1%, which are well within the range that courts have deemed indicative of broad support for settlement agreements in other cases.  *See, e.g.*, *Prudential*, 148 F.3d at 318 (opt-out rate of roughly 0.2% of the class and objection rate of roughly 0.004% was "truly insignificant"); *Stoetzner* v. *U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("response of the class members . . . strongly favors settlement"

where 29 out of 281 class members (roughly 10%) objected).[19]  In addition, the fact that over 5,200 Settlement Class Members have signed up to receive additional information about the Settlement Agreement, and over 64,000 unique individuals have visited the settlement website (Burns Decl. Ex. 1), is "indicative of affirmative endorsement of the settlement" particularly given the "extensive notice and outreach program" to Settlement Class Members.  *Varacallo* v. *Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 237 (D.N.J. 2005) (fact that "over 80,000 Class Members have utilized the toll-free telephone numbers to contact the call center or contacted Class Counsel for additional information about the Settlement and how to be included" weighed in favor of settlement approval).

These extraordinarily low opt-out and objection numbers are even more significant and demonstrate strong support by the Settlement Class given that the Settlement is highly publicized and many of the Settlement Class Members have a significant stake in the litigation and are represented by counsel.  This Settlement has been extensively covered and debated in the popular media and amongst Retired NFL Football Players for over a year.[20]  Simply put, the reaction of Settlement Class Members

---

[19]  *See also In re Metro. Life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871, at *26 (W.D. Pa. Dec. 28, 1999) (opt-out rate amounting to about 0.33% of the class); *In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*, No. 2:05-cv-232, 2008 WL 4974782, at *6-7 (E.D. Pa. Nov. 21, 2008) ("responses received weigh[ed] in favor of settlement," where there were 32 written objections, 7 verbal comments and/or objections at the fairness hearing, and 80 opt outs, out of a class of approximately 29,000); *Little-King* v. *Hayt Hayt & Landau*, 2013 WL 4874349, at *9 (D.N.J. Sept. 10, 2013) (22 opt outs and 4 objections out of a class of 50,000 was "small" and "create[s] a presumption that . . . weighs in favor of settlement"); *Weiss* v. *Mercedes Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995) (100 objectors out of 30,000 potential class members weighed in favor of settlement).

[20]  Burns Decl. Ex. 2, Ken Belson & Bill Pennington, *Former N.F.L. Players Face Deadline to Opt Out of Concussion Settlement*, N.Y. Times, Oct. 14, 2014; Burns Decl. Ex. 3, Ken Belson, *For Retirees, Decision on Concussion Settlement Will Not*

46

to the Settlement Agreement has been extraordinarily positive.  Accordingly, this *Girsh*

factor strongly favors approval.

### 3. Class Counsel Adequately Appreciated the Merits of the Case Prior to Settlement Negotiations

Where Class Counsel had an "adequate appreciation of the merits of the

case before negotiating [the settlement]," the third *Girsh* factor favors final approval of

the Settlement, even where no formal discovery was conducted.  *Cendant*, 264 F.3d at

319 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55

F.3d 768, 813 (3d Cir. 1995)); *see also In re Corrugated Container Antitrust Litig.*, 643

F.2d 195, 211 (5th Cir. 1981) ("[W]e are not compelled to hold that formal discovery was

a necessary ticket to the bargaining table. Because the plaintiffs did have access to

information, this case cannot be characterized as an instance of the unscrupulous leading

the blind.").  The circumstances here particularly counsel in favor of final approval

because, even without any formal discovery, Class Counsel had the ability to evaluate the

merits of the case on at least two significant and potentially dispositive issues:

preemption and causation.[21]

---

*Be a Simple One*, N.Y. Times, July 22, 2014; Burns Decl. Ex. 4, Sam Farmer, *Revised NFL Concussion Settlement Gets U.S. Judge's Preliminary OK*, L.A. Times, July 7, 2014; Burns Decl. Ex. 5, Ken Belson, *N.F.L. Agrees to Settle Concussion Suit for $765 Million*, N.Y. Times, Aug. 29, 2013.

[21]   In addition, as outlined below (*infra* § I.B.4), Plaintiffs would have faced numerous and significant obstacles in pursuing their claims that would not have benefitted from formal discovery including, for example, the NFL Parties' assumption of risk defense. Retired NFL Football Players—who are professional athletes—are deemed to understand and assume the risks inherent in playing professional football, which include the risk of head injury.  *See, e.g.*, *Benitez* v. *N.Y.C. Bd. of Educ.*, 541 N.E.2d 29 (N.Y. 1989) ("Awareness of the risk assumed is 'to be assessed against the background of the skill and experience of the particular plaintiff, and in that assessment a higher degree of awareness will be imputed to a professional than to one with less than professional experience in the particular sport.'" (citations omitted));

First, prior to the onset of settlement negotiations, Class Counsel faced a serious risk that Plaintiffs' claims would be dismissed in their entirety on the basis of LMRA preemption.  As Class Counsel argued in their brief in support of preliminary approval, "[h]ad the Court accepted the NFL Parties' arguments, the Plaintiffs' claims could have been dismissed outright, rendered impracticable, or severely jeopardized or impaired."  (Mem. in Supp. of Prelim. Approval at 64, June 25, 2014, Doc. No. 6073-5.)  This threshold legal issue created a powerful impetus to engage in negotiations while the Plaintiffs' claims remained legally viable, as this Court recognized in ordering the parties to mediation.

Having completed extensive briefing on the NFL Parties' preemption motions to dismiss, Class Counsel had a thorough and adequate appreciation of the merits of the preemption arguments.  Merits discovery would not (and could not) have aided Class Counsel in further evaluating their likelihood of success on preemption; as a result, the lack of such discovery in this matter does not counsel against approval.  Instead, this *Girsh* factor weighs in favor of final approval of the Settlement given the NFL Parties' preemption defense.  *See*, *e.g.*, *Briggs* v. *Hartford Fin. Servs. Grp. Inc.*, No. 2:07-cv-5190, 2009 WL 2370061, at *13, 16 (E.D. Pa. July 31, 2009) (approving final settlement despite absence of formal discovery and holding that no discovery was necessary where a

---

*see also Zemke* v. *Arreola*, 2006 WL 1587101, at *3 (Cal. Ct. App. June 12, 2006) ("risk of a head injury is inherent in the sport of football" and "[a]pplied in the sporting context, it precludes liability for injuries arising from those risks deemed inherent in a sport; as a matter of law, others have no legal duty to eliminate those risks or otherwise protect a sports participant from them").  Thus, discovery would not aid Plaintiffs or Class Counsel in evaluating the strength of the NFL Parties' assumption of risk defense.  Nor would it assist in evaluating the strength of certain other defenses, including statute of limitations, for which Class Counsel possess sufficient information to determine the weakness Plaintiffs would have on that threshold issue.

threshold legal issue was presented to the court); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1065-66 (S.D. Tex. 2012) (noting that defendants had planned to bring motion to dismiss which "would have raised legal issues difficult for . . . Plaintiffs to overcome" was factor in favor of approving settlement); *Trombley* v. *Nat'l City Bank*, 826 F. Supp. 2d 179, 195-96 (D.D.C. 2011) (approving class action settlement in part because "the legal landscape for [overdraft fee litigation] remains challenging and riddled with uncertainty" where a federal law preemption issue had not yet been decided by any federal appeals court); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 962 (N.D. Ill. 2011) (granting final approval of class action settlement in part because defendants had a "strong argument to compel the Class Representatives to arbitrate their claims, rather than proceeding with their class action" and "Class Members subject to mandatory arbitration could not obtain recovery in court"); *In re Apple Computer, Inc. Derivative Litig.*, 2008 WL 4820784, at *3-4 (N.D. Cal. Nov. 5, 2008) (approving settlement agreement and noting that defendants may have been successful on a second motion to dismiss).

Second, even if Plaintiffs succeeded in defeating some portion (or all) of the NFL Parties' preemption motions to dismiss, it would be difficult, if not impossible, for Plaintiffs to prove causation. Class Counsel engaged in significant investigation regarding the pathology surrounding the neurocognitive impairments alleged by Plaintiffs, the causes of such impairments and the likelihood of Settlement Class Members suffering from various impairments, which permitted Class Counsel to evaluate the strengths of their positions on significant and complex medical issues that would arise

if the litigation were to continue and on which their claims stand or fall. Moreover, unlike in most other cases, there has been an extraordinary amount of public discussion and debate about the issues underlying this litigation and related, publicly available research, providing Class Counsel with a great deal of information to evaluate Plaintiffs' claims without formal discovery. (*See infra* § I.B.4; *see also In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 270 (E.D. Pa. 2012) (although the litigation settled at an early stage, Class Counsel had "adequate knowledge of the litigation and informed negotiations" due to Class Counsel's "extensive investigations into the [nature of the antitrust conspiracy] in preparation for filing the complaint"); *In re ATI Techs., Inc. Sec. Litig.*, No. 2:01-cv-02541, 2003 WL 1962400, at *2 (E.D. Pa. Apr. 28, 2003) (although lacking formal discovery, the parties were able to "assess their strengths and weaknesses" prior to settlement).)

Indeed, studies—including those cited by Plaintiffs and others—establish that mild repetitive traumatic brain injury *may* be a risk factor for later developing one of the Qualifying Diagnoses, but it has not been shown to be a *cause* of those conditions. (Decl. of Dr. Kristine Yaffe ("Dr. Yaffe Decl.") ¶¶ 14, 47.)[22] In light of the uncertainty surrounding the causal relationship between Traumatic Brain Injury ("TBI") and the

---

[22] Dr. Yaffe is a Professor in the Departments of Psychiatry, Neurology and Epidemiology at University of California San Francisco ("UCSF"). In addition, Dr. Yaffe is a clinical neurologist and geropsychiatrist focusing on the treatment of patients with neurodegenerative diseases. Dr. Yaffe serves as the director of the UCSF Dementia Epidemiology Research Group and as the Chief of Geriatric Psychiatry and Director of the Memory Disorders Clinic at San Francisco Veteran's Affairs Medical Center. She is the principal investigator of seven grants from the National Institutes of Health, including grants related to cognitive decline, and has authored over 300 peer-reviewed articles. Dr. Yaffe also serves as the Roy and Marie Scola Endowed Chair in Psychiatry and the Vice Chair of clinical and translational research at UCSF. (*See* Dr. Yaffe Decl. Ex. A.)

Qualifying Diagnoses—corroborated by the testimony of the NFL Parties' experts—establishing to a reasonable degree of medical certainty that a TBI, or series of TBIs, from NFL Football play caused a developed condition would be exceedingly difficult, both on a general population basis and on a specific basis with respect to an individual player.  (*See id*. ¶¶ 16, 51-53.)   In short, formal discovery was not necessary to evaluate the weakness in Plaintiffs' causation case.

Despite these hurdles, Objectors contend that Class Counsel's discovery efforts to date "fall well short of the benchmark" established in other cases where courts have granted final approval after "extensive discovery."  (*See* Morey Obj. at 56-57, Doc. No. 6201.)[23]  Objectors are wrong.

"Even settlements reached at a very early stage and prior to formal discovery are appropriate when there is no evidence of collusion and the settlement represents substantial concessions by both parties."  *Little-King* v. *Hayt Hayt & Landau*,

---

[23]   Certain Objectors also contend that the Settlement Agreement should not be finally approved because "the NFL and Co-Lead Class Counsel have not disclosed the full extent of the underlying analyses, documents and information on which the [Settlement Agreement] is predicated."  (Armstrong Obj. at 25, Doc. No. 6233; *see also* Alexander Obj. at 5, Doc. No. 6237.)   This Court already has considered and rejected similar requests for discovery concerning settlement negotiations, including the evidence on which the parties relied when negotiating the Settlement Agreement.  (*See* Order at 1, Oct. 15, 2014, Doc. No. 6245.)   As this Court held, and as demonstrated by the NFL Parties in their opposition brief, discovery into the settlement negotiations is improper absent evidence of collusion between class counsel and the defendants, of which there is none here.  (*See* Resp. of NFL in Opp'n to Mot. for Leave to Conduct Limited Disc. at 16-19, Doc. No. 6185 (citing *Lobatz* v. *U.S. W. Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000) ("[s]ettlement negotiations involve sensitive matters" and "'discovery of settlement negotiations is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive'" (quoting *Mars Steel Corp.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 834 F.2d 677, 684 (7th Cir. 1987) (Posner, J.))) and *Thornton* v. *Syracuse Sav. Bank*, 961 F.2d 1042, 1046 (2d Cir. 1992) (quoting the same)).)

2013 WL 4874349, at *10 (D.N.J. Sept. 10, 2013); *see also* Morey Obj. at 55-57, Doc. No. 6201.  Far from collusive, and as discussed throughout this brief, counsel for the parties engaged in hard-fought, adversarial negotiations over the course of a year with assistance and oversight from both a former United States district court judge and a court-appointed special master.  (*See supra* at 26-29; *see also* Mem. Op. at 9-10, July 7, 2014, Doc. No. 6083.)   The NFL Parties made substantial concessions in reaching this Settlement Agreement, including carving out from the Release former players' rights to seek recovery under the 88 Plan and the Neurocognitive Disability Benefit and also waiving any requirement for a Settlement Class Member to prove causation prior to receiving a Monetary or Derivative Claimant Award.  (*See generally* Phillips Decl.; Settlement Agreement §§ 18.6, 29.1-29.2.)

Moreover, the cases cited by Objectors are wholly inapposite.  First, none of the plaintiffs in *Warfarin*, *Cendant* or *Prudential*—unlike Plaintiffs here—was faced with outright dismissal of his or her claims.  Rather, those cases settled after dispositive motions had already been denied.  *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 523-24 (3d Cir. 2004) (motion to dismiss had been denied); *Cendant,* 264 F.3d at 226 (same); *Prudential*, 148 F.3d at 292-93 (no motion to dismiss pending when plaintiffs obtained discovery);[24] *Gen. Motors Corp. Pick-Up Truck,* 55 F.3d at 779-80 (same).

---

[24]   Although plaintiffs in *Prudential* received some discovery, that case is distinguishable.  There, the Court had granted defendants' motion to dismiss the complaint without prejudice to plaintiffs' right to refile an amended complaint, which plaintiffs ultimately did.  In the meantime, the court ordered defendants to provide plaintiffs with copies of the substantial discovery materials already provided to the New Jersey Multi-State Life Insurance Task Force, which had simultaneously been

Second, both the Third Circuit decisions in *Community Bank* and *General Motors Corp. Pick-Up Truck* are distinguishable.

In *Community Bank*, the issue was whether objectors were denied meaningful participation in the final fairness hearing due to the court's refusal to permit objectors to engage in pre-hearing discovery or present testimony of witnesses at the hearing where no formal discovery had occurred in the case. The Third Circuit noted that although "no formal discovery was undertaken by class counsel," it was nevertheless "*likely* that [counsel for objectors] *ha[d] developed sufficient facts regarding this matter* and its prospective settlement value such that it would be able to present a cogent and supportable objection at the fairness hearing," given that counsel for objectors had previously litigated two similar suits. 418 F.3d 277, 316 (3d Cir. 2005) (emphasis added). As a result, the Court stated that it was "inclined to *agree* with the settling parties that the District Court's Order limiting discovery was not an abuse of discretion," but noted that it was unable to conclusively so hold, given the limited record before it. *Id*. at 317 (emphasis added). The Third Circuit thus remanded so that the district court could "develop fully the record" and reevaluate whether discovery would aid the court. *Id*.; *see also In re Cmty. Bank of N. Va.*, 467 F. Supp. 2d 466, 470 (W.D. Pa. 2006) (on remand addressing a different aspect of the Third Circuit's order). Importantly, the Third Circuit did not hold that there was an absolute right to discovery in advance of final approval where no formal discovery was conducted; nor did it hold that the objectors were entitled to discovery in that circumstance.

---

conducting an internal investigation of defendants' sales practices, which were at issue in the litigation. No such facts are present here.

In *General Motors Corp. Pick-Up Truck*, although the Court held that "the inchoate stage of case development" reduced its confidence in the adequacy of representation and fairness of the settlement, only "four months [had] elapsed from the filing of the consolidated complaint to the reaching of the settlement agreement" and the court was confronted with evidence of collusion between the parties due to the high amount of attorneys' fees, the manner in which such fees were negotiated and the lack of monetary relief available to settlement class members—who would receive a $1,000 coupon toward the purchase of a new GM truck. *Id.* at 813. Here, the period between the filing of the Complaints and the Settlement Agreement was significantly longer, during which the parties engaged in adversarial, arm's-length negotiations. Moreover, far from a "coupon" settlement case, the Settlement Agreement here provides for very significant, guaranteed and uncapped Monetary Awards of up to $5 million for each claimant over a 65-year term, and those payments will be made independently of any attorneys' fee award. Finally, the court in *General Motors Corp. Pick-Up Truck* did not hold that formal discovery was necessary in order for the settlement to be fair, reasonable and adequate, or that courts which approve settlements in such cases commit reversible error. Rather, the Third Circuit merely reiterated the established law that, pursuant to *Girsh*, courts must "determine whether counsel had an adequate appreciation of the merits of the case before negotiating [settlement]." *Id.* As demonstrated above, that requirement is met here.

Here, given the sound reasons for the stay of discovery, and the significant legal obstacles Plaintiffs face in proving their case—which further discovery would not have aided—Class Counsel had an adequate appreciation for the merits of Plaintiffs'

claims prior to entering into settlement negotiations, and, thus, the third *Girsh* factor weighs strongly in favor of final approval.

### 4. Absent Settlement, Plaintiffs Face Significant Hurdles to Establishing Liability and Damages

*Girsh* factors four and five—the risks of establishing liability and proving damages—"survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319.  In examining these factors, the Court "need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'" *Perry* v. *FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (quoting *Lachance* v. *Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997)).  As detailed by Class Counsel in their motion for preliminary approval (*see* Mem. in Supp. of Prelim. Approval at 61-71, June 25, 2014, Doc. No. 6073-5), Settlement Class Members would face significant—and likely insurmountable—hurdles in litigation.  *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *61 (E.D. Pa. Aug. 28, 2000) ("Although the court makes no determination of the merits of the claims of plaintiffs, it notes several obstacles that they would have to overcome . . . [noting, among other things, the speculative nature of future medical costs, debate over defendant's awareness of the dangers posed by their products, causation issues, defenses of comparative and contributory negligence, scientific complexity of the case, and statute of limitations defenses]. . . These risks to establishing liability and

damages show that plaintiffs' success at trial cannot be guaranteed.  Thus, these factors weigh in favor of settlement.").

> **Preemption**.  As discussed throughout this brief, pending before this Court are the NFL Parties' fully briefed and argued motions to dismiss the Complaints.  Those motions presented a significant roadblock to prosecution of Plaintiffs' claims.

> The NFL Parties contended as detailed above (*see supra* at 12-14) that Plaintiffs' claims are entirely preempted by Section 301 of the LMRA because the resolution of Plaintiffs' claims—whether based in negligence or fraud—would substantially depend upon interpretations of, or arise under, the terms of the CBAs.

> The NFL Parties' preemption arguments had substantial legal support.  Indeed, two federal courts already have denied motions to remand the cases of Settlement Class Members because those claims—the precise claims raised in this litigation—are preempted by federal labor law.  For example, in *Duerson*, the court held that a concussion-related negligence claim against the NFL similar to that alleged here was preempted because, in order to evaluate the reasonableness of the NFL's conduct, the court would have been required to interpret the terms of the CBA setting forth the duties of the NFL Member Clubs to protect player health and safety.  *Duerson* v. *Nat'l Football League*, 2012 WL 1658353, at *4, 6 (N.D. Ill. May 11, 2012).  And, as discussed above, in *Maxwell* v. *National Football League*, the Court held that "[t]he CBA places primary responsibility for identifying  . . . physical conditions on the team physicians . . . .  The physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  Order Den.

Pls.' Mot. to Remand at 1-2, *Maxwell*, No. 2:11-cv-08394, Doc. No. 58 (C.D. Cal. Dec. 8, 2011); *see also* Order Den. Pls.' Mot. to Remand at 1-2, *Pear* v. *Nat'l Football League*, No. 2:11-cv-08395, Doc. No. 61 (C.D. Cal. Dec. 8, 2011); Order Den. Pls.' Mot. to Remand at 1-2, *Barnes* v. *Nat'l Football League*, No. 2:11-cv-08396, Doc. No. 58 (C.D. Cal. Dec. 8, 2011).[25]

Moreover, numerous courts, consistent with settled labor preemption precedent, have held that player tort claims against the NFL and/or its Member Clubs are preempted under section 301. *See, e.g.*, *Williams* v. *Nat'l Football League*, 582 F.3d 863, 881-82 (8th Cir. 2009) (breach of fiduciary duty, negligence, gross negligence, fraud, constructive fraud, negligent misrepresentation, and intentional infliction of emotional distress claims preempted); *Givens* v. *Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010) (outrageous conduct, negligent infliction of emotional distress, and breach of duty of good faith and fair dealing claims preempted); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 909-11 (S.D. Ohio 2007) (wrongful death claim preempted); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178-79 (N.D.N.Y. 1990) (negligence, fraud, negligent misrepresentation, and negligent and intentional infliction of emotion distress claims preempted); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412-14 (N.C. Ct. App. 2009) (negligent retention and intentional misconduct claims preempted).

---

[25] Completely (and improperly) ignoring the decisions in *Maxwell, Pear, Barnes* and *Duerson*, which held that Plaintiffs' claims were substantially dependent upon provisions in the CBAs, the Morey Objectors cite to the decision in *Green* v. *Arizona Cardinals Football Club*, where the court held that claims against the club were not preempted by federal labor law and, therefore, should be remanded to state court. (*See* Morey Obj. at 65, Doc. No. 6201 (citing *Green* v. *Ariz. Cardinals Football Club*, 2014 WL 1920468, at *3 (E.D. Mo. May 14, 2014)).) The court's remand holding in *Green* is an outlier.

If the NFL Parties had succeeded on their motions to dismiss the Complaints on preemption grounds, the Complaints would have been dismissed in their entirety, and Plaintiffs would have received *no* relief in the courts.  Even if only a portion of the NFL Parties' motions were granted, a significant portion of the Settlement Class would have been left with no recourse.  This Settlement Agreement removes the substantial risk posed by the NFL Parties' strong preemption arguments.  *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *9 (E.D. Pa. Jan. 4, 2001) ("If further litigation presents a realistic risk of dismissal on summary judgment or an exonerating verdict at trial, the plaintiffs have a strong interest to settle the case early."); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1065-66 (S.D. Tex. 2012) (fact that defendants planned to bring motion to dismiss which had reasonable likelihood of success was a factor in favor of approving settlement); *In re Apple Computer, Inc. Derivative Litig.*, 2008 WL 4820784, at *3, 5 (N.D. Cal. Nov. 5, 2008) (approving settlement agreement and noting that defendants may have been successful on a second motion to dismiss).

*Causation***.**  Even if some or all of Plaintiffs succeeded in defeating the NFL Parties' motions to dismiss on preemption grounds, they would have faced significant hurdles in proving their claims at trial.  Chief among Plaintiffs' difficulties would have been proving causation.

The crux of Plaintiffs' complaint is that had the NFL properly treated concussions received by NFL players during their NFL careers and provided players with information regarding the effects of concussions and repetitive head trauma, and returning to play thereafter, then the players could have avoided their alleged injuries and

neurocognitive impairments or would have been able to minimize their effects. As Class Counsel stated in their brief in support of preliminary approval, "but for the proposed Settlement, Plaintiffs would have had to demonstrate that the actions of the NFL Parties, in allegedly concealing risks of concussion and exposing them to head traumas on numerous occasions, was the legal cause of their injuries." (Mem. in Supp. of Prelim. Approval at 64, June 25, 2014, Doc. No. 6073-5.) Plaintiffs face enormous challenges proving both general causation—whether concussions and repetitive head trauma are capable of causing long-term neurocognitive impairments in the first place—and specific causation—whether his specific concussion(s) actually caused his long-term injury and whether the NFL's alleged conduct substantially contributed to that injury. *See Soldo* v. *Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 524-25 (W.D. Pa. 2003) ("[T]o meet her causation burden, plaintiff must first establish that [defendant's product] is capable of causing [the injury] (general causation). She must then establish that, in her particular case, [defendant's product] did in fact cause her [injury] (specific causation) . . . Plaintiff must prove medical causation to a reasonable degree of medical certainty." (internal citations and quotation marks omitted).

First, to prove general causation, Plaintiffs must establish a causal connection between concussions (and repetitive head trauma) and long-term neurocognitive impairments—an issue subject to intense debate in the scientific community. Recent research from independent scientists demonstrates considerable uncertainty about the role that concussions play in later-life impairment, the incidence and prevalence of injury in former professional athletes, and the role of other genetic, environmental or lifestyle factors in neurocognitive impairment and neurological disease.

(*See* Dr. Yaffe Decl. ¶ 16 ("[I]n light of the uncertainty surrounding the causal relationship between mild repetitive TBI and the Qualifying Diagnoses, establishing to a reasonable degree of medical certainty that a mild TBI, or series of mild TBIs, from NFL play *caused* a developed condition would be exceedingly difficult in my opinion—both on a general population basis and even more so on a specific basis with respect to an individual player." (emphasis in original)).)   As one example, in the Journal of the International Neuropsychological Society the authors stated:

> To date, there has not yet been a well-controlled study exploring the prevalence of long-term cognitive or behavioral impairments in . . . American football. . . .  No prospective study has explored the prevalence of any particular neuropathological finding . . . in these athletes compared to non-athlete controls.  In the absence of prospective studies, it is unclear if any particular pathology can be solely attributed to repetitive head trauma, and whether it plays a role in the genesis of any behavioral or cognitive changes.

(Burns Decl. Ex. 6, Christopher Randolph, Stella Karantzoulis & Kevin Guskiewicz, *Prevalence and Characterization of Mild Cognitive Impairment in Retired National Football League Players*, 19 J. Int'l Neuropsychological Soc'y 873, 877 (2013); *see also* Dr. Yaffe Decl. ¶ 39 ("It is my belief—and no scientific study says or demonstrates otherwise—that based on the current state of the science, the association between mild repetitive TBI and the Qualifying Diagnoses is not clear.  And even if mild repetitive TBI emerges as a *risk factor* for developing the Qualifying Diagnoses, it is unclear whether this association is a causal one." (emphasis in original)).)

Moreover, the leading international conference on concussions in sport published a consensus statement evidencing the accepted view among the scientific community regarding CTE:

> It was further agreed that CTE was not related to concussions alone or simply exposure to contact sports. At present, there are no published

epidemiological, cohort or prospective studies relating to modern CTE. Owing to the nature of the case reports and pathological case series that have been published, it is not possible to determine the causality or risk factors with any certainty. As such, the speculation that repeated concussion or subconcussive impacts cause CTE remains unproven. The extent to which age-related changes, psychiatric or mental health illness, alcohol/drug use or co-existing medical or dementing illnesses contribute to this process is largely unaccounted for in the published literature.

(Burns Decl. Ex. 7, Paul McCrory et al., *Consensus Statement on Concussion in Sport: The 4th International Conference on Concussion in Sport Held in Zurich, November 2012*, 47 Brit. J. Sports Med. 250, 257 (2013); *see also* Dr. Yaffe Decl. ¶ 66 ("Because of the limited research available on CTE, and the lack of long-term, prospective studies, very little is known about CTE.  The scientific community does not completely understand the cause or causes of CTE.  Nor does the scientific community understand the diagnostic and clinical profile of CTE."); Decl. of Dr. Julie Ann Schneider[26] ("Dr. Schneider Decl.") ¶ 27 ("Because of the limited number of studies available, and the nature of the case reports that have been published, it is my opinion that we do not know enough about CTE to adequately understand its risk factors, the relation between repetitive TBI and CTE, or the diagnostic and clinical profile of CTE.").)

---

[26] Dr. Schneider is a professor of pathology (neuropathology) and neurological sciences at Rush University Medical Center in Chicago, Illinois.  In addition, Dr. Schneider is a board-certified practicing clinical neuropathologist and neurologist.  She serves as Associate Director, Neuropathology Core Leader, and Senior Neuropathologist of the Rush Alzheimer's Disease Center, is part of 17 investigative teams with grants to study various pathologies, and has authored over 180 peer-reviewed scientific articles.  Dr. Schneider was recently recognized by Thompson Reuters as being among the top 1% of highly cited researchers in the world in the area of neuroscience and behavior.  She was an invited member of the expert panel convened by the National Institute on Aging – Alzheimer's Association to provide new guidelines for the criteria for a pathologic diagnosis of Alzheimer's Disease in 2012.  (*See* Dr. Schneider Decl. Ex. A.)

Numerous other respected bodies, including the National Institutes of Health and the Institute of Medicine, have called for comprehensive further research into these issues.   (*See, e.g.*, Burns Decl. Ex. 8, Nat'l Insts. of Health, *Report on the Neuropathology of Chronic Traumatic Encephalopathy Workshop* (2012) ("[V]ery few studies have looked at biomarkers that address the long-term disease processes of CTE. Much work remains to identify useful, validated biomarkers that provide information about the injury mechanisms of CTE."); Burns Decl. Ex. 9, Inst. of Med. of the Nat'l Acads., *Sports-Related Concussions in Youth: Improving the Science, Changing the Culture* (2013) ("[I]t remains unclear whether repetitive head impacts and multiple concussions sustained in youth lead to long-term neurodegenerative diseases, such as chronic traumatic encephalopathy."); *see also* Dr. Yaffe Decl. ¶ 57.)

Second, even if a connection between concussions (and repetitive head trauma) and long-term neurocognitive impairment could be established generally (on a population-wide basis), each Plaintiff also would have had to prove *specific* causation— that is, that the actions of the NFL Parties were the cause of that player's injuries, as opposed to some cause related to prior football experience in middle school, high school, college or in another professional football league (*e.g.*, the Canadian Football League or the Arena Football League), or unrelated to football.[27]   In fact, many Retired NFL Football Players had the protection of a union and collectively-bargained for work rules while playing NFL Football unlike during their experiences playing football elsewhere

---

[27]   Objectors contend that Eligible Seasons should be credited for participation in the Canadian Football League.   (Gilchrist Obj. at 1, Doc. No. 6364; Wilson Obj. at 1, Doc. No. 6361; *see supra* § II.D.5.)   But the Canadian Football League shares no corporate relationship with the NFL.   If anything, an Offset, not credit, for participation in other professional football leagues would be justified given the causation issues explained herein.   For this reason, the objection lacks merit.

likely with less access to skilled medical care.  For members of the proposed Settlement Class who had short NFL careers compared to their amateur and non-NFL professional football exposure, this burden would be particularly problematic.  There are also many members of the proposed Settlement Class who developed their symptoms later in life and may have difficulties proving that their alleged injuries were not a result of the normal aging process.  Thus, the burden and expense of proving causation and negligence or intentional concealment would have been substantial, and the results at trial highly uncertain.  *See Diet Drugs*, 2000 WL 1222042, at *61 ("[T]he scientific complexity of this case is likely to lead to a battle of expert testimony which enhances the unpredictability of a trial outcome."); *In re Pet Food Prods. Liab. Litig.*, 2008 WL 4937632, at *15 (D.N.J. Nov. 18, 2008), *aff'd in part, vacated in part, remanded by* 629 F.3d 333 (3d Cir. 2010) (plaintiffs' admission that "the issue of causation would be a major battleground with the outcome unknown . . . satisf[ied] the fourth and fifth *Girsh* factors"); *see also* Dr. Yaffe Decl. ¶ 52 ("On an individual level, establishing causation between mild repetitive TBI and neurodegenerative syndromes is even more difficult. . . . [O]ne can imagine many players having many of the significant risk factors for developing a certain condition aside from the prior TBI exposure in NFL football," including, "age, a specific genetic profile or gene, obesity, cardiovascular disease, depression, post-traumatic stress disorder, or substance abuse.").

By contrast, the Settlement Agreement has taken causation out of the case, an enormous benefit to Settlement Class Members.  No Settlement Class Member need prove that his Qualifying Diagnosis was caused by the NFL.  No proof of causation is

required at all.  This is a significant benefit to the Settlement Class and heavily weighs in favor of approval.

      **Statutes of Limitations.**  Another significant potential risk for Settlement Class Members moving forward with this litigation is the NFL Parties' statute of limitations defenses.  *See*, *e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss at 24-25, *Maxwell* v. *Nat'l Football League*, No. 2:11-cv-08394, Doc. No. 67 (C.D. Cal. Dec. 20, 2011).  Many of the Retired NFL Football Players have not played for years or decades and thus were allegedly injured, and knew they were injured, long ago.  This scenario presents a serious challenge for those Plaintiffs, as their claims are outside the applicable statute of limitations.  *See*, *e.g.*, 42 Pa. Cons. Stat. Ann. § 5524(2) (two-year statute of limitations for personal injury claims in Pennsylvania); N.Y. C.P.L.R. § 214 (three-year statute of limitations for personal injury claims in New York).

      This is no less true in states with a discovery rule.  Pennsylvania's discovery rule, for example, places the burden on the plaintiff to show that the rule applies.  *See*, *e.g.*, *Dalrymple* v. *Brown*, 701 A.2d 164, 167 (Pa. 1997) ("The party seeking to invoke the discovery rule bears the burden of establishing the inability to know of the injury despite the exercise of reasonable diligence").  The discovery rule tolls the statute of limitations only "until the discovery of the injury is reasonably possible," which requires the plaintiff to prove that he engaged in objectively reasonable diligence.  *Id*. Here, the Complaints fail to allege that Retired NFL Football Players were unable to know of their injuries despite the exercise of reasonable diligence.  And given the significant publicity surrounding this issue, Plaintiffs would face a difficult battle relying on the discovery rule.

Furthermore, several states have declined to adopt a discovery rule for personal injury claims, holding that a plaintiff's claim accrues upon the date of the injury. *See*, *e.g.*, *Blanco* v. *Am. Tel. & Tel. Co.*, 689 N.E.2d 506, 509-10 (N.Y. 1997) (New York does not recognize a discovery rule tolling its three-year personal injury limitations period except in circumstances that are inapplicable here); *Chalmers* v. *Toyota Motor Sales Actions USA, Inc.*, 935 S.W.2d 258, 261 (Ark. 1996) (no discovery rule for personal injury cases); *Johnston* v. *Dow & Coulombe, Inc.*, 686 A.2d 1064, 1066 (Me. 1996) (discovery rule is limited to claims for legal malpractice, medical malpractice, and asbestosis); *Koenig* v. *Lambert*, 527 N.W.2d 903, 905 (S.D. 1995) (legislature has acknowledged and rejected discovery rule), *overruled on other grounds by Stratmeyer* v. *Stratmeyer*, 567 N.W.2d 220 (S.D. 1997); Va. Code Ann. § 8.01-230 ("the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person").

The fact that the Settlement Agreement appropriately factors in, and avoids, the significant risks presented by the NFL Parties' statute of limitations defenses weighs strongly in favor of settlement

*Assumption of Risk***.** The doctrine of assumption of risk also poses a significant challenge to Plaintiffs' claims going forward. Under that doctrine, one who voluntarily participates in an activity, such as tackle football, consents to those commonly appreciated risks that are inherent in and arise out of the nature of the activity and flow from such participation. *See*, *e.g.*, *Alqurashi* v. *Party of Four, Inc.*, 89 A.D.3d 1047, 1047 (N.Y. App. Div. 2011) ("The doctrine of primary assumption of risk provides that a voluntary participant in a sporting or recreational activity consents to those commonly

65

appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation" (internal quotations marks omitted)); *Ciocca* v. *BJ's Wholesale Club, Inc.*, No. 2:04-cv-05605, 2011 WL 5553646, at *4 (E.D. Pa. Nov. 14, 2011) ("Assumption of the risk is a complete defense to . . . negligence claims under Pennsylvania law.").

Contrary to Objectors' contention that the "obscure and unobserved" nature of the injuries at issue were not "fully appreciated" by Retired NFL Football Players (Morey Obj. at 67-68, Doc. No. 6201), courts repeatedly have held that the doctrine precluded similar personal injury claims involving players who were injured while playing football. *See*, *e.g.*, *Zemke* v. *Arreola*, 2006 WL 1587101, at *3 (Cal. Ct. App. June 12, 2006) ("the risk of a head injury is inherent in the sport of football"); *Glazier* v. *Keuka Coll.*, 275 A.D.2d 1039, 1039 (N.Y. App. Div. 2000) (plaintiff assumed risk of injuries because "as an experienced football player, [he] was aware that being tackled in a violent manner is an inherent part of football"); *Hunt* v. *Skaneateles Cent. Sch. Dist.*, 227 A.D.2d 939, 939-40 (N.Y. App. Div. 1996) (high school student assumed risk of football-related injury despite defendant's failure to require players to wear potentially protective equipment during practice); *Knight* v. *Jewett*, 834 P.2d 696, 708-12 (Cal. 1992) (risks of collision and injury are inherent in football and participants generally have no duty to eliminate or protect a plaintiff against such risks); *Benitez*, 541 N.E.2d at 33 (same); *Breheny* v. *Catholic Univ. of Am.*, 1989 WL 1124134, at *7 (D.D.C. Nov. 22, 1989) (finding personal injury claim barred because plaintiff knew and appreciated risks of playing touch football game).

*Damages*.  In addition to the numerous obstacles to proving liability, Plaintiffs would also face significant risks in recovering damages at trial due to the contributory negligence and comparative fault regimes in certain states.

According to many states' contributory negligence and comparative fault laws, a plaintiff found to have engaged in a dangerous activity that contributed to his or her injuries faces limited recovery—and in some instances no recovery at all.[28]  Here, if Retired NFL Football Players are shown to have contributed to their own injuries, they face the possibility of significantly reducing recovery or in some circumstances eliminating any chance of recovery altogether.  By contrast, the Settlement Agreement does not require Settlement Class Members to prove damages as long as they suffered a compensable injury in accordance with the Agreement.  This presents a significant benefit to Settlement Class Members that weighs in favor of settlement.

In sum, and importantly, Objectors do not contest that they face significant hurdles regarding each of these issues.  Rather, they merely recite their arguments in opposition and claim that those responses make their case strong.  But the fourth and fifth *Girsh* factors focus on the landscape of hurdles that Plaintiffs could face absent settlement.  *See Perry* v. *FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) ("the Court need not delve into the intricacies of the merits of each side's arguments, but rather may give credence to the estimation of the probability of success proffered by class

---

[28]  *See*, *e.g.*, *Litchford* v. *Hancock*, 352 S.E.2d 335, 337 (Va. 1987) (contributory negligence is defense which bars recovery in Virginia); *Garrett* v. *NationsBank, N.A. (S.)*, 491 S.E.2d 158 (Ga. Ct. App. 1997) (contributory negligence is defense in Georgia); Mass. Gen. Laws Ann. ch. 231, § 85 (contributory negligence is defense in Massachusetts); Mich. Comp. Laws Ann. § 600.2959 (comparative fault is defense in Michigan); 42 Pa. Cons. Stat. Ann. § 7102 (comparative negligence is defense in Pennsylvania).

counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." (citations omitted)).  There can be no dispute here that significant hurdles pose a very material threat to Plaintiffs' ultimate success in litigation.

> **5.      Absent Settlement, Plaintiffs Face the Risk of Maintaining a Class Action Through Trial**

The sixth *Girsh* factor asks whether the class action could be maintained through trial, or whether it would pose "intractable management problems if it were to become a litigation class and therefore be decertified." *Warfarin,* 391 F.3d at 537.  As the Third Circuit has explained, "under Federal Rule of Civil Procedure 23(a), a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable," and "proceeding to trial would always entail the risk, even if slight, of decertification." *Cendant*, 264 F.3d at 239 (internal quotation marks omitted). Therefore, courts have held that this *Girsh* factor—potential unmanageability—is either neutral or weighs in favor of settlement. *See*, *e.g.*, *Prudential*, 962 F. Supp. at 540 (favoring settlement); *In re Cendant*, 264 F.3d at 239 (neutral); *Imprelis Herbicide*, 296 F.R.D. at 369 (favoring settlement); *Processed Egg*, 284 F.R.D. at 273 (favoring settlement); *Little-King*, 2013 WL 4874349 at *11 (neutral or slightly favoring settlement).

In any event, given the size of the Settlement Class here, intractable management problems may well arise once the litigation reached the trial stage, with the result that Plaintiffs would be unable to maintain a class.

6.   **The Ability of the NFL Parties to Withstand a Greater Judgment Is Irrelevant Because the Settlement Fund Is Uncapped**

The NFL Parties' agreement to uncap the Monetary Award Fund is a "fact which weighs strongly in favor of the settlement," *Prudential,* 148 F.3d at 328, even if the NFL Parties could withstand a greater judgment.   The uncapping of the fund completely eliminates this issue.   Moreover, the NFL Parties have agreed to fund a Statutory Trust by the tenth anniversary of the Effective Date of the Settlement Agreement in an amount that, in the reasonable belief of the NFL Parties, ensures that all Monetary Awards and Derivative Claimant Awards get paid throughout the 65-year term. (Settlement Agreement § 25.6(d).)   By contrast, future litigants would face uncertainty as to whether the NFL Parties would be able to pay judgments finalized decades from now.

The fact that the NFL Parties "could afford to pay more does not mean that [they are] obligated to pay any more than what the . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached." *Warfarin*, 391 F.3d at 538.   Instead, where the benefits to the Settlement Class Members are significant—as they are here—the theoretical ability of the defendant to pay a greater judgment has to be balanced against the likelihood that a plaintiff could obtain a greater judgment.   *See id.*   Otherwise, in every case, anything less than a settlement that financially cripples a defendant would weigh against final approval.   That is not the law. *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *23 (D.N.J. Sept. 13, 2005) ("[M]any settlements have been approved where a settling defendant has had the ability to pay greater amounts. . . . This factor does not favor nor disfavor settlement."); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) ("Although it appears that the defendant bank has the ability to withstand a greater financial judgment,

the Court finds that, given the substantial risks and obstacles faced by the classes in proceeding to trial as discussed herein, such factor does not weigh against approving the settlement."); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("[T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate.").

In these circumstances, and in light of Objectors' failure to present evidence that they would have received more from individually pursuing their claims, defendants' ability to pay a higher settlement is at best neutral or irrelevant to determining the fairness of the settlement. *See Warfarin*, 391 F.3d at 538 (finding no error in district court's conclusion that defendants' ability to pay a higher amount was "irrelevant to determining the fairness of the settlement" where objectors could not establish that they would have received more if the case were tried).[29]

### 7. The Settlement Is Well Within the Range of Reasonableness in Light of the Best Possible Recovery and the Attendant Risks of Litigation

In order to assess the reasonableness of a proposed settlement seeking monetary relief, the court should consider "the present value of the damages plaintiffs would likely recover if successful, *appropriately discounted for the risk of not prevailing*." *Prudential*, 148 F.3d at 322 (citing *Gen. Motors Corp. Pick-Up Truck*, 55

---

[29] Relying on *Ortiz* v. *Fibreboard*, 527 U.S. 815 (1999), Objectors also intimate that the NFL Parties have some obligation to disclose the extent of any insurance coverage for these claims. (Morey Obj. at 58, Doc. No. 6201.) *Ortiz*, which did not involve an evaluation of a settlement's fairness under the *Girsh* factors, has no such requirement. Rather, the case "turn[ed] on the conditions for certifying a mandatory settlement class on a limited fund theory under Federal Rule of Civil Procedure 23(b)(1)(B)." *Ortiz*, 527 U.S. at 821. The Court held that "applicants for contested certification on this rationale must show that the fund is limited by more than the agreement of the parties, and has been allocated to claimants belonging within the class by a process addressing any conflicting interests of class members." *Id.*

F.3d at 806) (emphasis added); *see, e.g.*, *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 170

(3d Cir. 2006) (finding settlement was an "excellent" result in light of risk of establishing

liability and damages despite fact that settlement possibly represented only 4% of the

total damages claimed).  "While the court is obligated to ensure that the proposed

settlement is in the best interest of the class members by reference to the best possible

outcome, it must also recognize that settlement typically represents a compromise and not

hold counsel to an impossible standard."  *In re Aetna Inc. Sec. Litig.*, MDL No. 1219,

2001 WL 20928, at *6 (E.D. Pa. Jan. 4, 2001); *Gen. Motors Corp. Pick-Up Truck*, 55

F.3d at 806 (noting that "after all, settlement is a compromise, a yielding of the highest

hopes in exchange for certainty and resolution"); *Lazy Oil* v. *Wotco Corp.*, 95 F. Supp. 2d

290, 338-39 (W.D. Pa. 1997) (stating that a court "should not make a proponent of a

proposed settlement 'justify each term of settlement against a hypothetical or speculative

measure of what concessions might have been gained; inherent in compromise is a

yielding of absolutes and abandoning of highest hopes.'" (quoting *Cotton* v. *Hinton*, 559

F.2d 1326, 1330 (5th Cir. 1977))), *aff'd*, 166 F.3d 581 (3d Cir. 1999).

     With respect to the Monetary Awards, for those who elect to remain in the

Settlement Class, the Settlement Agreement provides generous cash awards—up to $5

million—while eliminating the significant hurdles that Plaintiffs would face at trial, even

assuming they reach that point.  (*See supra* § I.B.4.)  And the Monetary Awards will be

available far more quickly than would be the case should a plaintiff proceed to trial.  *See*

*In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 501 (W.D. Pa. 2003) ("[A] future

recovery, even one in excess of the proposed Settlement, may ultimately prove less

valuable to the Class than receiving the benefits of the proposed Settlement at this

time."). Further, Retired NFL Football Players are entitled to receive such Awards even if they have already received substantial benefits related to neurocognitive impairment pursuant to benefit programs provided under a CBA (*e.g.*, the 88 Plan). The Settlement also preserves Retired NFL Football Players' rights to pursue workers' compensation and to participate in or claim entitlement to any medical or disability benefits available under the current 2011 NFL CBA, including the 88 Plan and Neuro-Cognitive Disability Benefit. (Settlement Agreement §§ 18.6, 29.1-29.2.)

Moreover, the uncapped, inflation-adjusted nature of the Monetary Award Fund, in combination with the fact that Retired NFL Football Players may obtain a Qualifying Diagnosis at any time until the end of the 65-year term of the Fund, ensures that Retired NFL Football Players will have an opportunity to participate in the Settlement even if they develop neurocognitive impairments in the future. This provides incalculable "piece of mind" to Retired NFL Football Players that compensation will be there years in the future if they later develop compensable conditions. *See In re Diet Drugs Prods. Litig.*, 226 F.R.D. 498, 522-23 (E.D. Pa. 2005) (eighth and ninth *Girsh* factors favored settlement where "infusion of funds assures that all deserving class members will receive fair compensation" and settlement "guarantees payment to all class members who suffer injuries caused by diet drug-induced valvular heart damage"); *Processed Egg*, 284 F.R.D. at 275 (uncapped settlement fund confers "real and substantial benefits upon the [settling] Class" and weighs in favor of final approval).

Aside from the uncapped, 65-year term of the Settlement, the headline awards under the Monetary Award Grid also are well within the bounds of reasonableness. For example, in 2000, former NFL running back Merril Hoge brought

suit against the former Bears team physician for failure to warn him about the severity of his concussions, which Hoge alleged forced him to retire at the age of 29.  (*See* Burns Decl. Ex. 10, Rummana Hussain, *Hoge Wins Lawsuit Against Doctor*, Chi. Trib., July 22, 2000.)  Hoge sought $2.2 million in damages for the loss of potential earnings had he remained an active NFL player.  The jury ruled in Hoge's favor and awarded him $1.45 million for two years of the three-year contract for which he was not paid and $100,000 for pain and suffering.  (*Id.*).

Where, as here, Settlement Class Members are eligible to quickly and efficiently recover significant awards in the face of significant expense, delay and risks inherent in the litigation process, the eighth and ninth *Girsh* factors favor settlement.  *See*, *e.g.*, *In re AT&T Corp. Sec. Litig.*, 455 F.3d at 170 (settlement was an "excellent" result given risk of establishing liability and damages where settlement possibly represented only 4% of the total damages claimed); *Gates* v. *Rohm & Haas Co.*, No. 2:06-cv-01743, 2008 WL 4078456, at *7 (E.D. Pa. Aug, 22, 2008) (Because the "[s]ettlement eliminates the need for—and the risk of—proving on an individual basis" plaintiffs' damages, the eighth and ninth *Girsh* factors weigh in favor of the reasonableness of the settlement.); *cf.* *Processed Egg*, 284 F.R.D. at 276 (fact that "results achieved by the settlement for the Class and Subclasses are immediate, concrete, and realized without the costs and delays associated with extensive discovery and other later stages of litigation" weighs in favor of settlement).

Moreover, for Settlement Class Members who prefer to undertake litigation risk, the Settlement Agreement provides a choice—the right to opt out and incur the significant costs and attorneys' fees associated with ongoing litigation.  Objectors

who urge the court to reject this Settlement are, in essence, arguing that all claimants must be risk-takers willing to proceed with litigation; rejection of the Settlement would force them to do so—and negate their ability to receive substantial, and likely otherwise unattainable, Monetary Awards.  This result not only disregards the desires of those who prefer an efficient and immediate resolution of their claims, but also holds them hostage to the few who wish to risk continued litigation.  Indeed, as the court reasoned in *Diet Drugs*:

> The court has already noted the other obstacles to plaintiffs' success if the case were to proceed to trial. While the settlement avoids these risks, it also offers choice. Class members who wish to bear the risks of trial had an initial opt out right . . . The court finds that the benefits offered here are within the range of reasonableness considering the best possible recovery and all the attendant risks of litigation, and thus, these factors weigh in favor of settlement.

*Diet Drugs*, 2000 WL 1222042, at *62.  So, too, here.

**C.**    **The *Prudential* Factors Also Support Approval of the Settlement**

Like the *Girsh* factors, the *Prudential* factors favor settlement.[30]

---

[30] "While the Court must make findings as to the *Girsh* factors to approve a settlement as fair, reasonable and adequate, the *Prudential* factors are illustrative of additional factors that may be useful even though they are not essential or inexorable depending upon the specific circumstances."  *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 268 (E.D. Pa. 2012); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 323 (3d Cir. 1998).  Because the *Prudential* factors "are substantially similar to the factors provided in *Girsh*" we address only those *Prudential* considerations that have not yet been addressed above.  *In re Pet Food Prods. Liab. Litig.*, 2008 WL 4937632, at *24 (D.N.J. Nov. 18, 2008), *aff'd in part, vacated in part, remanded by* 629 F.3d 333 (3d Cir. 2010).  For a discussion of the "maturity of underlying substantive issues," *Prudential*, 148 F.3d at 323, *see supra* §§ I.B.3, I.B.4; the "development of scientific knowledge" is discussed *infra* § II.A.4; the comparison of class recovery to individual claim recovery is discussed *supra* § I.B.7; for a discussion of opt-out rights, *see infra* § II.K; for a discussion of the procedure for processing claims under the settlement, *see infra* § II.G.

In *Prudential*, the Third Circuit held that the court may consider "whether any provisions for attorneys' fees are reasonable" in analyzing the fairness, reasonableness and adequacy of the settlement.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 323 (3d Cir. 1998).  Here, the provision for attorneys' fees weighs in favor of settlement because such fees will not be paid out of the Monetary Award Fund available to Settlement Class Members; attorneys' fees will thus have no bearing on the ability of Settlement Class Members to obtain settlement benefits, including Monetary Awards and access to the Baseline Assessment Program.  (*See* Settlement Agreement § 21.1.)  Following the Fairness Hearing—consistent with Rule 23(h) of the Federal Rules of Civil Procedure—Settlement Class Members will have the opportunity to object to Class Counsel's petition for attorneys' fees, should they so desire.  *See* Fed. R. Civ. P. 23(h)(2) ("A class member . . . may object to the [attorneys' fees] motion."); *see also Prandini* v. *Nat'l Tea Co*., 557 F.2d 1015, 1021 (3d Cir. 1977) (finding that settlements with separate funds for attorneys' fees and class member awards reduce the "conflict between client and attorney," "make the court's task less burdensome and remove a source of uneasiness over the settlement procedure without in any way impairing the power to set a proper fee").[31]

---

[31]    Although the court in *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir. 1995), stated in dicta that even attorneys' fees paid from a separate fund could impact class members' interests, *id.* at 819-20, that case arose in a context completely different from the one here.  In that case, the district court had initially awarded attorneys' fees without any independent review of the fees whatsoever on the basis that the fee arrangement was a private "matter of contract between the parties . . . and . . . will have no impact on the class members." *Id.* at 819.  On appeal, the Third Circuit reversed and remanded on other grounds, stating that "a thorough judicial review of fee applications is required in all class action settlements." *Id.*  The court went on to note, in dicta, that, contrary to the district court's holding, the fee award to be paid by General Motors could, in theory,

Further, the manner in which the attorneys' fees were negotiated weighs strongly in favor of settlement, particularly given that "[t]he Settling Parties did not discuss the issue of attorneys' fees . . . until after an agreement in principal was reached on all material Settlement terms providing benefits to the Settlement Class and Subclass Members and after the Term Sheet was inked, in an abundance of caution and consistent with *Prandini* v. *National Tea Co.*, 585 F.2d 47, [49 n.1] (3d Cir. 1978)."  (Mem. in Supp. of Prelim. Approval at 30, June 25, 2014, Doc. No. 6073-5.)

\*       \*       \*

In sum, because (i) an initial presumption of fairness attaches, (ii) the *Girsh* factors weigh in favor of final approval, and (iii) the additional *Prudential* factors weigh in favor of final approval, this Court should approve the Settlement Agreement as fair, reasonable and adequate.

## II.
## THE OBJECTIONS ARE MERITLESS AND FAIL TO REBUT THAT THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

Out of a Settlement Class comprised of over 20,000 Retired NFL Football Players, only 200 Retired NFL Football Players or their estates have filed objections to the Settlement Agreement.  Although the objections address a number of topics, at

---

impact the total amount available to settlement class members to the extent the defendant is concerned with limiting his total liability arising from the lawsuit; therefore, paying a higher attorney fee could result in the defendant paying a lower settlement amount, particularly where—as in the case before it—the attorneys' fees and the settlement amount were likely negotiated simultaneously.  *Id.* at 803-04 (citing *Prandini*, 557 F.2d at 1021).  Here, attorneys' fees and the settlement terms were *not* negotiated simultaneously, *see supra* pp. 26, 38-39.  Moreover, unlike in *General Motors Corp. Pick-Up Truck,* the Settlement Agreement provides a vehicle for the Court to review Class Counsel's attorneys' fee petition at an appropriate time after the Fairness Hearing, at which time Settlement Class Members will have a full opportunity to object to the petition.  Thus, the dicta from *General Motors Corp. Pick-Up Truck* is inapposite.

76

bottom they all wish that the terms of the Settlement Agreement had been different.  But "compromise is the essence of a settlement" and "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."  *Cotton* v. *Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (affirming approval of class settlement); *see also In re Aetna Inc.*, MDL No. 1219, 2001 WL 20928, at *6 (E.D. Pa. Jan. 4, 2001) (class "settlement typically represents a compromise and [courts must] not hold counsel to an impossible standard.").  Objectors' desire for improved or different terms does not render the Agreement unfair, unreasonable or inadequate.[32]

### A.  The CTE-Related Objections Should Be Overruled

Several Objectors criticize the Settlement's treatment of CTE.  They argue that:  (i) the Settlement's "failure to compensate players who are living with CTE or who die with it after July 7" or to compensate "behavioral and mood disorders" associated with CTE makes the Settlement fundamentally unfair (Morey Obj. at 21, 28-29, Doc. No. 6201); (ii) the Settlement lacks "structural assurance of fair and adequate representation for the Wrongful Death CTE cases," in part because it does not compensate for the "behavior and mood deficiencies" associated with CTE  (Duerson Obj. at 15-19, Doc.

---

[32]   The NFL Parties respond below to the following categories of objections—all of which are meritless—including objections related to (1) the Qualifying Diagnoses; (2) the Monetary Award amounts and Offsets; (3) the requirement that Representative Claimants of Retired NFL Football Players who died prior to January 1, 2006 demonstrate their claims would not be barred by any applicable statute of limitations in order to receive a Monetary Award; (4) the BAP; (5) the Settlement process and procedures, including, among other things, the registration and claims processes, the requirements concerning the use of Qualified BAP Providers and Qualified MAF Physicians, and the Settlement Agreement's anti-fraud provisions; (6) the Education Fund; (7) the breadth of the Release; (8) the Settlement Agreement's Security provisions; (9) the deadline for opting out of the Settlement Agreement; (10) the requirement that Settlement Class Members sign objections by hand; (11) the adequacy of notice; and (12) attorneys' fees.  In each section, the NFL Parties identify a non-exhaustive list of Objectors who assert each objection. *See* Appx. A (providing complete list of Objectors).

No. 6241); (iii) the alleged "tradeoff of future CTE claims," evidences a lack of adequate representation (Miller Obj. at 4-6, Doc. No. 6213); and (iv) Class Representative Shawn Wooden was not an "appropriate[] representative of the interest of players who will suffer from CTE."  (Chelsey Obj. at 10-12, Doc. No. 6242.)

At bottom, Objectors argue that the failure to compensate CTE as a Qualifying Diagnosis after July 7, 2014 creates class certification problems and renders the Settlement Agreement fundamentally unfair.  These CTE-related objections are misguided, misleading, and meritless.

First, Objectors' accusation that CTE is not covered by the deal post-preliminary approval fundamentally distorts the parties' Agreement.  Although the Agreement does not (for good reason) compensate a post-mortem pathological diagnosis of CTE after preliminary approval, the Settlement *does* compensate living individuals who manifest the significant functional deficits allegedly associated with CTE, *i.e.*, memory and learning problems, attention problems, and executive dysfunction.  The research of Objectors' primary declarant—Dr. Robert Stern—demonstrates that these are the key symptoms allegedly associated with CTE.  Dr. Stern's research also supports the view that individuals with CTE eventually will develop dementia consistent with the definitions of Level 1.5 and Level 2 Neurocognitive Impairment, as well as other Qualifying Diagnoses.  Thus, based on Objectors' own expert, for the vast majority of the conditions associated with CTE, Retired NFL Football Players with CTE *will* qualify for Monetary Awards while living.  The fact that the Settlement Agreement does not compensate CTE *qua* CTE is an objection without substance.

Second, there was a considered decision by the parties not to compensate certain symptoms allegedly associated with CTE, such as mood and behavioral symptoms, because they are common among the general population and have numerous, multifactorial causes unrelated to NFL Football. Moreover, it is wrong to say that CTE is not covered; certain alleged *symptoms* of CTE (and, in fact, the other Qualifying Diagnoses) are not covered, based on rational reasons that reflect the extreme difficulty of proving such claims. Where, as here, any "relationship" between CTE and these symptoms is highly speculative, the parties' compromise on this point is entirely reasonable.

Third, future scientific developments regarding the relationship between CTE and certain mood and behavioral symptoms would not change the structure of the Settlement Agreement. The NFL Parties still would have been of the view that these symptoms not be compensated—whether relating to CTE or any other Qualifying Diagnosis—because they are so prevalent in the general population and because of their relative severity. Moreover, Objectors' speculation that a technique may be established in the next five to ten years to diagnose the tau protein associated with CTE in the brains of living players is of no consequence. The fundamental principle of the Settlement Agreement is to compensate manifest adverse conditions that materially impact daily life—not the presence of a certain protein that does not manifest in such symptoms.

Fourth, Objectors argue that it is unfair to compensate for CTE only in Retired NFL Football Players who died before preliminary approval. But Objectors have it backwards: the only reason CTE is a compensable condition pre-preliminary approval is because, by definition, a deceased player cannot take the required tests to establish a

Qualifying Diagnosis.  The parties agreed to this narrow exception regarding pre-preliminary approval CTE to *broaden* the scope of the Settlement, not to restrict it. Moreover, the parties did not want to compensate future post-mortem diagnoses of CTE, thereby arguably incentivizing suicide.

Finally, the argument by certain Objectors that Class Representative Shawn Wooden is not an adequate representative of the Subclass that includes Retired NFL Football Players who may develop CTE in the future is off the mark.  Mr. Wooden is asymptomatic and, like every other asymptomatic Retired NFL Football Player, has the alleged risk of developing the impairment compensated under the Settlement, including those symptoms that Objectors allege are associated with CTE.

### 1.     The Settlement Compensates Individuals with CTE Who Manifest Impairment While Living

Objectors' CTE-related objections are premised on a fundamental misunderstanding of the Agreement—that the Settlement Agreement does not compensate CTE.  (*See*, *e.g.*, Morey Obj. at 21, Doc. No. 6201.)  Objectors are wrong: The Settlement compensates the manifest deficits identified by Objectors' own declarant in his research on the subject.  (*See* Burns Decl. Ex. 11, Ann C. McKee et al., *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43 (2013) (the "McKee Study").)[33]

---

[33]  In the McKee Study, Dr. McKee and Dr. Stern examined the brains of 85 subjects who donated their brains to Boston University.  (McKee Study at 55.)  They then contacted the next of kin of approximately half of those subjects and asked them to recall the subjects' alleged symptoms while living.  (*See id*.)  The limitations of the McKee Study are described in detail in Dr. Yaffe's and Dr. Schneider's declarations.  (*See* Dr. Yaffe Decl. ¶¶ 69-74; Dr. Schneider Decl. ¶¶ 33-38.)  The NFL Parties do not accept the research as described by Objectors and reserve the right to contest the research on all fronts in any litigation.

According to the McKee Study, CTE is a post-mortem pathological diagnosis of tau protein in the brain that allegedly causes certain deficits and symptoms during an individual's lifetime.  (*See id.*)  CTE allegedly progresses in four stages.  Those four stages are described as CTE I through IV with CTE I being the earliest alleged stage of CTE and CTE IV being the most severe and most developed stage of CTE.  (McKee Study at 51-59.)  In reporting the symptoms associated with each stage, the McKee Study concluded that memory problems, attention and concentration problems, and executive dysfunction were associated with all four stages.  (*See id.* at 55, 57, 59, 61.)  At stage III, "[t]he most common presenting symptoms were memory loss, executive dysfunction, explosivity and difficulty with attention and concentration."  (*Id.* at 56.)  Moreover, "[s]eventy-five percent of subjects were considered cognitively impaired."  (*Id.* at 56-57.)  And at stage IV, "[e]xecutive dysfunction and memory loss were the most common symptoms at onset, and all developed severe memory loss with dementia during their course.  Most subjects also showed profound loss of attention and concentration, executive dysfunction, language difficulties, explosivity, aggressive tendencies, paranoia, depression, gait and visuospatial difficulties. . . ."  (*Id.* at 58-59.)  The McKee Study reported the following about the subgroup of retired football players in the study:  "thirty-one of the thirty-four former professional American football players had stage III–IV CTE or CTE plus co-morbid disease (89%)."  (*Id.* at 59.)  "CTE plus co-morbid disease" refers to players who were diagnosed with CTE and one of the following:  Alzheimer's Disease, Parkinson's Disease, ALS, or frontotemporal dementia, which would fall under the definition of Level 1.5 and Level 2 Neurocognitive Impairment in the Settlement

Agreement.  (*See id.* at 61; Dr. Yaffe Decl. ¶¶ 70, 80, 84; Dr. Schneider Decl. ¶¶ 31, 49, 51-52.)

        The deficits and Qualifying Diagnoses reported by the McKee Study allegedly associated with CTE are precisely what the Settlement Agreement compensates.   To that end, the Settlement compensates dementia *irrespective of pathological cause*.   Thus, the Monetary Awards for Level 1.5 Neurocognitive Impairment (early dementia) and Level 2 Neurocognitive Impairment (moderate dementia) compensate Settlement Class Members who experience neurocognitive impairment in the following areas:  learning and memory, complex attention, executive functioning, language, and visual-perceptual.  (Decl. of Dr. Scott R. Millis[34] ("Dr. Millis Decl.") ¶¶ 16, 18, 21.)   Given that learning and memory, complex attention, and executive functioning problems allegedly developed in Retired NFL Football Players with all alleged stages of CTE—particularly those with CTE III and CTE IV—the study supports the use of these areas to assess and compensate alleged CTE-related impairment in Retired NFL Football Players.  (Dr. Yaffe Decl. ¶¶ 81-84; Dr. Schneider Decl. ¶¶ 49-52.)

---

[34]  Dr. Millis is a tenured professor in the Department of Physical Medicine and Rehabilitation at Wayne State University School of Medicine and Director of Research at the Detroit Medical Center's Rehabilitation Institute of Michigan.  In addition, Dr. Millis is a board-certified clinical neuropsychologist and psychologist. He maintains an active program of research in traumatic brain injury, has authored over 130 peer-reviewed publications relating to neurobehavioral outcome and neuropsychology, and his research has been supported by the United States Department of Defense, National Institutes of Health, and the United States Department of Education.   Dr. Millis previously served as the Chief of Neuropsychology at the DMC Rehabilitation Institute of Michigan, and as the statistician for the Traumatic Brain Injury National Data Center over a ten-year period.  (*See* Dr. Millis Decl. Ex. A.)

In sum, based on the findings in the McKee Study, it is undisputed that at least 89% of the former NFL players studied in the McKee Study—who the Objectors argue would not be compensated under the Settlement—would have been eligible for a Qualifying Diagnosis while living under the Settlement.  (Dr. Yaffe Decl. ¶ 83.)  The remaining 3 of 34 players in the McKee Study also may have received compensation while living at the time they were studied by Dr. Stern and Dr. McKee, depending on their symptoms and the severity of their impairment.  (*Id.*)

Thus, the Settlement Agreement compensates many of the deficits identified in the McKee Study at the alleged early stages of CTE and all of the key symptoms identified in the McKee Study at the alleged later stages of CTE.

### 2.    The NFL Parties Reasonably Determined Not to Compensate Mood and Behavioral Symptoms

Objectors' CTE-related arguments thus hinge on the Settlement Agreement's exclusion of compensation for alleged mood and behavioral symptoms allegedly associated with CTE.  That exclusion was intentional and justified.  The Settlement Agreement does not compensate mood and behavioral symptoms such as depression, irritability, and aggressiveness (*whatever* the cause) because such symptoms are common in the general population and often have multifactorial causation, meaning that the causes of these symptoms can be attributed to numerous factors wholly unrelated to CTE, head trauma, or NFL Football; this is especially true in the context of Retired NFL Football Players who may have one of several significant risk factors for depression, including, but not limited to, sleep apnea, higher Body Mass Index, exposure to severe lifestyle changes, or drug abuse, which can be shown to increase the risk of depression or other behavioral symptoms.  (Dr. Yaffe Decl. ¶ 75; Dr. Schneider Decl. ¶ 39.)

In not compensating for those mood and behavioral conditions, the Settlement Agreement does not single out CTE as compared to other compensable conditions that may result in the same problems.  For example, although not part of the diagnostic profile, individuals with Alzheimer's Disease often experience depression, which is commonly associated with aging and, in fact, is a risk factor for cognitive decline and Alzheimer's Disease.  (Dr. Schneider Decl. ¶¶ 39, 42.)  Mood and behavioral conditions are not compensated in the Settlement Agreement for anyone.  They are common symptoms that afflict many people, including individuals dealing with the ramifications of neurocognitive or neuromuscular impairment.[35]  (Dr. Schneider Decl. ¶¶ 39, 42; *see also* Dr. Yaffe Decl. ¶ 75.)

Given these considerations, the NFL Parties, as part of the overall compromise achieved through the Settlement, agreed to compensate neurocognitive and neuromuscular impairment of a certain severity, even in light of the enormous difficulties Plaintiffs would face in establishing that head trauma during NFL Football caused the compensated impairments.  This decision to provide compensation for certain *alleged*

---

[35]  In their papers, many Objectors also focus on suicide as a known, established symptom of CTE.  (*See, e.g.*, Morey Obj. at 23, Doc. No. 6201.)   But this reasoning relating to mood and behavioral symptoms also applies to suicidal tendencies.  (Dr. Yaffe Decl. ¶ 76.)   Broadly speaking, there are no published cross-sectional, epidemiological or prospective studies which show a relationship between contact sports of any kind and risk of suicide.  (*See* Burns Decl. Ex. 12, Grant L. Iverson, *Chronic Traumatic Encephalopathy and Risk of Suicide in Former Athletes*, 48 Brit. J. Sports Med. 162, 162 (2014).)  To the contrary, one published epidemiological study suggests that retired NFL players have lower rates of death by suicide than the general population.  *See id.*  The "causes of suicide are also complex, multifactorial, and difficult to predict in individual instances."  (Dr. Yaffe Decl. ¶ 76.)  As such, Objectors' arguments that CTE is causally linked to suicide, as with other behavioral or mood driven symptoms, lacks any credible scientific support.

deficits, but not others, is consistent with the notion that a settlement is a compromise. (*See supra* § I.B.7 (citing cases).)

Here, the Settlement Class Members had clear notice regarding that compromise and the specific deficits that would be compensated. They were in a position to assess the risk of pursuing individual litigation in which they would need to establish a causal link between their alleged mood and behavioral symptoms and their NFL careers, and they were in a position to opt out and litigate their claims if they so desired. Thus, the compromise reached by the parties to compensate neurocognitive and neuromuscular impairment, but not mood and behavioral symptoms, was fair, reasonable, adequate and accepted by the vast majority of the Settlement Class.

### 3. The Science Regarding CTE Is New

In any event, the claim that these mood and behavioral symptoms are associated with CTE is highly speculative. The CTE-related objections themselves are not grounded in scientifically accepted principles.

The science of CTE is new. (Dr. Yaffe Decl. ¶¶ 17, 56; Dr. Schneider Decl. ¶¶ 18, 20; Dr. Millis Decl. ¶ 27.) Since 2005, when the first report occurred, CTE has been identified in fewer than 200 brains. (*See* Burns Decl. Ex. 13, Lauren K. Wolf, *Racing to Detect Brain Trauma*, 92 Chem. & Eng'g News 9, 11-12 (2014).) From a neuropathological perspective, as of today, CTE can only be diagnosed post-mortem. (Dr. Schneider Decl. ¶ 21.) This simply means that a neuropathologist must physically look at an individual's brain post-mortem (after death), determine if tau protein is present, and assess whether the tau protein is present in a reportedly unique distribution pattern. (*Id.*; Dr. Yaffe Decl. ¶ 55.) When CTE is present, the neuropathology is characterized by aggregation and accumulation of variations of tau, although there are

still many uncertainties regarding the neuropathology of CTE. (Dr. Schneider Decl. ¶¶ 21-23.)

Beyond these basic facts, almost nothing about CTE is known with certainty, including the "facts" claimed by Objectors. Although the research that has taken place thus far will help the scientific community generate new hypotheses to test and study, no conclusions relating to the causes of CTE or the diagnostic and clinical profile of CTE can yet be credibly or reliably established. (*See* Dr. Yaffe Decl. ¶¶ 56-58, 66-67, 74, 78; Dr. Schneider Decl. ¶¶ 24, 27-28; Dr. Millis Decl. ¶ 27; *see also* Burns Decl. Ex. 14, Jesse Mez, Robert A. Stern & Ann C. McKee, *Chronic Traumatic Encephalopathy: Where Are We and Where Are We Going?*, 13 Current Neurology & Neuroscience Rep. 407, 415 (2013) ("Stern Study") ("As noted throughout this review, CTE research is just beginning.").) The specific diagnostic profile of CTE and its causes or even association with football are unknown. (Dr. Yaffe Decl. ¶¶ 66-67, 78-79; Dr. Schneider Decl. ¶¶ 24, 27-28; *see also* Burns Decl. Ex. 15, Andrew Gardner et al., *Chronic Traumatic Encephalopathy in Sport: A Systematic Review*, 48 Brit. J. Sports Med. 84, 89 (2014) (stating that because no current "large-scale, prospective, longitudinal, clinicopathological studies" have yet occurred regarding CTE, "it is important to conduct systematic research [regarding CTE] to address specific unanswered questions," including the "clinical characteristics" of CTE, whether CTE has a genetic component, whether CTE causes neuropsychiatric symptoms, and the establishment of diagnostic criteria for CTE); Stern Study at 415 (listing a series of steps that need to be taken within the scientific community to understand CTE, including, among others, "1) prospective, longitudinal epidemiological studies to determine the incidence and

prevalence of CTE in the general population and to analyze whether a causal link exists between head injury and CTE; 2) careful clinical phenotyping in order to develop clinical consensus criteria").

In sum, the Objectors' claim that mood and behavioral symptoms are even associated with CTE is not grounded in science.[36]

**4.      Scientific Developments Will Have No Impact on the Settlement**

Recognizing the tenuous connection between science and their claims, Objectors argue that the science may develop and that the Settlement should account for those changes.  Specifically, Objectors assert that clinicians will be able to identify tau protein consistent with the presence of CTE in living individuals in the next five to ten years.  (Armstrong Obj. at 26-27, Doc. No. 6233; Morey Obj. App'x B at 10-11; Decl. of Dr. Robert A. Stern ¶ 38, Doc. No. 6201-16.)  But even if the science developed over that term, it would make no difference to the fairness of the Settlement Agreement.

First, a biomarker that will allow clinicians to identify the tau protein, and therefore CTE, in living people will not change the conclusion that the Settlement Agreement is fair, reasonable and adequate.

The Settlement Agreement compensates manifest neurocognitive or neuromuscular impairment, not the presence of proteins in the brain.  This is true with respect to all of the Qualifying Diagnoses and would be true with respect to CTE as well. For example, Retired NFL Football Players are not compensated for Alzheimer's Disease

---

[36]  Indeed, it was once believed by the scientific community that mood and behavioral symptoms were part of the clinical profile of Alzheimer's Disease.  (Dr. Schneider Decl. ¶¶ 39, 45.)  As research advanced, it became clear that belief was wrong.  (*Id.*) The same may be true here; mood and behavioral symptoms that Objectors prematurely assume are part of the clinical profile of CTE may not be part of the clinical profile of the neuropathological diagnosis.

because they have amyloid, a protein used to diagnose Alzheimer's Disease post-mortem, present in their brain in a certain pattern; they are compensated for Alzheimer's Disease if they manifest neurocognitive impairment consistent with Alzheimer's Disease. Indeed, many individuals in the general population have the amyloid protein consistent with Alzheimer's Disease found in their brain post-mortem, but were asymptomatic while living. (Dr. Schneider Decl. ¶¶ 44, 47.) In fact, in the McKee Study, one of the former professional football players—subject 68—who had stage III CTE pathology according to the Study, was asymptomatic. *See* McKee Study at 56. This finding demonstrates that the presence of the tau protein does not automatically result in impairment.

In sum, the Settlement does not compensate pathologies; it compensates significant neurocognitive or neuromuscular impairment that impacts the lives of Retired NFL Football Players and their families while they are living.

Second, even if science reaches the point where mood and behavioral symptoms are identified as part of the diagnostic profile of CTE, the parties have agreed not to compensate mood and behavioral symptoms associated with *any* conditions for the justifiable reasons above. As described above, the manifest deficits allegedly associated with CTE are compensated and the Settlement Agreement assumes causation, even if the science does not support it.

### 5. "Death by CTE" Was Included in the Settlement Because Decedents with CTE are Unable to Obtain Compensable Diagnoses

Objectors argue that the parties' decision to compensate post-mortem CTE pathological diagnoses that occurred prior to the date of preliminary approval is "arbitrary" and, therefore unjustified. (Jones Obj. at 3-4, Doc. No. 6235.)

In fact, the justification for this aspect of the Settlement is simple and fair: Retired NFL Football Players who were diagnosed with CTE prior to the date of preliminary approval may have qualified for Monetary Awards associated with Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or one of the other Qualifying Diagnoses while they were living.  However, they cannot now comply with the definitions and testing protocol set forth in the Settlement Agreement.  Thus, the parties agreed to compensate such Retired NFL Football Players based on the neuropathological diagnosis of CTE.  This generous effort to compensate Retired NFL Football Players is far from unreasonable, unfair, or inadequate.

The parties' decision not to compensate post-preliminary approval diagnoses of CTE is reasonable for an additional reason:  because CTE can be diagnosed only post-mortem, the parties did not want to risk incentivizing suicide.[37]

### 6. Shawn Wooden Is an Adequate Subclass Representative Regarding CTE Issues and No CTE Subclass Is Necessary

Objectors also claim that Shawn Wooden is not an adequate Subclass Representative for CTE issues because Mr. Wooden does not allege that he is at risk for developing CTE.  More specifically, Objectors argue that those at risk for CTE, as a separate subgroup, are not adequately represented, and thus the Settlement is not fair or adequate.  (*See*, *e.g.*, Duerson Obj. at 12, 18, Doc. No. 6241 (claiming that although Wooden did not agree with excluding future CTE cases, he "was not charged with

---

[37] One Objector argues that the requirement that "Death with CTE" diagnoses be made post-mortem by a board-certified neuropathologist is unreasonable and that Representative Claimants should be able to prove "Death with CTE" diagnoses by other means.  (Komlo Obj. at 1-4, Doc. No. 6222.)  This objection should be overruled because, as of today, CTE can be diagnosed only post-mortem through a neuropathological examination of a decedent's brain.  (Dr. Yaffe Decl. ¶ 55; Dr. Schneider Decl. ¶ 21.)

representing this Subclass of individuals. No one was."); Morey Obj. at 27-28, Doc. No. 6201; Miller Obj. at 3-4, Doc. No. 6213.)

Again, Objectors are mistaken.  A named class representative satisfies Rule 23's requirements when he or she is capable of "fairly and adequately protect[ing] class [or subclass] interests."  *Sullivan* v. *DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (internal quotation marks omitted).  That is the case here given the close alignment between the interests of Wooden—who represents the group of Retired NFL Football Players without a Qualifying Diagnosis—and the interests of all Retired NFL Football Players who allege that they are at risk for CTE and its claimed symptoms, and want CTE to be compensated.

First, Wooden has, in fact, alleged he is at a "heightened risk of developing further adverse neurological symptoms," (Compl. ¶ 125, *Wooden* v. *Nat'l Football League*, No. 1:12-cv-20269, Doc. No. 1 (S.D. Fla. Jan. 24, 2012)), which would of course include those symptoms described by the Objectors as associated with CTE.

Second, all of the Qualifying Diagnoses allegedly result from NFL Football, not just CTE.  Thus, Wooden, who was exposed to head trauma in NFL Football and does not know if he will develop CTE or any other Qualifying Diagnosis, had every incentive to negotiate to include as many conditions in the Settlement Agreement as possible, including CTE.  He and his counsel did, in fact, pursue this course, and the fact that the NFL Parties agreed in the end to compensate only neurocognitive and neuromuscular impairment of a certain severity for the various reasons discussed above does not even suggest that Wooden's interests did not align with

the interests of others in the same Subclass.[38]   *See also Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.* v. *Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ("[I]f every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair.").

**B.      The Standard for a Qualifying Diagnosis of Dementia
         Is Scientifically Valid and Reasonable**

Certain Objectors argue that the Settlement sets an unreasonably high bar to qualify for dementia.  (*See* Morey Obj. at 71-72, Doc. No. 6201 (arguing that the proffered value of the Settlement is illusory).)  Objectors complain that mood and behavioral symptoms are not compensated under the Settlement, assert that the thresholds to establish impairment are too high, and argue that the functional impairment standard is too severe.  Objectors also allege that Junior Seau and Dave Duerson would not have qualified for Level 1.5 or Level 2 Neurocognitive Impairment based on "public reports of their functioning by their family members and friends."  (*Id.*)  None of these arguments has merit.

First, the parties' decision not to compensate mood and behavioral symptoms was reasonable from both a scientific and legal perspective.  (*See supra* § II.A.2.)

Second, the criteria used for the definitions of Level 1.5 and Level 2 Neurocognitive Impairment, including the thresholds and functional impairment criteria,

---

[38]   It is not necessary to include subclasses for, say, depression or hypopituitarism (*see, e.g.*, Heimburger Obj. at 10, Doc. No. 6230), for the same reasons, namely, if Objectors contend these conditions are connected to participation in NFL Football, then Wooden, who played NFL Football and may therefore develop such conditions, had a strong incentive to push for their inclusion in the Settlement Agreement.

are directly supported by relevant medical and neuropsychological literature.  (*See* Millis Decl. ¶¶ 17-22, 32-34.)  More specifically, the thresholds are premised upon empirically based and scientifically accepted research.  (*Id.* ¶ 21, 32.)  The requirement that Retired NFL Football Players must exhibit impairment in two areas—known as cognitive domains—is scientifically valid and consistent with the level of impairment one would expect to see in individuals who suffer from dementia, particularly in a litigation context. (*Id.* ¶ 35.)  And the basis for the functional impairment standard—the Clinical Dementia Rating scale set forth by the National Alzheimer's Coordinating Center—is a highly validated scale for functional impairment associated with dementia.  (*Id.* ¶ 32.)

Finally, eligibility for compensation under the Settlement is not static. BAP Supplemental Benefits are available for qualified Retired NFL Football Players who are diagnosed with Level 1 Neurocognitive Impairment, *i.e.*, moderate cognitive impairment.  If a Retired NFL Football Player's Level 1 Neurocognitive Impairment progresses to dementia or any other Qualifying Diagnosis, he then will be eligible for a Monetary Award.   Similarly, Retired NFL Football Players who currently are asymptomatic will remain eligible for Monetary Awards for all of the Qualifying Diagnoses—other than Death with CTE—if they develop such conditions over the 65-year term of the Settlement.   Along these lines, the allegation that Messrs. Seau and Duerson would not have qualified for a Monetary Award while living is speculative at best.  The parties had to establish an objective set of criteria from which to evaluate and diagnose the Qualifying Diagnoses.  The allegation that "public reports of [the players'] functioning by their family and friends" would *not* have qualified certain retired players for Level 1.5 Neurocognitive Impairment is not evidence of a fault in the Settlement.

(Morey Obj. at 71-72, Doc. No. 6201.)  To the contrary, it reinforces the reasonableness of the fact that the parties agreed to provide compensation for retired players like Messrs. Seau and Duerson who obtained post-mortem neuropathological diagnoses of CTE prior to the date of preliminary approval.

**C.      There Is No Requirement that the Settlement Compensate Multiple Sclerosis or Epilepsy**

One Objector asserts that multiple sclerosis should be compensated under the Settlement.  (Collier Obj. at 1-4, Doc. No. 6220.)  Another asserts that epilepsy should be compensated under the Settlement.  (Duerson Obj. at 25, Doc. No. 6241.)

As an initial matter, Objectors who now claim that multiple sclerosis and epilepsy should be compensated under the Settlement Agreement did not bring claims against the NFL Parties alleging that NFL Football caused those injuries.  In other words, Objectors are complaining about the fact that the NFL Parties did not agree to compensate injuries that Objectors did not allege as injuries in their complaints.  There is no requirement that a settlement compensate every injury alleged in the complaint, let alone those that are not.  *See In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 156 (E.D. La. 2013) (overruling objection that settlement compensation matrices should "include additional or different conditions" when there was no "medical or scientific basis" to conclude those conditions were connected to the defendant's conduct); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *47 (E.D. Pa. Aug. 28, 2000) (overruling objection that class settlement compensating certain physical injuries must also compensate neuropsychiatric injuries where there was a "significant degree of controversy in the available literature" over the connection between the diet drugs and neuropsychiatric injury).

In any event, there is no increased risk of developing multiple sclerosis associated with head trauma of any severity. (*See*, *e.g.*, Burns Decl. Ex. 16, C.C.H. Pfleger et al., *Head Injury Is Not a Risk Factor for Multiple Sclerosis: A Prospective Cohort Study*, 15 Multiple Sclerosis 294, 294 (2009) (concluding that head injury of any severity does not affect the risk of acquiring MS later in life); Burns Decl. Ex. 17, M.J. Goldacre et al., *Risk of Multiple Sclerosis After Head Injury: Record Linkage Study*, 77 J. Neurology, Neurosurgery & Psychiatry 351, 353 (2006) (concluding that there was "no significant increase in [the] risk of MS at either short or long time intervals after head injury"); Dr. Yaffe Decl. ¶ 91.)

With respect to epilepsy, the science demonstrates that mild TBI where individuals lose consciousness for 30 minutes or less results in a slightly increased risk of post-traumatic epilepsy within five years of the TBI, but it is not clear that TBI that does not result in the loss of consciousness (or amnesia) increases the risk for epilepsy at all. (Burns Decl. Ex. 18, John F. Annegers et al., *A Population-Based Study of Seizures After Traumatic Brain Injuries*, 338 New Eng. J. Med. 20, 22 (1998).) And after five years, there is no increased risk of epilepsy associated with mild TBI. (*See id*.)

Objectors had notice that multiple sclerosis and epilepsy were not being compensated under the Settlement Agreement. (Long-Form Notice at 1, 6; Short-Form Notice at 1.) If Objectors wanted to pursue a claim against the NFL Parties regarding these diagnoses, they were free to opt out and do so.[39]

---

[39] In addition to multiple sclerosis and epilepsy, various Objectors complain that other conditions are not compensated under the Settlement. Those conditions include hypopituitarism, post-concussion syndrome, deafness, and grand mal-seizures. (Heimburger Obj. at 10, Doc. No. 6230; Barber Obj. at 3, Doc. No. 6226; Davis Obj. at 1-2, Doc. No. 6353; Hughes Obj. at 1, Doc. No. 6366.) Like multiple

**D.      Objections Concerning the Amount of, and
         <u>Offsets to, Monetary Awards Have No Merit</u>**

Notwithstanding, as shown above, that the Monetary Awards available to every eligible Settlement Class Member for the next 65 years likely exceed their potential (and highly unlikely) recovery in litigation, Objectors argue that the maximum Monetary Awards available for Qualifying Diagnoses are not sufficiently high and/or that the various reductions to these Awards—whether for age at time of Qualifying Diagnosis, non-NFL Football related Stroke or TBI, number of Eligible Seasons, or non-participation in the BAP—are somehow unjustified.

None of these objections has merit.  As discussed below, Objectors provide no support for their claims for more money, and ignore the additional benefit of the BAP.  The Settlement Agreement—instead of requiring Settlement Class Members to prove causation, as it could have—uses age reductions and Offsets as proxies for causation to differentiate, in a reasonable and just manner, levels of recovery between Settlement Class Members with the same Qualifying Diagnosis.  *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *68 (E.D. Pa. Aug. 28, 2000) (approving class settlement that provided differentiated recovery of benefits based on objective criteria on matrix without need to demonstrate causation, while noting that establishing causation at trial would have been difficult for certain class members).

**1.      Maximum Awards Are Sufficient**

With respect to the maximum Monetary Awards under the Settlement Agreement, Objectors simply demand more money without providing any compelling

---

sclerosis and epilepsy, most—if not all—of these conditions were never raised in Complaints filed in the litigation.  Moreover, the parties are not required to compensate every injury as part of the Settlement Agreement.

95

basis to conclude that the agreed-upon amounts are not fair and reasonable. (*See* Armstrong Obj. at 13-14, Doc. No. 6233; Alexander Obj. at 6, Doc. No. 6237.) But it is well established that "a settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995); *see also In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 316-17 (3d Cir. 1998) ("In deciding the fairness of a proposed settlement, we have said that the evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." (internal quotation marks omitted)); *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *6 (E.D. Pa. Jan. 4, 2001) ("[The court] must . . . recognize that settlement typically represents a compromise and not hold counsel to an impossible standard."); *Henderson* v. *Volvo Cars of N. Am., LLC*, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) ("complaining that the settlement should be 'better' . . . is not a valid objection" and "lack[s] merit." (internal citation omitted)); *Alin* v. *Honda Motor Co.*, 2012 WL 8751045, at *14 (D.N.J. Apr. 13, 2012) ("full compensation is not a prerequisite for a fair settlement").[40] As described in detail above,

---

[40]    *See also In re Am. Bus. Fin. Servs. Noteholders Litig.*, No. 2:05-cv-00232, 2008 WL 4974782, at *7 (E.D. Pa. Nov. 21, 2008) ("[T]he settlement is not intended to compensate each and every aggrieved individual fully for his loss, but instead represents a reasonable amount of relief for the settlement class, given the risks inherent in further litigation"); *Priddy* v. *Edelman,* 883 F.2d 438, 447 (6th Cir. 1989) ("fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement"); *Thomas* v. *Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998) ("The court should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 2013 WL 3224585, at *14 (C.D. Cal. June 17, 2013)

*see supra* § I.B.7, the Settlement Agreement provides generous cash awards—up to $5 million—while eliminating the attendant risks of litigation.

Objectors' argument about the insufficiency of the Awards is based on a crude calculation of an average anticipated Monetary Award between $135,000 and $225,000.   (Armstrong Obj. at 13-14, Doc. No. 6233.)   That analysis is flawed. Estimated "average" figures are meaningless; the average is skewed by significant reductions for Retired NFL Football Players who, for example, are age 80 or older at the time of Qualifying Diagnosis or earned no Eligible Seasons in the NFL.   The issue is whether Settlement Class Members with particular age and career length characteristics are entitled to Monetary Awards that are "unfair."   Simply averaging all Monetary Awards across the entire Settlement Class proves nothing.

In addition, certain Objectors argue that the maximum Monetary Awards are insufficient "once they are present value affected since they will not be paid immediately."   (Armstrong Obj. at 13, Doc. No. 6233.)   But the Monetary Awards under the Settlement are inflation protected, which eliminates concerns about the passage of time.   (*See* Settlement Agreement § 6.9 (providing an annual inflation adjustment of up to 2.5% for Monetary Awards).)   Moreover, eligible Settlement Class Members will receive

---

("[S]ettling plaintiffs trade the risk of recovering nothing for a reward that is necessarily less than their full *potential* recovery." (emphasis in original)); *Hall* v. *AT&T Mobility LLC*, 2010 WL 4053547, at *30 (D.N.J. Oct. 13, 2010) (objectors' preference for greater compensation "has no bearing on whether the terms of the Settlement Agreement itself are fair and reasonable.   After all, a settlement is, by its very nature, a compromise that naturally involves mutual concessions."); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 125 n.4 (S.D.N.Y. 2009) (refusing to consider broad unsupported objections by class members as to the amount of compensation they will receive under the settlement because they "are of little aid to the Court"), *aff'd sub. nom Priceline.com, Inc.* v. *Silberman*, 405 F. App'x 532 (2d Cir. 2010).

such inflation-protected Awards earlier than they would have if they were required to litigate their cases.

For these reasons, as well as those in Section I.B.7, these objections should be overruled.

### 2.   Reduction by Age at Time of Qualifying Diagnosis Is Fair

The Settlement Agreement reduces the maximum available Monetary Award based on age—the older the Retired NFL Football Player at the time of Qualifying Diagnosis, the greater the reduction, reflecting the fact that as one ages, the impairment compensated by the Settlement is more likely to be associated with the natural aging process.  (Settlement Agreement Ex. 3.)   Objectors lodge two complaints about this reduction:  (1) that such a reduction is *per se* unfair; and (2) that any such reduction should be based on the date of onset of the impairment, not the date of diagnosis, where credible evidence of impairment exists.  These objections are not well founded.

#### (a)   Age Reduction Is Reasonable

Objectors and the Brain Injury Association of America ("BIAA" as potential *amicus curiae*) contend that any reduction to Monetary Awards based upon the age of the Retired NFL Football Player at the time of Qualifying Diagnosis is unfair. Objectors do not explain why this is so (*see* Alexander Obj. at 6, Doc. No. 6237), while BIAA asserts that "[t]he sole factor in determining monetary awards should be the nature and extent of the impairment" because "[t]he consequences of a brain injury are the same whether experienced in the past . . . or the future . . . ." (Decl. of Drs. Masel & O'Shanick in Supp. of BIAA's Mot. to File *Amicus Curiae* Br. ("Masel/O'Shanick Decl.") ¶ 18, Doc. No. 6233-2.)

These objections ignore the well-founded reasoning behind these adjustments. First, there can be no dispute that the likelihood of neurocognitive impairment increases with age in the general population. (Dr. Yaffe Decl. ¶¶ 22, 50.) Thus, many former football players and non-football players alike will experience diminished neurocognitive functioning in their advanced years. The assertion of an alleged causal link between football and neurocognitive decline therefore is weaker in older former players, justifying a reduction of the Award. Thus, the assertion by BIAA that an 80-year old Retired NFL Football Player diagnosed with Alzheimer's Disease should be awarded the same monetary amount as a 40-year old who receives the same diagnosis runs contrary to medical, scientific and societal expectations and ignores the litigation risks aspect of the Settlement.

Second, a Retired NFL Football Player diagnosed later in life with neurocognitive impairment enjoyed a longer quality of life after NFL Football—at least with respect to neurocognitive issues—than a Retired NFL Football Player diagnosed with that same neurocognitive impairment at a younger age. It is thus reasonable to compensate them differently. *See Diet Drugs*, 2000 WL 1222042 at *22 (approving class settlement where compensation matrices included 11 separate age intervals ranging from those who are less than or equal to 24 years old to those who are 79 years of age, with compensation generally decreasing with age in part "because younger individuals have a longer damage period"); *see also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553, 557, 567 (W.D. Wash. 2004) (granting final approval to class settlement that paid different compensation in part based on age of settlement class member at time of injury).

99

Indeed, it is likely that litigation judgments and any resulting damages compensation would make precisely these same distinctions.  In sum, the reduction to Monetary Awards based upon the age of the Retired NFL Football Player at the time of Qualifying Diagnosis is fundamentally fair.

> **(b)** **Measuring Age Reduction from Date of Qualifying Diagnosis Promotes Efficiency and Reduces Fraud**

Objectors also argue that Monetary Awards should in any event be based upon the age of the Retired NFL Football Player at the time of the onset of impairment, rather than the date of Qualifying Diagnosis, where credible evidence of impairment exists.  (*See* Owens Obj. at 1-3, Doc. No. 6210; Barber Obj. at 5-6, Doc. No. 6226.)  This objection should be overruled as well.

The Settlement's requirement of measuring age at Qualifying Diagnosis is an objective criterion that avoids burdensome mini-trials on what constitutes "credible" evidence of onset of impairment.  For example, Objector Susan Owens states that her late husband was diagnosed with Alzheimer's Disease in 2006 but exhibited memory loss six years earlier in a manner that led to his resignation from employment—but for which he allegedly refused to seek a diagnosis "because of his, 'never say you can't go' football mentality" until he found himself lost near his home on several occasions.  (Owens Obj. at 2, Doc. No. 6210; Owens Obj. Ex. A, at 3, Doc. No. 6210-1.)  It would not be credible for the physician who diagnosed Mr. Owens in 2006 to conclude that he would have been diagnosed six years earlier with Alzheimer's Disease, let alone with Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or no Qualifying Diagnosis at all, without having examined Mr. Owens contemporaneously.  (Dr. Yaffe Decl. ¶ 93.)

The Class Action Settlement provides significant Monetary Awards to Settlement Class Members with Qualifying Diagnoses.   In turn, the Settlement Agreement requires that properly credentialed physicians with pertinent areas of expertise make the Qualifying Diagnoses based upon the medically-sound Injury Definitions set forth in Exhibit 1 to the Settlement Agreement.  The objective standard for when and how Qualifying Diagnoses are to be made is necessary to prevent fraud.  To allow Settlement Class Members to claim Qualifying Diagnoses based upon personal statements, anecdotal evidence, or retrospective assessments would undermine the Injury Definitions and allow guesswork to dictate substantial Monetary Award decisions.  *See In re Pet Food Prods. Liab. Litig*., 2008 WL 4937632, at *11 (D.N.J. Nov. 18, 2008) (overruling objection concerning omission of future expenses from settlement compensation coverage where calculation would be highly speculative and incapable of reasonable determination absent expert analysis, would potentially require prolonged involvement by the claims administrator and the Court, and may expose the claims process to potential exaggeration and fraud).

Finally, pegging compensation to the date of diagnosis not only is reasonable, but it *encourages* Settlement Class Members to seek medical diagnosis promptly upon experiencing neurocognitive impairment.  The fact that Monetary Awards are reduced by age at time of Qualifying Diagnosis (beginning at age 45) incentivizes Retired NFL Football Players to seek evaluation and diagnosis upon the onset of impairment instead of delaying.  As a result, Retired NFL Football Players will better

understand their neurocognitive condition and, if warranted, receive Monetary Awards that will assist in managing the impairment moving forward.[41]

Thus, these objections should be overruled.

### 3.    The Stroke Offset Is Scientifically Justified and Reasonable

Objectors' argument that the Stroke Offset is not scientifically justified[42] is equally flawed.

There is a scientifically established association between Stroke and the Qualifying Diagnoses, as well as neurocognitive decline generally, sufficient to justify an offset.  (*See, e.g.*, Burns Decl. Ex. 19, Jacob S. Elkins et al., *Pre-existing Hypertension and the Impact of Stroke on Cognitive Function*, 58 Annals Neurology 68 (2005) (clinical study stating that dementia frequently follows strokes—occurring in one fourth of stroke patients—and in particular concluding that any pre-existing hypertension increases the prevalence of cognitive decline); Burns Decl. Ex. 20, Ramesh Sahathevan et al., *Dementia, Stroke and Vascular Risk Factors; a Review*, 7 Int'l J. Stroke 61, 61 (2012) ("There is also substantial evidence that stroke risk factors such as hypertension . . . are independently associated with an increased risk of Alzheimer's disease and vascular cognitive impairment. . . . Physicians must be aware that stroke causes dementia.").)  In

---

[41]    Similarly, certain Objectors oppose a reduction based on age at the time of Qualifying Diagnosis because they claim that the NFL Parties' purported fraud concerning the connection between football and brain trauma "discouraged" Settlement Class Members "from seeking medical care or counseling related to perceived cognitive and mental health issues."  (Duerson Obj. at 21, Doc. No. 6241.)  This argument makes no sense—it is the *effect* of neurocognitive or neuromuscular impairment that leads a patient to his doctor, not the *cause*.  It is irrelevant whether "football-related disease . . . even crossed their minds" in recognizing the impairment.  (*See id*. at 22.)

[42]    (Morey Obj. at 32, Doc. No. 6201; Barber Obj. at 6-8, Doc. No. 6226.)

fact, Stroke is recognized as the second most common cause of dementia, known in the scientific community as "vascular dementia."  (*See* Dr. Yaffe Decl. ¶ 87.)

Moreover, if there is no relationship between Stroke and a Qualifying Diagnosis, the Settlement Agreement provides the Settlement Class Member with a vehicle to challenge the application of the Offset, namely, the Settlement Class Member can demonstrate, by clear and convincing evidence, that his Qualifying Diagnosis was not related to the Stroke, and if he does so, the Offset will not apply.  (Settlement Agreement § 6.7(d).)[43]  This exception covers Objectors' concerns.

Notwithstanding the recognized connection between Stroke and dementia, and the exception that allows Settlement Class Members to prove otherwise in appropriate cases, Objectors argue that no Stroke Offset should apply because football allegedly causes Stroke through TBI and the administration of Toradol (a medication that is sometimes administered to players to treat moderate to severe pain).  (Morey Obj. at 32-34, Doc. No. 6201.)  Objectors point to two studies in ostensible support of this TBI-related argument, but neither is on point.  (*See id.* at 33 (citing James F. Burke et al., *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 Neurology 33 (2013)); Masel/O'Shanick Decl. ¶ 17 (citing Burns Decl. Ex. 21, Yi-Hua Chen et al., *Patients with Traumatic Brain Injury: Population-Based Study Suggests Increased Risk of Stroke*, 42 Stroke 2733 (2011)).)  Both studies show a slightly increased risk of stroke during the first few months to years following a *moderate to severe* TBI.  Neither study

---

[43]   To that end, the Stroke Offset excludes "a transient cerebral ischaemic attack and related syndromes." (Settlement Agreement § 2.1(wwww).)   In other words, in negotiating the Stroke Offset, the parties agreed to a limited definition of stroke that excluded more mild ischaemic attacks, which is consistent with the scientific association between more severe strokes and the various Qualifying Diagnoses.

addresses the relationship between mild repetitive TBI and stroke.  A third study

described by Objectors (*see* Burns Decl. Ex. 22, Chien-Chang Liao et al., *Stroke Risk and*

*Outcomes in Patients with Traumatic Brain Injury: 2 Nationwide Studies*, 89 Mayo

Clinic Proc. 163 (2014)), although not cited, found that mild TBI was associated with

stroke during the 24-month period following the TBI; this study does not address the

theory that mild repetitive TBI causes remote stroke years after NFL play.  As for

Toradol, Objectors do not cite a single study suggesting that Toradol leads to increased

microbleeding,[44] which in turn leads to an increased risk of stroke.[45]  In any event, if

---

[44]  Objectors cite two additional studies in support of their argument that the Stroke Offset is unreasonable.  (Morey Obj. at 33 nn.36 & 38, Doc. No. 6201.)  Neither study meets Objectors' goal because the studies do not assess mild TBI and stroke.  The first study cited by Objectors, Ira R. Casson et al., *Is There Chronic Brain Damage in Retired NFL Players? Neuroradiology, Neuropsychology, and Neurology Examination of 45 Retired Players*, 6 Sports Health 384 (2014), after examining 45 Retired NFL Football Players, concluded that there is no higher risk of chronic brain damage in the population of Retired NFL Football Players, but also found evidence of microbleeding in four of the Retired NFL Football Players.  (*See* Morey Obj. Ex. 23, Doc. No. 6201-6.)  The study does not mention or reference stroke.  Objectors cite a second study, Puneet Kakar et al., *Cerebral Microbleeds: A New Dilemma in Stroke Medicine*, 1 J. Royal Soc'y Med. Cardiovascular Disease 1 (2012), to argue that microbleeds cause intracerebral hemorrhage and stroke.  (*See* Morey Obj. Ex. 24, Doc. No. 6201-6.)  This study does not, however, involve TBI or head trauma and notes that microbleeds are "an increasingly common neuroimaging finding in the context of ageing, cerebrovascular disease and dementia."  *Id.* at 1.  At most, when read together, the studies show that brain damage may increase the risk of microbleeds, which may increase the risk of stroke.  Such an attenuated and unsubstantiated causal chain cannot be used to suggest that the Stroke Offset is unreasonable, and is entirely irrelevant to the issue of whether Stroke can cause the Qualifying Diagnoses.

[45]  Objectors note that the FDA-approved label for NSAIDs, such as Toradol, states that NSAIDs increase the risk of stroke.  (Duerson Obj. at 26 n.42, Doc. No. 6241.)  In addition to the fact that the standard for warning about a condition on an FDA-approved label is quite different than an epidemiological study, the only study that the NFL Parties are aware of regarding Toradol and stroke, which Objectors do not cite, concludes that any increased risk of stroke from Toradol or any other NSAID is in the short-term, acute phase (30 days or less) following the administration of Toradol.

Objectors are correct, a Settlement Class Member can always establish that the exception applies to his circumstance.

In sum, because Stroke is an established and scientifically supported risk factor for developing the Qualifying Diagnoses, the negotiated Offset is fair and appropriate. To the extent that an individual believes his Stroke was not causally related to his Qualifying Diagnosis, the exception set forth in Section 6.7(d) of the Settlement Agreement provides the Settlement Class Member with a mechanism to prove his claim and still receive full compensation.

### 4. The Traumatic Brain Injury Offset Is Scientifically Justified and Reasonable

Objectors also protest the fact that the Settlement provides an Offset for a severe Traumatic Brain Injury ("TBI") unrelated to NFL Football.[46] (*See* Duerson Obj. at 25-27, Doc. No. 6241.)

As with Stroke, there is a scientifically established relationship between severe TBIs and the Qualifying Diagnoses. (Dr. Yaffe Decl. ¶¶ 13, 90; *see also* Burns Decl. Ex. 24, Amy Borenstein Graves et al., *The Association Between Head Trauma and Alzheimer's Disease*, 131 Am J. Epidemiology 491 (1990) (finding through a controlled study a statistically significant association between head trauma and Alzheimer's Disease); Burns Decl. Ex. 25, Yi-Kung Lee et al., *Increased Risk of Dementia in Patients*

---

(Burns Decl. Ex. 23, Chia-Hsuin Chang et al., *Increased Risk of Stroke Associated with Nonsteroidal Anti-Inflammatory Drugs: A Nationwide Case-Crossover Study*, 41 Stroke 1884 (2010).)

[46] Severe TBI is defined as a "severe traumatic brain injury unrelated to NFL football play, that occurs during or after the time the retired NFL football player played NFL football" and is consistent with certain classification codes from the World Health Organization's International Classification of Diseases that are used for severe TBIs. (Settlement Agreement § 2.1(aaaaa).)

*with Mild Traumatic Brain Injury: A Nationwide Cohort Study*,  8 PLOS ONE 1, 7 (2013) (finding that TBI is an independent significant risk factor of developing dementia even in the mild type); Burns Decl. Ex. 26, M. Anne Harris et al., *Head Injuries and Parkinson's Disease in a Case-Control Study*, 70 Occupational & Envtl. Med. 839 (2013) (finding that associations between head injuries and Parkinson's Disease were strongest where concussions and/or unconsciousness were involved).)  Allowing for an offset if there were a severe TBI unrelated to NFL play is thus entirely appropriate.

Objectors maintain that the Offset is nevertheless unfair because it applies regardless of the number of TBIs a player suffered during his NFL Football career, and because just one independent TBI can be grounds for the Offset.  (*See* Duerson Obj. at 25-27, Doc. No. 6241.)  That argument ignores the severity of the TBI necessary for the Offset to apply.  Objectors also ignore the exception in Section 6.7(d) of the Settlement Agreement that allows a Retired NFL Football Player to demonstrate that the Offset should not apply to his award if the severe TBI that he suffered did not causally relate to his Qualifying Diagnosis.

### 5.    The Eligible Seasons Offset Is Fair and Reasonable

Objectors also challenge the Settlement Agreement's use of "Eligible Seasons"[47] as an Offset in order to provide greater potential Monetary Awards to those who played in the NFL the longest.  Specifically, Objectors protest (1) the use of *any*

---

[47]    A Retired NFL Football Player earns an Eligible Season if he was on a Member Club's Active List on the date of three or more regular season or postseason games, or if he was on a Member Club's Active List on the date of one or more regular or postseason games, and then spent at least two regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury. (*See* Settlement Agreement § 2.1(kk).)  A Retired NFL Football Player earns half an Eligible Season if he was on a Member Club's practice, developmental, or taxi squad for at least eight regular or postseason games.  (*Id.*)

Offset as a proxy for "exposure," (2) the Eligible Season's lack of credit for training camp/preseason, the World League of American Football/NFL Europe/NFL Europa, and season-ending non-head injuries that occurred before the third game of the regular season, and (3) the use of "Eligible Seasons" as opposed to the definition of "Credited Seasons" set forth in the Bert Bell/Pete Rozelle NFL Players Retirement Plan (the "Retirement Plan").  None of these objections has merit.

        **(a)**        **Reasonableness of Offset for Exposure**

In support of their objection that there should be no Offset for exposure, Objectors assert that even "[a] single concussion, whether diagnosed or not, is capable of generating debilitating physical, cognitive and behavioral impairments that interfere with the activities of daily living and require treatment throughout the lifespan."  (Armstrong Obj. at 15, Doc. No. 6233 (quoting, without attribution, the Masel/O'Shanick Decl. ¶ 16).)

In fact, the Offset for exposure directly mirrors the theory of the cases that are being settled.  Plaintiffs alleged that the NFL Parties are liable for failing to warn players about the dangers of *repetitive* head impacts.  (*See* Turner Compl. ¶¶ 3, 54, 61, 62, 78, 86, 89, 116, 131, 133, 184, 203, 238, 253-63, 275-76, 281, 283, 293-94, 297, 302, 309-312, 314, 331, 346, 364, 374-75, 377, 380-81, 384, 387-88.)  Indeed, a federal district court denying the remand motion of one of the objectors to this Class Action Settlement specifically held that it would be impossible to consider the damage alleged without looking at the *totality* of the former player's NFL career.  *See Duerson* v. *Nat'l Football League*, 2012 WL 1658353, at *3 (N.D. Ill. May 11, 2012) ("[I]t is not possible for Duerson successfully to limit the time period to which his complaint refers" because to prove his claims he "must show that the CTE from which David Duerson suffered was

caused by repeated blows to the head during his time as an NFL player.  When making that showing, it would be exceedingly implausible to contend that the CTE was caused only by trauma suffered from 1987 through early 1993, and not by trauma from 1983 to 1986 or later in 1993.").  Tellingly, Objectors concede that "it is reasonable to assume that exposure to mild TBI increases as playing time increases."  (Armstrong Obj. at 15, Doc. No. 6233 (quoting, without attribution, Masel/O'Shanick Decl. ¶ 16).)[48]

For this reason, the Eligible Seasons Offset intended to serve as a proxy for length of exposure is fair and reasonable, and these objections should be overruled.

### (b)  Reasonableness of Covered Activities

#### (i)  Training Camp/Preseason

Objectors further contest the exclusion of participation in training camp and preseason games in the criteria for earning an Eligible Season.  (*See* Slack Obj. at 3-

---

[48]  Objectors contend that it is "not reasonable to assume that multiple concussions sustained over a short period of time are less debilitating than multiple concussions sustained over a long period of time."  (Armstrong Obj. at 15, Doc. No. 6233 (quoting, without attribution, Masel/O'Shanick Decl. ¶ 16).)  But the Offset is not assigning any weight of causation to any given impact—whether concussive or not— over any other.  Instead, it serves solely as a proxy for the length of exposure.

Similarly, the Duerson Objectors, without citation to any medical or scientific support, contend that an inadequately-handled concussion "can, and will, cause lasting damage most often in the form of CTE."  (Duerson Obj. at 27, Doc. No. 6241.)  But on the contrary, the very doctor that the Duerson Objectors cite in other sections of their submission, Dr. Robert Stern, has written that "[i]t is unknown whether a single blow to the head is sufficient to initiate the metabolic cascade that precedes the clinical and neuropathological changes characteristic of CTE, as all confirmed cases of CTE to date have had a history of multiple head injuries."  (Burns Decl. Ex. 27, Brandon E. Gavett, Robert A. Stern & Ann C. McKee, *Chronic Traumatic Encephalopathy:  A Potential Late Effect of Sport-Related Concussive and Subconcussive Head Trauma*, 30 Clinical J. Sports Med. 179, 184 (2011); *see also* Burns Decl. Ex. 28, Erik Brady, *Q&A: Robert Stern Sheds Light on BU Brain Study*, USA Today, Mar. 8, 2011 ("repetitive brain trauma is necessary for CTE to develop, and "[r]epetitive brain trauma is not just concussions – symptomatic concussions – but may also include repetitive sub-concussive or asymptomatic blows to the head").)

4, Doc. No. 6223; Heimburger Obj. at 1, 3-4, Doc. No. 6230; Duerson Obj. at 27, Doc. No. 6241.)  To that end, they argue that many players use the preseason to fight for roster spots and "demonstrate toughness and an ability to hit as hard or harder than other players." (Duerson Obj. at 27, Doc. No. 6241.)  Although undoubtedly true, the same point applies equally to the players who make regular season rosters and, as a result, experience longer periods of exposure to concussive and sub-concussive hits.  Moreover, the general rule requiring that a player be on an Active List on the date of three or more regular season or postseason games (*see supra* n.47) should come as no surprise to Settlement Class Members given that it is the same general rule for earning Credited Seasons under the Retirement Plan.  (*See* Retirement Plan at 1.10(a)-(b), 1.17, Doc. No. 6175-3.)

   In short, these Objectors simply do not like where the dividing line is drawn for exposure meriting an Eligible Season—a dividing line reached as part of arm's-length negotiation and a compromise that is the essence of settlement—but fail to present any compelling argument for why the Offset is not fair and reasonable.  *See Diet Drugs*, 2000 WL 1222042, at *19 (granting final approval to settlement where recovery was based on matrix compensation and reduced compensation where claimant took drug for fewer than 61 days).

   (ii)   NFL Europe

   Objectors also argue that it is unreasonable and unfair that Retired NFL Football Players who played in the World League of American Football, the NFL Europe League, and the NFL Europa League (collectively, "NFL Europe") are not credited with an Eligible Season for their participation.  (*See* Morey Obj. at 34-36, Doc. No. 6201; Slack Obj. at 4-5, Doc. No. 6223; Heimburger Obj. at 1, 3, 8, Doc. No. 6230; Jones Obj.

at 3, Doc. No. 6235.)  They contend that NFL Europe players practiced and played in games that exposed them to injury in the same manner as NFL players.  Because of the unique litigation risk the NFL Europe players face due to workers' compensation exclusivity laws and because NFL Europe was a developmental league, this objection lacks merit.

The now defunct NFL Europe (in each of its three iterations) was an affiliate of the NFL.  (Decl. of T. David Gardi ("Gardi Decl.") ¶¶ 5, 8-9.)  Each American football player who chose to play in NFL Europe signed a contract that made him an employee of NFL Europe; in turn, NFL Europe—as the employer—generally provided workers' compensation coverage for any injuries that occurred.  (*Id.* ¶¶ 5, 8-9, 11-12.)  On the contrary, NFL players were employed by Member Clubs and not the NFL itself.  (*Id.* ¶ 11; Turner Compl. ¶ 10.)  As a result, the NFL maintains a particularly strong workers' compensation exclusivity defense that Retired NFL Football Players who played in NFL Europe would need to overcome in order to succeed on litigation claims.

Workers' compensation generally is the exclusive remedy for former American NFL Europe players seeking compensation for injuries sustained as a result of their employment with NFL Europe.  NFL Europe provided workers' compensation coverage under the laws of various states, including Georgia (1995-1998), and Florida (1999-2007).  (Gardi Decl. ¶ 12.)  Under the laws of these states, when an employer provides workers' compensation coverage, the employer is immune from tort liability for any employee injuries arising out of the employment, including any harm caused by repetitive injuries like the repetitive head impacts alleged here.  *See* Fla. Stat. §§ 440.04(2), 440.10, 440.11, 440.151(2); Ga. Code Ann. §§ 34-9-11, 34-9-280.  Such

immunity applies even where the injuries occurred outside the state in which workers'
compensation was procured. *See* Fla. Stat. § 440.09(1)(d); Ga. Code Ann. § 34-9-242.
The fact that a former player may have sued the NFL, as opposed to its affiliate NFL
Europe, does not prevent the NFL from asserting the defense. *See Gulfstream Land &
Dev. Corp*. v. *Wilkerson*, 420 So. 2d 587, 589 (Fla. 1982) (stating that one corporation
could invoke workers' compensation exclusivity in an action by another company's
employee when there was "absolute integration" of the companies); *Coker* v. *Great Am.
Ins. Co*., 659 S.E.2d 625, 627-28 (Ga. Ct. App. 2008) (company could invoke workers'
compensation exclusivity when subsidiary employed plaintiff); Ga. Code Ann. §§ 34-9-
11(a), 34-9-224.  This unique legal hurdle justifies the differentiated Monetary Award
treatment for NFL Europe participation.

Moreover, NFL Europe was a developmental league with a shorter season,
which further distinguishes it from the NFL.  (Gardi Decl. ¶ 14.)  Contrary to the
assertion that a Settlement Class Member who played in NFL Europe "thereby
automatically loses 97.5% of the monetary benefits otherwise promised by the proposed
Settlement" (Jones Obj. at 3, Doc. No. 6235), such a Retired NFL Football Player would
still earn Eligible Seasons for his separate participation in the NFL itself.  NFL Europe
play occurred in the NFL offseason and did not preclude participation in the NFL.

These objections should be overruled.

### (c)  Use of "Eligible Season" as Opposed to "Credited Season"

Objectors next argue that the "Eligible Season" definition is "unfairly
narrow" because it does not include seasons in which a Retired NFL Football Player was
placed on an injured reserve list before the third game of the regular season unless he was
placed on injured reserve because of a concussion or head injury.  (Stewart Obj. at 1,

Doc. No. 6175; Slack Obj. at 3, 6-7, Doc. No. 6223.)  Objectors argue that the Settlement Agreement should instead use the definition of "Credited Season" set forth in the Retirement Plan under which one of the objectors generalizes that a player earns a credit for "seasons spent on [an] injured reserve list[] regardless of when during the season the player was placed on that list."[49]  (Stewart Obj. at 6, Doc. No. 6175.)  This objection too should be overruled for several reasons.

First, the notion that a player should be given credit for the time he served on an injured reserve list for an injury, prior to the third game of the regular season, *other than a concussion or head injury*, makes no sense.  For example, a Retired NFL Football Player who suffers a broken leg on the first day of training camp is unlikely to have experienced the same level of exposure as a player who played for a Member Club all season long.

Second, and in any event, use of Credited Season as defined in the Retirement Plan, as opposed to the definition of Eligible Season in the Settlement Agreement, would be to the detriment of certain Settlement Class Members.  For example, while the Settlement Agreement provides credit for a "half of an Eligible Season" if any former player was on a Member Club's practice, developmental, or taxi squad roster for at least eight regular or postseason games (Settlement Agreement § 2.1(kk)), the Retirement Plan provides no credit whatsoever for such a Retired NFL

---

[49]  Under the Credited Season definition, a player injured in the course and scope of employment after April 1, 1970 is given a Credited Season if he receives payment equal to his salary for three or more regular or post-season games pursuant to an injury grievance settlement or injury settlement waiver.  (Retirement Plan at 1.10(b), 1.17, Doc. No. 6175-3.)  Mr. Stewart would stand to benefit through use of this definition because he missed three entire regular seasons after being placed on an injured reserve list for *non-head injuries* during the preseason.  (Stewart Obj. at 1-3, Doc. No. 6175; Decl. of Andrew Stewart ¶ 3, Doc. No. 6175-1.)

Football Player unless he "is otherwise vested [in the Retirement Plan] and earns a Credited Season in 2001 or later."  (Retirement Plan at 1.10(f), Doc. No. 6175-3.)  In sum, the parties' negotiated use of the Eligible Season as a proxy for exposure was a fair settlement compromise and Objectors have offered no valid grounds to upset it.

> **6.      The Offset for Non-Participation in BAP Encourages Use of a Substantial Settlement Benefit**

Objectors conclusorily oppose the 10% Monetary Award Offset for certain Retired NFL Football Players who do not elect to participate in the BAP.  (*See* Morey Obj. at 74, Doc. No. 6201.)  Because the Offset is fair and justified, this objection is without merit.

The Offset is designed to encourage Retired NFL Football Players— particularly those who do not have Qualifying Diagnoses—to make use of the BAP because it will evaluate them objectively for evidence of neurocognitive decline, provide medical treatment and further testing for anyone found to be suffering from Level 1 Neurocognitive Impairment, document results for comparison against any future tests to determine whether neurocognitive abilities have deteriorated, and inform Retired NFL Football Players and their families of the Retired NFL Football Player's current level of neurocognitive functioning (while allowing them to ask related questions of the examining neuropsychologist and neurologist).  In addition, the Settlement Agreement provides that all Retired NFL Football Players who participate in the BAP will be encouraged to allow their resulting medical records to be used in medical research into neurocognitive impairment, safety and injury prevention with respect to football players. (*See* Settlement Agreement § 5.10(a).)   These are compelling reasons to encourage participation.

The Offset is also reasonably limited in scope. It does *not* apply to Retired NFL Football Players in Subclass 2 (*i.e.*, those with Qualifying Diagnoses prior to July 7, 2014) nor to Retired NFL Football Players in Subclass 1 (*i.e.*, those without Qualifying Diagnoses prior to July 7, 2014) who later receive a Qualifying Diagnosis of ALS or who receive any Qualifying Diagnosis prior to their deadline to receive a BAP baseline assessment examination. Instead, it applies only to those Retired NFL Football Players for whom there is a reasonable basis to encourage participation in the BAP for their own benefit. (Settlement Agreement § 6.7(b)(iv).)

For these reasons, the objection should be overruled.

**E.     Limiting Representative Claimants' Eligibility
         for Monetary Awards Is Fair**

Objectors challenge the requirement that Representative Claimants of Retired NFL Football Players who died prior to January 1, 2006 must demonstrate the timeliness of a litigation claim in order to receive a Monetary Award. Specifically, these objections complain about (1) the use of January 1, 2006 as a cut-off date, and (2) the use of the Settlement Date as the time for consideration of whether an unfiled litigation claim would be timely. Neither complaint is valid.

**1.     Use of 2006 Date as Cut-Off**

One Objector asserts that it is unfair that she may recover a Monetary Award only if her claim would not be barred by the applicable statute of limitations; she also deems it arbitrary that the Representative Claimant of a Retired NFL Football Player who died in 1984 is treated differently from the Representative Claimant of a Retired NFL Football Player who died in 2014. (*See* Williams Obj. at 1-4, 5, Doc. No. 6221.)

The requirement to prove the timeliness of the claim is no different than in continued litigation.[50]  It is fair and reasonable to require the demonstration of a threshold litigation requirement; this same obstacle would confront Objector if she had opted out.

Moreover, the use of the 2006 date of death cut-off was not arbitrary, but instead a fair compromise—indeed, under many states' law, a generous compromise—of a settlement negotiation.  Instead of requiring all decedents to prove the timeliness of their claims (as in the NFL Parties' interest) or requiring no decedents to prove timeliness, the parties reached a compromise based on the MDL Master Administrative Complaints filed in 2012, which alleged that the NFL's "policies and decision making relevant to its conduct and the risks of latent brain injury alleged herein[] occurred primarily at its corporate offices in New York City."  (MACAC ¶ 14.)  Because New York maintains a six-year statute of limitations for fraud[51]—the longest period of the claims alleged—the parties negotiated back six years from 2012 to 2006, and agreed that, in order to receive a Monetary Award, decedents who passed away in that year or later need not prove the timeliness of a litigation claim.[52]  This was a fair and reasonable solution, and the Objectors do not prove otherwise.[53]  *See*, *e.g.*, *In re*

---

[50]   For example, under Louisiana law, the right of action that would allow Objector to sue on behalf of the decedent prescribes one year to file from the death of the deceased absent tolling.  *See* La. Civ. Code art. 2315.1.

[51]   *See* N.Y. C.P.L.R. § 213(8).

[52]   In agreeing to this provision, the NFL Parties did not concede that any such claims would, in fact, be timely, but instead compromised for the purposes of settlement only.  The NFL Parties expressly reserve their right, in any ongoing litigation, to argue to the contrary.

[53]   Moreover, Objector is not prejudiced.  She will have the opportunity to argue to this Court what she claims in her objection—that decedent's "claims are not barred by the

*Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553, 564 (W.D. Wash. 2004) (overruling objection regarding class settlement that reduced monetary awards based on defense related to statute of limitations where cut-off date was "not arbitrary" because it corresponded to typical time for running of personal injury statutes of limitations).

### 2.    Use of Settlement Date for Measuring Timeliness

One Objector protests that a Representative Claimant of a deceased Retired NFL Player who died before January 1, 2006—and who never filed suit against the NFL Parties—will be eligible for a Monetary Award only if the Court determines that a wrongful death or survival claim filed by the Representative Claimant "would not be barred by the statute of limitations under applicable state law as of . . . the Settlement Date." (Kinard Obj. at 3, Doc. No. 6219 (quoting Settlement Agreement § 6.2(b)).)  He argues that use of the Settlement Date is unfair and prejudicial because Co-Lead Class Counsel filed the *Easterling* putative class action lawsuit on August 17, 2011, which the objection argues tolled the claims of Representative Claimants under *American Pipe & Construction Co.* v. *Utah*, 414 U.S. 538 (1974).  (*See* Kinard Obj. at 3-4, Doc. No. 6219.)

The Court's statute of limitations analysis for any such Representative Claimant will consider when the wrongful death or survival claim accrued under applicable state law.  To the extent that the claim did not expire prior to August 17, 2011, a Representative Claimant may elect to argue to the Court that the statute of limitations tolled as of August 17, 2011 through the Settlement Date (or even today).  The Court will

---

statute of limitations" because the "NFL only recently acknowledged the link between ALS and concussion injuries, and Mr. Williams could not have reasonably discovered that his bout with ALS was caused by the NFL's conduct."  (Williams Obj. at 4, Doc. No. 6221.)

then decide whether that argument has merit.  Assuming, *arguendo*, that Objector is correct on the merits of his tolling argument,[54] then there is no prejudice to the Representative Claimant whether the Settlement Agreement references the Settlement Date or August 17, 2011—in either case, the Representative Claimant would not be barred under the statute of limitations.  For this reason, the objection should be overruled.

**F.**      **The Scope of the BAP Is Sufficient and Appropriate**

Several Objectors challenge the sufficiency of the BAP's funding and testing protocols.  Because the BAP is well-funded and its testing protocols are medically justified, these objections have no merit.

**1.**      **Sufficiency of Funding**

Objectors claim that the BAP is insufficiently funded because the "NFL's analysis of the adequacy of the BAP fund . . . ignores actual data and includes a cap based on an obviously flawed assumption [and thus] is grossly inadequate."  (Morey Obj. at 72, Doc. No. 6201.)  More specifically, Objectors assert that the BAP Fund will run out of money because the actual cost of treating dementia can reach $56,000 per year, while the actuaries who prepared the NFL's analysis assumed that BAP Supplemental Benefits would not exceed $35,000 per player.  (*Id*.)  These objections are misguided.

First, the sufficiency of the BAP Fund is addressed in detail in the actuarial report submitted by the NFL Parties to the Special Master and later filed on the MDL 2323 docket.  (*See* Material Provided by Counsel to the NFL, Report of the Segal Group to Special Master Perry Golkin at 10, Doc. No. 6168.)  This report concludes not only that the BAP Fund is sufficient, but that, in fact, there may be "an $11 million

---

[54]   The NFL Parties expressly reserve their right, at an appropriate time, to oppose any such argument with regard to the specific claims of a given Settlement Class Member.

surplus on a net present value basis available [to] rollover into the [Monetary Award Fund] at the conclusion of the BAP."  (*Id.*)

Second, in arguing otherwise, Objectors misstate the purpose and scope of the BAP Supplemental Benefits.  The BAP provides "Supplemental Benefits"—in the form of medical treatment, including, as needed, counseling and pharmaceutical coverage—to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment (moderate neurocognitive impairment).  (*See* Settlement Agreement §§ 2.1(j), 5.11; *id*. Ex. 1.)  These Supplemental Benefits are *not* intended to treat dementia, as mistakenly asserted by Objectors; instead, any Retired NFL Football Players diagnosed with Level 1.5 or 2 Neurocognitive Impairment—which cover diagnoses of dementia—are eligible for awards from the Monetary Award Fund, not the BAP Fund.  Moreover, the maximum per player BAP Supplemental Benefit payable is to be determined (with the approval of the Court) on the one-year anniversary of the commencement of the BAP, by accounting for factors such as the number of Retired NFL Football Players using the BAP and diagnosed with Level 1 Neurocognitive Impairment in the first year.  (*See id*. § 5.14(b).)  This feature allows the parties, with the Court's approval, to control for any unanticipated variable cost in order to ensure the BAP Fund's sufficiency.

## 2.    Appropriateness of Testing Protocols

Objectors challenge a number of other aspects of the BAP:  (1) the Test Battery and Specific Impairment Criteria, (2) the pre-selection of qualified neuropsychologists to administer the tests and evaluate participating players, and (3) the requirement that pharmaceuticals provided as BAP Supplemental Benefits be ordered through mail order pharmacies.  Objectors' complaints should be overruled.

(a)   **The Test Battery and Specific Impairment Criteria Are Based on Well-Accepted and Scientifically Validated Tests**

The BAP Test Battery and Specific Impairment Criteria were developed in consultation with highly qualified consultants acting on behalf of Class Counsel and the NFL Parties.  Thus, the Test Battery and Specific Impairment Criteria are consistent with scientific standards and based on well-established criteria for diagnosing moderate neurocognitive impairment and dementia in individuals.  (Millis Decl. ¶¶ 17-22, 32-35.) Nevertheless, Objectors claim that the Test Battery excludes certain Qualifying Diagnoses, fails to test for mood and behavioral symptoms, and includes lengthy and inappropriate testing.   Each complaint is based on a misunderstanding or mischaracterization of the BAP.

First, Objectors assert that the tests in the BAP do not test for Alzheimer's Disease, Parkinson's Disease, or ALS.  (Armstrong Obj. at 20, Doc. No. 6233; Alexander Obj. at 7, Doc. No. 6237.)  That is true.  The BAP examination was not designed to test for these Qualifying Diagnoses.   Rather, Settlement Class Members must obtain diagnoses of those impairments from a qualified doctor outside the BAP.

Second, Objectors complain that the BAP does not test for mood and behavioral disorders.  (Morey Obj. at 72-73, Doc. No. 6201; Duerson Obj. at 23, Doc. No. 6241.)  Objectors are wrong.  The Test Battery includes two tests that address mood and behavioral symptoms: the MMPI-2RF and the Mini International Neuropsychiatric Interview.  (Settlement Agreement Ex. 2, at 1-9.)  That said, as discussed in detail above, (*see supra* § II.A.2), mood and behavioral symptoms are not compensated under the Settlement.   Nonetheless, to provide participating Retired NFL Football Players with a full assessment of the player's impairment, and to allow the diagnosing physicians to

recommend further testing or treatment in the event a player qualifies for BAP Supplemental Benefits, the parties to the Settlement Agreement agreed to include these tests.  (Millis Decl. ¶ 27.)

Third, Objectors complain that the Test Battery is too long and that certain tests are inappropriate for individuals with neurodegenerative disease.  (Morey Obj. at 72-73, Doc. No. 6201.)  This complaint misses the mark.  The neuropsychologists who will be administering the Test Battery under the terms of the Settlement Agreement are trained and well positioned to administer tests to players suffering from neurocognitive impairment, including dementia.   In addition, most of the tests in the Test Battery have "stopping rules" that allow the examiner to discontinue or shorten the length of the test when the patient fails to complete items correctly.  (Millis Decl. ¶ 26.)

Fourth, Objectors complain about the inclusion of validity testing, which tests for whether Retired NFL Football Players are exhibiting proper effort during the tests or whether they are faking impairment—also known as malingering.  (Morey Obj. at 73, Doc. No. 6201.)  Simply put, this complaint demonstrates a misunderstanding of the validity testing included in the Test Battery; comprehensive validity testing for malingering is absolutely necessary in this context to ensure that BAP Supplemental Benefits and Monetary Awards are provided only to qualified Retired NFL Football Players.   The validity testing agreed to in the Settlement is well accepted and scientifically valid.[55]  (Millis Decl. ¶¶ 28-30.)

---

[55]   Certain Objectors raise additional, miscellaneous complaints about the BAP, the Test Battery, and the Specific Impairment Criteria.  For example, Objectors assert that the approach should be "more holistic, human-based, and less linguistically reliant."  (Armstrong Obj. at 12, Doc. No. 6233.)  Objectors similarly complain about one specific test in the Test Battery:  the Test of Premorbid Function ("TOPF").  (*Id.*

**(b)      The Pre-Selection of Qualified Neuropsychologists Is Appropriate and Necessary to Ensure Medically Sound Diagnoses**

Objectors complain that BAP neuropsychologists should not be pre-selected. They allege that pre-selected neuropsychologists will "likely . . . be far more conservative in 'calling' impairment than a neuropsychologist chosen by a player." (Armstrong Obj. at 20, Doc. No. 6233.) They further assert, without support, that the use of Qualified BAP Providers will negatively impact Retired NFL Football Players because some unidentified aspect of the "physician selection criteria . . . will dissuade most busy treating doctors from participating." (Alexander Obj. at 8, Doc. No. 6237.)

But the requirement that a Retired NFL Football Player be examined prospectively by medical professionals screened for their credentials is entirely reasonable as an anti-fraud measure. Moreover, it benefits the Retired NFL Football Player and ensures consistent treatment amongst Settlement Class Members. The BAP provides Retired NFL Football Players with *free access* to highly credentialed Qualified BAP Providers—each of whom must be certified by the American Board of Professional Psychology or the American Board of Clinical Neuropsychology in the specialty of

---

at 11-13.)  As an initial matter, the overall Test Battery and Specific Impairment Criteria are based on scientifically valid and widely used and accepted neuropsychological tests and principles. (Millis Decl. ¶¶ 17-22, 32-35.) For this reason alone, these arguments are baseless. But these Objections also are incorrect as a matter of science. (*See id.* ¶¶ 35 (addressing the argument that the approach should be more "holistic" and noting that the definitions of Level 1, 1.5, and 2 Neurocognitive Impairment are consistent with the level of impairment one would expect to see in individuals who suffer from moderate cognitive impairment or dementia, respectively, particularly in a litigation context), 37 (addressing the criticisms of the TOPF, and explaining that the TOPF is highly reliable in a traumatic brain injury group of patients).)

Clinical Neuropsychology, or be a board-certified neurologist. (Settlement Agreement § 2.1(vvv).) The assertion that highly qualified neuropsychologists who must be certified—chosen by both parties, not only the NFL Parties—will skew their assessments in favor of the NFL Parties is baseless. Moreover, to the extent a Retired NFL Football Player already has seen properly credentialed medical professionals and received a Qualifying Diagnosis, he need not obtain another Qualifying Diagnosis. (*See id*. § 6.3(c)-(d); *id*. Ex 1.) Simply put, there is no basis for this objection.

### (c) Mail Order Pharmacies are Reasonable for Distributing Non-Experimental Medication

Finally, Objectors complain that pharmaceuticals provided as BAP Supplemental Benefits should not be limited to distribution from mail order providers. (Armstrong Obj. at 23, Doc. No. 6233.) In support, Objectors cite an example of a player requiring human growth hormone to treat a pituitary gland issue. Objectors also complain that 90-day prescriptions will restrict the clinicians' prescribing options. Both arguments are wrong for reasons that will be addressed by Class Counsel and the proposed BAP Administrator, Garretson Resolution Group. More specifically, the NFL Parties understand that mail order pharmacies are flexible and will work with local, brand pharmacies to prescribe drugs that cannot be shipped by mail order—assuming such drugs should be available in this context. The NFL Parties further understand that mail order pharmacies do not require 90-day prescriptions in all instances and will work with the BAP Administrator to address clinicians' concerns in this regard.

In sum, the myriad complaints about the BAP have no merit. The BAP, which is consistent with well accepted and scientifically valid principles, provides substantial benefits to the Settlement Class.

**G.**     **The Settlement Program Procedures Are Justifiable and Fair**

Objectors argue that the Class Action Settlement offers only illusory benefits because it purportedly requires Settlement Class Members to "navigate a complex and burdensome administrative process that appears to decrease the cost of the Settlement to the NFL." (Morey Obj. at 73, Doc. No. 6201; *see also* Heimburger Obj. at 18-19, Doc. No. 6230.)   Not so.   The Settlement Agreement sets forth a structured program designed to operate functionally, efficiently, consistent with due process, and without fraud, for 65 years, in order to provide Settlement Class Members with substantial benefits.

In their arguments to the contrary, Objectors assert that:  (1) cognitively impaired Settlement Class Members may be unable to follow the procedural requirements; (2) the registration requirement and the NFL's right to challenge such registration is inappropriate; (3) the BAP baseline assessment examination deadline is unreasonable; (4) the Claim Package is a barrier to recovery because of its burdensome requirements and deadline for submission; (5) Settlement Class Members should not be required to see Qualified MAF Physicians; (6) the appeals process is unfair; and (7) the anti-fraud provisions operate as anti-payment provisions.   None of these arguments has merit.

**1.     Cognitively Impaired Settlement Class Members**

First, Objectors hypothesize that cognitively impaired Settlement Class Members may be unable to follow the procedural requirements of the Class Action Settlement and, therefore, may have valid claims denied or reduced.  (Morey Obj. at 73-74, Doc. No. 6201.)  But Class Counsel and Counsel for the NFL Parties thoughtfully considered this concern and structured the Settlement Agreement to allow Representative

Claimants (for legally incapacitated or incompetent Retired NFL Football Players)[56] and individual counsel representing Settlement Class Members to carry out the claims process in a representative capacity.   (*See*, *e.g.*, Settlement Agreement § 30.2(a) (allowing counsel to "submit all claim forms, proof, correspondence, or other documents to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator on behalf of that Settlement Class Member").[57])   In addition, family members and close friends may also assist Retired NFL Football Players with their claims process.   Moreover, cognitively impaired Settlement Class Members would face these same challenges in litigating a case.

For these reasons, and because of the various reasonable accommodations outlined in the subsections that follow, Retired NFL Football Players are provided fair and reasonable structural protections to help them in the claims process.

## 2.    The Registration Requirements

Without citing any specific concern, Objectors challenge both the requirement that Settlement Class Members register for participation in the Class Action Settlement[58] and the NFL's right to challenge such registration.   (Morey Obj. at 74, Doc.

---

[56]   Representative Claimants are "authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players."   (Settlement Agreement § 2.1(eeee).)

[57]   The Settlement Class Member must sign his or her Claim Form, Derivative Claim Form, or Appeals Form, but that requirement does not impair the ability of counsel to coordinate the claims process itself.   (*Id*. § 30.2(a).)

[58]   Settlement Class Members generally must register within 180 days from the date that the Settlement Class Supplemental Notice is posted on the Settlement Website. (Settlement Agreement § 4.2(c).)

No. 6201.)[59]   These concerns have no merit:  Settlement Class Members were (more than) adequately notified of the registration requirement; the registration process is reasonable; and there are many rationales for requiring registration and allowing the NFL to challenge it.

First, the parties provided Settlement Class Members with ample notice of the registration requirement.  The Long-Form Notice states on its cover page, in bold, that "**Settlement Class Members will need to register to get benefits.  Settlement Class Members may sign up at the website or call 1-855-887-3485 for additional information about the Settlement and updates on the registration process**."  (Long-Form Notice at 1 (emphasis in original).)  The Long-Form Notice also sets forth the 180-day registration deadline.  (*Id*. at 15 ("To receive any Settlement benefits, you must register on or before 180 days from the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com."), 20 (listing "Important Dates," including the registration deadline).)   The Settlement Website homepage similarly informs Settlement Class Members when they can register and includes a link to "Sign Up for Future Information" when the registration period opens.  (*See* Settlement Website.)  To date, over 5,200 Settlement Class Members have signed up for future information about registration.  (*See* Burns Decl. Ex. 1.)

Second, Objectors do not argue that a registration requirement is *per se* unfair.  Nor could they.  Both the Third Circuit and courts in this District have approved

---

[59]   Other Objectors protest the registration deadline only in so far as failure to comply with the deadline would prevent a Retired NFL Football Player from participating in the BAP.  (Armstrong Obj. at 19, Doc. No. 6233.)  They propose the deadline be extended by two years.  (*Id*. at 20.)  For the reasons stated in this Subsection, the NFL Parties disagree.

class action settlements involving registration deadlines.  *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 317-18 (3d Cir. 2001) (summarizing that settlement class members, in order to perfect rights to recovery, must file registration form by given date to participate in settlement, and later file proof of claim form to seek monetary award); *In re Diet Drugs Prods. Liab. Litig.*, No. 99-cv-20593, 2007 WL 433476, at *1-2 (E.D. Pa. Feb. 2, 2007) (noting the Settlement Agreement required class members to register with the settlement trust by a given date in order to be entitled to monetary benefits).  In addition, the Settlement Agreement provides flexibility with respect to how Settlement Class Members can register by allowing either online or hard copy submission.  (Settlement Agreement § 4.2(a).)  The 180-day deadline provides Settlement Class Members with ample time to gather and submit the necessary information, and the Settlement Agreement further provides a "good cause" exception for missing the registration deadline.  (*Id.* § 4.2(c).)  Far from being unreasonable, as Objectors conclusorily contend, the registration process contains numerous accommodations.

Third, the registration process serves several critical purposes for the administrators overseeing the Settlement program.  For example, it provides the BAP Administrator and Claims Administrator with the necessary biographical information to ensure that Qualified BAP Physicians and Qualified MAF Physicians are selected in sufficient quantity and geographic scope to cover the needs of Settlement Class Members.  (*See id.* §§ 5.7(a)(ii), 6.5(b).)  Similarly, the BAP Administrator will use the registration database to encourage prompt participation in the BAP—for the benefit of the Retired NFL Football Players and to help determine the maximum per player BAP

126

Supplemental Benefit on the one-year anniversary of the commencement of the BAP. (*See*, *e.g.*, *id.* § 5.14(b).)

Finally, the ability of the NFL Parties to challenge Notices of Registration Determination is an important anti-fraud protection.  The NFL Parties may be in a position, based upon institutional knowledge and historic records, to detect fraudulent registrations that the Claims Administrator would have no reason to believe are false.  Moreover, the objections fail to note that the Settlement Agreement provides *both Settlement Class Members and the NFL Parties* with the right to challenge registration determinations.  (*Id.* § 4.3(a)(ii)-(iii).)  As it should.

### 3.    The BAP Baseline Assessment Examination Deadline

Objectors further protest the deadline for Retired NFL Football Players to undergo a BAP baseline assessment examination,[60] with some Objectors proposing that the Settlement should extend the deadline to take the BAP baseline assessment examination by two years and the term of the BAP "to possibly twenty years." (Armstrong Obj. at 19-20, Doc. No. 6233; *see also* Morey Obj. at 74, Doc. No. 6201; Alexander Obj. at 7, Doc. No. 6237.)  There is no basis for the objection.  Rather, there are several persuasive reasons for the current deadline and the length of the BAP's 10-year term.

First, requiring Retired NFL Football Players age 43 or older to participate in the BAP within two years furthers the goal of encouraging screening for, and detection

---

[60]   The Settlement Agreement provides that a Retired NFL Football Player who elects to receive a BAP baseline assessment examination must take it:  (i) within two years of the commencement of the BAP if he is age 43 or older on the Effective Date; or (ii) if he is younger than age 43 on the Effective Date, before his 45th birthday or within ten years of the commencement of the BAP, whichever occurs earlier.  (Settlement Agreement § 5.3.)

of, Qualifying Diagnoses.   As a general matter, the likelihood of neurocognitive impairment—as tested for in the BAP—increases with age in the general population. (Dr. Yaffe Decl. ¶¶ 22, 50.)   Prompt detection of such impairment, or the benefit of a baseline assessment for later comparison, is to the advantage of the Retired NFL Football Player.[61]

Second, the Settlement Agreement's Monetary Award Grid reduces awards by age, beginning at age 45, at the time of Qualifying Diagnosis.   (*See supra* § II.D.2(b); *see* Settlement Agreement Ex. 3.)   By encouraging a prompt examination for those 43 and older, the deadline protects against Retired NFL Football Players delaying examination to their own detriment.[62]

Finally, the proposal to extend the term to twenty years would accomplish little but drain administrative expense given the much shorter deadline to take a BAP baseline assessment examination (which they propose to extend by only two years to a maximum of twelve years—eight years shorter than the proposed term).   It also would

---

[61] The contention of certain Objectors that it is "nearly impossible to qualify for a monetary award" under the Settlement Agreement without a baseline examination is without support.   (Armstrong Obj. at 19, Doc. No. 6233; Alexander Obj. at 7, Doc. No. 6237.)   On the contrary, Qualified MAF Physicians are authorized to make Qualifying Diagnoses for which Settlement Class Members may claim a Monetary Award.   (*See* Settlement Agreement §§ 2.1(www), 6.3(b).)

[62] This is the same reason why a Retired NFL Football Player younger than age 43 on the Effective Date is given a BAP baseline medical assessment deadline of *before his 45th birthday*, or within ten years of the commencement of the BAP, whichever occurs earlier.   The parties negotiated to provide the youngest of the Retired NFL Football Players with more than two years to take the BAP baseline assessment examination because they are less likely in the general population to have Qualifying Diagnoses (and, to the extent they may be diagnosed, they are not subject to any Monetary Award reduction until they turn age 45).   (*See* Dr. Yaffe Decl. ¶¶ 22, 50; *see* Settlement Agreement Ex. 3.)

undermine the persuasive reasons for the current deadline outlined above.  For these reasons, the provision is fair and reasonable.

### 4.  The Claim Package

Objectors assert that the Claim Package that Settlement Class Members must submit to receive Monetary or Derivative Claimant Awards is a "barrier[] to recovery" because:  (i) a Retired NFL Football Player must submit it within two years of receiving a Qualifying Diagnosis;[63] (ii) the Settlement Agreement does not disclose the proposed claim form and instructions for submission; (iii) Settlement Class Members are required to provide objective evidence beyond a sworn statement of NFL employment and participation if claiming more than one Eligible Season; and (iv) it is unfair to require the submission of medical records as part of the Claim Package when records are unavailable for legitimate reasons.  (Morey Obj. at 75, Doc. No. 6201; Williams Obj. at 4, Doc. No. 6221.)  These objections are unfounded.

First, the two-year window for submission of a Monetary Award Claim Package[64] is ample time for Settlement Class Members (and their counsel, Representative Claimants and/or family and friends) to gather the necessary information for inclusion in

---

[63]  Alternatively, a Settlement Class Member may submit a Claim Package for a Monetary Award within two years after the Settlement Class Supplemental Notice is posted on the Settlement Website, if that date is later.  (Settlement Agreement § 8.3(a)(i).)

[64]  A Derivative Claim Package must be submitted no later than 30 days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant, as applicable) receives notification that he has been determined to be entitled to a Monetary Award.  (Settlement Agreement § 8.3(a)(ii).)  This deadline is also reasonable and necessary because Derivative Claimant Awards are compensated by reducing a Retired NFL Football Player's Monetary Award by 1%.  (*Id.* § 6.7(a).)  Therefore, the Claims Administrator must determine whether a valid Derivative Claimant Award exists prior to paying the Retired NFL Football Player, and if so, how many Derivative Claimants assert valid claims.  (*Id.* § 7.3.)

the Claim Package.  *See*, *e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 542227, at *10 (D.N.J. Feb. 16, 2007) (holding five months to submit claim form to be "a reasonable amount of time"), *aff'd*, 579 F.3d 241 (3d Cir. 2009).  And there are compelling reasons for including a deadline for the submission of a Claim Package.  If the Settlement Agreement were to allow five, ten, or fifteen years, the passage of time would risk undermining the effectiveness of the Agreement's anti-fraud provisions.  For example, the ability of the Claims Administrator to verify facts in the Claim Package may become increasingly difficult with the passage of time due to record preservation issues.[65]  (*See* Settlement Agreement §§ 8.6, 10.3.)

Moreover, the objections fail to note that the Settlement Agreement provides reasonable accommodation in the form of an exception to the two-year deadline for Settlement Class Members who can show that "substantial hardship" extending beyond the Qualifying Diagnosis precluded compliance with the deadline (provided that the Settlement Class Member submits the Claim Package within four years after the date of the Qualifying Diagnosis or after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later).  (*Id*. § 8.3.)

Second, with respect to the detailed content of the claim form and instructions for submission, the parties are not obligated to create all of the working documents that will underlie a settlement program prior to its approval.  The objections cite no authority to the contrary.  Further, Settlement Class Members are protected by the continuing and exclusive jurisdiction of this Court, including over the Settlement

---

[65]  These potential difficulties are highlighted by the story of one Objector described below in this section.  (*See generally* Williams Obj., Doc. No. 6221.)

Agreement and its interpretation, implementation and enforcement, to the extent that any such issues do arise.  (Settlement Agreement § 20.1(n); *see also id.* Ex. 4, Proposed Final Order and Judgment at 4-5.)

Third, the requirement that a Settlement Class Member present evidence beyond a sworn statement to support an assertion of *more than one* Eligible Season[66] is a reasonable anti-fraud provision.[67]  Contrary to the assertion that this requirement "is meant to thwart rather than facilitate payments" because it imposes an obligation on the Settlement Class Member when "the NFL itself has this data" (Morey Obj. at 75, Doc. No. 6201), the Settlement Agreement states that "the Claims Administrator will request that the NFL Parties and Member Clubs provide any employment or participation records of the Retired NFL Football Player in their reasonable possession, custody or control, which the NFL Parties and Member Clubs will provide in good faith" when a Claim Package contains insufficient evidence to substantiate the claimed Eligible Seasons. (Settlement Agreement § 9.1(a).)  This structure is fair and reasonable.  *See Varacallo* v.

---

[66]  The Settlement Agreement states that the Claim Package will require the Settlement Class Member to provide "records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football." (Settlement Agreement § 8.2(a).)  The assertion of NFL employment and participation in more than one Eligible Season, however, must be substantiated by objective evidence beyond the sworn statement of the Retired NFL Football Player, the sufficiency of which shall be in the Claims Administrator's discretion.  (*Id.* § 9.1(a)(i).)

[67]  For example, the Settlement Agreement provides a "half of an Eligible Season" when a former player was on a Member Club's practice, developmental, or taxi squad roster for at least eight regular or postseason games.  (Settlement Agreement § 2.1(kk).) The NFL Parties may not possess sufficient information to confirm all such claims. The Settlement Agreement would disallow a Retired NFL Football Player to claim— on his word alone—that he spent three straight seasons on a given Member Club's taxi squad in the 1960s, thus accruing 1.5 Eligible Seasons.  Instead, that Retired NFL Football Player would need to come forward with objective evidence (*e.g.*, pay stubs, newspaper printouts, etc.) that satisfies the Claims Administrator.

*Mass. Mut. Life Ins. Co*., 226 F.R.D. 207, 243 (D.N.J. 2005) (overruling objection that requirement of submitting supporting document was unfair because not unreasonable to assume settlement class member would have retained documentation supporting allegation, relief at lower value still available without supporting documentation, and defendant required to provide information that may support the claim); *see also In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 121, 161 (E.D. La. 2013) (approving as fair and reasonable class action settlement structure that paid greater compensation where settlement class members provided medical records as opposed to only sworn declarations regarding medical condition).

Finally, the requirement that medical records in support of a Qualifying Diagnosis be submitted is fair and reasonable.  One Objector claims that the medical records that would show the diagnosis of ALS for the late Delano Williams prior to his death in 1984 are no longer obtainable and "likely have been destroyed," either because the "obligation that a medical facility would have had to maintain Mr. Williams' records has expired" or because "the hospital where Mr. Williams died was destroyed by hurricane Katrina, along with everything in it."  (Williams Obj. at 2, 4, Doc. No. 6221.)  Thus, Objector argues that the Settlement Agreement should allow "other means of reasonable proof," including "a death certificate, obituary and/or the sworn testimony of persons with knowledge."  (*Id*. at 4.)  Unfortunately, none of these ideas would provide a class-wide solution while also providing the anti-fraud protection necessary for the NFL Parties.

If a "death certificate" is issued by an appropriately credentialed physician (under the terms of the Settlement Agreement) and states a Qualifying Diagnosis based

upon the criteria required under the Settlement Agreement, it would qualify as a medical record.  (Settlement Agreement Ex. 1.)  But if the "death certificate" does not meet those criteria, it fails to provide information necessary to confirm the appropriateness of the Qualifying Diagnosis—potentially worth millions of dollars—under the terms of the Settlement Agreement.  Similarly, the sworn testimony of family or friends would not ensure the validity of a Qualifying Diagnosis, particularly where those close to the attester stand to claim thousands or millions of dollars.[68]   Finally, an obituary is unreliable as hearsay and may generalize a medical condition to communicate to the public in a manner different from how medical professionals would document that same condition.  For example, an obituary would not describe the difference in neurological impairment in a manner sufficient to differentiate between Level 1, Level 1.5 and Level 2 Neurocognitive Impairment under the Settlement Agreement.

### 5. Qualified MAF Physicians

Objectors assert that requiring a Qualified MAF Physician to provide Qualifying Diagnoses after the Effective Date of the Settlement Agreement is unfair— because it leaves them currently "being required to guess" whether their condition "rise[s] to the level of Level 1.5 Cognitive Impairment"—and burdensome because Qualified MAF Physicians must be approved by Co-Lead Class Counsel and Counsel for the NFL Parties, the Retired NFL Football Player pays for the examination, and the Settlement Agreement does not include a hardship provision for those who live far away from a Qualified MAF Physician or are too ill to travel even a short distance.

---

[68]   The Settlement Agreement already requires the sworn testimony of the physician who provided the Qualifying Diagnosis to a Retired NFL Football Player who died prior to the Effective Date (in the form of a Diagnosing Physician Certification) unless that physician also died or is legally incapacitated or incompetent.  (Settlement Agreement § 8.2(a).)

(Heimburger Obj. at 8, Doc. No. 6230; Morey Obj. at 75-76, Doc. No. 6201.)  These objections are without merit.

As a preliminary matter, an Objector need not guess whether he has a Qualifying Diagnosis.  Under the Settlement Agreement, he could have received a diagnosis of Level 1.5 Neurocognitive Impairment prior to filing his objections, and still can receive such a diagnosis up to the Effective Date of the Settlement without being required to see a Qualified BAP Provider or Qualified MAF Physician.  He need only be examined by an appropriately credentialed physician and diagnosed based on evaluation and evidence generally consistent with the diagnostic criteria set forth in the Settlement Agreement.  (*See* Settlement Agreement § 6.3(c)-(d); *id*. Ex 1.)

As of the Effective Date, the requirement that a Qualified MAF Physician conduct an examination[69] for which a diagnosis may result in a Monetary Award of up to $5,000,000 is entirely reasonable.[70]  The Qualified MAF Physicians, by definition, are properly credentialed physicians with board-certification in their relevant fields who possess the ability to provide the specified examinations and services in a timely manner.  (*Id*. §§ 2.1(www), 6.5(b).)  By contrast, a Retired NFL Football Player's primary care physician who lacks these credentials may not possess the specialty training to provide the necessary services and make the necessary diagnoses in a manner that can be

---

[69]  In addition, a Retired NFL Football Player may avail himself of the free BAP baseline assessment examination in which Qualified BAP Providers are authorized to provide Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment.  (Settlement Agreement § 6.3(b).)

[70]  The generous Monetary Award payouts, ranging from thousands to millions of dollars, make it entirely disingenuous for the Morey Objectors to suggest that the responsibility to pay for a medical examination "may discourage players from even seeking out the qualifying diagnosis."  (Morey Obj. at 76 n.89, Doc. No. 6201.)

reasonably relied upon when such a diagnosis is the basis for a significant Monetary Award.

Finally, any logistical issues, such as the expense of travel, which create an unreasonable hardship for Retired NFL Football Players can be addressed by the Claims Administrator in consultation with Co-Lead Class Counsel, Counsel for the NFL Parties and the Special Master to be appointed by the Court to oversee the Settlement. But to mitigate any concerns, the Claims Administrator is to select Qualified MAF Physicians pursuant to criteria intended to reduce any burden on Retired NFL Football Players, including based on geographic proximity to retired players and insurance coverage and accessibility. (*Id*. § 6.5(b).) Moreover, the approval right of Co-Lead Class Counsel and Counsel for the NFL Parties may "not be unreasonably withheld." (*Id*. § 6.5(a).)

### 6.    The Appeal Procedures

Objectors assert that the appeals process for Monetary Award determinations is unfair because: (i) Settlement Class Members must pay a $1,000 fee for unsuccessful appeals while the NFL has "unlimited appeals"; and (ii) Settlement Class Members must present evidence in support of an appeal and satisfy a clear and convincing evidentiary standard to prevail. (Morey Obj. at 76-77, Doc. No. 6201; Armstrong Obj. at 23-24, Doc. No. 6233; Alexander Obj. at 8-9, Doc. No. 6237.) These objections are without merit.

First, the $1,000 fee is intended only as a reasonable disincentive to the taking of frivolous appeals that burden the Court, the NFL Parties, the Appeals Advisory Panel and Appeals Advisory Panel Consultants. (*See* Settlement Agreement §§ 9.7-9.8.) A Settlement Class Member who takes a successful appeal is reimbursed the $1,000 fee

in full.  (*Id.* § 9.6(a).)  Although the NFL Parties are not subject to the same $1,000 fee for unsuccessful appeals, the NFL Parties may take an appeal only in "good faith"; Co-Lead Class Counsel may petition the Court for appropriate relief if they believe that the NFL Parties are submitting vexatious, frivolous or bad faith appeals.  (*Id.* § 9.6(b).) Moreover, the NFL Parties are parties (as appellant or appellee) to each and every appeal; to the extent that they are deemed by the Court as taking bad faith appeals, the NFL Parties harm their on-going credibility before the Court.  This is an important check that will prevent an abuse of the appeal right.[71]

Second, *all* appellants—whether Settlement Class Members or the NFL Parties—must submit an appeal through use of an Appeals Form, present evidence in support of the appeal, and satisfy a clear and convincing evidentiary standard to prevail. (Settlement Agreement §§ 9.7-9.8.)  The appellant is provided the discretion to submit a supplemental written statement not to exceed five single-space pages in length.  (*Id.* § 9.7(a).)  The objections do not, and cannot, explain how such an appeal system favors the NFL Parties at the expense of Settlement Class Members.[72]  *See In re Oil Spill by Oil Rig*

---

[71]  Objectors also imply that it is unfair to subject Retired NFL Football Players to appeals by the NFL Parties because their neurocognitive issues may cause issues with memory, punctuality or meeting deadlines.  (Armstrong Obj. at 24, Doc. No. 6233.) But except for signing the actual Appeals Form, the Settlement Agreement allows Representative Claimants and individual counsel to carry out the claims process in a representative capacity.  (*See supra* § II.G.1; Settlement Agreement § 30.2(a).)

[72]  For example, certain Objectors hypothesize that needing to prove "significant behavioral CTE manifestation" by clear and convincing evidence in five pages would "make a successful appeal extremely rare."  (Armstrong Obj. at 24, Doc. No. 6233.) But that would never be the case.  An appellant arguing that the Claims Administrator wrongly denied a Qualifying Diagnosis made in accordance with the Settlement Agreement's Injury Definitions would inevitably submit supporting medical records as evidence. The written statement merely provides an additional way to explain the records, or why the Diagnosing Physician Certification is satisfactory.  The more

*Deepwater Horizon*, 910 F. Supp. 2d 891, 947 (E.D. La. 2012) ("Because appellate proceedings ensure that Settlement payments comply with the terms of the Settlement Agreement, they reduce uncertainty" and "numerous courts" have approved them).

> 7.     **The Anti-Fraud Provisions**

Objectors assert that the anti-fraud provisions in the Settlement Agreement operate as "anti-payment" provisions, specifically challenging the auditing of Claim Packages and the right of the Claims Administrator to investigate claims and request additional documentation. (Morey Obj. at 75, 77, Doc. No. 6201.) But these provisions are legitimate and important anti-fraud provisions.

As an initial matter, fraudulent conduct in class action settlement programs is a legitimate concern. For example, the September 6, 2013 Independent External Investigation of the Deepwater Horizon Court Supervised Settlement Program authored by Special Master Louis J. Freeh found evidence of fraudulent claims and stated a need for the application of "closer scrutiny and sound anti-fraud and business practices review" of claims. *See id.* at 10-12, *In re Oil Spill by Oil Rig Deepwater Horizon*, No. 2:10-md-02179, Doc. No. 11287 (E.D. La. Sept. 6, 2013); *see also In re Diet Drugs Prods. Liab. Litig.*, 573 F. App'x 178, 180 (3d Cir. 2014) (summarizing that "the Trust was inundated with fraudulent claims that included manipulated . . . test results" (citing *In re Diet Drugs Prods. Liab. Litig.*, 543 F.3d 179, 182 n.4 (3d Cir. 2008))). Thus, the ability of the Claims Administrator "to verify facts and details of . . . the Claim Package or Derivative Claim Package" in connection with the submission of a Monetary Award claim (Settlement Agreement § 8.6(a))—some seeking up to $5,000,000—is an important

---

likely use of the written statement by an appellant, however, would be to argue why the Claims Administrator wrongly calculated a Monetary Award. Five single-spaced pages should be more than sufficient.

check on fraud.  That check is particularly important here, where the NFL Parties commit to provide for an uncapped Monetary Award Fund.

Moreover, the mandatory audit of 10% of total Claim Packages that the Claims Administrator has found to qualify for Awards during the prior month—either on a random basis or to address a specific concern raised by the Package—is a deterrent for bad actors.  (*Id*. § 10.3(c).)  It makes known that there is a chance that the Claim Package will be scrutinized.  The mandatory provision also provides the NFL Parties with the assurance that the Claims Administrator remains diligent over the 65-year term of the Settlement program.  The right of the NFL Parties or Co-Lead Class Counsel to conduct an audit to verify an Award claim is also tailored to avoid abuse by requiring that the audit be taken in good faith and at their sole expense.  (*Id*. § 10.3(a).)  These types of audit rights—some even more stringent—have been previously approved by this Court in similar class action settlements.  *See In re Diet Drugs Prods. Liab. Litig.*, 434 F. Supp. 2d 323, 329 (E.D. Pa. 2006) (noting class action settlement "permitted quarterly audits of up to 15% of claims submitted to the Trust in order to prevent fraud, with the right of the court to require additional audits for 'good cause shown'" (citations omitted)).

Finally, Objectors fail to disclose that the obligation of the Settlement Class Member to cooperate with an audit by providing additional records and information is limited by *reasonableness*—a claim will be denied only if the Settlement Class Member "unreasonably" fails or refuses to provide the material within the time frame specified.  (Settlement Agreement § 10.3(b)(ii).)  The Settlement Agreement makes clear that the types of records and information that may be requested focus on information about the claimed Qualifying Diagnosis, the Retired NFL Football Player's health over

the past five years, and his NFL employment records.  (*Id*. § 10.3(e)(i-v).)  Objectors do

not, and cannot, explain how this is unreasonable.  On the contrary, it is legitimate and

appropriate.

        **8.**    **Objectors' Case Law Is Inapposite**

        The case law cited by Objectors is not to the contrary.  The Sixth Circuit's

reversal of class certification and settlement in *In re Dry Max Pampers Litigation*, 724

F.3d 713 (6th Cir. 2013) was not "due to an onerous claims process," as claimed by

Objectors (Morey Obj. at 78, Doc. No. 6201), but instead due to preferential treatment of

class counsel and only perfunctory relief for unnamed settlement class members.  *Id*. at

721.[73]  In *Walter* v. *Hughes Communications, Inc*., 2011 WL 2650711 (N.D. Cal. July 6,

2011), the court found a proposed claims process unreasonable "in light of the small cash

benefits contemplated"—a "mere $5" for "the vast majority of class members who would

receive any cash payment under the settlement."  *Id*. at *15.  Notably, the district court

opined that "[i]t would be rational for a class member to invest the time and effort to

perform the above steps and scrutinize the claim form if the economic incentive for so

doing was great enough."  *Id*.  Such is the case with the NFL Class Action Settlement,

which pays a base Monetary Award varying by age at the time of Qualifying Diagnosis

between $25,000 and $5,000,000—the exact type of economic incentive that the *Walter*

---

[73]   As part of its fairness assessment, the Sixth Circuit was skeptical that a diaper refund program would actually benefit settlement class members because it required that class members retained (and in turn would provide) their original receipt and the UPC code on the box.  *Id*. at 716, 718.  No similar issue exists in the NFL Class Action Settlement.  Instead, it is entirely reasonable that a Settlement Class Member support a Qualifying Diagnosis with medical records and evidence of NFL employment and participation.  (*See supra* §§ II.G.4, II.G.7.)

court felt would justify the investment of time and effort in the claims process.[74]  Finally,
*Eubank* v. *Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)—a case involving a class action
settlement that the Seventh Circuit labeled so "inequitable" it was "even scandalous"—
similarly involved a complex claims process for only a "modest[]" settlement that limited
damages to $750 for claims submitted to the defendant or $6,000 for claims sent to
arbitration where the defendant maintained the right to legal defenses including lack of
product defect, statutes of limitations, comparative fault and failure to mitigate damages.
*Id*. at 720-21, 724-25.  The issues identified by the Seventh Circuit with the claims
process, such as the requirement for claimants to provide "a slew of arcane data," are not
at issue here.  *Id*. at 725-26.

Objectors also argue that the Third Circuit decision in *In re Baby Products
Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013) supports denial of the claims process
here.  The *Baby Products* decision is inapposite.  The Third Circuit's primary concern
was that settlement class members ultimately received substantially *less* than this Court
anticipated, which in turn meant that a *cy pres* distribution of the remaining funds
amounted to significantly *more* than expected.  *Id*. at 175.  In essence, the balance
between direct class recovery and charity was not as advertised.  Not so here.  There is no
*cy pres* issue in this Settlement (*see infra* § II.H) and the NFL Parties are providing an
uncapped Monetary Award Fund for the direct benefit of Settlement Class Members.  In

---

[74]   In addition, the district court in *Walter* noted that allowing settlement class members
to make claims using an online form "could improve the claim submission
procedure."  *Walter*, 2001 WL 2650711 at *15.  The NFL Settlement Agreement
contemplates that Settlement Class Members may register for Class Action
Settlement benefits through an online method and will be provided a secure online
web interface for other notices and submissions.  (Settlement Agreement §§ 4.2(a),
8.5, 30.15.)

order to determine that the proposed structure is fair and reasonable, there is no requirement that the Court know—sitting here today—whether that Monetary Award Fund will ultimately pay out $400 million, $700 million or $1 billion in Monetary Awards. Moreover, the Third Circuit's concern with the claims process itself in *Baby Products* was that "many settlement class members did not submit claims because they lacked the documentary proof [of purchase and of the actual price paid] necessary to receive the higher awards contemplated"—$60, with an estimated $180 possible based on enhancements—"and the $5 award they could receive left them apathetic." *Id*. at 171, 176. As stated above, the substantial Monetary Awards in this Settlement are far greater than $60 or $180, and Objectors do not protest the types of proof necessary to claim a Monetary Award (*e.g*., valid medical diagnosis, and medical and NFL participation records).

In sum, the Settlement Agreement not only sets forth reasonable standards for what Settlement Class Members must do to avail themselves of its substantial benefits, but also provides reasonable accommodations—routinely ignored by Objectors—that counterbalance the justified need for structure and deadlines. Robust anti-fraud provisions are also critically important to this type of agreement, particularly where the NFL Parties are agreeing to fund Monetary Awards on an uncapped basis for 65 years. Even a cursory review of the history of class action settlement programs shows that unscrupulous individuals seek to claim benefits to which they are not entitled. (*See supra* § II.G.7.) A well-designed settlement program, like this Class Action Settlement, rightly seeks to deter and detect any such attempts at fraud.

141

**H.**     **The Education Fund Is Not a *Cy Pres* Distribution**

    Remarkably, Objectors argue that the Settlement Agreement is unfair *because* it includes a $10 million Education Fund for the benefit of Retired NFL Football Players and other football players.  They contend that the Education Fund is an improper *cy pres* distribution because it provides settlement monies to third-parties when those monies could be distributed to Settlement Class Members.  (*See* Armstrong Obj. at 29-34, Doc. No. 6233; Heimburger Obj. at 21-23, Doc. No. 6230.)  These arguments are without merit.  The Education Fund is not a *cy pres* distribution because it is not comprised of *unclaimed* monies from the other Settlement Funds—the BAP Fund and the Monetary Award Fund.  *See McDonough* v. *Toys "R" Us, Inc.*, 834 F. Supp. 2d 329, 351 (E.D. Pa. 2011) (explaining in the context of class-action suits that a "*cy pres* distribution is designed to be a way for a court to put any unclaimed settlement funds to their next best compensation use . . . ." (quoting *Klier* v. *Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011))); *see* Settlement Agreement §§ 2.1(ii), 2.1(oo), 23.1(c).  Even if the Education Fund were a *cy pres* distribution, the Third Circuit recognizes the propriety of such distributions where, as here, they relate to the class injury and represent only a small portion of the overall settlement.

    First, the Education Fund is not a *cy pres* distribution at all.[75]  *Cy pres* distributions involve the provision of *unclaimed* monies from a settlement fund to third

---

[75] Recognizing that the Education Fund is not a traditional *cy pres* distribution, Objectors seek to characterize the Fund as a "*ex ante cy pres*" distribution, but the only supporting authority they can muster is a law review article.  (*See* Heimburger Obj. at 21-22, Doc. No. 6250 (citing Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief & the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617, 661 (2010)).)  But the Education Fund does not fit the definition created in that law review article, which is the allocation of

parties—usually charities picked by the court.  *See In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 138-39 (E.D. La. 2013); *Klier*, 658 F.3d at 473-74.  Here, the Education Fund does not consist of unclaimed amounts from the BAP Fund or the Monetary Award Fund, but instead is $10 million in independent funding designated for educational programming.[76]  Moreover, the Education Fund benefits Settlement Class Members directly because—in addition to funding football injury prevention education—it specifically funds "programs promoting . . . the education of *Retired NFL Football Players* regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting *Retired NFL Football Players*."  (Settlement Agreement § 12.1 (emphasis added).)

Notably, the Education Fund is similar to the Gulf Region Health Outreach Program approved in the *Deepwater Horizon* class settlement over a *cy pres* objection.  The Outreach Program was established to expand regional healthcare by improving access in underserved communities and funding medical training for healthcare workers and other persons in those communities; objectors argued it was an improper *cy pres* distribution to non-class members (*i.e.*, persons who did not have a "Specified Physical Condition" caused by the oil spill).  *See Deepwater Horizon*, 295 F.R.D. at 138-39.  The court found that the Outreach Program, like the Education Fund

---

a charitable award up front in anticipation of a remainder of the amount to be distributed to a settlement class.  Redish et al. at 656-58.

[76]  Any funds that remain in the BAP Fund at the conclusion of its term will be transferred to the Monetary Award Fund for the benefit of Settlement Class Members. (Settlement Agreement §§ 5.14(a), 23.3(d).)  The Monetary Award Fund is structured to maintain a limited targeted reserve of only $250,000 in its final five years, and any *de minimis* funds that remain at its conclusion after 65 years will be properly disposed by the Court consistent with the purpose of the Settlement.  (*Id*. §§ 9.3(c), 23.3(b)(v)(1).)

here, provided benefits to class members as well as to non-class members, and it was not designed to be funded with unclaimed monies from other settlement funds. *Id.* at 122, 139. The court emphasized that funding for the Outreach Program did not "detract from the compensation that Class Members receive for Specified Physical Conditions" because funding for such compensation—like the Monetary Award Fund here—was "uncapped. . . in that all qualifying claims will be paid." *Id.* Finally, just like eliminating the Education Fund would not increase amounts Settlement Class Members receive for Qualifying Diagnoses, the court held that "[e]liminating the Outreach Program would not result in higher payments" because those payments were "based on negotiation of the fair value of those claims." *Id.* at 139. Thus, the Education Fund, like the Outreach Program, "does not constitute an improper *cy pres* distribution" and should be approved as fair. *Id.*

Second, even if the Education Fund were a *cy pres* distribution, it would nonetheless be proper. The Third Circuit has "join[ed] other courts of appeals in holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component . . . related to the class injury." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013). Here, the litigation being settled concerns long-term injuries purportedly resulting from NFL Football, and the Education Fund relates to safety and injury prevention in football. (*See* Turner Compl. ¶ 3; Settlement Agreement § 12.1.)

"To assess whether a settlement containing a *cy pres* provision" is fair, courts in the Third Circuit should—in addition to analyzing the settlement under the *Girsh* and *Prudential* factors—consider "the degree of direct benefit provided to the class," and as such, "*cy pres* awards should generally represent a small percentage of total

settlement funds."[77]  *Baby Prods.*, 708 F.3d at 174.  This Settlement Agreement plainly meets the Third Circuit standard:   substantial, direct benefits to Settlement Class Members valued at hundreds of millions of dollars versus the Education Fund cap of $10 million.[78]  *See In re Pharm. Indus. Avg. Wholesale Price Litig.*, 588 F.3d 24, 34-35 (1st Cir. 2009) (approving class settlement where *cy pres* award was expected to be nearly one-third of the aggregate amount paid directly to settlement class members); *see also In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 14 (D.D.C. 2013) (approving

---

[77]  Contrary to this clear guidance, Objectors rely on section 3.07 of the American Law Institute's Principles of the Law of Aggregate Litigation.  (*See* Armstrong Obj. at 31-32, Doc. No. 6233; Heimburger Obj. at 22, Doc. No. 6230.)  Not only does this section conflict with Third Circuit precedent, but it also pertains only to traditional *cy pres* distributions of unclaimed settlement amounts.  Objectors do not explain how such guidance could apply where the Monetary Award Fund is uncapped.  *See* Principles of the Law of Aggregate Litigation § 3.07 cmt. b, American Law Institute (explaining that *cy pres* distribution issue arose where settlement "funds may remain because some class members could not be identified or chose not to file claims.").

Similarly, none of the cases relied on by Objectors involved a settlement agreement with an uncapped fund.  *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) (involving *cy pres* distribution of unclaimed amounts in capped settlement fund); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) (Concurring, Weis, J.) (same); *Ira Holtzman, C.P.A.* v. *Turza*, 728 F.3d 682 (7th Cir. 2013) (same); *Dennis* v. *Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) (same); *Klier* v. *Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011) (same); *Nachsin* v. *AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) (same); *In re Thornburg Mort., Inc. Sec. Litig.*, 885 F. Supp. 2d 1097 (D.N.M. July 24, 2012) (same); *In re Matzo Food Prods. Litig.*, 156 F.R.D. 600 (D.N.J. 1994) (involving settlement where *only* payout was *cy pres* award to third parties); Order Den. Mot. for Approval of Cy Pres Distribution, *In re Checking Account Overdraft Litig.*, MDL No. 2036, Doc. No. 3430 (S.D. Fla. Apr. 15, 2013) (involving *cy pres* award of what parties *expected* would be the unclaimed portion of a capped settlement fund).

[78]  Contrary to Objectors' suggestion, it is unpersuasive to suggest that the Education Fund was used to inflate attorneys' fees given its relatively small size compared to the anticipated value of the overall Settlement.  (*See* Armstrong Obj. at 31, Doc. No. 6233.)

class settlement even though *cy pres* award was greater than aggregate direct benefit to claimants (citing *Baby Prods.*, 708 F.3d at 174)).

Consequently, this objection should be overruled.

## I.   The Release Is Appropriate

It is completely proper for the Release in the Settlement Agreement to be sufficiently broad to provide finality to the NFL Parties regarding the issues raised in this litigation.  Nevertheless, Objectors complain about the Release in two respects.  First, they assert that CTE—beyond the cases of CTE specifically compensated in the Agreement—should be excluded from the Release.  Second, they argue that the Release is overbroad because it releases claims in the *Dent* litigation.  Neither argument has merit.

### 1.    Death with CTE

Certain Objectors argue that the Release should exclude claims of CTE after the date of preliminary approval of the Settlement.  (*See*, *e.g.*, Morey Obj. at 25, 32, Doc. No. 6201; Duerson Obj. at 15-18, Doc. No. 6241.)  Like the Objectors' separate, CTE-related objections, this objection fails because it ignores the fact that players with CTE will be compensated in the future while living if they receive a Qualifying Diagnosis.[79]  (*See supra* § II.A.)

According to the Objectors, qualified Retired NFL Football Players nevertheless should be able to receive Monetary Awards for dementia, and then be able to turn around and claim alleged damages from CTE in a separate lawsuit based on the same symptoms, conditions, and impairments.  No rational defendant would agree to

---

[79]  The objections on this issue reveal the inconsistent and contradictory theories of many of the Objectors, thereby demonstrating the unsupported nature of many of the objections.  For example, the Pentz Objectors argue that it is premature to address CTE because it is only starting to be studied and that "this case was never really about CTE. . . ."  (Pentz Obj. at 8-9, Doc. No. 6213.)

such terms, which, among other things, would subject the NFL Parties to double recovery.  Releases are designed to achieve finality and to avoid duplicate recovery for the same injuries arising out of the same alleged conduct.  *See Fineman* v. *Armstrong World Indus., Inc.*, 980 F.2d 171, 218 (3d Cir. 1992) ("A plaintiff whose case concerns a single course of conduct . . . and a single injury . . . [may not] recover those profits twice or thrice over."); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 187, 2013 WL 4828225, at *2 (E.D. Pa. Sept. 9, 2013) (release—which covered all injuries related to defendant's product—barred plaintiff's complaint, which arose "out of the same alleged conduct by [defendant] and the same alleged injuries to Plaintiff as the settled case"); *see also In re Managed Care Litig.*, 2010 WL 6532982, at *12 (S.D. Fla. Aug. 15, 2010) (noting that the release contained in the settlement was proper and designed to achieve "global resolution and peace" of the lawsuit); *Dick* v. *Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 298 (W.D. Ky. 2014) (approving settlement where the "[settlement agreement's] assurance of finality provides the primary motivation for Defendants to settle").  The Objectors' request to narrow the Release to exclude future claims for CTE would undermine this fundamental principle and conflict with Third Circuit case law.  If Settlement Class Members wanted to sue for "CTE," they had notice of the scope of the Release and had the right to opt out.

## 2. Claims in *Dent* Litigation

Certain Objectors also argue that the Release is overbroad because it "arguably releases the Class Members' claims in *Dent* [v. *National Football League*]" (No. 14-2324-KAW (N.D. Cal.)), a case concerning the alleged improper or illegal use and dispensing of medications in the NFL.  (Armstrong Obj. at 34, Doc. No. 6233; Alexander Obj. at 9-10, Doc. No. 6237; *see also* Settlement Agreement § 18.1(a).)

147

As a preliminary matter, the NFL Parties have already represented to plaintiffs' counsel in the *Dent* litigation that the Release in the Settlement Agreement does not cover claims advanced in the *Dent* litigation solely to the extent that the *Dent* plaintiffs do not assert claims, in whole or in part, "arising out of, or relating to, head, brain and/or cognitive injury . . . of whatever cause. . . ." (*See* Burns Decl. Ex. 29, Letter from Brad. S Karp to William N. Sinclair (Oct. 2, 2014); *see also* Settlement Agreement § 18.1(a)(ii).)  Upon receipt of that representation, counsel for the *Dent* plaintiffs filed a motion to withdraw their motion to intervene on the issue of the Release because the parties resolved the issues giving rise to the motion, "thereby rendering the Motion to Intervene moot."  (Proposed Intervenors' Mot. to Withdraw Their Mot. to Intervene at 2, Doc. No. 6189.)  This Court granted the motion to withdraw.  (Order That Dent Pls.' Mot. to Withdraw Their Mot. to Intervene is Granted, Doc. No. 6246.)  Thus, these objections about the *Dent* litigation are much ado about nothing.

If, however, Objectors seek to argue as a general matter that claims for head, brain and/or cognitive injury should not be released, for example where the allegations concern the use of the drug Toradol—which they claim "can actually increase the likelihood of a concussion according to some medical reports" (Armstrong Obj. at 34, Doc. No. 6233)—such objections should be overruled.  The Third Circuit, in line with numerous other Circuits, has held that "a judgment pursuant to a class settlement can bar later claims . . . even though the precluded claim was not presented . . . in the class action itself," where the action to be barred is "based on the allegations underlying the claims in the settled class action."  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 366 (3d Cir. 2001).  Here, the litigation being settled concerns the purported actions

and inactions of the NFL Parties that allegedly resulted in head, brain and/or neurocognitive injury to Retired NFL Football Players through repetitive concussive and sub-concussive hits.

Moreover, underlying Related Lawsuits being settled include these same Toradol-related allegations concerning concussions. *See*, *e.g.*, Am. Compl. ¶¶ 135-43, *Finn* v. *Nat'l Football League*, No. 2:12-cv-1034, Doc. No. 1 (E.D. Pa.); *id.*, No. 2:11-cv-07067, Doc. No. 4 (D.N.J. Dec. 8, 2011); Compl. ¶¶ 102-10, *Arrington* v. *Nat'l Football League*, No. 2:12-cv-03797, Doc. No. 1 (E.D. Pa. July 5, 2012). Thus, it is entirely appropriate for the Release to apply, and these objections should be overruled.

## J.   The NFL Parties Have Provided Adequate Security

One Objector contests the Security provision in the Settlement Agreement by asserting that: (i) it does not provide any actual security backing payment obligations during the first ten years of the Settlement; (ii) the amount that the NFL Parties agreed to set aside in a Statutory Trust by the tenth anniversary of the Settlement cannot be relied upon to be paid out to the Monetary Award Fund; and (iii) despite the express language in the Settlement, the Court cannot issue an order voiding Settlement Class Members' Releases if the NFL Parties do not fulfill their payment obligations. (Utecht Obj. at 7-18, Doc. No. 6243; *see* Settlement Agreement § 25.6.) These objections are without merit.

First, the Settlement Agreement includes a representation and warranty by the NFL Parties that the NFL currently maintains, and will continue to maintain, an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings, which investment grade rating shall serve as security that the NFL Parties will meet their payment obligations for the first ten years of the Settlement. (Settlement Agreement § 25.6(a).) One Objector nonetheless argues that the Settlement provision is "misleading,"

yet concedes that "it is not fraudulent because it actually conveys to a careful lawyer that the 'rating' shall serve as security; not the bonds."  (Utecht Obj. at 9, Doc. No. 6243.)  In fact, the provision is clear on its face ("This investment grade rating shall serve as security[.]").  (Settlement Agreement § 25.6(a).)  Moreover, although Objector complains about the lack of collateral pledged by the NFL for the first ten years of the Settlement, there is no such legal requirement.  (Utecht Obj. at 9, Doc. No. 6243.)  Nor would one be justified given the NFL's substantial revenue streams, including its substantial television contracts that run beyond those ten years.  (*See* Burns Decl. Ex. 30, Richard Sandomir, *ESPN Extends Deal with N.F.L. for $15 Billion*, N.Y. Times, Sept. 8, 2011 (regarding contract running through 2021).)  If the NFL Parties violate the terms of the Settlement Agreement by failing to meet their payment obligations, the Court may render null and void the Releases and Covenants Not to Sue provided to Released Parties by Settlement Class Members affected by the non-payment.  (Settlement Agreement § 25.6(g).)

Second, Objector asserts that the NFL might underfund the Statutory Trust intended to contain moneys that, in the reasonable belief of the NFL Parties, will be sufficient to satisfy the NFL Parties' remaining payment obligations as they come due given reasonably expected investment returns over time.  (Utecht Obj. at 10-16, Doc. No. 6243; *see* Settlement Agreement § 25.6(d).)   But this objection ignores the NFL Parties' separate obligation under the Settlement Agreement to pay all valid Monetary Awards regardless of the amount held by the Statutory Trust.  Although the intent of the Statutory Trust is that it will fund all prospective Awards over the remaining course of the Settlement, if the Trust's investment returns fall short, the NFL Parties remain obligated to pay as much money as necessary to fulfill the obligations of the Monetary Award Fund

for its full 65-year term.  (*See* Settlement Agreement §§ 23.1(a), 23.3(b).)  Therefore, it is misleading and inaccurate for Objector to imply that the NFL Parties would claim that they have no such obligation.  (*See* Utecht Obj. at 15, Doc. No. 6243.)  Moreover, the objection distorts the purpose of the Security provision by seeking to require that the Settlement Trust be guaranteed to contain 100% of the NFL Parties' payment obligations.[80]  There is no requirement that a security term cover the full potential liability, and Objector cites no case to the contrary.

Finally, Objector contends in confusing fashion that "there are no grounds under the [Settlement Agreement] upon which a Court could base an order voiding the Plaintiffs' Releases if the NFL does not fulfill its obligations."  (Utecht Obj. at 16, Doc. No. 6243.)  Specifically, the objection states that the Court may deny an order to show cause why the Court shall not render null and void the Releases and "does not have the legal power to rescind the releases absent the NFL's agreement to expose themselves to this remedy or very egregious conduct by the NFL which it is not likely to commit."  (*Id.* at 17.)  In essence, Objector is saying the NFL Parties are unlikely to default materially on their payment obligations or are likely to cure any such default.  That is true.

For these reasons, these objections should be overruled.

---

[80]   Objector also takes issue with the right of the NFL Parties to the return of excess monies in the Statutory Trust under specified circumstances, but fails to explain persuasively how the requirement of Court approval prior to such withdrawal does not protect the Settlement Class.  (Utecht Obj. at 12-13, Doc. No. 6243.)  Instead, he contends that the need to show, by clear and convincing evidence, that the proposed withdrawal would materially impair the Settlement Agreement is "impossible" to satisfy.  (*Id.* at 13.)  Such conclusory arguments are insufficient to support an objection.

**K.**      **The Opt-Out Deadline Is Appropriate**

Objectors argue that the timing of the opt-out deadline is unfair and should be revised.  Specifically, Objectors argue that:  (i) a delayed opportunity to opt out after the Fairness Hearing should be permitted, and (ii) objectors should be permitted to object and appear at the Fairness Hearing even if they filed requests to opt out. (*See* Morey Obj. at 84-86, Doc. No. 6201; Duerson Obj. at 28-29, Doc. No. 6241; Utecht Obj. at 3-6, Doc. No. 6243.)  These arguments are without merit.

As an initial matter, the NFL Parties have already responded in full to the opt-out deadline arguments as part of briefing for this Court in opposition to multiple emergency motions to modify the July 7, 2014 preliminary approval order by delaying the opt-out deadline.  (*See* Resp. of NFL in Opp'n to Pls.' Emergency Mot. to Modify or Amend the July 7, 2014 Order at 8-19, Doc. No. 6186; Resp. of NFL in Opp'n to Pls.' Emergency Mot. to Modify the July 7, 2014 Order at 7-19, Doc. No. 6190.)  This Court, in turn, denied those motions and opinions are forthcoming.  (*See* Order Following Oral Arg. at Oct. 7, 2014 Telephone Conf., Doc. No. 6204.)  For the reasons articulated in the NFL Parties' prior briefing and incorporated by reference herein, each of the objections regarding the opt-out deadline should be overruled.

Briefly, the Court provided Settlement Class Members with sufficient notice under Federal Rule of Civil Procedure 23 and due process to review the terms of the Settlement Agreement and to decide whether to opt out or remain in the Settlement Class.  After evaluating the terms, a Settlement Class Member then must—by a date certain in advance of the fairness hearing—decide whether to opt out of the Settlement Class, or stay in it and object if he so desires; only objectors have an interest in the settlement and a right to participate at the fairness hearing.  Moreover, under well-

established Third Circuit precedent, in analyzing the fairness of a proposed class action settlement, the Court must look to, among other things, how the settlement class has reacted to the proposed settlement, including how many settlement class members have opted out.  (*See supra* § I.B.2.)  If Settlement Class Members are permitted to opt out after the fairness hearing and after the Court's ruling on final approval of the Class Action Settlement, then the Court would be unable to address this necessary factor and the parties and objectors will not be able to present argument to the Court regarding the factor at the fairness hearing.  (Resp. of NFL in Opp'n to Pls.' Emergency Mot. to Modify or Amend the July 7, 2014 Order at 13-14, Doc. No. 6186.)

In addition, certain Objectors argue that the Class Action Settlement is unfair because it impairs the ability of Opt Outs to litigate claims against the NFL because Qualified BAP Providers, Qualified MAF Physicians, members of the Appeals Advisory Panel, and Appeals Advisory Panel Consultants cannot hold their positions if serving as expert witnesses or consultants for Opt Outs in litigation against the NFL relating to the subject matter of the Class Action Complaint.  (Morey Obj. at 76 nn.86 & 88, Doc. No. 6201.)  This objection should be overruled because it proposes a clear conflict of interest.

Medical professionals have a choice—they can pick one role, or neither, but not both.  It is unreasonable for Objectors to expect that the NFL Parties would agree to allow a paid expert in an ongoing litigation against the NFL Parties to serve as a purportedly neutral expert in a Settlement program where the NFL Parties are responsible for financing Monetary Awards that are in part determined based upon the work of that expert.  Moreover, Objectors make no showing that the universe of potential expert

witnesses and consultants is so limited that the existence of the Settlement program will foreclose the retention of experts in litigation.  Such a claim would not be credible.

**L.**     **The Objector Signature Requirement Is Appropriate**

Public Citizen as potential *amicus curiae* claims that the objection process is unnecessarily burdensome and purportedly calculated to discourage objections by requiring the "signature by hand" of an objecting Settlement Class Member.  (Mem. of Public Citizen at 9, Doc. No. 6214-1.)  It argues the provision is contrary to the Federal Rules of Civil Procedure, and because of its potential impact to discourage the filing of objections, the "Court should not take into account the number of objections in assessing the fairness of the settlement." (*Id*. at 9-11.)  These arguments are without merit.

Public Citizen's reliance on 28 U.S.C. § 1654 and Federal Rule of Civil Procedure 23(c)(2)(B)(iv) in support of its argument regarding the impropriety of requiring a signature is misplaced.  Neither provision addresses the topic.  Section 1654 merely provides that parties "may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."   Similarly, Rule 23(c)(2)(B)(iv) allows class members to "enter an appearance through an attorney."   Here, Objectors' counsel is free to appear and represent clients by filing motions, drafting objections, and, if appropriate, participating at the Fairness Hearing.  But that has no bearing on the Court's authority to order a Settlement Class Member to comply with objection procedures that require a hand-signature.

In fact, Public Citizen does not cite any precedent in support of its argument.  On the contrary, federal district courts, including the United States District Court for the Eastern District of Pennsylvania, have recently approved class settlements

that required objectors to sign by hand. *See* Decl. of Michael McShane in Supp. of Pls.' Mot. for Prelim. Approval Ex. A, Agreement of Compromise & Settlement § 11.6, *In re CertainTeed Fiber Cement Siding Litig.*, MDL No. 2270, Doc. No. 25-2 (E.D. Pa. Sept. 30, 2013) (requiring any objection to "bear the signature of the Settlement Class Member (even if represented by counsel)"); *see also* Mem. & Order at 10, *Dryer* v. *Nat'l Football League*, No. 0:09-cv-02182, Doc. No. 270 (D. Minn. Apr. 8, 2013) ("The objector must sign and date the objection.").

Finally, it is notable that not a single Settlement Class Member filed an objection making this argument. Instead, contrary to Public Citizen's speculation that counsel for objectors would file objections "on behalf of only one or two clients, rather than all," six objections were filed on behalf of ten or more objectors. (*See* Mem. of Public Citizen at 10, Doc. No. 6214-1; Alexander Obj., Doc. No. 6237 (37 objectors); Armstrong Obj., Doc. No. 6233 (28 objectors); Barber Obj., Doc. No. 6226 (17 objectors); Chesley Obj., Doc. No. 6242 (16 objectors); Duerson Obj., Doc. No. 6241 (10 objectors); Miller Obj., Doc. No. 6213 (10 objectors).) In short, Public Citizen's concern was not realized, and its objection should be rejected.

**M.   Notice Was Proper**

The Objectors argue that the Settlement Class Notice is misleading in its description of the Settlement's compensation of Death with CTE. The Objectors' arguments are meritless; the Notice, as this Court rightly found, meets the requirements of Rule 23 and due process. (Order ¶ 4, July 7, 2014, Doc. No. 6084.)

**1.      The Objections Relating to the Purported Deficiencies in the Notice Are Meritless**

The Objectors contend that the Settlement Class Notice is "false and misleading" because it creates the impression that the Settlement Agreement provides recovery for Death with CTE when, in fact, it provides recovery only for Settlement Class Members who died with CTE prior to July 7, 2014.  (*See* Morey Obj. at 38-45, Doc. No. 6201; Duerson Obj. at 29-32, Doc. No. 6241; Alexander Obj. at 2-3, Doc. No. 6237; Heimburger Obj. at 18, Doc. No. 2630 (adopting Morey Objector's arguments); Miller Obj. at 7-8, Doc. No. 6213.)  This argument is frivolous.  The Settlement Class Notice accurately describes the scope of the recovery provided for Death with CTE.  The Long-Form Notice states clearly:   the Settlement Agreement provides recovery for "diagnoses of Death with CTE prior to **July 7, 2014**."  (Long-Form Notice at 6 (emphasis in original).)  Similarly, the Short-Form Notice cautions that the Settlement Agreement provides recovery only for "*certain* cases of chronic traumatic encephalopathy or CTE . . . diagnosed after death."  (Short-Form Notice at 1 (emphasis added).)[81]

Equally meritless is certain Objectors' contention that the Settlement Notice is "ambiguous and misleading" because "[o]ne must turn to other portions of the Notice, and ultimately to the Settlement Agreement" for a full explanation as to how Death with CTE is compensated.  (Pentz Obj. at 7, Doc. No. 6213.)  The notice need only summarize the litigation and apprise class members of the right and opportunity to inspect the complete settlement documents, which is clearly satisfied here.  *Prudential*, 148 F.3d at 326-27 (Rule 23(e) notice need only "summarize the litigation and the

---

[81]   The case law cited by the Morey Objectors does not require a different outcome. (*See* Morey Obj. at 45, Doc. No. 6201.) These cases arise under false advertising or securities laws and, as such, have no impact on the question before this Court: whether the notice complies with Rule 23 and due process.

settlement and . . . apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." (internal quotation marks omitted)); *Varacallo* v. *Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 227 (D.N.J. 2005) (A settlement notice is "designed only to be a summary of the litigation and the settlement and should not be unduly specific." (internal quotation marks omitted)); *see also Mendoza* v. *Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1351 (9th Cir. 1980) ("Notice in a class suit may consist of a very general description of the proposed settlement." (citing *Grunin* v. *Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975))). Moreover, any Settlement Class Member who wanted more specific information about the Settlement, beyond the Notice or Settlement Agreement itself, could have called the toll-free hotline or visited the Settlement Website. *See Varacallo*, 226 F.R.D. at 227 (the nature and extent of relief under a settlement agreement "is based on each Class Member's individual circumstances and every contingency could not possibly be summarized in any Notice. Had such been done, the Notice would most certainly have been too long and complex.").

Finally, the objection that Class Counsel "compounded the false and misleading nature of the Notice" through allegedly misleading statements in various news media should be rejected. (Morey Obj. at 48, Doc. No. 6201.) The Morey Objectors do not cite a single authority in which a court in this Circuit or elsewhere held a class action settlement notice to be inadequate under Rule 23 or due process as a result of statements made to the media about the settlement. Nor could they since the language contained in the notice itself and the manner of its distribution are the only relevant due process considerations. *See* Newberg on Class Actions § 16:20 (4th ed.) ("In reviewing the class

notice to determine whether it satisfies these requirements, the court must look solely to the language of the notices and the manner of their distribution."); *Adams* v. *S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1286 (11th Cir. 2007) (same).

> **2.     The Notice Satisfies the Requirements of Rule 23 and Due Process**

Under Rule 23(e)(1) of the Federal Rules of Civil Procedure, when approving a class action settlement, the district court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For classes certified under Rule 23(b)(3), courts also must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see Amchem Prods. Inc.* v. *Windsor*, 521 U.S. 591, 617 (1997). Rule 23(c)(2)(B) provides that the "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

Due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane* v. *Cen. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *DeJulius* v. *New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005).

Here, the requirements of Rule 23 and due process have been satisfied.

First, as this Court held in preliminarily approving the Settlement, "[t]he form and content of the proposed Long-Form [Settlement Class] Notice and Summary Notice . . . satisfy the requirements of Rule 23 and the Due Process clause." (Mem. Op. at 19, July 7, 2014, Doc. No. 6083.)  The Settlement Class Notice was written in plain and straightforward language and apprised all Settlement Class Members of:  the nature of the action; the definition of the Settlement Class; the Settlement Class claims and issues; that Settlement Class Members may enter an appearance through an attorney at the Fairness Hearing; that Settlement Class Members may elect to opt out of the Class Action Settlement; the binding effect of a class judgment on Settlement Class Members; the date, time, and location of the Fairness Hearing; the procedures and deadlines for submitting objections to any aspect of the Class Action Settlement; and the date for registration for Settlement benefits, including participation in the BAP and receipt of a Monetary Award or Derivative Claimant Award.  (*See* Mem. Op. at 19, July 7, 2014, Doc. No. 6083; Long-Form Notice at 18, 20; *see also* Fed. R. Civ. P. 23(c)(2)(B).)  Thus, the substantive information contained in the Settlement Class Notice was more than sufficient under Rule 23 and due process.  *See, e.g., In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 339-40, 358 (3d Cir. 2010) (affirming lower court's approval of similar notice plan); *Bradburn Parent Teacher Store, Inc.* v. *3M*, 513 F. Supp. 2d 322, 329 (E.D. Pa. 2007) (finding "adequate under the due process clause and Rule 23" notice which "describes the nature and background of this action and defines the class, Class claims and consequences of Class membership . . . summarizes the terms of the Settlement, including information relating to the size of the Settlement Fund; the release provisions of the settlement; and the attorneys' fees, expenses, and incentive award").

Second, Settlement Class Members were given more than adequate time to evaluate the Settlement Agreement and elect whether to opt out.  It is widely recognized that 30 to 60 days between mailing of adequate notice and the opt-out deadline satisfies due process.  *See*, *e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997) (citing cases).  Here, the Court provided approximately 90 days for Settlement Class Members to evaluate the terms of the proposed Settlement Agreement before requiring them to object or opt out.  The duration of the opt-out period more than satisfies due process.

Third, the dissemination of the Settlement Class Notice through multiple means ensures that notice has reached an extremely broad audience.  Upon information and belief, Class Counsel mailed the long-form Settlement Class Notice to Settlement Class Members based on lists maintained by the NFL and/or the National Football League Players Association.  (*See* Long-Form Notice; Mem. in Supp. of Prelim. Approval at 33, June 25, 2014, Doc. No. 6073-5.)  Pursuant to the Court's July 7, 2014 Order, upon information and belief, Class Counsel also published the one-page short-form notice in various publications, including *Time*, *Ebony*, *People*, and *Sports Illustrated*, produced television commercials on a combination of broadcast and cable networks, and published internet banner advertisements on targeted websites and internet advertising networks.  (Order ¶ 4, July 7, 2014, Doc. No. 6084.)  The short-form notice provides similar information in condensed form. (*See* Short-Form Notice; *see Zimmer Paper Prods., Inc.* v. *Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirements of both Fed. R. Civ. P. 23 and the due process clause.").)

Both the Short-Form Notice and Long-Form Notice also are available on the Settlement Website.  The Settlement Website has links to numerous other documents and information related to the Class Action Settlement, including the Settlement Agreement, the Court's preliminary approval order and opinion, Class Counsel's moving papers in support of preliminary approval, and the declaration of Judge Layn R. Phillips in support of preliminary approval.  (*See* Settlement Website.)  The Settlement Website also includes a Frequently Asked Questions page explaining, among other things, the basics of the Settlement Agreement and how to access additional information, including through use of a toll-free hotline.  (*See id.*; *see also In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*, No. 2:05-cv-232, 2008 WL 4974782, at *11 (E.D. Pa. Nov. 21, 2008) (approving notice plan that included publication and the establishment of a settlement litigation website for class members).)

In sum, because Settlement Class Members were given sufficient notice of the terms of the Settlement Agreement and ample time to evaluate its terms and determine whether to participate in the Class Action Settlement, object, or opt out of the Settlement, the Notice easily satisfies the demands of Rule 23 and due process.

## N.    <u>Attorneys' Fees Do Not Counsel Against Approval</u>

As already discussed, the Settlement Agreement's attorneys' fees provision does not counsel against approving the Settlement as fair, reasonable and adequate.  (*See supra* § I.C.)  Certain Objectors contend that the NFL Parties' agreement to place $112.5 million into an Attorneys' Fees Qualified Settlement Fund constitutes an inappropriate "kicker arrangement reverting unpaid attorneys' fees to the defendant." (Heimburger Obj. at 20-21, Doc. No. 6230; *see also* Settlement Agreement § 23.7.)  Not so.

The Settlement Agreement includes an uncapped, inflation-adjusted 65-year Monetary Award Fund for making payments to all Retired NFL Football Players (and their Representative Claimants or Derivative Claimants) who have or receive in the future a Qualifying Diagnosis.  The ultimate amount that the Court orders the NFL Parties to pay in attorneys' fees does not affect that uncapped obligation.  This is not a case involving a capped fund, or a common fund—such as the cases cited by Objectors (*see* Heimburger Obj. at 20-21, Doc. No. 6230)—where attorneys' fees directly come from monies otherwise earmarked for the settlement class.  *See In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 939-40 (9th Cir. 2011) (capped settlement fund); *Lobatz* v. *U.S. W. Cellular of Cal., Inc*., 222 F.3d 1142, 1144-45 (9th Cir. 2000) (same); *In re Citigroup, Sec. Litig. Inc*., 965 F. Supp. 2d 369, 401 (S.D.N.Y. 2013) (common fund).  Thus, Settlement Class Members suffer no prejudice.[82]

## CONCLUSION

For the foregoing reasons, the NFL Parties respectfully submit that this Court should grant final approval of the Settlement Agreement and overrule each of the objections.

---

[82] Certain Objections also contend that the Settlement Agreement is unfair because the attorneys' fees to be requested are too high in comparison to the stage of the litigation and because counsel is "double dipping" (i) by recovering from the Settlement Agreement as well as from a Settlement Class Member's Monetary or Derivative Award as a result of the contingency fee agreement and (ii) through Class Counsel's reservation of the right to petition the Court to set aside up to 5% of each Monetary Award and Derivative Claimant Award.  (*See* Armstrong Obj. 27-29, Doc. No. 6233; Alexander Obj. at 5, Doc. No. 6237; Miller Obj. at 6-7, Doc. No. 6213.)  These Objections, and any others on this issue, should be addressed when Class Counsel submits their petition for attorneys' fees to the Court.

Dated:  November 12, 2014                 Respectfully submitted,

                                          /s/ Brad S. Karp
                                          Brad S. Karp
                                          Theodore V. Wells Jr.
                                          Bruce Birenboim
                                          Lynn B. Bayard
                                          PAUL, WEISS, RIFKIND, WHARTON &
                                             GARRISON LLP
                                          1285 Avenue of the Americas
                                          New York, NY  10019-6064
                                          Main: 212.373.3000
                                          Fax: 212.757.3990
                                          bkarp@paulweiss.com
                                          twells@paulweiss.com
                                          bbirenboim@paulweiss.com
                                          lbayard@paulweiss.com

                                          Beth A. Wilkinson
                                          PAUL, WEISS, RIFKIND, WHARTON &
                                             GARRISON LLP
                                          2001 K Street, NW
                                          Washington, DC 20006-1047
                                          Main: 202.223.7300
                                          Fax: 202.223.7420
                                          bwilkinson@paulweiss.com

                                          and

                                          Robert C. Heim (Pa. Atty. ID 15758)
                                          DECHERT LLP
                                          Cira Centre
                                          2929 Arch Street
                                          Philadelphia, PA 19104-2808
                                          Main: 215.994.4000
                                          Fax: 215.994.2222
                                          Robert.heim@dechert.com

                                          **Attorneys for National Football League
                                          and NFL Properties LLC**

APPENDIX A

**APPENDIX A**
**LIST OF OBJECTORS**

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 1 | Alexander Objections | Alexander, Liyongo Patrise; Anderson, Charlie; Arbuckle, Charles E.; Bailey (as Representative of the Estate of Johnny Bailey, Jr.), Cassandra; Bronson, Ben; Ceaser, Jr., Curtis; Centers, Larry; Colbert, Darrell; Colon, Harry; Crooms, Christopher; Davis, Jerry W.; Denton, Tim; Dumas, Michael; Ervin, Corris; Field, Doak; Frank, Baldwin Malcolm; Frazier, Derrick; Garrett, Murray E.; Glosson, Clyde; Harris, Roderick; Hicks, Jr., Wilmer K.; Jackson, Patrick W.; Jones, Gary D.; McCoy, Ryan; Moses, Jerry James; Newsom, Anthony E.; Olison, Rance; Owens, John; Pollard, Robert; Pope, Derrick; Sanders, Glenell; Sanders, Thomas; Scales, Dwight; Scott, Todd C.; Smith, Frankie; Smith, Jermaine; Smith, Tyrone; Young, Sr., James A. | 6237 | 37 | 1 | 0 | 38 |
| 2 | Anderson Objections | Anderson, Curtis | 6248 | 1 | 0 | 0 | 1 |

A-1

*Privileged – Attorney Work Product*

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 3 | Armstrong Objections | Armstrong, Ramon; Newton, Jr., Nathaniel; Brown, Larry; Davis, Kenneth; McGruder, Michael; Odom, Clifton L.; Teague, George; Coleman, Drew; DeVaughn, Dennis; Harper, Alvin; Jones, Ernest; Kiselak, Michael; Loyd, Jeremy; Lewis, Gary Wayne; Lynch, Lorenzo; Scales, Hurles; Evans, Gregory; Mims, David; Ogelsby, Evan; Epps, Phillip E.; Haley, Sr., Charles L.; Smith, Kevin Rey; Lewis, Darryl Gerard; Wilson, Curtis Bernard; Edwards, Sr., Kelvin Mack; Levels, Dwayne; Page, Solomon; McKyer, Tim | 6233, 6353 | 28 | 0 | 0 | 28 |
| 4 | Barber Objections | Barber, Michael; Bell, Myron; Blake, Jeff; Bowie, Larry; Coates, Ben T.; Culpepper, Daunte; Curry, Eric; Hartwell II, Edgerton; McWilliams, Johnny; Murrell, Adrian; Murrell, Marques; Ross, Derek; Rudolph, Benjamin; Smith, Anthony; Smith, Fernando; Smith, Anthony ("Tony"); Wells, Jonathan | 6226 | 17 | 0 | 0 | 17 |
| 5 | Barnes Objections | Barnes, Larry Edward | 6369 | 1 | 0 | 0 | 1 |
| 6 | Barton Objections | Barton, Eric | 6379 | 1 | 0 | 0 | 1 |
| 7 | Brabham Objections | Mrs. Daniel Brabham (on behalf of Daniel Brabham) | 6356 | 0 | 1 | 0 | 1 |

A-2

*Privileged – Attorney Work Product*

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 8 | Carrington Objections | Carrington, Darren Russell | 6409 | 1 | 0 | 0 | 1 |
| 9 | Charleston Objections | Charleston, Jeff | 6411 | 1 | 0 | 0 | 1 |
| 10 | Chesley Objections | Chesley, Aloysuis; Cowsette, Delbert; Fox, Dustin; Graham, James "Scottie"; Grant, Frank; Jones, Jimmie; Mul-key, Herb; Musgrove, Spain; Perrin, Lonnie; Pierce, Kurt; Ray, Ricky; Seay, Virgil; Solomon, Jesse; Stufflebeem, John; Vactor, Ted; Wilcher, Michael | 6242 | 16 | 0 | 0 | 16 |
| 11 | Cleeland Objections | Cleeland, Mindy (on behalf of Cameron Cleeland) | 6382 | 0 | 0 | 1 | 1 |
| 12 | Collier Objections | Collier, Steven | 6220 | 1 | 0 | 0 | 1 |
| 13 | Cosbie Objections | Cosbie, Douglas | 6414 | 1 | 0 | 0 | 1 |
| 14 | Culver Objections | Culver, Jr., Lanell T. | 6407 | 1 | 0 | 0 | 1 |
| 15 | Daniel Objections | Daniel, Ruth N. (on behalf of William P. Daniel) | 6367 | 0 | 1 | 1 | 1 |
| 16 | Davis Objections | Davis, Michael L. | 6354 | 1 | 0 | 0 | 1 |

*Privileged – Attorney Work Product*

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 17 | Davis Objections | Davis, Leonard B. | 6383 | 1 | 0 | 0 | 1 |
| 18 | Duerson Objections | Duerson, Estate of David; Blue, Estate of Forrest; Deleone, Thomas; Sullivan, Gerald; Darrow, Barry; Austin, Ray; Herron, Bruce; Cornell, John; Noel, Tori; Adamle, Mike | 6241 | 8 | 2 | 0 | 10 |
| 19 | Duff Objections | Duff, William | 6348 | 1 | 0 | 0 | 1 |
| 20 | Duncan Objections | Duncan, James Brian | 6357 | 1 | 0 | 0 | 1 |
| 21 | Dutton Objections | Scheer, Barbara Dutton; Hughes, Mary M. Dutton | 6366 | 0 | 1 | 1 | 2 |
| 22 | Erickson Objections | Erickson, John Bernard | 6380 | 1 | 0 | 0 | 1 |
| 23 | Evans Objections | Evans, Troy | 6387 | 1 | 0 | 0 | 1 |
| 24 | Flint Objections | Flint, Judson | 6347 | 1 | 0 | 0 | 1 |
| 25 | Fujita Objections | Fujita, Scott | 6379 | 1 | 0 | 0 | 1 |
| 26 | Gilchrist Objections | Estate of Gilchrist, Carlton Chester | 6364 | 0 | 1 | 0 | 1 |
| 27 | Green Objections | Green, Justin | 6377 | 1 | 0 | 0 | 1 |
| 28 | Grimm Objections | Grimm, Daniel | 6346 | 1 | 0 | 0 | 1 |

A-4

Privileged – Attorney Work Product

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 29 | Hawkins Objections | Hawkins, Mary (on behalf of Ross C. Hawkins) | 6373 | 0 | 1 | 0 | 1 |
| 30 | Heimburger Objections | Heimburger, Craig; Heimburger, Dawn | 6230 | 1 | 0 | 1 | 2 |
| 31 | Hetherington Objections | Hetherington, Chris | 6394 | 1 | 0 | 0 | 1 |
| 32 | Jax Objections | Jax, James Garth | 6236 | 1 | 0 | 0 | 1 |
| 33 | Johnson Objections | Johnson, Duane "Troy" | 6395 | 1 | 0 | 0 | 1 |
| 34 | Jones Objections | Jones, Katherine; Jones, Preston | 6235 | 1 | 0 | 1 | 2 |
| 35 | Jones Objections | Jones, Kirk C. | 6396 | 1 | 0 | 0 | 1 |
| 36 | Jordan Objections | Jordan, Steven | 6375 | 1 | 0 | 0 | 1 |
| 37 | Kinard Objections | Kinard, John (On Behalf of Frank Kinard, Deceased) | 6219 | 0 | 1 | 0 | 1 |
| 38 | Komlo Objections | Komlo, Estate of William "Jeff" | 6222 | 0 | 1 | 0 | 1 |
| 39 | LaPlatney Objections | LaPlatney, Karen (on behalf of Joseph P. O'Malley) | 6390 | 0 | 1 | 0 | 1 |
| 40 | Lerer Objections | Lerer, Ben | 6379 | 1 | 0 | 0 | 1 |

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 41 | Levitt Objections | Levitt, Chad | 6391 | 1 | 0 | 0 | 1 |
| 42 | Mauck Objections | Mauck, Carl | 6405 | 1 | 0 | 0 | 1 |
| 43 | Mayberry Objections | Mayberry, James | 6388 | 1 | 0 | 0 | 1 |
| 44 | McFarland Objections | McFarland, James D. | 6400 | 1 | 0 | 0 | 1 |
| 45 | McGraw Objections | McGraw, Jonathan | 6378 | 1 | 0 | 0 | 1 |
| 46 | Meinert Objections | Meinert, Carmerita (on behalf of Dale Meinert) | 6408 | 0 | 1 | 0 | 1 |
| 47 | Miller Objections | Miller, Cleo; Flint, Judson; Underwood, Elmer; Clark, Sr., Vincent; Smerlas, Fred; Jones, Ken; Rourke, Jim; Piccone, Lou; Wilkins II, James David; Jackson, Robert | 6213 | 10 | 0 | 0 | 10 |
| 48 | Minor Objections | Minor, Claudie D., Jr. | 6363 | 1 | 0 | 0 | 1 |
| 49 | Minor Objections | Minor, Travis | 6389 | 1 | 0 | 0 | 1 |
| 50 | Moore Objections | Moore, Evan | 6376 | 1 | 0 | 0 | 1 |
| 51 | Moore Objections | Moore, Eugene | 6399 | 1 | 0 | 0 | 1 |

*Privileged – Attorney Work Product*

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 52 | Morey Objections | Morey, Sean; Faneca, Alan; Hamilton, Ben; Royal, Robert; Cartwright, Roderick "Rock"; Rohrer, Jeff; Considine, Sean | 6201 | 7 | 0 | 0 | 7 |
| 53 | Ndukwe Objections | Ndukwe, Ikechuku | 6410 | 1 | 0 | 0 | 1 |
| 54 | Ndukwe Objections | Ndukwe, Chinedum K. | 6393 | 1 | 0 | 0 | 1 |
| 55 | Nuefeld Objections | Neufeld, Ryan | 6406 | 1 | 0 | 0 | 1 |
| 56 | O'Hanley Objections | O'Hanley, Louise A. (on behalf of decedent Ross O'Hanley) | 6362 | 0 | 1 | 0 | 1 |
| 57 | Owens Objections | Owens, Susan (Widow of R.C. Owens, Deceased) | 6210 | 0 | 1 | 0 | 1 |
| 58 | Perfetto Objections | Perfetto, Eleanor M. (on behalf of Ralph R. Wenzel) | 6371 | 0 | 1 | 0 | 1 |
| 59 | Peterson Objections | Petersen, Ted | 6360 | 1 | 0 | 0 | 1 |
| 60 | Polk Objections | Polk, Da Shon | 6404 | 1 | 0 | 0 | 1 |
| 61 | Quillan Objections | Quillan, Frederick David | 6381 | 1 | 0 | 0 | 1 |
| 62 | Romberg Objections | Romberg, Brett | 6402 | 1 | 0 | 0 | 1 |
| 63 | Saturday Objections | Saturday, Jeffrey | 6384 | 1 | 0 | 0 | 1 |
| 64 | Sawyer Objections | Sawyer, John | 6358 | 1 | 0 | 0 | 1 |

A-7

*Privileged – Attorney Work Product*

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 65 | Slack Objections | Slack, Reginald; Rice, Matthew | 6223 | 2 | 0 | 0 | 2 |
| 66 | Steinbach Objections | Steinbach, Eric | 6401 | 1 | 0 | 0 | 1 |
| 67 | Stern Objections | Stern, Sally Miketa (on behalf of Andrew Miketa) | 6355 | 0 | 1 | 0 | 1 |
| 68 | Stewart Objection | Stewart, Andrew | 6175 | 1 | 0 | 0 | 1 |
| 69 | Stewart Objections | Stewart, Alexander | 6392 | 1 | 0 | 0 | 1 |
| 70 | Taylor Objections | Taylor, Jay | 6403 | 1 | 0 | 0 | 1 |
| 71 | Taylor Objections | Taylor, Willie T. | 6397 | 1 | 0 | 0 | 1 |
| 72 | Thomas Objections | David Thomas | 6398 | 1 | 0 | 0 | 1 |
| 73 | Trejo Objections | Trejo, Stephen | 6385 | 1 | 0 | 0 | 1 |
| 74 | Utecht Objections | Utecht, Ben | 6243 | 1 | 0 | 0 | 1 |
| 75 | Villapiano Objections | Villapiano, Philip J. | 6372 | 1 | 0 | 0 | 1 |
| 76 | Werner Objections | Werner, Clyde | 6412 | 1 | 0 | 0 | 1 |
| 77 | Williams Objections | Williams, Eric | 6345 | 1 | 0 | 0 | 1 |

A-8

*Privileged – Attorney Work Product*

| # | Submission Name | Objector(s) | Doc. No. | # of Retired Players | # of Rep. Claimants | # of Deriv. Claimants | # of Total Objectors |
|---|---|---|---|---|---|---|---|
| 78 | Williams Objections | Williams, Estate of Delano Roper | 6221 | 0 | 1 | 0 | 1 |
| 79 | Wilson Objections | Wilson, Jean (on behalf of Gerald Wilson) | 6361 | 0 | 1 | 0 | 1 |
| 80 | Wire Objections | Wire, Coy | 6379 | 1 | 0 | 0 | 1 |
| 81 | Worrell Objections | Worrell, Cameron | 6374 | 1 | 0 | 0 | 1 |
| 82 | Zeno Objections | Zeno, Lance | 6386 | 1 | 0 | 0 | 1 |
| TOTALS............ | | | | 183 | 18 | 4 | 205 |

Note: These totals include both timely and untimely filings—six submissions were untimely: the Anderson Objections, the Cosbie Objections, the Hetherington Objections, the Johnson Objections, the Mauck Objections, and the Werner Objections. In addition, the Morey Objections include four Retired NFL Football Players (Sean Morey, Ben Hamilton, Robert Royal, and Roderick "Rock" Cartwright) who opted out of the Settlement Agreement and, as a result, are no longer proper Objectors.