# EXHIBIT 3



The New York Times | http://nyti.ms/1udgSF4

PRO FOOTBALL   |   ANALYSIS   |   NYT NOW

# For Retirees, Decision on Concussion Settlement Will Not Be a Simple One

N.F.L. Concussion Settlement Divides Former Players

By KEN BELSON    JULY 22, 2014

Class-action settlements are often messy. When enough aggrieved people are thrown together, it is natural that some of them will be unhappy with a deal that is a result of a negotiation between parties trying to avoid a long, expensive trial with an uncertain outcome.

The proposed settlement in the case brought by more than 4,500 retired N.F.L. players who claim the league hid from them the dangers of concussions is similar. Asking 10 retired players what they think of the settlement might elicit 10 opinions.

In the coming weeks, though, the 20,000 retired players and their beneficiaries will have to make a final decision to accept the proposed deal, which includes an unlimited number of cash awards for a small set of severe neurological conditions; to opt out and perhaps sue the league for more; or to object and possibly appeal the settlement.

To make informed choices, retired players will have to pore over the settlement, consult their lawyers and doctors and consider their own health and financial needs. They will also have to weigh a host of arguments for and against accepting the plan.

Jeff Nixon, who played for the Buffalo Bills from 1979 to 1982, is among those who view the settlement as the best of several bad options. Going to trial, he said, was no slam dunk because the players would have

to clear several significant legal hurdles, most notably the league's argument that the collective bargaining agreement governed player injuries.

"The lawyers fought as hard as they could and got as much as they could from the settlement," said Nixon, who writes a blog about the settlement. "To continue litigation was pretty risky."

The settlement, he said, will get money into the hands of the former players who are in the worst shape, such as those with Parkinson's disease or Alzheimer's disease, and will act as an insurance policy for players whose health might deteriorate.

"We didn't get everything we wanted, but we got the N.F.L. to say, 'We'll give you guys money if you have symptoms,' " he said. "The bottom line is if you've got impairments and symptoms, you'll get paid."

There are many retired players, though, who say the settlement is irreparably flawed, and seven of them took the unusual step Monday of asking a federal appeals court to intervene to correct what they see as deficiencies.

Sean Morey, Alan Faneca and five other former players argued that most retirees would never see any money because many of their ailments would not be covered by the settlement. "The class, as certified, is doomed," they wrote in their filing.

They noted that players who had been found to have chronic traumatic encephalopathy, or C.T.E., a degenerative brain disease closely related with Alzheimer's disease, and who had died before the settlement was finalized, could receive up to $4 million. Anyone with a diagnosis of C.T.E. after the settlement was finalized could not receive an award.

Christopher Seeger, one of the lead lawyers for the plaintiffs in the class action, said the objectors had misread the settlement. The families of dead players who were found to have C.T.E. might receive awards because the players could no longer receive a diagnosis. C.T.E. was not included for living players because the settlement would cover those symptoms if they were to develop.

"Going forward, any retired player who is sick with a qualifying condition will get compensated, as C.T.E. cannot be currently diagnosed in living people," he said. "Whether you have C.T.E. or not, or whether or not you can prove you have C.T.E., if you have symptoms of a qualifying condition, you will be compensated."

Susan Owens, whose husband, R. C. Owens, played for the San Francisco 49ers, the Baltimore Colts and the Giants and died two years ago from Alzheimer's disease, raised another potential inconsistency. Under the settlement, younger retired players would receive larger awards than older players on the presumption that head trauma from playing football, and not old age, had contributed to their severe neurological conditions.

But Owens pointed to research by the Mayo Clinic and others who found that people with early-onset Alzheimer's often get the disease because it runs in their families. Other research, though, has shown that moderate or severe brain trauma may raise the risk of developing Alzheimer's disease.

Owens said her husband might have had Alzheimer's disease years before he received a diagnosis because he did not want to admit he was losing his memory. If he had received a diagnosis earlier, he might have been eligible for more money.

"My husband would never admit to anything," said Owens, who has said she might file an objection. "He was an expert at not letting people know how he was."

Retired players will also have to consider Article XI of the settlement, which essentially says that state and federal governments have the right to recover expenses associated with treatment for a player's illness. If a player were eligible for a $500,000 award and Medicare had paid $200,000 to treat his condition, the player would receive only $300,000.

The problem for players is figuring out how much the government has spent. A liens administrator will be appointed to determine those amounts, but players may not get answers until after the settlement has been completed. That means they may not know what they could receive until it

is too late, said Michael Kaplen, a lawyer who represents clients with traumatic brain injuries.

"Unless they know what the numbers are, then how can they decide whether to opt out?" he asked.

Seeger, the plaintiffs' lawyer, said that in other settlements he had worked on, he negotiated a fixed deduction that was drastically lower than the amount that the recipients owed. The government, he said, prefers the certainty of receiving small amounts from every recipient rather than spending years trying to claw back money from many people.

"The government likes these deals because rather than chasing these people individually, they can receive a fixed amount for each disease," he said.

Seeger said he was actively negotiating deductions now.

A version of this article appears in print on July 23, 2014, on page B13 of the New York edition with the headline: For Retirees, Decision on Concussion Settlement Will Not Be a Simple One.

© 2014 The New York Times Company