# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>        Plaintiffs,<br><br>                v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>        Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS |  |

### MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION FOR AN ORDER GRANTING FINAL APPROVAL OF SETTLEMENT AND <u>CERTIFICATION OF CLASS AND SUBCLASSES</u>

## TABLE OF CONTENTS

I.  **INTRODUCTION**........................................................................................................ 1

II. **MATERIAL TERMS OF THE SETTLEMENT** ............................................. 4

    A.  The Settlement Class and Subclasses ................................................. 4

    B.  The Settlement Benefits .................................................................... 6

        1.  The Baseline Assessment Program (BAP) ............................... 7

        2.  The Monetary Awards and Derivative Claimant Awards.......................... 9

            a)  Maximum Awards ...................................................... 10

            b)  Supplemental Awards ................................................. 11

            c)  Credited Eligible Seasons .......................................... 11

            d)  Offsets ...................................................................... 12

            e)  Lien Resolution......................................................... 13

            f)  Derivative Claimant Awards...................................... 14

            g)  Appeals .................................................................... 14

            h)  Funding .................................................................... 15

        3.  The Education Fund .................................................................. 16

    C.  Preservation of Collective Bargaining Benefits and Claims for Workers' Compensation .................................................................... 16

    D.  The Settlement Eliminates the NFL Parties' Defenses of Causation, Statutes of Limitations, and Other Defenses........................................ 18

    E.  Attorneys' Fees ................................................................................ 19

    F.  Releases, Covenants Not To Sue and Bar Order ................................ 20

III. **THE COURT SHOULD GRANT FINAL CERTIFICATION OF THE SETTLEMENT CLASS**............................................................................. 21

    A.  Numerosity...................................................................................... 21

    B.  Commonality................................................................................... 21

    C.  Typicality ....................................................................................... 23

D. Adequacy of Representation ................................................................. 24

E. Predominance ...................................................................................... 30

F. Superiority ........................................................................................... 33

IV. **THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS**. ............ 34

A. The Notice Was Widely Disseminated Through Direct Mail, the Media and the Internet, Satisfying the Requirements of Rule 23(e)(1) and Due Process. ............................................................................................... 35

B. The Form and Content of the Court-Approved Notices Satisfies the Requirements of Rule 23(e)(1) and Due Process.................................... 38

C. Class Members' Response to the Notice Program................................ 38

D. Objections to the Language of the Notices .......................................... 39

V. **THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE**.............................................................. 42

A. The Proposed Settlement Is Entitled to a Presumption of Fairness. .................... 42

B. The *Girsh* Factors Strongly Support Final Approval............................ 43

1. The Complexity, Expense, and Likely Duration of the Litigation ........... 44

2. The Reaction of the Class to the Settlement ............................. 47

3. The Stage of Proceedings and the Amount of Discovery Completed ........................................................................... 49

4. The Risks of Establishing Liability and Damages .................................. 52

5. The Risks of Maintaining the Class Action Through Trial...................... 60

6. The Ability of Defendants to Withstand a Greater Judgment.................. 61

7. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of All Attendant Risks of Litigation.......................................................................... 62

C. The Relevant *Prudential* Considerations Also Support Final Approval. ............. 64

**VI.**    **RESPONSE TO OBJECTIONS** ................................................................... 66

   A.    Some Objectors Argue That the Reductions and Offsets in the Monetary Award Grid Are Unfair, But These Types of Provisions Are Often Included In Similar Settlements. ............................................................. 66

   B.    Some Objectors Argue That the BAP Is Underinclusive, But It Is Only Intended to Provide Baseline Testing and Treatment for a Limited Time. .......... 69

   C.    Some Objectors Argue That the Claims Process Is Too Complicated, But the Procedures Are Typical of Complex Settlements. ......................................... 71

       1.    The Claims Process Uses Standard Procedures Present in Class Action Settlements Nationwide. ............................................................. 72

       2.    The Claim Process Does Not Create an Illusory Settlement Value. .......... 76

   D.    Some Objectors Argue That a Qualifying Diagnosis Should Be Compensated as of the Date of "Onset of Disease," But the Diagnosis Is Critical to the Fair Administration of the Settlement. ............................................ 78

   E.    Some Objectors Argue That Recovery Should Be Allowed When Class Members Died Before January 1, 2006, But the NFL Parties Do Not Have to Waive All Statute of Limitations Defenses for the Settlement to Be Fair. ........ 79

   F.    Objectors Argue That the $10 Million Education Fund Is An Impermissible *Cy Pres* Award, But It Is Merely One Component of a Fair and Reasonable Settlement. .................................................................................. 80

   G.    Some Objectors Argue That the Release Is Too Broad, But There Is Nothing Unfair About a Release That Provides the Defendants With Global Peace. ......................................................................................................... 83

   H.    Certain Objectors Claim that the Settlement Does Not Take Scientific Advancements into Account, But It Clearly Does. ............................................... 84

   I.    Certain Objectors Contend that the Settlement Sets an Unreasonably High Bar "To Qualify for Dementia," But the Testing Protocols Are Based on Sound Diagnostic Criteria. .................................................................................. 85

   J.    Some Objectors Argue That They Should Be Given a Second Opportunity to Opt Out, But It Is Well Settled That Class Members Must Choose Between Objecting and Opting Out. .................................................................... 86

   K.    Objectors' Arguments Regarding Attorneys' Fees Are Premature. ..................... 89

**VII.**    **CONCLUSION** ................................................................................ 90

iv

## Appendix A: Procedural History

A.   Plaintiffs' Claims ................................................................................ 93

B.   Procedural Background and Creation of This MDL ............................. 94

C.   Proceedings in this Court ................................................................... 95

D.   Mediation ........................................................................................... 97

E.   Public Announcement of the Proposed Settlement ............................. 98

F.   Court's Appointment of a Special Master ........................................... 98

G.   The Court's Denial Without Prejudice of Plaintiffs' Motion for
     Preliminary Approval, and Review of Supporting Documentation by the
     Special Master .................................................................................... 99

H.   The Court Grants Preliminary Approval of the Revised Settlement .................. 100

I.   The Release of Actuarial Reports and Tabulations ............................. 102

## TABLE OF AUTHORITIES

**Federal Cases**

*Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp.*,
478 F.2d 540 (3d Cir. 1973)..................................................................... 33

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................ passim

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
133 S.Ct. 1184 (2013) ............................................................................ 31

*Austin v. Pa. Dep't of Corr.*, 876 F. Supp. 1437 (E.D. Pa. 1995)................................. 42

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ....................................... 23, 24

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) ........................................ 31

*Bredbenner v. Liberty Travel, Inc.*, Civ. A. No. 09-905,
2011 WL 1344745 (D.N.J. Apr. 8, 2011) ..................................................... 61

*Buford v. H & R Block, Inc.*, 168 F.R.D. 340 (S.D. Ga. 1996)..................................... 30

*Butler v. Sears, Roebuck and Co.*, 727 F.3d 796 (7th Cir. 2013) .................................. 32

*Cassese v. Williams*, 503 F. App'x 55 (2d Cir. 2012) ................................. 89

*Chakejian v. Equifax Info. Serv., LLC*, 275 F.R.D. 201 (E.D. Pa. 2011) .............. 61, 64

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004) ....................................... 31

*Cicero v. DirecTV, Inc.*, No. 07-1182, 2010 WL 2991486 (C.D. Cal. July 27, 2010) ............... 83

*Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir. 1990)............... 63

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)................... 45, 53

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007).................................. 83

*DeJulius v. New England Health Care Emps. Pension Fund*,
429 F.3d 935 (10th Cir. 2005) ................................................................. 35

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ...................................... 87

*Dennis v. Kellog Co.*, 697 F.3d 858 (9th Cir. 2012).................................................. 80

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ......................... 26

*Dryer v. Nat'l Football League*, 2014 WL 5106738 (D. Minn. Oct. 10, 2014) ........................... 54

*Dryer v. National Football League*, 2013 WL 5888231 (D. Minn. Nov. 1, 2013) .................... 53

*Eisen v. Carlisle & Jacqueline*, 417 U.S. 156 (1974) .................................................................. 35

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) ..................................................... 41, 76, 77

*Fanning v. AcroMed Corp.*, Civ. A. No. 97-381,
   2000 WL 1622741 (E.D. Pa. Oct. 23, 2000) ........................................................................... 89

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ..................................................................... passim

*Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175 (3d Cir. 2014) ........................................... 61

*Hainey v. Parrott*, 617 F. Supp. 2d 668 (S.D. Ohio 2007) ........................................................ 88

*Hall v. Best Buy Co.*, 274 F.R.D. 154 (E.D. Pa. 2011) ............................................................... 44

*Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ............................................. 31

*In re Am. Family Enters.*, 256 B.R. 377 (D.N.J. 2000) .............................................................. 44

*In re AT & T Mobility Wireless Data Servs. Sales Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010) ............................................................................................ 64

*In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ..................................... passim

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ............................... 80

*In re Brand Name Prescription Drugs Antitrust Litig.*, 94 C 897,
   1996 WL 167347 (N.D. Ill. Apr. 4, 1996) ............................................................................. 88

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) ................................... 48

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ..................................................... passim

*In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d Cir. 2005) ................................................... 28

*In re Checking Account Overdraft Litig.*, No. 09-md-02036
   (S.D. Fla. Apr. 15, 2013) (D.E. 3430) .................................................................................. 80

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005) .......................................................... 88

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
   No. 3:08-MD-01998, 2009 WL 5184352 (W.D. Ky. 2009) ................................................... 52

*In re Deepwater Horizon,* 739 F.3d 790 (5th Cir. 2014) ................................................ 32

*In re Del-Val Fin. Corp. Sec. Litig.*, 162 F.R.D. 271 (S.D.N.Y. 1995) ....................................... 87

*In re Diet Drugs Liab. Litig.*, 431 F.3d 141 (3d Cir. 2005) .......................................... 27

*In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293 (3d Cir. 2004)............................................... 32

*In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 5243d Cir. 2009).......................................... 89

*In re Diet Drugs Prods. Liab. Litig.*, No. 1203, 99-20593,
2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ................................................... passim

*In re Diet Drugs*, 2013 WL 1796989 (E.D. Pa. Apr. 26, 2013)........................................ 79

*In re Diet Drugs*, MDL No. 1203, 2014 WL 4638840 (E.D. Pa. Sept. 16, 2014)....................... 78

*In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534 (1992) ........................................... 41

*In re Fasteners Antitrust Litig.*, No. 08-md-1912,
2014 WL 285076 (E.D. Pa. Jan. 24, 2014) ............................................................... 65

*In re Ferrero Litig.*, No. 12-56469, 2014 WL 3465685 (9th Cir. July 16, 2014)........................ 89

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Truck*"),
55 F.3d at 817 (3d Cir. 1996)............................................................................. passim

*In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92 (D.N.J. 2012)........................................... 86

*In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) ...................... 28, 30, 75

*In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330 (N.D. Ohio 2001) .......................... 26

*In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010) ............................................ 41

*In re Life USA Holding Inc.*, 242 F.3d 136 (3d Cir. 2001) ........................................................ 61

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003)....................................... 42

*In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001)........................... 31

*In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp. 2d 633 (D.N.J. 2004) ................................. 48

*In re Medtronic, Inc.*, No. 05–MDL–1726, 2008 WL 3895933
(D. Minn. Aug. 15, 2008) ................................................................................. 14

viii

*In re Nat'l Football League Players' Concussion Injury Litig.*,
842 F. Supp. 2d 1378 (J.P.M.L. 2012) ........................................................................... 95

*In re Nat'l Football League Players' Concussion Injury Litig.*,
961 F. Supp.2d 708 (E.D. Pa. 2014) ............................................................................. 102

*In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp.2d 891
(E.D. La. 2012) ................................................................................................... 28, 58, 83

*In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) .................. 28, 69

*In re Pet Food Products Liability Litig.*, 629 F.3d 333 (3d Cir. 2010) ........................... 64, 65, 87

*In re Phenylpropanoloamine Prods. Liab. Litig.*,
227 F.R.D. 553 (W.D. Wash. 2004) ........................................................................... 63, 64, 67

*In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-020002,
2014 WL 5149087 (E.D. Pa. Oct. 10, 2014) ............................................................................. 61

*In re Prudential Ins. Co. America Sales Practices Litig.*,
148 F.3d 283 (3d Cir. 1998) .............................................................................................. passim

*In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491 (W.D. Pa. 2003) ............................................... 46

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) ........................... 23

*In re School Asbestos Litig.*, 921 F.2d 1330 (3d Cir. 1990) ....................................................... 42

*In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221 (S.D. W.Va.  2005) .................................. 29, 59

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926,
1994 WL 578353 (N.D. Ala. Sept. 1, 1994) ............................................................................. 29

*In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178 (D.N.M. 2012) ........................ 63

*In re Thornburg Mortgage, Inc. Secs. Litig.*, 885 F. Supp. 2d 1097 (D.N.M. 2012) .................... 80

*In re Vioxx Prods. Liab. Litig.*, MDL No. 1657,
2014 WL 31645 (E.D. La. Jan. 3, 2014) ............................................................................. 14, 64

*In re Visa Check/Mastermoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) .............................................................................. 47

*In re Vitamins Antitrust Class Actions*, 215 F.3d 26 (D.C. Cir. 2000) ........................................ 87

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .................................... passim

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013) ................................................................................ 32

*In re Zyprexa Prods. Liab. Litig.*, MDL 1596,
  2006 WL 2385230 (E.D.N.Y. Aug. 15, 2006) .................................................... 14

*Int'l Union, United Auto., Aerospace, & Agr. Implement
  Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ..................... 28

*Ira Holtzman, C.P.A. & Assocs. Ltd. v. Turza*, 728 F.3d 682 (7th Cir. 2013) .............................. 80

*Jones v. H & R Block Tax Servs.*, 117 F.3d 1433 (11th Cir. 1997) ................................................ 31

*Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011) .................................................. 80

*Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997) ........................................................ 52

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) .................................................................. 82

*Lane v. Kitzhaber*, 283 F.R.D. 587 (D. Ore. 2012) ...................................................................... 22

*Lazy Oil Co. v. Witco,* 95 F. Supp. 2d 290 (W.D. Pa. 1997),
  *aff'd*, 166 F.3d 581 (3d Cir. 1999) ............................................................... 46, 53

*Little-King v. Hayt Hayt & Landau*, No. 11-5621 (MAH), 2013 WL 4874349
  (D.N.J. Sept. 10, 2013) .......................................................................................... 51

*Logory v. Cnty. of Susquehanna*, 277 F.R.D. 135 (M.D. Pa. 2011) ............................................ 22

*M.D. v. Perry 675 F.3d 832 (5th Cir. 2012)* ................................................................................ 22

*McGowan Investors LP v. Keefe Bruyette & Woods, Inc.*,
  540 F. Supp. 2d 571 (E.D. Pa. 2008) .................................................................... 83

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  672 F.3d 482 (7th Cir. 2012) ................................................................................. 32

*Mirakay v. Dakota Growers Pasta Co., Inc.*, No. 13-cv-4429 (JAP),
  2014 WL 5358977 (D.N.J. Oct. 20, 2014) ........................................................... 50

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ......................................................................... 41

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ......................................... 35

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) ............................................................... 80

*Newby v. Enron Corp.*, 394 F.3d 296 (5th Cir. 2004) ................................................................. 63

*Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922 (E.D. Mich. 2007) ................................................ 87

*Ortiz v. Fibreboard Corp., 527 U.S. 81 (1999)* .................................................................. 26, 27

*Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) ........................................... 52, 60

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ....................................................... 28, 29

*Powers v. Hamilton Cnty. Pub. Defender Comm'n,*
    501 F.3d 592 (6th Cir. 2007) .................................................................................. 30

*Prandini v. National Tea Co.*, 585 F.2d 47 (3d Cir. 1978) ......................................................... 19

*Ripley v. Sunoco, Inc.*, 287 F.R.D. 300 (E.D. Pa. 2012) ........................................................... 51

*Rowe v. E.I. DuPont de Nemours & Co.*, No. 06-1810 (RMB/AMD),
    2011 WL 3837106 (D.N.J. Aug. 26, 2011) ............................................................... 66

*Shaffer v. Continental Cas. Co.*, 362 F. App'x 627 (9th Cir. 2010) ........................................... 28

*Shuford v. Ala. State Bd. of Ed.*, 897 F. Supp. 1535 (M.D. Ala. 1995) ....................................... 47

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001) ................................................................... 24

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini,*
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ....................................................................... 48

*Sullivan v. DB Investment, Inc.*, 667 F.3d 273 (3d Cir. 2011) ............................................... passim

*Trombley v. Nat'l City Bank,* 826 F. Supp.2d 179 (D.D.C. 2011) .............................................. 51

*Turner. v. Nat'l Football League*, Civ. A. No. 14-cv-00029-AB
    (E.D. Pa. Jan. 6, 2014) .......................................................................................... 93

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ................................................ 41

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ......................................................... 21, 22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) .................................... 47, 48

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910) ................................................................. 42

**State Cases**

*Brown v. Textron Inc.*, No. 1:07cv340, 2008 WL 483335 (S.D. Ohio Feb. 19. 2008) ................ 79

*DeCosse v. Armstrong Cork Co.*, 319 N.W.2d 45 (Minn. 1982) .................................................. 79

*Gray v. Commonwealth*, 973 S.W.2d 61 (Ky. Ct. App. 1997) ..................................................... 79

*Hannebuth v. Bell Helicopter Int'l*, 694 P.2d 143 (Alaska 1984) ................................................ 79

*Lawhon v. L.B.J. Institutional Supply, Inc.*, 765 P.2d 1003 (Ariz. Ct. App. 1988) ..................... 79

*Southerland v. Hammond*, 693 N.E.2d 74 (Ind. Ct. App. 1998) ................................................... 79

**Federal Statutes**

28 U.S.C. § 1292(b) ................................................................................................................. 50

28 U.S.C. § 1407 ..................................................................................................................... 95

Fed. R. Civ. P. 23 ............................................................................................................ passim

Federal Rule of Evidence 702 ............................................................................................ 45, 53

Labor Management Relations Act ............................................................................................. 95

Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b) ............................................................. 13

**State Statutes**

C.G.S.A. § 52-555 .................................................................................................................... 79

Haw. Rev. Stat. § 657-20 ......................................................................................................... 79

**Other Authorities**

*Manual for Complex Litigation* (4th ed. 2014) ............................................................ 72, 73, 74

NEWBERG ON CLASS ACTIONS ................................................................................................ 32

*Principles of the Law of Aggregate Litigation* ........................................................................ 81

## I.       INTRODUCTION

The proposed class Settlement before the Court will provide significant and substantial monetary awards to thousands of Retired NFL Football Players if approved.  The Settlement is intended to resolve more than 5,000 cases filed in this MDL, as well as thousands of additional retired players' claims against the NFL Parties for injunctive relief, medical monitoring, and compensation for the long-term cognitive injuries and other losses suffered by them allegedly as a result of the Defendants' tortious conduct.  This is a landmark agreement that will establish a $75 million baseline assessment program ("BAP") to independently test eligible living retired players to determine whether and to what extent they may be suffering from any neurocognitive impairment.  In the event they are diagnosed with moderate neurocognitive impairment, these players will be entitled to supplemental benefits in the form of medical treatment and/or evaluation, including counseling and pharmaceutical coverage.

The Settlement also contains an uncapped monetary award fund ("MAF") that will immediately compensate seriously ill retired players and their families for diagnoses of dementia, Alzheimer's Disease, Parkinson's Disease and Amyotrophic Lateral Sclerosis ("ALS"), also known as Lou Gehrig's disease.  In the event a players' condition worsens, he and his family will be able to seek additional payments.  Importantly, the Settlement preserves Retired NFL Football Players' rights to pursue claims for worker's compensation and any and all medical and disability benefits under any applicable collective bargaining agreement, including the NFL's Neuro-Cognitive Disability Benefit.  In addition, the Settlement will ensure that the provision included in Article 65 of the current CBA, Section 2 – requiring that players execute a release of claims and covenant not to sue in order to be eligible for the NFL's Neuro-Cognitive Disability Benefit – will not be enforced or used against players in connection with this

Settlement.  The MAF will be available for 65 years to ensure that even the youngest retired players will have an opportunity to receive these benefits should they become eligible.

The third component of this comprehensive deal is a $10 million Education Fund to promote safety and injury prevention in football players, including youth football players, and to educate retired players regarding the NFL's medical and disability benefits programs and initiatives.

This Settlement has received unprecedented publicity since its announcement. Considering all of the news reports and stories about the Settlement and the state-of-the-art class notice program, the reaction of the Class has been extremely favorable.  Fewer than 1% of Retired NFL Football Players filed requests for exclusion and over 5,000 potential Settlement beneficiaries have registered to receive further notices regarding the Settlement and claims process, even though formal registration for Settlement benefits will not begin until after the Settlement has achieved final judicial approval.  In a case like this, where significant claims are at stake, and more than 5,000 individual actions were filed in the MDL alone, this positive response of Class Members should be given great weight.  This high level of favorable response is remarkable.

This memorandum is submitted in support of final approval of the Settlement and certification of the proposed Class and subclasses.  The Settlement is the product of many months of hard-fought, arm's-length and vigorous negotiations by highly experienced counsel, who consulted with numerous experts in the fields of neurology, neuropsychology, and other relevant specialties, actuarial science, economics, claims administration, and lien identification and satisfaction.  The negotiations were supervised by a Court-appointed mediator and overseen

by a Special Master.[1]  The parties were keenly aware of the risks of litigation throughout the

negotiations, especially given the Court's determination at the outset, even before discovery, to

address the threshold question whether Plaintiffs' claims were preempted under federal law

[CMO 2, at 2, ECF No. 62].[2]  The Court has been actively involved in reviewing the terms of the

Settlement for over a year and is well versed in the extended procedural history of this case.  For

ease of reference, that history is recounted in Appendix A.

The proposed Settlement provides significant and essential relief to the thousands of

Retired NFL Football Players and their families *now*.

Mindful of the guidance provided by the Court, Judge Phillips, and Special Master

Golkin, and armed with the input of numerous experts, the experiences of the Class

Representatives and other Class Members, and Class Counsel's collective decades of experience

in litigating and settling complex class actions, Plaintiffs and Class Counsel have determined that

the proposed Settlement is in the best interests of the Class, in light of the significant litigation

risks and costs, the state of the science related to concussive and sub-concussive head injuries,

and the significant monetary and other benefits ultimately offered by the NFL Parties.

The objections to the proposed Settlement filed by fewer than 1% of the retired players

are slight variations of the same complaint: the NFL Parties should have been more generous and

the Settlement should have been better.  But, as numerous courts have held, this complaint is not

---

[1] *See* Declaration of Co-Lead Class Counsel Christopher A. Seeger in Support of Final Approval
of Settlement and Certification of Class and Subclasses ("Seeger Decl.), Exhibit ("Ex.") 1, at ¶¶
22, 24. 57, 61;  *see also* Supplemental Declaration of Layn R. Phillips (Phillips Supp. Decl."),
Ex. 4, at ¶ 25.

[2] Indeed, there was a real threat to the viability of Plaintiffs' case, as the Court noted in its
Preliminary Approval Order:  "Many, if not all, of Plaintiffs' claims could have been dismissed
at this early stage of the litigation if the NFL Parties prevailed on the preemption issue."  [ECF
No. 6083, at 10].

a valid objection, as it fails to recognize that settlement is the product of compromise and ignores the significant risks and costs of litigation.  Aware that most courts have rejected such an objection, some objectors have repackaged it as a challenge to the adequacy of the Class Representatives.  But this argument fares no better.  Like numerous successful settlements approved by this Court and others, this Settlement uses a compensation matrix to account for exposure, age, and severity of disease, and provides several structural protections, including the use of subclasses, to ensure the fair and adequate representation of the groups and individuals affected.  None of the objections to the proposed Settlement justifies depriving the Class, the overwhelming majority of which has demonstrated its approval of the Settlement by neither opting out nor objecting, of the substantial monetary and other benefits the Settlement promises today.

Plaintiffs and Class Counsel submit that the proposed Settlement is fair, reasonable, and adequate and that the Court should grant final certification of the class and final approval of the proposed Settlement.

## II.   MATERIAL TERMS OF THE SETTLEMENT

### A.   The Settlement Class and Subclasses

The Settlement Class includes three types of claimants:

> (1) Retired NFL Football Players, defined as all living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club;

4

      (2) <u>Representative Claimants</u>, defined as authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players; and

      (3) <u>Derivative Claimants</u>, defined as spouses, parents, and children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

The Settlement Class also consists of two subclasses. Subclass 1 is defined as Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of Preliminary Approval, July 7, 2014, and their Representative Claimants and Derivative Claimants. Subclass 2 is defined as Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to July 7, 2014, and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death, or who died prior to July 7, 2014 and who received a post-mortem diagnosis of CTE. The Qualifying Diagnosis include Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE (post-mortem diagnosis prior to July 7, 2014). A description of each Qualifying Diagnosis is provided in the Settlement Agreement. *See* ECF No. 6087, at 106-110 (Exhibit 1 - Injury Definitions).[3]

Class Members can be ascertained easily from the NFL Parties' records, the NFL's pension plans, and other objective criteria. Current NFL Football players are not included in the

---

[3] References to page numbers in the Settlement Agreement are to the PACER system's assigned page numbers that appear in blue at the top of each page, and not to the page numbers appearing at the bottom of each page. References to page numbers in Objections are to the page number of the Objection, rather than the page number assigned by PACER.

proposed Class.  Individuals who tried out for a Member Club or team of the American Football

League, World League of American Football, NFL Europe League or NFL Europa League, but

did not make a preseason, regular season or postseason roster, practice squad, developmental

squad, or taxi squad, are also not included in the proposed class.

### B.        The Settlement Benefits

The Settlement provides three potential sources of benefits, each of which is discussed in

detail below.  Class Members must register to receive Settlement benefits.  Registration will be

overseen by the Claims Administrator, who will establish and administer both online and hard-

copy registration methods.  Unless good cause is shown, Class Members must register within

180 days from the date that the Claims Administrator provides notice of registration methods and

requirements.  An individual whose registration is denied may challenge the determination to the

Claims Administrator and may appeal to the Court (which may, in its discretion, refer the matter

to the Special Master), whose decision will be final and binding.  The NFL Parties also may

challenge a registration determination under certain circumstances.

To participate in the Settlement, Class Members will not have to prove that their

cognitive injuries were caused by NFL-related concussions or sub-concussive head injuries.

Class members will only have to submit a timely and complete claim package to be eligible to

receive Settlement benefits.

In addition, Class Members are not precluded from participating in the Settlement if they

have received benefits related to neurocognitive injuries pursuant to benefit programs provided

under a Collective Bargaining Agreement ("CBA") with the NFL (*e.g.*, the 88 Plan) or signed

releases and covenants not to sue the NFL pursuant to the Neuro-Cognitive Disability Benefit

under Article 65 of the 2011 CBA.  The NFL Parties have agreed not to assert any defense or

objection to a Class Member's receipt of benefits under the Settlement Agreement on the ground that he executed the Article 65 release and covenant not to sue.  As discussed below, apart from and in addition to Settlement benefits, Class Members are entitled to seek all applicable bargained-for benefits in the Collective Bargaining Agreements with the NFL.

1.      **The Baseline Assessment Program (BAP)**

The Settlement will create a BAP to evaluate retired players objectively for evidence of cognitive decline and provide medical treatment and further testing for any player found to be suffering from Level 1 Neurocognitive Impairment.  In addition to detecting any cognitive impairment, the results of BAP examinations can be used as a comparison against any future tests to determine whether a class member's cognitive abilities have deteriorated.  The BAP examinations also serve to inform Class Members of their current level of cognitive functioning. The NFL Parties will make an initial deposit of $35 million to fund the BAP, and will pay an additional $40 million to continue funding the BAP, as necessary.

All Class Members who are credited with at least one-half of an "Eligible Season," as described below, and who timely register to participate in the Settlement, may participate in the BAP and receive a baseline assessment examination.  A baseline assessment examination includes a detailed, standardized neuropsychological examination performed by a neuropsychologist certified by the American Board of Professional Psychology or the American Board of Clinical Neuropsychology, a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, and a basic neurological examination performed by a board-certified neurologist.  The deadline for receiving a baseline assessment examination depends on the age of the Class Member as of the Effective Date of the Settlement

7

Agreement.[4]  Class Members age forty-three or older as of the Effective Date must receive the

baseline assessment examination within two years of the Effective Date.  Class Members under

the age of forty-three as of the Effective Date must receive the baseline assessment examination

within ten years after commencement of the BAP, or before they turn forty-five, whichever

occurs first.  A Class Member of Subclass 1 who does not participate in the BAP remains eligible

for a Monetary Award if he develops a Qualifying Diagnosis, but the Monetary Award will be

reduced by ten percent (save a diagnosis of ALS), unless the Class Member received his

Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination.

Class Members who are diagnosed during a BAP baseline assessment examination with

Level 1 Neurocognitive Impairment will receive BAP Supplemental Benefits that entitle them to

medical testing or treatment, including, as needed, counseling and pharmaceutical coverage,

within a network of pre-approved providers and pharmacy vendors.  If Class Members are

diagnosed with Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment

during a BAP baseline assessment examination, they may file a claim to receive an award from

the Monetary Award Fund.

A web portal linked to the Settlement Website will be set up to assist Class Members in

accessing BAP services.  All eligible Class Members will be encouraged to take advantage of the

BAP.  In addition, subject to Class Members' reasonable informed consent, and in compliance

with applicable privacy and health laws and any other customary authorization, medical data

generated through the Settlement will be made available for use by those conducting medical

research in cognitive impairment, safety and injury prevention.

---

[4] The Effective Date is the date on which the Court's judgment becomes final, either because the deadline to appeal has expired without any appeals being filed or once any appeals are resolved, as more specifically detailed in the Settlement Agreement.

A BAP Administrator will be appointed to set up a network of qualified medical providers ("Qualified BAP Providers") to administer the baseline assessment examinations for Retired NFL Football Players.  The Court preliminarily appointed Garretson Resolution Group, Inc. ('GRG") to serve as the BAP Administrator.  *See* ECF No. 6084 at ¶ 3.e.  The work GRG has performed thus far to set up and operate the BAP, as well as GRG's operation of similar programs in the past, are described in the Affidavit of Matthew L. Garretson ("Garretson Aff."), attached as Ex. 2 hereto, at ¶¶ 4, 6-22.

The Court will also appoint a Special Master for five-year terms to oversee several aspects of the settlement administration, including the work of the BAP Administrator.  The annual compensation of the Special Master (not to exceed $200,000) and his or her reasonable out-of-pocket costs and expenses shall be paid from the Monetary Award Fund (which is funded by the NFL Parties).

## 2.     The Monetary Awards and Derivative Claimant Awards

The largest component of the Settlement is the Monetary Award Fund, which provides for the payment of cash Monetary Awards and Derivative Claimant Awards to Retired NFL Football Players diagnosed with Qualifying Diagnoses (defined in Exhibit 1 to the Settlement Agreement), and their Representative and Derivative Claimants.  Qualifying Diagnoses will be made by Qualified BAP Providers, Qualified MAF Physicians (board-certified neurologists, neurosurgeons, or other neuro-specialist physicians who are part of an approved list established by the Claims Administrator), or otherwise appropriately credentialed medical professionals.  Class members will have to submit information about their Qualifying Diagnosis in claim packages for the Claims Administrator's review and award determination.

Monetary Awards will be processed by the Claims Administrator appointed by the Court. BrownGreer PLC has been preliminarily appointed to serve as the Claims Administrator. *See* ECF No. 6084 at ¶ 3.f. The Affidavit of Orran L. Brown, Sr., attached as Ex. 3 hereto, discusses the setup and operation of the Monetary Award Fund and BrownGreer's experience in administering other similar class and mass tort settlement programs. *Id.* at ¶¶ 57-59, and Attachment 1. The costs of the Claims Administrator will be paid from the Monetary Award Fund.

### a)  Maximum Awards

The maximum Monetary Award for each Qualifying Diagnosis category is as follows:

| Qualifying Diagnosis | Maximum Award |
|---|---|
| ALS | $5 million |
| Death with CTE | $4 million |
| Alzheimer's Disease | $3.5 million |
| Parkinson's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment | $3 million |
| Level 1.5 Neurocognitive Impairment | $1.5 million |

The amount of a Class Member's Monetary Award is based on his Qualifying Diagnosis and his age at the time of diagnosis, and the application of any other applicable reductions or offsets. Generally, the younger a Class Member is when he receives a Qualifying Diagnosis, the greater the base compensation for the Monetary Award. Conversely, the older a class member is when he receives a Qualifying Diagnosis, the lower the base compensation for the Monetary Award. The award levels are described in the Settlement Agreement and Monetary Award Grid. *See* ECF No. 6087, Ex. 3, at 122.

All Monetary Awards will be adjusted upwards annually for inflation, beginning one year after the Effective Date, in an amount up to 2.5% per year.  The precise amount of the adjustment will be determined by the Special Master or the Court, based on consideration of the Consumer Price Index for Urban Consumers.

### b) Supplemental Awards

If, after receiving an initial Monetary Award, a Retired NFL Football Player becomes eligible for a larger award because of an additional Qualifying Diagnosis, the Class Member will be provided with a Supplemental Monetary Award to ensure that he receives the maximum award to which he is entitled.

### c) Credited Eligible Seasons

Class Members who are credited with at least five Eligible Seasons will receive the maximum Monetary Award for their injury and their age, subject to any other offset.  For Class Members with fewer than five Eligible Seasons, the Monetary Award will be reduced by an amount between 10% (for players with 4.5 Eligible Seasons) and 97.5% (for players with 0 Eligible Seasons), as set forth in this chart:

| Number of Credited Eligible Seasons | Percentage of Reduction in Monetary Award |
|:---:|:---:|
| 4.5 | 10% |
| 4.0 | 20% |
| 3.5 | 30% |
| 3.0 | 40% |
| 2.5 | 50% |
| 2.0 | 60% |
| 1.5 | 70% |
| 1.0 | 80% |

| Number of Credited Eligible Seasons | Percentage of Reduction in Monetary Award |
|:---:|:---:|
| 0.5 | 90% |
| 0 | 97.5% |

Pursuant to the Settlement Agreement, a Class Member earns one Eligible Season for each season in which he was on an NFL or AFL Member Club's Active List on the date of three or more regular season or postseason games, or on the date of one or more regular or postseason games and then spent two regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury.  A Class Member earns one-half of an Eligible Season for each season in which he was on an NFL or AFL Member Club's practice, developmental, or taxi squad for at least eight games, but for which he did not otherwise earn an Eligible Season.  Time spent playing for the World League of American Football, NFL Europe League, and NFL Europa League does not count towards, and is specifically excluded from, the calculation of an Eligible Season.  To determine the total number of Eligible Seasons credited to a player, all of the earned Eligible Seasons and half Eligible Seasons are summed together.  For example, if a player has earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons, and his award will be reduced by 30%.

d)      **Offsets**

Monetary Awards may be reduced by 75% for Class Members who suffered a medically diagnosed stroke prior to receiving a Qualifying Diagnosis.  This offset will only be applied if the player had the stroke before or after he played NFL Football.  Monetary Awards may also be reduced by 75% for Class Members who suffered a traumatic brain injury unrelated to NFL Football (such as in an automobile accident) during or after the time he played NFL Football.

These offsets presume that the player's injury was due to non-NFL Football causes, but Class Members will have the opportunity to present clear and convincing evidence to the Claims Administrator that the stroke or brain injury is not related to the Qualifying Diagnosis in order to avoid the offset.

In addition, as described above, Monetary Awards to Subclass 1 Class Members who do not participate in the BAP will be reduced by 10% (except for a diagnosis of ALS), unless the Class Member receives a Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination.  The purpose of this Offset is to encourage Class Members to make use of the BAP.

### e)      Lien Resolution

Once the Monetary Awards are calculated by the Claims Administrator, the Lien Resolution Administrator will administer the process for identifying and settling all applicable and legally enforceable government liens, which may include, among others, those related to state or federal governmental payors, Medicare Parts A and B (as contemplated by the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)), Medicare Part C or Part D plans, Medicaid, and other state or federal governmental healthcare programs with statutory reimbursement or subrogation rights (such as TRICARE, the Department of Veterans Affairs, and Indian Health Services).  The Court preliminarily appointed GRG to serve as Lien Resolution Administrator. *See* ECF No. 6084 at ¶ 3.e; *see also* Garretson Aff., Ex. 2, ¶¶ 2-7.a, 9, 23-29.  The amount of any liens will be deducted from the Monetary Award or Derivative Claimant Award, along with the reasonable costs incurred by the Lien Resolution Administrator, except that costs related to lien verification will be paid by the Monetary Award Fund.

This provision in the Settlement is a significant benefit to Class Members, who are required by law to repay these liens, because they will be able to take advantage of discounts the Lien Resolution Administrator can obtain by negotiating on a collective basis. The NFL Parties, like virtually all defendants in personal injury actions, required that the liens be satisfied in connection with the Settlement. Class Counsel, drawing on their experience from prior cases in which they had used a Lien Resolution Administrator,[5] insisted on including a Lien Resolution Program as part of the Settlement to provide Class Members with the added benefit of global resolution discounts. *See* Garretson Aff., Ex. 2, ¶4.

### f)    Derivative Claimant Awards

Derivative Claimants will be entitled to 1% of the Monetary Award received by the Retired NFL Football Players or Representative Claimants (for deceased, incompetent, or incapacitated retired players) based upon their relationship to the player. The Retired NFL Football Player or Representative Claimant will receive the remaining 99% of the Award. If there are multiple Derivative Claimants, the 1% award will be divided among them based on the laws of the state where the Retired NFL Football Player to whom they are related is domiciled.

### g)    Appeals

Class members and the NFL Parties have a right to appeal the determination of whether a Class Member is entitled to a Monetary Award or Derivative Claimant Award, or the amount of

---

[5] Indeed, Co-Lead Class Counsel pioneered the convention of using an administrator to resolve government liens on a classwide or mass basis. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2014 WL 31645, at *9-10 (E.D. La. Jan. 3, 2014); *In re Medtronic, Inc.*, No. 05–MDL–1726, 2008 WL 3895933, at *4 (D. Minn. Aug. 15, 2008); *In re Zyprexa Prods. Liab. Litig.*, MDL 1596, 2006 WL 2385230 (E.D.N.Y. Aug. 15, 2006). In light of the benefits of global resolution by a Lien Resolution Administrator, including both discounts for global resolution of liens that claimants are required to pay and allowing funds in excess of the "Holdback amount" to be paid without delay, complaints about lien resolution by Public Citizen, *see* ECF No. 6214-01, at 11-15, fall flat. *See* Garretson Aff., Ex. 2, ¶ 28(b)(2).

the Award.  Co-Lead Class Counsel also have the right to submit papers in support of, or in opposition to, an appeal.  Appeals will be overseen by the Court, which may seek the advice of a panel of physicians appointed by the Court, as defined in Section 2.1(g) of the Settlement Agreement ("Appeals Advisory Panel") or the neuropsychologists selected to serve as consultants ("Appeals Advisory Panel Consultants"), as defined in Section 2.1(h).  The Court may, in its discretion, refer the appeal to the Special Master, who also may seek advice from the Appeals Advisory Panel or the Appeals Advisory Panel Consultants.  Appellants must present clear and convincing evidence in support of the appeal.  To discourage baseless appeals, Class Members will be charged a fee of $1,000 to appeal their claim determination, but the fee will be refunded if the appeal is successful.  The NFL Parties may appeal Monetary Award or Derivative Claimant Award determinations in good faith.  If Co-Lead Class Counsel believe that the NFL Parties are submitting vexatious, frivolous, or bad faith appeals, they may petition the Court for the appropriate relief.

**h)     Funding**

Within six months after the Effective Date, the NFL Parties will deposit $120 million earmarked for the Monetary Award Fund will be deposited into the Settlement Trust Account. The NFL Parties will make additional monthly deposits, as needed, based upon monthly reports from the Claims Administrator.  The Monetary Award Fund shall maintain a targeted reserve of $10 million through the tenth year of its existence; a $5 million reserve for its eleventh through fiftieth years; a $1 million reserve for its fifty-first through sixtieth years; and a $250,000 reserve

15

through its sixty-fifth year.  Class Counsel expect the 65-year term to be long enough to compensate the youngest Class Members who may develop Qualifying Diagnoses.[6]

### 3.    The Education Fund

The NFL Parties have agreed to contribute $10 million to establish an Education Fund for the benefit of the Class.  This fund will support education, as directed by the Court with input from Class Counsel, Counsel for the NFL Parties, and medical experts, into cognitive impairment, safety and injury prevention with regard to football players.  A portion of the Education Fund will be used to fund education programs benefiting Retired NFL Football Players and safety-related initiatives in youth football, among other programs, to be approved by the Court.  The fund also will have an education component that will inform Retired NFL Football Players and their families about the NFL's medical and disability benefits programs and other programs and initiatives that would inure to their benefit.

### C.    Preservation of Collective Bargaining Benefits and Claims for Workers' Compensation

The Settlement preserves Class Members' rights to pursue any and all benefits under the current 2011 NFL Collective Bargaining Agreement, the 88 Plan, and any other current or future

---

[6] One objector claims that there is no "security" backing up the NFL Parties' payment obligations.  *See* Utecht Objection [ECF No. 6243], at 9-19 (taking various sections of the Settlement Agreement out of context).  This objector fails to acknowledge the "evergreen provision" in the Settlement Agreement [ECF No. 6087], at Section 23.3(b)(v), requiring reserves of $10 million in the first ten years of the life of the Monetary Award Fund, $5 million through the fiftieth year, and continuing in decreasing amounts of reserves through the end of the 65-year period, and the NFL's guarantee to maintain an investment grade rating of its Stadium Program Bonds, and the cash Statutory Trust created on the Tenth Anniversary Date of the creation of the Fund, as per Section 25.6.  This objector further ignores that a Settlement Trust Agreement will be Court-approved and subject to various statutory requirements.  *Id.*, at Section 23.5(c).  Additionally, he discounts the Court's power to order rescission of the releases.  Finally, he ignores the involvement of Special Master Golkin, who was court-appointed because of his expertise in this area and who counseled the Court in connection with its grant of Preliminary Approval.

applicable collective bargaining agreement.  Participation in the Settlement will not affect a Class Member's ability to pursue any bargained-for benefits, including the NFL's Neuro-Cognitive Disability Benefit.

The NFL's Neuro-Cognitive Disability Benefit provides former players who are vested based upon Credible Seasons with benefits for fifteen years, or until a player is 55years old, whichever occurs first. These monthly benefits range from $1,875 per month to $3,500 per month and increasing to as much as $4,500 per month in the future, depending upon whether the player qualifies for a "Moderately Impaired Benefit" or a "Mildly Impaired Benefit."

In addition, the Settlement will ensure that the provision included in Article 65 of the current CBA, Section 2 - requiring that players execute a release of claims and covenant not to sue in order to be eligible for the NFL's Neuro-Cognitive Disability Benefit - will not be enforced or used against the Class Members in connection with this settlement, unless they exclude themselves from the Class.  The NFL Parties have agreed not to enforce that release with respect to Settlement benefits to the extent a Class Member previously signed it when submitting an application.  Without the NFL's agreement on this point, certain Class Members would be barred from receiving any Settlement benefits and would be limited to benefits made available under the CBA only.

Moreover, as part of the release that Class Members will provide to the NFL Parties in exchange for the former's participation in the Settlement and right to Settlement benefits, Class Members will not be required to release or dismiss claims for workers' compensation or claims for NFL CBA Medical and Disability Benefits.

### D.  The Settlement Eliminates the NFL Parties' Defenses of Causation, Statutes of Limitations, and Other Defenses

The Settlement eliminates many significant obstacles that Class Members would have faced in the litigation, as summarized below in more detail.  Moreover, even within the confines of the Settlement, Class Members with a Qualifying Diagnosis do not have to prove or submit any evidence of causation in order to receive Monetary Awards.  *In other words, they do not need to show that their Qualifying Diagnoses resulted from concussions related to NFL Football.*  They will only have to provide a qualified medical professional's Qualifying Diagnosis and timely and completely submit the required paperwork and proof, as outlined in the Settlement Agreement.

In addition, currently undiagnosed Class Members can seek Monetary Awards if they later receive a Qualifying Diagnosis during the term of the Monetary Award Fund.  Class Members who received a Qualifying Diagnosis as of July 7, 2014 are entitled to Monetary Awards regardless of when they played NFL Football or how long ago they may have sustained a concussion, except for retired players who died prior to January 1, 2006.  No Monetary Awards will be made to Representative Claimants if the retired player died prior to January 1, 2006, unless the Court determines that their claim would not be barred by the applicable statute of limitations.  Absent the Settlement, these claimants would confront the *same* statute of limitations hurdle in pursuing wrongful death claims.  Other dispositive defenses available to the NFL Parties, including, assumption of the risk, and statutory employer, are similarly avoided by the Settlement.

### E.      Attorneys' Fees

The parties did not negotiate attorneys' fees at any point during the mediation sessions, deferring the discussion until after an agreement in principle was reached on all material settlement terms, in an abundance of caution and consistent with *Prandini v. National Tea Co*., 585 F.2d 47, 53 (3d Cir. 1978).  *See* Supplemental Declaration of Mediator and Former United States District Court Judge Layn R. Phillips in Support of Final Approval of Settlement and Certification of Class and Subclasses ("Phillips Supp. Decl."), attached as Ex. 4, ¶18 ("Notably, the Settling Parties did not discuss the issue of attorneys' fees at any point during the mediation sessions, except to defer the issue until after an agreement in principle was reached on all material settlement terms.  When the parties executed the Term Sheet there was no fee agreement in place.").  The NFL Parties thereafter agreed not to object to a petition for an award of class attorneys' fees and reasonable incurred costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel, provided the amount requested does not exceed $112.5 million.  The NFL Parties will pay the attorneys' fees separately and in addition to the amounts they will pay to fund the BAP Fund, Monetary Awards Fund, and Education Fund.  "Unlike traditional common fund cases where attorneys' fees are obtained directly from the common fund, the Settlement Class is further benefited by the separate payment of attorneys' fees by the NFL Parties."  *Id*. at ¶ 19.

Co-Lead Class Counsel will file a petition for an award of attorneys' fees and reimbursement of costs after the Effective Date.  Settlement Class Members will have an opportunity to comment on or object to the petition.  The Court will determine the amount of the attorneys' fees and costs in accordance with applicable fee jurisprudence.

After the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent of each Monetary Award and Derivative Claimant Award to facilitate the settlement program and related efforts of Co-Lead Class Counsel, Class Counsel, and Subclass Counsel. These set-aside monies will be held in a separate fund overseen by the Court.  Any future petition for a set-aside will describe:  (i) the proposed amount; (ii) how the money will be used; and (iii) any other relevant information (for example, the assurance that any "set-aside" from a Monetary Award or Derivative Claimant Award for a Settlement Class Member represented by his/her individual counsel will reduce the attorney's fee payable to that counsel by the amount of the "set-aside").  No money will be held back or set aside from any Monetary Award or Derivative Claimant Award without Court approval.

      **F.**      **Releases, Covenants Not To Sue and Bar Order**

In exchange for the benefits provided by the Settlement, Class Members will release all claims and dismiss with prejudice all actions and claims against, and covenant not to sue, the Released Parties in this litigation and all Related Lawsuits in this Court and other courts, in accordance with the terms of Article XVIII of the Settlement Agreement. *See* ECF No. 6087 at § 18.1.  Class Members will not be required to dismiss pending suits or forebear from bringing litigation relating to cognitive injuries against the National Collegiate Athletic Association ("NCAA") and any other collegiate, amateur, or youth football organizations and entities. Claims against the Riddell Defendants are also not be released or dismissed.

As a condition to approval of the Settlement, the parties intend to move the Court for a bar order and judgment reduction provision, as part of the Court's Final Order and Judgment. *See* proposed Final Order and Judgment filed contemporaneously with this memorandum.  The

bar order will bar other parties from seeking indemnification or contribution from the Released

Parties for claims relating to this litigation.

### III.    THE COURT SHOULD GRANT FINAL CERTIFICATION OF THE SETTLEMENT CLASS.

In granting preliminary approval of the proposed settlement, the Court also granted

preliminary certification of the Settlement Class and Subclasses.  *See* ECF No. 6083, at 12-17.

Because the Settlement Class and Subclasses satisfy the requirements of Rule 23(a) - numerosity,

commonality, typicality and adequacy - as well as the requirements of Rule 23(b)(3) -

predominance and superiority - the Court should now grant final class certification.

### A.    Numerosity

The proposed Class has over 20,000 members.  Given the size and impracticability of

joining all class members, the Court found that "the numerosity requirement of Rule 23(a) is

easily met."  *See* ECF No. 6083 at 13.  No objector disputes that numerosity is satisfied.

### B.    Commonality

The commonality requirement is satisfied if there are "questions of law or fact common

to the class."  Fed. R. Civ. P. 23(a)(2).  To be common, class claims "must depend upon a common

contention . . . of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of

the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  As the

Court recognized in preliminarily granting class certification, "[q]uestions and answers

surrounding the dangers of playing NFL Football, the impairment of cognitive abilities caused by

concussions, and the knowledge of the NFL Parties as to the risks presented by football-related

head impacts are common to the negligence and fraud claims asserted by both the named

Plaintiffs and the other members of the Settlement Class."  ECF No. 6083 at 13.

Most objectors concede that the commonality requirement is satisfied, but the Heimburger Objectors contend that commonality is lacking because class members "have been injured in unique and disparate ways." ECF No. 6230 at 13-15, 21. They rely on a Fifth Circuit case, *M.D. v. Perry*, in which the court found that the district court's analysis was insufficient because it did not tie the purportedly common questions to the plaintiffs' constitutional claims. 675 F.3d 832, 841 (5th Cir. 2012). But in *M.D.*, the Fifth Circuit noted that if the district court conducted an appropriately rigorous analysis, it might find commonality if the claims were "based on an allegation that the State engages in a pattern or practice of agency action or inaction – including a failure to correct a structural deficiency within the agency, such as insufficient staffing." *Id*. at 847; *see also Lane v. Kitzhaber*, 283 F.R.D. 587, 596 (D. Ore. 2012) (distinguishing *M.D.* because the plaintiffs alleged that the defendants engaged in a pattern or practice of inaction).

Consistent with *M.D.*, Plaintiffs allege that the NFL Parties engaged in a pattern or practice of action (and inaction). Plaintiffs allege that the NFL Parties voluntarily undertook to study head impacts in football when they formed the Mild Traumatic Brain Injury Committee, and then used the Committee to fraudulently conceal and to affirmatively misrepresent the long-term effects of these injuries. The answer to the question of whether the NFL Parties engaged in such fraudulent concealment or affirmative misrepresentation is an answer that would drive the resolution of the litigation—it is central to the validity of the claims. *See Logory v. Cnty. of Susquehanna*, 277 F.R.D. 135, 143 (M.D. Pa. 2011) ("Unlike *Dukes*, where commonality was destroyed where there was no 'common mode of exercising discretion that pervade[d] the entire company,' here there is a solid [prison] policy that applied directly to all potential class members."). The commonality requirement is satisfied.

### C.     Typicality

The typicality requirement is satisfied when "claims of representative plaintiffs arise from the same alleged wrongful conduct" as the claims of all class members.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).  "The typicality inquiry is intended to assess . . . whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented."  *Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994).  In preliminarily granting class certification, the Court found that Mr. Wooden's and Mr. Turner's claims were typical of those of the class and subclass members they sought to represent.  ECF No. 6083 at 14.

Most objectors agree that the typicality requirement is satisfied, but the Heimburger Objectors argue that Mr. Wooden's and Mr. Turner's claims are not typical because they have accumulated more than five "Eligible Seasons," did not play in NFL Europe, and do not have the same injuries as Mr. Heimburger.  ECF No. 6230 at 12.  These factual differences are immaterial to the typicality analysis.  As the Third Circuit has repeatedly confirmed, the plaintiffs' claims do not have to be factually identical to those of the class members to satisfy the typicality requirement.  *See Baby Neal*, 43 F.3d at 58 ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.") (citation omitted); *see also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) ("Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence.").

In addition, when, as here, plaintiffs challenge "a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *Baby Neal*, 43 F.3d at 58. Therefore, differences in the types of injuries they and class members suffered as a result of the policies and practices are irrelevant to the typicality analysis, as are other factual differences like whether they played for NFL Europe or how many seasons they played. The important consideration is whether "the interests of the named plaintiffs align with the interests of the absent [class] members." *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001). Mr. Wooden's and Mr. Turner's interests in obtaining maximum benefits from the NFL Parties are aligned with the interests of the absent class and subclass members they represent. *See* Affidavit of Kevin Turner ("Turner Aff."), at Ex. 5; Affidavit of Shawn Wooden ("Wooden Aff."), at Ex. 6. The typicality requirement is satisfied.

### D.      Adequacy of Representation

Rule 23(a)(4) requires class representatives and their counsel to "fairly and adequately protect the interests of the class." The adequacy requirement "serves to uncover conflicts of interests between the named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). It also "tests the qualifications of the counsel to represent the class." *Warfarin*, 391 F.3d at 532. The adequacy requirement is satisfied because Mr. Wooden and Mr. Turner, Co-Lead Class Counsel, Class Counsel and Subclass Counsel have vigorously represented the interests of the class and subclass members, and there is no disabling intra-class conflict. Indeed, as Judge Phillips notes "[it] was evident throughout the mediation process that Plaintiffs' counsel were prepared to litigate and try these cases, and face the risk of losing with no chance to recover for their labor or their expenses, if they were not able to achieve

a fair and reasonable settlement result for the proposed class."  Phillips Supp. Decl., at Ex. 4, ¶¶

2,3, 17.  *See* Declaration of Robert H. Klonoff Relating to the Proposed Class Settlement

("Klonoff Decl."), at Ex. 7, ¶¶ 31-35.  *See also* Turner Aff., Ex.5; Wooden Aff., Ex. 6; Seeger

Decl., at Ex. 1, ¶¶ 9-12, 32, 43-45; Declaration of Arnold Levin in Support of Final Approval of

Settlement and Certification of Class and Subclasses ("Levin Decl.), Ex. 8; Declaration of

Dianne M. Nast in Support of Final Approval of Settlement and Certification of Class and

Subclasses ("Nast Decl."), Ex. 9.

Several objectors argue that the Class Representatives and Class Counsel do not

adequately represent the Settlement Class and subclasses.  *See* Morey Objection [ECF No. 6201]

at 20-36, 80; Heimburger Objection [ECF No. 6230] at 7-13; Miller Objection [ECF No. 6213]

at 2-5; Alexander Objection [ECF No. 6237] at 2; Duerson Objection [ECF No. 6241] at 12-13,

32-33; Chesley Objection [ECF 6242] at 10-12.  The objectors contend that numerous conflicts

of interest exist among the Class Members based on differences in factual circumstances that can

only be ameliorated by creating a myriad of subclasses, each with its own representation.  For

example, the Morey Objectors contend that there must be separate representation for Class

Members who are discovered to have CTE in the future, Class Members who have suffered a

stroke outside of NFL Football, and Class Members who have suffered a non-football related

traumatic brain injury.  *See* ECF No. 6201 at 20-21.  The Heimburger Objectors contend that

Class Members who played for NFL Europe should be separately represented, and suggest that

there should be a subclass with separate representation for each Qualifying Diagnosis, and

perhaps for other possible consequences of concussions that are not compensated by the

Settlement.  *See* ECF No. 6230 at 7-13.

The objectors rely primarily on *Amchem*, in which the Supreme Court held that adequacy problems may arise when a settlement includes both class members who have been injured and those who have yet to suffer injuries.  521 U.S. at 626-27.  The Court explained that the interest of injured class members in securing "generous immediate payments" may conflict with the interests of those who are not yet injured in "ensuring an ample, inflation-protected fund for the future."  *Id.*  Two years later, in *Ortiz v. Fibreboard Corp.*, the Supreme Court held that a class that consisted of both injured and uninjured class members must be divided "into homogenous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel."  527 U.S. 815, 856 (1999).

Unlike the settlements in *Amchem* and *Ortiz*, this Settlement provides "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627.  By dividing the Settlement Class into two subclasses - one consisting of class members who have been diagnosed with a Qualifying Diagnosis and one consisting of class members who may be diagnosed with a Qualifying Diagnosis in the future - and providing each subclass with its own class representative and own counsel, the conflicts that were present in the *Amchem* and *Ortiz* settlements have been avoided.  *See* Klonoff Decl., Ex. 7, ¶¶ 35, 39; Phillips Supp. Decl., Ex. 4, ¶ 7.  *See also In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 343 (N.D. Ohio 2001) (subclasses cured potential intra-class conflict); *cf. Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189-90 (3d Cir. 2012) (dividing class into subclasses on remand would satisfy adequacy requirement).

Additional protections are built into the settlement.  The Monetary Award Fund is not capped, so all eligible class members may seek Monetary Awards or Derivative Claimant Awards without risk of depleting the fund.  There is no danger of the fund being depleted before

26

the youngest class members develop Qualifying Diagnoses.  The settlement also protects the interests of those who may develop severe neurocognitive impairments in the future by indexing the Monetary Awards for inflation and allowing class members to seek supplemental monetary awards if they are diagnosed with additional Qualifying Diagnoses.  *See In re Diet Drugs Prods. Liab. Litig.*, No. 1203, 99-20593, 2000 WL 1222042, at *49 (E.D. Pa. Aug. 28, 2000) ("step-up" provision and inflation indexing provided adequate structural protections); *see also In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141, 147 (3d Cir. 2005) ("The District Court specifically found that this Settlement Agreement includes structural protections to protect class members with varying diagnoses, pointing to the ability of a particular class member to 'step up' to higher compensation levels as their disease progresses.").

Even though the conflicts between present and future claimants that were problematic in *Amchem* and *Ortiz* have been addressed, the objectors contend that additional subclasses are required for every possible permutation of player experience.  Taking this suggestion to its illogical end, the adequacy requirement could only be satisfied if there was a subclass representative and subclass counsel for each Qualifying Diagnosis and age bracket in the Monetary Award Grid (requiring a total of forty-five subclasses), as well as each of the time periods for "Eligible Seasons," and each additional offset.  The objectors also raise a number of conditions or symptoms that they contend are tied to concussions suffered during NFL Football and should be separately represented (*e.g.,* multiple sclerosis, hypopituitarism, epilepsy, depression, aggression, sleep disorders).  In short, accepting the objectors' reasoning, there would have be a veritable battalion of subclasses, each with its own class representative and

counsel.  *See* Klonoff Decl., Ex. 7, ¶ 36-38, 46 (quoting from *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp.2d 891, 920 (E.D. La. 2012)).[7]

Courts have squarely rejected such an unworkable approach.  As the Third Circuit has commented, "if subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened."  *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) (quoting law review article).  *See also In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009) (citing to *Cendant* and potential "Balkanization").  Other courts have agreed.  *See, e.g.*, *Shaffer v. Continental Cas. Co.*, 362 F. App'x 627, 630–31 (9th Cir. 2010) (explaining that "the fact that it is possible to draw a line between categories of class members" does not necessarily mean that subclasses are required); *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007) ("[I]if every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair."); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146-48 (8th Cir. 1999) (rejecting need for creation of subclasses despite large differences in recovery among class members).  Grids and matrixes like the Monetary Award Grid, designed to account for exposure, age, and severity of disease, have been used

---

[7] In his Declaration, Prof. Klonoff quotes Judge Barbier's opinion in *Deepwater Horizon*: "in language that is directly applicable here, … that creating subclasses for each type of injury, 'each with separate class representatives and counsel …would have greatly complicated both the settlement negotiations and the overall administration of the litigation.'  Just as the Mediator here ensured structural integrity, Judge Barbier found that the presence of the magistrate judge guiding the *Deepwater Horizon* negotiations 'ensured structural integrity during the negotiations' without the need for subclasses."  Ex. 7, ¶ 46 (*Deepwater Horizon,* 910 F. Supp.2d at 920). In *Deepwater Horizon*, Judge Barbier relied extensively upon the Declaration of Prof. Klonoff.  *Id. See also In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D. 112 (E.D. La. 2013).

successfully in other approved class action settlements without requiring a separate subclass for each category of injury.[8]

In fact, unlike the proposed class in *Amchem*, which included individuals who were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods, and who may not even have been aware they were exposed, the class has a great deal of cohesion because all Retired NFL Football Players and their families are aware they played NFL Football.  They all allege that their injuries were caused by brain traumas experienced while playing professional football, over a defined period of time, resulting in an increased risk of suffering particular types of progressive injuries.  Thus, unlike *Amchem*, the Class Representatives' interests are closely aligned with those of the class members, such that fair and adequate representation can be ensured and sufficient unity exists for settlement class certification purposes.  The fact that the subclasses were not further subdivided into scores of sub-subclasses does nothing to call into question the adequacy of the Class Representatives or of Class Counsel, who collectively have decades of experience in litigating and resolving class action cases.  *See* Klonoff Decl., Ex. 7, ¶ 44 ("In my opinion, a class with so many subclasses would be inherently unmanageable, whether in the context of litigation or settlement

---

[8] *See, e.g., Petrovic*, 200 F.3d at 1146 ("[A]lmost every settlement will involve different awards for various class members."); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 239 (S.D. W.Va. 2005) ("By nature of the settlement, the parties have negotiated values to assign to claims based on the severity of physical injury.  [The Court] do[es] not consider the assignment of a lower value to claims where injuries are less serious to be evidence of conflict."); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 578353, at *12 (N.D. Ala. Sept. 1, 1994) ("To impose such a requirement would mean that there must be representative or represented claimants who fit each of the 60 categories on the Schedule of Benefits—and perhaps also in other possible categories that arguably should have, but were not, treated as meriting special classification in the Schedule—as well as representative or represented claimants having all the various combinations of characteristics that might produce different distributions from the Designated Funds. The number of persons needed to satisfy a standard based on permutation of these various factors would become so numerous as to justify a separate class action for the representative claimants.").

negotiations.  Assuming that existing class counsel had come close to obtaining the maximum amount for which the NFL was willing to settle, it is hard to imagine how progress would be made if the Court invalidated the settlement and ordered dozens of additional lawyers and subclass representatives to come to the bargaining table.").  Adequate representation was clearly provided by both the Class Representatives and Class Counsel.

### E.    Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  The Third Circuit has explained that "[t]he predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Sullivan v. DB Investment, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011)(en banc)(quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 266). "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  *Id.* at 298.

The predominance requirement is satisfied because the questions of law and fact surrounding the NFL Parties' liability for the injuries suffered by class members predominate over any issues affecting individual members. *See Klonoff Decl., Ex. 7, ¶¶ 51-57.  Indeed, the common questions noted above for Rule 23(a)(2) commonality purposes – whether the NFL Parties concealed or affirmatively misrepresented the long-term effects of concussive and subconcussive head blows from playing football – is the central issue in this litigation.  *See Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (predominance requirement is met if a "common question is at the heart of the litigation"); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 356 (S.D. Ga. 1996) ("'A single common issue

may be the overriding one in litigation, despite the fact that the suit also entails numerous remaining individual questions.'") (quoting treatise), *aff'd sub nom. Jones v. H & R Block Tax Servs.*, 117 F.3d 1433 (11th Cir. 1997); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 30 (D.D.C. 2001) ("As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement[.]" (citation omitted)).

Plaintiffs' claims for compensatory relief and medical monitoring are founded upon a common legal theory based on the NFL Parties' alleged knowledge and concealment of the dangers that concussions in football pose to NFL Football players. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class. Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class[.]"). A class settlement will ensure that a fully developed, well-designed claims process exists to compensate the Settlement Class members for their damages. That class members have varying injuries or damages does not defeat the predominance of common questions. *See Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004), *abrogated on other grounds by Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 n.18 (3d Cir. 2008)(holding predominance requirement met even though individual proofs of damages would be required); *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Truck*"), 55 F.3d at 817 (3d Cir. 1996) ("Because separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, such individual questions do not ordinarily preclude the use of the class action device."); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should

not preclude class determination when the common issues which determine liability predominate."). *See also In re Deepwater Horizon,* 739 F.3d 790, 815-16 (5th Cir. 2014); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491-92 (7th Cir. 2012).  Indeed, it is a widely accepted principle that the necessity to show individual damages does not defeat class certification.  *See* 2 NEWBERG ON CLASS ACTIONS § 4:54 (5th ed.) ("Courts in every circuit have therefore uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.  Indeed, a class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings.").

Most objectors concede that the predominance requirement is satisfied, but the Heimburger Objectors argue that appellate courts "simply do not permit the certification of personal-injury classes" because individual issues predominate over common issues.  ECF No. 6230 at 15.  But there is no need to look further than the Third Circuit's praise of the class settlement of personal injury claims in the *Diet Drugs* litigation to realize that the Heimburger Objectors' argument lacks merit.  *See In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 317 (3d Cir. 2004) ("The settlement approved and supervised by the District Court in this case is a landmark effort to reconcile the rights of millions of individual plaintiffs with the efficiencies and fairness of a class-based settlement"); *see also Sullivan*, 667 F.3d at 340 (Scirica, J., concurring) ("The class action device and the concept of the private attorney general are powerful instruments of social and economic policy. Despite inherent tensions, they have proven efficacious in resolving mass claims when courts have insisted on structural, procedural, and

substantive fairness.").  Indeed, "the text of the Rule does not categorically exclude mass tort cases from class certification."  *Amchem*, 521 U.S. at 625.  A number of additional courts have recognized that personal injury cases can be well-suited for class resolution.  *See* Klonoff Decl., Ex. 7, ¶¶ 53 & n.85, 56 & n.87 (citing cases).  Predominance is thus satisfied.

###     F.     Superiority

Rule 23(b)(3) also requires that the court find that the class action device is "superior to other available methods for fairly and efficiently adjudicating the controversy."  "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *Warfarin*, 391 F.3d at 533-34 (citation and quotation marks omitted).  Factors the court may consider include:

> (A)     the interest of members of the class in individually controlling the prosecution or defense of separate actions;

> (B)     the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

> (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D)     the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23 (b)(3)(A)-(D).[9]

Courts have recognized the benefits of "concentrating the litigation of claims in a single superior forum," rather than requiring "numerous individual suits brought by claimants."  *Sullivan*, 667 F.3d at 311-12; *see also Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 543 (3d Cir. 1973) ("The 'superiority requirement' was

---

[9] Any difficulties in managing the claims at trial need not be considered when the Court is confronted with a request for settlement-only class certification because the proposal is that there will be no trial.  *See Amchem*, 521 U.S. at 620; *Sullivan*, 667 F.3d at 322 n.56.

intended to refer to the preferability of adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit, and possibly requiring a defendant to answer suits growing out of one incident in geographically separated courts.").  In addition, should each of the more than 5,000 cases filed by against the NFL Parties be litigated individually, the parties could face years, if not decades, of litigation and significant expense in many different courts throughout the country, potentially resulting in conflicting rulings.  Recovery is highly uncertain especially given the NFL Parties' federal preemption defense.  Even if that defense were overcome, securing compensation for individual players and their family members would undoubtedly entail lengthy and costly trial and appellate proceedings.  *See* Klonoff Decl., Ex. 7, ¶ 61.  The class settlement eliminates the need for the overwhelming and redundant costs of individual trials.  *See Sullivan*, 667 F.3d at 310-12.

As all of the criteria of Rule 23(a) and (b)(3) have been amply satisfied, the proposed class should be certified.

## IV.    THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS.

This Court reviewed and approved the notice program and the proposed notices on two occasions – once when granting preliminary approval of the settlement [ECF No. 6083, at 17-20], and again when the notices were completed with the dates of all events leading up to the Fairness Hearing [ECF No. 6093].  The Court was on firm footing when it did so because the notice program used an innovative combination of direct mailing and several types of media with notice language that satisfies all requirements of due process.  *See* Klonoff Decl., ¶ 68 (discussing the "robust notice plan").  *See generally* Declaration of Katherine Kinsella ("Kinsella Decl."), Ex. 10.

Under Rule 23(e)(1) of the Federal Rules of Civil Procedure, district courts "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  In addition, for classes certified under Rule 23(b)(3), courts must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see Amchem*, 521 U.S. at 617;  *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173 (1974).

Due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950); *see also DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005).  Rule 23(c)(2)(B) provides that the "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).

A.     **The Notice Was Widely Disseminated Through Direct Mail, the Media and the Internet, Satisfying the Requirements of Rule 23(e)(1) and Due Process.**

Kinsella Media designed and implemented an extensive notice program with the assistance of Class Counsel.  The program included:

- Direct mail notice of the Long-Form Notice to Retired Players and family members who could be reasonably identified;

- Launch of the official settlement website, www.NFLConcussionSettlement.com;

35

- Extensive publication of the Summary Notice through several national periodicals;

- Extensive television and radio spots across several demographics;

- Advertising on NFL Network and NFL website;

- Wide use of the internet (through banner ads and key words);

- A call center accessed by a toll-free number with pre-recorded information and live operators; and

- Further outreach through nursing homes, players' associations, and other organizations.

*See generally* Kinsella Decl., Ex. 10.  The notice program was extensive and reached the vast majority of class members and their families through a combination of direct notice and a variety of media and organizations.

On July 9, 2014, immediately after the Court reviewed and approved the final forms of notice, the Long-Form Notice and Settlement Agreement were posted on the Settlement Website. Kinsella Decl., Ex. 10, ¶ 24; *see also* Brown Decl., Ex. 3, ¶ 37.  On July 14, 2014, the settlement website was fully rolled out, including extensive Frequently Asked Questions ("FAQs"), additional pleadings, a sign-up page to receive further information in the future (including information about registration), and the Court-approved notices.  Kinsella Decl., Ex. 10, ¶¶ 8, 24; Brown Decl., Ex. 3, ¶¶ 37-44.  After a "soft" launch on July 10 2014,[10]  the call center became fully operational on July 17, 2014, providing callers with the ability to listen to many FAQs, the ability to leave contact information for the receipt of future information (including registration),

---

[10] On July 10, 2014, a pre-recorded message informed callers that the call center would be fully operational on July 17, 2014, and directed callers to the settlement website.  *See* Declaration of Edward Radetich ("Radetich Decl."), Ex. 11, ¶ 5, Ex. B.

and the option to speak with live operators who were trained on the details of the settlement. Kinsella Decl., Ex. 10, ¶ 27; *see also* Radetich Decl., Ex. 11, ¶¶ 4-8.

A week later, on July 21, 2014, the internet keyword search program commenced. Certain words and phrases were registered on the Internet with major search engines to direct persons to "sponsored ads," which linked to the settlement website.  Kinsella Decl., Ex. 10, ¶ 25. This keyword campaign continues to this date.  On July 24, 2014, over 33,000 long-form notices were sent directly to class members and family members and their counsel of record in the MDL by first class mail.  *Id.*, ¶¶ 8-10.

In August, the Summary Notice began appearing in major nationwide periodicals, such as *Time*, *People*, *Ebony* and *Sports Illustrated*, followed by further publication in trade magazines, such as *Long Term Living* and *Senior Living Executive* in September.  *Id.*, ¶¶ 14-16.  August also saw the media campaign reach class members and their families through advertisements on television and radio networks such as ABC, CBS, CNN, The Weather Channel and Headline News, as well as NFL Properties and the American Urban Radio Networks.  *Id.*, ¶¶ 17-18, 21. At the same time, internet banner ads were deployed through such websites as CNN.com, Facebook.com, Weather.com and Yahoo.com, as well as NFL Properties.  *Id.*, ¶¶ 19-20, 22. Finally, at the end of August, a letter was sent to approximately 60,000 nursing homes and outreach was made through several chapters of NFL players' associations, as well as other entities.  *Id.*, ¶ 23.

The formal notice program has reached of 90% of class members and their families, and continues to provide information through the settlement website and call center.  *Id.*, ¶ 48.

In addition, the Settlement has been the subject of extensive, indeed overwhelming, coverage in media not paid for by the notice program.  The NFL is a focus of national interest

and the Settlement was discussed extensively on news shows, in the press, and in coverage during NFL games.  The on-screen discussions during the NFL games were a form of notice beyond that which any court could possible direct.  *See* Seeger Decl., Ex. 1, ¶ 70 and media analysis and circulation report attached thereto.  *See also* Kinsella Decl., Ex. 10, ¶ 30.

### B.   The Form and Content of the Court-Approved Notices Satisfies the Requirements of Rule 23(e)(1) and Due Process.

The form and content of the notices satisfied the requirements of Rule 23(e)(1) and due process.  Each form of notice was written in plain and straightforward language consistent with Rules 23(c)(2)(B) and 23(e)(1).  The notices objectively and neutrally apprised class members of the nature of the action; the definition of the Settlement Class sought to be certified for purposes of the settlement;  the claims and issues; that class members may enter an appearance through an attorney before the Court at the Fairness Hearing (in accordance with the procedures set forth in the notice); that the Court will exclude from the class anyone who elects to opt out of the settlement (and the procedures and deadlines for doing so); and the binding effect of a class judgment on class members under Rule 23(c)(3)(B).  The notices also disclosed the date, time, and location of the Fairness Hearing, and the procedures and deadlines for the submission of objections to any aspect of the settlement.  *See* Kinsella Decl., Ex. 10, at Exs. 1 & 3 thereto.

### C.   Class Members' Response to the Notice Program

Given the fulsomeness of the notice program, class members' response is resounding.  By October 14, 2014, nearly 66,000 visits were made to the settlement website, representing nearly 63,000 unique visitors.  Kinsella Decl., Ex. 10, ¶ 26; Brown Decl., Ex. 3, ¶ 43, and Attachment 7.  Over 4,500 calls have been made to the call center, with callers spending over 265 hours listening to the pre-recorded FAQs and over 2,300 callers spoke with the trained operators.

Kinsella Decl., Ex. 10, ¶ 28; Radetich Decl., Ex. 11, ¶ 9.  Although formal registration for the settlement will not commence until after the settlement is finally approved, as of October 14, 2014, over 5,000 individuals had signed up to receive further information (including information about registration), which includes over 3,100 retired players, 1,200 family members, and 320 representatives and counsel.  Brown Decl., Ex. 3, ¶ 43, and Attachment 7; Kinsella Decl., Ex. 10, ¶¶ 26, 28 n.4.

In contrast, only 234 individuals sought to opt out of the settlement[11] and 206 filed objections.[12]  While these individuals have either decided to pursue individual litigation or expressed concerns with the settlement, the majority of class members appear to be interested in finality and registration for settlement benefits.

### D.    Objections to the Language of the Notices

Some objectors have challenged the Court-approved notices, arguing that they are "overtly," "outright," or "patently" "false and misleading."  *See* Morey Objections [ECF No. 6201] at 38-53; Miller Objection [ECF No. 6213] at 7-8; Heimberger Objections [ECF No. 6230] at 18; Alexander Objections [ECF No. 6237] at 2-3; Duerson Objection [ECF No. 6241] at 29-32.  The objectors argue that even though the notices state that only "certain cases" of CTE, "Death with CTE prior to July 7, 2014," are eligible for monetary awards, the notices should have reiterated this information in other parts of the notices, such as alongside the Monetary Award Grid.

---

[11] This includes 209 retired players, and 23 family members, with two persons whose capacity is unknown.  Of these, 14 were late in mailing the opt-outs, and 26 did not comply with all the prerequisites. *See* ECF No. 6340.

[12] Of the objectors, six filed their objections late.  Five have since opted out and thus, were not counted in the tally of objectors.  Attached hereto as Ex. 12 is a Chart of the Objections.

These objections lack merit.  The Summary Notice does what it is supposed to do:  alert readers to the settlement, provide a brief summary of key settlement terms, and direct readers to sources of more complete information.  *See* Kinsella Decl., at Ex. 10, ¶ 35, and Ex. 3 thereto. The Summary Notice says that only "certain cases" of CTE will be eligible for monetary awards. *See* Klonoff Decl., Ex. 7, ¶¶ 70-71 (explaining the purpose of a short-form notice and why the notice in this case was not misleading).  Kinsella Decl., Ex. 10, ¶¶ 39-40.  A reader with questions about what cases of CTE will be eligible is directed to the settlement website and call center for further details.  *Id.*, ¶¶ 35, 37, 47.

The Long-Form Notice, which was mailed to Class Members and widely distributed, makes clear that only "certain cases" of CTE are eligible for compensation and explains in three different places that only diagnoses of "Death with CTE prior to July 7, 2014" are eligible for compensation.  Kinsella Decl., Ex. 10, ¶¶ 39-41, and Ex. 1 thereto, at 1, 7-8.  In response to the questions, "What are the Benefits of the Settlement?" and "Who is included in the Settlement?", the notice provides a list of Qualifying Diagnoses that includes "Death with CTE prior to **July 7, 2014**."  *Id.* (emphasis in original).  Readers of the notice who were still unsure if they might qualify had several sources of additional information, including the call center, Class Counsel, the Claims Administrator, and their own counsel if they were independently represented.  *See* Klonoff Decl., Ex. 7, ¶ 72 (explaining why the Long-Form Notice was not misleading or "oblique").  *See* Kinsella Decl., Ex. 10, ¶¶ 44-45, 47.  Further, the Settlement Website makes clear that "Players who die after the date of Preliminary Approval, July 7, 2014, are not eligible for benefits for "Death with CTE."  *Id.*, ¶ 42.  Brown Decl., Ex. 3, at Attachment 6.

The objectors' contention that due process required the notice to include additional repetition of the cases of CTE that are eligible to recover is unsupported by the case law.  There

is a presumption that notices will be read in their entirety, so there is no need to repeat even required information multiple times.  *See*, *e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 554 (1992).  The few cases the objectors cite are distinguishable because the notices omitted important information about the settlement.  *See In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197-98 (5th Cir. 2010) (notice failed to apprise class that all of settlement funds might go to *cy pres* distribution rather than to class members); *Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003) (notice failed to state that claims for emotional distress were released despite stating that "personal injury actions" were not released); *see also Eubank v. Pella Corp.*, 753 F.3d 718, 722-725, 728 (7th Cir. 2014) (finding many problems with settlement, including notice that was "incomplete and misleading [in failing] . . . to mention that . . . the only original representative who supported the settlement was the father-in-law of the lead class counsel who was both in financial trouble and ethically challenged").

If there is any general guidance to be taken from the cases the objectors cite, it is that notice need not be perfected like the proxy statements that were at issue in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), and the many other securities and consumer fraud cases upon which the Morey Objectors rely.  Rather, as summaries of a settlement agreement (which is available for review by the class), notices will inevitably be vulnerable to accusations that they are not fully informative, but such accusations do not amount to a violation of due process.  *See In re Katrina*, 628 F.3d at 199 ("The choice of words, while less than one hundred percent accurate, does not render the notice so clearly misleading that the district court abused its discretion in approving this portion of the notice.").  Thus, the notice program, and all of its components, were the best notice practicable, achieved overwhelming reach and satisfied due process.

## V.     THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE.

### A.     The Proposed Settlement Is Entitled to a Presumption of Fairness.

Courts have consistently recognized a universal and long-standing public policy favoring settlement of civil actions.  *See, e.g., Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims is favored by the courts.").  Settlements are particularly favored in complex cases such as this one.  *See, e.g., Warfarin* 391 F.3d at 535 ("there is an overriding public interest in settling class action litigation, and it should be encouraged"); *GM Truck*, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re School Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting Third Circuit's policy of "encouraging settlement of complex litigation that otherwise could linger for years"); *Austin v. Pa. Dep't of Corr.*, 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) ("the extraordinary amount of judicial and private resources consumed by massive class action litigation elevates the general policy encouraging settlements to 'an overriding public interest'").

To this end, courts should "apply an initial presumption of fairness when reviewing a proposed settlement where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation, and (4) only a small fraction of the class objected.'"  *Warfarin*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)); *see also In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a class action settlement reached in arm's length negotiations

between experienced, capable counsel after meaningful discovery.").  These factors require a presumption of fairness here.

First, the Settlement was reached following mediation sessions under the supervision of Judge Phillips, in multiple sessions over a period of months.  *See* Phillips Supp. Decl. at Ex. 4, ¶ 2.  These sessions were "vigorous, at arm's length and in good faith."  *Id.,* ¶¶ 2, 4-5.  During these mediation sessions, Plaintiffs' claims, the NFL Parties' defenses, and the strengths and weakness of each side's respective positions were discussed, evaluated, and negotiated.  *Id.* at ¶¶ 4, 20-26.  Second, although there was no formal discovery, because this Settlement was driven by legal issues and the science/medicine, the parties were able to evaluate the merits of their positions through consultation with experts and information exchanged during the mediation process and under the supervision of Special Master Golkin.  *Id.,* ¶¶ 5, 8-10.  *See* Seeger Decl., Ex. 1, ¶¶ 20, 22, 30-32.  Third, Co-Lead Class Counsel, Subclass Counsel and Class Counsel collectively have decades of experience in litigating and settling class actions and other complex litigation.[13]  And finally, only a small fraction of the class (less than 1%) has objected to the Settlement.

### B.    The *Girsh* Factors Strongly Support Final Approval.

Rule 23(e) requires a determination by the district court that the proposed settlement is "'fair, reasonable and adequate.'" *GM Truck*, 55 F.3d at 785.  The Third Circuit has "identified nine factors to be considered when determining whether a proposed class action settlement is fair, reasonable, and adequate." *Warfarin*, 391 F.3d at 534.  The elements of this test – known as the "*Girsh* factors" – are:

---

[13]  *See* Seeger Decl., Ex. 1, ¶ 2; Levin Decl., Ex., 8; Nast Decl., Ex. 9.

> (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*GM Truck*, 55 F.3d at 785 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). "These factors are a guide and the absence of one or more does not automatically render the settlement unfair." *In re Am. Family Enters.*, 256 B.R. 377, 418 (D.N.J. 2000). Indeed, "no single factor is dispositive." *Hall v. Best Buy Co.*, 274 F.R.D. 154, 169 (E.D. Pa. 2011). Each of the *Girsh* factors weighs in favor of approval of the Settlement.

### 1. The Complexity, Expense, and Likely Duration of the Litigation

The first *Girsh* factor asks whether the Settlement avoids a lengthy, complex, and expensive continuation of litigation. It takes into account the "probable costs, in both time and money, of continued litigation." *Cendant*, 264 F.3d at 233 (internal quotations omitted). This factor weighs strongly in favor of the Settlement.

In this case, continuing the litigation would be a complex, lengthy, uncertain, and expensive process. In the absence of the Settlement, the Court would first decide the threshold preemption issue, likely followed by an appeal. If Plaintiffs ultimately prevailed, they would then move for class certification. If the Court would have certified a litigation class, Plaintiffs would still face the uncertainty and possible delay of a likely Rule 23(f) interlocutory appeal. *See* Klonoff Decl., ¶ 134 (noting that litigation "would be expensive and protracted in the absence of settlement" and that "[o]ther mass tort cases, such as tobacco and asbestos, have been litigated for many years, sometimes for decades"); *see also* Phillips Supp. Decl., Ex. 4, ¶¶ 23, 30 ("I believe that the Settlement is fair and reasonable in light of the parties' claims and defenses,

and the expense uncertainty and time inherent in litigation the players' claims to judgment. In particular, it is my considered judgment that Plaintiffs would be unlikely to have obtained more money and benefits without going through years of discovery and trial, where they would face substantial ricks of loss due to their inability to prove negligence or fraud on the part of the NFL Parties ….").

In addition to addressing the preemption and class certification issues, the parties would engage in full-blown merits and expert discovery, including document production and depositions. *See* Klonoff Decl., ¶ 64 (noting the considerable expert costs the parties would incur due to the complicated scientific issues at the heart of the case). Because Plaintiffs allege that NFL Parties' knowledge and wrongful conduct spans decades, and given the evidentiary challenges with Plaintiffs' underlying fraud claims, there would have been extensive party and non-party discovery of all flavors – documents, depositions, and written. Were the case (or cases) to proceed through litigation, the NFL Parties, in turn, would no doubt pursue extensive discovery from Plaintiffs, their physicians and care providers, and knowledgeable family members, friends, employers, trainers, teammates, and other football teams/organizations (youth High School, and college teams and associations). The science-laden nature of Plaintiffs' claims—both at the generic, or general level, and case specifically – would involve deep science proofs from experts in a host of scientific and medical specialties. The parties would then brief summary judgment, expert challenges under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and Federal Rule of Evidence 702/703, and other pre-trial motions, followed by trial. Even if Plaintiffs prevailed at trial, a lengthy appeal (or, more likely, appeals) would no doubt follow. *See*, *e.g.*, *Warfarin,* 391 F.3d at 536 ("Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation, but also reduce the value of

the recovery to the class."); *In re Rent-Way Sec. Litig.,* 305 F. Supp. 2d 491, 501 (W.D. Pa. 2003) ("[R]egardless [of] which party or parties prevail at trial, a direct appeal would be virtually certain to follow, resulting in further expense and protraction of the proceedings").

Plaintiffs could lose, or see their damages substantially reduced, at any stage of the litigation. *See* Phillips Supp. Decl., Ex. 4, ¶¶ 21-22, 25. The Settlement secures immediate benefits for the Settlement Class, undiminished by further litigation expenses, and without the delay, risk and uncertainty of continued litigation. *See, e.g., In re Prudential Ins. Co. America Sales Practices Litig.,* 148 F.3d 283, 318 (3d Cir. 1998) ("[W]e conclude the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement."); *Lazy Oil Co. v. Witco,* 95 F. Supp. 2d 290, 297 (W.D. Pa. 1997), *aff'd,* 166 F.3d 581 (3d Cir. 1999) ("The Settlement provides benefits to the Class years earlier than would be possible if this case proceeded to trial and subsequent appeals."). Thus, the prospect of continued protracted litigation strongly favors approving the proposed Settlement.

The risk of delay is particularly troubling in this case because, as the Court has recognized, the alternative to settlement is "years of expensive, difficult, and uncertain litigation, with no assurance of recovery, while retired players' physical and mental conditions continue to deteriorate." *See* ECF No. 6083 at 17. *See also* Phillips Supp. Decl., Ex. 4, ¶¶ 23-25. Should litigation continue, Subclass 1 Class Members will not immediately receive the benefits of the BAP and, as a result, may not get tested. And Subclass 2 Class Members will not receive the monetary awards they so desperately need. *See id.* ("Many members of the proposed Settlement Class suffer from severe neurocognitive conditions that may worsen over time. The proposed

class action Settlement should more quickly make resources and compensation available for these retired players.").[14]

## 2.   The Reaction of the Class to the Settlement

The second *Girsh* factor "attempts to gauge whether members of the Class support the settlement." *Prudential*, 148 F.3d at 318.  Class members' support "creates a strong presumption … in favor of the settlement." *Cendant*, 264 F.3d at 235.  Indeed, some courts have expressed the view that class members' reaction to a settlement "may be *the most* significant factor" in the final approval inquiry.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) (emphasis added), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005); *accord Shuford v. Ala. State Bd. of Ed.*, 897 F. Supp. 1535, 1548 (M.D. Ala. 1995) ("In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself.").

The Class Members have spoken in favor of the Settlement in this case.  There have been tens of thousands of visits to the Settlement Website and calls to the call center, and thousands of individuals have signed up to receive more information.  It is evident that Class Members are eager for the benefits of the Settlement to become available. *See* Brown Decl., at Ex. 3, at Attachment 7.

---

[14] Proof of the matter is evident in the fact that the Subclass Representative for Subclass 2, Mr. Turner, had to use an electronic signature to sign his Affidavit, because his motor functions have recently diminished to the point that he is no longer capable of signing his own name with a pen. *See also* Arthur R. Miller, Proposed NFL Settlement Is Good for Players, philly.com (Sept. 10, 2014, 1:08 a.m.), http://www.philly.com/philly/opinion/inquirer/20140910_Proposed_NFL_settlement_is_good_for_players.html ("The proposed settlement benefits for retired players are substantial - considering all of the legal obstacles, and delays and expense of continued litigation, the achievements are remarkable. Retired players who are sick today with broadly defined neuro-cognitive injuries will receive care and compensation, and those who are healthy today but fear for their future will be protected and eligible to receive compensation over the next 65 years."), a copy of which is attached as Ex. 13.

In contrast, less than 1% of Class Members have objected to the Settlement.  Courts widely recognize that a small number of objections is strong evidence of the fairness, reasonableness, and adequacy of the Settlement.  *See, e.g.*, *Visa*, 396 F.3d at 118 ("'a small number of objections . . . can be viewed as indicative of the adequacy of the settlement'") (quoting treatise); *In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp.2d 633, 644 (D.N.J. 2004) ("The absence of objections from the overwhelming majority . . . [of] Class Members should be considered in approving the Settlement."); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) ("It has repeatedly been held that one indication of the fairness of a settlement is the lack of or small number of objections.") (citing authorities; internal quotation marks omitted); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").  And "[t]his is not a case in which the absence of opt outs and objectors can be rationalized on the ground that the settlement was not widely publicized." Klonoff Decl., Ex. 7, ¶ 135.

The Morey Objectors argue that the Settlement does not have the support of the Class Members, citing statements by seven Class Members in the press that suggest they will object or opt out.  *See* Morey Objection [ECF No. 6201] at 59-60.  Six of the quoted Class Members, however, have elected to participate in the Settlement and have not objected, namely, Kevin Mawae, Leroy Hoard, Wade Smith, Dorsey Levins and Emmit Smith.  *See* Opt-Out Report [ECF No. 6340] and Chart of Objectors at Ex. 12.  *See also* www.playersinjury.com/discussion (a copy of which is attached as Ex. 14), whereon numerous players commented favorably upon the Settlement.  Indeed, out of more than 20,000 living and deceased retired players, only 234 players or family members have elected to opt out (including late opt-outs) and only 206 have

48

lodged objections.  Thus, less than 2% of class members have expressed any dissatisfaction with

the Settlement.  This minute figure is powerful evidence of the Class Members' support for the

Settlement, particularly since more than 5,000 Class Members are represented by individual

counsel and the notice program included both direct mailings to the majority of Class Members

and a widespread media and Internet component.  The second *Girsh* factor therefore favors

approval of the Settlement.

### 3.     The Stage of Proceedings and the Amount of Discovery Completed

The Third Circuit has explained that the third *Girsh* factor requires courts to consider

whether the parties "have an 'adequate appreciation of the merits of the case before

negotiating.'"  *Prudential*, 148 F.3d at 319 (quoting *GM Truck*, 55 F.3d at 813).  This factor

"captures the degree of case development that class counsel have accomplished prior to

settlement.  Through this lens, courts can determine whether counsel had an adequate

appreciation of the merits of the case before negotiating."  *Cendant*, 264 F.3d at 235 (quoting

*GM Truck*, 55 F.3d at 813).  Courts consider the amount of both formal and informal discovery

the parties have undertaken.  *Id.* at 236-37 (rejecting arguments by objectors that the settlement

should be disapproved because the parties "mainly engaged in only informal discovery").

As in *Cendant*, some objectors argue that the lack of formal discovery prior to the

mediation weighs against approval of the settlement.  *See* Morey Objection [ECF No. 6201] at

55-57, 64-65; McFarland Objection [ECF No. 6400] at ¶ 21.  But this is not a case where formal

discovery was needed for the parties to understand the strengths and weaknesses of their claims.

*See* Seeger Decl., Ex. 1, ¶ 20.  When the Court directed the parties to engage in mediation with

Judge Phillips, it was already evident that there are two types of dispositive issues in this case,

legal and factual.  *See Mirakay v. Dakota Growers Pasta Co., Inc.*, No. 13-cv-4429 (JAP), 2014

WL 5358977, at *8 (D.N.J. Oct. 20, 2014) (noting that inquiry into case development has two inquiries, factual and legal, and noting that Court may consider "informal" discovery received from defendant, third parties, and experts). *See* Phillips Supp. Decl., Ex. 4, ¶¶ 5, 8-10, 20-25 (discussing the factual basis for the Settlement and the legal issues faced by the parties). The critical legal issue is preemption, which was extensively briefed and argued in the context of the NFL Parties' Rule 12(b)(6) motion. A loss on the preemption issue could have been the death knell to class members' claims, whether the Court granted the motion to dismiss or the Third Circuit issued an adverse ruling on a "controlling question" appeal pursuant to 28 U.S.C. § 1292(b). *See* Phillips Supp. Decl., ¶ 20. No discovery was central to the assessment of the legal risks presented by the host of legal defenses available to the NFL, some of which already have been successful in other cases.

The dispositive factual issue in the case is whether players' cognitive and neurologic symptoms and conditions can be tied to the concussions they suffered during NFL Football. This issue turns largely on science and medicine, not information in the possession of the defendants that could have been obtained through depositions of NFL officials or team owners.

Class Counsel created and maintained a comprehensive database of the Plaintiffs' claims and symptoms. *See* Seeger Decl., Ex. 1, ¶ 20. Class Counsel conducted extensive factual, legal, medical, scientific, economic, and actuarial research and consulted with numerous experts, both before commencing suit during the settlement negotiations. *See* Seeger Decl., Ex. 1, ¶ 30 ("[W]e engaged multiple experts in the fields of: medicine, namely, neurology, neuropsychology, and neuropsychiatry; actuarial science; economics; claims administration; and lien identification and satisfaction to determine, develop, and

test an appropriate settlement framework to evaluate and meet the needs of Retired NFL

Football Players suffering from or at increased risk for the claimed injuries related to

neuromuscular and neurocognitive impairment.  The doctors advised us on the diseases

associated with concussive head trauma, and their pathologies.  The economists and

actuaries assisted in modeling the possible disease incidence and adequacy of funding for

the monetary award levels contained in the Settlement.").  *See also* Phillips Supp. Decl.,

Ex. 4, ¶¶ 5, 8-10.  As with the controlling legal issues, discovery from the NFL Parties

would not have provided critical information on the medical science; that work had to be

done independently by Class Counsel outside of the formal channels of discovery.

Courts in this circuit and elsewhere have recognized that formal discovery is not required

if the parties are sufficiently in command of the facts of their case to be able to engage in

meaningful settlement negotiations.  *See Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 312 (E.D. Pa.

2012) (granting final approval of class action settlement at early stage of discovery and noting

that counsel engaged in "exhaustive investigation of the facts and the underlying claims and

defenses in this litigation"); *Little-King v. Hayt Hayt & Landau*, No. 11-5621 (MAH), 2013 WL

4874349, at *10 (D.N.J. Sept. 10, 2013) ("Even settlements reached at a very early stage and

prior to formal discovery are appropriate when there is no evidence of collusion and the

settlement represents substantial concessions by both parties."); *Trombley v. Nat'l City Bank,*

826 F. Supp.2d 179, 199-200 (D.D.C. 2011) (rejecting objections "regarding the sufficiency of

pre-settlement discovery," finding "that a sufficient factual investigation was undertaken,"

recognizing that negotiations process was at arm's length and adversarial, and noting that

"'formal discovery' is not a prerequisite, even for final approval purposes."); *In re Countrywide*

*Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *11

(W.D. Ky. 2009) (rejecting objectors' argument that there was insufficient pre-settlement discovery because "formal discovery is not necessary as long as (1) the interests of the class are not prejudiced by the settlement negotiations and (2) there are substantial factual bases on which to premise settlement").

Because Class Counsel were fully informed of the strengths and weaknesses of their case when they negotiated the settlement, this *Girsh* factor also supports approval of the settlement. *See* Klonoff Decl., Ex. 7, ¶ 136 ("Although it is true that some major cases have taken many years to resolve, the parties' ability to reach a comprehensive settlement here in a relatively short amount of time is a testament to the highly skilled work of class counsel under the supervision of the Mediator and the Special Master.  It is not a negative factor in my view.").

### 4.       The Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors, which are usually examined together, require an assessment of the risks of continued litigation versus settlement.  The fourth *Girsh* factor requires the court to "'examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them.'"  *Cendant*, 264 F.3d at 237 (quoting *GM Truck*, 55 F.3d at 814).  "[T]he Court need not delve into the intricacies of the merits of each side's arguments but, rather, may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'"  *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (quoting *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997)).  The fifth *Girsh* factor also "'attempts to measure the expected value of litigating the action rather than settling it at the current time.'" *Cendant*, 264 F.3d at 238-39 (quoting *GM Truck*, 55 F.3d at 816).

52

As in every case, Plaintiffs "face the general risk that they may lose at trial, since no one can predict the way in which a jury will resolve disputed issues." *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997); *see also Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995) ("[T]he risks surrounding a trial on the merits are always considerable."). In this case, Plaintiffs first would have to survive the fully-briefed and argued motion to dismiss on preemption grounds (including, quite possibly, interlocutory appellate review). Class certification always carries some risk. The NFL Parties' defenses of lack of causation, assumption of risk, statute of limitations, and workers' compensation bars present legitimate impediments that could result in dismissal or summary judgment following years of time-consuming and expensive discovery. *Daubert* and Federal Rule of Evidence 702 challenges could limit the scope of Plaintiffs' expert testimony with respect to the causal relationship between concussive and sub-concussive impacts in football play and certain disease processes. And any trial or final judgment by this Court would, of course, be subject to appeal.

Recently, the NFL was involved in another class action case that highlights the importance of Class Counsel's analysis of the risks of establishing liability and damages in continuing to litigate rather than settling. In *Dryer v. National Football League*, 2013 WL 5888231 (D. Minn. Nov. 1, 2013) the court granted final approval after conducting the Eighth Circuit's equivalent of a *Girsh*-factor analysis, noting, in pertinent part:

> Nearly all of the objections boil down to what is, in the Court's view, the objectors' very mistaken belief that they could reap significant financial benefits from continuing this case. … As discussed more fully below with respect to the strength-of-case factor, the chances that this lawsuit—or indeed any class-action lawsuit seeking to recoup sums for the alleged infringement of former NFL players' publicity rights by NFL Films—will succeed are slim at best. Too many obstacles stand in the way of that success. But the objectors want a financial payout more than they want to embrace the reality of the limitations of their claims. *Fortunately for the absent class members, experienced counsel and a*

53

> *knowledgeable and extremely capable Magistrate Judge saw the case for what it was, and negotiated a settlement that is truly one-of-a-kind, and a remarkable victory for the class as a whole.*

*Id.* at *2-3 (emphasis added).  Three class members opted out of the settlement.  *Id.* at *11.  A year later, the district court granted the NFL's motion for summary judgment, leaving the class members who had opted out with no recovery.  *Dryer v. Nat'l Football League*, 2014 WL 5106738, at *19-20 (D. Minn. Oct. 10, 2014).

The Morey Objectors argue that the fourth and fifth *Girsh* factors weigh against approval of the Settlement, but they merely rely on public information that favors their position and assume, because they allege their claims are "viable," that this Court, a jury, and an appellate court would accept all of the conclusions of experts who favor Plaintiffs' positions on causation and damages and exclude, discount, or ignore any medical or scientific experts who side with the NFL Parties' positions.  *See* ECF No. 6201, at 61-64.  As the Third Circuit explained in affirming a district court's approval of a class settlement, there is no compelling reason to think that "a jury confronted with competing expert opinions" would accept the plaintiffs' damages theory rather than that of the defendant, and thus when cases turn on competing expert opinions, the risk of establishing damages weighs in favor of approval of the settlement.  *Cendant*, 264 F.3d at 239.

Specifically, certain objectors assume that the opinions of their experts, who opine that Chronic Traumatic Encephalopathy ("CTE") is causally related to concussive and sub-concussive head trauma and is capable of identification in living persons, are the most persuasive opinions, and would survive evidentiary challenges and be accepted by a jury were the case able to go to trial.  Based on these assumptions, these objectors claim that claims for certain early symptomatology anecdotally described in association with CTE – or CTE itself –

should be compensated in the Settlement.[15]  Similarly, irrespective of whether characterized as a

symptom of CTE or not, certain objectors make similar claims about the causal relationship

between concussions and a host of other conditions, including aggression, depression, other

mood disorders, vertigo and sleep disorders, to name a few.[16]  At the outset, these objections are

line-drawing attacks that lack merit.  *See* Klonoff Decl., Ex. 7, ¶ 17.  Further, they virtually

ignore the risk that a contrary view, widely expressed in the medical and scientific literature,

could carry the day.  *See, e.g.* Declaration of Kenneth C. Fischer, M.D. ("Fischer Decl."), Ex. 15,

---

[15] Morey Objection [ECF No. 6201] at 21-32 and Morey Supplemental Objection [ECF No. 6232]; Miller Objection [ECF No. 6213], at 2-5; Komlo Objection [ECF No. 6222] (died in 2009 but no autopsy performed); Heimburger Objection [ECF No. 6230], at 1-4; Armstrong Objection [ECF No. 6233], at 15, 17-190;  Jones Objection [ECF No. 6235] at 4; Alexander Objection [ECF No. 6237], at 2, 6-7, 9; Duerson Objection [ECF 6241], at 1-21; Sixteen Plaintiffs Objection [ECF No. 6242]; Williams Objection [ECF No. 6345]; Gilchrist Objection[ECF No. 6364]; Perfetto Objection [ECF No. 6371]; Green Objection [ECF No. 6377]; Zeno Objection [ECF No. 6386]; Mayberry Objection [ECF No. 6388]; Levitt Objection [ECF No. 6391]; Moore Objection [ECF No. 6399]; McFarland Objection [ECF No. 6400]; Taylor Objection [ECF No. 6403]; Mauck Objection [ECF No. 6405]; Meinert Objection [ECF No. 6408]; Carrington Objection [ECF No. 6409].

[16] *See* Morey Objection [ECF No. 6201] at 28-29 and Supplemental Objection [ECF No. 6232] (mood and behavioral disorders, as symptoms of CTE); Collier Objection [ECF No. 6220] (Multiple Sclerosis); Barber Objection [ECF No. 6226] at 5 (sleep disorders, anger, anxiety, and depression); Armstrong Objection [ECF No. 6233] at 9-13 (vestibular disturbances, vision problems, anosmia, ageusia, headaches, epilepsy, sleep abnormalities, increased risk of stroke, pituitary hormone dysfunction, fatigue, decreased muscle mass and weakness, mood abnormalities, depression, anxiety, impulse disorders and suicidal thoughts); Duerson Objection [ECF No. 6241] at 18-21 (sensitivity to noise, visual impairment, chronic pain, headaches, tinnitus, sleep abnormalities, aggression, and suicidal thoughts but, equating these with CTE) and at 28 (referring to epilepsy); Davis Objection [ECF No. 6354] (hearing loss, dizziness, syncope, vertigo, balance problems, loss of taste, insomnia and vision issues); Barnes Objection [ECF No. 6369] (headaches, dizziness, balance problems, syncope, hearing loss, tinnitus, vision problems, depression, personality changes, social phobias, paranoia and rage); Hawkins Objection [ECF No. 6373] (Dementia with Lewy Bodies, which may be compensable as Parkinson's Disease or one of the dementia levels); Green Objection [ECF No. 6377] (depression, rage, and minor memory loss); Stewart Objection [ECF No. 6392] (headaches, vision problems, depression, mood swings, forgetfulness and brain fog); Johnson Objection [ECF No. 6395] (headaches and blurred vision); Moore Objection [ECF No. 6399] (rage, aggression, depression, and suicide); McFarland Objection [ECF No. 6400] (psychiatric, behavioral, motor and movement symptoms); Steinbach Objection [ECF No. 6401] (mood swings, depression, anxiety, and suicidal thoughts); Mauck Objection [ECF No. 6405] (mood swings and anxiety).

¶ 11 ("Because CTE is not diagnosable in living patients, claims that a living patient suffers from CTE cannot be medically confirmed.  Current research into CTE—essentially, case reports or series—has associated certain clinical symptoms retrospectively described by the family of deceased players (and non-players) as a potential clinical picture for CTE.  The reported list of associated symptoms is long and, given its genesis, anecdotal."); Declaration of Christopher C. Giza, M.D. ("Giza Decl.), Ex. 16, ¶ 16 ("[CTE] is inferred to be progressive, but no longitudinal studies have been conducted.  There are no epidemiological studies that permit accurate determination of incidence, risk, or causality. … The current description of CTE symptomatology, however, is confounded by the retrospective nature of the data collection and the limited database used.  Thus, the reported clinical observations are subject to selection bias.  Since CTE is currently diagnosable only post-mortem, there are no published epidemiological, cross-sectional or prospective studies relating to CTE."); Declaration of David Allen Hovda, Ph.D. ("Hovda Decl."), Ex. 17, ¶ 21 ("the majority of the data collected to date is retrospective in nature and restricted to a subset of subjects.  Thus, the reported clinical observations (*i.e.*, aggression, disinhibition, suicidality, etc.) are likely to be skewed by selection bias."); Declaration of John G. Keilp, Ph.D. ("Keilp Decl."), Ex. 18, ¶ 38 ("The science and clinical standards concerning CTE are in their infancy, and have yet to reach acceptance.").  Though the objectors challenge the fact that the Settlement does not compensate "CTE" as a Qualifying Diagnosis in living players, they ignore that the Settlement compensates several of the most serious conditions that have been reported as outcomes and co-morbid conditions of advanced CTE in the literature they cite, *i.e.*, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS.  *See* Hamilton Decl., Ex. 23, ¶ 36 ("More often than not in the case studies reported, CTE

neuropathology appears with other neuropathology, such as Alzheimer's disease, Parkinson's disease, etc."); Fischer Decl., Ex. 15, ¶ 12; Giza Decl., Ex. 16, ¶ 16.

Class Counsel, throughout the litigation and during the negotiations, consulted with experts to investigate the range of neuromuscular and neurocognitive diseases associated with concussions, mild traumatic brain injuries, and TBI, including dementia, Alzheimer's Disease, Parkinson's Disease, and/or ALS, proximately resulting from having played professional football in the NFL. *See* Phillips Supp. Decl., Ex. 4, ¶¶ 5, 7. *See* Seeger Decl., Ex.1, at ¶ 22. They were likewise aware of, thoroughly researched, and consulted with experts concerning CTE and the various behavioral, mood, and related symptoms and conditions raised by the objectors. *See* Seeger Decl., at Ex. 1, ¶¶ 16-18. The declarations submitted in support of the Settlement, together with the medical literature relied upon by the objectors, reflect the range of views and opinions on these issues. *See generally* Declarations of Fischer, Giza, Hovda, Keilp and Hamilton, filed herewith, at Exs. 15, 16, 17, 18 and 23 .

Co-Lead Class Counsel and the negotiating team, mindful of the looming preemption issue, zealously advocated for a settlement that would compensate the claims of all Retired NFL Football Players and their families on a class basis. Seeger Decl., Ex. 1, ¶¶ 19, 21. *See also* Phillips Supp. Decl., Ex. 4, ¶¶ 2-5, 8-10, 20. During the negotiations, however, Class Counsel determined which conditions the NFL Parties were willing to resolve on a global basis and those which they were not. In short, Class Counsel determined where the NFL Parties would draw the ultimate line and refuse to settle. Seeger Decl., Ex. 1, ¶ 23 ("In my experience, the approach the NFL Parties took is not uncommon… [D]efendants often try to draw lines on the basis of principle, litigation risk, business risk, and/or cost. The commitment of a defendant to those "lines" is always tested in the negotiating process, and it was here."). *See also* Phillips Supp.

Decl., Ex. 4, ¶¶ 8-9.  The NFL Parties were firm in their view.  Ultimately, the parties agreed to a

Settlement that provides compensation for only certain objectively verifiable and serious

diseases, *i.e.*, serious neurocognitive impairment and dementia, Alzheimer's Disease,

Parkinson's Disease, and ALS.  To be clear, these injuries have been scientifically associated

with TBI through epidemiological studies.  *See* Giza Decl., Ex. 16, ¶ 21 ("More broadly, there

are certain neurologic and neurodegenerative syndromes that have been associated through

epidemiological study in patients with traumatic brain injury of varying severities. These include

ALS, Parkinson's disease, Alzheimer's disease, and dementia."); Fischer Decl., Ex. 15, ¶¶ 6-7;

Hovda Decl., Ex. 17, ¶ 25.  As noted above, they are likewise described anecdotally in

descriptive reports of advanced CTE.  The NFL Parties were clear in their commitment to litigate

the claims of opt-outs for any other conditions, which they considered to be less severe, transient,

or not well supported by the science.  *See* Seeger Decl., Ex. 1, ¶ 22 ("It was our perception that

the NFL Parties were committed to litigating the claims of any opt-outs for any other conditions,

which they considered to be less severe, transient, or not well supported by the science.").  *See*

*supra Dryer* discussion.  Class Counsel, after careful consideration, consultation and research,

concluded that the ultimate settlement reached, to compensate players and their families for the

specific deficits and diseases that retired players may manifest while living – *i.e.*, severe

cognitive impairment/dementia (Levels 1.5 and 2), Alzheimer's Disease, Parkinson's Disease,

and ALS (Lou Gehrig's disease) – was the best possible settlement under the circumstances.  *See*

Klonoff Decl. Ex. 7, at ¶ 17 ("In my experience, every settlement is subject to line-drawing

attacks.  The question, however, is not whether the settlement is perfect, but whether the lines

that have been drawn have a rational basis and were carefully considered.").[17]

---

[17] In *In re Oil Spill by Oil Rig Deepwater Horizon*, objectors argued that the settlement should

Certain objectors latch on to the fact that the Settlement provides compensation to the families of those Retired NFL Football Players who died prior to the Preliminary Approval date, July 7, 2014, and who received a post-mortem finding on autopsy of CTE.  They claim it is therefore unfair to not compensate the families of those who die in the future and receive a post-mortem finding of CTE on autopsy.

But that feature of the Settlement was provided as an attempt to be fair to the families of those retired players who pre-deceased the Settlement, and thus had not sought the care of a neurologist or other neuro-specialist while living, but their families did obtain pathology of the retired player's brain, which reflected a pathological finding of CTE.  Seeger Decl., Ex. 1, ¶ 37. *See* Phillips Supp. Decl., at Ex. 4, ¶ 11.  In those instances, the players' death was sudden and unexpected, and neither the players nor their families were aware of the need or desire to obtain a diagnosis while living.  Class Counsel fought to secure recovery for the families of those individuals, and thus the "Death with CTE" injury definition was agreed to for pre-approval deaths with confirmed CTE from autopsy.  To be sure though, as described in Sections 6.3(e) and 8.2(a) of the Settlement Agreement, those retired players who died before Preliminary Approval will likewise be afforded an opportunity for compensation if they were diagnosed with

---

"include additional or different conditions."  But, as that court explained, the compensated conditions were appropriate and the exclusion of others did not render the settlement unfair.  295 F.R.D. 112, 156 (E.D. La. 2013).  Similarly, in *In re Serzone Prods. Liab. Litig.*, objectors complained that the settlement failed to compensate all possible injuries. 231 F.R.D. 221, 233 (E.D. Va. 2005).  The court overruled the objections, noting that the objectors advocated for the inclusion of injuries that had multiple potential causes.  *Id.*  The additional conditions the objectors have argued should be included in this settlement likewise have multiple causes and cannot be as firmly tied to football play as the injuries the settlement compensates.  The *Serzone* Court also noted that the appropriate remedy for class members who wished to recover for other medical conditions would have "been to opt out and seek recovery in the tort system."  *Id.* at 233.  This is a choice the objectors could have made in this case as well, but did not.  *See* Klonoff Decl., Ex. ¶ 92 ("[I]t is reasonable for settling parties to make choices and compromises. If a class member with one of the excluded conditions was upset with the settlement, he had the opportunity to opt out.").

a compensable disease while living.  Additionally, the NFL Parties' willingness to pay those who died with CTE before July 2014 does nothing to affect the monies available for other claimants in this uncapped deal, and like most other objections, this attack amounts to nothing more than line-drawing.  *See* Klonoff Decl., Ex. 7, at ¶ 17.

Since Preliminary Approval and the effectuation of the detailed Notice Program, Class members are now aware of the Settlement and that it requires a Qualifying Diagnosis in order to obtain a Monetary Award.  They should obtain a Qualifying Diagnosis if they are currently neurocognitively impaired.  *See* Seeger Decl., Ex. 1, ¶ 45.

Credence should be given to Class Counsel's estimation of the probability of success and the strength of the NFL Parties' defenses.  *See Perry*, 229 F.R.D. at 115.  After considering the risks and lengthy delays of continued litigation, Class Counsel concluded that the settlement, which will provide immediate benefits, is the best possible result for class members.  The fourth and fifth *Girsh* factors therefore weigh in favor of approving the settlement.

### 5.     The Risks of Maintaining the Class Action Through Trial

The sixth *Girsh* factor assesses the risk of decertification.  As one court has explained, "What the district court giveth, the district court may taketh away:  the court may decertify or modify a class at any time during the litigation should the class prove to be unmanageable." *Perry*, 229 F.R.D. at 116.  Rule 23(c)(1)(C) provides that an "order that grants or denies class certification may be altered or amended before final judgment."  The Third Circuit has noted that this factor is relatively "toothless" since there is always a risk of decertification and courts "can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321.  In this case, however, the court has not granted certification of a litigation class and there is a very real risk that the court would decline to do so.  Courts do not have to consider the manageability of a

trial when certifying a settlement class, but manageability concerns usually come to the forefront when a court is considering whether to certify a litigation class.[18] *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-020002, 2014 WL 5149087, at *19 (E.D. Pa. Oct. 10, 2014) (citing "the risks associated with certifying and maintaining a class").  This factor therefore favors approval of the settlement.

### 6.    The Ability of Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor, which considers the ability of the defendants to withstand a greater judgment, is neutral.  The defendant's ability to pay more than the settlement amount is relevant "where the defendants' finances are poor and the settlement is limited as a result, such that this factor must be analyzed at length in deciding whether or not to approve of the agreement at hand."  *Chakejian v. Equifax Info. Serv., LLC*, 275 F.R.D. 201, 214 (E.D. Pa. 2011) (finding this factor to be neutral where the defendant might be able to pay greater amount, but the plaintiffs' recovery appeared to be fair); *see also Warfarin*, 391 F.3d at 538 (finding no error in district court's determination that this factor was neutral even though DuPont's resources far exceeded the settlement amount); *Bredbenner v. Liberty Travel, Inc.*, Civ. A. No. 09-905, 2011 WL 1344745, at *15 (D.N.J. Apr. 8, 2011) ("courts in this district regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts").  Thus, the NFL Parties' ability to pay more does not weigh against approval of the settlement.  *See* Klonoff Decl., Ex. 7, ¶ 141 ("The NFL certainly has ample financial resources, but that does not mean it would agree to exhaust those resources to settle a case it views as questionable.").

---

[18] Differences in state law, which are irrelevant for settlement classes, can create manageability problems for litigation classes.  *See, e.g., Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183 (3d Cir. 2014); *In re Life USA Holding Inc.*, 242 F.3d 136, 147 n.11 (3d Cir. 2001).

7.     **The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of All Attendant Risks of Litigation**

The eighth and ninth *Girsh* factors – the range of reasonableness of the settlement in light of the best possible recovery and in light of all attendant risks of litigation – direct a district court to evaluate the settlement in some comparative fashion.  In *Warfarin*, the Third Circuit instructed district courts to evaluate "whether the settlement represents a good value for a weak case or a poor value for a strong case."  391 F.3d at 538.  Accordingly, in cases like this, where primarily monetary relief is sought, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."  *Id.*

The settlement's benefits are generous.  The Monetary Award Fund is uncapped.  Class members can recover as much as $5 million without having to prove causation or defeat statute of limitations and other dispositive defenses.  Their right to seek collective bargaining benefits and workers' compensation has been preserved.  All retired players are eligible to obtain a baseline assessment evaluation free of cost, and those who are diagnosed with Level 1 Neurocognitive Impairment will receive BAP Supplemental Benefits that entitle them to medical testing or treatment, including, as needed, counseling and pharmaceutical coverage.

Some objectors argue the amounts in the Monetary Award Grid are too low.  *See* Alexander Objection [ECF No. 6237] at ¶ 7;  Armstrong Objection [ECF No. 6233] at 13-14; Grimm Objection [ECF No. 6346]; Villapiano Objection [ECF No. 6372]; O'Malley/LaPlatney Objection [ECF No. 6390]; Moore Objection [ECF No. 6399].  Most represented objectors do not make this argument, probably because experienced counsel realize that the monetary awards are significant and on par with damages awarded in other similar cases.  *See* Klonoff Decl., ¶ 143

("The recoveries secured under the settlement strike me as quite substantial given all of the challenges that plaintiffs faced in proving their claims.").  Courts roundly reject objections that the settlement "just isn't enough," particularly when the objectors fail to take into account the risks of continued litigation.  *See Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (rejecting various objections that boiled down to arguments that the settlement fund was inadequate); *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) (accepting district court's rejection of objections based on the size of the settlement, which the objectors considered "unduly small in light of what they assert was the total possible recovery"); *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1243-44 (D.N.M. 2012) (objections that a settlement is too small without analyzing risks of litigation and case's specific circumstances are inadequate, and "[t]he suggestion that the Court should force an experienced, seasoned Plaintiffs' class counsel to take [a] case to trial should not be made lightly, for victory is not assured or even likely except in the very best of cases").

In other cases involving personal injuries, courts have approved class settlements that use matrices of diagnostic or other evaluative criteria to assign appropriate values to injury classifications.  *See, e.g.*, *Diet Drugs*, 2000 WL 1222042, at *19-23 (approving a personal injury class settlement for valvular heart disease caused by Pondomin and Redux, where settlement provided for initial screening program followed by injury awards subject to matrix criteria, such as age and severity of injury, for eligible claimants, in values ranging from $5,000 in medical services or $3,000 in cash, up to approximately $1.5 million); *In re Phenylpropanoloamine Prods. Liab. Litig.*, 227 F.R.D. 553, 557-58 (W.D. Wash. 2004) (granting final approval to personal injury class action for users of Dexatrim for ischemic stroke and other injuries, with awards ranging from $100 to $5 million, depending on matrix criteria of age, severity of injury,

63

etc.); *see also In re Vioxx Prods. Liab. Litig.*, MDL 1657, 2008 WL 3285912, at *3 (E.D. La. Aug. 7, 2008) (describing settlement in pharmaceutical mass tort MDL litigation, in which the claim valuation process included an objective numerical determination based on factors like the claimant's age, injury, and duration of Vioxx use).

This Settlement compares favorably to the settlements in the *Diet Drugs*, *Vioxx*, and *Phenylpropanoloamine* cases. Given the very real risks of continued litigation, along with the delays inherent in litigating a complex case of this nature and the possibility of a lengthy appeal, the value of the awards available to class members is manifest. *See Chakejian*, 275 F.R.D. at 215 ("[T]his settlement offers an immediate benefit, whereas litigation would prolong resolution of this controversy, particularly in the event of likely appeals."); *see also In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) ("Parties to a settlement benefit by immediately resolving the litigation and receiving 'some measure of vindication for [their] position[s] while foregoing the opportunity to achieve an unmitigated victory. Thus, the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial.'" (citation omitted)). These final two *Girsh* factors therefore favor approval of the proposed Settlement.

### C.   The Relevant *Prudential* Considerations Also Support Final Approval.

District courts may also consider the factors identified by the Third Circuit in *Prudential* when evaluating a proposed class action settlement. *See In re Pet Food Products Liability Litig.*, 629 F.3d 333, 350-51 (3d Cir. 2010). The *Prudential* considerations are:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of

> claims by other classes and subclasses; the comparison between the results
> achieved by the settlement for individual class or subclass members and the
> results achieved—or likely to be achieved—for other claimants; whether
> class or subclass members are accorded the right to opt out of the
> settlement; whether any provisions for attorneys' fees are reasonable; and
> whether the procedure for processing individual claims under the settlement
> is fair and reasonable.

*Prudential*, 148 F.3d at 323.  However, "[u]nlike the *Girsh* factors, each of which the district

court must consider before approving a class settlement, the *Prudential* considerations are just

that, prudential."  *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013); *see also*

*Pet Food*, 629 F.3d at 350 (noting that the *Prudential* factors need only be addressed "when

appropriate" and are "illustrative of additional inquiries that in many instances will be useful for

a thoroughgoing analysis of a settlement's terms").

Some of the *Prudential* factors are relevant to the Court's evaluation of this Settlement.

First, as discussed above, Class Counsel have sufficient information to make an informed

decision about the merits of the case and the risks of proceeding to trial, and about the fairness of

the Settlement terms.  *See In re Fasteners Antitrust Litig.*, No. 08-md-1912, 2014 WL 285076, at

*9, 11 (E.D. Pa. Jan. 24, 2014) (making similar finding where settlement negotiations began

before much formal discovery was conducted).  Second, Class Members had the opportunity to

opt out of the Settlement and pursue their claims on an individual basis.  Third, the procedure for

processing individual claims is fair and reasonable.  Although Class Members must register and

submit materials in support of their claims, they will receive mailings alerting them to the

requirements and reminding them to comply and they have access to the Settlement Website and

a toll-free number for additional information.  *See, e.g.*, ECF No. 6087 at § 14.1(d) (additional

notice will remind class members to register); *id.* at § 5.9 (BAP Administrator will send annual

notices reminding class members to schedule their BAP exams); *id.* at § 4.1 (describing website

65

and toll-free number). The settlement also defines the criteria for class members to qualify for benefits, establishes a network of specialists to perform the BAP examinations and provide Qualifying Diagnoses, and includes audit and appeal procedures to protect against fraud. Courts in this circuit have found claim processes incorporating similar procedures to be fair and reasonable. *See Rowe v. E.I. DuPont de Nemours & Co.*, No. 06-1810 (RMB/AMD), 2011 WL 3837106, at *17 (D.N.J. Aug. 26, 2011); *Diet Drugs*, 2000 WL 1222042, at *63. Therefore, the *Prudential* considerations, like the *Girsh* factors, strongly favor approval of the settlement.

## VI.    RESPONSE TO OBJECTIONS

A total of 205 Class Members objected to one or more aspects of the Settlement. Many of their objections have been addressed above in the discussions of class certification, notice, and the *Girsh* factors. Class Counsel respond to the remaining objections in this section.

### A.    Some Objectors Argue That the Reductions and Offsets in the Monetary Award Grid Are Unfair, But These Types of Provisions Are Often Included In Similar Settlements.

Several objectors challenge the fairness of the settlement based upon the methodology used to categorize and evaluate class members' injuries. These objections include challenges to the use of players' ages to arrive at injury values on the Monetary Award Grid,[19] the use of Eligible Seasons as an offset,[20] and the 75% reduction in awards to class members who have

---

[19] *See*, *e.g*., Owens Objection [ECF No. 6210] at 2; Barber Objection [ECF No. 6226] at 5-6; Armstrong Objection [ECF No. 6233] at 13-15; Alexander Objection [ECF No. 6237] at 6; Duerson Objection [ECF No. 6241] at 21-23, 27; Stewart Objection [ECF No. 6175] at 2; Slack and Rice Objection [ECF No. 6223] at 2-4; Morey Objection [ECF No. 6201] at 34-36; and Duerson Objection [ECF No. 6241] at 27.

[20] *See* Morey Objection [ECF No. 6201] at 34-36; Stewart Objection [ECF No. 6175] at 2-6; Slack and Rice Objection [ECF No. 6223] at 2-7; Jones Objection [ECF No. 6235] at 3; Duerson Objection [ECF No. 6241] at 27-28.

experienced traumatic brain injury or a stroke unrelated to NFL Football.[21]  But settlements often

use similar methods to value class members' claims.  As one court has recognized, "disparate

treatment of claims is obviously necessary if claims are to be valued and a settlement is to

occur."  *Phenylpropanoloamine*, 227 F.R.D. at 564 (overruling objection to the discounting of

claims based upon the statute of limitations because "it is simply not tenable to argue that this

sort of negotiated compromise renders the Settlement unfair because it allocates amounts among

Class Members").

 The reductions and offsets are the result of a hard-fought, arm's-length compromise, and

are based on objective criteria.  The age reductions reflect the fact that the average incidence of

each of the diseases in the general population increases with age.  *See* Klonoff Decl., ¶ 100 ("[I]t

is not unreasonable, in my view, to reduce awards based on age.  If, for example, a player is

diagnosed with Alzheimer's Disease at age 35, that player may have a strong case that the

disease was caused by concussions suffered while playing football.  On the other hand, if

Alzheimer's Disease is not diagnosed until age 80, the NFL's argument that football was *not* the

cause is much stronger, given the much higher prevalence of Alzheimer's Disease in the general

population in the age 80 category than in the age 45 category.").  *See* Declaration of Thomas

Vasquez, Ph. D. ("Vasquez Decl."), attached as Ex. 19, ¶¶ 10, 11, 15 ("[A]s an individual ages,

his probability of contracting one of the compensable diseases increases dramatically regardless

of whether or not he played football…As former players age, the relative contribution of

concussions experienced …declines in importance … It has long been recognized that the age of

---

[21] *See, e.g.*, Morey Objection, [ECF No. 6201] at 32-34 & 70-71; Barber Objection [ECF No. 6226] at 6-8; Duerson Objection [ECF No. 6241] at 25-27; Armstrong Objection [ECF No. 6233] at 16.

a claimant affects the value of his claim in the tort system – all else equal, the older the individual is, the lower the award.").   The offsets for Eligible Seasons serve as an objective substitute for exposure to injury.  *See* Klonoff Decl., Ex. 7, ¶ 98 ("In my opinion, it is not unreasonable to assume that someone who, for example, played for five seasons has a stronger case at trial than someone who only played for one, and thus is entitled to greater recovery."). *See* Vasquez Decl., Ex. 19, at ¶ 13 ("the number of years played by a former player is used as a proxy for the exposure to concussions and TBI.  It is assumed that the longer an individual played, the greater the number and severity of impacts he experienced and the greater should be his monetary award.").  The stroke and traumatic brain injury offsets account for the possibility of alternate causes of class members' injuries; notably, class members will have the opportunity to present evidence that their non-football related strokes and traumatic brain injuries are not the cause of their illnesses.  *See* Klonoff Decl., Ex. 7, ¶ 94 ("It certainly cannot be disputed that, in a contested trial against the NFL, a player who had suffered a prior stroke or traumatic brain injury would be vigorously cross-examined on that possible alternative cause (and the NFL would offer expert testimony to support that theory).  Thus, such claims are weaker than those by players who have not suffered prior strokes or traumatic brain injury.  It is only logical that weaker claims should be paid less."); *see also* Fischer Decl., Ex. 15, ¶¶ 20 & 21 (offset for stroke "is reasonable and supported by the science" and offset for severe TBI is "scientifically sound").

Other courts have approved settlements that include similar offsets and reductions.  In *Prudential*, for example, the Third Circuit affirmed a class settlement in which insurance claims were evaluated and scored to arrive at differing compensation values.  148 F.3d at 296-97. Likewise, in *Diet Drugs*, the court overruled objections that the settlement was unfair because awards were determined subject to matrix criteria like age and severity of injury.  2000 WL

1222042, at \*50-51.  And in the *Deepwater Horizon* case, the court overruled objections that the

settlement "should contain different dollar values, different conditions, payments based on

severity of disease and impairment, payments for relocation costs, and/or different standards of

proof" because the settlement matrix was "based on medical and empirical data, developed

through arms-length negotiations, and related to the relative strengths and merits of similarly

situated claims."  295 F.R.D. at 136-40.

> **B.      Some Objectors Argue That the BAP Is Underinclusive, But It Is Only
>           Intended to Provide Baseline Testing and Treatment for a Limited Time.**

Certain Objectors claim that the $75 million BAP is insufficient.  *See* Morey Objection

[ECF No. 6201], at 72-73.  They criticize the BAP because it will not pay for treatment for all

Class Members who ultimately receive a Qualifying Diagnosis for the same time period as the

Monetary Award Fund, *i.e.*, 65 years.  The short answer is that it was not intended to do so.  The

BAP's benefits and time period, like the other benefits of the proposed Settlement, were

bargained-for benefits.

The BAP is intended, first and foremost, to provide every participating Class Member

with a baseline assessment, which will include both a neuropsychological examination and a

neurological examination, as provided in Section 5.2 of the Settlement Agreement [ECF No.

6087].  The BAP Term is ten years, with an option to extend the program for another five years

to provide further BAP Supplemental Benefits.  *Id*. at Section 5.5.  There is no genuine reason

why a Class Member could not comply with the BAP requirements that he be tested within "(i)

within two (2) years of the commencement of the BAP if he is age 43 or older on the Effective

Date; or (ii) if he is younger than age 43 on the Effective Date, before his 45th birthday or within

ten (10) years of the commencement of the BAP, whichever occurs earlier." *Id.* at Section 5.3.

Thus, there is no need for the BAP to be extended to sixty-five years.

The secondary benefit of the BAP is to provide BAP Supplemental Benefits for those

Class members diagnosed by Qualified BAP Providers with Level 1 Neurocognitive Impairment,

as defined in Exhibit 1 to the Settlement Agreement. *Id.* at Section 5.11. "BAP Supplemental

Benefits shall comprise medical treatments and/or examinations generally accepted by the

medical community." *Id.* These benefits, however, are not a fixed amount. The maximum

amount of BAP Supplemental Benefits per player "shall be determined on the one-year

anniversary of the commencement of the BAP by Co-Lead Class Counsel and Counsel for the

NFL Parties, in consultation with the BAP Administrator, and with the approval of the Court."

*Id.* at Section 5.14(b). This process is designed to insure that the main goal of the BAP,

providing baseline assessments to all participating Class Members, is fulfilled.

In connection with the settlement negotiations, Co-Lead Class Counsel consulted with

their experts, including their actuarial team and the entity they selected to be the BAP

Administrator, GRG. Co-Lead Class Counsel determined that $75 million would be sufficient to

ensure the funding of a baseline assessment for all those Class Members who wanted one, as

well as money remaining to provide some treatment for a limited time period for those Class

Members who suffered impairment, but, not to the degree that would entitle them to a Monetary

Award, *i.e.*, those with Level 1 Neurocognitive Impairment.

The amount available for BAP Supplemental Benefits was modeled by Plaintiffs'

actuarial expert based upon input from the BAP Administrator. *See* Vasquez Decl, at Ex. 19, ¶¶

17-28. The BAP Administrator has determined, based upon his experience and review of the

standard payer rates, that the average costs of the assessment will be $3,500. *See* Garretson Aff.,

70

at Ex. 2, ¶ 22.  The BAP Administrator also estimated that the administrative costs to establish

and operate the BAP, which costs will be funded by the BAP, will not exceed $7.5 million.  *Id.* at

¶ 21.  As per the estimate of Plaintiffs' actuarial expert, it is anticipated that approximately

11,790 Class members will participate in the BAP and receive a baseline assessment.  Thus,

baseline assessments will cost the BAP approximately $41.3 million.  *See* Vasquez Decl., Ex. 19,

¶ 24.

   It was estimated that the amount remaining and available for BAP Supplemental Benefits

would be $26.2 million.  Thus, Mr. Vasquez estimated that between $35,000 and $52,000 will be

available per player for BAP Supplemental Benefits, based upon his estimate that between 500

and 750 Class Members would qualify for BAP Supplemental Benefits.  *See* Vasquez' Decl., Ex.

19, ¶¶ 26-28 and Table 3.

   In short, for the Objectors to argue that the BAP is insufficient because it will be unable

to pay for treatment for all Class Members for 65 years simply misapprehends the BAP's

purpose.

   **C.**  **Some Objectors Argue That the Claims Process Is Too Complicated, But the Procedures Are Typical of Complex Settlements.**

   Some objectors argue that the claims process is unreasonable and too complex for class

members to navigate, resulting in a settlement that provides only illusory value.  But the

settlement uses procedures similar to those found to be fair and reasonable by courts in this

circuit and nationwide, and does not raise any of the concerns courts have found with settlements

that offer only coupons or require burdensome claim procedures to receive nominal payments.

These objections should therefore be overruled.

1.     **The Claims Process Uses Standard Procedures Present in Class Action Settlements Nationwide.**

The objectors suggest that the procedures for obtaining settlement benefits are unreasonably complex and onerous, citing the registration process, the claim package and requirement that it include of evidence of NFL employment, the deadlines for receiving a baseline assessment examination, the requirement that a Qualified MAF Physician make a Qualifying Diagnosis, and the audit and appeal provisions.  *See* Morey Objection [ECF No. 6201] at 74-75; Heimburger Objection [ECF No. 6230] at 18; Armstrong Objection [ECF No. 6233] at 19-20.  In order to execute a settlement of this magnitude, however, deadlines, forms, and supported documents are needed to ensure an orderly and fair dispensation of settlement benefits to all eligible class members. "Class members must usually file claim forms providing details about their claims and other information needed to administer the settlement." *Manual for Complex Litigation* § 21.66 (4th ed. 2014).  In fact, similar settlement procedures have been approved and used successfully in class action settlements in this district and nationwide.[22]  *See* Klonoff Decl., Ex. 7, ¶103 ("These requirements strike me as reasonable ways to prevent fraud and assure timely review of the medical evidence.").  *See also* Brown Decl., Ex. 3, ¶¶ 57-59.

The Morey Objectors also complain that the claim form has not yet been provided to class members.  *See* ECF No. 6201 at 75.  But there is no requirement that the claim form be included with the settlement notice, and claim forms are typically distributed after final approval

---

[22] *See* Imprelis Class Action Settlement website, https://treedamagesettlement.com/Class1/CLAIMSPROCESS.aspx (last visited Oct. 23, 2014), attached as Ex. 20; Official Court-Authorized Website of MDL 2179 *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in Gulf of Mexico*, http://www.deepwaterhorizonsettlements.com/Default.aspx (last visited on Oct. 23, 2014), attached as Ex. 21;  AHP Diet Drug Settlement website, http://www.settlementdietdrugs.com/index.asp (last visited on Oct. 23, 2014), attached as Ex. 22.

of the settlement when there are objections.  *See Manual for Complex Litigation* § 21.312.  The

Morey Objectors also incorrectly contend that class members will be subject to an 80% offset if

they are unable to provide objective evidence of NFL employment.  *See* ECF No. 6201 at 75.

Section 9.1(a) of the Settlement Agreement, however, provides that if the Claims Administrator

determines that a class member has provided insufficient evidence of employment, "the Claims

Administrator will request that the NFL Parties and Member Clubs provide any employment or

participation records of the Retired NFL Football Player in their reasonable possession, custody

or control, which the NFL Parties and Member Clubs will provide in good faith."

      The Morey and Armstrong Objectors argue that the time period for class members to

obtain baseline testing is too short – without suggesting how a longer period would provide a

fairer settlement or whether the additional cost would be justified.  *See* ECF No. 6201 at 74; ECF

No. 6233 at 19-20.  The BAP was designed to protect class members' health and well-being

through prompt screening and to validate the ultimate proof requirements for receiving

compensation from the Monetary Award Fund.  A longer period for the BAP would not

meaningfully further class members' interests.  The settlement also has built-in safeguards to

accommodate late submissions when a class member can show substantial hardship.  *See* ECF

No. 6087 at § 8.3(a)(1).

      Some objectors take issue with settlement provisions requiring that Qualifying Diagnoses

be made by a Qualified MAF Physician, baseline assessments be performed by pre-approved

BAP Providers, and covered prescriptions be provided by approved pharmacies.  *See* Morey

Objection [ECF No. 6201] at 75-76; Heimburger Objection [ECF No. 6230] at 18; Armstrong

Objection [ECF No. 6233] at 19-23; and Alexander Objection [ECF No. 6237] at 7-8.  These

provisions are intended to ensure that highly-trained and qualified physicians to perform the

specialized testing and minimize the potential for unauthorized medical services and fraudulent

billing practices that can occur in the absence of a prescreened nationwide network of neutral

qualified healthcare providers.  *See* Klonoff Decl., Ex. 7, ¶ 108 ("This limitation is a reasonable

way to ensure that the diagnoses have consistency and integrity.").  *See also* Brown Decl., Ex. 3,

¶ 59.  Other courts have found that similar provisions enhance the fairness of the claim process.

*See Diet Drugs*, 2000 WL 1222042, at *63 (finding that claim procedures were fair because "an

intricate network of cardiologists has been established to perform echocardiograms, interpretive

visits and additional medical services").

A few objectors suggest that it will be difficult for class members to obtain necessary

testing by qualified physicians, but the exact opposite is true.  The BAP Administrator and

Claims Administrator must select qualified providers based, in part, on their geographic

proximity to class members.  *See* ECF No. 6087 at §§ 5.7(a)(ii) & 6.5(b).  *See also* Garretson

Aff., Ex. 2, at ¶¶ 13, 14.  The BAP Administrator will send reminders to class members about the

BAP deadlines, *id.* at § 5.9, and will work with retired players who register and are eligible for

the BAP, explaining how to arrange for an initial baseline assessment examination. *See*

Garretson Aff., Ex. 2, ¶¶ 13, 18.  And the Special Master and the Court will have continued

oversight over the Settlement to ensure that its terms are being executed effectively.

A few objectors argue that the settlement's audit and appeal provisions are unfair.  *See*

Morey Objection [ECF No. 6201] at 77; Heimburger Objection [ECF No. 6230] at 18; Alexander

Objection [ECF No. 6237] at 8-9.  Audit and appeal procedures are regularly included in class

action settlements involving large claims in order to check for inaccuracies and guard against

fraud.  *See Manual for Complex Litigation* § 21.66; *Diet Drugs*., 2000 WL 1222042, at *63

(finding settlement procedures to be fair in part because "the audit and appeal procedures protect

74

against fraud and the misuse of Settlement funds").  The objectors argue that it is not fair for the NFL to have unlimited appeal rights when class members must pay $1,000 to appeal a denied claim.  But class members who prevail will be refunded the $1,000 fee, and the settlement empowers Class Counsel to petition the Court for appropriate relief if they believe the NFL Parties are submitting vexatious, frivolous, or bad faith appeals. *See* Klonoff Decl., ¶ 112 (noting that the $1,000 fee "discourages groundless appeals but should not deter players who genuinely believe in the strength of their claims").

The fact that the claims program in the *Diet Drugs* litigation has successfully provided benefits to numerous class members confirms that the objectors' concerns are misplaced. Although larger and more complex, the *Diet Drugs* settlement shares many common features with this settlement.  The settlement created a nearly $4 billion fund that will pay benefits through 2015, including $1 billion for future medical examinations and $2.34 billion to settle individual suits.  The settlement imposed strict deadlines for compliance, used various forms and audit procedures to ensure that benefits were distributed properly, and ensured the court's continuing oversight of the process.  *See generally* www.settlementdietdrugs.com, Ex. 22.  In fact, this Court and the Third Circuit have approved several additional class action settlements involving detailed claims processes.  *See Ins. Brokerage*, 579 F.3d at 259 n.17 ("the District Court found the claims processing procedure fair and reasonable, … and we agree"); *Prudential*, 148 F.3d at 294-96 (describing claim form and supporting documentation requirements, the "four tier review process," and scoring process to determine award); *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 474-76 (E.D. Pa. 2010) (describing claim forms, causation defenses that may preclude awards, CertainTeed's inspection rights, and appeal procedures).

### 2.      The Claim Process Does Not Create an Illusory Settlement Value.

The Morey and Heimburger Objectors characterize the settlement benefits as illusory, likening the carefully planned claims process to those of coupon settlements and other marginal economic class settlements.   *See* Morey Objection [ECF No. 6201] at 73-74; Heimburger Objection [ECF No. 6230] at 18-19.  In support, they cite *GM Truck*, *Eubank*, and *In re Baby Products* for the proposition that "complicated procedures" in coupon and nominal award recoveries diminish the value of a settlement.  Each of these cases is easily distinguishable.

This settlement, which provides class members with valuable benefits, is nothing like the coupon settlement the Third Circuit rejected in *GM Truck*.  In *GM Truck*, the proposed settlement would have provided class members with $1,000 coupons that could only be used toward the purchase of a new GM vehicle, and even then only with certain restrictions.  55 F.3d at 780.  The Third Circuit dubbed the settlement "little more than a sales promotion for GM."  *Id.* at 808.  The court noted that a $1,000 certificate towards the purchase of a vehicle costing $22,000 or more conferred no benefit to a class member who could not afford a new car in the first place, and questioned the "real value" of the coupon where class members might feel beholden to use the certificate even though they would not have spent the money on a new automobile absent the settlement.  *Id.*

Nor is this settlement anything like the proposed settlement in *Eubank*, where the Seventh Circuit observed that "almost every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for was present in this case."  753 F.3d at 728.  Among other things, class counsel had a conflict of interest with absent class members because the class representative was his father-in-law and was also subject to disciplinary proceedings for multiple ethical violations, the settlement included one-sided terms,

and the notice was incomplete and misleading.  *Id.* at 723-29.  In addition, the court found that

the procedure for receiving settlement benefits, which required class members to either accept a

nominal payment or submit to arbitration where the defendant had the right to raise over a dozen

defenses, including comparative fault, natural weathering of the windows, and failure to mitigate

damages.  *Id.*  at 725.  In vacating the settlement, the Seventh Circuit acknowledged that the

claim process could leave a "claimant with nothing or even less than nothing:  additional bills to

pay."  *Id*.

Finally, in the *Baby Products* case, class members had to complete a multi-page form and

submit documentary evidence of their purchase to receive a payment of 20% of the price of the

product, and class members who did not submit documentary evidence received only $5.  708

F.3d at 170-71.  Given the minimal payouts and the documentation requirement, it is not

surprising that the majority of claims fell into the $5 category and class members were expected

to recover only $3 million of the $35.5 million settlement fund.  *Id.* at 171.  The Third Circuit did

not criticize the claims process, but instead remanded to the district court to reconsider the

fairness of the $5 cap and the level of proof required to receive a higher award and the fact that it

was unclear how much the class members would receive in total, as compared to the *cy pres*

recipient.  *Id*. at 175.

Because the benefits available to class members in this case are significantly greater than

the possible payouts in the *Baby Products* case, the Third Circuit's concerns about class

members having to jump through hoops to obtain a nominal payment are simply not relevant.

The objectors suggest that the NFL Parties have negotiated a "complex framework" in an effort

to minimize claims and that the "anti-fraud provision" is an "anti-payment" provision.  *See*

Morey Objection [ECF No. 6201] at 77.  But not only is the settlement fund uncapped, the NFL

77

Parties must pay the costs associated with the claims administration process, including the costs of notice, the Special Master's compensation, and other costs.  Because they alone bear the costs for "complexity," it is in the NFL Parties' interest to minimize the costs of administration.

> **D.  Some Objectors Argue That a Qualifying Diagnosis Should Be Compensated as of the Date of "Onset of Disease," But the Diagnosis Is Critical to the Fair Administration of the Settlement.**

Some objectors argue that class members should receive monetary awards based on their age when they first exhibited symptoms of a Qualifying Diagnosis rather than their age at the time of diagnosis.  *See* Owens Objection [ECF No. 6210] at 1-2; Barber Objection [ECF No. 6226] at 5-6.  The "Qualifying Diagnosis" requirement, which was carefully considered and negotiated by both sides, is a procedural safeguard against fraud.[23]  The physician certification ensures that a qualified doctor has made the diagnosis, that the class members actually manifests the symptoms to a degree that warrants a Qualifying Diagnosis, and that the methods used to make the Qualifying Diagnosis are medically sound and accepted.  The class member's age is important because as he ages he is more likely to develop one of the Qualifying Diagnoses.   The consideration of age is not uncommon in personal injury settlements as a scoring or ranking factor in determining a monetary award in mass tort settlements.  *See*, *e.g.*, *In re Diet Drugs*, MDL No. 1203, 2014 WL 4638840, at *2 (E.D. Pa. Sept. 16, 2014) ("Each matrix cell 'describes the amount which an eligible Class Member is entitled to recover' based on disease severity and age at time of diagnosis.").  These objections should be overruled.[24]

---

[23] *See Deepwater Horizon*, 295 F.R.D. at 140 ("All class members are protected by a specific, detailed and objective Specified Physical Condition Matrix, based on medical and empirical data, developed through arms-length negotiations, and related to the relative strengths and merits of similarly situated claims.").

[24] The Williams Objection [ECF No. 6221] makes an analogous argument.  The daughter of Mr. Williams, who died in 1984, argues that she should be able to participate in the settlement even though she is unable to locate his medical records. Even assuming that Ms. Williams could

### E. Some Objectors Argue That Recovery Should Be Allowed When Class Members Died Before January 1, 2006, But the NFL Parties Do Not Have to Waive All Statute of Limitations Defenses for the Settlement to Be Fair.

Representative and derivative claimants of deceased players are only eligible to recover for wrongful death and survival claims if the player died on or after January 1, 2006. *See* ECF No. 6087 at § 6.2. Two objectors argue that this limitation is unfair. *See* Kinard Objection [ECF No. 6219] at 2-5; Williams Objection [ECF No. 6221] at 2-4. While it may preclude these objectors from recovering, the provision is actually beneficial to most class members, whose claims would otherwise be barred by the statute of limitations. It is the result of hard-fought negotiations between the parties. Had the plaintiffs not secured this provision, claimants on behalf of *all* deceased class members would have had to show that their claims were timely. This provision completely eliminates that requirement for all players who died after 2005.

The parties also ensured that the provision accounted for the fact that there are variances in state law with respect to wrongful death statutes of limitation. Some states have a discovery rule for wrongful death,[25] while others do not.[26] Other states allow tolling for wrongful death claims in the event of fraudulent concealment.[27] Claimants may therefore recover despite the

---

participate despite the statute of limitations that bars her claim, allowing her to recover despite the absence of verifiable medical records would open the door to a multitude of other undocumented claims. *See, e.g., In re Diet Drugs*, 2013 WL 1796989, at *3 (E.D. Pa. Apr. 26, 2013) (The situation besetting plaintiff is not unique in the administration of the Settlement Agreement. There have been times throughout the years when a claimant, through no fault of his or her own, has been unable to obtain various medical or pharmacy records and thus has been precluded from obtaining certain benefits. This has not previously and cannot now be a basis for reading a provision out of the Settlement Agreement which was negotiated at arm's length and approved by this court after extensive hearings")

[25] *See, e.g., Hannebuth v. Bell Helicopter Int'l*, 694 P.2d 143 (Alaska 1984); *Lawhon v. L.B.J. Institutional Supply, Inc.*, 765 P.2d 1003 (Ariz. Ct. App. 1988); *Brown v. Textron Inc.*, No. 1:07cv340, 2008 WL 483335 (S.D. Ohio Feb. 19. 2008).

[26] *See, e.g.,* C.G.S.A. § 52-555; *Southerland v. Hammond*, 693 N.E.2d 74 (Ind. Ct. App. 1998).

[27] *See, e.g.,* Haw. Rev. Stat. § 657-20; *Gray v. Commonwealth*, 973 S.W.2d 61 (Ky. Ct. App. 1997); *DeCosse v. Armstrong Cork Co.*, 319 N.W.2d 45 (Minn. 1982).

January 1, 2006 limitation if they can show that their claim would not be barred by the applicable statute of limitations.

In essence, the objectors' argument is that the NFL Parties should have been much more generous and completely waived the statute of limitations defense. But the settlement is not unfair just because the NFL Parties did not categorically abandon all statute of limitations defenses as to each and every class member, even those who passed away decades ago. The objections should be overruled.

### F.   Objectors Argue That the $10 Million Education Fund Is An Impermissible *Cy Pres* Award, But It Is Merely One Component of a Fair and Reasonable Settlement.

The Heimburger and Armstrong Objectors argue that the $10 million Education Fund is an impermissible *cy pres* award and that the monies should instead be distributed directly to class members. *See* ECF No. 6230 at 21-23; ECF No. 6233 at 29-34. This is incorrect. "The *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011). The cases upon which the objectors rely involved either distributions of excess funds that remained after all individual claims had been satisfied,[28] or settlements that exclusively provided for *cy pres* distributions in lieu of any direct payments to class members.[29]

The Education Fund is nothing like the *cy pres* distributions in the objectors' cases. The NFL Parties will pay the $10 million without regard to the payment of individual claims, so it is

---

[28] *See Ira Holtzman, C.P.A. & Assocs. Ltd. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013); *Baby Prods.*, 708 F.3d at 172; *Dennis v. Kellog Co.*, 697 F.3d 858, 862-63 (9th Cir. 2012); *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 472 (5th Cir. 2011); *In re Checking Account Overdraft Litig.*, No. 09-md-02036 (S.D. Fla. Apr. 15, 2013) (D.E. 3430); *In re Thornburg Mortgage, Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1105 (D.N.M. 2012).

[29] *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011).

not funded by money left over after paying individual claims.  It is also not a substitute for direct

payments to class members, but rather *supplements* the substantial direct benefits that the

settlement provides to class members.  Thus, the concern expressed by some courts, reviewing

very different settlements, about a tradeoff between direct payments to class members and *cy*

*pres* distributions to third parties is simply inapplicable.  *See*, *e.g., Baby Prods.*, 708 F.3d at 174.

The objectors rely heavily on the American Law Institute's *Principles of the Law of*

*Aggregate Litigation*, § 3.07, to argue that any *cy pres* award or other distribution of funds to

non-class members is inappropriate when it is feasible to make further distributions to class

members.  *See* Heimburger Objection [ECF No. 6230] at 22; Armstrong Objection [ECF No.

6233] at 32.  But the ALI addresses the distribution of funds before class members have been

fully compensated under the terms of the settlement.  As the Third Circuit has held, a *cy pres*

award may be appropriate if the settlement as a whole is fair, reasonable and adequate:

> Although we agree with the ALI that *cy pres* distributions are most appropriate
> where further individual distributions are economically infeasible, we decline to
> hold that *cy pres* distributions are only appropriate in this context.  Settlements
> are private contracts reflecting negotiated compromises.  The role of a district court is
> not to determine whether the settlement is the fairest possible resolution—a task
> particularly ill-advised given that the likelihood of success at trial (on which all
> settlements are based) can only be estimated imperfectly.  The Court must
> determine whether the compromises reflected in the settlement—including those
> terms relating to the allocation of settlement funds—are fair, reasonable, and
> adequate when considered from the perspective of the class as a whole.

*Baby Prods.*, 708 F.3d at 173-74 (citations omitted).  Thus, to the extent the Education Fund is

properly characterized as a *cy pres* award, the question for the Court is whether the entire

settlement, including the allocation of $10 million to the Education Fund, is "fair, reasonable,

and adequate when considered from the perspective of the class as a whole."  *Id*. at 174.

81

The Third Circuit has also encouraged courts to compare the size of a proposed *cy pres* award to the size of the settlement, holding that "[b]arring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *Id.* Here, the $10 million allocated to the Education Fund represents less than 1% of the total projected settlement amount, as determined by the parties' actuarial experts. *See* ECF No. 6167, 6168;[30] *see also Diet Drugs*, 2000 WL 1222042, at *24 (billion-dollar settlement included direct payments to class members as well as the establishment of a $25 million medical research fund).

Most significantly, the Education Fund "bears a substantial nexus to the interests of the class members" and the nature of this lawsuit. *Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012). The Education Fund "will be established to fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players." *See* ECF No. 6087 at § 12.1. These programs will directly benefit class members and others like them (football players in general), and are closely tied to the nature of this lawsuit. These education programs also harmonize with the settlement's provisions preserving class members' bargained-for benefits. *See id.* at § 29. The objectors do not, and indeed cannot, seriously dispute that these educational programs "will benefit class members and further the purposes of [the claims] that form the basis for the class plaintiffs' lawsuit." *Lane*, 696 F.3d at 821. Their objections should therefore be overruled. *See* Klonoff Decl., Ex. 7, ¶ 114 ("The Education Fund … lines up perfectly with the compensation scheme in the settlement.").

---

[30] These actuarial reports provide the Court with the information that was lacking in *Baby Products*, enabling it to "estimate[] with reasonable accuracy" the "actual distribution" of the Settlement's funds. 708 F.3d at 174.

**G.      Some Objectors Argue That the Release Is Too Broad, But There Is Nothing Unfair About a Release That Provides the Defendants With Global Peace.**

Some objectors contend that the release is impermissibly broad.  *See* Miller Objection [ECF No. 6213] at 8-9; Armstrong Objection [ECF No. 6233] at 34; Alexander Objection [ECF No. 6237] at 9-10.  But "the law is settled that defendants entering into a class action settlement are entitled to obtain global peace and that class action releases may be broader than the claims directly compensated under the Settlement." *Deepwater Horizon*, 910 F. Supp. 2d at 962; *see also McGowan Investors LP v. Keefe Bruyette & Woods, Inc.*, 540 F. Supp. 2d 571, 577 (E.D. Pa. 2008) (Brody, J.) ("The Third Circuit consistently finds broad release language in class action settlement orders legally enforceable.").  The release is the result of careful negotiation by Class Counsel based on their evaluation of the strengths and weaknesses of the case.  *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 312 (W.D. Tex. 2007) ("[T]he undisputed evidence shows the release has been executed voluntarily and with adequate knowledge, as Class Counsel have evaluated the relative merits of each party's case and entered into the settlement with a full and fair view of the case's strengths and weaknesses."); *Cicero v. DirecTV, Inc.*, No. 07-1182, 2010 WL 2991486, at *8 (C.D. Cal. July 27, 2010) ("The language of the release was the product of careful bargaining by Class Counsel and DirecTV and the Court sees no need to modify it.  To do so may risk undoing a process which resulted in a very fair and reasonable settlement for the many Class Members.").  The Third Circuit has recognized that "achieving global peace is a valid, and valuable, incentive to class action settlements." *Sullivan*, 667 F.3d at 311; *see also Prudential*, 261 F.3d at 366–67 (refusing to grant broad release would undermine multidistrict class settlements because of defendants' concern that their exposure would be too great).

The objectors argue that the release should carve out two types of claims: (1) claims for CTE and death with CTE; and (2) claims asserted by the plaintiffs in *Dent v. National Football League*, Case No C-14-2324-KAW (N.D. Cal.), relating to the NFL's promotion and use of certain medications.  There is no reason to exclude either type of claim from the release.  First, claims for CTE are appropriately released.  As above, the settlement is designed to provide compensation to specific diseases and conditions from which retired players may suffer as a result of their playing professional football, not CTE which can only be diagnosed post mortem. Class members who died before the Court granted Preliminary Approval and received a post-mortem diagnosis of CTE will be entitled to compensation.  *See* ECF No. 6087, Ex. 1.  For other class members, the settlement compensates specified and demonstrated neurocognitive and neuromuscular deficits and diseases rather than CTE, since there is no accepted test to diagnose CTE in a living person.  *See supra* Section V.B.4; *see also Diet Drugs*, 2000 WL 1222042, at *49 (overruling objections to release of claims for condition that was not supported by clinical evidence).  Second, the objectors who reference the *Dent* litigation have not explained why they believe the release impacts the claims in the *Dent* case.  The *Dent* plaintiffs previously raised the possibility of their claims being released by the settlement in a motion to intervene, *see* ECF No. 6131, but after discussions with the NFL Parties they withdrew the motion.  *See* ECF No. 6189. Because the *Dent* plaintiffs and their counsel are satisfied that the release does not preclude their claims, the Court should overrule objections invoking that litigation.

## H.     Certain Objectors Claim that the Settlement Does Not Take Scientific Advancements into Account, But It Clearly Does.

Several objectors argue that the "science is frozen in place," leaving the Settlement unable to accommodate developments in neurocognitive science over the course of the Monetary

Award Fund.  *See* Duerson Objection [ECF No. 6241] at 25; *see also* Armstrong Objection [ECF No. 6233] at 26-27; Alexander Objection [ECF 6237] at 9.  However, the Settlement Agreement expressly recognizes the need for the Settlement to keep abreast of such developments, providing that "Co-Lead Class Counsel and Counsel for the NFL Parties agree to discuss in good faith possible prospective modifications to the definitions of the Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science."  ECF No. 6087, at §6.6(a).  Such discussions about the state of medical science are to occur at least every ten (10) years, even if no such developments have taken place.  *Id*.  ("on a periodic basis not to exceed once every ten (10) years.")  Contrary to what is implied by the Armstrong Objectors and Alexander Objectors (who merely repeat the Armstrong Objectors), the NFL Parties must engage in such dialogues "in good faith," and subject to Court oversight.  *Id*.; *see also* Section 30.11 and Article XXVI of the Settlement Agreement.

I.     **Certain Objectors Contend that the Settlement Sets an Unreasonably High Bar "To Qualify for Dementia," But the Testing Protocols Are Based on Sound Diagnostic Criteria.**

The Morey Objectors argue that to be eligible for Level 1.5 benefits (early dementia), Retired Players must satisfy an "unreasonably high bar."  Morey Objection [ECF No. 6201] at 71-72.  *See* ECF No. 6087, at 112-20 (Ex. 2 – Baseline Neuropsychological Test Battery and Specific Impairment Criteria for Retired NFL Football Players).  However, the Morey Objectors offer no support for this objection except to describe some of the qualifications for Level 1.5 (early dementia) and to speculate that two high-profile players might not have qualified.  *Id*. This is because the qualifications for each of the neurocognitive impairments, *i.e.,* Level 1 (moderate cognitive impairment), Level 1.5 (early dementia), and Level 2.0 (moderate dementia), are based on well-established methods and reasonable criteria. *See* Hamilton Decl.,

Ex. 23, ¶ 14 ("In particular, the BAP test battery comprises well-regarded mainstream examinations with well-developed normative data. These tests are very similar (and, in many cases, identical) to those that I, and others in our field of expertise, use in our everyday practice.").  *See also* Fischer Decl., Ex. 15, ¶¶ 8, 9, 14; *see also* Keilp Decl., Ex. 18, ¶ 22, 25-26. Indeed, as Dr. Fischer notes the "testing approach detailed in the Settlement comports with the state of the art in neurological medicine."  Fischer Decl., Ex. 15, ¶ 14.  *See also* Keilp Decl., Ex. 18,  20.A. ("The BAP test battery and the related Injury Definitions are a fair and objective means of determining the level of neurocognitive impairment based on standard procedures in Clinical Neuropsychology."); Hamilton Decl., Ex. 23, ¶ 23 ("the BAP test battery and associated criteria adopted as part of this Settlement are a reasonable and scientifically well-founded plan"). Accordingly, when the BAP test battery (and related thresholds) for neurocognitive impairments has been applied in testing with retired players, "it performs as intended. . . . a patient who will satisfy Level 1.5 Injury Definition by testing is most likely to be in the early stages of dementia." *Id.*, at ¶ 36.

### J.      Some Objectors Argue That They Should Be Given a Second Opportunity to Opt Out, But It Is Well Settled That Class Members Must Choose Between Objecting and Opting Out.

Several objectors argue that they should be given a second opportunity to opt out of the settlement, presumably in the event that that the Court overrules their objections.  *See* Morey Objection [ECF No. 6201], at 84-86; Duerson Objection [ECF No. 6241], at 28-29; Utecht Objection [ECF No. 6243], at 3-5; Chesley Objection [ECF No. 6242], at 13.  They want to both object to the settlement and preserve their right to opt out to pursue their own suits.  But it is well established that class members must choose between objecting and opting out.  *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 110 (D.N.J. 2012) ("The case law does not

suggest that a class member requesting exclusion from a settlement may nonetheless object to that settlement."); *Olden v. LaFarge Corp.,* 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007) (allowing a class member to simultaneously opt out of a settlement and object to the settlement "would countenance the practice of influencing litigation—or attempting to do so—in which the class member really has no stake"); *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.C. Cir. 2000) ("[C]lass members who have opted out of a 23(b)(3) class action have no standing to object to a subsequent class settlement; by opting out they 'escape the binding effect of the class settlement.'" (citation omitted)).  As one court has explained:

> Rule 23 requires potential class members to make a trade-off:  an individual either decides to remain a class member, bound by any and all judgments rendered in the class action but spared the expense of litigating on her own behalf, or she elects exclusion.  If she chooses exclusion, she is required to expend her own resources to bring her claims against the defendants, but she may potentially be rewarded by receiving a larger recovery.

*In re Del-Val Fin. Corp. Sec. Litig.*, 162 F.R.D. 271, 275 (S.D.N.Y. 1995).  Permitting additional time to opt out or allowing class members to object and opt out upsets the balance struck by Rule 23, which prescribes an orderly procedure for courts to evaluate objections and opt outs.  *Id.*

The Morey Objectors argue that they cannot be required to opt out before the Court grants class certification, which the Court allegedly has not yet done since its preliminary approval order only conditionally certified the class.  *See* ECF No. 6201 at 84.  But the 2003 amendments to Rule 23(c)(1)(C), which deleted the provision that a class certification "may be conditional," are irrelevant. The Third Circuit's affirmance of class settlements that have required class members to opt out before final approval (and final class certification) confirms the amendments did not change the well-established law in this regard.  *See, e.g., Pet Food*, 629 F.3d at 339-40; *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 & n.8 (2d Cir. 2006)

(holding that "conditional certification survives the 2003 amendment to Rule 23(c)(1)" and rejecting claim that amendment to Rule 23(c)(2)(B) "indicates that no opt-out notice can be sent until after certification").

The objectors also argue that class members should be given another chance to opt out because they need more time to evaluate the settlement.  But the fulsome notice program has provided class members with the information they need to consider their options, and the 99 days between the Court's grant of preliminary approval and the opt-out deadline gave class members more than enough time to make an informed decision.  *See Hainey v. Parrott*, 617 F. Supp. 2d 668, 679 (S.D. Ohio 2007) (denying request by objectors for second opt-out period partially because "[t]he class members had enough information at that time to make a reasoned decision whether or not to opt out of the settlement."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 94 C 897, 1996 WL 167347, at *3-4 (N.D. Ill. Apr. 4, 1996) (denying request for additional opt-out period where the notice had fully informed class members of their rights to opt out and the consequences of remaining in the class).

The opportunity for a second opt-out period is the exception, not the rule.  It has generally been permitted only when "solicitations by outside counsel contained misstatements, 'likely confused and misled class members, caused a high number of opt-outs, and therefore, had an adverse effect on the administration of justice.'"  *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 310-11 (3d Cir. 2005) (citation omitted).  That is not the case here.  As discussed above, less than one percent of Class Members objected.  There is no basis for providing objectors a second opportunity to opt out in contravention of established Rule 23 procedures.

### K.        Objectors' Arguments Regarding Attorneys' Fees Are Premature.

Some objectors[31] have challenged the amount of the attorneys' fee that Class Counsel

may request, but that issue is not yet before the Court.  As explained in the notice and Settlement

Agreement, Class Counsel intend to file their motion for attorneys' fees at an appropriate time

after the Court rules on the motion for final approval of the Settlement, and will address the basis

for their fee request in detail in that motion.  *See* ECF No. 6087 at § 21.1; ECF No. 6093, Ex. 1

at ¶ 34.  Class members will then have an opportunity to review the fee motion and file

objections, and to address the fee motion at a hearing.  This approach has been used by other

courts in this Circuit.  *See In re Diet Drugs Prods. Liab. Litig*., 582 F.3d 524, 530, 537, 553 (3d

Cir. 2009) (affirming award of attorneys' fees where motion for fees was filed after final

approval of settlement and objections to fees were permitted); *Fanning v. AcroMed Corp*., Civ.

A. No. 97-381, 2000 WL 1622741, at *1 (E.D. Pa. Oct. 23, 2000) (awarding attorneys' fees

where motion for fees was filed after settlement approval).  It is also consistent with Federal

Rule of Civil Procedure 23(h).  *See, e.g.*, *In re Ferrero Litig*., No. 12-56469, 2014 WL 3465685,

at *1 (9th Cir. July 16, 2014) (class members had adequate notice of class counsel's request for

attorneys' fees where they had opportunity to object after class counsel filed their motion);

*Cassese v. Williams*, 503 F. App'x 55, 57 (2d Cir. 2012) (Rule 23(h)(1) was satisfied where

notice stated amount of fees class counsel intended to apply for and class counsel filed their

motion two weeks before hearing).

Whatever objections may be had to the final request for attorneys' fees should be raised

at a proper time and place: when a request for attorney compensation is before the Court.

---

[31] *See* Morey Objection [ECF No. 6201] at 79-80; Miller Objection [ECF No. 6213] at 6-7;
Heimberger Objection [ECF No. 6230] at 19-21, 24; Armstrong Objection [ECF No. 6233] at
27-29; Alexander Objection [ECF No. 6237] at 5.

## VII.   CONCLUSION

For the reasons set forth above, the Court should certify the Settlement Class, grant final approval of the settlement, and enter the proposed Final Order and Judgment.

Dated:        November 12, 2014                          Respectfully submitted,


/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

***Co-Lead Class Counsel***

Sol Weiss
**ANAPOL SCHWARTZ**
1710 Spruce Street
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

***Co-Lead Class Counsel***

### *Class Counsel*

Steven C. Marks
**PODHURST ORSECK P.A.**
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com

Gene Locks
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: 866-562-5752
Fax: (215) 893-3444
glocks@lockslaw.com

### *Subclass Counsel*

Arnold Levin
**LEVIN FISHBEIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

*Counsel for Subclass 1*

Dianne M. Nast
**NAST LAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Fax: (215) 923-9302
DNast@nastlaw.com

*Counsel for Subclass 2*

### *Of Counsel*

Thomas V. Girardi
Graham B. LippSmith
**GIRARDI KEESE**
1126 Wilshire Blvd
Los Angeles, CA 90017
Phone: (213) 977-0211
Fax: (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

James R. Dugan, II
**THE DUGAN LAW FIRM**
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Phone: (504) 648-0180
Fax: (504) 648-0181
jdugan@dugan-lawfirm.com

Michael L. McGlamry
**POPE, MCGLAMRY, KILPATRICK
MORRISON & NORWOOD, P.C.**
3455 Peachtree Road, NE
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, GA 30326-3243
Phone: (404) 523-7706
Fax: (404) 524-1648
efile@pmkm.com

Charles S. Zimmerman
**ZIMMERMAN REED PLLP**
1100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: (612) 341-0400
Fax: (612) 341-0844
charles.zimmerman@zimmreed.com

David S. Casey, Jr.
Fred Schenk
**CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD
LLP**
110 Laurel Street
San Diego, CA  92101-1486
Phone: (619) 238-1811
Fax: (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

Anthony Tarricone
**KREINDLER & KREINDLER LLP**
277 Dartmouth Street
Boston, MA 02116
Phone: (617) 424-9100
Fax: (617) 424-9120
atarricone@kreindler.com

David A. Rosen
**ROSE, KLEIN & MARIAS LLP**
801 South Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Phone: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

Derriel McCorvey
**THE LAW FIRM OF DERRIEL C.
MCCORVEY**
115 W. Main Street, Suite 14
P.O. Box 2473
Lafayette, LA 70501
Phone: (337) 291-2431
derriel@mccorveylaw.com

## Appendix A: Procedural History

The Court is well familiar with the extensive procedural history of this litigation.  For ease of reference, that history is set forth herein.

### A.      Plaintiffs' Claims

The Class Action Complaint (the "Complaint") alleges generally that the NFL Parties breached their duties to Plaintiffs and other retired players by failing to take reasonable actions to protect players from the chronic risks created by concussive and sub-concussive head injuries and that the NFL Parties concealed those risks.  *See Turner. v. Nat'l Football League*, Civ. A. No. 14-cv-00029-AB (E.D. Pa. Jan. 6, 2014) [ECF No. 1].

Plaintiffs contend that, for many decades, evidence has linked repetitive head injuries to long-term neurological problems in many sports, including football.  They further contend that the NFL Parties, as the organizers, marketers, and the face of the most popular sport in the United States, in which head injuries are a regular occurrence and in which players are at risk for head injuries, were aware of the evidence and the risks associated with repetitive traumatic brain injuries, but failed to take reasonable action to address the risks and deliberately ignored and actively concealed the information from Plaintiffs.  The Complaint seeks injunctive relief, medical monitoring, and financial compensation for the long-term cognitive injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs and proposed class members, as a result of the NFL Parties' alleged tortious conduct, including negligence and misrepresentations.

Class Representatives Kevin Turner and Shawn Wooden are retired NFL Football players who allege that they suffered concussive and sub-concussive head injuries while playing football in the NFL.  Mr. Turner played eight seasons in the NFL for the New England Patriots and the

Philadelphia Eagles.  Mr. Wooden played nine seasons in the NFL for the Miami Dolphins and

the Chicago Bears.  They assert claims on behalf of a class of retired NFL players, some of

whom have already manifested serious harms from their injuries during their playing careers, and

all of whom are at risk for progression into a series of cognitive and neurological disabilities.

Mr. Wooden has experienced neurological symptoms, including migraine headaches,

sleep problems, concentration issues, and mood swings, but has not yet been diagnosed with any

neurological impairment.  Mr. Wooden alleges that he is at increased risk for developing a range

of neuromuscular and neurocognitive diseases associated with mild traumatic brain injuries, such

as dementia, Alzheimer's Disease, Parkinson's Disease, and/or Amyotrophic Lateral Sclerosis

("ALS"), as a result of his having played professional football in the NFL.  Mr. Wooden is the

Subclass 1 Representative.  *See* Wooden Aff., Ex. 5.  Mr. Turner was diagnosed with ALS in

June 2010.  He is the Subclass 2 Representative.  *See* Turner Aff., at Ex. 6.

### B.    Procedural Background and Creation of This MDL

On July 19, 2011, seventy-three former NFL players and certain of their wives filed a

complaint in the Superior Court of California against the NFL Parties and the Riddell

Defendants, alleging, among other things, that the NFL Parties breached a duty to protect the

health and safety of its players by failing to warn and protect them against the long-term risks

associated with football-related concussions.  *See* Complaint, *Maxwell v. Nat'l Football League*,

BC465842 (Super. Ct. Cal. July 19, 2011).  Shortly thereafter, two more groups of former NFL

players filed substantially similar complaints in California state court, and a fourth group of

plaintiffs filed a substantially similar complaint in the Eastern District of Pennsylvania.  *See*

Complaint, *Pear v. Nat'l Football League*, LC094453 (Super. Ct. Cal. Aug. 3, 2011); Complaint,

*Easterling v. Nat'l Football League*, 2:11-cv-05209 (E.D. Pa. Aug. 17, 2011); Complaint, *Barnes*

*v. Nat'l Football League*, BC468483 (Super. Ct. Cal. Aug. 26, 2011).  The NFL Parties removed

the state cases to federal court on the basis of federal question jurisdiction, asserting that claims

were subject to federal preemption under the Labor Management Relations Act ("LMRA").

This multi-district litigation was established on January 31, 2012 when the Judicial Panel

on Multidistrict Litigation ("JPML") transferred these four actions to the Eastern District of

Pennsylvania pursuant to 28 U.S.C. § 1407.  *See In re Nat'l Football League Players'*

*Concussion Injury Litig.*, 842 F. Supp. 2d 1378 (J.P.M.L. 2012).  The JPML found that the cases

"share factual issues arising from allegations against the NFL stemming from injuries sustained

while playing professional football, including damages resulting from the permanent long-term

effects of concussions while playing professional football in the NFL" and that "centralization

under Section 1407 in the Eastern District of Pennsylvania will serve the convenience of the

parties and witnesses and promote the just and efficient conduct of the litigation."  *Id.* at 1379.

In total, over 5,000 players have filed substantially similar lawsuits.

### C.    Proceedings in this Court

The Court convened an  initial status conference on April 25, 2012.  At the conference,

the Court selected Christopher A. Seeger of Seeger Weiss LLP as Plaintiffs' Co-Lead Counsel

for the MDL proceedings, and requested that another co-lead counsel from a Philadelphia-based

firm also be selected.  [ECF No. 64.]  Plaintiffs selected Sol Weiss of Anapol Schwartz as Co-

Lead Counsel.  [ECF No. 72.]  Plaintiffs also created, and the Court approved, a Plaintiffs'

Executive Committee ("PEC") and Plaintiffs' Steering Committee ("PSC") composed of various

attorneys for the plaintiffs who filed the cases pending before the Court.  *Id.*  The PEC included

then-proposed Class Counsel, Gene Locks and Steven C. Marks, and the PSC included then-

proposed Subclass Counsel, Arnold Levin and Dianne M. Nast.  In its July 7, 2014 Preliminary

Approval and Class Certification Order, the Court appointed all six of the aforementioned counsel were appointed as Class Counsel, Messrs. Seeger and Weiss as Co-Lead Class Counsel and Mr. Levin and Ms. Nast as Subclass Counsel.  The other members of the PEC and PSC were appointed as Of Counsel.  [ECF No. 6084.]

Collectively, Class Counsel amassed a database of their thousands of individual clients. The database included any diagnoses players had received and other medical information, subject to the protections of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-91, 42 U.S.C. § 1320d-2, as well as other player-specific information which Class Counsel organized and analyzed, along with their experts.  *See* Seeger Decl., Ex. 1, ¶ 20.

The Court established a schedule for Plaintiffs to file Master Administrative Complaints and for the NFL Parties to brief the threshold legal issue of whether Plaintiffs' claims are preempted by federal labor law.  [ECF No. 64.]  Plaintiffs filed a Master Administrative Long-Form Complaint, [ECF No. 83], and a Master Administrative Class Action Complaint for Medical Monitoring, [ECF No. 84], on June 7, 2012.  Plaintiffs then filed an Amended Master Administrative Long-Form Complaint, [ECF No. 2642], on July 17, 2012.  The NFL Parties filed motions to dismiss Plaintiffs' Master Administrative Complaints on preemption grounds on August 30, 2012, [ECF Nos. 3589, 3590], and Plaintiffs filed papers in opposition to that motion. [ECF Nos. 4130-34.]  The NFL Parties filed replies, [ECF Nos. 4254-55], and Plaintiffs' surreplies closed the briefing [ECF Nos. 4589, 4591].  The Court heard oral argument on the motions on April 9, 2013, and that motion has been *sub judice*.

### D.      Mediation

On July 8, 2013, the Court directed Plaintiffs and the NFL Parties to enter mediation. The Court appointed retired Judge Phillips as the mediator, and directed Judge Phillips to report back to the Court on or before September 3, 2013 with the results of mediation.  [ECF No. 5128] The Court held its ruling on the NFL Parties' motions to dismiss on preemption grounds in abeyance until the September 3, 2013 deadline, and it instructed the Settling Parties and their counsel to refrain from publicly discussing the mediation process or disclosing any discussions they may have as part of that process, without further order of the Court.  Plaintiffs were represented in the mediation by Co-Lead Class Counsel, Messrs. Seeger and Weiss, Class Counsel, Messrs. Marks and Locks, and Subclass Counsel, Mr. Levin and Ms. Nast.  *See, generally* Seeger Decl., Ex. 1; Levin Decl., Ex. 8; and Nast Decl., Ex. 9.

Following his appointment by the Court, Judge Phillips actively supervised and participated in the mediation process, and he regularly kept the Court apprised of the status of the process.  Judge Phillips presided over numerous negotiation/mediation sessions, including in-person and telephonic meetings with counsel, either jointly or in separate groups.  The mediation process culminated in the execution of a Term Sheet on August 29, 2013.  *See* Declaration of Mediator and Former United States District Judge Layn R. Phillips [ECF No. 6073-4].

Following the mediation, Judge Phillips executed a declaration in which he explained why he believed, based on his oversight of the mediation process and extensive experience in mediating other class and complex actions, the proposed settlement was fair, reasonable and adequate.  [ECF No. 6073-4 at ¶¶ 18-19.]  Judge Phillips noted the challenges that plaintiffs faced in proving their claims, as well as the risks the NFL Parties faced if they chose to litigate. [*Id.* at ¶¶ 12-17.]  He observed that the resulting settlement "represents a thoughtful, deliberative,

extraordinary and comprehensive settlement that will benefit thousands of NFL retirees and their families." [*Id.* at ¶ 18.]  Although the parties subsequently resumed negotiations and agreed to an uncapped settlement, the other key terms of the settlement negotiated with Judge Phillips's assistance remained unchanged, including the Monetary Award Grid.

### E.      Public Announcement of the Proposed Settlement

On August 29, 2013, the Court announced that "in accordance with the reporting requirements in [its] order of July 8, 2013, the Honorable Layn Phillips, the court-appointed mediator, informed [the Court] that the plaintiffs and the NFL defendants had signed a Term Sheet incorporating the principal terms of a settlement."  The Court "commend[ed] the parties and their counsel on their extensive and good faith negotiations and thank[ed] Judge Phillips for his diligence in assisting the parties in reaching an agreement."  The Court further commented that "the interests of all parties would be best served by a negotiated resolution of this case.  The settlement holds the prospect of avoiding lengthy, expensive and uncertain litigation[.]"  [ECF No. 5235.]  In its Order, the Court reserved judgment on the fairness and adequacy of the Settlement pending the Settling Parties' presentation to the Court of the Settlement Agreement, along with motions for preliminary and final approval.  *Id.*  Thereafter, the parties negotiated the Settlement Agreement that they submitted for preliminary approval in January 2014.

### F.      Court's Appointment of a Special Master

On December 16, 2013, pursuant to Rule 53, the Court appointed Perry Golkin to serve as Special Master to assist the Court in evaluating the economic aspects of the proposed settlement in view of its financial complexities.  [ECF No. 5607.]  Mr. Golkin agreed to serve in this capacity without compensation.  All expenses reasonably necessary to fulfill his duties were

to be shared equally by the Plaintiffs and the NFL Parties prior to final approval, and the allocation may be adjusted at the time of final approval.

G.    **The Court's Denial Without Prejudice of Plaintiffs' Motion for Preliminary Approval, and Review of Supporting Documentation by the Special Master**

Following months of further negotiations on the details of the settlement, Plaintiffs and the NFL Parties reached a final agreement, executed a Class Action Settlement Agreement, and moved for preliminary approval of the settlement. [ECF No. 5634.]

On January 14, 2014, the Court denied the motion without prejudice. [ECF No. 5657.] The Court praised the "commendable effort" of the parties in negotiating the class action settlement, and recognized that the settlement was the result of "good faith, arm's length negotiations." [ECF No. 5657 at 10.] At the same time, the Court expressed concerns about whether the proposed $675 million Monetary Award Fund would be sufficient to pay the contemplated awards to all qualifying class members, although the Court acknowledged that Plaintiffs had represented that their economists' analyses confirmed that there would be sufficient funding to provide benefits to all eligible class members. The Court denied the motion for preliminary approval without prejudice so as to allow the parties to provide the Court "with the information needed to evaluate the fairness of the proposed settlement." It directed the parties to share the documentation described in their submissions with the Special Master. [ECF No. 5658.]

Guided by the Court's Memorandum Opinion and the Special Master, the parties worked from January to June to provide the Court with the assurance that "all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their related claimants will be paid." *See* ECF No. 5657, at p. 10. In the course of conducting these further analyses, the parties

negotiated a revised Settlement Agreement with no cap on the Monetary Award Fund.  [ECF No. 6087].  Under the current Settlement Agreement, the NFL Parties must pay all valid claims for the next 65 years.  The significant award levels detailed in the Monetary Award Grid [ECF No. 6087-2], however, stayed the same.  While the parties continue to believe that the original $760 million settlement fund would have been sufficient to compensate all class members with valid claims, they have now guaranteed that all class members with  valid claims will receive an award without any concern that their projections might have been inaccurate due to some unpredictable factor or unforeseen events.  In exchange for agreeing to uncap the deal, the NFL Parties required the additional of certain measures designed to prevent fraudulent claims.  Nevertheless, under the new deal, the NFL Parties remain responsible for funding the Monetary Award Fund, the BAP, and the Education Fund, as well as paying, either directly or through their funding of the Monetary Award Fund or the BAP, for the notice costs, class attorneys' fees, and the fees and expenses of the Special Master, the Claims Administrator, and the BAP Administrator and certain fees of the Lien Resolution Administrator.

### H.    The Court Grants Preliminary Approval of the Revised Settlement

The Court Plaintiffs filed a second motion for preliminary approval on June 25, 2014. [ECF No. 6073.]  The Court preliminarily approved the settlement and certified the Settlement Class on July 7, 2014.  [ECF Nos. 6083 & 6084.]  Citing the involvement of Judge Phillips and Special Master Golkin, the Court concluded that the "hard-fought negotiations," were conducted in "good faith" and at "arm's length."  [ECF No. 6083, at 10.]

The Court recognized all of the significant benefits of the Settlement.  *Id*. at 5-7.  It also noted that in exchange for all of these benefits, class members agreed to provide the NFL Parties with releases and that "[i]n contrast to the previous version of the Settlement Agreement, the

Settlement Class Members who receive Monetary Awards are not required to dismiss pending

and/or forebear from bringing litigation relating to cognitive injuries against the [NCAA]  and

any other collegiate, amateur, or youth football organization."  *Id*. at 7.

The Court recognized the "hurdles" and "significant legal challenges facing Plaintiffs" in

proving their case-in-chief.  The Court noted that "Plaintiffs would be required to demonstrate

that retired players' injuries were caused by NFL Football play, as opposed to unrelated causes,

the natural aging process, or concussions or sub-concussive hits experienced in youth or college

football."  *Id*. at 11.  The Court also referenced the settlement's avoidance of "the threshold issue

of whether Plaintiffs' claims were preempted by federal labor law," and potential problems with

statutes of limitations and the assumption of the risk doctrine.  *Id.* at 10-11.  Additionally, the

Court recognized that the "NFL Parties could also contest whether there existed a consensus in

the scientific and medical communities at the time each player played sufficient to prove that the

NFL Parties knew or should have known – and concealed – the cognitive risks of football-related

concussions and sub-concussive hits."  *Id*. at 11.

The Court acknowledged that the parties had "not reached the discovery stage of

litigation," but concluded that "Co-Lead Class Counsel, Class Counsel and Subclass Counsel

possess adequate information concerning the strengths and weaknesses of Plaintiffs' claims

against the NFL Parties."  *Id*. at 10.  In support of this determination, the Court cited the

voluminous preemption briefing and the significant hurdles Plaintiffs faced if they continued to

litigate.  *Id*. at 10-11.[32]

---

[32]   The Morey Objectors unsuccessfully petitioned the Third Circuit pursuant to Rule 23(f) to
challenge the Court's Preliminary Approval Order.  The Third Circuit denied their petition on
September 11, 2014.  ECF. No 6166.  On August 5, 2014, the Green Objectors separately
appealed the Preliminary Approval Order, asserting jurisdiction under 28 U.S.C. § 1292(a)(1),
for their appeal.  ECF No. 6121.  That appeal is currently pending.

Additionally, the Court approved the proposed notice plan and ordered that notice be disseminated.  The Court also set forth specific procedures for opting out of the settlement and for lodging objections, with an opt-out/objection deadline of October 14, 2014.  Objectors had the opportunity to submit written objections and will have the opportunity to speak at the Fairness Hearing, scheduled for November 19, 2014, if they notified the Court of their intent to do so by November 3, 2014.  The Court specifically noted that it will "consider comments on and objections to the proposed Settlement Agreement" which are submitted and/or presented at the Fairness Hearing.  [ECF No. 6084, at 5-7.]

I.      **The Release of Actuarial Reports and Tabulations**

In connection with its denial of the initially presented motion for preliminary approval on January 14, 2014, the Court noted that "[t]he Declaration from Judge Phillips refers to 'analyses conducted by the independent economists or actuaries retained by the parties' to justify his belief that the $760 million to be paid by the NFL Parties 'is fair and reasonable and will be sufficient to fund the benefits to which the parties have agreed.'"  *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp.2d 708, 716 (E.D. Pa. 2014).  The Court directed the parties to share that documentation with Special Master Golkin.  *Id.*  The parties complied and produced actuarial reports to Special Master Golkin that formally compiled, organized and recorded information that had been imparted to Judge Phillips during the mediation process.  At Special Master Golkin's request, the parties' experts prepared some additional tabulations.

On September 8, 2014, the Court directed the Special Master to file the actuarial reports with the clerk of court.  [ECF No. 6160.]   On September 12, 2014, Special Master Golkin filed

the actuarial report and subsequent tabulations of Class Counsel's expert [ECF No. 6167] and the

NFL Parties' expert [ECF No. 6168].  In these reports, Class Counsel's expert forecasted that

3,600 former players would receive a Qualifying Diagnosis [ECF No. 6167 at 3] and the NFL

Parties' expert predicted that 3,488 former players would receive a Qualifying Diagnosis [ECF

No. 6168 at 42].