# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re:  National Football League Players' Concussion Injury Litigation | * * * * * * * * * * * | No. 2:12-md-02323-AB<br><br>MDL NO. 2323<br><br><br>HONORABLE ANITA B. BRODY<br><br>Civ. Action No. 14-00029-AB |

STATE OF OHIO     )
                       ) ss:
COUNTY OF CLERMONT  )

### AFFIDAVIT OF MATTHEW L. GARRETSON

    I, Matthew L. Garretson, having first been duly cautioned and sworn, do hereby depose and state as follows:

    1.    I am an adult over 21 years of age and am competent to testify to all matters contained herein.  I am the founder and Chief Executive Officer of The Garretson Resolution Group, Inc. and am an attorney licensed to practice law in the State of Ohio.  I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

### Garretson Resolution Group Experience and Expertise

    2.    The Garretson Resolution Group, Inc., doing business as Garretson Resolution Group ("**GRG**"), was founded in 1998 and currently employs 398 professionals.  GRG has its principal offices in Cincinnati, Ohio; Charlotte, North Carolina; Chattanooga, Tennessee; and New Orleans, Louisiana. The teams performing lien resolution services and implementing the Baseline Assessment Program ("**BAP**") are located in GRG's Charlotte office, while the medical

claims service representatives dedicated to deliver Class Member services for the BAP program are located in GRG's New Orleans office.

3.      GRG is a neutral provider of administrative services to parties who are settling personal injury and/or other claims.  GRG's services include complex settlement administration; medical consultation program administration; resolution of healthcare reimbursement claims asserted by Medicare, Medicaid, other governmental agencies such as the Veterans' Administration, and private healthcare entities; mandatory insurer reporting under Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, 42 U.S.C. § 1395y(b)(8) ("**MMSEA**"); and other related services.  A graphic detailing GRG's scope of services and depicting how they interrelate is attached hereto as **Exhibit A**.

4.      With regard to lien resolution in this present matter, the processes that will be utilized are state of the art and confer significant benefit to Class Members. GRG is a pioneer in the development of healthcare lien resolution programs in mass torts and class actions, and its programs have become the model for managing thousands of mass tort claims fairly, uniformly, and in a cost-effective fashion. In such programs, the Lien Resolution Administrator is able to leverage large volumes of claims, standardized processes, and proprietary technology to achieve the greatest possible reductions for Class Members while also meeting statutory obligations. Examples of success include working with the parties to develop comprehensive lien resolution programs in such matters as *In re Zyprexa Products Liability Litigation*, MDL Docket Number 1596 (United States District Court, Eastern District of New York), of which Judge Jack B. Weinstein said "The settlement techniques utilized in the instant litigation may provide a model for handling Medicare and Medicaid in future mass actions on a uniform, national basis." GRG has served extensively as Claims Administrator and/or Lien Resolution Administrator for the

courts and privately for the settling parties in many pharmaceutical, product liability, environmental exposure, and other matters. GRG was also recommended by all settling parties, and appointed by the respective federal judges, to serve as Lien Resolution Administrator in the Vioxx, Guidant, Medtronic, and Avandia Multi-District Litigation ("**MDL**") settlement programs *(In re: Vioxx Products Liability Litigation,* MDL Docket Number 1657 [United States District Court, Eastern District of Louisiana]; *In re: Guidant Corp. Implantable Defibrillators Products Liability Litigation,* MDL Docket Number 1708 [United States District Court, District of Minnesota]; *In re: Medtronic, Inc. Implantable Defibrillators Products Liability Litigation,* MDL Docket Number 1726, [United States District Court, District of Minnesota]; and, *In re Avandia Marketing, Sales Practices, and Product Liability Litigation,* MDL Docket No. 1871 [United States District Court, Eastern District of Pennsylvania]. In addition, GRG has employed such lien resolution protocols in its capacity of the neutral claims administrator in such matters as the World Trade Center ("**WTC**") Disaster Site property damage settlement and personal injury settlement *(In re: World Trade Center Disaster Site Litigation,* MDL Docket Number MC1 00, MC102 and MC103 [United States District Court, Southern District of New York]*)* as well as *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL Docket No. 2179 [United States District Court, Eastern District of Louisiana].

5.      GRG's lien resolution processes meet the obligations set forth in the settlement agreement, as well as Class Members' legal obligation to consider healthcare payers' interests in any settlement payments. Equally important, this process preserves Class Members' eligibility to receive benefits in the future. Regardless of the extent to which a Class Member has relied on his healthcare coverage in the past, GRG's formalized process ensures that payers will not deny coverage for any future medical expenses the Class Member might incur in connection with his

3

alleged injuries, on the ground that he has not satisfied his reimbursement obligation. This represents a significant achievement for the class. (For a detailed description of GRG's recommended lien resolution processes for this settlement, see the section "Healthcare Lien Resolution," below.)

6.     GRG has been appointed to provide claims administration and medical consultation program services by numerous parties and federal and state courts in a broad variety of national mass tort, multi-district litigation ("**MDL**"), and class action matters.    A comprehensive list of GRG's engagements is attached hereto as **Exhibit B**.

7.     In addition to the aforementioned past engagements, summaries of GRG's role in two current engagements follow:

a.     *In re Avandia Marketing, Sales Practices, and Product Liability Litigation*, MDL Docket No. 1871 (E.D. Pa.), with over 65,000 settling claimants and 80 settling law firms, is to my knowledge and experience the largest mass settlement of individual law firm claimant inventories (as opposed to a single, consolidated settlement of an MDL program) to date.  GRG was appointed by the defendant and nearly all of the settling law firms to perform a wide variety of services, including healthcare lien resolution.  GRG serves as a single conduit between the defendants and the 80 law firms representing the 65,000 settling claimants and, utilizing "state of the art" lien resolution processes, verifies that healthcare liens for each participating law firm's claimants are identified and resolved prior to disbursement.

b.     In *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL Docket No. 2179 (E.D. La.), GRG serves as the Claims Administrator of the Medical Settlement Agreement.  In this role, GRG manages all aspects of the Medical Settlement Agreement, including the Periodic Medical Consultation Program.  GRG

has established a national network of medical service providers to provide periodic medical consultation visits to qualifying Class Members. To that end, GRG identifies potential service providers, investigates the qualifications and credentials of the providers, and contracts with them to provide the covered services to the Class Members in their geographic region. GRG also coordinates and schedules all medical consultation visits for the Class Members (including reminder phone calls and letters), sends an explanation of benefits statement to the Class Member after each medical consultation visit, manages payment of the medical service providers for each consultation visit, and helps Class Members coordinate the program benefits with the Class Member's primary health insurance.

8.      In total, GRG's expertise allows it to administer medical consultation programs by effectively and efficiently organizing a network of healthcare providers, negotiating favorable rate structures, coordinating appointments, and compensating providers, as well as to effectively and efficiently identify, negotiate, and resolve healthcare liens with both governmental payers and private health insurers.

9.      GRG's success is the result of its deep and experienced team of experts, beginning with its executive management team. I serve as GRG's Founder and Chief Executive Officer; Jason Wolf serves as its President; Sylvius von Saucken, Esq. serves as its General Counsel and Chief Compliance Officer; Drew Dixon serves as its Chief Financial Officer; Dan Docherty serves as its Senior Vice President; Matt Francis serves as the Vice President of Healthcare Resolution; and Jon Paschal serves as Director of Medical Monitoring and Consulting. A copy of my biography setting forth my qualifications and experience is attached hereto as **Exhibit C**. A copy of Jason Wolf's biography setting forth his qualifications and experience is attached hereto as **Exhibit D**. Descriptions of the other executive team members'

experience and qualifications are available at http://www.garretsongroup.com/About-Us/Pages/Leadership-Team.aspx.

10.    The rest of GRG's team is also integral to its success.  In past and current programs, GRG has screened and retained a panel of licensed physicians to design and review diagnostic and evaluative criteria.  GRG also has retained a team of over forty registered nurses and medical billing coding specialists who have hands-on experience performing medical record and billing review.  GRG employs a team of accountants, actuaries, attorneys, fiduciary officers, process managers, and technologists, which has been specifically assembled to support large-scale medical consultation and baseline assessment programs as well as lien resolution matters. The team has been vetted over dozens of multi-district, complex mass tort and class action resolution programs.  Additional information concerning the qualifications of GRG's team is attached hereto as **Exhibit E**.

**Baseline Assessment Program**

11.    GRG is preliminarily appointed to serve as the Baseline Assessment Program ("**BAP**") Administrator in the NFL settlement.  GRG has extensive experience with coordinating medical payments among numerous care providers related to predetermined medical consultation or baseline assessment criteria.  GRG designs and administers each program to fit the specific terms and/or requirements of the parties, ranging from baseline evaluation to additional diagnosis to further procedures or benefits. Extensive baseline assessment programs can encompass thousands of prospective claimants and hundreds of medical service providers, and may require evaluations and other services for several years beyond the initial exposure.

12.    GRG currently administers medical consultation programs analogous to the Baseline Assessment Program, including the Periodic Medical Consultation Program under the

*Deepwater Horizon* Medical Settlement Agreement.  Our primary objectives in each program we administer are to provide access to quality healthcare professionals capable of assessing Class Members, and to educate Class Members on settlement benefits and how they can be accessed.

13.     In order to provide the best possible experience for Class Members, GRG maintains a dedicated medical claims service center in New Orleans, staffed by trained teams that serve solely as a resource to Class Members in these types of programs.  In addition to producing simple materials to help Class Members understand the benefits to which they are entitled, the medical claims service center communicates and explains the program's benefits, assists Class Members in accessing their benefits by finding the most conveniently located approved healthcare professionals, schedules appointments, and helps manage any interactions between the program and the Class Member's primary healthcare insurance, if applicable.  In addition, GRG has well-developed access and program orientation procedures for the medical service providers participating in these programs.  GRG's healthcare contracting group is experienced in contracting with provider organizations to offer high quality patient assessments at reasonable rates, and GRG's operations team administers appointments (including providing automated reminder phone calls and sending reminder letters with directions to the appointment) and adjudicates provider invoices quickly and accurately, utilizing proprietary software applications.

14.     Based upon the nuances of each specific program, GRG establishes a network of contracted medical practitioners, clinics, hospitals, and specialized medical centers to provide medical services. The process begins with identifying providers within a defined geographic proximity to the program's participants. GRG contacts providers to assess their capabilities and reviews information published by accrediting organizations to determine whether providers

satisfy the program's selection criteria. Qualification and credentialing require an in-depth review of each prospective provider's education, training, licenses, credentials, insurance coverage, and ability to deliver the required program services.

15.     Because this Settlement also provides for one or more Qualified Pharmacy Vendor(s), GRG will also select and contract with one or more national mail order pharmacies, utilizing the criteria listed in the Settlement Agreement.  In addition, GRG will work with all potential Qualified Pharmacy Vendors to ensure that each enrolled Qualified Pharmacy Vendor also offers the option to fill prescriptions at a local retail pharmacy, when necessary, due to the transportation and storage requirements of required therapies; the necessity of frequent medication dose adjustments during therapeutic trials by treating physicians; or the desire of Class Members to avail themselves of "face-to-face" counseling.   In enrolling Qualified Pharmacy Vendors, GRG will work to find the best balance between cost and accessibility options for Class Members, to include ensuring the availability of retail options for the reasons cited above.

16.     GRG's provider-relations team manages coordination efforts with enrolled providers and ensures that providers are properly trained on the program's requirements. The coordination efforts may include pre-authorizing or scheduling visits and examinations for program participants, coordinating benefits, and processing provider invoices and payments. The provider relations team utilizes GRG's HIPAA-compliant web portal to accommodate specific provider reporting and to facilitate the secure transmission of program documents and medical records.

17.     GRG has developed a process for efficiently validating, adjudicating, and processing medical invoice data. Medical service providers exchange invoice data with GRG

through electronic data interchange (EDI), saving time and reducing costs. GRG's billing management system is configurable to program specifications and capable of auto-adjudication. GRG coordinates directly with the accounting or fund administrator to disburse payments to providers, as directed by the program, through automated clearinghouse or by check.

18.     According to the terms of each specific program, GRG may communicate with program participants through our service center, program-specific web portal, and/or direct mailing. At our service center, highly trained representatives provide real-time assistance to program participants, such as explaining detailed program requirements, processing requests for program documentation, and scheduling appointments. The service center handles thousands of calls from program participants each week. The program-specific web portal is customized to enable participants to view or download documents, access records, and schedule appointments with medical service providers. All program communications are tracked, measured, and stored digitally.

19.     GRG issues in-depth analytical reports to the involved parties at the frequencies dictated by the program. Key reporting data points include participation rates, appointments/scheduling, diagnosed conditions, procedures performed and associated costs, cost analysis, and administrative expenses incurred.

20.     As participants' primary point of contact to these often detailed medical consultation programs, every GRG staff member strives to design and provide services that are easy for participants to access, understand, and leverage. To this end, we take full advantage of technologies that streamline and simplify the processes of appointment scheduling, invoice management, and reporting. Examples can be found in our provider-matching system, which quickly locates qualified providers in close proximity to participants' homes, and our automated

appointment reminder system that confirms scheduled appointments and provides detailed driving directions from the participant's home to the provider's practice site.

21.     The estimated administrative costs for the Baseline Assessment Program are $7,500,000.  In estimating administrative costs, GRG relied on its experience managing large nationwide programs, in particular the Periodic Medical Consultation Program under the *Deepwater Horizon* Medical Settlement Agreement.   Our cost projections were derived by estimating three categories of costs:  (a) fixed network and program setup costs, (b) fixed annual costs, and (c) variable costs.  To demonstrate the reasonableness of these estimates, we note that even at the plaintiffs' actuarial expert's projected participation level of 11,790 Retired NFL Football Players (of whom up to 750 would qualify for a Supplemental Benefit)[1], GRG's estimated administrative costs do not exceed $7,500,000.

22.     With respect to the estimated cost of BAP evaluations, GRG began by reviewing standard payer (i.e. Medicare and private health insurance) rates for these types of evaluations. The estimate of $3,500 per BAP evaluation is based on an analysis of standard payer rates, including the 75th Percentile of national Usual, Customary, and Reasonable rates (a commonly-used benchmark for healthcare costs) for both a neurology office visit with neurocognitive evaluation as well as an 8-hour session of neuropsychological testing. The 75th Percentile cost is $3,352.06, which was rounded to $3,500.  In our experience, the 75th Percentile is a high-end estimate, because providers will typically agree to contract for fees closer to the middle of the projected fees for these programs.  In addition, the parties consulted with various experts who reaffirmed that an approximate cost of $3,500 per baseline assessment was appropriate.

---

[1] Declaration of Thomas Vasquez, Ph.D. dated November 12, 2014.

| Baseline Itemized Evaluation | CPT Code | Medicare[2] | 50th Percentile UCR[3] | 75th Percentile UCR[3] |
|---|---|---|---|---|
| **Neurology Component** | | | | |
| Neurologist Office Visit | 99215 | $144.37 | $244.40 | $303.44 |
| Neurocognitive evaluation | 96116 | $94.93 | $185.85 | $301.94 |
| **Neuropsychological Component** | | | | |
| Battery, memory, verbal, oral testing (8 hours) | 96118 | $793.84 | $1,534.72 | $2,493.44 |
| Psychological testing | 96101 | $80.96 | $155.87 | $253.24 |
| **TOTAL** | | **$1,114.10** | **$2,120.84** | **$3,352.06** |

## Healthcare Lien Resolution

23.    When an individual is injured and the individual's healthcare insurance pays for the resulting medical costs, the insurer is then entitled to recoup their expenses if and when a third party is found to be responsible as may be demonstrated by a settlement, judgment, award, or other payment (whether or not there is a determination or admission of liability). Depending on the type of healthcare insurer, this right may arise under federal law, state law, and/or contractual language. Requiring resolution of legally enforceable statutory and governmental healthcare lien and/or reimbursement obligations prior to disbursement is not unique to the NFL settlement.   Given the broad scope of obligations that arise under current law related to healthcare liens and reimbursement claims in personal injury settlements as well as the significant penalties that may be imposed on settling parties for non-compliance, such

---

[2] 2014 National Rates for Medicare retrieved from OptumInsight, Inc., MICROMEDEX, American Medical Association, American Hospital Association (2013). OPTUM EncoderPro.com for Payers Professional. Retrieved from EncoderPro.com for Payers Professional Web site: https://www.encoderprofp.com/epro4payers/
[3] National Usual, Customary, and Reasonable rates taken from *National Fee Analyzer 2013* (OptumInsight, Inc.), pp. 455 and 477.

11

requirements have become commonplace in essentially all Mass Tort/Class Action personal injury settlements. With respect to Class Members in particular, the requirements set forth in Section 11 of the NFL Settlement Agreement are designed to ensure satisfaction of each Class Member's legal obligation to reimburse their healthcare insurers for medical costs paid on their behalf related to the Qualifying Diagnosis for which they are receiving compensation. These requirements are further intended to avoid potential penalties associated with non-compliance, such as direct action against the Class Member or other settling parties to recover unpaid claims/liens, interest being assessed on the claim/lien amount, and/or denial of the Class Member's future healthcare insurance benefits.

24.     GRG is preliminarily appointed to serve as the Lien Resolution Administrator ("**LRA**") in the NFL settlement. As the LRA, GRG will administer the process for the identification and resolution of all applicable and legally enforceable healthcare liens and/or reimbursement claims, which may include, among others, those related to state or federal governmental payers, Medicare Parts A and B (as contemplated by the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)), Medicare Part C and Part D plans, Medicaid, and other state or federal governmental healthcare programs with statutory reimbursement or subrogation rights such as the Defense Health Agency ("**DHA**") (formerly administered by TRICARE), the Department of Veterans Affairs, and Indian Health Services.

25.     GRG's lien resolution processes are "state of the art" and have been utilized in such matters as the *Vioxx Product Liability Litigation*, MDL 1657-L (Eastern District Louisiana); *In re: Avandia Marketing, Sales Practices, and Product Liability Litigation,* MDL Docket No. 1871; *In re Zyprexa Products Liability Litigation*, 451 F.Supp.2d 458, 461 (E.D.N.Y. 2006); and *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,*

MDL Docket No. 2179. It is important to note that settlement agreements related to all of the above referenced actions contain detailed requirements related to healthcare lien resolution prior to disbursement. These requirements stem from the potential exposure to liability/penalties all settling parties face in the event such legal obligations are not resolved.

26.     Achieving this level of success requires GRG to coordinate with scores of public and private entities, including the Centers for Medicare & Medicaid Services ("**CMS**"); the Benefits Coordination & Recovery Center ("**BCRC**"); all 53 state and territory Medicaid agencies; several other governmental healthcare payers, such as the Veterans Administration, the Defense Health Agency (previously managed by TRICARE), and Indian Health Services; as well as private healthcare providers and insurers and their recovery contractors. Having performed this work for over 15 years, GRG has strong and established work flow procedures with each of these entities and groups.

27.     Given the wide range of compensable injuries and complexities associated with the NFL settlement, GRG recognizes that a "one-size fits all" approach is not the appropriate means to resolve all lien obligations. Accordingly, GRG tailors its lien resolution programs to align with the facts and circumstances of each Class Member, the compensable injury, and the specific facts associated with the settlement program. With respect to Medicare Parts A and B in particular, GRG's processes provide several critical benefits, including but not limited to:

a.      Satisfaction of All Reimbursement Obligations. By participating in GRG's lien resolution processes with Medicare, settling parties satisfy any and all federal Medicare (Parts A & B) reimbursement obligations resulting from payments Medicare made for injury-related medical care from the first date of alleged exposure through the date of settlement. This uniform process meets the settling parties' legal obligation to protect Medicare's interest in

any settlement payments.

b.      Ensures Medicare Coverage in the Future. Regardless of the extent to which claimants have relied on Medicare coverage in the past, GRG's lien administration processes ensure that Medicare will not deny coverage for any future medical expenses a claimant might incur in connection with his/her alleged injuries at a later date for failure to satisfy his/her Medicare reimbursement obligation.

28.     Below is an outline of GRG's proposed methodology to resolve Class Member's Medicare reimbursement obligations related to their participation in the NFL Settlement.  As demonstrated below, GRG's proposed resolution programs account for the various nuances associated with each aspect of the NFL Settlement program.

a.      Proposed Resolution of Medicare's interests related to Level 2 Neurocognitive Impairment (i.e., moderate dementia) and Level 1.5 Neurocognitive Impairment (i.e., early Dementia)

(1)     GRG is presenting Medicare with a global model and proposed global resolution methodology to resolve all Medicare Part A and/or Part B fee-for-service recovery claims associated with Class Members receiving compensation from the Monetary Award Fund ("**MAF**") for a Qualifying Diagnosis of Level 2 Neurocognitive Impairment (i.e., moderate Dementia) and/or Level 1.5 Neurocognitive Impairment (i.e., early Dementia).  Global resolution refers to an agreement with CMS to resolve Medicare Part A and/or Part B reimbursement claims in connection with a mass settlement on an aggregate basis (as opposed to a claim-by-claim approach) based on values derived from compensable injury categories. GRG's global resolution process provides a fair and efficient means to resolve Medicare Secondary Payer obligations in connection with a mass tort settlement.

14

(2)     GRG researches and develops, with the assistance of Medical professionals, nursing staff, and billing and coding specialists, a global resolution model and associated Class Member-specific global repayment values (for each of the above referenced Qualifying Diagnoses) based on the clinical guidelines for the routine standard of care associated with the Qualifying Diagnoses.  GRG determines the medical costs associated with the common course of treatment for the above referenced Qualifying Diagnoses from date of injury through end of treatment or life expectancy (if applicable depending on the treatment associated with the Qualifying Diagnosis).  The Class Member-specific reimbursement values further account for factors unique to each individual including, but not limited to: (1) date of compensable treatment; (2) date of Medicare entitlement; and (3) enrollment in Other Primary Payer health coverage. These factors allow for adjustments in the values to ensure that the repayment obligation to Medicare aligns with the circumstances of each individual Class Member.

(3)     The reimbursement values derived from the above described global methodology are then deducted from the settlement awards of only those Class Members who: (1) qualify for a Monetary Award in connection with a Qualifying Diagnosis of Level 2 Neurocognitive Impairment or Level 1.5 Neurocognitive Impairment; and (2) are identified as entitled to Medicare Part A and/or Part B benefits during the period from date of injury through date of settlement.  The total global reimbursement amount paid to Medicare is based upon the modeled common course of treatment and associated medical costs for each of the above referenced Qualifying Diagnoses multiplied by the number of claimants in each injury category, subject to the adjustment factors described above. Payment of the aggregate or "global" sum of all these specific repayment amounts shall satisfy Medicare's past and future interests for fee-

15

for-service Medicare Part A and Part B items and services furnished to those Medicare-entitled Class Members receiving compensation for the above-referenced Qualifying Diagnoses.

(4)     The global resolution process provides several practical benefits to the settling parties. These benefits include (i) achieving the maximum possible reduction in liens for Class Members with like diagnoses; (ii) avoiding Class Member disbursement delays normally associated with identifying Medicare conditional payments for the individual related to the alleged injury; (iii) satisfying all requirements of the Medicare Secondary Payer statute and its accompanying regulations to open a tort recovery record with Medicare; (iv) satisfying Class Members' conditional payment reimbursement obligations; and (v) through recognition of payment in full satisfaction of the Medicare Program's interests, ensuring that Medicare will not deny relevant Class Members coverage for any future medical expenses they might incur in connection with their alleged injuries. These benefits to the Class are why this sort of approach has been successfully utilized in numerous MDL settlements involving personal injury claims since 2005.

b.     Proposed resolution of Medicare's interests related to Monetary Awards for the following Qualifying Diagnoses: Alzheimer's, Parkinson's, Death with Chronic Traumatic Encephalopathy, and Amyotrophic Lateral Sclerosis

(1)     GRG is requesting Medicare's agreement that Medicare Part A and/or Part B fee-for-service obligations for Class Members with a Qualifying Diagnosis of Alzheimer's, Parkinson's, Death with Chronic Traumatic Encephalopathy, and Amyotrophic Lateral Sclerosis will be resolved through the Traditional Recovery Demand Process, as opposed to the global resolution process described above. Medicare's Traditional Recovery Demand Process involves pulling claims on an individual basis to identify the exact payments

16

Medicare has made on behalf of a Class Member. Those claims are then audited to ensure that only medical expenses related to the compensable injury from date of injury through date of settlement are included in the repayment obligation. Note that a global resolution methodology may not be appropriate for these claims because there is not as readily predictable common course of treatment associated with these Qualifying Diagnoses. Medicare payments on behalf of claimants who develop these diagnoses could vary significantly for each Class Member. That said, as described more fully below, processes are in place to ensure that each of these Class Members for whom a traditional resolution process is required (as opposed to the global resolution process) receive the maximum possible reductions and a fair and equitable outcome.

(2)     Medicare's traditional recovery demand process affords Class Members with the opportunity to pursue administrative remedies (such as compromises, waivers, and/or appeals) to challenge the amount of Medicare's recovery claim in certain circumstances. GRG has extensive experience handling these matters and will review the facts and circumstances of each individual case to pursue the resolution strategy that meets statutory obligations and achieves equitable and fair reimbursement amounts for each Class Member. Based on historical work performed by GRG, Medicare Part A and/or Part B reimbursement obligations have consumed less than 20% of the gross settlement award on over 80% of cases resolved, with obligations in the majority of cases consuming less than 10% of the gross settlement award. GRG is able to begin identifying valid liens and establishing cases with lienholders prior to Class Members qualifying for and receiving a final proposed settlement award. Often, it is possible for GRG to determine the maximum possible repayment amount for any individual Class Member and to "hold back" that amount from each Class Member's gross settlement award. The Holdback amount represents the maximum Medicare repayment

obligation, which allows funds in excess of the Holdback amount to be disbursed to the Class Member (subject to Holdback amounts established for other lien types, if applicable, to the Class Member), rather than all funds being held until final adjudication. With respect to obligations associated with future medicals, GRG will evaluate these claims on an individual basis to determine whether a Medicare Set-Aside is appropriate to preserve a portion of funds to pay for future medical treatment associated with the compensable injury.

29.     With respect to Medicaid Obligations, GRG is presenting each of the Single State Medicaid Agencies with a standard protocol agreement and proposed resolution methodology to resolve all Medicaid recovery claims associated with the NFL Settlement.  Below is an outline of the proposed methodology.

a.     Proposed resolution of Medicaid's interests related to Monetary Awards for Qualifying Diagnosis: Alzheimer's, Parkinson's, Death with Chronic Traumatic Encephalopathy, Amyotrophic Lateral Sclerosis, Level 2 Neurocognitive Impairment, or Level 1.5 Neurocognitive Impairment.

(1)     GRG is presenting each of the Single State Medicaid Agencies with a standard protocol agreement and proposed resolution methodology to resolve all Medicaid recovery claims associated with Class Members receiving compensation from the Monetary Award Fund ("MAF") for the Qualifying Diagnosis of Alzheimer's, Parkinson's, Death with Chronic Traumatic Encephalopathy, Amyotrophic Lateral Sclerosis, Level 2 Neurocognitive Impairment, or Level 1.5 Neurocognitive Impairment.  GRG has executed this standard protocol agreement with the State Medicaid Agencies in numerous past settlement programs.  GRG's standard protocol agreement includes provisions that result in an effective and equitable resolution of each Medicaid Agency's interests as efficiently as possible.

(2)     One benefit of resolving state Medicaid obligations on an aggregate settlement program basis is the ability to include in the standard protocols a proposal that each Medicaid Agency's recovery claim will not exceed a certain percentage ("Holdback") of a Class Member's gross settlement award.  The Holdback allows for the partial disbursement of a Class Member's gross settlement award while withholding sufficient funds to satisfy any potential Medicaid recovery interest.  In past standard protocol agreements, the typical Holdback percentage recommended by GRG ranges from 20% to 30% of the Class Member's gross settlement award.  Since the Holdback amount is the maximum a Medicaid Agency can recover, this allows funds in excess of the Holdback amount to be disbursed to the Class Member (subject to Holdback amounts established for other lien types if applicable to the Class Member) rather than all funds being held until final adjudication. It is important to note that historically, GRG has been able to resolve Medicaid recovery claims for a majority of cases for an amount significantly less than the Holdback amount.  Any funds remaining after the Medicaid Agency's interest is fully satisfied may then be disbursed to the Class Member (subject to Holdback amounts established for other lien types if applicable to the Class Member).

(3)     Another benefit of resolving Medicaid obligations on an aggregate settlement program basis is the ability to include in the standard protocols a standard reduction of Medicaid's final recovery claim amount by a certain percentage ("Offset").  In past standard protocol agreements, the typical Offset percentage recommended by GRG is between 35% and 40%.  Note that in past programs, GRG has consistently received agreements to the recommended Holdback and Offset percentages from a majority of the Medicaid Agencies, and for those that did not agree with the recommended Holdback and Offset percentages, GRG has negotiated Holdback and Offset percentages with that particular Medicaid Agency.   Without the

inclusion of these Holdback and Offset provisions, Medicaid liens could consume an inequitable portion of a Class Member's settlement award.

(4)     After receiving an agreement to adopt GRG's standard protocols for Medicaid recovery, GRG will provide identifying information of Class Members who reside or have resided in a particular jurisdiction to the corresponding Medicaid Agency for verification of the Class Members receipt of Medicaid benefits.  For those Class Members that received Medicaid benefits, the Medicaid Agency will provide GRG with the itemized claims that make up the Medicaid Agency's repayment obligation.  GRG will then conduct an audit of those claims to ensure that only medical expenses related to the Class Member's Qualifying Diagnosis are included in the Medicaid Agency's repayment obligation.  Once a final repayment obligation is established, each Class Member's final Medicaid reimbursement amount will be the lesser of the Holdback amount or the final repayment obligation after applying the Offset. GRG will facilitate the satisfaction of the Medicaid Agencies' interests by ensuring payment of the final lien amount for each of the Class Members.

_____

Matthew L. Garretson

Sworn to before me and subscribed in my presence this 12th day of November, 2014.

_____

Notary Public

Suzanna R. Valentine
Notary Public, State of Ohio
My Commission Expires 01-06-2015

# Exhibit A

# GRG Scope of Services

**Fund Administration**
- Qualified Settlement Fund Administration
- Disbursement Services

**Claims Administration**
- Claims & Correspondence Processing
- *ComplianceConnection* Web Portal
- Claimant Education Call Center

**Medical Monitoring & Consulting**
- Provider Enrollment
- Program Administration

**Healthcare Lien Resolution**
- Medicare Resolution
- Medicaid Resolution
- Private Lien Resolution
- MMSEA Compliance

**Coordination Services**
- National Probate Coordination
- National Bankruptcy Coordination

**7** Mandatory Insurer Reporting (MMSEA)

Master Settlement Agreement

**1** Qualified Settlement Fund Administration



At Garretson Resolution Group, we navigate the complex demands of mass tort & class action settlements to achieve *efficient & cost-effective closure.*

**6** Healthcare Lien Evaluation & Resolution

**2** Special Master & Settlement Allocation

**5** National Probate/ Bankruptcy Coordination

**3** Medical Monitoring & Consulting



**4** Claims Administration

# Exhibit B

# GRG Experience

## Selected Physical Injury Appointments

*September 11th Victims Compensation Fund* (DOJ RFP Number DJJX-RFQ-11-0711)

*In re: Tronox Inc., Case No. 09-10156* (United States Bankruptcy Court, Southern District of New York)

*In re: Avandia Marketing, Sales Practices, and Product Liability Litigation,* MDL Docket No. 1871

*In re: World Trade Center Disaster Site Litigation,* MDL Docket Numbers MC100, 102, and 103

*In re: Medtronic, Inc. Sprint Fidelis Leads Products Liability Litigation*, MDL Docket No. 08-1905

*In re: Seroquel Products Liability Litigation, MDL Docket* No. *1769*

*In re: Vioxx Products Liability Litigation*, MDL Docket No. 1657

*In re: Guidant Corp. Implantable Defibrillators Products Liability Litigation*, MDL Docket No. 1708

*In re: Medtronic, Inc. Implantable Defibrillators Products Liability Litigation*, MDL Docket No. 1726

*In re: Zyprexa Products Liability Litigation*, MDL Docket No. 1596

*In re: OxyContin Litigation*, Civil Action No. 02-CP-18-1756 (Court of Common Pleas, South Carolina)

*Diet Drug Settlements* – privately retained Special Master / Administrator in 10 separate settlement groups

*In re*: Rezulin Products Liability Litigation, MDL Docket No. 1348

*In re: Gadolinium Based Contrast Agents Products Liability Litigation*, MDL Docket No. 1909

*In re: Bextra and Celebrex Products Liability Litigation*, MDL Docket No. 1699

*In re: Ortho Evra Products Liability Litigation*, MDL Docket No. 1742

*In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL Docket No. 2179.

*In Re C. R. Bard, Inc., Pelvic Repair System Products Liability Litigation*, MDL Docket No. 2187.

*In Re American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation,* MDL Docket No. 2325.

*In Re Boston Scientific Corp. Pelvic Repair System Products Liability Litigation*, MDL Docket No. 2326.

*In Re Ethicon, Inc., Pelvic Repair System Products Liability Litigation*, MDL Docket No. 2327.

*In Re Coloplast Corp. Pelvic Support Systems Products Liability Litigation*, MDL Docket No. 2387.

*In Re Cook Medical, Inc., Pelvic Repair System Products Liability Litigation*, MDL Docket No. 2440.

# Exhibit C





**Matt Garretson**
**Founder/ CEO**

Matt Garretson is the founding partner and CEO of Garretson Resolution Group (GRG), which provides mass tort/class action settlement allocation and fund administration services. The company also handles the resolution of reimbursement claims and liens, Medicare Set Asides and probate administration for individual and mass tort plaintiffs.  He received his BA from Yale University and his law degree at Kentucky's Salmon P. Chase College of Law.

Matt is a frequent speaker at Continuing Legal Education seminars about lawyers' professional responsibilities - including liens and reimbursement claims - in individual and mass tort settlements.  Furthermore, Matt is the author of a legal textbook published by West Publishing entitled *Negotiating and Settling Tort Cases*.  In addition, he has authored several articles[1] regarding professional responsibility in individual and mass tort settlements that have been published in many national, state as well as international publications.  In 2005, Loyola University Journal of Public Interest Law published an article he authored entitled, "A Practical Approach to Avoiding Conflicts of Interest in Aggregate Settlements."

Matt serves as the special master and/or administrator of settlement funds throughout the country in many product liability, civil rights and church-related sexual abuse matters.

Cincinnati Office                                                                          Charlotte Office
Phone 513.794.0400 • Fax 513.936.5186                        Phone 704.559.4300 • Fax 704.559.4331
6281 Tri-Ridge Blvd. • Ste. 300 • Cincinnati, OH • 45242        2115 Rexford Road • 4th Floor • Charlotte, NC • 28211

# Exhibit D





**Jason Wolf**
**President**

Jason's extensive operational and management experience was instrumental in the Garretson Resolution Group's (GRG) role in pioneering the field of third party Medicare Compliance in both single event and mass tort settlement programs. By identifying the needs of the settlement community and designing proprietary work flow processes, methodologies and systems, GRG built a practice that now employs over 200 professionals to serve its national client base.

Jason takes great pride in the company's leading position of recognizing issues in the changing landscape of healthcare providers' role in settlements. Jason's role in building strong business relationships with federal agencies, all state agencies, private health care plans and third party recovery contractors has assisted in the firm's success in facilitating fair agreements between interested parties (plaintiff, plaintiff counsel, defense, health care plan). GRG serves clients nationwide to ensure compliance with federal, state, military and private health care plans by defining and resolving obligations. GRG's work in mass tort settlements is nationally recognized and has resulted in formal appointments as "Lien Resolution Administrator" in dozens of settlements.

Jason has lectured to attorney and healthcare organizations, conferences and associations on various subjects including lien resolution in personal injury settlements, workers' compensation settlements and compliant use of Medicare Set-Aside funds.

Jason earned his graduate and undergraduate degree from Eastern Michigan University.

_____
www.garretsongroup.com

Cincinnati Office
Phone 513.794.0400 • Fax 513.936.5186
6281 Tri-Ridge Blvd. • Ste. 300 • Cincinnati, OH • 45242

Charlotte Office
Phone 704.559.4300 • Fax 704.559.4331
2115 Rexford Road • 4th Floor • Charlotte, NC • 28211

# Exhibit E

# GRG Resources: Multidisciplinary

|  | Program Managers, Associates & Analysts | Medical Billing & Coding Analysts; Registered Nurses | Medical Monitoring & Consulting Services | Supporting Information Technology |
|---|---|---|---|---|
| **Experience** | • +10 years administering GRG mass tort programs | • +10 years working for healthcare providers or payers<br>• Advanced experience auditing Medicaid, Medicare, private health claims<br>• Qualified by GRG medical review orientation process | • 3 years designing, creating, and implementing medical monitoring and consulting programs | • Existing & vetted web portal technology suite<br>• Minimization of cost by leveraging prior investment & existing infrastructure<br>• Rapid deployment & implementation |
| **Role** | • Analysis of complex data issues<br>• Development & maintenance of data controls | • Medical record evaluation<br>• Evaluation of provider bills [HCFA 1500; UB92]<br>• Application of quality assurance protocol | • Creation of program materials & procedures<br>• Network medical provider enrollment<br>• Class member communication<br>• Program administration | • Designed specifically for healthcare mass tort claims processing<br>• Self-service online claims form<br>• Claims workflow & processing<br>• Comprehensive transparent reporting |