# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## <u>DECLARATION OF ORRAN L. BROWN, SR.</u>

I, ORRAN L. BROWN, SR., hereby declare and state as follows:

## I.      <u>INTRODUCTION</u>

1.      *Personal Information.*  My name is Orran L. Brown, Sr.  I am the Chairman and a founding partner of BrownGreer PLC, located at 250 Rocketts Way, Richmond, Virginia 23231.

2.      *The Capacity and Basis of this Declaration.*  I am over the age of 21.  The matters set forth in this Declaration are based upon my personal knowledge and information received from the parties in this proceeding.  The opinions presented and recommendations made in this Declaration rest on my training and experience.

3.      *The Purpose of this Declaration.*  I submit this Declaration to describe my relevant experience, the mailing of the Notice to the Class as part of the Notice Plan developed for the proposed class action settlement of this litigation, the official public website used to provide information about the proposed settlement, and questions received by the Claims Administrator regarding the settlement.

## II.    BACKGROUND AND EXPERIENCE

**4.**    *Summary of My Personal Experience.*  I have worked in the mass claims area, including class actions, for over 25 years.  I have extensive experience as a lawyer handling class action proceedings, settlements and notices; as a claims administrator designing and implementing class action settlements, notice plans and notices to claimants and counsel; as a notice administrator; as a trustee or special master involved in multiple claim proceedings; and as an educator on class actions and other complex litigation.  My personal biography is attached to this Declaration as Attachment 1.

**5.**    *General Description of BrownGreer.*  BrownGreer has specialized in notice administration and settlement administration since my partner, Lynn Greer, and I founded the firm in 2002.  We are experts in the legal and administrative aspects of the design, approval, and implementation of notice plans, settlement programs and the design, staffing and operation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of multiple claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicles. We have played major roles in many of the largest and most complex multiple claim proceedings and multiple claim settlement programs in history, serving as administrators, special masters, trustees, or settlement counsel.  The BrownGreer summary attached as Attachment 2 to this Declaration provides detail on our firm.

**6.**    *Summary of Experience.*  BrownGreer has performed crucial administration or review roles in over 60 major programs involving over 31,000,000 class members and the disposition of over $29 billion in payments to qualifying claimants.  We have extensive experience in all aspects of notice and settlement design and implementation, including

2

developing and applying software programs to aid in the accumulation and updating of mailing lists and contact information of such persons and the review of materials received in settlement programs.

### III.   DEVELOPMENT OF THE MASTER MAILING LIST USED IN THE NOTICE PLAN.

**7.** *Commencement and Goals of the Analysis.* At the request of Class Counsel, BrownGreer assisted in the creation of the mailing list to be used in the direct mail component of the Settlement Class Notice Plan in this action. This work began on October 8, 2013, when BrownGreer first received a set of player data and began the process of aggregating various sets of data and the analysis necessary to assemble a list of known players possibly in the Settlement Class. The goals of this effort were to identify from available information sources: (1) as many living NFL Football Players (which includes players in the American Football League, the World League of American Football, the NFL Europe League and the NFL Europa League) as possible, whether currently playing or not playing, who may be within the Settlement Agreement's definition of Retired NFL Football Players; (2) as many deceased NFL Football Players as possible; (3) the family members of deceased NFL Football Players; and (4) the best known mailing address of living NFL Football Players and the family members of deceased NFL Football Players.

**8.** *Datasets Involved in this Analysis.* In the course of this work, BrownGreer received 31 datasets and created two more, for a total of 33 datasets of information on Class Members. These datasets varied by content and source. They included some combination of living and deceased players' names, dates of birth, dates of death, team names, years played, and the names, addresses, dates of birth, and dates of death of players' relatives. None of the datasets provided the same data points or provided complete address information on all player names.

3

Attachment 3 of this Declaration identifies each dataset by source and title, and shows the number of players and/or relatives and the type of information included in each dataset.

9. ***Datasets from Kinsella Media.*** Kinsella Media, LLC, the Settlement Class Notice Agent ("Kinsella Media"), provided BrownGreer with three sets of player data, one set of relative data, and three sets of combined player and relative data, shown in Rows 1-7 in Attachment 3. Kinsella Media created two of these datasets (Row 2 and Row 4) as a result of their involvement in *Dryer v. NFL*, Case No. 09-cv-02182-PAM-AJB (D. Minn.), a separate settlement related to NFL retiree publicity rights. Those two lists contained names and addresses for players and relatives. Kinsella Media obtained the list in Row 1 from STATS, LLC, an online sports statistics and information service. That dataset contained names, dates of birth, years played, and some address information for players. Kinsella Media created the two datasets in Rows 3 and 5 using NFL pension lists and the Social Security Death Index, to produce lists containing address information for players and relatives. Finally, Kinsella Media used public online sources to compile two sets of data on players who played in NFL Europe and the American Football League (Row 6 and Row 7).

10. ***Data from the NFL Parties.*** Class Counsel provided BrownGreer with seven sets of player data and one set of player and relative data that they had received from the NFL Parties (Rows 8-15 of Attachment 3). The NFL Parties derived this data from their records, including their pension lists, information on NFL Europe players, development and practice squad players, and deceased players.

11. ***Deceased Player List.*** Consulting firm ARPC in Washington, D.C., which had been retained by Class Counsel, provided BrownGreer with a dataset of deceased players (Row 16 in Attachment 3), which they had obtained from www.oldestlivingprofootball.com, a website

4

that lists names, dates of birth, dates of death, and the debut teams of all deceased professional football players.  This list was intended to include all former NFL players known to be deceased.

12.     *Lists from Certain NFL Teams.*  Class Counsel provided BrownGreer with datasets for living and deceased players, coaches, and relatives they received from 11 NFL teams:  the Baltimore Ravens, the Buffalo Bills, the Cincinnati Bengals, the Cleveland Browns, the Detroit Lions, the Green Bay Packers, the New York Jets, the Philadelphia Eagles, the San Francisco 49ers, the Tampa Bay Buccaneers, and the Tennessee Titans.  These are Rows 17-27 in Attachment 3.

13.     *Official NFL.com Website Data.*  BrownGreer programmed a web crawler to pull publicly available data from www.NFL.com, the official website of the NFL.  A web crawler is a program designed to search public websites systematically and record information made available by those sites, without having to pull the data by hand, one name at a time.  NFL.com maintains a database of statistics for what it calls "Current" and "Historical" players.  BrownGreer pulled player names, dates of birth, and/or places of birth for both Current and Historical players listed on this website.  This yielded the full names and dates of birth of 27,267 players (Row 28 in Attachment 3), of whom 3,010 were listed as Current and 24,257 as Historical.  This website does not provide mailing addresses for any of these current or former players.

14.     *DatabaseSports.com Data*.  BrownGreer also programmed a web crawler to pull publicly-available data from the www.databasesports.com website.  Databasesports.com maintains an online database of statistics and other information for popular sports, including football.  BrownGreer pulled player names, positions, dates of birth, and places of birth from that website for 22,138 players (Row 29 in Attachment 3).  This website does not furnish mailing

addresses for any players.  After comparing this dataset to the one that Kinsella Media had

obtained from STATS (Row 1 in Attachment 3), BrownGreer determined the two sets were

identical and that the databasesports.com site did not provide any additional or new information.

15.     ***Combined Dataset.***  BrownGreer compiled the 29 datasets described above into a

master dataset that included approximately 205,000 names.  Many of these names were

duplicates, because the names appeared in more than one—and often in several—of the 29 sets

of data.

16.     ***Initial Steps to Remove Duplicate Names from the Master Dataset.***  To identify

persons for whom the only information we had was a name or partial data and to remove

duplicate names from the master dataset, BrownGreer designed 20 tests and database queries to

run against the following fields:  name, address, date of birth, and date of death.  Before running

the tests, BrownGreer removed spaces and special characters from names and addresses.

BrownGreer also standardized the abbreviations of directions, street suffixes, and other common

address terms in all addresses.

17.     ***Identifying Entries with Name Only and No Other Information.***  The first test

identified 24,050 records that included only a name with no address information, date of birth, or

date of death.  BrownGreer removed these records from the dataset because there is no feasible

method to obtain a mailing list when all that is known about a person is a name, with no current

or former address, date of birth, date of death, Social Security Number, or other identifying

information.

18.     ***Tests to Remove Duplicate Entries.*** The other 19 tests compared names,

addresses, dates of birth, and dates of death to identify duplicate records.  The tests varied in

their level of restriction, with the more restrictive tests yielding the fewest duplicates and the

least restrictive yielding the most.  The most restrictive test searched for records where the full

name, full address, date of birth, and date of death were identical and did not identify any

duplicate entries.  The least restrictive test searched for records where the last name, first initial

of the first name, and the date of birth were identical.  After completing the tests, BrownGreer

retained the most complete record from among the duplicates, extracting information that one

record was missing from a less complete, but otherwise duplicative record, to compile the most

complete record available for each name entry.  Many entries contained name, address, and date

of birth.  Others had name and partial address, or name and date of birth, or name and date of

death, or some other combination of all these variable data points.  These tests removed 106,607

duplicates from the master dataset, resulting in a master set of 74,415 living and deceased

players and relatives.

   **19.** *LexisNexis.*  BrownGreer uses LexisNexis, a commercially available service, to

obtain best known mailing addresses for names with available data on old addresses, dates of

birth and/or dates of death.   LexisNexis provides addresses, dates of death, and known relative

information based on extensive database sources they access, including the Social Security Death

Index, the National Change of Address Database, national credit agencies and other databases.

   **20.** ***Initial Query with LexisNexis.***  To avoid unnecessary research costs and to assist

in further cleaning up the master dataset to remove duplicates, BrownGreer first separated the

known deceased individuals with a date of death from the other names and transferred

electronically to LexisNexis a list of 67,243 names of apparently living persons to obtain last

known addresses.  This yielded addresses for 55,636 names in the list and failed to find any

address for 11,607 names.  After receiving these results, BrownGreer scrubbed the dataset by

identifying and removing any duplicate records, which could now be identified because of the

identical addresses returned for the names that had certain differing data attributes from other lists and could not be safely removed until the addresses could be found to match.  BrownGreer removed 20,838 duplicates in this process, resulting in a dataset of 46,405 seemingly unique names of living individuals.

21.     *Query for Deceased Players.*  BrownGreer then returned that dataset to LexisNexis to run through their death database to identify whether any of the individuals were deceased but were not marked as deceased in any other yet available dataset.  This yielded an additional 2,289 deceased individuals.  BrownGreer combined that list with a separate list of 7,172 known deceased players for a total of 9,461 deceased individuals.  After analyzing the combined list for duplicates, BrownGreer removed 1,783 names as duplicates for a total of 7,674 deceased players and relatives.

22.     *Removing Deceased Relatives.*  In the Settlement Class Notice Campaign, the Notice was to be mailed to the living relatives of a deceased player, and not to a deceased relative.  Because BrownGreer derived names from different datasets that provided different data points, some deceased persons were identified as relatives while others were not.  We had to do further research to identify them and remove deceased relatives, who were not to receive the mailed Notice in the Settlement Class Notice Campaign.  A total of 123 persons marked as deceased relatives on the comprehensive list were identified as relatives in the original datasets, but to identify others, BrownGreer compared the names to our data on all known relatives and identified an additional 425 relatives who were deceased.  We then removed all known deceased relatives from the list of deceased persons, which left us a list of 7,126 deceased players for whom we needed to try to find information on living relatives so that the Notice could be mailed to them.

23. ***Identifying Family Members of Deceased Players.***  To obtain the most current list of the family members of deceased players, BrownGreer sent the list of 7,126 deceased players to LexisNexis, which ran the names of deceased players through their first degree relative database to identify known relatives based upon their association with the player in national address lists, credit applications, and other data sources, and to obtain best known addresses for those relatives.  First degree relatives include children, spouses, parents, and siblings. This resulted in 10,987 names of family members with available addresses.

24. ***Deceased Players without Relatives.***  After completing that search, there were 4,048 deceased players for whom neither BrownGreer nor LexisNexis was able to identify a living relative.  BrownGreer sent the list of those players to LexisNexis to obtain the players' last known addresses.  This resulted in 295 additional addresses.

25. ***Pro-Football-Reference.com Data.***  On December 8, 2013, after BrownGreer had completed the above steps, Class Counsel provided BrownGreer with a link to a post on the *Jeff Nixon Report* blog in which the author, Jeff Nixon, purported to list all professional football players since 1920 (Row 31 of Attachment 3).  The list included 23,204 names of players, their position(s) and years played, and a column indicating whether the player is deceased.  The list did not provide addresses, relative information, or dates of birth or death.  BrownGreer compared this list to the other datasets we had and found exact matches for all but 612 names as they appeared on the lists.  BrownGreer then went through each of the 612 names for which there was no exact match on one of the other lists and searched the other datasets for possible spelling variations of those names.  BrownGreer identified 11 names that were not on one of the other lists and sent those names to LexisNexis to try to find mailing addresses for them.  After these steps, BrownGreer identified one additional name with a valid address, that of a player.

26.    *Additional Lists from Certain NFL Teams.*  On December 18, 2013, Class Counsel provided BrownGreer with datasets for players from three additional NFL teams: the New York Giants, the Denver Broncos and the Kansas City Chiefs (Rows 32-34 of Attachment 3).  These three datasets contained a total of 1,829 names, including 1,559 players and 270 relatives.  None of the datasets included dates of birth or dates of death.  BrownGreer ran the tests described above to identify and remove duplicates and sent the combined dataset to LexisNexis to attempt to find current addresses and relatives of deceased players.  After these steps, BrownGreer identified an additional 621 names with addresses, consisting of 444 players and 177 relatives, who were not already in the comprehensive dataset.

27.    *Master Mailing List.*  On January 7, 2014, Class Counsel provided BrownGreer with instructions regarding the scope of the notice mailing list and BrownGreer finalized the list pursuant to those instructions, yielding a total list of 25,462 living players and 9,195 relatives of deceased players with addresses, for a total of 34,657 names with addresses in what became the Master Mailing List.

28.    *Updates to the Master Mailing List*.  In June 2014, Class Counsel asked BrownGreer to refresh the Master Mailing List.  BrownGreer sent the January 7, 2014 comprehensive list of 34,657 names of players and relatives to LexisNexis to identify any recently deceased players and any address changes that had occurred since that date.  This data analysis:

(a) Confirmed 29 additional addresses of players and relatives not previously confirmed.

(b) Yielded updated addresses for 5,784 players and relatives, which allowed BrownGreer to match 776 individuals as duplicates and remove them from the mailing list.

(c) Identified 71 recently deceased players and 150 relatives for 59 of those players.  This removed these 59 deceased player names from the mailing list and replaced them with the names and addresses of their relatives.

(d) Identified 43 relatives for 31 deceased players previously with no known relatives.  This removed these 31 deceased player names from the mailing list and replaced them with the names and addresses of their relatives.

29.     ***Final Master Mailing List for Original Mailing.***  After these last steps, we had a Master Mailing List consisting of 25,060 living players with addresses and 8,924 relatives of deceased players with addresses, for a total of 33,984 names with addresses.  The Mailing List Statistics report that is Attachment 4 to this Declaration provides a breakdown of the categories of players and relatives included on the Master Mailing List.  For each category, the Mailing List Statistics indicate whether BrownGreer obtained the addresses through data research or used the addresses as provided in the original data source.

30.     ***Establishing a Secure FTP Site for Data Transfers.***  BrownGreer created a secure FTP site for use in transferring the Master Mailing List to Smith Edwards Dunlap ("SED"), the firm that would mail the Notices to the individuals on the Master Mailing List, and Heffler Claims Group ("Heffler"), the firm maintaining the initial Call Center for the Settlement Program.  On June 24, 2014, BrownGreer posted to Master Mailing List to the Secure FTP Site for access by authorized persons from these two firms.

31.     ***Adding Counsel of Record to the Master Mailing List.***  Class Counsel directed BrownGreer to add counsel of record in MDL 2323 to the Master Mailing List.  BrownGreer logged on to PACER, entered a query for MDL 2323 in the Eastern District of Pennsylvania, and downloaded a list of counsel of record for the plaintiffs and defendants in this proceeding.  BrownGreer contacted the District Clerk's office to confirm that the list was current and that the Clerk updates the list regularly.  The Clerk's list included (1) 172 individual attorneys

11

representing plaintiffs; (2) seven attorneys representing movants; (3) the Special Master; and (4) 69 attorneys representing defendants and other corporate parties, including, among others, the NFL, various NFL teams, Roger Goodell, All American Sports Corp., Easton-Bell Sports., Riddell, and ESPN.  At Class Counsel's request, BrownGreer removed the Special Master and the 69 attorneys representing defendants and other corporate parties from the list.  BrownGreer also removed 10 attorneys from the list of plaintiffs' counsel who were marked as having terminated their status as counsel for any party, resulting in a net list of 169 attorneys.

32.     ***Announcement Regarding Master Mailing List on Public Website.***
BrownGreer included a statement on the public website for the Settlement Agreement, www.NFLConcussionSettlement.com, inviting Settlement Class Members and their attorneys to send an email to ClaimsAdministrator@NFLConcussionSettlement.com and furnish their name and current address (or the names and addresses of their clients). For any such emails received, BrownGreer checks the names provided against the Master Mailing List and informs the persons making this request whether the names appear on the Master Mailing List and at what addresses.  We have performed this service for several firms.

33.     ***Updating the Master Mailing List with Information Developed During the Notice Period.***  Working with SED and Heffler, BrownGreer established a process to update addresses for individuals included on the Master Mailing List and to add new individuals to the list.  Each week, BrownGreer receives through the secure FTP site any forwarding address updates, different addresses located by research on returns with no forwarding address, and any caller address changes as compiled by SED and Heffler through processing returned mailing, conducting additional data research and through calls to the Call Center.

After these updates each week, BrownGreer posts an updated version of the Master Mailing List to the secure FTP site.

34. ***Direct Requests to Update the Master Mailing List.*** BrownGreer receives requests to update the Master Mailing List directly through correspondence to the Claims Administrator P.O. Box and emails to the Claims Administrator email inbox. BrownGreer has also received requests to update addresses directly from law firms. In each instance, BrownGreer records the change in address to the Master Mailing List and forwards the new information to Heffler for the mailing of a new Notice packet. As of October 14, 2014, BrownGreer had received 137 such direct requests for updates to Settlement Class Member addresses.

35. ***Maintaining a History of All Address Changes.*** BrownGreer retains a history of all records received while compiling the original Master Mailing list and while processing the updates described above. For each record in the history, BrownGreer retains these data points:

   (a) The Notice ID assigned to the individual;

   (b) The individual's full name;

   (c) The individual's complete address;

   (d) The individual's date of birth, where available;

   (e) The source of the address, including whether BrownGreer received it from an original data source, obtained it through data research or received it through one of the update methods; and

   (f) The date BrownGreer received the updated address.

36. ***Current Mailing List.*** As of October 14, 2014, BrownGreer has completed a total of 3,258 updates to the Master Mailing List. Included in these updates were 34 requests sent

directly to BrownGreer and 151 requests to Heffler from individuals not previously included on

the Mailing List.  BrownGreer added these individuals to the Master Mailing List bringing the

total number of individuals to 34,167.  BrownGreer received the other 3,068 updates to the

mailing list from these sources:

> (a)  NCOA updated addresses from SED;

> (b)  Forwarding addresses from returned mail processed by SED;

> (c)  LexisNexis data research performed by Heffler on undeliverable mail;

> (d)  Updated addresses sent to BrownGreer by attorneys; an

> (e)  Updated addresses sent to BrownGreer by Class Members.

### IV.   THE OFFICIAL PUBLIC WEBSITE FOR THE PROPOSED SETTLEMENT

**37.    *Development and Launch of the Website.***  Pursuant to Section 4.1 of the

Settlement Agreement, and in consultation with the Parties and Kinsella Media, BrownGreer

developed a public, informational website, www.NFLConcussionSettlement.com, to provide

notice and additional courtesy information and services to the Settlement Class.  Following

the Court's entry of the Preliminary Approval Order on July 7, 2014, BrownGreer

coordinated with the Parties to receive approval to open the informational website.  On July

9, 2014, BrownGreer launched an initial version of the website to make available for

viewing, printing, and downloading PDF versions of the Long-form Notice and Settlement

Agreement.  On July 14, 2014, BrownGreer launched the comprehensive version of the

website that included the following five sections that remain on the site today:  (1) Home, (2)

Notice Materials, (3) Court Documents, (4) Frequently Asked Questions ("FAQs"),[1] and (5)

---

[1] Kinsella Media provided BrownGreer the initial 40 FAQs and answers for inclusion on the website on July 15, 2014. The FAQs section of the website displayed the following language on July 14-15 while those materials were still being developed:  "The parties to the Settlement are developing a set of Frequently Asked Questions with

(Footnote continued on next page)

Sign Up for Future Information.  Attachment 5 to this Declaration presents screen captures of all five of these pages.

38.     ***The "Home" Page.***  The "Home" page of the website serves as the site's primary landing page and provides introductory and summary information regarding the Settlement.  (Attachment 5 at 1.)  From this central page, website visitors can route easily to any of the site's four other pages using the top-anchored, horizontally oriented navigational bar.  The "Home" page also includes a prominent button inviting interested Settlement Class Members to take advantage of the "Sign Up for Future Information" feature discussed more thoroughly in Paragraph 42 below.  Additionally, on September 9, 2014, at the direction of the Parties, BrownGreer added a call-out box to the bottom of the page with detail on the Court-approved direct mail Notice campaign and an email address, ClaimsAdministrator@NFLConcussionSettlement.com, where Settlement Class Members can direct Notice-related or other questions.

39.     ***The "Notice Materials" Page.***  The "Notice Materials" page, available at www.NFLConcussionSettlement.com/NoticeMaterials.aspx, provides links to viewable, printable, and downloadable PDF versions of the (1) Long-form Notice, (2) Summary Notice, and (3) Injury Definitions (Exhibit 1 to the Settlement Agreement).  (Attachment 5 at 2.)

40.     ***The "Court Documents" Page.***  The "Court Documents" page, available at www.NFLConcussionSettlement.com/CourtDocs.aspx, provides links to viewable, printable, and downloadable PDF versions of the (1) Class Action Settlement Agreement with Exhibits,

---

answers. They will be available on this page soon."  Upon receipt of the FAQs set, BrownGreer immediately began coding the complete FAQs page and launched it in full on July 16, 2014.

(2) Injury Definitions,[2] (3) Preliminary Approval Order, (4) Preliminary Approval Memorandum Opinion, (5) Memorandum of Law in Support of Preliminary Approval, (6) Motion for Preliminary Approval, (7) Declaration of Layn R. Phillips, and (8) Declaration of Katherine Kinsella.  (Attachment 5 at 3.)  We will continue to add relevant materials to this page as they become available.

**41.**     ***The "FAQs" Page.***  The "FAQs" page, available at www.NFLConcussionSettlement.com/FAQ.aspx, presents the complete set of initial FAQs and answers that the Parties and Kinsella Media developed from the Long-form Notice, grouped into the following twelve sections:  (1) Basic Information, (2) Who Is Part Of The Settlement?, (3) The Baseline Assessment Program, (4) Monetary Awards, (5) Education Fund, (6) Remaining In The Settlement, (7) How To Get Benefits, (8) Excluding Yourself (Opting Out) From The Settlement, (9) The Lawyers Representing You, (10) Objecting To The Settlement, (11) The Court's Fairness Hearing, and (12) Getting More Information. (Attachment 5 at 4.)  In consultation with the Parties, BrownGreer also added a thirteenth section titled "Questions in Addition to Those in the Long-Form Notice" on September 9, 2014 that, as described more thoroughly in Paragraph 51 below, serves as a location for the posting of new FAQs and answers that present as the Program matures.  Settlement Class Members can navigate directly to subject matters of interest or can browse the complete set of FAQs.  Attachment 6 to this Declaration presents all 41 of the current FAQs and answers available on the official website.

**42.**     ***The "Sign Up for Future Information" Page.***  The "Sign Up for Future Information" page, available at www.NFLConcussionSettlement.com/SignUp.aspx, allows

---

[2] At the request of the Parties, BrownGreer included the "Injury Definitions" presented in Exhibit 1 to the Settlement Agreement on both the "Notice Materials" and "Court Documents" pages of the Settlement Program's website.

visitors to the website to identify themselves as Retired NFL Players or representatives, counsel, or family members of Retired NFL Players and enter primary contact information – Name, Address, Phone Number, and Email Address – for the Program's future use in providing additional information on how to register for the Settlement, if it is approved by the Court and that approval becomes final.  (Attachment 5 at 5.)  BrownGreer worked with the Parties to make clear on this page that this is *not* itself "registering" for the Settlement but is, instead, simply a courtesy function to request to receive information in the future from the Claims Administrator.  The system allows law firms with multiple clients to sign up *en masse*.  Additionally, as described in more detail in Paragraph 48 below, we also sign up individuals who mail correspondence to the Program requesting more information or who call the Program's toll-free phone line requesting the same.

43.   ***Website Visitor Activity.***  As of October 14, 2014, the Settlement Program's website had received 62,989 unique visitors, with representation from all 50 states, as determined by IP Address.  Those visitors included Retired NFL Players, Family Members of Retired NFL Players, and Counsel for Retired NFL Players, among others.  As of October 14, 2014, 3,175 visitors utilized the "Sign Up for Future Information" feature and provided contact information for the Program to use.  We will send emails and letters following Final Approval to provide notification of important dates and developments to those who signed up.  Tables 1 and 2 in Attachment 7 to this Declaration present detailed information on website visitor activity and sign-ups.

44.   ***Secure Web-based Portal.***  Pursuant to Article IV of the Settlement Agreement, if the Settlement Agreement receives Final Approval the informational website at www.NFLConcussionSettlement.com will become the primary engine for participation in

17

the Settlement Program.  It will include a secure web-based portal for use by the Parties and

Settlement Class Members and their designated counsel to accommodate various future

phases of the Settlement Program, including Registration, Claim Package submission, and

review outcome notification.  In consultation with the Parties, BrownGreer will develop,

establish, and maintain the secure portal and the informational pages of the website for the

remainder of the Settlement Program.

### V.      CLASS MEMBER INQUIRIES RECEIVED BY BROWNGREER

45.    ***Post Office Box.***  On July 2, 2014, BrownGreer set up a P.O. Box (P.O. Box

25369, Richmond, VA 23260) to which Settlement Class Members and others could send their

Opt Out requests and general questions about the Settlement Agreement or the proposed

Settlement Program.  The Long-form Notice and the informational website instructed Settlement

Class Members to direct their Opt Out requests to this P.O. Box.  BrownGreer retrieves mail

from this P.O. Box each business day and did so on Saturdays as well in the period surrounding

the October 14, 2014 Opt Out Deadline.

46.    ***Mail Intake and Storage.***  To maintain a permanent digital record of everything

received in hard copy relating to the Settlement Agreement, BrownGreer intake specialists scan

all materials received in the P.O. Box to create a PDF of each envelope and all its contents and

saves that PDF to a secure server dedicated to this Program.  BrownGreer has also retained all

hard copy materials received in a secure storage room in one of BrownGreer's offices in

Richmond, Virginia.

47.    ***Claims Administrator Email Inbox.***  BrownGreer established the email address

ClaimsAdministrator@NFLConcussionSettlement.com to allow Settlement Class Members and

others to direct general questions about the Settlement Agreement and proposed Settlement

18

Program ("CA Inbox").  This email address appears on the official public website of the

Program.  BrownGreer monitors the CA Inbox, responds to all inquiries within one business day,

and converts each email exchange into a PDF and saves it to the secured server.  The emails

themselves are also preserved in live form in BrownGreer's email archiver.

48.     ***Automatic Sign Up to Receive More Information.***  BrownGreer adds each person

who sends a letter to the Claims Administrator's P.O. Box or an email to the CA Inbox seeking

information about the Settlement to the database we maintain of persons who would like to

receive more information about the Settlement Program at a later date, particularly when the

Registration process opens and the deadline to register, without the person having to make that

specific request.  As of October 14, 2014, BrownGreer had automatically signed up 47 persons in

this fashion to receive more information, 22 of whom who sent letters to the P.O. Box and 25 of

whom emailed the CA Inbox.  Table 2 in Attachment 7 to this Declaration presents more

information on these persons.

49.     ***Updates to the Notice Mailing List.***  If a Settlement Class Member sends a letter

to the P.O. Box or the CA Inbox updating his or her name or address from how it appears on the

Master Mailing List used in the Settlement Class Notice Plan , BrownGreer makes the necessary

changes to the Master Mailing List.

50.     ***Where the Inquiry Corresponds to Existing FAQ.***  If a Settlement Class Member

poses a question that is answered by an existing FAQ, BrownGreer sends a response to the

Settlement Class Member that includes the existing FAQ and urges the person to consult with his

or her attorney, if represented.  Attachment 8 is a template of BrownGreer's normal response to

such inquiries.  As of October 14, 2014, BrownGreer had included an existing FAQ in 21 of the

50 letters and emails to which it had responded.

**51.** ***Where the Inquiry Does Not Correspond to Existing FAQ.*** If a Settlement Class Member poses a question that does not correspond to an existing FAQ, BrownGreer reviews the Settlement Agreement, the Long-Form Notice, and the Preliminary Approval Order and uses its program experience to draft a possible response. This draft response may include a proposed new FAQ. BrownGreer sends the original question and the draft response to Class Counsel and Counsel for the NFL Parties for their review and input. After Class Counsel and Counsel for the NFL Parties approve the draft response or provide changes, BrownGreer sends that response to the Settlement Class Member. If Class Counsel and Counsel for the NFL Parties approve a new FAQ, BrownGreer adds it to the "FAQs" page of the informational website as part of the section titled "Questions in Addition to Those in the Long-Form Notice." As of October 14, 2014, Class Counsel and Counsel for the NFL Parties had approved and BrownGreer had added one new FAQ to the "FAQs" page of the informational website.

**52.** ***Total Number of Letters and Emails Received.*** As of October 14, 2014, BrownGreer had received a total of 66 letters and emails. Table 3 in Attachment 7 to this Declaration presents detailed information on the representation status of the individuals who sent letters and emails to BrownGreer, as well the number of letters or emails that did or did not require a response and the FAQs BrownGreer included in its responses.

**53.** ***Correspondence Not Requiring a Response.*** Of the 66 letters and emails received, BrownGreer did not respond to 15 of them. Those 15 letters and emails were as follows:

    (a) 10 letters and emails were from Settlement Class Members wishing to update their contact information who did not request a response;

    (b) Three letters and emails were from individuals who did not identify a specific question; and

(c) Two letters and emails were unsolicited advertisements for products or services.

**54.    *Correspondence Requiring a Response.*** Of the 66 letters and emails received as of October 14, 2014, 51 of them warranted a response. Those 51 letters and emails concerned these subjects:

(a) 26 letters and emails were from Settlement Class Members requesting confirmation that they are included in the Settlement Class;

(b) 10 letters and emails were from were from Settlement Class Members seeking information about how to register for Settlement Benefits;

(c) Five letters and emails were general requests for additional information;

(d) Five letters and emails were from Settlement Class Members wishing to update their contact information who requested a response confirming the update;

(e) Four letters and emails were from third party lienholders seeking information about potential payments to specific Settlement Class Members; and

(f) Though the Long-Form Notice and the Settlement website instructed Settlement Class Members to mail their requests to Opt Out of the Settlement Class to the P.O. Box BrownGreer had established, one Settlement Class Member emailed her request to the CA Inbox. BrownGreer responded to the email and included this request to Opt Out of the Settlement Class in the Opt Out Report of the Claims Administrator filed with the Court on November 3, 2014.

**55.    *Tracking all Inquiries.*** BrownGreer tracks all letters and emails it receives and its responses to store the correspondent's identifying information, including his or her name, address, and phone number, if included; his or her Notice ID if the correspondent appears on the Master Mailing List; attorney information, if included; and the name of the Retired NFL Football Player to whom the correspondent is related. We also track the receipt date of the correspondence, the nature of the inquiry, and the response date.

**56.    *Transmittal of Copies to Class Counsel, Counsel to the NFL Parties, Kinsella Media, and Heffler.*** Each Monday, BrownGreer sends PDFs of the correspondence it received and responded to during the previous week, as well as its responses, in a Zip file to Class

Counsel, Counsel for the NFL Parties, and representatives of Kinsella Media and Heffler.  In addition to emailing copies of correspondence, BrownGreer posts them on a secure internet access site available only to authorized representatives of Class Counsel and Counsel for the NFL Parties, referred to as the "Party Access Portal," where they can be viewed and downloaded at any time.

## VI.  BROWNGREER'S EXPERIENCE WITH SIMILAR CLAIMS PROGRAMS

57.  ***Experience with Significant Personal Injury Settlement Programs.***  BrownGreer has extensive experience administering large-scale settlement programs that provide benefits of various types to injured persons.  We have had the honor of serving courts, class members, and parties in many of the nation's most significant personal injury settlement programs, including the $4.85 billion Vioxx Personal Injury Resolution Program (claims of heart attack and stroke relating to the painkiller Vioxx; 60,000 claimants), the $1.15 billion Sulzer Knee Prosthesis Settlement Program (revision surgery and other claims arising from an allegedly defective hip replacement device; 27,000 claimants), the $3.55 billion "Fen-Phen" Diet Drugs Settlement Program (claims of heart valve damage, stroke and other complications from use of the Diet Drugs; 600,000 claimants), and the $3 billion Dalkon Shield Claimants Trust (claims of pelvic inflammatory disease, spontaneous abortions and other injuries from use of an intrauterine contraceptive device; 400,000 claimants).  We currently serve in the ongoing $2.475 billion ASR Hip Implant Settlement Program (revision surgery and other claims arising from an allegedly defective hip replacement device; 7,500 claimants), the $650 million Pradaxa Settlement Program (claims of death and bleeding events from use of a blood thinning medication; 4,800 claimants), and the $100 million NuvaRing Settlement Program (arterial and venous thromboembolism and other injuries relating to a contraceptive device; 3,800 claimants), among

many others.  These past and present programs are similar to the proposed Settlement here not only in terms of size and scope, but also in terms of purpose and plan.  Each provided an avenue for class members alleging a range of personal injuries in progressive levels of severity to apply for defined benefits, such as a cash payment or an opportunity for medical monitoring within an approved network of physicians.  Our experience with these and other multifaceted personal injury claims resolution programs informs and facilitates our handling and implementation of each new program.  We simplify processes and employ systems and services that reduce the effort required of claimants and their counsel in submitting and completing claims, and that increase their understanding of and satisfaction with the program.

58.     ***The Settlement Includes Features of a Successful Benefits Program.***  The proposed Settlement uses the proven components of a successful claims resolution program of its size and type.  Programs of this scale and nature require well-planned and effective practices for claimant interaction with the program, thorough and efficient procedures for analyzing claimant records, a clear framework for making eligibility and award determinations, and reliable payment and anti-fraud processes.  This Settlement Agreement contains key and routine design elements that leverage the successes of historic resolution programs like those identified in Paragraph 57 above, that permit a claims administrator to implement the program and the parties' intentions correctly, including:

(a) **Registration:**  It is advisable to inject a stage in the program during which claimants will come forward to be identified and provide basic information pertinent to eligibility in the program, as this Settlement Agreement provides.  This allows the parties, the Court and the claims administrator to know the universe of persons who may present claims and to use the information provided to facilitate the ease of submission at later stages and prevent fraudulent duplicate claims or claims from fictitious persons.

(b) **Use and Exposure:**  The settlement agreement must define the persons who are eligible to seek benefits and how they prove use of the product in question or

exposure to the events giving rise to the claim, as this Settlement Agreement defines the playing history and required proof to be an eligible Settlement Class Member.

(c) **Injury Categorization:** The best programs specify the categories of injuries that will be compensable, the medical conditions that place a claimant in a particular category, and the proof required of such conditions, including the types of physicians and timing of diagnoses that can be used to establish eligibility.

(d) **Claim Form Submission:** Class Members who wish to assert claims must be required to assert that claim in a claim form that provides essential information on the claimant, use and exposure to the product or event involved in the program and injuries experienced. This process is best left for the claims administrator to design efficiently, working with the parties, to permit completion of the application in a user-friendly online process, using information on the claimant obtained during the registration process and eliciting only the information essential to the eligibility determination under the criteria codified in the Settlement Agreement.

(e) **Physicians Network:** Establishing an accessible group of physicians who can provide testing under proven diagnostic criteria in a controlled environment is a major settlement benefit and can be administered successfully. For example, the network of cardiologists made available under the Diet Drugs settlement provided echocardiograms and consultations to over 205,000 class members.

(f) **Deadlines:** A settlement plan should include clear and administrable deadlines for claimants and the claims administrator to act. Such deadlines enhance the progress of the program and create legitimate expectations of timing and performance.

(g) **Completing Claims:** A successful program incorporates a notice and deficiency cure process with a right to appeal to permit the completion of claims missing required information.

(h) **Fraud:** Requiring more extensive audits of claims randomly and as indicated by the materials submitted on a claim are effective measures to detect and deter fraudulent claim submissions.

(i) *Reporting:* The Claims Administrator should provide, as the Settlement Agreement requires, regular reports to the Court and the Parties on the claims received and the progress of administration.

These core resolution program components and others outlined in the Settlement Agreement

posture this Settlement for successful implementation.

59.    *Experience with the Proposed Settlement's Design and Requirements.*

BrownGreer has deep experience designing and implementing these elements of a successful

claims facility and the many other detailed components necessary for effective resolution of

significant personal injury settlements like this one.

(a) ***Combined Practitioner's and Administrator's Mindset.***  Our firm includes past federal court law clerks, national and international law firm litigators, and other experienced former practitioners whose practical experiences position us uniquely to understand the needs and aims of the Court and the Parties.  This skillset is particularly important in court-supervised class action settlements like this one, where a formal legal process controls the timing and deliverables required to launch and close a successful program.  Our firm's attorneys work intimately with our internal teams of analysts, project managers, claimant support agents, software programmers, and claims reviewers, allowing us to combine seasoned lawyering with a pragmatic understanding of the need for organized and centralized information and data, effective communication, and the administrative processes necessary to resolve multiple claims efficiently.

(b) ***User-Friendly Interfaces and Class Member Exchanges.***  We routinely develop processes and platforms to receive claims and supporting documentation, and we do so with an intentional eye toward offering intuitive and seamless experiences to those who interact with the programs we administer.  We create interactive databases that allow for instantaneous exchange of information, eliminating costs associated with data entry delays, thereby increasing the efficiency and ease of sharing critical information.  We establish secure web-based portals that allow for real-time data capture, ad hoc reporting by external users, and automatic notification of deadlines accompanied by email blasts alerting parties to these deadlines and requirements.  With a commitment to exceptional customer service and unceasing transparency, we support *pro se* and represented claimants alike and offer them real-time views into the status and progression of their claims.  We carry Rule 23's "plain language" dictate through to all of our interactions with claimants, carefully crafting call center scripts, portal user guides, and written notices for eligibility and award determinations.  For all class members who are represented by their personal counsel, we establish dedicated points of contact for each such law firm so that every law firm receives individualized attention with personal historic knowledge of the status and nature of that firm's claimant inventory.

(c) ***Effective and Administrable Procedures.***  In every case, we draw upon the Parties' and Court's express guidance given in the Settlement Agreement and related orders.  Where that express guidance affords discretion to the claims administrator or when unique situations arise beyond express guidance given, we develop Claims Administration Procedures ("CAPs") to implement the Settlement Agreement.  We memorialize such CAPs following thorough input from the Parties, just as we will do in this Program alongside development of related procedures for the Baseline Assessment Program.

(d) **Quality Assurance.**  BrownGreer employs a variety of market-leading strategies to measure and monitor internal quality and efficiencies in the administration of settlement programs.  We constantly analyze program data and, if needed, make adjustments based on the analysis of that data to increase output speeds, streamline processes and maximize efficiencies.  All employees receive thorough training, and each employee completes a phased battery of knowledge-based tests throughout the program to help our management teams identify potential opportunities for supplemental training.  BrownGreer equips each claims reviewer with access to detailed FAQs and access to electronic Q&A systems that allow reviewers to ask questions and receive answers quickly and efficiently, driving individual claims to correct conclusions and building a knowledge base for future claims handling in the program.  We also build discrepancy triggers into every review platform to alert the quality assurance team to potentially questionable data whenever there is an opportunity for human error in the process.  We design our systems to leverage infallible computer-based calculations and minimize human touch, but where human touch is required, we challenge those data points to increase accuracy.  Any claims that trigger a discrepancy metric receive a specialized quality assurance review.  Our dedicated special investigations team uses a variety of techniques to prevent the payment of any fraudulent claims, and we develop case-specific fraud prevention mechanisms and additional processes, such as the use of a positive pay reconciliation approach.

(e) **Qualified MAF Physicians.**  BrownGreer has significant experience in working with physicians and networks of physicians of many different specialties and disciplines as prescribing or treating physicians who have provided medical care to claimants in programs, or as experts, medical advisory panels or consultants in the design of medical eligibility criteria or review findings on submitted claims in a compensation program.

(1) As one example of such work, in *In re:  Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, Case No. 99-20593, MDL No. 123 (E.D. Pa), we serve as Wyeth's liaison to the trust facility created under the national class action settlement of heart damage claims relating to the "fen-phen" diet drugs.  Beginning in 2000, BrownGreer has been involved in the monitoring of the physicians network performing echocardiograms in the screening program created by the Settlement Agreement.  We monitor the credentials and performance of the Board-certified cardiologists with Level 2 training in echocardiography used by the trust for the medical review of claims and the Level 3 trained Board-certified cardiologists used by the supervisory court as its Technical Advisors.  We work with Class Counsel in the selection of the three highly credentialed and Level 3 trained Board-certified cardiologists who serve on a monitoring panel appointed by the court and to implement the supervisory role played by that body.  Throughout that program, we have measured and monitored the diagnoses and submissions of thousands of cardiologists, surgeons and other physicians who rendered diagnoses for the claimants involved in the settlement program.  In this role, we analyzed diagnoses

rendered by these cardiologists to detect outliers and assisted the client in developing a plan for assuring consistency of the diagnostics.  We continuously monitor cardiologist findings involving complex medical criteria to identify opportunities for clarifying the criteria and standards through education and training.

(2) We are accustomed to analyzing the credentials and qualifications of physicians to serve in roles needed by a settlement program, such as the selection of Qualified MAF Physicians under Section 6.5 of the Settlement Agreement, and are adept at monitoring the performance and integrity of such physicians through sophisticated data analytics and work product analyses.  In this program, we will analyze the geographic locations, results and performance of each Qualified BAP Physician to assess his or her suitability for services as a  Qualified MAF Physician, as well as our own analysis of the education, training, experience, credentials, insurance coverages, ability to provide necessary examinations in a timely manner, and geographic proximity to Retired NFL Football Players to assemble and keep fresh and current the inventory of Qualified MAF Physicians eligible to provide Qualifying Diagnoses in this program. Establishing a pre-screened and monitored network of providers will facilitate the uniform and proper application of the diagnoses criteria in the Settlement Agreement, minimize the incidents of non-compliant diagnoses, and assist in preventing inaccurate or fraudulent claim submissions.

All of the above best practices serve to make each resolution program as accessible and manageable as possible to all relevant stakeholders, and deploying these strategies in this NFL Concussion Settlement Program will engender effective, efficient, and user-friendly experiences from program launch to close.

I, Orran L. Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 12th day of November, 2014.

_____
Orran L. Brown

# ATTACHMENT 1



## FOUNDING PARTNER
# ORRAN L. BROWN



BROWNGREER PLC
250 Rocketts Way
Richmond, Virginia  23219-4052
Direct Dial:  (804) 521-7201
Facsimile:  (804) 521-7299
obrown@browngreer.com

Orran provides guidance on the legal and administrative aspects of the design, approval, and implementation of notice programs and claims facilities for the resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicles, and serves as or represents the trustees or directors of such facilities. He has served as a claims administrator, as a trustee directing the implementation of a settlement program, and as a special master presiding over discovery, records collection, and deposition scheduling and calendaring in coordinated multidistrict proceedings.

### *Education*

**Harvard Law School**
J.D. *cum laude,* 1981 (research assistant to Professor Lloyd Weinreb in criminal law and process)

**Hampden-Sydney College**
Hampden-Sydney, Virginia.  B.A. *summa cum laude*, Government and Foreign Affairs, 1978 (GPA 4.0 out of 4.0; Co-Valedictorian; Chairman of the Student Court; Baker Scholar; Jefferson Scholar; Phi Beta Kappa; Omicron Delta Kappa; Pi Sigma Alpha; Eta Sigma Phi; received Algernon Sydney Sullivan Medallion for Leadership at graduation)

### *Professional Experience*

**BrownGreer PLC**, Richmond, Virginia.
2002 – Present.  Partner and Founder of a law firm that specializes in MDL and multiple claim litigation and the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicles, and in serving as or representing the trustees or directors of such facilities.

**Bowman and Brooke, LLP**, Richmond, Virginia.
1999 – 2002.  Partner.  Founder and Director of the Mass Claims Resolution Group and member of the firm's Executive Committee.  Specialized in mass tort, class action, and other group claims facility matters, proceedings and appeals.  Advised management, trustees, and claims administrators



on the efficient design and operation of group claims facilities, strategies for the successful resolution of claims, the negotiation and drafting of resolution plans, legal proceedings to obtain court approval, and compliance with the agreements or court orders governing the claims resolution process.  Also handled several litigation matters.

**Adjunct Professor, University of Richmond School of Law.**
1997 – 2004.  Taught an upper-level course on MDL proceedings and complex litigation from 2001 through 2004.  Taught trial and appellate practice from 1997 through 2001.

**Outside Counsel to the Dalkon Shield Claimants Trust,** Richmond, Virginia.
1990 – Present.  Served as the primary outside general counsel to the $3.5 billion trust established in the Chapter 11 bankruptcy proceeding of the A. H. Robins Co. to handle over 400,000 personal injury claims arising from the Dalkon Shield IUD.  Advised the Trust's management, trustees, inside counsel, and other outside counsel in the United States and other countries on the legal and managerial aspects of the Trust's fiduciary duties, operations (including employment issues and the Trust's lease, banking, investment and other contractual relationships), claims processing arrangements, and coordination and design of Alternative Dispute Resolution, arbitration, and trial proceedings on Dalkon Shield Claims.  Represented the Trustees in the judicial proceedings in the bankruptcy and district courts, and many appeals to the Court of Appeals for the Fourth Circuit, arising out of implementing the bankruptcy Plan.  Performed the same role for the two other trust funds created to handle Dalkon Shield Claims.  Handled the steps and proceedings to close the three trusts and create insurance coverage and an escrow agent for run-off issues until 2008.

**Christian, Barton, Epps, Brent & Chappell**, Richmond, Virginia.
1986 – 1995.  Partner and Member of the firm's Executive Committee.  Handled securities fraud class actions, employment, products liability and commercial litigation in state and federal courts in Virginia and elsewhere.  Counseled clients on employment law issues.  Arbitrator for the American Arbitration Association for securities fraud and construction cases.  Joined the partnership in 1990.  Began representing the Dalkon Shield Claimants Trust in 1990 while still a member of this firm.

**Litigator in Houston, Texas.**
1982 – 1986.  First with Liddell, Sapp, Zively, Brown & LaBoon and then with Miller, Keeton, Bristow & Brown after the Liddell, Sapp Litigation Chairman moved to that firm.  General litigation matters, including the *Pennzoil v. Texaco* suit arising from Texaco's acquisition of Getty Oil.  Tied for the highest score on the February 1983 Texas bar examination.

**Law Clerk to the Hon. Robert R. Merhige, Jr.**
1981 – 1982.  United States District Court for the Eastern District of Virginia, Richmond, Virginia.

***Professional Activities***

- Virginia State Bar
- State Bar of Texas (Inactive status)



- Permanent Member, Fourth Circuit Judicial Conference
- Founding Member, Richmond Inn of Court

*Bar Admissions*

- Virginia and Texas
- United States District Courts in Virginia and Texas
- United States Supreme Court
- United States Court of Appeals for the Fourth Circuit
- United States Court of Appeals for the Fifth Circuit

*Selected Speaking and Writing*

- American Conference Institute:  *11th Annual Drug and Medical Device Litigation.  Making the Decision to Settle and Devising Novel End-Game Strategies*.  December 15, 2006.
- American Conference Institute:  *Resolving Mass Tort Products Liability Claims.  What You Must Know About Settlement Administration*.  March 28, 2007.
- American Conference Institute:  *Resolving Mass Tort Products Liability Claims.  Developing Your Settlement Position with Respect to Mass Tort Product Claims*.  March 28, 2007.
- Louisiana State Bar Association's 8th Annual Class Action/Mass Tort Symposium.  *The Function and Scope of the Claims Administration Process*.  October 17, 2008.

*Personal*

- Born in Lynchburg, Virginia, 1956
- Grew up on a family tobacco farm in Bedford County, Virginia, and worked on the farm until law school
- Married to Ellen Firsching Brown  (Former Environmental lawyer with Hunton & Williams, the Office of the Attorney General of Virginia and Dominion Resources; former law clerk to Hon. Frederick P. Stamp, Jr., United States District Judge for the Northern District of West Virginia)
- Four children (Orran, Jr., Carly, Read and Drew)
- Board of Trustees, Hampden-Sydney College, July 2009 – 2013
- Hampden-Sydney College Richmond Alumni Leadership Group, 2006 – present
- City of Richmond Charter Review Commission, 2008 – 2010
- Board of Directors, Housing Opportunities Made Equal, 2014 – present
- Board of Directors, The Corporation for Jefferson's Poplar Forest, February 2009 – present
- Board of Directors, Monument Avenue Preservation Society, 2007 – 2010
- Board of Trustees, The Roller-Bottimore Foundation, 2011 – present
- Various community activities, including coaching youth sports

# ATTACHMENT 2



# FIRM OVERVIEW

## NOVEMBER 10, 2014

BROWNGREER PLC
250 Rocketts Way
Richmond, VA 23231
www.browngreer.com



# BROWNGREER PLC

## OUR FIRM

BrownGreer PLC is a premier claims resolution firm that assists clients with the legal and administrative aspects of the design, approval and implementation of claims facilities to provide damages payments, medical monitoring or other benefits for the resolution of mass claims. We also develop and implement the notice campaigns and other communications to the potential and actual claimants involved in such programs. Members of our firm also serve as or represent the trustees or directors of claims facilities.

> "[BrownGreer] is probably one of the best outfits in the country to handle this kind of a disposition of funds and management of a class action."
>
> The Honorable John A. Gibney, Jr.
> U.S. District Judge, Eastern District of Virginia
> *Morgan v. Richmond School of Health and Technology, Inc., No. 3:12-cv-00373-JAG,*
> April 23, 2013

BrownGreer was formed in 2002, but our principals, Orran Brown and Lynn Greer, have been at the center of some of the most significant multiple claims resolutions for more than 25 years. Since that time, our mission has been to fulfill the responsibilities of any settlement program to the satisfaction of all involved parties, including claimants, counsel, courts and other governmental entities.

As a firm of lawyers, analysts, software programmers and claims reviewers, we combine highly skilled lawyering with a practical understanding of the need for organized and centralized information and data, effective communication, and the administrative processes necessary to resolve multiple claims efficiently.

> "[T]he expedited resolution of approximately fifty thousand personal injury claims could not have been achieved without the extraordinary effort and outstanding work put forth by BrownGreer PLC in its role as Claims Administrator."
>
> The Honorable Eldon E. Fallon
> U.S. District Judge, Eastern District of Louisiana
> *In re Vioxx Products Liability Litigation,* MDL Docket
> No. 1657, December 9, 2011

We administer and process claims for settlements arising from class actions, multidistrict litigation, government enforcement proceedings and other aggregation vehicles. Our court-supervised and voluntary settlement program experience covers causes of action including antitrust, bankruptcy, consumer protection, labor and employment, and products liability.

Our firm handles complex claims administration programs in a variety of industry contexts, including consumer products, food and beverage, financial services, pharmaceuticals and medical devices, and retail.

## OUR SERVICES

- ► Settlement Agreement Consultation
- ► Notice Administration
- ► Claims Processing
- ► Payment Programs
- ► Program Communications Management
- ► Claims Administration Audits
- ► Electronic Discovery
- ► Special Master



# SELECT EXPERIENCE

| | **SELECT PERSONAL INJURY SETTLEMENT PROGRAM EXPERIENCE** | | | |
|---|---|---|---|---|
| | **PROGRAM DESCRIPTION** | **ROLE** | **APPROX. PROGRAM SIZE** | **APPROX. SETTLEMENT FUND** |
| 1. | ***In re Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La.).** Class action settlement to resolve claims arising from the use of prescription painkillers. | Claims Administrator | 60,000 Claimants | $4.85 Billion |
| 2. | ***In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL Docket No. 1203 (E.D. Pa.).** Class action settlement to resolve claims arising from the "Fen-Phen" diet drugs. | Liaison for the Defendant to the Settlement Trust | 600,000 Claimants | $3.55 Billion |
| 3. | ***In re A.H. Robins Company Inc., Debtor (In re Dalkon Shield Claimants Trust)*, MDL Docket No. 211 (Bankr. E.D. Va.).** Class action settlement created in the Chapter 11 bankruptcy proceeding of the A.H. Robins Company to resolve claims arising from the Dalkon Shield intrauterine device. | Counsel to the Settlement Trust | 400,000 Claimants | $3 Billion |
| 4. | ***In re DePuy Orthopaedics, Inc., ASR Hip Implant Products*, MDL Docket No. 2197 (N.D. Ohio)**. Voluntary settlement program for claims relating metal-on-metal hip implant devices. | Claims Administrator | 7,500 Claimants | $2.475 Billion |
| 5. | ***In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL Docket No. 1203 (E.D. Pa.).** Voluntary settlement program to resolve opt outs from the class action settlement of claims arising from the "Fen-Phen" diet drugs. | Claims Administrator | 66,000 Claimants | $2.63 Billion |
| 6. | Confidential voluntary settlement program of claims arising from the use of a prescription medication. | Claims Administrator | 12,000 Claimants | Fund Uncapped; $1.4 Billion Disbursed |
| 7. | ***In re Sulzer Orthopedics and Knee Prosthesis Products Liability Litigation*, MDL Docket No. 1401 (N.D. Ohio)**. Class action settlement of claims relating to hip and knee implants. | Claims Administrator | 27,000 Claimants | $1.15 Billion |
| 8. | ***In re National Football League Players' Concussion Injury Litigation*, MDL Docket No. 2323 (E.D. Pa)**. Class action settlement to resolve claims the National Football League ignored and concealed risks of repetitive traumatic brain injuries. | Claims Administrator | TBD | Fund Uncapped |
| 9. | ***In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL Docket No. 2385 (S.D. Illinois)**. Class action settlement to resolve claims arising from the use of blood thinning medication. | Claims Administrator | 4,800 Claimants | $650 Million |



| | SELECT PERSONAL INJURY SETTLEMENT PROGRAM EXPERIENCE | | | |
|---|---|---|---|---|
| | **PROGRAM DESCRIPTION** | **ROLE** | **APPROX. PROGRAM SIZE** | **APPROX. SETTLEMENT FUND** |
| **10.** | Confidential voluntary settlement program of claims arising from the use of a prescription medication. | Claims Administrator | 2,700 Claimants | Fund Uncapped; $279 Million Disbursed |
| **11.** | ***In re Guidant Implantable Defibrillators Products Liability Litigation Settlement***, **MDL Docket No. 1708 (D. Minn.)**. Class action settlement to resolve claims related to a medical device company's cardiac resynchronization therapy devices, implantable cardiac defibrillators and pacemakers. | Advised Defendant and Defense Counsel | 26,000 Class Members | $240 Million |
| **12.** | ***In re Nuvaring Products Liability Litigation***, **MDL Docket No. 1964 (W.D. Mo.)**. Class action settlement to resolve claims concerning a contraceptive device. | Claims Administrator | 3,800 Claimants | $100 Million |
| **13.** | ***In re Phenylpropanolamine (PPA) Products Liability Litigation***, **MDL Docket No. 1407 (W.D. Wash.)**. Class action settlement trust established to resolve claims related to an over-the-counter weight loss product. | Claims Administrator | 500 Claimants | $60 Million |
| **14.** | ***In re Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation***, **MDL Docket No. 2100 (S.D. Ill.)**. Class action settlement to resolve claims related to a prescription oral contraceptive. | Claims Administrator | 9,000 Claimants | $24 Million |
| **15.** | ***In re OxyContin Litigation - All Cases***, **No. 2002-CP-18-1756 (Dorchester County S.C. Ct.)**. Class action settlement by a pharmaceutical company regarding a prescription pain killer. | Notice and Claims Administrator | 3,600 Class Members | $4.25 Million |
| **16.** | ***In re Seroquel Products Liability Litigation***, **MDL Docket No. 1769 (M.D. Fla.)**. Multidistrict litigation proceedings involving the antipsychotic prescription drug Seroquel. | Special Master; Project Manager | Company Did Not Disclose | Company Did Not Disclose |



| | SELECT ECONOMIC LOSS SETTLEMENT PROGRAM EXPERIENCE | | | |
|---|---|---|---|---|
| | **PROGRAM DESCRIPTION** | **ROLE** | **APPROX. PROGRAM SIZE** | **APPROX. SETTLEMENT FUND** |
| **1.** | ***Gulf Coast Claims Facility***. Voluntary claims program to resolve economic loss and physical injury claims arising from the April 20, 2010 oil spill in the Gulf of Mexico. | Claims Administrator; Transition Coordinator | 600,000 Claimants | $20 Billion cap; $6.5 Billion disbursed |
| **2.** | ***In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010***, MDL Docket No. 2179 **(E.D. La)**. Class action settlement to resolve economic loss and property damage claims arising from the April 20, 2010 oil spill in the Gulf of Mexico. | Claims Administrator | 220,000 Claimants | Uncapped Fund; $3.9 Billion disbursed |
| **3.** | ***In re Black Farmer's Discrimination Litigation***, No. 08-mc-0511 PLF **(D.D.C.)**. Class action settlement to resolve claims of discrimination against African-American farmers by the U.S. Department of Agriculture regarding farm loans and loan servicing for claimants who had missed deadlines in a prior settlement. | Claims Review and Evaluation | 40,000 Claimants | $1.25 Billion |
| **4.** | ***United States Securities and Exchange Commission v. American International Group, Inc.***, No. 06-Civ. 100-LAP **(S.D.N.Y.)**. Securities enforcement action settlement between the SEC and a multinational insurance corporation over allegations of accounting fraud and related shareholder litigation. | Audited the Claims Administrator | 260,000 Class Members | $843 Million |
| **5.** | ***In re Genetically Modified Rice Litigation***, MDL Docket No. 1811 **(E.D. Mo.)**. Voluntary claims program to resolve claims concerning genetically modified rice and crop values. | Claims Administrator | 12,000 Claimants | $750 Million |
| **6.** | ***In re Chinese-Manufactured Drywall Products Liability Litigation***, MDL Docket No. 2047 **(E.D. La.)**. Class action settlement for the remediation of homes containing defective drywall manufactured in China. | Claims Administrator; Lynn Greer, Special Master | 25,000 Claimants | Blend of Uncapped and Capped Funds; $395 Million disbursed |
| **7.** | ***United States v. National Treasury Employees Union***, No. 93-1170 **(D.C. App.)**. Class action settlement between a federal employees' union and the U.S. Government for back payment of wages. | Trustee of Settlement Trust | 212,000 Class Members | $173 Million |
| **8.** | ***Blando v. Nextel West Corp.***, No. 02-0921-FJG **(W.D. Mo.)**. Class action settlement by a wireless telecommunications provider to resolve claims under Missouri law involving "cost recovery fees" charged to customers. | Advisor to the Court | 5,000,000 Class Members | $165 Million |
| **9.** | ***In re Capital One Telephone Consumer Protection Act Litigation***, MDL Docket No. 2416 **(N.D. Ill.)**. Class action settlement to resolve claims arising from alleged violations of the Telephone Consumer Protection Act. | Claims Administrator | 17,500,000 Class Members | $75.4 Million |
| **10.** | ***In re Vioxx MDL Settlement Agreement Related to Consumer Class Actions***, MDL Docket No. 1657 **(E.D. La.)**. Class action settlement to resolve consumer protection claims arising from the marketing of prescription painkillers. | Claims Administrator | 8,000 Claimants | $23 Million |



| | **PROGRAM DESCRIPTION** | **ROLE** | **APPROX. PROGRAM SIZE** | **APPROX. SETTLEMENT FUND** |
|---|---|---|---|---|
| | **SELECT ECONOMIC LOSS SETTLEMENT PROGRAM EXPERIENCE** | | | |
| 11. | ***Yarger v. ING Bank, FSB***, No. 11-154-LPS (D. Del.). Class action settlement to resolve claims related to advertising fixed rate mortgages under Delaware consumer law. | Notice and Claims Administrator | 115,000 Class Members | $20 Million |
| 12. | ***United States of America v. Capital One, N.A.***, No. 1:12-cv-828 (E.D. Va.). Consent orders between a financial services company and (1) the Department of Justice and (2) the Office of the Comptroller of the Currency to resolve alleged violations of the Servicemembers Civil Relief Act. | Notice and Claims Administrator | 44,000 Claimants | $15 Million |
| 13. | ***Spinelli v. Capital One Bank (USA)***, No. 8:08-cv-132 (M.D. Fla.). Class action settlement by a financial services company with credit card holders to resolve claims under the Truth in Lending Act. | Notice and Claims Administrator | 9,000,000 Class Members | $5 Million |
| 14. | ***Hankins v. Carmax Inc.***, No. 03-C-07-005893 CN (Baltimore County Md. Cir. Ct.). Class action settlement to resolve claims that a retail car company sold used vehicles without disclosing that the vehicles had been used previously as short-term rentals. | Notice and Claims Administrator | 7,300 Class Members | $8 Million |
| 15. | ***Cohen v. Warner Chilcott Public Ltd. Co.***, No. 1:06-cv-00401-CKK (D.D.C). Class action settlement to resolve antitrust claims against two pharmaceutical companies regarding the sale of an oral contraceptive. | Notice Administrator | 2,000,000 Class Members | $6 Million |
| 16. | ***Morgan v. Richmond School of Health and Technology, Inc.***, No. 3:12-cv-00373-JAG (E.D. Va.). Class action settlement by a for-profit vocational college to resolve claims under the Equal Credit Opportunity Act, Title VI of the Civil Rights Act of 1964 and the Virginia Consumer Protection Act. | Notice and Claims Administrator | 4,200 Class Members | $5 Million |
| 17. | ***Rogers v. City of Richmond, Virginia***, No. 3:11-cv-00620 (E.D. Va.). Class action settlement under the Fair Labor Standards Act and Virginia law involving current and former city police officers alleging unpaid overtime wages. | Claims Administrator | 600 Claimants | $4.6 Million |
| 18. | ***Llewellyn v. Big Lots Stores, Inc.***, No. 09-cv-5085 (E.D. La.). Class action settlement by a retailer to resolve claims under the Fair Labor Standards Act regarding the classification of assistant store managers. | Claims Administrator | 200 Class Members | $4 Million |
| 19. | ***Herron v. CarMax Auto Superstores, Inc.***, No. 2006-CP-02-1230 (Aiken County S.C. Jud. Dist.). Class action settlement to resolve claims related to document processing fees charged to customers by a car dealer. | Notice and Claims Administrator | 27,000 Class Members | $3.8 Million |
| 20. | ***Collins v. Sanderson Farms, Inc.***, No. 2:06-cv-02946 (E.D. La.). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 21,000 Class Members | $3.1 Million |



| | **PROGRAM DESCRIPTION** | **ROLE** | **APPROX. PROGRAM SIZE** | **APPROX. SETTLEMENT FUND** |
|---|---|---|---|---|
| | **SELECT ECONOMIC LOSS SETTLEMENT PROGRAM EXPERIENCE** | | | |
| **21.** | ***Nader v. Capital One Bank (USA)**, No. CV-12-01265-DSF (**RZx**) (**C.D. Cal.**). Class action settlement by a financial institution to resolve claims under state privacy and wiretapping laws concerning the alleged recording of outbound customer service calls.* | Notice and Claims Administrator | 1,800,000 Class Members | $3 Million |
| **22.** | ***In re Children's Ibuprofen Oral Suspension Antitrust Litigation**, No. 1:04-mc-0535 (**D.D.C.**). Class action settlement to resolve claims of antitrust violations by two manufacturers of over-the-counter children's pain relievers.* | Notice Administrator | 10,000 Class Members | $3 Million |
| **23.** | ***United States of America v. Chevy Chase Bank, F.S.B.**, No. 1:13-cv-1214 (**E.D. Va.**). Consent decree between a financial services company and a federal regulatory agency involving allegations under the Equal Credit Opportunity and Fair Housing Acts.* | Notice and Claims Administrator | 3,500 Class Members | $2.85 Million |
| **24.** | ***Samuel v. EquiCredit Corp.**, No. 00-cs-6196 (**E.D. Pa.**). Class action settlement by a financial services institution to resolve claims under the Real Estate Settlement Procedures Act regarding the application of loan proceeds to pay mortgage broker fees.* | Notice and Claims Administrator | 13,000 Class Members | $2.5 Million |
| **25.** | ***Hall v. Capital One Auto Finance, Inc.**, No. 1:08-cv-01181 (**N.D. Ohio**). Class action settlement by a financial services company to resolve claims related to automobile repossession under Ohio consumer statutes.* | Notice and Claims Administrator | 3,400 Class Members | $1.5 Million |
| **26.** | ***Watts v. Capital One Auto Finance, Inc.**, No. CCB-07-03477 (**D. Md.**). Class action settlement by a financial services company to resolve claims related to automobile repossession under Maryland consumer statutes.* | Notice and Claims Administrator | 2,700 Class Members | $990,000 |
| **27.** | ***Churchill v. Farmland Foods, Inc.**, No. 4:06-cv-4023 (**C.D. Ill.**). Class action settlement by a pork processing company to resolve claims under the Fair Labor Standards Act and Illinois law regarding employee compensation for time spent donning/doffing protective equipment.* | Notice and Claims Administrator | 2,300 Class Members | $980,000 |
| **28.** | ***Polanco v. Moyer Packing Company**, No. C.P., 1852 (**Philadelphia County Pa.**) Class action settlement by a beef processing company to resolve claims under the Fair Labor Standards Act and Pennsylvania law regarding employee compensation for time spent donning/doffing protective equipment.* | Notice and Claims Administrator | 4,500 Class Members | $850,000 |
| **29.** | ***Bessey v. Packerland Plainwell, Inc.**, No. 4:06-cv-0095 (**W.D. Mich.**). Class action settlement by a pork processing company to resolve claims under the Fair Labor Standards Act and Michigan law regarding employee compensation for time spent donning/doffing protective equipment.* | Notice and Claims Administrator | 3,000 Class Members | $700,000 |



| | **PROGRAM DESCRIPTION** | **ROLE** | **APPROX. PROGRAM SIZE** | **APPROX. SETTLEMENT FUND** |
|---|---|---|---|---|
| | **SELECT ECONOMIC LOSS SETTLEMENT PROGRAM EXPERIENCE** | | | |
| 30. | ***Santiago v. GMAC Mortgage Group, Inc.***, No. 784574 (**E.D. Pa.**). Class action settlement by a financial services company to resolve claims under the Real Estate Settlement Procedures Act concerning charges for mortgage settlement services. | Notice and Claims Administrator | 84,000 Class Members | $650,000 |
| 31. | ***Contreras v. PM Beef Holdings, LLC***, No. 07-CV-3087 (**D. Minn.**). Class action settlement by a beef processing company to resolve claims under the Fair Labor Standards Act and Minnesota law for employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 3,000 Class Members | $500,000 |
| 32. | ***Morales v. Greater Omaha Packing Co. Inc.***, No. 8:08-cv-0161 (**D. Neb.**). Class action settlement by a beef processing company to resolve claims under the Fair Labor Standards Act and Nebraska law regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 4,000 Class Members | $490,000 |
| 33. | ***Graham v. Capital One Bank*** (USA), N.A., 8:13-cv-00743 (**C.D. Cal.**).  Class action settlement related to claims under the California Unfair Competition Law regarding alleged improper disclosures and charges assessed on credit card accounts. | Notice and Claims Administrator | 22,500 Class Members | $460,000 |
| 34. | Voluntary payment program by a city government to compensate current and former city police officers for unpaid overtime wages. | Claims Administrator | 175 Class Members | $300,000 |
| 35. | *In re Moyer Packing Co.*, P. & S. Docket No. D-07-0053 (**U.S. Dep't Agric.**). Consent decision involving a beef processing company to compensate cattle producers for goods sold based on weights derived using an allegedly malfunctioning weight calculation system. | Notice and Claims Administrator | 1,100 Claimants | $300,000 |
| 36. | ***Wilder v. Triad Financial Corp.***, No. 3:03-cv-863 (**E.D. Va.**). Class action settlement by a financial services company to resolve claims associated with automobile loan applications under the Fair Credit Reporting Act. | Notice and Claims Administrator | 80,000 Class Members | $200,000 |
| 37. | ***Conerly v. Marshall Durbin Food Corp.***, No. 2:06-cv-205 (**N.D. Ala.**). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 1,900 Class Members | $150,000 |
| 38. | ***Ferguson v. Food Lion, LLC***, No. 12-c-861 (**Berkeley County W. Va. Cir. Ct.**). Class action settlement by a retail company to resolve claims under the West Virginia Wage Payment and Collection Act regarding timing of paychecks issued to discharged employees. | Notice and Claims Administrator | 185 Class Members | $150,000 |
| 39. | Voluntary settlement by a food processing company to resolve claims regarding employee compensation for donning/doffing protective equipment. | Notice Administrator | 670 Class Members | $125,000 |



| | PROGRAM DESCRIPTION | ROLE | APPROX. PROGRAM SIZE | APPROX. SETTLEMENT FUND |
|---|---|---|---|---|
| | **SELECT ECONOMIC LOSS SETTLEMENT PROGRAM EXPERIENCE** | | | |
| 40. | *Cook v. Columbia Freightliner, LLC*, No. 10-CP-02-1987 (**Aiken County S.C. Jud. Dist.**). Class action settlement to resolve claims regarding a trucking company and the collection of administrative fees in the sale of motor vehicles. | Notice and Claims Administrator | 380 Class Members | $17,000 |
| 41. | Voluntary payments by a financial institution to reimburse fees charged to the credit card accounts of small business owners. | Payment Administrator | 650 Class Members | $16,000 |
| 42. | *Clark v. Group Hospitalization and Medical Services, Inc.*, No. 3:10-CIV-00333-BEN-BLM (**S.D. Cal.**). Class action settlement by a health insurance provider to resolve claims under the Employee Retirement Income Security Act and California's Unfair Competition Law. | Notice and Claims Administrator | 80 Class Members | $1,300 Disbursed |
| 43. | *Quinn v. BJC Health System*, No. 052-00821A (**City of St. Louis Mo. Cir. Ct.**). Class action settlement by a healthcare system to resolve claims associated with hospital fees charged to uninsured patients. | Claims Administrator | 26,000 Class Members | Company Did Not Disclose |
| 44. | *Hoseler v. Smithfield Packing Co., Inc.*, No. 7:07-cv-166-H (**E.D. N.C.**). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 12,200 Class Members | Company Did Not Disclose |
| 45. | *Edwards v. Tyson Foods, Inc.*, No. C07-4009 (**S.D. Iowa**). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 10,000 Class Members | Company Did Not Disclose |
| 46. | *Lopez v. Tyson Foods, Inc.*, No. 8:06-0459 (**D. Neb.**). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act and Nebraska law for employee compensation for time spent donning/doffing protective equipment. | Intake – Opt Ins | 8,500 Class Members | Company Did Not Disclose |
| 47. | *Gomez v. Tyson Foods, Inc.*, No. 08-021 (**D. Neb.**). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act and Nebraska law for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 5,300 Class Members | Company Did Not Disclose |
| 48. | *Guyton v. Tyson Foods, Inc.*, No. 3:07-cv-00088-JAJ-TJS (**S.D. Iowa**). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act and the Iowa law for employee compensation for time spent donning/doffing protective equipment. | Intake – Opt Ins | 4,200 Class Members | Company Did Not Disclose |



| | SELECT ECONOMIC LOSS SETTLEMENT PROGRAM EXPERIENCE | | | |
|---|---|---|---|---|
| | **PROGRAM DESCRIPTION** | **ROLE** | **APPROX. PROGRAM SIZE** | **APPROX. SETTLEMENT FUND** |
| **49.** | *Sharp v. Tyson Foods, Inc.*, **No. C07-4009MWB (N.D. Iowa)**. Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act and Iowa law for employee compensation for time spent donning/doffing protective equipment. | Intake – Opt Ins | 3,900 Class Members | Company Did Not Disclose |
| **50.** | *Acosta v. Tyson Foods, Inc.*, **No. 8:08-cv-86 (D. Neb.)**. Class action settlement by a poultry producer to resolve claims under the Fair Labor Standards Act and Nebraska law for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 3,700 Class Members | Company Did Not Disclose |
| **51.** | *Stout v. JELD-WEN, Inc.*, **No. 1:08-cv-0652 (N.D. Ohio)**. Class action settlement by a window manufacturer to resolve claims under Ohio law for the sale of allegedly defective windows. | Notice Administrator | 2,700 Class Members | Company Did Not Disclose |
| **52.** | *Parker v. The Smithfield Packing Co., Inc.*, **No. 2:06-cv-468 (E.D. Va.)**. Voluntary settlement by a pork producer to resolve claims by employees under the Fair Labor Standards Act for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 2,700 Class Members | Company Did Not Disclose |
| **53.** | *Ene v. Maxim Healthcare Services, Inc.*, **No. 4:09-cv-02453 (S.D. Tex.)**. Class action settlement by a healthcare provider to resolve claims under the Fair Labor Standards Act concerning the classification of healthcare recruiters as exempt from overtime pay. | Notice Administrator | 1,600 Class Members | Company Did Not Disclose |
| **54.** | *Colbert v. Marshall Durbin Food Corp.*, **Alabama Arbitration No. 30 160 00132 08 (N.D. Ala.)**. Class action settlement by a poultry processing company to resolve claims by employees under the Fair Labor Standards Act for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 1,300 Class Members | Company Did Not Disclose |
| **55.** | *Betancourt v. Maxim Healthcare Services, Inc.*, **No. 10-cv-04763 (N.D. Ill.)**. Class action settlement by a healthcare provider to resolve claims under the Fair Labor Standards Act concerning the classification of healthcare recruiters as exempt from overtime pay. | Notice Administrator | 1,200 Class Members | Company Did Not Disclose |
| **56.** | *In re Lehman Brothers Holdings Inc.*, **No. 08-13555-JMP (Bankr. S.D.N.Y.)**. Program to track, monitor and evaluate fees being charged by bankruptcy lawyers in the Lehman Brothers Chapter 11 bankruptcy proceeding. | Fee Committee Assistant | Not Applicable | Not Applicable |

# ATTACHMENT 3

# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

No. 2:12-md-02323 (E.D. PENN.)

### PLAYERS AND RELATIVES DATA SETS RECEIVED BY AND CREATED BY BROWNGREER TO COMPILE THE MASTER NOTICE MAILING LIST

| | Data Set | | Players | | | | | | Relatives | | | | All Names |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Row | Source and File Name | Date Received or Created by BrownGreer | Names | Any Address Information? | Date of Birth? | Date of Death? | Team Information? | Years Played Data? | Names | Address Information? | Date of Birth? | Date of Death? | Total |
| 1. | **Kinsella Media** (FootballPlayerData_v2) | 10/8/2013 | 22,138 | No | Yes | No | No | Yes | N/A | No | No | No | 22,138 |
| 2. | **Kinsella Media** (Combined Class List) | 10/10/2013 | 34,469 | Yes | No | No | No | No | 97 | No | No | No | 34,566 |
| 3. | **Kinsella Media** (Copy of 2013MAR06 LIVING) | 10/8/2013 | 17,070 | Yes | No | No | No | No | 10,517 | Yes | No | No | 27,587 |
| 4. | **Kinsella Media** (Copy of Custom Staging_Merged Relatives List) | 10/8/2013 | N/A | No | No | No | No | No | 6,324 | Yes | No | No | 6,324 |
| 5. | **Kinsella Media** (Deceased Player Address List) | 10/8/2013 | 1,608 | Yes | No | No | No | No | 625 | Yes | No | No | 2,233 |
| 6. | **Kinsella Media** (Europe NFL and AFL Split (NFL Europe Worksheet)) | 10/8/2013 | 3,613 | No | No | No | Yes | Yes | N/A | No | No | No | 3,613 |
| 7. | **Kinsella Media** (Europe NFL and AFL Split (AFL Worksheet)) | 10/8/2013 | 1,398 | No | No | Yes | Yes | Yes | N/A | No | No | No | 1,398 |
| 8. | **NFL (8-15 of Class Counsel)** (Copy of Living Inactive Players – 2013 05 09 (3)) | 11/7/2013 | 17,299 | Yes | Yes | No | No | Yes | N/A | No | No | No | 17,299 |
| 9. | **NFL (Class Counsel)** (By Age State Zip – Min 1 CS) | 11/7/2013 | 16,212 | Yes | Yes | No | No | Yes | N/A | No | No | No | 16,212 |
| 10. | **NFL (Class Counsel)** (Deceased NFL Players List) | 11/7/2013 | 1,617 | No | Yes | Yes | No | Yes | N/A | No | No | No | 1,617 |
| 11. | **NFL (Class Counsel)** (All NFLE Players) | 11/7/2013 | 3,582 | No | No | No | Yes | Yes | N/A | No | No | No | 3,582 |

© 2014 BrownGreer PLC

# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

No. 2:12-md-02323 (E.D. PENN.)

## PLAYERS AND RELATIVES DATA SETS RECEIVED BY AND CREATED BY BROWNGREER TO COMPILE THE MASTER NOTICE MAILING LIST

| | Data Set | | Players | | | | | | Relatives | | | | All Names |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Row | Source and File Name | Date Received or Created by BrownGreer | Names | Any Address Information? | Date of Birth? | Date of Death? | Team Information? | Years Played Data? | Names | Address Information? | Date of Birth? | Date of Death? | Total |
| 12. | **NFL (Class Counsel)** (PS signing—never on in season Roster) | 11/7/2013 | 1,912 | No | No | No | Yes | Yes | N/A | No | No | No | 1,912 |
| 13. | **NFL (Class Counsel)** (Dev Signing – never signed NFL Player Contract) | 11/7/2013 | 2 | No | No | No | Yes | Yes | N/A | No | No | No | 2 |
| 14. | **NFL (Class Counsel)** (PS S signing – never signed NFL Player Contract) | 11/7/2013 | 38 | No | No | No | Yes | Yes | N/A | No | No | No | 38 |
| 15. | **NFL (Class Counsel)** (Deceased NFL Player List (with surviving family information)) | 11/8/2013 | 1,617 | No | Yes | Yes | No | Yes | 376 | Yes | Yes | Yes | 1,993 |
| 16. | **ARPC** (Necrology_NFL) | 11/8/2013 | 6,425 | No | Yes | Yes | Yes | Yes | N/A | No | No | No | 6,425 |
| 17. | **NFL Team (49ers)** (49ers Mailing Addresses) | 11/21/2013 | 105 | Yes | No | No | Yes | No | 53 | Yes | No | No | 158 |
| 18. | **NFL Teams (Bengals)** (Bengals Mailing Addresses) | 11/21/2013 | 716 | Yes | No | Yes | Yes | No | 30 | Yes | No | No | 746 |
| 19. | **NFL Teams (Bills)** (Bills Mailing Addresses) | 11/21/2013 | 441 | Yes | No | No | Yes | No | 36 | Yes | No | No | 477 |
| 20. | **NFL Teams (Browns)** (Browns Mailing Addresses) | 11/21/2013 | 892 | Yes | No | Yes | Yes | No | N/A | No | No | No | 892 |
| 21. | **NFL Teams (Bucs)** (Bucs Mailing Addresses) | 11/21/2013 | 1,140 | Yes | Yes | No | Yes | No | 639 | Yes | Yes | No | 1,779 |
| 22. | **NFL Teams (Eagles)** (Eagles Mailing Addresses) | 11/21/2013 | 216 | Yes | No | No | Yes | No | N/A | No | No | No | 216 |

# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

No. 2:12-md-02323 (E.D. PENN.)

### PLAYERS AND RELATIVES DATA SETS RECEIVED BY AND CREATED BY BROWNGREER TO COMPILE THE MASTER NOTICE MAILING LIST

| Row | Source and File Name | Date Received or Created by BrownGreer | Names | Any Address Information? | Date of Birth? | Date of Death? | Team Information? | Years Played Data? | Names | Address Information? | Date of Birth? | Date of Death? | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Data Set** | | **Players** | | | | | | **Relatives** | | | | **All Names** |
| 23. | **NFL Teams (Jets)** (Jets Mailing Addresses) | 11/21/2013 | 403 | Yes | No | No | Yes | No | N/A | No | No | No | 403 |
| 24. | **NFL Teams (Lions)** (Lions Mailing Addresses) | 11/21/2013 | 256 | Yes | No | No | Yes | No | N/A | No | No | No | 256 |
| 25. | **NFL Teams (Packers)** (Packers Mailing Addresses) | 11/21/2013 | 2,286 | Yes | No | No | Yes | No | 478 | Yes | No | No | 2,764 |
| 26. | **NFL Teams (Ravens)** (Ravens Mailing Addresses) | 11/21/2013 | 326 | Yes | No | No | Yes | No | N/A | No | No | No | 326 |
| 27. | **NFL Teams (Titans)** (Titans Mailing Addresses) | 11/25/2013 | 546 | Yes | No | No | Yes | No | 165 | Yes | No | No | 1,024 |
| 28. | **NFL.com** (created from website) | 11/21/2013 | 27,267 | No | Yes | No | No | No | N/A | No | No | No | 27,267 |
| 29. | **DatabaseSports.com** (created from website) | 11/19/2013 | 22,138 | No | Yes | No | No | No | N/A | No | No | No | 22,138 |
| 30. | **SUBTOTALS** | | **185,732** | | | | | | **19,340** | | | | **205,072** |
| 31. | **Pro-Football-Reference.com** (created from website) | 12/8/2013 | 23,204 | No | No | No | No | Yes | N/A | No | No | No | 23,204 |
| 32. | **NFL Teams (Broncos)** (Broncos Mailing Addresses) | 12/18/2013 | 374 | Yes | No | No | Yes | No | N/A | No | No | No | 374 |
| 33. | **NFL Teams (Giants)** (Giants Mailing Addresses) | 12/18/2013 | 979 | Yes | No | No | Yes | No | 165 | Yes | No | No | 1,144 |
| 34. | **NFL Teams (Chiefs)** (Chiefs Mailing Addresses) | 12/18/2013 | 206 | Yes | No | No | Yes | No | 105 | Yes | No | No | 311 |
| 35. | **TOTALS** | | **210,495** | | | | | | **19,610** | | | | **230,105** |

| Row | Data Set | Date Received or Created by BrownGreer | Plaintiffs | Movants | Special Master | Defendants/ Corporate | Total Names of Counsel | Plaintiffs Added to List | Movants Added to List | Special Master Added to List | Defendants Added to List | Total Names Added to List |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36. | **Counsel of Record** | 7/28/2014 | 172 | 7 | 1 | 69 | 249 | 162 | 7 | 0 | 0 | 169 |

© 2014 BrownGreer PLC

3

# ATTACHMENT 4

# NFL CONCUSSION SETTLEMENT

*IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. PENN.)

## MAILING LIST STATISTICS
### (AS OF 6/24/14)

| Row | Category | Players | Relatives | Total |
|-----|----------|---------|-----------|-------|
| **1.** | Living Players Not Appearing on NFL.com list of "Current" Players with Address Obtained Through Data Research | 20,491 | N/A | **20,491** |
| **2.** | Living Players Not Appearing on NFL.com list of "Current" Players with Address Provided in Original Data Source | 2,051 | N/A | **2,051** |
| **3.** | Relatives of Deceased Players with Address Obtained Through Data Research | N/A | 8,857 | **8,857** |
| **4.** | Relatives of Deceased Players with Address Provided in Original Data Source | N/A | 67 | **67** |
| **5.** | Living Players Appearing on NFL.com list of "Current" Players with Address Obtained Through Data Research | 2,079 | N/A | **2,079** |
| **6.** | Living Players Appearing on NFL.com list of "Current" Players with Address Provided in Original Data Source | 2 | N/A | **2** |
| **7.** | Deceased Players without Relatives, but with Last Known Player Address Obtained Through Data Research | 407 | N/A | **407** |
| **8.** | Deceased Players without Relatives, but with Last Known Player Address Provided in Original Data Source | 30 | N/A | **30** |
| **9.** | **TOTAL: Mailable Addresses** | **25,060** | **8,924** | **33,984** |

© 2014 BrownGreer PLC

# ATTACHMENT 5



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. PENN.)

| HOME | NOTICE MATERIALS | COURT DOCUMENTS | FAQs | SIGN UP FOR FUTURE INFORMATION |



### Welcome to the NFL Concussion Settlement Program Website

A Settlement of a class action lawsuit was reached with the NFL and NFL Properties and retired NFL players, their representatives and family members. The retired NFL players sued, accusing the NFL of not warning players and hiding the damages of brain injury. On July 7, 2014 the Court granted preliminary approval of this Settlement.

Retired players, legal representatives of incapacitated or deceased players, and families of deceased players may be eligible to receive benefits from this Settlement.

The proposed settlement provides for three benefits:

1. Baseline medical exams for retired NFL players;
2. Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death; and
3. Education programs and initiatives related to football safety.

All valid claims for injury will be paid in full for 65 years.

Retired players, their legal representatives and family members <u>do not</u> have to prove that the players' injuries were caused by playing NFL football to get money from the Settlement.

**You will be able to register for benefits after the Court grants final approval of the Settlement. If you would like information in the future when the registration period opens, click "Sign Up for Future Information" below and provide your contact information.**

> **SIGN UP FOR
> FUTURE INFORMATION**

**NOTICE MAILING LIST:** Packets containing the Court-approved Notice regarding the Settlement have been mailed to known Class Members for whom home addresses could be reasonably obtained, on July 24, 2014. If you have any questions about whether you or any of your clients were included on that mailing list and at what address, you may send an email to ClaimsAdministrator@NFLConcussionSettlement.com and provide your name and current address (or the names and addresses of your clients). The Claims Administrator will check the list and let you know if your or your clients were on the list and at what address. You can also use that email to provide any address updates.



# CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. PENN.)

**HOME** | **NOTICE MATERIALS** | **COURT DOCUMENTS** | **FAQs** | **SIGN UP FOR FUTURE INFORMATION**

## Notice Materials

Click the links below to view, print or download these notice materials:

1. Long-form Notice
2. Summary Notice
3. Injury Definitions



 **CONCUSSION SETTLEMENT**

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. PENN.)

**HOME** | **NOTICE MATERIALS** | **COURT DOCUMENTS** | **FAQs** | **SIGN UP FOR FUTURE INFORMATION**

## Court Documents

**Click the links below to view, print or download these court documents:**

1. Class Action Settlement Agreement with Exhibits
2. Injury Definitions
3. Preliminary Approval Order
4. Preliminary Approval Memorandum Opinion
5. Memorandum of Law in Support of Preliminary Approval
6. Motion for Preliminary Approval
7. Declaration of Layn R. Phillips
8. Declaration of Katherine Kinsella





# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. PENN.)

**HOME   |   NOTICE MATERIALS   |   COURT DOCUMENTS   |   FAQs   |   SIGN UP FOR FUTURE INFORMATION**



---

## Frequently Asked Questions

**BASIC INFORMATION**

**WHO IS PART OF THE SETTLEMENT?**

**THE BASELINE ASSESSMENT PROGRAM**

**MONETARY AWARDS**

**EDUCATION FUND**

**REMAINING IN THE SETTLEMENT**

**HOW TO GET BENEFITS**

**EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT**

**THE LAWYERS REPRESENTING YOU**

**OBJECTING TO THE SETTLEMENT**

**THE COURT'S FAIRNESS HEARING**

**GETTING MORE INFORMATION**

**QUESTIONS IN ADDITION TO THOSE IN THE LONG FORM NOTICE**

### BASIC INFORMATION

**1. Why is this Notice being provided?**

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This Notice summarizes the Settlement and explains your legal rights and options.

This case is being heard in the U.S. District Court for the Eastern District of Pennsylvania. The case is known as *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323. The people who sued are called the "Plaintiffs." The National Football League and NFL Properties, LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are: (a) a retired player of the NFL, American Football League ("AFL"), World League of American Football, NFL Europe League or NFL Europa League, (b) an authorized representative of a deceased, legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.
**Back To Top**

**2. What is the litigation about?**

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems. The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players. The NFL Parties deny the claims in the litigation.
**Back To Top**

**3. What is a class action?**

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims. All of these people together are the proposed "class" or "class members." When a class action is settled, one court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves (opt out) from the settlement. In this case, the proposed class representatives are Kevin Turner and Shawn Wooden. Excluding yourself (opting

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. PENN.)

HOME | NOTICE MATERIALS | COURT DOCUMENTS | FAQs | SIGN UP FOR FUTURE INFORMATION

## Sign Up for Future Information on Registration Period

**Instructions:** If you would like to receive more information on how to register for the Settlement, once it is approved by the Court, fill out the form below. At a later date, you will receive complete information on how to register for benefits. The sections marked with an * must be completed.

If you are a lawyer and would like to sign up multiple clients in a group, email the Claims Administrator at ClaimsAdministrator@NFLConcussionSettlement.com for assistance.

Name:* [First] [Middle] [Last] [Suffix ▾]

Country:* ● USA ○ Foreign [United States ▾]

Address 1:* [                    ]

Address 2: [                    ]

City:* [                    ]

State:* [                    ▾]

Zip/Postal Code:* [          ]

Current Phone Number:* [      ] - [      ] - [      ]

Email Address:* [                    ]

Check the appropriate box below to indicate if you are a: *

☐ **Retired NFL Player**

☐ **Authorized representative of a Retired NFL Player or deceased Retired NFL Player**
   **Name the Retired NFL Player you represent:**
   [First] [Middle] [Last] [Suffix ▾]

☐ **Counsel to a Retired NFL Player or to a representative of a Retired NFL Player or deceased Retired NFL Player**
   **Name the Retired NFL Player you represent:**
   [First] [Middle] [Last] [Suffix ▾]

☐ **Spouse, parent, or dependent child of a Retired NFL Player or deceased Retired NFL Player**
   **Name the Retired NFL Player with whom you have or had relationship:**
   [First] [Middle] [Last] [Suffix ▾]

☐ **Other**

SUBMIT

# ATTACHMENT 6

# WEBSITE FAQs

**BASIC INFORMATION**
1. Why is this Notice being provided?
2. What is the litigation about?
3. What is a class action?
4. Why is there a Settlement?
5. What are the benefits of the Settlement?

**WHO IS PART OF THE SETTLEMENT?**
6. Who is included in the Settlement Class?
7. What players are not included in the Settlement Class?
8. What if I am not sure whether I am included in the Settlement Class?
9. What are the different levels of neurocognitive impairment?
10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

**THE BASELINE ASSESSMENT PROGRAM**
11. What is the Baseline Assessment Program ("BAP")?
12. Why should a retired player get a BAP baseline examination?
13. How does a retired player schedule a baseline assessment examination and where will it be done?

**MONETARY AWARDS**
14. What diagnoses qualify for monetary awards?
15. Do I need to prove that playing professional football caused the retired player's Qualifying Diagnosis?
16. How much money will I receive?
17. How does the age of the retired player at the time of first diagnosis affect a monetary award?
18. How does the number of seasons a retired player played affect a monetary award?
19. How do prior strokes or brain injuries of a retired player affect a monetary award?
20. How is a retired player's monetary award affected if he does not participate in the BAP program?
21. Can I receive a monetary award even though the retired player is dead?
22. Will this Settlement affect a retired player's participation in NFL or NFLPA related benefits programs?
23. Will this Settlement prevent retired players from bringing workers' compensation claims?

**EDUCATION FUND**
24. What types of education programs are supported by the Settlement?

**REMAINING IN THE SETTLEMENT**
25. What am I giving up to stay in the Settlement Class?

**HOW TO GET BENEFITS**
25. How do I get Settlement benefits?
27. Is there a time limit for Retired NFL Football Players and Representative Claimants to file claims for monetary awards?
28. Can I re-apply for compensation if my claim is denied?
29. Can I appeal the determination of my monetary award claim?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**
30. How do I get out of the Settlement?
31. If I do not exclude myself, can I sue the NFL Parties for the same thing later?

32.     If I exclude myself, can I still get benefits from this Settlement?

**THE LAWYERS REPRESENTING YOU**
33.     Do I have a lawyer in the case?
34.     How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**
35.     How do I tell the Court if I do not like the Settlement?
36.     What is the difference between objecting to the Settlement and excluding myself?

**THE COURT'S FAIRNESS HEARING**
37.     When and where will the Court hold a Fairness Hearing concerning the Settlement?
38.     Do I have to attend the hearing?
39.     May I speak at the hearing?

**GETTING MORE INFORMATION**
40.     How do I get more information?

# BASIC INFORMATION

**1.  Why is this Notice being provided?**

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement.  This Notice summarizes the Settlement and explains your legal rights and options.

This case is being heard in the U.S. District Court for the Eastern District of Pennsylvania.  The case is known as *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323.  The people who sued are called the "Plaintiffs."  The National Football League and NFL Properties, LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are:  (a) a retired player of the NFL, American Football League ("AFL"), World League of American Football, NFL Europe League or NFL Europa League, (b) an authorized representative of a deceased, legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.

**2.  What is the litigation about?**

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems.  The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players.  The NFL Parties deny the claims in the litigation.

**3.  What is a class action?**

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims.  All of these people

together are the proposed "class" or "class members." When a class action is settled, one court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves (opt out) from the settlement. In this case, the proposed class representatives are Kevin Turner and Shawn Wooden. Excluding yourself (opting out) means that you will not receive any benefits from the Settlement. The process for excluding yourself (opting out) is described here *(link to question 30)*.

### 4.   Why is there a Settlement?

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, and further settlement negotiations under the supervision of the Court-appointed Special Master, Perry Golkin, the Plaintiffs and the NFL Parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the litigation between the Settlement Class Members *(link to question 6)* and the NFL Parties is over. Only Settlement Class Members are eligible for the benefits summarized on this website. The NFL Parties will no longer be legally responsible to defend against the claims by Settlement Class Members made in this litigation.

The Court has not and will not decide in favor of the retired players or the NFL Parties. By reviewing this Settlement, the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel") *(link to question 33)* believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available here *(link to Court Documents page)*. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania *(link to question 35)*. You can also get this information by calling **1-855-887-3485**.

### 5.   What are the benefits of the Settlement?

Under the Settlement, the NFL Parties will pay to fund:

- Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, "Baseline Assessment Program"); *(link to question 11)*

- Monetary awards *(link to question 14)* for diagnoses of Death with CTE prior to **July 7, 2014**, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) and Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) (*see* Questions 14-21 and Injury Definitions *(link to Injury Definitions)*). **All valid claims under the Settlement, without**

**limitation, will be paid in full throughout the 65-year life of the Settlement (the "Monetary Award Fund")**; and

- Education programs *(link to question 24)* promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

In addition, the NFL Parties will pay the cost of notifying the Settlement Class. Administrative costs and expenses will be paid out of the Monetary Award Fund. The Baseline Assessment Program costs and expenses will be paid out of the Baseline Assessment Program Fund.

The details of the Settlement benefits are in the Settlement Agreement, which is available here *(link to Court Documents page)*. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania. *(link to question 35)* You can also get this information by calling **1-855-887-3485**.

**Note:** The Baseline Assessment Program and Monetary Award Fund will be administered independently of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims under the Settlement.

## WHO IS PART OF THE SETTLEMENT?

**6. Who is included in the Settlement Class?**

This Settlement Class includes three types of people:

Retired NFL Football Players:  All living NFL Football players who, prior to **July 7, 2014**, (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

Representative Claimants:  Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased, legally incapacitated or incompetent Retired NFL Football Players.

Derivative Claimants:  Spouses, parents, dependent children, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a living or deceased Retired NFL Football Player.  (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status prior to **July 7, 2014**:

- Subclass 1 includes:  Retired NFL Football Players who were not diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia),

Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE prior to **July 7, 2014**, and their Representative Claimants and Derivative Claimants.

- Subclass 2 includes:

  o Retired NFL Football Players who <u>were</u> diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to July 7, 2014, and their Representative Claimants and Derivative Claimants; and

  o Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to death or who died prior to **July 7, 2014** and received a diagnosis of Death with CTE.

**7.  What players are not included in the Settlement Class?**

The Settlement Class does not include current NFL players.  The Settlement Class also does not include people who tried out for but did not make it onto preseason, regular season or postseason rosters or practice, developmental or taxi squads of the NFL or any Member Clubs.

**8.  What if I am not sure whether I am included in the Settlement Class?**

If you are not sure whether you are included in the Settlement Class, you may call **1-855-887-3485** with questions.  You may also write with questions to NFL Concussion Settlement, **P.O. Box 25369, Richmond, VA 23260**.  You may also consult with your own attorney.

**9.  What are the different levels of neurocognitive impairment?**

In addition to ALS, Parkinson's Disease and Alzheimer's Disease, various levels of neurocognitive impairment are covered by this Settlement.  More details can be found in the Injury Definitions, which are available here *(link to Injury Definitions)* or by calling **1-855-887-3485**.

The level of neurocognitive impairment will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing, provided one of the areas is executive function, learning and memory, or complex attention, and related functional impairment as follows:

| LEVEL OF NEUROCOGNITIVE IMPAIRMENT | TYPE OF IMPAIRMENT | DEGREE OF DECLINE |
|---|---|---|
| Level 1 | Moderate cognitive impairment | Moderate cognitive decline |
| Level 1.5 | Early Dementia | Moderate to severe cognitive decline |
| Level 2 | Moderate Dementia | Severe cognitive decline |

If neurocognitive impairment is temporary and only occurs with delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

**10.  Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?**

No.  A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

## THE BASELINE ASSESSMENT PROGRAM

**11.  What is the Baseline Assessment Program ("BAP")?**

All living retired players who have earned at least one-half of an Eligible Season *(link to question 18)*, who do not exclude themselves *(link to question 30)* (opt out) from the Settlement, and who timely register to participate *(link to sign-up page)* in the Settlement may participate in the Baseline Assessment Program ("BAP").  Registration for benefits will not be available until after Final Settlement Approval.  **A retired player may provide his name and contact information now here *(link to sign-up page)* or by calling 1-855-887-3485.  This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.**

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment.  Retired players will have from two to ten years, depending on their age as of the date the Settlement is finally approved and any appeals are fully resolved ("Final Settlement Approval"), to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date of Final Settlement Approval will need to have a baseline examination within two years of the start of the BAP.

- Retired players under the age of 43 as of the date of Final Settlement Approval will need to have a baseline examination within 10 years of the start of the BAP, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.

Retired players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a monetary award.  Any award to a retired player may be reduced by 10% if the retired player does not participate in the BAP, as explained in more detail here *(link to question 20)*.

**12.  Why should a retired player get a BAP baseline examination?**

Getting a BAP baseline examination will be beneficial.  It will determine whether the retired player has any cognitive impairment.  If he is diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment), he will be eligible to receive further medical testing and/or treatment for that condition.  In addition, regardless of any cognitive impairment today, the results of the BAP baseline examination can be

used as a comparison to measure any subsequent deterioration of cognitive condition over the course of his life.  Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist, and the retired player and/or his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

Participation in the BAP does not prevent the retired player from filing a claim for a monetary award.  For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if the player develops a Qualifying Diagnosis *(link to question 14)*.  Participation in the BAP also will help ensure that, to the extent the retired player receives a Qualifying Diagnosis in the future, he will receive the maximum monetary award *(link to question 16)* to which he is entitled.

**13.  How does a retired player schedule a baseline assessment examination and where will it be done?**

Retired players need to register for Settlement benefits before they can get a baseline assessment examination.  Registration for benefits will not be available until after Final Settlement Approval.  **A retired player may provide his name and contact information now here *(link to sign-up page)* or by calling 1-855-887-3485.  This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination.  The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment.  The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

## MONETARY AWARDS

**14.  What diagnoses qualify for monetary awards?**

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE (the "Qualifying Diagnoses").  A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation.  This would also apply to Derivative Claimants.

Qualifying Diagnoses must be made by approved qualified specialists.  Any time prior to Final Settlement Approval, only board-certified neurologists, board-certified neurosurgeons or board-certified neuro-specialist physicians or similarly qualified specialists can make Qualifying Diagnoses.  Following Final Settlement Approval, only qualified specialists approved by the Claims Administrator will be able to make Qualifying Diagnoses with the exception of Qualifying Diagnoses made through the BAP.

**15.  Do I need to prove that playing football caused the Qualifying Diagnosis?**

No.  No proof is necessary that a retired player's Qualifying Diagnosis was caused by playing football or that he experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League or NFL Europa League in order to receive a monetary award.  The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

## 16.  How much money will I receive?

The amount of money you will receive depends on the retired player's:
- Specific Qualifying Diagnosis,
- Age at the time of diagnosis (*link to question 17*),
- Number of seasons (*link to question 18*) played or practiced in the NFL or the AFL,
- Diagnosis of a prior stroke or traumatic brain injury, (*link to question 19*) and
- Participation in a baseline assessment exam (*link to question 20*).

The amount of money you will receive also depends on:
- Any legally enforceable liens on the award,
- Any retainer agreement with an attorney, and
- Any further assessments ordered by the Court (*link to question 34*).

Certain costs and expenses related to resolving any liens for Settlement Class Members will be paid out of such Settlement Class Members' monetary awards or derivative claimant awards.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons (*link to question 18*) and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award.  If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

## 17.  How does the age of the retired player at the time of first diagnosis affect a monetary award?

Awards are reduced for retired players who were 45 or older when diagnosed.  The younger a retired player is at the time of diagnosis, the greater the award he will receive.  Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award within each age range for people diagnosed between the ages of 45-79; and
- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH W/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

## 18. How does the number of seasons a retired player played affect a monetary award?

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL or AFL. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

- A retired player also earns one-half of an Eligible Season for each season where he was on an NFL or AFL Member Club's practice, developmental or taxi squad for at least eight games, but did not otherwise earn an Eligible Season.

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

Time spent playing or practicing in the World League of American Football, NFL Europe League and NFL Europa League does <u>not</u> count towards an Eligible Season.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |
| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

### 19. How do prior strokes or traumatic brain injuries of a retired player affect a monetary award?

It depends. A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced: (1) a medically diagnosed stroke that occurred before or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis; or (2) a severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

### 20. How is a retired player's monetary award affected if he does not participate in the BAP program?

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award only if the retired player:

- Did not receive a Qualifying Diagnosis prior to **July 7, 2014**, and

- Does not participate in the BAP, and

- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

### 21. Can I receive a monetary award even though the retired player is dead?

Yes. Representative Claimants for deceased retired players with a Qualifying Diagnoses will be eligible to receive monetary awards. If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants *(link to question 6)* also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives.

Representative and Derivative Claimants will also need to register *(link to sign-up page)* for Settlement benefits.   Registration for benefits will not be available until after Final Settlement Approval. **Representative and Derivative Claimants can provide their name and contact information now here** *(link to sign-up page)* **or by calling 1-855-887-3485.  This ensures that they will receive additional notice about the registration process and deadlines when it becomes available.**

### 22.  Will this Settlement affect a retired player's participation in NFL or NFLPA-related benefits programs?

No.  The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association.  This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note:**  The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

### 23.  Will this Settlement prevent retired players from bringing workers' compensation claims?

No.  Claims for workers' compensation will not be released by this Settlement.

## EDUCATION FUND

### 24.  What types of education programs are supported by the Settlement?

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

## REMAINING IN THE SETTLEMENT

### 25.  What am I giving up to stay in the Settlement Class?

Unless you exclude yourself *(link to question 30)* (opt out) from the Settlement, you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case.  This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time. **However, the Settlement does not release any claims for workers' compensation** *(link to question 23)* **or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement**.

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC and RBG Holdings Corp.). **They are not parties to this Settlement and claims against them are not released by this Settlement**.

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves (opt out) from the Settlement, so please read it carefully. The Settlement Agreement is available here *(link to Court Documents Page)*.  The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania *(link to question 35)*.   You can also get this information by calling **1-855-887-3485**.  If you have any questions you can talk to the law firms listed here *(link to question 33)* for free or you can talk to your own lawyer if you have questions about what this means.

## HOW TO GET BENEFITS

**26.  How do I get Settlement benefits?**

To get benefits, you will need to register.  This is true for all Settlement Class Members, including Representative and Derivative Claimants.  Registration for benefits will not begin until after Final Settlement Approval.  If and when that occurs, further notice will be provided about the registration process and deadlines.  **However, you may provide your name and contact information now here *(link to Sign-Up Page)* or by calling 1-855-887-3485.  This ensures that you will receive additional notice about the registration process and deadlines when that becomes available.**  To receive any Settlement benefits, you must register on or before 180 days from the date that further notice about the registration process and deadlines is posted here *(link to question 40)*.   Information about the registration deadline will also be available by calling **1-855-887-3485.**

**27.  Is there a time limit for Retired NFL Football Players and Representative Claimants to file claims for monetary awards?**

Yes.  Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the date that further notice about the registration process and deadlines is posted here *(link to question 40)*.  Retired NFL Football Players and Representative Claimants for retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims.  This deadline may be extended up to an additional two years upon a showing of substantial hardship.

Derivative Claimants must submit claims no later than 30 days after a Retired NFL Football Player or a Representative Claimant receives notice of an entitlement to a monetary award.  All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

**28.  Can I re-apply for compensation if my claim is denied?**

Yes.  A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

**29.  Can I appeal the determination of my monetary award claim?**

Yes.  The Settlement establishes an independent process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

## EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT

If you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement.  You may do this by asking to be excluded from—opting out of—the Settlement Class.  If you exclude yourself (opt out), you cannot receive benefits from this Settlement.

**30.  How do I get out of the Settlement?**

On or before **October 14, 2014**, you must mail a letter or other written document to the Claims Administrator requesting exclusion from the Settlement Class.  Your request must include:

- Your name, address, telephone number, and date of birth;

- A copy of your driver's license or other government issued identification;

- A statement that "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion (opt out) request, postmarked on or before **October 14, 2014**, to:

NFL Concussion Settlement
P.O. Box 25369
Richmond, VA 23260

Your request to exclude yourself (opt out) is not effective unless and until the District Court grants Final Approval.

**31.  If I do not exclude myself (opt out), can I sue the NFL Parties for the same thing later?**

No.  Unless you exclude yourself (opt out), you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves.  If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself (opt out) on or before **October 14, 2014.**

**32.  If I exclude myself (opt out), can I still get benefits from this Settlement?**

No.  **If you exclude yourself (opt out) from the Settlement you will not get any Settlement benefits**.  You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

## THE LAWYERS REPRESENTING YOU

**33.  Do I have a lawyer in the case?**

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel."  They are:

| Christopher A. Seeger | Sol Weiss |
|---|---|
| Co-Lead Class Counsel | Co-Lead Class Counsel |

| SEEGER WEISS LLP | ANAPOL SCHWARTZ |
|---|---|
| 77 Water Street | 1710 Spruce Street |
| New York, NY 10005 | Philadelphia, PA 19103 |
| Steven C. Marks | Gene Locks |
| Class Counsel | Class Counsel |
| PODHURST ORSECK P.A. | LOCKS LAW FIRM |
| City National Bank Building | The Curtis Center, Suite 720 East |
| 25 W. Flagler Street, Suite 800 | 601 Walnut Street |
| Miami, FL 33130-1780 | Philadelphia, PA 19106 |
| Arnold Levin | Dianne M. Nast |
| Counsel - Subclass 1 | Counsel - Subclass 2 |
| LEVIN FISHBEIN SEDRAN & BERMAN | NAST LAW LLC |
| 510 Walnut Street, Suite 500 | 1101 Market Street, Suite 2801 |
| Philadelphia, PA 19106 | Philadelphia, Pennsylvania 19107 |

You will not be charged for contacting these lawyers. If you are represented by your own attorney, you should contact that attorney to discuss the proposed Settlement. You do not have to hire your own attorney to participate in the Settlement program, but the administrators of the Settlement cannot provide you with any legal advice or answer questions that depend upon your individual factual circumstances. If you do not already have your own attorney, you may hire one at your own expense.

**34.  How will the lawyers be paid?**

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs.  The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million.  These fees and incurred costs will be paid separately by the NFL Parties and not from the Baseline Assessment Program Fund, Education Fund or Monetary Award Fund. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time.  Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

After Final Settlement Approval, Co-Lead Class Counsel may ask the Court to set aside up to five percent of each monetary award and derivative claimant award to facilitate the Settlement program and related efforts of Co-Lead Class Counsel, Class Counsel and Subclass Counsel.  If approved, this money would be held in a separate fund overseen by the Court.  Any future request for a set-aside will describe:  (1) the proposed amount; (2) how the money will be used; and (3) any other relevant information.  This "set-aside" would come out of the claimant's attorney's fee if represented by individual counsel or, if not represented, out of the monetary award and derivative claimant award itself.  No money will be held back or set aside from any award without a Court order.  The set-aside is a matter between Class Counsel and individual counsel for Settlement Class Members.  The NFL Parties do not take a position on the proposal.

## OBJECTING TO THE SETTLEMENT

**35.  How do I tell the Court if I do not like the Settlement?**

If you have not excluded yourself (opted out), you may object to the Settlement or any part of it. The Court will consider your views. To object to the Settlement, you or your attorney must submit your written objection to the Court. The objection must include the following:

- The name of the case and multidistrict litigation, *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- If you are a Representative Claimant or Derivative Claimant, the name of the Retired NFL Football Player to whom you are related;

- Written statement or evidence establishing how you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

Attorneys filing objections on behalf of Settlement Class Members must follow the requirements in Section 14.3(b) of the Settlement Agreement.

You must mail your objection, postmarked on or before **October 14, 2014**, to:

| COURT |
|---|
| Clerk of the District Court/NFL Concussion Settlement |
| U.S. District Court for the Eastern District of Pennsylvania |
| United States Courthouse |
| 601 Market Street |
| Philadelphia, PA 19106-1797 |

**36.  What is the difference between objecting to the Settlement and excluding myself (opting out)?**

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different. You can object only if you do not exclude yourself (opt out) from the Settlement Class. Excluding yourself (opting out) is telling the Court that you do not want to be part of the Settlement Class and you do not want to receive any Settlement benefits. If you exclude yourself (opt out), you have no basis to object because the case no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak, but you do not have to. The Court will determine if you are allowed to speak *(link to question 39)* if you request to do so.

**37.  When and where will the Court hold a Fairness Hearing concerning the Settlement?**

The Court will hold the Fairness Hearing on **Wednesday, November 19, 2014 at 10:00 a.m.** at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106 in Courtroom 7B.  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call **1-855-887-3485**.  At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing.  After the hearing, the Court will decide whether to approve the Settlement.  We do not know how long the decision will take.

After the Fairness Hearing, the Court will consider the request for attorneys' fees and reasonable costs *(link to question 34)* by Co-Lead Class Counsel, Class Counsel and Subclass Counsel.

### 38.  Do I have to attend the hearing?

No.  Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have.  But you are welcome to attend at your own expense.  If you timely file an objection, you do not have to come to Court to talk about it.  As long as you filed your written objection on time, the Court will consider it.  You may also have your own lawyer attend at your expense, but it is not necessary.

### 39.  May I speak at the hearing?

On or before **November 3, 2014**, you may ask the Court for permission to speak at the Fairness Hearing.  The Court will determine whether to grant you permission to speak.  To make such a request, you must send written notice to the Court stating your intention to speak at the *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323 Fairness Hearing.  Be sure to include your name, address, telephone number, and your signature.  Your request to speak must be sent to the Court at this address *(link to question 35)*.

## GETTING MORE INFORMATION

### 40.  How do I get more information?

This Notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  You can get a copy of the Settlement Agreement here *(link to Court Documents Page)*.  The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District for the Eastern District of Pennsylvania *(link to question 35)*.  You also may write with questions to NFL Concussion Settlement, P.O. Box 25369, Richmond, VA 23260 or call **1-855-887-3485**.

**PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LITIGATION.**

| IMPORTANT DATES AND CONTACT INFORMATION | |
|---|---|
| **Exclusion (Opt Out) Deadline** | October 14, 2014 |
| **Objection Deadline** | October 14, 2014 |
| **Deadline to Request to Speak at the Fairness Hearing** | November 3, 2014 |
| **Fairness Hearing** | November 19, 2014 |
| **Start of Registration Period** | The date the announcement of the registration process is posted on the Settlement Website.  (This will occur following Final Settlement Approval after all appeals.) |
| **Registration Deadline** | 180 days after the start of the registration period |

| Deadline to Receive a BAP | • For retired players age 43 or older:  Within two years of Final Settlement Approval |  |
|---|---|---|
|  | • For retired players under age 43: Within ten years of Final Approval or before age 45, whichever comes sooner |  |
| Deadline to Submit a Claim | • For retired players (and their Representative Claimants) diagnosed by the date of Final Settlement Approval:  Within two years from the start of the registration period |  |
|  | • For retired players (and their Representative Claimants) diagnosed after the date of Final Settlement Approval:  Within two years from the date of diagnosis |  |
| Claims Administrator | **NFL Concussion Settlement**<br>**P.O. Box 25369**<br>**Richmond, VA 23260**<br>**Tel: 1-855-887-3485** |  |
| Court | Clerk of the District Court/NFL Concussion Settlement<br>U.S. District Court for the Eastern District of Pennsylvania<br>United States Courthouse<br>601 Market Street<br>Philadelphia, PA 19106-1797 |  |
| Class Counsel | Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP<br>77 Water Street<br>New York, NY 10005 | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ<br>1710 Spruce Street<br>Philadelphia, PA 19103 |
|  | Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
|  | Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

## QUESTIONS IN ADDITION TO THOSE IN THE LONG FORM NOTICE

**41.  If a player is deceased, how does a Representative Claimant prove that the player suffered from a Qualifying Diagnosis at the time of or before his death?**

The proof a Representative Claimant must submit to show that a deceased player received a Qualifying Diagnosis depends on the date of the player's death and the type of injury.

If the player dies before the Effective Date of the Settlement Agreement, the Representative Claimant may establish Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS by submitting medical records showing a diagnosis of such condition made before the player died.  The diagnosis must have been made by properly credentialed physicians, as described in Section 6.3(e) of the Settlement Agreement.

The Representative Claimant of a player who died before the date of Preliminary Approval (July 7, 2014) may establish Death with CTE by submitting medical records showing a diagnosis of Death with CTE made by a board-certified neuropathologist after the player's death.  Players who died after the date of Preliminary Approval are not eligible for benefits for Death with CTE.

All claimants, including Representative Claimants of deceased players, also must submit a Diagnosing Physician Certification signed by the physician who made the Qualifying Diagnosis, except that Representative Claimants of players who die before the Effective Date do not have to submit a Diagnosing Physician Certification if the physician who made the Qualifying Diagnosis also died before the Effective Date, or was deemed legally incapacitated or incompetent prior to that date, but they do have to submit evidence of the physician's death, incapacity or incompetence, and of his or her qualifications.

A Representative Claimant of a player who died before January 1, 2006 also must establish that the claim is not time-barred.

# ATTACHMENT 7

# NFL CONCUSSION SETTLEMENT

*IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. PENN.)

| NFL 1002 | CLAIMS ADMINISTRATOR UPDATE (THROUGH 10/14/14) | | | | | |
|---|---|---|---|---|---|---|
| **TABLE 1** | **WEBSITE VISITORS BY STATE** | | | | | |
| **Row** | **Location** | **Unique Visitors** | **Visits** | **Average Actions¹ Per Visit** | **Average Time (Minutes)** | **Bounce Rate²** |
| **1.** | California | 5,575 | 5,817 | 2 | 1 | 77.0% |
| **2.** | Texas | 4,066 | 4,310 | 2 | 1 | 74.1% |
| **3.** | Florida | 3,887 | 4,087 | 2 | 1 | 77.6% |
| **4.** | New York | 3,484 | 3,698 | 2 | 1 | 75.4% |
| **5.** | Illinois | 2,291 | 2,364 | 2 | <1 | 80.4% |
| **6.** | Pennsylvania | 2,231 | 2,288 | 2 | <1 | 79.8% |
| **7.** | Georgia | 2,016 | 2,144 | 2 | 1 | 74.8% |
| **8.** | Virginia | 1,898 | 1,971 | 1 | <1 | 81.8% |
| **9.** | New Jersey | 1,810 | 1,874 | 2 | <1 | 80.8% |
| **10.** | Ohio | 1,810 | 1,867 | 2 | 1 | 77.1% |
| **11.** | North Carolina | 1,748 | 1,837 | 2 | 1 | 79.5% |
| **12.** | Michigan | 1,706 | 1,757 | 2 | <1 | 79.7% |
| **13.** | Unknown | 7,605 | 8,288 | 3 | 3 | 75.1% |
| **14.** | Other | 22,862 | 23,646 | 2 | <1 | 79.3% |
| **15.** | **Totals** | **62,989** | **65,948** | **2** | **1** | **77.9%** |

¹ An action occurs anytime the visitor views a new webpage, follows a link or takes any other action on the website.
² The Bounce Rate is the percentage of visitors who leave website after viewing only one page.

## CHART 1:  WEBSITE VISITS FREQUENCY MAP



© 2014 BrownGreer PLC.

# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

No. 2:12-md-02323 (E.D. PENN.)

| NFL 1002 | CLAIMS ADMINISTRATOR UPDATE (THROUGH 10/14/14) | | | | | | |
|---|---|---|---|---|---|---|---|
| **TABLE 2** | **SIGN-UPS FOR FUTURE INFORMATION** | | | | | | |
| Row | Sign-Up Method | Retired Player | Authorized Rep | Attorney for Player or Family | Family Member | Other/ Unknown | Total |
| **1.** | Website | 2,045 | 209 | 77 | 668 | 176 | 3,175 |
| **2.** | Call Center | 1,048 | 10 | 18 | 608 | 116 | 1,800 |
| **3.** | P.O. Box | 10 | 0 | 4 | 8 | 0 | 22 |
| **4.** | Email | 13 | 1 | 5 | 4 | 2 | 25 |
| **5.** | **Totals** | **3,116** | **220** | **104** | **1,288** | **294** | **5,022** |



**CHART 2: WEEKLY INFORMATIONAL SIGN-UPS**

| | 7/14 | 7/21 | 7/28 | 8/4 | 8/11 | 8/18 | 8/25 | 9/1 | 9/8 | 9/15 | 9/22 | 9/29 | 10/6 | 10/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Email | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 3 | 4 | 11 | 2 |
| P.O. Box | 0 | 0 | 5 | 4 | 1 | 5 | 0 | 4 | 1 | 1 | 1 | 0 | 0 | 0 |
| Call Center | 3 | 5 | 626 | 259 | 225 | 184 | 104 | 69 | 71 | 55 | 58 | 69 | 42 | 30 |
| Website | 17 | 129 | 984 | 424 | 370 | 321 | 179 | 131 | 123 | 116 | 90 | 106 | 127 | 58 |
| **Total** | **20** | **154** | **1,769** | **2,456** | **3,052** | **3,562** | **3,845** | **4,049** | **4,244** | **4,421** | **4,573** | **4,752** | **4,932** | **5,022** |

| TABLE 3 | CLAIMANT CORRESPONDENCE AND CLAIMS ADMINISTRATOR RESPONSES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Row | Representation Status | Letters / Emails Received | Responses Sent | Response Not Required | Response FAQs[3] | | | | |
| | | | | | FAQ 6 | FAQ 14 | FAQ 21 | FAQ 26 | Other |
| **1.** | Pro Se or Unknown | 53 | 43 | 10 | 6 | 1 | 3 | 9 | 2 |
| **2.** | Represented | 13 | 8 | 5 | 1 | 0 | 0 | 1 | 0 |
| **3.** | **Totals** | **66** | **51** | **15** | **7** | **1** | **3** | **10** | **2** |

[3] The sum of all Response FAQs will not equal the total number of responses sent, because some responses require reference to multiple FAQs and other responses do not require any reference to FAQs.

© 2014 BrownGreer PLC.

# ATTACHMENT 8

# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. PENN.)

[DATE]

[SETTLEMENT CLASS MEMBER NAME]
[ADDRESS]
[CITY, STATE ZIP]

**RE:**    ***In re: National Football League Players' Concussion Injury Litigation***
   ***Case No. 2:12-md-02323 (E.D. Penn.)***

Dear [Mr./Ms.] [NAME]:

We are the Claims Administrator for the proposed settlement of the NFL concussion litigation.  We received your letter asking **[INSERT SUBJECT OF INQUIRY]**.  We can provide you with basic information regarding the Settlement, but we cannot give you legal advice on any matter.  If you are represented by an attorney, you should consult with that attorney on questions related to your claim and your particular circumstances.

We believe that your question is covered by this Frequently Asked Question and its response:

**[INSERT FAQ(S)]**

You can find more information about the Settlement by visiting the Settlement website at www.NFLConcussionSettlement.com.  Click on the "FAQs" link at the top of the home page at that site to see the entire set of Frequently Asked Questions.

We will keep a record of your name and address for you to receive more information in the future on how to register for benefits with the Settlement after it receives final approval from the courts.  If your address changes, please let us know.  If you have any additional questions, you may reach us at 1-855-887-3485 or by email at ClaimsAdministrator@NFLConcussionSettlement.com.

Thank you,

Claims Administrator
NFL Concussion Settlement