# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | CIVIL ACTION NO: 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**SUPPLEMENTAL DECLARATION OF MEDIATOR AND FORMER UNITED STATES DISTRICT COURT JUDGE LAYN R. PHILLIPS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AND CERTIFICATION OF CLASS AND SUBCLASSES**

Layn R. Phillips declares as follows:

1. Shortly after the Court heard oral argument on Defendants' motions to dismiss Plaintiffs' claims in this litigation on grounds of preemption under Section 301 of the Labor Management Relations Act, I was appointed by the Court to serve as the mediator in the negotiations between the Plaintiff Class and the National Football League and NFL Properties, LLC (collectively, the "NFL Parties"). I am a former United States District Court Judge. Previously, I submitted a declaration in support of preliminary approval of the proposed class

action settlement between the parties [ECF No. 6073-4].  My credentials, the procedural background regarding my appointment to serve as the mediator, and the details concerning my role in the mediation sessions in this matter are set forth in my earlier declaration and I incorporate that declaration herein by reference.  I submit this Supplemental Declaration in support of Class Counsel's Motion for Final Approval of the Settlement dated June 25, 2014 [ECF No. 6073-2], which was preliminarily approved on July 7, 2014 [ECF No. 6084, ¶ 3(b)], and Certification of the Class and Subclasses.  Without waiver of the mediation privilege, I describe below the reasons for my views.

2. Beginning in July, 2013, at the request of the Court, I conducted extensive mediation sessions with the parties jointly and separately over the course of approximately six months, overseeing the negotiations that resulted in the class settlement filed with the Court on January 6, 2014 [ECF No. 5634].  The Court agreed to hold in abeyance its decision on preemption until September 3, 2013.  The parties negotiated this Settlement under my supervision.  Each side was represented by zealous and highly competent counsel with stellar reputations.  With respect to Plaintiffs' counsel, they consistently and passionately expressed the need to protect the interests of the retirees and their families and fought hard for the greatest possible benefits for all of the players in the context of a settlement that the NFL Parties could accept.  I am satisfied that the demands (although some were rejected by the NFL) made by Plaintiffs' counsel represented every reasonable interest and injury claimed in this litigation.  In a negotiated resolution, neither side receives all that they want.

3. It was evident throughout the mediation process that Plaintiffs' counsel were prepared to litigate and try these cases, and face the risk of losing with no chance to recover for

their labor or their expenses, if they were not able to achieve a fair and reasonable settlement result for the proposed class.

4. The negotiations were intense, vigorous, and sometimes quite contentious. At all times the talks were at arm's length and in good faith. There was no collusion. The parties fought hard and went back and forth on numerous issues, including: settlement structures; baseline neurological testing; compensable injury categories; monetary award values; necessary proofs for class membership and entitlement to benefits; appropriate offsets for monetary awards; the breadth of released claims; and payment of costs of settlement administration and class notice, among other things. There were extensive and heated discussions of the strengths and weaknesses of the parties' various positions and of possible settlement structures. A number of different options and proposals were offered and rejected along the way. In the event the parties reached an impasse on a difficult point, I intervened and offered both sides suggestions and creative solutions for compromise. Ultimately, neither the Plaintiffs nor the NFL Parties were able to achieve all that they desired, and both sides were forced to make numerous concessions and trade-offs in order to reach an agreement.

5. Throughout the mediation process, the parties consulted with and relied on their respective independent medical experts in the fields of neurology, neuropsychology, and other relevant specialties in order to understand the science regarding the diseases associated with concussive head trauma and their pathologies, and to evaluate the strength of Plaintiffs' claimed injuries. They also retained actuarial/economics experts to model the sufficiency of the fund to ensure that all injured players would be compensated properly throughout the life of the Settlement. They consulted with experienced claims and lien administrators to establish workable procedures for the functioning of the various Settlement components, including

registration for benefits, testing of players for neurocognitive impairment, submission of claims, appeals from monetary award decisions, and lien identification and satisfaction.  Plaintiffs worked with a class action notice expert to create a Notice Plan and proposed class notices that met the requirements of Rule 23 and satisfied Due Process.  I met with the parties' experts at various times to satisfy myself that the medical, actuarial, or financial aspects of the deal were sound.

6. Early on, the parties agreed that a reasonable and fair settlement structure would encompass (i) a baseline assessment program ("BAP") to medically evaluate retired players for neurocognitive impairment; (ii) a compensation fund to provide cash payments to players diagnosed with neurocognitive or neuromuscular impairment[1]; and (iii) an education fund to promote safety in the sport of football and to educate retired players about available NFL medical and disability benefits programs and initiatives.  The Plaintiffs insisted that independent administrators oversee each component of the settlement program and that independent doctors conduct the baseline tests to determine whether living players suffer from neurocognitive decline.

7. In order to ensure the adequate and unconflicted representation of all of the proposed Class Members, Plaintiffs agreed to create two proposed separate subclasses, each represented by separate subclass counsel – (1) to include those Class Members who were not diagnosed with a qualifying injury; and (2) to encompass Class Members diagnosed with a qualifying injury.  Plaintiffs believed – and I agreed – that having these two separate subclasses

---

[1] Due to the young age of some of the retired players, the compensation fund needed to be available throughout the projected lifespan of those young players, which from an actuarial standpoint required a 65-year term.

would ensure that any final resolution did not favor retired players who are currently suffering from compensable injuries from those who have not been diagnosed and who may not develop compensable injuries for years to come, if ever. Subclass Counsel participated in the negotiations on behalf of their respective subclasses and were involved throughout the mediation process.

8. Plaintiffs' Co-Lead Counsel demanded that a range of injuries consistent with those alleged in the Complaints be considered eligible for a monetary award. They were not able to achieve all that they asked for in the negotiations. Plaintiffs' actions throughout the negotiations reflected a sound appreciation of the scientific issues associated with their claims. They were aware of mainstream medical literature linking traumatic brain injury to an increase in the likelihood for developing early-onset dementia, Alzheimer's Disease, Parkinson's Disease, and ALS. Informed by their experts and based on their investigation, the Plaintiffs concluded that it was fair to compensate retired players for those diagnoses as part of the Settlement.

9. Plaintiffs' Co-Lead Counsel passionately advocated for significant, "full value" awards for dementia, Alzheimer's Disease, Parkinson's Disease, and ALS. Importantly, they also insisted that even though, at present, not every retired player has been diagnosed with a qualifying injury, all retired players must be eligible to seek a monetary award if and when their symptoms progress to a compensable level. In addition, it was very important to the Plaintiffs that players be able to seek a supplemental monetary award if their condition worsens.

10. Each side relied upon their respective independent economists and actuaries to model the sufficiency of funding necessary to compensate Plaintiffs for these injuries at various monetary award levels throughout the life of the Settlement.

11. With limited exception, the Settlement compensates retired players and their families for deficits and diseases that they suffered from while living. Though the pathological diagnosis of CTE is not compensated as an injury prospectively, severe cognitive impairments developed in living retired players, which have been associated with traumatic brain injury in the medical literature as well as more advanced forms of CTE, are compensated (*i.e.*, early and moderate dementia). Plaintiffs also were able to secure recovery for the families of those individuals who were deceased prior to preliminary approval and had a post-mortem diagnosis of CTE, and thus the "Death with CTE" injury definition was agreed to for pre-approval deaths with confirmed CTE from autopsy.

12. Class Counsel also demanded that retired players maintain their rights to pursue claims for worker's compensation and benefits under all applicable Collective Bargaining Agreements and that their participation in the settlement not vitiate these rights. After robust negotiations on these points, the NFL Parties agreed not to enforce the releases and covenants not to sue that were previously executed by Class Members in connection with claims for the Neuro-Cognitive Disability Benefit under Article 65 of the current CBA. This was a major concession for the NFL Parties and a negotiating victory for the Plaintiffs, because these waivers would have deprived many retired players of substantial additional Settlement benefits.

13. As part of their negotiations, the parties agreed that the proposed Settlement will not require Class Members to prove that their injuries were caused by or even related to concussions suffered during NFL football play. Class Members will need only to demonstrate class membership and a qualifying injury in order to receive a monetary award. Appropriately, the parties, in consultation with their medical and actuarial experts, negotiated and agreed to four limited categories of downward adjustments, or offsets, that may be applied to all monetary

awards.  These offsets include: the player's age, if 45 or older, at the time of diagnosis of a qualifying injury; the incidence of a stroke or traumatic brain injury unrelated to football (*e.g.*, a severe car accident); failure to participate in the BAP, which is designed to provide early detection of a qualifying injury; and the number of seasons of active participation in NFL football play (which the parties considered an objective substitute for exposure to injury).

14. In addition, the Plaintiffs proposed to incorporate into the Settlement a mechanism whereby an expert in lien resolution would negotiate on a global basis the reduction of certain governmental liens applicable to Class Members' monetary awards, which would in turn increase their individual net recoveries.  Plaintiffs believed that it was unlikely that individual Class Members would be able to achieve this benefit on their own outside of the context of a class Settlement.

15. Moreover, the vast majority of Class Members will not be prevented from partaking in Settlement benefits due to applicable statutes of limitations.[2]  Even if a player retired decades ago and never filed suit against the NFL Parties, he may still be entitled to a baseline neuropsychological and neurological examination and a monetary award.

16. Co-Lead Class Counsel and the NFL Parties fought hard to reach a consensus on a total settlement value.  They worked with their experts to ensure there were sufficient funds to pay for evaluations of all living retired players eligible to be tested in the BAP and to pay the projected monetary awards.  Ultimately, the parties agreed to $765 million.

---

[2] The only exception is for players who died before January 1, 2006, more than eight (8) years ago.  The representatives of these players will have an opportunity, however, to demonstrate that their wrongful death or survival claim is not barred by governing state law.

17. Subclass Counsel fulfilled their fiduciary responsibilities and performed their own due diligence to evaluate the deal to determine for themselves whether it was fair and satisfied the needs of their respective Subclass members and Due Process.

18. Notably, the Settling Parties did not discuss the issue of attorneys' fees at any point during the mediation sessions, except to defer the issue until after an agreement in principal was reached on all material Settlement terms. When the parties executed the Term Sheet there was no fee agreement in place. Class Counsel agreed to settle Plaintiffs' claims on a global basis regardless of whether an agreement could be reached on this issue. In other words, the Plaintiffs' negotiators did not allow the issue of attorneys' fees to impede the resolution of the litigation. They agreed to go forward with this deal, and apply for fees at a later time, subject to Court approval.

19. Eventually, after the Court announced the Settlement on the record, the parties discussed the amount of payment of attorneys' fees separate and apart from all other Settlement benefits, and the NFL Parties agreed not to object to a petition for an award of attorneys' fees and reasonable incurred costs by Class Counsel, provided the amount requested does not exceed $112.5 million. In the event these attorneys' fees and costs are awarded by the Court, the NFL Parties will pay them on top of the other Settlement benefits. Unlike traditional common fund cases where attorneys' fees are obtained directly from the common fund, the Settlement Class is further benefitted by the separate payment of attorneys' fees by the NFL Parties.

20. Ever present in the minds of the parties during the mediation of this Settlement were the potential risks of litigation for both sides. The Court had heard oral argument on Defendants' preemption motions but was awaiting the results of the settlement talks before issuing a ruling. As the Court stated in the Preliminary Approval Order: "Many, if not all, of

Plaintiffs' claims could have been dismissed at this early stage of the litigation if the NFL Parties prevailed on the preemption issue." [ECF No. 6083, at 10].

21.  Plaintiffs' counsel recognized significant additional legal and factual hurdles that Plaintiffs would have faced if they proceeded with the litigation. In addition to preemption, the NFL Parties could have asserted a defense of lack of causation. Plaintiffs risked not being able to prove that they suffered cognizable injuries *as a result of* the NFL Parties, let alone the concussions and sub-concussive hits they experienced while playing in the NFL as opposed to some cause unrelated to football or as a result of prior football experience such as in middle school, high school and college. Many members of the proposed class developed their symptoms later in life and therefore may have had difficulty proving that their alleged injuries are not a result of the normal aging process. More broadly, the science regarding concussions and sub-concussive hits and cognitive impairment is still evolving, which makes it more difficult to prove negligence or fraud the earlier a player played. The research is often contradictory, thereby creating additional hurdles for a successful prosecution of Plaintiffs' claims.

22.  Plaintiffs faced other legal hurdles as well, including various statute of limitations arguments, statutory employer defense, and the assertion of the "assumption of risk" defense based on the argument that the retired NFL players knew at the time they played that football could be a dangerous activity and that the players assumed that risk when they chose to play.

23.  Moreover, in a litigation of this size and complexity it is likely that, even if Plaintiffs succeeded at trial on the merits, payments to seriously injured players would not occur for many years, especially since the NFL Parties have appellate rights. By resolving Plaintiffs' claims through settlement, Plaintiffs' counsel sought to compensate impaired retired NFL players who desperately need money and other relief now in order to address their medical conditions.

They also ensured that compensation and medical testing will be available for those retired NFL players who are not impaired at present, but may become so in the future.

24. Like Plaintiffs, the NFL Parties also faced great risks if they chose to litigate these cases. There was a significant risk that the Court would not accept, in whole or in part, their preemption defense, which in turn would leave much of the case intact. The same was true of the NFL Parties' other legal defenses of statute of limitations and assumption of risk. If the NFL Parties did not succeed on dismissing all of these cases as a matter of law, they faced years of very expensive discovery and potentially hundreds or thousands of trials in state and federal courts around the country. Among Plaintiffs' many claims and allegations, the NFL Parties faced the risks of litigating issues relating to helmet safety standards and rules of football play. Each potential lawsuit carried with it the risk of a significant damage verdict and a negative precedent that could affect all cases that followed.

25. In short, both sides faced substantial risks if they chose to litigate these matters and tremendous benefits if they could fairly resolve their differences.

26. Based on my extensive experience as a mediator and former judge, my frequent and detailed discussions with the parties, and the information made available to me during the mediation, I believed then that the $765 million proposed settlement reached in January, 2014, represented a fair and reasonable settlement given the substantial risks involved for both sides. That figure remains supportable today. Now that the parties have uncapped the Monetary Award Fund and eliminated the requirement from the earlier settlement that Class Members who receive monetary awards agree to release claims against the National Collegiate Athletic Association and/or other collegiate, amateur or youth football organizations and entities, the Settlement is even stronger for Plaintiffs.

27. This Settlement will benefit thousands of NFL retirees and their families. If the Settlement is approved, eligible retired NFL players immediately will be entitled to an innovative baseline testing program and, depending on their diagnosis, certain supplemental benefits for medical treatment and pharmaceuticals, as needed. In addition, players who are diagnosed with early or moderate dementia, ALS, Alzheimer's Disease, Parkinson's Disease, and certain players who died before Preliminary Approval and were diagnosed post-mortem with CTE will be eligible to receive significant cash awards, depending on the disease, the age of the player at diagnosis, the length of the player's career playing in the NFL and certain other relevant factors. The benefits will be made available promptly after the Effective Date of the Settlement and will remain available for 65 years, ensuring that players who appear healthy today but develop these kinds of medical issues in the future will have the comfort of knowing that compensation is available through the Settlement.

28. The Settlement also allocates substantial funding for education to advance the safety of the sport, including in youth football, and to educate retired players concerning available NFL medical and disability benefits programs and initiatives.

29. At the same time, the Settlement protects the rights of retired NFL players to seek benefits that have been collectively bargained between the NFL and the NFL Players Association, including pension benefits, and medical and disability benefits such as the 88 Plan and the Neuro-Cognitive Disability Benefit that was introduced in the 2011 Collective Bargaining Agreement. Plaintiffs' counsel fought hard to ensure that the retired NFL players could continue to apply for these extensive benefits, and the NFL Parties agreed that they would not enforce any release that had been signed by a class member in connection with applying for the Neuro-Cognitive Disability Benefit when he seeks to take part in the settlement benefits.

30. Therefore, for all of these reasons and the reasons in my earlier Declaration, I believe that the Settlement is fair and reasonable in light of the parties' claims and defenses, and the expense, uncertainty and time inherent in litigating the players' claims to judgment. In particular, it is my considered judgment that Plaintiffs would be unlikely to have obtained more money and benefits without going through years of discovery and trial, where they would face substantial risks of loss due to their inability to prove negligence or fraud on the part of the NFL Parties or judgments below what they will receive in this proposed Settlement. Moreover, the attendant delays presented by the likelihood of extended appellate practice further enhances the immediate benefits of the Settlement. I fully support Class Counsel's motion for Final Approval of the proposed Settlement and Certification of the Class and Subclasses.

I declare that the foregoing is true and correct.

Executed this 11th day of November 2014.

_____
LAYN R. PHILLIPS
Former United States District Court Judge