# Exhibit 7

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden,<br>*on behalf of themselves and*<br>*others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and<br>NFL Properties, LLC,<br>successor-in-interest to<br>NFL Properties, Inc.,<br><br>Defendants. | Hon. Anita B. Brody<br><br>Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

<u>**DECLARATION OF ROBERT H. KLONOFF RELATING TO THE PROPOSED CLASS SETTLEMENT IN THE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**</u>

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

**I.  INTRODUCTION**

1.  I am the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School.  I am submitting this declaration on the issues of class certification under Rule 23(b)(3), the sufficiency of the notice to the class, and the fairness of the proposed class settlement.  I am offering my opinions for the Court's consideration based on my background and experience.  I recognize that my role is limited and that the Court will make the ultimate decision.

**II.  QUALIFICATIONS**

2.  I have held my current position as the Jordan D. Schnitzer Professor of Law since June 1, 2014.  From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School.

1

Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor. I taught courses on complex litigation, civil procedure, and appellate procedure.  While at UMKC, I organized and chaired a major class action symposium in which leading class action scholars presented and published articles (Vol. 74, No. 3, UMKC Law Review).  Prior to my academic post at UMKC, I served for more than a dozen years as a partner with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  While serving as a partner at Jones Day, I also served for many years as an adjunct professor of law at Georgetown University Law Center, where I taught courses on class actions.  Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States.  I also served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit.  I received my law degree from Yale Law School.

3.  I am a co-author of the first casebook devoted specifically to class actions (Robert H. Klonoff, Edward K.M. Bilich, and Suzette Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed. 2012)).  As a textbook author in the class action field, I annually supplement my casebook, and thus remain up to date on the latest case law developments.  I am also the author of the Nutshell on class actions (Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 4th ed. 2012)).  These texts are used at law schools throughout the United States and have been cited by numerous courts and commentators.[1]  I have also authored or co-authored numerous scholarly articles on class actions.[2]  I also serve on the advisory board of *Class Action Litigation Report*, a Bloomberg/BNA publication.

---

[1] *See*, *e.g.*, *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (citing class action *Nutshell* (4th ed.)); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (citing class action *Nutshell* (1st ed.)); *LaRocque ex rel. Spang v. TRS Recovery Services, Inc.*, 285 F.R.D. 139, 151 n.27 (D. Me. 2012) (citing class action *Nutshell* (3d ed.)); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 151 n.5 (2003) (citing class action casebook).

[2] For example, I recently published *The Decline of Class Actions*, 90 WASH. U. L. REV. 729 (2013).  That article has already been widely cited. *See*, *e.g.*, *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); Brandon L. Garrett, *Aggregation and Constitutional Rights*, 88 NOTRE DAME L. REV. 593, 610 n.82 (2012) (citing manuscript pre-publication version); Deborah Hensler, *Goldilocks and the Class Action*, 126 HARV. L. REV. F. 56, 56 n.2 (2012) (citing manuscript pre-publication version); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1186 n.5 (2013) (citing manuscript pre-publication version).

4.   I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation* ("*ALI Aggregate Litigation*").   I was the principal author of the chapter that addresses class action settlements and attorneys' fees (chapter 3).   The project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published in May 2010.   It has been cited extensively by courts and commentators.[3]

5.   I have significant experience as a practicing lawyer.   I have had eight oral arguments before the U.S. Supreme Court, and many other oral arguments in federal and state trial and appellate courts throughout the country.   As a partner at Jones Day, I personally handled more than 100 class action cases, primarily (but not exclusively) on the defense side.   These cases have included some of the largest and most highly publicized civil cases in U.S. history.   My class action experience includes, among other things, class certification, class discovery, notice, settlement, claims administration, and a variety of appellate issues.   I have handled many types of class actions, including mass torts, antitrust, consumer, insurance, securities fraud, employment discrimination, RICO, and numerous others.   I have given lectures on class action issues and other litigation topics throughout the United States and abroad, including lectures at law schools in Cambodia, Canada, China, Colombia, Ecuador, India, Italy, Japan, the Philippines, Russia, South Korea, and Taiwan.   During the current academic year, I am also planning to give lectures in Australia, South Africa, Spain, and Turkey.   Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[4]

6.   In September 2011, Chief Justice John G. Roberts, Jr., appointed me to serve a three-year term as the only academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure.   That Committee considers and recommends amendments to the Federal Rules of Civil Procedure.   In May 2014, Chief Justice Roberts reappointed me to serve a

---

[3] *See, e.g.*, *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n.11 (2011); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Marketing & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266, 269, 273 (3d Cir. 2011); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 n.14–16 (5th Cir. 2011); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196, 198 (5th Cir. 2010).

[4] Examples of these speaking engagements are contained in my attached curriculum vitae (Exhibit A).

second three-year term on the Committee.  The Chair of the Committee, Judge David Campbell, has appointed me to serve on a Class Action Subcommittee, which will be considering possible amendments to the federal class action rule, Fed. R. Civ. P. 23.  I should also note that in October 2014, I was elected to membership in the International Association of Procedural Law.

7.  I have testified as an expert in numerous class action cases.  In the past four years, I have testified in the following cases:  *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("*Deepwater Horizon*") (submitted expert declarations on class settlements for economic and property damages (Doc. No. 7104-3), and personal injuries (Doc. No. 7111-4) (both filed 08/13/12), and supplemental expert declarations for both class settlements (Doc. No. 7727-4) (economic); (Doc. No. 7728-2) (medical) (both filed 10/22/12); *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert report on class certification and settlement fairness on Feb. 13, 2013; submitted supplemental expert report on Feb. 19, 2013; and testified in court on Feb. 20, 2013); *Robichaux v. State of Louisiana, et. al* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted written report on class action attorneys' fees on February 20, 2012, gave deposition testimony on March 7, 2012, and testified in court on April 11, 2012); and *In re AT&T Mobility Wireless Data Svcs. Sales Tex Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (submitted declarations on the fairness of a proposed settlement and on attorneys' fees and incentive payments, and testified in court on March 10, 2011).  Courts reviewing class settlements have relied extensively on my testimony.  For example, in the *Deepwater Horizon* case, Judge Barbier cited and quoted my written declarations (in his analysis of class certification and fairness) more than 60 times in his two opinions.[5]  Similarly, in the *AT&T Mobility* litigation, Judge St. Eve cited and quoted my written declarations in upholding a class settlement and awarding attorneys' fees.[6]

8.  Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae, attached hereto as Exhibit A.

9.  I offer this declaration solely in my personal capacity as a class action scholar and

---

[5] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891 (E.D. La. 2012) (approving economic and property damages settlement); 295 F.R.D. 112 (E.D.La. 2013) (approving medical benefits settlement).

[6] *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935 (N.D. Ill. 2011) (approving class settlement); 792 F. Supp. 2d 1028 (N.D. Ill. 2011) (awarding attorneys' fees).

practitioner, not in my capacity as a member of the Advisory Committee on Rules of Civil Procedure.  This declaration reflects solely my personal opinion, based on the unique facts of this case.

## III.  BASIS FOR TESTIMONY

10.  I have reviewed numerous pleadings, orders, briefs, declarations, and exhibits in this case, along with the settlement agreement documents.  As part of my review, I have looked at all (or substantially all) of the objections filed in connection with the settlement.

## IV. BACKGROUND

11.  This Court is thoroughly familiar with the terms of the proposed settlement agreement and with the background leading up to the settlement.[7]  In discussing class certification, notice, and fairness issues, I highlight facts that I believe are relevant.

## V. OVERVIEW

12.  In the remaining sections of this declaration, I offer—and explain—my opinion that (1) the settlement satisfies the class certification requirements of Rule 23; (2) the notice is not defective; and (3) the terms of the settlement are fair, reasonable, and adequate.  The purpose of this overview section is to identify major themes and concepts that lead me to my conclusions.[8]

13.  It is important to note at the outset that the Third Circuit has been relatively deferential in reviewing settlements.  On the issue of class certification, the Third Circuit recognizes that many of the issues that are problematic in the litigation context disappear in the settlement context.[9]  Likewise, the Third Circuit has stressed the "overriding public interest in settling class

---

[7] *See* Preliminary Approval Order (ECF No. 6083) (07/07/14).

[8] At various times, I use capitalized terms, such as Qualifying Diagnosis.  Such terms are defined in the June 25, 2014 Settlement Agreement.  In citing to page numbers in court filings, I use the Court's pagination (in blue at the top of each page), not the pagination used in the original filing.  All Internet sources cited in this declaration were last visited Nov. 9, 2014.

[9] *See*, *e.g.*, *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc) (noting that "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class" (citation omitted)); *see also In re Am. Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 243 (2d Cir. 2012) ("the existence of a settlement that eliminates manageability problems can alter the outcome of the predominance analysis").

action litigation,"[10] and it "encourage[s] settlement of complex litigation that otherwise could linger for years."[11]  At the same time, the court applies a "heightened standard" where, as here, class certification and settlement approval are sought simultaneously.[12]  At bottom, as the Third Circuit has recognized, a "settlement is a compromise," and a court should therefore "guard against demanding too large a settlement based on its view of the merits . . . ."[13]  These general guidelines are important in how I assess the terms of the settlement and the various objections that have been filed.

14.     Another critical fact is that, from the beginning of the court-ordered mediation, settlement talks have taken place under the supervision of an experienced Mediator, retired U.S. District Judge Layn Phillips. Judge Phillips's presence has helped to ensure that there is no collusion among the parties and that the terms are fair to the class.[14]  Also involved in latter stages of the settlement negotiations was Special Master Perry Golkin, a former partner at the private equity firm of Kohlberg Kravis Roberts & Co.  He, too, played a significant role.[15]

15.  I am also impressed by the fact that this Court's scrutiny at the preliminary review stage has been exacting.   The Court initially declined to grant preliminary approval.   It noted (correctly, in my view) that, because the monetary award fund was capped at $675 million,[16] there was a risk that funding would be inadequate to pay all of the claims of the 20,000+ class members.  As a result of the Court's ruling, the parties went back to the bargaining table and ultimately agreed to make the settlement uncapped.[17]  The parties also agreed to remove the

---

[10] *Warfarin*, 391 F.3d at 535.

[11] *In re School Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (citations omitted).

[12] *See, e.g., Warfarin*, 391 F.3d at 534; *In re GM Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995); *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 317 (3d Cir. 1998).

[13] *Prudential*, 148 F.3d at 317 (quoting *GM Corp.*, 55 F.3d at 806).

[14] *See* Preliminary Approval Memo. (ECF No. 6083) (07/07/14), at 10 ("Judge Phillips guided the parties through nearly two months of negotiations.  The parties attended numerous mediation sessions and aggressively asserted their respective positions.  The discussions were at times contentious.") (citing Phillips Decl. (01/03/14) ¶¶ 5–6); *see also* Seeger Decl. ¶¶ 26, 31 (discussing role of Judge Phillips); Supp. Phillips Decl. (11/11/14), at ¶¶ 2–5 (describing negotiations).

[15] *See* Preliminary Approval Memo. (ECF No. 6083) (07/07/14), at 3 ("Special Master Golkin has been a critical source of advice and financial expertise for the parties and me."); *see also* Seeger Decl. (filed 11/12/14) at ¶ 57 (discussing Special Master's role).

[16] Order Denying Preliminary Approval (ECF No. 5657) (01/14/14), at 10–12.

[17] *See* Class Action Settlement Agreement as of June 25, 2014, Case No. 2:12-md-02323-AB (ECF No. 6073-2) (filed 06/25/14) ("Settlement Agreement"), at § 3.1(a).

National Collegiate Athletic Association and other collegiate, amateur, and youth football organizations as parties who are released from liability under the settlement.[18]   By initially rejecting the proposed settlement, and thus prompting the parties to return with a much stronger agreement, the Court has taken seriously its role "as a fiduciary who . . . serve[s] as a guardian of the rights of absent class members."[19]

16.   In my discussions with class counsel regarding the revised settlement, I explained that, while I was impressed that the settlement was now uncapped, I believed the parties needed to specify how class members would be represented once the settlement receives Court approval, given the length of the claims process and ongoing work that will be required of counsel representing individual class members in that process.   In rendering an opinion on the settlement, I am assuming that this concern will be addressed prior to implementation of the settlement program.   I am advised by counsel that, assuming the Court grants final approval of the Settlement, class counsel's proposal for the continued and future representation of class members will be submitted for the Court's consideration at the time class counsel applies for an award of attorneys' fees.   I also asked that counsel explain the rationale underlying the treatment of seasons played by class members in NFL Europe.   I believe as well that the parties should consider modifications to the settlement agreement to address the NFL Europe issue.

17.   Most of the objections raised in this case involve line-drawing: injuries that are not covered should be covered; various offsets to (or reductions in) recovery are unfair; eligible seasons should be calculated differently; and so forth.   In my experience, every settlement is subject to line-drawing attacks.   The question, however, is not whether the settlement is perfect, but whether the lines that have been drawn have a rational basis and were carefully considered.[20] As I explain below, although it is always possible to argue that the lines could have been drawn differently, I am comfortable that the parameters of this settlement are reasonable.   Moreover,

---

[18] *Compare* Settlement Agreement § 18.1 *with* Class Action Settlement Agreement as of January 6, 2014, Case No. 2:12-md-02323-AB (ECF No. 5634-2) (01/06/14) ("January 6, 2014 Settlement Agreement"), at § 18.5.

[19] *Warfarin*, 391 F.3d at 534 (quoting *GM Corp.*, 55 F.3d at 785).

[20] *See, e.g., Deepwater Horizon*, 910 F. Supp. 2d at 948 (noting, in rejecting line-drawing challenges to class settlement, that "[d]isputes over where lines should be drawn do not necessarily call into question the reasonableness of the lines."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 341 (N.D. Ga. 1993) (rejecting objections to a plan for allocating settlement proceeds that was "rationally based on legitimate considerations") (citation omitted).

those class members who felt that the settlement did not adequately address their precise factual circumstances had a full and fair opportunity to opt out.[21]

18.   In assessing the objections to this settlement, it is important to underscore the challenges facing the class.  Absent a settlement, plaintiffs would have faced the difficult task of proving general causation (*i.e.*, that concussions from NFL football can cause the injuries at issue). Plaintiffs also would have had to show that the NFL deliberately withheld key information from the class regarding the dangers of football.   And, wholly apart from these difficult evidentiary hurdles, the NFL had a number of substantial defenses that could have resulted in no recovery by the class, including federal preemption under Section 301 of the Labor Management Relations Act ("LMRA"); lack of causation (*e.g.*, that the injuries in question were caused by playing middle school, high school, or college football); statutes of limitation (given that many of the class members have not played NFL football for many years); assumption of risk (given the well-known violent nature of the sport); and the statutory employer defense (*i.e.*, that employees of subcontractors are barred from recovering from general contractors and are limited to workers' compensation).[22]   The Court had made clear that it would rule on the preemption issue, which had been fully briefed and argued, if the parties did not reach an agreement by September 3, 2014.[23]   Given the strength of the preemption motion, class counsel faced a serious risk that the entire litigation could end with no recovery for class members.   Also, given the hard bargaining that had already taken place among experienced counsel under the supervision of a proactive Mediator, it is difficult to believe that the class could have secured a significantly better deal.[24]   A decision striking down this settlement could mean years of contested litigation, with class members receiving nothing in the interim (or losing altogether and receiving nothing).

---

[21] *See, e.g., Deepwater Horizon*, 910 F. Supp. 2d at 929 (relying, in approving class settlement, on the fact that "[a]ny plaintiff who [did] not wish to take part in the Settlement remained free to opt out of the Settlement and pursue his own action") (citation omitted).

[22] Layn R. Phillips Decl. (ECF No. 5634-4) (filed 01/06/14), at ¶¶ 12–15 (detailing the "significant legal and factual hurdles" faced by the class if they litigated the case); Preliminary Approval Memo. (ECF No. 6083) (07/07/14), at 10–11 (describing the "significant legal challenges facing Plaintiffs" and the "hurdles" faced by plaintiffs in "proving their case-in-chief").

[23] Seeger Decl. ¶ 26.

[24] *Id.* at ¶ 36 (plaintiffs' counsel "relied on our own assessment and belief that the $765 million figure [in the original settlement] was at the upper range of what the NFL Parties were willing to pay for a global resolution of Plaintiffs' claims"); Phillips Decl. ¶ 19 ("it is my considered judgment that Plaintiffs would be unlikely to have

19.   Finally, it is notable that, despite the settlement's wide publicity, few objections were filed, and very few class members chose to opt out.[25]   The low number of objections and opt outs suggests that most class members were satisfied with the basic terms of the agreement, despite the flaws alleged by the (relatively few) class members who chose to file objections.[26]   In some cases, *e.g.*, small claims consumer cases involving only a few dollars per class member, there may be insufficient incentive to opt out or object (or even to study the notice carefully), so caution must be used in giving too much weight to the sheer number of opt-outs and objections. Here, however, there was a discrete group of people with much at stake, who no doubt scrutinized the class notice, settlement agreement, and the wide press coverage.[27]   In these circumstances, the paucity of opt-outs and objections should be given much more weight than in some other class actions.

20.   I have carefully studied the various class member objections (and the Public Citizen amicus brief).  I take these submissions very seriously.  The briefs, in many instances, contain extensive citations and evidentiary material.  Ultimately, however, I am not persuaded that the settlement should be rejected.  Few, if any, class action settlements are without controversy.  But after studying the objections, looking at the history of the negotiations, and reviewing the revised settlement agreement in its entirety, it is my opinion that this settlement meets the Third Circuit's criteria for class certification and fairness.  It represents the product of hard work and creativity by the Court, counsel for the parties, the Mediator, and the Special Master.  In the following pages, I set forth my reasoning in detail.

---

obtained more money and benefits" except by litigating the case, in which event they would have faced "substantial risks" and delays).

[25] *See* Opt Out Report Submitted by Claims Administrator (ECF No. 6340), at ¶ 3 (less than 1 percent of class opted out); Seeger Decl. ¶ 71 (less than 1 percent of class opted out or objected).

[26] *See, e.g.*, *Deepwater Horizon*, 910 F. Supp. 2d at 938 (low numbers of opt-outs and objections are evidence of settlement's fairness); *Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012) ("[T]he existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair.").

[27] *See e.g.*, Seeger Decl. ¶ 70 (noting that "there have been more than 900 print and online stories about the Settlement since its announcement on August 29, 2013," and that "details of the Settlement were covered in national broadcasts and news programs on ESPN, CNN, FOX News, NBC, ABC, CBS, MSNBC, Al Jazeera, NPF, CNBC, NFL Network, Fox Sports 1, HLN, Bloomberg, Comcast Sports Network, and PBS, as well as on countless local stations").

## VI.  CLASS CERTIFICATION

21.  In this section, I offer my opinion on whether the case is suitable for certification as a settlement class.  The fact that the parties have reached a settlement does not relieve this Court of its duty to assess whether this case should be certified as a class action.[28]  And, as noted in ¶ 13, *supra*, the fact that the parties are simultaneously seeking class certification and settlement approval necessitates heightened scrutiny.

22.  To obtain class certification in the Third Circuit, plaintiffs must put forward a class definition that enables the class to be "currently and readily ascertainable based on objective criteria."[29]  In addition, plaintiffs must satisfy the four explicit requirements under Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation), and all the elements of at least one subdivision of Rule 23(b)—(b)(1)(A), (b)(1)(B), (b)(2), or (b)(3).[30]  In this case, plaintiffs seek certification under Rule 23(b)(3), and thus they must satisfy both "predominance" and "superiority" (excluding manageability).[31]  In this section, I offer my opinion on whether these requirements are met in this case.

### A. Ascertainability

23.  I do not have any concerns about the "ascertainability" of the class.  The class is defined in precise terms to encompass (1) all living football players who retired from the NFL (or a specified member club) prior to July 7, 2014 (the date of preliminary approval); (2) authorized representatives of deceased or legally incapacitated or incompetent retired players; and (3) close family members or others who assert the right to sue under state law based on their relationship with a retired player.[32]  No objector, to my knowledge, has protested on the ground that the

---

[28] *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc) ("before approving a class action settlement agreement, 'a district court must first determine that the requirements for class certification under Rule 23(a) and (b) and met'") (quoting *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010)).

[29] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (citing cases).

[30] *See, e.g.*, *In re Community Bank of N. Virginia*, 622 F.3d 275, 291 (3d Cir. 2010); *see also* Robert H. Klonoff, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 23–25, 30–133 (West 4th ed. 2012).

[31] *See, e.g.*, *Warfarin*, 391 F.3d at 527–29 ("the . . . concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class"); *Community Bank*, 622 F.3d at 291 ("'Confronted with a request for a settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.'") (quoting *Amchem*, 521 U.S. at 620).

[32] *See* Preliminary Approval Memo. (ECF No. 6083) (07/07/14), at 3–4; Settlement Agreement § 1.1.

members of the class are not ascertainable.

## B. Rule 23(a) and (b)(3)

### 1. Rule 23(a) Requirements

#### a. Rule 23(a)(1)—Numerosity

24.   Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all members is impracticable." *Id.* "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," the numerosity requirement is satisfied.[33]

25.   Here, numerosity is clearly satisfied.  The class size is estimated to be over 20,000.[34]  No objector argues that numerosity is not satisfied, and some affirmatively argue that it is met.[35]

#### b. Rule 23(a)(2)—Commonality

26.   To satisfy Rule 23(a)(2)'s requirement of "questions of law or fact common to the class," the class claims "must 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"[36]  A single common question satisfying this criterion will suffice.[37]  "The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence."[38]

27.   In my opinion, commonality is satisfied here.  There are numerous common questions, including:

- Whether the injuries in question can be caused by concussions from playing football;

---

[33] *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001) (citation omitted).

[34] *See* Pls' Mem. (ECF No. 6073) (filed 06/25/14), at 33; Preliminary Approval Memo. (ECF No. 6083) (07/07/14), at 4.

[35] *See, e.g.*, Morey Obj. (ECF No. 6201) (filed 10/06/14), at 97 (noting that numerosity is satisfied); Alexander Obj. (ECF No. 6233) (filed 10/14/14), at 3 (same).

[36] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

[37] *Id.* at 2556.

[38] *Sullivan*, 667 F.3d at 335 (Scirica, J., concurring).

- Whether the NFL withheld or misrepresented critical information about the dangers of football-related concussions;
- Whether the claims are preempted by Section 301 of the LMRA;
- Whether the players knowingly assumed the risk of injury, given the publicity surrounding potential injuries from concussions and the well-known violent nature of the sport;
- Whether workers' compensation provides the sole remedy;
- What statute of limitations period governs the claims.

Again, the vast majority of objectors do not dispute that commonality is satisfied here, and some affirmatively argue that it is met.[39]

### c. Rule 23(a)(3)—Typicality

28.   Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals."[40]  "'[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct."[41]

29.   Typicality is amply satisfied here.  The Subclass One representative, Shawn Wooden, is a retired NFL player who has not been diagnosed with any qualifying illness.  The Subclass Two representative, Kevin Turner, is also a retired NFL player; he has been diagnosed with Amyotrophic Lateral Sclerosis (ALS).  Again, the vast majority of objectors do not dispute that typicality is satisfied, and some affirmatively argue that it is met.[42]

---

[39] *See*, *e.g.*, Morey Obj. (ECF No. 6201) (filed 10/06/14), at 97 (common issues include "the NFL defendants' knowledge and concealment of the health risks posed by football-related concussions, and the NFL defendants' representations concerning those known health risks"); Alexander Obj. (ECF No. 6233) (filed 10/14/14), at 3 (noting that commonality is satisfied); *but see* Heimburger Obj. (ECF No. 6230) (filed 10/14/14), at 20–22 (arguing that commonality is not met).

[40] *Prudential*, 148 F.3d at 311 (citations omitted).

[41] *Id.* (quoting *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).

[42] *See*, *e.g.*, Morey Obj. (Doc. 6201) (filed 10/06/14), at 97 (explaining why typicality is satisfied and noting that the requirement has a "low threshold"); Alexander Obj. (ECF No. 6233) (filed 10/14/14), at 4 (noting that typicality is satisfied); *but see* Heimburger Obj. (ECF No. 6230) (filed 10/14/14), at 19 (arguing that typicality is not met).

### d. Rule 23(a)(4)—Adequacy of Representation

30.   Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  As the Third Circuit has explained, "[a]dequacy [of representatives] is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."[43]   Significantly, however, "[a]n intra-class conflict will not necessarily prevent certification if the settlement agreement contains sufficient structural protections to ensure that the interests of the class will be adequately represented despite the conflict."[44]   The Court must also assess the adequacy of class counsel.[45]   I first address both the zealousness of the class representatives and the adequacy of class counsel.  I then discuss potential intra-class conflicts.

### i. Zealousness of Class Representatives / Adequacy of Class Counsel

31.   It is my understanding that the class representatives were kept fully informed of settlement negotiations and material terms throughout the settlement talks.[46]   They "reviewed multiple drafts of the Agreement and accompanying exhibits."[47]   In addition, although co-lead class counsel took the lead on negotiating the settlement, counsel for the two subclasses "played an active role in the mediation process."[48]   According to class counsel, once there was an initial meeting of the minds on settlement, "Subclass Counsel each performed their own due diligence and independently assured themselves that the deal was fair and satisfied the needs of their respective Subclass members and Due Process."[49]

32.   The Mediator has testified that class counsel and counsel for the subclasses were

---

[43] *In re Certainteed Fiber Cement Siding Litig.*, MDL No. 2270, 2014 WL 1096030, at *11 (E.D. Pa. Mar. 20, 2014) (quoting *Larson v. AT & T Mobility LLC*, 687 F.3d 109, 132 n.35 (3d Cir. 2012)).

[44] *Certainteed Fiber Cement*, 2014 WL 1096030, at *11 (quoting *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 185 (3d Cir. 2012)).

[45] *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 262 (E.D. Pa. 2012) ("The Court analyzes the capabilities and performance of Interim Co–Lead Counsel under Rule 23(a)(4) based upon the factors set forth in Rule 23(g)." (citing *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010)).

[46] Seeger Decl. ¶¶ 29, 56.

[47] *Id.* at ¶ 56.  Kevin Turner has been the Subclass Two representative from the outset.  Corey Simpson was the original Subclass One representative.  He passed away on September 10, 2013, and was replaced by Shawn Wooden.  Prior to his death, Simpson was "aware of and agreed to the terms of the Settlement and he reviewed drafts of the Term Sheet before it was executed." *Id.* at ¶ 11 n.3.

[48] *Id.* at ¶ 27.

[49] *Id.* at ¶ 43.

"aggressive," "effective," and "fought hard for the greatest possible benefits."[50]  These attorneys are among the country's most prominent plaintiffs' attorneys.  Co-lead class counsel Christopher Seeger is a leading class action lawyer and has vast experience in aggregate cases involving personal injuries, including brain injuries linked to strokes.[51]  Co-lead class counsel Sol Weiss is likewise a prominent and experienced class action attorney with substantial experience in mass tort cases, including cases involving the statin drug Baycol and the diet drugs Fen-Phen.  Counsel for Subclass One, Arnold Levin, is another nationally-recognized lawyer with vast experience in aggregate personal injury cases, including cases involving Fen-Phen, breast implants, asbestos, Atrial "J" lead retention wire, and the diabetic drug Rezulin, among others.  Counsel for Subclass Two, Dianne Nast, also has broad experience in handling mass tort pharmaceutical cases, including cases involving the anti-depressants Zoloft and Effexor, and cases involving the birth control medication Yasmin.  Other members of the Plaintiffs' Executive Committee and Steering Committee are also well respected and have impressive credentials.  In short, this team of lawyers is a "who's who" of plaintiffs' attorneys who specialize in mass tort cases.  Their stature and experience represent an important piece of the puzzle in assessing the fairness of the settlement, especially in analyzing objections claiming that a better deal should have been negotiated.

### ii. Absence of Conflicts

33.  A number of objections raise concerns about conflicts of interest, given the myriad kinds of injuries allegedly linked to concussions from football, the categories of injuries designated by the settlement for compensation, and the various reductions and set-offs built into the settlement.[52]  According to these objections, the class cannot be certified in the absence of separate class representatives and class counsel representing each category of claimants.

---

[50] Phillips Decl. at ¶¶ 7, 11.

[51] *See*, *e.g.*, *id.* at ¶ 2 (citing numerous examples of prior mass tort cases).

[52] *See*, *e.g.*, Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 2; Chesley Obj. (ECF No. 6242) (filed 10/14/14), at 10–15; Duerson Obj. (ECF No. 6241) (filed 10/14/14) at 17–21; Heimburger Obj. (ECF No. 6230) (filed 10/14/14) at 14–15; Jones Obj. (ECF No. 6235) (filed 10/14/14) at 3; Miller Obj. (ECF No. 6213) (filed 10/14/14) at 2–4; Carrington Obj. (ECF No. 6409) (filed 11/03/14), at 5–6.

34.   As the Supreme Court explained in *Amchem Products, Inc. v. Windsor*,[53] adequacy concerns arise when a settlement includes both class members who have been injured and those who have not yet suffered injuries.  The interests of the two groups may conflict because class members who are currently injured have an interest in securing "generous immediate payments," while those who are not yet injured have an interest in "ensuring an ample, inflation-protected fund for the future."[54]  In *Ortiz v. Fibreboard Corp.*,[55] the Supreme Court reiterated that "it is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel."[56]

35.   Here, in my opinion, the core teachings of *Amchem* and *Ortiz* were followed.  The settlement is divided into two subclasses—those presently diagnosed with a Qualifying Diagnosis and those not presently diagnosed with a Qualifying Diagnosis—with separate class representatives and counsel for each subclass.  The first subclass was motivated to bargain for the best deal for the presently diagnosed, while the second subclass was motivated to ensure that those without Qualifying Diagnoses were left with funds in the event that they suffered injury in the future.  Importantly, because the fund for Qualifying Diagnoses is now uncapped, the actual conflict between the two subclasses is much less of a concern than it would have been for a capped fund.

36.   Several objectors (and one amicus submission), however, argue that additional subclasses were necessary to satisfy Rule 23(a)(4).[57]  These objections argue that such subclasses should have been created based on the precise injuries suffered and other criteria.

37.   The most detailed argument is raised by amicus Public Citizen, which argues that three specific conflicts required the creation of multiple subclasses: (1) conflicts arising from the

---

[53] 521 U.S. 591 (1997).

[54] *Id.* at 626–27.

[55] 527 U.S. 815 (1999).

[56] *Id.* at 856.

[57] *See, e.g.,* Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 2; Chesley Obj. (ECF No. 6242) (filed 10/14/14), at 10–15; Duerson Obj. (ECF No. 6241) (filed 10/14/14) at 17–21; Heimburger Obj. (ECF No. 6230) (filed 10/14/14) at 14–15; Jones Obj. (ECF No. 6235) (filed 10/14/14) at 3; Miller Obj. (ECF No. 6213) (filed 10/14/14) at 2–4; Memo. of Public Citizen as Amicus Curiae with Respect to Motion for Approval of Class Action Settlement (ECF No. 6214-1) (filed 10/14/14) ("Public Citizen Memo"), at 2–4.

various injuries allegedly caused by concussions that are not part of the damages grid in the settlement; (2) conflicts arising from the fact that the existing settlement grid makes distinctions based on the type of disease, age of class member at time of diagnosis, and length of eligible service; and (3) conflicts arising from the dollar values assigned to the various injuries covered by the settlement.[58]

38.   In support of the first category (conflicts arising from various injuries allegedly caused by concussions that are not part of the Settlement), Public Citizen relies upon the Brain Injury Association's experts.[59]   The Brain Injury experts note that the consequences of a concussion include "motor, sensory, and autonomic dysfunction as well as vestibular (balance) disturbances, visual perceptual (depth perception, visual figure ground), and oculomotor deterioration (impaired eye tracking, eye-hand coordination), anosmia (loss of sense of smell), ageusia (loss of sense of taste), and posttraumatic headache," as well as "movement disorders, such as Parkinsonism and epilepsy."[60]   The Brain Injury experts further note that concussions can cause "atherosclerosis (hardening of the arteries), fatigue, decreased muscle mass and weakness, mood abnormalities, and cognitive changes."[61]   Other consequences, according to those experts, include "reduced cognitive efficiency and inconsistency of performance," "depression, anxiety and impulse control disorders, such as disinhibition aggression and substance abuse," and failure to manage "undesirable behavior, including suicide and suicidal ideation."[62]   The Brain Injury experts, after reciting all of these consequences, note that "[m]any of the physical, neurological and neurobehavioral consequences of [traumatic brain injury] are missing from the list of qualifying diagnoses in the preliminarily-approved settlement."[63]   Public Citizen contends that each of these diagnosable consequences of concussions should have been represented at the bargaining table by separate class representatives and separate counsel.[64]

---

[58] Public Citizen Memo at 2–5.

[59] *Id.* at 3–4 (citing Decl. of Drs. Masel & O'Shanick in Support of BIAA's Motion for Leave to file Amicus Brief (ECF No. 6180-2) (filed 09/30/14) ("BIAA Decl.")).

[60] BIAA Decl. ¶ 8.

[61] *Id.*

[62] *Id.* at ¶¶ 9–10.

[63] *Id.* at ¶ 11.

[64] Public Citizen Memo. (ECF No. 6214-1), at 2–4.

39.   According to Public Citizen, multiple subclasses were also required for each of the qualifying diagnoses compensated by the settlement, since the settlement makes distinctions based on age and length of eligible service, as well as on dollar values.  Even if limited to the cognitive injuries specified in the complaint, Public Citizen's approach would require myriad subclasses.  If the subclassing process includes the many alleged injuries caused by concussions outlined by the Brain Injury experts, and if each of those injury categories is then subdivided based on age, length of eligible service, and dollar values, the required number of subclasses could easily exceed 50.  Neither *Amchem* nor any other case requires the creation of never-ending numbers of subclasses.

40.   Other objectors identify additional injuries that they contend required separate representation during the settlement negotiations, including dizzy spells, headaches, vertigo, balance problems, deafness, restless sleep, social phobias, explosive behavior, ringing in the ears, and others.[65]  These additional injuries would only add to the many subclasses that would be required by Public Citizen's approach.

41.  In terms of injuries, the Morey objectors focus their attention primarily on CTE, and argue that there should have been a separate subclass for those who are (or in the future will be) seeking recovery for CTE.[66]  But their rationale—that separate representation is needed for that injury[67]—is the same rationale advanced by Public Citizen and other objectors with respect to the numerous other possible consequences of concussions.  In other words, if a subclass were required for those pursuing compensation for CTE (beyond the agreement's compensation for players diagnosed with CTE post mortem prior to preliminary approval), the same reasoning

---

[65] *See, e.g.*, Duerson Obj. (ECF No. 6241) (filed 10/14/14) at 23–24 (objecting to lack of compensation for "sensitivity to noise, visual impairment, chronic pain, chronic headaches, incessant ringing in the ears, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions"); Armstrong Obj. (ECF No. 6353) (filed 11/03/14), at 5 (listing symptoms experienced by certain objectors, including "visuospatial issues," "executive function deficit," "mood and personality changes," "dysnomia," "a decreased ability to multi-task," "peripheral nerve disfunction (numbness, burning, and/or tingling)," "cervical spinal disorders," "attention and concentration deficits," "short- and long-term memory deficits," and "somatic disorders"); Chesley Obj. (ECF No. 6242) (filed 10/14/14), at 5 (listing "chronic headaches, depression, mood disorders, sleep dysfunction, attention and concentration deficits, and memory loss").

[66] Morey Obj. (ECF No. 6201) (filed 10/06/14), at 35–47, 51 n.42.

[67] *Id.* at 42 (arguing that "[n]either Representative Plaintiff shares Objectors' interest in securing compensation for *all cases* of CTE") (emphasis in original).

17

would require subclasses for those who seek compensation for each of the many other consequences of concussions identified by the Brain Injury experts and other objectors.

42. Various objectors contend that, in addition to subclasses based on injuries, age groups, dollar values, and eligible service, other differences among class members require subclasses. For example, one objector notes that the dangers of concussions could vary based on position played and player size.[68]  Others, including the Morey objectors, argue for separate subclasses for players who, under the current agreement, are subject to the 75 percent offset because of a prior stroke, and for players who played in NFL Europe.[69]

43. Again, once one goes down the road of subclassing beyond the two existing subclasses (presently diagnosed with a Qualifying Diagnosis and not presently diagnosed), it is hard to argue against additional subclasses based on player size, position played, and other categories urged by objectors.

44. In my opinion, a class with so many subclasses would be inherently unmanageable, whether in the context of litigation or settlement negotiations.  Assuming that existing class counsel had come close to obtaining the maximum amount for which the NFL was willing to settle, it is hard to imagine how progress would be made if the Court invalidated the settlement and ordered dozens of additional lawyers and subclass representatives to come to the bargaining table.

45. Moreover, there is an added complexity in creating multiple additional subclasses: Many, if not most, class members would fall into multiple subclasses, since they allege multiple kinds of injury, or are subject to reduction or offset in recovery under the current agreement.[70]

---

[68] *See* Duncan Obj. (ECF No. 6357) (filed 11/03/14), at 1–2 ("[A] small player, playing a skilled position, such as a kick off returnee, has a much higher risk of suffering a head injury when hit by a larger player than a larger player whose position does not require him to move as far or with the same amount of speed.").

[69] Morey Obj. (ECF No. 6201) (filed 10/06/14), at 47–49 (offsets); 49–51 (NFL Europe).

[70] *See*, *e.g.*, Michael L. Davis Obj. (ECF No. 6354) (filed 11/03/14), at 1–2 (alleging deafness, vision issues, balance problems); Steinbach Obj. (ECF No. 6401) (filed 11/03/14), at 1 (alleging anxiety, suicidal thoughts, violent mood swings, depression); *Easterling v. NFL* Complaint (Aug. 17, 2011) (E.D. Pa.) ¶ 51 (noting that "[t]he Plaintiffs individually have in the past experienced, and they may in the future suffer from an *assortment* of problems" and listing 15 *examples* of injuries) (emphasis added); *Maxwell v. NFL* Complaint (July 19, 2011) (Calif. Superior Ct.) ¶¶ 149–523 (detailing the circumstances and differing combinations of injuries suffered by the 75 individual plaintiffs).

None of the objectors even begins to address how the Court would deal with that added complexity.

46.   A similar issue arose in the massive *Deepwater Horizon* class settlement.  There, two class settlements were negotiated: one for economic injuries and one for personal injuries.  The economic injuries included monetary losses for businesses and individuals, real property damage, loss of opportunity for charter boat income, physical damage to vessels, loss of subsistence fishing, and loss of income from commercial fishing.[71]   The personal injuries included a variety of ocular, respiratory, dermal, neurological, and other conditions, both acute and chronic.[72]   In neither class were there any subclasses, even though each class encompassed multiple kinds of injuries.   Among the objections to the settlement was the argument that subclasses should have been created based upon the various types of injury to avoid conflicts of interest.   Judge Carl Barbier rejected those arguments.   He stated, in language that is directly applicable here, that "[i]f subclasses were entertained, there would be no principled basis for limiting the number of subclasses," and he concluded that creating subclasses for each type of injury, "each with separate class representatives and counsel . . . would have greatly complicated both the settlement negotiations and the overall administration of the litigation."[73]   Just as the Mediator here ensured structural integrity, Judge Barbier found that the presence of the magistrate judge guiding the *Deepwater Horizon* negotiations "ensured structural integrity during the negotiations" without the need for subclasses.[74]

47.   The Third Circuit has made the same point.   In *In re Insurance Brokerage Antitrust Litigation*, the court noted that, "[w]hile subclasses can be useful in preventing conflicts of interest, they have their drawbacks," including the potential to "create a 'Balkanization' of the class action and [they] present a huge obstacle to settlement if each subclass has an incentive to hold out for more money."[75]   The Eleventh Circuit, as well, has observed that *Amchem* and *Ortiz* "appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which

---

[71] 910 F. Supp. 2d at 903.

[72] 295 F.R.D. at 121–22.

[73] 910 F. Supp. 2d at 920 (citations omitted).

[74] *Id.* at 918.

[75] 579 F.3d 241, 271 (3d Cir. 2009) (quoting *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2001) (alteration by *Ins. Brokerage* court).

would include, but may not necessarily require, formally designated subclasses."[76]  The Sixth Circuit has similarly stated that "[s]ubclassing . . . is appropriate only when the court believes it will materially improve the litigation."[77]  And the Eighth Circuit has characterized as "untenable" the argument that "a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement," noting that "almost every settlement will involve different awards for various class members."[78]

48.  Here, the parties created two subclasses that directly address the conflict at issue in *Amchem* and *Ortiz* (between those with a present Qualifying Diagnosis and those without such a diagnosis).  Moreover, structural protection was provided by the fact that the negotiations were handled under the supervision of the court-appointed Mediator (a retired federal judge with vast experience in ADR), and by a capable Special Master.  In my opinion, further subclassing was unnecessary and would have only impeded the settlement process.[79]

49.  In sum, it is my opinion that the class satisfies the adequacy of representation requirement under Rule 23(a)(4).

### 2. Rule 23(b) Requirements

50.  As noted, the parties seek class certification under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  I address each of these requirements below.

### a. Predominance of Common Questions

51.  As noted in ¶ 22 & n.31, *supra*, in *Amchem*, the Supreme Court stated that a settlement

---

[76] *Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) (emphasis in original; citations omitted).

[77] *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986).

[78] *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999).  *Accord, e.g.*, *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) ("[D]isagreements over the proposed division of a settlement fund do not necessarily create conflicts of interest requiring separate representation. . . . Such a rule would place substantial burden on the settlement process.") (citation omitted).

[79] The Morey objectors also argue that, aside from subclassing, a lack of adequate representation is confirmed by the fact that the settlement does not provide compensation for CTE (except for players who died prior to July 7, 2014).  This argument overlaps with the argument that the settlement is unfair under Rule 23(e) because of the absence of such compensation.  I address the issue in ¶¶ 80–91, *infra*.

eliminates the need to satisfy the "manageability" requirement for superiority,[80] because "the proposal is that there be no trial."[81]   The Third Circuit has held that *Amchem* has implications for predominance as well.   For instance, in *In re Warfarin Sodium Antitrust Litigation*, the court found that a class settlement satisfied Rule 23(b)(3) despite the existence of choice-of-law concerns (applying the laws of multiple states) that could have been fatal in the litigation context.[82]   Similarly, the Second Circuit, in upholding certification of a securities class settlement, despite the fact that plaintiffs would have had to prove individual reliance at trial, noted that "the existence of a settlement that eliminates manageability problems can alter the outcome of the predominance analysis."[83]   Under the approach taken by the Second and Third Circuits, predominance is much more easily satisfied for a settlement class than for a litigation class.

52.   It is noteworthy that, while objectors offer myriad grounds for rejecting the settlement, virtually none of the objectors argues that the settlement should fail on predominance grounds. To the contrary, the objectors are virtually unanimous in not disputing that the predominance requirement is satisfied in this settlement class.[84]

53.   Mass tort personal injury cases are often not suitable for class certification.   In the contested class certification context, the "predominance" requirement of Rule 23(b)(3) has been a particular stumbling block, along with the "manageability" component of the superiority requirement.   Predominance can be especially difficult to satisfy, especially in the contested litigation context, when the main battleground in a case involves specific causation (*e.g.*, Was

---

[80] *See* FED. R. CIV. PROC. 23(b)(3) (requiring, for certification under this subdivision of the Rule, that the court find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy").

[81] *Amchem*, 521 U.S. at 620.

[82] 391 F.3d at 529–30 ("[W]hen dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class.").   Choice-of-law issues have been viewed as creating not only manageability concerns, but also predominance concerns.   *See*, *e.g.*, *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 349–52 (D.N.J. 1997); *Marshall v. H & R Block Tax Servs. Inc.*, 270 F.R.D 400, 407–10 (S.D. Ill. 2010); *In re Prempro*, 230 F.R.D. 555, 561–63 (E.D. Ark. 2005).

[83] *In re Am. Int'l Group, Inc. Secs. Litig.*, 689 F.3d 229, 242 (2d Cir. 2012).

[84] For instance, the Morey objectors, in their lengthy brief, devote only one paragraph to predominance, and they conclude that it is satisfied. Morey Obj. (ECF No. 6201) (filed 10/06/14), at 97–98.   Public Citizen's amicus brief does not even mention predominance.   *See* (ECF No. 6214-1) (filed 10/14/14).   Nor does the 35-page Armstrong Objection (ECF No. 6233) (filed 10/14/14), or the 10-page Alexander Objection (ECF No. 6237) (filed 10/14/14).

my heart disease caused by smoking defendant's cigarettes, or was it caused by high blood pressure and high cholesterol?).  Yet numerous authorities—including cases in the Third Circuit—have made clear that personal injury cases are not always ill-suited for class certification.[85]  Here, several factors support the conclusion that predominance is satisfied.

54.  First, as noted, *supra* ¶ 13, the Third Circuit is relatively deferential in upholding class certification in the settlement context, even if the case might not have been certified as a litigation class.  Under the settlement here, class members may participate without having to prove that their injuries were caused by playing NFL football.[86]  Specific causation is simply not an issue in this settlement.

55.  Second, the test for predominance is not whether there are individualized issues.  Rather, by the terms of Rule 23(b)(3), the question is whether the individualized issues *outweigh* the common issues.  In this case, there are a number of critical issues that are common to the class.  *See* ¶ 27, *supra* (discussing common issues).

56.  Third, there is a long line of cases finding mass torts suitable for class certification, where the defendant's conduct involves a single incident.[87]  Indeed, the *Diet Drugs* case, which

---

[85] *See, e.g., In re Diet Drugs*, Nos. 1203, 99–20593, 2000 WL 1222042, at *43 (E.D. Pa. Aug. 28, 2000) ("when taking the settlement into consideration for purposes of determining class certification, individual issues which are normally present in personal injury litigation become irrelevant, allowing the common issues to predominate"); *In re Diet Drugs*, 369 F.3d 293, 317 (3d Cir. 2004) (referring to Fen-Phen mass tort class settlement as a "landmark"); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 629 (5th Cir. 1999) (affirming certification of a (b)(3) class of casino employees claiming personal injuries from secondhand cigarette smoke at work); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553, 555–56 (W.D. Wash. 2004) (certifying (b)(3) class and approving settlement of claims alleging "increased risk of hemorrhagic stroke" and "a variety of injuries" caused by defendant's products); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 223 (S.D. W. Va. 2005) (certifying (b)(3) settlement class of "users and purchasers" of defendant's pharmaceutical products, who alleged "a range of physical and economic injuries").

[86] *See* Preliminary Approval Memo. (07/07/14), at 6 ("The Settlement does not require Settlement Class Members to prove that the Retired NFL Football Player's cognitive injuries were caused by NFL-related concussions or sub-concussive head injuries.").

[87] *See, e.g., Watson v. Shell Oil Co*., 979 F.2d 1014, 1021–22 & n.37 (5th Cir. 1992) (affirming district court's certification of a (b)(3) class alleging injury from an explosion at defendant's manufacturing facility); *Deepwater Horizon*, 295 F.R.D. at 161 (certifying (b)(3) settlement class for personal injuries resulting from oil spill); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) (certifying (b)(3) class alleging property damage from an oil spill at defendant's refinery); *In re Train Derailment near Amite, La.*, MDL 1531, 2006 WL 1561470, at **18, 25 (E.D. La. May 24, 2006) (certifying (b)(3) class and approving settlement in case involving personal injuries from a train derailment); *Sala v. Nat'l R. Passenger Corp.*, 120 F.R.D. 494, 500 (E.D. Pa. 1988) (certifying (b)(3) class of "all passengers who suffered injuries as a result of" the collision and derailment of defendant's train); *In re Three Mile Island Litigation*, 87 F.R.D. 433, 438–40 (M.D. Pa. 1980) (classes of residents suffering economic harm from nuclear accident certified); *Coburn v. 4-R Corp*., 77 F.R.D. 43, 45–46 (E.D. Ky. 1977) (certifying class of representatives of patrons killed in nightclub fire); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla.

involved personal injuries allegedly caused by a number of pharmaceutical products, cannot be characterized as a "single incident" case. Yet the case was approved as a settlement class. *See also* cases cited in ¶ 53 n.85, *supra* (more examples of mass tort cases certified despite absence of a single incident). Here, while the claims do not involve a single incident, they do involve an alleged common course of conduct by the NFL: the accumulation of knowledge that concussions can cause serious and life-threatening head injuries and the failure to disclose such danger to the players. Ultimately, the Rule 23(b)(3) inquiry must be fact-specific and viewed in light of controlling Circuit precedent.

57. Here, because of the case-dispositive common issues presented, the fact that the suit involves a single course of conduct by the NFL, and the Third Circuit's relatively deferential approach to class certification in the settlement context, I believe that the predominance requirement is satisfied.

### b. Superiority

58. Superiority under Rule 23(b)(3) is met when a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Here, in my opinion, the class action device is the superior vehicle for resolving the claims. In addressing superiority, I first address the broad question of whether a class action is superior to other specific methods of resolving the claims in this case. I then address the precise factors set out in Rule 23(b)(3)(A)–(D) that courts should weigh in evaluating superiority. Here, virtually every objection filed appears to assume, as its premise, that the class action device is the appropriate vehicle for resolving this litigation. I do not recall a single objector arguing, for example, that a "superior" approach would be to try as many as 20,000 cases separately.

### i. Superiority of Class Adjudication Over Other Mechanisms

59. "The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of

---

1973) (class of injured cruise passengers certified), *aff'd without opinion*, 507 F.2d 1279 (5th Cir. 1975); *Bentkowski v. Marfuerza Compania Maritima, S.A.*, 70 F.R.D. 401, 404–406 (E.D. Pa. 1976) (certifying class of injured cruise passengers; court noted that it viewed the case as "the exception which proves the rule that generally mass accidents are not the basis of a class action"); *Petition of Gabel*, 350 F. Supp. 624, 630–31 (C.D. Cal. 1972) (certifying class of representatives of passengers killed in air crash); *Mehl v. Canadian Pac. Ry.*, 227 F.R.D. 505, 521–22 (D.N.D. 2005) (certifying (b)(3) class of victims of train derailment and release of anhydrous ammonia gases).

adjudication."[88]   In other words, the Court must weigh the various alternatives, not simply look at whether a class action mechanism has any shortcomings.

60.  At first blush, given that the claims here involve personal injuries, which are often not suitable for class certification, one might have thought that the parties would look to non-class aggregate mechanisms to resolve the claims.  In the *Vioxx* litigation, for example, defendant pharmaceutical company Merck and various plaintiffs' counsel agreed to a $4.85 billion non-class settlement to resolve approximately 50,000 claims of personal injury allegedly caused by defendant's since-recalled painkiller.[89]   In certain respects, *Vioxx* represented a triumph—an innovative aggregate settlement in which the plaintiffs' attorneys managed to overcome the trend against certification of personal injury mass torts by structuring a settlement entirely outside of the constraints of Rule 23.  There is much to praise about that historic settlement.

61.  At the same time, the *Vioxx* settlement has received at least some criticism.  Because *Vioxx* did not proceed as a class action, but instead was an opt-in settlement, the parties had to create a mechanism to ensure that the vast majority of claimants participated in the settlement. As two scholars, Howard Erichson and Benjamin Zipursky, have explained, the settlement in that case contained two terms designed to achieve that purpose.  First, under the settlement, "for a lawyer to participate in the deal—that is, for any of the lawyer's clients to avail themselves of the settlement offer—the lawyer was required to recommend the settlement to all of the lawyer's eligible clients."[90]   Second, "if any clients decided not to participate in the settlement, the lawyer was required to withdraw from representing the nonsettling clients."[91]   Erichson and Zipursky criticized both of those terms.[92]

62.  It is not my purpose to opine on the pros and cons of the *Vioxx* settlement.  I bring it up only to make a simple point: Whatever the merits of the *Vioxx* approach based on the unique facts of that case, I believe that a class action settlement is the superior mechanism for resolving *this* case.  Rule 23(b)(3) provides a time-tested set of rules to ensure fairness to class members.

---

[88] *Community Bank*, 418 F.3d at 309 (citations and internal quotation marks omitted).

[89] *See* Alex Berenson, *Merck Agrees to Settle Vioxx Suits for $4.85 Billion*, N.Y. Times, Nov. 9, 2007, *available at* http://www.nytimes.com/2007/11/09/business/09merck.html.

[90] Howard M. Erichson & Benjamin C. Zipursky, *Consent Versus Closure*, 96 Cornell L. Rev. 265, 266 (2010).

[91] *Id.*

[92] *Id.* at 283.

Without the structure of a class action, there are no prescribed criteria for the mass settlement of claims. Courts in cases such as *Vioxx* have analogized such cases to class actions, calling them quasi-class actions.[93] Yet, there is no Federal Rule of Civil Procedure governing quasi-class actions. A court overseeing a mass settlement that does not fall under Rule 23 is forced to make up the rules of the game instead of relying on the specific criteria of Rule 23.

63.     Judge Scirica raised these very concerns in his concurring opinion in *Sullivan v. D.B. Investments, Inc.* As he noted:

> [S]ome observers believe there has been a shift in mass personal injury claims to aggregate non-class settlements. This is significant, for outside the federal rules governing class actions, there is no prescribed independent review of the structural and substantive fairness of a settlement including evaluation of attorneys' fees, potential conflicts of interest, and counsel's allocation of settlement funds among class members.[94]

64.     Likewise, just as an aggregate non-class settlement is not the answer here, 20,000 individual lawsuits are not a satisfactory alternative to a class action. An individual litigant would have the difficult and expensive task of proving that concussions can cause the injuries in question and that the NFL knowingly misled the players about the dangers of concussions. And each individual litigant would have to prove that any injuries for which he is seeking compensation were caused by the NFL and not, for example, by concussions suffered during middle school, high school, or college football, or from causes unrelated to playing football. Also, each class member would have to litigate the various legal and factual defenses put forward by the NFL. The factual and expert discovery, as well as the extensive briefing of legal issues, would be extremely expensive, and there would be no assurance that the player would ultimately prevail. In addition, with so many class members, it could take many years for an individual's case to go to trial, thus making it difficult, if not impossible, for players with existing serious injuries to recover on a timely basis. As a result, the players would not have

---

[93] *See, e.g., In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 554 (E.D. La. 2010) ("the *Vioxx* global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness") (citation omitted); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) (court reviewed reasonableness of fees because private settlement "ha[d] many of the characteristics of a class action and [was] characterized as a quasi-class action subject to general equitable powers of the court" (citations and internal quotation marks omitted)); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (to the same effect).

[94] 667 F.3d 273, 334 (3d Cir. 2011) (en banc) (Scirica, J., concurring) (citations omitted).

immediate access to the financial resources necessary to pay for mounting medical costs and treatments.[95]   The other possible scenario is that, because of the expense, risk, and delay involved, most players would choose not to pursue their claims at all, and thus the NFL would never be held accountable for its alleged misconduct.   That scenario is even less desirable than the prospect of years of litigation.   At least in the first scenario, some class members might have a chance of recovering damages.

### ii. Superiority Criteria

65.   Apart from the broad inquiry as to whether a class action is superior to other mechanisms for resolving the litigation, Rule 23(b)(3) instructs a court to look at four specific criteria in assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).   As noted in ¶ 22, *supra*, factor (D) is inapplicable because this is a settlement class.   Regarding factor (A), class members have little interest in controlling their own cases.   The cost of bringing suit is so high that litigating the claims individually could be cost-prohibitive.   The fact that so few class members have opted out of the settlement is evidence that most class members have little or no interest in pursuing their claims separately. *See* ¶ 19, *supra*.   Factor (B) likewise cuts in favor of the class settlement: The claims at issue have been centralized in this Court by the Judicial Panel on Multi-District Litigation (JPML),[96] so there is little or no risk of competing litigation (except perhaps by some opt-out plaintiffs).   Regarding factor (C), as just noted, the JPML has already determined that the cases should be concentrated

---

[95] It is incorrect to assume that, as former NFL players, class members have the resources to cover their medical expenses during the lengthy period that their individual cases would be pending. *See, e.g.*, Pablo S. Torre, *How (and Why) Athletes Go Broke*, SPORTS ILLUSTRATED, Mar. 23, 2009 (included in ECF No. 6201-12) (filed 10/06/14) at 25 (reporting that, "[a]lthough salaries have risen steadily during the last three decades," "[b]y the time they have been retired for two years, 78% of former NFL players have gone bankrupt or are under financial stress because of joblessness or divorce").

[96] *In re National Football League Players' Concussion Injury Litig.*, 842 F. Supp. 2d 1378 (J.P.M.L. 2012).

in one forum for pretrial purposes.  It makes perfect sense for this Court, having been selected as the MDL transferee Court, to oversee an aggregate settlement.  Thus, the criteria of Rule 23(b)(3)(A)–(C) confirm the superiority of the class action mechanism in this case.

### C. Conclusion on Class Certification

66.  In sum, it is my opinion that, under controlling law, the proposed settlement satisfies all of the requirements for certification of a Rule 23(b)(3) settlement class.

## VII. NOTICE

67.  In this section of my declaration, I review the sufficiency of the notice provided to class members in this case.

68.  The parties agreed to and executed a robust notice plan, which the Court approved.  As described by Katherine Kinsella of Kinsella Media, LLC, whose company designed and implemented the plan, the elements included direct notice by first-class mail to all known retired NFL football players and heirs of deceased retired players; broad media advertising through magazines, trade publications, television, radio, and the Internet; mailing to directors of approximately 60,000 nursing homes, assisted living facilities, and rehab facilities; outreach to NFL organizations; and the creation of a Settlement Website.[97]   Kinsella estimated that the notice plan "reached over 90% of Settlement Class Members."[98]  This plan was a thorough effort to reach as many class members as possible.  Indeed, to my knowledge, no objector claims that the notice program is subject to attack because it failed to reach a significant number of class members.

69.  Instead, the objections to notice are based on allegedly false and misleading statements in both the short and the long form of notice.  In particular, certain objectors claim that the notices did not inform class members that they could not recover for CTE (except for cases diagnosed prior to the date of the Court's preliminary approval).[99]  As the Morey objection asserts, the short and long form notices "fail[ed] to alert class members to the fact that they will

---

[97] *See* Decl. of Katherine Kinsella (filed 11/12/14), at ¶¶ 6–28.

[98] *Id.* at ¶ 48.

[99] *See, e.g.*, Morey Obj. (ECF No. 6201) (filed 10/06/14), at 53–62; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 2–3; Miller Obj. (ECF No. 6213) (filed 10/14/14), at 7–8.

not be compensated for current or future CTE, while significantly limiting the NFL Defendants'
liability."[100]

70.   To begin with, some objectors claim that the short form notice—which appeared as a
full-page ad in several widely-circulated magazines (and was downloadable from the settlement
website)—omitted the limitations of CTE compensation entirely, thus suggesting that recovery
for CTE was still available for class members or their families.[101]

71.   Of course, the whole purpose of a short form notice is to alert class members to the
claims and lawsuit, not to provide exhaustive information.  The short form notice must balance
the need for basic facts with the need to keep the notice short enough for a quick read in a one-
page magazine or newspaper advertisement.  Although the short form notice did not explain
precisely who would, and who would not, be eligible for damages for CTE, it did say—only for
CTE and not for other listed injuries—that monetary awards would be available for "*certain*
cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after
death."[102]   This limiting language alerted class members of the need to consult the long form
notice and the full settlement agreement for further details.  Indeed, the short form notice stated:
"For   More   Information   and   to   Register   for   Benefits:   1-855-887-3485   or
www.NFLConcussionSettlement.com."[103]   The Settlement Agreement, which is available on the
website under "Court Documents," makes absolutely clear that "[a] Qualifying Diagnosis of
Death with CTE shall be made only for Retired NFL Football Players who died prior to the date
of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a
board-certified neuropathologist of CTE."[104]

72.   Objectors make the same argument with respect to the long form notice, but their
argument is even weaker.  As they reluctantly concede,[105] the long form settlement states:

Monetary awards for death with CTE *prior to July 7, 2014*, ALS, Parkinson's

---

[100] Morey Obj. (ECF No. 6201) (filed 10/06/14), at 53.

[101] *See*, *e.g.*, *id.* at 53–55.

[102]   Summary   Notice   at   1,   *available   at*   https://www.nflconcussionsettlement.com/Documents/
Summary_Notice.pdf (emphasis added).

[103] *Id.*

[104] Settlement Agreement § 6.3(f).

[105] *See*, *e.g.*, Morey Obj. (ECF No. 6201) (filed 10/06/14), at 56.

> Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) and Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) (*see* Questions 14–21).  All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement . . . .

Long Form Notice at 7 (emphasis added); Kinsella Decl. ¶ 41.  Although objectors say that the notice refers to the cutoff only "obliquely,"[106] there is nothing "oblique" about this language.  Furthermore, as explained by Katherine Kinsella in her Declaration, the answers to Questions 5 ("What are the benefits of the Settlement?") and 6 ("Who is included in the Settlement Class?") in the long form notice specifically refer to coverage for CTE only for deaths prior to July 7, 2014.  *Id.* at ¶ 41; *see also* Long Form Notice at 7–8.  In sum, the long form notice contains three separate references to the CTE cutoff.  Ultimately, objectors are left with the argument that the long form notice is defective because it did not reference the CTE cutoff *more than* three times.  I do not find this argument persuasive.  Indeed, if this argument were correct, any notice could be attacked because it did not contain more repetition.  It should also be noted that, like the short form notice, the long form encouraged class members to review the entire settlement agreement.[107]  It also provided a toll free number for class members to call if they had any questions.[108]  Indeed, these points were made to class members numerous times in the course of the long form notice.[109]

73.  In addition to the explicit language in both the long form notice and the settlement agreement, any class member who viewed the settlement website and reviewed the settlement agreement would have discovered this limitation regarding CTE.  Furthermore, well before the time to opt out had expired, some objectors had filed court documents reflecting displeasure at the fact that CTE was not specifically covered (except in cases diagnosed after death for players

---

[106] *Id.*

[107] *See id.* at 7, 9, 18 ("Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves (opt out) from the Settlement, so please read it carefully.").

[108] *See id.* at 1, 7, 9, 18, 20.

[109] In all, the long form notice referred class members to the website and toll-free number 12 times.  The long form listed at the bottom of each page the settlement website and phone number for class members with questions about the settlement.

who died prior to the date of preliminary approval).[110]  Moreover, this point was noted—in terms easily understandable to a layperson—in the press coverage of this high-profile settlement.[111]

74.  In sum, I believe that the short and long form notices, the website, settlement agreement, and press publicity[112] provide assurance that class members were on notice of the settlement's limitations on the CTE remedy.

## VIII.  FAIRNESS OF PROPOSED CLASS SETTLEMENT

75.  In this section, I address the fairness of the proposed settlement under Rule 23(e), which provides that a proposed settlement may only be approved "after a hearing and on finding that it is fair, reasonable, and adequate."[113]  In the Third Circuit, the fairness of a settlement is analyzed under the so-called *Girsh* factors.[114]  I discuss the *Girsh* factors in part B below.  Before doing so, however, I address in part A the specific arguments raised by objectors as to why the settlement is unfair.

76.  Preliminarily, I should note that the test is not whether the settlement is perfect in the eyes of every class member or amicus, but whether it is reasonable.[115]  In an ideal world one

---

[110] *See, e.g.*, Morey Obj. (ECF No. 6082) (filed 07/02/14), at 30–36.  A number of very recent objections confirm that the limitations regarding CTE were widely known. *See, e.g.*, Jordan Obj. (ECF No. 6375) (filed 11/03/14), at 1; Werner Obj. (ECF No. 6412) (filed 11/03/14) at 2; Carrington Obj. (ECF No. 6409) (filed 11/03/14), at 2–5.

[111] *See, e.g.*, Patrick Hruby, *The Devil is in the Details,* Sports on Earth (July 8, 2014):

> "Are you a former NFL player worried about coming down with CTE?  Do you suspect you already have CTE . . . ?

> If you're alive and reading this today, guess what: You're out of luck, because the deal that [Judge] Brody just preliminarily approved gives you and your loved ones nothing.  Zip.  Bupkus. Not one single damned dollar."

*Available at* http://www.sportsonearth.com/article/83556224/nfl-settlement-concussions-cte-dementia-anita-brody-goodell.

[112] *See* ¶ 19 n.27, *supra* (describing how "[t]he Settlement has been widely publicized in the press and through formal class notice").

[113] FED. R. CIV. P. 23(e).

[114] *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).

[115] *See, e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (noting, in approving class settlement, that "compromise is the essence of a settlement . . . inherent in compromise is a yielding of absolutes and an abandoning of highest hopes"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."); *Henderson v. Volvo Cars of N. Am., LLC*, No. 09–4146 (CCC), 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) ("A settlement is, after all, not full relief but an acceptable compromise.") (citing cases); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, & Prods. Liab. Litig.*, No. 8:10ML-02151-JVS-(FMOx), 2013 WL 3224585, at *14 (C.D. Cal. June 17, 2013) ("Settlement is born of compromise, and settling plaintiffs trade the risk of recovering nothing for a reward that is

might wish for greater damages, compensation for other kinds of injuries, changes to the claims process, etc.  But the same can be said for virtually every settlement.  In the end, I conclude that this settlement passes muster under the governing standards.  It is a substantial improvement over the January 2014 agreement, which this Court rejected.  I am concerned that, if this settlement does not go forward, most class members may never receive any relief.

### A. Objectors' Arguments as to Why the Settlement is Unfair

77.   In this part, I discuss the grounds advanced by objectors in asserting that the proposed settlement is unfair.  Because some objectors offer myriad objections, I focus on what I view to be the most substantial arguments.  My analysis of the objections sets the stage for my subsequent discussion of the *Girsh* factors.

### 1. Line-drawing objections

78.   The most pervasive and vehemently asserted objections involve line-drawing: some injuries are covered, but others are not; some players' awards are unfairly reduced (*e.g.*, based on age or number of seasons played) or offset (based on a prior stroke or traumatic brain injury).

79.   In a case of this magnitude and level of complexity, any effort to draw lines would have generated criticism.  Yet, as the court stated in the *Deepwater Horizon* case, "lines must be drawn somewhere," and the lines drawn should be approved under Rule 23(e), unless the objectors can prove that those lines are "not reasonable."[116]  Although arguments can be made that the settlement should have been structured differently, the path that was chosen strikes me as a reasonable one.

### a. The Settlement's Omission of CTE Diagnosed After July 7, 2014

80.   A major objection to the settlement is that it does not specifically compensate for CTE, except with respect to cases identified (through autopsies) prior to the date of the Court's preliminary approval of the settlement (July 7, 2014).  Objectors and their experts assert that CTE is one of the most serious consequences of concussions, and that the failure to include that

---

necessarily less than their full *potential* recovery . . . Simply put, Plaintiffs might eventually recover more with continued litigation, but they also might recover nothing.") (emphasis in original).

[116] *Deepwater Horizon*, 910 F. Supp. 2d at 949 (citing *Warfield v. Fidelity & Deposit Co.*, 904 F.2d 322, 327 (5th Cir. 1990)).

remedy going forward renders the settlement unfair under Rule 23(e).[117]

81.   The settlement focuses on the neurological and cognitive consequences of concussions and subconcussive blows.   It provides cash for a qualifying diagnosis, *i.e.*, Level 1.5 Neurocognitive Impairment (early dementia), Level 2 Neurocognitive Impairment (moderate dementia), Alzheimer's Disease, Parkinson's Disease, ALS, and cases of CTE diagnosed prior to July 7, 2014.[118]   Players who qualify for one diagnosis can recover supplemental benefits if they later qualify for a second diagnosis.[119]   Significantly, class counsel insisted on ensuring that, "even though, at present, not every retired player has been diagnosed with a qualifying injury, all retired players [are] eligible to seek a monetary award if and when their symptoms progress to a compensable level."[120]   The settlement also provides a $75 million Baseline Assessment Program that is available to all eligible retired NFL players.[121]   In addition, any player who, as a result of the neuropsychological and neurological evaluations through the BAP, is found to suffer from Level 1 Neurocognitive Impairment may receive specified medical treatment and evaluation.[122]   The settlement also sets up a $10 million Education Fund to provide education for football players on safety and injury prevention, and education to retired football players on additional compensation and benefits to which they may be entitled under the NFL-supported benefit program.[123]   The NFL also agrees to pay administrative costs of the settlement, costs of notice, and attorneys' fees and costs up to $112.5 million.[124]   The settlement leaves intact retired players' rights to pursue workers' compensation and all medical and disability benefits under any applicable collective bargaining agreement.[125]   And, although Article 65 (Section 2) of the current Collective Bargaining Agreement requires players to release claims and agree not to sue in order to be eligible for the NFL's Neuro-Cognitive Disability Benefit, the NFL has agreed not

---

[117] *See, e.g.*, Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 18–20; Chesley Obj. (ECF No. 6242) (filed 10/14/14), at 7–10; Duerson Obj. (ECF No. 6241) (filed 10/14/14), at 1–3, 10–11; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 2; Carrington Obj. (ECF No. 6409) (filed 11/03/14), at 2–5.

[118] Settlement Agreement § 6.3(a).

[119] *Id.* at § 6.8

[120] Phillips Supp. Decl. ¶ 9.

[121] Settlement Agreement Art. V.

[122] *Id.* at § 5.11

[123] *Id.* at Art. XII.

[124] *Id.* at § 21.1

[125] *Id.* at §§ 18.1(a)(viii); 18.6.

to enforce such releases and agreements.[126]

82.   As I explained in ¶ 14, *supra*, the negotiations in this case were intensive and were supervised by an experienced Mediator.  Although the NFL made the important concession of lifting the $675 million cap on the monetary award fund after the Court initially denied preliminary approval, both sides have stated their belief, based on actuarial studies, that the original capped fund would have been sufficient to pay all the claims.[127]   Thus, the NFL's willingness to uncap the settlement cannot be interpreted to mean that the NFL would be willing to increase significantly the amount of the settlement.

83.   It is difficult to believe, based on the negotiations to date, that the NFL would agree to add additional money to the settlement fund, should the Court choose to strike down the revised settlement.  It is more reasonable to assume that the experienced class counsel and Mediator had secured close to the limit of what the NFL would agree to pay.[128]   As I explained in ¶ 18, *supra*, plaintiffs' case on the merits was challenging on a number of grounds.  They risked having the cases dismissed on legal grounds—including what I believe to be a serious preemption defense—or risked losing for failure of proof had they been forced to go to trial.  Any evaluation of fairness must take into account not only what would be desirable in theory but what class counsel would have been able to achieve in reality had they held out for a better deal.

84.   The settlement's exclusion of CTE going forward cannot be explained by a lack of aggressive negotiation by class counsel.  The NFL's position was that a global settlement should compensate the principal neurocognitive and neuromuscular conditions associated with the diseases specified in the settlement agreement, which in the NFL's view were the injuries "supported by the available science."[129]   As someone who has represented many Fortune 500 companies in class action litigation, I find this explanation to be credible.  It is not unreasonable for a defendant to adopt the view that some injury claims are not scientifically justified, would be

---

[126] Seeger Decl. ¶ 10; Settlement Agreement § 29.1.

[127] *See*, *e.g.*, Doug Farrar, *NFL removes cap on funds in revised concussion lawsuit settlement*, SPORTS ILLUSTRATED, June 25, 2014, http://www.si.com/nfl/2014/06/25/concussion-settlement# (noting that both sides' actuarial estimates supported the contention that the original capped settlement was sufficient). *See also* Seeger Decl. ¶ 61 (noting that class counsel "still support and stand behind the reasonableness of our experts' earlier actuarial assumptions").

[128] *See* Seeger Decl. ¶ 36 (opining that the current total settlement was "at the upper range of what the NFL Parties were willing to pay").

[129] *Id.* at ¶ 35.

unduly expensive to resolve, or for some other reason would be inappropriate to fund in a settlement.[130]

85.   Moreover, contrary to the arguments advanced by various objectors, excluding CTE in cases diagnosed after July 7, 2014, is not irrational.  In the first place, because CTE can only be diagnosed through a brain examination after death,[131] including CTE based on such a diagnosis would mean that none of the recovery would go to the players themselves.  Given the assumption that the NFL was close to the limit of what it would pay without CTE coverage (*see* ¶ 83, *supra*), it makes sense for the limited funds that class counsel could negotiate from the NFL to go primarily to the players themselves for their dire medical needs, not to family members after the players died.  Expanding the settlement to include CTE would have meant making cuts elsewhere, such as abandoning coverage for ALS, Alzheimer's Disease, or Parkinson's Disease.

86.   Furthermore, a prospective CTE remedy that was available to family members only after a player's death could have provided an incentive to players to commit suicide as a way of securing funds for family members.  This precise concern was noted in the press.[132]

87.   Given that there are reasonable arguments for the lines drawn by the settlement, I do not believe that excluding CTE (except for diagnoses prior to July 7, 2014) is unreasonable.[133]

88.   It should be noted, moreover, that some of the key symptoms of CTE are in fact covered by the Settlement Agreement.  According to objectors' expert, Dr. Robert Stern, one of "[t]he

---

[130] The fact that the NFL agreed to compensate what I am advised by class counsel are 51 cases of CTE diagnosed before July 7, 2014, does not mean that they were required to compensate for CTE going forward.  These 51 players did not have the chance to participate in the Baseline Assessment Program or other aspects of the Settlement.  *See* Seeger Decl. ¶ 37 (noting, in explaining provision allowing recovery for CTE diagnosed before July 7, 2014, that "it was not fair to deprive the families of those retired players of compensation where . . . neither the players nor their families were aware of the need or desire to obtain a diagnosis while living").

[131] *See, e.g.*, Robert Stern Decl. (submitted by Morey objectors), (ECF No. 6201-16) (filed 10/06/14), at ¶ 38.

[132] *See, e.g.*, Dwight P. Bostwick, *The NFL Settlement—What's the Deal?*, Huffington Post, Jan. 31, 2014, http://www.huffingtonpost.com/dwight-p-bostwick/nfl-concussion-settlement_b_4705565.html (article by attorney representing certain retired NFL players, noting concern that compensating for CTE after death could "encourage . . . depressed former players to commit suicide in an effort to prove they have CTE and gain financial benefits for their struggling family"); The Nixon Report, *Could Concussion Settlement increase suicides among former NFL Players?*, Nov. 20, 2013, http://jeffnixonreport.wordpress.com/2013/11/20/could-concussion-settlement-increase-suicides-among-former-nfl-players/ (quoting email from player contemplating "commit[ing] suicide or hav[ing] someone else kill me in case I chicken out" as a way of securing settlement funds to family members).

[133] The Supplemental Objections by the Morey Objectors (ECF No. 6420) (11/11/14) propose some alternative settlement structures, including one that compensates for all cases of death with CTE.  *Id.* at 9–11.  But the issue before the Court is not whether an objector can come up with another settlement that he might like better.  Rather, the issue is whether the deal that has been reached between the class and the NFL is reasonable.

primary clinical features of CTE" is "impaired cognition."[134]  Several of the injuries covered by the settlement, including Level 1.5 Neurocognitive Impairment (moderate to severe cognitive decline), Level 2.0 Neurocognitive Impairment (severe cognitive decline), and Alzheimer's Disease, provide compensation for impaired cognition.[135]

89.  Furthermore, it is also hard to justify making CTE a deal-breaker in terms of fairness but not doing the same for other purported effects of concussions.[136]  As noted above, ¶¶ 38, 40, objectors and their experts have argued that concussions are linked to deafness, vision problems, reduced cognitive efficiency of performance, depression, anxiety, impulse control disorders, suicidal ideation, fatigue, substance abuse, epilepsy, multiple sclerosis, and numerous other conditions.  If a settlement that does not fully compensate for CTE is deficient, it is hard to understand why a settlement would not be equally deficient for not covering *all* of the other arguable impacts of concussions.  Given the incidence of many of these injuries in the general population, it stands to reason that many class members would present them.

90.  The very nature of settlement is *compromise*.[137]  It is simply unrealistic to believe that the NFL would ever agree to provide compensation for every illness allegedly linked to

---

[134] Stern Decl. ¶ 31.

[135] *See* Settlement Agreement § 6.3(a) & Ex.1.  *See also* Phillips Supp. Decl. ¶ 11 ("Though the pathological diagnosis of CTE is not compensated as an injury prospectively, severe cognitive impairments developed in living retired players, which have been associated in the medical literature with more advanced forms of CTE, are compensated (*i.e.*, early and moderate dementia).").

[136] Objectors maintain that CTE is the one injury that is definitively and conclusively linked solely to "repetitive head trauma." Morey Obj. (ECF No. 6201) (10/06/14), at 37.  Although they offer impressive expert testimony, the views of these experts are not universally accepted in the scientific community, and the objectors do not discuss experts on the other side of the debate. *See, e.g.*, Loyola Medicine, *Despite NFL Settlement, There's Still No Conclusive Evidence Playing Football Causes Alzheimer's or CTE*, Aug. 30, 2013, http://loyolamedicine.org/newswire/news/despite-nfl-settlement-theres-still-no-conclusive-evidence-playing-football-causes (noting that "a recent study [by Dr. Christopher Randolph] . . . of retired NFL football players found no evidence that CTE even exists" and that "there is essentially no evidence to support the existence of any unique clinical disorder such as CTE"); Breitbart, *Conclusions First, Studies Later: The CTE Junk Science Condemning Football*, Jan. 24, 2014, http://www.breitbart.com/Breitbart-Sports/2014/01/23/CTE-Junk-Science (discussing studies published in U.S., Swiss, and British journals questioning the relationship between CTE and concussions from football, and quoting numerous academics to the same effect).  I do not have the medical expertise to weigh in on the medical debate.  What is important is that a debate exists.  *See* Seeger Decl. ¶ 16 (noting that various "case reports [linking CTE to certain mood disorders] . . . were anecdotal and subject to bias . . . [and such evidence] would have been subject to substantial evidentiary and legal challenges" by the NFL and its experts).  The lack of consensus regarding CTE provides reason for caution in striking down a settlement worth close to a billion dollars because of its failure to cover CTE going forward.

[137] *See, e.g.*, *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes") (citation and internal quotation marks omitted).

concussions from football.  It is also worth noting that, according to the terms of the settlement agreement, the players' health conditions are not static; rather, a player who does not have a Qualifying Diagnosis now may receive such a diagnosis in the future and thereby move into a compensable category.[138]

91.  Finally, to the extent that recovery for CTE (or a symptom/condition that an objector asserted was connected with it) was important to a particular class member, an easy solution was available: opt out of the class.[139]

### b. Omission of Other Asserted Injuries

92.  Other objectors raise line-drawing claims as well.  For instance, several objectors protest the exclusion of injuries aside from CTE, such as epilepsy, multiple sclerosis, deafness, dizzy spells, vision problems, headaches, mood swings, etc.  *See* ¶¶ 38, 40, *supra* (discussing a variety of alleged consequences of concussions).  Again, as with the exclusion of CTE going forward, it is reasonable for settling parties to make choices and compromises.  If a class member with one of the excluded conditions was upset with the settlement, he had the opportunity to opt out.

### i. Settlement Agreement Does Not Count Time in NFL Europe

93.  Several objectors complain that the settlement does not include time in NFL Europe in calculating eligible seasons for monetary awards.[140]  It is my belief that the parties should consider modifications to the settlement to address this issue .

### c. Offsets

### i. Stroke and Traumatic Brain Injury

94.  Several objectors challenge the fact that under the settlement, recovery is reduced by 75 percent for stroke or traumatic brain injury (*e.g.*, from an automobile accident) occurring prior to

---

[138] Seeger Decl. ¶ 73.

[139] *See*, *e.g.*, *Charron v. Pinnacle Group NY LLC*, 874 F. Supp. 2d 179, 209 (S.D.N.Y. 2012) ("Class Members who wished to pursue [certain] claims and who preferred to go for every last dollar, had ample opportunity to opt out of the Class").  *See also* ¶ 19 & n.26, *supra*.

[140] *See*, *e.g.*, Jones Obj. (ECF No. 6235) (filed 10/14/14), at 3; Heimburger Obj. (ECF No. 6230) (filed 10/14/14), at 15; Slack & Rice Obj. (ECF No. 6223) (filed 10/14/14), at 2–7.

the Qualifying Diagnosis.[141]   In my opinion, this offset is not unreasonable.  To the contrary, it is reasonable for the settlement to presume that, if someone suffered a stroke or traumatic brain injury prior to being diagnosed with a recoverable condition, the recoverable condition could have been caused in whole or in part by the stroke or traumatic brain injury (as opposed to being caused by playing NFL football).[142]   It certainly cannot be disputed that, in a contested trial against the NFL, a player who had suffered a prior stroke or traumatic brain injury would be vigorously cross-examined on that possible alternative cause (and the NFL would offer expert testimony to support that theory).   Thus, such claims are weaker than those by players who have not suffered prior strokes or traumatic brain injury.   It is only logical that weaker claims should be paid less.[143]   The parties might have chosen to make the offset lower (*e.g.*, 50 percent) or higher (*e.g.*, 85 percent), but this, again, is line-drawing, and does not raise a fundamental fairness problem.

95.   It is also important to note that these offsets are not absolute.   The settlement agreement allows class members to show that the offsets should not be applied in their particular circumstances.   Thus, the Settlement Agreement provides that

> "[i]f the Retired NFL Football Player receives a Qualifying Diagnosis subsequent to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, and if the Settlement Class Member demonstrates, by clear and convincing evidence, that the Qualifying Diagnosis was not causally related to the Stroke or the Traumatic Brain Injury, then the 75% Offset will not apply."[144]

In short, these offsets do not apply if a class member can make the requisite showing.

96.   Finally, as with the exclusion of CTE and other conditions, any class member who is

---

[141] *See, e.g.*, Duerson Obj. (ECF No. 6241) (filed 10/14/14), at 28–30; Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 15–18; Morey Obj. (ECF No. 6201) (filed 10/06/14), at 47–49; Barber Obj. (ECF No. 6226) (filed 10/14/14), at 6–8; Carrington Obj. (ECF No. 6409) (filed 11/03/14), at 6.

[142] *See, e.g.*, Dr. A. Peter Passmore, *Preventing Dementia Following a Stroke*, Journal of Quality Research in Dementia (lay summary), http://alzheimers.org.uk/site/scripts/documents_info.php?documentID=744 &pageNumber=4 (a single stroke can cause dementia); MedicineNet, *Vascular Dementia*, http://www.medicinenet.com/dementia/page5.htm (discussing link between strokes and vascular dementia); Alzheimer's Association, *Traumatic Brain Injury*, http://www.alz.org/dementia/traumatic-brain-injury-head-trauma-symptoms.asp (traumatic brain injury may increase risk of Alzheimer's Disease or another form of dementia).

[143] *See, e.g.*, *Deepwater Horizon*, 295 F.R.D. at 157 (approving medical benefits class settlement that "provide[d] for a range of potential proof, tying the amount of payments to the amount and quality of evidence presented"; the court noted that "[p]roviding a spectrum of settlement awards linked to a Class Member's level of proof is entirely appropriate").

[144] Settlement Agreement § 6.7(d).

unhappy about the offsets had the chance to opt out.

### ii. Reduction for Fewer than Five Seasons Played

97.   Under the settlement, monetary awards are reduced as the number of eligible seasons diminishes.  For example, the offset is 10% for 4.5 eligible seasons, 60% for 2 eligible seasons, and 90% for 0.5 eligible seasons.[145]  Several objectors argue that this reduction is unfair.[146]

98.   In my opinion, it is not unreasonable to assume that someone who, for example, played for five seasons has a stronger case at trial than someone who only played for one, and thus is entitled to greater recovery.[147]  I agree with co-lead class counsel that "the number of seasons of active participation in NFL football play" is "indicative of and an objective substitute for exposure to injury."[148]  I suspect that, had the agreement treated players with five active seasons the same as players with one active season, that treatment would have raised objections as well.

### iii. Reduction for Age

99.   Exhibit B-3 to the settlement agreement contains a grid setting forth reductions in compensation based on age at the time of Qualifying Diagnosis, with full recovery set at under age 45.  For instance, the compensation for a Qualifying Diagnosis of ALS at under age 45 is $5 million.  The amount is reduced by age bracket.  For example, the average base award for the 45–49 age bracket is $4.5 million, the average base award for the 60–64 age bracket is $3 million, and the average base award for the 80+ age bracket is $300,000.  Several objectors argue that age-based reductions are unfair.[149]

100.   As with reductions based on number of seasons, it is not unreasonable, in my view, to reduce awards based on age.  If, for example, a player is diagnosed with Alzheimer's Disease at

---

[145] *Id.* at § 6.7(b)(i).

[146] *See*, *e.g.*, Stewart Obj. (ECF No. 6175) (filed 09/22/14), at 2–4; Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 15–17.

[147] *Cf. Deepwater Horizon*, 910 F. Supp. 2d at 954 (dismissing objection to settlement's treatment of damages for real property sales that only included compensation for sales occurring before December 31, 2010 (about 8 months after the oil spill); court agreed that "any reduction in property values that persisted after that date [was] less likely to be predominantly attributable to the spill"); *id.* at 948 ("It is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims.") (citing cases).

[148] Seeger Decl. ¶ 42.

[149] *See*, *e.g.*, Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 17; Owens Obj. (ECF No. 6210) (filed 10/10/14) at 1–3; Barber Obj. (ECF No. 6226) (filed 10/14/14), at 5–6; Carrington Obj. (ECF No. 6409) (filed 11/03/14), at 5.

age 35, that player may have a strong case that the disease was caused by concussions suffered while playing football.  On the other hand, if Alzheimer's Disease is not diagnosed until age 80, the NFL's argument that football was *not* the cause is much stronger, given the much higher prevalence of Alzheimer's Disease in the general population in the age 80 category than in the age 45 category.[150]  Had the awards been set the same regardless of age, I suspect that such treatment would have generated objections as well.

### 2. Objections to Other Settlement Terms

#### a. Claims Process is too Stringent

101.  A number of objectors attack the settlement on the ground that the claims process is too stringent.[151]  I focus on terms that are highlighted by objectors as objectionable.

102.  Under the settlement, class members must file a claims package within two years of a qualifying diagnosis in order to recover.[152]  They are also required to provide "objective evidence [of NFL participation for more than one eligible season] beyond [a] sworn statement."[153]  Failure to provide such evidence limits the player to one eligible season.[154]  The claims administrator is entitled to investigate and request additional documentation.[155]  A class member must comply with such a request to recover a monetary award.[156]

103.  These requirements strike me as reasonable ways to prevent fraud and assure timely review of the medical evidence.  The claims involve potentially millions of dollars, and it is reasonable to impose the kinds of requirements imposed here.  Indeed, courts have routinely approved similar kinds of procedures.[157]

---

[150] *See, e.g.*, 2014 Alzheimer's Disease Facts and Figures, http://www.alz.org/downloads/Facts_Figures_2014.pdf at 9 ("The greatest risk factor for Alzheimer's disease is advanced age. Most people with Alzheimer's disease are diagnosed at age 65 or older. People younger than 65 can also develop the disease, although this is much rarer.").

[151] *See, e.g.*, Williams Obj. (ECF No. 6221) (filed 10/14/14), at 4; Komlo Obj. (ECF No. 6222) (filed 10/14/14), at 2; Heimburger Obj. (ECF No. 6230) (filed 10/14/14), at 25–26; Carrington Obj. (ECF No. 6409) (filed 11/03/14), at 7; Mayberry Obj. (ECF No. 6388) (filed 11/03/14), at 3–4.

[152] Settlement Agreement §§ 8.2(a), 8.3(a)(i).

[153] *Id.* at § 9.1(a)(i).

[154] *Id.* at § 6.7(b)(i)(8).

[155] *Id.* at § 8.6(a).

[156] *Id.*

[157] *See, e.g.*, *In re Processed Egg Products Antitrust Litig.*, 284 F.R.D. 249, 256 (E.D. Pa. 2012) (approving settlement where class members "had 127 days from the postmarked date that the notice of the settlement was

### b. Release is too Broad

104.   Several objectors express concern that the release language in the settlement is overly broad.[158]   Under the settlement, class members release claims relating to matters involved in the complaint (and/or related lawsuits) (1) "that were, or could have been asserted in" the complaint or a related suit, (2) "arising out of, or relating to, head, brain, and/or cognitive injury, as well as any injuries arising out of, or relating to concussions and/or subconcussive events . . . ," (3) "arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree . . . ," (4) "arising out of, or relating to, CTE," (5) "arising out of, or relating to, loss of support, services, consortium, companionship, society, or affection, or damage to familial relations . . . ," (6) "arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain, and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events . . . ," (7) "arising out of, or relating to, medical screening and medical monitoring for undeveloped, unmanifested, and/or undiagnosed head, brain, and/or cognitive injury as well as any injuries arising out of, or relating to, concussions and/or subconcussive events . . . ," and (8) "premised on any purported or alleged breach of any Collective Bargaining Agreement related to issues in the Class Action Complaint and/or Related Lawsuits, except for workers' compensation and claims alleging entitlement to NFL [Collective Bargaining Agreement] Medical and Disability Benefits."[159]

105.   I do not find this release language to be overly broad.   The release provisions focus on claims based on the conduct at issue in the complaint.   The NFL is not released from liability for any conduct not associated with the complaint—for example, claims involving knee injuries,[160]

---

mailed by first-class mail to the final postmarked date designated in the Claims Notice to return a completed Claim Form to make a claim for benefits."); *Helmick v. Columbia Gas Transmission*, No. 07-743, 2010 WL 2671506, at *11 (S.D. W.Va. July 1, 2010) (claims "bar date" set at 45 days after mailing of the claim forms); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 120 (S.D.N.Y. 2009) (claims deadline of 60 days after final approval); *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 443 (S.D.N.Y. 2004) (120-day claims deadline).

[158]   *See, e.g.*, Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 35; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 9–10.

[159]   Settlement Agreement § 18.1.

[160]   *See, e.g.*, Peter Barzilai & Erik Brady, *Knee injuries worry NFL players more than concussions*, USA TODAY, Jan. 27, 2014, *available at* http://www.usatoday.com/story/sports/nfl/2014/01/27/nfl-players-injury-survey-knee-head-concussions/4918341/ (reporting results of asking "293 players on 20 NFL teams . . . what body part they were most concerned about injuring in a game: 46% said knees or other parts of their legs, 24% said head and neck and 26% said none").

or claims alleging that the NFL illegally supplied players with addictive painkillers.[161]   And, while not all injuries alleged by class members are compensated, it is entirely permissible for a release to be broader than the claims subject to compensation.[162]

106.  As noted in ¶ 81, *supra*, the players preserve claims for workers' compensation, and for medical and disability benefits under the Collective Bargaining Agreement.   Moreover, in contrast to the January 2014 settlement agreement, this settlement does not release claims against the National Collegiate Athletic Association and other collegiate, amateur, or youth football organizations and entities. *See* ¶ 15, *supra*.   These features of the release, in my opinion, further support a finding of reasonableness.

### c. Qualifying Diagnosis Can Only be Made by "Qualified MAF Physicians"

107.  After the settlement's effective date, only "Qualified MAF Physicians" can make a qualifying diagnosis.[163]   The Claims Administrator will prepare the list, subject to approval "by Co-Lead Counsel and Counsel for the NFL Parties."[164]   Certain objectors object to this requirement.[165]

108.  This limitation strikes me as a reasonable way to ensure that the diagnoses have consistency and integrity.   It is my understanding from class counsel that the parties are working

---

[161] *See*, *e.g.*, Rick Maese, *Lawsuit: NFL pushed drugs on players*, WASHINGTON POST, May 20, 2014, *available at* http://www.washingtonpost.com/sports/redskins/lawsuit-nfl-pushed-drugs-on-players/2014/05/20/7148e190-e068-11e3-9442-54189bf1a809_story.html (reporting that "[m]ore than 600 players . . . filed a class-action complaint in U.S. District Court in San Francisco . . . alleging the league illegally supplied them with painkillers to conceal injuries and mask pain").

[162] *See*, *e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) ("The law is well established . . . that class action releases may include claims not presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct.") (citations omitted); *Berardinelli v. Gen. Am. Life Ins. Co.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded.  In fact, most settling defendants insist on this."); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (noting that in a (b)(3) settlement class with notice and opt-out rights, "a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint") (citations and internal quotation marks omitted); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 244 (D.N.J. 2005) ("The Court recognizes that in class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint, releases of known and unknown claims, or even claims over which the court lacked jurisdiction." (citing cases)).

[163] Settlement Agreement § 6.3.

[164] *Id.* at § 6.5(a).

[165] *See*, *e.g.*, Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 21–23; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 7–8.

hard to identify qualified physicians throughout the country so that class members will not be inconvenienced in seeking out such physicians.

### d. The BAP is Flawed

109.  A number of objectors argue that the BAP is flawed.[166]  Some objectors, for example, criticize the fact that retired players must register for the BAP within 180 days after notice is posted on a designated website.[167]  Failure to do so renders them ineligible for baseline testing and awards.  Players over age 43 are required to take baseline exams within two years after the BAP's launch; younger players must take the exams before their 45th birthday or within 10 years of the commencement of the program, whichever is earlier.[168]  No baseline exams will be conducted after 10 years.[169]

110.  In my opinion, contrary to the objectors' assertions, these requirements are not "too onerous."[170]  It is worth noting that class members will receive mailings alerting them of the requirements and reminding them of the deadlines to comply.[171]  The registration requirement allows the Claims Administrator and the BAP Administrator to identify and track the claimants they are responsible for dealing with, and is necessary to their task of identifying doctors and professionals in geographic proximity to registered class members.  The authorities cited in ¶ 104, n.155, *supra*, upholding reasonable deadlines for filing claims, also support the BAP deadlines and requirements discussed above.

### e. Unlimited Appeals by the NFL With No Fee While Class Members Pay $1000

111.  Under the settlement, the NFL can take unlimited appeals of monetary awards to class members.[172]  In the January 2014 version of the agreement, the NFL was restricted to 10 appeals

---

[166] *See, e.g.*, Duerson Obj. (ECF No. 6241) (filed 10/14/14), at 26–27; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 7; Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 20–21; Mayberry Obj. (ECF No. 6388) (filed 11/03/14), at 3.

[167] Settlement Agreement § 4.2(c).

[168] *Id.* at § 5.3.

[169] *Id.* at § 5.5.

[170] Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 20.

[171] Settlement Agreement §§ 5.9, 14.1(d).

[172] *Id.* at § 9.6(b).

per year.[173]   Also, the NFL pays no fee to appeal, whereas class members must pay $1,000 to appeal.[174]   Certain objectors protest these provisions.[175]

112.   In my opinion, these provisions are reasonable.   Since the NFL agreed to an uncapped monetary fund, it is understandable that it would contemplate a need for more than 10 appeals per year.   This approach seems like a reasonable way to help deter fraud.   Although the players (but not the NFL) must pay $1,000 to appeal, that payment will be refunded if the appeal is successful.   Such a provision thus discourages groundless appeals but should not deter players who genuinely believe in the strength of their claims, given the amounts at stake.   And, while the NFL is not required to pay the $1,000 fee, the settlement makes clear that, "[t]o the extent that Co-Lead Class Counsel believe that the NFL Parties are submitting vexatious, frivolous, or bad faith appeals, Co-Lead Class Counsel may petition the Court for appropriate relief."[176]   Thus, relief is available if the NFL abuses the appellate process.   Taken as a whole, these provisions establish a reasonable appellate procedure.

### f. $10 Million Education Fund is an Improper *Cy Pres* Fund

113.   Under the settlement, a $10 million Education Fund is established to "fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL [Collective Bargaining Agreement] Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players."[177]   Some objectors argue that this Education Fund constitutes an "improper initial *cy pres* fund . . . ."[178]

114.   Three features of the award here render it much less of a concern to me than in some cases involving funds that do not go directly to class members.   First, in some cases, the *cy pres*

---

[173] January 6, 2014 Settlement Agreement § 9.6(b).

[174] Settlement Agreement § 9.6(a).

[175] *See*, *e.g.*, Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 24–25; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 8–9.

[176] Settlement Agreement § 9.6(b).

[177] *Id.* at § 12.1.

[178] Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 30; *see also* Heimburger Obj. (ECF No. 6230) (filed 10/14/14), at 28–30; Anderson Obj. (ECF No. 6248) (filed 10/16/14), at 3.

remedy is the entire remedy in the case; class members get nothing.[179]  Here, the designation of the fund is on top of an uncapped fund for specified injuries.  Indeed, given the value of this settlement—in the range of close to a billion dollars—the $10 million Education Fund represents a relatively small part of the settlement.  As the Third Circuit has stated, "*cy pres* awards should generally represent a small percentage of total settlement funds,"[180] and that is certainly the case here.  Second, the fund is not going to some randomly selected organization that is unrelated to the lawsuit.[181]  Rather, the money is being used to educate retired NFL players (as well as those still playing) about safety and injury prevention.  The Education Fund thus lines up perfectly with the compensation scheme in the settlement.[182]  It would make little sense for the Court to strike down the settlement because of the Education Fund, and it would make even less sense to strike that provision and leave the rest of the settlement intact.

115.  In advancing the *cy pres* argument, the Armstrong objectors rely on § 3.07 of the *ALI Aggregate Litigation*.[183]  They quote comment b to § 3.07 as follows:  "'This Section takes the view that *in most circumstances*, distributions to class members better approximates the goals of the substantive laws *than distributions to third parties that were not directly injured by the defendant's conduct*.'"[184]  The italicized language reveals two fundamental points.  First, the rule articulated by the ALI is not absolute.  Second, and most important, the ALI's focus is on

---

[179] *See*, *e.g.*, *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011) (reversing approval of class settlement including *cy pres* distributions where the "proposed awards fail[ed] to (1) address the objectives of the underlying statutes, (2) target the plaintiff class, or (3) provide reasonable certainty that any member will be benefitted").

[180] *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013); *see also Deepwater Horizon*, 910 F. Supp. 2d at 960 (rejecting arguments that $57 million fund to promote Gulf Coast tourism and seafood industries—in the context of a settlement estimated at over $7 billion—amounted to improper *cy pres* where, "from the outset, a specific allotment of money was demanded by [plaintiffs] and provided by [defendant], in addition to compensation to individual class member claimants, to provide benefits for class members by promoting Gulf seafood and tourism").

[181] *Compare*, *e.g.*, *In re Motorsports Merch. Antitrust Litig.*, 160 F. Supp. 2d 1392, 1396–99 (N.D. Ga. 2001) (distributing $1.85 million remaining from class settlement in case alleging a conspiracy to fix prices of NASCAR race souvenirs to ten organizations including the Duke Children's Hospital and Health Center, the Make-a-Wish Foundation, the American Red Cross, and the Susan G. Komen Breast Cancer Foundation); *Superior Beverage Co., Inc. v. Owens-Illinois, Inc.*, 827 F. Supp. 477, 480 (N.D. Ill. 1993) (awarding $2 million from antitrust class action settlement to fifteen applicants, including the San Jose Museum of Art, the American Jewish Congress, a public television station, and the Roger Baldwin Foundation of the American Civil Liberties Union of Illinois).

[182] *See*, *e.g.*, *Deepwater Horizon*, 910 F. Supp. 2d at 960 (rejecting argument that $57 million fund to promote Gulf Coast tourism and seafood industries violated *cy pres* doctrine where "[a]lleged harm to the tourism and Gulf seafood industries [were] core components of the claimed damages being compensated by this Settlement").

[183] Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 33.

[184] *Id.* (quoting *ALI Aggregate Litigation* § 3.07 cmt. b) (emphasis added).

distributions to third parties that were not injured by the conduct at issue.  Here, as noted, the money is not going to an uninjured third party; rather, it is going directly to fund education programs for class members.  That point, standing alone, demonstrates the lack of merit in the objectors' challenge to the Education Fund.

116.  Finally, the *cy pres* objections illustrate my broader thematic point: No matter where a settlement draws lines, there will be complaints.  Here, for example, while some objectors want to do away with the Education Fund, one attorney representing certain class members has written that the fund should have been larger:

> I'm surprised the settlement includes only $10 million for programs to promote safety and education relating to concussions.  By comparison, one 30 second commercial during last year's Super Bowl cost $4 million dollars.  So, if the NFL wants to educate the public about the dangers of head injuries, they have set aside enough money to do so in a single 75 second Super Bowl commercial.[185]

Thus, the Education Fund has been criticized as being too large and as being too small.  These criticisms, taken together, only confirm that the settlement's approach is reasonable.

### g. No Consideration of Scientific Advances Except by NFL Consent

117.  Section 6.6(a) of the settlement provides that "on a periodic basis not to exceed once every ten (10) years, Co-Lead Class Counsel and Counsel for the NFL Parties agree to discuss in good faith possible prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted science."  Certain objectors contend that the agreement should be rejected because the NFL is not compelled to alter the terms of the settlement down the road to take into account advances in science.[186]  Some of the objectors are particularly upset because they read the agreement as *precluding* the parties from even meeting to discuss scientific advances more than once every ten years.[187]

118.  To begin with, I do not read the agreement as allowing the NFL to address scientific

---

[185]  Dwight P. Bostwick, *The NFL Settlement—What's the Deal?*, Huffington Post, Jan. 31, 2014, http://www.huffingtonpost.com/dwight-p-bostwick/nfl-concussion-settlement_b_4705565.html.

[186]  *See, e.g.*, Morey Supp. Obj. (ECF No. 6232) (filed 10/14/14), at 5; Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 27–28; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 9; Duerson Obj. (ECF No. 6241) (filed 10/14/14), at 28.

[187]  *See, e.g.*, Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 28; *see also* Miller Obj. (ECF No. 6213) (filed 10/14/14), at 9.

advances in bad faith.  The invocation of "good faith" in section 6.6(a) suggests that, if the NFL refuses in bad faith even to consider "generally accepted advances in medical sciences," plaintiffs can seek relief from the Court.

119.   Moreover, I do not read the language of section 6.6(a) as forbidding the parties from meeting more than once every ten years, should both sides choose to do so.  Rather, the language embodies the parties' agreement that neither side can *compel* the other side to meet more than once every ten years.

### h. Maximum Awards are Insufficient

120.   Several objectors complain that the maximum awards on the grid[188] (*e.g.*, $5 million for ALS, and $3.5 million for Alzheimer's Disease and Parkinson's Disease)[189] are too low.  As the Armstrong objectors put it, "[t]hese amounts are insufficient to compensate the injured players and/or their families . . . ."[190]

121.   As noted in ¶ 83, *supra*, class counsel were limited in what they could negotiate. Objectors must recognize that this settlement is a compromise, and thus the class members cannot expect to recover what they could conceivably recover as the best possible outcome at a trial.   Moreover, payments to individual class members of as much as $5 million are quite substantial in the settlement context.[191]   Finally, as I have noted throughout this declaration, class members who found the settlement inadequate had a right to opt out.

### i. Healthcare Liens

122.   Public Citizen as amicus objects to the settlement because, in its view, the settlement's approach to health care liens could unfairly block payments to class members for a considerable

---

[188] Settlement Agreement, Ex. B-3.

[189] *See, e.g.*, Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 6; Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 14–15.

[190] Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 14.

[191] *Compare, e.g.*, *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553, 557 (W.D. Wash. 2004) (approving class settlement of claims for "increased risk of hemorrhagic stroke" and "a variety of injuries" caused by defendant's products, including "compensation to each eligible Class Member ranging between $100 and $5,000,000, depending on the type and severity of the injury claimed, the Class Member's age and other liability and damages factors"); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 229–230 (S.D.W.Va. 2005) (approving class settlement of mass tort claims for "a range of physical and economic injuries" with benefits to class members ranging from $100 to $3.5 million).

period of time.[192]

123.   This is a complicated regulatory area, and the parties were obviously constrained to follow and take into account federal law, including Medicaid and Medicare, as well as contractual provisions with private insurers.  Public Citizen implies that this case is an outlier and that the approach here is somehow contrary to how these difficult issues are ordinarily handled.

124.   In fact, the Declaration of Matt Garretson, whose company (GRG) is serving as the lien resolution administrator for the settlement, discusses in great detail how the healthcare lien issues are being resolved.  Garretson notes that the provisions of section 11 of the settlement are "are designed to ensure satisfaction of each Class Member's legal obligation to reimburse their healthcare insurers for medical costs paid on their behalf related to the Qualifying Diagnosis for which they are receiving compensation."[193]   The provisions in section 11 are also designed to "avoid potential penalties associated with non-compliance, such as direct action against the Class Member or settling parties to recover unpaid claims/liens, interest being assessed on the claim/lien amount, and/or denial of the Class Member's future healthcare insurance benefits."[194] According to Garretson, the approach in this case was also used in numerous other mass tort cases, such as *Deepwater Horizon*, *Vioxx*, and *Zyprexa*.[195]   Garretson considers the approach to be "'state of the art.'"[196]   He describes in great detail (over six pages) how GRG is handling the lien resolution issues here.[197]   The issue of health care liens is a complicated and technical one, and GRG brings substantial expertise to the table.   I am not prepared to second-guess the comprehensive program adopted by GRG.

### j. Objection Procedures

125.   Public Citizen objects to what it calls "burdensome objection procedures."[198]   In

---

[192] Public Citizen Memo. (ECF No. 6214-1) (filed 10/14/14), at 11–15; *see also* Carrington Obj. (ECF No. 6409) (filed 11/03/14), at 6–7.

[193] Garretson Decl. ¶ 21.

[194] *Id.*

[195] *Id.* at ¶ 23.

[196] *Id.*

[197] *Id.* at ¶¶ 26–27.

[198] Public Citizen Memo. (ECF No. 6214-1) (filed 10/14/14), at 9.

particular, it protests the fact that an objection must contain the class member's signature by hand, even if he is represented by counsel.[199]   In my opinion, this modest requirement is not a reason to reject the settlement or open up a new period for class members to object.  Requiring a personal signature is a minor inconvenience to the client and to counsel and serves to ensure that it is indeed the client who is advancing the objection.  Other cases have approved a similar requirement.[200]

### 3.  Objections to Attorneys' Fees and Set-Aside

#### a. Clear-Sailing Provision Indicates Collusion

126.   Several objectors[201] protest the attorneys' fees provision and cite that provision as a basis for striking down the settlement.  Under the settlement, the NFL agrees not to object to attorneys' fees and costs not exceeding $112,500,000.  The issue of fees is not before the Court at the November 19, 2014 fairness hearing, but objectors apparently maintain that the agreement evidences collusion.  I disagree for several reasons.

127.   First, the funds to pay for the fees are paid separately by the NFL, and do not come out of the class members' recovery.  This is a plus in my view.  As the court noted in *Turner v. Murphy Oil USA, Inc.*,[202] the fact that fees would be paid separate from the class recovery, and that the fee amount was left to the court's discretion, is "significant because it exponentially decreases the possibility of collusion among counsel."[203]

128.   Second, the absence of collusion is confirmed by the active role of the Mediator at the

---

[199] Settlement Agreement § 14.3.

[200] *See*, *e.g.*, *Dryer v. NFL*, No. 09–2182 (PAM/AJB), 2013 WL 1408351, at *5 (D. Minn. Apr. 8, 2013) (preliminarily approving class settlement and requiring objectors to sign objections); *Barani v. Wells Fargo Bank, N.A.*, 12CV2999–GPC (KSC), 2014 WL 1389329, at *11 (S.D. Cal. Apr. 9, 2014) (same); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-2509-LHK, 2013 WL 6328811, at *6 (N.D. Cal. Oct. 30, 2013) (same).

[201] *See*, *e.g.*, Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 28–30; Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 5; Anderson Obj. (ECF No. 6248) (filed 10/16/14), at 3.

[202] 472 F. Supp. 2d 830, 845 (E.D. La. 2007).

[203] *Id.* at 845.  *See also*, *e.g.*, *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, Civ. No. 04-5184-GEB, 2007 WL 1652303, at *4 (D.N.J. June 5, 2007) (noting that the fact that defendants had agreed to pay attorneys' fees separately from the class relief weighed in favor of approving fee award); *Deepwater Horizon*, 910 F. Supp. 2d at 933–34 ("[Defendant] has also agreed not to oppose a significant award of common benefit attorneys' fees and costs, effectively sparing the class from having to pay for common-benefit fees and expenses").

settlement negotiations,[204] and by the fact that the parties "did not discuss the issue of attorneys' fees at any point during the negotiation sessions, except to defer the issue until after an agreement in principal was reached on all material Settlement terms providing benefits to the Settlement Class and Subclass Members . . . ."[205]  Plaintiffs' counsel were not legally required to take such a cautious approach, but they did so nonetheless.[206]

129.  In any event, as noted above, the issue of fees is not before the Court at the November 19, 2014 hearing.  If the Court approves the settlement, class members will have a subsequent opportunity to object to the attorneys' fees motion.

### b. Players Who Hired Their Own Lawyers Have to Pay Fees

130.  Contrary to arguments made by certain objectors,[207] the fact that some class members entered into contingent fee agreements with their own attorneys, and thus will have fees taken from their recovery, is not a concern.  This situation is not uncommon in class action settlements.[208]  Had these class members chosen to sue individually, they would have been required to pay a percent of any recovery for fees.[209]

---

[204] *See, e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("the supervision of settlement negotiations by a magistrate judge . . . makes it less likely" that class counsel "promot[ed] their own interests over those of the class"); *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 725 (E.D. La. 2008) (fact that the parties had engaged in mediation with a magistrate judge demonstrated a lack of collusion behind settlement); *Ridgely v. FEMA*, 2010 U.S. Dist. LEXIS 136368, at *3 (E.D. La. Dec. 13, 2010) (same); *McBean v. New York*, 233 F.R.D. 377, 383 (S.D.N.Y. 2007) (same).

[205] Seeger Decl. ¶ 46.

[206] Although the Third Circuit had at one time required such sequencing, *Prandini v. Nat'l Tea Co.*, 585 F.2d 47, 53 (3d Cir. 1978), the Supreme Court later made clear that simultaneous discussion of settlement terms and attorneys' fees is not prohibited. *Evans v. Jeff D.*, 475 U.S. 717, 737–38 & n.30 (1986).

[207] *See, e.g.*, Alexander Obj. (ECF No. 6237) (filed 10/14/14), at 5; Armstrong Obj. (ECF No. 6233) (filed 10/14/14), at 28–30; Brabham Obj. (ECF No. 6356) (filed 11/03/14), at 1.

[208] *See, e.g.*, *Deepwater Horizon*, 910 F. Supp. 2d at 946 ("Particularly given [defendant's] agreement not to oppose a substantial award of common benefit fees to be paid in addition to compensation paid to claimants and other benefits under the Settlement, there is no requirement that [defendant] separately pay the cost of individual attorneys.").

[209] Public Citizen complains that the class notice did not fairly apprise class members with retained counsel that they would have to pay their own lawyers notwithstanding the NFL's agreement to pay fees and costs to class counsel of up to $112,500,000. Public Citizen Memo. at 8.  Public Citizen concedes that question 16 in the long form notice references the fact that the amount a class member receives would be impacted by a retainer agreement with a lawyer. *Id.*  And if a class member was still confused, he could have called the toll free number listed in the long form notice or inquired directly with the lawyer he retained.

### c. 5% Set-Aside is Improper

131.  As noted (¶ 16, *supra*), the parties will be addressing the issue of representation of the class members during the 65-year claims period.  The set-aside may come into play during those discussions.  In all events, the Court will not be formally addressing the set-aside until the fee stage, and objectors will have the chance to weigh in at that time.

### B. The "*Girsh* Factors"

132.  In the Third Circuit, courts evaluate the reasonableness of a proposed class settlement under the *Girsh* factors.  These are:

> (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[210]

"These factors are a guide and the absence of one or more does not automatically render the settlement unfair."[211]   "Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh*."[212] Additionally, more recent Third Circuit precedent indicates that "a district court may consider several other factors illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms."[213]   These additional factors include, for example, "whether class or subclass members are accorded the right to opt out of the settlement,"[214] "whether the procedure for processing individual claims under the settlement is fair and reasonable,"[215] and "whether any provisions for attorneys' fees are reasonable."[216]

---

[210] *Girsh v. Jepson*, 521 F.3d at 157.

[211] *In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744, at *1 (D.N.J. Oct. 1, 2013) (citation omitted).

[212] *Id.* (citing *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 184 (E.D. Pa. 1997)).

[213] *Sullivan*, 667 F.3d at 320 (citations omitted). *See also Prudential*, 148 F.3d at 323.

[214] *Sullivan*, 667 F.3d at 320.

[215] *Id.*

[216] *Prudential*, 148 F.3d at 323.

133.   Application of these factors here reveals that most of them strongly support the settlement.

### 1. Complexity, Expense, and Likely Duration of the Litigation

134.   This case would be expensive and protracted in the absence of settlement.  It raises complicated scientific issues.  In advance of trial, the NFL would likely attack plaintiffs' experts pursuant to F.R.E. 702 and 703, challenging the assertion that the injuries here were caused by concussions.  At trial, the NFL would seek to show, through scientific proof, that concussions do not cause the types of injuries alleged by class members.  Plaintiffs would attempt to dispute the NFL through their own scientific proof.  The litigation of alternative causes (*e.g.*, Pop Warner, high school football, or college football) and defenses, both legal and factual, would also be time-consuming.[217]  Because the case would be heavily focused on science, the cost of experts would be considerable.  Other mass tort cases, such as tobacco and asbestos, have been litigated for many years, sometimes for decades.

### 2. Reaction of the Class to the Settlement

135.   The Morey objectors predicted that "the number of opt-outs and objectors would be high."[218]  This has proven not to be true.  As noted (¶ 19, *supra*), fewer than 1% of the 20,000 estimated class members opted out.  Similarly, fewer than 1% of class members filed objections.  And "many of these opt-outs and objections were filed on standard forms obtained through the Objectors' websites."[219]  This is not a case in which the absence of opt outs and objectors can be rationalized on the ground that the settlement was not widely publicized.  This settlement has been a leading news item for many months.[220]  As of October 14, 2014, the website had logged

---

[217] One letter to the Court illustrates the potential force of the defense that a player could have been injured prior to playing for the NFL.  Debra Pyka wrote the Court (Oct. 7, 2014) that her son did not play college or professional football but did play Pop Warner football through high school.  He committed suicide at age 25 and was later diagnosed with CTE.  *See also* Eric Smith, *Pop Warner*, *Mayo Clinic Implement Concussion Testing Protocol*, EAST VALLEY TRIBUNE, Aug. 19, 2014, http://www.eastvalleytribune.com/varsityxtra/article_265a0070-19d8-11e4-931d-0019bb2963f4.html (noting that young football players are especially susceptible to injuries from concussions).

[218] Morey Obj. (ECF No. 6201) (filed 10/06/14), at 75.

[219] Seeger Decl. ¶ 71.

[220] *See, e.g.*, Doug Farrar, *NFL, retired players reach $765 million settlement in concussion lawsuits*, SPORTS ILLUSTRATED, Aug. 29, 2013, *available at* http://www.si.com/nfl/audibles/2013/08/29/nfl-concussion-lawsuit-settlement; Seeger Decl. ¶ 70.

62,989 unique visitors, and 4,544 calls had been made to the toll-free number.[221]  Furthermore, as of October 14, 2014, 3,175 potential settlement beneficiaries have registered to receive additional notices relating to the settlement.[222]  Clearly, the class members were familiar with the settlement, and most chose not to opt out or object.

### 3. Stage of Proceedings and Amount of Discovery Completed

136.  Although it is true that some major cases have taken many years to resolve, the parties' ability to reach a comprehensive settlement here in a relatively short amount of time is a testament to the highly skilled work of class counsel under the supervision of the Mediator and the Special Master.  It is not a negative factor in my view.  In her concurring opinion in *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003), Judge Graber made precisely the point I am making here when she disputed the majority's suspicion about the promptness of the settlement at issue:

> Early dispute resolution is salutary, and we should not encourage the unnecessary expense, delay, and uncertainty caused by lengthy litigation when the parties are prepared to compromise.  Nor should we hold . . . that a prompt settlement necessarily suggests a failure to prosecute or defend the action with due diligence and reasonable prudence.  To the contrary, an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of the strengths and weaknesses of their positions and of the interests to be served by an amicable end to the case.[223]

137.  To be sure, the absence of discovery is a negative indicator under the *Girsh* factors. There are several considerations here, however, that render the lack of discovery less of a concern.  First, discovery was stayed in this litigation by the Court, pending resolution of certain potentially dispositive legal issues.  Second, during the pendency of that motion and while discovery was stayed, the Court ordered mediation in advance of discovery, and imposed a strict deadline to report back.  Under these circumstances, it would have been difficult for counsel to refuse to mediate without discovery.  Third, while at first blush it might appear that discovery was the only way for plaintiffs to assess the case, in fact plaintiffs could assess the case by

---

[221] Kinsella Decl. ¶¶ 26, 28.

[222] *Id.* at ¶ 26.

[223] 318 F.3d 937, 959 (9th Cir. 2003) (Graber, J., concurring) (citation omitted). *See also ALI Aggregate Litigation* § 3.05 cmt. a (recommending that "[a] court, in reviewing a settlement, should not give any predetermined weight either to the fact that the case was pending for a substantial period of time before a settlement was reached or to the fact that a settlement was reached early in the case"); Reporters' Notes to § 3.05 at 211 ("This Section agrees with the approach of Judge Graber.")

reviewing the science on concussions and comparing that science to the statements and positions taken by the NFL (*i.e.*, that concussions while playing football did not pose serious risks to players).[224]  Indeed, while the Morey objectors complain about the lack of discovery,[225] they go on to argue that:

> The publically available facts show that the NFL was aware of its responsibility to protect its players, knew or should have known that its policies and conduct were leading to widespread exposure to neurodegenerative diseases, and that—far from helping protect its players from brain trauma—the NFL sought to quash any research drawing a connection between the two.[226]

138.  Although discovery could have conceivably produced additional evidence favorable to the class, in my opinion, the publically available information was sufficient to ensure that class counsel did not negotiate from a position of weakness.

### 4–5. Risks of Establishing Liability and Damages

139.  As I have noted (¶ 18, *supra*), plaintiffs faced a host of challenges, including showing that concussions in fact caused the injuries plaintiffs allege, and that the injuries were caused by NFL football, as opposed to playing football in Pop Warner, grade school, high school, or college, when the likelihood of brain injury to skulls not fully formed is arguably considerable. Putting aside those risks, the NFL was prepared to litigate a host of credible defenses, such as federal preemption, assumption of risk, statutory employer, and statute of limitations.  Indeed, as noted (¶ 18, *supra*), the Court was prepared to rule on the NFL's fully-briefed preemption motion if the parties did not settle by September 3, 2014.  Plaintiffs thus faced serious risks in establishing liability and damages.

---

[224] Preliminary Approval Memo. (ECF No. 6083) (07/07/14), at 10 (Court found that class counsel "possess[ed] adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties."); *see id.* at 10 n.6 (citing cases noting that discovery is not a prerequisite for settlement in all cases); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 966–67 (N.D. Ill. 2011) (approving a settlement, even where "no formal discovery [had] taken place . . . prior to the parties' entering into the Settlement Agreement," because class counsel "obtained information about all the relevant issues during the half-year-long settlement negotiations" and it was "not clear how formal discovery would have produced appreciable benefits to the Court and to the parties that the informal discovery conducted by the parties did not bestow"); Seeger Decl. ¶ 20 (explaining why success of the settlement negotiations did not turn on information in the possession of the NFL).

[225] Morey Obj. (ECF No. 6201) (filed 10/06/14), at 70–72.

[226] *Id.* at 76; *see also id.* at 20–25 (summarizing the Class Action Complaint's detailed discussion of publically available facts establishing wrongdoing by the NFL).

### 6. Risks of Maintaining the Class Action Through Trial

140.  I explained above that, viewed through the lens of the Third Circuit's deferential class certification standard for settlement classes, the elements for class certification were established. *See* ¶¶ 21–66, *supra*.   Indeed, as I noted, very few of the objectors disagree with that point; virtually all of the objectors do not dispute that, aside from adequacy of representation, the elements of class certification were met for a settlement class.   But the entire analysis would change were the case to be litigated.   In that circumstance, the fact that this is a mass tort, with contested issues of specific causation, would make class certification more difficult.[227]

### 7. Ability of the Defendants to Withstand a Greater Judgment

141.  Although the NFL could afford a more expensive settlement, its tough negotiation position reflects the challenges plaintiffs faced in proving liability and damages.   The NFL certainly has ample financial resources, but that does not mean that it would agree to exhaust those resources to settle a case that it views as questionable.[228]

### 8–9. Range of Reasonableness in Light of (a) the Best Possible Recovery and (b) All Attendant Risks of Litigation

142.  "The last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case."[229]   "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."[230]

143.  The recoveries secured under the settlement strike me as quite substantial given all of

---

[227] *Cf. Grandalski v. Quest Diagnostics, Inc.*, 767 F.3d 175, 180 (3d Cir. 2014) (holding that the district court did not err in denying certification of a (b)(3) *litigation* class after performing a choice-of-law analysis; court distinguished *Sullivan* as "concern[ing] settlement classes, which do not pose the types of management problems that can arise in a nationwide class action trial").

[228] For this reason, the Supplemental Objections by the Morey Objectors (ECF No. 6420) (11/11/14) do not add anything new to the equation.   The supplemental objections argue at length that the NFL has the resources to pay more than it is paying under the current settlement. *See id.* at 3–13.   I do not dispute that the NFL has extensive resources, but it does not follow that the current settlement is unfair.   Rather, the Court must determine whether the settlement is fair based on all of the facts; just because the NFL might be able to pay more does not mean that the class could have negotiated a better settlement. *See Chakejian v. Equifax Information Services, LLC*, 275 F.R.D. 201, 214–15 (E.D. Pa. 2011) (noting that "courts in this district regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts") (citation and internal quotation marks omitted).

[229] *Warfarin*, 391 F.3d at 538.

[230] *Id.* (citing *Prudential*, 148 F.3d at 322).

the challenges that plaintiffs faced in proving their claims and winning on the various dispositive legal issues.   Players can recover as much as $5 million for a qualifying injury.   And they preserve other crucial benefits under the Collective Bargaining Agreement.   The NFL has agreed to pay class counsel's attorneys' fees and costs (up to $112,500,000) separately, and not out of the individual recoveries.   In short, the class ended up with a good deal, given the risks of litigation.

### 10. Additional Factors

144.   Several additional factors should be noted that, in my opinion, pertain to the fairness of the settlement.   First, the hands-on involvement of a mediator provides powerful assurance that the proposed settlement is free from any taint of collusiveness.[231]   Second, the fact that attorneys' fees and costs were not negotiated until after the settlement was in place—and that fees will be paid separately by the NFL and not out of the settlement fund—provides further assurance that no collusion took place.[232]   Third, the Settlement Agreement provided a right to opt out.[233]   Fourth, the claims procedures were fair and reasonable.[234]

### C.   Conclusion on Fairness, Adequacy, and Reasonableness of the Proposed Settlement

145.   Viewing the *Girsh* factors as a whole, and taking into account the additional factors noted above, I believe that the class settlement is fair, reasonable, and adequate.

## IX.   CONCLUSION

146.   For the forgoing reasons, it is my opinion that this Court should certify the case as a Rule 23(b)(3) class, reaffirm the validity of the notice program, and uphold the settlement as fair,

---

[231] *See, e.g.*, *Hall v. AT&T Mobility LLC*, No. 07–5325 (JLL), 2010 WL 4053547, at *7 (D.N.J. Oct. 13, 2010) ("the participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties"); ¶ 14, *supra*.

[232] *See, e.g.*, *Weber v. Government Employees Ins. Co.*, 262 F.R.D. 431, 451 (D.N.J. 2009) (certifying settlement class, approving settlement, and awarding attorneys' fees; court noted that "the parties' agreement with regard to attorney's fees was the product of arm's-length negotiations which did not commence until after the parties had reached agreement in principle [on] all the terms relating to relief for the Class") (citation and internal quotation marks omitted); ¶ 128, *supra*.

[233] *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"); ¶ 19, *supra*.

[234] *See e.g.*, *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 745 (E.D. Pa. 2013) (fact that "the procedure for processing individual claims under the settlement [was] fair and reasonable" weighed in favor of settlement approval); ¶¶ 102–103, *supra*.

reasonable, and adequate.


I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.


_____
Robert H. Klonoff

November 12, 2014

# Exhibit A

# CURRICULUM VITAE

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:  March 15, 1955
Place of Birth:  Portland, Oregon

## EDUCATION:

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

## WORK EXPERIENCE:

### Current Position:

Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School

### Prior Positions:

Dean of the Law School and Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (2007-2014)

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Elected Member, International Association of Procedural Law (effective October 2014)

Selected in November 2013 for the J. William Fulbright Specialist Roster

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Member, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Fellow, American Bar Foundation

Elected Member, American Law Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

**MEMBERSHIPS:**

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

**PUBLICATIONS:**

    **Books:**

        Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West Publishing Co. 2d ed.) (forthcoming 2015)

        Klonoff, *Introduction to United States Law:  A Textbook for International Students* (West Publishing Co. 2015) (forthcoming)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

        Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012 and 2013 update) (with teacher's manual)

        Klonoff ( associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010)(along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

        Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

        Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

        Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

        Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

        Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000) (with teacher's manual; supplemented annually)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

        Klonoff & Colby, *Sponsorship Strategy:  Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

**Articles and Book Chapters**:

*Federal Rules Symposium:  A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014)(co-author)(forthcoming)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B):  Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,* 39  Env. Law 1225 (2009)

*The Public Value of Settlement,*  78 Fordham L. Rev.  1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13  J. Internet Law 1 (2009)

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women: Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy: A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts: The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies: Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes: Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Served as a class action expert witness in numerous federal and state cases, including the British Petroleum Deepwater Horizon oil spill class settlement

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Convention, San Francisco, California (July 22, 2013)

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon  (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W.

De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta, Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy"  (1990-present)  and advocacy before the U.S. Supreme Court (1988-present)

## OTHER LEGAL ACTIVITIES:

International Association of Law Schools, Member of Annual Meeting Committee

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Member, Advisory Committee, Lawyers' Campaign for Equal Justice (Portland, Oregon)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Organizer and coordinator of Class Action symposium edition for spring 2006 UMKC Law Review (contributing authors included prominent law professors, judges, and practitioners)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Helped to develop walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

**VOLUNTEER WORK:**

Frequent guest speaker at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.