# Exhibit 8

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>        Defendants. | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody**<br><br><br>CIVIL ACTION NO: 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**DECLARATION OF SUBCLASS 1 COUNSEL ARNOLD LEVIN
IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
AND CERTIFICATION OF CLASS AND SUBCLASSES**

   Arnold Levin declares, pursuant to 28 U.S.C. §1746, based upon his personal knowledge, information and belief, the following:

### INTRODUCTION

   1.  I was appointed by the Court to serve on the Plaintiffs' Steering Committee in *In re National Football League Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.) [ECF No. 64]. I have also been appointed to serve as Subclass Counsel for Subclass 1 in connection with the Class Action Settlement ("Settlement") dated June 25, 2014 between the Plaintiff Class and the Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties"), which was preliminarily approved on July 7, 2014 [ECF No.

6084, ¶ 3(b)]. This Settlement is intended to resolve more than 5,000 lawsuits in this MDL and thousands of additional claims of Retired NFL Football Players against the NFL Parties for injunctive relief, medical monitoring, and compensation for the long-term cognitive injuries and other losses suffered by them allegedly as a result of the NFL Parties' tortious conduct. Subclass 1 includes "Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis [Level 1.5 Neurocognitive Impairment (early dementia), Level 2 Neurocognitive Impairment (moderate dementia), Alzheimer's Disease, Parkinson's Disease, Amyotrophic Lateral Sclerosis ("ALS"), and/or Death with CTE (chronic traumatic encephalopathy)] prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants." [ECF No. 6084, ¶ 2(b)(i)]. I am fully familiar with the claims asserted in this litigation against the NFL Parties, their potential defenses, including their motions to dismiss on grounds of preemption under Section 301 of the Labor Management Relations Act, the pleadings filed in this case, and the objections filed regarding the Settlement. I submit this Declaration in support of Class Counsel's Motion for Final Approval of the Settlement and Certification of the Class and Subclasses.

2.    I have practiced law for over 50 years and have substantial expertise in class actions, mass torts, complex personal injury suits, and multidistrict litigation. In over 100 cases (too many to cite), I have been appointed to leadership positions as Plaintiffs' Lead Counsel and/or a member of the Plaintiffs' Executive Committee or Steering Committee. As a brief sample of my leadership roles, in the *Diet Drugs* litigation, MDL No. 1203 (E.D. Pa.) (Bechtle, J./Bartle, J.), I served as Co-Lead Counsel for Plaintiffs' Management Committee, Plaintiffs' Liaison Counsel, and Class Counsel. The Court noted that: "Each of the Class Counsel [Arnold Levin, Sol Weiss, Gene Locks and others] are experienced in the conduct of class litigation, mass

tort litigation and complex personal injury litigation." *In re Diet Drugs*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000). *See also, e.g., In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL No. 2047 (E.D. La.) (Fallon, J.) (Lead Counsel of Plaintiffs' Steering Committee, Lead Negotiator, and Class Counsel); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, MDL No. 1014 (E.D. Pa.) (Bechtle, J./Buckwalter, J.) (Co-Lead Counsel of Plaintiffs' Legal Committee, Plaintiffs' Liaison Counsel, and Class Counsel); *In re Human Tissue Prod. Liab. Litig.*, MDL No. 1763 (D.N.J.) (Martini, J.) (medical monitoring Lead Counsel); *In re Asbestos School Litig.*, Master File No. 83-0268 (E.D. Pa.) (Kelly J./Giles, J.) (member of Plaintiffs' Executive Committee and Lead Trial Counsel); *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, MDL No. 2342 (E.D. Pa.) (Rufe, J.) (member of Plaintiffs' Steering Committee); *In re CertainTeed Corp. Roofing Shingles Prod. Liab. Litig.*, MDL No. 1817 (E.D. Pa.) (Pollak, J.) (Plaintiffs' Liaison Counsel); *In re Vioxx Prod. Liab. Litig.*, MDL No. 1657 (E.D. La.) (Fallon, J.) (member of Plaintiffs' Steering Committee and Plaintiffs' Negotiating Committee); *In re Propulsid Prod. Liab. Litig.*, MDL No. 1355 (E.D. La.) (Fallon, J.) (member of Plaintiffs' Steering Committee); *In re Rezulin Prod. Liab. Litig.*, MDL No. 1348 (S.D.N.Y.) (Kaplan, J.) (member of Plaintiffs' Executive Committee). In addition, I have been recognized as one of 500 leading lawyers in America by Lawdragon and The Legal 500 USA. I was also named to The National Law Journal's Inaugural List of America's Elite Trial Lawyers. Moreover, I have been recognized as one of the top 100 trial lawyers by The National Trial Lawyers Association, I have been acknowledged in The Best Lawyers in America, and I am listed in Martindale Hubbell's Register of Preeminent Lawyers. I am a Fellow of the International Society of Barristers. Further, U.S. News and World Report has designated my firm, Levin, Fishbein, Sedran & Berman, as one of the top 22 national plaintiffs' firms in mass torts and complex litigation.

3. Through my extensive leadership experience in litigating mass torts and class actions and negotiating complex settlements, I have a keen appreciation for the structural frameworks that are viable in a class settlement and I understand the legal issues common to global resolutions. From over 50 years of practicing law and having tried more than 100 cases before a jury, the empirical evidence has taught me the valuations (or ranges of values) that courts, juries, and experts place on various types of alleged injuries, as well as the risks, including difficulties proving liability and causation, the array of defenses available, the inherent delays of litigation and appeals (often for years), and the substantial expenses attendant to trying individual cases. It has taught me that the art of settlement is the art of compromise. As such, I was aware of and seriously considered the defenses of the NFL Parties in this litigation, predominantly the threshold issue of preemption, among other things, in our negotiations of this Settlement.

## SETTLEMENT NEGOTIATIONS AND
## FULFILLMENT OF FIDUCIARY RESPONSIBILITIES

4. In early July, 2013, Co-Lead Class Counsel Christopher A. Seeger invited me to participate in settlement negotiations with the NFL Parties as counsel for a proposed subclass ("Subclass 1") of retired players who were not diagnosed with injuries associated with concussive and sub-concussive head trauma but were at increased risk of developing a range of neuromuscular and neurocognitive diseases associated with mild traumatic brain injuries and as alleged in the Complaints, as a proximate result of having played professional football in the NFL. Plaintiffs' Steering Committee member Dianne M. Nast was asked to represent a proposed subclass ("Subclass 2") of retired players who have been diagnosed with diseases associated with mild traumatic brain injuries, such as dementia, Alzheimer's Disease, Parkinson's Disease, and/or ALS.

5. As an integral part of my representation of Subclass 1 members, I met with proposed Subclass 1 representative Retired NFL Football Player Corey J. Swinson. Mr. Swinson was a retired player who was not diagnosed with neurocognitive impairment. He agreed to serve as the Subclass 1 Representative. I concluded that he had standing to assert the rights of Subclass 1 members and was an adequate representative for the undiagnosed players. However, sadly, Mr. Swinson passed away suddenly and unexpectedly on September 10, 2013. During the negotiations of settlement terms in the summer of 2013, Co-Lead Class Counsel Chris Seeger and I conferred with Mr. Swinson concerning the terms of the proposed Settlement. Mr. Swinson was aware of and agreed to the terms of the Settlement and he reviewed drafts of the Term Sheet before it was executed.

6. Following Mr. Swinson's death, Plaintiff Shawn Wooden became the proposed Subclass 1 representative. Mr. Wooden played professional football in the NFL from 1996-2004. During his NFL career, he experienced repeated traumatic head impacts, and since his retirement from football, he has experienced neurological symptoms, including migraine headaches, sleep problems, concentration issues, and mood swings. Mr. Wooden has not been diagnosed with any neurocognitive impairment, but is at increased risk of developing a range of neuromuscular and neurocognitive diseases associated with mild traumatic brain injuries and as alleged in the Complaints, such as dementia, Alzheimer's Disease, Parkinson's Disease, and/or ALS, as a proximate result of having played professional football in the NFL.

7. On January 24, 2012, Mr. Wooden filed a complaint, through his attorney, Class Counsel Steven C. Marks of Podhurst Orseck, PA, against the NFL Parties in the United States District Court for the Southern District of Florida (*Wooden, et al. v. National Football League,* Case No. 1:12-cv-20269-JEM). That action was transferred to this MDL on February 23, 2012.

Thereafter, on June 7, 2012, a Master Administrative Class Action Complaint for Medical Monitoring was filed on his behalf in the MDL [ECF No. 84]. In that complaint, he alleged that he sustained repetitive traumatic head impacts during NFL games and/or practices, and that he is at increased risk of suffering from brain injuries caused by these head impacts.

8. Throughout these proceedings, Mr. Wooden has followed the litigation closely. He has had various meetings, telephone conferences and email exchanges with Mr. Marks about the status of proceedings, the NFL Parties' preemption motions and the oral argument on the motions, among other things. In addition, he has reviewed numerous press articles about the litigation and the settlement. *See, generally*, Affidavit of Shawn Wooden ("Wooden Aff.") dated November 10, 2014, filed herewith.

9. After the Term Sheet was announced, and when the original representative for Subclass 1, Mr. Corey Swinson, passed away suddenly in September, 2013, beginning in about October, 2013, Mr. Marks informed Mr. Wooden of the negotiations between the Plaintiffs and the NFL Parties regarding the Settlement Agreement and exhibits. *See* Wooden Aff. at ¶ 4. On October 16, 2013, I met with Mr. Wooden in my offices in Philadelphia, Pennsylvania regarding his representation of Subclass 1 Class Members in the proposed class action. My partner Daniel Levin was present at the meeting. Mr. Wooden asked me a number of questions regarding the settlement and proposed class action, and I discussed these issues in detail with him. He agreed to participate as the representative plaintiff of Subclass 1, and he supported the settlement.

10. Thereafter, Mr. Wooden monitored the progress of settlement negotiations, through myself and Mr. Marks, and he reviewed with counsel drafts of the Settlement Agreement and exhibits. He also continued to follow the press stories about the settlement. *See* Wooden Aff. at ¶ 5.

11. Consistent with my fiduciary duties to zealously represent the interests of all potential Class Members in Subclass 1, I participated in the negotiations with the NFL Parties in New York in person and via telephone, under the supervision of the Mediator Retired Federal District Court Judge Layn R. Phillips. For almost two months, the parties worked at a breakneck pace to negotiate the details of a global settlement on behalf of all Retired NFL Football Players, their Representative Claimants, and Derivative Claimants. After a Term Sheet was executed, we continued to work intensely for an additional four months to finalize and prepare a formal Settlement Agreement with exhibits, including injury definitions, testing protocols, a monetary award grid, class notices and a Notice Plan. At all times, the negotiations were conducted in good faith, at arm's length, and with an absence of conflict.

12. I conferred regularly with the other members of the Plaintiffs' negotiating team, including Co-Lead Class Counsel Chris Seeger and Subclass 2 Counsel Dianne Nast. We determined initially that a fair resolution of Plaintiffs' claims would have to include an NFL-funded program to independently evaluate retired players for evidence of neurocognitive impairment and a separate fund to fairly and adequately compensate those players found to be suffering from neuromuscular and neurocognitive injuries or diseases associated with concussive and sub-concussive head trauma.

13. We also concluded that a class settlement structured with two separate subclasses, each with its own independent representation and counsel – (1) to include those Class Members who have not been diagnosed with a qualifying injury but are at increased risk for suffering from neuromuscular or neurocognitive impairment due to their NFL football play, and (2) to encompass Class Members diagnosed with a qualifying injury – would best serve all Class Members' interests and meet with Due Process. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140,

1146, 1147-48 (8th Cir. 1999); *In re Diet Drugs*, 2000 WL 1222042, *50-51 (E.D. Pa. Aug. 28, 2000).

14. We consulted with experts in the fields of medicine (neurology and neuropsychology), actuarial science, economics, claims and lien administration, and class notice to explore appropriate settlement frameworks designed to evaluate and meet the needs of retired players suffering from or at increased risk for the claimed injuries related to neuromuscular and neurocognitive impairment and to evaluate Plaintiffs' claims.

15. Informed by these experts and based on our vast collective and extensive experience in negotiating class settlements providing benefits to victims suffering personal injuries, the Plaintiffs' negotiating team considered a variety of viable options regarding settlement structures, baseline testing, compensable injury categories and monetary award values, necessary proofs for class membership and entitlement to benefits, appropriate offsets for monetary awards, and payment of costs of settlement administration and class notice, among other things. The negotiations with the NFL Parties on all of these issues were hard-fought and adversarial. Both sides made concessions and trade-offs. At all times we strived to obtain the greatest possible benefits for the Plaintiffs in the context of a reasonable settlement that the NFL Parties could accept, however, we were prepared to resume litigation in the event a fair and adequate settlement could not be achieved.

16. We carefully weighed the inherent delays and significant risks of continuing litigation against the NFL Parties, including the pending preemption motions and significant additional defenses, such as lack of causation, statutes of limitations, statutory employer, and assumption of risk, among others.

17.     Class Counsel demanded that retired players' rights to pursue claims for worker's compensation and benefits available under governing collective bargaining agreements be preserved. In addition, it was important that the NFL Parties not enforce any releases or covenants not to sue that Class Members previously signed as a condition to receiving the NFL Neuro-Cognitive Disability Benefit pursuant to Article 65 of the current CBA. We were successful in achieving these benefits for Class Members.

18.     Ultimately, on August 29, 2013, the parties agreed that a Settlement valued at $765 million was sufficient (i) to create an Education Fund to make football safer and to educate retired players concerning available NFL medical and disability benefits programs and initiatives, (ii) to establish a Baseline Assessment Program ("BAP") for ten (10) years to test all eligible retired players for evidence of cognitive impairment and provide supplemental medical treatment and pharmaceuticals for those players diagnosed with moderate impairment, and (iii) to set up a Monetary Award Fund for sixty-five (65) years to compensate those retired players found to have dementia, Alzheimer's Disease, Parkinson's Disease, and/or ALS, the representatives of deceased players who received one of these Qualifying Diagnoses while living, and certain deceased players diagnosed post-mortem with CTE. The Settlement was structured so that even though certain retired players have not been diagnosed with a qualifying injury as of today, they will be eligible to seek a monetary award if and when their symptoms progress to a compensable level. All retired players entitled to a monetary award may seek a supplemental monetary award if their condition worsens.

19.     We negotiated this Settlement based on a number of factors, including, but not limited to, the expert opinions of our medical consultants, actuaries, and BAP and Claims Administrators with regard to (i) the costs necessary to conduct BAP evaluations for all eligible

living retired players and to provide supplemental medical treatment and pharmaceuticals to those players diagnosed with moderate neurocognitive impairment and (ii) the science supporting the injuries to be compensated in the Settlement, the values of those injuries, and the projected incidence of retired players receiving Qualifying Diagnoses during the life of the Settlement.  We also relied on our assessment and belief that the $765 million settlement figure was at the upper range of what the NFL Parties were willing to pay for a global resolution of Plaintiffs' claims.

20. With limited exception, the Settlement compensates retired players for deficits and diseases that they suffered from while living.  Our aim was to compensate those people and their families.  As explained by the Mediator (*see* Supplemental Declaration of Layn R. Phillips dated November 11, 2014 ("Phillips Supp. Decl., at ¶ 11) and attested to by Co-Lead Counsel (*see* Declaration of Christopher A. Seeger dated November 12, 2014 ("Seeger Decl."), at ¶ 37), although the pathological diagnosis of CTE is not compensated as an injury prospectively, the most serious cognitive impairments developed in living retired players that have been associated in the literature with CTE are compensated (*i.e.*, early and moderate dementia).  In addressing a potential resolution of pending claims, which included the claims of deceased retired players, we were able to achieve compensation for the families of those individuals who pre-deceased the Settlement but had not sought the care of a neurologist or other neuro-specialist while living, and their families did obtain pathology of the retired player's brain, which reflected a pathological finding of CTE.  This is a fair result, given the inequities if these families were not compensated, since, in many instances, the players' death was sudden and unexpected, and neither the players nor their families were aware of the need or desire to obtain a diagnosis while living.  Thus, the "Death with CTE" injury definition was agreed to for pre-approval deaths with confirmed CTE

from autopsy. *See* Phillips Supp. Decl. at ¶ 11; Seeger Decl. at ¶ 37. Going forward, players will be aware of the opportunity to be tested through the BAP to determine whether they have any neurocognitive impairment, and they will be aware that the Settlement compensates players for dementia, Alzheimer's Disease, Parkinson's Disease, and ALS.

21. Due to the long term of this Settlement (65 years) and the necessary involvement of Class Counsel to ensure that the terms of the Settlement are met and that Class Members' rights and interests are protected, Class Counsel included in the Agreement a provision that contemplates a petition to the Court to set aside up to five percent (5%) of each monetary award and Derivative Claimant award to facilitate the Settlement program and related efforts of Class Counsel.[1] In the event a Class Member is represented by individual counsel, the attorney's fee payable to that counsel will be reduced by the amount of the "set-aside," if approved by the Court, so that the set-aside will in no way increase fees paid by anyone who hired a contingent fee lawyer. These monies will be held in a separate fund overseen by the Court. The NFL Parties have taken no position on this issue. This provision was included in the class notice.

22. As set forth in the Seeger Declaration, the parties subsequently agreed to uncap the Monetary Award Fund and the NFL Parties promised to pay all valid claims for monetary awards, in order to address the Court's concern that all eligible Class Members over the 65-year lifespan of the deal need to be compensated at the significant award levels for which the deal provided. *See* Seeger Decl. at ¶ 61.

23. Significantly, the proposed Settlement does not require Class Members to prove that their injuries were caused by or related to concussions suffered during NFL football play. Class Members need only demonstrate class membership and a qualifying injury.

---

[1] Settlement Agreement, Section 21.1.

24.     In addition, the vast majority of Class Members will not be prevented from partaking in Settlement benefits due to applicable statutes of limitations.[2] Even if a player retired decades ago and never filed suit against the NFL Parties, he may still be entitled to a baseline neuropsychological and neurological examination and a monetary award.

25.     Further, the Settlement includes a mechanism to resolve certain governmental liens on a global basis so that these liens can be satisfied for a substantial reduction of their claimed amount, which will benefit individual Plaintiffs and increase their net awards. Outside of this Settlement, it would be incredibly burdensome for an individual claimant to negotiate these lien reductions.

26.     The parties agreed to maximum awards for each injury category ($5 million for ALS, $4 million for Death with CTE, $3.5 million for Alzheimer's Disease, $3.5 million for Parkinson's Disease, $3 million for Level 2 Neurocognitive Impairment, and $1.5 million for Level 1.5 Nuerocognitive Impairment). They also agreed to apply certain appropriate offsets to the monetary awards. These offsets include: the player's age at the time of diagnosis of a qualifying injury; the incidence of a stroke or severe traumatic brain injury unrelated to football, resulting in loss of consciousness for more than 24 hours (*e.g.*, a severe car accident); failure to participate in the BAP, which is designed to provide early detection of a qualifying injury; and the number of seasons of active participation in NFL football play (which we considered indicative of and an objective substitute for exposure to injury). I insisted on, and received, inflation-adjusted Monetary Awards to protect claimants over the 65-year term of the Settlement. As structured, the Settlement does not favor retired players who are currently suffering from

---

[2] The only exception is for players who died before January 1, 2006, more than eight years ago. The representatives of these players will have an opportunity, however, to demonstrate that their wrongful death or survival claim is not barred by governing state law.

compensable injuries over those who have not been diagnosed and who may not develop compensable injuries for years to come, if ever.

27. Notably, the Settling Parties did not discuss the issue of attorneys' fees at any point during the mediation sessions, except to defer the issue until after an agreement in principal was reached on all material Settlement terms providing benefits to the Settlement Class and Subclass Members. Eventually, the NFL Parties agreed not to object to a petition for an award of attorneys' fees and reasonable incurred costs by Class Counsel, provided the amount requested does not exceed $112.5 million. In the event attorneys' fees and costs are awarded by the Court, the NFL Parties will pay them on top of all other Settlement benefits. Unlike traditional common fund cases where attorneys' fees are obtained directly from the common fund, the Settlement Class is further benefitted by the separate payment of attorneys' fees by the NFL Parties. The parties contemplate that any petition for attorneys' fees and costs will be made at an appropriate time after final approval of the Settlement and that Settlement Class Members will have an opportunity to comment on or object to these fees.

28. In addition, the expenses of claims administration and the costs of the Special Master will be paid by the NFL Parties on top of the monetary awards paid to Class Members, which is an additional benefit for retired players, since, typically, these costs are paid from a capped fund that compensates claimants.

29. I performed my own due diligence and independently assured myself that all aspects of the deal were fair, reasonable and adequate, and satisfied the needs of Subclass 1 members and Due Process.

30. Throughout this process, Mr. Marks and I kept Mr. Wooden apprised of the settlement negotiations and of the numerous drafts of the Settlement Agreement and exhibits. He authorized, agreed to, and fully supports the Settlement. *See* Wooden Aff. at ¶¶ 7 & 9.

31. As Subclass 1 Counsel, I paid particular close attention to the structure of the BAP to make sure it was sufficiently funded for a period of ten (10) years to provide a baseline neuropsychological and neurological examination to every eligible living retired football player in order to determine whether – and to what extent – they have any neurocognitive impairment, and if found to be suffering from moderate impairment, to provide them with supplemental medical treatment and pharmaceuticals, as needed.

32. The Settlement is structured so that retired players who have not been diagnosed with a qualifying injury as of today may still be eligible to seek a monetary award if and when their symptoms progress to a compensable level. I assured myself that it is fair under the Settlement to provide monetary awards for diagnoses of Level 1.5 Neurocognitive Impairment (early dementia), Level 2 Neurocognitive Impairment (moderate dementia), Alzheimer's Disease, Parkinson's Disease, and ALS, but not other alleged ailments or conditions. *See In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 295 F.R.D. 112, 152, 154-56 (E.D. La. 2013) (rejecting objections that focused on "the Settlement's Matrix, arguing that it should contain different dollar values, different conditions, payments based on severity of disease and impairment, payments for relocation costs, and/or different standards of proof – essentially seeking to renegotiate Settlement terms that were negotiated at arm's length by Class Counsel and [defendant] over several months as part of a compromise of highly disputed claims."). I relied on the information we received from our experts, the pleadings, the medical literature, our analysis of the Plaintiffs' claims and alleged injuries, and the relevant case law, and my own

judgment of what could be achieved in a Settlement with the NFL Parties based on the hard-fought negotiations with them and the risks of litigation, including the Court's ruling on the preemption motions, which had been held in abeyance.

33. Based on my extensive experience in leadership positions in hundreds of class actions and multidistrict litigation, and my familiarity with the value of Plaintiffs' claims here and the potential defenses of the NFL Parties in this litigation, and the information made available to me during the negotiations and throughout the litigation, I whole-heartedly believe that the proposed Settlement is fair and reasonable, given the substantial risks, delay, and costs involved if the Settlement is not approved. I believe the Settlement should be approved so that all eligible players may be tested for neurocognitive impairment in the BAP and so that seriously ill players may promptly receive the compensation they deserve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of November, 2014.

_____
ARNOLD LEVIN
Subclass Counsel for Subclass 1