# Exhibit 9

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB |
| | MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, | **Hon. Anita B. Brody** |
| Plaintiffs, | |
| v. | |
| National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc., | CIVIL ACTION NO: 2:14-cv-00029-AB |
| Defendants. | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF SUBCLASS 2 COUNSEL DIANNE M. NAST
## IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
## AND CERTIFICATION OF CLASS AND SUBCLASSES

Dianne M. Nast declares, pursuant to 28 U.S.C. §1746, based upon her personal

knowledge, information and belief, the following:

## INTRODUCTION

1.      I was appointed by the Court to serve on the Plaintiffs' Steering Committee in *In*

*re National Football League Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.)

[ECF No. 64]. I have also been appointed to serve as Subclass Counsel for Subclass 2 in

connection with the Class Action Settlement ("Settlement") dated June 25, 2014 between the

Plaintiff Class and the Defendants National Football League and NFL Properties LLC

(collectively, the "NFL Parties"), which was preliminarily approved on July 7, 2014 [ECF No.

6084, ¶ 3(b)]. Subclass 2 includes "Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis [*i.e.*, Level 1.5 Neurocognitive Impairment (early dementia), Level 2 Neurocognitive Impairment (moderate dementia), Alzheimer's Disease, Parkinson's Disease, Amyotrophic Lateral Sclerosis ("ALS"), and/or Death with CTE (chronic traumatic encephalopathy)] prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE." [ECF No. 6084, ¶ 2(b)(ii)]. This Settlement represents the proposed resolution of more than 5,000 lawsuits in this MDL and thousands of additional Retired NFL Football Players' claims against the NFL Parties for injunctive relief, medical monitoring, and compensation for the long-term cognitive injuries and other losses suffered by them allegedly as a result of the NFL Parties' tortious conduct. I am fully familiar with the claims asserted in this litigation, the multiple potential defenses of the NFL Parties, including their motions to dismiss on grounds of preemption under Section 301 of the Labor Management Relations Act, the pleadings, and the objections filed regarding the Settlement. I submit this Declaration in support of Class Counsel's Motion for Final Approval of the Settlement and Certification of the Class and Subclasses.

2.      I have extensive experience in class actions, mass torts, antitrust, and multidistrict litigation. In more than 48 cases, I have been appointed to leadership positions as Plaintiffs' Lead Counsel and/or a member of the Plaintiffs' Executive Committee or Steering Committee. These cases include: *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, MDL No. 2342 (E.D. Pa.) (Rufe, J.) (Plaintiffs' Co-Lead Counsel); *Factor Concentrate Litig.*, MDL No. 986

(N.D. Ill.) (Plaintiffs' Co-Lead Counsel in $630 million settlement); *In re Serzone Prod. Liab. Litig.*, MDL No. 1477 (S.D. Va.) (PSC Member in $78 million settlement); *Paxil Antitrust Litig. (Nichols, et al. v. SmithKline Beecham Corp.)*, Civ. Act. No. 00-6222 (E.D. Pa.) (Padova, J.) (Plaintiffs' Co-Lead Counsel in $65 million settlement); *Wellbutrin SR Antitrust Litig.*, Civ. Act. No. 04-5525 (E.D. Pa.) (Stengel, J.) (Plaintiffs' Lead Counsel in $49 million settlement); *Avandia Marketing, Sales Practices and Prod. Liab. Litig.*, MDL No. 1871 (E.D. Pa.) (Rufe, J.) (Federal State Liaison, Chair of Plaintiffs' Advisory Committee, Chair of Fee Committee). In the *Diet Drugs* litigation (approximately $6.5 billion settlement), I was appointed to the Plaintiffs' Steering Committee and served as Subclass Counsel for class members who took diet drugs for 60 days or less and who had not been diagnosed with FDA Positive levels of valvular regurgitation. *See In re Diet Drugs*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000).

      3.      From 1992 until 2002, I served as a Director of the Federal Judicial Center Foundation, appointed by the late Chief Justice William H. Rehnquist. I was Chair of the Foundation for a five-year term. In January 2001, I was appointed by then-Chief Judge of the United States Court of Appeals for the Third Circuit, the late Judge Edward Becker, to serve on the Third Circuit Task Force on Selection of Class Counsel. The Task Force issued the frequently cited report, *Selection of Class Counsel*, Report of the Third Circuit Task Force (Daniel J. Capra, Reporter), 208 F.R.D. 340 (2002). I have chaired the Lawyers Advisory Committee for the Third Circuit, and served a three-year term on that committee. I also served for eight years on the Third Circuit's Committee on Revision of Judicial Conduct Rules of the Judicial Council, and on the Judicial Conference Long Range Planning Committee. I was selected by The American Law Institute to serve as an Adviser for the ALI's Principles of the Law of Aggregate Litigation Project. I have been honored by fellow lawyers to be listed in the

Best Lawyers in America, and have been included in each edition since 2003. I have been

selected by *The National Law Journal* as one of the country's top 50 women litigators.

4.      Over the course of my career, I have garnered an appreciation for viable structural

frameworks in complex settlements and I have a comprehensive understanding of the

overarching legal issues that are common to global resolutions. Additionally, I have acquired an

awareness of the ranges of valuations that courts, juries, and experts place on various types of

injuries, as well as the risks, including difficulties proving liability and causation, inherent delays

and costs associated with litigation.

## SETTLEMENT NEGOTIATIONS AND
## FULFILLMENT OF FIDUCIARY RESPONSIBILITIES

5.      In early July, 2013, Co-Lead Class Counsel Christopher A. Seeger invited me to

participate in settlement negotiations with the NFL Parties as counsel for a proposed subclass

("Subclass 2") of retired players who were diagnosed with injuries associated with concussive

and sub-concussive head trauma. Plaintiffs' Steering Committee member Arnold Levin was

asked to represent a proposed subclass ("Subclass 1") of retired players who have not been

diagnosed with any neurocognitive impairment but are at increased risk of developing a range of

neuromuscular and neurocognitive diseases associated with mild traumatic brain injuries and as

alleged in the Complaints, such as dementia, Alzheimer's Disease, Parkinson's Disease, and/or

ALS, also known as Lou Gehrig's disease, as a proximate result of having played professional

football in the NFL.

6.      As an integral part of my representation of Subclass 2 members, I met with the

Subclass 2 representative Kevin Turner. Mr. Turner played professional football in the NFL as a

fullback from 1992-1999. In June 2010, at the age of 41, he was diagnosed with ALS. As this

degenerative disease has rapidly progressed, Mr. Turner now requires around-the-clock care and

assistance with even the simplest, most basic daily activities, such as bathing, shaving, brushing

his teeth, etc. He is no longer able to feed himself and requires a feeding tube. Mr. Turner's

quality of life has been substantially impaired. He has experienced a severe decline of muscle

movement, motor function and an ability to speak. He has been hospitalized numerous times.

Mr. Turner has three young children. *See, generally*, Affidavit of Kevin Turner dated November

11, 2014 ("Turner Aff."), filed herewith.

7.       On January 20, 2012, Mr. Turner, through his attorney, Class Counsel Steven C.

Marks of Podhurst Orseck, PA, filed a complaint against the NFL Parties in the United States

District Court for the Southern District of Florida *(Jones, et al. v. National Football League*,

Case No. 1:11-cv-24594-JEM). That action was transferred to this MDL on February 14, 2012.

On July 11, 2012, Mr. Turner filed a Short Form Complaint against the NFL Parties. In that

complaint, he incorporated by reference the allegations of the Master Administrative Long-Form

Complaint and specifically alleged that he sustained repetitive, traumatic sub-concussive and/or

concussive head impacts during NFL games and/or practices, and that he suffers from symptoms

of brain injury caused by these head impacts.

8.       Throughout these proceedings, Mr. Turner has followed the litigation closely. He

had countless meetings, telephone conferences and email exchanges with Mr. Marks about the

status of proceedings, the NFL Parties' preemption motions and the oral argument on same.

Beginning in about July, 2013, Mr. Marks informed Mr. Turner of the settlement negotiations

between the Plaintiffs and the NFL Parties and his possible representation of Subclass 2 Class

Members. *See* Turner Aff. at ¶ 6.

9.       In August, 2013, I met with Mr. Turner at my offices in Philadelphia,

Pennsylvania regarding his representation of Subclass 2 Class Members in the proposed

settlement class.  Mr. Marks was present at that meeting, along with my partner Daniel Gallucci.
We discussed in detail the impending class settlement.  After our meeting, I determined that Mr.
Turner has standing to assert the rights of Subclass 2 members and he is an adequate
representative for them.

10.     Consistent with my fiduciary duties to zealously represent the interests of all
potential Class Members in Subclass 2, I participated in the negotiations with the NFL Parties in
New York in person and via telephone, under the supervision of the Mediator Retired Federal
District Court Judge Layn R. Phillips.  For almost two months, the parties worked diligently to
negotiate the details of a global resolution on behalf of all Retired NFL Football Players, their
Representative Claimants, and Derivative Claimants.  After a Term Sheet was executed, we
continued to work intensely for another four months to negotiate and prepare a formal Settlement
Agreement with exhibits, including injury definitions, testing protocols, a monetary award grid,
class notices and a Notice Plan.  At all times, the negotiations were conducted in good faith, at
arm's length, and with an absence of conflict.

11.     I conferred regularly with the other members of the Plaintiffs' negotiating team,
including Co-Lead Class Counsel Chris Seeger and Subclass 1 Counsel Arnold Levin.  We
determined initially that a fair resolution of Plaintiffs' claims would require the creation of an
NFL-funded program to independently evaluate retired players for evidence of neurocognitive
impairment and a separate fund to fairly and adequately compensate those players found to be
suffering from neuromuscular and neurocognitive injuries or diseases associated with concussive
and sub-concussive head trauma.

12.     We concluded that a class settlement structured with two separate subclasses,
each with its own independent representation and counsel – (1) to include those Class Members

who were not diagnosed with a qualifying injury but were at increased risk for suffering from a range of neuromuscular or neurocognitive impairment associated with traumatic brain injuries due to their NFL football play, and (2) to encompass Class Members already diagnosed with a qualifying injury – would best serve all Class Members' interests and meet with Due Process. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146, 1147-48 (8th Cir. 1999); *In re Diet Drugs*, 2000 WL 1222042, *50-51 (E.D. Pa. Aug. 28, 2000).

13.     We worked with medical experts as well as actuaries to explore appropriate settlement frameworks designed to evaluate and meet the needs of retired players suffering from or at increased risk for the claimed injuries related to neuromuscular and neurocognitive impairment. With these experts, we evaluated the Plaintiffs' claims and alleged injuries and developed an appropriate and fair matrix for global resolution of this litigation, and we conducted extensive legal research. We also consulted with experienced claims and lien administrators and a class notice expert.

14.     Informed by our experts and based on our vast collective and extensive experience in negotiating class settlements providing benefits to victims suffering personal injuries, the Plaintiffs' negotiating team considered a variety of viable options regarding baseline testing, compensable injury categories and monetary award values, necessary proofs for class membership and entitlement to benefits, appropriate offsets for monetary awards, and payment of costs of settlement administration and class notice. The negotiations with the NFL Parties on all of these points were hard-fought and adversarial. Both sides made demands and counter-demands, and ultimately a number of concessions and trade-offs. At all times we strived to obtain the greatest possible benefits for the Plaintiffs in the context of a reasonable settlement

that the NFL Parties could accept, however, we were prepared to resume litigation in the event a fair and adequate settlement could not be achieved.

15.     We carefully weighed the inherent delays and significant risks of continuing litigation against the NFL Parties, including the pending motions to dismiss on grounds of preemption and significant additional defenses, such as lack of causation, statutes of limitations, statutory employer, and assumption of risk.

16.     We successfully fought to preserve retired players' rights to all collectively bargained-for benefits and their rights to pursue claims for worker's compensation outside of the Settlement. In addition, we wanted the NFL Parties to agree that players who had signed releases or covenants not to sue in connection with the NFL Neuro-Cognitive Disability Benefit pursuant to Article 65 of the current CBA could nevertheless still participate in the Settlement and receive all benefits to which they were entitled. The NFL Parties agreed not to enforce these releases or covenants not to sue.

17.     Ultimately, on August 29, 2013, the parties agreed that a Settlement valued at $765 million was sufficient (i) to create an Education Fund to make football safer and to educate retired players concerning available NFL medical and disability benefits programs and initiatives, (ii) to establish a Baseline Assessment Program ("BAP") for ten (10) years to test all eligible retired players for evidence of cognitive impairment and provide supplemental medical treatment and pharmaceuticals for those players diagnosed with moderate impairment, and (iii) to set up a Monetary Award Fund for sixty-five (65) years to compensate those retired players found to have dementia, Alzheimer's Disease, Parkinson's Disease, and/or ALS, the representatives of deceased players who received one of these Qualifying Diagnoses while living, and certain deceased players diagnosed post-mortem with CTE. The Settlement was

structured so that even though certain retired players have not been diagnosed with a qualifying injury as of today, they will be eligible to seek a monetary award if and when their symptoms progress to a compensable level. All retired players entitled to a monetary award may seek a supplemental monetary award if their condition worsens.

18.     We negotiated this Settlement based on a number of factors, including, but not limited to, the expert opinions of our medical consultants, actuaries, and BAP and Claims Administrators with regard to (i) the costs necessary to conduct BAP evaluations for all eligible living retired players and to provide supplemental medical treatment and pharmaceuticals to those players diagnosed with moderate neurocognitive impairment and (ii) the science supporting the injuries to be compensated in the Settlement, the values of those injuries, and the projected incidence of retired players receiving Qualifying Diagnoses during the life of the Settlement. We also relied on our judgment and belief that the $765 million settlement figure was at the upper range of what the NFL Parties were willing to pay for a global resolution of Plaintiffs' claims.

19.     With limited exception, the Settlement compensates retired players for deficits and diseases that they suffered from while living. Our aim was to compensate those people and their families. As explained by the Mediator (*see* Supplemental Declaration of Layn R. Phillips dated November 11, 2014 ("Phillips Supp. Decl., at ¶ 11) and attested to by Co-Lead Counsel (*see* Declaration of Christopher A. Seeger dated November 12, 2014 ("Seeger Decl."), at ¶ 37), although the pathological diagnosis of CTE is not compensated as an injury prospectively, the most serious cognitive impairments developed in living retired players that have been associated in the literature with CTE are compensated (*i.e.*, early and moderate dementia). In addressing a potential resolution of pending claims, which included the claims of deceased retired players, we

were able to achieve compensation for the families of those individuals who pre-deceased the Settlement but had not sought the care of a neurologist or other neuro-specialist while living, and their families did obtain pathology of the retired player's brain, which reflected a pathological finding of CTE.  This is a fair result, given the inequities if these families were not compensated, since, in many instances, the players' death was sudden and unexpected, and neither the players nor their families were aware of the need or desire to obtain a diagnosis while living.  Thus, the "Death with CTE" injury definition was agreed to for pre-approval deaths with confirmed CTE from autopsy.  *See* Phillips Supp. Decl. at ¶ 11; Seeger Decl. at ¶ 37.  Going forward, players will be aware of the opportunity to be tested through the BAP to determine whether they have any neurocognitive impairment, and they will be aware that the Settlement compensates players for dementia, Alzheimer's Disease, Parkinson's Disease, and ALS.

20.     As set forth in the Seeger Declaration, the parties subsequently agreed to uncap the Monetary Award Fund and the NFL Parties promised to pay all valid claims for monetary awards, in order to address the Court's concern that all eligible Class Members over the 65-year lifespan of the deal need to be compensated at the significant award levels for which the deal provided.  *See* Seeger Decl. at ¶ 61.

21.     Significantly, the proposed Settlement does not require Class Members to prove that their injuries were caused by or related to concussions suffered during NFL football play. Class Members need only demonstrate class membership and a qualifying injury in order to receive a monetary award, which is a remarkable result.

22.     In addition, the Settlement includes a mechanism to resolve certain governmental liens on a global basis so that these liens can be satisfied for a substantial reduction of their claimed amount, which will benefit individual Plaintiffs and increase their net awards.  Outside

of this Settlement, it would be incredibly burdensome for an individual claimant to negotiate these lien reductions.

23.     Further, with limited exception, applicable statues of limitations will not bar Class Members from receiving Settlement benefits.[1]  Even if a player retired decades ago and never filed suit against the NFL Parties, he may still be entitled to a baseline neuropsychological and neurological examination and a monetary award.

24.     We agreed to maximum awards for each injury category ($5 million for ALS, $4 million for Death with CTE, $3.5 million for Alzheimer's Disease, $3.5 million for Parkinson's Disease, $3 million for Level 2 Neurocognitive Impairment, and $1.5 million for Level 1.5 Nuerocognitive Impairment), and also several appropriate and fair offsets to be applied to the monetary awards of Class Members.  These offsets include the player's age at the time of diagnosis of a qualifying injury; the incidence of a stroke or severe traumatic brain injury unrelated to football play, resulting in loss of consciousness for more than 24 hours (*e.g.*, a severe car accident); failure to participate in the BAP, which is designed to provide early detection of a qualifying injury; and the number of seasons of active participation in NFL football play (which we considered indicative of and an objective substitute for exposure to injury).  I insisted on, and received, inflation-adjusted Monetary Awards to protect claimants over the 65-year term of the Settlement. As structured, the Settlement does not favor retired players who are currently suffering from compensable injuries over those who have not been diagnosed and who may not develop compensable injuries for years to come, if ever.

---

[1]   The only exception is for players who died before January 1, 2006, more than eight years ago.  The representatives of these players will have an opportunity, however, to demonstrate that their wrongful death or survival claim is not barred by governing state law.

25.     We did not discuss the issue of attorneys' fees at any point during the mediation sessions, except to defer the issue until after an agreement in principal was reached on all material Settlement terms providing benefits to the Settlement Class and Subclass Members. Eventually, the NFL Parties agreed not to object to a petition for an award of attorneys' fees and reasonable incurred costs by Class Counsel, provided the amount requested does not exceed $112.5 million.  In the event attorneys' fees and costs are awarded by the Court, the NFL Parties will pay them on top of all other Settlement benefits.  Unlike traditional common fund cases where attorneys' fees are obtained directly from the common fund, the Settlement Class is further benefitted by the separate payment of attorneys' fees by the NFL Parties.  The parties contemplate that any petition for attorneys' fees and costs will be made at an appropriate time after final approval of the Settlement and that Settlement Class Members will have an opportunity to comment on or object to these fees.

26.     Due to the long term of this Settlement (65 years) and the necessary involvement of Class Counsel to ensure that the terms of the Settlement are met and that Class Members' rights and interests are protected, Class Counsel included in the Agreement a provision that contemplates a petition to the Court to set aside up to five percent (5%) of each monetary award and Derivative Claimant award to facilitate the Settlement program and related efforts of Class Counsel.[2]  In the event a Class Member is represented by individual counsel, the attorney's fee payable to that counsel will be reduced by the amount of the "set-aside," if approved by the Court, so that the set-aside will in no way increase fees paid by anyone who hired a contingent fee lawyer.  These monies will be held in a separate fund overseen by the Court.  The NFL Parties have taken no position on this issue.  This provision was included in the class notice.

---

[2]   Settlement Agreement, Section 21.1.

27.     I performed my own due diligence and independently assured myself that all aspects of the deal were fair, reasonable and adequate, and satisfied the needs of Subclass 2 members and Due Process.

28.     Throughout this process, Mr. Marks and I kept Mr. Turner apprised of the settlement negotiations and of the numerous drafts of the Settlement Agreement and exhibits. He authorized, agreed to, and fully supports the Settlement.  *See* Turner Aff. at ¶¶ 9 & 11.

29.     As Subclass 2 Counsel for retired players with a Qualifying Diagnosis, I was particularly concerned with the compensable injury categories and monetary award values.  After due consideration of all of the information I gleaned from our experts, the pleadings, the medical literature, our analysis of the Plaintiffs' claims and alleged injuries, and the relevant case law, and my own assessment of what was achievable in a Settlement with the NFL Parties based on the hard-fought negotiations with them and the risks of litigation, including the pending decision on the preemption motions, I believe the Settlement is fair and reasonable.

30.     In accordance with my duty to represent Subclass 2 as a whole, I did not try to favor a particular injury category within the subclass.  Objectively, however, in my view it was reasonable that a diagnosis of ALS would be entitled to a larger award given the fact that ALS is a rapidly progressive neurological disease that invariably leads to death, usually within three (3) to five (5) years after the onset of symptoms.

31.     Based on the wealth of experience I have from overseeing many dozens of class actions and multidistrict litigations, and my familiarity with the value of Plaintiffs' claims here and the array of potential defenses of the NFL Parties, and the information made available to me during the negotiations and throughout the litigation, I strongly believe that the proposed

Settlement is fair and reasonable, and should be approved so that these seriously ill players may promptly receive the compensation they deserve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of November, 2014.

_____
DIANNE M. NAST
Subclass Counsel for Subclass 2