# Exhibit 10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323 |
| | **DECLARATION OF KATHERINE KINSELLA** |

I, Katherine Kinsella, being duly sworn, hereby declare as follows:

1. I am founder and former president of Kinsella Media, LLC ("KM"), an advertising and legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members primarily in consumer and antitrust class actions and claimants in bankruptcy and mass tort litigation. My business address is 2001 Pennsylvania Avenue NW, Suite 300, Washington, D.C. 20006. My telephone number is (202) 686-4111.

2. I submit this declaration at the request of the parties in connection with *In re: National Football League Players' Concussion Injury Litigation.* I previously submitted a declaration executed June 25, 2014, outlining my firm's credentials and describing the Notice Program designed by KM. (Dkt. 6073-3.) The Court subsequently approved the Notice Program on July 7, 2014. This declaration describes the implementation of the Notice Program and measures taken to provide the best notice of the Settlement that was practicable under the circumstances.

3. This declaration is based upon my personal knowledge and upon information provided by the parties, my associates, and my staff. The information is of a type reasonably relied

upon in the fields of advertising, media, and communications.   My experience and

qualifications as an expert witness were included in my previously submitted declaration.

### Notice Plan

4.   The objective of the Notice Program was to provide adequate notice of the Settlement of

the instant case to Settlement Class Members, who are defined as follows:

> All living NFL Football players who, prior to the date of the Preliminary
> Approval and Class Certification Order, retired, formally or informally,
> from playing professional football with the NFL or any Member Club,
> including American Football League, World League of American
> Football, NFL Europe League and NFL Europa League players, or were
> formerly on any roster, including preseason, regular season, or postseason,
> of any such Member Club or league and who no longer are under contract
> to a Member Club and are not seeking active employment as players with
> any Member Club, whether signed to a roster or signed to any practice
> squad, developmental squad, or taxi squad of a Member Club ("Retired
> NFL Football Players");

> Authorized representatives, ordered by a court or other official of
> competent jurisdiction under applicable state law, of deceased or legally
> incapacitated or incompetent Retired NFL Football Players
> ("Representative Claimants"); and

> Spouses, parents, children who are dependents, or any other persons who
> properly under applicable state law assert the right to sue independently or
> derivatively by reason of their relationship with a Retired NFL Football
> Player or deceased Retired NFL Football Player ("Derivative Claimants").

5.   Class Members were divided into two Subclasses:

> Subclass 1, which shall consist of: "Retired NFL Football Players who
> were not diagnosed with a Qualifying Diagnosis prior to the date of the
> Preliminary Approval and Class Certification Order and their
> Representative Claimants and Derivative Claimants";[1] and,

> Subclass 2, which shall consist of: "Retired NFL Football Players who
> were diagnosed with a Qualifying Diagnosis prior to the date of the
> Preliminary   Approval   and   Class   Certification   Order   and   their

---

[1] "Qualifying Diagnosis" or "Qualifying Diagnoses" means Level 1.5 Neurocognitive Impairment (early Dementia),
Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, ALS, and/or
Death with CTE prior to July 7, 2014, as defined in the Settlement Agreement.

> Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE."

6. The following two-part Notice Plan was designed and implemented:

    a. Direct notice by first-class mail to all known Retired NFL Football Players and heirs of deceased retired players; and

    b. Broad notice through the use of paid media, including national consumer magazines, trade publications, television, radio, and Internet advertising.

In addition, outreach to nursing homes and NFL-related organizations was also undertaken as outlined below.

## **Direct Mail Notice**

7. Direct Mail Notice consisted of mailing a cover letter and the Long-Form Notice ("Notice") to potential Settlement Class Members to inform them of their rights and how they may participate in the Class Action Settlement. Attached as **Exhibits 1** and **2** are copies of the Notice and the envelope. This Direct Mail Notice was distributed via first-class mail to:

    a. A list of all readily identifiable Settlement Class Members, which includes Retired Football NFL Players and heirs of deceased retired players, developed through the process outlined in my previous declaration (*see* Paragraphs 12-16).

    b. Anyone who called the toll-free information line or wrote or emailed the Claims Administrator to request the Long-Form Notice.

8. The Notice was also available on the Settlement Website as a PDF file.

9. Smith-Edwards-Dunlap mailed the Notice by first-class mail on July 24, 2014, to 33,900 addresses. More information about how these addresses were identified is included in the

Declaration of Orran L. Brown, Sr. ("Brown Declaration").  In addition to the mailing to Class Members, 169 Notices were mailed to counsel of record.  3,280 of these Notices remain undelivered as of October 14, 2014.

10. Also, Heffler Claims Group ("Heffler") mailed 164 packets of Notices and/or Settlement Agreements to those who made a request from the call center and 336 packets requested directly from attorneys representing clients or from BrownGreer PLC ("BrownGreer"). More information about the Heffler mailings and undeliverable packets can be found in the Declaration of Edward J. Radetich Jr. ("Radetich Declaration").

### Paid Media Notice

11. The Paid Media portion of the Notice Plan ("Paid Media") was designed to provide notice of the Settlement to potential Settlement Class Members who did not receive the Notice because contact information was not readily available.  The Paid Media was, in accordance with best practice, designed by choosing a target audience that encompasses the characteristics of Settlement Class Members.  As described below, KM selected media vehicles based on their ability to provide effective and efficient penetration of the target audience.

12. KM analyzed the Settlement Class and determined there are ethnic, age, and gender differences among the Settlement Class Members.  The Settlement Class is made up of three discrete groups, each of which consumes media based on their demographics.  In addition to the Retired NFL Football Players, there are legal representatives and family members.

13. The Paid Media is based on specifically reaching individuals who fit within these demographic groups of Settlement Class Members.  Therefore, specific media was

chosen to reach all of the demographic groups included in the Settlement Class. Further details about why each medium was chosen are available in the Notice Plan filed with my previous declaration.

14. The plain language published notice ("Summary Notice") was designed as a four-color advertisement with an image of a generic football player to capture and hold the attention of the reader. The bold headline allowed potential Settlement Class Members to quickly determine if they might be affected by the Settlement. The text provided important information regarding the subject of the Settlement, the Class definition, and the legal rights available to Settlement Class Members. The Summary Notice prominently featured the toll-free number and the Settlement Website address where potential Settlement Class Members could get additional information. A copy of the Summary Notice is attached as **Exhibit 3**.

15. The Summary Notice appeared in national consumer magazines as follows:

   a. A full-page, color ad (7.625" x 10") appeared on page 84 in the September edition of *Ebony*, which went on sale on August 26, 2014, with an estimated circulation of 1,250,000.

   b. A full-page, color ad (8.125" x 10.75") appeared on page 83 in the August 18, 2014 edition of *People*, which went on sale on August 8, 2014, with an estimated circulation of 3,475,000.

   c. A full-page, color ad (8.125" x 10.75") appeared on page 57 in the August 25, 2014 edition of *People*, which went on sale on August 15, 2014, with an estimated circulation of 3,475,000.

    d.  A full-page, color ad (8.125" x 10.75") appeared on page 109 in the August 18, 2014 edition of *Sports Illustrated*, which went on sale August 13, 2014, with an estimated circulation of 3,000,000.

    e.  A full-page, color ad (8.125" x 10.75") appeared on page 24 in the August 25, 2014 edition of *Time*, which went on sale August 20, 2014, with an estimated circulation of 3,250,000.

16. The Summary Notice appeared in trade publications as follows:

    a.  A full-page, color ad (8.5" x 11.125") appeared on page 21 of the August 2014 edition of in *Long-Term Living*, which mailed August 26, 2014, with an estimated circulation of 50,080.

    b.  A full-page, color ad (8" x 10.75") appeared on page 25 of the September 2014 edition of *McKnight's Long-Term Care News & Assisted Living*, which mailed September 28, 2014, with an estimated circulation of 40,200.

    c.  A full-page, color ad (8.375" x 11.125") appeared on page 29 of the September 2014 edition of *Provider*, which mailed September 1, 2014, with an estimated circulation of 50,200.

    d.  A full-page, color ad (7.125" x 10.25") appeared on page 7 of the September/October 2014 edition of *Senior Living Executive*, which mailed September 23, 2014, with an estimated circulation of 21,808.

17. Thirty-second television commercials ("TV Spots"), which prominently featured the toll-free number and the Settlement Website address, ran from August 11, 2014, to August 24, 2014, across a variety of national channels and programs. The TV spots were aired across stations and programming viewed by Adults 50+ and ran throughout the day in

different program environments in order to reach the highest number of viewers. A combination of broadcast and cable networks were chosen, including, but not limited to ABC, CBS, CNN, The Weather Channel, and Headline News. The TV Spots delivered an estimated 86 gross rating points ("GRPs"),[2] resulting in an estimated 86,923,800 gross impressions.[3] A copy of the TV Spot script is attached as **Exhibit 4**.

18. Thirty- and sixty-second radio commercials ("Radio Spots"), which prominently featured the toll-free number and the Settlement Website address, ran from August 11, 2014, to August 31, 2014, on American Urban Radio Networks ("AURN"). The Radio Spots ran on a number of stations that are part of AURN, and ran throughout various programming, to reach the highest number of listeners. The radio commercials delivered an estimated 30,758,000 gross impressions. A copy of the Radio Spots script is attached as **Exhibit 5**.

19. Internet banner advertisements were designed to alert potential Settlement Class Members to the Settlement through the use of a bold message, graphics, and in some instances, video. The simple message enabled potential Settlement Class Members to quickly determine if they might be affected by the Settlement. When visitors clicked on the banner advertisement, they were connected directly to the Settlement Website. Samples of the banner advertisements are attached as **Exhibit 6**.

20. KM placed banner advertisements as follows:

---

[2] GRPs - Media planners use GRPs as a standard unit of measurement of audience size when buying ads. It is the sum of all ratings in a plan. These units measure the exposure to one or more programs or commercials. One GRP = 1% of TV households. GRPs are considered "duplicated" because they do not account for individuals (or households) that are exposed to an ad multiple times. GRPs can be expressed as gross impressions.
[3] Gross impressions - An "impression" is one opportunity for one individual to see (or hear) an advertisement. Gross impressions are the total number of opportunities to see (or hear) an advertisement based on an advertising campaign or plan. A gross impression is counted every time the ad is displayed. Mathematically, it is the number of people in the audience multiplied by the number of times the ad is displayed or broadcast. Gross Impressions is considered a "duplicated" figure because some individuals may see the notice more than once. For example, one person may see an ad on TV and in a magazine. Although it is one person seeing the ad, it counts as two gross impressions.

a.  Banner advertisements, including pre-roll and filmstrip, measuring 728 x 90, 300 x 250, 60 x 600, and 254 x 133 pixels appeared between August 8, 2014, and August 31, 2014, on a rotating basis, on the following networks and websites, for a total estimated 148,974,386 gross impressions:

   i.  CNN.com

   ii.  Facebook.com

   iii.  Microsoft Media Network

   iv.  Specific Media

   v.  Weather.com

   vi.  Yahoo!

### Advertising on NFL Properties

21. TV Spots were aired in different programming/dayparts on the NFL Network from August 11, 2014, to August 24, 2014.  The TV Spots delivered an estimated 11,106,000 gross impressions.  The TV spots prominently featured the toll-free number and Settlement website address.

22. From August 8, 2014, to August 31, 2014, banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels appeared on NFL.com.  The advertisements appeared on a rotating basis on pages that are part of the NFL.com website for a total estimated 30,005,122 gross impressions.

### Additional Outreach

23. In order to reach those people who may know unidentified Retired NFL Football Players and ask them to pass along information about the Settlement, KM undertook additional outreach as part of the Notice Plan.  This included:

a. A mailing to the directors of approximately 61,977 nursing homes, assisted living facilities, and rehab facilities that was sent on August 29, 2014. The mailing included a cover letter requesting their assistance in locating Retired NFL Football Players that are in their facilities, as well as a copy of the Summary Notice. A copy of the cover letter is attached as **Exhibit 7**.

b. Reaching out to various NFL organizations to request they inform their members of the Settlement and assist in locating Retired NFL Football Players whose addresses are unknown. KM reached out to:

    i. 15 chapters of the NFL Alumni Association

    ii. 35 chapters of the NFL Players' Association

    iii. 5 LinkedIn groups

    iv. NFL Player Care Foundation

    v. 2 marketing companies that represent professional athletes

Results of this outreach are included in a report attached as **Exhibit 8**.

## Electronic Notice

24. On July 9, 2014, a temporary version of the Settlement Website was established at the URL NFLConcussionSettlement.com, which contained the Settlement Agreement and Court pleadings. On July 14, 2014, the full Website was launched to enable potential Settlement Class Members to get information on the Settlement. The full Website included a function for potential Settlement Class Members to register to receive additional information. More information about the Settlement Website is available in the Brown Declaration.

25. Beginning on July 21, 2014, KM registered keywords and phrases with major search engines, including Google Advertising Partners (such as Google.com, AOL.com, and Ask.com) and Bing search engines (such as Bing/MSN and Yahoo!).   When a user searched for one of the specified search terms or phrases, sponsored links may have appeared on the results page, depending on a variety of factors determined by the search engine's formulas.

26. As of October 14, 2014, there had been 62,989 unique visits to the Settlement Website. 3,175 individuals signed up to receive more information in the future (including the process to register).   These sign-ups included 2,045 retired players, 209 authorized representatives, 77 attorneys representing players or families, 668 family members, and 1,764 others/unknown.

### Telephone Support

27. On July 17, 2014, the toll-free number with an interactive voice response system and option to speak to a live operator was established to enable potential Settlement Class Members to get information on the Settlement.   Settlement Class Members could also register to receive more information.

28. As of October 14, 2014, there were 4,544 calls to the toll-free number, with 1,800 individuals signing up to receive more information in the future (including 1,048 retired players, 10 authorized representatives, 18 attorneys representing players or families, 608 family members, and 116 others/unknown).[4]   More specific information about the call center is included within the Radetich Declaration.

---

[4] Additionally, 22 individuals sent a request to the Claims Administrator's P.O. Box and 25 individuals emailed the Claims Administrator to sign up to receive more information in the future (including the process to register).   More information is available in the Brown Declaration.

### Plain Language Notice

29. Rule 23(c)(2) of the Federal Rules of Civil Procedure requires class action notices to be written in "plain, easily understood language."   KM applies the plain language requirement in drafting notices in federal and state class actions, including the notices prepared for this litigation and approved by the Court.  The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Settlement Class Members.

### Other Media Coverage

30. In addition to the notification efforts described above, the Settlement was widely publicized in the media.  The extensive coverage of the Settlement, as detailed in the Declaration of Christopher A. Seeger (paragraph 70), alerted Class Members as well as the public to the Settlement, providing additional opportunities for Class Members to access the Long-form Notice and Settlement Agreement.  A simple online search for "NFL Concussion Settlement" directed Class Members to the Settlement Website.

### Objections to Notice Program

31. I reviewed the objections from the Estate of David Duerson, Estate of Forrest Blue, Thomas Deleone, Gerald Sullivan, Barry Darrow, Ray Austin, Bruce Herron, John Cornell, Tori Noel and Mike Adamle's Objections to Class Action Settlement ("Duerson Objection"); Objection of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine to Class Action Settlement ("Morey Objection"); Objection to Settlement ("Pentz Objection"), Objections to June 25, 2014 Class Action Settlement Agreement ("Alexander Objection"), and Objection of

Craig Heimburger and Dawn Heimburger ("Heimburger Objection") regarding the Notice Program.

32. The Duerson Objection states that the "Class Notice is Inaccurate and Misleading." The Morey Objection states that the "Notice is False, Misleading and Inconsistent with Rule 23 and Due Process." The core of these objections is that the description of what constitutes a CTE claim is not accurate and in some instances, "patently false."

33. Specifically, the Morey Objection states that the description of the CTE claim in the Summary Notice published in magazines and on the introductory page of the Settlement Website is false and fails to properly inform the Class Members.

34. With respect to these objections, KM carefully followed notice protocols upheld repeatedly by state and federal courts, as fully consistent with the intent and requirements of F.R.C.P. Rule 23, both in terms of the forms of notice used and content of the plain language text.

35. The purpose of the Summary Notice used in magazines was to 1) alert potential Class Members to the Settlement with an overview of the Settlement and Class Members' legal rights, and 2) direct them to the detailed Long-Form Notice, by prominently highlighting the toll-free number or address of the Settlement Website. The Summary Notice met all seven requirements of Rule 23 notice.

36. The other forms of notice – television spots, radio spots, and Internet banner ads - like the Summary Notice were selected based on the media usage of potential Class Members. These shorter forms of notice were tailored to the requirements of each medium with respect to length and were not intended to provide Class Members with all the information necessary to make a decision about opting out, objecting, or remaining in the

Settlement.  They were intended to inform Class Members that there is a Settlement and how to obtain detailed information.  The introductory page of the Settlement Website is exactly that, an introduction.  Detailed information is available in the Long-Form Notice and the Settlement Agreement itself, both of which are clearly available by a click in the navigation bar of the Website.

37. All forms of notice specifically direct Class Members to the Settlement Website where both the Long-Form Notice and the Settlement Agreement are available.  They also direct Class Members to the toll-free number where they can listen to an overview of the Settlement, request a Long-Form Notice, or speak to a live-operator and ask questions. The banner advertisements on the Internet allow persons to simply "click" through to the Settlement Website.

38. The purpose of the Long-Form Notice was to provide the details of the Settlement, allowing Class Members to make an informed decision about the value of the Settlement, claims that are covered, and process for registering for benefits.  It was designed as a question and answer document and includes an index for easy reference.  The Long-Form Notice, to which all Class Members were repeatedly directed, details information not provided in the shorter forms of notice.

39. With regard to the allegation in the Morey Objection that the Summary Notice in magazines is "patently false," this Notice, the summary page of the Long-Form Notice, and the Settlement Website introductory page state that monetary awards will be provided for "certain cases of chronic traumatic encephalopathy (CTE) (a neurological finding) diagnosed after death" and that "all valid clams will be paid in full for 65 years."

40. This language does not say that "all" cases of CTE qualify for monetary awards, but rather makes clear that, unlike the other Qualifying Diagnoses, only "certain" cases will qualify. The Long-Form Notice then defines early on what constitutes "certain" cases of CTE and, therefore, what qualifies as a "valid" claim for compensation.

41. Question 5 of Long-Form Notice, "What are the benefits of the Settlement?" clearly states that "Monetary awards for diagnoses of Death with CTE prior to July 7, 2014" are funded under the Settlement. Question 6 of the Long-Form Notice, "Who is included in the Settlement Class?" specifically defines who is included in Subclasses 1 and 2; in both instances, a CTE claim is "Death with CTE prior to July 7, 2014." In all three instances, the date of July 7, 2014 is bolded for clarity and emphasis.

42. In addition to the multiple references as to what constitutes valid CTE claims in the Long-Form Notice, the FAQs on the Settlement Website provided detailed information in Question 41 - "If a player is deceased, how does a Representative Claimant prove that the player suffered from a Qualifying Diagnosis at the time of or before his death?" It specifically says, "Players who died after the date of Preliminary Approval are not eligible for benefits for Death with CTE."

43. With respect to this date not being included in the tables outlining monetary awards based on Qualifying Diagnoses and age, those charts are predicated on the definition of "valid" CTE claims previously provided multiple times in the Long-Form Notice and, therefore, that information is not repeated.

44. Class Members had multiple opportunities to get comprehensive information about the Settlement and receive answers to any questions. The Long-Form Notice provided the toll-free number at the bottom of every page along with the URL of the Settlement

Website.  The toll-free number was also was cited nine times in the text, and many Class Members have called or gone online for information.

45. As outlined previously in this declaration, as of October 14, 2014, 4,544 individuals called the toll-free number with 2,302 speaking directly with a live operator.  In addition, over 62,989 unique visitors accessed the Settlement Website.  Many Class Members took the steps to get detailed information.

46. It is important to note that the vast majority of the retired NFL Football players and, therefore, the vast majority of the Class, had received the Long-Form Notice directly through the mail prior to any shorter forms of notice appearing in the media.  The mailed Long-Form Notice is the primary source for information about the Settlement.  The media program using the shorter forms of notice targeted the portion of the Class that included unidentified retired NFL football players, family members, heirs, or representatives and clearly directed these potential Class Members to comprehensive information and a means of asking any clarifying questions.

47. Based on my experience in hundreds of cases, many of which contain complicated information, I believe that it is highly unlikely that a Class Member would make a decision about their legal rights based on the shorter forms of notice or not take an action to get detailed information, particularly when health and welfare issues are so critical. The hypothetical dialogue outlined in the Duerson objection is exactly that, hypothetical, and not likely to reflect a real conversation given the serious nature of the claims in the Settlement.   As stated in paragraph 43, Class Members had every opportunity to be informed, learn of their rights, and get answers to any questions they might have about the Settlement.

## **Conclusion**

48. KM estimates that the Direct Mail Notice, in combination with the Paid Media Placements, reached over 90% of Settlement Class Members.  It is my opinion that the Notice Plan provided the best notice practicable under the circumstances, and it is consistent with the standards employed by KM in notification plans designed to reach unidentified members of settlement groups or classes.  The Notice Plan as implemented is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.

I declare under penalty of perjury that the foregoing is true and correct.


_____                    November 12, 2014
            Katherine Kinsella                                                           Date

# EXHIBIT 1



# NFL Concussion Settlement
## Benefits and Legal Rights

# NFL Concussion Settlement

## All Valid Claims of Retired NFL Football Players to be Paid in Full for 65 Years Monetary Awards, Baseline Medical Exams and Other Benefits Provided

*A federal court authorized this Notice.  This is not a solicitation from a lawyer.*

- The National Football League ("NFL") and NFL Properties, LLC (collectively, "NFL Parties") have agreed to a Settlement of a class action lawsuit seeking medical monitoring and compensation for brain injuries allegedly caused by head impacts experienced in NFL football.  The NFL Parties deny that they did anything wrong.

- The Settlement Class includes all retired players of the NFL, American Football League ("AFL"), World League of American Football, NFL Europe League and NFL Europa League, as well as authorized representatives of deceased, legally incapacitated or incompetent retired players and family members of retired players who meet certain criteria.

- The Settlement will provide eligible retired players with:

  o Baseline neuropsychological and neurological exams to determine if retired players are:

    a)  currently suffering from any neurocognitive impairment, including impairment serious enough for compensation, and

    b) eligible for additional testing and/or treatment ($75 million);

  o Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death.  The maximum monetary awards range from $1.5 million to $5 million depending on the diagnosis.  There is no cap on the amount of funds available to pay these Monetary Awards and all valid claims will be paid in full for 65 years; and

  o Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

- Authorized representatives of deceased, legally incapacitated or incompetent retired players and family members of retired players who meet certain criteria may also file claims for monetary awards (*see* Question 6).

- To get money, proof that injuries were caused by playing NFL football is not required.

- **Settlement Class Members <u>will need</u> to register to get benefits. Settlement Class Members may sign up at the website or call 1-855-887-3485 for additional information about the Settlement and updates on the registration process.**

## YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT

**STAY IN THE SETTLEMENT CLASS**

To be included in the Settlement Class, no action is needed. Once the Court approves the Settlement, you will be bound by the terms and releases contained in the Settlement. To receive benefits, however, you will need to register at a later date (see Question 26).

**EXCLUDE YOURSELF (OPT OUT)**

If you exclude yourself (opt out), you will get no benefits from the Settlement. This is the only option that allows you to participate in any other lawsuit against the NFL Parties about the claims in this case (see Question 30).

**OBJECT**

Write to the Court if you do not like the Settlement (see Question 35).

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.
- The Court in charge of this case still has to decide whether to grant final approval of the Settlement.

**This Notice is only a summary of the Settlement Agreement and your rights. You are encouraged to carefully review the complete Settlement Agreement at www.NFLConcussionSettlement.com.** The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania (see Question 35 for the address). You can also get this information by calling **1-855-887-3485**.

# CHAPTER 1: INTRODUCTION

**BASIC INFORMATION** ............................................................ **6**
1. Why is this notice being provided?
2. What is the litigation about?
3. What is a class action?
4. Why is there a Settlement?
5. What are the benefits of the Settlement?

**THE SETTLEMENT** ............................................................ **8**
6. Who is included in the Settlement Class?
7. What players are not included in the Settlement Class?
8. What if I am not sure whether I am included in the Settlement Class?
9. What are the different levels of neurocognitive impairment?
10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

**WHAT THIS NOTICE CONTAINS**

# CHAPTER 2: SETTLEMENT BENEFITS

**THE BASELINE ASSESSMENT PROGRAM** ..................................**11**
11. What is the Baseline Assessment Program ("BAP")?
12. Why should a retired player get a BAP baseline examination?
13. How does a retired player schedule a baseline assessment examination and where will it be done?

**MONETARY AWARDS** ............................................................**12**
14. What diagnoses qualify for monetary awards?
15. Do I need to prove that playing football caused the Qualifying Diagnosis?
16. How much money will I receive?
17. How does the age of the retired player at the time of first diagnosis affect a monetary award?
18. How does the number of seasons a retired player played affect a monetary award?
19. How do prior strokes or traumatic brain injuries of a retired player affect a monetary award?
20. How is a retired player's monetary award affected if he does not participate in the BAP program?
21. Can I receive a monetary award even though the retired player is dead?
22. Will this Settlement affect a retired player's participation in NFL or NFLPA-related benefits programs?
23. Will this Settlement prevent retired players from bringing workers' compensation claims?

**EDUCATION FUND** ............................................................**16**
24. What type of education programs are supported by the Settlement?

# CHAPTER 3: YOUR RIGHTS

**REMAINING IN THE SETTLEMENT** .................................................................. **18**
25. What am I giving up to stay in the Settlement Class?

**HOW TO GET BENEFITS** ............................................................................. **18**
26. How do I get Settlement benefits?
27. Is there a time limit to file claims for monetary awards?
28. Can I re-apply for compensation if my claim is denied?
29. Can I appeal the determination of my monetary award claim?

**EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT** ...... **19**
30. How do I get out of the Settlement?
31. If I do not exclude myself (opt out), can I sue the NFL Parties for the same thing later?
32. If I exclude myself (opt out), can I still get benefits from this Settlement?

**THE LAWYERS REPRESENTING YOU** .......................................................... **20**
33. Do I have a lawyer in the case?
34. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** ............................................................. **21**
35. How do I tell the Court if I do not like the Settlement?
36. What is the difference between objecting to the Settlement and excluding myself (opting out)?

**THE COURT'S FAIRNESS HEARING** ............................................................ **22**
37. When and where will the Court hold a Fairness Hearing concerning the Settlement?
38. Do I have to attend the hearing?
39. May I speak at the hearing?

**GETTING MORE INFORMATION** .................................................................. **22**
40. How do I get more Information?

# CHAPTER 1: INTRODUCTION

- Basic Information
- The Settlement

## BASIC INFORMATION

### 1. WHY IS THIS NOTICE BEING PROVIDED?

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement.  This Notice summarizes the Settlement and explains your legal rights and options.

This case is being heard in the U.S. District Court for the Eastern District of Pennsylvania.  The case is known as *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323.  The people who sued are called the "Plaintiffs."  The National Football League and NFL Properties, LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are:  (a) a retired player of the NFL, AFL, World League of American Football, NFL Europe League or NFL Europa League, (b) an authorized representative of a deceased, legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.

### 2. WHAT IS THE LITIGATION ABOUT?

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems.  The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players.  The NFL Parties deny the claims in the litigation.

### 3. WHAT IS A CLASS ACTION?

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims.  All of these people together are the proposed "class" or "class members."  When a class action is settled, one court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves (opt out) from the settlement.  In this case, the proposed class representatives are Kevin Turner and Shawn Wooden.  Excluding yourself (opting out) means that you will not receive any benefits from the Settlement.  The process for excluding yourself (opting out) is described in Question 30.

### 4. WHY IS THERE A SETTLEMENT?

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, and further settlement negotiations under the supervision of the Court-appointed Special Master, Perry Golkin, the Plaintiffs and the NFL Parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit.  Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant.  A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the litigation between the Settlement Class Members and the NFL Parties is over.  Only Settlement Class Members are eligible for the benefits summarized in this Notice.  The NFL Parties will no longer be legally responsible to defend against the claims by Settlement Class Members made in this litigation.

The Court has not and will not decide in favor of the retired players or the NFL Parties. By reviewing this Settlement, the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel," *see* Question 33) believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling **1-855-887-3485**.

## 5. WHAT ARE THE BENEFITS OF THE SETTLEMENT?

Under the Settlement, the NFL Parties will pay to fund:

* Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, "Baseline Assessment Program") (*see* Questions 11-13);

* Monetary awards for diagnoses of Death with CTE prior to **July 7, 2014**, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) and Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) (*see* Questions 14-21). **All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement (the "Monetary Award Fund")**; and

* Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million) (*see* Question 24).

In addition, the NFL Parties will pay the cost of notifying the Settlement Class. Administrative costs and expenses will be paid out of the Monetary Award Fund. The Baseline Assessment Program costs and expenses will be paid out of the Baseline Assessment Program Fund.

The details of the Settlement benefits are in the Settlement Agreement, which is available at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling **1-855-887-3485**.

**Note:** The Baseline Assessment Program and Monetary Award Fund will be administered independently of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims under the Settlement.

## THE SETTLEMENT

### 6. WHO IS INCLUDED IN THE SETTLEMENT CLASS?

This Settlement Class includes three types of people:

Retired NFL Football Players:  All living NFL Football players who, prior to **July 7, 2014**, (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

Representative Claimants:  Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased, legally incapacitated or incompetent Retired NFL Football Players.

Derivative Claimants:  Spouses, parents, dependent children, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a living or deceased Retired NFL Football Player.  (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status prior to **July 7, 2014**:

- Subclass 1 includes: Retired NFL Football Players who were <u>not</u> diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE prior to **July 7, 2014**, and their Representative Claimants and Derivative Claimants.

- Subclass 2 includes:

  o Retired NFL Football Players who <u>were</u> diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to **July 7, 2014**, and their Representative Claimants and Derivative Claimants; and

  o Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to death or who died prior to **July 7, 2014** and received a diagnosis of Death with CTE.

### 7. WHAT PLAYERS ARE NOT INCLUDED IN THE SETTLEMENT CLASS?

The Settlement Class does not include current NFL players.  The Settlement Class also does not include people who tried out for but did not make it onto preseason, regular season or postseason rosters or practice, developmental or taxi squads of the NFL or any Member Clubs.

## 8. WHAT IF I AM NOT SURE WHETHER I AM INCLUDED IN THE SETTLEMENT CLASS?

If you are not sure whether you are included in the Settlement Class, you may call **1-855-887-3485** with questions or visit www.NFLConcussionSettlement.com. You may also write with questions to NFL Concussion Settlement, **P.O. Box 25369, Richmond, VA 23260**. You may also consult with your own attorney.

## 9. WHAT ARE THE DIFFERENT LEVELS OF NEUROCOGNITIVE IMPAIRMENT?

In addition to ALS, Parkinson's Disease and Alzheimer's Disease, various levels of neurocognitive impairment are covered by this Settlement. More details can be found in the Injury Definitions, which are available at www.NFLConcussionSettlement.com or by calling **1-855-887-3485**.

The level of neurocognitive impairment will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing, provided one of the areas is executive function, learning and memory, or complex attention, and related functional impairment as follows:

| LEVEL OF NEUROCOGNITIVE IMPAIRMENT | TYPE OF IMPAIRMENT | DEGREE OF DECLINE |
|---|---|---|
| Level 1 | Moderate cognitive impairment | Moderate cognitive decline |
| Level 1.5 | Early Dementia | Moderate to severe cognitive decline |
| Level 2 | Moderate Dementia | Severe cognitive decline |

If neurocognitive impairment is temporary and only occurs with delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

## 10. MUST A RETIRED PLAYER BE VESTED UNDER THE NFL RETIREMENT PLAN TO RECEIVE SETTLEMENT BENEFITS?

No. A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

# CHAPTER 2:
# SETTLEMENT BENEFITS

- The Baseline Assessment Program
- Monetary Awards
- Education Fund

## THE BASELINE ASSESSMENT PROGRAM

### 11. WHAT IS THE BASELINE ASSESSMENT PROGRAM ("BAP")?

All living retired players who have earned at least one-half of an Eligible Season (see Question 18), who do not exclude themselves (opt out) from the Settlement (see Question 30), and who timely register to participate in the Settlement (see Question 26) may participate in the Baseline Assessment Program ("BAP").

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment. Retired players will have from two to ten years, depending on their age as of the date the Settlement is finally approved and any appeals are fully resolved ("Final Settlement Approval"), to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date of Final Settlement Approval will need to have a baseline examination within two years of the start of the BAP.

- Retired players under the age of 43 as of the date of Final Settlement Approval will need to have a baseline examination within 10 years of the start of the BAP, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (i.e., moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.

Retired players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a monetary award. Any award to a retired player may be reduced by 10% if the retired player does not participate in the BAP, as explained in more detail in Question 20.

### 12. WHY SHOULD A RETIRED PLAYER GET A BAP BASELINE EXAMINATION?

Getting a BAP baseline examination will be beneficial. It will determine whether the retired player has any cognitive impairment. If he is diagnosed with Level 1 Neurocognitive Impairment (i.e., moderate cognitive impairment), he will be eligible to receive further medical testing and/or treatment for that condition. In addition, regardless of any cognitive impairment today, the results of the BAP baseline examination can be used as a comparison to measure any subsequent deterioration of cognitive condition over the course of his life. Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist, and the retired player and/or his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

Participation in the BAP does not prevent the retired player from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if the player develops a Qualifying Diagnosis (see Question 14). Participation in the BAP also will help ensure that, to the extent the retired player receives a Qualifying Diagnosis in the future, he will receive the maximum monetary award to which he is entitled (see Question 20).

### 13. HOW DOES A RETIRED PLAYER SCHEDULE A BASELINE ASSESSMENT EXAMINATION AND WHERE WILL IT BE DONE?

Retired players need to register for Settlement benefits before they can get a baseline assessment examination. Registration for benefits will not be available until after Final Settlement Approval. **A retired player may provide his name and contact information now at www.NFLConcussionSettlement.com or by calling 1-855-887-3485. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

## MONETARY AWARDS

### 14. WHAT DIAGNOSES QUALIFY FOR MONETARY AWARDS?

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation. This would also apply to Derivative Claimants.

Qualifying Diagnoses must be made by approved qualified specialists. Any time prior to Final Settlement Approval, only board-certified neurologists, board-certified neurosurgeons or board-certified neuro-specialist physicians or similarly qualified specialists can make Qualifying Diagnoses. Following Final Settlement Approval, only qualified specialists approved by the Claims Administrator will be able to make Qualifying Diagnoses with the exception of Qualifying Diagnoses made through the BAP.

### 15. DO I NEED TO PROVE THAT PLAYING FOOTBALL CAUSED THE QUALIFYING DIAGNOSIS?

No. No proof is necessary that a retired player's Qualifying Diagnosis was caused by playing football or that he experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

## 16. HOW MUCH MONEY WILL I RECEIVE?

The amount of money you will receive depends on the retired player's:
- Specific Qualifying Diagnosis,
- Age at the time of diagnosis (*see* Question 17),
- Number of seasons played or practiced in the NFL or the AFL (*see* Question 18),
- Diagnosis of a prior stroke or traumatic brain injury (*see* Question 19), and
- Participation in a baseline assessment exam (*see* Question 20).

The amount of money you will receive also depends on:
- Any legally enforceable liens on the award,
- Any retainer agreement with an attorney, and
- Any further assessments ordered by the Court (*see* Question 34).

Certain costs and expenses related to resolving any liens for Settlement Class Members will be paid out of such Settlement Class Members' monetary awards or derivative claimant awards.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons (*see* Question 18) and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award.  If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

## 17. HOW DOES THE AGE OF THE RETIRED PLAYER AT THE TIME OF FIRST DIAGNOSIS AFFECT A MONETARY AWARD?

Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award within each age range for people diagnosed between the ages of 45-79; and
- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH w/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

## 18. HOW DOES THE NUMBER OF SEASONS A RETIRED PLAYER PLAYED AFFECT A MONETARY AWARD?

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL or AFL. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

- A retired player also earns one-half of an Eligible Season for each season where he was on an NFL or AFL Member Club's practice, developmental or taxi squad for at least eight games, but did not otherwise earn an Eligible Season.

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

Time spent playing or practicing in the World League of American Football, NFL Europe League and NFL Europa League does not count towards an Eligible Season.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |
| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

## 19. HOW DO PRIOR STROKES OR TRAUMATIC BRAIN INJURIES OF A RETIRED PLAYER AFFECT A MONETARY AWARD?

It depends. A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced: (1) a medically diagnosed stroke that occurred before or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis; or (2) a severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

## 20. HOW IS A RETIRED PLAYER'S MONETARY AWARD AFFECTED IF HE DOES NOT PARTICIPATE IN THE BAP PROGRAM?

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award only if the retired player:

- Did not receive a Qualifying Diagnosis prior to **July 7, 2014**, and
- Does not participate in the BAP, and
- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

**21. CAN I RECEIVE A MONETARY AWARD EVEN THOUGH THE RETIRED PLAYER IS DEAD?**

Yes.  Representative Claimants for deceased retired players with a Qualifying Diagnoses will be eligible to receive monetary awards.  If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives (see Question 16).

Representative and Derivative Claimants will also need to register for Settlement benefits (see Question 26).

**22. WILL THIS SETTLEMENT AFFECT A RETIRED PLAYER'S PARTICIPATION IN NFL OR NFLPA-RELATED BENEFITS PROGRAMS?**

No.  The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association.  This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note:**  The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

**23. WILL THIS SETTLEMENT PREVENT RETIRED PLAYERS FROM BRINGING WORKERS' COMPENSATION CLAIMS?**

No.  Claims for workers' compensation will not be released by this Settlement.

## EDUCATION FUND

**24. WHAT TYPE OF EDUCATION PROGRAMS ARE SUPPORTED BY THE SETTLEMENT?**

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

# CHAPTER 3:
# YOUR RIGHTS

- REMAINING IN THE SETTLEMENT
- HOW TO GET BENEFITS
- EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT
- THE LAWYERS REPRESENTING YOU
- OBJECTING TO THE SETTLEMENT
- THE COURT'S FAIRNESS HEARING
- GETTING MORE INFORMATION

## REMAINING IN THE SETTLEMENT

### 25. WHAT AM I GIVING UP TO STAY IN THE SETTLEMENT CLASS?

Unless you exclude yourself (opt out) from the Settlement (*see* Question 30), you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case. This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time. **However, the Settlement does not release any claims for workers' compensation (*see* Question 23) or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement.**

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC and RBG Holdings Corp.). **They are not parties to this Settlement and claims against them are not released by this Settlement.**

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves (opt out) from the Settlement, so please read it carefully. The Settlement Agreement is available at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling **1-855-887-3485**. If you have any questions you can talk to the law firms listed in the chart at the end of this Notice for free or you can talk to your own lawyer if you have questions about what this means.

## HOW TO GET BENEFITS

### 26. HOW DO I GET SETTLEMENT BENEFITS?

To get benefits, you will need to register. This is true for all Settlement Class Members, including Representative and Derivative Claimants. Registration for benefits will not begin until after Final Settlement Approval (*see* Question 37). If and when that occurs, further notice will be provided about the registration process and deadlines. **However, you may provide your name and contact information now at www.NFLConcussionSettlement.com or by calling 1-855-887-3485. This ensures that you will receive additional notice about the registration process and deadlines when that becomes available.** To receive any Settlement benefits, you must register on or before 180 days from the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com. Information about the registration deadline will also be available by calling **1-855-887-3485.**

## 27. IS THERE A TIME LIMIT TO FILE CLAIMS FOR MONETARY AWARDS?

Yes. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement. com. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims. This deadline may be extended up to an additional two years upon a showing of substantial hardship.

Derivative Claimants must submit claims no later than 30 days after a Retired NFL Football Player or a Representative Claimant receives notice of an entitlement to a monetary award. All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

## 28. CAN I RE-APPLY FOR COMPENSATION IF MY CLAIM IS DENIED?

Yes. A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

## 29. CAN I APPEAL THE DETERMINATION OF MY MONETARY AWARD CLAIM?

Yes. The Settlement establishes an independent process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

## EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT

If you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement. You may do this by asking to be excluded from—opting out of—the Settlement Class. If you exclude yourself (opt out), you cannot receive benefits from this Settlement.

## 30. HOW DO I GET OUT OF THE SETTLEMENT?

On or before **October 14, 2014**, you must mail a letter or other written document to the Claims Administrator requesting exclusion from the Settlement Class. Your request must include:

- Your name, address, telephone number, and date of birth;
- A copy of your driver's license or other government issued identification;
- A statement that "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and
- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion (opt out) request, postmarked on or before **October 14, 2014**, to:

NFL Concussion Settlement
P.O. Box 25369
Richmond, VA 23260

Your request to exclude yourself (opt out) is not effective unless and until the District Court grants Final Approval.

### 31. IF I DO NOT EXCLUDE MYSELF (OPT OUT), CAN I SUE THE NFL PARTIES FOR THE SAME THING LATER?

No.  Unless you exclude yourself (opt out), you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves.  If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself (opt out) on or before **October 14, 2014**.

### 32. IF I EXCLUDE MYSELF (OPT OUT), CAN I STILL GET BENEFITS FROM THIS SETTLEMENT?

No.  **If you exclude yourself (opt out) from the Settlement you will not get any Settlement benefits**.  You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

## THE LAWYERS REPRESENTING YOU

### 33. DO I HAVE A LAWYER IN THE CASE?

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel" (*see* Question 6).  They are listed at the end of this Notice with their contact information.

You will not be charged for contacting these lawyers.  If you are represented by an attorney, you may contact your attorney to discuss the proposed Settlement.  You do not have to hire your own attorney.  However, if you want to be represented by your own lawyer, you may hire one at your own expense.

### 34. HOW WILL THE LAWYERS BE PAID?

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs.  The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million.  These fees and incurred costs will be paid separately by the NFL Parties and not from the Baseline Assessment Program Fund, Education Fund or Monetary Award Fund.  Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time.  Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

After Final Settlement Approval, Co-Lead Class Counsel may ask the Court to set aside up to five percent of each monetary award and derivative claimant award to facilitate the Settlement program and related efforts of Co-Lead Class Counsel, Class Counsel and Subclass Counsel.  If approved, this money would be held in a separate fund overseen by the Court.  Any future request for a set-aside will describe:  (1) the proposed amount; (2) how the money will be used; and (3) any other relevant information.  This "set-aside" would come out of the claimant's attorney's fee if represented by individual counsel or, if not represented, out of the monetary award and derivative claimant award itself.  No money will be held back or set aside from any award without a Court order.  The set-aside is a matter between Class Counsel and individual counsel for Settlement Class Members.  The NFL Parties do not take a position on the proposal.

## OBJECTING TO THE SETTLEMENT

### 35.  HOW DO I TELL THE COURT IF I DO NOT LIKE THE SETTLEMENT?

If you have not excluded yourself (opted out), you may object to the Settlement or any part of it.  The Court will consider your views.  To object to the Settlement, you or your attorney must submit your written objection to the Court.  The objection must include the following:

- The name of the case and multidistrict litigation, *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- If you are a Representative Claimant or Derivative Claimant, the name of the Retired NFL Football Player to whom you are related;

- Written statement or evidence establishing how you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

Attorneys filing objections on behalf of Settlement Class Members must follow the requirements in Section 14.3(b) of the Settlement Agreement.

You must mail your objection, postmarked on or before **October 14, 2014**, to:

| COURT |
|---|
| Clerk of the District Court/NFL Concussion Settlement<br>U.S. District Court for the Eastern District of Pennsylvania<br>United States Courthouse<br>601 Market Street<br>Philadelphia, PA 19106-1797 |

### 36.  WHAT IS THE DIFFERENCE BETWEEN OBJECTING TO THE SETTLEMENT AND EXCLUDING MYSELF (OPTING OUT)?

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different.  You can object only if you do not exclude yourself (opt out) from the Settlement Class.  Excluding yourself (opting out) is telling the Court that you do not want to be part of the Settlement Class and you do not want to receive any Settlement benefits.  If you exclude yourself (opt out), you have no basis to object because the case no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement.  You may attend and you may ask to speak, but you do not have to.  The Court will determine if you are allowed to speak if you request to do so (*see* Question 39).

### 37. WHEN AND WHERE WILL THE COURT HOLD A FAIRNESS HEARING CONCERNING THE SETTLEMENT?

The Court will hold the Fairness Hearing on **Wednesday, November 19, 2014 at 10:00 a.m.** at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106 in Courtroom 7B.  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call **1-855-887-3485.**  At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing.  After the hearing, the Court will decide whether to approve the Settlement.  We do not know how long the decision will take.

After the Fairness Hearing, the Court will consider the request for attorneys' fees and reasonable costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel (*see* Question 34).

### 38. DO I HAVE TO ATTEND THE HEARING?

No.  Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have.  But you are welcome to attend at your own expense.  If you timely file an objection, you do not have to come to Court to talk about it.  As long as you filed your written objection on time, the Court will consider it.  You may also have your own lawyer attend at your expense, but it is not necessary.

### 39. MAY I SPEAK AT THE HEARING?

On or before **November 3, 2014,** you may ask the Court for permission to speak at the Fairness Hearing.  The Court will determine whether to grant you permission to speak.  To make such a request, you must send written notice to the Court stating your intention to speak at the *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323 Fairness Hearing.  Be sure to include your name, address, telephone number, and your signature.  Your request to speak must be sent to the Court at the address in Question 35.

## GETTING MORE INFORMATION

### 40. HOW DO I GET MORE INFORMATION?

This Notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  You can get a copy of the Settlement Agreement at www.NFLConcussionSettlement.com.  The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania (*see* Question 35 for the address).  You also may write with questions to NFL Concussion Settlement, **P.O. Box 25369, Richmond, VA 23260** or call **1-855-887-3485.  PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LITIGATION.**

| IMPORTANT DATES & CONTACT INFORMATION | |
|---|---|
| **EXCLUSION (OPT OUT) DEADLINE** | October 14, 2014 |
| **OBJECTION DEADLINE** | October 14, 2014 |
| **DEADLINE TO REQUEST TO SPEAK AT THE FAIRNESS HEARING** | November 3, 2014 |
| **FAIRNESS HEARING** | November 19, 2014 |
| **START OF REGISTRATION PERIOD** | The date the announcement of the registration process is posted on the Settlement Website. (This will occur following Final Settlement Approval after all appeals.) |
| **REGISTRATION DEADLINE** | 180 days after the start of the registration period |
| **DEADLINE TO RECEIVE A BAP** | • For retired players age 43 or older: Within two years of Final Settlement Approval<br><br>• For retired players under age 43: Within ten years of Final Approval or before age 45, whichever comes sooner |
| **DEADLINE TO SUBMIT A CLAIM** | • For retired players (and their Representative Claimants) diagnosed by the date of Final Settlement Approval: Within two years from the start of the registration period<br><br>• For retired players (and their Representative Claimants) diagnosed after the date of Final Settlement Approval: Within two years from the date of diagnosis |
| **CLAIMS ADMINISTRATOR** | **NFL Concussion Settlement**<br>**P.O. Box 25369**<br>**Richmond, VA 23260**<br>**Tel: 1-855-887-3485** |
| **COURT** | Clerk of the District Court/NFL Concussion Settlement<br>U.S. District Court for the Eastern District of Pennsylvania<br>United States Courthouse<br>601 Market Street<br>Philadelphia, PA 19106-1797 |

| CLASS COUNSEL | | |
|---|---|---|
| | Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP<br>77 Water Street<br>New York, NY 10005 | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ<br>1710 Spruce Street<br>Philadelphia, PA 19103 |
| | Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| | Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

1-855-887-3485
www.NFLConcussionSettlement.com

# EXHIBIT 2

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
SED

RETURN SERVICE REQUESTED

NFL Concussion Claims Administrator
2867 E. Allegheny Avenue
Philadelphia, PA 19134

NFL Concussion Settlement
Important Information Inside

# NFL Concussion Settlement

## Retired NFL Players and Their Families Could Get Money and Benefits

# EXHIBIT 3

# NFL Concussion Settlement

## All Valid Claims of Retired NFL Football Players to be Paid in Full for 65 Years Monetary Awards, Baseline Medical Exams and Other Benefits Provided



The NFL and NFL Properties have agreed to a class action Settlement with retired players who sued, accusing them of failing to warn of and hiding the dangers of brain injury associated with playing football. The Settlement does not establish any wrongdoing on the part of the NFL or NFL Properties.

**Who is included in the Settlement?**

The Settlement Class generally includes all retired players of the NFL, AFL, World League of American Football, NFL Europe League and NFL Europa League. The Settlement Class includes immediate family members of retired players and legal representatives of incapacitated, incompetent or deceased players.

**What does the Settlement provide?**

The Settlement provides money for three benefits:

- Baseline medical exams to determine if retired players suffer from neurocognitive impairment and are entitled to additional testing and/or treatment ($75 million),

- Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death. The maximum monetary awards range from $1.5 million to $5 million depending on the diagnosis. All valid claims will be paid in full for 65 years; and

- Education programs and initiatives related to football safety ($10 million).

## How can I get benefits?

You will need to register for benefits after the final approval of the Settlement. You may provide your contact information now at the website or phone number below to ensure that you receive additional notice about the registration process.

Retired players do <u>not</u> have to prove that their injuries were caused by playing NFL football to get money from the Settlement.

## What are my rights?

You do not need to do anything to be included in the Settlement Class. All Settlement Class members will be bound by the Settlement and give up the right to sue the NFL individually. If you want to keep your right to sue the NFL, you must exclude yourself from the Class by **October 14, 2014**. If you exclude yourself, you will not receive any benefits under the Settlement. If you stay in the Class, you may object to the Settlement by **October 14, 2014**.

The Court will hold a hearing on **November 19, 2014** to consider whether to approve the Settlement. You do not have to attend. However, you and/or your own lawyer may attend and request to speak at the hearing at your own expense. At a later date, the attorneys will ask the Court for an award of attorneys' fees and reasonable costs. The NFL and NFL Properties have agreed not to oppose or object to the request if the request does not exceed $112.5 million. The money would be paid by the NFL and NFL Properties in addition to the payments described above.

## Please Share this Notice with Other Players and Their Families

### For More Information and to Register for Benefits:
**1-855-887-3485 or www.NFLConcussionSettlement.com**

# EXHIBIT 4



# NFL TELEVISION SPOT SCRIPT

The NFL has agreed to a Settlement benefiting retired players, their families and representatives, relating to brain injuries.

If approved, the multimillion dollar settlement will provide compensation, baseline medical exams and other benefits.

Valid claims for conditions such as ALS, Alzheimer's, Parkinson's, Dementia and other diagnoses are guaranteed to be paid during the 65-year settlement.

If you did not receive an information package:

Call 1-855-887-3485 or go to NFLConcussionSettlement.com

# EXHIBIT 5



# NFL RADIO SPOT SCRIPTS

| NFL RADIO SPOT |
| :---: |
| :30 SECONDS |
| The NFL has agreed to a Settlement benefiting retired players, their families and representatives, relating to brain injuries. |
| If approved, the multi-million dollar settlement will provide compensation, baseline medical exams and other benefits. |
| Valid claims for conditions such as ALS, Alzheimer's, Parkinson's, Dementia and other diagnoses are guaranteed to be paid during the 65-year settlement. |
| If you did not receive an information package: |
| Call 1-855-887-3485 or go to NFLConcussionSettlement.com. |

| NFL RADIO SPOT |
| :---: |
| :60 SECONDS |
| The NFL has agreed to a Settlement benefiting retired players, their families and representatives, relating to brain injuries. |
| If approved, the multi-million dollar settlement will provide compensation, baseline medical exams and other benefits. |
| All valid claims for conditions like ALS, Alzheimer's, Parkinson's, Dementia, and certain other diagnoses are guaranteed to be paid during the 65-year settlement term.  The maximum payments range between $1.5 and $5 million, depending on the condition. |
| Retired players of the NFL and four other professional leagues are included and players do not need to prove that their injuries were caused by playing football to receive benefits. |
| If you did not receive an information package: |
| Call 855-887-3485 or go to NFLConcussionSettlement.com. That's 855-887-3485 or go to NFLConcussionSettlement.com. |

# EXHIBIT 6



**All News Video**



Innovation Nation

## Facebook's $2B toy replaces college tours

By Erica Fink @EricaFink



Your video will play in 00:25

Hit the quad in virtual reality with college tours on Oculus Rift.

**Most Popular Videos**

106     63     16     22     5

MSN RON – Age 25+ 300x250



MSN Video RON – Age 25+





# NFL CONCUSSION 2014: 160x600 DISPLAY



NFL Concussion 2014
Screenshots



**music.yahoo.com_728x90**



# EXHIBIT 7

# NFL Concussion Settlement

***Do you have retired, professional football players residing at your facility?
If so, please read and share the information below.***

There is a class action Settlement that may provide benefits to retired, professional football players, and your assistance is needed to locate these players.

The Settlement involves head trauma experienced during NFL playing careers that resulted in brain injuries which have caused or may cause long-term neurological problems.

The multi-million dollar NFL Concussion Settlement may provide compensation for conditions including ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease and Dementia. The Settlement may also provide baseline medical exams and other benefits.

In addition to players, the Settlement also includes immediate family members of retired, professional football players and legal representatives of incapacitated, incompetent or deceased players.

Enclosed is a Summary Notice that provides additional information about the Settlement.  <u>If you believe someone in your facility may be a part of this Settlement, please let them know, alert a family member or provide their name and address at the website below.</u>

You can also get more information by visiting www.NFLConcussionSettlement.com or calling 1-855-887-3485.

## Please Share the Summary Notice with Any Retired Professional Football Players and Their Families

### For additional information about the Settlement
**Write:  NFL Concussion Settlement
P.O. Box 25369
Richmond, VA 23260**

**Call:  1-855-887-3485**

**Visit:  www.NFLConcussionSettlement.com**

# EXHIBIT 8



## OUTREACH REPORT

Below is a table of the reported action from KM's outreach to NFL organizations (including alumni and player associations and related groups):

| REPORTED ACTION | NUMBER OF RESPONDENTS |
|---|---|
| Asked for Hardcopies | 1 |
| Emailed Members of Group/Other Presidents | 12 |
| Phone Call for More Information | 4 |
| Posted to LinkedIn Group | 2 |
| Posted on Facebook Group | 1 |
| Discuss at Chapter Meeting | 5 |
| Other Inquiries | 2 |