# Exhibit 13

# Proposed NFL settlement is good for players



*Dallas Cowboys wide receiver Dwayne Harris (17) pulls down a pass for a first down while being tackled by San Francisco 49ers free safety Eric Reid (35) during the second half of an NFL football game Sunday, Sept. 7, 2014, in Arlington, Texas. (AP Photo/Waco Tribune Herald/ Jose Yau)* AP

**Arthur R. Miller**

POSTED: WEDNESDAY, SEPTEMBER 10, 2014, 1:08 AM

Despite the many questions about the safety of football - and the headlines individual players create - the sport is more popular than ever. We still revel in the competition. Yet, for decades, we ignored the toll the sport was taking on the athletes themselves. Only recently have we paid attention to the lives wracked by neuro-cognitive illnesses. And the issue raises serious questions about whether the NFL knew, or

1

should have known, about the long-term risks associated with repetitive head impacts.

With so many questions unanswered, it came as a surprise when the retired players who were suing the NFL over the issue and the league announced a settlement last year. A vocal minority has criticized the deal, with the two greatest concerns being the benefits that players will receive and the belief that the NFL might have gotten off easy. Both criticisms lack merit.

The starting point in evaluating the settlement has to be the strength of the lawsuit itself.

The pro-players side argues that the NFL's conduct relating to head injuries has been questionable, with some even suggesting that the league purposefully concealed information that could have better protected players. Additionally, the neurological afflictions retired players are facing - at rates exceeding the general population - are truly serious.

But compelling personal stories, combined with alleged dubious behavior, do not make a slam-dunk case. The players' lawsuit makes this clear.

First, the alleged injuries occurred years, and sometimes decades, ago, in a game that is inherently and obviously dangerous. Even if a plaintiff can overcome a defense based on the passage of time, a jury might not sympathize with a well-compensated football player who did not believe there would be consequences to continuously hitting his head.

Moreover, most of these plaintiffs also played under a collective bargaining agreement, and there is strong case law requiring workplace claims to be arbitrated, thus preventing them from being heard in court. The NFL's motion

2

to dismiss on this basis was pending in federal court when the settlement was reached. Without that settlement, hundreds, if not most, of the plaintiffs' claims may well have been dismissed.

In addition, the science on concussions and football is fairly new. Although the growing research has shown that NFL players are more likely to be diagnosed with dementia, amyotrophic lateral sclerosis, and other neurological injuries, that alone is not enough to succeed in a courtroom. The very fact that this research is new could weaken claims of older plaintiffs who played the game when there was even less research - and less reason - for the NFL to have known of the potential consequences of repeated hits. More importantly, it is not enough to show that football leads to brain damage; a plaintiff needs to prove that his specific injury was caused by NFL football and not another factor - such as the natural aging process, genetics, high school or college football (many plaintiffs had longer amateur than pro careers), or simply bad luck. Proving legal causation would have been challenging or downright impossible.

The proposed settlement benefits for retired players are substantial - considering all of the legal obstacles, and delays and expense of continued litigation, the achievements are remarkable. Retired players who are sick today with broadly defined neuro-cognitive injuries will receive care and compensation, and those who are healthy today but fear for their future will be protected and eligible to receive compensation over the next 65 years. Importantly, a former player will not need to prove causation to receive compensation, and the programs and protocols for being paid will operate independently of the NFL, with strong court oversight.

3

Although the original settlement was potentially flawed because it had a hard cap on the money that would be available to the players, Judge Anita Brody's leadership has yielded a revised agreement that guarantees compensation to any retired player who develops a qualified neuro-cognitive injury. Uncapped liability is practically unheard of in litigation of this type, which speaks to the tremendous value the settlement provides.

For any player to opt out of this settlement and pursue litigation on his own seems foolish. It is highly likely that anyone going it alone would lose in court and end up with nothing. And although opt-outs and objections are common in class-action settlements, any unsuccessful objector who appeals would hold up benefits for every retired player.

For years, the NFL denied the link between head injuries and long-term neuro-cognitive problems, and refused to provide any benefits to those in need. Now the league has agreed to provide relief. It would be the ultimate irony if retired players who objected were the ones who stood in the way of that happening.

---

Arthur R. Miller is chairman of the New York University Sports and Society program and is a professor at the NYU School of Law. arthur.r.miller@nyu.edu

**Arthur R. Miller**

Read more at
http://www.philly.com/philly/opinion/inquirer/20140910_Proposed_NFL_settlement_is_good_for_players.html#FzbetptgitcKmKDt.99

4