UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIG., | ) ) ) ) | 2:12-md-02323-AB |

**SUPPLEMENTAL OBJECTION TO SETTLEMENT**

Objectors Cleo Miller, Judson Flint, Elmer Underwood, Vincent Clark, Sr., Fred Smerlas, Ken Jones, Jim Rourke, Lou Piccone, James David Wilkins II and Robert Jackson hereby submit this supplemental objection to the arguments made by the proponents of the settlement in their briefing and at the fairness hearing held on November 19, 2014.

### I. The Settlement Class May Not Be Certified Due to Fatal Intraclass Conflicts.

It is now clear that the settlement in its current form cannot be approved due to the fatal intra-class conflicts that are created by the settlement. The settlement favors currently injured class members at the expense of those who will die or be diagnosed with CTE in the future. Therefore, it fails the adequacy test set forth in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and must be rejected.

The NFL's defense of this disparate treatment fails to pass muster. The NFL argues that the payments of up to $4 million to players who died between 2006 and July 2014, and whose brains were later found to contain tau protein tangles (the marker for CTE) is to make up for the fact that they, unlike the living class members, did not have the "opportunity" to be diagnosed with one of the other qualifying diagnoses during their lifetimes.

First, the fact that the deceased players died before developing one of the devastating conditions covered by the settlement means that they are identically situated to the class members who will die in the future without developing one of the other qualifying diagnoses.

Second, there is no evidence that any of the deceased players were suffering from undiagnosed Alzheimers, Parkinsons , ALS or dementia prior to their deaths.  These diseases are not the kinds of conditions that could have been missed during the deceased players' lifetimes.  These were things that their primary doctors could have diagnosed, and therefore the fact that they did not participate in the testing protocols is irrelevant. While it is certain that the deceased players whose brains contained tau protein tangles were dealing with serious emotional and behavioral problems prior to their deaths, that makes them no different from the hundreds of living former players dealing with the same issues today.  Thus, there is absolutely no rationale for treating players who died with CTE prior to July 2014 any different than those who will die with CTE after July 2014.

Similarly situated class members must be treated the same.  This means that class members who die and are later found to have tau protein tangles in their brains must receive the same monetary awards, regardless of when they die.  There are three ways of achieving this result, as outlined below.

### A. Extend Death With CTE Awards to All Class Members Regardless of Date of Death.

As the objectors have advocated consistently in this lawsuit, the fatal intraclass conflict can be eliminated by treating all class members alike regardless of their date of death. Any class member who dies and is later found to have tau protein tangles in his brain should receive the payments set forth on the matrix for Death with CTE.

### B. Eliminate Death With CTE Benefits for All Class Members.

Another way of achieving a settlement that treats all similarly situated class members the same would be to eliminate settlement benefits for all class members who die and are later found to have tau protein tangles in their brains, regardless of the date of death. While the NFL clearly desires to reach settlements with those players who died with CTE prior to July 2014 for public relations reasons, it may not purchase that PR boost at the expense of living former players whose CTE symptoms will go uncompensated. It is true that the high profile deaths of those former players who committed suicide provided the primary impetus for this lawsuit, and likely drove the settlement of this case. However, it is also probable that it was those players' emotional and behavioral symptoms, and not ALS, Alzheimer's, Parkinson's or dementia, that drove them to take their own lives. A settlement that simply pays off these high profile symbols of the high price of head trauma, but does nothing to compensate the same symptoms and issues in living former players, is not permissible, because it achieves that beneficial PR for the NFL at the expense of the living class members.

### C. Eliminate Death With CTE From The Release.

Attorney Birenboim argued at the fairness hearing that CTE research is in its "infancy" compared to the other conditions that are covered. This is a reason for ***not addressing these claims at all*** at this time, not for releasing them for no consideration because not enough is known at the current time to connect CTE to mood and behavior disorders. The way to do this is to exclude claims for Death with CTE and claims for mood and behavior disorders associated with CTE from the release in this case. This would leave for another day the question of whether CTE causes these symptoms, rather than resolving those questions for all time against the class members simply because not enough studies have been done to date.

If further research confirms that head trauma leads to depression, poor impulse control and bad judgment with as much certainty as we now know head trauma causes Parkinson's, the settlement in its current form would preclude any compensation for these class members. This objection has to do with not freezing in place what the NFL concedes is immature science. It is premature to settle any claims relating to CTE.

The parties have not made the case for differential treatment of living and dead class members with tau protein in their brains. The payments to the 79 or so former players whose brains have been studied and found to contain tau protein are payoffs intended to make the NFL's public relations problems go away, not compensation based upon rational principles meant to make all class members whole for the problems associated with CTE. As argued in the Cleo Miller Objectors' original objection, the NFL may still elect to settle with these players' families outside of this settlement. It may

not use those players as hostages to extract the ransom of the wholesale release of all other class members' CTE claims for no consideration, for the next 65 years.

The NFL and particularly Class Counsel should be ashamed of pitting the deceased class members and living class members against each other in this way.  All class members, living and deceased, suffer and suffered from CTE.  Each class member should be treated the same under the settlement.   The date of death should not matter.  The deceased class members whose brains were found to have CTE did not develop any of the other diagnoses during their lifetimes.  If this does not prevent them from being eligible for a $4 million payment under the settlement, it should not bar other class members either.

## II.     The Best Guarantee Of The NFL's Performance Is Class Counsel's Continued Involvement.

Much has been made of the lack of a so-called guarantee as part of the settlement.  If the NFL goes bankrupt, claimants under the settlement would become unsecured creditors, unless enough money has been set aside to cover all future claims.  However, there is no lump sum that the NFL could pay into escrow now that would guarantee the payment of all claims for the next 65 years.  Even $1 billion might not be enough, depending upon future investment returns, and the number of claims filed.

The best guarantee of the NFL's continued performance of its obligations under the settlement is Class Counsel's continued commitment and willingness to enforce the settlement's terms for the next 65 years.  And the best way to ensure that commitment is to make Class Counsel's fees contingent upon the payment of claims.  Every time a claim is paid, Class Counsel should receive 15% of the amount of the payment out of a separate fund established by the NFL, up to a cap of $112.5 million.  This will guarantee, to the

5

greatest extent possible, that Class Counsel will retain an incentive to see that all claims are paid for the duration of the settlement.[1]

While Objectors are aware that Class Counsel's fee motion is not before the Court at this time, the cap on the NFL's fee payments, and the proposal to make an upfront lump sum fee payment to Class Counsel, presumably are. These are critical elements of the settlement that should be ruled upon at this time, for the reason that the NFL may elect not to proceed with the settlement if they are stricken. While the Court is free under the settlement to award Class Counsel less than $112.5 million, it is not clear that the Court would be free either to stage Class Counsel's fee award, or to require the NFL to pay more than $112.5 million in order to guarantee Class Counsel's incentive to make sure every claim is paid for the next 65 years. These things are necessary in order to make the settlement itself fair, and therefore they should be addressed at this time.

        Respectfully submitted,
        Cleo Miller, Judson Flint,
        Elmer Underwood, Vincent Clark, Sr.,
        Ken Jones, Fred Smerlas, Jim Rourke,
        Lou Piccone, James David Wilkins II, and
        Robert Jackson,
        By their attorneys,

        */s/ John J Pentz*
        John J. Pentz
        19 Widow Rites Lane
        Sudbury, MA 01776
        Phone: (978) 261-5725
        jjpentz3@gmail.com

---

[1] There is still the risk that Class Counsel will hit the $112.5 million cap prior to the expiration of 65 years, causing them to lose interest in the remainder of the settlement's term. For this reason, the Court may want to consider rejecting the cap on fees, and require the NFL to pay Class Counsel 15% of all claims paid, regardless of the total amount of claims paid. Time will show how valuable this settlement really is. Class Counsel's fees should be commensurate with that. If the settlement delivers only $300 million to class members, Class Counsel's fees should be correspondingly lower, and the NFL will save money. If the settlement delivers $1 billion, then Class Counsel has achieved a superior settlement, and should be rewarded in kind. Making the settlement uncapped only with regard to claims, but not fees, may not achieve the settlement's purpose if Class Counsel's interests are untied to the class' interests.

>Edward W. Cochran
>20030 Marchmont Rd.
>Cleveland Ohio 44122
>Phone: (216) 751-5546
>EdwardCochran@wowway.com

## CERTIFICATE OF SERVICE

 The undersigned hereby certifies that the foregoing document was filed via the ECF filing system on December 2, 2014, and that as a result electronic notice of the filing was served upon all attorneys of record.

>*/s/ John J. Pentz*
>John J. Pentz