# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>　　　　Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**POST-FAIRNESS HEARING SUPPLEMENTAL BRIEFING OF OBJECTORS SEAN MOREY, ALAN FANECA, BEN HAMILTON, ROBERT ROYAL, RODERICK CARTWRIGHT, JEFF ROHRER, AND SEAN CONSIDINE**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     Class Counsel and the NFL Have Not Refuted the Showing that the Settlement Is Unfair in Its Failure To Compensate the Vast Majority of Class Members for CTE While Extracting a Release for All CTE Claims ................................................................ 2

     A.     Class Counsel and the NFL Have Not – and Cannot – Overcome the Basic Medical Science Regarding CTE ................................................................ 4

          1.     Dr. Stern and Dr. Gandy Have Credibly Established the Need To Compensate CTE ................................................................ 4

          2.     The Basic Medical Science Set Forth by Dr. Stern and Dr. Gandy Is Widely Accepted by the Medical Community ................................................ 6

          3.     The Experts Hired by the NFL and Class Counsel Acknowledge the Experience and Knowledge of Dr. Stern and Dr. Gandy ........................... 8

          4.     The Experts Hired by the NFL and Class Counsel Are Biased ................. 9

          5.     The Tortured "Analysis" of the Experts Hired by the NFL and Class Counsel Fails To Refute the Accepted Medical Science Concerning CTE ................................................................ 11

               a.     Existing CTE Research Demonstrates Causation ........................ 11

               b.     CTE Presents with Severe and Debilitating Mood and Behavioral Symptoms ................................................................ 14

          6.     The Opinions Expressed in the Declarations of the Experts Hired by the NFL and Class Counsel – Which They Offer To Support the Settlement – Are Inconsistent Internally and With the Opinions They Have Expressed Before They Were Retained by the NFL and Class Counsel ................................................................ 16

          7.     The Science Surrounding CTE Should Not Be Frozen by the Settlement ................................................................ 17

     B.     Compensating "Dementia" Does Not Equal Compensating CTE ........................ 18

i

II.     The Failure To Credit NFL Europe Play and the Application of the 75% Non-NFL
        Traumatic Brain Injury Offsets Render the Settlement Unfair ........................................ 20

III.    The Class Conflicts Caused by the Settlement's Treatment of CTE, NFL Europe
        Play, and Non-NFL Traumatic Brain Injuries and Strokes Demonstrate a Lack of
        Adequate Representation in Violation of Federal Rule of Civil Procedure 23(a)(4) ....... 21

IV.     Procedural Hurdles Will Prevent Many Class Members from Ever Recovering ............ 22

V.      Class Notice Has Caused Confusion Among the Class .................................................... 24

VI.     The Public Interest and Public Opinion Disfavor Final Approval .................................. 25

VII.    The Settlement Does Not Guarantee That Funds Will Be Available To Pay Claims
        During the Full Term of the Settlement .......................................................................... 29

VIII.   Potential Improvements to the Settlement ...................................................................... 30

CONCLUSION ............................................................................................................................ 31

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ....................................................17, 18

*Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ......................................3

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751 (S.D.N.Y. 2003) .............10

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001).................................................1

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) .......................21

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010) ...........................................2

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) ....................................................24

*Falise v. Am. Tobacco Co.*, 94 F. Supp. 2d 316 (E.D.N.Y. 2000) ................................11

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Litig.*, 55 F.3d 768
    (3d Cir. 1995).........................................................................................................2, 25

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) ................................17, 18

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .....................................................17, 18

*Pearson v. NBTY, Inc.*, No. 12-1245, 2014 WL 6466128 (7th Cir. Nov. 19, 2014).....24

*Robertson v. Allied Signal, Inc.*, 914 F.3d 360 (3d Cir. 1990) ......................................13

*Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011) ...........................................................13

### STATUTES AND RULES

Fed. R. Civ. P. 23 ......................................................................................................2, 30

Fed. R. Civ. P. 23(a)(4).........................................................................................1, 21, 22

### OTHER AUTHORITIES

Associated Press, *Ex-Steeler Long Drank Antifreeze To Commit Suicide*, ESPN
    (Jan. 26, 2006), http://sports.espn.go.com/nfl/news/story?id=230700 ....................15

Brandeis, *Other People's Money* (National Home Library Foundation ed. 1933).......29

Carman, *et al.*, *"Mind the Gaps": Advancing Research in Short- and Long-Term Neuropsychological Outcomes of Youth Sports-Related Concussions*, Submitted, Nature Reviews Neurology (2014)........................................................8

Carroll, *Could Brain Injuries Be Behind the NFL Rap Sheet?*, NBC News (Sept. 17, 2014), http://www.nbcnews.com/storyline/nfl-controversy/could-brain-injuries-be-behind-nfl-rap-sheet-n205666........................................16, 17

Crary, *et al.*, *Primary Age-Related Tauopathy (PART): A Common Pathology Associated with Human Aging*, 128 Acta Neuropathologica 755 (2014)..................8

Dall, *et al.*, *Supply and Demand Analysis of the Current and Future US Neurology Workforce*, 81 Neurology 470 (2013)...................................................22

Dao, *Brain Ailments in Veterans Likened to Those in Athletes*, N.Y. Times (May 16, 2012), http://www.nytimes.com/2012/05/17/us/brain-disease-is-found-in-veterans-exposed-to-bombs.html?pagewanted=all&_r=0 .......................16

Daugherty, *Settlement II: Concussion Cases Become a Headache for NFL*, San Diego Reader (July 9, 2014), http://www.sandiegoreader.com/news/2014/jul/09/sporting-settlement-II ...........................26

DeGory, *New Concussion Settlement a Win-Win*, SportsIllustrated.com (June 26, 2014), http://mmqb.si.com/2014/06/26/new-concussion-settlement-kevin-turner..........................................................................................................25

Delsohn, *OTL: Belcher's Brain Had CTE Signs*, ESPN (Sept. 30, 2014), http://espn.go.com/espn/otl/story/_/id/11612386/jovan-belcher-brain-showed-signs-cte-doctor-says-report...............................................................................15

Erichson, *The NFL Concussion Settlement: Class Action Exploitation*, Mass Tort Litigation Blog (Nov. 18, 2014), http://lawprofessors.typepad.com/mass_tort_litigation/2014/11/the-nfl-concussion-settlement-and-class-action-exploitation.html.......................26

Fainaru & Fainaru-Wada, *Lawyers Fight Over Settlement Details*, ESPN.com (Jan. 24, 2014), http://espn.go.com/espn/otl/story/_/id/10346091/lead-negotiator-facing-strong-opposition-concussion-settlement...................................27

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011).................13, 14

Hruby, *The NFL Concussion Settlement Is Pure Evil*, Vice Sports (Oct. 28, 2014), https://sports.vice.com/article/the-nfl-concussion-settlement-is-pure-evil...........................26

Hruby, *The NFL Dodges on Brain Injuries*, The Atlantic (Sept. 4, 2014), http://www.theatlantic.com/entertainment/archive/2014/09/the-nfls-concussion-settlement-not-acceptable/379557 ........................................26

iv

Iverson, *Advances and Controversies in Neuropsychological Assessment: 7-Year Funding Disclosure*, http://www.sgtv.org/download/271113_iverson_ advances_controversies_in_np_assessment.pdf ..................................................11

Kaplen & De Caro, *Op-Ed: Concussion Settlement Is Deeply Flawed*, National Law Journal (July 21, 2014), http://www.nationallawjournal.com/id=1202663714809/OpEd-Concussion-Settlement-Is-Deeply-Flawed ...................................................................26

Keating, *NFL's Concussions Expert Also Sells Equipment to League*, ESPN The Magazine (Aug. 10, 2007), http://sports.espn.go.com/nfl/news/story?id=2967678 ...........................................10

Leavy, *The Woman Who Would Save Football*, Grantland (Aug. 17, 2012), http://grantland.com/features/neuropathologist-dr-ann-mckee-accused-killing-football-be-sport-only-hope/. ...............................................................9

*Manual for Complex Litigation* § 21.61 (4th ed.)..........................................................3

McDonald, *Study Finds a Strong Correlation Between Repeated Head Trauma and Domestic Abuse*, The Washington Post (Oct. 22, 2014)...................................15

McKee, *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43 (2013) .......................................................................9, 12, 15, 20

1 *McLaughlin on Class Actions* § 4:30 (11th ed.) ......................................................17

Naj, *et al.*, *Common Variants at MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 Are Associated with Late-Onset Alzheimer's Disease*, 43 Nature Genetics 436 (2011).............................................................................................8

Naj, *et al.*, *Effects of Multiple Genetic Loci on Age at Onset in Late-Onset Alzheimer Disease: A Genome-Wide Association Study*, 71 J.A.M.A. Neurology 1394 (2014)............................................................................8

Nelson, *et al.*, *Correlation of Alzheimer Disease Neuropathologic Changes with Cognitive Status: A Review of the Literature*, 71 J. Neuropathology & Experimental Neurology 362 (2012) ..............................................................8

NFL Concussion Class Settlement (May 1, 2014), https://www.youtube.com/ watch?v=9EWNBNgMoEk ..................................................................25

Pearson & Feeley, *NFL Critics Say Concussion Accord Ignores Broken Lives*, Bloomberg (Nov. 19, 2014), http://www.bloomberg.com/news/2014-11-19/nfl-settlement-objectors-seek-to-sway-judge-from-approval.html...................26

Reed, *Time's Running Out To Stop Bad NFL Concussion Settlement*, League of
Fans (Nov. 14, 2014), http://leagueoffans.org/2014/11/14/times-running-out-
to-stop-bad-nfl-concussion-settlement...........................................................................26

*Restatement (Third) of Torts: Phys. & Emot. Harm* § 36 (2010) ...........................................13, 15

Sandomir, *Partly by Shunning Documentary, ESPN Lifts It*, N.Y. Times
(Oct. 9, 2013), http://www.nytimes.com/2013/10/10/sports/football/by-
shunning-concussion-documentary-espn-gives-it-a-lift.html .................................................26

Schwarz, *Expert Ties Ex-Player's Suicide to Brain Damage*, N.Y. Times
(Jan. 18, 2007), http://www.nytimes.com/2007/01/18/sports/football/18
waters.html?pagewanted=all...........................................................................................15

Smith, *Ex-Falcons Lineman Had Brain Disease Linked to Concussions*, CNN
Health (Apr. 1, 2011), http://www.cnn.com/2011/HEALTH/04/01/
brain.concussion.dronett/index.html?hpt=Sbin ...............................................................15

Smith, *Lives After Junior*, ESPN (May 2, 2013)
http://espn.go.com/nfl/story/_/id/9410051/a-year-later-one-junior-seau-close-
friends-comes-forward-recount-version-descent ...............................................................15

Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl
Star*, Men's Journal (May 2011), http://www.mensjournal.com/
magazine/dave-duerson-the-ferocious-life-and-tragic-death-of-a-super-bowl-
star-2012100 ...............................................................................................................15

Sun, *NY Giants' Steve Tisch Reveals His $10M Plan To Further Concussion
Research*, Hollywood Reporter (Sept. 11, 2014),
http://www.hollywoodreporter.com/news/ny-giants-steve-tisch-reveals-
731376..........................................................................................................................10

Van Deerlin, *et al.*, *Common Variants at 7p21 Are Associated With
Frontotemporal Lobar Degeneration with TDP-43 Inclusions*,
42 Nature Genetics 234 (2010).......................................................................................8

Wertheimer, *The Smoke Gets in Their Eyes: Product Category Liability and
Alternative Feasible Designs in the Third Restatement*, 61 Tenn. L. Rev. 1429
(1994)............................................................................................................................3

Weiner, *et al.*, *Military Risk Factors for Alzheimer's Disease*, 9 Alzheimer's &
Dementia 445 (2013). ..............................................................................................8, 16

## INTRODUCTION

The settling parties have fallen woefully short of meeting their burden of demonstrating that the Settlement is fair, adequate, and reasonable.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 232 (3d Cir. 2001).  Most fundamentally, the Settlement is neither fair nor adequate because it fails to compensate the vast majority of the class for CTE – "the most serious and harmful disease that results from NFL and concussions"[1] – while specifically releasing all claims for CTE.  The failure to credit seasons played in NFL Europe and the imposition of extraordinary offsets for non-NFL traumatic brain injuries and strokes also render the Settlement unfair. Independently, the Settlement should not be approved because conflicts within the class demonstrate a lack of adequate representation in violation of Federal Rule of Civil Procedure 23(a)(4); the process for receiving benefits is overly burdensome and inadequate; and the notice was deficient.  The end result is that absent class members are being deprived of their property rights – claims carefully researched and aggressively asserted by Class Counsel claiming to be "the best of the best" – without due process.

---

[1] Co-Lead Class Counsel Seeger Weiss used to have on its website a tutorial relating to MTBI and football:

> Frequent brain trauma or multiple football concussions . . . has [been] shown to cause serious mental health problems.  ***Thousands of football players, many of whom are thought to have suffered more than one hundred mild traumatic brain injuries, are dealing with horrible and debilitating symptoms***.

> Multiple medical studies have found direct correlation between football concussions and suffering from symptoms of chronic traumatic encephalopathy, also known as CTE.  ***CTE is believed to be the most serious and harmful disease that results from NFL and concussions.***  CTE is a progressive degenerative disease that causes damage to the brain tissue and the accumulation of Tau Proteins.

*Up-To-Date Information on NFL Concussions*, Seeger Weiss LLP, (Sept. 9, 2014), http://www.seegerweiss.com/football-concussions/#ixzz3CByVHxui (emphasis added) (Objection 2 n.1 & Ex. 1).  Seeger Weiss removed that language after oral argument in the Third Circuit on September 10, 2014, at which the inadequate representation and failure to compensate CTE, as well as this language on the website, was raised.

The NFL and Class Counsel have repeatedly offered the ability of class members to opt out as a justification for the Settlement itself.[2]  But the issue is not whether a settlement includes the ability to opt out.  The issue is whether absent class members were presented with a fair settlement, compliant with Rule 23 and due process.  As the Third Circuit has stated, "the right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class" and ensure that the settlement is fair.  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Litig.*, 55 F.3d 768, 809 (3d Cir. 1995).  Class members should not be presented with a false choice – one between an inadequate settlement and the burdens of litigating complex claims alone.  They are instead entitled to a fair settlement.

Both Class Counsel and the NFL sloughed off serious concerns raised at the fairness hearing, in some instances attempting to mock them.  Indeed, Class Counsel's rebuttal argument regrettably degenerated to attacking the messenger given that he could not attack Objectors' message.

To be absolutely clear, Objectors want to see a settlement.  However, the law requires that settlement to be fair, adequate, and reasonable.  As structured, this Settlement fails that test.

## ARGUMENT

### I.    Class Counsel and the NFL Have Not Refuted the Showing that the Settlement Is Unfair in Its Failure To Compensate the Vast Majority of Class Members for CTE While Extracting a Release for All CTE Claims

Final approval should be denied where "the settlement treats 'similarly situated class members differently'" or "the settlement releases 'claims of parties who received no compensation in the settlement.'"  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 604 (3d Cir.

---

[2] *See, e.g.*, Fairness Hearing Tr. 56-57 (NFL counsel stating that class members were "free to opt out of the settlement"); NFL Br. 73 (Dkt. No. 6422) ("the Settlement . . . provides a choice—the right to opt out"); Klonoff Decl. ¶ 121 (Dkt. No. 6423-9) ("Finally, as I have noted throughout this declaration, class members who found the settlement inadequate had a right to opt out.").

2010) (quoting *Manual for Complex Litigation* § 21.61 (4th ed.)).  This Settlement does both by providing up to $4 million for death with CTE before July 7, 2014, but nothing for death with CTE after that date, and nothing to treat the very serious symptoms – including suicidality – of CTE in the living.

By including an award of up to $4 million for death with CTE before July 7, 2014, Class Counsel and the NFL have acknowledged that CTE is a real disease, linked to playing in the NFL.  Class Counsel, and the cadre of experienced plaintiffs' lawyers they lead, argued vigorously for this when – after this litigation had been pending for more than two years with hundreds of individual suits filed – they alleged that CTE is an injury suffered by the class that is caused by playing in the NFL.  *See Turner v. Nat'l Football League*, Civ. A. No. 2:14-cv-29-AB, Dkt. No. 1 ¶¶ 2, 252, 260, 312, 346, 364 (E.D. Pa. Jan. 6, 2014) ("Class Action Complaint"); *see also id.* ¶ 235 ("[T]he evidence that CTE is caused by repeated sublethal brain trauma is overwhelming.").[3]  The backpedaling they have done since being challenged on the Settlement's gross deficiency cannot avoid the judicially admitted stance they have previously taken.  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 211 n.20 (3d Cir. 2006) ("Judicial admissions are concessions in pleadings or briefs that bind the party who makes them.").

Nor can Class Counsel and the NFL avoid the science.  Their use of bought-and-paid-for experts in an attempt to cobble together an alternative medical and scientific reality is reminiscent of the tobacco companies claiming that lung cancer was not linked to smoking cigarettes.[4]  It ignores the truth.

---

[3] Co-Lead Class Counsel stated at the fairness hearing that they "have tried numerous bellwether cases," negotiated settlements for "many billions of dollars," and have consulted with numerous experts in this case.  Fairness Hearing Tr. 25, 33.

[4] *See, e.g.*, Wertheimer, *The Smoke Gets in Their Eyes: Product Category Liability and Alternative Feasible Designs in the Third Restatement*, 61 Tenn. L. Rev. 1429, 1452-53 (1994)

The entire class is entitled to some form of fair compensation for CTE – or CTE should be dropped from the release.

**A.     Class Counsel and the NFL Have Not – and Cannot – Overcome the Basic Medical Science Regarding CTE**

**1.     Dr. Stern and Dr. Gandy Have Credibly Established the Need To Compensate CTE**

Objectors submitted declarations from two of the world's leading experts on CTE – Dr. Robert Stern, Professor of Neurology, Neurosurgery, and Anatomy & Neurobiology at Boston University School of Medicine, and Dr. Samuel Gandy, Professor of Alzheimer's Disease Research and Professor of Neurology and Psychiatry at Mt. Sinai School of Medicine in New York City.  *See* Stern Decl. ¶ 1 (Dkt. No. 6201-16); Gandy Decl. ¶ 1 (Dkt. No. 6232-1).  Drs. Stern and Gandy submitted their declarations without compensation because they so strongly believe that the Settlement is unfair.  Each of them, in his initial declaration, clearly explained why CTE is central to this case and why refusing to compensate the vast majority of the class for CTE would be unfair.

Dr. Stern has "published (as first or second author) the largest case series of the clinical presentation of neuropathologically-confirmed CTE."  Stern Decl. ¶ 24.  He is a Fellow of the American Neuropsychiatric Association and the National Academy of Neuropsychology.  *Id.* ¶ 5. He sits on the editorial boards of several leading medical and scientific journals and on the grant review committees of several funding agencies, including the National Institutes of Health.  *Id.*

As Dr. Stern explained, the "primary clinical features of CTE include impaired cognition, mood, and behavior."  Stern Decl. ¶ 31.  These "behavioral and mood disorders associated with head impacts in former professional football players are just as important, just as serious, and

("[T]here is evidence that the cigarette industry as a whole has worked long and hard to conceal the true extent of the dangers of smoking.").

4

just as amenable to detection and diagnosis, as cognitive disorders." *Id.* ¶ 32; *see also id.* ¶ 33 ("Individuals with impairments in mood and behavior, but without significant cognitive impairment can still experience devastating changes in their lives."). Mood and behavioral changes affect not only the individual with CTE but also the individual's "family, friends, and other loved ones." *Id.* ¶ 34. CTE can also lead to cognitive disorders. *Id.* ¶ 41. Although Dr. Stern acknowledged that there is not currently a test to diagnose CTE in the living with 100% accuracy, he has stated that "within the next five to ten years there will be highly accurate, clinically accepted, and FDA-approved methods to diagnose CTE during life." *Id.* ¶ 38.

Dr. Gandy has explained that, "[p]athologically, CTE involves build-up of phosphorylated tau protein in the brain." Gandy Decl. ¶ 4. CTE is "the only neurodegenerative disease that has been linked to a specific acquired cause – repeated head trauma." *Id.* Consistent with Dr. Stern, Dr. Gandy has stated that "[i]ndividuals with neuropathologically confirmed CTE have significant problems with mood, behavior, and/or movement and not just problems with cognition." *Id.* ¶ 5. In his declaration, Dr. Gandy also explained that, "[b]ecause CTE symptoms present much earlier than the symptoms of other neurodegenerative diseases, individuals with CTE face decades of disability, a challenge that others afflicted with neurodegenerative disease do not face." *Id.* ¶ 7. Although some form of dementia "is evident in most individuals with CTE who survive to age 65," *id.* ¶ 8, "[t]he high rates of suicides, accidents, and drug overdoses" in individuals with CTE "often lead to death before the individual reaches age 65," *id.* ¶ 9.

Class Counsel attacked Dr. Stern and Dr. Gandy at the fairness hearing by distorting their work. To avoid the misimpression Class Counsel attempted to create, and to clarify matters for the Court, Dr. Stern and Dr. Gandy have submitted supplemental declarations (again without receiving any compensation).

In his supplemental declaration, Dr. Stern explains that CTE is a unique degenerative disease described in leading neurology textbooks.  Stern Supp. Decl. ¶ 4.  He reaffirms that there will be a test to diagnose CTE in the living long before the Settlement term concludes.  *Id.* ¶ 13. He also states that CTE research will continue into the future as it continues to receive funding from various organizations.  *Id.* ¶¶ 11-13.

In his supplemental declaration, Dr. Gandy states that "neuropathological diagnosis of CTE is currently available and is widely accepted and recognized in the medical and scientific community as a valid diagnosis."  Gandy Supp. Decl. ¶ 8.  He also notes that "[i]t is only a matter of time" before there will be "a reliable clinical diagnosis of CTE in the living."  *Id.* ¶ 9. Dr. Gandy also explains that "[r]epetitive brain trauma is a necessary condition for developing CTE; in the absence of repetitive brain trauma, an individual will not develop CTE."  *Id.* ¶ 12. "[I]n nearly 200 cases of neuropathologically confirmed CTE," Dr. Gandy states, "***every case*** has occurred in an individual who experienced repetitive brain trauma."  *Id.*

### 2.    The Basic Medical Science Set Forth by Dr. Stern and Dr. Gandy Is Widely Accepted by the Medical Community

The fundamental points Dr. Stern and Dr. Gandy have made about CTE are in no way extreme or aggressive.   Nine of the most prominent individuals working in the field of neuroscience have corroborated them through declarations they have submitted in support of Objectors – ***all without compensation*** for their time and effort.

These experts are:

- Dr. Patrick Hof, Regenstreif Professor of Neuroscience and Vice-Chair in the Department of Neuroscience at the Icahn School of Medicine at Mount Sinai in New York

- Dr. Jing Zhang, Professor of Pathology at the University of Washington and Chief of Neuropathology Services

- Dr. Martha Shenton, Professor of Psychology and Radiology, Brigham and Women's Hospital and Harvard Medical School

- Dr. Charles Bernick, Associate Director, Cleveland Clinic Lou Ruvo Center for Brain Health

- Dr. Michael Weiner, Professor in Radiology and Biomedical Engineering, Medicine, Psychiatry, and Neurology at the University of California, San Francisco

- Dr. James Stone, Associate Professor of Radiology and Medical Imaging and of Neurological Surgery at the University of Virginia; Co-Director of the University of Virginia Brain Injury and Sports Concussion Institute

- Dr. Thomas Wisniewski, Professor of Neurology, Pathology, and Psychiatry at NYU's School of Medicine

- Dr. Steven DeKosky, Visiting Professor of Radiology and Neurology at the University of Pittsburgh School of Medicine; Immediate Past Dean and Emeritus Professor of Neurology at the University of Virginia School of Medicine

- Dr. Wayne Gordon, Jack Nash Professor and Vice Chair of the Department of Rehabilitation Medicine at the Icahn School of Medicine at Mount Sinai in New York

These world-class experts make the following points in his or her declarations:

1. CTE is a unique neurodegenerative disease that is known to exist outside of ALS, Alzheimer's disease, or Parkinson's disease.

2. Repetitive brain trauma is a necessary condition for developing CTE.

3. ALS, Alzheimer's disease, and Parkinson's disease are found in the general population of individuals who have not suffered repetitive brain trauma. Suicidality does not present as a symptom of these diseases.

4. Mood and behavioral impairments such as depression, suicidality, hopelessness, impulsivity, explosiveness, rage, and aggression, although present in the general population, appear more frequently in individuals suffering from CTE than in the general population.

5. The mood and behavioral impairments associated with CTE can present prior to the onset of CTE-related dementia and can be the cause of significant disability and distress for the patient.

6.       A reliable, valid, and clinically accepted diagnosis of CTE in the living, based, in part, on objective biomarkers, will likely be possible in the next decade, if not sooner, and long before the 65-year term of the proposed Settlement expires.

7.       Although the Settlement uses the terms "Neurocognitive Impairment Level 1.0," "Neurocognitive Impairment Level 1.5," and "Neurocognitive Impairment Level 2.0," those terms are not used as diagnostic or classification categories in the accepted medical and scientific community.

The declarations are being included as attachments to this supplemental brief.

### 3.     The Experts Hired by the NFL and Class Counsel Acknowledge the Experience and Knowledge of Dr. Stern and Dr. Gandy

Although Class Counsel and the NFL seek to discredit Drs. Stern and Gandy (as well as Dr. Ann McKee), their own experts disagree. The settling parties' experts have coauthored numerous academic papers with all three doctors.[5]  And they acknowledge the groundbreaking work that Drs. Stern, Gandy, and McKee are conducting in the field of CTE research.  Dr. Schneider and Dr. Yaffe both agree, for example, that "Dr. Stern's research, which is conducted with other doctors at Boston University, including Dr. Ann McKee, constitutes important research in the field of CTE at this time."  Schneider Decl. ¶ 30 (Dkt. No. 6422-35); Yaffe Decl.

---

[5] *See* Carman, *et al.*, *"Mind the Gaps": Advancing Research in Short- and Long-Term Neuropsychological Outcomes of Youth Sports-Related Concussions*, Submitted, Nature Review Neurology (2014) (co-authors include Christopher Giza and Dr. Gandy); Crary, *et al.*, *Primary Age-Related Tauopathy (PART): A Common Pathology Associated with Human Aging*, 128 Acta Neuropathologica 755 (2014) (co-authors include Julie Schneider and Dr. McKee); Naj, *et al.*, *Effects of Multiple Genetic Loci on Age at Onset in Late-Onset Alzheimer Disease: A Genome-Wide Association Study*, 71 J.A.M.A. Neurology 1394 (2014) (co-authors include Julie Schneider, Dr. Stern, and Dr. McKee); Nelson, *et al.*, *Correlation of Alzheimer Disease Neuropathologic Changes with Cognitive Status: A Review of the Literature*, 71 J. Neuropathology & Experimental Neurology 362 (2012) (co-authors include Julie Schneider and Dr. McKee); Naj, *et al.*, *Common Variants at MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 Are Associated with Late-Onset Alzheimer's Disease*, 43 Nature Genetics 436 (2011) (co-authors include Julie Schneider and Dr. McKee); Van Deerlin, *et al.*, *Common Variants at 7p21 Are Associated With Frontotemporal Lobar Degeneration with TDP-43 Inclusions*, 42 Nature Genetics 234 (2010) (co-authors include Julie Schneider and Dr. McKee); Weiner, *et al.*, *Military Risk Factors for Alzheimer's Disease*, 9 Alzheimer's & Dementia 445 (2013) (co-authors include Kristine Yaffe and Dr. McKee).

¶ 69 (Dkt. No. 6422-36) (same quote).  Dr. Yaffe further explains that "[s]tudies such as [Ann McKee, Robert Stern, *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43 (2013) ("McKee *et al.* 2013")] should be lauded and praised for pioneering the science of CTE."  Yaffe Decl. ¶ 71.  Citing the McKee study that Objectors rely on, moreover, Dr. Fischer addresses the four stages of CTE without ever suggesting that those stages are not legitimate ways of tracking the progression of CTE.  Fischer Decl. ¶ 12 (Dkt. No. 6423-17); *see also* Hamilton Decl. ¶ 26 (Dkt. No. 6423-25); Nitz Supp. Decl. Ex. 1.  And in an article in the New York Times, "[Dr.] Hovda, whose research into the neurobiology of concussions demonstrated the vulnerability of the brain to second insults, says McKee's science is rigorous, significant, and does not overinterpret the available data."[6]  Rather than criticize the research conducted by Drs. Stern, Gandy, and McKee, the settling parties' experts embrace and rely upon it.

### 4.    The Experts Hired by the NFL and Class Counsel Are Biased

Dr. Stern and Dr. Gandy – and now the nine other preeminent experts that join in the fundamental points of their analysis – so strongly believe that the Settlement is a bad deal for players that they have provided their services to the Court and the class for free.  Though Class Counsel mocked this fact during the fairness hearing, *see* Fairness Hearing Tr. 196, the impartiality of expert testimony, and of the scientific studies that inform that testimony, is critical in a case such as this one.  As Class Counsel has expressly alleged, the NFL "propagated its own industry-funded and falsified research to support its position."  Class Action Complaint ¶ 84.

Neither the NFL nor Class Counsel, however, have disclosed the amount of compensation they paid to their experts or their experts' employers.  That omission – in stark

---

[6] Leavy, *The Woman Who Would Save Football*, Grantland (Aug. 17, 2012), http://grantland.com/features/neuropathologist-dr-ann-mckee-accused-killing-football-be-sport-only-hope/ (attached as Nitz Supp. Decl. Ex. 2).

contrast to Objectors' unqualified, unambiguous statement that none of their experts received any compensation whatsoever for their declarations – provides an appropriate baseline for this Court to view the credibility of the various expert declarations.  *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751, 756 (S.D.N.Y. 2003) (citing cases holding that experts may be cross-examined on their compensation "in an effort to impeach for bias").

Even apart from compensation for their declarations, the settling parties' experts have conflicts of interest that, at a minimum, call into question the value of their declarations.  For example, Class Counsel and the NFL never disclosed that the UCLA lab that employs Class Counsel experts Giza and Hovda received a $10 million donation from Steve Tisch, the co-owner of the New York Giants.[7]  Nor have Class Counsel and the NFL disclosed that ImPACT, the organization its expert Richard Hamilton consults for, has received funding from the NFL.[8] ImPACT's website notes that "[t]he science behind ImPACT was developed in response to requests for neurocognitive testing from the NFL to help determine safe return to play."  *Id.* ImPACT is the "league's *de facto* standard testing system."[9]  The settling parties likewise failed to disclose that Dr. Grant Iverson, a Visiting Professor of Physical Medicine and Rehabilitation at Harvard Medical School, has received funding from ImPACT, although they repeatedly rely on Iverson in their submissions.  *See* NFL Br. 84 n.35; Millis Decl. ¶¶ 21, 22 (Dkt. No. 6422-34);

---

[7] Sun, *NY Giants' Steve Tisch Reveals His $10M Plan To Further Concussion Research*, Hollywood Reporter (Sept. 11, 2014), http://www.hollywoodreporter.com/news/ny-giants-steve-tisch-reveals-731376 (attached as Nitz Supp. Decl. Ex. 3).

[8] ImPACT, https://www.impacttest.com/about/?ImPACT-Founders-6 (attached as Nitz Supp. Decl. Ex. 4).

[9] Keating, *NFL's Concussions Expert Also Sells Equipment to League*, ESPN The Magazine (Aug. 10, 2007), http://sports.espn.go.com/nfl/news/story?id=2967678 (attached as Nitz Supp. Decl. Ex. 5).

Keilp Decl. ¶¶ 30, 33 (Dkt. No. 6423-20).[10]  These associations demonstrate, at the very least, that the experts put forth by Class Counsel and the NFL have strong ties to the NFL that call into question their impartiality.

At the fairness hearing, Objectors asked that Class Counsel and the NFL be required to disclose the compensation the settling parties provided their experts.  The class and this Court have a right to know.  We reiterate that request.

> **5.  The Tortured "Analysis" of the Experts Hired by the NFL and Class Counsel Fails To Refute the Accepted Medical Science Concerning CTE**

Denying causal links is not new to large, vested corporate interests facing potential liability for causing broad-based injury.   Tobacco companies disputed any causal link between smoking and lung cancer well into the 1980s and denied the addictiveness of nicotine into the 1990s.  *See, e.g.*, *Falise v. Am. Tobacco Co.*, 94 F. Supp. 2d 316, 330-32 (E.D.N.Y. 2000).  Here too, the NFL – now supported by Class Counsel with their own financial incentive – argue that the Settlement's failure to compensate CTE is the result of limited science linking football to CTE.[11]  Those arguments lack merit.

> **a.    *Existing CTE Research Demonstrates Causation***

The experts retained by the NFL and Class Counsel urge that the current research into CTE is flawed because it does not use control groups.[12]  Fischer Decl. ¶ 11; Giza Decl. ¶ 16

---

[10] Iverson, *Advances and Controversies in Neuropsychological Assessment: 7-Year Funding Disclosure*,     http://www.sgtv.org/download/271113_iverson_advances_controversies_in_np_ assessment.pdf (attached as Nitz Supp. Decl. Ex. 6).

[11] *See, e.g.*, Class Counsel Br. 18; NFL Br. 47, 86; Klonoff Decl. ¶ 18; Yaffe Decl. ¶ 17 ("the causes of CTE are unknown"); Giza Decl. ¶ 19 ("any assumptions about a causal association between CTE and mild concussions or subconcussive brain injuries are premature").

[12] Of course, this is notwithstanding that Co-Lead Class Counsel Seeger Weiss has been proclaiming throughout this litigation that "[m]ultiple medical studies have found direct correlation between football concussions and suffering from symptoms of chronic traumatic

(Dkt. No. 6423-18); Hovda Decl. ¶ 22 (Dkt. No. 6423-19); Schneider Decl. ¶ 26; Yaffe Decl. ¶ 66.  Dr. Schneider, the NFL's expert, states that the "handful of studies that have been conducted relating to CTE are case reports or case series."  Schneider Dec. ¶ 26.  Dr. Yaffe, also the NFL's expert, states that "the only available studies [on CTE] are case reports."  Yaffe Decl. ¶ 66.  Both experts define "case report" and "case series" studies as those that do not have control groups.  *See* Schneider Decl. ¶ 26 (case series studies "lack . . . a proper control group"); Yaffe Decl. ¶ 64 (case report and case series studies are those that "look retrospectively at exposure and outcomes and do not have control groups").  In the 2013 McKee study cited by Objectors, however, "[e]ighteen age- and gender-matched individuals without a history of repetitive mild traumatic brain injury ***served as control subjects***."  McKee *et al.* 2013, *supra*, at 43 (emphasis added).[13]  The leading study ***does*** use a control group.

The experts retained by the NFL and Class Counsel also ignore the realities of mass-tort litigation in criticizing the lack of prospective, "double-blind randomized control trials" in the

---

encephalopathy, also known as CTE" and that "CTE is believed to be the most serious and harmful disease that results from NFL and concussions."  *See* p. 1 n.1, *supra*.  Co-Lead Class Counsel Anapol Schwartz has likewise stated that "[s]ymptoms of CTE include dementia, ***aggression, depression,*** memory loss, ***confusion, impaired judgment and impulse control problems***."  *Chronic Traumatic Encephalopathy*, NFL Concussion Lawsuits: An Anapol Schwartz Information Website, http://nfl-concussions-lawsuit.com/nfl-concussion-lawsuit-news/chronic-traumatic-encephalopathy/ (accessed Dec. 1, 2014) (attached as Nitz Supp. Decl. Ex. 7) (emphasis added).  And Class Counsel The Locks Law Firm has pronounced that, "[f]or many years, all credible scientific evidence leads to the conclusion that individuals who suffer repeated and cumulative trauma to the head are at significantly increased risk for permanent brain injuries."  The Locks Law Firm, *NFL Head Trauma Litigation*, http://www.lockslaw.com/html/nfl.html (accessed Nov. 30, 2014) (attached as Nitz Supp. Decl. Ex. 8).

[13] Just a few paragraphs after stating that all studies on CTE are "case reports or case series" studies without a control group, Dr. Schneider notes that the 2013 McKee study had "[e]ighteen gender-matched individuals without a history of repetitive mild TBI [who] served as the control group."  Schneider Decl. ¶ 31.  Dr. Schneider criticizes the control group used in the CTE studies for not including additional permutations such as "non-athletes who experienced head trauma" and "athletes without TBI" but offers no scientific basis for why the McKee study's comparison against age- and gender-matched individuals without a history of head trauma was invalid.  *Id.* ¶ 35.

area of CTE.  Yaffe Decl. ¶ 66.  As the Federal Judicial Center's authoritative guide explains, "ethical and practical constraints limit the use of" double-blind, randomized trials in studying exposures thought to be harmful to human beings.  Federal Judicial Center, *Reference Manual on Scientific Evidence* 555 (3d ed. 2011) ("FJC Man.").  It would be unethical, to say the least, to choose a sample of people and subject them at random to concussions and sub-concussive impacts to determine the effect of such impacts on their brains.  Epidemiological studies, including retrospective ones like the studies addressing CTE, are the "primary generally accepted methodology for demonstrating a causal relation" in mass-tort cases.  FJC Man. 551 n.2.

The experts retained by the NFL and Class Counsel also ignore the fact that causation in tort requires only "but for" and proximate causation.  *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366-67 (3d Cir. 1990).  The science shows that brain trauma is a but-for cause of CTE.  CTE only presents in people with a history of repeated brain trauma – unlike ALS, Alzheimer's disease, or Parkinson's disease, which present in the general population of individuals who have not suffered repetitive brain trauma.  *See* pp. 6-8, *supra*.  Moreover, the NFL's conduct was plainly a proximate cause of class members' harm.  "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'"  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011).  Unless the NFL's conduct was a "trivial contribution" to the class members' "cause of harm," the NFL's conduct is a proximate cause of the class members' injuries.  *Restatement (Third) of Torts: Phys. & Emot. Harm* § 36 (2010).

This Court – as well as the class for whom Class Counsel acts as a fiduciary – should take the highly experienced and esteemed group of plaintiffs' lawyers serving as Class Counsel at their word when they alleged that "the NFL publicly inserted itself into the business of head

injury research" and "propagated its own industry-funded and falsified research to support its position, despite its historic role as the guardian of player safety, and despite the fact that independent medical scientists had already come to the opposite conclusion."  Class Action Complaint ¶ 84; *see also id.* ¶ 284.  Even without the benefit of discovery, it is obvious that the NFL's deception regarding the effects of head injuries resulting from playing in the NFL contributed to the harm that thousands of players have suffered.

> **b.**   *CTE Presents with Severe and Debilitating Mood and Behavioral Symptoms*

Class Counsel and the NFL minimize the mood and behavioral issues that accompany CTE.  Class Counsel Br. 55; NFL Br. 6.  Moreover, their experts dismiss Objectors' call to compensate these symptoms as "premature" because they assert that there is no scientific consensus on the clinical profile of CTE, or whether mood and behavioral symptoms are part of that clinical profile.  Schneider Decl. ¶ 29; Yaffe Decl. ¶¶ 67, 75; Fischer Decl. ¶ 11; Hamilton Decl. ¶ 29.  Most of these experts argue that mood and behavioral issues are widespread in the general population, and therefore it is difficult to form conclusions about whether they are caused by CTE.  Dr. Schneider's analysis is typical:  "Even assuming that these studies were later proven true (*i.e.* that the diagnostic and clinical profile of CTE includes mood and behavioral symptoms), there is the added concern that many of the reported neurobehavioral symptoms are quite common in the general population."  Schneider Decl. ¶ 39.

Such "CTE denier" arguments ignore reality.  The relevant question is not whether symptoms of CTE are also present in the general population – and, notably, all of the Qualifying Diseases are also present in the general population – but whether they are more prevalent among those diagnosed with CTE than in the general population.  *See* FJC Man. 602.  After all, lung cancer presents in the general population absent a history of smoking, and emphysema presents

in the general population absent a history of coal dust exposure.  That did not preclude tobacco or black lung litigation from going forward on causation issues.[14]  As noted above, there is widespread agreement that individuals with CTE suffer from debilitating mood and behavioral symptoms at a far higher rate than the general population – a fact that Co-Lead Class Counsel has already acknowledged.  *See* p. 1 n.1 & pp. 7-8, *supra*.  Significantly, suicidality is a recognized symptom of CTE at its earliest stages.  *See* McKee *et al.* 2013, *supra*, at 56 tbl. 4.  Sadly, those symptoms have been expressed in the most extreme sense in the deaths of at least seven former players who have taken their lives.[15]

---

[14] Other experts likewise noted that symptoms like depression have many risk factors.  Dr. Yaffe's analysis is typical:  "Put simply, because mood and behavioral symptoms, such as depression, have many risk factors, these symptoms could be completely unrelated to CTE." Yaffe Decl. ¶ 75.  But legal causation does not require establishing sole causation, only "substantial factor" causation.  *See Restatement (Third) of Torts: Phys. & Emot. Harm* § 36 (2010).

[15] *See* Delsohn, *OTL: Belcher's Brain Had CTE Signs*, ESPN (Sept. 30, 2014), http://espn.go .com/espn/otl/story/_/id/11612386/jovan-belcher-brain-showed-signs-cte-doctor-says-report  (attached as Nitz Supp. Decl. Ex. 9); Smith, *Ex-Falcons Lineman Had Brain Disease Linked to Concussions*, CNN Health (Apr. 1, 2011), http://www.cnn.com/2011/HEALTH/04/01/ brain.concussion.dronett/index.html?hpt=Sbin (attached as Nitz Supp. Decl. Ex. 10); McDonald, *Study Finds a Strong Correlation Between Repeated Head Trauma and Domestic Abuse*, The Washington Post (Oct. 22, 2014), http://www.washingtonpost.com/news/morning-mix/wp/2014/ 10/22/study-finds-a-strong-correlation-between-repeated-head-trauma-and-domestic-abuse/  (attached as Nitz Supp. Decl. Ex. 11); Smith, *Lives After Junior*, ESPN (May 2, 2013) http://espn.go.com/nfl/story/_/id/9410051/a-year-later-one-junior-seau-close-friends-comes-for ward-recount-version-descent (attached as Nitz Supp. Decl. Ex. 12); Associated Press, *Ex-Steeler Long Drank Antifreeze To Commit Suicide*, ESPN (Jan. 26, 2006), http://sports.espn.go. com/nfl/news/story?id=2307003 (attached as Nitz Supp. Decl. Ex. 13); Solotaroff, *Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star*, Men's Journal (May 2011), http://www.mensjournal.com/magazine/dave-duerson-the-ferocious-life-and-tragic-death-of-a-super-bowl-star-20121002; Schwarz, *Expert Ties Ex-Player's Suicide to Brain Damage*, N.Y. Times (Jan. 18, 2007), http://www.nytimes.com/2007/01/18/sports/football/18waters.html ?pagewanted=all.

6.      **The Opinions Expressed in the Declarations of the Experts Hired by the NFL and Class Counsel – Which They Offer To Support the Settlement – Are Inconsistent Internally and With the Opinions They Have Expressed Before They Were Retained by the NFL and Class Counsel**

The experts retained by the NFL and Class Counsel make statements in their declarations that are either internally inconsistent or inconsistent with their other work.  For example, Dr. Yaffe, the NFL's expert, states that:  "It is my belief – and no scientific study says or demonstrates otherwise – that based on the current state of the science, the association between mild repetitive TBI and the qualifying diagnoses is not clear."  Yaffe Decl. ¶ 39.  She also asserts that "it is not yet possible to state with any certainty whether CTE causes any mood or behavioral symptoms."  *Id.* ¶ 75.  However, a 2011 study she co-authored states:

> The association of TBI with dementia has also been documented in ***many studies*** involving nonveteran populations . . . Dementia pugilistica was first recognized in professional boxers in 1928.  This condition, now referred to as ***chronic traumatic encephalopathy (CTE)***, has now been identified not only in boxers, but also in ***American football*** . . . .  CTE is thought to result from repeated multiple head injuries or sub-clinical impact to the head.  CTE manifests initially with ***emotional and behavioral symptoms*** . . . .[16]

Thus, in an earlier paper Dr. Yaffe endorsed essentially all of the widely accepted medical science that underlies Objectors' arguments.

For his part, Dr. Hovda expresses skepticism about the causal link between repeated concussions and CTE pathology.  But a 2012 New York Times article states:  "Dr. Hovda said that the growing body of research linking C.T.E. to multiple head injuries was 'quite remarkable.' "[17]  Similarly, though he now questions the link between CTE and mood and

---

[16] Weiner, *et al.*, *Military Risk Factors for Alzheimer's Disease*, 9 Alzheimer's & Dementia 445, 446 (2013) (emphasis added) (attached as Nitz Supp. Decl. Ex. 14).

[17] Dao, *Brain Ailments in Veterans Likened to Those in Athletes*, N.Y. Times (May 16, 2012), http://www.nytimes.com/2012/05/17/us/brain-disease-is-found-in-veterans-exposed-to-bombs.html?pagewanted=all&_r=0 (attached as Nitz Supp. Decl. Ex. 15).

behavioral issues, Hovda Decl. ¶ 21, in an article earlier **this year** he is quoted as saying: "Kind of like when you're intoxicated, where you take away inhibition and then all of a sudden if you have an underlying violent or aggressive personality it's more likely to surface . . . I've always said that concussions, or mild traumatic brain injuries, don't just happen to one person, they happen to the entire family."[18]  These statements are inconsistent with Dr. Hovda's declaration challenging Objectors.

### 7.  The Science Surrounding CTE Should Not Be Frozen by the Settlement

Even if the science surrounding CTE is continuing to evolve – and, as we show above, there is widespread agreement regarding fundamental points Dr. Stern and Dr. Gandy made in their initial declarations – that would provide a reason to **reject** the Settlement, not approve it.  In case after case, the Supreme Court has made clear that settlement provisions must keep pace with changing science and medicine.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 610-11 (1997) (settlement should not be approved if it "freez[es] in place the science" known at the time of settlement) (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630-31 (3d Cir. 1996)); *see also* 1 *McLaughlin on Class Actions* § 4:30 (11th ed.) (describing this point).  If a class is "divided between holders of present and future claims," then the class must be subdivided "with separate representation to eliminate conflicting interests of counsel."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999).  Otherwise, there is an irreconcilable conflict between the "'currently injured'" who seek "'generous immediate payments'" and those whose injuries have not yet been diagnosed.  *Id.* (quoting *Amchem*, 521 U.S. at 626).

---

[18] Carroll, *Could Brain Injuries Be Behind the NFL Rap Sheet?*, NBC News (Sept. 17, 2014), http://www.nbcnews.com/storyline/nfl-controversy/could-brain-injuries-be-behind-nfl-rap-sheet-n205666 (attached as Nitz Supp. Decl. Ex. 16).

The NFL and Class Counsel ask this Court to ignore the Supreme Court's decisions in *Amchem* and *Ortiz*. The class representatives do not allege that they have or are at risk of developing CTE. Class Action Complaint ¶¶ 4, 7; *see Georgine*, 83 F.3d at 630-31 (describing the inherent conflict between present claimants, who must accept the science as it is today, and future claimants, who could count on more advanced science if they brought claims in the future). The Settlement bargains away the rights of class members with current and future cases of CTE. As knowledge about CTE grows, diagnoses will be more readily available. The NFL and Class Counsel nonetheless seek to freeze the science in place (when they do not ignore it altogether) in violation of *Amchem* and *Ortiz*.[19]

### B.   Compensating "Dementia" Does Not Equal Compensating CTE

Class Counsel and the NFL are unequivocal that the Settlement does not compensate CTE other than for those who died before July 7, 2014. *See* Seeger Decl. ¶ 9 (Dkt. No. 6423-3); NFL Br. 77-78. Yet, they claim CTE is "sort of compensated" through the Settlement's compensation of "Level 1.5 Neurocognitive Impairment" or "Level 2 Neurocognitive Impairment." *See, e.g.*, NFL Br. 78. That convoluted argument fails.

First, there is no such thing as "Level 1.5 Neurocognitive Impairment" or "Level 2 Neurocognitive Impairment" except in the fantasy world of this Settlement.[20] The settling parties, for example, cite no peer-reviewed article establishing these "Levels" as commonly accepted methods to diagnose stages of dementia. That is because these "Levels" were created

---

[19] Indeed, the Settlement anticipates advances in science, only to disallow recovery. *See* Settlement § 6.6(c) (disallowing any compensation for newly diagnosable diseases).

[20] It is troubling that Class Counsel would agree to a bogus "diagnosis" like this. One of the allegations of the complaint is that the NFL sponsored junk science to deceive players into believing that concussions do not present the serious health risks that they, in fact, present. Class Action Complaint ¶ 84. Class members are entitled to have their fiduciaries, Class Counsel, insist that the Settlement use recognized and accepted medical standards in establishing qualifying diagnoses and care.

for this Settlement.  The renowned experts who have submitted declarations supporting the Objectors and address the "Levels" thus confirm that, although the Settlement uses the terms "Neurocognitive Impairment Level 1.0," "Neurocognitive Impairment Level 1.5," and "Neurocognitive Impairment Level 2.0," those terms are not used as diagnostic or classification categories in the accepted medical and scientific community.  *See* p. 8, *supra*.

Second, even if one were to accept the bogus dementia "diagnosis" used in the Settlement, a class member with CTE would never be able to receive the same maximum compensation through a dementia diagnosis as could be received through a diagnosis of death with CTE before July 7, 2014.  And many suffering some of the most serious symptoms of CTE – such as suicidality – would ***never be compensated*** through a dementia diagnosis:



As this chart shows, an individual who dies from CTE before July 7, 2014 can receive a maximum award of $4 million for Stage 1, Stage 2, Stage 3, or Stage 4 CTE.  An individual suffering from Stage 1 or Stage 2 CTE who dies after July 7, 2014 receives nothing.  And an individual suffering from Stage 3 or Stage 4 CTE who dies after July 7, 2014 must navigate through the complicated claims process and establish that he suffers from "Level 1.5

Neurocognitive Impairment" or "Level 2 Neurocognitive Impairment" before recovering up to $1.5 million or $3 million, respectively.[21]

## II.     The Failure To Credit NFL Europe Play and the Application of the 75% Non-NFL Traumatic Brain Injury Offsets Render the Settlement Unfair

The failure to credit play in NFL Europe, while requiring a release from those who played in NFL Europe, separately renders the Settlement unfair.  As demonstrated by Objectors at the fairness hearing, the contention that excluding credit was justified because NFL Europe had a shorter season and was really a "developmental league" holds no water.[22]  Fairness Hearing Tr. 90-92.  The NFL Europe players have suffered at the hands of the NFL in the same way as those who played in the United States.  In fact, many players played in both leagues.  *See*

---

[21] Individuals with CTE are similarly not assured a recovery just because, in some instances, they might also have Alzheimer's Disease, Parkinson's Disease, or ALS.  There is a significant lack of comorbidity with those qualifying diagnoses.  The NFL's experts admit as much.  Citing Dr. McKee's 2013 study, Drs. Yaffe and Schneider assert that at least 89% of the football players in McKee's study would qualify for a payment under one of the Settlement's non-CTE Qualifying Diagnoses.  Yaffe Decl. ¶ 83; Schneider Decl. ¶¶ 51-52.  Even assuming the accuracy of Dr. Yaffe's and Dr. Schneider's analyses, more than 1 out of every 10 class members suffering from CTE would not receive payment under the Settlement.  The settling parties offer no justification for that omission.  Nor do they explain why an individual who has been suffering from CTE for years or even decades should be subject to the offsets built into the Settlement based on the individual's age at the time of Qualifying Diagnosis.  *See* Settlement Ex. B-3; Gandy Decl. ¶ 7.  In any event, Drs. Yaffe and Schneider misinterpret Dr. McKee's study.  Of the 68 cases of CTE in Dr. McKee's 2013 study, only 37% had a comorbid diagnosis.  McKee *et al.* 2013, *supra*, at 61.  And of those exhibiting a comorbid disease, 76% (19 of 25) had Stage 3 or Stage 4 CTE.  *Id.* at 49-51 tbl. 2.  Similarly, dementia was found ***exclusively*** in those with Stage 3 or Stage 4 CTE.  *Id.* at 56 tbl. 4.  Thus, compensating comorbidities leaves individuals suffering from Stage 1 and Stage 2 CTE – and the devastating behavioral and mood impairments so common in those stages, *see, e.g.*, Stern Decl. ¶¶ 32-35 – without compensation.  That result is all the more unjust given that Stage 1 and Stage 2 CTE in individuals who died before July 7, 2014 will receive a maximum $4 million payout.

[22] Class Counsel, in one of his many media appearances attempting to sell the Settlement, offered a different, albeit bizarre, justification.  He urged that "NFL Europe, um, is part of the deal, but, you know, nobody, I think, is going to argue that they're playing at the level that the NFL in the United States is playing at or that they're getting hit like they are there."  Audio file: Interview of Chris Seeger, CBS Sports Radio, The Mojo Show, at 9:09-9:45 (aired July 10, 2014).  Neither Class Counsel nor the NFL has yet had the temerity to offer this justification to the Court.

Heimburger Decl. ¶¶ 11-12 (Dkt. No. 6230-1) (describing time spent playing in both Leagues, as well as the head trauma and symptoms sustained in each); Morey Decl. ¶ 7 (Dkt. No. 6201-17). Tellingly, neither the NFL nor Class Counsel even attempted to support this discriminatory treatment of NFL Europe players – or explained how Class Counsel's own expert was wrong when he said in his sworn declaration that this unfair treatment of NFL Europe players should be fixed. *See* Klonoff Decl. ¶ 16 ("[T]he parties should consider modifications to the settlement agreement to address the NFL Europe issue."); *id.* ¶ 93 (similar).

Similarly, the application of 75% award reductions in the case of a single instance of non-NFL traumatic brain injury or stroke creates an indefensible unfairness.  While some reduction might be inappropriate, Class Counsel and the NFL have offered no evidence to support such a drastic reduction.  The draconian offset for a ***single instance*** of non-NFL traumatic brain injury or stroke simply makes no sense when Class Counsel themselves agree that some players "***suffered more than one hundred*** mild traumatic brain injuries" during their careers.  *See* p. 1 n.1, *supra* (emphasis added).

### III.   The Class Conflicts Caused by the Settlement's Treatment of CTE, NFL Europe Play, and Non-NFL Traumatic Brain Injuries and Strokes Demonstrate a Lack of Adequate Representation in Violation of Federal Rule of Civil Procedure 23(a)(4)

Both Class Counsel and the NFL refused to address at the fairness hearing the fact that neither class representative alleged that: he has or is at risk of having CTE; he played in the NFL Europe; or he is subject to the 75% offsets.  *See* Class Action Complaint ¶¶ 4, 7.  As structured, the Settlement creates conflicts within the class.

The Third Circuit addresses intraclass conflicts through the framework of Rule 23(a)(4)'s adequacy requirement.  *See Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183-84 (3d Cir. 2012).   The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  *Id.* at 183.  Apart from

the basic unfairness created by these conflicts, the conflicts demonstrate a lack of adequate representation that precludes class certification under Rule 23(a)(4). The rights of class members were bargained away. Thus, approval should be denied on this separate ground.

## IV.   Procedural Hurdles Will Prevent Many Class Members from Ever Recovering

The confusing and burdensome process the Settlement imposes on class members will limit the number of meritorious claims the NFL actually has to pay. A class member does not have an automatic right to receive benefits from the Settlement. A class member must instead opt in to the Settlement by registering with the Claims Administrator within six months or be forever barred from compensation. *See* Settlement § 4.2. The Baseline Assessment Program, moreover, is capped at $75 million. *See id.* § 23.3(d). If it runs out, a class member will be unable to participate. And even if it does not run out, Class Counsel and the NFL decided that the Baseline Assessment Program should terminate decades before the 65-year term of the Settlement ends. *See id.* § 5.5. The Baseline Assessment Program also does not address mood and behavioral symptoms.

The Settlement, moreover, requires a "MAF physician" approved by the NFL to provide a Qualifying Diagnosis. *See* Settlement § 6.5(a).[23] The testing protocol MAF Physicians administer is burdensome and impractical. *See* Objection 72-73. As several declarations make clear, the Settlement's diagnostic or classification categories of "Neurocognitive Impairment

---

[23] A "MAF Physician" is a "board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician" approved by the NFL who is the only type of doctor "authorized to make Qualifying Diagnoses." Settlement § 2.1(www). There is no assurance in the Settlement that a MAF Physician will be within 50, 100, or even 500 miles of a class member, even though a class member cannot recover unless a MAF Physician provides a Qualifying Diagnosis. That will punish class members living in areas where there are shortages of neurologists – a shortfall that affects most of the country. *See* Dall, *et al.*, *Supply and Demand Analysis of the Current and Future US Neurology Workforce*, 81 Neurology 470, 470-71 (2013) (noting that there is already an "11% shortfall" in neurologists, which is expected to grow to a "19% shortfall" by 2025) (attached as Nitz Supp. Decl. Ex. 17).

Level 1.0," "Neurocognitive Impairment Level 1.5," and "Neurocognitive Impairment Level 2.0" are unknown in the medical and scientific community.  *See* p. 8, *supra*.  The testing protocol has not been validated for the purposes outlined in the settlement in the general, athlete, or football populations.  Stern Supp. Decl. ¶ 15.

As Dr. Stern explains, the current testing protocol was designed by individuals who do not specialize in dementia or neurodegenerative disease.  Stern Supp. Decl. ¶ 17.  The protocol "is not appropriate for evaluating whether retired professional football players have neurodegenerative diseases such as CTE or Alzheimer's disease."  Stern Decl. ¶ 43.  Among other problems, the protocol imposes a burdensome, five-hour test that will result in many class members not finishing the test.  *Id.* ¶¶ 43-44.  If this protocol is approved, it will "unfairly deprive at least some otherwise eligible persons with measurable cognitive deficits of compensation."  *Id.* ¶ 46.

Even if a player receives a Qualifying Diagnosis, he still faces many hurdles before recovering under the Settlement.  He must submit a Claim Package within two years of receiving a diagnosis.   *See* Settlement § 8.3(a)(i).  And even though the NFL already has the information, a player who qualifies for an award will receive at least an 80% offset unless he can provide sufficient evidence that he played in the NFL.  *Id.* § 6.7(b)(i)(8); *see id.* § 8.2(a)(v).

Finally, the appellate process is biased against the class.  A class member must pay $1,000 for an appeal to this Court but the NFL does not pay anything.  *See* Settlement § 9.6(a)-(b).  If a Claims Administrator denies an award, a class member must present clear and convincing evidence of error, and must do so in five pages with no reply.  *Id.* § 9.7.  As this procedural morass demonstrates, the settling parties have designed a process that will impede rather than assist class members who merit an award under the Settlement.

**V.     Class Notice Has Caused Confusion Among the Class**

The class notice was false and misleading.  The notice states that all cases of CTE will receive compensation:  Paragraph 14 of the long-form notice, for example, defines "Qualifying Diagnoses" to broadly include "Death with CTE" and then notes that "A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund."  *See* Objection 41.  That is not true.  Nor have the settling parties ever sought to defend that statement.  Instead, the settling parties state that a different part of the notice clarifies that the Settlement provides recovery for "Death with CTE *prior to July 7, 2014*."  NFL Br. 156 (quoting Long-Form Notice at 6); *see also* Class Counsel Br. 40.  As Objectors previously explained, however, a notice that contains both false and technically true statements is defective as a matter of law.  Objection 45-48; *see also Eubank v. Pella Corp.*, 753 F.3d 718, 728 (7th Cir. 2014) (vacating approval of settlement, in part because notice was "incomplete and misleading" and did not "provide a truthful basis for deciding whether to opt out."); *Pearson v. NBTY, Inc.*, No. 12-1245, 2014 WL 6466128, at *5 (7th Cir. Nov. 19, 2014) (Posner, J.) (noting deficient notice).

The false and misleading notice, moreover, was not without effect.  Class member Judson Flint, for example, explained in his August 21, 2014 objection that:

> I'm writing to suggest that CTE be addressed in living players because there is technology being developed that will diagnose that condition if not now somewhere in the near future.  The settlement only addresses CTE when a player dies and I think the court should have a clause in the settlement that will allow players to be compensated while they are still alive to take advantage of the benefits. . . .  I love my family and would like for them to be compensated if that condition is found but as a player I would rather my family and I could enjoy the benefits together while I'm still alive.

Dkt. No. 6347.  Mr. Flint believes that, if he dies with CTE, his family will receive payment. Not so.  Class member Eric Williams held the same incorrect belief:  "Players diagnosed with CTE (living) today, have to kill themselves or die for their family to ever benefit."  Dkt. No.

6345.[24]   Other former players as well as the media have likewise displayed confusion over the scope of the Settlement's coverage for CTE.  Objection 52-53.

The hundreds of players who have opted out or objected to the Settlement demonstrate why the Settlement should not be approved.  *See GM Trucks*, 55 F.3d at 812-13 & n.32 (noting an opt-out rate of 0.091% and an objection rate of 0.11% but ruling that "[t]he class reaction factor plainly does not, contrary to the district court's conclusion, weigh in favor of approving the settlement").  Even apart from those protesting voices, the "informational barriers to class opposition" – here, a false, misleading, and confusing notice – further counsel against drawing any "inference[s]" about whether class members who did not opt out or object to the Settlement actually think it is a good deal.  *Id.* at 812.  The defective notice provides an independent reason to deny approval.

## VI.   The Public Interest and Public Opinion Disfavor Final Approval

The issues presented in this litigation have broad implications beyond the serious damage suffered by any one individual class member and those closest to him.  The central allegations are that the NFL lied to its players and the public – indeed, elaborately so through sponsoring junk science – to deceive them about the substantial health risk attached to playing football.  Class Action Complaint ¶ 84.  After conducting extraordinary scientific, legal, and factual research, Class Counsel alleged that the NFL defrauded players out of their health, thereby injuring not only themselves but also their wives, girlfriends, families, and others around them.

---

[24] At the fairness hearing, Class Counsel suggested that Mr. Williams's objection was irrelevant because he submitted it on July 3, 2014, before the Court preliminarily approved the Settlement. Fairness Hearing Tr. 198.  But Class Counsel ignored the fact that their propaganda campaign in support of the Settlement, which contained much of the same misleading information contained in the notice, predated the notice and Mr. Williams's objection.  *See* DeGory, *New Concussion Settlement a Win-Win*, SportsIllustrated.com (June 26, 2014), http://mmqb.si.com/2014/06/26/ new-concussion-settlement-kevin-turner; Objection 48-52; NFL Concussion Class Settlement (May 1, 2014), https://www.youtube.com/watch?v=9EWNBNgMoEk.

Given the tremendous popularity of the NFL, it is not surprising that the issues of its conduct in dealing with concussions and brain trauma have drawn scrutiny from the media.  The PBS documentary and book *League of Denial* did much to expose the NFL's bad behavior.  *See* Nitz Supp. Decl. Exs. 18 & 19.  *League of Denial* so struck a nerve with the NFL that it reportedly pressured ESPN to pull ESPN's name and logo from the documentary even though the book was written by two ESPN reporters.[25]  Others have been similarly critical of defendants and this Settlement – although it is hard to be heard above the din of the NFL's non-stop media machine.[26]

Not surprisingly, a number of highly credible organizations have filed amici curiae memoranda arguing against final approval.  These include:  Public Citizen, one of the nation's most prominent public advocacy organizations; the Brain Injury Association of America, the country's oldest and largest nationwide brain injury advocacy organization; and the Parents

---

[25] *See* Sandomir, *Partly by Shunning Documentary, ESPN Lifts It*, N.Y. Times (Oct. 9, 2013), http://www.nytimes.com/2013/10/10/sports/football/by-shunning-concussion-documentary-espn-gives-it-a-lift.html (attached as Nitz Supp. Decl. Ex. 20).

[26] *See, e.g.*, Erichson, *The NFL Concussion Settlement: Class Action Exploitation*, Mass Tort Litigation Blog (Nov. 18, 2014), http://lawprofessors.typepad.com/mass_tort_litigation/2014/11/the-nfl-concussion-settlement-and-class-action-exploitation.html (attached as Nitz Supp. Decl. Ex. 21); Kaplen & De Caro, *Op-Ed: Concussion Settlement Is Deeply Flawed*, National Law Journal (July 21, 2014), http://www.nationallawjournal.com/id=1202663714809/OpEd-Concussion-Settlement-Is-Deeply-Flawed (attached as Nitz Supp. Decl. Ex. 22); Daugherty, *Settlement II: Concussion Cases Become a Headache for NFL*, San Diego Reader (July 9, 2014), http://www.sandiegoreader.com/news/2014/jul/09/sporting-settlement-II (attached as Nitz Supp. Decl. Ex. 23); Pearson & Feeley, *NFL Critics Say Concussion Accord Ignores Broken Lives*, Bloomberg (Nov. 19, 2014), http://www.bloomberg.com/news/2014-11-19/nfl-settlement-objectors-seek-to-sway-judge-from-approval.html (attached as Nitz Supp. Decl. Ex. 24); Hruby, *The NFL Concussion Settlement Is Pure Evil*, Vice Sports (Oct. 28, 2014), https://sports.vice.com/article/the-nfl-concussion-settlement-is-pure-evil (attached as Nitz Supp. Decl. Ex. 25); Hruby, *The NFL Dodges on Brain Injuries*, The Atlantic (Sept. 4, 2014), http://www.theatlantic.com/entertainment/archive/2014/09/the-nfls-concussion-settlement-not-acceptable/379557 (attached as Nitz Supp. Decl. Ex. 26); Reed, *Time's Running Out To Stop Bad NFL Concussion Settlement*, League of Fans (Nov. 14, 2014), http://leagueoffans.org/2014/11/14/times-running-out-to-stop-bad-nfl-concussion-settlement (attached as Nitz Supp. Decl. Ex. 27).

Concussion Coalition, a group of parents of children who have had life-altering concussions.[27] Notably, not a single organization has filed in support of the Settlement.

Thus, it is fair to say that those who are interested and not a party to the litigation think this is a bad deal that should not receive final approval.

Through their actions, Class Counsel – with their $112.5 million clear sailing agreement at stake – have done nothing to calm the fears of those who see the Settlement as a sell-out.  For starters, no discovery was done in this case and Class Counsel have refused to acknowledge what, if any, informal exchange of information occurred concerning the merits of this case. Thus, in settling the matter, the NFL will be allowed to continue to conceal what have been described as shameful and dangerous secrets not only from the public but from the players it defrauded.

Once settlement negotiations began, Class Counsel took great care to keep the class in the dark with no visibility in the negotiating process.  Members of the class were vocal but there was little they could do.[28]

At every turn, Class Counsel refused to provide information about the Settlement and how it was reached.  Notwithstanding that the fundamental concerns of the Morey Objectors were first raised on May 5, 2014, upon the filing of their motion for leave to intervene, *see* Dkt. No. 6019, at 1-2, 13-21, at no time did Class Counsel seek to provide information and address

---

[27] Class Counsel have aggressively opposed any organization making its views known to this Court through an amicus memorandum.  *See* Brain Injury Association of America (Dkt. No. 5608); Response in Opposition to BIAA's Motion for Leave To File Amicus Brief by Plaintiff (Dkt. No. 5633); Public Citizen (Dkt. No. 6214); Response to Public Citizen's Motion for Leave To File Amicus Curiae Memorandum by Plaintiff (Dkt. No. 6330); Parents Concussion Coalition (Dkt. No. 6427); Response in Opposition to PCC's Motion to File Amicus Brief by Plaintiff (Dkt. No. 6432).

[28] *See* Fainaru & Fainaru-Wada, *Lawyers Fight Over Settlement Details*, ESPN.com (Jan. 24, 2014), http://espn.go.com/espn/otl/story/_/id/10346091/lead-negotiator-facing-strong-opposition-concussion-settlement.

the concerns expressed to the Court.  Further, they opposed the motion filed by counsel for Mr. Duerson seeking dissemination of data relied on to reach the Settlement, *see* Dkt. No. 6146; opposed the motion filed by counsel for Mr. Duerson seeking to depose Mr. Seeger, *see* Dkt. No. 6182; opposed the motion filed by the Morey Objectors seeking leave to file limited discovery requests, *see* Dkt. No. 6183; and opposed the motion filed by the Morey Objectors requesting an order that Class Counsel and the NFL produce the evidence upon which they intended to rely at the fairness hearing and the evidence upon which they relied when they agreed to the Settlement, *see* Dkt. No. 6333.

Instead, Class Counsel – the fiduciary and guardian of the class – waited until seven days before the fairness hearing to provide any information to attempt to justify what they had done. Along with the NFL, they then submitted a combined 250 pages of briefing along with over 1,250 pages of exhibits, including 11 expert affidavits.  The transparent intent of this eleventh-hour "disclosure" clearly was to prevent any meaningful scrutiny of what Class Counsel had done in striking their deal.  The class deserves better.  So does the public, given the broad interest in the issues.

If, as Class Counsel contends, this is truly a fair and adequate Settlement for the class, then they should welcome review and celebrate their fine work.  If, on the other hand, this is a settlement that fails to compensate the core injury of living class members, has multiple conflicts within the class, and employs a complex claims process that unquestionably will limit payments by the NFL – as well as provide Class Counsel with a pot of gold along the way – then it is understandable that they would fight so hard to avoid revealing what transpired.

The shortcomings of the Settlement – particularly the failure to properly compensate CTE – are breathtaking.  Approval of such an inadequate deal reached under these clandestine

conditions would fly in the face of fairness as well as public policy favoring openness in court proceedings.  "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Brandeis, *Other People's Money* 62 (National Home Library Foundation ed. 1933).

## VII.   The Settlement Does Not Guarantee That Funds Will Be Available To Pay Claims During the Full Term of the Settlement

The Settlement, though it extends for 65 years, provides no guarantee that money will exist in the Statutory Fund to pay players who have qualifying claims.  *See* Dkt. No. 6243, at 10-12 (Utecht Objection).  The Settlement provides that, no later than 10 years after the effective date of the Settlement, the NFL will deposit funds in a Statutory Trust "sufficient to satisfy the NFL Parties' remaining anticipated payment obligations" for years 11-65.  Settlement § 25.6(d). But that guarantee is illusory.  The NFL decides how much money to deposit in the fund and the NFL may withdraw funds from the Statutory Trust.  *Id.*  While the NFL's withdrawal of funds is subject to court approval, the Settlement provides that such approval "shall be granted" unless the NFL is in material default, or if it can be shown by "clear and convincing evidence, that the proposed withdrawal would materially impair the Settlement Agreement."  *Id.*

At the fairness hearing, the Settling Parties scoffed at the idea that the security provisions of the Settlement could even matter, because the NFL would always be ultimately liable for the claims.  Fairness Hearing Tr. 203-04.  It may seem unlikely that the NFL will not be able to make the payments 65 years from now, but public tastes change and corporate fortunes fade. One need only look to the decline in the popularity of boxing in the past 65 years as an example. History, moreover, is replete with instances of corporate titans in one generation that become has beens in the next.  The Pennsylvania Railroad, Lehman Brothers, and Bethlehem Steel all illustrate this point.  For this reason too, the Settlement should not be approved.

29

**VIII.   Potential Improvements to the Settlement**

Objectors have consistently maintained – and continue to maintain – that this case should be settled.  *See* Dkt. 6420 at 9-11; Fairness Hearing Tr. 69, 102, 105.  But any settlement must meet the requirements of Rule 23 and due process.  Objectors respectfully submit that the following list of CTE-related potential improvements could go a long way toward ensuring that the Settlement is fair, adequate, and reasonable:

- Lift the monetary cap on the Baseline Assessment Program to allow for earlier diagnosis and meaningful treatment of CTE, including its serious early symptoms

- Extend the Baseline Assessment Program to the full term of the Settlement

- Provide a benefit for Death with CTE diagnosed post-mortem that is graduated downward over time to account for the fact that players will be receiving the benefit of enhanced treatment through the Baseline Assessment Program

- Provide that the issue of diagnosis of CTE in the living be revisited by counsel and the Court – advised by an agreed-upon panel of medical experts – every three years for the next 12 years, with the possibility of the Settlement being modified to allow for some form of compensation for CTE while alive instead of after death

- Include compensation for CTE while living once reliable tests are developed; treat all symptoms of CTE – Stages 1-4

- *Or* eliminate CTE from the release

Objectors also submit that other meaningful changes to the Settlement could be made in an effort to make it fair, adequate, and reasonable.  These include:

- Give credit for play in NFL Europe

- Reduce non-NFL traumatic brain injury/stroke offsets to a reasonable, evidence-based percentage

- Eliminate the opt-in requirement

- Eliminate the requirement that a "MAF physician" provide a Qualifying Diagnosis

- Use a recognized system for testing and diagnosis grounded in accepted medical science

30

- Eliminate the appeal fee for a class member and limit the number of appeals the NFL can take per year

- Re-notice the class with clear, consistent, and accurate language

Although the lack of compensation for current and future cases of CTE is the major failure of the Settlement, numerous other flaws independently and collectively render it unfair and require its rejection.  That said, Objectors believe that perhaps with the continued guidance of this Court, a settlement that is fair, adequate, and reasonable can be achieved.

## <u>CONCLUSION</u>

Final approval of the Settlement should be denied.

Dated: December 2, 2014

/s/ Steven F. Molo

William T. Hangley
Michele D. Hangley
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
(215) 496-7001 (telephone)
(215) 568-0300 (facsimile)
whangley@hangley.com
mdh@hangley.com

Steven F. Molo
Thomas J. Wiegand
Kaitlin R. O'Donnell
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
kodonnell@mololamken.com

Martin V. Totaro
Eric R. Nitz
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
mtotaro@mololamken.com
enitz@mololamken.com

Linda S. Mullenix
2305 Barton Creek Blvd., Unit 2
Austin, TX 78735
(512) 263-9330 (telephone)
lmullenix@hotmail.com

*Attorneys for Objectors*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 2, 2014, I caused the foregoing supplemental brief to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties.

<u>/s/ Steven F. Molo</u>