# EXHIBIT 10

# Ex-Falcons lineman had brain disease linked to concussions

*By Stephanie Smith , CNN Medical Producer*
*April 1, 2011 11:48 a.m. EDT*

CNN.com



*Chris and Shane Dronett, and their two children, Hayley and Berkley, in 2002.*

**Editor's Note:** *Dr. Sanjay Gupta gets a candid look at the mental deterioration of a former NFL player and the toll that chronic traumatic encephalopathy can take on a family on "Sanjay Gupta, M.D." at 7:30 a.m. ET Saturday and Sunday.*

**(CNN)** -- Former NFL lineman Shane Dronett's transformation from an affable prankster, quick to flash a wry smile, to a person who was often frightened -- and frightening -- was subtle at first.

It began in 2006, with a bad dream.

"He woke up in the middle of the night and started screaming and told everyone to run out of the house," said Chris Dronett, Shane Dronett's wife. "He thought that someone was blowing up our house. It was very frightening."

Chris tried to dismiss the incident as isolated, except that two weeks later, there was another outburst, then another, until they were an almost-nightly occurrence. And as Shane's fear and paranoia began overwhelming him, so did episodes of confusion and rage that sometimes turned violent.

Only three years after retiring from the NFL in 2006, Shane was suffering. The tragic culmination of his pain came when he committed suicide in 2009 at 38.

Scientists at the Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy tested Shane's brain tissue and confirmed that before he died he was suffering with a brain disease -- chronic traumatic encephalopathy -- that seems to afflict football players.

"There is evidence of CTE in his brain making him yet another former NFL player who had definite CTE," said Chris Nowinski, co-director of the traumatic encephalopathy center. Nowinski said the center has found evidence of CTE in the brains of 13 of 14 former NFL players, including Dronett.

Usually found in much older dementia patients, CTE is an accumulation of an abnormal protein in the brain called tau, which is associated with repeated head traumas -- concussions or subconcussive hits -- that are not allowed to heal. CTE can also diminish brain tissue and is associated with memory loss, depression, impulsive behavior and rage.

## Outrage comes out of nowhere

The Dronetts' daughter recalled an incident at a local burger joint: "He was ordering, and he got mad at (an employee) and just punched him in the face," said 16-year-old Hayley Dronett.

"He thought the guy was shaking the ice weird or something, and he took him down in the restaurant," added Chris.



*Duerson asked for brain to be studied*



*New NFL tests for concussions*

It was all uncharacteristic for a man whom Chris described as "someone who would light up the room," outgoing, affable, funny. It was incongruous behavior for a father who had been involved and close with his two daughters -- taking them four-wheeling, volunteering at school, even painting their fingernails.

"He was just the best dad in the world," said Hayley.

Researchers believe that the battering Shane Dronett took as an NFL lineman -- and the hits he accumulated over two decades of playing -- might explain his brain's deterioration.

"What we know is that by definition, a lineman will have their head hit almost every play of every game and every practice," said Dr. Robert Stern, co-director of the BU CSTE. "The estimates are around 1,000 or more hits for a lineman every season."

It might have been the accumulation of tens of thousands of subconcussive hits -- which might not result in overt concussion symptoms such as dizziness, short-term memory loss and confusion but could still cause brain damage -- that finally took a toll on Shane.

"I think the issue is that the brain was not meant to be hit even subconcussively 1,000 times a year," said Stern.

The NFL would not comment about Shane's case specifically, but it emphasized that the league supports the BU center's work and that it continues to take steps limit contact to the head and to ensure that concussions, when they occur, are properly treated.

**10 hard seasons of hard hits**

Shane played for 10 seasons, first with the Denver Broncos and then the Atlanta Falcons. He played defense on the 1998 Falcons team that had a storybook Super Bowl run.

Chris said her husband never let a concussion deter him.

"Shane didn't come out of games because he always said NFL players are so expendable," said Chris. "And if you're not out there, the next guy will be."

Kurt Warner: Playing with concussion "part of the game"

Shane played through dizzying hits.

"There were times when he'd be slow getting up and kind of try to shake it off and get back in there," said

Chris. "He would have headaches and he would say 'I wish someone would split my head open with an ax and relieve the pressure,' but it wasn't even an option to come out (of the game)."

## Could a tumor explain his behavior?

When Shane was found to have a brain tumor in 2007, at the height of his unorthodox behavior, it was actually a glimmer of hope for his wife.

"I was almost relieved because I was thinking, 'OK, here is the answer to why he's acting like this, because he had a tumor,' " said Chris. "And then after he recovered from the tumor being removed, he was back to the same symptoms of paranoia."

Shane's neurosurgeon said that he most likely had the tumor all his life and that the benign growth could not explain his behavior, Chris said.

Researchers at BU CSTE call the brain tumor potentially confounding, but most likely not a factor in Shane's behavior.

"There's no way we would ever know what was specifically caused by the tumor or the surgery for the tumor or CTE," said Stern. "But more than likely at least some of his behavior and symptoms were associated with the worsening of the CTE."

The reasons for Shane's behavioral changes soon became secondary to a bubbling fear for his wife and daughters. It came to a head during a ski trip that Chris took with her daughter Hayley in January of 2009.

"He called us 100 times a day, wondering where we were and we'd tell him we're in Utah ... and he just didn't believe it," said Chris. "He thought people were driving around the house and he was wondering who had been following him that day. It was just very scary."

Shane was supposed to pick up his family at the airport but never showed up. The next morning, Chris encountered her husband in the hallway of their home, brandishing a gun.

"I saw the gun, and I ran out the front door," said Chris. "He had gone into the kitchen, and as soon as I put my hand on the front door, I heard it."

What Chris had heard was the firing of the gun that killed Shane when he turned the gun on himself.

In a moment, months of consternation and abject fear ended, giving way to profound sadness for a family that, even as they waded through the mire of Shane's condition, could not have foreseen this end.

"He was always so full of life," said Chris. "Even his darkest moments, I just still never imagined that he would do that."

Two years removed from the terrible events of that January morning, Chris finds some solace knowing that a brain disease that could explain why she and her daughters lost Shane.

"I had nowhere to turn. I didn't know anything about (CTE). I didn't know other players were going through this type of stuff," said Chris. "I think if Shane knew at the time how serious (playing through concussion) could be down the road, he would have backed off."

Chris is heartened by rules changes and progress at the NFL level, but chafes when she hears about players who oppose those changes.

http://www.cnn.com/2011/HEALTH/04/01/brain.concussion.dronett/index.html?hpt=Sbin

"I know a lot of the players are against that, but they're young and they haven't seen what I've seen," said Chris.

Chris says that if she could speak directly to players, "I would tell them what I went through, what Shane went through and what other people I know have gone through and then let them make that decision. Because I feel like they're making their statements without being educated."



© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

# EXHIBIT 11

Ad

**Morning Mix**

# Study finds a strong correlation between repeated head trauma and domestic abuse



**By Soraya Nadia McDonald** October 22 ✉  Follow @SorayaTWP

Mary Ann Easterling, widow of former NFL safety Ray Easterling, told HBO Sports her husband became abusive, something she believes was a result of chronic traumatic encephalopathy. (AP Photo/Matt Rourke)

Perhaps the NFL should start watermarking its player contracts with a skull and crossbones or, at the very least, a warning from the surgeon general.

Following Tuesday night's "Real Sports" report on the link between domestic violence and chronic traumatic encephalopathy, the brain disease brought about by repeated concussions, there's a question of whether such a gesture would seem remotely adequate as a warning of possible prognosis of the disease.

HBO revealed the results of a 2013 study of brains of CTE victims conducted by Boston University, which, in tandem with the Sports Legacy Institute, specializes in studying the disease. The study of 33 men, authored by Robert Stern, found that more than 50 percent had never been violent prior to sustaining head injuries.

In just five years of playing in the NFL, Paul Oliver suffered three major concussions — and that was enough to radically alter his personality and turn him into someone his wife Chelsea, did not recognize.

She called him a monster.

"His behavior started to change and one example was we got in an argument and he shattered all our phones so I couldn't call the police and locked all the doors," Oliver told Jon Frankel of "Real Sports." "He told me if I got up off the couch that he would slam my head into the floor."

When understood as rarefied-but-horrific instances, they're troubling, but easier to write off. He was a bad guy. An exception. An anomaly.

But Oliver's experience with domestic violence as an NFL wife wasn't an exception. Her experience with an enraged partner who sabotaged any effort to contact law enforcement echoed that of Dewan Smith-Williams, estranged wife of former NFL offensive lineman Wally Williams. Like Oliver, Smith-Williams was one of the few women willing to come forward. She gave an account to The Washington Post of an episode with her husband: "I called the police and he snatched the phone from me," Smith-Williams. "I called from other phones, and he would

do the same."

Advertisement

Oliver, Smith-Williams and Mary Ann Easterling — Ray Easterling's widow — are just a few of the women comprising a sorority whose members were muscled into the shadows by the NFL, they maintain.

Over and over, they cite the NFL's culture of silence which prioritizes the league, its success, revenue, and reputation above all else. It's encapsulated in one telling phrase that has come to follow commissioner Roger Goodell's handling of the crises that were dominating discussions of the league: "Protect the shield."

Sure, he was doing his best to "protect the shield," but at what cost? And to whom?

HBO Sports spoke to 10 NFL wives who said their previously peaceful husbands became violent after repeated head trauma, but they didn't want to speak on camera. Chris Nowinski of the Sports Legacy Institute told Frankel he hears from them. They found Easterling. They found Smith-Williams.

And their stories are disturbingly similar.

Asked to provide a sampling of the e-mails he gets from player wives, Nowinski responded: "I'm scared for my life. My husband played 12 years of football and he was a loving man and now he has been stalking me and he's been violent with me — fifty exclamation points — help me. It's dozens of these e-mails come in all the time. We'll see

violence going forward because we're sending very big, very brain damaged people out into the community."

What now? As it stands, women feel they're risking their safety by coming forward. They don't feel supported or even heard by the NFL or their own communities. Will the NFL construct a mechanism to allow women to safely report domestic violence and suspicions their partners may have CTE? Well, first it has to be willing acknowledge that such a link exists.

Advertisement

"One on one, wives will share that," Easterling said. "When they know there's not a possibility of being threatened, they will share it out of earshot of their husbands."

Then there's the question of punishment. Is it ethical to punish a person for behaving in a way that is out of their control? In the case of CTE, incarceration doesn't do anything to solve the source of the violence. Involuntary actions are undeterred by the threat of jail time.

"We're not saying that what they're doing is not wrong and they shouldn't be punished like anybody else, but what we are saying is that we have to acknowledge the fact that the seat of some of this behavior might be the damage that we're doing to their brains," Nowinski said.

Ann McKee of Boston University told "Real Sports" when she received Oliver's brain, it contained lesions in the anterior temporal lobe. "Those areas are the parts of the brain that are concerned with emotionality and assaultiveness and ability to control ourselves," she said.

"You mean that as the disease progressed, he lost the ability to control himself?" Frankel asked.

"Yeah," McKee said. "That's a pattern we've seen over and over again."

Then there's the matter of those yet to enter the NFL, but who, as high school and college athletes, have already been identified and groomed for a football career.

How do you get an 18 or a 22-year-old to understand that a chance to convert a childhood passion into paydirt poses a danger not just to his body, but possibly to the very essence of who he is? On top of that, he's expected to weigh the fact that said decision not only affects him, but a family he may not even be able to conceive of one day having.

Advertisement

All of that is now up for consideration for prospects still in the stages of advanced adolescence. And who, when they're young and invincible, wants to believe that suicide or Lou Gehrig's disease or Alzheimer's is part of their future? After all, they've arrived at this juncture because they've lived their lives as exceptions, genetic freaks of nature faced with the opportunity to cash in the chip that makes them special.

If you're a wide receiver on the precipice of a life that comes with more money than you've ever seen before, is it so far of a stretch to think: *Maybe I can outrun this, too?*

And if you can't, is there any amount of money that makes

it worthwhile?

Soraya Nadia McDonald covers arts, entertainment and culture for the Washington Post with a focus on race and gender issues.

# EXHIBIT 12

 ESPN.com: NFL   [Print without images] 

Thursday, May 2, 2013

# Lives after Junior

By Shelley Smith
ESPN

INSIDE A RUN-DOWN, but clean gym tucked away on a small back street in Oceanside, Calif., a beach city about 80 miles south of Los Angeles, 79-year-old Tiaina Seau walks steadily on a slow-moving treadmill. His wife, 75-year-old Luisa, patiently pedals an outdated stationary bicycle.

This morning in mid-April is just like all the others they spend at the Junior Seau Fitness Center, a building next to the Oceanside Senior Citizens Center and across the street from the Boys & Girls Club. It's not the well-known gym in the middle of town on Mission Avenue, where Junior would often work out with his close friend Jay Michael Auwae, a Marine whom Junior met after retiring from a 20-year career. But a quiet, discreet building, not an easy place to find. And that's why Junior would come here religiously once he left behind his high-profile life in the NFL, often playing ukulele in the back with his cousin Dale Godinet.

"He used to say, 'Buddee, this is the best-kept secret in Oceanside,'" says Godinet. "It was his refuge."

Seau, who called everybody "Buddee" and also spelled it that way in texts, had two primary missions outside of football: aiding the youths of San Diego through his Junior Seau Foundation, launched in 1992, and making sure people young and old could exercise. So Junior and his cousin, Randall, who ran the Boys & Girls Club, opened Seau Fitness Center gym in 1996 with foundation money and a community grant, and filled it with the equipment that had been at the home he shared with his wife, Gina, until their divorce, as well as other machines donated personally by Arnold Schwarzenegger. They both served on the President's Council on Fitness, Sports & Nutrition.

Initially, the center opened as an after-school safe haven for teens, to keep them away from gangs, which are prevalent in Oceanside, just like in so many big cities in Southern California. When Junior realized the gym was mostly vacant while school was in session, Godinet and Junior reached out to the Senior Center nearby. And when the Boys & Girls club pulled its support, wanting to build up its own youth-only programs, the gym started catering to seniors. Its doors are open now largely because of city grants. Memberships are $55 a year for patrons over 55, in honor of Junior's jersey number. While it is formally known as the Junior Seau Fitness Center, locals have nicknamed it Club 55.

But the gym is in jeopardy of closing. The outdated equipment needs maintenance. The building needs repairs. A window is broken. There are no funds for renovations because the Seau family's patriarch is gone.

Nearly a year after Junior Seau committed suicide on May 2, 2012, Outside the Lines conducted dozens of interviews with his family and friends, including a two-hour exclusive with Auwae, who got to know Seau in early 2010, instantly bonding with the fellow Polynesian and becoming a frequent workout partner. In hindsight,

they say that Junior's actions signaled a man who was spiraling out of control, a man who wasn't prepared to leave behind the regimented life of pro football, the sport he'd been playing since he was a kid and slept with his three brothers in the Seaus' one-car garage.

The ebullient, smart, funny Junior was doing his best to hide a financial free fall and deep depression. But hidden from everyone, including him, was the degenerative brain disease chronic traumatic encephalopathy, which doctors confirmed this past January.



The Junior Seau Fitness Center, known in Oceanside as "Club 55," is in danger of closing.

"Everyone's looking for answers," says Auwae, a Master Gunnery Sergeant stationed near Oceanside, whose intense friendship with Seau and grief over his death has left a life in disarray. "What could I have done better? I'm a Marine. I'm trained to look for these signs. I couldn't even help Junior because he was beyond our help."

So every morning the Seaus come to the fitness center, where photos of Junior and news clippings of his career on the wall make it a living, breathing memorial to their son. They feel closer to him here sometimes than even at his own gravesite; it is a building with a cause he cared so much about and people who continue to keep it thriving. They say they pray every day that the doors will stay open somehow.

"When I come here, people see me and they see my son," says Junior's father, Tiaina.

But, sadly, there is no certainty to the gym's financial future. Or the future Seau left behind for his friends and family.

---

JUNIOR SEAU QUIETLY opened the door to the massive luxury hotel suite on the Las Vegas Strip. He walked in slowly, face ashen, his massive body hunched over as if he were grimacing in physical pain.

"He slammed a glass on the bar and looked at me and said: 'Buddee,'" recalls Auwae, who was staying in the suite with him. "I go, 'Man, please don't tell me this.'"

According to Auwae, it was mid-December 2010 and Seau had just lost close to a million dollars in 90 minutes playing high-stakes blackjack -- $40,000 to $50,000 a hand. Earlier in the day, the 12-time former Pro Bowl linebacker told Auwae he had won close to $800,000. After dinner at a local Italian restaurant, they went back to the room, where Auwae says he begged Seau to stay away from the blackjack tables.

"I said, 'Man, you clipped them,'" Auwae recalls. "'You did it. You got their money, just let it be. You can pay some bills, get some people off your back, and just relax. Let's go watch a show.'"

In the 10 months since they'd met at a reggae concert in San Diego, Auwae and Seau had traveled to Vegas a handful of times and had visited various California casinos, where Auwae says he witnessed Seau win big and lose big. This particular trip to Vegas was unplanned, coming just two days before Seau was due to attend his son Tyler's Division II semifinal football game for Delta State in Cleveland, Miss. At his home in Oceanside with Auwae, Seau suddenly called for a private jet.

"One minute, we were sitting at the table, and then he said, 'Let's pop,'" says Auwae. "What do you mean? Where we going? Boom, next thing you know we're sitting in Las Vegas in a suite." A $40,000-a-night suite with a private indoor pool, golf simulator, full butler service and a shellfish bar, which was stocked with crab and shrimp upon their arrival. Auwae says he never saw Seau put down any money, assuming the casino comped the room for a high roller like Junior.



Jay Michael Auwae (middle) still struggles with the loss of his "Buddee," and how the friendship triggered his own descent.

According to a lengthy October 2012 report by U-T San Diego, Seau owed $1.3 million in casino markers to Bellagio and Caesars Palace in November 2010, just a month before his trip with Auwae. According to the same report, he was losing $60,000 to $70,000 a month because of a poor post-retirement investment in Ruby Tuesday restaurant franchises, while his own restaurant, Seau's, was also in need of upgrades he couldn't afford.

After Seau returned to the room announcing he had won $800,000, Auwae recalls telling his friend to "just chill." Junior seemed to agree, content to lounge in the pool for a while with a cocktail in hand. Then there was a knock at the door. "They sent people up to the room to get him to go and play more," Auwae says, not wanting to name names or the casino. "So he goes down, and not even an hour and a half later he was back."

Junior looked distraught and told Auwae that he'd lost it all and then some. "He goes into his room and he's looking at the ceiling," Auwae says. "He's just staring like something's wrong with his head. At the time I'm like, dude, this guy's crazy. What's wrong with him? Why would he do that?"

In the past, Auwae had watched Junior in the high-stakes room and joined in the drinking and revelry that came along with it. But Seau had confided in him that his massive debts were mounting, and this trip was the first time Auwae truly understood that Junior was gambling away millions that didn't exist. And he couldn't watch anymore.

Auwae says Junior had already called Bette Hoffman, the trustee of Seau's estate, to wire more money to the casino. But Hoffman called Auwae, he says, and told him: "Whatever you got to do, you got to help [Junior]. You've got to stop him. You've got to stop him."

Auwae went to Junior's room, where he found him laying on the bed, still staring at the ceiling. "I go, 'Buddee, please let's go home. This ain't our world,'" Auwae says. "[Junior] goes, 'We gotta make it back. Buddee, I've got this.' And I go, 'Trust me, you don't got this.' He goes to bed. Morning comes, the money comes and the gentlemen come back up to grab him. He goes back down." According to Auwae, Seau lost another $400,000 that day.

Instead of continuing on with Junior to Tyler's football game, Auwae says he returned to California. Despite the disagreement, the two men remained close and did occasionally go to the casinos again. Auwae says he often made attempts to dissuade Seau from playing such high stakes, but Junior ignored the advice, telling Auwae: "I'm a grown man."

ON THE
FIELD,

Junior was larger than life. Former teammates say he surely had multiple concussions, based on the way he hit and was hit. But they say he never admitted to being hurt or impaired when he was between the lines. It was that way outside them as well. The



*Marine Jay Michael Auwae, a close friend of Seau's since 2010, is coming forward about Junior's spiral so people can better understand the crippling effects of CTE.*

man who played with no fear was afraid of showing weakness, especially in his private life.

Yet friends and family say that looking back at his actions -- not just gambling but womanizing and partying and sleepless nights -- Junior was exhibiting symptoms of both depression and CTE, a progressive degenerative disease associated with multiple concussions and other forms of head injury. At the time, they were noticed only in pieces, never being linked together. No one completed the puzzle -- until it was too late.

Unlike most of Seau's closest friends, Auwae never knew Junior the pro football star. While he had recognized Seau surfing several times in Oceanside, the two didn't grow close until February 2010, a month after Seau retired from the NFL for good. They were at a reggae concert that Auwae was promoting with a friend in San Diego, and he got Junior backstage. By many accounts from numerous people in Oceanside, including Junior's parents, the two men became nearly inseparable after that.

"I think he liked my discipline from being a Marine," says Auwae. "He would tell people: 'Twenty-four years of service in the Marine Corps.' He was proud. Of course, I'm proud of him. And I'm Polynesian, too. We connected on a lot of levels."

At 6-foot-3, 255 pounds, Junior towered over the 5-6, 175-pound Auwae, who was raised in Hawaii and resembles Seau. Junior's sister called him "mini-me." Junior called him "Tattoo" after the character on the old TV show "Fantasy Island." But despite his stature, Auwae was almost as strong as Junior and their daily workouts became legendary competitions among the locals.

Just about every morning before Auwae went to his shift on base, they went through their routine: a run along the Strand, a trip to the Mission Avenue gym where Junior would secretly add weight to Auwae's bar, making sure to win the circuit workout. If the waves were right, then they'd head out with longboards. If they weren't, then it was to Swami's Cafe for breakfast or to Jitters, a coffee joint, where they'd strum ukuleles with "Pops," the owner, and cousin Dale.

"Being Polynesian, and being that we loved to surf, loved to play music -- we both couldn't sing -- loved to play ukulele, it was a way of healing, spiritual healing," says Auwae.

Seau's charm drew countless new friends into his circle after retirement, each one feeling as though he or she had known Junior forever. Auwae knew he was referred to by some of Seau's friends as a hanger-on, but in reality, he says, he wanted nothing more than to be Seau's buddy. "[Junior] was just someone you couldn't not want to be around," he says.

That was also the case with the many women Seau had relationships with after divorcing his wife in 2002. One of his more serious girlfriends was Mary Nolan, whom he met in 2007 when she was only 22. Nolan lived with Seau in Boston during his final season as a New England Patriot in 2009, and returned with him to Oceanside, where they resided in Junior's $3.2 million home. According to Auwae and others, it was Nolan who was by Junior's side most often during his ups and downs in Vegas.

But less than two months before Seau's impulsive gambling trip with Auwae, that relationship came to a traumatic end and may have been the first major clue that Seau's mental state was deteriorating.

Early on the morning of Oct. 18, 2010, he was arrested and taken to jail, accused of assaulting Nolan, who'd learned that Seau had been cheating on her. Seau claimed that he never put a hand on Nolan, who immediately left Oceanside without filing a complaint. After posting bail, Junior ran his car off a cliff in what many of his friends now are convinced was a first suicide attempt, though Seau always insisted he simply fell asleep at the wheel and the police agreed.



Following an arrest for a domestic dispute, Seau ran his SUV off of a cliff early on the morning of Oct. 18, 2010. Friends and family say it may have been his first attempt at suicide.

His ex-wife Gina and their three children, Sydney, Jake and Hunter, and Junior's oldest son, Tyler, picked Seau up from the hospital and brought him to their house for a few days to heal. When he had trouble sleeping and Gina didn't have Ambien, Junior called Auwae, who says he came to pick up his friend and drive him home.

The media attention surrounding the arrest and crash was enormous, and Auwae, who had left Hawaii after hearing the news, says he stayed with Junior inside his home for several weeks, ordering in food and watching football. Seau, bandaged and bruised, refused to discuss the cause or reason for the crash, yet Auwae didn't push. He was accustomed to comforting injured servicemen through his work with Wounded Warriors.

Players around the NFL confirm that Junior was a heavy drinker, but Auwae says it was about that time Seau's drinking worsened and he was taking Ambien along with it to sleep. Auwae was as well. His own marriage was struggling and he, too, was in a raw emotional state.

Initially, Auwae says, he was swept up in what appeared to be Seau's zeal for life, the jetsetting, the drinking, the gambling and the women. But running with Seau put a growing strain on Auwae's relationship with his wife and their three children. By September 2011, he even contemplated suicide; Junior convinced him otherwise. "He knew that I wanted to end it for myself, but he saved me," Auwae says.

If Seau had suicidal thoughts, he never expressed them. Meanwhile, Auwae and others say that they noticed his memory beginning to fade, unable to remember simple things, like his daughter Sydney's volleyball game, or plans for lunch, to even the most mundane things like the day of the week.

"He would be like, 'Buddee, I've got to go somewhere,'" Auwae recalls. "And Sydney would call: 'Dad, where you at?' He would be like, 'Oh, dang, we forgot the game.' As I look back, there were so many incidents. It was almost common for me to see that. But I'm not thinking that way. Nobody's thinking that way."

---

SEAU WAS ALSO suffering with being away from football, the regimented lifestyle he'd known for the last 20-plus years. Post-retirement therapy is often advised for professional athletes to cope with the loss of such an intense and integral part of their lives. But Seau never reached out for help, just like he always chose to play through pain.

Following retirement, he hosted a reality sports series on Versus that was canceled after just one season, and he failed to secure an NFL broadcasting job even at the regional level. Instead, he watched his former peers on TV, still part of the game he gravely missed.

The failing restaurants had depleted his savings, as had a costly divorce from Gina, child support payments (as high as $40,000 a month during his playing days) and an extravagant lifestyle that at least back in 2006 had cost him around $400,000 a year, according to the U-T San Diego report. In 2011, Seau took a $1.2 million loan against the value of his Oceanside home.

Hoffman, a 73-year-old professional fundraiser and the trustee of Seau's estate, discussed Seau in an Outside the Lines interview for a different story. She said that Junior always believed he had to take care of the people around him. His family was massive and continually would go to his restaurant, Seau's, expecting to eat and drink for free. They had seen Junior make more than $50 million during his playing career, and surely couldn't have imagined that most of it was gone.

"There were a lot of people who hung out with him that never paid for anything," she said. "I got all the bills. I would notice some of the expenses from restaurants and I'd say, 'Oh my God, Junior. How could you have spent this much money?' One thousand dollars, easily, for a night out."

Auwae also says he watched Junior spending more and more money on dinner and drinks -- which was typical for Seau, who always wanted to be in charge -- but paying with different credit cards.

Yet even a week and a half before Seau died, there was nothing to indicate, according to Auwae and other friends, that Junior was thinking about ending his life. Auwae and Junior had driven to a charity golf tournament in Fontana, Calif., run by former Kansas City Chiefs running back Christian Okoye.

"We came home and he goes, 'Buddee, next year just promise me when we go to the tournament we'll catch a private plane,'" Auwae says. "He'd ordered the Mayweather-Cotto fight at his restaurant for the following week. He had a trip to Hawaii tentatively scheduled with his kids. Mother's Day was coming up."

Junior's daughter, Sydney, had just been admitted to USC, his alma mater, where Seau had recently played his ukulele at the spring game. He also had recently become a grandfather, when his then-22-year-old son Tyler and Tyler's girlfriend had a daughter.

Former teammate Mark Walczak was coming to stay the last weekend of April 2012 with Junior to celebrate Walczak's 50th birthday. The two men had been roommates when Junior moved to San Diego for his

rookie year in 1990.

Walczak told Outside the Lines that Junior seemed in good spirits at the thought of a weekend with old friends, and they spent Friday night, April 27, 2012, with Chargers team doctor David Chao and a few friends in Del Mar, about 20 miles from Oceanside. When they returned to Junior's house, there was an electrical outage in the neighborhood. They lit candles and talked long into the night.



Seau, less than a month before his suicide, strumming the ukulele at the USC spring game.

Auwae joined Junior and Walczak and they spent much of the next day on Seau's porch overlooking the ocean, playing music and grilling barbecue. It was then that Auwae said he found an envelope with a letter inside by the kitchen sink that had "Do not read" written on it.

"Well, I'm sorry but I'm going to read it," Auwae remembers thinking. "Junior comes walking in, and we stare at each other for a few seconds. Then he grabs the paper and says, 'Have a seat.' He tells me, 'Buddee, listen to this song.'"

Inside the envelope was a letter with the lyrics to "Who I Ain't," co-written by his friend Jamie Paulin, a musician in Nashville, Tenn. Junior had learned it on the ukulele. The country song is about a man attempting to reconcile his sinning ways and his faith. Auwae thinks now that the letter might have been an attempt at a suicide note, but at the time thought nothing of it.

By then, Auwae says he was fully aware that Seau's financial issues were far worse than they'd been on that December 2010 night in Vegas. Junior would likely have to close the doors on his restaurant, Seau's, because he couldn't pay for the necessary upgrades or the lease. And that meant laying off hundreds of employees, including his own son Tyler, who worked there. During Walzack's birthday visit, according to U-T San Diego, the Bellagio attempted to claim a $400,000 marker given to Seau, but the gambling debt couldn't be paid because of insufficient funds.

That Saturday night after the barbecue, Junior, Walczak and Auwae made plans go to a pricey restaurant, 333 Pacific, to have drinks. "He looks at me, 'Buddee, I need you to catch me.' Catch the bill," says Auwae, who was surprised that Seau would ask him to pay at such an expensive restaurant. "Normally I would treat if we were going to a cheaper establishment. But I was like, 'Oh, Buddee, cool. I'm going to pay it.'"

On Sunday, Walczak says he and Junior went to Carlsbad for lunch, where he was introduced to Seau's on-and-off girlfriend, Megan Noderer, who Junior had met at a wedding in Key West, Fla., a few months earlier. The pretty redhead was living in Dallas but came to San Diego to attend a baby shower for her sister-in-law. Later that night, Noderer and Walczak were waiting on Junior to return from meeting other friends for a birthday drink at a nearby bar. Walczak wanted to say goodbye to Junior before driving back to Phoenix. But by 10 p.m., Seau was still out so Walczak sent him a text.

"Buddee, thank you for an awesome birthday! I'm heading back now. Love you brother. Thanks again Buddee!!"

He never heard back.

On Monday, April 30, 2012, Junior played in former Raider Tim Brown's golf tournament in nearby Dana Point and was paired with former 49er Jerry Rice, who later told reporters that Seau seemed upbeat; he was also posing for photos and talking about his children and the upcoming NFL draft.

But sometime after 7:45 a.m. Wednesday morning, May 2, according to the coroner's report, Junior walked into a guest bedroom with a .357 magnum revolver, put it near his heart and pulled the trigger. Police say there was an impression of the barrel on his chest, meaning there was no hesitation mark, which signals fear, uncertainty or foul play. A half-bottle of water was found on the nightstand next to the bed. The gun was next to his right hand. Noderer, who had gone to work out, was the first person to find Seau.

Police traced the gun back to its original owner, who told them he traded it in at a gun shop in New York "a long time ago." They have not found out why or how Junior came to have it.



Auwae, who was on base, got the call from cousin Dale and rushed to Seau's home. Junior was already on a gurney in a body bag. Family members were standing around in the garage stunned and weeping hysterically. "I grabbed my phone and I sent a text to one of the people I'd met from Vegas numerous times," Auwae says. "I said, 'My friend is dead. Thank you very much.'"

Junior's mother, Luisa, in the driveway of her son's home on the morning of May 2, begging him to come back.

The person Auwae sent the text to, he says, was one of the Vegas casino hosts who enticed Junior back to the blackjack tables during the December 2010 episode. Auwae has since apologized to the man, having learned more about CTE and how it leads to compulsive behavior. He says Junior's gambling debts in Las Vegas and in California have been "washed away." The Las Vegas casino host declined to comment, but Auwae says several casinos have assured him Seau's debts no longer exist. U-T San Diego also reported that his gambling debts have been forgiven.

"I think it came to a boiling point," Auwae says of Junior's death. "Junior thought, 'This is the best way to deal with it, because my head has been hurting my whole life.' I don't think he had control with what was going on in his brain. He had too many things planned. He had too many people that loved him."

---

A YEAR LATER, Oceanside isn't the same without Junior. A portrait of him, fashioned out of letters, was donated to Jitters, the coffee shop that was often filled with the

sounds of Junior's ukulele. The words spell out his favorite phrase, "Work for today, plan for tomorrow, pray for the rest."

Another giant portrait of Junior smiling, sits on an easel in his parent's pristine Oceanside



*Friends, family and fans are still devastated by Seau's demise. They all thought he was larger than life, on and off the field.*

home. They planned a small, private ceremony, with T-shirts bearing one of Junior's favorite scriptures for the May 2 anniversary of his death, and then a backyard barbecue at their house, just like those Junior loved to throw impromptu and they loved to host.

"It's been hard to get to that point of everything not continuing to be very difficult," says Junior's sister, Annette. "Last year, when he died, the music stopped. But now the kids are starting to pick up their ukuleles again, remembering songs Junior taught them."

"There will be music Thursday," cousin Dale says. "Much music."

Auwae says he didn't go public with his knowledge of Junior's finances and gambling habits until now because he never wanted Seau's memory to be tarnished. But in light of the CTE diagnosis, Auwae says he believes it's important for others to understand the insidiousness of the disease and how it can ruin lives. Looking back, he recalls the two of them watching coverage of former NFL safety Dave Duerson's suicide. Duerson shot himself in the chest and left a suicide note, requesting that his brain be studied. Seau turned to Auwae and compared Duerson's emotional and physical struggles to those of the Wounded Warriors who Auwae continues to help.

"Now I feel like he knew what was going on," Auwae says.

At the same time, he also wrestles with how much Junior's suicide was just a way out for him, a solution to a myriad of problems that may or may not have been caused or blurred by CTE. All he really knows for certain, he says, is how 2½ years with Junior changed his own life.

"Buddee, ever since I met you my life went upside down," says Auwae, whose wife filed for divorce less than two weeks after Junior's death and last November filed a restraining order against him that will be lifted this week. (No charges were ever filed.) "A part of me regrets it, a part understands that everything has a purpose. There's this tug of war."

Auwae says he doesn't visit Junior's parents and siblings as much as he used to, saying it's too painful because they see Junior in him. Still, he will be there for the May 2 ceremony, ukulele in hand.

The status of the Junior Seau Foundation is believed to be stable because its funds are separate from Seau's estate, while the status of Seau's estate remains unknown. By law a person's estate should be revealed within a year of his or her death, but it is unclear what, if anything, there will be to split. Some assets have been sold. Junior's beachside home, which he bought in 2005 for $3.2 million, recently went for $1.975 million.

A family source told OTL that Pittsburgh Steelers safety Troy Polamalu, who grew up near Junior and went to USC and considers himself family, paid a good portion of Seau's funeral service and for his grave plot in the Eternal Hills Memorial Park, a prime spot near the main path where Junior's parents also will be buried. The family visits often, as does Auwae. One day in early spring, before the headstone was placed, he went and strummed "Earth Angel," one of Junior's favorite songs.

Seniors continue to trickle into the Junior Seau Center to rehabilitate injuries and exercise at a low cost, but Club 55 will shut its doors if it doesn't receive funds. The city of Oceanside recently donated $7,500 for the center (along with the Senior Center next door), but it will need substantially more.

A giant "Say Ow" banner hangs on the wall behind the strength machines. It was the name of Seau's line of activewear that ended as yet another failed business venture. Seau's mother sits at one of the machines and breaks into tears at the thought that it's been a year since her son took his own life. She can't bear that the Junior Seau Fitness Center, which meant so much to Junior, could soon be gone.

"It's where he could come and be himself," says cousin Dale. "It was a refuge for him and is still a tribute to him. His soul lives within these walls."

---

# EXHIBIT 13

12/1/2014
Case 2:12-md-02323-AB Document 6455-14 Filed 12/02/14 Page 25 of 92
ESPN.com: NFL - Ex-Steeler Long drank antifreeze to commit suicide

 **ESPN.com:** NFL

[Print without images]



**Thursday, January 26, 2006**

# Ex-Steeler Long drank antifreeze to commit suicide

Associated Press

PITTSBURGH -- Former Pittsburgh Steelers lineman Terry Long committed suicide by drinking antifreeze, a revised death certificate shows, and did not die as a direct result of football-related head injuries.

The Allegheny County coroner ruled in September that Long, 45, who had attempted suicide before, had died of meningitis. The condition, a swelling of the lining of Long's brain, was caused by football-related "chronic traumatic encephalopathy," also known as "punch-drunk syndrome," said the coroner at the time, Dr. Cyril Wecht.

But a revised death certificate, which Wecht's office never publicly announced, was filed Oct. 19, listing the manner of Long's death as suicide from drinking antifreeze. The ruling was changed when outside laboratory tests on Long's tissue and urine showed they contained ethylene glycol, the active ingredient in antifreeze, county officials said.

Joseph Dominick, chief of operations at the medical examiner's office, said Thursday that the antifreeze was what caused the swelling of the brain and the brain lining, and the football-related brain injuries were a contributing factor to the death.

The finding was first reported by the Pittsburgh Post-Gazette on Thursday.

Long died in a hospital about five hours after he was found unresponsive in his suburban Pittsburgh home on June 7.

The original findings reinvigorated the debate over the dangers football players -- particularly linemen -- face from repetitive head injuries.

The medical examiner felt Long's history of brain injury was still a "significant factor" in the death and that he would be remiss in not mentioning it in the updated report, Dominick said.

"People with chronic encephalopathy suffer from depression," Dr. Bennet Omalu, a neurologist who worked on Long's autopsy and is still with the medical examiner's office, told the newspaper. "The major depressive disorder may manifest as suicide attempts. Terry Long committed suicide due to the chronic traumatic encephalopathy due to his long-term play."

But Steelers team physician Dr. Joseph Maroon, a neurosurgeon and nationally recognized expert on concussions, disagreed with Omalu.

"I think it's fallacious reasoning, and I don't think it's plausible at all," Maroon said. "To go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative."

Long started at right guard for the Steelers from 1984 until 1991, when he attempted suicide with rat poison after he was suspended for violating the NFL's steroid policy. Long later rejoined the team

Case 2:12-md-02323-AB Document 6455-14 Filed 12/02/14 Page 26 of 92

although he was not re-signed after one season.

In March, Long was indicted by a federal grand jury on charges he fraudulently obtained loans for a chicken-processing plant which prosecutors allege he burned to the ground for the insurance money. At the time he died, Long's neighbor said he was separated from his second wife and was depressed about that as well as the federal charges he faced.

---

EXHIBIT 14



Alzheimer's & Dementia 9 (2013) 445–451

Alzheimer's
&
Dementia

# Military risk factors for Alzheimer's disease

Michael W. Weiner[a,b], Karl E. Friedl[c], Anthony Pacifico[c], Julie C. Chapman[d,e], Michael S. Jaffee[f],
Deborah M. Little[g], Geoffrey T. Manley[b], Ann McKee[h], Ronald C. Petersen[i], Roger K. Pitman[j],
Kristine Yaffe[a,b], Henrik Zetterberg[k,o], Robert Obana[l], Lisa J. Bain[m], Maria C. Carrillo[n,*]

[a]San Francisco Veterans Administration Medical Center, San Francisco, CA, USA
[b]University of California, San Francisco, CA, USA
[c]Telemedicine & Advanced Technology Research Center, U.S. Army Medical Research and Materiel Command, Fort Detrick, MD, USA
[d]War Related Illness & Injury Study Center, Veterans Affairs Medical Center, Washington, DC, USA
[e]Georgetown University School of Medicine, Washington, DC, USA
[f]University of Virginia School of Medicine, Charlottesville, VA
[g]Texas A&M Health Sciences College of Medicine, College Station, TX, USA
[h]New England Veterans Healthcare System and Brain Banks, Boston University School of Medicine, and Center for the Study of Traumatic Encephalopathy,
Boston, MA, USA
[i]Mayo Clinic, Rochester, MN, USA
[j]Massachusetts General Hospital, Harvard Medical School, Boston, MA, USA
[k]The Sahlgrenska Academy, University of Gothenburg, Gothenburg, Sweden
[l]Northern California Institute for Research and Education, The Veterans Health Research Institute, San Francisco, CA, USA
[m]Independent Science Writer, Elverson, PA, USA
[n]Alzheimer's Association, Chicago, IL, USA
[o]UCL Institute of Neurology, Queen Square, London WC1N 3BG, United Kingdom

**Abstract**        Traumatic brain injury (TBI) and post-traumatic stress disorder (PTSD) are signature injuries of
the wars in Iraq and Afghanistan and have been linked to an increased risk of Alzheimer's disease
(AD) and other dementias. A meeting hosted by the Alzheimer's Association and the Veterans'
Health Research Institute (NCIRE) in May 2012 brought together experts from the U.S. military
and academic medical centers around the world to discuss current evidence and hypotheses regarding
the pathophysiological mechanisms linking TBI, PTSD, and AD. Studies underway in civilian and
military populations were highlighted, along with new research initiatives such as a study to extend
the Alzheimer's Disease Neuroimaging Initiative (ADNI) to a population of veterans exposed to TBI
and PTSD. Greater collaboration and data sharing among diverse research groups is needed to ad-
vance an understanding and appropriate interventions in this continuum of military injuries and neu-
rodegenerative disease in the aging veteran.
© 2013 The Alzheimer's Association. All rights reserved.

*Keywords:*        Alzheimer's disease; Risk factors; Military medicine; Traumatic brain injury; Posttraumatic stress disorder; Tau;
Beta-amyloid; Apolipoprotein E e4; Biomarkers; Alzheimer's Disease Neuroimaging Initiative; Vietnam;
Veterans; Chronic traumatic encephalopathy; Blast injury

## 1. Introduction

Mounting evidence suggests that traumatic brain injury (TBI) and post-traumatic stress disorder (PTSD) resulting from military exposures increase the risk of developing neuro-

degenerative diseases such as Alzheimer's disease (AD). Therefore, understanding the mechanisms underlying this association has become a high priority, not only for the Department of Defense (DoD) and the Department of Veterans Affairs (VA), but for the Alzheimer's research community as well, which has recently intensified its focus on identifying individuals at high risk and preventing disease in its presymptomatic stages. Recognizing their shared priorities,

*Corresponding author. Tel.: 312-335-5722; Fax: 866-741-3716.
E-mail address: Maria.Carrillo@alz.org

1552-5260/$ - see front matter © 2013 The Alzheimer's Association. All rights reserved.
http://dx.doi.org/10.1016/j.jalz.2013.03.005

stakeholders and researchers from these communities came together on May 8, 2012, at a meeting hosted by the Alzheimer's Association to strategize about research partnerships to move the field forward quickly. The meeting was co-sponsored by the Veterans' Health Research Institute (NCIRE).

This *Perspective* article summarizes information presented at this meeting, including population-level evidence that TBI and PTSD in early life (i.e. postnatally) increases the risk of developing AD later in life; current evidence and hypotheses regarding the pathophysiological mechanisms that may underlie and link TBI, PTSD, and AD; and research efforts that are needed or are underway to advance our understanding of these mechanisms. These research communities have not traditionally collaborated or considered related mechanisms and markers of disease.

## 2. Soldiers and civilians at risk for TBI, PTSD, and AD

Since the beginning of the Iraq War in March of 2003, more than 200,000 U.S. service members deployed to Iraq and Afghanistan as part of Operation Iraqi Freedom (OIF) and Operation Enduring Freedom (OEF) have been diagnosed with TBI [1]. The vast majority of these cases were classified as mild TBI (mTBI), also known as concussion [2]. In the same period of time, nearly 67,000 deployed U.S. military personnel, as well as more than 16,000 nondeployed U.S. military personnel, were newly diagnosed with PTSD [3]. Approximately 22% of Iraq and Afghanistan veterans entering the VA health care system between 2002 and 2008 were diagnosed with PTSD [4]. TBI and PTSD have been called "invisible wounds," yet they are also considered the "signature injuries" of these 21st century wars [5]. TBI and PTSD are distinct disorders with different causes, but they may occur together and share some symptoms such as deficits in attention and memory, irritability, and sleep disturbances.

Moreover, both of these conditions raise the risk of substantial and severe long-term sequelae, including dementia. A recent cohort study of more than 180,000 veterans from the VA's own National Patient Care Database found that those diagnosed with PTSD were more than twice as likely to develop dementia [6]. Also, a prospective study of World War II veterans found that moderate and severe, but not mild, head injury was associated with 2- to 4-fold increased risk of AD and other dementias in late life [7].

The association of TBI with dementia has also been documented in many studies involving nonveteran populations (reviewed in [8]). Dementia pugilistica was first recognized in professional boxers in 1928 [9]. This condition, now referred to as chronic traumatic encephalopathy (CTE), has now been identified not only in boxers, but also in American football and other contact sports as well [10], and it has been linked to subsequent development of dementia [11]. CTE is thought to result from repeated multiple head injuries or subclinical impact to the head [12]. CTE manifests initially with emotional and behavioral symptoms; cognitive changes, including memory loss and executive dysfunction, later be-

come apparent. With increasing age, individuals with CTE often develop overt dementia, gait problems, parkinsonism, and speech abnormalities. Approximately 12% also develop an amylotrophic lateral sclerosis (ALS)-like condition called chronic traumatic encephalomyelopathy. The relationship of CTE to the development of AD pathology is unknown.

## 3. TBI

TBI is defined as an injury resulting from external force to the head, which results in an alteration or loss of consciousness. Most military or combat-related TBI occurs as a closed head injury as a result of exposure to an explosion (via primary blast wave, rotational brain injury, or brain contusion), motor vehicle accident, fall, or athletic activity. TBIs are classified as mild, moderate, or severe on the presence and duration of loss of consciousness (LOC), alteration of consciousness or mental state, and post-traumatic amnesia. The Glasgow Coma Scale (GCS) is the most common instrument used to assess the consequences of TBI. Other instruments include concussive scales such as the Cantu or Colorado scales.

The widespread use of improvised explosive devices (IEDs) in Iraq and Afghanistan has produced a high prevalence of TBI, reported to be as high as 23% of clinician-confirmed cases in one brigade combat team of nearly 4000 soldiers [13]. Although controversial, a unique TBI condition caused by a blast has been characterized by a different clinical pattern than TBI caused by other mechanisms [14–16], and the implications of these differences in terms of diagnosis, prognosis, and treatment are under investigation. The predominant neuropathological signs of TBI include diffuse axonal injury (DAI) and microhemorrhage [17]. Service members also frequently have a combination of injuries resulting from blast and nonblast (noncombat) events such as sports and motor vehicle accidents. Indeed, the vast majority (84%) of military TBIs occur in nondeployed settings from accidents, falls, sports, or training. Other factors that may influence the clinical and pathological presentation of TBI include the presence of polytrauma, PTSD, or other comorbidities as well as the frequency, severity, and cumulative effect of injuries. Genetic differences are also thought to play an important role.

To facilitate research on TBI across military, civilian, and veteran populations, a working group representing multiple federal agencies proposed a core set of outcome measures. This resulted in a set of common data elements (CDEs) that would enable comparison of findings across studies [18]. A 2-year multicenter study to test and refine these CDEs, the Transforming Research and Clinical Knowledge in Traumatic Brain Injury (TRACK-TBI) study, was funded by the National Institute of Neurological Disorders and Stroke (NINDS) in 2010. TRACK-TBI is also collecting data to support standardization of neuroimaging and genomics and proteomics tests for dementia. At the time of the meeting, TRACK-TBI had enrolled and collected imaging

or biospecimen data from more than 600 patients who presented to an emergency department within 24 hours of having a head injury. Most of these head injuries were mild; however, more than one quarter of individuals with mild TBI screened positive for PTSD, suggesting that the findings in this population may be applicable to military populations.

## 4. PTSD

In contrast to TBI, PTSD connotes a psychological condition in which an emotionally distressing event led to a constellation of symptoms. In patients with PTSD, there appear to be changes in synaptic connectivity associated with learning, such as fear conditioning, as well as alterations in central and peripheral hormones and regional atrophy of both gray and white matter. Veterans with PTSD have been shown to have reduced hippocampal volume that correlates with impaired memory, and functional imaging studies indicate that patients with PTSD have impaired brain function in the medial prefrontal cortex, amygdala, and hippocampus [19]. Brain atrophy in PTSD is also affected by PTSD severity [20,21]. However, chronic stress due to PTSD has also been shown to cause hypertrophy of the amygdala, an area of the brain that has evolved to deal with stressful, dangerous, and threatening situations. Thus, it may be that hippocampal atrophy represents an adaptive change in response to high stress rather than a form of brain damage.

Another possibility is that individuals with smaller hippocampi are at higher risk of developing PTSD. A study in Gulf War veterans [20] showed that current but not lifetime PTSD symptoms were associated with smaller hippocampal volume. This may mean that hippocampal size reverts to normal when PTSD symptoms abate or that individuals with small hippocampi fail to recover from PTSD. However, another study of identical twins pairs discordant for combat exposure in Vietnam found that hippocampal diminution was shared by the combat-unexposed twins of combat veterans with PTSD [22].

Studies also suggest that genetic factors and early life adversity may also influence the subsequent development of PTSD, possibly through neuroendocrine mechanisms involving glucocorticoid receptor responsiveness [23].

Given the different etiologies and symptoms, different diagnostic and treatment strategies are needed for subjects with PTSD compared with those with TBI; however, the overlap in symptoms causes problems with diagnosis. Moreover, any type of physical injury, including even mild TBI, increases the risk for PTSD [24–26], and PTSD can exacerbate cognitive and other symptoms of TBI [27]. However, PTSD can and usually does occur in the absence of TBI, and TBI is neither necessary nor sufficient for PTSD.

## 5. Identifying and managing TBI

Evaluating someone who has experienced head trauma to determine the extent of the injury is critical to limiting further brain damage. Rapid assessment is needed in the military theater and on the playing field to determine if it is safe for the soldier or athlete to return to his or her unit or team. Indeed, studies in high school and college football players suggest that there may be a period of increased vulnerability to repeat concussion for 7–10 days after a concussion [28]. In the military theater, screening is complicated because TBI occurs in the context of sleep deprivation, nutritional changes, emotional stress, polytrauma, and difficult environmental factors. In addition, service members may hide symptoms so they can return to action quickly. However, imaging studies show that there may be substantial brain injury even in the absence of self-reported symptoms [29].

In 2007, the DoD adopted a common diagnostic criterion set for TBI reporting to include any period of loss or a decreased level of consciousness, loss of memory for events immediately before or after the injury, or alteration in mental state at the time of the injury (confusion, disorientation, slowed thinking, etc.) [30]. The Military Acute Concussion Evaluation (MACE) was developed in 2006 by the Defense and Veterans Brain Injury Center (DVBIC) to assess in-theater combat-related TBI [31]. The MACE is used in conjunction with clinical algorithms, both of which were further modified in 2012 to incorporate standards for in-theater concussion care centers. These standards were based on recommendations from the Gray Team, a multiservice team formed by the Chairman of the Joint Chiefs of Staff.

Despite these efforts to improve the identification of TBI in theater, studies suggest that many cases of mild TBI are missed [24]. This indicates the need to come up with better early detection procedures in theater that rely on objective measures and mandatory reporting. New operational rules that are more event driven than symptom driven represent a paradigm change for the military. These rules require a 24-hour rest period after an incident, with prolonged rest in cases of multiple concussions over 12 months. Specific recommendations are provided for issues such as sleep problems and headache. Injured personnel must refrain from sports or other activities that increase the risk of concussion until medically cleared. MACE documentation is required after the event and as part of the return-to-duty evaluation. If symptoms do not improve, service members are moved to a concussion center. Medical screening is also required for all persons in any damaged vehicle, anyone within 50 m of blast, or anyone who receives a direct blow to the head.

## 6. Links between TBI, PTSD, and AD: Mechanisms, biomarkers, and neuroimaging

There are several possible mechanisms that could link PTSD and TBI with late-life dementia. Identification of common underlying biological mechanisms is essential to an improved understanding of military risk factors for the development AD and for the design of effective prevention and treatment strategies.

Brain injury may cause earlier onset or acceleration of Alzheimer's pathology [32]. For many years, β-amyloid

(Aβ) has been considered the dominant driver of AD. Scientists have also been investigating other molecular and cellular pathways and processes that contribute to AD pathogenesis. Abnormal phosphorylation of tau, which forms the neurofibrillary tangles characteristic of the AD brain, has been implicated as a mechanism of AD pathology for decades [33]. In the early stages of CTE, massive deposition of phophorylated tau (phospho-tau) is seen, particularly in the frontal cortex [11], and this tauopathy is distinct from that seen in AD. The connection between phospho-tau deposition in CTE and AD pathology is unknown. One possibility is that the tauopathy induced by brain injury may predispose an individual to later development of AD. Further, in neuropathological studies of blast-exposed veterans, changes were seen that were similar to those in young athletes with CTE [34].

A well-established risk factor for development of AD is the presence of an apolipoprotein E ε4 (*APOE* ε4) allele [35], which encodes for a protein gene product that regulates Aβ metabolism. The presence of the *APOE* ε4 allele is also associated with increased risk of poor outcome after TBI [36], suggesting a link between *APOE* ε4 and aberrant Aβ metabolism in the wake of head trauma. However, it is interesting to note that it is the *APOE* ε2 rather than the *APOE* ε4 allele that appears to be associated with impaired memory and worsening PTSD symptoms in combat-exposed veterans [37].

Another possible mechanism involves an association of PTSD and TBI with reduced cognitive reserve (CR). The concept of CR posits that intelligence, education, or other life experiences are in some way protective against neurodegeneration [38]. CR may influence the likelihood of developing PTSD [39], and in a study of children and adolescents with mild TBI, the occurrence of postconcussive symptoms was shown to be linked to CR [40]. It is possible that TBI earlier in life damages neurons, reduces connections between neurons, or otherwise diminishes the brain's capacity to function. Thus, later in life when Alzheimer's pathology may develop, an individual who had experienced TBI may develop symptoms at an earlier stage of pathology than someone who had not been exposed to TBI. Thus, TBI could be a risk factor for AD by both mechanisms: acceleration of Alzheimer's pathology and reduction of CR.

Biomarkers should be helpful in clarifying these mechanisms, in identifying endophenotypes of disease, and in assessing soldiers after a blast exposure to determine if intervention or removal from theater is needed. Using boxing as a human model of TBI, Zetterberg and colleagues studied biomarker changes in the cerebrospinal fluid (CSF) of amateur boxers [41] and later in Olympic boxers [42]. They showed that two markers of neuronal and axonal injury—neurofilament light (NFL) protein and total tau—as well as the astroglial injury marker glial fibrillary acidic protein (GFAP) were increased in boxers after bouts in which they had received many hits, but that only NFL and GFAP remained elevated after a period of rest, suggesting that boxing is clearly associated with profound signs of subcortical axonal injury.

Tau, the protein most often linked to neuronal damage in AD, did not remain elevated in these subjects, suggesting a different pathological mechanism in CTE compared with AD. The finding of increased NFL protein would be consistent with reduction of CR. The same team of investigators also assessed CSF biomarkers in army officers who had been exposed to blast overpressure from repeated explosions of firing heavy weapons and found no evidence of brain damage [43].

Neuroimaging of military personnel who have experienced TBI has also provided important clues about the mechanisms of injury and the possible relation to subsequent development of dementia, although many questions still remain. Diffusion tensor imaging (DTI) is particularly useful in identifying DAI, and studies using DTI support the hypothesis that blast-related TBIs may involve axonal injury [44].

## 7. ADNI and DoD-ADNI

The Alzheimer's Disease Neuroimaging Initiative (ADNI) is an ongoing, longitudinal, multicenter study supported by the National Institutes of Health (NIH) and private industry sponsors. Launched in 2003, ADNI is a public-private partnership among federal agencies (NIH, U.S. Food and Drug Administration), pharmaceutical companies, and nonprofit philanthropic organizations, including the Alzheimer's Association. The primary goal of ADNI is to develop, validate, and standardize the use of neuroimaging as an AD biomarker for use in clinical trials. Data generated by ADNI is made available on a public database (UCLA/LONI/ADNI). This database includes clinical data and the imaging data archive from where investigators may upload MRI and PET scans. The ADNI/LONI database is available to all qualified scientists and has supported the publication of more than 300 papers [45].

The first phase of ADNI, now known as ADNI-1, was completed in October 2010. More than 800 participants were enrolled at 57 sites in the United States and Canada. Data were collected from clinical exams, cognitive tests, structural magnetic resonance imaging (MRI), and blood tests. In addition, approximately half of the subjects also had fluorodeoxyglucose (FDG) positron emission tomography (PET) scans and lumbar punctures (LP) for CSF biomarker testing. As a result of add-on funding from the Alzheimer's Association and General Electric, approximately 100 participants had amyloid imaging PET scans with Pittsburgh compound B (PiB). ADNI-1 enrolled three groups of subjects: those with MCI, those with mild AD, and a control group who were cognitively normal. Subsequently, a Grand Opportunities (GO) grant and a continuation grant (ADNI-2) enabled the enrollment of an additional cohort of early MCI (eMCI) participants because it had become clear that the MCI population enrolled in the original ADNI cohort were too far advanced to capture changes that reflect the early stages of AD. In addition to exploring a broader range of severity, ADNI-2 is using an expanded set of imaging tools, including DTI, arterial spin labeling (ASL)

perfusion imaging, resting blood oxygen-level dependent (BOLD) MRI, and analysis of hippocampal subfields.

The major accomplishment of ADNI thus far has been to show that brain atrophy, especially in the hippocampus, is the most sensitive and robust measure of change that can be detected in AD and that it correlates with neuropsychological and functional changes. Another major finding from ADNI has been to show that amyloid deposition as measured by PET imaging predicts a high rate of conversion to MCI and AD [46]. CSF amyloid correlates with amyloid imaging, and acquisition of CSF allows the measurement of other biomarkers. A hypothetical model of biomarker changes as AD progresses was proposed in 2010 [47]. This model predicts lower CSF levels of β-amyloid 42 (Aβ42) as an early sign of AD, followed by elevation of tau and phospho-tau, which signal neuronal injury, and these biomarker changes have been linked to cognitive changes in healthy older adults [48]. Recent ADNI data show that approximately 20% of patients with clinically diagnosed AD appear not to have high levels of brain amyloid detected by amyloid PET imaging. Furthermore, using amyloid PET imaging, approximately 60% of subjects with MCI are positive (indicating MCI due to AD) and 30% of normal subjects in their middle 70s are positive (suggesting preclinical AD). ADNI has been a model for widespread sharing of scientific data without embargo. The World Wide ADNI project (sponsored by the Alzheimer's Association) links U.S. ADNI to similar projects in Australia, Japan, Europe, China, Taiwan, Argentina, Brazil, and Korea [49].

The Vietnam Veterans ADNI Project (DoD-ADNI) is the newest addition to ADNI. This project, funded by DoD, will enroll 210 Vietnam war veterans between the ages of 60 and 80 to examine the effects of TBI and PTSD on AD using imaging and biomarkers.

The primary hypothesis to be tested in DoD-ADNI is that veterans with combat-associated TBI and/or PTSD have increased risk for AD compared with veteran controls as measured by (1) increased florbetapir uptake on amyloid PET scans; (2) decreased CSF Aβ; (3) increased CSF tau and phospho-tau; (4) increased atrophy in several regions in the brain; and (5) reduced cognitive function, particularly delayed recall. The study will also examine the role of brain reserve and *APOE* genotype as well as the correlation between severity of TBI and severity of PTSD or cognitive impairment. The ultimate goal, as in the broader ADNI study, is to enable clinical trials and provide data to other investigators studying AD and TBI.

Subjects in DoD-ADNI will undergo a battery of imaging tests, structural (T1-weighted, T2-weighted, fluid attenuated inversion recovery [FLAIR] MRI, and DTI) and functional (ASL, functional MRI [fMRI], FDG-PET), as well as amyloid imaging with florbetapir. One of the advantages of DoD ADNI is that baseline data are available because of the armed forces qualifying exam and other examinations given at the time of induction. These assessments will enable investigators to determine how many of the veterans fulfill biomarker and imaging criteria for AD or other dementias, such as frontotemporal dementia (FTD) or vascular dementia, and whether dementia-related biomarker or imaging patterns correlate with a history of CTE or PTSD.

The VA has launched two other efforts aimed at improving outcomes for veterans with TBI and PTSD through its three War-Related Illness and Injury Centers (WRIISCs). The Markers for the Identification, Norming, & Differentiation of TBI and PTSD (MIND) study is designed to evaluate the prevalence of TBI and PTSD in OEF/OIF veterans and the effectiveness of screening instruments as well as to identify sensitive and specific objective markers for TBI and PTSD and develop prediction models. The MIND study includes multiple assessments: neuroimaging (DTI, PET, and fMRI); endocrine, neurologic, sensorimotor, and immunologic function; and angiogenic, genomic, and cognitive metrics. A second study, the Blast Injury Outcomes (BIO) study, aims to characterize mild and moderate TBI and PTSD resulting from blast injuries and to examine the relationship between these disorders using multiple measures, eventually leading to a diagnostic prediction algorithm. A convenience sample will be enrolled from multiple sites, including VA medical centers, college campuses, and community-based outpatient clinics. Subjects will be evaluated using neuroimaging; a full cognitive battery; and neurobehavioral, psychosocial, and physiologic measures. The VA and DoD recently released two Requests for Applications for grants concerning TBI and PTSD. Millions of dollars will be awarded to the successful applicants.

## 8. Moving forward

DoD-ADNI provides a unique opportunity to plot the development of biomarkers and correlate them with different types of head injury and PTSD; however, this is only a first step toward fully understanding the relationship of PTSD and TBI to AD. Realization of this goal will require a larger study to collect more subjects, including those with MCI and longitudinal measurements beyond 2 years. Additional studies should be funded to enroll younger subjects to capture early signs of pathology and map the progression to AD. There was broad agreement among participants at the Military Risk Factors for Alzheimer's Disease meeting that coordinated research and data sharing are required to discover relationships among AD, TBI, PTSD, and other military risk factors and to develop effective prevention and treatment strategies.

Additional priorities identified include

- Discovery and validation of additional biomarkers, including markers of inflammation and synaptic dysfunction, as well as other markers that may better predict neurodegeneration after TBI and PTSD.
- Determination of thresholds for exposure to injury in terms of number, timing, and the cumulative effects of exposure as well for TBI and PTSD.
- Development of a validated measure to capture TBI exposure since the point of first injury.

450                                   *M.W. Weiner et al. / Alzheimer's & Dementia 9 (2013) 445–451*

- Continued research on and development of TBI models for basic research.
- Development of standardized assays for biomarkers that will support longitudinal assessments for individuals with injuries. This includes new tests for alterations in olfactory memory and changes in cognition. Development of new radioligands for neuroimaging is also essential.
- Integration of results from standardized assays with electronic medical records or other databases.
- An improved understanding of the frequency of comorbidity of CTE with DAI and/or microhemorrhage.
- Development of tau ligands for imaging tau deposition in the intact brain.
- Support of longitudinal, well-defined studies that focus on the "highest risk" individuals for neurodegenerative disease.
- Creation and dissemination of a study inventory. The inventory would contain new initiatives and those currently funded. This would promote collaboration, avoid unnecessary duplication of efforts, and identify cohorts for longer term evaluation for late-stage disease.

## Acknowledgments

The opinions and assertions in this paper are those of the authors and do not necessarily represent an official perspective or policy of the Department of the Army, the Department of the Air Force, or the Department of Veterans Affairs.

## References

[1] DoD worldwide numbers for TBI. Accessed September 9, 2012 at: http://www.dvbic.org/dod-worldwide-numbers-tbi.

[2] Barth J, Isler W, Helmick K, Wingler I, Jaffee M. Acute battlefield assessment of concussion/mild TBI and return to duty evaluations. In: Kennedy C, Moore J, eds. Military neuropsychology. New York: Springer; 2010. p. 127–74.

[3] Fischer H. U.S. military casualty statistics: Operation New Dawn, Operation Iraqi Freedom, and Operation Enduring Freedom. Washington, DC: Congressional Research Service; 2010.

[4] Seal KH, Metzler TJ, Gima KS, Bertenthal D, Maguen S, Marmar CR. Trends and risk factors for mental health diagnoses among Iraq and Afghanistan veterans using Department of Veterans Affairs health care, 2002-2008. Am J Public Health 2009;99:1651–8.

[5] Invisible wounds: serving service members and veterans with PTSD and TBI Washington, DC: National Council of Disability; 2009.

[6] Yaffe K, Vittinghoff E, Lindquist K, Barnes D, Covinsky KE, Neylan T, et al. Posttraumatic stress disorder and risk of dementia among US veterans. Arch Gen Psychiatry 2010;67:608–13.

[7] Plassman BL, Havlik RJ, Steffens DC, Helms MJ, Newman TN, Drosdick D, et al. Documented head injury in early adulthood and risk of Alzheimer's disease and other dementias. Neurology 2000; 55:1158–66.

[8] Shively S, Scher AI, Perl DP, Diaz-Arrastia R. Dementia resulting from traumatic brain injury: What is the pathology? Arch Neurol 2012;69:1–7.

[9] Martland H. Dementia pugilistica. JAMA 1928;911:103–7.

[10] McKee AC, Stein TD, Nowinski CJ, Stern RA, Daneshvar DH, Alvarez VE, et al. The Spectrum of Disease in Chronic Traumatic Encephalopathy. Brain 2013;136:43–64.

[11] McKee AC, Cantu RC, Nowinski CJ, Hedley-Whyte ET, Gavett BE, Budson AE, et al. Chronic traumatic encephalopathy in athletes: progressive tauopathy after repetitive head injury. J Neuropathol Exp Neurol 2009;68:709–35.

[12] Gavett BE, Stern RA, McKee AC. Chronic traumatic encephalopathy: a potential late effect of sport-related concussive and subconcussive head trauma. Clin Sports Med 2011;30:179–88. xi.

[13] Terrio H, Brenner LA, Ivins BJ, Cho JM, Helmick K, Schwab K, et al. Traumatic brain injury screening: preliminary findings in a US Army Brigade Combat Team. J Head Trauma Rehabil 2009;24:14–23.

[14] Armonda RA, Bell RS, Vo AH, Ling G, DeGraba TJ, Crandall B, et al. Wartime traumatic cerebral vasospasm: recent review of combat casualties. Neurosurgery 2006;59:1215–25. discussion 1225.

[15] Bell RS, Vo AH, Neal CJ, Tigno J, Roberts R, Mossop C, et al. Military traumatic brain and spinal column injury: a 5-year study of the impact blast and other military grade weaponry on the central nervous system. J Trauma 2009;66:S104–11.

[16] Maas AI, Menon DK. Traumatic brain injury: rethinking ideas and approaches. Lancet Neurol 2012;11:12–3.

[17] Kumar R, Husain M, Gupta RK, Hasan KM, Haris M, Agarwal AK, et al. Serial changes in the white matter diffusion tensor imaging metrics in moderate traumatic brain injury and correlation with neurocognitive function. J Neurotrauma 2009;26:481–95.

[18] Thurmond VA, Hicks R, Gleason T, Miller AC, Szuflita N, Orman J, et al. Advancing integrated research in psychological health and traumatic brain injury: common data elements. Arch Phys Med Rehabil 2010;91:1633–6.

[19] Bremner JD. Neuroimaging in posttraumatic stress disorder and other stress-related disorders. Neuroimaging Clin N Am 2007;17:523–38. ix.

[20] Apfel BA, Ross J, Hlavin J, Meyerhoff DJ, Metzler TJ, Marmar CR, et al. Hippocampal volume differences in Gulf War veterans with current versus lifetime posttraumatic stress disorder symptoms. Biol Psychiatry 2011;69:541–8.

[21] Cardenas VA, Samuelson K, Lenoci M, Studholme C, Neylan TC, Marmar CR, et al. Changes in brain anatomy during the course of posttraumatic stress disorder. Psychiatry Res 2011;193:93–100.

[22] Gilbertson MW, McFarlane AC, Weathers FW, Keane TM, Yehuda R, Shalev AY, et al. Is trauma a causal agent of psychopathologic symptoms in posttraumatic stress disorder? Findings from identical twins discordant for combat exposure. J Clin Psychiatry 2010;71:1324–30.

[23] Yehuda R, Flory JD, Pratchett LC, Buxbaum J, Ising M, Holsboer F. Putative biological mechanisms for the association between early life adversity and the subsequent development of PTSD. Psychopharmacology (Berl) 2010;212:405–17.

[24] Elder GA, Cristian A. Blast-related mild traumatic brain injury: mechanisms of injury and impact on clinical care. Mt Sinai J Med 2009; 76:111–8.

[25] Hoge CW, Castro CA, Messer SC, McGurk D, Cotting DI, Koffman RL. Combat duty in Iraq and Afghanistan, mental health problems, and barriers to care. N Engl J Med 2004;351:13–22.

[26] Kennedy JE, Leal FO, Lewis JD, Cullen MA, Amador RR. Posttraumatic stress symptoms in OIF/OEF service members with blast-related and non-blast-related mild TBI. NeuroRehabilitation 2010;26:223–31.

[27] Bryant RA, Harvey AG. Postconcussive symptoms and posttraumatic stress disorder after mild traumatic brain injury. J Nerv Ment Dis 1999; 187:302–5.

[28] McCrea M, Guskiewicz K, Randolph C, Barr WB, Hammeke TA, Marshall SW, et al. Effects of a symptom-free waiting period on clinical outcome and risk of reinjury after sport-related concussion. Neurosurgery 2009;65:876–82.

[29] Bergsneider M, Hovda DA, Lee SM, Kelly DF, McArthur DL, Vespa PM, et al. Dissociation of cerebral glucose metabolism and level of consciousness during the period of metabolic depression following human traumatic brain injury. J Neurotrauma 2000;17:389–401.

[30] Consolidation of traumatic brain injury initiatives in the Department of Defense. Health Affairs Memorandum dated March 23, 2007. Department of Defense: Washington, DC; 2007.

*M.W. Weiner et al. / Alzheimer's & Dementia 9 (2013) 445–451*                                    451

[31] French L, McCrea M, Baggett M. The Military Acute Concussion Evaluation (MACE). J Special Operations Med 2008;8:68–77.

[32] Johnson VE, Stewart W, Smith DH. Widespread tau and amyloid-beta pathology many years after a single traumatic brain injury in humans. Brain Pathol 2012;22:142–9.

[33] Grundke-Iqbal I, Iqbal K, Tung YC, Quinlan M, Wisniewski HM, Binder LI. Abnormal phosphorylation of the microtubule-associated protein tau (tau) in Alzheimer cytoskeletal pathology. Proc Natl Acad Sci U S A 1986;83:4913–7.

[34] Goldstein LE, Fisher AM, Tagge CA, Zhang XL, Velisek L, Sullivan JA, et al. Chronic traumatic encephalopathy in blast-exposed military veterans and a blast neurotrauma mouse model. Sci Transl Med 2012;4:134ra60.

[35] Corder EH, Saunders AM, Strittmatter WJ, Schmechel DE, Gaskell PC, Small GW, et al. Gene dose of apolipoprotein E type 4 allele and the risk of Alzheimer's disease in late onset families. Science 1993;261:921–3.

[36] Zhou W, Xu D, Peng X, Zhang Q, Jia J, Crutcher KA. Meta-analysis of *APOE*4 allele and outcome after traumatic brain injury. J Neurotrauma 2008;25:279–90.

[37] Freeman T, Roca V, Guggenheim F, Kimbrell T, Griffin WS. Neuropsychiatric associations of apolipoprotein E alleles in subjects with combat-related posttraumatic stress disorder. J Neuropsychiatry Clin Neurosci 2005;17:541–3.

[38] Scarmeas N, Stern Y. Cognitive reserve and lifestyle. J Clin Exp Neuropsychol 2003;25:625–33.

[39] Kremen WS, Koenen KC, Boake C, Purcell S, Eisen SA, Franz CE, et al. Pretrauma cognitive ability and risk for posttraumatic stress disorder: a twin study. Arch Gen Psychiatry 2007;64:361–8.

[40] Fay TB, Yeates KO, Taylor HG, Bangert B, Dietrich A, Nuss KE, et al. Cognitive reserve as a moderator of postconcussive symptoms in children with complicated and uncomplicated mild traumatic brain injury. J Int Neuropsychol Soc 2010;16:94–105.

[41] Zetterberg H, Hietala MA, Jonsson M, Andreasen N, Styrud E, Karlsson I, et al. Neurochemical aftermath of amateur boxing. Arch Neurol 2006;63:1277–80.

[42] Neselius S, Brisby H, Theodorsson A, Blennow K, Zetterberg H, Marcusson J. CSF-biomarkers in Olympic boxing: diagnosis and effects of repetitive head trauma. PLoS One 2012;7:e33606.

[43] Blennow K, Jonsson M, Andreasen N, Rosengren L, Wallin A, Hellstrom PA, et al. No neurochemical evidence of brain injury after blast overpressure by repeated explosions or firing heavy weapons. Acta Neurol Scand 2011;123:245–51.

[44] Mac Donald CL, Johnson AM, Cooper D, Nelson EC, Werner NJ, Shimony JS, et al. Detection of blast-related traumatic brain injury in U.S. military personnel. N Engl J Med 2011;364:2091–100.

[45] Weiner MW, Veitch DP, Aisen PS, Beckett LA, Cairns NJ, Green RC, et al. The Alzheimer's Disease Neuroimaging Initiative: a review of papers published since its inception. Alzheimers Dement 2012; 8:S1–68.

[46] Rowe CC, Villemagne VL. Brain amyloid imaging. J Nucl Med 2011; 52:1733–40.

[47] Jack CR Jr, Knopman DS, Jagust WJ, Shaw LM, Aisen PS, Weiner MW, et al. Hypothetical model of dynamic biomarkers of the Alzheimer's pathological cascade. Lancet Neurol 2010;9:119–28.

[48] Stomrud E, Hansson O, Zetterberg H, Blennow K, Minthon L, Londos E. Correlation of longitudinal cerebrospinal fluid biomarkers with cognitive decline in healthy older adults. Arch Neurol 2010; 67:217–23.

[49] Carrillo MC, Bain LJ, Frisoni GB, Weiner MW. Worldwide Alzheimer's disease neuroimaging initiative. Alzheimers Dement 2012;8:337–42.

# Did you know?

You can track the impact of your article with citation alerts that let you know when your article (or any article you'd like to track) has been cited by another *Elsevier*-published journal.

**Visit www.alzheimersanddementia.org today!**

# EXHIBIT 15

*The New York Times*



May 16, 2012

# Brain Ailments in Veterans Likened to Those in Athletes

By **JAMES DAO**

Scientists who have studied a degenerative brain disease in athletes have found the same condition in combat veterans exposed to roadside bombs in Iraq and Afghanistan, concluding that such explosions injure the brain in ways strikingly similar to tackles and punches.

The researchers also discovered what they believe is the mechanism by which explosions damage brain tissue and trigger the wasting disease, called chronic traumatic encephalopathy, or C.T.E., by studying simulated explosions on mice. The animals developed evidence of the disease just two weeks after exposure to a single simulated blast, researchers found.

"Our paper points out in a profound and definitive way that there is an organic, structural problem in the brain associated with blast exposure," said Dr. Lee E. Goldstein of Boston University's School of Medicine and a lead author of the paper, which was published online Wednesday by the peer-reviewed journal Science Translational Medicine.

The paper provides the strongest evidence yet that some and perhaps many combat veterans with invisible brain injuries caused by explosions are at risk of developing long-term neurological disease — a finding that, if confirmed, would have profound implications for military policy, veterans programs and future research.

The study could provide a starting point for developing preventive measures for blast-related brain injuries, as well as drug therapies and diagnostic tests for C.T.E., an incurable disease detected only by autopsy.

"The animal model developed by the researchers will enable a better understanding of the brain pathology involved in blast injuries and, ideally, lead to new therapies to help service members and veterans with traumatic brain injuries," said Dr. Joel Kupersmith, the chief research and development officer for the Department of Veterans Affairs, which helped finance the research.

The paper also seems likely to fuel a debate that has raged for decades over whether veterans who struggle emotionally and psychologically after returning from war suffer from psychiatric problems or brain injuries.

Dr. Goldstein and his co-lead author, Dr. Ann McKee, co-director of the Center for the Study of Traumatic Encephalopathy at Boston University, assert that their paper shows that many of those veterans probably have organic brain injuries and should be given appropriate treatment and disability compensation.

"Not long ago, people said N.F.L. players with behavior problems were just having problems adjusting to retirement," Dr. Goldstein said. "Now it's more or less settled that there is a disease associated with their problems. But we do not have that consensus in the military world yet."

Since 2001, the military has confirmed traumatic brain injury — widely considered the precursor to C.T.E. — in more than 220,000 of the 2.3 million troops who have served in Iraq and Afghanistan, though some experts believe the actual number is higher. There is no way yet of estimating how many of those combat veterans may develop the disease.

Some experts who have read the paper questioned the authors' conclusions, saying that there was not enough data to conclude that blast exposure leads to C.T.E. Dr. McKee autopsied only four veterans, and three of them had head injuries from multiple sources, making it hard to determine the cause of the disease, they said.

"It's too small of a sample size," said Dr. David Hovda, director of the Brain Injury Research Center at the University of California, Los Angeles, and a health adviser to the Pentagon.

But Dr. Hovda said that the growing body of research linking C.T.E. to multiple head injuries was "quite remarkable."

Dr. Daniel P. Perl, professor of pathology at the Uniformed Services University of the Health Sciences, the military's medical school, said the study did not convince him that the injuries from blast exposure were identical to head injuries from sports, and he questioned whether data from the mouse research was applicable to humans. But Dr. Perl, who has just started his own project to study the brains of military personnel, called the paper "an important contribution."

While acknowledging some issues in using mice, Dr. McKee said that animal tests helped resolve a problem scientists face in studying C.T.E.: human patients typically suffer concussions in several ways, whether from car accidents, sports or combat. With mice, the researchers could ensure that the brain damage was caused solely by blast exposure.

C.T.E. causes neurological decay and is linked to memory loss, personality changes, impaired judgment, depression and dementia. A once obscure disorder thought mainly to afflict boxers, it has entered the popular lexicon in recent years as more athletes have received the diagnosis, including David Duerson, the former All-Pro defensive back for the Chicago Bears, who killed himself last year.

The new study out of Boston is just the second time scientists have found C.T.E. in combat veterans. Last fall, a team of researchers led by Dr. Bennet Omalu discovered evidence of the disease in a 27-year-old Iraq war veteran who committed suicide in 2010. The former Marine had reported being close to mortar blasts and roadside bombs in Iraq, but also experienced multiple concussions from contact sports.

Dr. Omalu, the chief medical examiner for San Joaquin County, Calif., said he was preparing another paper documenting C.T.E. in eight veterans who had received diagnoses of post-traumatic stress disorder before they died.

Dr. McKee, who directs a brain donation center at the Department of Veterans Affairs medical center in Bedford, Mass., said it took her four years to gain access to the brains of the four veterans. Three of the veterans had single or multiple exposures to blasts, while a fourth had multiple concussions from football and vehicle accidents.

She compared tissue samples from those veterans with the brains of four athletes — three amateur football players and a professional wrestler — three of whom reported multiple concussions and all of whom died in their teens or 20s. She also studied the brains of four people with no record of concussions.

In all the veterans and athletes, Dr. McKee found the signature evidence of early phase C.T.E.: dead or dying neurons, abnormal clumps of a toxic protein and damaged axons, the fibers that transmit signals between nerve cells. She found no evidence of the disease in the people with no reported concussions.

For the animal part of the study, Dr. Goldstein developed a 27-foot-long "shock tube" to simulate explosions. At one end of the aluminum tube the researchers attached a device that uses compressed nitrogen to explode a Mylar membrane, generating force equal to the explosion of a 120-millimeter mortar round. At the other end, they tied down mice, allowing their heads to move freely.

The researchers found that shock waves from the blast moving at more than 1,000 miles per hour had no perceptible effect on brain tissue. But the subsequent blast wind, traveling at 330 m.p.h., shook the skull violently in what the researchers called "bobblehead effect."

When the scientists examined specially stained tissue from the mouse brains under microscopes just two weeks later, they found the telltale signs of C.T.E.

The scientists also found that mice exposed to blasts showed short-term memory loss and declines in learning capacity just a few weeks later.

But when the researchers immobilized mouse heads during blasts, the mice did not develop learning problems later, suggesting that the brain trauma might be blocked by preventing the head from snapping around during an explosion.

Dr. Hovda said that one implication of the study might be that "traumatic brain injury is not an event that we recover from."

"Maybe it is the beginning of a series of events that we have to deal with for years," he said.

As devastating as that news may seem, it may also provide comfort to some military families.

Jennifer Smith, the widow of Michael Smith, the Marine found to have C.T.E. by Dr. Omalu, said she had gained a better understanding of his suicide after researchers told her his emotional problems might have been the result of a brain injury.

In an interview, Ms. Smith said that after her husband returned from his second tour of Iraq in 2009, he had nightmares and mood swings and seemed angry much of the time. (He also had a concussion from playing football in that period.)

Before he hanged himself in 2010, doctors gave him a diagnosis of post-traumatic stress disorder and put him on antidepressant drugs, to no avail, she said.

"He had no control over it," she said, referring to C.T.E.

EXHIBIT 16



**BREAKING: OHIO STATE FOOTBALL COACH HOLDS NEWS CONFERENCE**

GET ALERTS ✉

HOME   TOP VIDEOS   **MORE** ⌄     🔍

## NFL CONTROVERSY   137
STORIES

Continuing coverage of domestic violence cases involving NFL players Ray Rice and Adrian Peterson.



Sep 18

## Could Brain Injuries Be Behind the NFL Rap Sheet?

**COLLAPSE STORY**

BY LINDA CARROLL

obody saw the warning signs before pro wrestler Chris Benoit strangled his wife and smothered his son, before he placed Bibles next to the bodies and hanged himself from a weight machine.

Benoit was known as "mild-mannered" to WWE officials. After the terrible murder-suicide in 2007, some questioned whether steroids or "roid rage" might have been to blame.

But Dr. Julien Bailes diagnosed another problem after looking at his brain: chronic traumatic encephalopathy or CTE — a degenerative disease that is linked to repeated jolts to the brain.

With Ray Rice, Adrian Peterson and a growing number of NFL players involved in domestic abuse grabbing headlines, it's no wonder that some are starting to ask about a possible concussion connection.



NFL Sponsor 'Not Satisfied' With League's Handling of Scandals

  

NIGHTLY NEWS

Indeed, studies of severe traumatic brain injuries suggest that aggressive behavior might result after repeated concussions.

"Aggression is one of the most common aspects of severe TBI [traumatic brain injury]," said Dr. Douglas Smith, a professor of neurosurgery and director of the Center for Brain Injury and Repair at the University of Pennsylvania. "Generally aggression is thought to be linked to damage to the frontal lobes, which are responsible for executive function. The frontal lobes control things like restraint. Patients are disinhibited and can't modulate their behavior in general, and that includes aggressive behavior."

But brain injury experts say there is no clear cut link between brain injuries and violence.

"It's a very interesting question," said Dr. Bailes, chairman of the department of neurosurgery at the NorthShore University HealthSystem and co-director of the NorthShore Neurological Institute. "If we're talking about domestic violence and homicide—that has not been typical of CTE."

Bailes has autopsied a number of athletes who were suspected of having CTE and says he can think of only two of those, Benoit and a retired NFL player named Justin Strzelczyk, who seemed to have become violent after a history of concussions. Strzelczyk died in a fiery wreck after a high speed police chase and also was found to have CTE.



PLAY VIDEO

NFL Creates All-Female Team to Shape Domestic Violence Policy

  

Bailes, who had been a Steelers team physician when Strzelczyk was on the team, said that the player had undergone a major change in his personality after retirement.

More typical symptoms of CTE include difficulties maintaining relationships, both personal and business, Bailes said, adding that often players with advanced disease spiral into depression and substance abuse and sometimes end up taking their own lives.

But scientists have determined that repeated jolts to the brain can put you in the same place as one big blow to the head, Smith said. Add to that the fact that the frontal lobes are the area of the brain most likely to be damaged in sports like football and you might have a heightened risk of players acting on aggressive impulses.

It's not that repeated blows to the head make a person violent, said David Hovda, a professor of neurosurgery and director of the Brain Injury Research Center at the University of California, Los Angeles. They just might make you less inhibited.

Their effect is probably comparable to the impact of heavy drinking, he said.

"Kind of like when you're intoxicated, where you take away inhibition and then all of a sudden if you have an underlying violent or aggressive personality it's more likely to surface," Hovda said. "I've always said that concussions, or mild traumatic brain injuries, don't just happen to one person, they happen to the entire family."

Still, Smith said, although there seems to be high interest right now with all these sensational stories, there hasn't been enough of a connection between concussion history and aggressive behavior to prompt researchers to actually study the possible link.

Another way to look at it, Hovda said, is to think about the general population.

"If concussions caused violent behavior you'd expect to see millions of people shooting

Case 2:12-md-02323-AB Document 6455-14 Filed 12/02/14 Page 44 of 92

each other," he said.

First published September 17th 2014, 4:49 pm

## LINDA CARROLL

Linda Carroll is a regular contributor to NBC News. She writes about health and science and her work...
Expand Bio

EXHIBIT 17

# Supply and demand analysis of the current and future US neurology workforce

Timothy M. Dall, MS
Michael V. Storm, BA
Ritashree Chakrabarti,
  PhD
Oksana Drogan, MS
Christopher M. Keran,
  BA
Peter D. Donofrio, MD
Victor W. Henderson,
  MD, MS
Henry J. Kaminski, MD
James C. Stevens, MD
Thomas R. Vidic, MD

Correspondence to
Mr. Dall:
tim.dall@ihs.com

## ABSTRACT

**Objective:** This study estimates current and projects future neurologist supply and demand under alternative scenarios nationally and by state from 2012 through 2025.

**Methods:** A microsimulation supply model simulates likely career choices of individual neurologists, taking into account the number of new neurologists trained each year and changing demographics of the neurology workforce. A microsimulation demand model simulates utilization of neurology services for each individual in a representative sample of the population in each state and for the United States as a whole. Demand projections reflect increased prevalence of neurologic conditions associated with population growth and aging, and expanded coverage under health care reform.

**Results:** The estimated active supply of 16,366 neurologists in 2012 is projected to increase to 18,060 by 2025. Long wait times for patients to see a neurologist, difficulty hiring new neurologists, and large numbers of neurologists who do not accept new Medicaid patients are consistent with a current national shortfall of neurologists. Demand for neurologists is projected to increase from ~18,180 in 2012 (11% shortfall) to 21,440 by 2025 (19% shortfall). This includes an increased demand of 520 full-time equivalent neurologists starting in 2014 from expanded medical insurance coverage associated with the Patient Protection and Affordable Care Act.

**Conclusions:** In the absence of efforts to increase the number of neurology professionals and retain the existing workforce, current national and geographic shortfalls of neurologists are likely to worsen, exacerbating long wait times and reducing access to care for Medicaid beneficiaries. Current geographic differences in adequacy of supply likely will persist into the future. *Neurology®* 2013;81:470–478

## GLOSSARY

**AAN** = American Academy of Neurology; **ACS** = American Community Survey; **AMA** = American Medical Association; **BRFSS** = Behavioral Risk Factor Surveillance System; **CDC** = Centers for Disease Control and Prevention; **FTE** = full-time equivalent; **ICD-9** = *International Classification of Diseases, Ninth Revision;* **MEPS** = Medical Expenditure Panel Survey; **MGMA** = Medical Group Management Association; **NNHS** = National Nursing Home Survey; **NRMP** = National Residency Match Program; **PPACA** = Patient Protection and Affordable Care Act.

Neurologists provide care to many of the nation's most vulnerable populations, but indicators point to inadequate patient access to care. The average wait in 2012 for new patients to see a neurologist (34.8 business days) and for follow-up visits (30.0 days) was higher than in 2010 (28.1 days for new and 25.6 for follow-up visits).[1,2] Other studies report average wait for new patient visits of 24.1 days for neurosurgery, 20.3 for family practice, 16.8 for orthopedic surgery, and 15.5 for cardiology.[3,4] In 2012, 39% of children's hospitals reported vacancies of 12 months or longer for child neurologists, and child neurology ranked as one of the most short-handed specialties, with average wait times of 45 business days.[5]

While excessive wait times and difficulty recruiting suggest insufficient capacity to provide neurology services, there is substantial uncertainty regarding the future. Rising prevalence of neurologic conditions associated with an aging population, expanded medical coverage under the Patient Protection and Affordable Care Act (PPACA), and the nation's growing reliance on nonphysician

Supplemental data at
www.neurology.org

From IHS Healthcare & Pharma (T.M.D., M.V.S., R.C.), Washington, DC; American Academy of Neurology (O.D., C.M.K.), Minneapolis, MN; Vanderbilt University Medical Center (P.D.D.), Nashville, TN; Departments of Health Research & Policy and Neurology & Neurological Sciences (V. W.H.), Stanford University, Stanford, CA; Department of Neurology (H.J.K.), George Washington University, Washington, DC; Fort Wayne Neurological Center (J.C.S.), Fort Wayne, IN; and Elkhart Clinic (T.R.V.), Elkhart, IN.

Go to Neurology.org for full disclosures. Funding information and disclosures deemed relevant by the authors, if any, are provided at the end of the article.

© 2013 American Academy of Neurology

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.

clinicians to provide primary care (many of whom have limited training in neurology) will likely increase demand for neurologists.

This study forecasts neurologist supply and demand through 2025 nationally and by state. Key supply and demand trends are taken into account, with scenarios modeled that consider the implications of neurologist work patterns and number of new neurologists trained.

**METHODS** The microsimulation approach used to model neurologist supply and demand differs from approaches used historically, including the approach used in a 1998 neurologist workforce study.[6] We provide a brief overview of the data and methods; appendix e-1 on the *Neurology*® Web site at www.neurology.org provides greater detail.

**Modeling supply.** The approach simulates career choices of neurologists from training through retirement or mortality. Future year projections start with current supply and simulate retirement probability, new graduates, and patient care hours worked. The cycle repeats to simulate subsequent year's supply.

To develop a representative sample of neurologists in each state, we combined information from the 2012 American Academy of Neurology (AAN) database of neurologists, 2008 AAN Member Census File, and 2012 American Medical Association (AMA) Masterfile. The process produces an estimate of 16,366 child and adult neurologists (including residents and fellows, and physicians active in non–patient care activities such as teaching and research) practicing in 2012. This is a relative overestimation of the number of neurologists in practice as residents and fellows require supervision during patient encounters, and academic neurologists and some fellowship-trained neurologists pursue teaching and research and see patients part time.

The 2012 National Residency Match Program (NRMP) data suggest approximately 729 neurologists enter training annually, including 114 child neurology positions.[7] NRMP data report that international students represent roughly 40% of filled resident positions. Our analysis of AMA data for 2010–2011 suggests approximately 14% of neurology residents have a visa status that might require leaving the United States after training. The average training length of residency is assumed to be 4 years, with 2.8% attrition probability assumed for residents during training.[8] The age distribution of new residents comes from the AAN's database of neurologists. The computer simulation creates a synthetic population of new graduates each year with each new resident assigned an age, sex (56% male), and child/adult specialty that reflects distributions seen in recent years. The 2011 AAN Resident Survey indicates that 86% of neurology residents plan to enter fellowships following completion of their residency and reports that the majority of fellowships last a year or two.[9]

Retirement patterns for neurologists were estimated using age at retirement for 168 neurologists (ranging from age 54 to 88 years) whose status recently changed to Senior in the AAN's membership files. These patterns were consistent with retirement rates for general internists who participated in a 2006 survey conducted by the Association of American Medical Colleges.[10] Retirement rates are combined with mortality rates from the Centers for Disease Control and Prevention (CDC) to estimate overall attrition, taking into account that mortality rates through age 65 for professional occupations are approximately 25% lower than national rates for men and 15% lower for women.[11,12] Overall attrition rates suggest that for every 1,000 neurologists entering the workforce, 787 will remain active past age 60, 285 past age 65, and 16 past age 75.

In 2010, neurologists averaged 57.1 professional hours per week, with 42.3 hours in patient care activities. These numbers changed little over the previous decade.[13] To account for changing demographics of the neurologist workforce, we calculated average patient care hours by age and sex using data from the AAN 2010 Practice Profile Survey merged with the 2008 AAN Census. Women tend to work about 14% fewer hours in direct patient care compared to men of similar age.

Future supply is projected under alternative scenarios:

- The baseline scenario assumes current patterns of retirement and hours worked remain unchanged, 729 new neurologists enter the workforce annually, and the demographics of newly trained neurologists remain unchanged from the current distribution.
- High and low graduate scenarios model the implications of a 10% increase (high scenario) and a 10% decrease (low scenario) in new neurologists trained annually.
- Delayed or earlier retirement scenarios reflect neurologists retiring 2 years later or earlier (relative to current patterns).

**Modeling demand.** Demand projections consider demographic, socioeconomic, and health risk factors for a representative sample of the population in each state for 2010 and projected through 2025. Each person's characteristics are used to forecast his or her use of neurology services by care delivery setting (office, outpatient, emergency, and inpatient). The model then applies neurologist productivity estimates to calculate clinical full-time equivalents (FTEs) required to meet demand for services.

*The population database.* Population characteristics come from the United States Census Bureau's 2010 American Community Survey (ACS) and population projections, the CDC's 2009 and 2010 Behavioral Risk Factor Surveillance System (BRFSS), and the CDC's 2004 National Nursing Home Survey (NNHS).[14–18] The population database starts with the approximately 3 million individuals in the ACS, for which we have socioeconomic and demographic data. Health data from the approximately 1,029,000 people in the combined 2009 and 2010 BRFSS files (which covers the noninstitutionalized population) are randomly matched to the noninstitutionalized population in the ACS in the same state, age group, sex, race/ethnicity, income level, and insurance status. Health data from the NNHS are matched to the elderly, institutionalized population in the ACS by age group, sex, and race/ethnicity. The resulting database has over 3 million records and contains demographics (age, sex, race, and Hispanic ethnicity); metro/nonmetropolitan resident; household income; medical insurance type (private, public, self-pay); weight status (unknown, normal, overweight, obese); smoker/nonsmoker status; and diagnosed history of 9 general medical conditions (arthritis, asthma, cardiovascular disease, diabetes, hypertension, depression, heart attack, cancer, and stroke).

With data for approximately 169,000 participants in the combined 2005–2009 files of the Medical Expenditure Panel Survey (MEPS), we used logistic regression to estimate the relationship between patient characteristics and presence of select neurologic conditions: Alzheimer disease, attention-deficit/hyperactivity disorder, cerebral degeneration, epilepsy, extrapyramidal disease not elsewhere classified, mental retardation, migraine, mononeuritis of limb, multiple sclerosis, Parkinson disease, and sleep disorders.[19] These predictive equations were applied to the population database to estimate the probability that each person has the above conditions. Many patient conditions treated by neurologists (e.g., cerebral palsy) are unavailable in the population database. Health care utilization patterns associated with these omitted conditions are captured in the underlying rates of using neurologist services and vary by patient

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.

demographics and the other variables that may be correlated with the presence of these conditions (e.g., Medicaid status).

***The predictive equations for health care.*** Health care seeking behavior is generated from equations using data from the combined 2005–2009 files of the MEPS. Poisson regression quantifies the relationship between patient characteristics and annual number of office visits and annual outpatient visits to a neurologist. Logistic regression is used to calculate the annual probability of an emergency visit and annual probability of hospitalization for neurology-related conditions. Unlike office and outpatient visits, where MEPS specifically identifies the medical professional seen, emergency visits and hospitalizations have no information on medical professionals who provided services. For these settings, we identify neurology visits based on primary *ICD–9* diagnosis codes of 320.xx–359.xx (Diseases of the Nervous System). Separate regressions were estimated for adults and children for each care delivery setting. Explanatory variables include patient demographic and health characteristics described previously.

***Neurologist workload and care delivery.*** Estimates of provider time per encounter convert estimates of demand for services into demand for clinical FTEs. Productivity data come from multiple sources:

- The 2010 AAN Practice Profile Survey (n = 910) reports 72.9% of professional time goes to patient care, 9.7% to administrative responsibilities, 9.1% to research, 5.2% to teaching, and 3% to other activities.[20] Average patient encounters per week by neurologists are 17.4 new patient and 34.4 follow-up ambulatory visits; 8.9 new patient and 14.2 follow-up inpatient consults; and 3.8 new patient and 8.5 follow-up inpatient attending encounters.
- The AAN's 2011 Survey of Neurohospitalists (n = 189) reports that each week the average neurohospitalist has 12.6 new patient and 27.7 follow-up attending evaluations, and 18.0 new patient and 30.2 follow-up consulting evaluations.[21]
- The Medical Group Management Association's (MGMA) 2010 Physician Compensation and Production Survey reports that adult neurologists in group practices average 2,205 ambulatory encounters annually (n = 383 neurologists in 118 practices).[22] MGMA also reports an annual average 515 hospital encounters. Child neurologists average 1,851 ambulatory encounters per year (n = 38 neurologists in 19 practices) and 380 hospital encounters per year (n = 29 neurologists in 16 practices).

Combined with information on the average work relative value unit for new patient and follow-up visits in office/outpatient (2.43 for new patient visit level 4 and 0.93 for established patient visit level 3) and hospital settings (2.61 for initial hospital care level 2 and 1.39 for subsequent care) and after model calibration (to account for fewer patient visits among academic neurologists), we calculate that each 2,860 ambulatory visits equates to approximately one clinical FTE, and each 1,580 hospital consults equates to approximately one clinical FTE, representing about 42.3

---

**Figure 1    Estimated supply and demand for neurologists: 2012**



© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.

| | 2012 | | | 2014 PPACA demand impact | 2025 | | |
|---|---|---|---|---|---|---|---|
| State | Supply | Demand | Gap | | Supply | Demand | Gap |
| AK | 24.4 | 38.1 | 13.7 | 1.5 | 30 | 46 | 16 |
| AL | 185.3 | 295.6 | 110.3 | 8.6 | 207 | 334 | 127 |
| AR | 98.3 | 178.7 | 80.4 | 7.8 | 109 | 210 | 101 |
| AZ | 336.4 | 381.7 | 45.3 | 8.8 | 444 | 547 | 103 |
| CA | 1,650.6 | 1,935.5 | 284.9 | 56.1 | 1,811 | 2,309 | 498 |
| CO | 237.8 | 281.7 | 43.9 | 8.4 | 259 | 330 | 71 |
| CT | 218.4 | 223.2 | 4.8 | 3.6 | 231 | 239 | 8 |
| DC | 128.7 | 34.4 | (94.3) | 0.5 | 114 | 31 | (83) |
| DE | 38.8 | 56.1 | 17.3 | 0.9 | 43 | 66 | 23 |
| FL | 956.7 | 1,110.8 | 154.1 | 44.2 | 1,235 | 1,544 | 309 |
| GA | 391.4 | 544.2 | 152.8 | 21.3 | 487 | 684 | 197 |
| HI | 51.5 | 64.7 | 13.2 | 0.9 | 58 | 72 | 14 |
| IA | 109.0 | 189.2 | 80.2 | 2.2 | 116 | 200 | 84 |
| ID | 43.4 | 91.2 | 47.8 | 2.7 | 60 | 117 | 57 |
| IL | 662.0 | 755.3 | 93.3 | 18.4 | 669 | 818 | 149 |
| IN | 264.5 | 423.8 | 159.3 | 10.9 | 286 | 475 | 189 |
| KS | 113.2 | 170.1 | 56.9 | 3.6 | 122 | 188 | 66 |
| KY | 158.2 | 274.3 | 116.1 | 10.3 | 177 | 313 | 136 |
| LA | 223.1 | 269.0 | 45.9 | 10.2 | 234 | 305 | 71 |
| MA | 799.0 | 430.0 | (369.0) | 1 | 805 | 463 | (342) |
| MD | 548.0 | 341.2 | (206.8) | 7.7 | 551 | 402 | (149) |
| ME | 64.8 | 91.5 | 26.7 | 1.7 | 63 | 104 | 41 |
| MI | 556.2 | 631.1 | 74.9 | 15.3 | 612 | 698 | 86 |
| MN | 391.3 | 325.5 | (65.8) | 4.6 | 432 | 381 | (51) |
| MO | 365.9 | 379.6 | 13.7 | 10.5 | 381 | 432 | 51 |
| MS | 97.0 | 180.1 | 83.1 | 6.4 | 113 | 210 | 97 |
| MT | 41.0 | 59.1 | 18.1 | 2.3 | 51 | 70 | 19 |
| NC | 469.7 | 582.2 | 112.5 | 17.4 | 575 | 735 | 160 |
| ND | 22.2 | 39.9 | 17.7 | 0.9 | 20 | 42 | 22 |
| NE | 67.8 | 105.1 | 37.3 | 2.3 | 70 | 114 | 44 |
| NH | 86.2 | 83.5 | (2.7) | 1.8 | 93 | 102 | 9 |
| NJ | 497.8 | 509.7 | 11.9 | 12.8 | 532 | 567 | 35 |
| NM | 75.5 | 108.5 | 33.0 | 4.9 | 88 | 126 | 38 |
| NV | 71.9 | 150.5 | 78.6 | 5.3 | 108 | 215 | 107 |
| NY | 1,642.6 | 1,130.6 | (512.0) | 24.9 | 1,621 | 1,190 | (431) |
| OH | 663.1 | 740.0 | 76.9 | 20.5 | 694 | 803 | 109 |
| OK | 105.3 | 226.5 | 121.2 | 7.7 | 119 | 254 | 135 |
| OR | 194.6 | 235.3 | 40.7 | 7.6 | 229 | 291 | 62 |
| PA | 885.1 | 816.5 | (68.6) | 17 | 889 | 882 | (7) |
| RI | 81.6 | 67.3 | (14.3) | 1.4 | 91 | 73 | (18) |
| SC | 134.2 | 295.3 | 161.1 | 10.1 | 171 | 364 | 193 |
| SD | 32.4 | 48.1 | 15.7 | 1.3 | 31 | 53 | 22 |

**Table** Estimated supply and demand for neurologists by state: 2012–2025[a]

*Continued*

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.

| State | 2012 | | | 2014 PPACA demand impact | 2025 | | |
|---|---|---|---|---|---|---|---|
| | Supply | Demand | Gap | | Supply | Demand | Gap |
| TN | 300.4 | 390.7 | 90.3 | 12.4 | 358 | 466 | 108 |
| TX | 1,026.8 | 1,279.8 | 253.0 | 66.1 | 1,241 | 1,645 | 404 |
| UT | 134.3 | 149.1 | 14.8 | 4.3 | 160 | 191 | 31 |
| VA | 382.5 | 473.4 | 90.9 | 12.2 | 435 | 571 | 136 |
| VT | 31.7 | 41.4 | 9.7 | 0.7 | 34 | 48 | 14 |
| WA | 351.9 | 409.2 | 57.3 | 6.7 | 411 | 508 | 97 |
| WI | 255.4 | 375.8 | 120.4 | 6.4 | 287 | 430 | 143 |
| WV | 83.2 | 133.6 | 50.4 | 4.1 | 88 | 145 | 57 |
| WY | 15.0 | 32.5 | 17.5 | 0.9 | 15 | 37 | 22 |
| United States | 16,366 | 18,180 | 1,814 | 520 | 18,060 | 21,440 | 3,380 |

**Table** Continued

Abbreviation: PPACA = Patient Protection and Affordable Care Act.
[a] State numbers might not sum to US totals because of rounding.

hours of patient care activity each week. We assume that the proportion of neurologist time spent in patient care remains constant over time.

*Defining and estimating current demand.* Demand for neurologists is derived from patient demand for services, which is determined in part by patients' willingness and ability to pay for services given patient needs and cost of services. Provider demand is influenced by care delivery patterns. For example, to the extent that primary care providers refer patients to a neurologist rather than try to provide the care themselves, there will be an increased demand for neurologists. Likewise, greater use of advanced practice providers in neurology practices allows neurologists to focus on areas of greatest patient need, thus reducing the overall number of neurologists required to provide care to a given population. There are no established criteria for quantifying demand for physician time; therefore, determining whether there are too many, too few, or about the right number of providers is somewhat subjective.

Nevertheless, for this study demand does not equal "need," where need is based on a clinical definition taking into account patient epidemiologic considerations combined with assessment of how care could best be provided to the patient. Likewise, demand for neurology services does not necessarily equate to use of services, especially in geographic areas with reduced access to neurologists because of supply constraints.

Anecdotal evidence from neurologists we interviewed as part of this study consistently indicated difficulty hiring neurologists or nurse practitioners with training in neurology. While no estimate of the magnitude of a current national shortfall exists, demand appears to exceed supply as indicated by excessive wait times to see a neurologist, difficulty hiring neurologists, and number of practices no longer accepting new Medicaid beneficiaries.[1–5] That is, we would require more neurologists to reduce the waiting times to see a neurologist to 1–2 weeks from the present wait of 1 month.

Current national demand for neurologists is difficult to estimate directly, but mathematically demand equals current supply plus (minus) any current shortage (surplus). Current supply can be estimated for 2012. Indicators that a shortfall exists are evident (e.g., abnormally long wait times for appointments) but the magnitude of the shortfall is unknown. If one assumed that national supply and demand were in equilibrium in 2012 (i.e., no shortfall), then comparison of current supply to estimated case-mix adjusted demand in each state would suggest that in 12 states supply exceeds demand, in 3 states (Michigan, Ohio, and Florida) supply and demand are in equilibrium, and in 35 states supply is below demand. Approximately 62% of the nation's population lives in a state where supply is below that required to provide the current national average pattern of care.[16] To bring neurologist supply in these 35 states up to a level sufficient to provide the level of care afforded to the population in Michigan, Ohio, and Florida would take an additional 1,634 neurologists (or approximately 10% more neurologists than current supply). However, even among the 12 states where supply exceeds the level needed to provide the current national average level of care, there are indications of challenges hiring new neurologists. Massachusetts has double the ratio of neurologists per population as the national average, and a 2010 Physician Workforce Study sponsored by the Massachusetts Medical Society indicates the state has a severe shortage of neurologists.[23] Any such shortage in a state with the highest number of neurologists per capita might be explained by the large number of neurologists at nationally recognized academic medical centers in Massachusetts who draw patients from throughout the region. Still, the findings for Massachusetts reiterate that current national supply is insufficient to meet demand. The above findings suggest the nation could readily use an additional 10% adult neurologists, and based on average wait time the current shortfall of child neurologists is substantially greater. For modeling purposes, we assume a 10% shortfall of adult neurologists and a 20% shortfall of child neurologists.

**RESULTS** The forecasting equations for health care use (see appendix e-1) indicate statistically significant increases in use of neurology services associated with higher age, presence of the various neurology conditions, having insurance, and living in a metropolitan area. Non-Hispanic whites and blacks have significantly higher utilization among adults relative to Hispanics and non-Hispanic other races. Smoking is associated with lower rates of ambulatory visits, but higher rates of emergency visits.

Substantial geographic variation exists in adequacy of supply. Our analysis of the 2012 AMA Masterfile suggests that nationally there are an average of 5.2

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.



**Figure 2** Comparison of alternative supply and demand scenarios: 2012–2025

**Total**

**Adult**

**Child**

Supply scenarios
— Retire 2 years later
— 10% more graduates
····· Baseline
— 10% fewer graduates
— Retire 2 years earlier

neurologists per 100,000 population. Rates range from 12.1 (Massachusetts, which has a large number of academic medical centers) to 2.6 (Nevada and Wyoming). Using projected demand for each state after simulating demand for a representative sample of the population in each state, we compare supply and demand in 2012 (figure 1, table).

Controlling for demographics and the other health risk factors included in the analysis but assuming that patterns of care use and delivery remain unchanged over time, at the national level, demand grows by approximately 2,740 FTEs, from approximately 18,180 in 2012 to 20,920 by 2025. This includes growth in demand of 220 child and 2,520 adult neurologists.

Under PPACA, an estimated 30 million adults across the United States could gain medical coverage starting in 2014.[24] Because individual states have some leeway in how they implement PPACA, the total impact on demand for neurologist services is unknown. However, if the current health care use patterns of adults who would gain medical coverage change to patterns of privately insured adults who have similar health risk characteristics, an additional 520 adult neurologists could be needed starting in 2014 (table).

If care utilization patterns for patients in non-metropolitan areas were similar to patterns for similar patients in metropolitan areas, an additional 460 FTE neurologists would be needed in non-metropolitan areas (but this amount is part of the assumed current national shortfall).

Taking into account changing demographics and associated increase in prevalence of neurologic conditions, the national shortfall rises from 11% (the overall shortfall reflecting 10% for adult and 20% for child neurologists) in 2012 to 16% in 2025. With the impact of PPACA, the shortfall rises to 19% by 2025. Even if one assumed that supply and demand currently were in equilibrium at the national level, demand is projected to grow faster than supply.

A comparison of the various supply and demand scenarios projected suggests that even under the most optimistic supply scenario national provider shortfalls are likely to persist (figure 2). For adult neurology under the baseline scenarios, the national shortfall is projected to grow. While supply of child neurologists is growing at a slightly faster rate than demand, a shortfall is projected to persist through 2025. State-level shortages are projected to persist and grow more severe over time (figure 3).

**DISCUSSION** This study highlights a current substantial national shortfall of neurologists, especially pediatric neurologists, and even greater shortfalls in select states. Reports of difficulty filling neurologist

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.



Demand greater than supply

■ Demand 20% or more    ■ Demand 6-19%    ■ Demand = Supply (±5%)

Supply greater than demand

■ Supply 6-19%    ■ Supply 20% or more

positions, long wait time for scheduling new and follow-up visits, low access to care by Medicaid patients, and our sensitivity analysis all point toward a current national shortfall. Through 2025 demand for neurologists is projected to grow faster than supply, creating a serious limitation of access to care for those patients with neurologic disease. The magnitude of the future shortfall may be even greater than suggested by our findings. As more residents subspecialize (e.g., in sports medicine, as hospitalists, and in neurointensive care), there may be even fewer neurologists to provide care to patients with chronic conditions.

The primary strengths of this study include the following: 1) use of recent data with sufficient sample size to provide reliable estimates of key model parameters; 2) use of state-of-the-art workforce projection models; and 3) ability to forecast state and national supply and demand taking into account geographic variation in prevalence of neurologic conditions. The primary limitations include the following: 1) lack of quantified estimate of the magnitude of the current shortfall, although there is evidence that demand exceeds supply; 2) uncertainty of how care delivery patterns might change over time with emerging care delivery models and greater reliance on nurse practitioners and physician assistants; 3) uncertainty of whether low (and possibly decreasing) Medicare reimbursement rates will affect specialty choice for new physicians, as well as the impact of continued low reimbursement rates on physician retirement patterns; 4) uncertainty of whether changes in technology or medical intervention will change the way that care is used or delivered; and 5) the overestimation of present and future supply of neurologists when one factors in the duties of neurologic house staff, neurologists in administration positions, and academic neurologists whose capability of seeing patients is curtailed by other responsibilities. Another uncertainty is how expanding enrollments at existing allopathic and osteopathic medical schools and the development of new medical schools will affect the neurology workforce supply.[25,26] While we model the supply implications of high graduate and low graduate scenarios, potential large reductions in funding for graduate medical education could reduce the number of new graduates by levels even greater than our low graduate scenario.[27] This study does not assess neurologist distribution below the state level, and this is an area for future research.

Interviews with neurologists suggest that care delivery patterns likely will change over time, but

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.

the net impact on demand for neurologists is unclear. Under an Accountable Care Organization delivery model coupled with the Patient-Centered Medical Home concept, it is possible that neurologists might play more of a consultative role in patient care management. That is, neurologists might have less direct interaction with patients while providing consultation to primary care doctors and nurse practitioners. Such a scenario might decrease the demand for neurologists. However, the nation is not producing sufficient numbers of new primary care physicians to keep up with demand, many primary care physicians receive relatively little training in basic neurologic diagnosis and in caring for patients with chronic neurologic conditions, and the American Board of Internal Medicine no longer requires a rotation in neurology over a 3-year period of training. Consequently, a greater portion of primary care services might be delivered by nurse practitioners and physician assistants whose training in neurologic disease is even more limited, suggesting that a decrease in demand for neurologists associated with emerging care delivery models seems less probable than either the same or more demand.

Another trend affecting demand for neurologists is greater use of advanced practice nurses and physician assistants. Neurologists interviewed as part of this study indicated that many neurology practices are relying increasingly on nurse practitioners to provide follow-up care to patients, but face difficulty finding extenders with sufficient neurology training.

Despite the study limitations, the models and methods used provide supportive evidence that in many states there is an inadequate supply of neurologists, and that over time the shortfall will persist and increase. These findings underscore the importance of some combination of increasing the supply of neurologists, increasing the supply of nurse practitioners or other physician extenders who can assist with caring for patients with neurologic disease, and finding innovative ways to deliver care that improves provider productivity.

An article discussing the clinical implications of the current and future US neurology workforce will appear in an upcoming issue of Neurology®.

## AUTHOR CONTRIBUTIONS

T.M. Dall: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data, acquisition of data, statistical analysis, study supervision. M.V. Storm: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data, acquisition of data, statistical analysis. R. Chakrabarti: study concept and design, analysis and interpretation of data, statistical analysis. O. Drogan: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data, acquisition of data, study supervision and coordination, obtaining funding. C.M. Keran: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data, acquisition of data. Dr. Donofrio: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data. Dr. Henderson: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data. Dr. Kaminski: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data. Dr. Stevens: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data. Dr. Vidic: drafting/revising the manuscript for content, study concept and design, analysis and interpretation of data.

## ACKNOWLEDGMENT

The authors thank members of the AAN Workforce Task Force for their dedication and contributions to the project: William D. Freeman, MD, FAAN (Chair); Timothy A. Pedley, MD, FAAN (Co-Chair); Peter D. Donofrio, MD, FAAN; Robert C. Griggs, MD, FAAN; Victor W. Henderson, MD, FAAN; Henry J. Kaminski, MD, FAAN; Steven P. Ringel, MD, FAAN; Bruce Sigsbee, MD, FAAN; James C. Stevens, MD, FAAN; Kenneth A. Vatz, MD; and Thomas R. Vidic, MD, FAAN.

## STUDY FUNDING

Supported by the American Academy of Neurology and in part by an educational grant from Lilly USA, LLC.

## DISCLOSURE

T.M. Dall, M.V. Storm, and R. Chakrabarti are salaried employees of IHS Healthcare & Pharma. O. Drogan and C.M. Keran are salaried employees of the American Academy of Neurology. Dr. Donofrio, Dr. Henderson, Dr. Kaminski, and Dr. Vidic report no disclosures. J. Stevens received research support from Sanofi-Aventis, Biogen-Idec, Teva, and National Institute of Neurological Disorders and Stroke, and is on the Advisory Board for Biogen-Idec and Genzyme and the speakers' bureau for Genzyme, Biogen-Idec, and Teva. Dr. Vidic reports no disclosures. Go to Neurology.org for full disclosures.

Received February 1, 2013. Accepted in final form March 29, 2013.

## REFERENCES

1. American Academy of Neurology. 2012 Practice and Payment Trends Survey: Final Report. Minneapolis: American Academy of Neurology; 2012.
2. American Academy of Neurology. 2010 Medical Economics Issues Survey: Final Report. St. Paul: American Academy of Neurology; 2010.
3. Merritt Hawkins and Associates. Survey for Physician Appointment Wait Times. 2009. Available at: www.merritthawkins.com/pdf/mha2009waittimesurvey.pdf. Accessed August 1, 2012.
4. American Association of Neurological Surgeons. Survey on Medicare Participation Among Neurosurgeons. 2010. Available at: www.aans.org/-/media/Files/Legislative%20Activities/MedicareSurveyReport2010Final.ashx. Accessed August 1, 2012.
5. Children's Hospital Association. Pediatric Specialist Physician Shortages Affect Access to Care. 2012. Available at: http://www.childrenshospitals.net/AM/Template.cfm?Section=Surveys&;Template=/CM/ContentDisplay.cfm&ContentID=63293. Accessed December 22, 2012.
6. Roehrig C, Eisenstein S. Neurology in the Next Two Decades. St. Paul: American Academy of Neurology; 1999.
7. National Residency Match Program. Results and data: 2012 main residency match. Available at: www.nrmp.org/data/resultsanddata2012.pdf. Accessed December 22, 2012.
8. Rocky PH; American Medical Association. Graduate Medical Education: Will Supply Meet Demand? (Presentation citing Pugno PA, AAFP, Annual Rate of Attrition 2005–2009). 2012. Available at: www.uwmedicine.org/education/wwami/

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.

regional-gme/documents/rockey-national-picture-of-gme.pdf. Accessed December 22, 2012.

9. American Academy of Neurology. 2011 AAN Resident Survey Final Report. St. Paul: American Academy of Neurology; 2011. Available at http://www.aan.com/globals/axon/assets/9124.pdf. Accessed June 15, 2012.

10. Association of American Medical Colleges. The Complexities of Physician Supply and Demand: Projections Through 2025. Washington, DC: Association of American Medical Colleges; 2008.

11. Arias E. United States Life Tables, 2008: National Vital Statistics Reports. vol 61. no 3. Hyattsville, MD: National Center for Health Statistics; 2012.

12. Johnson NJ, Sorlie PD, Backlund E. The impact of specific occupation on mortality in the U.S. National Longitudinal Mortality Study. Demography 1999;36:355–367.

13. Adornato BT, Drogan O, Thoresen P, et al. The practice of neurology, 2000-2010: report of the AAN Member Research Subcommittee. Neurology 2011;77:1921–1928.

14. Centers for Disease Control and Prevention. Behavioral Risk Factor Surveillance System Survey. Atlanta: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention; 2010.

15. U.S. Census Bureau. Interim State Population Projections 2000-2030 based on Census 2000. Washington, DC: U.S. Census Bureau; 2005.

16. U.S. Census Bureau. 2010 American Community Survey. Washington, DC: U.S. Census Bureau; 2011.

17. U.S. Census Bureau. National Population Projections 2012 to 2060 (based on 2010 Census). Washington, DC: U.S. Census Bureau; 2012.

18. National Center for Health Statistics. The National Nursing Home Survey: 2004 Overview. Vital Health Statistics 2009;13. Available at: www.cdc.gov/nchs/data/series/sr_13/sr13_167.pdf. Accessed April 15, 2012.

19. Agency for Healthcare Research and Quality. 2005-2009 Medical Expenditure Panel Survey. Rockville, MD: Agency for Healthcare Research and Quality; 2011.

20. American Academy of Neurology. 2010 Practice Profile Form Final Report. St. Paul: American Academy of Neurology; 2010.

21. American Academy of Neurology. 2011 Neurohospitalist Survey Final Report. 2012. Available at: www.aan.com/globals/axon/assets/9122.pdf. Accessed April 15, 2012.

22. Medical Group Management Association. Physician Compensation and Production Survey. Englewood, CO: Medical Group Management Association;2010.

23. Massachusetts Medical Society. Physician Workforce Study. 2010. Available at: http://www.massmed.org/AM/Template.cfm?Section=Research_Reports_and_Studies2&;;TEMPLATE=/CM/ContentDisplay.cfm&;CONTENTID=36166. Accessed July 1, 2012.

24. Buettgens M, Hall MA. Who Will Be Uninsured After Health Insurance Reform? Urban Institute. 2011. Available at: www.urban.org/uploadedpdf/1001520-Uninsured-After-Health-Insurance-Reform.pdf. Accessed September 30, 2012.

25. Association of American Medical Colleges. Results of the 2011 Medical School Enrollment Survey. Washington, DC: Association of American Medical Colleges; 2012.

26. Whitcomb ME. New and Developing Medical Schools. New York: Josiah Macy Jr Foundation; 2009.

27. Nasca TJ, Miller RS, Holt KD. The potential impact of reduction in federal GME funding in the United States: a study of the estimates of designated institutional officials. J Graduate Med Educ 2011;3:585–590.

© 2013 American Academy of Neurology. Unauthorized reproduction of this article is prohibited.

EXHIBIT 18

WETA                              PBS.org

WATCH    SCHEDULE    CONNECT    TOPICS    ABOUT    SHOP    TEACHER CENTER



NEXT ON FRONTLINE

FRONTLINE > Sports > League of Denial: The NFL's Concussion Crisis >

# Transcript

 E-MAIL THIS      Tweet  2  |     Recommend  14     0 

## League of Denial: The NFL's Concussion Crisis

**PRODUCED BY**
Michael Kirk
Jim Gilmore
Mike Wiser

**REPORTED BY**
Jim Gilmore
Steve Fainaru
Mark Fainaru-Wada

**WRITTEN BY**
Michael Kirk & Mike Wiser
and
Steve Fainaru & Mark Fainaru-Wada

**DIRECTED BY**
Michael Kirk

ANNOUNCER: Tonight on FRONTLINE, the epic story of football's concussion crisis.

**HARRY CARSON, Author, Captain For Life:** These players come down with dementia.

ANNOUNCER: A major FRONTLINE investigation of what the NFL knew and when it knew it.

**STEVE FAINARU, FRONTLINE/ESPN:** The level of denial was just profound.

**BETH WILKINSON, NFL's Attorney:** We strongly deny those allegations that we withheld any information or misled the players.

**Dr. MICKEY COLLINS, Univ. of Pittsburgh Medical Ctr.:** We don't know who is at risk for it. We don't know if concussion in and of itself is what causes the abnormalities.

ANNOUNCER: A decades-long battle between scientists, players and the nation's most powerful sports league.

**BENNET OMALU, M.D., Medical Examiner:** You can't go against the NFL. They will squash you.

ANNOUNCER: Next, League of Denial: The NFL's Concussion Crisis.

**ANN MCKEE, M.D., Neuropathologist, BU CTE Center:** I'm really wondering if every single football player doesn't have this.

**FOOTBALL ANNOUNCERS:** Erenberg touchdown! Listen to this crowd! They're on fire!

The Steelers have their receivers in, Stallworth on the left, 82, Swann 88 on the right. Franco Harris is down to 30, big pileup.

He fumbled the ball! And let's see— Minnesota has it! Jeff Seamon on it.

Oh, yeah! It's still wild and woolly, and I love 'em that way!

You love 'em wild and woolly, and you're seeing it now.

Impressive drive by the Steelers!

Everybody loves everybody when you win.

The drive is used a lot of times. Here's a roll-out. Bradshaw fires. Stallworth touchdown!

An awesome physical team were the Steelers today, Pittsburgh, the Super Bowl champs!

NARRATOR: Pittsburgh. For 70 years, they've loved their football team, the Steelers.

**STAN SAVRAN, Pittsburgh Sports Reporter:** This is a tough town. The people here are tough, tough-minded. The way the Steelers played the game meshed perfectly with the people.

**STEELERS FAN:** Hit 'em! Hit 'em!

**STAN SAVRAN:** They loved that hard-hitting, punishing, brutal defense that they played.

NARRATOR: They called the defensive line the "steel curtain."

**STAN SAVRAN:** That just fit perfectly into the way they saw their own lives and what they had to be in order to survive.

NARRATOR: And if there was one iconic Steeler, it was number 52, "Iron Mike" Webster.

**JULIAN BAILES, M.D., Team Physician, Steelers, 1988-97:** Well, Mike Webster exemplified what it was like to be a player in the Steel City and a player in that era that for me was the greatest team of all time.

NARRATOR: In the 1970s, Webster anchored four Super Bowl championship teams.

**BOB FITZSIMMONS, Webster's Attorney:** Mike was a legend and a hero. He may have been "the" legend and "the" hero because here's that blue-collar worker, a center, who doesn't get any glory, doesn't catch the touchdown passes, doesn't kick the 52-

yard field goal to win a game. He's just in every play.

PAM WEBSTER, Wife: I just loved watching him play. And Mike's favorite games were the ones that were cold and snowy and frigid. And he could get up there with his short sleeves. And the dirtier and muddier it got made things better.

NARRATOR: Then 11 years after he retired, the people of Pittsburgh received some bad news.

NEWSCASTER: At what price glory? The Hall of Fame center Mike Webster died at the age of 50.

NEWSCASTER: He died on Tuesday. He was just 50 years old. He was known as "Iron Mike"—

NEWSCASTER: He had heart disease—

NARRATOR: The news that day would start a chain of events that would threaten to forever change the way Americans see the game of football.

NEWSCASTER: It is hard to find a former pro football player whose body hasn't paid a very high price.

NARRATOR: Mike Webster's body was delivered to the Allegheny County coroner's office.

MARK FAINARU-WADA, FRONTLINE/ESPN: Webster ends up in the autopsy room. And the pathologist who's on call that day is this guy, Bennet Omalu.

STEVE FAINARU, FRONTLINE/ESPN: Omalu parked his car and walked into the office. And he said, "What's going on?" And one of his colleagues said, "It's Mike Webster. He's— he's up in the autopsy room." And Omalu's response was, "Who's Mike Webster?"

BENNET OMALU, M.D., Medical Examiner: And everybody looked at me, like, "Where is he from? Is he from outer space? Who is this guy who doesn't know Mike Webster in Pittsburgh?"

MARK FAINARU-WADA: He's a Nigerian-born, incredibly well-educated guy. But he doesn't know anything about football.

NARRATOR: A doctor, Omalu was also a trained neuropathologist. From the beginning of the autopsy, Dr. Omalu could see the effects of 17 years in the football wars.

Dr. BENNET OMALU: Mike looked older than his age. He looked beat up. He looked— he looked worn out. He looked drained. If I had not been told his age, I would say he looked like 70.

NARRATOR: Omalu started at the feet and worked his way up.

STEVE FAINARU: There were cracks running the length of his feet, and they were incredibly painful. And so Webster would use duct tape his feet, as well, to sort of close those cracks and keep them— and keep them together.

GARRETT WEBSTER, Son: His feet and his legs were definitely— you could just tell were destroyed. You know, he had veins all over his legs, varicose veins and stuff like that.

NARRATOR: There were several herniated discs, a broken vertebra, torn rotator cuff and separated shoulder.

PAM WEBSTER: His teeth were falling out. His body— he had cellulitis. He had a heart — his heart, you know, was getting enlarged.

COLIN WEBSTER, Son: You know, he was supergluing his teeth back into his head, and he actually made that work. I mean, I think Dad's the only person who could actually, you know, have a medical problem like that and decide to fix it with superglue.

NARRATOR: Then there was the matter of Webster's forehead.

STEVE FAINARU: Webster's forehead was essentially fixed to its scalp. The skin on his forehead had built up almost a shelf of scar tissue that— from the continuous pounding of his head into other people.

NARRATOR: Webster's death certificate made Omalu suspect he may have suffered from a brain disorder.

Dr. BENNET OMALU: When I opened up his skull, in my mind, I had a mental picture of what his brain would look like, based on my education. I was expecting to see a brain with Alzheimer's disease features, so a shriveled, ugly-looking brain. But upon opening his skull, Mike's brain looked normal.

JEANNE MARIE LASKAS, GQ, "Game Brain" : He didn't understand why that would be, but he became more and more curious. It became sort of like his little private mission.

NARRATOR: Dr. Omalu wanted to fix the brain, preserve it in a chemical bath for further study.

Dr. BENNET OMALU: I said, "Let me fix this brain. Let me spend time with this brain. There's something— something doesn't match." And I remember the technician telling me, he said, "What are you fixing this brain for? That brain is normal."

STEVE FAINARU: And Omalu becomes very firm in that moment, and he says, "Fix the brain. I want you to fix the brain."

NARRATOR: What Omalu could not see was that hidden inside Webster's brain was evidence of a chronic disease.

STEVE FAINARU: And that decision would change the NFL because if Webster's brain had not been examined, I don't honestly think that we would be where we're at today.

NARRATOR: Steve Fainaru and his brother, Mark Fainaru-Wada, are investigative reporters. Steve has a Pulitzer Prize for reporting in Iraq. Mark broke the Barry Bonds steroids story.

For FRONTLINE, ESPN and in their own book, they've been investigating how the NFL has handled evidence that football may be destroying the brains of NFL players.

[www.pbs.org: Read an excerpt]

MARK FAINARU-WADA: I think in the simplest form, one major piece of our reporting just revolves around the simple question of what did the NFL know and when did it know it?

NARRATOR: The NFL would not cooperate with the Fainaru brothers, nor would it talk to FRONTLINE.

MARK FAINARU-WADA: We went to New York to meet with them and say, "Look, this is what we're doing. We'd like you to participate. We'd like you to make available these various people." And the NFL's message was, "Sorry. We're not going to help you."

NARRATOR: But they continued to report the story, beginning with Mike Webster's career in the NFL.

STEVE FAINARU: There's almost a Darwinian quality about the NFL. Webster wanted to prove to the world that he was going to be the toughest, and he did anything that he

possibly could to do that.

NARRATOR: Webster's Sunday afternoons were spent on the line of scrimmage, brutal territory known as "the pit."

ART ROONEY II, Pittsburgh Steelers President and Co-Owner: He had the violence in him. He could explode into the player. Every play was a fight.

NARRATOR: Webster's favorite weapon was his head.

FRED SMERLAS, Buffalo Bills, 1979-89: Well, Webby would hit you with his head first. And with that head, he'd pop you. And then he'd lift his shoulders. Now he'd get you up in the air. Once you hit full speed and you're moving backwards and he hits you, you're gone.

HARRY CARSON, Author, Captain For Life: When he would fire off the ball, he's coming to block me, and if I'm not ready for him, you know, he's going to pancake me. You know, he's going to hurt me.

NARRATOR: Hall of Fame linebacker for the New York Giants, Harry Carson went to war with Mike Webster.

HARRY CARSON: And so I have to meet force with force. All of my power is coming from my big rear end and my big thighs into my forearm, and I hit him in the face. I have to stun him, get my hands on him, throw him off when I see where the ball is going. And when I hit him in the face, his head is going back. He's going forward, but all of a sudden, his head is going back and his brain is hitting up against the inside of his skull.

ROBERT STERN, Ph.D., Neuropsychologist, Boston University: In football, one has to expect that almost every play of every game and every practice, they're going to be hitting their heads against each other. That's the nature of the game. Those things seem to happen around 1,000 to 1,500 times a year.

Each time that happens, it's around 20G or more. That's the equivalent of driving a car at 35 miles per hour into a brick wall 1,000 to 1,500 times per year.

NARRATOR: For Mike Webster, the head hits just kept on coming for 17 years.

GEORGE ATKINSON, Oakland Raiders, 1968-77: You have to survive, so you learn the methods to survive and be the best at surviving in that environment. The minute you put your pads on, you're only one play away from getting seriously injured.

NARRATOR: For Webster and others on the field, physical injuries went with the territory.

JIM OTTO, Oakland Raiders, 1960-74: I mean, it's affected my life. It surely has. But I'm not out there crying about it. I know that I went to war, and I came out of the battle with what I got. And you know, that's the way it is. That's the way Mike Webster would say it, too. I'm sure he would. I mean, we battled in there, and this is what— this is the result of it right here, sitting right here looking at you.

NARRATOR: But what Otto and others do not know is whether football has also caused injuries they cannot see, the result of what they called getting their bell rung.

ANNOUNCERS: Oh, did they hit him that time! His helmet went off.

I don't know how he held onto that! Sammy White, he did a remarkable catch with Skip Thomas and Jack Tatum jackknifing him as he caught the ball for a first down on the Oakland 45-yard line.

NARRATOR: In 1991, Mike Webster left football. Soon he and his family would come to believe those hits to the head had taken a devastating toll.

PAM WEBSTER, Wife: Mike wasn't Mike. He was angrier quicker than before, and didn't have the patience to have, you know, the kids on his lap or take a walk with the kids. Like, he didn't have that stamina physically.

NARRATOR: Over the years, he became increasingly confused.

COLIN WEBSTER, Son: He would forget, you know, which way the grocery store was, which way it was to go home. He was— he actually— he broke down in tears in front of me a couple of times because he couldn't get his thoughts together and he couldn't keep them in order.

NARRATOR: At home, there were bouts of rage.

PAM WEBSTER: He took a knife and slashed all his football pictures. They were all destroyed and gone and broken glass, and they were all down, you know? And it wasn't Mike.

NARRATOR: They'd been college sweethearts. But 27 years and four children later, Mike and Pam Webster's marriage ended.

PAM WEBSTER: We didn't understand what was happening. You're just trying to get by in this storm. I mean, your money's gone. Your pride's gone. Our bills are all overdue. Our house is getting foreclosed. All this security is gone. All those parameters are removed. So everything's crumbling.

NARRATOR: Once one of Pittsburgh's greatest football heroes, Webster began living out of a pickup truck.

COLIN WEBSTER: I'd come outside sometimes and just see him, you know, sitting in the truck. And it would be freezing and he'd just be sitting there, just looking miserable. He'd say, "You know, the worst thing is, is I'm actually getting to the point where sometimes, or if I don't have my medicine," he said, "I'm cold and I don't realize that I can fix it by putting a jacket on."

NARRATOR: Webster was often unable able to sleep.

SUNNY JANI, Friend: He had a lot of pain, and he hasn't slept for days. So he asked me, said, "Sunny, can you tase me?" I'm, like, "What does that mean?

So he pulls out this stun gun and goes "Bzz, bzz." I'm, like, "Mike, that's not healthy." He said, "But I haven't slept nothing." He said, "All you got to do is tase me right here." And I'm, like, "OK." I don't know, you know, he's my hero, I'm going to do whatever he tells me. So I tased him, and he goes—and he goes to sleep. I'm, like, "Wow!"

NEWSCASTER: A true champion who wound up homeless, depressed—

NARRATOR: The story of Webster's decline was revealed on ESPN, and then the local newspapers.

NEWSCASTER: He was arrested for forging 19 prescriptions for Ritalin, which he used to combat the erratic behavior caused by—

PAM WEBSTER: I think he was embarrassed. He was a leader on the team. He was Mike Webster. And then to be down to a place of poverty, a place where, you know, your brain can't function to finish a sentence without some help from Ritalin or whatever you need to function for a short period of time.

NARRATOR: For Iron Mike, TV interviews became impossible.

MIKE WEBSTER: No, I'm talking about— no, I'm just trying to find— yeah, well, everybody went through trauma as a kid. I'm not saying I was different than that. I'm just saying— the things we do to one another, OK—

Hell, I don't know what I'm saying. I'm just tired and confused right now, that's why I say I can't really— I can't say it the way I want to say it. I could answer this real easy at other times, but right now, I'm just tired.

COLIN WEBSTER: Maybe the saddest I ever heard him say was when someone saw my dad and, "Aren't you Mike Webster?" And he said, "I used to be." I think that really was how he felt because he really was. He wasn't the same person. It was— it was like, you know, a picture of him that was just shattered into a million pieces.

NARRATOR: Nearly broke, homeless and losing his mind, Webster decided football had hurt him, and the NFL was going to pay for it. In 1997, he went to see a lawyer.

BOB FITZSIMMONS, Webster's Attorney: The thing that struck me the most was how intelligent Mike was, and the problem was that he just couldn't continue those thought patterns for longer than a 30-second period, or a minute or two minutes. He would just go off on the tangents at that point. It was pretty obvious, actually, the first interview that he had some type of cognitive impairment.

NARRATOR: Attorney Bob Fitzsimmons drew up a disability claim against the NFL.

STEVE FAINARU, FRONTLINE/ESPN: He began to assemble a case with Webster to basically say that Webster had suffered brain damage as a result of his 17-year career in the NFL.

NARRATOR: Fitzsimmons pulled together Webster's complicated medical history.

BOB FITZSIMMONS: So I took the binder of records and got four doctors together, four separate doctors, all asking them, "Does he have a permanent disability that's cognitive? And is it related to football?"

NARRATOR: Webster's final application for disability contained over 100 pages and the definitive diagnosis of his doctors— football had caused Webster's dementia. His claim for disability was filed with the National Football League's retirement board.

STEVE FAINARU: The Disability Committee is part of the NFL. The head of the Disability Committee is the commissioner himself, so it's very much a creature of the NFL.

NARRATOR: From the beginning, the league's board was skeptical, reluctant to give Webster money.

COLIN WEBSTER, Son: They were fighting it from the beginning, against just the common sense of, you know, here's this guy, look at him, you know? He played for nearly 20 years in a brutal and punishing sport, and you know, this is what's going on with him. Why would you fight that? What possible motive?

NARRATOR: The league had its own doctor review Webster's case.

BOB FITZSIMMONS: The NFL had not only hired an investigator to look into this, they also hired their own doctor and said, "Hey, we want to evaluate Mike Webster."

NARRATOR: Dr. Edward Westbrook examined him.

MARK FAINARU-WADA, FRONTLINE/ESPN: Dr. Westbrook concurs with everything that the four other doctors have found and agrees that absolutely, there's no question that Mike Webster's injuries are football-related and that he appears to be have significant cognitive issues, brain damage, as a result of having played football.

NARRATOR: The NFL retirement board had no choice. They granted Webster monthly disability payments.

DOCUMENT: —"has determined that Mr. Webster is currently totally and permanently disabled."

NARRATOR: And buried in the documents, a stunning admission by the league's board — football can cause brain disease.

DOCUMENT: —"indicate that his disability is the result of head injuries he suffered as a football player."

BOB FITZSIMMONS: The NFL acknowledges that repetitive trauma to the head in football, football can cause a permanent disabling injury to the brain.

NARRATOR: The admission would not be made public until years later, when it was discovered by the Fainaru brothers.

MARK FAINARU-WADA: And that was a dramatic admission back in 2000. And in fact, when you talk about that later with Fitzsimmons, he describes that as the sort of proverbial smoking gun.

NARRATOR: It was now in writing. The NFL's own retirement board linked playing football and dementia. At the time, it was something the league would not admit publicly. And Webster felt he'd never received the acknowledgment that his years in the NFL had caused his problems.

PAM WEBSTER: Mike would call this his greatest battle. He'd say it was like David and Goliath, over and over, because it was. He was taking on something that was bigger than him. He took on this battle for the right reasons. He was the right person to do it. Unfortunately, it cost us everything.

NARRATOR: Just two years later, in 2002, Mike Webster died.

BROADCAST DIRECTOR: 15 seconds to air. Stand by all cameras. Ready with slow motion and isolated—

NARRATOR: The first broadcast of Monday Night Football in 1970 marked a turning point in the game's popularity and its revenues.

BROADCAST DIRECTOR: Take tape.

MARK FAINARU-WADA: I think the NFL has done an incredible job at marketing itself and turning itself into a spectacle, a sort of cultural part of our lives.

STAN SAVRAN, Pittsburgh Sports Reporter: It fit the personality of a society that became more violent, that became faster, wanted instant gratification.

ANNOUNCER: [ABC "Monday Night Football," 1970] O.J. Simpson gets the call. Look out!

STAN SAVRAN: Football, from the opening kickoff, it's full go.

ANNOUNCER: What a football player!

NARRATOR: The Monday night games were always among the highest rated television broadcasts.

ANNOUNCER: Look out! Look out!

MARK FAINARU-WADA: _Monday Night Football_— it's not just for football fans.

ANNOUNCER: Speaking of color commentators—

LEIGH STEINBERG, Sports Agent: It became an entertainment show.

ANNOUNCER: [ABC "Monday Night Football," 1983] —vivid picturization of the excitement—

ANNOUNCER: They're number one in the nation.

LEIGH STEINBERG: It became a happening.

HANK WILLIAMS, Jr.: [ABC "Monday Night Football," 1996] [singing] Are you ready for some football, a Monday night invasion—

NARRATOR: The glory and the violence of football was beamed into tens of millions of American living rooms during primetime.

HANK WILLIAMS, Jr.: [singing] Here come the hits, the bangs, the blocks and the spikes, because all my rowdy friends drop in on Monday nights!

STAN SAVRAN: People liked the violence of it. You watch a pro football game, and naturally, the biggest cheers are for the touchdowns, but the second biggest cheers are for a nasty hit.

STEVE YOUNG, San Francisco 49ers, 1987-99: And I describe it as the moment of impact, the moment when you actually have to go tackle somebody, it's really a game of will.

LEIGH STEINBERG: The actual logo of Monday Night Football showed helmets hitting together. And it became part of the popular jargon, you know, "He knocked him silly. He knocked him to the moon."

PLAYER: Set the tone! Knock him out! Knock him out! Let's go!

MARK FAINARU-WADA: There's no question the NFL marketed that violence. That's what we love about the game.

NARRATOR: The NFL's own highly crafted film productions celebrated the violence and the spectacle.

[NFL Films]

NFL NARRATOR: On this down and dirty dance floor, huge men perform a punishing pirouette. The meek will never inherit this turf because every play is hand-to-hand and body-to-body combat!

MIKE ORIARD, Kansas City Chiefs, 1970-73: NFL Films captures the essence of football itself, that tension between the violence and the beauty.

NFL NARRATOR: In the pit, there is more violence per square foot than anywhere else in sport!

MIKE ORIARD: The sense of football as something powerful and elemental and mythic and epic.

NFL NARRATOR: When you talk about big-hitting safeties, the Eagles Donnie Dawkins always emerges.

DONNIE DAWKINS: We're going to dominate this thing! Respect is not given—

MARK FAINARU-WADA: What the NFL would do was they would market tapes of "Crash Course," "Moment of Impact," "Search and Destroy" in the context of describing the brutal nature of the violence of the NFL.

NARRATOR: But away from the glamorized hits, there was a darker side. Superagent Leigh Steinberg saw it firsthand.

LEIGH STEINBERG: I watched athletes I represented play with collapsed lungs. I watched them completely fight with doctors at every time to get into the game. I watched players deceive coaches on the sidelines when they were injured and run back into a game.

NARRATOR: The inspiration for the movie sports agent Jerry Maguire, Steinberg was a

powerhouse alongside the new NFL.

STEVE FAINARU: He was very much a creature of this expanding juggernaut of the NFL.

MARK FAINARU-WADA: He ends up at one point representing 21 quarterbacks in the — 21 starting quarterbacks in the NFL one year.

NARRATOR: In the early 1990s, Steinberg represented one of football's top stars, Dallas quarterback Troy Aikman.

ANNOUNCER: Second and 14, passing down, coming up for Aikman again—

NARRATOR: In 1994, during the NFC championship, Aikman took a knee to the head.

ANNOUNCER: Down he goes! Stubblefield was there first. Troy Aikman took a knee to the head.

ANNOUNCER: You see it right here. It's Dennis Brown coming in. You see the knee right there, knee right on his helmet.

NARRATOR: Aikman's concussion was bad enough that he could not return to the game. Aikman was taken to a local hospital.

ANNOUNCER: —back to the locker room.

LEIGH STEINBERG: I went to visit Troy, who was sitting in a darkened hospital room all alone.

STEVE FAINARU: The room is dark because Aikman can't even stand looking into the light. It's— you know, it's this sort of surreal scene where the city is celebrating and the quarterback who won the game is in the hospital with his agent.

LEIGH STEINBERG: He looked at me and he said, "Leigh, where am I?" And I said, "Well, you're in the hospital." And he said, "Well, why am I here?" And I said, "Because you suffered a concussion today." And he said, "Well, who did we play?" And I said, "The 49ers." And he said, "Did we win?" "Yes, you won." "Did I play well?" "Yes, you played well." "Did— what does that— and so what's that mean?" "It means you're going to the Super Bowl."

MARK FAINARU-WADA: Five minutes later, they're sitting there, they're continuing to hang out, and Aikman suddenly turns to Steinberg and says, "What am I doing here?" And the next thing you know, they are reliving this conversation they'd had five minutes earlier.

LEIGH STEINBERG: For a minute, I thought he was joking. And I went through the same sequence of answers again. And his face brightened and we celebrated again. Maybe 10 minutes passed, and he looked at me with the same puzzled expression and asked the same sequence of questions.

It terrified me to see how tender the bond was between sentient consciousness and potential dementia and confusion was.

ANNOUNCER: Third down and 9, Young throws, and that's incomplete, and— down!

NARRATOR: 49ers quarterback Steve Young was another one of Leigh Steinberg's clients.

ANNOUNCER: —a sight that is the last thing in the world the 49ers would want to see. It looks as almost as if he's out cold.

ANNOUNCER: Al, I've been there. And there he is. He's up. That's a good sign. And what I like is he wants to get up off the ground.

ANNOUNCER: Look at this. He looks like he's out cold, and now he's walking off.

STEVE YOUNG, San Francisco 49ers, 1987-99: I remember thinking as I walked to the sidelines, "This is not good," you know? "This is just not the right thing to happen."

NARRATOR: It was young's seventh concussion.

ANNOUNCER: Well, that's a sight we thought would be impossible. Steve Young apparently knocked cold, knocked out cold, walks off the field—

NARRATOR: He would never play again.

STEVE YOUNG: If my knee is hurt, everyone knows it and I know it, and we can go deal with it, and shoulders. And there's only one place in your body that you really don't understand. And people always say the brain is the last frontier.

NARRATOR: For Steinberg, there was a growing recognition of just how dangerous the sport was.

LEIGH STEINBERG: The damage was occurring every week. And I had people who I loved and cared for. And I intuitively knew that this was not just a football issue, that it was happening to football players in the pros, it was happening in college, it was happening in high school. It was happening to every player in every collision sport. So not only was it an issue for my clients, it was a huge societal issue.

[www.More from Leigh Steinberg]

NEWSCASTER: We have put football injuries on the "American Agenda" tonight—

NEWSCASTER: —playing with pain, increasingly the price of life in the National Football League—

NEWSCASTER: We've heard so much recently on the danger of concussions in sports —

NEWSCASTER: This year, injuries in the National Football League may be out of control—

NARRATOR: By the mid-90s, the concussion crisis had made its way to NFL headquarters on Park Avenue in New York City.

NEWSCASTER: —escalates over the long-term effects of taking hits to head on the football field—

NARRATOR: NFL commissioner Paul Tagliabue orchestrated the league's response. Tagliabue had begun his career as a lawyer.

PETER KEATING, Reporter, ESPN: People have suggested strongly to me that he picked up a lot of techniques about how to aggressively defend things that could turn out to be class actions. You know, the NFL has had this strategy of going nuclear every time it goes to court because the first time you ever lose, you open up the floodgates to potential billions of dollars of damage.

NARRATOR: And Tagliabue said he was skeptical about the risk from concussions, once calling the controversy the result of "pack journalism."

PAUL TAGLIABUE, NFL Commissioner: [Sports panel discussion, December 1994] Concussions I think is, you know, one of these pack journalism issues, frankly. There's no increase in concussions. The number is relatively small. The problem is it's a journalist issue.

LEIGH STEINBERG: This is the commissioner of the NFL saying that there's no concussion issue. If it was ignorance, they should have known. They should have known because the issue is so critical.

NARRATOR: Still, Tagliabue created a scientific committee, the Mild Traumatic Brain Injury Committee, the MTBI. To lead it, he chose Elliot Pellman, the New York Jets team doctor, a firm believer that concussions were not a serious problem.

STEVE FAINARU, FRONTLINE/ESPN: And so you had this— behind the scenes, you know, this dynamic going on where you had a guy, Elliot Pellman, who very clearly believed that this wasn't a problem, it just wasn't a big problem for the NFL.

NARRATOR: To outsiders, the choice of Pellman was unusual. He was not an expert in neurology and had no background in brain research.

PETER KEATING: He went to a school in Guadalajara. Dr. Pellman is not a neurosurgeon. He's not a neuro anything. He's a rheumatologist.

STEVE FAINARU: You know, putting a rheumatologist on the head of the committee that arguably was going to have more influence over brain research, you know, than any other— any particular institution in the country at the time, you know, was, I think a lot of people felt, surprising.

NARRATOR: Most of Pellman's committee was made up of NFL loyalists. Nearly half the members were team doctors.

ROBERT CANTU, M.D., Neurosurgeon, Boston University: If you're going to put together a blue ribbon committee to study brain trauma, it should have as its chair somebody who has that as a background, either a neurologist, neurosurgeon, neuropathologist, preferably a clinician.

NARRATOR: For years, Pellman's committee would insist they were studying the problem, that the danger from concussions was overblown.

PETER KEATING: The way the NFL handled this was for 15 years to do research that looks awfully like it was designed to say that the league was OK in doing what it was doing — which wasn't much — to protect players from the dangers of concussions.

NARRATOR: Pellman's committee began writing a series of scientific papers, and in 2003, got the first of them published in the medical journal Neurosurgery.

ROBERT STERN, Ph.D., Neuropsychologist, Boston University: Those initial studies from the NFL were notorious in telling the world over and over and over again, "No, there's no relationship between hitting your head in football and later life problems. No, there's no relationship."

NARRATOR: The papers downplayed the risk of concussions—

DOCUMENT: —"Mild TBIs in professional football are not serious injuries."

NARRATOR: —insisted that players could return to the same game after suffering a concussion—

DOCUMENT: "Return to play does not involve a significant risk of a second injury.""

NARRATOR: —denied players suffered any long-term problems from concussions sustained while playing football—

DOCUMENT: —"that there was no evidence of worsening injury or chronic cumulative effects of multiple MTBIs in"—

NARRATOR: —and in one of the papers, even suggested their research might apply to younger athletes, despite the fact they had not studied high school or college players.

DOCUMENT: "It might be safe for college/high school football players to be cleared to return to play on the same day as their injury."

Dr. ROBERT CANTU: They were making comments which were greatly at odds with

prospective, double-blinded studies done at the college and the high school level that just weren't finding the same things. And that just didn't make sense to anyone that's a scientist.

NARRATOR: Dr. Robert Cantu edited the journal's sports medicine section. The papers were published despite his objections.

Dr. ROBERT CANTU: The papers started to make statements about multiple head injuries were not a problem in the NFL. If they went back into the same contest with a concussion, it didn't matter. If they got knocked out and went back into the same contest, it didn't matter. There were no long-term psychological problems or cognitive problems in these athletes, in essence, saying it wasn't a problem.

NARRATOR: Dr. Cantu says he took his concerns to the journal's editor-in-chief, Dr. Michael Apuzzo. Apuzzo was also a consultant for the New York Giants.

Dr. ROBERT CANTU: I said that I really think this data is flawed. I really think it shouldn't be published. He's the one that made the decision to publish papers, no matter whether the reviewers felt they should be published or not, no matter whether the section editor felt they should be published or not.

NARRATOR: Mark Lovell was a member of the committee and an author on some of the studies. He now admits there were problems with the research.

MARK LOVELL, Ph.D., Neuropsychologist: I look back on some of the papers, yeah, I think I could have done it differently. I think the fault of the paper was, it was maybe too early to be making those statements based on a fairly small sample of players, which is the major criticism of the study which I think is a valid one.

NARRATOR: The NFL committee published 16 papers. Neither Dr. Apuzzo, Dr. Pellman, nor Commissioner Tagliabue would speak to FRONTLINE about the papers. But in those articles, the league had issued its definitive denials.

PETER KEATING, Reporter, ESPN: The closer you look, the less this holds up. But it did establish, you know, this kind of impressive-looking set of findings which pushed off the day of reckoning for the league.

That's really what is happening here, right? During this whole run of research that's being published, the day of reckoning, where the league has to answer to somebody about what it's doing about concussions, just keeps getting pushed off and pushed off and pushed off.

NARRATOR: In Pittsburgh at just about this time, Mike Webster's brain tissue was being examined. Dr. Bennet Omalu was studying the microscopic samples.

BENNET OMALU, M.D., Medical Examiner: I put the slides in and looked. Whoa! I had to make sure the slides were Mike Webster's slides. I looked again. Ah! I looked again. I saw changes that shouldn't be in a 50-year-old man's brains, and also changes that shouldn't be in a brain that looked normal.

JULIAN BAILES, M.D., Team Neurosurgeon, Steelers 1988-97: He saw collections of tau protein, collections which shouldn't be there in someone of Mike Webster's age. And this is what jumped out at him as he looked at it through the microscope.

NARRATOR: Dr. Omalu believed he saw physical evidence of the long-term damage playing football could have on the brain. It was a scientific first.

Dr. BENNET OMALU: Because after I looked at it over and over and over and over, I was convinced this was something.

NARRATOR: It was a disease never previously identified in football players, chronic traumatic encephalopathy— CTE.

Dr. ROBERT CANTU: Chronic traumatic encephalopathy is a disease, a progressive neuro-degenerative disease, where the end stage leaves tau protein deposition in distinctive areas of the brain, in distinctive locations that separate this disease from any other, like Alzheimer's or some other dementia.

ROBERT STERN: For some reason, the repetitive brain trauma starts this cascade of events in the brain that changes the way this tau looks and behaves. It goes awry. And it starts destroying the integrity of the brain cells.

[www. More about CTE and the brain]

MARK FAINARU-WADA, FRONTLINE/ESPN: The tau is effectively closing in around the brain cells and choking them. And it's impacting the way the brain is working, and ultimately, erupting in issues around memory, agitation, anger.

NARRATOR: Omalu shared his evidence with leading brain researchers, who confirmed his findings. Then he submitted a scientific paper on the Webster case to the one journal that seemed to be most interested in head injuries in football, Neurosurgery, and Dr. Apuzzo accepted it.

STEVE FAINARU: Omalu is a junior pathologist in the Allegheny County coroner's office, but the people he published with were one of the leading Alzheimer's disease experts in the country, one of the leading neuropathologists in the country, and one of the most well-known coroners in the country.

NARRATOR: It was the first hard evidence that playing football could cause permanent brain damage.

JULIAN BAILES, M.D., Team Neurosurgeon, Steelers, 1988-97: Certainly, we knew that if you got hit on the head so many times, maybe you had a 20 percent chance of having dementia pugilistica if you were a former professional boxer. But we didn't really relate that in a modern sport like football, in a helmeted sport, that it could lead to that. And that was the big discovery, I think.

NARRATOR: Dr. Omalu believed the National Football League would want to know about his discovery.

Dr. BENNET OMALU: That was what I thought, in my naive state of mind. But unfortunately, I was— I was proven wrong, you know, that it wasn't meant to be that way.

NARRATOR: In a letter to the journal Neurosurgery, Dr. Pellman and other members of the NFL's MTBI committee attacked Dr. Omalu's paper.

DOCUMENT: "These statements are based on a complete misunderstanding of the relevant medical literature."

NARRATOR: They even questioned whether Mike Webster was suffering from neurological problems.

DOCUMENT: —"that there is inadequate clinical evidence that the subject had a chronic neurological condition"—

PETER KEATING, Reporter, ESPN: The league officials, the doctors and scientists serving on the MTBI committee, not only disputed those findings, they went after Dr. Omalu with a vengeance. They publicly said he should retract his findings.

NARRATOR: The NFL doctors insisted Dr. Omalu was misunderstanding the science of brain injury.

DOCUMENT: "We therefore urge the authors to retract their paper"—

STEVE FAINARU, FRONTLINE/ESPN: It's an extraordinary move under any

circumstances. Like, you don't try to get a paper retracted unless there's evidence of fraud or plagiarism or something like that.

DOCUMENT: "Omalu et al's description of chronic traumatic encephalopathy is completely wrong."

PETER KEATING: They went after him with missiles— I mean, like a nuclear missile strike on a guy's reputation. They basically told him to go away and never come back. And that was just for starters.

NARRATOR: In the end, Dr. Omalu's paper was not retracted. And now Omalu had another case.

NEWSCASTER: Terry Long killed himself by drinking anti-freeze.

NARRATOR: A second Steeler had died.

NEWSCASTER: Terry Long committed suicide by drinking anti-freeze.

NEWSCASTER: Terry Long was young—

NARRATOR: And Dr. Omalu received his brain.

Dr. BENNET OMALU: I came to work one morning and everybody there said, "Hey, we have another case for you." I said, "What are you talking about?" They said, "Oh, Terry Long died." I'm, like, "Who's Terry Long?" Said, "Oh, he's another NFL player. He died."

NARRATOR: Long was an offensive lineman with the Steelers for eight years. He battled in the pit alongside Mike Webster.

MARK FAINARU-WADA: He— like Webster, his life had sort of fallen apart in a lot of ways. He had issues, certainly, during his career.

STEVE FAINARU: He was a steroid user. He had been involved in some serious financial problems.

MARK FAINARU-WADA: And so ultimately, he committed suicide by drinking antifreeze.

NARRATOR: As he had for Webster, Dr. Omalu sectioned part of Long's brain and again had it stained.

JEANNE MARIE LASKAS, GQ, "Game Brain" : He ran the same test, same stains, found the same splotches, CTE in his brain, too. Now two former Steelers who had gone crazy about the same time.

Dr. BENNET OMALU: When I saw Terry Long's case, I became more convinced that this was not just an anomaly, a statistical anomaly.

NARRATOR: Omalu submitted another paper to Neurosurgery, this one about Terry Long.

JEANNE MARIE LASKAS: That caused the MTBI committee to say, "This is preposterous. This is not good science. This is still not something that we're buying into."

Dr. BENNET OMALU: If you read, Pellman made statements like what I practice is not medicine, it's not science. They insinuated I was not practicing medicine, I was practicing voodoo. Voodoo!

NARRATOR: The NFL would not publicly sit down with Dr. Omalu. But one night, in a private meeting, he brought his CTE slides and finally met face to face with one of the NFL's doctors.

Dr. BENNET OMALU: And the NFL doctor at some point said to me, "Bennet, do you know the implications of what you're doing?" I looked. He was on my left. I said, "Yeah, I think I do." He said, "No, you don't." [laughs] So we continued talking, talking. At some point, he interrupted me again, "Bennet, do you think you know the implications of what you're doing?" I said, "I think I do. I don't know." He said, "No, you don't." So we continued talking again.

Then a third time, he interrupted me, and I turned to him and I said, "OK, why don't you tell me what implications are?" He said, "OK, I'll tell you." He said, "If 10 percent of mothers in this country would begin to perceive football as a dangerous sport, that is the end of football."

[www. Watch on line]

JULIAN BAILES, M.D., Team Neurosurgeon, Steelers, 1988-97: For the most part, people didn't want to believe it's true. They didn't want to admit to themselves or anybody else that our beloved sport, probably our most popular sport, could end up with brain damage. I didn't want to admit it to myself, either. It was a hard message, a difficult message, a bad message, but it appeared to be true.

NEWSCASTER: Owners of the 32 teams—

NARRATOR: Then in New York, a change in the NFL's top leadership.

NEWSCASTER: The NFL will have a new commissioner—

NEWSCASTER: There's a changing of the guard at the National Football League.

NARRATOR: In September of 2006, Commissioner Paul Tagliabue stepped down.

NEWSCASTER: The right-hand man to Tagliabue is running the show.

NEWSCASTER: Tagliabue will be succeeded by Roger Goodell.

NARRATOR: His second in command and closest aide, Roger Goodell, took over. Goodell had grown up in Washington, the son of a United States senator from New York. Early in his career, he worked as former commissioner Pete Rozelle's driver.

MARK FAINARU-WADA: He basically got his job by writing to the commissioner and saying, "Please, I'd like to work in the NFL."

NARRATOR: It took Goodell 24 years to work his way to the top. He was chief operating officer when the league's scientific committee sent those controversial papers to the journal Neurosurgery.

STEVE FAINARU: Here's a guy who's spent more than half of his life in the NFL, and more than anyone should be acutely aware of the sort of dangers that are lurking in this problem.

NARRATOR: Now Goodell was fully in charge of the league's handling of the concussion crisis. He soon replaced the rheumatologist Dr. Elliot Pellman and promoted the neurologist Dr. Ira Casson.

PETER KEATING: Dr. Ira Casson, who is an expert, but an abrasive person who is contemptuous of the arguments that concussion can cause damage.

NARRATOR: Casson had once joined Pellman in attacking Omalu's work. Now one of Casson's first moves, a public denial of Omalu's conclusions.

[HBO Real Sports, May 14, 2007]

CORRESPONDENT: Ira Casson leads a team of NFL doctors who did a study of several hundred active players and reported that the concern over head injuries is overblown.

Is there any evidence, as far as you're concerned, that links multiple head injuries among pro football players with depression?

IRA CASSON, M.D., Co-Chair, MTBI Committee, 2007-09: No.

MARK FAINARU-WADA: Dr. Ira Casson ends up with this sort of very famous exchange that earns him the nickname "Dr. No."

CORRESPONDENT: With dementia?

Dr. IRA CASSON: No.

CORRESPONDENT: With early onset of Alzheimer's?

Dr. IRA CASSON: No.

JEANNE MARIE LASKAS, GQ, "Game Brain": And Ira Casson was asked repeatedly, "Is there any link between trauma, head trauma, and the kind of dementia we're seeing in these players?" And he says, "No. No. No. No."

CORRESPONDENT: Is there any evidence as of today that links multiple head injuries with any long-term problem like that?

Dr. IRA CASSON: In NFL players?

CORRESPONDENT: Yeah.

Dr. IRA CASSON: No.

NARRATOR: Then just one month later, in Chicago, a dramatic gesture from Commissioner Goodell. At an airport hotel, the league gathered the top NFL brass, team doctors and trainers.

MARK FAINARU-WADA: The NFL convenes a summit in the summer of 2007.

STEVE FAINARU: About 200 people are gathered there, and running the show is Ira Casson. The stakes for the NFL are obvious. It's huge business. If the business is potentially lethal, then that's going to have major implications for the game.

NARRATOR: On this day, the commissioner would take a front row seat to listen to the best medical minds in the league.

PETER KEATING: All the teams are present. All the teams had to send doctors and trainers. And the league's concussion people are there.

NARRATOR: They had even invited outside scientists who had become some of the league's biggest critics. But one person was missing.

PETER KEATING: Dr. Omalu is excluded, just underscoring how they don't want to do business with him.

BENNET OMALU, M.D., Neuropathologist: I was not aware of it. Nobody ever told me. Dr. Bailes called me and said the NFL is putting together a conference on CTE, that you were not invited.

JEANNE MARIE LASKAS: He is shunned. I mean, it was a loud just, "No, not you. Yes, you're the guy with all the research, you're the guy who's published the papers, you're the guy who's got the brains. But no, you're not coming."

NARRATOR: Former Steelers team doctor and neurosurgeon Julian Bailes had become a true believer in CTE and Omalu. They were now research partners. He offered to present Omalu's work to the group.

Dr. JULIAN BAILES: So I presented and showed our data, which was four or five cases

at that point.

NARRATOR: Besides Mike Webster and Terry Long, Omalu also found CTE in the brains of Andre Waters and Justin Strzelczyk. Bailes delivered Omalu's message: Playing football could cause permanent brain damage.

Dr. JULIAN BAILES: It wasn't met with any broad acceptance, to say the least.

STEVE FAINARU: Julian Bailes got up and talked about Omalu's work. And while he's up there, Casson is off to the side and he's rolling his eyes. He's clearly distressed by what he's hearing. And that was basically the idea that was conveyed by the NFL in that moment.

Dr. JULIAN BAILES: There was skepticism. There was dismissiveness on his part. There was great doubt.

NARRATOR: As Bailes left the meeting, he ran into New York Times reporter Alan Schwarz.

ALAN SCHWARZ: I remember Julian being furious, absolutely furious at how they had been treated in that room. And there was clearly— among the NFL committee, there was just a very steadfast belief that this is not a problem. "You guys don't know how to do research the way we do. And thank you for coming."

Dr. JULIAN BAILES: I was not the bearer of good news, probably, in many people's minds. This was not something that I made up. This was showing what the findings were.

NARRATOR: Earlier, Goodell had watched his mentor, Tagliabue, downplay the concussion controversy. Now he had heard firsthand how serious some respected scientists thought the issue was.

MARK FAINARU-WADA: Roger Goodell's on notice. The NFL has a serious issue around the question of concussions, around the issue of brain trauma, on the rising suggestion that there is a link between football and neuro-degenerative disease amongst its former players, and that there is a growing body of science that clearly establishes this link.

NARRATOR: Outside the conference's closed doors, the new commissioner insisted that the NFL had the problem under control.

[June 19, 2007]

ROGER GOODELL: The evidence is that our doctors are making excellent decisions. That's proven by the six-year study that we have and the research that's been done that looks at that issue intensively.

NARRATOR: The head of Goodell's concussion committee, Dr. Ira Casson, took on the critics.

IRA CASSON, M.D., Co-Chair, MTBI Committee, 2007-09: Anecdotes do not make scientifically valid evidence. I'm a man of science. I believe in empirically determined, scientifically valid data. And that is not scientifically valid data.

NARRATOR: Casson insisted there was no evidence that football players were at risk for CTE.

Dr. IRA CASSON: In my opinion, the only scientifically valid evidence of a chronic encephalopathy in athletes is in boxers and in some steeplechase jockeys.

NARRATOR: Dr. Casson declined to be interviewed by FRONTLINE.

ANNOUNCER: This venerable stadium will be a wild scene tonight!

NARRATOR: And as the teams took the field just a few months later, in the fall of 2007, the league's definitive statement on brain injury was given to every single player in a pamphlet.

ALAN SCHWARZ, The New York Times: The cover says, "What is a concussion," question mark. It said, you know, "If I get a concussion, am I further at risk for long-term problems?" And the answer was, and I'm virtually quoting, "Research has not shown that there are any long-term consequences to concussions in NFL players as long as each injury is treated properly."

STEVE FAINARU: The message was that football is safe to your brain. That was the message, "Don't worry about it."

[www: Timeline: NFL's changing positions]

NARRATOR: The commissioner and the league had successfully held the line, denying the dangers of football.

ALAN SCHWARZ: They refused to listen to people who didn't share their opinions about the research, and it was very much, you know, putting a stake in the ground saying everybody else is wrong. And that's what they did.

NARRATOR: Shunned by the league, bruised by the struggle and looking to make a change, Dr. Omalu left Pittsburgh. He moved to Lodi, California.

MARK FAINARU: He ends up in the dust bowl of north central California, and he's working as a medical examiner there, as far removed from the NFL as anybody could be, and trying to figure out how to sort of stay in it.

Dr. BENNET OMALU: I wish I never met Mike Webster. CTE has dragged me into the politics of science, the politics of the NFL. You can't go against the NFL. They'll squash you. I really, sincerely wished it didn't cross my path of life, seriously.

ANNOUNCERS: Second and 3, ball on the 3—

In motion, wide open, touchdown!

JANE LEAVY, Journalist: The brains are precious cargo.

ANNOUNCER: Now back to the third, and he goes outside—

CHRIS NOWINSKI, Author of the Book/Film Head Games: We have to get the brain usually within hours of the death.

ANNOUNCER: —scores a touchdown.

Dr. ROBERT CANTU: You have a brain that's intact. It's been removed from the upper spinal cord.

ANNOUNCER: He's at the 40! He's at the 45! Midfield! He's going to go!

NARRATOR: It is the brain of a former football player.

JANE LEAVY: This is a process that is awe-inspiring in the old-fashioned sense of the word.

CHRIS NOWINSKI: You have the responsibility of actually possessing somebody's brain, which is probably the best representation of who they were. You know, you really treat it with the utmost respect.

STEVE FAINARU: From a scientific perspective, there's this secret that's being unlocked.

ANN McKEE, M.D., Neuropathologist, BU CTE Center: We take it out, we weigh it,

we photograph it, all the external surfaces.

JANE LEAVY: The attitude is so careful about— that this is a person that's being delivered into their care.

Dr. ANN McKEE: I never forget that the brain is a human being. I feel very privileged that someone has trusted me with this duty.

NARRATOR: In 2008, Dr. Ann McKee was a leading Alzheimer's researcher.

Dr. ANN McKEE: This is what I do. I look at brains. I'm fascinated by it. I can spend hours doing it. In fact, if I want to relax, that's one way I can relax.

NARRATOR: Then one day, she received a phone call from the Boston University medical school.

ROBERT STERN, Ph.D., Neuropsychologist, Boston University: I called her and said, "Are you interested in looking at the brains of former football players?" And she didn't drop a beat and said, "Are you kidding!" I had no idea that she was a super football fan.

Dr. ANN McKEE: I was born with football— my brothers, my dad. I played football when I was a kid. I mean, you know, it was part of life. It's a part of growing up. It's— you know, it's a way of life. So I get it.

NARRATOR: Now Dr. McKee was joining a team of researchers to build on Dr. Omalu's discovery.

MARK FAINARU-WADA: She's learned a little bit about the work that had previously been done in this issue by Omalu and others, and she's eager to find some brains.

NARRATOR: McKee and colleagues from Boston University were determined to examine as many brains as they could, and this man knew how to get them.

MARK FAINARU-WADA, FRONTLINE/ESPN: Chris Nowinski shows up and says, "Look, I'll find the brains for you. I'll bring them to you. And they're going to be football players. Are you interested?" And she says, "Absolutely." You know, she describes it as like the greatest collision on earth for her.

NARRATOR: For Nowinski, the issue of CTE is personal. he worries he has it.

CHRIS NOWINSKI, Author of the Book/Film Head Games: I'd be a fool not to worry about CTE personally. And I took as much brain trauma as anybody. I think I have more than enough reasons to believe that I'm going to be fighting this myself. I am fighting it.

NARRATOR: At Harvard, Nowinski was a punishing tackler. He suffered countless head injuries. Then instead of the NFL, he became a professional wrestler..

MARK FAINARU-WADA: He ends up with the nickname Chris Harvard, the persona of this sort of snobbish wrestler who's smarter than all the fans.

CHRIS HARVARD: You people should be grateful to have someone of my intelligence in your presence!

NARRATOR: For Chris Harvard, the performance often ended with a blow to the head.

CHRIS NOWINSKI: Chris Harvard landed on his head quite a bit. You know, as much as wrestling is performance, there's a very, very small margin of error. And especially when you're learning the thing, you know, you fall on your head a lot.

NARRATOR: Nowinski began to have violent nightmares and migraine headaches.

CHRIS NOWINSKI: And I said, "There's something really wrong with me." And the headache didn't go away for five years.

NARRATOR: Brain trauma became an obsession.

CHRIS NOWINSKI: What motivated me every day was the fact that my head was killing me. And I knew that I felt awful. And I knew that I wasn't the only person, but I was a person in a position to make a difference.

NARRATOR: He would take on the task of finding brains of former football players for Dr. McKee.

STEVE FAINARU, FRONTLINE/ESPN: They call him, like, the designated brain chaser, like that's his job, to go out and get the brains.

NARRATOR: Nowinski made the hard calls, asking families to donate the brain of a deceased loved one.

CHRIS NOWINSKI: At the beginning, when I first kind of got up the nerve to do it, you know, I wrote down a script and I prepared, I practiced, mentally preparing myself for wandering into someone's life like this.

NARRATOR: Almost right away, Nowinski secured a portion of the brain of a 45-year-old former Tampa Bay Buccaneer, Tom McHale.

ROBERT STERN: Tom McHale was a brilliant guy, went to Cornell, had been playing football since a kid. His brilliance intellectually was matched by being an incredible athlete.

NARRATOR: Tom and Lisa McHale had three sons. Once his career was over, McHale ran a successful chain of restaurants. But then, uncharacteristically, trouble.

LISA McHALE, Wife: Restlessness, irritability and discontent describe Tom to a T today, but no way is it anywhere near the man I had known and the man I had been married to for years.

JANE LEAVY, Journalist: The change was so diabolical. He became a drug addict. He became depressed. He became— you know, had irate moments of, you know, violent temper.

NARRATOR: McHale's addictions spiraled out of control— pain killers, cocaine.

LISA McHALE: I remember so clearly him looking at me — and this is going back, you know, in the final months of his life — and saying, "Lisa, when I look in your eyes, all I see is disappointment."

And I honestly don't know whether he was seeing my disappointment, or whether it was his own disappointment that he was seeing reflected back. But it pains me to think of how much that hurt him.

NEWSCASTER: A former Tampa Bay Buccaneer was found dead this morning—

NEWSCASTER: A former Tampa Bay Buccaneers player—

NARRATOR: He had died of an overdose. Dr. McKee had read Dr. Omalu's research, but she wanted to see for herself.

ANN McKEE, M.D., Neuropathologist, BU CTE Center: We dissect and section his brain, do a whole series of microscopic slides, look at it with all sorts of different stains for different things, and then come to a conclusion about what the diagnosis is.

NARRATOR: What she saw was that telltale protein, tau.

Dr. ANN McKEE: This is a 45-year-old with terrific disease. I mean, he had florid disease. He has tau in all these regions of the his brain.

NARRATOR: Dr. McKee had examined thousands of brains, but the location of the

damage from CTE was different.

ROBERT STERN, Ph.D., Neuropsychologist, BU CTE Center: I remember my feeling. I was scared. I was really scared. It really was a turning point. It was a new understanding that, "Hey, you know, this might be bigger than we think."

NARRATOR: Dr. McKee soon had three brains, all with CTE. But rather than just publish in scientific journals, Chris Nowinski was determined to get the word out.

JANE LEAVY: Nowinski, who is not a scientist, says, "There are people getting hit here. If we speak up now, we may be able to, if not save lives, at least prevent the damage that we are seeing on Ann McKee's table."

NARRATOR: Nowinski decided to take on the NFL in a very public way, at their biggest event, the 2009 Super Bowl.

FAITH HILL, Entertainer: [singing] All right, what a night, it's finally here. Super Bowl Sunday's kicking into high gear—

NARRATOR: The glitz and glamour of the NFL production machine was in full gear, developed over decades—

FAITH HILL: [singing] We've been waitin' all day for a Super Bowl fight—

NARRATOR: —highly choreographed—

FAITH HILL: [singing] —running and hitting with all their might, yeah, everyone's ready for—

NARRATOR: —a national event with a carefully crafted story.

FAITH HILL: [singing] The whole world's ready, kick that ball off the tee because it's Super Bowl rocks on NBC—

NARRATOR: In Tampa, before the big game, Nowinski and McKee tried to crash the festivities by holding a press conference.

MARK FAINARU-WADA, FRONTLINE/ESPN: This is the genius of Nowinski, really, I mean, right? I mean, we're going to present her findings.

Dr. ANN McKEE: This is something you would never—

MARK FAINARU-WADA: Where do we want to announce that? Oh, let's go to Tampa Bay where the Super Bowl's about to play out, where there's 4,000 media members who are there waiting to watch.

Dr. ANN McKEE: We have examined thousands of brains, and this is not a normal part of aging. This is not something you normally see in the brain.

MARK FAINARU-WADA: They were saying, "Football caused this. This is an issue." I think McKee uses the word "crisis." She says, "This is a crisis, and anybody who doesn't believe it is in denial."

NARRATOR: Also on the panel, Nowinski's other star, Lisa McHale.

LISA McHALE: Eight months ago, I lost my best friend, my college sweetheart and my husband of 18 years—

NARRATOR: Lisa McHale had decided to go public with her husband's story.

LISA McHALE: I never hesitated to be public with Tom's findings because I was so fully blown away to know that Tom could have had the kind of injury he had to his brain and that it could have been caused by football. And I said, "My God, of course. This is information that I would have like to have had."

NARRATOR: And after her husband's death, McHale decided to become an advocate for Dr. McKee's research.

LISA McHALE: He is now the sixth confirmed case of CTE among former NFL players. And bearing in mind that only six former NFL players have been examined for CTE, I find these results to be not only incredibly significant but profoundly disturbing.

NARRATOR: But that day, there were few reporters listening.

CHRIS NOWINSKI: There were thousands of reporters across the street and probably two dozen who were willing to walk across and learn about CTE.

ROBERT STERN: That was the shocking part. You know, here we were in the midst of everything and this potentially giant story was being told, and virtually no one was there.

CHRIS NOWINSKI: Everyone, thank you so much for your time, and we're available if you want to stick around.

NARRATOR: Nowinski's press conference was no match for the show the NFL was putting on across town.

ANNOUNCER: The build-up is over, and away we go in Super Bowl 43!

NARRATOR: Then one of the most watched television broadcasts in history, a 30-second ad sold for $3 million. It was the crowning event for a year in which the NFL earned almost $8 billion.

ANNOUNCER: Here's the run-up, and Super Bowl 43 is under way with the flashbulbs a-poppin'!

MARK FAINARU-WADA: The league is this massive force financially. The Super Bowl is a spectacle. TV is paying huge money to televise the sport.

ANNOUNCER: He gets it away quickly and finds the tight end over the middle, and it's Heath Miller!

STEVE FAINARU: The NFL is broadcast over five networks. ESPN, where we work, their new contract with the NFL is worth almost $2 billion year. So they're basically paying around $120 million per game. That's, like, the budget of a Harry Potter movie every week, week in, week out.

ANNOUNCER: And the Pittsburgh Steelers become the first franchise in history to win six Super Bowls!

STADIUM ANNOUNCER: Ladies and gentlemen, here to present the Vince Lombardi Trophy, the commissioner of the National Football League, Roger Goodell.

ROGER GOODELL: Well, some said that we could not top last year's Super Bowl, but the Steelers and Cardinals did that tonight!

NARRATOR: Presiding over it all, the most powerful man in sports.

ROGER GOODELL: —and all the Steelers fans, congratulations on your sixth world championship!

NARRATOR: He sat atop a multi-billion-dollar empire that he was determined to protect.

STEVE FAINARU: One of his mantras was to "protect the shield," the NFL shield, to protect the integrity of the game.

NARRATOR: But now the league might face huge lawsuits and a tarnished image if Dr. McKee's findings about CTE held up.

Not long after her trip to Tampa, Dr. McKee received a phone call.

Dr. ANN McKEE: I was called by Ira Casson. And I remember thinking, "Why is Ira Casson calling me?"

STEVE FAINARU: She's intimidated from the start because she knew enough about Ira Casson, she said, to know that he wasn't necessarily a friend.

Dr. ANN McKEE: And he wanted me to come to the NFL office and present the data.

NARRATOR: That May, McKee and Nowinski arrived at NFL headquarters.

CHRIS NOWINSKI: We head on up to a very, very fancy conference room, nice wood paneling, jerseys and trophies in the glass. And it was probably 15 members of the committee.

MARK FAINARU-WADA: And one of the first things McKee notices is that there's only one other woman in the room, and it's not a doctor, it's a lawyer.

PETER KEATING, Reporter, ESPN: A lawyer is not there to offer medical advice. And a lawyer is not there to offer competitive athletic advice, either. A lawyer is there to figure out what the league needs to do to defend itself against a storm that may or may not come, but the league has to be ready to fight.

Dr. ANN McKEE: I'm up against a lot of doubters. I'm up against people who don't think that any of this holds any water. So, fine. I'm just going to show them what I have. And they kept interrupting.

NARRATOR: Dr. Ira Casson and others on the committee expressed their skepticism that playing football was the cause of CTE.

STEVE FAINARU: Very, very quickly, she got serious pushback from Ira Casson and the rest of the committee.

NARRATOR: Indianapolis Colt team physician Dr. Henry Feuer was one of the NFL doctors the meeting.

HENRY FEUER, M.D., MTBI Committee, 1994-2010: I just have a problem. Ann McKee— she cannot tell me where it's starting. We don't know the cause and effect. We don't know that right now. We don't know the incidence.

NARRATOR: The committee members believed Dr. McKee could not answer two important questions. Causation— did football cause CTE? And prevalence— how many players had it.

Dr. HENRY FEUER: She was seeing only those that were in trouble, and we know that there are thousands roaming around that are not having problems. So again, I think that's where we had— we may have had an issue.

JOSEPH MAROON, M.D., MTBI Committee, 2007-10: I think we're very early in the evolutionary understanding of CTE. A certain percentage of the individuals diagnosed with this have had steroid abuse, alcohol abuse, other substances abuses. We don't know the concussion history in many of these. And there may be other confounding factors in terms of the genetics that we simply don't understand.

ANN McKEE, M.D., Neuropathologist, BU CTE Center: They were convinced it was wrong, and I felt that they were in a very serious state of denial.

CHRIS NOWINSKI, Co-Director, BU CTE Center: I remember at one point, one of the NFL doctors asking, you know, "Couldn't you be misdiagnosing this? You know, these all look like they could be frontal temporal dementia." And Ann said, "Well, actually, I was on the NIH committee that defined how you diagnose that disease. So no, they're definitely different diseases." You know, like, she had the experience and they didn't.

NARRATOR: And according to Dr. McKee, there was something else, something

familiar about the way the NFL committee was acting.

Dr. ANN McKEE: I don't want to get into the sexism too much, but sexism plays a big role when you're a doctor of my age who's come up in the ranks with a lot of male doctors. Sexism is part of my life. And getting in that room with a bunch of males who already thought they knew all the answers— more sexism. I mean, you know, it was, like, "Oh, the girl talked. Now we can get back into some serious business."

Dr. HENRY FEUER: I— you know,I don't know why she feels that way. I thought that she presented herself, as I recall — it's been several years — that there was something — something in her manner. And— and I think she's a brilliant woman. She's done a great job. There was just something just about the way she said it. And not that everybody was looking down. You know, it was just—

NARRATOR: Dr. Feuer insists Dr. McKee is mistaken about how she was treated.

Dr. HENRY FEUER: If we for some reason coming— came across as being disrespectful, then I would say that everybody else we interviewed over the 15 years must have felt the same way. That's all I can say about that. And I feel strongly about that, too.

We would just— we would listen, and "Thank you," and that's it. Whether she wanted us to start— you know, I don't know where she's coming from on that.

NARRATOR: The meeting had changed nothing.

Just a few blocks from NFL headquarters, the commissioner had another problem. In a midtown Manhattan restaurant, an internal NFL research document was leaked to a reporter.

ALAN SCHWARZ, The New York Times: Documents were passed to me at Smith and Wollensky's in Manhattan, in an envelope. I mean, it was great — it was very "Deep Throat"— by somebody who shall remain nameless. But he literally slid it across the table in an envelope.

NARRATOR: It was a scientific study of former players commissioned by the National Football League itself.

ALAN SCHWARZ: At the bottom of page 32, there it was, "dementia." And they had asked players, or their representatives, their wives, "Have you been diagnosed by a physician as having Alzheimer's, dementia, or any other memory-related disease?""

ROBERT STERN, Ph.D., Neuropsychologist, BU CTE Center: What it showed was that former NFL players seem to have memory-related disorders at a much, much higher rate than people in the regular community. And here was a study that the NFL supported, and it came out not looking too good for the NFL.

ALAN SCHWARZ: It was the people who the league hired to find out the answers to these questions giving them the answers. And that's what they were. And so you knew that this was going to be big.

NARRATOR: The study went to the heart of the prevalence question. In this case, it showed the prevalence of brain disorders was far higher among football players than the NFL anticipated.

STEVE FAINARU, FRONTLINE/ESPN: So now Schwarz calls up the NFL to get a response. And what he gets from Greg Aiello, the league spokesman, is more denials. They're now denying their own study.

NARRATOR: Aiello insisted the study's design was flawed. But now the NFL's concussion crisis was again national news.

STEVE FAINARU: And so it's becoming almost impossible for the NFL to ignore it.

NARRATOR: At the same time, another force was also causing trouble for the NFL and the commissioner, the wives and widows of players with CTE.

JANE LEAVY, Author, The Woman Who Would Save Football: I don't think anyone else but the wives, sisters, mothers, daughters, and Ann McKee, could have forced this issue into American consciousness.

NARRATOR: Eleanor Perfetto was one of them. Her husband, Ralph Wenzel, had played for the Pittsburgh Steelers.

ELEANOR PERFETTO, Wife of Ralph Wenzel: As the disease progressed, he went from being ill but fairly functional to getting to the point where he could no longer, you know, dress or feed himself. And in the last year-and-a-half to two years before he died, he couldn't even walk anymore.

NARRATOR: She'd spent years trying to get help from the NFL and its players association. Then Perfetto took matters into her own hands. She showed up uninvited to a league meeting about caring for retired players.

MARK FAINARU-WADA, FRONTLINE/ESPN: There's going to be a meeting that the commissioner is holding with former players. And you know, her husband, suffering, you know, from dementia, obviously can't be represented there by anybody but her. And she's told she's not allowed to enter the room.

NARRATOR: It was the commissioner himself who kept Perfetto out.

ELEANOR PERFETTO: And I said, "I'd like to attend this meeting." And he said, "No, you can't attend. It's only for players. It's not for anyone else." And I said, "But my player — my husband is a player who's severely disabled, and he can't be here right now."

NARRATOR: Nevertheless, the commissioner said no.

NEWSCASTER: The issue is head injuries among players, and if those injuries can lead —

NARRATOR: As the concussion story received more attention, the coverage helped spark interest in the nation's capital.

NEWSCASTER: Congress considers concussions in the NFL—

NEWSCASTER: Congress is getting into the game. They're looking into the long-term impact—

Rep. JOHN CONYERS, Jr., (D-MI), Judiciary Committee Chairman: The meeting will come to order.

NEWSCASTER: Congress is looking into the long-term impact of concussions.

STEVE FAINARU: Congress saw it as a way to put the NFL's concussion policies on trial in the court of public opinion.

NARRATOR: The commissioner arrived like a celebrity, the star attraction at the hearing and the focus of all the cameras.

PETER KEATING, Reporter, ESPN: Goodell is asked point-blank if he stands by the idea that concussions don't hurt pro football players.

[October 2009]

ROGER GOODELL: Let me address your first question—

PETER KEATING: He can't answer.

ROGER GOODELL: You're obviously seeing a lot of data and a lot of information that

our committees and others have presented with respect to the linkage. And the medical experts should be the one to be able to continue that debate.

Rep. JOHN CONYERS: I just asked you a simple question. What's the answer?

ROGER GOODELL: The answer is the medical experts would know better than I would with respect to that, but we—

ALAN SCHWARZ: His consistent response to questions was, "I am not a scientist and any questions about the long-term effects of concussion or head trauma in NFL players are better addressed to scientists."

NARRATOR: One at a time, committee members went after Goodell.

Rep. MAXINE WATERS (D), California: We have heard from the NFL time and time again. You're always studying, you're always trying, you're hopeful. I want to know, what are you doing now?

Rep. LINDA SANCHEZ (D), California: The NFL sort of reminds me of the tobacco companies pre-'90s, when they kept saying, "No, there's no link between smoking and damage to your health or ill health effects."

MARK FAINARU-WADA: The last thing the league wanted to be dealing with in that moment was the analogy to big tobacco. There's nobody in America who doesn't know what that means. That means denial.

STEVE FAINARU: You have the commissioner of the NFL who's being hauled before Congress to answer why his own research arm has been denying since 1994 that football causes brain damage, when everybody from The New York Times to former NFL players, to the respected research scientists are saying, in fact, the opposite is true.

NEWSCASTER: —talked about NFL owners as being like tobacco executives—

NEWSCASTER: —but I think it's seen as being plausible—

NEWSCASTER: —the NFL, similar to what the tobacco industry engaged in—

NARRATOR: Back in New York, with the pressure mounting, the commissioner decided to make some dramatic changes.

[www: The NFL's positions]

NEWSCASTER: The NFL changes its playbook—

NEWSCASTER: New rules for treating athletes with concussions—

NEWSCASTER: NFL commissioner Roger Goodell wants all teams to adhere to a new policy for head injuries—

STEVE FAINARU: They'd just been hauled before Congress and the commissioner was embarrassed by Linda Sanchez. They'd been compared to big tobacco. And they were trying to fight back.

NARRATOR: The commissioner initiated a series of new rules designed to protect players from concussions.

STEVE FAINARU: It was quite obvious what they were doing. They were in the middle of a major damage control operation.

NEWSCASTER: From now on, teams should consider a concussion a game-ending injury.

NARRATOR: Dr. Casson was out.

NEWSCASTER: Dr. Casson resigned from the NFL's concussion committee.

NARRATOR: And a new concussion committee would be formed, led by two prominent neurosurgeons.

NEWSCASTER: The NFL is committed to medical and scientific research—

NARRATOR: And there was one other surprise.

ALAN SCHWARZ: I read on the wire that the NFL had given a million dollars to Boston University. What? And so I called up Chris, like, "What the hell's going on?" He didn't know what was going on. He's, like, "What are you talking about?"

CHRIS NOWINSKI, Co-Director, BU CTE Center: The answer was, "I don't know what you're talking about. This doesn't sound right at all."

ANN McKEE, M.D., Neuropathologist, BU CTE Center: A CBS reporter wanted to know what I thought of the gift of a million dollars. That was the first I heard of it. I was, like, floored.

NARRATOR: And Goodell offered Dr. McKee something she needed even more than money— brains.

MARK FAINARU-WADA: They get a letter from the league. It says you guys are now the NFL's "preferred" brain bank and that the league will help with efforts to direct families to donate the brains of former players to Boston so that they will be studied for CTE.

NEWSCASTER: The National Football League says it will encourage current and former players to donate their brains—

NARRATOR: As the story of the deal broke—

NEWSCASTER: The NFL is donating $1 million towards the study—

NARRATOR: —the NFL'S spokesman, Greg Aiello, received a call from reporter Alan Schwarz.

ALAN SCHWARZ: While we were talking, he said "It's clear that there are long-term consequences to concussions in NFL players." Now, that kind of statement don't make news if anybody else says it. But this time, it was the league saying it.

STEVE FAINARU: Schwarz stops. You know, he knows that the NFL has not only been denying this for years, that they've never come close to uttering anything even remotely close to this.

ALAN SCHWARZ: And I said, "Greg, you realize that's the first time that anyone associated with the league has made that connection." And I remember, he was a little — I don't— what's the adjective? Annoyed. He was annoyed.

MARK FAINARU-WADA: The Times now suddenly has a huge story, that the NFL has acknowledged a link between brain damage and football. And sure enough, stripped across the top of The Times sports section the next day is that very story.

NARRATOR: At Dr. McKee's research lab, thanks to the NFL's endorsement, the brain bank business was booming.

Dr. ANN McKEE: There were NFL players out there that were talking to their wives and saying, "I think this might be something." You know, "I'm experiencing some problems. And I'm thinking I should donate my brain to this work."

NARRATOR: By 2010, Dr. McKee had looked at the brains of 20 NFL players. She had found CTE in 19 of them. It was during that time that a brain arrived that would dramatically raise the stakes.

League of Denial: The NFL's Concussion Crisis | FRONTLINE | ...

ROBERT STERN, Ph.D., Neuropsychologist, BU CTE Center: Owen Thomas to me was a critical case. Here we have a 21-year-old who was a hard-hitting lineman from the age of 9 on.

CHRIS NOWINSKI: And then, seemingly out of nowhere, he decided to take his own life. Never been diagnosed with a concussion, never had a problem in the world.

NARRATOR: Owen Thomas had hanged himself in his off-campus apartment. Chris Nowinski secured his brain for Dr. McKee. Without any history of diagnosed concussions, it seemed unlikely he had CTE.

Dr. ANN McKEE: I was fully prepared to see nothing. I remember late at night looking at the brain and thinking, "Just going to knock this one off." And it just floored me. It just— I just couldn't believe what I was seeing.

NARRATOR: Such an advanced case of CTE had never been found in such a young person.

Dr. ANN McKEE: In, like, 20 spots in his frontal lobe. He's 21. He's so young. You know, that changes the game to me.

ANNOUNCER: —wrapped up and brought down by Owen Thomas—

NARRATOR: Because he'd never had a diagnosed concussion, Dr. McKee suspected Thomas might have gotten CTE from the everyday sub-concussive hits that are an inherent part of the game.

ANNOUNCER: Another nice play by Owen Thomas—

Dr. ANN McKEE: Those sub-concussive hits, those hits that don't even rise to the level of what we call a concussion, or symptoms, just playing the game can be dangerous.

ANNOUNCER: A crucial matchup in the AFC—

MARK FAINARU-WADA: McKee is saying, "Look, this is very much an issue at the core of the game, of offensive lineman and defensive linemen pounding the crud out of each other on every single play, on every single down and every single practice, and there's no getting around that."

NARRATOR: It was a controversial theory that raised fundamental questions about the way the game was played.

HARRY CARSON, Author, Captain For Life: The human body was not created or built to play football. When you have force against force, you're going to have injuries. And I'm not talking about the knees and— you know, all of that stuff is a given. But from a neurological standpoint, you're going to have— you're going to have some brain trauma.

NARRATOR: Harry Carson has been studying the matter since he retired 25 years ago.

HARRY CARSON: You know, most people are keyed in on the big hit. But the little mini-concussions are just as dangerous because you might be sustaining six to ten, maybe a dozen of these hits during the course of a game. And you know, if you're going up against top-flight players who are able to perfect those skills of hitting you upside the head, or you know, getting hit with an elbow or— it's one of those things that at some point, you're going to pay for it down the line.

[www: More from Harry Carson]

STEVE YOUNG, San Francisco 49ers, 1984-99: You know, I really worry about my lineman brothers. I really worry for my running back brothers. I mean, that's the truth. We're talking about a nefarious injury, one that you never feel until it's too late. So that's the— that's just— when I look back over 30 years of— associated with football, that's the thing that's most alarming to me.

MICHAEL ORIARD, Center, Kansas City Chiefs, 1970-73: The way the game is played, I don't see how you can eliminate all of those routine hits that linemen make every play. How do you eliminate them with— and have the game still be football?

NARRATOR: Back in the lab, McKee had seen another surprising case.

Dr. ANN McKEE: We had been able to get the brain of an 18-year-old who had died 10 days after suffering his fourth concussion playing high school sports.

NARRATOR: It was the brain of 18-year-old Eric Pelly. A high school senior, a straight-A student, he'd played multiple sports. His dream was to play for the Steelers.

ROBERT CANTU, M.D., Neurosurgeon, BU CTE Center: No one, I think, would have thought that you were going to find chronic traumatic encephalopathy in a high school athlete.

Dr. ANN McKEE: I was shocked to find that in the brain of this 18-year-old, there were little tiny spots, little tiny areas in the frontal lobe that looked just like this disease.

Dr. ROBERT CANTU: You have an 18-year-old with chronic traumatic encephalopathy. That just shouldn't happen.

Dr. ANN McKEE: I had an 18-year-old at that time. You know that that brain is supposed to be pristine. The fact that it was there, and he was only playing high school level sports, I mean, I think that's a cause for concern.

NARRATOR: For Dr. McKee and others, it raised the obvious question. How safe is it for children to play football?

YOUTH FOOTBALL TEAM: What time is it? Game time! What time is it? Game time!

HARRY CARSON: From a physical risk standpoint, you know what you are doing when you sign your kid up, that he can hurt his knee, OK? But what you should know now is your child could develop a brain injury as a result of playing football. It's not just on the pro level, it's on every level of football. The question is, do you want it to be your child?

NARRATOR: For Dr. McKee's colleague Dr. Cantu, the controversial answer was that no one under 14 should play tackle football.

Dr. ROBERT CANTU: With what we know about the youth brain compared with the adult brain, that it's more easily disrupted than the adult brain— the youth brain is lighter in weight, so it has less inertia to put it in motion, so you tap a youth head, and his brain moves much quicker than an adult brain that's heavier and therefore has more inertia. So I think we should be treating youths differently.

NARRATOR: And for the BU advocate Chris Nowinski, it was a danger the NFL helped to create.

CHRIS NOWINSKI: As long as the NFL dismissed this, that meant that parents were signing their kids up to go play football, believing that there was no risk. And you know, that wasn't fair to those kids or those parents, but especially those kids.

ANNOUNCER: Let's give him a big round of applause!

NARRATOR: Dr. McKee, who had grown up loving football, has struggled with her feelings about the sport.

Dr. ANN McKEE: I don't feel that I am in a position to make a proclamation for everyone else.

NEWSCASTER: If you had children who are 8, 10 and 12, would they play football?

Dr. ANN McKEE: 8, 10, 12? No. They would not.

NEWSCASTER: Why?

Dr. ANN McKEE: Because the way football is being played currently that I've seen, it's dangerous. It's dangerous and it could impact their long-term mental health. You only get one brain. The thing you want your kids to do most of all is succeed in life and be everything they can be. And if there's anything that may infringe on that, that may limit that, I don't want my kids doing it.

NARRATOR: McKee's warnings about the danger of the game have made her the subject of sharp criticism.

JANE LEAVY, Author, The Woman Who Would Save Football: She's a lightening rod because people see her as the woman out to destroy football as we know it. Probably the most hurtful charge that's been leveled against her is that she's crossed a line from scientist to activist.

NARRATOR: A number of prominent scientists believe she has overstated the dangers of playing football.

PETER DAVIES, Ph.D., Neuroscientist, Feinstein Institute: There's a kind of polarization in that the BU group are clearly the advocates for CTE research. But it's not the only issue. You know, there are other issues that we've got to look at. And how common is this? How many brain traumas do you need to get this? Is this something that everybody will get if they have enough brain trauma? Or is it the result of steroid or drug abuse in a small number of NFL players? We don't know. These are questions, not statements of fact.

NARRATOR: Some researchers say Dr. McKee has examined only a limited sample of players and too few brains to justify her conclusions.

MARK LOVELL, Ph.D., Neuropsychologist: There's been a sense of fear that's been put into parents that "Maybe I shouldn't let my kids play sports." Having said that, I still think it's something that we need to be concerned about. We just need more information on it in terms of, you know, what exactly is the incidence and the risk. Nobody knows that at this point in time. It's still being debated. Depends on who you listen to.

KEVIN GUSKIEWICZ, Ph.D., NFL Head, Neck and Spine Cmte.: Those that have been conducting the autopsies are working with what they have to work with.

I think that we need to learn more about these former athletes, learn more about them during their living years so that we can better understand what their neuro-cognitive function is like, what their emotional status is like. We just have to be careful not to say that this causes that and be able to connect those dots without having more prospective analysis.

Dr. ANN McKEE: I'm not surprised that people don't believe me. They don't have— they don't look at— they haven't done this work. They haven't looked at brain after brain after brain. I just feel that, I guess, the more cases we get, the more we persevere, the more they hear, eventually, they'll change their mind.

NARRATOR: Still, McKee and her colleagues at BU acknowledge there are limits to her research.

ROBERT STERN, Ph.D., Neuropsychologist, BU CTE Center: Not everyone who hits their head gets this disease. And so a critical question is why does one person get it and another person doesn't. There must be really important variables, genetics, things about the type of exposure to brain trauma people get. We need to figure those things out.

NARRATOR: Dr. McKee admits she's seeing only a small sample.

Dr. ANN McKEE: I think, to be truthful, even a selection bias in an autopsy sample, even if the family of an individual who's affected is much more likely to donate their brain

than a person who had no symptoms whatsoever— given that, we have still been just ridiculously successful in getting examples of this disease.

NARRATOR: Dr. McKee has now examined the brains of 46 former NFL players. 45 had CTE.

Dr. ANN McKEE: We have an enormously high hit rate. I mean, you know, that would be extraordinary with any other disease, to be able to pull in that many cases just that were suspected. So I think the incidence and prevalence has to be a lot higher than people realize.

NARRATOR: To her, it may be the beginnings of an epidemic.

Dr. ANN McKEE: I think it's going to be a shockingly high percentage. I'm really wondering where this stops. I'm really wondering, on some level, if every single football player doesn't have this.

911 OPERATOR: 911 emergency.

NARRATOR: And then another death.

MEGAN NODERER: Oh, my God! My boyfriend's been shot! My boyfriend's been shot!

NEWSCASTER: An apparent suicide by a powerful athlete—

911 OPERATOR: Your boyfriend?

MEGAN NODERER: Yes!

NEWSCASTER: A beloved NFL star apparently took his own life today—

911 OPERATOR: What is your boyfriend's name?

MEGAN NODERER: Junior Seau.

NEWSCASTER: Linebacker Junior Seau died today in an apparent suicide—

911 OPERATOR: Where did he shoot himself?

MEGAN NODERER: I can't tell, ma'am. It looks like in the heart.

NEWSCASTER: The untimely death of Junior Seau is provoking questions—

NARRATOR: As the news broke, the question emerged— did CTE play a part in Junior Seau's death?

ANNOUNCER: Here comes Seau! And he's sacked!

ANNOUNCER: All the way back at the…

NARRATOR: He had used his body and his head for 20 years in the NFL. Number 55 was a hard-hitting linebacker. Pain and injury were his specialty. he even bragged about it once on an NFL film.

JUNIOR SEAU: [NFL Films] A perfect hit is when you're faced up, coming one on one, and you hear him go, "Uh"— just a little "Uh."

NARRATOR: He talked about the price he was willing to pay.

JUNIOR SEAU: You have to sacrifice your body. You have to sacrifice years down the line. When we are 50, 40 years old, we probably won't be able to walk. That's the sacrifice that you take to play this game.

NARRATOR: And it had paid off. Seau made millions. He was a philanthropist, beloved in his community. But then a familiar story— his life fell apart.

NEWSCASTER: Junior Seau was arrested for domestic violence in Oceanside California early on Monday—

NEWSCASTER: Seau accused of hitting his 25-year-old girlfriend—

NEWSCASTER: Junior Seau drove his SUV right off a cliff in California—

NEWSCASTER: The former pro football star has apparently fallen on hard times—

NARRATOR: At 43, his business empire had imploded.

NEWSCASTER: His behavior changed dramatically—

NARRATOR: He'd lost millions of dollars gambling.

NEWSCASTER: —including compulsive gambling, alcohol abuse—

NARRATOR: He wasted everything.

NEWSCASTER: —and violent, off-the-field incidents.

GINA SEAU, Ex-Wife: We didn't know why he was detached or forgetting, or why he would bark at us for nothing or— we didn't know.

SYDNEY SEAU, Daughter: The past two years have been the roughest. And for a couple months at a time, I wouldn't hear from him at all. And that would scare me.

TYLER SEAU, Son: We got really close, and you know, I feel like it's turning around, OK, he wants to be part of my life. And then, all of a sudden, I wouldn't hear from him.

He's truly a legend, and he will be with us forever—

NARRATOR: Seau was one of the most popular players and out of the league for only two years. His brain became the most sought-after ever.

STEVE FAINARU: You've got a half dozen prominent researchers immediately began to mobilize to try to get their hands on this brain tissue.

GINA SEAU: I can understand where certain groups are saying, "Wow. This guy has played for 20 years. This would be a perfect candidate for us to study and see if he had it."

CHRIS NOWINSKI, Co-Director, BU CTE Center: I spent time making calls. I had, you know, a lot of— we had a lot of mutual friends, spoke to people at his foundation and just said, you know, "We would— like every other case, we would like to review this case, if you want."

NARRATOR: At the same time, far from the action, another researcher had received word of Seau's death.

BENNET OMALU, M.D., Neuropathologist: So when Junior Seau died, just like every other case, people called me. I don't follow football, so I said, "Who is Junior Seau?" They said, "Oh, you don't"— just like Mike Webster, "You don't know Junior Seau?" I'm, like, "How do I?" Said, "Oh, he's even bigger than Mike Webster." They said, "Oh, he just died. He committed suicide."

NARRATOR: Dr. Omalu had been looking for a chance to get back in the game in a big way. He telephoned Seau's son, Tyler, to get consent to take his father's brain.

Dr. BENNET OMALU: We did everything, spoke to the son. He gave us verbal consent. And the medical examiner requested that I come down — they've never had such a big case before, I'm an expert in this field — to help him.

STEVE FAINARU: He gets the first flight out the next morning. When he arrives at the

medical examiner's office, he's telling people that he has the verbal consent from Tyler Seau to harvest the brain.

NARRATOR: And it was Omalu who actually removed Seau's brain.

Dr. BENNET OMALU: I assisted at the autopsy. I took out the brain, processed the brain.

STEVE FAINARU: Just as they're finishing up the autopsy, the chaplain comes walking into the room and he says, literally, "Houston, we have a problem." And that problem is that he had just gotten off the phone with Tyler Seau, and according to Tyler, the NFL informed him that Omalu's research is bad and that his ethics are bad, that he's essentially unethical.

TYLER SEAU: People started saying things about Omalu, kind of telling me the kind of character that he has. And you know, I got a lot of email about it. But at that point, I was just kind of— you know, I don't want to hear all these things.

Dr. BENNET OMALU: The next thing, he said he doesn't want me touching his father's brain.

STEVE FAINARU: At that point, there's nothing else to do except leave. I mean, he just walks out of the room, and he takes his empty brain briefcase and he gets back on the plane, and he goes back to San Francisco without having any success.

Dr. BENNET OMALU: So I was very demoralized, I remember that day I was. People didn't notice. When I got into the cab I was crying. I mean, what have I done?

NARRATOR: Junior Seau's brain was sent to the National Institutes of Health, the NIH.

MARK FAINARU-WADA: The NFL very directly worked not only to get the brain to NIH, but in this case, to keep it away from Omalu's group or McKee's group by speaking badly about them.

NARRATOR: NFL doctors say the decision was made purely in the interest of science.

KEVIN GUSKIEWICZ, Ph.D., NFL Head, Neck and Spine Cmte.: Getting it into the hands of good science is their— the goal there. So yes, I think that was probably what was driving the suggestion that "Let's have NIH get involved."

NARRATOR: The final diagnosis in Seau's case was national news.

NEWSCASTER: ABC News and ESPN have learned exclusively Seau's brain—

NARRATOR: He had CTE.

NEWSCASTER: —visible signs of CTE, chronic traumatic encephalopathy—

NARRATOR: In the months following Seau's death, the NFL went on the offensive. The commissioner helped to promote a youth football safety initiative, the Heads Up program. The league donated $30 million dollars to the NIH to study sports injuries, including joint disease, chronic pain and CTE.

ROGER GOODELL, NFL Commissioner: We recently committed $30 million to the National Institutes of Health—

PETER KEATING, ESPN Reporter: Good PR is one part of the NFL strategy. But the other piece of it is that the NFL wants to come off as being very forward-looking. The NFL wants to keep pushing these questions into the future, keep the discoveries going, make it seem like these questions that still need to be resolved are things that the league is working with doctors and researchers on.

NARRATOR: It was a message the commissioner himself delivered, granting a rare TV news interview the morning of the Super Bowl.

BOB SCHIEFFER, CBS News Face the Nation: [February 3, 2013] I'm going to ask you this question because some widows of some NFL players have asked me to ask you. Do you now acknowledge that there is a link between the game and these concussions that people have been getting, some of these brain injuries?

ROGER GOODELL: Well, Bob, that's why we're investing in the research, so that we can answer the question, what is the link? What causes some of the injuries that our players are still dealing with? And we take those issues very seriously.

MARK FAINARU-WADA: Though the league previously, through Greg Aiello, acknowledged a link, there's no more acknowledging a link exists. There's "The science is still emerging and we're really going to try and do long-term studies on this. And we're going to figure out whether there's a link."

ROGER GOODELL: We're going to let the medical individuals make those points. We're going to give them the money, advance that science. In the meantime, we have to do everything we can to advance the game and make sure it's safe.

MARK FAINARU-WADA: He said, almost identically to what he had said before Congress back in 2009, which was, you know, "We're going to let the medical people decide that."

NARRATOR: Almost two decades after the NFL founded its first scientific committee to research the issue, the league continues to insist the evidence of a link between CTE and football is unclear.

PETER KEATING, Reporter, ESPN: It sure looks like it was just a relentless and endless delaying action. Year after year after year, at crisis after crisis after crisis, the concussions committee and its members assured the public that the league was looking into this.

The league actually never got around to looking at it in any kind of valid way. We're talking in the year 2013. This committee was founded in 1994. Maybe there should be better evidence by now.

NARRATOR: As the concussion crisis deepened, the commissioner faced yet another challenge, a lawsuit brought by more than 4,500 retired players.

PETER KEATING: The threat to the NFL from this litigation was existential. The threat was that the league was going to have to pay out in the billions with a B, not millions with an M.

NARRATOR: About one third of NFL veterans, including some of the biggest former stars, claimed the NFL had fraudulently concealed the danger to their brains.

THOMAS GIRARDI, Players' Attorney: The main allegations here are— it's very simple. There was a very severe hazard that was present in professional football, and it was a little secret. The NFL knew it, but the players certainly didn't know it.

NARRATOR: On the other side, the NFL's lawyers.

LEGAL AIDE: OK, representing the National Football League will be Paul Clement. He'll be flanked by Anastasia Danias — she's from the National Football League— and also Beth Wilkinson from Paul Weiss—

NARRATOR: They insisted the league had done nothing wrong.

BETH WILKINSON, NFL's Attorney: Let's be clear. Let's be clear. We strong— we strongly deny those allegations that we withheld any information or misled the players. And if we have to defend this suit, as Paul was alluding to, we will do that and be able to make those factual allegations. But we absolutely deny those allegations.

NARRATOR: But away from the cameras, the two sides were engaged in tense court-

ordered negotiations.

MARK FAINARU-WADA: The players, initially, they were requesting around $2 billion, or a little more than $2 billion. And what we've been told is the NFL was offering virtually nothing. They were offering "peanuts," as one person said.

NARRATOR: The players believed they had significant leverage, a threat to the NFL.

PETER KEATING: The threat was that the doctors and trainers, neuropsychologists, maybe owners, maybe commissioners and ex-commissioners, were going to have to testify under oath as to what they knew and when.

NEWSCASTER: —historic settlement today with the NFL—

NARRATOR: Then, with football season about to begin, a surprise settlement.

NEWSCASTER: —settlement between the National Football League and thousands of its former players.

NARRATOR: The league agreed to pay $765 million to resolve the lawsuit.

ALAN SCHWARTZ, The New York Times: It appears as if it ties it up quite nicely. You know, the two sides figured out that that was fair, and they were OK with it. And so the image of the situation to most fans is that the NFL got taken to task for the concussion problem, OK?

NEWSCASTER: There is a proposed settlement in a huge concussion lawsuit—

NARRATOR: But the settlement left one big question unanswered.

MARK FAINARU-WADA: There's no admission whatsoever of guilt by the league. The league makes it very clear they're not admitting any guilt, that there's no acknowledgement of any causation between football and the possibility of long-term brain damage. And that was— you know, that was a prominent part of the settlement.

PETER KEATING: I don't think we needed a trial to know that the NFL conducted a lot of shoddy research. And it wasn't hypothetical. It wasn't a supposition. What the trial would have done was bring out that evidence. You didn't need the trial to know that there was something wrong there. But the details of how they went about it, that's what's going to stay locked away.

[www: Inside the settlement]

NARRATOR: One week later, the commissioner made the league's position clear.

ROGER GOODELL: [CBS "This Morning," September 4, 2013] There was no admission of guilt. There was no recognition that anything was caused by football.

NARRATOR: The league would not have to answer those tough questions about what they knew and when they knew it.

ROGER GOODELL: —that we've reached an agreement here that resolves these issues, and we'll move forward from there.

HARRY CARSON, Author, Captain For Life: I think everyone now has a better sense of what damage you can get from playing football. And I think the NFL has given everybody 765 million reasons why you don't want to play football.

ANNOUNCERS: Erenberg touchdown!

Touchdown Pittsburgh Steelers!

Listen to this crowd! They're on fire!

NARRATOR: For now, the future of the league and the game of football seem secure.

ANNOUNCER: Franco Harris is now at the 30. Big pileup!

NARRATOR: But fundamental questions remain about how the game will be played, and who will play it.

ANNOUNCER: It's still wild and woolly and I love 'em that way.

ANNOUNCER: You love 'em wild and woolly and you're seeing it now!

**MARK FAINARU-WADA:** You've got the most popular sport in America basically on notice. You've got the very real question being asked of whether the nature of playing the sport exposes you to brain damage and lots of science that suggests that it can.

ANNOUNCER: An awesome physical team were the Steelers today!

**MARK FAINARU-WADA:** And that raises all sorts of questions for guys who are playing in the league, guys who played in the league, moms, kids, all of us who love football. It's pretty scary. It's a big deal.

ANNOUNCER: And the future opponents are going to have some trouble!

