stories that had come out. He said he once took a desperate call from a "prominent player" holed up in his basement, in tears and depressed, seeking guidance and empathy. The player essentially was looking to swap stories, compare their struggles, but Young was at a loss. It was true that the issue came to dominate his last couple of years in the NFL, but he felt that others had had it much worse, that he had become more of a pawn in the politics of concussions than a true casualty.

"Concussions didn't drive me out of the game," Young insisted. It was a combination of factors, including the changing nature of the 49ers organization and, in the end, his desire to finish his career in red and gold.

"I'm not the one that's going to be a real compelling story," he said. "I'm an expert on vanilla concussions: I felt tired, I rested up, and about a week later I felt 100 percent. That's my history. I'm the vanilla guy."

In reality, though, the message couldn't have been any less vanilla to the NFL and its fans: Steve Young, a certain Hall of Famer, had been forced from the game by concussions. The league had a burgeoning crisis.

By the late 1990s, Pittsburgh had become ground zero for concussion research in the United States. Nearly all the major players were connected to the University of Pittsburgh Medical Center, where Jonas Salk developed the polio vaccine, or the Steelers. Many of the specialists were connected to both the university and the team, whose training site was next door to the UPMC sports medicine facility. Mark Lovell continued to tinker with the concussion test he had created for the Steelers, bringing in a software developer who enabled him to administer the test on the computer. To that point, each exam had to be done with pencil and paper, a laborious process that made it time-consuming to administer and thus less attractive to the volunteer research subjects—the players— critical to making it work. The migration to computers made the exam faster, more accurate, and, not insignificantly, more marketable. What previously had been known to a small circle of neuropsychologists as the Pittsburgh Steelers Test Battery was soon rechristened as ImPACT: Immediate Post-Concussion Assessment and Cognitive Testing. ImPACT later received funding from UPMC, which maintained a

financial stake in the new company. Its founders were Lovell, his protégé Micky Collins, and Joe Maroon.

Julian Bailes, the smooth Louisiana neurosurgeon who had produced the ominous survey on NFL players, broke away from Maroon and moved to Orlando to run a neurosurgery ward and continue his own research. Bailes was still in possession of the raw data from the survey: the questionnaires compiled by Frank Woschitz and the union. He decided to bring in another researcher with Steelers connnections to help sort through the data and plot future research.

Kevin Guskiewicz was more steeped in Steelers lore than any of his fellow neuroscientists. He had grown up in Latrobe, Pennsylvania, a small city east of Pittsburgh that in the late 1800s fielded one of the first professional football teams. The Steelers held their training camp each fall at Latrobe's Saint Vincent College; as a kid, Guskiewicz would ride his bike to the school to watch his heroes, players such as Webster and Mean Joe Greene, from a hill overlooking the field. Guskiewicz's father designed kitchens and bathrooms and, with Guskiewicz's uncle, ran the Southside Inn, a bar that catered to steelworkers. When Guskiewicz was old enough, he worked the Saturday morning shift, pouring boilermakers at 7:30 A.M. At West Chester University near Philadelphia, Guskiewicz studied sports medicine and journalism. He wrote for the school newspaper, *The Quad,* and worked as a freelancer for the *Philadelphia Inquirer.* After he graduated, he applied to the prestigious Columbia University School of Journalism but was wait-listed. To say this minor setback was fortuitous for Guskiewicz would be the understatement of his life. At the last minute, he decided to apply to Pitt, which had a new master's program in exercise physiology and sports medicine. Within a few years, newspapers would be a dying industry. The concussion business was booming.

Guskiewicz had sandy hair, blue eyes, and an earnest, down-to-earth manner that allowed him to fit in with everyone from players to trainers to brain surgeons. People found him immediately disarming. (Later, when Guskiewicz received a $500,000 MacArthur "genius grant," he admitted he had heard of the award only because he'd seen a reference to it on an episode of *Friends.*) While studying at Pitt, Guskiewicz landed a job as an apprentice to the Steelers' longtime trainer Ralph

Berlin, aka the Plumber. As Berlin's second assistant, he learned how to treat elite athletes and served as a gofer and ankle taper. The Steelers put Guskiewicz through graduate school. He thought about continuing on as a Steelers trainer, but he was about to get married and concluded that it was a difficult life in which to raise a family. On the advice of his mentor at Pitt, he applied to get his doctorate at the University of Virginia, where Jeff Barth, the "Grandfather of Sports Neuropsychology," was waiting for him.

At Virginia, Guskiewicz worked with a local high school team and was immediately appalled by the way it treated concussions. "We were handling ankle sprains better than we were handling brain injuries," he said. "It was scary." Most of the research to that point had focused on cognition (Barth, Lovell, Collins, et al.); Guskiewicz, with the encouragement of another researcher, Dave Perrin, started to examine how concussions affected balance and motor skills. He found that the effect was often profound. He devised his own diagnostic tool to measure the connection between brain injuries and balance, and soon he too was publishing concussion research. Years earlier, when they had both been with the Steelers, Bailes and Guskiewicz used to hang out on the sideline during games—Bailes as an understudy to Maroon, Guskiewicz as an understudy to the Plumber—and now Bailes began inviting Guskiewicz to Florida to appear at concussion conferences and collaborate on research.

By then, Guskiewicz had finished his doctorate—his dissertation was titled *Effect of Mild Head Injury on Postural Stability in Athletes*—and was working as an assistant professor at the University of North Carolina in Chapel Hill. One afternoon during a conference in Florida, Bailes handed Guskiewicz a stack of papers: Woschitz's questionnaires. Bailes had something big in mind. The data had suggested to him that the plight of retired NFL players, particularly their mental health, was far more desperate than had been known previously. His idea was to set up a research institute to examine the long-term health effects of playing professional football and other sports, and he wanted Guskiewicz to run it. If the idea sounded far-fetched and perhaps overly ambitious, it's because it was—essentially an entire research institution born out of a bunch of six-year-old questionnaires stuffed into cardboard

boxes. The players union agreed to provide some of the seed money, roughly $75,000, though that concerned Guskiewicz. He feared the center would be perceived as a vehicle for the union, the research it produced a tool for getting players more benefits. That was certainly one goal of the union, but not necessarily of the researchers. Guskiewicz bought some independence by persuading UNC's vice chancellor for research to kick in $200,000. The fact that the center would be at UNC and not at the union offices in New York also helped. Still, three officials from the Players Association, including Frank Woschitz, were listed in the directory for the newly born Center for the Study of Retired Athletes.

Guskiewicz's first task was to update Woschitz's survey. "It was poorly constructed. I mean, it wasn't anybody's fault; it was probably just done by some office staffer that said, 'Oh, here are the kind of questions I think we want to know about,'" Guskiewicz said. He decided to start from scratch, constructing a 10-page survey that would turn into the most comprehensive health study in the history of the NFL. The survey was divided into seven sections: Football History, Medical History, Concussions, Musculoskeletal Injuries, Health Status, Nutritional and Substance Use, and Personal Information. The hundreds of questions included:

*How much bodily pain have you had during the past 4 weeks?*
*Have you felt downhearted and depressed?*
*Do you currently have a mental or physical condition that limits your ability to do the things you want to do?*

In the Concussions section, the survey first defined for the former players what a concussion actually was:

**A concussion is a blow to the head followed by a variety of symptoms that may include any of the following: headache, dizziness, loss of balance, blurred vision, "seeing stars," feeling in a fog or slowed down, memory problems, poor concentration, nausea, or throwing up. Getting "knocked out" or being unconscious does NOT always occur with a concussion.**

The survey went out in 2001. The response was overwhelming, an indication of how badly the players wanted to be heard. Guskiewicz sent out surveys to all 3,683 living members of the NFL Retired Players Association; 2,552—over 69 percent—sent it back. The survey highlighted more completely what the original had only hinted at: More than 60 percent of the players reported sustaining at least one concussion in their careers; nearly a quarter had had at least three. More than half said they'd lost consciousness on the field or experienced memory loss at least once. But perhaps the most disturbing finding was the apparent correlation between the number of concussions and depression. Players who reported concussions were three times as likely to report that they were depressed. Guskiewicz wasn't immediately sure why this was so, but he theorized that the concussions or the *symptoms* of the concussions—perpetual headaches, memory loss, erratic moods—were causing it.

Guskiewicz knew more than anyone the implications of where his research was headed. He was a former NFL trainer, albeit an apprentice, and a die-hard Steelers fan. Bailes, his colleague, was a former NFL doctor. "We're not here to paint an ugly picture of life in the NFL," Guskiewicz told the *Los Angeles Times*. But he added: "These injuries are a hazard of their occupations."

Guskiewicz continued to drill down. He followed up that survey with one that focused on mild cognitive impairment—the interim stage before full-blown dementia, characterized by memory loss, erratic behavior, and language difficulties. This time, 1,399 former NFL players and their close relatives participated. The results were even more ominous: Players who reported at least three concussions were *five times more likely* to be diagnosed with early signs of dementia. Part of the reason this finding was so devastating was the nature of the way concussions occurred. Guskiewicz had looked at college football players and found that those who experienced one concussion were much more likely to incur another one and then another. There was something about the initial trauma that primed the brain for further injury, especially when it had not had time to heal. The structure of Guskiewicz's NFL study—a survey conducted largely by mail—raised some questions about its accuracy. The players were self-reporting, after all, some many years after they had played. But the surveys were anonymous, and experience

suggested that players *under*reported their injuries. Most were like Gary Plummer, who upon hearing the definition of a mild concussion concluded that he'd had hundreds.

The study's conclusion was blunt: "Our findings suggest that the onset of dementia-related syndromes may be initiated by repetitive cerebral concussions in professional football players."

Guskiewicz kept going. He now focused on the earlier finding suggesting that concussions triggered depression. He isolated players reporting at least three concussions and found that they were three times more likely to be diagnosed with clinical depression.

Guskiewicz observed these results with pity and sadness. What had happened on the field to players such as Al Toon, Merril Hoge, and Troy Aikman was certainly powerful. But Guskiewicz—in his lab at UNC, away from the fans and the pressures of the NFL—was discovering something even more profound: a persuasive argument that concussions were not only an inevitable part of professional football but often led to misery and torment later in life—not only for the players but for everyone around them. The results were "daunting," he wrote, "given that depression is typically characterized by sadness, loss of interest in activities, decreased energy, and loss of confidence and self-esteem. These findings call into question how effectively retired professional football players with a history of three or more concussions are able to meet the mental and physical demands of life after playing professional football."

Guskiewicz, Bailes, and their colleagues made it clear that they believed that the game itself was causing something destructive and insidious to occur deep inside the brains of huge numbers of retired players. Football-induced concussions, they wrote, "can result in diffuse lesions in the brain. . . . These lesions result in biochemical changes, including an increase in excitatory neurotransmitters, which has been implicated in neuronal loss and cell death. A potential mechanism for lifelong depression could be this initial loss of neurons, which could be compounded by additional concussions, eventually leading to the structural changes seen with major depression."

Translated, their hypothesis was this: Football causes brain damage. Guskiewicz and his colleagues were laying out a scientific explanation for all the ominous research that had preceded it: why concussions were

hardly "minor" brain injuries; why they seemed to repeat themselves and come in clusters, inflicting more and more damage; why they led to devastating consequences such as depression, memory loss, and dementia, in much higher rates than in the general population; and why those symptoms sometimes never went away.

A more explosive theory was hard to imagine. But at this point it was just that—a theory. Detecting those changes in the brain of a retired professional football player would require one key missing element: The player would have to be dead.

Beyond Leigh Steinberg's awareness campaign and the disturbing science that continued to emerge, there was another—largely unspoken—reason the NFL's concussion culture was changing: In 1996, in Waukegan, Illinois, Merril Hoge was suing the Chicago Bears.

Technically, Hoge was suing only the team doctor and his primary employer, an Illinois hospital, but his complaint was an indictment of the way the Bears had handled his treatment before he was driven out of football. After his retirement, Hoge had plenty of time to ponder what had happened to him. As his brain recovered, he had taken a job as a football analyst for ESPN, a job at which he excelled. Still, he felt he wasn't the same person. At home, trivial matters set him off—his kids whining, the smallest mishap; one day his wife asked to borrow his toothbrush, and it was all he could to do keep himself from exploding. Bright lights tormented him, and so he installed dimmers in every room of his house. His ESPN colleagues knew that the film room had to be dark when he entered. "Managing my state is every day," he said.

One day, Hoge was working at a football camp when a woman walked up and berated him.

"You should be ashamed of the example that you set by going back and playing with a concussion," she said. She grabbed her son and walked away.

Hoge sat for a moment, stunned. He thought: "She's right, but she's wrong." Hoge believed that if he had been aware of the potential consequences of his injuries—brain damage, even death—he would have been wrong to go back on the field so quickly after his concussion in Kansas City, the one that had caused him to believe he could hear the

ocean. But he didn't. At that point, he still thought a concussion was like an ankle sprain or a pulled hamstring; no matter how bad it was, he could play through it. Five weeks later, when he was concussed a second time, it was too late. His career was over.

Hoge desperately missed football, and he soon directed his anger at the Bears' team physician, John Munsell. Munsell worked primarily as an internist at Lake Forest Hospital. He had been the Bears' doctor since 1978, sharing the duties with another physician. Munsell conducted preseason physicals and split time on the sidelines during home and away games. For this, the Bears paid him and his colleague an undisclosed retainer. Munsell treated not only the players but also, on occasion, coaches, team officials, and their families.

What transpired in Hoge's lawsuit was a preview of the NFL's troubles in the years ahead. Hoge was accusing Munsell of malpractice, but it went deeper than that. He argued that Munsell should have been aware of the latest developments in concussion research and applied them to his care. Instead, Hoge alleged, he was kept in the dark and allowed to continue to play despite his lingering symptoms. Hoge brought in the Pittsburgh Steelers brain trust—Maroon, Lovell, and Bailes—to explain the seriousness of concussions and the recent advances in diagnostic testing. Munsell argued that his treatment was state-of-the-art and that Hoge had had an obligation to inform the Bears' medical staff of his symptoms.

"It was a difficult case; there was no real precedent," said Robert Fogel, the Chicago lawyer who represented Hoge. "It isn't like a lot of other football players were suing doctors over their mistreatment of concussions."

Munsell was not an ideal witness for the defense. He acknowledged under oath that despite his role as team doctor he had no specialized training in sports medicine, nor had he read any medical literature on concussions. Before 1994, when Hoge's injury occurred, "I don't recall when I read an article in a book about a concussion," he said. He seemed unaware of the most recent protocols for allowing concussed athletes to return to play.

Munsell did not take notes or keep records on Hoge's brain injuries. Speaking of the night of the concussion in Kansas City, he said:

DISCOVERY                                    *The Vanilla Guy*

"I didn't carry a notebook or notepad or paper and pencil on my person, but I certainly would have had it been available to me."

That night on the team plane, Munsell informed Hoge that he would not play the next week. After touching down in Chicago, he never examined Hoge again.

Hoge's injury had occurred on August 22, 1994. Under questioning from Fogel, Hoge described the extent to which his injury was monitored:

"Merril, were you examined by any doctors from August 23rd till you returned to play August 29th?"

"No."

"Did you have any conversations with any doctors from August 23rd to return to play on August 29th?"

"No."

"Did you ever speak, and I mean in person, or on the telephone, with Dr. Munsell between August 23rd and August 29th when you returned to play?"

"No."

"Merril, after August 22, 1994, did Dr. Munsell ever examine you before you returned to play?"

"No."

"Did any doctor examine you before your return-to-play?"

"No."

Munsell's lawyers tried to show that Hoge had hidden his injuries from the Bears' medical staff. This was the crux of Munsell's argument: How could he be held responsible for failing to treat Hoge when he was never informed that the player still had symptoms when he went back on the field? Didn't Hoge bear some of the blame? Hoge knew football was a violent sport, yet he wanted so badly to continue playing that sport, he hid his injuries from the team doctor.

"We are dealing here with an intelligent man, not a child, not a person of suboptimal intelligence, but an intelligent adult," Munsell said. "I believe there was a responsibility to be shared there."

Munsell's lawyer went through a long windup before raising this issue with Hoge on the witness stand.

Hoge seemed to be waiting for it like a power hitter sitting on a fastball.

"We could probably save a lot of time here: Nobody told me anything about my concussion," he said. "Nobody told me about the signs and symptoms and what to be aware of. Had I known those things, you're darn right: I would have told him. Would have been more than happy to tell him.

"But at that time, I knew nothing. I did not know what I was risking. We talk about fatality and brain damage; I should have known about that, you're darn right I should have known. If I feel like I can perform and I'm doing everything possible to perform, I will perform. But we're not going to compare knees and ankles here. We're talking about a brain, far more important than any other part of our body. And I did deserve that.

"Dr. Munsell took me over as his patient; that is his obligation. Not to stick me on a plane, send me home, and have nothing to do with me again."

The jury awarded Hoge $1.55 million—the last two years on his contract plus $100,000 for pain and suffering.

Not long afterward, the judge threw a wrench into Hoge's celebration. He ruled that Fogel had failed to disclose a key piece of evidence: a letter from a Chicago neurosurgeon who believed that Munsell should not be held liable. A new trial was ordered, at which point Hoge and Munsell settled out of court.

Still, it was a devastating defeat for the Bears and, by extension, the NFL. It put the teams, its doctors, and the league on notice. Fogel suddenly found himself getting calls from lawyers around the country. They represented not only football players but athletes from other sports as well. The NFL's mushrooming crisis now had legal implications.

The league, of course, was aware of the lawsuit. An indication of its concern came late in the case, when Munsell's lawyers produced a new witness. According to a letter filed with the court, this witness, in contrast to the leading concussion experts in the country, would testify that "at all times Dr. Munsell acted within the standard of care" for the National Football League. *At all times*—the letter emphasized that

point repeatedly. Munsell's treatment met the standard of care for the NFL from the moment Merril Hoge heard the ocean in Kansas City. His treatment met the standard of care for the NFL when Hoge was allowed to take the field a week later without Munsell or any other doctor examining him. Munsell's treatment met the standard of care for the NFL right up to the moment five weeks later when Hoge bent down to make a block and his world went black, ending his career.

It turned out that Munsell's lawyers produced this expert witness too late, and so he was not allowed to appear in court in support of the Bears' team doctor. But Fogel always wondered how the witness suddenly materialized. "I just got the sense, you know, some of this went to another level."

The witness's name was Elliot Pellman. He was the head of the NFL's Mild Traumatic Brain Injury Committee.

# PART TWO

# DENIAL

# 7

## GALEN OF PERGAMON

Even though they were on opposite sides of Merril Hoge's lawsuit, Mark Lovell and Elliot Pellman knew each other well. One day back in 1994, Pellman had called Lovell in Pittsburgh, identifying himself as the chairman of the NFL's Mild Traumatic Brain Injury Committee. Pellman explained that the new entity had been created by Commissioner Paul Tagliabue to study concussions. He told Lovell he was familiar with his new concussion test—of course he would have been, since that test had been used to end Hoge's career—and invited him to participate in the committee's first meeting in February 1995 at the NFL Combine in Indianapolis.

As skeptical as Tagliabue was about the NFL's concussion problem ("a pack journalism issue"), the MTBI committee was a logical response to a mushrooming public relations crisis. The retirements of Toon and Hoge, Troy Aikman's erased memory after the 1993 NFC Championship Game, and the spate of head injuries league-wide had left fans with a growing impression that the entire sport was concussed. The Mild Traumatic Brain Injury Committee—some researchers said the name itself suggested the NFL's benign view of the problem—promised to take a scientific approach to concussions and come up with a series of measures to make the game safer than ever.

Lovell traveled to his first meeting of the MTBI committee with trepidation befitting a novice entering the seat of power. He had started

baselining the Steelers just two years earlier and was still unfamiliar with the world of pro sports. His innate shyness didn't help. Accompanied by the Steelers' doctor, Tony Yates, Lovell put on his best suit for the occasion. "What are you trying to do, embarrass me?" said Yates. When they walked into the hotel conference room where the first meeting was held, the dozen men who greeted Lovell were a picture of casualness in both manner and dress; some wore sweat suits emblazoned with their team's logo, as if they had just come off the sidelines. "I'm the only guy wearing a suit," Lovell recalled of the moment. "I feel like a jerk." Most of the men seemed to know one another, but Lovell didn't recognize any of them, nor did they seem to have any clue who he was. He suspected that they probably had no idea what a neuropsychologist was, much less how one might treat a concussion.

Lovell, of course, was involved in some of the most cutting-edge research in the emerging science of head trauma—he was one of Steinberg's people who believed the world was round. With the NFL's power and resources, he imagined he would be joining a veritable dream team of concussion experts to attack the problem. In fact, there were very few. The contemporary researchers whose studies were reshaping the entire conception of what a concussion was—men such as Jeff Barth, Julian Bailes, Joe Maroon, and Barry Jordan—were nowhere to be found. Instead, Tagliabue's concussion committee was made up almost entirely of NFL insiders. Nearly half the members were team doctors, the same men who had been sending players back on the field for years. There were two trainers, a consulting engineer, and an equipment manager. The committee did have one neurologist, Ira Casson, who had studied boxers and had made the fateful recommendation to Al Toon that he retire, and a neurosurgeon, Hank Feuer (pronounced FOY-er), who had done an internship at Indiana Medical School at the same time Maroon was there and worked for the Colts. Reflecting years later on his status as the committee's lone neurosurgeon, Feuer, measuring his words, said: "That was always, to me, ah, I just thought it's an *interesting* committee. The best way I could put it." The MTBI committee's epidemiologist— the man charged with analyzing much of the committee's research— was John Powell, the number cruncher behind the NFL's claim that concussions had held steady at one every three or four games.

The most perplexing choice was Tagliabue's handpicked chairman: Pellman. With the endorsement of the powerful commissioner, Pellman had instantly become one of the most influential concussion researchers in the country, yet he had not produced a single piece of scientific literature on the subject. This almost certainly was due in part to his medical specialty, rheumatology, which deals primarily with bone and joint disorders such as arthritis. Pellman was genial and stout, a balding man, then 41, routinely described by colleagues as "a good administrator." Through his contacts with the NFL, Pellman came to work as a top medical adviser with other leagues, including the NHL and Major League Baseball. One executive who worked closely with Pellman described him as a kind of medical "concierge" whose primary responsibilities were to administer flu shots and recommend specialists. "If an individual employee has a bad back, Elliot is great in New York about getting you in to see the best back guy," the executive said. He described Pellman as "honestly, a nice man" and suggested he was kept around because of his pleasantness.

The most complete professional biography of Pellman would be assembled years later by the *New York Times* after the newspaper discovered in 2005 that he had exaggerated his credentials in a biography he sent to the House Committee on Government Reform. This came as Pellman testified before the committee, offering effusive praise of baseball's steroids policy, the same policy that had done nothing to prevent Barry Bonds from shattering the career home run record. Pellman had claimed in his biography, which he circulated widely, that he obtained his medical degree from the State University of New York at Stony Brook. In reality, Pellman had attended medical school in Guadalajara, Mexico, and received his medical degree from the New York State Department of Education. Pellman also reported that he was an associate clinical professor at the Albert Einstein College of Medicine, when, in fact, he was an assistant clinical professor, an honorary position held by thousands of doctors, and didn't teach at the school. He told the *Times* the errors were minor. "In a way, I thank you," he said, "because those discrepancies are not important enough to be there, and they have all been fixed." Pellman explained he had enrolled at the Universidad Autónoma de Guadalajara, which had lower admissions standards,

because he received poor grades as an undergraduate biology major at NYU. He attributed his poor academic record to his complicated life at the time, including his father's death and a busy schedule working in his family's flower shop in the Bronx and as a cab driver. Pellman blamed the errors on his secretary and the New York Jets, where he had worked as team doctor since 1988. "So SUNY said he didn't get an MD from there?" Jets vice president Ron Colangelo told the *Times.* "Oh my goodness, oh my goodness gracious."

When Pellman first came to the NFL, he was practicing rheumatology at Long Island Jewish Medical Center. As the Jets' doctor, he had treated Al Toon after the concussion that ended Toon's career. When Pellman went to look for a neuropsychologist to test Toon's brain function, he approached a colleague, Bill Barr. "I don't know who any neuropsychologists are; I've never worked with one," Pellman said, according to Barr, who recounted the conversation to ESPN's Peter Keating. "But somebody said Al Toon should see a neuropsychologist, so I asked around and I'm calling you." As the NFL slowly began to adopt neuropsychological testing to diagnose concussions, Pellman brought on Barr to work with the Jets. Occasionally, the two men—along with Casson, another colleague at Long Island Jewish—would appear at coaching clinics to talk about concussions. Barr was struck by how ignorant Pellman seemed of all previous research. By then, Barth, Lovell, and others had been publishing for years. "During these lectures, Pellman's saying things like, 'Nothing has ever been done on concussions or mild brain injury and we're starting from scratch,'" Barr, who had moved on to New York University, said in an interview for this book. "I had been trained in evaluating MTBI, and I knew the literature. But he acted like nothing had ever been published on this before 1995."

Elliot Pellman's views on concussions were perfectly aligned with the NFL doctrine at the time, as articulated by Tagliabue and the NFL's PR machine. When he spoke publicly, he seemed to suggest that they were a routine part of the game and not a major concern. In 1994, the year the MTBI committee was formed, he told *Sports Illustrated* that "concussions are part of the profession, an occupational risk." A football player, he told the magazine, is "like a steelworker who goes up 100 stories, or a soldier." In 1999, by siding with Munsell, the Bears' doctor in the

Hoge case, Pellman—himself an NFL doctor and by then the head of scientific research for the league—had endorsed a treatment model that most leading concussion researchers would have equated with bloodletting and the application of leeches: allowing a severely concussed athlete who had no idea where he was to return to play without even a cursory exam. The same year, Pellman repeated the statistics the league had now floated for a decade—just one concussion every three games—and suggested that injuries to high-profile players such as Toon, Hoge, Aikman, and Steve Young had created a "mirage" that led people to "think the injuries have increased though they've really been there all the time."

Pellman seemed to practice what he preached. Former players described how, as the Jets' doctor, he often allowed concussed athletes back on the field. During a 1999 playoff game against the Jacksonville Jaguars, tight end Kyle Brady reached back for a pass from Vinny Testaverde and was knocked unconscious by a helmet-to-helmet hit. Dazed and nauseous, Brady was helped to the sideline, where Pellman and the medical staff examined him. Suddenly, out of the fog, Brady heard the booming voice of Jets head coach Bill Parcells: "Is he gonna be all right? When's he gonna get back in there?"

"You know, in a classic Parcells kind of way," recalled Brady, chuckling as he described the memory to ESPN's John Barr. "I'm not sure if it was a question. It might have been a command." Brady returned for the next offensive series, still woozy, his teammates telling him where to go. Asked if there was any basis for clearing him, Brady replied: "No. None." But he said he was just as eager as Parcells to see himself back on the field. "At that point, you're kind of like a slobbering dog," Brady said.

Kevin Mawae, who played center for the Jets for eight seasons, said he liked Pellman immensely, respected him "as a man," and even trusted him as his family physician. But he said it was clear in the Jets' locker room that Pellman served multiple masters. Pellman had cofounded a Long Island health care network, ProHEALTH Care Associates, which worked with multiple New York sports teams, including the Jets. The building was filled with memorabilia. "There's definitely some influential weight that goes with being a team doctor, and there's a conflict of interest because they work for the team," said Mawae. As more information about Pellman surfaced—his résumé embellishment, the

overlapping relationship between the Jets and his private practice, his brain research for the NFL despite his total lack of qualifications—Mawae began to hear "jokes in the locker room about Pellman's status with the NFL and things like that."

One running joke involved a three-word code—"Red Brick Broadway"—that Pellman had players recite to determine if they were able to play after a concussion. According to Mawae, "The three words were always the same. He would leave you and come back before the next series, and you'd go, 'Red Brick Broadway. I'm ready to go.'" In 2003, Pellman would face pointed questions about his treatment of a wide receiver, Wayne Chrebet, who was allowed to reenter a close game against the Giants after being knocked out for several minutes. "This is very important for your career," Pellman reportedly said before sending him back in. Chrebet was never the same and retired in 2005.

But players such as Mawae and Brady said such incidents were common. On one occasion, Mawae said, he suffered the same injury as Chrebet: He took a knee to the head and blacked out. "Next thing I know I'm laying prostrate on the ground," he said. "The first realization was, 'Wow I just got knocked out.'" After performing a "systems check," Pellman and the Jets' medical staff allowed Mawae to return for the next series, but "my teammates were telling me that I was making calls that weren't even in our playbook."

Reflecting on Pellman's selection as the NFL's top medical adviser and leading expert on concussions, Mawae said: "If you're gonna get a doctor that's a yes man, then it makes it easy for you." He regarded Pellman as a pawn. "Pellman's just a small part in this," Mawae said. "The bigger part is it's a multibillion-dollar industry that cannot afford something such as this."

In North Carolina, Kevin Guskiewicz was beginning to perform his own concussion studies, each with results more ominous than the one that preceded it. He watched the development of the NFL's new concussion committee with incredulity and amazement. Guskiewicz, of course, loved football—the Steelers, after all, had paid his way through grad school while he worked as an assistant trainer—but he felt that the NFL's new committee had willfully excluded the most respected researchers, especially those whose research indicated the potential for long-term

problems. "Quite frankly it was comical the way in which that original committee was pulled together; comical is probably the nicest way I could describe it," he said. "It seemed like they were cherry-picking anyone who seemed to be dabbling in this topic who was local in the New York area." Guskiewicz found the choice of Pellman ("a rheumatologist!") "bizarre." He wondered: "Who looked at the résumés of these individuals?"

"I'm trying to think of an analogy here: like in an airport when there's a major breach of security," said Guskiewicz. He thought the NFL's approach to the concussion problem was essentially: "Let's pick these folks, that will be the solution, ignore the problem, and it will all go away."

Lovell was part of the committee, but he too wondered how Pellman, with his limited neurological background, could possibly have landed the job. Pellman offered one explanation when he later wrote about the MTBI committee's formation: "On the basis of my experience with Mr. Toon, I was invited to the Commissioner's office to offer my limited insight into this problem. The Commissioner and I realized that we had more questions than answers. Was this a new problem or just an often misdiagnosed or unrecognized one? Was the premature retirement of these men a statistical anomaly or the beginning of an epidemic? I was asked to mount an effort to answer these questions."

Multiple sources, however, said Pellman had been Tagliabue's personal physician and they believed that was at least part of the reason he was named chairman.

"That's my understanding," said Lovell, a member of the committee from its inception.

In a statement to ESPN, Tagliabue acknowledged he was treated by Pellman but said that the first time he saw him as a patient was October 1997—three years after the formation of the MTBI committee. "No personal medical care had anything to do with Dr. Pellman's appointment to the committee in 1994," Tagliabue wrote, adding that Pellman got the job "based on his experience in sports medicine, his work with the Jets that included Al Toon's concussion-related retirement . . . and recommendations from Jets ownership and management."

The committee didn't publish its first research until October 2003—six years after Tagliabue became one of Pellman's patients. Pellman would continue as one of the commissioner's personal doctors until 2006.

Pellman, as promised, started from scratch. The MTBI committee began its work by spending months establishing an official NFL definition of a concussion. The lack of a consensus definition "has plagued the study of mild head injury in general and concussive injuries in athletes in particular," the committee wrote in an internal status report circulated in 1996. The new league definition was broad: "any traumatically induced alteration of brain function." That included a long list of symptoms: blackouts, wooziness, amnesia, headaches, vertigo, memory loss, personality change, lethargy, and so on. All constituted an NFL concussion, "or, as we quickly decided, the more academically appropriate term, *mild traumatic brain injury*," Pellman wrote.

The committee used that definition as the starting point for an epidemiological study it called the NFL Mild Brain Injury Surveillance Study, a system to monitor concussions across the league. The MTBI committee distributed forms to medical personnel from all 30 teams with instructions to keep up-to-date records every week. "A major obstacle to head injury research is the unavailability of willing test subjects," said one memo prepared by a bioengineering firm contracted to participate in the study. "The NFL has graciously sponsored a research program offering its players as those living subjects."

Lovell was put in charge of setting up the NFL's neuropsychological testing program, which he based on the model that he and Maroon had created for the Steelers. A few years later, after Lovell testified on behalf of Hoge—and, by extension, against the Chicago Bears and the league—Lovell thought he'd probably be ousted from the committee and would never work in the NFL again. But Pellman never brought it up, nor did anyone else. Instead, the league gave Lovell $12,000 in seed money to spread the gospel of neuropsychological testing. He traveled from city to city, team to team, armed with a letter of support from Tagliabue, who wrote: "We strongly recommend that all clubs in the NFL implement such a testing program so that neuropsychological data is available to club physicians, or other treating physicians, in the event of player concussions."

The NFL's concussion committee was up and running. Pellman re-

ported directly to Tagliabue. The commissioner was rarely seen at the committee's meetings—Feuer recalled him sitting in on only a couple of sessions, during which he rarely spoke—but his representatives frequently attended. Those representatives included, from the very beginning, NFL attorneys. Two lawyers who supported the early work of the MTBI committee were Jeff Pash, the league's general counsel, and Dorothy C. Mitchell, a young lawyer who served as counsel for policy and litigation. Mitchell's responsibilities included providing legal oversight for the NFL's medical and safety committee. Pellman and his colleagues later wrote that Mitchell "worked tirelessly to initiate the MTBI research."

Dorothy Mitchell's contribution to the MTBI committee wasn't totally clear, but at one point she used information related to the NFL's concussion research to try to discredit an expert witness in Hoge's lawsuit. That witness, John McShane, had been the team doctor for the Philadelphia Eagles and a clinical assistant professor at Thomas Jefferson University in Philadelphia. In 1996, McShane received a $134,000 grant from the NFL to study changes in the brain chemistry of concussed NFL players, a study that included other league-affiliated doctors, including Lovell. But before the study got off the ground, the Eagles sold their medical rights to another provider, and McShane was ousted as team doctor, leaving him without access to the players for his league-commissioned study.

Instead of intervening to keep the study alive, the NFL—first Pellman and then Mitchell—sought to recover the grant money, some of which already had been spent on sophisticated software. The aborted study had long been forgotten until July 2000, when Mitchell FedExed material related to the dispute to the attorney defending John Munsell, the Bears doctor who had treated Hoge. Munsell's attorney walked into court the next day and tried to use the NFL's documents against McShane, a former league physician who was prepared to testify that Munsell and the Bears had negligently sent Hoge back on the field to his doom.

McShane, sitting in the back of the courtroom as he watched the argument unfold, was baffled and angry. He felt he had tried to do research that would help the NFL with its concussion problem, only to be thwarted because the Eagles had changed medical providers. Now he

was under attack by the league because he planned to testify on behalf of Hoge. "I couldn't understand why anybody would be mad at me," he said. "I had all good intentions; I wanted to do a study that would provide valuable information. Then this change happened that I had no control over, and they were impugning me. I was just stunned."

The judge ruled that the dispute had nothing to do with the case, and McShane was allowed to testify. But it was an early sign of how the NFL and its ostensibly independent concussion committee were willing to throw their weight around—and for which side. The league was prepared to send Elliot Pellman, in his authority as chairman of the MTBI committee, to testify that Munsell's questionable treatment of Hoge was in fact sound. And the NFL lawyer who helped form that committee was willing to intervene in a concussion lawsuit against an NFL doctor. Before the MTBI committee had published a word of scientific research, it had staked out a position as a defender of the NFL.

The McShane study was just one of a number of early NFL concussion projects. The MTBI committee produced an educational video about how to wear a helmet properly. It looked at special mouthpieces and Kevlar caps that purported to reduce concussions. There seemed to be no end to the parade of gadgetry that passed before the MTBI committee from entrepreneurs seeking the imprimatur of the NFL. Many of the projects were considered and discarded, but Pellman was especially passionate about one initiative: helmet *design*. For various reasons, including the threat of lawsuits and a regulatory process that effectively was run by the helmet companies, there had been little in the way of helmet innovation over the years. With appropriate testing and the right design, Pellman thought, the NFL could use its vast resources to create a concussion-resistant helmet.

This was an attractive but not especially new idea and one that was not nearly as simple as it sounded. From the bloody early beginnings of football, the impulse to create more and better protection had been seen as an antidote to the sport's inherent brutality. Often the solutions were nonsensical or made the violence worse. In 1889, players for Princeton started wearing their hair long in the belief that it would protect them from head injuries, launching a nationwide trend. Around the turn of the century, some players wore "head harnesses"—leather straps that fit

snugly around the skull. Others wore hard leather nose protectors that hung from a strap that wrapped around the forehead. None of these devices worked, and some encouraged more head thumping. In 1905, when 18 players died—many from head trauma—several university presidents called for the abolition of football. President Teddy Roosevelt famously stepped in to save the sport, convening an emergency summit at the White House. "Football is on trial," he told representatives of the country's elite college football programs. The summit led to dramatic changes in the way the game was played: The forward pass was legalized, and the yardage needed for a first down went from 5 yards to 10, increasing the emphasis on speed. Football as we know it was saved. But the crisis, in what some would call a setback, also produced the NCAA.

As football evolved through the twentieth century, so did the methods for protecting the head. The head harness morphed into a full leather helmet; by the 1930s, teams were decorating them with colorful logos. But the deficiencies of leather helmets were obvious: They became flimsy and tore, reeked of sweat and mildew, and in the end did not provide much protection. Then, in 1939, Riddell, a Chicago company founded by a high school football coach, patented a helmet with a hard plastic shell. Mass production was delayed by World War II and a propensity of the early plastic helmets to shatter. The designer, Gerry Morgan, later Riddell's first chairman, observed that the human head is "the damnedest thing to fit. It comes in all shapes and sizes—egg heads, square heads, flat heads, and lopsided heads. The head isn't round, it's elongated, especially larger heads." The NFL made helmets mandatory in 1943, and by the mid-1950s, the plastic helmet—ABS thermoplastic, a high-strength polymer—was widely used.

But each technological advance came with a corollary: more destruction. One man's protection was another man's weapon. The face mask is but one example. The need for it was made abundantly clear by players like Hardy Brown, an undersized 49ers linebacker who liked to plunge his shoulder into the face of unsuspecting ball carriers—"the Humper," Brown called his signature tackle—shattering jaws and breaking noses. Brown later bragged that he knocked out 75 to 80 players during his ten-year career. George Halas once stopped a game to check Brown's shoulder pads for steel plates. But no sooner had Riddell started bolting

face masks onto its helmets than players figured out they could be used to wrestle men to the ground like steers. One was Dick "Night Train" Lane, a Hall of Fame cornerback for the Los Angeles Rams, Chicago Cardinals, and Detroit Lions whose brutal tackling style became known as the Night Train Necktie. By 1956, the NFL had instituted a penalty for an entirely new term that had entered the English language: *face masking.*

With the advent of the plastic helmet, football significantly cut down on catastrophic head injuries such as skull fractures and hemorrhages, but the flip side was that the human head was suddenly turned into a projectile. That dynamic in the NFL—a step forward for safety, followed by ingenious forms of new mayhem, followed by more rules—continued well into the 1980s and 1990s and was very much alive when Elliot Pellman began his new helmet project in 1995. Shortly after the MTBI committee was formed, Bob Cantu, a neurosurgeon and concussion researcher in Boston, ran into Pellman at a conference sponsored by the American Orthopaedic Society for Sports Medicine. Cantu had never met Pellman, who was still largely unknown among researchers, but he was struck immediately by Pellman's confidence that the NFL had a handle on the problem.

"I still remember Elliot waltzing into those meetings, saying, 'We've got this committee, and the National Football League; we're gonna solve the concussion problem,' " said Cantu. Pellman described how the NFL intended to accomplish this: "He said, 'We're going to build the best helmet imaginable,' " Cantu recalled. "They were going to eliminate this traumatic brain injury problem with a superhelmet. And it didn't matter how much it cost because the National Football League could afford anything."

The creation of a concussion-resistant superhelmet immediately struck Cantu as an idea both appealing and remarkably naive. The appeal was obvious: If the solution to reducing football-related concussions was tied to better equipment, the league could throw money at the problem. There would be no real need to examine how the game was played or the long-term effects on the players. But Cantu felt the solution was simplistic because he did not believe better helmets could prevent concussions, which, of course, were injuries that occurred *inside*

the skull. In fact, Cantu thought a new and supposedly improved helmet could make the problem worse as players became emboldened by the illusion of better protection, starting the cycle of mayhem all over again.

Cantu wasn't the only one with doubts. Lovell understood the vagaries of concussion better than any member of the MTBI committee. Over the next several years at his clinic at the University of Pittsburgh, he and his colleague Micky Collins would see dozens of patients a week. Lovell and Collins had been cranking out their own research, and if anything, it continued to reveal how diverse and unpredictable concussions were. They defied easy solutions; Collins called it a "cryptic" injury. Some people recovered quickly; others needed to stay in a dark room for weeks as their brains healed. Some people seemed able to withstand huge amounts of trauma. With others, a slight jostling of the head might trigger an injury. And as Guskiewicz would show, the severity of concussions often grew with each injury.

In the MTBI committee, Lovell said he argued that helmets were fine for protecting the outside of the head. He said he thought creating more and better protection was an interesting and certainly worthy endeavor. But the goal of engineering a superhelmet to reduce concussions was not a realistic solution, he said.

"I think that was a fantasy," said Lovell. "I've always said it's a fantasy. I never thought that was a realistic thing to do."

In many ways, Lovell thought the idea was understandable, the logical creation of an exuberant rheumatologist who had been put in charge of a brain committee, and of engineers and other MTBI members who didn't spend their lives studying the myriad symptoms of traumatic brain injury.

"It's the fantasy of people who don't spend 50 hours a week seeing patients who are all different," said Lovell.

But Pellman's enthusiasm was undiminished. At the end of 1999, he told the *Philadelphia Daily News*: "Within the next six months to a year, incredible stuff is going to come out. We think we're really going to be able to push the envelope. The helmet manufacturers no longer will have any excuses. We're going to understand the nature of this injury better. We think this is not only going to revolutionize head gear for

football players, but across the board. And we definitely think it can have an impact on decreasing the number of concussions."

How does one set out to create a superhelmet? The MTBI committee's idea was to take all NFL concussions between 1996 and 2001 and try to re-create the brain-scrambling hits on anthropomorphic crash-test dummies. (Photos showed the dummies wearing Riddell helmets with odd logos, like the players in *Any Given Sunday*.) The committee examined videotape of each recorded NFL concussion; in 182 cases, there was a clear view of where the point of impact had occurred. From those 182 concussions, the committee gleaned enough information in just a couple of dozen cases to calculate the speed at impact. An Ottawa engineering firm was hired to re-create those hits in the lab, using a weighted pendulum with a curved plastic hammer to simulate a helmet-to-helmet hit. The goal was to establish the amount of force that caused each injury, identify how and where the injuries occurred, and then design a helmet that better protected players against those types of hits.

The initial NFL research elicited some fascinating details about the action taking place on the field. The sheer magnitude of the violence was astonishing. The concussed athletes were being hit by fully armored players moving at speeds between 17 and 25 miles per hour (Usain Bolt reaches a top speed of nearly 28 miles per hour). For 15 milliseconds, their heads were struck with 70 g to 126 g forces. A longer duration, of course, would kill anyone, but the momentum transferred in such collisions is still the equivalent of being hit in the head by a 10-pound cannonball traveling at 30 miles per hour. The numbers alone raised ominous questions about the repetitive nature of football, which, as Vince Lombardi famously noted, "is not a contact sport, it's a collision sport." Everyone experiences elevated g forces from time to time—on roller coasters, stopping short in traffic, even sneezing—but the effects are worse when the elevated g forces are repeated over and over at extremely high levels. Like 25,000 car crashes, as Webster explained it.

By the end of 2001, the MTBI committee had amassed a trove of information about concussions in the NFL. The laboratory experiments alone encompassed not only the videotaped pounding of the crash-test dummies but a film library of hundreds of concussions, not to mention

the mathematical calculations on velocity, acceleration, and points of impact. The NFL Mild Brain Injury Surveillance Study had produced an enormous amount of data on the symptoms of concussion, including memory loss, loss of consciousness, concussion rates by position, games missed, and on and on. Lovell's neuropsychological testing program had been up and running for six years: All but three teams—the Vikings, Panthers, and Cowboys—were using some form of the test battery Lovell and Maroon had developed for the Steelers. From the original Group of 27 in 1993, the program had expanded to include thousands of neuropsychological tests on hundreds of NFL players. Pellman's MTBI committee had access to those data, too.

The MTBI committee was now ready to publish its research. But where? There are hundreds, if not thousands, of scientific and medical journals dealing with issues involving the brain, sports, or both, ranging from the *Journal of the American Medical Association* to the *Clinical Journal of Sport Medicine.* But only one had an NFL consultant as its editor in chief. Michael L. J. Apuzzo was a professor of neurosurgery at the University of Southern California. In 1992, he was appointed editor in chief of *Neurosurgery,* the official journal of the Congress of Neurological Surgeons. Apuzzo was a stereotactic neurosurgeon—a highly specialized field that involves the use of three-dimensional mapping to place probes deep inside the brain—and something of a Renaissance man. He had patrolled the Arctic Ocean on a nuclear submarine for NATO; produced a 2,540-page textbook titled *Brain Surgery: Complication Avoidance and Management*; helped design new instruments for microsurgery; and been honored by the queen of Spain. Bob Cantu, who knew Apuzzo well, used words such as *worldly, scholarly, erudite,* and *visionary* to describe him. "And he's also a very prideful person," said Cantu. "He doesn't lack for understanding of his accomplishments, which are significant. And yes, he likes a bit of the stage. . . . But don't most people?" Apuzzo's USC biography spanned nine pages when printed out and described him as "one of the world's best known and respected neurosurgeons."

Some people around the NFL also considered Apuzzo something of a jock sniffer. Among his many endeavors, Apuzzo, a tall, slender man with receding dark hair and plastic-framed glasses, worked the

sidelines as a consultant to the New York Giants. Bill Barr, the former neuropsychologist for the Jets, called Apuzzo "a sports guy wannabe. He works in LA, but he shows up at all the Giants games, which is not a convenient thing. That tells me he wants to be in the game so badly that he'll travel all the way across the country for these games. He's a neurosurgeon, but you'd see him on the sideline. Brandon Jacobs goes down with a knee injury and Apuzzo will be down there looking at the knee in his raincoat and golf cap." Apuzzo clearly was thrilled by his association with the NFL. After working the 2001 Super Bowl between the Giants and Ravens, he told an interviewer: "When I was in the military I worked in a nuclear-powered submarine where we'd be submerged for three months doing very dangerous things. We were dependent on each other for life and death, and it was an extremely moving bonding experience. Until this game I'd never experienced anything else like it. Everyone was very aware of what it meant to be a part of this game, to be a part of the team that came so far." Cantu said Apuzzo "really enjoyed the association" with the NFL in general and Tagliabue in particular. Apuzzo frequently worked into his conversations with Cantu that he'd just had lunch with the NFL commissioner in New York, a bit of name-dropping that didn't initially strike Cantu as important but soon would.

As editor in chief, Apuzzo set out to remake *Neurosurgery* in his own image: worldly, eclectic, erudite. He wanted to expand the journal's readership and impact by moving it beyond the narrow world of neurosurgery into what he called "an 'avant-garde' progressive position and internationality." It was the brain science equivalent of Tina Brown's makeover of the *New Yorker*. Apuzzo's avant-garde approach to *Neurosurgery* included transforming some of the journal's covers into abstract art and expanding its sports coverage. He decided to establish a sports section to solicit and publish articles on sports and the brain. Bob Cantu was Apuzzo's pick to edit the section.

Cantu was a logical choice. One researcher called him the "King of Concussions." Cantu had been looking into the relationship between sports and head injuries for perhaps as long as anyone alive. When Apuzzo brought him in, Cantu was in his early fifties, a trim man with short red hair that he combed from left to right. Cantu had grown up

in Santa Rosa, California, about an hour north of San Francisco, where his father owned a building supplies company. After pitching for two years at Cal, he blew out his arm, and so he decided to accelerate his entry into medical school at the University of California, San Francisco. Cantu moved to Boston in 1964 to do his residency at Massachusetts General Hospital and never left.

By the mid-1980s, Cantu was chief of neurosurgery service and chairman of the department of surgery at Emerson Hospital in Concord, Massachusetts; for fun, he worked the sidelines at high school football games. At the time, contact sports, especially football, were experiencing a wave of hysteria over something called second impact syndrome. The idea was that a first blow to the head might seem benign, but it primed the brain for the second blow, which killed you. The actual number of cases of second impact syndrome was, in fact, low, but the lack of understanding and the sinister nature of the injury led to a lot of media coverage. Cantu, who was watching teenagers collide every week, decided to start looking into the true nature of those collisions. He didn't want to miss the concussion that preceded the concussion that wound up killing a kid.

Cantu quickly realized there were no guidelines for how long a player should sit out after a concussion, and so he decided to come up with some himself. There wasn't a lot of research to draw on; Cantu admitted the exercise was a bit of a stab in the dark. One of his sources of inspiration was an experiment in which UCLA researchers had bashed rats in the head and then checked their glucose levels, glucose being the chemical that powers the brain. The levels stayed depressed for an average of 5 days but sometimes as long as 10, a possible indication of how long it might take to recover from a concussion. Later, the study's author, David Hovda, ran into Cantu at a meeting and asked him how he had come up with his recommendation that athletes sit out a week after suffering a concussion. Cantu pulled out Hovda's study. "You're making recommendations from rat data?" Hovda asked, grinning.

By the time Apuzzo tapped him as *Neurosurgery*'s sports section editor, Cantu had written dozens of papers on concussions and the criteria for returning to play. He had been named president of the American College of Sports Medicine. He was exactly the type of expert Lovell

had expected to see on the NFL's committee. Cantu's concussion guidelines were still somewhat arbitrary, but they gave coaches, trainers, and team doctors something to go on when assessing whether a player should be allowed back on the field. Cantu believed the NFL's research was a perfect candidate for the sports section of *Neurosurgery*; it could help advance the science of an issue that had long been important to him. His doubts about Elliot Pellman notwithstanding, he was curious to see what the NFL, with all its resources, came up with. "I knew the work had been done; I thought the work was important and suggested they submit the first paper to *Neurosurgery*," Cantu said.

The first NFL paper was accepted on May 27, 2003. It was published in the October 2003 issue under the title "Concussion in Professional Football: Reconstruction of Game Impacts and Injuries."

To launch the unprecedented initiative, Tagliabue contributed a bland guest editorial titled "Tackling Concussions in Sports." He wrote that the NFL's research already had "contributed to advancing our understanding of the science of concussions, which is a concern for everyone involved in competitive sports and recreational activities. The accompanying article confirms the groundbreaking character of this research."

Apuzzo was more effusive and colorful in a manner befitting his avant-garde publication. In an editor's note, he compared Elliot Pellman's MTBI committee to Galen of Pergamon, the Greek philosopher and medical researcher who studied the wounds of the Roman gladiators. "Football's participants dwarf Rome's gladiatorial combatants in number, and, in its most sophisticated form, the game's pageantry matches or exceeds the spectacle of Roman-designed events," Apuzzo wrote. "As in the ancient contests, modern football is attended by myriad injuries, the most frequent of which involve the brain."

"As in the past," Apuzzo continued, "the modern arenas of sport offer laboratories for the study of the mechanisms and events attendant to multiple injury end points in athletes, and they offer a substrate of important information for our general comprehension of the problem of human trauma in general."

Apuzzo described the research by "Pellman et al." as "highly responsible NFL-sponsored studies" combining field analysis with lab work and offering "significant new insights" into concussions, including "im-

portant data for consideration in the development of new directions in helmet design and testing."

The NFL's era of scientific exploration had begun.

The early reviews were glowing. In its first paper published in *Neurosurgery*, in October 2003, the NFL (Pellman et al.) not only had brought science to the question of why the lights were going out for so many players, it also had addressed an issue on the minds of many researchers who thought deeply about the subject. The paper suggested that the standards used to measure the effectiveness of football helmets in preventing head injuries had to be reassessed. The standards were set by a body known as the National Operating Committee on Standards for Athletic Equipment; everyone called it NOCSAE (pronounced NOC-SEE). It had the ring of a government agency—maybe part of the FTC or the Consumer Protection Agency—but in fact, NOCSAE was a private nonprofit organization funded mostly by the sporting goods manufacturers it regulated, including the helmet companies.

Not surprisingly, NOCSAE hadn't changed the way it tested and certified helmets for years. But now here was the NFL, with all its power and authority, using science as a catalyst for reform. NOCSAE focused primarily on the ability of helmets to withstand blows to the periphery and crown of the helmet, but the NFL's study indicated that many injuries occurred when players got hit in the face mask and the side and back of the helmet. This was progress. Cantu, who served as a consultant to NOCSAE, knew that the standards needed updating. In a review appended to the article, he called the NFL's first paper "the most extensive study to date on the biomechanics of athletic concussion in football" and praised "Pellman and his collaborators for this exciting, innovative and unique study and the NFL for funding this research on a topic very critical to its athletes."

Three months later, the NFL published another study in *Neurosurgery*. This second paper—"Concussion in Professional Football: Location and Direction of Helmet Impacts"—drilled down on where the concussive blows were delivered. Again it was illuminating. Pellman received credit as lead author, but most of the heavy lifting was done by Biokinetics, the Ottawa biomechanics firm brought in by the NFL, and

Dave Viano, a biomechanical engineer at Detroit's Wayne State University who had done crash-test studies for the auto industry. This time the NFL divided the human head into quadrants. The league found that 71 percent of the concussive blows were being struck on the side and back quadrants of the helmet, another repudiation of NOCSAE standards.

Again the reaction was positive. Julian Bailes, the neurosurgeon whose work with Barry Jordan had indicated that alarming numbers of retired football players had signs of dementia, wrote that the NFL had "ushered in a new era in the study and analysis of the many nuances of these high-speed bodily collisions." Alluding to the concussion videos, the NFL, Bailes wrote, was "studying by darkroom analysis an important laboratory for head injury, the football field."

An aura of good feeling settled over the Mild Traumatic Brain Injury Committee. The NFL had revealed itself as a force for good. Yes, the commissioner had appointed a rheumatologist to oversee scientific research into brain injuries, and yes, most of the doctors had ties to the league, but the science was the science. The NFL had resources that no other researchers had at their disposal: a vast library of videotape, an army of willing research assistants, a closed pool of subjects (the players), and, of course, gobs of money. The concussion research community stood by and waited to see what the Mild Traumatic Brain Injury Committee would produce next.

The wait lasted only a month. In the next issue of *Neurosurgery*, the league published NFL Paper Number 3.

This one was different; that much was clear.

The much praised biomechanical studies were over. This time, Pellman et al. had taken the statistics from the NFL Mild Brain Injury Surveillance Study and used them to paint a panorama of concussion in professional football.

It was in many respects a very pretty picture. The NFL didn't have much of a concussion problem, the study concluded. The injury occurred at an extremely low rate—about one every three games—a rate strangely similar to the statistics spouted by Tagliabue and the NFL's PR department for a decade, long before the study had been put in place. When concussions did occur, 92 percent of all players returned to the field in less than seven days—that is, they never missed a game.

Pellman and his fellow authors interpreted this as an indication not that players were being rushed back on the field or hiding their injuries but that concussions were minor events whose symptoms went away quickly with few, if any, long-term consequences. "More than one-half of the players returned to play within 1 day, and symptoms resolved in a short time in the vast majority of cases," they wrote.

The response from the scientific community this time was guarded, even puzzled. Many researchers noted the obvious flaw that blew an enormous hole in the NFL's claims that concussion rates were low: the reluctance of players to report their injuries to coaches and team medical personnel.

Nine months later came yet another NFL study in *Neurosurgery*. This one dealt with *repeat* concussions. Numerous previous studies had shown that one concussion left the brain vulnerable to another concussion if the brain wasn't given time to heal. Guskiewicz had taken it a step further: Repeat concussions, he'd found, appeared to increase the probability of dementia later in life greatly. But that wasn't a problem in the NFL, according to Pellman et al. The league looked at how quickly players went back on the field and concluded that they were at no greater risk than if they had never been concussed at all. The logic was that because players returned to the field so quickly, they must have been okay or the medical staff wouldn't have cleared them. This flew in the face not only of previous research but of widely known realities on an NFL sideline. First, players often didn't report their injuries. Second, they hid their symptoms whenever they could. Third, NFL doctors often deferred to the wishes of coaches and players, just as Pellman had deferred to Parcells. As Steelers doctor Tony Yates had said: "Only a head coach can pull a player off." The entire NFL culture was incentivized toward risk.

For the first time, the NFL also took on the issue of football and brain damage, a growing concern among researchers. The league's scientific opinion? This wasn't a problem in the NFL either. Boxers got brain damage. Football players didn't. It was as simple as that. "This injury has not been observed in professional football," Pellman and his colleagues wrote.

That was technically true: No one had yet cut open the skull of a

dead football player to examine his brain for signs of neurodegenerative disease. But after the findings of researchers such as Bailes, Jordan, and Guskiewicz, few doubted that day was coming. Pellman and his colleagues noted that the NFL's study was "admittedly not the best vehicle to search for evidence" of long-term brain damage in football players. Why? Because the league, in fact, hadn't studied the issue. But that didn't stop Pellman and his colleagues from offering an opinion. Yes, there were players who left the game with long-term symptoms after suffering repeated concussions. "They clearly did not have [brain damage] as that seen in boxers," Pellman et al. wrote.

The response to NFL Paper Number 4 was like a cannon going off in the tightly knit concussion research community. Before the paper was published, Cantu, as sports section editor at *Neurosurgery,* sent it around for peer review. Bailes and Guskiewicz were among the reviewers. The two researchers could hardly believe what they were reading. Not only was the NFL dumping on their research, but the league had taken a giant deductive leap by essentially declaring that pro football players were impervious to brain damage, as if they were superhuman. Bailes and Guskiewicz informed *Neurosurgery* that they were rejecting the paper's major findings. They weren't alone. Even Cantu, the editor, had misgivings about the NFL's conclusions and the paper's scientific underpinnings.

In most peer-reviewed journals, rejection by a preponderance of reviewers—particularly the assigning editor—is usually more than enough to prevent a paper from being published. Many scientists feel that's exactly the point of the peer-review process: to prevent science of questionable origin or credibility from making it into the literature—the engine of scientific progress. But *Neurosurgery,* at Apuzzo's direction, used a different process. Reviewers could raise their objections in a comments section appended to the paper, but the paper itself would stand.

Even in the stilted language of science, the comments on NFL Paper Number 4 were scathing. Guskiewicz called the NFL's conclusion that repeat concussions were of no real consequence "potentially dangerous." Bailes stated that the concussion rates calculated by the NFL do "not indicate a true ongoing incidence." In other words: wrong. Cantu wrote: "At first glance, the NFL's experience with single and repeat concussion

(no difference) and management (more than 50% of players return to the same game, including 25% of those with loss of consciousness) seems to be at odds with virtually all published guidelines and consensus statements on managing concussion."

The fact that the comments were published provided no solace to the reviewers. "We were like, 'Who reads the commentaries?'" said Guskiewicz. "It's a published paper. It became the gospel."

NFL Paper Number 4 now stood as peer-reviewed science. The NFL's research arm could hardly have staked out a more aggressive position. The league could now claim authority over the questions that soon enough would most threaten its future. It was judge and jury. The NFL was just getting warmed up.

# 8

# ONYEMALUKWUBE

In normal circumstances, Mike Webster's body wouldn't have ended up on the slab. In 2002, there were roughly 17,500 deaths in Allegheny County. Fewer than 1,000 were handled by the coroner's office, which intervenes only when death results from unknown or suspicious causes. Webster had died of a heart attack: Case closed. But for his fame, his very public descent into madness, and the unusual foresight of one man, his body would have been cremated after the funeral.

The man who stepped in was Joe Dominick, the chief deputy coroner. Dominick was a burly Pittsburgh native and die-hard Steelers fan. The son of a carpenter, he had been raised in the milieu of the steel town and then had become part of the new economy when Pittsburgh transitioned into health care. "I watched Mike Webster play football every Sunday, man!" he said. Dominick's 14-year-old son, Alexander, played center on his midget team, and Dominick had raised him on the legend of Iron Mike. Like every Steelers fan, Dominick had heard the stories about Webster's tortured post-football life. When he learned that he had died, Dominick decided to impound the body.

"The first thing I thought was this is a good way to put this issue to rest," he said. "My concern was if Mike died as a result of a drug overdose or he died as a result of injuries sustained that we were able to link to football, it changes the dynamics here. It's no longer a natural death."

The body arrived on a Saturday, and this too was a fortuitous key to

the secret inside Mike Webster's head. At the time, the coroner's office had more than a half dozen people qualified to perform an autopsy. The one who happened to be working that day, Dominick thought, was the perfect man for the job. For one thing, Bennet Omalu was a neuropathologist, a specialist in diseases of the central nervous system, although neuropathology was just the latest medical specialty Omalu had picked up. A pathologist by training, he seemed to collect degrees and certificates with the ease of a man picking out produce at the supermarket. Technically, Omalu was a neuropathology *student,* having completed his studies in that discipline at the University of Pittsburgh Medical Center three months earlier. He hadn't yet passed the exams, but he was brimming with curiosity and fresh ideas. "I was intellectually hard," Omalu said. "I had just finished my training."

At this point, it would be hard to conjure up a more unlikely character to wander into the Webster saga than Bennet Omalu. Nigerian by birth, short and stocky, he spoke English with a mesmerizing singsong accent, the pitch of his voice often rising and falling in the same melodic sentence. When Omalu swore, which was often, he made *motherfucker* sound like poetry. His face was equally expressive, conveying a wide range of emotions. Omalu was the ultimate open book: He had no filter, and whatever he was thinking in that moment would be fully expressed, often with no apparent concern for how it might sound to the person on the receiving end. Even his priest, Carmen D'Amico, was sometimes startled by what came out of his mouth: "He'll say things, and it's just like, 'Oh! Bennet, don't say that!'" The more controversial material often focused on his beliefs, a fusion of Roman Catholicism and Igbo tribal mysticism that sometimes became entwined with his medical practice. Omalu believed that the body was a vessel for the soul and that even in death—*especially* in death—the soul had to be honored. He was convinced that spirits inhabited the coroner's office and that the nights belonged to them. Once, while working alone with a dozen or so refrigerated bodies, Omalu thought he saw a figure leaning against the door, staring at him. When he looked again, the figure vanished. He then spotted another shadowy form walking away. Omalu looked at his watch; it was 7:30 P.M. "I said to myself, 'Bennet, you're trespassing. There's usually nobody here at this time; just get the fuck out of here.'

And guess what? What did I do? I quickly stopped what I was doing. I shut off the light. And I got the fuck out of there." On another occasion, Omalu was driving around with a brain in the backseat of his car. The car got a flat tire, and that night the empty dishwasher in Omalu's apartment started without explanation. He attributed these events to the brain's former owner.

Omalu wore impeccably tailored suits and tooled around Pittsburgh in a silver Mercedes-Benz E-Class sedan. He ordered his custom-made shirts without pockets to avoid collecting lint. He later designed his own $6,000 cuff links, which he was planning to sell in Dubai. Omalu sometimes spoke of himself in the third person, especially when provoked to outrage or anger ("He did not even acknowledge there was anybody like Omalu!"). He could seem indiscreet to the point of obliviousness. Once, while conducting an interview for this book, Omalu pulled out his laptop on the patio of a tony restaurant called Wine & Roses and showed images of disemboweled corpses while all around him diners brunched on quiche and eggs Florentine. To people who annoyed him, Omalu would sometimes remark: "I may do your autopsy some day. Remember that."

Omalu's indiscretions and eccentricities sometimes got him written off as a kook. But once you stripped away the mysticism and theatrics, the strange ghost stories and confessions, what was left was an inordinately well-educated immigrant with a razor-sharp mind, soaring ambition, and a keenly honed sense of moral outrage. All this would prepare Omalu well for what was about to occur. Julian Bailes, the neurosurgeon who later would become Omalu's biggest champion, noted that it's often the least conventional people who shake up the world. "Most discoveries of great things are not done by shrinking violets," Bailes said. "They're done by people who want to be noticed or provocative, want to be recognized for discovering things."

Never was Omalu more of an outsider than when it came to pro football. It would have been almost impossible to locate a human being within a 200-mile radius of Pittsburgh who was more ignorant about the sport. Omalu hadn't the slightest clue how football worked. He hadn't watched a game, much less attended one. "I didn't know what a Super Bowl was," he later said. He found the city's fevered obsession

with the Steelers baffling and pointless, "part of the American stupidity. You know, in Africa, we believe, yes, the white man is smart but the white man can be foolish." Omalu looked at the game through the lens of a Martian, if that Martian happened to practice neuropathology. Everything about it he found worrisome and dangerous. Why, for example, were the players sheathed in armor? He looked at the helmet and thought: "Why do they have to wear that big casing?"

Omalu was just 32, the junior pathologist on staff. Because of this, he often was scheduled to work weekends. "Guess who was on duty that Saturday?" said Omalu. "Omalu." As he prepared for work, he watched the news accounts of the sad demise of a local football hero, the stories about his Ritalin arrest, the rambling Hall of Fame speech, how Webster had slept in bus and train stations—a man broken mentally and physically. Omalu felt for the poor man. He wondered idly if he might have had some kind of brain disorder. Omalu recently had conducted an autopsy on a woman in her mid-forties. She had died after being beaten into a vegetative state by her husband. Omalu ran tests on the woman's brain and was struck when they revealed an unusual Alzheimer's-like pathology. He didn't do anything with his surprising finding, but the case was still fresh in his mind.

When Omalu arrived at the coroner's office and was told that Mike Webster was his first case, he didn't immediately make the connection.

"Who's Mike Webster?" he said.

"That's the greatest center who ever played," he was told.

"What's a center?" Omalu asked.

Then suddenly he got it: The body on the table belonged to the same broken man they had been talking about on TV.

"Fuck, man!" Omalu recalled thinking. "Thank you, Lord!"

Omalu looked down at Webster's battered corpse—the cracked feet, scarred knees, mangled fingers—and got to work. He always played music during autopsies; it helped calm him and break the monotony of carving up so many bodies. A hopeless romantic, he was going through a Teddy Pendergrass phase of love ballads. Omalu worked with such swiftness and precision that it could seem almost as if he were on autopilot. But with each incision, with each organ he removed, weighed, and sliced, he was looking for clues.

DENIAL

Omalu's belief in spirits extended to his autopsies. He believed he could communicate with the dead and that the dead in turn could tell him how they became dead. Omalu saw himself as their champion, a person who could give them voice. As he worked his way around Webster's body, he conducted an ongoing dialogue, trying to engage Webster's spirit: "Mike, in my heart, I think there's something wrong with you. I can't do this alone, you need to help me. Let's prove them wrong; let's go get them."

The autopsy lasted about an hour, building toward the moment Omalu had been waiting for: the removal of Webster's brain. To understand definitively what had gone wrong with Webster would require months of study. But when he was able to hold the brain in his hands, Omalu felt certain he would see some obvious signs of deterioration. Perhaps it would be shrunken and atrophied like a brain with Alzheimer's disease. But when Omalu removed Webster's brain, he was disappointed. It showed no outward signs of injury or disease. Omalu weighed it: 3½ pounds. It was perfectly normal.

Omalu shrugged.

Sorry, Mike. I couldn't help you after all.

But Omalu found himself thinking back to the case of the battered woman. And so, almost as an afterthought, he ordered his technician to preserve the brain for further study.

He recorded his intentions in the autopsy report: "The brain weighs 1575 grams and has been fixed in formalin for comprehensive neuropathologic examination. A report will be issued on a later date."

Omalu cleaned up and returned to his office. He called his boss, Allegheny County Coroner Cyril Wecht, a Pittsburgh legend. Wecht, among other things, had an uncanny ability to insinuate himself into every major crime and fatality of the day: O. J. Simpson, JonBenét Ramsey, even the Kennedy assassinations. He was an odd breed. People called Wecht a "celebrity pathologist."

"Sir, I've finished the autopsy," Omalu told Wecht. "I've saved the brain and, please, I'm asking for your permission to study it."

"What are you studying the brain for?" Wecht asked.

"Well, they said he had some neuropsychiatric problems. I want to see if he has some evidence of brain damage."

"Do whatever you want to do, Bennet," Wecht told him. "Just make sure you make me fucking famous."

O malu's full name was Bennet Ifeakandu Onyemalukwube.

His middle name meant: "Life is the greatest gift of all." His parents chose it for a reason: Omalu was born in the middle of a bloody civil war. Nigeria's Igbo tribe, of which his family was part, had annexed the southeastern part of the country to form the state of Biafra. When Omalu's mother went into labor, his father lay in a hospital bed, having nearly been killed when the Nigerian Air Force bombed their village. The two-and-a-half-year civil war ended in 1970, when Biafra was absorbed back into Nigeria. The conflict claimed at least 1 million lives, many from starvation and disease. In the United States, the war would be remembered for its disturbing images of skeletal children. Omalu recalled almost nothing beyond his village receiving rations of dried fish from the World Health Organization.

Omalu's last name, fully realized, meant: "If you know, come forth and speak." This too was fitting, for the Igbo had a reputation for being the most outspoken of Nigeria's three main tribes (the others are the Hausa and the Yoruba). "I'm an Igbo man," said Omalu. "I think we are bold people. That thing that you tell me I can't do is what I want to do." The Igbo are predominantly Christian, with many practicing a mix of Roman Catholicism and native rituals. The Igbo have complicated views on death and burial. Most believe in reincarnation and the interaction between the living and the spirit world. The Igbo are also known as businessmen and traders. Omalu's father, John, was orphaned at three and raised as a house servant by a local parish catechist. When he finished high school, according to Omalu, his "colonial master" paid his father's way to England, where he studied mining engineering and shortened the family name to Omalu. He returned to Nigeria and spent most of his life as a civil servant, eventually retiring as director of the Federal Ministry of Mines and Power.

Omalu was the product of an arranged marriage, the sixth of seven children. He attended the finest schools in Enugu, a city of about half a million people in southeastern Nigeria, living comfortably in a gated community, protected by armed guards, going to school in chauffeur-

driven cars. Math and English tutors came by the house twice a week to teach Omalu and his siblings. Bennet was quiet and introverted as a child. He excelled in class but had few friends and was something of a mama's boy. He was tidy and meticulous, voted the "neatest" kid in his class. By his late teens he yearned to break away, dreaming of becoming a jet-setting pilot.

"My childhood dream was to have a girlfriend in every major city of the world," he said. "I fly into Paris. I spend the night with my Paris girlfriend. I fly to Sydney, Australia. I spend the night with my Australian girlfriend. Then I fly to New York. . . ."

His parents nixed that idea and instead sent him to medical school at the University of Nigeria. After getting his degree, he worked four years as an emergency room physician and then, at 26, applied to a one-year visiting scholar program at the University of Washington's School of Public Health. After a year in Seattle, he went to New York to do his residency at Harlem Hospital.

Omalu had no idea what he wanted to do next. Then, one night, he was watching TV and stumbled upon a documentary about the assassination of JFK. There he saw Wecht, pathologist to the stars, making the case that Lee Harvey Oswald could not have acted alone. In his thirties, Wecht had challenged the conclusions of the Warren Commission before Congress; he called the lone gunman theory "an asinine, pseudoscientific sham." His conspiracy theories launched him into the public eye. Omalu was mesmerized. Wecht was a master of the medium: articulate, passionate, compelling—filled with the kinds of juicy details that later would turn forensic pathology into the basis for hit TV shows. Omalu fired off a letter to Wecht, asking if he could come to Pittsburgh for a one-month internship.

The one-month internship became a one-year fellowship, which was followed by two years studying neuropathology at UPMC, which was followed by two years studying for a master's degree in public health at the University of Pittsburgh, which was followed by three more years studying for an MBA at Carnegie Mellon.

Omalu continued to work in the coroner's office; his one-month internship had effectively turned into a full-time job working for Wecht, who seemed to see a younger version of himself in the flamboyant

Nigerian intellectual. "Bennet, you remind me of myself when I was your age," Wecht would tell him. Forensic pathology requires a bit of salesmanship and panache. As Dominick put it: "You gotta have giant balls to be a pathologist, especially a forensic pathologist." In addition to the scientific sleuthing, it requires an ability to get in front of a jury or a phalanx of TV cameras and come off as persuasive. Wecht taught Omalu how to dress and how to talk. The two men often had breakfast together. "He trained me," said Omalu. "He taught me things I wouldn't read in books. For Wecht, how much I respected him, whatever he wanted me to do I would have done."

Omalu went from wearing jeans to wearing $600 suits. Some people in the office referred to him as "Junior Wecht."

"We have a saying in Arabic: 'He knows where to look for the best piece of meat in the pink lamb,'" said Abdulrezak Shakir, a pathologist from Iraq who worked alongside Omalu and saw the relationship with Wecht develop. "What it means is if I go under this guy, that will be better for my future. I wish I have this capability. Not many people have it."

Omalu's close relationship with Wecht drew him into his boss's side business: private medical consultations. The famous forensic pathologist would get requests to perform autopsies and consultations from all over the country. It was a lucrative business. According to Omalu, Wecht charged as much as $10,000 for his services. He paid Omalu $300. "I would do all the work," Omalu said.

When Omalu asked for more money, Wecht told him he was getting "intangible benefits" from the work, Omalu said.

That turned out to be true. One of the private cases Omalu worked on for Wecht was the autopsy of the battered middle-aged woman. It was that case that led Omalu to save Mike Webster's brain.

Omalu placed the 3½-pound brain in a bucket of formaldehyde and water. The process, called fixing, hardens the brain, which in its natural state is the consistency of a soft-boiled egg and can be difficult to cut. Webster's brain soaked for two weeks. Omalu then sliced four 2-millimeter sections, each about the width of a dime, from the primary lobes (frontal, parietal, occipital, and temporal). Each of the sections was placed in a small container.

Omalu then drove Webster's brain tissue over to UPMC in his Mercedes. He handed off the tissue to Jonette Werley, a lab technician with more than 20 years of experience working with autopsied brains. Werley bathed the containers in alcohol to flush out the water, then in xylene to flush out the alcohol. She used a microtome—essentially a tiny meat slicer—to shave the 2-millimeter sections into 200 slivers of brain tissue, which were transferred onto glass slides. She stained the tissue with an array of antibodies selected by Omalu, each designed to highlight abnormalities associated with specific types of neurodegenerative disease.

Then Omalu forgot about it. He had a busy life. His decision to save Webster's brain was only a hunch, and he had other things to do. In addition to his work at the coroner's office, he was studying for a master's degree in public health (with a specialization in epidemiology), making regular court appearances, and conducting private autopsies for Wecht. Whatever time he had left he devoted to his girlfriend, Prema Mutiso, a Kenyan whom he later married. The couple had met in church, where Omalu spent most of his time away from work.

Omalu belonged to St. Benedict the Moor, a church founded in 1889 shortly after the National Congress of Black Catholics met in Washington, D.C., to demand greater representation in the Roman Catholic Church. By the time Omalu entered St. Benedict more than a century later, it was almost entirely black, with 80 to 90 percent of the parishioners being African American. The rest were African immigrants—Nigerians, Kenyans, Liberians, Sudanese, Ugandans, Congolese—who had settled in Pittsburgh.

Away from work, where his naked ambition sometimes engendered resentment, Omalu was beloved. He directed his energies into helping others. The church was located in the Hill District, for decades the center of African American life in Pittsburgh, whose rich history includes the Underground Railroad, the glory years of Negro League baseball, and the country's most widely circulated black newspaper, the *Pittsburgh Courier*. The influx of Africans into St. Benedict the Moor had created tensions, but Omalu served as a bridge between cultures. "What was remarkable about Bennet, he was able to, in our church, kind of dispel or dissipate that thinking that some African Americans

had about Africans as coming over here as privileged," said Father D'Amico.

Omalu quickly became one of the church's most prominent and valued members. It was obvious to others in the congregation that he had money—from his tailored suits, expensive car, and fine jewelry—but he didn't flaunt it. "He didn't tell anyone his background," said Father D'Amico. "None of us really knew what his work was. We knew he was from Nigeria, but you would never know from meeting him what a brilliant person this man was, the number of degrees he had, and the kind of groundbreaking work that he was doing." Father D'Amico frequently asked him to provide other members with money, clothes, whatever help was needed. Before Mass, rather than having members quietly pray, the priest encouraged them to openly express their gratitude to God about specific blessings in their lives. Omalu became one of the leaders of this "gathering rite," his melodic voice even more spellbinding in prayer.

"It was almost like preaching, you know?" said Father D'Amico. "I said to him, 'Bennet, you're one of the best prayers I know.' It would be so, so beautiful to listen to."

Omalu was so preoccupied by his nonstop life that when slides of Webster's brain came back from the neuropathology research lab, they sat on his desk for weeks. Eventually he brought them home to his apartment, where he kept a microscope on the dining room table. Omalu found that he often did his best work in the middle of the night. He would go to bed early, wake up around 2 A.M., and then work until he had to go to the office.

There, in his apartment, Omalu examined the Webster slides, trying to figure out what they meant. What he was seeing was not normal for a 50-year-old man. But what was it? He was so new to neuropathology that he didn't trust his own eyes. Omalu followed this routine for weeks, waking up at 2 A.M. and examining the slides closely, convinced that they were telling him something extraordinary but wanting to eliminate any doubt before he uttered a word to anyone and risked embarrassing himself.

What Omalu was seeing under the microscope was the buildup of tau, a protein that enables the brain's ability to function but can also strangle it. Without tau, neurons would collapse, cutting off the flow

of nutrients and molecules to the cells. But sometimes, especially later in life, tau congeals into clumps called neurofibrillary tangles. These tangles slowly strangle the neurons from the inside. In neuropathology, they are one of the two defining markers in Alzheimer's disease. The other marker is the buildup of beta-amyloid plaques: hardened proteins that surround the cells and poison them.

The staining of the slides is what brings the tau to life; otherwise, you can't see it. Under a microscope, tau appears as tiny brown splotches interspersed among a pattern of normal cells represented as dots, as if someone had dripped dark brown paint on a flecked marble tile. As Omalu examined the slides of Webster's brain, he saw lots of brown splotches. He also saw signs of amyloid plaque, but the pattern didn't look like Alzheimer's as he had been trained to identify it. There was very little beta-amyloid, and it had taken on a slightly different form. Even stranger, the tangles of tau seemed to be distributed haphazardly throughout different parts of the brain, almost without rhyme or reason. In Alzheimer's disease, numerous tangles are present in the hippocampus (an area of the brain involved with memory) before they are seen in the cortex (the outer part of the brain that is critical to cognition). But in Webster's brain it was the opposite: Omalu saw many tangles in the cortex but none in the hippocampus. And besides, Webster was 50: He wouldn't be expected to *have* Alzheimer's disease.

Omalu knew from his training that head trauma could cause tau to form tangles. The presence of a neurodegenerative disease had been chronicled in boxers since 1928, when Harrison Martland, the chief medical examiner for Essex County, New Jersey, published a landmark paper in which he used the expression "punch-drunk" as a medical term. The phrase, he noted, was already part of the vernacular of fight aficionados, who also referred to the condition as "slug-nutty" and "cutting paper dolls." The condition was most pronounced among "poor boxers who take considerable head punishment, seeking only to land a knockout blow," Martland wrote. In severe cases, Punch-Drunk Syndrome was characterized by "marked mental deterioration" that sometimes forced ex-fighters to be sent off to the asylum. Martland estimated that nearly half of all veteran fighters had some form of the syndrome.

Martland has since been lionized for what is now seen as the seminal

first study on head trauma and sport. But the reality was that his conclusions were not universally well received, especially by fight fans, who saw them as an unproven denunciation of the sport. It wasn't until 1973 that dementia pugilistica, as it came to be known, was accepted as irrefutable science. A British neuropathologist, J. A. N. "Nick" Corsellis, cut open the skulls of 15 former boxers who had died of natural causes. The autopsies showed cerebral atrophy in 14 of the 15 cases. Corsellis, who put together his own brain bank, the "Corsellis Collection," had shown for the first time that the repetitive head trauma associated with boxing led to the "destruction of cerebral tissue."

However, in Webster's brain, Omalu didn't see one of the hallmarks of dementia pugilistica: an opening in the septum pellucidum, the wall that separates the lateral ventricles in the brain. Plus, from what he had read, Webster didn't seem to have any of the symptoms of Parkinson's disease—slow gait, tremors, and slurred speech—that defined so many old boxers. Omalu's working theory was that Webster may have been suffering from something similar to Punch-Drunk Syndrome, the reason behind his irritability and erratic behavior. Even that would be groundbreaking as there had never been a diagnosed case of brain damage associated with football.

Omalu pressed on, still too reticent to come forward with his findings. He ordered additional stains of Webster's brain tissue, paying for them out of his own pocket. He stacked up every piece of literature he could find on concussions, dementia pugilistica, head trauma, and football on his dining room table and went through it paper by paper. He read Martland, Corsellis, and numerous others on boxing as well as the recent work related to football by researchers such as Jeff Barth, Kevin Guskiewicz, and Micky Collins. He came across papers published by something called the NFL's Mild Traumatic Brain Injury Committee, which was documenting the scientific effects of concussions in pro football.

Finally, in the spring of 2003, Omalu was ready to seek a second opinion. He turned to his mentor, Ronald Hamilton, the neuropathologist who had helped train him during his two-year fellowship at UPMC. Hamilton was renowned as the first neuropathologist to show that Lewy bodies—abnormal masses of protein that develop in nerve cells and are

commonly associated with Parkinson's disease—were twice as common in Alzheimer's patients than previously had been known. He had a close and somewhat paternalistic relationship with Omalu. Hamilton viewed his protégé as bright and ambitious but also a bit flamboyant and given to hyperbole. In forensic pathology—particularly Cyril Wecht's brand of forensic pathology—certainty and authority under the bright lights are valued. Not so in neuropathology, in which scientific debates are more measured and deliberate than the fierce advocacy required in the courtroom. Omalu spoke in pronouncements, an attitude that earned him a warning from the head of the neuropathology program that he might not make it in academia if he kept it up. "That's everybody's experience with him. Bennet has a powerful personality, and at first it's just like, *What?*" said Hamilton. "And then you start listening to him more and more—if you have the patience. And you start to realize that he's really right on the mark. It's just that his personality really drives some people nuts."

For his part, Omalu viewed Hamilton not only as a great scientist but as his introduction into a broader world. With characteristic bluntness, he announced one day: "Hamilton is gay. And Hamilton was the one who changed my attitudes toward gay people. I was very homophobic. I thought that gay people are bad people. Hamilton was the first gay person I had met. He was such a good guy; he was so good to me. For the first time in my life I realized that I had been fed lies by the church, by my family and society, that this guy is a good guy with a heart, who cared for me."

One afternoon, Omalu dropped by Hamilton's office at Presbyterian University Hospital and asked if he would look at a special case he had been assigned at the coroner's office.

"What's the case?" Hamilton asked.

"I'm not going to tell you; just look at it," said Omalu.

This was a favorite game among pathologists. You wanted the second opinion to come with a clean slate, not even a suggestion of bias. Omalu's biggest fear was that Hamilton would look at the slides and tell him that what he was seeing was "no big deal," perhaps a variant of Alzheimer's that Hamilton had seen many times before.

Hamilton put a slide under the microscope. Then another. Then another.

This wasn't Alzheimer's disease, not even early Alzheimer's. The game was getting intriguing. Hamilton looked at more slides, keeping his thoughts to himself. This was something he had taught Omalu: Don't muse. Wait until you're ready to make a diagnosis.

"Is this patient a boxer?" he asked finally.

That made the most sense. He figured it would not be unheard of for the body of a boxer to show up at the coroner's office. Maybe he had died in the ring and this was a case of dementia pugilistica.

"No, this guy is not a boxer," Omalu said, a smile coming over his face. "He's an NFL football player. A Pittsburgh Steeler. This is Mike Webster."

Hamilton's jaw dropped, literally.

He knew immediately it was a new discovery, one with profound implications. In some ways Hamilton thought it was obvious; why hadn't it been discovered before? But he had no doubts. The pathology—the haphazardly formed tangles, the scarcity of beta-amyloid—proved it.

"I mean, if I had really felt any kind of hesitation about the diagnosis whatsoever, I would have said no," said Hamilton. "But it was so obvious, so logically beautiful. These are boxers with helmets on that are hitting each other all the time. And Bennet was feeling the same way. So we both came to the same conclusions without being unduly influenced. He didn't say, 'I want you to look at this case. It's a brand new case of something that's gonna be really big.' He just said, 'I want you to take a look at this case and tell me what you think.' "

Hamilton, half in jest, said they should call it "dementia footballistica."

It was a once-in-a-lifetime discovery.

"I knew this was a billion-dollar kind of finding when I saw it," he said.

Hamilton knew he needed more firepower. Omalu would be seen as a nobody—young, eccentric, and Nigerian. He wasn't even officially a neuropathologist. Hamilton didn't want to see him or the findings dismissed out of hand. Hamilton was known and respected, but he knew he needed to go higher.

He called up Steve DeKosky, chairman of UPMC's Department of

Neurology, director of the Alzheimer's Disease Research Center, and an internationally renowned expert in Alzheimer's and related neuro-degenerative diseases. Hamilton knew that if Steve DeKosky concurred that this was a new syndrome and was willing to stake his name and reputation on it, that would stamp it as serious science. DeKosky didn't have time for games, and so Hamilton called him up and told him the story: how Omalu had an interesting case involving a 50-year-old man, how there were tangles of tau throughout the cortex but not in the hip-pocampus and very little beta-amyloid. Hamilton said he originally thought it was a boxer, only to be told by Omalu it was a 17-year veteran of the National Football League.

"*Really?*" said DeKosky.

DeKosky immediately flashed back to a conversation a few years earlier at a meeting of the Alzheimer's Association. A colleague had recounted speaking with a representative from the NFL Hall of Fame who was concerned about the plight of retired players. Too many were showing up at the annual induction ceremony with serious memory problems. DeKosky had been fascinated. He wondered about the con-nection between all those hits and the problems that were surfacing in Canton. DeKosky did a little research and found that the president of the Hall of Fame Players Association was a lawyer named Ron Mix, a Hall of Famer himself who had played 11 seasons as an offensive tackle, mostly with the Chargers. DeKosky wrote Mix, introducing himself and laying out the design for a longitudinal study that would track Hall of Famers over time. DeKosky never heard back. He hadn't thought about it much until Hamilton's phone call.

Even then, DeKosky was skeptical. He knew Omalu and viewed him the way almost everyone else did: "a wickedly smart guy" but cocky and prone to exaggeration. Hamilton told Omalu to pay DeKosky a visit.

Omalu figured he might get 5 to 10 minutes. Omalu, after all, was little more than a student; DeKosky was the department chair.

Omalu handed over the slides. DeKosky examined them under a microscope.

DeKosky was stunned. Hamilton had been right.

"This will change everything," DeKosky thought to himself. "This will change everything forever."

He felt that Omalu had discovered "a new syndrome. Or, actu-ally, the rediscovery of the physics that says if you beat the hell out of a human brain, this is one of the kinds of degenerative processes that occurs. I knew it was going to change everything, but quite frankly, it was so controversial that I just thought it's going to take a long time before this is accepted."

But that sealed it: If Steve DeKosky agreed, the only other step was to take it public by publishing the research in a medical journal.

That was no small task. It would be another year before the paper was completed. Omalu needed to expand on his research into head trauma and brain injury. DeKosky had to compile a clinical history of Webster by interviewing his family and creating a portrait of how his brain had short-circuited after his retirement. There was also the question of what to call the syndrome. Omalu thought it was critical that he come up with a name already in circulation so that if anyone attacked the findings, he could point to its earlier use in the medical lit-erature. He also wanted something with a good acronym for lay people to remember and understand. In his review of the literature, Omalu saw references to chronic insanity, chronic encephalopathy, traumatic neurosis, traumatic encephalopathy, and occasionally chronic traumatic encephalopathy. Those terms, he thought, were all used generally, not to describe a specific disorder such as dementia pugilistica. He settled on chronic traumatic encephalopathy, or CTE. He thought it was easy to remember, and the language fit: *Chronic* meant long-term, *traumatic* referred to trauma, and *encephalopathy* was a damaged brain.

To a man, the researchers thought they were providing a service to the NFL. DeKosky resurrected his letter to the Hall of Fame, explain-ing Omalu's findings and expressing the researchers' interest in doing a long-term study.

Omalu titled the paper "Chronic Traumatic Encephalopathy in a National Football League Player." He was the lead author. Hamil-ton, as the senior neuropathologist, also was listed, along with two of Omalu's colleagues who contributed a section on genetics. In scien-tific literature, the position of final author is traditionally bestowed as a gesture of respect for the scientist who made the research possible, the "senior author." Omalu initially picked DeKosky, an obvious choice.

He had validated the findings, and his presence gave the paper stature. But Wecht, the coroner, was irate. He was Omalu's mentor, the man who had made him. Webster had been autopsied in his lab. In the end, "Wecht really didn't have anything to do with" the paper, said DeKosky, but he ceded the position, in part because he worried that Omalu might "be fired if he ticked the guy off too much."

The paper laid out the story of Mike Webster's brain, though it didn't name Webster directly, instead describing the subject as a "50-year-old professional football player who died approximately 12 years after retirement from the NFL." Any true football fan who read it—not that any would—could have deduced from the "premortem history" that it was Iron Mike. The authors described the subject as an offensive lineman who was drafted into the NFL at 22 and played 17 seasons, 245 games overall, including 177 consecutive games in a 10-year window and 19 playoff games. Telephone interviews with family members revealed a man suffering from depression, memory loss, and signs of Parkinson's disease.

The first sentence got right to the point: "We present the results of the autopsy of a retired professional football player that revealed neuropathological changes consistent with long-term repetitive concussive brain injury." Translation: This football player got brain damage from the daily pounding of his sport.

The authors described it as a "sentinel case that draws attention to a possibly more prevalent yet unrecognized disease." They recommended additional study to explore this "emergent professional sport hazard."

Omalu first submitted the paper to the prestigious *Journal of the American Medical Association (JAMA)*. Three days later the paper was rejected. Omalu sent out a disappointed e-mail to his collaborators and suggested that they try submitting the paper to a journal called *Neurosurgery*. Reviewing the literature, Omalu had come to believe that *Neurosurgery* was "the official journal of the NFL committee on MTBI," as he wrote to Hamilton and DeKosky.

Submitting the paper to *Neurosurgery* made sense, because Omalu, Hamilton, and DeKosky all believed the NFL would welcome their discovery. Linking football and brain damage wasn't great news, of course, but the league, they thought, would have to confront the implications

that football causes brain damage and react accordingly, if only to protect the product.

They were scientists. In the years to come, they would all look back and reflect ruefully on how naive they had been.

"I thought they were gonna call me and embrace me and say, 'Motherfucker, you're such a hero,'" Omalu said. "I thought they were just gonna come and embrace me and give me a kiss on my cheek."