fact, that was the scenario many researchers thought most appropriate. Sharing tissue and conducting independent analyses would help ensure the accuracy of the findings and provide a deeper understanding, especially for a scientific phenomenon that was not well understood.

However, by that point, there was too much bad blood between the groups. No one with the Brain Injury Research Institute trusted Nowinski. When Omalu e-mailed Fitzsimmons and Bailes to ask what they thought about Nowinski's proposal, Fitzsimmons wrote: "I suggest we do our thing & just disregard Chris." Bailes quickly agreed. The group moved ahead alone, without informing Nowinski. Omalu, who had set up a small lab in his Lodi garage, worked feverishly to make a diagnosis before his rivals. "I hope we can know the results before the Boston group. ☺," Omalu wrote in an e-mail to his colleagues. In another e-mail, he suggested that the Brain Injury Research Institute "may have to plan on how to optimize the utility of the case and possibly announce it before the Boston group. ☺"

On July 1, six weeks after McHale's death, Omalu sent an e-mail to his colleagues with the subject line "Thomas McHale, NEWS ALERT!!!!!!!!!!!!!!!!!!"

"THOMAS MCHALE IS POSITIVE FOR CTE," he wrote. "Please let us have a phone conference ASAP!! We have to announce this before the Boston group. We also need to inform the family. . . . Congratulations!!"

Bailes contacted Lisa McHale's father, David D'Alessandro, a surgeon who had become the point person for the family. He explained the significance of the results. Omalu followed up with his own call to D'Alessandro. But McHale's family was reticent about going public. "Lisa is still struggling with the diagnosis and it is my understanding that Lisa may be afraid of losing her benefits and rapport with the NFL and probably does not want to upset the NFL," Omalu wrote to his colleagues. (Lisa McHale said she never spoke to Omalu, and she didn't recall expressing to her father any fears about losing benefits or upsetting the league.) Omalu mailed her a copy of his report. Lisa was devastated. She hadn't expected brain damage. Her husband had had no history of concussions. She had thought his brain would be valuable as a "control,"

a healthy specimen to measure against diseased brains. In fact, McHale was sick, his brain riddled with CTE.

Bailes suggested giving the family time to digest the diagnosis. Meanwhile, Nowinski, believing he had an agreement to make a joint announcement, was trying to contact Omalu. McKee had completed her own analysis and had also found CTE. But Omalu wouldn't return calls or e-mails from Cantu or Nowinski. Finally, Nowinski contacted Lisa McHale, apologizing for the delay.

"Sorry, but we're having trouble getting in touch with the other guys," he said.

"Oh, they called me two or three months ago," Lisa said.

"Really?" said a surprised Nowinski. "Did they tell you the results?"

"Yes, they said he was positive for CTE," she said.

"At that point, I said, 'All right, fine, all bets are off,'" said Nowinski. "They broke the agreement." Among other things, Nowinski thought the Omalu Group had created a potential disaster if McKee had come up with a different conclusion than Omalu had. "If we didn't find it, it would be very confusing," he said. "And they wouldn't return our frickin' calls. I mean, what can we do?"

Nowinski told Lisa McHale that he believed it was important to go public with the results. Lisa, whatever reticence she may have expressed previously, agreed.

The plan Nowinski developed would put on full display his gifts as an activist. He proceeded to choreograph a piece of guerrilla theater on the NFL's biggest stage. He persuaded the McHale family not only to come forward but to make the announcement during a press conference the week before Super Bowl XLIII in Tampa, where McHale had spent most of his playing career.

In addition to Lisa McHale, Nowinski brought in the entire team for the announcement: McKee, Cantu, even Ted Johnson, the former Patriots linebacker. And, of course, Nowinski himself. The press conference was held at a Tampa Marriott. The turnout said a lot about the level of public interest at the time. Earlier that day, more than 4,000 people had attended the Super Bowl's annual Media Day. Less than two dozen showed up to hear that another dead football player had brain

damage. But Schwarz was there for the *Times,* as was a reporter for the Associated Press, ensuring that the news hit the wires. A press release announced: "Leading medical experts at the Center for the Study of Traumatic Encephalopathy (CSTE) at Boston University School of Medicine (BUSM) reported today that nine-year NFL veteran, former Tampa Bay Buccaneer Tom McHale was suffering from chronic traumatic encephalopathy (CTE), a degenerative brain disease caused by head trauma, when he died in 2008 at the age of 45."

McHale was the sixth former NFL player to be diagnosed with CTE.

There was no mention that Omalu also had studied McHale's brain and reached the same conclusion. Omalu said he learned of BU's announcement on TV. Nowinski and the Boston Group had taken control of the issue and soon would be recognized as the leading authority on football-related brain damage. Omalu and his colleagues were destined to become an afterthought.

The SLI press release also noted that the group had discovered "early evidence of CTE in the youngest case to date, a recently deceased 18-year-old boy who suffered multiple concussions in high school football."

"This should be a wake-up call, especially to parents, coaches, and league administrators," said Nowinski. "We're exposing more than 1 million kids to early-onset brain damage, and we don't know yet how to prevent it."

Asked why the NFL had been so lax, Nowinski turned lawyerly: "I think it's because this is considered an on-the-job injury and it's a huge liability." He said he was in Tampa to recruit more players to donate their brains.

"I find these results to be not only incredibly significant but profoundly disturbing," said Lisa McHale, who would go on to sit on the Sports Legacy Institute's Family Advisory Board and serve as SLI's director of family relations. "We don't want to destroy the game. We want to make it safer." Even so, she said she was questioning whether she would let her sons, then 9 and 11, continue to play football.

But of all the people who spoke that day, none was more powerful than Ann McKee. In many ways, it was her coming-out party as a

spokeswoman for the disease. She was a natural: thoughtful, reasoned, believable. She made it seem perfectly natural that on the eve of the Super Bowl, a neuropathologist was standing in a conference room showing slides of a diseased brain to a bunch of sportswriters. McKee pointed out the clumps of tau, the brown splotches that had eaten away at McHale's identity. This was not the normal brain of a 45-year-old man, McKee explained. It looked like the brain of a 72-year-old former boxer. McKee said she had been looking at brains for more than two decades and that what had happened to Tom McHale was not at all normal.

"I have never seen this disease in the general population, only in these athletes," McKee said. "It's a crisis, and anyone who doesn't recognize the severity of the problem is in tremendous denial."

Not long afterward, McKee's phone rang. It was the NFL calling.

# 14

# BIG FOOTBALL

McKee would remember exactly where she was and what she was doing when she listened to Ira Casson's voice mail. It was that kind of call. She was taking part in a conference at the VA, and when she came out of a session, Casson had left her a message. "I was like, 'Oh, my God, what does Ira Casson want?'" McKee had never met Dr. No. She hadn't seen his virtuoso performance on HBO. She hadn't heard how he had mocked Bailes at the NFL Concussion Summit. And she had no idea that Casson, along with Pellman and Viano, had tried to get Omalu's work killed. But she had heard enough to be wary. "I knew he wasn't a friend," she said.

McKee returned the call nervously. Casson was pleasant and said the members of the NFL's Mild Traumatic Brain Injury Committee wanted to invite her to New York to present her work. They wanted to view the cases personally. McKee, though intimidated, welcomed the idea; she believed in the work, she knew it mattered, and she loved football. She hoped to convince the NFL that CTE was something it should pay attention to.

As they set a date for the meeting, McKee decided she "needed a little friendly accompaniment." She asked if Nowinski could attend, but the NFL refused. "Fine, I'm not coming," she said. The league relented, though it was suggested that Nowinski not speak during the meeting. McKee also decided to invite another expert in neurodegenerative disease, Daniel Perl, the director of neuropathology at the Mount Sinai School of Medicine and a consultant to BU's Alzheimer's Center. Perl was a heavyweight; among other things, he was the leading expert on a mysterious brain disorder found only on Guam. He had been fascinated by McKee's CTE cases. The disease clearly wasn't Alzheimer's, and the sheer amount of tau was stunning. Perl found he didn't need a microscope to see it: He could hold up some of the slides to the light and tell the brains were severely damaged.

On May 19, 2009, McKee, Perl, and Nowinski got together for breakfast in Manhattan before the meeting, not far from the NFL's Park Avenue offices. McKee was nervous but excited. She wasn't thinking about the future of football or even how the sport might need to change. She had important scientific information to pass along, and she hoped the NFL would take her seriously. Perl was expecting a straightforward academic presentation, like the hundreds he had participated in over the years, the audience respectful and curious.

"I didn't appreciate the political implications, okay?" he later said dryly. "That's the best way to describe it."

As they entered the lobby of NFL headquarters, McKee found herself in awe. It was cheesehead heaven. After being cleared through security, McKee, Perl, and Nowinski rode the elevator up to NFL Central, the inner sanctum, where America's richest and most popular sport was run. McKee saw the gleaming Lombardi Trophy, given to the winner of the Super Bowl; a trove of Green Bay Packers memorabilia; the legendary Jim Brown's old jersey. There was a waiting room with lined green turf that looked like it had been ripped from a stadium floor. There was no mistaking where they were. Even Perl, a casual fan, was impressed.

The trio was ushered into a huge board room with a lacquered table surrounded by plush chairs. Perl thought it was the fanciest conference room he had ever seen. There was high-tech equipment suitable for any type of presentation. As some two dozen participants took their seats, McKee noticed that she was one of just two women in the room; the other turned out to be an NFL lawyer. Along with the MTBI committee, there were a few other invited guests, including Peter Davies, the tau expert who to the league's chagrin had validated Omalu's work; John Mann, a Columbia University neuroscientist and psychiatrist who

specialized in suicide research; and Colonel Michael Jaffee, the national director of the Defense and Veterans Brain Injury Center, which was seeking to collaborate with the NFL. One of the lawyers present specialized in class-action litigation, the visitors later learned. Nowinski believed the lawyers were present "to figure out what the researchers had and what to be prepared for down the road" in the event of a lawsuit. "They were clearly thinking about it already," he said.

McKee had prepared a PowerPoint presentation, but she also brought along a box of lantern slides with 4-inch by 5-inch slivers of brain the doctors could hold up to the light. She started with those, passing around the brains, and it immediately became clear that this was not going to be the academic discussion she and Perl had anticipated. Members of the MTBI committee seized on the absence of visible bruising to question how football-related head trauma could have caused the disease. If there was no contusion, there was no trauma. Of course, that was the point: Almost all the brains, from Webster's on, had looked normal from the outside. This wasn't a disease caused by a single blow or even a few. The brain was deteriorating from the inside as a result of repetitive, consistent pounding.

McKee turned to the slides. She pointed out the brown splotches representing neurofibrillary tangles of tau protein that had suffocated the cells. This always had been the most powerful evidence. The tangles were indisputable signs of disease, and there was little or no beta-amyloid, which meant it wasn't Alzheimer's. And these were relatively young men with one common trait: All had played football for years. To McKee and Perl, the experts, this suggested dementia pugilistica, the boxer's disease, now found in football players. Members of the committee again challenged her. Some wanted to know why the tangles weren't closer to the surface of the brain, where the trauma had occurred. It was a reasonable enough question, but it had an edge. To many in the room, Casson seemed especially combative. His questions were along the lines of "How can you possibly think that? How is that possible?"

"Casson interrupted the most," said Colonel Jaffee. "He was the most challenging and at times mocking. These were pretty compelling neuropathological findings, and so I guess to outright deny there could

be a relationship, I didn't think that was really making an honest assessment of the evidence."

It was turning into Chicago all over again. Only now it was two years later, two years in which the NFL supposedly had made major changes in the way it addressed concussions. Hank Feuer, the Colts' physician and a charter member of the MTBI committee, said he was sitting directly across from McKee. He later said, "I honestly don't think we were any different with her than we were with anybody else. If we, for some reason, came across as being disrespectful, then I would say that everybody else we interviewed over the 15 years must have felt the same way." But as the meeting continued, the invited guests found themselves increasingly uncomfortable with the line of questioning. All had participated in sharp scientific debate. This was qualitatively different, they felt. McKee felt like it was more of an inquisition than a legitimate inquiry.

Mann, the Columbia suicide expert, had never met McKee, but he found her research compelling. It was obvious to him that she had found a serious brain disease in these players. After she was finished, Mann presented his own research, at one point describing data that showed how people who had had mild head injuries as children or adolescents were at an increased risk for suicidal behavior. Mann sought to connect his results to the cases McKee had presented.

Casson tossed up his hand and interrupted. "It would be impossible to link a disease like CTE to suicide," he asserted.

That wasn't true, said Mann: "It's not just possible, it's entirely plausible based on what I've seen from Ann McKee."

At one point, it was suggested to McKee that really, wasn't CTE just a "misdiagnosed case of frontotemporal dementia," a disease of the brain's frontal lobe? To which she replied: "Well, I was on the NIH committee that defined frontotemporal dementia's diagnostic criteria, so, no."

Perl studied the room. He, McKee, and Davies were the only experts in tau and neurodegenerative disease. He came to believe that no one else at the table truly understood the science. Or wanted to understand it. Casson and his colleagues—Viano and Pellman in particular—were most focused on proving that the cause of whatever they were seeing was *not* football. Perl described it as a "kind of unsophisticated denial. Now, admittedly it's not their field, okay? But we're the experts. Between Ann

and myself, you had at that point maybe 50 years cumulative of look-ing at brains day in and day out." Perl did notice that McKee's message seemed to be sinking in with some of the other team doctors, particu-larly those who didn't have a background in the brain, such as the ortho-pedists and emergency room physicians.

They weren't saying anything, but what Perl saw on their faces said, "Holy shit!"

McKee had experienced heated debate before. Scientists in the Alzheimer's community weren't shy about attacking their colleagues. But this was different, she thought. It was almost personal.

"I felt that they were in a very serious state of denial," she said. "I felt like they weren't really listening. That's honestly what I thought. That's how it felt, like they had their heads in the sand. They didn't want to see it, so they didn't see it."

McKee also couldn't help noticing the preponderance of testoster-one in the room. She was surrounded by men. She already worked in a field dominated by men, and she was familiar with the look they were throwing her way. It said to her: "Is that girl saying something? Could we get a doctor in here, please? Could we get someone in here who actu-ally knows what they're talking about?"

Casson, Viano, and Pellman—the triumvirate that had run the NFL's concussion committee for years—bombarded McKee and Perl with alternative theories: steroids, nutritional supplements, high blood pressure, diabetes. On and on they went until finally McKee threw up her hands.

"You are delusional," she told the NFL's men.

Jaffee, the military doctor, had a sense of déjà vu. He had faced similar denials from Pentagon doctors who still couldn't accept the idea that concussive blasts in the field might contribute to mental health problems such as post-traumatic stress.

"There were certainly questions unanswered: Why everyone who played doesn't have this? What factors lead to it?" he said. "Those would be questions I have, as opposed to questioning if there is any relationship."

The two-hour meeting ended cordially, with McKee and the oth-ers receiving thanks from the MTBI committee but no promises for follow-up. As Mann prepared to leave, Casson told him how surprised

he was that Mann had asserted that there was a relationship between head trauma and suicide. Mann couldn't tell whether Casson was genu-inely curious or dismissive. "My reaction was, if he believes it, they'll be in touch pretty fast," he said.

Mann never heard from Casson or anyone from the MTBI commit-tee again.

Out on Park Avenue, McKee, Nowinski, and Perl reflected for a few minutes, shocked by what they had just experienced. McKee was relieved it was over. It was clear to her that "we hadn't made a dent in anybody's opinion."

She couldn't wait to call her brother Chuck back in Wisconsin. He had to hear this not just because he was a doctor but because he was a sideline physician and a former football star. As McKee recounted the meeting, Chuck grew more and more angry that his sister had been attacked by those know-nothing doctors. Soon he and McKee were feeding off each other, blasting the league: *You wouldn't fucking believe these guys. These guys are such assholes.*

"Mental corruption, I think, is what we were talking about," Chuck McKee recalled. "That word never came up, that phrase never came up, but just that these people, what's the quote, 'A man will not believe some-thing that his livelihood depends on his not believing.' You know, that's kind of what it's about. These people could not believe that because it meant that they were marginalized. And that was so clear, that this was about their protecting their own stake in the NFL and their positions as medical advisers. And they didn't give a damn about the data, and they didn't give a damn about the players."

The committee, of course, had already taken a public position on the matter in published papers and commentary. To acknowledge otherwise was to admit that the NFL's men were wrong, incompetent, or both.

As their conversation ended, Chuck McKee had one last message for his baby sister: "Just hang in there, kid. You're right and they're wrong."

By now, it was hard for the NFL to say it hadn't been warned. McKee, of course, was just the latest authority to go directly to the league with her concerns. Over the previous decade, the roster of neuro-scientists making the case that football led to higher rates of depression,

memory loss, dementia, and brain damage read like an all-star team of researchers: Barry Jordan, Kevin Guskiewicz, Julian Bailes, Bob Cantu, Bob Stern, Ron Hamilton, Steve DeKosky, Danny Perl, Bennet Omalu, Ann McKee. The warnings had come in the form of player surveys, research papers, autopsy studies, and innumerable public statements by experts and former players. Bailes and Guskiewicz had delivered the message personally to Goodell at the 2007 summit in Chicago. And now, two years later, McKee and Perl had brought the message to the NFL's doorstep. Meanwhile, the number of dead football players with CTE continued to mount.

Jason Luckasevic didn't know the half of it, but he still thought he had enough ammunition to sue the NFL. The young Pittsburgh lawyer originally had been motivated by his desire to protect his friend Omalu back when Omalu was under attack by the league's doctors. At the time, Luckasevic hadn't had the slightest clue to what kind of case he might bring. But as he looked at the situation more closely, Luckasevic thought that what had happened to Omalu was part of a pattern that went back at least to the publication of the first NFL papers and possibly as far back as the formation of the MTBI committee in 1994. One of the more curious aspects of the concussion crisis was that almost everyone who ended up taking on the NFL *loved* the NFL. Luckasevic was no exception. He bled Steelers black and gold. Yet he came to see himself as an advocate for the players, many of whom simply wanted the league to acknowledge their suffering.

From a legal standpoint, what Luckasevic was considering was by any measure preposterous, the ultimate David and Goliath story. He was a small-time personal injury lawyer, an associate at the Pittsburgh firm of Goldberg, Persky & White. The NFL was, well, the NFL: a multi-billion-dollar industry with a legal winning percentage that rivaled that of Lombardi's Packers. A cursory glance at the NFL's case history told Luckasevic that one major hurdle—among many major hurdles—was that the league could fall back on the collective bargaining agreement with the players to argue that the claims didn't belong in court. The contract specifically set up the Bert Bell/Pete Rozelle NFL Player Retirement Plan to deal with long-term health problems related to NFL combat. To the extent that the league might be liable, it was the individual

teams, not the league, that managed injuries. The league would argue that the players' recourse was to appeal through the retirement plan or to bring workers' compensation claims against their teams.

Luckasevic thought that couldn't possibly be right. If the NFL had willfully denied or even concealed repeated warnings that football causes brain damage—and at that point there was no doubt in his mind that it had—that was a qualitatively different proposition. Luckasevic thought the collective bargaining agreement (CBA) couldn't protect the league from claims of negligence and fraud. "For me, it became an issue that, look, this isn't about a collective bargaining agreement," he said. "This is about something that they owe the players—as basic as the ball is to the game. I mean, you can't just hide from somebody that there's something inherently dangerous in my sport that's going to hurt you. You can't just lie to people about your sport." That became the core of Luckasevic's case: The NFL had had ample warning that football causes brain damage, but the league's response had been to deny that information and cover it up.

Even that, Luckasevic knew, would be a very tough sell. Who could possibly argue that the players didn't know what they were getting into when they strapped it on? But he would deal with that later. A similar claim had been made about smokers, after all.

Luckasevic began to look for cases that picked apart the argument that the CBA protected the league—a shield for the Shield. One such case, he felt, was *Brown, et al. v. N.F.L.,* a bizarre 2001 suit brought by Orlando Brown, a 6-foot-7, 360-pound offensive tackle who went by the nickname Zeus. While playing for Cleveland, Brown had been hit in the right eye by a penalty flag during a game against the Jaguars, temporarily blinding him. At the time, Brown was one of the highest-paid offensive linemen in the game, his contract worth nearly $35 million. The injury knocked him out of the sport for several years, though he did return in 2003 (Brown died at 40 in 2011 of an ailment related to diabetes). Brown sued the NFL for $200 million, arguing that the referee who hurled the penalty flag was a league employee whose negligence superseded the protection of the CBA. The NFL settled the case for an estimated $15 to $25 million in 2002.

Luckasevic began to line up consultants and expert witnesses. One

of the first was none other than Nowinski. On September 19, 2007, the activist and author of *Head Games* quietly signed a $5,000 retainer to "perform litigation services relating to potential and/or actual claims that may be asserted by one or more of our clients against the National Football League and others." Those services included "performing primary and secondary research regarding, among others, concussions in the NFL and related medical care and policies, epidemiology, helmets, player contracts, collective bargaining agreements and the '88 Plan.'" Luckasevic later ended the contract, feeling that Nowinski had promised much and delivered little, but questions lingered about whether Nowinski continued his involvement in the suit. When Nowinski was asked in spring 2013 if he was still consulting for lawyers suing the NFL, he replied: "Where did you hear that?" After a long pause, he said: "I have no comment." A few hours later, he wrote in an e-mail that "all of my consulting agreements" are vetted by the Sports Legacy Institute's board. A few months later, when interviewed again—this time with a lawyer and a PR person on the line with him—Nowinski reiterated his no-comment. Asked specifically about the 2007 agreement, he said, "That doesn't exist; you don't have a contract." After he was read the specific language from the contract, which had been obtained by the authors, he said, "I don't have any recollection of signing that contract."

Other researchers who had challenged the NFL would stay as far away from the lawsuit as possible, fearing it could compromise their independence. Guskiewicz, for one, said he could have built "a beach house on both coasts" with the money lawyers offered him, but he turned them all down.

As he pressed forward, Luckasevic thought more and more that he had a viable case. He decided he was ready to take it to his bosses. He needed to convince them that it was worth his time and their money. He made his pitch during a meeting with the partners. Explaining the case, he told them he wanted to take on the National Football League.

They laughed at him. The players were simply crazy, they told him. Moreover, the players had known that football was dangerous; *everybody* knew that. How would he prove to a jury that their problems were related to some brain disease, much less a sport? "I'd love to

cross-examine these experts," one partner told Luckasevic. "I'd have a field day if I was the NFL's lawyer."

"They practically laughed me out of the room, to put it nicely," Luckasevic recalled.

It wasn't that Goldberg, Persky & White was afraid of the NFL. The firm had helped pioneer asbestos litigation in the rust belt. But beyond the partners' howling skepticism about the potential for a lawsuit, the case probably would require a huge number of man-hours. It wasn't a case that one lawyer or even necessarily one firm could take on.

Finally, Luckasevic pleaded: "If I can pull this together, are you okay with it?"

The partners agreed to give him time to fish around as long as his other work didn't suffer. Here was a glimmer of hope. Luckasevic started cold-calling firms with a history of bringing class-action suits, but the reaction was much the same. "It was like being a musician and wanting to get your album bought or somebody to produce it," he said. The standard response was "We'll get back to you." At one point, Luckasevic thought he had a partner in a Houston-based firm, Lanier, which had won a $253 million judgment in the first lawsuit related to Vioxx, the notorious pain medication manufactured by Merck. But Lanier's lawyers ultimately pulled out after the NFL updated its concussion guidelines in 2007, telling Luckasevic they thought the move created timing and statutory problems.

By 2010, Luckasevic had neither clients nor a partner and was close to giving up. He was working closely with Jack Tierney, an older attorney in semi-retirement at Goldberg, Persky. Tierney had become Luckasevic's primary source of encouragement, "the only guy to support me, believe in me, believe in the case." When Luckasevic told Tierney he was ready to throw in the towel, Tierney said there was a lawyer in Miami that perhaps they should try. Herman Russomanno was just coming off a big win. He and another personal injury attorney, Stuart Ratzan, had won $11.5 million for O. J. McDuffie, a former Miami Dolphins receiver who had sued the team and its doctor for malpractice. McDuffie had led the AFC in receptions in 1998 and then sustained an injury to his left big toe that forced him to retire.

"Jack, I've already been told no about two dozen times," Luckasevic

said, wallowing in pessimism and self-pity. "Is this a joke? Do you want me to be told no again? I mean, seriously, give me a break."

"Fine, I'll call them," Tierney said.

Tierney was right. Russomanno was prepared to join the fight. Not only that, he told Tierney and Luckasevic he had a big gun in Los Angeles who might be interested, too. His name was Tom Girardi, and he had extensive experience suing utility giants and pharmaceutical companies. Girardi had been part of the famous "Erin Brockovich" lawsuit that won a $333 million settlement from Pacific Gas & Electric for leaking a toxic chemical into the groundwater of tiny Hinkley, California. Girardi thought the cases were similar: PG&E, like the NFL, had ignored warnings for years. "You have these players that have been knocked around," he said. "You have studies that are done with respect to the constant hitting of somebody's head; they are well known in the medical community. And that was information we can prove was given to the NFL."

There was an obvious disconnect. The dire warnings from the experts, the stirrings of a class-action lawsuit, and the steady parade of diseased ex-players all pointed to a gathering storm. Yet the NFL mostly carried on business as usual. There were changes—the 88 Plan, mandatory neuropsychological testing, a blizzard of concussion literature distributed by the league—but the response was hardly commensurate with the industry-rattling developments in the air. It was like reeling in the laundry in the path of a giant tornado. The MTBI committee stood largely intact. Pellman, the former chairman, had been reassigned but continued to work as NFL medical director and remained part of the committee. The MTBI committee kept on publishing: NFL Paper Number 16 ran in the June 2009 issue of *Neurosurgery*. That study involved bashing rats in the head to simulate "impacts . . . experienced by professional football players." The results: "no or minimal brain injury" for the players, although the rats admittedly took a beating.

What would it take for the NFL finally to respond? That September, Schwarz, the intrepid *Times* reporter, came out with another confounding story. The NFL had commissioned a study that reported that

former players between 30 and 49 years old were 19 times more likely to have Alzheimer's disease and other mental disorders than the normal rate among men that age. Bailes, whose own studies a decade earlier had shown the exact same thing, called the findings "a game-changer. . . . The ball's now in the NFL's court. They always say, 'We're going to do our own studies.' And now they have."

Aiello, the league spokesman, had the unenviable assignment of attacking the NFL's own work. The league-funded study by the University of Michigan's Institute for Social Research didn't formally diagnose the players with dementia, he said, and was limited because the information was derived from unreliable phone surveys. It was essentially the same argument Feuer had used to dismiss the work of Bailes and Guskiewicz as "virtually worthless" except that Aiello was using the argument against the NFL.

A few days later, in response to the latest disclosures, the House Judiciary Committee announced that it would hold hearings on football and brain damage.

Democratic committee staffers had been looking for an opportunity to bring the NFL back to Washington ever since the dramatic but obscure 2007 hearings on retired players in which Garrett Webster had described finding his addled father at a roach motel next to "a bucket of human waste." The NFL had managed to prevent the commissioner from testifying at those hearings, but this time the committee would insist on Goodell's attendance. The hearings held out the promise of drama and confrontation, a chance in many ways to put the NFL on trial for its handling of the concussion issue.

Weeks of not unexpected maneuvering preceded the hearings as committee staffers put together a roster of potential witnesses. Many were drawn from the neuroscience all-star team: Cantu, Bailes, Maroon, McKee. The fact that Omalu wasn't invited—and Nowinski was—was an indication of how far he had fallen and Nowinski had risen. After some resistance, the NFL agreed to send Goodell. But other potential witnesses—notably Casson, Viano, and Pellman—never got near the hearings. Committee staffers, working through the NFL's lobbyist, Jeff Miller, had asked for recommendations of NFL doctors who could testify. The league came back with three, none of whom were the current

or former chairs of the MTBI committee. Eric Tamarkin, the counsel for the Democratic majority, said he personally reached out to Casson, who ultimately did not testify.

Right up to the hearing, the NFL worked to massage the imagery and the message. One of the witnesses scheduled to appear with Goodell was Dick Benson, an Austin, Texas, man whose 17-year-old son, Will, a high school quarterback, had died in 2002 several weeks after sustaining a concussion. Benson had spent four years pushing for passage of "Will's Bill," which mandated training for high school coaches and trainers. Benson's testimony would be a powerful reminder of how the issue trickled down to the 3 million kids who played tackle football. Tamarkin informed Miller, the NFL's lobbyist, that he intended to put Benson on the same panel with Goodell.

"He went apoplectic," Tamarkin said. "Having a picture of a kid who passed away from playing football, he didn't want that message to be on the same panel." Tamarkin agreed to change the order. "We didn't want to sandbag anybody," he said. Instead, Gay Culverhouse, former president of the Tampa Bay Buccaneers, was placed on the panel that included Goodell. Culverhouse, whose father, Hugh, had owned the Bucs, had become an outspoken critic of the league, referred to by some retired players as a "rebel with a cause."

On October 28, 2009, the packed hearing was called to order at 10:03 A.M. in the Rayburn Building. The chairman, Michigan Democrat John Conyers, began: "Everyone that plays football at any level knows it is a dangerous sport. In fact, everyone that watches it knows it is a dangerous sport. There should be no surprise when a football player separates his shoulder, twists an ankle, busts a knee. But over the past several years, an increasing number of retired players have developed long-term memory and cognitive diseases such as dementia, Alzheimer's, depression, and chronic traumatic encephalopathy."

Conyers added, "There appears to be growing evidence that playing football may be linked to long-term brain damage."

Tamarkin and others had hoped to get Goodell finally to concede the link. In his opening statement, the commissioner, wearing a light blue tie with thin white stripes, and a yellow ribbon in support of the military, gave a bland review of the league's accomplishments on player safety and head injuries during his first three years. Goodell told the committee that he expected the NFL soon would announce its support for research into CTE. Goodell mentioned nothing about the link between football and brain damage, though in his written statement he allowed: "It is fair to say head trauma may play a role."

"Commissioner Goodell, is there a link between playing professional football and the likelihood of contracting a brain-related injury such as dementia, Alzheimer's, depression, or CTE?" Conyers asked, getting straight to the point during the question-and-answer period.

Goodell said the league was not waiting "for that debate to continue" among medical experts but instead was doing everything "we possibly can for our players now." He continued for nearly a minute before Conyers interrupted.

"Well, you have testified to that. But I just asked you a simple question. What's the answer?"

"The answer is, the medical experts would know better than I would with respect to that. But we are not treating that in any way in delaying anything that we do. We are reinforcing our commitment to make sure we make the safest possible deal for our——"

Conyers again cut him off dismissively: "All right. Okay. I have heard it."

Goodell wasn't Casson, but in his own equivocating way, the commissioner was just as resistant. Then, toward the end of the session, Linda Sanchez, a perky Los Angeles Democrat, ruined the NFL's day. Sanchez had been a driving force behind the 2007 hearings. A former labor lawyer, she had been elected in 2002, joining Loretta Sanchez as the first sisters to serve together in Congress. Their father, a Mexican immigrant and former machinist, had Alzheimer's disease. Sanchez said she regretted that Ira Casson hadn't made it to the hearing "because there are a number of really great questions I would have loved to have asked him." She still managed to make his presence felt by showing a clip of Dr. No's rapid-fire denials to HBO.

Sanchez asked Goodell to read aloud from the NFL pamphlet telling players that "current research" had not shown that repeated concussions lead to permanent problems, a statement that seemed to contradict a lot of current research.

"Okay. Thank you," Sanchez said politely when the commissioner was finished. Then she cheerfully tore into him:

"I am a little concerned—and I hear the concern expressed by some of the witnesses on the panel today—that the NFL sort of has this kind of blanket denial or minimizing of the fact that there may be this link. And it sort of reminds me of the tobacco companies pre-1990s when they kept saying, 'No, there is no link between smoking and damage to your health or ill effects.' And they were forced to admit that that was incorrect through a spate of litigation in the 1990s. Don't you think the league would be better off legally, and that our youth might be a little bit better off in terms of knowledge, if you guys just embraced that there is research that suggests this and admitted to it?"

It was a nightmare scenario for the NFL: the comparison to Big Tobacco. Others had made it before. Nowinski drew the analogy in *Head Games*; on a shelf in his office at BU, he displayed a book, *The Biologic Effects of Tobacco*. Brent Boyd, the former Vikings offensive lineman, repeatedly made the case that the NFL was like the powerful tobacco companies "fighting against the link between smoking and cancer." But now Linda Sanchez had introduced the analogy to the House Judiciary Committee.

"Well, Congresswoman, I do believe that we have embraced the research, the medical study of this issue," said Goodell.

"You are talking about one study, and that is the NFL's study," said Sanchez. "You are not talking about the independent studies that have been conducted by other researchers."

It was the hearings' most powerful moment, the one that would haunt the NFL for years. Part of what made Sanchez's argument so powerful was that it rang true. There were, in fact, many similarities between Big Tobacco and Big Football. The NFL didn't have 400 law firms on its payroll or a database of 180,000 research papers that had cost hundreds of millions of dollars to assemble. But much like the tobacco companies, the NFL had used its power and vast resources to try to discredit scientists it disagreed with and bury their work, cherry-picked data to make selective arguments about concussions, and elevated its own flawed research. Playing on "the margins of science" was

how Anthony Colucci, a former top researcher at R.J. Reynolds, had described Big Tobacco's strategy to the *Wall Street Journal* in 1993.

The tobacco fight's version of Omalu was Dr. Ernst Wynder, a public health researcher who was fresh out of medical school at Washington University in St. Louis when he published a landmark study in 1950 that identified smoking as a significant risk factor for lung cancer. As with Omalu's inquiry, Wynder's had started in the morgue: During an internship at New York University, he had watched the autopsy of a two-pack-a-day smoker who had died from lung cancer. Wynder followed up his first study by setting out to establish a direct link between smoking and cancer. He painted pure tobacco tar sucked out of Lucky Strike cigarettes onto the shaved backs of mice. Among the 62 mice still alive at the end of a year, 58 developed cancer.

That study, published in five parts beginning in 1953, prompted tobacco executives to form an "objective" and "disinterested" research group staffed by the public relations firm Hill & Knowlton. The Council for Tobacco Research—known originally as the Tobacco Industry Research Committee—soon began to churn out reports denying the connection between smoking and lung cancer. The council encouraged researchers to examine other factors such as "viruses and diet and car exhaust, to take contrarian positions, to savage the other side in the letters column of scientific journals," wrote Dan Zegart in *Civil Warriors: The Legal Siege on the Tobacco Industry.*

"The entire tobacco research council was a front put up by Hill & Knowlton," said Victor DeNoble, a former Philip Morris whistle-blower whose research proved nicotine is addictive, in an interview for this book. "They recruited scientists and paid them to make statements that just clearly were not true, couldn't be based in fact. They were opinions. And that went on for years."

The tobacco industry's researchers, foreshadowing the debate around football and brain damage, engaged in what Zegart called a "metaphysical quarrel over the definition of cause." There had long been an expectation that smoking heightened the risk for a variety of diseases, just as some scientists thought that the kind of brain damage seen in boxers might show up in other sports. But tobacco researchers continued to toss

out a host of other possible factors that might be to blame, making it difficult to establish a clear causal link.

Of course, there were a lot of differences, too, between the retired debate over the hazards of smoking and the one that was heating up over football. Smoking, in the end, was a public scourge with no real utility to anyone who came in contact with it. Football promoted discipline, character, and mental and physical well-being and brought people together by the millions. It was an incredibly sophisticated, uniquely American sport, and entire books would be written about its appeal. Also, football, unlike cigarettes, wasn't addictive (although some Texans might disagree). The tobacco industry's manipulative fight against science went on for five decades and left zero doubt about the risks of smoking. The research into football, though ominous, was relatively new and far less conclusive about the ultimate risk and prevalence of neurodegenerative disease.

That was the point, Nowinski told the committee when he testified later in the day: "So much of this crisis has mirrored Big Tobacco and the link between smoking and lung cancer. And I ask you, if you were able to create all the smoking laws and awareness we have today back in the 1950s when the first conclusive pathological research was done linking smoking to lung cancer, would you save those millions of people who smoked without understanding the risks?"

To the question of whether football should be banned, McKee replied, "Football is an American sport. Everyone loves it. I certainly would never want to ban football. . . . We haven't banned cigarette smoking. People smoke. People make that choice. But they need to make an informed decision. They need to understand the risks and it needs to be out there if they want to pay attention to what those risks are.

"What I don't understand is why we are expecting that exposure to repetitive head trauma will cause disease in 100 percent of the individuals that suffer this trauma," she continued. "Do we expect 100 percent of cigarette smokers to develop lung cancer? Do we expect 100 percent of children who play with matches or even with chainsaws to get hurt? No. Even if the percentage of affected individuals is 20 percent, or 10 percent or 5 percent, there are still thousands of kids and adults out

there right now playing football at all levels who will eventually come down with this devastating and debilitating disorder."

The comparison between the NFL and Big Tobacco had been planted in a public forum, and now the NFL was stained with it; it was as indelible as the tar that Ernst Wynder had smeared on his mice.

"Those hearings did one thing," said Bob Stern, one of the cofounders of the BU Group. "They said: 'NFL equals Tobacco.' "

Within three weeks of the hearing, Casson and Viano were out as cochairs of the MTBI committee. Goodell sent a memo to all teams stating that the two men had "graciously" resigned. The league announced several changes to its concussion policy, including a rule compelling teams to consult an independent neurologist after a player sustained any type of brain injury. Players with concussion symptoms were "no go" for practice or games and could not return to play the same day—a direct contradiction to the conclusion of one of the NFL's most controversial papers. A much-touted study to determine the long-term effects of playing football—originally scheduled to be released in 2010 and then pushed back to 2011 or 2012—was suspended indefinitely. Casson had been overseeing that study.

Then came the headline that the NFL never wanted to see: "Is Tackle Football Too Dangerous for Kids to Play?"

It ran atop a *New York Times* blog item written by Katherine Schulten, editor of The Learning Network. The piece referred to a guest column that had appeared in the *Times* a few days earlier in which a father, Adam Buckley Cohen, recounted his 10-year-old son Will's anxiety about playing football for his Pee Wee team. Cohen began the column with this quote from Will: "Dad, I'm scared. I only have one brain, and I don't want to hurt it playing football." Will had read about Troy Aikman's inability to remember his winning performance in the 1993 NFL Championship Game and was aware that Steve Young had retired because of concussions.

On the morning of December 20, Schwarz read a wire report that the NFL planned to donate $1 million to the Boston University Center for the Study of Traumatic Encephalopathy and would encourage current

and former players to donate their brains to the institute. Schwarz was surprised, in part because Nowinski, his best source, typically notified him about all breaking stories related to BU. When he got Nowinski on the phone, Schwarz was told, "I don't know anything. I don't know what the fuck is going on."

Nowinski was aware that Goodell had reached out to Cantu about supporting BU's research by urging players to donate their brains after death. The commissioner had mentioned the discussion during the hearings. But the BU Group had heard nothing about money. Nowinski became concerned that the donation would be perceived as an attempt by the NFL to buy BU's support. The BU brain trust—Cantu, McKee, Nowinski, and Stern—spoke by phone. Cantu told Schwarz that BU wouldn't take any money from the league without assurances of its independence.

Nowinski didn't think the timing of the NFL's announcement was coincidental. BU and the Players Association were preparing to announce the next day that the union would be recommending that players pledge their brains to BU. Nowinski figured the league, still reeling from the hearings, had gotten wind of the plan and wanted to share in the attention for supporting CTE research.

Schwarz reached out to Aiello for comment on the NFL's overtures to BU. He asked the NFL spokesman the standard questions: What went into the decision? Who was involved? He then posed the more vexing question: Why would the NFL give $1 million to a group whose findings it had fought for years?

Aiello said matter-of-factly: "It's quite obvious from the medical research that's been done that concussions can lead to long-term problems."

Wait, what? Had the NFL's chief spokesman just acknowledged the link that Goodell had scrupulously avoided weeks earlier in front of Congress? The link that Casson, Pellman, and Viano had fought for years? How did Aiello's comment square with the pamphlet advising NFL players: "Research is currently underway to determine if there are any long-term effects of concussion in NFL athletes"?

"Greg, that's the first time you've ever said that or anyone with the league has ever said that," Schwarz said evenly, concerned that Aiello might back off.

"We all share the same interest," said Aiello, sounding miffed and slightly impatient. "That's as much as I'm going to say."

The next day, stripped across the top of the *New York Times* sports section, was the following headline:

### N.F.L. ACKNOWLEDGES LONG-TERM CONCUSSION EFFECTS

Virginia Grimsley, the wife of John Grimsley, McKee's first CTE case, sent a bottle of champagne to BU. The group had brought about change.

"It was the turning point," said Nowinski. "I mean, the only way to say it is, you changed their mind. In a sense, it was a victory."

Aiello's statement, though, marked not only the first but also the *last* time anyone from the NFL has publicly acknowledged the connection between football and brain damage.

# 15

# "PLEASE, SEE THAT MY BRAIN IS GIVEN TO THE NFL'S BRAIN BANK"

The magnitude of the wreckage soon became apparent. It wasn't just Casson and Viano. The entire Mild Traumatic Brain Injury Committee had been blown up by Goodell. It had been 16 years since Tagliabue had created the NFL's research arm in response to a concussion crisis the ex-commissioner had never quite believed in. Under the leadership of Pellman and, later, Casson and Viano, the committee had published 16 scientific papers and assorted other studies. It had conducted biomechanical reconstructions of concussions on crash-test dummies, completed a six-year epidemiological survey involving hundreds of players, performed thousands of neuropsychological tests, engineered a new helmet, and even re-created NFL-strength concussions in rats. All of that was now discarded as worthless. It was as if a factory had been shuttered. Mitch Berger, a prominent San Francisco neurosurgeon who was among the researchers the league brought in to begin anew, said he and his colleagues "essentially started from zero." Even the much-ridiculed name—the Mild Traumatic Brain Injury Committee—was scrapped. The research entity that replaced it was christened the NFL Head, Neck and Spine Committee.

The Dissenters had won. The world had been turned upside down. As the NFL began to spread money around, it recruited its biggest critics to help solve a problem it once had treated as fiction and now acknowledged as deadly real. One of those critics was BU. To assuage the group's concerns about maintaining its independence, the NFL drafted a two-page letter, signed by Jeff Pash, the league's general counsel, recognizing "the importance of preserving the Center as an independent and credible voice." The letter designated BU the NFL's "preferred" brain bank and pledged to encourage players to "donate their brains to the Center." Cantu, one of the original Dissenters, who had described the previous committee as stooges for the commissioner, was named a "senior advisor" to the new panel.

Not everyone was thrilled with the new arrangement. Bernie Parrish, the retired Browns defensive back, who had pledged his brain to BU, warned that the NFL was trying to buy off the researchers. He wanted no part of it. A year earlier, even before the NFL made its donation, Parrish had confronted Nowinski about this very possibility.

"Look, you can't do that," he told him. "Once you accept money from them, they *own* your ass."

"We would never take money from them," Nowinski responded, according to Parrish.

Now BU was doing exactly that. Parrish wasn't happy.

"I want my brain back!" he declared during a follow-up hearing before the House Judiciary Committee. Not long after, he rescinded his pledge to BU.

Guskiewicz, who had savaged the NFL in a commencement speech and later compared Tagliabue's slapdash creation of the MTBI committee to an airport security breach, was brought on as a full-fledged member of the new panel, overseeing rules and equipment. From his days taping ankles for the Steelers, Guskiewicz had come far. His groundbreaking work would garner a $500,000 "genius grant" from the MacArthur Foundation for "major advances in the diagnosis, treatment, and prevention of sports-related concussions." Guskiewicz had to think long and hard before accepting the NFL's invitation. The league had approached him once before, an overture he had perceived as "damage control" to show that the NFL was doing something "without

canning Casson and Viano and admitting we were fools." Guskiewicz had said no that time, but now Casson and Viano were gone and everything was different, he believed. It was a total reversal. Guskiewicz signed on as an unpaid member of the committee, although he recognized that one of the first questions people would ask was "Did the NFL buy Kevin Guskiewicz?"

For years, the old committee boasted just one neurosurgeon, Hank Feuer of the Colts. It had been just another sign of the NFL's lack of seriousness about concussions—the virtual absence of the doctors most intimately familiar with the brain. Now the NFL was appointing brain surgeons to head the new committee. The cochairs were Richard Ellenbogen and Hunt Batjer, respected neurosurgeons with no previous ties to the NFL. Ellenbogen was chief of neurosurgery at Seattle's Harborview Medical Center, one of the country's busiest brain trauma facilities. His specialty was children. Ellenbogen had helped pass the Zackery Lystedt Law, which set strict return-to-play guidelines in Washington State, mandating the removal of any young athlete suspected of having a concussion. The law was named after a middle schooler in Maple Valley, Washington, who had returned to play after a concussion and developed a brain hemorrhage that almost cost him his life. Ellenbogen's team had performed several surgeries on the boy.

Goodell had recruited Ellenbogen personally. The brain surgeon was on his way to the emergency room one morning when his cell phone rang. The caller identified himself as the NFL commissioner. Ellenbogen thought it was one of his colleagues or an old friend having some fun with him, so he proffered Goodell an obscenity. Goodell assured him that he was in fact the NFL commissioner and was looking for a doctor to chair his new concussion committee. "I felt like such a dope," Ellenbogen recalled. He met with Goodell and agreed to take the job.

Batjer, a native Texan, was just completing a 17-year run as chairman of neurosurgery at Northwestern University's Feinberg School of Medicine in Chicago. When Batjer got the call from the NFL, it immediately touched a nerve. He reflected back on an experience he'd had two years earlier while watching an exhibition soccer match in Lake Forest, Illinois. During the game, a player was knocked unconscious.

After spending several minutes on his back, the player returned to action only to collapse face-first on the turf. Batjer rushed onto the field. He feared the young man was dead.

"I'm a neurosurgeon," Batjer said as he approached the player, who thankfully was beginning to stir. "This kid is out of here. He needs to get to the Lake Forest emergency room. I'll drive him. He needs a CT scan now."

"I'm sorry, Doc, thanks for introducing yourself," someone told him. "But it's the coach's call."

Batjer and Ellenbogen professed to know very little about the old NFL committee—or "the MB, whatever, TI committee," as Ellenbogen referred to it—and the contempt it had engendered before its ignominious dissolution. In an interview for this book, Ellenbogen said he had reviewed one of "Elliot Pellman's articles" for *Neurosurgery*—Paper Number 14, on biomechanics—but claimed, "I never knew there was a committee." That statement appeared to be at odds with Ellenbogen's review, in which he wrote that the authors and "the NFL MTBI committee are to be congratulated on the 14th contribution in a superb series of the analysis of concussions in NFL players."

The two neurosurgeons got an early crash course in what they were facing courtesy of the House Judiciary Committee. The football hearings the previous October had been so successful, the NFL so thoroughly demoralized, that the committee decided to take the show on the road in a series of forums across the country. One was held in New York. Linda Sanchez and her colleagues appeared slow to accept the legitimacy of the league's new doctors. After listening to Batjer and Ellenbogen talk about their goals, Sanchez said they sounded "like the same old NFL." The two men had been on the job two months and felt they were being criticized for not solving the problem. Referring to the recent Deepwater Horizon disaster, Ellenbogen turned to Batjer and whispered: "That's less time than oil has been spilling into the gulf."

It was an early indication of the scrutiny they would find themselves under. Ellenbogen and Batjer wanted to ignore the NFL's recent past, but because of it they wouldn't get the benefit of the doubt—not for a while, perhaps not ever.

"The NFL has had its four stages of grief: denial, more denial, some level of recognition, and now research," said New York Democrat Anthony Weiner.

The NFL's previous work was "infected," Weiner told Batjer and Ellenbogen. Their immediate task was "to mop up."

Ellenbogen decided the committee had to accomplish something, "one thing," quickly. Even that, though, would not prove easy. The decision was made to produce a poster warning players about the dangers of concussions—a poster that would replace the NFL's pamphlet insisting that "current research" hadn't shown that repeated concussions could lead to long-term brain damage. Ellenbogen said as many as 30 people took part in crafting the new poster, including representatives of the new NFL committee, the NFLPA, and the Centers for Disease Control, as well as several lawyers. The poster they finally settled on was titled "CONCUSSION—A Must Read for NFL Players . . . Let's Take Brain Injuries Out of Play." The poster listed a series of concussion facts and symptoms, and it warned, "Repetitive brain injury, when not treated promptly and properly, may cause permanent damage to your brain."

Ellenbogen said about the process of coming to agreement on the poster's language: "It was the most painful thing I think I've ever done."

There was no place for Bennet Omalu in this brave new world. While Nowinski and McKee were soaking up the spotlight, the man who had set the NFL's concussion crisis in motion was carrying out his duties as San Joaquin County medical examiner, cutting up bodies at the dank coroner's office in tiny French Camp, California, and moonlighting in the lab he had set up in his garage.

Omalu seemed like a man in exile. His moods vacillated between a self-pitying desire to stay as far away from the NFL as possible and a yearning to be recognized for his historic discovery. One day Omalu would say, "To be honest with you, I really wish I never touched Mike Webster's brain." The next day he would rage against all the attention now going to the BU Group, whose members frequently downplayed the significance of his work.

BU's researchers literally kept a file on what they alleged were Omalu's exaggerations, primarily his claims that he had discovered

CTE. (In fact, Omalu discovered brain damage in pro football players and applied the preexisting term *chronic traumatic encephalopathy* to the disease.) "Bennet has done a marvelous thing and deserves all the credit in the world," said Cantu. "My problem with him is that he is not scrupulously sticking to the facts, ma'am. He embellishes remarkably. And that will bring him down." Of course, some research scientists would soon level the same criticism at Cantu.

Nowinski was no more charitable. Speaking on the popular *Dennis & Callahan* radio show on Boston's WEEI one day, he was asked, "What woke up the NFL?"

"I honestly believe having been in the meetings with the NFL last year that it was Dr. McKee," he said, "because the first pathologist who looked at this work overinterpreted the findings and was not as credible."

When Jeanne Marie Laskas, a writer for *GQ*, contacted Nowinski in spring 2009 and asked where she could find Omalu, Nowinski replied, "Oh, he's not in it anymore," according to Laskas.

"It sounds like he discovered it," she said.

"Well, he had a lot to do with it then, but he's just not in it anymore. He moved," said Nowinski. (Nowinski later said he told Laskas that Omalu wasn't doing research with *him* anymore, not that he wasn't doing it at all.)

Laskas eventually tracked down Omalu in French Camp. She discovered the "happiest man alive that I was asking" about CTE.

"But Dr. Omalu, I heard you aren't in it anymore," Laskas said.

"No! No!" Omalu said, his voice rising. "Dr. Omalu is in it! Dr. Omalu is in it!"

Omalu's third paper on CTE in an NFL player—Andre Waters—was ultimately rejected by *Neurosurgery*, even though the diagnosis had made the front page of the *New York Times*. Omalu believed, without evidence, that this was because the three cases would have represented a series, and Apuzzo, doing the NFL's bidding, didn't want to acknowledge they were anything more than random. The Waters paper eventually appeared in *The Journal of Forensic Nursing*, a fact that was privately ridiculed by doctors affiliated with the league.

But Omalu brought many of his problems on himself. He couldn't seem to get out of his own way, never recognizing the need to filter.

In January 2010, he was invited to speak at the first meeting of a new concussion committee that had been formed by the Players Association. The meeting took place at a Palm Beach resort and drew dozens of current and former players, union officials, doctors, and widows. Hall of Fame defensive end Jack Youngblood stood by with a stopwatch, with instructions to sack any speaker who went over seven minutes.

Omalu droned on for 45 as Youngblood stood by, seemingly helpless to stop the cherubic African researcher. "What happened, Jack, your stopwatch break?" somebody asked Youngblood. Omalu left the crowd numb and murmuring. He again showed the grisly autopsy photos of Webster. "It was like crime photos, like Dillinger, you know?" said Lovell, who attended. "He had no idea how inappropriate that was or didn't care." Omalu then proposed that NFL players sit out at least 99 days after a concussion, at which point the players in attendance "started laughing in his face," said Lovell. Even people originally sympathetic to Omalu's cause were appalled. "He was just going on and on," said Guskiewicz. "He put up those pictures of Mike on the slab. That may be very appropriate in a pure medical meeting where you've got a bunch of pathologists or even physicians. But you've got players in there. You had former teammates in there. You had some coaches. You had some former wives."

Guskiewicz thought the event had the effect of further legitimizing BU and confirming some people's worst fears about Omalu. "I think it exposed him in front of an audience and confirmed what some people had heard about him," he said. "It's like, 'Ah, I've heard about this guy. And now I see. Now I understand.'"

But some people thought the backlash against Omalu went deeper than his indiscretions and outside-the-box proposals. Certainly, other researchers were unconventional and took provocative stances. Cantu would call for a complete ban on tackle football for children under 14, a recommendation far more controversial than Omalu's proposed three-month recovery period. And Omalu was vastly more qualified than many people now sitting at the NFL's table, notably Nowinski.

Even people who didn't sympathize with Omalu's views marveled at the swiftness with which he was dispatched. "He got steamrolled," said Micky Collins, never a huge Omalu fan. "Completely. He was really the first guy that did all this stuff, you know? He got rolled—rolled and put away wet."

Bailes thought the NFL identified Omalu early on as the league's biggest threat, a bomb thrower who knew nothing about football and was therefore beholden to no one. That was one reason, Bailes believed, the league had invited him to the Chicago summit to present Omalu's work but not Omalu himself. "I don't think they liked the whole scene from the beginning," said Bailes. "He was perhaps perceived as not mainstream, certainly not an American. It's like, 'How can a Nigerian doctor tell us what's wrong with our sport?'"

Harry Carson, the Giants Hall of Fame linebacker, thought Omalu's marginalization was easy to understand: He looked and sounded different from every person in the medical establishment, the NFL, and the concussion committees. "I think it's because he's a black man, I honestly believe that," Carson said. "And he's not an American black man; he's from Africa." Before arriving in the NFL, Carson had attended South Carolina State, an obscure black school. He saw parallels between his life and Omalu's. "It was up to me to prove people wrong, and I think with him it's the same way," he said. "People will think less of him because of his skin color. And it's not because I'm black and he's black. It is because he did the groundbreaking work."

"This is something that is too big for everybody to not be included," said Carson. "And when you have an authority like him on the outside looking in when he was the one who provided the information, there's something wrong with that picture."

On February 17, 2011, police were summoned to a luxury condo in Sunny Isles Beach, Florida, a spit of land north of Miami. The condo, Ocean One, towered over the turquoise water. At 2:51 P.M., the police entered Unit 603. The tenant hadn't responded to his fiancée's calls or the building manager pounding on the door. Once inside, officers found the apartment immaculate, the air tinged with the smell of a cigar. The police announced their presence, but no one responded. The officers made their way through the apartment room by room, arriving finally at the master bedroom, where a large man lay nude on top of the bed, a blanket drawn up to his neck, a chrome Taurus .38 Special by his

side. The man had a single gunshot wound on the left side of his chest, just below the nipple.

Up to that moment, to the extent that Dave Duerson had played a role in the NFL's concussion crisis, it was a lightning rod for many retired players, who saw him as a traitor and a fellow traveler with the worst of the league's deniers. The former Bears safety had been very much a part of the system. As a player rep on the Bert Bell retirement board, he had turned down numerous disability claims from broken men. Records show that Duerson cast a proxy vote when the board unanimously rejected Webster's appeal for full benefits in 2003. During the 2007 congressional hearings on the retirement system, Duerson invoked his 84-year-old father's Alzheimer's disease as proof that football didn't cause brain damage.

But that wasn't the message Duerson was sending now. Before pulling the trigger, he had staged his condo meticulously. On the living room table were assorted clues, "as if someone's trying to tell you a story in a room," said Duerson's son Tregg. There was a copy of *Sports Illustrated* from three months earlier with a headline on the cover: "CONCUSSIONS." The word was superimposed over Steelers linebacker James Harrison demolishing a helpless receiver. "THE HITS THAT ARE CHANGING THE GAME . . . AND THE HITS NO ONE IS NOTICING," the cover said. Next to the magazine were two identical binders filled with documents from the retirement board's Traumatic Brain Injury Evaluation Program. There was a DVD case for *Trapped: Haitian Nights,* a "psychological thriller that delves into the dark world of Voodoo, deception, and the fragility of the mind." Duerson had laid out all his disability files, as well as documents indicating that he was preparing to file a workers' compensation claim related to brain trauma. He was scheduled to fly to California the next month to be assessed by four doctors, including a neurologist.

"It was eerie because you almost kind of felt his presence in the place," said Duerson's ex-wife, Alicia, the mother of his four children.

Duerson's family and friends thought it was as if he were trying to explain himself, to make one final plea for understanding. His suicide note ran five typed pages and had the feel of an instruction manual, which some relatives thought fitting, since Duerson was always telling

people what to do. The note contained no salutation and was titled "REFERENCE TOPICS FOR LATER." Those topics included notes on his finances and possessions. Only a small portion addressed Duerson's thoughts on how football had destroyed him. It was the only part of the note in all caps:

*MY MIND SLIPS. THOUGHTS GET CROSSED. CANNOT FIND MY WORDS. MAJOR GROWTH ON THE BACK OF SKULL ON LOWER LEFT SIDE. FEEL REALLY ALONE. THINKING OF OTHER NFL PLAYERS WITH BRAIN INJURIES. SOMETIMES, SIMPLE SPELLING BECOMES A CHORE, AND MY EYESITE GOES BLURY. . . . I THINK SOMETHING IS SERIOUSLY DAMAGED IN MY BRAIN, TOO. I CANNOT TELL YOU HOW MANY TIMES I SAW STARS IN GAMES, BUT I KNOW THERE WERE MANY TIMES THAT I WOULD "WAKE UP" WELL AFTER A GAME, AND WE WERE ALL AT DINNER.*

On the last page, almost as if he had just remembered something he had forgotten, Duerson provided a handwritten addendum:

*PLEASE, SEE THAT MY BRAIN IS GIVEN TO THE NFL'S BRAIN BANK.*

A week after Duerson killed himself, *Time* called him "Football's First Martyr." That was a stretch. Webster, after all, had died nine years earlier. Andre Waters also had turned a gun on himself, and Justin Strzelczyk had chosen to go up in flames. But the act was chilling. Duerson had shot himself in the chest to preserve his brain for study. The cool preparation and the contrition his death seemed to signal to all the players he had judged harshly spoke to the horror of the disease.

Duerson didn't seem like a man who had been destined for this, as if anyone were. He had grown up in Muncie, Indiana, a star scholar-athlete who was scouted by the Dodgers and chose to play football at Notre Dame. His father spent nearly four decades working on an assembly line for General Motors. Awed by the machinery, Duerson as a small

child would tell his dad: "I want to do that." "No, son, you want to *own* that," his father would say. Duerson made the National Honor Society, displaying great drive and ambition and a meticulous attention to detail that would later seem in contrast to his savage approach to the game.

Alicia met Duerson during his freshman year at Notre Dame, and it was hard for her to reconcile the smart, reserved young man she had come to love with the beast he became on the field. On Fridays before game day, Duerson liked to read Jack Tatum's autobiography, *They Call Me Assassin*, in which the former Raiders safety bragged: "I like to believe that my best hits border on felonious assault." When Alicia went to meet Duerson after the game near the locker room, she was scared of him, wary of coming close. Duerson was irked and confused. "Get over here and give me a hug," he said. "I was just playing a game," he assured her. "I'm fine now. It's out of my system."

A third-round pick in the 1983 draft, Duerson became one of the hardest hitters on a Chicago Bears team built around one of the best defenses the game had ever seen. One of Duerson's closest friends on the Bears was linebacker Otis Wilson. When the two men joined forces on a big hit, they hovered over their victims, barking and howling. The defense became known as the Junkyard Dogs. Duerson, like Tatum, viewed the defensive backfield as a free fire zone. "That was Dave's thinking," Alicia said in an interview for this book. "Make them remember the hits and they won't be coming up the middle that much."

It didn't seem to matter if Duerson couldn't remember the hits as long as they had their desired effect. That was part of the job description: headaches, nausea, "dings," and, at times, huge gaps in his memory.

"He had a lot of concussions," said Alicia. "But back then, you know, there was nobody pulling you off to the side. It was just, 'Shake it off, go back in.' And I think because there was no real free agency—this is just my opinion—I just think everybody probably tried to kill themselves because you don't want to not play, then you don't get the money next year."

Duerson graduated with honors from Notre Dame and earned a degree in economics. He contemplated running for office someday. He and Alicia saw themselves as a power couple, driven to help others. Duerson ended up playing 11 seasons in the NFL, making the Pro Bowl four times. He served as a Bears player rep and played an important role in

the fight for free agency, gaining the trust of Gene Upshaw, the head of the players union. Duerson thought someday he might succeed Upshaw and told people that Upshaw was grooming him for the position.

After Duerson retired in 1993, he started a career in the food industry. He first bought McDonald's franchises and then purchased a food distribution company called Fair Oaks Farms. He doubled the company's annual revenues to more than $60 million, according to a story in *Men's Journal* magazine that chronicled his rise and fall. Stogie in hand, Duerson looked the part of a successful businessman. He and Alicia were living the high life they had always envisioned for themselves. When they vacationed in Paris, they stayed at five-star hotels, rented a BMW, and flew on the Concorde. Duerson bought a 17-room, 8,000-square-foot house with a four-car garage and a swimming pool in the same neighborhood as Michael Jordan.

Duerson was named to the board of trustees at Notre Dame and also served on the board of the Boys & Girls Clubs of America. He earned an MBA through Harvard's executive training program. He had a beautiful wife and four kids.

"We always knew that the next level we were going higher," Alicia said of Duerson's life after football. "David never, ever thought the next level would be going lower."

When Duerson decided he wanted to be bought out of his ownership stake in Fair Oaks Farms, it was to start his own company, Duerson Foods. That made sense; Duerson always thought he could do things better than everyone else and had had great success with Fair Oaks. But Harold Rice, one of his closest friends, thought it was odd that he was complaining so much about his Fair Oaks partner, Shelly Lavin. Duerson sounded irrational. "He thinks I'm some nigger he can control," Duerson would say of Lavin. "I'm not his boy." But Rice chalked it up to Duerson's bluster and need to demonstrate that he was in charge.

The new business buried Duerson financially. He had leveraged all his assets to create what he hoped would be a meat-distribution empire. Rice said Duerson spent $24 million to launch the company, when he probably should have spent $5 million. "He had emptied all the accounts for Duerson Foods, put everything in that one deal," Alicia said.

The people closest to him began to see him as reckless and occasionally disconnected from reality. They noticed that Duerson seemed less able to control his emotions, more prone to fits of rage. He lost his temper with employees or exploded in anger at business meetings. During one meeting with Marriott to discuss servicing the hotel chain's restaurants, Duerson became confrontational. "You guys are looking at me like I don't know what I'm talking about," he said. Alicia, who was working with her husband, watched as the room fell silent. "You got to understand, Dave was 6-2, maybe 230, 240 at that time," she said. "In a room with little bitty white men, you know what I mean? Sometimes when he got mad, he would have that glare in his eyes. I can't explain it. It's like you're dealing with somebody that's not rational."

In February 2005, Duerson traveled to South Bend for a Notre Dame board of trustees meeting. Alicia went with him. They had a nice dinner together and then returned to the hotel, the Morris Inn, where they went to the bar for a drink. Alicia was tired, and so she headed upstairs while Dave stayed to hang out with friends. Shortly afterward, Dave shook her awake. Alicia was certain he wasn't drunk, but he wasn't himself. Duerson had grown paranoid that she was having an affair, and now he wanted to confront her.

"He wanted to discuss something that was in his head that wasn't real," she said. "I was trying to walk him through it to show him how it was not real, but his mind was just so screwed up. And he didn't believe me, and one thing led to another."

Duerson had that glare in his eyes. Alicia became scared and tried to get away. A witness described seeing the door fly open and then Alicia being pushed out, her body slamming into the wall. Then, just as quickly, Duerson was calm, aghast at what he had done. Alicia was taken to the hospital for cuts to the head and dizziness. Duerson was charged with misdemeanor battery. The incident cost him his spot as a Notre Dame trustee. Later, he described the incident as a "one-time event" in which he lost control for "three seconds" and his "biggest regret."

By 2006, Duerson's life was in free fall. He was forced to shutter Duerson Foods, the big house went into foreclosure, and he divorced Alicia. He moved down to Florida, into the ritzy condo he and Alicia had purchased as a winter getaway when their life was going so well.

Gradually, he began to withdraw from family, friends, and former teammates, creating a new life in Florida built around a facade: He was fine, had plenty of money, and was on the verge of resurrecting his career.

Tregg, a private banking analyst, knew his dad was going through a rough time, and he would call him in Florida and ask, "How's it going, anything I can do?"

"No, things are going fine," Duerson would say. "I'm looking at this business. I might buy this business with this guy."

In reality, Duerson was deep in debt. Alicia claimed he owed her $70,000 in child support, one bank was after him for $9 million, and he was behind on his condo fees. Five months before his death, he filed for bankruptcy.

Duerson had maintained his connections with Upshaw, still hoping against all reason that he might someday lead the union. When Upshaw died suddenly in 2008, Duerson's dream was revealed to be just that—a dream. But he was allowed to keep his appointment as one of the union's three voting members on the disability board. The position put him in contact with the growing number of retired players who were seeking benefits for cognitive problems stemming from football. He also was familiar with the league's ongoing attempts to deal with the problem, mostly through rule changes and fines to limit blows to the head.

If there was a point when Duerson became conflicted by his own worsening condition and his disdain, public and private, for the claims that football caused brain damage, he didn't show it. Nor did he hide his contempt for what he saw as the softening of the game.

Duerson had a radio show, *Double Time with Double D*, that ran on VoiceAmerica. On October 21, 2010, Duerson told his listeners, "I'm pissed today."

He lamented the NFL's crackdown on dangerous head-to-head tackles. He read one of his own Facebook postings: "The Big Hit has been told to turn in his pads and jockstrap." He read several comments from readers ridiculing the league for trying to "sissify" the sport. At one point, Duerson recalled a 1984 playoff game in which his teammate Todd Bell blasted Redskins running back Joe Washington. "He helicoptered this brother, *helicoptered* him," Duerson said. "It was a wonderful

hit, it was clean, but based upon what the commissioner is talking about today, they would have suspended Todd on the spot." Later he added, "I have expressed several times, there is nothing like hearing the air rush out of a man's body."

At no point during the one-hour show did Duerson address the issue behind the rule changes: the possibility that football was causing neurodegenerative disease in his fellow retired players.

Four months later, Duerson was alone in his Florida condo, carefully plotting his suicide. He laid out a Bible, set aside books for various family members, and smoked one last cigar. At 2:52 A.M.—just before he shot himself, authorities concluded—he sent a text message to Alicia. The last line read: "I really do think there's something going on in my brain in the back left side. Get it to the NFL. Please."

Duerson sent a similar text to his fiancée and scribbled the same message at the end of his typed suicide note. Clearly, he wanted to leave nothing to chance.

The task fell to Tregg, but Duerson's son had no idea how to go about donating his father's brain to science. Like every other football fan, Tregg knew that concussions were a hot topic, but he hadn't heard about CTE or the initiative to create a brain bank for NFL players. Tregg had only questions, most of which he thought were bizarre: How does one donate a brain? What is the NFL's brain bank? Does the coroner need to do something special to keep my dad's brain? What does this do to our funeral plans?

In his search for answers, Tregg called the Players Association, figuring his dad had worked with the union and someone there would be able to help him. He reached one of his father's former teammates.

"My dad committed suicide and I'm trying to donate his brain to the NFL," Tregg said. "Can you help me?"

"Okay, I'll get on this and call you back," the man said.

At the same time, Alicia Duerson sought help from Connie Payton, the wife of Bears great Walter Payton, another former teammate of Duerson's. On the Duersons' behalf, an employee from the Paytons' foundation contacted the NFL's offices and explained the family's desire to donate the brain to science.

Despite Duerson's last words—"Please, See That My Brain Is Given to the NFL's Brain Bank"—no such place existed. But it was hard to imagine that any other research institution except Boston University—the league's "preferred" brain bank—fit that description. Both the union and the league had pledged to encourage players to donate their brains to BU after death. The NFL's $1 million gift was intended to underwrite the BU Group's research. Shortly after the donation, the group presented Goodell with its "Impact Award" during a gala fund-raiser at the Boston Harbor Hotel. Guests were treated to a large cake adorned with a football-shaped "brain" that appeared to be made of fondant.

Tregg was directed to Nowinski, who explained the process and sent him the paperwork. Fighting through a haze of sadness and exhaustion, Tregg read the documents. He stopped at the language describing how even his father's eyes would be part of the donation.

"You want to take his eyes?" Tregg asked Nowinski.

"Yes, we need to take the eyes; they are actually really important to our study," Nowinski said. BU was exploring whether an examination of the optic nerve might help with the diagnosis of CTE.

"Okay," Tregg recalled saying, "and then I just signed it. And then we faxed it off. And that was it."

But the NFL wasn't nearly as unified behind BU as the league's letter of support and million-dollar gift suggested. Top members of the reconstituted concussion committee were already expressing doubts about BU and, unknown to the BU researchers, were working to keep Duerson's brain away from the group.

The new NFL doctors said they had four primary concerns about BU, which they voiced to fellow researchers, journalists, and the families of former players: (1) There wasn't enough research for BU to state conclusively that football-related head trauma was causing CTE. (2) BU had oversold its findings, feeding a growing hysteria about the risks of playing football. (3) BU refused to share brain tissue with other scientists, making it impossible to validate its conclusions. (4) The group's growing fame and funding were predicated on establishing the link between football and brain damage, creating an inherent bias.

By then, Ann McKee had emerged as BU's rock star, eclipsing even Nowinski. Her appeal as a spokeswoman seemed boundless. The

sudden attention had yanked her out of her "rabbit hole" of self-imposed scientific isolation and cast her into the spotlight, where she was sought out by everyone from *60 Minutes* to HBO to explain the new football disease. Laypersons, journalists, neuroscientists, athletes—all seemed fascinated by her dazzling looks and her ability to make CTE understandable. Much was made about how McKee studied the brains of dead players during the week, then put on her cheesehead and her Packers jersey to watch Sunday's game. "She's a brilliant scientist who happens to be a little blond bombshell," said Eleanor Perfetto, the widow of a former player, Ralph Wenzel, whose brain was studied by McKee. Introducing McKee at a conference in Las Vegas, a fellow researcher gushed: "In addition to having golden features, she has a gold standard. If it doesn't meet her gold standard, it ain't CTE."

McKee and her colleagues had used their platform to become increasingly assertive about the dangers of football. One of their most ominous assertions was that full-blown concussions weren't what was triggering the disease. Rather, McKee and her group believed that CTE was essentially dementia pugilistica—boxer's dementia—now being found in other contact sports, especially football and hockey. As in boxing, it was the accumulation of hundreds or thousands of "subconcussive" blows that caused the damage, not one big knockout punch or open-field collision. "We don't think it's because of direct blows," McKee said. "This is a very internal part of the brain. I mean, it's really deep inside." Cantu called CTE "a dose-related phenomenon" involving "total brain trauma."

These assertions had obvious implications for the NFL. The league could change the rules to cut down on helmet-to-helmet hits. It could monitor the number of concussions in an effort to reduce them. It could put independent neurologists on the sidelines to look for concussions and try to end the culture of pain that pressured players to play through it. But if CTE was occurring at a deeper level, as the BU Group believed, that raised questions about the very essence of football.

One of BU's main critics was Mitch Berger, the chairman of the neurological surgery department at the University of California San Francisco Medical Center. Berger, a strapping former Harvard defensive end with wavy salt-and-pepper hair, had been brought onto the new NFL committee to conduct a longitudinal study on football-related head

trauma—the long-term study that had been started and then abandoned by the original MTBI committee. Berger, who once had a tryout with the Bears, was so prominent and well regarded within the neurosurgery community, UCSF put his face on a billboard off Interstate 80 near the San Francisco side of the Bay Bridge.

Berger didn't doubt that McKee had seen CTE in some former players, but he was troubled by what he perceived as the BU Group's agenda. The group's survival, he felt, depended on proving that CTE was a major health problem. "I mean, their whole existence, their funding, relies on this [idea] that they're perpetuating that it's a fact if you play football you're going to have some form of cognitive impairment," he said. "So it's very, very difficult to accept it because it is so biased. I mean, anybody would say the same thing: You can't help but believe there's a bias. This is what they're there to do—to show that there is a link." He called BU's reluctance to share brain tissue with other scientists "suspect."

Berger likened the hysteria generated by BU to fears that cell phones caused brain tumors. For BU to suggest an absolute link between football and brain damage was "irresponsible," he said.

Berger's criticism was a common refrain: How could McKee be certain that head trauma was causing this disease? In fact, she couldn't be sure. It was all too new, and there weren't enough cases. The mechanism by which head banging turned into brain disease was unknown, though it was well established in the scientific literature that head trauma could lead to long-term cognitive problems.

Yet there wasn't a single recorded case of CTE in someone who had not sustained some form of brain trauma. To scientists such as Omalu, Bailes, McKee, Cantu, Hamilton, and DeKosky, along with numerous others, that alone was overwhelmingly persuasive. There was simply no other common factor. It was true, as critics like Berger noted, that there was a self-selecting quality to the cases: McKee was getting the brains of people who had been profoundly impaired, and their families wanted answers. The BU Group was drawing from a sample size that was "skewed beyond belief," Cantu acknowledged. But the sheer number and variety of cases was impossible to ignore, he felt.

"Mitch Berger, with all due respect, is full of shit," said Cantu, defending the BU Group when the criticism surfaced publicly.

"No, *not* with respect," Cantu added testily. He suggested that Berger and others were jealous about the publicity the BU Group and McKee had received. "This is a neuropathological diagnosis that's black-and-white, and one confirmed by anyone who has looked at the tissue," Cantu said. "It's not something with bias. It's not like if this brain doesn't have it, we'll duck it or stick it in a bucket."

Nowinski called Berger's comments "bizarre. I mean, the facts are the facts." He noted that the criticism had come from "somebody connected with the group that profits from the sport."

Berger and other members of the NFL committee wanted to steer Duerson's brain away from the BU publicity machine. The designation of BU as the NFL's preferred brain bank and the $1 million donation had predated the new committee by several months. The doctors thought it was irrelevant. Almost from the new committee's inception, Ellenbogen and Batjer had advised Goodell to start funneling the NFL's money to the National Institutes of Health. Their argument was that the NIH could play a neutral role—"like Switzerland"—and farm out the research to independent scientists who didn't have a vested interest in proving that CTE was connected to football.

The conflict put Duerson's family in the cross fire of a highly unusual situation. Duerson had asked to make sure that his brain was turned over to the NFL's brain bank. The NFL had designated BU as its "preferred" brain bank, and league officials had even directed Duerson's family to Nowinski. Yet the NFL's doctors wanted to divert Duerson's brain away from BU to the NIH.

"We had Dave Duerson's brain," Hunt Batjer, one of the committee cochairs, would later complain. "We talked to the family, the coroner, we had two outstanding neuropathologists waiting via NIH. But Nowinski flew into Chicago and told the family he represents the NFL, and they got it."

It hadn't gone exactly that way. But Batjer's tone reflected the new NFL committee's disdain for the BU Group. It was a fight that was far from over.

Two and a half months after Duerson's suicide, BU held a press conference to announce that he had CTE. Alicia, Tregg, and Duerson's other three children attended.

McKee said the case was indisputable evidence that the disease was connected to football. She added: "I think in Dave Duerson's case it drove him to suicide."

For McKee, Duerson's death was simply more proof that the NFL—and, by extension, the entire football-mad country—was facing a huge problem. Including Duerson, McKee had examined the brains of 25 deceased NFL players; 24 had CTE. McKee understood the lingering doubts. She herself had once had them. With each new case of CTE, she thought: "I just can't even believe this."

"There's definitely this feeling like, 'I must be making this up,'" McKee said. "You know, you're pushing credibility so far. You're thinking, 'This can't be true.' But then I kept saying: 'It is true. It is true. I've been doing this for too long. I've never seen this thing before, and it's really there.'"

McKee found herself thinking: "I'm really wondering where this stops. I'm really wondering if every single football player doesn't have this."

# 16

# CONCUSSION, INC.

The NFL's concussion crisis continued to metastasize, spread by a growing army of former players, doctors, and lawyers. In Los Angeles, a prominent workers' compensation lawyer named Ron Feenberg began meeting former players with cognitive problems and saw another way to go after the league. California has some of the most lenient workers' compensation laws in the country. Any employee who works in the state for any length of time is eligible to file a claim regardless of where the company he or she works for is based. That meant any former NFL player who played even one game in California could file a claim against his team if he could show that he suffered debilitating injuries during his career.

Feenberg, a voluble man with a full head of gray hair, soon found himself drawn into the horrifying world of gridiron dementia. The lawyer recruited some two dozen clients who claimed to have traumatic brain injuries or some combination of orthopedic injuries and neurological disorders that stemmed from their careers. On one level, Feenberg thought these were garden-variety workers' compensation cases, not much different from "someone falling down a flight of stairs, getting your finger caught in a machine." But what struck him was how devastating the injuries were to the men and their families. It was like a siege on their identities. "I have players who have been shown pictures of themselves in uniform, and they don't even recognize the photograph and they can't tell you who that picture is even though it's themselves," he said.

Feenberg thus began to file claims with the California Workers' Compensation Appeals Board. The forms were straightforward, full of checked boxes and brief explanations. In the section where the former NFL player was asked to identify which body part had been injured, Feenberg would write in "brain." The players sought compensation from individual teams, not from the NFL. "McDonald's franchises answer to McDonald's corporate, but if you slip and fall at a fast food store on water or grease and break your leg, you bring your action against your direct employer," he explained. Within two years, hundreds of former players had lined up to file workers' compensation claims in California for brain injuries, opening up a new front against the league. In response, the NFL mounted a fierce lobbying campaign to close the loophole while teams and insurers fought the individual claims. The league had exerted the same pressures in an attempt to change the laws in other states. The battle became so heated that Patriots quarterback Tom Brady and Saints quarterback Drew Brees wrote a joint letter to the *San Francisco Chronicle* in opposition to the proposed change.

Jason Luckasevic, the young Pittsburgh lawyer, was out for bigger game than Feenberg. Relatively speaking, the workers' compensation cases were small legal matters, often involving thousands of dollars. His fight was against the entire NFL, with the stakes potentially in the billions. But the workers' compensation cases were not entirely unrelated to the whale Luckasevic was pursuing. To mount a case that the NFL had denied and concealed evidence that football causes brain damage, Luckasevic needed actual living players (or the families of deceased players) who were willing to come forward. This had proved one of his more difficult hurdles. During his three-year journey, Luckasevic had found numerous players who initially expressed interest, but when push came to shove, they were ambivalent about taking on the league or fearful of exposing their grotesque afflictions to a public that admired them for their mental and physical toughness. The workers' comp cases provided a potential feeder system to lawyers such as Luckasevic who were girding for the bigger fight ahead.

One of the first brain-related workers' compensation cases involved Fred McNeill, a quiet and thoughtful former Minnesota Vikings linebacker who played from 1974 to 1985. Ironically, McNeill himself had

been a lawyer—even handling some workers' comp cases on behalf of former Vikings—until the deterioration of his brain abruptly ended his legal career. He had started attending law school just before his retirement, and by his late thirties he had made partner at Zimmerman Reed, a Minneapolis firm. Then, at 44, he was fired. McNeill managed to get other jobs and lost them, too. "It seems like it started that I was taking a longer time to do the work," said McNeill, his voice slow and gentle, edged with a kind of bewilderment at what had happened to him. "What I found is that in those firms, the attorneys that were managing me perceived that it was taking me longer to do the work than it should have been taking." Before long, McNeill was bankrupt, no longer practicing law, his loving family broken apart. He drifted through his days in intermittent states of lucidity and confusion. McNeill was still able to recall in great detail pieces of his distant past, such as his blocked punt on Oakland's Ray Guy in the first quarter of the 1977 Super Bowl. But his short-term memory was shot. He often couldn't remember people he just met or conversations he just had. He was living with his 23-year-old son, Gavin, who managed most of his father's needs out of their Los Angeles apartment. Gavin compared the experience to "seeing Superman lose his powers. But, in the brighter side of things, I'm gonna save him now."

Asked what he feared most about the future, Gavin said: "You know, I don't even want to talk about it. I don't even want to put it out there in the universe."

Luckasevic met Fred and his ex-wife, Tia, at a meeting of retired players in Las Vegas and recruited them to his cause. On July 19, 2011, the McNeills joined the 75 former players and their relatives suing the NFL for concealing the link between football and brain damage. The other players included Mark Duper, a longtime wide receiver for the Miami Dolphins; former New York Giants running back Rodney Hampton; and Steve Nelson, who played linebacker for 14 years with the New England Patriots.

Luckasevic finally had his lawsuit. It had grown out of an idle conversation with his friend Bennet Omalu one morning in Pittsburgh five years earlier. Along the way, Luckasevic had been laughed out of a conference room by the partners in his own firm and turned away by countless other lawyers. Now the 34-year-old associate was the coauthor of an 86-page complaint that would precipitate a tsunami of litigation against the NFL.

The complaint, written by Luckasevic and edited by his more experienced cocounsels Tom Girardi and Herman Russomanno, and Russomanno's partner, Bob Borrello, alleged that the NFL had created a fraudulent research arm to whitewash a problem that directly threatened its bottom line. At the center of the allegations was the league's MTBI committee. The complaint claimed that the NFL, "to further a scheme of fraud and deceit, had members of the NFL's Brain Injury Committee deny knowledge of a link between concussion and cognitive decline." Most of the major players in the drama of the previous decade figured prominently in the legal narrative: Omalu, McKee, Pellman, Casson, Guskiewicz, Lovell. Riddell, the NFL's official helmet maker, was named as a codefendant over allegations that its product was unsafe and the company had failed to provide sufficient warnings about the potential for long-term brain damage. In a cover sheet that outlined the nature of the filing, the lawyers checked the box for "Product Liability" in which bodily injury, death, or damage occurred.

When the complaint was filed, the lawyers had no idea where it might lead and whether other players would follow. "We thought maybe there was a body out there of two or three hundred players who've really been significantly harmed," said Girardi. Right up until they filed, their suit included only a few players, but as word spread that it was about to become a reality, more and more players signed on.

After the case was filed, players (and, with them, lawyers) continued to come out of the woodwork. It was as if an unspoken taboo had vanished. Luckasevic and Girardi had filed their case in California Superior Court, the logic being that the case might do better in state court. The next month, though, a Philadelphia personal injury lawyer, Larry Coben of the firm Anapol Schwartz PC, filed the first suit in federal court on behalf of seven more players. Coben previously had won cases against helmet makers Riddell and Schutt, and he had been exploring a lawsuit against the NFL for some time. Now, among his clients was former Chicago Bears quarterback Jim McMahon, who the previous year had acknowledged that he was having memory problems at age fifty-two. McMahon's admission was particularly jarring: Most fans still

remembered him for his rebellious leadership of the 1985 Bears, mooning reporters, snubbing his nose at NFL Commissioner Pete Rozelle, and leading with his head. When he appeared in public now, McMahon still wore his trademark sunglasses, but it was generally to talk about how he had trouble finding his way home.

"I won't remember a helluva lot about this interview in ten minutes, probably," McMahon told ESPN's Steve Delsohn.

The lead plaintiff in the federal suit was a former Atlanta Falcons safety named Ray Easterling. The suit did not provide much detail about his plight, but the litany of Easterling's problems was by now painfully familiar: mood swings, inattentiveness, business failures, erratic behavior. Easterling's hands shook. He had impulsive urges to run for miles in the dark or to chop wood, which he stacked in his driveway in Richmond, Virginia; once, while chopping, he accidentally took off part of his thumb.

Eight months after the lawsuit was filed, Easterling shot himself to death at the home he shared with his wife of 36 years. He was 62. His brain, it was later discovered, was riddled with CTE. By the time the results were released, one year after Jason Luckasevic and his colleagues filed the first lawsuit, more than 3,000 retired players and their relatives were suing the National Football League—nearly one quarter of all living former NFL players. And counting.

Every few days, Fred McNeill would travel to a clinic in Newport Beach and stuff his 6-foot-2 frame into a small space-age room while 100 percent oxygen was pumped into his lungs. The hyperbaric oxygen therapy had been recommended by a psychiatrist and author, Daniel Amen, whose Amen Clinics around the country had attracted the attention of numerous retired NFL players who were concerned about their brains. Many players swore by the treatments, which were said to promote healing and improve memory, but to date there was no conclusive evidence that the process worked. A November 2012 study of 50 military service members with post-concussion syndrome found "no efficacy in symptom relief" after 30 straight days of 90-minute treatments in the hyperbaric chambers.

No longer a backwater of medical research, concussions had become a booming industry, attractive not only to the world's most prominent researchers but also to any number of entrepreneurs. No one could keep up with the array of products and gadgetry suddenly flooding the market. There were dietary supplements to treat brain swelling and others to prevent brain cells from dying. There were soft protective coverings that fit over helmets and hard skullcaps that sat beneath them like Kevlar yarmulkes. There were mouth guards and neck braces and helmet sensors that recorded the magnitude and frequency of each hit. After producing a few concussion stories for ESPN, the authors of this book found themselves bombarded with creative proposals. One read: "I would like to talk to you about the last 7 years of development of a Physics and Engineering foundation I have discovered. It is an Energy Absorption System that only allows 10 to 15 G's to the end user of all helmets. I have found the Holy Grail that will protect and preserve football, our troops and so much more."

It was a strange new world of experimentation and opportunism. The rapid pace of the research and the high-profile disclosures of prematurely demented football players were provoking a wave of anxiety among parents, coaches, athletes, and medical professionals. Everyone wanted answers to the proliferating questions: Since CTE could be diagnosed only postmortem, was there any way to detect the disease in living patients? Was there a way to predict—through genetic profiling or other means—who was more likely to get the disease (and get them out of harm's way)? How many concussions were too many? What products, if any, might reduce the effect of head trauma in football? The questions produced more questions, which in turn produced more opportunities.

No one was better positioned to cash in than the early pioneers, researchers such as Bailes and Maroon and Lovell. Each staked out new territory that presented opportunities for (1) scientific discovery and (2) financial gain. Bailes was researching a medieval-sounding device that he said could potentially prevent the brain from rattling around inside the skull. "You have to indulge me a little bit here," he said one afternoon in his office outside Chicago, displaying what appeared to be a form of neckwear with two large rubber beads in front. "So this is a new device. It's a first attempt ever to prevent brain injury by using a

collar that compresses the jugular veins, which back up the blood in the brain some, and it decreases the room for slosh."

Some of Bailes's other initiatives sounded more promising. He and Omalu coauthored a pilot study that used brain scans to detect tau protein in five former NFL players—including Fred McNeill—the first time researchers were able to show signs of CTE in living patients. The scans, developed by Gary Small, a UCLA professor of psychiatry and behavioral sciences, had previously been used to detect Alzheimer's disease. "I've been saying that identifying CTE in a living person is the Holy Grail for this disease," Bailes said. "It's not definitive, and there's a lot we still need to discover to help these people, but it's very compelling. It's a new discovery." The announcement produced a cascade of new questions, in particular: If CTE could be diagnosed in living players, could the NFL force them to be tested? Would brain scans become mandatory at the NFL Combine? Was it a collective bargaining issue? Would children have to be tested before playing contact sports? Before every season or even every game? After a concussion? What was the threshold for banning a player? The mind reeled at the implications.

Concussions had become a full-time profession. ImPACT was so successful that Mark Lovell left his job at UPMC to run the company full-time. Fifteen years after Lovell and Maroon administered crude neuropsychological tests on Merril Hoge and 26 of his Steelers teammates, ImPACT had become a global phenomenon, the default standard for concussion testing. There were occasional skeptical studies and people such as Bill Barr and Chris Randolph, a Chicago neuropsychologist, who railed against the claims that ImPACT was better than any of the myriad other neuropsych tests that were out there. But it was like complaining about the domination of Kleenex over all the other facial tissues. ImPACT was what people turned to when a concussion occurred. The test was used by nearly every NFL team, all NHL teams, all Major League Baseball teams, all Major League Soccer teams, and the U.S. Olympic boxing, soccer, and hockey teams, not to mention rugby, soccer, and auto racing leagues around the world. ImPACT was used by Cirque du Soleil, the Pittsburgh Ballet, and the Lingerie Football League. It was used by 62 colleges and universities in California alone. Lovell and Collins insisted that ImPACT was just "a tool in the toolbox" for treating

concussions, but it was marketed to schools as a tool no less indispensable than a screwdriver or a hammer. An army of ImPACT trainers stood by to ensure, for a small fee, that the test was administered correctly.

Lovell's reputation as a researcher had taken a big hit because of his association with the MTBI committee. The obvious conflicts of interest—pushing his own company to teams while running the NFL's neuropsych testing program—also had caught up with him, and the league finally cut him loose, like Casson, Viano, and most of the other original MTBI members. "Mark was canned," said Guskiewicz. Unlike the combative Collins, who took the attacks on ImPACT personally, Lovell seemed not to care much about the criticism anymore. In many ways, that was easy: ImPACT was a success beyond anyone's wildest dreams, and Lovell was in demand from Europe to South Africa. But he also had suffered two heart attacks—one at 43, another at 59—for reasons no one could explain, and the experience made him more laconic and philosophical than ever. "I'm not out to get anyone," he said over dinner one evening. "I've moved on, you know? I don't want to spend the rest of my life chasing down Bill Barr. I just don't care."

After leaving UPMC, Lovell, often wearing jeans and a fleece pullover, spent most of his days at ImPACT's new headquarters, a largely vacant suite in a business park down the road from the Steelers' practice facility. In the afternoons, a flock of geese often settled outside his window, which looked out on the Monongahela River. Lovell, still youthful-looking at 60, knew his legacy in the NFL saga was mixed at best. His research had helped bring attention to the problem. He had created the most widely used concussion test in the world. But he also had played a key role on a discredited committee whose major findings he now disavowed. Lovell continued to see himself as a marginal figure in the drama, the MTBI committee a product of its ignorant times and no more.

"You publish stuff," Lovell said, shrugging. "I always thought we were publishing a snapshot of things. And people tried to say we were publishing a movie. It's not the way it works. But it got interpreted that way."

Lovell and Maroon would live on in the gray areas of the concussion crisis—not Pellman or Dr. No but still part of the NFL's denial